## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| *John Hummel*, | |
| Petitioner, | No. 4-16-CV-00133-O |
| v. | Death Penalty Case |
| *Lorie Davis*, Director, Texas Department of Criminal Justice, Correctional Institutions Division, | |
| Respondent | |

## Petition for Writ of Habeas Corpus
## under 28 U.S.C. § 2254

# Appendix

**Michael Mowla**
**P.O. Box 868**
**Cedar Hill, TX 75106**
**Phone: 972-795-2401**
**Fax: 972-692-6636**
michael@mowlalaw.com
**Texas Bar No. 24048680**
**Attorney for Petitioner**
**(Lead counsel of record)**

**Kristin R. Brown**
**17304 Preston Road Suite 1250**
**Dallas, TX 75252**
**Phone: 214-446-3909**
**Fax: 214-481-4868**
kbrown@idefenddfw.com
**Texas Bar No. 24081458**
**Attorney for Petitioner**

**Appendix (with corresponding Bates page numbers)**

- *Capital Judgment* and sentence (App. 0001-0004)
- Indictment (original) (App. 0005-0006)
- Initial Application for Writ of Habeas Corpus (App. 0007-0192)
- Affidavit of Dr. Susan Hardesty (App. 0193-0212)
- Affidavit of Laura Smith (App. 0213-0250)
- Affidavit of Haila Adams (App. 0251-0253)
- Affidavit of Cody Bell (App. 00254-0255)
- Affidavit of Stephanie Bennett (App. 0256-0258)
- Affidavit of Chad Brown (App. 0259-0264)
- Affidavit of Efrain Chaidez (App. 0265-0267)
- Affidavit of Lance Dupre (App. 0268-0269)
- Affidavit of Fred Emmer (App. 0270-0272)
- Affidavit of Shana Fowler (App. 0273-0274)
- Affidavit of George Goodson (App. 0275-0276)
- Affidavit of Thomas Hamilton (App. 0277-0281)
- Affidavit of Brian Jeter (App. 0282-0283)
- Affidavit of Wayne Matthias (App. 0284-0286)
- Affidavit of Christy Pack (App. 0287-0288)
- Affidavit of Christopher Paris (App. 0289-0292)
- Affidavit of Tonya Paris (App. 0293-294)
- Affidavit of Derrick Parris (0295-0298)
- Affidavit of Joseph Patterson (App. 0299-0300)
- Affidavit of Tommy Rigmaiden (App. 0301-0303)
- Affidavit of Rory Thomas (App. 0304-0305)
- Affidavit of Juror Nathaniel Davis (App. 0306-0307)
- Border Patrol Documents (App. 0308-0316)
- Phone Transcripts (App. 0317-0335)
- San Diego Medical Records (App. 0336-0406)
- Tarrant County Policy for Dress Code (App. 0407-0414)
- Tarrant County Policy for High Risk Inmates (App. 0415-0422)

- Tarrant County Sherriff's Office letter (App. 0423-0424)

- Petitioner's Military Records (App. 0425-0436)

- Petitioner's Employment Records (App. 0437-0457)

- Excerpts from Appellate Brief (App. 0458-0465)

- Findings of Fact, Conclusions of Law, Recommendations and Order (App. 0466-0603)

- *Ex parte Hummel*, WR-81,578-01 (Tex. Crim. App., Feb. 10, 2016) (per curium, Alcala, J. dissenting) (App. 0604-0605)

- SCOTUS docket for 15-9284, *Hummel v. Texas*, 137 S.Ct. 63, 2016 U.S. LEXIS 4742 (Oct. 3, 2016) (App. 0606)

- Affidavit of trial counsel Larry Moore (App. 0607-0636)

- Affidavit of appellate counsel John Stickels (App. 0637-0641)

- Affidavit of Robert Gill (App. 0642-0644)

- Affidavit of trial counsel Fred Cummings (App. 0645-0654)

- Tarrant County Jail classification records for Petitioner from December 31, 2009 to March 29, 2010 and September 29, 2010 to April 26, 2011 (App. 0655-0669)

- Affidavit of Dr. Susan Hardesty (App. 0670-0673)

- Affidavit of Laura Smith Sovine (App. 0674-0678)

- Excerpts of Tarrant County Jail Records (App. 0679-0723)

- Excerpts from John Hummel Myspace Profile Information (App. 0724-0734)

- Excerpt from Military Records (App. 0735)

- Supplemental Affidavit of Larry Moore (App. 0736-0746)

- Affidavit of J. Randall Price (App. 0747-0758)

- Allen, J., *Mentalizing in the Developmental and Treatment of Attachment Trauma*, Karnac (2013). (App. 0759-1114)

- DSM-5 personality disorders section (App. 1115-1332)

### Certificate of Service

I certify that on February 4, 2017, this document was served upon all parties and attorneys of record via the ECF filing system.

**/s/ Michael Mowla**
**Michael Mowla**

CASE NO. 1184294D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 432nd |
| | § | |
| VS | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## CAPITAL JUDGMENT

On June 13, 2011 this cause was called for trial and the State by her Criminal District Attorney, Assistants MILES BRISSETTE and ROBERT GILL and the attorneys for the Defendant, JOHN WILLIAM HUMMEL, Honorable FRED CUMMINGS, LARRY M. MOORE and PAMELA FERNANDEZ, announced ready for trial; and the State having made known that it would seek the Death Penalty in this cause and the Defendant having been heretofore arraigned; and, it appearing to the Court that the Defendant was mentally competent and the Defendant having been charged in the Indictment with Capital Murder; thereupon, a Jury of good and lawful men and women, to-wit: Juror No. 100, Foreperson, and eleven others, was duly selected, impaneled and sworn as the law directs, and the said Criminal District Attorney read to the Jury, Count One, Paragraph Two and Paragraph Three of the Indictment herein, and the Defendant having stood mute, and counsel for the Defendant having entered a plea of Not Guilty to Count One, Paragraph Two, and Paragraph Three on behalf of the Defendant, of the Indictment, hereto; and the Jury, after hearing the evidence, and being duly charged by the Court, retired to consider its verdict, and after deliberation, returned into open court on the 28th day of June, 2011, the following verdict, to-wit:

### VERDICT FORM

We the Jury, find the Defendant, JOHN WILLIAM HUMMEL, guilty of the offense of Capital Murder, as charged in the indictment.

Signed: *Juror No. 100*
Foreperson of the Jury

The parties announced ready for the second phase of the trial, and the Jury, having heard all the evidence, and being duly charged by the Court, retired to consider its verdict, and after due deliberation, returned into open court, on the 28th day of June, 2011, their answers to the following Special Issues, and their verdict:

747

SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

In your verdict you will
answer "Yes" or "No"                          Answer:      <u>YES</u>


SPECIAL ISSUE NO. 2

Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

In you verdict you will
answer "Yes" or "No"                          Answer:      <u>NO</u>


**VERDICT FORM**

We, the Jury, having unanimously agreed upon the answer to the foregoing issues do hereby return the same into court as our verdict.

Signed: *Juror No. 100*
Foreperson of the Jury

After an individual poll of the Jurors, the Court duly accepted the verdict and ORDERED the same to be filed.

The Jury having answered Special Issue One "YES" and Special Issue Two, "NO", it being mandatory that the punishment be death, the Court assessed the punishment at Death.

The Defendant, JOHN WILLIAM HUMMEL, was asked by the Court, whether he had anything to say why sentence should not be pronounced against him, and the Defendant answered nothing in bar thereof;

The Court proceeded, in the presence of the said Defendant JOHN WILLIAM HUMMEL, and his counsel of record, to pronounce sentence against him as follows:

IT IS THEREFORE THE ORDER, JUDGMENT AND DECREE OF THIS COURT that you be remanded to the custody of the Sheriff of Tarrant County, Texas, delivered to the Institutional Division of the Texas Department of Criminal Justice, where you shall be continuously confined until 6:00 p.m. on a date to be determined by this Court upon a mandate of affirmance issued by the Texas Court of Criminal Appeals at the state penitentiary at Huntsville.

You shall be caused to die by intravenous injection of a substance or substances in a lethal quantity sufficient to cause your death until you are dead. Said execution procedure to be determined and to be supervised by the Director of the Institutional Division of the Texas Department of Criminal Justice.

**App. 0002**

748

The Clerk of this Court is ordered to issue to the Director of the Institutional Division of the

Texas Department of Criminal Justice a death warrant in accordance with this sentence.

HON. RUBEN GONZALEZ, JR.
PRESIDING JUDGE
432ND DISTRICT COURT
TARRANT COUNTY, TEXAS

June 29, 2011
Date Signed

**App. 0003**

749

CASE NO. 1184294D         COUNT ONE
INCIDENT NO./TRN: 9047565932

THE STATE OF TEXAS                          §        IN THE 432ND DISTRICT COURT
                                            §
v.                                          §
                                            §
JOHN WILLIAM HUMMEL                         §        TARRANT COUNTY, TEXAS
                                            §
STATE ID NO.: TX08542212                    §        Date:   JUN 2 8 2011



Right Thumbprint

X _____ 71305
PERSON TAKING PRINT

JUDGMENT AND SENTENCE
FINGERPRINT PAGE

Clerk
KW

Page 4 of 4

App. 0004

750

NAME   JOHN WILLIAM HUMMEL

ADDRESS   600 LITTLE SCHOOL, #RD

    KENNEDALE TX 76060

RACE W   SEX M   AGE 34   DOB 11/4/1975

CASE NO. 1184294   DATE FILED   12/22/2009

CID NO.   0763423

OFFENSE   MURDER - CAPITAL MULTIPLE

DATE   12/17/2009

I.P. JOY HUMMEL, CLYDE BEDFORD

AGENCY Kennedale PD

OFFENSE NO. 0900017546

COURT 432nd District Court

INDICTMENT NO. 1184294

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURORS OF TARRANT COUNTY, TEXAS,

duly elected, tried, empaneled, sworn, and charged to inquire of offenses committed in Tarrant County, in the State of Texas, upon their oaths do present in and to the

396th DISTRICT COURT

of said County that JOHN WILLIAM HUMMEL, hereinafter called Defendant, in the County of Tarrant and St aforesaid, on or about the 17th day of December 2009, did

THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, CLYDE BEDFORD, BY STRIKING HIM WITH A BAT AND DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF / INDIVIDUAL, JOY HUMMEL, BY STABBING HER WITH A KNIFE AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

PARAGRAPH TWO: AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 17TH DAY OF DECEMBER, 2009, DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, CLYDE BEDFORD, BY STRIKING HIM WITH A BAT AND DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, JOY HUMMEL, BY STABBING HER WIT DAGGER AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

PARAGRAPH THREE: AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 17T DAY OF DECEMBER, 2009, DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, CLYDE BEDFORD, BY STRIKING HIM WITH A BAT AND DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, JOY HUMMEL, BY STABBING HER WI SWORD AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSAC

**App. 0005**

2

NAME     JOHN WILLIAM HUMMEL
CASE NO. 1184294
PAGE    2 of 2

Filed (Clerk's use only)

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 17 2010

TIME 10:35

BY_____ DEPUTY

AGAINST THE PEACE AND DIGNITY OF THE STATE.

_____
Criminal District Attorney
Tarrant County, Texas
INDICTMENT - ORIGINAL

_____
Foreman of the Grand Jury

**App. 0006**

3

## IN THE 432nd JUDICIAL DISTRICT COURT
## TARRANT COUNTY, TEXAS

C - 432 - 00 9923 - 1184294-A

|                                       |     |                                          |
| ------------------------------------- | --- | ---------------------------------------- |
|                                       | )   | Trial Cause No.                          |
| EX PARTE                              | )   | 1184294D                                 |
| JOHN WILLIAM HUMMEL,                  | )   |                                          |
| APPLICANT                             | )   |                                          |
|                                       | )   |                                          |
|                                       | )   |                                          |

FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS
TIME
BY _____ JUN 0 5 2013
_____ 12:19 ___
_____ DEPUTY

## INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS
## (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAM FARINA-HENRY (No. 24082979)
(E-mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**2**

# TABLE OF CONTENTS

APPLICATION FOR A WRIT OF HABEAS CORPUS .......................................... 1

PROCEDURAL HISTORY ................................................................................ 4

A.   Trial Court Proceedings ........................................................................ 4

     1.  Indictment ..................................................................................... 4

     2.  Trial .............................................................................................. 4

     3.  State Appellate Proceedings ......................................................... 5

     4.  State Habeas Proceedings ............................................................ 6

STATEMENT OF FACTS ................................................................................. 6

A.   Evidence at Trial ................................................................................... 6

     1.  Guilt/Innocence Phase Presentation ............................................ 6

     2.  The Prosecution Punishment Phase Presentation ........................ 6

     3.  The Defense Punishment Phase Presentation ............................... 8

B.   Post-Conviction Investigation .............................................................. 13

     1.  Family and Early Life ................................................................. 13

     2.  Teenage Years ............................................................................ 16

     3.  Military Service ......................................................................... 19

     4.  Adult Years ................................................................................ 21

STANDARD OF CARE ................................................................................... 25

A.   Ineffective Assistance of Trial Counsel ............................................... 25

B.   Ineffective Assistance of Appellate Counsel ....................................... 29

ARGUMENT .................................................................................................. 30

i

3

CLAIM ONE: HUMMEL WAS DENIED HIS DUE PROCESS RIGHT TO AN IMPARTIAL JURY WHEN JUROR DAVIS COMMITTED MISCONDUCT BY AUTOMATICALLY VOTING FOR DEATH ...................................................... 30

A.   Legal Standard .................................................................................... 31

B.   Juror Davis Automatically Voted for Death Based on Testimony During the Guilt/Innocence Phase Evidence ......................................................... 33

C.   Juror Davis's Misconduct Entitles Hummel to a New Trial ........................... 34

D.   Juror Davis's Misconduct Entitles Hummel to a New Punishment Phase ..... 35

E.   Conclusion ........................................................................................... 36

CLAIM TWO: HUMMEL'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO ARGUE THAT THE STATE'S EVIDENCE WAS INSUFFICIENT TO SHOW FUTURE DANGER ...................................... 36

A.   Relevant Facts ..................................................................................... 37

B.   The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding That There Was a Probability That Hummel Would Commit Future Acts of Violence ................................................................................................ 38

C.   Trial and Appellate Counsel Were Ineffective for Failing to Argue That The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding of Future Dangerousness ......................................................................... 40

CLAIM THREE: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL WAS NOT A FUTURE DANGER .. 40

A.   Trial Counsel's Performance Was Unreasonable for Failing to Present Evidence That Hummel Was Not a Future Danger ....................................... 42

B.   Hummel Was Prejudiced by Trial Counsel's Failure to Present Readily Available Evidence That Hummel Would Not Constitute a Future Danger to Society ................................................................................................. 43

     1.  Behavior in Tarrant County Jail ............................................... 43

     2.  Mental Health Expert .............................................................. 46

C.   Conclusion ........................................................................................... 46

**App. 0009**

4

CLAIM FOUR: TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT EXPERT TESTIMONY REGARDING HUMMEL'S LIFE HISTORY ................................................................................................ 47

A. Legal Standard ................................................................................ 48

B. Counsel Should Have Presented the Testimony of an Expert to Explain Hummel's Social History ............................................................. 50

    1. Childhood ............................................................................... 51

    2. Adulthood .............................................................................. 56

C. The Failure to Present an Expert to Explain Hummel's Social History Prejudiced His Trial ........................................................................ 60

CLAIM FIVE: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT RELEVANT LAY WITNESSES ........................................... 62

