have a moral, ethical, or religious problem judging an individual and could answer the two special issues in a way that would lead to a death sentence if supported by the evidence. (24 RR at 230, 252.)

### 3. Prospective Juror Dennis

Dennis, a forty-four-year-old African American male, was questioned individually on June 1, 2011. (Ex. 36 at 3 [Dennis Questionnaire]; 29 RR at 5.) He answered questions from both sides during his individual voir dire before the State used its twelfth peremptory challenge to remove him from the jury. (29 RR at 50.) Trial counsel did not object to the State's striking of Dennis.

During Dennis's individual voir dire and on his questionnaire, he indicated that he believed in the death penalty and thought it should be used about as frequently as it had been previously. (Ex. 36 at 6 [Dennis Questionnaire]; 29 RR at 13.) Dennis indicated that whether a person should receive the death penalty depended on the circumstances of the crime. (29 RR at 13.) Throughout the process of questioning, Dennis stated several times that he could answer both special issues in a way that would result in a death sentence as long as the evidence was there. (*Id.* at 23-24, 44.) He also stated that he did not have any moral, ethical, or religious objection to judging another person. (*Id.* at 33.)

### D. Comparative Juror Analysis

An analysis of answers provided by prospective jurors Gonzales, Williams, and Dennis during their individual voir dire and on their questionnaires reveals that they provided responses similar to several non-minority venire members accepted by the State. This indicates that the State's use of peremptory challenges for Gonzales, Williams, and Dennis was racially motivated. *See Miller-El*, 545 U.S. at 241.

As discussed in the previous section, all three individuals believed in the death penalty. On their questionnaires, Gonzales and Williams both summarized

142

**156**

**App. 0161**

their death penalty beliefs as, "I believe that the death penalty is appropriate for all crimes involving murder." (Ex. 38 at 6 [Gonzales Questionnaire]; Ex. 41 at 6 [Williams Questionnaire].) On his questionnaire, Dennis indicated "I believe that the death penalty is appropriate for some crimes involving murder, and I could return a verdict which assessed the death penalty in a proper case." (Ex. 36 at 6 [Dennis Questionnaire].) A large number of State-accepted white panelists shared the same belief, including several who ultimately served on the jury. (See, e.g., Ex. 32 at 6 [Armstrong Questionnaire]; Ex. 33 at 6 [Base Questionnaire]; Ex. 34 at 6 [Cantrell Questionnaire].)

Additionally, Williams and Dennis both answered that they believed the death penalty should be used as a punishment for crime about as frequently as it has been previously. (Ex. 41 at 6 [Williams Questionnaire]; Ex. 36 at 6 [Dennis Questionnaire].) Although Gonzales answered he thought it should be used "less frequently," he explained during his individual questioning that his answer was based on the belief that prisoners were locked up "alone." (Ex. 38 at 6 [Gonzales Questionnaire]; 16 RR at 106-07.) Many of the white panelists accepted by the State answered identically to Williams and Dennis, including several who ultimately served on the jury. (See, e.g., Ex. 32 at 6 [Armstrong Questionnaire]; Ex. 33 at 6 [Base Questionnaire]; Ex. 34 at 6 [Cantrell Questionnaire]. In fact, two white jurors who were accepted by both sides and served on the jury believed the death penalty should be used "less frequently." (Ex. 37 at 6 [Ferianc Questionnaire]; Ex. 39 at 6 [Olson Questionnaire].)

Furthermore, the three minority panelists in question were not more strongly in favor of life without parole as a sentence than white panelists accepted by the State. When describing their view on life in prison without parole, both Gonzales and Williams agreed that life would be "appropriate in all cases of capital murder." (Ex. 38 at 5 [Gonzales Questionnaire]; Ex. 41 at 5 [Williams Questionnaire].)

143

Several other white panelists the State did not exercise a strike on, including one who served on the jury, also stated life without parole is "appropriate in all cases of murder." (*See, e.g*, Ex. 39 at 5 [Olson Questionnaire].)

Based on their willingness to consider the death penalty as discussed above, and further answers provided during individual voir dire, all three prospective minority jurors were open to considering both the death penalty and life without parole. Their answers indicated that they did not have a bias for either the State or the defense. A large number of State-accepted white panelists provided similar answers, including many who ultimately served on the jury. (*See, e.g.*, Ex. 32 at 5-6 [Armstrong Questionnaire]; Ex. 33 at 5-6 [Base Questionnaire]; Ex. 34 at 5-6 [Cantrell Questionnaire].)

### E. Deficient Performance and Prejudice

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." ABA Guidelines, Guideline 10.8 (Commentary) (citing Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43). Trial counsel violated this important duty by failing to raise a *Batson* challenge when the State used three peremptory challenges to remove minority prospective jurors Gonzales, Williams, and Dennis. In fact, trial counsel failed to raise any objections to the removal of these three jurors. As such, the State was not required to provide a race-neutral reason for its removal of prospective jurors Gonzales, Williams, and Dennis, making the task of comparative juror analysis, and appellate review, much more difficult.

A close analysis of these three prospective jurors indicates that their qualifications and opinions were similar to those of white venire members accepted by the State. Trial counsel had possession of each panelist's juror questionnaire and was present for all of the individual voir dire sessions. Counsel should have

**158**

been aware that Gonzales, Williams, and Dennis were similarly situated to white panelists accepted by the State. Indeed, based on the answers provided by the three minority prospective jurors during their individual voir dire, it appears that they fell right in the middle of the road when expressing their views on the death penalty and life without parole. The striking similarity of their answers with many State-accepted white panelists should have been observed by trial counsel to reveal the State's discriminatory motive behind its peremptory challenges to prospective jurors Gonzales, Williams, and Dennis.

Trial counsel's failure to object to a racially discriminatory peremptory strike was objectively unreasonable performance.[18] As discussed in the previous section, prospective jurors Gonzales, Williams, and Dennis were similarly situated to other accepted jurors in terms of their qualifications and opinions regarding the death penalty. There is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left Hummel with a constitutionally-infirm jury; a malady that can only be remedied by a new trial. *See Robbins*, 528 U.S. at 285; *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d at 329-30.

## CLAIM TWELVE

### HUMMEL'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING

The "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

---

[18] To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them. *See Robbins*, 528 U.S. at 285.

**159**

less than death." *Lockett*, 438 U.S. at 604 (emphasis in original, footnote omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."). Texas' statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of this Constitutional mandate. Therefore, Hummel's death sentence violates his applicable state and federal Constitutional rights, as well as state statutory law, United State Supreme Court case law, and state case law, and should be vacated.

### A. The Texas Statute and Hummel's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute instructs that a trial court shall submit at least two issues to the jury: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. Tex. Code Crim. Proc. Art. 37.071 §2 (b)(1), (e)(1).

Regarding this second special issue, the trial court shall also instruct the jury that if the jury finds a circumstance warranting life, the court will sentence the defendant to life in prison and the defendant will be ineligible for parole. *Id.* at §2 (e)(2)(A-B). Further, the court instructs that the jury must answer this question "Yes" or "No," that it may not answer "No" unless unanimous or "Yes" unless ten

146

**160**

or more jurors agree, and that the jurors need not agree on the particular evidence that is mitigating. *Id.* at §2 (f)(1-3).

Along with these procedural instructions, the Texas statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's *moral blameworthiness*." Tex. Code Crim. Proc. Art. 37.071 §2 (f)(4) (emphasis added). No further definition of "moral blameworthiness" is provided. Neither are there further instructions regarding the relationship of this instruction to the dictates of the special issue itself.

As directed by the statute, the trial court in Hummel's case gave the statutorily required instructions during the punishment phase of trial before the jury retired to deliberate. (4 CR at 727.) Specifically, the court instructed the jury to answer Special Issue Number 2: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." (*Id.* at 727.) In addition, the court admonished the jury that in answering Special Issue Number 2, "You shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." (*Id.* at 727.)

## B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and Warrant a Life Sentence

The Supreme Court has long required that a jury "must be permitted to 'consider fully' . . . mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir*, 550 U.S. at 260. Each juror must have broad

147

**161**

discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the State approves as mitigating. *Tennard*, 542 U.S. at 285 ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations omitted); *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Furthermore, the avenues of mitigation open to a capital jury are not, and must not be, limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."); *Hodge v. Kentucky*, __ U.S. __, 133 S. Ct. 506, 506 (2012) (Sotomayor, J., dissenting from denial of cert.) ("Mitigation evidence need not, and rarely could, 'explain' a heinous crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead."). For example, the Supreme Court has upheld the mitigating potential of evidence that an inmate has adjusted well in prison leading up to his trial. *Skipper*, 476 U.S. at 4-5.

In *Skipper*, the Court considered evidence that the defendant wished to present from two jailers and a visitor that the defendant had "made a good adjustment" in jail. *Id.* at 3. The Court noted that "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id.* at 4-5 (quoting *Lockett*

148

**162**

*v. Ohio*, 438 U.S. at 604.). Thus, such evidence could not "be excluded from the sentencer's consideration." *Id.* at 5.

Importantly, the Court noted that evidence regarding Skipper's adjustment in prison "would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4; *Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."). Yet the Court found that it could "hardly be disputed" that this evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Skipper*, 476 U.S. at 4, 7 ("[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination.").

Like the defendant in *Skipper*, Hummel presented to the jury evidence regarding his background and character as mitigation evidence. Some of this evidence related to the conceptualization of mitigation expressed in *Wiggins* that "defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less *culpable*." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*) (emphasis added). However, other evidence—*i.e.*, that Hummel had been a Marine—bore no specific link to his legal or moral blameworthiness for the crime in question. Rather, such evidence offered compelling argument that, although legally and morally to blame for the crime, Hummel was a worthwhile person who was not deserving of a death sentence. Just as much as evidence that Hummel's mental health or background contributed to the crime, this type of evidence held equal potential for jurors to weigh and decide it mitigated Hummel's overall deservingness of being executed. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) ("[S]o long as the class of murderers subject to capital punishment is

**163**

**App. 0168**

narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant."). However, based on the language of Texas' statute, it is unclear how any evidence of a positive character and worthwhile life, as opposed to a "disadvantaged background," would be given effect by the jury.

Because of the statutorily mandated instruction, the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to Hummel's "moral blameworthiness." For any of Hummel's jurors to have given full effect to evidence they found warranted a sentence of life, but that did not reduce Hummel's blameworthiness for the crime, the juror would have had to violate their instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001). Because, "[w]e generally presume that jurors follow their instructions," there is a reasonable probability that the result of Hummel's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### C. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Hummel's trial, the jury was prohibited from giving effect to any mitigation evidence that did not meet a narrowed category of evidence, unconstitutionally limiting their ability to give that reasoned moral response. *Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

The Supreme Court previously upheld the validity of the Texas death penalty statute "on the basis of assurances that the special issues would be

150

**164**

interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry v. Lynaugh*, 492 U.S. at 318. Since that time, repeat warnings have been,

> issued from th[e] Court regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death.

*Brewer v. Quarterman*, 550 U.S. 286, 296 (2007).

In this case, the application of the Texas death penalty statute impaired Hummel's rights to have *all* mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence. *Penry v. Lynaugh*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced."). Therefore, Hummel's death sentence should be reversed.

### CLAIM THIRTEEN

### HUMMEL'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY

Because of the prosecutorial discretion established under Texas' system of administering criminal justice, a vast minority of Texas counties are responsible for a sizable majority of death sentences assessed over the last thirty-six years. Both geographic and racial disparities have created a system of capital punishment in Texas that punishes, not based on the heinousness of a defendant's crime, but on the irrelevant factors of where he lives and what races were involved in the crime. Hummel's capital sentence was handed down in the midst of this arbitrary system. As such, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Hummel's sentence of death violates his applicable state and federal Constitutional rights, as well as state

151

**165**

statutory law, and United States Supreme Court and state case law and should be vacated.

### A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

The United States Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."). The Court briefly suspended the death penalty in *Furman v. Georgia* during the 1970s based on this heightened standard. 408 U.S. 238 (1972) (per curiam). The Court rested its decision on the basis that the lack of guidance and narrowing in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

Following *Furman*, the Court has been careful to weigh a death penalty sentencing scheme to determine whether there are suitable safeguards to prevent the arbitrary assignment of death. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case"). In finding mandatory death sentencing unconstitutional, the Court noted that juries will often refuse to convict defendants because they are deterred from automatically sentencing someone to death. *Id.* at 302. "Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly." *Id.* at

**166**

303. Instead, a death penalty scheme must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Id.*

In 1976, the Court believed States had developed an answer to the *Furman* test that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). The Court held that procedural reforms—such as a bifurcated trial, narrowing of death eligible crimes, and proportional appellate review—"focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant" preventing it from "wantonly and freakishly impos[ing] the death sentence." *Id.* at 206-07.

