an objective standard of reasonableness under prevailing professional norms because any challenge at trial or on appeal to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have lacked merit and would have been futile. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("reasonably competent counsel need not perform a useless or futile act"); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d 610, 623-24 (Tex. Crim. App. 2009) (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

18. There is no reasonable probability that the outcome of the punishment phase of Applicant's trial or the outcome of Applicant's appeal would have been different had trial and appellate counsel advanced meritless challenges to the legal sufficiency of the evidence to prove Applicant's future dangerousness. *See Barrera v. State*, 978 S.W.3d 665, 668-69 (Tex. App.—Corpus Christi 1998, pet. ref'd) (no prejudice resulted from counsel's failure to raise objection that lacked merit). Therefore, Applicant has failed to meet his burden to prove by a preponderance of the evidence that the alleged deficiency of his trial and appellate counsel resulted in prejudice.

19. The Court recommends that Applicant's second claim for relief be denied.

## B. Claim for Relief Three

Applicant alleges that his trial counsel were ineffective for failing to present evidence that Applicant was not a future danger through Tarrant County Jail employees who supervised him while he was confined there and through a mental-health expert such psychiatrist Susan Hardesty, M.D. [Application at 40-47.]

**1413**

## Findings of Fact

1.   Applicant submits affidavits from Tarrant County Jail employees Tony Rigmaiden, Rory Thomas, and Cody Bell, who supervised Applicant while he was confined in the jail.  [*See* Applicant's Exhibits 4, 20, 21.]

2.   Trial counsel did not identify Rigmaiden, Thomas, or Bell during their investigation.  [*See* Moore's suppl. affidavit at 3.]

3.   In Moore's experience, testimony of jail personnel is often not particularly favorable to the defense by the time of trial unless there is "at least some personal relationship with, or affinity for the defendant that has developed with the officers."  [Moore's suppl. affidavit at 2.]

4.   Members of the defense team asked Applicant about the possibility of finding jail guards, chaplains, or other jail personnel with whom Applicant had developed a sufficiently good relationship that they might be willing to testify on his behalf, but Applicant never identified any such prospective witness and was not very encouraging that any such witnesses might be found.  [Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

5.   In light of Moore's experience in dealing with testimony of jail personnel, as well as the fact that Applicant never identified any such prospective witnesses and was not encouraging that such witnesses might be found, Applicant's trial counsel made a reasonable strategic determination not to send the defense team's private investigator to the jail because his efforts would be better focused on other areas that might prove more beneficial to Applicant's case.  [Moore's suppl. affidavit at 2.]

6.   Applicant's assertion that he did nothing to dissuade trial counsel from pursuing an investigation into Tarrant County jail staff and that he "simply could not recall the names of any specific jail staff he could recommend that counsel speak to" is unsupported by the record.  [*See* Supplemental Response To State's Answer at 5.]

7.   Even if Applicant could not recall a specific name, he did not even generally indicate that he had become particularly close to any Tarrant County Jail personnel who might be willing to testify for the defense, and he gave his trial counsel reason to believe that the expenditure of valuable resources in

17

**1414**

**App. 0482**

pursuing this area would not yield anything of value to Applicant's case. [*See* Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

8.  Although Rigmaiden's, Bell's, and Thomas' names appear in jail logs contained in Applicant's Exhibit 44, nothing in those entries show that any of them had developed at least some personal relationship with or affinity for Applicant. [*See* Applicant's Exhibit 44.]

9.  Given Applicant's failure to identify any jail personnel with whom he had developed such close relationship, Applicant's lack of encouragement that such witnesses might be found, and Moore's experiences in seeking testimony from jail personnel, it was not unreasonable for trial counsel to make the strategic investigative decision to focus their efforts on areas that might prove more beneficial to Applicant's case.

10. Trial counsel presented testimony from Frank AuBuchon (the defense team's prison classification expert), Dr. McGarrahan, and lay witnesses to show Applicant's lack of disciplinary issues in jail, Applicant's lack of a violent or criminal history, and the likelihood that Applicant would adapt well to the structured environment of prison life. [RR 43: 113-14, 166, 178, 232; RR 44: 70, 73, 159; Moore's affidavit at 5-6; Cummings' affidavit at 3-4.]

11. Trial counsel stressed in closing arguments that Applicant did not pose a future danger, in part based on AuBuchon's testimony and because Applicant had no history of violence, no prior criminal history, and no issues during his incarceration in jail. [RR 45: 69, 78-81.]

12. The proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, and Bell provides no meaningful new facts about Applicant's pretrial confinement that Applicant's trial counsel did not develop through other witnesses. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; *see* Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

13. The facts that Applicant alleges should have been presented through Rigmaiden, Thomas, and Bell serve largely the same purposes as and are largely cumulative of other evidence that Applicant had no disciplinary issues while confined in jail, that he would likely adjust well to a prison

18

**1415**

App. 0483

setting if he were sentenced to life without parole, and that he allegedly posed a low risk of future violence. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; Moore's affidavit at 5-6; Moore's suppl. affidavit at 2-3.]

14. Applicant overrates the potential impact of the facts contained in the habeas affidavits of Rigmaiden, Thomas, and Bell and unfairly overlooks or underrates the testimony presented through Dr. McGarrahan, AuBuchon, and lay witnesses. [*See* Application at 42-45; *see also* RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; RR 45: 69, 78-81; Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

15. Applicant's assertion that his trial counsel never addressed the issue of whether Applicant as an individual possessed a likelihood of committing acts of violence in the future "is simply not true" in light of the evidence presented at Applicant's trial. [Moore's supplemental affidavit at 2-3; *see* Supplemental Response To State's Answer at 7.]

16. Applicant's Tarrant County Jail records attached to Cummings' habeas affidavit reflect that during Applicant's confinement he was classified as "High Custody," required MHMR services, and was on suicide watch. [Cummings' affidavit at 5 & jail records attached thereto.]

17. Applicant's Tarrant County Jail records showing Applicant was closely supervised and classified as "High Custody" would have provided little, if any, benefit to Applicant's punishment case because Applicant's jury could have reasonably assumed that Applicant had no disciplinary issues in jail because his classification left him little opportunity to violate the rules or because Applicant was on his best behavior pending his capital-murder trial where he faced the death penalty.

18. Applicant asserts that trial counsel should have retained a mental-health expert such as Dr. Hardesty, a psychiatrist, "to explain how [Applicant's] past patterns of behavior and mental status did not support a finding that he would be a future danger" and to explain that he was a low risk to commit future acts of violence in a prison setting because he would be unlikely to encounter the severe familial and financial stressors that plagued him before the crime. [Application at 46; *see* Applicant's Exhibit 1.]

**1416**

19. Trial counsel thoroughly investigated Applicant's background and upbringing in order to determine how those factors may have influenced Applicant's behavior in murdering his family members. [Moore's affidavit at 7.]

20. Trial counsel presented testimony from the available lay and expert witnesses and gave the jury as complete a picture as possible of Applicant's life history from his childhood until he murdered his family members and was confined in jail.

21. Trial counsel discussed potential mental-health experts whom they might use in Applicant's case, they contacted several mental-health experts, and they decided to retain Dr. McGarrahan, a highly qualified forensic psychologist and neuropsychologist, because of Moore's previous work with her, Moore's opinion of her abilities, her reputation in the legal community, and her good professional relationship with J. Randall Price, Ph.D., the forensic psychologist and neuropsychologist retained by the State in this case. [Moore's affidavit at 7.]

22. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

23. Dr. McGarrahan based her testimony on nearly eleven hours evaluating Applicant and interviewing Applicant about his "entire social history," reviewing a large volume of records and videos regarding Applicant, talking to Applicant's sister and mother, reviewing medical records of Applicant's mother, and reviewing psychological test data from Dr. Price's evaluation of Applicant. [RR 44: 121-24.]

24. Trial counsel and Dr. McGarrahan collaborated and made a reasonable strategic decision that it was not in Applicant's best interest and would not benefit Applicant's case to have Dr. McGarrahan or another expert in risk assessment perform a formal violence risk assessment of Applicant. [Moore's affidavit at 7-8.]

**1417**

App. 0485

25.   The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Affidavit of J. Randall Price, Ph.D. at 1-2 (hereinafter referred to as "Dr. Price's affidavit").]

26.   Dr. Hardesty's proposed testimony would have opened the door to damaging testimony from Dr. Price, which would have been devastating to the defense and which would have outweighed any potential benefit to be gained from Dr. Hardesty's proposed testimony. [Moore's affidavit at 8; Cummings' affidavit at 6.]

27.   Dr. Hardesty's opinion that Applicant would not pose a future risk of violence, even if it were determined to be admissible at trial, is not so compelling that it would have changed the jury's answer to the future-dangerousness special issue, especially in light of State's powerful evidence that Applicant posed a future danger. [*See* Applicant's Exhibit 1.]

28.   Dr. Hardesty's habeas affidavit does not disclose the scientific methodology by which she reached her opinion or contain any objective source material to substantiate the validity or appropriateness of her methodology. [*See* Applicant's Exhibit 1.]

29.   Dr. Hardesty's opinions contained in her habeas affidavit rest solely on her personal assessment of Applicant's future dangerousness, not upon any standardized risk assessment measures or any scientific or statistical comparisons. [Applicant's Exhibit 1; *see* Moore's affidavit at 8-9 (expressing belief that Dr. Hardesty's opinion "would be essentially the same type of testimony that the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to *Daubert*" when offered by the State).]

30.   Dr. Hardesty's assertions that Applicant, while incarcerated, would not experience the stressors that were antecedents to his crimes and that Applicant would not encounter "a relational model that would be iterative of attachment" are unrealistic assessments of the life in prison that Applicant could face if he were incarcerated on a sentence of life without parole. [Moore's affidavit at 9; *see* Applicant's Exhibit 1.]

**1418**

31. Trial counsel made a well-reasoned strategic decision based on their thorough investigation, their professional judgment, and their reliance on a well-qualified mental-health expert about how to best present evidence that Applicant would not constitute a future danger if he received a sentence of life without parole instead of death.

32. Even after reviewing the opinions contained in Dr. Hardesty's affidavit, Moore does not question that he and Cummings made the correct decision about how to best present Applicant's case at the punishment phase of the trial. [*See* Moore's affidavit at 9.]

33. Applicant's annihilation of his family, and his demeanor and actions before and afterward (many of which were documented on video recordings seen by the jury), demonstrated Applicant's cold-hearted capacity for extreme violence and sufficed to establish his future dangerousness.

34. The Court rejects Applicant's claim that he had "never committed a single act of violence in his life before this crime." [Supplemental Response to State's Answer at 8 n.3.] Applicant researched the effects of rat poison on humans and tried to poison his family, which exhibited Applicant's desire and propensity to commit acts of violence by killing his family in a brutal manner so that he could be free to pursue a relationship with Freeze. [RR 41: 11, 14; RR 43: 36-40; SX 228, 347C, 349A2.]

35. In Moore's experience in ten death-penalty cases tried to verdict, the facts of the particular offense on trial are "generally paramount" in the jury's determination of the future-dangerousness special issue. [Moore's suppl. affidavit at 4.]

36. In Moore's opinion, Applicant's actions before and during the vicious murders of his family members had an "indelible impact" on the jury that was "probably impossible for anyone to overcome." [Moore's suppl. affidavit at 4.]

37. Trial counsel exercised their prerogative not to call prison employees or a psychiatrist such as Dr. Hardesty to testify at the punishment phase of Applicant's trial on the issue of future dangerousness.

**1419**

38. Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present testimony from jail personnel on the issue of future dangerousness during the punishment phase of a death-penalty trial.

39. Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present expert testimony such as that proffered by Dr. Hardesty on the issue of future dangerousness during the punishment phase of a death-penalty trial.

40. The failure of trial counsel to discover Rigmaiden, Thomas, and Bell or to retain Dr. Hardesty was not the result of inadequate investigation or preparation of Applicant's case.

41. Applicant's trial counsel performed well within the wide range of reasonable professional assistance in conducting the investigation of Applicant's case and making strategic decisions about what areas of investigation to pursue, what evidence to present, and what witnesses to call in an effort to obtain a favorable answer to the future-dangerousness special issue.

42. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

43. Applicant's allegations of ineffective assistance are conclusory.

44. It is not reasonable to believe that the proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, Bell, and Dr. Hardesty, when weighed along with the remaining relevant evidence contained in the record, would have significantly diminished the powerful impact of the State's evidence of Applicant's future dangerousness and caused the jury to answer the future-dangerousness special issue differently.

