counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.   An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.   An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.   An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.   Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.   In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d at 704-05.

**1493**

8.  Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9.  The validity of a stop or an arrest is determined solely by analyzing the objective facts surrounding the event. *Garcia v. State*, 827 S.W.2d 937, 943 (Tex. Crim. App. 1992). "Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which [the officers] acted is of no consequence." *Id.* (quoting *United States v. Causey*, 834 F.3d 1179, 1185 (5th Cir. 1987)). The telephone conversations and later written CBP report focused on only one valid basis to detain Applicant at the border and such evidence would not have rendered alternative objective bases to detain Applicant invalid or inapplicable.

10. Applicant's conclusory allegations fail to satisfy his burden to demonstrate that his appellate counsel provided ineffective assistance. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. Applicant's allegations amount to nothing more than an impermissible second-guessing of appellate counsel's strategic decisions made based on counsel's experience and research about how to best challenge the denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions on appeal. *See Strickland*, 466 U.S. at 690-91; *see also Scheanette*, 144 S.W.3d at 510 (fact that another attorney may have pursued different tactic insufficient to prove ineffective-assistance claim).

12. The strategic decisions of Applicant's trial counsel not to offer cumulative evidence in a different format do not support a claim of ineffective assistance. *See Parker*, 565 F.3d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative); *Coble*, 496 F.3d at 436 (counsel's decision not to present cumulative testimony does not

**1494**

constitute ineffective assistance); *Barnes v. United States*, 859 F.2d 607, 608 (8th Cir. 1988) ("[d]irect- and cross-examination techniques are matters of trial strategy left to the discretion of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

13.    There is no reasonable probability that, had Applicant's trial counsel introduced the transcript of the telephone calls and the written report at issue, Applicant would have prevailed at the suppression hearing or at his trial.  The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable.  Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

14.    Applicant has not met his burden to demonstrate by a preponderance of the evidence that his appellate counsel failed to raise a claim of indisputable merit under settled law.  Applicant has not shown deficient performance of his appellate counsel.

15.    There is no reasonable probability that Applicant would have prevailed on direct appeal had his appellate counsel "more clearly argued" the point of error challenging the denial of Applicant's motion to suppress his confession and the evidence seized as a result of the confession.  Therefore, Applicant has not met his burden to prove by a preponderance of the evidence that he suffered any prejudice as a result of his appellate counsel's alleged deficient performance.

16.    The Court recommends that Applicant's ninth claim for relief be denied.

I.    **Claim for Relief Ten**

Applicant alleges that his appellate counsel was ineffective for failing to appeal the Court's erroneous denial of challenges for cause of nine prospective jurors who illustrated that their views would impair their ability to follow the Court's instructions and their oath. [Application at 126.]

**1495**

## Findings Of Fact

1. Applicant's allegations concern the Court's denial of Applicant's challenges for cause against veniremembers Thomas Bancroft Jr., LaDonna Butler, Kayla McFarland, Leslie Cuevas, Pamela Powell, Steven Guidroz, Kenneth Zeiger, Donna Beauchamp, and Janie Cantu Hermosillo.  [Application at 126-37.]

2. On direct appeal, Applicant's appellate counsel reviewed the entire voir dire proceedings, including the voir dire of the nine veniremembers at issue in this habeas proceeding, and he researched the applicable law.  [Stickels' affidavit at 4.]

3. Applicant's appellate counsel did not raise points of error relating to the nine veniremembers at issue because in his opinion "there was no error in the trial court's refusal of [Applicant's] challenges for cause." [Stickels' affidavit at 4.]

4. Applicant cites only limited excerpts of the nine veniremembers' relevant voir dire and offers no substantial argument or authority to support his assertions that the Court erroneously denied his challenges for cause. [Application at 126-27.]  Applicant's arguments and assertions overlook the totality of the voir dire of the nine prospective jurors at issue.

5. Veniremember Bancroft

   a. Applicant challenged veniremember Bancroft for cause because he would create a burden on the defense to produce evidence of mitigating circumstances. [RR 16: 199.]

   b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 199.]

   c. Bancroft agreed that, if he took the oath as a juror, he would have to follow the law of the State of Texas and that he had no difficulty doing so. [RR 16: 148.]

   d. The State reminded Bancroft several times that neither party had any burden of proof on the mitigation special issue, and Bancroft agreed that a criminal defendant never had a burden of proof, even when there was no burden of proof on the State. [RR 16: 158-59, 161, 165-66.]

e.  When Applicant's trial counsel asked if Bancroft felt the language of the mitigation special issue put the burden on the defense to bring mitigating circumstances or to convince him of the sufficiency of the mitigating circumstances, Bancroft responded that "something is going to have to come out," that "someone's going to have to show me what kind of person they are," and that "since you're . . . defending him, you would probably have to tell me something about him." [RR 16: 193.]

f.  When Applicant's trial counsel explained that the law did not envision the defense having the burden on the mitigation special issue, Bancroft responded "[r]ight," and then the following exchange occurred:

> Q.  [DEFENSE COUNSEL] So . . . what I'm getting from you is . . . you kind of feel like that question is putting a burden on me, am I correct?
>
> A.  [BANCROFT] What I'm saying is the evidence in the case would be, you know, back to what caused it or what happened, but . . . if someone's trying to prove the Defendant's character and background, I – you've got to tell me or either he's got to tell me. I mean, I don't know their background or character unless someone does tell me that. Not saying you got to prove it, but . . . I got to know something about your character or background –
>
> Q.  Okay.
>
> A.  – to answer that question.
>
> Q.  Do you think it would be my obligation to convince you that that evidence was sufficient?
>
> A.  No.

[RR 16: 194 (emphasis added).]

g.  While Bancroft correctly expressed that there would have to be evidence from some source to allow him to answer the mitigation special issue, he clearly understood that neither side bore any burden to convince him of the existence and/or sufficiency of mitigating evidence.

**1497**

App. 0565

h.    At worst, Bancroft's answers were vacillating or contradictory at times regarding the mitigation special issue and whether he would place a burden on the defense.

i.    Bancroft's overall voir dire demonstrated his ability to follow the Court's instructions and to answer the mitigation special issue based on the law and the evidence.

6.    Veniremember Butler

a.    Applicant challenged Butler for cause on the grounds that: (i) her failure to see a distinction between the terms "probability" and "possibility" reduced the State's burden of proof on the future-dangerousness special issue; and (ii) she would require a nexus between a mitigating circumstance and the actual commission of the crime, which unduly narrowed the mitigating circumstances the defense would be allowed to bring to the jury. [RR 16: 250.]

b.    The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 251.]

c.    During the State's individual voir dire, Butler stated that "probability" meant "[a] chance that it would happen again." [RR 16: 209.]

d.    Butler agreed that a "probability" was not a certainty and that a probability fell somewhere between a "possibility" and a certainty. [RR 16: 209.]

e.    During the defense's voir dire, Butler agreed that "probability" meant there was "some degree of likelihood." [RR 16: 240.]

f.    Butler stated that she and most people probably would interpret the terms "possibility" and "probability" as being "similar." [RR 16: 240.]

g.    Butler indicated that she did not see a difference in the degree of likelihood being inquired about by the two terms and that one would not ask her to find a greater degree of likelihood than the other. [RR 16: 241.]

h.    During the State's questioning when the distinction between the terms "probability" and "possibility" was explained, Butler had an

101

**1498**

appropriate understanding of the meaning of the terms, she saw and accepted the distinction between the terms, and she saw a "probability" as something more than a "possibility."

i.  The defense's questioning regarding the distinction between a "probability" and a "possibility" merely sought out Butler's interpretation of the terms and did not explain that the law required Butler to see and accept the distinction between the terms. [RR 16: 240-41.]

j.  At worst, Butler's answers about her understanding of "probability" were vacillating, contradictory or unclear.

k.  Based on Butler's overall responses and demeanor, she exhibited a proper understanding that "probability" meant more than a "possibility."

l.  With regard to the mitigation special issue, Butler stated that she would keep an open mind, look at all the evidence, and not automatically answer the special issue "no." [RR 16: 216.]

m.  Butler stated that the mitigation special issue did not place a burden on the defense to prove the existence or sufficiency of a mitigating circumstance. [RR 16: 245-46.]

n.  Butler responded affirmatively when Applicant's trial counsel asked if she thought the mitigation special issue was talking about blameworthiness for the offense of conviction and if she believed the instruction compelled her to find a mitigating circumstance only if it had some type of direct connection to the commission of the crime. [RR 16: 247-48.]

o.  Butler found the application of the mitigation special issue as stated by Applicant's trial counsel to be "confusing." [RR 16: 248-49.]

p.  Butler responded during the State's questioning that she would keep an open mind, look at all the evidence, and not automatically answer the mitigation special issue "no." [RR 16: 216.]

q.  Butler's overall voir dire showed that she would follow the Court's instructions in answering the mitigation special issue.

102

**1499**

App. 0567

7.   Veniremember McFarland

a.   Applicant challenged McFarland for cause because, in considering the future-dangerousness special issue, she would consider if there was a probability that a third party would commit criminal acts of violence on Applicant's behalf. [RR 17: 289.]

b.   The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 17: 289.]

c.   McFarland indicated that she could give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty, depending on the facts of the case. [RR 17: 237.]

d.   McFarland defined society as "[t]he public . . . a group or community of people," and she agreed that the definition of society was a broad term that could include the world at large. [RR 17: 245-46.] Then, the following relevant exchange occurred:

Q.    [PROSECUTOR] But the question here is the Legislature said we have – the State has the burden of proof beyond a reasonable doubt that the Defendant is going to be a continuing threat to society.

And remember from our discussions earlier that he's going to be . . . convicted of capital murder is going to be in the penitentiary the rest of their life.  So you see in your mind, is there a possibility that someone could be a threat to society from the penitentiary?

A.    [MCFARLAND] Most of me says no, but, you know, a very, very small chance that they could be.  You know, there's the Internet, there's family contact that could do something for them in that way, not – not directly themselves, but I do think there is a – some chance that they could find a way to do something on the outside world outside prison.

Q.    Do people from the penitentiary ever escape from the penitentiary?

A.    Yes.

Q.    Do people from . . . the society outside the penitentiary go to work in the penitentiary?

**1500**

**App. 0568**

A.     Yes.

Q.     Do they visit the penitentiary sometimes?

A.     Yes.

Q.     So you see that there's some . . . possibility for interaction –

A.     Yes.

Q.     – of – of inmates with people from your definition of society?

A.     Yes.

[RR 17: 246-47.]

e.     Applicant's trial counsel later revisited the issue in the following exchange:

Q.     [DEFENSE COUNSEL] Okay.  And then I know you had talked earlier about . . . the criminal acts of violence. . . . I understand the way you think of it as being a group in public or a group or community of people.  And [the prosecutor] had talked about [society] also was prison, and I think you said originally that you're thinking no, but then you thought about the Internet?

A.     Yes. . . . I guess I was just trying to think of ways that an inmate could interact or communicate with the outside world.

Q.     And what if – if the Judge were to tell you or – you understand that in Texas, they don't have access to the Internet?

A.     No, I don't know that.

Q.     Okay.

A.     No, . . . it was something out of . . . my head.  I don't know –

Q.     Okay.

A.     – phone calls, letters, you know.

104

**1501**

**App. 0569**

Q.     Okay.

A.     Family visits.

Q.     I'm sorry.  You had said something earlier about also a family member, maybe?

A.     Yes.

Q.     So is . . . your definition . . . of probability that the Defendant would commit – commit criminal acts would be that it could also be by one of their family members?

A.     Yes.  They could arrange it.

* * *

Q.     (BY [DEFENSE COUNSEL]) You understand that the acts would be by the Defendant and not a third person?

A.     Yes.

Q.     Because a second ago, you said it could be by a family member?

A.     Well, . . . I guess I just had in my mind that if someone in prison wanted to get back at someone outside of prison, they would find a way to possibly . . . find some way of causing harm to them or – or – I don't know how much more to put it into words, but I think if there's a will, there's a way.

Q.     So would it be fair to say for you that –

A.     They may not do it directly, but I think there is a chance that they could do it indirectly.

Q.     Okay.  So be fair to say that for you, you would attribute acts in Special Issue No. 1, acts of a third person, to the Defendant in – in this question?

A.     Yes.

[RR 17: 281-83.]

**1502**

f.   Read as a whole, McFarland's responses at issue simply reveal her thought process during questioning about whether a person confined in the penitentiary could commit future acts of violence in society outside of prison.

g.   McFarland never indicated that she would hold acts of a third party against Applicant if Applicant himself did not play a part in directing the third party's acts of violence.

h.   McFarland responded affirmatively when defense counsel asked, "You understand that the acts would be by the Defendant and not a third person?" [RR 17: 282.]

i.   McFarland's overall voir dire demonstrates her ability to follow the Court's instructions in answering the mitigation special issue and to give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty depending on the facts of the case. [RR 17: 237, 244-45.]

8.   Veniremember Cuevas

a.   Applicant challenged Cuevas for cause because:  (i) she indicated that her answer to the future-dangerousness special issue would be automatic based upon her analysis in finding Applicant guilty; (ii) she indicated that she had a predisposition toward the death penalty; and (iii) she never mentioned in her jury questionnaire anything about having followed the capital-murder case involving her church Sunday school classmate's murder even though question 85 specifically asked that question. [RR 20: 236-37.]

b.   The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 20: 238.]

c.   During the State's individual voir dire, Cuevas said that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

d.   Although Cuevas put in her questionnaire that the death penalty should be available for capital murder, murder of a policeman, and murder of children, she understood and had no issue with the

definition of capital murder as charged in Applicant's case. [RR 20: 197-98.]

e.   Defense counsel asked Cuevas if she believed that the death penalty "would be the only appropriate option" for the offenses she listed in her questionnaire, and Cuevas responded: "Well, I don't know that it's the only option because what's been explained is we have to look at two things and make our decision based on . . . answering those two questions." [RR 20: 224.]  When asked if a life sentence would be an option when dealing with those types of crimes, Cuevas responded, "I have to answer yes." [Id.]

f.   Cuevas' response on her jury questionnaire that the death penalty should be available for "capital murder, murder of policemen, murder of children" [Applicant's Exhibit 35, p.7] did not, as Applicant alleges, show her predisposition to give the death penalty to someone who murdered a child. [Application at 130.]

g.   Cuevas understood and agreed that in Applicant's trial the definition of the crime was the one shown on the State's PowerPoint, she understood that she would have to keep an open mind and consider all phases of the case before reaching a decision, and she believed she could follow the Court's instructions and go through the procedure in reaching a decision. [RR 20: 192, 197.]

h.   Cuevas told the State that, regardless of what was in Cuevas' questionnaire, she could follow her oath and apply the law to the facts in the case and render a just verdict. [RR 20: 206.]

i.   With regard to the mitigation special issue, Cuevas could keep an open mind, consider mitigating evidence in a case, and vote based on her view of whether the evidence rose to such a level that it was mitigating, and she would vote "yes" if it rose to the level of mitigating in her mind and "no" if it did not. [RR 20: 211.]  Cuevas would keep an open mind, follow her oath, and give the mitigation issue a fair review. [RR 20: 212-14.]  She understood that she had to keep an open mind until the State met its burden in the guilt-innocence phase and on the future-dangerousness special issue and until the jurors decided among themselves how to answer the mitigation special issue. [RR 20: 215.]

