C-432-009923-1184294-A

| EX PARTE | § | IN THE 432nd JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## AFFIDAVIT OF ROBERT K. GILL

"My name is Robert Keith Gill. I am an assistant criminal district attorney in Tarrant County, Texas. I have been so employed for a little over five years. I was the lead prosecutor on cause number 1184294, *The State of Texas v. John William Humm*el, which is the subject of the instant writ application.

Prior to being employed with the Tarrant County DA's office five years ago, I served over fourteen years as a state district judge hearing felony criminal cases. During my time on the bench I presided over numerous death penalty trials. Before taking the bench in January of 1993, I served over eleven years as an assistant criminal district attorney in Tarrant County. I have prosecuted many criminal cases, including many death penalty cases, both before and after serving on the bench. I am board certified in criminal law by the Texas Board of Legal Specialization and have been continuously board certified since 1988. I am a frequent speaker at continuing legal education courses around the state of Texas on criminal law issues. I am the author of two substantive legal publications dealing with criminal law matters: *The Texas Criminal Lawyers Handbook* and *Texas Criminal Forms* (both James Publishing).

I am familiar with the *Batson* case and its progeny, and with article 35.261 of the Texas Code of Criminal Procedure. I know that the law prohibits a prosecutor from exercising a peremptory challenge on a racial basis. It is not my practice, nor is it the practice of the Tarrant County DA's office, to exercise peremptory challenges on a racial basis. I did not exercise any peremptory challenge on a racial basis in the Hummel case.

In the writ application in the instant case, Applicant alleges that his defense team was ineffective for failing to raise a *Batson* claim at the time of trial with regard to the State's peremptory challenges against three veniremembers. The defense team was not ineffective for failing to raise this claim at trial because the State did not exercise its peremptory challenges against any of these three veniremembers on a racial basis. Each peremptory challenge was made on a strictly non-racial basis; and, in fact, there were

1



numerous race-neutral reasons for the peremptory challenge used against each of the three individuals.

The race-neutral reasons for the peremptory challenges at issue are as follows:

<u>Veniremember Gonzales #15</u>—The State of Texas exercised a peremptory challenge against this venireman for the following reasons: he was late to court for his individual voir dire appointment; he was only twenty-two years old; he lived with his mother; he was single with no children; he expressed difficulty judging another person; he believed that life without parole was a punishment preferable to the death penalty; he believed that the death penalty should be used less frequently; he had a conflict with jury duty because it would cause him to miss work and he would be worried about his job since he had just recently started the job; he testified that jury duty would be a financial hardship on him; and he testified that he was expecting to take a vacation in June, which was when the trial on the merits was scheduled. Generally I do not want to accept veniremen who have reasons important to them that they cannot serve on a jury. I want people on the jury who do not mind serving and doing their civic duty. On the basis of his jury questionnaire, I had rated Gonzales a weak State's juror before I heard his individual voir dire. After having heard the individual voir dire, my opinion remained the same, and the State exercised a peremptory strike against him.

<u>Veniremember Williams #83</u>— The State of Texas exercised a peremptory challenge against this veniremember for the following reasons: she had a cousin who had been in trouble with the law; she wanted the State to meet its burden on special issue number one by an absolute certainty; she wanted absolute proof that the defendant committed the crime; she had trouble with the concepts contained within the special issues; she found her job as a teacher's assistant to be very stressful; she took blood pressure medication; she liked to watch crime shows on television; she agreed with the statement that life without parole was appropriate in all cases of capital murder; and she did not want to be a juror. Ultimately, it was my opinion that she would have a very difficult time being part of a jury that assessed the death penalty due to her religious views and her elevated burden of proof.

<u>Veniremember Dennis #132</u>— The State of Texas exercised a peremptory challenge against this veniremember for the following reasons: he was a postal clerk by profession; he had a family member who had undergone treatment, counseling, or hospitalization related to molestation; someone in his family had been through a bankruptcy; he had a relative who had been to prison; he had previously served as a juror in a murder case

767

where the jury returned a not guilty verdict; he said that he had been previously harassed by police; he had worked previously as a security guard (the same profession as the defendant); he felt that the justice system was broken and was terrible at dealing with crime; and he was not sure how he would feel about giving someone the death penalty and how it would affect him after the verdict.

Further Affiant sayeth not.

_____

ROBERT K. GILL
Assistant Criminal District Attorney
Tarrant County, Texas

Subscribed and sworn to before me on this the  5TH  day of November, 2013.

TRISH STEGALL
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 12-03-2015

_____

Notary Public for The State of Texas
My commission expires:  12/3/15

3

**768**

**App. 0644**

FILED
THOMAS A. WILDER, DIST. CLK.
TARRANT COUNTY, TEXAS

OCT 11 2013

TIME _____ 1:52

BY_____ SR _____ DEPUTY

CAUSE NO. C-432-009923-1184294-A

| | |
|---|---|
| EX PARTE | IN THE 432ND DISTRICT COURT |
| | OF |
| JOHN WILLIAM HUMMEL | TARRANT COUNTY, TEXAS |

## AFFIDAVIT

BEFORE ME, the undersigned authority on this day personally appeared the person known to me to be the Affiant, who, after being duly sworn by me, under oath stated:

"My name is Fred Cummings. I have been licensed by the State of Texas as an attorney and counselor at law since May 9, 1986. I have been Board Certified in Criminal Law by the Texas Board of Legal Specialization since December 1993 and I have been Board Certified in Criminal Trial Advocacy by the National Board of Trial Advocacy since October 16, 1996. I have been in private practice as a criminal defense lawyer since June of 2001. I have been approved for appointment to death penalty cases since 2002. I have been trial counsel in three cases in which the death penalty was assessed. I have represented more than twenty-five other capital murder defendants where a death sentence was not assessed. I have attended more than 230 hours of legal seminars specific to death penalty litigation since 2002. I am familiar with the Guidelines and Standards for Texas Capital Counsel regarding my duties as trial counsel after conviction; the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases; and the Disciplinary Rules of Professional Conduct of the State Bar of Texas. I am providing this affidavit by order of Judge Gonzalez in response to allegations in an application for a writ of habeas corpus that I provided ineffective assistance of counsel to John Hummel. I have reviewed the Initial Application for Writ of Habeas Corpus and I will address the allegations against me and Larry Moore in Claim Two, Claim Three, Claim Four, Claim Five, Claim Six, Claim Seven, Claim Eight, Claim Nine, and Claim Eleven in this affidavit."

