1

1   REPORTER'S RECORD
    VOLUME 7 OF 55
2   TRIAL COURT CAUSE NO. 1184294D
    COURT OF APPEALS NO. AP-76,596
3

4   STATE OF TEXAS          )(    IN THE 432ND JUDICIAL
                            )(
5   VS.                     )(    DISTRICT COURT OF
                            )(
6   JOHN WILLIAM HUMMEL     )(    TARRANT COUNTY, TEXAS

7

8

9        ********************************************

10

         HEARING ON MOTIONS TO SUPPRESS

11       ********************************************

12

13

14

15

16       On the 19th day of January, 2011, the

17  following proceedings came on to be heard in the

18  above-entitled and -numbered cause before the Honorable

19  Ruben Gonzalez, Jr., Judge Presiding, held in Fort

20  Worth, Tarrant County, Texas:

21       Proceedings reported by machine shorthand.

22

23

24            ANGIE TAYLOR, CSR, RPR
              Official Court Reporter
25             432nd DISTRICT COURT



```
 1                    A P P E A R A N C E S

 2

 3   HONORABLE ROBERT K. GILL - SBOT NO. 07961600
     HONORABLE D. MILES BRISSETTE - SBOT NO. 50511628
 4   Assistant District Attorneys
     401 W. Belknap Street
 5   Fort Worth, Texas  76196
     Phone:  817-884-1400
 6

 7                    Attorney(s) for the State of Texas.

 8


 9
     HONORABLE LARRY M. MOORE - SBOT NO. 14357800
10   HONORABLE FRED CUMMINGS - SBOT NO. 05225400
     4210 West Vickery Boulevard
11   Fort Worth, Texas 76107
     Phone:  817-338-4800
12

13
                     Attorney(s) for the Defendant.
14

15

16

17

18

19

20

21

22

23

24

25
```

1

CHRONOLOGICAL INDEX
VOLUME 7
2     HEARING ON MOTION TO SUPPRESS

3
JANUARY 19, 2011                              PAGE       VOL
4

| 5 | STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|
| 6 | Jason Charbonnet | 6,71 | 18,84 | | 7 |
| 7 | Jorge Bernal | 85,129 | 124,132 | | 7 |
| 8 | Ernesto Enriquez | 134,160 | 145,162 | | 7 |
| 9 | | | | | |
| 10 | Proceedings Adjourned................. | | | 165 | 7 |
| 11 | Court Reporter's Certificate........... | | | 166 | 7 |

12

13              ALPHABETICAL WITNESS INDEX

| 14 | WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|
| 15 | Bernal, Jorge | 85,129 | 124,132 | | 7 |
| 16 | Charbonnet, Jason | 6,71 | 18,84 | | 7 |
| 17 | Enriquez, Ernesto | 134,160 | 145,162 | | 7 |

18

19                  EXHIBIT INDEX

| 20 | STATE'S PRETRIAL NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|---|
| 21 | 16 | Video Clip | 119 | 120 | 7 |
| 22 | 32-A | Search Warrant-Camera | 76 | 76 | 7 |
| 23 | 34 | Consent to Search Dr. Ford | 15 | 15 | 7 |
| 24 | | | | | |
| 25 | | | | | |

1
<u>EXHIBIT INDEX</u>

<u>STATE'S PRETRIAL</u>

2   <u>NO.</u>          <u>DESCRIPTION</u>          <u>OFRD</u>     <u>ADMT</u>     <u>VOL</u>

| | | | | | |
|---|---|---|---|---|---|
| 3 | 38 | Order Declaring Incorporation | 76 | 76 | 7 |
| 4 | | | | | |
| 5 | 39 | Printout from NLETS | 82 | 82 | 7 |
| 6 | 40 | Printout from NLETS | 82 | 82 | 7 |
| 7 | | | | | |
| 8 | 41 | Blowup Diagram-Photos of Port | 98 | 98 | 7 |

9

10  <u>DEFENDANT'S PRETRIAL</u>

<u>NO.</u>          <u>DESCRIPTION</u>          <u>OFRD</u>     <u>ADMT</u>     <u>VOL</u>

| | | | | | |
|---|---|---|---|---|---|
| 11 | | | | | |
| | 1 | NCIC/NLETS Record Display | 159 | 159 | 7 |
| 12 | | | | | |

13

14

15

16

17

18

19

20

21

22

23

24

25

1    PROCEEDINGS
2         (January 19, 2011 ~ 9:06 a.m.)
3         (Open court, Defendant present)
4         THE COURT:  We're on back on the record.
This is in the State of Texas versus John Hummel case.
6         Are both sides ready to proceed in the
7    second day?
8         MR. BRISSETTE:  The State's ready, Your
9    Honor.
10        MR. MOORE:  Yes, we're ready, Judge.
11        THE COURT:  Mr. Brissette, I believe the
12   last time we ended was the video was being played.  Are
13   you ready to resume the play of the video?
14        MR. BRISSETTE:  I believe so, Your Honor.
15   That would be State's PT-37.
16        THE COURT:  Thank you.
17        MR. BRISSETTE:  Judge, with the recess last
18   time with the DVD, it's put it back to the beginning.
19   We need to move forward in time for you.  I guess we'll
20   try to catch where we were in the break.  There's no
21   counter on the actual DVD for us at this time from the
22   original evidence.
23        THE COURT:  I understand.
24        (State's Pretrial Exhibit No. 37 published)
25        THE COURT:  Let's go ahead and take a

6

1    15-minute break.  Thank you.
2         (Recess from 10:45 a.m. to 11:13 a.m.)
3         (Open court, Defendant present)
4         THE COURT:  We're back on the record.
5         Both sides ready to proceed?
6         MR. BRISSETTE:  The State's ready.
7         MR. MOORE:  Yes, Judge.
8         THE COURT:  All right, Mr. Brissette.  You
9    may continue.
10              JASON CHARBONNET,
11   having been previously first duly sworn, testified as
12   follows:
13        DIRECT EXAMINATION (Cont'd)
14   BY MR. BRISSETTE:
15        Q.  Detective, we just had an opportunity, through
16   the last part of last night and this morning, to watch
17   your interview, the trio of investigators from Texas
18   interview with Mr. Hummel in San Diego; is that correct?
19        A.  Yes.
20        Q.  At some point in the early morning hours of
21   that Monday morning, did the three of you retire to a
22   hotel to sleep for awhile?
23        A.  Yes.
24        Q.  Prior to going to bed, did you have an occasion
25   to come in contact with any local law enforcement in the

8

1    state of California?
2         A.  Yes.
3         Q.  Who were they?
4         A.  An investigator from the Oceanside Police
5    Department and from the San Diego Police Department.
6         Q.  Let's start with the San Diego Police
7    Department.  Was there at some point in time, to your
8    knowledge, an attempt to locate based on a motor vehicle
9    in question?
10        A.  Yes.
11        Q.  And the attempt to locate was for what vehicle?
12        A.  For Mr. Hummel's vehicle.
13        Q.  Are you aware of any authorities, local law
14   enforcement in the State of California, that were able
15   to find that vehicle?
16        A.  Yes.
17        Q.  And which agency was that?
18        A.  The San Diego Police Department.
19        Q.  And what did they do with the vehicle, to your
20   knowledge, at that time?
21        A.  They took custody of it and towed it to their
22   impound yard into a secure facility.
23        Q.  They have a homicide yard?
24        A.  They do.
25        Q.  And the secure facility, could you describe it

1    for me?
2         A.  It's a -- it's a very large warehouse.
3         Q.  Is the vehicle locked inside the warehouse?
4         A.  Yes.
5         Q.  Were there certain security measures that you
6    observed while you were there?
7         A.  Yes.
8         Q.  What were they?
9         A.  You had to get through -- you had to call
10   through a security gate, and then it was opened by
11   someone somewhere whenever they allowed you access into
12   it.
13        Q.  Was there an alarm on the building as well?
14        A.  I believe so, yes.
15        Q.  This other agency you met with, who was that?
16        A.  The Oceanside Police Department.
17        Q.  Did you meet with one of their homicide
18   detectives?
19        A.  I did.
20        Q.  Do you remember that detective's name?
21        A.  Investigator Darrah.
22        Q.  Does he have a first name?
23        A.  George.
24        Q.  And Investigator Darrah, did you have an
25   occasion to speak to him in the early morning hours on

11

1  Monday before you went to bed?
2      A.  Yes, we did.
3      Q.  And did you meet him face to face after you had
4  gotten some sleep Monday day -- Monday?
5      A.  Yes.
6      Q.  The Defendant in this case told you about a
7  motel room in the city of Oceanside?
8      A.  Yes.
9      Q.  Is that in the county of San Diego?
10     A.  Yes, it is.
11     Q.  In the state of California?
12     A.  It is.
13     Q.  Did Investigator Darrah tell you that he had
14  done anything to secure that facility?
15     A.  Yes, he did.
16     Q.  And what -- based on your understanding, what
17  efforts were done to secure the room that Mr. Hummel
18  told you about?
19     A.  They did -- they stated they did an initial
20  cursory search of the inside of the room to make sure
21  nobody was in it and then placed an officer outside the
22  door and waited for a -- for Mr. Darrah to arrive with
23  any type of search warrants.
24     Q.  Did the investigators from Texas meet up at
25  Oceanside and visit with this homicide detective?

---

1      Q.  Were you, the three together, in the same room
2  discussing the facts and explaining what took place to
3  Investigator Darrah?
4      A.  The three, meaning?
5      Q.  Yourself, Darrah, Rizy.
6      A.  Yes.
7      Q.  Did you go with Investigator Darrah when this
8  was brought to a -- a Judge out there?
9      A.  Yes.
10     Q.  And did you get a chance to meet the Judge?
11     A.  I did.
12     Q.  And was this gone over in the Judge's presence?
13     A.  Yes.
14     Q.  Did Officer Darrah -- Investigator Darrah sign
15  this in the Judge's presence?
16     A.  Yes.
17     Q.  And did the Judge issue the search warrant?
18     A.  Yes.
19     Q.  And what is the warrant for?
20     A.  It's for the search of the hotel room at the
21  Coast Inn and for his vehicle.
22     Q.  Were they both at the same location?
23     A.  No.
24     Q.  Is it your understanding that the law out there
25  allows to have multiple locations in one warrant?

---

10

1      A.  Yes.
2      Q.  And was a search warrant produced as a result
3  of the conversations?
4      A.  Yes.
5      Q.  Were you the affiant on the search warrant?
6      A.  No.
7      Q.  Were you precluded under the laws of California
8  to be the affiant?
9      A.  Yes.
10     Q.  Who was the affiant?
11     A.  George Darrah.
12         MR. BRISSETTE:  May I approach, Your Honor?
13         THE COURT:  You may.
14     Q.  (BY MR. BRISSETTE)  Detective, I'm going to
15  show you what's been marked for identification purposes
16  as PT-30.  Take a second to look at PT-30 and see if you
17  recognize the document.
18     A.  Yes, I do.
19     Q.  And is PT-30 the search warrant that was
20  prepared in California with respect to this case?
21     A.  Yes.
22     Q.  How did Investigator Darrah come up with the
23  facts that related to the Texas side of this case?
24     A.  They were -- they were given to him by myself
25  and Investigator Rizy.

---

12

1      A.  Yes.
2      Q.  Did that catch you by surprise then?
3      A.  Very.
4      Q.  Were you able to -- were the two scenes able to
5  be processed while you were out there?
6      A.  Yes.
7      Q.  And were items collected from those scenes?
8      A.  Yes.
9      Q.  At some point in time, you arrived back in the
10  state of Texas?
11     A.  Yes.
12     Q.  Did you bring Mr. Hummel back with you?
13     A.  No.
14     Q.  Did you have an occasion to prepare a search
15  warrant at some point for a Sony camera?
16     A.  I did.
17     Q.  Can you explain to the Court the nature of
18  preparing a search warrant for the Sony camera?
19     A.  The camera was in the possession of a female
20  civilian, who arrived on scene before -- or at the same
21  time or a little bit before Officer Worthy did.  She
22  began to take pictures on her personal camera and
23  explained -- when she came in to talk to me, she
24  explained to me that she had photos of the -- of the
25  fire on the camera, so it was seized at that time by me.

13

1    Q.   And did you execute a warrant SW-20317 to take
2    the images off that camera?
3    A.   Yes.
4    Q.   And you've had a chance to look at PT-32 prior
5    to coming up here, and that's the -- the affidavit for
6    that warrant?
7    A.   Yes.
8    Q.   Did you have an occasion to -- based on what
9    Mr. Hummel told you and some investigation you did on
10   your own, to figure out where Mr. Hummel was employed?
11   A.   Yes.
12   Q.   And where was that?
13   A.   It was at the -- it's now called the Harris
14   Methodist Hospital in Cleburne.
15   Q.   Was he being paid, based on your understanding,
16   directly or indirectly by Harris?
17   A.   Indirectly.
18   Q.   Who did he work for then?
19   A.   A company called Champion National Security.
20   Q.   Through your investigation, did you come in
21   contact with an individual by the name of William Ford,
22   who is a medical doctor at that hospital?
23   A.   Yes.
24   Q.   Did you receive certain equipment from
25   Dr. Ford?

14

1    A.   I did.
2    Q.   What did you receive from Dr. Ford?
3    A.   I received his CPU from his office computer.
4    Q.   I'm going to get techie on you for a second.
5    CPU is the chip?
6    A.   The actual tower is what we received from him.
7    Q.   So you -- the whole personal computer?
8    A.   Yes.
9    Q.   Would that be a Compaq Presario?
10   A.   It was.
11   Q.   And prior to taking this from Dr. Ford, did you
12   give him a consent to search form?
13   A.   I did.
14   Q.   And did Dr. Ford sign that in your presence?
15   A.   He did.
16        MR. BRISSETTE:  Approach the witness, Your
17   Honor?
18        THE COURT:  You may.
19   Q.   (BY MR. BRISSETTE)  I'm going to show you
20   what's been marked for identification purposes as PT-34.
21   Do you recognize PT-34?
22   A.   Yes.
23   Q.   And what is PT-34?
24   A.   It's a consent to search form.
25   Q.   For what?

15

1    A.   For Dr. Ford's computer.
2    Q.   And what date did you present that to Dr. Ford?
3    A.   On January the 5th of 2010.
4    Q.   And did Dr. Ford have a chance to look at it
5    and sign it?
6    A.   Yes.
7    Q.   And what did you leave with him in addition to
8    the consent to search form?
9    A.   We left him with a -- copy of -- of this
10   with -- showing what we took from him.
11   Q.   Did you take something back to Tarrant County
12   from Johnson County that day in addition to this?
13   A.   Yes.
14   Q.   And did you record the serial number that you
15   brought back?
16   A.   I did.
17   Q.   And that's on the consent to search?
18   A.   It is.
19        MR. BRISSETTE:  Your Honor, at this time we
20   offer PT-34 for the purposes of this hearing, tender to
21   Defense.
22        MR. CUMMINGS:  We have no objection to the
23   admission of State's Exhibit PT-34 for purposes of this
24   hearing, Your Honor.
25        THE COURT:  It's admitted.

16

1        (State's Pretrial Exhibit No. 34 admitted)
2        THE COURT:  From a housekeeping standpoint,
3    that -- that concludes all the evidence in the evidence
4    list -- well, except for PT-16, I believe?
5        MR. BRISSETTE:  Yes, Your Honor, and I'll
6    have that this afternoon.
7        THE COURT:  All right.  Thank you.
8        May I have just a moment?
9        MR. BRISSETTE:  Sure.
10       THE COURT:  You may proceed.
11   Q.   (BY MR. BRISSETTE)  Detective, I want to direct
12   your attention back to PT-15.  I forgot to ask you
13   yesterday about if the PD in the Medical Examiner's
14   Office were able to identify the individuals that were
15   found in the three rooms.  In the AB corner, do you know
16   who was found deceased in that room?
17   A.   Yes.
18   Q.   And who was that?
19   A.   Clyde Bedford.
20   Q.   In the CD corner, do you know who that
21   individual was?
22   A.   Yes.
23   Q.   And who was that?
24   A.   Jodi Hummel.
25   Q.   And do you know how Ms. Hummel was identified?

19

1    A.   As later identified by the Medical Examiner's
2    Office.
3    Q.   Do you know what means they had to use?
4    A.   I do not know.
5    Q.   And then the AD corner, do you know who was
6    found in that room?
7    A.   Joy Hummel.
8    Q.   Do you know if Joy was pregnant or not at the
9    time?
10   A.   She was.
11   Q.   Was Joy Hummel, to your knowledge, related to
12   Mr. Hummel in some way?
13   A.   Yes.
14   Q.   How were they related?
15   A.   By marriage.
16   Q.   The individual found in the CD corner, Jodi,
17   how was she related to Mr. Hummel?
18   A.   She was the daughter of Joy and Mr. Hummel.
19   Q.   And in the AB corner, Mr. Bedford, how was he
20   related to Mr. Hummel?
21   A.   He is the father-in-law of Mr. Hummel.
22   Q.   Would he be Joy's father, then?
23   A.   Yes.
24   Q.   And Jodi's grandfather?
25   A.   Yes.

18

1        MR. BRISSETTE:  Pass the witness.
2        THE COURT:  Cross-examination.
3              CROSS-EXAMINATION
4    BY MR. CUMMINGS:
5    Q.   Detective Charbonnet, did you use anything to
6    prepare for your testimony here today?
7    A.   My case report.
8    Q.   Is that the white book that you have at your
9    left elbow?
10   A.   It is.
11       MR. CUMMINGS:  Your Honor, may I approach
12   and take a brief period of time to look through the
13   white notebook there?
14       THE COURT:  That will be fine.  We'll be
15   off the record.
16       (Recess from 11:26 a.m. to 11:46 a.m.)
17       (Open court, Defendant present)
18       THE COURT:  All right.  Back on the record.
19   You may proceed.
20       MR. CUMMINGS:  Thank you, Your Honor.
21   Q.   (BY MR. CUMMINGS)  Detective Charbonnet, thank
22   you for letting me look at your notebook there.  And I
23   believe you told me that's the entirety of the
24   documentation that you used in preparation for your
25   testimony; was that correct?

20

1    A.   This file, and I have my photos there.
2    Q.   Would you look at page 264 and just tell me
3    what that is?  I have a copy of that, but I haven't, for
4    the life of me, figured out what it is.  It appears to
5    be a fax of three pages, I believe, from San Diego to
6    here to the D.A.'s office.  I'm not sure.
7    A.   I can't tell you exactly where it came from.
8    Q.   Just to be sure I picked the right page number,
9    that's some sort of a fax cover sheet?
10   A.   Is this the page you're referring to?
11   Q.   Yes.  Xerox?
12   A.   It doesn't have an exact place that it came
13   from.
14   Q.   Okay.  Would you -- further in your book, page
15   519 in your book, there's a series of pages 516 to 519,
16   I want to talk about.  Let me know when you're there.
17   A.   Okay.
18   Q.   516, and on, appear to be the crime scene log
19   at the fire at 600 Little School Road; is that correct?
20   A.   Yes.
21   Q.   The pages that are contained within the sheet
22   protector there on 519, what are those?
23   A.   That appears to be part of the crime scene log,
24   also.
25   Q.   Okay.  So 516 --

20

1        MR. CUMMINGS:  May I approach the witness,
2    Your Honor?
3        THE COURT:  You may.
4    Q.   (BY MR. CUMMINGS)  516, 17 and 18 are -- are
5    departmental forms, correct?
6    A.   Yes.
7    Q.   These loose pieces of paper, are those
8    continuations of the crime scene log after y'all ran out
9    of their forms, or -- what are they?
10   A.   They appear to be.
11   Q.   Okay.  Are they numbered -- excuse me.  Are the
12   times consistent with following the last where it shows
13   that you entered the crime scene at 14:40 and left at
14   14:40 -- 56?
15   A.   You said 14:56?
16   Q.   That's the last entry on the printed form here
17   on page 518.
18   A.   And then reentered it, yeah.
19   Q.   So it -- okay.  Thank you.
20        You've given each of those loose-leaf pages
21   to the D.A.'s office in addition to everything else
22   within that white notebook, have you not?
23   A.   I have.
24   Q.   Okay.  I've been provided pretty much all of
25   your work, I suspect.  There is something that I got

23

1  early on called Discovery 1. It's a DVD that contains
2  what appears to be all the pages within that notebook
3  that you just shared with me. Did you prepare that, or
4  did you provide that to someone else to prepare that --
5  that DVD?
6     A. I didn't provide it.
7     Q. Okay. You are a detective with the Kennedale
8  Police Department, and I believe you testified that you
9  had prior service with Mansfield?
10    A. Yes.
11    Q. Where did you go to the police academy?
12    A. Tarrant County College.
13    Q. And I'm sorry, I've forgotten. When did you
14 graduate?
15    A. 2001.
16    Q. When you went to the course there at Tarrant
17 County, were you already employed at Mansfield, or did
18 you get your first position after you graduated?
19    A. After I graduated.
20    Q. When did you go to work for Mansfield?
21    A. I believe it was maybe May in their -- their
22 marshal's office.
23    Q. May of 2001?
24    A. Yes.
25    Q. Did you remain within the marshal's office

---

24

1  this case. How many other detectives or investigators
2  are there with the Kennedale Police Department?
3     A. Detective Dagnell is the only other one that
4  entered, I believe, one thing into evidence for us, and
5  that was it.
6     Q. I'm just trying to get a feel for how big the
7  investigative section is of that agency.
8     A. Three.
9     Q. Three? Okay. And -- and Carlson and yourself
10 and Dagnell?
11    A. Yes.
12    Q. Thank you.
13       You are also certified as an arson
14 investigator, correct?
15    A. Yes.
16    Q. Have you ever worked as a firefighter?
17    A. No.
18    Q. When did you -- or strike that.
19       How did you attain that certification,
20 arson investigator?
21    A. Through the Kennedale Fire Department.
22    Q. What is involved in order to get that
23 certification?
24    A. A 128-hour course.
25    Q. Where did you take that course?

---

22

1  while you were there at Mansfield?
2     A. No.
3     Q. What were your assignments there at Mansfield?
4     A. In what part?
5     Q. You worked at Mansfield from 2001 until when?
6     A. April of 2002.
7     Q. Okay. And then is that when you moved to
8  Kennedale?
9     A. Yes.
10    Q. Did you work for the fire department there at
11 Mansfield at all?
12    A. No.
13    Q. Had you had fire -- experience as a firefighter
14 prior to going to work at Mansfield?
15    A. No.
16    Q. When you went to work for Kennedale, what was
17 your assignment initially?
18    A. Patrol.
19    Q. When did you move to the C -- the criminal
20 investigations unit?
21    A. Almost five years ago.
22    Q. 2005 or 2006?
23    A. I -- I can't be exact on the exact date. I
24 believe it was around five years ago, so 2005.
25    Q. Sergeant Carlson and yourself are involved in

---

24

1     A. Kennedale Fire Department.
2     Q. Who taught it?
3     A. It was put on by several different instructors,
4  but Kennedale Fire Department was involved in it, also.
5     Q. Are there -- are you the only arson
6  investigator in the city of Kennedale?
7     A. No.
8     Q. Who else?
9     A. Detective Dagnell, and there's others in the
10 fire department now.
11    Q. Okay. Some agencies like Fort Worth, I
12 believe, use cross-trained firefighters, send them back
13 to the police academy. Apparently, Kennedale goes to
14 the police department, finds somebody interested and
15 trains them. Is that accurate or fair to say?
16    A. Yes.
17    Q. Okay. Prior to this fire, how many fires have
18 you investigated as far as arson's concerned?
19    A. Two.
20    Q. When did you attain the certification of arson
21 investigator?
22    A. 2006.
23    Q. Had you received any supplemental training in
24 the area of arson investigation?
25    A. No.

1  Q.  There are some times available to us from all
2  sorts of sources involved in this case, such as the
3  police Unit 51, the recording that we partially observed
4  yesterday.  Is it possible that the -- let me ask it
5  just straightaway.
6           Appears to be two to three minutes'
7  difference between the dispatch logs and the video on --
8  that comes from the police unit.  Is there any
9  coordination that goes on as far -- is that possible
10  that there is a variance of a -- of a few minutes from
11  the different sources?
12  A.  To be honest with you, I -- I don't know.
13  Q.  Okay.  You never have sat down and -- and made
14  the comparison or look to see -- for instance,
15  there's -- there's indications from your agency dispatch
16  from the dispatcher, so-and-so arrived on the scene.  I
17  believe it's Worthy that was driving that unit, was it
18  not?
19  A.  Yes.
20  Q.  And if there are records that indicate he
21  arrived on the scene at a period -- particular time but
22  the police unit varies from that time, which is going to
23  be more accurate, in your opinion, or do you know?
24  A.  Say this again?
25  Q.  If there's a variance between the police video

1  time indicated on the screen that we watched yesterday
2  and the one that the dispatcher enters in the report
3  indicating when so-and-so got on the scene -- in this
4  case, Worthy -- which -- which would you rely on, or
5  which is -- I mean, I don't --
6  A.  Are you asking me my -- personally which one do
7  I use?
8  Q.  Yes.
9  A.  Dispatch.
10  Q.  Okay.  So if there is some sort of variance --
11  there -- they try to keep theirs accurate.
12           THE REPORTER:  I'm sorry?
13  Q.  (BY MR. CUMMINGS)  If there's some sort of
14  variance, they -- dispatch tries to keep theirs
15  accurate?
16  A.  As far as I -- as far as I know.
17  Q.  Okay.  Was there a sword, a Samurai sword
18  recovered from the crime scene, from the fire scene?
19  A.  Not when I was inside the scene.
20  Q.  Were you -- or did you follow up on some
21  information in your investigation that there was, in
22  fact, a sword and a knife that were located under one of
23  the bodies?
24  A.  I believe so.
25  Q.  Okay.  Would you -- if you need to refresh your

1  memory by looking at your report, please do so.
2           Did you, in fact, learn that there was a --
3  a Samurai sword and some sort of knife, dagger or
4  something located under one of the bodies by a
5  firefighter and given to investigators, according to one
6  of the firefighters?
7  A.  May I look at my report real quick?
8  Q.  Sure.
9  A.  Mr. Cummings, I don't see anything in my report
10  about it.
11  Q.  Thank you for looking.
12           Were the -- were there times that you were
13  conducting your investigation in one location and
14  Sergeant Carlson was on a different tact at a different
15  location?
16  A.  Yes.
17  Q.  Okay.  Did you request that Chief McMurry
18  obtain statements or reports from each of the
19  firefighters who worked that scene?
20  A.  Yes.
21  Q.  Okay.  Do you recall -- and receiving a report
22  from Jacob Foresman that was written -- looks like an
23  interoffice correspondence kind of thing written to
24  Chief McMurry on the 22nd of December, 2009?
25  A.  Yes.

1  Q.  Is that contained within your -- in your
2  notebook?
3  A.  I believe so.
4  Q.  Okay.  Would you refer to that, please?
5  A.  Okay.
6  Q.  Is that a report that was written for you or
7  for your benefit, or is that something that Sergeant
8  Carlson was working?
9  A.  We just requested a statement from each of the
10  firefighters that was out there.
11  Q.  Okay.  So if my recollection is that one of
12  you-all stumbled across this information and followed up
13  on it trying to determine the source of this information
14  and -- and the accuracy of it, it wouldn't have been
15  you?
16  A.  No.
17  Q.  Okay.  All right.  Let's move to a different --
18  you were on the scene at the fire pretty early.  Pretty
19  early.
20  A.  Yes.
21  Q.  Officer Worthy, however, was the first present
22  from the Kennedale Police Department, correct?
23  A.  Yes.
24  Q.  Were you on the scene when John Hummel first
25  appeared at 600 Little School Road?

29

1    A.  Yes.

2    Q.  Do you recall who it was that -- strike that.

3 Let me ask it differently.

        Do you know who John Hummel first contacted

there at the -- at the fire scene?

6    A.  I was told it was Captain Hull.

7    Q.  Did you interview John Hummel at the crime

8 scene?

9    A.  No.

10    Q.  John Hummel then left the crime scene and went

11 to the Kennedale Police Department, correct?

12    A.  Yes.

13    Q.  Did he go, or did he leave and go there at your

14 direction?

15    A.  No.

16    Q.  Were you present when he was instructed or

17 asked to go to the Kennedale Police Department?

18    A.  No.

19    Q.  Did you leave at the same time John Hummel did

20 and go to the Kennedale Police Department?

21    A.  No.

22    Q.  Do you know approximately how long it was

23 before you did?

24    A.  20 minutes, approximately.

25    Q.  So is it fair to say that Mr. Hummel was there

30

1 at the police department for about 15, 20 minutes before

2 you joined him in the room, the interview room?

3    A.  Yes.

4    Q.  Okay.  Do you know who went with him -- strike

5 that.

6        You sponsored a tape or observed a -- a VHS

7 tape that was played yesterday, correct?

8    A.  Yes.

9    Q.  There was an individual that we first saw spell

10 some words for Mr. Hummel in the room, stuff like that.

11 Who was that?

12    A.  Captain Hull.

13    Q.  Okay.  When you arrived at the police station,

14 did you remain outside that interview room for any

15 length of time before you entered it?

16    A.  I don't recall.

17    Q.  Is there a way that you can observe an

18 interview that is taking place in that room from the

19 outside?

20    A.  Yes.

21    Q.  How do you do that?

22    A.  It's -- there's closed-circuit -- or

23 television on the other side of the wall.

24    Q.  Do you recall whether you did that or not?

25    A.  I don't recall.

31

1    Q.  Okay.  Were you present -- strike that.

2        Obviously, when -- when that tape first

3 starts, you're not in the room, you're not there,

4 correct?

5    A.  Correct.

6    Q.  It's just Captain Hull?

7    A.  Correct.

8    Q.  And it appears that Mr. Hummel is in the

9 process of filling out what has been now introduced for

10 purposes of this hearing as PT-18 when we first see an

11 image on the screen, correct?

12    A.  Yes.

13    Q.  Okay.  And it appears obvious, but I'm going to

14 ask you:  Were you present and did you observe Captain

15 Hull read Mr. Hummel his Miranda warning or anything

16 like that prior to having him fill out what is now in

17 evidence as PT-18?

18    A.  No.

19    Q.  Let me direct your attention to PT-20, which is

20 the consent to search form witnessed by Sergeant Carlson

21 later on that morning.  And I don't recall, but were you

22 present when Sergeant Carlson obtained this consent to

23 search from Mr. Hummel?

24    A.  I believe I was in the room.

25    Q.  Okay.  There were times during that video that

32

1 you-all, for various reasons, either the bathroom or

2 smoking, had to remove Mr. Hummel from the room,

3 correct?

4    A.  Remove him?

5    Q.  There were times -- if -- if that term bothers

6 you -- there were times that he exited the room and left

7 to go to the bathroom or to smoke, correct?

8    A.  Yes.

9    Q.  And I believe you testified that you-all used

10 the sally port for him to be able to smoke in -- in some

11 comfort because of the cold --

12    A.  Yes.

13    Q.  -- right?

14        Was he accompanied wherever he was

15 within -- since he was back in the secure area of the

16 police agency, was he always accompanied while he was

17 outside that room and off that video?

18    A.  Yes.

19    Q.  Who accompanied him?

20    A.  It would either be myself, Agent Steele,

21 Sergeant Carlson, Captain Hull.

22    Q.  So it could have been any or -- any of you-all?

23    A.  Yes.

24        THE COURT:  I need to ask a quick question.

25 Now, is Chief Hull Police Chief Hull or Fire Department

33

1  Chief Hull?

2      MR. CUMMINGS:  Captain Hull, Judge, is the

3  fire department, correct?

4      THE WITNESS:  No.

5      MR. BRISSETTE:  Police chief.

6      MR. CUMMINGS:  I'm sorry.  I said it wrong.

7  I should have said police.

8      THE COURT:  Thank you.  All right.

9      Q.  (BY MR. CUMMINGS)  Kennedale is a small- to

10 mid-size agency in the -- in the county?

11     A.  Yes.

12     Q.  Relative to the other agencies?

13     A.  Yes.

14     Q.  How many captains are there?

15     A.  One.

16     Q.  And does he oversee your unit in addition to

17 other responsibilities?

18     A.  As a whole?

19     Q.  Yes.

20     A.  Yes.

21     Q.  Okay.  During the times that he was out smoking

22 in the sally port, were you-all continuing your

23 discussion with him?

24     A.  No.

25     Q.  Did you-all also accompany him to the restroom?

34

1      A.  Yes.

2      Q.  Did you interview him at all at any other

3  location outside of that videotaped interview room?

4      A.  No.

5      Q.  When you -- so if you gave him any instructions

6  regarding a consent to search, those instructions would

7  have taken place in that room and in that room only,

8  correct?

9      A.  Yes.

10     Q.  Tell me about Agent Steele.  He's an ATF agent?

11     A.  Yes.

12     Q.  How did he come to be involved in this case?

13     A.  He is on a multi-jurisdictional task force.

14     Q.  Have you worked for -- with him before?

15     A.  No.

16     Q.  Do you know who called him to be at that fire

17 scene?

18     A.  No.

19     Q.  Was there a decision, prior to entering that

20 room, that he was going to participate in the interview

21 of John Hummel?

22     A.  Say again, please?

23     Q.  It was a bad question.

24         Who decided that he would participate in

25 the interview of John Hummel?

35

1      A.  I did.

2      Q.  Rio, the dog, Rio, the arson dog -- or whatever

3  he is -- did that canine accompany Agent Steele, or was

4  it some other individual who assisted you?

5      A.  Some other individual who assisted me.

6      Q.  Okay.  Did someone there at the fire scene ask

7  Mr. Hummel to accompany them to the police station?

8      A.  Did somebody at -- I believe Captain Hull -- he

9  went with Captain Hull down to --

10     Q.  If he wasn't in your presence, fine, but I

11 mean --

12     A.  He was -- he was not in my presence.

13     Q.  Okay.  So you are not -- you are not aware of

14 the language that he used in order to get him to the

15 police station?

16     A.  No.

17     Q.  Okay.  Whenever you -- you first entered that

18 room with Agent Steele, had you already made your mind

19 up at that point that this individual was a suspect?

20     A.  No.

21     Q.  Okay.  At what -- at some point in the process,

22 though, you did make that decision, did you not?

23     A.  No.

24     Q.  The interview of Mr. Hummel that we observed on

25 tape became accusatory pretty quickly, in my opinion.

36

1  Is that an unfair characterization, in your opinion?

2      A.  If that's your opinion, that's okay.

3      Q.  You were pressing him -- as a matter of fact,

4  early on or throughout that tape, there were several

5  places where either you or Agent Steele pretty much made

6  it clear that you didn't believe him and that he needed

7  to -- to -- you didn't use the word fess up, but

8  essentially tell you the truth because you didn't

9  believe he'd been telling you the truth?

10     A.  Yes.

11     Q.  That -- that occurred fairly early on, did it

12 not?

13     A.  Early on how?  I -- I don't know if I

14 understand your question.

15     Q.  Okay.  Do you recall telling him that he could

16 leave at any time?

17     A.  I don't recall.

18     Q.  Do you know whether or not he was told he could

19 leave by Captain Hull prior to your entry into that room

20 and interviewing the -- Defendant?

21     A.  I can't answer for Captain Hull.

22     Q.  Is it fair to say that he became a suspect

23 during that interview?

24     A.  He was becoming questionable.

25     Q.  One of the tactics or one of the questions that

39

1  you asked him indicated to him -- or indicated to
2  Mr. Hummel that -- that you had a -- a witness that
3  there was an altercation either between Clyde Bedford or
4  Joy Hummel and John. Who was that witness?
5      A.  There was not one.
6      Q.  So that was a fabrication?
7      A.  Yeah.
8      Q.  Have you attended any other police training in
9  addition to your TCJC or TCC, whatever it's called,
10 training?
11     A.  Uh-huh, I have.
12     Q.  Have you -- as a result of becoming a
13 detective, did they send you to some in-service training
14 or additional training?
15     A.  They did.
16     Q.  What type?
17     A.  I attended an interview interrogation school in
18 Meridian, Mississippi, and a statement analysis school
19 in San Angelo, Texas.
20     Q.  How long was the interview interrogation
21 school?
22     A.  40 hours.
23     Q.  Was any one particular technique taught there?
24     A.  Dr. Steve Rhodes.
25     Q.  I'm sorry?

38

1      A.  Dr. Steve Rhodes.
2      Q.  Could you spell the last name?
3      A.  R-h-o-d-e-s.
4      Q.  Was the -- did he teach the Reid Technique?
5      A.  No.
6      Q.  Have you ever been trained in that?
7      A.  No.
8      Q.  And what was the other school -- interview
9  interrogation, what was the other --
10     A.  Statement analysis.
11     Q.  What is -- what is that about?
12     A.  Review and analyze statements to verify
13 inconsistencies, things of that nature.
14     Q.  When did you attend the interview interrogation
15 school, approximately?
16     A.  Approximately 2007.
17     Q.  And the statement analysis?
18     A.  Same year, I believe.
19     Q.  The interview that we observed of -- from 12/18
20 of '09, John Hummel, that interview pretty quickly moved
21 to an effort get an admission of guilt from John Hummel;
22 is that -- is that fair?
23     A.  Just like I answered before just a few minutes
24 ago, if that's what you believed, that it moved real
25 quickly, that's fine. I thought that it moved as

39

1  quickly as -- as the interview did.
2      Q.  Okay. And let me -- let me eliminate a time
3  factor involved.
4      A.  Okay.
5      Q.  But it did evolve to an effort to getting an
6  admission of guilt from the individual, John Hummel?
7      A.  It evolved into possibly trying to -- there was
8  more to the story than what he was saying.
9      Q.  Okay. Was there any discussion with John
10 Hummel off camera regarding his -- obtaining his clothes
11 from him?
12     A.  Not that I was ever privy to.
13     Q.  During the interview that we observed,
14 initially involved you and Agent Steele, and then
15 Sergeant Carlson, by himself, entered the room and
16 appeared to be in there for several minutes talking with
17 John Hummel. During the time that Carlson was in the
18 room, were you participating in the interview; in other
19 words, watching the interview, still active?
20     A.  I don't recall exactly where I was, standing
21 or --
22     Q.  There were knocks on the door and such as that.
23 This investigation at the scene was still going on, was
24 it not?
25     A.  It was.

40

1      Q.  You-all were getting information from people
2  who are actually still actively involved at the fire
3  scene, correct?
4      A.  Not that I knew of.
5      Q.  Okay. There were knocks on the door and that
6  sort of thing and pieces of paper that came in. Do you
7  have any idea what those were? Primarily to Agent
8  Steele while you were talking?
9      A.  I don't know.
10     Q.  Okay.
11     A.  You'd have to ask Agent Steele that.
12     Q.  We have not been provided or seen on camera any
13 consent to search form for the clothing that John Hummel
14 had taken from him there on the 18th. Is there one?
15     A.  No.
16     Q.  About an hour and a half into the tape you --
17 and that may not be -- it's based upon the counter on
18 the software. But approximately an hour and a half into
19 the tape, you administered Miranda warnings to
20 Mr. Hummel, correct?
21     A.  Yes.
22     Q.  Why?
23     A.  I wanted him to make sure that he knew that he
24 was not under arrest and that he was free to leave at
25 any time.

