1                    REPORTER'S RECORD
                     VOLUME 21 OF 55
2              TRIAL COURT CAUSE NO. 1184294D
               COURT OF APPEALS NO. AP-76,596
3

4  STATE OF TEXAS           )(        IN THE 432ND JUDICIAL
                            )(
5  VS.                      )(        DISTRICT COURT OF
                            )(
6  JOHN WILLIAM HUMMEL      )(        TARRANT COUNTY, TEXAS

7

8

9        *****************************************

10                       JURY VOIR DIRE

11       *****************************************

12

13

14        On the 18th day of May, 2011, the

15  following proceedings came on to be heard in the

16  above-entitled and -numbered cause before the Honorable

17  Elizabeth Berry, Judge Presiding, held in Fort Worth,

18  Tarrant County, Texas:

19        Proceedings reported by machine shorthand.

20

21

22

23

24                   ANGIE TAYLOR, CSR, RPR
                     Official Court Reporter
25                    432nd DISTRICT COURT



1                    A P P E A R A N C E S

2

3  HONORABLE D. MILES BRISSETTE - SBOT NO. 50511628
   HONORABLE ROBERT K. GILL - SBOT NO. 07961600
4  Assistant District Attorneys
   401 W. Belknap Street
5  Fort Worth, Texas  76196
   Phone:  817-884-1400
6

7                    Attorney(s) for the State of Texas.

8

9

   HONORABLE FRED CUMMINGS - SBOT NO. 05225400
10 HONORABLE LARRY M. MOORE - SBOT NO. 14357800
   4210 West Vickery Boulevard
11 Fort Worth, Texas 76107
   Phone:  817-338-4800
12
   HONORABLE PAMELA S. FERNANDEZ - SBOT NO. 24045868
13 403 North Sylvania, Suite 11
   Fort Worth, Texas 76111
14 817-8313003

15
                    Attorney(s) for the Defendant.
16

17

18

19

20

21

22

23

24

25

1                          CHRONOLOGICAL INDEX
                                VOLUME 21
2                              JURY VOIR DIRE

3  <u>MAY 18, 2011</u>

4  <u>PROSPECTIVE JURORS</u>                          <u>PAGE</u>        <u>VOL</u>

5  PAMELA POWELL
      State's Voir Dire by Mr. Brissette.....      6        21
6  Defendant's Voir Dire by Mr. Cummings..        30        21
      Defendant's Challenge for Cause........       58        21
7  Challenge Denied.......................         59        21
      Defendant's Peremptory Challenge.......       59        21
8
   RAYMOND HUYGE
9  Excused by Agreement...................         62        21

10 GREY CHAPMAN
      State's Voir Dire by Mr. Gill..........       66        21
11 Defendant's Voir Dire by Mr. Moore.....        103        21
      Prospective Juror Accepted.............      134        21
12 Prospective Juror Sworn................        134        21
      Prospective Juror Instructed...........      134        21
13
   SCOTT SMILEY
14 State's Voir Dire by Mr. Brissette.....        138        21
      Prospective Juror Excused by Agreement.      146        21
15
   DENNIS COURTNEY
16 State's Voir Dire by Mr. Gill..........        149        21
      Defendant's Voir Dire by Mr. Cummings..      180        21
17 Defendant's Peremptory Challenge.......        198        21

18 SAMANTHA BORJA
      State's Voir Dire by Mr. Brissette.....      201        21
19 Defendant's Voir Dire by Mr. Moore.....        219        21
      State's Challenge for Cause............      230        21
20 Challenge Granted......................        231        21

21 PAULA COTTEN
      State's Voir Dire by Mr. Gill..........      234        21
22 Defendant's Voir Dire by Ms. Fernandez.        274        21
      Defendant's Challenge for Cause........      295        21
23 Challenge Granted......................        298        21

24
      Proceedings adjourned.................       300        21
25
      Court Reporter's Certificate...........      301        21

1          ALPHABETICAL PROSPECTIVE JUROR INDEX

2    PROSPECTIVE JURORS:                              PAGE      VOL

3    BORJA, SAMANTHA
     State's Voir Dire by Mr. Brissette.....    201        21
4    Defendant's Voir Dire by Mr. Moore.....    219        21
     State's Challenge for Cause............    230        21
5    Challenge Granted......................    231        21

6    CHAPMAN, GREY
     State's Voir Dire by Mr. Gill..........     66        21
7    Defendant's Voir Dire by Mr. Moore.....    103        21
     Prospective Juror Accepted.............    134        21
8    Prospective Juror Sworn................    134        21
     Prospective Juror Instructed...........    134        21
9
     COURTNEY, DENNIS
10   State's Voir Dire by Mr. Gill..........    149        21
     Defendant's Voir Dire by Mr. Cummings..    180        21
11   Defendant's Peremptory Challenge.......    198        21

12   COTTEN, PAULA
     State's Voir Dire by Mr. Gill..........    234        21
13   Defendant's Voir Dire by Ms. Fernandez.    274        21
     Defendant's Challenge for Cause........    295        21
14   Challenge Granted......................    298        21

15   HUYGE, RAYMOND
     Excused by Agreement...................     62        21
16
     POWELL, PAMELA
17   State's Voir Dire by Mr. Brissette.....      6        21
     Defendant's Voir Dire by Mr. Cummings..     30        21
18   Defendant's Challenge for Cause........     58        21
     Challenge Denied.......................     59        21
19   Defendant's Peremptory Challenge.......     59        21

20   SMILEY, SCOTT
     State's Voir Dire by Mr. Brissette.....    138        21
21   Prospective Juror Excused by Agreement.    146        21

22

23

24

25

5

1       P R O C E E D I N G S

2       (May 18, 2011 ~ 9:03 a.m.)

3       (Open court, Defendant present)

4       (Prospective juror enters courtroom)

5       THE COURT:  Go ahead and have a seat right

6   there.

7       Okay.  You are Potential Juror No. 49,

8   Pamela Sue Powell; is that correct?

9       PROSPECTIVE JUROR:  Yes, ma'am.

10      THE COURT:  All right, Ms. Powell.  I need

11  to swear you in for this proceeding, so if you'll raise

12  your right hand.

13      (Prospective juror sworn)

14      THE COURT:  Okay.  You filled out a jury

15  questionnaire.  Has anything changed since the time you

16  filled that out you need to let us know of?

17      PROSPECTIVE JUROR:  No, ma'am.

18      THE COURT:  And has anything changed about

19  your schedule since you were here for the minipanel?

20      PROSPECTIVE JUROR:  No, ma'am.

21      THE COURT:  Okay.  You'll recall that the

22  person on trial in this case is John William Hummel.

23  He's represented by Pamela Fernandez, Larry Moore and

24  Fred Cummings.

25      And the State of Texas is represented by

6

1   Robert Gill and Miles Brissette.

2       And both sides are going to be able to talk

3   to you today about some issues in your jury

4   questionnaire as well as the death penalty issues that

5   you have on your paperwork that you brought back.  Thank

6   you very much.  And the State, since they have the

7   burden of proof, gets to go first.

8       So you may proceed.

9       There's water in this pitcher if you need

10  any.

11      PROSPECTIVE JUROR:  Okay.  Thank you.

12      PAMELA SUE POWELL,

13  a prospective juror, having been first duly sworn,

14  testified as follows:

15          VOIR DIRE EXAMINATION

16  BY MR. BRISSETTE:

17      Q.  Good morning.

18      A.  Hi.  Good morning.

19      Q.  How are you today?

20      A.  Good.

21      Q.  Now, your coworkers sent a list of questions

22  that they wanted us to get out of the way.  First of

23  all, you're under oath.

24      A.  Oh, really?

25      Q.  Yeah.  You know, that's been done to a couple

7

1   of county employees in the past, but we didn't -- we

2   didn't take their questions.

3       A.  Okay.

4       Q.  This morning I want to go over a few things,

5   and I want to start with some general stuff.  We're

6   going to have more of the PowerPoint for you up here on

7   the screen.

8           The first part of this is, since you work

9   in the building and you know most every prosecutor and

10  you've helped raise just about all of us that have come

11  through the ranks over the years, would any -- the fact

12  that you know the prosecutors and the Defense in the

13  case, would that affect your judgment in any way on the

14  case if you were asked to be a juror?

15      A.  No, not at all.

16      Q.  Had you heard anything about Mr. Hummel's case

17  prior to jury selection?

18      A.  No.

19      Q.  Have you looked it up --

20      A.  No.

21      Q.  -- on the Mainframe or anything like that?

22      A.  No.

23      Q.  Any friends come up and talk to you and said,

24  Well, you're on that case; here's what the facts are?

25      A.  No.

8

1       Q.  I want to go over a little bit about your

2   questionnaire.  You win the award for the best

3   handwriting out of the 210 as well.  You took the

4   longest almost to fill out your questionnaire, but you

5   do have the best handwriting --

6       A.  Well, thank you.

7       Q.  -- of anybody on this.  So there's no guessing

8   what goes on in the -- in the questionnaire.

9           In this aspect or this part of the voir

10  dire, we're going to talk about the questions that were

11  toward the end of the questionnaire about the death

12  penalty itself.

13      A.  Okay.

14      Q.  And since you handle misdemeanor appeals and

15  you worked in the misdemeanor courts, have you ever been

16  involved in a capital murder case at all before?

17      A.  Never.

18      Q.  Prior to coming in downstairs in the central

19  jury room, had you really even been given any

20  definitions of what the death penalty is all about?

21      A.  No.

22      Q.  Okay.  In your -- your questionnaire you

23  checked, I believe the death penalty is appropriate for

24  some crimes involving murder, and I can return a verdict

25  which assesses the death penalty in a proper case.

9

11

What's that mean to you?

A.   It just means that I'm comfortable with it.  I don't have anything against the death penalty being the punishment for the offense, murder, capital murder.

Q.   Okay.  And as we go through this, I want -- we're going to go through a couple of things here, and the slides will just pop up.  So I see you have your cheaters here with you today, too, as well.

A.   Yes.

Q.   If you need to use them to look at anything, my allergies make it such that you don't understand something I'm saying, I'll be happy to rephrase it and go through it.

A.   Okay.

Q.   The process at this point as a prospective juror is just you're required to tell the truth.  All we want to know this morning is what your thoughts are.

If you're selected as a juror, though, in the case, you'll be required to follow the law that -- that Judge Berry and Judge Gonzalez will give you in a case.  You understand that part?

A.   Yes, sir.

Q.   Any problems with being able to take an oath?

A.   No, sir.

Q.   The definition of capital murder that we're

---

as we go through the facts in the capital murder, the focus has to stay to two homicides in the same criminal transaction that were knowingly.

A.   Right.

Q.   The law doesn't define what criminal -- same criminal transaction is.  A jury has to decide what that means to them.

Going in -- in the -- the Wedgwood Church when that happened, when the gunman went in there and started shooting people, that is all happening at the same time or relatively around the same time.  Some would say that's that same criminal transaction.

The bombing up in Oklahoma City, all right, or other examples that have been talked about while you've been waiting to come up here are -- we've had some cases here in the county where a gentleman got mad at different people and went around the county and started shooting one after another because he had a grudge against them.  They had done him wrong, and he wanted to end -- end their lives.

So what same criminal transaction means to you as a juror, you bring that forward, and you deliberate as a whole and figure out what's going to go on.  Okay?

A.   Okay.

---

10

12

going to talk about today, Ms. Powell, is when -- a person commits capital murder when he knowingly murders more than one person during the same criminal transaction.

Just a minute ago when I asked you about the -- your views on the death penalty, the question you checked, you mentioned the word murder.  You understand the death penalty is not, as the law is written for this case, is what we're using, it has to be two murders --

A.   Right.

Q.   -- in the same criminal transaction in order for a capital offense death penalty to be available?

A.   Right.

Q.   So a death penalty, for the definition we have of capital murder here in this case, is not available for just one murder.  You understand that?

A.   Yes.

Q.   And I know you've been around the courthouse long enough to know that we've tried capital cases where police officers have been shot, where children have been murdered.

A.   Correct.

Q.   Where there's been robberies at convenience stores, and there's many different aspects to the capital murder law, but for the Indictment in this case

---

Q.   Any questions on that?

A.   No.

Q.   In a punishment phase of a capital case -- I know in misdemeanor we don't do a lot of punishment phases in this building, but in any case, the punishment phase, a jury can take all the evidence they heard during the guilt/innocence phase.  So everything we put in exhibit-wise, even from the State and if the Defense wants to put exhibits in, they have that right, but they don't have to.  So whatever you hear either from the witness stand or brought in as exhibits during the guilt/innocence phase, a jury can consider that in the punishment phase.

We can also bring additional evidence in.  And during a guilt/innocence phase, we're not allowed to bring in bad character or bad reputation about a particular individual on trial.  Punishment, we can.  We can bring all that forward to a jury.  Then we can also prove up those unadjudicated offenses.  So if they have other crimes, maybe other charges pending in another county, maybe other charges pending in the county or some they may never been charged formally in a complaint or Indictment, we can bring those forward and prove them up to the jury or have an opportunity to do that.  Does that make some sense?

13

15

1    A.  Yes, sir.

2    Q.  What's going to result from that is a jury has

3 to decide two special issues.  Special Issue No. 1, the

4 future dangerousness; and Special Issue No. 2, whether

5 there's any mitigation found by the jury for a

6 particular individual that warrants a life sentence.

7 Does that make sense?

8    A.  Yes, sir.

9    Q.  And the way that the jury answers those two

10 questions instructs the Judge on how to sentence a

11 Defendant.  When Mr. Gill talked to you a couple of

12 weeks ago about some of this, that the jury -- decisions

13 are final upon the Judge in Texas.  The Judge can't go

14 on their own and do some stuff that's a little bit off.

15 They have to follow the law.  Any questions about that?

16    A.  No, sir.

17    Q.  So I would imagine Judge Gonzalez will instruct

18 the jury that a sentence of life without parole means

19 that a Defendant is ineligible from release from prison

20 while on parole.

21       So if a jury has found an individual guilty

22 of the definition of capital murder we talked about, two

23 or more individuals murdered during the same criminal

24 transaction, they are in the punishment phase, there's

25 two things that can happen by law.  That is either life

1    Q.  Yeah.

2    A.  No, I wouldn't think so.

3    Q.  All right.

4    A.  Probably more certain.

5    Q.  Probability is more certain that something's

6 going to take place?

7    A.  Right.

8    Q.  Is probability greater in your mind than

9 possibility?

10    A.  Yes.

11    Q.  Anything's possible.

12    A.  True.

13    Q.  I grew up in Tampa, and we'd say each year the

14 Bucs had a chance to win something, but we'd end up

15 wearing paper bags to the football games before the

16 season was out.  Not back then, nothing -- you know,

17 everything is possible, but at the end of the season the

18 Bucs were still 0 and 16, usually.  You understand that?

19    A.  Right.

20    Q.  Criminal acts of violence.  The Legislature did

21 not define this.  So remember when Mr. Gill and Mr.

22 Cummings were talking to you a couple of weeks ago,

23 anything that's not defined by the Legislature is up to

24 the jury's interpretation.  So when they wrote this,

25 they could have written, commit future murders, future

14

16

1 without parole and the individual dies in custody,

2 natural causes, or a death penalty is imposed.  And the

3 third that's taken place over the years is we've seen

4 escapes.  I'm sure you've seen that in the media over

5 the years where people have escaped.

6    A.  Yes, sir.

7    Q.  So those really are the three avenues that can

8 go through those.  And the jury, the way they answer the

9 special issues, decides how that's going to take place,

10 the two legal ones, either life in prison without parole

11 or the death penalty.

12    A.  Right.

13    Q.  So Special Issue No. 1:  Do you find beyond a

14 reasonable doubt that there's a probability that the

15 Defendant would commit criminal acts of violence that

16 would constitute a continuing threat to society.

17       The folks down in Austin wrote this.  All

18 right?  So we're going to go through a couple of phrases

19 here and get your understanding on some of the stuff.

20       The first one is the word "probability."

21 What's a probability mean to you?

22    A.  Most likely.

23    Q.  Is it less than certainty -- absolute certainty

24 to you?

25    A.  Less than certainty?

1 aggravated robberies, future sexual assaults, but they

2 wrote just "criminal acts of violence."

3       So based on your experience and life here

4 in the building and outside, what do you think criminal

5 acts of violence are?

6    A.  Assault bodily injury, serious bodily injury,

7 just --

8    Q.  And through your years here at the building as

9 a clerk in the -- in the county clerk's office, you've

10 had a chance to see a lot of different types of acts of

11 criminal violence listed in charging documents, have you

12 not?

13    A.  Correct.

14    Q.  And is that what you think when you look at

15 criminal acts of violence here?

16    A.  Pretty much, yes.

17    Q.  The last part here is society.  What does

18 society mean to you when you look at this?

19    A.  The, like, community.

20    Q.  Okay.  Knowing that when you get to Special

21 Issue No. 1, the jury has already voted one time 12/0,

22 12/zip, that a person is guilty beyond a reasonable

23 doubt.

24       Special Issue No. 1 we know we're at two

25 options here, either life without parole or the death

19

1  penalty. Can you see a -- inside the fence line of the
2  penitentiary, that's a society as well?
3      A.  Yes.
4      Q.  Okay. Guards go in and out, ministers go in
5  and out, doctors and nurses go in and out. Does that
6  society then interact with the society that's outside
7  the fence line?
8      A.  The -- explain that again now.
9      Q.  Sure. You have a society we talked about.
10 Your first one is -- is where we live?
11     A.  Yes, sir.
12     Q.  And then there's a society that takes place
13 inside the penitentiary as well. Would you agree with
14 that?
15     A.  Right.
16     Q.  And that the two interact on a daily basis?
17     A.  Correct.
18     Q.  Much like sheriff's department people go in and
19 out of the county jail every day.
20     A.  Right.
21     Q.  The county jail, would you -- would you say
22 that is a society as well by -- by itself?
23     A.  Yes.
24     Q.  Okay. Any problems with that then in looking
25 at this issue on what society might mean to you?

1  the question?
2      A.  Right.
3      Q.  We went over it, and there's many more, but a
4  jury has to sit there and take it in a whole and decide
5  based on what we've seen is this person a future danger
6  and has the State proven that beyond a reasonable doubt.
7          And if we -- we do, we have to prove it
8  unanimously to you. Where a no answer it can be a split
9  vote down to 10 to 2, a unanimous has to be 12/0.  12/0
10 in guilt/innocence, and then you have to vote 12/0
11 unanimous, yes, this person is a future danger, and it
12 has to be proven to you beyond a reasonable doubt.
13         So knowing that a yes answer moves the
14 Defendant one step closer to the death penalty, would
15 you be able to answer yes if it's proved by the State
16 beyond a reasonable doubt that he is a future danger, a
17 particular Defendant?
18     A.  Yes.
19     Q.  And the converse is true as well. Bob and I
20 come in here and in a -- in a particular case as
21 prosecutors working for Mr. Shannon, we don't prove
22 beyond a reasonable doubt to your satisfaction that
23 there's a future danger, can you vote no?
24     A.  If -- yes.
25     Q.  State comes in, we just don't prove it. You

18

1      A.  No.
2      Q.  The Judge would instruct the jury that if the
3  answer is no to Special Issue No. 1, it's a life
4  sentence. If no, it only takes ten or more jurors to
5  agree.
6          So for all the stuff you've seen in the
7  building throughout your career, when we get to capital
8  cases, it does not have to be a unanimous verdict of the
9  jury for the answer to be no on Special Issue No. 1.
10         It's the only time you'll see stuff that
11 has a split vote like this is that's possible. So if a
12 jury -- if ten or more jurors agree that he's not a
13 future dangerousness to society, a particular Defendant,
14 then that's okay. It can be a 10/2 vote for no. Okay?
15     A.  Okay.
16     Q.  Problems with that?
17     A.  No.
18     Q.  For a yes vote, Yes, an individual is a future
19 dangerousness to society, the State has to prove that to
20 you beyond a reasonable doubt. The same burden that's
21 on Bob and I for the first phase of the trial, yes or
22 no, did a person commit two acts of -- two homicides
23 during the same criminal transaction, that same burden
24 that was used in that part is used in Special Issue No.
25 1. Remember all the things you can consider to answer

20

1  may be mad at us, the jury as a whole may be mad at us,
2  but you're able to follow your oath, follow the law as
3  it's been provided to you by the Judge and say, They
4  didn't meet their burden; we're going to vote no. Can
5  you do that?
6      A.  Yes.
7      Q.  And knowing that a no vote would be a life
8  sentence without parole, and you don't go to Special
9  Issue No. 2 because you've told me you can follow your
10 oath and look at the law and apply it. Because right
11 now you don't know anything about a case, yes?
12     A.  That's correct.
13     Q.  And part of that oath is you got to keep an
14 open mind to everything.
15     A.  Yes.
16     Q.  So if you can keep an open mind, you'll
17 evaluate the evidence, not only in the guilt/innocence
18 phase, but in the punishment phase as well?
19     A.  Correct.
20     Q.  And in the guilt/innocence phase, I think Mr.
21 Cummings talked to you last week about the elements that
22 are for a particular case, and we touched briefly on the
23 lesser-included offense of murder.
24     A.  Uh-huh.
25     Q.  Well, whether it's murder or capital murder,

21

23

1  there's those elements that we have to go through. And
2  if we don't prove that it took place in Tarrant County,
3  what's the jury supposed to do?  Guilt/innocence phase,
4  we don't prove all the elements, I prove it took place
5  in Deep Ellum as opposed to downtown Fort Worth.
6        I don't have jurisdiction here, do I?  If
7  the offense -- if all the testimony came out that the
8  shooting took place or the stabbing took place or the
9  strangulation took place in Dallas County as opposed to
10  Tarrant County, we wouldn't have jurisdiction.
11    A.  Correct.
12    Q.  And the jury would have to find an individual
13  not guilty, right?
14    A.  Correct.
15    Q.  You may not want to do it, but that's the law.
16  That's the oath you'd have to do.  Do you understand
17  that?
18    A.  Yes.
19    Q.  And you may be pissed at us again for not --
20  for screwing something up like that, but there's
21  technicalities in the law, and you understand that as a
22  juror, you're required to call balls and strikes?
23    A.  Right.
24    Q.  And that oath, you're required to follow the
25  law whether you -- whether you think the guy is guilty

1  imposed.
2        And what Judge Gonzalez will instruct you,
3  if you're a juror, is that they shall consider
4  mitigating evidence, that meaning the jury, to be
5  evidence that a juror might regard as reducing the
6  Defendant's moral blameworthiness.
7        Now, in looking at a defendant as a whole
8  and this question, looking at Special Issue No. 2, one
9  has to look at is there anything in the jury -- that the
10  jury sees that, you know what, this is some mitigating
11  evidence; it reduces the Defendant's moral
12  blameworthiness.
13        And some examples that have taken place
14  over the years around the State is, You know, he's 18
15  when he committed the murder or multiple murders.  We'll
16  use the law that we have here.  And his mind wasn't
17  really developed and he wasn't all there, somebody
18  called him knucklehead, that type of stuff, and he
19  wasn't there.  He had a bad upbringing, he was abused,
20  that type of stuff.
21        And that may be one of the avenues that a
22  juror out of the 12 says, You know what, to me that's
23  mitigating.  And we can probably spend the rest of the
24  day figuring out what might be mitigating evidence for a
25  particular case, but it's -- it's not fair at this point

22

24

1  or not, if the State doesn't prove each element beyond a
2  reasonable doubt, a jury's required to find that
3  individual not guilty because the State hasn't met its
4  burden.  Do you understand that?
5    A.  Right, yes, sir.
6    Q.  And you can do that?
7        Special Issue No. 2:  Whether taking into
8  consideration all the evidence, including the
9  circumstances of the offense, the Defendant's character
10  and background and the personal moral culpability of the
11  Defendant, there is sufficient mitigating circumstance
12  or circumstances to warrant that a sentence of life
13  imprisonment rather than a death sentence be imposed.
14        Once again, the folks in Austin put this
15  together for us.  Mr. Moore and Mr. Cummings and Ms.
16  Fernandez are going to have a different slant on this, a
17  different view.  You've -- you've been through a number
18  of these type of cases or -- or criminal cases, at least
19  not this type, in the building.  You know we usually
20  have differing views between the two tables?
21    A.  Right.
22    Q.  The State's position is that it pivots on the
23  word "sufficient" here, sufficient mitigating
24  circumstance or circumstances to warrant that a sentence
25  of life imprisonment rather than a death sentence be

1  to go through all that because you haven't had a chance
2  to hear the case.
3        And a juror can pick up mitigating evidence
4  at any point during the trial.  After Bob and I get done
5  making our opening statements and if the Defense chooses
6  to make one, the first witness out of the box, the first
7  person we call may give you enough mitigating evidence
8  in your mind to find Special Issue No. 2 yes later down
9  the road.  Okay?
10        It may be a witness in the middle of the
11  State's case.  It may be a witness at the end of the
12  State's case.  It may be a physical exhibit that we
13  bring you.  Okay?  There's no burden of proof on this
14  case on this question.  There's no burden on the State
15  and no burden, like there is no burden ever, on the
16  Defense.  All right?
17    A.  Right.
18    Q.  Now, you've known Mr. Cummings and Mr. Moore
19  and Ms. Fernandez for a number of years.  They're very
20  good lawyers, but they don't have to do anything.
21  They've satisfied their obligation when Mr. Hummel came
22  to court.  All right?  They can sit there all they want.
23        So though you may want them to bring some
24  mitigating evidence forward as -- just as a human being
25  as part of nature, you understand if you take that oath

25

1  as a juror, you're required not to hold that against
2  anybody if they don't want to put on a case.
3          They could just say, You know what, we know
4  the State hasn't proven their case; we're just going to
5  sit down behind them. That's done on a regular basis,
6  and a lot of times that may be true. That's trial
7  strategy.
8          But as part of this, you have to, as a
9  juror, look at this independently first and then
10  collectively as a jury to decide whether there's any
11  mitigating evidence and talk it out as a group.
12          Any questions about what this is in looking
13  at whether or not someone diminishes a Defendant's moral
14  blameworthiness in a case?
15      A.  No, sir, no questions.
16      Q.  You can keep an open mind and evaluate the
17  whole case before making a decision?
18      A.  Yes, sir.
19      Q.  The instructions for Special Issue No. 2 that
20  the Court will give you is -- like I said, again,
21  there's no burden of proof, not from the State, not from
22  the Defense.
23          This is a question that gives a jury, we
24  hope, pause to decide if there's anything else that is
25  mitigating in this person's life that warrants a life

26

1  sentence as opposed to the jury imposing the death
2  penalty. Does that make some sense?
3      A.  Yes, sir.
4      Q.  If the answer is no, the death penalty is
5  imposed. And a no vote must be unanimous. So in order
6  for a death penalty to be imposed, there's 36 votes that
7  have to take place: 12 for guilt/innocence, the
8  person's guilty; 12 unanimous that, yes, there's a
9  future dangerousness; and then 12 that, no, there's no
10  mitigating evidence.
11          And it's a lockstep. You don't get to
12  Special Issue No. 1 until you've voted unanimously for
13  guilt/innocence. You don't get to Special Issue No. 2
14  until a jury has unanimously found there's future
15  dangerousness. Does that make some sense?
16      A.  Yes, sir.
17      Q.  If there's a split vote in the special issues
18  and it's 10 to 2 type stuff, we're at an issue where
19  it's life imprisonment. Have you ever heard of a hung
20  jury?
21      A.  Yes. Yes, sir.
22      Q.  All right. A hung jury would be a different
23  vote. It could be 10 that want to say there is no
24  future dangerousness and two that says -- excuse me. My
25  allergies are catching up to me.

27

1          For future dangerousness, it could be 10
2  that says, Yes, future dangerousness and 2 that says
3  they're not. All right? That would be where you're
4  starting to run into some stuff that you'll have to keep
5  deliberating back there, if you can, without doing
6  violence to your conscience. And the Judge would give
7  some guidance if the jury asked for it.
8          In looking at this and looking at your
9  questionnaire as we go through this, you understand that
10  an answer of yes, it's 10 or more jurors agree. So
11  Special Issue No. 1 is yes. If you believe there's a
12  future dangerousness, you go to 2.
13          And on 2, the answer is no if the death
14  penalty is to be imposed and yes if it's not to be
15  imposed. They kind of flip the answers on you there.
16      A.  Right.
17      Q.  If you find -- looking at this, can you keep an
18  open mind, if there is mitigating evidence, to vote yes,
19  there is mitigating evidence?
20      A.  Yes.
21      Q.  And if you find none, can you keep an open mind
22  and vote no?
23      A.  Yes.
24      Q.  And knowing that if you answer no to Special
25  Issue No. 2, the death penalty would result, can you do

28

1  that?
2      A.  Yes, sir.
3      Q.  Is there any reason, be it moral, ethical or
4  religious you cannot be part of the process that results
5  in the death penalty?
6      A.  No, sir.
7      Q.  In looking at your questionnaire, For what
8  crimes do you think the death penalty should be
9  available, you had to fill this out in a vacuum down in
10  the central jury room. And you answered, When someone
11  purposely intends to kill someone, crimes against
12  children or family violence.
13          And you understand that for the context
14  that we're talking about here, it would have to be two
15  individuals killed during the same criminal transaction?
16      A.  Right.
17      Q.  Can you focus your -- your attention then under
18  the law, if the Judge swears you in as a juror, that you
19  will apply the laws to the facts as they're given to you
20  in the case irrespective of what your view might be to
21  what you thought coming in on the questionnaire?
22      A.  Yes, sir.
23      Q.  Now, you have a family member that's married to
24  Judge Street?
25      A.  Yes. Yes, sir.

29

1    Q.  Any issues with the family member being married
2  to a judge that you would have in bringing your views to
3  this case?
4    A.  No, sir.
5    Q.  Now, you have also -- I hate to go into some of
6  this, but it's here.  There is a stepbrother that has --
7  looks like a little DWI history, maybe some controlled
8  substance history.  Is that here in Tarrant County?
9    A.  Yes, sir.
10    Q.  Knowing that -- that Bob and I work for the
11  D.A.'s Office and work for Mr. Curry and now for Mr.
12  Shannon, it's our office, as you know, prosecuting that.
13    A.  Correct.
14    Q.  Would that give you any pause or any
15  hesitation, hold it against Bob and I for being from the
16  same office?
17    A.  Not at all.
18    Q.  Same with your sister in Parker County.  Would
19  that affect in any way that the prosecutors had to do
20  their job out there as well?
21    A.  No, sir.
22    Q.  Can you keep an open mind to all the -- the
23  process?
24    A.  Yes, sir.
25    Q.  Any questions you have on this that I haven't

30

1  gone over?
2    A.  No, sir.
3        MR. BRISSETTE:  Thank you.  Pass the juror.
4        THE COURT:  Defense?
5        MR. CUMMINGS:  Thank you, Your Honor.
6             VOIR DIRE EXAMINATION
7  BY MR. CUMMINGS:
8    Q.  Good morning, Ms. Powell.
9    A.  Good morning.
10    Q.  How are you?
11    A.  Good.  Thank you.
12        MR. CUMMINGS:  Your Honor, could you let
13  her have access to her questionnaire?
14        THE COURT:  Sure.
15        MR. CUMMINGS:  I'd like her to have the
16  comfort of having it if she needs to refer to it.
17    Q.  (BY MR. CUMMINGS)  You and I have worked with
18  each other or been around each other for awhile.  When
19  did you come to work for the county?
20    A.  August 18th, I believe, 1993.
21    Q.  '93.  What assignments have you had in the
22  county clerk's office?
23    A.  Just intake, settings, traffic appeals.  I've
24  been a court clerk for several of the misdemeanor
25  courts, and then this last position just misdemeanor

31

1  appeals, expunctions.
2    Q.  How long have you been doing this position
3  you're in now?
4    A.  Nine years.
5    Q.  I was chief of family violence until 2001.  Did
6  you work in that court at that time?
7    A.  I wasn't assigned to the court, but
8  occasionally I would have to go up there and take a plea
9  or fill in if someone was absent, yes, sir.
10    Q.  Okay.  I try to treat people like I would want
11  to be treated.  I hope I've done that with you.  Have
12  you got any issues with me?
13    A.  No, sir.
14    Q.  Okay.  How about Mr. Moore?
15    A.  No, sir.
16    Q.  Have you ever worked -- he doesn't do as
17  many -- or doesn't do a lot of misdemeanors -- or maybe
18  that is a misperception on my part, maybe he does -- but
19  had to work with him before?
20    A.  I've seen him in the building several times.
21  I've heard his name.  I haven't worked with him very
22  much, but...
23    Q.  My impression is that you're a very quiet
24  woman.  I don't recall hearing you say ten words in
25  the -- I know that we have worked together.

32

1    A.  That's true.
2    Q.  I know that we have seen each other in court,
3  but you -- you keep to yourself pretty much, don't you?
4    A.  Pretty much, yes, sir.
5    Q.  How about Ms. Fernandez?
6    A.  I don't believe I'm familiar with Ms.
7  Fernandez.
8    Q.  Okay.  The -- you have some interesting prior
9  work history.  What did you do for the health
10  department?
11    A.  I was with the animal control.
12    Q.  Tell me what you did.
13    A.  I was the -- well, I was the field officer for
14  awhile, and then I was in charge of the animal bites
15  investigations.
16    Q.  Really?
17    A.  Yes, sir.
18    Q.  How long did you do that?
19    A.  I think seven, eight years.
20    Q.  Did the -- has the City done away with their
21  animal control?
22    A.  No, sir.  In fact, they have a -- a new
23  facility.  I believe it's over there off of 287.
24    Q.  The -- when you worked for them, did you work
25  down at Calvert -- Calvert Street, the police academy?

33

1    A.  Yes, sir.

2    Q.  That's a pretty rustic facility.

3    A.  It is.  It's pretty rundown.

4    Q.  So you have a -- a strong interest in the
welfare of animals?

6    A.  Yes, sir.

7    Q.  Are they -- is that -- are you active in any

8  groups pertaining to preservation or -- of animals,

9  SPCA, anything like that?

10    A.  No, sir.

11    Q.  Okay.  But you had that job for awhile.

12        Back to your job as a county clerk.  What

13  kind of training have you received in the area of

14  criminal law?

15    A.  Just issuing of warrants and research on if the

16  warrant was actually served and if they were

17  incarcerated at the time and bomb research.

18    Q.  Does the county clerk give you-all any sort of

19  training that you have to go through when you -- when

20  you come to work for her?

21    A.  Yes, sir, they train you on all of that.

22    Q.  Do they provide you a Penal Code or Code of

23  Criminal Procedure to refer to occasionally?

24    A.  Yes, sir.

25    Q.  I know that the district clerk actually has --

34

1  I've forgotten what they call them, but they have clerks

2  who -- verifiers, I think, is what they call them --

3  grade the papers of the clerks in the courtroom as well

4  as they're not bashful at all about telling the

5  prosecutor or the defense lawyer you screwed this up.

6  Do you have anybody that functions in that capacity?

7    A.  Yes, sir, we do.

8    Q.  Have you served in that capacity?

9    A.  I was the verifier at one time also, yes, sir.

10    Q.  Okay.  You put on your questionnaire that you

11  enjoy reading things about criminal law.  Tell me about

12  that.  What in particular?

13    A.  Just the forensic science, the investigation

14  type --

15    Q.  Okay.  So it's not necessarily the legal aspect

16  but more the forensic --

17    A.  Forensic science, the investigating, yes, sir.

18    Q.  Okay.  What have you done to further your

19  education in that area?

20    A.  Nothing.

21    Q.  Is that -- were you -- you like to read crime

22  novels?  Is -- is that what we're talking about?

23    A.  I do, but I really don't have time.  Single

24  parent with two kids, and they're both very active in

25  school and sports, and I just really don't have much

35

1  time to read.

2    Q.  Okay.  Did you ever have occasion to interact

3  with Bob Gill when he was Judge Bob Gill?

4    A.  No, sir.  Occasionally, I would have to go up

5  to his court and take a plea, if it was a plea in bar on

6  a felony case, and I would go up to his court and just

7  take a plea, but...

8    Q.  Okay.  How about -- how about Mr. Brissette?

9  You work closely with him in any capacity over the years

10  you've been here?

11    A.  Yes, sir.  He was in some of the courts --

12  courtrooms that I was assigned to, maybe Judge Mills'

13  court.

14    Q.  So of the five of us, Miles is who you have --

15  are closest to, if that's fair to say?

16    A.  Yes, sir.

17    Q.  Anything about that that's going to be

18  something I need to be concerned about?

19    A.  No, sir.

20    Q.  Do you feel an affinity or a closeness to the

21  prosecutors because they're county employees just as you

22  are?

23    A.  Somewhat closeness as in coworkers, but I don't

24  know any of the prosecutors on a personal level.

25    Q.  Do you see yourself -- I mean, I was a county

36

1  employee for 15 years.  This is one big happy family in

2  this building.  Do you see it that way?

3    A.  Yes, sir.

4    Q.  Okay.  There is a closeness, and even though

5  you work for a different elected official, is there --

6  there's more of a bond with them than there would be

7  with the Criminal Defense Bar, correct?

8    A.  Yes, sir.

9    Q.  Is that something I should be concerned about?

10    A.  No, sir.

11    Q.  What do you think we do as criminal defense

12  lawyers?

13    A.  You do your job to defend the Defendant.

14    Q.  One of the questions we asked you about asked

15  you about victims' rights versus defendant's rights.

16  And you indicated -- I'm not going to be able to tell

17  you the question number because I didn't put it in my

18  notes.

19        But you indicated that, Sometimes feel like

20  the Defendant has more or better rights than the victim.

21  Do you recall that?

22    A.  Yes, sir.

23    Q.  Do you need to find the question to --

24    A.  No, sir --

25    Q.  -- put it in context?

39

1   A.  -- I remember that.

2   Q.  Page 16.  Explain that to me.

3   A.  I was probably thinking more along, say, the
family court for that matter.  It seems like recently I
was in family court trying to get more child support,
6   and it seemed like it was always more in favor of the
7   child's father rather than the child.

8   Q.  Your ex works for the airlines?

9   A.  No, sir.  He's -- he's with the county as well.

10   Q.  What does your ex-husband do?

11   A.  He's with IT.

12   Q.  Okay.  How long -- you just recently were in
13   family court for a modification, correct?

14   A.  Correct.

15   Q.  How long have you-all been divorced?

16   A.  We were really never married.  We've been
17   together for like 18 years, and then just within the
18   past year, we kind of went separate ways and...

19   Q.  I would not have thought about your family
20   matters flashing over into defendant's versus victim's
21   rights, but apparently you do see a correlation there.
22   Does that -- is that pretty contentious?  In other
23   words, is this -- your experience in court, tell me
24   about it.

25   A.  Well, it -- the whole process took over a year,

38

1   and this was just to get a modification.  I was already
2   getting child support.  I just needed an -- an increase,
3   and it took like a whole year just for the whole
4   process.  Because he wasn't wanting to cooperate with
5   his attorney or my attorney, it dragged out for a year.
6   He wasn't providing any paperwork to anybody.

7   Q.  Who represented you?

8   A.  Elaine Ryan.

9   Q.  Okay.  And someone you selected to represent
10   you?

11   A.  Yes, sir.

12   Q.  Who represented him?

13   A.  I can't even really remember his name.

14   Q.  These are family lawyers --

15   A.  Gary Nichols, I want to say, but I'm not real
16   sure.

17   Q.  Ex Fort Worth officer?

18   A.  I'm not sure of that.

19   Q.  He is.  But he's a family lawyer.

20   A.  Yes.

21   Q.  And it sounds like your lawyer is a family
22   lawyer?

23   A.  Yes, sir.

24   Q.  And they played by a little different set of
25   rules.  They'd probably argue with me, but they're not

here to argue with me, so I'm going to just give you my
2   opinion.  They play by a little different set of rules
3   in that courthouse than we do.

4        But I'm worried about the way you were
5   treated by the lawyers, whether that's going to splash
6   over on me or Mr. Moore or Ms. Fernandez.

7   A.  No, sir.

8   Q.  Is their burden of proof going to be any less
9   because you feel an affinity towards them as fellow
10   county employees?

11   A.  No, sir.

12   Q.  Your sister was a 9-1-1 operator where?

13   A.  She was with Southlake and Watauga.

14   Q.  Okay.  Is this --

15   A.  And Colleyville.

16   Q.  Have you got the one sister?

17   A.  Yes, sir.

18   Q.  So is that prior to her experience in Parker
19   County?

20   A.  Yes, sir.

21   Q.  Okay.  What's -- is there a -- is this a fairly
22   recent thing, the theft or the problem -- criminal
23   problem?

24   A.  I want to say it's probably been about three,
25   maybe four years.

40

1   Q.  She's not a young woman.

2   A.  No, she's 50.

3   Q.  What do you attribute -- is there something in
4   her life going on that you think that caused her to do
5   these things?

6   A.  To be honest with you, I really don't know.
7   She's just different.

8   Q.  Okay.

9   A.  She's -- I guess she reminds me a lot of my
10   dad, and I kind of follow in my mom's footsteps.

11   Q.  You say that -- in your questionnaire that
12   tougher punishment is needed for crimes against children
13   and/or elderly and animals.  Do you need me to find that
14   particular question for you?

15   A.  No, sir.

16   Q.  Okay.  I love your writing.  I'm with Mr.
17   Brissette.  You get the gold star.

18        Can you explain that to me?

19   A.  I just -- I guess I'm very soft-hearted towards
20   children and animals, just, you know, because they can't
21   take care of themselves and it just -- it really bothers
22   me to hear about, you know, when something wrong is done
23   to them, and I just think there needs to be a tougher
24   punishment than what there is.

25   Q.  Okay.  When you worked in the -- in the county

41

1  courts, did you observe voir dire?

2      A.  Maybe once or twice.

3      Q.  You actually sat and watched the whole thing?
Was it in -- and this was obviously in one of the
misdemeanor courts?

6      A.  Yes, sir.

7      Q.  Quite different process than what you're
8  experiencing now, correct?

9      A.  Oh, yes.

10     Q.  Did you ever sit and watch the trials?

11     A.  No, sir.

12     Q.  Did you have particular cases that you were
13  interested in enough to follow what was going on?

14     A.  Not anything particular that I can think of
15  now.

16     Q.  Okay.  How about cases elsewhere in the
17  courthouse in the district courts?  Have you had cases
18  that piqued your interest that you wanted to keep up
19  with?

20     A.  No, sir.

21     Q.  Okay.  When you said tougher punishment is
22  needed, are you familiar with the types of sentences
23  that are meted out in these district courts for crimes
24  against children or animal abuse or anything like that?

25     A.  Well, I noticed that the death on a child at

42

1  the age of six, I think it should be higher than that.

2      Q.  Okay.  Had you looked at the capital murder
3  statute independent of the paperwork with you?

4      A.  No, sir.

5      Q.  Okay.  Have you had occasion to -- you say you
6  have a Penal Code to refer to in your job as well as the
7  Code of Criminal Procedure.  Have you had occasion to
8  look at Chapter 19, which is the homicide chapter?

9      A.  No, sir.

10     Q.  Okay.  The -- we asked you about punishment,
11  whether it's too harsh, too lenient, okay.  You
12  indicated it's too lenient generally, not just as it's
13  narrowed down to crimes against children and animals.
14  Tell me about that.

15     A.  Well, DWIs, it seems like there's a -- too many
16  people getting repeat DWIs and then getting back out
17  there and getting them again.

18     Q.  Okay.  And DWIs are kind of the majority of the
19  cases that -- in the courts that you work in --

20     A.  Yes, sir.

21     Q.  Okay.  What about any other types of offenses,
22  more serious offenses?

23     A.  Maybe the assault bodily injury on family
24  members and then --

25     Q.  There's an emphasis for probation counseling in

43

1  family violence court.  It was when I was there, and it
2  still is, I think.  What do you think about that?

3      A.  I think it's good that there's counseling.

4      Q.  Okay.  Sometimes it doesn't take, and they come
5  back.

6      A.  That's true.

7      Q.  Have you been a victim of family violence?

8      A.  No, sir.

9      Q.  Okay.  We asked you about exonerations, I
10  think.  I may -- your language was -- I think -- I'm
11  sorry.  I know because of where this is on my outline.
12  This is the question dealing with innocent people being
13  found guilty.  Okay?

14          There are -- are you aware of that, or do
15  you believe that sometimes innocent people are found
16  guilty, and you said, Not good, sometimes people are
17  caught up in the wrong place at the wrong time, evidence
18  not submitted at the trial and DNA later proves some
19  people of their innocence.  Can you expand on that a
20  little bit?

21     A.  Just that some people are sentenced, and then
22  later, like evidence or a witness changes their story,
23  and they are proven that they're innocent and released
24  from prison.

25     Q.  Do you -- you mentioned DNA earlier in one of

44

1  your responses.  What do you know about DNA?

2      A.  Not really a whole lot, just --

3      Q.  Your educational background is agriculture from
4  Tarleton?

5      A.  Uh-huh.

6      Q.  How many hours did you have out there?

7      A.  I really didn't -- I can't even remember.  I
8  didn't finish.

9      Q.  Okay.  Was it -- were your hours -- did you
10  take a lot of science, chemistry, that type of stuff?

11     A.  No, sir.

12     Q.  Okay.  Okay.  You -- you're aware of parole?

13     A.  Yes, sir.

14     Q.  And you're aware that -- or are you aware that
15  for a long time, as far as felonies are concerned,
16  people are eligible for parole for even murder cases.
17  Have you got an opinion about that?

18     A.  No, sir.

19     Q.  Okay.  We ask you the question about -- because
20  parole is not an issue in a capital murder case, if a
21  juror finds guilty beyond a reasonable doubt of capital
22  murder, right?

23     A.  Right.

24     Q.  Do you trust the system and believe that if you
25  were to determine that the proper verdict in this case

47

1  results in a life sentence, that the individual that was
2  sentenced would spend the rest of his life in the
3  penitentiary?
  A.  Yes.
5    Q.  Okay.  I ask you that because for so long, so
6  many of our citizens don't trust the system because they
7  believe parole is used too liberally.  Do you fit in
8  that category?
9    A.  No, sir.
10    Q.  Okay.  You indicated you want to serve.  This
11  is probably going to be a two-week trial.  We've had you
12  up here; although, it's not too big a trip for you
13  compared to everyone else on the panel since you just
14  got to come up a few floors.
15    A.  Yes, sir.
16    Q.  But we have -- if you get selected as a juror
17  in this case, you will probably have two-plus weeks out
18  of your life where you don't have any control over it.
19  Why would you want -- or tell me why you say you want to
20  serve.
21    A.  Just very interested in the system and finding
22  out more information about the case and what's involved,
23  the evidence.
24    Q.  Do you -- you've been in Texas for how long?
25    A.  All my life, 53 years.

46

1    Q.  Do you follow the fact that we execute more
2  people than most of the countries in the world?
3    A.  Yes, sir.
4    Q.  Does that concern you in any way?
5    A.  No, sir.
6    Q.  You think that's appropriate?
7    A.  Yes, sir.
8    Q.  Actually, you indicated that you think the
9  death penalty should be used more frequently; is that
10  right?
11    A.  Probably, yes, sir.
12    Q.  Can you tell me what you had in mind when you
13  answered that way?
14    A.  Just maybe some of the offenses, maybe the
15  punishment for them.
16    Q.  You indicated that you thought a child under
17  six, that threshold --
18    A.  Right.  I think that age should be raised.
19    Q.  Okay.  Where do you think it ought to be?
20    A.  12, maybe 15.
21    Q.  Okay.  What other types of offenses, other than
22  raising the ceiling for the age of a child?  That's
23  kind -- we call that status.
24    A.  Right.
25    Q.  You know, an officer in the line of duty, a

47

1  firefighter in their line of duty, their status alone,
2  the murder of someone like that and in the case of a
3  child, if they're under six, the status of being an
4  individual who's less than six years of age by itself is
5  enough to make that a capital murder.  Okay?
6    A.  Okay.
7    Q.  Okay.  The elements in the Indictment where the
8  theory of the case that the State is proceeding on is
9  more than one murder -- knowing murder.  Those elements
10  are there.  Now, you're used to working with misdemeanor
11  Informations, are you not?
12    A.  Yes, sir.
13    Q.  When you were a verifier, was that something
14  that you would look at?  I mean, would you -- what did
15  you do as a verifier?
16    A.  Just verifying the Information with the plea
17  agreement and the sentence.  It matches with what's on a
18  plea agreement and what -- what's put into the computer
19  system.
20    Q.  Did you --
21    A.  Before it's --
22    Q.  I'm sorry.
23    A.  Before it's like released to the State.
24    Q.  Okay.  Were there occasions when you kicked it
25  back because the plea agreement was outside the range of

48

1  punishment?
2    A.  No, sir.
3    Q.  Okay.  Did you look -- concern yourself with
4  the language in the Information of the charging
5  instrument at all?  Did that -- was that part of your
6  role?
7    A.  Yes, sir.
8    Q.  What were you looking for there?
9    A.  Making sure that -- sometimes the offense would
10  be changed.  It would be -- he would be charged one
11  offense, and then take a lesser-included, or they would
12  waive Count One and --
13    Q.  Okay.  The State has the burden of proving
14  beyond a reasonable doubt to you the elements, and
15  that's -- they don't have to prove the sky was blue or
16  gray or anything like that.  But they do have to satisfy
17  you as a juror that the parts that make up the offense
18  of capital murder have been proved beyond a reasonable
19  doubt.  Okay?
20    A.  Yes, sir.
21    Q.  Are you familiar with the term "manner and
22  means"?  "Manner and means."
23    A.  Yes, sir.
24    Q.  Okay.  And then in your assignment in the -- in
25  County Court 5, manner and means in an assault bodily

49

1  injury case may have been hitting with his hand or
2  kicking with his foot or something like that, right?
3      A.  Correct.
4      Q.  There are -- it's their choice -- "they" being
   the District Attorney's Office -- their choice to decide
6  how the offense occurred and whether they can prove that
7  particular way.  You agree with that?
8      A.  Yes, sir.
9      Q.  Do you -- so the Informations that you work
10  with, were -- you realized that those were prepared by
11  an assistant district attorney prior to your working it,
12  right?
13      A.  Yes.
14      Q.  In the case of a homicide, a capital murder,
15  the State still has to prove manner and means.  So
16  they're going to have somewhere in their Indictment how
17  they believe the death was caused, whether it be by
18  shooting with a firearm or stabbing with a knife or
19  drowning with water or whatever.
20          They're going to put on their case, and
21  they're going to put before you the evidence they
22  believe that is going to prove their case, and they may
23  very well go through the proof of their case and
24  establish to you that, in fact, two murders occurred.
25          But if they were to somehow make a mistake

50

1  and not know that the ME is going to say that the death
2  was caused by stabbing with a knife as opposed to
3  shooting with a gun and they said we're going to prove
4  shooting with a gun, what are you going to do in that
5  situation?  You know a homicide has occurred.  You know
6  you got a dead body.  You know the person they accused
7  is the one that did it, but they just screwed up.  Are
8  you going to -- what is your responsibility as a juror?
9      A.  I definitely would want to discuss that among
10  the other jurors.
11      Q.  My question is:  If they -- if their proof
12  doesn't match -- I mean, they have proved everything
13  else.  Tarrant County, the date, everything's solid, but
14  somehow, some way, they didn't talk to the ME before the
15  trial or something, and they get the manner and means
16  wrong.  They haven't -- they can't prove that element
17  beyond a reasonable doubt.  What is your responsibility
18  as a juror?
19      A.  Just -- if they don't prove that the burden of
20  proof's not there, then he's innocent, if, you know,
21  they don't come up with enough evidence to show that,
22  you know, he is guilty.
23      Q.  Is that -- can you see how that would be a hard
24  task?  You know that someone's committed a homicide and
25  it's a mistake on the part of the State that they didn't

51

1  prove it right.
2      A.  Right.
3      Q.  Can you -- can you hold them to their burden?
4      A.  I would be more inclined to think that maybe
5  he's innocent if there's, yeah, error on their part.
6      Q.  Okay.  If something -- if -- if, in fact, there
7  is a problem, if, in fact, you decide, By golly, you
8  know, I'm not satisfied.  They haven't proved it to me
9  beyond a reasonable doubt.  Is that going to cause you a
10  problem?  You work in the same building --
11      A.  No, sir.
12      Q.  -- with these gentlemen.  Any problem at all?
13      A.  No, sir.
14      Q.  What do you think a juror's role is?  Do you
15  see them as part of law enforcement or part of the
16  prosecution of a case?
17      A.  No, sir.  They're just kind of neutral.  They
18  look at both sides and use their judgment to determine
19  if that person's guilty.
20      Q.  When I talked to you during the minipanel, had
21  you ever thought about the fact that all the way up
22  until we get into this environment, we've only had
23  probable cause applied to the case?  It's the jury.
24  Until the jury gets it, or in a bench trial the Judge
25  gets it, nobody's actually looked at the case through

52

1  the view of beyond a reasonable doubt.  Have you ever
2  thought about that before?
3      A.  No, sir.
4      Q.  Okay.  You got any problem with the range of
5  punishment for a murder case?  Can you give
6  consideration to the entire range, honestly?
7      A.  Yes, sir.
8      Q.  You know that's a pretty low -- that's a big
9  range, 5 years to 99 or life.  That is just huge.  Can
10  you give -- can you honestly tell me that you have an
11  open mind to that entire range?
12      A.  Yes, sir.
13      Q.  Okay.  I want to talk about these special
14  issues.  And I'm pretty close to using up my time.  But
15  I want to visit with you about these particular things.
16          What -- what do you see Special Issue No. 1
17  as asking you to do?
18      A.  Look at the testimonies or the evidence to see
19  if he's going to be a harm to other people in society.
20      Q.  Okay.  Do you -- you see that's kind of asking
21  you to predict the future?
22      A.  Yes, sir.
23      Q.  What -- what are your expectations about, you
24  know, the evidence as it pertains to that special issue?
25      A.  Just to listen to all the testimony or whatever

53

1  information is brought into the trial --

2      Q.  Okay.

3      A.  -- about his moral character, or...

4      Q.  This special issue is:  Do you find from the
5  evidence beyond a reasonable doubt there is a
6  probability the Defendant will commit criminal acts of
7  violence that would constitute a continuing threat to
8  society.  Okay?

9      A.  Uh-huh.

10     Q.  So there, who has the burden?

11     A.  The State.

12     Q.  Okay.  And do they -- do we have a burden at
13  all?

14     A.  No, sir.

15     Q.  You've satisfied me you understand what
16  criminal acts of violence are, and society is
17  essentially the community, I believe is your word, that
18  we live in.

19         Can you tell me the difference between
20  where probability falls as far -- can you define
21  probability?  What does probability mean to you?

22     A.  Most likely.

23     Q.  Okay.  When you get to Special Issue No. 1, you
24  will have already served as a juror in the
25  guilt/innocence phase of the trial.  Okay?

54

1      A.  Uh-huh.

2      Q.  You will have decided, as a member of that jury
3  and as an individual, because it takes -- you're just as
4  important -- you may be the foreperson.  But if you're
5  not, that foreperson doesn't have any greater right or
6  vote or control of the process than you do.  This is 12
7  people who have to agree, or else a guilty verdict
8  doesn't occur or a death sentence doesn't occur if the
9  guilty verdict is the case.

10     A.  Right.

11     Q.  But you're asked to deal with Special Issue No.
12  1.  You're in -- I'm trying to set a context here and --
13  you've already heard evidence of two murders, two
14  knowing murders that don't have any defenses, there's no
15  mental retardation, there's no -- the -- the accused is
16  within the -- the proper age range, it's not an
17  accident, it's not insanity, it's not something they did
18  because they didn't -- they didn't intend to do because
19  they were high or something like that.  I believe on
20  your questionnaire you had something like that.

21         You've already made this choice.  You've
22  decided beyond a reasonable doubt that's where we're at.
23  Now you're being asked to ask -- answer Special Issue
24  No. 1.  Do you -- do you see a difference in the -- in
25  the role that you have in the punishment phase?

55

1      A.  Yes, sir.

2      Q.  Are you going to be in a mindset that my
3  goodness, I mean, we've already found that this guy's
4  committed two murders.  There's no defense.  It's a --
5  it's a given.  It's a foregone conclusion.  Obviously,
6  the continuing threat to society.  Does that fall within
7  your way of thinking?

8      A.  Yes, sir.

9      Q.  Okay.  The -- it's -- it's -- you can take into
10  consideration the evidence from the first phase of a
11  trial, obviously --

12     A.  Yes, sir.

13     Q.  -- in answering the special issues in the
14  second phase.

15         You can -- and many times the prosecutor
16  will stand up and -- and ask the judge to -- to admit
17  all the evidence from the first phase of the trial and
18  during the second phase or whatever for the benefit of
19  the jury.  We all know that's the case anyway, but it's
20  something done.

21         But my question to you here is -- you've
22  already made that decision that, my God, this guy has
23  committed two murders, and there's no justification,
24  they're innocent victims.  The -- is this going to be
25  pretty much automatic for you as far as Special Issue

56

1  No. 1 under those circumstances?

2      A.  Yes, sir.

3      Q.  Okay.  Not knowing any more than you do, have
4  you got an inkling or -- or got a suspicion that you
5  know anything about this case?

6      A.  No, sir.

7      Q.  Okay.  Not knowing any more than you do, is
8  that a fair analysis?  Is that -- you feel like I've
9  tricked you in any way with this -- going through this
10  process in asking you about this?

11     A.  No, sir.

12     Q.  Okay.  The second special issue has -- asks you
13  for a different analysis.  In order to get here, you
14  would have already found that someone's guilty beyond a
15  reasonable doubt, each of you have, and then you would
16  have -- each of you found that the -- you believe beyond
17  a reasonable doubt that the Defendant would commit
18  continuing acts of criminal violence that constitute a
19  threat to society.

20         Now you're being asked to look at the
21  evidence again and try to determine whether there's some
22  reason that a life sentence would be more appropriate.
23  Do you see that?

24     A.  Yes, sir.

25     Q.  What's the sort of thing that you would expect?

57

1     A.  Like was it an act of passion, is that what
2 caused it or --
3     Q.  Okay.  Some people would take age.  I don't
4 remember whether Mr. Brissette used that particular
5 example with you, but there are certain -- you decide
6 what's mitigation.  The only thing that I'm concerned
7 with is whether you have an open mind to this.
8     A.  Yes, sir.
9     Q.  Okay.  And we -- there are cases where age can
10 be mitigation.  One person might decide that -- that an
11 18-year-old is old enough to be responsible and it's not
12 mitigating to them.  And another person may decide, You
13 know what, I've raised kids, and 18, they ain't even
14 near grown yet, and they really haven't -- I think we're
15 scientifically learning that they haven't even
16 formulated their brain completely at that point in their
17 life, and there is a scientific basis for saying, no,
18 they're not responsible as an adult, and -- someone
19 18 or around that age, that would be mitigating.  Okay?
20     A.  Right.
21     Q.  Do you have any questions of me?
22     A.  No, sir.
23     Q.  Thank you very much for your attention and your
24 answers.
25     A.  Thank you.

58

1          MR. CUMMINGS:  That's all I have, Your
2 Honor.
3          THE COURT:  Ms. Powell, if you will have a
4 seat in the front hallway, we'll call you back in in
5 just a few minutes.
6          PROSPECTIVE JUROR:  Okay.  Thank you.
7          THE COURT:  Thank you.
8          (Prospective juror exits courtroom)
9          THE COURT:  State, have a challenge for
10 cause?
11          MR. BRISSETTE:  No, ma'am.
12          THE COURT:  Does the Defense?
13          MR. CUMMINGS:  Yes, Your Honor.  We
14 challenge for cause on the basis that the potential
15 juror would minimize or reduce the State's burden of
16 proof as to Special Issue No. 1, in that she indicated
17 that she would have an automatic vote of yes to that
18 issue based solely upon the evidence presented to her at
19 the guilt/innocence phase.
20          THE COURT:  Go ahead.
21          MR. BRISSETTE:  Judge, the entire tenor of
22 her voir dire was that she would be open-minded and
23 follow the law.  Mr. Cummings' fact pattern, as you'll
24 recall, that -- when she answered it would be automatic
25 is -- he went through for about four minutes in fact

59

1 pattern that the juror is allowed to consider as part of
2 answering the question yes.  And based on that fact
3 pattern, they go into what (sic) she said that.
4          They never challenged her on her admissions
5 throughout the State's voir dire for -- that she could
6 consider and be opened-minded throughout the entire
7 process and hold the State to our burden and never put
8 the burden on the Defense.
9          THE COURT:  That's denied.
10          State, exercise a peremptory?
11          MR. BRISSETTE:  No, ma'am.
12          THE COURT:  Defense?
13          MR. CUMMINGS:  We'll exercise a peremptory,
14 Your Honor.
15          THE COURT:  Okay.  Will you bring her back
16 in for a moment, please?
17          (Prospective juror enters courtroom)
18          THE COURT:  Ms. Powell, just right there is
19 fine.
20          Ms. Powell, you are going to be released
21 from further service in this case.  You don't have to
22 return for any further proceedings or for the trial, but
23 I want to thank you very much for your service up to
24 this point.
25          And if you'll leave the plastic part of

60

1 your jury badge with the bailiff, they're going to mail
2 you your jury check.  Okay.  All right.  Thank you so
3 much.
4          PROSPECTIVE JUROR:  All righty.  Thank you.
5          (Prospective juror excused)
6          (Recess from 10:19 a.m. to 10:27 a.m.)
7          (Open court, Defendant present)
8          (Prospective juror enters courtroom)
9          THE COURT:  Hi.
10          PROSPECTIVE JUROR:  Hello.
11          THE COURT:  You are Prospective Juror No.
12 51, Raymond Carl Huyge; is that correct?
13          PROSPECTIVE JUROR:  Yes.
14          THE COURT:  If you will raise your right
15 hand so I can swear you in, please?
16          (Prospective juror sworn)
17          THE COURT:  When we met in the minipanel
18 interview, we discussed scheduling in this case.  Has
19 anything changed about your schedule?
20          PROSPECTIVE JUROR:  Yes, ma'am.
21          THE COURT:  Okay.  Can you tell us what
22 that is?
23          PROSPECTIVE JUROR:  I had forgotten I had
24 previously made a commitment for the period of June 23rd
25 through the 26th to sit in at a cousin's monument shop

61

1  that I've been involved with since I was young.
2        THE COURT: Uh-huh.
3        PROSPECTIVE JUROR: And they're attending a
4  trade show, and they'll be leaving, so I'll be the only
5  one to be able to stay in their business and keep it
6  open; otherwise, they have got to close the business for
7  four days.
8        THE COURT: Where is that?
9        PROSPECTIVE JUROR: It's on -- it's in Fort
10  Worth at -- on Greenleaf Street.
11        THE COURT: Okay. Anything else?
12        PROSPECTIVE JUROR: As far as obligation?
13        THE COURT: Uh-huh.
14        PROSPECTIVE JUROR: No.
15        THE COURT: Okay.
16        PROSPECTIVE JUROR: I've got a letter here
17  from the owner, if you'd like to see it.
18        THE COURT: Well, unfortunately, that's
19  pretty much the same as you having a job to go to every
20  day.
21        PROSPECTIVE JUROR: Right.
22        THE COURT: Which every other juror that
23  we've interviewed has that same obligation already in
24  place. So I don't see that as being any different than
25  just other people having to arrange time off of work.

62

1  So I don't think that's going to get you anywhere, even
2  though you wanted it to, right?
3        PROSPECTIVE JUROR: Well, it wasn't -- it
4  was something I had forgot about when this came up.
5        THE COURT: Okay.
6        PROSPECTIVE JUROR: And it was something I
7  feel obliged to do to help them out.
8        THE COURT: Okay.
9        MR. MOORE: Can we take up something
10  outside the presence of the juror, please?
11        THE COURT: Sure. Just have a seat out in
12  the hallway and we'll call you back in.
13        (Prospective juror exits courtroom)
14        MR. MOORE: Judge, I am concerned about
15  some of the answers that he's given on his
16  questionnaire, and it's obvious that he has other
17  commitments that I think will involve his mind, and we
18  are agreeable to excusing him from service in this case
19  based on all those reasons. I've discussed it with Mr.
20  Hummel, and he's in agreement.
21        MR. BRISSETTE: We are, as well --
22        THE COURT: State agree?
23        MR. GILL: Yes, Your Honor.
24        THE COURT: We're going to reward him for
25  that?

63

1        All right. Will you bring him back in,
2  please?
3        (Prospective juror enters courtroom)
4        THE COURT: All right, Mr. Huyge. You can
5  stand right there.
6        This probably won't come as a surprise to
7  you, but the lawyers in this case are nicer than I am,
8  and they have agreed to let you off of the case so that
9  you can take care of that obligation.
10        So if you'll leave that plastic part of the
11  jury badge with the bailiff, you are going to be free to
12  go. You're excused from further service in the case,
13  and they will mail you your jury check from the central
14  jury room. Okay? Thank you.
15        PROSPECTIVE JUROR: Thank you.
16        (Prospective juror excused)
17        THE COURT: Okay. No. 52.
18        (Prospective juror enters courtroom)
19        THE COURT: Hello.
20        PROSPECTIVE JUROR: Hi.
21        THE COURT: Just go ahead and have a seat,
22  please.
23        PROSPECTIVE JUROR: Thank you.
24        THE COURT: You are Potential Juror No. 52,
25  Grey Randall Chapman; is that right?

64

1        PROSPECTIVE JUROR: Yes.
2        THE COURT: And, Mr. Chapman, we're (sic)
3  finally got our schedules coordinated, and we're all
4  here on the same place, on the same day.
5        PROSPECTIVE JUROR: Thank God.
6        THE COURT: Exactly. All right. Has
7  anything changed about your schedule since we talked at
8  the minipanel interview?
9        PROSPECTIVE JUROR: Okay. There's --
10  there's one thing that I want to say. We were talking
11  about a specific time frame, two weeks in June
12  basically, and -- and the thing that I want to bring up
13  is that I've -- I've had a trip scheduled for June 30th,
14  okay, which, granted, is outside the time frame that
15  it -- it's expected to occur in, but that trip is to
16  Yellowstone National Park, and I had to make
17  reservations like a year and a half in advance to go
18  ahead and get in there. And -- and if I -- if I have to
19  lose that because the trial goes over, then that would
20  lock Yellowstone National Park out for a long time for
21  me, so...
22        THE COURT: Okay. Anything else?
23        PROSPECTIVE JUROR: That's it.
24        THE COURT: Okay. Anything changed since
25  you filled out your jury questionnaire that you need to

65

1   let us know about?

2        PROSPECTIVE JUROR:  No.

3        THE COURT:  All right.  Let me go ahead and

4   swear you in for purposes of today's proceedings.  If

5   you'll raise your right hand.

6        (Prospective juror sworn)

7        THE COURT:  Okay.  Let me ask you this

8   about your trip.  Just -- let's see.  Starting June

9   13th, anticipated to go two weeks, roughly around the

10  24th.

11       PROSPECTIVE JUROR:  Okay.

12       THE COURT:  If it were to go into that

13  following week as long as it finishes before the 30th,

14  you would be okay --

15       PROSPECTIVE JUROR:  Absolutely.

16       THE COURT:  -- is that correct -- okay?

17       And it's not going to be one of those

18  things where you're -- if you're still here on the 28th,

19  you're going to start flipping out a little bit and not

20  be able to pay attention to the case?

21       PROSPECTIVE JUROR:  Maybe not by the 28th,

22  but by the 29th, probably.

23       THE COURT:  Okay.  Well, I think you're

24  going to be safe on your time frame, but I appreciate

25  you reminding us of that.

66

1        PROSPECTIVE JUROR:  Okay.

2        THE COURT:  As you will recall, the person

3   on trial in this case is John William Hummel.  He is

4   represented by Pamela Fernandez, Larry Moore and Fred

5   Cummings.

6        The State of Texas is represented by Robert

7   Gill and Miles Brissette.

8        Both sides are going to have the

9   opportunity to talk to you today about the issues in

10  those written instructions that you received regarding

11  the death penalty and some things on your jury

12  questionnaire.  So since the State has the burden of

13  proof, they do get to talk to you first.

14       You may proceed.

15       MR. GILL:  Thank you.

16       GREY RANDALL CHAPMAN,

17  a prospective juror, having been first duly sworn,

18  testified as follows:

19       VOIR DIRE EXAMINATION

20  BY MR. GILL:

21  Q.   Good morning, Mr. Chapman.

22  A.   Good morning.

23  Q.   As I was introduced today and a couple of weeks

24  ago, I'm Bob Gill.  This is Miles Brissette over here to

25  my left, and we are the Assistant District Attorneys

67

1   that have been assigned to try this case.

2        And we're going to go over some different

3   things that we went over the last time you were here and

4   may touch a little bit upon some of the same things as

5   you heard as sort of a segue into the topics we need to

6   discuss today.

7        One of the things that's going to be the

8   same is your -- your oath as a juror today is the same

9   as you took the last time you were in court oath.  Your

10  oath at this point is simply to tell the truth about how

11  you feel about things.

12       And if you are selected to be a juror, the

13  oath -- the oath changes, and you become obligated to

14  follow the law and apply the evidence to the law and

15  reach a verdict accordingly.  Okay?  I take it -- you're

16  nodding at me in kind of a knowing manner.  You

17  understand that --

18  A.   I understand.

19  Q.   -- your obligations here?

20       Okay.  And I -- I appreciate your bringing

21  to the fact that you have a trip on June 30th.  And

22  you're a member of the Sierra Club; is that right?

23  A.   Yes, I am.

24  Q.   Okay.  So this is -- this trip is a pretty big

25  deal to you, right?

68

1   A.   Yes.

2   Q.   What -- what are you planning to do on the

3   trip?

4   A.   Well, I'm actually riding my motorcycle from

5   Fort Worth up to Yellowstone National Park.  I'm meeting

6   my son in Colorado Springs, and he's going to go ahead

7   and come up with us.  He's actually living in Salt Lake

8   City, and he's going to -- he's going to make the trip

9   with us.  And then we're going to stay in Yellowstone

10  for about five days and then -- and then come on back

11  home, so...

12  Q.   So involving people from a great distance away

13  from here, I bet, took a big deal of coordination to get

14  that all set, didn't it?

15  A.   We've been working on it a year and a half.

16  Q.   Well, the Judge says she thinks you're going to

17  be all right with that vacation juxtaposed to this

18  trial.  No one can guarantee it.  That's one thing we

19  don't know about a trial.  If we think it's going to end

20  on one date -- we know when it's going to start.  We

21  just don't know exactly when it's going to end, and

22  really, it's kind of beyond everybody's control because

23  things just last as long as they last.

24       I guess what I want to make sure of is that

25  if you're a juror in the case and -- and you just tell

1  us how you feel about this.  As we start getting
2  towards -- start creeping towards the 30th, what are you
3  going to start thinking about?
4      A.  Well, like I said, I probably -- you know, I'll
5  be okay, you know, a couple of days in advance, but if
6  it gets down to the day before, it's going to be on my
7  mind.  I mean, I'm being honest with you, so...
8      Q.  Well, the thing I'm concerned about is that one
9  of the last things a jury has to do before they get
10  released is what?
11      A.  Render a verdict.
12      Q.  Yeah, they got to deliberate and all that,
13  don't they?  And you don't just get to -- we don't just
14  stop in the middle of testimony and say, all right,
15  we're done.
16      A.  Yes.
17      Q.  I mean, the jury's function is to see it
18  through to the end and -- and to render a verdict on
19  what they've heard.
20          And I guess the -- the question at this
21  point becomes if you start getting distracted because of
22  your impending trip, what happens to you -- your ability
23  to deliberate as a juror.
24          And one of the things -- one of the things
25  we're constantly concerned about is people hurrying up

1  the questionnaire is that you have -- you have work
2  pressures.  And the pressures -- you're -- you mentioned
3  that on the questionnaire.  I guess it's because you're
4  concerned about the work pressures vis-a-vis your
5  responsibility as a juror; is that right?
6      A.  I don't know if the -- if the question was --
7  was understood by me exactly like that, but, you know,
8  that -- that's a consideration in, you know, my overall
9  thought process, so...
10      Q.  Yeah.
11      A.  Yeah.
12      Q.  Well, two -- two weeks, or more if the trial
13  goes longer, is a long time to be away from work.
14      A.  Yes.
15      Q.  You're backing that up against a week or week
16  and a half vacation at that point.
17      A.  Yeah.
18      Q.  You know, if you're a juror in the case, you're
19  basically going to be out of work for three-plus weeks,
20  so what -- what does that do to you?
21      A.  That -- that would mean that I would go ahead
22  and have to get busy immediately going ahead and trying
23  to make sure that things were filled in that needed to
24  be filled in.
25      Q.  Okay.  So are you -- are you telling me that

1  their verdict just to -- just to get out of the jury
2  room, to get on about their business.  That's a --
3  that's a constant concern to everybody involved in a --
4  I suppose any kind of legal case.
5      A.  Yeah.  Well, okay.  I'll make this statement
6  about the way that I feel about that:  In the job that I
7  have as controller for a -- for a manufacturing company,
8  there are things that need to be done by a certain time.
9  And if those things don't get done by a certain time,
10  then there's a cost involved in that.  Okay?  But
11  there's a worse cost involved in doing a -- a quick job
12  rather than a good job.
13          So it's my -- the way that I live my life
14  is if I miss a deadline because I couldn't go ahead and
15  get it done right, then at least I got it done right.
16      Q.  Okay.  That's fair.  So you -- so I -- I think,
17  if I can read between the lines there, what you're
18  saying is you'd get the jury deliberations done right
19  and worry about the trip when you got out of court.  Is
20  that -- or am I putting words in your mouth?  I don't
21  want to do that.
22      A.  It would be in the back of my mind, but, yes, I
23  would be go ahead and function.
24      Q.  Okay.  One of the other things -- kind of along
25  that same line, one of the things that you mentioned in

1  you'd be able to make arrangements and take care of
2  your -- your work concerns and your jury service and --
3      A.  Assuming that I had access to a computer after,
4  you know, our daily work was done, okay?  I -- I -- I --
5  I'd have to go ahead and -- I'd say yes to that
6  question, but on the basis that I go ahead and be able
7  to go ahead and get to the Internet, okay, so I can go
8  ahead and, you know, do some things that nobody else
9  might be able to do.
10      Q.  Would you be able to do that?
11      A.  Yes.
12      Q.  Okay.  I think what we -- I think what --
13  what's contemplated here is that we work pretty normal
14  business hours during the course of the trial.  We work
15  a -- we work a 9:00 to -- 9:00 to 5:00 or a 9:00 to 5:30
16  or 8:30 to 5:00 or 8:30 to 5:30, something like that,
17  maybe an occasional day when we went a little bit later
18  than that.  Is that kind of your understanding of how
19  we -- how we might proceed?
20      A.  Yes.
21      Q.  You can work on those parameters?
22      A.  Yes.
23      Q.  Okay.  Now, a few other questions about the
24  questionnaire.  Are you a graduate of SIU?
25      A.  Yes.

1   Q.  And your wife is also, right?

2   A.  Yes.

3   Q.  Now, is the -- is the mascot over at

Edwardsville the same as the Carbondale mascot, the

Saluki?

6   A.  No.

7   Q.  I'm a Saluki.  What are you?

8   A.  Chimega.  It's -- it's -- it's actually a

9  cougar.

10   Q.  Okay.  Well, you spend as much time as I do

11  explaining what the heck the mascot is?

12   A.  Actually, nobody has asked me that question for

13  quite some time.

14   Q.  Okay.  Okay.  I'm getting -- I'm getting a

15  little bit further in the questionnaire, and I wanted to

16  ask you about one point.

17        You made an entry -- something about a

18  racing case where you got -- you felt like a police

19  officer tricked you into racing against him and --

20   A.  Yes.

21   Q.  -- you ended up with a citation, I suppose?

22   A.  No, he -- he let me go.

23   Q.  Okay.  Okay.  What did you think about that

24  procedure -- about that instance?

25   A.  Oh, I felt like he was looking to go ahead and

1  take advantage of his -- of his position and -- and he

2  was just trying to go ahead and find whatever he could,

3  not necessarily within the law but within what he

4  wanted, so...

5   Q.  Okay.  Does that give you any kind of a general

6  distaste towards police officers because of that

7  instance or maybe that and other things that have

8  happened to you in your life?

9   A.  No.  Generally, I think that police officers

10  have a very difficult job and that they perform it to

11  the best of their ability, and I don't have a problem

12  with police.

13   Q.  Okay.  So if police officers were to testify in

14  the course of a criminal trial in which you sat as a

15  juror, would you be able to judge their credibility the

16  same as you would anyone else, or do you -- or do the

17  police officers come into the witness stand with some

18  kind of a -- a cloud over them, a strike against them or

19  something like that?

20   A.  No, I don't think that would be a

21  consideration.

22   Q.  Would you repeat your answer?  I'm not sure I

23  understood you.

24   A.  That would not be a consideration for me about

25  what has happened within the past.

1   Q.  Okay.  And along -- kind of along those same

2  lines, one of these questions you were asked, What is

3  your impression of prosecutors in general?

4   A.  Cold and heartless, I think I wrote for that.

5   Q.  That's exactly what you wrote.

6   A.  Yes.

7   Q.  So I guess the question is:  Why did you write

8  that?

9   A.  Well, you know, your job is to go ahead and --

10  and -- and convict people.  Okay?  So you're going to

11  be, you know, nailing them along the line on different

12  points basically, and -- and, you know, what -- what

13  kind of person would it take to go ahead and do that?

14  Okay.  They're going to have to be unemotional, okay,

15  they're not going to have -- they're not going to be --

16  they're not going to allow themselves to, you know, get,

17  you know, personally involved.

18        And I'm sure that there's other problems,

19  other things that go personally involved, but, you know,

20  you got to remain detached, you got to remain cold,

21  okay, basically, unemotional, and -- and so that's got

22  to do with what I said there.

23        And I -- and I don't think it's anything to

24  do with, you know, the job.  It's just -- it's just what

25  you have to do in your job.  So, I mean, I -- I knew a

1  prosecuting attorney from church, and -- and he was a

2  little that way, so -- in the way that he treated

3  general situations.  I mean, you know, it's just the way

4  you got to be, I think.

5   Q.  Okay.  I don't know if that's a good thing or a

6  bad thing.  I'm trying to figure out -- you laughed

7  pretty good at the beginning of the question --

8   A.  Because I was laughing because you were asking

9  about it.

10   Q.  Why wouldn't you think I would ask you about

11  something like that?

12   A.  Yes.  It's -- I mean, it's just -- it's just a

13  thing.  I mean, you know, whether it's good or bad, I

14  mean, it's probably good for some situations and bad for

15  some situations.

16   Q.  Okay.  So let me ask you kind of like the same

17  thing I asked you about police officers.  Do you -- do

18  your feelings about -- would your feelings about

19  prosecutors enter into this case and affect your service

20  as a juror?

21   A.  No.

22   Q.  Okay.  What do you think about the defense

23  lawyers?

24   A.  There's good ones and bad ones.

25   Q.  Okay.  Someone else said they get -- they

77

1   get -- they get better by the price.  Is that --

2   A.  I probably would go along with that.

3   Q.  Okay.  So is there anything about us

4   personally, any of us here personally, that -- that, you

5   know, that -- that you want to comment on or you think

6   would affect you as a juror in the case?

7   A.  Not that I can think of.

8   Q.  Okay.  Okay.  The next page reveals that one --

9   on -- once upon a time in St. Louis, you sat on a

10  juror -- on a jury for a death penalty trial, capital

11  murder trial.

12  A.  It was actually during that voir dire process.

13  Q.  Okay.  Okay.  So you did not actually make it

14  on the jury?

15  A.  That's correct.

16  Q.  You went through this procedure --

17  A.  Yes.

18  Q.  -- in that case also?

19  A.  Yes.

20  Q.  Do they do it similarly?  Is it an individual

21  voir dire?

22  A.  It was -- it was -- we didn't have individual.

23  It was -- the questions were asked of the group, and

24  then if anybody wanted to respond, then they basically

25  raised their hand.

78

1   Q.  So it was more like your first visit to court a

2   couple of weeks ago?

3   A.  Yes, although there were more specific

4   questions about the death penalty and things like that.

5   Q.  Okay.  Okay.  Well, that's what we're getting

6   ready to get into today.

7   A.  Yeah.

8   Q.  Texas law requires that when we get down to

9   death penalty questions, that it be done individually.

10  And were you a citizen of Illinois or Missouri at the

11  time?

12  A.  Missouri.

13  Q.  Missouri.  Okay.

14      I guess Missouri does not have a similar

15  statute where they require it to be done individually.

16  A.  It was a long time ago, so things have changed.

17  Things probably changed.

18  Q.  So the guy in the case got the death penalty, I

19  understand, from your questionnaire?

20  A.  Yes.

21  Q.  What did you think about that?

22  A.  Well -- okay.  I had prior knowledge of the

23  case, a lot of knowledge about the case, and when I

24  walked into -- and I -- I saw him and I seen

25  pictures of him and I read the descriptions in the

79

1   newspaper, I -- my -- my ability to be impartial on the

2   case was completely compromised.

3   Q.  Well, obviously that's why you didn't make it

4   on the jury, right?

5   A.  That's right.

6   Q.  Okay.  You think justice was done in that case?

7   A.  Yes.

8   Q.  We have -- I don't know -- I don't know how

9   many people get called for two death penalty trials as a

10  juror during their lifetime.  It has to be a -- it has

11  to be a pretty small number, of which you are one.

12      How about this case here?  Do you have

13  any -- any prior knowledge or information from any

14  source about this case?

15  A.  No.  Which is surprising, actually, because I

16  try to keep up on the news, and it seems I would have

17  known about this, but I don't know anything about it.

18  Q.  Well, the allegation in the Indictment is that

19  this offense occurred on December 17th of 2009, and it

20  occurred in the city of Kennedale, which is between

21  Arlington and Mansfield in -- in Tarrant County,

22  southeast Tarrant County.

23      And the -- the two individuals that are

24  alleged to be killed would be Joy Hummel and Clyde

25  Bedford.  So it happened -- it happened just before

80

1   Christmas of 2009.  Does anything of what I just told

2   you ring any bells with you about the case?

3   A.  No.

4   Q.  Very good.

5      At one point in your life, you went down to

6   a juvenile court just -- it says here curious.  Curious

7   about how the juvenile system works?

8   A.  Yes.

9   Q.  Was that courthouse here in Texas, or was it in

10  Missouri or elsewhere?

11  A.  It was in Missouri.

12  Q.  And what did you think about the way the

13  juvenile court worked in the state of Missouri?

14  A.  Actually, I thought it was -- it worked very

15  well.  I listened to a couple of, you know, people get

16  up and testify, and I -- and I -- and I -- and a couple

17  of cases came through, and -- and I thought that things

18  were handled very well.

19  Q.  Okay.

20  A.  And that punishment was appropriate.

21  Q.  Okay.  So was there any one thing that

22  occasioned your curiosity?

23  A.  Actually, yes.  My son had gotten into some

24  trouble over some fireworks and setting off fireworks in

25  the city and -- and I wound up getting an idea about

81

1  what -- what it was like --

2     Q.  Okay.

3     A.  -- so...

4     Q.  Okay.  You wanted to do a little research and

5  see what was going on down there?

6     A.  Yeah.

7     Q.  Okay.  Okay.  You also indicated -- I'm looking

8  at Question 131.  You put your son is in a very

9  difficult situation involving a friend's -- a friend of

10  a friend or something that's in some trouble himself.

11     A.  Serious trouble.

12     Q.  Serious trouble.  Yeah, I'd consider that

13  serious trouble, too.  Is that situation ongoing here in

14  Tarrant County?

15     A.  No.

16     Q.  Where's -- where is that?  Is that Salt Lake

17  City?

18     A.  Salt Lake City.

19     Q.  Okay.  All right.  Is there -- is there any

20  connection in your mind between that and -- and this

21  case and your ability to serve as a juror here?

22     A.  No.

23     Q.  Is that something that would distract you from

24  your -- your service as a juror here?

25     A.  No.  That's about to be over from the

82

1  standpoint of the loose ends, so...

2     Q.  Okay.  So one last thing I wanted to talk to

3  you about on your questionnaire is really the very last

4  page of substantive questions.  You stated that in

5  relation to your work pressures also is one thing, and

6  then you do not want to be responsible for someone

7  dying.

8     A.  That's correct.

9     Q.  Explain -- explain that to me in a little more

10  detail, if you would, please.

11     A.  Okay.  So, in other words, what I'm saying

12  there is -- is -- and I think this is probably common

13  for most people, I would think -- that if I am put in

14  the position to go ahead and punish somebody with the

15  death penalty or vote as part of the jury to go ahead

16  and punish somebody with the death penalty, then that

17  would -- that would weigh heavily on my conscience from

18  the standpoint of I would feel like I had blood on my

19  hands over the situation.

20     Q.  Okay.  And you mention that is a fairly common

21  situation, and I -- I tend to agree with you.  I think

22  that is a pretty common situation.  You know, the day --

23  the last day you were in court, you were there along

24  with 49 other people.  We talked to two other groups of

25  50 people that same way, that same procedure.

83

1     So we have a group of about 150 people that

2  we're looking at to be the -- to be jurors in this case

3  that we're going to interview like you.  We only need 12

4  people on the jury, so it takes us 150 people or so to

5  get a pool of 12 to make our jury.

6     So we have a -- a lot of people that, for

7  one reason or another, can't serve on this type of case.

8  That's one of the reasons.  But you're -- you're

9  Potential Juror No. 52.  We've already talked to 52

10  people.  The State of Texas is, in fact, seeking the

11  death penalty in this case.  I don't want there to be

12  any mistake about that, that at the end of the trial,

13  we're going to ask the jury, whoever that is, to

14  sentence this individual right over here to the death

15  penalty.

16     And you said earlier you keep up with the

17  newspaper, what's going on in our society, so that you

18  understand that the death penalty is a real thing in the

19  State of Texas.

20     A.  Yes.

21     Q.  But we -- the people get executed here

22  frequently.

23     A.  More than any other state, I believe.

24     Q.  That's absolutely correct, more than a lot of

25  countries.  Probably more than everybody else put

84

1  together.  I don't know about that, but it's certainly a

2  possibility.

3     How does that impact your potential service

4  as a juror?  You know, not only is there -- is there --

5  might be blood on your hands; it's -- you know, it's a

6  very permanent thing.

7     A.  Well, it's just, you know, it would be my

8  responsibility to go ahead and -- and not think about

9  the -- the consequences of what I was doing.

10     Q.  One of the other things you mentioned in your

11  questionnaire is -- is that you are aware of the

12  exonerations that have taken place through -- through

13  DNA and otherwise?

14     A.  Yes.

15     Q.  So you are aware that at least in some

16  jurisdictions, mistakes have been made.  Would -- would

17  that weigh on your mind if you were a juror in the case?

18     A.  Well, if -- it's not just me that's going ahead

19  and making that decision; it would be all the jurors

20  that would be with me.  So if we all felt the same way

21  or 10 out of 12 felt the same way, then I can't hold

22  myself responsible for, you know, in the way that you're

23  talking about.  I can still feel like I was responsible

24  for, you know, that I had blood on my hands over the

25  situation, but as far as like me, you know, thinking,

85

1   well, if I do this, okay, then, you know, this -- these
2   are going to be the consequences, and that, quite
3   frankly, I -- I -- I couldn't factor that into my
4   decision-making process.
5       Q.  Well, there are 12 jurors on a criminal case
6   and it takes 12 to make these decisions, but one thing
7   that both sides have been careful to remind people of as
8   we go through this process is that each juror renders an
9   individual verdict.  It's not a collective decision.
10  People don't get together back in the jury room and say,
11  Okay, well, we've got seven for and five against;
12  therefore, the -- therefore, we're going to -- we're
13  going to do this with seven.  It's like -- you know,
14  it's not like a democracy is what I'm saying.  It's not
15  majority rule.  It takes all 12 people to line up one
16  way before a verdict can be rendered.  So you have an
17  individual verdict.  So does the guy next to you and the
18  woman next to him.
19      A.  Uh-huh.
20      Q.  And, you know, so therefore, there's -- there's
21  12 of you, so there's a little bit of cover there, but
22  each individual person has an individual verdict.  How
23  do you feel about that?
24      A.  Well, I -- I don't know what exactly that
25  process would be.  Is it like, okay, I'm going to write

86

1   down whether I'm -- you know, we're going to do like
2   secret bids on -- secret votes on the thing, and then
3   it's going to be tallied or, you know, or are people
4   going to go ahead and say who feels this way, and we're
5   going to raise our hands, you know?
6           Is everybody going to be aware of the
7   decision that everybody else makes?  I don't -- I don't
8   know that, so...
9       Q.  Well, I can't tell you that either.  I've
10  never -- I've never been on a jury that's actually
11  deliberated.  I know that -- that from past experiences
12  there have been occasions where jurors have written down
13  their vote on a piece of paper and presumedly those had
14  been collected by someone and -- and tallied.
15          In the vast majority of situations I have
16  seen, though, there have been no -- no clues that there
17  have been a -- a written vote like that, that I assume
18  people are sitting around the table and raising their
19  hands or giving a voice vote.  Certainly a lot quicker
20  to do it that way, timesaver rather than tearing up
21  paper, writing down and calculating.
22          There's also -- you know, juries
23  deliberate, so people have an opportunity to express
24  viewpoints.  So it might be -- it might be pretty
25  obvious to the other people there what your viewpoint

87

1   is.
2       A.  Yeah.
3       Q.  I would assume that -- you know, I don't know
4   if I've ever heard of a jury that didn't deliberate, so
5   I assume that's a pretty common thing.
6       A.  Yeah.  Well, in answer to your question,
7   really, I mean, if I feel that the -- that the
8   punishment is according to the criteria that are laid
9   out, then -- then I have no choice but to go ahead and
10  vote whatever way is right, so...
11      Q.  Well, we have mentioned earlier that there's an
12  oath that jurors have to follow to render a verdict
13  according to the law and the evidence.  And you and I
14  spent some time talking about this.  How do you feel
15  about your ability to follow your oath as a juror?
16      A.  I can do that.
17      Q.  Okay.  And that's all anyone can ask of you.
18          Ultimately, though, at this point of the
19  trial, you -- you have the ability to tell us how you
20  feel about things.  If you come to a situation where
21  your personal viewpoint is so strong that it would
22  affect your ability to follow your oath, your
23  responsibility at this point is to let us know about
24  that.  If someone feels that way, they are not required
25  to take that oath as a juror.

88

1           You see what I'm saying?
2       A.  Yes.
3       Q.  Okay.  So let's -- let's talk about some of the
4   substantive law that we're going to be -- and you've
5   gone over the -- the homework that was sent home with
6   you, right?
7       A.  Yes.
8       Q.  Obviously if you know what the questions are,
9   you've done that.  I appreciate that.
10          But let's talk about this for just a
11  second.  Over here this is the same definition of
12  capital murder that we went over when you were in court
13  a couple of weeks ago:  A person commits capital murder
14  when he knowingly murders more than one person during
15  the same criminal transaction.
16          And this is a crime for which someone can
17  receive the death penalty.  How do you feel about this
18  definition, subjecting someone to a possible death
19  penalty?
20      A.  It's appropriate.
21      Q.  You understand that if only one person was
22  killed during the criminal transaction, that the crime
23  we'd be talking about is murder?
24      A.  Yes.
25      Q.  We went over that a couple of weeks ago.

1   And the punishment range for the offense of
2  murder is from not less than 5 or more than 99 years or
3  life if the individual is found guilty of committing a
4  knowing murder without any legal justification or
5  excuse.
6   A.  Yes.
7   Q.  How do you feel about that punishment range?
8   A.  Well, on the top end, I don't have a problem
9  with it.  On the bottom end, I think it's a little
10 strange.
11  Q.  Why is that?
12  A.  That wouldn't go ahead and compromise my
13 ability to go ahead and, you know, render a verdict over
14 the range of punishment possibilities.
15  Q.  Well, what your -- what your duty would be as a
16 juror, if you found yourself in that situation, that is
17 deliberating at the punishment phase of a murder trial,
18 would be to look at that full range of punishment, 5 to
19 99 years or life, and then decide where within that
20 range you felt like the punishment ought to be.
21  A.  Yes.
22  Q.  And could you consider the entire range before
23 you made your decision?
24  A.  Yes.
25  Q.  Okay.  Very simple.  That's all the law

1   A.  It says other unadjudicated offenses, so that
2  means adjudicated offenses couldn't be --
3   Q.  Well, they can be.
4   A.  Okay.
5   Q.  But -- but just for the purposes of this trial,
6  this is one of the examples we chose.
7   A.  Okay.
8   Q.  So if someone has been found guilty of a crime,
9  yes, they certainly can.  I'm glad you brought that up.
10  A.  Okay.
11  Q.  But -- but the law -- and the law didn't allow
12 us to bring in unadjudicated offenses for a long time.
13 This changed, I think, somewhere in the '90s.  And now
14 we can bring -- if they -- even if they've never been in
15 court on it, if they committed it, we can show it to the
16 jury in the punishment phase of the trial.
17   So once -- once all the evidence is
18 presented, both sides rest and close, you hear
19 summations of counsel, and then the jury's confronted
20 with the special issues that you went over in your -- in
21 your homework.
22   The first one we call the future
23 dangerousness issue because it's concerned -- it's
24 concerned with what's going to possibly happen in the
25 future.

1  requires you to do.
2   Two-phase trials.  All trials -- criminal
3  trials in Texas are conducted in two phases.  First the
4  guilt/innocence phase of the trial; second we have the
5  punishment phase.
6   The first phase of the trial, the
7  consideration for the jury is did this guy commit this
8  crime as charged.
9   Second phase of the trial opens it up a lot
10 more to a lot -- lot more considerations going towards
11 what the proper punishment should be.  But a jury
12 deliberating at the punishment phase and considering
13 those issues can take into consideration all the
14 evidence they heard at the first phase of the trial.
15   Obviously the jurors should take into
16 consideration what were the facts of this case, what did
17 he do here.  That makes sense, doesn't it?
18  A.  Yes.
19  Q.  And we can go beyond evidence admissible at the
20 first phase of the trial at the punishment phase.  Like
21 bad character of the Defendant, can't go into that at
22 the first phase; bad reputation; evidence of other
23 crimes the individual may have committed.  Those are
24 additional information a jury can receive at the
25 punishment phase of the trial.

1   The second one is whether there's
2  sufficient mitigation for a life sentence.  The answers
3  that the jury gives tell the Judge how the Judge has to
4  sentence.  If the answers come out one way, the Judge
5  has to give the death penalty.  If the answers come out
6  another way, the Judge has to give a life sentence, and
7  the Judge has no discretion about -- about what the
8  sentence should be.  The Judge has to do what the jury
9  says to do.
10   I need to go a little faster, don't I?  You
11 remember a lot of this from what you read in the
12 homework?
13  A.  Yes.
14  Q.  Okay.  The Judge is going to instruct the jury
15 that a sentence of life without parole means that the
16 individual is ineligible for release from the
17 penitentiary on parole.  In other words, they're staying
18 in prison the rest of their life if they get convicted
19 of capital murder.
20  A.  Yes.
21  Q.  Some people that get convicted of capital
22 murder are staying in for the rest of their natural life
23 because they're in there on a life sentence.  Some of
24 them are going to be executed because they are the ones
25 that receive the death penalty.  But either way, they

93

1  never come out of the penitentiary alive.
2      A.  Yes.
3      Q.  So here's Special Issue No. 1.  You went
4  through that pretty quick.  Let me point out a couple of
5  things about it.
6          It starts off with the phrase "beyond a
7  reasonable doubt," and it starts off with that phrase
8  because the burden of proof is on the State.  Just like
9  at the first phase of the trial.  We have to prove
10 beyond a reasonable doubt the person's guilty; we've got
11 to prove beyond a reasonable doubt that there's a
12 probability that the Defendant would commit these
13 criminal acts of violence that would constitute a
14 continuing threat to society.
15         "Probability" is not defined under our law.
16 What does probability mean to you?
17     A.  That would mean that there's a chance that
18 something like that could -- some -- a danger could --
19 could present itself again.
20     Q.  Exactly right.  Yeah.  Probability, science,
21 probability, statistics, it's all how big of a chance is
22 there, right?
23         The Legislature writes these questions.
24 They use the word "probability" and did not use the word
25 "possibility."  Do they mean different things to you,

94

1  "possibility" and "probability"?
2      A.  Yes.
3      Q.  They also didn't use the word "certainty" here,
4  so the State does not have to prove there's any kind of
5  a certainty.
6      A.  It's -- it'd be impossible if there's a
7  certainty on future.
8      Q.  Sure would, wouldn't it?
9          So the law doesn't require us to do any
10 kind of impossible act.  It -- it backs it down to where
11 it's -- it's possible for the State to prove it.  In
12 your mind, is it possible the State can prove this to
13 you?
14     A.  Yes.
15     Q.  Okay.  And the phrase -- next phrase, "criminal
16 acts of violence," what does that mean?
17     A.  That would mean that that person would be -- it
18 would be probable that that person would go ahead and
19 attempt to hurt another person again.
20     Q.  That's a pretty broad term, criminal acts of
21 violence, right?  Again, the Legislature wrote this.
22 They -- they didn't require us to prove that there's
23 going to be another murder or there's going to be a
24 sexual assault or there's going to be a robbery or
25 there's going to be a simple assault.  It encompasses

95

1  all that kind of stuff.  You see how that works?
2      A.  Yes.
3      Q.  Okay.  And the last term that we probably need
4  to discuss just a little bit is the term "society."
5  That's not defined either.  So what does society mean to
6  you?
7      A.  People that are -- that are living around a
8  person or in the world at large.  I mean, you know, it's
9  just people.
10     Q.  Yeah.  It's a pretty broad definition too,
11 isn't it?
12     A.  Yeah.
13     Q.  Okay.  So do you think it's possible that the
14 State can prove to you beyond a reasonable doubt that
15 the answer to this question ought to be yes?
16     A.  Yes.
17     Q.  Okay.  And if we prove to you that the answer
18 should be yes, would you be able to answer it yes
19 knowing that you've moved one step closer to giving
20 someone the death penalty?
21     A.  Yes.
22     Q.  Do you think that you could answer this
23 question yes just based on the facts of -- of a criminal
24 offense?  Do you think there's some criminal offense,
25 some capital murders, that would lead you to believe

96

1  that the answer to this question should be yes?
2      A.  Yes.
3      Q.  The facts of that case.
4          Just a couple of other quick things about
5  this Question No. 1 that the Judge is going to instruct
6  you; that if the jury answers this question no, the
7  Defendant's going to receive a life sentence, and the
8  trial is over at that point.
9          If the jury answers it no, if ten or more
10 jurors agree, the State must prove it beyond a
11 reasonable doubt before it could be answered yes, and if
12 it's answered yes, then the jury moves to consider that
13 second special issue that, by your nod, I see that
14 you're familiar with.
15     A.  Yes.
16     Q.  You're familiar with the process.
17         Okay.  We've been over that question, so
18 here's Special Issue No. 2, which I assume you've been
19 over too.
20     A.  Yes.
21     Q.  Okay.  You see -- you see what this question is
22 basically asking you?  It's basically saying, Whoa, wait
23 a minute here.  We're headed towards the death penalty,
24 but is there something here that makes a life sentence
25 more appropriate than a death penalty?

97

1   A.   Yes.

2   Q.   Do you have anything in mind right now that you
3   think might be something sufficiently mitigating to
4   warrant a life sentence rather than the death sentence?

5   A.   Well, I would think that the -- the events
6   leading up to the committing of the crime as well as the
7   behavior of the -- of the person that -- that supposedly
8   committed the crime would -- would play a part in -- in
9   my feeling about that -- about that -- answering that
10  question.

11  Q.   Okay.  Let me skip ahead a couple of slides
12  here.

13          I don't remember if this was in the packet
14  of instructions you received or not, this definition.

15  A.   I don't recall that.

16  Q.   Okay.  So mitigating evidence is evidence a
17  juror might regard as reducing the Defendant's moral
18  blameworthiness.

19  A.   Yeah.

20  Q.   I think from the answer you gave me a minute
21  ago, I think that even what -- whether you've seen this
22  definition or not, that's kind of how you understand
23  it --

24  A.   Yes.

25  Q.   -- the question.

98

1          So the -- this question has the word
2   "sufficient" in it.  So what -- why do you think that
3   word sufficient is in that question?

4   A.   Well, because sufficient is -- is a subjective
5   type of a -- of a decision that's based upon weighing
6   out the circumstances involved in -- in making the
7   decision, basically, if that makes sense.

8   Q.   That makes perfect sense to me.  Because right
9   up here you're being asked, Taking into consideration
10  all of the evidence, including the circumstances of the
11  offense, the Defendant's character and background and
12  the personal moral culpability of the Defendant, there
13  is a sufficient mitigating circumstance or
14  circumstances.

15          So you see where -- when this question was
16  written, it was contemplated that if there is some
17  mitigating circumstance or circumstances, it might be
18  enough in one case to say a life sentence is warranted,
19  but based upon the facts of another case, it might not
20  be sufficient in that case.

21  A.   I can understand that.

22  Q.   It's -- it's like you said, it's completely
23  subjective.  It depends on, first of all, what you think
24  might be a mitigating circumstance.  And the law does
25  not require you as a juror to consider any one

99

1   particular piece of evidence to be mitigating.  It's
2   just whatever you think.

3          One juror might think the fact that a
4   person was 18 years of age when they committed the
5   capital murder is in itself a mitigating circumstance
6   because the individual's young, they're immature, their
7   brain may not have completely formed yet giving them a
8   decent, moral compass like someone may have in their 30s
9   or 40s.

10  A.   Yes.

11  Q.   And another juror may say, well, that's not --
12  I don't think that's mitigating because he's old enough
13  to vote, he's old enough to serve in the Army, he's old
14  enough to do a lot of things, and, you know, the facts
15  in this case show me that -- that he knows what's going
16  on.  He knew -- he knew morally what he was doing was
17  wrong.

18          And it may be -- it may be that 18 years of
19  age excuses a guy in one -- in one set of facts and
20  doesn't excuse another guy in another set of facts.  You
21  see how that might work?

22  A.   Yes.

23  Q.   But whatever it is, the question only
24  contemplates that if you as a juror come across
25  something you find to be a mitigating factor, whatever

100

1   it might be, that you'd be able to give it effect and
2   vote the appropriate way on this -- on this question.

3   A.   Yes.

4   Q.   You see how that works?

5   A.   Yes.

6   Q.   It's kind of a failsafe question because you
7   found the guy guilty, which sends him towards the death
8   penalty; you found the answer to Question No. 1 should
9   be yes, that he's going to be a continuing threat to
10  society.  That sends him another step closer to the
11  death penalty, and this gives a jury a way to say, Wait
12  a minute, let's slow down just for a second and see if
13  there's something else here that warrants a life
14  sentence or the death penalty.

15          Tell you what, if I'm -- if I'm beating a
16  dead horse over here and you understand the concepts,
17  just -- just raise your right hand.  But I think, from
18  what I've seen, you're catching on to this a lot quicker
19  than most people have.

20  A.   Probably because I run through something like
21  this back a few years ago, so...

22  Q.   Is Missouri -- do you remember that -- if they
23  were similar in some of the concepts we've talked about?

24  A.   Yes.

25  Q.   Okay.  Okay.  Here's some further instructions

101

1  you receive on Question No. 2.  There's no burden of
2  proof on either side.  Remember up here -- well, up at
3  the top, it didn't say beyond a reasonable doubt?
4      A.  Right.
5      Q.  So no burden of proof.  Just whatever you think
6  as a juror based upon the facts.
7          If the jury answers the question no, the
8  deliberations are over, the jury returns a verdict
9  requiring the Judge to sentence a Defendant to the death
10 penalty, and everybody gets to go on their vacation.
11         You answer no only if you're unanimous.
12 Any vote that sends someone towards the death penalty
13 has to be unanimous.  On the other hand, you can answer
14 yes, there is a sufficient mitigating factor if ten or
15 more people agree.  Remember it's the same thing you
16 encountered on that previous question.
17     A.  Yes.
18     Q.  You can answer in the Defendant's favor if ten
19 or more people agree.  And if you answer it yes, a
20 sentence of life in prison is -- is imposed.
21         Knowing that a no answer to Question 2
22 would require the Judge to sentence someone to the death
23 penalty, would you be able to answer no if you felt like
24 that was the right answer under the facts of the case?
25     A.  Yes.

102

1      Q.  Is there any reason at all, whether we've
2  discussed it or not this morning, whether it's moral,
3  religious, ethical, whatever it might be that you would
4  not be able to be a part of a process that results in
5  the death penalty?
6      A.  No.
7      Q.  A little hesitation there.
8      A.  Well, because I see that I am qualifying myself
9  more and more.
10     Q.  Yeah, you are.  You're getting -- those --
11 that's the jury box over there.  Right now, you're --
12 you're about to take a seat over in the jury box.  How
13 does that make you feel?
14     A.  Sad.
15     Q.  Why is that?
16     A.  For the reasons I stated before about being a
17 part of a process that results in somebody dying.
18     Q.  Okay.  Well, we've talked about this for -- I
19 guess I've been rattling on here for about 40 minutes.
20 I mean, have your -- have your feelings changed as we've
21 gone through this?
22     A.  No.
23     Q.  You still -- still believe your -- you have the
24 ability to do it if you're called upon?  This is -- this
25 is really your last chance to tell me that there's --

1  that there's --
2      A.  I wish I could say something else besides what
3  I'm saying, but I'm telling you the truth.
4      Q.  Okay.  I'll take you at your word, then.
5  Thanks, Mr. Chapman.
6          MR. GILL:  That's all we have, Your Honor.
7          THE COURT:  Defense?
8              VOIR DIRE EXAMINATION
9  BY MR. MOORE:
10     Q.  Mr. Chapman, I'm Larry Moore.  Fred Cummings
11 and Pam Fernandez and I represent John in this case, and
12 I've had the opportunity to listen to what you and Mr.
13 Gill have talked about, but I want to take a few minutes
14 to visit with you about some of the same things, because
15 I doubt that it comes as a great surprise, I don't see
16 this the way Mr. Gill sees it.
17     A.  Right.
18     Q.  And it really doesn't make any difference
19 because neither of us is going to be in that jury box,
20 but you very well may.  And so it's important that --
21 that I understand how you feel.  Okay?
22         Because the way this process works is this
23 is a two-step process.  You decide how you feel about
24 your ability to serve, and then I get to excuse a
25 certain number of people from service, and so does Mr.

104

1  Gill for whatever reason.  So basically we kind of judge
2  how we feel about your answers.
3          So if I ask you questions you don't
4  understand or I need to explain something better to you,
5  please let me know.  You've obviously looked at this
6  stuff and understood quite a bit of it, and so far I
7  haven't noticed anything that I felt like was problems
8  for you.
9          I did want to ask you a question or two
10 about the questionnaire.  The company you work at, what
11 kind of -- is it a manufacturer, or what is that?
12     A.  Yes.
13     Q.  What kind of trailer components do they make?
14     A.  Trailer brakes.
15     Q.  Is it for like big trailers?
16     A.  Primarily recreation vehicles and horse
17 trailers, some agriculture.
18     Q.  Do y'all sell mainly to manufacturers?
19     A.  Distributors.
20     Q.  Distributors?
21         And you -- you worked there for a year and
22 a half.  Where -- where did you work before that?
23     A.  I -- prior to that, I -- I was a -- a software
24 consultant for accounting and manufacturing.
25     Q.  I'd like to change my job to what you want to

105

1  change yours to, retired and be a world traveler.  When
2  you find out how to do that, let me know.
3          Okay.  You got -- your wife, what is the
4  name of the company she works for?
5      A.  Expedx.
6      Q.  What is that?
7      A.  It's a paper distributing company.
8      Q.  Under the educational -- other educational
9  program, you indicated that you've got a concealed
10  handgun license?
11      A.  Yes, sir.
12      Q.  You also -- do you have a -- are you a licensed
13  CPA, or what is that -- there's something I can't -- I
14  couldn't read the first word.
15      A.  I -- I was licensed -- I was a licensed CPA at
16  one time.  I didn't keep up with it.
17      Q.  Okay.  You indicated that your -- you go to
18  Universal Christian Church and that that apparently is a
19  change in your religion because you indicated that you
20  were raised as an agnostic; is that correct?
21      A.  That's correct.
22      Q.  When did you -- when did you find Christ or
23  when did you become involved with the church?
24      A.  2005.
25      Q.  Was there any particular event that caused that

107

1  regarding the position that the Disciples of Christ
2  Church take --
3      A.  There probably is not an official position on
4  the Disciples of Christ.
5      Q.  You're not aware of any?
6      A.  No.
7      Q.  Okay.  Does your wife attend that church with
8  you?
9      A.  Yes.
10      Q.  Your involvement with the Sierra Club and the
11  Wilderness Society, what -- what motivates you to belong
12  to those organizations?
13      A.  Well, I -- as a younger person, I always liked
14  to go ahead and get out in the country and fish or -- or
15  camp or -- or hike or whatever, and -- and so I believe
16  that the -- that getting involved in those
17  environmentally-related organizations was an outgrowth
18  of the love that I have for the outdoors.
19      Q.  When you -- when you are going to Yellowstone,
20  are y'all going to camp out or are y'all going to stay
21  in the lodge --
22      A.  We're going to stay in the Old Faithful Inn.
23      Q.  Okay.  Have you ever been there before?
24      A.  Yes.  Several occasions.
25      Q.  Okay.  What kind motorcycle are you going to

106

1  to happen, or how did that change come about?
2      A.  Yes.  That -- that actually happened with a
3  client I had as a consultant at the time.  I was sitting
4  at her desk, and -- and she had a prayer sitting there,
5  and I thought it was a pretty cool prayer.  And so she
6  came back to her desk and asked me -- and I asked her
7  about it, I wanted a copy of it.
8          And she said, Well, what church do you go
9  to.  And I said, Well, I really don't go to church at
10  all, you know, except on maybe Christmas and, you know,
11  Easter, or something like that.
12          And she said, Really, well, I'm going --
13  I'm going to go home and pray about this, and then I'll
14  talk to you about -- tomorrow or the next day.  Okay.
15          So anyway, so she calls me -- she calls me
16  the next day, and she said, It came to me that -- that I
17  should -- I should try to go ahead and get you involved
18  on this Walk to Emmaus, okay, which is a -- it's really
19  a Methodist -- three days of intensive Christian
20  training, basically, to go ahead and get you into a
21  leadership role in the church, okay, or follow up with
22  your relationship with Christ and God.  And -- and so
23  she told me about that, and I decided to do that, and
24  that was the beginning of the change in me.
25      Q.  Are you aware, do you know, have any knowledge

108

1  ride up there?
2      A.  I've got a Harley Davidson Ultra Classic.  It's
3  the -- my wife will be on the back, you know, and we got
4  this -- you put saddle bags in the trunk, and, you know,
5  just -- and we're going to fill it up as much as we can
6  get in it and take off, so...
7      Q.  Good for you.
8          The time that you called the police, you
9  said there was animal abuse by a neighbor?
10      A.  Yes.
11      Q.  Tell me a little bit about what happened.
12      A.  Okay.  There is a -- a person that lives in
13  back of us that had two dogs that apparently they
14  recently got.  And, you know, that's fine because I have
15  three dogs myself, but they leave their dogs outside on
16  chains, and -- and the dogs get wrapped up in the chain
17  and then they can't get to water, they can't get to
18  food, and they make a lot of noise because they're very
19  uncomfortable.
20          And -- and I will go ahead and put up with
21  that to some extent.  Okay?  I'll give them -- okay,
22  well, they're -- they -- they're -- they stepped out for
23  a little bit, they'll be back and they'll take care of
24  it or whatever.  Okay?
25          But at some point, you know, like 11:30 at

109

1  night or something like that, when I'm trying to go
2  ahead and go to sleep and I've got a dog that's making
3  all kinds of noise right behind me, I say enough is
4  enough, and I came to that point.
5      Q.  Did -- did -- did the police respond, or did
6  animal control respond to the complaint?
7      A.  Within about ten minutes, the dog was not
8  making the noise anymore.
9      Q.  Okay.  Did you ever hear anything else about
10  it, or was there anything else done that you know of?
11     A.  No.
12     Q.  The dog still on a chain?
13     A.  Actually, I haven't seen the dog on a chain
14  since then.  I'm not -- I'm close to some of my
15  neighbors, but these are new people, and I'm not close
16  to them.
17     Q.  Do you live over there in TCU near the
18  church --
19     A.  No, I actually live on the east side in
20  Meadowbrook.
21     Q.  How did you get to the University Christian
22  Church?
23     A.  Well, my -- we got -- I got married in the
24  Disciples of Christ Church in St. Louis, and we had gone
25  to a few churches, you know, for like Christmas, like I

110

1  was saying, you know, once in a while, casual, and --
2  and TCU seemed to be the one that -- that we liked the
3  best, so...
4      Q.  Okay.  The -- the case up in St. Louis that
5  you -- you said that you had a lot of prior knowledge
6  about that, was it just from media reports, or did you
7  have some personal knowledge?
8      A.  Media.
9      Q.  So based on what you read in the media, that's
10  what gave you an opinion or gave you enough information
11  that you felt like you weren't qualified to serve as a
12  juror?
13     A.  I knew he was guilty, and I would have
14  convicted him and given him the death penalty.
15     Q.  Okay.  So what kind of case was it?  Do you
16  remember?
17     A.  The -- the specifics of the case?
18     Q.  Just the nature of the crime.
19     A.  Oh, he -- he robbed an elderly couple out in
20  the County in -- in a -- in a rural area and then burned
21  their house down to go ahead and try to cover up his
22  crime with his brother.  His brother was in on it, too.
23  So his brother actually testified against him in -- in a
24  plea-bargain arrangement to go ahead and get off of a
25  capital punishment.

111

1      Q.  Do you remember what kind of agreement they
2  made with him to testify?
3      A.  He would get life in prison rather than death.
4      Q.  Okay.  The car racing incident that you talked
5  about, was that here in Fort Worth?
6      A.  No, that was actually in St. Louis.
7      Q.  In regard to some of the questions regarding
8  capital punishment, I wanted to ask you about a couple
9  of your answers.
10         One of them was:  Are you generally in
11  favor of the death penalty as punishment for capital
12  murder?  You said, Yes, that there are people who would
13  do serious harm to others again and again, and they must
14  be stopped.  Do you remember that answer?
15     A.  Absolutely.
16     Q.  Do you think that everybody that is convicted
17  of capital murder has that propensity, or do you think
18  there may be some that do and some that don't?
19     A.  Some that do and some that don't.
20     Q.  Okay.  Depends on the particular individual?
21     A.  Yeah.
22     Q.  What -- in regard to a sentence of life in
23  prison without parole, you said that you're generally
24  opposed to that with few exceptions.  And then down here
25  on the explanation, you wrote, It depends on the facts

112

1  and the individual.  What were you thinking when you
2  wrote that?
3      A.  Well, you know, I felt like I was forced into
4  an answer that I really didn't -- that really wasn't
5  part of the choices on that particular thing because
6  I'm -- I'm really more in the middle as far as that
7  whole question goes, and you know, it just depends
8  completely on -- on the facts of the case.
9      Q.  Okay.  And I guess what -- you understand what
10  we're trying to find out is we -- we -- there are two
11  possible punishments for capital murder.  It's life
12  without parole and the death penalty.
13         And neither one of those punishments are
14  available in Texas for any other crime.  That's --
15  capital murder is the only crime for which either one of
16  them is a possibility.  And just based on the questions,
17  I wanted to make sure that you didn't feel like that one
18  was generally more appropriate than the other, that it
19  was kind of a fact basis.  Is that --
20     A.  Yes, that is the way I feel.
21     Q.  Okay.  Thank you.
22         You said that the situation with your son
23  involving his friend's ex-husband who sexually abused
24  his daughters, did you -- did I hear you correct when
25  you said that's about to resolve itself?

115

1    A.   Yes.

2    Q.   And in what way?

3    A.   He is about to be arrested.

4    Q.   Okay.  So there been an ongoing investigation

5    up to this point?

6    A.   Yes.  The holdup was that one of the sexually

7    abused girls was not going to go ahead and reveal the

8    facts on -- to anybody but her psychiatrist, and so that

9    finally happened, and that's what put everything in

10   motion to end it, so...

11   Q.   Okay.  Is this the son that's going to go up

12   to --

13   A.   Yes.

14   Q.   -- Yellowstone with you?

15   A.   Yes.

16   Q.   The friend -- this friend of his, is it his

17   girlfriend?

18   A.   Yes.

19   Q.   Okay.  And this is her ex-husband?

20   A.   Yes.

21   Q.   Abused the children.

22        You indicated that you may know somebody by

23   the name of Jason Campbell.

24   A.   The name rings a bell, but I'm not sure it's

25   the same Jason Campbell.

114

1    Q.   Would it have been somebody that lives here or

2    somebody that lives someplace else?

3    A.   In the Fort Worth or Dallas area.

4    Q.   Okay.  What would that person be?  You know --

5    the Jason Campbell you know, do you have any idea what

6    he does?

7    A.   Well, he was -- he was involved in an Irish

8    dance school that my daughter was in.

9    Q.   I'm not sure it's the same one.  This is -- I

10   think it's a Marine.

11        Okay.  Let me talk to you -- some of this

12   you've gone over, and I want to make sure that I

13   understand it all.  Murder has got a pretty simple

14   definition.  You knowingly cause another person's death

15   without any kind of legal justification or excuse,

16   that's murder.

17        Because the law recognizes there's some

18   circumstances under which I can cause the death, do it

19   knowingly, but I'm not held criminally responsible.

20   Self-defense, defense of a third person, if I'm legally

21   insane --

22        THE REPORTER:  I'm sorry.  I'm having a

23   hard time hearing you.

24        MR. MOORE:  I'm sorry.  I'm trailing off.

25   I'll try to do better.

113

1    Q.   (BY MR. MOORE)  So this presumes that there is

2    no legal justification.  Okay?  And it can be any

3    manner and means that they want to allege.  They just

4    got to allege it and prove it.

5        If you're found guilty of murder in Texas,

6    the range of punishment is from 5 years to 99 years or

7    life, and I noticed when you talked to Mr. Gill -- I

8    don't remember exactly the word -- you said you have

9    some reservation or some hesitancy about the --

10   A.   The low end.

11   Q.   The low end.  What were you thinking or what do

12   you mean?

13   A.   Well, it seems to me that five years is kind of

14   a capricious -- I guess, would be the word that I'd use

15   for the low end.  I feel like, you know, if -- let's say

16   that -- that -- that the person's moral character or,

17   you know, mitigating circumstances were extreme in this

18   case, okay, and -- and granted, okay, you know, the

19   answer to that -- that first question to go ahead and

20   determine, you know, if they were going to be a

21   continuing, you know, problem or not, okay, would be

22   yes.  Okay.

23        Well, maybe -- maybe, you know, there's --

24   there's something else, okay, that's going on here that

25   that would -- that -- that would -- that would change

116

1    the -- the -- you know, the seriousness or -- or the --

2    or, you know -- or the consequences of -- of -- of -- of

3    what might happen in the future or -- or -- or

4    immediately, then -- if that makes sense.  I -- I'm

5    thinking that, you know, five years might be too much,

6    okay, for extreme -- you know, an extreme case of, you

7    know, mitigating circumstances.

8    Q.   Okay.  And we don't exactly -- there's

9    obviously -- in any case there could be mitigating

10   circumstances.

11        I don't know that we actually explained to

12   you.  There's -- the punishment phase of a case that is

13   not a capital murder case is a little bit different.

14   Each side gets to present evidence, but when the jury

15   goes out, they're not asked to answer questions.

16   They're asked to come up with a number, whether it's 5,

17   10, 15?

18   A.   Or 99.

19   Q.   Yeah.  They just pick a number that they feel

20   is appropriate based on everything they've heard.  It's

21   only when somebody's convicted of capital murder that we

22   use the special issues.

23   A.   That's right.  That's right.  I remember.

24   Q.   But -- but it's -- the theory's the same.

25   Mitigating evidence is admissible at the -- at a murder

119

1   case just like it is a capital murder case.  And the
2   jury gives it whatever weight that they want to give it
3   in making their decision.
4           Okay.  Capital murder is a little bit
5   different.  This one is -- he's the technical man
6   (indicating).
7           MR. CUMMINGS:  If I can get you to punch a
8   button.
9           MR. MOORE:  That's five buttons, is the
10  problem.
11      Q.  (BY MR. MOORE)  Okay.  Elements are the facts
12  that are required to be proven under the Penal Code.
13  Okay?  And -- and there's several different ways to
14  commit capital murder in Texas, but the way that we
15  allege in -- that you allege in this Indictment is
16  what's on that little chart up there.  And that's what
17  they got to prove in order to convict somebody of any of
18  it.
19      A.  Yeah.
20      Q.  Okay.  And there may well be a situation where
21  they could prove that there were two knowing murders,
22  but there may be some question in the juror's mind as to
23  whether it was a single criminal transaction, okay,
24  because there's no legal definition of that.
25      A.  Of a single transaction.

118

1   Q.  Uh-huh.  Some people feel like it means a
2   single criminal act, like placing the bomb in Oklahoma
3   City killed more than one person.
4           Some people may see something different
5   than that to be encompassed in what constitutes a single
6   criminal transaction, but it's an individual decision
7   you make.
8           And it's not envisioned that the jury will
9   go back there and say, okay, let's come up with a common
10  definition of the term because it's left to your
11  understanding.  Any term that's not legally defined is
12  left to your common understanding of the term.  You see
13  how that works?
14      A.  Yes.
15      Q.  So the guy sitting next to you may say, okay,
16  that means one act, setting off the bomb, killing more
17  than one person.  You may say, No, it means more to me
18  than that.  But that's not a problem because each of you
19  has to judge it based on your own understanding and your
20  own conscience.  You see how that works?
21      A.  Yes.
22      Q.  If -- so there well could be, you know, the
23  fact that the jury find there was a murder and murder,
24  but it's not a capital murder, and that's how we get to
25  the lesser offense.  You see how that works?

120

1   A.  Yeah.
2   Q.  Did you ask a question during the panel voir
3   dire about lesser-included offenses?
4   A.  Yes.
5   Q.  That's what I thought.  And that's how we get
6   there because the jury may well find -- or they may find
7   there's not a knowing killing.
8   A.  Actually, the question was somewhat answered
9   but not really answered that I asked.
10  Q.  Okay.  We -- we punish homicides in Texas based
11  on the state of mind of the Defendant.  Okay?  And in
12  order for it to be a murder, it has to be a knowing or
13  intentional murder, which are legally defined.
14          If I'm driving a hundred miles an hour down
15  a city street and a kid runs out in front of my car and
16  I run him over and kill him, I may not have been
17  reasonably certain that my conduct was going to cause
18  the death because I didn't even know he was there until
19  he ran out.  You see what I mean?
20          So that may not be a murder, but I very
21  well might have been reckless or negligent the way I was
22  driving.  It would still be homicide, but just a
23  different homicide.
24  A.  Yes.
25  Q.  You see how that works?

1   A.  Yes.
2   Q.  Does that answer your question about lesser
3   offenses or how we get there or how they might come up?
4   A.  Partially.  The -- the question that -- that I
5   really need to have a better understanding about is, you
6   know, there's this -- there's this 99 years at the
7   maximum possible, you know, punishment for murder, okay,
8   and -- and then there's life in prison as a possibility,
9   too.  Okay?
10          And I'm -- I'm having problems
11  understanding exactly what is life in prison versus, you
12  know, some period of years that would take him, you
13  know, beyond just passing away anyway.  I -- I don't
14  know what life in prison really means.
15  Q.  It's different for capital murder than it is
16  for murder.  If -- for murder -- you find somebody
17  guilty of murder and he gets life in prison, the real
18  difference comes in his parole -- in regard to parole.
19  A.  Okay.  That's the answer I need.
20  Q.  You can never discharge a life sentence.  You
21  can parole it, but you can never discharge it.
22  A.  That's exactly the answer I wanted to have.
23  Q.  It's conceivable, I guess, if you were young
24  enough and you live long enough, you could discharge a
25  99-year sentence theoretically so that you wouldn't be

121

123

1 paroled. If you ever got paroled for murder, you would
2 be on parole for life.
3    A.  Yeah.
4    Q.  Now, with capital murder, parole is not even a
5 consideration, not a possibility.
6    A.  Right.
7    Q.  You get convicted of that, you die in prison,
8 and they -- your body -- if your family's still around,
9 wants to come claim your body, they can. If not, you're
10 buried there in the prison cemetery. Okay?
11    A.  Okay.
12    Q.  All right. I'm glad we cleared that up. I
13 remembered that from the other day.
14       It's only when you're convicted of capital
15 murder that we get to the special issues. This is --
16 this is the first question, and these questions are the
17 way that we distinguish who gets life and who gets
18 death. Okay?
19       And the presumption is that not everyone
20 that's convicted of capital murder is going to be given
21 the death penalty. If -- if that was the way they
22 wanted to write the statute, the Legislature could have
23 done that. You do these things, and the death penalty
24 results. But that's not what they did.
25       What they said is, okay, if you're guilty

1 there's -- the jury would get a legal definition of the
2 term "preponderance of the evidence" because if I -- I
3 have the burden to prove my claim by a preponderance of
4 the evidence. It's the greater weight and degree of the
5 credible evidence, is the legal definition.
6       So civil lawyers like to talk about the
7 scales of justice. The feather hits one side of the
8 scale, I'm entitled to a verdict. Okay?
9       Beyond a reasonable doubt is more than
10 that. If the State seeks to go in and take a child away
11 from a parent, claiming that that parent is unfit, there
12 is a legal burden in the law called clear and convincing
13 evidence, and that's got a legal definition. I can't
14 remember if Mr. Cummings told it to y'all or not during
15 that panel discussion, but it is the degree of proof
16 that would be necessary to create a firm conviction or
17 belief as to the truth of the matter asserted in the
18 mind of the trier of fact. So it would have to be
19 sufficient to have that firm conviction or belief that
20 the parent was unfit.
21       Proof beyond a reasonable doubt is more
22 than that, and it's beyond all reasonable doubt. And I
23 guess the -- the presumption is that there may be some
24 doubts that are unreasonable. Little green martians
25 came down and made me do it. I mean, that's not a

122

124

1 of capital murder, there's two punishments, and how we
2 decide who gets life or death is in the answers to these
3 two questions.
4       And I think the theory is -- let's -- this
5 is the way we're going to narrow down. Of all the
6 people that are convicted of capital murder, this is how
7 we're going to narrow them down to those people that
8 actually get death.
9       Because if it didn't -- if there wasn't
10 some function like that, questions would kind of be
11 meaningless. You see what I mean?
12       And they carry a burden into the punishment
13 phase in regard to that question. They've got to prove
14 guilt beyond a reasonable doubt, and then they've got to
15 answer -- prove that the answer to this question should
16 be yes beyond a reasonable doubt. And -- and beyond a
17 reasonable doubt is not defined for you. Okay? And you
18 understand that that's the degree of certainty or proof,
19 or whatever you want to call it, that is going to take
20 to convince you of somebody's guilt or convince you that
21 the answer should be yes. You see how that works?
22    A.  Yes.
23    Q.  Now, it doesn't -- it doesn't make much sense,
24 but a lesser -- some lesser burdens of proof in the law
25 have a legal definition. If I sue you in a civil court,

1 reasonable -- that's not a doubt based on reason and
2 common sense.
3       And so I -- you know, it's not beyond all
4 doubt, but that is beyond all reasonable doubt. You see
5 what I mean? You see how we get there? Do you have any
6 questions about that?
7    A.  No. That would -- it would just open up the --
8 the possibility that there could be some -- some
9 reasonable doubt. I mean, not some reasonable, but some
10 doubt, okay, that --
11    Q.  There could be some doubt, but it's got to be
12 basically an unreasonable doubt because if there's
13 any -- if it's a doubt that you presume to be
14 reasonable, then that's not -- you don't answer that
15 question. You see what I mean? You make that
16 distinction --
17    A.  Yeah.
18    Q.  -- what's reasonable --
19       THE REPORTER:  I'm sorry.
20    Q.  I'm -- we're -- we can't both talk at the same
21 time.
22    A.  Sorry about that.
23    Q.  You make the decision as to whether it's a
24 reasonable doubt or an unreasonable doubt.
25    A.  Yes.

125

1   Q.   Because they got to get by every reasonable
2   doubt, and we're just -- what the other -- the Chicken
3   Little, the sky is falling kind of doubt.  You see what
4   I mean?  You have a question?
5   A.   Yes, I understand.
6   Q.   Okay.
7   A.   I was thinking.
8   Q.   And they've got to prove, as he sits there in
9   court the day the question's asked, that that
10  probability exists.  And -- and Mr. Gill asked you a
11  question.  You know, he talked to you about that they --
12  the Legislature chose that term as a term -- as opposed
13  to any other term.
14          And it specifically -- he specifically
15  asked you if you saw a distinction or a difference in
16  the terms "possibility" and "probability," okay, and I
17  believe you said you did.
18  A.   Yes.
19  Q.   Is that right?
20          What's the distinction that you see?
21  A.   Probability is -- possible and probable are two
22  different ideas.  Probable -- probable means that --
23  that there's probably a greater chance of -- of it being
24  true than not, okay; whereas, possible means, well,
25  there's no -- there's no judgment that you could make

126

1   about how -- about whether or not it really -- it's a 90
2   percent chance or a 10 percent chance.
3   Q.   Sure.
4   A.   Yeah, so...
5   Q.   Within the scheme of the world, that's
6   something that could occur.
7   A.   Yeah.
8   Q.   But in terms of putting a number on it or
9   anything else, I guess probable -- what you're telling
10  me, probability denotes a greater degree of likelihood
11  that it would occur than a possibility?
12  A.   Yes.
13  Q.   Okay.  And I think that's what the Legislature
14  intended, that, you know, they've got to prove that this
15  probability exists.  And it's not just that the person
16  would be a bad person or that he would be unpleasant or
17  hard to get along with.  It's that he would do specific
18  things, that he would commit criminal acts of violence
19  in the future and that those criminal acts of violence,
20  by whatever you take that to mean -- I think you said
21  assaults or something like that -- would be sufficient
22  to, in your mind, constitute him as a threat to society.
23  Because that's required in order for you to answer the
24  question yes.  Okay?
25  A.   Yes.

127

1   Q.   Now, the kind of proof and the degree of proof
2   that it would be necessary to convince you beyond a
3   reasonable doubt that that probability exists is up to
4   you.  Some jurors look at that and say, okay, you're
5   asking me to predict future conduct; and in order for me
6   to get to that point, you're going to have to show me a
7   history of repeated conduct.  Okay?
8          Other jurors may not require that, and
9   that's up to the jurors.  You -- you decide.
10          You indicated to Mr. Gill that there were
11  some circumstances or that -- I can't remember exactly
12  how he put it -- that you thought in some cases the
13  actual facts of the case might be sufficient to provide
14  the answer to Question 1, am I --
15  A.   That's correct.
16  Q.   -- paraphrasing you correctly?
17  A.   Yes.
18  Q.   All right.  I did not take that to mean that
19  you thought in all instances where you found someone
20  guilty of capital murder, you would find that the answer
21  should be yes; is that correct?
22  A.   That's correct.
23  Q.   Okay.  Some facts may be so profound that it
24  tells you everything that you need to know about the
25  person to find them to be a threat.  Am I understanding

128

1   that correctly?
2   A.   Yes.
3   Q.   Okay.  In other cases it may not be.  I mean,
4   that's up to you to decide.
5   A.   Right.
6   Q.   And the type and character of evidence that it
7   would take to convince you in your mind to that degree
8   of satisfaction is up to you.  And it may be different
9   for the guy sitting next to you in the jury box, and
10  that's completely okay.  Any questions about that?
11  A.   No.
12  Q.   All right.  It's only when Question 1 is
13  answered yes that Question 2 even becomes an issue.  If
14  it's answered no, we go home.  10/2, you answer question
15  no, no -- I mean, Question 1 no -- we've done this a
16  while.  I apologize.  My words are running together.
17          It takes 12 answers to answer it yes.  Do
18  you have any thought of what happens if it's 6 to 6?
19  A.   Well, I guess you do some more deliberating or
20  you -- you're a hung jury, I guess, would be a
21  possibility.
22  Q.   There is a process by which you certify to the
23  Court that you can't reach a verdict.  You'd probably
24  get an instruction to go back and consider and
25  deliberate some more, if you could, but you'd also be

129

1  instructed you don't violate your -- your individual
2  conscience just in order to get a verdict.  Okay?
3      A.  Okay.
4      Q.  Okay.  Because I can't think of anything more
5  unfair to you or to the Defendant.  You have to be
6  convinced in your own heart and soul that's the right
7  thing to do before you vote either way.  If you just
8  can't get there, you can't get there.  The jury's
9  discharged, and that's the end of their service.
10         And you understand, I take it, that it
11  takes 12 people to get past that first question answered
12  yes.  So you see how one person has the ability, if they
13  answer that question no, to ensure that there's not
14  going to be a death sentence.  You see what I mean?
15      A.  Yes.
16      Q.  It's a collective judgment.  It can be a
17  collective judgment, but each person votes their
18  independent conscience.  Any -- any problem with that?
19      A.  No.
20      Q.  Okay.  Question 2 is a little bit different
21  because there's no burden of proof in regard to Question
22  2.  And it's presumed that the evidence of mitigation
23  can come from anywhere in the trial.  It can be
24  circumstances surrounding the commission of the crime.
25  It can be circumstances regarding the -- his character,

130

1  his background.
2         There is no requirement that the mitigating
3  circumstances have a direct bearing on the way or the
4  manner in which the crime was committed.  Okay?  It can
5  be independent of that.
6         And let me give you an example.  If
7  somebody is on trial for a particular offense and in
8  his -- in the past prior to that, you know, he served
9  his country at war or he did some great act of kindness
10  to other people or he rushed into a fire and then saved
11  a -- you know, an elderly person, or whatever it may be,
12  that act may have actually no connection to the
13  commission of the crime, but it's an act that the jury
14  can look at and decide, do I feel like that's a
15  mitigating circumstance that I ought to give weight and
16  consider in making this decision.  Okay?
17      A.  Yes.
18      Q.  Do you have any problem with that idea?
19      A.  No.
20      Q.  Okay.  And there's no limitation on what it can
21  be.  For some people it could be artistic talent or
22  music ability or anything else.  It's just if there's
23  something about this individual that tells me that a
24  life without parole is enough.  He can die in the
25  penitentiary for however long it takes is enough

131

1  punishment for this crime.  You see what I mean?
2      A.  Yes.
3      Q.  And you don't have to be able to even enunciate
4  what that circumstance is.  For you it's a -- it's a
5  moral decision that you make, and you don't have to be
6  able to catch it and paint it red and hold it in your
7  hand.  It's just how you feel about it.
8         There can be ten different jurors vote to
9  answer this question no based on ten different
10  circumstances, because what's important to you may not
11  be important to the next guy.  You see how that works?
12      A.  Yeah.
13      Q.  I think that's also probably why there's no
14  burden in regard to the question because how do I prove
15  a mitigating circumstance when it's up to you as to
16  what's mitigating?
17      A.  Right.
18      Q.  One of the things that's -- that's bothersome
19  to me is that question -- that the way they worded the
20  question, it says, Is there a sufficient mitigating
21  circumstance.  Sometimes jurors look at that and say,
22  okay, well, they're going to have to convince me of the
23  sufficiency of the mitigating circumstance, and it's not
24  envisioned that that would be the case.  Okay?
25      A.  Right.

132

1      Q.  You see what I mean?
2         You just -- you judge it and you weigh it
3  how you weigh it, but basically in looking at the
4  complete testimony that you've heard and everything that
5  you know, you make that determination in your own mind
6  as to whether or not the death penalty or a life
7  sentence is appropriate.  Any questions about that?
8      A.  No.
9      Q.  Does that system make sense to you?
10      A.  Yes.
11      Q.  It's intended to give the jurors some guidance
12  in how to weigh the evidence, and how successful it is
13  depends on the jury.  Okay?
14         If the jury answers the question no, it's a
15  life sentence.  If they answer it yes, it's a death
16  sentence.
17         Anything that we've talked about that you
18  have any questions about at this point?
19      A.  No.
20      Q.  Okay.  Is there anything about this process --
21  and sometimes I get concerned because we've been sitting
22  here for 30, 40 minutes talking about the death penalty,
23  life without parole and all this other stuff.  Anything
24  about anything regarding this process or what we've done
25  up to this point that makes you think this guy is guilty

133

1   of anything?
2       A.   That makes me think what?
3       Q.   That John may be guilty of anything?
4       A.   I have no idea about that.
5       Q.   And that's the way that it's supposed to be.  I
6   just get concerned because we've got to talk about
7   everything now, or we don't get to talk about it later.
8       A.   Right.
9       Q.   And sometimes I feel like we're kind of putting
10  the cart in front of the horse in that regard and we're
11  talking about issues that may or may not ever come into
12  play.
13           Have you got any questions for me?
14      A.   Not that I can think of.
15      Q.   We appreciate your time.  Thank you very much,
16  Mr. Chapman.
17           MR. MOORE:  I'll pass the juror.
18           THE COURT:  All right, Mr. Chapman.  If
19  you'll have a seat out in the front hallway, we'll call
20  you back in in just a few minutes.
21           (Prospective juror exits courtroom)
22           THE COURT:  State, challenge for cause?
23           MR. GILL:  No, Your Honor.
24           THE COURT:  Defense?
25           MR. MOORE:  We have none, Your Honor.

134

1            THE COURT:  State, exercise a peremptory?
2            MR. GILL:  May we have a minute, Your
3   Honor?
4            THE COURT:  Sure.
5            (Pause in proceedings)
6            THE COURT:  I asked if the State wished to
7   exercise a peremptory.
8            MR. GILL:  We do not.
9            MR. MOORE:  We don't either.  We'll accept
10  him.
11           THE COURT:  Okay.  Will you bring him back
12  in and have him come up and sit in the chair.
13           THE BAILIFF:  Yes, ma'am.
14           (Prospective juror enters courtroom)
15           THE COURT:  Mr. Chapman, you are Juror No.
16  6 in the case of the State of Texas versus John William
17  Hummel.  I need to administer an oath to you as a juror.
18  You will be sworn in again once all 12 of you have been
19  assembled as a group, so if you'll raise your right
20  hand, please.
21           (Prospective Juror Sworn)
22           THE COURT:  I know that you have with you
23  your instructions that you were given in this case, but
24  I'm going to repeat several of those with you.
25           Do not ask anyone about the law applicable

135

1   to this case or research the law or the case on your
2   own.  Do not discuss the case with anyone.  It is most
3   important that you not discuss the case with anyone,
4   conduct Internet research or read or listen to any media
5   report about the case.
6            You may not receive information about this
7   case from any other source other than what you are
8   presented in the courtroom concerning the case.  That
9   means to not Google or search any party or lawyer or
10  court personnel in this case.
11           Do not conduct any research whatsoever on
12  the Internet about the case or the parties or facts
13  involved in it.  You may not write or blog about the
14  case, events surrounding the case or your jury service.
15  You may not Tweet about the parties, events or facts in
16  this case or your jury service on this case.
17           Do not send e-mail communication to anyone
18  conveying your jury experience or information about this
19  case.  At any time you are not to use your cell phone to
20  ask anyone questions about this case, report facts on
21  this case or research the case.
22           You may not use Facebook, MySpace, LinkedIn
23  YouTube, Twitter or any other social network on the
24  Internet to discuss your jury service or issues in this
25  case or people involved in this case or to research

136

1   persons involved in this case.
2            You have been given a trial date of Monday,
3   June 13th.  You will need to report at 9:00 o'clock that
4   morning to the 437 -- 432nd District Court, which is
5   located on the 6th floor of this building where you had
6   your minipanel interview.  Okay?
7            If anything changes about this date, that
8   date, the Court will notify you, but right now I
9   anticipate that that date will remain the same.  Okay?
10           PROSPECTIVE JUROR:  Okay.
11           THE COURT:  Do you have any questions?
12           PROSPECTIVE JUROR:  No.
13           THE COURT:  Okay.  All right.  Then you're
14  excused until then, and we'll see you back at that time.
15  Okay?  Thank you very much.
16           (Juror exits courtroom)
17           THE COURT:  1:00 o'clock.
18           (Recess from 12:04 p.m. to 1:01 p.m.)
19           (Open court, Defendant present)
20           (Prospective juror enters courtroom)
21           THE COURT:  How are you?
22           PROSPECTIVE JUROR:  Just fine.
23           THE COURT:  Good.  You are Potential Juror
24  No. 53, Scott Owen Smiley, and I need to swear you in
25  for purposes of this afternoon's proceedings.  If you'll

139

1  raise your right hand.

2       (Prospective juror sworn)

3       THE COURT:  You filled out this jury

4  questionnaire several weeks ago now.  Has anything

5  changed substantially that you need to let us know

6  about?

7            PROSPECTIVE JUROR:  No, nothing I can think

8  of.

9       THE COURT:  Okay.  And we discussed

10  scheduling when you were here for the minipanel.  Has

11  anything changed regarding your schedule?

12            PROSPECTIVE JUROR:  Other than just it's

13  hard to miss two weeks of work, but...

14       THE COURT:  Okay.  All right.  Let me just

15  tell you a little bit about the procedure this

16  afternoon.  Obviously, this is individual voir dire, so

17  you are in the hot seat.  Both sides are going to have

18  an opportunity to talk to you this afternoon about some

19  information in your jury questionnaire as well as the

20  death penalty issues in this case.

21            You'll recall that John William Hummel is

22  on trial and that he's represented by Fred Cummings,

23  Larry Moore and Pamela Fernandez; and that the State is

24  represented by Robert Gill and Miles Brissette.  Okay?

25            Because the State has the burden of proof,

1       Q.  And you got your --

2       A.  Until I graduated.

3       Q.  You have your engineering degree?

4       A.  Yeah.

5       Q.  You've also lived, it looks like, in Florida,

6  Kansas and Colorado.  Which -- which have you liked best

7  so far?

8       A.  I call Texas home now.  Been here -- been here

9  a long time.  Each -- each of those places has some

10  positive things.

11       Q.  And the name of your current place of

12  employment?

13       A.  Archer Western Contractors.

14       Q.  Is that a private company or --

15       A.  It's a private company owned by two brothers,

16  Matt and Dan Walsh, from Chicago, Illinois.

17       Q.  How big a company is it?

18       A.  We do $4 billion worth of construction

19  annually.  Pretty big.  We're like number ten in the

20  Engineering News Record top 400 contractors.

21       Q.  So are there offices throughout the U.S. then?

22       A.  Around 14 offices throughout the U.S.

23       Q.  You do any international work?

24       A.  They just started last year.  We've got a

25  little work in Puerto Rico.

138

1  they get to go first.

2            With that, you may proceed.

3       MR. BRISSETTE:  Thank you.

4            SCOTT OWEN SMILEY,

5  a prospective juror, having been first duly sworn,

6  testified as follows:

7            VOIR DIRE EXAMINATION

8  BY MR. BRISSETTE:

9       Q.  Good afternoon, sir.  How are you?

10       A.  Just fine.

11       Q.  My name is Miles Brissette.  This is Bob Gill.

12  We're the prosecutors that have been assigned by Mr.

13  Shannon's office to prosecute the case involving Mr.

14  Hummel, who's seated over here with his three attorneys.

15            Want to go through a little bit -- we have

16  your questionnaire.  Want to start -- how did you come

17  from Iowa to Texas?

18       A.  Had to go to where the work was.

19       Q.  Okay.  Had -- prior to going to Iowa State, had

20  you done construction growing up, high school job, stuff

21  like that?

22       A.  My father was a contractor in Iowa, so I worked

23  for him and was a member of the labor union in Iowa,

24  worked on several projects in Iowa before I went to

25  college and then on the summers.

140

1       Q.  As a program manager, do you supervise any

2  individuals?

3       A.  I've got -- I work with estimating staff, and

4  then I have five project managers that I work with, and

5  then I oversee about 30 construction projects in the --

6  in the state of Texas from -- from here to down to San

7  Antonio.

8       Q.  Spend a lot of time in your pickup truck then?

9       A.  No, most project managers get to do that.  I'm

10  in the office most of the time chasing new projects and

11  dealing with issues on current projects.

12       Q.  You indicated in your questionnaire that some

13  owners and engineers that just aren't -- aren't as

14  committed to the project are what you don't like about

15  the job the most.

16       A.  Yeah.  They can be a challenge sometimes.  To

17  build a construction project, it really takes strong

18  people from all three sides, and when you get a weakness

19  on one side, sort of think of it as a three-legged

20  stool.  When there's one leg that's weak, the thing sort

21  of tends to teeter over.

22            You know, we need the owner to make

23  decisions.  We need the engineer to provide the right

24  design to make the decisions, and as a contractor,

25  need to take care of it through (sic) and do -- do our

**141**

1  part of the project also.
2      Q.  And your wife works for Sabre Holdings; is that
3  correct?
4      A.  Yeah.
5      Q.  And she's a financial accountant for them?
6      A.  Yes.
7      Q.  And your two children, your daughter and your
8  son, do they live here in the Metroplex as well?
9      A.  Yeah, my daughter lives in North Richland
10  Hills, and my son still lives with us in Southlake.
11      Q.  Is your daughter married?
12      A.  No.
13      Q.  You've had an occasion to, I guess, be
14  involved, from what I could gather from this, two
15  different trials.  One where your -- your friend was on
16  trial?
17      A.  Right.
18      Q.  And one that you were a juror in the case?
19      A.  That's correct.
20      Q.  All right.  So let's take the one where you
21  were -- your friend was on trial.  Can you tell me a
22  little bit about that case?
23      A.  There's a couple that worked at the same
24  company as I at E.B. Construction, the previous employer
25  here in Texas.  And it was a couple that -- I worked

**142**

1  with him at the company on different projects, never
2  really on the same project, but knew each other there.
3              And we had gotten close to them, went and
4  did things with them on weekends, went -- went to
5  dinners, went boating, went on vacations.  And it ended
6  up that he was shot and killed, and she was charged with
7  his murder.  And she was found guilty, and she's in
8  Gatesville prison right now.
9      Q.  Was that a murder that took place here in
10  Tarrant County?
11      A.  Yeah, in Tarrant County and North Richland
12  Hills in 1994.
13      Q.  All right.  Little bit before my time at the
14  D.A.'s Office here, but certainly it's the same office.
15  Mr. Curry was in charge back then, and he's since
16  passed, and Mr. Shannon has the reins now.
17              But it's the Tarrant County D.A.'s Office.
18  Any ill will towards Bob or I, the fact that we work at
19  the same prosecutor's office back in 1994?  I know you
20  indicated in your questionnaire, wrongly convicted your
21  friend.
22      A.  No.
23      Q.  Why do you think she was wrongly convicted for
24  the murder?
25      A.  Well, I guess first off, we weren't allowed to

**143**

1  attend the trial because we were potential witnesses, so
2  I guess we didn't get to hear all the testimony or what
3  came out in the trial.  So, you know, I guess we just
4  have that -- that he's gone and he can't speak to his
5  side of the story, and all we've got to listen to then
6  is her side of the story.
7      Q.  And what was her side of the story?
8      A.  She says that some -- that three guys had broke
9  into the house and shot him and made it look like she
10  had did it.
11      Q.  Do you remember -- what was her full name?  Do
12  you know?
13      A.  Diane Carlson.  I don't recall her middle name.
14      Q.  Okay.  Did you ever have a chance, if you were
15  a witness on the case, were you going to be a witness
16  for the State or the Defense?
17      A.  I don't remember which side it was.  I just
18  know we weren't allowed to attend.
19      Q.  Did you ever meet with any of the prosecutors
20  in the case?
21      A.  Yes.
22      Q.  And what was your take on that when you met
23  with the prosecutors?
24      A.  I guess our first impression was that we felt
25  that they had made up their mind and weren't looking at

**144**

1  her side of the story and were just looking to convict
2  her for the murder.
3      Q.  So, once again, I circle back to that question.
4  You know, my oath is to see that justice is done.  All
5  right?  That's the oath of a prosecutor in the State of
6  Texas.  You understand that's what Bob and I have to do
7  in this particular case?
8      A.  Yes.
9      Q.  It appears that your friend's experience with
10  the justice system still weighs on you?
11      A.  That's true.
12      Q.  At this point all you're required to do in a
13  case is to take the oath that Judge Berry just gave you
14  to tell the truth.
15              If you're selected as a juror, you're going
16  to have to take an oath to render a verdict based on the
17  law and the evidence.
18              Any of the experiences with Ms. Carlson's
19  case, the fact that she's in Gatesville now, does that
20  weigh on your mind when you look at somebody else that's
21  facing a homicide charge?
22      A.  Well, I mean, it's -- it's there.  We try to be
23  fair in this case.
24      Q.  And the law anticipates that people from time
25  to time will have issues they believe strongly in, and

1  if you believe in something so strongly that you can't
2  take the oath, now is the time to tell us because if --
3  if you're quiet, in about an hour and a half or so, you
4  may know if you're a juror on the case. And then it's
5  too late because you understand both sides are entitled
6  to have a fair trial in the case, right?
7      A.  Yes, I understand that.
8      Q.  Do you think the -- the experience with Ms.
9  Carlson and her incarceration in Gatesville would rise
10  to a level where you would be distracted or it would
11  cause you to sway your judgment one way or the other in
12  future criminal proceedings such as this?
13      A.  I guess -- I'd say I'm more concerned of what I
14  had in my other legal experience on being on a jury
15  before where I came away from that feeling we weren't
16  given all the information, that we were always asked to
17  leave the room and didn't know what was going on.
18      Q.  Okay. So let's switch gears to that. You were
19  on jury duty for a -- what type of case again?
20      A.  It was a rape.
21      Q.  Sexual assault case?
22      A.  Or incest, stepfather and daughter.
23      Q.  That was back in 1996?
24      A.  Yes.
25      Q.  Do you remember what court it was in?

1      A.  It was in this building. I don't know which
2  specific court.
3      Q.  And listed in your questionnaire to Answer 90,
4  It felt like the jury was not given all the information
5  on the case. We had to leave the room many times. The
6  Judge would not answer questions.
7          MR. CUMMINGS: Your Honor, I need to take
8  up something outside the presence of the venireman.
9          THE COURT: Okay. Mr. Smiley, if you'll
10  have a seat out in the hallway, we're going to call you
11  back in in just a few minutes.
12          (Prospective juror exits courtroom)
13          MR. CUMMINGS: Your Honor, I made the State
14  aware. We can agree to dismiss this juror. As it turns
15  out, Mr. Moore represents Diane Smiley on a writ.
16          MR. MOORE: Diane Carlson.
17          MR. CUMMINGS: Diane Carlson, I'm sorry.
18  Mr. Smiley's friend.
19          MR. MOORE: It hadn't been filed yet, but I
20  have represented her for awhile in the process of doing
21  a writ.
22          MR. CUMMINGS: So I made Mr. Gill aware of
23  it while Mr. Brissette was proceeding with his
24  questioning of the venireman, and we have agreed to just
25  let him be dismissed, if that's okay with the Court.

1          THE COURT: Is that okay with the State?
2          MR. GILL: That is our agreement, Your
3  Honor.
4          THE COURT: Excellent. I'm sure he will
5  enjoy the irony of us sending him out of the room, so
6  that we could have secret discussions, and then sending
7  him away.
8          Will you bring him back in, please?
9          (Prospective juror enters courtroom)
10          THE COURT: Okay, Mr. Smiley.
11          PROSPECTIVE JUROR: Yes.
12          THE COURT: We're going to let you take
13  your book and read it wherever you want to. You do not
14  have to stay for any further proceedings in this case.
15  The lawyers have agreed to excuse you, and so you won't
16  have to be a part of the trial.
17          If you'll turn in the plastic part of your
18  jury badge, they are going to mail you your jury check,
19  but I do want to thank you very much for talking to us
20  on the two occasions that you had to -- three occasions
21  that you've had to come down here.
22          PROSPECTIVE JUROR: Okay.
23          THE COURT: And, anyway, I appreciate your
24  service. Thank you.
25          PROSPECTIVE JUROR: Thank you.

1          (Prospective juror excused)
2          THE COURT: Is 56 here?
3          THE BAILIFF: 56, yes, ma'am.
4          THE COURT: Yes, sir.
5          (Prospective juror enters courtroom)
6          THE COURT: Hi.
7          PROSPECTIVE JUROR: Hi.
8          THE COURT: If you'll go ahead and have a
9  seat, please.
10          You are Potential Juror No. 56, Dennis
11  Edward Courtney; is that correct?
12          PROSPECTIVE JUROR: Yes, ma'am.
13          THE COURT: Mr. Courtney, you met with us a
14  couple of times over the past few weeks. You filled out
15  a jury questionnaire. Has anything substantial changed
16  since you filled out that questionnaire?
17          PROSPECTIVE JUROR: No, ma'am.
18          THE COURT: Has anything changed regarding
19  your schedule since you met with us at the minipanel?
20          PROSPECTIVE JUROR: No.
21          THE COURT: Okay. I'm going to swear you
22  in for purposes of today's proceedings. If you'll raise
23  your right hand, please.
24          (Prospective juror sworn)
25          THE COURT: As you will recall, John

149

151

1  William Hummel is the person on trial in this case.

2      PROSPECTIVE JUROR:  Yes, ma'am.

3      THE COURT:  His attorneys are Fred
Cummings, Larry Moore and Pamela Fernandez.

5      The State is represented by Robert Gill and

6  Miles Brissette, and they have the burden of proof in

7  this case, so they get to go first.  There's water in

8  this pitcher --

9      PROSPECTIVE JUROR:  Okay.

10      THE COURT:  -- if you need a drink.

11      PROSPECTIVE JUROR:  I'm fine.

12      THE COURT:  Probably going to take about an

13  hour for us to talk to you, so...

14      PROSPECTIVE JUROR:  Okay.  Not a problem.

15      THE COURT:  Okay.  You may proceed.

16      MR. GILL:  Thank you.

17          DENNIS EDWARD COURTNEY,

18  a prospective juror, having been first duly sworn,

19  testified as follows:

20          VOIR DIRE EXAMINATION

21  BY MR. GILL:

22      Q.  Good afternoon.

23      A.  Good afternoon.

24      Q.  How are you doing this afternoon?

25      A.  I'm good.

1  then?

2      A.  Yes.  And I -- and I also do -- it's a small --

3  small center, so I do -- jump in and do the same things.

4  Just -- I'm just kind of in that position to make sure

5  the flow continues.

6      Q.  Okay.  That's very important --

7      A.  Yes, it is.

8      Q.  -- in the world, isn't it, for a lot of

9  reasons?

10      A.  It is.

11      Q.  Where's the -- generally, where is the center

12  located?

13      A.  It's off Montgomery Street, Camp Bowie area,

14  Fort Worth.

15      Q.  I'm not familiar with that.  I know they built

16  a new center down right off of 8th Avenue a little bit

17  west of 8th Avenue, but I thought Baylor had a center

18  down there --

19      A.  They've got several.  Actually, they have got a

20  surgery hospital down off of 12th Avenue, just down from

21  Plaza, and then they've got the one -- several

22  throughout the -- actually throughout the Metroplex.

23      Q.  Okay.  Is your wife in the same line of work?

24      A.  She's an LVN, works for a doctor -- doctor's

25  office.

150

152

1      Q.  Well, we got you in here a little earlier.  I

2  know you were supposed to be here at 1:00, but there was

3  another juror ahead of you, but he wasn't here very

4  long.  So you didn't have to wait as long as some of the

5  other people that have gotten here at 1:00 o'clock.

6      A.  Good.

7      Q.  I know that's good news for you.  It's good

8  news for us too.

9          So you went over the oaths that's part of

10  your service as a juror the last time you were here, and

11  that oath is still applicable today, that you're

12  obligated to tell the truth.

13          And that changes if you're selected to be a

14  juror.  Your oath becomes to render a verdict based on

15  the law and the evidence.  The law as the Judge gives it

16  to you, and then the evidence as you hear it from the

17  witness stand.

18          Just a couple of questions about your

19  questionnaire before we get started on the substantive

20  part.  Will you tell me exactly what you do at work?

21      A.  I am preop and recovery manager.  I'm an RN,

22  and I -- I'm over several nurses and ancillary staff for

23  a surgery center.

24      Q.  Okay.  So you're -- you're supervising the

25  nurses that are -- are doing the preop and recovery

1      Q.  Okay.  Now, getting back a little bit deeper in

2  your questionnaire, you were asked if you have ever been

3  a witness or been interested in the outcome of a

4  criminal case.  And you responded that you've been

5  curious about some major trials in the media wanting to

6  know the outcome.

7      A.  Nothing in particular.  Just in cases that have

8  come -- you know, come out and just kind of interested

9  in just, you know, how the trials have -- have unfolded

10  and what actually, you know, took place and what have

11  you.

12      Q.  Okay.  So you've never been a witness --

13      A.  No, sir.

14      Q.  -- a witness in a case.  It's just -- is it

15  general curiosity about things you've seen in the -- in

16  the news?

17      A.  Yes, sir.  Yeah, just general.  That would be a

18  good statement, just general curiosity.

19      Q.  Okay.  Now, have you heard anything in the

20  news, whether it's television, print, Internet, whatever

21  it might be, about this particular case?

22      A.  No, sir.

23      Q.  Okay.  The allegations in the Indictment are

24  that this offense occurred on December 17th of 2009,

25  that it occurred down in Kennedale, Texas, which is

153

1  between Arlington and Mansfield; and that persons by the
2  name of Joy Hummel and Clyde Bedford were the injured
3  parties.  Does that ring any bells with you for any
4  reason?
5       A.  No, sir, it does not.
6       Q.  You were also asked quite a few questions about
7  the death penalty as a possible punishment for crime.
8  Of course the reason you're asked that is the State of
9  Texas is seeking the death penalty in this particular
10  case.
11      A.  Right.
12      Q.  And just -- just in case the questionnaire
13  didn't really allow you to express your opinions, could
14  you tell us what your personal opinion is about the
15  death penalty as a punishment for crime?
16      A.  Well, first and foremost, it's the law, and,
17  you know, if someone were to be found guilty by beyond
18  that reasonable doubt, then, you know, if the law
19  requires that that be on the table, then I think that it
20  should be -- I mean, it should be at least looked at
21  and -- and noted.
22      Q.  Okay.  So do you feel like you're open-minded
23  with regard to all the possibilities that could be the
24  outcome of a criminal trial if you were to be a juror in
25  the trial?

154

1       A.  Yes, sir.
2       Q.  How do you know Skid Morris?
3       A.  Friends from church.
4       Q.  Have you been attending the same church for
5  quite awhile?
6       A.  Yes, sir, for about six years, seven years.
7       Q.  While I'm looking through here -- see if
8  there's anything else I want to ask you -- let me tell
9  you that if you have any questions about anything as we
10  go through this this afternoon, please stop me and ask
11  me.
12      A.  Okay.  Thank you.
13      Q.  Whether it has to do with something I'm talking
14  about or not or something else that just springs into
15  your mind -- you know, we talked to a lot of people and
16  sometimes -- sometimes I can tell from the look on their
17  face I'm not being very clear.
18      A.  Right.
19      Q.  And sometimes I'm not being very clear and I'm
20  not getting any kind of signal back.  So I'd like to
21  know I'm -- if for some reason I'm not explaining myself
22  adequately, just stop me and I -- I'll do something
23  because I want to make sure --
24      A.  Thank you for that.
25      Q.  I want to make sure that I'm fair to you and

155

1  that you're answering the -- we're on the same page as
2  far as what I'm asking and what you're answering.
3       A.  Okay.
4            THE COURT:  Mr. Courtney, can I remind you
5  of one thing?
6            PROSPECTIVE JUROR:  Yes.
7            THE COURT:  That is that the court reporter
8  has to write down every single thing --
9            PROSPECTIVE JUROR:  Right.
10           THE COURT:  -- that's being said.  So if --
11           PROSPECTIVE JUROR:  Try to vocalize.
12           THE COURT:  No.
13           PROSPECTIVE JUROR:  Okay.
14           THE COURT:  Only one person --
15           PROSPECTIVE JUROR:  Okay --
16           THE COURT:  -- can talk at a time.
17           PROSPECTIVE JUROR:  Okay.
18           THE COURT:  Okay?
19           PROSPECTIVE JUROR:  Okay.
20           THE COURT:  All right.  Thank you.
21           PROSPECTIVE JUROR:  Thank you.
22      Q.  (BY MR. GILL)  Okay.  From -- from the last
23  time you were in court, you probably recall this
24  definition of capital murder.  This is what we're going
25  to work with in this case as far as the definition of

156

1  capital murder.
2            Do you remember that there are other
3  definitions of capital murder in the State of Texas, the
4  murder of a -- of a policeman in the line duty, for
5  example, is a capital murder.  The murder of a child
6  under six is a capital murder.
7            But this is the definition we're going to
8  use in this particular case.  It's a murder of more than
9  one person during the same criminal transaction.  And we
10  went over the definition of knowingly last time you were
11  in court.  The person has to -- has to appreciate the
12  consequences of their actions.  They have to be
13  reasonably certain that their action is going to cause
14  this result.  You know, use your common sense.  You got
15  to know what -- that you could kill a guy by what you're
16  doing.
17            If -- if, you know, a -- a homicide -- if a
18  death is caused accidentally, that's not a crime.  If
19  the death is caused by a lesser mental state, something
20  lesser than knowing, like reckless or criminal
21  negligence, that would not be a murder or a capital
22  murder under our law.  It would be a different lesser
23  form of homicide.
24            The more -- the more someone intends the
25  consequences of their actions, the more punishable they

1  are, is generally how the law works.

2         For example, if I -- if I dig a hole in my

3  front yard and I'm -- I'm working on some pipes and the

4  hole is six feet deep and I forget to put some tape

5  around it when I go in to eat dinner for the night and

6  someone's walking down the street texting and they fall

7  into it, kill themselves, I've certainly caused that

8  person's death, but I haven't done it knowingly.  I

9  wouldn't be guilty of murder.  I might be guilty of

10  something like criminally negligent homicide because

11  I -- I was negligent.  I left an unattended nuisance in

12  my front yard.  You see how that would work?

13     A.  Yes, sir.

14     Q.  So in order to be guilty of murder or capital

15  murder, a person has to knowingly engage in that

16  conduct.  And, of course, if a person knowingly murders

17  one person during the same criminal transaction, they'd

18  be guilty of murder rather than capital murder.

19         Capital murder is more than one during the

20  same criminal transaction.  You see how that breaks

21  down?

22     A.  Yes, sir.

23     Q.  And the reason I wanted to cover this with you

24  is because you indicated in your questionnaire that a

25  couple of the -- that one of the circumstances you

1  thought the death penalty might be appropriate would be

2  a premeditated murder.

3         And first of all, our law doesn't

4  contemplate premeditation when we talk about murders,

5  capital murder, et cetera.  And second of all, it has to

6  be capital murder before the death penalty is applicable

7  punishment.  Are you okay with that, how that breaks

8  down under the law?

9     A.  Yes, sir.

10     Q.  Obviously, we ask you these questions about how

11  you feel before you ever had any explanation of what the

12  law is just because we want to know how you feel about

13  things.  But are you -- are you comfortable in your

14  ability to follow the law as it pertains to these

15  different definitions?

16     A.  Yes, sir.

17     Q.  Do you understand that the law does not

18  require -- for this culpable mental state of knowingly,

19  does not require us to prove that something was

20  premeditated?

21     A.  Yes, sir.

22     Q.  We -- we merely have to prove the individual

23  was reasonably certain that his conduct was going to

24  cause the result.  The intent of knowing can be formed

25  just instantaneously.  Otherwise, it could be -- there

1  could be premeditation involved.  We're just not

2  required to prove that.

3     A.  Right.

4     Q.  We are only required to prove the -- the

5  elements of the offense.  And we went over those last

6  time we were in court.  There was a list of about seven

7  things.  We have to prove that it happened in Tarrant

8  County, Texas; it happened on or about a certain date;

9  that the person on trial is the person that was

10  responsible that acted knowingly.

11         In a capital murder case, we have to prove

12  that more than one death was caused during the same

13  criminal transaction, which is a term that's not defined

14  under our law; and we have to prove the manner and means

15  by which the individual was killed.

16         And in the Indictment, the State can allege

17  any manner and means that we -- we feel like covers the

18  situation.  We can allege that the individual was shot

19  with a firearm, that they were stabbed with a knife or

20  that they were smothered with a paper sack.  But

21  whatever we plead we have to prove.  Does that sound

22  reasonable to you?

23     A.  Yes, sir.

24     Q.  It's called holding the State to its burden of

25  proof.  Our burden of proof is to prove all of those

1  elements to you beyond a reasonable doubt; and if we

2  fail, the law requires you as a juror to find the

3  individual not guilty.

4         If you have a reasonable doubt about any

5  one of those things, the law requires you to find the

6  individual guilty.  And I take it from reading your

7  questionnaire and your answers here today, that you'd be

8  able to follow your oath and do that?

9     A.  Yes, sir, I would.

10     Q.  Now, the proof -- the proof at trial may show

11  that the individual was killed.  It may show that the

12  individual was shot with a firearm.  And if the State

13  pled in its Indictment that we -- the individual was

14  killed by being stabbed with a knife, you see where you

15  failed.  We still prove the individual was dead.  We

16  proved the guy on trial was the guy that did it.  We

17  proved everything else, but we failed there.  And you

18  understand your obligation there?

19     A.  Yes, sir.

20     Q.  What would it be?

21     A.  Not guilty.

22     Q.  And that's true with regard to any of those --

23  any of those elements.

24         Now, the -- at the -- at the

25  guilt/innocence phase of the trial, the jury hears about

1 how the crime was committed, and the State attempts to
2 prove at that phase of the trial that the individual's
3 guilty.
4        And, of course, if we -- like we just
5 discussed, if they -- if we prove that the individual's
6 guilty, we're entitled to a verdict of guilty, and we
7 move to a second phase of the trial.
8        And at that phase of the trial, it's called
9 the punishment phase of the trial.  First phase dealing
10 with guilt/innocence issues, we call the guilt/innocence
11 phase.  The second phase of the trial deals with
12 punishment issues; we call that the punishment phase of
13 the trial.  Real creative, huh?
14        But the evidence at the punishment phase of
15 a criminal trial consists of the following and can
16 consist of the following:  First of all, the jury can
17 use all the evidence they heard at the first phase of
18 the trial.  So everything they heard from the witness
19 stand, all the exhibits they saw, whatever that might
20 be, everything that they heard in court about the trial
21 at the first phase of the trial, they can apply at the
22 second phase of the trial.  It seems only reasonable if
23 we're going to punish the guy, the jury can take into
24 consideration what he did, right?
25        A.  Yes, sir.

1        Q.  We can also go beyond evidence that was heard
2 at the first phase of the trial, and we can talk about
3 things like the Defendant's bad character.  If the
4 Defendant has a bad character, we can prove it to a jury
5 at the punishment phase of a trial, but not at the
6 guilt/innocence phase of the trial.
7        There wouldn't be anything about his
8 character at the first phase of the trial.  Wouldn't be
9 anything about his bad reputation at the first phase of
10 the trial, but you might hear it at the punishment
11 phase.
12        Same with evidence of other unadjudicated
13 offenses.  A jury can hear about that at the punishment
14 phase of the trial, and they can't hear about that at
15 the first phase of the trial because the issue there is
16 solely did he do this crime on trial or didn't he.  You
17 see how that might work?
18        A.  Yes, sir.
19        Q.  Did you have a chance to go over the homework
20 that the Judge sent home with you?
21        A.  I did.
22        Q.  Okay.  Well, you know then that in the
23 punishment phase of a capital murder trial, if the jury
24 answers questions -- at a -- at a murder trial, for
25 example, the jury will decide on a range of -- within a

1 range of years what that particular crime calls for.
2        A jury may go back into the jury room
3 having heard a murder trial and heard something about
4 the Defendant from one side or the other, say, well,
5 this case is worth 99 years; or this case is worth 60
6 years; or this case is worth 15 years; or this case is
7 worth 5 years, depending on the facts of case.  You see
8 how that might work?
9        A.  Yes, sir.
10        Q.  We talked about this at the first visit we had
11 in court.  Would you be -- would you be able to apply
12 that entire punishment range if you were to have found
13 someone guilty of murder rather than capital murder?
14        A.  Yes, sir, I would.
15        Q.  Comfortable in your ability to do that?
16        A.  Yes, sir.
17        Q.  Keep an open mind?
18        A.  Absolutely.
19        Q.  That differs from the punishment phase of a
20 capital murder trial where a jury is called upon to
21 answer special issues.  That is what these questions are
22 called.  They're called special issues.
23        One deals with whether or not the
24 individual's going to be a continuing threat to society,
25 future dangerousness.

1        The second one deals with is there
2 sufficient mitigation for a life sentence instead of the
3 death penalty.  And depending on how the jury answers
4 those questions, the Judge must follow the jury's
5 answers and sentence a Defendant one way or the other.
6        The questions are answered one way, the --
7 the punishment is the death penalty; if it's answered
8 any -- any number of different ways, the sentence will
9 be a life sentence.  However the jury tells the Judge to
10 do it, that's how the Judge has to do it.  Okay?
11        A.  Yes, sir.
12        Q.  Stop me if you have any questions.  Okay?
13 Otherwise, I'm just going to keep on talking.
14        A.  Okay.
15        Q.  At the punishment phase of a capital murder
16 trial in the Jury Charge, the instructions the Judge
17 gives to the jury to guide their deliberations, the
18 Judge is going to instruct the jury that a sentence of
19 life without parole means that the Defendant is
20 ineligible for release from prison on parole.
21        Our law in Texas used to be different.  It
22 used to be that an individual that received a life
23 sentence for any crime would ultimately be eligible for
24 release on parole at some point.
25        And it's really kind of beside the point

1  right now to talk about how long that would be because
2  for purposes of a capital murder trial in Texas, the law
3  is they never are eligible for parole.  They never get
4  out.  The only time a person gets out of prison if
5  they've been convicted of capital murder under present
6  laws is they are dead.  They either die of natural
7  causes, or they're executed, and that is how they get
8  out of prison.  Otherwise, life means life.  Okay?
9           Could you follow that instruction?
10     A.  Yes, sir.
11     Q.  So we get all that behind us, and here's
12  Special Issue No. 1, which -- which should be the same
13  as what was written in the instructions you were given.
14           Okay.  You've taken a couple of seconds and
15  read through that again to refresh your recollection.
16  Do you see where this question is asking the jury:  Is
17  there a probability this guy is going to constitute a
18  continuing threat to society?  That's kind of shortening
19  it.
20           The issue at the first phase of the trial
21  was is this guy guilty of this one crime, so you see how
22  this is a different question --
23     A.  Yes, sir.
24     Q.  -- the jury's confronted with?
25           His behavior at X point versus his

1     A.  Yes, sir.
2     Q.  So let's go through a couple of these terms
3  because some of them, like beyond a reasonable doubt --
4  well, actually, there's nothing in this question
5  that's -- that's given a specific legal definition.  You
6  have your own -- to use your own definitions of these
7  terms as you might use them in ordinary -- in your
8  ordinary daily business.
9           But the term "probability."  Obviously,
10  that word is right smack in the middle of that question.
11  What does that mean to you, the term probability?
12     A.  I mean, take it to the root word, probable.  I
13  mean, it's likely that it's going to happen.
14     Q.  Okay.  The Legislature chose this term when
15  they could have chosen other terms like certainty.  They
16  did not choose the term certainty.  You see where that
17  means the State does not have to prove beyond a
18  reasonable doubt that this guy is for sure going to do
19  something?
20     A.  Right.
21     Q.  On the other hand, they didn't choose the term
22  probability either -- I mean possibility.  You see where
23  there's a difference between the terms probability and
24  possibility?
25     A.  Yes.

---

166

1  probability in the future.  You see how that's a
2  completely different question?
3     A.  Yes, sir.
4     Q.  However, there are some things about this that
5  are the same.  The burden of proof here.  We have to
6  prove beyond a reasonable doubt someone's guilty of a
7  criminal offense.  We have to prove beyond a reasonable
8  doubt that the answer to this question should be yes.
9  We have to -- the State has the burden to prove that the
10  individual is, in fact, going to be -- there's a
11  probability he's going to constitute a continuing threat
12  to society.
13           For individuals found guilty of the death
14  penalty, that's the first step our Legislature has
15  designed for us to decide who's going to receive one
16  punishment, the death penalty, and who's going to
17  receive the other one.
18           You see where the Legislature has made a
19  judgment that only people that there's a probability
20  they're going to continue to constitute a threat to
21  society are going to receive the death penalty, and
22  those that will not constitute a continuing threat to
23  society, or the State fails in their burden, will
24  receive the benefit of the doubt and receive a life
25  sentence?

168

1     Q.  And for some people it's a pretty big
2  difference; for some people it's a -- it's a relatively
3  small difference, but there is, in fact, a difference.
4           Possibility means something is possible
5  in -- in whatever -- whatever realm it might be
6  possible.  It's possible the sun blows up within our
7  lifetime.  It just runs out of energy.  It superheats
8  itself, or whatever.  It's not probable that's going to
9  happen because it's been burning the same way for
10  millions of years and likely for millions more.  You
11  see --
12     A.  Yes, sir.
13     Q.  -- where there might be a distinction there?
14           The next term is this term "criminal acts
15  of violence."  And what might that mean to you?
16     A.  I mean, back to murder again, or acts of
17  violence such as rape or anything that would be
18  considered a criminal offense.
19     Q.  Okay.  So it's a pretty wide open term, isn't
20  it?
21     A.  I would think so.
22     Q.  Kind of like probability.  Probability is
23  pretty wide open.  High probability, low probability,
24  medium probability.  The Legislature could have used the
25  term "murder."  They could have required us to prove

1  another murder; they could have required us to prove
2  rape; they could have required us to prove robbery or a
3  simple slapping, a simple -- a simple assault.  But they
4  chose to not narrow it down to any one type of offense
5  and to use this broad term, "criminal acts of violence."
6  So to you, does that term encompass a -- a wide range
7  of -- of possible behavior?
8      A.  Yes, sir, it does.
9      Q.  And then the next term I want to talk to you
10  about is the term "society."  What does society mean to
11  you?
12      A.  Us.
13      Q.  Everybody or human beings?
14      A.  Yes.
15      Q.  Okay.  So remember, for the terms of -- the
16  punishment terms in a capital murder case, that an
17  individual -- we're talking about an individual here.
18  The jury will be deliberating on an individual who's
19  never getting out of the penitentiary.  So the
20  Legislature must have contemplated that -- that there
21  are situations where an individual who's incarcerated
22  for the rest of his life could be a continuing threat to
23  society.  Otherwise, the State is being required to
24  prove an impossible -- an impossibility here.
25          Is it possible to you that the State could

1  of the trial and apply that law to it and reach a
2  verdict according to that law and that evidence.  So
3  each case is different, right?
4      A.  Exactly.
5      Q.  So -- so it's important that a juror approach a
6  case that they're required to sit on with an open mind.
7  It's one of those you-don't-know-until-you-hear-it kind
8  of things.  You may never think that something -- that
9  the State could prove that beyond a reasonable doubt,
10  but all of a sudden you hear it.
11          And you see where you might hear it at the
12  first phase of the trial, the guilt/innocence phase of
13  the trial?  There might be something about that murder
14  itself, the way the murder was committed, the motivation
15  for it, the people involved, that lead you to believe
16  that that individual is capable of -- of committing
17  those criminal acts of violence in the future.
18          On the other hand, it may come to you at
19  the punishment phase of the trial when you realize, yes,
20  that the State has met their burden of proof here.
21          The important thing, though, is that
22  there's nothing automatic about this question.  Just
23  because someone got found guilty of capital murder
24  doesn't mean the answer to this question should be
25  automatic; is that correct?

1  prove to you beyond a reasonable doubt that the answer
2  to this question should be yes?
3      A.  Yes.
4      Q.  That there's a -- that there's a probability
5  that some persons would commit criminal acts of violence
6  in the penitentiary that would constitute them a
7  continuing threat to society?
8      A.  Yes, sir.
9      Q.  On the other hand, you see where the State
10  might fail in its burden here, and if the -- the
11  Defendant would be entitled to the benefit of the doubt
12  there and receive a life sentence.
13          And if you felt like the State of Texas
14  failed in its burden, would you be able to answer the
15  question no and follow your oath as a juror?
16      A.  I would.
17      Q.  See, the whole thing -- the whole thing
18  about -- about criminal trials in general and about this
19  case in particular is that jurors are given a set of
20  instructions by the Judge, called the Court's Charge,
21  which contains the law that they'll follow during your
22  deliberations, and they're required to follow that law
23  because that's what their oath binds them to do.
24          The other part of the equation is that the
25  jury takes the evidence that they hear during the course

1      A.  Yes, sir.
2      Q.  Because that -- because each case stands or
3  falls on its own facts; is that right?
4      A.  Yes, it does.
5      Q.  And -- and I think we already talked about the
6  fact that this is a -- a completely different question
7  that the jury is asked at the first phase of the trial,
8  right?
9      A.  Yes, sir.
10      Q.  What did he do on this occasion versus --
11  versus what is the overall prognosis kind of thing.
12      A.  Right.
13      Q.  Okay.  Here's some further instructions the
14  jury is going to receive on Question No. 1.  If the jury
15  answers the question no, the sentence that would be
16  imposed would be the life sentence without parole
17  because the jury has found that the State failed in its
18  burden of proof.
19          The jury can answer the question, though,
20  if 10 or more jurors agree.  The State has to prove
21  beyond a reasonable doubt the -- that the yes answer
22  should be -- that the yes answer is the proper answer,
23  and if the jury is unanimous, all 12 people agree the
24  answer should be yes, then we move -- the jury moves to
25  deliberate on the second question.  It takes one step

1  closer to -- to imposing the death penalty.
2          So here's the next question.  Knowing that
3  a yes answer moves an individual on trial one step
4  closer to receiving the death penalty, would you be able
5  to answer yes if that was proved to you beyond a
6  reasonable doubt?
7      A.  Yes.
8      Q.  By the same token, if the State failed in its
9  burden, would you be able to answer the question no,
10  knowing the life sentence would be imposed?
11      A.  Yes, I would.
12      Q.  So let's assume for a second the jury has
13  answered Special Issue No. 1 yes and the jury's going to
14  begin deliberating on Special Issue No. 2.  So here's
15  the language of Special Issue No. 2.
16          Okay.  The first thing you know about that
17  is up at the top there's no phrase, "Do you find beyond
18  a reasonable doubt."  Nothing in here about beyond a
19  reasonable doubt.  So that beyond a reasonable doubt
20  language tells the jury that the State has the burden of
21  proof on that particular issue.  Since it doesn't appear
22  here, the State has no burden of proof.
23          And since the Defendant never has the
24  burden of proof at any point during a capital murder
25  trial, the Defendant doesn't have the burden of proof

175

1  offense, his character, everything, taking the whole
2  case together and looking at all of it together, is
3  there something sufficient here that would make the life
4  sentence more appropriate than the death penalty,
5  whatever you might think it is.
6          See, because before the jury gets to this
7  question, there's -- they're heading toward the death
8  penalty.  You find him guilty, you find the answer to
9  Question No. 1 should be yes, you move towards the death
10  penalty.
11          And this is -- this is a question our
12  Legislature has designed to separate death penalties
13  from life sentences based upon something that the law
14  doesn't recognize in those other areas.  Okay?
15      A.  Okay.
16      Q.  Now, you may not have a definition of something
17  you think is a -- is a mitigating circumstance or
18  mitigating evidence today.  It's kind of -- it's another
19  one of those you-know-it-when-you-see-it things.  And it
20  might be -- it might be something you find in one
21  capital murder case if you're a juror, and if you sat on
22  a different capital murder case, it might not apply to
23  that case at all.  It might not be sufficient there.
24          Some jurors might say that an individual
25  who's young -- in Texas someone could receive a death

174

1  here either.
2          So what does that leave?  That just leaves
3  each juror to decide for himself or herself what the
4  answer to this question should be.  Taking into
5  consideration all the evidence, including the
6  circumstances of the offense, the Defendant's character
7  and background and his personal moral culpability.
8          So taking all those things into
9  consideration, what's the right thing to do here.
10  That's the question that the jury would confront -- be
11  confronted with.
12          Let me jump ahead a couple of slides.
13          The Judge is going to instruct the jury
14  that they shall consider mitigating evidence to be
15  evidence that a juror might regard as reducing the
16  Defendant's moral blameworthiness.
17          See how that works?  That's what mitigating
18  evidence is.
19      A.  Okay.
20      Q.  It's something, no matter -- whatever the juror
21  might think it is, that reduces someone's moral
22  blameworthiness.  And the question asked to you, if
23  there's something here that reduces his moral
24  blameworthiness, is it sufficient in light of all these
25  other things up here -- the circumstances of the

176

1  penalty if they're 18 years old.  If they commit a crime
2  on their 18th birthday, they could receive the death
3  penalty for it.
4          But some jurors might say that that's a
5  sufficient -- sufficient mitigating circumstance under
6  the facts of some capital murder case because an
7  individual who's 18 years old is not as mature, is not
8  as mentally capable, is not as -- not as morally
9  understanding as someone who's maybe in their 30s or
10  40s.  Their brain hasn't completely formed.  They don't
11  have -- have the worldliness of someone in their 30s or
12  40s to -- to guide their moral compass.
13          And someone -- some juror may say, Well, in
14  this case, he was 18 years old.  I don't think he was
15  mature enough to receive the death penalty; therefore,
16  under these facts, I think a life sentence is
17  appropriate.
18          You see how that might work?
19      A.  Yes, sir.
20      Q.  And that's just an example.
21      A.  Okay.
22      Q.  Some other juror might say, huh-uh.  He's old
23  enough to serve in the military, he's old enough to
24  vote, he's old enough to operate as an adult under our
25  law.  I don't think that's a mitigating circumstance.

---

**177**

1   But whatever it is, it just depends on the facts of the
2   case as something you hear.
3          Do you think that if you found something
4   mitigating, that you could look at -- look at it in
5   terms of this question?
6      A.  I could.
7      Q.  If you found -- whatever it might be, if you
8   found in the course of a trial -- it might come from the
9   State, it might come from the Defendant -- from the
10  Defense that might present evidence, it might come from
11  the State's first witness during the trial.  The first
12  witness might say, I saw this happen during the
13  Defendant's 18th birthday party.
14         So, you know, the Defendant didn't bring
15  that evidence forward, but you might find it to be
16  mitigating or some other juror might find it to be
17  mitigating in the course of some criminal trial.
18         The key is, though, that if you think -- if
19  you find something mitigating, that you look at this
20  question and decide for yourself if it's sufficiently
21  mitigating and then vote accordingly.  Would you be able
22  to do that?
23     A.  Yes, sir.
24     Q.  Again, it's just going to depend on the facts
25  of the case.  You see how that would work?

---

**178**

1      A.  I do.
2      Q.  And one of the things we have to operate under
3   during the course of -- of this procedure is we can't
4   tell you what the facts of the case is -- are on trial.
5   We can't say, Well, here's what happened, this, this,
6   this and this; what do you think, what's your verdict
7   going to be?
8          That's unfair to you because, you know,
9   we're not witnesses.  We can't -- we can't cross-examine
10  each other in that situation, and that's what -- you
11  know, we have to -- we have to have that procedure in
12  trial to get to the truth of the matter.
13     A.  Right.
14     Q.  So do you see where there's -- there's not a
15  burden of proof on the State here, and since there's no
16  burden of proof ever on the Defendant, that that
17  evidence can just come from anywhere in the trial, if it
18  does.  You see how that would work?
19     A.  I do.
20     Q.  And would you be able to follow the Judge's
21  instructions on -- on Special Issue No. 2?
22     A.  Yes, I would.
23     Q.  Okay.  And here are a couple of other
24  instructions you receive on Special Issue No. 2.  Again,
25  no burden of proof on either side.  The State doesn't

---

**179**

1   have to bring you the mitigating evidence, and they
2   don't have to prove it sufficient either.  It's just
3   what you think as a juror.
4          If you answer the question no, that means
5   you find there was no sufficient mitigating
6   circumstance, if all 12 people agree, the Defendant
7   receives the death penalty.
8          And you can only answer it no if you're
9   unanimous, but you can answer it yes.  If 10 or more
10  jurors agree there's a sufficient mitigating
11  circumstance, it could be answered yes, and the verdict
12  would be returned into court and the Defendant would
13  receive a life sentence.
14         And the 12 -- the 10 jurors or 12 jurors,
15  however many agree on the mitigating factor, they don't
16  have to agree on the same thing.  You might think it's
17  because the guy is 18 years old; someone else might
18  think it's because he had a poor upbringing or something
19  like that, that that was sufficient to them.  You see
20  how that works?
21     A.  Yes, sir.
22     Q.  Because each individual juror has their own
23  individual verdict in the course of a criminal trial.
24         So knowing that a no answer to Question 2
25  would subject the individual on trial to the death

---

**180**

1   penalty, would you be able to answer it no if you found
2   there was no sufficient mitigating circumstance?
3      A.  Yes, sir.
4      Q.  The other way -- other side of the coin is
5   knowing that a yes answer would result in a life
6   sentence, would you be able to answer the question yes
7   if you felt like there were a sufficient mitigating
8   circumstance?
9      A.  Yes, sir, I would.
10     Q.  Is there any reason at all, moral, ethical
11  religious, anything we've talked about, anything we
12  haven't talked about, any reason at all you could not be
13  part of a process that resulted in a -- in a death
14  penalty?
15     A.  No, sir.
16     Q.  Do you have any questions of me about anything,
17  anything we've gone over or anything else?
18     A.  I do not.
19     Q.  Okay.  Thank you very much.
20         MR. GILL:  We pass the juror, Your Honor.
21         THE COURT:  Defense?
22         MR. CUMMINGS:  Thank you, Your Honor.
23              VOIR DIRE EXAMINATION
24  BY MR. CUMMINGS:
25     Q.  Good afternoon, Mr. Courtney.

181

1   A.  Good afternoon.

2   Q.  We visited about two weeks ago.  I think you

3 sat on the front row, if I recall.

4   A.  I did.

5   Q.  I want to spend some time with you and kind of

6 get a feel for what your thoughts are regarding the

7 topic of the afternoon, which is, of course, the death

8 penalty and your ability to go through the procedures.

9        What do you do as a registered nurse in

10 charge of recovery and --

11   A.  And preop.

12   Q.  Preop?

13   A.  Yes, sir.

14   Q.  How big a operation is it that you work --

15   A.  We -- we do about 600 patients a month or so.

16   Q.  Is it primarily day surgery type thing?

17   A.  Yeah, exactly.  All-day surgeries, pain

18 injections, just different -- colonoscopies, different

19 things like that.

20   Q.  As a registered nurse, you're supervising other

21 nurses?

22   A.  Yes, sir.

23   Q.  Are you -- when you're working, are you the --

24 I guess the -- you're the -- over the entire operation

25 as far as the nurses?

182

1   A.  As far as those in the preop and PACU, I do

2 have a nurse manager that's over me that's over the

3 entire center that's over OR, preop PACU and any -- any

4 of the nurses that fall under her.

5   Q.  You always worked in the surgical area?

6   A.  No, sir.  I've worked in several different

7 areas of nursing.

8   Q.  How long -- how long have you been a nurse?

9   A.  Since '95.

10   Q.  What did you do prior to that?

11   A.  I worked in a refinery up in the Panhandle.

12   Q.  Do you know James and Linda Skidmore outside of

13 the church?

14   A.  Yes, sir.  We are -- we're friends outside the

15 church as far as, you know, just maybe going out to eat

16 every once in a while or, you know, just kind of -- kind

17 of casual acquaintances.

18   Q.  I went through the police academy with him back

19 in 1972 and '73, and he worked for Fort Worth for a

20 while before he -- he left and went to greener pastures.

21 Does he ever talk to you about his -- he's primarily

22 administrative now, isn't he?

23   A.  He -- he is, yes, sir.

24   Q.  And he's a lieutenant now; is that right?

25   A.  Lieutenant or captain, one.

183

1   Q.  He's worked for several sheriffs.  Does he --

2 when you-all go and socialize, does he talk to you about

3 his business?

4   A.  No.  It's -- he doesn't talk about his; we

5 don't talk -- my wife and I don't talk about ours, so we

6 just -- just kind of have a -- have a time to eat and

7 whatever.

8   Q.  You and your wife share a profession.  His wife

9 works at the SO as well?

10   A.  Yes, sir, she --

11   Q.  I don't know her.  What does she do?

12   A.  I really don't know for sure.  Administrative,

13 I know, but that's all that I do know about her -- her

14 position.

15   Q.  Okay.  The -- you indicated on your

16 questionnaire you've been curious about major trials and

17 following them in the media.  Do you recall which

18 trials?

19   A.  Nothing in general.  I mean, just, you know, if

20 something, you know, comes up and enters a lot in the

21 media about it, you know, that would -- being a nurse I

22 just kind -- I'm kind of interested in -- in all aspects

23 and just learning in general and just knowing the

24 processes and --

25   Q.  Did you ever work in trauma care?

184

1   A.  Some, yes.

2   Q.  Did you -- have you worked in either -- either

3 of the major -- well, I guess there's -- it used to be

4 just JPS here, but I guess Harris Hospital does a lot of

5 ER stuff?  Have you ever worked in a big --

6   A.  Not in a big hospital.  I worked in a small

7 community hospital in the Panhandle in the emergency

8 room, but nothing -- nothing bigger than that, just in

9 the small community.

10   Q.  Is that, where, Hutchison County --

11   A.  Yes, sir.

12   Q.  Were you raised there?

13   A.  Born and raised, yes, sir.

14   Q.  Born and raised.  Flat, windy and cold.

15   A.  Yes, it is.

16   Q.  That's what I think of.

17        You were pretty young then in 1981 when you

18 were on that jury?

19   A.  I was.  I was 20, 21 years old at the time.

20   Q.  Tell me about that experience.

21   A.  It was a rape trial that was -- and it was

22 actually my first time to be called for jury duty and

23 was on that and sat in with the other members of the --

24 of the jury and, you know, listened to the -- what the

25 State had to bring forth and plus any witnesses that

185

1  they had brought forth as well.  As far as, you know,

2  the -- the woman that had allegedly been raped and --

3  all the way up through, you know, the officers and --

4  and physicians that had taken care of her as well.

5      Q.  How long a trial was it?

6      A.  It was about a week.

7      Q.  That's a long time ago, but jury selection last

8  half a day?

9      A.  Probably so, yeah.  Again, it was a long time

10  ago, but it didn't -- it wasn't a lengthy process at

11  all.

12      Q.  Was there a defense put forth?

13      A.  Yes, there was.

14      Q.  You indicated that that was a life experience

15  that you thought was rewarding.  Or actually, you said,

16  I liked the experience gained from serving as a young

17  man.  Why?

18      A.  Just knowing the -- the judicial system and

19  how -- kind of seeing it from another perspective rather

20  than just, you know, hearing or seeing or reading it in

21  textbooks.

22      Q.  Were you -- did you have any evidence presented

23  to you other than words?  In other words, other than

24  testimony from witnesses?

25      A.  There was -- as far as I could remember --

186

1  again, it was a long time, but there was testimonies

2  and -- from both his -- you know, for him and against,

3  so, I mean, there was a variety of -- of people that

4  were there.

5      Q.  And as far as the lawyers were concerned, seem

6  like they did their jobs, respective jobs?

7      A.  Yes, sir.  It seemed like both -- both were

8  very -- very adequate in performing their duties.

9      Q.  We asked you about life without parole.

10  Have -- are you familiar with the way we have -- the way

11  typically parole is done?  That was a terrible question.

12  Let me reask it.

13          Are you familiar with the concept of

14  parole?

15      A.  Yes, sir.

16      Q.  When -- and you realize that in a typical

17  criminal case, even murder cases, parole is a factor.

18  It's something the jury is made aware of and they're

19  told they cannot consider it in assessing their

20  punishment, but I think a lot of people don't trust the

21  system primarily because of the application of parole.

22          And I want to be -- you indicated that you

23  trust and believe that we, in fact, are dealing with, in

24  a capital murder case, life without parole.  Is that

25  true?

187

1      A.  State that again?

2      Q.  We ask you do you believe that life without

3  parole means that the individual will never be released

4  from prison.  I believe that's paraphrasing the

5  question --

6      A.  Yeah.  I mean, from what I understand, if it's

7  life without parole, that means that the person is

8  incarcerated until they -- until they die.

9      Q.  Okay.  And -- and -- and the reason that's

10  important to me is that I have actually talked to jurors

11  after these kind of cases and who have said to me, Well,

12  we didn't have a confidence that he would never get out,

13  and so we went ahead and voted for the death sentence.

14  You see?

15      A.  Right.

16      Q.  And so I want to be able to have confidence

17  that you believe that we actually have now life without

18  parole because we haven't had it for that many years.

19      A.  Right.  And -- and I do understand that -- that

20  is the -- that is the way that it is.  If it's life

21  without parole, that means that the person is

22  incarcerated.

23      Q.  At the time you filled out the questionnaire,

24  you indicated that you would want to serve.  Do you

25  still feel that way?

188

1      A.  Yes, sir.  I mean, of course, there's aspects

2  of reasons not to.  I mean, you know, we can all come up

3  with reasons not to.  I've got, you know, my job and --

4  which they're very, very lenient on, you know, allowing

5  me to -- to -- to do my civic duty, but I -- I think it

6  would be, you know, something that I myself -- I mean,

7  I'm -- I'm -- I'm an educated person, and I know that I

8  can follow what the law says to do, and I think that's

9  what it all boils down to.  If the law says this, that's

10  the way it should -- should be.

11      Q.  I have been related to nurses, and even though

12  my background is law enforcement and the law, I, in my

13  experience with -- I call it in my previous life -- with

14  nurses and friends of my spouse, things like that.  I

15  would suspect you're a fairly caring person, or you

16  wouldn't have gotten into your profession.

17      A.  Yes, sir.

18      Q.  And -- so I'm -- I'm just curious if you

19  considered the magnitude of -- of -- of a trial where

20  the accusation involves multiple murders and that the

21  possible outcome would be very, actually, at some point

22  in the future, the death of the accused.

23      A.  Yes, sir.  And I think that caring factor

24  would -- would definitely be something that I would make

25  sure, you know, beyond that reasonable doubt that I

1   wouldn't just jump into something just because -- just
2   to follow the crowd or follow one or two to say, Well,
3   yeah, this -- this is the way it should be, but -- but
4   actually follow what -- what has been presented.
5          Q.   Okay.  Most -- I think almost all of my side,
6   with maybe a couple of exceptions or just variations,
7   because they -- they come from the law just as the
8   State's comes -- comes from the same source, and so you
9   see that they should be very similar to what the State
10  has put before you.
11         But what I want to talk to you about is the
12  elements of capital murder.  And I want to -- you know,
13  we talked about that, about the State having the burden,
14  having to prove the elements.  We spent some time about
15  that in the -- in the group setting.  And I do not
16  recall whether or not I asked your group because we did
17  three.  We've seen 150 people in this case, and so far
18  you're -- individually, we've seen a third of those, as
19  you know from your juror number.
20         But the State has got the burden to prove
21  to you beyond a reasonable doubt these bullet points.
22  We call them elements.  They come from the Penal Code,
23  Code of Criminal Procedure.
24         It's the State's responsibility to -- to
25  charge crime and then to prosecute it.  They get to

190

1   select how they're going to charge their case, and then
2   go forth and attempt to do that.
3          So in the case of a capital murder and the
4   way that it's alleged in this case, these elements here
5   are what they're going to have to prove to you beyond a
6   reasonable doubt.
7          Manner and means is how it's done.  Okay?
8   Shooting with a gun, stabbing with a knife, run over
9   with a car, whatever.  Being a juror is kind of
10  technical, and you're -- maybe not as technical as some
11  of the things you do, but in a different way, very much
12  the same.
13         You -- it's not just a gut check kind of --
14  gut reaction kind of thing.  The State has got to prove,
15  no wink-wink, each and every one of these elements.
16         So my question to you is:  If you're in a
17  situation where they prove to you that, in fact, the
18  accused caused two murders, but they -- they somehow
19  don't get with the Medical Examiner, and they don't get
20  it right, and they say shooting with a gun, and, in
21  fact, it's stabbing with a knife, do you have the --
22  what are you going to do in that situation?
23         A.   You can't find for capital murder because they
24  didn't prove all of the elements.
25         Q.   The -- I think we asked you this.  I think

192

1   you've answered.  I want to go over it just to be sure.
2   Already talked about the parole.
3          There are certain circumstances where
4   perhaps in the accusation where they're alleging
5   multiple murders, maybe for -- maybe they don't prove it
6   occurred in the same criminal transaction.  Maybe you're
7   not satisfied in that situation.  And maybe, in fact,
8   you believe that, yes, one is a knowing murder, but the
9   other, no, it's not.
10         And so you're now faced with the lesser
11  offense of murder where you're dealing with the typical
12  range of punishment.  The 12 of you collectively get
13  together and decide what's appropriate.  There's only
14  about a half a dozen cases -- states that do that for
15  typical, you know, for criminal cases.  But that would
16  be what you would be called upon to do.
17         So can you give fair consideration to that
18  entire range of punishment, as little as 5 and as much
19  as 99 years or life?
20         A.   Yes, sir, I could.
21         Q.   Okay.  I want to talk to you about the special
22  issues.
23         You've heard this from Mr. Gill, and he's
24  gone over these issues, and I want to visit with you
25  about them from our perspective.  But I'm -- I think you

1   grasp the process, the way we do this.  You think -- do
2   you think it's a process that you can participate in?
3          A.   Yes, sir.
4          Q.   Do you think it's -- do you think it's a fair
5   process?
6          A.   I do.
7          Q.   Okay.  When you're in -- that Special Issue No.
8   1 is straight out of the law.  You can see that the
9   burden of proof is on the State, and they're asking you
10  to essentially kind of predict the future.  Can you --
11  do you accept that as true?
12         A.   I can see that as a reasonable statement.
13         Q.   Okay.  Constitute a continuing threat to
14  society.  We actually refer it shorthand as the future
15  dangerousness question.
16         Do you believe that they still have their
17  burden of proving to you beyond a reasonable doubt that
18  this is the case?
19         A.   Yes, sir.
20         Q.   And whose burden is that?
21         A.   It's on the State.
22         Q.   Okay.  The concern as a defense lawyer is this
23  word "probability" and whether or not that somehow
24  reduces the jurors' idea that -- as to the level of
25  proof.  You -- believe it or not, a lot of people have

193

1  difficulty with that term, "probability," and you hit it
2  spot on.
3        But what do you -- what are you going to
4  expect in the way of evidence in order to predict this
5  future, so to speak?
6    A.  I mean, again, I'm using the terminology.  I'd
7  have to -- it'd have to be beyond a reasonable doubt for
8  me to -- to see what was presented, you know, and, of
9  course, not knowing the case, just to be able to see
10  that and know beyond a reasonable doubt to be able to
11  proceed with that.
12    Q.  Do you do anything like that as far as try to
13  make that prognosis, or is that -- is that the right
14  word?
15    A.  Diagnosis?
16    Q.  Yeah, but that's not necessarily -- that's
17  something that is -- you determine that's the -- what
18  you're dealing with.  There -- isn't there a medical
19  term about kind of a prediction of where you're going --
20    A.  Prognosis --
21    Q.  Prognosis.  Okay.  What do you do when you --
22  what kind of things do you do in your field when you're
23  trying to make a prognosis?
24    A.  Well, basically the same thing.  I mean, you're
25  looking at -- at the evidence of -- or symptoms, as it

194

1  is, with patients, and you have to make adjustments and,
2  you know, just look at -- at what's going on and
3  what's -- you know, just what the evidence is showing
4  in -- in their lab works and what you have.
5    Q.  Okay.  This -- I want to set kind of the
6  context of Special Issue No. 1, and then we'll move on.
7  The -- but this is that last bullet point.  I meant to
8  take it out, and apparently I didn't get it done.
9        When you are called upon to make this
10  decision on Special Issue No. 1, okay, you've already
11  decided collectively, each of you individually, 12 votes
12  of guilty of capital murder, or else you'd just be
13  talking about a number for murder.  Okay?  Capital
14  murder.
15        So -- and sometimes when you talk to folks
16  that come from other fields, they'll make statements
17  like, Well, you know, I think it's appropriate for a
18  life sentence if it was an accident, or something like
19  that.  I don't think you would make that kind of
20  statement.  But we hear a lot of different things that,
21  in fact, if it were that case, we wouldn't be talking
22  about guilty of capital murder.
23        So I break it down to this slide to where
24  you have found somebody guilty of knowingly committing
25  the murders of more than one person in the same criminal

195

1  transaction.  There's no defenses, no insanity, it's an
2  innocent victim, the accused is over 18, there's no
3  mental retardation.  Okay?
4        And that's where you are when you are then
5  called upon to make this decision.  Do you believe that
6  this will be a separate analysis on your part, or do you
7  believe that this is kind of a waste of time because
8  you've already made the decision when you found the
9  individual guilty, and obviously that person who you
10  have found to, beyond a reasonable doubt, cause more
11  than one murder in the same criminal transaction must be
12  a continuing threat to society?
13    A.  Not necessarily.
14    Q.  I want to talk to you about the final Special
15  Issue No. 2.  Can you see that -- this is the process,
16  you have found an individual guilty beyond a reasonable
17  doubt.  That's 12 of you, 12 guiltys.  Okay?  You have
18  now made a determination -- the State has satisfied you
19  beyond a reasonable doubt as to Special Issue No. 1 as
20  12 yeses.  In order for a death sentence to result,
21  there have to be 12 more nos; otherwise, a death
22  sentence does not result.  Do you accept that if an
23  individual is found guilty of capital murder, are you
24  confident he's never, ever going to get out again until
25  he dies, either naturally or by execution?

196

1    A.  From what the law states, yes.
2    Q.  So that's the process.
3        My question to you, as far as Special Issue
4  No. 2, is:  Will you give consideration to this --
5  separate consideration to this special issue?
6    A.  Absolutely, yes.
7    Q.  You'll be asked to -- a lot of different
8  questions, and we ask you a lot of different ways,
9  similar questions trying to get a feel for -- you --
10  because of your background, do you have any ideas about
11  what sort of evidence you would hear in a trial that
12  would affect your decision on this special issue?
13    A.  I'm sure -- I mean, as far as background, just
14  knowing individual testimony, forensics.
15    Q.  Would you have an expectation that I would
16  bring you the evidence that would enable you to answer
17  this question?
18    A.  I'm not sure I understand the question exactly.
19    Q.  Okay.  Let me restate it, if I can.
20        There's no burden of proof on this
21  question.
22    A.  Right.
23    Q.  Okay.  You can get this information from any
24  source.  You may decide from your first witness that you
25  have heard some -- something about the accused that, to

197

1  your way of thinking, it would be more appropriate that
2  he spent the rest of his life, for as long as possible,
3  incarcerated as opposed to an execution.  Okay?
4      A.  Yes, I understand that now.
5      Q.  Okay.  Now, my question to you is:  Are you
6  going to hold it against me if at the end of this
7  process, you're looking at Special Issue No. 2 and
8  you're wondering what was the Defense lawyer doing here?
9  He didn't bring me anything that I can make this -- I
10  can adequately answer.
11      A.  No, I won't hold it against you at all.
12      Q.  Do you have an expectation that in order to
13  answer this question, I've got to bring you the
14  evidence?
15      A.  I don't -- I don't see why.
16      Q.  Okay.  Mitigating evidence has a definition in
17  Texas, and it's up there on that slide.  It's the same
18  thing that, I think, Bob put up for you.  They have a
19  similar slide.
20          Can you think of examples of mitigating
21  evidence that you can share with me?
22      A.  Well, just like he said awhile ago, you know,
23  just as far as, you know, age or -- or something like
24  that, you know, background of -- of the -- of the
25  person's youth or childhood or something like -- along

198

1  those lines.
2          I think that would be, from what I'm
3  understanding of the -- of the term would be mitigating
4  evidence.
5      Q.  Mr. Courtney, thank you for your time.
6      A.  Thank you.
7          MR. CUMMINGS:  That's all I have, Your
8  Honor.
9          THE COURT:  Mr. Courtney, if you will have
10  a seat out in the front hallway, we will call you back
11  in in just a few minutes.
12          PROSPECTIVE JUROR:  Okay.  Thank you.
13          (Prospective juror exits courtroom)
14          THE COURT:  Juror 56, does the State have a
15  challenge for cause?
16          MR. GILL:  We do not.
17          THE COURT:  Does the Defense?
18          MR. CUMMINGS:  No, Your Honor.
19          THE COURT:  State, exercise a peremptory?
20          MR. GILL:  The State does not.
21          THE COURT:  Does the Defense?
22          MR. CUMMINGS:  Yes, Your Honor.
23          THE COURT:  Will you bring Mr. Courtney
24  back in, please?
25          (Prospective juror enters courtroom)

199

1          THE COURT:  Mr. Courtney.
2          PROSPECTIVE JUROR:  Yes, ma'am.
3          THE COURT:  I want to thank you very much
4  for your service in this case and -- however, you are
5  not going to be a juror.
6          PROSPECTIVE JUROR:  Okay.
7          THE COURT:  So that's probably good news.
8          If you'll leave the plastic part of your
9  badge with the bailiff, the jury room is going to mail
10  you your check, but thank you again so much for your
11  participation in this case.
12          PROSPECTIVE JUROR:  Thank you.
13          THE COURT:  Okay.
14          (Prospective juror excused)
15          (Recess from 2:20 p.m. to 2:30 p.m.)
16          (Open court, Defendant present)
17          (Prospective juror enters courtroom)
18          THE COURT:  Hi.
19          PROSPECTIVE JUROR:  Hello.
20          THE COURT:  You are Potential Juror No. 57,
21  Samantha Ann Borja; is that correct?
22          PROSPECTIVE JUROR:  Yes, ma'am.
23          THE COURT:  All right.  If you'll raise
24  your right hand, I'm going to swear you in for this
25  proceeding.

200

1          (Prospective juror sworn)
2          THE COURT:  Okay.  You met with us in the
3  minivoir interviews, and I was wondering if anything
4  has changed in regards to your schedule since that time?
5          PROSPECTIVE JUROR:  No.
6          THE COURT:  Has anything changed since you
7  filled out your jury questionnaire that you need to let
8  us know about?
9          PROSPECTIVE JUROR:  No.
10          THE COURT:  Okay.  You will recall that the
11  person on trial in this case is Mr. John William Hummel.
12  He is represented by Pamela Fernandez, Larry Moore and
13  Fred Cummings.
14          The State of Texas is represented by Robert
15  Gill and Miles Brissette, and both sides are going to
16  have the opportunity to talk to you today about your
17  written instructions that you brought back with you and
18  your jury information sheet.  Okay?
19          PROSPECTIVE JUROR:  Okay.
20          THE COURT:  All right.  State, you may
21  proceed.
22          MR. BRISSETTE:  Thank you, Your Honor.
23          SAMANTHA ANN BORJA,
24  a prospective juror, having been first duly sworn,
25  testified as follows:

201

1   BY MR. BRISSETTE:

2   Q.  Ma'am, good afternoon.  How are you?

3   A.  I'm doing good.  Thank you.

4   Q.  If there's anything you don't understand today,

5   I'm -- the allergy season is upon us, and -- and mine is

6   flared up more than -- than normal.  I'll be happy to

7   rephrase some of the stuff.

8        As the Judge just introduced, my name is

9   Miles Brissette, and my partner is Bob Gill.  We work

10  for a gentleman named Joe Shannon, who's the Criminal

11  District Attorney here in Tarrant County.  We're going

12  to talk to you about -- a little bit this afternoon

13  about your views on the punishment phase of a death

14  penalty.

15  A.  Okay.

16  Q.  Before we do that, I want to go through some of

17  your questionnaire.  Okay?

18  A.  That's fine.

19  Q.  What Lowe's do you work at?

20  A.  The one on Bryant Irvin.

21  Q.  I thought you looked familiar.  I -- part of my

22  paycheck goes to that store for my own home house

23  repairs.

24  A.  Okay.  I thought you -- I recognized you also.

202

1   Q.  Usually not in a suit on the weekend.  I come

2   in on one of my three or four trips because I forgot

3   something.

4        You're now a -- I think you've been

5   promoted.  You're a head cashier at Lowe's, correct?

6   A.  Yes, sir.

7   Q.  And you have folks, I guess, that work

8   underneath you if you're head cashier there at the

9   Bryant Irvin store?

10  A.  Yes, I do.

11  Q.  Anything about the fact that I'm a customer and

12  come in and buy odds and ends from you affect your

13  judgment in any way in a criminal case such as this?

14  A.  No, sir.

15  Q.  In addition to working at Lowe's, your

16  questionnaire indicated that you have a couple of part

17  time jobs as well.

18  A.  I was looking for one, and I have attained one

19  recently, yes.

20  Q.  Okay.  And what's your second job?

21  A.  I'm working as a floor staff at Rave Motion

22  Pictures at Northeast Mall.

23  Q.  All right.  You drive a little bit then?

24  A.  Yeah.

25  Q.  You live near Everman?

203

1   A.  Yes.

2   Q.  And drive over to Bryant Irvin, and then you're

3   all the way over to Northeast Mall?

4   A.  Usually it's Northeast Mall first and then back

5   to Bryant Irvin.  I work mainly the night shift at

6   Lowe's.

7   Q.  And you want to go back to school?

8   A.  Yes.  I'm planning on taking online courses to

9   combat my summer job.

10  Q.  And where are you taking online courses at?

11  A.  Tarrant County College.

12  Q.  Have you already enrolled in those courses?

13  A.  No, sir.

14  Q.  When do you plan on going back?

15  A.  At the next start of the semester, not during

16  the summer.

17  Q.  The case that we're going to talk -- that's on

18  trial took place in Kennedale.  Do you know where

19  Kennedale is?

20  A.  Yes, sir, I do.

21  Q.  Do you know anything about this case outside of

22  what you've heard in the panel you were on a couple of

23  weeks ago?

24  A.  No.

25  Q.  Were you living in Everman back in 2009 around

204

1   Christmastime?

2   A.  Yes, sir.

3   Q.  Do you talk to other folks that live in

4   Everman?  Does your family live there?

5   A.  Yes, they do.

6   Q.  What's your family consist of in Everman?

7   A.  My mother and father and my brothers.

8   Q.  They talk to you about anything that took

9   place?

10  A.  No.

11  Q.  Why anthropology?

12  A.  I've always wanted to travel.  I've never

13  actually traveled out of Texas, and I've always been

14  curious about other cultures, and it seemed like the

15  ideal profession for me.

16  Q.  You like Harry Potter?

17  A.  Yes, sir.

18  Q.  You read all the books?

19  A.  Yes.

20  Q.  What was your favorite?

21  A.  The third one.

22  Q.  There's a question, What is your impression of

23  prosecutors in general?  And you answered, They try to

24  get the hard facts.

25       What's that mean to you?

205

1    A.   Well, when certain things are at stake, whether
2    it be something in civil court or like a criminal court,
3    you have to find the truth in the facts because
4    something is always at stake.
5         Q.   And then your impression of defense attorneys
6    is they try to outmaneuver the prosecutors.
7         A.   Yes.
8         Q.   Care to explain that?
9         A.   From the -- from what I've read out of the
10   papers I've received from the Court, it seems the
11   Prosecutor is always going to try to prove itself, and
12   it's up to the Defense to prove them wrong or, you know,
13   submit a reasoning to disown them.
14        Q.   In -- at your -- your house there in Everman,
15   you live with your mother?
16        A.   Yes.
17        Q.   Are your parents married or divorced?
18        A.   Married.
19        Q.   So it's your mom and dad and then your brother
20   or brothers?
21        A.   Two brothers, Adam and Michael.
22        Q.   Are they older or younger?
23        A.   Older.
24        Q.   And what do they do for a living?
25        A.   My brother, Michael, he works with my father at

206

1    L.H. Land.  It's a -- as a tape and bedder, and Adam is
2    actually disabled, so he does not work.
3         Q.   All right.  And as all of us coughing here,
4    there's a pitcher of water there, and I promise nobody
5    has coughed on, and cups if you need some.  Okay?
6         A.   Thank you.
7         Q.   Prior to getting picked for jury duty, have you
8    ever thought about the capital murder laws in the State
9    of Texas?
10        A.   They're -- it came up sometimes in school, but
11   other than that, no.
12        Q.   In which school, TCC?
13        A.   No, high school, really.
14        Q.   Where did you go to high school?
15        A.   Everman.
16        Q.   What context did it come up in Everman?
17        A.   We were doing a mock election where the class,
18   they ran for office, and the class deliberated on
19   choosing people.
20        Q.   All right.  What was the -- what context did it
21   really come up -- what was the discussion around?
22        A.   We had to come up with a PowerPoint
23   presentation based on viewpoints such as the death
24   penalty or having a weapon and such things as that that
25   would normally come up in presidential elections.

207

1         Q.   All right.  And what position did you take on
2    the death penalty in that mock election?
3         A.   From what I remember, I believe I was -- I saw
4    the necessity of it, but I was against it.
5         Q.   Okay.  Is that a view you share personally
6    outside of the mock election?
7         A.   Yes, sir.
8         Q.   Is that a view you've had for awhile?
9         A.   Yes.
10        Q.   You understand today -- and we'll have a little
11   PowerPoint here as well -- the oath right now that
12   you're under is to tell the truth.
13        A.   Yes, sir.
14        Q.   Now, as we go through this for the next half
15   hour or so, I want to make sure you understand that if
16   you're selected as a juror, you have to take a second
17   oath, and that's to render a verdict that's based on the
18   law and the evidence.
19        A.   Yes, sir.
20        Q.   Up until this point and -- and -- and through
21   whether or not if you have to come back and raise your
22   hand again today, you can tell us whatever you want, and
23   you don't have to follow any law right now.  All you
24   have to do is answer the questions truthfully.
25             But if you're selected and you get selected

208

1    as a juror, you got to follow the law to the letter,
2    whether your personal beliefs are of such a state that
3    you just can't, you know, in real life, you know, I
4    don't believe in capital punishment.  That's what I
5    gathered from your -- your questionnaire, is that this
6    wasn't something you were into; is that correct?
7         A.   Yes, sir.
8         Q.   So you see where that may rub up against an
9    oath in a case?
10        A.   Yes.
11        Q.   So the law allows people to have their beliefs
12   and have those beliefs so deeply rooted that they can't
13   take the oath and -- and honestly give fair
14   consideration to both sides in a case.  You understand
15   that?
16        A.   Yes.
17        Q.   Is your belief that the death penalty shouldn't
18   be around so strong that -- that it would cause you to
19   not be able to follow the -- your oath as a juror?
20        A.   I think it would be hard, yes.
21        Q.   Okay.  How so?
22        A.   Well, besides, you know, being confronted with
23   it in a mock election, I know that this is totally
24   different, and being faced with that decision, I don't
25   think I'd want to deal with that, have that on my

1  conscience.

2  Q.  All right.  And that's -- that's not uncommon

3  for people to sit up on the -- on the stand and not want

4  to have it on their conscience.  Is there a reason why

5  you wouldn't want to have it on your conscience?

6  A.  As I see it, both decisions are just -- they're

7  not pertaining to my life.  They're someone else's, and

8  I see that I don't have a place to judge that person.

9  Q.  Okay.  I notice in your questionnaire that

10  you're a parishioner of All Saints?

11  A.  Yes.

12  Q.  Being raised in -- by Jesuits, I understand

13  that -- that the Catholic church has some views on the

14  death penalty in the United States.  Are you aware of

15  those views?

16  A.  No, sir.

17  Q.  Are you aware of anything that the church

18  has -- Catholic church has for or against the death

19  penalty of a person?

20  A.  No.

21  Q.  When you talk about your views as -- as you sit

22  here today, are they of such a nature that you couldn't

23  sit in judgment of somebody else?  Is that what you're

24  saying?

25  A.  Yes, sir.

1  you be able to sit in judgment, then, without doing

2  violence to your conscience?

3  A.  Yes.

4  Q.  Do you know what I mean by doing violence to

5  your conscience?

6  A.  Making it hard on my conscience.

7  Q.  Yeah.  I mean, we -- we brought in 210 people

8  originally.  Okay.  210 folks came in to jury selection

9  because we figured out of that 210, there might be some

10  folks that their views just are such that, you know

11  what, this case might not be the best thing for them.

12  So each side is entitled to have some unbiased jurors in

13  a case to hear the facts and render a verdict based on

14  the law and the evidence outside of people's personal

15  views that they may have.  They have to leave them

16  outside the door.

17  So the question that I have is:  You've

18  expressed a view that from -- you exhibited at Everman

19  when you were doing the mock election, and your personal

20  view that you know what, the death penalty is just not

21  for me, neither is the other punishment option, which is

22  life in prison; that somebody else should be the one

23  that sits in judgment.  Am I understanding what you've

24  said so far?

25  A.  Yes, sir.

1  Q.  You understand if you were to take the second

2  oath that's up there, you would have to sit in judgment

3  of someone?

4  A.  Yes, I do.

5  Q.  And am I understanding you correctly that your

6  belief is that only somebody else higher than this

7  should be able to sit in judgment of people?

8  A.  Yes, sir.

9  Q.  How so?

10  A.  Because from both of these options, either life

11  in prison or the death penalty, it eventually leads to

12  death, I believe; and I don't think it's right for me to

13  be able to say when it should happen because it'll

14  happen either way.

15  Q.  All right.  Happen either way by -- what do you

16  mean?  Naturally?

17  A.  Naturally or eventually.

18  Q.  So you're confronted with an issue here then

19  that as a juror, you have to follow the law if you're

20  selected.

21  A.  Yes.

22  Q.  And you would have to sit in judgment of

23  somebody?

24  A.  Yes.

25  Q.  I'm slipping through to a question here.  Would

1  Q.  You understand, though, if you're a juror in

2  the case, that's not for somebody else to decide?  That

3  would be for you to decide.

4  A.  Yes, sir.

5  Q.  And what I'm understanding you is you said

6  you're not that person that can do that?

7  A.  No, sir, I'm not.

8  Q.  That you wouldn't be able to take the oath to

9  follow the law and decide a verdict in the punishment

10  phase of either life imprisonment or the death penalty?

11  A.  I could follow the law, and from what I

12  understand and from what I've read and what I've been

13  informed of, I would have to be confronted with the

14  choice of sending a person to either life in prison or

15  the death penalty.

16  And as far as -- I don't know how that

17  process will actually -- what -- everything is involved

18  in that process, I would opt for life in prison, not the

19  death penalty, for sure.  I wouldn't opt for that

20  option.

21  Q.  Now, you have your homework assignment that

22  you -- you brought back with you, your paperwork?

23  A.  Yeah.

24  Q.  And you've read the two special issues that are

25  there?

213

1    A.   The options, yes.

2    Q.   Am I understanding you that you already have

3    made up your mind, if we get to a punishment phase in a

4    capital case, that you would answer the questions in

5    such a way that a life sentence would be imposed?

6    A.   Yes.

7    Q.   So let's go through a few of those special

8    issues now.  Special Issue No. 1:  Do you find beyond a

9    reasonable doubt that there's a probability the

10   Defendant would commit criminal acts of violence that

11   would constitute a continuing threat to society?

12         Now, if I understand you correctly, based

13   upon the views you've expressed here -- do you know how

14   we got here first?

15   A.   Yes.

16   Q.   How did we get here?

17   A.   This question?

18   Q.   Yes, ma'am.  Besides me tricking the computer

19   to go to the question.

20   A.   We've -- I've seen the evidence in court.

21   Q.   Okay.  And there's -- has there been a verdict

22   rendered at one phase of the trial already?

23   A.   Yes.

24   Q.   So what has the person been found guilty of if

25   we're going to consider Special Issue No. 1?

214

1    A.   Capital murder.

2    Q.   All right.  And the definition in this case is

3    the knowingly killing two individuals during the same

4    criminal transaction.  You understand that?

5    A.   Yes, sir.

6    Q.   So based on your personal beliefs that I

7    believe you've told me are well-founded, you would

8    answer Special Issue No. 1 in a way that an individual

9    would be subject to a life sentence without parole as

10   opposed to proceeding to Special Issue No. 2; is that

11   correct?

12   A.   Well, I noticed it was kind of -- you could

13   only answer -- if you answered negatively in this one

14   and then affirmative in the next question, that it would

15   result in that.  And on this question before I read the

16   end result, I first answered yes.

17   Q.   Okay.  You haven't had any facts yet.

18   A.   No.

19   Q.   And if I understand what your beliefs are is

20   that you wouldn't want to answer the questions

21   personally in a way that would end up in a life sentence

22   as opposed to a death sentence?

23   A.   Yes.

24   Q.   You understand that if a jury were to answer

25   that they're not a continuing threat to society, if the

215

1    answer is no to this, then a life sentence is -- put

2    in place by the Judge?

3    A.   Yes, I saw that.

4    Q.   So would you have a predisposition then in this

5    case to answer this no to guarantee that a life sentence

6    without parole be put in place?

7    A.   I was kind of confounded by it.  The answering

8    just those two questions would lead to just, you know, a

9    continuation based on the jurors' decision, so I

10   understand that, that it would lead to the life

11   sentence.

12   Q.   All right.  And would you vote in such a way as

13   to guarantee that a life sentence would be imposed,

14   based on your views, even if the State had proved to you

15   beyond a reasonable doubt that a person was a future

16   danger?

17   A.   Yes.

18   Q.   And like we've gone over here, the Judge would

19   instruct you if the answer is no, then the sentence is

20   life.  And no doesn't have to be unanimous.  No could be

21   ten to two, as I think the instruction's laid out for

22   you.

23         We talked about just a minute ago proof

24   beyond a reasonable doubt for the answer yes.  You

25   have -- the State would have to prove to you beyond a

216

1    reasonable doubt to be the answer of yes.

2         And if unanimous -- if an unanimous yes,

3    you move to the second issue.

4    A.   Yes.

5    Q.   So we're clear, your predisposition is to find

6    Special Issue No. 1 to be no so that a life sentence is

7    imposed as opposed to giving the -- holding the State to

8    its burden beyond a reasonable doubt and answering the

9    question?

10   A.   If the State proved enough for me, then, yes,

11   depending on the evidence.

12   Q.   Okay.  Now I'm confused.  Let's take a breath

13   here.  Okay?

14         For the question Special Issue No. 1, it

15   has to be proved beyond a reasonable doubt to be yes.

16   A.   Uh-huh.

17   Q.   That the State has proved that a particular

18   individual on trial for capital murder is a future

19   danger to society.  Okay?  You know if you were to

20   answer that question yes, that you would move the

21   Defendant one step closer to the death penalty.

22   A.   Yes.

23   Q.   Taking that into consideration, could you

24   answer the question yes, knowing that we're one step

25   away from the death penalty and having to consider

217                                                                                      219

1   Special Issue No. 2?
2       A.   No.
3       Q.   All right.  You couldn't consider it?
4       A.   No.
5       Q.   And it's okay if you can't.  That's why we have
6   the 210 jurors.  You understand that if you were to, as
7   a jury, answer the question no to Special Issue No. 1,
8   that the trial's over at that point, and you wouldn't
9   proceed to Special Issue No. 2?
10      A.   Yes.
11      Q.   And in an abundance of caution, I want to go
12  over Special Issue No. 2 with you, just in case at some
13  point, since we've got your answers here, I want to make
14  sure we're clear on some stuff.
15           Based on your life experiences -- this is
16  the mitigation question:  Is there sufficient mitigating
17  circumstances (sic) or circumstances to warrant that a
18  sentence of life imprisonment rather than a death
19  sentence be imposed.
20           If I understand what you've said to us so
21  far this afternoon is that your predisposition on coming
22  in and your views on the death penalty would be such
23  that you would find a way to have mitigating evidence in
24  favor of somebody.  If you had to answer this question,
25  you would answer, yes, there is mitigating evidence.  Do

1   second question yes so a life sentence would take place?
2       A.   Yes.
3       Q.   I'll bring this question up again for you.  Is
4   there any reason, be it moral, ethical or religious that
5   you could not be part of the process that results in the
6   death penalty?
7       A.   Yes.
8       Q.   And I understand that would be moral and
9   ethical for you, not so much religious?
10      A.   Moral and ethical.
11      Q.   Anything anybody can do to change your mind on
12  that?
13      A.   No.
14      Q.   Thank you, ma'am.
15           MR. BRISSETTE:  Your Honor, we'll pass the
16  juror.
17           THE COURT:  Defense?
18           MR. MOORE:  Thank you, Judge.
19           VOIR DIRE EXAMINATION
20  BY MR. MOORE:
21      Q.   Ms. Borja, I'm Larry Moore, and I, along with
22  Fred Cummings and Pam Fernandez, represent John in this
23  case.  And I want to talk to you just a little bit about
24  your views regarding the death penalty so that I'm sure
25  that we all understand how you feel and that you're

218                                                                                      220

1   I understand that correctly?
2       A.   Yes.
3       Q.   And what is that based upon?
4       A.   My belief.
5       Q.   Can I change your beliefs in that way?
6       A.   No, sir.
7       Q.   All right.  Can anybody else change your
8   beliefs?
9       A.   No, sir.
10      Q.   And they're something that have been vested in
11  you since your days in Everman High School when you were
12  doing your mock election?
13      A.   Yes.
14      Q.   And you understand that there's no burden of
15  proof for Special Issue No. 2, and if one were to answer
16  no on that, it would be the death penalty?
17      A.   Yes, sir.
18      Q.   No must be unanimous, but the yes answer that
19  you said that you would do is ten or more have to agree.
20      A.   Yes.
21      Q.   You picked up on that -- it's a flip from the
22  first question, correct?
23      A.   Yes.
24      Q.   And if I understand you, you would be
25  predisposed to answer the first question no and the

1   sure -- so that you are sure how you feel about it.
2   Okay?
3           And -- and I want to talk to you a little
4   bit about some of the things on the questionnaire,
5   because it's my take that some of the things you put in
6   the questionnaire are a little bit inconsistent with
7   what you told us today.
8       A.   Okay.
9       Q.   And -- and I want to start with a little bit of
10  an explanation.  In -- in a capital murder case, to be
11  qualified as a juror, you don't have to believe that the
12  death penalty is a great thing.  You don't have to be
13  ready to do it tomorrow.  If -- if the situation was
14  that only people that were in favor of the death penalty
15  could serve as jurors, you know, how fair is that going
16  to be and how good of a cross-section of the community
17  is that going to represent?
18           What the law does demand is that the
19  jurors' personal beliefs not be such that it prevents
20  them or impairs -- substantially impairs them from being
21  able to serve.  Okay?
22           The requirement is that the -- the issues
23  in the case -- guilt/innocence, punishment, all that --
24  be based on the evidence in the case and not on
25  anybody's personal views in regard to that.  Do you see

221

1  what I mean?

2      A.  Yes, sir.

3      Q.  Okay.  And -- and you're the only person in

America that knows for sure how you feel about this, and

you probably hadn't thought about it a lot before you

6  got called down here a week or so ago for the

7  empaneling.

8              And I -- I assume that you thought about it

9  some since then; is that right?

10     A.  Yes, sir.

11     Q.  Okay.  And one of the things that is -- is

12 important is that you understand that the process is

13 intended for the jurors to look at the facts and then

14 make an honest answer to the issues that are presented

15 to them based strictly on those facts.  You see how that

16 works?

17     A.  Yes, sir.

18     Q.  Some people may think that the death penalty is

19 a great thing and that we ought to do it more often, but

20 they're not allowed -- or they're not supposed to be

21 able to answer the questions or find somebody guilty

22 based on that personal belief.  You see how that works?

23     A.  Yes, sir.

24     Q.  You're supposed to look at the facts and make a

25 determination, have they proved what they have to prove

222

1  in order to get to where they want to go.

2              And if they do it, great; if they don't do

3  it, great because this is a situation where the

4  individual jurors judge the evidence.  You with me so

5  far?

6      A.  Yes, sir.

7      Q.  Okay.  You got reservations about the death

8  penalty.  You told us that in the -- in the

9  questionnaire.  One of the questions asked you to --

10 to -- it asked you, In regard with reference to the

11 cap -- to the death penalty, which of the following

12 statements would best represent your beliefs.

13             And there was about five different choices.

14 One of the choices was, I could never, regardless of the

15 facts and circumstances, return a verdict which assess

16 the death penalty.  And you didn't check that.  Okay?

17     A.  Okay.

18     Q.  One you checked said, I do not believe the

19 death penalty ever ought to be invoked; however, as long

20 as the law provides for it, I could assess it under the

21 proper set of circumstances.

22             And -- and to me that answer appeared to be

23 a little bit consistent -- or actually a lot consistent

24 with the question where it asked you earlier, Do you --

25 are you generally in favor of the death penalty capital

223

1  punishment as a punishment for capital murder?

2              And you wrote no.  You said, I am not

3  generally.  It depends on the circumstances, et cetera;

4  is that correct?

5      A.  Yes, sir.

6      Q.  Do you remember that answer?

7      A.  Uh-huh.

8      Q.  At -- at the time that you were answering the

9  questionnaire, did you feel like that there might be

10 some set of facts and circumstances, however horrible,

11 which -- in which you could feel that the death penalty

12 was an appropriate punishment?

13     A.  Where I could understand it from a certain

14 viewpoint, but not to where I would be the one making

15 the decision, no.

16     Q.  Okay.

17     A.  I think that's the difference that you saw.

18     Q.  All right.  Well, just let me -- you've gone

19 through the process, and you kind of feel how you -- do

20 you feel like you understand how we go from a finding of

21 guilt, to somebody's guilty of capital murder, to the

22 actual decision as to whether or not he gets death?

23     A.  Yes.

24     Q.  The jury, they may hear additional evidence

25 about the particular Defendant on trial.  They may hear

224

1  nothing in the punishment phase.  There may be evidence

2  that the guy had been, you know, basically a blight on

3  society since the day he got born, been in trouble time

4  and time again, this -- evidence that he's committed

5  other murders, whatever it may be; or there may be no

6  evidence, it's just the evidence of the crime.

7              And what is presumed is that the jury would

8  go out and consider that first question and decide

9  whether or not he was a future danger and base the

10 evidence -- base the answer to the question on the

11 evidence, not on whether or not they felt the death

12 penalty was appropriate.  Okay?  And answer that

13 question honestly.

14             Do you think that you could act as a juror

15 and honestly answer that question, even if it was to

16 result in you going forward with the process regarding

17 the death penalty?

18     A.  Depending on the evidence that I received, yes.

19     Q.  Okay.  So if -- if there was sufficient

20 evidence to convince you, acting as a juror, that the

21 guy was a future danger, you could honestly answer that

22 and say, yes, he is a future danger even though you knew

23 that that could lead you to the consideration of the

24 next question; is that correct?

25     A.  Yes.

225

1    Q.  All right.  And the second question is a little

2  bit different because it doesn't look strictly at the

3  crime that is committed.  It kind of looks at the

4  particular Defendant, his background, his character,

5  what kind of person -- not just what did he do in this

6  particular case but what kind of person has he been.

7         Because any evidence that might be relevant

8  to those sentencing questions is admissible, whether

9  it's good evidence or bad evidence.  If he's got a prior

10  history of bad acts or whatever, you know, the State can

11  introduce them.  If this was the first and only time

12  that he ever got in trouble or he had a prior history of

13  engaging in -- in good behavior or he did things to help

14  his neighbors or serve his country or whatever it may

15  be, that's admissible for the jury to take into

16  consideration and decide whether or not they feel like

17  it's a mitigating circumstance.  Because you decide as a

18  juror what evidence is mitigating to you.  You see what

19  I mean?

20    A.  Yeah.

21    Q.  Could be the State -- you know, his -- his

22  mental condition, could be the kind of background that

23  he had, you know, the environment in which he grew up,

24  could be any number of things.  But the intention is

25  that all of that evidence be taken by the jurors, they

226

1  give it whatever weight that they want to give it and

2  then make an honest decision based on the evidence that

3  they've heard.  Okay?

4         Now, you said earlier that you thought you

5  might have a predisposition to answer that question,

6  that there is a mitigating circumstance.  But are you

7  telling us that you would answer that question yes even

8  if you didn't find evidence in the mitigating

9  circumstance?

10    A.  Well, all I -- the only -- I haven't received

11  any evidence -- any verdict, so all my answers today are

12  based on my beliefs.

13    Q.  Okay.  And you understand that if you got to

14  the point where you were a juror, your -- your personal

15  beliefs are not to dictate the answers.  It's your --

16  it's how you feel about the evidence?

17    A.  Yes, sir.

18    Q.  You think you can do that?

19    A.  Yes, I could.

20    Q.  Okay.  And there may -- if there's not any

21  evidence in the mitigating circumstance, then what the

22  law says is that the jurors are going to answer that

23  question no, that there is no mitigating circumstance.

24         If there is evidence of a mitigating

25  circumstance and if the juror feels like that's

227

1  sufficient to convince them that the life sentence is

2  appropriate, then they answer it yes.  You see how that

3  works?

4    A.  Yes.

5    Q.  So I take, it based on what you're telling us

6  and -- and with this further discussion, you do feel

7  like that you could participate and answer that honestly

8  based on the evidence that you heard in the case; is

9  that correct?

10    A.  Yes.

11    Q.  And I understand that you don't want to --

12  believe me, if we were only taking volunteers, we -- we

13  would not be very busy down here.  We -- we call

14  citizens down here as part of their civic duty and we

15  ask them to undertake very difficult responsibilities in

16  regard to these cases.

17         And -- and it's a difficult -- it's a

18  difficult thing sometimes because they're difficult

19  decisions, and a lot of people don't want to make them,

20  but as part of our civic duty, that's what we do.  Okay?

21  Have you got any questions about that?

22    A.  No, sir.

23    Q.  Ms. Borja, I appreciate it.  Thank you.

24         MR. MOORE:  I don't have any other

25  questions.

228

1         THE COURT:  I have two questions for you,

2  Ms. Borja.

3         You told Mr. Moore that your answers today

4  are based on your beliefs; is that right?

5         PROSPECTIVE JUROR:  Yes.

6         THE COURT:  Okay.  Obviously, nobody's

7  heard any evidence at this point, so the question is

8  whether you can take the oath that's required of you as

9  a juror, which would be to base your verdict on the law

10  and the evidence in the case.  Okay?

11         And so my question is whether as a -- if

12  you were selected to be a juror and had to take that

13  oath, would you base your decision in the case upon your

14  personal beliefs or upon the law and the evidence that's

15  presented in the case?

16         PROSPECTIVE JUROR:  The law and the

17  evidence.

18         THE COURT:  Okay.  And would your opinion

19  about the death penalty and not be -- wanting to be a

20  part of a process where that could potentially result,

21  would that feeling interfere with or impair your ability

22  to view the evidence impartially?

23         PROSPECTIVE JUROR:  At this point I can

24  say, no, it wouldn't, Your Honor.

25         THE COURT:  Okay.  Well, you understand

229

1  that once you're in the jury box, it's too late to -- to
2  say, Hey, you know what, my personal opinion is so
3  strong that there's no way that I could base my decision
4  on the evidence? I'm always going to vote against the
5  death penalty.
6          You understand how it's too late at that
7  point?
8          PROSPECTIVE JUROR:  Yes.
9          THE COURT:  Okay.  And so that's why we're
10  having to ask you these questions now, and in light of
11  that, what's your answer to that question?
12          PROSPECTIVE JUROR:  Could you repeat your
13  question one more time?
14          THE COURT:  Yeah.  I'm sure my question got
15  lost somewhere in that explanation, didn't it?
16          My question was whether your belief that
17  you're not in favor of the death penalty and that you
18  would rather not be a part of a process that could
19  result in that, whether that belief is so strong that
20  that would interfere with your ability to follow your
21  oath as a juror and base your decision on the law and
22  the evidence.
23          PROSPECTIVE JUROR:  Yes, it would.
24          THE COURT:  Okay.  If you will have a seat
25  out in the hallway, we'll call back in in just a few

230

1  minutes.  You can take your instructions with you.
2          PROSPECTIVE JUROR:  Thank you.
3          THE COURT:  Thank you.
4          (Prospective juror exits courtroom)
5          THE COURT:  Okay.  Juror 57, State, have a
6  challenge for cause?
7          MR. BRISSETTE:  Yes, Your Honor.  The
8  juror, throughout the State's questioning of her and in
9  the Court's questioning, the last question, she has held
10  true to her beliefs that they're based on her moral and
11  ethical belief, she could not sit in judgment of
12  somebody.  One, she could not be part of a case that
13  would render a death penalty, and her beliefs are
14  such -- rise to such a level that they would interfere
15  with her giving this case a fair read; that she would be
16  biased toward the life without parole aspect of this and
17  she would not be able to sit in judgment and render a
18  verdict based on the law and the evidence in the case,
19  and her personal beliefs would bleed over into the case
20  to the extent that it would prejudice the State.
21          MR. MOORE:  I -- I don't believe that her
22  having that -- a predisposition or bias in favor of life
23  without parole is the basis for a challenge for cause.
24  If -- the question is whether or not her personal views
25  would substantially impair or prevent her service as a

231

1  juror in the case, and I think the questions that was
2  asked -- that I asked her and the Court asked her about
3  could she answer it based on the evidence in the case
4  and under the law were, yes, she could.
5          MR. BRISSETTE:  Judge, I think her
6  statements have impaired her and prevent her from her
7  involvement in this case of following that.  It
8  substantially impaired her to a point where she can't
9  sit in judgment in this case.  I think she's expressed
10  those views, and she's not going to waver from them.
11          THE COURT:  Based upon the overall tenor of
12  the juror's statements, I'm going to grant the State's
13  challenge for cause to Juror 57.
14          Will you bring her back in, please?
15          THE BAILIFF:  Yes, ma'am.
16          (Prospective juror enters courtroom)
17          THE COURT:  All right, Ms. Borja.  Do you
18  have -- do you have your plastic part of your jury
19  badge?
20          PROSPECTIVE JUROR:  No, I think I dropped
21  it in my car.
22          THE COURT:  Oh, okay.
23          PROSPECTIVE JUROR:  Sorry.
24          THE COURT:  Okay.  No worries.  If you find
25  it, will you mail it back to the central jury room?

232

1          PROSPECTIVE JUROR:  Yeah.
2          THE COURT:  They are going to mail you your
3  jury check because you're going to be excused from any
4  further service in this case.
5          PROSPECTIVE JUROR:  Okay.
6          THE COURT:  I do want to thank you very
7  much, though, for your service up to this point, your
8  participation.  And will you do me a favor?
9          PROSPECTIVE JUROR:  Sure.
10          THE COURT:  We've talked to 57 people so
11  far, and you're one of the smartest, most articulate
12  people that we've talked to out of that large of a group
13  of people and people up to 70 years old.  So tell your
14  mom that she should be proud of you and work on getting
15  back into school.  Okay?
16          PROSPECTIVE JUROR:  I definitely will.
17          THE COURT:  Okay.
18          PROSPECTIVE JUROR:  Thank you, ma'am.
19          THE COURT:  All right.  Thank you very
20  much.
21          (Prospective juror exits courtroom)
22          THE COURT:  Okay.  57, Paula Cotten.
23          (Prospective juror enters courtroom)
24          THE COURT:  Hello.  You are Potential Juror
25  No. 58, Paula Cotten; is that right?

233

1    PROSPECTIVE JUROR: Yes, ma'am.

2         THE COURT: And, Ms. Cotten, I need to

3    swear you in for today's proceedings, so if you'll raise

4    your right hand, please?

5         (Prospective juror sworn)

6         THE COURT: All right. Do you actually

7    have a folder with all of your instructions?

8         PROSPECTIVE JUROR: It was easier not to

9    lose it in the length of time it's been.

10        THE COURT: That's very organized.

11        You filled out a jury questionnaire several

12   weeks ago. Has anything substantial changed that you

13   need to let us know of?

14        PROSPECTIVE JUROR: No.

15        THE COURT: And has anything changed about

16   your schedule since you were here last?

17        PROSPECTIVE JUROR: No.

18        THE COURT: Okay. As you will recall, the

19   person on trial in this case is John William Hummel. He

20   is represented by Fred Cummings, Larry Moore and Pamela

21   Fernandez.

22        The State is represented by Robert Gill and

23   Miles Brissette. Both sides are going to have the

24   opportunity to talk to you this afternoon regarding

25   issues in your jury information sheet as well as the

235

1    with you issues that -- that would pertain to the trial

2    of any criminal case. Today we're going to talk

3    specifically about the death penalty.

4         A. Okay.

5         Q. Okay? We've been introduced to you, and just

6    so we go over the oaths that jurors take once again real

7    quick, your obligation today is just to tell us the

8    truth about how you honestly feel about things.

9         A. Okay.

10        Q. And then if you are selected to be a juror in

11   the case, you take an additional oath, and that oath

12   binds you to render a verdict based on the law and the

13   evidence.

14        A. Okay.

15        Q. The law as the Judge gives to you in the Jury

16   Charge and the evidence that you hear from the witness

17   stand during the trial.

18        A. Okay.

19        Q. Okay. There are a couple of preliminary

20   matters I want to talk to you about your questionnaire

21   before we get too far into the legal issues.

22        A. Okay.

23        Q. First of all, I notice that you're scheduled

24   for a vacation on June 9th --

25        A. Yes.

234

1    death penalty issues that are being faced in this case.

2    Okay?

3         PROSPECTIVE JUROR: Okay.

4         THE COURT: All right. You may proceed.

5         MR. GILL: Thank you.

6         PAULA YOUNG COTTEN,

7    a prospective juror, having been first duly sworn,

8    testified as follows:

9              VOIR DIRE EXAMINATION

10   BY MR. GILL:

11        Q. Good afternoon, Ms. Cotten.

12        A. Thank you. Hello.

13        Q. You doing all right this afternoon?

14        A. I'm doing good, a bit nervous.

15        Q. Okay, good. I hope we didn't keep you waiting

16   too long.

17        A. No, that's all right.

18        Q. Okay. Thank you.

19        As you know, this is the individual

20   interview that we talked to you about last time you were

21   in court, and this is our opportunity today to talk to

22   you about the matters of law that are peculiar to the

23   punishment phase of a death penalty case.

24        A. Okay.

25        Q. The last time you were in court, we covered

236

1         Q. -- is that right, to go out to Palo Duro?

2         A. Uh-huh, but we'll be back the 11th.

3         Q. Okay. That was the first question. We're

4    starting trial on the 13th.

5         A. Okay.

6         Q. Okay. You're only going out there overnight

7    maybe or --

8         A. We're -- we're leaving the 8th. I just -- I

9    couldn't remember the exact date, but it's the 8th

10   through the 11th.

11        Q. Okay. But you'll be back in plenty of time for

12   the trial?

13        A. Oh, yes.

14        Q. We anticipate the trial is going to take about

15   two weeks.

16        A. Yes.

17        Q. Will you be able to dedicate two weeks for the

18   trial?

19        A. Yes.

20        Q. Also you indicated on the questionnaire that

21   your -- your mother has a number of health issues.

22        A. Yes, sir.

23        Q. Okay. Does she depend on you for care, or does

24   she have someone else to care for her --

25        A. I have a brother and sister, but I live in the

237

1    same area that she does, so I'm the person she depends
2    on.  She does not drive anymore, so I'm first, but my
3    brother and sister are also available.
4        Q.  Okay.  So you're primary care?
5        A.  Uh-huh.
6        Q.  And then you have some people for backup?
7        A.  Yes.
8        Q.  Okay.  Generally, the way a criminal trial
9    works is the jury would be instructed to report to the
10   courthouse every day at 8:30 or 9:00 o'clock.  I don't
11   know exactly how Judge Gonzalez does it.  Mostly -- most
12   of the courts are 9:00 o'clock in the morning.
13       A.  Okay.
14       Q.  You know, everybody in the witness stand -- on
15   and on -- in the jury box at 9:00 ready to get going.
16   Okay?
17       A.  Okay.
18       Q.  And we work until 5:00, 5:30, maybe -- maybe a
19   couple of days a little later than that.  You know,
20   maybe a late night, maybe not, mostly business hours.
21       A.  Okay.
22       Q.  And generally don't work Saturdays and
23   Sundays --
24       A.  Okay.
25       Q.  -- in court.

238

1            Now, I can't say in a capital murder trial
2    that the Judge might work a Saturday, might not.  Okay?
3        A.  Okay.
4        Q.  But that's generally the schedule that we would
5    follow.  Would -- would your situation with your mother
6    allow you to attend court on that schedule?
7        A.  Oh, yes, because like I said, my sister is
8    always there when I'm not.
9        Q.  Okay.  That's all we need to know about that.
10   Then you'll be available if -- if needed, right?
11       A.  Yes, sir.
12       Q.  Okay.  You have five grandkids?
13       A.  Yes.
14       Q.  How many do you have?
15       A.  I have -- let me think.  Ten.
16       Q.  Okay.
17       A.  I had to think.
18       Q.  I had to say --
19       A.  Well, I had to add a couple there --
20       Q.  Okay.  So generally, what ages do they range?
21       A.  I have a six-month-old, three-year-old,
22   five-and-a-half, and all the others are like 11 up.  I
23   have two in college.
24       Q.  Okay.  Pretty wide range.
25       A.  Yes, pretty wide range.

239

1        Q.  Okay.  You got some boys and some girls in
2    there, I take it?
3        A.  Yes, mainly boys.
4        Q.  Mainly boys, okay.
5            You indicated on the questionnaire that you
6    have a stepson that was convicted of selling drugs?
7        A.  Yes, sir.
8        Q.  About how long ago was that, and where did that
9    occur?
10       A.  That occurred here in Tarrant County, probably
11   19 years ago, around that time.
12       Q.  Okay.  So quite awhile ago then?
13       A.  Yes, quite awhile ago.
14       Q.  Okay.  Okay.  What was the outcome of the case?
15       A.  He went to -- to the federal prison for one
16   year, around a year.
17       Q.  Federal prison?
18       A.  Yes.  It was -- he sold drugs to a federal man.
19       Q.  Okay.  The questionnaire also -- also asked you
20   your impression of prosecutors and -- and defense
21   attorneys in general, and you said that the prosecutors
22   are trying to protect us from crime?
23       A.  Yes, sir.
24       Q.  And that the Defense attorneys defend the
25   person who is evil.  I know it's necessary, but I find

240

1    it hard.
2        A.  Yeah.  I -- I know there's good people and bad,
3    but that was my opinion at that time.  I have to say I
4    had had a medical procedure the day before, so I don't
5    really know if I was thinking real clearly that
6    afternoon.
7        Q.  Okay.  Okay.  What's your impression of -- of
8    defense attorneys today?
9        A.  Well, I know they have a job.  I mean, I still
10   know that there's some bad people they have to defend,
11   but I know there are innocent people also.
12       Q.  Okay.  So you don't have any type of
13   prejudgment about -- about the situation you're involved
14   in here?
15       A.  No, sir.
16       Q.  Now, you indicated that you followed the Joe
17   Dinkins case.
18       A.  Yes.  He was a -- my husband was a fireman and
19   he was a fireman acquaintance of ours, and so I kept up
20   with that.
21       Q.  You think that justice was done in that case?
22       A.  Well, that's probably -- I don't know all the
23   circumstances because I wasn't at the trial, but I knew
24   her, and it bothered me that I don't think he went to
25   prison a very long time for killing her and the doctor.

241

1    Q.  Okay.  And I -- you know, I remember hearing
2  about the case, but I can't remember what -- what the
3  outcome was either, so...
4           Is there anything -- anything about that
5  case you think would -- would carry over into your
6  service as a juror in this case?
7    A.  No.  I know the day -- last time I was here, I
8  had a strong opinion, and I didn't realize at the time
9  it was probably John (sic) Dinkins case that came out.
10  But I really realized, instructed by the Court, I
11  couldn't make a fair -- but, I mean, that was what was
12  in my mind that day.  It bothered me.
13    Q.  Okay.  Does it still bother you?
14    A.  Maybe a little bit.  You know, it's just
15  something when you know a person and they lose their
16  life, that bothers you.
17    Q.  Uh-huh.  Well, there's -- there's, you know,
18  having something like that bothering you, and then
19  it's -- then there's another situation where having
20  something like that bother you to the point where you
21  would take it out on someone else during the course of a
22  criminal --
23    A.  No, I don't.  I don't take things out on other
24  people, usually.
25    Q.  So you can keep the two matters separate?

242

1    A.  I can keep them separate.
2    Q.  You realize that whatever -- whatever goes on
3  in this case, it has -- it absolutely doesn't have
4  anything to do at all with the Dinkins case?
5    A.  Yes, I understand that.  I think that was just
6  such a personal thing with me.
7    Q.  Okay.
8    A.  Because she was my friend also.  I mean, I have
9  to say it was both of them.
10    Q.  So you indicated that -- the last time you were
11  here that you believe the death penalty is appropriate
12  for some crimes involving murder, and you could return a
13  verdict which assesses the death penalty in a proper
14  case?
15    A.  Yes.
16    Q.  Is that still your opinion today?
17    A.  Yes, sir.
18    Q.  Do you recognize that under our law, there's --
19  you know, our law is set up to differentiate people that
20  can get convicted of capital murder, that some should
21  receive the death penalty and some should receive life
22  in prison.
23    A.  Yes, sir.
24    Q.  And that all that is decided based upon the law
25  that the Judge gives you in a Jury Charge and then --

243

1  and then the facts of the case as they come out during
2  the trial.
3    A.  Yes, sir.
4    Q.  Is that your understanding of how a criminal
5  trial should work?
6    A.  Yes.  I mean, I think I've learned a lot just
7  from sitting up here those -- the last time I was here.
8    Q.  Okay.  Well, you know, this isn't the kind of
9  thing that people just sit around the breakfast table
10  and think about.
11    A.  No.
12    Q.  But do you have any qualms at all about your --
13  your ability to be a juror in a case where the -- where
14  the death penalty is a possible punishment?
15    A.  No.
16    Q.  You know, some people think that the death
17  penalty is just -- just fine and dandy, but for someone
18  else to be on the jury and do it; they could never do it
19  themselves.  How do you feel about that?
20    A.  I think I could.  It would be hard, I'm sure,
21  but since I believe in the death penalty, I think I
22  should be able to look at it and make a decision if I
23  was called upon.
24    Q.  By the same token, someone might say, Well, I
25  think that -- I think that a life sentence is an

244

1  appropriate punishment for someone convicted of capital
2  murder, but by the same token they think, Well, it's
3  something that they would want to give the death penalty
4  for everyone if they were on the jury.  How do you feel
5  about that?
6    A.  No, I think I would have to listen to what the
7  circumstances were.
8    Q.  Okay.  Let me tell you that as we go through
9  this process today, if you have any questions about
10  anything at all, please tell me because you are the 58th
11  person we've -- we've talked to, and I could -- I'm
12  going to have another, you know, 15 minutes or so of
13  questions for you.  I get halfway through that and --
14  and -- and forget what we talked about here, honestly.
15    A.  Okay.
16    Q.  So if you have anything you want to ask about
17  that I haven't explained fully to you, let me know.
18    A.  Okay.
19    Q.  Because I understand that -- that -- like I
20  said earlier, no one sits around their kitchen and
21  thinks about this stuff --
22    A.  No.
23    Q.  -- until you have to come down here and be
24  confronted with it.
25    A.  Yeah, and read and -- and listen to the

245

1  different things that you're told.

2     Q.  Okay.  So here's how all this works.  And you

3  heard a little bit about it last time you were in court

4  because you heard about the definition of capital murder

5  that we're operating under here.

6     A.  Uh-huh.

7     Q.  A person commits capital murder when he

8  knowingly murders more than one person during the same

9  criminal transaction.

10     A.  Uh-huh.

11     Q.  We talked about -- last time we talked about

12  the difference between murder and capital murder.

13  Remember that?

14     A.  Yes, it's more than one, it's capital.

15     Q.  Exactly.  If it's only -- if it's only -- I

16  shouldn't -- you know, only one, it sounds like I'm

17  diminishing the crime of murder, which I don't mean to

18  do, but if it's one -- one killing, one knowing killing

19  of another human being, that's murder.

20     A.  Uh-huh.

21     Q.  If there's more than one during the same

22  criminal transaction, it's capital murder.

23     A.  Uh-huh.

24     Q.  You see how that works?

25     A.  Yes.

246

1     Q.  We also define capital murder as the murder of

2  a peace officer or a fireman during the course of duty

3  or murder of a child under six.  But this is the

4  definition we're going to be working with in this case.

5  So this is -- this is what I want you to keep in mind as

6  we go through the discussion today.

7     A.  Okay.

8     Q.  Okay?  I don't remember if on your

9  questionnaire you said that you thought that -- that

10  murder would be appropriate for the death penalty or

11  not, but you understand that for the offense of murder

12  in the State of Texas, the death penalty is not a

13  possible punishment.  Remember we talked about that last

14  time you were in court?

15     A.  Okay.  Say that again.

16     Q.  For the offense of murder --

17     A.  Uh-huh.

18     Q.  -- the death penalty is not a possible

19  punishment.

20     A.  Okay.

21     Q.  Do you remember that?

22     A.  Yes.

23     Q.  It's only capital murder.

24     A.  Okay.

25     Q.  One murder during the course of a transaction,

247

1  no death penalty.

2     A.  Okay.

3     Q.  More than one, possible death penalty.

4     A.  Okay.

5     Q.  Okay.  The murder is punishable by the range of

6  years we talked about last time you were in court, which

7  is not less than 5 years or more than 99 years or life.

8     A.  Yes, sir.

9     Q.  That's the punishment range for the offense of

10  murder.

11     A.  Okay.

12     Q.  If the jury finds someone guilty of a knowing

13  murder, that is the range of punishment they have to

14  give fair consideration to.  And last time you were in

15  court I asked everybody if they could follow their oath

16  and -- and give fair consideration to that entire range,

17  and you told us that you could.

18     A.  Yes.

19     Q.  Is that still your feeling today?

20     A.  Yes.

21     Q.  You understand that a knowing murder could

22  encompass a whole lot of different situations?

23     A.  Yes.

24     Q.  And that's why the Legislature gives us --

25  gives us a -- a very wide range.  That's the widest we

248

1  have under our law of possible punishments, from 5 years

2  up to 99 years or life, so that that punishment range

3  can encompass every possible situation that arises as to

4  a knowing murder.

5     A.  Okay.

6     Q.  Okay.  See where that would be fair?

7     A.  Yes.

8     Q.  You see where a jury would have to -- have to

9  be able to give fair consideration to that range and

10  then make up their mind later on after they hear the

11  facts of the case?

12     A.  Yes.

13     Q.  Would you be able to do that?

14     A.  Yes.  I think that's where I struggled last

15  time in court, you know, and -- but I have thought about

16  it and thought whatever the law says, I would have to go

17  along with it.

18     Q.  That's exactly it.  You do what the law says

19  for you to do, and you apply the facts to it that you

20  hear from the witness stand, and then you make your

21  decision.

22     A.  Okay.

23     Q.  So not knowing today what facts you're going to

24  hear, you see where you have to keep -- keep an open

25  mind --

249

1    A.  Uh-huh.

2    Q.  -- to all this stuff because you don't know
3  what you're going to hear.

4    A.  No.

5    Q.  Okay.  And if someone -- if someone forecloses
6  their mind to one possibility or another, then -- then
7  they're not able to serve on the jury.  They're not able
8  to follow the law.  You see how that works?

9    A.  Yes, sir.

10   Q.  Okay.  So in other words, to be a juror, you've
11 got to be able to do the things a juror does, follow the
12 law.

13   A.  Okay.

14   Q.  Okay.  Does that sound reasonable?

15   A.  Yes, it sounds reasonable.

16   Q.  Okay.  Now, in order to find someone guilty of
17 either murder or capital murder or any criminal offense,
18 for that matter, the State has to prove all of the
19 elements of the charge.  And we put those up on the --
20 on the PowerPoint last time you were in court.

21   A.  Uh-huh.

22   Q.  Those were the fact that it happened in Tarrant
23 County, Texas; the fact that the person on trial is the
24 person that it -- that caused the person's death; that
25 they did it knowingly; that they did it on or about a

250

1  certain date; they did it during the same -- same
2  criminal transaction; more than one person was killed.

3         And then we also have to prove what's known
4  as a manner and means.  The law requires us to set out
5  in an Indictment, the charging instrument, the manner
6  and means, the way the death was caused so the Defendant
7  can defend himself against that.

8         So if the proof indicates that the death
9  was caused by being shot with a firearm -- in other
10 words, we -- in other words, we allege in our Indictment
11 that -- that the Defendant killed the victim by shooting
12 him with a firearm, that's what the State is bound to
13 prove.

14   A.  Okay.

15   Q.  If we allege it happened in Tarrant County,
16 Texas, that is what we are bound by law to prove.

17   A.  Okay.

18   Q.  And we have to prove it beyond a reasonable
19 doubt, all those things.  And if we fail, you know what
20 happens?

21   A.  He's innocent, not guilty.

22   Q.  Yeah, exactly.  Exactly.  Because the burden of
23 proof --

24   A.  Uh-huh.

25   Q.  -- in any criminal trial, including a capital

251

1  murder case, is upon the State of Texas, and it never
2  shifts over to the Defendant.

3         So if we were in a situation where we got
4  into trial in a criminal trial, the burden of proof
5  being on the State, of course, and we allege in our
6  Indictment that we caused the person's death by -- that
7  the Defendant caused the person's death by stabbing him
8  with a knife and we prove that he smothered the guy with
9  a plastic bag, you see where we failed?

10   A.  Uh-huh.

11   Q.  We have failed miserably, as a matter of fact.
12 And the jury's obligation in that situation would be to
13 do what?

14   A.  To -- not guilty.

15   Q.  Exactly.  And the jury would know that -- that
16 the person was killed, the Defendant killed that guy,
17 but they -- but it wasn't done the way the State
18 charged.

19   A.  Okay.

20   Q.  And it would be -- probably be hard for just
21 about everybody who sat on a jury to follow the law in
22 that situation, but you see where their oath as a juror
23 would require them to do that?

24   A.  Yes.

25   Q.  And if you were in that situation, would you be

252

1  able to follow your oath as a juror?

2    A.  Yes.

3    Q.  No matter how hard it was?

4    A.  Yeah.

5    Q.  Okay.  It would be hard, wouldn't it?

6    A.  Yeah, it would.  I have to be honest.  It
7  would.

8    Q.  And you come out of that -- you come out of the
9  jury room and you sit down and write my boss a letter
10 and tell him to get rid me --

11   A.  Because you didn't do your job.

12   Q.  -- because I'm a complete incompetent, right?
13 But you would have done your oath -- followed your oath
14 as a juror.

15   A.  Yes.

16   Q.  Okay.  So if a jury finds an individual guilty
17 during a criminal trial, that's the guilt/innocence
18 phase of the trial, so named because that's the issue
19 there.  We move to the second phase of the trial called
20 the punishment phase.

21   A.  Uh-huh.

22   Q.  We talked a little bit about the punishment
23 phase of a regular criminal trial.  The jury sets a
24 sentence within a range of years that's set out by law.

25         In a capital murder trial, it's a little

253

1  bit different, but the way the evidence is admitted is
2  the same. And the evidence admitted is, first of all,
3  the jury can take into consideration all the evidence
4  that they heard at the first phase of the trial about
5  how the crime was committed.
6       A.  Okay.
7       Q.  Because we don't -- you know, that's -- that's
8  obviously something a jury should take into
9  consideration when they decide the sentence, right?
10      A.  Yes.
11      Q.  Then we can go beyond what the law allows us to
12  do at the first phase of the trial and introduce things
13  like a Defendant's bad character, his bad reputation and
14  evidence of other crimes a Defendant may have committed.
15  We can't do that at the first phase of the trial.
16      A.  Uh-huh.
17      Q.  We can only do that at the second phase of the
18  trial because that's the way our law is written.
19           And then the jury in a capital murder
20  trial, instead of setting sentence within the range of
21  years, instead of writing down on the jury -- on the
22  verdict form death or life in prison, the jury answers
23  special issues.
24           Did you read this homework assignment that
25  was sent home --

254

1       A.  Yes.
2       Q.  Okay. So you know a little bit about the
3  special issues.
4       A.  Uh-huh.
5       Q.  The first one deals with is the Defendant going
6  to be a continuing threat to society, right?
7       A.  Yes.
8       Q.  The second one being, is there sufficient
9  mitigation for a life sentence instead of the death
10  penalty.
11      A.  Yes.
12      Q.  And the way the jury answers those questions
13  tells the Judge what the Judge has to do.
14      A.  Okay.
15      Q.  If the -- if the jury answers the questions a
16  certain way, a Judge has no choice but to sentence a
17  Defendant to the death penalty.
18      A.  Okay.
19      Q.  And if the questions are answered one of a
20  couple of different ways -- other ways, the Judge has to
21  sentence the Defendant to life imprisonment.
22      A.  Okay.
23      Q.  So while the jury doesn't write down life or
24  death on their verdict form, what they do tells the
25  Judge what the Judge must do.

255

1       A.  Okay.
2       Q.  And for purposes of deliberations in a capital
3  murder trial, the Judge is going to instruct the jury
4  that a sentence of life without parole means that the
5  Defendant is ineligible for release from prison on
6  parole.
7           That individual convicted of capital murder
8  is going to the penitentiary for the rest of his life,
9  no matter what sentence he gets. Because if he gets the
10  death penalty, he's going to be in the penitentiary
11  until he's executed; and if he receives a life sentence,
12  he's going to be in prison until he dies a natural
13  death.
14      A.  Okay.
15      Q.  The law didn't used to be that way, but the law
16  is that way now, and that's the law that we're going to
17  operate under for this trial.
18      A.  Okay.
19      Q.  Okay? Just keep that in the back of your mind
20  as we go through these questions also. Okay?
21      A.  Okay.
22      Q.  So here's the first special issue that you
23  confront as a juror.
24      A.  Okay.
25      Q.  Okay. So it's a lot of what you might think is

256

1  a lot of legalese, but it's really a lot of -- a lot of
2  phrases that aren't defined under our law, but you'll
3  have to give their ordinary, common meaning if you're a
4  juror in the case.
5       A.  Okay.
6       Q.  And it starts with that phrase up there,
7  "beyond a reasonable doubt." And that's there. You
8  recognize that from the first phase of the trial, right?
9       A.  Yes, sir.
10      Q.  That's our burden of proof. It's up there
11  because the State has the burden of proof on this
12  question: Do you find beyond a reasonable doubt that
13  there is a probability that the Defendant would commit
14  criminal acts of violence that would constitute a
15  continuing threat to society?
16           Burden of proof on the State of Texas.
17      A.  Okay.
18      Q.  We are the only side of a criminal lawsuit that
19  ever has the burden of proof. We have to prove guilt
20  beyond a reasonable doubt. We have to prove the answer
21  to this question beyond a reasonable doubt. And the
22  Defense never has the burden of proof.
23      A.  Okay.
24      Q.  So if someone ever asks you, Is the
25  Defendant -- does the Defendant have to do this, or

257

1  Would you require the Defendant to do this, the answer's
2  always no because they never have a burden of proof.
3  You see how that works?
4    A.  Uh-huh.
5    Q.  Always on the State.
6          So we have to prove beyond a reasonable
7  doubt that the answer should be yes.
8    A.  Okay.
9    Q.  If we fail, your oath as a juror requires you
10 to do what?
11   A.  Put no.
12   Q.  Exactly.  Just like your oath requires you to
13 say not guilty, your oath as a juror requires you to say
14 no if we fail in our burden of proof.
15   A.  Okay.
16   Q.  So if we can look at some of these terms very
17 quickly here.  The term "probability."  We have to prove
18 that there's a probability.  What does the term
19 "probability" mean to you?
20   A.  That there's a chance that he would recommit a
21 criminal act.
22   Q.  "Chance" is a good word there.  I don't know
23 why the Legislature decided to use the word
24 "probability" instead of "chance," but I think it's
25 because they wanted to -- to differentiate and make

258

1  it -- make it clear we're talking about more than a
2  possibility here.
3    A.  Okay.
4    Q.  In your mind, is there a difference between
5  probability and possibility?
6    A.  Yes, because probability, in my mind, would
7  make me think he'd do it again, where possibility, I
8  wouldn't think that probably.
9    Q.  Yeah.  There's a possibility of almost
10 anything --
11   A.  Uh-huh.
12   Q.  -- isn't there?
13         There's a possibility I'm going to walk out
14 of here tonight, buy a ticket and win the lottery,
15 right?
16   A.  Yeah.
17   Q.  If I buy a ticket.  If I buy a ticket.
18   A.  Yeah, if I buy a ticket.
19   Q.  Okay.  Which I don't do very often, but is
20 there a probability of that?
21   A.  Yes, in some cases.
22   Q.  In some cases, yeah, but not many cases.
23   A.  No.
24   Q.  Because I've never felt that lucky.
25   A.  Well, I don't buy them, so I don't know.

259

1    Q.  I wish I could get that feeling once in a
2  while, but I just -- I just don't.
3          And you'll see also that the -- that the
4  Legislature did not use the term "certainty" here or
5  "for sure" or anything that strong.  You think that's
6  because there's no way in the world we could ever prove
7  for sure that something's going to happen in the future?
8    A.  That's right.  You don't know.
9    Q.  So the law -- so the Legislature only requires
10 us to show a probability, that probably -- it probably
11 could happen.
12   A.  Okay.
13   Q.  Instead of -- instead of possible, that's
14 pretty slim; instead of certain because that's too
15 certain.
16   A.  Yeah.
17   Q.  Too strong.  Okay.
18         The next phrase is "criminal acts of
19 violence" that I want to talk to you about.  That's a
20 pretty broad phrase, too, isn't it?
21   A.  Yes.
22   Q.  You see where the law does not require us to
23 prove any particular type of criminal act of violence?
24 It doesn't require us to prove another murder, it
25 doesn't require us to prove that the act could be a

260

1  robbery or even a simple assault; it just says, criminal
2  acts of violence.
3          So you see how that could mean anything
4  that -- that might fit under the criminal law and is an
5  act of violence?
6    A.  Uh-huh.
7    Q.  Pretty wide -- wide-ranging phrase, isn't it?
8    A.  Yes, sir.
9    Q.  So we're not tied down to any one particular
10 thing there.
11   A.  Okay.
12   Q.  And then the last term is the term "society."
13 What does society mean to you?
14   A.  People.
15   Q.  People?  You mean, people everywhere?
16   A.  Uh-huh.
17   Q.  Human beings?
18   A.  Uh-huh.
19   Q.  Okay.  Remember, for purposes of this question
20 that the -- that the least that's going to happen on
21 this guy on trial is he's going to go to the
22 penitentiary for the rest of his life, right?
23   A.  Yes.
24   Q.  This is trying to get us to separate who gets
25 the death penalty or who gets the life sentence.

261

1    A.  Okay.
2    Q.  So is it possible we could prove to you that
3  someone in the pen for the rest of their life could be a
4  continuing threat to society?
5    A.  Say that again?  I'm trying to listen and --
6    Q.  I understand.
7        Is it possible we could prove to you that
8  someone who's going to be in the penitentiary for the
9  rest of their life could be a continuing threat to
10  society?
11    A.  Yes.
12    Q.  So we put this all together, the State has to
13  prove there's a probability the Defendant would commit
14  criminal acts of violence that would constitute a
15  continuing threat to society.
16        In the law, this is often referred to as
17  the future dangerousness question because we're looking
18  into the future on it.  We don't have crystal ball, so
19  we have to do the best we can with -- with what's
20  available to us, but that's -- that's what this question
21  is requiring us to do.
22    A.  Okay.
23    Q.  Do you see where you're being asked something
24  completely different here than you were asked at the
25  first phase of the trial where you found the Defendant

262

1  guilty?
2    A.  Yes.
3    Q.  Because you don't get to this question unless
4  you've already found someone guilty, right?
5    A.  Yes.
6    Q.  And in that situation you're being asked what
7  did this guy do on this occasion on, you know, January
8  1st of 2010, what did this guy do -- if that's what date
9  we allege in the Indictment -- what happened on that
10  date.  Very focused inquiry, right?
11    A.  Uh-huh.
12    Q.  And this is asking is there a probability.  You
13  know, what's the probability of what he's going to be
14  like in the future.
15    A.  Uh-huh.
16    Q.  Two completely different things, right?
17    A.  Yes.
18    Q.  It wouldn't make very much sense for the
19  Legislature to come along with Special Issue No. 1 and
20  have you answer something that was exactly the same as
21  you answered the first phase of the trial, would it?
22    A.  No.
23    Q.  It wouldn't make much sense.
24    A.  No.
25    Q.  One asks something completely different.

263

1        Because the focus is separating who gets
2  the death penalty from who doesn't.
3    A.  Okay.
4    Q.  Okay.  That's what -- that's what the law
5  has -- that's what the Supreme Court has required us to
6  do over the years, is give us -- give juries some
7  mechanism, some scheme to separate who gets the death
8  penalty from who gets a lesser punishment.
9    A.  Uh-huh.
10    Q.  What are some factors the jury can take into
11  consideration?  And so that's -- this is one of the
12  things.
13    A.  Okay.
14    Q.  So here are some -- a few additional
15  instructions the jury would receive about that Special
16  Issue No. 1.  If the jury answers that question no, the
17  Defendant ends up with a life sentence.
18    A.  Uh-huh.
19    Q.  Trial's over.
20    A.  Uh-huh.
21    Q.  The Defendant gets a life sentence because the
22  State hasn't proved its case.
23    A.  Okay.
24    Q.  The jury can answer it no if ten or more people
25  agree.  We have to be unanimous to prove -- to have a

264

1  yes answer beyond a reasonable doubt.  Okay?
2    A.  Okay.
3    Q.  If everyone -- if everyone says yes, then we
4  move to the second question, but if ten or more people
5  say no, the trial is over; the Defendant gets a life
6  sentence.
7    A.  Okay.
8    Q.  So here's -- here's the question:  If you
9  answer that question yes, the Defendant moves one step
10  closer to receiving the death penalty.  All right?
11    A.  Uh-huh.
12    Q.  So would you be able to answer yes if we proved
13  our case knowing he gets one step closer to the death
14  penalty?
15    A.  Yes.
16    Q.  On the other hand, if you -- if we failed in
17  our burden of proof, would you be able to answer the
18  question yes following your oath as a juror -- I mean,
19  be able to vote no if we failed, knowing that that
20  results in a life sentence?
21    A.  Yes.
22    Q.  In other words, you would just do whatever the
23  facts of the case --
24    A.  Whatever.
25    Q.  -- dictate for you to do as a juror?

265

1    A.   Uh-huh.

2    Q.   You don't have any predisposition about that?

3    A.   No.  I mean, it's been explained probably
better than I've ever understood it, you know, before I
came to court last week or the two weeks ago.

6    Q.   Okay.  So if the jury answers Special Issue No.
7  1 yes, the jury moves on to consider Special Issue No.
8  2.  And I'll give you a second to read through it.

9         Okay.  That's a mouth full, isn't it?

10   A.   It is.

11   Q.   Okay.  We're going to break it down --

12   A.   Okay.

13   Q.   -- so I can ask you a couple of questions about
14  it.

15        First thing I want you to notice about it
is right up here in the first line, that phrase, "beyond
a reasonable doubt" isn't there, is it?

18   A.   No.

19   Q.   That means that the State does not have a
20  burden of proof on this question.  We had the burden of
21  proof at the guilt/innocence phase of the trial, we had
22  the burden of proof on Special Issue No. 1, but not
23  here.

24   A.   Uh-huh.

25   Q.   Now, you know that the Defense never has the

266

1  burden of proof in a criminal trial.

2    A.   Yes.

3    Q.   So they have no burden of proof here either.

4    A.   Okay.

5    Q.   This question is designed to fit in with the
beliefs of the individual juror, to let the individual
juror decide for himself or herself what they think
about the facts of the case and whether a life sentence
is warranted instead of the death penalty.

10   A.   Okay.

11   Q.   It gives -- it gives the jury a chance to say,
Yes, we're headed towards the death penalty because we
found the guy guilty, because we've answered Special
Issue No. 1 yes, we have found that he's a continuing
threat to society; but there's something about this case
or something about the guy on trial that makes a life
sentence warranted instead of the death penalty.

18   A.   Okay.

19   Q.   Now, I'm going to skip ahead a couple of slides
here so I can show you a definition.  This is what the
laws defines mitigating evidence to be.

22   A.   Okay.

23   Q.   It's something that a juror might regard as
reducing the Defendant's moral blameworthiness.

25   A.   Okay.

267

1    Q.   In other words, there's -- there's some factor
from somewhere that makes this guy less morally
blameworthy than someone else might be who's -- who's
involved in a similar thing.

5    A.   Okay.

6    Q.   Okay.  And the law recognizes if someone is
less morally blameworthy, that the -- a life sentence is
a more appropriate punishment than -- than the death
penalty.

10   A.   Okay.

11   Q.   Because most of the stuff is all about -- about
moral blame.  Okay?

13   A.   Okay.

14   Q.   Does that make sense to you?

15   A.   Yes.

16   Q.   Now, I don't know -- I don't know what -- if
you can think of a -- of a sufficient mitigating
circumstance in your mind right now or not, and a lot of
people can't and that's okay because it's one of those
things -- it's -- it's -- you know it when you see it.

21   A.   Okay.

22   Q.   And it's going to depend upon the facts of the
individual case on trial.

24   A.   Okay.

25   Q.   And what may be a sufficient mitigating

268

1  circumstance in one case may not be a sufficient
mitigating circumstance in another case.

3    A.   Okay.

4    Q.   So let me throw you out an example.  You can
agree with it or disagree with it.  I don't know how you
feel about it, but this is just an example of something
that's been recognized under our law before.

8         A person in Texas could be found guilty and
be given the death penalty if they're 18 years old.

10   A.   Okay.

11   Q.   That's -- that's the minimum age our law
recognizes.  So everyone 18 years and older can receive
the death penalty in Texas.

14   A.   Okay.

15   Q.   But the juror might be involved in the trial of
a criminal case, and they might have heard this criminal
case and think, Wait a minute, this guy is only 18 years
old, and I know, from my personal experience having
raised kids or knowing kids or whatever it might be,
that people 18 years old, their -- their -- their brain
hadn't maybe not finished forming yet, they're not as
mature as someone who's 30 or 40, they don't have an
understanding of the world like someone who's 30 or 40,
they may be less morally blameworthy because of their
age, maturity level than someone who's older that might

**269**

have committed the same crime.

A. Okay.

Q. The jury might say, Well, you know, he's -- he's guilty of capital murder, he did it, there's no question about it. And yes, he could constitute a continuing threat to society, but because of his age, it's more just here to let him spend the rest of his life, the next 50 or 60 or 70 years, whatever it's going to be, in prison rather than giving him the death penalty.

A. Okay.

Q. And that same juror might think in another case, the same guy on trial for something else may think, Wait a minute, he's 18 years old, he's old enough to serve his country, he's old enough to vote. In this case that's not a sufficient mitigating circumstance. He does, in fact, deserve the death penalty.

A. Okay.

Q. That's just an example.

A. Okay.

Q. I mean, you can use that example or not use that example, but the -- but the -- the thrust of this whole subject and this whole area of inquiry I have for you is: If you were a juror and you came across something in the trial that you thought was sufficiently

**270**

mitigating, could you give that effect by voting such a way that a life sentence was imposed instead of the death penalty?

A. Yes, I think, in certain mitigating circumstances.

Q. And you may not be able to tell us today what you think. You may be able to. But the question is: If you -- if you see it in the trial, would you be able to give it effect?

A. Yes, I would be able to.

Q. And then your oath as a juror would require you to do that.

A. Yes.

Q. Your oath as a juror would require you to say, Wait a minute here, I think this is a sufficient mitigating factor and give -- give the life sentence instead of the death penalty.

A. Yes.

Q. Okay. There's no burden of proof on either side. It could come from -- your sufficient mitigating factor in your mind could come from the State's evidence, one of our witnesses says something you think is sufficiently mitigating. It could come from one of the Defendant's witnesses.

A. Okay.

**271**

Q. It may come from both witnesses.

The point is no matter where it comes from, if you think it's sufficient, that you vote yes on this question such that you feel like a life sentence is warranted instead of the death penalty.

A. Yes.

Q. Because -- because if you answer yes, you're saying yes, there is a -- there is a sufficient mitigating circumstance. And if you vote no, you're saying there is no sufficient mitigating circumstance because there might not -- there might not be.

A. Uh-huh.

Q. Your sufficient mitigating circumstance might not be the same as the guy sitting next to you.

A. Uh-huh.

Q. You may -- you know, the guy on trial might be 18, you think that's sufficiently mitigating. He may think because his parents beat him every night when he was a child, that that is a sufficient mitigating circumstance. So you don't have to agree on that.

A. Okay.

Q. And again, both of you might think under the facts of a given case it's not sufficient. You see how that works?

A. Yes.

**272**

Q. Again, it depends on what? The facts of the case.

A. Okay.

Q. All right?

A. Uh-huh.

Q. Isn't that right?

A. Yes.

Q. I'm not trying to put words in your mouth.

A. No. I mean, I would look at all of the different causes, maybe, and effects.

Q. You'd have to, wouldn't you?

A. Yes.

Q. Okay. So there are a couple of other instructions you get on Special Issue No. 2. Again, there's no burden of proof on either side.

If the jury answers it no, the Defendant receives the death penalty, and you can only answer no if everybody on the jury thinks the answer should be no.

A. Okay.

Q. And answer it yes and give the Defendant a life sentence if ten or more people agree.

A. Okay.

Q. Okay? Because the Defendant gets the benefit of the doubt just like on question No. 1. Do you remember?

273

1    A.  Uh-huh.

2    Q.  So here's the question:  Knowing that a no
3  answer to Question 2 would result in the death penalty,
4  would you be able to answer no if you felt like that was
5  the proper answer based on all the evidence that you
6  heard?

7    A.  Yes.

8    Q.  The flip side of that question is:  Would you
9  be able to answer yes if you felt that was the proper
10 answer based on the evidence you heard?

11   A.  Yes.

12   Q.  Knowing that would give a life sentence?

13   A.  Yes.

14   Q.  So here's the last area of inquiry I have for
15 you.  Is there any reason, moral, ethical, religious or
16 from -- from anything else where you could not be part
17 of a process that results in someone receiving the death
18 penalty?

19   A.  I don't think so, no.

20   Q.  Well, Ms. Cotten, I appreciate your time.

21   A.  Okay.

22        MR. GILL:  That's all we have, Your Honor.

23        THE COURT:  Defense?

24        MS. FERNANDEZ:  Thank you, Judge.

25        VOIR DIRE EXAMINATION

274

1  BY MS. FERNANDEZ:

2    Q.  Good afternoon, Ms. Cotten.

3    A.  Good afternoon.

4    Q.  My name is Pamela Fernandez.

5    A.  Okay.

6    Q.  And you may remember, from when Fred talked to
7  you at the -- at the minipanel, that this is my first
8  time on this type of case?

9    A.  Can you talk just a little bit louder for me?
10 You're quiet.

11   Q.  Okay.  Sorry about that.  I'm not usually
12 accused of that.  I have three kids, so...

13        Can you hear me better now?

14   A.  Yes, I can.

15   Q.  Okay.  As the Judge said, I'm sitting with Mr.
16 Larry Moore, Mr. Fred Cummings, and this is my first
17 time doing this kind of case.  Okay?  So I understand
18 how it is to be nervous.

19   A.  Okay.

20   Q.  It seems like you relaxed a little, though?

21   A.  Okay.

22   Q.  No?

23   A.  No, I don't think I can.

24   Q.  Okay.  You said your daughter is a nurse --

25   A.  Yes.

275

1    Q.  -- on your questionnaire?

2    A.  Uh-huh.

3    Q.  Where is she a nurse at?

4    A.  She works for orthopedic doctors.

5    Q.  Oh, okay.  I always have to make sure because
6  my sister is a nurse, and she's been at several
7  hospitals in the area.

8    A.  No, she's only worked in neonatal, and then she
9  went to orthopedic.

10   Q.  Okay.  And your son is -- is a fireman?

11   A.  Yes.  I have a son that's a fireman.  I have
12 uncles, I have a nephew, and my ex-husband was a
13 fireman.

14   Q.  And where -- what cities, counties --

15   A.  Everybody is in Fort Worth, except my
16 son-in-law is Mesquite.

17   Q.  Okay.  And is this -- are there any firemen
18 from the City of Kennedale that you guys --

19   A.  No.

20   Q.  No?

21        Before I forget, Mr. Gill asked you about
22 taking care of your mother.

23   A.  Uh-huh.

24   Q.  I don't think he asked this, so there's a
25 possibility that we could be sequestered.  I don't know

276

1  that that's going to happen.  We can't know that right
2  now.

3        What that means is that you would be -- you
4  would be put up in a hotel with everybody else.  I'm
5  sure you understand the basic meaning of that.

6        Is there anything about you being primary
7  caretaker for your mother that would interrupt that for
8  being sequestered for two weeks?

9    A.  No.  I think I'm mainly primary because I live
10 where she lives and I'm the oldest child.

11   Q.  Okay.  I don't think he asked you that, so I
12 wanted to --

13   A.  Okay.

14   Q.  -- so I want to get that out of the way.

15        Okay.  As far as the firefighting, do you
16 have -- would it be fair to say that you have strong
17 feelings about any kind of arson, things like that?

18   A.  I guess I never thought that I had strong
19 feelings about arson.  I mean, I haven't thought about
20 that.

21   Q.  So their -- their career choices are just that,
22 career choices to you?

23   A.  They were career choices, yes.

24   Q.  So is there anything -- now that you -- now
25 that I sort of put it in your mind, is there anything

1  you can think about as far as intentionally or knowingly
2  setting a house fire that would go as to your feelings
3  on the death penalty?
4      A.  I don't really understand.  Go ahead and say it
5  again because, I mean, I don't -- I can't imagine
6  anybody setting fires, but I never have thought -- I'm
7  not strong on any feelings about setting fires.  I just
8  never had thought about anybody doing it.
9      Q.  Okay.
10     A.  I mean, it's just not something I think about.
11     Q.  Okay.  And -- okay.  Well, we have to, I guess,
12  get all your feelings out.
13     A.  That's all right.  That's all right.  But, I
14  mean, it's just something I never had thought about.
15     Q.  Okay.  Let me go back to -- all right.  I want
16  to ask you some more questions about your questionnaire.
17     A.  Okay.  That's fine.
18     Q.  And if you needed a copy of it to look back --
19     A.  No, I'm -- I can just remember that was a long
20  day, and by the time I got to that, I was drained.
21  Okay?
22     Q.  And with you having the procedure --
23     A.  Yeah, the day before, and I had asked them if
24  it would affect me, and they said no, but thinking about
25  it and talking to another doctor's office, they said

1  of it because I had worked with her at St. Joseph, and
2  then she went into private practice and I worked for
3  her.
4      Q.  Oh, okay.  And what about -- was there anything
5  you disliked about working for her, or not necessarily
6  for her, but in that field?
7      A.  No, not that I can think of.
8      Q.  Okay.  And I think, you know, I can understand
9  why you answered No. 46, which would be, Do you have any
10  fixed opinion concerning psychiatric or psychological
11  testimony?  You said you'd have to make an individual
12  decision.
13     A.  Yes, because I've seen too many different cases
14  that every -- everyone's different.
15     Q.  Okay.  We talked a little bit earlier about --
16  or you talked a little earlier about the Joe Dinkins --
17     A.  Yes.
18     Q.  -- deal?
19         His sentence -- I know he had -- you had
20  said you -- tell me what your feelings are about the
21  sentence that you -- you think he received?
22     A.  I think he -- it bothered me because he killed
23  two people, and I think maybe it was five or -- it
24  wasn't over ten years, but as I say, I didn't know all
25  the extenuating circumstances.  I was on the outside.

1  they would recommend 24 hours, and it wasn't 24 hours.
2      Q.  Oh, yeah.
3      A.  So...
4      Q.  Well, I'm glad that you're better now.
5      A.  Yeah.
6      Q.  Okay.  One of the questions you had asked --
7  were asked was about working for a mental health
8  facility or a hospital, and you said you worked for a
9  psychologist --
10     A.  I worked for a psychologist.
11         THE COURT:  Okay.  Stop.  Can you wait for
12  her to finish her question --
13         PROSPECTIVE JUROR:  I'm sorry.
14         THE COURT:  -- before you start talking?
15  Because she can only take --
16         PROSPECTIVE JUROR:  Okay.  I'm sorry.  I
17  didn't realize I was doing that.
18         THE COURT:  -- down one person talking at a
19  time.  Thank you.
20     Q.  (BY MS. FERNANDEZ)  And that would be Judith
21  Allen Robinson?
22     A.  Yes, ma'am.
23     Q.  Okay.  What is it that you liked best about
24  working for her?
25     A.  I just enjoy working with her.  That was more

1      Q.  Okay.  Do you recall that he was actually -- he
2  was tried two different times?  They tried him for one
3  first, and then they went back a couple -- maybe within
4  ten years and tried him for the second one?
5      A.  I don't think so.  I think he just had one
6  trial, if I remember, and I don't know if it was just
7  for Paula, but I'm not for sure.
8      Q.  Okay.  Let me ask you this:  Why do you
9  think -- it seems to me like you followed it a little
10  bit closely?
11     A.  Oh, I did.
12     Q.  Yeah.  With good reason because you said you
13  guys were familiar with them and the family.
14         Why do you think the -- if you know or have
15  an opinion, why do you think the jury gave him the
16  sentence they did?
17     A.  Because there had to be extenuating
18  circumstances I did not know about.  You know, I mean, I
19  just know he walked into a Foley's, and then she went in
20  the car and he killed her, and he had already been over
21  to the hospital and killed the doctor at the same time.
22     Q.  Okay.  Do you think -- obviously, not having
23  been on the jury --
24     A.  Uh-huh.
25     Q.  -- but do you think that justice was done in

281

1  that case?

2      A.  It's always hard for me to see a person killed.

3  I mean, you know, their death just seems like it -- it

4  should be valuable.  I mean, I don't know how else to

5  say that, you know.  And I don't know what she did to

6  cause him to want to kill her.

7      Q.  I don't -- you know, if death were easy --

8      A.  I know.

9      Q.  You know...

10         You said also that you were involved -- in

11  your questionnaire again -- you were in Parker County

12  for a CPS case, that you were on jury duty for that?

13     A.  Yes, ma'am.

14     Q.  Okay.  And was there a verdict -- did you

15  render a verdict as a juror?

16     A.  Yes, I did.

17     Q.  Okay.  And also, you've been to court quite a

18  little bit.  You were a witness for your stepson at his

19  trial?

20     A.  Yes, ma'am.

21     Q.  Okay.  In his case, do you think justice was

22  done as well?

23     A.  Yes.

24     Q.  Was his life -- I know he was ultimately

25  convicted of selling them, but was he, in your opinion,

282

1  addicted to the drugs?  Was he using them?

2      A.  Yes, ma'am.

3      Q.  Do you think that caused him to make the

4  decisions that he was making that maybe he normally

5  wouldn't have done?

6      A.  I don't know.  I felt like he did it, he wanted

7  the money, so I can't -- you know, I don't know if the

8  drugs caused him to want the money, but that was the

9  reason he did it, for the money.

10     Q.  Right.  I mean, it could be maybe.  Maybe he

11  was selling to buy more --

12     A.  Uh-huh.

13     Q.  -- and to feed the habit or whatever, but you

14  don't know that for sure, or do you suspect it?  How

15  about that?

16     A.  I suspected it.

17     Q.  Okay.  Oh, and it's the -- on the Parker County

18  deal, did you -- you lived in Parker County at that

19  point or --

20     A.  Yes, ma'am, I did.

21         THE REPORTER:  If you could wait until she

22  finishes the question --

23         PROSPECTIVE JUROR:  All right.

24     Q.  (BY MS. FERNANDEZ)  Okay.  It's getting late in

25  the day.

283

1      Okay.  So you've been in Tarrant County for

2  three years?

3      A.  Uh-huh.

4      Q.  And that Parker County was just previous to

5  this?

6      A.  Parker County was five and a half years ago.

7      Q.  Okay.  On your -- again, on your questionnaire

8  you said that as far as the -- and I'm trying to keep in

9  mind too that -- what you said earlier about having been

10  on -- within 24 hours of that procedure, so with respect

11  to the punishment of criminal offenders, do you believe

12  that the criminal justice system is generally -- and you

13  checked off too lenient.  What did you have in mind when

14  you thought that it was too lenient?

15     A.  Well, I guess I read in the paper there's so

16  many cases that it looks like the guilt has been proven

17  and they're not given a real -- a just sentence to me.

18     Q.  Okay.

19     A.  The best way I can understand it.

20     Q.  Okay.  And obviously, this would be on the

21  outside looking in.  Do you feel like your feelings on

22  that are so strong that it would be hard for you to be a

23  juror and consider the full range of punishment in the

24  case?

25     A.  Okay.  Say it again for me.

284

1      Q.  I probably asked that badly --

2      A.  No, I'm just --

3      Q.  Okay.  Given your feelings that -- that too

4  lenient of sentences are given or not enough -- yeah,

5  time, would that affect your ability to take the oath

6  and sit as a juror to consider the full range of

7  punishment, such as on the murder one, 5 to 99 to life?

8  Do you think your feelings are so strong that it would

9  be too hard for you to consider the lower end?

10     A.  My feelings are strong, but I think I would try

11  to go back and look at what the law tells me to do.  I

12  mean, I'm very law-abiding, so usually that wins out

13  over other things.

14     Q.  I understand that.

15         You probably remember this from when we

16  were on the minipanels.  We kind of have to pin you down

17  to a yes or no.  Trying to is good, but when we have

18  to -- would it -- would you be able to consider the

19  lower end, or -- do you know for sure right now you

20  couldn't?

21     A.  It would be very hard.  I would have to hear

22  extenuating circumstances that would cause me to look at

23  the lower end.

24     Q.  Okay.  And -- and obviously, that -- that's

25  what the law calls for, that you could be able to look

287

1  at all the evidence and give everything fair
2  consideration, fair -- you know, the weight that it --
3  that you think it deserves and then make your decision
4  after that, not be predisposed to one end or the other
5  at this point.
6      A.  No, I don't -- I think I could.  I mean, you
7  know, I might not like it.
8      Q.  Okay.  Okay.  Well, that's fair.  That's fair.
9          These are the elements of capital murder
10  and, obviously, you were told about that there are types
11  of capital murder, but for purposes of what we're
12  dealing with here in this case, we're talking about
13  knowingly causing the death of -- of an individual by a
14  certain manner or means and then also knowingly causing
15  the death of another individual during the same criminal
16  transaction.  Okay?
17          So what I'm looking at here is the manner
18  and means.  And I know that Mr. Gill had touched base
19  with you a little bit, but I wanted to explore your
20  feelings a little more on this.
21          If you knew -- if it were proven to you by
22  the State beyond a reasonable doubt and you knew for
23  sure 100 percent that the person on trial murdered those
24  people knowingly, okay, but that the State didn't prove
25  the manner and means that they told you they were going

1  that it would because you had -- because you found
2  somebody guilty, that it would lower the burden of proof
3  for the State on this question because in your mind,
4  they have met their burden of proof as to
5  guilt/innocence?
6          Did that make sense?  I'm sorry.  I might
7  have asked that bad.
8      A.  I think you need to repeat it.  Somewhere I
9  lost something.
10      Q.  Sorry about that.
11          Would your automatic yes to this be such
12  that the State really wouldn't have a burden of proof on
13  this; it's already -- you're already set on this?
14      A.  That's hard to answer.  It would be according
15  to what I had already heard.  My influence, my decision.
16      Q.  Okay.  Influence your decision?
17      A.  It would probably be yes.
18      Q.  And I hate to have to pin you down, but that's
19  what this part of the trial is all about.
20          So if I'm understanding you correctly, what
21  you're telling me -- and I don't want to put words in
22  your mouth.  Okay?  So correct me if I'm wrong, please.
23          You would not -- in other words, by
24  answering yes automatically to this question, you're
25  telling me that the State no longer has a burden of

286

1  to do, such as they said that the -- it was done by
2  pushing somebody over a cliff, and then they proved at
3  trial that they were actually run over by a vehicle
4  first, and that's what actually killed them.  Okay?  In
5  your heart of hearts, would you be able to still say,
6  knowing that this person -- and it was proven to you
7  beyond all reasonable doubt, in your heart of hearts,
8  would you still be able to say not guilty?
9      A.  Yes.
10      Q.  Thank you for your honesty.  I appreciate that.
11  That's what this is all about.
12          All right.  This is the Special Issue No.
13  1.  Do you -- now, the only way you get to Special Issue
14  No. 1 is you've already found somebody guilty, okay, of
15  the capital murder.
16          And, of course, we're talking about all of
17  this in general terms because we don't know whether
18  somebody is guilty or not guilty at this point, correct?
19      A.  Yes.
20      Q.  Okay.  So as far as Special Issue No. 1,
21  would -- would -- would you automatically -- because you
22  found somebody guilty, would you automatically say yes
23  to this question without further consideration?
24      A.  I think yes.
25      Q.  Okay.  And would you answer it in such a way

288

1  proof with you, that this is an automatic yes, and they
2  are relieved of their burden of proof as to Special
3  Issue No. 1?
4      A.  Yes.
5      Q.  All right.  On Special Issue No. 2, as Mr. Gill
6  said, there is no burden of proof on this one.  Okay?
7  But if you got to this question, was this -- this was
8  written by the Legislature and put into law as a way for
9  a jury to put the brakes on the death penalty, okay, and
10  say, Whoa, whoa, whoa.  You know, we -- we've already
11  answered one question yes, okay, and we need to sit back
12  and -- and really, really think about this.  Okay?
13          And I think Mr. Gill used the example of an
14  18-year-old.  Okay?  You don't have to be able to define
15  it for your fellow jurors.  Okay?  You don't have to,
16  you know, wrap it up in a neat little package and
17  present it to them.  Okay?
18          And it could be for each individual person,
19  what they think is mitigating.  It could be anything
20  from a single act of kindness in the person's entire
21  lifetime.  It could be a bad childhood.  Maybe they were
22  left alone all the time as a child, and you thought that
23  was mitigating enough -- or sufficiently mitigating to
24  warrant life instead of death.
25          It could be somebody having served in the

289

1   military.  I mean, there's just literally millions of
2   things out there that could be.  Okay?
3           When you're thinking of mitigating
4   circumstances, are those -- the things that I just
5   talked about, as well as what Mr. Gill said earlier, are
6   those things you could consider as mitigating, or is
7   there something in your mind that you're thinking is --
8   because we're talking about having found somebody guilty
9   of murder, you've already answered yes to the first
10  question.  Is there something in your mind that you're
11  already saying the only thing that would be mitigating
12  for me would be this, and there's nothing else you
13  could -- or the State could bring me -- or that would
14  come out in the trial that would change my mind?
15      A.   I probably could think of several things that
16  might be mitigating to me.
17      Q.   Okay.  And there's -- would it be fair to say
18  that there's -- because you think of those right now,
19  would it be fair to say that there's also something
20  later on that you never thought of as mitigating that
21  could come up?
22      A.   Yes.
23      Q.   Okay.
24           MS. FERNANDEZ:  May I have a moment, Your
25  Honor?

290

1           THE COURT:  Yes.
2      Q.   (BY MS. FERNANDEZ)  Ms. Cotten, what was the --
3   the type of practice that the doctor you worked for --
4   when she went into private practice, what did she do?
5      A.   She worked with child-abuse children.  She did
6   weight loss.  I mean, it was a wide range that she had,
7   that there were some children who had some abuse in
8   their background, but it was also weight loss.  It was
9   kind of weight loss.
10     Q.   So -- oh, like the abuse in her background
11  might have led to the -- them gaining the weight and --
12     A.   No.  She did some weight loss, and then she had
13  some children that came in.  In their background maybe
14  they were having behavior problems or something, and
15  they worked -- there was different areas there.  I mean,
16  it's -- that's been awhile ago, too, so it's hard for me
17  to remember all the different cases.
18     Q.   Okay.
19          MS. FERNANDEZ:  One more minute, Your
20  Honor, please.
21          Thank you, Ms. Cotten.  I appreciate your
22  honesty.
23          Thank you, Judge.
24          THE COURT:  Ms. Cotten, I need to make sure
25  I understand the answer you gave to one of Ms.

291

1   Fernandez' questions.  That's regarding Question No. 1,
2   the issue of future dangerousness.
3           PROSPECTIVE JUROR:  Okay.
4           THE COURT:  Do you recall that question?
5           PROSPECTIVE JUROR:  Yes.
6           THE COURT:  Okay.  And in a capital murder
7   case in which the jury has found the Defendant guilty of
8   the offense of capital murder, the jury would then be
9   confronted with Question No. 1, asking you whether you
10  find beyond a reasonable doubt that there's a
11  probability that the Defendant would commit criminal
12  acts of violence that would constitute a continuing
13  threat to society.  You understand that that's the
14  question you would be faced with?
15          And was your answer to Ms. Fernandez that
16  you would automatically always answer that question yes
17  based on having found someone guilty of the offense of
18  capital murder?
19          PROSPECTIVE JUROR:  With all the
20  information I had, I would probably say yes.  I mean,
21  I'm not understanding somewhere what y'all are wanting.
22  But, I mean, if I found them guilty -- I mean, I'm sure
23  there's other things they would show me, but if I found
24  them guilty and there were so many circumstances I
25  already seen, the answer might be yes -- probably would

292

1   be yes.  I mean, the way that I'm thinking right now.  I
2   don't know if I'm thinking of it right.
3           My answer is still yes, the way I'm reading
4   it.  I mean, I may be missing something.
5           THE COURT:  Okay.  Well, nobody's asking
6   you to answer the question in this case.
7           PROSPECTIVE JUROR:  Uh-huh.
8           THE COURT:  What I'm asking you is whether
9   you would automatically always answer that question yes
10  based upon having found someone guilty of the offense of
11  capital murder?
12          PROSPECTIVE JUROR:  Okay.  So that's going
13  into the death penalty, right?
14          THE COURT:  Correct.
15          PROSPECTIVE JUROR:  Okay.  The answer is
16  no.  I'm sorry.  I misunderstood.
17          THE COURT:  Okay.
18          PROSPECTIVE JUROR:  I mean, I'm sorry.
19          THE COURT:  Okay.
20          PROSPECTIVE JUROR:  Too many questions
21  right now.
22          THE COURT:  Right.  There are.  But there
23  are two phases of the trial, and once the jury has found
24  someone guilty of the offense of capital murder, then
25  there is a penalty phase of the trial where you may or

293

1  may not receive additional evidence.  Then the jury
2  would receive these instructions, and this would be the
3  first question that you're called upon as a jury to
4  answer in the punishment phase of the trial.
5           So now do you understand what I'm asking?
6           PROSPECTIVE JUROR:  I guess I'm going to
7  answer yes.  I'm sorry.
8           THE COURT:  Okay.
9           PROSPECTIVE JUROR:  That's the best I can
10 understand it right now.
11          THE COURT:  All right.  So to your
12 understanding, that just based upon the fact that you
13 found somebody guilty of the offense of capital murder,
14 that would lead you to automatically answer Special
15 Issue No. 1 yes?
16          PROSPECTIVE JUROR:  If there is a
17 probability they would commit another crime.  I mean,
18 that's what I'm reading, that he would go on to commit
19 more crimes.
20          THE COURT:  Okay.  And so that's the
21 question, is whether you would automatically find that
22 there is that probability just based on the fact that
23 you found them guilty of the offense?
24          PROSPECTIVE JUROR:  No, there wouldn't -- I
25 wouldn't automatically -- no, just because I answered to

294

1  the death penalty, you know, convicting them does not
2  mean I would automatically say yes.
3           THE COURT:  Okay.
4           PROSPECTIVE JUROR:  I'm sorry.  I --
5  there's something I'm losing -- I was losing in there.
6           THE COURT:  That's okay.  I just wanted to
7  make sure that we were on -- understanding each other.
8           PROSPECTIVE JUROR:  Okay.  Going back, I
9  can think about it the right way.
10          THE COURT:  Okay.
11          PROSPECTIVE JUROR:  The way I should be
12 thinking.  Okay?
13          THE COURT:  I'm not trying to tell you how
14 to think.
15          PROSPECTIVE JUROR:  No.  I mean, just I was
16 not in the -- maybe that phase or something, thinking
17 that -- I mean, I don't know how to describe, but I'm
18 answering yes to it, but I know that we would have to go
19 and decide the death or the parole -- life without
20 parole.
21          THE COURT:  Well, that's the whole purpose
22 of the punishment phase is to make that decision.  And
23 this is the first question that you would answer toward
24 making that decision.
25          PROSPECTIVE JUROR:  Then I'm going to say

295

1  yes.  I'm sorry.  I mean, I -- the best my ability, I
2  would have to say yes.
3           THE COURT:  Okay.
4           PROSPECTIVE JUROR:  Okay.
5           THE COURT:  All right.  If you will go
6  ahead and have a seat out in the hallway we will call
7  you back in in just a few minutes.
8           PROSPECTIVE JUROR:  Okay.
9           (Prospective juror exits courtroom)
10          THE COURT:  State, have a challenge for
11 cause?
12          MR. GILL:  No.
13          THE COURT:  Defense?
14          MR. MOORE:  Yes, Judge.  We would challenge
15 her in regard to Question 1.  Her views --
16          THE REPORTER:  I'm sorry.  I can't hear
17 you.
18          MR. MOORE:  We would challenge her in
19 regard to her views on Question 1.  It reduces the
20 State's burden of proof in regard to that question.
21          THE COURT:  Go ahead.
22          MR. GILL:  Well, what I want to point out
23 to the Court is it's -- it's not the last answer she
24 gave that -- that dictates how the Court should rule on
25 this challenge for cause, whatever she is most emphatic

296

1  about, what she most believes in, and what she most
2  understands.
3           And what I want to point out here is that I
4  spent quite a bit of time with her on this question.
5  And I explained to her how it worked, and she agreed
6  with me that she was asked something completely
7  different at the second phase of trial than she was
8  asked at the first phase of trial.
9           She said she'd follow her oath and base her
10 answer on the evidence.  She said she could answer no if
11 the State failed to prove it to her beyond a reasonable
12 doubt.  She said she could answer yes if the State did
13 prove it.
14          And that was after a full explanation of
15 the law and also -- also in combination with her oath as
16 a juror.
17          And I want the Court to note that when she
18 was asked these questions by the Defense, she was asked
19 a short series of leading questions that did not contain
20 any explanation of what the law provided for, or any
21 reference to exactly what she was being asked in
22 juxtaposition to what she was already asked in the first
23 phase of trial.
24          And -- and she was -- she was ambushed into
25 a short series of -- of answers based on very leading

**297**

1 questions. And when the Court started to question her,
2 she was again still confused because there wasn't any
3 explanation contained in the -- in what the Court was
4 asking her to do. You just went back to this -- to the
5 phrase, Would you automatically do something?
6          And she didn't know what she was being
7 asked. And then when -- when it was given --
8 explanation -- was given explanation of how this worked
9 and in relation to the first phase of the trial, then
10 she was emphatic that her answer was that she could, in
11 fact, answer it no based on the facts of the case. And
12 it was only after her answer was left dangling for a
13 little while that she changed it again.
14          So the overall tenor of her -- of her -- of
15 her examination here from everybody was that -- and when
16 she fully understood what she's being asked, she could
17 follow the law.
18          MR. MOORE: I don't take that. Apparently
19 Mr. Gill's a mind reader and knows what she's thinking.
20 I got the impression that she was trying as hard as she
21 could to be honest in answering the question, and her
22 gut feeling was that if she found somebody guilty of
23 capital murder, that question is answered yes.
24          I mean, she kept coming back to it even
25 with the Court's questioning, and that was -- she

**298**

1 didn't -- Ms. Fernandez was asking her the questions.
2 All she asked her was -- is essentially, If you find
3 somebody guilty, is that question going to automatically
4 be answered yes, and she said yes.
5          THE COURT: Okay. I'm granting Defendant's
6 challenge to cause -- challenge for cause as to Juror
7 58.
8          Will you bring her back in, please?
9          (Prospective juror enters courtroom)
10          THE COURT: Okay. Ms. Cotten, do you have
11 a plastic part of your jury badge? Yes. If you'll
12 leave that with the bailiff, you are not going to have
13 to return as a juror in this case.
14          PROSPECTIVE JUROR: Okay.
15          THE COURT: I want to thank you very much
16 for your service up to this point, and you are free to
17 go. They will mail you your jury check. Okay?
18          PROSPECTIVE JUROR: Okay. Give this to the
19 bailiff?
20          THE COURT: Yes, ma'am.
21          PROSPECTIVE JUROR: The other jury summons
22 get me back to my car without paying the bus?
23          THE COURT: Just leave the plastic part.
24          PROSPECTIVE JUROR: Oh.
25          THE COURT: You can take the paper part.

**299**

1          Okay. Thank you.
2          PROSPECTIVE JUROR: Thank you.
3          (Prospective juror excused)
4          THE COURT: We're done.
5          (Proceedings adjourned at 4:26 p.m.)

**300**

1 THE STATE OF TEXAS      )
2 COUNTY OF TARRANT       )
3          I, Angelica Taylor, Official Court Reporter
4 in and for the 432nd Judicial District Court of Tarrant
5 County, State of Texas, do hereby certify that the above
6 and foregoing contains a true and correct transcription
7 of all portions of evidence and other proceedings
8 requested in writing by counsel for the parties to be
9 included in this volume of the Reporter's Record, in the
10 above-styled and -numbered cause, all of which occurred
11 in open court or in chambers and were reported by me.
12          I further certify that this Reporter's
13 Record of the proceedings truly and correctly reflects
14 the exhibits, if any, admitted by the respective
15 parties.
16          WITNESS MY OFFICIAL HAND this the 25th day
17 of January, 2012.
18
19
20
21 ANGELICA TAYLOR, TEXAS CSR NO. 7180
   Cert Exp. Date: 12/31/2013
22 Official Court Reporter
      432nd Judicial District Court
23    401 West Belknap Street
      Fort Worth, Texas 76196
24
25

| | | | | |
|---|---|---|---|---|
| ' | 195:21 | 265:8, 272:14, | 51 [1] - 60:12 | 103:24, 129:12, |

'73 [1] - 182:19
'90s [1] - 91:13
'93 [1] - 30:21
'95 [1] - 182:9

**0**

0 [1] - 15:18

**1**

1 [50] - 13:3, 14:13, 16:21, 16:24, 18:3, 18:9, 18:25, 26:12, 27:11, 52:16, 53:23, 54:12, 54:24, 56:1, 58:16, 93:3, 96:5, 100:8, 127:14, 128:12, 128:15, 165:12, 172:14, 173:13, 175:9, 192:8, 194:6, 194:10, 195:19, 213:8, 213:25, 214:8, 216:6, 216:14, 217:7, 262:19, 263:16, 265:7, 265:22, 266:14, 272:24, 286:13, 286:14, 286:20, 288:3, 291:1, 291:9, 293:15, 295:15, 295:19
10 [11] - 19:9, 26:18, 26:23, 27:1, 27:10, 84:21, 116:17, 126:2, 172:20, 179:9, 179:14
10/2 [2] - 18:14, 128:14
100 [1] - 285:23
10:19 [1] - 60:6
10:27 [1] - 60:6
11 [1] - 238:22
11:30 [1] - 108:25
11th [2] - 236:2, 236:10
12 [26] - 23:22, 26:7, 26:8, 26:9, 46:20, 54:6, 83:3, 83:5, 84:21, 85:5, 85:6, 85:15, 85:21, 128:17, 129:11, 134:18, 172:23, 179:6, 179:14, 191:12, 194:11, 195:17, 195:20,

12/0 [4] - 16:21, 19:9, 19:10
12/31/2013 [1] - 300:21
12/zip [1] - 16:22
12:04 [1] - 136:18
12th [1] - 151:20
131 [1] - 81:8
13th [3] - 65:9, 136:3, 236:4
14 [1] - 139:22
15 [5] - 36:1, 46:20, 116:17, 163:6, 244:12
150 [3] - 83:1, 83:4, 189:17
16 [2] - 15:18, 37:2
17th [2] - 79:19, 152:24
18 [18] - 5:2, 23:14, 37:17, 57:13, 57:19, 99:4, 99:18, 176:1, 176:7, 176:14, 179:17, 195:2, 268:9, 268:12, 268:17, 268:20, 269:14, 271:17
18-year-old [2] - 57:11, 288:14
18th [3] - 30:20, 176:2, 177:13
19 [2] - 42:8, 239:11
1972 [1] - 182:19
1981 [1] - 184:17
1993 [1] - 30:20
1994 [2] - 142:12, 142:19
1996 [1] - 145:23
1:00 [3] - 136:17, 150:2, 150:5
1:01 [1] - 136:18
1st [1] - 262:8

**2**

2 [36] - 13:4, 19:9, 20:9, 22:7, 23:8, 24:8, 25:19, 26:13, 26:18, 27:2, 27:12, 27:13, 27:25, 96:18, 101:1, 101:21, 128:13, 129:20, 129:22, 173:14, 173:15, 178:21, 178:24, 179:24, 195:15, 196:4, 197:7, 214:10, 217:1, 217:9, 217:12, 218:15,

273:3, 288:5
20 [1] - 184:19
2001 [1] - 31:5
2005 [1] - 105:24
2009 [4] - 79:19, 80:1, 152:24, 203:25
2010 [1] - 262:8
2011 [1] - 5:2
2012 [1] - 300:17
21 [1] - 184:19
210 [5] - 8:3, 211:7, 211:8, 211:9, 217:6
23rd [1] - 60:24
24 [3] - 278:1, 283:10
24th [1] - 65:10
25th [1] - 300:16
26th [1] - 60:25
287 [1] - 32:23
28th [2] - 65:18, 65:21
29th [1] - 65:22
2:20 [1] - 199:15
2:30 [1] - 199:15

**3**

30 [4] - 132:22, 140:5, 268:22, 268:23
30s [3] - 99:8, 176:9, 176:11
30th [4] - 64:13, 65:13, 67:21, 69:2
36 [1] - 26:6

**4**

4 [1] - 139:18
40 [4] - 102:19, 132:22, 268:22, 268:23
400 [1] - 139:20
401 [1] - 300:23
40s [3] - 99:9, 176:10, 176:12
432nd [3] - 136:4, 300:4, 300:22
437 [1] - 136:4
46 [1] - 279:9
49 [2] - 5:7, 82:24
4:26 [1] - 299:5

**5**

5 [11] - 48:25, 52:9, 89:2, 89:18, 115:6, 116:16, 163:7, 191:18, 247:7, 248:1, 284:7
50 [3] - 40:2, 82:25, 269:8

52 [4] - 63:17, 63:24, 83:9
53 [2] - 45:25, 136:24
56 [4] - 148:2, 148:3, 148:10, 198:14
57 [5] - 199:20, 230:5, 231:13, 232:10, 232:22
58 [2] - 232:25, 298:7
58th [1] - 244:10
5:00 [3] - 72:15, 72:16, 237:18
5:30 [3] - 72:15, 72:16, 237:18

**6**

6 [3] - 128:18, 134:16
60 [2] - 163:5, 269:8
600 [1] - 181:15
6th [1] - 136:5

**7**

70 [2] - 232:13, 269:8
7180 [1] - 300:21
76196 [1] - 300:23

**8**

8:30 [3] - 72:16, 237:10
8th [4] - 151:16, 151:17, 236:8, 236:9

**9**

9-1-1 [1] - 39:12
90 [2] - 126:1, 146:3
99 [11] - 52:9, 89:2, 89:19, 115:6, 116:18, 120:6, 163:5, 191:19, 247:7, 248:2, 284:7
99-year [1] - 120:25
9:00 [7] - 72:15, 136:3, 237:10, 237:12, 237:15
9:03 [1] - 5:2
9th [1] - 235:24

**A**

a.m [3] - 5:2, 60:6
abiding [1] - 284:12
ability [20] - 69:22, 74:11, 79:1, 81:21, 87:15, 87:19, 87:22, 89:13, 102:24,

130:22, 158:14, 163:15, 181:8, 228:21, 229:20, 243:13, 284:5, 295:1
able [60] - 6:2, 9:23, 19:15, 20:2, 36:16, 61:5, 65:20, 72:1, 72:6, 72:9, 72:10, 74:15, 95:18, 100:1, 101:23, 102:4, 131:3, 131:6, 160:8, 163:11, 170:14, 173:4, 173:9, 177:21, 178:20, 180:1, 180:6, 187:16, 193:9, 193:10, 208:19, 210:7, 210:13, 211:1, 212:8, 220:21, 221:21, 230:17, 236:17, 243:22, 248:9, 248:13, 249:7, 249:11, 252:1, 264:12, 264:17, 264:19, 270:6, 270:7, 270:8, 270:10, 273:4, 273:9, 284:18, 284:25, 286:5, 286:8, 288:14
above-styled [1] - 300:10
absent [1] - 31:9
absolute [1] - 14:23
absolutely [6] - 65:15, 83:24, 111:15, 163:18, 196:6, 242:3
abundance [1] - 217:11
abuse [5] - 41:24, 108:9, 290:5, 290:7, 290:10
abused [4] - 23:19, 112:23, 113:7, 113:21
academy [2] - 32:25, 182:18
accept [3] - 134:9, 192:11, 195:22
access [2] - 30:13, 72:3
accident [2] - 54:17, 194:18
accidentally [1] - 156:18
according [4] - 87:8, 87:13, 171:2, 287:14
accordingly [2] -

67:15, 177:21
**accountant** [1] - 141:5
**accounting** [1] - 104:24
**accusation** [2] - 188:20, 191:4
**accused** [7] - 50:6, 54:15, 188:22, 190:18, 195:2, 196:25, 274:12
**acquaintance** [1] - 240:19
**acquaintances** [1] - 182:17
**act** [13] - 57:1, 94:10, 118:2, 118:16, 130:9, 130:12, 130:13, 224:14, 257:21, 259:23, 259:25, 260:5, 288:20
**acted** [1] - 159:10
**acting** [1] - 224:20
**action** [1] - 156:13
**actions** [2] - 156:12, 156:25
**active** [2] - 33:7, 34:24
**acts** [27] - 14:15, 15:20, 16:2, 16:5, 16:10, 16:15, 18:22, 53:6, 53:16, 56:18, 93:13, 94:16, 94:20, 126:18, 126:19, 168:14, 168:16, 169:5, 170:5, 171:17, 213:10, 225:10, 256:14, 259:18, 260:2, 261:14, 291:12
**actual** [2] - 127:13, 223:22
**Adam** [2] - 205:21, 206:1
**add** [1] - 238:19
**addicted** [1] - 282:1
**addition** [1] - 202:15
**additional** [6] - 12:14, 90:24, 223:24, 235:11, 263:14, 293:1
**adequate** [1] - 186:8
**adequately** [2] - 154:22, 197:10
**adjourned** [1] - 299:5
**adjudicated** [1] - 91:2
**adjustments** [1] - 194:1
**administer** [1] - 134:17
**administrative** [2] -

182:22, 183:12
**admissible** [4] - 90:19, 116:25, 225:8, 225:15
**admissions** [1] - 59:4
**admit** [1] - 55:16
**admitted** [3] - 253:1, 253:2, 300:14
**adult** [2] - 57:18, 176:24
**advance** [2] - 64:17, 69:5
**advantage** [1] - 74:1
**affect** [9] - 7:13, 29:19, 76:19, 77:6, 87:22, 196:12, 202:12, 277:24, 284:5
**affinity** [2] - 35:20, 39:9
**afternoon** [19] - 137:16, 137:18, 138:9, 149:22, 149:23, 149:24, 154:10, 180:25, 181:1, 181:7, 201:3, 201:13, 217:21, 233:24, 234:11, 234:13, 240:6, 274:2, 274:3
**afternoon's** [1] - 136:25
**age** [14] - 42:1, 46:18, 46:22, 47:4, 54:16, 57:3, 57:9, 57:19, 99:4, 99:19, 197:23, 268:11, 268:25, 269:6
**ages** [1] - 238:20
**aggravated** [1] - 16:1
**agnostic** [1] - 105:20
**ago** [26] - 10:5, 13:12, 15:22, 66:24, 78:2, 78:16, 88:13, 88:25, 97:21, 100:21, 137:4, 181:2, 185:7, 185:10, 197:22, 203:23, 215:23, 221:6, 233:12, 239:8, 239:11, 239:12, 239:13, 265:5, 283:6, 290:16
**agree** [23] - 17:13, 18:5, 18:12, 27:10, 49:7, 54:7, 62:22, 82:21, 96:10, 101:15, 101:19, 146:14, 172:20, 172:23, 179:6, 179:10, 179:15,

179:16, 218:19, 263:25, 268:5, 271:20, 272:21
**agreeable** [1] - 62:18
**agreed** [4] - 63:8, 146:24, 147:15, 296:5
**agreement** [6] - 47:17, 47:18, 47:25, 62:20, 111:1, 147:2
**agriculture** [2] - 44:3, 104:17
**ahead** [45] - 5:5, 58:20, 63:21, 64:18, 65:3, 68:6, 70:14, 70:23, 71:21, 71:22, 72:5, 72:6, 72:7, 72:8, 73:25, 74:2, 75:9, 75:13, 82:14, 82:15, 84:8, 84:18, 86:4, 87:9, 89:12, 89:13, 94:18, 97:11, 106:17, 106:20, 107:14, 108:20, 109:2, 110:21, 110:24, 113:7, 115:19, 148:8, 150:3, 174:12, 187:13, 266:19, 277:4, 295:6, 295:21
**ain't** [1] - 57:13
**airlines** [1] - 37:8
**alive** [1] - 93:1
**all-day** [1] - 181:17
**allegation** [1] - 79:18
**allegations** [1] - 152:23
**allege** [10] - 115:3, 115:4, 117:15, 159:16, 159:18, 250:10, 250:15, 251:5, 262:9
**alleged** [2] - 79:24, 190:4
**allegedly** [1] - 185:2
**alleging** [1] - 191:4
**Allen** [1] - 278:21
**allergies** [2] - 9:11, 26:25
**allergy** [1] - 201:6
**allow** [4] - 75:16, 91:11, 153:13, 238:6
**allowed** [5] - 12:15, 59:1, 142:25, 143:18, 221:20
**allowing** [1] - 188:4
**allows** [2] - 208:11, 253:11
**almost** [3] - 8:4, 189:5, 258:9

**alone** [2] - 47:1, 288:22
**ambushed** [1] - 296:24
**America** [1] - 221:4
**analysis** [3] - 56:8, 56:13, 195:6
**ancillary** [1] - 150:22
**and..** [1] - 37:18
**Angelica** [1] - 300:3
**ANGELICA** [1] - 300:21
**animal** [6] - 32:11, 32:14, 32:21, 41:24, 108:9, 109:6
**animals** [5] - 33:5, 33:8, 40:13, 40:20, 42:13
**Ann** [1] - 199:21
**ANN** [1] - 200:23
**annually** [1] - 139:19
**Answer** [1] - 146:3
**answer** [145] - 14:8, 18:3, 18:9, 18:25, 19:8, 19:13, 19:15, 26:4, 27:10, 27:13, 27:24, 54:23, 74:22, 87:6, 95:15, 95:17, 95:18, 95:22, 96:1, 97:20, 100:8, 101:11, 101:13, 101:18, 101:19, 101:21, 101:23, 101:24, 111:14, 112:4, 115:19, 116:15, 120:2, 120:19, 120:22, 122:15, 122:21, 124:14, 126:23, 127:14, 127:20, 128:14, 128:17, 129:13, 131:9, 132:15, 146:6, 163:21, 166:8, 170:1, 170:14, 171:24, 172:19, 172:21, 172:22, 172:24, 173:3, 173:5, 173:9, 174:4, 175:8, 179:4, 179:8, 179:9, 179:24, 180:1, 180:5, 180:6, 196:16, 197:10, 197:13, 207:24, 213:4, 214:8, 214:13, 214:20, 214:24, 215:1, 215:5, 215:19, 215:24, 216:1, 216:20, 216:24,

217:7, 217:24, 217:25, 218:15, 218:18, 218:25, 221:14, 221:21, 222:22, 223:6, 224:10, 224:12, 224:15, 224:21, 226:5, 226:7, 226:22, 227:2, 227:7, 229:11, 231:3, 256:20, 257:7, 262:20, 263:24, 264:1, 264:9, 264:12, 264:17, 271:7, 272:17, 272:18, 272:20, 273:3, 273:4, 273:5, 273:9, 273:10, 286:25, 287:14, 290:25, 291:15, 291:16, 291:25, 292:3, 292:6, 292:9, 292:15, 293:4, 293:7, 293:14, 294:23, 295:23, 296:10, 296:12, 297:10, 297:11, 297:12
**answer's** [1] - 257:1
**answered** [27] - 28:10, 46:13, 58:24, 96:11, 96:12, 119:8, 119:9, 128:13, 128:14, 129:11, 164:6, 164:7, 173:13, 179:11, 191:1, 204:23, 214:13, 214:16, 254:19, 262:21, 266:13, 279:9, 288:11, 289:9, 293:25, 297:23, 298:4
**answering** [11] - 55:13, 59:2, 97:9, 155:1, 155:2, 215:7, 216:8, 223:8, 287:24, 294:18, 297:21
**answers** [31] - 13:9, 27:15, 57:24, 62:15, 92:2, 92:4, 92:5, 96:6, 96:9, 101:7, 104:2, 111:9, 122:2, 128:17, 132:14, 160:7, 162:24, 164:3, 164:5, 172:15, 217:13, 226:11, 226:15, 228:3, 253:22, 254:12, 254:15,

3

263:16, 265:6, 272:16, 296:25
anthropology [1] - 204:11
anticipate [2] - 136:9, 236:14
anticipated [1] - 65:9
anticipates [1] - 144:24
Antonio [1] - 140:7
anyway [4] - 55:19, 106:15, 120:13, 147:23
apologize [1] - 128:16
appeals [3] - 8:14, 30:23, 31:1
appear [1] - 173:21
appeared [1] - 222:22
applicable [3] - 134:25, 150:11, 158:6
application [1] - 186:21
applied [1] - 51:23
apply [8] - 20:10, 28:19, 67:14, 161:21, 163:11, 171:1, 175:22, 248:19
appreciate [10] - 65:24, 67:20, 88:9, 133:15, 147:23, 156:11, 227:23, 273:20, 286:10, 290:21
approach [1] - 171:5
appropriate [23] - 8:23, 46:6, 56:22, 80:20, 88:20, 96:25, 100:2, 112:18, 116:20, 132:7, 158:1, 175:4, 194:17, 197:1, 223:12, 224:12, 227:2, 242:11, 244:1, 246:10, 267:8
Archer [1] - 139:13
area [10] - 33:13, 34:19, 110:20, 114:3, 151:13, 182:5, 237:1, 269:23, 273:14, 275:7
areas [3] - 175:14, 182:7, 290:15
argue [2] - 38:25, 39:1
arises [1] - 248:3
Arlington [2] - 79:21, 153:1

Army [1] - 99:13
arrange [1] - 61:25
arrangement [1] - 110:24
arrangements [1] - 72:1
arrested [1] - 113:3
arson [2] - 276:17, 276:19
articulate [1] - 232:11
artistic [1] - 130:21
aspect [3] - 8:9, 34:15, 230:16
aspects [3] - 10:24, 183:22, 188:1
assault [8] - 16:6, 42:23, 48:25, 94:24, 94:25, 145:21, 169:3, 260:1
assaults [2] - 16:1, 126:21
assembled [1] - 134:19
asserted [1] - 123:17
assess [2] - 222:15, 222:20
assesses [2] - 8:25, 242:13
assessing [1] - 186:19
assigned [4] - 31:7, 35:12, 67:1, 138:12
assignment [3] - 48:24, 212:21, 253:24
assignments [1] - 30:21
Assistant [1] - 66:25
assistant [1] - 49:11
assume [6] - 86:17, 87:3, 87:5, 96:18, 173:12, 221:8
assuming [1] - 72:3
attained [1] - 202:18
attempt [2] - 94:19, 190:2
attempts [1] - 161:1
attend [4] - 107:7, 143:1, 143:18, 238:6
attending [2] - 61:3, 154:4
attention [3] - 28:17, 57:23, 65:20
Attorney [1] - 201:12
attorney [4] - 38:5, 49:11, 76:1
Attorney's [1] - 49:5
attorneys [6] - 138:14, 149:3, 205:5, 239:21, 239:24, 240:8

Attorneys [1] - 66:25
attribute [1] - 40:3
August [1] - 30:20
Austin [2] - 14:17, 22:14
automatic [7] - 55:25, 58:17, 58:24, 171:22, 171:25, 287:11, 288:1
automatically [11] - 286:21, 286:22, 287:24, 291:16, 292:9, 293:14, 293:21, 293:25, 294:2, 297:5, 298:3
available [7] - 10:12, 10:15, 28:9, 112:14, 237:3, 238:10, 261:20
Avenue [3] - 151:16, 151:17, 151:20
avenues [2] - 14:7, 23:21
award [1] - 8:2
aware [14] - 43:14, 44:12, 44:14, 84:11, 84:15, 86:6, 106:25, 107:5, 146:14, 146:22, 186:18, 209:14, 209:17
awhile [10] - 30:18, 32:14, 33:11, 146:20, 154:5, 197:22, 207:8, 239:12, 239:13, 290:16

**B**

background [14] - 22:10, 44:3, 98:11, 130:1, 174:7, 188:12, 196:10, 196:13, 197:24, 225:4, 225:22, 290:8, 290:10, 290:13
backing [1] - 71:15
backs [1] - 94:10
backup [1] - 237:6
bad [21] - 12:16, 23:19, 76:6, 76:13, 76:14, 76:24, 90:21, 90:22, 126:16, 162:3, 162:4, 162:9, 225:9, 225:10, 240:2, 240:10, 253:13, 287:7, 288:21
badge [6] - 60:1,

63:11, 147:18, 199:9, 231:19, 298:11
badly [1] - 284:1
bag [1] - 251:9
bags [2] - 15:15, 108:4
BAILIFF [3] - 134:13, 148:3, 231:15
bailiff [5] - 60:1, 63:11, 199:9, 298:12, 298:19
ball [1] - 261:18
balls [1] - 21:22
bar [1] - 35:5
Bar [1] - 36:7
bargain [1] - 110:24
base [8] - 224:9, 224:10, 228:9, 228:13, 229:3, 229:21, 285:18, 296:9
based [50] - 16:3, 19:5, 58:18, 59:2, 62:19, 95:23, 98:5, 98:19, 101:6, 110:9, 112:16, 116:20, 118:19, 119:10, 124:1, 131:9, 144:16, 150:14, 175:13, 206:23, 207:17, 211:13, 213:12, 214:6, 215:9, 215:14, 217:15, 218:3, 220:24, 221:15, 221:22, 226:2, 226:12, 227:5, 227:8, 228:4, 230:10, 230:18, 231:3, 231:11, 235:12, 242:24, 273:5, 273:10, 291:17, 292:10, 293:12, 293:22, 296:25, 297:11
bashful [1] - 34:4
basic [1] - 276:5
basis [7] - 17:16, 25:5, 57:17, 58:14, 72:6, 112:19, 230:23
Baylor [1] - 151:17
bearing [1] - 130:3
beat [1] - 271:18
beating [1] - 100:15
become [2] - 67:13, 105:23
becomes [3] - 69:21, 128:13, 150:14
bedder [1] - 206:1
Bedford [2] - 79:25,

153:2
begin [1] - 173:14
beginning [2] - 76:7, 106:24
behavior [5] - 97:7, 165:25, 169:7, 225:13, 290:14
behind [3] - 25:5, 109:3, 165:11
beings [2] - 169:13, 260:17
belief [9] - 123:17, 123:19, 208:17, 210:6, 218:4, 221:22, 229:16, 229:19, 230:11
beliefs [17] - 208:2, 208:11, 208:12, 214:6, 214:19, 218:5, 218:8, 220:19, 222:12, 226:12, 226:15, 228:4, 228:14, 230:10, 230:13, 230:19, 266:6
believes [1] - 296:1
Belknap [1] - 300:23
bell [1] - 113:24
bells [2] - 80:2, 153:3
belong [1] - 107:11
bench [1] - 51:24
benefit [4] - 55:18, 166:24, 170:11, 272:23
Berry [2] - 9:20, 144:13
beside [1] - 164:25
best [12] - 8:2, 8:5, 74:11, 110:3, 139:6, 211:11, 222:12, 261:19, 278:23, 283:19, 293:9, 295:1
bet [1] - 68:13
better [8] - 36:20, 77:1, 104:4, 114:25, 120:5, 265:4, 274:13, 278:4
between [9] - 22:20, 53:19, 70:17, 79:20, 81:20, 153:1, 167:23, 245:12, 258:4
beyond [78] - 14:13, 16:22, 18:20, 19:6, 19:12, 19:16, 19:22, 22:1, 44:21, 48:14, 48:18, 50:17, 51:9, 52:1, 53:5, 54:22, 56:14, 56:16, 68:22, 90:19, 93:6, 93:10,

93:11, 95:14, 96:10, 101:3, 120:13, 122:14, 122:16, 123:9, 123:21, 123:22, 124:3, 124:4, 127:2, 153:17, 160:1, 162:1, 166:6, 166:7, 167:3, 167:17, 170:1, 171:9, 172:21, 173:5, 173:17, 173:18, 173:19, 188:25, 189:21, 190:5, 192:17, 193:7, 193:10, 195:10, 195:16, 195:19, 213:8, 215:15, 215:24, 215:25, 216:8, 216:15, 250:18, 253:11, 256:7, 256:12, 256:20, 256:21, 257:6, 264:1, 265:16, 285:22, 286:7, 291:10, 296:11
**bias** [1] - 230:22
**biased** [1] - 230:16
**bids** [1] - 86:2
**big** [13] - 36:1, 45:12, 52:8, 67:24, 68:13, 93:21, 104:15, 139:17, 139:19, 168:1, 181:14, 184:5, 184:6
**bigger** [1] - 184:8
**billion** [1] - 139:18
**binds** [2] - 170:23, 235:12
**birthday** [2] - 176:2, 177:13
**bit** [41] - 8:1, 13:14, 43:20, 65:19, 67:4, 72:17, 73:15, 85:21, 95:4, 104:6, 108:11, 108:23, 116:13, 117:4, 129:20, 137:15, 138:15, 141:22, 142:13, 151:16, 152:1, 201:13, 202:23, 219:23, 220:4, 220:6, 220:9, 222:23, 225:2, 234:14, 241:14, 245:3, 252:22, 253:1, 254:2, 274:9, 279:15, 280:10, 281:18, 285:19,

296:4
**bites** [1] - 32:14
**blame** [1] - 267:12
**blameworthiness** [8] - 23:6, 23:12, 25:14, 97:18, 174:16, 174:22, 174:24, 266:24
**blameworthy** [3] - 267:3, 267:7, 268:24
**bleed** [1] - 230:19
**blight** [1] - 224:2
**blog** [1] - 135:13
**blood** [3] - 82:18, 84:5, 84:24
**blows** [1] - 168:6
**blue** [1] - 48:15
**boating** [1] - 142:5
**Bob** [13] - 18:21, 19:19, 24:4, 29:10, 29:15, 35:3, 66:24, 138:11, 142:18, 144:6, 197:18, 201:10
**bodily** [4] - 16:6, 42:23, 48:25
**body** [3] - 50:6, 121:8, 121:9
**boils** [1] - 188:9
**bomb** [3] - 33:17, 118:2, 118:16
**bombing** [1] - 11:13
**bond** [1] - 36:6
**book** [1] - 147:13
**books** [1] - 204:18
**Borja** [5] - 199:21, 219:21, 227:23, 228:2, 231:17
**BORJA** [1] - 200:23
**born** [3] - 184:13, 184:14, 224:3
**boss** [1] - 252:9
**bother** [2] - 241:13, 241:20
**bothered** [3] - 240:24, 241:12, 279:22
**bothering** [1] - 241:18
**bothers** [2] - 40:21, 241:16
**bothersome** [1] - 131:18
**bottom** [1] - 89:9
**bound** [2] - 250:12, 250:16
**Bowie** [1] - 151:13
**box** [7] - 24:6, 102:11, 102:12, 103:19, 128:9, 229:1, 237:15
**boys** [3] - 239:1, 239:3, 239:4

**brain** [4] - 57:16, 99:7, 176:10, 268:20
**brakes** [2] - 104:14, 288:9
**break** [2] - 194:23, 265:11
**breakfast** [1] - 243:9
**breaks** [2] - 157:20, 158:7
**breath** [1] - 216:12
**briefly** [1] - 20:22
**bring** [25] - 11:22, 12:14, 12:16, 12:18, 12:23, 24:13, 24:23, 59:15, 63:1, 64:12, 91:12, 91:14, 134:11, 147:8, 177:14, 179:1, 184:25, 196:16, 197:9, 197:13, 198:23, 219:3, 231:14, 289:13, 298:8
**bringing** [2] - 29:2, 67:20
**BRISSETTE** [13] - 6:16, 30:3, 58:11, 58:21, 59:11, 62:21, 138:3, 138:8, 200:22, 201:2, 219:15, 230:7, 231:5
**Brissette** [13] - 6:1, 35:8, 40:17, 57:4, 66:7, 66:24, 137:24, 138:11, 146:23, 149:6, 200:15, 201:10, 233:23
**broad** [4] - 94:20, 95:10, 169:5, 259:20
**broke** [1] - 143:8
**brother** [7] - 110:22, 110:23, 205:19, 205:25, 236:25, 237:3
**brothers** [4] - 139:15, 204:7, 205:20, 205:21
**brought** [8] - 6:5, 12:11, 53:1, 91:9, 185:1, 200:17, 211:7, 212:22
**Bryant** [4] - 201:21, 202:9, 203:2, 203:5
**Bucs** [2] - 15:14, 15:18
**build** [1] - 140:17
**building** [11] - 7:9, 12:5, 16:4, 16:8, 18:7, 22:19, 31:20, 36:2, 51:10, 136:5,

146:1
**built** [1] - 151:15
**bullet** [2] - 189:21, 194:7
**burden** [79] - 6:7, 18:20, 18:23, 20:4, 22:4, 24:13, 24:14, 24:15, 25:21, 39:8, 48:13, 50:19, 51:3, 53:10, 53:12, 58:15, 59:7, 59:8, 66:12, 93:8, 101:1, 101:5, 122:12, 123:3, 123:12, 129:21, 131:14, 137:25, 149:6, 159:24, 159:25, 166:5, 166:9, 166:23, 170:10, 170:14, 171:20, 172:18, 173:9, 173:20, 173:22, 173:24, 173:25, 178:15, 178:16, 178:25, 189:13, 189:20, 192:9, 192:17, 192:20, 196:20, 216:8, 218:14, 250:22, 251:4, 256:10, 256:11, 256:16, 256:19, 256:22, 257:2, 257:14, 264:17, 265:20, 265:22, 266:1, 266:3, 270:19, 272:15, 287:2, 287:4, 287:12, 287:25, 288:2, 288:6, 295:20
**burdens** [1] - 122:24
**buried** [1] - 121:10
**burned** [1] - 110:20
**burning** [1] - 168:9
**bus** [1] - 298:22
**business** [7] - 61:5, 61:6, 70:2, 72:14, 167:8, 183:3, 237:20
**busy** [2] - 71:22, 227:13
**but..** [3] - 31:22, 35:7, 137:13
**button** [1] - 117:8
**buttons** [1] - 117:9
**buy** [7] - 202:12, 258:14, 258:17, 258:18, 258:25, 282:11
**BY** [18] - 6:16, 30:7, 30:17, 66:20, 103:9, 115:1, 117:11,

138:8, 149:21, 155:22, 180:24, 201:2, 219:20, 234:10, 274:1, 278:20, 282:24, 290:2

---

## C

**calculating** [1] - 86:21
**Calvert** [2] - 32:25
**camp** [2] - 107:15, 107:20
**Camp** [1] - 151:13
**Campbell** [3] - 113:23, 113:25, 114:5
**cannot** [2] - 28:4, 186:19
**cap** [1] - 222:11
**capable** [2] - 171:16, 176:8
**capacity** [3] - 34:6, 34:8, 35:9
**capital** [113] - 8:16, 9:4, 9:25, 10:2, 10:12, 10:15, 10:19, 10:25, 11:1, 12:3, 13:22, 18:7, 20:25, 42:2, 44:20, 44:21, 47:5, 48:18, 49:14, 77:10, 88:12, 88:13, 92:19, 92:21, 95:25, 99:5, 110:25, 111:8, 111:11, 111:17, 112:11, 112:15, 116:13, 116:21, 117:1, 117:4, 117:14, 118:24, 120:15, 121:4, 121:14, 121:20, 122:1, 122:6, 127:20, 155:24, 156:1, 156:3, 156:5, 156:6, 156:21, 157:14, 157:18, 157:19, 158:5, 158:6, 159:11, 162:23, 163:13, 163:20, 164:15, 165:2, 165:5, 169:16, 171:23, 173:24, 175:21, 175:22, 176:6, 186:24, 189:12, 190:3, 190:23, 194:12, 194:13, 194:22, 195:23, 206:8, 208:4, 213:4, 214:1, 216:18, 220:10, 222:25,

223:1, 223:21,
238:1, 242:20,
244:1, 245:4, 245:7,
245:12, 245:14,
245:22, 246:1,
246:23, 249:17,
250:25, 252:25,
253:19, 255:2,
255:7, 269:4, 285:9,
285:11, 286:15,
291:6, 291:8,
291:18, 292:11,
292:24, 293:13,
297:23
**capricious** [1] -
115:14
**captain** [1] - 182:25
**car** [6] - 111:4, 119:15,
190:9, 231:21,
280:20, 298:22
**Carbondale** [1] - 73:4
**care** [12] - 40:21, 63:9,
72:1, 108:23,
140:25, 183:25,
185:4, 205:8,
236:23, 236:24,
237:4, 275:22
**career** [4] - 18:7,
276:21, 276:22,
276:23
**careful** [1] - 85:7
**caretaker** [1] - 276:7
**caring** [2] - 188:15,
188:23
**Carl** [1] - 60:12
**Carlson** [4] - 143:13,
145:9, 146:16,
146:17
**Carlson's** [1] - 144:18
**carry** [2] - 122:12,
241:5
**cart** [1] - 133:10
**case** [253] - 5:22, 7:13,
7:14, 7:16, 7:24,
8:16, 8:25, 9:19,
9:21, 10:9, 10:15,
10:25, 12:3, 12:5,
19:20, 20:11, 20:22,
23:25, 24:2, 24:11,
24:12, 24:14, 25:2,
25:4, 25:14, 25:17,
28:20, 29:3, 35:6,
44:20, 44:25, 45:17,
45:22, 47:2, 47:8,
49:1, 49:14, 49:20,
49:22, 49:23, 51:16,
51:23, 51:25, 52:5,
54:9, 55:19, 56:5,
59:21, 60:18, 62:18,
63:7, 63:8, 63:12,

65:20, 66:3, 67:1,
68:25, 70:4, 71:18,
73:18, 76:19, 77:6,
77:18, 78:18, 78:23,
79:2, 79:6, 79:12,
79:14, 80:2, 81:21,
83:2, 83:7, 83:11,
84:17, 85:5, 90:16,
96:3, 98:18, 98:19,
98:20, 99:15,
101:24, 103:11,
110:4, 110:15,
110:17, 112:8,
115:18, 116:6,
116:9, 116:12,
116:13, 117:1,
127:13, 131:24,
134:16, 134:23,
135:1, 135:2, 135:3,
135:5, 135:7, 135:8,
135:10, 135:12,
135:14, 135:16,
135:19, 135:20,
135:21, 135:25,
136:1, 137:20,
138:13, 141:18,
141:22, 143:15,
143:20, 144:7,
144:13, 144:19,
144:23, 145:4,
145:6, 145:19,
145:21, 146:5,
147:14, 149:1,
149:7, 152:4,
152:14, 152:21,
153:10, 153:12,
155:25, 156:8,
159:11, 163:5,
163:6, 163:7,
169:16, 170:19,
171:3, 171:6, 172:2,
175:2, 175:21,
175:22, 175:23,
176:6, 176:14,
177:2, 177:25,
178:4, 186:17,
186:24, 189:17,
190:1, 190:3, 190:4,
192:18, 193:9,
194:21, 199:4,
199:11, 200:11,
202:13, 203:17,
203:21, 208:9,
208:14, 211:11,
211:13, 212:2,
213:4, 214:2, 215:5,
217:12, 219:23,
220:10, 220:23,
220:24, 225:6,
227:8, 228:10,
228:13, 228:15,

230:12, 230:15,
230:18, 230:19,
231:1, 231:3, 231:7,
231:9, 232:4,
233:19, 234:1,
234:23, 235:2,
235:11, 239:14,
240:17, 240:21,
241:2, 241:5, 241:6,
241:9, 242:3, 242:4,
242:14, 243:1,
243:13, 246:4,
248:11, 251:1,
256:4, 263:22,
264:13, 264:23,
266:8, 266:15,
267:23, 268:1,
268:2, 268:16,
268:17, 269:13,
269:16, 271:23,
272:2, 274:8,
274:17, 281:1,
281:12, 281:21,
283:24, 285:12,
291:7, 292:6,
297:11, 298:19
**cases** [26] - 10:19,
11:16, 18:8, 22:18,
41:12, 41:16, 41:17,
42:19, 44:16, 57:9,
80:17, 127:12,
128:3, 152:7,
186:17, 187:11,
191:14, 191:15,
227:16, 258:21,
258:22, 279:13,
283:16, 290:17
**cashier** [2] - 202:5,
202:8
**casual** [2] - 110:1,
182:17
**catch** [1] - 131:6
**catching** [2] - 26:25,
100:18
**category** [1] - 45:8
**Catholic** [2] - 209:13,
209:18
**caught** [1] - 43:17
**caused** [17] - 40:4,
49:17, 50:2, 57:2,
105:25, 156:18,
156:19, 157:7,
159:12, 190:18,
249:24, 250:6,
250:9, 251:6, 251:7,
282:3, 282:8
**causes** [3] - 14:2,
165:7, 272:10
**causing** [2] - 285:13,
285:14

**caution** [1] - 217:11
**ceiling** [1] - 46:22
**cell** [1] - 135:19
**cemetery** [1] - 121:10
**center** [6] - 150:23,
151:3, 151:11,
151:16, 151:17,
182:3
**central** [4] - 8:18,
28:10, 63:13, 231:25
**Cert** [1] - 300:21
**certain** [19] - 15:4,
15:5, 57:5, 70:8,
70:9, 103:25,
119:17, 156:13,
158:23, 159:8,
191:3, 205:1,
223:13, 250:1,
254:16, 259:14,
259:15, 270:4,
285:14
**certainly** [5] - 84:1,
86:19, 91:9, 142:14,
157:7
**certainty** [10] - 14:23,
14:25, 94:3, 94:5,
94:7, 122:18,
167:15, 167:16,
259:4
**certify** [3] - 128:22,
300:5, 300:12
**cetera** [2] - 158:5,
223:3
**chain** [3] - 108:16,
109:12, 109:13
**chains** [1] - 108:16
**chair** [1] - 134:12
**challenge** [14] - 58:9,
58:14, 133:22,
140:16, 198:15,
230:6, 230:23,
231:13, 295:10,
295:14, 295:18,
295:25, 298:6
**challenged** [1] - 59:4
**chambers** [1] - 300:11
**chance** [15] - 15:14,
16:10, 24:1, 93:17,
93:21, 102:25,
125:23, 126:2,
143:14, 162:19,
257:20, 257:22,
257:24, 266:11
**change** [10] - 104:25,
105:1, 105:19,
106:1, 106:24,
115:25, 218:5,
218:7, 219:11,
289:14
**changed** [19] - 5:15,

5:18, 48:10, 60:19,
64:7, 64:24, 78:16,
78:17, 91:13,
102:20, 137:5,
137:11, 148:15,
148:18, 200:4,
200:6, 233:12,
233:15, 297:13
**changes** [4] - 43:22,
67:13, 136:7, 150:13
**Chapman** [8] - 63:25,
64:2, 66:21, 103:5,
103:10, 133:16,
133:18, 134:15
**CHAPMAN** [1] - 66:16
**Chapter** [1] - 42:8
**chapter** [1] - 42:8
**character** [15] - 12:16,
22:9, 53:3, 90:21,
98:11, 115:16,
128:6, 129:25,
162:3, 162:4, 162:8,
174:6, 175:1, 225:4,
253:13
**charge** [7] - 32:14,
142:15, 144:21,
181:10, 189:25,
190:1, 249:19
**Charge** [4] - 164:16,
170:20, 235:16,
242:25
**charged** [5] - 12:22,
48:10, 90:8, 142:6,
251:18
**charges** [2] - 12:20,
12:21
**charging** [3] - 16:11,
48:4, 250:5
**chart** [1] - 117:16
**chasing** [1] - 140:10
**cheaters** [1] - 9:8
**check** [8] - 60:2,
63:13, 147:18,
190:13, 199:10,
222:16, 232:3,
298:17
**checked** [4] - 8:23,
10:7, 222:18, 283:13
**chemistry** [1] - 44:10
**Chicago** [1] - 139:16
**Chicken** [1] - 125:2
**chief** [1] - 31:5
**child** [14] - 37:5, 37:7,
38:2, 41:25, 46:16,
46:22, 47:3, 123:10,
156:5, 246:3,
271:19, 276:10,
288:22, 290:5
**child's** [1] - 37:7
**child-abuse** [1] -

290:5
childhood [2] -
197:25, 288:21
children [11] - 10:20,
28:12, 40:12, 40:20,
41:24, 42:13,
113:21, 141:7,
290:5, 290:7, 290:13
Chimega [1] - 73:8
choice [6] - 49:4, 49:5,
54:21, 87:9, 212:14,
254:16
choices [6] - 112:5,
222:13, 222:14,
276:21, 276:22,
276:23
choose [2] - 167:16,
167:21
chooses [1] - 24:5
choosing [1] - 206:19
chose [4] - 91:6,
125:12, 167:14,
169:4
chosen [1] - 167:15
Christ [5] - 105:22,
106:22, 107:1,
107:4, 109:24
Christian [3] - 105:18,
106:19, 109:21
Christmas [3] - 80:1,
106:10, 109:25
Christmastime [1] -
204:1
church [14] - 76:1,
105:23, 106:8,
106:9, 106:21,
107:7, 109:18,
154:3, 154:4,
182:13, 182:15,
209:13, 209:17,
209:18
Church [5] - 11:8,
105:18, 107:2,
109:22, 109:24
churches [1] - 109:25
circle [1] - 144:3
circumstance [32] -
22:11, 22:24, 98:13,
98:17, 98:24, 99:5,
130:15, 131:4,
131:15, 131:21,
131:23, 175:17,
176:5, 176:25,
179:6, 179:11,
180:2, 180:8,
225:17, 226:6,
226:9, 226:21,
226:23, 226:25,
267:18, 268:1,
268:2, 269:16,

271:9, 271:10,
271:13, 271:20
circumstances [35] -
22:9, 22:12, 22:24,
56:1, 98:6, 98:10,
98:14, 98:17,
114:18, 115:17,
116:7, 116:10,
127:11, 129:24,
129:25, 130:3,
131:10, 157:25,
174:6, 174:25,
191:3, 217:17,
222:15, 222:21,
223:3, 223:10,
240:23, 244:7,
270:5, 279:25,
280:18, 284:22,
289:4, 291:24
citation [1] - 73:21
cities [1] - 275:14
citizen [1] - 78:10
citizens [2] - 45:6,
227:14
City [7] - 11:13, 32:20,
68:8, 81:17, 81:18,
118:3, 275:18
city [3] - 79:20, 80:25,
119:15
civic [1] - 188:5,
227:14, 227:20
civil [3] - 122:25,
123:6, 205:2
claim [2] - 121:9,
123:3
claiming [1] - 123:11
class [2] - 206:17,
206:18
Classic [1] - 108:2
clear [6] - 123:12,
154:17, 154:19,
216:5, 217:14, 258:1
cleared [1] - 121:12
clearly [1] - 240:5
clerk [5] - 16:9, 30:24,
33:12, 33:18, 33:25
clerk's [2] - 16:9,
30:22
clerks [2] - 34:1, 34:3
client [1] - 106:3
cliff [1] - 286:2
close [6] - 52:14, 61:6,
91:18, 109:14,
109:15, 142:3
closely [2] - 35:9,
280:10
closeness [3] - 35:20,
35:23, 36:4
closer [8] - 19:14,
95:19, 100:10,

173:1, 173:4,
216:21, 264:10,
264:13
closest [1] - 35:15
cloud [1] - 74:18
Club [2] - 67:22,
107:10
clues [1] - 86:16
Clyde [2] - 79:24,
153:2
Code [7] - 33:22, 42:6,
42:7, 117:12,
189:22, 189:23
coin [1] - 180:4
cold [3] - 75:4, 75:20,
184:14
collected [1] - 86:14
collective [3] - 85:9,
129:16, 129:17
collectively [3] -
25:10, 191:12,
194:11
college [2] - 138:25,
238:23
College [1] - 203:11
Colleyville [1] - 39:15
colonoscopies [1] -
181:18
Colorado [2] - 68:6,
139:6
combat [1] - 203:9
combination [1] -
296:15
comfort [1] - 30:16
comfortable [3] - 9:2,
158:13, 163:15
coming [4] - 8:18,
28:21, 217:21,
297:24
comment [1] - 77:5
commission [2] -
129:24, 130:13
commit [17] - 14:15,
15:25, 18:22, 53:6,
56:17, 90:7, 93:12,
117:14, 126:18,
170:5, 176:1,
213:10, 256:13,
261:13, 291:11,
293:17, 293:18
commitment [1] -
60:24
commitments [1] -
62:17
commits [3] - 10:2,
88:13, 245:7
committed [17] -
23:15, 50:24, 55:4,
55:23, 90:23, 91:15,
97:8, 99:4, 130:4,

140:14, 161:1,
171:14, 224:4,
225:3, 253:5,
253:14, 269:1
committing [4] - 89:3,
97:6, 171:16, 194:24
common [9] - 82:12,
82:20, 82:22, 87:5,
118:9, 118:12,
124:2, 156:14, 256:3
communication [1] -
135:17
community [5] -
16:19, 53:17, 184:7,
184:9, 220:16
company [9] - 70:7,
104:10, 105:4,
105:7, 139:14,
139:15, 139:17,
141:24, 142:1
compared [1] - 45:13
compass [2] - 99:8,
176:12
complaint [2] - 12:22,
109:6
complete [2] - 132:4,
252:12
completely [13] -
57:16, 79:2, 98:22,
99:7, 112:8, 128:10,
166:2, 172:6,
176:10, 261:24,
262:16, 262:25,
296:6
components [1] -
104:13
compromise [1] -
89:12
compromised [1] -
79:2
computer [3] - 47:18,
72:3, 213:18
concealed [1] - 105:9
conceivable [1] -
120:23
concept [1] - 186:13
concepts [2] - 100:16,
100:23
concern [4] - 46:4,
48:3, 70:3, 192:22
concerned [14] -
35:18, 36:9, 44:15,
57:6, 62:14, 69:8,
69:25, 71:4, 91:23,
91:24, 132:21,
133:6, 145:13, 186:5
concerning [2] -
135:8, 279:10
concerns [1] - 72:2
conclusion [1] - 55:5

condition [1] - 225:22
conduct [7] - 119:17,
127:5, 127:7, 135:4,
135:11, 157:16,
158:23
conducted [1] - 90:3
confidence [2] -
187:12, 187:16
confident [1] - 195:24
confounded [1] -
215:7
confront [2] - 174:10,
255:23
confronted [8] -
91:19, 165:24,
174:11, 208:22,
210:18, 212:13,
244:24, 291:9
confused [2] - 216:12,
297:2
connection [2] -
81:20, 130:12
conscience [11] -
27:6, 82:17, 118:20,
129:2, 129:18,
209:1, 209:4, 209:5,
211:2, 211:5, 211:6
consequences [5] -
84:9, 85:2, 116:2,
156:12, 156:25
consider [23] - 12:12,
18:25, 23:3, 59:1,
59:6, 81:12, 89:22,
96:12, 98:25,
128:24, 130:16,
174:14, 186:19,
213:25, 216:25,
217:3, 224:8, 265:7,
283:23, 284:6,
284:9, 284:18, 289:6
consideration [29] -
22:8, 52:6, 55:10,
71:8, 74:21, 74:24,
90:7, 90:13, 90:16,
98:9, 121:5, 161:24,
174:5, 174:9,
191:17, 196:4,
196:5, 208:14,
216:23, 224:23,
225:16, 247:14,
247:16, 248:9,
253:3, 253:9,
263:11, 285:2,
286:23
considerations [1] -
90:10
considered [2] -
168:18, 188:19
considering [1] -
90:12

consist [2] - 161:16, 204:6
consistent [2] - 222:23
consists [1] - 161:15
constant [1] - 70:3
constantly [1] - 69:25
constitute [16] - 14:16, 53:7, 56:18, 93:13, 126:22, 165:17, 166:11, 166:20, 166:22, 170:6, 192:13, 213:11, 256:14, 261:14, 269:5, 291:12
constitutes [1] - 118:5
Construction [1] - 141:24
construction [4] - 138:20, 139:18, 140:5, 140:17
consultant [2] - 104:24, 106:3
contain [1] - 296:19
contained [1] - 297:3
contains [2] - 170:21, 300:6
contemplate [1] - 158:4
contemplated [3] - 72:13, 98:16, 169:20
contemplates [1] - 99:24
contentious [1] - 37:22
context [6] - 28:13, 36:25, 54:12, 194:6, 206:16, 206:20
continuation [1] - 215:9
continue [1] - 166:20
continues [1] - 151:5
continuing [25] - 14:16, 53:7, 55:6, 56:18, 93:14, 100:9, 115:21, 163:24, 165:18, 166:11, 166:22, 169:22, 170:7, 192:13, 195:12, 213:11, 214:25, 254:6, 261:9, 261:15, 266:14, 269:6, 291:12
contractor [2] - 138:22, 140:24
Contractors [1] - 139:13

contractors [1] - 139:20
control [6] - 32:11, 32:21, 45:18, 54:6, 68:22, 109:6
controlled [1] - 29:7
controller [1] - 70:7
convenience [1] - 10:23
converse [1] - 19:19
conveying [1] - 135:18
convict [3] - 75:10, 117:17, 144:1
convicted [17] - 92:18, 92:21, 110:14, 111:16, 116:21, 121:7, 121:14, 121:20, 122:6, 142:20, 142:23, 165:5, 239:6, 242:20, 244:1, 255:7, 281:25
convicting [1] - 294:1
conviction [2] - 123:16, 123:19
convince [7] - 122:20, 127:2, 128:7, 131:22, 224:20, 227:1
convinced [1] - 129:6
convincing [1] - 123:12
cool [1] - 106:5
cooperate [1] - 38:4
coordinated [1] - 64:3
coordination [1] - 68:13
copy [2] - 106:7, 277:18
correct [41] - 5:8, 10:22, 16:13, 17:17, 20:12, 20:19, 21:11, 21:14, 29:13, 36:7, 37:13, 37:14, 41:8, 49:3, 60:12, 65:16, 77:15, 82:8, 83:24, 105:20, 105:21, 112:24, 127:15, 127:21, 127:22, 141:3, 141:19, 148:11, 171:25, 199:21, 202:5, 208:6, 214:11, 218:22, 223:4, 224:24, 227:9, 286:18, 287:22, 292:14, 300:6
correctly [7] - 127:16, 128:1, 210:5,

213:12, 218:1, 287:20, 300:13
correlation [1] - 37:21
cost [2] - 70:10, 70:11
Cotten [10] - 232:22, 232:25, 233:2, 234:11, 273:20, 274:2, 290:2, 290:21, 290:24, 298:10
COTTEN [1] - 234:6
cougar [1] - 73:9
coughed [1] - 206:5
coughing [1] - 206:3
counsel [2] - 91:19, 300:8
counseling [2] - 42:25, 43:3
Count [1] - 48:12
counties [1] - 275:14
countries [2] - 46:2, 83:25
country [4] - 107:14, 130:9, 225:14, 269:15
county [17] - 7:1, 11:16, 11:17, 12:21, 16:9, 17:19, 17:21, 30:19, 30:22, 33:12, 33:18, 35:21, 35:25, 37:9, 39:10, 40:25
County [29] - 21:2, 21:9, 21:10, 29:8, 29:18, 39:19, 48:25, 50:13, 79:21, 79:22, 81:14, 110:20, 142:10, 142:11, 142:17, 159:8, 184:10, 201:12, 203:11, 239:10, 249:23, 250:15, 281:11, 282:17, 282:18, 283:1, 283:4, 283:6, 300:5
COUNTY [1] - 300:2
couple [37] - 6:25, 9:6, 13:11, 14:18, 15:22, 66:23, 69:5, 78:2, 80:15, 80:16, 88:13, 88:25, 93:4, 96:4, 97:11, 110:19, 111:8, 141:23, 141:25, 148:14, 150:18, 157:25, 165:14, 167:2, 174:12, 178:23, 189:6, 202:16, 203:22, 235:19, 237:19, 238:19, 254:20, 265:13,

266:19, 272:13, 280:3
course [18] - 72:14, 74:14, 153:8, 157:16, 161:4, 170:25, 177:8, 177:17, 178:3, 179:23, 181:7, 188:1, 193:9, 241:21, 246:2, 246:25, 251:5, 286:16
courses [3] - 203:8, 203:10, 203:12
Court [19] - 25:20, 48:25, 128:23, 136:4, 136:8, 146:25, 205:10, 231:2, 241:10, 263:5, 295:23, 295:24, 296:17, 297:1, 297:3, 300:3, 300:4, 300:22, 300:22
court [53] - 5:3, 24:22, 30:24, 31:6, 31:7, 32:2, 35:5, 35:6, 35:13, 37:4, 37:5, 37:13, 37:23, 43:1, 60:7, 67:9, 70:19, 78:1, 80:6, 80:13, 82:23, 88:12, 91:15, 122:25, 125:9, 135:10, 136:19, 145:25, 146:2, 155:7, 155:23, 156:11, 159:6, 161:20, 163:11, 179:12, 199:16, 205:2, 213:20, 234:21, 234:25, 237:25, 238:6, 245:3, 246:14, 247:6, 247:15, 248:15, 249:20, 265:5, 281:17, 300:11
COURT [171] - 5:5, 5:10, 5:14, 5:18, 5:21, 30:4, 30:14, 58:3, 58:7, 58:9, 58:12, 58:20, 59:9, 59:12, 59:15, 59:18, 60:9, 60:11, 60:14, 60:17, 60:21, 61:2, 61:8, 61:11, 61:13, 61:15, 61:18, 61:22, 62:5, 62:8, 62:11, 62:22, 62:24, 63:4, 63:17, 63:19, 63:21,

63:24, 64:2, 64:6, 64:22, 64:24, 65:3, 65:7, 65:12, 65:16, 65:23, 66:2, 103:7, 133:18, 133:22, 133:24, 134:1, 134:4, 134:6, 134:11, 134:15, 134:22, 136:11, 136:13, 136:17, 136:21, 136:23, 137:3, 137:9, 137:14, 146:9, 147:1, 147:4, 147:10, 147:12, 147:23, 148:2, 148:4, 148:6, 148:8, 148:13, 148:18, 148:21, 148:25, 149:3, 149:10, 149:12, 149:15, 155:4, 155:7, 155:10, 155:12, 155:14, 155:16, 155:18, 155:20, 180:21, 198:9, 198:14, 198:17, 198:19, 198:21, 198:23, 199:1, 199:3, 199:7, 199:13, 199:18, 199:20, 199:23, 200:2, 200:6, 200:10, 200:20, 219:17, 228:1, 228:6, 228:18, 228:25, 229:9, 229:14, 229:24, 230:3, 230:5, 231:11, 231:17, 231:22, 231:24, 232:2, 232:6, 232:10, 232:17, 232:19, 232:22, 232:24, 233:2, 233:6, 233:10, 233:15, 233:18, 234:4, 273:23, 278:11, 278:14, 278:18, 290:1, 290:24, 291:4, 291:6, 292:5, 292:8, 292:14, 292:17, 292:19, 292:22, 293:8, 293:11, 293:20, 294:3, 294:6, 294:10, 294:13, 294:21, 295:3, 295:5, 295:10, 295:13, 295:21, 298:5,

298:10, 298:15,
298:20, 298:23,
298:25, 299:4
**Court's** [3] - 170:20,
230:9, 297:25
**courthouse** [5] -
10:18, 39:3, 41:17,
80:9, 237:10
**Courtney** [8] - 148:11,
148:13, 155:4,
180:25, 198:5,
198:9, 198:23, 199:1
**COURTNEY** [1] -
149:17
**courtroom** [25] - 5:4,
34:3, 58:8, 59:17,
60:8, 62:13, 63:3,
63:18, 133:21,
134:14, 135:8,
136:16, 136:20,
146:12, 147:9,
148:5, 198:13,
198:25, 199:17,
230:4, 231:16,
232:21, 232:23,
295:9, 298:9
**courtrooms** [1] -
35:12
**courts** [9] - 8:15,
30:25, 35:11, 41:1,
41:5, 41:17, 41:23,
42:19, 237:12
**cousin's** [1] - 60:25
**cover** [3] - 85:21,
110:21, 157:23
**covered** [1] - 234:25
**covers** [1] - 159:17
**coworkers** [2] - 6:21,
35:23
**CPA** [2] - 105:13,
105:15
**CPS** [1] - 281:12
**create** [1] - 123:16
**creative** [1] - 161:13
**credibility** [1] - 74:15
**credible** [1] - 123:5
**creeping** [1] - 69:2
**crime** [32] - 34:21,
88:16, 88:22, 90:8,
91:8, 97:6, 97:8,
110:18, 110:22,
112:14, 112:15,
129:24, 130:4,
130:13, 131:1,
153:7, 153:15,
156:18, 161:1,
162:16, 163:1,
164:23, 165:21,
176:1, 189:25,
224:6, 225:3,

239:22, 245:17,
253:5, 269:1, 293:17
**crimes** [11] - 8:24,
12:20, 28:8, 28:11,
40:12, 41:23, 42:13,
90:23, 242:12,
253:14, 293:19
**criminal** [92] - 10:3,
10:11, 11:2, 11:5,
11:6, 11:12, 11:21,
13:23, 14:15, 16:2,
16:4, 16:11, 16:15,
18:23, 22:18, 28:15,
33:14, 34:11, 36:11,
39:22, 53:6, 53:16,
56:18, 74:14, 85:5,
88:15, 88:22, 90:2,
93:13, 94:15, 94:20,
95:23, 95:24,
117:23, 118:2,
118:6, 126:18,
126:19, 145:12,
152:4, 153:24,
156:9, 156:20,
157:17, 157:20,
159:13, 161:15,
166:7, 168:14,
168:18, 169:5,
170:5, 170:18,
171:17, 177:17,
179:23, 186:17,
191:6, 191:15,
194:25, 195:11,
202:13, 205:2,
213:10, 214:4,
235:2, 237:8,
241:22, 243:4,
245:9, 245:22,
249:17, 250:25,
250:25, 251:4,
252:17, 252:23,
256:14, 256:18,
257:21, 259:18,
259:23, 260:1,
260:4, 261:14,
266:1, 268:16,
283:11, 283:12,
285:15, 291:11
**Criminal** [6] - 15:20,
33:23, 36:7, 42:7,
189:23, 201:11
**criminally** [2] -
114:19, 157:10
**criteria** [1] - 87:8
**cross** [2] - 178:9,
220:16
**cross-examine** [1] -
178:9
**cross-section** [1] -
220:16

**crowd** [1] - 189:2
**crystal** [1] - 261:18
**CSR** [1] - 300:21
**culpability** [3] - 22:10,
98:12, 174:7
**culpable** [1] - 158:18
**cultures** [1] - 204:14
**CUMMINGS** [18] -
30:5, 30:7, 30:12,
30:15, 30:17, 58:1,
58:13, 59:13, 117:7,
146:7, 146:13,
146:17, 146:22,
180:22, 180:24,
198:7, 198:18,
198:22
**Cummings** [14] - 5:24,
15:22, 20:21, 22:15,
24:18, 66:5, 103:10,
123:14, 137:22,
149:4, 200:13,
219:22, 233:20,
274:16
**Cummings'** [1] - 58:23
**cups** [1] - 206:5
**curiosity** [3] - 80:22,
152:15, 152:18
**curious** [6] - 80:6,
152:5, 183:16,
188:18, 204:14
**current** [2] - 139:11,
140:11
**curry** [1] - 29:11
**Curry** [1] - 142:15
**custody** [1] - 14:1
**customer** [1] - 202:11

# D

**D.A.'s** [3] - 29:11,
142:14, 142:17
**dad** [2] - 40:10, 205:19
**daily** [3] - 17:16, 72:4,
167:8
**Dallas** [1] - 21:9,
114:3
**Dan** [1] - 139:16
**dance** [1] - 114:8
**dandy** [1] - 243:17
**danger** [10] - 19:5,
19:11, 19:16, 19:23,
93:18, 215:16,
216:19, 224:9,
224:21, 224:22
**dangerousness** [14] -
13:4, 18:13, 18:19,
26:9, 26:15, 26:24,
27:1, 27:2, 27:12,
91:23, 163:25,
192:15, 261:17,

291:2
**dangling** [1] - 297:12
**date** [11] - 50:13,
68:20, 136:2, 136:7,
136:8, 136:9, 159:8,
236:9, 250:1, 262:8,
262:10
**Date** [1] - 300:21
**daughter** [6] - 114:8,
141:7, 141:9,
141:11, 145:22,
274:24
**daughters** [1] - 112:24
**Davidson** [1] - 108:2
**days** [6] - 61:7, 68:10,
69:5, 106:19,
218:11, 237:19
**dead** [4] - 50:6,
100:16, 160:15,
165:6
**deadline** [1] - 70:14
**deal** [8] - 54:11, 67:25,
68:13, 208:25,
279:18, 282:18
**dealing** [7] - 43:12,
140:11, 161:9,
186:23, 191:11,
193:18, 285:12
**deals** [4] - 161:11,
163:23, 164:1, 254:5
**death** [193] - 6:4, 8:11,
8:20, 8:23, 8:25, 9:3,
10:6, 10:8, 10:12,
10:14, 14:2, 14:11,
16:25, 19:14, 22:13,
22:25, 26:1, 26:4,
26:6, 27:13, 27:25,
28:5, 28:8, 41:25,
46:9, 49:17, 50:1,
54:8, 66:11, 77:10,
78:4, 78:9, 78:18,
79:9, 82:15, 82:16,
83:11, 83:14, 83:18,
88:17, 88:18, 92:5,
92:25, 95:20, 96:23,
96:25, 97:4, 100:7,
100:11, 100:14,
101:9, 101:12,
101:22, 102:5,
110:14, 111:3,
111:11, 112:12,
114:14, 114:18,
119:18, 121:18,
121:21, 121:23,
122:2, 122:8,
129:14, 132:6,
132:15, 132:22,
137:20, 153:7,
153:9, 153:15,
156:18, 156:19,

157:8, 158:1, 158:6,
159:12, 164:3,
164:7, 166:13,
166:16, 166:21,
173:1, 173:4, 175:4,
175:7, 175:9,
175:12, 175:25,
176:2, 176:15,
179:7, 179:25,
180:13, 181:7,
187:13, 188:22,
195:20, 195:21,
201:14, 206:23,
207:2, 208:17,
209:14, 209:18,
210:11, 210:12,
211:20, 212:10,
212:15, 212:19,
214:22, 216:21,
216:25, 217:18,
217:22, 218:16,
219:6, 219:24,
220:12, 220:14,
221:18, 222:7,
222:11, 222:16,
222:19, 222:25,
223:11, 223:22,
224:11, 224:17,
228:19, 229:5,
229:17, 230:13,
234:1, 234:23,
235:3, 242:11,
242:13, 242:21,
243:14, 243:16,
243:21, 244:3,
246:10, 246:12,
246:18, 247:1,
247:3, 249:24,
250:6, 250:8, 251:6,
251:7, 253:22,
254:9, 254:17,
254:24, 255:10,
255:13, 260:25,
263:2, 263:7,
264:10, 264:13,
266:9, 266:12,
266:17, 267:8,
268:9, 268:13,
269:9, 269:17,
270:3, 270:17,
271:5, 272:17,
273:3, 273:17,
277:3, 281:3, 281:7,
285:13, 285:15,
288:9, 288:24,
292:13, 294:1,
294:19
**December** [2] - 79:19,
152:24
**decent** [1] - 99:8
**decide** [31] - 11:6,

13:3, 19:4, 25:10,
25:24, 49:5, 51:7,
57:5, 57:10, 57:12,
89:19, 103:23,
122:2, 127:9, 128:4,
130:14, 162:25,
166:15, 174:3,
177:20, 191:13,
196:24, 212:2,
212:3, 212:9, 224:8,
225:16, 225:17,
253:9, 266:7, 294:19
**decided** [6] - 54:2,
54:22, 106:23,
194:11, 242:24,
257:23
**decides** [1] - 14:9
**decision** [34] - 25:17,
55:22, 84:19, 85:4,
85:9, 86:7, 89:23,
98:5, 98:7, 117:3,
118:6, 124:23,
130:16, 131:5,
194:10, 195:5,
195:8, 196:12,
208:24, 215:9,
223:15, 223:22,
226:2, 228:13,
229:3, 229:21,
243:22, 248:21,
279:12, 285:3,
287:15, 287:16,
294:22, 294:24
**decision-making** [1] -
85:4
**decisions** [7] - 13:12,
85:6, 140:23,
140:24, 209:6,
227:19, 282:4
**dedicate** [1] - 236:17
**Deep** [1] - 21:5
**deep** [1] - 157:4
**deeper** [1] - 152:1
**deeply** [1] - 208:12
**defend** [4] - 36:13,
239:24, 240:10,
250:7
**Defendant** [62] - 5:3,
13:11, 13:19, 14:15,
18:13, 19:14, 19:17,
22:11, 36:13, 36:20,
53:6, 56:17, 60:7,
90:21, 93:12, 98:12,
101:9, 119:11,
129:5, 136:19,
162:4, 163:4, 164:5,
164:19, 170:11,
173:23, 173:25,
177:9, 177:14,
78:16, 179:6,

179:12, 199:16,
213:10, 216:21,
223:25, 225:4,
250:6, 250:11,
251:2, 251:7,
251:16, 253:14,
254:5, 254:17,
254:21, 255:5,
256:13, 256:25,
257:1, 261:13,
261:25, 263:17,
263:21, 264:5,
264:9, 272:16,
272:20, 272:23,
291:7, 291:11
**defendant** [1] - 23:7
**defendant's** [2] -
36:15, 37:20
**Defendant's** [16] -
22:9, 23:6, 23:11,
25:13, 96:7, 97:17,
98:11, 101:18,
162:3, 174:6,
174:16, 177:13,
253:13, 266:24,
270:24, 298:5
**Defense** [18] - 7:12,
12:8, 24:5, 24:16,
25:22, 36:7, 58:12,
59:8, 143:16,
177:10, 197:8,
198:17, 198:21,
205:12, 239:24,
256:22, 265:25,
296:18
**defense** [19] - 30:4,
34:5, 36:11, 55:4,
59:12, 76:22, 103:7,
114:20, 133:24,
180:21, 185:12,
192:22, 205:5,
219:17, 239:20,
240:8, 273:23,
295:13
**defenses** [2] - 54:14,
195:1
**define** [5] - 11:5,
15:21, 53:20, 246:1,
288:14
**defined** [8] - 15:23,
93:15, 95:5, 118:11,
119:13, 122:17,
159:13, 256:2
**defines** [1] - 266:21
**definitely** [3] - 50:9,
188:24, 232:16
**definition** [26] - 9:25,
10:14, 13:22, 88:11,
88:18, 95:10, 97:14,
97:22, 114:14,

117:24, 118:10,
122:25, 123:1,
123:5, 123:13,
155:24, 155:25,
156:7, 156:10,
167:5, 175:16,
197:16, 214:2,
245:4, 246:4, 266:20
**definitions** [4] - 8:20,
156:3, 158:15, 167:6
**degree** [7] - 122:18,
123:4, 123:15,
126:10, 127:1,
128:7, 139:3
**deliberate** [7] - 11:23,
69:12, 69:23, 86:23,
87:4, 128:25, 172:25
**deliberated** [2] -
86:11, 206:18
**deliberating** [6] - 27:5,
89:17, 90:12,
128:19, 169:18,
173:14
**deliberations** [5] -
70:18, 101:8,
164:17, 170:22,
255:2
**demand** [1] - 220:18
**democracy** [1] - 85:14
**denied** [1] - 59:9
**Dennis** [1] - 148:10
**DENNIS** [1] - 149:17
**denotes** [1] - 126:10
**department** [2] -
17:18, 32:10
**describe** [1] - 294:17
**descriptions** [1] -
78:25
**deserve** [1] - 269:17
**deserves** [1] - 285:3
**design** [1] - 140:24
**designed** [3] - 166:15,
175:12, 266:5
**desk** [2] - 106:4, 106:6
**detached** [1] - 75:20
**detail** [1] - 82:10
**determination** [3] -
132:5, 195:18,
221:25
**determine** [5] - 44:25,
51:18, 56:21,
115:20, 193:17
**developed** [1] - 23:17
**diagnosis** [1] - 193:15
**Diane** [2] - 146:15,
146:16
**diane** [1] - 143:13,
146:17
**dictate** [2] - 226:15,
264:25

**dictates** [1] - 295:24
**die** [4] - 121:7, 130:24,
165:6, 187:8
**dies** [3] - 14:1, 195:25,
255:12
**difference** [12] -
53:19, 54:24,
103:18, 120:18,
125:15, 167:23,
168:2, 168:3,
223:17, 245:12,
258:4
**different** [62] - 10:24,
11:17, 16:10, 22:16,
22:17, 26:22, 36:5,
38:24, 39:2, 40:7,
41:7, 56:13, 61:24,
67:2, 75:11, 93:25,
116:13, 117:5,
117:13, 118:4,
119:23, 120:15,
125:22, 128:8,
129:20, 131:8,
131:9, 141:15,
142:1, 156:22,
158:15, 164:8,
164:21, 165:22,
166:2, 171:3, 172:6,
175:22, 181:18,
182:6, 190:11,
194:20, 196:7,
196:8, 208:24,
222:13, 225:2,
245:1, 247:22,
253:1, 254:20,
261:24, 262:16,
262:25, 272:10,
279:13, 279:14,
280:2, 290:15,
290:17, 296:7
**differentiate** [2] -
242:19, 257:25
**differing** [1] - 22:20
**differs** [1] - 163:19
**difficult** [6] - 74:10,
81:9, 227:15,
227:17, 227:18
**difficulty** [1] - 193:1
**dig** [1] - 157:2
**diminishes** [1] - 25:13
**diminishing** [1] -
245:17
**Dinkins** [4] - 240:17,
241:9, 242:4, 279:16
**dinner** [1] - 157:5
**dinners** [1] - 142:5
**dire** [8] - 8:10, 41:1,
58:22, 59:5, 77:12,
77:21, 119:3, 137:16
**DIRE** [11] - 6:15, 30:6,

66:19, 103:8, 138:7,
149:20, 180:23,
201:1, 219:19,
234:9, 273:25
**direct** [1] - 130:3
**disabled** [1] - 206:2
**disagree** [1] - 268:5
**discharge** [3] -
120:20, 120:21,
120:24
**discharged** [1] - 129:9
**Disciples** [3] - 107:1,
107:4, 109:24
**discretion** [1] - 92:7
**discuss** [6] - 50:9,
67:6, 95:4, 135:2,
135:3, 135:24
**discussed** [5] - 60:18,
62:19, 102:2, 137:9,
161:5
**discussion** [4] -
123:15, 206:21,
227:6, 246:6
**discussions** [1] -
147:6
**disliked** [1] - 279:5
**dismiss** [1] - 146:14
**dismissed** [1] -
146:25
**disown** [1] - 205:13
**distance** [1] - 68:12
**distaste** [1] - 74:6
**distinction** [4] -
124:16, 125:15,
125:20, 168:13
**distinguish** [1] -
121:17
**distract** [1] - 81:23
**distracted** [2] - 69:21,
145:10
**distributing** [1] -
105:7
**distributors** [2] -
104:19, 104:20
**district** [4] - 33:25,
41:17, 41:23, 49:11
**District** [6] - 49:5,
66:25, 136:4,
201:12, 300:4,
300:22
**divorced** [2] - 37:15,
205:17
**DNA** [4] - 43:18,
43:25, 44:1, 84:13
**doctor** [4] - 151:24,
240:25, 280:21,
290:3
**doctor's** [2] - 151:24,
277:25
**doctors** [2] - 17:5,

275:4
**documents** [1] - 16:11
**dog** [4] - 109:2, 109:7, 109:12, 109:13
**dogs** [4] - 108:13, 108:15, 108:16
**done** [38] - 6:25, 11:19, 24:4, 25:5, 31:11, 32:20, 34:18, 40:22, 55:20, 69:15, 70:8, 70:9, 70:15, 70:18, 72:4, 78:9, 78:15, 79:6, 88:9, 109:10, 121:23, 128:15, 132:24, 138:20, 144:4, 157:8, 186:11, 190:7, 194:8, 240:21, 251:17, 252:13, 280:25, 281:22, 282:5, 286:1, 299:4
**door** [1] - 211:16
**doubt** [88] - 14:14, 16:23, 18:20, 19:6, 19:12, 19:16, 19:22, 22:2, 44:21, 48:14, 48:19, 50:17, 51:9, 52:1, 53:5, 54:22, 56:15, 56:17, 93:7, 93:10, 93:11, 95:14, 96:11, 101:3, 103:15, 122:14, 122:16, 122:17, 123:9, 123:21, 123:22, 124:1, 124:4, 124:9, 124:10, 124:11, 124:12, 124:13, 124:24, 125:2, 125:3, 127:3, 153:18, 160:1, 160:4, 166:6, 166:8, 166:24, 167:3, 167:18, 170:1, 170:11, 171:9, 172:21, 173:6, 173:18, 173:19, 188:25, 189:21, 190:6, 192:17, 193:7, 193:10, 195:10, 195:17, 195:19, 213:9, 215:15, 215:24, 216:1, 216:8, 216:15, 250:19, 256:7, 256:12, 256:20, 256:21, 257:7, 264:1, 265:17, 272:24,

285:22, 286:7, 291:10, 296:12
**doubts** [1] - 123:24
**down** [48] - 14:17, 19:9, 24:8, 25:5, 28:9, 32:25, 42:13, 69:6, 78:8, 80:5, 81:5, 86:1, 86:12, 86:21, 94:10, 100:12, 110:21, 111:24, 119:14, 122:5, 122:7, 123:25, 140:6, 147:21, 151:16, 151:18, 151:20, 152:25, 155:8, 157:6, 157:21, 158:8, 169:4, 188:9, 194:23, 221:6, 227:13, 227:14, 244:23, 252:9, 253:21, 254:23, 260:9, 265:11, 278:18, 284:16, 287:18
**downstairs** [1] - 8:18
**downtown** [1] - 21:5
**dozen** [1] - 191:14
**dragged** [1] - 38:5
**drained** [1] - 277:20
**drink** [1] - 149:10
**drive** [3] - 202:23, 203:2, 237:2
**driving** [2] - 119:14, 119:22
**dropped** [1] - 231:20
**drowning** [1] - 49:19
**drugs** [4] - 239:6, 239:18, 282:1, 282:8
**duly** [6] - 6:13, 66:17, 138:5, 149:18, 200:24, 234:7
**during** [39] - 10:3, 12:7, 12:11, 12:15, 13:23, 18:23, 24:4, 28:15, 51:20, 55:18, 72:14, 77:12, 79:10, 88:14, 88:22, 119:2, 123:14, 156:9, 157:17, 157:19, 159:12, 170:21, 170:25, 173:24, 177:11, 177:12, 178:3, 203:15, 214:3, 235:17, 241:21, 243:1, 245:8, 245:21, 246:2, 246:25, 250:1, 252:17, 285:15

**Duro** [1] - 236:1
**duties** [1] - 186:8
**duty** [12] - 46:25, 47:1, 89:15, 145:19, 156:4, 184:22, 188:5, 206:7, 227:14, 227:20, 246:2, 281:12
**DWI** [1] - 29:7
**DWIs** [3] - 42:15, 42:16, 42:18
**dying** [2] - 82:7, 102:17

# E

**e-mail** [1] - 135:17
**E.B** [1] - 141:24
**easier** [1] - 233:8
**east** [1] - 109:19
**Easter** [1] - 166:11
**easy** [1] - 281:7
**eat** [3] - 157:5, 182:15, 183:6
**educated** [1] - 188:7
**education** [1] - 34:19
**educational** [3] - 44:3, 105:8
**Edward** [1] - 148:11
**EDWARD** [1] - 149:17
**Edwardsville** [1] - 73:4
**effect** [3] - 100:1, 270:1, 270:9
**effects** [1] - 272:10
**eight** [1] - 32:19
**either** [29] - 12:10, 13:25, 14:10, 16:25, 86:9, 92:25, 95:5, 101:2, 112:15, 129:7, 134:9, 165:6, 167:22, 174:1, 178:25, 179:2, 184:2, 195:25, 210:10, 210:14, 210:15, 212:10, 212:14, 241:3, 249:17, 266:3, 270:19, 272:15
**Elaine** [1] - 38:8
**elderly** [3] - 40:13, 110:19, 130:11
**elected** [1] - 36:5
**election** [6] - 206:17, 207:2, 207:6, 208:23, 211:19, 218:12
**elections** [1] - 206:25
**element** [2] - 22:1, 50:16

**elements** [18] - 20:21, 21:1, 21:4, 47:7, 47:9, 48:14, 117:11, 159:5, 160:1, 160:23, 189:12, 189:14, 189:22, 190:4, 190:15, 190:24, 249:19, 285:9
**eligible** [3] - 44:16, 164:23, 165:3
**Ellum** [1] - 21:5
**elsewhere** [2] - 41:16, 80:10
**emergency** [1] - 184:7
**Emmaus** [1] - 106:18
**empaneling** [1] - 221:7
**emphasis** [1] - 42:25
**emphatic** [2] - 295:25, 297:10
**employee** [1] - 36:1
**employees** [3] - 7:1, 35:21, 39:10
**employer** [1] - 141:24
**employment** [1] - 139:12
**enable** [1] - 196:16
**encompass** [3] - 169:6, 247:22, 248:3
**encompassed** [1] - 118:5
**encompasses** [1] - 94:25
**encountered** [1] - 101:16
**end** [24] - 8:11, 11:20, 15:14, 15:17, 24:11, 68:19, 68:21, 69:18, 83:12, 89:8, 89:9, 113:10, 115:10, 115:11, 115:15, 129:9, 197:6, 214:16, 214:21, 284:9, 284:19, 284:23, 285:4
**ended** [2] - 73:21, 142:5
**ends** [3] - 82:1, 202:12, 263:17
**energy** [1] - 168:7
**enforcement** [2] - 51:15, 188:12
**engage** [1] - 157:15
**engaging** [1] - 225:13
**engineer** [1] - 140:23
**engineering** [1] - 139:3
**Engineering** [1] - 139:20

**engineers** [1] - 140:13
**enjoy** [3] - 34:11, 147:5, 278:25
**enrolled** [1] - 203:12
**ensure** [1] - 129:13
**enter** [1] - 76:19
**enters** [15] - 5:4, 59:17, 60:8, 63:3, 63:18, 134:14, 136:20, 147:9, 148:5, 183:20, 198:25, 199:17, 231:16, 232:23, 298:9
**entire** [11] - 52:6, 52:11, 58:21, 59:6, 89:22, 163:12, 181:24, 182:3, 191:18, 247:16, 288:20
**entitled** [5] - 123:8, 145:5, 161:6, 170:11, 211:12
**entry** [1] - 73:17
**enunciate** [1] - 131:3
**environment** [2] - 51:22, 225:23
**environmentally** [1] - 107:17
**environmentally-related** [1] - 107:17
**envisioned** [2] - 118:8, 131:24
**equation** [1] - 170:24
**ER** [1] - 184:5
**error** [1] - 51:5
**escaped** [1] - 14:5
**escapes** [1] - 14:4
**essentially** [3] - 53:17, 192:10, 298:2
**establish** [1] - 49:24
**estimating** [1] - 140:3
**et** [2] - 158:5, 223:3
**ethical** [8] - 28:3, 102:3, 180:10, 219:4, 219:9, 219:10, 230:11, 273:15
**evaluate** [2] - 20:17, 25:16
**event** [1] - 105:25
**events** [3] - 97:5, 135:14, 135:15
**eventually** [2] - 210:11, 210:17
**Everman** [9] - 202:25, 203:25, 204:4, 204:6, 205:14, 206:15, 206:16, 211:18, 218:11

**everywhere** [1] - 260:15
**evidence** [127] - 12:6, 12:14, 20:17, 22:8, 23:4, 23:5, 23:11, 23:24, 24:3, 24:7, 24:24, 25:11, 26:10, 27:18, 27:19, 43:17, 43:22, 45:23, 49:21, 50:21, 52:18, 52:24, 53:5, 54:13, 55:10, 55:17, 56:21, 58:18, 67:14, 87:13, 90:14, 90:19, 90:22, 91:17, 97:16, 98:10, 99:1, 116:14, 116:25, 123:2, 123:4, 123:5, 123:13, 128:6, 129:22, 132:12, 144:17, 150:15, 150:16, 161:14, 161:17, 162:1, 162:12, 170:25, 171:2, 174:5, 174:14, 174:15, 174:18, 175:18, 177:10, 177:15, 178:17, 179:1, 185:22, 193:4, 193:25, 194:3, 196:11, 196:16, 197:14, 197:16, 197:21, 198:4, 207:18, 211:14, 213:20, 216:11, 217:23, 217:25, 220:24, 222:4, 223:24, 224:1, 224:4, 224:6, 224:10, 224:11, 224:18, 224:20, 225:7, 225:9, 225:18, 225:25, 226:2, 226:8, 226:11, 226:16, 226:21, 226:24, 227:8, 228:7, 228:10, 228:14, 228:17, 228:22, 229:4, 229:22, 230:18, 231:3, 235:13, 235:16, 253:1, 253:2, 253:3, 253:14, 266:21, 270:22, 273:5, 273:10, 285:1, 293:1, 296:10, 300:7
**evil** [1] - 239:25
**ex** [6] - 37:8, 37:10, 38:17, 112:23, 113:19, 275:12

**ex-husband** [4] - 37:10, 112:23, 113:19, 275:12
**exact** [1] - 236:9
**exactly** [22] - 68:21, 71:7, 75:5, 85:24, 93:20, 115:8, 116:8, 120:11, 120:22, 127:11, 150:20, 171:4, 181:17, 196:18, 237:11, 248:18, 250:22, 251:15, 257:12, 262:20, 296:21
**Exactly** [2] - 64:6, 245:15
**EXAMINATION** [1] - 6:15, 30:6, 66:19, 103:8, 138:7, 149:20, 180:23, 201:1, 219:19, 234:9, 273:25
**examination** [1] - 297:15
**examine** [1] - 178:9
**Examiner** [1] - 190:19
**example** [1] - 57:5, 130:6, 156:5, 157:2, 162:25, 176:20, 268:4, 268:6, 269:19, 269:21, 269:22, 288:13
**examples** [4] - 11:14, 23:13, 91:6, 197:20
**excellent** [1] - 147:4
**except** [2] - 106:10, 275:15
**exceptions** [2] - 111:24, 189:6
**excuse** [6] - 26:24, 89:5, 99:20, 103:24, 114:15, 147:15
**excused** [8] - 60:5, 63:12, 63:16, 136:14, 148:1, 199:14, 232:3, 299:3
**excuses** [1] - 99:19
**excusing** [1] - 62:18
**execute** [1] - 46:1
**executed** [4] - 83:21, 92:24, 165:7, 255:11
**execution** [2] - 195:25, 197:3
**exercise** [5] - 59:10, 59:13, 134:1, 134:7, 198:19
**exhibit** [2] - 12:8, 24:12
**exhibit-wise** [1] - 12:8
**exhibited** [1] - 211:18

**exhibits** [4] - 12:9, 12:11, 161:19, 300:14
**exists** [3] - 125:10, 126:15, 127:3
**exits** [9] - 58:8, 62:13, 133:21, 136:16, 146:12, 198:13, 230:4, 232:21, 295:9
**exonerations** [2] - 43:9, 84:12
**Exp** [1] - 300:21
**expand** [1] - 43:19
**expect** [2] - 56:25, 193:4
**expectation** [2] - 196:15, 197:12
**expectations** [1] - 52:23
**expected** [1] - 64:15
**Expedx** [1] - 105:5
**experience** [12] - 16:3, 37:23, 39:18, 135:18, 144:9, 145:8, 145:14, 184:20, 185:14, 185:16, 188:13, 268:18
**experiences** [3] - 86:11, 144:18, 217:15
**experiencing** [1] - 41:8
**explain** [7] - 17:8, 37:2, 40:18, 82:9, 104:4, 205:8
**explained** [4] - 116:11, 244:17, 265:3, 296:5
**explaining** [2] - 73:11, 154:21
**explanation** [9] - 111:25, 158:11, 220:10, 229:15, 296:14, 296:20, 297:3, 297:8
**explore** [1] - 285:19
**express** [2] - 86:23, 153:13
**expressed** [3] - 211:18, 213:13, 231:9
**expunctions** [1] - 31:1
**extent** [2] - 108:21, 230:20
**extenuating** [3] - 279:25, 280:17, 284:22
**extreme** [3] - 115:17, 116:6

**F**

**face** [1] - 154:17
**Facebook** [1] - 135:22
**faced** [4] - 191:10, 208:24, 234:1, 291:14
**facility** [3] - 32:23, 33:2, 278:8
**facing** [1] - 144:21
**fact** [34] - 7:11, 32:22, 46:1, 49:24, 51:6, 51:7, 51:21, 58:23, 58:25, 59:2, 67:21, 83:10, 99:3, 112:19, 118:23, 123:18, 142:18, 144:19, 166:10, 168:3, 172:6, 186:23, 190:17, 190:21, 191:7, 194:21, 202:11, 249:22, 249:23, 251:11, 269:17, 293:12, 293:22, 297:11
**factor** [9] - 85:3, 99:25, 101:14, 179:15, 186:17, 188:23, 267:1, 270:16, 270:21
**factors** [1] - 263:10
**facts** [47] - 7:24, 11:1, 28:19, 90:16, 95:23, 96:3, 98:19, 99:14, 99:19, 99:20, 101:6, 101:24, 111:25, 112:8, 113:8, 117:11, 127:13, 127:23, 135:12, 135:15, 135:20, 163:7, 172:3, 176:6, 176:16, 177:1, 177:24, 178:4, 204:24, 205:3, 211:13, 214:17, 221:13, 221:15, 221:24, 222:15, 223:10, 243:1, 248:11, 248:19, 248:23, 264:23, 266:8, 267:22, 271:23, 272:1, 297:11
**fail** [5] - 160:2, 170:10, 250:19, 257:9, 257:14
**failed** [10] - 160:15, 160:17, 170:14, 172:17, 173:8, 251:9, 251:11,

264:16, 264:19, 296:11
**fails** [1] - 166:23
**failsafe** [1] - 100:6
**fair** [24] - 23:25, 35:15, 56:8, 70:16, 144:23, 145:6, 154:25, 191:17, 192:4, 208:13, 220:15, 230:15, 241:11, 247:14, 247:16, 248:6, 248:9, 276:16, 285:1, 285:2, 285:8, 289:17, 289:19
**fairly** [1] - 39:21, 82:20, 188:15
**Faithful** [1] - 107:22
**fall** [3] - 55:6, 157:6, 182:4
**falling** [1] - 125:3
**falls** [2] - 53:20, 172:3
**familiar** [10] - 32:6, 41:22, 48:21, 96:14, 96:16, 151:15, 186:10, 186:13, 201:22, 280:13
**family** [18] - 28:12, 28:23, 29:1, 31:5, 36:1, 37:4, 37:5, 37:13, 37:19, 38:14, 38:19, 38:21, 42:23, 43:1, 43:7, 204:4, 204:6, 280:13
**family's** [1] - 121:8
**far** [31] - 44:15, 53:20, 55:25, 61:12, 84:25, 104:6, 112:6, 139:7, 155:2, 155:25, 181:25, 182:1, 182:15, 185:1, 185:25, 186:5, 189:17, 193:12, 196:3, 196:13, 197:23, 211:24, 212:16, 217:21, 222:5, 232:11, 235:21, 276:15, 277:1, 283:8, 286:20
**faster** [1] - 92:10
**father** [4] - 37:7, 138:22, 204:7, 205:25
**favor** [3] - 37:6, 101:18, 111:11, 217:24, 220:14, 222:25, 229:17, 230:22, 232:8
**favorite** [1] - 204:20
**feather** [1] - 123:7

federal [3] - 239:15, 239:17, 239:18
feed [1] - 282:13
feelings [14] - 76:18, 102:20, 276:17, 276:19, 277:2, 277:7, 277:12, 279:20, 283:21, 284:3, 284:8, 284:10, 285:20
feet [1] - 157:4
fellow [2] - 39:9, 288:15
felonies [1] - 44:15
felony [1] - 35:6
felt [18] - 73:18, 73:25, 84:20, 84:21, 89:20, 101:23, 104:7, 110:11, 112:3, 143:24, 146:4, 170:13, 180:7, 224:11, 258:24, 273:4, 273:9, 282:6
fence [2] - 17:1, 17:7
FERNANDEZ [7] - 273:24, 274:1, 278:20, 282:24, 289:24, 290:2, 290:19
Fernandez [16] - 5:23, 22:16, 24:19, 32:5, 32:7, 39:6, 66:4, 103:11, 137:23, 149:4, 200:12, 219:22, 233:21, 274:4, 291:15, 298:1
Fernandez' [1] - 291:1
few [17] - 7:4, 45:14, 58:5, 72:23, 100:21, 103:13, 109:25, 111:24, 133:20, 146:11, 148:14, 153:6, 198:11, 213:7, 229:25, 263:14, 295:7
field [3] - 32:13, 193:22, 279:6
fields [1] - 194:16
figure [2] - 11:23, 76:6
figured [1] - 211:9
figuring [1] - 23:24
filed [1] - 146:19
fill [4] - 8:4, 28:9, 31:9, 108:5
filled [11] - 5:14, 5:16, 64:25, 71:23, 71:24, 137:3, 148:14, 148:16, 187:23, 200:7, 233:11
final [2] - 13:13,

195:14
finally [2] - 64:3, 113:9
financial [1] - 141:5
fine [8] - 59:19, 108:14, 136:22, 138:10, 149:11, 201:19, 243:17, 277:17
finish [2] - 44:8, 278:12
finished [1] - 268:21
finishes [2] - 65:13, 282:22
fire [2] - 130:10, 277:2
firearm [5] - 49:18, 159:19, 160:12, 250:9, 250:12
firefighter [1] - 47:1
firefighting [1] - 276:15
fireman [6] - 240:18, 240:19, 246:2, 275:10, 275:11, 275:13
firemen [1] - 275:17
fires [2] - 277:6, 277:7
fireworks [1] - 80:24
firm [2] - 123:16, 123:19
first [86] - 6:7, 6:13, 6:22, 7:8, 14:20, 17:10, 18:21, 24:6, 25:9, 55:10, 55:17, 66:13, 66:17, 78:1, 90:3, 90:6, 90:14, 90:20, 90:22, 91:22, 93:9, 98:23, 105:14, 115:19, 121:16, 129:11, 138:1, 138:5, 142:25, 143:24, 149:7, 149:18, 153:16, 158:3, 161:9, 161:16, 161:17, 161:21, 162:2, 162:8, 162:9, 162:15, 163:10, 165:20, 166:14, 171:12, 172:7, 173:16, 177:11, 184:22, 196:24, 200:24, 203:4, 213:14, 214:16, 218:22, 218:25, 224:8, 225:11, 234:7, 235:23, 236:3, 237:2, 253:2, 253:4, 253:12, 253:15, 254:5, 255:22, 256:8,

261:25, 262:21, 265:15, 265:16, 274:7, 274:16, 280:3, 286:4, 289:9, 293:3, 294:23, 296:8, 296:22, 297:9
fish [1] - 107:14
fit [3] - 45:7, 260:4, 266:5
five [12] - 35:14, 68:10, 85:11, 115:13, 116:5, 117:9, 140:4, 222:13, 238:12, 238:22, 279:23, 283:6
five-and-a-half [1] - 238:22
fixed [1] - 279:10
flared [1] - 201:7
flashing [1] - 37:20
flat [1] - 184:14
flip [3] - 27:15, 218:21, 273:8
flipping [1] - 65:19
floor [2] - 136:5, 202:21
floors [1] - 45:14
Florida [1] - 139:5
flow [1] - 151:5
focus [3] - 11:2, 28:17, 263:1
focused [1] - 262:10
folder [1] - 233:7
Foley's [1] - 280:19
folks [7] - 14:17, 22:14, 194:15, 202:7, 204:3, 211:8, 211:10
follow [42] - 9:19, 13:15, 20:2, 20:9, 21:24, 40:10, 41:13, 46:1, 58:23, 67:14, 87:12, 87:15, 87:22, 106:21, 158:14, 160:8, 164:4, 165:9, 170:15, 170:21, 170:22, 178:20, 188:8, 189:2, 189:4, 207:23, 208:1, 208:19, 210:19, 212:9, 212:11, 229:20, 238:5, 247:15, 249:8, 249:11, 251:21, 252:1, 296:9, 297:17
followed [3] - 240:16, 252:13, 280:9
following [1] - 65:13, 161:15, 161:16,

183:17, 222:11, 231:7, 264:18
follows [6] - 6:14, 66:18, 138:6, 149:19, 200:25, 234:8
food [1] - 108:18
foot [1] - 49:2
football [1] - 15:15
footsteps [1] - 40:10
forced [1] - 112:3
forecloses [1] - 249:5
foregoing [1] - 300:6
foregone [1] - 55:5
foremost [1] - 153:16
forensic [3] - 34:13, 34:16, 34:17
forensics [1] - 196:14
foreperson [2] - 54:4, 54:5
forget [3] - 157:4, 244:14, 275:21
forgot [2] - 62:4, 202:2
forgotten [2] - 34:1, 60:23
form [3] - 156:23, 253:22, 254:24
formally [1] - 12:22
formed [3] - 99:7, 158:24, 176:10
forming [1] - 268:21
formulated [1] - 57:16
Fort [10] - 21:5, 38:17, 61:9, 68:5, 111:5, 114:3, 151:14, 182:19, 275:15, 300:23
forth [4] - 184:25, 185:1, 185:12, 190:2
forward [6] - 11:22, 12:18, 12:23, 24:24, 177:15, 224:16
founded [1] - 214:7
four [4] - 39:25, 58:25, 61:7, 202:2
frame [3] - 64:11, 64:14, 65:24
frankly [1] - 85:3
Fred [10] - 5:24, 66:4, 103:10, 137:22, 149:3, 200:13, 219:22, 233:20, 274:6, 274:16
free [2] - 63:11, 298:16
frequently [2] - 46:9, 83:22
friend [9] - 81:9, 81:10, 113:16, 141:15, 141:21,

142:21, 146:18, 242:8
friend's [3] - 81:9, 112:23, 144:9
friends [4] - 7:23, 154:3, 182:14, 188:14
front [8] - 58:4, 119:15, 133:10, 133:19, 157:3, 157:12, 181:3, 198:10
full [6] - 89:18, 143:11, 265:9, 283:23, 284:6, 296:14
fully [2] - 244:17, 297:16
function [3] - 69:17, 70:23, 112:10
functions [1] - 34:6
future [41] - 13:4, 15:25, 16:1, 18:13, 18:18, 19:5, 19:11, 19:16, 19:23, 26:9, 26:14, 26:24, 27:1, 27:2, 27:12, 52:21, 91:22, 91:25, 94:7, 116:3, 126:19, 127:5, 145:12, 163:25, 166:1, 171:17, 188:22, 192:10, 192:14, 193:5, 215:15, 216:18, 224:9, 224:21, 224:22, 259:7, 261:17, 261:18, 262:14, 291:2

G

gained [1] - 185:16
gaining [1] - 290:11
games [1] - 15:15
Gary [1] - 38:15
Gatesville [3] - 142:8, 144:19, 145:9
gather [1] - 141:14
gathered [1] - 208:5
gears [1] - 145:18
general [3] - 7:5, 74:5, 75:3, 76:3, 152:15, 152:17, 152:18, 170:18, 183:19, 183:23, 204:23, 239:21, 286:17
generally [14] - 42:12, 74:9, 111:10, 111:23, 112:18,

151:11, 157:1,
222:25, 223:3,
237:8, 237:22,
238:4, 238:20,
283:12
**gentleman** [2] - 11:16,
201:11
**gentlemen** [1] - 51:12
**GILL** [19] - 62:23,
66:15, 66:20, 103:6,
133:23, 134:2,
134:8, 147:2,
149:16, 149:21,
155:22, 180:20,
198:16, 198:20,
234:5, 234:10,
273:22, 295:12,
295:22
**Gill** [11] - 6:1, 35:3,
66:7, 66:24, 137:24,
138:11, 149:5,
200:15, 201:10,
233:22
**gill** [15] - 13:11, 15:21,
103:13, 103:16,
104:1, 115:7,
125:10, 127:10,
146:22, 191:23,
275:21, 285:18,
288:5, 288:13, 289:5
**gill's** [1] - 297:19
**girlfriend** [1] - 113:17
**girls** [2] - 113:7, 239:1
**given** [20] - 8:19,
28:19, 55:5, 62:15,
110:14, 121:20,
134:23, 136:2,
145:16, 146:4,
165:13, 167:5,
170:19, 268:9,
271:23, 283:17,
284:3, 284:4, 297:7,
297:8
**glad** [3] - 91:9, 121:12,
278:4
**God** [3] - 55:22, 64:5,
106:22
**gold** [1] - 40:17
**golly** [1] - 51:7
**Gonzalez** [4] - 9:20,
13:17, 23:2, 237:11
**goodness** [1] - 55:3
**Google** [1] - 135:9
**grade** [1] - 34:3
**graduate** [1] - 72:24
**graduated** [1] - 139:2
**grandkids** [1] - 238:12
**grant** [1] - 231:12
**granted** [2] - 64:14,
115:18

**granting** [1] - 298:5
**grasp** [1] - 192:1
**gray** [1] - 48:16
**great** [7] - 68:12,
103:15, 130:9,
220:12, 221:19,
222:2, 222:3
**greater** [5] - 15:8,
54:5, 123:4, 125:23,
126:10
**green** [1] - 123:24
**greener** [1] - 182:20
**Greenleaf** [1] - 61:10
**grew** [2] - 15:13,
225:23
**GREY** [1] - 66:16
**Grey** [1] - 63:25
**group** [7] - 25:11,
77:23, 83:1, 134:19,
189:15, 189:16,
232:12
**groups** [2] - 33:8,
82:24
**growing** [1] - 138:20
**grown** [1] - 57:14
**grudge** [1] - 11:19
**guarantee** [3] - 68:18,
215:5, 215:13
**guards** [1] - 17:4
**guess** [29] - 40:9,
40:19, 68:24, 69:20,
71:3, 75:7, 78:14,
102:19, 112:9,
115:14, 120:23,
123:23, 126:9,
128:19, 128:20,
141:13, 142:25,
143:2, 143:3,
143:24, 145:13,
181:24, 184:3,
184:4, 202:7,
276:18, 277:11,
283:15, 293:6
**guessing** [1] - 8:7
**guidance** [2] - 27:7,
132:11
**guide** [2] - 164:17,
176:12
**guilt** [5] - 122:14,
122:20, 223:21,
256:19, 283:16
**guilt/innocence** [21] -
12:7, 12:12, 12:15,
19:10, 20:17, 20:20,
21:3, 26:7, 26:13,
53:25, 58:19, 90:4,
160:25, 161:10,
162:6, 171:12,
220:23, 252:17,
265:21, 287:5

**guilty** [80] - 13:21,
16:22, 21:13, 21:25,
22:3, 26:8, 43:13,
43:16, 44:21, 50:22,
51:19, 54:7, 54:9,
56:14, 89:3, 91:8,
93:10, 100:7, ·
110:13, 115:5,
120:17, 121:25,
127:20, 132:25,
133:3, 142:7,
153:17, 157:9,
157:14, 157:18,
160:3, 160:6,
160:21, 161:3,
161:6, 163:13,
165:21, 166:6,
166:13, 171:23,
175:8, 194:12,
194:22, 194:24,
195:9, 195:16,
195:23, 213:24,
247:12, 249:16,
250:21, 251:14,
252:16, 257:13,
262:1, 262:4,
266:13, 268:8,
269:4, 286:8,
286:14, 286:18,
286:22, 287:2,
289:8, 291:7,
291:17, 291:22,
291:24, 292:10,
292:24, 293:13,
293:23, 297:22,
298:3
**guiltys** [1] - 195:17
**gun** [4] - 50:3, 50:4,
190:8, 190:20
**gunman** [1] - 11:9
**gut** [3] - 190:13,
190:14, 297:22
**guy** [34] - 21:25,
55:22, 78:18, 85:17,
90:7, 99:19, 99:20,
100:7, 118:15,
128:9, 131:11,
132:25, 156:15,
160:16, 161:23,
165:17, 165:21,
167:18, 179:17,
224:2, 224:21,
251:8, 251:16,
260:21, 262:7,
262:8, 266:13,
266:16, 267:2,
268:17, 269:13,
271:14, 271:16
**guys** [3] - 143:8,

275:18, 280:13

## H

**habit** [1] - 282:13
**half** [10] - 64:17,
68:15, 71:16,
104:22, 145:3,
185:8, 191:14,
207:14, 238:22,
283:6
**halfway** [1] - 244:13
**hallway** [9] - 58:4,
62:12, 133:19,
146:10, 198:10,
229:25, 295:6
**hand** [18] - 5:12, 49:1,
60:15, 65:5, 77:25,
100:17, 101:13,
131:7, 134:20,
137:1, 148:23,
167:21, 170:9,
171:18, 199:24,
207:22, 233:4,
264:16
**HAND** [1] - 300:16
**handgun** [1] - 105:10
**handle** [1] - 8:14
**handled** [1] - 80:18
**hands** [5] - 82:19,
84:5, 84:24, 86:5,
86:19
**handwriting** [2] - 8:3,
8:5
**happy** [3] - 9:12, 36:1,
201:7
**hard** [19] - 50:23,
114:23, 126:17,
137:13, 204:24,
208:20, 211:6,
240:1, 243:20,
251:20, 252:3,
252:5, 281:2,
283:22, 284:9,
284:21, 287:14,
290:16, 297:20
**Harley** [1] - 108:2
**harm** [2] - 52:19,
111:13
**Harris** [1] - 184:4
**Harry** [1] - 204:16
**harsh** [1] - 42:11
**hate** [2] - 29:5, 287:18
**head** [2] - 202:5, 202:8
**headed** [1] - 96:23,
266:12
**heading** [1] - 175:7
**health** [3] - 32:9,
236:21, 278:7
**hear** [29] - 12:10, 24:2,

40:22, 91:18, 109:9,
112:24, 143:2,
150:16, 162:10,
162:13, 162:14,
170:25, 171:7,
171:10, 171:11,
177:2, 194:20,
196:11, 211:13,
223:24, 223:25,
235:16, 248:10,
248:20, 248:24,
249:3, 274:13,
284:21, 295:16
**heard** [31] - 7:16, 12:6,
26:19, 31:21, 54:13,
67:5, 69:19, 87:4,
90:14, 116:20,
132:4, 152:19,
161:17, 161:18,
161:20, 162:1,
163:3, 191:23,
196:25, 203:22,
226:3, 227:8, 228:7,
245:3, 245:4, 253:4,
268:16, 273:6,
273:10, 287:15
**hearing** [4] - 31:24,
114:23, 185:20,
241:1
**hears** [1] - 160:25
**heart** [3] - 129:6,
286:5, 286:7
**hearted** [1] - 40:19
**heartless** [1] - 75:4
**hearts** [2] - 286:5,
286:7
**heavily** [1] - 82:17
**heck** [1] - 73:11
**held** [2] - 114:19,
230:9
**hello** [5] - 60:10,
63:19, 199:19,
232:24, 234:12
**help** [2] - 62:7, 225:13
**helped** [1] - 7:10
**hereby** [1] - 300:5
**herself** [2] - 174:3,
266:7
**hesitancy** [1] - 115:9
**hesitation** [2] - 29:15,
102:7
**hi** [6] - 6:18, 60:9,
63:20, 148:6, 148:7,
199:18
**High** [1] - 218:11
**high** [5] - 54:19,
138:20, 168:23,
206:13, 206:14
**higher** [2] - 42:1,
210:6

14

hike [1] - 107:15
Hills [2] - 141:10, 142:12
himself [4] - 81:10, 174:3, 250:7, 266:7
history [6] - 29:7, 29:8, 32:9, 127:7, 225:10, 225:12
hit [1] - 193:1
hits [1] - 123:7
hitting [1] - 49:1
hold [8] - 25:1, 29:15, 51:3, 59:7, 84:21, 131:6, 197:6, 197:11
holding [2] - 159:24, 216:7
Holdings [1] - 141:2
holdup [1] - 113:6
hole [2] - 157:2, 157:4
home [8] - 68:11, 88:5, 106:13, 128:14, 139:8, 162:20, 201:23, 253:25
homework [6] - 88:5, 91:21, 92:12, 162:19, 212:21, 253:24
homicide [10] - 42:8, 49:14, 50:5, 50:24, 119:22, 119:23, 144:21, 156:17, 156:23, 157:10
homicides [3] - 11:2, 18:22, 119:10
honest [6] - 40:6, 69:7, 221:14, 226:2, 252:6, 297:21
honestly [9] - 52:6, 52:10, 208:13, 224:13, 224:15, 224:21, 227:7, 235:8, 244:14
honesty [2] - 286:10, 290:22
Honor [25] - 30:5, 30:12, 58:2, 58:13, 59:14, 62:23, 103:6, 133:23, 133:25, 134:3, 146:7, 146:13, 147:3, 180:20, 180:22, 198:8, 198:18, 198:22, 200:22, 219:15, 228:24, 230:7, 273:22, 289:25, 290:20
hope [3] - 25:24, 31:11, 234:15
horrible [1] - 223:10

horse [3] - 100:16, 104:16, 133:10
Hospital [1] - 184:4
hospital [5] - 151:20, 184:6, 184:7, 278:8, 280:21
hospitals [1] - 275:7
hot [1] - 137:17
hotel [1] - 276:4
hour [4] - 119:14, 145:3, 149:13, 207:15
hours [7] - 44:6, 44:9, 72:14, 237:20, 278:1, 283:10
house [5] - 110:21, 143:9, 201:23, 205:14, 277:2
huge [1] - 52:9
human [4] - 24:24, 169:13, 245:19, 260:17
Hummel [12] - 5:22, 24:21, 62:20, 66:3, 79:24, 134:17, 137:21, 138:14, 149:1, 153:2, 200:11, 233:19
Hummel's [1] - 7:16
hundred [1] - 119:14
hung [3] - 26:19, 26:22, 128:20
hurrying [1] - 69:25
hurt [1] - 94:19
husband [5] - 37:10, 112:23, 113:19, 240:18, 275:12
Hutchison [1] - 184:10
Huyge [2] - 60:12, 63:4

I

idea [5] - 80:25, 114:5, 130:18, 133:4, 192:24
ideal [1] - 204:15
ideas [2] - 125:22, 196:10
ill [1] - 142:18
Illinois [2] - 78:10, 139:16
imagine [2] - 13:17, 277:5
immature [1] - 99:6
immediately [1] - 71:22, 116:4
impact [1] - 84:3
impair [2] - 228:21,

230:25
impaired [2] - 231:6, 231:8
impairs [2] - 220:20
impartial [1] - 79:1
impartially [1] - 228:22
impending [1] - 69:22
important [10] - 54:4, 103:20, 131:10, 131:11, 135:3, 151:6, 171:5, 171:21, 187:10, 221:12
imposed [15] - 14:2, 22:13, 23:1, 26:5, 26:6, 27:14, 27:15, 101:20, 172:16, 173:10, 213:5, 215:13, 216:7, 217:19, 270:2
imposing [2] - 26:1, 173:1
impossibility [1] - 169:24
impossible [3] - 94:6, 94:10, 169:24
impression [8] - 31:23, 75:3, 143:24, 204:22, 205:5, 239:20, 240:7, 297:20
imprisonment [6] - 22:13, 22:25, 26:19, 212:10, 217:18, 254:21
incarcerated [5] - 33:17, 169:21, 187:8, 187:22, 197:3
incarceration [1] - 145:9
incest [1] - 145:22
incident [1] - 111:4
inclined [1] - 51:4
included [4] - 20:23, 48:11, 119:3, 300:9
including [4] - 22:8, 98:10, 174:5, 250:25
incompetent [1] - 252:12
inconsistent [1] - 220:6
increase [1] - 38:2
independent [3] - 42:3, 129:18, 130:5
independently [1] - 25:9
indicated [25] - 36:16, 36:19, 42:12, 45:10, 46:8, 46:16, 58:16,

81:7, 105:9, 105:17, 105:19, 113:22, 127:10, 140:12, 142:20, 157:24, 183:15, 185:14, 186:22, 187:24, 202:16, 236:20, 239:5, 240:16, 242:10
indicates [1] - 250:8
indicating) [1] - 117:6
Indictment [13] - 10:25, 12:23, 47:7, 49:16, 79:18, 117:15, 152:23, 159:16, 160:13, 250:5, 250:10, 251:6, 262:9
individual [66] - 12:17, 13:6, 13:21, 14:1, 18:18, 21:12, 22:3, 45:1, 47:4, 54:3, 77:20, 77:22, 83:14, 85:9, 85:17, 85:22, 89:3, 90:23, 92:16, 111:20, 112:1, 118:6, 129:1, 130:23, 137:16, 158:22, 159:15, 159:18, 160:3, 160:6, 160:11, 160:12, 160:13, 160:15, 164:22, 166:10, 169:17, 169:18, 169:21, 171:16, 173:3, 175:24, 176:7, 179:22, 179:23, 179:25, 187:3, 195:9, 195:16, 195:23, 196:14, 214:8, 216:18, 222:4, 234:19, 252:16, 255:7, 266:6, 267:23, 279:11, 285:13, 285:15, 288:18
individual's [4] - 99:6, 161:2, 161:5, 163:24
individually [4] - 78:9, 78:15, 189:18, 194:11
individuals [6] - 13:23, 28:15, 79:23, 140:2, 166:13, 214:3
ineligible [4] - 13:19, 92:16, 164:20, 255:5
influence [2] - 287:15, 287:16
information [14] -

45:22, 53:1, 79:13, 90:24, 110:10, 135:6, 135:18, 137:19, 145:16, 146:4, 196:23, 200:18, 233:25, 291:20
Information [2] - 47:16, 48:4
Informations [2] - 47:11, 49:9
informed [1] - 212:13
injections [1] - 181:18
injured [1] - 153:2
injury [4] - 16:6, 42:23, 49:1
inkling [1] - 56:4
Inn [1] - 107:22
innocence [1] - 43:19
innocent [9] - 43:12, 43:15, 43:23, 50:20, 51:5, 55:24, 195:2, 240:11, 250:21
inquiry [3] - 262:10, 269:23, 273:14
insane [1] - 114:21
insanity [2] - 54:17, 195:1
inside [2] - 17:1, 17:13
instance [2] - 73:24, 74:7
instances [1] - 127:19
instantaneously [1] - 158:25
instead [14] - 164:2, 253:20, 253:21, 254:9, 257:24, 259:13, 259:14, 266:9, 266:17, 270:2, 270:17, 271:5, 288:24
instruct [9] - 13:17, 18:2, 23:2, 92:14, 96:5, 164:18, 174:13, 215:19, 255:3
instructed [3] - 129:1, 237:9, 241:10
instruction [2] - 128:24, 165:9
instruction's [1] - 215:21
instructions [17] - 25:19, 66:10, 97:14, 100:25, 134:23, 164:16, 165:13, 170:20, 172:13, 178:21, 178:24, 200:17, 230:1, 233:7, 263:15,

272:14, 293:2
**instructs** [1] - 13:10
**instrument** [2] - 48:5, 250:5
**intake** [1] - 30:23
**intend** [1] - 54:18
**intended** [3] - 126:14, 132:11, 221:13
**intends** [2] - 28:11, 156:24
**intensive** [1] - 106:19
**intent** [1] - 158:24
**intention** [1] - 225:24
**intentional** [1] - 119:13
**intentionally** [1] - 277:1
**interact** [3] - 17:6, 17:16, 35:2
**interest** [2] - 33:4, 41:18
**interested** [5] - 41:13, 45:21, 152:3, 152:8, 183:22
**interesting** [1] - 32:8
**interfere** [3] - 228:21, 229:20, 230:14
**international** [1] - 139:23
**Internet** [5] - 72:7, 135:4, 135:12, 135:24, 152:20
**interpretation** [1] - 15:24
**interrupt** [1] - 276:7
**interview** [5] - 60:18, 64:8, 83:3, 136:6, 234:20
**interviewed** [1] - 61:23
**interviews** [1] - 200:3
**introduce** [2] - 225:11, 253:12
**introduced** [3] - 66:23, 201:9, 235:5
**investigating** [1] - 34:17
**investigation** [2] - 34:13, 113:4
**investigations** [1] - 32:15
**invoked** [1] - 222:19
**involve** [1] - 62:17
**involved** [24] - 8:16, 45:22, 61:1, 70:3, 70:10, 70:11, 75:17, 75:19, 98:6, 105:23, 106:17, 107:16, 114:7, 135:13, 135:25, 136:1,

141:14, 159:1, 171:15, 212:17, 240:13, 267:4, 268:15, 281:10
**involvement** [2] - 107:10, 231:7
**involves** [1] - 188:20
**involving** [6] - 8:24, 68:12, 81:9, 112:23, 138:13, 242:12
**Iowa** [5] - 138:17, 138:19, 138:22, 138:23, 138:24
**Irish** [1] - 114:7
**irony** [1] - 147:5
**irrespective** [1] - 28:20
**Irvin** [4] - 201:21, 202:9, 203:2, 203:5
**Issue** [62] - 13:3, 13:4, 14:13, 16:21, 16:24, 18:3, 18:9, 18:24, 20:9, 22:7, 23:8, 24:8, 25:19, 26:12, 26:13, 27:11, 27:25, 52:16, 53:23, 54:11, 54:23, 55:25, 58:16, 93:3, 96:18, 165:12, 173:13, 173:14, 173:15, 178:21, 178:24, 192:7, 194:6, 194:10, 195:15, 195:19, 196:3, 197:7, 213:8, 213:25, 214:8, 214:10, 216:6, 216:14, 217:1, 217:7, 217:9, 217:12, 218:15, 262:19, 263:16, 265:6, 265:7, 265:22, 266:14, 272:14, 286:12, 286:13, 286:20, 288:3, 288:5, 293:15
**issue** [20] - 17:25, 26:18, 44:20, 52:24, 53:4, 56:12, 58:18, 91:23, 96:13, 128:13, 162:15, 165:20, 173:21, 196:5, 196:12, 210:18, 216:3, 252:18, 255:22, 291:2
**issues** [36] - 6:3, 6:4, 13:3, 14:9, 26:17, 29:1, 31:12, 52:14, 55:13, 66:9, 90:13, 91:20, 116:22,

121:15, 133:11, 135:24, 137:20, 140:11, 144:25, 161:10, 161:12, 163:21, 163:22, 191:22, 191:24, 212:24, 213:8, 220:22, 221:14, 233:25, 234:1, 235:1, 235:21, 236:21, 253:23, 254:3
**issuing** [1] - 33:15
**IT** [1] - 37:11
**it'd** [2] - 94:6, 193:7
**it'll** [1] - 210:13
**itself** [9] - 8:12, 17:22, 47:4, 93:19, 99:5, 112:25, 168:8, 171:14, 205:11

---

### J

**jail** [2] - 17:19, 17:21
**James** [1] - 182:12
**January** [2] - 262:7, 300:17
**Jason** [3] - 113:23, 113:25, 114:5
**Jesuits** [1] - 209:12
**job** [21] - 29:20, 33:11, 33:12, 36:13, 42:6, 61:19, 70:6, 70:11, 70:12, 74:10, 75:9, 75:24, 75:25, 104:25, 138:20, 140:15, 188:3, 202:20, 203:9, 240:9, 252:11
**jobs** [3] - 186:6, 202:17
**Joe** [3] - 201:11, 240:16, 279:16
**John** [11] - 5:22, 66:3, 103:11, 133:3, 134:16, 137:21, 148:25, 200:11, 219:22, 233:19, 241:9
**Joseph** [1] - 279:1
**Joy** [2] - 79:24, 153:2
**JPS** [1] - 184:4
**judge** [10] - 29:2, 55:16, 62:14, 74:15, 104:1, 118:19, 132:2, 209:8, 222:4, 231:5
**Judge** [57] - 9:20, 13:10, 13:13, 13:17, 18:2, 20:3, 23:2,

27:6, 28:18, 28:24, 35:3, 35:12, 51:24, 58:21, 68:16, 92:3, 92:4, 92:6, 92:7, 92:8, 92:14, 96:5, 101:9, 101:22, 144:13, 146:6, 150:15, 162:20, 164:4, 164:9, 164:10, 164:16, 164:18, 170:20, 174:13, 201:9, 215:2, 215:18, 219:18, 235:15, 237:11, 238:2, 242:25, 254:13, 254:16, 254:20, 254:25, 255:3, 273:24, 274:15, 290:23, 295:14
**Judge's** [1] - 178:20
**judgment** [17] - 7:13, 51:18, 125:25, 129:16, 129:17, 145:11, 166:19, 202:13, 209:23, 210:2, 210:7, 210:22, 211:1, 211:23, 230:11, 230:17, 231:9
**judicial** [1] - 185:18
**Judicial** [2] - 300:4, 300:22
**Judith** [1] - 278:20
**jump** [2] - 151:3, 174:12, 189:1
**June** [7] - 60:24, 64:11, 64:13, 65:8, 67:21, 136:3, 235:24
**juries** [2] - 86:22, 263:6
**jurisdiction** [2] - 21:6, 21:10
**jurisdictions** [1] - 84:16
**juror** [162] - 5:4, 5:13, 6:13, 7:14, 9:16, 9:18, 11:22, 21:22, 23:3, 23:5, 23:22, 24:3, 25:1, 25:9, 28:18, 30:3, 44:21, 45:16, 48:17, 50:8, 50:18, 53:24, 58:8, 58:15, 59:1, 59:17, 60:5, 60:8, 60:16, 61:22, 62:10, 62:13, 63:3, 63:16, 63:18, 65:6, 66:17, 67:8, 67:12, 68:25, 69:23, 71:5, 71:18, 74:15,

76:20, 77:6, 77:10, 79:10, 81:21, 81:24, 84:4, 84:17, 85:8, 87:15, 87:25, 89:16, 97:17, 98:25, 99:3, 99:11, 99:24, 101:6, 110:12, 133:17, 133:21, 134:14, 134:17, 136:16, 136:20, 137:2, 138:5, 141:18, 144:15, 145:4, 146:12, 146:14, 147:9, 148:1, 148:5, 148:24, 149:18, 150:3, 150:10, 150:14, 153:24, 160:2, 170:15, 171:5, 174:3, 174:15, 174:20, 175:21, 176:13, 176:22, 177:16, 179:3, 179:22, 180:20, 189:19, 190:9, 198:13, 198:14, 198:25, 199:5, 199:14, 199:17, 200:1, 200:24, 207:16, 208:1, 208:19, 210:19, 212:1, 219:16, 220:11, 224:14, 224:20, 225:18, 226:14, 226:25, 228:9, 228:12, 229:21, 230:4, 230:5, 230:8, 231:1, 231:16, 232:21, 232:23, 233:5, 234:7, 235:10, 241:6, 243:13, 249:10, 249:11, 251:22, 252:1, 252:14, 255:23, 256:4, 257:9, 257:13, 264:18, 264:25, 266:6, 266:7, 266:23, 268:15, 269:12, 269:24, 270:11, 270:14, 281:15, 283:23, 284:6, 295:9, 296:16, 298:9, 298:13, 299:3
**Juror** [12] - 5:7, 60:11, 63:24, 83:9, 134:15, 134:21, 136:23, 148:10, 199:20, 231:13, 232:24, 298:6

**JUROR** [109] - 5:9,
5:17, 5:20, 6:11,
58:6, 60:4, 60:10,
60:13, 60:20, 60:23,
61:3, 61:9, 61:12,
61:14, 61:16, 61:21,
62:3, 62:6, 63:15,
63:20, 63:23, 64:1,
64:5, 64:9, 64:23,
65:2, 65:11, 65:15,
65:21, 66:1, 136:10,
136:12, 136:22,
137:7, 137:12,
147:11, 147:22,
147:25, 148:7,
148:12, 148:17,
148:20, 149:2,
149:9, 149:11,
149:14, 155:6,
155:9, 155:11,
155:13, 155:15,
155:17, 155:19,
155:21, 198:12,
199:2, 199:6,
199:12, 199:19,
199:22, 200:5,
200:9, 200:19,
228:5, 228:16,
228:23, 229:8,
229:12, 229:23,
230:2, 231:20,
231:23, 232:1,
232:5, 232:9,
232:16, 232:18,
233:1, 233:8,
233:14, 233:17,
234:3, 278:13,
278:16, 282:23,
291:3, 291:5,
291:19, 292:7,
292:12, 292:15,
292:18, 292:20,
293:6, 293:9,
293:16, 293:24,
294:4, 294:8,
294:11, 294:15,
294:25, 295:4,
295:8, 298:14,
298:18, 298:21,
298:24, 299:2
**juror's** [3] - 51:14,
117:22, 231:12
**jurors** [34] - 18:4,
18:12, 27:10, 50:10,
83:2, 84:19, 85:5,
86:12, 87:12, 90:15,
96:10, 127:4, 127:8,
127:9, 131:8,
131:21, 132:11,
170:19, 172:20,
175:24, 176:4,

179:10, 179:14,
187:10, 211:12,
217:6, 220:15,
221:13, 222:4,
225:25, 226:22,
235:6, 288:15
**jurors'** [3] - 192:24,
215:9, 220:19
**jury** [192] - 5:14, 6:3,
7:17, 8:19, 11:6,
12:6, 12:12, 12:18,
12:24, 13:2, 13:5,
13:9, 13:12, 13:18,
13:21, 14:8, 16:21,
18:2, 18:9, 18:12,
19:4, 20:1, 21:3,
21:12, 23:4, 23:9,
23:10, 25:10, 25:23,
26:1, 26:14, 26:20,
26:22, 27:7, 28:10,
51:23, 51:24, 54:2,
55:19, 60:1, 60:2,
63:11, 63:13, 63:14,
64:25, 66:11, 69:9,
70:1, 70:18, 72:2,
77:10, 77:14, 79:4,
82:15, 83:4, 83:5,
83:13, 85:10, 86:10,
87:4, 90:7, 90:11,
90:24, 91:16, 92:3,
92:8, 92:14, 96:6,
96:9, 96:12, 100:11,
101:7, 101:8,
102:11, 102:12,
103:19, 116:14,
117:2, 118:8,
118:23, 119:6,
123:1, 128:9,
128:20, 130:13,
132:13, 132:14,
135:14, 135:16,
135:18, 135:24,
137:3, 137:19,
145:14, 145:19,
146:4, 147:18,
148:15, 160:25,
161:16, 161:23,
162:4, 162:13,
162:23, 162:25,
163:2, 163:20,
164:3, 164:9,
164:17, 164:18,
165:16, 169:18,
170:25, 172:7,
172:14, 172:17,
172:19, 172:23,
172:24, 173:12,
173:20, 174:10,
174:13, 175:6,
184:18, 184:22,
184:24, 185:7,

186:18, 199:9,
200:7, 200:18,
206:7, 211:8,
214:24, 217:7,
223:24, 224:7,
225:15, 229:1,
231:18, 231:25,
232:3, 233:11,
233:25, 237:9,
237:15, 243:18,
244:4, 247:12,
248:8, 249:7,
251:15, 251:21,
252:9, 252:16,
252:23, 253:3,
253:8, 253:19,
253:21, 253:22,
254:12, 254:15,
254:23, 255:3,
263:10, 263:15,
263:16, 263:24,
265:6, 265:7,
266:11, 269:3,
272:16, 272:18,
280:15, 280:23,
281:12, 288:9,
291:7, 291:8,
292:23, 293:1,
293:3, 298:11,
298:17, 298:21
**Jury** [3] - 164:16,
235:15, 242:25
**jury's** [9] - 15:24, 22:2,
69:17, 91:19, 129:8,
164:4, 165:24,
173:13, 251:12
**justice** [8] - 79:6,
123:7, 144:4,
144:10, 240:21,
280:25, 281:21,
283:12
**justification** [4] -
55:23, 89:4, 114:15,
115:2
**juvenile** [3] - 80:6,
80:7, 80:13
**juxtaposed** [1] - 68:17
**juxtaposition** [1] -
296:22

---

**K**

---

**Kansas** [1] - 139:6
**keep** [23] - 20:13,
20:16, 25:16, 27:4,
27:17, 27:21, 29:22,
32:3, 41:18, 61:5,
79:16, 83:16,
105:16, 163:17,
164:13, 234:15,

241:25, 242:1,
246:5, 248:24,
255:19, 283:8
**Kennedale** [5] - 79:20,
152:25, 203:18,
203:19, 275:18
**kept** [2] - 240:19,
297:24
**key** [1] - 177:18
**kicked** [1] - 47:24
**kicking** [1] - 49:2
**kid** [1] - 119:15
**kids** [5] - 34:24, 57:13,
268:19, 274:12
**kill** [5] - 28:11, 119:16,
156:15, 157:7, 281:6
**killed** [17] - 28:15,
79:24, 88:22, 118:3,
142:6, 159:15,
160:11, 160:14,
250:2, 250:11,
251:16, 279:22,
280:20, 280:21,
281:2, 286:4
**killing** [6] - 118:16,
119:7, 214:3,
240:25, 245:18
**kind** [74] - 27:15,
33:13, 37:18, 40:10,
42:18, 46:23, 51:17,
52:20, 67:16, 68:22,
70:4, 70:24, 72:18,
74:5, 74:18, 75:1,
75:13, 76:16, 94:4,
94:10, 95:1, 97:22,
100:6, 104:1,
104:11, 104:13,
107:25, 110:15,
111:1, 112:19,
114:15, 115:13,
122:10, 125:3,
127:1, 133:9, 151:4,
152:8, 154:20,
164:25, 165:18,
168:22, 171:7,
172:11, 175:18,
181:5, 182:16,
183:6, 183:22,
185:19, 187:11,
190:9, 190:13,
190:14, 192:10,
193:19, 193:22,
194:5, 194:19,
195:7, 214:12,
215:7, 223:19,
225:3, 225:5, 225:6,
225:22, 243:8,
274:17, 276:17,
284:16, 290:9
**kindness** [2] - 130:9,

288:20
**kinds** [1] - 109:3
**kitchen** [1] - 244:20
**knife** [7] - 49:18, 50:2,
159:19, 160:14,
190:8, 190:21, 251:8
**know..** [1] - 281:9
**knowing** [39] - 16:20,
19:13, 20:7, 27:24,
29:10, 47:9, 54:14,
56:3, 56:7, 67:16,
89:4, 95:19, 101:21,
117:21, 119:7,
119:12, 156:20,
158:24, 173:2,
173:10, 179:24,
180:5, 183:23,
185:18, 191:8,
193:9, 196:14,
216:24, 245:18,
247:12, 247:21,
248:4, 248:23,
264:13, 264:19,
268:19, 273:2,
273:12, 286:6
**knowingly** [19] - 10:2,
11:3, 88:14, 114:14,
114:19, 156:10,
157:8, 157:15,
157:16, 158:18,
159:10, 194:24,
214:3, 245:8,
249:25, 277:1,
285:13, 285:14,
285:24
**knowledge** [6] -
78:22, 78:23, 79:13,
106:25, 110:5, 110:7
**known** [3] - 24:18,
79:17, 250:3
**knows** [3] - 99:15,
221:4, 297:19
**knucklehead** [1] -
23:18

---

**L**

---

**L.H** [1] - 206:1
**lab** [1] - 194:4
**labor** [1] - 138:23
**laid** [2] - 87:8, 215:21
**Lake** [3] - 68:7, 81:16,
81:18
**Land** [1] - 206:1
**language** [4] - 43:10,
48:4, 173:15, 173:20
**large** [2] - 95:8,
232:12
**Larry** [9] - 5:23, 66:4,
103:10, 137:23,

149:4, 200:12,
219:21, 233:20,
274:16
**last** [38] - 16:17,
20:21, 30:25, 67:3,
67:9, 68:23, 69:9,
82:2, 82:3, 82:23,
95:3, 102:25,
139:24, 150:10,
155:22, 156:10,
159:5, 185:7, 194:7,
230:9, 233:16,
234:20, 234:25,
241:7, 242:10,
243:7, 245:3,
245:11, 246:13,
247:6, 247:14,
248:14, 249:20,
260:12, 265:5,
273:14, 295:23
**late** [4] - 145:5, 229:1,
229:6, 237:20,
282:24
**laughed** [1] - 76:6
**laughing** [1] - 76:8
**law** [119] - 9:19, 10:8,
10:25, 11:5, 13:15,
13:25, 20:2, 20:10,
21:15, 21:21, 21:25,
23:16, 28:18, 33:14,
34:11, 51:15, 58:23,
67:14, 74:3, 78:8,
87:13, 88:4, 89:25,
91:11, 93:15, 94:9,
98:24, 114:17,
122:24, 123:12,
134:25, 135:1,
144:17, 144:24,
150:15, 153:16,
153:18, 156:22,
157:1, 158:3, 158:8,
158:12, 158:14,
158:17, 159:14,
160:2, 160:5,
164:21, 165:2,
170:21, 170:22,
171:1, 171:2,
175:13, 176:25,
188:8, 188:9,
188:12, 189:7,
192:8, 196:1,
207:18, 207:23,
208:1, 208:11,
210:19, 211:14,
212:9, 212:11,
220:18, 222:20,
226:22, 228:9,
228:14, 228:16,
229:21, 230:18,
231:4, 234:22,

235:12, 235:15,
242:18, 242:19,
242:24, 248:1,
248:16, 248:18,
249:8, 249:12,
250:4, 250:16,
251:21, 252:24,
253:11, 253:18,
255:15, 255:16,
256:2, 259:9,
259:22, 260:4,
261:16, 263:4,
267:6, 268:7,
268:11, 275:16,
284:11, 284:12,
284:25, 288:8,
296:15, 296:20,
297:17
**law-abiding** [1] -
284:12
**laws** [4] - 28:19,
165:6, 206:8, 266:21
**lawsuit** [1] - 256:18
**lawyer** [7] - 34:5,
38:19, 38:21, 38:22,
135:9, 192:22, 197:8
**lawyers** [9] - 24:20,
36:12, 38:14, 39:5,
63:7, 76:23, 123:6,
147:15, 186:5
**lead** [6] - 95:25,
171:15, 215:8,
215:10, 224:23,
293:14
**leadership** [1] -
106:21
**leading** [3] - 97:6,
296:19, 296:25
**leads** [1] - 210:11
**learned** [1] - 243:6
**learning** [2] - 57:15,
183:23
**least** [5] - 22:18,
70:15, 84:15,
153:20, 260:20
**leave** [10] - 59:25,
63:10, 108:15,
145:17, 146:5,
174:2, 199:8,
211:15, 298:12,
298:23
**leaves** [1] - 174:2
**leaving** [2] - 61:4,
236:8
**led** [1] - 290:11
**left** [7] - 66:25, 118:10,
118:12, 157:11,
182:20, 288:22,
297:12
**leg** [1] - 140:20

**legal** [15] - 14:10,
34:15, 70:4, 89:4,
114:15, 115:2,
117:24, 122:25,
123:1, 123:5,
123:12, 123:13,
145:14, 167:5,
235:21
**legalese** [1] - 256:1
**legally** [3] - 114:20,
118:11, 119:13
**legged** [1] - 140:19
**Legislature** [19] -
15:20, 15:23, 93:23,
94:21, 121:22,
125:12, 126:13,
166:14, 166:18,
167:14, 168:24,
169:20, 175:12,
247:24, 257:23,
259:4, 259:9,
262:19, 288:8
**length** [1] - 233:9
**lengthy** [1] - 185:10
**lenient** [6] - 42:11,
42:12, 188:4,
283:13, 283:14,
284:4
**less** [9] - 14:23, 14:25,
39:8, 47:4, 89:2,
247:7, 267:2, 267:7,
268:24
**lesser** [12] - 20:23,
48:11, 118:25,
119:3, 120:2,
122:24, 156:19,
156:20, 156:22,
191:10, 263:8
**lesser-included** [3] -
20:23, 48:11, 119:3
**letter** [3] - 61:16,
208:1, 252:9
**level** [5] - 35:24,
145:10, 192:24,
230:14, 268:25
**liberally** [1] - 45:7
**license** [1] - 105:10
**licensed** [2] - 105:12,
105:15
**lieutenant** [2] -
182:24, 182:25
**life** [136] - 13:6, 13:18,
13:25, 14:10, 16:3,
16:25, 18:3, 20:7,
22:12, 22:25, 25:25,
26:19, 40:4, 45:1,
45:2, 45:18, 45:25,
52:9, 56:22, 57:17,
70:13, 74:8, 80:5,
89:3, 89:19, 92:2,

92:6, 92:15, 92:18,
92:22, 92:23, 96:7,
96:24, 97:4, 98:18,
100:13, 101:20,
111:3, 111:22,
112:11, 115:7,
120:8, 120:11,
120:14, 120:17,
120:20, 121:2,
121:17, 122:2,
130:24, 132:6,
132:15, 132:23,
164:2, 164:9,
164:19, 164:22,
165:8, 166:24,
169:22, 170:12,
172:16, 173:10,
175:3, 175:13,
176:16, 179:13,
180:5, 185:14,
186:9, 186:24,
187:2, 187:7,
187:17, 187:20,
188:13, 191:19,
194:18, 197:2,
208:3, 209:7,
210:10, 211:22,
212:10, 212:14,
212:18, 213:5,
214:9, 214:21,
215:1, 215:5,
215:10, 215:13,
215:20, 216:6,
217:15, 217:18,
219:1, 227:1,
230:16, 230:22,
241:16, 242:21,
243:25, 247:7,
248:2, 253:22,
254:9, 254:21,
254:23, 255:4,
255:8, 255:11,
260:22, 260:25,
261:3, 261:9,
263:17, 263:21,
264:5, 264:20,
266:8, 266:16,
267:7, 269:8, 270:2,
270:16, 271:4,
272:20, 273:12,
281:24, 284:7,
288:24, 294:19
**lifetime** [3] - 79:10,
168:7, 288:21
**light** [2] - 174:24,
229:10
**likelihood** [1] - 126:10
**likely** [4] - 14:22,
53:22, 167:13,
168:10

**limitation** [1] - 130:20
**Linda** [1] - 182:12
**line** [10] - 17:1, 17:7,
46:25, 47:1, 70:25,
75:11, 85:15,
151:23, 156:4,
265:16
**lines** [3] - 70:17, 75:2,
198:1
**LinkedIn** [1] - 135:22
**list** [2] - 6:21, 159:6
**listed** [2] - 16:11,
146:3
**listen** [1] - 52:25,
103:12, 135:4,
143:5, 244:6,
244:25, 261:5
**listened** [2] - 80:15,
184:24
**literally** [1] - 289:1
**live** [13] - 17:10, 53:18,
70:13, 109:17,
109:19, 120:24,
141:8, 202:25,
204:3, 204:4,
205:15, 236:25,
276:9
**lived** [2] - 139:5,
282:18
**lives** [7] - 11:20,
108:12, 114:1,
114:2, 141:9,
141:10, 276:10
**living** [4] - 68:7, 95:7,
203:25, 205:24
**located** [2] - 136:5,
151:12
**lock** [1] - 64:20
**lockstep** [1] - 26:11
**lodge** [1] - 107:21
**longest** [1] - 8:4
**look** [33] - 9:10, 16:14,
16:18, 20:10, 23:9,
25:9, 42:8, 47:14,
48:3, 51:18, 52:18,
56:20, 89:18, 127:4,
130:14, 131:21,
143:9, 144:20,
154:16, 177:4,
177:19, 194:2,
221:13, 221:24,
225:2, 243:22,
257:16, 272:9,
277:18, 284:11,
284:22, 284:25
**looked** [6] - 7:19,
42:2, 51:25, 104:5,
153:20, 201:22
**looking** [23] - 17:24,
23:7, 23:8, 25:12,

27:8, 27:17, 28:7,
48:8, 73:25, 81:7,
83:2, 132:3, 143:25,
144:1, 154:7, 175:2,
193:25, 197:7,
202:18, 261:17,
283:21, 285:17
**looks** [4] - 29:7, 139:5,
225:3, 283:16
**loose** [1] - 82:1
**lose** [3] - 64:19, 233:9,
241:15
**losing** [2] - 294:5
**loss** [4] - 290:6, 290:8,
290:9, 290:12
**lost** [2] - 229:15, 287:9
**lottery** [1] - 258:14
**louder** [1] - 274:9
**Louis** [4] - 77:9,
109:24, 110:4, 111:6
**love** [2] - 40:16,
107:18
**low** [5] - 52:8, 115:10,
115:11, 115:15,
168:23
**Lowe's** [4] - 201:20,
202:5, 202:15, 203:6
**lower** [4] - 284:9,
284:19, 284:23,
287:2
**lucky** [1] - 258:24
**LVN** [1] - 151:24

### M

**ma'am** [25] - 5:9, 5:17,
5:20, 58:11, 59:11,
60:20, 134:13,
148:3, 148:12,
148:17, 149:2,
199:2, 199:22,
201:3, 213:18,
219:14, 231:15,
232:18, 233:1,
278:22, 281:13,
281:20, 282:2,
282:20, 298:20
**mad** [3] - 11:16, 20:1
**magnitude** [1] -
188:19
**mail** [8] - 60:1, 63:13,
135:17, 147:18,
199:9, 231:25,
232:2, 298:17
**Mainframe** [1] - 7:21
**major** [3] - 152:5,
183:16, 184:3
**majority** [3] - 42:18,
85:15, 86:15
**Mall** [3] - 202:22,

203:3, 203:4
**man** [3] - 117:5,
185:17, 239:18
**manager** [3] - 140:1,
150:21, 182:2
**managers** [2] - 140:4,
140:9
**manner** [1] - 48:21,
48:22, 48:25, 49:15,
50:15, 67:16, 115:3,
130:4, 159:14,
159:17, 190:7,
250:4, 250:5,
285:14, 285:17,
285:25
**Mansfield** [2] - 79:21,
153:1
**manufacturer** [1] -
104:11
**manufacturers** [1] -
104:18
**manufacturing** [2] -
70:7, 104:24
**Marine** [1] - 114:10
**married** [7] - 28:23,
29:1, 37:16, 109:23,
141:11, 205:17,
205:18
**martians** [1] - 123:24
**mascot** [3] - 73:3,
73:4, 73:11
**match** [1] - 50:12
**matches** [1] - 47:17
**Matt** [1] - 139:16
**matter** [9] - 37:4,
123:17, 174:20,
178:12, 249:18,
251:11, 252:3,
255:9, 271:2
**matters** [4] - 37:20,
234:22, 235:20,
241:25
**mature** [3] - 176:7,
176:15, 268:22
**maturity** [1] - 268:25
**maximum** [1] - 120:7
**ME** [2] - 50:1, 50:14
**Meadowbrook** [1] -
109:20
**mean** [104] - 9:1,
14:21, 16:18, 17:25,
35:25, 47:14, 50:12,
53:21, 55:3, 69:7,
69:17, 71:21, 75:25,
76:3, 76:12, 76:13,
76:14, 87:7, 93:16,
93:17, 93:25, 94:16,
94:17, 95:5, 95:8,
102:20, 115:12,
119:19, 122:11,

123:25, 124:5,
124:9, 124:15,
125:4, 126:20,
127:18, 128:3,
128:15, 129:14,
131:1, 132:1,
144:22, 153:20,
167:11, 167:12,
167:13, 167:22,
168:15, 168:16,
169:10, 171:24,
183:19, 186:3,
187:6, 188:1, 188:2,
188:6, 193:6,
193:24, 196:13,
204:25, 210:16,
211:4, 211:7, 221:1,
225:19, 240:9,
241:11, 242:8,
243:6, 245:17,
257:19, 260:3,
260:13, 260:15,
264:18, 265:3,
269:21, 272:9,
276:19, 277:5,
277:10, 277:14,
280:18, 281:3,
281:4, 282:10,
284:12, 285:6,
289:1, 290:6,
290:15, 291:20,
291:22, 292:1,
292:4, 292:18,
293:17, 294:2,
294:15, 294:17,
295:1, 297:24
**meaning** [3] - 23:4,
256:3, 276:5
**meaningless** [1] -
122:11
**means** [38] - 9:2, 11:7,
11:21, 13:18, 48:22,
48:25, 49:15, 50:15,
91:2, 92:15, 115:3,
118:1, 118:16,
118:17, 120:14,
125:22, 125:24,
135:9, 159:14,
159:17, 164:19,
165:8, 167:17,
168:4, 179:4, 187:3,
187:7, 187:21,
190:7, 250:4, 250:6,
255:4, 265:19,
276:3, 285:14,
285:18, 285:25
**meant** [1] - 194:7
**mechanism** [1] -
263:7
**media** [8] - 14:4,

110:6, 110:8, 110:9,
135:4, 152:5,
183:17, 183:21
**medical** [2] - 193:18,
240:4
**Medical** [1] - 190:19
**medium** [1] - 168:24
**meet** [2] - 20:4, 143:19
**meeting** [1] - 68:5
**member** [5] - 28:23,
29:1, 54:2, 67:22,
138:23
**members** [2] - 42:24,
184:23
**mental** [6] - 54:15,
156:19, 158:18,
195:3, 225:22, 278:7
**mentally** [1] - 176:8
**mention** [1] - 82:20
**mentioned** [6] - 10:7,
43:25, 70:25, 71:2,
84:10, 87:11
**merely** [1] - 158:22
**Mesquite** [1] - 275:16
**met** [8] - 22:3, 60:17,
143:22, 148:13,
148:19, 171:20,
200:2, 287:4
**meted** [1] - 41:23
**Methodist** [1] - 106:19
**Metroplex** [2] - 141:8,
151:22
**Michael** [2] - 205:21,
205:25
**middle** [5] - 24:10,
69:14, 112:6,
143:13, 167:10
**might** [87] - 17:25,
23:5, 23:24, 28:20,
57:10, 72:9, 72:19,
84:5, 86:24, 97:3,
97:17, 98:17, 98:19,
98:24, 99:3, 99:21,
100:1, 102:3, 116:3,
116:5, 119:21,
120:3, 127:13,
152:21, 157:9,
158:1, 161:19,
162:10, 162:17,
163:8, 167:7, 168:5,
168:13, 168:15,
170:10, 171:11,
171:13, 174:15,
174:21, 175:5,
175:20, 175:22,
175:23, 175:24,
176:4, 176:18,
176:22, 177:7,
177:8, 177:9,
177:10, 177:12,

177:15, 177:16,
179:16, 179:17,
211:9, 211:11,
223:9, 225:7, 226:5,
238:2, 243:24,
255:25, 260:4,
266:23, 267:3,
268:15, 268:16,
268:19, 268:25,
269:3, 269:12,
271:11, 271:13,
271:16, 271:22,
285:7, 287:6,
289:16, 290:11,
291:25
**miles** [1] - 119:14
**Miles** [10] - 6:1, 35:14,
66:7, 66:24, 137:24,
138:11, 149:6,
200:15, 201:10,
233:23
**military** [2] - 176:23,
289:1
**millions** [3] - 168:10,
289:1
**Mills'** [1] - 35:12
**mind** [50] - 15:8,
20:14, 20:16, 23:16,
24:8, 25:16, 27:18,
27:21, 29:22, 46:12,
52:11, 57:7, 62:17,
69:7, 70:22, 81:20,
84:17, 94:12, 97:2,
117:22, 119:11,
123:18, 126:22,
128:7, 132:5,
143:25, 144:20,
154:15, 163:17,
171:6, 213:3,
219:11, 241:12,
246:5, 248:10,
248:25, 249:6,
255:19, 258:4,
258:6, 267:18,
270:21, 276:25,
283:9, 283:13,
287:3, 289:7,
289:10, 289:14,
297:19
**minded** [3] - 58:22,
59:6, 153:22
**mindset** [1] - 55:2
**mine** [1] - 201:6
**minimize** [1] - 58:15
**minimum** [1] - 268:11
**minipanel** [9] - 5:19,
51:20, 60:17, 64:8,
136:6, 137:10,
148:19, 200:3, 274:7
**minipanels** [1] -

284:16
**ministers** [1] - 17:4
**minute** [10] - 10:5,
96:23, 97:20,
100:12, 134:2,
215:23, 268:17,
269:14, 270:15,
290:19
**minutes** [12] - 58:5,
58:25, 102:19,
103:13, 109:7,
132:22, 133:20,
146:11, 198:11,
230:1, 244:12, 295:7
**misdemeanor** [7] -
8:14, 8:15, 12:4,
30:24, 30:25, 41:5,
47:10
**misdemeanors** [1] -
31:17
**miserably** [1] - 251:11
**misperception** [1] -
31:18
**miss** [2] - 70:14,
137:13
**missing** [1] - 292:4
**Missouri** [8] - 78:10,
78:12, 78:13, 78:14,
80:10, 80:11, 80:13,
100:22
**mistake** [3] - 49:25,
50:25, 83:12
**mistakes** [1] - 84:16
**misunderstood** [1] -
292:16
**mitigating** [89] -
22:11, 22:23, 23:4,
23:10, 23:23, 23:24,
24:3, 24:7, 24:24,
25:11, 25:25, 26:10,
27:18, 27:19, 57:12,
57:19, 97:3, 97:16,
98:13, 98:17, 98:24,
99:1, 99:5, 99:12,
99:25, 101:14,
115:17, 116:7,
116:9, 116:25,
130:2, 130:15,
131:15, 131:16,
131:20, 131:23,
174:14, 174:17,
175:17, 175:18,
176:5, 176:25,
177:4, 177:16,
177:17, 177:19,
177:21, 179:1,
179:5, 179:10,
179:15, 180:2,
180:7, 197:16,
197:20, 198:3,

217:16, 217:23,
217:25, 225:17,
225:18, 226:6,
226:8, 226:21,
226:23, 226:24,
266:21, 267:17,
267:25, 268:2,
269:16, 270:1,
270:4, 270:16,
270:20, 270:23,
271:9, 271:10,
271:13, 271:17,
271:19, 288:19,
288:23, 289:3,
289:6, 289:11,
289:16, 289:20
**mitigation** [8] - 13:5,
57:6, 57:10, 92:2,
129:22, 164:2,
217:16, 254:9
**mock** [6] - 206:17,
207:2, 207:6,
208:23, 211:19,
218:12
**modification** [2] -
37:13, 38:1
**mom** [2] - 205:19,
232:14
**mom's** [1] - 40:10
**moment** [2] - 59:16,
289:24
**Monday** [1] - 136:2
**money** [3] - 282:7,
282:8, 282:9
**Montgomery** [1] -
151:13
**month** [2] - 181:15,
238:21
**monument** [1] - 60:25
**Moore** [15] - 5:23,
22:15, 24:18, 31:14,
39:6, 64:4, 103:10,
137:23, 146:15,
149:4, 200:12,
219:21, 228:3,
233:20, 274:16
**MOORE** [19] - 62:9,
62:14, 103:9,
114:24, 115:1,
117:9, 117:11,
133:17, 133:25,
134:9, 146:16,
146:19, 219:18,
219:20, 227:24,
230:21, 295:14,
295:18, 297:18
**moral** [25] - 22:10,
23:6, 23:11, 25:13,
28:3, 53:3, 97:17,
98:12, 99:8, 102:2,

115:16, 131:5,
174:7, 174:16,
174:21, 174:23,
176:12, 180:10,
219:4, 219:8,
219:10, 230:10,
266:24, 267:12,
273:15
**morally** [5] - 99:16,
176:8, 267:2, 267:7,
268:24
**morning** [11] - 6:17,
6:18, 7:4, 9:17, 30:8,
30:9, 66:21, 66:22,
102:2, 136:4, 237:12
**Morris** [1] - 154:2
**most** [17] - 7:9, 14:22,
46:2, 53:22, 82:13,
100:19, 135:2,
140:9, 140:10,
140:15, 189:5,
232:11, 237:11,
267:11, 295:25,
296:1
**mostly** [2] - 237:11,
237:20
**mother** [6] - 204:7,
205:15, 236:21,
238:5, 275:22, 276:7
**motion** [1] - 113:10
**Motion** [1] - 202:21
**motivates** [1] - 107:11
**motivation** [1] -
171:14
**motorcycle** [2] - 68:4,
107:25
**mouth** [4] - 70:20,
265:9, 272:8, 287:22
**move** [8] - 161:7,
172:24, 175:9,
194:6, 216:3,
216:20, 252:19,
264:4
**moved** [1] - 95:19
**moves** [6] - 19:13,
96:12, 172:24,
173:3, 264:9, 265:7
**MR** [69] - 6:16, 30:3,
30:5, 30:7, 30:12,
30:15, 30:17, 58:1,
58:11, 58:13, 58:21,
59:11, 59:13, 62:9,
62:14, 62:21, 62:23,
66:15, 66:20, 103:6,
103:9, 114:24,
115:1, 117:7, 117:9,
117:11, 133:17,
133:23, 133:25,
134:2, 134:8, 134:9,
138:3, 138:8, 146:7,

146:13, 146:16,
146:17, 146:19,
146:22, 147:2,
149:16, 149:21,
155:22, 180:20,
180:22, 180:24,
198:7, 198:16,
198:18, 198:20,
198:22, 200:22,
201:2, 219:15,
219:18, 219:20,
227:24, 230:7,
230:21, 231:5,
234:5, 234:10,
273:22, 295:12,
295:14, 295:18,
295:22, 297:18
**MS** [7] - 273:24, 274:1,
278:20, 282:24,
289:24, 290:2,
290:19
**multiple** [3] - 23:15,
188:20, 191:5
**murder** [177] - 8:16,
8:24, 9:4, 9:25, 10:2,
10:7, 10:15, 10:16,
10:25, 11:1, 13:22,
20:23, 20:25, 23:15,
42:2, 44:16, 44:20,
44:22, 47:2, 47:5,
47:9, 48:18, 49:14,
52:5, 77:11, 88:12,
88:13, 88:23, 89:2,
89:4, 89:17, 92:19,
92:22, 94:23, 99:5,
111:12, 111:17,
112:11, 112:15,
114:13, 114:16,
115:5, 116:13,
116:21, 116:25,
117:1, 117:4,
117:14, 118:23,
118:24, 119:12,
119:13, 119:20,
120:7, 120:15,
120:16, 120:17,
121:1, 121:4,
121:15, 121:20,
122:1, 122:6,
127:20, 142:7,
142:9, 142:24,
144:2, 155:24,
156:1, 156:3, 156:4,
156:5, 156:6, 156:8,
156:21, 156:22,
157:9, 157:14,
157:15, 157:18,
157:19, 158:2,
158:5, 158:6,
159:11, 162:23,
162:24, 163:3,

163:13, 163:20,
164:15, 165:2,
165:5, 168:16,
168:25, 169:1,
169:16, 171:13,
171:14, 171:23,
173:24, 175:21,
175:22, 176:6,
186:17, 186:24,
189:12, 190:3,
190:23, 191:8,
191:11, 194:12,
194:13, 194:14,
194:22, 195:11,
195:23, 206:8,
214:1, 216:18,
220:10, 223:1,
223:21, 238:1,
242:12, 242:20,
244:2, 245:4, 245:7,
245:12, 245:17,
245:19, 245:22,
246:1, 246:3,
246:10, 246:11,
246:16, 246:23,
246:25, 247:5,
247:10, 247:13,
247:21, 248:4,
249:17, 251:1,
252:25, 253:19,
255:3, 255:7,
259:24, 269:4,
284:7, 285:9,
285:11, 286:15,
289:9, 291:6, 291:8,
291:18, 292:11,
292:24, 293:13,
297:23
**murdered** [3] - 10:21,
13:23, 285:23
**murders** [20] - 10:2,
10:9, 15:25, 23:15,
49:24, 54:13, 54:14,
55:4, 55:23, 88:14,
95:25, 117:21,
157:16, 158:4,
188:20, 190:18,
191:5, 194:25,
224:5, 245:8
**music** [1] - 130:22
**must** [8] - 26:5, 96:10,
111:13, 164:4,
169:20, 195:11,
218:18, 254:25
**MY** [1] - 300:16
**MySpace** [1] - 135:22

**N**

**nailing** [1] - 75:11
**name** [12] - 31:21,

38:13, 105:4,
113:23, 113:24,
138:11, 139:11,
143:11, 143:13,
153:2, 201:9, 274:4
**named** [2] - 201:11,
252:18
**narrow** [3] - 122:5,
122:7, 169:4
**narrowed** [1] - 42:13
**National** [3] - 64:16,
64:20, 68:5
**natural** [4] - 14:2,
92:22, 165:6, 255:12
**naturally** [3] - 195:25,
210:16, 210:17
**nature** [3] - 24:25,
110:18, 209:22
**near** [4] - 57:14,
109:17, 202:25
**neat** [1] - 288:16
**necessarily** [5] -
34:15, 74:3, 193:16,
195:13, 279:5
**necessary** [3] -
123:16, 127:2,
239:25
**necessity** [1] - 207:4
**need** [34] - 5:10, 5:16,
6:9, 9:10, 35:18,
36:23, 40:13, 64:25,
67:5, 70:8, 83:3,
92:10, 95:3, 104:4,
120:5, 120:19,
127:24, 134:17,
136:3, 136:24,
137:5, 140:22,
140:23, 140:25,
146:7, 149:10,
200:7, 206:5, 233:2,
233:13, 238:9,
287:8, 288:11,
290:24
**needed** [6] - 38:2,
40:12, 41:22, 71:23,
238:10, 277:18
**needs** [2] - 30:16,
40:23
**negatively** [1] - 214:13
**negligence** [1] -
156:21
**negligent** [3] - 119:21,
157:10, 157:11
**neighbor** [1] - 108:9
**neighbors** [2] -
109:15, 225:14
**neonatal** [1] - 275:8
**nephew** [1] - 275:12
**nervous** [2] - 234:14,
274:18

**network** [1] - 135:23
**neutral** [1] - 51:17
**never** [34] - 8:17,
12:22, 37:16, 59:4,
59:7, 86:10, 91:14,
93:1, 120:20,
120:21, 142:1,
152:12, 165:3,
169:19, 171:8,
173:23, 187:3,
187:12, 195:24,
204:12, 222:14,
243:18, 251:1,
256:22, 257:2,
258:24, 265:25,
276:18, 277:6,
277:8, 277:14,
289:20
**new** [4] - 32:22,
109:15, 140:10,
151:16
**News** [1] - 139:20
**news** [6] - 79:16,
150:7, 150:8,
152:16, 152:20,
199:7
**newspaper** [2] - 79:1,
83:17
**next** [19] - 77:8, 85:17,
85:18, 94:15,
106:14, 106:16,
118:15, 128:9,
131:11, 168:14,
169:9, 173:2,
203:15, 207:14,
214:14, 224:24,
259:18, 269:8,
271:14
**nicer** [1] - 63:7
**Nichols** [1] - 38:15
**night** [5] - 109:1,
157:5, 203:5,
237:20, 271:18
**nine** [1] - 31:4
**NO** [1] - 300:21
**nobody** [3] - 72:8,
73:12, 206:4
**nobody's** [3] - 51:25,
228:6, 292:5
**noise** [3] - 108:18,
109:3, 109:8
**none** [2] - 27:21,
133:25
**normal** [2] - 72:13,
201:7
**normally** [2] - 206:25,
282:4
**North** [2] - 141:9,
142:11
**Northeast** [3] -

202:22, 203:3, 203:4
**nos** [1] - 195:21
**note** [1] - 296:17
**noted** [1] - 153:21
**notes** [1] - 36:18
**nothing** [12] - 15:16,
34:20, 137:7, 152:7,
167:4, 171:22,
173:18, 183:19,
184:8, 224:1, 289:12
**notice** [3] - 209:9,
235:23, 265:15
**noticed** [4] - 41:25,
104:7, 115:7, 214:12
**notify** [1] - 136:8
**novels** [1] - 34:22
**nuisance** [1] - 157:11
**number** [14] - 22:17,
24:19, 36:17, 79:11,
103:25, 116:16,
116:19, 126:8,
139:19, 164:8,
189:19, 194:13,
225:24, 236:21
**numbered** [1] - 300:10
**nurse** [8] - 181:9,
181:20, 182:2,
182:8, 183:21,
274:24, 275:3, 275:6
**nurses** [8] - 17:5,
150:22, 150:25,
181:21, 181:25,
182:4, 188:11,
188:14
**nursing** [1] - 182:7

**O**

**o'clock** [5] - 136:3,
136:17, 150:5,
237:10, 237:12
**oath** [54] - 6:23, 9:23,
20:2, 20:10, 20:13,
21:16, 21:24, 24:25,
67:8, 67:9, 67:10,
67:13, 87:12, 87:15,
87:22, 87:25,
134:17, 144:4,
144:5, 144:13,
144:16, 145:2,
150:11, 150:14,
160:8, 170:15,
170:23, 207:11,
207:17, 208:9,
208:13, 208:19,
210:2, 212:8, 228:8,
228:13, 229:21,
235:11, 247:15,
251:22, 252:1,
252:13, 257:9,

257:12, 257:13,
264:18, 270:11,
270:14, 284:5,
296:9, 296:15
**oaths** [2] - 150:9,
235:6
**obligated** [2] - 67:13,
150:12
**obligation** [7] - 24:21,
61:12, 61:23, 63:9,
160:18, 235:7,
251:12
**obligations** [1] - 67:19
**obliged** [1] - 62:7
**observe** [1] - 41:1
**obvious** [2] - 62:16,
86:25
**obviously** [18] - 41:4,
55:5, 55:11, 79:3,
88:8, 90:15, 104:5,
116:9, 137:16,
158:10, 167:9,
195:9, 228:6, 253:8,
280:22, 283:20,
284:24, 285:10
**occasion** [6] - 35:2,
42:5, 42:7, 141:13,
172:10, 262:7
**occasional** [1] - 72:17
**occasionally** [3] -
31:8, 33:23, 35:4
**occasioned** [1] -
80:22
**occasions** [5] - 47:24,
86:12, 107:24,
147:20
**occur** [6] - 54:8,
64:15, 126:6,
126:11, 239:9
**occurred** [10] - 49:6,
49:24, 50:5, 79:19,
79:20, 152:24,
152:25, 191:6,
239:10, 300:10
**odds** [1] - 202:12
**OF** [2] - 300:1, 300:2
**offenders** [1] - 283:11
**offense** [34] - 9:4,
10:12, 20:23, 21:7,
22:9, 48:9, 48:11,
48:17, 49:6, 79:19,
89:1, 95:24, 98:11,
118:25, 130:7,
152:24, 159:5,
166:7, 168:18,
169:4, 174:6, 175:1,
191:11, 246:11,
246:16, 247:9,
249:17, 291:8,
291:17, 292:10,

292:24, 293:13,
293:23
**offenses** [11] - 12:19,
42:21, 42:22, 46:14,
46:21, 91:1, 91:2,
91:12, 119:3, 120:3,
162:13
**Office** [4] - 29:11,
49:5, 142:14, 142:17
**office** [11] - 16:9,
29:12, 29:16, 30:22,
138:13, 140:10,
142:14, 142:19,
151:25, 206:18,
277:25
**officer** [5] - 32:13,
38:17, 46:25, 73:19,
246:2
**officers** [7] - 10:20,
74:6, 74:9, 74:13,
74:17, 76:17, 185:3
**offices** [1] - 139:21,
139:22
**official** [2] - 36:5,
107:3
**Official** [2] - 300:3,
300:22
**OFFICIAL** [1] - 300:16
**often** [3] - 221:19,
258:19, 261:16
**Oklahoma** [2] - 11:13,
118:2
**Old** [1] - 107:22
**old** [21] - 57:11, 99:12,
99:13, 176:1, 176:7,
176:14, 176:22,
176:23, 176:24,
179:17, 184:19,
232:13, 238:21,
268:9, 268:18,
268:20, 269:14,
269:15
**older** [4] - 205:22,
205:23, 268:12,
268:25
**oldest** [1] - 276:10
**once** [13] - 22:14,
41:2, 77:9, 91:17,
110:1, 134:18,
144:3, 182:16,
229:1, 235:6, 259:1,
292:23
**one** [160] - 10:3, 10:16,
11:18, 14:20, 16:21,
17:10, 19:14, 23:8,
23:21, 24:6, 34:9,
36:1, 36:14, 39:16,
41:4, 43:25, 47:9,
48:10, 50:7, 57:10,
61:5, 64:10, 65:17,

67:7, 68:18, 68:20, 69:8, 69:24, 70:24, 70:25, 73:16, 75:2, 77:8, 79:11, 80:5, 80:21, 82:2, 82:5, 83:7, 83:8, 84:10, 85:6, 85:15, 88:14, 88:21, 91:6, 91:22, 92:1, 92:4, 95:19, 98:18, 98:25, 99:3, 99:19, 105:16, 110:2, 111:10, 112:13, 112:15, 112:17, 113:6, 114:9, 117:5, 118:3, 118:16, 118:17, 123:7, 129:12, 140:19, 140:20, 141:18, 141:20, 145:11, 151:21, 155:5, 155:14, 156:9, 157:17, 157:19, 157:25, 159:12, 160:5, 163:4, 163:23, 164:1, 164:5, 164:6, 165:21, 166:15, 166:17, 169:4, 171:7, 172:25, 173:3, 175:19, 175:20, 178:2, 182:25, 189:2, 190:15, 191:8, 194:25, 195:11, 201:21, 202:2, 202:18, 204:21, 211:22, 213:22, 214:13, 216:21, 216:24, 218:15, 221:11, 222:9, 222:14, 222:18, 223:14, 229:13, 230:12, 232:11, 239:15, 244:20, 245:8, 245:14, 245:16, 245:18, 245:21, 246:25, 247:3, 249:6, 250:2, 254:5, 254:8, 254:19, 260:9, 262:25, 263:11, 264:9, 264:13, 267:19, 268:1, 270:22, 270:23, 278:18, 280:2, 280:4, 280:5, 284:7, 285:4, 288:6, 288:11, 290:19, 290:25
**One** [4] - 48:12, 131:18, 141:15,

278:6
**ones** [4] - 14:10, 76:24, 92:24
**ongoing** [2] - 81:13, 113:4
**online** [2] - 203:8, 203:10
**open** [22] - 5:3, 20:14, 20:16, 25:16, 27:18, 27:21, 29:22, 52:11, 57:7, 58:22, 60:7, 61:6, 124:7, 136:19, 153:22, 163:17, 168:19, 168:23, 171:6, 199:16, 248:24, 300:11
**open-minded** [2] - 58:22, 153:22
**opened** [1] - 59:6
**opened-minded** [1] - 59:6
**opening** [1] - 24:5
**opens** [1] - 90:9
**operate** [2] - 176:24, 178:2, 255:17
**operating** [1] - 245:5
**operation** [2] - 181:14, 181:24
**operator** [1] - 39:12
**opinion** [12] - 39:2, 44:17, 110:10, 153:14, 228:18, 229:2, 240:3, 241:8, 242:16, 279:10, 280:15, 281:25
**opinions** [1] - 153:13
**opportunity** [8] - 12:24, 66:9, 86:23, 103:12, 137:18, 200:16, 233:24, 234:21
**opposed** [10] - 21:5, 21:9, 26:1, 50:2, 111:24, 125:12, 197:3, 214:10, 214:22, 216:7
**opt** [2] - 212:18, 212:19
**option** [2] - 211:21, 212:20
**options** [3] - 16:25, 210:10, 213:1
**OR** [1] - 182:3
**or..** [1] - 53:3
**order** [14] - 10:11, 26:5, 56:13, 117:17, 119:12, 126:23, 127:5, 129:2, 157:14, 193:4, 195:20, 197:12,

222:1, 249:16
**ordinary** [3] - 167:7, 167:8, 256:3
**organizations** [2] - 107:12, 107:17
**organized** [1] - 233:10
**originally** [1] - 211:8
**orthopedic** [2] - 275:4, 275:9
**otherwise** [7] - 61:6, 84:13, 158:25, 164:13, 165:8, 169:23, 195:21
**ought** [6] - 46:19, 89:20, 95:15, 130:15, 221:19, 222:19
**outcome** [6] - 152:3, 152:6, 153:24, 188:21, 239:14, 241:3
**outdoors** [1] - 107:18
**outgrowth** [1] - 107:17
**outline** [1] - 43:11
**outmaneuver** [1] - 205:6
**outside** [15] - 16:4, 17:6, 47:25, 62:10, 64:14, 108:15, 146:8, 182:12, 182:14, 203:21, 207:6, 211:14, 211:16, 279:25, 283:21
**overall** [4] - 71:8, 172:11, 231:11, 297:14
**overnight** [1] - 236:6
**oversee** [1] - 140:5
**Owen** [1] - 136:24
**OWEN** [1] - 138:4
**own** [11] - 13:14, 118:19, 118:20, 129:6, 132:5, 135:2, 167:6, 172:3, 179:22, 201:23
**owned** [1] - 139:15
**owner** [2] - 61:17, 140:22
**owners** [1] - 140:13

**P**

**p.m** [5] - 136:18, 199:15, 299:5
**package** [1] - 288:16
**packet** [1] - 97:13
**PACU** [2] - 182:1, 182:3

**page** [4] - 37:2, 77:8, 82:4, 155:1
**pain** [1] - 181:17
**paint** [1] - 131:6
**Palo** [1] - 236:1
**Pam** [2] - 103:11, 219:22
**PAMELA** [1] - 6:12
**Pamela** [8] - 5:8, 5:23, 66:4, 137:23, 149:4, 200:12, 233:20, 274:4
**panel** [4] - 45:13, 119:2, 123:15, 203:22
**Panhandle** [2] - 182:11, 184:7
**paper** [7] - 15:15, 86:13, 86:21, 105:7, 159:20, 283:15, 298:25
**papers** [2] - 34:3, 205:10
**paperwork** [4] - 6:5, 38:6, 42:3, 212:22
**parameters** [1] - 72:21
**paraphrasing** [2] - 127:16, 187:4
**parent** [4] - 34:24, 123:11, 123:20
**parents** [2] - 205:17, 271:18
**parishioner** [1] - 209:10
**Park** [3] - 64:16, 64:20, 68:5
**Parker** [7] - 29:18, 39:18, 281:11, 282:17, 282:18, 283:4, 283:6
**parole** [45] - 13:18, 13:20, 14:1, 14:10, 16:25, 20:8, 44:12, 44:16, 44:20, 45:7, 92:15, 92:17, 111:23, 112:12, 120:18, 120:21, 121:2, 121:4, 130:24, 132:23, 164:19, 164:20, 164:24, 165:3, 172:16, 186:9, 186:11, 186:14, 186:17, 186:21, 186:24, 187:3, 187:7, 187:18, 187:21, 191:2, 214:9, 215:6, 230:16, 230:23, 255:4, 255:6,

294:19, 294:20
**paroled** [2] - 121:1
**part** [46] - 7:8, 8:9, 9:21, 16:17, 18:24, 20:13, 24:25, 25:8, 28:4, 31:18, 48:5, 50:25, 51:5, 51:15, 59:1, 59:25, 63:10, 82:15, 97:8, 102:4, 102:17, 112:5, 141:1, 147:16, 147:17, 150:9, 150:20, 170:24, 180:13, 195:6, 199:8, 201:22, 202:16, 219:5, 227:14, 227:20, 228:20, 229:18, 230:12, 231:18, 273:16, 287:19, 298:11, 298:23, 298:25
**Partially** [1] - 120:4
**participate** [2] - 192:2, 227:7
**participation** [2] - 199:11, 232:8
**particular** [33] - 12:17, 13:6, 18:13, 19:17, 19:20, 20:22, 23:25, 34:12, 40:14, 41:12, 41:14, 49:7, 52:15, 57:4, 99:1, 105:25, 111:20, 112:5, 130:7, 144:7, 152:7, 152:21, 153:9, 156:8, 163:1, 170:19, 173:21, 216:17, 223:25, 225:4, 225:6, 259:23, 260:9
**parties** [5] - 135:12, 135:15, 153:3, 300:8, 300:15
**partner** [1] - 201:10
**parts** [1] - 48:17
**party** [2] - 135:9, 177:13
**pass** [4] - 30:3, 133:17, 180:20, 219:15
**passed** [1] - 142:16
**passing** [1] - 120:13
**passion** [1] - 57:1
**past** [7] - 7:1, 37:18, 74:25, 86:11, 129:11, 130:8, 148:14
**pastures** [1] - 182:20
**patients** [2] - 181:15,

194:1
**pattern** [3] - 58:23, 59:1, 59:3
**Paula** [3] - 232:22, 232:25, 280:7
**PAULA** [1] - 234:6
**pause** [3] - 25:24, 29:14, 134:5
**pay** [1] - 65:20
**paycheck** [1] - 201:23
**paying** [1] - 298:22
**peace** [1] - 246:2
**peculiar** [1] - 234:22
**pen** [1] - 261:3
**Penal** [4] - 33:22, 42:6, 117:12, 189:22
**penalties** [1] - 175:12
**penalty** [151] - 6:4, 8:12, 8:20, 8:23, 8:25, 9:3, 10:6, 10:8, 10:12, 10:14, 14:2, 14:11, 17:1, 19:14, 26:2, 26:4, 26:6, 27:14, 27:25, 28:5, 28:8, 46:9, 66:11, 77:10, 78:4, 78:9, 78:18, 79:9, 82:15, 82:16, 83:11, 83:15, 83:18, 88:17, 88:19, 92:5, 92:25, 95:20, 96:23, 96:25, 100:8, 100:11, 100:14, 101:10, 101:12, 101:23, 102:5, 110:14, 111:11, 112:12, 121:21, 121:23, 132:6, 132:22, 137:20, 153:7, 153:9, 153:15, 158:1, 158:6, 164:3, 164:7, 166:14, 166:16, 166:21, 173:1, 173:4, 175:4, 175:8, 175:10, 176:1, 176:3, 176:15, 179:7, 180:1, 180:14, 181:8, 201:15, 206:24, 207:2, 208:17, 209:14, 209:19, 210:11, 211:20, 212:10, 212:15, 212:19, 216:21, 216:25, 217:22, 218:16, 219:6, 219:24, 220:12, 220:14, 221:18, 222:8, 222:11, 222:16, 222:19,

222:25, 223:11, 224:12, 224:17, 228:19, 229:5, 229:17, 230:13, 234:1, 234:23, 235:3, 242:11, 242:13, 242:21, 243:14, 243:17, 243:21, 244:3, 246:10, 246:12, 246:18, 247:1, 247:3, 254:10, 254:17, 255:10, 260:25, 263:2, 263:8, 264:10, 264:14, 266:9, 266:12, 266:17, 267:9, 268:9, 268:13, 269:10, 269:17, 270:3, 270:17, 271:5, 272:17, 273:3, 273:18, 277:3, 288:9, 292:13, 292:25, 294:1
**pending** [2] - 12:20, 12:21
**penitentiary** [12] - 17:2, 17:13, 45:3, 92:17, 93:1, 130:25, 169:19, 170:6, 255:8, 255:10, 260:22, 261:8
**people** [99] - 11:10, 11:17, 14:5, 17:18, 31:10, 42:16, 43:12, 43:15, 43:16, 43:19, 43:21, 44:16, 46:2, 52:19, 54:7, 57:3, 61:25, 68:12, 69:25, 75:10, 79:9, 80:15, 82:13, 82:24, 82:25, 83:1, 83:4, 83:6, 83:10, 83:21, 85:7, 85:10, 85:15, 86:3, 86:18, 86:23, 86:25, 92:21, 95:7, 95:9, 100:19, 101:15, 101:19, 103:25, 109:15, 111:12, 118:1, 118:4, 122:6, 122:7, 129:11, 130:10, 130:21, 135:25, 140:18, 144:24, 150:5, 154:15, 166:19, 168:1, 168:2, 171:15, 172:23, 179:6, 186:3, 186:20, 189:17, 192:25, 206:19,

208:11, 209:3, 210:7, 211:7, 220:14, 221:18, 227:19, 232:10, 232:12, 232:13, 237:6, 240:2, 240:10, 240:11, 241:24, 242:19, 243:9, 243:16, 260:14, 260:15, 263:24, 264:4, 267:19, 268:20, 272:21, 279:23, 285:24
**people's** [1] - 211:14
**percent** [3] - 126:2, 285:23
**peremptory** [5] - 59:10, 59:13, 134:1, 134:7, 198:19
**perfect** [1] - 98:8
**perform** [1] - 74:10
**performing** [1] - 186:8
**perhaps** [1] - 191:4
**period** [2] - 60:24, 120:12
**permanent** [1] - 84:6
**person** [78] - 5:22, 10:2, 10:3, 16:22, 18:22, 19:5, 19:11, 24:7, 50:6, 57:10, 57:12, 66:2, 75:13, 85:22, 88:13, 88:14, 88:21, 94:17, 94:18, 94:19, 95:8, 97:7, 99:4, 107:13, 108:12, 114:4, 114:20, 118:3, 118:17, 126:15, 126:16, 127:25, 129:12, 129:17, 130:11, 149:1, 155:14, 156:9, 156:11, 157:15, 157:16, 157:17, 159:9, 165:4, 187:7, 187:21, 188:7, 188:15, 194:25, 195:9, 200:11, 209:8, 209:19, 212:6, 212:14, 213:24, 215:15, 221:3, 225:5, 225:6, 233:19, 237:1, 239:25, 241:15, 244:11, 245:7, 245:8, 249:23, 249:24, 250:2, 251:16, 268:8, 278:18, 281:2,

285:23, 286:6, 288:18
**person's** [12] - 25:25, 26:8, 51:19, 93:10, 114:14, 115:16, 157:8, 197:25, 249:24, 251:6, 251:7, 288:20
**personal** [21] - 22:10, 35:24, 87:21, 98:12, 110:7, 153:14, 174:7, 208:2, 211:14, 211:19, 214:6, 220:19, 220:25, 221:22, 226:14, 228:14, 229:2, 230:19, 230:24, 242:6, 268:18
**personally** [6] - 75:17, 75:19, 77:4, 207:5, 214:21
**personnel** [1] - 135:10
**persons** [3] - 136:1, 153:1, 170:5
**perspective** [2] - 185:19, 191:25
**pertain** [1] - 235:1
**pertaining** [2] - 33:8, 209:7
**pertains** [2] - 52:24, 158:14
**phase** [90] - 12:3, 12:6, 12:7, 12:12, 12:13, 12:15, 13:24, 18:21, 20:18, 20:20, 21:3, 53:25, 54:25, 55:10, 55:14, 55:17, 55:18, 58:19, 89:17, 90:2, 90:4, 90:5, 90:6, 90:9, 90:12, 90:14, 90:20, 90:22, 90:25, 91:16, 93:9, 116:12, 122:13, 160:25, 161:2, 161:7, 161:8, 161:9, 161:11, 161:12, 161:14, 161:17, 161:21, 161:22, 162:2, 162:5, 162:6, 162:8, 162:9, 162:11, 162:14, 162:15, 162:23, 163:19, 164:15, 165:20, 171:12, 171:19, 172:7, 201:14, 212:10, 213:3, 213:22, 224:1, 234:23, 252:18, 252:19,

252:20, 252:23, 253:4, 253:12, 253:15, 253:17, 256:8, 261:25, 262:21, 265:21, 292:25, 293:4, 294:16, 294:22, 296:7, 296:8, 296:23, 297:9
**phases** [3] - 12:5, 90:3, 292:23
**phone** [1] - 135:19
**phrase** [11] - 93:6, 93:7, 94:15, 173:17, 256:6, 259:18, 259:20, 260:7, 265:16, 297:5
**phrases** [2] - 14:18, 256:2
**physical** [1] - 24:12
**physicians** [1] - 185:4
**pick** [2] - 24:3, 116:19
**picked** [2] - 206:7, 218:21
**pickup** [1] - 140:8
**Pictures** [1] - 202:22
**pictures** [1] - 78:25
**piece** [2] - 86:13, 99:1
**pin** [2] - 284:16, 287:18
**pipes** [1] - 157:3
**piqued** [1] - 41:18
**pissed** [1] - 211:19
**pitcher** [3] - 6:9, 149:8, 206:4
**pivots** [1] - 22:22
**place** [24] - 14:3, 14:9, 15:6, 17:12, 21:2, 21:4, 21:8, 21:9, 23:13, 26:7, 43:17, 61:24, 64:4, 84:12, 139:11, 142:9, 152:10, 203:18, 204:9, 209:8, 215:2, 215:6, 219:1
**places** [1] - 139:9
**placing** [1] - 118:2
**plan** [1] - 203:14
**planning** [2] - 68:2, 203:8
**plastic** [8] - 59:25, 63:10, 147:17, 199:8, 231:18, 251:9, 298:11, 298:23
**play** [3] - 39:2, 97:8, 133:12
**played** [1] - 38:24
**Plaza** [1] - 151:21
**plea** [8] - 31:8, 35:5,

35:7, 47:16, 47:18, 47:25, 110:24
**plea-bargain** [1] - 110:24
**plead** [1] - 159:21
**pled** [1] - 160:13
**plenty** [1] - 236:11
**plus** [3] - 45:17, 71:19, 184:25
**point** [44] - 9:15, 23:25, 24:4, 57:16, 59:24, 67:10, 69:21, 71:16, 73:16, 80:5, 87:18, 87:23, 93:4, 96:8, 108:25, 109:4, 113:5, 127:6, 132:18, 132:25, 144:12, 164:24, 164:25, 165:25, 173:24, 188:21, 194:7, 207:20, 217:8, 217:13, 226:14, 228:7, 228:23, 229:7, 231:8, 232:7, 241:20, 271:2, 282:19, 285:5, 286:18, 295:22, 296:3, 298:16
**points** [2] - 75:12, 189:21
**police** [12] - 10:20, 32:25, 73:18, 74:6, 74:9, 74:12, 74:13, 74:17, 76:17, 108:8, 109:5, 182:18
**policeman** [1] - 156:4
**pool** [1] - 83:5
**poor** [1] - 179:18
**pop** [1] - 9:7
**portions** [1] - 300:7
**position** [10] - 22:22, 30:25, 31:2, 74:1, 82:14, 107:1, 107:3, 151:4, 183:14, 207:1
**positive** [1] - 139:10
**possibilities** [2] - 89:14, 153:23
**possibility** [21] - 15:9, 84:2, 93:25, 94:1, 112:16, 120:8, 121:5, 124:8, 125:16, 126:11, 128:21, 167:22, 167:24, 168:4, 249:6, 258:2, 258:5, 258:7, 258:9, 258:13, 275:25
**possible** [28] - 15:11, 15:17, 18:11, 88:18,

94:11, 94:12, 95:13, 112:11, 120:7, 125:21, 125:24, 153:7, 168:4, 168:6, 169:7, 169:25, 188:21, 197:2, 243:14, 246:13, 246:18, 247:3, 248:1, 248:3, 259:13, 261:2, 261:7
**possibly** [1] - 91:24
**Potential** [7] - 5:7, 63:24, 83:9, 136:23, 148:10, 199:20, 232:24
**potential** [3] - 58:14, 84:3, 143:1
**potentially** [1] - 228:20
**Potter** [1] - 204:16
**POWELL** [1] - 6:12
**Powell** [7] - 5:8, 5:10, 10:1, 30:8, 58:3, 59:18, 59:20
**PowerPoint** [4] - 7:6, 206:22, 207:11, 249:20
**practice** [3] - 279:2, 290:3, 290:4
**pray** [1] - 106:13
**prayer** [2] - 106:4, 106:5
**predict** [4] - 52:21, 127:5, 192:10, 193:4
**prediction** [1] - 193:19
**predisposed** [2] - 218:25, 285:4
**predisposition** [6] - 215:4, 216:5, 217:21, 226:5, 230:22, 265:2
**prejudgment** [1] - 240:13
**prejudice** [1] - 230:20
**preliminary** [1] - 235:19
**premeditated** [2] - 158:2, 158:20
**premeditation** [2] - 158:4, 159:1
**preop** [6] - 150:21, 150:25, 181:11, 181:12, 182:1, 182:3
**prepared** [1] - 49:10
**preponderance** [2] - 123:2, 123:3
**presence** [2] - 62:10, 146:8
**present** [9] - 5:3, 60:7, 93:19, 116:14,

136:19, 165:5, 177:10, 199:16, 288:17
**presentation** [1] - 206:23
**presented** [8] - 58:18, 91:18, 135:8, 185:22, 189:4, 193:8, 221:14, 228:15
**preservation** [1] - 33:8
**presidential** [1] - 206:25
**pressures** [4] - 71:2, 71:4, 82:5
**presume** [1] - 124:13
**presumed** [2] - 129:22, 224:7
**presumedly** [1] - 86:13
**presumes** [1] - 115:1
**presumption** [2] - 121:19, 123:23
**pretty** [32] - 16:16, 32:3, 32:4, 33:2, 33:3, 37:22, 52:8, 52:14, 55:25, 61:19, 67:24, 72:13, 76:7, 79:11, 82:22, 86:24, 87:5, 93:4, 94:20, 95:10, 106:5, 114:13, 139:19, 168:1, 168:19, 168:23, 184:17, 238:24, 238:25, 259:14, 259:20, 260:7
**prevent** [2] - 230:25, 231:6
**prevents** [1] - 220:19
**previous** [4] - 101:16, 141:24, 188:13, 283:4
**previously** [1] - 60:24
**price** [1] - 77:1
**primarily** [4] - 104:16, 181:16, 182:21, 186:21
**primary** [3] - 237:4, 276:6, 276:9
**print** [1] - 152:20
**prison** [30] - 13:19, 14:10, 43:24, 92:18, 101:20, 111:3, 111:23, 120:8, 120:11, 120:14, 120:17, 121:7, 121:10, 142:8, 164:20, 165:4, 165:8, 187:4,

210:11, 211:22, 212:14, 212:18, 239:15, 239:17, 240:25, 242:22, 253:22, 255:5, 255:12, 269:9
**private** [4] - 139:14, 139:15, 279:2, 290:4
**probability** [54] - 14:14, 14:20, 14:21, 15:5, 15:8, 53:6, 53:20, 53:21, 93:12, 93:15, 93:16, 93:20, 93:21, 93:24, 94:1, 125:10, 125:16, 125:21, 126:10, 126:15, 127:3, 165:17, 166:1, 166:11, 166:19, 167:9, 167:11, 167:22, 167:23, 168:22, 168:23, 168:24, 170:4, 192:23, 193:1, 213:9, 256:13, 257:17, 257:18, 257:19, 257:24, 258:5, 258:6, 258:20, 259:10, 261:13, 262:12, 262:13, 291:11, 293:17, 293:22
**probable** [8] - 51:23, 94:18, 125:21, 125:22, 126:9, 167:12, 168:8
**probation** [1] - 42:25
**problem** [14] - 39:22, 39:23, 51:7, 51:10, 51:12, 52:4, 74:11, 89:8, 115:21, 117:10, 118:18, 129:18, 130:18, 149:14
**problems** [7] - 9:23, 17:24, 18:16, 75:18, 104:7, 120:10, 290:14
**procedure** [9] - 73:24, 77:16, 82:25, 137:15, 178:3, 178:11, 240:4, 277:22, 283:10
**Procedure** [3] - 33:23, 42:7, 189:23
**procedures** [1] - 181:8
**proceed** [9] - 6:8, 66:14, 72:19, 138:2, 149:15, 193:11,

200:21, 217:9, 234:4
**proceeding** [5] - 5:11, 47:8, 146:23, 199:25, 214:10
**proceedings** [11] - 59:22, 65:4, 134:5, 136:25, 145:12, 147:14, 148:22, 233:3, 299:5, 300:7, 300:13
**process** [41] - 9:15, 28:4, 29:23, 37:25, 38:4, 41:7, 54:6, 56:10, 59:7, 71:9, 77:12, 85:4, 85:8, 85:25, 96:16, 102:4, 102:17, 103:22, 103:23, 128:22, 132:20, 132:24, 146:20, 180:13, 185:10, 192:1, 192:2, 192:5, 195:15, 196:2, 197:7, 212:17, 212:18, 219:5, 221:12, 223:19, 224:16, 228:20, 229:18, 244:9, 273:17
**processes** [1] - 183:24
**profession** [3] - 183:8, 188:16, 204:15
**profound** [1] - 127:23
**prognosis** [5] - 172:11, 193:13, 193:20, 193:21, 193:23
**program** [2] - 105:9, 140:1
**project** [6] - 140:4, 140:9, 140:14, 140:17, 141:1, 142:2
**projects** [5] - 138:24, 140:5, 140:10, 140:11, 142:1
**promise** [1] - 206:4
**promoted** [1] - 202:5
**proof** [64] - 6:7, 24:13, 25:21, 39:8, 49:23, 50:11, 58:16, 66:13, 93:8, 101:2, 101:5, 122:18, 122:24, 123:15, 123:21, 127:1, 129:21, 137:25, 149:6, 159:25, 160:10, 166:5, 171:20, 172:18, 173:21, 173:22, 173:24,

173:25, 178:15,
178:16, 178:25,
192:9, 192:25,
196:20, 215:23,
218:15, 250:8,
250:23, 251:4,
256:10, 256:11,
256:16, 256:19,
256:22, 257:2,
257:14, 264:17,
265:20, 265:21,
265:22, 266:1,
266:3, 270:19,
272:15, 287:2,
287:4, 287:12,
288:1, 288:2, 288:6,
295:20
**proof's** [1] - 50:20
**propensity** [1] -
111:17
**proper** [9] - 8:25,
44:25, 54:16, 90:11,
172:22, 222:21,
242:13, 273:5, 273:9
**prosecute** [2] -
138:13, 189:25
**prosecuting** [2] -
29:12, 76:1
**prosecution** [1] -
51:16
**Prosecutor** [1] -
205:11
**prosecutor** [4] - 7:9,
34:5, 55:15, 144:5
**prosecutor's** [1] -
142:19
**prosecutors** [14] -
7:12, 19:21, 29:19,
35:21, 35:24, 75:3,
76:19, 138:12,
143:19, 143:23,
204:23, 205:6,
239:20, 239:21
**Prospective** [2] -
60:11, 134:21
**prospective** [41] - 5:4,
5:13, 6:13, 9:15,
58:8, 59:17, 60:5,
60:8, 60:16, 62:13,
63:3, 63:16, 63:18,
65:6, 66:17, 133:21,
134:14, 136:20,
137:2, 138:5,
146:12, 147:9,
148:1, 148:5,
148:24, 149:18,
198:13, 198:25,
199:14, 199:17,
200:1, 200:24,
230:4, 231:16,

232:21, 232:23,
233:5, 234:7, 295:9,
298:9, 299:3
**PROSPECTIVE** [109] -
5:9, 5:17, 5:20, 6:11,
58:6, 60:4, 60:10,
60:13, 60:20, 60:23,
61:3, 61:9, 61:12,
61:14, 61:16, 61:21,
62:3, 62:6, 63:15,
63:20, 63:23, 64:1,
64:5, 64:9, 64:23,
65:2, 65:11, 65:15,
65:21, 66:1, 136:10,
136:12, 136:22,
137:7, 137:12,
147:11, 147:22,
147:25, 148:7,
148:12, 148:17,
148:20, 149:2,
149:9, 149:11,
149:14, 155:6,
155:9, 155:11,
155:13, 155:15,
155:17, 155:19,
155:21, 198:12,
199:2, 199:6,
199:12, 199:19,
199:22, 200:5,
200:9, 200:19,
228:5, 228:16,
228:23, 229:8,
229:12, 229:23,
230:2, 231:20,
231:23, 232:1,
232:5, 232:9,
232:16, 232:18,
233:1, 233:8,
233:14, 233:17,
234:3, 278:13,
278:16, 282:23,
291:3, 291:5,
291:19, 292:7,
292:12, 292:15,
292:18, 292:20,
293:6, 293:9,
293:16, 293:24,
294:4, 294:8,
294:11, 294:15,
294:25, 295:4,
295:8, 298:14,
298:18, 298:21,
298:24, 299:2
**protect** [1] - 239:22
**proud** [1] - 232:14
**prove** [93] - 12:19,
12:23, 18:19, 19:7,
19:21, 19:25, 21:2,
21:4, 22:1, 48:15,
49:6, 49:15, 49:22,
50:3, 50:16, 50:19,

51:1, 93:9, 93:11,
94:4, 94:11, 94:12,
94:22, 95:14, 95:17,
96:10, 115:4,
117:17, 117:21,
122:13, 122:15,
123:3, 125:8,
126:14, 131:14,
158:19, 158:22,
159:2, 159:4, 159:7,
159:11, 159:14,
159:21, 159:25,
160:15, 161:2,
161:5, 162:4, 166:6,
166:7, 166:9,
167:17, 168:25,
169:1, 169:2,
169:24, 170:1,
171:9, 172:20,
179:2, 189:14,
189:20, 190:5,
190:14, 190:17,
190:24, 191:5,
205:11, 205:12,
215:25, 221:25,
249:18, 250:3,
250:13, 250:16,
250:18, 251:8,
256:19, 256:20,
257:6, 257:17,
259:6, 259:23,
259:24, 259:25,
261:2, 261:7,
261:13, 263:25,
285:24, 296:11,
296:13
**proved** [15] - 19:15,
48:18, 50:12, 51:8,
160:16, 160:17,
173:5, 215:14,
216:10, 216:15,
216:17, 221:25,
263:22, 264:12,
286:2
**proven** [8] - 19:6,
19:12, 25:4, 43:23,
117:12, 283:16,
285:21, 286:6
**proves** [1] - 43:18
**provide** [3] - 33:22,
127:13, 140:23
**provided** [2] - 20:3,
296:20
**provides** [1] - 222:20
**providing** [1] - 38:6
**proving** [2] - 48:13,
192:17
**psychiatric** [1] -
279:10
**psychiatrist** [1] -

113:8
**psychological** [1] -
279:10
**psychologist** [2] -
278:9, 278:10
**Puerto** [1] - 139:25
**punch** [1] - 117:7
**punish** [4] - 82:14,
82:16, 119:10,
161:23
**punishable** [2] -
156:25, 247:5
**punishment** [86] - 9:4,
12:3, 12:4, 12:5,
12:13, 12:17, 13:24,
20:18, 40:12, 40:24,
41:21, 42:10, 46:15,
48:1, 52:5, 54:25,
80:20, 87:8, 89:1,
89:7, 89:14, 89:17,
89:18, 89:20, 90:5,
90:11, 90:12, 90:20,
90:25, 91:16,
110:25, 111:8,
111:11, 115:6,
116:12, 120:7,
122:12, 131:1,
153:7, 153:15,
158:7, 161:9,
161:12, 161:14,
162:5, 162:10,
162:13, 162:23,
163:12, 163:19,
164:7, 164:15,
166:16, 169:16,
171:19, 186:20,
191:12, 191:18,
201:14, 208:4,
211:21, 212:9,
213:3, 220:23,
223:1, 223:12,
224:1, 234:23,
243:14, 244:1,
246:13, 246:19,
247:9, 247:13,
248:2, 252:20,
252:22, 263:8,
267:8, 283:11,
283:23, 284:7,
293:4, 294:22
**punishments** [4] -
112:11, 112:13,
122:1, 248:17
**purpose** [1] - 294:21
**purposely** [1] - 28:11
**purposes** [8] - 65:4,
91:5, 136:25,
148:22, 165:2,
255:2, 260:19,
285:11

**pushing** [1] - 286:2
**put** [34] - 12:7, 12:9,
22:14, 25:2, 34:10,
36:17, 36:25, 47:18,
49:20, 49:21, 59:7,
81:8, 82:13, 83:25,
108:4, 108:20,
113:9, 127:12,
157:4, 185:12,
189:10, 197:18,
215:1, 215:6, 220:5,
249:19, 257:11,
261:12, 272:8,
276:4, 276:25,
287:21, 288:8, 288:9
**putting** [3] - 70:20,
126:8, 133:9

## Q

**qualified** [2] - 110:11,
220:11
**qualifying** [1] - 102:8
**qualms** [1] - 243:12
**question's** [1] - 125:9
**questioning** [4] -
146:24, 230:8,
230:9, 297:25
**questionnaire** [59] -
5:15, 6:4, 8:2, 8:4,
8:8, 8:11, 8:22, 27:9,
28:7, 28:21, 30:13,
34:10, 40:11, 54:20,
62:16, 64:25, 66:12,
71:1, 71:3, 72:24,
73:15, 78:19, 82:3,
84:11, 104:10,
137:4, 137:19,
138:16, 140:12,
142:20, 146:3,
148:15, 148:16,
150:19, 152:2,
153:12, 157:24,
160:7, 183:16,
187:23, 200:7,
201:18, 202:16,
208:5, 209:9, 220:4,
220:6, 222:9, 223:9,
233:11, 235:20,
236:20, 239:5,
239:19, 246:9,
275:1, 277:16,
281:11, 283:7
**questions** [73] - 6:21,
7:2, 8:10, 12:1,
13:10, 13:15, 25:12,
25:15, 29:25, 36:14,
57:21, 72:23, 75:2,
77:23, 78:4, 78:9,
82:4, 88:8, 93:23,

104:3, 111:7,
112:16, 116:15,
121:16, 122:3,
122:10, 124:6,
128:10, 132:7,
132:18, 133:13,
135:20, 136:11,
146:6, 150:18,
153:6, 154:9,
158:10, 162:24,
163:21, 164:4,
164:6, 164:12,
180:16, 196:8,
196:9, 207:24,
213:4, 214:20,
215:8, 221:21,
222:9, 225:8,
227:21, 227:25,
228:1, 229:10,
231:1, 244:9,
244:13, 254:12,
254:15, 254:19,
255:20, 265:13,
277:16, 278:6,
291:1, 292:20,
296:18, 296:19,
297:1, 298:1
**quick** [4] - 70:11, 93:4,
96:4, 235:7
**quicker** [2] - 86:19,
100:18
**quickly** [1] - 257:17
**quiet** [3] - 31:23,
145:3, 274:10
**quite** [10] - 41:7,
73:13, 85:2, 104:6,
153:6, 154:5,
239:12, 239:13,
281:17, 296:4

## R

**racing** [3] - 73:18,
73:19, 111:4
**raise** [12] - 5:11, 7:10,
60:14, 65:5, 86:5,
100:17, 134:19,
137:1, 148:22,
199:23, 207:21,
233:3
**raised** [9] - 46:18,
57:13, 77:25,
105:20, 184:12,
184:13, 184:14,
209:12, 268:19
**raising** [2] - 46:22,
86:18
**ran** [2] - 119:19,
206:18
**RANDALL** [1] - 66:16

**Randall** [1] - 63:25
**range** [34] - 47:25,
52:4, 52:6, 52:9,
52:11, 54:16, 89:1,
89:7, 89:14, 89:18,
89:20, 89:22, 115:6,
162:25, 163:1,
163:12, 169:6,
191:12, 191:18,
238:20, 238:24,
238:25, 247:5,
247:9, 247:13,
247:16, 247:25,
248:2, 248:9,
252:24, 253:20,
283:23, 284:6, 290:6
**ranging** [1] - 260:7
**ranks** [1] - 7:11
**rape** [4] - 145:20,
168:17, 169:2,
184:21
**raped** [1] - 185:2
**rather** [13] - 22:13,
22:25, 37:7, 70:12,
86:20, 97:4, 111:3,
157:18, 163:13,
185:19, 217:18,
229:18, 269:9
**rattling** [1] - 102:19
**Rave** [1] - 202:21
**Raymond** [1] - 60:12
**reach** [3] - 67:15,
128:23, 171:1
**reaction** [1] - 190:14
**read** [20] - 34:21, 35:1,
70:17, 78:25, 92:11,
105:14, 110:9,
135:4, 147:13,
165:15, 204:18,
205:9, 212:12,
212:24, 214:15,
230:15, 244:25,
253:24, 265:8,
283:15
**reader** [1] - 297:19
**reading** [5] - 34:11,
160:6, 185:20,
292:3, 293:18
**ready** [1] - 78:6,
220:13, 237:15
**real** [8] - 38:15, 83:18,
120:17, 161:13,
208:3, 235:6, 240:5,
283:17
**realize** [5] - 171:19,
186:16, 241:8,
242:2, 278:17
**realized** [2] - 49:10,
241:10
**Really** [1] - 106:12

**really** [42] - 6:24, 8:19,
14:7, 23:17, 32:16,
34:23, 34:25, 37:16,
38:13, 40:6, 40:21,
44:2, 44:7, 57:14,
68:22, 82:3, 87:7,
102:25, 103:18,
106:9, 106:18,
112:4, 112:6, 119:9,
120:5, 120:14,
126:1, 140:17,
142:2, 153:13,
164:25, 183:12,
206:13, 206:21,
240:5, 241:10,
256:1, 277:4,
287:12, 288:12
**realm** [1] - 168:5
**reask** [1] - 186:12
**reason** [18] - 28:3,
56:22, 83:7, 102:1,
104:1, 124:1, 153:4,
153:8, 154:21,
157:23, 180:10,
180:12, 187:9,
209:4, 219:4,
273:15, 280:12,
282:9
**reasonable** [85] -
14:14, 16:22, 18:20,
19:6, 19:12, 19:16,
19:22, 22:2, 44:21,
48:14, 48:18, 50:17,
51:9, 52:1, 53:5,
54:22, 56:15, 56:17,
93:7, 93:10, 93:11,
95:14, 96:11, 101:3,
122:14, 122:16,
122:17, 123:9,
123:21, 123:22,
124:1, 124:4, 124:9,
124:14, 124:18,
124:24, 125:1,
127:3, 153:18,
159:22, 160:1,
160:4, 161:22,
166:6, 166:7, 167:3,
167:18, 170:1,
171:9, 172:21,
173:6, 173:18,
173:19, 188:25,
189:21, 190:6,
192:12, 192:17,
193:7, 193:10,
195:10, 195:16,
195:19, 213:9,
215:15, 215:24,
216:1, 216:8,
216:15, 249:14,
249:15, 250:18,

256:7, 256:12,
256:20, 256:21,
257:6, 264:1,
265:17, 285:22,
286:7, 291:10,
296:11
**reasonably** [3] -
119:17, 156:13,
158:23
**reasoning** [1] - 205:13
**reasons** [6] - 62:19,
83:8, 102:16, 151:9,
188:2, 188:3
**receive** [24] - 88:17,
90:24, 92:25, 96:7,
101:1, 135:6,
166:15, 166:17,
166:21, 166:24,
170:12, 172:14,
175:25, 176:2,
176:15, 178:24,
179:13, 242:21,
263:15, 268:12,
293:1, 293:2
**received** [8] - 33:13,
66:10, 97:14,
164:22, 205:10,
224:18, 226:10,
279:21
**receives** [3] - 179:7,
255:11, 272:17
**receiving** [3] - 173:4,
264:10, 273:17
**recent** [1] - 39:22
**recently** [4] - 37:4,
37:12, 108:14,
202:19
**recess** [3] - 60:6,
136:18, 199:15
**reckless** [2] - 119:21,
156:20
**recognize** [3] -
175:14, 242:18,
256:8
**recognized** [2] -
201:25, 268:7
**recognizes** [3] -
114:17, 267:6,
268:12
**recollection** [1] -
165:15
**recommend** [1] -
278:1
**recommit** [1] - 257:20
**Record** [3] - 139:20,
300:9, 300:13
**recovery** [3] - 150:21,
150:25, 181:10
**recreation** [1] - 104:16
**red** [1] - 131:6

**reduce** [1] - 58:15
**reduces** [5] - 23:11,
174:21, 174:23,
192:24, 295:19
**reducing** [4] - 23:5,
97:17, 174:15,
266:24
**refer** [4] - 30:16,
33:23, 42:6, 192:14
**reference** [2] - 222:10,
296:21
**referred** [1] - 261:16
**refinery** [1] - 182:11
**reflects** [1] - 300:13
**refresh** [1] - 165:15
**regard** [19] - 23:5,
97:17, 111:7,
111:22, 120:18,
122:13, 129:21,
131:14, 133:10,
153:23, 160:22,
174:15, 220:25,
222:10, 227:16,
266:23, 295:15,
295:19, 295:20
**regarding** [12] - 66:10,
107:1, 111:7,
129:25, 132:24,
137:11, 148:18,
181:6, 219:24,
224:16, 233:24,
291:1
**regardless** [1] -
222:14
**regards** [1] - 200:4
**registered** [2] - 181:9,
181:20
**regular** [2] - 25:5,
252:23
**reins** [1] - 142:16
**related** [2] - 107:17,
188:11
**relation** [2] - 82:5,
297:9
**relationship** [1] -
106:22
**relatively** [2] - 11:11,
168:2
**relaxed** [1] - 274:20
**release** [5] - 13:19,
92:16, 164:20,
164:24, 255:5
**released** [5] - 43:23,
47:23, 59:20, 69:10,
187:3
**relevant** [1] - 225:7
**relieved** [1] - 288:2
**religion** [1] - 105:19
**religious** [6] - 28:4,
102:3, 180:11,

219:4, 219:9, 273:15
**remain** [3] - 75:20, 136:9
**remember** [40] - 15:21, 18:25, 37:1, 38:13, 44:7, 57:4, 92:11, 97:13, 100:22, 101:2, 101:15, 110:16, 111:1, 111:14, 115:8, 116:23, 123:14, 127:11, 143:11, 143:17, 145:25, 156:2, 169:15, 185:25, 207:3, 223:6, 236:9, 241:1, 241:2, 245:13, 246:8, 246:13, 246:21, 260:19, 272:25, 274:6, 277:19, 280:6, 284:15, 290:17
**remembered** [1] - 121:13
**remind** [2] - 85:7, 155:4
**reminding** [1] - 65:25
**reminds** [1] - 40:9
**render** [12] - 69:11, 69:18, 87:12, 89:13, 144:16, 150:14, 207:17, 211:13, 230:13, 230:17, 235:12, 281:15
**rendered** [2] - 85:16, 213:22
**renders** [1] - 85:8
**repairs** [1] - 201:24
**repeat** [5] - 42:16, 74:22, 134:24, 229:12, 287:8
**repeated** [1] - 127:7
**rephrase** [2] - 9:12, 201:8
**report** [4] - 135:5, 135:20, 136:3, 237:9
**reported** [1] - 300:11
**reporter** [1] - 155:7
**REPORTER** [4] - 114:22, 124:19, 282:21, 295:16
**Reporter** [2] - 300:3, 300:22
**Reporter's** [2] - 300:9, 300:12
**reports** [1] - 110:6
**represent** [5] - 38:9, 103:11, 219:22, 220:17, 222:12

**represented** [14] - 5:23, 5:25, 38:7, 38:12, 66:4, 66:6, 137:22, 137:24, 146:20, 149:5, 200:12, 200:14, 233:20, 233:22
**represents** [1] - 146:15
**reputation** [4] - 12:16, 90:22, 162:9, 253:13
**requested** [1] - 300:8
**require** [15] - 78:15, 94:9, 94:22, 98:25, 101:22, 127:8, 158:18, 158:19, 251:23, 257:1, 259:22, 259:24, 259:25, 270:11, 270:14
**required** [20] - 9:16, 9:19, 21:22, 21:24, 22:2, 25:1, 87:24, 117:12, 126:23, 144:12, 159:2, 159:4, 168:25, 169:1, 169:2, 169:23, 170:22, 171:6, 228:8, 263:5
**requirement** [2] - 130:2, 220:22
**requires** [10] - 78:8, 90:1, 153:19, 160:2, 160:5, 250:4, 257:9, 257:12, 257:13, 259:9
**requiring** [2] - 101:9, 261:21
**research** [8] - 33:15, 33:17, 81:4, 135:1, 135:4, 135:11, 135:21, 135:25
**reservation** [1] - 115:9
**reservations** [2] - 64:17, 222:7
**resolve** [1] - 112:25
**respect** [1] - 283:10
**respective** [2] - 186:6, 300:14
**respond** [3] - 77:24, 109:5, 109:6
**responded** [1] - 152:4
**responses** [1] - 44:1
**responsibilities** [1] - 227:15
**responsibility** [6] - 50:8, 50:17, 71:5, 84:8, 87:23, 189:24
**responsible** [7] - 57:11, 57:18, 82:6,

84:22, 84:23, 114:19, 159:10
**rest** [12] - 23:23, 45:2, 91:18, 92:18, 92:22, 169:22, 197:2, 255:8, 260:22, 261:3, 261:9, 269:7
**restate** [1] - 196:19
**result** [13] - 13:2, 27:25, 156:14, 158:24, 180:5, 195:20, 195:22, 214:15, 214:16, 224:16, 228:20, 229:19, 273:3
**resulted** [1] - 180:13
**results** [8] - 28:4, 45:1, 102:4, 102:17, 121:24, 219:5, 264:20, 273:17
**retardation** [2] - 54:15, 195:3
**retired** [1] - 105:1
**return** [5] - 8:24, 59:22, 222:15, 242:12, 298:13
**returned** [1] - 179:12
**returns** [1] - 101:8
**reveal** [1] - 113:7
**reveals** [1] - 77:8
**reward** [1] - 62:24
**rewarding** [1] - 185:15
**Richland** [2] - 141:9, 142:11
**Rico** [1] - 139:25
**rid** [1] - 252:10
**ride** [1] - 108:1
**riding** [1] - 68:4
**rights** [4] - 36:15, 36:20, 37:21
**righty** [1] - 60:4
**ring** [2] - 80:2, 153:3
**rings** [1] - 113:24
**rise** [2] - 145:9, 230:14
**RN** [1] - 150:21
**road** [1] - 24:9
**robbed** [1] - 110:19
**robberies** [2] - 10:23, 16:1
**robbery** [3] - 94:24, 169:2, 260:1
**Robert** [6] - 6:1, 66:6, 137:24, 149:5, 200:14, 233:22
**Robinson** [1] - 278:21
**role** [4] - 48:6, 51:14, 54:25, 106:21
**room** [13] - 8:19, 28:10, 63:14, 70:2, 85:10, 145:17,

146:5, 147:5, 163:2, 184:8, 199:9, 231:25, 252:9
**root** [1] - 167:12
**rooted** [1] - 208:12
**roughly** [1] - 65:9
**row** [1] - 181:3
**rub** [1] - 208:8
**rule** [2] - 85:15, 295:24
**rules** [2] - 38:25, 39:2
**run** [5] - 27:4, 100:20, 119:16, 190:8, 286:3
**rundown** [1] - 33:3
**running** [1] - 128:16
**runs** [2] - 119:15, 168:7
**rural** [1] - 110:20
**rushed** [1] - 130:10
**rustic** [1] - 33:2
**Ryan** [1] - 38:8

## S

**Sabre** [1] - 141:2
**sack** [1] - 159:20
**sad** [1] - 102:14
**saddle** [1] - 108:4
**safe** [1] - 65:24
**Saints** [1] - 209:10
**Salt** [2] - 68:7, 81:16
**salt** [1] - 81:18
**Saluki** [2] - 73:5, 73:7
**Samantha** [1] - 199:21
**SAMANTHA** [1] - 200:23
**San** [1] - 140:6
**sat** [7] - 41:3, 74:14, 77:9, 175:21, 181:3, 184:23, 251:21
**satisfaction** [2] - 19:22, 128:8
**satisfied** [5] - 24:21, 51:8, 53:15, 191:7, 195:18
**satisfy** [1] - 48:16
**Saturday** [1] - 238:2
**Saturdays** [1] - 237:22
**saved** [1] - 130:10
**saw** [7] - 78:24, 125:15, 161:19, 177:12, 207:3, 215:3, 223:17
**scale** [1] - 123:8
**scales** [1] - 123:7
**schedule** [9] - 5:19, 60:19, 64:7, 137:11, 148:19, 200:4, 233:16, 238:4, 238:6
**scheduled** [2] - 64:13,

235:23
**schedules** [1] - 64:3
**scheduling** [2] - 60:18, 137:10
**scheme** [2] - 126:5, 263:7
**school** [9] - 34:25, 114:8, 138:20, 203:7, 206:10, 206:12, 206:13, 206:14, 232:15
**School** [1] - 218:11
**science** [4] - 34:13, 34:17, 44:10, 93:20
**scientific** [1] - 57:17
**scientifically** [1] - 57:15
**Scott** [1] - 136:24
**SCOTT** [1] - 138:4
**screen** [1] - 7:7
**screwed** [2] - 34:5, 50:7
**screwing** [1] - 21:20
**search** [1] - 135:9
**season** [3] - 15:16, 15:17, 201:6
**seat** [12] - 5:5, 58:4, 62:11, 63:21, 102:12, 133:19, 137:17, 146:10, 148:9, 198:10, 229:24, 295:6
**seated** [1] - 138:14
**second** [29] - 55:14, 55:18, 56:12, 88:11, 90:4, 90:9, 92:1, 96:13, 100:12, 158:5, 161:7, 161:11, 161:22, 164:1, 172:25, 173:12, 202:20, 207:16, 210:1, 216:3, 219:1, 225:1, 252:19, 253:17, 254:8, 264:4, 265:8, 280:4, 296:7
**seconds** [1] - 165:14
**secret** [3] - 86:2, 147:6
**section** [1] - 220:16
**see** [106] - 9:7, 16:10, 17:1, 18:10, 35:25, 36:2, 37:21, 50:23, 51:15, 52:16, 52:18, 52:20, 54:24, 56:23, 61:17, 61:24, 65:8, 69:17, 81:5, 88:1, 95:1, 96:13, 96:21, 98:15, 99:21, 100:4, 100:12, 102:8,

103:15, 118:4, 118:12, 118:20, 118:25, 119:19, 119:25, 122:11, 122:21, 124:4, 124:5, 124:15, 125:3, 125:20, 129:12, 129:14, 131:1, 131:11, 132:1, 136:14, 144:4, 154:7, 157:12, 157:20, 160:14, 162:17, 163:7, 165:16, 165:21, 166:1, 166:18, 167:16, 167:22, 168:11, 170:9, 170:17, 171:11, 174:17, 175:6, 175:19, 176:18, 177:25, 178:14, 178:18, 179:19, 187:14, 189:9, 192:8, 192:12, 193:8, 193:9, 195:15, 197:15, 208:8, 209:6, 209:8, 220:25, 221:15, 221:22, 225:18, 227:2, 245:24, 248:6, 248:8, 248:24, 249:8, 251:9, 251:22, 257:3, 259:3, 259:22, 260:3, 261:23, 267:20, 270:8, 271:23, 281:2
**seeing** [2] - 185:19, 185:20
**seeking** [2] - 83:10, 153:9
**seeks** [1] - 123:10
**seem** [1] - 186:5
**sees** [2] - 23:10, 103:16
**segue** [1] - 67:5
**select** [1] - 190:1
**selected** [12] - 9:18, 38:9, 45:16, 67:12, 144:15, 150:13, 207:16, 207:25, 210:20, 228:12, 235:10
**selection** [3] - 7:17, 185:7, 211:8
**self** [1] - 114:20
**self-defense** [1] - 114:20
**sell** [1] - 104:18

**selling** [3] - 239:6, 281:25, 282:11
**semester** [1] - 203:15
**send** [1] - 135:17
**sending** [3] - 147:5, 147:6, 212:14
**sends** [3] - 100:7, 100:10, 101:12
**sense** [16] - 12:25, 13:7, 26:2, 26:15, 90:17, 98:7, 98:8, 116:4, 122:23, 124:2, 132:9, 156:14, 262:18, 262:23, 267:14, 287:6
**sent** [4] - 6:21, 88:5, 162:20, 253:25
**sentence** [97] - 13:6, 13:10, 13:18, 18:4, 20:8, 22:12, 22:13, 22:24, 22:25, 26:1, 45:1, 47:17, 54:8, 56:22, 83:14, 92:2, 92:4, 92:6, 92:8, 92:15, 92:23, 96:7, 96:24, 97:4, 98:18, 100:14, 101:9, 101:20, 101:22, 111:22, 120:20, 120:25, 129:14, 132:7, 132:15, 132:16, 164:2, 164:5, 164:8, 164:9, 164:18, 164:23, 166:25, 170:12, 172:15, 172:16, 173:10, 175:4, 176:16, 179:13, 180:6, 187:13, 194:18, 195:20, 195:22, 213:5, 214:9, 214:21, 214:22, 215:1, 215:5, 215:11, 215:13, 215:19, 216:6, 217:18, 217:19, 219:1, 227:1, 243:25, 252:24, 253:9, 253:20, 254:9, 254:16, 254:21, 255:4, 255:9, 255:11, 260:25, 263:17, 263:21, 264:6, 264:20, 266:8, 266:17, 267:7, 270:2, 270:16, 271:4, 272:21, 273:12,

279:19, 279:21, 280:16, 283:17
**sentenced** [2] - 43:21, 45:2
**sentences** [3] - 41:22, 175:13, 284:4
**sentencing** [1] - 225:8
**separate** [8] - 37:18, 175:12, 195:6, 196:5, 241:25, 242:1, 260:24, 263:7
**separating** [1] - 263:1
**sequestered** [2] - 275:25, 276:8
**series** [2] - 296:19, 296:25
**serious** [6] - 16:6, 42:22, 81:11, 81:12, 81:13, 111:13
**seriousness** [1] - 116:1
**serve** [14] - 45:10, 45:20, 81:21, 83:7, 99:13, 103:24, 110:11, 176:23, 187:24, 220:15, 220:21, 225:14, 249:7, 269:15
**served** [5] - 33:16, 34:8, 53:24, 130:8, 288:25
**service** [21] - 59:21, 59:23, 62:18, 63:12, 72:2, 76:19, 81:24, 84:3, 103:25, 129:9, 135:14, 135:16, 135:24, 147:24, 150:10, 199:4, 230:25, 232:4, 232:7, 241:6, 298:16
**serving** [1] - 185:16
**set** [14] - 38:24, 39:2, 54:12, 68:14, 99:19, 99:20, 170:19, 194:5, 222:21, 223:10, 242:19, 250:4, 252:24, 287:13
**sets** [1] - 252:23
**setting** [7] - 80:24, 118:16, 189:15, 253:20, 277:2, 277:6, 277:7
**settings** [1] - 30:23
**seven** [5] - 32:19, 85:11, 85:13, 154:6, 159:6
**several** [15] - 30:24, 31:20, 107:24, 117:13, 134:24,

137:4, 138:24, 150:22, 151:19, 151:21, 182:6, 183:1, 233:11, 275:6, 289:15
**sexual** [3] - 16:1, 94:24, 145:21
**sexually** [2] - 112:23, 113:6
**shall** [2] - 23:3, 174:14
**Shannon** [4] - 19:21, 29:12, 142:16, 201:11
**Shannon's** [1] - 138:13
**share** [3] - 183:8, 197:21, 207:5
**sheet** [2] - 200:18, 233:25
**sheriff's** [1] - 17:18
**sheriffs** [1] - 183:1
**shift** [1] - 203:5
**shifts** [1] - 251:2
**shooting** [9] - 11:10, 11:18, 21:8, 49:18, 50:3, 50:4, 190:8, 190:20, 250:11
**shop** [1] - 60:25
**short** [2] - 296:19, 296:25
**shortening** [1] - 165:18
**shorthand** [1] - 192:14
**shot** [6] - 10:20, 142:6, 143:9, 159:18, 160:12, 250:9
**show** [10] - 50:21, 61:4, 91:15, 99:15, 127:6, 160:10, 160:11, 259:10, 266:20, 291:23
**showing** [1] - 194:3
**sic** [5] - 59:3, 64:2, 140:25, 217:17, 241:9
**side** [19] - 101:2, 109:19, 116:14, 123:7, 140:19, 143:5, 143:6, 143:7, 143:17, 144:1, 163:4, 178:25, 180:4, 189:5, 211:12, 256:18, 270:20, 272:15, 273:8
**sides** [11] - 6:2, 51:18, 66:8, 85:7, 91:18, 137:17, 140:18,

145:5, 200:15, 208:14, 233:23
**Sierra** [2] - 67:22, 107:10
**signal** [1] - 154:20
**similar** [6] - 78:14, 100:23, 189:9, 196:9, 197:19, 267:4
**similarly** [1] - 77:20
**simple** [1] - 89:25, 94:25, 114:13, 169:3, 260:1
**simply** [1] - 67:10
**single** [7] - 34:23, 117:23, 117:25, 118:2, 118:5, 155:8, 288:20
**sister** [7] - 29:18, 39:12, 39:16, 236:25, 237:3, 238:7, 275:6
**sit** [21] - 19:4, 24:22, 25:5, 41:10, 60:25, 134:12, 171:6, 209:3, 209:21, 209:23, 210:2, 210:7, 210:22, 211:1, 230:11, 230:17, 231:9, 243:9, 252:9, 284:6, 288:11
**sits** [3] - 125:8, 211:23, 244:20
**sitting** [9] - 86:18, 106:3, 106:4, 118:15, 128:9, 132:21, 243:7, 271:14, 274:15
**situation** [27] - 50:5, 81:9, 81:13, 82:19, 82:21, 82:22, 84:25, 87:20, 89:16, 112:22, 117:20, 159:18, 178:10, 190:17, 190:22, 191:7, 220:13, 222:3, 238:5, 240:13, 241:19, 248:3, 251:3, 251:12, 251:22, 251:25, 262:6
**situations** [6] - 76:3, 76:14, 76:15, 86:15, 169:21, 247:22
**SIU** [1] - 72:24
**six** [9] - 42:1, 46:17, 47:3, 47:4, 154:6, 156:6, 157:4, 238:21, 246:3
**six-month-old** [1] -

238:21
**Skid** [1] - 154:2
**Skidmore** [1] - 182:12
**skip** [2] - 97:11,
266:19
**sky** [2] - 48:15, 125:3
**slant** [1] - 22:16
**slapping** [1] - 169:3
**sleep** [1] - 109:2
**slide** [3] - 194:23,
197:17, 197:19
**slides** [4] - 9:7, 97:11,
174:12, 266:19
**slim** [1] - 259:14
**slipping** [1] - 210:25
**slow** [1] - 100:12
**smack** [1] - 167:10
**small** [6] - 79:11,
151:2, 151:3, 168:3,
184:6, 184:9
**smartest** [1] - 232:11
**smiley** [2] - 146:9,
147:10
**Smiley** [2] - 136:24,
146:15
**SMILEY** [1] - 138:4
**smiley's** [1] - 146:18
**smothered** [2] -
159:20, 251:8
**SO** [1] - 183:9
**so..** [18] - 64:21,
68:11, 69:7, 71:9,
74:4, 81:3, 82:1,
86:8, 87:10, 100:21,
108:6, 110:3,
113:10, 126:4,
149:13, 241:3,
274:12, 278:3
**social** [1] - 135:23
**socialize** [1] - 183:2
**Society** [1] - 107:11
**society** [48] - 14:16,
16:17, 16:18, 17:2,
17:6, 17:9, 17:12,
17:22, 17:25, 18:13,
18:19, 52:19, 53:8,
53:16, 55:6, 56:19,
83:17, 93:14, 95:4,
95:5, 100:10,
126:22, 163:24,
165:18, 166:12,
166:21, 166:23,
169:10, 169:23,
170:7, 192:14,
195:12, 213:11,
214:25, 216:19,
224:3, 254:6,
256:15, 260:12,
260:13, 261:4,
261:10, 261:15,

266:15, 269:6,
291:13
**soft** [1] - 40:19
**soft-hearted** [1] -
40:19
**software** [1] - 104:23
**sold** [1] - 239:18
**solely** [2] - 58:18,
162:16
**solid** [1] - 50:13
**someone** [52] - 25:13,
28:10, 28:11, 31:9,
38:9, 47:2, 57:18,
76:25, 82:6, 86:14,
87:24, 88:16, 88:18,
91:8, 95:20, 99:8,
101:12, 101:22,
127:19, 153:17,
156:24, 163:13,
171:23, 175:25,
176:9, 176:11,
176:13, 179:17,
209:7, 210:3,
236:24, 241:21,
243:17, 243:24,
244:1, 247:12,
249:5, 249:16,
256:24, 261:3,
261:8, 262:4, 267:3,
267:6, 268:22,
268:23, 268:25,
273:17, 291:17,
292:10, 292:24
**someplace** [1] - 114:2
**something's** [2] -
15:5, 259:7
**Sometimes** [1] - 36:19
**sometimes** [14] - 43:4,
43:15, 43:16, 48:9,
131:21, 132:21,
133:9, 140:16,
154:16, 154:19,
194:15, 206:10,
227:18
**somewhat** [2] - 35:23,
119:8
**somewhere** [6] -
49:16, 91:13,
229:15, 267:2,
287:8, 291:21
**son** [10] - 68:6, 80:23,
81:8, 112:22,
113:11, 141:8,
141:10, 275:10,
275:11, 275:16
**son-in-law** [1] -
275:16
**sorry** [19] - 43:11,
47:22, 114:22,
114:24, 124:19,

124:22, 146:17,
231:23, 274:11,
278:13, 278:16,
287:6, 287:10,
292:16, 292:18,
293:7, 294:4, 295:1,
295:16
**sort** [7] - 33:18, 56:25,
67:5, 140:19,
140:20, 196:11,
276:25
**soul** [1] - 129:6
**sound** [2] - 159:21,
249:14
**sounds** [3] - 38:21,
245:16, 249:15
**source** [4] - 79:14,
135:7, 189:8, 196:24
**southeast** [1] - 79:22
**Southlake** [2] - 39:13,
141:10
**SPCA** [1] - 33:9
**special** [22] - 13:3,
14:9, 26:17, 52:13,
52:24, 53:4, 55:13,
56:12, 91:20, 96:13,
116:22, 121:15,
163:21, 163:22,
191:21, 196:5,
196:12, 212:24,
213:7, 253:23,
254:3, 255:22
**Special** [62] - 13:3,
13:4, 14:13, 16:20,
16:24, 18:3, 18:9,
18:24, 20:8, 22:7,
23:8, 24:8, 25:19,
26:12, 26:13, 27:11,
27:24, 52:16, 53:23,
54:11, 54:23, 55:25,
58:16, 93:3, 96:18,
165:12, 173:13,
173:14, 173:15,
178:21, 178:24,
192:7, 194:6,
194:10, 195:14,
195:19, 196:3,
197:7, 213:8,
213:25, 214:8,
214:10, 216:6,
216:14, 217:1,
217:7, 217:9,
217:12, 218:15,
262:19, 263:15,
265:6, 265:7,
265:22, 266:13,
272:14, 286:12,
286:13, 286:20,
288:2, 288:5, 293:14
**specific** [5] - 64:11,

78:3, 126:17, 146:2,
167:5
**specifically** [3] -
125:14, 235:3
**specifics** [1] - 110:17
**Spend** [1] - 140:8
**spend** [5] - 23:23,
45:2, 73:10, 181:5,
269:7
**spent** [4] - 87:14,
189:14, 197:2, 296:4
**splash** [1] - 39:5
**split** [3] - 18:11, 19:8,
26:17
**sports** [1] - 34:25
**spot** [1] - 193:2
**spouse** [1] - 188:14
**Springs** [1] - 68:6
**springs** [1] - 154:14
**St** [5] - 77:9, 109:24,
110:4, 111:6, 279:1
**stabbed** [2] - 159:19,
160:14
**stabbing** [6] - 21:8,
49:18, 50:2, 190:8,
190:21, 251:7
**staff** [3] - 140:3,
150:22, 202:21
**stake** [2] - 205:1,
205:4
**stand** [10] - 12:11,
55:16, 63:5, 74:17,
150:17, 161:19,
209:3, 235:17,
237:14, 248:20
**standpoint** [2] - 82:1,
82:18
**stands** [1] - 172:2
**star** [1] - 40:17
**start** [11] - 7:5, 65:19,
68:20, 69:1, 69:2,
69:3, 69:21, 138:16,
203:15, 220:9,
278:14
**started** [5] - 11:10,
11:18, 139:24,
150:19, 297:1
**starting** [3] - 27:4,
65:8, 236:4
**starts** [3] - 93:6, 93:7,
256:6
**STATE** [1] - 300:1
**state** [10] - 19:25,
80:13, 83:23,
119:11, 133:22,
140:6, 156:19,
158:18, 187:1, 208:2
**State** [113] - 5:25, 6:6,
12:8, 18:19, 19:6,
19:15, 22:1, 22:3,

23:14, 24:14, 25:4,
25:21, 47:8, 47:23,
48:13, 49:15, 50:25,
53:11, 58:9, 59:7,
59:10, 62:22, 66:6,
66:12, 83:10, 83:19,
93:8, 94:4, 94:11,
94:12, 95:14, 96:10,
123:10, 134:1,
134:6, 134:16,
137:23, 137:25,
138:19, 143:16,
144:5, 146:13,
147:1, 149:5, 153:8,
156:3, 159:16,
159:24, 160:12,
161:1, 166:9,
166:23, 167:17,
169:23, 169:25,
170:9, 170:13,
171:9, 171:20,
172:17, 172:20,
173:8, 173:20,
173:22, 177:9,
178:15, 178:25,
184:25, 189:9,
189:13, 189:20,
190:14, 192:9,
192:21, 195:18,
198:14, 198:19,
198:20, 200:14,
200:20, 206:8,
215:14, 215:25,
216:7, 216:10,
216:17, 225:10,
225:21, 230:5,
230:20, 233:22,
246:12, 249:18,
250:12, 251:1,
251:5, 251:17,
256:11, 256:16,
257:5, 261:12,
263:22, 265:19,
285:22, 285:24,
287:3, 287:12,
287:25, 289:13,
295:10, 296:11,
296:12, 300:5
**State's** [12] - 22:22,
24:11, 24:12, 58:15,
59:5, 177:11, 189:8,
189:24, 230:8,
231:12, 270:21,
295:20
**statement** [4] - 70:5,
152:18, 192:12,
194:20
**statements** [5] - 24:5,
194:16, 222:12,
231:6, 231:12
**states** [2] - 191:14,

196:1
**States** [1] - 209:14
**statistics** [1] - 93:21
**status** [3] - 46:23, 47:1, 47:3
**statute** [3] - 42:3, 78:15, 121:22
**stay** [6] - 11:2, 61:5, 68:9, 107:20, 107:22, 147:14
**staying** [2] - 92:17, 92:22
**step** [11] - 19:14, 95:19, 100:10, 103:23, 166:14, 172:25, 173:3, 216:21, 216:24, 264:9, 264:13
**stepbrother** [1] - 29:6
**stepfather** [1] - 145:22
**stepped** [1] - 108:22
**stepson** [2] - 239:6, 281:18
**still** [24] - 15:18, 43:2, 49:15, 65:18, 84:23, 102:23, 109:12, 119:22, 121:8, 141:10, 144:10, 150:11, 160:15, 187:25, 192:16, 240:9, 241:13, 242:16, 247:19, 286:5, 286:8, 292:3, 297:2
**stool** [1] - 140:20
**stop** [5] - 69:14, 154:10, 154:22, 164:12, 278:11
**stopped** [1] - 111:14
**store** [2] - 201:23, 202:9
**stores** [1] - 10:24
**story** [5] - 43:22, 143:5, 143:6, 143:7, 144:1
**straight** [1] - 192:8
**strange** [1] - 89:10
**strangulation** [1] - 21:9
**strategy** [1] - 25:7
**street** [2] - 119:15, 157:6
**Street** [5] - 28:24, 32:25, 61:10, 151:13, 300:23
**strictly** [2] - 221:15, 225:2
**strike** [1] - 74:18
**strikes** [1] - 21:22
**strong** [15] - 33:4,

87:21, 140:17, 208:18, 229:3, 229:19, 241:8, 259:5, 259:17, 276:16, 276:18, 277:7, 283:22, 284:8, 284:10
**strongly** [2] - 144:25, 145:1
**struggled** [1] - 248:14
**stuff** [20] - 7:5, 13:14, 14:19, 18:6, 18:10, 23:18, 23:20, 26:18, 27:4, 44:10, 95:1, 104:6, 132:23, 138:20, 184:5, 201:8, 217:14, 244:21, 249:2, 267:11
**styled** [1] - 300:10
**subject** [2] - 179:25, 214:9
**subjecting** [1] - 88:18
**subjective** [2] - 98:4, 98:23
**submit** [1] - 205:13
**submitted** [1] - 43:18
**substance** [1] - 29:8
**substantial** [2] - 148:15, 233:12
**substantially** [4] - 137:5, 220:20, 230:25, 231:8
**substantive** [3] - 82:4, 88:4, 150:19
**successful** [1] - 132:12
**sudden** [1] - 171:10
**sue** [1] - 122:25
**SUE** [1] - 6:12
**Sue** [1] - 5:8
**sufficiency** [1] - 131:23
**sufficient** [42] - 22:11, 22:23, 92:2, 98:2, 98:3, 98:4, 98:13, 98:20, 101:14, 123:19, 126:21, 127:13, 131:20, 164:2, 174:24, 175:3, 175:23, 176:5, 179:2, 179:5, 179:10, 179:19, 180:2, 180:7, 217:16, 224:19, 227:1, 254:8, 267:17, 267:25, 268:1, 269:16, 270:15, 270:20, 271:3, 271:8,

271:10, 271:13, 271:19, 271:23
**sufficiently** [6] - 97:3, 177:20, 269:25, 270:23, 271:17, 288:23
**suit** [1] - 202:1
**summations** [1] - 91:19
**summer** [2] - 203:9, 203:16
**summers** [1] - 138:25
**summons** [1] - 298:21
**sun** [1] - 168:6
**Sundays** [1] - 237:23
**superheats** [1] - 168:7
**supervise** [1] - 140:1
**supervising** [2] - 150:24, 181:20
**support** [2] - 37:5, 38:2
**suppose** [2] - 70:4, 73:21
**supposed** [5] - 21:3, 133:5, 150:2, 221:20, 221:24
**supposedly** [1] - 97:7
**Supreme** [1] - 263:5
**surgeries** [1] - 181:17
**surgery** [3] - 150:23, 151:20, 181:16
**surgical** [1] - 182:5
**surprise** [2] - 63:6, 103:15
**surprising** [1] - 79:15
**surrounding** [2] - 129:24, 135:14
**suspect** [2] - 188:15, 282:14
**suspected** [1] - 282:16
**suspicion** [1] - 56:4
**sway** [1] - 145:11
**swear** [7] - 5:11, 60:15, 65:4, 136:24, 148:21, 199:24, 233:3
**swears** [1] - 28:18
**switch** [1] - 145:18
**Sworn** [1] - 134:21
**sworn** [14] - 5:13, 6:13, 60:16, 65:6, 66:17, 134:18, 137:2, 138:5, 148:24, 149:18, 200:1, 200:24, 233:5, 234:7
**symptoms** [1] - 193:25
**system** [10] - 44:24,

45:6, 45:21, 47:19, 80:7, 132:9, 144:10, 185:18, 186:21, 283:12

---

## T

**table** [3] - 86:18, 153:19, 243:9
**tables** [1] - 22:20
**talent** [1] - 130:21
**tallied** [2] - 86:3, 86:14
**Tampa** [1] - 15:13
**Tarleton** [1] - 44:4
**Tarrant** [18] - 21:2, 21:10, 29:8, 50:13, 79:21, 79:22, 81:14, 142:10, 142:11, 142:17, 159:7, 201:12, 203:11, 239:10, 249:22, 250:15, 283:1, 300:4
**TARRANT** [1] - 300:2
**task** [1] - 50:24
**Taylor** [1] - 300:3
**TAYLOR** [1] - 300:21
**TCC** [1] - 206:12
**TCU** [2] - 109:17, 110:2
**tearing** [1] - 86:20
**technical** [3] - 117:5, 190:10
**technicalities** [1] - 21:21
**teeter** [1] - 140:21
**television** [1] - 152:20
**Ten** [1] - 238:15
**ten** [17] - 18:4, 18:12, 31:24, 96:9, 101:14, 101:18, 109:7, 131:8, 131:9, 139:19, 215:21, 218:19, 263:24, 264:4, 272:21, 279:24, 280:4
**tend** [1] - 82:21
**tends** [1] - 140:21
**tenor** [3] - 58:21, 231:11, 297:14
**term** [33] - 48:21, 94:20, 95:3, 95:4, 118:10, 118:11, 118:12, 123:2, 125:12, 125:13, 159:13, 167:9, 167:11, 167:14, 167:16, 167:21, 168:14, 168:19, 168:25, 169:5,

169:6, 169:9, 169:10, 193:1, 193:19, 198:3, 257:17, 257:18, 259:4, 260:12
**terminology** [1] - 193:6
**terms** [11] - 125:16, 126:8, 167:2, 167:7, 167:15, 167:23, 169:15, 169:16, 177:5, 257:16, 286:17
**terrible** [1] - 186:11
**testified** [7] - 6:14, 66:18, 110:23, 138:6, 149:19, 200:25, 234:8
**testify** [3] - 74:13, 80:16, 111:2
**testimonies** [2] - 52:18, 186:1
**testimony** [8] - 21:7, 52:25, 69:14, 132:4, 143:2, 185:24, 196:14, 279:11
**TEXAS** [2] - 300:1, 300:21
**Texas** [40] - 5:25, 13:13, 45:24, 66:6, 78:8, 80:9, 83:10, 83:19, 90:3, 112:14, 115:5, 117:14, 119:10, 134:16, 138:17, 139:8, 140:6, 141:25, 144:6, 152:25, 153:9, 156:3, 159:8, 164:21, 165:2, 170:13, 175:25, 197:17, 200:14, 204:13, 206:9, 246:12, 249:23, 250:16, 251:1, 256:16, 268:8, 268:13, 300:5, 300:23
**textbooks** [1] - 185:21
**texting** [1] - 157:6
**THE** [179] - 5:5, 5:10, 5:14, 5:18, 5:21, 30:4, 30:14, 58:3, 58:7, 58:9, 58:12, 58:20, 59:9, 59:12, 59:15, 59:18, 60:9, 60:11, 60:14, 60:17, 60:21, 61:2, 61:8, 61:11, 61:13, 61:15, 61:18, 61:22, 62:5, 62:8, 62:11, 62:22,

62:24, 63:4, 63:17,
63:19, 63:21, 63:24,
64:2, 64:6, 64:22,
64:24, 65:3, 65:7,
65:12, 65:16, 65:23,
66:2, 103:7, 114:22,
124:19, 133:18,
133:22, 133:24,
134:1, 134:4, 134:6,
134:11, 134:13,
134:15, 134:22,
136:11, 136:13,
136:17, 136:21,
136:23, 137:3,
137:9, 137:14,
146:9, 147:1, 147:4,
147:10, 147:12,
147:23, 148:2,
148:3, 148:4, 148:6,
148:8, 148:13,
148:18, 148:21,
148:25, 149:3,
149:10, 149:12,
149:15, 155:4,
155:7, 155:10,
155:12, 155:14,
155:16, 155:18,
155:20, 180:21,
198:9, 198:14,
198:17, 198:19,
198:21, 198:23,
199:1, 199:3, 199:7,
199:13, 199:18,
199:20, 199:23,
200:2, 200:6,
200:10, 200:20,
219:17, 228:1,
228:6, 228:18,
228:25, 229:9,
229:14, 229:24,
230:3, 230:5,
231:11, 231:15,
231:17, 231:22,
231:24, 232:2,
232:6, 232:10,
232:17, 232:19,
232:22, 232:24,
233:2, 233:6,
233:10, 233:15,
233:18, 234:4,
273:23, 278:11,
278:14, 278:18,
282:21, 290:1,
290:24, 291:4,
291:6, 292:5, 292:8,
292:14, 292:17,
292:19, 292:22,
293:8, 293:11,
293:20, 294:3,
294:6, 294:10,
294:13, 294:21,

295:3, 295:5,
295:10, 295:13,
295:16, 295:21,
298:5, 298:10,
298:15, 298:20,
298:23, 298:25,
299:4, 300:1
theft [1] - 39:22
themselves [4] -
40:21, 75:16, 157:7,
243:19
theoretically [1] -
120:25
theory [2] - 47:8,
122:4
theory's [1] - 116:24
therefore [4] - 85:12,
85:20, 176:15
they've [12] - 24:21,
69:19, 91:14,
116:20, 122:13,
122:14, 125:8,
126:14, 151:19,
151:21, 165:5, 226:3
thinking [18] - 37:3,
55:7, 69:3, 84:25,
112:1, 115:11,
116:5, 125:7, 197:1,
240:5, 277:24,
289:3, 289:7, 292:1,
292:2, 294:12,
294:16, 297:19
thinks [3] - 68:16,
244:21, 272:18
third [4] - 14:3,
114:20, 189:18,
204:21
thoughts [2] - 9:17,
181:6
threat [27] - 14:16,
53:7, 55:6, 56:19,
93:14, 100:9,
126:22, 127:25,
163:24, 165:18,
166:11, 166:20,
166:22, 169:22,
170:7, 192:13,
195:12, 213:11,
214:25, 254:6,
256:15, 261:4,
261:9, 261:15,
266:15, 269:6,
291:13
three [15] - 14:7,
39:24, 71:19,
106:19, 108:15,
138:14, 140:18,
140:19, 143:8,
147:20, 189:17,
202:2, 238:21,

274:12, 283:2
three-legged [1] -
140:19
three-plus [1] - 71:19
three-year-old [1] -
238:21
threshold [1] - 46:17
throughout [8] - 18:7,
59:5, 59:6, 139:21,
139:22, 151:22,
230:8
throw [1] - 268:4
thrust [1] - 269:22
ticket [4] - 258:14,
258:17, 258:18
tied [1] - 260:9
timesaver [1] - 86:20
today [30] - 6:3, 6:19,
9:8, 10:1, 66:9,
66:23, 67:6, 67:8,
78:6, 150:11, 160:7,
175:18, 200:16,
201:5, 207:10,
207:22, 209:22,
220:7, 226:11,
228:3, 234:21,
235:2, 235:7, 240:8,
242:16, 244:9,
246:6, 247:19,
248:23, 270:6
today's [3] - 65:4,
148:22, 233:3
together [10] - 22:15,
31:25, 37:17, 84:1,
85:10, 128:16,
175:2, 191:13,
261:12
token [1] - 173:8,
243:24, 244:2
tomorrow [2] -
106:14, 220:13
tonight [1] - 258:14
took [14] - 8:3, 21:2,
21:4, 21:8, 21:9,
37:25, 38:3, 67:9,
68:13, 142:9,
152:10, 203:18,
204:8
top [4] - 89:8, 101:3,
139:20, 173:17
topic [1] - 181:7
topics [1] - 67:5
totally [1] - 208:23
touch [1] - 67:4
touched [2] - 20:22,
285:18
tougher [3] - 40:12,
40:23, 41:21
toward [4] - 8:11,
175:7, 230:16,

294:23
towards [12] - 39:9,
40:19, 69:2, 74:6,
90:10, 96:23, 100:7,
101:12, 142:18,
175:9, 266:12
trade [1] - 61:4
traffic [1] - 30:23
trailer [2] - 104:13,
104:14
trailers [2] - 104:15,
104:17
trailing [1] - 114:24
train [1] - 33:21
training [3] - 33:13,
33:19, 106:20
transaction [27] -
10:4, 10:11, 11:3,
11:6, 11:12, 11:21,
13:24, 18:23, 28:15,
88:15, 88:22,
117:23, 117:25,
118:6, 156:9,
157:17, 157:20,
159:13, 191:6,
195:1, 195:11,
214:4, 245:9,
245:22, 246:25,
250:2, 285:16
transcription [1] -
300:6
trauma [1] - 183:25
travel [1] - 204:12
traveled [1] - 204:13
traveler [1] - 105:1
treat [1] - 31:10
treated [3] - 31:11,
39:5, 76:2
trial [158] - 5:22,
12:17, 18:21, 24:4,
25:6, 43:18, 45:11,
50:15, 51:24, 53:1,
53:25, 55:11, 55:17,
59:22, 64:19, 66:3,
68:18, 68:19, 71:12,
72:14, 74:14, 77:10,
77:11, 83:12, 87:19,
89:17, 90:4, 90:6,
90:9, 90:14, 90:20,
90:25, 91:5, 91:16,
93:9, 96:8, 129:23,
130:7, 136:2,
137:22, 141:16,
141:21, 143:1,
143:3, 145:6,
147:16, 149:1,
153:24, 153:25,
159:9, 160:10,
160:16, 160:25,
161:2, 161:7, 161:8,

161:9, 161:11,
161:13, 161:15,
161:18, 161:20,
161:21, 161:22,
162:2, 162:5, 162:6,
162:8, 162:10,
162:14, 162:15,
162:16, 162:23,
162:24, 163:3,
163:20, 164:16,
165:2, 165:20,
171:1, 171:12,
171:13, 171:19,
172:7, 173:3,
173:25, 177:8,
177:11, 177:17,
178:4, 178:12,
178:17, 179:23,
179:25, 184:21,
185:5, 188:19,
196:11, 200:11,
203:18, 213:22,
216:18, 223:25,
233:19, 235:1,
235:17, 236:4,
236:12, 236:14,
236:18, 237:8,
238:1, 240:23,
243:2, 243:5,
249:23, 250:25,
251:4, 252:17,
252:18, 252:19,
252:23, 252:25,
253:4, 253:12,
253:15, 253:18,
253:20, 255:3,
255:17, 256:8,
260:21, 261:25,
262:21, 264:5,
265:21, 266:1,
266:16, 267:23,
268:15, 269:13,
269:25, 270:8,
271:16, 280:6,
281:19, 285:23,
286:3, 287:19,
289:14, 292:23,
292:25, 293:4,
296:7, 296:8,
296:23, 297:9
trial's [2] - 217:8,
263:19
trials [11] - 41:10,
79:9, 90:2, 90:3,
141:15, 152:5,
152:9, 170:18,
183:16, 183:18
tricked [2] - 56:9,
73:19
tricking [1] - 213:18

tried [4] - 10:19, 280:2, 280:4
trier [1] - 123:18
trip [10] - 45:12, 64:13, 64:15, 65:8, 67:21, 67:24, 68:3, 68:8, 69:22, 70:19
trips [1] - 202:2
trouble [7] - 80:24, 81:10, 81:11, 81:12, 81:13, 224:3, 225:12
truck [1] - 140:8
true [12] - 15:12, 19:19, 25:6, 32:1, 43:6, 125:24, 144:11, 160:22, 186:25, 192:11, 230:10, 300:6
truly [1] - 300:13
trunk [1] - 108:4
trust [4] - 44:24, 45:6, 186:20, 186:23
truth [10] - 9:16, 67:10, 103:3, 123:17, 144:14, 150:12, 178:12, 205:3, 207:12, 235:8
truthfully [1] - 207:24
try [14] - 31:10, 56:21, 67:1, 79:16, 106:17, 110:21, 114:25, 144:22, 155:11, 193:12, 204:23, 205:6, 205:11, 284:10
trying [17] - 37:5, 54:12, 71:22, 74:2, 76:6, 109:1, 112:10, 193:23, 196:9, 239:22, 260:24, 261:5, 272:8, 283:8, 284:17, 294:13, 297:20
turn [1] - 147:17
turns [1] - 146:14
Tweet [1] - 135:15
twice [1] - 41:2
Twitter [1] - 135:23
two [63] - 10:9, 11:2, 13:3, 13:9, 13:22, 13:25, 14:10, 16:24, 17:16, 18:22, 22:20, 26:24, 28:14, 34:24, 45:11, 45:17, 49:24, 54:13, 55:4, 55:23, 64:11, 65:9, 71:12, 79:9, 79:23, 82:24, 90:2, 90:3, 103:23, 104:9, 108:13, 112:10, 117:21,

122:1, 122:3, 125:21, 137:13, 139:15, 141:7, 141:14, 147:20, 181:2, 189:2, 190:18, 205:21, 212:24, 214:3, 215:8, 215:21, 228:1, 236:15, 236:17, 238:23, 241:25, 262:16, 265:5, 276:8, 279:23, 280:2, 292:23
two-phase [1] - 90:2
two-plus [1] - 45:17
two-step [1] - 103:23
two-week [1] - 45:11
type [11] - 22:18, 22:19, 23:18, 23:20, 26:18, 34:14, 44:10, 83:7, 98:5, 128:6, 145:19, 169:4, 181:16, 240:12, 259:23, 274:8, 290:3
types [5] - 16:10, 41:22, 42:21, 46:21, 285:10
typical [3] - 186:16, 191:11, 191:15
typically [1] - 186:11

**U**

U.S [2] - 139:21, 139:22
ultimately [3] - 87:18, 164:23, 281:24
Ultra [1] - 108:2
unadjudicated [4] - 12:19, 91:1, 91:12, 162:12
unanimous [14] - 18:8, 19:9, 19:11, 26:5, 26:8, 101:11, 101:13, 172:23, 179:9, 215:20, 216:2, 218:18, 263:25
unanimously [3] - 19:8, 26:12, 26:14
unattended [1] - 157:11
unbiased [1] - 211:12
uncles [1] - 275:12
uncomfortable [1] - 108:19
uncommon [1] - 209:2
under [32] - 6:23, 28:17, 46:16, 47:3,

56:1, 93:15, 101:24, 105:8, 114:18, 117:12, 156:6, 156:22, 158:8, 159:14, 165:5, 176:5, 176:16, 176:24, 178:2, 182:4, 207:12, 222:20, 231:4, 242:18, 245:5, 246:3, 248:1, 255:17, 256:2, 260:4, 268:7, 271:22
underneath [1] - 202:8
understood [5] - 71:7, 74:23, 104:6, 265:4, 297:16
undertake [1] - 227:15
unemotional [2] - 75:14, 75:21
unfair [2] - 129:5, 178:8
unfit [2] - 123:11, 123:20
unfolded [1] - 152:9
unfortunately [1] - 61:18
union [1] - 138:23
United [1] - 209:14
Universal [1] - 105:18
University [1] - 109:21
unless [1] - 262:3
unpleasant [1] - 126:16
unreasonable [3] - 123:24, 124:12, 124:24
up [118] - 7:6, 7:19, 7:23, 9:7, 11:13, 11:15, 12:19, 12:24, 15:13, 15:14, 15:23, 21:20, 24:3, 26:25, 31:8, 34:5, 35:4, 35:6, 41:18, 43:17, 45:12, 45:14, 48:17, 50:7, 50:21, 51:21, 52:14, 55:16, 59:23, 62:4, 62:9, 64:12, 68:5, 68:7, 69:25, 71:15, 73:21, 79:16, 80:16, 80:25, 83:16, 85:15, 86:20, 90:9, 91:9, 97:6, 98:9, 101:2, 105:16, 106:21, 108:1, 108:5, 108:16, 108:20, 110:4, 110:21, 113:5, 113:11, 116:16,

117:16, 118:9, 120:3, 121:12, 124:7, 127:3, 127:9, 128:4, 128:8, 131:15, 132:25, 134:12, 138:20, 142:6, 143:25, 146:8, 168:6, 173:17, 174:25, 182:11, 183:20, 185:3, 188:2, 197:17, 197:18, 201:7, 205:12, 206:10, 206:16, 206:21, 206:22, 206:25, 207:20, 208:8, 209:3, 210:2, 213:3, 214:21, 218:21, 219:3, 225:23, 232:7, 232:13, 238:22, 240:19, 242:19, 243:7, 248:2, 248:10, 249:19, 256:6, 256:10, 263:17, 265:16, 276:4, 288:16, 289:21, 298:16
upbringing [2] - 23:19, 179:18

**V**

vacation [4] - 68:17, 71:16, 101:10, 235:24
vacations [1] - 142:5
vacuum [1] - 28:9
valuable [1] - 281:4
variations [1] - 189:6
variety [1] - 186:3
vast [1] - 86:15
vehicle [1] - 286:3
vehicles [1] - 104:16
venireman [2] - 146:8, 146:24
verdict [40] - 8:24, 18:8, 44:25, 54:7, 54:9, 67:15, 69:11, 69:18, 70:1, 85:9, 85:16, 85:17, 86:22, 87:12, 89:13, 101:8, 123:8, 128:23, 129:2, 144:16, 150:14, 161:6, 171:2, 178:6, 179:11, 179:23, 207:17, 211:13, 212:9, 213:21, 222:15, 226:11,

228:9, 230:18, 235:12, 242:13, 253:22, 254:24, 281:14, 281:15
verifier [3] - 34:9, 47:13, 47:15
verifiers [1] - 34:2
verifying [1] - 47:16
versus [7] - 36:15, 37:20, 120:11, 134:16, 165:25, 172:10, 172:11
vested [1] - 218:10
victim [4] - 36:20, 43:7, 195:2, 250:11
victim's [1] - 37:20
victims [1] - 55:24
victims' [1] - 36:15
view [8] - 22:17, 28:20, 52:1, 207:5, 207:8, 211:18, 211:20, 228:22
viewpoint [3] - 86:25, 87:21, 223:14
viewpoints [2] - 86:24, 206:23
views [10] - 10:6, 22:20, 29:2, 201:14, 209:13, 209:15, 209:21, 211:10, 211:15, 213:13, 215:14, 217:22, 219:24, 220:25, 230:24, 231:10, 295:15, 295:19
violate [1] - 129:1
violence [34] - 14:15, 15:20, 16:2, 16:5, 16:11, 16:15, 27:6, 28:12, 31:5, 43:1, 43:7, 53:7, 53:16, 56:18, 93:13, 94:16, 94:21, 126:18, 126:19, 168:15, 168:17, 169:5, 170:5, 171:17, 211:2, 211:4, 213:10, 256:14, 259:19, 259:23, 260:2, 260:5, 261:14, 291:12
vis [2] - 71:4
vis-a-vis [1] - 71:4
visit [5] - 52:15, 78:1, 103:14, 163:10, 191:24
visited [1] - 181:2
vocalize [1] - 155:11
voice [1] - 86:19
VOIR [11] - 6:15, 30:6,

66:19, 103:8, 138:7,
149:20, 180:23,
201:1, 219:19,
234:9, 273:25
**voir** [8] - 8:9, 41:1,
58:22, 59:5, 77:12,
77:21, 119:2, 137:16
**volume** [1] - 300:9
**volunteers** [1] -
227:12
**vote** [33] - 18:11,
18:14, 18:18, 19:9,
19:10, 19:23, 20:4,
20:7, 26:5, 26:17,
26:23, 27:18, 27:22,
54:6, 58:17, 82:15,
86:13, 86:17, 86:19,
87:10, 99:13, 100:2,
101:12, 129:7,
131:8, 176:24,
177:21, 215:12,
229:4, 264:19,
269:15, 271:3, 271:9
**voted** [3] - 16:21,
26:12, 187:13
**votes** [4] - 26:6, 86:2,
129:17, 194:11
**voting** [1] - 270:1

## W

**wait** [4] - 96:22, 150:4,
278:11, 282:21
**Wait** [4] - 100:11,
268:17, 269:14,
270:15
**waiting** [2] - 11:15,
234:15
**waive** [1] - 48:12
**walk** [1] - 258:13
**Walk** [1] - 106:18
**walked** [2] - 78:24,
280:19
**walking** [1] - 157:6
**Walsh** [1] - 139:16
**wants** [2] - 12:9, 121:9
**war** [1] - 130:9
**warrant** [6] - 22:12,
22:24, 33:16, 97:4,
217:17, 288:24
**warranted** [4] - 98:18,
266:9, 266:17, 271:5
**warrants** [4] - 13:6,
25:25, 33:15, 100:13
**waste** [1] - 195:7
**Watauga** [1] - 39:13
**watch** [1] - 41:10
**watched** [1] - 41:3
**water** [5] - 6:9, 49:19,
108:17, 149:7, 206:4

**waver** [1] - 231:10
**ways** [6] - 37:18,
117:13, 164:8,
196:8, 254:20
**weak** [1] - 140:20
**weakness** [1] - 140:18
**weapon** [1] - 206:24
**wearing** [1] - 15:15
**Wedgwood** [1] - 11:8
**week** [8] - 20:21,
45:11, 65:13, 71:15,
185:6, 221:6, 265:5
**weekend** [1] - 202:1
**weekends** [1] - 142:4
**weeks** [21] - 13:12,
15:22, 45:17, 64:11,
65:9, 66:23, 71:12,
71:19, 78:2, 88:13,
88:25, 137:4,
137:13, 148:14,
181:2, 203:23,
233:12, 236:15,
236:17, 265:5, 276:8
**weigh** [6] - 82:17,
84:17, 132:2, 132:3,
132:12, 144:20
**weighing** [1] - 98:5
**weighs** [1] - 144:10
**weight** [10] - 117:2,
123:4, 130:15,
226:1, 285:2, 290:6,
290:8, 290:9,
290:11, 290:12
**welfare** [1] - 33:5
**well-founded** [1] -
214:7
**west** [1] - 151:17
**West** [1] - 300:23
**Western** [1] - 139:13
**whatsoever** [1] -
135:11
**whereas** [1] - 125:24
**whoa** [2] - 288:10
**Whoa** [2] - 96:22,
288:10
**whole** [11] - 11:23,
19:4, 20:1, 23:7,
25:17, 37:25, 38:3,
41:3, 44:2, 112:7,
170:17, 175:1,
247:22, 269:23,
294:21
**wide** [9] - 168:19,
168:23, 169:6,
238:24, 238:25,
247:25, 260:7, 290:6
**wide-ranging** [1] -
260:7
**widest** [1] - 247:25
**wife** [9] - 73:1, 105:3,

107:7, 108:3, 141:2,
151:23, 183:5, 183:8
**Wilderness** [1] -
107:11
**William** [7] - 5:22,
66:3, 134:16,
137:21, 149:1,
200:11, 233:19
**win** [3] - 8:2, 15:14,
258:14
**windy** [1] - 184:14
**wink** [2] - 190:15
**wink-wink** [1] - 190:15
**wins** [1] - 284:12
**wise** [1] - 12:8
**wish** [2] - 103:2, 259:1
**wished** [1] - 134:6
**witness** [20] - 12:11,
24:6, 24:10, 24:11,
43:22, 74:17,
143:15, 150:17,
152:3, 152:12,
152:14, 161:18,
177:11, 177:12,
196:24, 235:16,
237:14, 248:20,
248:21
**WITNESS** [1] - 300:16
**witnesses** [7] - 143:1,
178:9, 184:25,
185:24, 270:22,
270:24, 271:1
**woman** [4] - 31:24,
40:1, 85:18, 185:2
**wondering** [2] - 197:8,
200:3
**word** [19] - 10:7,
14:20, 22:23, 53:17,
93:24, 94:3, 98:1,
98:3, 103:4, 105:14,
115:8, 115:14,
167:10, 167:12,
192:23, 193:14,
257:22, 257:23
**worded** [1] - 131:19
**words** [16] - 31:24,
37:23, 70:20, 82:11,
92:17, 128:16,
185:23, 249:10,
250:10, 264:22,
267:1, 272:8,
287:21, 287:23
**works** [30] - 37:8,
80:7, 95:1, 100:4,
103:22, 105:4,
118:13, 118:20,
118:25, 119:25,
122:21, 131:11,
141:2, 151:24,
157:1, 174:17,

179:20, 183:9,
194:4, 205:25,
221:16, 221:22,
227:3, 237:9, 245:2,
245:24, 249:8,
257:3, 271:24, 275:4
**world** [7] - 46:2, 95:8,
105:1, 126:5, 151:8,
259:6, 268:23
**worldliness** [1] -
176:11
**worried** [1] - 39:4
**worries** [1] - 231:24
**worry** [1] - 70:19
**worse** [1] - 70:11
**Worth** [10] - 21:5,
38:17, 61:10, 68:5,
111:5, 114:3,
151:14, 182:19,
275:15, 300:23
**worth** [5] - 139:18,
163:5, 163:6, 163:7
**wound** [1] - 80:25
**wrap** [1] - 288:16
**wrapped** [1] - 108:16
**writ** [2] - 146:15,
146:21
**write** [7] - 75:7, 85:25,
121:22, 135:13,
155:8, 252:9, 254:23
**writes** [1] - 93:23
**writing** [4] - 40:16,
86:21, 253:21, 300:8
**written** [10] - 10:8,
15:25, 66:10, 86:12,
86:17, 98:16,
165:13, 200:17,
253:18, 288:8
**wrongly** [2] - 142:20,
142:23
**wrote** [9] - 14:17,
15:24, 16:2, 75:4,
75:5, 94:21, 111:25,
112:2, 223:2

## Y

**y'all** [5] - 104:18,
107:20, 123:14,
291:21
**yard** [2] - 157:3,
157:12
**year** [12] - 15:13,
37:18, 37:25, 38:3,
38:5, 64:17, 68:15,
104:21, 139:24,
238:21, 239:16
**years** [61] - 7:11, 14:3,
14:5, 16:8, 23:14,
24:19, 31:4, 32:19,

35:9, 36:1, 37:17,
39:25, 45:25, 47:4,
52:9, 89:2, 89:19,
99:4, 99:18, 100:21,
115:6, 115:13,
116:5, 120:6,
120:12, 154:6,
163:1, 163:5, 163:6,
163:7, 168:10,
176:1, 176:7,
176:14, 179:17,
184:19, 187:18,
191:19, 232:13,
239:11, 247:6,
247:7, 248:1, 248:2,
252:24, 253:21,
263:6, 268:9,
268:12, 268:17,
268:20, 269:8,
269:14, 279:24,
280:4, 283:2, 283:6
**Yellowstone** [6] -
64:16, 64:20, 68:5,
68:9, 107:19, 113:14
**yeses** [1] - 195:20
**you-all** [3] - 33:18,
37:15, 183:2
**you-don't-know-until
-you-hear-it** [1] -
171:7
**you-know-it-when-
you-see-it** [1] -
175:19
**young** [7] - 40:1, 61:1,
99:6, 120:23,
175:25, 184:17,
185:16
**YOUNG** [1] - 234:6
**younger** [2] - 107:13,
205:22
**yourself** [5] - 32:3,
35:25, 48:3, 89:16,
177:20
**youth** [1] - 197:25
**YouTube** [1] - 135:23