1          REPORTER'S RECORD
            VOLUME 24 OF 55
2      TRIAL COURT CAUSE NO. 1184294D
       COURT OF APPEALS NO. AP-76,596
3

4   STATE OF TEXAS          )(     IN THE 432ND JUDICIAL
                            )(
5   VS.                     )(     DISTRICT COURT OF
                            )(
6   JOHN WILLIAM HUMMEL     )(     TARRANT COUNTY, TEXAS

7

8

9

10          ******************************************

11                      JURY VOIR DIRE

12          ******************************************

13

14

15

16          On the 23rd day of May, 2011, the

17   following proceedings came on to be heard in the

18   above-entitled and -numbered cause before the Honorable

19   Elizabeth Berry, Judge Presiding, held in Fort Worth,

20   Tarrant County, Texas:

21          Proceedings reported by machine shorthand.

22

23

24          ANGIE TAYLOR, CSR, RPR
             Official Court Reporter
25            432nd DISTRICT COURT



```
 1                    A P P E A R A N C E S

 2

 3   HONORABLE D. MILES BRISSETTE - SBOT NO. 50511628
     HONORABLE ROBERT K. GILL - SBOT NO. 07961600
 4   Assistant District Attorneys
     401 W. Belknap Street
 5   Fort Worth, Texas  76196
     Phone:  817-884-1400
 6

 7                    Attorney(s) for the State of Texas.

 8

 9
     HONORABLE FRED CUMMINGS - SBOT NO. 05225400
10   HONORABLE LARRY M. MOORE - SBOT NO. 14357800
     4210 West Vickery Boulevard
11   Fort Worth, Texas 76107
     Phone:  817-338-4800
12
     HONORABLE PAMELA S. FERNANDEZ - SBOT NO. 24045868
13   403 North Sylvania, Suite 11
     Fort Worth, Texas 76111
14   817-8313003

15
                     Attorney(s) for the Defendant.
16

17

18

19

20

21

22

23

24

25
```

1                       CHRONOLOGICAL INDEX
                             VOLUME 24
2                         JURY VOIR DIRE

3  MAY 23, 2011

4  PROSPECTIVE JURORS                         PAGE      VOL

5  MARIA RUIZ
   Prospective Juror Claims Exemption.....      7        24
6
   Prospective Juror No. 76, Patsy Vaughn
7  Excused by Agreement...................      8        24

8  Prospective Juror No. 78, Kenneth Walker
   Excused by Agreement...................      8        24
9
   BRANN JETER
10 Defendant's Peremptory Challenge.......     10        24

11 ROBERT WAYBRIGHT
   State's Voir Dire by Mr. Gill..........     13        24
12 Defendant's Voir Dire by Mr. Moore.....     52        24
   Defendant Reserves Peremptory..........     92        24
13
   GEORGE ADAMS
14 State's Voir Dire by Mr. Brissette.....     95        24
   Defendant's Voir Dire by Mr. Cummings..    121        24
15 State's Peremptory Challenge...........    138        24

16 KATHLEEN OLSON
   State's Voir Dire by Mr. Gill..........    141        24
17 Defendant's Voir Dire by Mr. Moore.....    179        24
   Prospective Juror Accepted.............    217        24
18 Prospective Juror Sworn................    217        24
   Prospective Juror Instructed...........    218        24
19
   VALERIE WILLIAMS
20 State's Voir Dire by Mr. Brissette.....    222        24
   Defendant's Voir Dire by Ms. Fernandez.    254        24
21 State's Peremptory Challenge...........    260        24

22 ROBERT WAYBRIGHT
   Defendant's Peremptory Challenge.......    261        24
23

24 Proceedings Adjourned..................    261        24

25 Court Reporter's Certificate...........    262        24

1            <u>ALPHABETICAL PROSPECTIVE JUROR INDEX</u>

2  <u>PROSPECTIVE JURORS</u>:                       <u>PAGE</u>      <u>VOL</u>

3  ADAMS, GEORGE
    State's Voir Dire by Mr. Brissette.....   95       24
4  Defendant's Voir Dire by Mr. Cummings.. 121       24
    State's Peremptory Challenge........... 138       24
5
    JETER, BRANN
6  Defendant's Peremptory Challenge.......  10       24

7  OLSON, KATHLEEN
    State's Voir Dire by Mr. Gill.......... 141       24
8  Defendant's Voir Dire by Mr. Moore..... 179       24
    Prospective Juror Accepted............. 217       24
9  Prospective Juror Sworn................ 217       24
    Prospective Juror Instructed........... 218       24
10
    RUIZ, MARIA
11  Prospective Juror Claims Exemption.....   7       24

12  WAYBRIGHT, ROBERT
    State's Voir Dire by Mr. Gill..........  13       24
13  Defendant's Voir Dire by Mr. Moore.....  52       24
    Defendant Reserves Peremptory..........  92       24
14  Defendant's Peremptory Challenge....... 261       24

15  WILLIAMS, VALERIE
    State's Voir Dire by Mr. Brissette..... 222       24
16  Defendant's Voir Dire by Ms. Fernandez. 254       24
    State's Peremptory Challenge........... 260       24
17

18

19

20

21

22

23

24

25

7

5

PROCEEDINGS

1   P R O C E E D I N G S
2   (May 23, 2011 ~ 8:38 a.m.)
3   (Open court, Defendant present)
4   (Prospective juror enters courtroom)
5   THE COURT:  Good morning.
6   PROSPECTIVE JUROR:  Good morning.
7   THE COURT:  You are Potential Juror No. 77,
8   Maria Ruiz?
9   PROSPECTIVE JUROR:  Yes, ma'am.
10   THE COURT:  Okay.  I need to swear you in
11   for purposes of today's proceeding, so if you'll raise
12   your right hand, please?
13   (Prospective juror sworn)
14   THE COURT:  Okay.  You filled out a jury
15   questionnaire several weeks ago.  Has anything
16   substantial changed since you filled it out that you
17   need to let us know about?
18   PROSPECTIVE JUROR:  No.
19   THE COURT:  Okay.  When we discussed
20   scheduling at the minipanel meeting a couple of weeks
21   ago, has anything changed about your schedule in regards
22   to your service in this case?
23   PROSPECTIVE JUROR:  Actually, yes.
24   THE COURT:  Okay.  And you need to speak a
25   little bit louder because I can barely hear you.

1   whether your mom is going to still be having health
2   problems and able to care for your children?
3   PROSPECTIVE JUROR:  Yes.
4   THE COURT:  Okay.  Is she -- do you know at
5   this point, or is that up in the air?
6   PROSPECTIVE JUROR:  I don't know.
7   THE COURT:  Okay.  Because the law allows
8   you to have an exemption when you have child -- children
9   the age of your children if they would not have adequate
10   care if you were required to be here on jury service.
11   PROSPECTIVE JUROR:  Okay.
12   THE COURT:  Okay?  If you were required to
13   be here on jury service, would your children have
14   adequate care or supervision?
15   PROSPECTIVE JUROR:  No.
16   THE COURT:  Okay.  Then I'm going to let
17   you claim your exemption that you have if you want to do
18   that.  Do you want to claim your exemption?
19   PROSPECTIVE JUROR:  Yes.
20   THE COURT:  Okay.
21   MR. BRISSETTE:  Judge, was that a yes, just
22   for the record?
23   THE COURT:  It was.  I heard her, and the
24   court reporter got it.
25   MR. BRISSETTE:  Okay.

6

1   PROSPECTIVE JUROR:  My mom is having
2   surgery today.
3   THE COURT:  Today?
4   PROSPECTIVE JUROR:  Uh-huh.  And she's the
5   one that takes care of my two kids, and I really don't
6   have a baby-sitter, like --
7   THE COURT:  Okay.  How old are your kids?
8   PROSPECTIVE JUROR:  Four months and four
9   years.
10   THE COURT:  All right.  I wish you would
11   have called because we could have rescheduled your being
12   here today.
13   THE BAILIFF:  We did, Judge.
14   THE COURT:  Okay.
15   THE BAILIFF:  I told her if she could get
16   somebody for a couple hours this morning, we would be
17   all right.
18   THE COURT:  Okay.  All right.  So we're
19   trying to get you out of here as fast as possible.
20   Now, tell me this:  If -- is your mom's
21   surgery a -- is it a minor surgery or a major surgery?
22   PROSPECTIVE JUROR:  I don't know how to
23   explain it.  She has a tumor, so...
24   THE COURT:  Okay.  And if you were selected
25   to serve as a juror in this case, do you have any idea

8

1   THE COURT:  Okay.  If you'll just sign that
2   and date it?
3   I'm so sorry.  I hope your mom's okay.
4   Okay.  You're going to be excused from any
5   further service in this case.  So sorry you had to come
6   in this morning.  Thank you very much for that, though.
7   Thank you for your service.
8   The jury room will mail you your jury
9   check.  Just leave that plastic part of your badge with
10   the bailiff.  Okay?
11   PROSPECTIVE JUROR:  Okay.
12   THE COURT:  All right.
13   PROSPECTIVE JUROR:  Thank you.
14   THE COURT:  Thank you.
15   (Prospective juror excused)
16   (Recess from 9:14 a.m. to 9:45 a.m.)
17   (Open court, Defendant present)
18   THE COURT:  Back on the record.
19   Mr. Cummings, you've informed the Court of
20   an agreement regarding the next couple of jurors?
21   MR. CUMMINGS:  Yes, Your Honor.  The State
22   and Defense have agreed to excuse Juror No. 78 and Juror
23   No. 76.  That was the sequence in which they were going
24   to appear this morning.
25   We have reviewed the questionnaires and

9

1  decided, based upon the responses to these 26-page juror
2  questionnaires, we don't feel that either one of them
3  will stand up to the voir dire process.
4         I've visited with Mr. Hummel.  He is in
5  agreement with excusing these two veniremen.
6         THE COURT:  Is that correct, Mr. Hummel?
7         THE DEFENDANT:  Yes, ma'am.
8         THE COURT:  And, Mr. Gill, is that correct
9  on the part of the State?
10         MR. GILL:  Yes, Your Honor.
11         THE COURT:  Okay.  76 has been notified by
12  telephone.  If you'll bring in 78?
13         (Prospective juror enters courtroom)
14         THE COURT:  Good morning, Mr. Walker.
15         PROSPECTIVE JUROR:  Good morning.
16         THE COURT:  The bus wasn't cooperating with
17  you too well this morning, was it?
18         PROSPECTIVE JUROR:  No.
19         THE COURT:  Okay.  Well, I have good news
20  and bad news.  The -- the bad news is that you spent
21  your morning hassling with coming down here and waiting
22  on the bus; but the good news is you're not going to
23  have to spend an hour up here talking to us or have to
24  come back for any more proceedings or for the trial
25  because you're going to be excused.  Okay?

10

1         PROSPECTIVE JUROR:  Okay.
2         THE COURT:  If you'll leave that plastic
3  part of your badge with the bailiff, the central jury
4  room will mail you your check, and that'll be it.
5         PROSPECTIVE JUROR:  Thank you very much.
6         THE COURT:  Thank you very much.
7         (Prospective juror excused)
8         THE COURT:  So, hopefully, 84 will be here
9  in about 20, 30 minutes.
10         (Recess from 9:47 a.m. to 10:29 a.m.)
11         (Open court, Defendant present)
12         THE COURT:  Prior to the next juror being
13  brought in, we interviewed Juror No. 80 on May 12th in
14  between jurors 27 and 31, so both sides agreed to hold
15  off on exercising peremptory strikes until such time as
16  we reached that number in the chronology.  We are next
17  taking Juror No. 84, so as to Juror No. 80, does the
18  State exercise a peremptory?
19         MR. BRISSETTE:  No.
20         THE COURT:  Does the Defense?
21         MR. CUMMINGS:  We do, Your Honor.
22         THE COURT:  Okay.  Deputy Tremaine, can you
23  notify No. 80 that he has not been selected and is
24  released and we'll mail him his check?
25         THE BAILIFF:  Yes, Your Honor.

11

1         THE COURT:  And if you will bring in No.
2  84, please?
3         (Prospective juror enters courtroom)
4         THE COURT:  Hi.
5         PROSPECTIVE JUROR:  Hello.
6         THE COURT:  You are Potential Juror No. 84,
7  Robert Waybright; is that correct?
8         PROSPECTIVE JUROR:  Correct, yes, ma'am.
9         THE COURT:  All right.  Mr. Waybright, let
10  me go ahead and swear you in for purposes of this
11  process.  If you'll raise your right hand?
12         (Prospective juror sworn)
13         THE COURT:  You filled out a jury
14  information sheet several weeks ago.  Has anything
15  substantial changed since that time that you need to
16  inform us of?
17         PROSPECTIVE JUROR:  No, ma'am.
18         THE COURT:  We talked about scheduling for
19  this case when you were here for the minipanel
20  interview.  Has anything changed in regards to your
21  schedule that you need to let us know about?
22         PROSPECTIVE JUROR:  No, ma'am.
23         THE COURT:  Okay.  You will recall that the
24  person on trial in this case is Mr. John William Hummel.
25  He is represented in this case by Pamela Fernandez,

12

1  Larry Moore and Fred Cummings.  The State of Texas is
2  represented by Miles Brissette and Robert Gill.
3         Both sides are going to have the
4  opportunity to talk to you this morning regarding issues
5  on your jury questionnaire, as well as the death penalty
6  issues.
7         Did you have a chance to look over the
8  paperwork that was sent home with you?
9         PROSPECTIVE JUROR:  I did.
10         THE COURT:  Okay.  So what they're
11  discussing with you will be familiar from that
12  paperwork.
13         PROSPECTIVE JUROR:  As much as possible,
14  yes, ma'am.
15         THE COURT:  Exactly.  And it will take
16  about an hour for them to talk to you, so there's water
17  here if you need any.
18         PROSPECTIVE JUROR:  Okay.  Thank you.
19         THE COURT:  Okay.  All right.
20         State, you may proceed.
21         MR. GILL:  Thank you.
22         ROBERT DUVON WAYBRIGHT,
23  a prospective juror, having been first duly sworn,
24  testified as follows:
25         VOIR DIRE EXAMINATION

13

1   BY MR. GILL:
2       Q.   Good morning.
3       A.   Good morning.
4       Q.   We appreciate you coming in early this morning,
5   help us along here.  Make our afternoon a little bit
6   shorter.  We may actually get out of here by 5:00
7   o'clock or so this way.
8       A.   Okay.
9       Q.   I'm hoping you didn't get too wet coming in.
10  It started raining, didn't it?
11      A.   It did.
12      Q.   Okay.  We are going to cover some of the issues
13  this morning about death penalty trials that we did not
14  cover last time you were in court.
15      A.   Okay.
16      Q.   Last time we covered pretty much the generic
17  criminal law topics that apply to the trial of any
18  criminal case, and today we're going to be working on
19  the issues that are specific to the death penalty and
20  the death penalty punishment phase of a capital murder
21  trial.
22           Recall from the last time you were in court
23  that the oath that you take at this part of the trial
24  only obligates you to tell the truth?
25      A.   Okay.

14

1       Q.   And if you are selected to be a juror in the
2   case, your oath changes, and you make an oath to render
3   a verdict based on the law and the evidence.
4       A.   Yes.
5       Q.   And the Judge gives you the law that is
6   applicable to the case in a written instrument called
7   the Court's Charge that guides your deliberation.  And
8   the other factor you need to take into consideration in
9   reaching a verdict will be the evidence that you hear
10  during the trial of the case.
11      A.   Yes, sir.
12      Q.   Every case is different.  That's why we're not
13  allowed to sit here and tell you what the facts are of
14  the case beforehand and ask you how you decide it.  It's
15  all going to have to come from the witness stand.
16      A.   Okay.
17      Q.   One of your -- one of your major functions as a
18  juror is to judge the credibility of witnesses.
19           As you sit here today, based upon your
20  experience and -- and your beliefs, is there any reason,
21  whether it's moral, ethical or religious that you could
22  not be a part of a case that ended up with the
23  assessment of the death penalty?
24      A.   No, sir.
25      Q.   I noticed from your questionnaire that one of

15

1   the -- one of the issues you have with the process is
2   that you don't -- you're not sure you have the time to
3   devote to being a juror?
4       A.   Well, generically speaking, I don't think
5   anybody really wants to come down here, so...
6       Q.   Okay.  So you -- your feelings are pretty much
7   like everybody else's?
8       A.   I would imagine I'm in the same group as
9   everybody else.
10      Q.   You don't have any -- you don't have any
11  special conflicts or anything?
12      A.   No, sir, not at this time.
13      Q.   Okay.  Now, you filled out the questionnaire
14  before you found out what the -- what the trial of the
15  case was going to involve.
16      A.   Correct.
17      Q.   We're going to start the trial on June 13th,
18  and the best estimate would be that it's going to last
19  for about two weeks.
20      A.   Correct.
21      Q.   Does that kind of fit into the time frame you
22  expected?
23      A.   I changed my schedule, so if I get called, I'll
24  be available.
25      Q.   Something else I noticed about your

16

1   questionnaire was that you had a couple of concerns
2   about the -- the effectiveness of the criminal justice
3   system with regard to the money spent and the time it
4   takes to get something to trial.  Do you want to explain
5   those -- explain your feelings on that to me a little
6   bit?
7       A.   Once again, I don't -- I think that's a generic
8   statement from everybody in the community.  Everybody
9   feels like there's -- it takes more time to get people
10  convicted and get them into prison than it does -- it's
11  probably necessary, what you feel -- but that's probably
12  a generic statement that everybody feels the same way.
13      Q.   Is there any reason, based on your views, that
14  you would not be able to sit in a case such as this and
15  render a fair and impartial verdict?
16      A.   No, sir.
17      Q.   Because that's what a -- that's what a juror's
18  job is to do, is to take the evidence that they've
19  received from the jury's -- from the witness stand and
20  apply it to the law and reach a -- a fair verdict based
21  upon the facts of that case.
22           Is there any reason you would not be able
23  to do that?
24      A.   No, sir.
25      Q.   Well, then, if you recall -- one other thing I

17

1  wanted to ask you about. At some point your house has
2  been ransacked. You had a burglary of a -- of a
3  habitation?
4      A.  Well, yes, sir.
5      Q.  Where were you living at that time?
6      A.  Dallas, Texas.
7      Q.  So that's something that occurred over in
8  Dallas County?
9      A.  Yes, sir, it did.
10     Q.  Have you had any contact with the criminal
11  justice system over here in Tarrant County?
12     A.  My sister was convicted of a -- of a child
13  molestation case probably 20 years -- 15 years ago -- 20
14  years ago. And at the time we came to the trial, but
15  that's it. She -- she served a probated sentence and is
16  since released, so it's -- that's it. That's the last
17  of it.
18     Q.  Okay. Do you have any misgivings about the
19  criminal justice system as a result of that process?
20     A.  No, sir. I think -- I think it was fair at the
21  time.
22     Q.  All right. Let's get into the -- the issues at
23  hand here.
24          You recall from last time you were in court
25  that a capital murder is defined as taking place when an

18

1  individual knowingly murders more than one person during
2  the same criminal transaction. Do you remember that?
3      A.  Yes, sir.
4      Q.  And I think -- I think I asked the group is
5  that a -- do you think that is a fair definition of
6  capital murder. Let me ask that of you again today.
7      A.  Well, as opposed to just murder, it's evidently
8  a higher -- higher penalty or a higher weight placed
9  upon the concept of murder, if that's possible.
10     Q.  Well, that's exactly it.
11          And -- and we have a number of different
12  grades of homicides in the State of Texas. We have
13  criminally negligent homicide, we have a reckless
14  murder, we have murder and we have capital murder.
15     A.  Right.
16     Q.  And they all vary in punishment ranges
17  depending upon the -- the culpable mental state of the
18  individual committing the murder and also about on
19  aggravating factors that may or may not be present.
20          Remember we contrasted the offense of
21  murder with the offense of capital murder by saying that
22  a murder is -- under our law is the knowing murder of --
23  of more -- of one person during a criminal transaction.
24          Capital murder is an aggravated murder.
25  It's more than one person for a criminal transaction.

19

1          Do you think that -- that the definition we
2  have here of the murder of more than one person during
3  the same criminal transaction is something that ought to
4  be possibly punished by the death penalty?
5      A.  Well, I believe in the death penalty, so this
6  would fit into that category, yes, sir.
7      Q.  On the other hand, you see where the offense of
8  murder, the murder of -- of one person, is not
9  punishable by the death penalty. Do you remember
10  that --
11     A.  I do remember.
12     Q.  -- from earlier discussion?
13          That crime, the crime of murder, is
14  punishable by a range -- punishment within a range of
15  years not less than 5 or more than 99 years or life in
16  the penitentiary. We went over that last time.
17     A.  Yes, sir.
18     Q.  And -- and at that time you expressed an
19  ability to -- to give that range of punishment fair
20  consideration. Is that still your viewpoint today?
21     A.  Yes, sir, it is.
22     Q.  Because our Legislature writes all these laws,
23  and they recognize there are many different situations
24  under which either a murder or capital murder can take
25  place. And we leave it up to the jurors to decide where

20

1  within the range of punishment for murder the individual
2  crime were -- what's justice for that individual crime.
3  You see how that works?
4      A.  Yes, sir.
5      Q.  Okay. With regard to the offense of capital
6  murder, we allow the jury to -- the jury answers
7  questions, and then the Judge sentences based upon the
8  answers to those questions. The Judge -- the jury
9  doesn't come out and just say life imprisonment or death
10  penalty; they answer some questions.
11     A.  Okay.
12     Q.  Okay. So if we were to talk about evidence
13  that a jury might hear -- our trials in Texas are
14  divided into two distinct phases. One phase is the
15  guilt/innocence phase of the trial. The issue for the
16  jury is: Did the State prove its case beyond a
17  reasonable doubt?
18          If the jury finds that the State failed to
19  prove its case beyond a reasonable doubt for any reason,
20  the jury finds the individual not guilty and everybody
21  goes home because the trial is over, because we don't
22  punish people that have been found not guilty. They are
23  discharged from their obligations under the criminal
24  justice system.
25          And we have to prove all of the evidence

21

1   of -- all the elements of a crime.  We went over the
2   elements the last time you were in court, and they
3   include, for a capital murder case, the fact that the
4   crime happened on or about a certain date; that it
5   happened in Tarrant County, Texas; that the individual
6   charged is the individual that committed the murder.  We
7   have to prove that more than one person was killed
8   during the same criminal transaction, and we also have
9   to prove the manner and means by which the individual
10  was killed.
11          And the manner and means are simply --
12  that's simply a legal term meaning the way they did it.
13  Like, for example, shooting with a firearm or -- or
14  strangling with a cord or -- or drowning in a -- in a
15  pool, something like that?
16      A.  Okay.
17      Q.  But the State is bound to prove each and every
18  one of those elements beyond a reasonable doubt, and if
19  we fail, the jury's job is to render a not guilty
20  verdict based upon their oath.
21      A.  Okay.
22      Q.  Would you be able to follow your oath and find
23  someone not guilty if the State failed to prove any of
24  the elements to you?
25      A.  I think within my ability, yes, sir.

22

1       Q.  Okay.  And sometimes your ability gets tested
2   more in some cases than in other cases.  Some cases
3   there's a pretty clear definition, a pretty clear split
4   between what's -- what the State's burden is and what
5   the proof is.
6           In some cases it might not be so clear.
7   For example, if we were to charge someone with shooting
8   an individual, killing them by shooting them with a
9   firearm where the proof at the trial actually showed the
10  individual was -- was killed by being stabbed with a
11  knife, you see where the result of the case would be the
12  same -- the result of the -- of the offense, the person
13  would be dead either way; however, the State of Texas
14  would have failed in its burden?
15      A.  Right.
16      Q.  Because our burden is to prove that it happened
17  by shooting with a firearm.
18      A.  Correct.
19      Q.  Not just -- we don't -- our burden isn't simply
20  to prove that they were -- that they were killed; we
21  have to prove how it was done.
22      A.  Okay.
23      Q.  So if we failed in that burden, would you be
24  able to find the individual not guilty and follow your
25  oath?

23

1       A.  I would follow my oath, yes, sir.
2       Q.  That is the key to being a juror, is following
3   the oath.
4           And the other key to a juror is that -- is
5   letting the facts decide how you decide all the issues
6   in the case.  We can sit here and talk all day long
7   about these -- about these things but, ultimately, as a
8   juror, you receive a set of facts, you receive the law
9   from the Judge, and you render your decision thereon.
10      A.  Yes, sir.
11      Q.  So that's -- that's -- that's simply it.  That
12  is simply the -- the job of a juror, take the oath,
13  apply the facts, render a decision.  Okay?
14      A.  Sounds too easy.
15      Q.  Well, it's -- like I said, it's a lot simpler
16  here talking about it than it is in practice.
17      A.  I understand.
18      Q.  But have you ever been a juror before?
19      A.  In a very short trial, yes, sir.
20      Q.  Yeah, you served in a municipal trial?
21      A.  Yes, sir.
22      Q.  White Settlement, right?
23      A.  Yes, sir.
24      Q.  That probably lasted a day or day and a half?
25      A.  No, sir, it lasted about two hours.

24

1       Q.  Okay.  Well, this one is going to last a little
2   longer, probably.
3       A.  I understand.
4       Q.  So I was talking about the phases of a criminal
5   trial.  We have a guilt/innocence phase, and we have a
6   punishment phase.
7           At the punishment phase of a -- of a
8   noncapital trial, the jury decides within the range of
9   punishment, the range of years that's given for the
10  crime.
11          At a punishment trial for a capital murder
12  case, a jury decides special issues.  And in taking into
13  consideration all the evidence of the case, the jury can
14  take into consideration all the evidence that they heard
15  at the first phase of the trial in deciding the
16  punishment issues.
17      A.  Yes.
18      Q.  They can also take into consideration
19  additional evidence that the State can't bring at the
20  first phase of the trial.  For example, evidence of a
21  bad character of the Defendant.  We can't bring that at
22  the first phase of the trial.  You'll hear no testimony
23  about that.  But you may hear it at the second phase of
24  a criminal trial.
25          Same with bad reputation and same with

25

27

1 evidence of other crimes the Defendant may have
2 committed. Can't talk about them at the first phase of
3 the trial. We can, however, show them to a jury at the
4 second phase of the trial.
5           Then, ultimately, in a capital murder case,
6 the jury deliberates on special issues. Shorthand
7 versions, the first question -- did you read the packet
8 the Judge sent -- the paper the Judge sent home with
9 you?
10      A. I did, but it's been a few weeks, sir.
11      Q. Well, the first question -- the first special
12 issue the jury confronts is often referred to as the
13 future dangerousness issue. The next question is
14 also -- often referred to as the mitigation issue.
15           And the answers to those questions tell the
16 Judge how the Judge has to sentence. If the questions
17 are answered one way, the Judge has no discretion except
18 to sentence a Defendant to the death penalty.
19           If they're answered any other way, the
20 Judge has no discretion but to sentence the Defendant to
21 a life sentence.
22           And here's an instruction that the jury
23 would receive in the punishment phase of the trial:
24 That a sentence of life without parole means that the
25 Defendant is ineligible for release from prison on

26

1 parole.
2           So an individual in the State of Texas for
3 crimes committed within a range -- well, for this time,
4 period, we're talking about now for this case, the
5 individual never gets out of the penitentiary if they
6 get convicted of capital murder. They either -- they
7 either serve a life sentence until their natural death,
8 or they serve a sentence on a death penalty until
9 they're executed.
10      A. Yes, sir.
11      Q. So that is -- that is a parameter that I ask
12 you to keep in mind as we go through these questions
13 today.
14      A. Okay.
15      Q. So here's the first question that the jury will
16 deliberate on: Do you find beyond a reasonable doubt
17 that there's a probability that the Defendant would
18 commit criminal acts of violence that would constitute a
19 continuing threat to society?
20           This is the question referred to as the
21 future dangerousness question because it concerns itself
22 with whether the Defendant would be a continuing threat
23 to society.
24      A. You're asking me to answer that question, sir?
25      Q. I was going to ask you to answer that question

1 if you're a juror, but first I want to go through some
2 of the parts of it because some of these terms aren't
3 defined by law. And the first thing I want to talk to
4 you about is this phrase, "beyond a reasonable doubt."
5      A. Right.
6      Q. That, of course, tells you the State of Texas
7 has the burden of proof here. We have the burden of
8 proof at the first phase of the trial to prove beyond a
9 reasonable doubt the individual's guilty. We have the
10 burden of proof to prove beyond a reasonable doubt that
11 the answer to this question should be yes.
12           And if we prove it beyond a reasonable
13 doubt, the jury's obligation is to vote yes, each
14 individual -- individual juror. If we fail in our
15 burden, the jury's responsibility is to vote no based
16 upon the oath. You see how that works?
17      A. I do.
18      Q. Okay. So burden of proof is on the State. The
19 burden of proof in a criminal case is never on the
20 Defendant. In a -- in a -- in a capital murder case,
21 the burden of proof is never on the Defendant. That's
22 another one of the principles you need to keep in mind
23 if you're a juror in a capital case and as we go through
24 this process today. Follow your oath, let the facts
25 tell you what to do. The Defense never has a burden of

28

1 proof. Okay?
2      A. Yes, sir.
3      Q. Then we have this phrase, "probability," also
4 not defined by the law. So what does -- what does the
5 phrase "probability" mean to you?
6      A. A good possibility.
7      Q. A good possibility? Yeah. It's different than
8 the word "possibility"?
9      A. Right.
10      Q. Because that's -- that's something that's --
11 there's a possibility of a lot of things, right?
12      A. Right. But it has to be a weighted
13 possibility.
14      Q. There you go. Greater -- greater than a mere
15 possibility.
16      A. Correct.
17      Q. And the Legislature -- the Legislature used the
18 term "probability" because they want the State to have
19 more of a burden of proof than possibility, but they
20 didn't use the word "certainty." So in other words, we
21 don't have to prove there's a certainty that the
22 individual's going to commit these criminal acts of
23 violence.
24      A. We can't look into the future.
25      Q. We can't look into the future.

29

1    A.   No, sir.

2    Q.   We just have the -- we just have the burden to

3    show there's a probability, there's some type of --

4    something beyond a mere possibility.  Is that kind of

5    how that -- that phrase works for you?

6    A.   It's a -- it's a higher standard, yes, sir.

7    Q.   Higher standard than possibility?

8    A.   Right.

9    Q.   But lower than certainty?

10   A.   Yes.

11   Q.   I think that's why the Legislature chose that

12   particular word.  Possibility is -- is too low of a

13   standard, and certainty is too high of a standard, so

14   it's somewhere in the middle.

15   A.   I appreciate the Fifth Amendment, actually.

16   Q.   Okay.  This next phrase, "criminal acts of

17   violence."  You notice how the Legislature there didn't

18   tie us down to any particular type of criminal violence.

19   We can prove anything -- we can prove that the -- that

20   the -- there's a probability the Defendant is going to

21   commit anything from a simple assault, all the way up to

22   another murder and anything in between, anything that

23   could be considered a criminal act of violence in your

24   mind.  So it's pretty wide -- pretty wide open there,

25   too, isn't it?

30

1    A.   It is.

2    Q.   And then the last term we need to talk about a

3    little bit is "society."  So what does the term

4    "society" mean to you?

5    A.   Individuals that are free and at liberty to

6    make choices.

7    Q.   Now, one of the things we have to keep in mind

8    when we talk about the punishment phase and talk about

9    this question is remember that the individual's been

10   convicted of capital murder, that whose -- whose future

11   we're debating on here in answering this question is

12   going to be in the penitentiary for the rest of his

13   life.  The only thing the jury is deciding at this point

14   is, is his natural -- is it going to be his natural life

15   or is he going to be executed?

16   A.   Right.

17   Q.   So the individual we're debating on here about

18   whether there's a probability he'll commit these

19   criminal acts of violence that would constitute a

20   continuing threat to society is going to be in the

21   penitentiary.

22   A.   Yes, sir.

23   Q.   So is it possible a person in the penitentiary

24   can be a continuing threat to society?

25   A.   Yes, sir.

31

1    Q.   People in the -- could people in society

2    interact with people in the penitentiary?

3    A.   Yes, they do.

4    Q.   Okay.  So as you see also -- and this is a --

5    this is an important point to recall.  You see how this

6    is a completely different inquiry than you were asked at

7    the first phase of the trial?

8         At the first phase of the trial, the jury

9    is concerned with, did this guy do this crime that

10   happened on X date.  Here -- we're talking about a date

11   of December 17th of 2009.  So did the Defendant commit

12   this crime on December 17th of 2009, or whatever date is

13   alleged in the Indictment?

14        But in this question, the question deals

15   with what is -- what is the probability he's going to

16   commit criminal acts of violence in the future, not

17   did -- what he did on that date, but what -- what is the

18   probability for the future.  See how that works?

19   A.   I see the difference, yes, sir.

20   Q.   Completely different.

21   A.   Right.

22   Q.   So just because you found someone guilty at the

23   first phase of the trial of committing a capital murder

24   would not mean that you automatically answer this

25   question one way or the other, correct?

32

1    A.   Correct.

2    Q.   You'd have to look at the facts you were given.

3    A.   Correct.

4    Q.   Now, it may be, if you were a juror in the

5    case, that -- that the -- the facts of the first phase

6    of the trial were enough -- would be enough for you to

7    answer this question yes.  The way the capital murder

8    was committed would lead you to believe the individual

9    was going to be a continuing threat to society.

10        On the other hand, it may be something else

11   the State brings you at the punishment phase of the

12   trial to go along with what you heard in the first phase

13   of the trial.  But the key is if the State fails in its

14   burden, you answer this question no even though you

15   found the individual guilty of murder.

16   A.   I understand.

17   Q.   You see how that works?

18   A.   Yes, sir, I do.

19   Q.   Burden of proof on the State, right?

20   A.   Correct.

21   Q.   Who -- who is it in the criminal trial who

22   never has the burden of proof?

23   A.   The Defendant.

24   Q.   Exactly.  Okay.  So could you answer this

25   question yes if the State proved it to you beyond a

35

1  reasonable doubt, knowing that the individual was -- has
2  taken one step closer to receiving the death penalty?
3      A.  I believe I could do that.
4      Q.  On the other hand, do you have any hesitation
5  about that?
6      A.  Well, this is something I've never done before,
7  so I'm not going to take this lightly.  So I would say
8  at the best of my ability at this moment, if you can't
9  convince the jury, all 12 of us, that this is the --
10 this crime happened and this is the punishment phase, I
11 believe we could make a -- I could make a good choice.
12     Q.  Okay.  Now, one thing -- one thing that -- that
13 you're going to glean from going through this process
14 and from the Court's instruction later on, if you're a
15 juror, is each juror's verdict is his individual
16 verdict, that ultimately -- ultimately, you know, to --
17 to take any action on the case, the jury has to agree,
18 but each juror has their own individual verdict.  And
19 they -- and they decide for himself or herself if the
20 State's proven its case and -- and whether other factors
21 exist.
22     A.  I understand.
23     Q.  Okay.  Okay.  So -- and -- and this is a
24 step-by-step process.  You first decide if the
25 individual's guilty or not guilty; then you decide

34

1  Special Issue No. 1.  If the -- if Special Issue No. 1
2  is answered no, the jury's done with their deliberation
3  because the jury at that point has -- has decided that
4  the individual should receive a life sentence.  The
5  verdict would be returned into open court.  The jury
6  will be done with their deliberation at that point if
7  the question's answered no.
8      A.  Okay.
9      Q.  If the question's answered yes, the jury would
10 then proceed to consider Special Issue No. 2.  And let
11 me run through this real quick.  And there's Special
12 Issue No. 2.  I'll give you a second to read through
13 that because it's kind of lengthy.
14     A.  (Prospective juror complies).
15     Q.  Okay.  Lengthy question, right?
16     A.  It is.
17     Q.  Well, it's -- our Legislature wrote it, and
18 we're going to break it down in just a second.  I think
19 it'll make more sense after we break it down.  But let
20 me tell you that there is a definition that we're going
21 to be concerned with here.  That the Judge is going to
22 instruct the jury that mitigating evidence is anything a
23 juror might regard as reducing a Defendant's moral
24 blameworthiness.  Okay?
25         If it's mitigating, it reduces his moral

36

1  blameworthiness.  Okay.  So that's -- that's an
2  important definition we need to keep in mind as we go
3  through this question.
4          The first thing I want to point out to you
5  with regard to this question, up here at the beginning
6  it doesn't say anything about beyond a reasonable doubt.
7      A.  Okay.
8      Q.  That means that the State does not have a
9  burden of proof on Special Issue No. 2.  We have a
10 burden of proof for everything else, for the -- for the
11 guilt/innocence phase and for Special Issue No. 1, but
12 not on Special Issue No. 2.  So who has the burden of
13 proof on Special Issue No. 2?
14     A.  Witnesses?
15     Q.  Well, the facts of the case?
16     A.  The facts.
17     Q.  The facts of the case.  Exactly.
18     A.  Must be something that -- that we -- mitigating
19 circumstances.
20     Q.  The key is that neither the State nor the
21 Defense have a burden of proof because, remember, the
22 Defense never has a burden of proof.
23     A.  Right.
24     Q.  So the Legislature has decided it's just going
25 to be the facts of the case that tell the jury -- or

1  actually, each individual juror, is there something they
2  find mitigating about this particular case?  Because it
3  says:  Taking into consideration all the evidence,
4  including the circumstances of the offense, the
5  Defendant's character and background and his personal
6  moral culpability, is there a sufficient mitigating
7  circumstance or circumstances to warrant that a sentence
8  of life imprisonment rather than a death penalty be
9  imposed?
10         So taking everything into consideration --
11 and here's how you approach it.  Taking everything into
12 consideration, everything I heard during this trial, and
13 my -- and my personal background and beliefs as a juror,
14 is there something I find mitigating here?  Is there
15 something here that reduces the Defendant's moral
16 blameworthiness?
17         And then if I do find there's something
18 that reduces his moral blameworthiness, is it sufficient
19 in light of everything else up here, the circumstances
20 of the offense, his character, et cetera, to warrant
21 that a life sentence rather than the death penalty be
22 imposed?  You see how that works?
23     A.  Given every chance not to use the death
24 penalty.
25     Q.  That is exactly what this question is for.

37

1   A.   Which I appreciate.

2   Q.   That is exactly what our question is for
3   because our courts have said -- our higher courts -- our
4   appellate courts have said we had a -- we had a series
5   of questions under our law, but they didn't give jurors
6   an opportunity to take something into consideration that
7   was mitigating.  We only had these rote questions --

8   A.   Right.

9   Q.   -- that the jury had to answer.

10   A.   Because my understanding is we've already found
11   him guilty by the evidence.

12   Q.   That's right.

13   A.   But now we're actually deciding if that -- that
14   guilt has got mitigating circumstances.

15   Q.   And you've also -- remember, you've also found
16   that he's going to be a continuing threat to society.

17   A.   Correct, by the first issue.

18   Q.   Exactly.  You've made -- you've made two
19   independent decisions.

20   A.   It does take the pressure off the jury a little
21   bit.

22   Q.   It does.  And it also takes -- you know, it's
23   kind of a failsafe question.  You ask -- you find him
24   guilty, you move a step closer to the death penalty.
25   You find he was a continuing threat to society, you move

38

1   another step toward the death penalty.  And here you
2   decide, is there something about this case that makes a
3   life sentence more just than the death penalty?

4        Is there something you could think of right
5   now that you think might be a sufficient mitigating
6   circumstance in a capital murder case?

7   A.   Look at the mental status at the time, I think.

8   Q.   Okay.  What -- what about the mental status
9   would lead you to decide the case one way or the other?

10   A.   Well, the evidence is one thing, but when
11   someone commits murder, there -- there could have been
12   some reason that they were involved in the process in
13   the first place.  It could have been a drug -- you know,
14   is he on drugs or something like that, and that would
15   have done -- they wouldn't have been thinking clearly if
16   they were.

17   Q.   And that's -- that's an example that I often
18   use when I tell someone what a mitigating circumstance
19   might be because someone may look at the facts of the
20   case and say, well, he certainly did a capital murder.

21   A.   Right.

22   Q.   And he certainly is going to be a continuing
23   threat to society, but because he was on controlled
24   substances at the time --

25   A.   Right.

39

1   Q.   -- he just wasn't -- he wasn't thinking
2   clearly, and that reduces his moral blameworthiness.

3        Is that -- is that something you think
4   might be important in every case or in particular cases
5   or -- what do you think about that?

6   A.   I think the situation here where there's a
7   capital murder, I think that it should be -- it's what
8   we're asked to do is to -- to decide if this man was
9   thinking clearly at the time he did this.

10   Q.   Okay.  Is that -- is that something you think
11   could be a mitigating circumstance in every capital
12   murder case, that is, if you found someone was using
13   drugs at the time of the offense?

14   A.   I think, there again, I would have to hear the
15   evidence because it would be hard to make a decision,
16   because we don't know when the drug use was taking
17   place, we don't know -- there's a lot more at stake.
18   They would have to have -- probably that -- hear from
19   some medical people.

20   Q.   And that is -- that is exactly what this
21   question is all about, is taking into consideration all
22   the facts in the case and in your -- your beliefs as to
23   what you think a mitigating circumstance is, and then if
24   you think it's mitigating, you give it effect by voting
25   in such a way that a life sentence is imposed instead of

40

1   a death penalty?

2   A.   Correct.

3   Q.   So some jurors may say, Well, the fact that
4   someone was on -- was on drugs at the time, they think
5   that is a sufficient mitigating factor in a capital
6   murder case.

7        And some other people might say, Well, you
8   know, he voluntarily took those drugs, and when you
9   voluntarily take drugs, you know what they're going to
10   do to you and you know you're not going to be in your
11   right mind; therefore, it's not a sufficient mitigating
12   circumstance.

13   A.   It could go both ways, yes, sir.

14   Q.   Just depends on the facts of the case.

15   A.   Correct.

16   Q.   Another situation that -- that has been thrown
17   out as a possible mitigating circumstance is that
18   everybody under our law, 18 years of age and over, is --
19   is -- could be punished with the death penalty, if they
20   commit a capital murder and the jury thinks it's the
21   right punishment.

22   A.   Yes, sir.

23   Q.   Some people might say, Well, an 18-year-old
24   is -- they're immature.  Medical science has shown their
25   brain -- brain may not have completely formed; that they

41

1  don't have the same moral compass that someone in their
2  30s or 40s might have based upon life experiences, et
3  cetera. And they may say, Well, because of that, being
4  18 years of age could be a mitigating circumstance under
5  some -- in some capital murder cases. See how that
6  might work, just as an example?
7      A.  I can see how it works, but I think that was
8  not our decision. That was already made by the
9  Legislature.
10     Q.  And again, I'm just throwing it out as an
11  example. And another juror might say, Well, at 18 years
12  of age, they can do everything an adult can do and,
13  therefore, they ought to be responsible for their -- for
14  their actions. They can vote, they can serve in the
15  military --
16     A.  Right.
17     Q.  -- et cetera, so therefore, they're mature
18  enough under the eyes of the law.
19     A.  Under the eyes of the law, correct.
20     Q.  So I'm just throwing that out as -- as an
21  example.
22     A.  I understand.
23     Q.  But the key is whatever you think as a juror
24  based upon the facts of the case, if you think it's
25  sufficiently mitigating that you give it effect, give

43

1      A.  I can do that.
2      Q.  That's fine.
3          On the other hand, if you felt like the
4  right thing to do would be to answer the question yes,
5  would you be able to do that, knowing that the answer to
6  the question would require the Judge to give a life
7  sentence in the penitentiary?
8      A.  I could do that.
9      Q.  And I forgot to tell you at the beginning of
10 this process, as I started talking to you this morning,
11 if you have any questions about anything at all, please
12 stop me as we're going through this.
13     A.  I do have one question.
14     Q.  Please.
15     A.  Back to the first phase of the trial.
16     Q.  Uh-huh.
17     A.  Since he was involved in a criminal -- since
18 the Defendant in this case was involved in a criminal
19 act, if he -- if the jury finds him guilty -- or not
20 guilty because the evidence wasn't presented, what
21 happens to the criminal, the other part of that trial?
22 Obviously, he was -- he was doing a crime. Am I
23 understanding that correct? Some criminal act was
24 taking place, and then the murders took place. Is that
25 the way I understand it, or are we all putting the --

42

1  that mitigation effect, that reduction in
2  blameworthiness by answering the question yes --
3      A.  Yes, I understand.
4      Q.  -- that you do find there's a sufficient
5  mitigating circumstance.
6      A.  I understand.
7      Q.  If you don't find there's a sufficient
8  mitigating circumstance, obviously, you answer the
9  question no.
10         Now, answering the question no, if all 12
11 jurors agree, the individual receives the death penalty.
12         And if 10 or more jurors agree that the
13 answer should be yes, the individual receives a life
14 sentence. You see how that works?
15     A.  Yes.
16     Q.  The Defendant gets the benefit of the doubt on
17 the numbers also.
18         The question for you at this point is that:
19 Based upon your moral view and taking into consideration
20 your viewpoints, if the State's -- well, if you were to
21 decide that the answer to the question should be no,
22 based upon the evidence, would you be able to answer it
23 no, knowing that the jury's going to return a verdict
24 that requires the Judge to sentence the individual to
25 the death penalty?

44

1  because that's what gets it to that -- am I
2  misunderstanding the --
3      Q.  Well, let's go back to the -- to the
4  PowerPoint.
5      A.  Okay.
6      Q.  Is that -- is that the slide that you had the
7  question about?
8      A.  That slide right there because it says he
9  knowingly murders during the same criminal transaction.
10 Was that transaction another criminal event, that in the
11 process of he murdered two people?
12     Q.  That's a good question. And we haven't been
13 asked that question before.
14     A.  Oh, sorry.
15     Q.  That's okay. I'm glad you asked it.
16     A.  Because it does seem that there is another
17 criminal activity that's got to be answered for, under
18 the law.
19     Q.  Okay. But the criminal transaction we're
20 talking about here is the --
21     A.  Is the murder.
22     Q.  Is the murder.
23     A.  Okay. I understand. I just had a question
24 about the transaction part.
25     Q.  Well, actually -- actually I was going to cover

45

1  the phrase "same criminal transaction" with you --
2      A.  Okay.
3      Q.  -- right at the end, but let's go ahead and
4  cover it now.  That also does not have a legal
5  definition.
6      A.  Oh, okay.
7      Q.  Okay.
8      A.  I'm with you.
9      Q.  So the juror -- each individual juror, and the
10  jury as a whole, then would give that phrase the meaning
11  they give it in ordinary -- in their ordinary daily
12  business.  Okay?
13      A.  Okay.
14      Q.  So some jurors may believe that a criminal
15  transaction would be -- the same criminal transaction
16  would be one act such as throwing a -- throwing a hand
17  grenade into a crowded room.  That might be a single
18  act --
19      A.  Right.
20      Q.  -- that would qualify as the same criminal
21  transaction.
22      A.  Got you.
23      Q.  And under the facts of another case, the jury
24  might say, Well, this also constitutes a criminal
25  transaction, that being an individual -- say that

46

1  there's a business that involved three partners, and one
2  partner sitting at home at night, he gets one of the --
3  one of their -- their transactional statements back from
4  his accountant, and they -- and there's a lot of
5  discrepancies in there.
6          He realizes that the other two guys are
7  cheating him.  They're cheating him out of a lot of
8  money.  And he gets angry and grabs a handgun and goes
9  over to the first guy's house and murders him, and then
10  he drives all the way across town, finds his other
11  partner and murders him.  And the jury can say that's
12  the same criminal transaction because it all involved
13  one motivation, you see?
14      A.  But he had time to think about each one.
15      Q.  He had time to think about each one.
16      A.  So he didn't -- since he didn't have to make
17  the second choice, if he made the first choice.
18      Q.  He did make the second choice.
19      A.  Okay.
20      Q.  All -- regarding the same motivation, that he
21  was being cheated in his partnership.  You see how --
22  you see how another juror might say --
23      A.  I can see.
24      Q.  That's same criminal transaction --
25      A.  Right.

47

1      Q.  -- because it all involved one thing?
2      A.  Right.
3          THE COURT:  Okay.  Mr. Waybright, can you
4  do me a favor?
5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  You're just talking at the same
7  time, and since she has to type it down, only one person
8  can talk at a time.  If you'll just hold off until he's
9  finished.
10          PROSPECTIVE JUROR:  Okay.
11      Q.  (BY MR. GILL)  And those -- and those may be
12  two kind of extreme examples about what a same criminal
13  transaction is.  And there might be a million
14  circumstances in between.  You see how that might work?
15      A.  Yes.
16      Q.  You know, it might be that -- you know, that
17  all the -- all the -- the whole transaction took place
18  at one location, but over the course of a period of
19  time.  That might be a different definition of same
20  criminal transaction.  You see how that might work?
21      A.  I'm still stuck on the word "criminal" there.
22  The criminal transaction to me, he goes in, does a drug
23  bust or drug buy, and in the process of doing the drug
24  buy, he commits murder.
25      Q.  Okay.

48

1      A.  That's a criminal transaction and -- and -- and
2  the -- consequently, the murders happened as part of
3  that criminal transaction.
4      Q.  Okay.
5      A.  That's what I'm thinking.
6      Q.  So that's -- that's not exactly what we're
7  talking about here because that is not part of that
8  definition.
9      A.  Okay.
10      Q.  The criminal transaction we're talking about
11  here is -- is the murder transaction.
12      A.  I understand.
13      Q.  The same transaction murders.  The State is not
14  required to prove to you any other crime that took place
15  during this transaction other than the two murders.
16      A.  Okay.
17      Q.  You see how that works?
18      A.  I do see it.
19      Q.  Okay.  I'm glad you asked that question because
20  there is another form -- another definition for capital
21  murder, which you have read a lot about in the
22  newspaper, the -- the concept of an individual killing
23  one person but doing so during the commission of another
24  felony like robbery or burglary.
25      A.  Correct, that's what I'm referring to.

49

50

51

52

Q. Okay. So you see the difference -- the difference between killing one individual during a robbery, but yet killing two persons during the same criminal transaction, it doesn't involve any other crime.

A. Okay. I understand.

Q. That's what we're talking about here.

A. I understand.

Q. I'm glad you brought that up.

A. Right.

Q. A unique question, one I haven't thought of.

A. Put that on the books.

Q. Put that one on the books.

Here's another concept I wanted to talk to you briefly regarding the offense of murder. You notice here that the State has to prove the individual knowingly murdered more than one person during the same criminal transaction.

And I think we talked about this a little bit at the minipanel a couple of weeks ago, that knowingly means that if an individual does a crime knowingly, it means that he's reasonably certain that his conduct is going to cause someone's death.

A. Yes -- yes, yes, sir.

Q. And that -- intent of knowing that you're going to do something can be formed very quickly.

A. Correct.

Q. One of the things you mentioned in your questionnaire was you felt like the -- like the death penalty was proper for premeditated crimes. We do not have to prove that the crime was premeditated to qualify as capital murder. You see what I'm saying?

A. I understand that right.

Q. Now, there may be -- there may be evidence in the case that it was premeditated. The example I gave you a minute ago about the individual that got wronged on his partnership, drove to one house and then another house. Obviously, there's some -- some amount of premeditation that occurred there because he thought about it for awhile?

A. Right.

Q. But the same thing could have been true if he would have killed his two partners in the same room. If he had gotten that partnership statement, read it in the presence of his two partners and said, By God, you guys are cheating me, pulled out a handgun, shot them both dead, that would also qualify under this capital murder statute.

A. I think that's the question I had.

Q. Okay. Because he knew his conduct was

reasonably certain to cause those two guys' death, whether he thought about it for a period of time or not. You see how that works?

A. The question there again, did he knowingly do it. That's the only --

Q. Did he know his conduct was reasonably certain to cause their deaths, not -- not how long he planned it out.

A. Right.

Q. But did he know, at the time he did it, that it was reasonably certain to cause the death. That is our burden of proof in a capital case. Okay?

A. Right, thank you.

Q. Okay. Do you have any questions about anything else we've been over?

A. I think that was the big one.

Q. Okay. Do you have any questions at all about -- about anything that might involve your service as a juror in a criminal case?

A. I'd rather be somewhere else, but, no, I don't have any questions.

Q. Okay. We'll take that as a given that you'd rather be somewhere else. Okay?

A. Yes, sir.

Q. Because while your -- while your question was -- about the criminal transaction was a unique question, the position about rather be someplace is --

A. I understand.

Q. Okay. Well, if you don't have any other questions, Mr. Waybright, I appreciate your time with me this morning.

MR. GILL: Judge, that's all we have.

THE COURT: Thank you.

Do you need a drink of water?

PROSPECTIVE JUROR: I can sure use one. Thank you.

THE COURT: Okay.

Defense, you may proceed.

MR. MOORE: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. MOORE:

Q. Mr. Waybright, Larry Moore.

A. Yes, sir.

Q. This is Fred Cummings and Pam Fernandez. We represent John in this case.

A. Yes, sir.

Q. And I've had the opportunity to hear your exchange with Mr. Gill, so I'm hoping that we won't have to spend quite as much time. But I don't think it'll come as a great surprise, I don't see this the way he

53

1 sees it. Okay? It really doesn't make any difference
2 because people that matter are the people that are going
3 to be on this jury and how they look at this.
4          And -- and this process right now has
5 really got one purpose, and that is to tell you
6 everything -- all the law that might possibly apply to
7 the trial of the case. Okay?
8          A. Yes, sir.
9          Q. Because we ask you to do a little introspection
10 and decide for yourself how you feel about that. Once
11 you take the oath to be a juror in the case, your oath
12 tells you you're bound to follow that law whether or not
13 you agree with it or not. Okay?
14          And we don't want somebody to be in that
15 position where their conscience is telling them one
16 thing and the law is telling them something else. And
17 so what the law says is that if a person's disagreement
18 with some aspect of the law that might apply to the
19 trial of a case is so profound that they just don't feel
20 like that they could serve in that case, they're not
21 required to take the oath. You see what I mean?
22          A. Yes, sir.
23          Q. But that's a decision you make. You have to
24 tell us that.
25          And then each side gets to excuse a certain

54

1 number of people from service in the case for whatever
2 reason. So basically, we have to kind of judge your
3 responses and how comfortable we are with your ability
4 to serve as a juror. You see how that works?
5          A. Yes, sir.
6          Q. It's not brain surgery, but it's -- it's more
7 based on how you feel about your service than anything
8 else. Okay?
9          A. Yes, sir.
10          Q. So if I ask you a question that you don't
11 understand or you need to make a comment about, please
12 let me know. I mean, this whole purpose is to inquire
13 about your thoughts and your feelings and how
14 comfortable you are with the prospect of serving as a
15 juror in this kind of case.
16          And this doesn't -- we don't get to do this
17 in every case. In most cases -- well, in all criminal
18 cases it's done in a -- in a panel as a whole. And so
19 only when they say the State is seeking the death
20 penalty that we get to individually talk to each juror.
21 So that's a little bit different procedure.
22          I wanted to talk to you a little bit about
23 some of your -- the things on your questionnaire. You
24 were a nurse before you went into the ministry?
25          A. Yes, sir.

55

1          Q. And I think you said that you were -- did you
2 ever do active duty in the Air Force?
3          A. I did six years active duty in the nurse corp
4 of the Air Force, yes, sir.
5          Q. Where were you stationed?
6          A. I was stationed three years at Luke Air Force
7 Base in Phoenix, Arizona, outside of Phoenix, and then I
8 did about three and a half years at Carswell, which is
9 now the joint reserve base.
10          Q. Did you ever -- you were never deployed
11 overseas or anything?
12          A. No, sir.
13          Q. When did you go to the -- you -- you took a
14 master's in divinity from Dallas Baptist. When did you
15 do that? Was that after -- while you were -- while you
16 were in the Air Force or after you got out of the Air
17 Force --
18          A. Actually, it was from Southwestern Baptist
19 Theological Seminary, and I started in 1993, January of
20 '93, and graduated in 1996, in May of 1996.
21          Q. What -- what were your active duty years in the
22 Air Force?
23          A. It was 2000 -- excuse me. It's been so long
24 ago. 1982 I went on active duty but actually started my
25 service in '83 and got out in '88.

56

1          Q. Okay. So you went to the seminary. I
2 apologize.
3          A. Yes, sir.
4          Q. You got your undergraduate degree at --
5          A. Correct. That's correct.
6          Q. Have you ever -- what -- let me back up.
7          Have you ever served at any other church
8 other than Travis Avenue Baptist Church?
9          A. Yes, sir. I served as a associate pastor in --
10 over in White Settlement at the Normandale Baptist for
11 about two years.
12          Q. Your position with Travis Avenue, your -- you
13 indicated staff minister, business manager and IT
14 director.
15          A. Correct.
16          Q. Do you minister to the congregation directly,
17 or do you mainly do administrative duties?
18          A. Most of my interface with the congregation is
19 usually in the technical area. Even though I have a
20 degree, I don't use it in the same -- maybe the same
21 light as a minister would do it, but I'm on the staff,
22 and I get treated as a minister by the law, but I do
23 more IT and more business transactions.
24          So if somebody has a problem with a gift, a
25 contribution, I would get that resolved, or we have a

1 records problem, I can get that resolved. That's pretty
2 much my role.
3 Q. Okay. What caused you to go to the seminary?
4 I mean, you were -- you were a nurse, you've been a
5 nurse. What caused you to go to seminary and become a
6 minister?
7 A. Well, I think a lot -- a lot had to do with the
8 death and dying that I dealt with. I dealt about 14, 15
9 years in I.C.U. and dealt a lot with people who faced
10 death and just didn't seem we could ever give them the
11 answer. Always felt like there was more than what I
12 could put my finger on, so I think God chose to send me
13 there to seminary and get those answers.
14 Q. Okay. In the -- in the time that you were at
15 Normandale Baptist, did you actually counsel the people
16 that were going through that process and --
17 A. Yes, sir, I did. A few. It was not a -- not a
18 big congregation, so it wasn't that big of a issue.
19 Q. How many -- how many people are in the
20 congregation at Travis Avenue now?
21 A. It depends on who you ask. It's about -- it's
22 about 2700 is the actual active attendance, and I think
23 we have 4300 on the actual rolls.
24 Q. On the rolls?
25 A. Yes, sir.

1 Q. Your wife works for the White Settlement School
2 District now?
3 A. Yes, sir.
4 Q. Is she in the administration, or does she
5 actually serve as a nurse in the school?
6 A. She is actually a nurse working with students
7 in the special ed department.
8 Q. Was all of the postgraduate work that you did
9 at Southwestern Baptist?
10 A. In seminary -- in theology, yes, sir.
11 Q. Do you have postgraduate work in other fields?
12 A. I -- actually, not really. Like I took the
13 math and the computer sciences classes after the first
14 bachelor's, but not really postgraduate. It was just
15 while I was on base at -- at Luke, it's the dessert,
16 nothing to do, so we took classes.
17 Q. Okay. You indicated you don't know whether
18 your denomination has an official position in regard to
19 the death penalty?
20 A. Well, I don't think you could ask that of the
21 seminary and they'd give you an answer. I think the
22 idea of being a Baptist, particularly Southern Baptist,
23 is that we're individually accountable, and that's the
24 issue. So if you were to look it up, you probably
25 wouldn't find an official position, but it's left up to

1 the individual decision.
2 Q. All right. That Travis Avenue is a Baptist --
3 Southern Baptist Convention Church?
4 A. Yes, sir, it is.
5 Q. Okay. The -- you said earlier that you had
6 a -- is it a daughter that has -- is on probation for
7 some kind of -- or is it her husband --
8 A. It's her husband.
9 Q. Her husband? Which -- which daughter is it?
10 A. It's my oldest daughter. She has had a drug
11 problem, and the husband went to a -- a party and he got
12 drunk or something and did something that someone
13 accused him of, and he was -- he pled rather than
14 serve -- rather than go before a jury.
15 Q. A jury? How old was the child supposed that
16 was --
17 A. 15.
18 Q. 15? Was your daughter at the party, or was
19 this before they got --
20 A. No, she was at the party. They were married at
21 the time, yes, sir, but she does not remember that
22 exchange either, so...
23 Q. Did he remember it?
24 A. He does not remember at the moment, is what he
25 says.

1 Q. Okay. Did he feel like that he was guilty of
2 that offense?
3 A. He says he's innocent but, there again, if I
4 were to question him, he could not identify that he
5 didn't do it, which always leaves room for doubt.
6 Q. Was that in Tarrant County or --
7 A. Collin County.
8 Q. Collin County?
9 A. Yes, sir.
10 Q. How long ago was it that that case was
11 disposed?
12 A. Oh, it's been about three years, sir.
13 Actually, take it back. It was -- we actually went --
14 we actually was -- were in the process about -- probably
15 about six years ago is when it started, so it was about
16 probably three years -- it was about three years ago,
17 yes, sir.
18 Q. Okay. How has that affected the relationship
19 between your daughter and him? Are they still together?
20 Is that --
21 A. Well, I think they're -- yes, sir, they are,
22 and he -- one of the provisions for his probation was
23 that he could not touch alcohol, and at this point it's
24 been a good thing. So they've actually found a better
25 bond as husband and wife because he doesn't drink

61

1  anymore.

2      Q.  Okay.  You said that your daughter had a drug
3  problem.  Is that the same daughter?

4      A.  Yes, sir.

5      Q.  Has she been able to deal with --

6      A.  At this point she's sober and clean without
7  drugs.

8      Q.  Congratulations.  Good for you.

9           For how long a period of time had she dealt
10  with an addiction issue?

11     A.  At least ten years.

12     Q.  What type of -- was there a particular type of
13  drug that she used, or was there more than one drug?  Do
14  you know?

15     A.  Her first marriage was to her drug dealer.

16     Q.  Okay.

17     A.  I had no idea about that.  As -- later in life
18  she got -- just the last few years she was addicted to
19  painkillers, Hydrocodone and I don't think Oxycontin,
20  but Hydrocodone, Vicodin.

21     Q.  Did she have any physical problems prior to
22  getting addicted to like --

23     A.  Well, she said she had back pain, so the --
24  that prescription was legal, but just couldn't ever get
25  off of it.  And she is diagnosed as a -- with bipolar

62

1  disorder but, there again, she's been treated for that,
2  but she's under the care of a good physician, so at this
3  moment she's good.

4      Q.  I'm sorry.  Do they give her medication for the
5  bipolar?

6      A.  Yes, sir.

7      Q.  You said one time you wrote a letter to the
8  editor of a newspaper about protesting the use of public
9  funds.  For why?

10     A.  Well, the question, I believe -- I don't
11  remember the exact question that you asked on the form,
12  but it's probably for something -- I've been known to be
13  a little activist in my day.  I'm not sure exactly what
14  I wrote.

15     Q.  Well -- and she's got the form if you need to
16  look at it.

17          Have you ever written a letter to the
18  editor of a newspaper?  Yes.  If yes, about what
19  subject.  Protest use of public funds.  Do you remember
20  what --

21     A.  I don't remember exactly what that was for, but
22  I just wanted to answer the question honestly in case
23  you decide to look.  My name appears on some list
24  someplace.

25     Q.  How -- how do you know Judge Wilson, Sharen

63

1  Wilson?

2      A.  She's a church member.

3      Q.  How do you know -- is George Mackey also a
4  church member?

5      A.  Yes, sir, he is.  I don't -- I know his -- I
6  took care of his -- or I taught his son in the fifth
7  grade.  That's about all I know of George.  I know we --
8  we sent some of our own people to him, but I don't
9  really know that well.

10     Q.  Okay.  And Larry Thompson from the D.A.'s
11  Office?

12     A.  Yes, sir.  I occasionally interface with him on
13  Sunday mornings.  He teaches Sunday school class.

14          There's probably about 20 lawyers on that
15  list that I could start rattling off, if I had to, but
16  those are the three big that I know are involved in
17  criminal cases.

18     Q.  Okay.  What was it that interested you about
19  the O. J. Simpson case?

20     A.  This -- this -- I think, like everybody else,
21  we were just interested to see if the -- if the State
22  would actually prove its case, but since I've been here,
23  I've learned a lot about why they did not -- why it was
24  not successful, so it's been an interesting
25  enlightenment to me so far, not something I necessarily

64

1  wanted to learn, however.

2      Q.  Okay.  You indicated that you had some concerns
3  with the criminal justice system in terms of the appeal
4  process dragging out so long.  Am I -- is that correct,
5  or am I incorrect about that?

6      A.  Well, inasmuch as -- I think as far as the
7  death penalty's concerned, I think that's the issue
8  probably is that I think -- I don't know if that's
9  exactly the question that was answered at the time, but
10  I can appreciate the Fifth Amendment, I can appreciate
11  why we do what we do, the appeal process does.  It gives
12  us time to think about it.  Now that I've had time to
13  think about what I'm here for, I can -- I would say I
14  would change my mind on that -- that statement a little
15  bit --

16     Q.  Okay.

17     A.  -- now that I think about it, because I do need
18  time to process this information.

19     Q.  Well, it's -- it's a significant undertaking
20  for --

21     A.  It's not something I do every day.

22     Q.  Yeah.  Well, we do --

23     A.  Which is a good thing.

24     Q.  Yeah.  I want to talk to you a little bit about
25  the law that might apply in the trial of the case.

65

1    A.  Okay.

2    Q.  And I -- and I -- I -- I think I want to start

3    with just what constitutes murder.

4            Murder has kind of got a simple definition.

5    If you knowingly cause the death of another individual

6    by any means, then that's a crime, and that's the crime

7    of murder.  And as Mr. Gill told you, we have other

8    types of homicides with lesser states of mind.

9    A.  Right.

10   Q.  You can -- you can kill somebody and it not be

11   reasonably certain that you're going to kill them by

12   your conduct.  And that's what's required because that

13   definition of knowingly is that you were reasonably

14   certain that your conduct is going to cause their death.

15   Okay?

16           For it to be -- for it to be murder, it has

17   to be that state of mind or intentionally, which is a

18   greater state of mind.

19           If I do it negligently or if I do it

20   recklessly, which is legally defined also, it's still a

21   homicide.  It's not a murder.  Okay?

22   A.  Right.

23   Q.  And this presupposes that there's not any kind

24   of legal justification for it.  There are certain things

25   that the law recognizes as being a justification for my

66

1    engaging in the conduct such that I would not be

2    penalized for it.  If I'm defending my wife or defending

3    myself, you know, they -- that's self-defense under the

4    statute, and that's a justification that excuses me from

5    criminal responsibility.

6            So to find somebody guilty of murder, you

7    have to presuppose that there's no legitimate or legal

8    excuse for it.  Okay?

9    A.  Correct.

10   Q.  Do you have any questions about how -- just

11   basically what a murder is, how we get to the offense of

12   murder?

13   A.  I understand.

14   Q.  Okay.  Capital murder adds something to that.

15   And there's several different ways under the statute by

16   which we get there.  And when the Legislature penalizes

17   conduct and creates a crime, they set out the facts that

18   have to be proved in order to establish that, and we

19   call that the elements of the offense.

20           But, basically, it's just the facts that

21   the State has to allege and has to prove in order to

22   find somebody guilty.  Okay?  And that's -- the

23   statutory scheme that's alleged in this Indictment is

24   what's on that screen now.

25           And it, basically, is that there is one or

67

1    more -- the statute talks about more than one murder

2    during the course of the same criminal transaction.

3    Okay?  So each one of them has to be done knowingly, and

4    if there's no legal justification or excuse for either

5    one and they are part of the same criminal transaction.

6    Okay?

7    A.  Yes, sir.

8    Q.  Now, you can have a murder and a murder that

9    are not a capital murder.  You can have two murders that

10   are not part of a single criminal transaction.  You see

11   what I mean?

12   A.  Like the murder took place at two different

13   times?

14   Q.  Well, that's because there's no definition --

15   A.  Right, I understand.

16   Q.  -- what constitutes --

17           THE REPORTER:  I'm sorry.  If you could

18   just wait until he finishes the question before you

19   answer, please?

20           I didn't hear your question.

21           MR. MOORE:  That's all right.

22   Q.  (BY MR. MOORE)  There's no -- since there is no

23   definition of what constitutes a single criminal

24   transaction, we leave it to the jurors' understanding of

25   the term.  Okay?  And the juror applies his own

68

1    definition.  What that means is we don't assume or

2    presume that the jury will go back there and say, Hey,

3    let's come up with the definition that all of us can

4    agree upon for single criminal transaction.

5            There may be agreement; there may not

6    because it's an individual -- you -- it's an individual

7    determination.  If you think it's one transaction, it's

8    one transaction.  If you don't, it's not.  You see how

9    that works?

10   A.  Yes, sir.

11   Q.  And it's not required that you use the same

12   definition as another juror.  Mr. Gill gave you the --

13   you know, a possible example of one act that kills more

14   than one person.  The Oklahoma City bombing, you know,

15   one bomb kills 160, whatever it is, people.  Some jurors

16   say, Okay, that's what I think we're talking about with

17   a single criminal transaction.

18           Now, other jurors may think that it's

19   something different from that, but they would have to

20   apply their own understanding of what it was.  You see

21   how that works?

22   A.  Yes, sir.

23   Q.  Does that cause you any concern that there's

24   not -- there doesn't have to be a commonality amongst the

25   jurors as to a particular definition?

69

1    A.   It's life.

2    Q.   Well --

3    A.   There's no certainty.

4    Q.   You know, there's -- the problem with it is --
you know, he gave you another example about the business

6  partner got cheated by his partners, and he kills one

7  and then he drives across the county and kills another.

8  That -- I assume some juror could look at that and say

9  that's one transaction because, you know, it's his

10 understanding of what constitutes one transaction, but

11 that's a decision that he has to make for himself.  Is

12 that one transaction or is that two transactions?  You

13 see what I mean?

14           Because if it's one, it's -- it can be

15 capital murder, but if in his mind that's two separate

16 transactions and not one, then it's two murders for

17 which he can be penalized for each murder, but it's not

18 a capital murder.  You see that's a juror's decision?

19 A.   I understand the gravity of the question.  I

20 understand the reason that you're -- that we're

21 discussing that because it would make a difference

22 whichever -- whether or not we apply the death penalty.

23 I understand.

24 Q.   Because if you -- you find that there's a

25 murder and there's a murder but you don't find it was

70

1  one transaction, then you find him guilty of murder.

2  You don't find him guilty of capital murder.  You see

3  how that works?

4    A.   Yes, sir.

5    Q.   Okay.  And -- and sometimes jurors have a

6  problem because the guy sitting next to them is applying

7  a different definition from what they might apply.  They

8  say, I don't care.  You know, to me, that's one act.  To

9  you, it may be more than one act joined by, you know,

10 close proximity in time or a close geographic --

11 whatever it is that makes your -- you think a single

12 criminal transaction encompassed all the conduct.

13           And some jurors have a problem with the

14 fact, okay, we're playing with two different definitions

15 here because the law doesn't envision you're going to go

16 back and arrive at a common definition.  You see what I

17 mean?

18 A.   Correct.

19 Q.   Okay.  Have you got any question about that,

20 how we get from murder to capital murder?

21 A.   No, sir.

22 Q.   Okay.  And the jury is required to find all of

23 the elements that are set out by beyond a reasonable

24 doubt, and there's a presumption that none of them are

25 any less important or any more important than any of the

71

1  others.  That's why earlier when Mr. Gill was having a

2  discussion with you about, you know, they got to prove

3  the date, they got to prove the location, they got to

4  prove how it was done, just like they have to prove that

5  this is the guy that did it.  You see what I mean?

6    A.   Yes, sir.

7    Q.   Some jurors sometimes have a problem because

8  they look at parts of that as being somewhat technical.

9  If they allege, okay, you know, I -- he killed him with

10 a knife, but the proof shows that, yeah, he killed them,

11 but he shot them with a gun, well, that's a variance

12 between the pleadings and the proof.

13           And the law says if the jury finds that,

14 they got to send -- find him not guilty even though they

15 know that two people are dead.  And some jurors just

16 can't do that.  They just don't agree with that part of

17 the law.  They think it's something of a technicality,

18 and they could not in good conscience set somebody free

19 in those circumstances.  How do you feel about your

20 ability to do something like that?

21 A.   Once again, as a theoretical, I believe that I

22 could do the right -- that I could make the right choice

23 at the time if the evidence were there.

24 Q.   Okay.  And this is kind of -- sometimes we use

25 admittedly extreme examples because this is the part

72

1  that I told you about we asked you to be introspective

2  and look at it and -- and make a decision as to what

3  your abilities are.

4           And it's -- sometimes it's hard because

5  we're doing it theoretically, but there's a reason why

6  we're asking these questions because we don't want to be

7  in a situation where jurors are in the box and taken

8  that oath, and then for the first time they actually

9  say, Okay, I can't do that, I'm not going to do that.

10 Okay?  That's unfair to you; that's unfair to the

11 Defense; it's unfair to the State.

12           And so it's -- it's important that you're

13 comfortable with your ability to do something like that.

14 That's -- when you say, I would hope or, I think or, I

15 might be able to do the right thing, that causes me a

16 little bit of unease.

17           I mean, do you think that you can do that?

18 Is that something that you -- are -- could make yourself

19 follow the law even though you might not agree with the

20 results or the consequences of that decision, or is it

21 just something that you don't think you could do?

22 A.   I think I'd get lost in the details, actually.

23 Q.   What do you mean by that?

24 A.   Well, I'd probably get -- get -- I'd be like

25 the juror that would say, depends on -- it's a detail, I

73

1  guess, is the word I was thinking.  It's a detail I
2  might not be able to overcome.
3       Q.  By that being -- being -- means that might be
4  something that you could not follow your oath in regard
5  to, that you could not find the guy not guilty in that
6  situation?
7       A.  Once again, I think if the evidence were there,
8  I would -- I would have to say that I could find them
9  guilty, if the evidence were there beyond a reasonable
10  doubt.
11      Q.  Okay.  And maybe I'm misunderstanding your
12  answer.  I understand that you think you can find him
13  guilty.  If you found that evidence to -- to demonstrate
14  to you, yeah, the guy was killed, but they missed the --
15  they misallege the means, they allege that he pushed him
16  off a cliff, but they proved that they ran over him with
17  a car, the victim is just as dead, he's never going to
18  come back.
19          But are you comfortable with your ability
20  in that situation to say, They didn't prove it the way
21  they're required to; my oath tells me I have to vote not
22  guilty, and I can do that?
23      A.  I would follow my oath.
24      Q.  Okay.  And that's -- that's the inquiry.
25      A.  I understand.

74

1       Q.  And I apologize.  You probably understood it
2  better than I did.
3       A.  Took my brain for a little -- little twist, but
4  I'm good.
5       Q.  You know, the -- the only way that you get to
6  that special issue submission procedure with the two
7  questions is if the jury finds somebody guilty of
8  capital murder.  If they find him guilty of murder, even
9  if it's two murders, you know, they're given that range
10  of punishment from 5 to 99 or life, and they go out
11  there and pick a number that they think is appropriate
12  based on everything they've heard, the facts of the case
13  and that particular Defendant.
14          And I know Mr. Gill asked you about that,
15  but I -- I don't believe you have any qualms or problems
16  with any part of that range of punishment; is that
17  correct?
18      A.  No, sir, I do not.
19      Q.  Okay.  So they're -- you're of the mind that
20  there may be some facts and circumstances that you could
21  find somebody guilty of murder, knowingly taking a life,
22  but based on whatever the circumstances were, where five
23  years might be an appropriate sentence?
24      A.  Yes, sir.
25      Q.  Okay.  And the same with life.  I mean, the

75

1  presumption is the jury's going to let the facts dictate
2  the verdict.
3       A.  Yes, sir.
4       Q.  Okay.  If they find the Defendant guilty of
5  capital murder, it's a completely different inquiry
6  because what's intended is that the State -- the jury
7  will answer these questions.  And the answers to the
8  questions, as Mr. Gill told you, dictate the sentence
9  that the Judge will return.
10          Now, the questions are intended to ask the
11  jury to find certain facts.  Okay?  This is the way we
12  decide, of all the people that get convicted of capital
13  murder, who's going to get the death penalty.
14          The presumption is that if the Legislature
15  had wanted everybody that was found guilty of capital
16  murder to get the death penalty, they could have tried
17  and write the statute in that way, that if you do this,
18  this, this and this, it's the death penalty.  That's not
19  what they said.
20          What they said is, Okay, if you are found
21  guilty of capital murder, there's two possible
22  punishments, and the way we're going to decide which it
23  is is by the jury answering these questions.  You see
24  how that works?
25      A.  Yes, sir.

76

1       Q.  Okay.  The problem with the question is they
2  may or may not accomplish the purpose.  They may not
3  help us in determining who gets life or death because it
4  depends on the way the jury looks at the questions;
5  that, you know, it's presumed that the questions are
6  going to ask us to find something different, but they
7  may or may not because it depends on how the jury looks
8  at the question?
9          And let me just kind of visit with you
10  about the first one.  It asks you to find beyond a
11  reasonable doubt whether there is a probability that the
12  Defendant would commit criminal acts of violence that
13  would constitute a continuing threat to society.  I'm
14  sorry.
15          And the jury knows at the time that they
16  find him guilty that he has committed two -- at least
17  two murders in the course of a single criminal
18  transaction.  Some jurors, that is going to be enough in
19  every case for them to answer yes because that is going
20  to be sufficient to establish him as a future danger to
21  that juror.
22          That's not what the law envisions.  The law
23  envisions that they might be able to go out there and
24  answer that question no based on the facts of the case.
25  See what I mean?

79

1    A.   Yes, sir.

2    Q.   Do you think that there could be circumstances

3  where you could find somebody guilty of capital murder

4  under this scheme where there's more than one murder in

5  the same criminal transaction and yet still not be

6  convinced that that person was a threat or a danger?

7    A.   I think there are circumstances that would

8  happen, yes, sir.

9    Q.   Okay.  And -- and that's what's envisioned is

10  that that question is not going to be automatically

11  answered just because he's guilty.  Because if the juror

12  thinks that, then that question doesn't serve any

13  purpose at all.

14    A.   Right.

15    Q.   See what I mean?

16         And they got the burden to prove it beyond

17  a reasonable doubt.  Now, when Mr. Gill was talking to

18  you about the question, there was some discussion -- I

19  remember you said something about, We don't know the

20  future, because he was asking you about, well, they

21  didn't use the word -- they didn't use the word

22  "possibility," they didn't use the word "absolute

23  certainty," but they used that word "probability."  And

24  that's one that you also apply your -- your definition

25  for the term.  And if I remember correctly, you said

1    A.   I don't believe I have any concerns, no, sir.

2    Q.   Okay.  And it's not even enough that it would

3  be criminal acts of violence.  They would have to be

4  sufficient under the law for you to find it to

5  constitute him as a threat to society.

6         So by whatever act of violence you might

7  find it to be, so you -- you would also have to be -- find

8  that those -- that act or those acts were of sufficient

9  nature and degree that you would feel it constitutes

10  that particular individual to be a threat.  You see how

11  that works?

12    A.   I see how it works, yes, sir.

13    Q.   And do you have any questions about that?

14    A.   I don't believe I do, no, sir.

15    Q.   Okay.  It's only if the jury unanimously

16  answers that question yes that they go to the second

17  question.  If they answer it no, he gets a life

18  sentence; the party's over.

19    A.   Right.

20    Q.   If you go -- if you answer it yes, now for the

21  first time, the death penalty is a possibility because

22  they met their burden in regard to finding guilty, they

23  met their burden in regard to that first question.  And

24  the way that we determine whether it's life or death is

25  this second question.  Okay?

78

1  something to the -- a great -- a good possibility or

2  something like that?

3    A.   Correct.

4    Q.   Okay.  And I assume that that is something more

5  and greater -- a larger or greater degree of likelihood

6  than a mere possibility that it could occur; is that

7  correct?

8    A.   Correct.

9    Q.   Okay.  And that's what they got to prove.  As

10  he's sitting in court the day the jury makes that

11  determination, that that degree of likelihood, by

12  whatever definition you give, it exists.

13         And it's not just that he's going to be an

14  unpleasant fellow or that he might do bad things in the

15  future.  It's that he's going to do certain types of

16  acts.  Okay?  And -- and those certain types of acts are

17  criminal acts of violence.

18         There's -- it's not legally defined.  We

19  leave it to your understanding.  But you do understand

20  that it has to be an act of violence, as you would

21  define that, and it would have to be such an act that it

22  would be a crime.  You see what I mean?

23    A.   Yes, sir.

24    Q.   Okay.  Have you got any concerns about what

25  we're talking about in that regard?

80

1         And I -- I -- I want to visit with you

2  about the second question because it can be very

3  problemsome for some jurors.  We don't define any other

4  terms.  You get that instruction in regard to mitigation

5  that we'll talk about in just a second.

6         But one -- one of the things that you said

7  earlier -- and I can't remember exactly how you said it,

8  but it was something -- the question takes the pressure

9  off the jury or something like that?  Do you remember

10  saying something like that?

11    A.   I do.

12    Q.   What did you mean by that?

13    A.   Well, when you -- when I first came here to be

14  on the jury, first summoned, and then once we learned it

15  was a capital murder trial, the impression that I

16  thought at that point was it was -- if we found him

17  guilty, it was an automatic death penalty.

18    Q.   Okay.

19    A.   There was no room -- the -- just the decision

20  to find him guilty was an automatic process.

21    Q.   Okay.  And you understand now that that is --

22    A.   I see it's much more complicated than that.

23    Q.   Okay.  The issue of the death penalty

24  turns on the findings of these two questions, but it's

25  really -- it isn't -- you don't even get to the second

81

1  one unless you've already met that -- the State's
2  already met that burden that he's a future danger.
3          And then the jury looks at all the facts
4  and the circumstances in order to answer Question 2.
5  And it asks the jury to take in consideration -- excuse
6  me -- all of the evidence in the case, the circumstances
7  of the offense, the Defendant's character and background
8  and the personal moral culpability of the Defendant, do
9  you find that there is a sufficient mitigating
10  circumstance such that a sentence of life imprisonment
11  rather than a death penalty should be imposed?  Okay?
12          Now, Mr. Gill told you they don't have to
13  prove that there is no mitigating circumstance, and the
14  laws presumes that I don't have to prove that there is
15  one.  Okay?
16      A.  Right.
17      Q.  And -- and I assume that the presumption that
18  the reason there isn't a burden is because we leave it
19  to the individual to decide what's mitigating and what's
20  not.  Okay?
21          The juror gets to decide.  They look at the
22  evidence, and they decide if some evidence is mitigating
23  or if it's not mitigating.  And you -- during your
24  discussion, for example, when you're talking to Mr. Gill
25  about the issue of drug addiction.  If somebody commits

83

1      A.  Yes, sir.
2      Q.  Okay.  One of the problems that we have with
3  this is that word, "sufficient mitigating circumstance"
4  because some jurors see that as -- as putting the burden
5  on me to convince them that the mitigating circumstances
6  exist or that the mitigating circumstances are
7  sufficient to tell them that the life sentence is
8  appropriate.  Okay?
9          And the law doesn't envision I got that
10  burden, but just by reading the question, some jurors
11  get to that.  How do you feel about that idea?
12      A.  It goes back to the definition of sufficient.
13  I think it's individual -- what my tolerance for
14  sufficient might be different than -- so I might have
15  a -- I might feel that it didn't take a whole lot of --
16  of evidence or -- to make that -- to meet that
17  determination.
18      Q.  Okay.
19      A.  But at least at this point we've heard more
20  information than we had in the original trial, so...
21      Q.  You may have or you may not have.
22      A.  Yeah.
23      Q.  Okay.  The law says that the State doesn't have
24  to prove any additional evidence.  There may not be any
25  additional evidence --

82

1  a crime under the influence of drugs such as that don't
2  have the same ability that appreciates the wrongfulness
3  of their conduct or to conform their conduct to the
4  requirements of the law, that's not a legal defense.
5  But a juror may look at that and say, You know, somebody
6  that was not in that state of mind, was not intoxicated,
7  on drugs or in the throes of that addiction, you know,
8  may not have acted in the same way, and so I'm not going
9  to judge them the same way.
10      A.  But we've already said that he was knowingly,
11  and that at that point that -- you can't have both
12  definitions, really.
13      Q.  That's up to you because you make the
14  determination.  You may find that somebody acted
15  knowingly and yet still feel that there was some type of
16  impairment.  If not, you wouldn't vote -- you're not
17  going to vote guilty, anyway.
18      A.  Right.
19      Q.  But it's an individual determination.
20      A.  Right.
21      Q.  You're going to have to decide, based on the
22  facts, whether or not that use of drugs impacted his
23  ability to know that his conduct was reasonably certain
24  to cause the death and appreciate their wrongfulness.
25  You see what I mean?

84

1      A.  Okay.
2      Q.  -- for them to put on?
3      A.  Right.
4      Q.  Any -- what the law is is that any evidence
5  that is relevant to the issue of punishment is
6  admissible by either --
7      A.  Right.
8      Q.  -- State or Defense.  If when he was six years
9  old, he spit on the sidewalk and the State wanted to
10  introduce that, they can.  Okay?
11          If when he was six years old, he went next
12  door and helped his elderly neighbor take down the
13  laundry, we can introduce that.
14          Because there's no -- anything that --
15  that -- that the Court finds is relevant to this
16  decision making that might give the jury some insight
17  into his background or his character or the kind of
18  person he's been in his life is admissible.  You see
19  what I mean?
20      A.  Yes, sir.
21      Q.  So there may very well be additional evidence;
22  there may not.  It just -- it varies by case.  My
23  concern is I want to make sure that you don't see by
24  just the way the question is worded that I have any
25  burden of -- of production of the evidence or any burden

85

87

1    of persuasion of the jury to convince them that that
2    question should be answered yes.
3        A.   Well, and for me, it's the -- the first issue
4    is actually asked one way, and the second question is
5    actually asked the opposite.
6        Q.   Uh-huh.
7        A.   So as a matter of determining at this point
8    right -- in this (sic) circumstances, the two questions
9    are right next to each other, so it makes the
10   decision -- makes that -- that a little more
11   complicated.  I think if we had time --
12       Q.   Yeah --
13       A.   -- to think about that.
14       Q.   And you don't -- and I -- I -- I think the
15   important thing to remember is that it is a stairstep
16   process.
17       A.   Right.
18       Q.   You don't get to Question 2 until you've
19   disposed of Question 1 because if you don't -- if that's
20   not disposed with a unanimous yes answer, then you don't
21   ever answer Question 2.
22       A.   Yes.
23       Q.   You certify your verdict and give it to the
24   Judge, and the trial is over.
25            Do you feel like that the way that question

1        A.   Right.
2        Q.   Okay?  Because I'm not compelled to do it, but
3    we may do it.  And the problem with it is --
4            Would you put the definition of mitigating
5    circumstance up there?
6            This -- this sometimes causes a problem
7    because the -- the instruction that you would get tells
8    you that mitigating evidence is evidence that a juror
9    might regard as reducing the moral blameworthiness of
10   the Defendant.  Okay?
11           It doesn't -- each juror makes that
12   decision individually.  Let me ask you a question:  What
13   do you think that they're telling you in regard to
14   mitigating evidence when they talk about reducing his
15   moral blameworthiness.  Blameworthiness for what?
16       A.   I almost need a definition of that definition
17   (sic).  I think I'm a little slow upstairs sometimes
18   there.
19           Reducing the Defendant's moral
20   blameworthiness.  I believe what it says is that -- that
21   the evidence should actually reduce his blame or his --
22   his guilt, I guess, is the better word for me.
23       Q.   Okay.
24       A.   If I'm reading that correctly.
25       Q.   His blameworthiness for -- for the crime he

86

88

1    is worded, that second one, puts any burden on the
2    Defense?
3        A.   But the way the question is worded, it would be
4    in the Defendant's best and the best -- best -- what's
5    the word there?  It would actually be good for him if
6    you didn't have that -- if you did have some -- some
7    evidence to the -- in this case.
8        Q.   And that --
9        A.   So --
10       Q.   That's reasonable?
11       A.   Right.
12       Q.   And I think it would be reasonable to assume
13   that we're probably going to try to introduce some
14   evidence that we feel is mitigating.  What I'm concerned
15   about and what the question is a little more basic than
16   that is:  Do you feel that I have some legal obligation
17   or legal necessity to produce that evidence or convince
18   the jury that it's sufficient just by the way that
19   question is worded?
20       A.   It doesn't say that.
21       Q.   Okay.  And that's the -- that's the -- that's
22   the inquiry I'm trying to make.
23       A.   I understand.
24       Q.   Do you -- I -- I want you to understand the
25   difference between what I have to do and what I may do.

1    committed?
2        A.   Right, correct.
3        Q.   There's not -- the law doesn't require there to
4    be a nexus or a connection, a direct link --
5        A.   Okay.
6        Q.   -- between the mitigating circumstance that the
7    juror may find it to be and the actual commission of the
8    crime.  So it does not have to be -- it may be
9    independent of the actual commission of the crime.  Let
10   me give you an example.
11       A.   Okay.
12       Q.   If a particular Defendant on trial at some
13   point during the past has honorably served his country
14   in the military or -- and been engaged in some heroic
15   act or done particular acts of kindness in the past,
16   that may not directly link to the commission of the
17   crime.  Okay?
18           But the jurors may want to take that into
19   consideration as -- as mitigating evidence.  The problem
20   is that sometimes in looking at that, jurors get -- have
21   a problem because it talks about moral blameworthiness.
22       A.   Right.
23       Q.   Do you think that you could fairly consider
24   mitigating evidence that was independent of the actual
25   commission of the crime?

89

91

A. I believe I could.

Q. Okay. This isn't -- none of us wrote this. This -- this is your Legislature's work.

A. I understand.

Q. And sometimes it's kind of a complex process.

Is there anything about this special issue submission that you have a question about at this point?

A. Not as -- not as far as the law says it, but as far as the human being, I'm thinking it -- to ask me to set aside the -- the behavior that caused us to be here and then turn around and say --

Q. I don't think it causes you to set that aside because I think it says you can consider all the circumstances of the crime.

A. Right.

Q. And any additional evidence or other evidence that you may have regarding his character, background, upbringing, things like that.

And there may be -- I think what's important for the jury to recognize, there may be things in the person's background that have profoundly affected him in the way that he looks at things and the way that he reacts that are different from the way that anybody else might react in that situation. You see what I mean?

---

Judge. You get an instruction that tells you, go back and consider it; get a verdict if you can. Okay?

But it also tells you you don't -- you will not violate your individual conscience just in order to get a verdict. Okay? Because that's what's required. Each individual juror decides for himself, in his own heart and his own mind, what they feel is appropriate, and they don't abandon that just to get out of that little room.

And when you certify to the Judge -- when the jury certifies to the Judge, Judge, we cannot get a verdict without causing someone to violate their conscience, your service is over. Okay? Certify that to the Court, the Judge discharges the jury and that's the end of your service. You see how that works?

A. Yes, sir.

Q. The only way that there's ever a death sentence is if those questions are answered unanimously yes, unanimously no. You see how that works?

A. Yes, sir.

Q. One juror has the power to ensure that that won't occur.

A. It's a serious business.

Q. Uh-huh. And that's what's required.

Do you have any questions for us?

---

90

A. Yes, sir.

Q. And the jury is called on to judge him as an individual, not only in light of what he's done, but in light of the kind of person he is and the influence that's been brought to bear on him and things like that. Any questions about that?

A. We're saying basically we're giving him the benefit of the doubt by that Special Issue No. 2?

Q. Well, you decide whether or not the death penalty is the only appropriate punishment because that's basically what that question asks you, is life without parole enough?

A. I understand.

Q. Okay. You know that it takes a unanimous verdict on both of these questions to lead to a death sentence.

A. Correct.

Q. It takes at least ten jurors on either one of these questions to get to a life sentence.

Have you got any thoughts as to what happens if the jury doesn't have ten going one way or unanimous going the other way?

A. I would imagine that happens.

Q. It does. And what happens is if the jury cannot answer the question, they certify that to the

---

92

A. I don't think I have any.

Q. Mr. Waybright, you've been very patient with me, and I appreciate it. Thank you very much.

THE COURT: If you will have a seat out in the hallway, we will call you back in in just a few minutes.

PROSPECTIVE JUROR: Thank you.

THE COURT: Thank you.

(Prospective juror exits courtroom)

THE COURT: Juror No. 84, new No. 83, does the juror -- sorry. Does the State have a challenge for cause?

MR. GILL: No. 84?

THE COURT: Correct.

MR. GILL: No challenge for cause.

THE COURT: Does the Defense?

MR. MOORE: We don't have any challenge for cause, Judge.

THE COURT: All right. State, exercise a peremptory?

MR. GILL: No, Your Honor.

THE COURT: Defense?

MR. MOORE: I would like to reserve that until we get to 81.

THE COURT: Okay. That will be fine.

93

1      MR. MOORE:  That shouldn't be --
2      THE COURT:  That will be --
3      MR. MOORE:  -- this afternoon.
4      THE COURT:  -- three more jurors.
5          Okay.  Will you bring him back in, please?
6      (Prospective juror enters courtroom)
7      THE COURT:  Okay.  Mr. Waybright, since we
8  took you out of order today, we will call you by the end
9  of business today to let you know whether you will have
10  any further service in this case.
11      PROSPECTIVE JUROR:  Okay.
12      THE COURT:  Okay.  If you are going to be a
13  juror and even in the meantime, be sure to follow all of
14  the written instruction I've given you regarding not
15  seeking out any outside information about the case and
16  following your instructions about the Internet and other
17  social media formats.  Do not seek out any information
18  or give out any information about the process or your
19  service.
20      PROSPECTIVE JUROR:  Okay.
21      THE COURT:  Okay?
22      PROSPECTIVE JUROR:  All right.
23      THE COURT:  So we will notify you by the
24  end of today.  Thank you very much --
25      PROSPECTIVE JUROR:  Thank you.

94

1      THE COURT:  -- for your time.
2      (Prospective juror retires)
3      (Recess from 12:05 p.m. to 1:05 p.m.)
4      (Open court, Defendant present)
5      THE COURT:  Okay.  We're ready for 81,
6  George Adams.
7      (Prospective juror enters courtroom)
8      THE COURT:  Right here, Mr. Adams.  How are
9  you?
10      PROSPECTIVE JUROR:  Good.
11      THE COURT:  Okay.  You are Prospective
12  Juror No. 81, George Edward Adams; is that correct?
13      PROSPECTIVE JUROR:  Yes.
14      THE COURT:  I need to swear you in for
15  purposes of these proceedings this afternoon, so if
16  you'll raise your right hand, please?
17      (Prospective juror sworn)
18      THE COURT:  You filled out a jury
19  questionnaire several weeks ago now.  Has anything
20  substantial changed since you filled that out that you
21  need to let us know about?
22      PROSPECTIVE JUROR:  No.
23      THE COURT:  We discussed scheduling when
24  you were here for your minipanel interview.  Is there
25  anything that changed about your schedule that would

95

1  interfere with your ability to serve in this case?
2      PROSPECTIVE JUROR:  No.
3      THE COURT:  You will recall that the person
4  on trial in this case is John William Hummel.  He is
5  represented by Fred Cummings, Larry Moore and Pamela
6  Fernandez.
7          The State of Texas is represented by Miles
8  Brissette and Robert Gill.
9          Both sides are going to have the
10  opportunity to talk to you this afternoon regarding your
11  jury questionnaire and the death penalty issues that are
12  involved in this case.  It will take about an hour,
13  hopefully.  There's some water right here if you need
14  some.  Okay?
15      PROSPECTIVE JUROR:  All right.
16      THE COURT:  State, you may proceed.
17      MR. BRISSETTE:  Thank you.
18          GEORGE EDWARD ADAMS,
19  a prospective juror, having been first duly sworn,
20  testified as follows:
21          VOIR DIRE EXAMINATION
22  BY MR. BRISSETTE:
23  Q.  Good afternoon, sir.  How are you?
24  A.  I'm doing well.
25  Q.  I noticed on your questionnaire that you may

96

1  have some hearing issues.
2  A.  Normal 57-year-old hearing issues.
3  Q.  Well, I have normal 38-year-old hearing issues
4  with a good double-ear infection right now, so if my
5  voice drops, let me know, and we'll go from there.
6  A.  Okay.
7  Q.  I also noticed your brother has, I guess,
8  retired from the Arlington Police Department at some
9  point?
10  A.  Yes.
11  Q.  He was a sergeant over there?
12  A.  Best I know he was a detective.
13  Q.  A detective.  Okay.
14  A.  From what I understood, he retired after 30
15  years as a gold-shield detective, so...
16  Q.  Anything about your brother's employment
17  working over at the Arlington Police Department that
18  would -- see, now I can hear you.  That's perfect.
19  A.  Okay.  Sorry.
20  Q.  Anything about your brother's employment as a
21  Arlington police detective would affect you in sitting
22  in judgment of somebody else in a criminal case here in
23  Tarrant County?
24  A.  No.
25  Q.  Where did you do aerospace work at?

97

1    A.   Vought, LTV over in Grand Prairie.
2    Q.   What kind of tools would you make?  I mean, are
3  they declassified where you can talk about them?
4    A.   No, they weren't declassified.  I was a pattern
5  toolmaker.  My trade was woodworking, so they hired
6  woodworkers to form aluminum blocks that aren't square,
7  that are odd shapes that you have to sit and grind into
8  unusual shapes.
9    Q.   So were you using a -- was this before CNC
10  machines or was this --
11    A.   They had CNC machines, too, so I don't know
12  why, you know, the hand work was done instead of a
13  machine doing it.
14    Q.   So would you cut a blank down then with a band
15  saw and start in with the hand tools then?
16    A.   Uh-huh.  Mostly aluminum blocks, and yes, we
17  cut them, file them, grind them, drill holes in it.
18  They give you a pattern to work from and build the tool
19  from those patterns.
20    Q.   And then I -- I also notice that you were an
21  actual cabinetmaker.  Did you have your own shop or is
22  this --
23    A.   After the aerospace work, I did.  I was a
24  partnership -- a furniture cabinetmaking business.
25    Q.   What's your favorite piece to make?

98

1    A.   Furniture.  You know, not so much cabinets, but
2  I like making furniture.  And I've been in management
3  for the last 18 years, so the only woodwork I've done in
4  the last 18 years is as a hobby.
5    Q.   Do you have a shop at home?
6    A.   Yes.
7    Q.   What's your favorite wood to work with?
8    A.   Walnut.
9    Q.   Okay.  Looks like you've picked up a little bit
10  of welding along the way as well?
11    A.   I'm learning welding right now, actually.
12    Q.   Do you have a welder?
13    A.   Acetylene torch.  I don't know if you'd call it
14  a welder.  You can weld with it.
15    Q.   How long ago was your house broken into, sir?
16    A.   I don't remember the date.  Maybe five years
17  ago, six years ago.
18    Q.   Did they ever catch the person?
19    A.   No.  I knew who it was and told them who it
20  was, but I don't know of him ever being caught.
21    Q.   And you told the Fort Worth Police Department?
22    A.   Yes.
23    Q.   And then your girlfriend's son had an incident,
24  I believe, where he was molested.  She didn't feel that
25  justice was done, or you didn't feel justice was done?

99

1    A.   She didn't.  It's something she's told me, I
2  know very little about.
3    Q.   Was that here in Tarrant County as well?
4    A.   No.
5    Q.   Anything about either one of those incidents
6  would affect you in this case?
7    A.   No.
8    Q.   As part of this afternoon's activities, this is
9  a chance for the State and the Defense to talk to you
10  about the punishment phase of the case, and the
11  punishment phase of the case being the capital murder
12  itself.
13         When Mr. Gill and Mr. Cummings talked to
14  you a couple of weeks ago, we talked about general terms
15  of criminal law and about the elements of basic murder
16  and stuff like that.  We're going to go back through a
17  few things about your oath and where we're at to catch
18  up, and then get your thoughts and views about the death
19  penalty as we go forward.  Does that make some sense?
20    A.   Yes.
21    Q.   Right now the oath the Judge gave you was to
22  simply just tell the truth, and we'll have a few things
23  show up here this afternoon on the overhead.
24         If you're selected as a juror in the case,
25  one of the verdicts (sic) will be to render a verdict

100

1  based on the evidence and the law in the case.  And
2  that's what you'll have to do if you're selected as one
3  of the jurors.  You should actually know this afternoon
4  if you're one of the jurors.
5    A.   I'm sorry?
6    Q.   You'll know this afternoon if you're one of the
7  jurors on the case.
8    A.   Okay.
9    Q.   It happens that quick at this point.
10    A.   Okay.
11    Q.   And taking that into mind, I believe you had
12  noted somewhere on here you may have a vacation planned
13  for June?
14    A.   Yeah.  I don't have a firm date set for it at
15  this point.
16    Q.   Okay.
17    A.   It depends kind of on my fiance's work schedule
18  when she can get off, so I can probably work around it.
19    Q.   Work around the trial?  Perfect.
20         Before we dive too deep into this, is there
21  any reason, be it moral, ethical or religious that you
22  could not be part of the process that results in the
23  death penalty?
24    A.   No.
25    Q.   A person commits capital murder when he

101

1  knowingly murders more than one person during the same
2  criminal transaction.  If you've ever had any
3  discussions with your brother over the years about what
4  the different laws might be in Texas, there are a number
5  of different ways that a capital murder could be
6  committed.
7          When your brother was on the force, if he
8  were killed in the line of duty, that would be
9  definitely a capital murder case.
10         But for a particular case itself, the law
11  carves out.  You have to deal with the law that pertains
12  to that one.  And in this case, we're dealing with two
13  murders, two knowing murders, during the same criminal
14  transaction.
15         The law does not define what a criminal
16  transaction is.  That's up to each juror to come up to
17  what their own terms might be.
18     A.  Okay.
19     Q.  It could be -- it's a timeframe/space issue,
20  but that's a determination a jury needs to make on their
21  own, each individually and collectively as a whole.
22  Does that make some sense?
23     A.  Does somewhat.  I'm not sure I understand the
24  definition of what that criminal transaction is.
25     Q.  Well, what are your thoughts on it?  What are

102

1  your concerns?
2     A.  Well, committing two murders while in the
3  process of committing a crime, criminal transaction
4  sounds like committing a crime.
5     Q.  Okay.
6     A.  If it means committing a felony or means
7  something different, define it because I didn't know
8  what that meant.
9     Q.  All right.  Well, let's take a look at it and
10  walk through it here and see if we can make some sense
11  out of it.
12         So we have two murders, and the law's
13  talking about a -- an action, a criminal transaction, an
14  event.
15     A.  Okay.
16     Q.  All right?  So what if we -- if I said same
17  criminal event to you, what does that mean?
18     A.  Same criminal offense?
19     Q.  Event.
20     A.  Yes, that would -- that would indicate they
21  were done at the same time.
22     Q.  Okay.
23     A.  Or very near the same time.
24     Q.  So the law doesn't define -- there's no
25  definition that I can give you for same criminal

103

1  transaction.  We have worked through some examples here
2  over the last couple of weeks, and one example might be
3  the Murrah Federal Building up in Oklahoma City when the
4  fertilizer truck was put outside and detonated.
5     A.  Right.
6     Q.  The other might be where we've had incidents
7  here in the county before where businessmen have been
8  upset at their partners and for whatever reason decide
9  one was going to get even with the other two partners
10  and gone to two parts of town in one evening and -- and
11  killed two people.
12     A.  Okay.
13     Q.  Just examples.
14     A.  Okay.  So that -- that would be an example even
15  though they weren't done at the same time?
16     Q.  It -- on a clock, the exact same time, correct.
17  The jury has to decide how long a window is for that
18  clock.
19     A.  Okay.
20     Q.  If that's to -- make some sense.
21     A.  Yes.
22     Q.  That's for the jury's determination.  And your
23  view of working on the same criminal transaction and the
24  juror sitting to your right or to your left may be
25  something completely different.  But if it satisfies the

104

1  requirements in your own mind that you've met that, and
2  then collectively as a whole, we're dealing with a
3  capital murder.
4          If we're not, if it doesn't meet the same
5  criminal transaction, then you're dealing with two
6  traditional murders then.  You see that?
7     A.  Yes.
8     Q.  And if it's an element that the State has to
9  prove to you that two murders were committed knowingly
10  during the same criminal transaction, whatever that
11  definition is to you, if we don't meet that burden, the
12  Defendant's not guilty of capital murder then, is he?
13     A.  No.
14     Q.  Okay.  We would be looking at some
15  lesser-included offense of traditional murder.  Does
16  that make some sense?
17     A.  Yes, it does.
18     Q.  Any questions about that?
19     A.  No.
20     Q.  As we go about and look at these things, we
21  have the elements from the first phase that we talked
22  about a couple of weeks ago, and those elements, just
23  like the definition, it can have manner and means in
24  there.
25         And as part of the manner and means, a

105

1 manner and means may be that on a certain date and time
2 Miles Brissette did then and there knowingly commit a
3 murder; to-wit, by a shooting two people with a gun.
4 And it's proved at trial -- the Prosecution proves at
5 trial that he didn't shoot him with a gun; he stabbed
6 him with a knife. Okay?
7    A. Okay.
8    Q. I -- as a Defendant, I'm sitting pretty good at
9 that point because the State hasn't proved the proper
10 manner and means, right?
11    A. Right.
12    Q. And if you have to hold the State to every one
13 of their elements and they didn't meet it beyond a
14 reasonable doubt, what -- what say the -- the jury? The
15 jury says not guilty, right?
16    A. I believe so.
17    Q. Yeah. Well, if the State doesn't meet their
18 elements, the tie goes to the runner, and the runner is
19 the Defendant, right?
20    A. Right.
21    Q. Okay. There's no issue about that because you
22 have to hold the State to the burden. The Defendant
23 never has a burden in a criminal case in Texas.
24    A. Right, okay.
25    Q. The burden stays at this table and this table

106

1 alone. Can you agree with it -- that with me?
2    A. Yes.
3    Q. What you will see, though, when we talk about
4 cases such as this, is we're -- we're -- if we're
5 talking about the punishment phase of a death penalty
6 case, a jury has already found a Defendant guilty of two
7 knowing murders during the same criminal transaction.
8       So in a punishment phase, there are two
9 more decisions that have to be made, two questions. Did
10 you have a chance to look at the homework assignment the
11 Judge gave you --
12    A. Yes.
13    Q. -- leading up to this?
14       So you know about the special issues we're
15 going to talk about.
16    A. Yes.
17    Q. To consider those, it's not an automatic that
18 we answer Special Issue No. 1 because as a juror, you're
19 going to have to take that oath to follow the law, and
20 the law says you have to look at everything. And part
21 of the stuff you get to look at in the punishment phase
22 is everything you heard during the guilt/innocence
23 phase, you don't have to forget about. You can consider
24 that again.
25    A. Right.

107

1    Q. So you may already be there with all the
2 information you had during the guilt/innocence phase to
3 answer the questions in Special Issue 1 and 2. But
4 there could be more evidence brought forward as well.
5       During the guilt/innocence phase, the State
6 can't bring any evidence of bad reputation or bad
7 character. You may hear of that during the punishment
8 phase. You may also hear of unadjudicated offenses.
9 When your brother would make a collar on somebody or
10 make an arrest, they may file one charge on him and have
11 a lot of other charges they didn't prove up or didn't
12 file with the D.A.
13       During the punishment phase of a case,
14 those other charges that weren't the main collar could
15 be proved up as well --
16    A. Okay.
17    Q. -- if that makes some sense.
18    A. Yes.
19    Q. And that's what we're talking about, about
20 unadjudicated cases. So there are some different areas
21 there where one can bring that forward.
22       So as we're looking at this and we go
23 forward, we'll look at the two questions. Our shorthand
24 version is future dangerousness and sufficient
25 mitigation for a life sentence.

108

1       And depending on how a jury answers these
2 both -- first individually and then collectively as a
3 whole -- decides how a jury is going to tell the Judge
4 or instruct the Judge how to sentence a Defendant.
5       As Mr. Gill told you in the big panel, the
6 Judge has to follow the Court's decision -- the jury's
7 decision. They go through it, and they make the
8 sentence based on that.
9       The Judge will tell you, if you're selected
10 as a juror on this case, that a sentence of life without
11 parole means the Defendant is ineligible for release
12 from prison on parole. So two things legally are
13 options. Life without parole, they'll die in custody of
14 natural causes; or the death penalty, and they'll be
15 executed at a date and time certain.
16       The third is, is we've seen in North Texas,
17 sometimes inmates escape from even the maximum security
18 jail.
19       MR. CUMMINGS: Your Honor, I'm going to
20 object. There's only two legal results of guilty of
21 capital murder, not three.
22       THE COURT: Sustained.
23    Q. (BY MR. BRISSETTE) Two legal reasons, as I
24 went through, the -- the two options of how somebody
25 comes in and out of prison. And you've heard about

109

1  other instances as we go through it.

2      So Special Issue No. 1:  Do you find beyond

3  a reasonable doubt that there's a probability that a

4  Defendant would commit criminal acts of violence that

5  would constitute a continuing threat to society?

6          And the jury has to make a decision yes or

7  no.  So before we go through that, there's some

8  questions on some words in here that I need to ask you

9  about.

10     A.  Okay.

11     Q.  What does probability mean to you?

12     A.  More than likely.

13     Q.  More than likely.  All right.  Is probability

14 greater than an absolute certainty or less than an

15 absolute certainty?

16     A.  I say less than.

17     Q.  Is probability greater than possible?

18     A.  Yes.

19     Q.  Okay.  What would you think criminal acts of

20 violence would be?

21     A.  Acts against other humans.

22     Q.  And society itself in looking at this in this

23 context?

24     A.  I'm sorry?

25     Q.  Looking at the word "society" in looking at

110

1  this context.

2      A.  Society, that's the public.

3      Q.  Does it change your decision or answer for

4  society knowing that the two options for a punishment on

5  a capital case are life in prison without parole or the

6  death penalty, that the person's going to be confined

7  during this?

8      A.  Does it change what?

9      Q.  Does it change -- can society be the people

10 inside a penitentiary system?

11     A.  I wondered about that because I wondered what

12 kind of continuing threat someone could be if they're

13 going to be in prison the rest of their life, or death.

14 To those two, neither one is going to be much of a

15 threat to society, and -- the way I looked at it.

16         Since you brought up that there are parts

17 of society that are in prison also, I've never been

18 there, but I assume that they protect prisoners from

19 being killed in prison or violence against them.  I

20 mean, I know it happens, but I don't know what answer

21 you're looking for there.

22     Q.  Well, there's -- there's no particular answer

23 I'm looking for.  I'm just looking for your thoughts on

24 it.

25     A.  Well, but I don't think of life in prison

111

1  without parole or the death sentence that a person with

2  either of those sentences could be much threat to

3  society.

4      Q.  Okay.  Would you be predisposed then to answer

5  the question no without hearing any additional evidence

6  on it?

7      A.  What's predisposed mean?

8      Q.  With a mindset that you're going to come in and

9  answer it no to begin with because they're going to be

10 locked up?

11     A.  Ask the question again.

12     Q.  Sure.  Based on what your -- what you've

13 explained to me, if I understand it right, that a person

14 that's in the penitentiary system would have little to

15 no chance of ever being a continuing threat to society

16 because they are in the penitentiary system.

17     A.  Right.

18     Q.  Is that a view you would -- you would bring

19 into the case?

20     A.  Yes.

21     Q.  Is it a view, even if you took an oath, that

22 you would -- you would have when you sat in the jury

23 box?

24     A.  I'm sorry?

25     Q.  Is it a view that you would have, Mr. Adams,

112

1  when you were sitting in the jury box?  The Judge is

2  going to explain to you that you have to follow your

3  oath as a juror.

4      A.  Right.

5      Q.  And size the case up based on the facts and the

6  evidence.  Is this a view that is so strong that you

7  wouldn't be able to -- to call balls and strikes on the

8  case?  You would already have this determination set in

9  your mind, because to you, when I look at this question,

10 they can't be a continuing threat because they're in

11 prison?

12     A.  Well, if the question was -- when I walked in

13 here and when you asked me the question, am I open to

14 understanding that better and my view changes on that,

15 yes.

16     Q.  Okay.

17     A.  I was predisposed based on what I knew, and I

18 hadn't even thought about society being the inmates in

19 prison.

20     Q.  Okay.  Do you see how people -- if we had two

21 separate societies, if we take the society inside the

22 fence line and the one that sits outside the fence line,

23 do you see where societies may interact where we have

24 staff that goes in and staff that comes out each day?

25     A.  Yes.

115

1   Q.  We have inmates that transition in and out of
2   society?
3   A.  Yes.
4   Q.  Or the two societies.
5       And we have clergy and stuff like that that
6   would go to the other society?
7   A.  Yes.
8   Q.  What do you think the overall safety is in the
9   penitentiary system based on what you -- you know as a
10  citizen here?
11  A.  I don't have much view on that.  I don't know
12  how safe it is in prison.  I don't have any formed idea
13  of that.  I know there's violence in prison, and I know
14  that.  How much?  I don't know.
15  Q.  Okay.
16  A.  One in ten or nine in ten get accosted in
17  prison, I don't know.
18  Q.  And I don't know if anybody has a study on
19  that.  I was just -- it's --
20  A.  Yeah.
21  Q.  -- what your perception of it is.
22  A.  That's kind of what it is.  I don't know.
23  Q.  Okay.  So a jury collectively, after each
24  person decides individually, has to come up with an
25  answer to this question based on the evidence.

---

1   mind beyond a reasonable doubt, would you have any
2   hesitation voting no?
3   A.  No.
4   Q.  Now, the second question, there is no burden
5   from either side.  That first question had a burden on
6   the State still.  So to get to the second question, a
7   jury's had to vote 12/0 guilty of capital murder;
8   Special Issue No. 1, 12/0 unanimous, yes, they're a
9   future danger.
10      Now we're here to this last question.  This
11  last question doesn't have a burden for either side.
12  A.  Okay.
13  Q.  This is totally the jury's discretion.
14  A.  Okay.
15  Q.  It's one where the jury has to -- if the death
16  sentence is going to be imposed, it has to be unanimous
17  answer of no.  If it's yes, then it's a life sentence.
18      And the jury in this case, taking into
19  consideration all the evidence, including the
20  circumstances of the offense, the Defendant's character,
21  background and personal moral culpability of the
22  Defendant, there is sufficient mitigating circumstance
23  or circumstances to warrant a sentence of life
24  imprisonment rather than the death sentence be imposed.
25      So this is a chance for a juror, looking at

---

114

1       It's not automatic based on the
2   guilt/innocence phase of the case.  The jury has to make
3   a decision yes or no.  If it's yes for this question, it
4   has to be proven to you beyond a reasonable doubt.  All
5   right?
6       If it's no, it doesn't have to be proved
7   beyond a reasonable doubt.  And based on how you answer
8   it decides whether or not you get to go to the second
9   question.
10      Knowing that a yes answer moves the
11  Defendant one step closer to the death penalty, would
12  you be able to answer this Question No. 1 yes if proved
13  to you beyond a reasonable doubt by the State?
14  A.  To Question 2?
15  Q.  To Question No. 1.
16  A.  Question 1, yes.
17  Q.  So what we're asking --
18  A.  Yes.
19  Q.  -- if we prove to you beyond a reasonable doubt
20  that they could be a future danger to society --
21  A.  Yes.
22  Q.  -- criminal acts, could you vote yes?
23  A.  Yes.
24  Q.  And the same question I would -- I would throw
25  in reverse.  If the State didn't meet its burden in your

---

116

1   this case individually as 1 of 12 and then 12 of 12, to
2   decide if there is any mitigation evidence in favor of
3   the Defendant.
4       Now, knowing that the Defense has no burden
5   of proof in a case, that mitigation evidence can come
6   exclusively from the State's side of the tables.  Okay?
7   They don't have to put on a case.
8   A.  Right.
9   Q.  So if you're wanting to hear evidence from
10  them, you may not hear it here either.
11  A.  Okay.
12  Q.  Okay?  As a citizen, you may want to hear it,
13  but the law says if you're going to take that oath and
14  really follow it to the letter, that you have to set it
15  aside if they don't bring you anything.  Okay?
16  A.  Okay.
17  Q.  Now, so if the law sets up the facts that they
18  don't have to bring anything to you and you still have
19  to be able to consider mitigating evidence, then that
20  puts you in a position where the mitigating evidence may
21  come in from the State through some of its witnesses.
22      It could come in from an early witness.  It
23  could be a piece of paper we put in front of you as an
24  exhibit.  It could be a disk with a -- with video on it,
25  audio on it, what have you.  Whatever it is, if you feel

1  that that might be mitigating, can you look at it and
2  consider it long enough to determine whether or not it
3  reduces the Defendant's moral blameworthiness in your
4  mind?
5          And I apologize.  There's no definition for
6  reducing the Defendant's moral blameworthiness.
7     A.  Okay.  I think I understand that.
8     Q.  But they ask you -- the law requires you to
9  give it effect and see if it does, in your mind, rise to
10  the level of sufficient mitigating evidence.
11         You may look at it and say, yes, it does;
12  you may look at it and say, no, it doesn't.  That's a
13  decision you have to make independent and then as a jury
14  as a whole.  Does that make sense?
15    A.  Yes.
16    Q.  And can you keep an open mind and do that?
17    A.  Yes.
18    Q.  Have any thoughts on what mitigating evidence
19  might be in a case such as this?
20    A.  Well, when I think of the death penalty --
21    Q.  Yes, sir.
22    A.  -- and -- and me making decisions about
23  someone's life, I kind of think those mitigating
24  evidence to me would -- would make a difference.  I can
25  imagine ways that this could happen, and the way I view

1  older, I got more liberal again.
2          So that doesn't mean I've changed my mind
3  completely as to which way I go, but it does change, I
4  think, the way I look at things.
5     Q.  Through your -- you've spent -- I think you've
6  spent all your life here in the -- in the North Texas
7  area, have you not?
8     A.  Basically, yes.
9     Q.  How have you seen it change since -- in your
10  adult life up here?  How's -- how's crime changed in the
11  area?
12    A.  I haven't found crime changed a lot.  You know,
13  my views on the death penalty that I was talking about
14  changing isn't based on crime in the area or crime I've
15  witnessed, just how I felt about it, you know, views in
16  general.  Even political views can go from liberal to
17  conservative in a lifetime, so...
18    Q.  So with the options that one has for the
19  questionnaire, you checked that, I believe the death
20  penalty is appropriate for some crimes involving murder
21  and could return a verdict assessing the death penalty
22  in a proper case.
23         Has that not been your view over the -- the
24  past couple decades?
25    A.  No, that has been -- I think that has been over

1  the person and -- and the decision about the punishment
2  for them could change depending on circumstances.
3     Q.  Okay.  And that is what the law requires you to
4  do is keep an open mind to stuff and follow your oath.
5     A.  Right.
6     Q.  Now, knowing that a no answer to Special Issue
7  No. 2 would result in the death penalty being imposed,
8  would you be able to answer no if you felt it was proper
9  based on the evidence?
10    A.  Yes.
11    Q.  And the same would be true on the other side.
12  If you found mitigating evidence, would you be able to
13  answer the question yes?
14    A.  Yes.
15    Q.  How have your thoughts on the death penalty
16  changed since you started this process?
17    A.  I won't say they've changed.  I've thought a
18  lot about it, which I haven't done.
19    Q.  Okay.
20    A.  And I have thought about it since this started.
21  I haven't thought about it a lot in the past.  And I
22  even wondered how my views have changed on that over the
23  years.  You know, when I was young I was more liberal
24  and thought of things a little different, and as I got
25  older, I got more conservative; and then as I got even

1  the last couple of decades and still is.
2     Q.  And there's a -- a question that came right
3  behind that, sir.  For what crimes do you think the
4  death penalty should be appropriate?  And you put
5  murder.
6          You understand that -- now that we've gone
7  through all the questions with you, that it has to be a
8  certain type of murder to qualify?
9     A.  Yes.
10    Q.  Then there's -- you wrote -- for what's the
11  best argument for death penalty in your opinion, you
12  wrote, It saves resources in prison.
13    A.  Yeah.
14    Q.  What do you mean by that?
15    A.  If you really tell me you're going to put a man
16  in prison for the rest of his life and there's
17  absolutely no chance of him seeing parole or the outside
18  or anything else, to me there's not much difference in
19  them.  I mean, that is a death sentence, in my opinion.
20    Q.  Okay.  And you understand those are the two
21  options?
22    A.  Uh-huh, yeah.
23    Q.  So knowing that that's one of the two options,
24  is life in prison without parole, would you -- do you
25  favor one of the two?

121

1  A.  Well, yeah, and what I said about resources is
2  I'm not sure society -- you know, if someone's going
3  into prison with a chance of rehabilitation or a chance
4  of parole and all, then I can see them being in prison,
5  I was paying for it, I was getting them food, keep them
6  warm, let's take care of them, let's make -- you know,
7  give them healthcare, give them everything people need
8  and rehabilitate or get out, serve their time.
9  Q.  Okay.
10  A.  In this case, I'm not sure -- I think that's a
11  lot of money to take care of someone for 60 years when
12  there is no chance they're coming out.  Then -- I mean,
13  that's the -- that's the best defense I could give you
14  for it, you know, save the resources.  The outcome's the
15  same.  The time is the only difference.
16  Q.  Becomes an equation then?
17  A.  Yes.
18      MR. BRISSETTE:  Judge, we pass the juror.
19      THE COURT:  Defense?
20      VOIR DIRE EXAMINATION
21  BY MR. CUMMINGS:
22  Q.  Mr. Adams, how are you today?
23  A.  I'm doing good, sir.
24  Q.  Good.  I want to visit with you as well.  Looks
25  like the State took about half an hour.  I don't know

122

1  that we'll take that long.  But I want to kind of flush
2  out some of the things you've said on your
3  questionnaire, as well as what you've shared with the
4  Prosecutor today.
5      And like I said the other day whenever we
6  were doing the panel discussion in the other court, this
7  isn't a matter of me trying to convince you as to the
8  strength of my case or anything about that.  It's just a
9  matter of we're trying to exercise our strikes in an
10  intelligent manner so that we can represent our client
11  to the best of our ability.
12      The -- and I want to start with where you
13  ended up.  I want to try to understand -- you've
14  obviously spent some time thinking about this since we
15  first brought you down here to serve your community,
16  right?
17  A.  Yes.
18  Q.  Can you tell me how that process is -- I mean,
19  how much time have you spent thinking about it?
20  A.  Not a lot.
21  Q.  Okay.
22  A.  Enough that I wanted to try to sort out my
23  feelings so I knew how I felt when you asked me these
24  questions.
25  Q.  And how do you feel?

123

1  A.  I feel pretty clear on how I feel about it.  I
2  say pretty clear, not a hundred percent.
3  Q.  Can you --
4  A.  Questioning myself all the time.
5  Q.  Can you summarize it for me, how you feel about
6  it?
7  A.  Can you be more specific what you're asking me,
8  what I feel about it?
9  Q.  Okay.  I sure can.  You just kind of gave me a
10  question in my mind.  You -- you indicated that the
11  resources involved in housing someone in the
12  penitentiary would perhaps be worthwhile if there was a
13  chance of rehabilitation.  Is that fair --
14  A.  Yes.
15  Q.  -- restatement of what you said?
16  A.  Yes.
17  Q.  And what worries me about that is that -- is
18  that an -- you know that if someone is found guilty of
19  capital murder, they're never going home.
20  A.  Right.
21  Q.  Okay.
22  A.  Uh-huh.
23  Q.  They're going to die in the penitentiary.
24  They're either going to die of natural causes, or
25  they're going to die as a result of the State executing

124

1  them.  Okay?
2      Rehabilitation, can you -- in your mind, is
3  rehabilitation only going to be something that would
4  result in someone's release back into the community?
5  A.  Yes.
6  Q.  So -- and is -- so if that's the way you feel,
7  is that an indication to me that you're going to be
8  inclined to assess the death penalty once -- if, in
9  fact, you have decided that someone is guilty beyond a
10  reasonable doubt of capital murder?
11  A.  Yes, I believe I -- I understand the question.
12  Q.  Well, and you might not because I didn't ask it
13  very well.  Okay?  We'll talk some more.
14  A.  Okay.
15  Q.  This -- I want to flash through these slides.
16  The -- you understand we've spent some time talking
17  about what capital murder is.  Are you satisfied that
18  you understand that we're talking about more than one
19  knowing murder that takes place in the same criminal
20  transaction?
21  A.  Yes.
22  Q.  Okay.  Are you -- are you clear that they have
23  to prove beyond a reasonable doubt that it occurred
24  during the same criminal transaction or they have to --
25  and further, they have to prove that there are two

125

1   murders, at least, or else that we might end up with
2   what's called a lesser-included offense?
3          In other words, you as a juror might
4   decide, Oh, they didn't prove those elements, but we do
5   believe that one murder did occur. Okay?
6   A. Okay.
7   Q. If that is the situation, then the -- then we
8   would be dealing with the first-degree punishment range
9   versus the death penalty and life without parole. Okay?
10  A. Yes.
11  Q. The process for punishment is different for
12  that murder case. It's where you all decide for
13  yourselves where within that range, 5 to 99 or life,
14  that you would assess punishment. And once you arrived
15  at a consensus, a unanimous consensus of the 12 of you,
16  you render your verdict and say give us a number or the
17  term life, and that would be the sentence.
18         What we're talking about and what you're --
19  and why you're going through this lengthy process is
20  because we're discussing the possibility that a capital
21  murder verdict would be the result that the jury would
22  arrive at, and if that's the case, a different procedure
23  takes place, which we have gone over with you -- they've
24  gone over with you, and I'm going to go over with you as
25  well, right?

126

1   A. Yes.
2   Q. Before you can get to the punishment phase on a
3   capital murder case, you've essentially gone down this
4   path. Okay? You have decided that this individual has
5   knowingly committed multiple murders in the same
6   criminal transaction.
7          You haven't found any defenses. It's not
8   an accident or mistake, or else it wouldn't be a knowing
9   commission of two murders. There's no insanity defense.
10  The victims have no -- there was no justification --
11  reasonable legal justification for doing this. They are
12  innocent victims, didn't deserve to die, the accused is
13  over 18, and he's not mentally retarded.
14         Those are the things you're going to know
15  before you're called upon to answer the special issues.
16  Okay?
17  A. Okay.
18  Q. And there's Special Issue No. 1. The -- can
19  you -- are you comfortable with what you're being asked
20  to do here or what you're being asked to answer here?
21  A. I'm -- comfortable? No. I mean, I do feel a
22  duty to do it. I do feel I can make clear decisions,
23  you know, there's -- there's nothing about this that I
24  feel I can't do. And I do feel -- something I want to
25  do? No. And it's not something I look forward to being

127

1   a part of.
2   Q. You can obviously understand that we wouldn't
3   want 12 volunteers.
4   A. Right.
5   Q. I don't even know if they would want 12
6   volunteers.
7   A. Right.
8   Q. But we certainly don't.
9          And the fact that you've put thought into
10  it and it does cause you concern is a reassurance to me
11  that you're going to take your duties very seriously.
12         And so I'm -- if that makes you more
13  uncomfortable, I'm sorry, but that's just the honest
14  truth.
15         What are you -- who has the burden of proof
16  here in this -- as you understand it right now, this
17  special issue?
18  A. The -- the State.
19  Q. Okay. They're asking you to determine a
20  probability. Are you -- and I can't remember whether
21  Mr. Brissette asked you about probability, but you
22  understand the term, do you not?
23  A. Yes.
24  Q. Okay. And do you see that as a greater
25  requirement than a possibility?

128

1   A. Yes.
2   Q. All right. Criminal acts of violence is not
3   defined. You decide for yourself. I think you gave the
4   definition that's very reasonable.
5          Constitute a continuing threat to society.
6   Now, case law has said that all of our institutions
7   compose or make up our society. Okay? Our schools, our
8   government, our libraries and our penal institutions as
9   well. Can you see that as being reasonable?
10  A. Yes.
11  Q. We have ministers that go within our jails and
12  our prisons. We have guards that work within them. We
13  have other prisoners who have been convicted of status
14  crimes or drug related crimes or DWI or whatever who,
15  you know, they need to be able to serve their sentence,
16  pay their debt to society and come home safe. Don't you
17  agree?
18  A. Yes.
19  Q. Okay. So do you have any trouble considering
20  the penitentiary system as part of society?
21  A. No.
22  Q. Okay. What type of thing would you expect to
23  hear in order to answer this question yes or no?
24  A. What's the question again? What type of
25  evidence?

1   Q.   Yeah.

2   A.   What would I expect to hear?

3   Q.   You see where it's asking you to predict the

4   future?

5   A.   Yes, as far as -- yeah.  And -- and when I

6   think of threat to society, again, I always thought of

7   that being -- I never thought of that being inside the

8   criminal system; and two, making a judgment about

9   whether someone can be a threat to society, I can only

10   judge about the part of society I know and see.  You

11   keep your prisons locked, and I haven't been in there,

12   so I can't even say what the chances or what chance of

13   someone being a threat to that part of society because I

14   haven't seen that part.  I can -- I can only make it

15   about the part I see.

16   Q.   Would you be able to answer Special Issue No. 1

17   based upon the evidence -- strike that.  I don't want to

18   ask that.

19          Special Issue No. 1 is the first step in a

20   process.  And this is the way a death sentence results.

21   There has to be a unanimous verdict, 12 guiltys.  Okay?

22   And then there has to be a unanimous verdict of 12

23   yeses.  And then there has to be a unanimous verdict of

24   12 nos.

25          And if that's the case, once that process

1   is complete, those 36 votes, then there's no discretion

2   on the part of the Judge.  If that's the vote, guilty,

3   yes, no, then a death sentence results.  Okay?

4          And the idea is to require the State to

5   prove the future dangerousness question beyond a

6   reasonable doubt or else a death sentence won't result.

7   And it has to be to all -- each individual juror.  All

8   12 have to agree.  Any one, it doesn't -- a death

9   sentence does not result.  Okay?

10   A.   Okay.

11   Q.   And it's the same with Special Issue No. 2.

12   Because you have told us the way you feel about no

13   chance of rehabilitation, he's never going to get out of

14   the penitentiary, are you going to be more inclined to

15   vote or respond to these special issues in such a way

16   that a death sentence is going to result because you --

17   once you found an individual guilty of capital murder?

18   A.   No.  Actually, when I think of the death

19   penalty or life in prison without parole, I'm a little

20   confused on what to say here.  Say that again.  I mean,

21   I understood it when you said it.

22   Q.   Okay.  What could I -- and it's my fault.  I

23   make a living communicating, and if you didn't

24   understand me, it's my fault.

25          But the problem that I think we're having

1   is, is that you've struggled with this and some of the

2   things you've said to the Prosecutor kind of put him on

3   edge about -- I assume, it looked like -- about whether

4   or not you would respond to all -- in all cases for life

5   without parole as opposed to the death penalty.

6          And I'm concerned just the opposite, that

7   you may, because you think there's no possibility of

8   rehabilitation if he's never going to come back in the

9   community, so, therefore, you're going to automatically

10   go death.  Do you --

11   A.   Right.  No, I don't think that at all.  In

12   fact, when he talked about the circumstances at the

13   punishment phase, those will play a part in that

14   decision.  You know, they brought up when -- when we --

15   last time I was here, they brought up an instance I

16   hadn't really thought of.  And it was murder, not

17   capital murder, but an old couple, where one asked the

18   other one to -- to murder them.

19          I could see where a sentence -- punishment

20   for that might be different than the punishment for a

21   murder that happened a different way.

22   Q.   Which is probably why we have the range that we

23   have, 5 -- as little as 5 and up until recently, even

24   probation was possible.  It's not anymore, but it's 5 to

25   99.  Pretty broad range.

1          So let me -- well, find where I am here.

2   Just a second.

3          So let me finish up this Special Issue No.

4   1.  You're going to be asked -- again, you won't be

5   given this question until you've already heard all the

6   evidence in the -- in the guilt/innocence phase and

7   decided that they have proved their case beyond a

8   reasonable doubt to your satisfaction and that the

9   individual is, in fact, guilty of capital murder.

10          Then you're going to be asked to answer

11   this question.  Do you have investments?  Can you see

12   where making your investments is kind of planning on the

13   future or maybe in selection of where you're going to

14   make your investments, you're kind of predicting or

15   trying to predict the future?

16   A.   Yes.

17   Q.   Okay.  Can you analyze that or transfer that to

18   what you'd be called upon to do here?  Can you see

19   perhaps what sort of thing that you might be interested

20   in knowing in order to answer this question?

21   A.   Yes.

22   Q.   Is it a separate analysis, as far as you're

23   concerned?

24   A.   Than what?

25   Q.   Than the guilt/innocence phase.

135

1    A.   Yes, I think so.

2    Q.   Can you see where -- answering the question, Do

3 you find beyond a reasonable doubt that on or about a

4 certain date in Tarrant County, Texas, the Defendant did

5 knowingly -- answering this series of elements yes

6 resulting in guilty is a separate process from answering

7 this question because you're being --

8    A.   Oh, yes.

9    Q.   The Legislature wouldn't be putting you through

10 this if it was the same thing, right?

11    A.   Yes, they seem different to me.

12    Q.   Now, mitigating circumstances is defined

13 something that you might regard as reducing the

14 Defendant's moral blameworthiness.  Okay?

15    A.   Yes.

16    Q.   It could be anything.  Do you agree?

17    A.   Yes.

18    Q.   Some people it's perhaps the age of a -- of an

19 individual.  If they're 18 years old, that might be

20 mitigating.  To someone else, some other juror, it might

21 not be at all.  You're old enough to go to war, you're

22 old enough to take life in service of your country.  One

23 juror may decide that an 18-year-old isn't fully

24 developed mentally, hadn't really formed their moral

25 compass, so to speak.

134

1    A.   Uh-huh.

2    Q.   Can you see how it's just going to matter on

3 how you're going to look at it?  I can't tell you or

4 suggest to you, but what I am concerned is:  Do you

5 believe that you could take this one last look at the

6 evidence brought before you and seriously consider this

7 question?

8    A.   Yes.

9    Q.   Okay.  The -- just like you've probably never

10 thought about the death penalty to a great extent, I --

11 I -- I believe based upon your limited involvement with

12 the criminal justice system, you may not have given a

13 lot of thought to parole, have you?

14    A.   Not a lot.

15    Q.   Okay.  For a long time we had -- there was a

16 possibility of parole even in capital murder.  One of

17 the questions that we put in the questionnaire, for a

18 reason, is to ask whether or not you believe that

19 someone would actually remain the rest of their life in

20 the penitentiary if you assessed a verdict of life

21 without parole.

22        You indicated that you didn't have any

23 trouble with that.  Is that still true?

24    A.   What was it again that --

25    Q.   Okay.  The question is:  Do you believe that

136

1 someone will remain in the penitentiary for the rest of

2 their life if they receive a verdict or a sentence of

3 life without parole?

4    A.   Yes, I assume that.

5    Q.   Okay.  We had you fill out this questionnaire

6 the -- before we bombarded you with all these legal

7 issues, and -- and -- and that's the way the process is.

8 But before you had a chance to think about it here

9 recently, we asked you about whether or not you

10 generally were in favor of the death penalty, and you

11 indicated you were not because you were unsure if it

12 deters others.

13    A.   I thought it asked me if I thought it

14 deterred --

15    Q.   Okay.

16    A.   -- crime.

17        If the death penalty was a deterrent to

18 capital murder or other things that would get the death

19 penalty.

20    Q.   Right.

21    A.   Yeah, I think I indicated, no, I don't believe

22 it is a deterrent.

23    Q.   Okay.  Is this a process that you could

24 honestly take part in?

25    A.   Yes, sir.

1    Q.   Your -- the date trial -- Mr. Brissette asked

2 you about your vacation.  We are going to try this case

3 from the 13th of June until we're done.  We

4 anticipate -- a trial is different from anything that

5 you've ever done.  I mean, it's an adversary process.  I

6 don't have any idea how many questions they're going to

7 ask their witnesses.  They don't have any idea how many

8 we're going to ask their witnesses as well or whether

9 we're going to put on additional witnesses.

10        We estimate that the case is going to run

11 at least two weeks.  That would take us through the 24th

12 of June.  Is that going to be a problem?

13    A.   Well, let me ask you this:  How much time is it

14 going to consume of mine between now and June 13th?

15    Q.   If you're swore -- if you're accepted as a

16 juror today, sir, you will be sworn today.  You will go

17 about your business, and Judge Berry will tell you to

18 return at 09:00 hours on the 13th of June.

19    A.   Okay.  Then I can -- I can -- I can either -- I

20 can -- I have the option of -- I can do the vacation

21 before then, actually.

22    Q.   Okay.

23    A.   Or I can put it off until -- indefinitely, you

24 know, until this trial is over.

25    Q.   Do you -- last issue and I'll sit down.  And I

137

1  appreciate your patience with me.  Do you have or have
2  you developed any knowledge about the facts of this case
3  at this point?
4      A.  No, not facts of this case.  I will tell you
5  the only thing I know about this case is I learned
6  before you gave me anything even told me it was a
7  capital murder at all, and that was either the person
8  sitting next to me or one down, in the very first day,
9  she said she was told this was going to be a capital
10 murder trial of someone who had killed their pregnant
11 wife.  I'm telling you that because that's what I heard
12 them say.  I never heard anything else like that since
13 then.  That's what I heard the day before I got any of
14 this.
15     Q.  Have you formed, from any source, an opinion as
16 to the guilt of my client based upon what you've just
17 told us?
18     A.  No, sir.
19     Q.  The accusation is from the -- December of 2009.
20 It was alleged to have occurred in Kennedale, Texas, and
21 the two names in the Indictment are Clyde Bedford and
22 Joy Hummel.  Any of that ring any bells?
23     A.  No, don't even remember hearing it on the news
24 or anything at all about it.
25     Q.  Thank you very much, sir.

138

1      A.  Yes, sir.
2          MR. CUMMINGS:  That's all I have, Judge.
3          THE COURT:  Mr. Adams, if you will have a
4  seat out in the front hallway, we will call you back in
5  in just a few moments.
6          PROSPECTIVE JUROR:  Okay.
7          (Prospective juror exits courtroom)
8          THE COURT:  State, have a challenge for
9  cause to Juror 81?
10         MR. BRISSETTE:  No.
11         THE COURT:  Defense?
12         MR. CUMMINGS:  No, Your Honor.
13         THE COURT:  State, exercise a peremptory?
14         MR. BRISSETTE:  Yes.
15         (Prospective juror enters courtroom)
16         THE COURT:  Okay.  Mr. Adams, I want to
17 thank you very much for your service in the case, and it
18 is vital that we have citizens who can and will
19 participate in our criminal justice system.
20         You are not going to be selected as a juror
21 in the case, and so you're excused.  If you'll leave
22 that plastic part of your jury badge with the bailiff,
23 the central jury room is going to mail you your check.
24         PROSPECTIVE JUROR:  Okay.
25         THE COURT:  And you're done.  You can

139

1  schedule your vacation whenever you want.
2          PROSPECTIVE JUROR:  All right.
3          THE COURT:  Thank you.
4          (Prospective juror excused)
5          THE COURT:  We're ready for No. 82.
6          (Prospective juror enters courtroom)
7          THE COURT:  Good afternoon.  You are
8  Prospective Juror No. 82, Kathleen Sue Olson; is that
9  correct?
10         PROSPECTIVE JUROR:  Yes.
11         THE COURT:  And, Ms. Olson, I need to swear
12 you in for this process this afternoon, so if you'll
13 raise your right hand?
14         (Prospective juror sworn)
15         THE COURT:  Okay.  You filled out a jury
16 information sheet approximately -- I've lost track of
17 time.
18         PROSPECTIVE JUROR:  Three weeks.
19         THE COURT:  Three weeks ago now.
20         Has anything changed since you filled that
21 out that would affect your service in the case?
22         PROSPECTIVE JUROR:  No, I retired, but --
23 in April, but I'm going to go back part time just about
24 one day a week.  I would be able to get off for jury
25 service.

140

1          THE COURT:  Okay.  All right.  In the same
2  profession?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  And place of employment?
5          PROSPECTIVE JUROR:  Uh-huh.
6          THE COURT:  Okay.  And so your schedule is
7  kind of unknown at this point, but you said that you can
8  work around that?
9          PROSPECTIVE JUROR:  Yes, I'm sure they'll
10 let me off for jury service.
11         THE COURT:  Okay.
12         PROSPECTIVE JUROR:  I'll probably just work
13 one Friday a week.
14         THE COURT:  All right.  Both sides are
15 going to have the opportunity to talk to you this
16 afternoon regarding that issue as well as anything else
17 on your jury information sheet and the death penalty
18 issues that are involved in this case.
19         You will recall that the people that you're
20 going to be talking to are the State of Texas.  Miles
21 Brissette and Robert Gill represent the State of Texas.
22         And the person on trial in this case is
23 John William Hummel, and his attorneys are Fred
24 Cummings, Larry Moore and Pamela Fernandez.  Okay?
25         It'll take about an hour.  If you need some

141

1    water, there's some right here in this pitcher.  Okay?

2        All right.  You may proceed.

3        MR. GILL:  Thank you.

4        KATHLEEN SUE OLSON,

5    a prospective juror, having been first duly sworn,

6    testified as follows:

7        VOIR DIRE EXAMINATION

8    BY MR. GILL:

9        Q.  Good afternoon, Ms. Olson.

10       A.  Hi.

11       Q.  How are you?

12       A.  Good.

13       Q.  Are you comfortable?

14       A.  Uh-huh.

15       Q.  As comfortable as you can be, huh?

16       A.  Yeah, the seat's much more comfortable than the

17   benches.

18       Q.  Very good.  Yeah, they're not very comfortable.

19   Or these -- or these jury seats out here, they're not

20   very comfortable either.

21           But generally what has -- what has happened

22   is it takes us around -- somewhere around 25 or 30

23   minutes per side to talk to you, so you're looking at

24   being up there for, you know, 50 minutes to an hour or

25   so.

142

1           Everybody that sits up there is nervous,

2    but your only job here today is to tell us how you

3    honestly feel about the matters of law we're going to

4    talk to you about because the -- the oath you took a

5    second ago only obligates you to tell the truth at this

6    point.

7           And we're going to ask you what your

8    feelings are, so your only obligation is to tell us how

9    you feel.  Not -- you know, we're not going to give you

10   a true/false exam or a legal exam or anything like that.

11          And then if you are selected to be a juror

12   in the case, you take a different oath.  That is to

13   render a verdict that's based on the law that the Judge

14   gives you in the Court's Charge and then also on the

15   facts of the case that you'll hear from the witness

16   stand during the course of the trial.

17          So you can see how your -- your obligation

18   changes.  Today you can tell us whatever you want to

19   about the law.  If you're selected to be a juror, you

20   have to follow your oath and follow the law.  Okay?

21          So you're going back to work.

22       A.  Yes.  Well, just part time, just like one day a

23   week.

24       Q.  Okay.  Well, this trial is going to start on

25   June 13th, and we're going to work Monday through

143

1    Friday, you know, normal -- normal business hours.  Are

2    you going back into nursing?

3        A.  Yeah.

4        Q.  Who --

5        A.  It's the same employer, Calloway Creek Surgery

6    Center over in North Richland Hills.

7        Q.  All right.  I suppose that's kind of a Monday

8    through Friday operation, isn't it?

9        A.  Yes, but I've already told them about this,

10   and, I mean, they always let people off for jury

11   service.

12       Q.  Okay.

13       A.  So...

14       Q.  Very good.

15       A.  I was just going to go in one day a week, which

16   is their busiest day of the week, and help out.

17       Q.  Okay.  Are you -- are you in the reserves

18   presently?

19       A.  No.

20       Q.  How long you been out of the reserves?

21       A.  Since '78.

22       Q.  And was your father a military man?

23       A.  Yes.

24       Q.  Okay.  That explains the Frankfurt, Germany.

25       A.  Uh-huh.

144

1        Q.  He was stationed over there at the time?

2        A.  Yes.

3        Q.  Okay.  Where else were you stationed as --

4    growing up?

5        A.  Georgia, Hawaii, Kansas.  That's about it when

6    I was born.  They been to Japan.

7        Q.  Which of those places did you enjoy the most?

8        A.  Hawaii.  We left Hawaii to come back here.

9        THE COURT:  Yeah.

10       Q.  (BY MR. GILL)  Okay.  Four kids?

11       A.  Three kids.

12       Q.  Three kids?

13       A.  Uh-huh.

14       Q.  Who's the two-year-old?

15       A.  My grandson.

16       Q.  Is that your only grandchild?

17       A.  Yes.  Well, actually, no.  I had a

18   granddaughter yesterday.

19       Q.  Oh --

20       A.  Born yesterday.

21       Q.  -- congratulations.

22       A.  Thank you.

23       Q.  Now does -- which of your children does the

24   grandson belong to?

25       A.  The daughter, married, that lives with me.

1    Q.  Okay.  The LVN?

2    A.  Yes.

3    Q.  Okay.  And how about the brand new

4 granddaughter?

5    A.  Belongs to my son.

6    Q.  Okay.  And do they live around here?

7    A.  They live in Arlington.

8    Q.  Makes it a lot easier for you to spoil her,

9 huh?

10    A.  Looking forward to it.

11    Q.  Okay.  Which -- you attend Fellowship Church in

12 Grapevine?

13    A.  I did for years.  I haven't really been

14 attending regularly, though.

15    Q.  Okay.  You're asked in Question 27:  Do you

16 know whether your religion has taken an official

17 position with regard to the use of the death penalty as

18 a punishment for crime.  And your answer was, "Thou

19 shalt not kill."

20    A.  That's more personal.  I shouldn't kill.

21    Q.  Okay.

22    A.  I think -- I thought a lot about the paperwork

23 y'all gave us, and I could be part of a jury and decide

24 on someone's innocence or guilt, and then I would just

25 be answering the special issue questions.  And then the

---

1   other -- other different ways, the Judge has no choice

2 but to give a life sentence.

3    A.  Correct.

4    Q.  Okay.  So you're okay with that procedure?

5    A.  Yes, because it's the law.

6    Q.  Okay.

7    A.  And I'm following the law.  I'm not the one --

8 I don't feel like it would be on me that I was the one

9 putting someone to death.  It would be the law.

10    Q.  Well, that's -- that's what a juror's job is,

11 is to follow the law and apply the evidence that they

12 hear to the law and decide -- then decide where the

13 chips fall.  You see how that would work?

14    A.  Right.

15    Q.  You okay with that procedure?

16    A.  Yes.

17    Q.  Okay.  So I take it, then, the position of your

18 church really has very little bearing on your service as

19 a juror?

20    A.  No.  No, it doesn't have any bearing.  I mean,

21 I just -- personally I -- when I think the death -- you

22 know, killing, I -- I shouldn't kill, I mean, is what I

23 mean -- mean by that.

24    Q.  Okay.  You also take a couple of medications

25 for anxiety?

---

1 Court is the one that determines the punishment.

2 Because in my eyes, I don't feel like I would be the one

3 responsible for the death if it -- if it came to that.

4    Q.  Okay.

5    A.  That's how I've been thinking about it ever

6 since I read the papers.

7    Q.  Okay.

8    A.  Because of the special issue questions.

9    Q.  So what -- what do you think about that

10 procedure?

11    A.  I think it's the law.  I mean, I -- I respect

12 the law, and I -- I can follow the law.

13    Q.  Okay.  So could you be a part of that procedure

14 if it -- if it resulted in someone receiving the death

15 penalty?

16    A.  Yes.

17    Q.  Because that's exactly the procedure.  The jury

18 does not just flat out decide the -- the sentence.  The

19 jury answers questions.

20    A.  Correct.

21    Q.  But you would know going into it -- in fact,

22 you'll know today what effect your answers have.  Like

23 if the questions are answered one way, the Judge has no

24 choice but to assess the death penalty.  And if the

25 questions are answered any number of different ways --

---

1    A.  Uh-huh.

2    Q.  What -- what occasions that?  What -- what

3 brings about your anxiety?

4    A.  Well, it started with work when I worked in the

5 hospital setting and I was working as a OR

6 cardiovascular open heart nurse, and I was on call 24/7

7 for like 18 months straight, and, you know, there are

8 family issues with my daughter, and it was just a

9 stressful time.

10    Q.  Uh-huh.  Are you still on the medications?

11    A.  Yes.

12    Q.  Okay.  Now, a lot of people would say that

13 being on a jury that -- where the death penalty is a

14 possible punishment is a stressful operation.  How do

15 you feel about that?

16    A.  I don't think it would be too stressful.

17    Q.  Okay.

18    A.  I mean --

19    Q.  Now, you indicate also you have a daughter

20 that's undergoing some treatment for depression?

21    A.  Yes.

22    Q.  Is that right?

23    A.  Uh-huh.

24    Q.  I don't want to get too far into that, but is

25 that anything that would affect you on a -- in a case

149

1  like this?
2      A.  No.  I mean, she doesn't particularly want me
3  to serve on the jury because she'd rather I stay home
4  and help her, but I think she needs to, you know, play
5  her part as a mother role more and take responsibility
6  because I'm planning on going on vacation in August, and
7  the same thing.  I mean, she's been at home with him for
8  two years taking care of him, and I retired recently,
9  and I was going to plan on taking care of him while she
10  goes back to work, so...
11      Q.  Okay.
12      A.  I don't think it'll be a problem.
13      Q.  Okay.  Is she -- is she able to work currently?
14      A.  Yes.  Yes.  She's still on unemployment right
15  now.  She's just been kind of waiting to find the right
16  job and the right hours, waiting for me to retire so I
17  would be home.
18      Q.  Now, is your son currently in treatment?
19      A.  No, no.
20      Q.  Is that something in the past?
21      A.  Yes, 13 years ago.
22      Q.  Now, you mentioned that a -- a couple of people
23  you know, a couple of relatives, have been accused of
24  crimes before.  Is that -- are those incidents that
25  occurred in Tarrant County, or did they occur elsewhere?

150

1      A.  Well, my daughter that lives with me was in a
2  family violence incident, and it was dismissed, with her
3  baby's father.
4      Q.  And were -- with your son, were those incidents
5  that occurred here, or did they occur somewhere else?
6      A.  His drugs?  It was here.
7      Q.  It was here.  Okay.  And just guessing maybe
8  around 13 years ago?
9      A.  Yes.
10      Q.  Something like that?
11      A.  Yes.
12      Q.  Okay.
13      A.  In fact, I've been talking to an attorney about
14  getting his nondisclosure on his charges because he
15  completed all his time, and it's been years.
16      Q.  Okay.  So he -- he received a deferred
17  adjudication for that; is that right?
18      A.  No.  He went into a -- like a rehab jail for a
19  year and -- it's like a boot camp type.  And, yeah,
20  he -- and then probation, and then he finished all of
21  that.
22      Q.  Okay.  Now, if that happened in Tarrant County,
23  Texas, the -- the agency that prosecuted that case would
24  have been the Tarrant County District Attorney's Office.
25  That would have been the office that Mr. Brissette and I

151

1  work for.  Is there anything about that you feel like
2  our office conducted itself improperly --
3      A.  No.
4      Q.  -- or there was some type of injustice --
5      A.  No, because I think the Judge -- because I was
6  there at the hearing, and his attorney was one of his
7  high school friend's father, and they kind of -- because
8  the Judge knew him well, I guess, they gave him a break
9  and told him, we're going to send you to this -- I don't
10  know -- 10, 20, $30,000 rehab jail program.  Are you
11  worth it?  Are you going to do good?  So, no, I
12  appreciated that he got that chance and it helped.
13      Q.  Do you remember who the Judge was?
14      A.  No, I don't.
15      Q.  So I guess that situation, it seems to have
16  worked out pretty well for him?
17      A.  Yes.
18      Q.  That the train got on the right track --
19      A.  Yes.
20      Q.  -- and everything is going well now?
21      A.  Yeah.
22      Q.  Now, you mentioned another incident also that
23  happened to your daughter where she was recently
24  assaulted.
25      A.  Yes.

152

1      Q.  And where did -- where did that occur?
2      A.  In Dallas.
3      Q.  And has -- has someone been arrested for
4  that --
5      A.  He was arrested for it, and that's where I was
6  this morning.  We were at the D.A.'s in Dallas.  They're
7  still discussing before the Indictment -- or Grand
8  Jury -- before the Grand Jury.
9      Q.  Is there anything about that that you think
10  might carry over and affect you as a juror in this
11  particular case?
12      A.  No.
13      Q.  Have you spent any time this week watching the
14  Casey Anthony case?
15      A.  Oh, yes.
16      Q.  Okay.  And what's going on with that?
17      A.  What's going on?
18      Q.  Have they started trial?
19      A.  Tuesday morning.  Tomorrow morning.  Yeah, I'm
20  a big follower of that, I confess.
21      Q.  I'm sorry?
22      A.  I was -- I'm a big follower of that, I confess.
23  I've been watching it for three years.
24      Q.  And what is it about that particular case
25  that's captured your interest as opposed to all the

153

1 other --
2   A.  Well, first because the child was missing, and
3 when it was reported that she had been missing for 31
4 days and the mother hadn't reported it, and then the
5 body being found and circumstances and -- it's just
6 because I watch headline news every night.  I mean,
7 because I can watch it whenever I want.  It's on every
8 30 minutes, so I just always heard about it every night.
9   Q.  Okay.  Do you have any opinion as to how that
10 case ought to turn out, or are you just curious?
11   A.  Oh, yeah.  Oh, yeah.
12   Q.  What do you think about it?
13   A.  I think she's guilty.  I mean, I do.
14   Q.  How long was your dad a sheriff's deputy?
15   A.  I'm not sure.  He was courier military for 23
16 years.  He retired and we moved to Hawaii.  And we lived
17 there for a year.  It was too expensive to live there,
18 and all his family was here in Texas, and his parents
19 were old and getting sick.
20       And when he first came back here, I think
21 he worked like one of the Chevrolet dealers, and then I
22 think after that, he started with the Sheriff's
23 Department.  So probably -- I don't know.  I just don't
24 remember.  Five or ten years.  I was a teenager.  I
25 didn't pay attention.

154

1   Q.  So you don't know what his duties would have
2 been?
3   A.  I'm not sure what his duties were.  He might
4 have worked in the courtroom like as a bailiff or -- I
5 don't know.
6   Q.  Okay.  And then we go on to ask you some
7 questions about the -- about the death penalty as a
8 possible punishment for crime, and you said, first of
9 all, you believe that God judges, and at one point in
10 your life, apparently you were against the death
11 penalty, but you've changed your mind.  What caused you
12 to change your mind?
13   A.  Well, it was just so much depending on
14 circumstances.  I mean, like I think I wrote on there if
15 they were heinous crimes like -- I would believe in the
16 death penalty like when the Nazis were being tried for
17 the Holocaust or, you know, a mother killed her child,
18 was hiding, covering it all up and all that and -- and
19 it would just depend on the circumstances.  I mean, I --
20   Q.  That's exactly -- exactly what our law
21 contemplates, is that the -- actually, everything that
22 occurs during the course of a criminal trial depends on
23 the circumstances.  First of all, does it fit within the
24 law as to -- as to the particular charge, and then has
25 the State proven its case and then what -- what should

155

1 the punishment be.  All -- all completely circumstance
2 and factor.
3   A.  And then, I mean, I also said in there that I
4 also think a life sentence is even more punishment
5 because they're having to think about it the rest of
6 their life.  And I guess as a Christian, I feel like if
7 they didn't know Christ before that happened, then in
8 the course of 20 or 30 years they're in prison, they
9 might find Christ.  I guess in my thoughts that I would
10 want them to have that opportunity.
11       But that -- it's hard for me to say either
12 way.  I mean, I had no problem with them putting the
13 Nazis to death after the Holocaust.  I mean -- and a lot
14 of them even weren't put to death.  They were in prison
15 for life.
16   Q.  Well, that's a pretty extreme circumstance,
17 too.
18   A.  Right, right.
19   Q.  Yeah.  We see lots of references to the Nazis
20 on the questionnaires.
21   A.  Yeah, do you?
22   Q.  Of course, if you give someone a life sentence
23 and lock them up for the rest of their life, that --
24 that assumes they're going to think about it every day
25 and that they're actually the kind of person that --

156

1 that would lead the right -- lead to the right path.
2       Question 135, you mentioned that your
3 daughter and your grandson live with you, you have a lot
4 of family issues, court cases, visitations, things like
5 that.  You kind of wanted us to know about all that.  Is
6 that --
7   A.  Well, just like I mentioned, my daughter has
8 depression, and she's been in this abusive relationship
9 with the baby's father for years, and he did assault her
10 recently and -- and there is going to be a Grand Jury
11 hearing on that, and she depends on me a little too
12 much, you know.  She needs to grow up a little and --
13   Q.  I kind of got that impression from what you
14 said earlier about her -- her living with you and --
15   A.  Right.  Because I said -- I want -- I said, I
16 would enjoy being on the jury, and she's like, Oh, I
17 don't want you to.  I want you to be home.
18       And I'm planning a trip to Israel in
19 August, and she was like, I don't want you to go.
20 But...
21   Q.  She just wants to go with you on that one.
22   A.  Well, yes, she did want to go with me, but
23 that's too expensive.  I would just as soon go by
24 myself.
25   Q.  Okay.  Well, here's -- here's what we're going

157

1 to talk about today. We have a little PowerPoint over
2 here so you can follow along visually as we go through
3 these questions orally.
4          First question: Is there any reason,
5 moral, ethical, religious, anything at all, preventing
6 you from being part of a process that results in the
7 death penalty?
8     A.  No.
9     Q.  Next, you will recall, we went over this
10 definition of -- of capital murder last time you were in
11 court, and this was the definition that we're going to
12 use in this case.
13          There are other ways to commit the offense
14 of murder -- capital murder in Texas. We went over
15 those. The murder of someone during a robbery or murder
16 of a child under six, those are also death penalty
17 cases, but this is the definition we'll be concerned
18 about in this case.
19          The murder of more than one person during
20 the same criminal transaction where those murders are
21 done knowingly, knowing meaning that the person knows
22 the results of their -- of their actions. They're
23 reasonably certain the result -- the result would be
24 death what -- of what they're doing.
25          It doesn't require that we prove that it's

158

1 premeditated or thought out or anything like that, just
2 that it was done knowingly, that the person appreciated
3 the consequences of their action, that it could result
4 in their death.
5          During the same criminal transaction. That
6 phrase is not defined under our law. The jurors have to
7 give it the same definition they give it in everyday
8 life, and whatever that -- whatever that phrase might
9 mean to you as a juror.
10          Because when terms -- the terms are not
11 defined under our law, then the jurors have to give that
12 term the meaning they ascribe to it. And you can agree
13 with the other jurors on the definition of something, or
14 you may not.
15          You give it -- but whatever it is, you give
16 it the definition you're comfortable with. And that
17 could mean two murders that happened at the same time.
18 It could mean two murders that happened at the same
19 place at different times. It could mean two -- two
20 murders that happened at two different places at two
21 different times, as long as it fits in with your
22 definition of same criminal transaction, and as long as
23 it's done knowingly.
24          An example might be -- the example of the
25 Oklahoma City bombing has been used as -- as an example

159

1 of something that occurred during the same criminal
2 transaction. One bomb, many deaths occurred during that
3 time.
4          Something else that might fit that
5 definition is an individual who's a business partner
6 with two other individuals and he finds out one night
7 he's been cheated by the two of them. So he gets in his
8 car, grabs his trusty handgun and drives over to the
9 first guy's house and shoots him and then drives all the
10 way across town to the second guy's house and shoots
11 him.
12          A juror might say that's during the same
13 criminal transaction because it was the same motivation
14 for both -- for both of the -- for both of the crimes.
15 You see how that might work?
16     A.  Yes.
17     Q.  So it might be kind of two different -- two
18 different extremes of the -- of the same definition?
19     A.  Correct. I understand.
20     Q.  Another definition might well be something that
21 happened -- more of a middle definition -- something
22 that happened at one time or in a close period of time
23 in one place. You see where that might -- might also
24 fit that definition?
25     A.  Uh-huh.

160

1     Q.  Okay. Knowingly does not presuppose any type
2 of -- of premeditation. It just means that at that
3 time, they were reasonably certain their conduct was
4 going to cause that result.
5          Now, our law does require, as part of our
6 burden of proof, that we prove everything we charge an
7 individual with. That is part of the oath you would
8 take as a juror. You would -- you would take an oath to
9 require the State to prove its entire case beyond a
10 reasonable doubt.
11          And last week we put the -- two weeks ago,
12 we put the -- all the elements up on a -- on a
13 PowerPoint during a jury selection, and they included
14 the fact that the crime happened in Tarrant County,
15 Texas, on or about a certain date; that the individual
16 on trial is the individual that -- that committed the
17 act; and it occurred during the same criminal
18 transaction, done knowingly; and we also have to prove
19 what's known as a manner and means. We have to prove
20 how the murders were committed.
21          So, for example, if we allege that it
22 was -- that the deaths were caused by the Defendant
23 stabbing someone with a knife, that's what we're bound
24 to do. And if we prove that he pushed him off a cliff,
25 the jury would be bound to find the individual on trial

161

1   not guilty because we failed in our proof. You see how
2   that would work?
3       A.  Uh-huh.
4       Q.  And you see where your oath as a juror would
5   bind you to find the individual not guilty in that
6   situation because we failed to prove our case?
7           Would -- would you be able to follow your
8   oath as a juror in that situation and find the
9   individual not guilty?
10      A.  Yes.
11      Q.  You understand in that situation we would have
12  proved that the Defendant killed a guy, but we didn't
13  prove the right manner and means. So we've got some
14  explaining to do with our boss the next day, but the --
15  but the effect on you would be you would have to find
16  the individual not guilty. You see how that would work?
17      A.  Right.
18      Q.  And your oath as a juror would bind you to do
19  that.
20          Same -- by the same token, if we proved the
21  guy had been killed and we -- we allege that it was done
22  by shooting him with a gun, we proved that, but it was
23  someone else who committed the crime, you see how you'd
24  have to find that guy on trial not guilty?
25      A.  Right.

162

1       Q.  Now, that's the -- that's the guilt/innocence
2   phase of the trial. If an individual is found not
3   guilty, the trial is over, and everybody goes home.
4           If the individual's convicted of whatever
5   crime he's been charged with, we move to the punishment
6   phase of the trial. And you heard -- at the first jury
7   selection process you were at a couple of weeks ago, you
8   heard if it's a -- a noncapital crime, how the jury
9   takes the range of punishment that the Judge gives them
10  and they go back into the jury room and deliberate and
11  decide where within that range of punishment does the
12  offense fall; what is the proper punishment for that
13  particular offense?
14          For the crime of murder, the punishment
15  range is not less than 5 years or more than 99 years or
16  life. Do you remember that?
17      A.  Yes.
18      Q.  And you told us at that time that you would be
19  able to give fair consideration to that entire range of
20  punishment --
21      A.  Yes.
22      Q.  -- is that right?
23      A.  Uh-huh.
24      Q.  You understand that's for a knowing murder,
25  that the individual was reasonably certain that they

163

1   were going to cause someone's death?
2       A.  Yes.
3       Q.  And you are comfortable with that entire range;
4   is that correct?
5       A.  Yes.
6       Q.  And you'd be able to follow your oath as a
7   juror --
8       A.  Yes.
9       Q.  -- and apply that entire range?
10          It seems what your -- like what you were
11  talking about earlier. At this stage of the trial, you
12  have to keep an open mind to everything. All the -- all
13  the -- everything within the range of possibility that
14  the law accounts for. And it's only after you hear the
15  facts of the case that you -- that you make your
16  decision.
17          And then once you -- once you hear the
18  facts of the case, you don't have to keep an open mind
19  anymore because at that point, you take up your duty as
20  a juror and make a decision. Okay?
21          But until you hear the facts, the key to
22  being a juror is to follow your oath and keep an open
23  mind about things.
24          So evidence-wise, here's some different --
25  different types of evidence. If you're a juror in a

164

1   case and you get to the punishment phase, you can take
2   into consideration all the evidence you hear at the
3   first phase of the trial, how the crime was committed,
4   what the guy on trial did to get convicted of the crime.
5   You take all that evidence.
6           Then you can hear more evidence. Some
7   cases you don't hear any more evidence, but in some
8   cases you do. And that can include evidence of a bad
9   character of the Defendant, his bad reputation and other
10  crimes he may have committed.
11          We can't bring anything from these three
12  categories at this first phase of the trial. We have to
13  wait until the punishment phase of the trial before we
14  can do that.
15          Then the jury takes all that information,
16  and they deliberate. And you went over these -- over
17  these special issues in the materials the Judge gave to
18  you.
19          And the first special issue is shorthand
20  referred to as the future dangerousness issue. So we're
21  looking at what -- what might happen in the future.
22          The next one is the mitigation issue, and
23  as we talked earlier, the answers tell the Judge how the
24  Judge has to sentence a Defendant.
25      A.  Right.

165

1    Q.  For purposes of our discussions today, let's
2    assume this:  That a sentence of life without parole
3    means the Defendant is ineligible for release from
4    prison on parole.
5           So if an individual gets convicted of
6    capital murder, before we ever get to the punishment
7    phase of the trial, we know the individual's never going
8    to come out of the penitentiary alive.  Okay?  They're
9    either going to live their natural life under a life
10   sentence, or they'll be executed on a death penalty.
11   Okay?
12        A.  All right.
13        Q.  So here's Special Issue No. 1.  I'll give you a
14   second to read through it.
15        A.  (Prospective juror complies).
16        Q.  And the first thing I want to point out to you
17   here is it starts with the phrase, "Do you find beyond a
18   reasonable doubt?"  So that tells the jury that the
19   State has the burden of proof to prove that the answer
20   to this question should be yes.
21          Because the Defense in a criminal trial
22   never has the burden of proof.  Okay?  The State -- if
23   there's a burden of proof, it's always on the State.
24   And the phrase "beyond a reasonable doubt" here means we
25   have the same burden to prove to you as a juror the

166

1    answer to this question as we did at the first phase of
2    the trial.
3           We have to prove guilt beyond a reasonable
4    doubt.  We have to prove this beyond a reasonable doubt.
5    And you know that the standard of beyond a reasonable
6    doubt is the same standard that is applicable in all
7    criminal cases.  We do not have a special standard of
8    proof in a death penalty case.
9           We have to prove a -- a -- a -- a theft
10   case.  If we're trying a theft case in one of our
11   misdemeanor courts, we have to prove the Defendant's
12   guilt beyond a reasonable doubt.  If we're trying an
13   auto theft case or a robbery case, we have to prove the
14   Defendant's guilt beyond a reasonable doubt.  Same
15   standard of proof, and it's applicable in both cases of
16   a capital murder trial.
17          So the second phrase I want to talk to you
18   about is this phrase, "probability."  Do you find beyond
19   a reasonable doubt there's a probability?  And none of
20   the terms in this particular question are defined, so
21   the jury has to give all these terms their normal and
22   ordinary meaning in your -- your daily life.
23          And what does the word "probability" mean
24   to you as a -- as a daily matter?
25        A.  That it would probably happen again.

167

1    Q.  Okay.  The Legislature wrote this
2    questionnaire, wrote all our criminal laws.  And when
3    they were writing this, they could have used a lot of
4    different terms here.  They could have used
5    "possibility."  They could have used "certainty."  But
6    they used the term "probability."
7           You see where probability is somewhere in
8    between certainty and possibility?  Something is
9    possible, there's a whole lot of things that are
10   possible.  There's a whole, whole lot less things that
11   are certain, and probability is somewhere in the middle.
12          So we have to prove to you there's a
13   probability the Defendant would commit criminal acts of
14   violence that would constitute a continuing threat to
15   society.
16          The phrase "criminal acts of violence" is
17   also not defined, so what does that -- what does that
18   phrase mean to you?
19        A.  Well, any kind of criminal act of violence, any
20   kind of assault or murder.
21        Q.  Okay.  It's a very wide phrase, isn't it?  It
22   contemplates all kinds of things.  In fact, it doesn't
23   even say anything about being against a person, does it?
24        A.  No.
25        Q.  It says, "criminal acts of violence."

168

1    A.  Destroying property or --
2    Q.  Violent destruction of property.  It would have
3    to be violent because it does say criminal acts of
4    violence, but it could be -- it's a very wide range of
5    possibilities, isn't it?
6           You see, the Legislature did not tie us
7    down to any particular type of criminal act of violence
8    here.  They don't -- they don't require us to prove the
9    Defendant's going to commit a murder or he's going to
10   commit a violent act on property, just any one of those
11   things.  You see how that works?
12        A.  Right.
13        Q.  And they have to constitute a continuing threat
14   to society.  And that term, again, not defined.  So what
15   does that phrase mean to you?
16        A.  It could mean to anyone, to somebody -- someone
17   they know or someone they don't know.
18        Q.  Okay.  Again, pretty wide open, isn't it?
19          So is it possible that the State can prove
20   to you beyond a reasonable doubt that there's a
21   probability that a person could commit criminal acts of
22   violence that would constitute a continuing threat to
23   society?
24        A.  Yes.  I guess that would be during the
25   punishment phase where you would bring in character and

169

1  all that.

2      Q.  We could.  We could bring that to you.  Now, we

3  could -- it's possible that a jury may not hear anything

4  additional at the punishment phase of the trial.  They

5  can only -- they could hear the facts of the case on

6  trial, the facts of the capital murder, and neither side

7  present anything else, and the jury would have to make

8  their decision based on that.

9          Now, it's also very possible the jury would

10  hear more of those -- of those things you were referring

11  to, but either way, is it possible we could prove to you

12  there's a possibility -- I'm sorry -- probability that

13  someone would commit those criminal acts of violence?

14      A.  Yes, the burden is on you.

15      Q.  The burden is on us.  Exactly.

16          So -- but it's possible we could do that?

17      A.  Uh-huh.

18      Q.  And could we do that, considering the fact that

19  they'd be serving a life sentence in the penitentiary?

20  Because we know the person would be serving a life --

21  life sentence in the penitentiary.  So that's possible

22  also?

23      A.  Yes.

24      Q.  Okay.  Now, do you see where this is asking you

25  something completely different than you were asked at

170

1  the first phase of the trial?  The first phase of the

2  trial you were asked, did this guy do this one thing on

3  this -- at this one occasion, this one criminal

4  transaction.  And now here you're being asked look into

5  the -- kind of look into the future and decide a whole

6  separate issue; is that right?

7      A.  Correct.

8      Q.  Okay.  Do you see where in some cases, a jury

9  would be called upon to answer this question no even

10  though they found someone guilty of capital murder?

11      A.  Correct.

12      Q.  Because the State would have failed in their

13  burden of proof here.

14      A.  Correct.

15      Q.  So it's possible someone commits a capital

16  murder, they knowingly murder two or more people during

17  the same criminal transaction, and the jury finds

18  they're not going to be a continuing threat to society.

19      A.  Right.

20      Q.  Something -- they may have done something at

21  the first phase of the trial that's completely

22  situational.

23      A.  Correct.

24      Q.  Okay.  So here's another question for you:

25  Knowing that a yes answer moves a person on trial one

171

1  step closer to the death penalty, could you answer the

2  question yes knowing that you're moving one step closer

3  to the death penalty?

4      A.  Yes.

5      Q.  And by the same token, if you felt like the

6  proper answer was no, would you answer that no, knowing

7  that the life sentence would be assessed?

8      A.  Yes.

9      Q.  Because if the jury answered this no, if 10 or

10  more people answered no, your deliberations would be

11  over, and the jury would return a life sentence.

12      A.  Correct.

13      Q.  It takes 12 people to answer it yes, 10 to

14  answer it no.

15      A.  Okay.  What happens if they can't agree on

16  that?

17      Q.  Well, the jury would not have completed their

18  assignment.  Let's just put it that way.  You might

19  receive some additional instructions from the Judge

20  asking you to continue your deliberation, but other than

21  that, that's as far as we can go with an answer to that

22  question.  Okay?

23      A.  Okay.

24      Q.  Okay.  So if the jury answers all that --

25  answers that yes beyond a reasonable doubt, they

172

1  confront Special Issue No. 2.  And if you'd like to read

2  it over again, go ahead.

3      A.  (Prospective juror complies).

4      Q.  Okay.  You notice at this beginning and also

5  maybe from the -- I don't remember exactly what the

6  Judge's material said -- it doesn't say anything about

7  beyond a reasonable doubt up here.  That means since it

8  doesn't appear there, the State has no burden of proof

9  on this particular special issue.  And since the Defense

10  never has a burden of proof in a criminal trial, the

11  Defense does not have a burden of proof here.

12          So this question is just up to each

13  individual juror to decide for himself or herself if

14  there's something about the case that is sufficiently

15  mitigating to warrant a life sentence rather than the

16  death penalty.  Okay?

17          So there is a phrase in this question that

18  is defined.  Mitigating evidence is defined.  Anything

19  that you as a juror might regard as reducing the

20  Defendant's moral blameworthiness is something that is

21  a -- a mitigating circumstance or mitigating evidence.

22  Okay?

23          So this is an opportunity for a jury that's

24  headed toward giving someone a death penalty to take a

25  step back and say, Wait a minute, there's something here

173

1  I find to be sufficiently mitigating that this guy
2  deserves a life sentence instead of the death penalty.
3          Because at this point you've already
4  found -- if you're deliberating on this question, you
5  found the guy guilty and you've also found that he's a
6  continuing threat to society.  And there might be
7  something about that case that makes a jury stop for a
8  second and say, This is sufficiently mitigating.  I
9  think a life sentence is -- is more just than the death
10 penalty here.
11         Do you have something in mind today that
12 you think might be a mitigating circumstance?
13     A.  Mental health issue.
14     Q.  Okay.  Such as?
15     A.  I'm not quite sure.  Schizophrenia, bipolar,
16 anything, you know.
17     Q.  Okay.  And that's -- and that's a good example
18 because if a person is -- is in some type maybe in a --
19 in a manic episode, they may not appreciate the
20 consequences of their actions.  They may have done it
21 knowingly, but they -- but I think what you're telling
22 me is in that situation, you can see where they might be
23 less morally blameworthy than someone else who might
24 have done the same thing --
25     A.  Or mental health condition.

174

1      Q.  And that's what this is all about is, is there
2  something here that makes this guy less morally
3  blameworthy than someone else might have been in the
4  same situation and done the same kind of thing?
5          Someone else might say that an individual
6  who's 18 years of age when they commit the crime --
7  because an 18-year-old could be convicted of capital
8  murder and sentenced to the death penalty under our law.
9  They may say that individual, because of their age,
10 their young age, might be less morally blameworthy than
11 someone else because they might -- might be of the
12 opinion that 18-year-olds are less mature, their brains
13 may not have fully formed and they just have had less
14 life experiences to form a moral compass than someone
15 that's in their 30s or 40s.
16         And they may say because of that -- that
17 person's young age, that may be a sufficient mitigating
18 circumstance to overcome some type of situation they've
19 got themselves involved in.
20         And another juror may say, Well, I don't
21 agree with that because an 18-year-old is just as --
22 just as capable of performing other things in our
23 society as -- as the 30 or 40-year-old, you know, they
24 can vote and do the other things, serve in the military,
25 that kind of thing.  So that's -- that's just an

175

1  example.
2          But the purpose of this question is that if
3  you as a juror find something to be sufficiently
4  mitigating, that you be able to give that effect by
5  removing that person from -- from the death penalty
6  consideration by answering this question yes.
7      A.  Yes.
8      Q.  And you can do that?
9      A.  Yes.
10     Q.  Okay.  By the same token, if you felt like even
11 though there might be some -- some mitigating
12 circumstances, if you felt like they were not
13 sufficient, based upon all the considerations in the
14 case, would you be able to answer the question no,
15 knowing that the individual would receive the death
16 penalty?
17     A.  Yes.
18     Q.  Okay.  You understand that since neither side
19 has the burden of proof here, it's just you decide --
20 decide if it's sufficient or not.  You have to decide,
21 first of all, is it a mitigating circumstance, and
22 second of all, is it -- is it sufficient, because
23 neither side has the burden of proof.  And that proof
24 that you find to be mitigating and may ultimately find
25 to be sufficiently mitigating, could come from the State

176

1  of Texas.  That could be some proof -- if the Defense
2  never did anything during trial, never presented one
3  witness or asked one question on cross-examination, you
4  see where it might be possible for a juror to say, I
5  find something sufficiently mitigating here because the
6  State may have proved it?
7          With an example of an individual that's 18
8  years old, they commit the crime, our first witness may
9  have said that the crime happened at the Defendant's
10 18th birthday party.  So the State may have proved that
11 mitigating factor to the jury.  And that's just an
12 example.
13     A.  Okay.
14     Q.  That may never happen in a -- in a million
15 years, but then again, it might.  Kind of why we pick
16 these examples, is there's something that's kind of
17 unusual, but they illustrate the point.
18     A.  Okay.
19     Q.  Okay.  So I think we've been over that, and
20 we've been over the fact that you could answer the
21 question either way depending on what you felt like the
22 proof brought to you?
23     A.  Right.
24     Q.  Having gone through this whole procedure with
25 me today -- and I appreciate your patience -- is there

**177**

1  anything you've heard or anything you thought about
2  while you're on the -- the hot seat there that leads you
3  to believe you could not be part of this process?
4      A.  No.
5      Q.  And I didn't tell you this at the beginning,
6  but have I explained myself clearly throughout all this?
7  Have you understood everything?
8      A.  Yes.
9      Q.  And do you have any questions about anything,
10 whether we've been over it today or whether we went over
11 it at the first time you were in court or just about the
12 criminal justice system in general?
13     A.  No.  Like I said, I feel like the jury's duty
14 is to determine the guilt and then just answer the two
15 special questions, and it's the Court and the State of
16 Texas, the law, that determines the punishment based on
17 the answers to those questions.
18         Do other jurors not see that, that they all
19 feel like they're going to be responsible for someone's
20 death?
21     Q.  Well, you know, given human nature, we have a
22 whole -- a whole range of -- of understandings of -- of
23 what we're -- of what we're talking about.
24     A.  Yeah.
25     Q.  And, you know, we have a lot of people come up

**178**

1  to the witness stand, and they have a lot of -- a lot of
2  preconceived ideas about things or they heard something
3  and -- on the news that leads them to believe one thing
4  or another.
5          And I -- I -- I understand from talking to
6  you here today that you just -- you're just kind of a
7  straight, down the middle of the road, you're going to
8  call them as you see them kind of person?
9      A.  Yeah.
10     Q.  Is that a fair --
11     A.  Yes.
12     Q.  -- understanding?
13     A.  Yes.
14     Q.  Okay.  Any questions or comments about anything
15 we've been over?
16     A.  No.
17     Q.  Okay.  Thanks, Ms. Olson.
18         MR. GILL:  Thank you, Judge.
19         THE COURT:  All right.  Ms. Olson, we're
20 going to take a brief restroom break.  I don't know if
21 you need one or not, but there are restrooms and water
22 fountains out in the hallway, and we'll call you back in
23 in just a few minutes.
24         PROSPECTIVE JUROR:  All right.  Thank you.
25         (Prospective juror exits courtroom)

**179**

1          (Recess from 2:49 p.m. to 2:58 p.m.)
2          (Open court, Defendant and
3          Prospective juror present)
4          THE COURT:  Okay.  Defense, you may
5  proceed.
6          MR. MOORE:  Thank you, Your Honor.
7              VOIR DIRE EXAMINATION
8  BY MR. MOORE:
9      Q.  Ms. Olson, I'm Larry Moore.  Fred Cummings and
10 Pam Fernandez and I represent John in this case.  And
11 the State has filed notice that they intend to ask the
12 jury, if they find John guilty, to vote on those
13 questions in such a way that he'll be executed.
14         So the take that I have on some of this
15 stuff is completely different to the take that they may
16 have, and all that really doesn't mean very much because
17 we're entitled to whatever opinions we want.
18         The opinions that are important are your
19 opinions.  Okay?  Because you're the only one in this
20 room that has the prospect of ending up in one of those
21 juror seats.
22         And this is kind of a two-step process.
23 Because the first thing we do is we tell you every bit
24 of the law that we think might apply to the trial of the
25 case so that you will understand what the parameters are

**180**

1  of the -- of the legal framework under which you would
2  be asked to work, and make sure that you're comfortable
3  with your ability to do that.  Because as an American
4  citizen, you don't have to take an oath to operate or
5  apply under a law that you just, in good conscience,
6  don't agree with.  Okay?
7          You may have to follow the law when you get
8  outside, but you don't have to take an oath as a juror
9  to operate under the law that, in good conscience, you
10 don't think is right or that it's something that you
11 ought to be doing personally.  You see how that works?
12     A.  Yeah.
13     Q.  Okay.  Because some jurors just -- you know,
14 when they look at these things and they haven't ever
15 seen it before and it takes them a while to formulate
16 their thoughts, they -- you know, they go back and
17 forth, and they ultimately have to make a decision as to
18 whether or not they feel they can do this and whether or
19 not they can participate.
20         Because the law says that the State and the
21 Defense are both entitled to jurors that can fairly
22 apply all the law that might come into play and to base
23 their decisions on the facts of the case and not any
24 kind of personal opinions or personal experiences that
25 they may have had.

181

1      Some jurors can do that; some can't.  It
2  depends on their background and how they view things.
3  I -- I can't stand income tax laws.  I think they're
4  unfair.  I think they're unjust.  I think they unduly
5  punish people that make less money.  And so if somebody
6  called me down there to be a juror in federal court on
7  an income tax case, I'd have to say, Thank you very
8  much, but no thanks.  I just -- I'm not going to do
9  that.  I can't do that.  My disagreement with that law
10  is so profound I could not fairly operate under it.
11  Okay?  My feelings would interfere with my service as a
12  juror.
13          And that's the first part of this process.
14  We tell you these things so you could tell us if there's
15  something like that in this law that would prohibit you
16  from being able to serve.  Okay?
17          The second part of the process is we have
18  to make an independent judgment based on your answers,
19  because each side gets to excuse a certain number of
20  people from service for whatever reason.  And so we're
21  kind of listening to what you say and watching how you
22  say it to see how comfortable we are with your
23  responses.
24          Feel like you understand the process?
25      A.  Yes.

182

1      Q.  Okay.  And, you know, this isn't a test to see
2  who gets on jury duty.  This isn't -- you know, there's
3  no right or wrong answer.  The only wrong answer is
4  something that's not completely honest because how you
5  feel is how you feel, and we all respect that.
6          I -- I wanted to talk to you a little bit
7  about some of the things that Mr. Gill has talked to you
8  about because our perspective is different, as I told
9  you.  But before I do that, I want to talk to you about
10  the questionnaire a little bit because I -- I heard your
11  conversation, and I've got some of that.  There's a
12  couple things I wanted to ask a little more about.
13          The Calloway Creek Surgery Center.  That's
14  a day surgery center, I think?
15      A.  Yes.
16      Q.  Okay.  And do you actually work in the
17  operating room?
18      A.  Well, I retired in April, and I'm supposed to
19  start back in the next couple of weeks, but just like
20  part time, just one day a week.
21      Q.  What day are you going to work?
22      A.  Friday, busiest day for them.
23      Q.  Where is -- is that -- is the Calloway Creek
24  Day Surgery Center, is that somewhere close to the North
25  Hills Hospital?

183

1      A.  Right.  It's right next door.
2      Q.  Okay.
3      A.  I worked there for 29 years, and then I worked
4  at Calloway for three.
5      Q.  Okay.  So you were at North Hills for 29 years?
6      A.  Uh-huh.
7      Q.  Were you in the operating room there too?
8      A.  Yes.
9      Q.  When did you get your nursing degree?
10      A.  In '92.  Before that I was an operating room
11  technician, so I was there at the same company for 32
12  years.
13      Q.  Did you get your operating room technician
14  training in the Air Force?
15      A.  Yes.
16      Q.  You indicated that you take Xanax for anxiety.
17  Is -- do you take it on a daily basis?
18      A.  Yes.  I started off taking it in like January
19  for nighttime because I'm grinding my teeth so terrible,
20  you know, stress, and it helped.  And then I started
21  taking it in the daytime.  My daughter was causing me a
22  lot of stress with her...
23      Q.  Do you also take Zoloft on daily basis?
24      A.  Yes.  I started that back years before pretty
25  much when I was going through menopause.  It helps.

184

1      Q.  Okay.  The anxiety that you -- that you deal
2  with, is it panic attacks or general anxiety?
3      A.  No, I'm a smoker, and I'm trying to cut back on
4  smoking and just -- my daughter stresses me out with her
5  personal problems, and...
6      Q.  Okay.  How long have your -- your daughter and
7  her son lived with you?
8      A.  Well, he's just two years old, and she's lived
9  with me six years.
10      Q.  So is it six years all together or eight years?
11      A.  Eight years all together.
12      Q.  Okay.  She quit.  She's an LVN, right?
13      A.  Yes.
14      Q.  And she quit working, the way I understand it,
15  whenever her son was born?
16      A.  Right.  Well, she quit work a little bit before
17  he was born because she was missing so much.  She was in
18  a car accident and injured her back when she was seven
19  months pregnant.  Then she tried to work, but she was
20  missing so much work they told her to go ahead and take
21  off till after the baby was born.  She went back after
22  the baby was born and worked -- I don't remember -- six,
23  eight months or so, and then she's been off for
24  unemployment because she got fired for missing a lot of
25  work because of the child and all that and --

185

1    Q.  Does your daughter -- you said that your
2  daughter -- her medication is being managed by a nurse
3  practitioner?
     A.  Yes.
     Q.  Does she work for a particular psychiatrist?
6    A.  I think his name is George Acre -- no, I don't
7  remember his name.
8    Q.  Okay.  Where is -- where is his office?
9    A.  It's in Bedford.
10   Q.  In Bedford?
11   A.  Uh-huh.
12   Q.  The situation with your daughter and the father
13 of your grandson, how long a period of time -- did they
14 actually live together?
15   A.  No, they just had an on-and-off relationship
16 for like eight years, and then they had a child two
17 years ago.
18   Q.  When did the assault -- the sexual assault take
19 place that you referenced?
20   A.  April 2nd.
21   Q.  Did that happen at your home, or did it happen
22 someplace --
23   A.  At his home.
24   Q.  At his home?
25       Was she there visiting or picking up the

186

1  child --
2    A.  Yeah, she was there to go see his new apartment
3  to see where her son would be -- and what the living
4  conditions were, if it was a safe environment because he
5  just moved and --
6    Q.  Okay.  And his apartment is in Dallas County?
7    A.  Yes.
8    Q.  Now, you said something that the District
9  Attorney's Office over there is contemplating or -- have
10 they got a Grand Jury presentation scheduled or --
11   A.  Well, they had one scheduled and they
12 rescheduled it, and she went and talked to them today
13 about her side of the story, and then they're going to
14 reschedule another day.  It will -- it's going to the
15 Grand Jury.
16   Q.  Okay.  Was he arrested in connection --
17   A.  Yes.
18   Q.  -- with the assault?
19       Do you recall what police department it was
       arrested him?
       A.  Dallas.
22   Q.  Is there a child custody order in place --
23   A.  Yes.
24   Q.  -- between them?
25   A.  Yes.

187

1    Q.  Is your daughter the managing conservator of
2  the child?
3    A.  Yes.
4    Q.  The situation with your son, how old was he
5  when he got involved with drugs?
6    A.  Probably in high school.  And I think all of
7  these arrests and things were like when he was in --
8  like 23, so it was like 13 years ago.
9    Q.  How -- was he arrested more than one time?
10   A.  Yes.
11   Q.  What types of drugs was he using?
12   A.  He was mostly using marijuana, but I think he
13 got caught with other stuff, mushrooms, I don't know.
14   Q.  Okay.  Now, you say the lawyer that represented
15 him was a friend of his father?
16   A.  It's one of his high school friend's father.
17   Q.  Do you remember what the name of the lawyer
18 was?
19   A.  I can't think of it right off the top of my
20 head, no.  It was a big cowboy.
21   Q.  Okay.  Where was the -- you said he went into a
22 one-year residential program?
23   A.  Yeah, Breckenridge, I think.
24   Q.  I'm sorry?
25   A.  In Breckenridge.

188

1    Q.  In Breckenridge?
2    A.  Uh-huh.
3    Q.  Was that out of Tarrant County, the case, or
4  was he prosecuted someplace else?
5    A.  It was out of Tarrant County.
6    Q.  Is he still actually on probation right now?
7    A.  No, no, no.  He finished all that.  That's why
8  I said I've been talking to a lawyer about getting his
9  felony a nondisclosure since he finished all his
10 probation and -- and it's been years -- it's been years,
11 and he said they could do a nondisclosure as far as --
12   Q.  Did -- who's the lawyer you've been talking to?
13   A.  Todd Rash.
14   Q.  Okay.  But there hadn't been anything filed in
15 regard to that?
16   A.  No, not yet.  We're supposed to do it in the
17 next week.
18   Q.  Okay.  One of the questions said -- asked you:
19 Have you or someone close to you been involved in the
20 matter of the justice system where you feel justice was
21 not done?
22       You said, Yes, grandson's father assaulted
23 my daughter with a gun, and no charges were billed by
24 the Grand Jury.
25   A.  Yes.

189

1    Q.   Is this a separate occurrence?

2    A.   Yes.

3    Q.   A previous occurrence from what's going on now?

4    A.   Yes.

5    Q.   Was that also in Dallas, or was that here?

6    A.   It was in Richardson.

7    Q.   Okay.

8    A.   Where he previously lived.

9    Q.   And did the Richardson police arrest him?

10   A.   No.  My daughter has a habit of not reporting

11   things for a couple of days after because she thinks

12   about it.  I mean, she doesn't -- she still loves the

13   man, she doesn't want to get him in trouble, she has to

14   think about it awhile, so that's the issue, is that it

15   was reported late and --

16   Q.   And they just didn't pursue it?

17   A.   Well, I mean, it -- yeah, I don't know whatever

18   happened.  We were told it was supposed to go to the

19   Grand Jury, and we never heard any more.

20   Q.   Has there been any discussions about that with

21   the Dallas D.A., the prior incident?

22   A.   Yeah, I mean, it's been brought up, yes,

23   uh-huh.

24   Q.   Was your father in the Air Force?

25   A.   He was Army, Navy during World War II, and --

190

1    for two years, then moved to the Army.

2    Q.   What was your father's name?

3    A.   Mike Downey.

4    Q.   What's the last time?

5    A.   Downey, D-o-w-n-e-y.  Milford Downey, but he

6    went by Mike.

7    Q.   I worked back here in the D.A.'s Office back

8    the last -- last part of the '70s, but I don't remember

9    his name.

10       I want to talk to you a little bit about

11   the death penalty, but I'll probably do that in relation

12   to these -- the process.  I did want to ask you one

13   question, though.  You said on the questionnaire that

14   you felt like that a life sentence without parole was a

15   harsher punishment than the death penalty to you.

16   A.   Yes.

17   Q.   And why do you -- what prompted that answer?

18   A.   Well, because you're denying someone their

19   freedom the rest of their life, and they have time to

20   think about everything that happened, and, I mean, I

21   think denial of freedom is worse than death.

22   Q.   Okay.  And some people feel that way.

23   A.   Yes.  Everybody's different.

24   Q.   The law presumes that the death penalty is the

25   ultimate punishment, there's nothing worse than that,

191

1    but how you feel is how you feel.

2        Let's -- let's talk a little bit about the

3    law.  Murder's got a pretty simple definition.  If I

4    knowingly cause somebody's death and there's no type of

5    legal justification or excuse for it, that's murder.

6        There's some justification or excuses that

7    the law recognizes will excuse my conduct in causing

8    that person's death from any kind of criminal liability.

9    If I'm acting in self-defense, if I'm defending my

10   family, things like that are recognized as a legal

11   excuse for the conduct.  It's just not a murder, so it

12   would be justified.

13       So this definition presumes that that's not

14   the case, that there's not -- there's not a legal

15   justification or excuse for the conduct.  It's just

16   something that I have done knowingly, and that's that --

17   got that legal definition, I'm reasonably certain that

18   my conduct is going to cause that death.

19       Because murder is a -- what we call a

20   result-oriented -- result-oriented offense.  Okay?  And

21   so the state of mind goes to the result.  I have to be

22   reasonably certain my conduct is going to cause the

23   death.

24       There are other types of homicides, which

25   is what we call a crime where somebody dies, that are

192

1    based on a lesser state of mind.  And let me give you an

2    example.

3        If I decide that I'm going to drive my car

4    blindfolded down the street in the middle of the

5    neighborhood just to see if I can do it, I may not have

6    the reasonable certainty that I am going to kill a

7    particular child that might run out in the street that I

8    never saw or knew about.  You see what I mean?

9    A.   Uh-huh.

10   Q.   And so I may not be reasonably certain that

11   conduct is going to cause a death, but I'm obviously

12   guilty of a homicide because I was at the very least

13   reckless about it and that there was -- I was creating a

14   substantial and unjustifiable risk that a death could

15   occur from that type of conduct, and I disregard the

16   risk.  That's the definition of reckless.  Okay?

17       So what has to be -- what has to be present

18   in order for it to be a murder is that knowing element,

19   that state of mind of knowing.  Other -- something less

20   than that, it still can be a crime; it just may not be a

21   murder.  Are you with me on how that works?

22   A.   Yes.

23   Q.   And murder, I guess, presupposes that there are

24   all kinds of factual situations that will meet that

25   definition, and that's why we get that wide range of

193

1 punishment from 5 to 99 years, because what is presumed
2 is when the jury hears all the evidence in the case,
3 they will go out and they will come to an agreement on
4 some number as to what is appropriate punishment for all
5 the facts in that case, that -- that offense and that
6 particular Defendant, whether it's 5, 10, 15, 50 or 75,
7 whatever it may be, anywhere from 5 to 99 life. Okay?
8            What's required to be -- to serve as a
9 juror is that you not have any kind of predisposition
10 that would keep you from being able to consider that
11 full range. Some jurors are of the mind, If I find
12 somebody was reasonably certain that their conduct is
13 going to cause the death and he went ahead and did it
14 and caused the death, then 5 years just ain't enough.
15 You see what I mean?
16            How do you feel about that idea?
17     A.  It would depend on the crime and the
18 circumstances, like you said, if it was reckless, if
19 they were drunk or if they were mentally disturbed
20 and --
21     Q.  And the jury can consider all those factors.
22 What the jury has to find is if -- they have to find
23 that it's a knowing act, or it's not a murder. Okay?
24 And whether he was under the influence of drugs or
25 intoxicated or whatever else, if the jury finds that he

194

1 did not have that culpable mental state of knowing, then
2 they don't find him guilty of murder. Okay?
3            If they find that he was on drugs at the
4 time but he was still able to know that, you know, his
5 conduct -- he was reasonably certain his conduct was
6 going to cause the death, then they can find him guilty
7 of murder, but then they can turn around and consider
8 that in mitigation of the punishment.
9     A.  Correct.
10     Q.  Okay. Capital murder is different because
11 there are only some types of murders that are capital
12 murders. And capital murder has a different range of
13 punishment than any other murder under our law because
14 at that point, there's only two punishments; life
15 without parole or death by lethal injection. And
16 neither one of them is available for any other crime.
17 Okay?
18            The decision as to which one becomes -- is
19 appropriate is made on the basis of that special issue
20 submission. The jury is asked those questions, and the
21 way that they answer the question dictates the result.
22 And I want to make sure that you understand, the Judge's
23 function is ministerial. If the answer -- if the
24 questions are answered a certain way, she says a death
25 sentence. If they're answered a different way, she says

195

1 a life sentence. Okay? She has no independent judgment
2 to make. The jury decides the punishment by the way the
3 questions are answered.
4     A.  Correct.
5     Q.  And it's assumed, I guess, that these questions
6 are going to ask the jury to make some additional
7 findings about the particular Defendant. I want to back
8 up just for a second.
9            When we -- when they -- when the
10 Legislature creates an offense, they set out the facts
11 that have to be proven in order to convict of that
12 offense. We call them elements, but basically it's just
13 the facts that the jury has to find to find somebody
14 guilty.
15            And there are different ways that you can
16 get capital murder from murder. Basically, it's murder
17 plus some aggravating factor. Under this little slide
18 over here are the elements of the offense of capital
19 murder, as alleged in this particular Indictment.
20            The allegation in this particular
21 Indictment is that on or about December the 17th of
22 2009, in Tarrant County, Texas, that Mr. Hummel
23 caused -- did knowingly cause the death of one
24 individual, Clyde Bedford, and that he knowingly caused
25 the death of another individual, Joy Hummel, and that

196

1 both transactions -- both murders occurred during the
2 course of a single criminal transaction. Okay?
3            They -- they also have to -- have alleged
4 in the Indictment the manner and means by which death is
5 alleged to have occurred. And with manner and means, as
6 Mr. Gill told you, they have to set out, for purposes of
7 notice, what it is that they intend to try to prove as
8 to the way the death was accomplished.
9            Each of those elements -- and at this -- at
10 this point I -- I wanted to tell you those allegations
11 for one reason, and that is to ask you if you've ever
12 heard anything in connection with this allegation or Mr.
13 Hummel or anything about this case?
14     A.  No. No, I haven't.
15     Q.  Not from the news, the newspaper, other jurors,
16 anything?
17     A.  No. I'm afraid I watch the national news and
18 the international news and not the local.
19     Q.  Well, good. So as we start here today, you've
20 got a blank slate, and there's nothing in your mind that
21 would tell you that Mr. Hummel's guilty of anything in
22 this case?
23     A.  No.
24     Q.  Okay. Okay. I want to talk to you generically
25 about these elements of capital murder because it's

197

1    required that the State prove each of them to you beyond
2    a reasonable doubt.  Okay?
3            And I want to start with that burden of
4    proof.  Mr. Gill told you proof beyond a reasonable
5    doubt is not defined in the law.  There are other
6    standards of proof that are lesser standards that are
7    defined.  Okay?  And I want to talk to you a little bit
8    about some of them.
9            One of them is if you're suing somebody for
10   something they've done to you, some wrong, if I back
11   into your car leaving the parking lot this afternoon and
12   you sue me for the damages, the standard of proof by
13   which you would have to prove your case is what's called
14   a preponderance of the evidence.  And that's got a legal
15   definition.  It's the greater weight and degree of the
16   credible evidence.
17           Civil lawyers kind of talk about a scales
18   of justice and if you drop a leaf or a feather on one
19   side and the scale tips, then you're entitled to a
20   judgment.  Okay?  And that's the legal definition for
21   preponderance of the evidence.
22           Proof beyond a reasonable doubt is more
23   than that.  Okay?  If the State was to try to come in
24   and deem your daughter to be an unfit parent such that
25   the State would terminate her rights to the child, in

198

1    order for the State to do that, they would have to prove
2    their allegation that she was unfit by what's called
3    clear and convincing evidence.  Okay?  And that's
4    legally defined.
5            And clear and convincing evidence is the --
6    evidence of the -- of a -- the nature and degree that
7    would be sufficient to establish a mind -- in the mind
8    of the trier of fact a firm conviction or belief as to
9    the truth of the matter asserted.
10           So the evidence would have to be sufficient
11   to establish a firm conviction and belief that your
12   daughter was an unfit parent before the jury could find
13   against her and terminate her rights to take the child.
14   You see what I mean?  Proof beyond a reasonable doubt is
15   more than that.
16           Mr. Gill told you it is the same burden of
17   proof in every criminal case, whether it's a traffic
18   ticket or a theft or a capital murder.  Okay?  One thing
19   that he didn't say, which I will tell you, is you are
20   the one as the juror that determines how much evidence
21   it takes you to find -- to reach that degree of
22   satisfaction, to be convinced to that degree.
23           It may be that -- we talk about the
24   threshold of evidence.  The amount of evidence that it
25   takes to convince you that somebody's guilty of capital

199

1    murder may be significantly more than the amount of
2    evidence that it would take to convince you beyond a
3    reasonable doubt he's guilty of running a red light.
4    You see what I mean?
5            The seriousness of the charge, the
6    seriousness of the situation may dictate to you a
7    difference in the threshold of evidence or the amount of
8    evidence that it takes to be convinced to that degree of
9    certainty.  Any question about that?
10       A.   No.
11       Q.   Okay.  Do you have some thought in your mind as
12   to what we're talking about when we say proof beyond a
13   reasonable doubt?
14       A.   Well, it's not beyond all possible doubt, so
15   beyond a reasonable doubt is what a reasonable person
16   would think.  I mean, I come across that in nursing,
17   what would a reasonable, prudent nurse do.
18       Q.   Okay.  And I wanted -- and -- and you're right.
19   It's not beyond all doubt, but it is beyond all
20   reasonable doubt, so I guess there's some distinction
21   between what constitutes a reasonable doubt and
22   unreasonable doubt.  I mean, a juror may have a doubt
23   that I did it because a little spaceman came down and
24   put a ray gun in my head and made me do it.  That's not
25   a doubt based on reason and common sense.

200

1        A.   Right.
2        Q.   You see what I mean?
3        A.   Right.
4        Q.   So that may be an unreasonable doubt.  It is
5    required that it be proof beyond all reasonable doubt by
6    whatever definition you give that.
7        A.   Right.
8        Q.   Okay.  And they've got to prove all those
9    elements to that degree of certainty, and it's not --
10   it's not assumed or presumed that any element is any
11   less important than any other.  And sometimes jurors
12   have a problem with the idea of that manner and means
13   because they kind of look at that as basically some kind
14   of technicality.
15           If they allege that they caused the death
16   by pushing him off the cliff and they prove that they
17   caused the death by running him over with a Buick, well,
18   then, there's a variance between what they allege in the
19   Indictment and what they prove.  Okay?
20           And the law tells the jury that they have
21   to find that guy not guilty because they didn't prove
22   all those elements beyond a reasonable doubt.  But he's
23   just as dead.  You see what I mean?
24       A.   Yeah.
25       Q.   And some jurors cannot -- mentally can't make

201

1  that jump.  I mean, they just say -- they don't -- they
2  feel like it's a technicality, they don't agree with it,
3  they don't think it's fair, they don't want to be put in
4  the position of possibly having to find somebody not
5  guilty because the State made a mistake like that.  How
6  do you feel about that idea?
7      A.  I think the State's normally better prepared
8  than that.
9      Q.  And they get to allege as many different ways
10  that they think of -- the crime having been committed as
11  they think the evidence could prove, but they got to
12  prove it however they allege it.  Okay?
13          And I -- and that's admittedly kind of an
14  extreme example, but I think it's kind of demonstrative
15  of the type of mental exercise we're asking you to make
16  for us in terms of judging your ability to work with
17  this law.  Any questions about that?
18      A.  No.
19      Q.  Okay.  More problemsome sometimes is that --
20  the fact that we don't define "same criminal
21  transaction" for you.  And it's not presumed that the
22  jury is going to go out -- these are what we call terms
23  of common use and understanding.  If they don't have a
24  legal definition, each juror applies his own definition.
25  You don't go back and -- and -- as a juror, it's not

202

1  envisioned you go back as a juror and say, Okay, let's
2  define proof beyond a reasonable doubt, let's define
3  same criminal transaction and so forth because it's an
4  individual decision based on your understanding of the
5  term.  Okay?
6          Now, the problem that happens is it's not
7  required that the two -- that the two jurors sitting
8  next to each other have the same understanding because
9  based on their experiences or their understanding of the
10  terms, there may be a divergence there.  And one juror
11  may very well feel that same criminal transaction means
12  just exactly what it says, it's the same transaction,
13  the same act.
14          I think you used the example of a -- of a
15  bomb, one bomb kills two people.  Another juror may feel
16  that it encompasses more than -- that it entails --
17  excuse me -- more than one act, but they may, you know,
18  feel like that there has to be some commonalty in terms
19  of geographic location or timeframe or whatever it is.
20  None of that is set out for you because the term is not
21  defined.  It's how you define it.  You see how that
22  works?
23      A.  Yes.
24      Q.  Have you got any questions about that?
25      A.  No.

203

1      Q.  Okay.  And it doesn't -- I guess what I'm
2  trying to emphasize for you, these are individual moral
3  decisions that a juror makes, and it's not required that
4  the jury have any kind of agreement on what the
5  definitions are.  What's important is each individual
6  juror votes his own conscience.  Okay?
7      A.  Correct.
8      Q.  All right.  It's only whenever the jury finds
9  somebody guilty of capital murder -- because they may
10  find there was a murder and a murder but it wasn't the
11  same transaction.  If -- if -- if -- if your
12  understanding of the same criminal transaction is one
13  act that results in two deaths and you find two murders
14  occurred a block apart, you may -- that wouldn't be the
15  same criminal transaction.  You see what I mean?  It
16  would depend on your definition.
17      A.  I can see how some people -- yeah.
18      Q.  Okay.  And some -- it would just depend on how
19  you viewed that.
20          And in that case you could find somebody
21  guilty of murder and another murder; you just simply
22  couldn't find them guilty of capital murder because it
23  does not meet your criteria for what a criminal
24  transaction is.  All right?
25      A.  Okay.

204

1      Q.  So if you find that, that it did occur in one
2  transaction, then you find him guilty of capital murder,
3  and then we get to the punishment phase, or the issues
4  are -- become involved.
5          And it's -- it's envisioned that these
6  issues will ask the jury to find something different
7  from what they already found.  If the way we're going to
8  decide, of all the people who get convicted of capital
9  murder, who gets life and who gets death is through
10  these questions, it would only make sense that this
11  question is intended to ask you to find something
12  different or something more than you already found.  You
13  see what I mean?
14      A.  Uh-huh.
15      Q.  If the question didn't do that, what good is
16  the question?  But the problem that comes is -- is we
17  don't define anything in the question, and the jurors,
18  in the way they view the questions, sometimes have --
19  have some issues.
20          And let me give you an example.  Some
21  jurors -- in order to get to this question under the
22  capital murder scheme that's alleged in this Indictment,
23  you're going to have to have found that there was at
24  least two murders committed in a single criminal
25  transaction.

205

1   And then at the punishment phase, there may
2   be evidence admitted or there may not. Anything that's
3   relevant to that decision of life or death is
4   admissible. It's -- you know, it's kind of a wide-open
5   deal.
6        The State's got evidence that the guy
7   pushed his grandmother when he was six years old, they
8   can introduce that if they want to. If I've got
9   evidence that when he was six years old, he helped his
10  grandmother take in the wash from the -- you know, from
11  the clothesline every day, I can introduce that if I
12  want to. Any evidence that might go to his character,
13  background and so forth is admissible to help the jury,
14  if it does, in answering questions.
15       So the problem is you would have had to
16  already found him guilty of capital murder on that
17  scheme to -- to get to this question. And some jurors
18  are of a mind that answers for them the future
19  dangerousness issue, because if they find somebody
20  guilty of capital murder on that scheme, he is always
21  going to be a danger. And that's not what's envisioned.
22  Are you -- how do you feel about that idea?
23  A.   I -- I don't think so either, no, because it
24  could have been a crime of passion. That doesn't
25  mean --

206

1   Q.   Maybe circumstances that'll never be repeated.
2   A.   Right.
3   Q.   And -- and one of the things that is -- is
4   problemsome to this, that even though you found him
5   guilty of capital murder, this question is -- is asking
6   essentially for you to make some kind of a finding
7   regarding what he's going to do in the future. Okay? I
8   hesitate to use the term "predict the future," but it
9   almost is that because it asks you to find is there a
10  probability that he's going to do certain things. Okay?
11       And we don't define probability, but your
12  definition more likely than not that he would or -- I
13  think that's what it was. What did you tell me that --
14  earlier you told Mr. Gill the -- your understanding of
15  probability was?
16  A.   Well, that it -- it's likely to happen.
17  Q.   Okay. It's likely. The question is: Is it
18  likely that he is going to do certain things in the
19  future, and that's commit criminal acts of violence by
20  whatever definition you give to them.
21       And I know y'all -- you talked about
22  something that -- that -- I think the answer you gave
23  was any kind of assault or murder that he might commit
24  in the future; is that correct?
25  A.   I don't remember. I'm not following that part.

207

1   Q.   Well, that's because I'm --
2   A.   I guess.
3   Q.   What do you think we're talking about when we
4   say, "criminal acts of violence"?
5   A.   Well, like it's not just murder. I mean, it
6   could be assault, it could be, you know, destruction of
7   property.
8   Q.   Do you think -- do you think criminal acts of
9   violence entails destruction of property?
10  A.   Yeah, sometimes.
11  Q.   Okay. In order for it -- whatever you find
12  criminal acts of violence entails, it's not just that
13  would engage in those specific acts, but that those acts
14  would be such a nature and degree that you would find
15  that that would constitute him as a threat to society.
16  So they would have to be of a sufficient severity that
17  you would consider him to be a threat. You see what I
18  mean?
19  A.   Yeah. I mean, I -- like I said, if it was a
20  crime of passion or if it was mental health issues, I
21  mean, it would all depend on the mitigating
22  circumstances, I guess, to whether he was a continuous
23  threat to society.
24  Q.   Sure. And you can consider all the evidence,
25  mitigating evidence, aggravating evidence. Some jurors

208

1   with that question say, If you want me to make a
2   prediction about him going to commit criminal acts of
3   violence in the future, you're going to have to show me
4   a pattern of violence, that he's been violent in the
5   past.
6   A.   Right.
7   Q.   And that it's not an isolated incident. It's
8   not a situation that's from some kind of mental --
9   A.   Right.
10  Q.   -- aberration or situation that can't be
11  repeated.
12  A.   Right.
13  Q.   That is a decision you make.
14  A.   Right.
15  Q.   Okay. And the jury has to be unanimous in
16  order to answer that question. It takes -- in order to
17  answer it yes, I mean. And the State has to be --
18  convince each individual juror by their own standard
19  that they have of beyond a reasonable doubt. Because
20  it's an individual moral decision.
21       We presume that the jury's verdict is going
22  to be a result of all of their individual verdicts
23  because what the instruction is you'll vote your
24  conscience, okay, based on the evidence. And you may
25  see it different from somebody else.

209

1    If 12 people answer it yes, then you go on
2    to the second question, and for the first time, the
3    State has proved enough to where the death penalty
4    becomes an option.  Because if there's a no answer to
5    that question, the death penalty is not even a
6    consideration.  Okay?
7        Now I know you and Mr. Gill had a
8    discussion about what happens if it's 6/6, and I think
9    that what he told you is correct in that the jury may
10   get an instruction that tells them go back and reach a
11   verdict if you can.  Okay?  What that instruction would
12   also tell you is you may not violate your individual
13   conscience just in order to get a verdict.  Okay?
14       A.   Right.
15       Q.   You would -- you would -- we would want the
16   jury to discuss and talk about their -- you know, the
17   evidence in the case and so forth and come to a
18   resolution on the question if they can just like we
19   would on the guilt/innocence verdict.
20       But if they're not able to do that, we
21   don't leave them in that jury room forever.  Okay?  The
22   jury certifies to the Court, We cannot reach a verdict
23   without violating somebody's conscience.
24       A.   Uh-huh.
25       Q.   And that -- the Court will discharge you from

210

1    service at that point.  Okay?
2        So the only way that a death sentence ever
3    results is if there is a unanimous verdict of yes on the
4    first question and a unanimous verdict of no on the
5    second question.  You see how that works?
6        A.   Okay.
7        Q.   One juror can keep there from being a death
8    sentence because you can't answer the question.  You
9    can't answer the question, there's no death penalty.
10   Any question about how that works?
11       A.   So is it up to the Judge then, the punishment?
12       Q.   Huh?
13       A.   Is it up to the Judge then, the punishment?
14       Q.   The jury is discharged, and that's the end of
15   the jury's participation in the case.
16       A.   Is it a mistrial or what?
17       Q.   Well, I can't go into that.  I can tell you
18   there's not going to be any death sentence in that case.
19       A.   Okay.
20       Q.   Okay?  The second special issue is a little bit
21   different because they don't have to prove that there
22   are no mitigating circumstances.  Okay?  There is no --
23   it's -- it's -- the law says there's no burden of proof
24   on this question.  I sometimes get concerns because if
25   you read the question, it's asking the jurors to weigh.

211

1    And if you're asking the jurors to perform a weighing
2    function, a lot of times jurors want to ascribe some
3    kind of burden of proof.  Okay?
4        They're not -- it's not envisioned that
5    they've got to prove that there are no mitigating
6    circumstances.  The law doesn't presume that I have to
7    prove that there are mitigating circumstances.  Does
8    that make any sense to you?
9        A.   Right.
10       Q.   Okay.  Because there's a distinction as to what
11   I have to do and what I may do.  Okay?  And here's the
12   problem.  What is mitigating evidence is what's
13   mitigating to you, and what's mitigating to you may not
14   be mitigating to the guy next to you.  Okay?  Each
15   individual decides for himself or herself from the
16   evidence whether or not there's any mitigating evidence,
17   and if so, how much weight they give it in -- in
18   answering the question.
19       And it may be that ten jurors all vote to
20   answer the question no, and it's for ten different
21   reasons, ten different circumstances.  For one juror, it
22   may be something about the way the -- the crime was
23   committed, you know.  You know, he had some kind of
24   mental issue or something at the time of the crime.
25       For another juror it may be something in

212

1    his character or background.  For another juror it may
2    be something, you know, a single act of kindness that he
3    did at some point in his life that had a profound
4    influence on somebody else's life.  Because we don't
5    define that for you.  You decide.
6        Now, where I have concerns is it says:  Do
7    you find that there is a sufficient mitigating
8    circumstance?  Okay?  And we don't give you an
9    instruction that tells you how you weigh the mitigating
10   circumstances against the facts of the offense or
11   whatever else, you know, his background or character or
12   whatever it is that you're weighing.  We leave that to
13   your decision making as to what is sufficient or
14   insufficient.
15       But basically you see how that question is
16   asking you to make a life or death decision?  Is a life
17   sentence an appropriate sentence under all the
18   circumstances that you've heard, or is the death
19   sentence the only appropriate sentence?
20       A.   It would --
21       THE REPORTER:  I'm sorry?
22       PROSPECTIVE JUROR:  It would depend on the
23   mitigating circumstances.
24       Q.   (BY MR. MOORE)  And that's exactly right, and
25   that's what's envisioned, but I want to make sure that

213

1  you understand the law doesn't presume that I'm going to
2  have to prove the mitigating circumstances.
3      A.  Right.
4      Q.  Because I may not even know what it is that you
5  think is mitigating.
6      A.  Right.
7      Q.  It doesn't mean we may not -- you know, we
8  won't be offering evidence because we probably will, but
9  I don't have the -- there's not a requirement that I do
10 that, and there's not a requirement that I convince the
11 jury that they're sufficient.  Because you weigh it.
12 It's an individual, moral decision that you make that
13 dictates life or death.
14          And you may give great weight to one single
15 fact in a person's life on par with everything else
16 they've done.  You know, because you decide is the --
17 you know at the very least this person is never leaving
18 the penitentiary, that when he dies in the penitentiary,
19 they would, you know, contact his family if they're
20 still around and say, You can come claim the body; and
21 if they don't do it, he's buried in the prison cemetery.
22 But he never leaves custody.
23          And you decide on a par with all that,
24 under all those circumstances, is there anything about
25 his character and background and upbringing, the

214

1  commission of the crime, anything else you want to
2  consider that tells you that's enough.  We don't need to
3  kill this guy.  You see what I mean?
4      A.  Yes.
5      Q.  All right.  Now, we've got one other thing.
6          This is an instruction that the Court would
7  give in connection with the question, and it tells you
8  that mitigating evidence is evidence that the juror
9  might regard as reducing the Defendant's moral
10 blameworthiness.  Okay?
11          Now, what I want to tell you in addition to
12 that is the law does not presume or assume that there's
13 got to be some connection between that mitigating
14 evidence and the actual commission of the crime.  Okay?
15          In the example that you were using as
16 mitigating circumstance, some kind of mental problem to
17 where he may not regard the wrongfulness of his
18 conduct in the same way that somebody else does, that
19 has a direct bearing on the crime.  The law says he
20 doesn't have to do that.  There can be mitigating
21 circumstances that are different from that.
22          Let me give you an example.  A juror might
23 consider as mitigating some prior incident that had
24 nothing to do with it.  He served his country honorably
25 in the service; that he went to war and did something

215

1  that was very meritorious.  It could be a -- as little
2  as a single act of kindness that he did.  I mean,
3  because we don't limit it, and we specifically don't
4  limit it to those things that directly bear on the
5  commission of the crime.
6          Have you got any question about that?
7      A.  No.
8      Q.  Do you think you would be able to consider
9  circumstances as mitigating that did not bear directly
10 on the commission of the crime?
11     A.  Yes.
12     Q.  Okay.  Because there is no limitation.  If you
13 think it's mitigating, it's mitigating.  You give
14 whatever weight you think is important.  This is kind of
15 a long-winded discussion.  You feel like you understand
16 the process?
17     A.  Uh-huh.
18     Q.  Are you comfortable with your ability to -- to
19 work within the framework of the law?
20     A.  Yes.
21     Q.  Okay.  Have you got any thoughts in your mind
22 at this point that -- because we've talked about the
23 death penalty and everything else.  Is there anything
24 about this procedure that makes you think that John's
25 guilty of anything?

216

1      A.  No.
2      Q.  If you're selected as a juror, can you just go
3  in there with an open mind?
4      A.  Yes.
5      Q.  And look at the evidence and be fair?
6      A.  Yes.
7      Q.  Can you give this man a fair trial?
8      A.  Yes.
9      Q.  Will you do that?
10     A.  Yes.
11     Q.  Ms. Olson, you've been very patient.  We thank
12 you very much.
13          MR. MOORE:  That's all I have, Judge.
14          THE COURT:  Thank you.
15          If you will have a seat out in the front
16 hallway, we'll call you back in in just a few minutes.
17          PROSPECTIVE JUROR:  Okay.  Thank you.
18          (Prospective juror exits courtroom)
19          THE COURT:  Juror 82, State, have a
20 challenge for cause?
21          MR. GILL:  We do not.
22          THE COURT:  Defense?
23          MR. MOORE:  No, we don't have a challenge,
24 Judge.
25          THE COURT:  State, exercise a peremptory?

217

219

1    MR. GILL:  No, Your Honor.

2    THE COURT:  Defense?

3    MR. MOORE:  Could I have one second?

4    THE COURT:  Yes.

5    MR. MOORE:  All right, Judge.  I'm sorry.

6    THE COURT:  That's fine.

7    MR. MOORE:  We'll accept her.

8    THE COURT:  Bring her back in and up here,

9    please.

10    (Prospective juror enters courtroom)

11    THE COURT:  Okay.  Ms. Olson, you are Juror

12    No. 9 in the case of the State of Texas versus John

13    William Hummel.  I need to administer you an oath as a

14    juror now at this point.  You will also be given that

15    same oath when all 12 jurors are assembled when the

16    trial begins.  Okay?  So if you'll raise your right

17    hand?

18    (Prospective juror sworn)

19    THE COURT:  You were informed at the

20    minipanel that our schedule for trial in this case is to

21    begin Monday, June 13th at 9:00 o'clock, and I don't

22    foresee at this point that that will change.  So just

23    plan on being here that morning unless -- if that does

24    change, you will be notified by the Court, and the only

25    thing would be to move it back, not forward.

218

1    PROSPECTIVE JUROR:  Okay.

2    THE COURT:  Okay?  Wear your jury badge

3    anytime that you're in and around the courthouse so that

4    people know that you're a juror and know not to discuss

5    the case around you.

6    And when the trial begins, you'll be

7    reporting to the 432nd District Court on the 6th floor

8    where you had your minipanel interview.

9    PROSPECTIVE JUROR:  Okay.

10    THE COURT:  Okay?  I know that you have

11    received this instruction orally and in writing, but I

12    need to remind you because it is very important in a

13    case of this type and this magnitude that all the jurors

14    meticulously follow their jury instructions.

15    So I'm going to remind you once more.  Do

16    not ask anyone about the law applicable to this case or

17    research the law or the case on your own.  Do not

18    discuss the case with anyone.  It is most important that

19    you do not discuss the case with anyone, conduct

20    Internet research or read or listen to any media report

21    about the case.

22    You may not receive information about this

23    case from any other source other than what you are

24    presented in the courtroom concerning the case.

25    That means do not Google or search any

party or lawyer or court personnel in this case.  Do not

2    conduct any research whatsoever on the Internet about

3    this case or the parties or facts involved in it.  You

4    may not write or blog about the case, events surrounding

5    the case or your jury service.  You may not Tweet about

6    the parties, events or facts in this case or your jury

7    service on this case.

8    Do not send e-mail communication to anyone

9    conveying your jury experience or information about this

10    case.  At any time you are not to use your cell phone to

11    call anyone to ask questions about issues in this case,

12    to report facts about this case or to research the case.

13    You may not use Facebook, MySpace, LinkedIn

14    YouTube, Twitter or any other social network on the

15    Internet to discuss your jury service or issues in this

16    case or people involved in this case or to research

17    persons involved in this case.

18    Do you have any questions regarding your

19    instructions or when you're supposed to return?

20    PROSPECTIVE JUROR:  No.

21    THE COURT:  Okay.  Well --

22    PROSPECTIVE JUROR:  Is that --

23    THE COURT:  No.  This is your jury

24    questionnaire.  I'll keep that.  Do you need to write

25    down the date?

220

1    PROSPECTIVE JUROR:  No, not the date; the

2    time and the court.

3    THE COURT:  Okay.  I'll -- I'll -- I've got

4    a piece of paper.

5    And you can park at LaGrave Field, and that

6    will get you on and off the bus.

7    (Prospective juror retires)

8    (Recess from 3:54 p.m. to 4:04 p.m.)

9    (Open court, Defendant present)

10    THE COURT:  Okay.  We're ready for No. 83,

11    Valerie Williams.

12    (Prospective juror enters courtroom)

13    THE COURT:  How are you?

14    PROSPECTIVE JUROR:  Good.  How about

15    yourself?

16    THE COURT:  Doing well.

17    Okay.  You are Potential Juror No. 83,

18    Valerie Williams; is that right?

19    PROSPECTIVE JUROR:  Yeah.

20    THE COURT:  All right, Ms. Williams.  If

21    you'll raise your right hand, I need to swear you in.

22    (Prospective juror sworn)

23    THE COURT:  Okay.  Now, you are awfully

24    quiet so everybody's going to have to hear you, so if

25    you want to either scoot your chair up or move that

221

1  microphone a little bit, that will probably help us all.
2  Okay?
3          You filled out a jury questionnaire with us
4  a couple of weeks ago. Has anything substantial changed
5  in your life that would affect your scheduling or
6  anything that you filled out on that questionnaire that
7  you need to change?
8          PROSPECTIVE JUROR: No.
9          THE COURT: Okay. Anything about your
10 schedule change since we met at the minipanel and you
11 found out the dates for the trial that you need to let
12 us know about?
13         PROSPECTIVE JUROR: No.
14         THE COURT: Okay. You will recall that the
15 person on trial in this case is John William Hummel.
16 He's represented by Pamela Fernandez, Fred Cummings and
17 Larry Moore.
18         The State of Texas is represented by Miles
19 Brissette and Robert Gill, and they -- both sides are
20 going to have the opportunity to talk to you this
21 afternoon. It'll take about an hour, and they're going
22 to be talking to you about your jury questionnaire and
23 the death penalty issues in this case. Okay? Do you
24 have any questions before we get started?
25         PROSPECTIVE JUROR: No, ma'am.

222

1          THE COURT: Okay. State, you may proceed.
2          MR. BRISSETTE: Thank you, Judge.
3          VALERIE WILLIAMS,
4  a prospective juror, having been first duly sworn,
5  testified as follows:
6                VOIR DIRE EXAMINATION
7  BY MR. BRISSETTE:
8      Q.  Good afternoon, Ms. Williams. How are you?
9      A.  I'm okay. How about you?
10     Q.  Well, I got some allergies going on, so if I'm
11 not clear enough, just say, Miles, I don't understand
12 what you're talking about. Okay?
13         Now, we have had a chance to look at your
14 questionnaire, and I want to go over a few things with
15 you on that. And we're going to talk about what your
16 views are on a couple of different things.
17         Did we have to get you out of school today?
18     A.  No, I took the day off.
19     Q.  You took the day off. Okay. What school are
20 you a teacher's assistant at?
21     A.  Western Hills Primary.
22     Q.  And how many -- how many years have you been
23 there?
24     A.  This is going on my 11th year.
25     Q.  What's your favorite thing about the school

223

1  itself?
2      A.  It's just a real friendly atmosphere, teachers
3  and pretty good group of students.
4      Q.  I know that's a -- a bad question to ask at the
5  end of the year because my mom taught for a couple
6  decades, and my sister teaches, but it's -- is it -- are
7  you ready for the summer to be here?
8      A.  Most certainly.
9      Q.  And you said on your questionnaire that if you
10 had to do it all over again, you'd like to be the
11 teacher instead of the teacher assistant?
12     A.  Probably so.
13     Q.  Why?
14     A.  Most likely financial, first off, and I guess
15 kind of more authority in the room decisions that are
16 made.
17     Q.  So as a teacher's assistant, are you assigned
18 to a particular class for the day, or do you have
19 different classes to cover?
20     A.  I have the same class every day, special ed.
21     Q.  And what age groups are your special ed
22 students?
23     A.  Three through six.
24     Q.  And do the -- do the kids for three to six stay
25 in the same class with you all day, or are they in and

224

1  out?
2      A.  They stay all day.
3      Q.  What's your class size?
4      A.  We have eight students.
5      Q.  And you have a 17-year-old that's in the 11th
6  grade?
7      A.  Yes.
8      Q.  What school does -- does the 17-year-old go to?
9      A.  He's at Brewer High School.
10     Q.  A little nervous up there?
11     A.  Yeah.
12     Q.  Well, you're in complete control. You are the
13 teacher today. Okay? We're going to show you a few
14 things on the PowerPoint here this afternoon, go over a
15 few things and ask you your opinions on some stuff.
16 There's no wrong answers. We just want to understand
17 what your feelings are on a few things. Okay?
18     A.  Okay.
19     Q.  And as the Judge said, there's some water right
20 there if you need it to get through this. As we go
21 through your questionnaire, what did Pastor Dukes talk
22 about this past weekend?
23     A.  Well, for starters we're pretty much a new
24 church and we're getting a new facility. We meet at
25 Fort Worth Community Center right now, so we got a new

225

1  church.

2  Q.  You're meeting in the new theater right now,

3  right?

4  A.  Uh-huh.

5  Q.  Is that a yes?

6  A.  Yes.

7  Q.  She has to take down everything and she gets

8  mad at me.

9  A.  I'm sorry, yes.

10  Q.  She won't get mad at you, just me.  Nobody else

11  in here but me.  Okay?

12      So where -- have y'all found a place to buy

13  some land or anything yet as a church?

14  A.  It's a -- a church already.

15  Q.  And has -- I know the congregation -- I think

16  from what I found out -- started out with 27 folks at

17  the first service.  Has it -- has it grown over the

18  years now?

19  A.  It's 50.

20  Q.  50?

21  A.  Uh-huh.

22  Q.  Where's the land and where's the church, the

23  existing building?

24  A.  Off of East Berry.

25  Q.  Okay.  What's your favorite part of the

226

1  ministry?  Is it the Bible study or the women's

2  ministry?

3  A.  The women's ministry is the favorite.

4  Q.  Has Pastor Dukes made it through his teachings

5  at TCU yet?

6  A.  I think he's almost through.  He'll be

7  through -- the end of this year he will be through.

8  Q.  Does the -- I know it's a nondenominational

9  church, and I think I understand the basic tenets from

10  what I've been able to -- to read.  Does -- does the

11  church have a position on the death penalty either way

12  that you know of?

13  A.  I'm not for certain, never really spoken about

14  it in church.

15  Q.  Looking through some of your stuff here, it

16  says that you -- you've hit the top three of the -- the

17  law and order type shows, CSI, NCIS and Law & Order.

18  Which one is your favorite?

19  A.  That's kind of hard to say.  I really like all

20  of them.

21  Q.  You notice this really isn't like Law & Order,

22  is it?

23  A.  Not at all.

24  Q.  We don't solve a case inside an hour.

25  A.  No.

227

1  Q.  And we don't drive fancy cars like they do in

2  CSI and NCIS.

3      Now, the stuff that you have seen on TV

4  with that, you know you have to set it aside if you're a

5  juror in the case, right?

6  A.  Okay.  Yes.

7  Q.  What's most interesting to you in those shows?

8  A.  I guess sometimes the suspense, how smart some

9  of the -- the officers are in figuring out the cases and

10  the evidence that they find.

11  Q.  So you like having to think through some of the

12  stuff with them?

13  A.  I do sometimes.  Sometimes I don't figure it

14  out until the end.

15  Q.  Do you ever find yourself thinking ahead and

16  solving it before they do on TV?

17  A.  Sometimes I have an idea, but not always right.

18  Q.  Does your son sit there and watch it with you

19  and try to say, Mom, I know what's going to happen?

20  A.  He doesn't watch it with me.

21  Q.  The -- in looking through this, there's a

22  relative that you have in Alabama that looks like they

23  might have been in some trouble in the past?

24  A.  Yes.

25  Q.  Is that a close relative of yours?

228

1  A.  It will be a cousin.

2  Q.  Anything about your cousin's situation in life

3  that would affect you in sitting in judgment of somebody

4  here in Fort Worth?

5  A.  No.  I really don't know the situation.  I just

6  know that he's been in trouble.

7  Q.  Are you left-handed?

8  A.  Yes.  My checks?

9  Q.  Your checks are just like my sister's

10  left-handedness.

11      Okay.  So we get to this question about --

12  it's Question 114.  It talks about the death penalty.  I

13  gave you some boxes to check.

14      I believe that the death penalty is

15  appropriate for all crimes involving murder.

16      And then there's a Question 115:  For what

17  crimes do you think the death penalty should be

18  available?  And you put murder.  This was about a month

19  or so ago when you got to fill this questionnaire out

20  before Mr. Gill or Mr. Cummings got to talk to you at

21  all about any of the stuff that takes place in this.

22      Do you understand now that the death

23  penalty is only available in Texas for capital crimes?

24  A.  Yes.

25  Q.  Okay.  So the unfortunate part is we have to

229

1  get you to fill the 26 pages out at some point, and it
2  was before we gave you a good understanding of what it
3  was.
4      A.  Right.
5      Q.  Now that you've had a chance to listen to Mr.
6  Gill and Mr. Cummings, does that change your thought a
7  little bit about this, that you understand that if
8  you're a juror, it can only apply to capital crimes?  It
9  is not just -- it's not available for regular murder
10 cases?
11     A.  Right.
12     Q.  And as we look at this for -- part of the stuff
13 today, your oath is to just simply to tell us the truth
14 and give us your feelings on stuff.
15     A.  Right.
16     Q.  And if you're selected as a juror, you have to
17 render a verdict that's based on the law and the
18 evidence.  So despite what your feelings are, what your
19 beliefs are, you're going to be asked to take an oath;
20 and if you can take that oath without doing violence to
21 your conscience and apply the law that the Judge gives
22 you to the facts that you hear from the witness stand
23 that you're on, sitting over in the juror's seats, and
24 base your decision based on -- solely on that.  That's
25 what you're going to be asked to do.

230

1      A.  Right.
2      Q.  Now, going into this -- this point so far, is
3  there any reason, be it moral, ethical or religious,
4  that you can't be part of a process that results in the
5  death penalty?
6      A.  No.
7      Q.  You hesitated about that.  Were you just
8  thinking about it?
9      A.  Oh, I mean, I was reading over that again, but,
10 no.
11     Q.  It's probably something you never really had to
12 think about until you got picked for this jury
13 selection, is it?
14     A.  Exactly.
15     Q.  Well, you're -- you're one of about 210 that
16 hadn't thought about it that week until you were picked.
17 Okay?
18     A.  Okay.
19     Q.  There was a group of 50 that you were on and
20 there was a group of 50 before you and a group of 50
21 after you that is coming through this process.  So all
22 we ask you to do at this point is to tell us what you
23 think, and if you're selected as a juror, you have to
24 keep an open mind and follow -- follow your oath as a
25 juror and do what the law says and apply the law and the

231

1  facts.
2      A.  Right.
3      Q.  That's what your job is.
4          For the capital murder that we're talking
5  about here, for this particular discussion this
6  afternoon, it's when a person knowingly commits two
7  murders during the same criminal transaction.
8          Now, the law does not define what same
9  criminal transaction is, doesn't give us a definition
10 for it.  So if you remember back to when Mr. Gill was
11 talking to you and Mr. Cummings, stuff that doesn't have
12 a definition by law from the folks down in Austin is
13 open to your interpretation as a juror.
14         And it's your individual interpretation
15 first until you make up your mind and then collectively
16 as a whole as you deliberate the case back together as
17 12.  Does that make some sense?
18     A.  Yes.
19     Q.  So some examples that have been tossed about
20 here during the last couple of weeks while we've been
21 working up here are the Federal Building up in Oklahoma
22 City when it was blown up.  Multiple people lost their
23 lives during the same criminal transaction, possibly.
24 You can look at it that way.
25         Or an incident where, you know, a guy's mad

232

1  at two of his buddies, two of his business partners, two
2  of his buddies.  They've taken all the money out of the
3  account they were working on to build something, and he
4  goes around town and hunts them down one night and
5  shoots them.  Okay?
6          Those are examples that have been used.
7  Certainly we could probably spend the rest of the day
8  thinking of what examples are, but as a juror, you have
9  to make up your mind to yourself first what the criminal
10 transaction means to you, and then determine if the
11 murders were committed during that same criminal
12 transaction and whether they were knowingly.
13         Because if they're not -- remember those
14 elements that Mr. Gill went over with you, that we have
15 to have a Defendant, on or about a certain date in
16 Tarrant County, Texas, did then and there knowingly
17 commit -- we have to list out how the crime took place.
18         So if the State doesn't prove that it took
19 place to -- in the same criminal transaction, we don't
20 have a capital offense; we have two murders then
21 possibly, right?
22     A.  Right.
23     Q.  So if we couldn't prove to you that it took
24 place in the same criminal transaction, a Defendant in a
25 particular case is entitled to a not guilty verdict,

233

1  right?

2      A.  It sounds right.

3      Q.  Because the State hasn't met its elements.

4          And where does the burden sit in a case

5  such as this, a criminal case?  Where does the burden of

6  proof sit?

7      A.  On the jury.

8      Q.  I'm sorry?

9      A.  On the jury?

10     Q.  How about on the State?

11     A.  On the State.

12     Q.  I have the burden.  The Defense, Mr. Cummings,

13  Mr. Moore and Ms. Fernandez, don't have any

14  responsibility or burden of proof in the case.  Does

15  that make some sense?

16     A.  Yes.

17     Q.  I want to make sure that's clear because if you

18  ever got a speeding ticket or anything higher than that

19  in Texas, a criminal charge, the burden of proof sits

20  with the prosecutors on that case, not with the Defense,

21  the citizen accused.  Okay?

22          So the responsibility for proving to you

23  that something happened always sits with the State, with

24  Bob and I here.  Okay?  And we have to prove to you the

25  elements of the offense.  And that's given to the

234

1  Defendant, as you recall when Mr. Gill talked to you

2  about the Indictment in the case.

3          The Indictment tells the Defendant what

4  they're being charged with.  It's not evidence of guilt.

5  It's just a roadmap the State has to live up to and

6  prove those elements beyond a reasonable doubt.

7          When I was talking back a minute ago about

8  the elements, the burden of proof is in there beyond a

9  reasonable doubt, but more importantly, the manner and

10  means.  And what I mean by that is it says, on or about

11  a certain date, Miles Brissette did knowingly kill John

12  Doe by shooting John Doe with a firearm.  Okay?

13          And the Medical Examiner comes in here and

14  testifies.  The Medical Examiner gets on the stand and

15  says, He was not shot with a gun; he was stabbed with a

16  knife.  Okay?

17          Now, the State gets to pick what language

18  goes in the Indictment.  So if I'm the guy on trial and

19  they've picked the wrong language, that favors the guy

20  that's on trial, doesn't it?

21     A.  Yes.

22     Q.  All right.  And it's, Well, hey, they got

23  close, Miles still killed him, he's guilty.  That's not

24  what the law is.  If the State doesn't prove its

25  elements, what's the jury have to do?

235

1      A.  They would have to prove it.

2      Q.  No -- they would have to prove it?  If the

3  State doesn't prove it, does the jury find him not

4  guilty?  That confuse you?

5      A.  Yeah.

6      Q.  Okay.  I apologize.

7          So we have a burden of proof.  We have some

8  elements in a case.

9      A.  Right.

10     Q.  Okay.  Let's make it easy.  You've heard of

11  this charge called driving while intoxicated?

12     A.  Yes.

13     Q.  That happens a lot in Texas, unfortunately,

14  doesn't it?

15     A.  I think.

16     Q.  All right.  Right or wrong, it's illegal to

17  drive with alcohol in your system when it impairs --

18  impairs your sense or ability to drive.  Okay?

19     A.  It's wrong, yes.

20     Q.  So there's -- there's seven elements to that

21  case, if you want to go with me here.  There are seven

22  different points a jury has to find.  The first six are

23  really never in dispute because a police officer has

24  always stopped the person behind the wheel.  Okay?  So

25  the question is whether or not they were intoxicated.

236

1  All right?

2          So out -- with a trial -- when we're

3  looking at a DWI trial, if you heard no testimony about

4  any alcohol, what would you find?  If the trial -- if

5  the elements were that the officer came in and

6  testified, yes, I saw Miles behind the wheel, it was on

7  that date here in Tarrant County, the proper place, the

8  proper time, but you never heard any mention of whether

9  or not Miles had anything to drink, could you find me

10  guilty of DWI, driving while intoxicated?

11     A.  No.

12     Q.  Okay.  Because the State hadn't proved what?

13  One of the elements.

14     A.  The elements were, yes.

15     Q.  Okay.  And you don't have to do this in a

16  vacuum.  If you're on a jury, the Judge is going to give

17  you the Court's Charge.  Remember when -- when Bob was

18  talking to you about a Court's Charge a couple of weeks

19  ago and he read some stuff from a piece of paper?

20          The Judge gives the jury the instructions,

21  the law in the case, and it tells the jury how to apply

22  the law and read it and go over it and use it as a guide

23  to reach a verdict.  Okay?

24          So you're kind of getting quizzed unfairly

25  here because I don't have a copy of the Court's Charge

237

1  to put in front of you.  We're going to go through some
2  of the questions here in a second.
3          But if the Indictment sets out a set of
4  elements and the State doesn't prove each one of those
5  to a juror's satisfaction beyond a reasonable doubt, the
6  jury has to acquit or find the Defendant not guilty.
7  Does that make sense?
8      A.  Yes.
9      Q.  And you can do that and follow your oath as a
10 juror; is that correct?
11     A.  Yes.
12     Q.  Okay.  Any questions on that?
13     A.  No.
14     Q.  All right.  For the second phase of a case
15 where we're talking about the punishment phase in a
16 capital murder case, a jury has already found a
17 Defendant guilty of knowingly killing two or more
18 individuals during the same criminal transaction.  Okay?
19 So the jury has already found that they have killed two
20 individuals, that it was during the same criminal
21 transaction and that it was beyond a reasonable doubt to
22 get to the punishment phase in a capital case.  They
23 have voted 12/zip unanimously that the person is guilty.
24 Okay?
25          At the punishment phase, the jury can take

238

1  the evidence that they heard during the first phase of
2  the case.  So all the evidence the State of Texas may
3  bring into a case, the evidence, if any, that the
4  Defense wants to put in in a case, the jury can consider
5  that once again for the punishment phase.  They can
6  consider all, part or none of it, whatever they want to
7  consider.
8          The State can also bring additional
9  evidence in.  During the guilt/innocence phase of a
10 case, we can't bring in acts of bad reputation, bad
11 character type evidence of a particular person.  During
12 the punishment phase we're allowed to do that.  And you
13 may hear some of that from a prosecution of a case.
14          There's also what's called unadjudicated
15 offenses.  Those are crimes that we may not have talked
16 about during the first part of the case that we can
17 bring up during the second part.
18          So if they've done something else in their
19 life that, you know, needs to be talked about, one can
20 bring that up and talk about it at this point.  I kind
21 of look at it like a roll of film.  During the first
22 phase of the trial, the guilt/innocence phase, it's just
23 those pictures of the person's life for what he's on
24 trial with in the Indictment; and during the punishment
25 phase, it's the rest of that roll of film and whatever

239

1  other rolls of film their life consists of.  Does that
2  make some sense?
3      A.  Yes.
4      Q.  You and I are old enough to remember what rolls
5  of film are.  We've had a few in here that haven't.
6  They didn't know what rolls of film were.  Some of your
7  students and the folks at the school, you know, where --
8  it's how things are changing nowadays, but that's the
9  best way I have to look at some of this.
10          Did you have a chance to go over the two
11 special issues in the piece of paper the Judge gave you
12 prior to coming in?
13     A.  I didn't go over it today.
14     Q.  But had you had a chance to look them over
15 prior to this?
16     A.  Yes.
17     Q.  Okay.
18     A.  I don't remember a lot, but, yes, I went over
19 it.
20     Q.  Well, guess what?  I have included them up here
21 so we don't have to -- to shoot in the dark here.  Okay?
22     A.  Okay.
23     Q.  There -- Special Issue No. 1, we -- we call it
24 the future dangerousness question around the courthouse.
25 And Special Issue No. 2 is sufficient mitigation for a

240

1  life sentence.
2          And how a jury answers these questions
3  tells the Judge how the Judge shall sentence the
4  Defendant.  Okay?  The Judge is going to tell you, if
5  you're selected as a juror in the case, that a sentence
6  of life without parole means the Defendant is ineligible
7  for release from prison on parole.  Do you know what
8  parole is?
9      A.  Not exactly.
10     Q.  Parole is something that would be granted by
11 the board -- Texas Board of Pardons and Paroles to
12 certain individuals based on certain crimes.  Okay?
13 What this is telling you, with the current law that
14 we're under for this case, is that if a jury has found
15 somebody guilty beyond a reasonable doubt for capital
16 murder, they're never going to leave the penitentiary
17 system alive.  Okay?
18     A.  Okay.
19     Q.  They're either going to die of natural causes
20 by serving a life without parole, or they're going to
21 die at a date and time certain set by a Court through
22 lethal injection.  Does that make some sense?
23     A.  Yes.
24     Q.  So that brings up Special Issue No. 1.  I'll
25 let you read that over for a second.

241

1    A.   (Prospective juror complies).

2    Q.   So you'll notice the first thing, Ms. Williams,

3   is that there's a burden of proof on this one again.  So

4   for the guilt/innocence phase and Special Issue No. 1,

5   the State's still under that burden of proof.

6         I have to prove to you beyond a reasonable

7   doubt that there is a probability that a Defendant would

8   commit criminal acts of violence that would constitute a

9   continuing threat to society.

10        If I don't prove to you beyond a reasonable

11  doubt, you have to say by your verdict, no, there's not

12  a continuing threat.  Does that make some sense?

13   A.   Yes.

14   Q.   And if we do prove to you beyond a reasonable

15  doubt that there is a continuing threat, the State's

16  entitled to your yes answer.  Does that make sense?

17   A.   Yes.

18   Q.   So let's go through little bit of this.

19        In looking at this, what does probability

20  mean to you?

21   A.   Is there a chance or is there a possibility.

22   Q.   Okay.  Perfect.  And that's something that's

23  been said by a lot of people in here.  Would you

24  consider it an absolute certainty, or is it something

25  less than that?

242

1    A.   I think it would have to be absolute.

2    Q.   Probability would have to be absolute?

3    A.   Uh-huh, absolute probability.

4    Q.   Okay.  What's absolute certainty mean to you

5   then?

6    A.   That with the evidence that's given, that it is

7   absolute whether the Defendant committed the crime or

8   not.

9    Q.   Okay.  You understand that when we're talking

10  about this issue, we're not talking about the crime they

11  actually committed at this point?

12   A.   Uh-huh.  How would I have worded that?

13   Q.   Excuse me?

14   A.   How would I have worded that?

15   Q.   I'm a little lost on --

16        THE COURT:  How would I have worded that.

17   Q.   (BY MR. BRISSETTE)  I don't know.

18   A.   Oh.  Well, I don't know if I used the wrong

19  word or not, but that's what that meant to me -- or

20  means to me.

21   Q.   Okay.  You understand that when we're looking

22  at this, we're looking at whether or not there's going

23  to be -- you're looking into the future.  This is where

24  the jury has to have a crystal ball and make a judgment

25  call.  Okay?

243

1         And you have to judge what the State's

2   presented to you and see if we've proved it beyond a

3   reasonable doubt.

4         What do you think criminal acts of violence

5   would be?

6    A.   Probably murder.

7    Q.   Okay.  The folks down in Austin wrote this

8   question.  You notice they could have put anything they

9   want in here because it's their book.  They didn't put

10  murder in, but can you see that it could be a future

11  murder?  Could you see it also to be future violent acts

12  against people, something less than murder?

13   A.   It could be both.

14   Q.   The law, if you're selected as a juror,

15  requires you to keep an open mind to look at that.

16  Could you do that?

17   A.   Yes.

18   Q.   And society.  What's society mean to you, Ms.

19  Williams?

20   A.   It means the atmosphere that we live in or

21  those around us is considered as society.

22   Q.   Could those that actually live in the

23  penitentiary system as well be part of society?

24   A.   I'm not really for certain on that.

25   Q.   Okay.

244

1    A.   I would say yes, considering what they did.

2    Q.   For some in the penitentiary system, the

3   society that you know that's out -- that can go to

4   worship services over in the arts district on a Sunday,

5   yes?

6    A.   Can you repeat that again?

7    Q.   Sure.  Maybe if I stand up, my voice will

8   travel a little bit better.

9         There are some, when we look at society,

10  that if they're in the penitentiary system, they'll get

11  out one day.  They'll serve their sentence and they'll

12  be released.  They'll be released back into the society

13  that you know of that we have talked about here.  Is

14  that your understanding?

15   A.   Yes.

16   Q.   All right.  Do churches have ministries that go

17  to the penitentiaries as well?

18   A.   Yes, there are some.

19   Q.   So would you see that the society of the

20  penitentiary and the society of the outside world can

21  interact?

22   A.   Yes, I believe they do.

23   Q.   We have people that work in the penitentiary

24  system that have lives outside the fence, yes?

25   A.   Yes.

245

1   Q.  Okay.  So in looking at this special issue, Do
2   you find beyond a reasonable doubt that there's a
3   probability that a Defendant would commit criminal acts
4   of violence that would constitute a continuing threat to
5   society, knowing that the person's never going to be
6   released from the penitentiary system, can you see a
7   person doing that inside the penitentiary system?
8       A.  Can you ask the question a different way?
9       Q.  Sure.  The special issue here that we have, we
10  know that based on what the law is, if you were at this
11  point and you're looking at this question, that there's
12  two options for the Defendant at that point.  It's
13  either life without parole or the death penalty.
14          So when we look at this question, we have
15  to prove to you beyond a reasonable doubt that a
16  particular Defendant is going to constitute a continuing
17  threat to society, knowing that -- that their society
18  that they're in is in the penitentiary.  Do you see
19  criminal acts of violence that could take place in that
20  situation?
21      A.  Yes.
22      Q.  Okay.  And if the State does not prove that to
23  you beyond a reasonable doubt, you'll hold us to our
24  burden and say, No, we didn't prove to you that it was
25  continuing acts; is that correct?

246

1       A.  Yes.
2       Q.  Now, this isn't an automatic issue.  You're not
3   going to answer this yes just because you found somebody
4   guilty of the homicide itself to begin with, are you?
5       A.  No.
6       Q.  You're going to stop and give this equal
7   deliberation, fair consideration like you gave the
8   guilt/innocence phase if you're selected as a juror; is
9   that correct?
10      A.  Correct.
11      Q.  Because that's what your oath is, is to look at
12  stuff and evaluate it.
13      A.  Yes.
14      Q.  Now, to answer this question yes, the facts of
15  the actual offense that you voted on in the
16  guilt/innocence may be sufficient in your mind, if it
17  is, to carry you forward to a yes answer, or it may not
18  meet that burden.  But that's something you have to
19  decide independent of your first vote.  Does that make
20  some sense?
21      A.  Yes.
22      Q.  Knowing that a yes answer moves the Defendant
23  one step closer to the death penalty, would you be able
24  to answer the question yes if the State proved to you
25  beyond a reasonable doubt that it should be yes?

247

1       A.  Yes.
2       Q.  And the opposite being the same.  I think we've
3   gone over that oath you've taken.  If you follow the law
4   and apply the law to the facts, if the State doesn't
5   prove it to you, you can answer it no, correct?
6       A.  Correct.
7       Q.  And follow that oath you have to take?
8       A.  Yes.
9       Q.  So if a jury answers it yes, that's a 12/0 vote
10  that has to be unanimous, so it's been 12/0 for guilty,
11  12/zip for yes to Special Issue No. 1.  Then we go to
12  Special Issue No. 2.  Okay?
13      A.  Okay.
14      Q.  Special Issue No. 2:  Whether, taking into
15  consideration all the evidence, including the
16  circumstances of the offense, the Defendant's character
17  and background and the personal moral culpability of the
18  Defendant, there is sufficient mitigating circumstance
19  or circumstances to warrant that a sentence of life
20  imprisonment rather than a death sentence be imposed.
21          So with this special issue, there's no
22  burden of proof.  That burden that Mr. Gill talked about
23  so much a couple weeks ago and I talked about here today
24  from guilt/innocence to Special Issue No. 1, it stops.
25          This is the jury's question at this point.

248

1   This is your -- your call throughout.  There's no burden
2   that has to be met.  If there's no burden on the State,
3   as we talked about, there's never a burden on the
4   Defense.  They don't have to bring anything on a case.
5   Okay?
6           So it gets to be a little tricky here.
7   They're not trying to trick you with the Legislature,
8   but they are in the sense that if there's no burden of
9   proof from either side, how are you ever going to hear
10  about mitigating evidence.  Okay?  Either side can bring
11  you mitigating evidence, and it can come in in any form
12  or fashion.  It's what you believe is mitigating
13  evidence.  Okay?  It's what rises to a sufficient level
14  in your mind.
15          It may be the first witness the State puts
16  on during the guilt/innocence phase; it may be a
17  physical exhibit we put in; it may be a journal; it may
18  be a book; it may be a written document of some kind.
19  And you say, You know what, I think that's mitigating
20  evidence in my mind.
21          And if it is, then you have to look at it
22  and see if it's sufficient to warrant a life sentence.
23  Okay?  That's what your oath as a juror asks you to walk
24  through.  And if it is, then you give it the effect and
25  we'll see where we're at.  Okay?

1         And that's a decision you as a juror have

2 to make as you go through this. And you follow the

3 Court's Charge, and you apply it accordingly. Okay?

4         Now, the Judge, if you're selected as a

5 jury (sic), the Judge will instruct the jury that they

6 shall consider mitigating evidence to be evidence that a

7 juror might regard as reducing the Defendant's moral

8 blameworthiness.

9         There's no definition for what moral

10 blameworthiness is. Okay? But if you think that the

11 evidence that's brought in, the mitigating evidence,

12 reduces the Defendant's moral blameworthiness in your

13 eyes and you give it that effect and then you find that,

14 yes, there is mitigating evidence.

15         If a jury, as a whole, ten or more of you,

16 find that it's mitigating evidence, it can be a 10/2

17 vote that, yes, there is mitigating evidence, then a

18 life sentence is imposed. Okay?

19         If the answer is no, there's no mitigating

20 evidence, that the evidence we found is not sufficient

21 enough to be mitigating, that has to be a unanimous

22 decision. Okay?

23         So if there's no, the unanimous decision

24 comes in and says then that's the death penalty. Okay?

25 What are your thoughts on that?

---

1 first day. Okay? So you can -- you can respect the

2 Defendant's burden and respect that he doesn't have to

3 bring you anything. Can you do that and follow your

4 oath as a juror?

5     A. Yes.

6     Q. Okay. Knowing that a no answer to the second

7 special issue would result in the death penalty, would

8 you be able to answer no if you felt it was the proper

9 answer based on the evidence?

10     A. Is that asking no to the death penalty?

11     Q. No, ma'am. What it's asking here is this --

12 here's where we're at: The answer of no here -- to get

13 to this question, a jury has found the person guilty,

14 answered Special Issue No. 1 yes, there's a future

15 threat, future dangerousness; and then to have the death

16 penalty be imposed, this answer has to be no, that

17 there's no mitigating evidence.

18     A. Okay.

19     Q. If it's yes, it's a life sentence. Okay?

20         So in context to that question that we

21 have, knowing that a no answer -- knowing that a no

22 answer would result in the death penalty, would you be

23 able to answer no, there was no mitigating evidence, if

24 you felt it was proper based on the evidence in the

25 case?

---

1     A. On that question in general or the death

2 penalty?

3     Q. Let's start with the question in general. Then

4 we'll move back to the death penalty.

5     A. Ask that question again.

6     Q. Sure. Having read through this -- and you've

7 had a chance to read through this -- does anything

8 bother you in this question, Special Issue No. 2?

9     A. No.

10     Q. You think --

11     A. It doesn't bother me.

12     Q. You think you could walk through that and apply

13 that if you're a juror?

14     A. Yes.

15     Q. And knowing that what you're looking for in

16 that is you're looking for mitigating evidence that a

17 jury will regard as reducing the Defendant's moral

18 blameworthiness. That's what you're looking for.

19         And there's no burden. Nobody has to bring

20 it to you. Nobody has a duty to bring it to you. As

21 part of society, you may want somebody to be bringing

22 everything they could, but the law requires them to do

23 nothing.

24         Mr. Hummel has satisfied his only

25 requirement in this case when he came to court the very

---

1     A. Yes.

2     Q. Okay. And the same would be true. You would

3 hold us to our -- you would hold yourself to your oath

4 that if you found mitigating evidence, you -- and it was

5 sufficient enough, you would answer the question yes?

6     A. Yes.

7     Q. Now, before, a little while ago, I asked you --

8 asked if you had general views on the death penalty. I

9 think we are about ready to get into that. What are

10 your general thoughts on the death penalty as a whole

11 then?

12     A. I don't really know. I've never really thought

13 about it until this has come about.

14     Q. Yes, ma'am.

15     A. But I do believe in it. Considering the

16 crime -- the crime that would be committed, I would say

17 yes.

18     Q. Is there anything that I need to know about

19 that you -- I haven't asked you about yet on your views

20 on this -- this topic?

21     A. Not for certain. I don't know what you want to

22 ask me about.

23     Q. Well, it's late in the day. I don't know

24 either sometimes.

25         As we go through this, you have to keep an

253

1  open mind to both ends.

2  A.  Right.

3  Q.  And I know that you checked on your

4  questionnaire, I believe it's -- you put that life

5  without parole is also appropriate in all capital

6  crimes.  Do you recall that?

7  A.  Not really.  That's been awhile.

8  Q.  Okay.

9  A.  But that's what I said, depending on what the

10  crime was committed, you would -- I would say death

11  penalty or life in prison, depending on what it is.

12  Q.  And do you remember the discussion that Mr.

13  Gill had with you when we were talking about regular

14  murder and the wide punishment range that it had from

15  five years to life?

16  A.  Right.

17  Q.  Okay.  And that the Legislature had to put some

18  room in there to consider the wide range of what may

19  take place with a crime, whether it's a mercy killing of

20  two elderly people who were, you know, terminal type

21  cancer type issues, or just a brutal murder itself that

22  might get the high end of the punishment range?  Do you

23  see where the life without parole and the death penalty

24  itself can that -- that range as well when you're

25  looking at a capital crime?

254

1  A.  Right.

2  Q.  And I think you answered it the best just

3  awhile ago there, that you don't know any of the facts

4  yet.  Person's innocent until proven guilty, and you

5  have to keep an open mind and apply your oath to the

6  facts of the case.  Does that make some sense?

7  A.  Yes.

8  Q.  And what's your oath?

9  A.  To tell the truth.

10  Q.  All right.  Tell the truth right now.  What's

11  your oath when you're a juror?

12  A.  To go according to what the Judge has told us

13  to do.

14  Q.  Are you going to keep an open mind and be able

15  to do that throughout this case?

16  A.  Yes.

17  MR. BRISSETTE:  Thank you, Your Honor.

18  We'll pass the juror.

19  THE COURT:  Defense?

20  MS. FERNANDEZ:  Thank you, Judge.

21  VOIR DIRE EXAMINATION

22  BY MS. FERNANDEZ:

23  Q.  Hello, Ms. Williams.  How are you?

24  A.  Good.  How are you?

25  Q.  I'm okay.  It's getting late in the day, so --

255

1  again, I'm Pam Fernandez, and I have the privilege of

2  sitting with Larry Moore and Fred Cummings and helping

3  to defend John, so I don't think I'm going take as much

4  time as -- as Mr. Brissette did, but I just want to talk

5  to you about some things as well.  Okay?

6  Now, you understand at this point that we

7  talked -- do you remember what we talked about at the

8  last time we were all together?  You were sitting out

9  there in the middle, and it was -- we were talking about

10  the guilt/innocence phase.

11  Well, we're here today to talk about the

12  penalty phase, obviously, and it doesn't mean that we're

13  asking you to make up your mind as to guilt/innocence at

14  this point either, just trying to -- kind of how you

15  filled out the questionnaire in a vacuum, well, we got

16  the answers from you in a vacuum, so we get to go over

17  that with you.  Okay?

18  On Special Issue No. 1, you understand

19  that, of course, the State is the only one with the

20  burden of proof throughout the entire trial except for

21  under Special Issue No. 2, and they have to prove beyond

22  all reasonable doubt that there is a probability that

23  the Defendant would commit criminal acts of violence and

24  those criminal acts of violence would be of such a

25  nature, okay, so as to constitute a continuing threat to

256

1  society.  Okay?  You see how that works?

2  A.  (No response.)

3  THE REPORTER:  I'm sorry?

4  PROSPECTIVE JUROR:  Yes.

5  Q.  (BY MS. FERNANDEZ)  I'm sorry.  She can't take

6  down nods.  I wish -- that would be good, though.

7  And Special Issue No. 2, taking -- of

8  course, taking into consideration all of the evidence,

9  including the circumstances of the offense, the

10  Defendant's character and background and the personal

11  moral culpability of the Defendant, do you find that

12  there is a sufficient mitigating circumstance or

13  circumstances to warrant that a sentence of life

14  imprisonment rather than a sentence of death be imposed?

15  Now, I wanted to ask you, can you think of

16  any examples today of what mitigation would be?  Or --

17  I'm sorry.  In your mind what would constitute

18  mitigation?

19  A.  I'm not really certain I could give you an

20  answer.

21  Q.  Okay.  Well -- and that's okay because what

22  mitigation is to you may not necessarily be mitigation

23  to the other people you'll be sitting with on the jury

24  should you become a juror.  Okay?  And you don't have to

25  be able to spell it out or speak to your fellow jurors.

257

1  It's -- whatever you think it is in your mind is what
2  you individually would be applying to this question.
3  Okay?
4           So, for instance, it could be something as
5  simple as a simple act of kindness from the person's
6  life. You know, it could be that you found out from the
7  first witness that the State puts on that the person on
8  trial helped his grandmother, you know, every Sunday
9  with the laundry or something. You know, in your mind
10 if that was sufficient enough to be a mitigating
11 circumstance, that's all you need.
12           Now, it could be a multitude of things
13 throughout the trial. Okay? But all it really takes
14 is -- is one thing. Okay? It could be that somebody
15 served in the military. That could be mitigating for
16 you. Okay? But again, it's not something that you have
17 to be able to spell out with your fellow jurors. Okay?
18           And most importantly if you are sitting
19 in one of the seats over there as a juror, okay,
20 these -- these are -- what we have on the screen are our
21 rights as that juror. Okay? And that would be you have
22 the absolute right to the truth, the whole truth and
23 nothing but the truth.
24           That means you have the right to -- if the
25 State just doesn't meet their burden, if you don't feel

258

1  like you've gotten the whole truth, then you have a
2  right, as an individual juror, to vote however you want
3  to vote, and you don't have to go with the rest of the
4  jurors. You see how that works?
5       A.  Yes.
6       Q.  And you have the absolute -- absolute right to
7  vote your conscience free from intimidation, pressure or
8  criticism from anyone. And I -- again, you see how that
9  works? I know being a teacher's aide in the -- in a
10 school district, you probably can withstand a lot of
11 pressure working with children all day --
12      A.  Yes.
13      Q.  -- I would assume.
14      A.  Yes.
15      Q.  And you also have the absolute right to define
16 reasonable doubt as to what it means to you and not
17 someone else. Okay?
18           When you're voting with your jurors and
19 you're deliberating doesn't mean that you have to
20 give -- spell it out for them how you feel. Okay? You
21 have a right to vote the way you want to vote, and you
22 have a right to be able to -- to stick with that vote.
23 Okay?
24           And you have the absolute right to
25 determine what constitutes a mitigating circumstance to

259

1  you and not someone else, and this is what we talked
2  about a little bit earlier under Special Issue No. 2.
3  Okay?
4           Once again, if you -- if you feel like
5  there is something mitigating, okay, one circumstance or
6  many circumstances, okay, and a fellow juror is in the
7  back is saying, Well, you know what, Ms. Williams, you
8  haven't spelled it out for me; I need to know. They
9  don't need to know. Can you see how that works?
10      A.  Yes.
11      Q.  Okay. And other than that, I mean, do you have
12 any questions for me?
13      A.  No.
14      Q.  Okay. I'm not used to somebody so quiet. I'm
15 sorry. I have three children. You're probably just
16 ready to be quiet after a long day at work, right?
17      A.  No, I didn't work today.
18      Q.  You didn't work today? Okay. You had to take
19 the day off because of this?
20      A.  Yeah. It's just -- I mean, I never been on a
21 jury -- well, selection for a jury, so it's all
22 different.
23      Q.  Okay. Well, thank you very much for your
24 attention.
25           MS. FERNANDEZ:  And pass the veniremen.

260

1           THE COURT:  Thank you.
2           Ms. Williams, if you'll have seat out in
3  the front hallway, we're going to call you back in here
4  in just a few minutes. Okay?
5           PROSPECTIVE JUROR:  Okay.
6           (Prospective juror exits courtroom)
7           THE COURT:  State, have a challenge for
8  cause?
9           MR. BRISSETTE:  No.
10           THE COURT:  Defense?
11           MR. MOORE:  No, we don't have a challenge.
12           THE COURT:  State, exercise a peremptory?
13           MR. BRISSETTE:  Yes.
14           THE COURT:  Can you bring her back in,
15 please?
16           (Prospective juror enters courtroom)
17           THE COURT:  Ms. Williams, I want to thank
18 you very much for your service in this case. I know
19 this situation is a little intimidating to be in, but
20 your service is vital to our system of justice. I want
21 to thank you for that.
22           You are not going to be called upon to have
23 any further service in the case, so if you'll leave the
24 plastic part of your badge with the bailiff on your way
25 out, the central jury room will mail you your check.

261

1   Okay?

2                PROSPECTIVE JUROR:  Thank you.

3                THE COURT:  Thank you so much.

4                PROSPECTIVE JUROR:  Thank you.

5                (Prospective juror excused)

6                THE COURT:  Now, the issue of Juror No. 84.

7   The Defense declined to exercise a peremptory.  Does the

8   Defense exercise a peremptory?

9                MR. CUMMINGS:  The -- the State having not

10  used a peremptory, we will, Your Honor.

11               THE COURT:  Okay.  Deputy Tremaine, will

12  you notify No. 84 that he's excused?  If he'll mail in

13  his jury badge, they'll send him his check.

14               We'll start tomorrow with 86.

15               (Proceedings adjourned at 4:57 p.m.)

16

17

18

19

20

21

22

23

24

25

---

262

1   THE STATE OF TEXAS      )

2   COUNTY OF TARRANT       )

3                I, Angelica Taylor, Official Court Reporter

4   in and for the 432nd Judicial District Court of Tarrant

5   County, State of Texas, do hereby certify that the above

6   and foregoing contains a true and correct transcription

7   of all portions of evidence and other proceedings

8   requested in writing by counsel for the parties to be

9   included in this volume of the Reporter's Record, in the

10  above-styled and -numbered cause, all of which occurred

11  in open court or in chambers and were reported by me.

12               I further certify that this Reporter's

13  Record of the proceedings truly and correctly reflects

14  the exhibits, if any, admitted by the respective

15  parties.

16               WITNESS MY OFFICIAL HAND this the 25th day

17  of January, 2012.

18

19

20

21  ANGELICA TAYLOR, TEXAS CSR NO. 7180
    Cert Exp. Date: 12/31/2013
    Official Court Reporter
          432nd Judicial District Court

23        401 West Belknap Street
          Fort Worth, Texas 76196

24

25

**$**

$30,000 [1] - 151:10

**'**

'70s [1] - 190:8
'78 [1] - 143:21
'83 [1] - 55:25
'88 [1] - 55:25
'92 [1] - 183:10
'93 [1] - 55:20

**0**

09:00 [1] - 136:18

**1**

1 [24] - 34:1, 35:11,
85:19, 106:18,
107:3, 109:2,
114:12, 114:15,
114:16, 115:8,
116:1, 126:18,
129:16, 129:19,
132:4, 165:13,
239:23, 240:24,
241:4, 247:11,
247:24, 251:14,
255:18
10 [5] - 42:12, 151:10,
171:9, 171:13, 193:6
10/2 [1] - 249:16
10:29 [1] - 10:10
114 [1] - 228:12
115 [1] - 228:16
11th [2] - 222:24,
224:5
12 [16] - 33:9, 42:10,
116:1, 125:15,
127:3, 127:5,
129:21, 129:22,
129:24, 130:8,
171:13, 209:1,
217:15, 231:17
12/0 [4] - 115:7, 115:8,
247:9, 247:10
12/31/2013 [1] -
262:21
12/zip [2] - 237:23,
247:11
12:05 [1] - 94:3
12th [1] - 10:13
13 [3] - 149:21, 150:8,
187:8
135 [1] - 156:2
13th [6] - 15:17, 136:3,
136:14, 136:18,
142:25, 217:21

14 [1] - 57:8
15 [5] - 17:13, 57:8,
59:17, 59:18, 193:6
160 [1] - 68:15
17-year-old [2] -
224:5, 224:8
17th [3] - 31:11, 31:12,
195:21
18 [10] - 40:18, 41:4,
41:11, 98:3, 98:4,
126:13, 133:19,
148:7, 174:6, 176:7
18-year-old [4] -
40:23, 133:23,
174:7, 174:21
18-year-olds [1] -
174:12
18th [1] - 176:10
1982 [1] - 55:24
1993 [1] - 55:19
1996 [2] - 55:20
1:05 [1] - 94:3

**2**

2 [21] - 34:10, 34:12,
35:9, 35:12, 35:13,
81:4, 85:18, 85:21,
90:8, 107:3, 114:14,
118:7, 130:11,
172:1, 239:25,
247:12, 247:14,
250:8, 255:21,
256:7, 259:2
20 [6] - 10:9, 17:13,
63:14, 151:10, 155:8
2000 [1] - 55:23
2009 [4] - 31:11,
31:12, 137:19,
195:22
2011 [1] - 5:2
2012 [1] - 262:17
210 [1] - 230:15
23 [3] - 5:2, 153:15,
187:8
24/7 [1] - 148:6
24th [1] - 136:11
25 [1] - 141:22
25th [1] - 262:16
26 [1] - 229:1
26-page [1] - 9:1
27 [3] - 10:14, 145:15,
225:16
2700 [1] - 57:22
29 [2] - 183:3, 183:5
2:49 [1] - 179:1
2:58 [1] - 179:1
2nd [1] - 185:20

**3**

30 [6] - 10:9, 96:14,
141:22, 153:8,
155:8, 174:23
30s [2] - 41:2, 174:15
31 [2] - 10:14, 153:3
32 [1] - 183:11
36 [1] - 130:1
38-year-old [1] - 96:3
3:54 [1] - 220:8

**4**

40-year-old [1] -
174:23
401 [1] - 262:23
40s [2] - 41:2, 174:15
4300 [1] - 57:23
432nd [3] - 218:7,
262:4, 262:22
4:04 [1] - 220:8
4:57 [1] - 261:15

**5**

5 [11] - 19:15, 74:10,
125:13, 131:23,
131:24, 162:15,
193:1, 193:6, 193:7,
193:14
50 [7] - 141:24, 193:6,
225:19, 225:20,
230:19, 230:20
57-year-old [1] - 96:2
5:00 [1] - 13:6

**6**

6/6 [1] - 209:8
60 [1] - 121:11
6th [1] - 218:7

**7**

7180 [1] - 262:21
75 [1] - 193:6
76 [2] - 8:23, 9:11
76196 [1] - 262:23
77 [1] - 5:7
78 [2] - 8:22, 9:12

**8**

80 [3] - 10:13, 10:17,
10:23
81 [4] - 92:24, 94:5,
94:12, 138:9
82 [3] - 139:5, 139:8,
216:19

83 [3] - 92:10, 220:10,
220:17
84 [8] - 10:8, 10:17,
11:2, 11:6, 92:10,
92:13, 261:6, 261:12
86 [1] - 261:14
8:38 [1] - 5:2

**9**

9 [1] - 217:12
99 [7] - 19:15, 74:10,
125:13, 193:1, 193:7,
162:15, 193:1, 193:7
9:00 [1] - 217:21
9:14 [1] - 8:16
9:45 [1] - 8:16
9:47 [1] - 10:10

**A**

a.m [5] - 5:2, 8:16,
10:10
abandon [1] - 91:8
aberration [1] -
208:10
abilities [1] - 72:3
ability [16] - 19:19,
21:25, 22:1, 33:8,
54:3, 71:20, 72:13,
73:19, 82:2, 82:23,
95:1, 122:11, 180:3,
201:16, 215:18,
235:18
able [38] - 7:2, 16:14,
16:22, 21:22, 22:24,
42:22, 43:5, 61:5,
72:15, 73:2, 76:23,
112:7, 114:12,
116:19, 118:8,
118:12, 128:15,
129:16, 139:24,
149:13, 161:7,
162:19, 163:6,
175:4, 175:14,
181:16, 193:10,
194:4, 209:20,
215:8, 226:10,
246:23, 251:8,
251:23, 254:14,
256:25, 257:17,
258:22
above-styled [1] -
262:10
absolute [14] - 77:22,
109:14, 109:15,
241:24, 242:1,
242:2, 242:3, 242:4,
242:7, 257:22,
258:6, 258:15,

258:24
absolutely [1] -
120:17
abusive [1] - 156:8
accept [1] - 217:7
accepted [1] - 136:15
accident [2] - 126:8,
184:18
accomplish [1] - 76:2
accomplished [1] -
196:8
according [1] - 254:12
accordingly [1] -
249:3
accosted [1] - 113:16
account [1] - 232:3
accountable [1] -
58:23
accountant [1] - 46:4
accounts [1] - 163:14
accusation [1] -
137:19
accused [4] - 59:13,
126:12, 149:23,
233:21
acetylene [1] - 98:13
acquit [1] - 237:6
Acre [1] - 185:6
act [24] - 29:23, 43:19,
43:23, 45:16, 45:18,
68:13, 70:8, 70:9,
78:20, 78:21, 79:6,
79:8, 88:15, 160:17,
167:19, 168:7,
168:10, 193:23,
202:13, 202:17,
203:13, 212:2,
215:2, 257:5
acted [2] - 82:8, 82:14
acting [1] - 191:9
action [3] - 33:17,
102:13, 158:3
actions [3] - 41:14,
157:22, 173:20
active [5] - 55:2, 55:3,
55:21, 55:24, 57:22
activist [1] - 62:13
activities [1] - 99:8
activity [1] - 44:17
acts [39] - 26:18,
28:22, 29:16, 30:19,
31:16, 76:12, 78:16,
78:17, 79:3, 79:8,
88:15, 109:4,
109:19, 109:21,
114:22, 128:2,
167:13, 167:16,
167:25, 168:3,
168:21, 169:13,
206:19, 207:4,

207:8, 207:12,
207:13, 208:2,
238:10, 241:8,
243:4, 243:11,
245:3, 245:19,
245:25, 255:23,
255:24
**actual** [8] - 57:22,
57:23, 88:7, 88:9,
88:24, 97:21,
214:14, 246:15
**Adams** [6] - 94:6,
94:8, 94:12, 111:25,
121:22, 138:3
**adams** [1] - 138:16
**ADAMS** [1] - 95:18
**addicted** [2] - 61:18,
61:22
**addiction** [3] - 61:10,
81:25, 82:7
**addition** [1] - 214:11
**additional** [11] - 24:19,
83:24, 83:25, 84:21,
89:16, 111:5, 136:9,
169:4, 171:19,
195:6, 238:8
**adds** [1] - 66:14
**adequate** [2] - 7:9,
7:14
**adjourned** [1] - 261:15
**adjudication** [1] -
150:17
**administer** [1] -
217:13
**administration** [1] -
58:4
**administrative** [1] -
56:17
**admissible** [4] - 84:6,
84:18, 205:4, 205:13
**admitted** [2] - 205:2,
262:14
**admittedly** [2] - 71:25,
201:13
**adult** [2] - 41:12,
119:10
**adversary** [1] - 136:5
**aerospace** [2] - 96:25,
97:23
**affect** [7] - 96:21,
99:6, 139:21,
148:25, 152:10,
221:5, 228:3
**affected** [2] - 60:18,
89:21
**afraid** [1] - 196:17
**afternoon** [17] - 13:5,
93:3, 94:15, 95:10,
95:23, 99:23, 100:3,
100:6, 139:7,

139:12, 140:16,
141:9, 197:11,
221:21, 222:8,
224:14, 231:6
**afternoon's** [1] - 99:8
**age** [10] - 7:9, 40:18,
41:4, 41:12, 133:18,
174:6, 174:9,
174:10, 174:17,
223:21
**agency** [1] - 150:23
**aggravated** [1] - 18:24
**aggravating** [3] -
18:19, 195:17,
207:25
**ago** [32] - 5:15, 5:21,
11:14, 17:13, 17:14,
49:20, 50:11, 55:24,
60:10, 60:15, 60:16,
94:19, 98:15, 98:17,
99:14, 104:22,
139:19, 142:5,
149:21, 150:8,
160:11, 162:7,
185:17, 187:8,
221:4, 228:19,
234:7, 236:19,
247:23, 252:7, 254:3
**agree** [16] - 33:17,
42:11, 42:12, 53:13,
68:4, 71:16, 72:19,
106:1, 128:17,
130:8, 133:16,
158:12, 171:15,
174:21, 180:6, 201:2
**agreed** [2] - 8:22,
10:14
**agreement** [5] - 8:20,
9:5, 68:5, 193:3,
203:4
**ahead** [6] - 11:10,
45:3, 172:2, 184:20,
193:13, 227:15
**aide** [1] - 258:9
**ain't** [1] - 193:14
**Air** [8] - 55:2, 55:4,
55:6, 55:16, 55:22,
183:14, 189:24
**air** [1] - 7:5
**Alabama** [1] - 227:22
**alcohol** [3] - 60:23,
235:17, 236:4
**alive** [2] - 165:8,
240:17
**allegation** [3] -
195:20, 196:12,
198:2
**allegations** [1] -
196:10
**allege** [9] - 66:21,

71:9, 73:15, 160:21,
161:21, 200:15,
200:18, 201:9,
201:12
**alleged** [7] - 31:13,
66:23, 137:20,
195:19, 196:3,
196:5, 204:22
**allergies** [1] - 222:10
**allow** [1] - 20:6
**allowed** [2] - 14:13,
238:12
**allows** [1] - 7:7
**almost** [3] - 87:16,
206:9, 226:6
**alone** [1] - 106:1
**aluminum** [2] - 97:6,
97:16
**Amendment** [2] -
29:15, 64:10
**American** [1] - 180:3
**amount** [4] - 50:13,
198:24, 199:1, 199:7
**analysis** [1] - 132:22
**analyze** [1] - 132:17
**and..** [1] - 184:5
**Angelica** [1] - 262:3
**ANGELICA** [1] -
262:21
**angry** [1] - 46:8
**answer** [95] - 20:10,
26:24, 26:25, 27:11,
31:24, 32:7, 32:14,
32:24, 37:9, 42:8,
42:13, 42:21, 42:22,
43:4, 43:5, 57:11,
58:21, 62:22, 67:19,
73:12, 75:7, 76:19,
76:24, 79:17, 79:20,
81:4, 85:20, 85:21,
90:25, 106:18,
107:3, 110:3,
110:20, 110:22,
111:4, 111:9,
113:25, 114:7,
114:10, 114:12,
115:17, 118:6,
118:8, 118:13,
126:15, 126:20,
128:23, 129:16,
132:10, 132:20,
145:18, 165:19,
166:1, 170:9,
170:25, 171:1,
171:6, 171:13,
171:14, 171:21,
175:14, 176:20,
177:14, 182:3,
190:17, 194:21,
194:23, 206:22,

208:16, 208:17,
209:1, 209:4, 210:8,
210:9, 211:20,
241:16, 246:3,
246:14, 246:17,
246:22, 246:24,
247:5, 249:19,
251:6, 251:8, 251:9,
251:12, 251:16,
251:21, 251:22,
251:23, 252:5,
256:20
**answered** [19] - 25:17,
25:19, 34:2, 34:7,
34:9, 44:17, 64:9,
77:11, 85:2, 91:18,
146:23, 146:25,
171:9, 171:10,
194:24, 194:25,
195:3, 251:14, 254:2
**answering** [1] -
30:11, 42:2, 42:10,
75:23, 133:2, 133:5,
133:6, 145:25,
175:6, 205:14,
211:18
**answers** [19] - 20:6,
20:8, 25:15, 57:13,
75:7, 79:16, 108:1,
146:19, 146:22,
164:23, 171:24,
171:25, 177:17,
181:18, 205:18,
224:16, 240:2,
247:9, 255:16
**Anthony** [1] - 152:14
**anticipate** [1] - 136:4
**anxiety** [5] - 147:25,
148:3, 183:16,
184:1, 184:2
**anytime** [1] - 218:3
**anyway** [1] - 82:17
**apart** [1] - 203:14
**apartment** [2] - 186:2,
186:6
**apologize** [4] - 56:2,
74:1, 117:5, 235:6
**appeal** [2] - 64:3,
64:11
**appear** [2] - 8:24,
172:8
**appellate** [1] - 37:4
**applicable** [4] - 14:6,
166:6, 166:15,
218:16
**applies** [2] - 67:25,
201:24
**apply** [23] - 13:17,
16:20, 23:13, 53:6,
53:18, 64:25, 68:20,

69:22, 70:7, 77:24,
147:11, 163:9,
179:24, 180:5,
180:22, 229:8,
229:21, 230:25,
236:21, 247:4,
249:3, 250:12, 254:5
**applying** [2] - 70:6,
257:2
**appreciate** [12] - 13:4,
29:15, 37:1, 52:5,
64:10, 82:24, 92:3,
137:1, 173:19,
176:25, 214:17
**appreciated** [2] -
151:12, 158:2
**appreciates** [1] - 82:2
**approach** [1] - 36:11
**appropriate** [13] -
74:11, 74:23, 83:8,
90:10, 91:7, 119:20,
120:4, 193:4,
194:19, 212:17,
212:19, 228:15,
253:5
**April** [3] - 139:23,
182:18, 185:20
**area** [4] - 56:19, 119:7,
119:11, 119:14
**areas** [1] - 107:20
**argument** [1] - 120:11
**Arizona** [1] - 55:7
**Arlington** [4] - 96:8,
96:17, 96:21, 145:7
**Army** [2] - 189:25,
190:1
**arrest** [2] - 107:10,
189:9
**arrested** [5] - 152:3,
152:5, 186:16,
186:20, 187:9
**arrests** [1] - 187:7
**arrive** [2] - 70:16,
125:22
**arrived** [1] - 125:14
**arts** [1] - 244:4
**ascribe** [2] - 158:12,
211:2
**aside** [4] - 89:10,
89:12, 116:15, 227:4
**aspect** [1] - 53:18
**assault** [8] - 29:21,
156:9, 167:20,
185:18, 186:18,
206:23, 207:6
**assaulted** [2] -
151:24, 188:22
**assembled** [1] -
217:15
**asserted** [1] - 198:9

assess [3] - 124:8, 125:14, 146:24
assessed [2] - 134:20, 171:7
assessing [1] - 119:21
assessment [1] - 14:23
assigned [1] - 223:17
assignment [2] - 106:10, 171:18
assistant [3] - 222:20, 223:11, 223:17
associate [1] - 56:9
assume [11] - 68:1, 69:8, 78:4, 81:17, 86:12, 110:18, 131:3, 135:4, 165:2, 214:12, 258:13
assumed [2] - 195:5, 200:10
assumes [1] - 155:24
atmosphere [2] - 223:2, 243:20
attacks [1] - 184:2
attend [1] - 145:11
attendance [1] - 57:22
attending [1] - 145:14
attention [2] - 153:25, 259:24
attorney [2] - 150:13, 151:6
Attorney's [2] - 150:24, 186:9
attorneys [1] - 140:23
audio [1] - 116:25
August [2] - 149:6, 156:19
Austin [2] - 231:12, 243:7
authority [1] - 223:15
auto [1] - 166:13
automatic [5] - 80:17, 80:20, 106:17, 114:1, 246:2
automatically [3] - 31:24, 77:10, 131:9
available [5] - 15:24, 194:16, 228:18, 228:23, 229:9
Avenue [4] - 56:8, 56:12, 57:20, 59:2
awfully [1] - 220:23
awhile [4] - 50:15, 189:14, 253:7, 254:3

**B**

baby [3] - 6:6, 184:21, 184:22
baby's [2] - 150:3,

156:9
baby-sitter [1] - 6:6
bachelor's [1] - 58:14
background [14] - 36:5, 36:13, 81:7, 84:17, 89:17, 89:21, 115:21, 181:2, 205:13, 212:1, 212:11, 213:25, 247:17, 256:10
bad [12] - 9:20, 24:21, 24:25, 78:14, 107:6, 164:8, 164:9, 223:4, 238:10
badge [6] - 8:9, 10:3, 138:22, 218:2, 260:24, 261:13
BAILIFF [3] - 6:13, 6:15, 10:25
bailiff [5] - 8:10, 10:3, 138:22, 154:4, 260:24
ball [1] - 242:24
balls [1] - 112:7
band [1] - 97:14
Baptist [10] - 55:14, 55:18, 56:8, 56:10, 57:15, 58:9, 58:22, 59:2, 59:3
barely [1] - 5:25
Base [1] - 55:7
base [4] - 55:9, 58:15, 180:22, 229:24
based [47] - 9:1, 14:3, 14:19, 16:13, 16:20, 20:7, 21:20, 27:15, 41:2, 41:24, 42:19, 42:22, 54:7, 74:12, 74:22, 76:24, 82:21, 100:1, 108:8, 111:12, 112:5, 112:17, 113:9, 113:25, 114:1, 114:7, 118:9, 119:14, 129:17, 134:11, 137:16, 142:13, 169:8, 175:13, 177:16, 181:18, 192:1, 199:25, 202:4, 202:9, 208:24, 229:17, 229:24, 240:12, 245:10, 251:9, 251:24
basic [3] - 86:15, 99:15, 226:9
basis [3] - 183:17, 183:23, 194:19
bear [3] - 90:5, 215:4, 215:9

bearing [3] - 147:18, 147:20, 214:19
become [3] - 57:5, 204:4, 256:24
becomes [3] - 121:16, 194:18, 209:4
Bedford [4] - 137:21, 185:9, 185:10, 195:24
beforehand [1] - 14:14
begin [3] - 111:9, 217:21, 246:4
beginning [4] - 35:5, 43:9, 172:4, 177:5
begins [2] - 217:16, 218:6
behavior [1] - 89:10
behind [3] - 120:3, 235:24, 236:6
belief [2] - 198:8, 198:11
beliefs [4] - 14:20, 36:13, 39:22, 229:19
Belknap [1] - 262:23
bells [1] - 137:22
belong [1] - 144:24
belongs [1] - 145:5
benches [1] - 141:17
benefit [2] - 42:16, 90:8
Berry [2] - 136:17, 225:24
best [11] - 15:18, 33:8, 86:4, 96:12, 120:11, 121:13, 122:11, 239:9, 254:2
better [6] - 60:24, 74:2, 87:22, 112:14, 201:7, 244:8
between [15] - 10:14, 22:4, 29:22, 47:14, 49:2, 60:19, 71:12, 86:25, 88:6, 136:14, 167:8, 186:24, 199:21, 200:18, 214:13
beyond [67] - 20:16, 20:19, 21:18, 26:16, 27:4, 27:8, 27:10, 27:12, 29:4, 32:25, 35:6, 70:23, 73:9, 76:10, 77:16, 105:13, 109:2, 114:4, 114:7, 114:13, 114:19, 115:1, 124:9, 124:23, 130:5, 132:7, 133:3, 160:9, 165:17, 165:24,

166:3, 166:4, 166:5, 166:12, 166:14, 166:18, 168:20, 171:25, 172:7, 197:1, 197:4, 197:22, 198:14, 199:2, 199:12, 199:14, 199:15, 199:19, 200:5, 200:22, 202:2, 208:19, 234:6, 234:8, 237:5, 237:21, 240:15, 241:6, 241:10, 241:14, 243:2, 245:2, 245:15, 245:23, 246:25, 255:21
Bible [1] - 226:1
big [8] - 51:16, 57:18, 63:16, 108:5, 152:20, 152:22, 187:20
billed [1] - 188:23
bind [2] - 161:5, 161:18
bipolar [3] - 61:25, 62:5, 173:15
birthday [1] - 176:10
bit [25] - 5:25, 13:5, 16:6, 30:3, 37:21, 49:20, 54:21, 54:22, 64:15, 64:24, 72:16, 98:9, 179:23, 182:6, 182:10, 184:16, 190:10, 191:2, 197:7, 210:20, 221:1, 229:7, 241:18, 244:8, 259:2
blame [1] - 87:21
blameworthiness [21] - 34:24, 35:1, 36:16, 36:18, 39:2, 42:2, 87:9, 87:15, 87:20, 87:25, 88:21, 117:3, 117:6, 133:14, 172:20, 214:10, 249:8, 249:10, 249:12, 250:18
blameworthy [3] - 173:23, 174:3, 174:10
blank [2] - 97:14, 196:20
blindfolded [1] - 192:4
block [1] - 203:14
blocks [2] - 97:6, 97:16
blog [1] - 219:4
blown [1] - 231:22

board [1] - 240:11
Board [1] - 240:11
Bob [2] - 233:24, 236:17
body [2] - 153:5, 213:20
bomb [4] - 68:15, 159:2, 202:15
bombarded [1] - 135:6
bombing [2] - 68:14, 158:25
bond [1] - 60:25
book [2] - 243:9, 248:18
books [2] - 49:12, 49:13
boot [1] - 150:19
born [6] - 144:6, 144:20, 184:15, 184:17, 184:21, 184:22
boss [1] - 161:14
bother [2] - 250:8, 250:11
bound [4] - 21:17, 53:12, 160:23, 160:25
box [3] - 72:7, 111:23, 112:1
boxes [1] - 228:13
brain [4] - 40:25, 54:6, 74:3
brains [1] - 174:12
brand [1] - 145:3
break [4] - 34:18, 34:19, 151:8, 178:20
Breckenridge [3] - 187:23, 187:25, 188:1
Brewer [1] - 224:9
brief [1] - 178:20
briefly [1] - 49:15
bring [25] - 9:12, 11:1, 24:19, 24:21, 93:5, 107:6, 107:21, 111:18, 116:15, 116:18, 164:11, 168:25, 169:2, 217:8, 238:3, 238:8, 238:10, 238:17, 238:20, 248:4, 248:10, 250:19, 250:20, 251:3, 260:14
bringing [1] - 250:21
brings [3] - 32:11, 148:3, 240:24
BRISSETTE [15] - 7:21, 7:25, 10:19,

95:17, 95:22,
108:23, 121:18,
138:10, 138:14,
222:2, 222:7,
242:17, 254:17,
260:9, 260:13
**Brissette** [10] - 12:2,
95:8, 105:2, 127:21,
136:1, 140:21,
150:25, 221:19,
234:11, 255:4
**broad** [1] - 131:25
**broken** [1] - 98:15
**brother** [4] - 96:7,
101:3, 101:7, 107:9
**brother's** [2] - 96:16,
96:20
**brought** [12] - 10:13,
49:9, 90:5, 107:4,
110:16, 122:15,
131:14, 131:15,
134:6, 176:22,
189:22, 249:11
**brutal** [1] - 253:21
**buddies** [2] - 232:1,
232:2
**Buick** [1] - 200:17
**build** [2] - 97:18,
232:3
**Building** [2] - 103:3,
231:21
**building** [1] - 225:23
**burden** [82] - 22:4,
22:14, 22:16, 22:19,
22:23, 27:7, 27:10,
27:15, 27:18, 27:19,
27:21, 27:25, 28:19,
29:2, 32:14, 32:19,
32:22, 35:9, 35:10,
35:12, 35:21, 35:22,
51:12, 77:16, 79:22,
79:23, 81:2, 81:18,
83:4, 83:10, 84:25,
86:1, 104:11,
105:22, 105:23,
105:25, 114:25,
115:4, 115:5,
115:11, 116:4,
127:15, 160:6,
165:19, 165:22,
165:23, 165:25,
169:14, 169:15,
170:13, 172:8,
172:10, 172:11,
175:19, 175:23,
197:3, 198:16,
210:23, 211:3,
233:4, 233:5,
233:12, 233:14,
233:19, 234:8,

235:7, 241:3, 241:5,
245:24, 246:18,
247:22, 248:1,
248:2, 248:3, 248:8,
250:19, 251:2,
255:20, 257:25
**burglary** [2] - 17:2,
48:24
**buried** [1] - 213:21
**bus** [3] - 9:16, 9:22,
220:6
**busiest** [2] - 143:16,
182:22
**business** [12] - 45:12,
46:1, 56:13, 56:23,
69:5, 91:23, 93:9,
97:24, 136:17,
143:1, 159:5, 232:1
**businessmen** [1] -
103:7
**bust** [1] - 47:23
**but..** [1] - 156:20
**buy** [3] - 47:23, 47:24,
225:12
**BY** [15] - 13:1, 47:11,
52:16, 67:22, 95:22,
108:23, 121:21,
141:8, 144:10,
179:8, 212:24,
222:7, 242:17,
254:22, 256:5

## C

**cabinetmaker** [1] -
97:21
**cabinetmaking** [1] -
97:24
**cabinets** [1] - 98:1
**Calloway** [4] - 143:5,
182:13, 182:23,
183:4
**camp** [1] - 150:19
**cancer** [1] - 253:21
**cannot** [4] - 90:25,
91:11, 200:25,
209:22
**capable** [1] - 174:22
**capital** [95] - 13:20,
17:25, 18:6, 18:14,
18:21, 18:24, 19:24,
20:5, 21:3, 24:11,
25:5, 26:6, 27:20,
27:23, 30:10, 31:23,
32:7, 38:6, 38:20,
39:7, 39:11, 40:5,
40:20, 41:5, 48:20,
50:7, 50:22, 51:12,
66:14, 67:9, 69:15,
69:18, 70:2, 70:20,

74:8, 75:5, 75:12,
75:15, 75:21, 77:3,
80:15, 99:11,
100:25, 101:5,
101:9, 104:3,
104:12, 108:21,
110:5, 115:7,
123:19, 124:10,
124:17, 125:20,
126:3, 130:17,
131:17, 132:9,
134:16, 135:18,
137:7, 137:9,
157:10, 157:14,
165:6, 166:16,
169:6, 170:10,
170:15, 174:7,
194:10, 194:11,
194:12, 195:16,
195:18, 196:25,
198:18, 198:25,
203:9, 203:22,
204:2, 204:8,
204:22, 205:16,
205:20, 206:5,
228:23, 229:8,
231:4, 232:20,
237:16, 237:22,
240:15, 253:5,
253:25
**captured** [1] - 152:25
**car** [5] - 73:17, 159:8,
184:18, 192:3,
197:11
**cardiovascular** [1] -
148:6
**care** [11] - 6:5, 7:2,
7:10, 7:14, 62:2,
63:6, 70:8, 121:6,
121:11, 149:8, 149:9
**carry** [2] - 152:10,
246:17
**cars** [1] - 227:1
**Carswell** [1] - 55:8
**carves** [1] - 101:11
**case** [215] - 5:22, 6:25,
8:5, 11:19, 11:24,
11:25, 13:18, 14:2,
14:6, 14:10, 14:12,
14:14, 14:22, 15:15,
16:14, 16:21, 17:13,
20:16, 20:19, 21:3,
22:11, 23:6, 24:12,
24:13, 25:5, 26:4,
27:19, 27:20, 27:23,
32:5, 33:17, 33:20,
35:15, 35:17, 35:25,
36:2, 38:2, 38:6,
38:9, 38:20, 39:4,
39:12, 39:22, 40:6,

40:14, 41:24, 43:18,
45:23, 50:10, 51:12,
51:19, 52:20, 53:7,
53:11, 53:19, 53:20,
54:1, 54:15, 54:17,
60:10, 62:22, 63:19,
63:22, 64:25, 74:12,
76:19, 76:24, 81:6,
84:22, 86:7, 93:10,
93:15, 95:1, 95:4,
95:12, 96:22, 99:6,
99:10, 99:11, 99:24,
100:1, 100:7, 101:9,
101:10, 101:12,
105:23, 106:6,
107:13, 108:10,
110:5, 111:19,
112:5, 112:8, 114:2,
115:18, 116:1,
116:5, 116:7,
117:19, 119:22,
121:10, 122:8,
125:12, 125:22,
126:3, 128:6,
129:25, 132:7,
136:2, 136:10,
137:2, 137:4, 137:5,
138:17, 138:21,
139:21, 140:18,
140:22, 142:12,
142:15, 148:25,
150:23, 152:11,
152:14, 152:24,
153:10, 154:25,
157:12, 157:18,
160:9, 161:6,
163:15, 163:18,
164:1, 166:8,
166:10, 166:13,
169:5, 172:14,
173:7, 175:14,
179:10, 179:25,
180:23, 181:7,
188:3, 191:14,
193:2, 193:5,
196:13, 196:22,
197:13, 198:17,
203:20, 209:17,
210:15, 210:18,
217:12, 217:20,
218:5, 218:13,
218:16, 218:17,
218:18, 218:19,
218:21, 218:23,
218:24, 219:1,
219:3, 219:4, 219:5,
219:6, 219:7,
219:10, 219:11,
219:12, 219:16,
219:17, 221:15,
221:23, 226:24,

227:5, 231:16,
232:25, 233:4,
233:5, 233:14,
233:20, 234:2,
235:8, 235:21,
236:21, 237:14,
237:16, 237:22,
238:2, 238:3, 238:4,
238:10, 238:13,
238:16, 240:5,
240:14, 248:4,
250:25, 251:25,
254:6, 254:15,
260:18, 260:23
**cases** [21] - 22:2,
22:6, 39:4, 41:5,
54:17, 54:18, 63:17,
106:4, 107:20,
131:4, 156:4,
157:17, 164:7,
164:8, 166:7,
166:15, 170:8,
227:9, 229:10
**Casey** [1] - 152:14
**catch** [2] - 98:18,
99:17
**categories** [1] -
164:12
**category** [1] - 19:6
**caught** [2] - 98:20,
187:13
**caused** [10] - 57:3,
57:5, 89:10, 154:11,
160:22, 193:14,
195:23, 195:24,
200:15, 200:17
**causes** [6] - 72:15,
87:6, 89:12, 108:14,
123:24, 240:19
**causing** [3] - 91:12,
183:21, 191:7
**cell** [1] - 219:10
**cemetery** [1] - 213:21
**center** [1] - 182:14
**Center** [4] - 143:6,
182:13, 182:24,
224:25
**central** [3] - 10:3,
138:23, 260:25
**Cert** [1] - 262:21
**certain** [40] - 21:4,
49:22, 51:1, 51:6,
51:11, 53:25, 65:11,
65:14, 65:24, 75:11,
78:15, 78:16, 82:23,
105:1, 108:15,
120:8, 133:4,
157:23, 160:3,
160:15, 162:25,
167:11, 181:19,

191:17, 191:22, 192:10, 193:12, 194:5, 194:24, 206:10, 206:18, 226:13, 232:15, 234:11, 240:12, 240:21, 243:24, 252:21, 256:19
certainly [5] - 38:20, 38:22, 127:8, 223:8, 232:7
certainty [15] - 28:20, 28:21, 29:9, 29:13, 69:3, 77:23, 109:14, 109:15, 167:5, 167:8, 192:6, 199:9, 200:9, 241:24, 242:4
certifies [2] - 91:11, 209:22
certify [6] - 85:23, 90:25, 91:10, 91:13, 262:5, 262:12
cetera [3] - 36:20, 41:3, 41:17
chair [1] - 220:25
challenge [8] - 92:11, 92:15, 92:17, 138:8, 216:20, 216:23, 260:7, 260:11
chambers [1] - 262:11
chance [21] - 12:7, 36:23, 99:9, 106:10, 111:15, 115:25, 120:17, 121:3, 121:12, 123:13, 129:12, 130:13, 135:8, 151:12, 222:13, 229:5, 239:10, 239:14, 241:21, 250:7
chances [1] - 129:12
change [13] - 64:14, 110:3, 110:8, 110:9, 118:2, 119:3, 119:9, 154:12, 217:22, 217:24, 221:7, 221:10, 229:6
changed [16] - 5:16, 5:21, 11:15, 11:20, 15:23, 94:20, 94:25, 118:16, 118:17, 118:22, 119:2, 119:10, 119:12, 139:20, 154:11, 221:4
changes [3] - 14:2, 112:14, 142:18
changing [2] - 119:14, 239:8
character [17] - 24:21,

36:5, 36:20, 81:7, 84:17, 89:17, 107:7, 115:20, 164:9, 168:25, 205:12, 212:1, 212:11, 213:25, 238:11, 247:16, 256:10
Charge [6] - 14:7, 142:14, 236:17, 236:18, 236:25, 249:3
charge [7] - 22:7, 107:10, 154:24, 160:6, 199:5, 233:19, 235:11
charged [3] - 21:6, 162:5, 234:4
charges [4] - 107:11, 107:14, 150:14, 188:23
cheated [3] - 46:21, 69:6, 159:7
cheating [3] - 46:7, 50:21
check [7] - 8:9, 10:4, 10:24, 138:23, 228:13, 260:25, 261:13
checked [2] - 119:19, 253:3
checks [2] - 228:8, 228:9
Chevrolet [1] - 153:21
child [14] - 7:8, 17:12, 59:15, 153:2, 154:17, 157:16, 184:25, 185:16, 186:1, 186:22, 187:2, 192:7, 197:25, 198:13
children [7] - 7:2, 7:8, 7:9, 7:13, 144:23, 258:11, 259:15
chips [1] - 147:13
choice [7] - 33:11, 46:17, 46:18, 71:22, 146:24, 147:1
choices [1] - 30:6
chose [2] - 29:11, 57:12
Christ [2] - 155:7, 155:9
Christian [1] - 155:6
chronology [1] - 10:16
church [12] - 56:7, 63:2, 63:4, 147:18, 224:24, 225:1, 225:13, 225:14, 225:22, 226:9, 226:11, 226:14

Church [3] - 56:8, 59:3, 145:11
churches [1] - 244:16
circumstance [29] - 36:7, 38:6, 38:18, 39:11, 39:23, 40:12, 40:17, 41:4, 42:5, 42:8, 81:10, 81:13, 83:3, 87:5, 88:6, 115:22, 155:1, 155:16, 172:21, 173:12, 174:18, 175:21, 212:8, 214:16, 247:18, 256:12, 257:11, 258:25, 259:5
circumstances [46] - 35:19, 36:4, 36:7, 36:19, 37:14, 47:14, 71:19, 74:20, 74:22, 77:2, 77:7, 81:4, 81:6, 83:5, 83:6, 85:8, 89:14, 115:20, 115:23, 118:2, 131:12, 133:12, 153:5, 154:14, 154:19, 154:23, 175:12, 193:18, 206:1, 207:22, 210:22, 211:6, 211:7, 211:21, 212:10, 212:18, 212:23, 213:2, 213:24, 214:21, 215:9, 247:16, 247:19, 256:9, 256:13, 259:6
citizen [4] - 113:10, 116:12, 180:4, 233:21
citizens [1] - 138:18
City [4] - 68:14, 103:3, 158:25, 231:22
civil [1] - 197:17
claim [3] - 7:17, 7:18, 213:20
class [5] - 63:13, 223:18, 223:20, 223:25, 224:3
classes [3] - 58:13, 58:16, 223:19
clean [1] - 61:6
clear [11] - 22:3, 22:6, 123:1, 123:2, 124:22, 126:22, 198:3, 198:5, 222:11, 233:17
clearly [4] - 38:15, 39:2, 39:9, 177:6
clergy [1] - 113:5

client [2] - 122:10, 137:16
cliff [3] - 73:16, 160:24, 200:16
clock [2] - 103:16, 103:18
close [7] - 70:10, 159:22, 182:24, 188:19, 227:25, 234:23
closer [6] - 33:2, 37:24, 114:11, 171:1, 171:2, 246:23
clothesline [1] - 205:11
Clyde [2] - 137:21, 195:24
CNC [2] - 97:9, 97:11
collar [2] - 107:9, 107:14
collectively [5] - 101:21, 104:2, 108:2, 113:23, 231:15
Collin [2] - 60:7, 60:8
comfortable [16] - 54:3, 54:14, 72:13, 73:19, 126:19, 126:21, 141:13, 141:15, 141:16, 141:18, 141:20, 158:16, 163:3, 180:2, 181:22, 215:18
coming [6] - 9:21, 13:4, 13:9, 121:12, 230:21, 239:12
comment [1] - 54:11
comments [1] - 178:14
commission [10] - 48:23, 88:7, 88:9, 88:16, 88:25, 126:9, 214:1, 214:14, 215:5, 215:10
commit [25] - 26:18, 28:22, 29:21, 30:18, 31:11, 31:16, 40:20, 76:12, 105:2, 109:4, 157:13, 167:13, 168:9, 168:10, 168:21, 169:13, 174:6, 176:8, 206:19, 206:23, 208:2, 232:17, 241:8, 245:3, 255:23
commits [6] - 38:11, 47:24, 81:25, 100:25, 170:15, 231:6

committed [22] - 21:6, 25:2, 26:3, 32:8, 76:16, 88:1, 101:6, 104:9, 126:5, 160:16, 160:20, 161:23, 164:3, 164:10, 201:10, 204:24, 211:23, 232:11, 242:7, 242:11, 252:16, 253:10
committing [6] - 18:18, 31:23, 102:2, 102:3, 102:4, 102:6
common [3] - 70:16, 199:25, 201:23
commonalty [2] - 68:24, 202:18
communicating [1] - 130:23
communication [1] - 219:8
Community [1] - 224:25
community [4] - 16:8, 122:15, 124:4, 131:9
company [1] - 183:11
compass [3] - 41:1, 133:25, 174:14
compelled [1] - 87:2
complete [2] - 130:1, 224:12
completed [2] - 150:15, 171:17
completely [11] - 31:6, 31:20, 40:25, 75:5, 103:25, 119:3, 155:1, 169:25, 170:21, 179:15, 182:4
complex [1] - 89:5
complicated [2] - 80:22, 85:11
complies) [4] - 34:14, 165:15, 172:3, 241:1
compose [1] - 128:7
computer [1] - 58:13
concept [3] - 18:9, 48:22, 49:14
concern [3] - 68:23, 84:23, 127:10
concerned [8] - 31:9, 34:21, 64:7, 86:14, 131:6, 132:23, 134:4, 157:17
concerning [1] - 218:24
concerns [8] - 16:1, 26:21, 64:2, 78:24, 79:1, 102:1, 210:24,

212:6
**condition** [1] - 173:25
**conditions** [1] - 186:4
**conduct** [25] - 49:23,
50:25, 51:6, 65:12,
65:14, 66:1, 66:17,
70:12, 82:3, 82:23,
160:3, 191:7,
191:11, 191:15,
191:18, 191:22,
192:11, 192:15,
193:12, 194:5,
214:18, 218:19,
219:2
**conducted** [1] - 151:2
**confess** [2] - 152:20,
152:22
**confined** [1] - 110:6
**conflicts** [1] - 15:11
**conform** [1] - 82:3
**confront** [1] - 172:1
**confronts** [1] - 25:12
**confuse** [1] - 235:4
**confused** [1] - 130:20
**congratulations** [2] -
61:8, 144:21
**congregation** [5] -
56:16, 56:18, 57:18,
57:20, 225:15
**connection** [5] - 88:4,
186:16, 196:12,
214:7, 214:13
**conscience** [12] -
53:15, 71:18, 91:4,
91:13, 180:5, 180:9,
203:6, 208:24,
209:13, 209:23,
229:21, 258:7
**consensus** [2] -
125:15
**consequences** [3] -
72:20, 158:3, 173:20
**consequently** [1] -
48:2
**conservative** [2] -
118:25, 119:17
**conservator** [1] -
187:1
**consider** [23] - 34:10,
88:23, 89:13, 91:2,
106:17, 106:23,
116:19, 117:2,
134:6, 193:10,
193:21, 194:7,
207:17, 207:24,
214:2, 214:23,
215:8, 238:4, 238:6,
238:7, 241:24,
249:6, 253:18
**consideration** [21] -

14:8, 19:20, 24:13,
24:14, 24:18, 36:3,
36:10, 36:12, 37:6,
39:21, 42:19, 81:5,
88:19, 115:19,
162:19, 164:2,
175:6, 209:6, 246:7,
247:15, 256:8
**considerations** [1] -
175:13
**considered** [2] -
29:23, 243:21
**considering** [4] -
128:19, 169:18,
244:1, 252:15
**consists** [1] - 239:1
**constitute** [15] -
26:18, 30:19, 76:13,
79:5, 109:5, 128:5,
167:14, 168:13,
168:22, 207:15,
241:8, 245:4,
245:16, 255:25,
256:17
**constitutes** [8] -
45:24, 65:3, 67:16,
67:23, 69:10, 79:9,
199:21, 258:25
**consume** [1] - 136:14
**contact** [2] - 17:10,
213:19
**contains** [1] - 262:6
**contemplates** [2] -
154:21, 167:22
**contemplating** [1] -
186:9
**context** [3] - 109:23,
110:1, 251:20
**continue** [1] - 171:20
**continuing** [26] -
26:19, 26:22, 30:20,
30:24, 32:9, 37:16,
37:25, 38:22, 76:13,
109:5, 110:12,
111:15, 112:10,
128:5, 167:14,
168:13, 168:22,
170:18, 173:6,
241:9, 241:12,
241:15, 245:4,
245:16, 245:25,
255:25
**continuous** [1] -
207:22
**contrasted** [1] - 18:20
**contribution** [1] -
56:25
**control** [1] - 224:12
**controlled** [1] - 38:23
**Convention** [1] - 59:3

**conversation** [1] -
182:11
**conveying** [1] - 219:9
**convict** [1] - 195:11
**convicted** [11] - 16:10,
17:12, 26:6, 30:10,
75:12, 128:13,
162:4, 164:4, 165:5,
174:7, 204:8
**conviction** [2] - 198:8,
198:11
**convince** [9] - 33:9,
83:5, 85:1, 86:17,
122:7, 198:25,
199:2, 208:18,
213:10
**convinced** [3] - 77:6,
198:22, 199:8
**convincing** [2] -
198:3, 198:5
**cooperating** [1] - 9:16
**copy** [1] - 236:25
**cord** [1] - 21:14
**corp** [1] - 55:3
**Correct** [2] - 92:14,
194:9
**correct** [54] - 9:6, 9:8,
11:7, 11:8, 15:16,
15:20, 22:18, 28:16,
31:25, 32:1, 32:3,
32:20, 37:17, 40:2,
40:15, 41:19, 43:23,
48:25, 50:2, 56:5,
56:15, 64:4, 66:9,
70:18, 74:17, 78:3,
78:7, 78:8, 88:2,
90:17, 94:12,
103:16, 139:9,
146:20, 147:3,
159:19, 163:4,
170:7, 170:11,
170:14, 170:23,
171:12, 195:4,
203:7, 206:24,
209:9, 237:10,
245:25, 246:9,
246:10, 247:5,
247:6, 262:6
**correctly** [3] - 77:25,
87:24, 262:13
**counsel** [2] - 57:15,
262:8
**country** [3] - 88:13,
133:22, 214:24
**county** [2] - 69:7,
103:7
**County** [20] - 17:8,
17:11, 21:5, 60:6,
60:7, 60:8, 96:23,
99:3, 133:4, 149:25,

150:22, 150:24,
160:14, 186:6,
188:3, 188:5,
195:22, 232:16,
236:7, 262:5
**COUNTY** [1] - 262:2
**couple** [24] - 5:20,
6:16, 8:20, 16:1,
49:20, 99:14, 103:2,
104:22, 119:24,
120:1, 131:17,
147:24, 149:22,
149:23, 162:7,
182:12, 182:19,
189:11, 221:4,
222:16, 223:5,
231:20, 236:18,
247:23
**courier** [1] - 153:15
**course** [11] - 27:6,
47:18, 67:2, 76:17,
142:16, 154:22,
155:8, 155:22,
196:2, 255:19, 256:8
**court** [22] - 5:3, 7:24,
8:17, 10:11, 13:14,
13:22, 17:24, 21:2,
34:5, 78:10, 94:4,
122:6, 156:4,
157:11, 177:11,
179:2, 181:6, 219:1,
220:2, 220:9,
250:25, 262:11
**Court** [15] - 8:19,
84:15, 91:14, 146:1,
177:15, 209:22,
209:25, 214:6,
217:24, 218:7,
240:21, 262:3,
262:4, 262:22,
262:22
**COURT** [127] - 5:5,
5:7, 5:10, 5:14, 5:19,
5:24, 6:3, 6:7, 6:10,
6:14, 6:18, 6:24, 7:4,
7:7, 7:12, 7:16, 7:20,
7:23, 8:1, 8:12, 8:14,
8:18, 9:6, 9:8, 9:11,
9:14, 9:16, 9:19,
10:2, 10:6, 10:8,
10:12, 10:20, 10:22,
11:1, 11:4, 11:6,
11:9, 11:13, 11:18,
11:23, 12:10, 12:15,
12:19, 47:3, 47:6,
52:8, 52:12, 92:4,
92:8, 92:10, 92:14,
92:16, 92:19, 92:22,
92:25, 93:2, 93:4,
93:7, 93:12, 93:21,

93:23, 94:1, 94:5,
94:8, 94:11, 94:14,
94:18, 94:23, 95:3,
95:16, 108:22,
121:19, 138:3,
138:8, 138:11,
138:13, 138:16,
138:25, 139:3,
139:5, 139:7,
139:11, 139:15,
139:19, 140:1,
140:4, 140:6,
140:11, 140:14,
144:9, 178:19,
179:4, 216:14,
216:19, 216:22,
216:25, 217:2,
217:4, 217:6, 217:8,
217:11, 217:19,
218:2, 218:10,
219:21, 219:23,
220:3, 220:10,
220:13, 220:16,
220:20, 220:23,
221:9, 221:14,
222:1, 242:16,
254:19, 260:1,
260:7, 260:10,
260:12, 260:14,
260:17, 261:3,
261:6, 261:11
**Court's** [8] - 14:7,
33:14, 108:6,
142:14, 236:17,
236:18, 236:25,
249:3
**courthouse** [2] -
218:3, 239:24
**courtroom** [17] - 5:4,
9:13, 11:3, 92:9,
93:6, 94:7, 138:7,
138:15, 139:6,
154:4, 178:25,
216:18, 217:10,
218:24, 220:12,
260:6, 260:16
**courts** [4] - 37:3, 37:4,
166:11
**cousin** [1] - 228:1
**cousin's** [1] - 228:2
**cover** [5] - 13:12,
13:14, 44:25, 45:4,
223:19
**covered** [1] - 13:16
**covering** [1] - 154:18
**cowboy** [1] - 187:20
**creates** [2] - 66:17,
195:10
**creating** [1] - 192:13
**credibility** [1] - 14:18

credible [1] - 197:16
Creek [3] - 143:5,
182:13, 182:23
crime [67] - 19:13,
20:2, 21:1, 21:4,
24:10, 31:9, 31:12,
33:10, 43:22, 48:14,
49:5, 49:21, 50:6,
65:6, 66:17, 78:22,
82:1, 87:25, 88:8,
88:9, 88:17, 88:25,
89:14, 102:3, 102:4,
119:10, 119:12,
119:14, 135:16,
145:18, 154:8,
160:14, 161:23,
162:5, 162:8,
162:14, 164:3,
164:4, 174:6, 176:8,
176:9, 191:25,
192:20, 193:17,
194:16, 201:10,
205:24, 207:20,
211:22, 211:24,
214:1, 214:14,
214:19, 215:5,
215:10, 232:17,
242:7, 242:10,
252:16, 253:10,
253:19, 253:25
crimes [18] - 25:1,
26:3, 50:5, 119:20,
120:3, 128:14,
149:24, 154:15,
159:14, 164:10,
228:15, 228:17,
228:23, 229:8,
238:15, 240:12,
253:6
Criminal [1] - 128:2
criminal [143] - 13:17,
13:18, 16:2, 17:10,
17:19, 18:2, 18:23,
18:25, 19:3, 20:23,
21:8, 24:4, 24:24,
26:18, 27:19, 28:22,
29:16, 29:18, 29:23,
30:19, 31:16, 32:21,
43:17, 43:18, 43:21,
43:23, 44:9, 44:10,
44:17, 44:19, 45:1,
45:14, 45:15, 45:20,
45:24, 46:12, 46:24,
47:12, 47:20, 47:21,
47:22, 48:1, 48:3,
48:10, 49:4, 49:18,
51:19, 52:1, 54:17,
63:17, 64:3, 66:5,
67:2, 67:5, 67:10,
67:23, 68:4, 68:17,

70:12, 76:12, 76:17,
77:5, 78:17, 79:3,
96:22, 99:15, 101:2,
101:13, 101:15,
101:24, 102:3,
102:13, 102:17,
102:18, 102:25,
103:23, 104:5,
104:10, 105:23,
106:7, 109:4,
109:19, 114:22,
124:19, 124:24,
126:6, 129:8,
134:12, 138:19,
154:22, 157:20,
158:5, 158:22,
159:1, 159:13,
160:17, 165:21,
166:7, 167:2,
167:13, 167:16,
167:19, 167:25,
168:3, 168:7,
168:21, 169:13,
170:3, 170:17,
172:10, 177:12,
191:8, 196:2,
198:17, 201:20,
202:3, 202:11,
203:12, 203:15,
203:23, 204:24,
206:19, 207:4,
207:8, 207:12,
208:2, 231:7, 231:9,
231:23, 232:9,
232:11, 232:19,
232:24, 233:5,
233:19, 237:18,
237:20, 241:8,
243:4, 245:3,
245:19, 255:23,
255:24
criminally [1] - 18:13
criteria [1] - 203:23
criticism [1] - 258:8
cross [1] - 176:3
cross-examination
  [1] - 176:3
crowded [1] - 45:17
crystal [1] - 242:24
CSI [2] - 226:17, 227:2
CSR [1] - 262:21
culpability [5] - 36:6,
81:8, 115:21,
247:17, 256:11
culpable [2] - 18:17,
194:1
Cummings [13] - 8:19,
12:1, 52:19, 95:5,
99:13, 140:24,
179:9, 221:16,

228:20, 229:6,
231:11, 233:12,
255:2
CUMMINGS [7] - 8:21,
10:21, 108:19,
121:21, 138:2,
138:12, 261:9
curious [1] - 153:10
current [1] - 240:13
custody [3] - 108:13,
186:22, 213:22
cut [3] - 97:14, 97:17,
184:3

D

D-o-w-n-e-y [1] -
190:5
D.A [2] - 107:12,
189:21
D.A.'s [3] - 63:10,
152:6, 190:7
dad [1] - 153:14
daily [5] - 45:11,
166:22, 166:24,
183:17, 183:23
Dallas [9] - 17:6, 17:8,
55:14, 152:2, 152:6,
186:6, 186:21,
189:5, 189:21
damages [1] - 197:12
danger [6] - 76:20,
77:6, 81:2, 114:20,
115:9, 205:21
dangerousness [8] -
25:13, 26:21,
107:24, 130:5,
164:20, 205:19,
239:24, 251:15
dark [1] - 239:21
Date [1] - 262:21
date [20] - 8:2, 21:4,
31:10, 31:12, 31:17,
71:3, 98:16, 100:14,
105:1, 108:15,
133:4, 136:1,
160:15, 219:25,
220:1, 232:15,
234:11, 236:7,
240:21
dates [1] - 221:11
daughter [25] - 59:6,
59:9, 59:10, 59:18,
60:19, 61:2, 61:3,
144:25, 148:8,
148:19, 150:1,
151:23, 156:3,
156:7, 183:21,
184:4, 184:6, 185:1,
185:2, 185:12,

187:1, 188:23,
189:10, 197:24,
198:12
days [2] - 153:4,
189:11
daytime [1] - 183:21
dead [5] - 22:13,
50:22, 71:15, 73:17,
200:23
deal [4] - 61:5, 101:11,
184:1, 205:5
dealer [1] - 61:15
dealers [1] - 153:21
dealing [4] - 101:12,
104:2, 104:5, 125:8
deals [1] - 31:14
dealt [4] - 57:8, 57:9,
61:9
death [167] - 12:5,
13:13, 13:19, 13:20,
14:23, 19:4, 19:5,
19:9, 20:9, 25:18,
26:7, 26:8, 33:2,
36:8, 36:21, 36:23,
37:24, 38:1, 38:3,
40:1, 40:19, 42:11,
42:25, 49:23, 50:4,
51:1, 51:11, 54:19,
57:8, 57:10, 58:19,
64:7, 65:5, 65:14,
69:22, 75:13, 75:16,
75:18, 76:3, 79:21,
79:24, 80:17, 80:23,
81:11, 82:24, 90:9,
90:15, 91:17, 95:11,
99:18, 100:23,
106:5, 108:14,
110:6, 110:13,
111:1, 114:11,
115:15, 115:24,
117:20, 118:7,
118:15, 119:13,
119:19, 119:21,
120:4, 120:11,
120:19, 124:8,
125:9, 129:20,
130:3, 130:6, 130:8,
130:16, 130:18,
131:5, 131:10,
134:10, 135:10,
135:17, 135:18,
140:17, 145:17,
146:3, 146:14,
146:24, 147:9,
147:21, 148:13,
154:7, 154:10,
154:16, 155:13,
155:14, 157:7,
157:16, 157:24,
158:4, 163:1,

165:10, 166:8,
171:1, 171:3,
172:16, 172:24,
173:2, 173:9, 174:8,
175:5, 175:15,
177:20, 190:11,
190:15, 190:21,
190:24, 191:4,
191:8, 191:18,
191:23, 192:11,
192:14, 193:13,
193:14, 194:6,
194:15, 194:24,
195:23, 195:25,
196:4, 196:8,
200:15, 200:17,
204:9, 205:3, 209:3,
209:5, 210:2, 210:7,
210:9, 210:18,
212:16, 212:18,
213:13, 215:23,
221:23, 226:11,
228:12, 228:14,
228:17, 228:22,
230:5, 245:13,
246:23, 247:20,
249:24, 250:1,
250:4, 251:7,
251:10, 251:15,
251:22, 252:8,
252:10, 253:10,
253:23, 256:14
deaths [4] - 51:7,
159:2, 160:22,
203:13
debating [2] - 30:11,
30:17
debt [1] - 128:16
decades [3] - 119:24,
120:1, 223:6
December [4] - 31:11,
31:12, 137:19,
195:21
decide [43] - 14:14,
19:25, 23:5, 33:19,
33:24, 33:25, 38:2,
38:9, 39:8, 42:21,
53:10, 62:23, 75:12,
75:22, 81:19, 81:21,
81:22, 82:21, 90:9,
103:8, 103:17,
116:2, 125:4,
125:12, 128:3,
133:23, 145:23,
146:18, 147:12,
162:11, 170:5,
172:13, 175:19,
175:20, 192:3,
204:8, 212:5,
213:16, 213:23,

246:19
**decided** [6] - 9:1, 34:3, 35:24, 124:9, 126:4, 132:7
**decides** [8] - 24:8, 24:12, 91:6, 108:3, 113:24, 114:8, 195:2, 211:15
**deciding** [3] - 24:15, 30:13, 37:13
**decision** [38] - 23:9, 23:13, 39:15, 41:8, 53:23, 59:1, 69:11, 69:18, 72:2, 72:20, 80:19, 84:16, 85:10, 87:12, 108:6, 108:7, 109:6, 110:3, 114:3, 117:13, 118:1, 131:14, 163:16, 163:20, 169:8, 180:17, 194:18, 202:4, 205:3, 208:13, 208:20, 212:13, 212:16, 213:12, 229:24, 249:1, 249:22, 249:23
**decisions** [7] - 37:19, 106:9, 117:22, 126:22, 180:23, 203:3, 223:15
**declassified** [2] - 97:3, 97:4
**declined** [1] - 261:7
**deem** [1] - 197:24
**deep** [1] - 100:20
**defend** [1] - 255:3
**DEFENDANT** [1] - 9:7
**Defendant** [62] - 5:3, 8:17, 10:11, 24:21, 25:1, 25:18, 25:20, 25:25, 26:17, 26:22, 27:20, 27:21, 29:20, 31:11, 32:23, 42:16, 43:18, 74:13, 75:4, 76:12, 81:8, 87:10, 88:12, 94:4, 105:8, 105:19, 105:22, 106:6, 108:4, 108:11, 109:4, 114:11, 115:22, 116:3, 133:4, 160:22, 161:12, 164:9, 164:24, 165:3, 167:13, 179:2, 193:6, 195:7, 220:9, 232:15, 232:24, 234:1, 234:3, 237:6, 237:17, 240:4,

240:6, 241:7, 242:7, 245:3, 245:12, 245:16, 246:22, 247:18, 255:23, 256:11
**Defendant's** [23] - 34:23, 36:5, 36:15, 81:7, 86:4, 87:19, 104:12, 115:20, 117:3, 117:6, 133:14, 166:11, 166:14, 168:9, 172:20, 176:9, 214:9, 247:16, 249:7, 249:12, 250:17, 251:2, 256:10
**defending** [3] - 66:2, 191:9
**Defense** [22] - 8:22, 10:20, 27:25, 35:21, 35:22, 72:11, 84:8, 86:2, 92:16, 99:9, 116:4, 165:21, 172:9, 172:11, 176:1, 180:21, 233:12, 233:20, 238:4, 248:4, 261:7, 261:8
**defense** [14] - 52:13, 66:3, 82:4, 92:22, 121:13, 121:19, 126:9, 138:11, 179:4, 191:9, 216:22, 217:2, 254:19, 260:10
**defenses** [1] - 126:7
**deferred** [1] - 150:16
**define** [14] - 78:21, 80:3, 101:15, 102:7, 102:24, 201:20, 202:2, 202:21, 204:17, 206:11, 212:5, 231:8, 258:15
**defined** [18] - 17:25, 27:3, 28:4, 65:20, 78:18, 128:3, 133:12, 158:6, 158:11, 166:20, 167:17, 168:14, 172:18, 197:5, 197:7, 198:4, 202:21
**definitely** [1] - 101:9
**definition** [59] - 18:5, 19:1, 22:3, 34:20, 35:2, 45:5, 47:19, 48:8, 48:20, 65:4, 65:13, 67:14, 67:23, 68:1, 68:3, 68:12, 68:25, 70:7, 70:16,

77:24, 78:12, 83:12, 87:4, 87:16, 101:24, 102:25, 104:11, 104:23, 117:5, 128:4, 157:10, 157:11, 157:17, 158:7, 158:13, 158:16, 158:22, 159:5, 159:18, 159:20, 159:21, 159:24, 191:3, 191:13, 191:17, 192:16, 192:25, 197:15, 197:20, 200:6, 201:24, 203:16, 206:12, 206:20, 231:9, 231:12, 249:19
**definitions** [3] - 70:14, 82:12, 203:5
**degree** [1] - 56:4, 56:20, 78:5, 78:11, 79:9, 125:8, 183:9, 197:15, 198:6, 198:21, 198:22, 199:8, 200:9, 207:14
**deliberate** [4] - 26:16, 162:10, 164:16, 231:16
**deliberates** [1] - 25:6
**deliberating** [2] - 173:4, 258:19
**deliberation** [5] - 14:7, 34:2, 34:6, 171:20, 246:7
**deliberations** [1] - 171:10
**demonstrate** [1] - 73:13
**demonstrative** [1] - 201:14
**denial** [1] - 190:21
**denomination** [1] - 58:18
**denying** [1] - 190:18
**department** [2] - 58:7, 186:19
**Department** [4] - 96:8, 96:17, 98:21, 153:23
**deployed** [1] - 55:10
**depression** [2] - 148:20, 156:8
**deputy** [3] - 10:22, 153:14, 261:11
**deserve** [1] - 126:12
**deserves** [1] - 173:2
**despite** [1] - 229:18
**dessert** [1] - 58:15
**Destroying** [1] - 168:1
**destruction** [3] -

168:2, 207:6, 207:9
**detail** [2] - 72:25, 73:1
**details** [1] - 72:22
**detective** [4] - 96:12, 96:13, 96:15, 96:21
**determination** [8] - 68:7, 78:11, 82:14, 82:19, 83:17, 101:20, 103:22, 112:8
**determine** [6] - 79:24, 117:2, 127:19, 177:14, 232:10, 258:25
**determines** [3] - 146:1, 177:16, 198:20
**determining** [2] - 76:3, 85:7
**deterred** [1] - 135:14
**deterrent** [2] - 135:17, 135:22
**deters** [1] - 135:12
**detonated** [1] - 103:4
**developed** [2] - 133:24, 137:2
**devote** [1] - 15:3
**diagnosed** [1] - 61:25
**dictate** [3] - 75:1, 75:8, 199:6
**dictates** [2] - 194:21, 213:13
**die** [7] - 108:13, 123:23, 123:24, 123:25, 126:12, 240:19, 240:21
**dies** [2] - 191:25, 213:18
**difference** [10] - 31:19, 49:1, 49:2, 53:1, 69:21, 86:25, 117:24, 120:18, 121:15, 199:7
**different** [61] - 14:12, 18:11, 19:23, 28:7, 31:6, 31:20, 47:19, 54:21, 66:15, 67:12, 68:19, 70:7, 70:14, 75:5, 76:6, 83:14, 89:23, 101:4, 101:5, 102:7, 103:25, 107:20, 118:24, 125:11, 125:22, 131:20, 131:21, 133:11, 136:4, 142:12, 146:25, 147:1, 158:19, 158:20, 158:21, 159:17, 159:18, 163:24, 163:25,

167:4, 169:25, 179:15, 182:8, 190:23, 194:10, 194:12, 194:25, 195:15, 201:9, 204:6, 204:12, 208:25, 210:21, 211:20, 211:21, 214:21, 222:16, 223:19, 235:22, 245:8, 259:22
**dire** [1] - 9:3
**DIRE** [8] - 12:25, 52:15, 95:21, 121:20, 141:7, 179:7, 222:6, 254:21
**direct** [2] - 88:4, 214:19
**directly** [4] - 56:16, 88:16, 215:4, 215:9
**director** [1] - 56:14
**disagreement** [2] - 53:17, 181:9
**discharge** [1] - 209:25
**discharged** [2] - 20:23, 210:14
**discharges** [1] - 91:14
**discrepancies** [1] - 46:5
**discretion** [4] - 25:17, 25:20, 115:13, 130:1
**discuss** [5] - 209:16, 218:4, 218:18, 218:19, 219:15
**discussed** [2] - 5:19, 94:23
**discussing** [4] - 12:11, 69:21, 125:20, 152:7
**discussion** [9] - 19:12, 71:2, 77:18, 81:24, 122:6, 209:8, 215:15, 231:5, 253:12
**discussions** [3] - 101:3, 165:1, 189:20
**disk** [1] - 116:24
**dismissed** [1] - 150:2
**disorder** [1] - 62:1
**disposed** [3] - 60:11, 85:19, 85:20
**dispute** [1] - 235:23
**disregard** [1] - 192:15
**distinct** [1] - 20:14
**distinction** [2] - 199:20, 211:10
**District** [8] - 58:2, 150:24, 186:8, 218:7, 262:4, 262:22
**district** [2] - 244:4,

**258**:10
**disturbed** [1] - 193:19
**dive** [1] - 100:20
**divergence** [1] -
    202:10
**divided** [1] - 20:14
**divinity** [1] - 55:14
**document** [1] - 248:18
**Doe** [2] - 234:12
**done** [34] - 22:21,
    33:6, 34:2, 34:6,
    38:15, 54:18, 67:3,
    71:4, 88:15, 90:3,
    97:12, 98:3, 98:25,
    102:21, 103:15,
    118:18, 136:3,
    136:5, 138:25,
    157:21, 158:2,
    158:23, 160:18,
    161:21, 170:20,
    173:20, 173:24,
    174:4, 188:21,
    191:16, 197:10,
    213:16, 238:18
**door** [2] - 84:12, 183:1
**double** [1] - 96:4
**double-ear** [1] - 96:4
**doubt** [75] - 20:17,
    20:19, 21:18, 26:16,
    27:4, 27:9, 27:10,
    27:13, 33:1, 35:6,
    42:16, 60:5, 70:24,
    73:10, 76:11, 77:17,
    90:8, 105:14, 109:3,
    114:4, 114:7,
    114:13, 114:19,
    115:1, 124:10,
    124:23, 130:6,
    132:8, 133:3,
    160:10, 165:18,
    165:24, 166:4,
    166:6, 166:12,
    166:14, 166:19,
    168:20, 171:25,
    172:7, 197:2, 197:5,
    197:22, 198:14,
    199:3, 199:13,
    199:14, 199:15,
    199:19, 199:20,
    199:21, 199:22,
    199:25, 200:4,
    200:5, 200:22,
    202:2, 208:19,
    234:6, 234:9, 237:5,
    237:21, 240:15,
    241:7, 241:11,
    241:15, 243:3,
    245:2, 245:15,
    245:23, 246:25,
    255:22, 258:16

**down** [23] - 9:21, 15:5,
    29:18, 34:18, 34:19,
    47:7, 84:12, 97:14,
    122:15, 126:3,
    136:25, 137:8,
    168:7, 178:7, 181:6,
    192:4, 199:23,
    219:25, 225:7,
    231:12, 232:4,
    243:7, 256:6
**Downey** [3] - 190:3,
    190:5
**dragging** [1] - 64:4
**drill** [1] - 97:17
**drink** [3] - 52:9, 60:25,
    236:9
**drive** [4] - 192:3,
    227:1, 235:17,
    235:18
**drives** [4] - 46:10,
    69:7, 159:8, 159:9
**driving** [2] - 235:11,
    236:10
**drop** [1] - 197:18
**drops** [1] - 96:5
**drove** [1] - 50:12
**drowning** [1] - 21:14
**drug** [12] - 38:13,
    39:16, 47:22, 47:23,
    59:10, 61:2, 61:13,
    61:15, 81:25, 128:14
**drugs** [14] - 38:14,
    39:13, 40:4, 40:8,
    40:9, 61:7, 82:1,
    82:7, 82:22, 150:6,
    187:5, 187:11,
    193:24, 194:3
**drunk** [2] - 59:12,
    193:19
**Dukes** [2] - 224:21,
    226:4
**duly** [4] - 12:23, 95:19,
    141:5, 222:4
**during** [55] - 14:10,
    18:1, 18:23, 19:2,
    21:8, 36:12, 44:9,
    48:15, 48:23, 49:2,
    49:3, 49:17, 67:2,
    81:23, 88:13, 101:1,
    101:13, 104:10,
    106:7, 106:22,
    107:2, 107:5, 107:7,
    107:13, 110:7,
    124:24, 142:16,
    154:22, 157:15,
    157:19, 158:5,
    159:1, 159:2,
    159:12, 160:13,
    160:17, 168:24,
    170:16, 176:2,

**189**:25, 196:1,
    231:7, 231:20,
    231:23, 232:11,
    237:18, 237:20,
    238:1, 238:9,
    238:11, 238:16,
    238:17, 238:21,
    238:24, 248:16
**duties** [4] - 56:17,
    127:11, 154:1, 154:3
**duty** [10] - 55:2, 55:3,
    55:21, 55:24, 101:8,
    126:22, 163:19,
    177:13, 182:2,
    250:20
**DUVON** [1] - 12:22
**DWI** [3] - 128:14,
    236:3, 236:10
**dying** [1] - 57:8

## E

**e-mail** [1] - 219:8
**ear** [1] - 96:4
**early** [2] - 13:4, 116:22
**easier** [1] - 145:8
**East** [1] - 225:24
**easy** [2] - 23:14,
    235:10
**ed** [3] - 58:7, 223:20,
    223:21
**edge** [1] - 131:3
**editor** [2] - 62:8, 62:18
**Edward** [1] - 94:12
**EDWARD** [1] - 95:18
**effect** [9] - 39:24,
    41:25, 42:1, 117:9,
    146:22, 161:15,
    175:4, 248:24,
    249:13
**effectiveness** [1] -
    16:2
**eight** [5] - 184:10,
    184:11, 184:23,
    185:16, 224:4
**either** [31] - 9:2, 19:24,
    22:13, 26:6, 26:7,
    59:22, 67:4, 84:6,
    90:18, 99:5, 111:2,
    115:5, 115:11,
    116:10, 123:24,
    136:19, 137:7,
    141:20, 155:11,
    165:9, 169:11,
    176:21, 205:23,
    220:25, 226:11,
    240:19, 245:13,
    248:9, 248:10,
    252:24, 255:14
**elderly** [2] - 84:12,

**253**:20
**element** [3] - 104:8,
    192:18, 200:10
**elements** [32] - 21:1,
    21:2, 21:18, 21:24,
    66:19, 70:23, 99:15,
    104:21, 104:22,
    105:13, 105:18,
    125:4, 133:5,
    160:12, 195:12,
    195:18, 196:9,
    196:25, 200:9,
    200:22, 232:14,
    233:3, 233:25,
    234:6, 234:8,
    234:25, 235:8,
    235:20, 236:5,
    236:13, 236:14,
    237:4
**elsewhere** [1] -
    149:25
**emphasize** [1] - 203:2
**employer** [1] - 143:5
**employment** [3] -
    96:16, 96:20, 140:4
**encompassed** [1] -
    70:12
**encompasses** [1] -
    202:16
**end** [10] - 45:3, 91:15,
    93:8, 93:24, 125:1,
    210:14, 223:5,
    226:7, 227:14,
    253:22
**ended** [2] - 14:22,
    122:13
**ending** [1] - 179:20
**ends** [1] - 253:1
**engage** [1] - 207:13
**engaged** [1] - 88:14
**engaging** [1] - 66:1
**enjoy** [2] - 144:7,
    156:16
**enlightenment** [1] -
    63:25
**ensure** [1] - 91:21
**entails** [3] - 202:16,
    207:9, 207:12
**enters** [10] - 5:4, 9:13,
    11:3, 93:6, 94:7,
    138:15, 139:6,
    217:10, 220:12,
    260:16
**entire** [5] - 160:9,
    162:19, 163:3,
    163:9, 255:20
**entitled** [5] - 179:17,
    180:21, 197:19,
    232:25, 241:16
**environment** [1] -

**186**:4
**envision** [2] - 70:15,
    83:9
**envisioned** [6] - 77:9,
    202:1, 204:5,
    205:21, 211:4,
    212:25
**envisions** [2] - 76:22,
    76:23
**episode** [1] - 173:19
**equal** [1] - 246:6
**equation** [1] - 121:16
**escape** [1] - 108:17
**essentially** [2] - 126:3,
    206:6
**establish** [4] - 66:18,
    76:20, 198:7, 198:11
**estimate** [2] - 15:18,
    136:10
**et** [3] - 36:20, 41:2,
    41:17
**ethical** [4] - 14:21,
    100:21, 157:5, 230:3
**evaluate** [1] - 246:12
**evening** [1] - 103:10
**event** [4] - 44:10,
    102:14, 102:17,
    102:19
**events** [2] - 219:4,
    219:6
**everyday** [1] - 158:7
**evidence** [136] - 14:3,
    14:9, 16:18, 20:12,
    20:25, 24:13, 24:14,
    24:19, 24:20, 25:1,
    34:22, 36:3, 37:11,
    38:10, 39:15, 42:22,
    43:20, 50:9, 71:23,
    73:7, 73:9, 73:13,
    81:6, 81:22, 83:16,
    83:24, 83:25, 84:4,
    84:21, 84:25, 86:7,
    86:14, 86:17, 87:8,
    87:14, 87:21, 88:19,
    88:24, 89:16, 100:1,
    107:4, 107:6, 111:5,
    112:6, 113:25,
    115:19, 116:2,
    116:5, 116:9,
    116:19, 116:20,
    117:10, 117:18,
    117:24, 118:9,
    118:12, 128:25,
    129:17, 132:6,
    134:6, 147:11,
    163:24, 163:25,
    164:2, 164:5, 164:6,
    164:7, 164:8,
    172:18, 172:21,
    193:2, 197:14,

197:16, 197:21,
198:3, 198:5, 198:6,
198:10, 198:20,
198:24, 199:2,
199:7, 199:8,
201:11, 205:2,
205:6, 205:9,
205:12, 207:24,
207:25, 208:24,
209:17, 211:12,
211:16, 213:8,
214:8, 214:14,
216:5, 227:10,
229:18, 234:4,
238:1, 238:2, 238:3,
238:9, 238:11,
242:6, 247:15,
248:10, 248:11,
248:13, 248:20,
249:6, 249:11,
249:14, 249:16,
249:17, 249:20,
250:16, 251:9,
251:17, 251:23,
251:24, 252:4,
256:8, 262:7
**evidence-wise** [1] -
163:24
**evidently** [1] - 18:7
**exact** [2] - 62:11,
103:16
**exactly** [22] - 12:15,
18:10, 32:24, 35:17,
36:25, 37:2, 37:18,
39:20, 48:6, 62:13,
62:21, 64:9, 80:7,
146:17, 154:20,
169:15, 172:5,
202:12, 212:24,
230:14, 240:9
**exam** [2] - 142:10
**examination** [1] -
176:3
**EXAMINATION** [8] -
12:25, 52:15, 95:21,
121:20, 141:7,
179:7, 222:6, 254:21
**Examiner** [2] - 234:13,
234:14
**example** [28] - 21:13,
22:7, 24:20, 38:17,
41:6, 41:11, 41:21,
50:10, 68:13, 69:5,
81:24, 88:10, 103:2,
103:14, 158:24,
158:25, 160:21,
173:17, 175:1,
176:7, 176:12,
192:2, 201:14,
202:14, 204:20,

214:15, 214:22
**examples** [9] - 47:12,
71:25, 103:1,
103:13, 176:16,
231:19, 232:6,
232:8, 256:16
**except** [2] - 25:17,
255:20
**exchange** [2] - 52:23,
59:22
**exclusively** [1] - 116:6
**Excuse** [1] - 242:13
**excuse** [12] - 8:22,
53:25, 55:23, 66:8,
67:4, 81:5, 181:19,
191:5, 191:7,
191:11, 191:15,
202:17
**excused** [8] - 8:4,
8:15, 9:25, 10:7,
138:21, 139:4,
261:5, 261:12
**excuses** [2] - 66:4,
191:6
**excusing** [1] - 9:5
**executed** [5] - 26:9,
30:15, 108:15,
165:10, 179:13
**executing** [1] - 123:25
**exemption** [3] - 7:8,
7:17, 7:18
**exercise** [9] - 10:18,
92:19, 122:9,
138:13, 201:15,
216:25, 260:12,
261:7, 261:8
**exercising** [1] - 10:15
**exhibit** [2] - 116:24,
248:17
**exhibits** [1] - 262:14
**exist** [2] - 33:21, 83:6
**existing** [1] - 225:23
**exists** [1] - 78:12
**exits** [5] - 92:9, 138:7,
178:25, 216:18,
260:6
**Exp** [1] - 262:21
**expect** [2] - 128:22,
129:2
**expected** [1] - 15:22
**expensive** [2] -
153:17, 156:23
**experience** [2] -
14:20, 219:9
**experiences** [4] -
41:2, 174:14,
180:24, 202:9
**explain** [4] - 6:23,
16:4, 16:5, 112:2
**explained** [2] -

111:13, 177:6
**explaining** [1] -
161:14
**explains** [1] - 143:24
**expressed** [1] - 19:18
**extent** [1] - 134:10
**extreme** [4] - 47:12,
71:25, 155:16,
201:14
**extremes** [1] - 159:18
**eyes** [4] - 41:18,
41:19, 146:2, 249:13

### F

**Facebook** [1] - 219:13
**faced** [1] - 57:9
**facility** [1] - 224:24
**fact** [16] - 21:3, 40:3,
70:14, 124:9, 127:9,
131:12, 132:9,
146:21, 150:13,
160:14, 167:22,
169:18, 176:20,
198:8, 201:20,
213:15
**factor** [5] - 14:8, 40:5,
155:2, 176:11,
195:17
**factors** [3] - 18:19,
33:20, 193:21
**facts** [50] - 14:13,
16:21, 23:5, 23:8,
23:13, 27:24, 32:2,
32:5, 35:15, 35:16,
35:17, 35:25, 38:19,
39:22, 40:14, 41:24,
45:23, 66:17, 66:20,
74:12, 74:20, 75:1,
75:11, 76:24, 81:3,
82:22, 112:5,
116:17, 137:2,
137:4, 142:15,
163:15, 163:18,
163:21, 169:5,
169:6, 180:23,
193:5, 195:10,
195:13, 212:10,
219:3, 219:6,
219:12, 229:22,
231:1, 246:14,
247:4, 254:3, 254:6
**factual** [1] - 192:24
**fail** [2] - 21:19, 27:14
**failed** [7] - 20:18,
21:23, 22:14, 22:23,
161:1, 161:6, 170:12
**fails** [1] - 32:13
**failsafe** [1] - 37:23
**fair** [12] - 16:15, 16:20,

17:20, 18:5, 19:19,
123:13, 162:19,
178:10, 201:3,
216:5, 216:7, 246:7
**fairly** [3] - 88:23,
180:21, 181:10
**fall** [2] - 147:13,
162:12
**familiar** [1] - 12:11
**family** [6] - 148:8,
150:2, 153:18,
156:4, 191:10,
213:19
**fancy** [1] - 227:1
**far** [10] - 63:25, 64:6,
89:8, 89:9, 129:5,
132:22, 148:24,
171:21, 188:11,
230:2
**fashion** [1] - 248:12
**fast** [1] - 6:19
**father** [9] - 143:22,
150:3, 151:7, 156:9,
185:12, 187:15,
187:16, 188:22,
189:24
**father's** [1] - 190:2
**fault** [2] - 130:22,
130:24
**favor** [4] - 47:4, 116:2,
120:25, 135:10
**favorite** [6] - 97:25,
98:7, 222:25,
225:25, 226:3,
226:18
**favors** [1] - 234:19
**feather** [1] - 197:18
**Federal** [2] - 103:3,
231:21
**federal** [1] - 181:6
**feelings** [9] - 15:6,
16:5, 54:13, 122:23,
142:8, 181:11,
224:17, 229:14,
229:18
**fellow** [4] - 78:14,
256:25, 257:17,
259:6
**Fellowship** [1] -
145:11
**felony** [3] - 48:24,
102:6, 188:9
**felt** [13] - 43:3, 50:4,
57:11, 118:8,
119:15, 122:23,
171:5, 175:10,
175:12, 176:21,
190:14, 251:8,
251:24
**fence** [3] - 112:22,

244:24
**Fernandez** [8] - 11:25,
52:19, 95:6, 140:24,
179:10, 221:16,
233:13, 255:1
**FERNANDEZ** [4] -
254:20, 254:22,
256:5, 259:25
**fertilizer** [1] - 103:4
**few** [15] - 25:10,
57:17, 61:18, 92:5,
99:17, 99:22, 138:5,
178:23, 216:16,
222:14, 224:13,
224:15, 224:17,
239:5, 260:4
**fiance's** [1] - 100:17
**Field** [1] - 220:5
**fields** [1] - 58:11
**fifth** [1] - 63:6
**Fifth** [3] - 29:15, 64:10
**figure** [1] - 227:13
**figuring** [1] - 227:9
**file** [3] - 97:17, 107:10,
107:12
**filed** [2] - 179:11,
188:14
**fill** [3] - 135:5, 228:19,
229:1
**filled** [5] - 5:14, 5:16,
11:13, 15:13, 94:8,
94:20, 139:15,
139:20, 221:3,
221:6, 255:15
**film** [5] - 238:21,
238:25, 239:1,
239:5, 239:6
**financial** [1] - 223:14
**findings** [2] - 80:24,
195:7
**fine** [3] - 43:2, 92:25,
217:6
**finger** [1] - 57:12
**finish** [1] - 132:3
**finished** [4] - 47:9,
150:20, 188:7, 188:9
**finishes** [1] - 67:18
**firearm** [4] - 21:13,
22:9, 22:17, 234:12
**fired** [1] - 184:24
**firm** [3] - 100:14,
198:8, 198:11
**first** [78] - 12:23,
24:15, 24:20, 24:22,
25:2, 25:7, 25:11,
26:15, 27:1, 27:3,
27:8, 31:7, 31:8,
31:23, 32:5, 32:12,
33:24, 35:4, 37:17,
38:13, 43:15, 46:9,

46:17, 58:13, 61:15,
72:8, 76:10, 79:21,
79:23, 80:13, 80:14,
85:3, 95:19, 104:21,
108:2, 115:5,
122:15, 125:8,
129:19, 137:8,
141:5, 153:2,
153:20, 154:8,
154:23, 157:4,
159:9, 162:6, 164:3,
164:12, 164:19,
165:16, 166:1,
170:1, 170:21,
175:21, 176:8,
177:11, 179:23,
181:13, 209:2,
210:4, 222:4,
223:14, 225:17,
231:15, 232:9,
235:22, 238:1,
238:16, 238:21,
241:2, 246:19,
248:15, 251:1, 257:7
**first-degree** [1] -
125:8
**fit** [5] - 15:21, 19:6,
154:23, 159:4,
159:24
**fits** [1] - 158:21
**five** [4] - 74:22, 98:16,
153:24, 253:15
**flash** [1] - 124:15
**flat** [1] - 146:18
**floor** [1] - 218:7
**flush** [1] - 122:1
**folks** [4] - 225:16,
231:12, 239:7, 243:7
**follow** [31] - 21:22,
22:24, 23:1, 27:24,
53:12, 72:19, 73:4,
73:23, 93:13,
106:19, 108:6,
112:2, 116:14,
118:4, 142:20,
146:12, 147:11,
157:2, 161:7, 163:6,
163:22, 180:7,
218:14, 230:24,
237:9, 247:3, 247:7,
249:2, 251:3
**follower** [2] - 152:20,
152:22
**following** [4] - 23:2,
93:16, 147:7, 206:25
**follows** [4] - 12:24,
95:20, 141:6, 222:5
**food** [1] - 121:5
**Force** [8] - 55:2, 55:4,
55:6, 55:16, 55:17,

55:22, 183:14,
189:24
**force** [1] - 101:7
**foregoing** [1] - 262:6
**foresee** [1] - 217:22
**forever** [1] - 209:21
**forget** [1] - 106:23
**forgot** [1] - 43:9
**form** [6] - 48:20,
62:11, 62:15, 97:6,
174:14, 248:11
**formats** [1] - 93:17
**formed** [6] - 40:25,
50:1, 113:12,
133:24, 137:15,
174:13
**formulate** [1] - 180:15
**Fort** [4] - 98:21,
224:25, 228:4,
262:23
**forth** [4] - 180:17,
202:3, 205:13,
209:17
**forward** [8] - 99:19,
107:4, 107:21,
107:23, 126:25,
145:10, 217:25,
246:17
**fountains** [1] - 178:22
**four** [3] - 6:8, 144:10
**frame** [1] - 15:21
**framework** [2] - 180:1,
215:19
**Frankfurt** [1] - 143:24
**Fred** [7] - 12:1, 52:19,
95:5, 140:23, 179:9,
221:16, 255:2
**free** [3] - 30:5, 71:18,
258:7
**freedom** [2] - 190:19,
190:21
**Friday** [4] - 140:13,
143:1, 143:8, 182:22
**friend** [1] - 187:15
**friend's** [2] - 151:7,
187:16
**friendly** [1] - 223:2
**front** [5] - 116:23,
138:4, 216:15,
237:1, 260:3
**full** [1] - 193:11
**fully** [2] - 133:23,
174:13
**function** [2] - 194:23,
211:2
**functions** [1] - 14:17
**funds** [2] - 62:9, 62:19
**furniture** [3] - 97:24,
98:1, 98:2
**future** [33] - 25:13,

26:21, 28:24, 28:25,
30:10, 31:16, 31:18,
76:20, 77:20, 78:15,
81:2, 107:24,
114:20, 115:9,
129:4, 130:5,
132:13, 132:15,
164:20, 164:21,
170:5, 205:18,
206:7, 206:8,
206:19, 206:24,
208:3, 239:24,
242:23, 243:10,
243:11, 251:14,
251:15

---

**G**

**general** [8] - 99:14,
119:16, 177:12,
184:2, 250:1, 250:3,
252:8, 252:10
**generally** [2] - 135:10,
141:21
**generic** [3] - 13:16,
16:7, 16:12
**generically** [2] - 15:4,
196:24
**geographic** [2] -
70:10, 202:19
**GEORGE** [1] - 95:18
**George** [5] - 63:3,
63:7, 94:6, 94:12,
185:6
**Georgia** [1] - 144:5
**Germany** [1] - 143:24
**gift** [1] - 56:24
**gill** [24] - 9:8, 52:23,
65:7, 68:12, 71:1,
74:14, 75:8, 77:17,
81:12, 81:24, 99:13,
182:7, 196:6, 197:4,
198:16, 206:14,
209:7, 228:20,
229:6, 231:10,
232:14, 234:1,
247:22, 253:13
**Gill** [5] - 12:2, 95:8,
108:5, 140:21,
221:19
**GILL** [14] - 9:10,
12:21, 13:1, 47:11,
52:7, 92:13, 92:15,
92:21, 141:3, 141:8,
144:10, 178:18,
216:21, 217:1
**girlfriend's** [1] - 98:23
**given** [12] - 24:9, 32:2,
36:23, 51:22, 74:9,
93:14, 132:5,

134:12, 177:21,
217:14, 233:25,
242:6
**glad** [3] - 44:15, 48:19,
49:9
**glean** [1] - 33:13
**God** [3] - 50:20, 57:12,
154:9
**gold** [1] - 96:15
**gold-shield** [1] - 96:15
**Google** [1] - 218:25
**government** [1] -
128:8
**grabs** [2] - 46:8, 159:8
**grade** [2] - 63:7, 224:6
**grades** [1] - 18:12
**graduated** [1] - 55:20
**Grand** [4] - 97:1,
152:7, 152:8,
156:10, 186:10,
186:15, 188:24,
189:19
**grandchild** [1] -
144:16
**granddaughter** [2] -
144:18, 145:4
**grandmother** [3] -
205:7, 205:10, 257:8
**grandson** [4] - 144:15,
144:24, 156:3,
185:13
**grandson's** [1] -
188:22
**granted** [1] - 240:10
**Grapevine** [1] -
145:12
**gravity** [1] - 69:19
**great** [4] - 52:25, 78:1,
134:10, 213:14
**greater** [9] - 28:14,
65:18, 78:5, 109:14,
109:17, 127:24,
197:15
**grenade** [1] - 45:17
**grind** [2] - 97:7, 97:17
**grinding** [1] - 183:19
**group** [6] - 15:8, 18:4,
223:3, 230:19,
230:20
**groups** [1] - 223:21
**grow** [1] - 156:12
**growing** [1] - 144:4
**grown** [1] - 225:17
**guards** [1] - 128:12
**guess** [17] - 73:1,
87:22, 96:7, 151:8,
151:15, 155:6,
155:9, 168:24,
192:23, 195:5,
199:20, 203:1,

207:2, 207:22,
223:14, 227:8,
239:20
**guessing** [1] - 150:7
**guide** [1] - 226:22
**guides** [1] - 14:7
**guilt** [9] - 37:14,
87:22, 137:16,
145:24, 166:3,
166:12, 166:14,
177:14, 234:4
**guilt/innocence** [20] -
20:15, 24:5, 35:11,
106:22, 107:2,
107:5, 114:2, 132:6,
132:25, 162:1,
209:19, 238:9,
238:22, 241:4,
246:8, 246:16,
247:24, 248:16,
255:10, 255:13
**guilty** [87] - 20:20,
20:22, 21:19, 21:23,
22:24, 27:9, 31:22,
32:15, 33:25, 37:11,
37:24, 43:19, 43:20,
60:1, 66:6, 66:22,
70:1, 70:2, 71:14,
73:5, 73:9, 73:13,
73:22, 74:7, 74:8,
74:21, 75:4, 75:15,
75:21, 76:16, 77:3,
77:11, 79:22, 80:17,
80:20, 82:17,
104:12, 105:15,
106:6, 108:20,
115:7, 123:18,
124:9, 130:2,
130:17, 132:9,
133:6, 153:13,
161:1, 161:5, 161:9,
161:16, 161:24,
162:3, 170:10,
173:5, 179:12,
192:12, 194:2,
194:6, 195:14,
196:21, 198:25,
199:3, 200:21,
201:5, 203:9,
203:21, 203:22,
204:2, 205:16,
205:20, 206:5,
215:25, 232:25,
234:23, 235:4,
236:10, 237:6,
237:17, 237:23,
240:15, 246:4,
247:10, 251:13,
254:4
**guiltys** [1] - 129:21

gun [7] - 71:11, 105:3,
105:5, 161:22,
188:23, 199:24,
234:15
guy [19] - 31:9, 70:6,
71:5, 73:5, 73:14,
161:12, 161:21,
161:24, 164:4,
170:2, 173:1, 173:5,
174:2, 200:21,
205:6, 211:14,
214:3, 234:18,
234:19
guys [2] - 46:6, 50:20
guys' [1] - 51:1

**H**

habit [1] - 189:10
habitation [1] - 17:3
half [3] - 23:24, 55:8,
121:25
hallway [5] - 92:5,
138:4, 178:22,
216:16, 260:3
HAND [1] - 262:16
hand [14] - 5:12,
11:11, 17:23, 19:7,
32:10, 33:4, 43:3,
45:16, 94:16, 97:12,
97:15, 139:13,
217:17, 220:21
handed [1] - 228:7
handedness [1] -
228:10
handgun [3] - 46:8,
50:21, 159:8
hard [4] - 39:15, 72:4,
155:11, 226:19
harsher [1] - 190:15
hassling [1] - 9:21
Hawaii [4] - 144:5,
144:8, 153:16
head [2] - 187:20,
199:24
headed [1] - 172:24
headline [1] - 153:6
health [4] - 7:1,
173:13, 173:25,
207:20
healthcare [1] - 121:7
hear [32] - 5:25, 14:9,
20:13, 24:22, 24:23,
39:14, 39:18, 52:22,
67:20, 96:18, 107:7,
107:8, 116:9,
116:10, 116:12,
128:23, 129:2,
142:15, 147:12,
163:14, 163:17,

163:21, 164:2,
164:6, 164:7, 169:3,
169:5, 169:10,
220:24, 229:22,
238:13, 248:9
heard [25] - 7:23,
24:14, 32:12, 36:12,
74:12, 83:19,
106:22, 108:25,
132:5, 137:11,
137:12, 137:13,
153:8, 162:6, 162:8,
177:1, 178:2,
182:10, 189:19,
196:12, 212:18,
235:10, 236:3,
236:8, 238:1
hearing [7] - 96:1,
96:2, 96:3, 111:5,
137:23, 151:6,
156:11
hears [1] - 193:2
heart [2] - 91:7, 148:6
heinous [1] - 154:15
hello [2] - 11:5, 254:23
help [6] - 13:5, 76:3,
143:16, 149:4,
205:13, 221:1
helped [5] - 84:12,
151:12, 183:20,
205:9, 257:8
helping [1] - 255:2
helps [1] - 183:25
her.. [1] - 183:22
hereby [1] - 262:5
heroic [1] - 88:14
herself [3] - 33:19,
172:13, 211:15
hesitate [1] - 206:8
hesitated [1] - 230:7
hesitation [2] - 33:4,
115:2
Hi [2] - 11:4, 141:10
hiding [1] - 154:18
high [5] - 29:13,
151:7, 187:6,
187:16, 253:22
High [1] - 224:9
higher [6] - 18:8, 29:6,
37:3, 233:18
Higher [1] - 29:7
Hills [4] - 143:6,
182:25, 183:5,
222:21
himself [5] - 33:19,
69:11, 91:6, 172:13,
211:15
hired [1] - 97:5
hit [1] - 226:16
hobby [1] - 98:4

hold [7] - 10:14, 47:8,
105:12, 105:22,
245:23, 252:3
holes [1] - 97:17
Holocaust [2] -
154:17, 155:13
home [15] - 12:8,
20:21, 25:8, 46:2,
98:5, 123:19,
128:16, 149:3,
149:7, 149:17,
156:17, 162:3,
185:21, 185:23,
185:24
homework [1] -
106:10
homicide [4] - 18:13,
65:21, 192:12, 246:4
homicides [3] - 18:12,
65:8, 191:24
honest [2] - 127:13,
182:4
honestly [3] - 62:22,
135:24, 142:3
Honor [12] - 8:21,
9:10, 10:21, 10:25,
52:14, 92:21,
108:19, 138:12,
179:6, 217:1,
254:17, 261:10
honorably [2] - 88:13,
214:24
hope [2] - 8:3, 72:14
hopefully [2] - 10:8,
95:13
hoping [2] - 13:9,
52:23
hospital [1] - 148:5
Hospital [1] - 182:25
hot [1] - 177:2
hour [8] - 9:23, 12:16,
95:12, 121:25,
140:25, 141:24,
221:21, 226:24
hours [5] - 6:16,
23:25, 136:18,
143:1, 149:16
house [7] - 17:1, 46:9,
50:12, 50:13, 98:15,
159:9, 159:10
housing [1] - 123:11
human [2] - 89:9,
177:21
humans [1] - 109:21
Hummel [12] - 9:4,
9:6, 11:24, 95:4,
137:22, 140:23,
195:22, 195:25,
196:13, 217:13,
221:15, 250:24

Hummel's [1] - 196:21
hundred [1] - 123:2
hunts [1] - 232:4
husband [5] - 59:7,
59:8, 59:9, 59:11,
60:25
Hydrocodone [2] -
61:19, 61:20

**I**

I.C.U [1] - 57:9
idea [13] - 6:25, 58:22,
61:17, 83:11,
113:12, 130:4,
136:6, 136:7,
193:16, 200:12,
201:6, 205:22,
227:17
ideas [1] - 178:2
identify [1] - 60:4
II [1] - 189:25
illegal [1] - 235:16
illustrate [1] - 176:17
imagine [3] - 15:8,
90:23, 117:25
immature [1] - 40:24
impacted [1] - 82:22
impairment [1] - 82:16
impairs [2] - 235:17,
235:18
impartial [1] - 16:15
important [14] - 31:5,
35:2, 39:4, 70:25,
72:12, 85:15, 89:20,
179:18, 200:11,
203:5, 215:14,
218:12, 218:18
importantly [2] -
234:9, 257:18
imposed [11] - 36:9,
36:22, 39:25, 81:11,
115:16, 115:24,
118:7, 247:20,
249:18, 251:16,
256:14
impression [2] -
80:15, 156:13
imprisonment [6] -
20:9, 36:8, 81:10,
115:24, 247:20,
256:14
improperly [1] - 151:2
inasmuch [1] - 64:6
incident [7] - 98:23,
150:2, 151:22,
189:21, 208:7,
214:23, 231:25
incidents [4] - 99:5,
103:6, 149:24, 150:4

inclined [2] - 124:8,
130:14
include [2] - 21:3,
164:8
included [5] - 104:15,
125:2, 160:13,
239:20, 262:9
including [4] - 36:4,
115:19, 247:15,
256:9
income [2] - 181:3,
181:7
incorrect [1] - 64:5
indefinitely [1] -
136:23
independent [7] -
37:19, 88:9, 88:24,
117:13, 181:18,
195:1, 246:19
indicate [2] - 102:20,
148:19
indicated [8] - 56:13,
58:17, 64:2, 123:10,
134:22, 135:11,
135:21, 183:16
indication [1] - 124:7
Indictment [14] -
31:13, 66:23,
137:21, 152:7,
195:19, 195:21,
196:4, 200:19,
204:22, 234:2,
234:3, 234:18,
237:3, 238:24
individual [78] - 18:1,
18:18, 20:1, 20:2,
20:20, 21:5, 21:6,
21:9, 22:8, 22:10,
22:24, 26:2, 26:5,
27:14, 30:17, 32:8,
32:15, 33:1, 33:15,
33:18, 34:4, 36:1,
42:11, 42:13, 42:24,
45:9, 45:25, 48:22,
49:2, 49:16, 49:21,
50:11, 59:1, 65:5,
68:6, 79:10, 81:19,
82:19, 83:13, 90:3,
91:4, 91:6, 124:6,
130:7, 130:17,
132:9, 133:19,
159:5, 160:7,
160:15, 160:16,
160:25, 161:5,
161:9, 161:16,
162:2, 162:25,
165:5, 172:13,
174:5, 174:9,
175:15, 176:7,
195:24, 195:25,

202:4, 203:2, 203:5,
208:18, 208:20,
208:22, 209:12,
211:15, 213:12,
231:14, 258:2
**individual's** [6] - 27:9,
28:22, 30:9, 33:25,
162:4, 165:7
**individually** [8] -
54:20, 58:23, 87:12,
101:21, 108:2,
113:24, 116:1, 257:2
**individuals** [5] - 30:5,
159:6, 237:18,
237:20, 240:12
**ineligible** [4] - 25:8,
108:11, 165:3, 240:6
**infection** [1] - 96:4
**influence** [4] - 82:1,
90:4, 193:24, 212:4
**inform** [1] - 11:16
**information** [12] -
11:14, 64:18, 83:20,
93:15, 93:17, 93:18,
107:2, 139:16,
140:17, 164:15,
218:22, 219:9
**informed** [2] - 8:19,
217:19
**injection** [2] - 194:15,
240:22
**injured** [1] - 184:18
**injustice** [1] - 151:4
**inmates** [3] - 108:17,
112:18, 113:1
**innocence** [1] -
145:24
**innocent** [3] - 60:3,
126:12, 254:4
**inquire** [1] - 54:12
**inquiry** [4] - 31:6,
73:24, 75:5, 86:22
**insanity** [1] - 126:9
**inside** [5] - 110:10,
112:21, 129:7,
226:24, 245:7
**insight** [1] - 84:16
**instance** [2] - 131:15,
257:4
**instances** [1] - 109:1
**instead** [4] - 39:25,
97:12, 173:2, 223:11
**institutions** [2] -
128:6, 128:8
**instruct** [3] - 34:22,
108:4, 249:5
**instruction** [12] -
25:22, 33:14, 80:4,
87:7, 91:1, 93:14,
208:23, 209:10,

209:11, 212:9,
214:6, 218:11
**instructions** [5] -
93:16, 171:19,
218:14, 219:19,
236:20
**instrument** [1] - 14:6
**insufficient** [1] -
212:14
**intelligent** [1] - 122:10
**intend** [2] - 179:11,
196:7
**intended** [3] - 75:6,
75:10, 204:11
**intent** [1] - 49:25
**intentionally** [1] -
65:17
**interact** [3] - 31:2,
112:23, 244:21
**interest** [1] - 152:25
**interested** [3] - 63:18,
63:21, 132:19
**interesting** [2] - 63:24,
227:7
**interface** [2] - 56:18,
63:12
**interfere** [2] - 95:1,
181:11
**international** [1] -
196:18
**Internet** [4] - 93:16,
218:20, 219:2,
219:15
**interpretation** [2] -
231:13, 231:14
**interview** [3] - 11:20,
94:24, 218:8
**interviewed** [1] -
10:13
**intimidating** [1] -
260:19
**intimidation** [1] -
258:7
**intoxicated** [5] - 82:6,
193:25, 235:11,
235:25, 236:10
**introduce** [5] - 84:10,
84:13, 86:13, 205:8,
205:11
**introspection** [1] -
53:9
**introspective** [1] -
72:1
**investments** [3] -
132:11, 132:12,
132:14
**involve** [3] - 15:15,
49:4, 51:18
**involved** [17] - 38:12,
43:17, 43:18, 46:1,

46:12, 47:1, 63:16,
95:12, 123:11,
140:18, 174:19,
187:5, 188:19,
204:4, 219:3,
219:16, 219:17
**involvement** [1] -
134:11
**involving** [2] - 119:20,
228:15
**isolated** [1] - 208:7
**Israel** [1] - 156:18
**issue** [40] - 20:15,
25:12, 25:13, 25:14,
37:17, 57:18, 58:24,
61:10, 64:7, 74:6,
80:23, 81:25, 84:5,
85:3, 89:6, 101:19,
105:21, 127:17,
136:25, 140:16,
145:25, 146:8,
164:19, 164:20,
164:22, 170:6,
172:9, 173:13,
189:14, 194:19,
205:19, 210:20,
211:24, 242:10,
245:1, 245:9, 246:2,
247:21, 251:7, 261:6
**Issue** [35] - 34:1,
34:10, 34:12, 35:9,
35:11, 35:12, 35:13,
90:8, 106:18, 107:3,
109:2, 115:8, 118:6,
126:18, 129:16,
129:19, 130:11,
132:3, 165:13,
172:1, 239:23,
239:25, 240:24,
241:4, 247:11,
247:12, 247:14,
247:24, 250:8,
251:14, 255:18,
255:21, 256:7, 259:2
**issues** [31] - 12:4,
12:6, 13:12, 13:19,
15:1, 17:22, 23:5,
24:12, 24:16, 25:6,
95:11, 96:1, 96:2,
96:3, 106:14,
126:15, 130:15,
135:7, 140:18,
148:8, 156:4,
164:17, 204:3,
204:6, 204:19,
207:20, 219:11,
219:15, 221:23,
239:11, 253:21
**IT** [2] - 56:13, 56:23
**it'll** [5] - 34:19, 52:24,

140:25, 149:12,
221:21
**itself** [9] - 26:21,
99:12, 101:10,
109:22, 151:2,
223:1, 246:4,
253:21, 253:24

## J

**jail** [3] - 108:18,
150:18, 151:10
**jails** [1] - 128:11
**January** [3] - 55:19,
183:18, 262:17
**Japan** [1] - 144:6
**job** [7] - 16:18, 21:19,
23:12, 142:2,
147:10, 149:16,
231:3
**John** [11] - 11:24,
52:20, 95:4, 140:23,
179:10, 179:12,
217:12, 221:15,
234:11, 234:12,
255:3
**John's** [1] - 215:24
**joined** [1] - 70:9
**joint** [1] - 55:9
**journal** [1] - 248:17
**Joy** [2] - 137:22,
195:25
**Judge** [64] - 6:13,
7:21, 14:5, 20:7,
20:8, 23:9, 25:8,
25:16, 25:17, 25:20,
34:21, 42:24, 43:6,
62:25, 75:9, 85:24,
91:1, 91:10, 91:11,
91:14, 92:18, 99:21,
106:11, 108:3,
108:4, 108:6, 108:9,
112:1, 130:2,
136:17, 138:2,
142:13, 146:23,
147:1, 151:5, 151:8,
151:13, 162:9,
164:17, 164:23,
164:24, 171:19,
178:18, 210:11,
210:13, 216:13,
216:24, 217:5,
222:2, 224:19,
229:21, 236:16,
236:20, 239:11,
240:3, 240:4, 249:4,
249:5, 254:12,
254:20
**judge** [8] - 14:18,
52:7, 54:2, 82:9,

90:2, 121:18,
129:10, 243:1
**Judge's** [2] - 172:6,
194:22
**judges** [1] - 154:9
**judging** [1] - 201:16
**judgment** [7] - 96:22,
129:8, 181:18,
195:1, 197:20,
228:3, 242:24
**Judicial** [2] - 262:4,
262:22
**jump** [1] - 201:1
**June** [8] - 15:17,
100:13, 136:3,
136:12, 136:14,
136:18, 142:25,
217:21
**juror** [163] - 5:4, 5:13,
6:25, 8:15, 9:1, 9:13,
10:7, 10:12, 11:3,
11:12, 12:23, 14:1,
14:18, 15:3, 23:2,
23:4, 23:8, 23:12,
23:18, 27:1, 27:14,
27:23, 32:4, 33:15,
33:18, 34:14, 34:23,
36:1, 36:13, 41:11,
41:23, 45:9, 46:22,
51:19, 53:11, 54:4,
54:15, 54:20, 67:25,
68:12, 69:8, 72:25,
76:21, 77:11, 81:21,
82:5, 87:8, 87:11,
88:7, 91:6, 91:21,
92:9, 92:11, 93:6,
93:13, 94:2, 94:7,
94:17, 95:19, 99:24,
101:16, 103:24,
106:18, 108:10,
112:3, 115:25,
121:18, 125:3,
130:7, 133:20,
133:23, 136:16,
138:7, 138:15,
138:20, 139:4,
139:6, 139:14,
141:5, 142:11,
142:19, 147:19,
152:10, 158:9,
159:12, 160:8,
161:4, 161:8,
161:18, 163:7,
163:20, 163:22,
163:25, 165:15,
165:25, 172:3,
172:13, 172:19,
174:20, 175:3,
176:4, 178:25,
179:3, 179:21,

180:8, 181:6,
181:12, 193:9,
198:20, 199:22,
201:24, 201:25,
202:1, 202:10,
202:15, 203:3,
203:6, 208:18,
210:7, 211:21,
211:25, 212:1,
214:8, 214:22,
216:2, 216:18,
216:19, 217:10,
217:14, 217:18,
218:4, 220:7,
220:12, 220:22,
222:4, 227:5, 229:8,
229:16, 230:23,
230:25, 231:13,
232:8, 237:10,
240:5, 241:1,
243:14, 246:8,
248:23, 249:1,
249:7, 250:13,
251:4, 254:11,
254:18, 256:24,
257:19, 257:21,
258:2, 259:6, 260:6,
260:16, 261:5
**JUROR** [66] - 5:6, 5:9,
5:18, 5:23, 6:1, 6:4,
6:8, 6:22, 7:3, 7:6,
7:11, 7:15, 7:19,
8:11, 8:13, 9:15,
9:18, 10:1, 10:5,
11:5, 11:8, 11:17,
11:22, 12:9, 12:13,
12:18, 47:5, 47:10,
52:10, 92:7, 93:11,
93:20, 93:22, 93:25,
94:10, 94:13, 94:22,
95:2, 95:15, 138:6,
138:24, 139:2,
139:10, 139:18,
139:22, 140:3,
140:5, 140:9,
140:12, 178:24,
212:22, 216:17,
218:1, 218:9,
219:20, 219:22,
220:1, 220:14,
220:19, 221:8,
221:13, 221:25,
256:4, 260:5, 261:2,
261:4
**Juror** [14] - 5:7, 8:22,
10:13, 10:17, 11:6,
92:10, 94:12, 138:9,
139:8, 217:11,
220:17, 261:6
**juror's** [6] - 16:17,
33:15, 69:18,

147:10, 229:23,
237:5
**jurors** [53] - 8:20,
10:14, 19:25, 37:5,
40:3, 42:11, 42:12,
45:14, 68:15, 68:18,
68:25, 70:5, 70:13,
71:7, 71:15, 72:7,
76:18, 80:3, 83:4,
83:10, 88:18, 88:20,
90:18, 93:4, 100:3,
100:4, 100:7, 158:6,
158:11, 158:13,
177:18, 180:13,
180:21, 181:1,
193:11, 196:15,
200:11, 200:25,
202:7, 204:17,
204:21, 205:17,
207:25, 210:25,
211:1, 211:2,
211:19, 217:15,
218:13, 256:25,
257:17, 258:4,
258:18
**jurors'** [1] - 67:24
**Jury** [7] - 152:8,
156:10, 186:10,
186:15, 188:24,
189:19
**jury** [180] - 5:14, 7:10,
7:13, 8:8, 10:3,
11:13, 12:5, 20:6,
20:8, 20:13, 20:16,
20:18, 20:20, 24:8,
24:12, 24:13, 25:3,
25:6, 25:12, 25:22,
26:15, 30:13, 31:8,
33:9, 33:17, 34:3,
34:5, 34:9, 34:22,
35:25, 37:9, 37:20,
40:20, 43:19, 45:10,
45:23, 46:11, 53:3,
59:14, 59:15, 68:2,
70:22, 71:13, 74:7,
75:6, 75:11, 75:23,
76:4, 76:7, 76:15,
78:10, 79:15, 80:9,
80:14, 81:3, 81:5,
84:16, 85:1, 86:18,
89:20, 90:2, 90:21,
90:24, 91:11, 91:14,
94:18, 95:11,
101:20, 103:17,
105:14, 105:15,
106:6, 108:1, 108:3,
109:6, 111:22,
112:1, 113:23,
114:2, 115:15,
115:18, 117:13,
125:21, 138:22,

138:23, 139:15,
139:24, 140:10,
140:17, 141:19,
143:10, 145:23,
146:17, 146:19,
148:13, 149:3,
156:16, 160:13,
160:25, 162:6,
162:8, 162:10,
164:15, 165:18,
166:21, 169:3,
169:7, 169:9, 170:8,
170:17, 171:9,
171:11, 171:17,
171:24, 172:23,
173:7, 176:11,
179:12, 182:2,
193:2, 193:21,
193:22, 193:25,
194:20, 195:2,
195:6, 195:13,
198:12, 200:20,
201:22, 203:4,
203:8, 204:6,
205:13, 208:15,
209:9, 209:16,
209:21, 209:22,
210:14, 213:11,
218:2, 218:14,
219:5, 219:6, 219:9,
219:15, 219:23,
221:3, 221:22,
230:12, 233:7,
233:9, 234:25,
235:3, 235:22,
236:16, 236:20,
236:21, 237:6,
237:16, 237:19,
237:25, 238:4,
240:2, 240:14,
242:24, 247:9,
249:5, 249:15,
250:17, 251:13,
256:23, 259:21,
260:25, 261:13
**jury's** [15] - 16:19,
21:19, 27:13, 27:15,
34:2, 42:23, 75:1,
103:22, 108:6,
115:7, 115:13,
177:13, 208:21,
210:15, 247:25
**justice** [15] - 16:2,
17:11, 17:19, 20:2,
20:24, 64:3, 98:25,
134:12, 138:19,
177:12, 188:20,
197:18, 260:20
**justification** [9] -
65:24, 65:25, 66:4,
67:4, 126:10,

126:11, 191:5,
191:6, 191:15
**justified** [1] - 191:12

# K

**Kansas** [1] - 144:5
**Kathleen** [1] - 139:8
**KATHLEEN** [1] - 141:4
**keep** [19] - 26:12,
27:22, 30:7, 35:2,
117:16, 118:4,
125:11, 129:11,
163:12, 163:18,
163:22, 193:10,
210:7, 219:24,
230:24, 243:15,
252:25, 254:5,
254:14
**Kennedale** [1] -
137:20
**key** [6] - 23:2, 23:4,
32:13, 35:20, 41:23,
163:21
**kids** [6] - 6:5, 6:7,
144:10, 144:11,
144:12, 223:24
**kill** [8] - 65:10, 65:11,
145:19, 145:20,
147:22, 192:6,
214:3, 234:11
**killed** [17] - 21:7,
21:10, 22:10, 22:20,
50:18, 71:9, 71:10,
73:14, 101:8,
103:11, 110:19,
137:10, 154:17,
161:12, 161:21,
234:23, 237:19
**killing** [7] - 22:8,
48:22, 49:2, 49:3,
147:22, 237:17,
253:19
**kills** [5] - 68:13, 68:15,
69:6, 69:7, 202:15
**kind** [67] - 15:21, 29:4,
34:13, 37:23, 47:12,
54:2, 54:15, 59:7,
65:4, 65:23, 71:24,
76:9, 84:17, 89:5,
90:4, 97:2, 100:17,
110:12, 113:22,
117:23, 122:1,
123:9, 131:2,
132:12, 132:14,
140:7, 143:7,
149:15, 151:7,
155:25, 156:5,
156:13, 159:17,
167:19, 167:20,

170:5, 174:4,
174:25, 176:15,
176:16, 178:6,
178:8, 179:22,
180:24, 181:21,
191:8, 193:9,
197:17, 200:13,
201:13, 201:14,
203:4, 205:4, 206:6,
206:23, 208:8,
211:3, 211:23,
214:16, 215:14,
223:15, 226:19,
236:24, 238:20,
248:18, 255:14
**kindness** [4] - 88:15,
212:2, 215:2, 257:5
**kinds** [2] - 167:22,
192:24
**knife** [5] - 22:11,
71:10, 105:6,
160:23, 234:16
**knowing** [32] - 18:22,
33:1, 42:23, 43:5,
49:25, 101:13,
106:7, 110:4,
114:10, 116:4,
118:6, 120:23,
124:19, 126:8,
132:20, 157:21,
162:24, 170:25,
171:2, 171:6,
175:15, 192:18,
192:19, 193:23,
194:1, 245:5,
245:17, 246:22,
250:15, 251:6,
251:21
**knowingly** [33] - 18:1,
44:9, 49:17, 49:21,
49:22, 51:4, 65:5,
65:13, 67:3, 74:21,
82:10, 82:15, 101:1,
104:9, 105:2, 126:5,
133:5, 157:21,
158:2, 158:23,
160:1, 160:18,
170:16, 173:21,
191:4, 191:16,
195:23, 195:24,
231:6, 232:12,
232:16, 234:11,
237:17
**knowledge** [1] - 137:2
**known** [2] - 62:12,
160:19
**knows** [2] - 76:15,
157:21

# L

LaGrave [1] - 220:5
land [2] - 225:13, 225:22
language [2] - 234:17, 234:19
larger [1] - 78:5
Larry [8] - 12:1, 52:17, 63:10, 95:5, 140:24, 179:9, 221:17, 255:2
last [27] - 13:14, 13:16, 13:22, 15:18, 17:16, 17:24, 19:16, 21:2, 24:1, 30:2, 61:18, 98:3, 98:4, 103:2, 115:10, 115:11, 120:1, 131:15, 134:5, 136:25, 157:10, 160:11, 190:4, 190:8, 231:20, 255:8
lasted [2] - 23:24, 23:25
late [3] - 189:15, 252:23, 254:25
laundry [2] - 84:13, 257:9
Law [2] - 226:17, 226:21
law [107] - 7:7, 13:17, 14:3, 14:5, 16:20, 18:22, 23:8, 27:3, 28:4, 37:5, 40:18, 41:18, 41:19, 44:18, 53:6, 53:12, 53:16, 53:17, 53:18, 56:22, 64:25, 65:25, 70:15, 71:13, 71:17, 72:19, 76:22, 79:4, 82:4, 83:9, 83:23, 84:4, 88:3, 89:8, 99:15, 100:1, 100:10, 101:11, 101:15, 102:24, 106:19, 106:20, 116:13, 116:17, 117:8, 118:3, 128:6, 142:3, 142:13, 142:19, 142:20, 146:11, 146:12, 147:5, 147:7, 147:9, 147:11, 147:12, 154:20, 154:24, 158:6, 158:11, 160:5, 163:14, 174:8, 177:16, 179:24, 180:5, 180:7, 180:9, 180:20, 180:22,

181:9, 181:15, 190:24, 191:3, 191:7, 194:13, 197:5, 200:20, 201:17, 210:23, 211:6, 213:1, 214:12, 214:19, 215:19, 218:16, 218:17, 226:17, 229:17, 229:21, 230:25, 231:8, 231:12, 234:24, 236:21, 236:22, 240:13, 243:14, 245:10, 247:3, 247:4, 250:22
law's [1] - 102:12
laws [5] - 19:22, 81:14, 101:4, 167:2, 181:3
lawyer [5] - 187:14, 187:17, 188:8, 188:12, 219:1
lawyers [2] - 63:14, 197:17
lead [5] - 32:8, 38:9, 90:15, 156:1
leading [1] - 106:13
leads [2] - 177:2, 178:3
leaf [1] - 197:18
learn [1] - 64:1
learned [3] - 63:23, 80:14, 137:5
learning [1] - 98:11
least [9] - 61:11, 76:16, 83:19, 90:18, 125:1, 136:11, 192:12, 204:24, 213:17
leave [11] - 8:9, 10:2, 19:25, 67:24, 78:19, 81:18, 138:21, 209:21, 212:12, 240:16, 260:23
leaves [2] - 60:5, 213:22
leaving [2] - 197:11, 213:17
left [5] - 58:25, 103:24, 144:8, 228:7, 228:10
left-handed [1] - 228:7
left-handedness [1] - 228:10
legal [22] - 21:12, 45:4, 61:24, 65:24, 66:7, 67:4, 82:4, 86:16, 86:17, 108:20, 108:23, 126:11, 135:6,

142:10, 180:1, 191:5, 191:10, 191:14, 191:17, 197:14, 197:20, 201:24
legally [4] - 65:20, 78:18, 108:12, 198:4
Legislature [16] - 19:22, 28:17, 29:11, 29:17, 34:17, 35:24, 41:9, 66:16, 75:14, 133:9, 167:1, 168:6, 195:10, 248:7, 253:17
Legislature's [1] - 89:3
legitimate [1] - 66:7
lengthy [3] - 34:13, 34:15, 125:19
less [16] - 19:15, 70:25, 109:14, 109:16, 162:15, 167:10, 173:23, 174:2, 174:10, 174:12, 174:13, 181:5, 192:19, 200:11, 241:25, 243:12
lesser [5] - 65:8, 104:15, 125:2, 192:1, 197:6
lesser-included [2] - 104:15, 125:2
lethal [2] - 194:15, 240:22
letter [3] - 62:7, 62:17, 116:14
letting [1] - 23:5
level [2] - 117:10, 248:13
liability [1] - 191:8
liberal [3] - 118:23, 119:1, 119:16
liberty [1] - 30:5
libraries [1] - 128:8
life [105] - 19:15, 20:9, 25:21, 25:24, 26:7, 30:13, 30:14, 34:4, 36:8, 36:21, 38:3, 39:25, 41:2, 42:13, 43:6, 61:17, 69:1, 74:10, 74:21, 74:25, 76:3, 79:17, 79:24, 81:10, 83:7, 84:18, 90:11, 90:19, 107:25, 108:10, 108:13, 110:5, 110:13, 110:25, 115:17, 115:23, 117:23, 119:6,

119:10, 120:16, 120:24, 125:9, 125:13, 125:17, 130:19, 131:4, 133:22, 134:19, 134:20, 135:2, 135:3, 147:2, 154:10, 155:4, 155:6, 155:15, 155:22, 155:23, 158:8, 162:16, 165:2, 165:9, 166:22, 169:19, 169:20, 169:21, 171:7, 171:11, 172:15, 173:2, 173:9, 174:14, 190:14, 190:19, 193:7, 194:14, 195:1, 204:9, 205:3, 212:3, 212:4, 212:16, 213:13, 213:15, 221:5, 228:2, 238:19, 238:23, 239:1, 240:1, 240:6, 240:20, 245:13, 247:19, 248:22, 249:18, 251:19, 253:4, 253:11, 253:15, 253:23, 256:13, 257:6
lifetime [1] - 119:17
light [5] - 36:19, 56:21, 90:3, 90:4, 199:3
lightly [1] - 33:7
likelihood [2] - 78:5, 78:11
likely [7] - 109:12, 109:13, 206:12, 206:16, 206:17, 206:18, 223:14
limit [2] - 215:3, 215:4
limitation [1] - 215:12
limited [1] - 134:11
line [3] - 101:8, 112:22
link [2] - 88:4, 88:16
LinkedIn [1] - 219:13
list [3] - 62:23, 63:15, 232:17
listen [2] - 218:20, 229:5
listening [1] - 181:21
live [9] - 145:6, 145:7, 153:17, 156:3, 165:9, 185:14, 234:5, 243:20, 243:22
lived [4] - 153:16,

184:7, 184:8, 189:8
lives [4] - 144:25, 150:1, 231:23, 244:24
living [4] - 17:5, 130:23, 156:14, 186:3
local [1] - 196:18
location [3] - 47:18, 71:3, 202:19
lock [1] - 155:23
locked [2] - 111:10, 129:11
long-winded [1] - 215:15
look [45] - 12:7, 28:24, 28:25, 32:2, 38:7, 38:19, 53:3, 58:24, 62:16, 62:23, 69:8, 71:8, 72:2, 81:21, 82:5, 102:9, 104:20, 106:10, 106:20, 106:21, 107:23, 112:9, 117:1, 117:11, 117:12, 119:4, 126:25, 134:3, 134:5, 170:4, 170:5, 180:14, 200:13, 216:5, 222:13, 229:12, 231:24, 238:21, 239:9, 239:14, 243:15, 244:9, 245:14, 246:11, 248:21
looked [2] - 110:15, 131:3
looking [26] - 88:20, 104:14, 107:22, 109:22, 109:25, 110:21, 110:23, 115:25, 141:23, 145:10, 164:21, 226:15, 227:21, 236:3, 241:19, 242:21, 242:22, 242:23, 245:1, 245:11, 250:15, 250:16, 250:18, 253:25
looks [7] - 76:4, 76:7, 81:3, 89:22, 98:9, 121:24, 227:22
lost [4] - 72:22, 139:16, 231:22, 242:15
louder [1] - 5:25
loves [1] - 189:12
low [1] - 29:12
lower [1] - 29:9

**LTV** [1] - 97:1
**Luke** [2] - 55:6, 58:15
**LVN** [2] - 145:1, 184:12

## M

**ma'am** [9] - 5:9, 9:7, 11:8, 11:17, 11:22, 12:14, 221:25, 251:11, 252:14
**machine** [1] - 97:13
**machines** [2] - 97:10, 97:11
**Mackey** [1] - 63:3
**mad** [3] - 225:8, 225:10, 231:25
**magnitude** [1] - 218:13
**mail** [7] - 8:8, 10:4, 10:24, 138:23, 219:8, 260:25, 261:12
**main** [1] - 107:14
**major** [2] - 6:21, 14:17
**man** [5] - 39:8, 120:15, 143:22, 189:13, 216:7
**managed** [1] - 185:2
**management** [1] - 98:2
**manager** [1] - 56:13
**managing** [1] - 187:1
**manic** [1] - 173:19
**manner** [13] - 21:9, 21:11, 104:23, 104:25, 105:1, 105:10, 122:10, 160:19, 161:13, 196:4, 196:5, 200:12, 234:9
**Maria** [1] - 5:8
**marijuana** [1] - 187:12
**marriage** [1] - 61:15
**married** [2] - 59:20, 144:25
**master's** [1] - 55:14
**material** [1] - 172:6
**materials** [1] - 164:17
**math** [1] - 58:13
**matter** [8] - 53:2, 85:7, 122:7, 122:9, 134:2, 166:24, 188:20, 198:9
**matters** [1] - 142:3
**mature** [2] - 41:17, 174:12
**maximum** [1] - 108:17
**mean** [91] - 28:5, 30:4, 31:24, 53:21, 54:12,

57:4, 67:11, 69:13, 70:17, 71:5, 72:17, 72:23, 74:25, 76:25, 77:15, 78:22, 80:12, 82:25, 84:19, 89:25, 97:2, 102:17, 109:11, 110:20, 111:7, 119:2, 120:14, 120:19, 121:12, 122:18, 126:21, 130:20, 136:5, 143:10, 146:11, 147:20, 147:22, 147:23, 148:18, 149:2, 149:7, 153:6, 153:13, 154:14, 154:19, 155:3, 155:12, 155:13, 158:9, 158:17, 158:18, 158:19, 166:23, 167:18, 168:15, 168:16, 179:16, 189:12, 189:17, 189:22, 190:20, 192:8, 193:15, 198:14, 199:4, 199:16, 199:22, 200:2, 200:23, 201:1, 203:15, 204:13, 205:25, 207:5, 207:18, 207:19, 207:21, 208:17, 213:7, 214:3, 215:2, 230:9, 234:10, 241:20, 242:4, 243:18, 255:12, 258:19, 259:11, 259:20
**meaning** [5] - 21:12, 45:10, 157:21, 158:12, 166:22
**means** [35] - 21:9, 21:11, 25:24, 35:8, 49:21, 49:22, 65:6, 68:1, 73:3, 73:15, 102:6, 104:23, 104:25, 105:1, 105:10, 108:11, 160:2, 160:19, 161:13, 165:3, 165:24, 172:7, 196:4, 196:5, 200:12, 202:11, 218:25, 232:10, 234:10, 240:6, 242:20, 243:20, 257:24, 258:16
**meant** [2] - 102:8, 242:19

**meantime** [1] - 93:13
**media** [2] - 93:17, 218:20
**Medical** [2] - 234:13, 234:14
**medical** [2] - 39:19, 40:24
**medication** [2] - 62:4, 185:2
**medications** [2] - 147:24, 148:10
**meet** [11] - 83:16, 104:4, 104:11, 105:13, 105:17, 114:25, 192:24, 203:23, 224:24, 246:18, 257:25
**meeting** [2] - 5:20, 225:2
**member** [2] - 63:2, 63:4
**menopause** [1] - 183:25
**mental** [11] - 18:17, 38:7, 38:8, 173:13, 173:25, 194:1, 201:15, 207:20, 208:8, 211:24, 214:16
**mentally** [4] - 126:13, 133:24, 193:19, 200:25
**mention** [1] - 236:8
**mentioned** [5] - 50:3, 149:22, 151:22, 156:2, 156:7
**mercy** [1] - 253:19
**mere** [3] - 28:14, 29:4, 78:6
**meritorious** [1] - 215:1
**met** [8] - 79:22, 79:23, 81:1, 81:2, 104:1, 221:10, 233:3, 248:2
**meticulously** [1] - 218:14
**microphone** [1] - 221:1
**middle** [6] - 29:14, 159:21, 167:11, 178:7, 192:4, 255:9
**might** [89] - 20:13, 22:6, 34:23, 38:5, 38:19, 39:4, 40:7, 40:23, 41:2, 41:6, 41:11, 45:17, 45:24, 46:22, 47:13, 47:14, 47:16, 47:19, 47:20, 51:18, 53:6, 53:18, 64:25, 70:7, 72:15,

72:19, 73:2, 73:3, 74:23, 76:23, 78:14, 79:6, 83:14, 83:15, 84:16, 87:9, 89:24, 101:4, 101:17, 103:2, 103:6, 117:1, 117:19, 124:12, 125:1, 125:3, 131:20, 132:19, 133:13, 133:19, 133:20, 152:10, 154:3, 155:9, 158:8, 158:24, 159:4, 159:12, 159:15, 159:17, 159:20, 159:23, 164:21, 171:18, 172:19, 173:6, 173:12, 173:22, 173:23, 174:3, 174:5, 174:10, 174:11, 175:11, 176:4, 176:15, 179:24, 180:22, 192:7, 205:12, 206:23, 214:9, 214:22, 227:23, 249:7, 253:22
**Mike** [2] - 190:3, 190:6
**Miles** [10] - 12:2, 95:7, 105:2, 140:20, 221:18, 222:11, 234:11, 234:23, 236:6, 236:9
**Milford** [1] - 190:5
**military** [6] - 41:15, 88:14, 143:22, 153:15, 174:24, 257:15
**million** [2] - 47:13, 176:14
**mind** [56] - 26:12, 27:22, 29:24, 30:7, 35:2, 40:11, 64:14, 65:8, 65:17, 65:18, 69:15, 74:19, 82:6, 91:7, 100:11, 104:1, 112:9, 115:1, 117:4, 117:9, 117:16, 118:4, 119:2, 123:10, 124:2, 154:11, 154:12, 163:12, 163:18, 163:23, 173:11, 191:21, 192:1, 192:19, 193:11, 196:20, 198:7, 199:11, 205:18, 215:21, 216:3, 230:24, 231:15,

232:9, 243:15, 246:16, 248:14, 248:20, 253:1, 254:5, 254:14, 255:13, 256:17, 257:1, 257:9
**mindset** [1] - 111:8
**mine** [1] - 136:14
**minipanel** [7] - 5:20, 11:19, 49:20, 94:24, 217:20, 218:8, 221:10
**minister** [5] - 56:13, 56:16, 56:21, 56:22, 57:6
**ministerial** [1] - 194:23
**ministers** [1] - 128:11
**ministries** [1] - 244:16
**ministry** [4] - 54:24, 226:1, 226:2, 226:3
**minor** [1] - 6:21
**minute** [3] - 50:11, 172:25, 234:7
**minutes** [8] - 10:9, 92:6, 141:23, 141:24, 153:8, 178:23, 216:16, 260:4
**misallege** [1] - 73:15
**misdemeanor** [1] - 166:11
**misgivings** [1] - 17:18
**missed** [1] - 73:14
**missing** [5] - 153:2, 153:3, 184:17, 184:20, 184:24
**mistake** [2] - 126:8, 201:5
**mistrial** [1] - 210:16
**misunderstanding** [2] - 44:2, 73:11
**mitigating** [104] - 34:22, 34:25, 35:18, 36:2, 36:6, 36:14, 37:7, 37:14, 38:5, 38:18, 39:11, 39:23, 39:24, 40:5, 40:11, 40:17, 41:4, 41:25, 42:5, 42:8, 81:9, 81:13, 81:19, 81:22, 81:23, 83:3, 83:5, 83:6, 86:14, 87:4, 87:8, 87:14, 88:6, 88:19, 88:24, 115:22, 116:19, 116:20, 117:1, 117:10, 117:18, 117:23, 118:12, 133:12, 133:20,

172:15, 172:18,
172:21, 173:1,
173:8, 173:12,
174:17, 175:4,
175:11, 175:21,
175:24, 175:25,
176:5, 176:11,
207:21, 207:25,
210:22, 211:5,
211:7, 211:12,
211:13, 211:14,
211:16, 212:7,
212:9, 212:23,
213:2, 213:5, 214:8,
214:13, 214:16,
214:20, 214:23,
215:9, 215:13,
247:18, 248:10,
248:11, 248:12,
248:19, 249:6,
249:11, 249:14,
249:16, 249:17,
249:19, 249:21,
250:16, 251:17,
251:23, 252:4,
256:12, 257:10,
257:15, 258:25,
259:5
**mitigation** [13] -
25:14, 42:1, 80:4,
107:25, 116:2,
116:5, 164:22,
194:8, 239:25,
256:16, 256:18,
256:22
**molestation** [1] -
17:13
**molested** [1] - 98:24
**Mom** [1] - 227:19
**mom** [3] - 6:1, 7:1,
223:5
**mom's** [2] - 6:20, 8:3
**moment** [3] - 33:8,
59:24, 62:3
**moments** [1] - 138:5
**Monday** [3] - 142:25,
143:7, 217:21
**money** [5] - 16:3,
46:8, 121:11, 181:5,
232:2
**month** [1] - 228:18
**months** [4] - 6:8,
148:7, 184:19,
184:23
**Moore** [8] - 12:1,
52:17, 95:5, 140:24,
179:9, 221:17,
233:13, 255:2
**MOORE** [17] - 52:14,
52:16, 67:21, 67:22,

92:17, 92:23, 93:1,
93:3, 179:6, 179:8,
212:24, 216:13,
216:23, 217:3,
217:5, 217:7, 260:11
**moral** [34] - 14:21,
34:23, 34:25, 36:6,
36:15, 36:18, 39:2,
41:1, 42:19, 81:8,
87:9, 87:15, 87:19,
88:21, 100:21,
115:21, 117:3,
117:6, 133:14,
133:24, 157:5,
172:20, 174:14,
203:2, 208:20,
213:12, 214:9,
230:3, 247:17,
249:7, 249:9,
249:12, 250:17,
256:11
**morally** [3] - 173:23,
174:2, 174:10
**morning** [20] - 5:5,
5:6, 6:16, 8:6, 8:24,
9:14, 9:15, 9:17,
9:21, 12:4, 13:2,
13:3, 13:4, 13:13,
43:10, 52:6, 152:6,
152:19, 217:23
**mornings** [1] - 63:13
**most** [8] - 54:17,
56:18, 144:7,
218:18, 223:8,
223:14, 227:7,
257:18
**Mostly** [1] - 97:16
**mostly** [1] - 187:12
**mother** [3] - 149:5,
153:4, 154:17
**motivation** [3] - 46:13,
46:20, 159:13
**move** [6] - 37:24,
37:25, 162:5,
217:25, 220:25,
250:4
**moved** [3] - 153:16,
186:5, 190:1
**moves** [1] - 114:10,
170:25, 246:22
**moving** [1] - 171:2
**MR** [53] - 7:21, 7:25,
8:21, 9:10, 10:19,
10:21, 12:21, 13:1,
47:11, 52:7, 52:14,
52:16, 67:21, 67:22,
92:13, 92:15, 92:17,
92:21, 92:23, 93:1,
93:3, 95:17, 95:22,
108:19, 108:23,

121:18, 121:21,
138:2, 138:10,
138:12, 138:14,
141:3, 141:8,
144:10, 178:18,
179:6, 179:8,
212:24, 216:13,
216:21, 216:23,
217:1, 217:3, 217:5,
217:7, 222:2, 222:7,
242:17, 254:17,
260:9, 260:11,
260:13, 261:9
**MS** [4] - 254:20,
254:22, 256:5,
259:25
**multiple** [2] - 126:5,
231:22
**multitude** [1] - 257:12
**municipal** [1] - 23:20
**murder** [177] - 13:20,
17:25, 18:6, 18:7,
18:9, 18:14, 18:18,
18:21, 18:22, 18:24,
19:2, 19:8, 19:13,
19:24, 20:1, 20:6,
21:3, 21:6, 24:11,
25:5, 26:6, 27:20,
29:22, 30:10, 31:23,
32:7, 32:15, 38:6,
38:11, 38:20, 39:7,
39:12, 40:6, 40:20,
41:5, 44:21, 44:22,
47:24, 48:11, 48:21,
49:15, 50:7, 50:22,
65:3, 65:4, 65:7,
65:16, 65:21, 66:6,
66:11, 66:12, 66:14,
67:1, 67:8, 67:9,
67:12, 69:15, 69:17,
69:18, 69:25, 70:1,
70:2, 70:20, 74:8,
74:21, 75:5, 75:13,
75:16, 75:21, 77:3,
77:4, 80:15, 99:11,
99:15, 100:25,
101:5, 101:9, 104:3,
104:12, 104:15,
105:3, 108:21,
115:7, 119:20,
120:5, 120:8,
123:19, 124:10,
124:17, 124:19,
125:5, 125:12,
125:21, 126:3,
130:17, 131:16,
131:17, 131:18,
131:21, 132:9,
134:16, 135:18,
137:7, 137:10,

157:10, 157:14,
157:15, 157:19,
162:14, 162:24,
165:6, 166:16,
167:20, 168:9,
169:6, 170:10,
170:16, 174:8,
191:5, 191:11,
191:19, 192:18,
192:21, 192:23,
193:23, 194:2,
194:7, 194:10,
194:12, 194:13,
195:16, 195:19,
196:25, 198:18,
199:1, 203:9,
203:10, 203:21,
203:22, 204:2,
204:9, 204:22,
205:16, 205:20,
206:5, 206:23,
207:5, 228:15,
228:18, 229:9,
231:4, 237:16,
240:16, 243:6,
243:10, 243:11,
243:12, 253:14,
253:21
**murder's** [1] - 191:3
**murdered** [2] - 44:11,
49:17
**murders** [36] - 18:1,
43:24, 44:9, 46:9,
46:11, 48:2, 48:13,
48:15, 67:9, 69:16,
74:9, 76:17, 101:1,
101:13, 102:2,
102:12, 104:6,
104:9, 106:7, 125:1,
126:5, 126:9,
157:20, 158:17,
158:18, 158:20,
160:20, 194:11,
194:12, 196:1,
203:13, 204:24,
231:7, 232:11,
232:20
**Murrah** [1] - 103:3
**mushrooms** [1] -
187:13
**must** [1] - 35:18
**MY** [1] - 262:16
**MySpace** [1] - 219:13

## N

**name** [6] - 62:23,
185:6, 185:7,
187:17, 190:2, 190:9
**names** [1] - 137:21

**national** [1] - 196:17
**natural** [7] - 26:7,
30:14, 108:14,
123:24, 165:9,
240:19
**nature** [5] - 79:9,
177:21, 198:6,
207:14, 255:25
**Navy** [1] - 189:25
**Nazis** [3] - 154:16,
155:13, 155:19
**NCIS** [2] - 226:17,
227:2
**near** [1] - 102:23
**necessarily** [2] -
63:25, 256:22
**necessary** [1] - 16:11
**necessity** [1] - 86:17
**need** [36] - 5:10, 5:17,
5:24, 11:15, 11:21,
12:17, 14:8, 27:22,
30:2, 35:2, 52:9,
54:11, 62:15, 64:17,
87:16, 94:14, 94:21,
95:13, 109:8, 121:7,
128:15, 139:11,
140:25, 178:21,
214:2, 217:13,
218:12, 219:24,
220:21, 221:7,
221:11, 224:20,
252:18, 257:11,
259:8, 259:9
**needs** [4] - 101:20,
149:4, 156:12,
238:19
**negligent** [1] - 18:13
**negligently** [1] - 65:19
**neighbor** [1] - 84:12
**neighborhood** [1] -
192:5
**nervous** [2] - 142:1,
224:10
**network** [1] - 219:14
**never** [37] - 26:5,
27:19, 27:21, 27:25,
32:22, 33:6, 35:22,
55:10, 73:17,
105:23, 110:17,
123:19, 129:7,
130:13, 131:8,
134:9, 137:12,
165:7, 165:22,
172:10, 176:2,
176:14, 189:19,
192:8, 206:1,
213:17, 213:22,
226:13, 230:11,
235:23, 236:8,
240:16, 245:5,

248:3, 252:12, 259:20

**new** [7] - 92:10, 145:3, 186:2, 224:23, 224:24, 224:25, 225:2

**news** [10] - 9:19, 9:20, 9:22, 137:23, 153:6, 178:3, 196:15, 196:17, 196:18

**newspaper** [4] - 48:22, 62:8, 62:18, 196:15

**next** [17] - 8:20, 10:12, 10:16, 25:13, 29:16, 70:6, 84:11, 85:9, 137:8, 157:9, 161:14, 164:22, 182:19, 183:1, 188:17, 202:8, 211:14

**nexus** [1] - 88:4

**night** [5] - 46:2, 153:6, 153:8, 159:6, 232:4

**nighttime** [1] - 183:19

**nine** [1] - 113:16

**NO** [1] - 262:21

**nobody** [1] - 250:20

**Nobody** [2] - 225:10, 250:19

**noncapital** [2] - 24:8, 162:8

**nondenominational** [1] - 226:8

**nondisclosure** [3] - 150:14, 188:9, 188:11

**none** [5] - 70:24, 89:2, 166:19, 202:20, 238:6

**normal** [5] - 96:2, 96:3, 143:1, 166:21

**normally** [1] - 201:7

**Normandale** [2] - 56:10, 57:15

**North** [5] - 108:16, 119:6, 143:6, 182:24, 183:5

**nos** [1] - 129:24

**noted** [1] - 100:12

**nothing** [7] - 58:16, 126:23, 190:25, 196:20, 214:24, 250:23, 257:23

**notice** [9] - 29:17, 49:15, 97:20, 172:4, 179:11, 196:7, 226:21, 241:2, 243:8

**noticed** [4] - 14:25, 15:25, 95:25, 96:7

**notified** [2] - 9:11, 217:24

**notify** [3] - 10:23, 93:23, 261:12

**nowadays** [1] - 239:8

**number** [9] - 10:16, 18:11, 54:1, 74:11, 101:4, 125:16, 146:25, 181:19, 193:4

**numbered** [1] - 262:10

**numbers** [1] - 42:17

**nurse** [9] - 54:24, 55:3, 57:4, 57:5, 58:5, 58:6, 148:6, 185:2, 199:17

**nursing** [3] - 143:2, 183:9, 199:16

---

### O

**o'clock** [2] - 13:7, 217:21

**oath** [53] - 13:23, 14:2, 21:20, 21:22, 22:25, 23:1, 23:3, 23:12, 27:16, 27:24, 53:11, 53:21, 72:8, 73:4, 73:21, 73:23, 99:17, 99:21, 106:19, 111:21, 112:3, 116:13, 118:4, 142:4, 142:12, 142:20, 160:7, 160:8, 161:4, 161:8, 161:18, 163:6, 163:22, 180:4, 180:8, 217:13, 217:15, 229:13, 229:19, 229:20, 230:24, 237:9, 246:11, 247:3, 247:7, 248:23, 251:4, 252:3, 254:5, 254:8, 254:11

**object** [1] - 108:20

**obligates** [2] - 13:24, 142:5

**obligation** [4] - 27:13, 86:16, 142:8, 142:17

**obligations** [1] - 20:23

**obviously** [7] - 42:8, 43:22, 50:13, 122:14, 127:2, 192:11, 255:12

**occasion** [1] - 170:3

**occasionally** [1] - 63:12

**occasions** [1] - 148:2

**occur** [8] - 78:6,

91:22, 125:5, 149:25, 150:5, 152:1, 192:15, 204:1

**occurred** [13] - 17:7, 50:14, 124:23, 137:20, 149:25, 150:5, 159:1, 159:2, 160:17, 196:1, 196:5, 203:14, 262:10

**occurrence** [2] - 189:1, 189:3

**occurs** [1] - 154:22

**odd** [1] - 97:7

**OF** [2] - 262:1, 262:2

**offense** [31] - 18:20, 18:21, 19:7, 20:5, 22:12, 36:4, 36:20, 39:13, 49:15, 60:2, 66:11, 66:19, 81:7, 102:18, 104:15, 115:20, 125:2, 157:13, 162:12, 162:13, 191:20, 193:5, 195:10, 195:12, 195:18, 212:10, 232:20, 233:25, 246:15, 247:16, 256:9

**offenses** [2] - 107:8, 238:15

**offering** [1] - 213:8

**office** [3] - 150:25, 151:2, 185:8

**Office** [4] - 63:11, 150:24, 186:9, 190:7

**officer** [2] - 235:23, 236:5

**officers** [1] - 227:9

**official** [3] - 58:18, 58:25, 145:16

**Official** [2] - 262:3, 262:22

**OFFICIAL** [1] - 262:16

**often** [3] - 25:12, 25:14, 38:17

**Oklahoma** [4] - 68:14, 103:3, 158:25, 262:15

**old** [16] - 6:7, 59:15, 84:9, 84:11, 131:17, 133:19, 133:21, 133:22, 144:14, 153:19, 176:8, 184:8, 187:4, 205:7, 205:9, 239:4

**older** [2] - 118:25, 119:1

**oldest** [1] - 59:10

**Olson** [8] - 139:8,

139:11, 141:9, 178:17, 178:19, 179:9, 216:11, 217:11

**OLSON** [1] - 141:4

**on-and-off** [1] - 185:15

**once** [14] - 16:7, 53:10, 71:21, 73:7, 80:14, 124:8, 125:14, 129:25, 130:17, 163:17, 218:15, 238:15, 259:4

**One** [1] - 14:17

**one** [181] - 6:5, 9:2, 14:17, 14:25, 15:1, 16:25, 18:1, 18:23, 18:25, 19:2, 19:8, 20:14, 21:7, 21:18, 24:1, 25:17, 27:22, 30:7, 31:25, 33:2, 33:12, 38:9, 38:10, 43:13, 45:16, 46:1, 46:2, 46:3, 46:13, 46:14, 46:15, 47:1, 47:7, 47:18, 48:23, 49:2, 49:11, 49:13, 49:17, 50:3, 50:12, 51:16, 52:10, 53:5, 53:15, 60:22, 61:13, 62:7, 66:25, 67:1, 67:3, 67:5, 68:7, 68:8, 68:13, 68:14, 68:15, 69:6, 69:9, 69:10, 69:12, 69:14, 69:16, 70:1, 70:8, 70:9, 76:10, 77:4, 77:24, 80:6, 81:1, 81:15, 83:2, 85:4, 86:1, 90:18, 90:21, 91:21, 99:5, 99:25, 100:2, 100:4, 100:6, 101:1, 101:12, 103:2, 103:9, 103:10, 105:12, 107:10, 107:21, 110:14, 112:22, 113:16, 114:11, 115:15, 119:18, 120:23, 120:25, 124:18, 125:5, 130:8, 131:17, 131:18, 133:22, 134:5, 134:16, 137:8, 139:24, 140:13, 142:22, 143:15, 146:1, 146:2, 146:23, 147:7, 147:8, 151:6, 153:21, 154:9,

156:21, 157:19, 159:2, 159:6, 159:22, 159:23, 164:22, 166:10, 168:10, 170:2, 170:3, 170:25, 171:2, 176:2, 176:3, 178:3, 178:21, 179:19, 179:20, 182:20, 186:11, 187:9, 187:16, 187:22, 188:18, 190:12, 194:16, 194:18, 195:23, 196:11, 197:9, 197:18, 198:18, 198:20, 202:10, 202:15, 202:17, 203:12, 204:1, 206:3, 210:7, 211:21, 213:14, 214:5, 217:3, 226:18, 230:15, 232:4, 236:13, 237:4, 238:19, 241:3, 244:11, 246:23, 255:19, 257:14, 257:19, 259:5

**one-year** [1] - 187:22

**Open** [1] - 8:17

**open** [24] - 5:3, 10:11, 29:24, 34:5, 94:4, 112:13, 117:16, 118:4, 148:6, 163:12, 163:18, 163:22, 168:18, 179:2, 205:4, 216:3, 220:9, 230:24, 231:13, 243:15, 253:1, 254:5, 254:14, 262:11

**operate** [3] - 180:4, 180:9, 181:10

**operating** [4] - 182:17, 183:7, 183:10, 183:13

**operation** [2] - 143:8, 148:14

**opinion** [5] - 120:11, 120:19, 137:15, 153:9, 174:12

**opinions** [5] - 179:17, 179:18, 179:19, 180:24, 224:15

**opportunity** [8] - 12:4, 37:6, 52:22, 95:10, 140:15, 155:10, 172:23, 221:20

**opposed** [3] - 18:7,

131:5, 152:25
**opposite** [3] - 85:5, 131:6, 247:2
**option** [2] - 136:20, 209:4
**options** [7] - 108:13, 108:24, 110:4, 119:18, 120:21, 120:23, 245:12
**OR** [1] - 148:5
**orally** [2] - 157:3, 218:11
**order** [17] - 66:18, 66:21, 81:4, 91:4, 93:8, 128:23, 132:20, 186:22, 192:18, 195:11, 198:1, 204:21, 207:11, 208:16, 209:13, 226:17
**Order** [2] - 226:17, 226:21
**ordinary** [3] - 45:11, 166:22
**oriented** [2] - 191:20
**original** [1] - 83:20
**ought** [4] - 19:3, 41:13, 153:10, 180:11
**outcome's** [1] - 121:14
**outside** [8] - 55:7, 93:15, 103:4, 112:22, 120:17, 180:8, 244:20, 244:24
**overall** [1] - 113:8
**overcome** [2] - 73:2, 174:18
**overhead** [1] - 99:23
**overseas** [1] - 55:11
**own** [14] - 33:18, 63:8, 67:25, 68:20, 91:6, 91:7, 97:21, 101:17, 101:21, 104:1, 201:24, 203:6, 208:18, 218:17
**Oxycontin** [1] - 61:19

**P**

**p.m** [7] - 94:3, 179:1, 220:8, 261:15
**packet** [1] - 25:7
**pages** [1] - 229:1
**pain** [1] - 61:23
**painkillers** [1] - 61:19
**Pam** [3] - 52:19, 179:10, 255:1
**Pamela** [4] - 11:25,

95:5, 140:24, 221:16
**panel** [3] - 54:18, 108:5, 122:6
**panic** [1] - 184:2
**paper** [5] - 25:8, 116:23, 220:4, 236:19, 239:11
**papers** [1] - 146:6
**paperwork** [3] - 12:8, 12:12, 145:22
**par** [2] - 213:15, 213:23
**parameter** [1] - 26:11
**parameters** [1] - 179:25
**Pardons** [1] - 240:11
**parent** [2] - 197:24, 198:12
**parents** [1] - 153:18
**park** [1] - 220:5
**parking** [1] - 197:11
**parole** [30] - 25:24, 26:1, 90:12, 108:11, 108:12, 108:13, 110:5, 111:1, 120:17, 120:24, 121:4, 125:9, 130:19, 131:5, 134:13, 134:16, 134:21, 135:3, 165:2, 165:4, 190:14, 194:15, 240:6, 240:7, 240:8, 240:10, 240:20, 245:13, 253:5, 253:23
**Paroles** [1] - 240:11
**part** [52] - 8:9, 9:9, 10:3, 13:23, 14:22, 43:21, 44:24, 48:2, 48:7, 67:5, 67:10, 71:16, 71:25, 74:16, 99:8, 100:22, 104:25, 106:20, 127:1, 128:20, 129:10, 129:13, 129:14, 129:15, 130:2, 131:13, 135:24, 138:22, 139:23, 142:22, 145:23, 146:13, 149:5, 157:6, 160:5, 160:7, 177:3, 181:13, 181:17, 182:20, 190:8, 206:25, 225:25, 228:25, 229:12, 230:4, 238:6, 238:16, 238:17, 243:23, 250:21,

260:24
**participate** [2] - 138:19, 180:19
**participation** [1] - 210:15
**particular** [30] - 29:12, 29:18, 36:2, 39:4, 61:12, 68:25, 74:13, 79:10, 88:12, 88:15, 101:10, 110:22, 152:11, 154:24, 154:24, 162:13, 166:20, 168:7, 172:9, 185:5, 192:7, 193:6, 195:7, 195:19, 195:20, 223:18, 231:5, 232:25, 238:11, 245:16
**particularly** [2] - 58:22, 149:2
**parties** [4] - 219:3, 219:6, 262:8, 262:15
**partner** [4] - 46:2, 46:11, 69:6, 159:5
**partners** [7] - 46:1, 50:18, 50:20, 69:6, 103:8, 103:9, 232:1
**partnership** [4] - 46:21, 50:12, 50:19, 97:24
**parts** [4] - 27:2, 71:8, 103:10, 110:16
**party** [5] - 59:11, 59:18, 59:20, 176:10, 219:1
**party's** [1] - 79:18
**pass** [3] - 121:18, 254:18, 259:25
**passion** [2] - 205:24, 207:20
**past** [8] - 88:13, 88:15, 118:21, 119:24, 149:20, 208:5, 224:22, 227:23
**Pastor** [2] - 224:21, 226:4
**pastor** [1] - 56:9
**path** [2] - 126:4, 156:1
**patience** [2] - 137:1, 176:25
**patient** [2] - 92:2, 216:11
**pattern** [2] - 97:4, 97:18, 208:4
**patterns** [1] - 97:19
**pay** [2] - 128:16, 153:25
**paying** [1] - 121:5
**penal** [1] - 128:8

**penalized** [2] - 66:2, 69:17
**penalizes** [1] - 66:16
**penalty** [107] - 12:5, 13:13, 13:19, 13:20, 14:23, 18:8, 19:4, 19:5, 19:9, 20:10, 25:18, 26:8, 33:2, 36:8, 36:21, 36:24, 37:24, 38:1, 38:3, 40:1, 40:19, 42:11, 42:25, 50:5, 54:20, 58:19, 69:22, 75:13, 75:16, 75:18, 79:21, 80:17, 80:23, 81:11, 90:10, 95:11, 99:19, 100:23, 106:5, 108:14, 110:6, 114:11, 117:20, 118:7, 118:15, 119:13, 119:20, 119:21, 120:4, 120:11, 124:8, 125:9, 130:19, 131:5, 134:10, 135:10, 135:17, 135:19, 140:17, 145:17, 146:15, 146:24, 148:13, 154:7, 154:11, 154:16, 157:7, 157:16, 165:10, 166:8, 171:1, 171:3, 172:16, 172:24, 173:2, 173:10, 174:8, 175:5, 175:16, 190:11, 190:15, 190:24, 209:3, 209:5, 210:9, 215:23, 221:23, 226:11, 228:12, 228:14, 228:17, 228:23, 230:5, 245:13, 246:23, 249:24, 250:2, 250:4, 251:7, 251:10, 251:16, 251:22, 252:8, 252:10, 253:11, 253:23, 255:12
**penalty's** [1] - 64:7
**penitentiaries** [1] - 244:17
**penitentiary** [31] - 19:16, 26:5, 30:12, 30:21, 30:23, 31:2, 43:7, 110:10, 111:14, 111:16, 113:9, 123:12, 123:23, 128:20,

130:14, 134:20, 135:1, 165:8, 169:19, 169:21, 213:18, 240:16, 243:23, 244:2, 244:10, 244:20, 244:23, 245:6, 245:7, 245:18
**people** [48] - 16:9, 20:22, 31:1, 31:2, 39:19, 40:7, 40:23, 44:11, 53:2, 54:1, 57:9, 57:15, 57:19, 63:8, 68:15, 71:15, 75:12, 103:11, 105:3, 110:9, 112:20, 121:7, 133:18, 140:19, 143:10, 148:12, 149:22, 170:16, 171:10, 171:13, 177:25, 181:5, 181:20, 190:22, 202:15, 203:17, 204:8, 209:1, 218:4, 219:16, 231:22, 241:23, 243:12, 244:23, 253:20, 256:23
**per** [1] - 141:23
**percent** [1] - 123:2
**perception** [1] - 113:21
**peremptory** [9] - 10:15, 110:18, 92:20, 138:13, 216:25, 260:12, 261:7, 261:8, 261:10
**perfect** [3] - 96:18, 100:19, 241:22
**perform** [1] - 211:1
**performing** [1] - 174:22
**perhaps** [3] - 123:12, 132:19, 133:18
**period** [6] - 26:4, 47:18, 51:2, 61:9, 159:22, 185:13
**person** [47] - 11:24, 18:1, 18:23, 18:25, 19:2, 19:8, 21:7, 22:12, 30:23, 47:7, 48:23, 49:17, 68:14, 77:6, 84:18, 90:4, 95:3, 98:18, 100:25, 101:1, 111:1, 111:13, 113:24, 118:1, 137:7, 140:22, 155:25, 157:19, 157:21,

158:2, 167:23, 168:21, 169:20, 170:25, 173:18, 175:5, 178:8, 199:15, 213:17, 221:15, 231:6, 235:24, 237:23, 238:11, 245:7, 251:13, 257:7
**person's** [10] - 53:17, 89:21, 110:6, 174:17, 191:8, 213:15, 238:23, 245:5, 254:4, 257:5
**personal** [10] - 36:5, 36:13, 81:8, 115:21, 145:20, 180:24, 184:5, 247:17, 256:10
**personally** [2] - 147:21, 180:11
**personnel** [1] - 219:1
**persons** [2] - 49:3, 219:17
**perspective** [1] - 182:8
**persuasion** [1] - 85:1
**pertains** [1] - 101:11
**phase** [71] - 13:20, 20:14, 20:15, 24:5, 24:6, 24:7, 24:15, 24:20, 24:22, 24:23, 25:2, 25:4, 25:23, 27:8, 30:8, 31:7, 31:8, 31:23, 32:5, 32:11, 32:12, 33:10, 35:11, 43:15, 99:10, 99:11, 104:21, 106:5, 106:8, 106:21, 106:23, 107:2, 107:5, 107:8, 107:13, 114:2, 126:2, 131:13, 132:6, 132:25, 162:2, 162:6, 164:1, 164:3, 164:12, 164:13, 165:7, 166:1, 168:25, 169:4, 170:1, 170:21, 204:3, 205:1, 237:14, 237:15, 237:22, 237:25, 238:1, 238:5, 238:9, 238:12, 238:22, 238:25, 241:4, 246:8, 248:16, 255:10, 255:12
**phases** [2] - 20:14, 24:4

**Phoenix** [2] - 55:7
**phone** [1] - 219:10
**phrase** [18] - 27:4, 28:3, 28:5, 29:5, 29:16, 45:1, 45:10, 158:6, 158:8, 165:17, 165:24, 166:17, 166:18, 167:16, 167:18, 167:21, 168:15, 172:17
**physical** [2] - 61:21, 248:17
**physician** [1] - 62:2
**pick** [3] - 74:11, 176:15, 234:17
**picked** [4] - 98:9, 230:12, 230:16, 234:19
**picking** [1] - 185:25
**pictures** [1] - 238:23
**piece** [5] - 97:25, 116:23, 220:4, 236:19, 239:11
**pitcher** [1] - 141:1
**place** [24] - 17:25, 19:25, 38:13, 39:17, 43:24, 47:17, 48:14, 67:12, 124:19, 125:23, 140:4, 158:19, 159:23, 185:19, 186:22, 225:12, 228:21, 232:17, 232:19, 232:24, 236:7, 245:19, 253:19
**placed** [1] - 18:8
**places** [2] - 144:7, 158:20
**plan** [2] - 149:9, 217:23
**planned** [2] - 51:7, 100:12
**planning** [3] - 132:12, 149:6, 156:18
**plastic** [4] - 8:9, 10:2, 138:22, 260:24
**play** [3] - 131:13, 149:4, 180:22
**playing** [1] - 70:14
**pleadings** [1] - 71:12
**pled** [1] - 59:13
**plus** [1] - 195:17
**point** [45] - 7:5, 17:1, 30:13, 31:5, 34:3, 34:6, 35:4, 42:18, 60:23, 61:6, 80:16, 82:11, 83:19, 85:7, 88:13, 89:7, 96:9, 100:9, 100:15,

105:9, 137:3, 140:7, 142:6, 154:9, 163:19, 165:16, 173:3, 176:17, 194:14, 196:10, 210:1, 212:3, 215:22, 217:14, 217:22, 229:1, 230:2, 230:22, 238:20, 242:11, 245:11, 245:12, 247:25, 255:6, 255:14
**points** [1] - 235:22
**Police** [3] - 96:8, 96:17, 98:21
**police** [4] - 96:21, 186:19, 189:9, 235:23
**political** [1] - 119:16
**pool** [1] - 211:25
**portions** [1] - 262:7
**position** [10] - 52:2, 53:15, 56:12, 58:18, 58:25, 116:20, 145:17, 147:17, 201:4, 226:11
**possibilities** [1] - 168:5
**possibility** [23] - 28:6, 28:7, 28:8, 28:11, 28:13, 28:15, 28:19, 29:4, 29:7, 29:12, 77:22, 78:1, 78:6, 79:21, 125:20, 127:25, 131:7, 134:16, 163:13, 167:5, 167:8, 169:12, 241:21
**possible** [22] - 6:19, 12:13, 18:9, 30:23, 40:17, 68:13, 75:21, 109:17, 131:24, 148:14, 154:8, 167:9, 167:10, 168:19, 169:3, 169:9, 169:11, 169:16, 169:21, 170:15, 176:4, 199:14
**possibly** [5] - 19:4, 53:6, 201:4, 231:23, 232:21
**postgraduate** [3] - 58:8, 58:11, 58:14
**Potential** [3] - 5:7, 11:6, 220:17
**power** [1] - 91:21
**PowerPoint** [4] - 44:4, 157:1, 160:13,

224:14
**practice** [1] - 23:16
**practitioner** [1] - 185:3
**Prairie** [1] - 97:1
**preconceived** [1] - 178:2
**predict** [3] - 129:3, 132:15, 206:8
**predicting** [1] - 132:14
**prediction** [1] - 208:2
**predisposed** [3] - 111:4, 111:7, 112:17
**predisposition** [1] - 193:9
**pregnant** [2] - 137:10, 184:19
**premeditated** [4] - 50:5, 50:6, 50:10, 158:1
**premeditation** [2] - 50:14, 160:2
**prepared** [1] - 201:7
**preponderance** [2] - 197:14, 197:21
**prescription** [1] - 61:24
**presence** [1] - 50:20
**present** [9] - 5:3, 8:17, 10:11, 18:19, 94:4, 169:7, 179:3, 192:17, 220:9
**presentation** [1] - 186:10
**presented** [4] - 43:20, 176:2, 218:24, 243:2
**presently** [1] - 143:18
**pressure** [4] - 37:20, 80:8, 258:7, 258:11
**presume** [5] - 68:2, 208:21, 211:6, 213:1, 214:12
**presumed** [4] - 76:5, 193:1, 200:10, 201:21
**presumes** [3] - 81:14, 190:24, 191:13
**presumption** [4] - 70:24, 75:1, 75:14, 81:17
**presuppose** [2] - 66:7, 160:1
**presupposes** [2] - 65:23, 192:23
**pretty** [18] - 13:16, 15:6, 22:3, 29:24, 57:1, 105:8, 123:1, 123:2, 131:25, 151:16, 155:16, 168:18, 183:24,

191:3, 223:3, 224:23
**preventing** [1] - 157:5
**previous** [1] - 189:3
**previously** [1] - 189:8
**Primary** [1] - 222:21
**principles** [1] - 27:22
**prison** [26] - 16:10, 25:25, 108:12, 108:25, 110:5, 110:13, 110:17, 110:19, 110:25, 112:11, 112:19, 113:12, 113:13, 113:17, 120:12, 120:16, 120:24, 121:3, 121:4, 130:19, 155:8, 155:14, 165:4, 213:21, 240:7, 253:11
**prisoners** [2] - 110:18, 128:13
**prisons** [2] - 128:12, 129:11
**privilege** [1] - 255:1
**probability** [35] - 26:17, 28:3, 28:5, 28:18, 29:3, 29:20, 30:18, 31:15, 31:18, 76:11, 77:23, 109:3, 109:11, 109:13, 109:17, 127:20, 127:21, 166:18, 166:19, 166:23, 167:6, 167:7, 167:11, 167:13, 168:21, 169:12, 206:10, 206:11, 206:15, 241:7, 241:19, 242:2, 242:3, 245:3, 255:22
**probated** [1] - 17:15
**probation** [6] - 59:6, 60:22, 131:24, 150:20, 188:6, 188:10
**problem** [23] - 56:24, 57:1, 59:11, 61:3, 69:4, 70:6, 70:13, 71:7, 76:1, 87:3, 87:6, 88:19, 88:21, 130:25, 136:12, 149:12, 155:12, 200:12, 202:6, 204:16, 205:15, 211:12, 214:16
**problems** [5] - 7:2, 61:21, 74:15, 83:2, 184:5
**problemsome** [3] -

80:3, 201:19, 206:4
**procedure** [10] -
54:21, 74:6, 125:22,
146:10, 146:13,
146:17, 147:4,
147:15, 176:24,
215:24
**proceed** [7] - 12:20,
34:10, 52:13, 95:16,
141:2, 179:5, 222:1
**proceeding** [1] - 5:11
**proceedings** [5] -
9:24, 94:15, 261:15,
262:7, 262:13
**process** [45] - 9:3,
11:11, 15:1, 17:19,
27:24, 33:13, 33:24,
38:12, 43:10, 44:11,
47:23, 53:4, 57:16,
60:14, 64:4, 64:11,
64:18, 80:20, 85:16,
89:5, 93:18, 100:22,
102:3, 118:16,
122:18, 125:11,
125:19, 129:20,
129:25, 133:6,
135:7, 135:23,
136:5, 139:12,
157:6, 162:7, 177:3,
179:22, 181:13,
181:17, 181:24,
190:12, 215:16,
230:4, 230:21
**produce** [1] - 86:17
**production** [1] - 84:25
**profession** [1] - 140:2
**profound** [3] - 53:19,
181:10, 212:3
**profoundly** [1] - 89:21
**program** [2] - 151:10,
187:22
**prohibit** [1] - 181:15
**prompted** [1] - 190:17
**proof** [60] - 22:5, 22:9,
27:7, 27:8, 27:10,
27:18, 27:19, 27:21,
28:1, 28:19, 32:19,
32:22, 35:9, 35:10,
35:13, 35:21, 35:22,
51:12, 71:10, 71:12,
116:5, 127:15,
160:6, 161:1,
165:19, 165:22,
165:23, 166:8,
166:15, 170:13,
172:8, 172:10,
172:11, 175:19,
175:23, 176:1,
176:22, 197:4,
197:6, 197:12,

197:22, 198:14,
198:17, 199:12,
200:5, 202:2,
210:23, 211:3,
233:6, 233:14,
233:19, 234:8,
235:7, 241:3, 241:5,
247:22, 248:9,
255:20
**proper** [10] - 50:5,
105:9, 118:8,
119:22, 162:12,
171:6, 236:7, 236:8,
251:8, 251:24
**property** [5] - 168:1,
168:2, 168:10,
207:7, 207:9
**prosecuted** [2] -
150:23, 188:4
**prosecution** [1] -
238:13
**Prosecution** [1] -
105:4
**Prosecutor** [2] -
122:4, 131:2
**prosecutors** [1] -
233:20
**prospect** [2] - 54:14,
179:20
**prospective** [34] - 5:4,
5:13, 8:15, 9:13,
10:7, 11:3, 11:12,
12:23, 34:14, 92:9,
94:2, 94:7, 94:17,
95:19, 138:7,
138:15, 139:4,
139:6, 139:14,
141:5, 165:15,
172:3, 178:25,
179:3, 216:18,
217:10, 220:7,
220:12, 220:22,
222:4, 241:1, 260:6,
260:16, 261:5
**Prospective** [4] - 93:6,
94:11, 139:8, 217:18
**PROSPECTIVE** [66] -
5:6, 5:9, 5:18, 5:23,
6:1, 6:4, 6:8, 6:22,
7:3, 7:6, 7:11, 7:15,
7:19, 8:11, 8:13,
9:15, 9:18, 10:1,
10:5, 11:5, 11:8,
11:17, 11:22, 12:9,
12:13, 12:18, 47:5,
47:10, 52:10, 92:7,
93:11, 93:20, 93:22,
93:25, 94:10, 94:13,
94:22, 95:2, 95:15,
138:6, 138:24,

139:2, 139:10,
139:18, 139:22,
140:3, 140:5, 140:9,
140:12, 178:24,
212:22, 216:17,
218:1, 218:9,
219:20, 219:22,
220:1, 220:14,
220:19, 221:8,
221:13, 221:25,
256:4, 260:5, 261:2,
261:4
**protect** [1] - 110:18
**Protest** [1] - 62:19
**protesting** [1] - 62:8
**prove** [88] - 20:16,
20:19, 20:25, 21:7,
21:9, 21:17, 21:23,
22:16, 22:20, 22:21,
27:8, 27:10, 27:12,
28:21, 29:19, 48:14,
49:16, 50:6, 63:22,
66:21, 71:2, 71:3,
71:4, 73:20, 77:16,
78:9, 81:13, 81:14,
83:24, 104:9,
107:11, 114:19,
124:23, 124:25,
125:4, 130:5,
157:25, 160:6,
160:9, 160:18,
160:19, 160:24,
161:6, 161:13,
165:19, 165:25,
166:3, 166:4, 166:9,
166:11, 166:13,
167:12, 168:8,
168:19, 169:11,
196:7, 197:1,
197:13, 198:1,
200:8, 200:16,
200:19, 200:21,
201:11, 201:12,
210:21, 211:5,
211:7, 213:2,
232:18, 232:23,
233:24, 234:6,
234:24, 235:1,
235:2, 235:3, 237:4,
241:6, 241:10,
241:14, 245:15,
245:22, 245:24,
247:5, 255:21
**proved** [18] - 32:25,
66:18, 73:16, 105:4,
105:9, 107:15,
114:6, 114:12,
132:7, 161:12,
161:20, 161:22,
176:6, 176:10,

209:3, 236:12,
243:2, 246:24
**proven** [5] - 33:20,
114:4, 154:25,
195:11, 254:4
**proves** [1] - 105:4
**proving** [1] - 233:22
**provisions** [1] - 60:22
**proximity** [1] - 70:10
**prudent** [1] - 199:17
**psychiatrist** [1] -
185:5
**public** [3] - 62:8,
62:19, 110:2
**pulled** [1] - 50:21
**punish** [2] - 20:22,
181:5
**punishable** [2] - 19:9,
19:14
**punished** [2] - 19:4,
40:19
**punishment** [72] -
13:20, 18:16, 19:14,
19:19, 20:1, 24:6,
24:7, 24:9, 24:11,
24:16, 25:23, 30:8,
32:11, 33:10, 40:21,
74:10, 74:16, 84:5,
90:10, 99:10, 99:11,
106:5, 106:8,
106:21, 107:7,
107:13, 110:4,
118:1, 125:8,
125:11, 125:14,
126:2, 131:13,
131:19, 131:20,
145:18, 146:1,
148:14, 154:8,
155:1, 155:4, 162:5,
162:9, 162:11,
162:12, 162:14,
162:20, 164:1,
164:13, 165:6,
168:25, 169:4,
177:16, 190:15,
190:25, 193:1,
193:4, 194:8,
194:13, 195:2,
204:3, 205:1,
210:11, 210:13,
237:15, 237:22,
237:25, 238:5,
238:12, 238:24,
253:14, 253:20
**punishments** [2] -
75:22, 194:14
**purpose** [5] - 53:5,
54:12, 76:2, 77:13,
175:2
**purposes** [5] - 5:11,

11:10, 94:15, 165:1,
196:6
**pursue** [1] - 189:16
**pushed** [3] - 73:15,
160:24, 205:7
**pushing** [1] - 200:16
**put** [29] - 49:12, 49:13,
57:12, 84:2, 87:4,
103:4, 116:7,
116:23, 120:4,
120:15, 127:9,
131:2, 134:17,
136:9, 136:23,
155:14, 160:11,
160:12, 171:18,
199:24, 201:3,
228:18, 237:1,
238:4, 243:8, 243:9,
248:17, 253:4,
253:17
**puts** [4] - 86:1,
116:20, 248:15,
257:7
**putting** [5] - 43:25,
83:4, 133:9, 147:9,
155:12

---

### Q

**qualify** [4] - 45:20,
50:6, 50:22, 120:8
**qualms** [1] - 74:15
**question's** [2] - 34:7,
34:9
**questioning** [1] -
123:4
**questionnaire** [27] -
5:15, 12:5, 14:25,
15:13, 16:1, 50:4,
54:23, 94:19, 95:11,
95:25, 119:19,
122:3, 134:17,
135:5, 167:2,
182:10, 190:13,
219:24, 221:3,
221:6, 221:22,
222:14, 223:9,
224:21, 228:19,
253:4, 255:15
**questionnaires** [3] -
8:25, 9:2, 155:20
**questions** [68] - 20:7,
20:8, 20:10, 25:15,
25:16, 26:12, 37:5,
37:7, 43:11, 51:14,
51:17, 51:21, 52:5,
66:10, 72:6, 74:7,
75:7, 75:8, 75:10,
75:23, 76:4, 76:5,
79:13, 80:24, 85:8,

90:6, 90:15, 90:19,
91:18, 91:25,
104:18, 106:9,
107:3, 107:23,
109:8, 120:7,
122:24, 134:17,
136:6, 145:25,
146:8, 146:19,
146:23, 146:25,
154:7, 157:3, 177:9,
177:15, 177:17,
178:14, 179:13,
188:18, 194:20,
194:24, 195:3,
195:5, 201:17,
202:24, 204:10,
204:18, 205:14,
219:11, 219:18,
221:24, 237:2,
237:12, 240:2,
259:12
**quick** [2] - 34:11,
100:9
**quickly** [1] - 50:1
**quiet** [3] - 220:24,
259:14, 259:16
**quit** [3] - 184:12,
184:14, 184:16
**quite** [2] - 52:24,
173:15
**quizzed** [1] - 236:24

## R

**raining** [1] - 13:10
**raise** [6] - 5:11, 11:11,
94:16, 139:13,
217:16, 220:21
**ran** [1] - 73:16
**range** [29] - 19:14,
19:19, 20:1, 24:8,
24:9, 26:3, 74:9,
74:16, 125:8,
125:13, 131:22,
131:25, 162:9,
162:11, 162:15,
162:19, 163:3,
163:9, 163:13,
168:4, 177:22,
192:25, 193:11,
194:12, 253:14,
253:18, 253:22,
253:24
**ranges** [1] - 18:16
**ransacked** [1] - 17:2
**Rash** [1] - 188:13
**rather** [13] - 36:8,
36:21, 51:20, 51:23,
52:2, 59:13, 59:14,
81:11, 115:24,

149:3, 172:15,
247:20, 256:14
**rattling** [1] - 63:15
**ray** [1] - 199:24
**reach** [5] - 16:20,
198:21, 209:10,
209:22, 236:23
**reached** [1] - 10:16
**reaching** [1] - 14:9
**react** [1] - 89:24
**reacts** [1] - 89:23
**read** [15] - 25:7, 34:12,
48:21, 50:19, 146:6,
165:14, 172:1,
210:25, 218:20,
226:10, 236:19,
236:22, 240:25,
250:6, 250:7
**reading** [3] - 83:10,
87:24, 230:9
**ready** [6] - 94:5,
139:5, 220:10,
223:7, 252:9, 259:16
**real** [2] - 34:11, 223:2
**realizes** [1] - 46:6
**really** [28] - 6:5, 15:5,
53:1, 53:5, 58:12,
58:14, 63:9, 80:25,
82:12, 116:14,
120:15, 131:16,
133:24, 145:13,
147:18, 179:16,
226:13, 226:19,
226:21, 228:5,
230:11, 235:23,
243:24, 252:12,
253:7, 256:19,
257:13
**reason** [17] - 14:20,
16:13, 16:22, 20:19,
38:12, 54:2, 69:20,
72:5, 81:18, 100:21,
103:8, 134:18,
157:4, 181:20,
196:11, 199:25,
230:3
**reasonable** [74] -
20:17, 20:19, 21:18,
26:16, 27:4, 27:9,
27:10, 27:12, 33:1,
35:6, 70:23, 73:9,
76:11, 77:17, 86:10,
86:12, 105:14,
109:3, 114:4, 114:7,
114:13, 114:19,
115:1, 124:10,
124:23, 126:11,
128:4, 128:9, 130:6,
132:8, 133:3,
160:10, 165:18,

165:24, 166:3,
166:4, 166:5,
166:12, 166:14,
166:19, 168:20,
171:25, 172:7,
192:6, 197:2, 197:4,
197:22, 198:14,
199:3, 199:13,
199:15, 199:17,
199:20, 199:21,
200:5, 200:22,
202:2, 208:19,
234:6, 234:9, 237:5,
237:21, 240:15,
241:6, 241:10,
241:14, 243:3,
245:2, 245:15,
245:23, 246:25,
255:22, 258:16
**reasonably** [15] -
49:22, 51:1, 51:6,
51:11, 65:11, 65:13,
82:23, 157:23,
160:3, 162:25,
191:17, 191:22,
192:10, 193:12,
194:5
**reasons** [2] - 108:23,
211:21
**reassurance** [1] -
127:10
**receive** [8] - 23:8,
25:23, 34:4, 135:2,
171:19, 175:15,
218:22
**received** [3] - 16:19,
150:16, 218:11
**receives** [2] - 42:11,
42:13
**receiving** [1] - 33:2,
146:14
**recently** [5] - 131:23,
135:9, 149:8,
151:23, 156:10
**recess** [5] - 8:16,
10:10, 94:3, 179:1,
220:8
**reckless** [4] - 18:13,
192:13, 192:16,
193:18
**recklessly** [1] - 65:20
**recognize** [2] - 19:23,
89:20
**recognized** [1] -
191:10
**recognizes** [2] -
65:25, 191:7
**Record** [2] - 262:9,
262:13
**record** [2] - 7:22, 8:18

**records** [1] - 57:1
**red** [1] - 199:3
**reduce** [1] - 87:21
**reduces** [6] - 34:25,
36:15, 36:18, 39:2,
117:3, 249:12
**reducing** [10] - 34:23,
87:9, 87:14, 87:19,
117:6, 133:13,
172:19, 214:9,
249:7, 250:17
**reduction** [1] - 42:1
**referenced** [1] -
185:19
**references** [1] -
155:19
**referred** [4] - 25:12,
25:14, 26:20, 164:20
**referring** [2] - 48:25,
169:10
**reflects** [1] - 262:13
**regard** [19] - 16:3,
20:5, 34:23, 35:5,
58:18, 73:4, 78:25,
79:22, 79:23, 80:4,
87:9, 87:13, 133:13,
145:17, 172:19,
188:15, 214:9,
249:7, 250:17
**regarding** [10] - 8:20,
12:4, 46:20, 49:15,
89:17, 93:14, 95:10,
140:16, 206:7,
219:18
**regards** [2] - 5:21,
11:20
**regular** [2] - 229:9,
253:13
**regularly** [1] - 145:14
**rehab** [2] - 150:18,
151:10
**rehabilitate** [1] - 121:8
**rehabilitation** [6] -
121:3, 123:13,
124:2, 124:3,
130:13, 131:8
**related** [1] - 128:14
**relation** [1] - 190:11
**relationship** [3] -
60:18, 156:8, 185:15
**relative** [2] - 227:22,
227:25
**relatives** [1] - 149:23
**release** [5] - 25:25,
108:11, 124:4,
165:3, 240:7
**released** [5] - 10:24,
17:16, 244:12, 245:6
**relevant** [3] - 84:5,
84:15, 205:3

**religion** [1] - 145:16
**religious** [4] - 14:21,
100:21, 157:5, 230:3
**remain** [2] - 134:19,
135:1
**remember** [37] - 18:2,
18:20, 19:9, 19:11,
30:9, 35:21, 37:15,
59:21, 59:23, 59:24,
62:11, 62:19, 62:21,
77:19, 77:25, 80:7,
80:9, 85:15, 98:16,
127:20, 137:23,
151:13, 153:24,
162:16, 172:5,
184:22, 185:7,
187:17, 190:8,
206:25, 231:10,
232:13, 236:17,
239:4, 239:18,
253:12, 255:7
**remind** [2] - 218:12,
218:15
**removing** [1] - 175:5
**render** [9] - 14:2,
16:15, 21:19, 23:9,
23:13, 99:25,
125:16, 142:13,
229:17
**repeat** [1] - 244:6
**repeated** [2] - 206:1,
208:11
**report** [2] - 218:20,
219:12
**reported** [4] - 153:2,
153:4, 189:15,
262:11
**Reporter** [2] - 262:3,
262:22
**reporter** [1] - 7:24
**REPORTER** [3] -
67:17, 212:21, 256:3
**Reporter's** [2] - 262:9,
262:12
**reporting** [2] - 189:10,
218:7
**represent** [4] - 52:20,
122:10, 140:21,
179:10
**represented** [7] -
11:25, 12:2, 95:5,
95:7, 187:14,
221:16, 221:18
**reputation** [4] - 24:25,
107:6, 164:9, 238:10
**requested** [1] - 262:8
**require** [7] - 43:6,
88:3, 130:4, 157:25,
160:5, 160:9, 168:8
**required** [15] - 7:10,

7:12, 48:14, 53:21,
65:12, 68:11, 70:22,
73:21, 91:5, 91:24,
193:8, 197:1, 200:5,
202:7, 203:3
**requirement** [4] -
127:25, 213:9,
213:10, 250:25
**requirements** [2] -
82:4, 104:1
**requires** [5] - 42:24,
117:8, 118:3,
243:15, 250:22
**reschedule** [1] -
186:14
**rescheduled** [2] -
6:11, 186:12
**research** [5] - 218:17,
218:20, 219:2,
219:12, 219:16
**reserve** [2] - 55:9,
92:23
**reserves** [2] - 143:17,
143:20
**residential** [1] -
187:22
**resolution** [1] - 209:18
**resolved** [2] - 56:25,
57:1
**resources** [4] -
120:12, 121:1,
121:14, 123:11
**respect** [4] - 146:11,
182:5, 251:1, 251:2
**respective** [1] -
262:14
**respond** [2] - 130:15,
131:4
**response)** [1] - 256:2
**responses** [3] - 9:1,
54:3, 181:23
**responsibility** [5] -
27:15, 66:5, 149:5,
233:14, 233:22
**responsible** [3] -
41:13, 146:3, 177:19
**rest** [11] - 30:12,
110:13, 120:16,
134:19, 135:1,
155:5, 155:23,
190:19, 232:7,
238:25, 258:3
**restatement** [1] -
123:15
**restroom** [1] - 178:20
**restrooms** [1] -
178:21
**result** [21] - 17:19,
22:11, 22:12, 118:7,
123:25, 124:4,

125:21, 130:6,
130:9, 130:16,
157:23, 158:3,
160:4, 191:20,
191:21, 194:21,
208:22, 251:7,
251:22
**result-oriented** [2] -
191:20
**resulted** [1] - 146:14
**resulting** [1] - 133:6
**results** [10] - 72:20,
100:22, 108:20,
129:20, 130:3,
157:6, 157:22,
203:13, 210:3, 230:4
**retarded** [1] - 126:13
**retire** [1] - 149:16
**retired** [6] - 96:8,
96:14, 139:22,
149:8, 153:16,
182:18
**retires** [2] - 94:2,
220:7
**return** [6] - 42:23,
75:9, 119:21,
136:18, 171:11,
219:19
**returned** [1] - 34:5
**reverse** [1] - 114:25
**reviewed** [1] - 8:25
**Richardson** [2] -
189:6, 189:9
**Richland** [1] - 143:6
**rights** [3] - 197:25,
198:13, 257:21
**ring** [1] - 137:22
**rise** [1] - 117:9
**rises** [1] - 248:13
**risk** [2] - 192:14,
192:16
**road** [1] - 178:7
**roadmap** [1] - 234:5
**robbery** [4] - 48:24,
49:3, 157:15, 166:13
**Robert** [5] - 11:7,
12:2, 95:8, 140:21,
221:19
**ROBERT** [1] - 12:22
**role** [2] - 57:2, 149:5
**roll** [2] - 238:21,
238:25
**rolls** [5] - 57:23,
57:24, 239:1, 239:4,
239:6
**room** [18] - 8:8, 10:4,
45:17, 50:18, 60:5,
80:19, 91:9, 138:23,
162:10, 179:20,
182:17, 183:7,

183:10, 183:13,
209:21, 223:15,
253:18, 260:25
**rote** [1] - 37:7
**Ruiz** [1] - 5:8
**run** [3] - 34:11,
136:10, 192:7
**runner** [2] - 105:18
**running** [2] - 199:3,
200:17

## S

**safe** [2] - 113:12,
128:16, 186:4
**safety** [1] - 113:8
**sat** [1] - 111:22
**satisfaction** [3] -
132:8, 198:22, 237:5
**satisfied** [2] - 124:17,
250:24
**satisfies** [1] - 103:25
**save** [1] - 121:14
**saves** [1] - 120:12
**saw** [3] - 97:15, 192:8,
236:6
**scale** [1] - 197:19
**scales** [1] - 197:17
**schedule** [9] - 5:21,
11:21, 15:23, 94:25,
100:17, 139:1,
140:6, 217:20,
221:10
**scheduled** [2] -
186:10, 186:11
**scheduling** [4] - 5:20,
11:18, 94:23, 221:5
**scheme** [5] - 66:23,
77:4, 204:22,
205:17, 205:20
**schizophrenia** [1] -
173:15
**School** [2] - 58:1,
224:9
**school** [11] - 58:5,
63:13, 151:7, 187:6,
187:16, 222:17,
222:19, 222:25,
224:8, 239:7, 258:10
**schools** [1] - 128:7
**science** [1] - 40:24
**sciences** [1] - 58:13
**scoot** [1] - 220:25
**screen** [2] - 66:24,
257:20
**search** [1] - 218:25
**seat** [5] - 92:4, 138:4,
177:2, 216:15, 260:2
**seat's** [1] - 141:16
**seats** [4] - 141:19,

179:21, 229:23,
257:19
**second** [34] - 24:23,
25:4, 34:12, 34:18,
46:17, 46:18, 79:16,
79:25, 80:2, 80:5,
80:25, 85:4, 86:1,
114:8, 115:4, 115:6,
132:2, 142:5,
159:10, 165:14,
166:17, 173:8,
175:22, 181:17,
195:8, 209:2, 210:5,
210:20, 217:3,
237:2, 237:14,
238:17, 240:25,
251:6
**security** [1] - 108:17
**see** [120] - 19:7, 20:3,
22:11, 27:16, 31:4,
31:5, 31:18, 31:19,
32:17, 36:22, 41:5,
41:7, 42:14, 46:13,
46:21, 46:22, 46:23,
47:14, 47:20, 48:17,
48:18, 49:1, 50:7,
51:3, 52:25, 53:21,
54:4, 63:21, 67:10,
68:8, 68:20, 69:13,
69:18, 70:2, 70:16,
71:5, 75:23, 76:25,
77:15, 78:22, 79:10,
79:12, 80:22, 82:25,
83:4, 84:18, 84:23,
89:24, 91:15, 91:19,
96:18, 102:10,
104:6, 106:3,
112:20, 112:23,
117:9, 121:4,
127:24, 128:9,
129:3, 129:10,
129:15, 131:19,
132:11, 132:18,
133:2, 134:2,
142:17, 147:13,
155:19, 159:15,
159:23, 161:1,
161:4, 161:16,
161:23, 167:7,
168:6, 168:11,
169:24, 170:8,
173:22, 176:4,
177:18, 178:8,
180:11, 181:22,
182:1, 186:2, 186:3,
192:5, 192:8,
193:15, 198:14,
199:4, 200:2,
200:23, 202:21,
203:15, 203:17,
204:13, 207:17,

208:25, 210:5,
212:15, 214:3,
243:2, 243:10,
243:11, 244:19,
245:6, 245:18,
248:22, 248:25,
253:23, 256:1,
258:4, 258:8, 259:9
**seeing** [1] - 120:17
**seek** [1] - 93:17
**seeking** [2] - 54:19,
93:15
**seem** [3] - 44:16,
57:10, 133:11
**sees** [1] - 53:1
**selected** [16] - 6:24,
10:23, 14:1, 99:24,
100:2, 108:9,
138:20, 142:11,
142:19, 216:2,
229:16, 230:23,
240:5, 243:14,
246:8, 249:4
**selection** [5] - 132:13,
160:13, 162:7,
230:13, 259:21
**self** [2] - 66:3, 191:9
**self-defense** [2] -
66:3, 191:9
**Seminary** [1] - 55:19
**seminary** [6] - 56:1,
57:3, 57:5, 57:13,
58:10, 58:21
**send** [5] - 57:12,
71:14, 151:9, 219:8,
261:13
**sense** [22] - 34:19,
99:19, 101:22,
102:10, 103:20,
104:16, 107:17,
117:14, 199:25,
204:10, 211:8,
231:17, 233:15,
235:18, 237:7,
239:2, 240:22,
241:12, 241:16,
246:20, 248:8, 254:6
**sent** [4] - 12:8, 25:8,
63:8
**sentence** [78] - 17:15,
25:16, 25:18, 25:20,
25:21, 25:24, 26:7,
26:8, 34:4, 36:7,
36:21, 38:3, 39:25,
42:14, 42:24, 43:7,
74:23, 75:8, 79:18,
81:10, 83:7, 90:16,
90:19, 91:17,
107:25, 108:4,
108:8, 108:10,

111:1, 115:16,
115:17, 115:23,
115:24, 120:19,
125:17, 128:15,
129:20, 130:3,
130:6, 130:9,
130:16, 131:19,
135:2, 146:18,
147:2, 155:4,
155:22, 164:24,
165:2, 165:10,
169:19, 169:21,
171:7, 171:11,
172:15, 173:2,
173:9, 190:14,
194:25, 195:1,
210:2, 210:8,
210:18, 212:17,
212:19, 240:1,
240:3, 240:5,
244:11, 247:19,
247:20, 248:22,
249:18, 251:19,
256:13, 256:14
**sentenced** [1] - 174:8
**sentences** [2] - 20:7,
111:2
**separate** [6] - 69:15,
112:21, 132:22,
133:6, 170:6, 189:1
**sequence** [1] - 8:23
**sergeant** [1] - 96:11
**series** [2] - 37:4, 133:5
**serious** [1] - 91:23
**seriously** [2] - 127:11,
134:6
**seriousness** [2] -
199:5, 199:6
**serve** [18] - 6:25, 26:7,
26:8, 41:14, 53:20,
54:4, 58:5, 59:14,
77:12, 95:1, 121:8,
122:15, 128:15,
149:3, 174:24,
181:16, 193:8,
244:11
**served** [7] - 17:15,
23:20, 56:7, 56:9,
88:13, 214:24,
257:15
**service** [31] - 5:22,
7:10, 7:13, 8:5, 8:7,
51:18, 54:1, 54:7,
55:25, 91:13, 91:15,
93:10, 93:19,
133:22, 138:17,
139:21, 139:25,
140:10, 143:11,
147:18, 181:11,
181:20, 210:1,

214:25, 219:5,
219:7, 219:15,
225:17, 260:18,
260:20, 260:23
**services** [1] - 244:4
**serving** [4] - 54:14,
169:19, 169:20,
240:20
**set** [15] - 23:8, 66:17,
70:23, 71:18, 89:10,
89:12, 100:14,
112:8, 116:14,
195:10, 196:6,
202:20, 227:4,
237:3, 240:21
**sets** [2] - 116:17,
237:3
**setting** [1] - 148:5
**Settlement** [3] - 23:22,
56:10, 58:1
**seven** [3] - 184:18,
235:20, 235:21
**several** [4] - 5:15,
11:14, 66:15, 94:19
**severity** [1] - 207:16
**sexual** [1] - 185:18
**shall** [2] - 240:3, 249:6
**shalt** [1] - 145:19
**shapes** [2] - 97:7, 97:8
**shared** [1] - 122:3
**Sharen** [1] - 62:25
**sheet** [3] - 11:14,
139:16, 140:17
**sheriff's** [1] - 153:14
**Sheriff's** [1] - 153:22
**shield** [1] - 96:15
**shoot** [2] - 105:5,
239:21
**shooting** [7] - 21:13,
22:7, 22:8, 22:17,
105:3, 161:22,
234:12
**shoots** [3] - 159:9,
159:10, 232:5
**shop** [2] - 97:21, 98:5
**short** [1] - 23:19
**shorter** [1] - 13:6
**shorthand** [3] - 25:6,
107:23, 164:19
**shot** [3] - 50:21,
71:11, 234:15
**show** [5] - 25:3, 29:3,
99:23, 208:3, 224:13
**showed** [1] - 22:9
**shown** [1] - 40:24
**shows** [3] - 71:10,
226:17, 227:7
**sic** [3] - 85:8, 99:25,
249:5
**sic)** [1] - 87:17

**sick** [1] - 153:19
**side** [14] - 53:25,
115:5, 115:11,
116:6, 118:11,
141:23, 169:6,
175:18, 175:23,
181:19, 186:13,
197:19, 248:9,
248:10
**sides** [5] - 10:14, 12:3,
95:9, 140:14, 221:19
**sidewalk** [1] - 84:9
**sign** [1] - 8:1
**significant** [1] - 64:19
**significantly** [1] -
199:1
**simple** [5] - 29:21,
65:4, 191:3, 257:5
**simpler** [1] - 23:15
**simply** [8] - 21:11,
21:12, 22:19, 23:11,
23:12, 99:22,
203:21, 229:13
**Simpson** [1] - 63:19
**single** [12] - 45:17,
67:10, 67:23, 68:4,
68:17, 70:11, 76:17,
196:2, 204:24,
212:2, 213:14, 215:2
**sister** [2] - 17:12,
223:6
**sister's** [1] - 228:9
**sit** [9] - 14:13, 14:19,
16:14, 23:6, 97:7,
136:25, 227:18,
233:4, 233:6
**sits** [4] - 112:22,
142:1, 233:19,
233:23
**sitter** [1] - 6:6
**sitting** [15] - 46:2,
70:6, 78:10, 96:21,
103:24, 105:8,
112:1, 137:8, 202:7,
228:3, 229:23,
255:2, 255:8,
256:23, 257:18
**situation** [23] - 39:6,
40:16, 72:7, 73:6,
73:20, 89:24, 125:7,
151:15, 161:6,
161:8, 161:11,
173:22, 174:4,
174:18, 185:12,
187:4, 199:6, 208:8,
208:10, 228:2,
228:5, 245:20,
260:19
**situational** [1] -
170:22

**situations** [2] - 19:23,
192:24
**six** [14] - 55:3, 60:15,
84:8, 84:11, 98:17,
157:16, 184:9,
184:10, 184:22,
205:7, 205:9,
223:23, 223:24,
235:22
**size** [2] - 112:5, 224:3
**slate** [1] - 196:20
**slide** [3] - 44:6, 44:8,
195:17
**slides** [1] - 124:15
**slow** [1] - 87:17
**smart** [1] - 227:8
**smoker** [1] - 184:3
**smoking** [1] - 184:4
**so..** [8] - 6:23, 15:5,
59:22, 83:20, 96:15,
119:17, 143:13,
149:10
**sober** [1] - 61:6
**social** [2] - 93:17,
219:14
**societies** [3] - 112:21,
112:23, 113:4
**society** [60] - 26:19,
26:23, 30:3, 30:4,
30:20, 30:24, 31:1,
32:9, 37:16, 37:25,
38:23, 76:13, 79:5,
109:5, 109:22,
109:25, 110:2,
110:4, 110:9,
110:15, 110:17,
111:3, 111:15,
112:18, 112:21,
113:2, 113:6,
114:20, 121:2,
128:5, 128:7,
128:16, 128:20,
129:6, 129:9,
129:10, 129:13,
167:15, 168:14,
168:23, 170:18,
173:6, 174:23,
207:15, 207:23,
241:9, 243:18,
243:21, 243:23,
244:3, 244:9,
244:12, 244:19,
244:20, 245:5,
245:17, 250:21,
256:1
**solely** [1] - 229:24
**solve** [1] - 226:24
**solving** [1] - 227:16
**someone** [44] - 21:23,
22:7, 31:22, 38:11,

38:18, 38:19, 39:12,
40:4, 41:1, 59:12,
91:12, 110:12,
121:11, 123:11,
123:18, 124:9,
129:9, 129:13,
133:20, 134:19,
135:1, 137:10,
146:14, 147:9,
152:3, 155:22,
157:15, 160:23,
161:23, 168:16,
168:17, 169:13,
170:10, 170:15,
172:24, 173:23,
174:3, 174:5,
174:11, 174:14,
188:19, 190:18,
258:17, 259:1
**someplace** [4] - 52:2,
62:24, 185:22, 188:4
**sometimes** [20] - 22:1,
70:5, 71:7, 71:24,
72:4, 87:6, 87:17,
88:20, 89:5, 108:17,
200:11, 201:19,
204:18, 207:10,
210:24, 227:8,
227:13, 227:17,
252:24
**somewhat** [2] - 71:8,
101:23
**somewhere** [9] -
29:14, 51:20, 51:23,
100:12, 141:22,
150:5, 167:7,
167:11, 182:24
**son** [10] - 63:6, 98:23,
145:5, 149:18,
150:4, 184:7,
184:15, 186:3,
187:4, 227:18
**soon** [1] - 156:23
**sorry** [23] - 8:3, 8:5,
44:14, 62:4, 67:17,
76:14, 92:11, 96:19,
100:5, 109:24,
111:24, 127:13,
152:21, 169:12,
187:24, 212:21,
217:5, 225:9, 233:8,
256:3, 256:5,
256:17, 259:15
**sort** [2] - 122:22,
132:19
**sounds** [3] - 23:14,
102:4, 233:2
**source** [2] - 137:15,
218:23
**Southern** [1] - 58:22,

25

59:3
Southwestern [2] - 55:18, 58:9
spaceman [1] - 199:23
speaking [1] - 15:4
special [27] - 15:11, 24:12, 25:6, 25:11, 58:7, 74:6, 89:6, 106:14, 126:15, 127:17, 130:15, 145:25, 146:8, 164:17, 164:19, 166:7, 172:9, 177:15, 194:19, 210:20, 223:20, 223:21, 239:11, 245:1, 245:9, 247:21, 251:7
Special [35] - 34:1, 34:10, 34:11, 35:9, 35:11, 35:12, 35:13, 90:8, 106:18, 107:3, 109:2, 115:8, 118:6, 126:18, 129:16, 129:19, 130:11, 132:3, 165:13, 172:1, 239:23, 239:25, 240:24, 241:4, 247:11, 247:12, 247:14, 247:24, 250:8, 251:14, 255:18, 255:21, 256:7, 259:2
specific [3] - 13:19, 123:7, 207:13
specifically [1] - 215:3
speeding [1] - 233:18
spell [3] - 256:25, 257:17, 258:20
spelled [1] - 259:8
spend [3] - 9:23, 52:24, 232:7
spent [8] - 9:20, 16:3, 119:5, 119:6, 122:14, 122:19, 124:16, 152:13
spit [1] - 84:9
split [1] - 22:3
spoil [1] - 145:8
spoken [1] - 226:13
square [1] - 97:6
stabbed [3] - 22:10, 105:5, 234:15
stabbing [1] - 160:23
staff [4] - 56:13, 56:21, 112:24
stage [1] - 163:11
stairstep [1] - 85:15
stake [1] - 39:17

stand [9] - 9:3, 14:15, 16:19, 142:16, 178:1, 181:3, 229:22, 234:14, 244:7
standard [10] - 29:6, 29:7, 29:13, 166:5, 166:6, 166:7, 166:15, 197:12, 208:18
standards [2] - 197:6
start [11] - 15:17, 63:15, 65:2, 97:15, 122:12, 142:24, 182:19, 196:19, 197:3, 250:3, 261:14
started [15] - 13:10, 43:10, 55:19, 55:24, 60:15, 118:16, 118:20, 148:4, 152:18, 153:22, 183:18, 183:20, 183:24, 221:24, 225:16
starters [1] - 224:23
starts [1] - 165:17
state [8] - 18:17, 65:17, 65:18, 82:6, 191:21, 192:1, 192:19, 194:1
STATE [1] - 262:1
State [106] - 8:21, 9:9, 10:18, 12:1, 12:20, 18:12, 20:16, 20:18, 21:17, 21:23, 22:13, 24:19, 26:2, 27:6, 27:18, 28:18, 32:11, 32:13, 32:19, 32:25, 35:8, 35:20, 48:13, 49:16, 54:19, 63:21, 66:21, 72:11, 75:6, 83:23, 84:8, 84:9, 92:11, 92:19, 95:7, 95:16, 99:9, 104:8, 105:9, 105:12, 105:17, 105:22, 107:5, 114:13, 114:25, 115:6, 116:21, 121:25, 123:25, 127:18, 130:4, 138:8, 138:13, 140:20, 140:21, 154:25, 160:9, 165:19, 165:22, 165:23, 168:19, 170:12, 172:8, 175:25, 176:6, 176:10, 177:15, 179:11, 180:20, 197:1,

197:23, 197:25, 198:1, 201:5, 208:17, 209:3, 216:19, 216:25, 217:12, 221:18, 222:1, 232:18, 233:3, 233:10, 233:11, 233:23, 234:5, 234:17, 234:24, 235:3, 236:12, 237:4, 238:2, 238:8, 245:22, 246:24, 247:4, 248:2, 248:15, 255:19, 257:7, 257:25, 260:7, 260:12, 261:9, 262:5
State's [10] - 22:4, 33:20, 42:20, 81:1, 116:6, 201:7, 205:6, 241:5, 241:15, 243:1
statement [4] - 16:8, 16:12, 50:19, 64:14
statements [1] - 46:3
states [1] - 65:8
stationed [4] - 55:5, 55:6, 144:1, 144:3
status [3] - 38:7, 38:8, 128:13
statute [5] - 50:23, 66:4, 66:15, 67:1, 75:17
statutory [1] - 66:23
stay [3] - 149:3, 223:24, 224:2
stays [1] - 105:25
step [12] - 33:2, 33:24, 37:24, 38:1, 114:11, 129:19, 171:1, 171:2, 172:25, 179:22, 246:23
step-by-step [1] - 33:24
stick [1] - 258:22
still [21] - 7:1, 19:20, 47:21, 60:19, 65:20, 77:5, 82:15, 115:6, 116:18, 120:1, 134:23, 148:10, 149:14, 152:7, 188:6, 189:12, 192:20, 194:4, 213:20, 234:23, 241:5
stop [3] - 43:12, 173:7, 246:6
stopped [1] - 235:24
stops [1] - 247:24
story [1] - 186:13

straight [2] - 148:7, 178:7
strangling [1] - 21:14
street [2] - 192:4, 192:7
Street [1] - 262:23
strength [1] - 122:8
stress [2] - 183:20, 183:22
stresses [1] - 184:4
stressful [3] - 148:9, 148:14, 148:16
strike [1] - 129:17
strikes [3] - 10:15, 112:7, 122:9
strong [1] - 112:6
struggled [1] - 131:1
stuck [1] - 47:21
students [5] - 58:6, 223:3, 223:22, 224:4, 239:7
study [2] - 113:18, 226:1
stuff [16] - 99:16, 106:21, 113:5, 118:4, 179:15, 187:13, 224:15, 226:15, 227:3, 227:12, 228:21, 229:12, 229:14, 231:11, 236:19, 246:12
styled [1] - 262:10
subject [1] - 62:19
submission [3] - 74:6, 89:7, 194:20
substances [1] - 38:24
substantial [5] - 5:16, 11:15, 94:20, 192:14, 221:4
successful [1] - 63:24
Sue [1] - 139:8
sue [1] - 197:12
SUE [1] - 141:4
sufficient [38] - 36:6, 36:18, 38:5, 40:5, 40:11, 42:4, 42:7, 76:20, 79:4, 79:8, 81:9, 83:3, 83:7, 83:12, 83:14, 86:18, 107:24, 115:22, 117:10, 174:17, 175:13, 175:20, 175:22, 198:7, 198:10, 207:16, 212:7, 212:13, 213:11, 239:25, 246:16, 247:18, 248:13, 248:22,

249:20, 252:5, 256:12, 257:10
sufficiently [7] - 41:25, 172:14, 173:1, 173:8, 175:3, 175:25, 176:5
suggest [1] - 134:4
suing [1] - 197:9
summarize [1] - 123:5
summer [1] - 223:7
summoned [1] - 80:14
Sunday [4] - 63:13, 244:4, 257:8
supervision [1] - 7:14
suppose [1] - 143:7
supposed [5] - 59:15, 182:18, 188:16, 189:18, 219:19
surgery [6] - 6:2, 6:21, 54:6, 182:14
Surgery [3] - 143:5, 182:13, 182:24
surprise [1] - 52:25
surrounding [1] - 219:4
suspense [1] - 227:8
sustained [1] - 108:22
swear [5] - 5:10, 11:10, 94:14, 139:11, 220:21
swore [1] - 136:15
sworn [11] - 5:13, 11:12, 12:23, 94:17, 95:19, 136:16, 139:14, 141:5, 217:18, 220:22, 222:4
system [24] - 16:3, 17:11, 17:19, 20:24, 64:3, 110:10, 111:14, 111:16, 113:9, 128:20, 129:8, 134:12, 138:19, 177:12, 188:20, 235:17, 240:17, 243:23, 244:2, 244:10, 244:24, 245:6, 245:7, 260:20

**T**

table [2] - 105:25
tables [1] - 116:6
talks [3] - 67:1, 88:21, 228:12
TARRANT [1] - 262:2
Tarrant [16] - 17:11, 21:5, 60:6, 96:23, 99:3, 133:4, 149:25,

150:22, 150:24,
160:14, 188:3,
188:5, 195:22,
232:16, 236:7, 262:4
**taught** [2] - 63:6,
223:5
**tax** [2] - 181:3, 181:7
**Taylor** [1] - 262:3
**TAYLOR** [1] - 262:21
**TCU** [1] - 226:5
**teacher** [3] - 223:11,
224:13
**teacher's** [3] - 222:20,
223:17, 258:9
**teachers** [1] - 223:2
**teaches** [2] - 63:13,
223:6
**teachings** [1] - 226:4
**technical** [2] - 56:19,
71:8
**technicality** [3] -
71:17, 200:14, 201:2
**technician** [2] -
183:11, 183:13
**teenager** [1] - 153:24
**teeth** [1] - 183:19
**telephone** [1] - 9:12
**ten** [10] - 61:11, 90:18,
90:21, 113:16,
153:24, 211:19,
211:20, 211:21,
249:15
**tenets** [1] - 226:9
**term** [14] - 21:12,
28:18, 30:2, 30:3,
67:25, 77:25,
125:17, 127:22,
158:12, 167:6,
168:14, 202:5,
202:20, 206:8
**terminal** [1] - 253:20
**terminate** [2] - 197:25,
198:13
**terms** [14] - 27:2, 64:3,
80:4, 99:14, 101:17,
158:10, 166:20,
166:21, 167:4,
201:16, 201:22,
202:10, 202:18
**terrible** [1] - 183:19
**test** [1] - 182:1
**tested** [1] - 22:1
**testified** [5] - 12:24,
95:20, 141:6, 222:5,
236:6
**testifies** [1] - 234:14
**testimony** [2] - 24:22,
236:3
**TEXAS** [2] - 262:1,
262:21

**Texas** [34] - 12:1,
17:6, 18:12, 20:13,
21:5, 22:13, 26:2,
27:6, 95:7, 101:4,
105:23, 108:16,
119:6, 133:4,
137:20, 140:20,
140:21, 150:23,
153:18, 157:14,
160:15, 176:1,
177:16, 195:22,
217:12, 221:18,
228:23, 232:16,
233:19, 235:13,
238:2, 240:11,
262:5, 262:23
**that'll** [2] - 10:4, 206:1
**THE** [135] - 5:5, 5:7,
5:10, 5:14, 5:19,
5:24, 6:3, 6:7, 6:10,
6:13, 6:14, 6:15,
6:18, 6:24, 7:4, 7:7,
7:12, 7:16, 7:20,
7:23, 8:1, 8:12, 8:14,
8:18, 9:6, 9:7, 9:8,
9:11, 9:14, 9:16,
9:19, 10:2, 10:6,
10:8, 10:12, 10:20,
10:22, 10:25, 11:1,
11:4, 11:6, 11:9,
11:13, 11:18, 11:23,
12:10, 12:15, 12:19,
47:3, 47:6, 52:8,
52:12, 67:17, 92:4,
92:8, 92:10, 92:14,
92:16, 92:19, 92:22,
92:25, 93:2, 93:4,
93:7, 93:12, 93:21,
93:23, 94:1, 94:5,
94:8, 94:11, 94:14,
94:18, 94:23, 95:3,
95:16, 108:22,
121:19, 138:3,
138:8, 138:11,
138:13, 138:16,
138:25, 139:3,
139:5, 139:7,
139:11, 139:15,
139:19, 140:1,
140:4, 140:6,
140:11, 140:14,
144:9, 178:19,
179:4, 212:21,
216:14, 216:19,
216:22, 216:25,
217:2, 217:4, 217:6,
217:8, 217:11,
217:19, 218:2,
218:10, 219:21,
219:23, 220:3,
220:10, 220:13,

220:16, 220:20,
220:23, 221:9,
221:14, 222:1,
242:16, 254:19,
256:3, 260:1, 260:7,
260:10, 260:12,
260:14, 260:17,
261:3, 261:6,
261:11, 262:1
**theater** [1] - 225:2
**theft** [4] - 166:9,
166:10, 166:13,
198:18
**themselves** [1] -
174:19
**Theological** [1] -
55:19
**theology** [1] - 58:10
**theoretical** [1] - 71:21
**theoretically** [1] - 72:5
**therefore** [4] - 40:11,
41:13, 41:17, 131:9
**thereon** [1] - 23:9
**they've** [13] - 16:18,
60:24, 74:12,
118:17, 125:23,
174:18, 197:10,
200:8, 211:5,
213:16, 232:2,
234:19, 238:18
**thinking** [12] - 38:15,
39:1, 39:9, 48:5,
73:1, 89:9, 122:14,
122:19, 146:5,
227:15, 230:8, 232:8
**thinks** [3] - 40:20,
77:12, 189:11
**third** [1] - 108:16
**Thompson** [1] - 63:10
**Thou** [1] - 145:18
**thoughts** [12] - 54:13,
90:20, 99:18,
101:25, 110:23,
117:18, 118:15,
155:9, 180:16,
215:21, 249:25,
252:10
**threat** [37] - 26:19,
26:22, 30:20, 30:24,
32:9, 37:16, 37:25,
38:23, 76:13, 77:6,
79:5, 79:10, 109:5,
110:12, 110:15,
111:2, 111:15,
112:10, 128:5,
129:6, 129:9,
129:13, 167:14,
168:13, 168:22,
170:18, 173:6,
207:15, 207:17,

207:23, 241:9,
241:12, 241:15,
245:4, 245:17,
251:15, 255:25
**three** [20] - 46:1, 55:6,
55:8, 60:12, 60:16,
63:16, 93:4, 108:21,
139:18, 139:19,
144:11, 144:12,
152:23, 164:11,
183:4, 223:23,
223:24, 226:16,
259:15
**threshold** [2] - 198:24,
199:7
**throes** [1] - 82:7
**throughout** [5] -
177:6, 248:1,
254:15, 255:20,
257:13
**throw** [1] - 114:24
**throwing** [4] - 41:10,
41:20, 45:16
**thrown** [1] - 40:16
**ticket** [2] - 198:18,
233:18
**tie** [3] - 29:18, 105:18,
168:6
**timeframe** [1] - 202:19
**timeframe/space** [1] -
101:19
**tips** [1] - 197:19
**to-wit** [1] - 105:3
**today** [36] - 6:2, 6:3,
6:12, 13:18, 14:19,
18:6, 19:20, 26:13,
27:24, 93:8, 93:9,
93:24, 121:22,
122:4, 136:16,
142:2, 142:18,
146:22, 157:1,
165:1, 173:11,
176:25, 177:10,
178:6, 186:12,
196:19, 222:17,
224:13, 229:13,
239:13, 247:23,
255:11, 256:16,
259:17, 259:18
**today's** [1] - 5:11
**Todd** [1] - 188:13
**together** [6] - 60:19,
184:10, 184:11,
185:14, 231:16,
255:8
**token** [3] - 161:20,
171:5, 175:10
**tolerance** [1] - 83:13
**tomorrow** [2] -
152:19, 261:14

**took** [19] - 40:8, 43:24,
47:17, 48:14, 55:13,
58:12, 58:16, 63:6,
67:12, 74:3, 93:8,
111:21, 121:25,
142:4, 222:18,
222:19, 232:17,
232:18, 232:23
**tool** [1] - 97:18
**toolmaker** [1] - 97:5
**tools** [2] - 97:2, 97:15
**top** [2] - 187:19,
226:16
**topic** [1] - 252:20
**topics** [1] - 13:17
**torch** [1] - 98:13
**tossed** [1] - 231:19
**totally** [1] - 115:13
**touch** [1] - 60:23
**toward** [2] - 38:1,
172:24
**town** [4] - 46:10,
103:10, 159:10,
232:4
**track** [2] - 139:16,
151:18
**trade** [1] - 97:5
**traditional** [2] - 104:6,
104:15
**traffic** [1] - 198:17
**train** [1] - 151:18
**training** [1] - 183:14
**transaction** [86] -
18:2, 18:23, 18:25,
19:3, 21:8, 44:9,
44:10, 44:19, 44:24,
45:1, 45:15, 45:21,
45:25, 46:12, 46:24,
47:13, 47:17, 47:20,
47:22, 48:1, 48:3,
48:10, 48:11, 48:13,
48:15, 49:4, 49:18,
52:1, 67:2, 67:5,
67:10, 67:24, 68:4,
68:7, 68:8, 68:17,
69:9, 69:10, 69:12,
70:1, 70:12, 76:18,
77:5, 101:2, 101:14,
101:16, 101:24,
102:3, 102:13,
103:1, 103:23,
104:5, 104:10,
106:7, 124:20,
124:24, 126:6,
157:20, 158:5,
158:22, 159:2,
159:13, 160:18,
170:4, 170:17,
196:2, 201:21,
202:3, 202:11,

202:12, 203:11,
203:12, 203:15,
203:24, 204:2,
204:25, 231:7,
231:9, 231:23,
232:10, 232:12,
232:19, 232:24,
237:18, 237:21
**transactional** [1] -
46:3
**transactions** [4] -
56:23, 69:12, 69:16,
196:1
**transcription** [1] -
262:6
**transfer** [1] - 132:17
**transition** [1] - 113:1
**travel** [1] - 244:8
**Travis** [4] - 56:8,
56:12, 57:20, 59:2
**treated** [2] - 56:22,
62:1
**treatment** [2] - 148:20,
149:18
**Tremaine** [2] - 10:22,
261:11
**trial** [96] - 9:24, 11:24,
13:17, 13:21, 13:23,
14:10, 15:14, 15:17,
16:4, 17:14, 20:15,
20:21, 22:9, 23:19,
23:20, 24:5, 24:8,
24:11, 24:15, 24:20,
24:22, 24:24, 25:3,
25:4, 25:23, 27:8,
31:7, 31:8, 31:23,
32:6, 32:12, 32:13,
32:21, 36:12, 43:15,
43:21, 53:7, 53:19,
64:25, 80:15, 83:20,
85:24, 88:12, 95:4,
100:19, 105:4,
105:5, 136:1, 136:4,
136:24, 137:10,
140:22, 142:16,
142:24, 152:18,
154:22, 160:16,
160:25, 161:24,
162:2, 162:3, 162:6,
163:11, 164:3,
164:4, 164:12,
164:13, 165:7,
165:21, 166:2,
166:16, 169:4,
169:6, 170:1, 170:2,
170:21, 170:25,
172:10, 176:2,
179:24, 216:7,
217:16, 217:20,
218:6, 221:11,

221:15, 234:18,
234:20, 236:2,
236:3, 236:4,
238:22, 238:24,
255:20, 257:8,
257:13
**trials** [2] - 13:13,
20:13
**trick** [1] - 248:7
**tricky** [1] - 248:6
**tried** [3] - 75:16,
154:16, 184:19
**trier** [1] - 198:8
**trip** [1] - 156:18
**trouble** [5] - 128:19,
134:23, 189:13,
227:23, 228:6
**truck** [1] - 103:4
**true** [5] - 50:17,
118:11, 134:23,
252:2, 262:6
**true/false** [1] - 142:10
**truly** [1] - 262:13
**trusty** [1] - 159:8
**truth** [12] - 13:24,
99:22, 127:14,
142:5, 198:9,
229:13, 254:9,
254:10, 257:22,
257:23, 258:1
**try** [7] - 86:13, 122:13,
122:22, 136:2,
196:7, 197:23,
227:19
**trying** [11] - 6:19,
86:22, 122:7, 122:9,
132:15, 166:10,
166:12, 184:3,
203:2, 248:7, 255:14
**tuesday** [1] - 152:19
**tumor** [1] - 6:23
**turn** [3] - 89:11,
153:10, 194:7
**turns** [1] - 80:24
**TV** [2] - 227:3, 227:16
**Tweet** [1] - 219:5
**twist** [1] - 74:3
**Twitter** [1] - 219:14
**two** [95] - 6:5, 9:5,
15:19, 20:14, 23:25,
37:18, 44:11, 46:6,
47:12, 48:15, 49:3,
50:18, 50:20, 51:1,
56:11, 67:9, 67:12,
69:12, 69:15, 69:16,
70:14, 71:15, 74:6,
74:9, 75:21, 76:16,
76:17, 80:24, 85:8,
101:12, 101:13,
102:2, 102:12,

103:9, 103:10,
103:11, 104:5,
104:9, 105:3, 106:6,
106:8, 106:9,
107:23, 108:12,
108:20, 108:23,
108:24, 110:4,
110:14, 112:20,
113:4, 120:20,
120:23, 120:25,
124:25, 126:9,
129:8, 136:11,
137:21, 144:14,
149:8, 158:17,
158:18, 158:19,
158:20, 159:6,
159:7, 159:17,
160:11, 170:16,
177:14, 179:22,
184:8, 185:16,
190:1, 194:14,
202:7, 202:15,
203:13, 204:24,
231:6, 232:1,
232:20, 237:17,
237:19, 239:10,
245:12, 253:20
**two-step** [1] - 179:22
**two-year-old** [1] -
144:14
**type** [23] - 29:3, 29:18,
47:7, 61:12, 82:15,
120:8, 128:22,
128:24, 150:19,
151:4, 160:1, 168:7,
173:18, 174:18,
191:4, 192:15,
201:15, 218:13,
226:17, 238:11,
253:20, 253:21
**types** [7] - 65:8, 78:15,
78:16, 163:25,
187:11, 191:24,
194:11

**U**

**ultimate** [1] - 190:25
**ultimately** [6] - 23:7,
25:5, 33:16, 175:24,
180:17
**unadjudicated** [3] -
107:8, 107:20,
238:14
**unanimous** [15] -
85:20, 90:14, 90:22,
115:8, 115:16,
125:15, 129:21,
129:22, 129:23,
208:15, 210:3,
210:4, 247:10,

249:21, 249:23
**unanimously** [4] -
79:15, 91:18, 91:19,
237:23
**uncomfortable** [1] -
127:13
**under** [36] - 18:22,
19:24, 20:23, 37:5,
40:18, 41:4, 41:18,
41:19, 44:17, 45:23,
50:22, 62:2, 66:3,
66:15, 77:4, 79:4,
82:1, 157:16, 158:6,
158:11, 165:9,
174:8, 180:1, 180:5,
180:9, 181:10,
193:24, 194:13,
195:17, 204:21,
212:17, 213:24,
240:14, 241:5,
255:21, 259:2
**undergoing** [1] -
148:20
**undergraduate** [1] -
56:4
**understandings** [1] -
177:22
**understood** [4] - 74:1,
96:14, 130:21, 177:7
**undertaking** [1] -
64:19
**unduly** [1] - 181:4
**unease** [1] - 72:16
**unemployment** [2] -
149:14, 184:24
**unfair** [4] - 72:10,
72:11, 181:4
**unfairly** [1] - 236:24
**unfit** [3] - 197:24,
198:2, 198:12
**unfortunate** [1] -
228:25
**unfortunately** [1] -
235:13
**unique** [2] - 49:11,
52:1
**unjust** [1] - 181:4
**unjustifiable** [1] -
192:14
**unknown** [1] - 140:7
**unless** [2] - 81:1,
217:23
**unpleasant** [1] - 78:14
**unreasonable** [2] -
199:22, 200:4
**unsure** [1] - 135:11
**unusual** [2] - 97:8,
176:17
**up** [69] - 7:5, 9:3, 9:23,
14:22, 19:25, 29:21,

35:5, 36:19, 49:9,
56:6, 58:24, 58:25,
68:3, 82:13, 87:5,
98:9, 99:18, 99:23,
101:16, 103:3,
106:13, 107:11,
107:15, 110:16,
111:10, 112:5,
113:24, 116:17,
119:10, 122:13,
125:1, 128:7,
131:14, 131:15,
131:23, 132:3,
141:24, 142:1,
144:4, 154:18,
155:23, 156:12,
160:12, 163:19,
172:7, 172:12,
177:25, 179:20,
185:25, 189:22,
195:8, 210:11,
210:13, 217:8,
220:25, 224:10,
231:15, 231:21,
231:22, 232:9,
234:5, 238:17,
238:20, 239:20,
240:24, 244:7,
255:13
**upbringing** [2] -
89:18, 213:25
**upset** [1] - 103:8
**upstairs** [1] - 87:17

**V**

**vacation** [5] - 100:12,
136:2, 136:20,
139:1, 149:6
**vacuum** [3] - 236:16,
255:15, 255:16
**Valerie** [2] - 220:11,
220:18
**VALERIE** [1] - 222:3
**variance** [2] - 71:11,
200:18
**varies** [1] - 84:22
**vary** [1] - 18:16
**veniremen** [1] -
259:25
**veniremen** [1] - 9:5
**verdict** [37] - 14:3,
14:9, 16:15, 16:20,
21:20, 33:15, 33:16,
33:18, 34:5, 42:23,
75:2, 85:23, 90:15,
91:2, 91:5, 91:12,
99:25, 119:21,
125:16, 125:21,
129:21, 129:22,

129:23, 134:20, 135:2, 142:13, 208:21, 209:11, 209:13, 209:19, 209:22, 210:3, 210:4, 229:17, 232:25, 236:23, 241:11
**verdicts** [2] - 99:25, 208:22
**version** [1] - 107:24
**versions** [1] - 25:7
**versus** [2] - 125:9, 217:12
**Vicodin** [1] - 61:20
**victim** [1] - 73:17
**victims** [2] - 126:10, 126:12
**video** [1] - 116:24
**view** [12] - 42:19, 103:23, 111:18, 111:21, 111:25, 112:6, 112:14, 113:11, 117:25, 119:23, 181:2, 204:18
**viewed** [1] - 203:19
**viewpoint** [1] - 19:20
**viewpoints** [1] - 42:20
**views** [9] - 16:13, 99:18, 118:22, 119:13, 119:15, 119:16, 222:16, 252:8, 252:19
**violate** [3] - 91:4, 91:12, 209:12
**violating** [1] - 209:23
**violence** [39] - 26:18, 28:23, 29:17, 29:18, 29:23, 30:19, 31:16, 76:12, 78:17, 78:20, 79:3, 79:6, 109:4, 109:20, 110:19, 113:13, 128:2, 150:2, 167:14, 167:16, 167:19, 167:25, 168:4, 168:7, 168:22, 169:13, 206:19, 207:4, 207:9, 207:12, 208:3, 208:4, 229:20, 241:8, 243:4, 245:4, 245:19, 255:23, 255:24
**violent** [5] - 168:2, 168:3, 168:10, 208:4, 243:11
**visit** [3] - 76:9, 80:1, 121:24

**visitations** [1] - 156:4
**visited** [1] - 9:4
**visiting** [1] - 185:25
**visually** [1] - 157:2
**vital** [2] - 138:18, 260:20
**voice** [2] - 96:5, 244:7
**voir** [1] - 9:3
**VOIR** [8] - 12:25, 52:15, 95:21, 121:20, 141:7, 179:7, 222:6, 254:21
**volume** [1] - 262:9
**voluntarily** [2] - 40:8, 40:9
**volunteers** [2] - 127:3, 127:6
**vote** [23] - 27:13, 27:15, 41:14, 73:21, 82:16, 82:17, 114:22, 115:7, 130:2, 130:15, 174:24, 179:12, 208:23, 211:19, 246:19, 247:9, 249:17, 258:2, 258:3, 258:7, 258:21, 258:22
**voted** [2] - 237:23, 246:15
**votes** [2] - 130:1, 203:6
**voting** [3] - 39:24, 115:2, 258:18
**Vought** [1] - 97:1

# W

**wait** [2] - 67:18, 164:13
**Wait** [1] - 172:25
**waiting** [3] - 9:21, 149:15, 149:16
**walk** [3] - 102:10, 248:23, 250:12
**walked** [1] - 112:12
**walker** [1] - 9:14
**walnut** [1] - 98:8
**wants** [3] - 15:5, 156:21, 238:4
**war** [2] - 133:21, 214:25
**War** [1] - 189:25
**warm** [1] - 121:6
**warrant** [7] - 36:7, 36:20, 115:23, 172:15, 247:19, 248:22, 256:13
**wash** [1] - 205:10
**watch** [5] - 153:6,

153:7, 196:17, 227:18, 227:20
**watching** [3] - 152:13, 152:23, 181:21
**water** [6] - 12:16, 52:9, 95:13, 141:1, 178:21, 224:19
**Waybright** [7] - 11:7, 11:9, 47:3, 52:5, 52:17, 92:2, 93:7
**WAYBRIGHT** [1] - 12:22
**ways** [9] - 40:13, 66:15, 101:5, 117:25, 146:25, 147:1, 157:13, 195:15, 201:9
**wear** [1] - 218:2
**week** [10] - 139:24, 140:13, 142:23, 143:15, 143:16, 152:13, 160:11, 182:20, 188:17, 230:16
**weekend** [1] - 224:22
**weeks** [20] - 5:15, 5:20, 11:14, 15:19, 25:10, 49:20, 94:19, 99:14, 103:2, 104:22, 136:11, 139:18, 139:19, 160:11, 162:7, 182:19, 221:4, 231:20, 236:18, 247:23
**weigh** [3] - 210:25, 212:9, 213:11
**weighing** [2] - 211:1, 212:12
**weight** [5] - 18:8, 197:15, 211:17, 213:14, 215:14
**weighted** [1] - 28:12
**weld** [1] - 98:14
**welder** [2] - 98:12, 98:14
**welding** [2] - 98:10, 98:11
**West** [1] - 262:23
**western** [1] - 222:21
**wet** [1] - 13:9
**whatsoever** [1] - 219:2
**wheel** [2] - 235:24, 236:6
**whichever** [1] - 69:22
**White** [3] - 23:22, 56:10, 58:1
**whole** [21] - 45:10, 47:17, 54:12, 54:18,

83:15, 101:21, 104:2, 108:3, 117:14, 167:9, 167:10, 170:5, 176:24, 177:22, 231:16, 249:15, 252:10, 257:22, 258:1
**wide** [9] - 29:24, 167:21, 168:4, 168:18, 192:25, 205:4, 253:14, 253:18
**wide-open** [1] - 205:4
**wife** [4] - 58:1, 60:25, 66:2, 137:11
**William** [5] - 11:24, 95:4, 140:23, 217:13, 221:15
**Williams** [10] - 220:11, 220:18, 220:20, 222:8, 241:2, 243:19, 254:23, 259:7, 260:2, 260:17
**WILLIAMS** [1] - 222:3
**Wilson** [2] - 62:25, 63:1
**winded** [1] - 215:15
**window** [1] - 103:17
**wise** [1] - 163:24
**wish** [2] - 6:10, 256:6
**wit** [1] - 105:3
**withstand** [1] - 258:10
**witness** [10] - 14:15, 16:19, 116:22, 142:15, 176:3, 176:8, 178:1, 229:22, 248:15, 257:7
**WITNESS** [1] - 262:16
**witnessed** [1] - 119:15
**witnesses** [6] - 14:18, 35:14, 116:21, 136:7, 136:8, 136:9
**women's** [2] - 226:1, 226:3
**wondered** [3] - 110:11, 118:22
**wood** [1] - 98:7
**woodwork** [1] - 98:3
**woodworkers** [1] - 97:6
**woodworking** [1] - 97:5
**word** [15] - 28:8, 28:20, 29:12, 47:21, 73:1, 77:21, 77:22, 77:23, 83:3, 86:5, 87:22, 109:25, 166:23, 242:19

**worded** [7] - 84:24, 86:1, 86:3, 86:19, 242:12, 242:14, 242:16
**words** [30] - 28:20, 109:8, 125:3
**works** [30] - 20:3, 27:16, 29:5, 31:18, 32:17, 36:22, 41:7, 42:14, 48:17, 51:3, 54:4, 58:1, 68:9, 68:21, 70:3, 75:24, 79:11, 79:12, 91:15, 91:19, 168:11, 180:11, 192:21, 202:22, 210:5, 210:10, 256:1, 258:4, 258:9, 259:9
**World** [1] - 189:25
**world** [1] - 244:20
**worries** [1] - 123:17
**worse** [2] - 190:21, 190:25
**worship** [1] - 244:4
**Worth** [4] - 98:21, 224:25, 228:4, 262:23
**worth** [1] - 151:11
**worthwhile** [1] - 123:12
**write** [3] - 75:17, 219:4, 219:24
**writes** [1] - 19:22
**writing** [3] - 167:3, 218:11, 262:8
**written** [4] - 14:6, 62:17, 93:14, 248:18
**wronged** [1] - 50:11
**wrongfulness** [3] - 82:2, 82:24, 214:17
**wrote** [10] - 34:17, 62:7, 62:14, 89:2, 120:10, 120:12, 154:14, 167:1, 167:2, 243:7

# X

**Xanax** [1] - 183:16

# Y

**y'all** [3] - 145:23, 206:21, 225:12
**year** [7] - 144:14, 150:19, 153:17, 187:22, 222:24, 223:5, 226:7
**years** [71] - 6:9, 17:13, 17:14, 19:15, 24:9,

40:18, 41:4, 41:11,
55:3, 55:6, 55:8,
55:21, 56:11, 57:9,
60:12, 60:15, 60:16,
61:11, 61:18, 74:23,
84:8, 84:11, 96:15,
98:3, 98:4, 98:16,
98:17, 101:3,
118:23, 121:11,
133:19, 145:13,
149:8, 149:21,
150:8, 150:15,
152:23, 153:16,
153:24, 155:8,
156:9, 162:15,
174:6, 176:8,
176:15, 183:3,
183:5, 183:12,
183:24, 184:8,
184:9, 184:10,
184:11, 185:16,
185:17, 187:8,
188:10, 190:1,
193:1, 193:14,
205:7, 205:9,
222:22, 225:18,
253:15
**yeses** [1] - 129:23
**yesterday** [2] -
144:18, 144:20
**young** [3] - 118:23,
174:10, 174:17
**yourself** [7] - 53:10,
72:18, 128:3,
220:15, 227:15,
232:9, 252:3
**yourselves** [1] -
125:13
**YouTube** [1] - 219:14

## Z

**Zoloft** [1] - 183:23