A. Trial Counsel Failed to Identify and Present Lay Witness Testimony Regarding Hummel's Complete Life Story ..................................... 64

    1. Witnesses Available to Testify ............................................... 65

    2. Further Information From Witnesses Who Testified ............... 70

B. Counsel's Failure to Present This Testimony Lacked Any Strategic Rationale and Was Therefore Deficient Performance ...................... 71

C. Trial Counsel's Deficient Performance Prejudiced Hummel's Trial ............. 72

CLAIM SIX: TRIAL COUNSEL ERRED BY FAILING TO PRESENT HUMMEL'S MILITARY SERVICE AS MITIGATION EVIDENCE ................. 73

A. Testimony at Trial ........................................................................... 75

B. Trial Counsel's Failure to Present Hummel's Military Service as Mitigation Evidence Constituted Ineffective Assistance of Counsel ................ 76

    1. Available Evidence of Hummel's Military Service ................. 76

C. Conclusion ....................................................................................... 79

**App. 0010**

**5**

CLAIM SEVEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL SUFFERED FROM COMPLEX POST-TRAUMATIC STRESS DISORDER RESULTING FROM ATTACHMENT TRAUMA.................................................................. 80

A.  Legal Standard.................................................................................... 81

B.  Trial Counsel Performed Deficiently in Failing to Present Evidence of Hummel's Attachment Trauma and Complex PTSD, Through a Qualified Expert Witness After a Thorough Investigation ............................................ 82

   1.  Trial Counsel's Investigation into Hummel's Childhood ...................... 82

   2.  Trial Counsel Mistakenly Relied on the Testimony of a Neuropsychologist Hired Before Counsel's Investigation Had Concluded. 83

   3.  Reasonable Professional Norms Required Counsel Retain the Assistance of an Expert with Specialized Expertise in Attachment Trauma and Complex PTSD 85

C.  Trial Counsel's Failure to Present Testimony Regarding Hummel's Attachment Trauma and Complex PTSD from a Qualified Expert Witness Prejudiced Hummel's Trial ............................................................. 91

CLAIM EIGHT: HUMMEL'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE STATE IMPERMISSIBLY INJECTED INFLAMMATORY AND PREJUDICIAL EVIDENCE INTO BOTH PHASES OF THE TRIAL; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE .................................................................................................. 93

A.  Relevant Facts .................................................................................. 94

B.  The State's Focus on Inflammatory, Emotion-Driven Evidence and Argument to Secure a Conviction of Capital Murder Deprived Hummel of His Right to a Fair Trial.................................................................................. 98

   1.  Contextual Evidence.......................................................................... 98

   2.  Emotion-Driven Evidence .............................................................. 100

C.  The Evidence Presented Referencing Jodi and the Unborn Child Constituted Impermissible Victim Impact Evidence at Punishment and Deprived Hummel of the Right to a Fair Punishment Proceeding ............................................. 102

D.   Trial Counsel Was Ineffective for Failing to Object to This Evidence, as Was Appellate Counsel for Failing to Raise This Error on Appeal ..................... 104

E.   Conclusion .................................................................................. 105

CLAIM NINE: TRIAL COUNSEL FAILED TO EFFECTIVELY PRESENT EVIDENCE THAT HUMMEL'S CONFESSION SHOULD BE SUPPRESSED .................................................................................... 105

A.   Relevant Facts .............................................................................. 106

  1.   Warrantless Detention ............................................................ 106

  2.   Arrest .................................................................................. 109

  3.   Detention and Confession ....................................................... 109

  4.   Pre-Trial Hearing .................................................................. 110

B.   Trial Counsel Performed Deficiently in Failing to Present Relevant Documents and Transcripts of Phone Calls to Support Their Motion to Suppress ..................................................................................... 113

C.   Had Trial Counsel Not Performed Deficiently, the Court Would Have Found Hummel's Detention Unlawful and Granted the Motion to Suppress Hummel's Confession .................................................................. 116

  1.   Unlawful Detention ................................................................ 116

  2.   Attenuation Analysis .............................................................. 117

  3.   Conclusion ........................................................................... 124

D.   Appellate Counsel Was Ineffective in Failing to Sufficiently Appeal the Court's Failure to Grant the Defense Motions to Suppress .......................... 124

CLAIM TEN: APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO APPEAL THE TRIAL COURT'S ERRONEOUS DENIAL OF DEFENSE COUNSEL'S VALID CHALLENGES FOR CAUSE OF NINE PROSPECTIVE JURORS .................................................................................... 126

A.   Relevant Facts .............................................................................. 127

7

B.  The Trial Court Erred by Failing to Grant Trial Counsel's Challenges for
    Cause ............................................................................................. 128

    1. Potential Juror Bancroft ............................................................. 128

    2. Potential Juror Butler ................................................................. 129

    3. Potential Juror McFarland .......................................................... 130

    4. Potential Juror Cuevas ................................................................ 130

    5. Potential Juror Powell ................................................................ 131

    6. Potential Juror Guidroz .............................................................. 132

    7. Potential Juror Zeiger ................................................................. 132

    8. Potential Juror Beauchamp ......................................................... 132

    9. Potential Juror Hermosillo .......................................................... 133

C.  The Court's Erroneous Denial of Valid Challenges for Cause Prejudiced
    Hummel's Trial ................................................................................ 134

    1. Juror Sanchez ............................................................................. 135

D.  Hummel's Appellate Counsel Was Ineffective by Failing to Appeal the
    Court's Ruling on Trial Counsel's Motions to Strike for Cause .................. 136

E.  Conclusion ..................................................................................... 137

CLAIM ELEVEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
OBJECT TO THE STATE'S DISCRIMINATORY USE OF PEREMPTORY
STRIKES TO REMOVE MINORITY VENIRE MEMBERS IN VIOLATION OF
HUMMEL'S CONSTITUTIONAL RIGHTS ..................................................... 137

A.  Legal Standard ................................................................................ 138

    1. Comparative Juror Analysis ........................................................ 139

B.  Jury Selection in Hummel's Case ....................................................... 140

C.  Minority Prospective Jurors Discriminatorily Struck by the State ............... 140

    1. Prospective Juror Gonzales ......................................................... 140

vi

**App. 0013**

2. Prospective Juror Williams.................................................................. 141

3. Prospective Juror Dennis ................................................................... 142

D. Comparative Juror Analysis ......................................................................... 142

E. Deficient Performance and Prejudice........................................................... 144

CLAIM TWELVE: HUMMEL'S DEATH SENTENCE SHOULD BE VACATED
BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED
THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING .... 145

A. The Texas Statute and Hummel's Jury Instructions ..................................... 146

B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital
Jury May Find Mitigating and Warrant a Life Sentence ............................... 147

C. Conclusion.................................................................................................... 150

CLAIM      THIRTEEN:    HUMMEL'S     DEATH     SENTENCE     IS
UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'
ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY ..... 151

A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied
Arbitrarily ................................................................................................... 152

B. Texas' Death Penalty Scheme Is Unconstitutional ....................................... 153

1. Geography.............................................................................................. 155

2. Race ...................................................................................................... 158

C. Conclusion.................................................................................................... 160

CLAIM FOURTEEN: HUMMEL'S RIGHTS UNDER THE SIXTH, EIGHTH,
AND    FOURTEENTH    AMENDMENTS    TO   THE   UNITED   STATES
CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS
PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE
JUROR WOULD RESULT IN A LIFE SENTENCE ......................................... 160

A. The Supreme Court Has Invalidated Jury Instructions That Place An Added
Burden on the Sentencer Before Finding Mitigating Circumstances. .......... 162

**App. 0014**

B.   Texas' 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence ............................................................................. 164

C.   The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations .................................................................................................. 165

D.   Conclusion ..................................................................................................... 167

CLAIM FIFTEEN: HUMMEL IS INELIGIBLE FOR A DEATH SENTENCE BECAUSE OF HIS MENTAL IMPAIRMENTS ................................................. 167

PRAYER FOR RELIEF ..................................................................................... 171

viii

10

# TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007)............................................ passim

*Allen v. United States*, 164 U.S. 492 (1896) ........................................................ 166

*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006)......................................... 136

*Arizona v. Washington*, 434 U.S. 497 (1978) ...................................................... 166

*Atkins v. Virginia*, 536 U.S. 304 (2002)............................................... 168, 169, 170

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................. 138

*Bobby v. Van Hook*, 558 U.S. 4 (2009).................................................................. 26

*Brewer v. Quarterman*, 550 U.S. 286 (2007) ...................................................... 151

*Brown v. Illinois*, 422 U.S. 590 (1975)................................................ 118, 120, 124

*Bruton v. United States*, 391 U.S. 123 (1968) ......................................................... 1

*Chapman v. California*, 386 U.S. 18 (1967)............................................................ 30

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)........................................................ 26

*Darden v. Wainwright*, 477 U.S. 168 (1986)............................................................ 1

*Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007) ......................................... 126

*Downum v. United States*, 372 U.S. 734 (1963) .................................................. 166

*Enmund v. Florida*, 458 U.S. 782 (1982) ............................................................ 168

*Evitts v. Lucey*, 469 U.S. 387 (1985) ................................................... 29, 125, 136

*Florida v. Royer*, 460 U.S. 491 (1983) ................................................................ 117

*Ford v. Wainwright*, 477 U.S. 399 (1986) ........................................................... 152

*Furman v. Georgia*, 408 U.S. 238 (1972)............................................................ 152

*Gideon v. Wainwright*, 372 U.S. 335 (1963) .................................................. 31, 32

*Godfrey v. Georgia*, 446 U.S. 420 (1980)............................................................ 153

*Gregg v. Georgia*, 428 U.S. 153 (1976)....................................................... 153, 157

*Harrington v. Richter*, 131 S. Ct. 770 (2011) .................................................. 26, 28

*Hernandez v. New York*, 500 U.S. 352 (1991)..................................................... 138

*Hodge v. Kentucky*, 133 S. Ct. 506 (2012)........................................................... 148

*Irvin v. Dowd*, 366 U.S. 717 (1961)..................................................... 30, 126, 134

*Jackson v. Virginia*, 443 U.S. 307 (1979)........................................................ 2, 37

*Johnson v. California*, 545 U.S. 162 (2005) ....................................................... 138

*Jurek v. Texas*, 428 U.S. 262 (1976)............................................................. passim

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)................................................... 113

*Lockett v. Ohio*, 438 U.S. 586 (1978) ..................................................... 1, 32, 146

*Lutwak v. United States*, 344 U.S. 604 (1953)........................................................ 1

*McCleskey v. Kemp*, 481 U.S. 279 (1987)........................................................... 148

*McKoy v. North Carolina*, 494 U.S. 433 (1990).................................................. 164

*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005).................................................... 27

**App. 0016**

**11**

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ............................................. 138, 139, 140
*Mills v. Maryland*, 486 U.S. 367 (1988) ............................................. 162, 163, 164
*Morgan v. Illinois*, 504 U.S. 719 (1992) ............................................ 31, 32, 35, 36
*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................ 26
*Parker v. Gladden*, 385 U.S. 363 (1966) .............................................................. 36
*Penry v. Johnson*, 532 U.S. 782 (2001) ..................................................... 150, 154
*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................ 149, 151, 154, 158
*Porter v. McCollum*, 558 U.S. 30 (2009) ...................................................... passim
*Rice v. Collins*, 546 U.S. 333 (2006) ................................................................ 138
*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008) ......................................... 29, 136
*Rivera v. Illinois*, 566 U.S. 148 (2009) .............................................................. 93
*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................ 26, 27, 28, 73
*Roper v. Simmons*, 543 U.S. 551 (2005) ............................................................ 168
*Rose v. Clark*, 478 U.S. 570 (1986) .................................................................. 30
*Sears v. Upton*, 130 S. Ct. 3259 (2010) .............................................................. 71
*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................................ passim
*Smith v. Robbins*, 528 U.S. 259 (2000) ......................................................... passim
*Snyder v. Louisiana*, 552 U.S. 472 (2008) ........................................................ 138
*Strickland v. Washington*, 466 U.S. 668 (1984) .............................................. passim
*Taylor v. Alabama*, 457 U.S. 687 (1982) ...................................... 121, 122, 123, 124
*Tennard v. Dretke*, 542 U.S. 274 (2004) ............................................... 61, 72, 148
*United States v. Brown*, 553 F.3d 768 (5th Cir. 2008) ........................................ 139
*United States v. Watson*, 423 U.S. 411 (1976) ................................................... 116
*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) ................................. 136
*United States v. York*, 600 F.3d 347 (5th Cir. 2010) ....................................... 31, 34
*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ................................................... 25
*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................................ 126
*Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir. 2009) ........................... 62, 72
*Whitaker v. Quarterman*, 200 Fed. Appx. 351 (5th Cir. 2006) .............................. 81
*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................ passim
*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................... 29, 47, 73
*Wong Sun v. United States*, 371 U.S. 487 (1963) ................................................ 120
*Wood v. Allen*, 558 U.S. 290 (2010) .................................................................. 74
*Woodson v. North Carolina*, 428 U.S. 280 (1976) ....................................... 152, 153
*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................ 160

## State Cases

*Akins v. State*, 202 S.W.3d 879 (Tex. App.—Fort Worth 2006) ......................... 117
*Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App. 1986) .................................... passim
*Beltran v. State*, 728 S.W.2d 382 (Tex. Crim. App. 1987) ................................... 39

**App. 0017**

**12**

*Bennett v. State*, 738 S.W.2d 33 (Tex. App.—Texarkana 1987, no pet.)............... 35
*Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007).................... 38, 39, 40
*Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997)........................... 102, 103
*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ........................ 42, 46, 81
*Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004) .............. 99, 100, 101, 105
*Ex parte Adams*, 768 S.W.2d 281 (Tex. Crim. App. 1989).............................. 93, 94
*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)................................ 62
*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) ............................... 62, 145
*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012) .................................. 25
*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)........................ passim
*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012).............................. 25
*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ............................. 28
*Ex parte Miller*, 330 S.W.3d 610 (Tex. Crim. App. 2009)........................ 104, 105
*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)................... 29, 40, 136
*Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004).......................... 30, 126
*Garcia v. State*, 201 S.W.3d 695 (Tex. Crim. App. 2006) ................................... 99
*Griffith v. State*, 983 S.W.2d 282 (Tex. Crim. App. 1998)................................... 46
*Heath v. Boyd*, 175 S.W.2d 214 (Tex. 1943) ................................................... 116
*Hollis v. State*, 219 S.W.3d 446 (Tex. App.—Austin 2007) ............................... 116
*Hughes v. State*, 878 S.W.2d 142 (Tex. Crim. App. 1992) ................................ 129
*Johnson v. State*, 496 S.W.2d 72 (Tex. Crim. App. 1973) ................................ 121
*Johnson v. State*, 871 S.W.2d 744 (Tex. Crim. App. 1994) .............................. 121
*Keeton v. State*, 724 S.W.2d 58 (Tex. Crim. App. 1987) ................................... 39
*Linscomb v. State*, 829 S.W.2d 164 (Tex. Crim. App. 1992) ............................. 138
*Maixner v. State*, 753 S.W.2d 151 (Tex. Crim. App. 1988) ........................ 118, 122
*Martinez v. State*, 763 S.W.2d 413 (Tex. Crim. App. 1988) .............................. 134
*Mayes v. State*, 816 S.W.2d 79 (Tex. Crim. App. 1991) ..................................... 99
*Meza v .State*, 206 S.W.3d 684 (Tex. Crim. App. 2006)................................ 30, 124
*Monge v. State*, 315 S.W.3d 35 (Tex. Crim. App. 2010).................................... 117
*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) .................... 93, 101
*Munroe v. State*, 637 S.W.2d 475 (Tex. Crim. App. 1982).................................. 35
*Newbury v. State*, 135 S.W.3d 22 (Tex. Crim. App. 2004) ................................ 100
*Nieto v. State*, 365 S.W.3d 673 (Tex. Crim. App. 2012).................................... 138
*Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000) ............................. 101, 105
*Rogers v. State*, 853 S.W.2d 29 (Tex. Crim. App. 1993) .................................... 99
*Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002) .................................. 102
*Self v. State*, 709 S.W.2d 662 (Tex. Crim. App. 1986)................................ 118, 123
*State v. Johnson*, 871 S.W.2d 744 (Tex. Crim. App. 1994) .............................. 118
*State v. Mazuca*, 375 S.W.3d 294 (Tex. Crim. App. 2012).......................... 118, 122
*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999).............. 25, 26, 117, 124

xi

**13**

*Valle v. State*, 109 S.W.3d 500 (Tex. Crim. App. 2003) ........................................ 38
*Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981) ............................... 38, 39
*Warren v. State*, 562 S.W.2d 474 (Tex. Crim. App. 1981) ................................... 39
*Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) ................................... 139