Even those procedures, however, continue to be reviewed for their effectiveness in preventing the arbitrary assessment of death. *Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980) (reviewing the application of Georgia's aggravating factor that a crime be "outrageously or wantonly vile, horrible or inhuman"). When it can be said that "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," a state's death penalty scheme can no longer be said to be imposing a death sentence "based on reason rather than caprice or emotion." *Id.* at 433.

### B. Texas' Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas' death penalty statute in *Jurek v. Texas* in 1976. 428 U.S. at 273-74 ("[T]he Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death."). The Court found that Texas' narrowing of death eligible crimes and

**App. 0172**

bifurcation of the guilt/innocence and penalty trials would likely ensure "the evenhanded, rational, and consistent imposition of death sentences under law." *Id.* at 276. However, even this judgment has been the subject of repeated review to ensure that the practical effect of Texas's system is not the creation of an arbitrary assignment of death. *See, e.g., Penry v. Lynaugh*, 492 U.S. at 328 (invalidating Texas' statute for failing to instruct juries they may consider mitigating evidence); *Penry v. Johnson*, 532 U.S. at 804 (invalidating Texas' supplemental instruction on mitigation for failing to sufficiently provide a jury the mechanism to consider mitigation evidence).

Were a court to review the state of the death penalty in Texas today, it would find much the same "lightning strike" phenomenon that was found unconstitutional in *Furman*. In 2011, Texas had 1,089 murders. Tex. Dep't of Pub. Safety, *Index Crime Analysis 2011, available at* http://www.txdps.state.tx.us/crimereports/11/citCh3.pdf (last visited on May 28, 2013). Yet, only eight death sentences were assessed by Texas juries in 2011. Tex. Dep't Crim. Justice, *Offenders on Death Row, available at* http://www.tdcj.state.tx.us/stat/dr_offenders_on_dr.html (last visited on May 28, 2013). Further, the number of death sentences assessed throughout the state has declined significantly over the three decades. (*Id.*) Despite being the "capital of capital sentencing," the numbers show that even in Texas a death sentence is becoming increasingly rare as a utilized punishment.

Although Texas juries continue to be guided by the special issues under Texas law in making a judgment in an individual capital case, there are other factors at work that mean that Texas' system no longer functions as an "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

**168**



## 1. Geography

Since 1976, there have been 780 offenders that either have been executed or are currently housed on death row in Texas. Tex. Dep't Crim. Justice, *Death Row Information, available at* http://www.tdcj.state.tx.us/death_row/index.html (last visited May 22, 2013). Yet only 119 out of the 254 counties in Texas have contributed an offender to that list.[19] *Id.* Seven counties (Bexar, Dallas, Harris, Jefferson, Nueces, Smith, and Tarrant) accounted for nearly eighty percent of these offenders. *Id.* Five additional counties (Cameron, El Paso, Lubbock, Montgomery, and Travis) accounted for another ten percent. *Id.*

Texas is not alone in this phenomenon. Multiple studies conducted throughout the country have identified geographic discrepancies with the imposition of the death penalty within a particular state.[20] *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. 389 (2010) (discussing studies in Arizona, Pennsylvania, Missouri, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty* (March 2009), *available at* http://works.bepress.com/adam_gershowitz/5/ (last

---

[19] Only 119 counties of the 254 have ever sentenced an inmate to death, including people who are no longer on death row, making up the over 1000 inmates that have received a death sentence in Texas since 1976. Tex. Dep't Crim. Justice, *Number of Offenders Sentenced to Death From Each County, available at* http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited May 22, 2013).

[20] This, of course, says nothing of the geographic discrepancy identified *between* the various states that assess the death penalty. *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL OF RIGHTS J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique. The result is that-not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty-significant discrepancies exist among the death penalty jurisdictions.").

**169**

visited September 20, 2012). In one study, the authors found that over a four year period in Missouri, seventy-six percent of cases charged as either murder one, murder two, or involuntary manslaughter met the statutory definition to be eligible for the death penalty. Katherine Barnes et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-11 (2009). However, only five percent of those ever faced a death penalty trial. *Id.* at 309. As a result, prosecutors throughout the state made the decision not to seek death in seventy-one percent of death eligible cases. *Id.* This discretion was not spread evenly, though, as prosecutors in St. Louis City and Jackson County charged capital cases far less frequently (6.5 percent of cases) than prosecutors in the rest of the state (20 percent). *Id.* at 344.

A commission created to study the death penalty in New Jersey similarly noted concern about "the existence of variability among counties in the application of the death penalty." New Jersey Death Penalty Commission Report at 43 (Jan. 2007) available at http://www.njleg.state.nj.us/committees/dpsc_final.pdf (last visited May 26, 2012). The commission considered a hypothetical where:

> The exact same case of a killing occurs in neighboring counties. All of the circumstances are the same. In one county the defendant is capitally prosecuted, is subject to a penalty trial, and is subject to the ultimate outcome of death. In the other county the defendant is not so treated; either through a plea bargaining or other processes he receives a penalty that is much less harsh.

*Id.* Although the facts of the hypothetical could be attributed to multiple factors, the commission was "troubled by the degree to which the geographic location where the crime was committed appears to affect the ultimate disposition of the case." *Id.*

In *Jurek* and in *Gregg*, the Supreme Court considered the issue of whether prosecutorial discretion in choosing which cases to seek the death penalty created

156

**170**

App. 0175

an impermissible arbitrariness in capital sentencing. *Gregg*, 428 US. at 199; *Jurek*, 428 U.S. at 274 ("we reject it for the reasons set out in our opinion today in *Gregg*"). The Court determined that this decision-making worked to remove defendants from the risk of death and did not violate the constitution, as long as the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg*, 428 U.S. at 199. Justice White, in his concurrence, noted that the decision of prosecutors would likely mirror that of juries in deciding which cases to seek death based on the seriousness of the offense.

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

Experience of the last thirty-six years has shown that the practical effect of the use of prosecutorial discretion has not been to narrow the field of death eligible defendants to the most serious and heinous cases. It stretches credulity to imagine that the seven counties in Texas that are responsible for nearly eighty percent of the inmates executed or currently on death row correspondingly have significantly more heinous crimes occurring than other counties. Rather, other factors like ideological beliefs regarding the death penalty, the depth of experience in prosecuting capital cases, and the available resources (both time and money) to prosecute a capital case impact a prosecutor's decision whether the seek the death penalty. *See* Gershowitz, *Statewide Capital Punishment*, at 11-15 (noting various times prosecutor offices have declined to pursue the death penalty because of available resources).

**171**

**App. 0176**

The influence of such factors on the capital system in Texas renders it no longer the "evenhanded, rational, and consistent" system of imposing the death penalty the Supreme Court expected it to be in 1976. *Jurek*, 428 U.S. at 276. The Court on a prior occasion reversed course in its belief that the Texas system would work properly in practice. *Compare Penry v. Lynaugh*, 492 U.S. at 318 ("the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present") *with Jurek*, 428 U.S. at 272 (noting the Texas CCA indicated it would "interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"). The geographic disparities in the imposition of the death penalty in Texas offer equally compelling grounds to abandon the expectation that prosecutorial discretion can offer a consistent application of the law. *Marbury v. Madison*, 1 Cranch 137, 163 (U.S. 1803) ("The government of the United States has been emphatically termed a government of laws, and not of men.").

## 2. Race

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases. David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUMAN RIGHTS L. REV. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICHIGAN J. OF RACE & LAW 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUSTON L. REV. 807 (2008-2009) (same); Scott Phillips, *Continued Racial*

158

**172**

**App. 0177**

*Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUSTON
L. REV. 131 (2012) (same).

One study considered the Harris County District Attorney's decisions
regarding the charging of capital cases under the Holmes administration. Phillips,
45 HOUSTON L. REV. at 816, 818. The study found that disparities existed between
the treatment of black and white defendants and victims. *Id.* at 830. Although
black and white defendants were charged with capital murder at relatively similar
rates, black defendants were more likely to have committed a less serious offense
than their white counterparts. *Id.* In contrast, black victims were significantly less
likely to prompt a capital charge than white victims. *Id.* at 834.

A second study looked at the same factors in Harris County under the
Rosenthal administration to determine if the same racial disparities continued.
Phillips, 50 HOUSTON L. REV. at 134. While this second study revealed that race of
the defendant did not matter under the Rosenthal administration, race of the victim
still proved to be a controlling factor. *Id.* at 148. The findings of the second study
suggest that "the death penalty was imposed on behalf of white victims at more
than twice the rate one would expect if the system were blind to race, and . . . on
behalf of white female victims at more than five times the rate one would expect if
the system were blind to race and gender." *Id.* at 150.

In another study, a random sample of 276 adults were given a file summary
for a triple murder case. Epstein, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. at 407-
08. The variables in the experiment were 1) some of the group was given a
maximum sentence to allot of life without parole, while others could give a death
sentence and 2) the suspect's name for some was a race-neutral name and for
others was a name traditionally associated with minorities. *Id.* The results of the
study showed that the verdicts of guilt varied little when only life without parole

**173**

was possible, but when the maximum sentence was death the defendants with traditional minority names were significantly more likely to be found guilty. *Id.*

The existence of racial disparities in capital sentencing can also cut in the opposite direction, depending on the geographic region of the study. *See* Barnes, 51 ARIZ. L. REV. at 348. A study of Missouri's death penalty revealed that black defendants were about a third as likely to face a capital charge as white defendants. *Id.* White defendants were also more likely to have those capital charges go to trial, while black defendants were more likely to have a jury reject the capital charge. *Id.*

Regardless of the direction of the disparity, these studies show that race continues to be a motivating factor behind the imposition of the death penalty— even if that factor is unconsciously applied. When the law is utilized in such a way that it becomes more directed at a "particular class of persons," especially in the context of racial discrimination, the implementation of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

### C. Conclusion

For the foregoing reasons, Texas' death penalty scheme is unconstitutional. Therefore, Hummel sentence of death should be vacated.

## CLAIM FOURTEEN

### HUMMEL'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

The "10-12" jury instruction in the Texas capital sentencing scheme violates Hummel's applicable state and federal Constitutional rights, as well as state

160

**174**

statutory law and state case law. Therefore, Hummel's death sentence should be vacated.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased;[21] (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. Art. 37.071 § 2(b)(1)-(2), (e)(1).

The court shall sentence a defendant to death if jury answers "Yes" to the first two special issues and "No" to the third special issues. If the jury returns a "No" answer to either of the first two special issues, a "Yes" to the third special issue, or if the jury is unable to answer all of the questions submitted to them under these guidelines, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. Art. 37.071 § 2(g).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. Art. 37.071 § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. Tex. Code Crim. Proc. Art. 37.071 § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds a mitigating circumstance under the third special issue, the

---

[21] This second special issue is used in cases where the jury has found a defendant guilty under the law of parties. Art. 37.071(b)(2). In Hummel's case the jury was only given the first and third special issues. (4 CR at 726-27.)

**175**

**App. 0180**

defendant will be sentenced to life without parole. Tex. Code Crim. Proc. Art. 37.071 (e)(2). Yet, the jury is not instructed about, and indeed is prohibited from being informed of, the effect of failure to agree on any of the questions submitted to them, which also renders a life without parole sentence. Tex. Code Crim. Proc. Art. 37.071 § 2(a)(1).

Trial counsel filed a pretrial motion to declare the Texas capital sentencing scheme unconstitutional, including a challenge to the constitutionality of the 10-12 instruction, on August 4, 2010. (2 CR at 272-75.) The court denied trial counsel's motion on April 26, 2011. (10 RR at 53.) Despite the pre-trial defense motion that this statutory "10-12" rule would mislead the jury, the trial court instructed the jury in accordance with the requirements of the statute. Following deliberations, the jury returned unanimous answers of "Yes" to the continuing threat question and "No" to the mitigating circumstances question. (45 RR at 94-95.)

Because this statutory scheme misinforms the jury and brings outside considerations that impermissibly bear on the jury's verdict, the Texas statute violates the principles of the Eighth and Fourteenth Amendments, depriving Hummel of a fair sentencing trial.

### A. The Supreme Court Has Invalidated Jury Instructions That Place An Added Burden on the Sentencer Before Finding Mitigating Circumstances.