**Conclusions of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

23

**1420**

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

**1421**

6. In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7. Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8. Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d 713, 728-29 (Tex. Crim. App. 2006).

9. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

**1422**

**App. 0490**

12. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Austin 1989, pet. ref'd).

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518.

14. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty at trial is not alone a basis to prove a claim of ineffective assistance. The fact that Applicant's habeas counsel now believe that another type of expert witness should have been called to testify on the issue of future dangerousness does not support an allegation of ineffective assistance. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance"); *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (same).

15. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987) ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

16. The failure to present essentially cumulative testimony that Applicant would not pose a future danger if he were sentenced to life without parole instead of death did not constitute deficient performance. *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (counsel's decision not to present

**1423**

cumulative testimony does not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *Id.* at 1518 ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required").

17.  Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present evidence that Applicant would not constitute a future danger if he were sentenced to life without parole instead of death. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight).

18.  Dr. Hardesty's proffered opinions of Applicant's future dangerousness do not satisfy the reliability requirements of TEX. R. EVID. 702 because her determination that Applicant would not be a future danger if he were sentenced to life in prison is the same type of unreliable prediction of future dangerousness rejected as unreliable in *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).

19.  Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting evidence that Applicant would not pose a future danger if he were sentenced to life without parole fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

20.  Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the future-dangerousness special issue differently had counsel called Rigmaiden, Thomas, Bell, and Dr. Hardesty to testify at his trial. *See Ex parte Medina*, 361 S.W.3d 633, 644 (Tex. Crim.

App. 2011) (providing prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

21. Given the cumulative nature of the evidence contained in the habeas affidavits of Rigmaiden, Thomas, and Bell, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue differently had trial counsel discovered and called those witnesses to testify during the punishment phase of Applicant's trial. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir. 2009) (upholding state court's finding of no prejudice where additional testimony was cumulative).

22. There is no reasonable probability that the proposed testimony of Rigmaiden, Thomas, Bell, and Dr. Hardesty would have persuaded Applicant's jury to answer the future-dangerousness special issue differently. This is especially true given that the weight of the aggravating facts was staggering and presented a powerful case to meet the State's burden to prove beyond a reasonable doubt that Applicant constituted a future danger and in light of the fact that the jury heard other lay and expert testimony that Applicant had never been violent, that he had no disciplinary issues in jail and no prior criminal history, that he committed the murders when emotions he repressed his entire life flooded out, and that he would likely adjust very well to the prison environment. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable.

23. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

24. The Court recommends that Applicant's third claim for relief be denied.

## C.    Claim for Relief Four

Applicant alleges that trial counsel were ineffective for failing to present expert testimony of a "social history expert witness" such as social worker Laura Smith to explain to the jury "how [Applicant's] life history shaped the person that he became later in life." [Application at 47-50.]

## Findings Of Fact

1. Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial, but he is unaware of any legal requirement to use a "social history expert witness" in every such case in order to accomplish that purpose. [Moore's affidavit at 10.]

2. Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3. Prevailing professional norms do not require trial counsel in a death-penalty case to retain a "social history expert witness" such as social worker Smith or to call such a witness to testify at the punishment phase of a death-penalty trial.

4. Applicant's defense team included an experienced mitigation specialist with a master's degree and license in social work and an experienced private investigator. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

5. Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the charged offense. [Moore's affidavit at 7.]

6. Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

29

**1426**

App. 0494

7. Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

8. Many people contacted by the defense team either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

9. The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom the team contacted. [Moore's affidavit at 14.]

13. Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14. Trial counsel presented all of the witnesses whom they were able to locate and convince to testify and whom they thought were necessary to develop

**1427**

the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10; Cummings' affidavit at 6.]

15. Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16. At the request of Applicant's trial counsel, Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist, administered a full neuropsychological evaluation as well as personality and emotional testing involving twenty to thirty different tasks and instruments to Applicant over about eleven hours total on October 13 and December 20, 2010. [RR 44: 118-22.]

17. Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, correspondence from Applicant's sister Neata to Applicant, medical records for Applicant's mother, and psychological test data from Applicant's evaluation by Dr. Price, the State's forensic psychologist and neuropsychologist; she spoke to Neata and Jackie; she performed a clinical interview to ask Applicant about his "entire social history"; she conducted a mental-status examination during which she observed Applicant and discussed with Applicant any psychiatric symptoms he was having; and she discussed the offenses with Applicant in great detail. [RR 44: 121-24.]

18. Trial counsel discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Applicant. [Moore's affidavit at 7.]

19. The defense team discussed various mitigation themes as they came to light, including Applicant's participation in role-playing games; Applicant's use of marijuana, alcohol, and other drugs; the possibility that Applicant suffered from being raised in poverty; the possibility that Applicant had a mental disorder or illness; the possibility that Applicant observed sexual abuse in his household; and the possibility that Applicant was abused or neglected as a child. [Cummings' affidavit at 7.]

20. Trial counsel conducted a thorough investigation and made the strategic decision that the most effective way to develop Applicant's mitigation case was to present evidence of Applicant's life history through the available lay witnesses and then to use that story as a basis for the opinions offered by Dr.

31

**1428**

McGarrahan about how Applicant's life history shaped the person he became later in life and how it related to his commission of the murders. [Moore's affidavit at 10; Cummings' affidavit at 6; Moore's suppl. affidavit at 5-6.]

21. Contrary to Applicant's assertions, Applicant's trial counsel *did* present expert testimony about Applicant's life history through Dr. McGarrahan to develop the relevant social history as part of Applicant's mitigation case. [Dr. Price's affidavit at 3-4.]

22. Dr. McGarrahan's testimony during the punishment phase of Applicant's trial illuminated how Applicant's life history shaped the person he became later in life and related to Applicant's murders of his family members. [*See generally* RR 44: 118-63.]

23. Dr. McGarrahan testified during the punishment phase of Applicant's trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

24. Dr. McGarrahan opined that Applicant murdered his family when the emotions he had repressed for thirty-five years flooded out in an emotional rage at the time of the offense; she admitted, however, that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

25. Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness who was at least as qualified as a "social history expert witness" such as social worker Smith to develop a comprehensive social history and present her findings to the jury, and she testified effectively and credibly regarding Applicant's relevant life history. [Dr. Price's affidavit at 3-4.]

26. There is no reason to believe that Applicant's jury would have been more persuaded by the testimony of a social worker like Smith than it was by a well-qualified forensic psychologist and neuropsychologist like Dr. McGarrahan, who communicated effectively and used minimal technical jargon while testifying to the same or similar topics. [*See* Moore's suppl. affidavit at 5; Dr. Price's affidavit at 2-4; RR 44: 118-63.]

**1429**

**App. 0497**

27. The *substance* of the testimony from Dr. McGarrahan and other witnesses developed the important facts of Applicant's life and life events and gave the jury a sufficiently complete understanding of Applicant's life history. [*See* Moore's suppl. affidavit at 6.]

28. Trial counsel presented the necessary facts and developed the expert testimony necessary to present Applicant's mitigation case to the jury without retaining Smith and calling her to testify at trial. [Moore's affidavit at 11.]

29. Trial counsel exercised sound trial strategy based on a thorough investigation in determining what witnesses to call at trial and how to best present Applicant's mitigation case to the jury.

30. Trial counsel exercised their prerogative to rely on lay witnesses and Dr. McGarrahan rather than a "social history expert witness" such as social worker Smith.

31. Even if a "social history expert witness" such as social worker Smith could have helped the jury to understand how Applicant's life events impacted him, Moore's extensive experience has taught him that jurors often ascribe relatively little importance to opinion testimony of the type contained in Smith's affidavits. [Moore's supplemental affidavit at 5.]

32. Smith's habeas affidavit provides a lengthy recitation of Applicant's life history taken from lay-witness testimony at trial, lay-witness affidavits obtained by Applicant's habeas counsel, records pertaining to Applicant, and Smith's five-hour interview with Applicant at the Polunsky Unit. [Applicant's Exhibit 2.] However, Smith offers no explanation of how her opinions and proposed testimony might have been different had she been limited to the testimony available to trial counsel at the time of Applicant's trial. [*Id.*]

33. Applicant offers no explanation how Dr. McGarrahan's evaluation of Applicant and the subject matter of her testimony were deficient or why testimony from a social worker such as Smith would have been more persuasive to the jury. [*See* Application at 47-62.]

34. Smith's explanation of Applicant's actions surrounding the murder of his family members would not have been more valuable, persuasive, or credible to the jury than the trial testimony of Dr. McGarrahan and the lay witnesses. [Moore's suppl. affidavit at 5.]

35. Smith's affidavit contains no meaningful facts or any necessary expert opinions that trial counsel did not cover in the mitigation presentation at trial [Moore's affidavit at 11; Moore's suppl. affidavit at 5] or that would have persuaded the jury to answer the mitigation special issue differently.

36. Applicant's trial counsel acted reasonably in relying on Dr. McGarrahan to relate the relevant social-history issues to the jury. [Dr. Price's affidavit at 4.]

37. Applicant simply criticizes the manner in which his experienced trial counsel presented his life history rather than alleging an outright failure to present such facts. [Moore's suppl. affidavit at 5.]

38. Applicant's jury could evaluate the testimony provided by lay witnesses and Dr. McGarrahan and could determine without hearing from a "social history expert witness" such as Smith whether any of the trial testimony justified a "yes" answer to the mitigation special issue.

39. The information contained in Smith's habeas affidavit would not have made Applicant's mitigating evidence more compelling, understandable, or different; it would not have tipped the scales against the powerful aggravating facts presented by the State or changed Applicant's sentence. [Moore's affidavit at 6.]

40. The failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith did not result from an inadequate investigation or inadequate preparation of Applicant's mitigation case.

41. It is not reasonable to believe that the proposed testimony contained in the habeas affidavit of social worker Smith, when considered together with the remaining relevant evidence contained in the record, would have diminished the powerful impact of the aggravating evidence and persuaded the jury to answer the mitigation special issue differently.

**1431**

42. Applicant incorrectly seeks to have this Court overlook the mitigation facts and themes actually investigated and presented by his trial counsel and to second-guess counsel for not calling a different witness who may have presented the evidence differently. [Supplemental Response To State's Answer at 9-13; Moore's suppl. affidavit at 5.]

43. Applicant's allegation of prejudice is conclusory.

44. Applicant's claim for relief second-guesses in hindsight the strategic decisions of his trial counsel about what witnesses to call and about how to best present Applicant's mitigation case to the jury.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of

**1432**

counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.   An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.   An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.   Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.   Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than a social worker such as Smith to testify about Applicant's life and its effects on him is not alone a basis to support a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been called to testify. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

8.   Applicant's trial counsel were not ineffective for failing to present largely cumulative testimony such as that contained in Smith's habeas affidavit. *See Coble*, 496 F.3d at 436 (decision not to present cumulative testimony does

36

**1433**

**App. 0501**

not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

9.  The strategic decisions made by Applicant's trial counsel based on a thorough investigation about what witnesses to call to testify and how to best present Applicant's mitigation case were matters of trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427.

10. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller*, 810 F.2d at 1410 ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander*, 775 F.2d at 602).

11. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located a different expert who could have testified to the same or similar subject matter does not support Applicant's claim of ineffective assistance.

12. Applicant's jury did not require the assistance of a social worker such as Smith in order to evaluate the testimony presented by Applicant's lay and expert witnesses and to determine the appropriate answer to the mitigation special issue. *See Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (jury did not need expert testimony to understand "humanizing" evidence; jury "could use its common sense or own sense of mercy").

13. Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present mitigation evidence at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 389 S.W.3d at 633-34 ("Both prongs

of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

14.  Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting mitigating evidence at trial fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's allegations are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

15.  Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the mitigation special issue differently had counsel called a "social history expert witness" such as Smith to testify. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

16.  There is no reasonable probability that, but for the failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith, the jury would have answered the mitigation special issue "yes" instead of "no." The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. The record does not affirmatively demonstrate Applicant's claims, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

17.  The Court recommends that Applicant's fourth claim for relief be denied.

**1435**

**App. 0503**

## D.   Claim for Relief Five

Applicant alleges that his trial counsel were ineffective for failing to present testimony from relevant lay witnesses that was necessary for the jury to properly weigh whether Applicant deserved a life sentence.   [Application at 62-63.] Specifically, Applicant contends that counsel failed to uncover significant areas of mitigating evidence, present witnesses from throughout his life, and discover that lay witnesses whom they called to testify had more information to provide about Applicant's life. [*Id.*]

### Findings Of Fact

1.   Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial.   [Moore's affidavit at 10.]