**1504**

j.      Regarding the future-dangerousness special issue, Cuevas stated that she could apply the law to the facts of the case and render a just verdict. [RR 20: 206-07.] She would answer the special issue "yes" if the State met its burden of proof, and she would have no hesitation in answering "no" if the State did not meet its burden. [RR 20: 208.]

k.      With regard to the future-dangerousness special issue, the following relevant exchange occurred between Applicant's trial counsel and Cuevas:

[DEFENSE COUNSEL] And then you're being called upon to answer this questions, Special Issue No. 1. Is that something that's pretty much a given? I mean, if you've answered all of these questions such that a – a guilty verdict has taken place, can you see where the – that someone could decide it's a no-brainer, it's – it's an automatic response of yes because after all, we've already found these things? Is that a yes?

A.     [CUEVAS] Yes.

Q.     Okay. No, . . . the law puts the burden on the State. The law says that they have to bring you evidence that this – this particular question, the answer is yes. They have to satisfy each of the 12 of you of that.

Would they have already satisfied you if the answer is yes, because after all, they have proven these things to you beyond a reasonable doubt other than the found to be a future danger at the bottom. The slide is really meant to deal with the next special issue. That's the only difference.

Can you see that it – with some people, that it could very well be an automatic choice, it's – it's a no-brainer?

A.     Yes.

Q.     Okay. Would it be so with you?

A.     Yes.

[RR 20: 230-31.]

**1505**

**App. 0573**

l.   The Court questioned Cuevas to clarify her responses regarding the future-dangerousness special issue:

> THE COURT: . . . What you said to [defense counsel] was that you felt like the answer to Question No. 1 would be automatic based upon what your decision was in the guilt/innocence phase of the trial.
>
> And certainly it can be based upon the same evidence. My question to you is whether it's asking the same thing.
>
> [CUEVAS]: I don't think so.
>
> THE COURT: Okay. So just because you found somebody guilty of the offense of capital murder, you're not saying that you would automatically find that they were going to be a future danger in Question No. 1, or are you saying that? That's what I'm trying to figure out.
>
> [CUEVAS]: I guess it would just depend on the evidence that you heard during the trial. I mean, I don't know that I can adequately answer that question at the moment.

[RR 20: 235-36.]

m.   Regarding the future-dangerousness special issue, Cuevas' answers, at worst, were vacillating, contradictory, or unclear as to whether she would automatically answer the question "yes" after a finding of guilt.

n.   Cuevas stated that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

o.   Early in the defense's individual voir dire, Cuevas said she formed her opinion regarding the death penalty in 1994 or 1995 when a policeman in her Sunday school class in San Antonio, Texas, was killed while trying to stop a robbery in his neighborhood. [RR 20: 216.] Cuevas "followed the case very closely," she heard about the defendant's bad childhood "and everything that had happened to him," and she thought the defendant in that case deserved the death penalty even though she felt bad for him. [*Id.*] Cuevas would look that defendant up on the Internet every couple of years, and she found

out a few years ago that he was executed. [*Id.*] Cuevas did not attend the trial. [RR 20: 217.]

p.  Cuevas was not challengeable for cause simply because she never mentioned on her jury questionnaire that she followed the capital-murder case involving her Sunday school classmate's murderer even though question 85 specifically asked that question. The defense never questioned Cuevas about why she did not include this information in response to question 85 in the jury questionnaire. Nothing in the record indicates whether Cuevas misunderstood that question 85 called for her to include the case of her Sunday school classmate's murderer as a case in which she had an interest. *See Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999) ("written questions are by nature vulnerable to misinterpretation").

q.  Given the readiness with which Cuevas disclosed and discussed the case of her Sunday school classmate's murderer during her individual voir dire, the Court finds that Cuevas had no intention to be dishonest in her responses to the jury questionnaire.

r.  Cuevas disclosed her connection to the case involving her Sunday school classmate's murderer, thus providing the defense an opportunity to intelligently exercise its challenges and to determine whether she could be a disinterested and impartial juror.

s.  Nothing indicates that Cuevas' knowledge regarding the case involving her Sunday school classmate's murderer would have had effect on her ability to follow her oath and the law in Applicant's case.

t.  Cuevas' overall voir dire demonstrated that she would follow her oath and the Court's instructions and render a punishment verdict based on the facts in evidence and the law provided by the Court.

9.  Veniremember Powell

a.  Applicant challenged Powell for cause on the basis that she would minimize or reduce the State's burden of proof on the future-dangerousness special issue by automatically voting "yes" solely upon the evidence presented to her at the guilt-innocence phase of the trial. [RR 21: 58.]

110

**1507**

b.  The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 21: 59.]

c.  During the State's individual voir dire, Powell indicated that she would answer the future-dangerousness special issue "yes" if the State met its burden beyond a reasonable doubt and "no" if the State failed to meet its burden. [RR 21: 19.]

d.  Powell understood that her oath would require her to keep an open mind to everything. [RR 21: 20.]

e.  Powell agreed to evaluate the evidence from both the guilt-innocence and punishment phases of trial. [RR 21: 20.]

f.  Powell responded affirmatively when asked if she could "keep an open mind to all the – the process." [RR 21: 29.]

g.  During the defense's voir dire, Powell responded that the future-dangerousness special issue asked her to "[l]ook at the testimonies or the evidence to see if he's going to be a harm to other people in society." [RR 21: 52.]

h.  Powell responded that she would listen to "all the testimony or whatever information is brought into the trial." [RR 21: 52-53.]

i.  Powell understood that the State bore the burden on the future-dangerousness special issue and that the defense had no burden at all. [RR 21: 53.]

j.  The entire exchange about whether Powell would automatically answer the future-dangerousness special issue "yes" based upon finding Applicant guilty is as follows:

> Q.  [DEFENSE COUNSEL] But you're asked to deal with Special Issue No. 1. . . . I'm trying to set a context here and – you've already heard evidence of two murders, two knowing murders that don't have any defenses, there's no mental retardation, . . . the accused is within . . . the proper age range, it's not an accident, it's not insanity, it's not something that . . . they didn't intend to do because they were high or something like that. I believe on your questionnaire you had something like that.

111

**1508**

App. 0576

You've already made this choice. You've decided beyond a reasonable doubt that's where we're at. Now you're being asked to . . . answer Special Issue No. 1. Do you – do you see a difference in the – in the role that you have in the punishment phase?

A.    [POWELL] Yes, sir.

Q.    Are you going to be in a mindset that my goodness, I mean, we've already found that this guy's committed two murders. There's no defense. It's a – it's a given. It's a foregone conclusion. Obviously, the continuing threat to society. Does that fall within your way of thinking?

A.    Yes, sir.

Q.    Okay. . . . [Y]ou can take into consideration the evidence from the first phase of a trial, obviously –

A.    Yes, sir.

Q.    – in answering the special issues in the second phase.

You can – and many times the prosecutor will stand up and – and ask the judge to – to admit all the evidence from the first phase of the trial and during the second phase or whatever for the benefit of the jury. We all know that's the case anyway, but it's something done.

But my question to you here is – you've already made that decision that, My God, this guy has committed two murders, and there's no justification, they're innocent victims. The – is this going to be pretty much automatic for you as far as Special Issue No. 1 under those circumstances?

A.    Yes, sir.

[RR 21: 54-56.]

k.    In response to the defense's challenge for cause to Powell, the State pointed out:

[PROSECUTOR]:   Judge, the entire tenor of [Powell's] voir dire was that she would be open-minded and follow the law. [Defense counsel's] fact pattern, as you'll recall, that – when she answered it

would be automatic is – he went through for about four minutes in fact pattern that the juror is allowed to consider as part of answering the question yes.  And based on that fact pattern, they go into what (sic) she said that.

They never challenged her on her admissions throughout the State's voir dire for – that she would consider and be open-minded throughout the entire process and hold the State to our burden and never put the burden on the Defense.

[RR 21: 58-59.]

l.    The fact that Powell could answer the future-dangerousness special issue "yes" based on the facts of an offense did not render her unfit to serve because the circumstances of an offense and the events surrounding it may alone be sufficient to sustain an affirmative finding to the future-dangerousness special issue.

m.    Powell did not manifest an inability to reconsider or reweigh the evidence from the guilt-innocence phase in the particular context of the future-dangerousness special issue; therefore, Powell did not demonstrate herself to be unable to objectively follow the law.

n.    Counsel never explained to Powell that the future-dangerousness issue required a different analysis than finding Applicant guilty; thus, Applicant has not shown that Powell understood the requirements of the law and would be unable to put aside her personal beliefs and follow the law.

o.    At worst, Powell's responses were vacillating, unclear, or contradictory about whether she would automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

p.    Powell's overall voir dire showed that she would follow the Court's instructions and answer the future-dangerousness special issue based on the facts and the law and that she would not automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

q.    Applicant never challenged Powell on the ground he states in this habeas proceeding that her connection to the criminal justice system –

113

*i.e.*, she worked as a clerk in Tarrant County and had a close relationship with others who worked in the court building – "may have biased her opinion as a juror." [Application at 131.] Alternatively, Powell's voir dire examination unequivocally demonstrated that her position in the clerk's office would have absolutely no effect on her service as a juror.

10.  Veniremember Guidroz

a.  Applicant challenged Guidroz for cause because his reading of the mitigation special issue would place the burden on the defendant. [RR 27: 115.]

b.  The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 27: 116.]

c.  The following relevant exchange occurred during the defense's individual voir dire of Guidroz:

Q.  [DEFENSE COUNSEL] It's envisioned that . . . the question [regarding mitigation] doesn't put a question on either side, but if the issue is whether or not it's sufficient, some jurors look at that and say, Well, it's got to be my job to convince me it's sufficient.

Do you feel like just by the way the question is worded it puts any kind of legal burden on the Defense to produce the mitigating evidence or to convince the jury that that mitigating evidence is sufficient?

A.  [GUIDROZ] I would say, yes.

Q.  Okay. And that's a little bit different from what the law requires.

A.  I'm sorry?

Q.  That is different from what the law would envision, but they wrote the question in a bad way.

A.  Okay.

[RR 27: 109.]

**1511**

App. 0579

    d.    Guidroz could answer the mitigation special issue "no" if he felt it was proper based on the evidence in the case. [RR 27: 91.]

    e.    Guidroz was open to the idea that there could be something that would be sufficient for him to find a mitigating circumstance. [RR 27: 111.]

    f.    Guidroz's overall voir dire demonstrates that he could follow his oath and the law in answering the mitigation special issue. [RR 27: 87.]

11.    Veniremember Zeiger

    a.    Applicant challenged Zeiger for cause because he would have a predisposition to answer the future-dangerousness special issue "yes." [RR 28: 103.]

    b.    The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 28: 103-04.]

    c.    During the State's individual voir dire, the State informed Zeiger that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 61, 66.]

    d.    Zeiger stated that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and that he could answer "no" if the State failed to meet its burden. [RR 28: 66-67.]

    e.    During questioning by Applicant's trial counsel, the following exchange occurred:

    Q.    [DEFENSE COUNSEL] Well, I guess what I'm trying to get is how you're looking at [the future-dangerousness special issue]. Because he's going to be guilty before you ever ask this question. And you know that under this statutory scheme, that means he killed at least two people during the course of a single criminal transaction.

    And what I'm asking for – you is does that tell you that he's always going to be a danger, such that that question is always going to be answered yes; or do you think there could be situations where you would find – could find somebody guilty –

    A.    [ZEIGER] I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again.

115

**1512**

**App. 0580**

Q.     Okay.  And – and that's sometimes the problem with the question.  You see that – and because of the way you're looking at it, that question really is not serving any purpose, does it.

A.     There might be one – I'm trying to think of the word – one exception.

Q.     I'm sure there probably is an exception where I would say, you know, now maybe he wouldn't do it again because – but not likely.

Q.     Not likely what?  Not likely they're –

A.     The person's already found guilty of capital murder, and the question of whether they would commit the crime, I would have to say probably that, you know, yeah, they would, but there might be an exception.

Q.     Okay.

A.     But I don't know what that exception would be, and I'd have to weigh all the – the variables and – and understand, I guess, the individual, the circumstances of . . . what happened and, you know, that's almost – that's a whole life.

Q.     Okay. . . . I just want to make sure that we're on the same page.  The question is not asking you is he going to commit that crime again.

A.     Right.

Q.     The question is:  Is there a probability that he would commit crimes of violence?  And from what –

A.     It's – it's hard to say, but that's a yes-or-no answer.

Q.     Okay.

A.     I mean, to me it's not a yes-or-no answer.

Q.     What would it be?  That's what the question calls for.

**1513**

A.   Well, . . . it really depends on the individual and – and all the extenuating, you know, circumstances and everything.

Q.   Okay.  Do you feel like that you're predisposed to say that the answer should be yes if you find somebody guilty of capital murder?

A.   Yes.

[RR 28: 92-94.]

f.   Zeiger later said that the "system" made sense, and he acknowledged that the special issues required the jury to find something additional about the defendant because not every capital murderer would get the death penalty.  [RR 28: 100.]

g.   Zeiger's counsel did not ask whether Zeiger could set aside his predisposition and follow his oath as a juror.

h.   Arguably, Zeiger at times gave responses that could be interpreted as showing a predisposition to answer "yes" to the future-dangerousness special issue if someone was guilty of capital murder for killing two people.  However, he also stated that there could be an exception, that he would have to weigh all the variables and understand the individual and the circumstances of what happened, and that it depended on the individual and all the extenuating circumstances.  Additionally, Zeiger stated during the State's questioning that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and "no" if it did not.  [RR 28: 66-67.]

i.   At worst, Zeiger's responses were vacillating, contradictory, or unclear.

j.   In context, Zeiger's entire voir dire established that he would be able to set aside his personal beliefs and follow the Court's instructions in answering the future-dangerousness special issue.