"I was appointed to represent John William Hummel, by Judge Ruben Gonzalez on December 23, 2009. I discussed the case with Larry M. Moore and asked him to be co-counsel. He agreed to do so. We discussed and agreed upon a private investigator

and mitigation specialist to add to our defense team as well. I met Mr. Hummel in the holdover of the 432nd District Court of Tarrant County, Texas, on December 31, 2009. He had just arrived at the Tarrant County Jail after being transported from San Diego, California. Judge Gonzalez conducted an Article 15.17 hearing and granted a motion for the appointment of co-counsel, a motion for the appointment of a defense investigator, and a motion for the appointment of a mitigation specialist. Jury selection commenced on April 28, 2011 and continued until June 2, 2011. The jury trial began on June 13, 2011. The jury found the client guilty of capital murder on June 22, 2011 and the punishment phase of the trial began that same day. On June 28, 2011, the jury returned their verdict on the special issues and Mr. Hummel was sentenced to die by lethal injection as a result. During my representation of John Hummel I made eleven non-evidentiary appearances in court on his behalf, participated in thirty-eight (38) days of evidentiary hearings, jury selection, or jury trial, and expended over 595 hours in the investigation of his case and in the preparation of his defense. I believe Mr. Moore expended even more out-of-court time in the representation of John Hummel. On July 6, 2011, I spoke with Mr. Brad Levenson, the Director of the Office of Capital Writs, and pledged my cooperation with his office once he had a release from Mr. Hummel. Once we had that release, Mr. Moore and I released our case files to the Office of Capital Writs for their use in the representation of Mr. Hummel. I released my entire file including my work product. I have discussed the trial team's defense of Mr. Hummel with the lawyers from the Office of Capital Writs on two or three occasions and I have been candid about some of the difficulties we encountered in his defense, particularly with the family members of the Applicant."

### APPLICANT'S CLAIM TWO:
### HUMMEL'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO ARGUE THAT THE STATE'S EVIDENCE WAS INSUFFICIENT TO SHOW FUTURE DANGER

"This claim is not supported by the trial record as it pertains to the arguments made to the jury by Applicant's trial counsel. Larry Moore and I divided the 30 minutes allotted to us for final argument in the punishment phase of Applicant's jury trial. Mr. Moore went first and devoted the majority of his time arguing there was insufficient evidence to answer yes to the first special issue. (Reporter's Record V45,

65-73) I closed the defense final argument and spent the vast majority of my time arguing the evidence was insufficient as to the first special issue. (RR45, 73-84)"

"It is true that we did not move for a directed verdict based upon the legal insufficiency of the state's evidence as to Special Issue Number One. This was not a "failure" on our part. It is not necessary for trial counsel to make such a motion to preserve that appellate issue. I am confident that Judge Gonzalez would not have granted such a motion."

### APPLICANT'S CLAIM THREE:
### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL WAS NOT A FUTURE DANGER

"The allegation that Mr. Moore and I failed to present available affirmative evidence that would have rebutted the State's assertion that Mr. Hummel was a "future danger." This allegation is untrue for the following reasons:"

"I interviewed Applicant on several occasions in an effort to identify potential witnesses for his defense. On at least two occasions, I asked Mr. Hummel if there were any jailers that he thought would testify on his behalf. On each occasion Applicant said he did not know of any. Brendan Ross, our mitigation specialist, met with Applicant and conducted in depth interviews of Mr. Hummel to gather as much information about him as she could. Our defense investigator, Bobby Walton, interviewed Applicant on several occasions. Mr. Hummel did not inform any of us of any deputies who indicated a willingness to testify for him. I spent many hours with Mr. Hummel. I visited him in jail on at least seven different occasions to interview him as well as counsel him prior to trial. Each day that we had court, and there were approximately 40 such days, I met with Applicant before court to insure he had fresh civilian clothes to wear that day. I spent time with him on each of those days discussing his case and answering his questions. I built a rapport with Mr. Hummel and he was comfortable talking to me. He never suggested that there were any jailers who were willing to testify for him. Mr. Moore and I met with Brendan Ross and Bobby Walton regarding our defense of John Hummel to compare notes on several occasions. None of us had any indication there were jailers who were willing to testify on Mr. Hummel's behalf."

"The defense expert witness, Frank Aubuchon, testified that John Hummel had no disciplinary issues whatsoever in the Tarrant County Jail because he reviewed

Applicant's jail records. (RR40, 70)  Obviously we provided Mr. Aubuchon those records so that he could use them in his evaluation and then give the jury that information as a basis for that evaluation.  We did not offer the actual jail records because they contain a lot of extraneous information that could possibly influence a juror against the client such as the amount of money on his books and how he spent it, who visited him in jail, his communications to and from jail personnel, and the fact that he was given the security designation of "High Custody" throughout most of his incarceration in the Tarrant County Jail.  What the jail records do not contain is an affirmative statement that Applicant was a model prisoner or that he had not been disciplined.  Applicant suggests we should have offered them to prove a statement of fact that is not contained within the documents and I believe that is unreasonable."

"Within Applicant's jail records is a Primary Inmate Classification Security Level Assessment dated December 31, 2009.  This form reflects that the original classification recommended for Mr. Hummel was Level 3 – Medium and that this recommendation was overridden by Chief Alan Dennis who ordered Applicant's classification to be SPC1 – High Custody.  High Custody is labeled as Level 2 – Maximum on the form.  The primary reason given was the high profile nature of Applicant's case but the boxes next to suicidal, MHMR, and Protective Custody were also marked.  When I visited Applicant in the jail for the first time on January 6, 2010 he was wearing handcuffs, leg irons, and a green smock.  In my experience the jail dresses an inmate in a green smock if there is some concern about suicide.  Applicant admitted that he had made a statement that could be interpreted as suicidal.  On January 13, 2010, Mr. Hummel was handcuffed and shackled during my visit with him but I do not have any notes about his clothing.  Subsequent to this visit, I do not believe Mr. Hummel was handcuffed and shackled during any of our visits again.  With the exception of the first visit, I believe that Mr. Hummel was always dressed in a green jail jumpsuit when I saw him.  However, he was still in a "rotation" unit when I visited him on October 12, 2010.  In a rotation unit, the inmates are locked individually in cells and typically released for exercise one hour each day.  There are Classification Records in the jail records obtained by our mitigation specialist for a period of time from 12/31/09 to 03/29/10 and from 09/29/10 to 04/26/11.  During those two periods of time Applicant was evaluated for classification purposes 36 times with no change reflected in his classification: maximum.  However, each classification entry also indicated that Mr.