1    Q.  The -- I believe it was during your testimony
2   that you indicated the temperature at -- on that
3   particular day.  Excuse me.  Do you recall that it was
4   particularly cold?
5    A.  Yes.
6    Q.  Excuse me.  When John Hummel left, you had
7   taken from him his shoes, had you not?  He left in
8   stocking feet, did he not?
9    A.  Yes.
10    Q.  He was -- we -- we observed him shivering on
11   the recording.  He walked out of that building pretty
12   much the way we saw him walk out of that room; is that
13   right?
14    A.  Yes.
15    Q.  Short-sleeve shirt and stock -- or sock --
16   shoeless feet?
17    A.  Yes.
18    Q.  Do you know how the VIN was obtained from the
19   van, the Windstar van?
20    A.  No.
21    Q.  It was on the consent to search form, so I
22   assume it was obtained prior to having Mr. Hummel sign a
23   consent to search form; is that fair to say?
24    A.  Sure.
25    Q.  Okay.  Did you-all search the vehicle?

1   investigation, you went back and forth on some
2   occasions; is that correct?
3    A.  At times, yes.
4    Q.  Okay.  When was the crime scene log started?
5    A.  Can I refer to my --
6    Q.  Sure.
7    A.  Okay.
8           THE COURT:  Mr. Cummings, why don't we find
9   a spot where we can take a break for lunch?
10           MR. CUMMINGS:  Anytime, Judge.
11           THE COURT:  Okay.  Well, then, let's take
12   one now while he's reviewing his notes.  Let's go ahead
13   and take a recess for --
14           THE WITNESS:  Don't answer the question
15   right now?
16           THE COURT:  Detective Charbonnet, you may
17   answer the question.
18           THE WITNESS:  I'm sorry.  It appears that
19   it was started on 2:35 a.m.
20    Q.  (BY MR. CUMMINGS)  Thank you.
21           THE COURT:  I'm sorry.  You said 5:30 a.m.?
22           THE WITNESS:  2:35 a.m.
23           THE COURT:  2:35 a.m.  Thank you.
24           I only have one more question, if -- if I
25   may?

1    A.  No.
2    Q.  You went to the trouble to get his consent.
3   How come y'all didn't follow up?
4    A.  I don't know.
5    Q.  Okay.  Were you allowed into the fire scene
6   prior to the discovery of the deceased?
7    A.  No.
8    Q.  What triggered your admission to the crime
9   scene -- to the fire scene, crime scene, whichever?
10    A.  I got a call from dispatch stating that the
11   fire chief wanted me to come to 600 Little School Road.
12    Q.  That was the call you received initially to go
13   to the location, correct?
14    A.  Yes.
15    Q.  I'm asking about when you actually went into
16   the house.  What -- what -- who gave you approval, it's
17   okay for you to go in the house?
18    A.  The fire chief.
19    Q.  Okay.  And you were still on scene at that --
20   when that took place?
21    A.  Yeah.
22    Q.  Okay.  How far away is the police station is
23   600 Little School?
24    A.  Half a mile, maybe three quarters.
25    Q.  Okay.  So there was -- during your

1           MR. CUMMINGS:  Sure, Judge.
2           THE COURT:  If you would ask him,
3   Detective, when did he receive authorization from the
4   fire chief -- chief to enter the scene?
5    Q.  (BY MR. CUMMINGS)  2:35 a.m. is when the crime
6   scene log started.  When did you obtain permission to
7   enter?
8    A.  I don't have the exact time for that.
9    Q.  As far as -- do you recall in -- in not
10   necessarily exact time, but in sequence of events, how
11   soon it was that you -- strike that.
12           Who decided that a crime scene log was
13   necessary?
14    A.  It might have been me.
15    Q.  Okay.  Some agency -- different agencies --
16   agencies differ as far as who's in crime -- charge at
17   one of these things.  Who was in charge?
18    A.  At the time I was.
19    Q.  So once it became -- at what point did you
20   become in charge?
21    A.  The commander of the whole entire scene was the
22   fire chief.  Okay?  And as far as the crime scene log
23   part of it, that was me.
24    Q.  So were you the one who ultimately said,
25   officer so-and-so, would you please -- or do -- do the

45

47

1  crime scene log?

2      A.  I believe the fire chief was standing there

3  with me, and we said, yeah, we need crime scene, I

4  believe was what it was.

5      Q.  Thank you.

6              MR. CUMMINGS:  Is that all you need, Judge?

7              THE COURT:  We still don't have an

8  approximate time in relation to his answer.

9              MR. CUMMINGS:  Well, I -- I thought we'd

10  start back up right there.

11              THE COURT:  Okay.  Sounds good.

12              We'll be in recess until -- it's 12:30.

13  How about 1:45?  We'll resume at that point.  Thank you.

14              (Recess from 12:32 p.m. to 1:54 p.m.)

15              (Open court, Defendant present)

16              THE COURT:  All right.  Are both sides

17  ready to proceed?

18              MR. BRISSETTE:  The State's ready.

19              MR. CUMMINGS:  Yes, Your Honor.

20              THE COURT:  All right.  I believe that you

21  are still on cross.

22              MR. CUMMINGS:  Thank you, Your Honor.

23      Q.  (BY MR. CUMMINGS)  Detective Charbonnet, we

24  were talking about the -- the crime scene log, and I

25  think over lunch we've determined that those handwritten

46

1  pages on page 519 in your notebook are actually

2  contained within the discovery material that's been

3  provided to Defense.

4              This was a process where initially the fire

5  department responded to a structure fire, and at some

6  point in time, the chief out there decided that this was

7  more than just a structure fire, correct?

8      A.  Can you rephrase that?

9      Q.  The chief decided to call you out.

10      A.  Yes.

11      Q.  Why?

12      A.  At first he -- I got a call that -- that the

13  chief wanted me out for a fire.  That was it.

14      Q.  Do they call you when it's -- just a

15  structure fire?

16      A.  We have a new -- we had a new fire chief at the

17  time, and that was his thing.

18      Q.  So it wasn't a decision based upon the

19  discovery of a body --

20      A.  No.

21      Q.  -- or anything like that?

22      A.  No.

23      Q.  I see.  And that's why you were called before

24  any -- strike that.

25              Were you called before anybody, as far as

1  your understanding is concerned, entered into the

2  structure itself?

3      A.  As far as firemen?

4      Q.  Yes.

5      A.  Just regular fire suppression?

6      Q.  Yes, sir.

7      A.  I -- I don't know if anybody was in there

8  before I was called or not as far as putting water on

9  the -- on the fire.

10      Q.  When you got there, the fire was still going --

11      A.  Yes.

12      Q.  -- correct?  Okay.  And had to be fought for

13  quite a few minutes before it was extinguished, correct?

14      A.  Yes.

15      Q.  When you initially entered, you did so for the

16  purposes of taking photographs, correct?

17      A.  And preserving any possible evidence or

18  anything that could help identify what happened in the

19  fire.

20      Q.  And what do you mean by that?

21      A.  Just to preserve any -- any way to find out how

22  the fire got started.

23      Q.  Okay.  So on your initial entry, you were doing

24  more than just capturing the images or the scene as it

25  existed when you first walked in; you were also looking

48

1  to collect evidence?

2      A.  We were looking for anything that could

3  possibly lead us to a conclusion or lead us in any

4  direction to help find out why the fire took place.

5      Q.  Okay.  Would you tell -- there are some

6  terminology here I'm not familiar with.  I don't know if

7  the Judge is or not, but assuming he's not, what's a

8  quint?

9      A.  A quint is -- and I'm not in the fire

10  suppression.

11              THE REPORTER:  I'm sorry, sir?

12              THE WITNESS:  I'm not in the fire

13  suppression line of this, but a quint is a -- is a fire

14  truck that holds various positions.  It can do various

15  things.  It's also a ladder truck, a water truck, a

16  tanker -- not a water truck -- a tanker, has a ladder on

17  it, it's capable of doing multiple things that other

18  vehicles would be able to do.

19      Q.  (BY MR. CUMMINGS)  In looking through the

20  dispatch logs, there appear to be, I think, three

21  designations for fire units Q-59, M-59, if I remember

22  correctly, and C-59.  Do you know what those stand for?

23      A.  The Q-59 is Quint 59.

24      Q.  Right.

25      A.  The M-59 is Medic 59.  The C-59, I'm not sure

51

1  exactly.  I've never heard that one.
2      Q.  What is the chief -- how is Chief McMurry
3  referred to?
4      A.  It may be Chief 59, also.
5      Q.  Okay.  In addition to your agency and your
6  city's agency, there were Mansfield and other city
7  agencies there, fire agencies there as well, aren't --
8  weren't there?
9      A.  Yes.
10     Q.  Forest Hill?
11     A.  Yes.
12     Q.  Okay.  Let's go back to the -- to the interview
13 process.  You -- I'm going to ask you to refer to your
14 supplement that you prepared.  I don't see any page
15 number that you have, but I think I -- I've been
16 provided a 17- or 18-page supplement I think you
17 prepared to offense report 0900017546.  Do you have
18 that?
19     A.  Uh-huh.
20     Q.  Okay.  And the offense report number,
21 0900017546, that number is consistent throughout all of
22 the agency's reports pertaining to this incident, is it
23 not?
24     A.  Yes.
25     Q.  And the -- I noticed that the -- there is a

50

1  dispatch report of some sort or an incident report as
2  well as a missing persons report.  They all reflect that
3  same offense report number, correct?
4      A.  Yes.
5      Q.  All right.  You give quite a few details about
6  the interview that took place on the 18th of December
7  within your supplement.  On the fifth page of the
8  document that I have, is there a paragraph that
9  begins, during the interview?
10         THE COURT:  I'm sorry.  What document are
11 you referring to?
12         MR. CUMMINGS:  The supplement that
13 Detective Charbonnet prepared to the original offense
14 report.
15         THE COURT:  All right.  Thank you.
16     Q.  (BY MR. CUMMINGS)  In there you talk about
17 identifying physical evidence on Mr. Hummel's clothing,
18 and you indicate in your report that you took that
19 clothing --
20     A.  Yes.
21     Q.  -- from him because of the -- because of the
22 fact that you recognized that there was, in fact,
23 possibly some biological or something of an evidentiary
24 nature that you wanted to collect, correct?
25     A.  I could tell that there was something on -- on

52

1  the clothing.
2      Q.  And essentially your statement is that you told
3  him that it was part of the investigative process for
4  them to take his clothes, and you were going to take his
5  clothes, correct?
6      A.  Yes.
7      Q.  Did you-all admonish him that he didn't have to
8  give you his clothes?
9      A.  No.
10     Q.  Did you ever give him any sort of information
11 consistent or similar to what you do whenever you get a
12 consent to search from somebody where you let them know
13 that they can decline or anything like that?  Did you
14 ever let him know he could decline?
15     A.  No.
16     Q.  Okay.  Throughout that interview, it appears
17 from watching it that initially Agent Steele was
18 handling the questioning, but at some point you decided
19 to take over the lead as far as any questioning was
20 concerned, and from that point on, it was primarily you
21 directing the questioning; is that correct?
22     A.  I believe that we both went -- questioned back
23 and forth.
24     Q.  And is it -- once you recognized -- I believe,
25 in your words, or maybe Agent Steele's words -- once you

1  decided that his story just didn't make sense, you-all
2  spent quite a bit of time trying to persuade this man to
3  tell you the truth; is that right?
4      A.  Yes.
5      Q.  And were those persuasive efforts that you were
6  exerting?  I mean, were you -- you were doing everything
7  you could, everything you had been trained to do, to try
8  to get the information you needed to gather, right?
9      A.  Yes.
10     Q.  The arson arrest warrant is what I'd like to
11 talk to you about now, the -- the affidavit that you
12 prepared.  I believe you testified on direct examination
13 that there were five of you-all who gathered.  I may
14 have misunderstood, but it seemed there were five of
15 you-all that discussed areas of incendiary -- did
16 five -- did you and four others get together and try to
17 decide how you needed to proceed as far as this fire
18 investigation was concerned?
19     A.  Yes.
20     Q.  Okay.  Who were those four others?
21     A.  Agent Steele, Investigator Ingram, Rehfeld and
22 Sergeant Carlson.
23     Q.  Rehfeld.  How is -- is that a firefighter?
24     A.  He's with the Tarrant County Fire Marshal's
25 office.

55

1    Q.  Okay.  How does that relationship work?  Your
2  fire department gets there, and they decide we need our
3  arson investigator for one reason or another, and you're
4  called and you're in charge at that point.  Ultimately,
5  you have the Tarrant County Fire Marshal that shows up,
6  you have ATF personnel who show up, Tarrant County
7  Sheriff's Department was out there.  Why was -- strike
8  that.
9          What is the relationship -- or how does the
10  Tarrant County fire marshal get involved?
11    A.  It's called by the fire chief, fire marshal's
12  office.
13    Q.  And is -- what is their purpose?
14    A.  To come out and assist in investigating the
15  fire.
16    Q.  Is the fire marshal involved in a fire that is
17  accidental or -- I mean, what triggers a fire chief
18  decision, I need to involve a fire marshal?
19    A.  Honestly, I don't -- I don't know the answer to
20  that question.
21    Q.  Okay.
22    A.  It would be better left for the fire chief.
23    Q.  Are they always on the scene whenever you've
24  been called on a suspicious fire suspected of being
25  arson?

54

1    A.  Well, since I've only worked two, I don't think
2  they've been on either one of those.
3    Q.  But they were on this one, fire --
4    A.  Yes, yes.
5    Q.  ATF.  You had two ATF agents out there,
6  correct?
7    A.  Yes.
8    Q.  Are you familiar with them enough to talk about
9  them?
10    A.  Not really.
11    Q.  Your report indicates -- identifies Agent
12  Steele as an ATF agent.  Is he an ATF agent, to your
13  knowledge, or is he a deputized local officer who worked
14  with ATF?
15    A.  He is -- he is an ATF agent.  The other one is
16  a deputized task-force agent.
17    Q.  There was a Bedford firefighter?
18    A.  Yes.
19    Q.  Langford?
20    A.  Yes.
21    Q.  Who was actually the affiant in one of our
22  exhibits, the search warrant of the firearm?
23    A.  Yes.
24    Q.  Okay.  Langford's day-to-day job is a Bedford
25  fireman?

1    A.  As far as I know, yes.
2    Q.  Have you worked with him on any other fires?
3    A.  No.
4    Q.  Okay.  The five of you confer.  When was that?
5    A.  At the -- to my recollection, it's the end of
6  Friday and into Saturday.
7    Q.  The 18th was Thursday, is that accurate, or
8  am I --
9    A.  I believe it was -- the 18th was a Friday.
10    Q.  So on the -- on in -- you worked through the
11  night in -- on the 18th, and you-all met later in the
12  p.m. hours of the 18th on into the 19th; is that
13  accurate?
14    A.  Yes.
15    Q.  Okay.  I'm just trying to -- I'm thinking of
16  everything with dates is not -- so at some point after
17  that meeting, you go home, get some rest?
18    A.  Yes.
19    Q.  And then you're called back to do an arrest
20  warrant for John Hummel, who is now in custody in
21  California, correct?
22    A.  Yes.
23    Q.  Did you have any assistance in preparing that
24  arrest warrant affidavit from any of those other four
25  arson investigators?

56

1    A.  Yes.
2    Q.  Did they -- did they come down and join you to
3  prepare that?
4    A.  They were -- we talked to them on the
5  telephone.
6    Q.  I see.
7          Whenever you -- you wrote that arrest
8  warrant affidavit, you talked about Rio, the dog, and
9  his -- the evidence that he provided you-all, correct?
10    A.  Yes.
11    Q.  And you actually put in the affidavit that the
12  dog is trained to alert on fire accelerants, correct?
13    A.  Yes.
14    Q.  Had you worked with that canine before?
15    A.  No.
16    Q.  Had you ever worked with a canine that alerts
17  on accelerants before?
18    A.  No.
19    Q.  Were you present when Officer Langford
20  processed -- processed the scene with Rio?
21          Let me ask it different.  Did you accompany
22  Mr. Langford when he went through the house with Rio?
23    A.  No.
24    Q.  However, you included in your affidavit that
25  Rio had alerted to accelerants on -- in -- at six or

59

1  seven different points in the house, correct?

2      A.  Yes.

3      Q.  And at the time you did this warrant, that's
all you knew?

5      A.  Yes.

6      Q.  Who collected samples from those -- just for

7  clarification, is it six points or seven points?  I -- I

8  remember two in each bedroom, or where there was

9  sleeping area, and one centrally located in the house;

10 is that correct?  And that would make seven?

11     A.  I believe that is correct.

12     Q.  Okay.  Who collected those seven samples?

13     A.  They were collected by the Tarrant County Fire

14 Marshal's Office and ATF.

15     Q.  Okay.  So was this done with your involvement?

16     A.  Yes.  I photographed.

17     Q.  So you were present as they were doing it, you

18 were part of the team, your function was to record it by

19 photography?

20     A.  Yes.

21     Q.  You subsequently have learned there were no

22 accelerants, correct?

23     A.  Yes.

24     Q.  Were you able, just out of curiosity, to know

or -- strike that.

58

1          You were there when they collected the

2  stuff, but you weren't there necessarily when Rio went

3  through, correct?

4      A.  Yes.

5      Q.  Okay.  Forget the next question.

6          Do you recall -- I think it's in your

7  supplement, maybe.  Correct me if I'm wrong, but I

8  believe in your report, you indicated that you took your

9  initial photographs to document the -- to document the

10 scene as soon as possible; in other words, when you

11 first went in.  Is that accurate or --

12     A.  If I may refer to the report?

13     Q.  Please.

14     A.  Okay.  I don't see where I said that I put

15 there -- whenever -- documenting anything.

16     Q.  Okay.  And we have -- I've located where we

17 came across that.

18          Sergeant Carlson is your supervisor?

19     A.  Yes.

20     Q.  He was in doing a photo log as you were taking

21 your photos; is that correct?

22     A.  Yes.

23     Q.  There was a Lieutenant Cleveland, who was

24 also -- Fire Lieutenant Cleveland, who was also in the

25 fire scene.  I don't know if he was necessarily

60

1  accompanying you while you were doing that, but he was

2  present as well; is that accurate?

3      A.  I believe so.

4      Q.  Do you recall locating Joy Hummel's purse with

5  Lieutenant Cleveland and Sergeant Carlson?  Were you

6  there when they did that in the laundry room?

7      A.  I don't remember being right there with them

8  whenever they --

9      Q.  Okay.  And I'm just trying to establish whether

10 or not they gathered or collected some items out of her

11 purse on that initial passthrough or whether it was

12 later.  Do you know?

13     A.  I -- I -- I don't recall.

14     Q.  When you prepared your arrest warrant affidavit

15 for the offense of arson, you described the crime scene

16 for the Judge and the evidence that you-all gathered

17 together that you believed indicated that it was, in

18 fact, arson, and then you talked about the reasons that

19 you believe implicated or -- that you should have a

20 warrant for John Hummel.  Is that a fair assessment of

21 an affidavit that you prepared?

22     A.  Yes, sir.

23     Q.  Okay.

24          THE COURT:  Let me --

25     Q.  (BY MR. CUMMINGS)  When you described John

60

1  Hummel --

2          THE COURT:  Let me interject real quick.

3  Let me take a look at the affidavit so I can read that

4  right now, and I can follow along a little bit better.

5          MR. CUMMINGS:  Sure.

6          This is PT-24, Your Honor.

7          THE COURT:  Thank you.  Let me review this.

8          All right.  You may proceed.

9          MR. CUMMINGS:  Thank you, Your Honor.

10          And for the benefit of the Court, I'm

11 asking about a paragraph on page 2 of his affidavit.

12 The husband of Joy Hummel arrived back at their

13 residence on the second page of the affidavit.

14     Q.  (BY MR. CUMMINGS)  Detective, you prepared this

15 warrant to present a Judge -- excuse me -- prepared this

16 affidavit to present a Judge in the effort to get a

17 warrant for Mr. Hummel's arrest, correct?

18     A.  Yes.

19     Q.  And in that affidavit, you indicated that John

20 Hummel had displayed no emotion whatsoever during the

21 time that you-all interviewed him at the police station;

22 is that fair to say?  Is that accurate?

23     A.  Yes, sir.

24     Q.  You sat here with us the last two days watching

25 videos, in particular yesterday's video, and is it still

63

1  your opinion that Mr. Hummel did not display any emotion
2  at all?
3      A.  Based on the information told me by Sergeant
   Carlson, yes.
5      Q.  You were not necessarily in the room when
6  Sergeant Carlson was present; however, you told us that
7  you were observing outside on a video monitor; is that
8  correct?
9      A.  No, that's not what I said.
10     Q.  Okay.  Were you observing just portions of
11 Sergeant Carlson's interview of Mr. Hummel from the
12 outside?
13     A.  I don't recall if I walked by or what exactly I
14 was doing at that time.
15     Q.  But you weren't actively tag-teaming him,
16 working with Sergeant Carlson in an effort to get more
17 information out of this gentleman?
18     A.  No.
19     Q.  There were times that he broke down on the tape
20 that we watched yesterday and actually cried.  You left
21 that out.  Did you not know about it?
22     A.  I knew about it.
23     Q.  That's not emotion?
24     A.  I said based on the information that Sergeant
25 Carlson gave to me, there was not any emotion.

62

1      Q.  You knew about it.  You're -- you're drawing a
2  distinction here, so explain it to me.
3      A.  Sergeant Carlson explained that whenever he
4  would bend over and make the loud whining noises, that
5  when he looked up, there was no tears in his eyes, there
6  was no running of the nose, quivering of the speech,
7  nothing to that nature.  The Kleenexes were not wet,
8  according to what he told me.  He believed they were not
9  wet.  So the emotion appeared to him to -- to possibly
10 be not real.
11     Q.  So even though what we saw in the video
12 appeared to be emotion, it's your information that it
13 was artificial or contrived?
14     A.  Rephrase that.
15     Q.  Well, you're describing the same thing we
16 observed, and you're indicating that Sergeant Carlson
17 didn't believe that it was real, and therefore -- or you
18 put in your affidavit there was none --
19     A.  Yes.
20     Q.  -- because you didn't believe the emotion that
21 it appears on the video?
22     A.  Yes.
23     Q.  Okay.  Let's talk about missing persons report.
24 Do you have an operations manual there at the Kennedale
25 Police Department?

1      A.  For what?
2      Q.  Police agencies -- many police agencies you
3  can't go to work without a rule telling you when to show
4  up and how you're dressed and where you can go and when
5  you can take a break and stuff like that.  Do you have a
6  procedures manual or a general orders handbook or some
7  document like that that dictates how you conduct
8  yourself as a Kennedale police officer?
9      A.  Yes.
10     Q.  Is there a chapter or book or section of it
11 that governs your conduct as an investigator or as an
12 investigating officer even in uniform?
13     A.  At the time?
14     Q.  Yes.
15     A.  Not that I recall.
16     Q.  Was there a procedure in place at that time as
17 to what you do when someone files a missing person
18 report to Kennedale?
19     A.  Not that I've ever seen in our policy and
20 procedures manual.  I don't know what goes on in the
21 other divisions.
22     Q.  Okay.  You worked for awhile in uniform before
23 you were promoted to detective?
24     A.  Yes.
25     Q.  Okay.  And I would assume that the person who

64

1  is charged with taking missing person reports is
2  probably one of those uniformed officers, correct?
3      A.  Yes.
4      Q.  Uniformed officers are usually governed a lot
5  more stringently or tightly than investigative
6  personnel, correct?
7      A.  I believe we follow the same general orders.
8      Q.  Generally, yes, but, I mean, aren't there
9  specific guidelines on how -- how they take a report?
10     A.  At the time there -- there was -- no, to answer
11 your question.
12     Q.  Okay.  Was -- is there -- strike that.
13         Was there on the 20th of December, 2009, a
14 standard policy at the Kennedale Police Department on
15 when you take a missing persons report?
16     A.  Not that I was aware of.
17     Q.  Okay.  Is there any sort of waiting period that
18 you want the citizen to have expire before you take such
19 a report, generally?
20     A.  No.
21     Q.  Whenever Chris Paris showed up at the Kennedale
22 Police Department to report John Hummel missing, Brian
23 Goode took the report, did he not?
24     A.  Yes.
25     Q.  Is Brian Goode a uniformed sergeant?

65

1    A.   He is.

2    Q.   And whenever he met with this gentleman, were

3 you present?

4    A.   No.

5    Q.   Before he took a report -- strike that.

6         At some point this sergeant -- this patrol

7 sergeant came to talk to you and Sergeant Carlson,

8 correct?

9    A.   Yes.

10   Q.   He did that before he took the report, correct?

11   A.   Yes.

12   Q.   And you-all conferred with Mr. Brissette before

13 he took the report, correct?

14   A.   Yes.

15   Q.   And after you-all met -- or excuse me.  Strike

16 that.

17        After Brian Goode -- Sergeant Brian Goode

18 met with you-all, it was only then he felt he had the

19 authorization to go ahead and do a missing persons

20 report, correct?

21   A.   The authorization?

22   Q.   Okay.  Bad word.  Pick whatever you want.  He

23 didn't do the report until he met with you-all and got

24 it approved?

25   A.   Yes.

66

1    Q.   Somebody suggested that when he do that report,

2 that he make sure that the NCIC printout or broadcast,

3 or whatever word is used, indicated that Mr. Hummel was

4 armed and dangerous, correct?

5    A.   Somebody did.

6    Q.   Did -- did it occur while you were present?  I

7 mean --

8    A.   I was not there whenever that was being done.

9    Q.   Okay.  You know it was done, but it wasn't --

10 you don't know who?

11   A.   Exactly.

12   Q.   The arrest warrant affidavit identifies that

13 missing persons reportee or reporter as whom?

14   A.   Christopher Harris.

15   Q.   Okay.  Now, this man's actual name is

16 Christopher Paris; is that correct?

17   A.   Yes.

18   Q.   P-a-r-i-s?

19   A.   It is.

20   Q.   Had you -- you're aware of a criminal history.

21 You know quite a bit about this guy, don't you?

22   A.   I believe Sergeant Carlson looked at that.

23   Q.   Okay.  So that is a mistake in the -- in the

24 affidavit?

25   A.   Yes.

67

1    Q.   Let's go to California.

2         You had the assistance of Detective George

3 Darrah, D-a-r-r-a-h; is that correct?

4    A.   Yes.

5    Q.   And he was an Oceanside detective?

6    A.   Yes.

7    Q.   And Detective Darrah is the affiant on the

8 search warrant that authorized you-all to search --

9 ultimately authorized you-all to search the motel room

10 there at the Coast Inn as well as a -- the Windstar van,

11 correct?

12   A.   Yes, sir.

13   Q.   The van was actually located as a result of you

14 gentlemen interviewing Mr. Hummel at the San Diego

15 County Jail, correct?

16   A.   Yes.

17   Q.   He gave you -- actually drew a map as to where

18 the Windstar van was?

19   A.   Yes.

20   Q.   And it was legally parked in a pay lot just

21 north of the border?

22   A.   Yes, sir.

23   Q.   The -- somebody enlisted the help of the

24 California authorities to go get that van and pull it to

25 a secure location.  Was it -- do you know whether it was

68

1 you or Sergeant Carlson and the agent present?

2    A.   It was not me.  I don't know exactly the person

3 that made the phone call.

4    Q.   The van was actually seized from that parking

5 lot and taken, I believe you testified on direct, to a

6 secure warehouse facility prior to Detective Darrah's

7 obtaining the search -- a search warrant, correct?

8    A.   Yes.

9    Q.   Were you aware -- strike that.

10        Did you help in the preparation of that

11 affidavit --

12   A.   Can you --

13   Q.   -- of the search warrant?

14   A.   Can you rephrase it?

15   Q.   Sure.  Did you assist Detective Darrah prepare

16 the search warrant affidavit?

17   A.   Yes.

18   Q.   Did you have the benefit of the videotape taken

19 by one of the -- I'm trying to think of the term or the

20 title that they use out there, but I can't recall it --

21 but one of the crime scene people out there?

22        There is a video -- or are you aware

23 there's a video of the motel room where two uniformed

24 officers, one a sergeant, one not, go in for -- go into

25 that motel room for exigent reasons, security check or

71

1  MR. CUMMINGS:  Your Honor, I pass the

2  witness.

3  THE COURT:  Redirect?

4  REDIRECT EXAMINATION

5  BY MR. BRISSETTE:

6  Q.  Detective, do you have Lieutenant Langford's

7  canine report in front of you?

8  A.  I believe I do.  Can I have a moment to look?

9  Q.  Please.

10  A.  No, sir, I don't believe I have Mr. Langford's

11  report.

12  Q.  When Defense counsel asked you if there were

13  seven samples taken, if Lieutenant Langford processed

14  eight samples, do you have a definitive source in your

15  book that you can swear to today?

16  A.  No, sir.

17  Q.  So when you answered seven because the Defense

18  threw it out there, is it seven, or do you know?

19  A.  I -- I don't have a definitive answer.

20  Q.  Do you know what the Tarrant County Arson Task

21  Force is?

22  A.  Yes, sir.

23  Q.  What is it?

24  A.  It's a -- it's a task force comprised of

25  several firefighters that are cross-trained in arson

---

71 (continued)

1  something like that prior to you guys getting that

2  warrant?

3  A.  I -- I've -- I've never seen that particular

4  video, no.

5  Q.  Okay.  And were you aware of that --

6  A.  No.

7  Q.  -- conduct?

8  The Sony camera that Ms. Lee -- is that

9  right?  Ms. Lee?  Is that her name?

10  A.  Whitney Lee, yeah.

11  Q.  Whitney Lee.  The Sony camera that Whitney Lee

12  used to take four photographs of the fire scene, you

13  essentially told her that camera was now evidence and

14  took it from her, correct?

15  A.  Yes.

16  Q.  She -- it wasn't -- I mean, once you make them

17  aware that she had done that, you decided that was --

18  you were going to seize it, correct?

19  A.  Yes.

20  Q.  Finally, the Compaq Presario.  You went down to

21  the hospital in Cleburne and spoke to Dr. Ford; is that

22  correct?

23  A.  Yes, sir.

24  Q.  Where did you meet up with Dr. Ford?

25  A.  In his office.

---

70

1  Q.  Excuse me.  And that was at Harris Hospital

2  Cleburne or something like that?

3  A.  I -- I believe it used to be called Walls, but

4  they said it was called --

5  Q.  Okay.

6  A.  -- Harris Methodist.

7  Q.  And this was a desktop computer in his office?

8  A.  Yes, sir.

9  Q.  Was it his personal computer or his staff or

10  something like that?

11  A.  I believe his personal computer.

12  Q.  Okay.  Did you process his office for crime

13  scene or DNA or anything like that to try to determine

14  who perhaps had been using that computer?

15  A.  No.

16  Q.  Okay.  Did you -- and when you collected it,

17  you collected the box and left the monitor and the

18  keyboard and stuff like that, correct?

19  A.  Yes, sir.

20  Q.  What I would have called a CPU, what I think

21  everybody else understands it as CPU.  Anyway...

22  MR. CUMMINGS:  May I have just one moment,

23  please, Judge?

24  THE COURT:  You may.

25  Q.  (BY MR. CUMMINGS)  Thank you, Detective.

---

72

1  training, and they participate in -- if there's a fire

2  that cities need their assistance, then they -- they

3  respond to it.

4  Q.  Several.  Is it multiple agencies like the 43

5  here in Fort -- in Tarrant County?

6  A.  Yes, sir.

7  Q.  Does it include other counties as well?

8  A.  Yes, sir.

9  Q.  Does it include representatives that may not be

10  from the fire service like video forensic folks?

11  A.  Yes, sir.

12  Q.  Did you receive resources from our office as

13  part of that task force that day?

14  A.  Yes, sir.

15  Q.  And who was that?

16  A.  We received resources from Mr. Porter.

17  Q.  In your 128-hour arson class, did you go over

18  evidence collection?

19  A.  Yes.

20  Q.  In your classes to become a detective or a

21  peace officer, did you go over evidence collection?

22  A.  Yes.

23  Q.  With respect to fire debris, what happens to it

24  once it leaves the scene?  What can happen to it?

25  A.  It can -- it can degrade very quickly.

75

1    Q.  With respect to what you observed at the
2   Kennedale Police Department with Mr. Hummel, did you
3   have any observations about his clothes that day?
4    A.  Yes.
5    Q.  And what were those observations, for the
6   Court, please?
7    A.  That I saw some sort of reddish-brownish
8   material on -- on his pants.
9    Q.  You answered Mr. Cummings that you did not know
10  if there was any conversation about whether or not a
11  consent was obtained in your presence.  As you've
12  developed this investigation, are you aware that others
13  may have had a conversation with him about his clothes?
14   A.  Yes.
15   Q.  And who would that other person be?
16   A.  Agent Steele.
17   Q.  The clothes that we see him reenter the video
18  on at Kennedale PD, whose clothes are those?
19   A.  They belong to Sergeant Carlson.
20   Q.  Where were the clothes?
21   A.  He had them in his office.
22   Q.  Defense counsel asked you about how one attains
23  a VIN number.  You are familiar with the computer
24  systems for law enforcement in the state of Texas, are
25  you not?

1    A.  Yes.
2    Q.  What is it?
3    A.  It's the search warrant for the camera.
4    Q.  PT-32 is the affidavit; is that correct?
5    A.  Yes, sir.
6    Q.  Does the District Clerk's Office here in
7   Tarrant County assign particular numbers to documents
8   when you file them with the clerk's office?
9    A.  Yes.
10   Q.  Do you recognize the search warrant number on
11  PT-32 to be the same as PT-32A?
12   A.  Yes.
13   Q.  32A is the actual warrant?
14   A.  Yes, sir.
15   Q.  Is the City of Kennedale an incorporated city
16  under the Texas charters?
17   A.  Yes.
18   Q.  I'm showing you what has been marked for
19  identification purposes as PT-38.  Will you take a
20  second to look at that, sir?
21       What does PT-38 appear to be?
22   A.  It's the order certifying -- declaring that
23  we're an incorporated city, that Kennedale is an
24  incorporated city.
25       MR. BRISSETTE:  Your Honor, the State will

74

1    A.  I am.
2    Q.  Can you look up a license plate from anything
3   from publicdata.com to the more advanced TLETS that you
4   have to get a VIN number?
5    A.  Yes.
6    Q.  You don't need to search one's vehicle to
7   obtain a VIN number, do you?
8    A.  No, sir.
9    Q.  Let's talk about this vehicle a little bit
10  more.  Defense counsel asked you if the vehicle had been
11  towed from the parking spot that it was parked in
12  legally prior to Detective Darrah's search warrant; is
13  that correct?
14   A.  Yes, sir.
15   Q.  Was that vehicle towed after the Defendant had
16  signed two separate consent to searches for that
17  vehicle?
18   A.  Yes.
19       MR. BRISSETTE:  Judge, may I have just a
20  second?
21       THE COURT:  You may.
22   Q.  (BY MR. BRISSETTE)  Detective, I'm going to
23  show you what's been marked for identification purposes
24  as State's Exhibit PT-32A, as in apple.  Do you
25  recognize what this appears to be?

76

1   tender to Defense counsel PT-32A, which is the face
2   sheet to PT-32; and then PT-38, Articles of
3   Incorporation for the City of Kennedale.  Offer them for
4   the purpose of this hearing.
5       MR. CUMMINGS:  Can we look at 32?
6       MR. BRISSETTE:  Yeah.
7       MR. CUMMINGS:  Your Honor, we have no
8   objection to PT-32A for purposes of this hearing, and
9   nor do we have an objection to PT-38A for purposes of
10  this hearing.
11      MR. BRISSETTE:  Judge, if I may?
12      THE COURT:  You may.
13      MR. BRISSETTE:  It's 38, not 38A.
14      MR. CUMMINGS:  I'm sorry.
15      MR. BRISSETTE:  Okay.
16      THE COURT:  PT-32A, as in Alpha, and PT-38
17  are admitted.
18      (State's Pretrial Exhibit Nos. PT-32A,
19       PT-38 admitted)
20   Q.  (BY MR. BRISSETTE)  Detective, in your white
21  binder up there, do you have some printouts from NLETS
22  Incorporated in your binder?
23   A.  Yes.
24   Q.  You know what NLETS is, yes?
25   A.  Yes.

77

1  Q.  Do you have -- there's two transmittals, I
2  think, that are in question here.  Everybody agrees on
3  both sides.  One is an attempt to locate for a motor
4  vehicle, and one is a missing persons transmission to
5  NLETS.  Can you locate those two items, sir?
6     A.  Sorry.  I'm trying to get to the missing
7  persons report.
8         I have the missing persons one here from
9  NLETS.
10    Q.  All right.  Let's start with that one.  Prior
11 to this being entered into NLETS, was there a report
12 taken by the Kennedale Police Department?
13    A.  Yes.
14    Q.  And by that, I mean a report for missing
15 persons?
16    A.  Yes.
17    Q.  Who took the report?
18    A.  Sergeant Goode.
19    Q.  And I believe on cross, the Defense asked you,
20 did you have a conversation with Sergeant Goode on that
21 Saturday?
22    A.  Yes.
23    Q.  There's language that goes into the
24 miscellaneous fields on a missing persons report; is
25 there not?

78

1     A.  There is.
2     Q.  And I believe on this one, there are five lines
3  entered into the NCIC; is that correct?
4     A.  Yes.
5     Q.  On the miscellaneous, or the M-I-S field?
6     A.  Yes.
7     Q.  The language that was placed in here by
8  Kennedale PD, how did it come about?
9     A.  I'm -- I'm not real sure, sir.
10    Q.  Well, let's go through this.  What did you know
11 at that point?  Did you know whether or not Mr. Hummel
12 had served in the military prior to the NCIC
13 transmission on Saturday afternoon?
14    A.  Yes.  The information we got came from the
15 interviews that we had with him before and the
16 information that we had learned throughout the
17 investigation up to that point.
18    Q.  Did you incorporate your observations on how
19 the individual was acting when you entered this
20 information in as well?
21    A.  Yes.
22    Q.  Can you tell us what the -- the miscellaneous
23 field states?
24    A.  Want me to read it directly from here?
25    Q.  Please.