**Statutes**
Tex. Code Crim. Proc. Art. 35.261 ....................................................................... 138
Tex. Code Crim. Proc. Art. 37.071 .............................................. 146, 147, 161, 162

**Other Authority**
ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989)........................................................................ 82
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ...................... passim
ABA Standards for Criminal Justice (3d ed. 1993) ................................................ 27
ABA Supplementary Guidelines for the Mitigation Function of Defense Team in Death Penalty Cases, 36 HOFSTRA L. REV. 677 (2008) .......................... 48, 49, 63
Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION (Aug. 1985)................................................................. 61, 63
John Blume & Pamela Leonard, *Capital Cases: Principles of Developing and Presenting Mental Health Evidence in Criminal Cases*, THE CHAMPION (Nov. 2000)........................................................................................................ 73
John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4 (Aug. 1995) ..................................................................................... 49
Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923 (2008) 85
Mark D. Cunningham et al., *Serious Assaults on Prison Staff*, 39 J. CRIM. JUSTICE 143 (2011) ........................................................................................... 43
Richard G. Dudley & Pamela Blume Leonard, *Getting it Right: Life History Investigation As the Foundation for A Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008) ................................................................... 81
State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21, 2006)............................................................................... 27, 28, 62, 136

App. 0019

**14**

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

*"Fairness is what Justice really is."*

- Justice Potter Stewart

In every criminal trial, "[a] defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953); *accord Bruton v. United States*, 391 U.S. 123, 135 (1968). Still, there is an equally-recognized principle that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Darden v. Wainwright*, 477 U.S. 168, 188 (1986) (Blackmun, J., dissenting) ("Although the Constitution guarantees a criminal defendant only 'a fair trial [and] not a perfect one,' . . . this Court has stressed repeatedly . . . that the Eighth Amendment requires a heightened degree of reliability in any case where a State seeks to take the defendant's life.").

While broadly viewed it appears that John Hummel received such a "fair" trial, in actuality there were significant errors that permeated Hummel's trial, infringing his right to a fair and impartial jury, his right to effective and diligent counsel, and his right to have the jury measure the full weight of his life's story against the State's case in punishment.

Despite the best efforts of the criminal justice system, errors occur, often unseen in the moment, but revealed upon post-conviction habeas investigation. In Hummel's case, the strength of his conviction and the reliability of his death sentence crumble under the impact of a single instance of juror misconduct. Here, a juror, who swore to follow the court's instructions and deliberate both guilt and punishment cases, made up his mind as to Hummel's guilt and death sentence during the middle of the State's case at guilt. In deciding to vote for guilt and for

1

death before all the evidence had been presented, this juror robbed Hummel of his constitutional protection of a fair and impartial tribunal.

Next, a sentence can only be found competent if supported by sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). In Texas, the law demands that only those defendants who are found to be in danger of committing future acts of violence may receive the death penalty. Yet, the State did not present sufficient evidence to meet this burden of proof, a fact Hummel's trial counsel and appellate counsel failed to argue on his behalf. Further, evidence available to his trial counsel to counter the State's case—testimony from prison guards and an expert witness that Hummel was not likely to commit future acts of violence—was neither investigated nor presented by trial counsel.

And while trial counsel's efforts in Hummel's case were certainly valiant, they still fell short of fulfilling the rigorous investigative demands of a capital case. Trial counsel investigated the relationships between Hummel and his immediate family members, narrowly focusing on suspicions that Hummel was sexually abused. However, proof of this did not materialize and their investigation into other avenues of mitigation evidence suffered.

For example, counsel failed to investigate several important time periods and themes in Hummel's life, particularly his military service and adult life. As a result, Hummel's jury heard a defense presentation that thematically and chronologically skipped from Hummel's abusive, neglected childhood to the violent acts on the night of the crime. A complete investigation would have enabled trial counsel to present to the jury Hummel's entire life story, thus providing an understanding of how Hummel became the person he did. The jury would have learned about significant mitigating themes in Hummel's life, including the attachment trauma he suffered as a child, causing him to escape into fantasy role-playing games as a teenager, his formation of a new identity and early

2

**16**

successful service in the United States Marine Corps, and ultimately his struggles with severe physical ailments and complex post-traumatic stress disorder in the period leading up to the crime.

Hummel's constitutional right to a fair trial was further infringed by improperly prejudicial evidence presented by the State. During the guilt/innocence presentation, the State presented substantial evidence about the death of Hummel's six-year-old-daughter and the unborn child, despite neither being part of the indicted crime. The argument and evidence put forward by the State included irrelevant and highly prejudicial testimony from the girl's teachers and a photograph of the excised fetus. Evidence that normally would have been prejudicial in the punishment phase, became even more objectionable and incendiary when presented in the guilt/innocence phase.

These and other errors, as will be explained in detail below, accumulated to undermine the constitutional safeguards of due process in Hummel's capital trial. Whether individually or collectively, these errors raise concerns about the wisdom and justice of imposing the most final of punishments in this case. For the reasons discussed below, Hummel's conviction and sentence should be overturned, and Hummel should be granted a new trial or a reversal of his death sentence.

# I.

## PROCEDURAL HISTORY

John William Hummel is confined under a sentence of death pursuant to the judgment of the 432nd District Court, Tarrant County, Texas, case number 1184294D, which was rendered on June 27, 2011, and entered on June 29, 2011. (45 RR at 97; CR at 747-49.)[1]

### A. Trial Court Proceedings

On December 23, 2009, this Court appointed Fred Cummings to represent Hummel during his capital trial. (CR at 21.) Larry Moore was appointed to represent Hummel as co-counsel on December 31, 2009. (*Id.* at 24.)

#### 1. Indictment

On February 17, 2010, a grand jury indicted Hummel with capital murder in the course of knowingly causing the deaths of Clyde Bedford and Joy Hummel during the same criminal transaction. (CR at 2.)

#### 2. Trial

Voir dire began on April 28, 2011, and concluded on June 2, 2011. (11 RR at 28; 31 RR at 28.) Hummel was arraigned on April 28, 2011. (11 RR at 21.) The court entered a plea of not guilty on Hummel's behalf. (11 RR at 22.) Opening statements for the guilt/innocence phase of the trial began on June 13, 2011. (33 RR at 19.) The State's case-in-chief continued until June 22, 2011, when the State rested. (40 RR at 23.) Defense counsel did not call any affirmative witnesses and rested its case shortly thereafter. (*Id.* at 28.) Closing arguments occurred on the same day, and the case was submitted to the jury for deliberations. (*Id.* at 50 *et seq.*, 78.) The jury found Hummel guilty of capital murder. (*Id.* at 79; *see also* CR at 721.)

---

[1] "CR" refers to the Clerk's Record in Hummel's trial. "RR" refers to the Reporter's Record in Hummel's trial.

**18**

**App. 0023**

The punishment phase began the same day. (41 RR at 7.) Neither party made opening statements to the jury. (*Id.*) The State presented its case-in-chief until the defense was permitted to present several out-of-state witnesses on June 24, 2011. (43 RR at 50.) On June 27, 2011, the State called three additional witnesses before resting its case. (44 RR at 33.) Defense counsel then called two further witnesses before resting its case. (*Id.* at 163.) On June 28, the State called two rebuttal witnesses (45 RR at 6, 32) before resting its case in rebuttal. (*Id.* at 46.) Defense counsel did not present any rebuttal witnesses. (*Id.* at 47.)

Both sides then gave closing arguments, and the jury immediately retired for deliberations. (45 RR at 57, 65, 73, 93.) Later that same day, the jury returned a verdict of "Yes" to Special Issue One, and "No" to Special Issue Two. (45 RR at 94-95.) John Hummel was formally sentenced to death on June 28, 2011. (45 RR at 97; CR at 747-49.)

### 3. State Appellate Proceedings

On June 28, 2011, Hummel was notified of his right to appeal. (CR at 745.) Hummel was declared indigent and John Stickels was appointed to represent him. (*Id.* at 757.) A Motion for New Trial was filed on July 21, 2011, alleging insufficient evidence to sustain Hummel's conviction and the jury's finding as to Special Issue One. (*Id.* at 761.) The court took no action on the motion (*id.* at 763), and it was denied under operation of law on September 22, 2011. *See* Tex. R. App. Pro. Art 21.8.

Mr. Stickels filed an opening appellate brief in *John William Hummel v. The State of Texas*, Cause Number AP-76,956, in the Court of Criminal Appeals ("CCA") on September 21, 2012. The State submitted a brief in response on January 18, 2013. Appellate counsel did not file a reply brief. The CCA heard oral arguments on February 27, 2013. As of the date of this filing, the CCA has not issued a decision on Hummel's appeal.

**19**

### 4. State Habeas Proceedings

The 432nd District Court appointed the Office of Capital Writs ("OCW") to represent Hummel in filing an application for a writ of habeas corpus pursuant to the Code of Criminal Procedure Article 11.071 on June 30, 2011. (CR at 746.) This Application follows.

## II.

## STATEMENT OF FACTS

### A. Evidence at Trial

### 1. Guilt/Innocence Phase Presentation

The prosecution presented evidence that on the night of December 17, 2009, Hummel used a baseball bat and several knives to murder his wife Joy Hummel, their daughter Jodi, and Joy's father Clyde Bedford. Hummel then set the house on fire and left Texas for California, where he was arrested. (*See* 33-40 RR.)

The defense presented no evidence during the guilt/innocence stage. (40 RR at 24.)

### 2. The Prosecution Punishment Phase Presentation

The State presented three main areas of evidence in favor of the death penalty during the punishment phase. First, the prosecution argued that Hummel's actions leading up to and following the crime exhibited he had planned the murders and was happy once they were completed. The prosecution presented the testimony of Kennedale police investigator James Rizy to describe how Hummel had attempted to poison his family two days before the crime. Rizy also testified that Hummel had left after the crime and traveled to Oceanside, California, where he went to a strip club and took drugs. (41 RR at 8-31.) Scott Matejka testified that he met Hummel at the California strip club and the two of them decided to go to Mexico to buy drugs. Matejka stated that he and Hummel smoked crack cocaine

**App. 0025**

and that Hummel was stopped at the border when crossing back from Mexico. (42 RR at 23-52.)

Next, the prosecution focused on other alleged bad conduct on the part of Hummel as evidence of aggravation, specifically implying sexual deviance. The prosecution presented the testimony of two strippers, Tomiko Race and Gretchen Bow, who testified that Hummel would frequently visit them and request dances. They stated that Hummel would call them after work and wanted to spend time with them. (42 RR at 72-85, 109-29.) The prosecution also presented the testimony of William Ford, a doctor at the hospital where Hummel worked as a security guard, and Champion Security employees Matt Sullivan and Cindy Green. Dr. Ford testified that he found pornography on his own work computer and suspected that someone was using the computer when he was not in his office. (*Id.* at 95-108.) The prosecution offered testimony of a computer expert to show that Hummel had accessed Dr. Ford's computer and the testimony of Cindy Green to show that Hummel was on shift at the hospital when Dr. Ford's computer was used. (*Id.* at 138-78.) Hummel's supervisor Matt Sullivan testified that Hummel had received infractions for this unauthorized computer use, as well as smoking and watching television. Sullivan had a disciplinary meeting with Hummel the morning after the crime, where Hummel admitted to his infractions. (*Id.* at 5-13.)

Finally, the prosecution presented rebuttal testimony to discount Hummel's military service. Lieutenant Colonel Michael Dougherty testified that Hummel was an average Marine who had to be counseled about his frequent visits to strip clubs. In addition, Dougherty testified that the medals Hummel received for his service were received by all members of his unit and not earned for his individual efforts. (45 RR at 5-30.) Captain Sergio Santos testified that Hummel was not a very impressive Marine, and that Santos had revoked Hummel's security clearance

7

**App. 0026**

**21**

because he left the base without permission and had questionable integrity. (*Id.* at 32-46.)

In closing, the prosecution argued that Hummel would be a future danger based on the planning and lack of restraint shown in the crime (45 RR at 86), and that nothing in Hummel's history was sufficiently mitigating to warrant a life sentence. (45 RR at 87.)

### 3. The Defense Punishment Phase Presentation

#### a. Lay Witnesses

During the punishment phase of trial, Hummel's counsel presented the testimony of Hummel's sister, two former girlfriends, two school employees from Hummel's high school, and four members of the Pack family from South Carolina that were friends with Hummel's family when he was a child. The testimony offered by these witnesses fell into three main categories: Hummel's family life as a child, Hummel's educational disability, and Hummel's experience in romantic relationships.

#### i. Family Life

First, trial counsel presented evidence that Hummel was raised in a family environment that lacked love and appropriate relationships. Counsel presented the testimony of Hummel's sister, Neata Woody, who was nine years older than Hummel. In addition, counsel presented Linda Pack, who had been close friends with Hummel's mother Jackie, as well as Mark Pack (Linda's son), Christy Pack (Mark's wife), and Derrick Parris (Mark's cousin). The Packs would go every Sunday to the Hummels' house for dinner.

Hummel and his family lived outside of town on a farm owned by a local dentist. Hummel would help his father out on the farm. (43 RR at 105-08.) Neata testified that her parents never showed affection to their children and that she mainly took care of Hummel as a child. (*Id.* at 211.)

8

Neata felt her parents were abusive. (43 RR at 221.) Her parents would discipline them with strikes from a belt and often would leave them alone. (*Id.* at 213-18.) Mark Pack remembered Hummel's father throwing Hummel off a tractor on one occasion. (*Id.* at 112.) Derrick Parris also remembered once when Hummel's father beat him with a belt, leaving marks, and once with a broom handle. (*Id.* at 153.)

Hummel's parents had a strange relationship. Linda Pack testified that Hummel's father cheated on Hummel's mother and that Hummel's mother once asked Linda if she would sleep with her husband. (43 RR at 143-44.) Neata remembered walking in on her father receiving oral sex from a woman from their church. (*Id.* at 252.) Parris remembered Hummel's father slapping Parris's mother on the rear inappropriately. (*Id.* at 155.)

Hummel's parents were strict. They would only allow few friends to visit, like the Packs for Sunday dinners. (43 RR at 218.) They provided essential care to Neata and Hummel, but never any affection. (*Id.* at 249-50.) Hummel's mother was more generous to other people's children than her own. (*Id.* at 127.) She would spend money for gifts for other people's children, like shoes for Linda Pack's daughter, but not on her own kids. (*Id.* at 138-45.)