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. In the state of Maryland, the capital sentencing jury proceeded through three sections of a verdict form. In Section I, the jury was asked to evaluate whether any of ten aggravating factors was present. *Id.* at 385-86. If the jury unanimously found at least one aggravating factor, it was instructed to move on to Section II, where it was instructed to mark "Yes" next to any mitigating factors it

**176**

unanimously found. *Id.* at 386-88. The jury was only instructed to move on to Section III if one of more of the mitigating factors in Section II had been marked "Yes."[22] *Id.* at 388. If all the mitigating factors in Section II were marked "No," the defendant was sentenced to death. *Id.* at 389.

In assessing the constitutionality of this sentencing scheme, the *Mills* Court noted that "in a capital case 'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.'" 486 U.S. at 374 (alteration and emphasis in original) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion))). The *Mills* Court held that the Maryland capital sentencing scheme was unconstitutional because a reasonable jury could have interpreted the jury instructions and the accompanying verdict form as requiring that the jury should mark "No" next to a mitigating factor unless the jurors were unanimous, even if all but one of the jurors thought that factor was present. *See Mills*, 486 U.S. at 378-79, 384. Given this potential interpretation by a reasonable juror, there was an unacceptable risk that the jury could be prevented from reaching the balancing stage even if all twelve jurors believed that some mitigating circumstance was present but could not agree on a particular mitigating factor. *Id.* at 384 ("[T]he sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.").

---

[22] In Section III, jurors were asked to balance the mitigating circumstances marked "Yes" in Section II against the aggravating circumstances marked "Yes" in Section I. *Id.* at 388-89.

**177**

**App. 0182**

Similarly, in *McKoy v. North Carolina* the Supreme Court examined a North Carolina capital sentencing scheme that burdened the ability of a majority of a jury to reach a life sentence. 494 U.S. 433 (1990). In that case, the requirement that the jury find the presence of an individual mitigating factor unanimously was explicit in the statute. *Id.* at 435. Because the unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," the North Carolina statute violated the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

### B. Texas' 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence

*Mills* and *McKoy* establish that a jury should not be instructed in a way that allows a minority of the jury to sway the verdict to a sentence of death. *Mills*, 486 U.S. at 384 ("The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."). Yet the 10-12 rule embodied in the Texas scheme does just this.

Hummel's jury was asked to consider whether he posed a future danger and whether any mitigating factors warranted a life sentence. (53 RR at 8-9.) This situation is best explained with a hypothetical. Suppose that in Hummel's jury, Jurors one through five wanted to answer "No" to the future dangerousness question. Under Texas' scheme, they would not have the ten votes needed to answer the first special issue. In addition, they were instructed that they could not answer the question without a unanimous "Yes" vote or ten votes of "No." It is a reasonable probability that these five jurors might be swayed by the seven vote majority to come to an agreed "Yes" vote, fearing that not answering the question might result in a mistrial.

**178**

Suppose then, that during deliberations on the second special issue, jurors six through ten wanted to answer "Yes" to finding mitigating evidence. Again, their five votes would be short of the ten needed to get a life sentence and would be subject to pressure from the seven vote majority to agree to a unanimous "No" vote. Without knowledge that under Texas law a single holdout "No" juror on this special issue would result in a life sentence, there is a reasonable possibility that these jurors would change their vote instead of allow what they perceived to be a mistrial.

With the jury thus answering the future dangerousness special issue "Yes" and the mitigation special issue "No" under these circumstances, Hummel would be sentenced to death. Yet under the hypothetical, ten jurors would have found a valid statutory reason to grant a life sentence. Only two jurors would have answered the special issues in a way that would lead to a death sentence. Yet the requirement under the statute to instruct that ten votes for *each* special issue are needed to answer a special issue, and the simultaneous prohibition under the statute from telling the jury the truth that a single vote is enough to assign a life verdict, allows a minority of jurors to rule while impairing the ability of the majority of jurors to effectuate their desire for a life sentence. This is exactly the risk the Supreme Court expressed in *Mills* and *McKoy* violates the protections of the Eight and Fourteenth Amendments. Thus, the capital sentencing scheme employed in Texas is unconstitutional.

## C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations

In addition to violating the Supreme Court precedent of *Mills* and *McKoy* by giving undue effect to a minority voice in the jury, the effect of Texas' 10-12 rule creates an impermissible outside influence on jury deliberations. By misleading jurors as to the result of their failure to reach a unanimous or ten vote agreement,

the statute improperly coerces juries into death sentences on the basis of stimuli divorced from the merits of the case.

It is a classic and common feature of American jurisprudence that when a jury is unable to agree a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963). Yet this option is so costly and cumbersome, the law presumes that jurors should enter deliberations able to be swayed in their opinion in order to reach a verdict. *Allen v. United States*, 164 U.S. 492, 501 (1896). A reasonable juror should feel the weight of the instructions from the trial court and attempt to avoid reaching an impasse.

This concern over having a mistrial understandably rises to new heights in a capital case. Unlike nearly all other cases, the constitutionally required procedures and safeguards that take place in a capital trial create an atmosphere in which a juror is keenly aware of the expense and care being taken. Jurors are told of the weeks that are spent and the hundreds of veniremen that are questioned in order to find twelve suitable jurors. They are told to expect (and usually sit through) a long trial with copious amounts of evidence from lay and expert witness. They are treated to not one, but two sets of opening argument, closing argument, and jury instructions. They are led to believe that all manner of experts could be retained at great expense to testify at the trial. (53 RR at 47.)

In this setting, a reasonable juror would understandably be loath to be the cause of a mistrial by failing to reach a verdict. The jurors are then instructed that they must reach a unanimous (or ten person) vote in order to answer the special issues in the punishment phase. Yet, unlike any trials that a juror might be generally familiar with, under Texas law a verdict will be reached if the jury fails to answer the special issues during the punishment phase. The law's desire for unanimity no longer operates.

**180**

However, by intentionally failing to instruct the jury that a sentence of life without parole will result, even if the jury fails to reach an agreement on any of the special issues, the statute misleads a juror about the effect of their vote. A reasonable juror could, therefore, labor under the impression that a failure to reach an agreement with the other eleven jurors would result in a costly re-trial. Instead of operating as an intended incentive to reach a verdict, in a capital case the 10-12 rule creates an outside influence on a juror's deliberation and vote.

### D. Conclusion

Because of the reasons stated above, the Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments of the Constitution. Thus, Hummel's death sentence was impermissibly obtained and should be vacated.

## CLAIM FIFTEEN

## HUMMEL IS INELIGIBLE FOR A DEATH SENTENCE BECAUSE OF HIS MENTAL IMPAIRMENTS

Hummel's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, because his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution.

In *Atkins v. Virginia*, the Supreme Court held the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of mentally retarded individuals. The Court determined that society recognized the lesser moral culpability of criminal offenders with mental retardation, as evidenced by a national consensus prohibiting the execution of persons with mental retardation. Because of their diminished culpability, the execution of a person with mental retardation would not serve any valid retributive or deterrent function. Furthermore, several factors indicated that persons with mental retardation were at

**181**

much greater risk of wrongfully receiving a sentence of death. *Atkins v. Virginia*, 536 U.S. 304, 320-21 (2002).

The underlying rationale behind the national consensus observed by the Court was the lesser individual culpability of a person with mental retardation. In *Atkins*, the Court noted that persons with mental retardation, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control their impulses." *Atkins*, 536 U.S. at 318. Recognizing these cognitive deficits, the Court then held that "the large number of States prohibiting the execution of mentally retarded . . . persons provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* at 316. The Court reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*. 543 U.S. 551, 571 (2005).

Next, the Court examined what impact this diminished culpability had on the legitimate goals of criminal punishment. Unless the imposition of the death penalty "measurably contributes" to one or both of the penological goals of retribution or deterrence, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (internal quotation omitted). The Court held that the retributive value of punishment "necessarily depends on the culpability of the offender." *Atkins,* 536 U.S. at 319. With respect to capital punishment "the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." *Id.* at 319. Subjecting persons with mental retardation to capital punishment similarly did not serve a deterrent purpose. The deterrent value of punishment is necessarily reduced when an individual's cognitive and behavioral impairments "make it less likely that they can process the

**182**

information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320. Executing persons with mental retardation would also have no deterrent effect with respect to offenders who are not mentally retarded. *Id.*

Finally, the Court reasoned that the reduced capacity of mentally retarded offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . ." *Atkins*, 536 U.S. at 320 (internal quotation omitted). Mentally retarded individuals are less able to "make a persuasive showing of mitigation . . . . are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* a 320-21. Mental retardation is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with mental retardation "face a special risk of wrongful execution." *Id.* at 321.

Hummel suffers from mental impairments that affect him in much the same way as intellectual disability. Complex post-traumatic stress disorder, due to attachment trauma, prevents Hummel from responding and reacting to social situations and stressors in the way that an average individual would. (Ex. 1 at ¶¶ 37, 42-42, 52, 57 [Aff. of Dr. Hardesty].)

Like intellectual disability which requires "significant limitations in adaptive skills such as communication, self-care, and self-direction," Hummel's mental impairment left him unable to control his impulses and engage in logical reasoning. (Ex. 1 at ¶¶52, 57 [Aff. of Dr. Hardesty].) As in *Atkins*, these cognitive deficiencies significantly reduce Hummel's moral culpability. As Hummel's impairments left him unable to consider the future repercussions of his actions, there is no deterrent value in his execution. Further, Hummel's mental

169

**183**

impairments make him susceptible to an enhanced risk of wrongful execution as they diminished his ability to communicate with counsel and others, and are likely to be misinterpreted by a jury as an aggravating, rather than a mitigating factor.

The same concerns that underlie execution of mentally retarded offenders exist in Hummel's case as well. The imposition of the death penalty would be grossly disproportionate to Hummel's moral culpability, would not "measurably advance the deterrent or retributive purpose of the death penalty," and carries an enhanced risk of error. *Atkins*, 536 U.S. at 320-21. For these reasons, this Court should vacate Hummel's death sentence.

170

**184**

## IV.

## PRAYER FOR RELIEF

WHEREFORE, John William Hummel prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of his claims;

2. Vacate his death sentence and conviction;

3. Grant any other relief that law or justice may require.

Respectfully submitted,

DATED:    June 5, 2013          By _____
                                Robert Romig


                                By _____
                                Sam Farina-Henry

171

**185**

**App. 0190**

STATE OF TEXAS §

COUNTY OF TARRANT §

VERIFICATION

BEFORE ME, the undersigned authority, on this day personally appeared Robert Romig, who upon being duly sworn by me testified as follows:

1.  I am a member of the State Bar of Texas.

2.  I am the duly authorized attorney for John William Hummel, having the authority to prepare and to verify Hummel's Application for Post-Conviction Writ of Habeas Corpus.

3.  I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

_Robert Romig_
Robert Romig

SUBSCRIBED AND SWORN TO BEFORE ME on this 5th day of June, 2013.

_Elizabeth Garza_
Notary Public, State of Texas



ELIZABETH GARZA
Notary Public, State of Texas
My Commission Expires
APRIL 29, 2015

Notary . . . Bond

172

**186**

**App. 0191**



# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Application for Writ of Habeas Corpus by hand to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, via hand delivery)

Honorable Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, via hand delivery)

Helena Faulkner, Asst. Crim. D.A.
Tarrant County District Attorney
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, via hand delivery)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on June 5, 2013 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Robert Romig

173

**187**

**App. 0192**

## AFFIDAVIT OF DR. SUSAN J. HARDESTY

I, Susan J. Hardesty, state and declare as follows:

**Education and Experience**

1. I, Susan J Hardesty, am the Vice President and Medical Director for The Menninger Clinic, in Houston Texas.

2. I received my medical training at The University of North Carolina at Chapel Hill, graduating in 1990 with the degree Doctor of Medicine with Honors. I completed Residency in Psychiatry at The Medical University of South Carolina ("MUSC"). I am board-certified in psychiatry and in forensic psychiatry.

3. I am licensed to practice medicine in both Texas and South Carolina. I have a special interest in hospital psychiatry and forensic psychiatry. In my role as Medical Director, I oversee the clinical practice of all physicians at The Menninger Clinic.  I am also the administrative supervisor of the pharmacy, the social workers and the psychologists who practice at the clinic.

4. In my forensic practice I do both civil and criminal evaluations. At MUSC, I was the director of the forensic fellowship. In that role I performed or supervised more than 100 criminal evaluations for the state of South Carolina. I am familiar with all phases of evaluation for criminal responsibility, criminal competencies and mitigation.

5. In my clinical practice at The Menninger Clinic a major focus of the work is in understanding the role of trauma in the lives of people. Trauma is a term that includes both physical trauma, such as abuse, assault, and physical injury as well as emotional trauma, which includes, neglect, emotional abuse, abandonment and other issues of

early childhood development. I have presented and published in the academic field of trauma and treatment of trauma.