2.   Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3.   Based on the wantonness and severity of Applicant's crime, trial counsel needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel concentrated their efforts in those areas they felt would be most productive.   [Moore's suppl. affidavit at 7-8.]

4.   Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

**1436**

**App. 0504**

5.  Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the murders. [Moore's affidavit at 7.]

6.  Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

7.  Many people whom the defense team contacted either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

8.  The defense team identified and interviewed every potential witness it could locate. [Cummings' affidavit at 6.]

9.  The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom they contacted. [Moore's affidavit at 14.]

**1437**

**App. 0505**

13.    Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14.    Trial counsel presented all of the witnesses whom they were able to locate and convince to testify, whom they thought could provide admissible relevant mitigation evidence about Applicant, and who were necessary to develop the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10, 16; Cummings' affidavit at 6, 8.]

15.    Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16.    Trial counsel called a number of lay and expert witnesses to testify at the punishment phase of Applicant's trial: Haila Scoggins, who taught Applicant during his four years in high school; Tommy Stribble, who sponsored and explained Applicant's permanent school records spanning from elementary school through high school; Mark Pack, who was Applicant's childhood friend; Christy Pack, who is Mark Pack's wife; Linda Pack, who was Jackie's best friend for about ten years and spent time with her family at the Hummel's farm; Parris, who was Applicant's friend and spent time at the Hummel home; Stephanie Bennett, who dated Applicant during his senior year in high school; Letti Hubertz, who began a relationship with Applicant in California while he was in the Marines and moved with him to South Carolina following his discharge from the military; Applicant's older sister Neata; Dr. McGarrahan, a forensic psychologist and neuropsychologist; and AuBuchon, the defense's prison classification expert

17.    The lay witnesses called to testify by Applicant's trial counsel presented evidence about a variety of matters including Applicant's childhood, family life, school years, work history, medical history, and military service.

    a.    Applicant was born to Jackie and John Hummel, Sr., at Arlington Memorial Hospital when the Hummels lived in Grand Prairie, Texas. [RR 43: 209.] Neata, Applicant's only sibling, was nine and a half years older than Applicant. [RR 43: 208.]

**1438**

b. From the time Applicant was born, Jackie placed full responsibility for Applicant's care on young Neata and often left the children home alone. [RR 43: 210-11, 215-16.]

c. Applicant's family moved to South Carolina when Applicant was three years old, and five years later the family moved to a small cinder-block house that was set far off the road on a 400-acre farm in Jonesville, South Carolina, where they lived a "cloistered existence." [RR 43: 105-06, 113, 125, 160, 208-10.]

d. When Parris visited the farm where the Hummel family lived, he and Applicant would fish, play video games, play outside in the hay, and "just do boys stuff." [RR 43: 155, 164.]

e. Applicant's parents controlled who Applicant and Neata could have as friends and did not allow Applicant and Neata to visit other people's houses, with the exception of going to the house of Jackie's best friend Linda Pack to play with the Pack children. [RR 43: 160, 219-20, 250.]

f. When the Pack family ate lunch at the Hummel home almost every Sunday after church for a number of years, Applicant would keep to himself and play video games in his or Neata's bedroom. [RR 43: 105, 109, 123-24, 126, 129, 135-37.]

g. Jackie was very generous and extravagant with the Pack children, but not at all with Applicant and Neata. [RR 43: 110-11, 127, 134, 140-41, 229-30.]

h. Applicant's parents were very strict; they never showed Applicant and Neata any affection; and they did not hug, kiss, or hold the children. [RR 43: 111, 211-21, 249-50.]

i. Applicant and Neata were expected to respond quickly when their parents told them to do something, they did not talk back to their parents, and they were often disciplined with a belt if they did not do as they were told. [RR 43: 119, 128, 139-40, 213-14, 218, 250.] Neata felt that her parents were abusive toward her and Applicant. [RR 43: 221.]

42

**1439**

App. 0507

j.   Mark Pack witnessed John Sr. throw a twelve- or thirteen-year-old Applicant off of a tractor when Applicant drove the tractor too close to a cow. [RR 43: 111-12.] Parris witnessed John Sr. hit Applicant on two occasions: (1) he hit Applicant with a belt eight or more times on the back, front, head, and shoulders as punishment for turning a bull loose; and (2) he hit Applicant four or five times on the back with a broom handle when Applicant was accused of kicking a cat. [RR 43: 152-54.]

k.   When Neata was seventeen years old, she saw another woman performing oral sex on her father; Applicant was asleep in the room with Neata. [RR 43: 252.] When Parris' mother would walk through the kitchen at the Hummel home, John Sr. would "smack her on the butt and that type of deal." [RR 43: 155.]

l.   Applicant was a quiet, pleasant, cooperative, and responsible high school student who had no problems with other students, although he did not interact much with them. [RR 43: 60-61.] He graduated with a cumulative GPA of 2.515 and ranked twentieth in a senior class of forty-five students, but he was considered a special-education student because of his learning disability related to spelling and grammar. [RR 43: 68-70, 91.] Trial counsel introduced evidence regarding Applicant's permanent school records spanning from elementary school through high school. [*See generally* RR 43: 75-94.] Applicant's parents did not seem interested in Applicant's education. [RR 43: 55-56.]

m.   Applicant participated in a graphic art club in ninth and tenth grades and in ROTC in eleventh grade; as a senior, Applicant came in second place in an art contest for a logo he designed for Project Hope. [RR 43: 92-93.]

n.   The Hummels' wood-burning stove caused Applicant to smell like bacon, and Applicant did not like that his classmates nicknamed him "Bacon" as a result. [RR 43: 156, 223.]

o.   Applicant's friends thought Applicant was "stupid." [RR 43: 119-20, 159, 161.]

**1440**

**App. 0508**

p.   Applicant played video games and Dungeons and Dragons. [RR 43: 65.]

q.   Applicant dated Bennett for about a year during his senior year of high school, but she broke up with him because he wanted to marry her after high school and she was not ready for that type of relationship. [RR 43: 172-76, 182.] Applicant cried and was hurt when Bennett broke up with him. [RR 43: 177.] Bennett remembered Applicant as a nice guy who treated her appropriately and who knew how to act around women; she saw nothing to suggest that Applicant would be capable of killing four people. [RR 43: 174, 178, 180-81, 183.]

r.   Applicant moved into an apartment with a friend when he was nineteen or twenty years old. [RR 43: 225.]

s.   Applicant joined the Marines on his twenty-second birthday and went to boot camp the same day. [RR 43: 225.]

t.   In 2002, near the end of Applicant's service in the Marines, Applicant began a six-month romantic relationship with Hubertz, who was pregnant with another man's child, and they moved together to South Carolina in May 2002 when Applicant was discharged from the Marines. [RR 43: 187-89, 199, 225.] Applicant worked and had a home life with Hubertz, Applicant gave Hubertz's son his last name, and Hubertz did not know Applicant to frequent bars or strip clubs or to use drugs. [RR 43: 191-94, 199, 203-04, 226.] Applicant treated Hubertz with respect and was never abusive. [RR 43: 192-93.] A few weeks after Hubertz's son was born, Applicant agreed for his sister to send Hubertz and her newborn son on a bus back to California. [RR 43: 195-97, 227-28.]

u.   Applicant was more self-assured and had more self-esteem when he returned to South Carolina after serving in the military. [RR 43: 157, 166.]

v.   When Applicant went to strip clubs after returning from the military, Applicant would get too attached to the dancers, and, if someone showed Applicant any interest, "all of a sudden he was in love." [RR 43: 157-59.]

44

**1441**

App. 0509

w.    Applicant moved to Texas, where he met Joy. [RR 43: 228.]

x.    Neata did not think that Applicant and Joy seemed like a happy loving couple, but Applicant acted "[w]onderful" toward Jodi. [RR 43: 253.]

y.    Applicant had colitis and underwent surgery to remove part of his intestines, resulting in Applicant having a colostomy bag for about a year afterward. [RR 43: 230.] Applicant was unemployed during the time that he had medical problems, and Joy would nag Applicant about not having enough money for food. [RR 43: 230-33.]

z.    Witnesses testified that they had never seen Applicant become violent with anyone. [RR 43: 113-14, 166, 178, 232.] When Applicant became frustrated or mad, he "[j]ust ball[ed] up, like he was holding everything in," turned "beet red," and clinched up. [RR 43: 114; *see* RR 43: 232.]

18.    Dr. McGarrahan testified about how Applicant's mental health and life history affected the person he became and related to the murders of his family members.

a.    Applicant has a learning disability in the area of spelling. [RR 44: 125.]

b.    Applicant has a full-scale IQ score of 109, which falls in the average to almost high-average range. [RR 44: 125-26.]

c.    Applicant does not suffer from a severe mental disorder or primary psychiatric condition, although he showed mild depression and anxiety. [RR 44: 126, 145.]

d.    Applicant has traits of several personality disorders, *i.e.*, narcissism, antisocial, schizoid, and borderline. [RR 44: 126-27.] A personality disorder is a longstanding enduring maladaptive way of interacting with the world which often causes an individual to have a great deal of impairment in the ability to interact with the world. [RR 44: 127.] Personality disorders affect how a person thinks, feels, and behaves in his ability to control his impulses. [RR 44: 127.]

**1442**

**App. 0510**

e.  Narcissists are often demanding and need attention, affection, and admiration. [RR 44: 128.] They have very high thoughts of themselves and often lack empathy. [RR 44: 129.] Their outward self-esteem is often developed as a way to defend against feelings of very low self-esteem due to failure and lack of accomplishments in life. [RR 44: 129.] Sometimes they exploit or step on others to get what they need in life. [RR 44: 129.]

f.  Applicant meets the adult criteria for antisocial personality disorder, which is someone who has difficulty conforming to societal standards. [RR 44: 130-31.] Persons with adult antisocial personality disorder are irresponsible in many areas of their lives, they are often underachievers, they can be deceitful and manipulative, and they are impulsive. [RR 44: 130.]

g.  Persons with schizoid personality disorder have a long-standing pattern of detachment in their relationships with others. [RR 44: 131.] They often appear "flat," *i.e.*, there is not emotional expression on their faces, and they may not express much emotion over time. [RR 44: 131.] Other than close family members, they are essentially unable to form attachments with others. [RR 44: 132.]

h.  Individuals with a diagnosis of borderline personality disorder often lack direction about their plan for life and what their goals are going to be. [RR 44: 132.] They chronically feel empty inside, so they are always searching for something that they are unable to fill. [RR 44: 132.]

i.  Development of a personality disorder is out of a person's control; it develops over time as a result of experiences with the world and biological makeup. [RR 44: 128.]

j.  Dr. McGarrahan absolutely believed that the environment in which Applicant was raised was a major contributing factor to his personality makeup as an adult. [RR 44: 133, 135.] Applicant's mother came from an emotionally neglectful home herself, and she did not develop the skills or ability to show affection, attention, or nurturing. [RR 44: 135.] Applicant's mother's caregiving was inconsistent, and there was emotional and psychological neglect of Applicant and Neata. [RR 44: 133-34.] The caregiving duties were

**1443**

**App. 0511**

given to young Neata. [RR 44: 135.] Applicant's mother did not play with Applicant and Neata, put them on her lap, hug them, tell them she loved them, or give them affection. [RR 44: 133, 135.]

k.    The internal emotions that people experience do not develop if critical periods are missed early in life. [RR 44: 136.] Learning to appropriately express emotions comes along with early development from watching others model it and having the opportunity to express emotions. [RR 44: 136.] However, emotions were not allowed to be expressed in the Hummel home; Applicant's emotions were controlled by his mother. [RR 44: 136-37.] Applicant feels emotions, but he is unable to express them. [RR 44: 136.]

l.    Dr. McGarrahan opined that Applicant repressed his emotions for over thirty years, that he did not know how to express his emotions appropriately, and that the repressed emotions came out in a flood of emotional rage at the time of the murders. [RR 44: 138.] Applicant was not doing much thinking; he was operating on pure emotion at the time. [RR 44: 138-39.]

m.    In Applicant's San Diego confession, Applicant appeared to be very blunt, unaffected, and unfeeling because after committing the murders his flood of emotion was out and he was back to having difficulty showing what he was feeling and experiencing. [RR 44: 140.]

n.    There is a hereditary component to Applicant's personality, which is supported by the fact that Applicant's mother and sister exhibit the same types of personality issues. [RR 44: 140.] Applicant, his mother, and his sister all have a very difficult time expressing their emotions, and they all come across as cold and unfeeling at times. [RR 44: 140-41.]

o.    Applicant could not express a good reason why he committed the murders of his family members other than that he had been thinking about wrongs done to him dating back to fourth grade that most people would have long forgotten. [RR 44: 141.] "And all of the wrongs done to him from elementary school through junior high, high school into the military, his acquaintances who made fun of him, the stressors he was dealing with at home, all built up and came out in an explosive rage." [RR 44: 141.]