117

**1514**

12. Veniremember Beauchamp

    a.    Applicant challenged Beauchamp because she would reduce the State's burden on the future-dangerousness special issue and vote "yes" based upon the proof of multiple murders in the same transaction. [RR 28: 158.]

    b.    The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 158-59.]

    c.    During the State's individual voir dire, Beauchamp indicated her understanding that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 121-22.]

    d.    Beauchamp understood the State's burden of proof on the future-dangerousness special issue and could answer question "yes" if the State met its burden of proof and "no" if the State did not meet its burden. [RR 28: 121-22, 128-29.]

    e.    Beauchamp could see that finding a defendant guilty of capital murder was a different question than asking if he would possibly constitute a continuing threat to society. [RR 28: 130-31.]

    f.    Beauchamp understood that the future-dangerousness special issue would not be answered "yes" just because she found the defendant guilty of capital murder; it would depend on the facts of the case. [RR 28: 131.]

    g.    Beauchamp could return a death sentence if it were proper under the facts and law, and she could return a life sentence if the evidence pointed toward it. [RR 28: 138.]

    h.    During voir dire by Applicant's trial counsel, Beauchamp stated that her expectation was to be "presented with the whole story . . . in order to make a fair judgment and provide a yes-or-no answer based on that statement." [RR 28: 154.] Additionally, the following exchange occurred:

        Q.    [DEFENSE COUNSEL] But before you're called upon to answer Special Issue No. 1, you are in a situation where you've already found beyond a reasonable doubt that the individual knowingly committed capital murder. There's not any defense. He's

not mentally retarded.  No accident.  The victim is innocent.  There was no self-defense involved.  All those issues are gone.  You have found this person to have knowingly caused multiple deaths.  Okay?

With that context, is it a foregone conclusion with you that the answer to Special Issue No. 1 would be yes?

A.    [BEAUCHAMP] Yes.

Q.    Because sometimes that's a lot of information to already have about the individual, is it not?

A.    Could be, yes.

Q.    Okay.  And . . . I want to be clear with you.  I'm asking you if the information that you have received already in the guilt/innocence phase on which you derived your verdict of guilty beyond a reasonable doubt of capital murder without any defense available, any justification, innocent victims, that that by itself is going to be enough for you to answer yes to Special Issue No. 1 and would do so automatically because of the guilt/innocence phase evidence you've received?

A.    Yes, based on the definition.

Q.    Okay.  The multiple commission of murders in one criminal transaction for you would be enough to answer this question, correct?

A.    Yes.

* * *

Q.    . . . Whose burden is it to prove this question?

A.    The State.

Q.    Okay. . . . I want to be sure I understand.  In a situation where you have found somebody guilty of multiple murders in the same criminal transaction without any of the mistake defenses, accident, anything like that, is your response to Special Issue No. 1 going to be yes every time?

A.      If they provided that, yes.

[RR 28: 155-57.]

i.      At worst, Beauchamp's answers were vacillating, contradictory, or unclear as to whether she would automatically answer the future-dangerousness special issue "yes" after finding a defendant guilty of a double murder committed without justification.

j.      Beauchamp's overall voir dire showed that she would follow the Court's instructions and answer the future-danger special issue based on the facts and law.

13.   Veniremember Hermosillo

a.      Applicant challenged Hermosillo for cause with regard to the mitigation special issue because she would require the defense to show why or how the crime happened and to produce evidence and convince the jury of the sufficiency of the mitigating evidence. [RR 28: 225-26.]

b.      The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 226-27.]

c.      During the State's individual voir dire, the State informed Hermosillo that the State did not have the burden of proof on the mitigation special issue. [RR 28: 189.]

d.      Hermosillo understood that the defense never had a burden of proof on the mitigation special issue. [RR 28: 189.]

e.      Hermosillo would not have any problem answering the mitigation special issue "yes" if she felt there was mitigating evidence. [RR 28: 192.]

f.      Hermosillo defined her role in deciding the special issue as "[t]o look at all the evidence and, you know, decide for myself, but I'd have to know all the – you know, all the evidence provided by y'all." [RR 28: 192-93.]

g.      Hermosillo understood a defendant's right to remain silent, and she had no problem with the fact that she might hear only one side of the situation. [RR 28: 193-94.]

120

**App. 0585**

h.   Applicant's trial counsel informed Hermosillo that neither party bore a burden with regard to the mitigation special issue. [RR 28: 216.]

i.   Hermosillo stated that the defense would have to "present reasons why that may have caused this incident or this murder," to prove the defendant's character or something about him like whether this was his first time, and to convince her that there is another side to the defendant. [RR 28: 217-18.]

j.   Hermosillo responded affirmatively when asked whether the defense would have to present evidence and convince her it was sufficient. [RR 28: 218.]

k.   Hermosillo thought there could be mitigating circumstances that would be sufficient to show that a death sentence was not appropriate. [RR 28: 219.]

l.   When the Court questioned Hermosillo, she understood that she would take an oath to follow the law contained in the Court's instructions. [RR 28: 222.]

m.   The following exchange occurred between the Court and Hermosillo:

THE COURT:   Okay.   As a juror, you would receive an instruction that the law does not require a Defendant to prove his innocence or to produce any evidence at all.  Do you understand that instruction?

[HERMOSILLO]:  Yes, ma'am.

THE COURT:   All right.   As a juror, would you be able to follow that instruction, or is your feeling that you've mentioned today, is that such a strong feeling that you would not be able to follow that instruction?

[HERMOSILLO]:  No, ma'am.  I – I would have to, you know, follow all the instructions and really pay attention to, you know, what's put before me.   I don't think I would have any problem following instructions, you know. . . . I think that the Defendant would have to –

THE REPORTER:  I'm sorry.  Please repeat that.

121

**1518**

App. 0586

[HERMOSILLO]:  I said I think that the Defendant's attorney would have to show; otherwise, you know, or prove him to be – I'm tired – that they would have to show that he – you know, there's other circumstances that caused him to – to, you know, cause the murder.

But I – I would really have to, you know, follow the rules and listen to everything, all the evidence, before I – you know, I cannot make up my kind and say, Well, yeah, he's guilty, you know.  I can't do that.  I have to listen to everything that's brought before me.

THE COURT:  Well –

[HERMOSILLO]:  I wouldn't have any problems with that even though . . . in the past . . . I may have thought, well, you know, once a person's here, he's guilty or – and I can't judge somebody until I know the facts.  I've never served on a jury before, so I don't know how things are, you know, brought forth, how the evidence is brought before use and stuff, so I would have to just make sure that I'm, you know, following the Judge's guidance and/or rules or make sure I follow everything exact.

THE COURT: . . . But my question to you is whether you could follow the instruction that the Judge would give you saying that the Defendant does not have a burden of proof, they do not have to present any evidence whatsoever in any stage of the trial.

[HERMOSILLO]:  Yes, ma'am.  I think I could.

THE COURT:  Okay.  When you say that you think you can, I need a more definite answer –

[HERMOSILLO]:  I know I can.

[RR 28: 222-25.]

n.  At worst, Hermosillo gave vacillating, contradictory, or unclear answers about whether she wanted the defense to present mitigating evidence at the punishment phase.

o.  In the end, Hermosillo assured the Court that she could put aside her personal views, follow the Court's instructions, and not impose a

122

**1519**

**App. 0587**

burden of proof on the defense with regard to the mitigation special issue.

14. The Court granted Applicant two additional peremptory strikes during the course of the voir dire proceedings.

## Conclusions Of Law

1. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

2. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

3. A veniremember may be challenged for cause if he has a bias or prejudice against any phase of the law upon which the defendant is entitled to rely. TEX. CODE CRIM. PROC. art. 36.16(c)(2). Bias against the law is refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

4. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003).

5. Before a prospective juror may be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Gardner*, 306 S.W.3d at 295; *Sells*, 121 S.W.3d at 759.

6.     The proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Sells*, 121 S.W.3d at 759. The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow it. *Id.*

7.     When called upon to review a trial court's decision to grant or deny a challenge for cause, an appellate court looks at the entire record to determine if there is sufficient evidence to support the trial court's ruling. *Sells*, 121 S.W.3d at 759. An appellate court affords considerable deference to the trial court's ruling because the trial judge is in the best position to evaluate a veniremember's demeanor and responses and to hear his tone of voice. *Gardner*, 306 S.W.3d at 295-96; *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

8.     A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Gardner*, 306 S.W.3d at 296; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007).

9.     When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the reviewing court must defer to the trial court's decision. *Gardner*, 306 S.W.3d at 296; *Ladd*, 3 S.W.3d at 559.

10.    Because the Court granted Applicant two additional peremptory strikes, in order to demonstrate a reasonable probability that he would have prevailed on appeal, Applicant must show that the Court erroneously denied at least three of his challenges for cause. *Feldman*, 71 S.W.3d at 744; *see Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1992) (op. on reh'g) ("Where the court reinstates peremptory strikes, to show harm, the party complaining on appeal must show that one additional juror sat on the case than the number of reinstated peremptory strikes").

11.    Applicant has failed to establish that appellate counsel's strategic decisions were objectively unreasonable and that there is a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised the claims Applicant suggests.

12.    Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his appellate counsel fell below an objective standard of reasonableness under prevailing professional norms

**1521**

because counsel, based on a review of the record and the law, determined that points of error on appeal challenging the denial of Applicant's challenges for cause would have been without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d at 623-24 (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

13.  Applicant's allegations are too conclusory to meet his burden to establish the first prong of *Strickland*, and he should be denied relief. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

14.  Even if Applicant could show that his appellate counsel was deficient for failing to raise points of error on appeal challenging the denial of the nine challenges for cause he refers to in this claim, he has not met his further burden to show resulting prejudice. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

15.  Applicant would have been unable to establish on appeal that the Court erroneously denied at least three of the nine challenges for cause at issue. Thus, there is no reasonable probability that Applicant's case would have been reversed on appeal had appellate counsel raised points of error challenging the denial of the nine challenges for cause at issue. Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered prejudice as a result of the alleged deficient performance of his appellate counsel.

16.  The Court recommends that Applicant's tenth claim for relief be denied.

## J.  Claim for Relief Eleven

Applicant asserts that trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove minority veniremembers in violation of Applicant's constitutional rights. [Application at 137.]

## Findings Of Fact

1.  Applicant's allegations focus on three minority veniremembers: Aaron Gonzales, a Hispanic male; Valerie Williams, an African-American female; and Darryl Dennis, an African-American male. [Application at 137-45.]

2.  Moore has raised *Batson* challenges on several past occasions in both death-penalty and non-death-penalty cases, and he would have raised a *Batson* challenge in Applicant's case had he believed there was anything to suggest any racial motivation in the State's use of peremptory strikes on Gonzales, Williams, or Dennis. [Moore's affidavit at 26, 29.]

3.  Applicant makes no attempt to establish the *prima facie* case required by the first step of the *Batson* analysis. [*See* Application at 137-45.]

4.  Trial counsel had strategic reasons for not objecting to the State's exercise of peremptory challenges against Gonzales, Williams, and Dennis. [Moore's affidavit at 27].

5.  Trial counsel recognized that there were "obvious race neutral reasons for each of [the State's peremptory] strikes" at issue in this habeas proceeding. [Cummings' affidavit at 10.]

6.  There were a number of strategic reasons that trial counsel did not want Gonzales to be seated on Applicant's jury: (a) Gonzales was only twenty-two years old; (b) his father was in law enforcement, and he was personally considering a possible career in law enforcement; (c) he gave inconsistent answers about his ability to judge another person; (d) he seemingly placed responsibility for bringing mitigating evidence before the jury and the burden of persuading the jury of the importance of such mitigating evidence on the defense; and (e) he appeared to have a significant work problem if he were chosen to serve. [Moore's affidavit at 27.]

7.  Moore did not object to the State's excusal of Gonzales because Moore did not want Gonzales seated as a juror and because Moore wanted to force the State to use a peremptory strike on Gonzales, "as that is an important part of the 'art' of capital voir dire." [Moore's affidavit at 27.]

8. Even if the State had not struck Gonzales, he likely would not have been seated as a juror at Applicant's trial because Applicant's trial counsel did not want him to serve as a juror. [*See* Moore's affidavit at 27]

9. It was apparent to Moore that the State would not accept Williams as a juror because Williams was somewhat "soft" on the death penalty and there was uncertainty about the position her church might ultimately take on the death penalty. [Moore's affidavit at 28.]

10. In Moore's experience, individuals such as Williams have a great problem in taking the ultimate responsibility of voting for death. [Moore's affidavit at 28.]

11. Trial counsel wanted the State to be compelled to expend a peremptory challenge to excuse Williams from the jury. [Moore's affidavit at 28.]

12. A *Batson* challenge regarding Williams would not have succeeded because there were obvious reasons for the State to strike her. [Moore's affidavit at 28.]

13. Both sides had issues with Dennis as a potential juror. [Moore's affidavit at 28.]

14. Applicant makes no showing that the defense would not have exercised a peremptory strike to remove Dennis had the State accepted him as a juror.

15. Had the defense accepted Dennis as a juror for Applicant's trial, there is a possibility that he would not have been a favorable juror for Applicant. [*See* Moore's affidavit at 28.]

16. The State had no racial motivation for exercising a peremptory strike against Gonzales, Williams, or Dennis, and it would have been "unethical" in Moore's opinion to make a *Batson* challenge absent any basis to support it. [Moore's affidavit at 26-29.]

17. Over the course of thirty years, Moore has never known lead prosecutor Robert K. Gill to be racially biased or to act in a racially motivated manner in any of the actions Gill has taken in court. [Moore's affidavit at 28-29.]

18.  Moore has never known prosecutor Miles Brissette act in a racially motivated manner in any case that they previously had together. [Moore's affidavit at 29.]

19.  Applicant's trial counsel made a reasonable and strategic decision not to raise what they believed would be a futile *Batson* claim.

20.  Lead prosecutor Gill provided an affidavit in this habeas proceeding setting forth a number of facially race-neutral reasons for the State's exercise of peremptory strikes on Gonzales, Williams, and Dennis. [Gill's affidavit (State's Exhibit 1).]

21.  The voir dire proceedings and the jury questionnaires relating to Gonzales, Williams, and Dennis support the State's facially race-neutral reasons for exercising peremptory on those veniremembers as set forth in Gill's habeas affidavit.

22.  Applicant's comparative analysis does not take into account the State's race-neutral explanations for exercising the three peremptory strikes at issue. [*See* Application at 142-45.]

23.  With regard to the *Strickland* prejudice prong, Applicant offers only the bare assertion that "[t]here is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left [Applicant] with a constitutionally-infirm jury; a malady that can only be remedied by a new trial." [Application at 145 (citations omitted).]

24.  Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

25.  Applicant's assertions of prejudice are conclusory.

**Conclusions Of Law**

1.  In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at

**1525**

521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2.   To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.   He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.   An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.   An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.   An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.   Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances

**1526**

as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.  A three-step analysis guides the evaluation of a defendant's equal-protection challenges to a prosecutor's use of peremptory challenges: (a) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (b) upon such a showing, the burden of proof shifts to the State to provide a race-neutral explanation for striking the veniremembers in question; and (c) the trial court must determine whether the defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson v. Kentucky*, 476 U.S. 79, 94-98 (1986); *Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012).