Hummel was non-assaultive and that his classification was due to the high profile nature of his case and that it was a form of protective custody since he was labeled as a "child offender". (See attached relevant excerpts from jail records) These records support my belief that Chief Alan Dennis had an extraordinary interest in Applicant's case. During the break in the trial after the guilty verdict and before the punishment phase began, an individual in casual business clothes walked past the railing on the opposite side of the courtroom and said "We've got the first part done. Now let's finish it." The man then proceeded back into the secured hallway unchallenged by the bailiffs. When I asked one of the bailiffs he told me he was Chief Dennis. I have never seen an administrator for the Tarrant County Sheriff's Office take such an interest in one of my cases. To be clear, I am not suggesting anything improper on the part of Chief Dennis. Arguably he was protecting Applicant from being hurt by another inmate in general population. But his interest, if known, would have a chilling effect on any correction officers contacting us on Applicant's behalf. Providing an affidavit to an investigator is vastly different from testifying in a death penalty jury trial. Detention Officer Rigmaiden, Detention Officer Bell, nor Detention Officer Thomas contacted me or anyone else representing Applicant even though I was listed on their computer system as Applicant's lawyer. Applicant did not give us their names even when I had asked him, on more than one occasion, if there were any possible witnesses among his guards. I would have used them if I had been aware of them. I am confident that John was a model inmate as far as compliance with his guards was concerned but the jail records do not support the statement by Applicant that he was not classified as "High Risk." Just the opposite is true."

"John Hummel did not have any criminal history at the time of his arrest. We did not offer criminal background records because there were none to offer, however, the jury was informed of John Hummel's lack of criminal history through the testimony of our expert witness, Frank Aubuchon. (RR44, 70) The jury learned through the testimony of Frank Aubuchon that Applicant was honorably discharged after serving as a Marine as well. (RR44, 70)

"Mr. Moore and I made a conscious and informed decision to not offer expert testimony regarding Special Issue Number One because that would open the door to an evaluation by the state's expert, Dr. J. Randall Price, Ph.D. We arrived at that decision

after conferring with Dr. Antoinette McGarrahan, Ph.D. who believed that Applicant would not score well on a formal violence risk assessment evaluation. We believe that Dr. Price would have negated any benefit from such expert testimony."

## APPLICANT'S CLAIM FOUR:
## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT EXPERT TESTIMONY REGARDING HUMMEL'S LIFE HISTORY

"I have attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death penalty litigation and half of those were specific to identifying and presenting mitigation evidence. The first day I appeared in court on behalf of Applicant I got Judge Gonzalez to appoint Brendan Ross, a qualified and experienced mitigation specialist in addition to Mr. Moore and Bobby Walton, a defense investigator. We met as a team shortly thereafter and began gathering mitigation evidence and identifying potential mitigation witnesses. Mr. Walton conducted his duties as defense investigator, but in this case those duties included assisting Ms. Ross with potential mitigation witnesses as well. We all worked on putting together the best mitigation case we could. It is always difficult to get family members to speak about the skeletons in the family closet but in this case we had potential witnesses hide from us, threaten to have us arrested for trespassing or harassment, deny us access to critical potential witnesses, and assure us they were going to do everything to see the client get the death penalty. We identified and interviewed every potential witness that we could. We used all of the witnesses who could provide admissible relevant mitigation evidence about Applicant and we even compelled some who were uncooperative. Applicant claims that we were ineffective for not using a Social Worker to explain Applicant's life history. The example provided is a more complete life history but it is based upon additional information from a number of witnesses who were not available to us at trial. The Office of Capital Writs had our full cooperation and assistance. We took their calls and answered their questions. They had the benefit of our investigation to build upon. They had two years to locate additional witnesses that we had not. We used the lay witnesses that we were able to identify to provide as complete a story as we could and used a forensic psychologist to assist us with explaining it to the jury. I do not believe we were ineffective for presenting our defense in this way."

## APPLICANT'S CLAIM FIVE:
## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT RELEVANT LAY WITNESSES

"Applicant claims that we were ineffective for failing to present relevant lay witnesses as a result of an investigation that was narrowly focused on suspicions that Applicant was sexually abused thereby failing to develop other avenues of mitigation evidence. This claim is false. The witnesses that we sponsored in the punishment phase of Applicant's jury trial were all we had after a lengthy investigation into anyone that we could locate that had ever been associated with Applicant."

"I had Brendan Ross, an experienced licensed social worker and mitigation specialist appointed to assist us in our investigation into the life of John Hummel at my first appearance as Applicant's lawyer. Ms. Ross gathered relevant social records from various sources and interviewed Applicant to start that investigation. From that beginning, Ms. Ross and our defense investigator, Bobby Walton, began trying to locate people associated with Applicant and once located, to interview them regarding anything they knew about Applicant including identifying other potential witnesses. We investigated current friends and associates, family members, present and former church members, school classmates, and former friends. We explored various themes as they came to light. We considered Applicant's participation in role-playing games, his use of marihuana, alcohol and other drugs, the possibility that he suffered from being raised in poverty, the possibility that he had a mental disorder or illness, the possibility that he had observed sexual or physical abuse in his household, and the possibility that he had been abused or neglected as a child. We were alert for the existence of these issues but we did select our witnesses on the basis of any one issue. Some of the people identified could not be located. Some who were located would not cooperate with us. Applicant's sister would not meet with us or appear at trial until she was ordered to appear by a district judge. Applicant's aunt threated our investigator with arrest for trespass when she went to the home to interview Applicant's mother. (We were finally able to interview her at our office on a later date) Applicant's aunt and cousin were very open in their belief that Applicant should get the death penalty. Some of the witnesses interviewed could not remember anything relevant but gave us leads to others who did. We conducted our investigation in Texas, California, and

South Carolina. Those who could provide relevant and helpful testimony were subpoenaed to appear."