79

1     A.  "Law enforcement sensitive.  Subject possibly
2  mentally unstable.  Person of interest in homicide.
3  Considered armed and dangerous.  Approach with caution.
4  Subject has military background.  Do not arrest or
5  detain based on this record.  If located, contact
6  Kennedale PD 817-478-5416, advise location and direction
7  of travel."
8     Q.  Do you include as part of that missing person a
9  vehicle license plate number?
10    A.  Yes.
11    Q.  Do you include the make and model of the
12 vehicle as well?
13    A.  Yes.
14    Q.  Anywhere in here does it say arrest the
15 individual?
16    A.  No.
17    Q.  Prior to the missing persons report being
18 taken, there's parallel set of investigations going on
19 at the PD that afternoon, are there not?
20    A.  Yes.
21    Q.  Had you learned any information from
22 Dr. Peerwani's office yet as to the victims?
23    A.  Yes.
24    Q.  What had you gathered at that point from
25 preliminary reports?

80

1     A.  That one of them had been stabbed to death and
2  one of them was considered a -- a homicide.
3     Q.  Would somebody suffering stab injuries be
4  inconsistent with a -- a fatality in a fire?
5     A.  Yes.
6     Q.  So you had a homicide at one point?
7     A.  Yes.
8     Q.  Did you know the cause of death yet for the
9  male or the child yet?
10    A.  No, sir.
11    Q.  Can you find the attempt to locate, please?
12        Detective, would it help if I told you
13 originally when I imaged your notebook, it was behind
14 some consent to search forms?  Because that's what
15 sequence it is.  It's 146 pages in.
16    A.  Probably not because --
17        MR. BRISSETTE:  Judge, may I approach?
18        THE COURT:  You may.
19        MR. CUMMINGS:  Actually, what I'd like to
20 do, can we project so the Judge can benefit from this
21 too?  Do you have any problem with that?
22        MR. BRISSETTE:  Do you have any problem
23 with me printing them out and mark them?
24        MR. CUMMINGS:  Okay.
25        MR. BRISSETTE:  Judge, I think we have an

**Page 81**

1  agreement between the parties that we will print out
2  what we just talked about, which is an NLETS printout
3  from a terminal that Kennedale PD, that shows the
4  missing persons report.  There's some language on either
5  side of it as a header on the documents that the State
6  and Defense have as part of discovery.
7         THE COURT:  Does the NLETS report contain
8  confidential information or, you know, personal data?
9         MR. BRISSETTE:  The personal data would be
10  the same data that would be on the top of an Indictment
11  for a defendant at this point.
12         THE COURT:  Well, does it contain like a
13  Social Security number or --
14         MR. BRISSETTE:  No, sir.
15         THE COURT:  Okay.  All right.  That's fine.
16         MR. BRISSETTE:  And then the attempt -- the
17  attempt to locate his vehicle information in it, VIN
18  numbers stuff that we talked about in court today.
19  Those -- we can make that, I guess, two separate
20  exhibits called the attempt to locate State's 40, and
21  State's PT-39 would be the NCIC missing persons.
22         THE COURT:  All right.  Why don't you go
23  ahead and print that out?  If you want to take a quick
24  break so you can accomplish all that, that's fine.
25         MR. BRISSETTE:  Okay.

**Page 82**

1         THE COURT:  We'll be in recess.
2         (Recess from 2:56 p.m. to 3:27 p.m.)
3         (Open court, Defendant present)
4         THE COURT:  You may proceed.
5         MR. BRISSETTE:  Your Honor, before we took
6  the break, the State was going to print two documents
7  from the discovery that the Defense has.  We've done
8  that and labeled one PT-39, which is the printout from
9  NLETS with the missing persons report attached to it for
10  purposes of NCIC; and PT-40, which is a printout of the
11  NLETS for attempt to locate vehicle that actually was
12  printed by the Oceanside Police Department through a
13  rebroadcast from the California Department of Justice.
14  I've shown Defense Counsel both of these, and we offer
15  these at this time, PT-39 and PT-40.
16         MR. CUMMINGS:  These are by agreement, Your
17  Honor.  We have no objection.
18         THE COURT:  All right.  PT-39 and 40 are
19  admitted.
20         (State's Exhibit Nos. PT-39,
21         PT-40 admitted)
22    Q.  (BY MR. BRISSETTE)  Detective, if you could,
23  could you take us through PT-39 that's on the screen
24  right now?  What are we looking at here?
25    A.  This is an NCIC printout of a missing person.

**Page 83**

1    Q.  All right.  The MIS areas, can you show us that
2  on PT-39, what you were reading for the Court before we
3  admitted this?
4    A.  This area, these five lines right here.
5    Q.  All right.  Where it starts with M.K.E. or Mike
6  just above --
7    A.  Right here?
8    Q.  Yes, sir.
9    A.  Yes, sir.
10    Q.  From that down, are you the best person in the
11  police department to explain how these individual fields
12  work and how the data is filled in to the right side of
13  that -- the hash mark or the slash mark?
14    A.  No, sir.
15    Q.  And would that be best left for one of the
16  dispatchers?
17    A.  Yes, sir.
18    Q.  Do you know the date and time that this was
19  entered?
20    A.  The date is right here, 12/19/2009 at 18:22
21  Eastern Standard Time.
22    Q.  PT-40, do you understand what this is, sir?
23    A.  Yes, sir.
24    Q.  What is this?
25    A.  It's attempt to locate broadcast.

**Page 84**

1    Q.  And what date and time was this entered into
2  NLETS or NCIC?
3    A.  It was entered on 12/20 at 15:40 hours Central
4  Standard Time.
5    Q.  So a day after, roughly, that PT-39 was
6  entered?
7    A.  Yes, sir.
8         MR. BRISSETTE:  Pass the witness.
9         THE COURT:  Recross?
10         RECROSS-EXAMINATION
11  BY MR. CUMMINGS:
12    Q.  Detective Charbonnet, can you tell the Court
13  when the missing person report was filed or taken by
14  Sergeant Goode?
15    A.  Can you give me just a moment?
16    Q.  Please.
17    A.  It was taken on 12/19/2009 at 15:18 hours,
18  according to the report.
19    Q.  And without putting PT-39 back up on the board,
20  it was just a couple of hours later he would have put it
21  into the system?
22    A.  Yes.
23    Q.  Thank you.
24         MR. CUMMINGS:  That's all I have for
25  Detective Charbonnet, Your Honor.

85

1   THE COURT: All right, Detective. You may
2   step down.
3   THE WITNESS: Thank you.
4   MR. MOORE: We would ask that he remain
5   subject to recall.
6   THE COURT: You're subject to recall.
7   THE WITNESS: Yes, sir.
8   (Witness retires)
9   THE COURT: State, call your next witness.
10   MR. GILL: We call Jorge Bernal.
11   (Witness enters courtroom)
12   THE COURT: Jorge Bernal?
13   THE WITNESS: Yes, sir.
14   THE COURT: Please raise your right hand.
15   (Witness sworn)
16   THE COURT: Please be seated, sir.
17   You may proceed when you're ready.
18   JORGE BERNAL,
19   having been first duly sworn, testified as follows:
20   DIRECT EXAMINATION
21   BY MR. GILL:
22   Q. Please tell the Judge your name.
23   A. Jorge Bernal.
24   Q. Pull the -- thank you very much.
25   A. Jorge Bernal.

86

1   Q. And how are you employed or occupied?
2   A. I am employed by U.S. Customs and Border
3   Protection.
4   Q. You're in uniform today. Are those your dress
5   blues you're wearing today?
6   A. Yes, sir.
7   Q. All right. How long have you been employed by
8   Customs and Border Protection?
9   A. Three years, four months.
10   Q. What did you do before you went to work for
11   Customs and Border Protection?
12   A. I was with TSA for two years.
13   Q. And for those of us that don't know, is that
14   Traffic -- Transportation Safety Administration?
15   A. Transportation Security Administration.
16   Q. And how about before that?
17   A. I was working construction.
18   Q. Did you do anything else before you were in
19   construction?
20   A. I did four years of active duty in the United
   States Marine Corp.
22   Q. And did you receive an honorable discharge from
23   the Marines?
24   A. Yes, I did, sir.
25   Q. After your release from your -- your first

87

1   commitment to the Marines, did you join the reserves?
2   A. Yes, sir.
3   Q. And how long did you serve in the Marine
4   Reserves?
5   A. Four years as well.
6   Q. And what rank did you reach?
7   A. Sergeant.
8   Q. Now, is United States Custom and Border
9   Protection under the umbrella of the Department of
10   Homeland Security?
11   A. Yes, sir.
12   Q. And do you have to undergo a period of training
13   before you can become an officer with the Customs and
14   Border Protection Service?
15   A. Yes. We go to the federal law enforcement
16   training in Glynco, Georgia for 16 weeks, is when I
17   went.
18   Q. Approximately when did you do that 16 weeks
19   training?
20   A. It was September of 2007.
21   Q. And when you -- I take it you graduated?
22   A. Yes, sir.
23   Q. And upon graduation, what rank did you achieve?
24   A. Of U.S. Custom and Border Protection officer.
25   Q. As a Customs and Border Protection officer, do

88

1   you undergo periodic retraining?
2   A. Yes, sir.
3   Q. And approximately how often do you do that?
4   A. It ranges. It was some erratic training,
5   training whether it's continuous training on defensive
6   tactics or firearm or any changes in the law, anything
7   like that. It's very often, actually.
8   Q. Are those some of the same subjects that you're
9   taught in your initial academy?
10   A. Yes, sir.
11   Q. What are some of the other things that you
12   learned in your initial academy, your initial training?
13   A. Customs law, immigration law, anything --
14   anything involving state law where we're going to be
15   working at, and as well as defensive tactics and
16   anything involving arresting or seizures or, you know,
17   the training with our sidearm that we are required to --
18   to carry.
19   Q. So you're commissioned to carry a sidearm,
20   also; is that correct?
21   A. Yes, sir.
22   Q. Did you receive any of the same training in
23   your -- in -- in the Marines?
24   A. Yes, sir.
25   Q. What type of training did you receive in the

89

1  Marines that's applicable to your -- your duties today?

2      A.   Defensive tactics and weapons training.

3      Q.   I take it you received -- the part of the

defensive tactics and weapons training you received in

the Marines is part of their basic training program?

6      A.   That is correct.

7      Q.   That all Marines have to go through in order to

8  become a Marine?

9      A.   Yes, sir.

10      Q.   So what are your job duties today with Customs

11  and Border Protection?

12      A.   I am assigned back to the -- as a primary

13  officer.  I was -- before this, I was with the team that

14  dealt with anybody leaving the country, and we would

15  inspect them as we would people entering the country, so

16  now I'm assigned to inspecting people before they enter

17  the country.

18      Q.   And how long have you been assigned to inspect

19  people before they enter the country?

20      A.   Since -- I'm back again assigned to that since

21  October of this year -- of last year, I'm sorry.

22      Q.   So were you assigned to that same job back on

23  December 20th of 2009?

24      A.   Yes, sir.

25      Q.   On December 20th of 2009, were you assigned as

90

1  a primary officer inspecting people as they entered and

2  applied for admission?

3      A.   Yes, sir.

4      Q.   And where are you assigned?  Where within the

5  United States are you assigned?

6      A.   I'm assigned at the San Ysidro Port of Entry in

7  San Ysidro, California.

8      Q.   What part of California is that in?

9      A.   Southern California, borders Mexico.

10      Q.   Is it near a major U.S. city?

11      A.   Yes, sir.

12      Q.   Which one?

13      A.   San Diego.

14      Q.   Is it near a major city in the country of

15  Mexico?

16      A.   Yes, sir.

17      Q.   Which one?

18      A.   Tijuana, Mexico.

19      Q.   So is there a lot of traffic between the United

20  States and Mexico at that port of entry?

21      A.   Yes, sir.  It's the biggest and busiest in the

22  world.

23      Q.   Do you have an estimate as to the number of --

24  of pedestrians on average pass through your port of

25  entry every day?

91

1      A.   It varies throughout the week and throughout

2  the time of year, but it's in the thousands, many

3  thousands.  I don't have an exact number for you.

4      Q.   If we were told by Border Protection Officer

5  Herb Day that you average 10,000 pedestrians a day, is

6  that -- does that sound like an accurate number?

7      A.   Yes, sir.

8      Q.   How about number of vehicles per day?

9      A.   A lot more.

10      Q.   A lot more?

11      A.   Yes, sir.

12      Q.   I take it the San Ysidro Port of Entry is an

13  inter -- port of international entry?

14      A.   Yes, sir.

15      Q.   It's an international port?

16      A.   Yes, sir.

17      Q.   Between the country of the United States and --

18      A.   And Mexico.

19      Q.   -- Mexico?

20      A.   Yes, sir.

21      Q.   And Mexico is a foreign country?

22      A.   That's correct.

23      Q.   So when you talk about people coming to you as

24  a primary officer and applying for admission, they're

25  applying for admission to the United States?

92

1      A.   Yes, sir.

2      Q.   And they are applying for admission and they're

3  coming from the country of Mexico?

4      A.   Yes, sir.

5      Q.   Could you briefly describe to the Judge the

6  port area that you work in?

7      A.   Yes, sir.  It's -- we neighbor Tijuana,

8  Tijuana, Mexico, north, northwest part of Mexico; and

9  it's the port that we have -- the major international

10  airport, which is on the U.S. side, is San Diego

11  Lindbergh, and on the Mexican side is Tijuana

12  International Airport.

13           And we have people flying to Tijuana from

14  anywhere in the world, and then they apply for entry in

15  San Ysidro from -- from Tijuana, Mexico.  It's -- we're

16  located in the southwest area of the United States.

17      Q.   Now, we think of -- of you being a port of

18  entry from the country of Mexico.  Is your -- is -- are

19  the people applying to admission to the United States

20  from that port strictly Mexicans?

21      A.   No, sir.

22      Q.   Do they -- where else do you receive people --

23      A.   Anyone and everyone in the world that they can

24  get to Tijuana from, they'll be applying for entry at

25  San Ysidro Port of Entry.

93

```
 1    Q.  What are some of the other major ethnic groups
 2  that come through that port from the country of Mexico?
 3    A.  We get a lot of people from Somalia, we get a
 4  lot of people from the -- Iraq, from everywhere and
 5  anywhere, Asia, you know, Saudi Arabia, from all over
 6  the world.
 7    Q.  Do you see a lot of Russians come through?
 8    A.  Not a lot, but we do have quite a few that come
 9  through.
10    Q.  How about Iranians?
11    A.  Yes.
12    Q.  Now, what -- where specifically within the port
13  of entry are you assigned?
14    A.  I could be assigned anywhere as a primary
15  officer.  It could be the primary lanes, vehicle lanes
16  or the primary pedestrian lanes, which is where I was
17  assigned when the gentleman applied for entry into the
18  United States.
19         I could be assigned to clear any vehicle or
20  person that was assigned to vehicle secondary or
21  pedestrian secondary, as well as we have officers -- we
22  have people that travel into the United States, and they
23  have visitor's visa, and that allows them to enter the
24  United States up to 25 miles.  And within the 25
25  miles -- miles, they can stay up to 30 days.  Anything
```

94

```
 1  beyond that distance or that time frame, they have to
 2  get -- obtain a I-94, which is a permit for them to go a
 3  further distance or a longer -- stay for a longer period
 4  of time.  And I could also be assigned to that, which is
 5  called the old port -- old port offices, and there's
 6  where I would issue them their permits.
 7    Q.  So would it be a fair statement that when you
 8  report for work on any given day, you could be assigned
 9  to a number of different -- any one of a number of
10  different duty stations?
11    A.  That's correct.  There's many more, but, yes.
12    Q.  Okay.  And is there a security reason for that?
13    A.  Yes, we have to --
14    Q.  Is there --
15         THE REPORTER:  I'm sorry.  Could you wait
16  till he finishes the question before asking the next
17  question?
18         MR. GILL:  I'm sorry.  I'm -- I'm trying to
19  ask two questions at once.
20    Q.  (BY MR. GILL)  Is there a security reason for
21  you being assigned to different locations within the
22  port?
23    A.  Yes.  They have to rotate us around everywhere
24  and anywhere.  It doesn't -- it doesn't repeat itself
25  from week to week because we deal with people trying to
```

95

```
 1  kind of like obtain knowledge as to how we operate
 2  and -- and try to find weaknesses in any of our
 3  different areas of the port of entry as to who might be
 4  the officer that inspects you the more, the most, who
 5  inspects you the least.  And they might be -- want to
 6  find that out and find out where you might be assigned,
 7  so if they are trying to bring something into the
 8  country, there's a better chance of them being
 9  successful.
10         Now, by them alternating where we are
11  assigned and assigning us in different areas, it's
12  harder for them to -- to obtain that knowledge from us
13  as to how we operate.
14    Q.  Is security a serious concern at the port?
15    A.  Yes, sir.
16    Q.  When you -- when you go to work on a given day,
17  how are you dressed?
18    A.  We have different uniforms that we can wear.
19  Since mostly a primary officer, I wear BDUs, which are
20  the most comfortable, most -- we do get involved in
21  chases or taking people down, aggressive people, so
22  that's the one I personally wear.  And there's BDUs,
23  tactical boots and, you know, my duty belt, my weapon
24  and my bulletproof vest, everything.
25    Q.  Do you wear a uniform?
```

96

```
 1    A.  Yes, sir.
 2    Q.  Does your uniform -- do you wear a badge?
 3    A.  Yes, sir.  If it happens to be the BDUs, they
 4  will not have this badge showing, the actual badge
 5  showing.  It will be a patch.  It is the exact same --
 6  resembles our exact -- our actual badge.
 7    Q.  And your -- your patches contain language that
 8  identify you as a -- as a border protection agent?
 9    A.  Yes, sir.
10    Q.  Is that correct?
11    A.  Yes, sir.
12    Q.  You carry a sidearm?
13    A.  Yes, sir.
14         THE COURT:  I have a question.  I
15  understand you using acronym BDU.  What does that stand
16  for.
17         THE WITNESS:  Well, different agencies
18  refer to it different, even throughout the military, but
19  it is -- it is --
20         THE COURT:  Is that battle dress uniform?
21         THE WITNESS:  In the military, yes, but
22  we're not technically in battle, but that is correct.
23         THE COURT:  All right.  Thank you.
24    Q.  (BY MR. GILL)  It's a battle-type article of
25  clothing; is that correct?
```

97

1    A.   Yes, sir.

2    Q.   Something you can move around in?

3    A.   Yes, sir.

4    Q.   Let me show you what has been marked as State's Exhibit No. 41, which I can -- have -- you've seen this

6  before, haven't you?

7    A.   Yes, sir.

8    Q.   Now, State's Exhibit 41 contains a diagram of

9  the -- of the port area where you were; is that correct?

10   A.   Yes, sir.

11   Q.   And it also contains a number of different

12 photographs that correspond to different areas of the

13 port --

14   A.   That is correct.

15   Q.   -- is that also correct?

16        Have you had a chance to -- to look over

17 the diagram which -- which is in the middle of the

18 exhibit?

19   A.   Yes, sir.

20   Q.   And without it being to scale, is that a fairly

21 accurate representation of the port area?

22   A.   Yes, sir.

23   Q.   Have you also had a chance to exam the

24 photographs which are contained -- they're sub-marked A

25 through K?

98

1    A.   Yes, sir.

2    Q.   And do you recognize the scene depicted in each

3  of the photographs?

4    A.   Yes, sir.

5    Q.   And is each of those photographs an accurate

6  depiction of the port as it appeared back in December of

7  2009?

8    A.   Yes, sir.

9        MR. GILL:  Your Honor, at this time we'd

10 offer State's 41.

11       MR. CUMMINGS:  We have no objections to

12 State's 41.  I guess it's PT-41, for purposes --

13       MR. GILL:  That's correct.

14       MR. CUMMINGS:  -- of this hearing.

15       THE COURT:  All right.  41 is admitted.

16       (State's Pretrial Exhibit No. 41 admitted)

17   Q.   (BY MR. GILL)  Okay.  Officer, what I'd like

18 you to do is let's just walk the Judge through what we

19 see on the diagram, first of all, and then we can talk

20 about what's contained in the photographs, all right?

21   A.   Yes, sir.

22   Q.   Let's just -- let's just walk -- walk through

23 as a person would enter from the country of Mexico.  And

24 can you show the Judge what a person would go through to

25 enter from the country of Mexico?

99

1    A.   Mexico would be here.  Anything beyond this

2  point is a line which kind of shows it here.  It's a

3  white line with yellow stripes going, and it tells you

4  anything beyond this point, which would be facing

5  this -- facing going down this way, the United States.

6  Anything behind that point is Mexico, which it would be

7  up here.  So as -- as you're walking, you're walking

8  from the south to north.  South being here, north being

9  down here.  And --

10   Q.   So south is at the top of the diagram and north

11 is at the bottom of the diagram?

12   A.   That's correct.

13   Q.   And when you were -- you were -- you were

14 referring to the signage for the international border,

15 you were referring to number -- Photograph No. B?

16   A.   Photograph No. B is correct.

17   Q.   And that is signage that warns someone that

18 they are, in fact, crossing the international border at

19 that point; is that correct?

20   A.   Yes, sir.

21   Q.   Okay.  And what happens next?

22   A.   Well, depending on the traffic of the amount of

23 traffic of pedestrians coming across the border, as you

24 can see in picture No -- picture letter A, there's

25 always -- for the most part always a line -- a huge line

100

1  of people trying to enter the country.

2    Q.   Is that looking back into Mexico --

3    A.   That's looking south back into Mexico from --

4  from our gate, which would be this gate here.  And we

5  either allow them to go through the turnstile door,

6  which is on the left side on picture F, or the actual --

7  there's an actual door there with a key pad that we --

8  numbered key pad, and we have the numbers to -- or the

9  code to open it up.  And only those -- only the officers

10 have the code to that.

11       So as they are traveling north, these are

12 pictures facing north.  They would have to come through

13 this gate either through the turnstile or the actual

14 door itself.  Once they have gone past that point,

15 there's no going back because we will not allow them,

16 unless as you walk a little further north, there's a

17 building to the right as you're traveling north, which

18 is the -- it's called the old port, Picture C, and

19 that's where we issue the I-94s, the permits to

20 travelers with visitor's visas.

21       So those people, if they wish to go back to

22 Mexico, we would allow them if it shows they were issued

23 an I-94, because a lot of people tend to park in Mexico,

24 cross-walk to obtain their I-94s, and they go back and

25 get their car and then enter the United States through

101

1 the vehicle primarily lanes. So that is -- once you've
2 entered, if you are -- if you don't -- if you do not
3 need an I-94, you will continue to walk north, go just
4 past the old port on the right-hand side, which will be
5 looking something like this here on Picture G. They're
6 walking. That's -- it's called the tunnel area.
7 They're about to enter the tunnel -- the indoor part of
8 the tunnel there, and as you can see, we -- from the
9 beginning when they're about to enter the country,
10 there's signage everywhere. We have signs everywhere.
11 They're walking here, which at this point
12 they're traveling around this area here traveling north,
13 and they are about to approach the doors where you
14 actually make it into the indoor part of the tunnel.
15 And there's the doors on Picture D, so once
16 you make it past that point, there's even more signs. I
17 don't see any more pictures on that.
18 So once -- once you make it past that,
19 it's -- it's quite -- quite a long hallway, quite a long
20 tunnel. And then eventually, the traveler will make it
21 to where the primary officer would be in this area of
22 the exhibit here, which shows the booths where the
23 officer would be on Picture J as well as K.
24 And as you can see -- I don't know if you
25 can tell -- there's even more signs there explaining to

102

1 them what is required from them to enter the country,
2 that they are actually about to make entry into the
3 United States, different sides for whether they have
4 passports or not, because some travelers still, if they
5 happen to use them, some do still travel with only an ID
6 card because they don't have anything else or birth
7 certificate and no ID or, you know, or actual passport,
8 or if they happen to be a resident of the United States,
9 they have resident cards. And also there's signage
10 everywhere.
11 As they are about to approach our booths,
12 which, as you can see on Picture J and K -- this would
13 be a picture from the traveling public, they are about
14 to approach our booths. We tend to have booths that --
15 there will be a booth -- I'll be assigned to a booth,
16 which I'm facing another officer, so he's taking care of
17 one person, I'm taking care of another person. And they
18 go in between both of us. And then there will be an
19 officer behind me and an officer in front of me, which
20 is next to that officer, face away from me because he's
21 next to the officer that is directly to the side of me
22 at an angle.
23 So when we're in the primarily pedestrian
24 lanes, we can see a portion of the public who's waiting
25 to make entry into the United States, as well as

103

1 secondary, which would be past that point.
2 So if -- when we have anybody trying to
3 make entry into the United States, if there's any kind
4 of issue, whether they don't have enough documentation
5 and we do not have enough documentation in front us to
6 be sure that they are who they say they are as far as
7 being a U.S. citizen or a resident or visitor, if
8 there's any kind of checking that we need to be -- to
9 have done, we refer them to south secondary.
10 Now, if -- if there's something more
11 serious that might come up when we run their information
12 on the -- on our computers, then we refer them to the
13 port enforcement team, whether it's -- if they have any
14 warrants -- any warrants, if they happen to be
15 missing -- because we do get a lot of minors as well
16 that will come up as missing.
17 So anything -- anything more than either
18 lacking documents or having priors with us as far as
19 trying to smuggle people or narcotics, they will go to
20 south secondary. If it's something more serious, then
21 they go to a port enforcement team, which would be -- as
22 you're making entry into the United States, it would be
23 to the right, to the east part of the port.
24 THE COURT: All right. Thank you.
25 THE WITNESS: Yes, sir.

104

1 Q. (BY MR. GILL) The blue rectangles on the
2 diagram, do those represent -- represent the booths
3 where the primary officers are stationed?
4 A. That is correct.
5 Q. And if -- if an individual wants to make entry
6 into the United States, they would have to present
7 themselves to an officer at one of the primary booths;
8 is that correct?
9 A. That's correct.
10 Q. On December the 20th of 2009, were you assigned
11 to work one of those primary booths?
12 A. Yes, I was, sir.
13 Q. And as an officer assigned to work one of the
14 primary booths, what are your duties?
15 A. To, number one, inspect the traveling public,
16 make sure that they do have the proper documents to
17 enter into the United States and also make sure that
18 they're not bringing any -- anything that is illegal in
19 the sense of narcotics, for instance, or weapons. If
20 you suspect anything, then we might check them further
21 at that point. So first and foremost is to make sure
22 that they -- they are legally able to enter the United
23 States.
24 Q. And -- and I take it it's -- it's necessary for
25 you to wear your sidearm when you're conducting that

105

1 duty?

2     A.   Yes, sir.

3     Q.   What are some of the security concerns that

4 arise when you're working that booth as a primary

5 officer?

6     A.   Security concerns is we have travelers that are

7 either wanted in any way, shape or form by local, state

8 or federal authorities, and especially now that we are

9 required to run everybody and anybody that crosses the

10 border for wants and warrants, they might be wanted and

11 they might try to flee from us, or they might try to

12 attack us to try to get away.  And that's one of the

13 major security concerns there, as well as after 911,

14 trying to bring any -- anything that could cause harm to

15 others, you know, that -- whether it's explosives or --

16 or anything.  Everything and anything that could cause

17 harm to people.

18     Q.   So I take it security is -- is a major concern

19 at this port of entry?

20     A.   Yes, because you are entering the country.

21     Q.   And are you concerned for your own security?

22     A.   Yes, sir.

23     Q.   Are you concerned for the security of the other

24 people in the -- waiting in line to legally enter and

25 conduct their legal business?

106

1     A.   Yes, sir.

2     Q.   As well as other officers?

3     A.   Yes, sir.

4     Q.   Okay.  At any given time in this -- in this

5 queue area waiting to get into the country, there are a

6 number of people.

7     A.   A great number of people, yes, sir.

8     Q.   Is this -- is this port area busy 24 hours a

9 day?

10     A.   24 hours a day, yes, sir.

11     Q.   Now, a minute ago you were talking about --

12 about running someone to see if they were wanted

13 anywhere.  How do you accomplish that at the -- at the

14 primary booth?

15     A.   We -- through our computer, we have different

16 programs that we use as far as to run the person.  We

17 submit their information, you know, first name, last

18 name, date of birth.

19         And then it'll run through different

20 databases, and if anything comes back, then -- you know,

21 then we go from there, depending on what comes up as far

22 as whether they're wanted, whether they have priors with

23 us, anything.  Everything and anything.

24     Q.   What system are you -- are you querying at that

25 point?

107

1     A.   We use -- it's called -- well, the actual

2 program used is Pedestrian, but it uses different

3 systems.

4     Q.   Okay.

5     A.   And they have made so many changes lately that

6 I -- I'm not even sure exactly.

7     Q.   It's your understanding that your querying

8 major law enforcement databases at that point?

9     A.   Yes.

10     Q.   As well as a terrorist watch list?

11     A.   Yes, sir.

12     Q.   Just one other question about the -- about the

13 entry tunnel here.  By the time an individual gets to

14 your position up here at the -- at -- at a primary

15 booth, have they gone through any type of metal detector

16 or -- or other security screening?

17     A.   No metal detectors, no, nothing like that.

18     Q.   I take it you have a computer monitor with you

19 there in the booth?

20     A.   That is correct.

21     Q.   So you can tell what's going on.

22         So take us through the procedure as -- if a

23 person walks up to you and you're in the primary booth,

24 they apply for admission into the United -- United

25 States, take us through the procedure that you go

108

1 through to check that individual's documentation and

2 determine whether or not they should be allowed to

3 enter.

4     A.   Okay.  As the person approaches the primary

5 pedestrian booth, as soon as they present themselves to

6 myself, I will first obtain from that person whatever

7 they have, whether it's the -- if they happen to be a

8 U.S. citizen, the passport, lack thereof.  If they have

9 any form of ID, government ID to be accompanied by the

10 birth certificate, or unless they happen to be a

11 resident of the United States, a resident card or

12 visitor visas, stuff like that.  If they have what

13 they're required to have by law, then after that, I'll

14 go ahead and ask them, you know, what is the -- the

15 purpose of your visit to Mexico, as well ask them if

16 they're bringing anything back from Mexico with them.

17         And if they are not and I feel comfortable

18 with -- with their story, then I'll admit them into the

19 United States.  If they're lack -- lacking documents

20 trying to enter the United States, then I will -- after

21 I run them, I will still refer them to south secondary

22 so they can further check, whether it's by

23 fingerprinting them or running any of the other systems

24 we might have as far as immigration systems to double

25 check their status.

1    Q.  So if an individual does not satisfy you that
2  they have the proper documentation or if you feel
3  there's something amiss with that person, you can refer
4  them to an additional inspection?
5    A.  Yes, sir.
6    Q.  And that is known as soft secondary?
7    A.  Soft secondary, yes.
8    Q.  And if they present -- if you feel like they
9  present a greater threat or if they meet certain
10 criteria, you can send them to the port enforcement
11 team?
12   A.  Yes, sir.
13   Q.  And that's also known as secondary; is that
14 correct?
15   A.  Yes, sir.
16   Q.  And that's a different area from soft
17 secondary?
18   A.  Yes.  It's a secure location.  You have to have
19 a code to go in there.  Once you go in there, you
20 will -- we'll give you a full pat-down to check for
21 weapons or anything, and we will hold you there until we
22 can find out the information that we're lacking.  Or if
23 you happen to be transporting a car with narcotics, then
24 we can go -- as far as if it's hidden within the person,
25 then we can request anything else that we might need

110

1  after that to go to the hospital, you know, for them to
2  pass drugs or anything like that.
3        So that's why they would go to that area
4  because they're not -- because we need to make sure
5  they're not going to go anywhere at that point.
6    Q.  If an individual -- well, do you ask everybody
7  that presents themselves to you the same series of
8  questions?
9    A.  Not the same series of questions.  I can ask
10 them different types of questions to obtain the same
11 information that I want.  One is to make sure that they
12 are admissible to the United States, and, two, that
13 they're not bringing anything into the United States
14 that is illegal or is going to cause harm to anybody.
15   Q.  Do you -- if they -- if they are -- are trying
16 to portray themselves as United States citizens, do you
17 inquire of them what their business was in Mexico?
18   A.  Yes, sir.
19   Q.  And you have broad authority to do that?
20   A.  Yes, sir.
21   Q.  Are you familiar with the Western Hemisphere
22 Travel Initiative Program?
23   A.  Yes, sir.
24   Q.  Under that program, what is considered
25 acceptable identification for a person presenting

themselves for entry into the United States?
2    A.  U.S. passport if they happen to be U.S.
3  citizens, also an enhanced driver's license, which some
4  states do offer that for their citizens of the
5  residence, and so we accept that as a valid travel
6  document to enter the United States as far as U.S.
7  citizens are concerned.
8    Q.  Does Texas feature an enhanced driver's
9  license?  Do we offer an enhanced driver's license?
10   A.  Texas does not.
11   Q.  So if an individual shows up at your primary
12 booth and presents themselves for admission into the
13 United States claiming to be a United States citizen and
14 only presents a Texas driver's license, have they
15 presented to you proper documentation for entry?
16   A.  No, sir.
17   Q.  Okay.  So what do you do at that point?
18   A.  Then I -- I am required to run them
19 automatically.
20   Q.  Let me direct your attention to January, back
21 to January 20th of 2009, and ask you if you were at work
22 approximately 5:48 that morning?
23   A.  Yes, sir.
24   Q.  And did an individual present himself to you
25 for admission at approximately 5:48 a.m. on December

112

1  20th of 2009?
2    A.  Yes, sir.
3    Q.  Do you see that individual in the courtroom
4  today?
5    A.  Yes, I do, sir.
6    Q.  Could you please point him out and describe
7  what he's wearing today?
8    A.  He's to my front right side, and he's wearing a
9  green outfit, green jumpsuit, seems like.
10       MR. GILL:  Your Honor, will the -- may the
11 record reflect he's identified the Defendant?
12       THE COURT:  The record will so reflect.
13   Q.  (BY MR. GILL)  Did you notice this individual,
14 the Defendant over here to my left, when he was in line
15 getting ready to approach the primary booths?
16   A.  I noticed him shortly before he was about to
17 approach me, yes, because from the view we have before
18 they approach us.
19   Q.  And what did you notice about him?
20   A.  I noticed he was expressionless.
21   Q.  And what does that mean to you?
22   A.  I mean, based on my training and experience of
23 working them dealing with so many people is that I
24 just told me there was something wrong with him for --
25 for whatever reason, which I didn't know, and that I was

1  going to make sure to check him thoroughly before
2  allowing -- I allowed him to enter the United States.
3      Q.  And did he ultimately approach the primary
booth where you were working?
5      A.  Yes, sir.
6      Q.  And would you lead the Judge through your
7  exchange with him after he approached the booth where
8  you were working?
9      A.  Yes, sir.  As best as I can remember, he
10  approached my booth, and like I said, he didn't appear
11  to have any expression on his face, so I was wondering
12  what could be going on with him.
13          And he presented a Texas driver's license
14  and Texas driver's license only, and at that point I
15  would -- I asked him, you know, what's your citizenship,
16  which he replied by saying, U.S. citizen.
17          And I asked him if he had anything else
18  besides just a Texas driver's license because that was
19  not enough for -- for him to prove to me that he was a
20  U.S. citizen.  He said no.
21          So then as I'm looking at him, I start
22  running his name on the computer, and I ask him what
23  were you doing in Mexico, what was the reason for your
24  visit to Mexico, and he said that he went to Mexico to
25  clear his mind out and didn't say much after that.

114

1          And I asked him, so what are you doing out
2  here?  What were you doing in Mexico, what brings you
3  out here.  And I asked him if -- if he's staying in
4  California.  He said he came down here, that he was --
5  he was staying in San Diego area, and for what reason,
6  and he said, just to have fun.
7          And as I'm getting that information out of
8  him, you know, I asked him, are you bringing anything
9  back from Mexico?  No.
10          So by that time -- give or less around that
11  time, after running his name, the information comes up
12  in front of the screen.  At that point he comes up on my
13  computer screen as armed and dangerous, and when that
14  happens the -- what's -- it's a big, red, square red box
15  that says A&D.
16          THE REPORTER:  I'm sorry?
17          THE WITNESS:  A&D.
18          And when that happens, the officer in front
19  of me, the officer behind me, whatever they're doing,
20  that's going to take over their computer screens.  It's
21  going to show A&D, for them to respond to my group, as
22  well as soft secondary -- officers from soft secondary
23  in their screens, that will show -- it will show where
24  our management is, our supervisor, which is an area
25  that's called the fish bowl, which they will receive

---

1  everything from there and which is located -- that
2  office is closer to where the vehicles enter the United
3  States.  They will see that as well as waiting for -- to
4  hear anything on the radio as far as, you know, if we
5  need help, any more help because everybody that is in
6  the pedestrian side since I was assigned to a pedestrian
7  side, we'll be aware of that.  And also on the -- where
8  we issue the permits, they will know that as well
9  because if it was something major, they can come and
10  assist us from the old port area.
11          So everybody's pretty much aware, even the
12  port enforcement team, which that person will eventually
13  go to, they are aware that that's happening, so in case
14  that we need further assistance and to give them a heads
15  up that somebody is going to be coming into that area
16  where they're at.
17          So at that point pretty much everybody
18  stops.  Everybody stops, and the focus is that armed and
19  dangerous, you know, information that we have in our
20  computer screens.
21          So at that point when -- when that happened
22  that I saw this armed and dangerous, I told him to keep
23  his hands on the counter both for his safety and mine
24  and not to do anything, not to move, not -- not to do
25  anything, let us handle it from this point.

116

1          At that point he will be approached by the
2  officers surrounding me, the -- in front of me and
3  behind me.  They will approach, and if I -- during that
4  time, I'm verifying the information as much information
5  as I can from what he provided to me, which happened to
6  be a Texas driver's license, and what it says on the
7  screen.  Everything I had in front of me matched, so I
8  told the officers it's a match.  So at that point they
9  handcuff him, and -- and he gets escorted to the port
10  enforcement team.
11      Q.  So an armed and dangerous is a -- is a very
12  serious alert?
13      A.  Yes.
14      Q.  And why is that?
15      A.  Because we could be dealing with somebody who
16  could potentially hurt us, hurt others, hurt himself
17  because obviously he is wanted for whatever reason
18  because we don't have enough information at that point.
19  All we have is just his information to match, you know,
20  whatever documents he gave us, and we don't know what
21  this person is capable of or anything like that, so he
22  has his very high priority, and we need to make sure to
23  get -- have full control of that person at all -- at all
24  times and from that point on until we resolve whether --
25  whether it's an actual a hundred percent match or not.