When Hummel was young, kids called him "Bacon" because of how he smelled. (43 RR at 223.) His friends believed he was not smart. They made fun of him when they thought he was making up having girlfriends. (*Id.* at 159, 168.) Hummel was very quiet at Sunday dinners. (*Id.* at 126.) While the others would play games after dinner, Hummel would go to his room and play video games. (*Id.* at 109.)

In addition to her testimony regarding Hummel's life as a child, Neata also testified about knowing the victims Joy and Jodi, and that Hummel was having financial problems. (43 RR at 229-32.) On cross-examination, Neata told the jury

9

**App. 0028**

that she did not want to be there testifying for her brother, but had been subpoenaed by the defense. She believed Hummel was responsible for the victims' deaths and that the jury should do what was "correct." She stated that she and her family were "broken" when they lost the victims. She also stated that she thought Hummel would kill her parents with a sword. (*Id.* at 232-48, 255-56.)

### ii. Education

Next, trial counsel offered evidence that Hummel struggled in school due to a learning disability. Parris testified that Hummel was "stupid" and could not spell the word "egg." (43 RR at 159-61.) Haila Scoggins (now Haila Adams) was the special education teacher for Hummel when he was in high school. Hummel had a disability in his writing, like dyslexia, and needed accommodations in order to graduate from high school. According to Scoggins, Hummel was quiet, pleasant, and cooperative and liked to play video games and "Dungeons and Dragons." Although Scoggins held parent teacher conferences, Hummel's parents never attended and she only met Hummel's mother once during his school career. The last time she saw Hummel was just after he graduated from high school when he was working at a fast food restaurant. (*Id.* at 50-72.) Tommy Stribble was the special education director for Hummel's schools and was custodian of records. He confirmed that Hummel failed the fourth grade, was a member of ROTC, and lacked any disciplinary problems. (*Id.* at 75-100.)

### iii. Romantic Life

Finally, trial counsel presented evidence regarding Hummel's romantic life. Stephanie Bennett testified that she and Hummel met in high school and began double dating with her older brother. They mainly went to the movies, hung out, and went to church together. Hummel wanted to marry Bennett, but she was not ready. They broke up and Hummel was upset, but he was never violent towards her. (43 RR at 170-83.) Another girlfriend, Letti Ulbright, testified that she had a

10

relationship with Hummel for a brief period after he was in the Marines. Ulbright was pregnant and homeless when she met Hummel. They began their relationship in California, but soon moved to South Carolina to become a family. They lived in a trailer and Hummel work at a Kohler factory. When Ulbright gave birth two months later, Hummel's sister Neata came to her one day with a letter supposedly from Hummel saying he no longer wanted to be a family. Neata sent Ulbright back to California. Ulbright testified that Hummel was never violent or abusive to her. (*Id.* at 185-206.)

### iv. Other Evidence

In addition to the themes described above, Derrick Parris testified briefly regarding Hummel's adult life. Parris described how Hummel lost weight to become a Marine and had more self-esteem while he was enlisted. Parris was surprised Hummel became a Marine and an intelligence analyst because he was not smart. After he came back from the Marines, Hummel would go to strip clubs. According to Parris, Hummel had a hard time distinguishing the fantasy flirting of the strippers from someone who actually was attracted to him. (43 RR at 157-61, 166.)

### b. Expert Witnesses

The defense presented the testimony of two expert witnesses: a prison classification expert and a neuropsychologist.

### i. Prison Classification

Frank Aubuchon, a former Texas Department of Criminal Justice ("TDCJ") employee, testified as a defense expert on the prison classification system. Aubuchon described the various types of facilities that Hummel might be placed in if given life without parole. He also described the security protocols that prisons use to keep guards safe. (44 RR at 34-59.)

**25**

**App. 0030**

Aubuchon described the process TDCJ uses to classify an inmate based on his crime and past conduct, ranging from least restricted ("G1") to most restricted ("G5") and Administrative Segregation. Based on Hummel's offense reports, military records, medical records, and jail behavior, Aubuchon predicted that Hummel would be classified as a "G3" if given a sentence of life without parole. He also believed based on Hummel's good behavior and military history, Hummel would function well in prison. (44 RR at 59-73.)

On cross-examination, Aubuchon admitted that he did not know that Hummel had once gone absent without leave ("AWOL") in the military. Further, Aubuchon agreed that prisoners can escape, can make weapons, and can hurt others while in prison. However, he testified that escapes are rare and that the prison system has adapted to prevent violent acts by inmates. (44 RR at 73-116.)

### ii. Mental Health

Dr. Antoinette McGarrahan testified that she was a forensic psychologist who specialized in neuropsychology, the study of brain behavior. She performed an evaluation of Hummel, including a clinical interview, review of Hummel's vital records such as medical, education, and military records, and interviews with Hummel's sister and mother. (44 RR at 118-23.)

Dr. McGarrahan testified that Hummel had an IQ of 109 and did not exhibit any diagnosable clinical disorders. However, in her opinion Hummel did suffer from several traits of narcissism, antisocial personality disorder, schizoid disorder, and borderline personality disorder. Hummel's narcissistic traits meant he was self-focused and lacked empathy. His anti-social traits meant that Hummel was irresponsible, deceitful, and manipulative. Hummel's schizoid features caused Hummel to be detached in his relationships with others. Finally, Hummel's borderline traits caused Hummel to feel empty and lack goals. These traits were involuntary and permanent. (44 RR at 124-32.)

12

**26**

Dr. McGarrahan testified that the lack of nurturing Hummel experienced from his family contributed to these feelings. Hummel became unable to express his emotions, holding in his anger and frustrations, and unable to form meaningful relationships. Ultimately Hummel's emotions came out in a flood on the night of the crime. (44 RR at 132-43.)

On cross-examination, Dr. McGarrahan agreed that Hummel was irresponsible, grandiose, manipulative, impulsive, and unable to appreciate consequences of his actions. She also agreed that Hummel was like a "sleeping volcano" and that she could not tell whether another set of circumstances would set him off. (44 RR at 146-55.)

### B. Post-Conviction Investigation

Post-conviction investigation has uncovered significantly more details regarding Hummel's life history that were available to present to his capital jury.

### 1. Family and Early Life

Hummel was born in 1975 to John Hummel Sr. ("John Sr.") and his wife Jackie. Hummel's mother Jackie was raised in an abusive home. She, her brother Thomas Hamilton, and their siblings, witnessed their father severely beat their mother. Their mother would hide bottles of pepper juice and bleach around the house so that she could throw them at their father when he was violent. During one such episode, their mother shot and wounded their father. Their mother would in turn beat her own children to the point they would cry for each other. Jackie's family was also very poor. There were times when their mother worked two jobs and could only feed them by boiling a potato; they would drink the liquid for lunch and eat the potato for dinner. (Ex. 12 at ¶¶3-4, 17 [Affidavit ("Aff.") of Thomas Hamilton].)

13

Jackie married John Sr., and they had two children together, John Hummel Jr. and Neata Hummel Woody.[2] Hummel was born in Grand Prairie, Texas, but the family moved to Pacolet, South Carolina when Hummel was around four years old. The Hummels moved after Jackie got into legal trouble for writing bad checks. In addition, the family moved to follow a traveling preacher named Andrew Carrigan who had started the Morning Star Baptist Church in Pacolet. (Ex. 12 at ¶¶6-7 [Aff. of Hamilton].)

Another reason for the move was John Sr.'s extramarital affairs, which were common knowledge in the family. John Sr. had been caught cheating, but he and Jackie remained married. In fact, Jackie may have even encouraged these affairs. (Ex. 12 at ¶8 [Aff. of Hamilton].)

Because of financial problems, the Hummels eventually moved onto a farm in South Carolina. John Sr. worked the farm (in addition to his day job at the Kohler ceramics plant) in exchange for free rent. The farm was out in the country and isolated from the rest of the town. (Ex. 12 at ¶9 [Aff. of Hamilton]; Ex. 15 at ¶4(a) [Aff. of Christy Pack]; Ex. 3 at ¶7 [Aff. of Haila Adams]; Ex. 13 at ¶5 [Aff. of Brian Jeter].)

As a result, Hummel was isolated from other children. He hardly left the farm except for school and church. He did not have friends except those that were invited over by his parents. Even kids Hummel knew that also lived out in rural areas, "country kids," did not become friends with Hummel until he was in high

---

[2] Post-conviction investigation has been unable to ascertain more information regarding the Hummel family's origins. John Hummel Sr. passed away in 2005 and has no living relatives that post-conviction counsel has been able to identify. Jackie Hummel and Neata Woody, as well as other immediate family members of Hummel, have been contacted multiple times and have either refused to be interviewed or have been prevented from being interviewed by other family members.

App. 0033

**28**

school. Possibly because of this isolation, people found Hummel to be quiet and odd. He was shy around other people. He would get visibly nervous whenever kids would tease him or when he was put on the spot by an adult. He seemed afraid to fail in front others. (Ex. 12 at ¶12 [Aff. of Hamilton]; Ex. 15 at ¶4(a-b) [Aff. of Pack]; Ex. 13 at ¶¶2, 5 [Aff. of Jeter].)

Neata moved away when she was seventeen and Hummel was eight. Around that time, Hummel's uncle Thomas Hamilton moved to South Carolina from Texas and became Hummel's support. Hamilton often babysat Hummel. He taught Hummel to hunt and fish. Hummel would ask Hamilton to play games with him, because Hamilton was kind to Hummel and would not get upset when Hummel won—unlike Hummel's father. Unfortunately, Hamilton moved back to Texas when Hummel was around thirteen. (Ex. 12 at ¶¶10-11 [Aff. of Hamilton].)

Hummel's father was an obsessive and violent person. He liked to shoot plastic toy soldier figures and then paint their "wounds" red. He also liked to pour lighter fluid on ant hills and set them ablaze. Hummel had an opposite personality from his father and did not obsess over guns. However, his father made Hummel play war games with him anyway. Hummel's father was wrapped up in his own life of work at the plant and tending the farm. He did not spend much time with his family, preferring instead to play video games or watch TV in his free time. He never encouraged Hummel. So great was his absence that Hummel's teachers were not even aware that Hummel had a father in his life. (Ex. 12 at ¶¶13-14 [Aff. of Hamilton]; Ex. 3 at ¶7 [Aff. of Adams]; Ex. 8 at ¶4 [Aff. of Lance Dupre].)

Hummel's mother Jackie was also wrapped up in her own life. She spent most of her time with her own friends. She never spent time, money, or energy to take Hummel to the movies, parks, or shopping malls, etc. Outside observers did not think Jackie ever showed love or concern for her son. No one witnessed either

15

**App. 0034**

parent ever express love, give Hummel or Neata hugs or kisses, or say "I love you." (Ex. 12 at ¶15 [Aff. of Hamilton]; Ex. 15 at ¶4(c) [Aff. of Pack].)

However, Hummel's parents maintained strict control over their son's daily life—where he went, who he would see, etc.—all while not showing him attention or affection. The attitude they expressed to Hummel was "do your homework and go to school and stay out of our way." As a result, Hummel spent most of his free time in his room, playing video games or watching TV. (Ex. 12 at ¶16 [Aff. of Hamilton]; Ex. 15 at ¶3(a) [Aff. of Pack].)

## 2. Teenage Years

During his teenage years, Hummel "blended into the woodwork" at school. He struggled with a learning disability at school, yet neither of his parents took an interest in his schoolwork. Teachers observed that he never initiated conversations and did not seem to interact with the other children. It was like he was hiding or trying to avoid attention. Hummel was never aggressive, never angry, always maintaining an even keel and acting like nothing bothered him. He did not talk about his family. (Ex. 3 at ¶¶3-6 [Aff. of Adams]; Ex. 19 at ¶7 [Aff. of Joseph Patterson]; Ex. 10 at ¶6 [Aff. of Shana Fowler].)

Hummel's earliest friends were other boys who would help out on the Hummel's farm. (Ex. 13 at ¶¶2, 6 [Aff. of Jeter]; Ex. 19 at ¶¶2, 6 [Aff. of Patterson].) It appeared to others that Hummel wanted closer relationships but was unable to form them. In friendships Hummel did make, he was often manipulated and used. For example, Hummel's friends would get him to buy things for them or to give them rides places. Hummel wore a smile and tried to please his peers, going out of his way to do what they wanted. As a result of this desire to please, Hummel presented different characters of himself to his peers depending on the audience. Some believed he was a class clown, while others described him as shy and quiet. He played sports with some classmates, seeming athletic, while others

16

**App. 0035**

**30**

never believed he was athletic, preferring instead to play video games. Hummel was influenced to be like the people around him, trying to fit in and make closer relationships with others. (Ex. 6 at ¶¶12-13 [Aff. of Chad Brown]; Ex. 8 at ¶7 [Aff. of Dupre]; Ex. 13 at ¶¶3-4 [Aff. of Jeter]; Ex. 19 at ¶¶3-4, 8-9 [Aff. of Patterson]; Ex. 3 at ¶11 [Aff. of Adams].)

Hummel was often the object of ridicule. Friends made fun of his inability to spell, saying that he was stupid, and made fun of his attempts to date girls. They also teased him for being immature. Hummel had problems interacting socially with his peers at their level. He would say random things that did not make sense—like thinking the word "corn" was a catchphrase. He could not explain why he thought what he said was funny. He would jump into conversations of others with comments that were immature and not relevant to what was being said. His friends also teased him about his clothes. Hummel would wear strange shirts with dragons, camouflage pants, and bedroom slippers that he called "moccasins." Despite his awkwardness and his friends' taunts, Hummel continued to try to please his friends. When he was teased or bullied, Hummel would back off, not confronting the other individuals or getting mad. (Ex. 8 at ¶¶5-7 [Aff. of Dupre]; Ex. 10 at ¶¶3-5 [Aff. of Fowler]; Ex. 6 at ¶¶10-15 [Aff. of Brown].)

By late high school, Hummel had developed a passion (bordering on obsession) for role-playing games, such as Dungeons and Dragons. These games were some of the few things that made him excited. They provided Hummel with a way to escape his real life. Hummel would often talk about the games after they were over, reminiscing about the game. However, Hummel would frequently create characters that were too complex for him to manage. It was difficult for Hummel to mentally keep up with the type of characters he tried to play. This lead to poor results in the games. And while other players would use a single character, Hummel tried to create multiple characters at the same time. He would constantly

17

**App. 0036**

**31**

change his characters to try to be better at the game, often taking whatever successful moves his friends did and copying them. Hummel had trouble stepping away from the fantasy of the games. One time he tried to pull game dice out while he was driving a car full of his friends somewhere, just to continue playing the game. His friends had to force him to stop playing and concentrate on driving. Whatever conversations were going on, Hummel would turn them to talking about fantasy games. (Ex. 3 at ¶8 [Aff. of Adams]; Ex. 8 at ¶3 [Aff. of Dupre]; Ex. 6 at ¶¶6-9 [Aff. of Brown].)

During his senior year, Hummel dated Stephanie Bennett after they met while he was working at a Hardee's fast food restaurant. After speaking on the phone several times, and before ever going on a date in person, Hummel told Bennett that he loved her. Bennett did not think it was normal to be that serious so quickly. From the beginning of their relationship, Hummel got very close to Bennett and her family. He would go to church and eat with the Bennetts every Sunday, and would spend holidays with them. Hummel would talk about his and Bennett's future and say that they would get married. He wanted to plan everything about their future together. Yet, Bennett did not feel the same and started pulling away. Hummel had no idea and thought they were going to spend the rest of their lives together. When Bennett broke up with Hummel, he was hurt and surprised. (Ex. 5 at ¶4 [Aff. of Stephanie Bennett].)