6. A copy of my resume is attached to this affidavit as Attachment A.

## Examination of John Hummel

Purpose of Evaluation

7. I was contacted by the Office of Capital Writs, current post-conviction counsel for John Hummel. I was asked to perform a mental health assessment of Mr. Hummel and diagnose any mental illnesses or impairments Hummel suffered during his life and at the time of the crime. I was also asked to review and comment upon mental health testimony presented by Dr. Antoinette McGarrahan on behalf of Mr. Hummel during his capital trial.

8. I interviewed Mr. Hummel on April 12, 2013 at the Polunsky Unit in Livingston Texas. The interview was conducted in the contact interview room, at the Polunsky Unit, from 1:15 PM to approximately 4:00 PM on the above date.

9. I also reviewed a number of materials provided by post-conviction counsel, including witness affidavits, trial testimony, school and medical records, and academic literature. A full list of the materials I reviewed can be found as Attachment B.

Consent

10. Mr. Hummel was informed of my identity and affiliation with the Office of Capital Writs and the Menninger Clinic. He was informed that I was hired to assist in the appeal of his death penalty sentence. Mr. Hummel understood the limits and intent of this evaluation and agreed to proceed with the evaluation.



2

**192**

Mental Status and Cognitive Evaluations

11. I conducted examinations of Mr. Hummel's mental status and cognitive function. Mr. Hummel readily cooperated with both examinations.

12. Based on the initial consent, Mr. Hummel's intact mental state, intact cognitive examination, and his understanding of the appeal process and possible outcomes, I felt that he had full capacity to proceed with the interview.

**Background**

13. John Hummel was born on November 4, 1975, in Arlington, Texas. His father was John Harold Hummel and his mother was Jackie Lou Hummel. John has one sister, Neata Romaine Hummel, who is nine years older than John. He was raised in Pacolet, South Carolina. John's family lived on a farm where his father worked in addition to his job at Kohler Manufacturing Company. John and Neata were socially isolated on the farm except for school.

14. John describes his family as very strict and much focused on religion. His father was always working and his mother was very strict about following the rules. John describes Neata his sister as his primary caregiver and felt she was more like a mother to him. His parents used corporal punishment to enforce the rules of the family. He did not describe the spankings as abusive. However, John's friends and uncle describe the style of parenting used by John's parents as extremely neglectful and emotionally hurtful.

15. If John and Neata made noise or disobeyed then they were punished, often getting beat with a belt. Neata was hit with a clothes hanger. John spent a lot of time isolated in his room with games. When he was

3

**193**

angry he would beat up a pillow.  John and Neata were not allowed to show anger when they were being punished. John recalls receiving very little affection as a child, except from Neata.

16. John's mother especially did not show love to her children, but would show affection for other people's children by buying them gifts. When asked if he felt depressed to see his mother give expensive gifts to her friend's children while denying him and his sister even modest items John downplayed this issue.  John seemed very affectively disconnected from the content of this question and other questions about the incongruity between his view of his family and the views others had of the Hummels.

17. John attended elementary and high school in Pacolet and Jonesville, South Carolina. John struggled in school despite having an above average IQ.  He had a learning disorder that impacted his ability to read and spell.  This disorder was not formally diagnosed until John was in high school. Once he had accommodations made for his learning disorder, he was able to pass the high school exit examinations.  In addition, he was colorblind. This made him the butt of many jokes among his peers at school. John minimized the issue of teasing and did not elaborate on that issue in our conversation.

18. During his senior year of high school, John dated a young woman named Stephanie Bennett, whom he liked a lot. He integrated himself into Bennett's family and believed their relationship would end in marriage. At the time, Bennett began to distance herself from John; he did not recognize the emotional cues she was giving. She expressed surprise that he did not pick up on these cues. John was unable to explain the emotional disconnect between himself and Bennett.  He

4

**194**

EXHIBIT 1 Page 4

was unsure why the relationship with Bennett failed and what his role in the failure of the relationship might have been.

19. John described himself as an avid player of Dungeons & Dragons during school. He felt very at home in the fantasy world and played multiple characters in these games. Friends reported that John often tried to emulate their game play.

20. After high school John began to work at the warehouse of the BMG music company. He stated he was doing okay but could not make enough money to cover his expenses. He describes an incident in which he and his girlfriend came home to find his apartment being broken into. Shortly after the incident his family urged him to return home. John at this point decided to join the Marines.

21. John described the early part of his career in the Marines as good. He did basic training at Parris Island in South Carolina and was chosen to work as an intelligence specialist when a training slot in that specialty became available. John thrived in the work he was doing and interacted well with his colleagues and platoon leaders. His work involved reviewing and plotting intelligence data on troop and supply movements and positions. He felt he was good at the work and, in fact, so good that he felt he was better than some of the newer officers.

22. During the Marines, John began to frequent strip clubs and befriend strippers who worked there, believing that they cared for him on a personal level. John in fact became obsessed with the relationships he formed with the strippers. Again he had a distorted view of the roles and relationships he had formed. John also overvalued and emulated the style of dress and behavior of his close friends to the point that

5

**App. 0197**

they found it necessary to bring this to his attention and ask that he be his own man.

23. John stated he did well until his friends were reassigned and a new captain took over, He then got sloppy with his appearance, gained weight, was placed in a special weight control unit. Again, John was isolated from a support group and was subjected to teasing and humiliation. John felt he was treated unfairly during this time because it was his belief that the captain took out his dislike of one of John's colleagues, who had transferred out of the unit, on John.

24. John stated that, as he became disillusioned with the new leadership of his intelligence group, he got more depressed, gained more weight and felt very isolated. At one point, John attempted to go absent without leave. He was not away from his base for long but this episode resulted in the loss of his security clearance and the work that he enjoyed. After losing his role as an intelligence specialist, his assignments seemed trivial and he decided not to re-enlist and left the Marines with an honorable discharge.

25. During his visits to the strip clubs John met Lettie Ulbright, a homeless woman who was pregnant, and befriended her. John was not the father of the child, but he brought her home with him to South Carolina when he left the Marines. They lived in a mobile home together and John worked at the Kohler Manufacturing Company making plumbing appliances. For a while, he and the Ulbright did well together. John stopped going to strip clubs and seemed to be doing okay. John's sister Neata, however, arranged for Ulbright to leave shortly after her baby was born and John again began to drift.

6

**196**

**App. 0198**

EXHIBIT 1 Page 6

26. John's employment history shows that he changed jobs frequently. John worked at a cigarette warehouse, worked as a security guard and also worked in a restaurant. During this period, John was spending much more time at strip clubs, using marijuana, smoking cigarettes, and drinking.   He remained obsessed with fantasy games and computer games.  Rather than return home and live with his parents, John abruptly left South Carolina and moved to Texas.

27. Once in Texas he met his future wife, Joy. Joy became pregnant in November 2003, and the two were married in early 2004. Their daughter Jodi was born in July 2004. According to John, things were going pretty well during the first year of his marriage. Money was tight, but John was employed at a clothing warehouse and the family was getting by. John described work at the warehouse as hard, trivial, and at times unfair. John was teased by his coworkers and he felt they did not take good care of the work environment, which John believes led to him suffering an injury on the job.

28. One day, one of John's coworkers left a box open behind him while they were working on the packing line. John stepped back and tripped over the box, severely injuring his back. He injured two discs in his back, requiring two surgeries which ultimately were not fully successful.  Following the surgeries, John had constant back and leg pain and he could not work.

29. With John physically unable to work, the family began to struggle financially.  This left John increasingly stressed over his family's situation.  Eventually, John, Joy and Jodi were forced to move into Joy's father's home.

30. To make matters worse, John was diagnosed with Crohn's disease, a type of inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. John's case was severe enough to warrant surgery: an upper duodenal resection. The surgery involved removing a part of the bowel and reconnecting the remaining pieces. This type of surgery is debilitating due to the fact that there is a period when one cannot eat and then a slow advancing of diet. Typically, a single abdominal surgery of this kind requires a minimum of six months of recovery time to return to full functioning. Multiple surgeries take proportionately longer for a person to feel fully well.

31. John suffered multiple complications from this surgery. He ended up with peritonitis and needed an ostomy with an external bag. He also developed blood clots in both arms. After about a year, John had healed enough to have the colostomy reversed but still suffered from severe leg and back pain. The orthopedic surgeon recommended another surgery. But after the significant problems with the bowel surgery, and the minimal success of his prior back surgeries, John was very frightened of having yet another operation. After refusing the operation, the surgeon discharged John, saying he had reached maximum medical benefit of treatment and he was expected to return to some type of sedentary work. John received a small disability settlement but was denied permanent disability benefits. At this point, John was unable to lift objects or stand for long periods of time, so he no longer could perform manufacturing or warehouse work. Due to the family's precarious financial situation, John could not afford work training to obtain a more skilled job.

32. John again felt helpless and as though he was unfairly treated as a result of problems that were beyond his control. Because of his medical conditions, John was unable to work for four years. At home, John was criticized for not having enough money, for not helping with the baby, for not getting a better job, and for not helping more around the house. However, John was weakened by his surgeries and medical problems, and was in constant pain. He felt both Joy and her father did not understand just how weak he was and how difficult and painful it was for him perform physical tasks. John underwent five significant, invasive surgeries and felt that as he was just beginning to fully recover, he was not being supported by his family.

33. John's medical problems negatively impacted his marriage and life with Joy. Joy tried to help, but she did not understand or accept that John could not physically do the things he had done in the past. John was humiliated by having the ostomy, by the occasional odors, leaks and spills. These issues negatively impacted their sexual relationship as well. John and Joy required the help of friends for things John would normally have been able to provide. Moreover, Joy's father was also critical of John's inability to provide for the family and to perform certain tasks.

34. John often felt like he was not cared for, misunderstood, and being blamed for things that were beyond his control.

35. John finally found a job as a security guard, making between 8 to 10 dollars an hour. He said it was very difficult to support the family on that small amount of money so Joy also had to work. John attempted to alleviate his stress about the situation his family was in by playing computer games and smoking, but was criticized for these activities.

9

**199**

36. Shortly after starting his new job, John met a young woman, Kristie Freeze, who worked at a convenience store and the two began corresponding frequently. Eventually, John became caught up in the belief that he was in a meaningful relationship with Freeze. In fact, she did not view her association with John in the same way. After a single sexual encounter, Freeze decided to end their relationship, leaving John feeling more than ever trapped in a difficult marriage, alone, with no emotional support, and no hope for change.

## Discussion

37. Mr. Hummel has a trauma-related illness that has been lifelong and pervasive, and can best be characterized as complex post-traumatic stress disorder, due to attachment trauma. "Attachment theory" is the psychological construct that one must form secure an emotional attachment to a consistent caregiver to be able to develop an integrated sense of self and to later be able to form mature, reciprocal adult relationships. "Attachment trauma" is the term used to define severe disruption of the development of personality and a sense of stable emotional self, which occurs when the early childhood relationships with mother or other primary caregivers are disrupted and/or pathological. Research shows that basic attachment patterns that are evident by one year of age are reflected in adult attachment disorders.

38. Dr. Jon Allen describes this as "a stress pile-up model" which "predicates childhood adversity as promoting disorder in the face of adult stress." And further, in discussing attachment trauma, Dr. Allen notes that trauma in this context can best be described as feeling alone in the midst of unbearably painful emotions. For a child, physical or

sexual abuse creates fear, and if the abuser is also the caregiver, the child has no source of emotional comfort, and therefore is alone and afraid. Extensive, consistent neglect from a caregiver provokes the same fearful reaction, and a child will similarly feel alone and afraid with no recourse as a result of neglectful parenting. Repetitive episodes of this type of trauma lead to a very unstable sense of self and an attachment in which the child desperately needs the parent to survive but at the same time is constantly fearful of abandonment by the caregiver. Moreover, the child feels alone and has no recourse for easing the fear and finding comfort because the source of comfort is also the source of the distress. This creates a very disorganized and, at times, dissociative response from the child.

39. As I reviewed the affidavits and testimony of the many witnesses who have known John and his family, I discerned a clear pattern of attachment trauma.

40. John's parents were very strict and showed him, and his sister, very little affection. His mother rarely hugged or comforted John and Neata. John's mother was herself a victim of childhood abuse and, in what is well known as a sad and vicious cycle, perpetrated abuse on her own children. This is commonly seen as the abused parent herself does not know how to be a nurturing parent. John's mother was described as a disciplinarian and she was not particularly engaged with her children's lives. For example, John's learning disability was not addressed until he was in high school. John's father was functionally absent from John's life as he was primarily focused on his work or satisfying his own needs. John's mother had legal problems prior to leaving Texas. John's father had multiple affairs, at

11

**201**

EXHIBIT 1 Page 11

times in the home. Neata observed one such affair when she caught her father with another woman in the family home.