47

**1444**

p.  Applicant stated that Joy and Eddie criticized and nagged him about his lack of a job at times, his inability to do things around the house, and his medical problems. [RR 44: 142.]

q.  Applicant told Dr. McGarrahan that, in the months leading up to the offense, he rapidly fell in love with Freeze and that being single more and more attractive so that he might pursue a life with her even though he intellectually knew that Freeze did not feel the same way about him. [RR 44: 142.] With Applicant's personality makeup, any affection or attention became emotional for him or became what Applicant thought was emotional. [RR 44: 143.] This was evident in Applicant's history that, if a woman showed him some attention, even if it was a stripper or a casual acquaintance, it quickly developed into what Applicant thought love was supposed to be in a relationship with a man and a woman. [RR 44: 143-44.] Applicant was looking for a loving relationship, but he did not know how to go about getting it. [RR 44: 144.]

r.  One important thing in Applicant's personality is his inability to form and maintain close relationships, including with close relatives such as his mother and sister. [RR 44: 144.]

s.  The issues regarding Applicant's personality, the genesis of which was his childhood, played a big role in his commission of the murders. [RR 44: 145.] As a result of repressing his emotions, in the weeks leading up to the offense, Applicant was fixating on conduct dating back to grade school because he was not allowed to deal with his emotions at the time. [RR 44: 145.] A lifetime of Applicant repressing his emotions led to this event. [RR 44: 158.]

t.  Applicant told Dr. McGarrahan that he loved his daughter, and he could not explain why he murdered her. [RR 44: 158.]

u.  Applicant did not decide to have personality issues; these issues were visited upon him by heredity and his environment. [RR 44: 159.]

v.  Based on Applicant's jail and military records, Applicant has done fairly well in structured environments. [RR 44: 159.] Although Applicant had a time when he left his military post without

**1445**

**App. 0513**

permission, he also received several commendations for his military service and was honorably discharged from the service. [RR 44: 160.]

19. Testimony from other witnesses at the guilt-innocence and punishment phases of the trial shed further light on Applicant's life history.

    a.    Applicant and Joy married in a very small wedding while Joy was pregnant with Jodi. [RR 44: 8.]

    b.    Applicant and Joy faced financial hardships every month, and Joy's friends helped out the couple from time to time. [RR 40: 17-18; RR 44: 9.]

    c.    Applicant could not work for several years because of a hurt back and because of his Crohn's disease. [RR 44: 9, 16.] Applicant had surgeries, and he had a colostomy bag for a period of time. [RR 44: 16.]

    d.    Applicant and Joy continued to struggle financially even after Applicant got his job as a security guard. [RR 44: 16.]

    e.    Christopher Paris, a State's witness, testified that he knew Applicant from church, that he and his wife were in a Sunday school class with Applicant and Joy, that the two couples gathered "on occasion" for events outside church, that he had been to the Hummel home two or three times, and that he knew the Hummels to be a close family unit. [RR 36: 58, 87.]

    f.    When the Hummel family's vehicle was totaled, the Sunday school class pulled together to fund the down payment on a minivan, and Paris took Joy to buy the vehicle. [RR 36: 59.]

    g.    Paris visited Applicant in the Tarrant County Jail for a while, and he occasionally brought Applicant's mother to the jail to visit Applicant. [RR 36: 89.]

    h.    In the Marines, Applicant was an intelligence clerk with a security clearance. [RR 45: 18-19, 29.]

**1446**

**App. 0514**

i.    Lieutenant Colonel Michael Dougherty described Applicant as a "pretty average, marginally effective" Marine. [RR 45: 11, 20.]

j.    Dougherty found Applicant to be fairly good-natured and happy-go-lucky; if Applicant became frustrated or angry, he became silent and his face muscles tensed. [RR 45: 13.]

k.    Although Applicant received a number of military commendations and awards, all but one (a basic rifleman's badge from boot camp) were given to the unit as a whole. [RR 45: 16-17, 27.]

l.    Applicant never earned a good-conduct medal, which would have required him to complete three uninterrupted years of service with no nonjudicial punishments. [RR 45: 15.]

m.    During Applicant's military service, Applicant and Buddy Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Dougherty thought would lead them down the wrong path. [RR 45: 12, 23.] Dougherty counseled both Applicant and Matthias on the matter. [RR 45: 12.]

n.    Applicant had several entries in his military records for failing to maintain his weight and pass the physical fitness test. [RR 45: 30, 34-35.]

o.    Captain Sergio Santos testified that Applicant was not a very impressive Marine at all. [RR 45: 34.]

p.    In May 2000, Applicant went AWOL from his post for a period under twenty hours and had his pay docked for a month as a result. [RR 45: 35, 44, 46.]

q.    Santos revoked Applicant's security clearance because he found Applicant to be untrustworthy. [RR 45: 36.]

r.    The paperwork to revoke Applicant's security clearance states that Applicant lied to his seniors on numerous occasions and that his integrity was questionable. [RR 45: 38, 45.]

**1447**

**App. 0515**

s.  Applicant was a lance corporal when he was honorably discharged from the Marines. [RR 45: 43-44.]

20.  Moore talked to Applicant's maternal uncle Thomas Hamilton during the pretrial investigation and made a strategic decision that it was not in Applicant's best interest to call Hamilton to testify because Hamilton did not support the allegations of abuse made by Neata and other witnesses, he was very defensive of his sister Jackie, and his testimony was inconsistent with that of other witnesses. [Moore's affidavit at 15.]

21.  Cummings talked to George Goodson, a former neighbor of Applicant and Joy, during the investigation of Applicant's case; however, Goodson did not want to testify at Applicant's trial, and counsel ultimately made a strategic decision that it was not in Applicant's best interest to call Goodson as a witness. [Moore's affidavit at 15.]

22.  The failure to locate Brian Jeter, Joseph Patterson, Chad Brown, and Shana Fowler as mitigation witnesses did not result from an inadequate investigation into Applicant's life history, and Applicant has not shown otherwise.

23.  The defense team obtained Lance Dupre's name and exhausted every lead it had in trying to contact him in person or by telephone, but he never contacted the defense. [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts made to locate and interview Dupre were in any manner deficient or unreasonable. [*See* Application at 66-67.]

24.  The defense team did not locate Paris before trial even though it "aggressively tried to do so." [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts to locate Paris were in any manner deficient or unreasonable. [*See* Application at 69-70.]

25.  Paris' trial testimony covered many facts which were the same as or similar to those matters contained in his habeas affidavit. [*Compare* RR 36: 58-59, 87, 89 *with* Applicant's Exhibit 16.]

26.  Although Paris's habeas affidavit discusses the extent of his relationship with the Hummels and his knowledge of problems in their marriage, he testified at trial that the couples got together "on occasion" outside church

for an event and that he viewed the Hummels as a happy family unit. [RR 36: 58, 87.]

27. The defense team's private investigator interviewed all of Applicant's neighbors, but none provided helpful testimony or wished to testify on Applicant's behalf. [Moore's affidavit at 15.]

28. The defense team contacted those individuals whom Applicant identified as his "friends" at work; however, they denied the existence of any such friendship and indicated that they knew very little of Applicant, that they did not really care for Applicant, and that they did not want to testify. [Moore's affidavit at 15.]

29. The defense team contacted people from the Hummels' church and subpoenaed the minister to testify; however, the minister later determined that Applicant deserved the death penalty, and he was unwilling to help Applicant at his trial. [Moore's affidavit at 15-16.]

30. Trial counsel investigated the suspicions of Dr. McGarrahan, other defense-team members, and friends of the Hummel family that Applicant and/or Neata were sexually abused by their parents or another adult close to the family. [Moore's affidavit at 11-12, 14.]

    a. Applicant, Neata, and Jackie each adamantly denied that any type of sexual abuse ever occurred, and none of the other individuals who were interviewed could provide any proof that sexual or physical abuse had occurred other than what was testified to at trial. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

    b. Applicant told members of the defense team that his home life, upbringing, and family life were very positive; he denied witnessing or experiencing any abuse growing up; and he adamantly denied even those things which others told the defense team they had witnessed. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

    c. Neata would only admit to that abuse about which she ultimately testified, and she repeatedly denied that anything further or more severe had taken place. [Moore's affidavit at 12.]

**1449**

    d.    Jackie denied any abuse in the home, although she acknowledged that she and Applicant's father were not demonstrative in their affection for Applicant and Neata. [Moore's affidavit at 12.]

    e.    Applicant's contention that trial counsel narrowly focused their mitigation investigation on suspicions that Applicant was sexually abused and that counsel failed to rigorously pursue other avenues of mitigation evidence is untrue and unsupported by the record. [Moore's affidavit at 11; Cummings' affidavit at 7; see Application at 62, 64.]

    f.    No one informed any defense-team member that Neata said in the hallway during trial that her father had sexually abused her or that she had sexually abused Applicant. [Moore's affidavit at 12; *see* Application at 64 n.2 (citing Applicant's Exhibit 18).] Based on Moore's knowledge of and contact with Parris, Moore "simply do[es] not believe" that such an event occurred. [Moore's suppl. affidavit at 13.]

    g.    Because Neata denied that sexual abuse had occurred, Applicant's trial counsel had no good-faith basis to engage in the line of questioning suggested by Applicant, and counsel cannot be considered deficient for asking such questions under the circumstances. [Moore's suppl. affidavit at 12.]

31.    During the investigation, Applicant's trial counsel did not overlook the *potential* value of Applicant's military service. Applicant's trial counsel obtained Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.] Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.]

**1450**

32. By Applicant's own accounts, his military service was not something that would be particularly fruitful to his mitigation case, and Moore knew about problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

33. Applicant has not provided an affidavit signed by Christopher Boling; therefore, all references to statements allegedly made by Boling to a third party are stricken and given no consideration.

34. Applicant provided Matthias' name to the defense team's mitigation specialist, but the team was unable to locate him. [Moore's suppl. affidavit at 7.]

35. Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf, but Applicant never provided the names of Emmer, Chaidez, or Boling, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17; Moore's suppl. affidavit at 7.]

36. The failure to locate Matthias, Emmer, Chaidez, and Boling did not result from an inadequate investigation into Applicant's life history for purposes of developing a mitigation case.

37. Trial counsel made a strategic decision to attempt to minimize the negative aspects of Applicant's military service. [Moore's affidavit at 17.] The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez would not have made Applicant's military service more compelling or mitigating, and the evidence would have provided both positive and negative information about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.] The affidavits of Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation while in the military service, but "they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending 'strip clubs.'" [Moore's suppl. affidavit at 8.]

38. Applicant's military career as described in the habeas affidavits of Chaidez, Emmer, and Matthias is not the type of military service that, when combined with other mitigating evidence introduced at Applicant's trial, would have tipped the scales against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony

of Applicant's commanding officers about Applicant's military service during the State's rebuttal case.

39. Many facts that Applicant faults his trial counsel for not asking Bennett, Scoggins, and Christy Pack during their trial testimony were elicited from either these or other witnesses at Applicant's trial.

40. Any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial is not so compelling or of such significance that trial counsel can be deemed deficient for not discovering it and/or inquiring about it at trial, especially in light of the thorough investigation conducted by trial counsel and the totality of the evidence presented at trial.

41. There is no reason to believe that any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial would have changed the outcome of the punishment phase of Applicant's trial.

42. Applicant's trial counsel had a qualified mitigation specialist and private investigator appointed early in the case; sought funds for and hired a forensic psychologist and neuropsychologist who explained at trial how Applicant's life history contributed to his commission of the charged offense; traveled to South Carolina to seek out and interview Applicant's family and friends and to investigate his background; sought to discover witnesses from Applicant's family, friends, church, employment, and neighborhood; took all actions necessary to secure the presence of potentially beneficial witnesses at Applicant's trial; were prepared to cross-examine the State's witnesses; presented a strategically developed cohesive mitigation theme based on the witnesses available at the time of Applicant's trial; and urged the jury during final arguments to answer the special issues in a way that would require a sentence of life rather than death.

43. Applicant's trial counsel complied with prevailing professional norms in making strategic decisions, in presenting the testimony of the available beneficial witnesses, and in constructing a cohesive mitigation theme through lay and expert witnesses.