8.  The ultimate burden of persuasion regarding improper motivation rests with, and never shifts from, the party challenging the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

9.  The failure of trial counsel to lodge a *Batson* objection is not presumptively prejudicial for purposes of a claim of ineffective assistance of counsel. *See Young v. Bowersox*, 161 F.3d 1159, 1160-61 (8th Cir. 1998). Even if an error premised on *Batson* is shown, it does not warrant setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment. *See id*.

10. The failure of Applicant's trial counsel to raise a *Batson* objection during voir dire did not fall below an objective standard of reasonableness under prevailing professional norms because counsel made a reasonable strategic decision not to raise a claim that they believed to be without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"). Applicant has failed to meet his burden to prove that his trial counsel were deficient.

11. *Batson* requires Applicant to do more than show that minority veniremembers were peremptorily struck from the venire; Applicant must also raise an inference that the prosecutor excluded the veniremembers from the jury on account of their race. *See Batson*, 476 U.S. at 96. Simply alleging that two African-American veniremembers and one Hispanic

**1527**

**App. 0595**

veniremember were impermissibly struck does not satisfy this threshold requirement. *See Hassan*, 369 S.W.3d at 875-78.

12. The State's facially race-neutral reasons for exercising the peremptory strikes at issue satisfy the second prong of the *Batson* inquiry. *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (at second step of process, proponent of strike need only tender facially race-neutral explanation) (citing *Purkett*, 514 U.S. at 767-68).

13. A comparative analysis relates to the third prong of the *Batson* framework and must be conducted in light of the race-neutral explanations tendered by the State. *See Purkett*, 514 U.S. at 768 ("It is not until the third step that the persuasiveness of the justification [for the peremptory strike] becomes relevant"). Applicant's comparative analysis, which is based upon a narrow view of the record and does not examine the State's race-neutral explanations for striking the veniremembers at issue, cannot even begin to demonstrate pretext or racial motivation behind the State's peremptory strikes at issue. Applicant has failed to prove that the prosecutor's explanations were incorrect, much less that they were a pretext for discrimination.

14. Applicant has not met his burden to satisfy the three-pronged analysis of *Batson*; therefore, he has not met his burden to establish that a *Batson* challenge would have succeeded. Under such circumstances, Applicant has not proven by a preponderance of the evidence that the performance of his trial counsel fell below an objective standard of reasonableness under prevailing professional norms. Applicant's claims are not firmly founded in the record, and Applicant fails to establish deficient performance by his trial counsel.

15. Even if Applicant could demonstrate that his trial counsel's failure to raise a *Batson* claim was objectively unreasonable, he bears the further burden to show a reasonable probability that the outcome of his trial would have been different had trial counsel lodged a Batson objection. *See Batiste v. State*, 888 S.W.2d 9, 15-17 (Tex. Crim. App. 1994) (claim of ineffective assistance for failing to raise Batson claim subject to Strickland's prejudice prong).

16. There is no reasonable probability that the outcome of any stage of Applicant's proceedings would have been different had Applicant's trial counsel asserted a *Batson* claim during voir dire. There simply is no

131

**1528**

**App. 0596**

evidence to suggest either that the alleged deficient performance of trial counsel or the makeup of the seated jury had a prejudicial effect on Applicant's defense at any phase of his trial. *See Batiste*, 888 S.W.2d at 14.

17. The Court recommends that Applicant's eleventh claim for relief be denied.

## Claim Twelve
## Consideration of Mitigating Evidence

Applicant alleges that his death sentence should be vacated because the punishment-phase jury instruction restricted the evidence the jury could determine was mitigating. [Application at 145.] He argues that he was unable to have all mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence because the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to his "moral blameworthiness." [*Id.* at 149-51.]

### Finding of Fact

1. Special issue two in the Court's charge on punishment instructed the jury regarding the consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

### Conclusions of Law

1. The complained-of language in the mitigation special issue did not unconstitutionally narrow the definition of mitigating evidence to that which reduced Applicant's moral blameworthiness. *Roberts*, 220 S.W.3d at 534.

2. Special Issue Two posed no barrier to the jury giving effect to any of Applicant's alleged mitigating evidence. *Roberts*, 220 S.W.3d at 534.

**1529**

**App. 0597**

## Claim Thirteen
## Arbitrary Imposition of the Death Penalty

Applicant alleges that his death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty. [*See* Application at 151.] He asserts that geographical and racial disparities have rendered Texas' death-penalty scheme unconstitutional. [*See id.* at 151-60.]

### Findings of Fact

1.    Applicant has not shown that he was singled out for selective prosecution or that the death-penalty statute was applied against him in any unconstitutionally arbitrary or capricious manner. [Application at 151-60.]

2.    The materials cited and relied on by Applicant do not establish his claim.

### Conclusions of Law

1.    The discretion afforded the State to seek the death penalty is not unconstitutional. *Ladd*, 3 S.W.3d at 574; *see Gregg v. Georgia*, 428 U.S. 153, 199 (1976).

2.    Applicant's challenge to the constitutionality of Texas' death-penalty scheme based on the geographic and racial reasons he asserts is without merit. *See Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004) (varying decision-making between counties regarding seeking death penalty does not violate right to equal protection); *Allen v. State*, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003) (rejecting disparate-application claim based on county's financial constraints or ability to seek death penalty); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App. 1999) (rejecting claim based on statistical studies that Texas death sentences are disproportionately imposed in racially discriminatory manner).

**1530**

App. 0598

## Claim Fourteen
## "10-12" Rule

Applicant asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the Court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. [*See* Application at 160.] He argues that the "10-12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), and that the effect of the "10-12 rule" creates "an impermissible outside influence on jury deliberations" by improperly coercing juries into death sentences. [Application at 162-67.]

## Findings of Fact

1. Special issue two of the Court's punishment charge instructed the jury regarding its consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

3. The Court did not instruct the jury that a hold-out vote by one juror would result in a life sentence.

## Conclusions of Law

1. This Court was prohibited by TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1) from instructing any juror or prospective juror of the effect of a failure of the jury to agree on the mitigation special issue.

2. There is no constitutional violation in failing to inform jurors of the effect of their failure to agree on special issues. *E.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Luna v. State*, 268 S.W.3d 594, 09 (Tex.

**1531**

Crim. App. 2008); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

## Claim Fifteen
### Eligibility for the Death Penalty

Applicant asserts that he is ineligible for a death sentence because "his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution." [Application at 167.]

**Findings of Fact**

1.  Applicant relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eight Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of individuals with intellectual disability. [Application at 167.]

2.  Although the term "mental retardation" has been employed in the past, such as it was at the time *Atkins* was decided, the Supreme Court of the United States now favors use of the term "'intellectual disability' to describe the identical phenomenon," and this Court will therefore follow suit. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

3.  Applicant's claim for relief is not based on intellectual disability as was the claim in *Atkins*.

4.  Applicant offers no persuasive argument that *Atkins* should be extended to require a blanket exemption from the death penalty for persons suffering from CPTSD.

5.  There is no objective evidence that society views as inappropriate the execution of death-eligible individuals who have CPTSD.

6.  Applicant fails to demonstrate a trend among state legislatures to categorically prohibit the imposition of capital punishment against offenders who suffer from CPTSD.

135

**1532**

7. Applicant does not suffer from a major mental illness. [RR 44: 145.]

8. Applicant's objective neuropsychological and psychological test results and the facts of the offense are inconsistent with Applicant's claim that he is ineligible for the death penalty because of an alleged mental impairment. [Dr. Price's affidavit at 7-9.]

9. Applicant's behavior prior to, during, and after the charged capital-murder offense is inconsistent with his allegation about the effect of the alleged mental impairment. [Dr. Price's affidavit at 8-9.]

10. Applicant's actions around the time of the offense clearly indicated that he had the capacity to understand and process information, to control his impulses, to engage in logical reasoning, to consider the future repercussions of his actions, and to communicate. [Dr. Price's affidavit at 8-9.]

11. Applicant's psychological and neuropsychological test data and his life history are not at all similar to an individual with intellectual disability. [Dr. Price's affidavit at 7.]

## Conclusions of Law

1. Applicant's claim is not based on an intellectual disability, and *Atkins* does not extend to exempt persons with mental illness from imposition of the death penalty. *Soliz v. State*, 432 S.W.3d 895, 903-04 (Tex. Crim. App. 2014) (Soliz not exempt from death penalty despite expert testimony that Soliz diagnosed with partial fetal-alcohol syndrome and had cognitive and functional abilities similar to person with mental retardation); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *see Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *People v. Castaneda*, 51 Cal.4th 1292, 1345, 127 Cal.Rptr.3d 200, 249, 254 P.3d 249, 290 (2011); *Simmons v. State*, 105 So.3d 475, 511 (Fla. 2012); *Lewis v. State*, 279 Ga. 756, 764, 620 S.E.2d 778, 786 (2005); *State v. Dunlap*, 2013 WL 4539806 (Idaho August 27, 2013); *Matheney v. State*, 833 N.W.2d 454, 458 (Ind. 2005); *Dunlap v. Commonwealth*, 2013 WL 3121689 at *65 (Ky. June 20, 2013); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock*, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-60 (2006); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013).

**1533**

**App. 0601**

2.  Applicant would have been eligible for the death penalty even if he had been diagnosed with CPTSD. *See Soliz v. State*, 432 S.W.3d at 903-04; *Mays*, 318 S.W.3d at 379.

## RECOMMENDATION

This Court recommends that Applicant's requests for relief be denied.

**SIGNED AND ENTERED** this  *21ST*  day of *January*, 2015.

**HON. RUBEN GONZALEZ, Jr.**
**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**

137

**1534**

FILED
THOMAS A WILDER, DIST. CLERK

JAN 21 2015

TIME _____
BY _____ DEPUTY

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432nd JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## ORDER

The Court takes judicial notice of the reporter's record and clerk's records for the underlying trial in this case. The Court further takes judicial notice of all hearings attendant to this case over which the Court personally presided.

The Court recommends to the Texas Court of Criminal Appeals that it **DENY** relief to JOHN WILLIAM HUMMEL in this cause.

The Court further orders and directs:

1. The Clerk of this Court to file these findings and transmit them, along with the Writ Transcript, to the Clerk of the Texas Court of Criminal Appeals as required by law.

2. The Clerk of this Court to furnish a copy of the Court's finding to Applicant, John William Hummel, by and through his counsel of record, the Hon. Brad Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas 78711, and to the appellate section of the Tarrant County Criminal District Attorney's Office.

**SIGNED AND ENTERED** this _21ST_ day of _January_, 2015.

_____
**HON. RUBEN GONZALEZ, Jr.**
**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**

SCANNED

138

**1535**

**App. 0603**



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. WR-81,578-01

## EX PARTE JOHN WILLIAM HUMMEL

### ON APPLICATION FOR WRIT OF HABEAS CORPUS CAUSE NO. 1184294D IN THE 432ND DISTRICT COURT TARRANT COUNTY

*Per curiam.*   ALCALA, J., *dissents.*

### O R D E R

This is a post conviction application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure article 11.071.

Applicant was convicted in June 2011 of capital murder committed in December 2009. TEX. PENAL CODE ANN. § 19.03(a). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the

Hummel - 2

trial court sentenced him to death.  Art. 37.071, § 2(g).[1]  This Court affirmed applicant's

conviction and sentence on direct appeal.  *Hummel v. State,* No. AP-76,596 (Tex. Crim. App.

Nov. 20, 2013) (not designated for publication).

Applicant presented fifteen allegations in his application in which he challenges the

validity of his conviction and sentence.  The trial court did not hold a live evidentiary

hearing.  As to all of these allegations, the trial judge entered findings of fact and conclusions

of law and recommended that relief be denied.

This Court has reviewed the record with respect to the allegations made by applicant.

We agree with the trial judge's recommendation and adopt the trial judge's findings and

conclusions.  Based upon the trial court's findings and conclusions and our own review of

the record, relief is denied.

IT IS SO ORDERED THIS THE 10TH DAY OF FEBRUARY, 2016.

Do Not Publish

---

[1] Unless otherwise indicated, all references to Articles are to the Texas Code of Criminal Procedure.

**App. 0605**



Visiting the Court | Touring the Building | Exhibitions

Search: ◉ All Documents ○ Docket   **Advanced Search**

Enter Search Text: [＿＿＿＿＿＿] [Search] [Help]

**Home | Search Results**

No. 15-9284            *** CAPITAL CASE ***

Title:           John William Hummel, Petitioner

                    v.

                    Texas

Docketed:         May 12, 2016

Lower Ct:          Court of Criminal Appeals of Texas

  Case Nos.:        (WR-81,578-01)