"Applicant was not very helpful to our efforts. He did not provide the names of anyone who served with him in the Marines. If he had given us even one of their names we could have more than likely located the others and developed testimony about his military service years. Applicant denied witnessing or experiencing any abuse growing up and reported a normal childhood. Applicant reported his Dungeons and Dragons role playing games as harmless games that he played on paper occasionally. The Office of Capital Writs located one witness who reported in great detail playing with Applicant as a young man. We had not located that witness and did not have that information."

"We presented our evidence in the punishment phase with the witnesses we had available to us. We were not just obtaining affidavits from people who in some cases did not even sign those affidavits. The issues presented at punishment were dictated by the available witnesses, not the other way around."

## APPLICANT'S CLAIM SIX:
## TRIAL COUNSEL ERRED BY FAILING TO PRESENT HUMMEL'S MILITARY SERVICE AS MITIGATION EVIDENCE

"The jury was informed of Applicant's military service through the testimony of Frank Aubuchon. (RR44, 70). As indicated above, we did not have the names of any other Marines that we could sponsor on this topic. Applicant wisely chose not to testify. When the state put on two military witnesses as rebuttal witnesses, we used cross examination to emphasize the positive aspects of Applicant's military service. Applicant's military records are unremarkable and would not have been any more persuasive with the jury regarding this issue."

## APPLICANT'S CLAIM SEVEN:
## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL SUFFERED FROM COMPLEX POST-TRAUMATIC STRESS DISORDER RESULTING FROM ATTACHMENT TRAUMA

"Dr. Antoinette McGarrahan, Ph.D., an experienced licensed forensic neuropsychologist, evaluated Applicant for Post-Traumatic Stress Disorder and

determined that he was not symptomatic prior to the deaths of his wife and child and father-in-law. We relied on that expert opinion and believe there is no such evidence."

## APPLICANT'S CLAIM EIGHT:
### HUMMEL'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE STATE IMPERMISSIBLY INJECTED INFLAMMATORY AND PREJUDICIAL EVIDENCE INTO BOTH PHASES OF THE TRIAL; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE

"Applicant claims that the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial, over our objections, that we were ineffective. Applicant admits that much of the evidence was allowed in the trial court over trial counsel's objections. The inflammatory and prejudicial evidence was ruled to be contextual by the trial court and therefore admissible. Applicant was indicted for three separate Capital Murders for his alleged conduct on the 17[th] of December 2009. Applicant's jury trial arose from an indictment that alleged that Applicant knowingly caused the death of his father-in-law, by striking him with a bat, and knowingly caused the death of his wife by stabbing her with a knife or sword during the same criminal transaction. One of the other pending indictments alleges that Applicant caused the death of his daughter, a child under the age of six, by striking her with a bat. By proceeding to trial on the chosen indictment potential jurors could not be fully questioned about the impact a child victim would have upon them. However, the State opened their case with that extraneous murder victim and emphasized it throughout the trial. Mr. Moore and I objected frequently but the court ruled that it was contextual conduct and overruled our objections. We were not ineffective."

## APPLICANT'S CLAIM NINE:
### TRIAL COUNSEL FAILED TO EFFECTIVELY PRESENT EVIDENCE THAT HUMMEL'S CONFESSION SHOULD BE SUPPRESSED

"Mr. Moore and I moved to suppress the video recorded statement of Applicant and litigated the issue in a contested pretrial hearing that lasted from January 18, 2011 through January 21, 2011. (RR6, RR7, RR8, and RR9) Applicant complains that we were ineffective because we did not offer transcripts of recordings of telephone calls between officers of the Customs and Border Protection Service and the Kennedale Police Department during the contested suppression hearing in which we argued the

Border Patrol illegally detained Applicant, and in so doing, tainted any subsequent statements by Applicant. The very existence of those recordings became known to us during those hearings. We were given copies and used them during cross-examination of the relevant witnesses so that the trial court was aware of the communications."

### APPLICANT'S CLAIM ELEVEN:
### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S DISCRIMINATORY USE OF PEREMPTORY STRIKES TO REMOVE MINORITY VENIRE MEMBERS IN VIOLATION OF HUMMEL'S CONSTITUTIONAL RIGHTS

"Applicant claims I was ineffective for failing to object to the use of peremptory strikes on Juror #15, Juror #83, and Juror #132. I was present in court during the individual voir dire of each of these potential jurors. I did not raise a Batson challenge to the State's use of their peremptory strike in each case because of obvious race neutral reasons for each of those strikes."

"I have responded to these claims to the best of my ability within the constraints of my ethical responsibility to my client. I will supplement these responses if ordered by the court.

Fred Cummings, *Affiant*

*SUBSCRIBED* and *SWORN* to before me Aundrea Conca, on this the 11th day of October 2013.

Aundrea Conca, Notary Public

AUNDREA KRISTINA CONCA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                            05 13 11 1113
HUMMEL,JOHN WILLIAM                    RACE W E   SEX M AGE 35 DOB 11 04 75

CELL:  26 G 01  OFFICER:  CSC  REASON:  010  DATE:  04 26 11 0849
REMARKS:  RE 2MAX/SUSPENSE DATE REVIEW/
OVER 25               FELONY            UNSENTENCED         NON ASSAULTIVE
MAXIMUM               FIRST OFFENDER    SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION      HIGH PROFILE      CHILD OFFENDER

CELL:  26 G 01  OFFICER:  MED  REASON:  010  DATE:  03 28 11 0527
REMARKS:  SUSPENSE DATE REVIEW/RMN@2MAX
OVER 25               FELONY            UNSENTENCED         NON ASSAULTIVE
MAXIMUM               FIRST OFFENDER    SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION      HIGH PROFILE      CHILD OFFENDER

CELL:  26 G 01  OFFICER:  LJS  REASON:  010  DATE:  02 26 11 2038
REMARKS:  2MAX/SUSPENSE DATE REVIEW
OVER 25               FELONY            UNSENTENCED         NON ASSAULTIVE
MAXIMUM               FIRST OFFENDER    SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION      HIGH PROFILE      CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                          05 13 11 1113
HUMMEL,JOHN WILLIAM                    RACE W E   SEX M AGE 35 DOB 11 04 75

CELL:  26 G 01  OFFICER:  TLS  REASON:  010  DATE:  02 05 11 0257
REMARKS:  KS 0710685
OVER 25              FELONY             UNSENTENCED        NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER     SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE       CHILD OFFENDER