119

1    Q.  So pretty much everybody in your area drops
2  what they're doing and pays attention to what's going on
3  at your booth where the armed and dangerous is?
4    A.  Yes, sir.
5    Q.  Okay.  And in this particular case, is that
6  what happened?
7    A.  Yes, sir.
8    Q.  And this particular man right over here was
9  then handcuffed by other agents; is that correct?
10    A.  Yes, sir.
11    Q.  Now, was he the only person handcuffed when you
12  received an armed and dangerous alert?
13    A.  Yes, sir.
14    Q.  Do you handcuff everybody that comes up as an
15  armed and dangerous?
16    A.  Yes, sir.
17    Q.  Is that part of your standard protocol for
18  conducting business at the --
19    A.  That's part of our policies and procedures that
20  we have to follow.
21    Q.  Every armed and dangerous gets handcuffed?
22    A.  Yes, sir.
23    Q.  And why is that?
24    A.  Because they potentially could be dangerous,
25  and we need to make sure that they are restrained right

118

1  away and taken into a secure location.
2    Q.  And are they taken to a secure location for
3  further inspection?
4    A.  Yes, sir.
5    Q.  And -- because you don't get a whole lot of
6  information on your screen at that point?
7    A.  No, sir.
8    Q.  But if someone -- if this -- where are all the
9  armed and dangerous persons taken?
10    A.  Into the port enforcement team area.
11    Q.  Okay.  So this is serious enough where they
12  skip soft secondary and go straight to the port
13  enforcement team?
14    A.  Yes, sir.
15    Q.  And back at the port enforcement team, do they
16  have more resources to research that individual
17  situation?
18    A.  Yes, sir.
19    Q.  And is that what happened in this particular
20  case?
21    A.  Yes, sir.
22    Q.  Okay.  Regardless of whether this Defendant had
23  come up armed -- come up armed and dangerous, were you
24  going to allow him to enter the United States without
25  further inspection?

1    A.  No, sir.
2    Q.  Why was that?
3    A.  Because of the lack of documents, and he was --
4  he was going to be referred to soft secondary,
5  regardless.
6    Q.  Now, who has the burden to show that -- that a
7  person is -- is legally entering the United States?  Is
8  the burden on you to keep them out, or is the burden on
9  them to prove that they are, in fact, an admissible
10  person under the laws of the United States?
11    A.  The burden is on them to prove to the officer
12  that they are admissible into the country.
13    Q.  Now, last night, did you have an occasion to
14  watch a -- a short video clip of the Defendant entering
15  the port area?
16    A.  Yes, sir.
17    Q.  And let me show you what's been marked as
18  State's Exhibit Pretrial 16, which I can represent to
19  you is a copy of that short video clip that you watched
20  last night.  Is it an accurate depiction of the -- of
21  the events as they went down on December the 20th of
22  2009?
23    A.  Yes, sir.
24         MR. GILL:  At this time we offer State's
25  Pretrial 16.

120

1         MR. CUMMINGS:  Your Honor, I was given the
2  opportunity to view the contents of Pretrial 16 during
3  the break.  We have no objections to the introduction of
4  Pretrial 16 for purposes of this hearing.
5         THE COURT:  16 is admitted.
6         (State's Pretrial Exhibit No. 16 admitted)
7         MR. GILL:  May we publish it, Your Honor?
8         THE COURT:  You may.
9         (State's Pretrial Exhibit No. 16 published)
10    Q.  (BY MR. GILL)  Officer Bernal, what are we
11  looking at here?
12    A.  You're looking at the vehicle -- I'm sorry, the
13  pedestrian primary lanes.  Actually, you're looking at
14  the tunnel way.  The gentleman has just entered the
15  indoor part of the -- part of the tunnel, and he's
16  walking north.
17    Q.  Is this the individual that you've identified
18  earlier?
19    A.  Yes, sir.
20    Q.  Okay.
21    A.  That's a view of the primary booths as we're
22  looking south towards Mexico right before the travel
23  public makes or applies for entry into the United
24  States.
25    Q.  And your booth is actually over to the far left

121

1  of -- of this view; is that correct?

2      A.  Yes, sir.

3      Q.  Okay.  And you said the individual moving right

there, is that the individual we've been watching?

5      A.  Yes, sir.

6      Q.  Now, on this view right here, is this the -- is

7  this you?

8      A.  Yes, it is.

9      Q.  The booth you're working?

10     A.  Yes, sir.

11     Q.  And this is the Defendant that you identified

12  in court earlier?

13     A.  Yes, sir, in front --

14     Q.  Standing right in front of you?

15     A.  Yes, sir.

16     Q.  Okay.  So what are you doing at this point?

17     A.  At this point I'm asking him questions like I

18  mentioned before about, you know, because he just

19  presented me a Texas driver's license, and asked him if

20  he had anything else to show to me to prove that he's a

21  U.S. citizen, which he did not have.

22         So at this point I start running him on my

23  computer, and I'm also taking care of asking him the

24  questions as to what he was doing in Mexico and what is

25  he doing out here in this part of the country.  At that

122

1  point, you know, I'm running him and waiting to get a

2  response from our systems.

3      Q.  And as you're working, we see other people

4  coming through the pedestrian lanes and going about

5  their business; is that correct?

6      A.  Yes, sir.

7         Now, a little before this, before the

8  officers actually start approaching me, we have had

9  already an answer from our systems, and the officer that

10  was directly in front of me has come around his booth,

11  and he's standing behind the -- the gentleman.  And also

12  another officer came from the pedestrian soft secondary

13  area, as well as the officer to my -- in front of me to

14  the left.  So at this point I'm verifying the

15  information that is in front of me to make sure that we

16  do have a match.

17     Q.  And we saw three -- three other officers

18  approach from three different directions at that point;

19  is that right?

20     A.  Yes, sir.

21     Q.  Is that standard procedure?

22     A.  Yes, sir.  And at this point I told them that

23  we do have a match, and he has been handcuffed.

24     Q.  Okay.  Is this the individual right here?

25     A.  Yes, sir.

123

1      Q.  Okay.  And where is he headed at this point?

2      A.  He's heading to the port enforcement team.

3      Q.  Okay.  And I'm -- just so -- to go over this --

4  this view a little bit more, at the top of the -- the

5  view here, that's the tunnel area?

6      A.  Yes, sir.

7      Q.  And would the soft secondary be over in this

8  area here?

9      A.  Yes, sir.

10     Q.  Off to the right side?

11     A.  That's correct.

12     Q.  What are these two units right here?

13     A.  Those are x-ray machines.

14     Q.  Okay.  And here, here, here, here, here, here

15  on -- on to the right, what are all those areas?

16     A.  Those are primary booths, and in between each

17  set of primary booths, that's where the travelers will

18  walk through.

19     Q.  Okay.  So under the Western Hemisphere Travel

20  Initiative Program, an individual has to have a U.S.

21  passport to be admitted as a U.S. citizen?

22     A.  A U.S. citizen has to have a U.S. passport or a

23  passport card.

24     Q.  Okay.

25     A.  To enter the United States.

124

1      Q.  Or -- or an enhanced driver's license?

2      A.  That's correct, from the states that do provide

3  it.

4      Q.  And could they be admissible with a driver's

5  license which was accompanied by a birth certificate

6  showing that they were born in the United States?

7      A.  That is correct.

8      Q.  Okay.  Other -- other than those scenarios, if

9  they don't have any of those -- those documentation

10  scenarios, they are not admissible into the United

11  States; is that correct?

12     A.  That is correct.

13         MR. GILL:  We pass the witness.

14         THE COURT:  Cross-examination?

15             CROSS-EXAMINATION

16  BY MR. CUMMINGS:

17     Q.  Officer Bernal, my name is Fred Cummings.  We

18  met briefly in the back, did we not?

19     A.  Yes, sir.

20     Q.  I just have a few questions for you.

21         You prepared a one-page report after this

22  incident.  Do you -- have you had the benefit of being

23  able to review your report?

24     A.  Yes, sir.

25     Q.  Okay.  According to the report that I've --

125

1  have been given a copy of through discovery, this
2  particular incident that we just watched on the screen
3  there occurred on the 20th of December 2009, according
4  to your report, at approximately 5:48 a.m.; is that
5  accurate?
6      A.   Yes, sir.
7      Q.   The video clock appears to have -- be a little
8  bit off as far as the time.  Which do we go by, your
9  report or the -- the video?
10     A.   As far as the -- the report that I submitted, I
11  go off of that time which I will -- I will have obtained
12  from the computer screen.
13     Q.   Okay.  And I don't know how far off it is.  It
14  may just be a little bit, but it seems to us in
15  reviewing this there seems to be a small discrepancy.
16          I'm curious.  You deal with thousands of
17  people every day, yet you're able to identify my client.
18  How are you able to identify him?
19     A.   How am I able to identify him?  After reviewing
20  the video, I recognized him.
21     Q.   Okay.  So you had a benefit of seeing -- when
22  you were authenticating the video that we just observed,
23  you have compared the gentleman here in the courtroom
24  with that video and made your identification based upon
25  that; is that accurate?

126

1      A.   Yes, sir.
2      Q.   Okay.  Your function is -- has been very well
3  described to us here today, so it appears that based
4  upon your testimony, even had the armed and dangerous
5  not come up on your screen, because of the lack of
6  documentation, that individual who went through your
7  checkpoint was going to be checked by someone else
8  probably in soft secondary at the very least; is that
9  correct?
10     A.   That is correct.
11          MR. CUMMINGS:  One moment, please, Your
12  Honor.
13     Q.   (BY MR. CUMMINGS)  The procedure that you-all
14  used in order to handcuff this individual, that would
15  not have taken place had the red box A&D not have come
16  up, correct?  That's a terrible question.
17          You had -- the procedures that took place
18  that we observed on the video were because the policy
19  that you have in dealing with somebody that alerts A&D,
20  armed and dangerous, correct?
21     A.   Yes, sir.
22     Q.   Had John Hummel come to you and merely had that
23  Texas driver's license and nothing more, he wouldn't
24  have necessarily been handcuffed and taken into custody.
25  How would he had gotten from your work station to soft

127

1  secondary?
2      A.   I would have escorted him.
3      Q.   Okay.  And as -- as you've already said,
4  regardless of what happened, he was going there at the
5  very least?
6      A.   Yes, sir.
7      Q.   But he would not have necessarily been
8  handcuffed?
9      A.   No, sir.
10     Q.   Did you receive any other documentation from
11  Mr. Hummel, such as a Social Security card?
12     A.   No, sir.
13     Q.   Would that have been satisfactory
14  documentation?
15     A.   No, sir.
16     Q.   I'm just curious.  A birth certificate in
17  addition to a Texas driver's license, is that adequate
18  anymore?
19     A.   It is if they happen not to have their -- their
20  passport as I view it, yes, and we will put in our
21  system as being non-WHTI compliant, which is the Western
22  Hemisphere Travel Initiative Complaint (sic).
23     Q.   A&Ds, how often -- I'm sorry.  You said you
24  have done this for how many years now?
25     A.   Three years, four months.

128

1      Q.   Three years, four months.  And you're not
2  always necessarily in the passenger area.  You -- you
3  also work vehicles and other jobs around the port,
4  correct?
5      A.   Yes, sir.
6      Q.   When you -- how many A&Ds have you dealt with
7  over the course of those three years, four months?  Any
8  idea?
9      A.   How many have I had in front of me?
10     Q.   Yes.
11     A.   Of those A&Ds?  I believe it's about eight.
12     Q.   Okay.
13     A.   I have assisted to many, many, many more, but
14  as the other officers assisted to my A&D, person pop up
15  when I run somebody, has been about it.
16     Q.   The policies that you have in place, every one
17  of those three officers that responded are armed
18  officers?
19     A.   That is correct.
20     Q.   Everybody that works -- strike that.
21          Does everyone who works in the port for
22  Customs and Border Protection wear a sidearm?
23     A.   Yes, sir.
24          MR. CUMMINGS:  Thank you very much,
25  Officer.

1    Pass the witness.

2    THE COURT:  Redirect?

3    MR. GILL:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. GILL:

6    Q.   This port enforcement business is serious

7    business, isn't it?

8    A.   Yes, sir.

9    Q.   You said you've had at least eight A&Ds present

10   themselves to you?

11   A.   Yes, sir.

12   Q.   You've assisted many other officers in

13   detaining subjects that have been flagged as A&D also;

14   is that correct?

15   A.   Yes, sir.

16   Q.   Have any of those incidents resulted in

17   violence?

18   A.   Yes, sir.

19   Q.   Can you describe some of those incidents to the

20   Judge, please?

21   A.   Sure.  The latest one we had was where my

22   immediate supervisor was directly involved with that,

23   Your Honor.  And the gentleman did come up as an A&D,

24   which happened to be in the vehicle primary lanes.  And,

25   of course, he's driving a vehicle.  He decided he was

---

130

1    going to take off on the officer.  And by doing so, when

2    he started taking off, in our booths we have a port

3    runner button, and that would be considered a port

4    runner when somebody is trying to run the port.

5        So the officer pressed it.  The arms -- the

6    wooden arms would come down, spikes strip come up from

7    the ground to -- and pop the tires, and that individual

8    happened to do that at that point, and when -- while

9    doing that, he -- the -- any vehicles that have crossed

10   the border through any of the -- either that lane or any

11   of the other lanes would have been already traveling,

12   and when that happens, like I said, the arms come down,

13   the spikes go up, so those vehicles will stop.  And they

14   will be in the way of that vehicle trying to get away

15   from us.

16       So what happened at that point, the -- the

17   individual used his vehicle to try to force his way out

18   of there, out of our port; and by doing so, he rammed

19   his vehicle on the other person's vehicle, as well as

20   trying to run -- run over other officers.

21       And at that point, whether me as an officer

22   is in danger or another officer is in danger or the

23   traveling public is in danger, we are allowed to use our

24   firearm, and that's what happened just recently, and

25   there was a shooting at the port.

---

1    And, you know, the -- because a vehicle

2    is -- is a deadly weapon, it could be used as a -- as a

3    deadly weapon at that point if they're trying to make

4    their way out of the port by ramming other vehicles

5    or -- or trying to run over people or officers.

6    Q.   Security -- the port area is a very

7    security-conscious area, especially after 911; is that

8    fair to say?

9    A.   Yes, sir.

10   Q.   In the vehicle we saw and also in the

11   photographs, in the primary booth area, there's some

12   glass?

13   A.   Yes, sir.

14   Q.   And is that bulletproof glass?

15   A.   Yes, it is, sir.

16   Q.   And what's the purpose of that bulletproof

17   glass?

18   A.   To help us survive getting shot at, which it

19   does happen, and it has happened.  If somebody's trying

20   to get away from either of us or the officer behind us

21   or vice-versa, so that not more people get hurt or

22   killed in the process of -- if we have somebody who's

23   dangerous.

24   Q.   So would it be a fair statement that the

25   policies and directives you operate under are written so

---

132

1    that you and the general public can be secure?

2    A.   Yes, sir.

3    Q.   When an individual presents himself for

4    admission, such as this Defendant over here did, and

5    present to you a, for example in this case, Texas

6    driver's license, while you're interviewing that person

7    at the primary booth, do you compare that individual to

8    the photograph on the picture identification they've

9    provided to you?

10   A.   Yes, sir.

11   Q.   Is that part of -- of your security procedure?

12   A.   Yes, sir.

13   Q.   And is that part of your citizenship

14   verification procedure?

15   A.   Yes, sir.

16   Q.   And do you do that on a normal basis?

17   A.   Yes, sir.

18   Q.   Did you do that on this occasion?

19   A.   Yes, sir.

20       MR. GILL:  We'll pass the witness.

21       THE COURT:  Any further questions?

22       MR. CUMMINGS:  Yes, Your Honor.

RECROSS-EXAMINATION

24   BY MR. CUMMINGS:

25   Q.   Officer Bernal, the individual that presented

133

1  himself to you on the video there, he didn't give you
2  any problem whatsoever, did he?
3      A.  No, sir.
4      Q.  When you told him to leave his hands on the
counter, he did so, correct?
6      A.  Yes, he did comply.
7      Q.  He didn't resist your assisting officers one
8  bit, did he?
9      A.  No, sir.
10          MR. CUMMINGS:  Thank you, sir.
11          THE COURT:  May the witness be excused?
12          MR. GILL:  Nothing further from the State.
13          MR. CUMMINGS:  Yes, Your Honor.
14          THE COURT:  Officer Bernal, you're excused.
15  You may step down.  Thank you.
16          THE WITNESS:  Thank you, Your Honor.
17          (Witness retires)
18          THE COURT:  Call your next witness.
19          MR. GILL:  Ernesto Enriquez.
20          (Witness enters courtroom)
21          THE COURT:  Mr. Enriquez?
22          THE WITNESS:  Yes, sir.
23          (Witness sworn)
24          THE COURT:  Please be seated, sir.  You may
proceed when you're ready.

134

1              ERNESTO ENRIQUEZ,
2  having been first duly sworn, testified as follows:
3          DIRECT EXAMINATION
4  BY MR. GILL:
5      Q.  Tell us all your name, please, sir.
6      A.  My name is Ernesto P. Enriquez.
7      Q.  And how are you employed or occupied?
8      A.  I'm an officer of the Homeland Security
9  Department under United States Custom and Border
10  Protection.
11      Q.  How long have you been employed with Customs
12  and Border Protection?
13      A.  I've been employed for eight years.  This will
14  be my ninth year.
15      Q.  Did you undergo a -- a period of training to
16  qualify you to hold that job?
17      A.  Yes, sir.
18      Q.  Would you describe to the Judge what training
19  you've undergone?
20      A.  I went to immigration officer training, basic
21  training at Glynco, Georgia, for six weeks, and I've
22  been trained for firearm training -- firearms training,
23  law enforcement training and immigration training.
24      Q.  And do you undergo periodic retraining from
25  time to time?

135

1      A.  Yes, sir.
2      Q.  Before your employment as a border protection
3  officer, how were you employed?
4      A.  I was -- I did 20 years in the United -- United
5  States Navy.
6      Q.  And what assignment in the Navy?
7      A.  I was a mechanic and manager.
8      Q.  Were you at work at your job as a border
9  protection officer on January the 20 -- I'm sorry,
10  December the 20th of 2009?
11      A.  Yes, sir.
12      Q.  And where were you assigned on that particular
13  day?
14      A.  I was assigned as a secondary inspector or
15  secondary officer at the port enforcement unit at the
16  San Ysidro Port of Entry.
17      Q.  Is -- is that a -- pretty much a permanent
18  assignment for you?
19      A.  Yes, sir.
20      Q.  And what are -- what are your job duties there?
21      A.  My job -- one of my jobs is to take
22  fingerprints of the travelers that are referred to from
23  primary inspect -- inspection area.
24      Q.  Let's look at that diagram over to your left
25  for just a second.  Do you recognize that as being a --

136

1  a rough diagram of the -- the port area where you
2  worked?
3      A.  Yes, sir.
4      Q.  And if we heard testimony earlier that an
5  individual applying for admission comes in through this
6  way and presents themselves down here to an officer at
7  the -- at the primary booths, if an individual does not
8  satisfy the officer working the primary booth, is that
9  one of the -- one of the individuals that might be
10  escorted to you for further processing?
11      A.  Yes, sir.
12      Q.  And we have a green arrow down -- or they
13  brought over this direction to you to the left of --
14      A.  To the left of the red arrow, sir.
15      Q.  Yeah, okay.  Right over here.  So your office
16  area is over -- over in this area; is that correct?
17      A.  That's correct, sir.
18      Q.  And what -- what do you have there that allows
19  you to do your job?
20      A.  Can you repeat the question, sir?
21      Q.  What do you have -- what do you have in front
22  of you that allows you to do your job, that assists you
23  in doing your job?
24      A.  The system I have in front of me is what they
25  call the integrated automatic -- automated fingerprint

139

1  system, which is a computer-based taking the images of
2  the prints of the individual that's from the primary
3  area.

4     Q.  So at the point an individual is in front of
5  you, they're undergoing a -- a further inspection to
6  determine their admissibility?

7     A.  Yes, sir.

8     Q.  Or determine whether or not they're wanted by
9  another agency --

10    A.  Yes, sir.

11    Q.  -- for some reason.

12        Do you have individuals that are brought to
13 you that are -- that are wanted by -- on warrants by
14 other agencies?

15    A.  Yes, sir.

16    Q.  Federal agencies as well as state agencies?

17    A.  That's correct, sir.

18    Q.  Do people come in front of you for further
19 inspection that are -- have been flagged as missing
20 persons?

21    A.  Yes, sir.

22    Q.  Do you get persons that have been flagged as --
23 as armed and dangerous?

24    A.  Yes, sir.

25    Q.  So you see pretty much everybody, every type of

138

1  individual that has a difficulty entering the United
2  States?

3     A.  Yes, sir.

4     Q.  And do you see quite a large number of people
5  during a given day?

6     A.  Yes, sir.

7     Q.  What happens when a -- when a person that has
8  been flagged as armed and dangerous is brought to your
9  area?

10    A.  When they are brought to the area, they are
11 only brought down with a handcuff on for officer safety,
12 and if it -- if it's -- once they're brought in the
13 secondary, which is my area, they take the cuffs off,
14 and -- and that's when I do the -- take their
15 fingerprints and verify the identity of the person
16 that's being brought from the primary.

17    Q.  Between the time they're -- they're brought
18 from primary and -- and unhandcuffed and turned over to
19 you, do they undergo a -- a search to make sure they're
20 not armed in any way?

21    A.  That's correct, sir.

22    Q.  And that's part of your procedures and
23 directives?

24    A.  Yes, sir.

25    Q.  Okay.  And -- and that's for your protection as

140

1  well as their protection?

2     A.  Yes, sir.

3     Q.  Okay.  Now, on December the 20th of 2009, did
4  you have an individual by the name of John William
5  Hummel --

6     A.  Yes, sir.

7     Q.  -- that was brought to you after having been
8  flagged on the primary booth as armed and dangerous?

9     A.  Yes, sir.

10    Q.  Do you see that individual in the courtroom
11 today?

12    A.  Yes, sir.

13    Q.  Okay.  Would you please describe what he's
14 wearing -- where he is in the courtroom and what he's
15 wearing today?

16    A.  He is wearing a dark -- semi-dark green shirt.

17    Q.  Is he the -- the third person over here to my
18 left?

19    A.  That's correct, sir.

20        MR. GILL:  Can the record reflect he's
21 identified the Defendant?

22        THE COURT:  The record will so reflect.

23    Q.  (BY MR. GILL)  And for what reason was
24 Mr. Hummel presented to you on December 20th of 2009?

25    A.  He was presented as a missing person lookout,

1  possibly armed and dangerous.

2     Q.  What does a missing person lookout mean?

3     A.  A missing person is -- is a lookout from
4  National Crime Information Center from a different
5  agency or different country -- county or state that's
6  indicating that such person is reported as missing.

7     Q.  And is some -- is that something that you
8  investigate?

9     A.  Yes, that's correct, sir.

10    Q.  And you -- you make attempts -- do you make
11 attempts to verify that information through the
12 originating agency?

13    A.  Yes, sir.

14    Q.  Now, you said one of the first things you do
15 is -- is fingerprint the individual?

16    A.  That's correct, sir.

17    Q.  Did you fingerprint Mr. Hummel?

18    A.  Yes, I did.

19    Q.  And what system did you query when you first
20 ran Mr. Hummel's fingerprints?

21    A.  The first system I queried is the National
22 Crime Information Center, which is the -- and also the
23 Treasury Enforcement Communication System.

24    Q.  Did that reveal any information to you?

25    A.  Yes, sir.

141

1    Q.   What was that?

2    A.   That the person is reported as missing.

3    Q.   Okay.  And do you recall what time of the

morning you ran his prints through that system?

A.   I believe three after 6:00 -- 6:00 in the

6   morning.

7    Q.   Okay.  6:03 a.m.?

8    A.   6:03 a.m., that's correct, sir.

9    Q.   Did that -- did that query confirm that he was

10  a United States citizen?

11   A.   No, sir.

12   Q.   So that was still under investigation?

13   A.   That's correct, sir.

14   Q.   Did you then do an additional query?

15   A.   Yes, I did.

16   Q.   On which system?

17   A.   I reaffirm on National Crime Information Center

18  and the Treasury Communications System.

19   Q.   Is that known as TECS?

20   A.   Yes, sir.

21   Q.   The Treasury Enforcement Communications System?

22   A.   Yes, sir.

23   Q.   And what did that query reveal to you?

24   A.   The query revealed that Mr. Hummel is -- is --

25  is on the lookout for a missing person.

142

1    Q.   Now, do your policies and directives require

2   you to notify a supervisor at this point?

3    A.   No, sir.

4    Q.   Okay.  What -- what do your policies and

5   directives require you to do?

6    A.   The policy, if the person is confirmed --

7   confirmed as a wanted person, I have to refer them to

8   our prosecution unit.

9    Q.   Okay.  If they're a missing person, you confirm

10  that through the originating agency?

11   A.   That's correct, sir.

12   Q.   So in this instance, did you make any telephone

13  calls?

14   A.   Yes, sir, I did.

15   Q.   Who did you call?

16   A.   I called the Kennedale Police Department.  I

17  had contact with an officer named Renee.

18        THE REPORTER:  I'm sorry?

19        THE WITNESS:  Renee.

20   Q.   (BY MR. GILL)  Do you recall what time you made

the telephone call to -- your first telephone call to

22  Kennedale Police Department?

23   A.   I believe 50 minutes after 6:00 o'clock in the

24  morning.

25   Q.   So 6:50 a.m.?

143

1    A.   Yes, sir.

2    Q.   And what did you inform the officer at the

3   Kennedale Police Department?

4    A.   I informed -- I informed her to verify that the

5   person is -- have a lookout as a missing individual or a

6   missing person from -- from that Kennedale county police

7   department.

8    Q.   And did you --

9        THE COURT:  Let me interrupt you for a

10  moment.  6:50 a.m., what time?  What time zone?

11        THE WITNESS:  It's Pacific Time.

12        THE COURT:  That is Pacific?

13        THE WITNESS:  Pacific.

14   Q.   (BY MR. GILL)  So all the times I've discussed

15  with you has been Pacific Time --

16   A.   Yes, sir.

17   Q.   -- is that correct?

18        THE COURT:  Thank you.

19   Q.   (BY MR. GILL)  Did you inform the officer at

20  Kennedale the name and date of birth of the individual

21  that you had in front of you?

22   A.   Yes, sir.

23   Q.   Okay.  Did you have a conversation with

24  Mr. Hummel while you were conducting your conversation?

25   A.   A brief conversation, sir.

144

1    Q.   And what did you -- did you ask him something?

2    A.   Yes.  I asked him a question.

3    Q.   What did you ask him?

4    A.   I asked him the -- what was his purpose of

5   going to Mexico or purpose of his visit to Mexico.

6    Q.   And is that part of your normal investigation

7   of an individual applying for admission?

8    A.   Yes, sir.

9    Q.   You want to know their purpose for being out of

10  the country?

11   A.   Yes, sir.

12   Q.   What was his reply?

13   A.   His replied, I went to Tijuana to get some

14  weeds (sic).

15   Q.   Now, while you were working on verifying this

16  information with the Defendant, did you get a call back

17  from the officer at the Kennedale Police Department?

18   A.   That's correct, sir, yes, sir.

19   Q.   And what did the officer inform you at that

20  time?

21   A.   The officer told me to hold the person because

22  he has a warrant -- a warrant over at the Kennedale

23  Police Department.

24   Q.   Okay.  Had you been able to confirm a warrant

25  through any of the systems that you queried?

145

1    A.   No, sir.

2    Q.   And what did you do with regard to that

3 information?

4    A.   After I received that information from Officer

5 Renee of the Kennedale Police Department, I turned over

6 the case to our prosecution unit to Officer Kandal.

7         MR. GILL:  We'll pass the witness.

8         THE COURT:  Cross-examination?

9         MR. MOORE:  Thank you, Your Honor.

10                CROSS-EXAMINATION

11 BY MR. MOORE:

12    Q.   Let me -- Officer Enriquez, my name is Larry

13 Moore.  I'm one of the lawyers representing Mr. Hummel.

14 Let me visit with you a minute first about this diagram.

15         Okay.  You said that the -- the area where

16 you work is off the diagram here to the left of this red

17 arrow?

18    A.   Yes, sir.

19    Q.   What is it called?  What is it actually called?

20    A.   Port enforcement secured area.

21    Q.   Okay.  So it's a -- it's a secured area.

22 It's -- people coming and going through these gates

23 aren't allowed to go back there; is that right?

24    A.   They're not allowed to go back there.

25    Q.   He was -- he would have been brought back there

146

1 by some of the port enforcement officers; is that

2 correct?

3    A.   Yes, sir.

4    Q.   Okay.  How many people work in the area where

5 you work?

6    A.   I don't recall the day that we worked how many

7 people work in that area.  It's for security purposes.

8 It's supposed -- it's supposed to be more than three

9 officers.

10    Q.   More than three officers?

11    A.   Yes, sir.

12    Q.   Okay.  And so if -- if -- the way I understand

13 it, if -- if somebody is sent back here to y'all, it's

14 because something has been flagged through as they may

15 try to make entry through the primary area, for y'all to

16 make further verification of what the situation is with

17 this person; is that right?

18    A.   Yes, sir.

19    Q.   And you try to do that by, I think you said,

20 taking his fingerprints and comparing them or running

21 them through the database?

22    A.   Yes, sir.

23    Q.   Okay.  The database that you compare the

24 fingerprints to, it is the NCIC database; is that

25 correct?

147

1    A.   Supposed to be the FBI Federal Bureau of

2 Investigation database.

3    Q.   The FBI database, and it also -- does it also

4 include -- I think you said there was something having

5 to do with the Treasury Department?

6    A.   Treasury Information Communication System.

7    Q.   Okay.  When you got the call -- when you got

8 the information back from the initial inquiry, I believe

9 you indicated that the missing persons report popped up

10 that -- that we've been talking about that he was

11 possibly armed and dangerous and that he was missing,

12 the Kennedale report?

13    A.   Yes.

14    Q.   Okay.  And did it also verify that he had a

15 military background, or did you get any other

16 identifying information?

17    A.   No, sir.

18    Q.   Do you normally get that kind of information

19 when you make those kind of inquiries for somebody

20 that's been in the service?  Will it usually pop up on

21 your system?

22    A.   I haven't come across to that, sir.

23    Q.   Okay.  So it doesn't access -- if it's

24 accessing FBI records, it's not accessing military

25 people's --

148

1    A.   I don't -- I don't know, sir.

2    Q.   You don't ever remember seeing that?

3    A.   I don't remember seeing that.

4    Q.   All you remember with regard to this guy was

5 the missing persons --

6    A.   That's correct.

7    Q.   -- missing person information?

8         What is your protocol or procedure -- well,

9 let me back up because I think you told us your -- your

10 protocol, when it's a missing persons inquiry or

11 information, is to contact the initiating agency?

12    A.   That's correct, sir.

13    Q.   All right.

14    A.   It's called the ORI.

15    Q.   If it -- if it comes up that there's an actual

16 warrant or a want for a -- a hold for the legal system,

17 is there a different process that you follow?

18    A.   Well, I -- when there's -- if it's a warrant --

19 a warrant confirmation on it, we refer them to our

20 prosecution units.

21    Q.   Okay.

22    A.   With warrant -- wanted and warrant unit, they

23 process it.

24    Q.   So had -- had the information come up and said

25 there's a warrant out of -- of Texas for Mr. Hummel at

**149**

1  that point, you would have sent him right on to the
2  prosecution unit to make further inquiry about the
3  warrant?
4      A.  Yes, sir.
5      Q.  But because it came up as a missing person -- a
6  missing persons entry, it kind of falls to you to
7  inquire of -- of the originating agency itself; is that
8  right?
9      A.  Yes, sir.
10     Q.  Now, the -- the missing persons information
11  that you received indicated in it, did it not, that you
12  weren't to detain him or arrest him, that they were just
13  interested in -- in knowing -- be notified about where
14  he was; is that correct?
15     A.  Yes, sir.
16     Q.  All right.  When you contacted Investigator
17  Renee, you did -- you did it by telephone; is that
18  right?
19     A.  Yes, sir.
20     Q.  And I say, Investigator Renee.  Somebody named
21  Renee at the police department there in Kennedale, okay?
22     A.  Yes, sir.
23     Q.  Is that correct?
24     A.  Yes, that's correct.
25     Q.  All right.  And I think you said that when you

**150**

1  talked to Ms. Renee, was it in that first conversation
2  that she told you that they had a warrant, or was it -- did she
3  wanted to hold him for the warrant, or was it -- did she
4  have to get back to you?  How did that work?
5     A.  I -- she said on -- from the first telephone
6  conversation, she told me that she going to get back --
7  she's going to call me back.
8     Q.  Okay.  So what do you do?  In that situation,
9  you got Mr. Hummel sitting there in your office, or some
10  area, I take it.  Is -- where would he be sitting?  Is
11  it --
12     A.  He's sitting right where the -- the waiting
13  chairs are.
14     Q.  Okay.
15     A.  And he's right in front of me.
16     Q.  So everybody is just kind of sitting over there
17  and sitting over here?
18     A.  Yes, sir.
19     Q.  Until we get -- do you recall how long it was
20  before you got -- you got the phone call back from
21  Ms. Renee?
22     A.  About between 45 and 50 minutes, roughly.
23     Q.  Do you recall what time you made your initial
24  phone call to the Kennedale Police Department?
25     A.  Yes, sir.  It's three minutes after 6:00

**151**

1  o'clock in the morning Pacific Time.
2     Q.  So Pacific Time 6:03, you call Kennedale Police
3  Department, and they tell you we'll get back with you --
4     A.  Yes, sir.
5     Q.  -- right?
6          So she acknowledged, didn't she, that, yes,
7  we generated that missing persons report regarding
8  Mr. Hummel?
9     A.  I -- I don't remember that.
10     Q.  You don't remember that?
11     A.  No.
12     Q.  Okay.  She said she'll get back to you,
13  whatever --
14     A.  She's going to get back with me.
15          THE REPORTER:  I'm sorry, sir.  I didn't
16  hear your answer.
17          THE WITNESS:  She's going to get back with
18  me.  That's what she said.
19     Q.  (BY MR. MOORE)  Okay.  And then about how long,
20  40 to 45 minutes later, that she called you back?
21     A.  Yes, sir.
22     Q.  And it's the same person, Ms. Renee?
23     A.  Ms. Renee called me back.
24     Q.  And that's when she tells you, okay, hold him
25  for the warrant?

**152**

1     A.  That's what she told me.
2     Q.  And it's an arson warrant; is that right?  Do
3  you recall what she told you it was a warrant for?
4     A.  It's an arson warrant, yes.  That's what she
5  told me.
6     Q.  All right.  So at that time, do you then make
7  an effort to verify the warrant on NCIC since it hadn't
8  been there before, or do you just send him on to the
9  next guy?
10     A.  I just sent him to the next guy.
11     Q.  So you -- you -- you made inquiry of -- of NCIC
12  and whatever else, the Treasury Department.  They
13  haven't indicated there's any warrant.  Ms. Renee calls
14  you back 45 minutes after the first phone call and says,
15  hold him, we got a warrant.  Then you send him on to
16  the --
17     A.  To the next officer.
18     Q.  To the next officer.
19          And who -- and you told us what that is
20  called, the security enforcement something?
21     A.  It's what you call the prosecution unit, the
22  San Ysidro Criminal -- Criminal Enforcement Unit.
23     Q.  Okay.  Criminal Enforcement Unit.
24          Did you make another phone call after that
25  second phone call?  Did you make a -- or get a third

155

1   phone call with Ms. Renee?

2       A.  I get -- I get a third phone call.

3       Q.  Okay.  And at that point did you tell her how

4   you referred it to that prosecution unit or whatever it

5   is?

6       A.  I do not recall, sir.

7       Q.  Okay.  Do you recall telling her that Officer

8   Kandal was going to be handling it and that he would be

9   talking to her or anything like that?

10      A.  I remember that, sir.

11      Q.  Okay.  So that's what you told her?

12      A.  I told her.

13      Q.  Do you recall whether or not he actually got on

14  the phone during that conversation?

15      A.  Say again?

16      Q.  Do you recall whether or not Officer Kandal

17  actually got on that -- on the phone with her that same

18  conversation?

19      A.  I don't know, sir.  I don't remember.

20      Q.  Would you have just transferred the call to

21  him, or how would that have worked?

22      A.  I -- what I -- what I did is call Officer

23  Kandal and told him that officer -- or Agent -- Agent

24  Renee called back with me and she said that hold the

25  person.

154

1       Q.  Okay.

2       A.  He has a warrant for arson.

3       Q.  All right.  Now, when he -- when you're

4   referring to the prosecution people, Officer Kandal and

5   his bunch, does he stay there with you, or where do

6   they -- where does he go?

7       A.  He stayed -- he stayed in my area.

8       Q.  He stayed in your area?

9       A.  Until he comes down and I turn it over to him

10  physically.

11      Q.  Okay.  What happened -- how long did it take

12  for Officer Kandal to come down?

13      A.  I don't remember.  I don't recall, sir.

14      Q.  Okay.  But it was sometime after that second

15  phone call, which would have been about 6:45 or a little

16  before 7:00 in the morning?

17      A.  After 7:00 o'clock, probably.

18      Q.  So it would have been sometime after 7:00 that

19  Officer Kandal came down.

20              Is he taken -- was he taken from your area

21  at that point?

22      A.  I don't remember.  I don't recall, sir.

23      Q.  Okay.  Is it typical, whenever you've got

24  information now, that, yes, there is a warrant for him,

25  would he had been rehandcuffed at that point, or would

156

1   he have been -- what would have happened?

2       A.  No, sir.  Typically, we -- we wait until the

3   prosecution officer or the CEU officer to come down and

4   reinterview the individual.

5       Q.  Okay.  Had that not -- had there not been a

6   missing persons report pop up, when you did the ten --

7   the -- the computer inquiry regarding the fingerprints,

8   it's my understanding that -- that the documents that

9   Mr. Hummel had presented to the primary officer for

10  entry was a Texas driver's license; is that right?

11      A.  I believe so, sir.

12      Q.  Okay.  What happened?  How do you verify -- I

13  mean, when he's sent back here to you to verify this

14  missing persons report or something, had -- had that not

15  panned out, had -- had you found -- called and that had

16  been withdrawn or something like that, how would you

17  verify his citizenship to send him on into the country?

18      A.  We -- the way -- the way it work on -- on

19  the -- on that kind of situation is refer the person to

20  the supervisor if I cannot verify his citizenship.

21      Q.  Okay.  And what do you look for when you

22  send -- when you -- when you try to verify his

23  citizenship through his fingerprints, how are you

24  attempting to verify?  What do you need to find in order

25  to verify it?

156

1       A.  We -- typically we call the -- we call the

2   other agency to verify the -- the birth of the

3   individual, refer to our office.

4       Q.  Okay.  So like if he had a Texas driver's

5   license, you call the Texas Department of Public Safety,

6   or would you call -- how -- how would you verify that

7   information?

8       A.  We -- we either call Texas for a record and

9   verify where he was born.

10      Q.  Okay.

11      A.  To verify his citizenship.

12      Q.  Okay.  The information that was provided to you

13  in the NCIC missing persons report is in regard -- in

14  regard to date of birth and all that information.  It

15  was the same as what appeared on his driver's license --

16      A.  Yes, sir.

17      Q.  -- was it not?

18              Okay.  So that information at least was

19  consistent?