At the end of his senior year, Hummel graduated high school, passing his exit exam only after receiving an accommodation for his learning disability. After graduating, Hummel did not appear to have any goals or ambitions, nor did he get any encouragement from his family or community. He worked at the Hardee's and lived briefly on his own. Hummel struggled financially, and when his apartment was broken into he was faced with the prospect of moving back in with his parents. Instead, he chose to join the United States Marine Corps, a decision that surprised

18

**App. 0037**

**32**

many of his friends. To them, Hummel would not fit well in the military and the decision to join seemed impulsive and not well thought-out. (Ex. 3 at ¶¶9-10 [Aff. of Adams]; Ex. 6 at ¶16 [Aff. of Brown]; Ex. 8 at ¶8 [Aff. of Dupre].)

### 3. Military Service

Despite Hummel's learning disability, he was identified for service in the intelligence division. Hummel was tasked with plotting troop movements and building terrain models for combat exercises, a job that matched his passion for fantasy games. He was stationed at Camp Pendleton in Oceanside, California. Friends back home in South Carolina noted that Hummel seemed proud to be in the military, happy with his life, and the most physically fit he had ever been. (Ex. 29 [Military Records]; Ex. 6 at ¶¶17-18 [Aff. of Brown].)

Hummel also made strong friendships in the military. Hummel's roommate, Wayne "Buddy" Matthias, who was also in the intelligence division, introduced Hummel to his friends, Fred Emmer and Efrain Chaidez. The four became close friends, spending most of their daily free time and weekends together. Although they each had different personalities and backgrounds, they connected. Like the others, Hummel used the military to start a new identity and new life and leave his South Carolina past behind him. (Ex. 14 at ¶¶2-4 [Aff. of Wayne Matthias]; Ex. 9 at ¶¶2-3 [Aff. of Fred Emmer]; Ex. 7 at ¶¶2-4 [Aff. of Efrain Chaidez].)

Hummel was quiet and shy at first, but he got more comfortable and outgoing as time went on. His friends felt he did well in the Marines and was a dependable guy, who had their back. He was generous, friendly, and stayed out of trouble. (Ex. 14 at ¶4 [Aff. of Matthias]; Ex. 7 at ¶¶5-7 [Aff. of Chaidez]; Ex. 9 at ¶¶3-4 [Aff. of Emmer].)

As time went on, Hummel's friends noticed that he began copying their mannerisms, dressing like they did, and even getting tattoos like them. Hummel was like a "chihuahua" following around bigger dogs. Even as he acted like his

19

**App. 0038**

**33**

friends, it was clear he felt like an outsider trying to fit in. His friends had to sit him down and tell him that he had to stop copying them and that he needed to become his own person. (Ex. 14 at ¶8 [Aff. of Matthias]; Ex. 9 at ¶9 [Aff. of Emmer].)

The group often drank and went to strip clubs during their free time. Hummel became particularly absorbed with going to strip clubs and made friends with the staff at the clubs. He tried to show the strippers he cared for them, offering to escort them out of the bars and getting mad at anyone who mistreated them. However, Hummel was not a "ladies' man" and never actually dated the strippers, or any other women. Hummel interpreted the attention he got at the strip clubs as meaningful, when in fact these relationships were more in Hummel's mind than in reality. Similarly, Hummel was still obsessed with role-playing games and fantasy, to such an extent that his friends felt he was disconnected from reality and dodging real life. (Ex. 14 at ¶¶6-7 [Aff. of Matthias]; Ex. 7 at ¶¶8-9 [Aff. of Chaidez]; Ex. 9 at ¶¶5, 7 [Aff. of Emmer].)

Although Hummel had gotten fit upon entering the Marines, over time he gained weight and was labeled what the Marines called a "Fat Body." The Marine Corps method was to break down its members and build them into the Marine ideal, which did not include being overweight. Those who were overweight were put on a management program. This also meant that they could not get promoted, even though promotions were usually automatic based on how long someone served. As a result, Hummel kept missing promotions and saw younger men get promoted above him even though he had been there longer. (Ex. 9 at ¶10 [Aff. of Emmer]; Ex. 14 at ¶5 [Aff. of Matthias].)

In addition to impacting his promotions, Hummel's weight made him the object of ridicule among fellow Marines. He was bullied by others in his company, and given a hard time by his supervisors. Even his friends teased him,

20

**App. 0039**

**34**

calling him a "Fat Body" and "teddy bear." (Ex. 7 at ¶10 [Aff. of Chaidez]; Ex. 9 at ¶10 [Aff. of Emmer].)

In the spring of 2000, all three of Hummel's friends left Camp Pendleton. Chaidez was transferred to San Diego to attend school, while Matthias and Emmer were discharged. As a result, Hummel was left with two more years of service without his close friends and support group. Not long after they were discharged, Matthias and Emmer received a call that Hummel had attempted to go AWOL, but his truck had broken down in Arizona. Matthias and Emmer picked Hummel up and brought him back to the base. He told them that he was stressed and that he could not handle the military without the support of his friends. (Ex. 14 at ¶¶8-9 [Aff. of Matthias]; Ex. 9 at ¶¶11-14 [Aff. of Emmer]; Ex. 7 at ¶12 [Aff. of Chaidez].)

Because he had left the base without authorization, Hummel was restricted to the base and his security clearance was taken away. This meant he could no longer do intelligence work and was assigned menial tasks. He was distraught about losing his security clearance. He was no longer the friendly, outgoing person his friends had known. He finished the remainder of his time in the Marines and was discharged back to South Carolina. His friends from high school noticed that he was no longer fit, assertive, confident, and proud the way he had been when he joined the military. He seemed brooding and less jovial. It seemed like he had lost the sense of belonging that he had once had. (Ex. 14 at ¶10 [Aff. of Matthias]; Ex. 9 at ¶¶13-14 [Aff. of Emmer]; Ex. 7 at ¶13 [Aff. of Chaidez]; Ex. 6 at ¶19 [Aff. of Brown].)

### 4. Adult Years

Hummel returned home to South Carolina after his military discharge, bringing with him the pregnant homeless girl Letti Ulbright. For a brief time, Hummel held a stable job at the factor where his father worked and lived with

21

**App. 0040**

**35**

Ulbright as though they were a family. However, after Hummel's sister Neata sent Ulbright away from him, Hummel began to drift, moving from temporary job to temporary job. His friends noticed that he now smoked and drank a lot, which he had not done before the military. Hummel also went frequently to strip clubs. Whereas before his time in the military Hummel occasionally visited a strip club, now it was a "way of life" for him. These trips to strip clubs replaced his role-playing games. Hummel took the attention from strippers seriously. He would act like the strippers were interested in him and wanted relationships. Hummel seemed like he was living in a fantasy world, out of touch with reality, spending much of his time watching movies and at strip clubs. (Ex. 30 [Hummel Employment Records]; Ex. 8 at ¶9 [Aff. of Dupre]; Ex. 6 at ¶¶20-23 [Aff. of Brown].)

Hummel started dressing in dark, gothic clothing and listening to "hard" music. He started spending time romantically with a woman he had known in high school, Shana Fowler, but would periodically disappear for a while and then show back up suddenly, with no explanation. (Ex. 6 at ¶¶24-25 [Aff. of Brown]; Ex. 10 at ¶¶7-8 [Aff. of Fowler].)

One day he simply stopped hanging around his friends altogether. When his friends looked for him, they were told he had moved to another town in South Carolina, and even then they could not find him. Hummel ultimately moved to Texas to live with his cousin. Before he left, one night he visited Fowler and gave her son some collectible figurines that he had kept pristine in their original packaging. Fowler felt it was unusual for Hummel to give up his collectibles. He spoke about moving to Texas, but had no plans or purpose. (Ex. 6 at ¶26 [Aff. of Brown]; Ex. 10 at ¶9 [Aff. of Fowler].)

When Hummel arrived in Texas, his extended family members noticed that he had changed. They felt that Hummel was not the same person as he had been

22

**App. 0041**

**36**

growing up. He was no longer the same active, fun kid that his uncle Thomas Hamilton had known in South Carolina. (Ex. 12 at ¶¶19-20 [Aff. of Hamilton].)

In very short succession after moving to Texas, Hummel began dating Joy Bedford, she became pregnant, they married, and Joy gave birth to Jodi Hummel. Hummel got work at the Williamson-Dickey clothing factory. Less than a year later, however, Hummel injured his back at work, causing him to take medical leave and undergo multiple surgeries. Over the next several years, Hummel required significant medical care and was unable to work. (Ex. 30 [Hummel employment records]; Ex. 25 [Hummel medical records].)

Hummel's lack of employment caused his family substantial financial problems. A neighbor remembers helping Hummel to seek VA benefits from the military. Hummel's wife worked long hours as a massage therapist and would tell their neighbor, George Goodson, about how hard times were for the family. Goodson gave the family a computer and sold them one of his cars to help out. In addition to his back injury Hummel developed Crohn's disease, which further debilitated him. Ultimately, finances got so bad that Goodson helped Hummel and his family move into Joy's father's home. (Ex. 11 at ¶¶2-8 [Aff. of George Goodson].)

The Hummels attended a Sunday school class at Shady Oaks Baptist Church in Hurst, Texas, where they met Chris and Tonya Paris. The families became close friends and their kids frequently played together. Chris Paris remembers that Hummel and Joy had opposite personalities, with Joy being social and outgoing while Hummel was very quiet and reserved. Hummel was friendly, though, and would cook meals for parties—even though he could not eat the meals because of the special diet required by his Crohn's disease. Hummel tried to interact with people and appeared to be a good father to Jodi. (Ex. 16 at ¶¶2-3 [Aff. of Christopher Paris]; Ex. 17 at ¶¶2-3 [Aff. of Tonya Paris].)

23

**App. 0042**

**37**

Hummel would share facts of his life with others, but never opened up about his feelings or problems. Chris Paris knew that Hummel had been in the military, but Hummel never talked about what that experience had been like for him. Hummel also never opened up about the impact of his medical problems and how his pain bothered him. (Ex. 16 at ¶¶4-5 [Aff. of Chris Paris].)

The Parises knew of the Hummels' financial problems and that Hummel had been unemployed for a long time. Joy worked very hard, even going to friends' houses after work to give massages and getting home very late. The Parises helped out when they could, including fixing Hummel's roof so that they could get house insurance. Chris Paris also helped fix Hummel's truck and paid for a down payment on a van when the truck later was in an accident. (Ex. 16 at ¶¶6-7 [Aff. of Chris Paris].)

Hummel, his family, and his friends were very excited in 2009 when Hummel was able to get work as a night security guard. The job seemed to pull Hummel out of a slump and gave him pride. A drawback to the job, though, was that Hummel was not around his family and friends as much, since he worked nights. He began missing church and other social events. (Ex. 16 at ¶8 [Aff. of Chris Paris].)

This separation, and a strained marriage, led Hummel to begin an affair in late 2009. His friends could tell there were tensions between Hummel and Joy. The Parises tried to offer their support to help Hummel and Joy repair their marriage. A month before the crime occurred, at a church conference, Joy spoke to Tonya Paris about the strain between her and Hummel. When Hummel picked up Joy from the conference, Chris Paris could tell there was something wrong between them. (Ex. 17 at ¶4 [Aff. of Tonya Paris]; Ex. 16 at ¶9 [Aff. of Chris Paris].)

24

**App. 0043**

**38**

When the crime occurred and the word of it spread, Hummel's friends were shocked and surprised. People that grew up with him in South Carolina, his military friends, and his newest friends in Fort Worth felt the crime was out of character for the Hummel they knew. No one ever experienced any anger or violence from Hummel. When his military friends heard that Hummel had traveled back to California after the crime, it seemed to them that Hummel was "chasing 1999" and trying to get back to a place where he was happy. (Ex. 19 at ¶9 [Aff. of Patterson]; Ex. 13 at ¶8 [Aff. of Jeter]; Ex. 7 at ¶14 [Aff. of Chaidez]; Ex. 14 at ¶11 [Aff. of Matthias]; Ex. 9 at ¶15 [Aff. of Emmer]; Ex. 11 at ¶9 [Aff. of Goodson]; Ex. 17 at ¶5 [Aff. of Tonya Paris]; Ex. 16 at ¶10 [Aff. of Chris Paris].)

## III.
## STANDARD OF CARE

### A. Ineffective Assistance of Trial Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Hummel must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

**39**

To establish deficiency, Hummel must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688). A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393–94 (2005) (O'Connor, J., concurring) (*citing Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1482 (2010) (ABA Standards "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA Standards for Criminal Justice] as "guides to determining what is reasonable."'") (quoting *Wiggins*, 539 U.S. at 524). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Hummel's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at

26

**App. 0045**

**40**

the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ("ABA Guidelines") and the ABA Standards for Criminal Justice (3d ed. 1993) ("ABA Standards"); *see also* State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21, 2006) ("Texas Guidelines").

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Pursuant to the ABA Guidelines, counsel was required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines, Guideline 10.7. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the ABA Standards state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." ABA Standards, Standard 4-4.1 (emphasis added); Texas Guidelines, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or

27

**41**

statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guidelines, Guideline 10.10.1. The CCA holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d at 400–01 (Cochran, J., concurring).

To establish prejudice, Hummel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94). Hummel need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

**42**

**App. 0047**

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "[i]t is unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence.]" *Id.* The Texas Court of Criminal appeals "[has] adapted the Supreme Court's prejudice test to require that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

## B. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are governed by *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

**43**

An appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza v .State*, 206 S.W.3d 684, 689 (Tex. Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error").

## IV.

## ARGUMENT

## CLAIM ONE

### HUMMEL WAS DENIED HIS DUE PROCESS RIGHT TO AN IMPARTIAL JURY WHEN JUROR DAVIS COMMITTED MISCONDUCT BY AUTOMATICALLY VOTING FOR DEATH

Some constitutional rights are so basic to a fair trial that their denial can never be treated as harmless error. *Chapman v. California*, 386 U.S. 18, 23 (1967). "The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right to a trial before an impartial jury."). And the violation of this right, like the violation of the right to counsel and the right to an impartial judge, undermines the integrity of the trial itself and necessitates a reversal without a showing of prejudice. *Rose v. Clark*, 478 U.S. 570, 578 (1986) (Harmless error analysis "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."); *Irvin*, 366 U.S. at 722 ("The failure to accord an accused a fair hearing violates even the minimal standards of due process.").

During jury selection for Hummel's capital trial, Juror Davis agreed that he would not vote for a death sentence before hearing and considering evidence presented at the punishment phase of Hummel's trial. He affirmed this by taking the juror's oath. Yet prior to the conclusion of the guilt/innocence phase evidence

**App. 0049**

**44**

presentation, Juror Davis made up his mind not only to find Hummel guilty, but also to vote for a death sentence. Because of this misconduct, Hummel was denied his constitutionally protected, due process right to be tried before an impartial jury. As such, his sentence violates applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and should therefore be reversed.

### A. Legal Standard

"From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials *before impartial tribunals* in which every defendant stands equal before the law." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) (emphasis added). The very nature of the voir dire process is designed to seat jurors who are fair, open-minded, and unbiased. Each juror selected swears to abide by and fulfill certain oaths, duties, and admonitions. These promises include, among other things, that each juror will pay close attention and consider all of the evidence admitted by the court. (33 RR at 10-11.) When any juror violates these promises, either intentionally or inadvertently, the defendant's Sixth Amendment right to a trial by an impartial jury is threatened. *See United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010) ("Under the Sixth Amendment, every defendant has the right to trial by an impartial jury. Deliberations prior to the close of evidence threaten that impartiality.") (internal citations omitted).