41. The environment described above has the characteristics of a setting in which there would be little safety or security with respect to relationships and the formation of secure sense of self and safe attachment patterns. The idea of an emotionally disconnected mother with a strict and harshly punitive disciplinary style and a self-absorbed father who is frequently absent and indiscreet in his violations of familial boundaries is a typical environment in which dysregulation of attachment and personality disorder formation is likely to occur.

42. The impact of this attachment trauma is seen in John's social interactions with others in high school, the military, and beyond. John was consistently described by friends as passive, withdrawn, quiet, guarded, socially inept, slow, and frequently was the butt of jokes. John was also very focused on escapism, as reflected by the amount of time he spent playing fantasy role-playing games, watching movies, and staying in his room.

43. John has a very passive and avoidant personality style. He did not respond to obviously upsetting situations. He misread social cues. He looked for safety in environments he could control. He craved social attachment at the same time he did not know how to be a social being. The long pattern of teasing and frustrated relationships that he experienced throughout his life created a vicious cycle of seeking nurturing connections with others, then forming maladaptive relationships leading to rejection by the people to whom he went to for support.

12

**App. 0204**

**202**

EXHIBIT 1 Page 12

44. In the Marines, John seemed to merge his identity with that of his close friends, copying their dress, behavior and even personal mannerisms. This was severe enough that his friends had to call it to his attention. However, this was probably the most successful period of his life, as John finally had a group of friends to provide support to him. He functioned well as long as he was supported by a sense of safe attachment. When his friends in the Marines were discharged, John's performance suffered without his support network.

45. This pattern was repeated when he brought Lettie Ulbright to South Carolina after his military service. During the period that they lived together, John functioned well. However, when this safe attachment was disrupted by his family, John again regressed, bouncing from job to job and engaging in unhealthy activities.

46. The events of John's life leading up to the crime created significant feelings of stress, severe illness, the need for nurture, the failure of the nurturer and feeling alone without hope—mimicked the original attachment trauma John had experienced as a child. However, the adult response to the abandonment is rage, anger or flight. John first attempted to flee to distractions, like games and smoking, then a "better" relationship, then, in anger, he attempted to eliminate the source of the pain. Not the original parents, but the person(s) who should have been his nurturers but who unknowingly recapitulated the past pattern.

47. John believed that the original back injury was the fault of the coworkers who teased and ridiculed him, and who themselves did not do good work. He blamed the injury on the sloppiness of his coworkers.

13

**203**

EXHIBIT 1 Page 13

48. The resulting two back surgeries were unsuccessful, leaving John weakened, in constant pain, and unable to work and support his family. His failure to be able to work was not his fault, but he was expected by his family to do things which he was unable to do. Thus, at a time when John most needed to feel a supportive attachment to his wife and family, John instead felt disconnected and rejected.

49. These feelings of unfairness were compounded when John developed Crohn's disease. John was forced to undergo abdominal surgery and suffered multiple complications, which resulted in John needing an ostomy and external bag. This complication furthered John's feelings of isolation, incapacitation, and failure. Moreover, John could not work and was denied disability benefits, which meant John's family faced significant financial difficulties.

50. John was able to return to work after four years of unemployment. However, the work did not pay enough to alleviate the family's financial stresses.

51. Amidst this tumultuous backdrop, John met and began a relationship with Kristie Freeze. Consistent with his pattern, he misread cues and quickly saw this relationship as an escape from the cumulative stress of the prior four years. The prospect of safety from ridicule, embarrassment and abandonment again clouded his ability to accurately judge the nature and context of the relationship and it soon failed.

52. Ultimately, the great weight of the stressors in John's life, which mimicked the attachment trauma he experienced as a child, created a post-traumatic response in John. The trauma suffered by those with attachment trauma is usually the total sense of abandonment and fear

14

**204**

EXHIBIT 1 Page 14

that occurred in early childhood. With any type of trauma, the hallmark of having a post-traumatic reaction is that responses become conditioned to the highest level of emotional valence reached in the past. This essentially means that a small event or series of events may trigger an emotional response that is hugely disproportionate to what would be expected from the event. The fight or flight mechanism of the body is activated. It is well known that this is an emotion driven response driven in the brain by the limbic system (that part of the brain that mediates emotional response) and the necessity of attaining safety literally causes the slower, cortical brain (thinking and logic) to be bypassed.

53. Here, John's feelings of fear and being alone were the results of the series of severe and painful medical conditions and procedures. These feelings then likely started a chain of events that repeatedly triggered stressful reactions. In addition to the physical pain, stress and distress, John's sense of being unjustly injured and misunderstood by his family continuously recapitulated the emotional distress of his childhood. The combination of feeling belittled by his inability to meet his expectations as a man, a father and provider and the termination of his escapist relationship with Freeze culminated in a very disorganized and self-defeating strategy that is typical in a severe stress response. The clumsiness of John's later actions and his rage are consistent with the disproportionate emotional valence of the trauma response.

54. In post-trauma responses, there is a dissociative quality and often a frank dissociative episode inherent in the response. Dissociation is evident in the details of this crime, the emotional blunting that was

15

evident in the interview after the event and the seemingly normal and unconcerned behavior that he showed immediately after killing his family. In John's case, there was not frank dissociation, but there was a dissociative quality present in his emotional response.

55. Many attachment trauma patients describe this dissociative quality as watching the events from a distance. They are aware of what is happening, but once the immediate fear and rage are discharged, the events take on the quality of being like a movie, or a play. There is a disconnection from the reality of the tragedy. Emotional blunting is often misconstrued as callousness or lack of caring, but this is not actually the case. In trauma response, the emotional blunting is protective and carries the psychological safety that also has become part of the learned response to the severe distress.

56. In essence, John was disconnected mentally and emotionally from the likely outcome of the commission of a serious crime but was relieved of the extreme emotional pressure to escape a relationship in which he was reliving the emotional trauma of his childhood. And so, his physical escape was as poorly planned and executed as the crime. John's former military friend best summarized by saying John was "chasing 1999," a time in the middle of John's military service when he was surrounded by a network of supportive friends. It is not coincidental that this is where John went, in the context of attachment trauma and his history. It is the one place where, for a while, John was fully accepted, successful, and safe.

**Expert Opinion**

57. It is my opinion, to a reasonable degree of medical certainty, that John Hummel suffered from a form of traumatic illness best summarized as

16

**App. 0208**

**206**

EXHIBIT 1 Page 16

complex post-traumatic stress disorder due to attachment trauma.[1] John clearly experienced attachment trauma as a result of his parents' neglect, physical abuse and social isolation. This trauma is evident from John's repeated inability to create secure attachments with others, as reflected in his failed romantic relationships and his lack of personal success when not surrounded by a support network. Ultimately, through no fault of his own, John found himself in a great deal of physical pain and financial and emotional stress. However, John again felt neglected and abandoned during this vulnerable period of his life. As such, John essentially was reliving the attachment trauma of his youth, which ultimately resulted in a post-trauma response. In trauma, when the adult experiences an event or series of events that re-capitulate the childhood trauma, the result is the highly charged flight or fight response. The abused child can neither fight nor escape, but the adult can. For John, his attempts to escape both intellectually and through another relationship were not successful. So the passive fear of the infant became the rage of the adult. John described that as the unrelenting internal pressure, almost a voice in his head, driving him to do something. Another characteristic of this type of response is the fact that because one is not operating from the rational, thinking part of the brain, but rather from the highly

---

[1] Complex post-traumatic stress disorder is not formally included in the The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Revised ("DSM-IV-TR"), or the forthcoming fifth edition ("DSM-V-TR"). It is the subject of much research and much is published in the literature on it. Similarly, this disorder is not formally included in the current edition of the International Statistical Classification of Diseases and Related Health Problems, Tenth Edition ("ICD-10"), but it is proposed for inclusion in the forthcoming ICD-11.

17

**207**

sensitized, emotional part of the brain, careful planning, logic, and consideration of the consequences in essence "go out the window." The details of the crime and the "escape" are quite consistent with this pattern and quite inconsistent with the intellectual level and skills that Mr. Hummel possessed.

58. It is also my opinion, to a reasonable degree of medical certainty, that Mr. Hummel met the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Revised ("DSM-IV-TR") for Personality Disorder NOS, with borderline and dependent traits and met the criteria for Dysthymia. Dysthymia is a chronic low level depression and anxiety often associated with persons who have experienced trauma. It is characterized by low mood, low self-esteem, low energy or fatigue more days than not.

**Future Risk of Violence**

59. While Mr. Hummel has committed a serious and violent crime, if one considers the psychological components of his history and both his past and current level of adaptation to the prison setting, it is my opinion, that, the long term risk of further violence is low to moderate, particularly in the prison setting. The reason for this opinion is as follows: (A) John did not have a significant past history of violence until the crime. (B) John's coping style was in fact, until the time of the crime, a passive acceptance and denial of the circumstances that surrounded him or escape into games, movies, books, etc. (C) John is unlikely to have the extreme set of circumstance that were the antecedents to the crime, namely financial and familial stressors. (D) John will be in a contained environment in which his needs are met, but there is not a relational model that would be iterative of

18

**208**

**App. 0210**

EXHIBIT 1 Page 18

attachment. (E) John has established a more informed religious attachment than previously, providing greater personal stability.

60. Mr. Hummel discussed his coping with prison and with the idea of being in general population and he has a perspective of acceptance of responsibility for his offense while maintaining the best possible use of the remainder of his life in a confined setting.

61. I have read and reviewed this nineteen page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _21_ of May, 2013 in Houston, Harris County, Texas.



Dr. Susan J. Hardesty

Subscribed and sworn to before me on _May 21_, 2013.

Notary Public, State of Texas

> ELIZABETH H. GOLMON
> Notary Public, State of Texas
> My Commission Expires
> December 17, 2013

## List of Materials Reviewed

1. Allen, JG Mentalizing in the Development and Treatment of Attachment Trauma. c. 2013
2. Skodol, AE et. al. Personality Disorders in DSM-5 Section 3, Publication Pending. 2013
3. Testimony of "
   A. Dr. Antoinette Rose McGarrahan
   B. Neata Woody
   C. Haila Scoggins
   D. Linda Jean Petty Pack
   E. Stephanie Ruth Bennett
   F. Mark Pack
   G. Christie Gregory Pack
4. Affidavit of:
   A. Chad Brown
   B. Brian Jeter
   C. Christy Pack
   D. Haila Adams
   E. Joseph "JoJo" Patterson
   F. Lance Dupre
   G. Shana Fowler
   H. Stephanie Bennett
   I. Thomas Hamilton
   J. Efrain Chaidez
   K. George Goodson
   L. Christopher Paris
   M. Tonya Paris
5. School Records of Jodi Hummel, James F. Delaney Elementary School
6. School Records of John W. Hummel Spartanburg High School
7. School Records of John W. Hummel Union County School District
8. Hummel, Employment Records, Champion National Security
9. Hummel, Prison clinic records, MHMR Tarrant County
10. Hummel, Social Security Disability Decision, 2/20/09
11. Hummel Medical Records, Spartanburg County, 12/09-12/10
12. Hummel Medical Records, Texas Back Institute
13. Videotaped interview of John Hummel in California 1/11/10

20



**App. 0212**

**210**

EXHIBIT 1 Page 20

# AFFIDAVIT OF LAURA SMITH

I, Laura Smith, state and declare as follows:

**Education and Experience**

1. I received a Bachelor of Arts degree in Psychology from the University of Texas at Austin in 1999. I went on to complete a Master's of Science in Social Work with a Clinical Concentration in 2001, also from the University of Texas at Austin.

2. I am currently employed by Travis County as the supervisor of a team of social workers who provide intensive support services to families in need through community centers operated by Travis County Health and Human Services. Prior to this, from 2001 to 2003 I worked directly with incarcerated fathers, their children, and the caregivers who supported those children through a non-profit organization called Family Forward. From 2003-2011, I worked in counseling and case management of the formerly incarcerated as they returned to the community via a non-profit organization called Crime Prevention Institute. From 2011-2013, I worked in drop-out prevention programs with at risk youth residing in public housing through a non-profit organization called Communities in Schools of Central Texas.