44. Trial counsel exercised their prerogative in deciding what witnesses to call to testify and what questions to ask them.

55

**1452**

45. Applicant's claim that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented is unpersuasive second-guessing in hindsight.

46. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

47. There is considerable overlap between the information that Applicant claims his trial counsel should have discovered and presented via the lay witnesses and the facts and themes trial counsel actually developed at trial. [Moore's affidavit at 16.]

48. To the extent that any of the evidence or proposed testimony provided by Applicant is not cumulative, there is no reason to believe that such evidence would have been considered so powerful, compelling, or significant by the jury that it would have changed Applicant's sentence.

49. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls far short of the type that courts have found to support a finding of prejudice.

50. Applicant's crime was premeditated, cold-blooded, and heinous; the aggravating facts at trial were severe.

51. The jury was well aware through lay and expert testimony of neglect, abuse, attachment issues, and family stresses in Applicant's life before and at the time of the murders and their potential effect on Applicant's decision to murder his family.

## Conclusions Of Law

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

**1453**

2.    To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.    He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.    An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852.    A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694.    An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.    "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.    In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.    In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5.    Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533.    "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

6.    In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7.    Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8.    Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

9.    An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10.   An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11.   Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

12.   The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427. The decisions of Applicant's trial counsel to call certain witnesses and not to call others who were uncooperative or would not

benefit Applicant's case were the result of an extensive investigation and strategic reasoning about the best way to present Applicant's case.

13. Trial counsel thoroughly investigated Applicant's background for mitigation purposes and called all of the available witnesses who could provide relevant, beneficial evidence. The actions of trial counsel fall within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Moore v. Johnson*, 194 F.3d 586, 591-92 (5th Cir. 1999).

14. To obtain relief on an ineffective-assistance claim based on an uncalled witness, an applicant must show that the witness was available to testify and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). Applicant's trial counsel cannot be deemed ineffective for failing to call family members, neighbors, church members, coworkers, and others who did not want to testify or whose testimony would not have benefitted Applicant's mitigation case. Likewise, Applicant's trial counsel cannot be faulted for failing to call witnesses whom they made reasonable efforts to locate and interview without success.

15. Applicant's trial counsel fulfilled their duty to conduct a reasonable and thorough investigation of Applicant's life history as part of the mitigation investigation, even in the face of dealing with threats, uncooperative witnesses, and witnesses whose testimony would have damaged Applicant's case.

16. Under the circumstances at the time of Applicant's trial, Dupre was not a witness who was available to the defense. *See Ex parte White*, 160 S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony).

17. Applicant's trial counsel were not deficient for failing to present largely cumulative testimony. *See Coble*, 496 F.3d at 436 (failure to present cumulative testimony does not constitute ineffective assistance).

18. No prejudice results from the failure to present cumulative mitigation evidence. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (no prejudice in failing to present cumulative mitigation evidence; to establish prejudice, new evidence presented in habeas proceeding must differ in

substantial way in strength and subject matter from evidence actually presented at sentencing).

19. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located witnesses who were not found during a thorough investigation or has presented evidence that could have been asked of witnesses who did testify does not support Applicant's claim of ineffective assistance.

20. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); *Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance).

21. The basis of Applicant's current claim – essentially that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – is rejected as unpersuasive. *See Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) (courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees'" involving questions of whether counsel investigated enough or presented enough mitigating evidence; "[t]hose questions are even less susceptible to judicial second-guessing"); *Dowthitt v. State*, 230 F.3d 733, 743 (5th Cir. 2000) (same).

22. Applicant's complaints constitute an impermissible second-guessing of the manner in which his experienced trial counsel chose to present Applicant's mitigation case at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

23. Counsel acted well within prevailing professional norms, and Applicant has failed to meet his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting Applicant's life history to develop the mitigation case fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's complaints are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

24. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls short of the type that courts have found to support a finding of prejudice. *See, e.g., Rompilla*, 545 U.S. at 392-93; *Wiggins*, 539 U.S. at 516-17; *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000).

25. Given the largely cumulative nature of the evidence that Applicant alleges his trial counsel should have presented, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the mitigation special issue differently had trial counsel discovered and called those witnesses to testify. *See Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker*, 565 F.2d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative).

26. Even when the powerful aggravating evidence is reweighed against the totality of the available mitigating evidence, there is no reasonable probability that, but for the failure of Applicant's trial counsel to present the testimony at issue, the jury would have answered the mitigation special issue differently. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

27. The Court recommends that Applicant's fifth claim for relief be denied.

**1458**

E.     **Claim for Relief Six**

Applicant alleges that his trial counsel were ineffective for failing to present

Applicant's military service as mitigation evidence. [Application at 73.]

**Findings Of Fact**

1.     Based on the wantonness and severity of Applicant's crime, Moore believed that he needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel made a strategic decision to concentrate its mitigation efforts in those areas they felt would be most productive. [Moore's supplemental affidavit at 7-8.]

2.     Applicant has not submitted a signed affidavit from Christopher Boling; instead, he relies on statements Boling allegedly made to a third person.

3.     Applicant's trial counsel did not overlook the *potential* value of Applicant's military service to the mitigation presentation at trial. [Moore's affidavit at 17.]

4.     Applicant's trial counsel obtained copies of Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

5.     Lay witnesses for the defense informed the jury that Applicant joined the Marines on his twenty-second birthday, served for about four years, was assigned as an intelligence analyst, and was more self-assured and had a higher self-esteem when he left the Marines. [RR 43: 161, 166, 225, 231.]

6.     The defense's expert witnesses testified that they reviewed Applicant's military records, that Applicant was honorably discharged from the Marines, that Applicant's military service showed his ability to do well in a structured environment, and that Applicant received several commendations for his military service. [RR 44: 70, 73, 159-60.]

7.     By Applicant's own accounts to members of the defense team, his military service was "lackluster," was not a positive experience, and was not something that would be particularly fruitful to his mitigation case, and

62

**1459**

Moore knew about the problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

8.    Trial counsel made a strategic decision to attempt to avoid or minimize negative evidence related to Applicant's military career. [Moore's affidavit at 17; Moore's suppl. affidavit at 7-8.]

9.    Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

10.   Trial counsel knew about disciplinary action taken when Applicant went AWOL from his military post, and counsel made a strategic decision to try to avoid that issue to the degree possible during presentation of the defense witnesses. [Moore's affidavit at 17-18.]

11.   Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf. [Moore's suppl. affidavit at 7; Moore's affidavit at 17.]

12.   Applicant never provided the names of Chaidez, Emmer, or Boling to trial counsel or other defense-team members, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17.]

13.   Applicant provided Matthias' name to the defense team's mitigation specialist, but the defense team was not able to locate him. [Moore's suppl. affidavit at 7.]

14.   The failure of trial counsel to locate Matthias or to discover Emmer, Chaidez, and Boling was not the result of an inadequate investigation into Applicant's background and life history.

15.   The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez do not make Applicant's military service more compelling or mitigating, and such testimony would have provided both positive and

**1460**

**App. 0528**

negative information to the jury about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.]

16.   Although the affidavits provided by Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation during his military service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending strip clubs. [Moore's suppl. affidavit at 8.]

17.   Applicant's military service was not, as Applicant claims, a positive and "powerfully mitigating episode in [his] life."

    a.   Applicant was a "pretty average, marginally effective" Marine; he was not a very impressive Marine. [RR 45: 11, 34.]

    b.   All but one of Applicant's commendations and awards were given to his military unit as a whole. [RR 45: 27.]

    c.   Applicant and Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Dougherty thought would lead them down the wrong path. [RR 45: 12, 23.]

    d.   When Applicant was not interested in something, he needed maximum guidance or supervision to ensure its completion. [RR 45: 22-23.]

    e.   Applicant had several entries for failing to maintain his weight within the required standards and failing to pass the physical fitness test. [RR 45: 30, 34-35.]

    f.   Applicant went AWOL for under twenty hours because he was unhappy, and his pay was docked as a result. [RR 45: 35, 46.]

    g.   Santos revoked Applicant's security clearance because Applicant was untrustworthy and lied to his seniors. [RR 45: 36, 38-39, 45.]

18.   Regardless of how Applicant tries to portray his military service, the facts contained in the habeas affidavits of Matthias, Emmer, and Chaidez, as well as the testimony of Dougherty and Santos presented during the State's

**1461**

**App. 0529**

rebuttal case, rebut any assertion that the jury would have considered Applicant's military service to be particularly mitigating.

19. The punishment-phase evidence and arguments would not have been significantly different or more compelling had the evidence contained in the habeas affidavits of Chaidez, Matthias, and Emmer been introduced as evidence at the punishment phase of Applicant's trial.

20. There is no reasonable probability that the facts contained in the habeas affidavits of Chaidez, Matthias, and Emmer would have caused the totality of the mitigating circumstances to outweigh the overwhelming and compelling aggravating facts presented at Applicant's trial.

21. Applicant's military career, even as described in the habeas affidavits of Matthias, Emmer, and Chaidez is not the type of service that the jury would have considered to be a particularly mitigating circumstance, especially when balanced against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony of Applicant's commanding officers during the State's rebuttal case.

22. Trial counsel exercised their prerogative in deciding what witnesses to call and what questions to ask about Applicant's military service.

23. Applicant's arguments simply second-guess in hindsight the manner in which his highly experienced trial counsel strategically chose to present evidence of Applicant's military service.

## Conclusions Of Law

1. All references by Applicant to facts learned during alleged conversations of others with Christopher Boling are given no consideration in this habeas proceeding pursuant to TEX. R. EVID. 602 and 802.

2. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

**1462**

**App. 0530**

3.  To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

4.  An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

5.  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

6.  Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

**1463**

**App. 0531**

7.     In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

8.     Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

9.     Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

10.    An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

11.    An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

12.    Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

13.    "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518. The fact that another attorney

**1464**

may have pursued a different tactic at trial is insufficient to support a claim of ineffective assistance. *Scheanette*, 144 S.W.3d at 510.

14. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); Payne, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance). Courts must be particularly wary of arguments that essentially come down to a matter of degrees involving questions of whether counsel investigated enough or presented enough mitigating evidence. *Dowthitt*, 230 F.3d at 743.

15. To obtain relief based on an uncalled witness, an applicant must show the witness was available and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d at 52. The witnesses whose affidavits Applicant presents in this habeas proceeding would have provided negative information about Applicant's military service in conjunction with the positive information they could provide, and Applicant's trial counsel made a reasonable strategic decision based on their investigation of Applicant's military service to avoid the negative aspects of his service to the degree possible during the presentation of the defense witnesses.

16. *Porter v. McCollum*, 558 U.S. 30 (2009), cited by Applicant, is distinguishable from Applicant's case. The evidence of Applicant's unremarkable military service comes nowhere near the circumstances presented in *Porter. See id.* at 41, 43-44.

17. Given the totality of the circumstances, the breadth of the defense team's investigation, the strategic decisions resulting from the investigation, and the totality of the representation provided, Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in not locating Matthias, Emmer, Chaidez, and Boling as witnesses to testify about Applicant's military service fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's

**1465**

claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

18. There is no reasonable probability that the facts contained in the affidavits of Chaidez, Matthias, and Emmer would have had any effect on the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's allegations are not firmly founded in the record, and Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of trial counsel.

19. The Court recommends that Applicant's sixth claim for relief be denied.

## F.  **Claim for Relief Seven**

Applicant contends that his trial counsel were ineffective for failing to present evidence that he suffered from complex post-traumatic stress disorder (CPTSD) resulting from attachment trauma. [*See* Supplemental Response To State's Answer at 16-21; Initial Application for Writ of Habeas Corpus at 80-93.] Applicant alleges that trial counsel should have: (a) conducted a complete investigation of his life history and psycho-social development; (b) hired an expert witness with specialized experience in trauma-related disorders; and (c) called such expert to testify at trial about his attachment trauma and CPTSD and their effects on his life and mental health. [*See* Application at 82.]

## Findings Of Fact

1.    CPTSD is a psychological injury resulting from prolonged exposure to very extreme trauma such as entrapment or kidnapping, slavery or enforced labor, long-term imprisonment, torture, or abuse from which there is little or no hope of escape. [Dr. Price's affidavit at 4.]

2.    Many signs, symptoms, and conditions have been ascribed to CPTSD, rendering it so non-specific that it has failed to gain general acceptance in the mental-health community as a mental disorder. [Dr. Price's affidavit at 5.]