  Decision Date:     February 10, 2016

~~~Date~~~      ~~~~~~~Proceedings and Orders~~~~~~~~~~~~~~~~~~~~~

May 10 2016     Petition for a writ of certiorari and motion for leave to proceed in forma pauperis filed. (Response due June 13, 2016)

Jun 13 2016     Order extending time to file response to petition to and including July 13, 2016.

Jul 15 2016     Order further extending time to file response to petition to and including August 12, 2016.

Aug 4 2016     Brief of respondent Texas in opposition filed.

Aug 18 2016    DISTRIBUTED for Conference of September 26, 2016.

Aug 23 2016    Reply of petitioner John William Hummel filed. (Distributed)

Oct 3 2016     Petition DENIED.

---

~~Name~~~~~~~~~~~~~~~~~~~~          ~~~~~~Address~~~~~~~~~~~~~~~~~~          ~~Phone~~~

**Attorneys for Petitioner:**

Jared P. Tyler                   Tyler Law Firm, PLLC               (713) 861-4004

                              P. O. Box 764

                              Houston, TX 77001

                              jptyler@tylerlawfirm.org

Party name: John William Hummel

**Attorneys for Respondent:**

Tomee M. Heining                Assistant Attorney General         (512) 936-1600

   Counsel of Record                P.O. Box 12548

                              Capitol Station

                              Austin, TX 78711-2548

                              tomee.heining@texasattorneygeneral.gov

Party name: Texas

January 13, 2017 | Version 2014.2

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | * | IN 432nd JUDICIAL |
| | * | DISTRICT COURT |
| JOHN WILLIAM HUMMEL | * | TARRANT COUNTY, TEXAS |

## COUNSEL'S AFFIDAVIT IN RESPONSE TO WRIT ALLEGATIONS

*BEFORE ME*, the undersigned authority, on this date personally appeared the Affiant, a person known by me to be Larry M. Moore, Attorney at Law, who, after being duly sworn by me, stated as follows:

"My name is Larry M. Moore, and I am an Attorney at Law, duly licensed to practice law in the State of Texas.    I was previously appointed as one of the two trial attorneys representing Mr. John William Hummel (the Applicant in this *Writ Application*), in Cause No. 1184294, the case which is the underlying basis for this proceeding.    I have received a copy of the Court's Order dated July 29th, 2013, ordering that I and Fred Cummings (Mr. Hummel's other appointed trial counsel in this case), file written affidavits in this cause on or before September 9th, 2013, responding to the ineffective assistance of counsel claims made against us in the *Writ Application*, more particularly Claims Numbers 2, 3, 4, 5, 6, 7, 8, 9 and 11.    This Affidavit is therefore submitted pursuant to that Order of the Court.

### Professional Background

I have been licensed to practice law in the State of Texas since November of 1977.    I am also licensed to practice in the United States District Court for the Northern District of Texas; the United States Court of Appeals for the Fifth Circuit; and the United States Supreme Court.    I am Board Certified in Criminal Law by the Texas Board of Legal Specialization, and I have been so certified since 1982.    I was awarded an *"AV Rating"* for *"legal expertise and professional reputation"* by Martindale-Hubbell in September of 1997, and I have maintained that rating since that date (now designated as *"AV Preeminent"*).    I

**527**

have been chosen as a *"Texas Super Lawyer"* by *Law and Politics*, and as published in *Texas Monthly Magazine*, in each successive year beginning in 2004. From November of 1977, until January 31st, 1986, I served as an Assistant Criminal District Attorney for the Office of the Criminal District Attorney of Tarrant County, Texas. During my tenure as an Assistant District Attorney, I served for several years as Chief of the Economic Crimes Section of that Office; and from November of 1984, through January 31st, 1986, I served as Director of the Criminal Division of that Office, supervising all of the criminal trial attorneys within the office (well over 100 lawyers). I have been engaged in the private practice of law since February 1st, 1986, and my practice is devoted exclusively to criminal defense. I have continuously maintained an office for the practice of law in Fort Worth, Tarrant County, Texas, since February 1st, 1986; and I have represented a large number of defendants in a variety of criminal cases in the criminal courts of Tarrant County, Texas; in the criminal courts of a number of other counties within the State of Texas; in the United States District Court for the Northern District of Texas; in various appellate courts within the State of Texas; and before the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court. I have particular experience in the trial of death penalty cases, having participated in approximately a dozen death penalty trials, both in State and federal court. I previously served on the Committee appointed pursuant to Texas Code of Criminal Procedure Article 26.052, for the formulation and implementation of *Standards for the Qualification of Attorneys for Appointment to Death Penalty Cases in the 8th Administrative Judicial Region of Texas*, from the inception of that Committee upon the original enactment of Article 26.052, until 2011; and during my tenure on that Committee, I was the person that was primarily responsible for the original drafting, and subsequent re-draftings of those *Standards*. I have previously served at two separate times on the State Bar of Texas Committee on Legal Services to the Poor in Criminal Matters, and while serving on that Committee, I was involved in the drafting and implementation of the *State Bar of Texas Standards for Representation in Death Penalty Cases;* and later, in the Committee's drafting of its *State Bar of Texas Standards for Representation in Non-Capital*

*Cases*. I have previously testified on a number of occasions as an expert witness in regard to various aspects of criminal law and procedure in various courts of the State of Texas, and I have written a number of articles, and spoken at a number of continuing legal education seminars dealing with criminal law topics throughout the State of Texas; including seminars developed and sponsored by the State Bar of Texas; the Tarrant County Criminal District Attorney's Office; the Texas Criminal Defense Lawyers Association; the Tarrant County Criminal Defense Lawyers Association; the Center for American and International Law; and the Texas Corrections Association. I previously served for approximately three years as an adjunct professor at Texas Wesleyan University School of Law, wherein I supervised the Wesleyan Innocence Project, and oversaw the Project's investigation and prosecution of post-conviction innocence claims. I have previously helped to *"team teach"* two graduate seminars and an undergraduate senior level course on the death penalty at the University of Texas at Arlington. I was previously elected to serve on the Boards of Directors of the Texas Criminal Defense Lawyers Association and the Tarrant County Criminal Defense Lawyers Association, ultimately serving as President of the Tarrant County Criminal Defense Lawyers Association in 2004. By education, training and experience, I believe that I am generally cognizant of the requirements for the *"effective assistance of counsel"* in a criminal case, particularly including death penalty cases.

### Response to Writ Allegations

I have reviewed the *Initial Application for Writ of Habeas Corpus* filed in this cause, together with its supporting documents. I have specifically reviewed the claims of *"ineffective assistance of counsel"* that are made against Fred Cummings and me, and which are contained within the *Writ Application* as Claims Numbers 2, 3, 4, 5, 6, 7, 8, 9 & 11. Based upon the totality of our representation of Mr. Hummel at his trial, I do not believe that Mr. Cummings and I provided ineffective assistance of counsel to Mr. Hummel at his trial, and I shall attempt to respond to these claims individually as ordered by the Court.

<u>Claim Two</u> - (Trial Counsel's Ineffectiveness For Failing to Argue that
the State's Evidence Was Legally Insufficient to Show Future Danger)

In Claim Two, the Applicant alleges first, that the evidence at Mr. Hummel's trial
was "*legally insufficient*" to support the jury's affirmative answer to Special Issue No. 1 at
Appellant's trial; and second, that we as Applicant's trial counsel, were ineffective for
failing to argue such legal insufficiency of the evidence to the Court at Applicant's trial. In
the <u>*Writ Application*</u>, Applicant's writ counsel argue in conclusory terms that the evidence
adduced at Applicant's trial was legally insufficient, analogizing the facts of Applicant's
case to those of several other cases wherein the appellate court has ultimately determined
that the evidence in those cases was legally insufficient to support an affirmative finding to
Special Issue No. 1. I am aware that the Court of Criminal Appeals has consistently held
that the facts of the offense alone may be sufficient to support an affirmative finding on the
"*future dangerousness*" issue. I am further aware that in appellate challenges to the legal
sufficiency of the evidence to support such a finding, the Court may look to other cases
wherein the State has failed to present sufficient evidence to sustain its burden;
nevertheless, I am also aware that the resolution of such a legal sufficiency challenge <u>must</u>
be resolved upon the facts of each individual case pursuant to controlling precedent from
the Court of Criminal Appeals. In the instant case, I do not recall arguing the "*legal
insufficiency*" of the evidence to support an affirmative answer to Special Issue No. 1 to the
Trial Court. It is my belief that such an argument would have been a futile, as I did <u>not</u>
believe that the Trial Judge would ever grant an instructed verdict against the State on
that special issue, based upon all of the facts adduced at Applicant's trial. Further, I did
<u>not</u> believe that such a request or argument upon that issue was necessary to be made in
the trial court in order to preserve the legal sufficiency issue for review during an appeal of
the case. Unfortunately, the State's evidence regarding the crime, the planning and
premeditation of the offense, the prior unsuccessful poisoning attempt (the evidence of
which was contained within the Applicant's statements to the police obtained upon his
arrest, and introduced through Investigator Rizy, a District Attorney's Office investigator,

not a Kennedale Police Officer as alleged in the _Writ Application_), his attempts to secret the crime, his flight, etc., all painted a horrific picture which I did not believe that the Trial Court would deem to be legally insufficient to support an affirmative answer to Special Issue No. 1. Additionally, there were even parts of our own mental health expert's (Dr. McGarrahan) testimony that could conceivably be seen as supporting such an affirmative answer to the Special Issue. Although we did not make such a _"legal sufficiency"_ argument to the Court, both Mr. Cummings and I did argue to the jury that the evidence in the case did <u>not</u> support an affirmative answer to the Special Issue, and we aggressively sought to demonstrate that fact through the evidence which we introduced at punishment as part of our trial strategy. For such reasons, I do <u>not</u> believe that our failure to argue the _"legal insufficiency"_ of the evidence to support an affirmative finding to Special Issue No. 1 to the Trial Court constitutes ineffective assistance.

<div align="center">

Claim Three - (Trial Counsel's Ineffectiveness for Failing
to Present Evidence that Applicant Was Not a Future Danger)

</div>

In Claim Three, Applicant asserts that we were ineffective in failing to present _"readily available evidence"_ that Applicant would not constitute a _"future danger,"_ through Tarrant County Jail Officers supervising Applicant while he was confined therein, and through a mental health expert who would explain how "Hummel's past patterns of behavior and mental status did not support a finding that he would be a future danger."

First and foremost, it is important to note that through almost <u>every</u> witness that we called a punishment in Applicant's trial, we sought to demonstrate that Applicant had <u>never</u> previously committed an act of violence, and that he would not constitute a future danger. Applicant's writ counsel assert that the prison classification expert whom we called to testify at Applicant's trial, Frank AuBuchon, "testified in broad terms that Hummel would do well in the prison system based on his good behavior in the county jail and his military records." I believe that such a characterization grossly understates Mr. AuBuchon's testimony. He testified that he had reviewed Applicant's military records, medical records, police reports regarding the crime and "specifically regarding what had

occurred at the offense and after his eventual apprehension," a TLETS report, his criminal history, a notice of extraneous offenses "which indicated what his prior criminal background was," and "all of his jail classification records and his incident records for the entire time he's been incarcerated here in Tarrant County." Through Mr. AuBuchon's testimony, we were able to demonstrate not only Applicant's lack of any prior criminal history, but also his absolute lack of any disciplinary issues while incarcerated in the Tarrant County Jail. Based upon all of this information, Mr. AuBuchon was able to testify as to how Applicant would likely be classified if incarcerated for life in the Texas prison system, and how that classification would affect his actual work and living environment within the penitentiary system for the rest of his natural life. Mr. AuBuchon was also able to offer his opinion that based upon his review of all of the relevant records, Applicant would probably adapt quite well to prison life. Through the lay witnesses that we called to testify, we were also able to demonstrate the lack of any previous acts of violence by the Applicant; and then later, through Dr. McGarrahan's testimony, we were again able to show the lack of any prior criminal history for the Applicant, and his good behavior while incarcerated. All of this testimony we hoped would lead the jury to find that Mr. Hummel was not a future danger. In preparation for Applicant's trial, we specifically discussed with Mr. Hummel whether or not there were any jail guards, chaplains, or other jail personnel with whom he felt that he might have a sufficiently good relationship that they might be willing to testify on his behalf. To my recollection, he was unable to provide us with any such names, nor did we develop any through our independent investigation. Obviously, Applicant's writ counsel were able to obtain affidavits from some such individuals whom we did not locate; nevertheless, it is my belief that we communicated essentially the same information that they might have been able to provide to the jury through the other sources that did testify.

In regard to that part of this claim dealing with the allegation that we should have obtained a mental health expert to testify that Applicant would not constitute a future danger, I heartily dispute that assertion. During our pretrial preparation in this case, it soon became apparent that we would need a psychological evaluation done of Mr. Hummel,

in order to adequately investigate and document the possible mental and emotional issues that we felt might exist with Mr. Hummel. We attempted to investigate his background and upbringing as fully as possible, in order to determine how those factors may have influenced his behavior in the commission of this crime, if they did. Mr. Cummings and I specifically discussed potential mental health experts whom we might seek to have appointed to assist us in this regard, and I actually made telephone calls to several different experts. From early in my representation, I determined that I wanted to seek the assistance of Dr. Antoinette McGarrahan in this case, due to my familiarity with her work, my opinion of her abilities, and her reputation in the legal community. I had worked with her previously on several cases, and I know her to be highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions. I also knew that the State intended to use Dr. J. Randall Price as their expert, and due to his prior professional relationship with Dr. McGarrahan, and their mutual respect, I felt it unlikely that he would dispute any findings that she might make. We discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Mr. Hummel. We specifically decided, that based upon her initial findings regarding Mr. Hummel, she should do personality testing in order to determine whether he suffered from any diagnosable personality disorders, as well as any mental illness or disability. As Dr. McGarrahan's evaluation progressed, we specifically discussed with her whether or not she should do a formal violence risk assessment of Mr. Hummel. Due to the nature of the personality disorder that she determined Mr. Hummel suffers, and the results of the objective psychological tests administered by her to him, she indicated that many of the traits that she found to exist in connection with his personality disorder are also characteristics of psychopathy. She indicated that she felt that if she were to do a formal violence risk assessment using a standardized risk assessment instrument such as the Psychopathy Checklist Revised (PCLR), or the Violence Risk Assessment Guide (VRAG), that Mr. Hummel would in all likelihood <u>not</u> have scored *"excessively high;"* however, neither would he have likely scored *"low"* either. She indicated that he would in

all probability score in the "*moderate*" to "*moderately high risk*" range, and it was our consensus belief that such a finding would <u>not</u> have been helpful testimony for us. We were also aware that the Court would limit the evaluation of Mr. Hummel to be done by the State's expert, Dr. Price, to those issues regarding Mr. Hummel which we intended to address in our experts' testimony, and to those "*tests*" administered by our experts. By determining <u>not</u> to do a formal violence risk assessment, we were able to insure that the State's expert would not be able to do one as well. I had previously worked with the State's expert in this case, Dr. Price, on a number of occasions, and I therefore knew that if given the opportunity, he would do the same type of violence risk assessment that we had discussed with Dr. McGarrahan; and therefore, I believed that it would <u>absolutely</u> <u>not</u> be in Mr. Hummel's best interest to give the State the opportunity to do such a risk assessment of Mr. Hummel with Dr. Price. Mr. Cummings and I even specifically discussed the feasibility of obtaining another mental health expert (other than Dr. McGarrahan) for purposes of doing such a risk assessment, just in order to see how it might result (specifically Dr. Mark Cunningham, another mental health expert with whom I had previously worked, and who has significant experience and expertise in risk assessment). Our thinking was that if the results of such an assessment were not helpful, then we would simply not use him as a witness; however, we determined that we would not be able to "keep secret" the use of such an additional expert, so we ultimately determined that pursuing such a possibility would <u>not</u> be in Mr. Hummel's best interest for the reasons set out herein.