CELL:  26 G 01  OFFICER:  JWL  REASON:  010  DATE:  02 03 11 1313
REMARKS:  MASS MOVE FROM 25 TO 26
OVER 25              FELONY             UNSENTENCED        NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER     SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE       CHILD OFFENDER

CELL:  25 G 01  OFFICER:  LJS  REASON:  010  DATE:  01 30 11 1559
REMARKS:  2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25              FELONY             UNSENTENCED        NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER     SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE       CHILD OFFENDER


PF = 1 CELL MENU   2 INMATE MENU   3 MISC MENU    10 MAIN MENU        P424SH70
```

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                                05 13 11 1113
HUMMEL,JOHN WILLIAM                   RACE W E   SEX M AGE 35 DOB 11 04 75

CELL:  25 G 01  OFFICER:  SWC  REASON:  002  DATE:  01 03 11 1355
REMARKS:  2MAX/MASS MOVE/25G/CAPT. GRAVITT
OVER 25              FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION    HIGH PROFILE      CHILD OFFENDER

CELL:  26 G 01  OFFICER:  TMT  REASON:  010  DATE:  01 03 11 0515
REMARKS:  RHS TO 26G 01/CELL CLOSURE/SGT.NEAVES
OVER 25              FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION    HIGH PROFILE      CHILD OFFENDER

CELL:  25 G 01  OFFICER:  LJS  REASON:  010  DATE:  12 31 10 1552
REMARKS:  2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25              FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION    HIGH PROFILE      CHILD OFFENDER


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

Date: 5/13/2011 Time: 11:13:30 AM

Page: 1 Document Name: untitled

INMATE 0763423 CLASSIFICATION                                05 13 11 1113
HUMMEL,JOHN WILLIAM                    RACE W E   SEX M AGE 35 DOB 11 04 75

CELL: 25 G 01  OFFICER: CSC  REASON:  010  DATE: 12 15 10 0731
REMARKS:  PLACED IN HOLDING
OVER 25           FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION  HIGH PROFILE      CHILD OFFENDER

CELL: 02 B 01  OFFICER: CSC  REASON:  010  DATE: 12 15 10 0730
REMARKS:  PLACED IN HOLDING
OVER 25           FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION  HIGH PROFILE      CHILD OFFENDER

CELL: 25 G 01  OFFICER: DRD  REASON:  010  DATE: 12 04 10 1707
REMARKS:  2.MAX SUSPENSE DATE REVIEW/NO CHANGES
OVER 25           FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION  CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70


Date: 5/13/2011 Time: 11:13:33 AM                            **782**

**App. 0658**

Case 4:16-cv-00133-O Document 14-2 Filed 02/04/17 Page 18 of 37 PageID 835

```
INMATE 0763423 CLASSIFICATION                              05 13 11 1113
HUMMEL,JOHN WILLIAM                    RACE W E  SEX M AGE 35 DOB 11 04 75

CELL:  25 G 01  OFFICER:  CSC  REASON:  010  DATE:  12 03 10 0920
REMARKS:  RE 2MAX/MAKE SAPCE/
OVER 25              FELONY              UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION    CHILD OFFENDER

CELL:  55 B 22  OFFICER:  LMS  REASON:  014  DATE:  12 02 10 1900
REMARKS:  REAMIN HI PROFILE
OVER 25              FELONY              UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER         PROTECTIVE CUSTODY
MHMR OBSERVATION    CHILD OFFENDER

CELL:  55 B 22  OFFICER:  LMS  REASON:  010  DATE:  12 02 10 1859
REMARKS:  MASS MOVE/FLOOR CLSED/CPT LEGGETT
OVER 25              FELONY              UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER         PROTECTIVE CUSTODY
MHMR OBSERVATION    CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU         P424SH70
```

**783**

App. 0659

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                            05 13 11 1113
HUMMEL,JOHN WILLIAM                   RACE W E  SEX M AGE 35 DOB 11 04 75

CELL:  26 L 02  OFFICER:  CMB  REASON:  010  DATE:  11 02 10 1330
REMARKS:  2MAX/SUSPENSE DATE REVIEW/NO MOVE
OVER 25              FELONY           UNSENTENCED      NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER   SMOKER           PROTECTIVE CUSTODY
MHMR OBSERVATION     CHILD OFFENDER

CELL:  26 L 02  OFFICER:  PWM  REASON:  010  DATE:  10 07 10 0157
REMARKS:  NEED CELL/2 MAX
OVER 25              FELONY           UNSENTENCED      NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER   SMOKER           PROTECTIVE CUSTODY
MHMR OBSERVATION     CHILD OFFENDER

CELL:  26 H 02  OFFICER:  CSC  REASON:  010  DATE:  09 29 10 1405
REMARKS:  RE 2MAX/MAKE SPACE/
OVER 25              FELONY           UNSENTENCED      NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER   SMOKER           PROTECTIVE CUSTODY
MHMR OBSERVATION     CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

Date: 5/13/2011 Time: 11:13:45 AM

**784**

App. 0660

```
INMATE 0763423 CLASSIFICATION                           04 14 10 1213
HUMMEL,JOHN WILLIAM                   RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  26 P 03  OFFICER:  DRD  REASON:  010  DATE:  03 29 10 2216
REMARKS:  2.MAX SUSPENSE DATE REVIEW NO CHANGES
OVER 25            FELONY              UNSENTENCED        NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER      SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  26 P 03  OFFICER:  RGB  REASON:  002  DATE:  03 09 10 1822
REMARKS:  MASS MOVE/SGT DUNHAM
OVER 25            FELONY              UNSENTENCED        NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER      SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  25 O 03  OFFICER:  DBB  REASON:  010  DATE:  03 05 10 1347
REMARKS:  NEED CELL FOR ANOTHER/2MAX
OVER 25            FELONY              UNSENTENCED        NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER      SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU   3 MISC MENU   10 MAIN MENU        P424SH70
```