20      A.  Yes, sir.

21      Q.  Did -- did you -- did he -- or did you ask him

22  whether or not he had any other documentation of his

23  citizenship at that point?

24      A.  No, I did not, sir.

25      Q.  Okay.  Once you found the missing persons hit,

157

1  he was going on to somebody else, anyway?
2      A.  That's correct, sir.
3      Q.  And then what -- I mean, excuse me.
4          Had they not told you that there was a
5  warrant for him, what would have happened at that point?
6  Had they said, you know, we just -- missing persons
7  report, thank you very much, we didn't want him arrested
8  or detained, that's what we put in the initial inquiry,
9  what would y'all have done with him at that point?
10     A.  We still -- we still have to verify his status,
11 his citizenship.
12     Q.  Okay.  So you just had to verify he was an
13 American citizen, and he'd be on his way?
14     A.  Yes, sir.
15     Q.  It was the information from the Kennedale
16 Police Department that they had a warrant that kicked
17 him over to the prosecution enforcement people, whatever
18 it is?
19     A.  Yes, sir.
20     Q.  Okay.  Did you -- did you do a report in -- in
21 connection with your involvement in all this?
22     A.  Yes, sir.  It's the standard procedure to make
23 a report -- make a report.
24     Q.  Was it that little one-page report?
25     A.  Yes, sir.

158

1      Q.  Did you do -- did you look at anything else
2  prior to coming to testify today --
3      A.  No, sir.
4      Q.  -- in connection with this?
5          Okay.  Let me ask you a question, and I
6  just -- this is information that's been provided to us
7  by the State.  Is that your writing on here?
8      A.  Yes, sir.
9      Q.  Okay.  So that -- that -- that page is the --
10 let me just go ahead and mark it.
11         MR. MOORE:  Thank you.
12     Q.  (BY MR. MOORE)  Let me hand you what's been
13 marked for identification purposes as Defendant's
14 Pretrial Exhibit No. 1.  Tell me what that is, please.
15     A.  This is a NIC -- NCIC NLETS direct record
16 display.
17     Q.  Okay.  So that's what you actually pulled up on
18 your -- or gotten on your computer from the inquiry that
19 you made?
20     A.  Yes, sir.
21     Q.  Okay.  As a result of -- of that inquiry coming
22 up with that information, that's when you made the phone
23 call to Ms. Renee; is that correct?
24     A.  Yes, sir.
25     Q.  Okay.  And you actually indicated on -- in the

159

1  notes in there information regarding that phone call and
2  all that jazz?
3      A.  Yes, sir.
4      Q.  Okay.  That's your handwriting?
5      A.  That's my handwriting.
6      Q.  You did that that day, I take it?
7      A.  Yes, sir.
8      Q.  What is that 06:50?
9      A.  That's the time, sir.
10     Q.  That's the time that you would have had that
11 conversation or made that contact?
12     A.  That's the second -- I believe it's the second
13 phone call when she returned the call.
14         MR. MOORE:  We'd offer Defendant's Pretrial
15 No. 1.
16         THE COURT:  Any objection?
17         MR. GILL:  No objection.
18         THE COURT:  Admitted.
19         (Defendant's Pretrial Exhibit
20         No. 1 admitted)
21     Q.  (BY MR. MOORE)  This -- this -- let me just get
22 you to look at this -- at this page right here.  Is that
23 a copy of the report that you did?
24     A.  Yes, sir.
25     Q.  Okay.  And in that report, do you actually

160

1  document, do you not, that Officer Renee confirmed that
2  he had an outstanding warrant; is that right?
3      A.  That's what she told me.
4      Q.  Okay.  Thank you very much, Mr. Enriquez.
5          MR. MOORE:  I pass the witness, Judge.
6          THE COURT:  Redirect?
7          MR. GILL:  Thank you, Your Honor.
8              REDIRECT EXAMINATION
9  BY MR. GILL:
10     Q.  Okay.  Officer Enriquez, just a couple of --
11 couple of things.
12         When you were speaking with the officer
13 from the Kennedale Police Department on the phone, she
14 only gave you verbal confirmation of a warrant?
15     A.  That's correct, sir.
16     Q.  Were you ever able to electronically confirm
17 the existence of a warrant?
18     A.  No, sir.
19     Q.  And before you could definitely say there's a
20 warrant, don't you have to have electronic confirmation
21 of that through one of your databases?
22     A.  Yes, sir.
23     Q.  Okay.  And at your particular work station, in
24 order to -- to verify information, you query a number of
25 different databases in order to accomplish your

161

1   purposes; is that correct?

2      A.   That's correct, sir.

3      Q.   Through all of your confirmation -- through all
of your work that morning, did you ever confirm that
Mr. Hummel over here was a United States citizen?

6      A.   No, sir.

7      Q.   So that is -- that is a matter that was still
8   outstanding at the time he left you?

9      A.   That's correct, sir.

10     Q.   Now, based upon your initial report -- or the
11  report that you wrote, your report states that you began
12  your procedure with Mr. Hummel at 6:03 a.m.?

13     A.   Yes, sir.

14     Q.   When you began -- when you -- when he
15  approached your -- your station and you took his
16  fingerprints on the IAFIS system, I-A-F-I-S; is that
17  correct?

18     A.   That's correct, sir.

19     Q.   None of the report indicates that at 6:50, you
20  made your first contact with the ORI, Kennedale Police
21  Department.

22     A.   Yes, sir.

23     Q.   And there was a period of time after that that
24  you got the confirmation -- the verbal confirmation back
25  from Ms. Renee at the Kennedale Police Department?

162

1      A.   Yes, sir.

2      Q.   And you said that was somewhere around 40 to 45
3   minutes later?

4      A.   Yes, sir.

5      Q.   So these investigations that you conduct take
6   some time?

7      A.   Yes, sir.

8      Q.   Okay.

9           MR. GILL:  Pass the witness.

10          MR. MOORE:  One question, Judge.

11          RECROSS-EXAMINATION

12  BY MR. MOORE:

13     Q.   When you got at 6:50 or whatever, right about
14  that time, when you had got the information -- the
15  verbal information from Ms. Renee that there was an
16  outstanding warrant for him, you didn't -- you weren't
17  making any more efforts at that point to try to verify
18  that he was a citizen, I take it?

19     A.   No, sir.

20     Q.   No.  You just referred him over to the
21  prosecution guy, and they were going to take care of him
22  from that point on because he had that warrant; is that
23  right?

24     A.   I turned him over to the prosecution unit.

25          MR. MOORE:  Thank you.

163

1           THE COURT:  I have a question -- or I'll
2   invite either counsel to ask the question -- but on the
3   NCIC reporting where it has the miscellaneous comments,
4   is that binding or controlling on the part of the U.S.
5   border patrol to follow those requests, or may they just
6   look at those and advise them at will and act on their
7   own initiative?

8           You can ask that question if you'd like.

9      Q.   (BY MR. MOORE)  On the little NCIC return that
10  you got back -- let me show it to you since we're asking
11  about it.

12          Okay.  I think what he's referring to is
13  these comments here.  You know, they've got
14  miscellaneous comments --

15     A.   Uh-huh.

16     Q.   -- where they say that -- that, you know, this
17  is law enforcement sensitive, the subject's possibly a
18  mentally unstable person, he's of interest in a homicide
19  case, considered armed and dangerous, approach with
20  caution.  It says he has a military background, but it
21  also says, do not arrest or detain based on this record.

22          What -- what does that mean to you or how
23  does -- how do y'all handle something like that when it
24  tells you don't arrest him --

25     A.   We -- based on this information, we do not

164

1   arrest or detain, is what this (sic) sir.

2      Q.   Okay.  All you did was try to verify --

3      A.   Verify.

4      Q.   -- from them that, hey, we did what you said,
5   let us know?

6      A.   Yes.

7      Q.   You got him, you did that, and they tell you
8   you got a warrant?

9      A.   Yes, sir.

10     Q.   All right.

11          MR. MOORE:  I think that's all I have,
12  Judge.

13          THE COURT:  Mr. Gill, do you have any other
14  questions?

15          MR. GILL:  We do not, Your Honor.

16          THE COURT:  All right.  Thank you.

17          May Officer Enriquez be excused?

18          MR. MOORE:  Yes.

19          MR. GILL:  Yes.

20          THE COURT:  Officer, you may step down.
21  Thank you.

22          THE WITNESS:  You're welcome.

23          (Witness retires)

24          THE COURT:  Gentlemen, what's your
25  pleasure?  You want to persist, or do you want to stop?

1    MR. GILL:  We would not get through with
2  another witness today anyway, and I understand we have
3  some child care issues.
          MR. MOORE:  I've got another matter I need
   to attend to.
6          THE COURT:  All right.  We'll be in recess.
7  Let me ask both of you, if we continue to get started at
8  9:00 o'clock, do you think we're going to be done by
9  Friday?
10          (Discussion off the record)
11          THE COURT:  We will resume at 9:00 a.m.
12  tomorrow.  Thank you.
13          (Proceedings adjourned at 5:06 p.m.)
14
15
16
17
18
19
20
21
22
23
24

                                          166
1  THE STATE OF TEXAS    )
2  COUNTY OF TARRANT     )
3          I, Angelica Taylor, Official Court Reporter
4  in and for the 432nd Judicial District Court of Tarrant
5  County, State of Texas, do hereby certify that the above
6  and foregoing contains a true and correct transcription
7  of all portions of evidence and other proceedings
8  requested in writing by counsel for the parties to be
9  included in this volume of the Reporter's Record, in the
10  above-styled and -numbered cause, all of which occurred
11  in open court or in chambers and were reported by me.
12          I further certify that this Reporter's
13  Record of the proceedings truly and correctly reflects
14  the exhibits, if any, admitted by the respective
15  parties.
16          WITNESS MY OFFICIAL HAND this the 25th day
17  of January, 2012.
18
19
20
21
22  ANGELICA TAYLOR, TEXAS CSR NO. 7180
    Cert Exp. Date: 12/31/2013
23  Official Court Reporter
       432nd Judicial District Court
24     401 West Belknap Street
       Fort Worth, Texas 76196
25

**'**

**'09** [1] - 38:20

**0**

**06:50** [1] - 159:8
**0900017546** [2] -
49:17, 49:21

**1**

**1** [4] - 21:1, 158:14,
159:15, 159:20
**10,000** [1] - 91:5
**10:45** [1] - 6:2
**11:13** [1] - 6:2
**11:26** [1] - 18:16
**11:46** [1] - 18:16
**12/18** [1] - 38:19
**12/19/2009** [2] - 83:20,
84:17
**12/20** [1] - 84:3
**12/31/2013** [1] -
166:22
**128-hour** [2] - 23:24,
72:17
**12:30** [1] - 45:12
**12:32** [1] - 45:14
**146** [1] - 80:15
**14:40** [2] - 20:13,
20:14
**14:56** [1] - 20:15
**15** [1] - 30:1
**15-minute** [1] - 6:1
**15:18** [1] - 84:17
**15:40** [1] - 84:3
**16** [9] - 87:16, 87:18,
119:18, 119:25,
120:2, 120:4, 120:5,
120:6, 120:9
**17** [2] - 20:4, 49:16
**18** [1] - 20:4
**18-page** [1] - 49:16
**18:22** [1] - 83:20
**18th** [6] - 40:14, 50:6,
55:7, 55:9, 55:11,
55:12
**19th** [1] - 55:12
**1:45** [1] - 45:13
**1:54** [1] - 45:14

**2**

**2** [1] - 60:11
**20** [4] - 29:24, 30:1,
135:4, 135:9
**2001** [3] - 21:15,
21:23, 22:5
**2002** [1] - 22:6

**2005** [2] - 22:22, 22:24
**2006** [2] - 22:22, 24:22
**2007** [2] - 38:16, 87:20
**2009** [13] - 27:24,
64:13, 89:23, 89:25,
98:7, 104:10,
111:21, 112:1,
119:22, 125:3,
135:10, 139:3,
139:24
**2010** [1] - 15:3
**2012** [1] - 166:17
**20th** [11] - 64:13,
89:23, 89:25,
104:10, 111:21,
112:1, 119:21,
125:3, 135:10,
139:3, 139:24
**22nd** [1] - 27:24
**24** [2] - 106:8, 106:10
**25** [2] - 93:24
**25th** [1] - 166:16
**264** [1] - 19:2
**2:35** [4] - 43:19, 43:22,
43:23, 44:5
**2:56** [1] - 82:2

**3**

**30** [1] - 93:25
**32** [1] - 76:5
**32A** [1] - 75:13
**34** [1] - 16:1
**38** [1] - 76:13
**38A** [1] - 76:13
**3:27** [1] - 82:2

**4**

**40** [5] - 37:22, 81:20,
82:18, 151:20, 162:2
**401** [1] - 166:24
**41** [6] - 97:5, 97:8,
98:10, 98:12, 98:15,
98:16
**43** [1] - 72:4
**432nd** [2] - 166:4,
166:23
**45** [4] - 150:22,
151:20, 152:14,
162:2

**5**

**50** [2] - 142:23, 150:22
**51** [1] - 25:3
**516** [4] - 19:15, 19:18,
19:25, 20:4
**518** [1] - 20:17
**519** [4] - 19:15, 19:22,

**46:1**
**56** [1] - 20:14
**59** [3] - 48:23, 48:25,
49:4
**5:06** [1] - 165:13
**5:30** [1] - 43:21
**5:48** [3] - 111:22,
111:25, 125:4
**5th** [1] - 15:3

**6**

**600** [4] - 19:19, 28:25,
42:11, 42:23
**6:00** [4] - 141:5,
142:23, 150:25
**6:03** [4] - 141:7, 141:8,
151:2, 161:12
**6:45** [1] - 154:15
**6:50** [4] - 142:25,
143:10, 161:19,
162:13

**7**

**7180** [1] - 166:22
**76196** [1] - 166:24
**7:00** [3] - 154:16,
154:17, 154:18

**8**

**817-478-5416** [1] -
79:6

**9**

**911** [2] - 105:13, 131:7
**9:00** [2] - 165:8,
165:11

**A**

**A&D** [8] - 114:15,
114:17, 114:21,
126:15, 126:19,
128:14, 129:13,
129:23
**A&Ds** [4] - 127:23,
128:6, 128:11, 129:9
**a.m** [17] - 6:2, 18:16,
43:19, 43:21, 43:22,
43:23, 44:5, 111:25,
125:4, 141:7, 141:8,
142:25, 143:10,
161:12, 165:11
**AB** [2] - 16:15, 17:19
**able** [7] - 7:14, 12:4,
16:14, 32:10, 48:18,
57:24, 104:22,

**124:23, 125:17,**
125:18, 125:19,
144:24, 160:16
**above-styled** [1] -
166:10
**academy** [4] - 21:11,
24:13, 88:9, 88:12
**accelerants** [4] -
56:12, 56:17, 56:25,
57:22
**accept** [1] - 111:5
**acceptable** [1] -
110:25
**access** [2] - 8:11,
147:23
**accessing** [2] - 147:24
**accidental** [1] - 53:17
**accompanied** [5] -
32:14, 32:16, 32:19,
108:9, 124:5
**accompany** [4] -
33:25, 35:3, 35:7,
56:21
**accompanying** [1] -
59:1
**accomplish** [3] -
81:24, 106:13,
160:25
**according** [7] - 27:5,
62:8, 84:18, 124:25,
125:3
**accuracy** [1] - 28:14
**accurate** [15] - 24:15,
25:23, 26:11, 26:15,
55:7, 55:13, 58:11,
59:2, 60:22, 91:6,
97:21, 98:5, 119:20,
125:5, 125:25
**accusatory** [1] - 35:25
**achieve** [1] - 87:23
**acknowledged** [1] -
151:6
**acronym** [1] - 96:15
**act** [1] - 163:6
**acting** [1] - 78:19
**active** [2] - 39:19,
86:20
**actively** [2] - 40:2,
61:15
**actual** [12] - 14:6,
66:15, 75:13, 96:4,
96:6, 100:6, 100:7,
100:13, 102:7,
107:1, 116:25,
148:15
**AD** [1] - 17:5
**addition** [7] - 15:7,
15:12, 20:21, 33:16,
37:9, 49:5, 127:17
**additional** [3] - 37:14,

**109:4, 141:14**
**adequate** [1] - 127:17
**adjourned** [1] - 165:13
**administered** [1] -
40:19
**Administration** [2] -
86:14, 86:15
**admissibility** [1] -
137:6
**admissible** [5] -
110:12, 119:9,
119:12, 124:4,
124:10
**admission** [15] -
15:23, 38:21, 39:6,
42:8, 90:2, 91:24,
91:25, 92:2, 92:19,
107:24, 111:12,
111:25, 132:4,
136:5, 144:7
**admit** [1] - 108:18
**admitted** [15] - 15:25,
16:1, 76:17, 76:19,
82:19, 82:21, 83:3,
98:15, 98:16, 120:5,
120:6, 123:21,
159:18, 159:20,
166:14
**admonish** [1] - 51:7
**advanced** [1] - 74:3
**advise** [2] - 79:6,
163:6
**affiant** [5] - 10:5, 10:8,
10:10, 54:21, 67:7
**affidavit** [19] - 13:5,
52:11, 55:24, 56:8,
56:11, 56:24, 59:14,
59:21, 60:3, 60:11,
60:13, 60:16, 60:19,
62:18, 66:12, 66:24,
68:11, 68:16, 75:4
**afternoon** [3] - 16:6,
78:13, 79:19
**agencies** [13] - 24:11,
33:12, 44:15, 44:16,
49:7, 63:2, 72:4,
96:17, 137:14,
137:16
**agency** [16] - 7:17,
8:15, 23:7, 25:15,
32:16, 33:10, 44:15,
49:5, 49:6, 137:9,
140:5, 140:12,
142:10, 148:11,
149:7, 156:2
**agency's** [1] - 49:22
**Agent** [15] - 32:20,
34:10, 35:3, 35:18,
36:5, 39:14, 40:7,
40:11, 51:17, 51:25,

52:21, 54:11, 73:16, 153:23
**agent** [7] - 34:10, 54:12, 54:15, 54:16, 68:1, 96:8
**agents** [2] - 54:5, 117:9
**aggressive** [1] - 95:21
**ago** [4] - 22:21, 22:24, 38:24, 106:11
**agreement** [2] - 81:1, 82:16
**agrees** [1] - 77:2
**ahead** [5] - 43:12, 65:19, 81:23, 108:14, 158:10
**airport** [1] - 92:10
**Airport** [1] - 92:12
**alarm** [1] - 8:13
**alert** [3] - 56:12, 116:12, 117:12
**alerted** [1] - 56:25
**alerts** [2] - 56:16, 126:19
**allow** [4] - 100:5, 100:15, 100:22, 118:24
**allowed** [7] - 8:11, 42:5, 108:2, 113:2, 130:23, 145:23, 145:24
**allowing** [1] - 113:2
**allows** [4] - 11:25, 93:23, 136:18, 136:22
**almost** [1] - 22:21
**Alpha** [1] - 76:16
**altercation** [1] - 37:3
**alternating** [1] - 95:10
**American** [1] - 157:13
**amiss** [1] - 109:3
**amount** [1] - 99:22
**analysis** [3] - 37:18, 38:10, 38:17
**analyze** [1] - 38:12
**Angelica** [1] - 166:3
**ANGELICA** [1] - 166:22
**Angelo** [1] - 37:19
**angle** [1] - 102:22
**answer** [9] - 36:21, 43:14, 43:17, 45:8, 53:19, 64:10, 71:19, 122:9, 151:16
**answered** [3] - 38:23, 71:17, 73:9
**anytime** [1] - 43:10
**anyway** [2] - 157:1, 165:2
**anyway..** [1] - 70:21

**appear** [5] - 19:18, 20:10, 48:20, 75:21, 113:10
**appeared** [6] - 28:25, 39:16, 62:9, 62:12, 98:6, 156:15
**apple** [1] - 74:24
**applicable** [1] - 89:1
**applied** [2] - 90:2, 93:17
**applies** [1] - 120:23
**apply** [2] - 92:14, 107:24
**applying** [7] - 91:24, 91:25, 92:2, 92:19, 92:24, 136:5, 144:7
**approach** [16] - 10:12, 14:16, 18:11, 20:1, 79:3, 80:17, 101:13, 102:11, 102:14, 112:15, 112:17, 112:18, 113:3, 116:3, 122:18, 163:19
**approached** [4] - 113:7, 113:10, 116:1, 161:15
**approaches** [1] - 108:4
**approaching** [1] - 122:8
**approval** [1] - 42:16
**approved** [1] - 65:24
**approximate** [1] - 45:8
**April** [1] - 22:6
**Arabia** [1] - 93:5
**area** [47] - 24:24, 32:15, 57:9, 83:4, 92:6, 92:16, 97:9, 97:21, 101:6, 101:12, 101:21, 106:5, 106:8, 109:16, 110:3, 114:5, 114:24, 115:10, 115:15, 117:1, 118:10, 119:15, 122:13, 123:5, 123:8, 128:2, 131:6, 131:7, 131:11, 135:23, 136:1, 136:16, 137:3, 138:9, 138:10, 138:13, 145:15, 145:20, 145:21, 146:4, 146:7, 146:15, 150:10, 154:7, 154:8, 154:20
**areas** [6] - 52:15, 83:1, 95:3, 95:11, 97:12,

123:15
**arise** [1] - 105:4
**armed** [23] - 66:4, 79:3, 114:13, 115:18, 115:22, 116:11, 117:3, 117:12, 117:15, 117:21, 118:9, 118:23, 126:4, 126:20, 128:17, 137:23, 138:8, 138:20, 139:8, 140:1, 147:11, 163:19
**arms** [3] - 130:5, 130:6, 130:12
**arrest** [14] - 40:24, 52:10, 55:19, 55:24, 56:7, 59:14, 60:17, 66:12, 79:4, 79:14, 149:12, 163:21, 163:24, 164:1
**arrested** [1] - 157:7
**arresting** [1] - 88:16
**arrive** [1] - 9:22
**arrived** [6] - 12:9, 12:20, 25:16, 25:21, 30:13, 60:12
**arrow** [3] - 136:12, 136:14, 145:17
**arson** [17] - 23:13, 23:20, 24:5, 24:20, 24:24, 35:2, 52:10, 53:3, 53:25, 55:25, 59:15, 59:18, 71:25, 72:17, 152:2, 152:4, 154:2
**Arson** [1] - 71:20
**arson's** [1] - 24:18
**article** [1] - 96:24
**Articles** [1] - 76:2
**artificial** [1] - 62:13
**Asia** [1] - 93:5
**assessment** [1] - 59:20
**assign** [1] - 75:7
**assigned** [25] - 89:12, 89:16, 89:18, 89:20, 89:22, 89:25, 90:4, 90:5, 90:6, 93:13, 93:14, 93:17, 93:19, 93:20, 94:4, 94:8, 94:21, 95:6, 95:11, 102:15, 104:10, 104:13, 115:6, 135:12, 135:14
**assigning** [1] - 95:11
**assignment** [3] - 22:17, 135:6, 135:18
**assignments** [1] -

22:3
**assist** [3] - 53:14, 68:15, 115:10
**assistance** [4] - 55:23, 67:2, 72:2, 115:14
**assisted** [5] - 35:4, 35:5, 128:13, 128:14, 129:12
**assisting** [1] - 133:7
**assists** [1] - 136:22
**assume** [2] - 41:22, 63:25
**assuming** [1] - 48:7
**ATF** [9] - 34:10, 53:6, 54:5, 54:12, 54:14, 54:15, 57:14
**attached** [1] - 82:9
**attack** [1] - 105:12
**attain** [2] - 23:19, 24:20
**attains** [1] - 73:22
**attempt** [9] - 7:8, 7:11, 77:3, 80:11, 81:16, 81:17, 81:20, 82:11, 83:25
**attempting** [1] - 155:24
**attempts** [2] - 140:10, 140:11
**attend** [2] - 38:14, 165:5
**attended** [2] - 37:8, 37:17
**attention** [4] - 16:12, 31:19, 111:20, 117:2
**authenticating** [1] - 125:22
**authorities** [3] - 7:13, 67:24, 105:8
**authority** [1] - 110:19
**authorization** [3] - 44:3, 65:19, 65:21
**authorized** [2] - 67:8, 67:9
**automated** [1] - 136:25
**automatic** [1] - 136:25
**automatically** [1] - 111:19
**available** [1] - 25:1
**average** [2] - 90:24, 91:5
**aware** [12] - 7:13, 35:13, 64:16, 66:20, 68:9, 68:22, 69:5, 69:17, 73:12, 115:7, 115:11, 115:13
**awhile** [2] - 6:22, 63:22

**B**

**background** [3] - 79:4, 147:15, 163:20
**bad** [2] - 34:23, 65:22
**badge** [4] - 96:2, 96:4, 96:6
**based** [16] - 7:8, 9:16, 13:8, 13:15, 40:17, 46:18, 61:3, 61:24, 79:5, 112:22, 125:24, 126:3, 137:1, 161:10, 163:21, 163:25
**basic** [2] - 89:5, 134:20
**basis** [1] - 132:16
**bathroom** [2] - 32:1, 32:7
**battle** [3] - 96:20, 96:22, 96:24
**battle-type** [1] - 96:24
**BDU** [1] - 96:15
**BDUs** [3] - 95:19, 95:22, 96:3
**became** [3] - 35:25, 36:22, 44:19
**become** [4] - 44:20, 72:20, 87:13, 89:8
**becoming** [2] - 36:24, 37:12
**bed** [2] - 6:24, 9:1
**Bedford** [5] - 16:19, 17:19, 37:3, 54:17, 54:24
**bedroom** [1] - 57:8
**began** [3] - 12:22, 161:11, 161:14
**beginning** [1] - 101:9
**begins** [1] - 50:9
**behind** [7] - 80:13, 99:6, 102:19, 114:19, 116:3, 122:11, 131:20
**Belknap** [1] - 166:24
**belong** [1] - 73:19
**belt** [1] - 95:23
**bend** [1] - 62:4
**benefit** [6] - 28:7, 60:10, 68:18, 80:20, 124:22, 125:21
**Bernal** [8] - 85:10, 85:12, 85:23, 85:25, 120:10, 124:17, 132:25, 133:14
**BERNAL** [1] - 85:18
**best** [3] - 83:10, 83:15, 113:9
**better** [3] - 53:22, 60:4, 95:8

**between** [10] - 25:7, 25:25, 37:3, 81:1, 90:19, 91:17, 102:18, 123:16, 138:17, 150:22
**beyond** [3] - 94:1, 99:1, 99:4
**big** [2] - 23:6, 114:14
**biggest** [1] - 90:21
**binder** [2] - 76:21, 76:22
**binding** [1] - 163:4
**biological** [1] - 50:23
**birth** [8] - 102:6, 106:18, 108:10, 124:5, 127:16, 143:20, 156:2, 156:14
**bit** [9] - 12:21, 52:2, 60:4, 66:21, 74:9, 123:4, 125:8, 125:14, 133:8
**blue** [1] - 104:1
**blues** [1] - 86:5
**board** [1] - 84:19
**bodies** [2] - 26:23, 27:4
**body** [1] - 46:19
**book** [5] - 18:8, 19:14, 19:15, 63:10, 71:15
**booth** [20] - 102:15, 105:4, 106:14, 107:15, 107:19, 107:23, 108:5, 111:12, 113:4, 113:7, 113:10, 117:3, 120:25, 121:9, 122:10, 131:11, 132:7, 136:8, 139:8
**booths** [14] - 101:22, 102:11, 102:14, 104:2, 104:7, 104:11, 104:14, 112:15, 120:21, 123:16, 123:17, 130:2, 136:7
**boots** [1] - 95:23
**border** [10] - 67:21, 96:8, 99:14, 99:18, 99:23, 105:10, 130:10, 135:2, 135:8, 163:5
**Border** [12] - 86:2, 86:8, 86:11, 87:8, 87:14, 87:24, 87:25, 89:11, 91:4, 128:22, 134:9, 134:12
**borders** [1] - 90:9
**born** [2] - 124:6, 156:9

**bothers** [1] - 32:5
**bottom** [1] - 99:11
**bowl** [1] - 114:25
**box** [3] - 70:17, 114:14, 126:15
**break** [6] - 6:1, 43:9, 63:5, 81:24, 82:6, 120:3
**Brian** [4] - 64:22, 64:25, 65:17
**brief** [2] - 18:12, 143:25
**briefly** [1] - 92:5, 124:18
**bring** [3] - 12:12, 95:7, 105:14
**bringing** [4] - 104:18, 108:16, 110:13, 114:8
**brings** [1] - 114:2
**BRISSETTE** [32] - 6:6, 6:14, 10:12, 10:14, 14:16, 14:19, 15:19, 16:5, 16:9, 16:11, 18:1, 33:5, 45:18, 71:5, 74:19, 74:22, 75:25, 76:6, 76:11, 76:13, 76:15, 76:20, 80:17, 80:22, 80:25, 81:9, 81:14, 81:16, 81:25, 82:5, 82:22, 84:8
**Brissette** [2] - 6:8, 65:12
**broad** [1] - 110:19
**broadcast** [2] - 66:2, 83:25
**broke** [1] - 61:19
**brought** [12] - 11:8, 15:15, 136:13, 137:12, 138:8, 138:10, 138:11, 138:12, 138:16, 138:17, 139:7, 145:25
**brownish** [1] - 73:7
**building** [3] - 8:13, 41:11, 100:17
**bulletproof** [3] - 95:24, 131:14, 131:16
**bunch** [1] - 154:5
**burden** [4] - 119:6, 119:8, 119:11
**Bureau** [1] - 147:1
**busiest** [1] - 90:21
**business** [6] - 105:25, 110:17, 117:18, 122:5, 129:6, 129:7
**busy** [1] - 106:8

**button** [1] - 130:3
**BY** [44] - 6:14, 10:14, 14:19, 16:11, 18:4, 18:21, 20:4, 26:13, 33:9, 43:20, 44:5, 45:23, 48:19, 50:16, 59:25, 70:25, 71:5, 74:22, 76:20, 82:22, 84:11, 85:21, 94:20, 96:24, 98:17, 104:1, 112:13, 120:10, 124:16, 126:13, 129:5, 132:24, 134:4, 139:23, 142:20, 143:14, 143:19, 145:11, 151:19, 158:12, 159:21, 160:9, 162:12, 163:9

**C**

**C-59** [2] - 48:22, 48:25
**California** [13] - 7:1, 7:14, 9:11, 10:7, 10:20, 55:21, 67:1, 67:24, 82:13, 90:7, 90:8, 90:9, 114:4
**camera** [12] - 12:15, 12:18, 12:19, 12:22, 12:25, 13:2, 39:10, 40:12, 69:8, 69:11, 69:13, 75:3
**canine** [4] - 35:3, 56:14, 56:16, 71:7
**cannot** [1] - 155:20
**capable** [2] - 48:17, 116:21
**Captain** [10] - 29:6, 30:12, 31:6, 31:14, 32:21, 33:2, 35:8, 35:9, 36:19, 36:21
**captains** [1] - 33:14
**capturing** [1] - 47:24
**car** [2] - 100:25, 109:23
**card** [4] - 102:6, 108:11, 123:23, 127:11
**cards** [1] - 102:9
**care** [5] - 102:16, 102:17, 121:23, 162:21, 165:3
**Carlson** [22] - 22:25, 23:9, 27:14, 28:8, 31:20, 31:22, 32:21, 39:15, 39:17, 52:22, 58:18, 59:5, 61:4, 61:6, 61:16, 61:25, 62:3, 62:16, 65:7,

66:22, 68:1, 73:19
**Carlson's** [1] - 61:11
**carry** [3] - 88:18, 88:19, 96:12
**case** [14] - 9:6, 10:20, 10:23, 18:7, 23:1, 25:2, 26:4, 34:12, 115:13, 117:5, 118:20, 132:5, 145:6, 163:19
**catch** [1] - 12:2
**caution** [2] - 79:3, 163:20
**CD** [2] - 16:20, 17:16
**Center** [3] - 140:4, 140:22, 141:17
**Central** [1] - 84:3
**centrally** [1] - 57:9
**Cert** [1] - 166:22
**certain** [3] - 8:5, 13:24, 109:9
**certificate** [4] - 102:7, 108:10, 124:5, 127:16
**certification** [3] - 23:19, 23:23, 24:20
**certified** [1] - 23:13
**certify** [2] - 166:5, 166:12
**certifying** [1] - 75:22
**CEU** [1] - 155:3
**chairs** [1] - 150:13
**chambers** [1] - 166:11
**Champion** [1] - 13:19
**chance** [6] - 11:10, 13:4, 15:4, 95:8, 97:16, 97:23
**changes** [2] - 88:6, 107:5
**chapter** [1] - 63:10
**characterization** [1] - 36:1
**CHARBONNET** [1] - 6:10
**Charbonnet** [7] - 18:5, 18:21, 43:16, 45:23, 50:13, 84:12, 84:25
**charge** [4] - 44:16, 44:17, 44:20, 53:4
**charged** [1] - 64:1
**charters** [1] - 75:16
**chases** [1] - 95:21
**check** [7] - 68:25, 104:20, 108:1, 108:22, 108:25, 109:20, 113:1
**checked** [1] - 126:7
**checking** [1] - 103:8
**checkpoint** [1] - 126:7
**Chief** [7] - 27:17,

27:24, 32:25, 33:1, 49:2, 49:4
**chief** [15] - 33:5, 42:11, 42:18, 44:4, 44:22, 45:2, 46:6, 46:9, 46:13, 46:16, 49:2, 53:11, 53:17, 53:22
**child** [2] - 80:9, 165:3
**chip** [1] - 14:5
**Chris** [1] - 64:21
**Christopher** [2] - 66:14, 66:16
**circuit** [1] - 30:22
**cities** [1] - 72:2
**citizen** [13] - 64:18, 103:7, 108:8, 111:13, 113:16, 113:20, 121:21, 123:21, 123:22, 141:10, 157:13, 161:5, 162:18
**citizens** [4] - 110:16, 111:3, 111:4, 111:7
**citizenship** [8] - 113:15, 132:13, 155:17, 155:20, 155:23, 156:11, 156:23, 157:11
**City** [2] - 75:15, 76:3
**city** [8] - 9:7, 24:6, 49:6, 75:15, 75:23, 75:24, 90:10, 90:14
**city's** [1] - 49:6
**civilian** [1] - 12:20
**claiming** [1] - 111:13
**clarification** [1] - 57:7
**class** [1] - 72:17
**classes** [1] - 72:20
**clear** [3] - 36:6, 93:19, 113:25
**Cleburne** [3] - 13:14, 69:21, 70:2
**Clerk's** [1] - 75:6
**clerk's** [1] - 75:8
**Cleveland** [3] - 58:23, 58:24, 59:5
**client** [1] - 125:17
**clip** [2] - 119:14, 119:19
**clock** [1] - 125:7
**closed** [1] - 30:22
**closed-circuit** [1] - 30:22
**closer** [1] - 115:2
**clothes** [8] - 39:10, 51:4, 51:5, 51:8, 73:3, 73:13, 73:17, 73:18, 73:20
**clothing** [5] - 40:13,

50:17, 50:19, 51:1,
96:25
clyde [1] - 16:19
Clyde [1] - 37:3
Coast [2] - 11:21,
67:10
code [3] - 100:9,
100:10, 109:19
cold [2] - 32:11, 41:4
collect [2] - 48:1,
50:24
collected [8] - 12:7,
57:6, 57:12, 57:13,
58:1, 59:10, 70:16,
70:17
collection [2] - 72:18,
72:21
College [1] - 21:12
comfort [1] - 32:11
comfortable [2] -
95:20, 108:17
coming [9] - 13:5,
91:23, 92:3, 99:23,
115:15, 122:4,
145:22, 158:2,
158:21
commander [1] -
44:21
comments [3] - 163:3,
163:13, 163:14
commissioned [1] -
88:19
commitment [1] - 87:1
Communication [2] -
140:23, 147:6
Communications [2] -
141:18, 141:21
company [1] - 13:19
Compaq [2] - 14:9,
69:20
compare [2] - 132:7,
146:23
compared [1] - 125:23
comparing [1] -
146:20
comparison [1] -
25:14
Complaint [1] -
127:22
compliant [1] - 127:21
comply [1] - 133:6
comprised [1] - 71:24
computer [19] - 14:3,
14:7, 15:1, 70:7,
70:9, 70:11, 70:14,
73:23, 106:15,
107:18, 113:22,
114:13, 114:20,
115:20, 121:23,
125:12, 137:1,

155:7, 158:18
computer-based [1] -
137:1
computers [1] -
103:12
concern [2] - 95:14,
105:18
concerned [7] - 24:18,
47:1, 51:20, 52:18,
105:21, 105:23,
111:7
concerns [3] - 105:3,
105:6, 105:13
concludes [1] - 16:3
conclusion [1] - 48:3
conduct [5] - 63:7,
63:11, 69:7, 105:25,
162:5
conducting [4] -
27:13, 104:25,
117:18, 143:24
confer [1] - 55:4
conferred [1] - 65:12
confidential [1] - 81:8
confirm [5] - 141:9,
142:9, 144:24,
160:16, 161:4
confirmation [6] -
148:19, 160:14,
160:20, 161:3,
161:24
confirmed [3] - 142:6,
142:7, 160:1
connection [2] -
157:21, 158:4
conscious [1] - 131:7
consent [15] - 14:12,
14:24, 15:8, 15:17,
31:20, 31:22, 34:6,
40:13, 41:21, 41:23,
42:2, 51:12, 73:11,
74:16, 80:14
considered [5] - 79:3,
80:2, 110:24, 130:3,
163:19
consistent [4] - 20:12,
49:21, 51:11, 156:19
construction [2] -
86:17, 86:19
Cont'd [1] - 6:13
contact [7] - 6:25,
13:21, 79:5, 142:17,
148:11, 159:11,
161:20
contacted [2] - 29:4,
149:16
contain [3] - 81:7,
81:12, 96:7
contained [5] - 19:21,
28:1, 46:2, 97:24,