To be considered an impartial jury in a capital case, jurors must not simply meet typical standards regarding biases and prejudices; they must also be able to consider whether evidence presented by the defense is mitigating. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.").

31

**45**

**App. 0050**

"[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original) (plurality opinion); *accord Abdul-Kabir v. Quarterman*, 550 U.S. 233, 234 (2007). The corollary that "the sentencer *may not refuse to consider* . . . relevant mitigating evidence" is equally "well established." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (emphasis added; internal quotations omitted).

Furthermore, *each* juror individually must be able to consider mitigating evidence, since "[t]he measure of a jury is taken by reference to the impartiality of each, individual juror." *Morgan*, 504 U.S. at 734 n.8. The importance of this focus on individual jurors is highlighted by the vast amounts of time and resources that are spent on individualized voir dire in capital cases. *Cf. Gideon*, 372 U.S. at 344 (noting that "reason and reflection" indicate the obvious need for appointed counsel because "[g]overnments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime.").

A juror who does not consider the evidence presented by the defendant during the punishment phase of trial, but instead automatically votes for death based on a finding of guilt, commits misconduct and violates the defendant's due process rights. *Morgan*, 504 U.S. at 735 ("[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law.").

**App. 0051**

**46**

**B. Juror Davis Automatically Voted for Death Based on Testimony During the Guilt/Innocence Phase Evidence**

Juror Davis was individually questioned on May 19, 2011. (22 RR at 150.) Davis was accepted by both sides to be seated as a juror in Hummel's trial. Along with the other jurors, he was sworn in on June 13, 2011, and took an oath that he would consider all evidence and pay close attention throughout the trial. (*Id.* at 10.) Additionally, the oath stated, "You must not be influenced in any degree by any personal feeling of sympathy for or prejudice against the State or the Defendant in this case, for each is entitled to the same fair and impartial consideration." (*Id.* at 13.) Juror Davis also stated several times throughout his individual voir dire that he would render a verdict based on the law and evidence of the case and set his feelings aside. (*See, e.g.*, *id.* at 162.)

During post-conviction habeas investigation, however, juror Davis revealed that he had not followed his promises to counsel or his oath. Davis met with a post-conviction investigator and discussed his participation in Hummel's trial. Davis revealed that he had not considered any of the evidence presented during the punishment phase of trial. Instead, Davis stated:

> The turning point for me was during the guilt phase when the woman Hummel had an affair with testified. At that point I made up my mind and decided Hummel should get the death penalty. There is nothing his attorneys could have said that would have made a difference to me.
> After deciding Hummel should get the death penalty, the rest of the trial felt like a formality. We answered the punishment phase questions, but my mind was already made up.

(Ex. 22 at ¶¶ 4-5 [Aff. of Juror Davis].)

In making these statements, Davis revealed that he had violated his oath, deciding Hummel's guilt and automatically assigning a death sentence before the conclusion of the prosecution's evidence at the guilt/innocence phase.

**App. 0052**

**47**



## C. Juror Davis's Misconduct Entitles Hummel to a New Trial

Juror Davis made his decision that Hummel was guilty and deserved a death sentence *prior* to the conclusion of evidence during the guilt/innocence phase. Therefore, his decision to find Hummel guilty was based solely on a partial presentation of the State's evidence. When Davis was sworn in at the beginning of the trial, he received the following instruction from the trial court: "Since you will need to consider all the evidence admitted by me, it is important that you pay close attention to the evidence as it's presented." (33 RR at 10-11.) The trial court further reminded jurors in the charge that "it is your sworn duty to follow all of the rules of law as I explain them to you." (4 CR at 709.) In several locations throughout the charge jurors were instructed on their duty to make a determination as to the defendant's guilt "after careful and impartial consideration of all the evidence in the case." (4 CR at 710, 717.) Juror Davis clearly disregarded all of these instructions when he determined Hummel's guilt prior to hearing all of the evidence in the case.

Jurors who prematurely decide guilt in a case reach conclusions most likely unfavorable to the defendant before the defense has a chance to present its case or the court has the opportunity to properly instruct the jury. When jurors form premature conclusions about a case, the burden of proof will have been, in effect, shifted from the State to the defendant, who then has "the burden of changing by evidence the opinion thus formed." *York*, 600 F.3d at 357 (quoting *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993). Therefore, requiring a juror to consider all of the evidence in the case prior to making a determination of guilt protects a defendant's Sixth Amendment right to a fair trial as well as his due process rights and insures the burden remains on the State to prove the case beyond a reasonable doubt.

**48**

**App. 0053**

Juror Davis's refusal to consider all evidence prior to making a determination of guilt denied Hummel the right to an impartial jury for the guilt/innocence phase. As such, Hummel's conviction should be reversed and he should be afforded a new trial.

### D. Juror Davis's Misconduct Entitles Hummel to a New Punishment Phase

Independently, because Juror Davis's decision was made prior to the presentation of any evidence at the punishment phase, he was constitutionally impaired from being an impartial juror during the punishment phase. *Morgan*, 504 U.S. at 729 ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do").

Automatically voting for death after a finding of guilt essentially erases the State's burden to prove beyond a reasonable doubt that a defendant will be a continuing threat to society. Further, it signifies that the juror has refused to consider any of the evidence presented during the punishment phase that might mitigate against a death sentence. *Skipper*, 476 U.S. at 4 (noting that a "sentencer may not refuse to consider" mitigation evidence).

As such, Hummel was denied his right to an impartial jury during the punishment phase of his trial. *Cf. Munroe v. State*, 637 S.W.2d 475, 478 (Tex. Crim. App. 1982) (recognizing that a defendant is denied a fair and impartial trial when a single juror increases punishment based on impermissible discussion of parole law); *Bennett v. State*, 738 S.W.2d 33, 34 (Tex. App.—Texarkana 1987, no pet.) (finding defendant was denied right to trial by impartial jury when evidence revealed that the jury determined sentence before hearing evidence on punishment). Because of this, his sentence of death should be vacated.

## E. Conclusion

Juror Davis's decision to convict Hummel before the end of the guilt/innocence presentation, and his subsequent refusal to hold the State to their burden for the future dangerousness special issue or to consider mitigating evidence presented during the punishment phase of trial, violated the oath he took as a juror and denied Hummel his core constitutional right to twelve impartial jurors. *Parker v. Gladden*, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."). The presence of a juror who automatically assigned the death penalty violated Hummel's due process rights. *See Morgan*, 504 U.S. at 727 ("The failure to accord an accused a fair hearing violates even the minimal standards of due process."). Thus, Hummel's conviction and sentence are unconstitutional and cannot be carried out. *Id.* at 729 ("If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence."). His conviction and sentence of death should be reversed.

## CLAIM TWO

### HUMMEL'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO ARGUE THAT THE STATE'S EVIDENCE WAS INSUFFICIENT TO SHOW FUTURE DANGER

The evidence presented by the State during the punishment phase regarding Hummel's potential for future acts of violence can only be described as marginal. Hummel had no criminal record and no history of disciplinary incidents while in custody before trial. The State failed even to present anecdotal evidence that Hummel had committed any type of aggressive or violent actions in his childhood, teenage years, or adult life, before the days leading up to the crime. The prosecution relied almost exclusively on the facts of the crime as aggravating

**50**

evidence. Yet, those facts were insufficient to suggest Hummel had any probability of committing violent acts in the future.

As such, the prosecution's evidence was legally insufficient for a jury to find beyond a reasonable doubt that there was a probability Hummel would be a future danger. *Jackson*, 443 U.S. at 316 ("no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."). However, neither trial nor appellate counsel argued this to the Court. Because counsel failed to argue that the evidence was insufficient, Hummel's rights were violated under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. His death sentence should be reversed.

### A. Relevant Facts

The prosecution's presentation at the punishment phase of trial regarding Hummel's likelihood of violence focused almost entirely on Hummel's actions surrounding the crime. Kennedale Police Department investigator James Rizy testified that Hummel had attempted to poison his family two days before the crime occurred. (41 RR at 8-31.) Besides the crime itself, this was the only act of violence or even attempt at violence the prosecution pointed to in Hummel's past. The remainder of the State's punishment case consisted of testimony regarding Hummel's trips to strip clubs and viewing of pornography, his use of marijuana and other drugs, and that Hummel was a below average employee. (*See* 42 RR at 5, 23, 72, 95, 109.) In rebuttal to the defense's punishment presentation, the State called two military servicemen to testify that Hummel was a below average Marine, who was counseled for going to strip clubs and whose security clearance was revoked. (*See* 45 RR at 6, 32.)

App. 0056

**51**

In closing argument, the prosecution described Hummel as a "monster" and an "animal," stating that he was a future danger because of his attempt, and then murder of, his family. (45 RR at 59, 62-64, 85-87.)

## B. The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding That There Was a Probability That Hummel Would Commit Future Acts of Violence

Although the CCA has held that the facts of a particular crime and the circumstances surrounding it can support a finding of future dangerousness, it does not follow that the underlying facts alone in all cases will provide such support. *See, e.g., Valle v. State*, 109 S.W.3d 500, 503 (Tex. Crim. App. 2003). For example, in *Wallace v. State*, the defendant was found guilty of capital murder in the course of a robbery and sentenced to death. 618 S.W.2d 67, 68 (Tex. Crim. App. 1981). The State's only evidence regarding whether the defendant would commit future violent acts was the defendant's own admission on cross-examination that he had attempted a robbery a few weeks before the murder, and that the defendant had a military violation for being absent without leave. *Id.* at 68-69. According to the CCA, "[t]here was no other evidence presented that could be considered relevant to the issue of future violent conduct. Specifically, there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence." *Id.* at 69. The CCA found the evidence of future violent conduct to be legally insufficient, and reformed the defendant's punishment to life imprisonment. *Id.*

Similarly, in *Berry v. State*, the defendant was found guilty of murdering her infant son and sentenced to death. 233 S.W.3d 847, 850-51 (Tex. Crim. App. 2007). Evidence at punishment showed that Berry had abandoned one of her other children as well. *Id.* at 861. The State argued that because there was a possibility, albeit a slim one, that she could become pregnant in prison, she posed a danger to

38

**App. 0057**

**52**

any hypothetical future children. *Id.* at 862, 864. The CCA held that the evidence indicated that the defendant had only ever been dangerous to two of her children, and had not "harmed or attempted to harm any of her other children, an unrelated child, or any other person." *Id.* at 864. Because there was a very low probability she would have any more children, the Court found it unlikely that she would be a future danger, and reformed her sentence to one of life imprisonment. *Id.*

The fact patterns of *Wallace* and *Berry* mirror the evidence presented during Hummel's punishment phase. Besides the underlying crime itself, the only other evidence of violence the State introduced was Hummel's thwarted attempt to poison his family shortly before the murders. As in *Wallace*, "there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence" presented by the State. 618 S.W.2d at 69. The rest of the State's case at punishment consisted of testimony that Hummel frequented strip clubs, occasionally used illicit drugs, and looked at pornography on a computer at work. While these behaviors may not have painted Hummel in the most flattering light, these prior acts are legally insufficient to support a finding that there is a probability that Hummel would commit future acts of criminal violence. *See also Beltran v. State*, 728 S.W.2d 382, 390 (Tex. Crim. App. 1987) (defendant's multiple convictions for drunk driving were not criminal acts of violence and thus did not support a finding of future dangerousness); *Keeton v. State*, 724 S.W.2d 58, 60-61, 64 (Tex. Crim. App. 1987) (prior conviction for possession of marijuana and uncooperativeness during probation were not sufficient for a finding of future dangerousness); *Wallace*, 618 S.W. 2d at 68-69; *Warren v. State*, 562 S.W.2d 474, 477 (Tex. Crim. App. 1981) (a prior felony theft conviction was insufficient to sustain a finding of future dangerousness).

Further, Hummel was found guilty of killing his family, but this was the only violent or criminal act proved beyond a reasonable doubt before the jury.

39

**App. 0058**

**53**

Like the defendant in *Berry*, had Hummel received a sentence of life without parole there is no possibility he would have the opportunity to start a family, or undergo the familial and financial stressors he was experiencing at the time of the crime. (*See* Ex. 1 at ¶59 [Aff. of Dr. Susan Hardesty].) As such, *Berry* clearly establishes that a rational jury would have necessarily entertained a reasonable doubt as to whether Hummel was a future danger solely on the basis of his crime.

## C. Trial and Appellate Counsel Were Ineffective for Failing to Argue That The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding of Future Dangerousness

Despite the lack of evidence of future dangerousness presented by the State, and the precedential cases of *Wallace* and *Berry*, neither trial counsel nor appellate counsel raised a claim that the State's evidence of future dangerousness was insufficient to support the jury's verdict. Counsels' failure to argue this point was objectively unreasonable. *Ex parte Santana*, 227 S.W.3d at 704-05 (noting that appellate counsel, like trial counsel, is held to a *Strickland* standard of professional responsibility). If "a rational jury would have necessarily entertained a reasonable doubt as to the probability of [an] appellant's dangerousness in the future," the trial court's judgment must be changed to one of life imprisonment. *Berry*, 233 S.W.3d at 860. Hummel's sentence should be vacated and reformed to life in prison, or remanded for a new punishment phase of trial.

## CLAIM THREE

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL WAS NOT A FUTURE DANGER

The first of two questions the Hummel jury had to answer following the punishment phase was "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." (CR at 726.) The State had the burden of proving beyond a reasonable doubt that the answer to this question was "Yes." (*Id.*) Trial counsel, however,

40

**54**

was ineffective for failing to present available evidence that would have convinced the jurors to answer this question "No," thereby guaranteeing a life sentence for Hummel. *See Jurek v. Texas*, 428 U.S. 262, 274-75 (1976) ("prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system."); ABA Guidelines, Guideline 10.11 (commentary), ("Studies show that 'future dangerousness is on the minds of most capital jurors, and is thus at issue in virtually all capital trials,' whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration." (internal quotation marks omitted)).

Counsel failed to present affirmative evidence in the form of lay witnesses, expert witnesses, jail records, and criminal background records that would have rebutted the State's assertion that Hummel was a "future danger." Trial counsel could and should have elicited testimony from several Officers at the Tarrant County Jail, who would have testified that Hummel was not classified as "High Risk," that Hummel got along with officers and other inmates, and that Hummel was not aggressive or threatening. Though counsel did present testimony from a prison classification expert, counsel also should have presented testimony from a behavioral or mental health expert to discuss how Hummel's personality and past history indicated that it was unlikely that he would commit future acts of criminal violence.

Trial counsel's failure to present evidence that would have convinced the jury that Hummel was not a future danger was objectively unreasonable and Hummel suffered prejudice. Because Hummel's rights under the state and Federal Constitutions, state statutory, and United States Supreme Court and state case law were violated, Hummel is entitled to a new punishment phase trial.

**55**



### A. Trial Counsel's Performance Was Unreasonable for Failing to Present Evidence That Hummel Was Not a Future Danger

During the punishment phase, trial counsel called Frank AuBuchon, a former Texas Department of Criminal Justice ("TDCJ") classifications officer, to educate the jury about the prison system in Texas, including how inmates were classified and the various security features of TDCJ prisons. (44 RR at 34, *passim.*) AuBuchon did not meet or interview Hummel, but testified in broad terms that Hummel would do well in the prison system based on his good behavior in county jail and his military record. (*Id.* at 73.) However, trial counsel did not admit any records relating to Hummel's time in the Tarrant County jail nor his time in the military.