3. I am also an adjunct faculty member at the University of Texas at Austin School of Social Work, teaching Theories and Methods of Interventions with Groups. I am trained as a Victim/Offender Mediation Specialist and an Offender Employment Specialist. I have been licensed by the State of Texas as a Licensed Master Social Worker since 2001. In 2012, I received my Advanced Practitioner license from the Texas State Board of Social

Worker Examiners, allowing me to practice independently in the State of Texas.

4. A copy of my resume is attached to this affidavit.

## Involvement in John Hummel's Case

5. I was contacted by current counsel for John Hummel and asked to consult on his post-conviction habeas corpus proceedings. Specifically, I was asked to provide an explanation of Mr. Hummel's life history and an opinion of the elements in that life history that particularly impacted Mr. Hummel's development and decision-making.

6. To form my opinion, I reviewed various records from Mr. Hummel's life, including educational, employment, medical, military, and Veterans Affairs records, as well as letters sent to Mr. Hummel by his mother Jackie Hummel and sister Neata Woody. In addition, I reviewed the testimony of witnesses presented by Mr. Hummel's trial counsel at the punishment phase of his capital trial. Finally, I reviewed affidavits collected from Mr. Hummel's post-conviction counsel. A list of the testimony and affidavits reviews is attached to this affidavit.

7. On March 7, 2013, I interviewed Mr. Hummel at the Polunsky Unit in Livingston, Texas. The interview lasted approximately five hours. Mr. Hummel was cooperative and appeared to put forth his best effort in answering my questions.[1]

## Introduction

8. All of us are a product of our life experiences and social history. To understand how a person comes to take certain actions in life, one must

---

[1] Information from that interview is contained throughout this affidavit and cited to as "Interview with John Hummel."

look at what elements of his life were brought to bear on that decision. Often what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past. Erik Erikson's widely accepted theory of "identity development" posits that there are eight stages an individual goes through during their development. At each stage, there is a critical conflict, which requires a healthy resolution to create a new quality in self. For example, at infancy, the crisis is trust versus mistrust. A baby cries and, if its needs are attended to and it is nurtured, the baby leaves the stage of infancy having developed a sense of trust in its caregivers and in the world. If the baby is neglected, or needs are ignored, the baby moves into toddlerhood with a sense of fear and mistrust of caregivers and the world at large. Erikson's research suggests that trust and identity formation are the key ingredients to a healthy development of self and identity. (Erik Erikson, Identity and the Life Cycle, 1980)

9.  This affidavit seeks to explore the areas in which John Hummel did not successfully resolve these developmental conflicts, nor did his parents or support system, thereby rendering him nearly incapable of forming close and intimate relationships, leading to a total inability to manage multiple stressors such as loss of income, multiple medical illnesses, and emotional stress/fatigue. When these multiple factors collided, John's limited abilities to empathize and problem solve were overshadowed by his inability to love and connect, resulting in a violent crime in which he was trying to escape a life he could not handle.

## Early Development:  Instability and Lack of Nurturing

10. John Hummel was born on November 4, 1975 in Arlington, Texas. The Hummel family consisted of John, his father John Sr., his mother Jackie,

and his sister Neata.  Neata is nine years older than John.  When John was around three years old, his family moved to Pacolet, South Carolina.  The Hummel family was following a traveling minister named Andrew Carrigan, who started the Morning Star Baptist church in Pacolet.  John's family moved onto a farm that was isolated from the rest of the town. (Affidavit of Thomas Hamilton.)

11.  John's parents were not a stable, supportive influence in his life.  John Sr. was overly interested in guns and violence.  John's uncle, Thomas Hamilton, remembers John Sr. taking green plastic army toy figures and shooting them with a .22 caliber rifle.  He would then paint the figures red where the bullets had hit.  John's father would also pour lighter fluid on ant piles and set them on fire.  John's father would make John play war games with him even though John did not share his father's interest.  John's father seemed more "wrapped up" in his own life rather than John's.  (Affidavit of Thomas Hamilton.)   On at least some occasions, John's father physically abused him by hitting him with a belt or other object.  (Affidavit of Derrick Parris.) John's father once threw him from a moving tractor, at approximately age 12.  (Testimony of Mark Pack.)

12.  John's mother was also not a nurturing figure.  Jackie Hummel did not show love and concern for her children.  (Affidavit of Thomas Hamilton.) John's mother showed greater interest in her friends and their children than her own children.  Jackie Hummel was generous with other children, buying them clothes and toys.  Even at Christmas, it appeared that Jackie was focused on others, not John or Neata.  (Testimony of Christy Pack and Linda Pack.)

13.  Much of the early care and raising of John fell to his sister Neata, who was herself a nine-year-old child when John was born.  Neata reports being the

**214**

EXHIBIT 2 Page 4

one who fed, changed, and generally cared for John as a baby. She also states that her parents left her alone to care for John for hours at a time. From all accounts, Neata was the only one paying attention to John's needs and acting as a parental figure. John reports that his sister Neata did most of the daily work in raising him. (Testimony of Neata Woody; Interview of John Hummel.) However, a nine year old is not a mature enough caregiver to attend to the needs of a baby, both physical and emotional.

14. Neata left home and moved to Texas when she was eighteen and John was nine. When this happened, John lost the person he was likely the closest too.

15. About this same time, John's uncle Thomas Hamilton moved to South Carolina and lived with the Hummels for nearly six years. He remembers John as a timid and shy child. Hamilton took Neata's place as the person giving John any attention. (Affidavit of Thomas Hamilton.)

16. Hamilton taught John how to hunt and fish, and played games with him. Often, they would not catch anything because John was so interested in talking to Hamilton. John liked playing games with his uncle because his uncle would not get angry if he lost, unlike John's father. (Affidavit of Thomas Hamilton.)

17. Hamilton worried about John's social development because it did not seem like John got off the farm very often. John's parents never allowed him to socialize with other kids or families, with the exception of Jackie's friend Linda Pack and her children. To Hamilton, John seemed afraid to interact with people because he would fail in front of them and get picked on. (Affidavit of Thomas Hamilton; Interview of John Hummel.)

18. John's daily routine consisted largely of attending school and church and helping out on the farm. Hamilton noted that John's parents did not seem

pay much attention to John while at the same time controlling his life. Their attitude toward John was "do your homework" and "stay out of our way." (Affidavit of Thomas Hamilton.)

19. One of John's primary interactions with people outside his family was on Sundays, when the Pack family would come to dinner at the Hummel's house. Derrick Parris, a Pack cousin and one of John's close friends growing up, remembers attending church at Morningside Baptist with the Hummels and then going nearly every Sunday for dinner at their house. But for Parris, it felt like the Hummels were "acting" like a family. Each week, they would prepare the same meal and play board games. (Affidavit of Derrick Parris.)

20. Parris did not feel there was genuine love between John's family members. John's parents did not show much outward affection for their children. Christy Pack, who married John's friend Mark Pack and attended these Sunday dinners, did not remember seeing anyone in the Hummel family ever hug or kiss or say "I love you." (Affidavit of Christy Pack; Affidavit of Derrick Parris.)

21. From his early life history, it is clear that John did not experience secure attachments in his childhood with his parents. The most important tenet of attachment theory is that an infant/child forms a secure bond with an adult caregiver who is responsive to its needs. It is believed, and supported by empirical evidence, that children who do not securely attach with an adult early in their social development grow up to experience attachment problems in adulthood, especially an extreme sensitivity to rejection.

22. In fact, John Bowlby (1960), one of the original researchers and attachment theorists, stated that infants in fact grieve and mourn when an

appropriate maternal attachment is not formed. He also suggests that an inability to form close relationships is the result of the too frequent substitution of caregivers. This most certainly applies in John's case. Early in his infancy, his mother (a primary attachment figure) turned over the caregiving to his nine year old sister, who was not able to meet his physical and emotional needs, resulting in a very early and deep seated grief and longing, as well as the lack of a 'blueprint' for how to create intimacy and close relationships.

23. As a child, John's needs were not consistently met, and emotional expression was not allowed in the home. Appropriate caring relationships were not modeled. Because of this, it appears that John never formed appropriate love relationships or became capable of adult attachments. This deficit would have serious impacts on his ability to form relationships throughout the rest of his life and his ability to relate and empathize with others. According to Social Learning Theory, the work of Albert Bandura, humans (especially children) learn social skills and behaviors almost entirely through observational modeling and imitating those skills. If emotional expression is not allowed in the home—caring gestures are not displayed, the child is not allowed to form many friendships, and the child is not shown love by his parents—the 'act' of love is not something that has been modeled or taught and is therefore not possible to demonstrate.

**Exposure to Abuse**

24. As a child, John also suffered some physical abuse by his parents, and he was exposed to abuse of others.

25. Neata testified that both her parents hit her and John. (Testimony of Neata Woody.) John reports that his mother whipped his sister Neata with a

7

**App. 0219**

217

EXHIBIT 2 Page 7

metal hanger. (Interview of John Hummel.) This abuse is somewhat unsurprising, as John's mother Jackie had experienced physical abuse as a child. Her father was very abusive to her mother. Jackie's mother responded by hiding bottles of pepper juice and bleach to throw at him. One occasion of abuse ended with her mother shooting her father. Jackie's mother also hit her and her siblings to the point where they would cry for each other. (Affidavit of Thomas Hamilton.)

26. Friends recall that John's father hit him on occasions, sometimes with objects, when John would make mistakes. (Testimony of Derrick Parris.)

27. In addition to physical abuse, there are signs that John was exposed to inappropriate sexual conduct, possibly rising to abuse. John's father had been caught having multiple sexual affairs, which may have been another reason the family relocated to South Carolina. These affairs did not end his parents' marriage, though, and the behavior did not stop. John's friends saw John's father act inappropriately with women. (Testimony of Derrick Parris.) Neata once came upon her father receiving oral sex from a female member of their church. (Affidavit of Thomas Hamilton; Testimony of Neata Woody.)

28. In addition to his affairs, there are signs that John's father may have sexually abused Neata. Neata left home at the age of seventeen, and at least one person reported hearing Neata admit that her father sexually abused her. Others report that Jackie showed feelings of hatred for Neata. Neata would frequently leave home and go to the Pack family's house. (Affidavit of Derrick Parris.)

29. Further, Neata has exhibited strange behavior toward John, suggesting that she may also have transferred her abuse into abuse of John. In letters from Neata to John, she often references secrets kept between only the two of

them, and she specifically states that her mother was tested for dementia and the results were clear. Neata says, "that means she does remember. When she laughs and tells me it never happened. No wonder things are so messed up, like us." (Letters from Neata Woody to John Hummel.)

30. Physical abuse can have obvious immediate as well as long term physical consequences for a child such as shaken baby syndrome and impaired brain development in extreme cases. However, there are also significant long term consequences of physical abuse, consequences which manifest psychologically and behaviorally. According to one longitudinal study, 80% of adults who had been physically abused as children met the diagnostic criteria for at least one psychiatric disorder by age 21. (Silverman, Reinherz, & Giaconia, 1996). Other psychological and emotional conditions associated with abuse and neglect include panic disorder, dissociative disorders, attention-deficit/hyperactivity disorder, depression, anger, posttraumatic stress disorder, and reactive attachment disorder (Teicher, 2000; De Bellis & Thomas, 2003; Springer, Sheridan, Kuo, & Carnes, 2007).

31. It has not been confirmed that John experienced any sexual abuse directly. Witnesses have said that John's father was known for promiscuity in extra marital affairs, and some have alluded to suspicions of sexual abuse of John's sister Neata. Neata does not confirm this, but has reported witnessing her father engaged in sexual acts with other women. If John was in fact exposed to sexual abuse, even indirectly, there are long term consequences associated. A child's exposure to overly mature sexual content or a child's direct experience with sexual abuse can interrupt attachment patterns as well as create disturbances in the creation of a true

identity or sense of self. The necessary components in establishing a positive identity include love, attention, nurturing, affection, intimacy, autonomy, power, and control. The experience of abuse or neglect impacts each of these areas. An abusive experience affects the child's identity, how the child behaves in order to have his/her needs met, and how the child responds and interacts with other people. (US Department of Health and Human Services, Urquiza and Winn, 1994). According to a National Institute of Justice study, abused and neglected children were 11 times more likely to be arrested for criminal behavior as a juvenile, 2.7 times more likely to be arrested for violent and criminal behavior as an adult, and 3.1 times more likely to be arrested for one of many forms of violent crime (juvenile or adult) (English, Widom, & Brandford, 2004).

## Formative Years:  Continued Lack of Support and Attachment

32. John's social development was impaired early on by the geographic isolation he experienced growing up on the farm where his family lived. Because the farm was in a remote, rural area, John was naturally separated from many of his peers. (Affidavit of Brian Jeter.)  Even more, though, John's parents strictly limited when John could leave the farm and whether other people could visit him. (Affidavit of Christy Pack.)