3.    Research on CPTSD has not risen to the level required to be determined a disorder, *i.e.*, a constellation of signs and symptoms that is not accounted for by some other condition, even though the developers of both the fourth and fifth editions of the Diagnostic and Statistical Manual of Mental Disorders (the DSM-IV and DSM-V) have considered it. [Dr. Price's affidavit at 5.]

4.    CPTSD has remained essentially a "syndrome," which is a collection of signs and symptoms that suggest some abnormal condition. [Dr. Price's affidavit at 5.]

5.    CPTSD is not included in the DSM-V or in the International Statistical Classification of Diseases and Related Health Problems. [Moore's suppl. affidavit at 9.]

6.    Trial counsel thoroughly investigated Applicant's life history and presented as complete a picture of Applicant's life history as possible given the witnesses who were available to the defense at the time of Applicant's trial.

7.    At trial, Applicant's trial counsel presented the available information that was supported by the evidence. [Moore's suppl. affidavit at 11.]

8.    Trial counsel considered potential mental-health experts who might assist them in developing the mitigation case, and Moore called several different experts. [Moore's affidavit at 7.]

9.    Moore had previously worked in several cases with Dr. McGarrahan, a forensic psychologist and neuropsychologist whom Moore knew to be

70

**App. 0535**

**1467**

"highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions." [Moore's affidavit at 7.]

10.  Trial counsel retained Dr. McGarrahan due to Moore's familiarity with her work, his opinion of her abilities, her reputation in the legal community; and the prior professional relationship and mutual respect between Dr. Price (the State's expert) and Dr. McGarrahan.  [Moore's affidavit at 7.]

11.  Dr. McGarrahan spent approximately eleven hours administering cognitive tests and psychological inventories to Applicant. [RR 44: 121-22.]

12.  Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, various correspondence from Applicant's sister Neata Woody to Applicant, Jackie Hummel's medical records, and psychological test data from Dr. Price's evaluation conducted the weekend before she testified; she performed a clinical interview to ask Applicant about his "entire social history"; she performed a mental status examination during which she made observations of Applicant and discussed with him any psychiatric symptoms he was having; and she discussed the offenses in great detail with Applicant. [RR 44: 121-24.]

13.  There is no indication that Dr. McGarrahan ever diagnosed Applicant with CPTSD or informed Applicant's trial counsel that such a diagnosis might be possible.

14.  At trial, Dr. McGarrahan testified about every deficit and disorder she found to exist with Applicant based upon her exhaustive interviews and testing, the information she received from Applicant's family, and her review of Applicant's relevant records.  [Moore's suppl. affidavit at 10.]

15.  Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; and their significance to Applicant's actions in murdering his family members. [RR 44: 126-46, 158-61.]

16.  Moore has called experts, including doctorate-level social scientists, to testify in other trials about the presence of "attachment disorder," but he did not believe based on the available facts in Applicant's case that any

71

**1468**

App. 0536

additional expert other than Dr. McGarrahan was necessary to adequately address Applicant's attachment issues at trial. [Moore's affidavit at 21-22.]

17. Dr. McGarrahan was qualified to evaluate Applicant and to present evidence of attachment issues at Applicant's trial [Dr. Price's affidavit at 6-7], and the strategic decision of trial counsel to call Dr. McGarrahan rather than to retain another type of expert witness was not objectively unreasonable.

18. Even if Dr. Hardesty has experience in treating patients with attachment disorder and CPTSD, such experience is not a prerequisite to conducting a comprehensive forensic psychological evaluation and testifying at trial to the results of the evaluation. [Dr. Price's affidavit at 6-7.]

19. Trial counsel exercised their prerogative and made a strategic decision to present evidence about Applicant's attachment issues and other psychological issues through the testimony of Dr. McGarrahan and lay witnesses. [Moore's supplemental affidavit at 10; see RR 44: 126-46, 158-61.]

20. Even if Applicant's trial counsel had been informed of a diagnosis of CPTSD at the time of Applicant's trial, counsel would not have been required to present testimony about the diagnosis at trial, as such diagnosis reasonably could be viewed as damaging evidence of future dangerousness.

21. In Moore's experience, diagnoses for mental disorders which are not included in the diagnostic manuals are subject to attack at trial on that basis alone and, therefore, can have markedly less effect upon jurors. [Moore's suppl. affidavit at 9-10.] Moore is "skeptical about the jury's willingness to give credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals." [Moore's suppl. affidavit at 10-11.]

22. In over thirty-five years trying criminal cases, Moore has found that jurors are reticent to accept "learned opinions" without an evidentiary basis to support them. [Moore's suppl. affidavit at 10.] Moore would be concerned about the "scarcity" of underlying evidence upon which Dr. Hardesty based her diagnosis of CPTSD. [Moore's suppl. affidavit at 10.]

**1469**

23. Dr. Hardesty's allusions to the denials of child abuse or neglect by Applicant and Neata as constituting evidence that abuse and neglect did, in fact, occur are "inappropriate." [Dr. Price's affidavit at 7.]

24. While denial of abuse does not foreclose a clinical diagnosis, such denials create a "unique and challenging problem in being able to support and defend such a diagnosis before the jury" that cannot be overlooked or ignored in the trial of a criminal case. [Moore's suppl. affidavit at 10.]

25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Dr. Price's affidavit at 1-2.]

26. Had Dr. Hardesty testified that she diagnosed Applicant with CPTSD, Dr. Price would have been available to testify and dispute her analysis that Applicant suffered from CPTSD secondary to attachment trauma and that such condition played any role in Applicant's murder of his family members. [Dr. Price's affidavit at 6.]

27. Events in Applicant's childhood such as the lack of being told he was loved, not having been hugged, being isolated on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse are not in the ballpark with the conditions usually discussed in relationship to CPTSD. [Dr. Price's affidavit at 6.]

28. Hummel has shown an ability to form attachments with adults such as his sister and uncle; he "escaped" his family of origin shortly after high school when he joined the Marines, where he was successful as an intelligence specialist until he became dissatisfied with his situation, went AWOL, and lost his security clearance; and he maintained several relationships with women, even though he became "attached" to them too quickly and appeared to be poor in interacting with the opposite sex. [Dr. Price's affidavit at 6.]

29. Applicant's most likely motivations for murdering his family members were "multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled." [Dr. Price's affidavit at 6.]

**1470**

**App. 0538**

30. The jury did not find Applicant's attachment issues and personality traits, the facts of his life, or their role in his commission of the murders to be sufficiently mitigating to absolve Applicant of moral blameworthiness for his premeditated, calculated, heinous acts.

31. Even with the addition of Dr. Hardesty's proposed testimony about CPTSD, the overwhelming and compelling aggravating facts and circumstances in this case still would have outweighed the totality of Applicant's mitigating evidence.

32. Dr. Hardesty's proffered testimony about CPTSD contained in her habeas affidavit would not have been substantially more compelling than the evidence presented through Dr. McGarrahan, and there is no reasonable probability that the jury would have been persuaded by Dr. Hardesty's diagnosis of CPTSD to answer the mitigation special issue in Applicant's favor.

33. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

34. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

35. Applicant's allegations of prejudice are conclusory.

## Conclusions Of Law

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under

74

**1471**

prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. Applicant's trial counsel cannot be deemed to have been deficient for failing to discover and present a diagnosis of CPTSD when the defense team's well-qualified mental-health expert did not make such a diagnosis. *See, e.g., Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001) (counsel's failure to investigate and discover Campbell's PTSD not ineffective when clinical

**1472**

App. 0540

psychologist failed to make such diagnosis); *Pruett v. Thompson*, 996 F.2d 1560, 1573-74 (4ᵗʰ Cir. 1993) (counsel's failure to investigate or present evidence of mental illness, developmental problems, organic brain damage, and PTSD not ineffective where counsel consulted psychiatrist who concluded Pruett did not suffer from any of the alleged mental illnesses or abnormalities); *Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003) (counsel not ineffective for not investigating and discovering Taylor's PTSD after forensic psychologist failed to make such diagnosis).

8. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; Weisinger, 775 S.W.2d at 427. Applicant's trial counsel acted within the wide range of reasonable professional assistance and were not objectively unreasonable in making a strategic decision to rely on Dr. McGarrahan rather than to retain another type of expert such as Dr. Hardesty to testify at Applicant's trial.

9. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty is not alone a basis to prove a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been retained and called to testify about a diagnosis that was not available to counsel at the time of trial. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

10. Applicant's attack on counsel's performance is simply based on impermissible second-guessing and hindsight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight). Applicant has not met his burden to prove that his trial counsel were deficient for not retaining an expert such

76

**1473**

App. 0541

as Dr. Hardesty to testify that he suffers from CPTSD resulting from attachment trauma.

18. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. There is no reasonable probability that the proposed testimony of Dr. Hardesty contained in her habeas affidavits about CPTSD resulting from attachment trauma would have changed the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

12. The Court recommends that Applicant's seventh claim for relief be denied.

## G.    Claim for Relief Eight

Applicant alleges that his due-process right to a fair trial was violated when the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial and that his trial and appellate counsel were ineffective. [Application at 93.]

## Findings Of Fact

1. The State elected to proceed to trial on the capital-murder indictment alleging that Applicant murdered Joy and Eddie in the same criminal transaction. [RR 4: 4-5]

**1474**

2.   Applicant also murdered his daughter Jodi and his unborn child during the same criminal episode.

3.   Applicant's discussion of his eighth claim for relief, which is phrased as a due-process violation, largely focuses on whether portions of the State's opening statements and jury arguments and various trial evidence referring to Jodi and the unborn child were too inflammatory and prejudicial to be admitted, were inadmissible as same-transaction contextual evidence, and were impermissible victim-impact evidence. [*See* Application at 93-103.]

4.   Applicant provides a single conclusory paragraph and only two record citations to support his claim that his trial counsel were ineffective, alleging that trial counsel performed deficiently "[t]o the extent [they] failed to object and preserve the errors committed by the State and court." [Application at 104 (citing RR 39: 194-97; RR 42: 79).]

   a.   Applicant first cites the introduction during the guilt-innocence phase of SX 318, an autopsy photograph of the unborn child and Joy's uterus after their removal from Joy's body. [Application at 104 (citing RR 39: 194-97).] Trial counsel objected to the introduction of SX 318 [RR 39: 194-97], and Applicant neither challenges the sufficiency of the objections made by trial counsel nor asserts that counsel could have done anything differently. [*See* Application at 104.]

   b.   Applicant's second record citation is to the introduction of photographs of Applicant's family members from Applicant's MySpace page during the punishment phase of his trial. [Application at 104 (citing RR 42: 79).] Moore did not object to these photographs because he did not think there was any meaningful objection to the photographs that the Court would sustain at the punishment stage of the trial and because Moore made a strategic decision that the photographs might benefit Applicant's case by showing that Applicant loved his family and by demonstrating that Applicant's commission of the murders was solely the result of his mental and emotional problems. [Moore's affidavit at 23-24.]

5.   Applicant neither explains how any of the referenced opening statements discussing Jodi were improper nor identifies any valid legal basis for his trial counsel to have objected. [*See* Application at 94-95.]

**1475**

6.     The State's opening statements at the guilt-innocence phase referring to Jodi were proper because Applicant murdered Jodi in the same criminal episode as Joy and Eddie, who were the named victims in the indictment, and the circumstances of Jodi's murder were admissible as same-transaction contextual evidence.

7.     Applicant seems to simply assume that the cited testimony of Audria Hastings, Jodi's kindergarten teacher, was inflammatory and prejudicial because it referred to Jodi. [*See* Application at 95.] Applicant neither explains why Hastings' testimony was inadmissible as same-transaction contextual evidence nor offers any valid legal objection that trial counsel should have made to Hastings' testimony. [*See id*.] Moreover, in addition to Hastings' testimony delineated by Applicant, Hastings identified a photograph of Jodi showing how the child looked in class earlier on the day of the murders. [RR 33: 63; SX 1.]

8.     Trial counsel objected during Hastings' testimony to videotapes showing Jodi with her teachers and kindergarten class, and the Court overruled those objections. [RR 33: 70-74.]

9.     Applicant complains that testimony of Jodi's school nurse, Constance Smith, "continued the focus on Jodi" at the guilt-innocence phase of the trial. [Application at 95.]

    a.     The testified-to incident when Jodi hurt herself on the school playground and Joy went to the school to comfort her occurred the afternoon of December 17, 2009, the same day Applicant murdered his family. [RR 33: 81-82.]

    b.     Smith also testified that on the day of the murders Joy appeared to be in good health and was excited about her pregnancy. [RR 33: 87.]

    c.     Applicant fails to specifically explain why Smith's testimony about the activities and interactions of Joy (a named victim) and her daughter Jodi on the day Applicant murdered them was inadmissible. [*See* Application at 95.]

    d.     Applicant offers no valid legal basis for his trial counsel to have objected to Smith's testimony referenced in the application. [Application at 95.]