In Applicant's <u>*Writ Application*</u>, writ counsel present the affidavit of Dr. Susan Hardesty, a psychiatrist, as an example of the type of mental health expert that would have been "*available*" to us for purposes of testifying that Mr. Hummel would not constitute a "*future danger.*" In reviewing Dr. Hardesty's Affidavit, it appears that her opinion rests solely upon her personal assessment of the "*future dangerousness*" issue, and not upon any standardized risk assessment measures, nor any scientific or statistical comparisons. As such, it is my belief that her opinion would be essentially the same type of testimony that

the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to _Daubert_, when offered by experts testifying on behalf of the State. For such reason, I have great concern as to whether or not such testimony would even be deemed to be admissible if offered.   Additionally, and even more importantly, were such testimony to be admitted on behalf of the Applicant, then it would clearly "_open the door_" to rebuttal testimony by the State's witnesses and experts.   In my opinion, that testimony would have been even more devastating to Mr. Hummel's case.   Further, Dr. Hardesty's assertions that while incarcerated "John is unlikely to have the extreme set of circumstance (_sic_) that were the antecedents to the crime, namely  financial and familial stressors;"  and that while incarcerated, "there is not a relational model that would be iterative of attachment,"  seem to be somewhat unrealistic.   My experience, and my discussions with mental health experts and corrections officials over the almost thirty-six years that I have practiced criminal law, have taught me that living in a prison setting can be every bit as stressful, or even more stressful, than living outside of the prison setting.   Additionally, for such inmates, prison becomes their home, and they can make attachments and form relationships that can be every bit as strong as those they might develop on the outside. Most importantly, Dr. McGarrahan also disagrees with Dr. Hardesty's assertions in that regard.   It was our conscious strategic decision _not_ to seek to elicit any expert opinion testimony regarding the issue of future dangerousness from our witnesses, based upon our knowledge of all of the evidence in the case.    Additionally, such testimony would have opened the door to rebuttal testimony from the State upon that issue, as we did _not_ believe that such a course would have been in Mr. Hummel's best interest. Despite the Affidavit of Dr. Hardesty, I _still_ believe that to be the correct decision; and for those reasons, I do not believe that we rendered ineffective assistance of counsel in that regard.

<u>Claim Four</u> - (Trial Counsel's Ineffectiveness for Failing
to Present Expert Testimony Regarding Hummel's Life History)

In Claim Four, the Applicant alleges that we were ineffective by failing "to retain the services of a social history expert witness,"  who could have "provided an explanation to the

jury of how Hummel's life history shaped the person that he became later in life." From my education and experience, I am aware of the need to attempt to provide a compelling mitigation case in the punishment phase of any death penalty trial; however, I am not aware of any legal requirement that we utilize a "*social history expert witness*" in every such case in order to accomplish that purpose. In Applicant's case, we attempted to perform a complete mitigation investigation into every aspect of Mr. Hummel's life. We obtained the services of an experienced Mitigation Specialist, Ms. Brendan Ross (who holds a Master's Degree in social work), to assist with that investigation. We also utilized our private investigator to assist us with that investigation. We intervened dozens of potential witnesses, and attempted to locate any prospective witness who might conceivably have information about the Applicant's life and upbringing which could conceivably be important to our mitigation presentation at trial. We very literally <u>never</u> stopped our investigation of the Applicant's life history, even through the Applicant's trial. As we prepared for trial, we discussed as a team the most effective way for us to develop our mitigation case before the jury. Many of the prospective witnesses to whom we attempted to talk refused to cooperate with us, while others simply could not, or would not, provide us with any helpful information. Some of them even indicated that they would attempt to convince the jury that Mr. Hummel deserved to receive the death penalty should we attempt to compel them to testify. We actually subpoenaed several witnesses to appear at Applicant's trial whom we did not ultimately call to testify due to various concerns that we had about their proposed testimony. We determined that the most effective way for us to present our mitigation case at Applicant's trial, was by using the lay witnesses that we had to present the story of Applicant's life, and then to attempt to use that story as a basis for the opinions to be offered by our expert witnesses, Mr. AuBuchon and Dr. McGarrahan. Although there were admittedly some "*gaps*" in the life story of Mr. Hummel that we presented, we presented all of those witnesses that we were able to locate and convince to testify, that we felt were necessary to develop the facts regarding Applicant's life. We then used Dr. McGarrahan to testify not only to Applicant's mental and emotional condition, but also to

how the facts of his life had affected him, and led him to become the person that he was. I have reviewed the Affidavit of Ms. Laura Smith, the "social history expert witness" that Applicant's writ counsel have included in support of this claim. I also requested that Dr. McGarrahan review Ms. Smith's Affidavit as well, in order to assist me in answering this claim. While Ms. Smith's Affidavit contains a number of conclusions regarding how the facts of Mr. Hummel's life affected him, and his ability to cope with the problems in his life, neither Dr. McGarrahan nor I believe that there are any meaningful facts or any necessary expert opinions contained therein which we did not cover in the mitigation presentation that we made to the jury. Perhaps (although far from certain) a witness like Ms. Smith could have helped us to make the presentation of our mitigation case to the jury somewhat more compelling; however, I do not believe that our failure to call such a witness prevented us from presenting the necessary facts, or from developing the expert opinion testimony necessary for us to effectively present our mitigation case. It is my belief and understanding that the question of whether or not we rendered effective assistance to Mr. Hummel turns upon whether or not we adequately investigated and developed the mitigation evidence regarding Mr. Hummel's life, and not upon whether or not we utilized a particular expert witness in order to present the evidence at trial. For such reason, I do not believe that we rendered ineffective assistance in this regard.

### Claim Five - (Trial Counsel's Ineffectiveness For Failing to Present Relevant Lay Witnesses)

In Claim Five, the Applicant alleges that although we investigated Applicant's early childhood and relationships with immediate family members, our investigation "was narrowly focused on suspicions that Hummel was sexually abused," and when proof of such abuse did not materialize, we "did not rigorously pursue other avenues of mitigation evidence." They further indicate in a footnote: "Counsel uncovered suggestions that Hummel's sister had been sexually abused by their father, and the suspicion that Neata then sexually abused Hummel." That allegation is simply not true. Based upon Hummel's presentment to Dr. McGarrahan, and to various members of the trial team; and later based

upon Neata's presentment to Dr. McGarrahan, and to us; it was our collective suspicion that either or both of them may have been sexually abused by their parents, or by some other adult close to the family. Both the Applicant and his sister appear to present symptoms that are commonly found among individuals who have a history of sexual abuse. Even friends of the Hummel family, particularly Mark Pack and Derrick Parris, indicated to us that they had suspected that something of that nature may have been occurring within the Hummel home. Both Dr. McGarrahan and I separately inquired of Mr. Hummel, his sister Neata, and his mother, Jackie Hummel, whether anything of this nature had ever occurred, and it was adamantly denied by each of them. Mr. Hummel indicated that his home life, upbringing, and family life was all very positive, without any instances of abuse or neglect, and there was nothing that he found troubling about it. Neata would admit only to that abuse to which she ultimately testified had occurred, and she specifically denied repeatedly that anything further, or more severe, had taken place. Ms. Jackie Hummel also specifically denied that any abuse had ever occurred within their home, although she did acknowledge that she and her husband were not demonstrative in their affection for their children. None of the neighbors, friends, schoolmates, or other individuals whom we interviewed could provide any proof that any abuse, either sexual or physical, had occurred within the home, other than that which was testified to at trial. In the face of such specific denials, and the lack of any substantive evidence to the contrary, there was absolutely no good faith basis for me to ask that question of Neata on the witness stand, contrary to the assertions of Applicant's writ counsel in their *Writ Application*. Neither Derrick Parris, nor any other person, ever indicated to any member of Mr. Hummel's trial team that they had ever heard Ms. Woody make the statement which Mr. Parris now claims that she made in the courtroom hallway during Mr. Hummel's trial. I am quite confident that if any of the people that Mr. Parris said were also present when Neata made such statement could have corroborated what Mr. Parris said had occurred, then writ counsel would have included their affidavits to that effect with this Application.

Based upon all of my knowledge of, and contact with Mr. Parris, I simply do not believe that actually occurred.

Few, if any, of the members of Mr. Hummel's family wished to assist us in his defense. Some refused to talk to us; some indicated they wished to tell the jury to give him the death penalty; some had knowledge of his chronic marijuana use (even when the family struggled financially); and some even sought to prevent us from talking to other members of the family. Ms. Neata Woody, Applicant's sister, refused to voluntarily testify on Mr. Hummel's behalf. I subpoenaed her to appear against her will. At the hearing in South Carolina to compel her to answer the subpoena, Ms. Woody presented a letter from her doctor indicating that she would not be able to endure such testimony; nevertheless, the South Carolina Court compelled her to appear, and I compelled her to testify against her will. After her testimony, we transported Mr. Woody and her husband to the airport for their return flight.    Upon her arrival at the airport, Ms. Woody suffered a serious and debilitating stroke that required her to remain here in the hospital for about another week or so before she was able to fly home. The results of that stroke have left her disabled and unable to work. I attempted to help her obtain benefits from the Court, and from the State of Texas, for that disability, but I was not successful. Obviously, her doctor was correct in his belief as to her inability to testify at Mr. Hummel's trial.

We first interviewed Derrick Parris in the Spartanburg Jail. I had to obtain permission from his attorney in his pending criminal case in order to even be able to talk to him. Each time I spoke with Mr. Parris, the information that he offered about Mr. Hummel's life and background would change to a degree.    Despite my concerns over such changes, I nonetheless felt that he had important information regarding the physical abuse of Mr. Hummel by his father that I was unable to prove by any other means. Mr. Parris refused to fly to Texas for the trial. I wired him five hundred dollars ($500) in cash in order to pay for gas and food for him and for members of his family, in order for them to drive to Texas. When he arrived here, his car broke down. I advanced additional funds to him for his meals and expenses, so that he could use that money to pay for the repairs to his car. Neither he,

nor several of the other witnesses that we subpoenaed from South Carolina to testify at the trial, had _any_ funds with which to buy food while they were here in Texas. They had _no_ ability to simply buy it, and then to seek reimbursement later, as was the procedure followed by the District Clerk's Office. Mr. Cummings and I advanced all of those individuals funds with which to buy food and necessities while here in Texas, out of our own pockets. I was also required to guarantee all of the rooms, and all of the room charges, for all of these witnesses, with my personal credit card. While the room rentals were eventually paid directly by the County, the witnesses all received a _per diem_ for their food and expenses, so we never actually recouped all of the charges which were required to pay. Additionally, when Mr. Parris checked out of his room, the hotel reported that the comforter from the bed, and other bedding items were missing from the room. I asked Mr. Parris about this by telephone, and he denied any knowledge of the missing items. In order to avoid having the hotel charge Mr. Parris with theft, we paid the replacement costs from our own pockets, which I recall was somewhere around two hundred ($200) dollars or more.

Prior to Mr. Hummel's trial, his mother, Jackie Hummel, was living with her sister, Edwina Penny. Ms. Penny and Mr. Hummel's cousin, Michael Castlow, both indicated that they wished to see Mr. Hummel get the death penalty in this case. Ms. Penney affirmatively sought to keep us from having any contact with Ms. Hummel, even to the point of threatening to have members of the defense team arrested if we came back onto her property. We were eventually able to interview Ms. Hummel only through our own dogged persistence in seeking to do so, something which it appears writ counsel have not yet been able to accomplish. As indicated previously, Mr. Hummel specifically denied to us that any abuse had occurred within the home; even to the point of denying those things which Ms. Woody, Derrick Parris, Mark Pack, and others had told us that they witnessed. Applicant was of little assistance in leading us to individuals who would be willing to testify on his behalf, and our own independent investigation was hampered by an almost universal lack of cooperation from the vast majority of the people that we did contact. We were also

threatened with arrest by other individuals in South Carolina in the event that we persisted in our attempts to speak with them.

I spoke directly with Thomas Hamilton, Mr. Hummel's uncle, and Jackie Hummel's brother, during our pretrial investigation in this case. During our conversation, I inquired into his knowledge of any possible abuse within the Hummel home. He was very defensive of his sister, and adamant in his denial that anything of that nature had occurred, even to the point of refuting some of those things which Neata had told us occurred. In the Affidavit which he provided to writ counsel, he still denies any knowledge of abuse; however, he is much less adamant that anything of that nature could have taken place within the home. He also told me that he suffers with hepatitis, and that Applicant had promised to give him "a part of his liver" to help him deal with that illness. Due to the fact that Mr. Hamilton did not support the allegations of abuse made by Neata Woody and other witnesses, and was very defensive of his sister, we did not believe that it was in Mr. Hummel's best interest to call Mr. Hamilton to testify at Mr. Hummel's trial, as his testimony was inconsistent with that of our other witnesses.

Similarly, Fred Cummings spoke directly with George Goodson during our investigation in this case. Mr. Goodson was supportive of John, but he was also afraid that his testimony would be harmful to John, mainly because of his own prior prison record; and he therefore did not wish to testify. He had spoken to the prosecutors in the case, and they were aware of his knowledge of the family, and of his criminal record. We ultimately determined it was not in John's best interest to call him as a witness for all of those reasons. Our investigator interviewed all of John's neighbors, and none of them would provide helpful testimony, nor wished to testify on John's behalf. We contacted those individuals whom Mr. Hummel identified as his "*friends*" at work, and they denied any such friendship, indicating that they knew very little of John; that they did not really care for him; and that they did not wish to be called to testify. We contacted people from the church that the Hummels' attended, particularly including the Minister of the Church, who had moved to a church in Corpus Christi by the time of the trial. We actually subpoenaed

the Minister to testify; however, he eventually determined that John deserved the death penalty for his crimes, and his sense of loss for John's wife, daughter, and father-in-law made him very uncomfortable and essentially unwilling, to do anything to help John at his trial.   We obtained Lance DuPre's name during the course of our investigation.   We attempted to contact him through telephone numbers that we discovered for his mother and his aunt.  I left a business card at the house where we believed his family to live while I was in South Carolina, asking that he call us.   Shortly before trial, we determined that it appeared that Mr. DuPre worked at the State Crime Lab in Columbia, South Carolina.  We made telephone calls to <u>every</u> number that we were able to locate as possibly being a way to reach him, yet we never got an answer, nor received any return phone call from him.  We exhausted every lead that we had in our efforts to locate him.   Prior to trial, we also attempted to contact Christopher Paris.  At that time, Mr. Paris had separated from his wife, and we were never able to locate another way by which to contact him.   He was not visiting John in the jail at that time, and we were simply unable to locate him even though we aggressively tried to do so.

When we were initially contacted by Applicant's writ counsel, we provided <u>all</u> of our files, notes, and records pertaining to John's cases to them; including those of our mitigation specialist and our investigator.   Those files contained the names of every potential witness of whom we became aware, and every one to whom we actually spoke. It is illogical to think that with all of that information as a starting point, and with an additional year or so with which to continue to investigate, that writ counsel would not be able to come up with <u>any</u> additional witnesses.   We called those witnesses at trial that we felt were necessary in order to present as complete of a picture as we possibly could of John's life.   Obviously, we did not locate <u>every</u> potential witness with knowledge of some aspect of John's life, yet that is <u>not</u> what I believe is required for the effective assistance of counsel.  From a review of the affidavits provided in Applicant's *Writ Application*, I fail to see any new material facts, or any different mitigation themes, from what we were actually able to develop at Applicant's trial.   Members of the defense team made three separate trips