```
INMATE 0763423 CLASSIFICATION                                04 14 10 1213
HUMMEL,JOHN WILLIAM              RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  25 N 01  OFFICER: PRH  REASON:  010  DATE:  03 02 10 0809
REMARKS:  2MAX/CELL SWAP/NEED SPC SPACE
OVER 25            FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER      SMOKER               PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  55 A 01  OFFICER: MED  REASON:  010  DATE:  02 26 10 0336
REMARKS:  NEED SPACE FOR ANOTHER/REHSE/RMN@2MAX
OVER 25            FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER      NON-SMOKER           PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  25 N 01  OFFICER: RTF  REASON:  002  DATE:  02 04 10 1320
REMARKS:  REMOVE SPC PER CPT. PILINGTON/RMN 2MAX
OVER 25            FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER      NON-SMOKER           PROTECTIVE CUSTODY
MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU    10 MAIN MENU         P424SH70
```

```
INMATE 0763423 CLASSIFICATION                              04 14 10 1213
HUMMEL,JOHN WILLIAM                    RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  02 B 01  OFFICER:  RTF  REASON:  002  DATE:  02 04 10 1317
REMARKS:  HOLDING TO RECLASS CELL
OVER 25             FELONY              UNSENTENCED           NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER      NON-SMOKER            PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  25 N 01  OFFICER:  RTF  REASON:  005  DATE:  02 04 10 0844
REMARKS:  RMN SPC1 PER JAIL ADMIN/MHMR???
OVER 25             FELONY              UNSENTENCED           NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER      NON-SMOKER            SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  25 N 01  OFFICER:  LMS  REASON:  010  DATE:  02 01 10 0816
REMARKS:  2MAX/SUSPENSE DATE REVIEW
OVER 25             FELONY              UNSENTENCED           NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER      NON-SMOKER            SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

Date: 4/14/2010 Time: 12:13:50 PM

**787**

**App. 0663**

INMATE 0763423 CLASSIFICATION                                    04 14 10 1213
HUMMEL,JOHN WILLIAM                        RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  25 N 01  OFFICER:  DLC  REASON:  010  DATE:  01 26 10 0537
REMARKS:  2MAX/SUSPENSE DATE REVIEW
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  25 N 01  OFFICER:  RGB  REASON:  001  DATE:  01 22 10 1736
REMARKS:  MASS MOVE/CPT PILKINGTON
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  25 O 01  OFFICER:  RGB  REASON:  002  DATE:  01 22 10 1733
REMARKS:  MASS MOVE/CPT PILKINGTON
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU         P424SH70

App. 0664

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                          04 14 10 1213
HUMMEL,JOHN WILLIAM              RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  26 O 01  OFFICER:  DRD  REASON:  010  DATE:  01 17 10 1649
REMARKS:  2.MAX SUSPENSE DATE REVIEW/NO CHANGES
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER:  MED  REASON:  010  DATE:  01 13 10 0548
REMARKS:  SUSPENSE DATE REVIEW/RMN@2MAX
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER:  DRD  REASON:  010  DATE:  01 10 10 1635
REMARKS:  RMN2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

App. 0665

INMATE 0763423 CLASSIFICATION                          04 14 10 1214
HUMMEL,JOHN WILLIAM              PACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  26 O 01  OFFICER:  CMB  REASON:  C1   DATE:  01 07 10 0713
REMARKS:  RMN2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25           FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER    NON-SMOKER         SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER:  CMB  REASON:  C1   DATE:  01 03 10 1318
REMARKS:  RMN2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25           FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER    N  SMOKER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER:  RGB  REASON:  C14  DATE:  12 31 09 2033
REMARKS:  MUST NOTIFY CHIEF DENNIS BEFORE RELEASED
OVER 25           FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER    N  SMOKER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU  10 MAIN MENU        P424SH70

App. 0666

076342
HUMMEL,JOHN WILLIAM
11/04/75    W    M

# Tarrant County Sheriff's Department
## Confinement Bureau
### Primary Inmate Classification Security Level Assessment



OVERRIDE Reasons
HIGH PROFILE
SPC / PER
CHIEF DENNIS

HIGH RISK
☐ ASSAULTIVE
☒ ESCAPE
☐ SUICIDAL
☐ MHMR
☐ OTHER

SPECIAL NEEDS
☒ PROTECTIVE CUSTODY
☐ MEDICAL
☐ JUVENILE
☐ HANDICAP
☒ OTHER
HIGH PROFILE

CFMT-116    GPC-1636    REVISED 9/15/97

**App. 0667**

Inmate Name: ___   HUMMEL,JOHN WILLIAM
            11/04/75    W       M
Inmate CID: ___

**Circle whether override of security designation was recommended:**    (YES)        (NO)

**Written explanation of Override:**

_HIGH PROFILE_
_SPC I PER CHIEF DENNIS_

**Circle the recommended security designation:**

| HIGH MAXIMUM | (HIGH CUSTODY) | MEDIUM ASSAULTIV E-ESCAPE | MEDIUM | MEDIUM PRE-SENTENCED | MIN.PRE. | MINIMUM | LOW MINIMUM | VERY LOW MINIMUM |
|---|---|---|---|---|---|---|---|---|

**Recommended Housing Assignment:**    _260  01_

**Signature of CLASSIFICATION OFFICER and Assessment Date:**    _R Brown  69131    12/31/09    1902_
_R Brown_

**Supervisory Review of Override:**
Circle whether Override of Security was approved or disapproved
(If 'DISAPPROVED' is circled, provide a written explanation)    DISAPPROVED        (APPROVED)

**Written Explanation of Disapproval:**

_____

_____

**Circle Final Security Designation:**

| HIGH MAXIMUM | (HIGH CUSTODY) | MEDIUM ASSAULTIV E-ESCAPE | MEDIUM | MEDIUM PRE-SENTENCED | MIN.PRE. | MINIMUM | LOW MINIMUM | VERY LOW MINIMUM |
|---|---|---|---|---|---|---|---|---|

**Signature of SUPERVISOR and Date of Override Review:**    _Sgt ___    _Sgt ___    _57237_    _12/-/4/10_

INT-116   GPC-1636

**App. 0668**

## AFFIDAVIT OF DR. SUSAN HARDESTY

I, Dr. Susan Hardesty , state and declare as follows:

1. I am currently employed as the Vice President and Medical Director for The Menninger Clinic in Houston, Texas. I am board-certified in psychiatry and in forensic psychiatry. I am licensed to practice medicine in Texas and South Carolina.

2. I was previously retained by post-conviction counsel for John Hummel to perform a mental health assessment of Mr. Hummel and to review testimony presented by Dr. Antoinette McGarrahan, the defense's neuropsychologist, on behalf of Mr. Hummel during his capital trial.