98:20
contains [4] - 21:1,
97:8, 97:11, 166:6
contents [1] - 120:2
continuations [1] -
20:8
continue [3] - 6:9,
101:3, 165:7
continuing [1] - 33:22
continuous [1] - 88:5
contrived [1] - 62:13
control [1] - 116:23
controlling [1] - 163:4
conversation [11] -
73:10, 73:13, 77:20,
143:23, 143:24,
143:25, 150:1,
150:6, 153:14,
153:18, 159:11
conversations [1] -
10:3
coordination [1] -
25:9
copy [5] - 15:9, 19:3,
119:19, 125:1,
159:23
corner [5] - 16:15,
16:20, 17:5, 17:16,
17:19
Corp [1] - 86:21
Correct [1] - 58:7
correct [122] - 6:18,
18:25, 19:19, 20:5,
23:14, 28:22, 29:11,
30:7, 31:4, 31:5,
31:7, 31:11, 32:3,
32:7, 33:3, 34:8,
40:3, 40:20, 42:13,
43:2, 46:7, 47:12,
47:13, 47:16, 50:3,
50:24, 51:5, 51:21,
54:6, 55:21, 56:9,
56:12, 57:1, 57:10,
57:11, 57:22, 58:3,
58:21, 60:17, 61:8,
64:2, 64:6, 65:8,
65:10, 65:13, 65:20,
66:4, 66:16, 67:3,
67:11, 67:15, 68:7,
69:14, 69:18, 69:22,
70:18, 74:13, 75:4,
78:3, 88:20, 89:6,
91:22, 94:11, 96:10,
96:22, 96:25, 97:9,
97:14, 97:15, 98:13,
99:12, 99:16, 99:19,
104:4, 104:8, 104:9,
107:20, 109:14,
117:9, 121:1, 122:5,
123:11, 124:2,

124:7, 124:11,
124:12, 126:9,
126:10, 126:16,
126:20, 128:4,
128:19, 129:14,
133:5, 136:16,
136:17, 137:17,
138:21, 139:19,
140:9, 140:16,
141:8, 141:13,
142:11, 143:17,
144:18, 146:2,
146:25, 148:6,
148:12, 149:14,
149:23, 149:24,
157:2, 158:23,
160:15, 161:1,
161:2, 161:9,
161:17, 161:18,
166:6
correctly [2] - 48:22,
166:13
correspond [1] -
97:12
correspondence [1] -
27:23
Counsel [1] - 82:14
counsel [6] - 71:12,
73:22, 74:10, 76:1,
163:2, 166:8
counter [3] - 40:17,
115:23, 133:5
counties [1] - 72:7
country [23] - 89:14,
89:15, 89:17, 89:19,
90:14, 91:17, 91:21,
92:3, 92:18, 93:2,
95:8, 98:23, 98:25,
100:1, 101:9, 102:1,
105:20, 106:5,
119:12, 121:25,
140:5, 144:10,
155:17
COUNTY [1] - 166:2
county [4] - 9:9,
33:10, 140:5, 143:6
County [14] - 15:11,
15:12, 21:12, 21:17,
52:24, 53:5, 53:6,
53:10, 57:13, 67:15,
71:20, 72:5, 75:7,
166:5
couple [3] - 84:20,
160:10, 160:11
course [5] - 21:16,
23:24, 23:25, 128:7,
129:25
Court [9] - 12:17,
60:10, 73:6, 83:2,
84:12, 166:3, 166:4,

166:23, 166:23
court [7] - 6:3, 18:17,
45:15, 81:18, 82:3,
121:12, 166:11
COURT [80] - 6:4, 6:8,
10:13, 14:18, 15:25,
16:2, 16:7, 16:10,
18:2, 18:14, 18:18,
20:3, 32:24, 33:8,
43:8, 43:11, 43:16,
43:21, 43:23, 44:2,
45:7, 45:11, 45:16,
45:20, 50:10, 50:15,
59:24, 60:2, 60:7,
70:24, 71:3, 74:21,
76:12, 76:16, 80:18,
81:7, 81:12, 81:15,
81:22, 82:1, 82:4,
82:18, 84:9, 85:1,
85:6, 85:9, 85:12,
85:14, 85:16, 96:14,
96:20, 96:23, 98:15,
103:24, 112:12,
120:5, 120:8,
124:14, 129:2,
132:21, 133:11,
133:14, 133:18,
133:21, 133:24,
139:22, 143:9,
143:12, 143:18,
145:8, 159:16,
159:18, 160:6,
163:1, 164:13,
164:16, 164:20,
164:24, 165:6,
165:11
courtroom [6] - 85:11,
112:3, 125:23,
133:20, 139:10,
139:14
cover [1] - 19:9
CPU [4] - 14:3, 14:5,
70:20, 70:21
cried [1] - 61:20
crime [20] - 19:18,
19:23, 20:8, 20:13,
26:18, 29:7, 29:10,
42:8, 42:9, 43:4,
44:5, 44:12, 44:16,
44:22, 45:1, 45:3,
45:24, 59:15, 68:21,
70:12
Crime [3] - 140:4,
140:22, 141:17
criminal [3] - 22:19,
66:20, 152:23
Criminal [2] - 152:22
criteria [1] - 109:10
cross [8] - 18:2,
24:12, 45:21, 71:25,

77:19, 100:24, 124:14, 145:8
**CROSS** [3] - 18:3, 124:15, 145:10
**cross-examination** [3] - 18:2, 124:14, 145:8
**CROSS-EXAMINATION** [3] - 18:3, 124:15, 145:10
**cross-trained** [2] - 24:12, 71:25
**cross-walk** [1] - 100:24
**crossed** [1] - 130:9
**crosses** [1] - 105:9
**crossing** [1] - 99:18
**CSR** [1] - 166:22
**cuffs** [1] - 138:13
**Cummings** [4] - 27:9, 43:8, 73:9, 124:17
**CUMMINGS** [49] - 15:22, 18:4, 18:11, 18:20, 18:21, 20:1, 20:4, 26:13, 33:2, 33:6, 33:9, 43:10, 43:20, 44:1, 44:5, 45:6, 45:9, 45:19, 45:22, 45:23, 48:19, 50:12, 50:16, 59:25, 60:5, 60:9, 60:14, 70:22, 70:25, 71:1, 76:5, 76:7, 76:14, 80:19, 80:24, 82:16, 84:11, 84:24, 98:11, 98:14, 120:1, 124:16, 126:11, 126:13, 128:24, 132:22, 132:24, 133:10, 133:13
**curiosity** [1] - 57:24
**curious** [2] - 125:16, 127:16
**cursory** [1] - 9:20
**custody** [3] - 7:21, 55:20, 126:24
**Custom** [3] - 87:8, 87:24, 134:9
**Customs** [8] - 86:2, 86:8, 86:11, 87:13, 87:25, 89:10, 128:22, 134:11
**customs** [1] - 88:13

**D**

**D.A.'s** [2] - 19:6, 20:21
**dagger** [1] - 27:3
**Dagnell** [3] - 23:3, 23:10, 24:9

**danger** [3] - 130:22, 130:23
**dangerous** [22] - 66:4, 79:3, 114:13, 115:19, 115:22, 116:11, 117:3, 117:12, 117:15, 117:21, 117:24, 118:9, 118:23, 126:4, 126:20, 131:23, 137:23, 138:8, 139:8, 140:1, 147:11, 163:19
**dark** [2] - 139:16
**Darrah** [14] - 8:21, 8:24, 9:13, 9:22, 10:11, 10:22, 11:3, 11:5, 11:7, 11:14, 67:3, 67:7, 68:15
**DARRAH** [1] - 67:3
**Darrah's** [2] - 68:6, 74:12
**data** [4] - 81:8, 81:9, 81:10, 83:12
**database** [5] - 146:21, 146:23, 146:24, 147:2, 147:3
**databases** [4] - 106:20, 107:8, 160:21, 160:25
**Date** [1] - 166:22
**date** [8] - 15:2, 22:23, 83:18, 83:20, 84:1, 106:18, 143:20, 156:14
**dates** [1] - 55:16
**daughter** [1] - 17:18
**day-to-day** [1] - 54:24
**days** [2] - 60:24, 93:25
**deadly** [2] - 131:2, 131:3
**deal** [2] - 94:25, 125:16
**dealing** [3] - 112:23, 116:15, 126:19
**dealt** [2] - 89:14, 128:6
**death** [2] - 80:1, 80:8
**debris** [1] - 72:23
**deceased** [2] - 16:16, 42:6
**December** [13] - 27:24, 50:6, 64:13, 89:23, 89:25, 98:6, 104:10, 111:25, 119:21, 125:3, 135:10, 139:3, 139:24
**decide** [2] - 52:17, 53:2
**decided** [8] - 34:24,

44:12, 46:6, 46:9, 51:18, 52:1, 69:17, 129:25
**decision** [4] - 34:19, 35:22, 46:18, 53:18
**declaring** [1] - 75:22
**decline** [2] - 51:13, 51:14
**Defendant** [15] - 6:3, 9:6, 18:17, 36:20, 45:15, 74:15, 82:3, 112:11, 112:14, 118:22, 119:14, 121:11, 123:4, 139:21, 144:16
**defendant** [1] - 81:11
**Defendant's** [1] - 158:13, 159:14, 159:19
**Defense** [11] - 15:21, 46:3, 71:12, 71:17, 73:22, 74:10, 76:1, 77:19, 81:6, 82:7, 82:14
**defensive** [4] - 88:5, 88:15, 89:2, 89:4
**definitely** [1] - 160:19
**definitive** [2] - 71:14, 71:19
**degrade** [1] - 72:25
**Department** [40] - 7:5, 7:7, 7:18, 8:16, 21:8, 23:2, 23:21, 24:1, 24:4, 28:22, 29:11, 29:17, 29:20, 32:25, 53:7, 62:25, 64:14, 64:22, 73:2, 77:12, 82:12, 82:13, 87:9, 134:9, 142:16, 142:22, 143:3, 144:17, 144:23, 145:5, 147:5, 150:24, 151:3, 152:12, 156:5, 157:16, 160:13, 161:21, 161:25
**department** [10] - 22:10, 24:10, 24:14, 30:1, 33:3, 46:5, 53:2, 83:11, 143:7, 149:21
**departmental** [1] - 20:5
**depicted** [1] - 98:2
**depiction** [2] - 98:6, 119:20
**deputized** [2] - 54:13, 54:16
**describe** [6] - 7:25, 92:5, 112:6, 129:19,

134:18, 139:13
**described** [3] - 59:15, 59:25, 126:3
**describing** [1] - 62:15
**designations** [1] - 48:21
**desktop** [1] - 70:7
**details** [1] - 50:5
**detain** [4] - 79:5, 149:12, 163:21, 164:1
**detained** [1] - 157:8
**detaining** [1] - 129:13
**Detective** [13] - 44:3, 50:13, 60:14, 67:2, 67:7, 68:6, 68:15, 70:25, 74:12, 82:22, 84:12, 84:25, 85:1
**detective** [19] - 6:15, 9:25, 10:14, 16:11, 18:5, 18:21, 21:7, 23:3, 24:9, 37:13, 43:16, 45:23, 63:23, 67:5, 71:6, 72:20, 74:22, 76:20, 80:12
**detective's** [1] - 8:20
**detectives** [2] - 8:18, 23:1
**detector** [1] - 107:15
**detectors** [1] - 107:17
**determine** [5] - 28:13, 70:13, 108:2, 137:6, 137:8
**determined** [1] - 45:25
**developed** [1] - 73:12
**diagram** [10] - 97:8, 97:17, 98:19, 99:10, 99:11, 104:2, 135:24, 136:1, 145:14, 145:16
**dictates** [1] - 63:7
**Diego** [10] - 6:18, 7:5, 7:6, 7:18, 9:9, 19:5, 67:14, 90:13, 92:10, 114:5
**differ** [1] - 44:16
**difference** [1] - 25:7
**different** [29] - 24:3, 25:11, 27:14, 28:17, 44:15, 56:21, 57:1, 94:9, 94:10, 94:21, 95:3, 95:11, 95:18, 96:17, 96:18, 97:11, 97:12, 102:3, 106:15, 106:19, 107:2, 109:16, 110:10, 122:18, 140:4, 140:5, 148:17, 160:25
**differently** [1] - 29:3

**difficulty** [1] - 138:1
**DIRECT** [3] - 6:13, 85:20, 134:3
**direct** [6] - 16:11, 31:19, 52:12, 68:5, 111:20, 158:15
**directing** [1] - 51:21
**direction** [4] - 29:14, 48:4, 79:6, 136:13
**directions** [1] - 122:18
**directives** [4] - 131:25, 138:23, 142:1, 142:5
**directly** [5] - 13:16, 78:24, 102:21, 122:10, 129:22
**discharge** [1] - 86:22
**discovery** [6] - 42:6, 46:2, 46:19, 81:6, 82:7, 125:1
**Discovery** [1] - 21:1
**discrepancy** [1] - 125:15
**discussed** [2] - 52:15, 143:14
**discussing** [1] - 11:2
**discussion** [2] - 33:23, 39:9
**Discussion** [1] - 165:10
**dispatch** [7] - 25:7, 25:15, 26:9, 26:14, 42:10, 48:20, 50:1
**dispatcher** [2] - 25:16, 26:2
**dispatchers** [1] - 83:16
**display** [2] - 61:1, 158:16
**displayed** [1] - 60:20
**distance** [2] - 94:1, 94:3
**distinction** [1] - 62:2
**District** [3] - 75:6, 166:4, 166:23
**divisions** [1] - 63:21
**DNA** [1] - 70:13
**doctor** [1] - 13:22
**document** [8] - 10:17, 50:8, 50:10, 58:9, 63:7, 111:6, 160:1
**documentation** [11] - 18:24, 103:4, 103:5, 108:1, 109:2, 111:15, 124:9, 126:6, 127:10, 127:14, 156:22
**documenting** [1] - 58:15
**documents** [9] - 75:7,

81:5, 82:6, 103:18,
104:16, 108:19,
116:20, 119:3, 155:8
**dog** [4] - 35:2, 56:8,
56:12
**done** [11] - 9:14, 9:17,
57:15, 66:8, 66:9,
69:17, 82:7, 103:9,
127:24, 157:9, 165:8
**door** [6] - 9:22, 39:22,
40:5, 100:5, 100:7,
100:14
**doors** [2] - 101:13,
101:15
**double** [1] - 108:24
**down** [24] - 25:13,
35:9, 56:2, 61:19,
69:20, 83:10, 85:2,
95:21, 99:5, 99:9,
109:20, 114:4,
119:21, 130:6,
130:12, 133:15,
136:6, 136:12,
138:11, 154:9,
154:12, 154:19,
155:3, 164:20
**Dr** [12] - 13:25, 14:2,
14:11, 14:14, 15:1,
15:2, 15:4, 37:24,
38:1, 69:21, 69:24,
79:22
**drawing** [1] - 62:1
**dress** [2] - 86:4, 96:20
**dressed** [2] - 63:4,
95:17
**drew** [1] - 67:17
**driver's** [17] - 111:3,
111:8, 111:9,
111:14, 113:13,
113:14, 113:18,
116:6, 121:19,
124:1, 124:4,
126:23, 127:17,
132:6, 155:10,
156:4, 156:15
**driving** [2] - 25:17,
129:25
**drops** [1] - 117:1
**drugs** [1] - 110:2
**duly** [3] - 6:11, 85:19,
134:2
**during** [13] - 31:25,
33:21, 36:23, 39:13,
39:17, 41:1, 42:25,
50:9, 60:20, 116:3,
120:2, 138:5, 153:14
**duties** [4] - 89:1,
89:10, 104:14,
135:20
**duty** [4] - 86:20,

94:10, 95:23, 105:1
**DVD** [2] - 21:1, 21:5

## E

**early** [8] - 6:20, 8:25,
21:1, 28:18, 28:19,
36:4, 36:11, 36:13
**east** [1] - 103:23
**Eastern** [1] - 83:21
**effort** [5] - 38:21, 39:5,
60:16, 61:16, 152:7
**efforts** [3] - 9:17, 52:5,
162:17
**eight** [4] - 71:14,
128:11, 129:9,
134:13
**either** [14] - 32:1,
32:20, 36:5, 37:3,
54:2, 81:4, 100:5,
100:13, 103:17,
105:7, 130:10,
131:20, 156:8, 163:2
**elbow** [1] - 18:9
**electronic** [1] - 160:20
**electronically** [1] -
160:16
**eliminate** [1] - 39:2
**emotion** [7] - 60:20,
61:1, 61:23, 61:25,
62:9, 62:12, 62:20
**employed** [9] - 13:10,
21:17, 86:1, 86:2,
86:7, 134:7, 134:11,
134:13, 135:3
**employment** [1] -
135:2
**end** [1] - 55:5
**Enforcement** [4] -
140:23, 141:21,
152:22, 152:23
**enforcement** [23] -
6:25, 7:14, 73:24,
79:1, 87:15, 103:13,
103:21, 107:8,
109:10, 115:12,
116:10, 118:10,
118:13, 118:15,
123:2, 129:6,
134:23, 135:15,
145:20, 146:1,
152:20, 157:17,
163:17
**enhanced** [4] - 111:3,
111:8, 111:9, 124:1
**enlisted** [1] - 67:23
**Enriquez** [7] - 133:19,
133:21, 134:6,
145:12, 160:4,
160:10, 164:17

**ENRIQUEZ** [1] - 134:1
**enter** [22] - 44:4, 44:7,
89:16, 89:19, 93:23,
98:23, 98:25, 100:1,
100:25, 101:7,
101:9, 102:1,
104:17, 104:22,
105:24, 108:3,
108:20, 111:6,
113:2, 115:2,
118:24, 123:25
**entered** [17] - 20:13,
23:4, 30:15, 35:17,
39:15, 47:1, 47:15,
77:11, 78:3, 78:19,
83:19, 84:1, 84:3,
84:6, 90:1, 101:2,
120:14
**entering** [6] - 34:19,
89:15, 105:20,
119:7, 119:14, 138:1
**enters** [3] - 26:2,
85:11, 133:20
**entire** [1] - 44:21
**entirety** [1] - 18:23
**Entry** [4] - 90:6, 91:12,
92:25, 135:16
**entry** [25] - 20:16,
36:19, 47:23, 90:20,
90:25, 91:13, 92:14,
92:18, 92:24, 93:13,
93:17, 95:3, 102:2,
102:25, 103:3,
103:22, 104:5,
105:19, 107:13,
111:1, 111:15,
120:23, 146:15,
149:6, 155:10
**equipment** [1] - 13:24
**Ernesto** [2] - 133:19,
134:6
**ERNESTO** [1] - 134:1
**erratic** [1] - 88:4
**escorted** [3] - 116:9,
127:2, 136:10
**especially** [2] - 105:8,
131:7
**essentially** [3] - 36:8,
51:2, 69:13
**establish** [1] - 59:9
**estimate** [1] - 90:23
**ethnic** [1] - 93:1
**events** [2] - 44:10,
119:21
**eventually** [2] -
101:20, 115:12
**everywhere** [5] - 93:4,
94:23, 101:10,
102:10
**evidence** [13] - 16:3,

23:4, 31:17, 47:17,
48:1, 50:17, 56:9,
59:16, 69:13, 72:18,
72:21, 166:7
**evidentiary** [1] - 50:23
**evolve** [1] - 39:5
**evolved** [1] - 39:7
**exact** [8] - 19:12,
22:23, 44:8, 44:10,
91:3, 96:5, 96:6
**exactly** [7] - 19:7,
39:20, 49:1, 61:13,
66:11, 68:2, 107:6
**exam** [1] - 97:23
**EXAMINATION** [12] -
6:13, 18:3, 71:4,
84:10, 85:20,
124:15, 129:4,
132:23, 134:3,
145:10, 160:8,
162:11
**examination** [4] -
18:2, 52:12, 124:14,
145:8
**Examiner's** [2] -
16:13, 17:1
**example** [1] - 132:5
**except** [1] - 16:4
**exchange** [1] - 113:7
**excuse** [7] - 20:11,
41:3, 41:6, 60:15,
65:15, 70:1, 157:3
**excused** [3] - 133:11,
133:14, 164:17
**execute** [1] - 13:1
**exerting** [1] - 52:6
**exhibit** [2] - 97:18,
101:22
**Exhibit** [13] - 15:23,
16:1, 74:24, 76:18,
82:20, 97:5, 97:8,
98:16, 119:18,
120:6, 120:9,
158:14, 159:19
**exhibits** [3] - 54:22,
81:20, 166:14
**exigent** [1] - 68:25
**existed** [1] - 47:25
**existence** [1] - 160:17
**exited** [1] - 32:6
**Exp** [1] - 166:22
**experience** [2] -
22:13, 112:22
**expire** [1] - 64:18
**explain** [3] - 12:17,
62:2, 83:11
**explained** [3] - 12:23,
12:24, 62:3
**explaining** [2] - 11:2,
101:25

**explosives** [1] -
105:15
**expression** [1] -
113:11
**expressionless** [1] -
112:20
**extinguished** [1] -
47:13
**eyes** [1] - 62:5

## F

**fabrication** [1] - 37:6
**face** [5] - 9:3, 76:1,
102:20, 113:11
**facility** [4] - 7:22, 7:25,
9:14, 68:6
**facing** [4] - 99:4, 99:5,
100:12, 102:16
**fact** [8] - 26:22, 27:2,
36:3, 50:22, 59:18,
99:18, 119:9
**factor** [1] - 39:3
**facts** [2] - 10:23, 11:2
**fair** [10] - 24:15, 29:25,
36:22, 38:22, 41:23,
59:20, 60:22, 94:7,
131:8, 131:24
**fairly** [2] - 36:11,
97:20
**falls** [1] - 149:6
**familiar** [4] - 48:6,
54:8, 73:23, 110:21
**far** [26] - 24:18, 25:9,
26:16, 42:22, 44:9,
44:16, 44:22, 46:25,
47:3, 47:8, 51:19,
52:17, 55:1, 103:6,
103:18, 106:16,
106:21, 108:24,
109:24, 111:6,
115:4, 120:25,
125:8, 125:10,
125:13
**fatality** [1] - 80:4
**father** [2] - 17:21,
17:22
**father-in-law** [1] -
17:21
**fax** [2] - 19:5, 19:9
**FBI** [3] - 147:1, 147:3,
147:24
**feature** [1] - 111:8
**federal** [3] - 87:15,
105:8, 137:16
**Federal** [1] - 147:1
**feet** [2] - 41:8, 41:16
**felt** [1] - 65:18
**female** [1] - 12:19
**fess** [1] - 36:7

few [6] - 25:10, 38:23, 47:13, 50:5, 93:8, 124:20
field [2] - 78:5, 78:23
fields [2] - 77:24, 83:11
fifth [1] - 50:7
figure [1] - 13:10
figured [1] - 19:4
file [2] - 19:1, 75:8
filed [1] - 84:13
files [1] - 63:17
fill [1] - 31:16
filled [1] - 83:12
filling [1] - 31:9
finally [1] - 69:20
fine [5] - 18:14, 35:10, 38:25, 81:15, 81:24
fingerprint [3] - 136:25, 140:15, 140:17
fingerprinting [1] - 108:23
fingerprints [8] - 135:22, 138:15, 140:20, 146:20, 146:24, 155:7, 155:23, 161:16
finishes [1] - 94:16
fire [57] - 12:25, 19:19, 22:10, 22:13, 24:10, 24:17, 26:18, 28:18, 29:5, 33:3, 34:16, 35:6, 40:2, 42:5, 42:9, 42:11, 42:18, 44:4, 44:22, 45:2, 46:4, 46:5, 46:7, 46:13, 46:15, 46:16, 47:5, 47:9, 47:10, 47:19, 47:22, 48:4, 48:9, 48:12, 48:13, 48:21, 49:7, 52:17, 53:2, 53:10, 53:11, 53:15, 53:16, 53:17, 53:18, 53:22, 53:24, 54:3, 56:12, 58:23, 69:12, 72:1, 72:10, 72:23, 80:4
Fire [8] - 23:21, 24:1, 24:4, 32:25, 52:24, 53:5, 57:13, 58:24
firearm [4] - 54:22, 88:6, 130:24, 134:22
firearms [1] - 134:22
firefighter [5] - 22:13, 23:16, 27:5, 52:23, 54:17
firefighters [5] - 24:12, 27:6, 27:19, 28:10, 71:25

fireman [1] - 54:25
firemen [1] - 47:3
fires [2] - 24:17, 55:2
first [29] - 6:11, 8:22, 21:18, 28:21, 28:24, 29:4, 30:9, 31:2, 31:10, 35:17, 46:12, 47:25, 58:11, 85:19, 86:25, 98:19, 104:21, 106:17, 108:6, 134:2, 140:14, 140:19, 140:21, 142:21, 145:14, 150:1, 150:5, 152:14, 161:20
fish [1] - 114:25
five [8] - 22:21, 22:24, 52:13, 52:14, 52:16, 55:4, 78:2, 83:4
flagged [6] - 129:13, 137:19, 137:22, 138:8, 139:8, 146:14
flee [1] - 105:11
flying [1] - 92:13
focus [1] - 115:18
folks [1] - 72:10
follow [3] - 26:20, 42:3, 60:4, 64:7, 117:20, 148:17, 163:5
followed [1] - 28:12
following [1] - 20:12
follows [3] - 6:12, 85:19, 134:2
Force [1] - 71:21
force [5] - 34:13, 54:16, 71:24, 72:13, 130:17
Ford [9] - 13:21, 13:25, 14:2, 14:11, 14:14, 15:2, 15:4, 69:21, 69:24
Ford's [1] - 15:1
foregoing [1] - 166:6
foreign [1] - 91:21
foremost [1] - 104:21
forensic [1] - 72:10
Foresman [1] - 27:22
Forest [1] - 49:10
forget [1] - 58:5
forgot [1] - 16:12
forgotten [1] - 21:13
form [10] - 14:12, 14:24, 15:8, 20:16, 31:20, 40:13, 41:21, 41:23, 105:7, 108:9
forms [1] - 20:5, 20:9, 80:14
Fort [3] - 24:11, 72:5,

166:24
forth [2] - 43:1, 51:23
fought [1] - 47:12
four [10] - 52:16, 52:20, 55:24, 69:12, 86:9, 86:20, 87:5, 127:25, 128:1, 128:7
frame [1] - 94:1
Fred [1] - 124:17
free [1] - 40:24
Friday [3] - 55:6, 55:9, 165:9
front [20] - 71:7, 102:19, 103:5, 112:8, 114:12, 114:18, 116:2, 116:7, 121:13, 121:14, 122:10, 122:13, 122:15, 128:9, 136:21, 136:24, 137:4, 137:18, 143:21, 150:15
full [2] - 109:20, 116:23
fun [1] - 114:6
function [2] - 57:18, 126:2

**G**

gate [4] - 8:10, 100:4, 100:13
gates [1] - 145:22
gather [1] - 52:8
gathered [2] - 52:13, 59:10, 59:16, 79:24
general [2] - 63:6, 64:7, 132:1
generally [2] - 64:8, 64:19
generated [1] - 151:7
gentleman [7] - 61:17, 65:2, 93:17, 120:14, 122:11, 125:23, 129:23
gentlemen [2] - 67:14, 164:24
George [3] - 8:23, 10:11, 67:2
Georgia [2] - 87:16, 134:21
GILL [34] - 85:10, 85:21, 94:18, 94:20, 96:24, 98:9, 98:13, 98:17, 104:1, 112:10, 112:13, 119:24, 120:7, 120:10, 124:13, 129:3, 129:5,

132:20, 133:12, 133:19, 134:4, 139:20, 139:23, 142:20, 143:14, 143:19, 145:7, 159:17, 160:7, 160:9, 162:9, 164:15, 164:19, 165:1
gill [1] - 164:13
given [9] - 10:24, 20:20, 27:5, 94:8, 95:16, 106:4, 120:1, 125:1, 138:5
glass [3] - 131:12, 131:14, 131:17
Glynco [2] - 87:16, 134:21
Goode [7] - 64:23, 64:25, 65:17, 77:18, 77:20, 84:14
governed [1] - 64:4
government [1] - 108:9
governs [1] - 63:11
graduate [1] - 21:14
graduated [3] - 21:18, 21:19, 87:21
graduation [1] - 87:23
grandfather [1] - 17:24
great [1] - 106:7
greater [1] - 109:9
green [4] - 112:9, 136:12, 139:16
ground [1] - 130:7
group [1] - 114:21
groups [1] - 93:1
guess [2] - 81:19, 98:12
guidelines [1] - 64:9
guilt [2] - 38:21, 39:6
guy [5] - 66:21, 148:4, 152:9, 152:10, 162:21
guys [1] - 69:1

**H**

half [3] - 40:16, 40:18, 42:24
hallway [1] - 101:19
HAND [1] - 166:16
hand [3] - 85:14, 101:4, 158:12
handbook [1] - 63:6
handcuff [1] - 116:9, 117:14, 126:14, 138:11
handcuffed [6] -

117:9, 117:11, 117:21, 122:23, 126:24, 127:8
handle [2] - 115:25, 163:23
handling [2] - 51:18, 153:8
hands [2] - 115:23, 133:4
handwriting [2] - 159:4, 159:5
handwritten [1] - 45:25
harder [1] - 95:12
harm [3] - 105:14, 105:17, 110:14
Harris [5] - 13:13, 13:16, 66:14, 70:1, 70:6
hash [1] - 83:13
headed [1] - 123:1
header [1] - 81:5
heading [1] - 123:2
heads [1] - 115:14
hear [2] - 115:4, 151:16
heard [2] - 49:1, 136:4
hearing [8] - 15:20, 15:24, 31:10, 76:4, 76:8, 76:10, 98:14, 120:4
help [8] - 47:18, 48:4, 67:23, 68:10, 80:12, 115:5, 131:18
Hemisphere [3] - 110:21, 123:19, 127:22
Herb [1] - 91:5
hereby [1] - 166:5
hidden [1] - 109:24
high [1] - 116:22
Hill [1] - 49:10
himself [5] - 39:15, 111:24, 116:16, 132:3, 133:1
history [1] - 66:20
hit [1] - 156:25
hold [8] - 109:21, 134:16, 144:21, 148:16, 150:3, 151:24, 152:15, 153:24
holds [1] - 48:14
home [1] - 55:17
Homeland [2] - 87:10, 134:8
homicide [7] - 7:23, 8:17, 9:25, 79:2, 80:2, 80:6, 163:18
honest [1] - 25:12

honestly [1] - 53:19
Honor [31] - 10:12,
14:17, 15:19, 15:24,
16:5, 18:11, 18:20,
20:2, 45:19, 45:22,
60:6, 60:9, 71:1,
75:25, 76:7, 82:5,
82:17, 84:25, 98:9,
112:10, 120:1,
120:7, 126:12,
129:3, 129:23,
132:22, 133:13,
133:16, 145:9,
160:7, 164:15
honorable [1] - 86:22
Hospital [2] - 13:14,
70:1
hospital [3] - 13:22,
69:21, 110:1
hotel [2] - 6:22, 11:20
hour [2] - 40:16, 40:18
hours [9] - 6:20, 8:25,
37:22, 55:12, 84:3,
84:17, 84:20, 106:8,
106:10
house [5] - 42:16,
42:17, 56:22, 57:1,
57:9
housekeeping [1] -
16:2
huge [1] - 99:25
Hull [13] - 29:6, 30:12,
31:6, 31:15, 32:21,
32:25, 33:1, 33:2,
35:8, 35:9, 36:19,
36:21
Hummel [66] - 6:18,
9:17, 12:12, 13:9,
13:10, 16:24, 16:25,
17:7, 17:11, 17:12,
17:17, 17:18, 17:20,
17:21, 28:24, 29:4,
29:7, 29:10, 29:19,
29:25, 30:10, 31:8,
31:15, 31:23, 32:2,
34:21, 34:25, 35:7,
35:24, 37:2, 37:4,
38:20, 38:21, 39:6,
39:10, 39:17, 40:13,
40:20, 41:6, 41:22,
55:20, 59:20, 60:1,
60:12, 60:20, 61:1,
61:11, 64:22, 66:3,
67:14, 73:2, 78:11,
126:22, 127:11,
139:5, 139:24,
140:17, 141:24,
143:24, 145:13,
148:25, 150:9,
151:8, 155:9, 161:5,

161:12
Hummel's [5] - 7:12,
50:17, 59:4, 60:17,
140:20
hundred [1] - 116:25
hurt [4] - 116:16,
131:21
husband [1] - 60:12

I

I-94 [3] - 94:2, 100:23,
101:3
I-94s [2] - 100:19,
100:24
IAFIS [2] - 161:16
ID [4] - 102:5, 102:7,
108:9
idea [2] - 40:7, 128:8
identification [8] -
10:15, 14:20, 74:23,
75:19, 110:25,
125:24, 132:8,
158:13
identified [6] - 16:25,
17:1, 112:11,
120:17, 121:11,
139:21
identifies [2] - 54:11,
66:12
identify [6] - 16:14,
47:18, 96:8, 125:17,
125:18, 125:19
identifying [2] - 50:17,
147:16
identity [1] - 138:15
illegal [2] - 104:18,
110:14
image [1] - 31:11
imaged [1] - 80:13
images [3] - 13:2,
47:24, 137:1
immediate [1] -
129:22
immigration [4] -
88:13, 108:24,
134:20, 134:23
implicated [1] - 59:19
impound [1] - 7:22
in-service [1] - 37:13
incendiary [1] - 52:15
incident [4] - 49:22,
50:1, 124:22, 125:2
incidents [2] - 129:16,
129:19
include [5] - 72:7,
72:9, 79:8, 79:11,
147:4
included [2] - 56:24,
166:9

inconsistencies [1] -
38:13
inconsistent [1] - 80:4
incorporate [1] -
78:18
incorporated [3] -
75:15, 75:23, 75:24
Incorporated [1] -
76:22
Incorporation [1] -
76:3
indicate [2] - 25:20,
50:18
indicated [12] - 26:1,
37:1, 41:2, 58:8,
59:17, 60:19, 66:3,
147:9, 149:11,
152:13, 158:25
indicates [2] - 54:11,
161:19
indicating [3] - 26:3,
62:16, 140:6
indications [1] - 25:15
Indictment [1] - 81:10
indirectly [2] - 13:16,
13:17
individual [45] - 13:21,
16:21, 17:16, 30:9,
35:4, 35:5, 35:19,
39:6, 78:19, 79:15,
83:11, 104:5,
107:13, 109:1,
110:6, 111:11,
111:24, 112:3,
112:13, 118:16,
120:17, 121:3,
121:4, 122:24,
123:20, 126:6,
126:14, 130:7,
130:17, 132:3,
132:7, 132:25,
136:5, 136:7, 137:2,
137:4, 138:1, 139:4,
139:10, 140:15,
143:5, 143:20,
144:7, 155:4, 156:3
individual's [1] -
108:1
individuals [3] -
16:14, 136:9, 137:12
indoor [3] - 101:7,
101:14, 120:15
inform [3] - 143:2,
143:19, 144:19
information [54] -
26:21, 28:12, 28:13,
40:1, 51:10, 52:8,
61:3, 61:17, 61:24,
62:12, 78:14, 78:16,
78:20, 79:21, 81:8,

81:17, 103:11,
106:17, 109:22,
110:11, 114:7,
114:11, 115:19,
116:4, 116:18,
116:19, 118:6,
122:15, 140:11,
140:24, 144:16,
145:3, 145:4, 147:8,
147:16, 147:18,
148:7, 148:11,
148:24, 149:10,
154:24, 156:7,
156:12, 156:14,
156:18, 157:15,
158:6, 158:22,
159:1, 160:24,
162:14, 162:15,
163:25
Information [4] -
140:4, 140:22,
141:17, 147:6
informed [2] - 143:4
Ingram [1] - 52:21
initial [11] - 9:19,
47:23, 58:9, 59:11,
88:9, 88:12, 147:8,
150:23, 157:8,
161:10
initiating [1] - 148:11
initiative [1] - 163:7
Initiative [3] - 110:22,
123:20, 127:22
injuries [1] - 80:3
Inn [2] - 11:21, 67:10
inquire [2] - 110:17,
149:7
inquiries [1] - 147:19
inquiry [8] - 147:8,
148:10, 149:2,
152:11, 155:7,
157:8, 158:18,
158:21
inside [3] - 8:3, 9:20,
26:19
inspect [4] - 89:15,
89:18, 104:15,
135:23
inspecting [2] - 89:16,
90:1
inspection [6] - 109:4,
118:3, 118:25,
135:23, 137:5,
137:19
inspector [1] - 135:14
inspects [2] - 95:4,
95:5
instance [3] - 25:14,
104:19, 142:12
instructed [1] - 29:16

instructions [2] -
34:5, 34:6
instructors [1] - 24:3
integrated [1] - 136:25
inter [1] - 91:13
interest [2] - 79:2,
163:18
interested [2] - 24:14,
149:13
interject [1] - 60:2
international [5] -
91:13, 91:15, 92:9,
99:14, 99:18
International [1] -
92:12
interoffice [1] - 27:23
interrogation [4] -
37:17, 37:20, 38:9,
38:14
interrupt [1] - 143:9
interview [27] - 6:17,
6:18, 29:7, 30:2,
30:14, 30:18, 34:2,
34:3, 34:20, 34:25,
35:24, 36:23, 37:17,
37:20, 38:8, 38:14,
38:19, 38:20, 39:1,
39:13, 39:18, 39:19,
49:12, 50:6, 50:9,
51:16, 61:11
interviewed [1] -
60:21
interviewing [3] -
36:20, 67:14, 132:6
interviews [2] - 78:15
introduced [1] - 31:9
introduction [1] -
120:3
investigate [1] - 140:8
investigated [1] -
24:18
investigating [2] -
53:14, 63:12
investigation [12] -
13:9, 13:20, 24:24,
26:21, 27:13, 39:23,
43:1, 52:18, 73:12,
78:17, 141:12, 144:6
Investigation [1] -
147:2
investigations [3] -
22:20, 79:18, 162:5
investigative [3] -
23:7, 51:3, 64:5
investigator [8] - 7:4,
8:21, 23:14, 23:20,
24:6, 24:21, 53:3,
63:11
Investigator [10] -
8:24, 9:13, 10:22,

10:25, 11:3, 11:7,
11:14, 52:21,
149:16, 149:20
**investigators** [5] -
6:17, 9:24, 23:1,
27:5, 55:25
**invite** [1] - 163:2
**involve** [1] - 53:18
**involved** [12] - 22:25,
23:22, 24:4, 25:2,
34:12, 39:3, 39:14,
40:2, 53:10, 53:16,
95:20, 129:22
**involvement** [2] -
57:15, 157:21
**involving** [2] - 88:14,
88:16
**Iranians** [1] - 93:10
**Iraq** [1] - 93:4
**issue** [5] - 11:17, 94:6,
100:19, 103:4, 115:8
**issued** [1] - 100:22
**issues** [1] - 165:3
**it'll** [1] - 106:19
**items** [3] - 12:7, 59:10,
77:5
**itself** [4] - 47:2, 94:24,
100:14, 149:7

## J

**Jacob** [1] - 27:22
**Jail** [1] - 67:15
**January** [5] - 15:3,
111:20, 111:21,
135:9, 166:17
**JASON** [1] - 6:10
**jazz** [1] - 159:2
**job** [10] - 54:24, 89:10,
89:22, 134:16,
135:8, 135:20,
135:21, 136:19,
136:22, 136:23
**jobs** [2] - 128:3,
135:21
**Jodi** [2] - 16:24, 17:16
**Jodi's** [1] - 17:24
**John** [22] - 28:24,
29:4, 29:7, 29:10,
29:19, 34:21, 34:25,
37:4, 38:20, 38:21,
39:6, 39:9, 39:17,
40:13, 41:6, 55:20,
59:20, 59:25, 60:19,
64:22, 126:22, 139:4
**Johnson** [1] - 15:12
**join** [2] - 56:2, 87:1
**joined** [1] - 30:2
**Jorge** [4] - 85:10,
85:12, 85:23, 85:25