The presentation of a prison classification expert alone, without any further evidence that Hummel as an individual would have not posed a danger in the future, fell short of offering relevant evidence to the jury's determination of the first special issue. The CCA has stated that the future danger special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). While it is "theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, . . . incapacitation is not the sole focus of the Legislature or of our death penalty precedents." *Id.* at 269. Thus, although AuBuchon could offer evidence that the TDCJ system would be able to minimize any risk of danger from Hummel, this testimony did little to address the more important question of whether there was any likelihood that Hummel posed a danger in the future. Instead, trial counsel should have presented readily available lay and witness testimony that would have addressed this question, as discussed below.

**App. 0061**

**56**

**B. Hummel Was Prejudiced by Trial Counsel's Failure to Present Readily Available Evidence That Hummel Would Not Constitute a Future Danger to Society**

Had trial counsel thoroughly investigated the matter of whether Hummel was a future danger, counsel would have discovered several sheriff's officers at the Tarrant County jail who could have testified to Hummel's good behavior during his time in custody before and during trial. Additionally, trial counsel should have employed an expert witness to discuss why Hummel's past behavioral patterns and mental health status indicated that he would likely not be a future danger in a prison setting. Trial counsel's failure to investigate and present this evidence was unreasonable and objectively deficient.

**1. Behavior in Tarrant County Jail**

Inmates who have had disciplinary problems during previous periods of incarceration are more likely to commit future acts of criminal violence in prison. *See* Mark D. Cunningham et al., *Serious Assaults on Prison Staff*, 39 J. CRIM. JUSTICE 143, 147 (2011). Common sense suggests the opposite then to be true. As such, trial counsel should have presented testimony from witnesses with personal knowledge of Hummel's good behavior in the Tarrant County jail, as well as jail records that confirm the same.

New inmates are sorted into classifications upon arrival at the Tarrant County jail according to their respective risk level. (Ex. 20 at ¶2 [Aff. of Tommy Rigmaiden].) "High Risk" inmates wear red uniforms and general population (or low risk) inmates wear green uniforms. (Ex. 26 at 6 [Tarrant County Jail Dress Code Policy]; Ex. 20 at ¶¶2-4 [Aff. of Rigmaiden].) Inmates are classified as "High Risk" if they are deemed to be assaultive, an escape risk, or high profile due to the nature of the charges or the inmate's community status. (Ex. 27 at 5-6 [Tarrant County Jail Risk Policy].) Any time a "High Risk" inmate leaves their cell, they are placed in handcuffs and leg irons and accompanied by two officers.

43

(Ex. 27 at 6 [Tarrant County Risk Policy]; Ex. 20 at ¶3 [Aff. of Rigmaiden].) Low risk inmates are not restrained outside their cells and are only accompanied by one officer. (Ex. 20 at ¶4 [Aff. of Rigmaiden]; Ex. 4 at ¶6 [Aff. of Cody Bell].) Low risk inmates are functionally equivalent to a general population inmate in a state prison setting. (Ex. 20 at ¶4 [Aff. of Rigmaiden].)

Hummel was not categorized as a "High Risk" inmate during his incarceration at Tarrant County jail. Detention Officer Tommy Rigmaiden, of the Tarrant County Sheriff's Office, remembers Hummel wore a green suit for the period of time before and during his trial.[3] (Ex. 20 at ¶5 [Aff. of Rigmaiden].) Tarrant County Sheriff's Officer Cody Bell also would have testified that, as a low profile and low risk inmate, Hummel wore a green suit. (Ex. 4 at ¶6 [Aff. of Bell].)

Tarrant County Sheriff's officers also would have testified that Hummel was quiet and respectful in his interactions with jail staff. Officer Rigmaiden saw Hummel in the jail every day for a two-year period, remembering him as "quiet and reserved." (Ex. 20 at ¶6 [Aff. of Rigmaiden].) Officer Bell reported that every time he interacted with Hummel, Hummel was pleasant and outgoing. (Ex. 4 at ¶3 [Aff. of Bell].) Hummel and Officer Bell shared a more personal connection, as they both had served in the military. Id. Occasionally the two would talk about their experiences in boot camp, and the mental and physical rigors of military service. Id. Tarrant County Sheriff's Officer Rory Thomas would have testified that Hummel was quiet, speaking only to the officers when he needed something and otherwise would not bother anyone. (Ex. 21 at ¶4 [Aff. of Rory Thomas].)

---

[3] In Tarrant County, after an inmate receives a death sentence, they are automatically classified as "High Risk" regardless of prior classification. (Ex. 27 at 6 [Tarrant County Risk Policy].)

App. 0063

**58**

Most importantly, officers from the Tarrant County jail would have testified that Hummel was never a threat to officers, jail staff, or other inmates. Hummel never gave officers any problems or trouble and was very compliant with the jail rules, as evidenced by Hummel's lack of any disciplinary infractions during his pretrial and trial incarceration in Tarrant County. (Ex. 4 at ¶4 [Aff. of Bell]; Ex. 20 at ¶8 [Aff. of Rigmaiden]; Ex. 21 at ¶3 [Aff. of Thomas]; Ex. 28 at 2 [Tarrant County Sheriff's Office Letter].) Hummel was not assaultive or aggressive towards officers or other inmates, and he got along well with other inmates. (Ex. 4 at ¶¶4, 7 [Aff. of Bell]; Ex. 20 at ¶9 [Aff. of Rigmaiden]; Ex. 21 at ¶5 [Aff. of Thomas].) Several officers would have testified that they believed there was no danger that Hummel would be violent in prison in the future, and that he would have adjusted well to a general population setting in prison. (Ex. 4 at ¶8 [Aff. of Bell]; Ex. 20 at ¶9 [Aff. of Rigmaiden].)

This testimony would have provided the jury with highly persuasive evidence that Hummel was not likely to be a future danger if sentenced to a term of life without the possibility of parole. Hummel had no history of violent or criminal actions prior to this crime, and similarly had no disciplinary problems while in jail custody awaiting his trial. In making the claim that Hummel was a future danger, the State argued that if he could kill his family, he could do anything if given the chance in prison. (*See* 45 RR at 86.) However, this assertion is contradicted by the two years Hummel spent in a general population jail setting. Classified as a low risk inmate, Hummel was subject to less stringent security controls and had greater access to other inmates. Yet, in two years of custody, Hummel did not have a single disciplinary infraction and was described as "a model inmate," never behaving aggressively or engaging in assaultive behavior. There is a reasonable probability that, with this testimony, Hummel's jury would have voted "No" to the first special issue resulting in a life sentence.

45

## 2. Mental Health Expert

Because expert witness testimony is one of the most powerful tools an attorney can use to present their case, trial counsel should have presented a mental health expert to explain how Hummel's past patterns of behavior and mental status did not support a finding that he would be a future danger. *See Coble*, 330 S.W.3d at 268. Had trial counsel retained such an expert, such as Dr. Susan Hardesty (*see* Claim Seven, *post*), the following testimony could have been presented.

There are several factors to indicate that there is a low risk of Hummel committing future acts of violence in a prison setting. Hummel did not have a significant history of violence prior to the crime, and his coping mechanism for significant stressors was passive acceptance, denial, and retreat into fantasy games, movies or books. In a prison setting, Hummel would be unlikely to encounter the severe stressors that plagued him prior to the crime, namely familial and financial stress. For the rest of his life, Hummel would be in a contained, restricted environment in which his primary needs would be met, but he would not encounter relational and attachment issues. (Ex. 1 at ¶59 [Aff. of Dr. Hardesty].)

Testimony from an expert would have provided particularly credible evidence to the jury regarding Hummel's likelihood of future acts of violence. *Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) ("An appellant's potential for being a future danger is a question of fact which the jury must answer. Furthermore, this Court has previously recognized that testimony from mental health experts is relevant to that issue." (internal citation omitted)). Trial counsel's failure to provide such testimony to the jury prejudiced Hummel's trial.

## C. Conclusion

If jurors had heard testimony from the three Tarrant County sheriff's officers and an expert witness, as discussed above, there is a reasonable probability that at least one juror would not have found Hummel to be a future danger. Testimony

46

**60**

from officers who personally supervised Hummel during his time in jail would have been highly persuasive. Moreover, testimony from an expert witness explaining why Hummel's personality, behavior patterns and mental health made it unlikely Hummel would be a future danger would have been invaluable in convincing a jury to vote "No" on the first special issue.

Trial counsel's failure to present testimony from corrections officers and a mental health expert constituted deficient performance that was not reasonable under prevailing professional norms. *See Williams*, 529 U.S. at 395-96 (counsel ineffective for failing to uncover and present evidence of, inter alia, defendant's good conduct in prison); ABA Guidelines, Guideline 10.11 (commentary) (citing *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) as holding that "evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does 'not relate specifically to petitioner's culpability for the crime he committed.'"). Because there is a reasonable probability that at least one juror would have found the information presented through these witnesses negated the State's theory that Hummel would present a continuing threat to society, Hummel is entitled to a new punishment phase. *See Wiggins*, 539 U.S. at 536.

## CLAIM FOUR

### TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT EXPERT TESTIMONY REGARDING HUMMEL'S LIFE HISTORY

During the punishment phase, trial counsel presented testimony from lay witnesses about Hummel's childhood in South Carolina. As discovered in post-conviction investigation, trial counsel could and should have presented a complete narrative of Hummel's life, including testimony from lay witnesses about other periods in Hummel's life. (*See* Claim Five, *post*.) Further, however, trial counsel failed to present an expert witness to explain the full narrative of Hummel's life

47

**App. 0066**

**61**

story. Such an expert could have drawn connections for the jury between the life events Hummel experienced and the behaviors he later exhibited. Under applicable professional norms for capital counsel, trial counsel's failure to hire such an expert constitutes deficient performance. *See Strickland*, 466 U.S. at 688; ABA Guidelines, Guideline 10.11(F)(2) (retaining a social historian can facilitate compliance with the requirement in the ABA Guidelines of presenting "insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability."); *see also* ABA Supplementary Guidelines for the Mitigation Function of Defense Team in Death Penalty Cases, Guideline 10.11, 36 HOFSTRA L. REV. 677, 689-90 (2008) (hereinafter "ABA Supplementary Guidelines"). This failure prejudiced Hummel's applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Legal Standard

Since *Wiggins v. Smith*, defense attorneys in capital cases have been on notice as to the necessity of performing a wide-ranging investigation into their client's life history. 539 U.S. at 510. Defense attorneys now regularly retain mitigation specialists as part of the defense team, who review records and meet with witnesses, gathering and weaving the bare facts of the client's life into a compelling narrative. ABA Guidelines, Guideline 10.7 (commentary) (noting that a "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); ABA Supplementary Guidelines, Guideline 10.4(A) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

**62**

**App. 0067**

However, it is not enough to simply gather the facts of a defendant's life story and then present it through lay witness testimony. An expert should also be retained to synthesize that information into a coherent psycho-social narrative for presentation to the jury. *See* ABA Guidelines, Guideline 10.11 (commentary) (noting the importance of presenting "the client's complete social history" at punishment); *see also* ABA Supplementary Guidelines, Guideline 10.11. Such an expert then uses their particularized expertise relevant to the defendant to present the social history developed by a mitigation specialist in a cohesive narrative. John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4, 10 (Aug. 1995) ("[P]ersuasive expert testimony must . . . enable the jury to see the world from your client's perspective, i.e., to appreciate his subjective experience.").

Like any subject matter that warrants an expert opinion, here, the defendant's life story must be explained to the jury in a way that illuminates why it is relevant to moral culpability. It is not sufficient to present a parade of witnesses discussing the defendant's history—an expert must also be hired to give that life history context.

> . . . In other words, you have to give the fact-finder a view of the crime from the defendant's perspective. If you don't, you run the risk of making your client seem "otherly," frightening and thus expendable. What you strive for is to enable the fact-finder to look through your client's eyes and to walk, at least for a few minutes, in his shoes.

*Id.*

## B. Counsel Should Have Presented the Testimony of an Expert to Explain Hummel's Social History

In Hummel's case, trial counsel were clearly aware of the importance of utilizing expert witness testimony, as they presented an expert to speak to Hummel's mental health (*but see* Claim Seven, *post*), as well as an expert to discuss the prison classification system. (*See* 44 RR at 34-116.) Had counsel similarly performed a sufficient investigation and presentation of Hummel's social history, they would have been able to retain the services of a social history expert witness, such as social worker Laura Smith.

Ms. Smith received her Masters of Science in Social Work from the University of Texas at Austin and is currently employed by the Travis County Health and Human Services division. In her position she supervises a team of social workers who provide support services to families at various community centers operated by Travis County. She has over a decade of experience providing counseling and care to incarcerated individuals and their families, as well as to at-risk youths. She holds an Advanced Practitioner license from the Texas State Board of Social Worker Examiners and is an adjunct faculty member at the University of Texas at Austin. (Ex. 2 at ¶¶1-3 [Aff. of Laura Smith].)

If Ms. Smith had been consulted by Hummel's trial counsel, she could have provided an explanation to the jury of how Hummel's life history shaped the person he became later in life. As Ms. Smith explains, "All of us are a product of our life experiences and social history. To understand how a person comes to take certain actions in life, one must look at what elements of his life were brought to bear on that decision. Often what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past." (Ex. 2 at ¶8 [Aff. of Laura Smith].)

**64**

Particularly, after reviewing testimony and affidavits provided by those closest to Hummel, as well as his various medical, educational, and military records, Ms. Smith would have explained how Hummel's early development started him down a path resulting in Hummel being "nearly incapable of forming close and intimate relationships" and "leading to a total inability to manage multiple stressors such as loss of income, multiple medical illnesses, and emotional stress/fatigue." (Ex. 2 at ¶9 [Aff. of Laura Smith].) Beyond merely a medical diagnosis that portrayed Hummel as having negative and dangerous traits (*see* Claim Seven, *post*), the jury would have learned the following about Hummel's development as a child and how the resulting impairments rose to the surface throughout his life.

### 1. Childhood

#### a. Early Childhood Development

Hummel's parents did not provide a stable, supportive environment in Hummel's early childhood. His father was abusive and overly obsessed with guns and violence. His mother was also not a nurturing figure, showing greater interest in her own life and friends, rather than her children. Hummel lacked much of the love and concern one would expect from parental figures. To a large degree, he was cared for and raised by his sister, who was only nine years older than he. However, as a child herself, Neata was incapable of providing for the physical and emotional needs of a baby. (Ex. 2 at ¶¶10-13 [Aff. of Laura Smith].) The lack of this nurturing was fundamentally damaging to Hummel's development as a person. Ms. Smith notes:

> Erik Erikson's widely accepted theory of "identity development" posits that there are eight stages an individual goes through during their development. At each stage, there is a critical conflict, which requires a healthy resolution to create a new quality in self. For example, at infancy, the crisis is trust versus mistrust. A baby cries and, if its needs are attended to and it is nurtured, the baby leaves the

51

> stage of infancy having developed a sense of trust in its caregivers and in the world. If the baby is neglected, or needs are ignored, the baby moves into toddlerhood with a sense of fear and mistrust of caregivers and the world at large. Erikson's research suggests that trust and identity formation are the key ingredients to a healthy development of self and identity.