33. Even when visitors were allowed, such as the weekly Pack family Sunday dinners, John would isolate himself.  Christy Pack remembers John as quiet, seeming to prefer retreating to his bedroom to play rather than staying with the group. (Testimony of Christy Pack.)

34. The year Neata left, John lost the person who was most nurturing to him. It does not appear that his parents changed their behavior to start raising him.  Neither parent took an interest in John's education, despite the fact

that John was struggling.   As a result, John was required to repeat the fourth grade that year.   It took his uncle moving to South Carolina for John to regain a support figure in his life.   (Interview with John Hummel; Hummel school records; Affidavit of Thomas Hamilton.)

35. In school, John struggled with a serious learning impairment because of dyslexia. (Affidavit of Haila Adams.) His school records (and later testing by the military) indicate that John's intellect was average to above average. However, his disability meant he had a hard time spelling and writing, which made it difficult to succeed in his classwork.

36. In high school, John was enrolled in a special education resource class to address his learning problems.   John almost was not allowed to graduate high school, taking the exit exam's writing portion four times.   On his fourth attempt, John was given an alternative scoring to account for his deficits in spelling and grammar.   Only then was he able to pass and graduate. (Testimony of Tommy Stribble; Testimony of Haila Adams.)

37. His special education teacher, Haila Adams, felt like John "blended into the woodwork" in class, rarely engaging and often trying to avoid attention.   Adams was unsure whether John had many or any friends, as most other children did not interact with John.   John never acted out; he just seemed lonely. (Affidavit of Haila Adams.)

38. John was frequently teased and bullied by other school children, including those he considered his friends.   They saw him as slow and an oaf.   John was teased and bullied because he was unable to write or spell well. (Affidavit of Chad Brown.)   Kids would call him "Bacon," a nickname John hated, because of the way he smelled.   His family heated their home with a wood-burning stove, which made his clothes smell.   (Affidavit of Thomas Hamilton; Affidavit of Derrick Parris.)   But John was not good at

confrontation.  When teased, John would back down, not saying anything, holding in his emotions. (Affidavit of Shana Fowler.)

39.  John struggled in his ability to interact with his peers.  Friends report that John would jump into a conversation with comments that were immature or not relevant.  He would say random things that did not make sense to others, but that he thought were funny.  For example, one friend remembers John saying the word "corn" like it was a catchphrase.  When asked, John could not explain why he said it or why he thought it was funny. (Affidavit of Chad Brown.)

40.  John did not dress appropriately to his peers.  This may have been because his family did not have the means to give him new clothes, or because John was struggling to express his individuality.  Friends remember him wearing things like bedroom slippers (which John called "moccasins"), cargo pants, trench coats, and shirts with pictures of dragons—often all at once. (Affidavit of Chad Brown; Affidavit of Derrick Parris.)

41.  John was easily influenced by his peers.  He was eager to please and wanted to be liked.  Friends would take advantage of John because he was easy to manipulate.  They would have John buy things, like video games or a PlayStation console, telling John he would be "cool" if he did.  They had John drive them around because he had a car.  One friend, Chad Brown, has said that John seemed to like the responsibility and that he thought John was trying to have deeper connections and closer friendships with people.  But Brown reports that despite John's efforts these deeper connections never seemed to materialized for John. (Affidavit of Chad Brown; Affidavit of Derrick Parris.)

42.  Many of the people who spent time with John in high school came to have widely disparate impressions of John.  For example, some friends viewed

John as athletic, playing sports often with them. (Affidavit of Brian Jeter; Affidavit of Joseph Paterson.) Others thought John was overweight, not athletic, and only interested in video games. (Affidavit of Shana Fowler; Affidavit of Haila Adams; Testimony of Derrick Parris). Some saw him as the class clown, friendly to everyone. (Affidavit of Joseph Paterson.) Others remember John as someone who was quiet and kept to himself, doing anything he could to avoid attention. (Affidavit of Shana Fowler; Affidavit of Christy Pack; Affidavit of Haila Adams.)

43. From John's interactions with others during his formative years, it is apparent that he continued to be unable to properly attach and form positive, supportive relationships. Even those he considered his close friends would tease and manipulate him. Because John never formed secure attachments, he also never formed a solid sense of self. Identity is built around emotional development and relationships with others. Again, referencing Erik Erikson's well documented theory of psychosocial development, the crises John should have been negotiating ages six to eleven were Industry versus Inferiority. If a child succeeds academically, feels competent and supported, they exit this stage in a state of Industry. In John's case, he was neglected and abused by parents, his school work was suffering, and he did not feel socially or academically competent in the least bit. Instead he entered pre-adolescence in a state of total inferiority without social supports or parental love and connection.

44. John's identity in the eyes of others was unclear. John's friends and family report different 'versions' of John. What's more, John's identity in his own eyes also seems unclear. He describes himself as a loner and isolated, without any attachments or interesting relationships. As will be discussed,

he became fairly obsessed with role playing games in which he creates multiple characters, and often times had trouble letting go of those characters.

45. The next stage in Erikson's psychosocial development theory is Identity versus Role Confusion. A young person successfully navigates adolescence by establishing an identity—defined by individuation and unique qualities, but also by connection to groups and associations with others—therefore entering adulthood with a solid sense of self. A young person not completing this stage successfully, as it is clear John did not, enters adulthood confused, extremely sensitive to rejection, and with a weak or non-existent sense of self.

46. John did not appropriately develop socially, academically, or emotionally. It appears he instinctually kept trying to reach out and connect, but all he received in return was continuous abuse, neglect, bullying, or confusion. He was never successful in any relationships, and even his close friends found him odd or off-putting. This lack of connection, but basic human desire to connect, is extremely frustrating, potentially rage building. In my opinion, John did not understand how to succeed in relationships, yet desperately wished to please others.

**Early Adulthood: Escapism, Failure, and Rejection**

47. As a young adult, John did not appear to have any goals or ambitions. During high school, John worked part-time at a local Hardee's fast-food restaurant. (Hummel social security records.) Friends did not see particular encouragement from John's family to make plans for the future. (Affidavit of Chad Brown.) John began to be focused on movies, video games, and role-playing games, such as Dungeons and Dragons.

(Affidavit of Chad Brown; Affidavit of Derrick Parris.)   One of his teachers, Haila Adams, noticed these games were one of the few things John ever was excited about.   She felt that John played these games as a way to escape his real life. (Affidavit of Haila Adams.)

48. In role-playing games, players design a character representing an individual in an imaginary setting.   These characters may have special skills or powers, such as the ability to use magic spells or communicate with animals.   Game play is performed through the verbal impersonation of the characters by the players. Characters interact with each other, and with the fictional setting's inhabitants, to solve problems, have battles, or gather treasure, with the players using dice to randomly determine event outcomes.   Over time, characters gain experience "points" and become more powerful.

49. Usually, a player will keep a character for several months.   However, John had difficulty keeping up with the characters he created.   John liked to play more advanced characters that required remembering complex information in order to be successful.   John created characters that were too complex for him to mentally keep up with.   Because of this either his game would have poor results or he would have to abandon his character.   (Affidavit of Chad Brown.)

50. Most players also usually played only one character.   John would play two or three characters at the same time.   John would also change his characters based on what his friends were doing in the game.   When other players were successful, John would mimic the actions of the other players to make his characters better. (Affidavit of Chad Brown.)

51. John had trouble separating himself from these role-playing games.   He would frequently carry the game pieces with him.   In conversations with

friends, John would attempt to get the subject always back to the games they were playing. One friend remembers a time that their group took a break from playing to go somewhere. While driving, John pulled out the dice and wanted to continue playing. The others had to stop John and tell him to focus on the road and what was going on around him. (Affidavit of Chad Brown.)

52. John also did not always seem to know where the line was between reality and the game. A friend remembers playing the video game "Zelda" with John and other friends. The person playing had his character stab someone in the game, saying "I bet that hurt." John took a knife and poked him in the shoulder. Though he got in trouble, John did not seem to know what he had done wrong. (Affidavit of Derrick Parris.)

53. John brought this to bear on his relationships with others as well. He dated a woman named Stephanie Bennett during his senior year of high school. Bennett was one year younger than John. They started their relationship by talking often over the phone after a mutual friend introduced them. Before they had ever met in person, John told Bennett that he was falling in love with her. Bennett thought this was strange, but continued to date him. (Affidavit of Stephanie Bennett.)

54. Once in this relationship, John started becoming overly attached. He became close to Bennett's family. He started going to her church, instead of with his own family. He even started to eat Sunday dinner with Bennett's family rather than his own. Bennett remembers that John spent most holidays at her house. (Affidavit of Stephanie Bennett.)

55. After a short while, John started talking to Bennett about their future together. He wanted to plan everything out about their future. To Bennett, it was like the idea that they were going to get married was a "done deal"



in John's mind. Yet at this same time, Bennett started pulling away from John. John did not seem to realize at all, thinking everything was fine. Ultimately, Bennett broke off their relationship. John was surprised and upset. (Affidavit of Stephanie Bennett.)

56. Once again, John's inability to attach left him feeling alone, angry, left out, and frustrated. He tried to escape through role playing games, but this only served to further alienate him from his friends who believed that even the way he played the games was odd and off-putting. He could not succeed even in the game, contributing to feelings of rejection and failure and an urge to escape. This loneliness, rejection, and need to escape only further served to limit his social skills and keep him disconnected from others. This cycle became a self-fulfilling prophecy—his fears of not being able to connect and therefore being rejected, led to his odd behavior, bullying, and a further and further sense of isolation. This isolation continued to inhibit a healthy development of self.

**Graduation: Failed Independence**

57. On June 2, 1995, John graduated from Jonesville High School. (Hummel school records.) He quit his part-time job at the Hardee's and began work at a warehouse for BMG Music. John moved out of his parents' home and got an apartment of his own. (Interview with John Hummel.)

58. John's friends would come to his apartment because he was older and they were still in high school. They would bring girls over with them and hang out. John started drinking and going to bars. John even had a long-term relationship with a woman named Jennifer Wood. (Affidavit of Derrick Parris.)

59. After two years of living on his own, however, John struggled to pay his bills and live independently as an adult. Then one day, he and Jennifer arrived at his apartment just in time to interrupt a break-in. Although nothing was taken, John's parents insisted he move back to their house. John decided rather than live at home again, he would join the Marine Corps. (Interview with John Hummel.)

60. Once again, John's relationship failed and his ability to live on his own and support himself adequately failed. Rather than go back to his parent's house where he felt he would be miserable and yet again dependent on his controlling and unloving parents, he again escaped from his current life, "wiped the board clean" and joined the Marines.

**Military Career: Opportunity for Success**

61. John enlisted in the Marine Corps on September 26, 1997. John was initially assigned to combat support, but part way through basic training John was identified as having a sufficient aptitude to qualify for work as an intelligence specialist. For the next year, John went back and forth between various Marine trainings and spending time back in South Carolina. In late 1998, John was stationed at Camp Pendleton, California. (Interview with John Hummel; Hummel military records.)

62. Unlike prior to joining the military, John initially succeeded and thrived in the military. John's commanders felt John was a very competent Marine who did solid work. They never felt he gave his commanders any problems. Friends remember John as dependable, quiet, and laid back. John stayed out of trouble, even when friends would get into altercations. (Affidavit of Efrain Chaidez.)

63. At Camp Pendleton, John became particularly close to three men – Wayne "Buddy" Matthias, Fred Emmer, and Efrain Chaidez. John and Mathias were roommates and both worked in the intelligence branch. Matthias had been at Camp Pendleton for about a year before John arrived and already had a group of friends. Matthias brought John into the group when he arrived. (Affidavit of Wayne Matthias.)

64. The four friends (John, Matthias, Emmer and Chaidez) had very different personalities and backgrounds when they first connected, but they became very close, even forming a new identity together. Chaidez was from inner-city Chicago where he had been involved in a gang. He recognized in John the same desire he had to make a new life in the military. He felt John was trying to escape his life in rural South Carolina. (Affidavit of Efrain Chaidez.)

65. The four friends spent most of their time together, hanging out daily and spending almost all their weekends together. Matthias noticed that John started to copy many of the behaviors of him and Emmer. He started wearing the same types of clothes and getting tattoos. He even started emulating some of Matthias's mannerisms. Matthias had to talk to John about being his own person and that he should not copy his friends. (Affidavit of Wayne Matthias.)