**1476**

**App. 0544**

e.     Applicant simply assumes that trial counsel should have objected to the testimony because it referred to Jodi. [Application at 95.]

10.   Applicant asserts that the State "consistently made references to Jodi throughout the remainder of the trial," and he cites numerous pages in the reporter's record to support his contention. [Application at 95.]

a.     Applicant does not delineate exactly what testimony on the pages he cites was objectionable, and this Court will not make Applicant's arguments for him. [*See* Application at 95.]

b.     Applicant provides no valid legal basis for his trial counsel to have objected to testimony on the pages he cites. [Application at 95.]

c.     Applicant seems to simply assume that trial counsel should have objected to something on the pages listed because it referenced Jodi. [*See* Application at 95.]

d.     Some testimony on the pages cited by Applicant mentions Jodi in the context of being the daughter of Joy or the granddaughter of Eddie, the two victims named in the indictment for which Applicant was on trial. [*See* RR 36: 50 (Applicant's co-worker recounts conversation with Applicant on December 18, the morning after the murders; she remarked that Jodi must be excited about Christmas, and Applicant responded, "Yes, she is"), 58 (Christopher Paris came to know that the Hummels had a daughter named Jodi); RR 37: 167 (DNA analyst obtained known DNA samples from autopsy work for Joy, Eddie, and Jodi), 198 (DNA analyst excluded Joy, Eddie, and Jodi as contributors to DNA sample near top rim of Applicant's black hat), 203 (DNA analyst found Jodi's DNA on area of bat); RR 40: 10 (Eddie's former co-worker got to know Eddie's daughter Joy and granddaughter Jodi), 18 (Jodi was Joy's daughter). ]

e.     None of the testimony on the pages cited by Applicant as referencing Jodi went beyond what was permissible as same-transaction contextual evidence.

80

**1477**

11. Applicant complains that the State shifted the focus of the trial to Joy's unborn child. [*See* Application at 96.]

   a. Applicant offers no specific explanation why the opening statements, witness testimony, or closing arguments he cites were improper. [*See* Application at 96.]

   b. Applicant provides no valid legal basis upon which his trial counsel should have objected. [Application at 96.]

   c. Applicant seems to assume that the referenced matters were improper simply because they referenced the unborn child. [*See id.*]

   d. The focus of the opening statements cited by Applicant was on Joy (a named victim) and her physical state of being pregnant. [*See* RR 33: 25 (Joy had recently gone to doctor and heard baby's heartbeat for first time), 29 (Joy, who was pregnant, was asleep in the master bedroom when Applicant returned home to commit the murders), 31 ("His wife who is pregnant, lays dead at his feet").]

   e. The testimony Applicant cites referred either to Joy's pregnancy and physical condition near the time of the murders or to Applicant's disregard for his unborn child's safety, which was relevant to his state of mind leading up to the murders. [*See* RR 33: 68 (in December 2009, Joy "was pregnant"); RR 39: 101 (Freeze testifies she became uncomfortable with Applicant when she learned Joy was pregnant because Applicant had no concern for his unborn child's safety), 143 (Freeze learned Joy was pregnant one or two days after Freeze and Applicant had sex; Freeze and Applicant exchanged texts concerning Freeze finding out about the pregnancy).]

   f. The three pages of the State's closing arguments described by Applicant as containing "[r]epeated references" to the unborn child's death contain arguments which were permissible based on properly admitted evidence at trial and did not impermissibly focus the jury on the unborn child's death. [*See* RR 40:50 (Applicant "snuffed out four lives that had nothing to do with him, other than he wanted to be single"), 53 ("He killed his pregnant wife"), 56 (Applicant "killed his pregnant wife").]

**1478**

12.   Applicant's trial counsel objected to SX 318 and 379, the two alleged highly inflammatory photographs of the unborn child cited by Applicant. [Application at 96; RR 38: 93; RR 39: 194-97, 202; *see* SX 318, 379.] Applicant makes no allegation of any other objection that his trial counsel could or should have raised. [*See* Application at 96.]

13.   Applicant refers to punishment-phase testimony by Applicant's sister Neata that she needed to wait before visiting Jodi's gravestone [RR 43: 234-35]; that she sent Jodi a Christmas dress, but she never got a photo of Jodi in the dress because "everything was burned in their house" [RR 43: 235]; that the loss of Joy and Jodi had left the Hummel family "broken" [RR 43: 236]; and that Applicant's aunt would have been able to take Jodi in and provide for her if Applicant had asked her to do so [RR 43: 239]. [Application at 97.]

   a.   Applicant fails to explain how the testimony he cites was so prejudicial or inflammatory as punishment-phase evidence as to render it inadmissible or to articulate a valid legal objection that his trial counsel could have, but did not, make. [*See* Application at 97.]

   b.   In asserting that Neata's description of the Hummel family as "'broken' after Jodi's death" was impermissible victim-impact evidence because Jodi was not a named victim, Applicant overlooks that Neata's testimony was in response to a question about how the loss of "Joy *and* Jodi" had affected Neata's family; thus, the question included a named victim. [RR 43: 236 (emphasis added); *see* Application at 97.]

14.   Applicant cites punishment-phase testimony from various State's witnesses referencing either Jodi or the unborn child. [*See* Application at 97.]

   a.   During the portion of Tomiko Race's testimony cited by Applicant, the State introduced a number of photographs depicting Jodi, Joy, and/or Applicant that were posted on Applicant's MySpace page. [RR 43: 78-79.] Moore made a reasonable strategic decision not to object to the photographs. [Moore's affidavit at 23-24.]

   b.   Applicant cites Melody Anderson's testimony that she was in the hospital room when Jodi was born, that she saw sonogram photographs of the unborn child, and that Eddie was a good grandfather to Jodi; Phillip King's testimony that Eddie would leave the senior center and go home in time to pick up Jodi from the bus

82

**1479**

stop every day; and Cindy Lee's testimony that Jodi would get donuts when Joy dropped off Eddie at the senior center. [Application at 97 (citing RR 44: 8, 10-11, 14, 22, 32 ).]

    i.    In context, the testimony cited by Applicant focused on the lives and familial relationships and activities of Joy and Eddie, the named victims. [RR 44: 8, 10-11, 14, 22, 32.]

    ii.    Contrary to Applicant's contentions, testimony about Jodi's visits to the senior center when Joy dropped off Eddie did not fall within the definition of victim-impact evidence.

    iii.    Applicant provides no valid legal objection that his trial counsel should have, but did not, make.

15.    Applicant asserts that thirty-one "inflammatory and prejudicial" photographs of the unnamed victims during the punishment phase were introduced without objection. [Application at 97-98.] As discussed in previous findings of fact herein, trial counsel had strategic reasons for not objecting to the photographs taken from Applicant's MySpace account. [Moore's affidavit at 23-24.] Applicant offers no valid legal basis for his trial counsel to have objected to the remaining photographs to which he refers. [*See* Application at 97-98.] Finally, many of the photographs at issue include Joy, a named victim at trial.

16.    Applicant complains that the State made "repeated references" to Jodi and the unborn child during closing arguments at the punishment phase of trial. [Application at 98.]

    a.    Applicant simply cites a number of arguments without any explanation of how they were impermissible punishment-phase arguments or what valid legal objection his trial counsel should have made, and the Court will not make Applicant's arguments for him. [*See* Application at 98.]

    b.    The cited arguments were permissible as either summations of the evidence, reasonable deductions from the evidence, or pleas for law enforcement. [RR 45: 57-59, 61, 62-63, 85, 86, 88.]

17.    Applicant presents a single paragraph addressing his contention that his appellate counsel was ineffective for failing to raise the cited matters on direct appeal. [*See* Application at 104-05.]

**1480**

18. Applicant fails to identify specific points of error that his appellate counsel should have raised or substantive arguments that counsel should have made on direct appeal to the Court of Criminal Appeals. [*See* Application at 104-05.]

19. Applicant asserts in conclusory fashion that his appellate counsel was ineffective for not "re-raising trial counsel's objection" to the State's use of photographs of the unborn child in light of case law regarding the prejudicial nature of photographs of unborn children. [Application at 104-05.]

    a. SX 379 is an 8x10 color photograph of a biohazard evidence bag containing the unborn child. The photograph does not focus on the unborn child, and the contents are not readily identifiable from the photograph as an unborn child. [SX 379; *see* RR 38: 93.]

    b. SX 379 was conditionally admitted for record purposes only during the testimony of a DNA analyst as part of the chain of custody regarding a DNA profile she extracted from the unborn child. [RR 38: 90-95.] It was later admitted for all purposes during the medical examiner's testimony that he had collected a fetus from Joy and packaged it in an evidence bag as show in in SX 379. [RR 39: 202.]

    c. SX 379 was never published to the jury. [*See* RR 38: 94; RR 39: 202.]

    d. SX 318 is a photograph introduced at the guilt-innocence phase of the trial during the medical examiner's testimony. The portion of SX 318 depicting the unborn child measures 5x7; is black and white; and appears to depict the unborn child, an umbilical cord, and Joy's uterus. [SX 318.]

    e. The State argued in response to the objections of Applicant's trial counsel that SX 318 was admissible because: (1) Joy was pregnant; (2) the photograph "starts the chain of custody for DNA samples to prove paternity for this baby"; and (3) based on the area of the stab wounds depicted in SX 315 (an autopsy photograph of Joy's wounds) "it goes to what [Applicant] was stabbing at" because when one lines up the stab wounds shown in SX 315 "you line that up anatomically on a female that's pregnant and you're stabbing in the area where the womb is." [RR 39: 196.]

84

**1481**

f. The Court concluded that the probative value of SX 318 outweighed any prejudice, that the evidence was contextual, and that the manner in which the deaths occurred was an issue for the jury. [RR 39: 197-98.]

g. SX 318 was never published to the jury.

h. The circumstances regarding the photographs introduced here as SX 318 and 379 differ significantly from those found in *Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000), and *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004), which are relied on by Applicant.

    i. SX 318 and 379 had probative value to issues in the guilt-innocence phase of Applicant's trial.

        (a) SX 379 was admitted as part of the chain of custody of the unborn child collected by the medical examiner and the DNA profile later extracted from the unborn child by a DNA analyst. [RR 38: 90-95; RR 39: 202.]

        (b) When SX 318 was offered during the medical examiner's testimony, the State offered a number of reasons for its admissibility relating to matters in issue during the guilt-innocence phase of the trial. [RR 39: 196.]

    ii. SX 318 and 379 were offered during medical testimony at the guilt-innocence phase of the trial, they were properly authenticated, and the State offered a number of reasons to admit the evidence that were related to facts in issue. [RR 39: 196.]

    iii. SX 318 and 379 were not offered merely to show that Joy was pregnant, that she died, that Applicant knew Joy was pregnant, and that the unborn child died as a result of Joy's death. [RR 39: 196.]

    iv. Neither SX 318 nor 379 was published to the jury; the State did not emphasize the photographs in its closing arguments; the photographs were among a multitude of photographs introduced into evidence; and the photographs admitted at guilt-innocence included autopsy photographs and crime-scene photographs

85

**1482**

depicting the burned remains of Joy, Eddie, and five-year-old Jodi.

v.     In light of the circumstances surrounding the admission of SX 318 and 379 into evidence, the photographs would not have had such an emotional impact to suggest that the jury made a decision on some emotional basis rather than on the basis of Applicant's confession to the premeditated, deliberate, heinous murders of his family members so that he could pursue a relationship with Freeze.

i.     Applicant provides no analysis demonstrating that the alleged error in admitting SX 318 and 379 would have been found harmful under TEX. R. APP. P. 44.2(b) had appellate counsel raised a point of error challenging the admission of the photographs of the unborn child. [Application at 104-05.]

j.     Any error in admitting SX 318 and/or 379 was harmless under TEX. R. APP. P. 44.2(b).

i.     The jury had before it Applicant's videotaped and written confessions describing in chilling, remorseless detail the premeditated, cold-blooded, heinous murders of his pregnant wife, his crippled father-in-law, and his five-year-old daughter; the measures Applicant took to cover up his crimes, including setting fires in each victim's bedroom, disposing of the murder weapons, and fabricating an alibi; and his flight to Oceanside, California. [SX 347B.]

ii.     The jury saw numerous photographs depicting the victims' burned bodies during their autopsies and at the crime scene.

iii.     Neither photograph at issue was published to the jury.

iv.     The State did not emphasize the photographs during closing arguments.

v.     The jury heard overwhelming evidence to support its verdict finding Applicant guilty of capital murder and its answers to the special issues in a manner that required imposition of the death penalty.