to South Carolina, and one trip to California, during its investigation in this case.   I personally made two trips to South Carolina in an attempt to locate potential witnesses, and to attempt to persuade them to testify on John's behalf.   Mr. Cummings and I paid a significant amount of money out of our own pockets (which was not reimbursed by the Court), in our attempts to locate such witnesses and get them to Texas to testify at John's trial.   In light of all of our efforts in this regard, the claim by Applicant's writ counsel that we "did not rigorously pursue other avenues of mitigation evidence" is not only factually incorrect, but also personally offensive.

<u>Claim Six</u> - (Trial Counsel's Ineffectiveness in Failing
to Present His Military Service as Mitigation Evidence)

In Claim Six, the Applicant alleges that we were ineffective in that we "failed to investigate and present evidence that Hummel served honorably in the United States Marine Corps."   During our investigation into Mr. Hummel's background, we sought to obtain copies of Mr. Hummel's military records.  Although we had difficulty in obtaining a "*complete*" copy of such records, we were able to obtain a number of records pertaining to Mr. Hummel's military service which we provided to our expert witnesses, Mr. AuBuchon and Dr. McGarrahan.  We specifically inquired of Mr. Hummel regarding individuals in the service whom he befriended, and who might potentially be available to testify on his behalf. He was apparently unable or unwilling to provide us with such information, as I do not recall him ever providing us with the names of any such individuals.   We attempted to develop testimony regarding Mr. Hummel's military service through both our lay witnesses, and through the expert witnesses whom we called to testify.  We felt that such service could possibly be important to our mitigation presentation, particularly in regard to support for Mr. AuBuchon's opinion as to how Mr. Hummel might function within the prison environment, and in regard to Dr. McGarrahan's opinions as well. My recollection is that Mr. Hummel seemingly "*down-played*" his military service in his discussions with us, and he did not really depict his service in a positive or successful way.  We were aware of the disciplinary action taken at the end of Mr. Hummel's service when he went AWOL from his

post, and we attempted to avoid that issue to the degree possible during the presentation of our witnesses. Obviously, the State felt the need to rebut the information that we presented regarding Hummel's military service, as evidenced by the rebuttal witnesses that they called. In my cross-examination of those witnesses, I attempted to develop as much positive information about his military service, his commendations, and his "*honorable discharge*" from service, as was possible.

I specifically disagree with the assertions of Applicant's writ counsel that: "Several available witnesses who knew Mr. Hummel as a Marine were available and willing to testify on Hummel's behalf." Had Mr. Hummel (or any other person) provided us with any of these names, then we would have attempted to contact them; and our independent investigation was unable to discover such witnesses. Interestingly, of the four witnesses whom writ counsel indicate were <u>available</u> and <u>willing to testify</u> (Wayne Matthias, Efrain Chaidez, Fred Emmer, and Christopher Boling), they have only been to obtain a signed affidavit from one of those individuals, Mr. Efrain Chaidez. They were apparently unable to obtain such signed affidavits from Mr. Matthias, Mr. Emmer and Mr. Boling, much less being able to martial them into court and to obtain their live testimony. I would have obviously loved to have any witness who could have mitigated the negative aspects of the testimony from Mr. Hummel's commanding officers; however, we were not apprised of any such witnesses, and were unable to develop the names of any such prospective witnesses through our independent investigation. It also appears in reviewing in the proffered affidavits, that those individuals would have provided a good deal of negative information about Mr. Hummel's military service in conjunction with that positive information that they could provide. Based upon the totality of these circumstances, and the totality of our representation, I do <u>not</u> believe that our failure to obtain such testimony amounted to ineffective assistance.

<u>Claim Seven</u> - (Trial Counsel's Ineffectiveness for Failing to
Present Evidence that Applicant Suffers From a "Complex
Traumatic Stress Disorder Resulting from Attachment Trauma")

In Claim Seven, Applicant alleges that we were ineffective for failing to retain a
mental health expert to testify as to the existence of Applicant's "complex traumatic stress
disorder resulting from attachment trauma." In my preparation to draft this Affidavit, I
visited at length with Dr. McGarrahan in regard to allegations contained within the <u>*Writ*</u>
<u>*Application*</u>, and particularly in regard to the allegations made in regard to this particular
claim. Dr. McGarrahan has advised me that she was previously contacted by Applicant's
writ counsel, and asked to review the lay witnesses' affidavits which they had obtained, and
which they are utilizing in support of their ineffective assistance claims in this Application.
After her review of such witness affidavits, it is my understanding that writ counsel
inquired as to whether the information contained within those affidavits altered her
opinions of Mr. Hummel in any way, or would change the testimony that she gave at Mr.
Hummel's trial. She indicated to me that she informed writ counsel that nothing that she
was provided changed her opinions or testimony in regard to Mr. Hummel in any way. Dr.
McGarrahan further advised that she provided all of her test results, and all of the
underlying test data, to another neuro-psychologist retained on behalf of writ counsel for
his review. I do not find any affidavit from such neuro-psychologist disputing either the
test results that Dr. McGarrahan obtained, the methodology that she used, or the testimony
that she gave. I also provided the affidavits of Dr. Hardesty and Ms. Smith to Dr.
McGarrahan for her review, and asked her opinions in regard to the information and
opinions expressed within those affidavits. Dr. McGarrahan advised that she observed
essentially <u>no</u> new or different factual information within the affidavits, other than perhaps
some of the information that Applicant may have himself provided. This was consistent
with my opinion regarding such affidavits. Dr. McGarrahan indicated that Applicant had
consistently denied that he suffered any trauma or abuse in his home, and also denied
having any attachment issues. He described his family relationships to her (as he did to us)
in positive terms, adamantly denying that any abuse, neglect, or abandonment had

occurred. Similarly, Neata Woody denied that any abuse, neglect, or abandonment had occurred, over and above that which she testified about at Applicant's trial. John and Neata's mother also denied that anything of that nature had occurred, as did other family members to whom we spoke. Dr. McGarrahan indicated that she had seen some evidence of potential PTSD symptomatology in Applicant's presentation to her, and as evidenced by one of the psychological test instrument results. For those reasons, Dr. McGarrahan went back and re-interviewed Mr. Hummel in order to discuss the *"traumatic event"* that he was thinking about when he responded to the test items asking about a *"traumatic event."* Although Dr. McGarrahan believed that Mr. Hummel might possibly *"open up"* at that time about the abuse that we suspected had occurred in his home, Mr. Hummel instead indicated to her that the *"traumatic event"* that he was thinking about in answering the test questions was his killing of his family.

Dr. McGarrahan and I specifically discussed Dr. Hardesty's opinion that Applicant suffers from a "complex traumatic stress disorder resulting from attachment trauma." As noted by Dr. Hardesty, this particular diagnosis is not a disorder that appears within the DSM; nevertheless, "post-traumatic stress disorder" is a recognized disorder that appears within the "anxiety disorders" contained within the DSM. While Dr. McGarrahan agrees that Mr. Hummel suffers from significant attachment issues, and testified to such opinion during Applicant's trial, she does not believe that sufficient evidence exists for a diagnosis of "post-traumatic stress disorder," although he did display some of those symptoms. Primarily, there was simply no evidence from Mr. Hummel, his family, or others, that he suffered from any "traumatic event or events" that would constitute the genesis of such a disorder. Importantly, the diagnostic criteria for PTSD contained within the DSM require that the individual experience, witness, or be confronted with an event or events "that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others," and the individual's response to such event "involved intense fear, helplessness, or horror." As there was absolutely <u>no</u> <u>evidence</u> from Applicant or anyone else that John had experienced such a "traumatic event," the PTSD diagnosis was simply

not possible.   Additionally, in order to qualify for a diagnosis of PTSD, the diagnostic criteria require that the traumatic event be <u>persistently</u> <u>re-experienced</u>, through recurrent and intrusive distressing recollections of the  event; recurrent distressing dreams of the event; a sense of re-living the experience, such as flashbacks, etc.; the presence of intense psychological distress at exposure to cues that symbolize or resemble an aspect of the traumatic event; and/or  "physiological reactivity" upon exposure to cues that symbolize or resemble an aspect of the traumatic event.   There was absolutely no evidence from any source that Applicant suffered from any such *"re-experiencing"* of the event, such as would satisfy this criteria, and be necessary to a diagnosis of PTSD.

Pursuant to Dr. Hardesty's affidavit, she did a two hour and forty-five minute interview of the Applicant, wherein she conducted a mental status evaluation and an evaluation of his cognitive functioning.  That interview and evaluation (without benefit of any further testing) together with her review of his records, etc., was the basis for her opinions.  Her diagnosis of "complex post-traumatic stress disorder due to attachment trauma," turns upon a finding of attachment trauma in the form of "extensive, consistent neglect from a caregiver."  While Ms. Woody and other witnesses indicated to us that there were instances of neglect and emotional distance within the home; she, the Applicant, and other family members, did not specifically indicate that such "extensive, consistent neglect" had occurred.   Additionally, in interviews with other members of John's family, they attributed his disengagement from social interaction and his preference for playing computer games and spending time alone, to his laziness and to his chronic use of marijuana.  Obviously, we did not wish to present that evidence at Applicant's trial.  Dr. Hardesty's determination that Applicant suffers from a "Personality Disorder NOS," does nevertheless mirror the diagnosis that Dr. McGarrahan made in that regard to great degree.

In sum, neither the members of the defense team, nor Dr. McGarrahan, saw any factual basis that would support a diagnosis of PTSD.   I am aware that social scientists (sociologists and social workers) refer to *"attachment disorder"* within their discipline, even

though such a disorder does not appear in the DSM.  I have previously worked with Ph.D. level social scientists, and even had them testify as to the presence of such an *"attachment disorder"* in other trials; nevertheless, under the facts which we possessed, I did not believe that any additional expert, other than Dr. McGarrahan, would be necessary to adequately address Mr. Hummel's attachment issues at trial.  In my opinion, the approximately eleven hours that Dr. McGarrahan spent interviewing, testing, and evaluating Mr. Hummel, together with the personal interviews that she conducted with members of his family, and the countless hours that she spent reviewing his relevant records, police reports, etc., all gave her a much more compelling basis for her opinion that that of Dr. Hardesty. Under all of these circumstances, I do not believe that our failure to call such an additional expert constitutes ineffective assistance.

<u>Claim Eight</u> - (Trial Counsel's Ineffectiveness in Failing to Object to Victim
Impact Evidence Relating to the Deaths of Defendant's Daughter and Unborn Child)

In Claim Eight, the Applicant asserts in a multi-faceted claim that the Applicant's trial was prejudiced by the impermissible injection of inflammatory and prejudicial evidence regarding the deaths of Jodi Hummel and the unborn child that Joy Hummel was carrying at the time of her death.  As part of this Claim, Applicant asserts that we were ineffective in failing to object to the introduction of such evidence.

I agree with the assertion of Applicant's writ counsel that the introduction of evidence in the guilt/innocence stage of Application's trial, regarding the deaths of Jodi Hummel and the unborn baby, far exceeded what should have been admitted as "same transaction contextual evidence."  We specifically objected to the introduction of such evidence, and we were overruled on that basis.  If such evidence was in fact "same transaction contextual evidence," then the allegations of those deaths should have been included within a single indictment alleging all four deaths.  Article 19.03(a)(7), Texas Penal Code, provides that the murders of more than one person "during the same criminal transaction" constitutes the offense of capital murder.  In this instance, the State returned three separate indictments charging capital murder against the Applicant, two of which currently remain pending.  It

seems disingenuous that the State would be allowed to carve a "single criminal transaction" into three separate indictments (presumably giving them three separate "*bites at the apple*"), yet then allow them to claim that the existence of that "same criminal transaction" is what legitimizes the introduction of evidence regarding the un-indicted deaths in the trial of one of the indictments.

I do fervently disagree however, with writ counsel's assertions that: "the inadmissible, inflammatory evidence offered by the State throughout Hummel's trial was occasionally objected to by defense counsel (see, e.g., 39 RR at 194-97), while other times no objection was made (see, e.g., 42 RR at 79)." In my review of Applicant's *Writ Application*, the only evidence regarding Jodi and/or the unborn child that they reference where we did not object, were photographs of Jodi and Joy while pregnant, which were drawn from Applicant's and Joy's "*My Space*" pages. They were photographs made during Joy's and Jodi's lifetime, and they showed them as they appeared during life. They were offered at the punishment stage, after much more damning photographs of Jodi and Joy while pregnant (including autopsy and crime scene photos of their bodies) had already been admitted over our objections during the guilt/innocence phase of the trial. (See: 39 R.R. at 194-198; and 33 R.R. at 71-74, as examples). We did not object to the introduction of those photographs at punishment for essentially two reasons. First, at that stage of the proceedings, and in light of the evidence which had already been admitted over objection, together with the very nature of the content of the photos themselves, I did not believe that there was any meaningful objection that would lie at that point which would be sustained by the Trial Court. Additionally, I believed that the introduction of the autopsy photographs of the unborn fetus was virtually indefensible; and that error had already been preserved and could not be deemed as waived by the admission of this type of evidence. Additionally, I actually had some thought that the photographs being offered at this point might conceivably even help support our mitigation case. It was our belief, and our presentation to the jury, that Applicant actually loved his family, and that the commission of this crime was solely the result of the mental and emotional problems that he suffered,

which we intended to present through Dr. McGarrahan's testimony. In my mind, the existence of such photos in the "*My Space*" pages added some credence to our assertions of John's love for his family. The mere fact that he took time to upload such photographs to the "My Space" page was demonstrative of at least some affinity for his family.

Obviously, we were concerned with the prospect that the State would seek to have the jury "*punish*" John for the deaths of Jodi and the unborn child, even though such deaths were not alleged in the indictment on trial. It was for that reason that I sought to introduce the other two pending indictments into evidence, which alleged the death of Jodi, and the deaths of Joy and her unborn child. The State's objection to the introduction of those indictments was grounded in their assertion that such indictments were irrelevant to the charge on trial. Such objection seemed both hypocritical and without merit, since they had already introduced a morass of evidence regarding their deaths over our objections. Even when the Court sustained the State's objection in that regard, and we were left without copies of the actual indictments for presentation to the jury, we nonetheless argued to the jury that they should not punish Mr. Hummel on that basis, as the State still had the ability to call Mr. Hummel to answer for those cases. It is my memory that we objected at every instance when the State attempted to offer evidence regarding the deaths of Jodi and the unborn child throughout the guilt/innocence phase of the trial, and the Applicant's writ counsel have not cited any instances in their Application where we did not so object, other than to the photographs drawn from the "*My Space*" pages offered at punishment. Under these circumstances, I do not believe that our failure to object to such photographs constituted ineffective assistance.

<div align="center">

Claim Nine - (Trial Counsel's Ineffectiveness for Failing to Effectively
Present Evidence that Hummel's Confession Should be Suppressed)

</div>

In Claim Nine, Applicant alleges that we were ineffective in failing to introduce transcripts and/or the original tape recordings of pertinent conversations between officers of the Kennedale Police Department and the United States Border Patrol, and copies of reports generated by the Border Patrol agents regarding this incident. During the