3. Post-conviction counsel for Mr. Hummel have asked that I review certain portions of the State's response to my affidavit, including portions of affidavits submitted by Mr. Hummel's trial counsel. The State's response, and both affidavits from trial counsel, focus on the fact that trial counsel's expert, Dr. Antoinette McGarrahan, was unable to diagnose Mr. Hummel with post-traumatic stress disorder ("PTSD") and argues that my diagnosis of Mr. Hummel was incorrect. The State and trial counsel also noted that Dr. McGarrahan testified about "attachment issues" at trial, implying that there is nothing to distinguish her testimony in that regard from my affidavit. These responses mischaracterize my diagnosis and opinions regarding Mr. Hummel, and undervalue the importance and significance of attachment trauma.

4. During the course of my examination of Mr. Hummel and the preparation of my affidavit, it was clear to me that Mr. Hummel did not suffer a discrete physical injury or singular traumatic event that would support a diagnosis of PTSD as defined in the Diagnostic and Statistical Manual of Mental

EXHIBIT 42 Page 1 **838**

App. 0669

Disorders, Fourth Edition Revised ("DSM-IV-TR"). I did not diagnose Mr. Hummel with PTSD according to the diagnostic criteria of the DSM-IV-TR and did not state so in my prior affidavit.

5. Rather, I stated that Mr. Hummel suffered from complex post-traumatic stress disorder due to attachment trauma. This is not a DSM-IV-TR diagnosis but rather a clinical diagnosis founded in learned opinion in a rapidly growing body of psychiatric, psychological and neuroscience literature on neuron connectivity in childhood and the results of deprivation, trauma or neglect on development. "Attachment trauma" does not refer to a specific injury or discrete event. Rather, the traumatic experience is the result of neglect and a lack of stable, nurturing parenting or having disruptions in the development of early childhood relationships with parents and caregivers. As I described in my previous affidavit, this type of trauma is characterized by extensive, consistent and repetitive neglect. Part of the difficulty in identifying this type of trauma is the fact that it is characterized by the absence of caring, predictable parental responses, rather than the observation of active abuse (such as physical, sexual or verbal abuse).

6. In his affidavit, Larry Moore suggests that based on his prior experience with "Ph.D. level social scientists" he did not believe any additional expert was needed to evaluate Mr. Hummel besides Dr. McGarrahan. While I cannot speak to Mr. Moore's depth of knowledge regarding attachment trauma, I can unequivocally state that as an M.D. trained in Psychiatry and Neurology, I myself would not have recognized and fully understood the impact of attachment trauma in Mr. Hummel prior to my 10 years of experience working in psychology and psychiatry with a focus on trauma-informed care.

2

EXHIBIT 42 Page 2 **839**

App. 0670

7. Similarly, I would not expect a neuropsychologist, even one with forensic training, to be able to recognize and understand the full extent of attachment trauma without specific experience in the care and treatment of these patients or without research experience in this very specific aspect of brain development. Attachment trauma is a psychological construct that describes the impact of persistent neglect and disruptions to early childhood relationships on a person's sense of self and personality.

8. Psychological testing and neuropsychological testing are normed tests designed to compare performance to a certain population. Interpretation of these tests is based on absolute findings (e.g., IQ tests, reading level, math level, etc.) and on clinical history and background. The tests are designed to show deficits in function compared to a normative group. They do not reveal the etiology of the deficits. Personality tests will show patterns suggestive of certain behavioral clusters associated with personality disorders, but which may also be related to other types of psychiatric illness. They do not define personality disorders nor do they speak to etiology. Personality disorders can be associated with childhood neglect and abuse, but symptoms described in the standard tests can also be associated with post-traumatic stress disorders, depressive disorders and other anxiety disorders as interpreted in context of the clinical history. As such, Dr. McGarrahan's testing results alone would not have revealed the depth of Mr. Hummel's underlying traumatic illness. They would have to be interpreted in the context of history and clinical judgment which would then be applied to the data to formulate a diagnosis or diagnostic theory.

9. Recognizing attachment trauma and its full impact on a person requires skilled, specialized training and experience in that specific field. There is evidence that attachment trauma can lead to depression, personality disorder,



3

EXHIBIT 42 Page 3 **840**

App. 0671

and dissociation under severe stress. Mr. Hummel suffered from each of these conditions throughout the course of his life as well as in the events leading up to and after his crime.

10. The affidavit of Mr. Moore states that Dr. McGarrahan indicated that Mr. Hummel consistently denied having any attachment issues. It is very unlikely that a person who has suffered the degree of emotional neglect in childhood that leads to this type of trauma will describe themselves as having experienced "trauma" or even bad childhood experiences. Children lack the insight necessary to realize when they receive severely neglectful parenting. In their eyes, their life experience is normal, but in reality, their psychological and physiological brain development is negatively impacted by the lack of parental nurturing and care. I and the other clinicians I work with regularly have to teach our patients about the effects of the emotional neglect they have experienced in their lives. By living through the neglect and unstable parenting of his childhood, it is not surprising that Mr. Hummel lacks the necessary insight to recognize his experience as unusual or harmful. Similarly, Mr. Hummel's sister, Neata Woody, was neglected by their parents and thus would lack the necessary insight as well.

11. It is clear that Mr. Hummel's trial counsel and Dr. McGarrahan observed the signs of Mr. Hummel's attachment trauma—they admit that their own investigation into Mr. Hummel's background led them to inquire about these very issues of Mr. Hummel and his family. They reported Mr. Hummel's mother's description of an extremely neglectful and at times sadistic parenting style. But this data was not extrapolated to the testing results in a way that suggests an understanding of attachment trauma. To fully understand and develop the necessary evidence (and testimony) regarding this attachment trauma, it would have been necessary for Mr. Hummel's trial



4

EXHIBIT 42 Page 4 **841**

App. 0672

counsel to consult with a psychologist or psychiatrist specifically trained and working in this field. Without such consultation, it is unsurprising that they were unable to adequately present this information to Mr. Hummel's jury, nor that they continue to misunderstand the nature of my diagnosis of attachment trauma.