**JORGE** [1] - 85:18
**joy** [1] - 17:7
**Joy** [6] - 17:8, 17:11,
17:18, 37:4, 59:4,
60:12
**Joy's** [1] - 17:22
**Judge** [28] - 6:7, 11:8,
11:10, 11:17, 33:2,
43:10, 44:1, 45:6,
48:7, 59:16, 60:15,
60:16, 70:23, 74:19,
76:11, 80:17, 80:20,
80:25, 85:22, 92:5,
98:18, 98:24, 113:6,
129:20, 134:18,
160:5, 162:10,
164:12
**Judge's** [2] - 11:12,
11:15
**Judicial** [2] - 166:4,
166:23
**jumpsuit** [1] - 112:9
**jurisdictional** [1] -
34:13
**Justice** [1] - 82:13

## K

**Kandal** [7] - 145:6,
153:8, 153:16,
153:23, 154:4,
154:12, 154:19
**keep** [4] - 26:11,
26:14, 115:22, 119:8
**Kennedale** [44] - 21:7,
22:8, 22:16, 23:2,
23:21, 24:1, 24:4,
24:6, 24:13, 28:22,
29:11, 29:17, 29:20,
33:9, 62:24, 63:8,
63:18, 64:14, 64:21,
73:2, 73:18, 75:15,
75:23, 76:3, 77:12,
78:8, 79:6, 81:3,
142:16, 142:22,
143:3, 143:6,
143:20, 144:17,
144:22, 145:5,
147:12, 149:21,
150:24, 151:2,
157:15, 160:13,
161:20, 161:25
**key** [2] - 100:7, 100:8
**keyboard** [1] - 70:18
**kicked** [1] - 157:16
**killed** [1] - 131:22
**kind** [10] - 27:23, 95:1,
99:2, 103:3, 103:8,
147:18, 147:19,
149:6, 150:16,

155:19
**Kleenexes** [1] - 62:7
**knife** [2] - 26:22, 27:3
**knocks** [2] - 39:22,
40:5
**knowing** [1] - 149:13
**knowledge** [6] - 7:8,
7:20, 17:11, 54:13,
95:1, 95:12
**known** [3] - 109:6,
109:13, 141:19

## L

**labeled** [1] - 82:8
**lack** [4] - 108:6,
108:19, 119:3, 126:5
**lacking** [3] - 103:18,
108:19, 109:22
**ladder** [2] - 48:15,
48:16
**lane** [1] - 130:10
**lanes** [9] - 93:15,
93:16, 101:1,
102:24, 120:13,
122:4, 129:24,
130:11
**Langford** [4] - 54:19,
56:19, 56:22, 71:13
**Langford's** [3] - 54:24,
71:6, 71:10
**language** [5] - 35:14,
77:23, 78:7, 81:4,
96:7
**large** [2] - 8:2, 138:4
**Larry** [1] - 145:12
**last** [10] - 6:16, 20:12,
20:16, 38:2, 60:24,
89:21, 106:17,
119:13, 119:20
**lately** [1] - 107:5
**latest** [1] - 129:21
**laundry** [1] - 59:6
**law** [15] - 6:25, 7:13,
11:24, 17:21, 73:24,
79:1, 87:15, 88:6,
88:13, 88:14, 107:8,
108:13, 134:23,
163:17
**laws** [2] - 10:7, 119:10
**lawyers** [1] - 145:13
**lead** [4] - 48:3, 51:19,
113:6
**leaf** [1] - 20:20
**learn** [1] - 27:2
**learned** [4] - 57:21,
79:21, 88:12
**least** [5] - 95:5, 126:8,
127:5, 129:9, 156:18
**leave** [7] - 15:7, 29:13,

29:19, 36:16, 36:19,
40:24, 133:4
**leaves** [1] - 72:24
**leaving** [1] - 89:14
**Lee** [5] - 69:8, 69:9,
69:10, 69:11
**left** [21] - 15:9, 18:9,
20:13, 29:10, 32:6,
41:6, 41:7, 53:22,
61:20, 70:17, 83:15,
100:6, 112:14,
120:25, 122:14,
135:24, 136:13,
136:14, 139:18,
145:16, 161:8
**legal** [2] - 105:25,
148:16
**legally** [5] - 67:20,
74:12, 104:22,
105:24, 119:7
**length** [1] - 30:15
**less** [1] - 114:10
**letter** [1] - 99:24
**letting** [1] - 18:22
**license** [19] - 74:2,
79:9, 111:3, 111:9,
111:14, 113:13,
113:14, 113:18,
116:6, 121:19,
124:1, 124:5,
126:23, 127:17,
132:6, 155:10,
156:5, 156:15
**Lieutenant** [5] - 58:23,
58:24, 59:5, 71:6,
71:13
**life** [1] - 19:4
**Lindbergh** [1] - 92:11
**line** [7] - 48:13, 99:2,
99:3, 99:25, 105:24,
112:14
**lines** [2] - 78:2, 83:4
**list** [2] - 16:4, 107:10
**local** [4] - 6:25, 7:13,
54:13, 105:7
**locate** [5] - 7:8, 7:11,
77:3, 77:5, 80:11,
81:17, 81:20, 82:11,
83:25
**located** [8] - 26:22,
27:4, 57:9, 58:16,
67:13, 79:5, 92:16,
115:1
**locating** [1] - 59:4
**location** [10] - 11:22,
27:13, 27:15, 34:3,
42:13, 67:25, 79:6,
109:18, 118:1, 118:2
**locations** [2] - 11:25,
94:21

**locked** [1] - 8:3
**log** [10] - 19:18, 19:23,
20:8, 43:4, 44:6,
44:12, 44:22, 45:1,
45:24, 58:20
**logs** [2] - 25:7, 48:20
**look** [19] - 10:16, 13:4,
15:4, 18:12, 18:22,
19:2, 25:14, 27:7,
60:3, 71:8, 74:2,
75:20, 76:5, 97:16,
135:24, 155:21,
158:1, 159:22, 163:6
**looked** [2] - 62:5,
66:22
**looking** [14] - 27:1,
27:11, 47:25, 48:2,
48:19, 82:24, 100:2,
100:3, 101:5,
113:21, 120:11,
120:12, 120:13,
120:22
**lookout** [5] - 139:25,
140:2, 140:3,
141:25, 143:5
**looks** [1] - 27:22
**loose** [2] - 20:7, 20:20
**loose-leaf** [1] - 20:20
**loud** [1] - 62:4
**lunch** [2] - 43:9, 45:25

## M

**M-59** [2] - 48:21, 48:25
**M.K.E** [1] - 83:5
**machines** [1] - 123:13
**major** [8] - 90:10,
90:14, 92:9, 93:1,
105:13, 105:18,
107:8, 115:9
**male** [1] - 80:9
**man** [2] - 52:2, 117:8
**man's** [1] - 66:15
**management** [1] -
114:24
**manager** [1] - 135:7
**Mansfield** [3] - 21:9,
21:17, 21:20, 22:1,
22:3, 22:5, 22:11,
22:14, 49:6
**manual** [3] - 62:24,
63:6, 63:20
**map** [1] - 67:17
**Marine** [3] - 86:21,
87:3, 89:8
**Marines** [6] - 86:23,
87:1, 88:23, 89:1,
89:5, 89:7
**mark** [4] - 80:23,
83:13, 158:10

marked [8] - 10:15, 14:20, 74:23, 75:18, 97:4, 97:24, 119:17, 158:13
marriage [1] - 17:15
Marshal [1] - 53:5
marshal [3] - 53:10, 53:16, 53:18
marshal's [3] - 21:22, 21:25, 53:11
Marshal's [2] - 52:24, 57:14
match [5] - 116:8, 116:19, 116:25, 122:16, 122:23
matched [1] - 116:7
material [2] - 46:2, 73:8
matter [3] - 36:3, 161:7, 165:4
McMurry [3] - 27:17, 27:24, 49:2
mean [15] - 26:5, 35:11, 47:20, 52:6, 53:17, 64:8, 66:7, 69:16, 77:14, 112:21, 112:22, 140:2, 155:13, 157:3, 163:22
meaning [1] - 11:4
means [1] - 17:3
measures [1] - 8:5
mechanic [1] - 135:7
Medic [1] - 48:25
Medical [2] - 16:13, 17:1
medical [1] - 13:22
meet [6] - 8:17, 9:3, 9:24, 11:10, 69:24, 109:9
meeting [1] - 55:17
memory [1] - 27:1
mentally [2] - 79:2, 163:18
mentioned [1] - 121:18
merely [1] - 126:22
Meridian [1] - 37:18
met [7] - 8:15, 55:11, 65:2, 65:15, 65:18, 65:23, 124:18
metal [2] - 107:15, 107:17
Methodist [2] - 13:14, 70:6
Mexican [1] - 92:11
Mexicans [1] - 92:20
Mexico [33] - 90:9, 90:15, 90:18, 90:20, 91:18, 91:19, 91:21,

92:3, 92:8, 92:15, 92:18, 93:2, 98:23, 98:25, 99:1, 99:6, 100:2, 100:3, 100:22, 100:23, 108:15, 108:16, 110:17, 113:23, 113:24, 114:2, 114:9, 120:22, 121:24, 144:5
mid [1] - 33:10
mid-size [1] - 33:10
middle [1] - 97:17
might [12] - 44:14, 95:3, 95:5, 95:6, 103:11, 104:20, 105:10, 105:11, 108:24, 109:25, 136:9
Mike [1] - 83:5
mile [1] - 42:24
miles [3] - 93:24, 93:25
military [7] - 78:12, 79:4, 96:18, 96:21, 147:15, 147:24, 163:20
mind [2] - 35:18, 113:25
mine [1] - 115:23
minors [1] - 103:15
minute [2] - 106:11, 145:14
minutes [12] - 25:10, 29:24, 30:1, 38:23, 39:16, 47:13, 142:23, 150:22, 150:25, 151:20, 152:14, 162:3
minutes' [1] - 25:6
Miranda [2] - 31:15, 40:19
MIS [2] - 78:5, 83:1
miscellaneous [5] - 77:24, 78:5, 78:22, 163:3, 163:14
missing [46] - 50:2, 62:23, 63:17, 64:1, 64:15, 64:22, 65:19, 66:13, 77:4, 77:6, 77:8, 77:14, 77:24, 79:8, 79:17, 81:4, 81:21, 82:9, 82:25, 84:13, 103:15, 103:16, 137:19, 139:25, 140:2, 140:3, 140:6, 141:2, 141:25, 142:9, 143:5, 143:6, 147:9, 147:11, 148:5,

148:7, 148:10, 149:5, 149:6, 149:10, 151:7, 155:6, 155:14, 156:13, 156:25, 157:6
Mississippi [1] - 37:18
mistake [1] - 66:23
misunderstood [1] - 52:14
model [1] - 79:11
moment [6] - 16:8, 70:22, 71:8, 84:15, 126:11, 143:10
Monday [4] - 6:21, 9:1, 9:4
monitor [3] - 61:7, 70:17, 107:18
months [4] - 86:9, 127:25, 128:1, 128:7
mOORE [1] - 145:11
MOORE [16] - 6:7, 85:4, 145:9, 151:19, 158:11, 158:12, 159:14, 159:21, 160:5, 162:10, 162:12, 162:25, 163:9, 164:11, 164:18, 165:4
Moore [1] - 145:13
morning [12] - 6:16, 6:20, 6:21, 8:25, 31:21, 111:22, 141:4, 141:6, 142:24, 151:1, 154:16, 161:4
most [4] - 95:4, 95:20, 99:25
mostly [1] - 95:19
motel [4] - 9:7, 67:9, 68:23, 68:25
motor [2] - 7:8, 77:3
move [4] - 22:19, 28:17, 97:2, 115:24
moved [4] - 22:7, 38:20, 38:24, 38:25
moving [1] - 121:3
MR [132] - 6:6, 6:7, 6:14, 10:12, 10:14, 14:16, 14:19, 15:19, 15:22, 16:5, 16:9, 16:11, 18:1, 18:4, 18:11, 18:20, 18:21, 20:1, 20:4, 26:13, 33:2, 33:5, 33:6, 33:9, 43:10, 43:20, 44:1, 44:5, 45:6, 45:9, 45:18, 45:19, 45:22, 45:23, 48:19, 50:12, 50:16, 59:25,

60:5, 60:9, 60:14, 70:22, 70:25, 71:1, 71:5, 74:19, 74:22, 75:25, 76:5, 76:6, 76:7, 76:11, 76:13, 76:14, 76:15, 76:20, 80:17, 80:19, 80:22, 80:24, 80:25, 81:9, 81:14, 81:16, 81:25, 82:5, 82:16, 82:22, 84:8, 84:11, 84:24, 85:4, 85:10, 85:21, 94:18, 94:20, 96:24, 98:9, 98:11, 98:13, 98:14, 98:17, 104:1, 112:10, 112:13, 119:24, 120:1, 120:7, 120:10, 124:13, 124:16, 126:11, 126:13, 128:24, 129:3, 129:5, 132:20, 132:22, 132:24, 133:10, 133:12, 133:13, 133:19, 134:4, 139:20, 139:23, 142:20, 143:14, 143:19, 145:7, 145:9, 145:11, 151:19, 158:11, 158:12, 159:14, 159:17, 159:21, 160:5, 160:7, 160:9, 162:9, 162:10, 162:12, 162:25, 163:9, 164:11, 164:15, 164:18, 164:19, 165:1, 165:4
multi [1] - 34:13
multi-jurisdictional [1] - 34:13
multiple [3] - 11:25, 48:17, 72:4
MY [1] - 166:16

**N**

name [17] - 8:20, 8:22, 13:21, 38:2, 66:15, 69:9, 85:22, 106:17, 106:18, 113:22, 114:11, 124:17, 134:5, 134:6, 139:4, 143:20, 145:12
named [2] - 142:17, 149:20
narcotics [3] - 103:19, 104:19, 109:23
National [4] - 13:19, 140:4, 140:21,

141:17
nature [1] - 12:17, 38:13, 50:24, 62:7
Navy [2] - 135:5, 135:6
NCIC [14] - 66:2, 78:3, 78:12, 81:21, 82:10, 82:25, 84:2, 146:24, 152:7, 152:11, 156:13, 158:15, 163:3, 163:9
near [2] - 90:10, 90:14
necessarily [7] - 44:10, 58:2, 58:25, 61:5, 126:24, 127:7, 128:2
necessary [2] - 44:13, 104:24
need [18] - 26:25, 32:24, 45:3, 45:6, 53:2, 53:18, 72:2, 74:6, 101:3, 103:8, 109:25, 110:4, 115:5, 115:14, 116:22, 117:25, 155:24, 165:4
needed [3] - 36:6, 52:8, 52:17
neighbor [1] - 92:7
never [3] - 25:13, 49:1, 69:3
new [2] - 46:16
next [11] - 58:5, 85:9, 94:16, 99:21, 102:20, 102:21, 133:18, 152:9, 152:10, 152:17, 152:18
NIC [1] - 158:15
night [4] - 6:16, 55:11, 119:13, 119:20
ninth [1] - 134:14
NLETS [1] - 76:21, 76:24, 77:5, 77:9, 77:11, 81:2, 81:7, 82:9, 82:11, 84:2, 158:15
NO [1] - 166:22
nobody [1] - 9:21
noises [1] - 62:4
non [1] - 127:21
non-WHTI [1] - 127:21
none [2] - 62:18, 161:19
normal [2] - 132:16, 144:6
normally [1] - 147:18
north [12] - 67:21, 92:8, 99:8, 99:10, 100:11, 100:12, 100:16, 100:17,

11

101:3, 101:12, 120:16
northwest [1] - 92:8
Nos [2] - 76:18, 82:20
nose [1] - 62:6
notebook [7] - 18:13, 18:22, 20:22, 21:2, 28:2, 46:1, 80:13
notes [2] - 43:12, 159:1
nothing [4] - 62:7, 107:17, 126:23, 133:12
notice [2] - 112:13, 112:19
noticed [3] - 49:25, 112:16, 112:20
notified [1] - 149:13
notify [1] - 142:2
number [25] - 15:14, 19:8, 49:15, 49:20, 49:21, 50:3, 73:23, 74:4, 74:7, 75:10, 79:9, 81:13, 90:23, 91:3, 91:6, 91:8, 94:9, 97:11, 99:15, 104:15, 106:6, 106:7, 138:4, 160:24
numbered [3] - 20:11, 100:8, 166:10
numbers [3] - 75:7, 81:18, 100:8

**O**

o'clock [4] - 142:23, 151:1, 154:17, 165:8
objection [6] - 15:22, 76:8, 76:9, 82:17, 159:16, 159:17
objections [2] - 98:11, 120:3
observations [3] - 73:3, 73:5, 78:18
observe [2] - 30:17, 31:14
observed [11] - 8:6, 25:3, 30:6, 35:24, 38:19, 39:13, 41:10, 62:16, 73:1, 125:22, 126:18
observing [2] - 61:7, 61:10
obtain [9] - 27:18, 44:6, 74:7, 94:2, 95:1, 95:12, 100:24, 108:6, 110:10
obtained [5] - 31:22, 41:18, 41:22, 73:11, 125:11

obtaining [2] - 39:10, 68:7
obvious [1] - 31:13
obviously [2] - 31:2, 116:17
occasion [6] - 6:24, 8:25, 12:14, 13:8, 119:13, 132:18
occasions [1] - 43:2
occupied [2] - 86:1, 134:7
occur [1] - 66:6
occurred [3] - 36:11, 125:3, 166:10
Oceanside [6] - 7:4, 8:16, 9:7, 9:25, 67:5, 82:12
October [1] - 89:21
OF [2] - 166:1, 166:2
offense [5] - 49:17, 49:20, 50:3, 50:13, 59:15
offer [8] - 15:20, 76:3, 82:14, 98:10, 111:4, 111:9, 119:24, 159:14
office [18] - 14:3, 19:6, 20:21, 21:22, 21:25, 52:25, 53:12, 69:25, 70:7, 70:12, 72:12, 73:21, 75:8, 79:22, 115:2, 136:15, 150:9, 156:3
Office [4] - 16:14, 17:2, 57:14, 75:6
officer [63] - 9:21, 44:25, 54:13, 63:8, 63:12, 72:21, 87:13, 87:24, 87:25, 89:13, 90:1, 91:24, 93:15, 95:4, 95:19, 98:17, 101:21, 101:23, 102:16, 102:19, 102:20, 102:21, 104:7, 104:13, 105:5, 114:18, 114:19, 119:11, 122:9, 122:12, 122:13, 124:17, 130:1, 130:5, 130:21, 130:22, 131:20, 132:25, 133:14, 134:8, 134:20, 135:3, 135:9, 135:15, 136:6, 136:8, 138:11, 142:17, 143:2, 143:19, 144:17, 144:19, 144:21, 152:17,

152:18, 153:23, 155:3, 155:9, 160:10, 160:12, 164:20
Officer [18] - 11:14, 12:21, 28:21, 56:19, 91:4, 120:10, 128:25, 145:4, 145:6, 145:12, 153:7, 153:16, 153:22, 154:4, 154:12, 154:19, 160:1, 164:17
officers [22] - 64:2, 64:4, 68:24, 93:21, 100:9, 104:3, 106:2, 114:22, 116:2, 116:8, 122:8, 122:17, 128:14, 128:17, 128:18, 129:12, 130:20, 131:5, 133:7, 146:1, 146:9, 146:10
offices [1] - 94:5
Official [2] - 166:3, 166:23
OFFICIAL [1] - 166:16
often [3] - 88:3, 88:7, 127:23
old [5] - 94:5, 100:18, 101:4, 115:10
once [14] - 44:19, 51:24, 51:25, 69:16, 72:24, 94:19, 100:14, 101:1, 101:15, 101:18, 109:19, 138:12, 156:25
One [1] - 110:11
one [69] - 8:17, 11:25, 23:3, 23:4, 26:2, 26:6, 26:22, 27:4, 27:5, 27:13, 28:11, 33:15, 36:25, 37:5, 37:23, 40:14, 43:12, 43:24, 44:17, 44:24, 49:1, 53:3, 54:2, 54:3, 54:15, 54:21, 57:9, 64:2, 68:19, 68:21, 68:24, 70:22, 73:22, 77:3, 77:4, 77:8, 77:10, 78:2, 80:1, 80:2, 80:6, 82:8, 83:15, 90:12, 90:17, 94:9, 95:22, 102:17, 104:7, 104:11, 104:13, 104:15, 105:12, 107:12, 124:21, 126:11, 128:16,

129:21, 133:7, 135:21, 136:9, 140:14, 145:13, 157:24, 160:21, 162:10
one's [1] - 74:6
one-page [2] - 124:21, 157:24
open [6] - 6:3, 18:17, 45:15, 82:3, 100:9, 166:11
opened [1] - 8:10
operate [3] - 95:1, 95:13, 131:25
operations [1] - 62:24
opinion [5] - 25:23, 35:25, 36:1, 36:2, 61:1
opportunity [2] - 6:15, 120:2
order [8] - 23:22, 35:14, 75:22, 89:7, 126:14, 155:24, 160:24, 160:25
orders [2] - 63:6, 64:7
ORI [2] - 148:14, 161:20
original [1] - 50:13
originally [1] - 80:13
originating [3] - 140:12, 142:10, 149:7
outfit [1] - 112:9
outside [7] - 9:21, 30:14, 30:19, 32:17, 34:3, 61:7, 61:12
outstanding [3] - 160:2, 161:8, 162:16
oversee [1] - 33:16
own [3] - 13:10, 105:21, 163:7

**P**

p.m [6] - 45:14, 55:12, 82:2, 165:13
Pacific [3] - 143:11, 143:12, 143:15, 151:1, 151:2
pacific [1] - 143:13
pad [2] - 100:7, 100:8
page [14] - 19:2, 19:8, 19:10, 19:14, 20:17, 46:1, 49:14, 50:7, 60:11, 60:13, 124:21, 157:24, 158:9, 159:22
pages [7] - 19:5, 19:15, 19:21, 20:20, 21:2, 46:1, 80:15

paid [1] - 13:15
panned [1] - 155:15
pants [1] - 7:8
paper [2] - 20:7, 40:6
paragraph [2] - 50:8, 60:11
parallel [1] - 79:18
Paris [2] - 64:21, 66:16
PARIS [1] - 66:18
park [1] - 100:23
parked [2] - 67:20, 74:11
parking [2] - 68:4, 74:11
part [27] - 6:16, 19:23, 22:4, 44:23, 51:3, 57:18, 72:13, 79:8, 81:6, 89:3, 89:5, 90:8, 92:8, 99:25, 101:7, 101:14, 103:23, 117:17, 117:19, 120:15, 121:25, 132:11, 132:13, 138:22, 144:6, 163:4
partially [1] - 25:3
participate [3] - 34:20, 34:24, 72:1
participating [1] - 39:18
particular [12] - 25:21, 37:23, 41:3, 60:25, 69:3, 75:7, 117:5, 117:8, 118:19, 125:2, 135:12, 160:23
particularly [1] - 41:4
parties [3] - 81:1, 166:8, 166:15
pass [11] - 18:1, 71:1, 84:8, 90:24, 110:2, 124:13, 129:1, 132:20, 145:7, 160:5, 162:9
passenger [1] - 128:2
passport [1] - 102:7, 108:8, 111:2, 123:21, 123:22, 123:23, 127:20
passports [1] - 102:4
passthrough [1] - 59:11
past [5] - 100:14, 101:4, 101:16, 101:18, 103:1
pat [1] - 109:20
pat-down [1] - 109:20
patch [1] - 96:5
patches [1] - 96:7

**patrol** [3] - 22:18, 65:6, 163:5
**pay** [1] - 67:20
**pays** [1] - 117:2
**PD** [6] - 16:13, 73:18, 78:8, 79:6, 79:19, 81:3
**peace** [1] - 72:21
**Pedestrian** [1] - 107:2
**pedestrian** [9] - 93:16, 93:21, 102:23, 108:5, 115:6, 120:13, 122:4, 122:12
**pedestrians** [3] - 90:24, 91:5, 99:23
**Peerwani's** [1] - 79:22
**people** [36] - 40:1, 68:21, 89:15, 89:16, 89:19, 90:1, 91:23, 92:13, 92:19, 92:22, 93:3, 93:4, 93:22, 94:25, 95:21, 100:1, 100:21, 100:23, 103:19, 105:17, 105:24, 106:6, 106:7, 112:23, 122:3, 125:17, 131:5, 131:21, 137:18, 138:4, 145:22, 146:4, 146:7, 154:4, 157:17
**people's** [1] - 147:25
**per** [1] - 91:8
**percent** [1] - 116:25
**perhaps** [1] - 70:14
**period** [7] - 18:12, 25:21, 64:17, 87:12, 94:3, 134:15, 161:23
**periodic** [2] - 88:1, 134:24
**permanent** [1] - 135:17
**permission** [1] - 44:6
**permit** [1] - 94:2
**permits** [3] - 94:6, 100:19, 115:8
**persist** [1] - 164:25
**person** [52] - 63:17, 63:25, 64:1, 68:2, 73:15, 79:2, 79:8, 82:25, 83:10, 84:13, 93:20, 98:23, 98:24, 102:17, 106:16, 107:23, 108:4, 108:6, 109:3, 109:24, 110:25, 115:12, 116:21, 116:23, 117:11, 119:7, 119:10,

128:14, 132:6, 138:7, 138:15, 139:17, 139:25, 140:2, 140:3, 140:6, 141:2, 141:25, 142:6, 142:7, 142:9, 143:5, 143:6, 144:21, 146:17, 148:7, 149:5, 151:22, 153:25, 155:19, 163:18
**person's** [1] - 130:19
**personal** [6] - 12:22, 14:7, 70:9, 70:11, 81:8, 81:9
**personally** [2] - 26:6, 95:22
**personnel** [2] - 53:6, 64:6
**persons** [28] - 50:2, 62:23, 64:15, 65:19, 66:13, 77:4, 77:7, 77:8, 77:15, 77:24, 79:17, 81:4, 81:21, 82:9, 118:9, 137:20, 137:22, 147:9, 148:5, 148:10, 149:6, 149:10, 151:7, 155:6, 155:14, 156:13, 156:25, 157:6
**persuade** [1] - 52:2
**persuasive** [1] - 52:5
**pertaining** [1] - 49:22
**phone** [15] - 68:3, 150:20, 150:24, 152:14, 152:24, 152:25, 153:1, 153:2, 153:14, 153:17, 154:15, 158:22, 159:1, 159:13, 160:13
**photo** [1] - 58:20
**photograph** [1] - 132:8
**Photograph** [2] - 99:15, 99:16
**photographed** [1] - 57:16
**photographs** [9] - 47:16, 58:9, 69:12, 97:12, 97:24, 98:3, 98:5, 98:20, 131:11
**photography** [1] - 57:19
**photos** [3] - 12:24, 19:1, 58:21
**physical** [1] - 50:17
**physically** [1] - 154:10
**pick** [1] - 65:22

**picked** [1] - 19:8
**picture** [5] - 99:24, 100:6, 102:13, 132:8
**Picture** [5] - 100:18, 101:5, 101:15, 101:23, 102:12
**pictures** [3] - 12:22, 100:12, 101:17
**pieces** [2] - 20:7, 40:6
**place** [11] - 11:2, 19:12, 30:18, 34:7, 42:20, 48:4, 50:6, 63:16, 126:15, 126:17, 128:16
**placed** [2] - 9:21, 78:7
**places** [1] - 36:5
**plate** [2] - 74:2, 79:9
**played** [1] - 30:7
**pleasure** [1] - 164:25
**point** [66] - 6:20, 7:7, 12:9, 12:15, 35:19, 35:21, 44:19, 45:13, 46:6, 51:18, 51:20, 53:4, 55:16, 65:6, 78:11, 78:17, 79:24, 80:6, 81:11, 99:2, 99:4, 99:6, 99:19, 100:14, 101:11, 101:16, 103:1, 104:21, 106:25, 107:8, 110:5, 111:17, 112:6, 113:14, 114:12, 115:17, 115:21, 115:25, 116:1, 116:8, 116:18, 116:24, 118:6, 121:16, 121:17, 121:22, 122:1, 122:14, 122:18, 122:22, 123:1, 130:8, 130:16, 130:21, 131:3, 137:4, 142:2, 149:1, 153:3, 154:21, 154:25, 156:23, 157:5, 157:9, 162:17, 162:22
**points** [3] - 57:1, 57:7
**Police** [30] - 7:4, 7:5, 7:6, 7:18, 8:16, 21:8, 23:2, 28:22, 29:11, 29:17, 29:20, 32:25, 62:25, 64:14, 64:22, 73:2, 77:12, 82:12, 142:16, 142:22, 143:3, 144:17, 144:23, 145:5, 150:24, 151:2, 157:16, 160:13,

161:20, 161:25
**police** [23] - 21:11, 24:13, 24:14, 25:3, 25:8, 25:22, 25:25, 30:1, 30:13, 32:16, 33:5, 33:7, 35:7, 35:15, 37:8, 42:22, 60:21, 63:2, 63:8, 83:11, 143:6, 149:21
**policies** [5] - 117:19, 128:16, 131:25, 142:1, 142:4
**policy** [4] - 63:19, 64:14, 126:18, 142:6
**pop** [4] - 128:14, 130:7, 147:20, 155:6
**popped** [1] - 147:9
**port** [51] - 32:10, 33:22, 90:20, 90:24, 91:13, 91:15, 92:6, 92:9, 92:17, 92:20, 93:12, 94:5, 94:22, 95:3, 95:14, 97:9, 97:13, 97:21, 98:6, 100:18, 101:4, 103:13, 103:21, 103:23, 105:19, 106:8, 109:10, 115:10, 115:12, 116:9, 118:10, 118:12, 118:15, 119:15, 123:2, 128:3, 128:21, 129:6, 130:2, 130:3, 130:4, 130:18, 130:25, 131:4, 131:6, 135:15, 136:1, 145:20, 146:1
**Port** [4] - 90:6, 91:12, 92:25, 135:16
**porter** [1] - 72:16
**portion** [1] - 102:24
**portions** [2] - 61:10, 166:7
**portray** [1] - 110:16
**position** [2] - 21:18, 107:14
**positions** [1] - 48:14
**possession** [1] - 12:19
**possible** [4] - 25:4, 25:9, 47:17, 58:10
**possibly** [8] - 39:7, 48:3, 50:23, 62:9, 79:1, 140:1, 147:11, 163:17
**potentially** [2] - 116:16, 117:24
**precluded** [1] - 10:7
**pregnant** [1] - 17:8

**preliminary** [1] - 79:25
**preparation** [2] - 18:24, 68:10
**prepare** [6] - 12:14, 18:6, 21:3, 21:4, 56:3, 68:15
**prepared** [10] - 10:20, 49:14, 49:17, 50:13, 52:12, 59:14, 59:21, 60:14, 60:15, 124:21
**preparing** [2] - 12:18, 55:23
**Presario** [2] - 14:9, 69:20
**presence** [6] - 11:12, 11:15, 14:14, 35:10, 35:12, 73:11
**present** [26] - 6:3, 15:2, 18:17, 28:21, 29:16, 31:1, 31:14, 31:22, 45:15, 56:19, 57:17, 59:2, 60:15, 60:16, 61:6, 65:3, 66:6, 68:1, 82:3, 104:6, 108:5, 109:8, 109:9, 111:24, 129:9, 132:5
**presented** [7] - 111:15, 113:13, 121:19, 132:25, 139:24, 139:25, 155:9
**presenting** [1] - 110:25
**presents** [5] - 110:7, 111:12, 111:14, 132:3, 136:6
**preserve** [1] - 47:21
**preserving** [1] - 47:17
**pressed** [1] - 130:5
**pressing** [1] - 36:3
**Pretrial** [12] - 16:1, 76:18, 98:16, 119:18, 119:25, 120:2, 120:4, 120:6, 120:9, 158:14, 159:14, 159:19
**pretty** [12] - 20:24, 28:18, 35:25, 36:5, 38:20, 41:11, 115:11, 115:17, 117:1, 135:17, 137:25
**previously** [1] - 6:11
**primarily** [4] - 40:7, 51:20, 101:1, 102:23
**primary** [36] - 89:12, 90:1, 91:24, 93:14, 93:15, 93:16, 95:19, 101:21, 104:3,

104:7, 104:11,
104:14, 105:4,
106:14, 107:14,
107:23, 108:4,
111:11, 112:15,
113:3, 120:13,
120:21, 123:16,
123:17, 129:24,
131:11, 132:7,
135:23, 136:7,
136:8, 137:2,
138:16, 138:18,
139:8, 146:15, 155:9
**print** [3] - 81:1, 81:23,
82:6
**printed** [2] - 20:16,
82:12
**printing** [1] - 80:23
**printout** [5] - 66:2,
81:2, 82:8, 82:10,
82:25
**printouts** [1] - 76:21
**prints** [2] - 137:2,
141:4
**priority** [1] - 116:22
**priors** [2] - 103:18,
106:22
**privy** [1] - 39:12
**problem** [3] - 80:21,
80:22, 133:2
**procedure** [10] -
63:16, 107:22,
107:25, 122:21,
126:13, 132:11,
132:14, 148:8,
157:22, 161:12
**procedures** [5] - 63:6,
63:20, 117:19,
126:17, 138:22
**proceed** [9] - 6:5,
16:10, 18:19, 45:17,
52:17, 60:8, 82:4,
85:17, 133:25
**proceedings** [3] -
165:13, 166:7,
166:13
**process** [9] - 31:9,
35:21, 46:4, 49:13,
51:3, 70:12, 131:22,
148:17, 148:23
**processed** [4] - 12:5,
56:20, 71:13
**processing** [1] -
136:10
**produced** [1] - 10:2
**Program** [2] - 110:22,
123:20
**program** [3] - 89:5,
107:2, 110:24
**programs** [1] - 106:16

**project** [1] - 80:20
**promoted** [1] - 63:23
**proper** [4] - 104:16,
109:2, 111:15
**prosecution** [11] -
142:8, 145:6,
148:20, 149:2,
152:21, 153:4,
154:4, 155:3,
157:17, 162:21,
162:24
**Protection** [12] - 86:3,
86:8, 86:11, 87:9,
87:14, 87:24, 87:25,
89:11, 91:4, 128:22,
134:10, 134:12
**protection** [5] - 96:8,
135:2, 135:9,
138:25, 139:1
**protector** [1] - 19:22
**protocol** [3] - 117:17,
148:8, 148:10
**prove** [4] - 113:19,
119:9, 119:11,
121:20
**provide** [3] - 21:4,
21:6, 124:2
**provided** [9] - 20:24,
40:12, 46:3, 49:16,
56:9, 116:5, 132:9,
156:12, 158:6
**PT-15** [1] - 16:12
**PT-16** [1] - 16:4
**PT-18** [2] - 31:10,
31:17
**PT-20** [1] - 31:19
**PT-24** [1] - 60:6
**PT-30** [3] - 10:16,
10:19
**PT-32** [4] - 13:4, 75:4,
75:11, 76:2
**PT-32A** [6] - 74:24,
75:11, 76:1, 76:8,
76:16, 76:18
**PT-34** [5] - 14:20,
14:21, 14:23, 15:20,
15:23
**PT-38** [5] - 75:19,
75:21, 76:2, 76:16,
76:19
**PT-38A** [1] - 76:9
**PT-39** [5] - 81:21,
82:8, 82:15, 82:18,
82:20, 82:23, 83:2,
84:5, 84:19
**PT-40** [4] - 82:10,
82:15, 82:21, 83:22
**PT-41** [1] - 98:12
**public** [6] - 102:13,
102:24, 104:15,

120:23, 130:23,
132:1
**Public** [1] - 156:5
**publicdata.com** [1] -
74:3
**publish** [1] - 120:7
**published** [1] - 120:9
**pull** [2] - 67:24, 85:24
**pulled** [1] - 158:17
**purpose** [7] - 53:13,
76:4, 108:15,
131:16, 144:4,
144:5, 144:9
**purposes** [16] - 10:15,
14:20, 15:20, 15:23,
31:10, 47:16, 74:23,
75:19, 76:8, 76:9,
82:10, 98:12, 120:4,
146:7, 158:13, 161:1
**purse** [2] - 59:4, 59:11
**put** [7] - 24:3, 56:11,
58:14, 62:18, 84:20,
127:20, 157:8
**putting** [2] - 47:8,
84:19

## Q

**Q-59** [2] - 48:21, 48:23
**qualify** [1] - 134:16
**quarters** [1] - 42:24
**queried** [2] - 140:21,
144:25
**query** [6] - 140:19,
141:9, 141:14,
141:23, 141:24,
160:24
**querying** [2] - 106:24,
107:7
**questionable** [1] -
36:24
**questioned** [1] - 51:22
**questioning** [3] -
51:18, 51:19, 51:21
**questions** [10] - 36:25,
94:19, 110:8, 110:9,
110:10, 121:17,
121:24, 124:20,
132:21, 164:14
**queue** [1] - 106:5
**quick** [4] - 27:7, 32:24,
60:2, 81:23
**quickly** [5] - 35:25,
38:20, 38:25, 39:1,
72:25
**quint** [3] - 48:8, 48:9,
48:13
**Quint** [1] - 48:23
**quite** [9] - 47:13, 50:5,
52:2, 66:21, 93:8,

101:19, 138:4
**quivering** [1] - 62:6

## R

**r-h-o-d-e-s** [1] - 38:3
**radio** [1] - 115:4
**raise** [1] - 85:14
**rammed** [1] - 130:18
**ramming** [1] - 131:4
**ran** [3] - 20:8, 140:20,
141:4
**ranges** [1] - 88:4
**rank** [2] - 87:6, 87:23
**ray** [1] - 123:13
**reach** [1] - 87:6
**read** [3] - 31:15, 60:3,
78:24
**reading** [1] - 83:2
**ready** [7] - 6:5, 6:6,
45:17, 45:18, 85:17,
112:15, 133:25
**reaffirm** [1] - 141:17
**real** [6] - 27:7, 38:24,
60:2, 62:10, 62:17,
78:9
**really** [1] - 54:10
**reason** [9] - 53:3,
94:12, 94:20,
112:25, 113:23,
114:5, 116:17,
137:11, 139:23
**reasons** [3] - 32:1,
59:18, 68:25
**rebroadcast** [1] -
82:13
**receive** [10] - 13:24,
14:2, 44:3, 72:12,
86:22, 88:22, 88:25,
92:22, 114:25,
127:10
**received** [10] - 14:3,
14:6, 24:23, 42:12,
72:16, 89:3, 89:4,
117:12, 145:4,
149:11
**receiving** [1] - 27:21
**recently** [1] - 130:24
**Recess** [4] - 6:2,
18:16, 45:14, 82:2
**recess** [4] - 43:13,
45:12, 82:1, 165:6
**recognize** [6] - 10:17,
14:21, 74:25, 75:10,
98:2, 135:25
**recognized** [3] -
50:22, 51:24, 125:20
**recollection** [2] -
28:11, 55:5
**record** [14] - 6:4,