(*Id.* at ¶8.) In Hummel's case, he did not experience the attachments to his parental figures that would have allowed him to form feelings of trust and a secure self and identity. Hummel's uncle, another substitute caregiver in his early life, witnessed Hummel's lack of social development. Hummel appeared to be afraid to interact with others and afraid of failing in front of people. Empirical evidence shows "that children who do not securely attach with an adult early in their social development grow up to experience attachment problems in adulthood, especially an extreme sensitivity to rejection." (*Id.* at ¶¶17-18, 21.)

The consistent theme heard from family and friends who knew the Hummels was that the household lacked the normal displays of affection and love. Underneath the family's façade of normalcy was an apparent lack of care and concern for Hummel and his sister. Hummel's "needs were not consistently met, and . . . [a]ppropriate caring relationships were not modeled." Attachment theory states that infants "grieve and mourn when an appropriate maternal attachment is not formed." The lack of parental care, replaced by substitute caregivers, meant that Hummel lacked a "'blueprint' for how to create intimacy and close relationships." Hummel, therefore, "never formed appropriate love relationships or became capable of adult attachments," deficits which had "serious impacts on his ability to form relationships throughout the rest of his life and his ability to relate and empathize with others." (Ex. 2 at ¶¶18-23 [Aff. of Laura Smith].)

Moreover, Hummel's exposure to abuse further impaired his development and put him at risk for serious psychiatric disorders. In addition to impacting brain

development physically, studies show that "80% of adults who had been physically abused as children met the diagnostic criteria for at least one psychiatric disorder by age 21." Such disorders include depression and posttraumatic stress disorder. Also, "[a] child's exposure to overly mature sexual content or a child's direct experience with sexual abuse can interrupt attachment patterns as well as create disturbances in the creation of a true identity or sense of self. . . . According to a National Institute of Justice study, abused and neglected children were 11 times more likely to be arrested for criminal behavior as a juvenile, 2.7 times more likely to be arrested for violent and criminal behavior as an adult, and 3.1 times more likely to be arrested for one of many forms of violent crime." (Ex. 2 at ¶¶30-31 [Aff. of Laura Smith].)

### b. Formative Years – Child to Young Adult

As he grew up, Hummel's developmental impairments frustrated his ability to attach to others. He physically isolated himself from others and did his best to avoid attention. Despite his efforts, he was frequently teased and bullied by classmates. Because of a learning disability, he struggled to do well in school. When he did make friends, Hummel had trouble appropriately interacting with his peers. He would interrupt conversations with random, immature comments and believe comments he made were funny even if no one else understood them. (Ex. 2 at ¶¶32-40 [Aff. of Laura Smith].)

"Because [Hummel] never formed secure attachments, he also never formed a solid sense of self. Identity is built around emotional development and relationships with others." Based on Erikson's theory of psychosocial development, from age six to eleven Hummel should have been negotiating a crisis of "Industry versus Inferiority." "If a child succeeds academically, feels competent and supported, they exit this stage in a state of Industry." Instead, Hummel,

"entered pre-adolescence in a state of total inferiority without social supports or parental love and connection." (Ex. 2 at ¶43 [Aff. of Laura Smith].)

These deficits compounded as Hummel entered his teenage years. "A young person successfully navigates adolescence by establishing an identity—defined by individuation and unique qualities, but also by connection to groups and associations with others—therefore entering adulthood with a solid sense of self. A young person not completing this stage successfully . . . enters adulthood confused, extremely sensitive to rejection, and with a weak or non-existent sense of self." Hummel's inability to attach appropriately to others and his feelings of inferiority led him to be easily influenced by his peers. Friends were able to manipulate Hummel and take advantage of a clear desire on his part to have more meaningful relationships. As a result of Hummel's eagerness to please others, his peers came to have "widely disparate impressions" of him. Hummel himself failed to develop a clear sense of his own identity. (Ex. 2 at ¶¶41-42, 44-45 [Aff. of Laura Smith].)

Although Hummel "instinctually kept trying to reach out and connect," all he received in return was "continuous abuse, neglect, bullying, or confusion." This desire to connect but inability to succeed was likely "extremely frustrating" and "potentially rage building." (Ex. 2 at ¶46 [Aff. of Laura Smith].)

c. Teenage Years

Leading into Hummel's teen years, this lack of attachment and absence of clear identity led Hummel to seek alternate fulfillment and means of escape from his reality. Hummel became absorbed with movies, video games, and especially role-playing games like Dungeons and Dragons. In these games, Hummel created characters that had special abilities and who could interact with other fictional characters. (Ex. 2 at ¶¶47-48 [Aff. of Laura Smith].)

However, Hummel exhibited his psychological impairments in the way he played these games. While most players would create one character at a time,

Hummel had several. Hummel would constantly change aspects of his characters, mimicking the attributes of his friends' characters. Hummel would also consistently be forced to abandon his characters and create new ones because his characters had become too complex for his own abilities to play them. (Ex. 2 at ¶¶49-50 [Aff. of Laura Smith].)

Hummel's reliance on these games for escape meant that he had difficulty putting the games down, often attempting to play when his friends wanted a break or at inappropriate times. He would also reminisce afterwards about games they had played. Hummel did not seem to always know the line between reality and fantasy. (Ex. 2 ¶¶51-52 [Aff. of Laura Smith].)

This blurring of reality and fantasy came to bear on the one significant romantic relationship Hummel experienced during high school. Before ever having a date, Hummel told a girl he loved her. Hummel became overly attached both to her and her family, spending weekends and holidays with them. Yet, as his girlfriend began to pull away, Hummel continued to believe they would stay together and ultimately get married. When the girlfriend ended the relationship, Hummel was completely surprised and hurt. (Ex. 2 at ¶¶53-55 [Aff. of Laura Smith].)

As Hummel ended his young adult years, graduating from high school and entering the adult world, he was left with "feelings of rejection and failure and an urge to escape." These feelings "only further served to limit his social skills and keep him disconnected from others." The impacts of the psychological impairments Hummel experienced as he grew up became a "self-fulfilling prophecy—his fears of not being able to connect and therefore being rejected, led to his odd behavior, bullying, and a further and further sense of isolation." (Ex. 2 at ¶56 [Aff. of Laura Smith].)

55

**App. 0074**

**69**

## 2. Adulthood

Hummel's entrance into the adult world brought with it all the feelings of isolation, rejection, and failure he had experienced as a child, but with the addition of a new found responsibility to react to those feelings. At first, Hummel enjoyed a brief success—living in his own apartment with a steady job at a music company's warehouse. However, Hummel struggled to live independently and pay his bills. When his apartment was broken into, his parents insisted that he return back home to live with them. (Ex. 2 at ¶¶57-59 [Aff. of Laura Smith].)

Rather than return to his parents, however, Hummel chose what his friends saw as an impulsive and surprising alternative, joining the United States Marine Corps. Leaving his family and friends behind, Hummel essentially "wiped the board clean" of his life and escaped to a completely new identity as a Marine. This action completed the cycle that would become a fixture in Hummel's adult life: a brief period of success followed by a recurrence of his childhood feelings of failure, rejection, and a desire to escape, to which Hummel would react by impulsively and dramatically fleeing from the source of these feelings. (Ex. 2 at ¶¶60, 114 [Aff. of Laura Smith].)

### a. Military Service

Upon entering the military, Hummel initially thrived both in his duties and in his personal connections. He was based in Oceanside, California, and was selected for the intelligence division, where he worked on strategy and planning war games. He made three close friends, with whom he spent most of his days and weekends. Hummel formed a new identity with these other men, adopting their mannerisms, dress, and even tattoos. His friends noted how, like them, he seemed to be starting a new life in the military. And when on leave and back in South Carolina, his friends there saw a change in Hummel, who was more physically fit, happy, and proud. (Ex. 2 at ¶¶61-65, 70 [Aff. of Laura Smith].)

**70**

However, Hummel carried with him to the military his interest in fantasy games and problems separating reality from fiction. Through his new friends, he began frequenting strip clubs. His friends remember Hummel spending his free time at the clubs, getting to know the staff and strippers, and even acting as though he had personal relationships with the women. And in his intelligence duties, he was given sensitive information and made maps and plans that reminded him of his role-playing games. Even to outside observers Hummel appeared to be dodging real life. (Ex. 2 at ¶¶66-68 [Aff. of Laura Smith].)

Consistent with his life pattern, Hummel's success in the military began to decline and was replaced by rejection, failure, and isolation. Over time, Hummel had gained significant weight and was less physically fit. In the Marines, this both made him the target of ridicule and prevented his promotion. Then, in the early part of 2000, Hummel's three friends were transferred or discharged from the military. This meant that he lost his closest friends and the support network they created for him. As Hummel struggled to adapt to this loss, his feelings of failure returned. He briefly went absent without leave ("AWOL") and, though he returned to the base, he was stripped of his security clearance and lost his intelligence job. (Ex. 2 at ¶¶72-78 [Aff. of Laura Smith].)

The loss of Hummel's friends was significant, "especially since he had struggled so much to form any meaningful relationships at all and had finally felt he was competent and successful, proud and happy—only to have it all start to unravel." The loss was "compounded to an even greater degree as [Hummel] lost his intelligence job and security clearance, knew his superiors were disappointed in him and felt they could not trust him, and was relegated to mundane work." Hummel finished his military service having lost the sense of pride he once felt and instead again "feeling a very strong sense of rejection and failure." (Ex. 2 at ¶¶77, 79, 83 [Aff. of Laura Smith].)

**App. 0076**

**71**

### b. Return to South Carolina

As he was leaving the military, Hummel met a group of homeless youth in his trips to strip clubs. Again attempting to form connections, Hummel would buy these individuals food and hotel rooms to sleep in. He began a relationship with one young woman name Letti Ulbright, who was pregnant. When Hummel returned to South Carolina and was discharged, he took Letti with him and started a new identity. "They were like a family" and this "represented a new life for [Hummel], a new chance at success." Hummel was now "in the role of 'man of the house' and trying to do the right thing by a woman in need, even though he was not the baby's father." It was "another attempt by [Hummel] at connection and an effort at being in the role he thought he was supposed to have." (Ex. 2 at ¶¶80-85 [Aff. of Laura Smith].)

However, once again Hummel's brief success turned to failure and his "attachments and relationships were severed." After Ulbright gave birth, Hummel's sister Neata orchestrated sending Ulbright back to California, supposedly because Ulbright was not good for Hummel. "Neata's involvement in orchestrating [Ulbright]'s departure shows her role as more of a maternal than sibling figure to [Hummel], and also demonstrates an over-involvement and inappropriate role with [Hummel]. The episode would have further cemented [Hummel]'s negative experience with family attachments, creating hostility and sensitivity. It also continued a pattern that led [Hummel] to desire escape from his current life situation." (Ex. 2 ¶87 [Aff. of Laura Smith].)

In the absence of Ulbright, Hummel drifted, looking for a way to escape. He took temporary jobs, continued visiting strip clubs, and began drinking and smoking heavily. His high school friends noted how Hummel acted like the strippers were his girlfriends and that he seemed to be living in a fantasy world. Hummel stopped hanging out with his friends and eventually moved to Texas

**72**

**App. 0077**

without telling many people where he was going. (Ex. 2 at ¶¶88-96 [Aff. of Laura Smith.])

By this point in Hummel's adult life, Erickson's theory of development would suggest he was struggling with the crisis of Intimacy versus Isolation. Hummel's inability to form real, lasting relationships drove him further into isolation. "Once again, when faced with failure and his own inability to live independently in relationship to others, [Hummel] 'wiped the board clean,' abandoning all his friendships and moving away unexpectedly. This impulsive conduct fell squarely within the patterns of behavior [Hummel] had developed over the course of his life whereby he reacted to stress by escaping and attempting to start a new life, a new identity, functionally a 'new game.'" (Ex. 2 at ¶97 [Aff. of Laura Smith].)

### c. Texas

Shortly after moving to Texas, Hummel began a relationship with Joy Bedford. The relationship moved quickly, with Joy becoming pregnant and the couple marrying only a few months into the relationship. Hummel got a job at a clothing manufacturer's warehouse and his daughter Jodi was born less than a year after he had moved to Texas. Despite the rapidity with which Hummel adopted his new life as father and husband, Hummel experienced one of his longest episodes of success over the next year. (Ex. 2 at ¶¶98-99 [Aff. of Laura Smith].)

However, like all prior episodes of success, this too began to crumble. While working at the warehouse, Hummel tripped over a box and injured his back, requiring multiple surgeries. Over the next several years, Hummel was unable to work, suffering severe back pain, a diagnosis of Crohn's disease[4], and multiple

---

[4] Chron's disease is "a type of inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. John's case was severe enough to warrant surgery: an upper duodenal resection. The surgery

**App. 0078**

**73**

medical procedures. Hummel's family suffered financially. They depended on help from friends and eventually moved into Joy's father's house. Hummel's marriage soured, with Hummel again feeling like a failure as he received pressure from his wife and father-in-law to provide for his family. Although Hummel was eventually able to return to work after four years of severe medical problems, the work was menial and did little to improve his family's financial situation. (Ex. 2 at ¶¶99-105 [Aff. of Laura Smith].)

Again Hummel fixated on a desire to escape. He briefly entered a romantic relationship with Kristi Freeze, a clerk he met at a convenience store. Like his previous romantic relationships, though, Hummel believed the relationship was serious just as Freeze was ending the relationship. Their relationship, which Hummel perceived as an escape from his real life, ended shortly before the crime. Following the crime, Hummel took a further act of disconnection and escape, driving back to California, the place he had experienced his closest connections and greatest success. (Ex. 2 at ¶¶106-10 [Aff. of Laura Smith].)

## C. The Failure to Present an Expert to Explain Hummel's Social History Prejudiced His Trial

Trial counsel's failure to present the testimony of an expert witness like Laura Smith prejudiced Hummel's capital trial by failing to explain to the jury why his life story mitigated his actions. At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability. Moral culpability acknowledges an elementary psychological reality—

---

involved removing a part of the bowel and reconnecting the remaining pieces. This type of surgery is debilitating due to the fact that there is a period when one cannot eat and then a slow advancing of diet. Typically, a single abdominal surgery of this kind requires a minimum of six months of recovery time to return to full functioning. Multiple surgeries take proportionately longer for a person to feel fully well." (Ex. 1 at ¶30 [Aff. of Dr. Hardesty].)

60

**App. 0079**

**74**

that people do not arrive at their choices from the same path. Thus, it follows that the degree of "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice. Indeed, mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added). Thus, a jury's understanding of the evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense. Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION (Aug. 1985) ("[E]xplain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime.").

Had Ms. Smith testified, the jury would have learned that "Hummel's life has been deeply impaired by the lack of appropriate nurturing and attachment he experienced as a child." In Ms. Smith's opinion:

> This lack of attachment impacted the way [Hummel] relates to the world and how he acts in it. As a child [Hummel] spent most of his time isolated and alone, and was neglected emotionally by his parents, thereby making it nearly impossible to learn how to form relationships with other people, outside of fantasy games. As a result, [Hummel] is unable to solve problems in real life versus escaping to fantasy. He has a tendency to run away or disappear when things get difficult, without a clear understanding of what the consequences might be for those actions.

(Ex. 2 at ¶¶111-12 [Aff. of Laura Smith].) Hummel's experiences in joining the military, during his military service, his relationships in South Carolina, his move to Texas, and his life in Texas illustrate the pattern Hummel's life took: brief success, then failure, and, because he cannot cope or adapt to his problems, an overwhelming desire to escape. (Ex. 2 at ¶¶113-14 [Aff. of Laura Smith].)

61

**75**