66. John and his friends spent a lot of time playing games, drinking, and going to strip clubs. John began to gravitate to strip clubs even more than the others. Mathias remembers John going to these clubs almost every night. John became friendly with the staff and the strippers. Emmer does not remember John ever dating anyone or having relationships with women other than interacting with strippers. Chaidez recalls that John would especially try to show the women that he cared about them by asking to

EXHIBIT 2 Page 19

escort them to their cars. He even stood up to other men if he thought they were mistreating the women. John became so attached that he talked about opening up his own strip club. (Affidavit of Wayne Mathias; Affidavit of Efrain Chaidez; Affidavit of Fred Emmer.)

67. John continued to be interested in playing role-playing games like Dungeons and Dragons. His friends noted that he was interested in fantasy, to an extent that was more than usual. To them it seemed like John was dodging real life. (Affidavit of Wayne Mathias; Affidavit of Fred Emmer.)

68. In his role as an intelligence specialist, John had a security clearance to receive sensitive information. He would be told about enemy movements, make reports and maps reflecting this information, and then communicate that information to his commanders. He built terrain models of the areas his fellow Marines would operate in. He enjoyed this job, and said it reminded him of playing role playing games. (Interview with John Hummel.)

69. John felt fulfilled by this work, it gave him a chance to play those role playing games, but in real life. His basic needs were attended to, he made a living, he felt connected, and the military provided a strong structure and discipline that he could not create on his own. In the military, similar to in prison, most decisions are made for you. There is a uniform, a chain of command, expected behavior, clear expectations, and clear feedback.

70. When John would return home to South Carolina on leave, his friends noticed a change in him. They saw that John was more fit and in shape physically. John seemed happy and proud. Chad Brown remembers John riding in a car with friends during one leave when the subject of the Monica Lewinsky scandal came up. John got very serious and told the

group "that's my commander-in-chief you are talking about." Brown was impressed by the seriousness and loyalty John expressed. (Affidavit of Chad Brown.)

71. As the first period of his life where John experienced relative success, both in being recognized for his abilities and in forming close friendship bonds, John would have particularly tied his sense of self to this time in his life. Even this success was moderated by his past: his copying of his friends shows a lack of clear sense of self or identity; and he continued to rely on finding fulfillment in fantasy. This time in war games rather than video games or role-playing games. John exhibited a need to connect to others, without the actual capacity to do so in an appropriate or effective manner. Yet, he was able to form some bonds and find his place and an identity.

**Military Career: Return to Failure**

72. Not everything was positive for John, though, in the Marines. During his trips home, he would no longer exercise and would eat junk food. Over time, this meant that he gained significant weight and lost some of his fitness. He constantly struggled to meet the physical requirements of the Marines. (Interview of John Hummel.)

73. Upon his return, this weight gain made him a target of teasing and even some bullying by other members of his unit. His friends noticed that he was overweight, and even poked fun at him sometimes. Chaidez recalls that John particularly got a hard time from some of his commanding sergeants. John was assigned to a "Weight Control" program during his first deployment overseas in late 1999. (Affidavit of Wayne Matthias; Affidavit of Efrain Chaidez; Affidavit of Fred Emmer; Hummel military records.)

74. Unfortunately for John, just as this struggle was reaching its worst, his friends and support in the military were transferred away. Matthias, Emmer, and Chaidez were all transferred away or discharged in early 2000. The friends went their separate ways, while John remained behind at Camp Pendleton to finish another two years of service. (Affidavit of Wayne Matthias; Affidavit of Efrain Chaidez; Affidavit of Fred Emmer.)

75. Looking back, John's friends see that time as a point when John lost his support system. Chaidez believes John needed more attention paid to him, particularly because of his weight struggles. John seemed to be struggling and did not have "tough" enough "skin" to get through it. (Affidavit of Efrain Chaidez.)

76. Shortly after their discharge, Mathias and Emmer learned that John was not doing well and had changed in demeanor. In May of 2000, they got a call from John. John had planned on going AWOL, but had only gotten as far as Arizona when his truck broke down. Mathias and Emmer drove out to Arizona and brought John and the truck back to California. They could tell John was stressed and depressed. John told them he was having a hard time because he no longer had a support network. (Affidavit of Wayne Mathias; Affidavit of Fred Emmer.)

77. For John, it was compounded that he was bullied and overweight, felt like a failure in the only job he had ever been successful at, and lost his only friends, all at the same time. This was a significant loss for John, especially since he had struggled so much to form any meaningful relationships at all and had finally felt he was competent and successful, proud and happy— only to have it all start to unravel.

78. Because John returned to base in a short time, he was only given a minor reprimand and fine. However, his new commanders took action to revoke

John's security clearance. Without that security clearance, he was no longer eligible to work as an intelligence specialist. Instead, John was given mundane and custodial jobs, such as moving cargo on and off ships or setting up command tents. (Interview with John Hummel; Hummel military records.)

79. The loss was compounded to an even greater degree as John lost his intelligence job and security clearance, knew his superiors were disappointed in him and felt they could not trust him, and was relegated to mundane work and feeling a very strong sense of rejection and failure.

80. John continued going to strip clubs, frequently by himself. He met and began spending time with a group of homeless young adults who lived in Oceanside, California near the military base. John would buy the kids food, take them to movies, and rent them hotel rooms to stay in. John even dated some of the women in the group. (Interview with John Hummel.)

81. Once again, John made an attempt to connect and to feel useful. He likely was being used by this group of homeless individuals, who only wanted to hang around him so he would buy things or do things for them (similar to his "friends" in high school). This is again not a meaningful connection, but another misguided attempt at real connection.

82. A few months before John was to be discharged, he began a relationship with a twenty-year-old homeless woman name Letti Ulbright. Ulbright was pregnant at the time, though John was not the father. Hummel and Ulbright decided that she would come back to South Carolina with John and they would be a family. (Testimony of Letti Hubertz.)

83. In April 2002, John was sent back to South Carolina to attend separation classes and be discharged from the Marines. As he got closer to his discharge, John's high school friends noticed that John started to lose the

confidence and assertiveness he had developed at the early stages of his military service. He physically became less fit and stopped exercising. John was no longer proud and jovial, but instead was described as brooding. He attended only one day of separation classes and then stopped going, ending his military career with a reprimand for an Unauthorized Absence. (Hummel military records; Affidavit of Chad Brown.)

## Return to South Carolina: Repeating Patterns of Failure and Escape

84. Once back in South Carolina as a civilian, John and Ulbright moved in with John's parents and John got a job at the Kohler factory with his father, glazing toilets and sinks. After a few months, John and Ulbright moved to their own mobile home. John worked the night shift and no longer frequented strip clubs or bars. They were like a family, spending time with John's parents and John's sister Neata who was living in South Carolina again. (Testimony of Letti Hubertz.)

85. This might have represented a new life for John, a new chance at success. Even though he was spending time with his parents and working for his father, he was in the role of "man of the house" and trying to do the right thing by a woman in need, even though he was not the baby's father. In my opinion, this was another attempt by John at connection and an effort at being in the role he thought he was supposed to have—that of a provider.

86. In September 2002, Ulbright gave birth to a baby boy. Two weeks after the baby was born, John's sister Neata convinced John that Ulbright was not good for him and he should break off the relationship. One day while John was at work, Neata took Ulbright to a bus station and gave her a ticket to California and a letter Neata said was from John saying he was not ready to be a father. The letter said John had left for Texas, although he

had not. When Ulbright looked at the ticket, she noticed that it had been purchased two weeks before. (Testimony of Letti Hubertz; Testimony of Neata Woody.)

87. Once again, John's attachments and relationships were severed. Neata's involvement in orchestrating Letti's departure shows her role as more of a maternal than sibling figure to John, and also demonstrates an over involvement and inappropriate role with John. The episode would have further cemented John's negative experience with family attachments, creating hostility and sensitivity. It also continued a pattern that led John to desire escape from his current life situation.

88. After Ulbright left South Carolina, John quit his job at Kohler. For the next year, John changed jobs often, working at a cigarette warehouse, a temporary security agency, and a Cracker Barrel restaurant. (Hummel social security records.)

89. John also reverted back to spending most of his time and money drinking, smoking, and frequenting strip clubs. John's high school friends remembered that prior to the military, John never smoked or drank, having seen his father suffer a heart attack from smoking. Now, John smoked both tobacco and marijuana, and drank frequently. His trips to strip clubs became "more like a way of life for him." John went to strip clubs "almost every night." (Affidavit of Chad Brown; Affidavit of Derrick Parris; Affidavit of Joseph Patterson.)

90. John's friends saw a different John than the person who they had grown up with. He wore black clothing, a trench coat, and goth-style rings. John listened to harder music than before. (Affidavit of Chad Brown.)

91. John replaced his interest in playing Dungeons and Dragons with trips to see strippers. John seemed to think the attention he received from women

at the clubs was real. He acted like the women were his girlfriends. His friends explained to John the girls were just working, and often the women would give him fake phone numbers, but John would continue to talk about the women like they wanted to have relationships with him. To his friends, John seemed to be living in a fantasy world. (Affidavit of Chad Brown; Affidavit of Derrick Parris.)

92. At this point, John was becoming less and less connected to reality. His propensity for role playing games as an escape from reality turned into creating fictional relationships in real life. This is another indication of poor social skills, and an inability to read people accurately, as well as a true need for connection and closeness but an inability to form those relationships.

93. As time went on, John was clearly struggling. One friend from school that he became romantically involved with remembers John as drifting in and out of her life. They would hang out and then she would not hear from him for a while. Then he would suddenly show up at her house unannounced. He did not seem to have any goals or plans, or significant relationships. (Affidavit of Shana Fowler.)

94. In late 2003, John left his hometown and moved to another town in South Carolina without telling his friends. After a few days of absence, his friends asked John's parents where John was and discovered he had left without saying anything to anyone. (Affidavit of Chad Brown.)

95. John briefly moved in with a stripper and her boyfriend. However, the couple had not paid their rent and soon they were being evicted. Facing moving back with his parents, John chose instead to move to Texas and live with his cousin, Michael. (Interview with John Hummel.)

96. John left South Carolina and moved to Texas with little or no warning to any of his friends. He spoke to one friend about moving, but did not have any definite plans or purpose. She remembers that one night John gave her son some collectible figurines that she knew John loved. She thought it was strange for him to give those up. That was the last time she saw John. (Affidavit of Shana Fowler.)

97. Once again, when faced with failure and his own inability to live independently in relationship to others, John "wiped the board clean," abandoning all his friendships and moving away unexpectedly. This impulsive conduct fell squarely within the patterns of behavior John had developed over the course of his life whereby he reacted to stress by escaping and attempting to start a new life, a new identity, functionally a "new game." In Erikson's theory of development the crisis to be resolved during adulthood (age 19-40) is Intimacy vs. Isolation. John clearly was suffering and not able to form intimate connections, leading to more and more of a sense of loneliness and isolation.

**Life in Texas: Repeating the Pattern of Failure and Need to Escape**

98. Soon after arriving in Texas, John's cousin introduced him to Joy Bedford. John and Joy had a short romance before Joy became pregnant around November 2003. The couple married in February 2004 and their daughter Jodi was born that summer on July 17, 2004. (Interview with John Hummel.)

99. Around the same time John married Joy, John got a job at the warehouse of clothing company Williamson Dickey. After a year of relative stability, however, John tripped over a box at work in May 2005. John's back was

injured in the fall, putting John on worker's compensation. (Hummel Employment Records.)

100. Over the next several years, John struggled with medical problems that prevented him from working. He received multiple surgeries for his back injury, but continued to experience significant pain from the injury. John applied for but was denied Social Security disability benefits in late 2006. (Hummel Medical Records.)

101. Around this same time, however, doctors diagnosed John with Crohn's disease, a type of inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. John's case was severe enough to require surgery, and a significant portion of his large intestine was removed. For a time, John was required to wear a colostomy bag. John also had to eat a special diet. (Hummel Medical Records; Interview with John Hummel; Affidavit of Christopher Paris.) Crohn's Disease is extremely limiting and can have very serious complications. Sufferers begin to associate eating with fear of intense abdominal pain. The frequent attacks of diarrhea and the continuous use of a colostomy bag can create humiliation, social isolation, and low self-esteem (New York Times, In Depth Report).

102. Because of John's medical problems and inability to work, John's family began to struggle financially. George Goodson, one of the Hummels' neighbors, remembers helping John's family move into Joy's father's home when their financial situation was particularly bad. Goodson gave John a computer to help them out and sold the Hummels one of his cars. He also remembers John asking for help getting VA medical benefits set up. Joy worked as a massage therapist and Goodson would occasionally get massages from Joy. During those massages, he remembers Joy talking