**1483**

## Conclusions Of Law

1.  Claims alleging a violation of a rule of evidence are not cognizable on habeas corpus. *See Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). Further, because evidentiary complaints are subject to a harmless-error analysis, they are not cognizable. *Ex parte Truong*, 770 S.W.2d 810, 913 (Tex. Crim. App. 1989). Therefore, to the extent Applicant challenges the admissibility of the arguments and evidence at issue, his claim for relief is not cognizable in this habeas proceeding.

2.  The only cognizable issue is whether trial and appellate counsel rendered ineffective assistance with regard to this evidence.

3.  In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

4.  To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

5.  An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

6.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

7.  An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

8.  Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

9.  In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

10. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

11. Applicant's contentions regarding his claims of ineffective assistance are too conclusory to meet his burden to satisfy either prong of *Strickland*. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

**1485**

12. Evidence relating of the deaths of Jodi and the unborn child was admissible as same-transaction contextual evidence. *See, e.g., Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (in capital-murder trial for killing homeowner's guest during burglary, evidence Camacho and accomplices kidnapped and later murdered homeowner's wife and son admissible as same-transaction contextual evidence).

13. Although Applicant complains that "the amount, detail, and focus of the testimony surpassed any contextual purpose" [Application at 99], "[r]arely will the prejudicial value render inadmissible any evidence that is context of the offense." *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986). The Court of Criminal Appeals has never found that non-errors may in their cumulative effect cause error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).

14. The evidence Applicant cites as being impermissible victim-impact evidence does not fall within the definition of such evidence. *See Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (victim-impact evidence is evidence of the effect of an offense on people other than the victim).

15. Applicant has not met his burden to demonstrate by a preponderance of the evidence that the performance of trial counsel on either occasions when trial counsel objected or when they did not object fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range or reasonable professional assistance. Therefore, Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

16. There is no reasonable probability that the evidence cited by Applicant was so inflammatory or prejudicial that it would have impermissibly shifted the focus from the relevant issues in Applicant's trial and that Applicant would have been acquitted or sentenced to life without parole had his trial counsel objected to the evidence cited. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance.

89

**1486**

**App. 0554**

17.   Applicant fails to demonstrate that appellate counsel could have raised points of error on appeal challenging the admissibility of SX 318 and 379 that would have had indisputable merit under well-settled law and would have necessarily resulted in reversible error. *See Ex parte Flores*, 387 S.W.3d at 639. Therefore, Applicant has failed to meet his burden to establish that his appellate counsel was ineffective for failing to raise a challenge on direct appeal to the Court's admission of those exhibits into evidence.

18.   Even if the Court erred in admitting SX 318 and 379 into evidence, the error would have been subject to a harmless-error analysis pursuant to TEX. R. APP. P. 44.2(b), which requires the appellate court to disregard any nonconstitutional error that does not affect substantial rights. Based on the entire record at the guilt-innocence phase of the trial, any error in admitting SX 318 and SX 379 would have been disregarded as harmless on direct appeal. *See, e.g., Rolle v. State*, 367 S.W.3d 746, 752-56 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (admission of photograph of murder victim's unborn child who was not named victim held harmless, distinguishing *Reese* and *Erazo*); *Erazo v. State*, 167 S.W.3d 889, 890-91 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (op. on remand for a harmless-error analysis; error in *Erazo* found to be harmless). Applicant has not met his burden to show by a preponderance of the evidence that his appellate counsel's decision not to challenge the admission of SX 318 and 379 on appeal constituted deficient performance that resulted in prejudice.

19.   The Court recommends that Applicant's eighth claim for relief be denied.

## H.   **Claim for Relief Nine**

Applicant alleges that his trial counsel failed to effectively present evidence that Applicant's confessions should be suppressed and that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions. [Application at 105-06.]

**1487**

**Findings Of Fact**

1.  Applicant alleges that his trial counsel were ineffective because they did not: (a) "offer as exhibits transcripts of the phone calls that took place between [Kennedale police captain Darrell] Hull, [CBP officer Paul] Kandal, and the Kennedale dispatcher during the detaining and arrest" of Applicant; and (b) "submit other documents created by the Border Patrol during their detention" of Applicant which allegedly "would have established that there was no lawful basis for [Applicant's] detention by the Border Patrol, that [Applicant's] resulting arrest was unlawful, and that his subsequent confession was a violation of his rights under the Fourth Amendment." [Application at 105-06.]

2.  Trial counsel moved to suppress Applicant's statements and confessions, as well as seized evidence, and counsel and litigated the issue in a contested pretrial suppression hearing lasting four days. [CR 2: 324-51; RR 6-9; Cummings' affidavit at 9.]

3.  Trial counsel aggressively litigated a multitude suppression issues, including the legality of Applicant's detention by CBP. [RR 6-9; Moore's affidavit at 25.]

4.  Following the pretrial suppression hearing, Applicant's trial counsel filed an extensive trial memorandum in support of the motions to suppress. [CR 3: 406-42; Moore's affidavit at 26.]

5.  Trial counsel obtained copies of the tape recordings and reports relied upon by Applicant in this habeas proceeding. [Moore's affidavit at 25; Cummings' affidavit at 10.]

6.  Trial counsel reviewed the recordings and reports at issue in preparation for cross-examining the witnesses from the Kennedale Police Department and CBP at the pretrial suppression hearing. [Moore's affidavit at 25; Cummings' affidavit at 10.]

7.  At the pretrial suppression hearing, trial counsel used the recordings and reports at issue during cross-examination of the relevant witnesses so that the Court was aware of the communications. [Cummings' affidavit at 10.]

8.  All of the significant relevant facts contained in the recorded telephone conversations and written reports relied on by Applicant in this habeas

**1488**

proceeding were acknowledged by the witnesses at the pretrial suppression hearing. [Moore's affidavit at 26.]

9.  The Court was made aware of the relevant facts contained in the transcript and report during the pretrial suppression hearing and in the memorandum of law filed by trial counsel in support of the motions to suppress.

10. The transcript and the written report submitted by Applicant in this habeas proceeding do not contain facts that differed significantly from what the Court heard at the pretrial suppression hearing, and the documents would not have changed the Court's findings regarding Applicant's lawful detention or the attenuation of any taint.

11. All of the information contained in the recordings and reports that trial counsel believed to be relevant to the legality of Applicant's border detention was acknowledged during cross-examination of the State's witnesses during the suppression hearing; hence, there was no need for Applicant's trial counsel to impeach those witnesses by introducing the actual reports and recordings. [Moore's affidavit at 25-26.]

12. The Court was well aware at the pretrial suppression hearing that Kandal verified Applicant's citizenship, that Kandal told the Kennedale police dispatcher during their telephone conversation at 7:16 a.m. PST that Applicant was an otherwise admissible person whom he could not hold without a warrant, that Kandal stated he could not hold Applicant in order to encourage the Kennedale Police Department to act quickly so that Kandal could move Applicant out of his jurisdiction, and that Kandal was in contact with Hull during the time the Kennedale Police Department was working to process a warrant. [RR 8: 32-33, 87, 89-90, 100.]

13. Kandal was required to continue holding Applicant in order to determine what Kennedale wanted to do about Applicant being a missing person. [RR 8: 90-92.] Kandal was not bound by the language in the Kennedale Police Department's missing-person report instructing agencies not to detain or arrest Applicant because Kandal operates under the policies and directives of CBP to contact the jurisdiction, verify the information, and find out what the agency wants done with the individual who has been reported missing. [RR 8: 91, 100.]

**1489**

App. 0557

14. The record does not support Applicant's claim that the transcript and report at issue "revealed a concerted effort" on the part of the Kennedale Police Department and CBP "to invent some justification" to hold Applicant while Kennedale officers started the process of obtaining an arrest warrant. [*See* Application at 115.]

15. Neither the transcript of the telephone calls nor the written report submitted by Applicant in this habeas proceeding supports Applicant's assertion of any improper motive or wrongdoing on the part of the Kennedale Police Department or CBP in Applicant's detention. *Cf. Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's rejection of Applicant's claim that he was illegally detained at the border based on lies was supported by the record).

16. The Court of Criminal Appeals addressed on direct appeal Applicant's contention that he was unlawfully detained at the border based on intentional lies and falsehoods and found that this Court's determination regarding the lawfulness of the detention was supported by the record. *See Hummel*, 2013 WL 6123283 at *7-18.

17. As the Court held in denying Applicant's pretrial motions to suppress, Applicant's detention by CBP pending the issuance of an arrest warrant was justified on several grounds based on federal law and CBP's policies. *See Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's findings that CBP agents had authority to detain Applicant pursuant to federal law and policies and procedures was supported by record).

18. Nothing in the transcript or report submitted by Applicant in this habeas proceeding invalidates this Court's previous determination that Applicant's detention pursuant to federal law or CBP's policies and procedures was lawful, and the Court would not have changed any of its findings or rulings related to Applicant's motions to suppress had Applicant's trial counsel introduced the transcript and report into evidence at the pretrial suppression hearing.

19. There is no reasonable probability that Applicant would have been acquitted or sentenced to life without parole if the Court had suppressed Applicant's confession or the murder weapons found as a result of the confession.

   a. Fire investigators unanimously concluded that the fire at Applicant's house was an arson under the Texas Penal Code. [RR 34: 248-49.]

93

**1490**

**App. 0558**

    b.    The jury heard medical-examiner testimony about and saw photographs of the extensive non-fire-related injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

    c.    Blood matching the DNA of Applicant, Joy, and Eddie was found on clothing that Applicant voluntarily turned over during his December 18, 2009, noncustodial interview at the Kennedale Police Department. [RR 35: 39; RR 37: 190-91, 196-97, 200-01; SX 341B.]

    d.    During Applicant's interview at the Kennedale Police Department, Steele saw blood on Applicant's pant leg, blood on Applicant's socks, and very recent scratch marks on Applicant's back. [RR 35: 42-44, 60-62; SX 274-76.]

    e.    Applicant's statements at the Kennedale Police Department raised Steele's suspicions because Applicant's story did not make sense. [RR 35: 81; *see* SX 341B.]

    f.    Shortly after leaving the police station on December 18, 2009, Applicant fled in his van to California, which evidenced Applicant's consciousness of guilt.

20.    Applicant contends that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions because he "should have more clearly argued" that Applicant's confession should have been suppressed based on the actions of the Kennedale Police Department and CBP. [Application at 124-25.]

21.    In preparing Applicant's brief on direct appeal, appellate counsel reviewed the motions to suppress filed by trial counsel, reviewed the applicable facts, and researched the applicable law. [Stickels' affidavit at 2-3.]

22.    On direct appeal to the Court of Criminal Appeals, appellate counsel challenged this Court's denial of Applicant's motion to suppress his confessions. [*See* Application at 125; Applicant's Exhibit 31.]

23.    Based on his research and experience, Applicant's appellate counsel presented appellate issues challenging the denial of Applicant's motions to suppress in "an appropriate manner that [he believes] was calculated to obtain relief" on appeal. [Stickels' affidavit at 3.]

**1491**

24. The appellate arguments advanced by Applicant's appellate counsel focused on the sufficiency of the arrest-warrant affidavit to establish probable cause and also argued that Applicant's confession was "the culmination and result of all of the previous unconstitutional state actions," which "allud[ed] to an earlier discussion of false statements" made by the Kennedale Police Department to CBP.

25. Applicant does not articulate exactly how his appellate counsel should have argued the claims differently or how counsel's failure to do so fell outside the wide range of reasonable professional assistance. [*See* Application at 124-25.]

26. Applicant's complaint simply second-guesses in hindsight his appellate counsel's strategic decisions based on counsel's experience and research about how to best challenge on direct appeal the Court's denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions. [*See* Application at 124-25.]

27. Applicant has not shown that the appellate contention he alleges counsel should have made had indisputable merit under settled case law. Therefore, Applicant has not demonstrated that he would have prevailed on appeal had his appellate counsel raised different issues or argued the issues raised differently. [*See* Application at 124-25.]

28. There was no legal or factual basis for the Court to suppress Applicant's confessions or the evidence found as a result of the confessions.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that

95

**1492**

**App. 0560**