Applicant's suppression hearing, we obtained copies of the tape recordings made of conversations between representatives of the Kennedale Police Department and the U.S. Border Patrol agents from the State's prosecutors. We also obtained copies of the reports generated by the Border Patrol Agents, and we reviewed those recordings and reports in preparation for our cross-examination of those witnesses. We aggressively litigated the issue of the legality of Mr. Hummel's detention by the Border Patrol. During my cross-examination of Border Patrol Officer Paul Kandal, he acknowledged that the only basis upon which he continued to detain Mr. Hummel after they had determined his citizenship, was upon the missing persons report that had been previously generated by the Kennedale Police Department. This was true, even though Officer Kandal acknowledged that the missing persons report specifically directed that Mr. Hummel not be detained, when and if located. To my knowledge and memory, all of the information which I believed to be relevant to the legality of Mr. Hummel's detention which was contained within those recordings and reports was acknowledged by the State's witnesses during our questioning of those witnesses; therefore, there was no need to "impeach" them through introduction of the actual reports and recordings. Officer Kandal's testimony regarding his authority under the Western Hemisphere Travel Initiative to detain individuals seeking to enter the country without the required documentation was limited merely to his assertion that such Initiative granted him lawful authority to detain Mr. Hummel for investigation of his citizenship, or for an administrative violation of the statute. Officer Kandal never asserted that such was the authority upon which he relied to hold Mr. Hummel in this instance; rather, he acknowledged that his sole authority for doing so was the missing person's report previously generated by the Kennedale Police Department, indicating that Mr. Hummel should not be detained on the basis of such report. Additionally, Officer Kandal acknowledged that there had been no rescission of the admonition contained within the report not to hold Mr. Hummel on the basis of that report, yet he continued to do so anyway. Since the witnesses acknowledged those relevant facts contained within the recordings and reports which we felt bore on the legality of his detention, there was not a

necessity to introduce the recordings and the reports themselves. We detailed the relevant facts which we had elicited from the State's witnesses at the suppression hearing which we felt bore upon this issue in the extensive (37 pages) <u>Trial Memorandum</u> which we filed with the Court in support of the motions to suppress. Since it is my belief that the recorded telephone conversations, and the written incident reports of the United States Border Patrol Officers, which are referenced by writ counsel, do <u>not</u> contain relevant facts which were not acknowledged by the witnesses, our decision not to offer those recordings and/or reports into evidence would not constitute ineffective assistance in the absence of a specific showing to the contrary. Even then, such a failure would be viewed in light of the totality of our representation.

<u>Claim Eleven</u> - (Trial Counsel's Ineffectiveness for Failing to Object to the State's Discriminatory Use of Peremptory Challenges to Remove Minority Venire Members)

In Claim Eleven, the Applicant alleges that we were ineffective for failing to make a *Batson* challenge to the State's use of peremptory challenges to three prospective minority jurors: Mr. Gonzales – a twenty-two year old Hispanic male; Ms. Williams – a forty-seven year old African American female; and Mr. Dennis – a forty-four year old African American male. I am cognizant of the requirements of *Batson* and its progeny, and have made *Batson* challenges on several occasions in the past, in both death penalty cases and non-death penalty cases. In this case, had I believed that the State's use of its peremptory challenges in any of these three instances was racially motivated, then I would have made such a challenge; however, based upon the circumstances in this case, I did <u>not</u> believe that to be the basis for which they struck these individuals. I do not believe that a *Batson* challenge lies in every instance wherein the State uses a peremptory challenge to excuse a juror of a minority race; conversely, I actually believe it to be unethical to make such a challenge in the absence of evidence to suggest some racial motivation for the exercise of the peremptory challenge. I do not have either copies of the questionnaires for these three prospective jurors, nor my notes from my review of their questionnaires and from their individual voir dire examination, as I believe that the Court collected such documents at the conclusion of

voir dire.  I also do not have much, if any, independent recollection of their individual questioning.  I have reviewed the Court's Reporter's transcript of the individual questioning of each of these prospective jurors however, and it has provided me with some information as to why we would not have objected to the State's exercise of the peremptory challenge as to each of these prospective jurors.

Prospective Juror Gonzales was a very young (age 22) individual, whose father was in law enforcement, and who was personally considering a possible career in law enforcement. His answers in regard to his ability to judge another person were inconsistent, although he did indicate a seeming preference for a sentence of life without parole as opposed to a death sentence, as that would compel the sentenced defendant to spend the remainder of his life dwelling upon what he had done.  He seemed to place the responsibility for bringing mitigating evidence before the jury, and the burden of "*persuading*" the jury of the importance of such mitigating evidence, upon the defense.  He also had what appeared to be a significant work problem if he were chosen to serve.  Based upon his youth, and the totality of his answers, I would <u>not</u> have wanted Mr. Gonzales to serve as a juror in the case, thus I would not have objected to the State's excusal of him.  It is apparent from the State's questioning of him that they did not want him as a juror, and I would thereupon have tried to force them to use a strike to excuse him if I could, even though we did not want him as a juror, as that is an important part of the "*art*" of capital voir dire.  I see nothing in the transcript of his questioning, nor do I have any recollection of anything, that would suggest that the State's strike of Mr. Gonzales was racially motivated.

Prospective Juror Williams was a forty-seven you old African American female.  She worked as a teacher's assistant in an elementary school in the area of special education. She had a nephew (to whom she did not appear to be terribly close)  whom had had some trouble with the law.  She seemed to have some trouble with the legal concepts regarding the special issues, but announced a general acceptance of the death penalty. She was not really able to provide any examples of mitigating evidence when directly asked.  She appeared to be a very nice lady with a kind heart, and a person who was deeply religious. I

would have <u>gladly</u> accepted her as a juror. From my examination of the record, it is apparent that the State would not accept her due to her being somewhat "*soft*" on the death penalty, and due to an uncertainty as to the position that her Church might ultimately take on capital punishment. My experience has been that individuals such as her have a great problem in taking the ultimate responsibility of voting for death, and for that reason, we knew that they would not accept her as a juror. Our portion of her voir dire examination was focused simply upon <u>not</u> providing her with any opportunity to disqualify, so that we could compel the State to use a strike to excuse her. I see nothing in the record to suggest any racial motivation in the exercise of that strike.

Prospective Juror Dennis was a forty-four year old African American male. I also do not really have an independent recollection of him or his questioning, but I have reviewed the Court Reporter's Record of his individual voir dire. It appears that both sides were actually considering accepting him for service, even though there appeared to be issues with him for each side about which they would be concerned. From the State's perspective, Mr. Dennis did not know how the act of giving a death sentence would personally affect him afterwards, and he was unable to develop further for us how that might ultimately affect his decision-making. From our perspective, we would have had concerns over the manner in which he emphasized the possible motive for the killings as being the only potential mitigating evidence that he could envision, and he never did really appear to expand his views of mitigating evidence much beyond that point. His statement that the criminal justice system was "*broken*" due to recent DNA exonerations would also have been a great concern to the State. We would have probably accepted him as a juror had Mr. Hummel agreed, as we did not accept any prospective jurors for service without an agreement among all of us, including Mr. Hummel. I find nothing in the record of the questioning of Mr. Dennis which suggests a racial motivation for the exercise of their strike, and I obviously did not see any such basis at the time of his questioning either.

At the time of Mr. Hummel's trial, I had known the lead prosecutor in the case, Bob Gill, for almost thirty (30) years. I supervised him as a prosecutor in the District Attorney's

Office; I had tried cases previously against him as a defense lawyer before he became a judge; and I had tried cases before him when he served as a District Judge. Throughout that time, I had never known him to be racially biased, nor do I ever recall having seen him act in a racially motivated manner in any of the actions which he had taken in court. While I was far less familiar with Mr. Brissette, than with Mr. Gill, at the time of Mr. Hummel's trial, I had also never seen him act in a racially motivated manner in any case which we had previously had together. Had I seen anything during the voir dire examination of these three prospective jurors that suggested that the State's exercise of their peremptory challenges was in any way racially motivated, then I would have made a _Batson_ challenge, and I would have attempted to prove such racial motivation; I simply did not see anything then, nor do I see anything now, which suggests a racial motivation for the exercises of their peremptory challenges on these three prospective jurors. Such being the case, I do <u>not</u> believe that our failure to make such a _Batson_ challenge constitutes ineffective assistance in this instance.

<div align="center">Conclusion</div>

Several of the claims contained within Applicant's _Writ Application_ to which the Court has ordered that I respond, are phrased in sweeping and conclusory terms, without specific references to those places within the trial record, or to particular items of evidence or portions of testimony where it is alleged that we failed to object. This fact has made it exceedingly difficult to succinctly answer some of the claims that are contained with that Application. I have not read the entire trial transcript in preparing this Affidavit; however, I have referred to portions of such record to refresh my recollection as to the questioned events. Similarly, I have reviewed portions of my trial file, as well as parts of our investigator's and mitigation specialist's files. I have sought the assistance of our Mitigation Specialist, our investigator, and our expert, Dr. McGarrahan, to assist me in locating information within our files pertaining to the issues raised in this _Writ Application_. I have discussed these issues with Fred Cummings, my co-counsel in the trial of this case, but I have essentially worked independently from Mr. Cummings in the actual drafting of

this Affidavit. I have not discussed the content of this Affidavit with either the counsel for the State, or the counsel for the Applicant. I have tried to limit my revelation of privileged information which I possess as a result of my representation of Mr. Hummel, to only those matters which I believe are necessary to fully answer the Claims to which I have been ordered to respond. Should the Court have additional questions, or should the Court order that I respond to additional questions from the counsel for either party in this _Writ Application_, then I will do so in the manner directed by the Court; however, being compelled to answer these Claims has placed me in the virtually untenable position of providing information which I believe to be very harmful to my client, Mr. Hummel, and that is of the utmost concern to me. The effective assistance of counsel is viewed within the context of the totality of the representation provided in the case. It is my fervent belief, that we made a comprehensive and laborious effort in the defense of Mr. Hummel, in the face of a mountain of evidence, and a set of horrific facts. Based upon that totality of our representation, I firmly believe that we provided him the best representation that we could, and that those efforts meet the criteria required for the effective assistance of counsel."

_(signature)_

LARRY M. MOORE

SUBSCRIBED and SWORN to before me on this the 9th day of August, 2013.



KIMBERLY MOORE, Notary Public

KIMBERLY MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 5-31-2014

## IN THE 432nd JUDICIAL DISTRICT COURT
## TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | § | Trial Cause No. |
| JOHN WILLIAM HUMMEL, | § | 1184294D |
| APPLICANT | § |  |
|  | § |  |
|  | § |  |

### AFFIDAVIT OF JOHN W. STICKELS
### (POST CONVICTION APPLICATION FOR WRIT OF HABEAS CORPUS)

|  |  |
|---|---|
| STATE OF TEXAS | § |
|  | § |
| COUNTY OF TARRANT | § |

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared John W. Stickels, who, being by me duly sworn, stated as follows:

"My name is John W. Stickels. I was licensed to practice law by the State Bar of Texas in May of 1983. I am Board Certified in Criminal Trial Law and Criminal Appellate Law by the Texas Board of Legal Specialization.

I was appointed to represent Mr. John Hummel in the appeal of his death sentence received in cause number 1184294D in the 432$^{nd}$ District Court of Tarrant County, Texas. In the process of representing Mr. Hummel, I reviewed the transcripts, researched the law applicable to the issues presented, and prepared

---

Affidavit of John W. Stickels                                                                 Page 1

**565**

Appellant's Brief. In addition, I appeared for oral argument before the Texas Court of Criminal Appeals and argued Mr. Hummel's case before that court.

Mr. Hummel's initial application for writ of habeas corpus alleges that I rendered ineffective assistance of counsel for failing to urge on appeal that the state's evidence was insufficient to show that Mr. Hummel is a future danger. Mr. Hummel's application for writ of habeas corpus admits that the Court of Criminal Appeals has stated repeatedly that it is the law in the state of Texas that the facts of a particular crime and the circumstances surrounding it can support a finding of future dangerousness. In the process of preparing Mr. Hummel's appellate brief, I reviewed the guilt/innocence facts and the applicable law concerning future dangerousness and determined that the facts proven by the State and found by the jury are sufficient to support the jury's finding that Mr. Hummel is a future danger. Because I made this determination, I decided not to include the 'future danger' issue in Mr. Hummel's appellate brief because I considered it to be frivolous.

Mr. Hummel's initial application for writ of habeas corpus alleges that I rendered ineffective assistance of counsel for failing to sufficiently appeal the court's failure to grant the defense motions to suppress. In connection with Mr. Hummel's Motion to Suppress, I reviewed the filed motion to suppress, reviewed the applicable facts, researched the applicable law, and presented the arguments in a proper and suitable manner which as calculated to obtain relief for Mr. Hummel

on this issue. In my opinion, based upon my research and experience, I presented the motion to suppress issue in an appropriate manner that was calculated to obtain relief. I understand the motion to suppress could have been presented in a different manner. However, I made the decision to present the motion to suppress issue in the manner I did because I decided it was the best way to obtain relief.

Mr. Hummel's initial application for writ of habeas corpus also alleges that I rendered ineffective assistance of counsel for failing to appeal the state's impermissible injection of inflammatory and prejudicial evidence into both phases of the trial. In my opinion, the trial court did not err in admitting the complained of evidence because it was admissible as contextual evidence and/or admissible victim impact evidence. Because I determined the trial court did not err in admitting the complained of evidence, I did not include it in Mr. Hummnel's appellate brief.

Mr. Hummel's initial application for writ of habeas corpus further alleges that I rendered ineffective assistance of counsel for failing to appeal the trial court's erroneous denial of defense counsel's valid challenges for cause of nine prospective jurors. Specifically, Mr. Hummel alleges that the trial court erred in failing to grant the defense challenges for cause for prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo and that I rendered ineffective assistance of counsel for failing to appeal the court's

ruling.  In the process of writing Mr. Hummel's appellate brief, I reviewed the reporter's record concerning all of the prospective jurors, including prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo.  In addition, I researched the applicable law concerning possible challenges for cause with respect to any prospective juror.  It was my opinion when I wrote Mr. Hummel's appellate brief that there was no error in the trial court's refusal of defendant's challenges for cause.  Therefore, I decided not to include those issues in Mr. Hummel's appellate brief.

In the process of reviewing the record to respond to the allegations in Mr. Hummel's application for writ of habeas corpus, I reviewed the reporter's records specifically concerning prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo.  In addition, I researched the applicable law concerning possible challenges for cause with respect prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo.  After reviewing the facts and researching the issues concerning prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo, it continues to be my opinion there was no error in the trial court's refusal of defendant's challenges for cause."

Dated October 9, 2013

John W. Stickels

Affidavit of John W. Stickels

Page 4

**568**

SUBSCRIBED AND SWORN TO me, the undersigned Notary Public, by the said John W. Stickels on the 9th day of October, 2013.



Notary Public, State of Texas

**App. 0641**