12. The interpretation of the testing results in testimony of Dr. McGarrahan spoke to personality traits only in the context of personality disorder and broad generalizations of behavior. While the description of the absence of nurture was present, the conclusions drawn were not fully illustrative of the stresses, the behaviors and physiological and psychological results of these stressors. Particularly missing were the elements of brain structural change, certain deficits in executive function, and a linkage of these to the period of time during which Mr. Hummel was ill and unable to provide for his family, and was not supported emotionally by them.

13. I have read and reviewed this five-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on March 2ι , 2014 in ___Houston___, Texas.

_Susan G Hardesty MD_
Dr. Susan Hardesty

Subscribed and sworn to before me on March 26, 2014.

Notary Public, State of Texas



ELIZABETH GOLMON
Notary Public, State of Texas
My Commission Expires
December 17, 2017

5

EXHIBIT 42 Page 5   **842**

App. 0673

# AFFIDAVIT OF LAURA SOVINE

I, Laura Sovine, state and declare as follows:

1.  I recently changed my name after being married on August 9, 2013.  My name before marriage was Laura Smith, and that is the name on my prior affidavit I signed for Mr. Hummel on May 22, 2013.

2.  I was previously retained by post-conviction counsel for John Hummel to provide an affidavit discussing Mr. Hummel's life history and the various social and psychological factors in his life that contributed to shaping his character and actions.  Post-conviction counsel for Mr. Hummel asked that I review certain portions of the State's response to my affidavit, including portions of affidavits submitted by Mr. Hummel's trial counsel.

3.  The State suggests that the testimony of Dr. Antoinette McGarrahan, a defense neuropsychologist, at Mr. Hummel's trial sufficiently discussed how the facts of Hummel's life affected him.  The State characterizes Dr. McGarrahan's testimony as describing Mr. Hummel's "attachment issues" and their impact on how Hummel "thought, felt, and acted."  The State's response further suggests that there are no significant differences between my affidavit and Dr. McGarrahan's testimony.  This argument, however, misunderstands the distinction between the fields of Psychology and Social Work.  In doing so, the State's answer fails to appreciate the important difference between the testimony Mr. Hummel's jury heard from Dr. McGarrahan and the testimony I believe I could have offered in mitigation of his sentence.

4.  The contents of my affidavit, and therefore the substance of what I might have testified to at Mr. Hummel's trial, focusses on how the attachment trauma Mr. Hummel experienced as a child created a pattern of failure and

1

EXHIBIT 43 Page 1   **844**

App. 0674

alienation in his life that was compounded through his interactions with others. As someone who holds a Master's of Science in Social Work, my training and educational focus differs from someone who has received advanced degrees in the field of Psychology. Although related in the problems each seek to address, namely assisting individuals to better relate to the world around them, psychology and social work focus on different aspects of that problem. Psychology tends to focus on the mental processes of the individual and on diagnosing any impairment in those processes. Social work focusses on the interactions between individuals, between the individual and groups, and between individuals and society, in order to understand how systems and social forces are at play in that individual.

5.  My training and education has focused on psychological concepts such as Social Learning Theory, which looks at how social systems interact together and act on an individual. Development Theory is a related concept that focuses on how the impact of social forces on individuals in the early stages of their lives causes the individuals either to thrive or to be impaired. Although these concepts are included within the field of psychology, they are utilized by social workers to focus on the individual's interaction with social forces around him.

6.  Importantly, when seeking to understand an individual's life and character, psychology and social work provide different information. A psychologist, using testing and diagnostic measures, can diagnose a specific impairment in the person's mind. While that can provide information about the impulses and emotions the person is feeling, it does not tell the story of how that person's diagnosis relates to their development as a child, their

2

EXHIBIT 43 Page 2   **845**

**App. 0675**

interactions with others, or how certain life events motivated their behavior. And often it does not seek to provide a narrative to understand how the story may have developed, and what kinds of environmental factors came into play for the individual, such as culture, family discipline, relationships, modeling of relationships, religious beliefs, etc. Psychology mostly seeks to diagnose but does not seek to find root causes and therefore explain motivation more clearly.

7. In my previous affidavit related to Mr. Hummel's case, I relied on my training, education, and experience as a social worker to evaluate how the mental health diagnosis of Hummel combined with his childhood development and other life events led him down the path he ultimately followed. Particularly, I believe that his childhood absence of appropriate examples of nurturing and attachment led him to be incapable of stable, affirming attachments and relationships with others. This, in turn, led Mr. Hummel to lack a clear identity of self, exhibited in his abnormal and inappropriate to his age obsession in role-playing games and fantasy, and to his tendency to attempt radical escape when life became difficult. From his childhood and adolescence in South Carolina, to his time in the military, to his adult life in Texas before the crime, Mr. Hummel's life story shows a pattern of creating a new identity for himself that has only a brief success before turning into failure, and which drives him to "clear the game board" for a new start.

8. The testimony of Dr. McGarrahan during Mr. Hummel's capital trial focused on explaining her diagnosis of Hummel's mental health disorder and its symptoms. She touched on the issue of Hummel's childhood development, and she described Hummel's crime as being the result of

3

EXHIBIT 43 Page 3  **846**

App. 0676

negative emotions flooding out after years of repression. However, as a psychologist, Dr. McGarrahan's testimony necessarily centered on the emotions and thoughts within Mr. Hummel's mind. Testimony from someone with a social work background would have presented the jury with the other half of the coin—explaining why and how the stages of Mr. Hummel's life, most importantly his lack of appropriate relationships and nurturing attachments, reinforced his mental impairments and sent him down his life path.

//

//

//

//

//

//

//

//

4

EXHIBIT 43 Page 4  **847**

**App. 0677**

9. Both perspectives are equally important to a complete understanding of an individual's behavior. It is critical to have a psychological evaluation and diagnosis of disorder. But it is also critical to form the narrative of how Mr. Hummel got to that place, how much of it is organic and "nature" vs. how much of it is environmental or "nurture." Had Mr. Hummel had testimony from a social worker during his trial to present this information to the jury, it is possible they would have had a more holistic understanding of him and his motivations.

I have read and reviewed this five page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on March 25 , 2014 in Austin, Texas.



Laura Sovine

Subscribed and sworn to before me on March 25, 2014.

GABRIEL SOLIS
Notary Public, State of Texas
My Commission Expires
January 13, 2016
NOTARY WITHOUT BOND

Notary Public, State of Texas

5

EXHIBIT 43 Page 5 **848**

**App. 0678**