15:14, 18:15, 18:18,
57:18, 79:5, 112:11,
112:12, 139:20,
139:22, 156:8,
158:15, 163:21,
165:10
**Record** [2] - 166:9,
166:13
**recording** [2] - 25:3,
41:11
**records** [2] - 25:20,
147:24
**recovered** [1] - 26:18
**recross** [1] - 84:9
**RECROSS** [3] - 84:10,
132:23, 162:11
**RECROSS-**
**EXAMINATION** [3] -
84:10, 132:23,
162:11
**rectangles** [1] - 104:1
**red** [5] - 114:14,
126:15, 136:14,
145:16
**reddish** [1] - 73:7
**reddish-brownish** [1]
- 73:7
**redirect** [3] - 71:3,
129:2, 160:6
**REDIRECT** [3] - 71:4,
129:4, 160:8
**reenter** [1] - 73:17
**reentered** [1] - 20:18
**refer** [13] - 28:4, 43:5,
49:13, 58:12, 96:18,
103:9, 103:12,
108:21, 109:3,
142:7, 148:19,
155:19, 156:3
**referred** [5] - 49:3,
119:4, 135:22,
153:4, 162:20
**referring** [6] - 19:10,
50:11, 99:14, 99:15,
154:4, 163:12
**reflect** [5] - 50:2,
112:11, 112:12,
139:20, 139:22
**reflects** [1] - 166:13
**refresh** [1] - 26:25
**regard** [4] - 145:2,
148:4, 156:13,
156:14
**regarding** [5] - 34:6,
39:10, 151:7, 155:7,
159:1
**regardless** [3] -
118:22, 119:5, 127:4
**regular** [1] - 47:5
**rehandcuffed** [1] -

154:25
**Rehfeld** [2] - 52:21, 52:23
**Reid** [1] - 38:4
**reinterview** [1] - 155:4
**related** [5] - 10:23, 17:11, 17:14, 17:17, 17:20
**relation** [1] - 45:8
**relationship** [2] - 53:1, 53:9
**relative** [1] - 33:12
**release** [1] - 86:25
**rely** [1] - 26:4
**remain** [3] - 21:25, 30:14, 85:4
**remember** [14] - 8:20, 48:21, 57:8, 59:7, 113:9, 148:2, 148:3, 148:4, 151:9, 151:10, 153:10, 153:19, 154:13, 154:22
**remove** [2] - 32:2, 32:4
**Renee** [17] - 142:17, 142:19, 145:5, 149:17, 149:20, 149:21, 150:1, 150:21, 151:22, 151:23, 152:13, 153:1, 153:24, 158:23, 160:1, 161:25, 162:15
**repeat** [2] - 94:24, 136:20
**rephrase** [3] - 46:8, 62:14, 68:14
**replied** [2] - 113:16, 144:13
**reply** [1] - 144:12
**report** [68] - 18:7, 26:2, 27:1, 27:7, 27:9, 27:21, 28:6, 49:17, 49:20, 50:1, 50:2, 50:3, 50:14, 50:18, 54:11, 58:8, 58:12, 62:23, 63:18, 64:9, 64:15, 64:19, 64:22, 64:23, 65:5, 65:10, 65:13, 65:20, 65:23, 66:1, 71:7, 71:11, 77:7, 77:11, 77:14, 77:17, 77:24, 79:17, 81:4, 81:7, 82:9, 84:13, 84:18, 94:8, 124:21, 124:23, 124:25, 125:4, 125:9, 125:10, 147:9,

147:12, 151:7, 155:6, 155:14, 156:13, 157:7, 157:20, 157:23, 157:24, 159:23, 159:25, 161:10, 161:11, 161:19
**reported** [3] - 140:6, 141:2, 166:11
**reportee** [1] - 66:13
**Reporter** [2] - 166:3, 166:23
**reporter** [1] - 66:13
**REPORTER** [6] - 26:12, 48:11, 94:15, 114:16, 142:18, 151:15
**Reporter's** [2] - 166:9, 166:12
**reporting** [1] - 163:3
**reports** [4] - 27:18, 49:22, 64:1, 79:25
**represent** [3] - 104:2, 119:18
**representation** [1] - 97:21
**representatives** [1] - 72:9
**representing** [1] - 145:13
**request** [2] - 27:17, 109:25
**requested** [2] - 28:9, 166:8
**requests** [1] - 163:5
**require** [2] - 142:1, 142:5
**required** [5] - 88:17, 102:1, 105:9, 108:13, 111:18
**research** [1] - 118:16
**resembles** [1] - 96:6
**reserves** [1] - 87:1
**Reserves** [1] - 87:4
**residence** [2] - 60:13, 111:5
**resident** [5] - 102:8, 102:9, 103:7, 108:11
**resist** [1] - 133:7
**resolve** [1] - 116:24
**resources** [3] - 72:12, 72:16, 118:16
**respect** [3] - 10:20, 72:23, 73:1
**respective** [1] - 166:14
**respond** [2] - 72:3, 114:21
**responded** [2] - 46:5, 128:17

**response** [1] - 122:2
**responsibilities** [1] - 33:17
**rest** [1] - 55:17
**restrained** [1] - 117:25
**restroom** [1] - 33:25
**result** [4] - 10:2, 37:12, 67:13, 158:21
**resulted** [1] - 129:16
**resume** [2] - 45:13, 165:11
**retire** [1] - 6:21
**retires** [3] - 85:8, 133:17, 164:23
**retraining** [2] - 88:1, 134:24
**return** [1] - 163:9
**returned** [1] - 159:13
**reveal** [2] - 140:24, 141:23
**revealed** [1] - 141:24
**Review** [1] - 38:12
**review** [2] - 60:7, 124:23
**reviewing** [3] - 43:12, 125:15, 125:19
**Rhodes** [2] - 37:24, 38:1
**right-hand** [1] - 101:4
**Rio** [7] - 35:2, 56:8, 56:20, 56:22, 56:25, 58:2
**Rizy** [2] - 10:25, 11:5
**Road** [3] - 19:19, 28:25, 42:11
**room** [31] - 9:7, 9:17, 9:20, 11:1, 11:20, 16:16, 17:6, 30:2, 30:10, 30:14, 30:18, 31:3, 31:24, 32:2, 32:6, 32:17, 34:3, 34:7, 34:20, 35:18, 36:19, 39:15, 39:18, 41:12, 59:6, 61:5, 67:9, 68:23, 68:25
**rooms** [1] - 16:15
**rotate** [1] - 94:23
**rough** [1] - 136:1
**roughly** [1] - 84:5, 150:22
**rule** [1] - 63:3
**run** [11] - 103:11, 105:9, 106:16, 106:19, 108:21, 111:18, 128:15, 130:4, 130:20, 131:5
**runner** [1] - 130:3, 130:4
**running** [8] - 62:6, 106:12, 108:23,

113:22, 114:11, 121:22, 122:1, 146:20
**Russians** [1] - 93:7

## S

**safety** [2] - 115:23, 138:11
**Safety** [2] - 86:14, 156:5
**sally** [2] - 32:10, 33:22
**samples** [4] - 57:6, 57:12, 71:13, 71:14
**Samurai** [2] - 26:17, 27:3
**San** [18] - 6:18, 7:5, 7:6, 7:18, 9:9, 19:5, 37:19, 67:14, 90:6, 90:7, 90:13, 91:12, 92:10, 92:15, 92:25, 114:5, 135:16, 152:22
**sat** [2] - 25:13, 60:24
**satisfactory** [1] - 127:13
**satisfy** [2] - 109:1, 136:8
**Saturday** [3] - 55:6, 77:21, 78:13
**Saudi** [1] - 93:5
**saw** [7] - 30:9, 41:12, 62:11, 73:7, 115:22, 122:17, 131:10
**scale** [1] - 97:20
**scenarios** [2] - 124:8, 124:10
**scene** [46] - 12:20, 19:18, 19:23, 20:8, 20:13, 25:16, 25:21, 26:3, 26:18, 26:19, 27:19, 28:18, 28:24, 29:5, 29:8, 29:10, 34:17, 35:6, 39:23, 40:3, 42:5, 42:9, 42:19, 43:4, 44:4, 44:6, 44:12, 44:21, 44:22, 45:1, 45:3, 45:24, 47:24, 53:23, 56:20, 58:10, 58:25, 59:15, 68:21, 69:12, 70:13, 72:24, 98:2
**scenes** [2] - 12:4, 12:7
**School** [4] - 19:19, 28:25, 42:11, 42:23
**school** [5] - 37:17, 37:18, 37:21, 38:8, 38:15
**screen** [10] - 26:1, 31:11, 82:23,

114:12, 114:13, 116:7, 118:6, 125:2, 125:12, 126:5
**screening** [1] - 107:16
**screens** [3] - 114:20, 114:23, 115:20
**search** [35] - 9:20, 9:23, 10:2, 10:5, 10:19, 11:17, 11:20, 12:14, 12:18, 14:12, 14:24, 15:8, 15:17, 31:20, 31:23, 34:6, 40:13, 41:21, 41:23, 41:25, 51:12, 54:22, 67:8, 67:9, 68:7, 68:13, 68:16, 74:6, 74:12, 75:3, 75:10, 80:14, 138:19
**searches** [1] - 74:16
**seated** [2] - 85:16, 133:24
**second** [10] - 10:16, 14:4, 60:13, 74:20, 75:20, 135:25, 152:25, 154:14, 159:12
**secondary** [21] - 93:20, 93:21, 103:1, 103:9, 103:20, 108:21, 109:6, 109:7, 109:13, 109:17, 114:22, 118:12, 119:4, 122:12, 123:7, 126:8, 127:1, 135:14, 135:15, 138:13
**section** [2] - 23:7, 63:10
**secure** [11] - 7:22, 7:25, 9:14, 9:17, 32:15, 67:25, 68:6, 109:18, 118:1, 118:2, 132:1
**secured** [2] - 145:20, 145:21
**Security** [6] - 13:19, 81:13, 86:15, 87:10, 127:11, 134:8
**security** [18] - 8:5, 8:10, 68:25, 94:12, 94:20, 95:14, 105:3, 105:6, 105:13, 105:18, 105:21, 105:23, 107:16, 131:6, 131:7, 132:11, 146:7, 152:20
**security-conscious** [1] - 131:7

see [24] - 10:16, 25:14, 27:9, 31:10, 46:23, 49:14, 56:6, 58:14, 73:17, 93:7, 98:19, 99:24, 101:8, 101:17, 101:24, 102:12, 102:24, 106:12, 112:3, 115:3, 122:3, 137:25, 138:4, 139:10
seeing [3] - 125:21, 148:2, 148:3
seize [1] - 69:18
seized [2] - 12:25, 68:4
seizures [1] - 88:16
semi [1] - 139:16
semi-dark [1] - 139:16
send [7] - 24:12, 37:13, 109:10, 152:8, 152:15, 155:17, 155:22
sense [2] - 52:1, 104:19
sensitive [2] - 79:1, 163:17
sent [4] - 146:13, 149:1, 152:10, 155:13
separate [2] - 74:16, 81:19
September [1] - 87:20
sequence [2] - 44:10, 80:15
sergeant [5] - 64:25, 65:6, 65:7, 68:24, 87:7
Sergeant [25] - 22:25, 27:14, 28:7, 31:20, 31:22, 32:21, 39:15, 52:22, 58:18, 59:5, 61:3, 61:6, 61:11, 61:16, 61:24, 62:3, 62:16, 65:7, 65:17, 66:22, 68:1, 73:19, 77:18, 77:20, 84:14
serial [1] - 15:14
series [3] - 19:15, 110:7, 110:9
serious [6] - 95:14, 103:11, 103:20, 116:12, 118:11, 129:6
serve [1] - 87:3
served [1] - 78:12
service [4] - 21:9, 37:13, 72:10, 147:20
Service [1] - 87:14
set [2] - 79:18, 123:17

seven [7] - 57:1, 57:7, 57:10, 57:12, 71:13, 71:17, 71:18
several [5] - 24:3, 36:4, 39:16, 71:25, 72:4
shape [1] - 105:7
shared [1] - 21:3
sheet [3] - 19:9, 19:21, 76:2
Sheriff's [1] - 53:7
shirt [2] - 41:15, 139:16
shivering [1] - 41:10
shoeless [1] - 41:16
shoes [1] - 41:7
shooting [1] - 130:25
short [3] - 41:15, 119:14, 119:19
short-sleeve [1] - 41:15
shortly [1] - 112:16
shot [1] - 131:18
show [15] - 10:15, 14:19, 53:6, 63:3, 74:23, 83:1, 97:4, 98:24, 114:21, 114:23, 119:6, 119:17, 121:20, 163:10
showed [1] - 64:21
showing [5] - 15:10, 75:18, 96:4, 96:5, 124:6
shown [1] - 82:14
shows [7] - 20:12, 53:5, 81:3, 99:2, 100:22, 101:22, 111:11
sic [1] - 164:1
sic) [2] - 127:22, 144:14
side [13] - 10:23, 30:23, 81:5, 83:12, 92:10, 92:11, 100:6, 101:4, 102:21, 112:8, 115:6, 115:7, 123:10
sidearm [5] - 88:17, 88:19, 96:12, 104:25, 128:22
sides [4] - 6:5, 45:16, 77:3, 102:3
sign [4] - 11:14, 14:14, 15:5, 41:22
signage [4] - 99:14, 99:17, 101:10, 102:9
signed [1] - 74:16
signs [3] - 101:10, 101:16, 101:25

similar [1] - 51:11
sitting [5] - 150:9, 150:10, 150:12, 150:16, 150:17
situation [4] - 118:17, 146:16, 150:8, 155:19
six [3] - 56:25, 57:7, 134:21
size [1] - 33:10
skip [1] - 118:12
slash [1] - 83:13
sleep [2] - 6:22, 9:4
sleeping [1] - 57:9
sleeve [1] - 41:15
small [2] - 33:9, 125:15
smoke [2] - 32:7, 32:10
smoking [2] - 32:2, 33:21
smuggle [1] - 103:19
so-and-so [3] - 25:16, 26:3, 44:25
Social [2] - 81:13, 127:11
sock [1] - 41:15
soft [11] - 109:6, 109:7, 109:16, 114:22, 118:12, 119:4, 122:12, 123:7, 126:8, 126:25
software [1] - 40:18
Somalia [1] - 93:3
someone [8] - 8:11, 21:4, 35:6, 63:17, 99:17, 106:12, 118:8, 126:7
sometime [2] - 154:14, 154:18
somewhere [2] - 8:11, 162:2
Sony [4] - 12:15, 12:18, 69:8, 69:11
soon [3] - 44:11, 58:10, 108:5
sorry [19] - 21:13, 26:12, 33:6, 37:25, 43:18, 43:21, 48:11, 50:10, 76:14, 77:6, 89:21, 94:15, 94:18, 114:16, 120:12, 127:23, 135:9, 142:18, 151:15
sort [9] - 19:9, 26:10, 26:13, 27:3, 40:6, 50:1, 51:10, 64:17, 73:7
sorts [1] - 25:2
sound [1] - 91:6

sounds [1] - 45:11
source [2] - 28:13, 71:14
sources [2] - 25:2, 25:11
south [8] - 99:8, 99:10, 100:3, 103:9, 103:20, 108:21, 120:22
Southern [1] - 90:9
southwest [1] - 92:16
speaking [1] - 160:12
specific [1] - 64:9
specifically [1] - 93:12
speech [1] - 62:6
spell [2] - 30:9, 38:2
spent [1] - 52:2
spikes [2] - 130:6, 130:13
sponsored [1] - 30:6
spot [2] - 43:9, 74:11
square [1] - 114:14
stab [1] - 80:3
stabbed [1] - 80:1
staff [1] - 70:9
stand [2] - 48:22, 96:15
Standard [2] - 83:21, 84:4
standard [4] - 64:14, 117:17, 122:21, 157:22
standing [4] - 39:20, 45:2, 121:14, 122:11
standpoint [1] - 16:2
start [6] - 7:6, 45:10, 77:10, 113:21, 121:22, 122:8
started [6] - 43:4, 43:19, 44:6, 47:22, 130:2, 165:7
starts [2] - 31:3, 83:5
state [8] - 7:1, 9:11, 12:10, 73:24, 88:14, 105:7, 137:16, 140:5
STATE [1] - 166:1
State [8] - 7:14, 75:25, 81:5, 82:6, 85:9, 133:12, 158:7, 166:5
State's [18] - 6:6, 15:23, 16:1, 45:18, 74:24, 76:18, 81:20, 81:21, 82:20, 97:4, 97:8, 98:10, 98:12, 98:16, 119:18, 119:24, 120:6, 120:9
statement [7] - 28:9, 37:18, 38:10, 38:17, 51:2, 94:7, 131:24
statements [2] -

27:18, 38:12
states [4] - 78:23, 111:4, 124:2, 161:11
States [46] - 86:21, 87:8, 90:5, 90:20, 91:17, 91:25, 92:16, 92:19, 93:18, 93:22, 93:24, 99:5, 100:25, 102:3, 102:8, 102:25, 103:3, 103:22, 104:6, 104:17, 104:23, 107:25, 108:11, 108:19, 108:20, 110:12, 110:13, 110:16, 111:1, 111:6, 111:13, 113:2, 115:3, 118:24, 119:7, 119:10, 120:24, 123:25, 124:6, 124:11, 134:9, 135:5, 138:2, 141:10, 161:5
stating [1] - 42:10
station [8] - 30:13, 35:7, 35:15, 42:22, 60:21, 126:25, 160:23, 161:15
stationed [1] - 104:3
stations [1] - 94:10
status [2] - 108:25, 157:10
stay [3] - 93:25, 94:3, 154:5
stayed [3] - 154:7, 154:8
staying [2] - 114:3, 114:5
Steele [12] - 32:20, 34:10, 35:3, 35:18, 36:5, 39:14, 40:8, 40:11, 51:17, 52:21, 54:12, 73:16
Steele's [1] - 51:25
step [3] - 85:2, 133:15, 164:20
Steve [2] - 37:24, 38:1
still [15] - 39:19, 39:23, 40:2, 42:19, 45:7, 45:21, 47:10, 60:25, 102:4, 102:5, 108:21, 141:12, 157:10, 161:7
stock [1] - 41:15
stocking [1] - 41:8
stop [2] - 130:13, 164:25
stops [2] - 115:18
story [3] - 39:8, 52:1,

108:18
**straight** [1] - 118:12
**straightaway** [1] - 25:5
**Street** [1] - 166:24
**strictly** [1] - 92:20
**strike** [13] - 23:18, 29:2, 30:4, 31:1, 44:11, 46:24, 53:7, 57:25, 64:12, 65:5, 65:15, 68:9, 128:20
**stringently** [1] - 64:5
**strip** [1] - 130:6
**stripes** [1] - 99:3
**structure** [4] - 46:5, 46:7, 46:15, 47:2
**stuff** [6] - 30:10, 58:2, 63:5, 70:18, 81:18, 108:12
**stumbled** [1] - 28:12
**styled** [1] - 166:10
**sub** [1] - 97:24
**sub-marked** [1] - 97:24
**subject** [4] - 79:1, 79:4, 85:5, 85:6
**subject's** [1] - 163:17
**subjects** [2] - 88:8, 129:13
**submit** [1] - 106:17
**submitted** [1] - 125:10
**subsequently** [1] - 57:21
**successful** [1] - 95:9
**suffering** [1] - 80:3
**suggested** [1] - 66:1
**supervisor** [5] - 58:18, 114:24, 129:22, 142:2, 155:20
**supplement** [5] - 49:14, 49:16, 50:7, 50:12, 58:7
**supplemental** [1] - 24:23
**supposed** [3] - 146:8, 147:1
**suppression** [3] - 47:5, 48:10, 48:13
**surprise** [1] - 12:2
**surrounding** [1] - 116:2
**survive** [1] - 131:18
**suspect** [4] - 20:25, 35:19, 36:22, 104:20
**suspected** [1] - 53:24
**suspicious** [1] - 53:24
**SW-20317** [1] - 13:1
**swear** [1] - 71:15
**sword** [4] - 26:17, 26:22, 27:3

**sworn** [5] - 6:11, 85:15, 85:19, 133:23, 134:2
**system** [12] - 84:21, 106:24, 127:21, 136:24, 137:1, 140:19, 140:21, 141:4, 141:16, 147:21, 148:16, 161:16
**System** [4] - 140:23, 141:18, 141:21, 147:6
**systems** [7] - 73:24, 107:3, 108:23, 108:24, 122:2, 122:9, 144:25

## T

**tact** [1] - 27:14
**tactical** [1] - 95:23
**tactics** [5] - 36:25, 88:6, 88:15, 89:2, 89:4
**tag** [1] - 61:15
**tag-teaming** [1] - 61:15
**tanker** [2] - 48:16
**tape** [8] - 30:6, 30:7, 31:2, 35:25, 36:4, 40:16, 40:19, 61:19
**Tarrant** [12] - 15:11, 21:12, 21:16, 52:24, 53:5, 53:6, 53:10, 57:13, 71:20, 72:5, 75:7, 166:4
**TARRANT** [1] - 166:2
**task** [4] - 34:13, 54:16, 71:24, 72:13
**Task** [1] - 71:20
**task-force** [1] - 54:16
**taught** [3] - 24:2, 37:23, 88:9
**Taylor** [1] - 166:3
**TAYLOR** [1] - 166:22
**TCC** [1] - 37:9
**TCJC** [1] - 37:9
**teach** [1] - 38:4
**team** [11] - 57:18, 89:13, 103:13, 103:21, 109:11, 115:12, 116:10, 118:10, 118:13, 118:15, 123:2
**teaming** [1] - 61:15
**tears** [1] - 62:5
**techie** [1] - 14:4
**technically** [1] - 96:22
**technique** [1] - 37:23

**Technique** [1] - 38:4
**TECS** [1] - 141:19
**telephone** [6] - 56:5, 142:12, 142:21, 149:17, 150:5
**television** [1] - 10:23
**temperature** [1] - 41:2
**ten** [1] - 155:6
**tend** [2] - 100:23, 102:14
**tender** [2] - 15:20, 76:1
**term** [2] - 32:5, 68:19
**terminal** [1] - 81:3
**terminology** [1] - 48:6
**terrible** [1] - 126:16
**terrorist** [1] - 107:10
**testified** [7] - 6:11, 21:8, 32:9, 52:12, 68:5, 85:19, 134:2
**testify** [1] - 158:2
**testimony** [5] - 18:6, 18:25, 41:1, 126:4, 136:4
**TEXAS** [2] - 166:1, 166:22
**Texas** [25] - 6:17, 9:24, 10:23, 12:10, 37:19, 73:24, 75:16, 111:8, 111:10, 111:14, 113:13, 113:14, 113:18, 116:6, 121:19, 126:23, 127:17, 132:5, 148:25, 155:10, 156:4, 156:5, 156:8, 166:5, 166:24
**THE** [105] - 6:4, 6:8, 10:13, 14:18, 15:25, 16:7, 16:10, 18:2, 18:14, 18:18, 20:3, 26:12, 32:24, 33:4, 33:8, 43:8, 43:11, 43:14, 43:16, 43:18, 43:21, 43:22, 43:23, 44:2, 45:7, 45:11, 45:16, 45:20, 48:11, 48:12, 50:10, 50:15, 59:24, 60:2, 60:7, 70:24, 71:3, 74:21, 76:12, 76:16, 80:18, 81:7, 81:12, 81:15, 81:22, 82:1, 82:4, 82:18, 84:9, 85:1, 85:3, 85:6, 85:7, 85:9, 85:12, 85:13, 85:14, 85:16, 94:15, 96:14, 96:17, 96:20, 96:21, 96:23, 98:15,

103:24, 103:25, 112:12, 114:16, 114:17, 120:5, 120:8, 124:14, 129:2, 132:21, 133:11, 133:14, 133:16, 133:18, 133:21, 133:22, 133:24, 139:22, 142:18, 142:19, 143:9, 143:11, 143:12, 143:13, 143:18, 145:8, 151:15, 151:17, 159:16, 159:18, 160:6, 163:1, 164:13, 164:16, 164:20, 164:22, 164:24, 165:6, 165:11, 166:1
**theirs** [2] - 26:11, 26:14
**themselves** [8] - 104:7, 108:5, 110:7, 110:16, 111:1, 111:12, 129:10, 136:6
**therefore** [1] - 62:17
**thereof** [1] - 108:8
**they've** [3] - 54:2, 132:8, 163:13
**thinking** [1] - 55:15
**third** [3] - 139:17, 152:25, 153:2
**thoroughly** [1] - 113:1
**thousands** [3] - 91:2, 91:3, 125:16
**threat** [1] - 109:9
**three** [22] - 6:21, 11:1, 11:4, 16:15, 19:5, 23:8, 23:9, 25:6, 42:24, 48:20, 86:9, 122:17, 122:18, 127:25, 128:1, 128:7, 128:17, 141:5, 146:8, 146:10, 150:25
**threw** [1] - 111:8
**throughout** [7] - 36:4, 49:21, 51:16, 78:16, 91:1, 96:18
**Thursday** [1] - 55:7
**tightly** [1] - 64:5
**Tijuana** [9] - 90:18, 92:7, 92:8, 92:11, 92:13, 92:15, 92:24, 144:13
**tires** [1] - 130:7
**title** [1] - 68:20
**TLETS** [1] - 74:3

**today** [14] - 18:6, 71:15, 81:18, 86:4, 86:5, 89:1, 89:10, 112:4, 112:7, 126:3, 139:11, 139:15, 158:2, 165:2
**together** [3] - 11:1, 52:16, 59:17
**tomorrow** [1] - 165:12
**took** [17] - 7:21, 11:2, 15:10, 42:20, 48:4, 50:6, 50:18, 58:8, 64:23, 65:5, 65:10, 65:13, 69:14, 77:17, 82:5, 126:17, 161:15
**top** [3] - 81:10, 99:10, 123:4
**towards** [1] - 120:22
**towed** [3] - 7:21, 74:11, 74:15
**tower** [1] - 14:6
**traffic** [3] - 90:19, 99:22, 99:23
**Traffic** [1] - 86:14
**trained** [6] - 24:12, 38:6, 52:7, 56:12, 71:25, 134:22
**training** [28] - 24:23, 37:8, 37:10, 37:13, 37:14, 72:1, 87:12, 87:16, 87:19, 88:4, 88:5, 88:12, 88:17, 88:22, 88:25, 89:2, 89:4, 89:5, 112:22, 134:15, 134:18, 134:20, 134:21, 134:22, 134:23
**trains** [1] - 24:15
**transcription** [1] - 166:6
**transferred** [1] - 153:20
**transmission** [2] - 77:4, 78:13
**transmittals** [1] - 77:1
**Transportation** [2] - 86:14, 86:15
**transporting** [1] - 109:23
**Travel** [3] - 110:22, 123:19, 127:22
**travel** [5] - 79:7, 93:22, 102:5, 111:5, 120:22
**traveler** [1] - 101:20
**travelers** [5] - 100:20, 102:4, 105:6, 123:17, 135:22
**traveling** [8] - 100:11, 100:17, 101:12,

102:13, 104:15,
130:11, 130:23
Treasury [5] - 140:23,
141:18, 141:21,
147:5, 152:12
treasury [1] - 147:6
tries [1] - 26:14
triggered [1] - 42:8
triggers [1] - 53:17
trio [1] - 6:17
trouble [1] - 42:2
truck [4] - 48:14,
48:15, 48:16
true [1] - 166:6
truly [1] - 166:13
truth [3] - 36:8, 36:9,
52:3
try [14] - 26:11, 52:7,
52:16, 70:13, 95:2,
105:11, 105:12,
130:17, 146:15,
146:19, 155:22,
162:17, 164:2
trying [23] - 23:6,
28:13, 39:7, 52:2,
55:15, 59:9, 68:19,
77:6, 94:18, 94:25,
95:7, 100:1, 103:2,
103:19, 105:14,
108:20, 110:15,
130:4, 130:14,
130:20, 131:3,
131:5, 131:19
TSA [1] - 86:12
tunnel [9] - 101:6,
101:7, 101:8,
101:14, 101:20,
107:13, 120:14,
120:15, 123:5
turn [1] - 154:9
turned [3] - 138:18,
145:5, 162:24
turnstile [2] - 100:5,
100:13
two [17] - 12:4, 24:19,
25:6, 54:1, 54:5,
57:8, 60:24, 68:23,
74:16, 77:1, 77:5,
81:19, 82:6, 86:12,
94:19, 110:12,
123:12
type [6] - 9:23, 37:16,
88:25, 96:24,
107:15, 137:25
types [1] - 110:10
typical [1] - 154:23
typically [2] - 155:2,
156:1

**U**

U.S [17] - 86:2, 87:24,
90:10, 92:10, 103:7,
108:8, 111:2, 111:6,
113:16, 113:20,
121:21, 123:20,
123:21, 123:22,
163:4
ultimately [4] - 44:24,
53:4, 67:9, 113:3
umbrella [1] - 87:9
under [12] - 10:7,
26:22, 27:4, 40:24,
75:16, 87:9, 110:24,
119:10, 123:19,
131:25, 134:9,
141:12
undergo [5] - 87:12,
88:1, 134:15,
134:24, 138:19
undergoing [1] -
137:5
undergone [1] -
134:19
unfair [1] - 36:1
unhandcuffed [1] -
138:18
uniform [6] - 63:12,
63:22, 86:4, 95:25,
96:2, 96:20
uniformed [4] - 64:2,
64:4, 64:25, 68:23
uniforms [1] - 95:18
Unit [3] - 25:3, 152:22,
152:23
unit [13] - 22:20, 25:8,
25:17, 25:22, 33:16,
135:15, 142:8,
145:6, 148:22,
149:2, 152:21,
153:4, 162:24
United [48] - 86:20,
87:8, 90:5, 90:19,
91:17, 91:25, 92:16,
92:19, 93:18, 93:22,
93:24, 99:5, 100:25,
102:3, 102:8,
102:25, 103:3,
103:22, 104:6,
104:17, 104:22,
107:24, 108:11,
108:19, 108:20,
110:12, 110:13,
110:16, 111:1,
111:6, 111:13,
113:2, 115:2,
118:24, 119:7,
119:10, 120:23,
123:25, 124:6,

124:10, 134:9,
135:4, 138:1,
141:10, 161:5
units [3] - 48:21,
123:12, 148:20
unless [2] - 100:16,
108:10
unstable [2] - 79:2,
163:18
up [50] - 9:24, 10:22,
13:5, 26:20, 28:12,
35:19, 36:7, 42:3,
45:10, 53:5, 53:6,
62:5, 63:4, 64:21,
69:24, 74:2, 76:21,
78:17, 84:19, 93:24,
93:25, 99:7, 100:9,
103:11, 103:16,
106:21, 107:14,
107:23, 111:11,
114:11, 114:12,
115:15, 117:14,
118:23, 126:5,
126:16, 128:14,
129:23, 130:6,
130:13, 147:9,
147:20, 148:9,
148:15, 148:24,
149:5, 155:6,
158:17, 158:22
uses [1] - 107:2

**V**

valid [1] - 111:5
van [7] - 41:19, 67:10,
67:13, 67:18, 67:24,
68:4
variance [4] - 25:10,
25:25, 26:10, 26:14
varies [2] - 25:22, 91:1
various [3] - 32:1,
48:14
vehicle [31] - 7:8,
7:11, 7:12, 7:15,
7:19, 8:3, 11:21,
41:25, 74:6, 74:9,
74:10, 74:15, 74:17,
77:4, 79:9, 79:12,
81:17, 82:11, 93:15,
93:19, 93:20, 101:1,
120:12, 129:24,
129:25, 130:14,
130:17, 130:19,
131:1, 131:10
vehicles [4] - 48:18,
91:8, 115:2, 128:3,
130:9, 130:13, 131:4
verbal [3] - 160:14,
161:24, 162:15

verification [2] -
132:14, 146:16
verify [23] - 38:12,
138:15, 140:11,
143:4, 147:14,
152:7, 155:12,
155:13, 155:17,
155:20, 155:22,
155:24, 155:25,
156:2, 156:6, 156:9,
156:11, 157:10,
157:12, 160:24,
162:17, 164:2, 164:3
verifying [3] - 116:4,
122:14, 144:15
versa [1] - 131:21
vest [1] - 95:24
VHS [1] - 30:6
vice [1] - 131:21
vice-versa [1] - 131:21
victims [1] - 79:22
video [2] - 25:7,
25:25, 31:25, 32:17,
60:25, 61:7, 62:11,
62:21, 68:22, 68:23,
69:4, 72:10, 73:17,
119:14, 119:19,
125:7, 125:9,
125:20, 125:22,
125:24, 126:18,
133:1
videos [1] - 60:25
videotape [1] - 68:18
videotaped [1] - 34:3
view [8] - 112:17,
120:2, 120:21,
121:1, 121:6, 123:4,
123:5, 127:20
VIN [5] - 41:18, 73:23,
74:4, 74:7, 81:17
violence [1] - 129:17
visa [1] - 93:23
visas [2] - 100:20,
108:12
visit [5] - 9:25, 108:15,
113:24, 144:5,
145:14
visitor [2] - 103:7,
108:12
visitor's [2] - 93:23,
100:20
volume [1] - 166:9

**W**

wait [2] - 94:15, 155:2
waited [1] - 9:22
waiting [7] - 64:17,
102:24, 105:24,
106:5, 115:3, 122:1,

150:12
walk [8] - 41:12,
98:18, 98:22,
100:16, 100:24,
101:3, 123:18
walked [3] - 41:11,
47:25, 61:13
walking [5] - 99:7,
101:6, 101:11,
120:16
walks [1] - 107:23
wall [1] - 30:23
Walls [1] - 70:3
wants [2] - 104:5,
105:10
warehouse [3] - 8:2,
8:3, 68:6
warning [1] - 31:15
warnings [1] - 40:19
warns [1] - 99:17
warrant [60] - 10:2,
10:5, 10:19, 11:17,
11:19, 11:25, 12:15,
12:18, 13:1, 13:6,
52:10, 54:22, 55:20,
55:24, 56:8, 57:3,
59:14, 59:20, 60:15,
60:17, 66:12, 67:8,
68:7, 68:13, 68:16,
69:2, 74:12, 75:3,
75:10, 75:13,
144:22, 144:24,
148:16, 148:18,
148:19, 148:22,
148:25, 149:3,
150:2, 150:3,
151:25, 152:2,
152:3, 152:4, 152:7,
152:13, 152:15,
154:2, 154:24,
157:5, 157:16,
160:2, 160:14,
160:17, 160:20,
162:16, 162:22,
164:8
warrants [5] - 9:23,
103:14, 105:10,
137:13
watch [3] - 6:16,
107:10, 119:14
watched [4] - 26:1,
61:20, 119:19, 125:2
watching [4] - 39:19,
51:17, 60:24, 121:4
water [3] - 47:8, 48:15,
48:16
weaknesses [1] - 95:2
weapon [3] - 95:23,
131:2, 131:3
weapons [4] - 89:2,

89:4, 104:19, 109:21
**wear** [7] - 95:18,
95:19, 95:22, 95:25,
96:2, 104:25, 128:22
**wearing** [6] - 86:5,
112:7, 112:8,
139:14, 139:15,
139:16
**weeds** [1] - 144:14
**week** [3] - 91:1, 94:25
**weeks** [3] - 87:16,
87:18, 134:21
**welcome** [1] - 164:22
**West** [1] - 166:24
**Western** [3] - 110:21,
123:19, 127:21
**wet** [2] - 62:7, 62:9
**whatsoever** [2] -
60:20, 133:2
**whichever** [1] - 42:9
**whining** [1] - 62:4
**white** [5] - 18:8, 18:13,
20:22, 76:20, 99:3
**Whitney** [3] - 69:10,
69:11
**whole** [4] - 14:7,
33:18, 44:21, 118:5
**WHTI** [1] - 127:21
**William** [2] - 13:21,
139:4
**Windstar** [3] - 41:19,
67:10, 67:18
**wish** [1] - 100:21
**withdrawn** [1] -
155:16
**Witness** [1] - 85:11
**witness** [23] - 14:16,
18:1, 20:1, 37:2,
37:4, 71:2, 84:8,
85:8, 85:9, 85:15,
124:13, 129:1,
132:20, 133:11,
133:17, 133:18,
133:20, 133:23,
145:7, 160:5, 162:9,
164:23, 165:2
**WITNESS** [20] - 33:4,
43:14, 43:18, 43:22,
48:12, 85:3, 85:7,
85:13, 96:17, 96:21,
103:25, 114:17,
133:16, 133:22,
142:19, 143:11,
143:13, 151:17,
164:22, 166:16
**witnessed** [1] - 31:20
**wondering** [1] -
113:11
**wooden** [1] - 130:6
**word** [3] - 36:7, 65:22,

66:3
**words** [5] - 30:10,
39:19, 51:15, 58:10
**works** [2] - 128:20,
128:21
**world** [4] - 90:22,
92:14, 92:23, 93:6
**Worth** [2] - 24:11,
166:24
**Worthy** [4] - 12:21,
25:17, 26:4, 28:21
**writing** [2] - 158:7,
166:8
**written** [4] - 27:22,
27:23, 28:6, 131:25
**wrote** [2] - 56:7,
161:11

## X

**x-ray** [1] - 123:13
**Xerox** [1] - 19:11

## Y

**y'all** [6] - 20:8, 42:3,
146:13, 146:15,
157:9, 163:23
**yard** [2] - 7:22, 7:23
**year** [5] - 38:18, 89:21,
91:2, 134:14
**years** [12] - 22:21,
22:24, 86:9, 86:12,
86:20, 87:5, 127:24,
127:25, 128:1,
128:7, 134:13, 135:4
**yellow** [1] - 99:3
**yesterday** [5] - 16:13,
25:4, 26:1, 30:7,
61:20
**yesterday's** [1] -
60:25
**you-all** [23] - 28:12,
32:1, 32:9, 32:22,
33:22, 33:25, 40:1,
41:25, 51:7, 52:1,
52:13, 52:15, 55:11,
56:9, 59:16, 60:21,
65:12, 65:15, 65:18,
65:23, 67:8, 67:9,
126:13
**yourself** [4] - 11:5,
22:25, 23:9, 63:8
**Ysidro** [7] - 90:6, 90:7,
91:12, 92:15, 92:25,
135:16, 152:22

## Z

**zone** [1] - 143:10