REPORTER'S RECORD

VOLUME 29 OF 55

TRIAL COURT CAUSE NO. 1184294D

COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE 432ND JUDICIAL |
| | ) | |
| vs. | ) | DISTRICT COURT OF |
| | ) | |
| JOHN WILLIAM HUMMEL | ) | TARRANT COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JURY VOIR DIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

FEB 02 2012

Louise Pearson, Clerk

On the 1st of June, 2011, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Elizabeth Berry, Judge presiding, held in Fort Worth, Tarrant County, Texas:

Proceedings reported by stenographic method.

JACCI WALKER, TEXAS CSR NO. 6843
Deputy Official Court Reporter,
432nd District Court
5208 Airport Freeway, Suite 105
Fort Worth, Texas 76117
(817) 335-5568

ORIGINAL

1              **A P P E A R A N C E S**

2

3    HONORABLE D. MILES BRISSETTE
     SBOT No. 50511628
     HONORABLE ROBERT K. GILL
4    SBOT No. 07961600
     Assistant District Attorneys
5    401 W. Belknap Street
     Fort Worth, Texas  76196
6    817/884-1400
     **ATTORNEY(S) FOR THE STATE OF TEXAS**
7

8    HONORABLE FRED CUMMINGS
     SBOT No. 05225400
9    HONORABLE LARRY M. MOORE
     SBOT No. 14357800
10   4210 West Vickery Boulevard
     Fort Worth, Texas  76107
11   817/338-4800

12   HONORABLE PAMELA S. FERNANDEZ
     SBOT No. 24045868
13   403 North Sylvania, Suite 11
     Fort Worth, Texas  76111
14   817/831-3003
     **ATTORNEY(S) FOR DEFENDANT**

15

16

17

18

19

20

21

22

23

24

25

CHRONOLOGICAL INDEX
VOLUME 29
JURY VOIR DIRE

JUNE 1, 2011

PROSPECTIVE JURORS:                                PAGE      VOL

DARRYL DENNIS
State's Voir Dire by Mr. Gill..........            7         29
Defendant's Voir Dire by Mr. Cummings..            33        29
State's Peremptory Challenge...........            50        29

NIKKO MARTINEZ
Excused by Agreement...................            51        29

Prospective Juror No. 138, Carla Kidd
Excused by Agreement...................            51        29

MARIA RUIZ
State's Voir Dire by Mr. Brissette.....            57        29
Defendant's Voir Dire by Mr. Moore.....            89        29
Prospective Juror Accepted.............            122       29
Prospective Juror Sworn................            122       29
Prospective Juror Instructed...........            122       29

Prospective Juror No. 135,
Martin Fernandez, Excused by Agreement.            125       29

KATHERINE MORRISON
Defendant's Peremptory Challenge.......            125       29

Disclosure.............................            126       29

Court Reporter's Certificate...........            127       29

# ALPHABETICAL LIST OF WITNESSES

**PROSPECTIVE JURORS:**                              **PAGE**     **VOL**

DARRYL DENNIS
State's Voir Dire by Mr. Gill...........      7          29
Defendant's Voir Dire by Mr. Cummings..     33          29
State's Peremptory Challenge...........     50          29

NIKKO MARTINEZ
Excused by Agreement...................     51          29

KATHERINE MORRISON
Defendant's Peremptory Challenge.......    125          29

MARIA RUIZ
State's Voir Dire by Mr. Brissette.....     57          29
Defendant's Voir Dire by Mr. Moore.....     89          29
Prospective Juror Accepted.............    122          29
Prospective Juror Sworn................    122          29
Prospective Juror Instructed...........    122          29

1

REPORTER'S RECORD

VOLUME 29 OF 55

TRIAL COURT CAUSE NO. 1184294D

COURT OF APPEALS NO. AP-76,596

| STATE OF TEXAS | ) IN THE 432ND JUDICIAL |
| vs. | ) DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | ) TARRANT COUNTY, TEXAS |

..............................

JURY VOIR DIRE

..............................

On the 1st of June, 2011, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Elizabeth Berry, Judge presiding, held in Fort Worth, Tarrant County, Texas:

Proceedings reported by stenographic method.

JACCI WALKER, TEXAS CSR NO. 6843
Deputy Official Court Reporter,
432nd District Court
5208 Airport Freeway, Suite 105
Fort Worth, Texas 76117
(817) 335-5568

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

---

**A P P E A R A N C E S**

HONORABLE D. MILES BRISSETTE
SBOT No. 50511628
HONORABLE ROBERT K. GILL
SBOT No. 07961600
Assistant District Attorneys
401 W. Belknap Street
Fort Worth, Texas 76196
817/884-1400
**ATTORNEY(S) FOR THE STATE OF TEXAS**

HONORABLE FRED CUMMINGS
SBOT No. 05225400
HONORABLE LARRY M. MOORE
SBOT No. 14357800
4210 West Vickery Boulevard
Fort Worth, Texas 76107
817/338-4800

HONORABLE PAMELA S. FERNANDEZ
SBOT No. 24045868
403 North Sylvania, Suite 11
Fort Worth, Texas 76111
817/831-3003
**ATTORNEY(S) FOR DEFENDANT**

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

---

3

CHRONOLOGICAL INDEX
VOLUME 29
JURY VOIR DIRE

JUNE 1, 2011

PROSPECTIVE JURORS:                              PAGE     VOL

DARRYL DENNIS
State's Voir Dire by Mr. Gill.......... 7      29
Defendant's Voir Dire by Mr. Cummings.. 33     29
State's Peremptory Challenge.......... 50      29

NIKKO MARTINEZ
Excused by Agreement................... 51     29

Prospective Juror No. 138, Carla Kidd
Excused by Agreement................... 51     29

MARIA RUIZ
State's Voir Dire by Mr. Brissette..... 57    29
Defendant's Voir Dire by Mr. Moore..... 89    29
Prospective Juror Accepted............. 122    29
Prospective Juror Sworn................ 122    29
Prospective Juror Instructed........... 122    29

Prospective Juror No. 135,
Martin Fernandez, Excused by Agreement. 125   29

KATHERINE MORRISON
Defendant's Peremptory Challenge....... 125    29

Disclosure............................. 126     29

Court Reporter's Certificate........... 127     29

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

---

4

ALPHABETICAL LIST OF WITNESSES

PROSPECTIVE JURORS:                              PAGE     VOL

DARRYL DENNIS
State's Voir Dire by Mr. Gill.......... 7      29
Defendant's Voir Dire by Mr. Cummings.. 33     29
State's Peremptory Challenge........... 50      29

NIKKO MARTINEZ
Excused by Agreement................... 51     29

KATHERINE MORRISON
Defendant's Peremptory Challenge....... 125    29

MARIA RUIZ
State's Voir Dire by Mr. Brissette..... 57    29
Defendant's Voir Dire by Mr. Moore..... 89    29
Prospective Juror Accepted............. 122    29
Prospective Juror Sworn................ 122    29
Prospective Juror Instructed........... 122    29

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

5

1    **P R O C E E D I N G S**
2         VOLUME 29 OF 55
3    (WEDNESDAY, JUNE 1, 2011, AT 9:01 A.M.)
4         (Defendant present.)
5         THE COURT:  Okay.  132.
6         MR. GILL:  Darryl Dennis.
7         THE COURT:  Okay.  Deputy Court Reporter,
8    Jacci Walker, is present for the proceedings this
9    morning and she was sworn by the Court as the deputy
10   court reporter.
11        Good morning.
12        PROSPECTIVE JUROR:  Good morning.
13        THE COURT:  Go ahead and have a seat,
14   please.  You are Potential Juror No. 132, Darryl
15   Dennis; is that correct?
16        PROSPECTIVE JUROR:  Yes.
17        THE COURT:  All right.  Mr. Dennis, I
18   need to swear you in for this proceeding this morning.
19   So if you'll raise your right hand, please.
20        (Prospective juror sworn.)
21        THE COURT:  Okay.  You will remember that
22   this individual interview process is designed for both
23   sides to have the opportunity to talk to you about the
24   death penalty issues in this case as well as some of
25   the other legal issues that will be confronted by
     ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
              alliedfwtx@aol.com

6

1    jurors in this case.
2         PROSPECTIVE JUROR:  Yes.
3         THE COURT:  The person on trial is John
4    William Hummel.  His lawyers are Fred Cummings, Larry
5    Moore, Pamela Fernandez.  And the State is represented
6    by Robert Gill and Miles Brissette.
7         You filled out this jury questionnaire.
8    It's been about a month ago now.  Has anything
9    substantial changed in your life that would affect
10   your ability to serve in this case as a juror?
11        PROSPECTIVE JUROR:  No.
12        THE COURT:  And anything about your
13   schedule that has changed since we discussed the trial
14   dates with you at the last meeting?
15        PROSPECTIVE JUROR:  No.
16        THE COURT:  Okay.  I'm going to either
17   need you to scoot up or move that microphone just a
18   little bit so that everybody can hear you because
19   you're kind of soft-spoken, and I know it's a little
20   nerve racking to be up there in the hot seat, but
21   everybody understands that.
22        So the State has the burden of proof in
23   this case, so they get to go first.  It will take
24   about an hour for everybody to talk to you.  There's
25   water right there if you need some.
     ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
              alliedfwtx@aol.com

7

1         PROSPECTIVE JUROR:  All right.
2         THE COURT:  Okay.  You may proceed.
3         DARRYL DENNIS,
4    a prospective juror, having been first duly sworn,
5    testified as follows:
6         **VOIR DIRE EXAMINATION BY THE STATE**
7    BY MR. GILL:
8    **Q.**  Good morning, Mr. Dennis.
9    **A.**  **Good morning.**
10   **Q.**  How you doing this morning?
11   **A.**  **Okay.**
12   **Q.**  Did you work last night?
13   **A.**  **No.**
14   **Q.**  Okay.  Are you still on the 2:00 a.m. to
15   10:00 a.m. shift?
16   **A.**  **Yes.**
17   **Q.**  Do you work out of a particular station?
18   **A.**  **Keller.**
19   **Q.**  Okay.  I didn't know they worked all night up
20   there.
21   **A.**  **Yeah.  We open at two, so...**
22   **Q.**  Okay.  That's a fairly -- at least that
23   building's been expanded recently --
24   **A.**  **Yes.**
25   **Q.**  -- is that correct?  Okay.  It's functioning a
     ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
              alliedfwtx@aol.com

8

1    little better up there now?
2    **A.**  **Not particularly, but more space.**
3    **Q.**  This is the individual voir dire that we
4    talked about the last time you appeared in court, and
5    you took another oath today.  The same oath you took
6    last time you were in court.
7         It obligates you to tell the truth about
8    the things we ask you about today.  If you're selected
9    to be a juror in the case, which you will know right
10   at the end of your interview this morning, you take a
11   different oath and that oath binds you to follow the
12   law and render a verdict according to the law and the
13   evidence.  Okay?
14        So the things -- We're going to kind of
15   follow the same format we followed last time you were
16   in court.  I'm going to tell you a little bit about
17   how the law works and then just ask you how you feel
18   about it, then ultimately whether you can follow that
19   law or not --
20   **A.**  **Yes.**
21   **Q.**  -- if you were a juror in the case.  Okay?
22        And as we go through the process this
23   morning, if I haven't explained myself very well,
24   because you're the first person we're talking to
25   today, or if you have any question about anything else
     ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
              alliedfwtx@aol.com

**9**

1  at all as we go through this, please don't hesitate to
2  ask me.
3     **A.   Okay.**
4     **Q.**   How long have you lived in the Tarrant County
5  area?
6     **A.   Five years.**
7     **Q.**   Okay.  You spent -- You spent the majority of
8  your life out in Los Angeles, correct?
9     **A.   Yes.**
10    **Q.**   Do you have any grandkids?
11    **A.   No.**
12    **Q.**   I notice just from reading your questionnaire
13 that there's a -- there's a lot going on out in Los
14 Angeles.  You had -- There was court cases and you had
15 people that worked in the criminal justice system and,
16 you know, just a -- just a variety of things that --
17 that were stated responses to this questionnaire.
18          Is there anything about all that that
19 would affect you if you were a juror in a case here in
20 Tarrant County?
21    **A.   No.**
22    **Q.**   And I take it your jury service also is out in
23 Los Angeles --
24    **A.   Yes.**
25    **Q.**   -- is that right?

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

**10**

1          You made the comment that you didn't have
2  to -- you didn't like to drive into downtown Los
3  Angeles?
4     **A.   Yes.**
5     **Q.**   I've done that one time in my life.  I'll
6  never forget it.  I didn't like it either.  I don't
7  think I'll ever do it again.
8          We ask you a lot of questions about the
9  death penalty on your questionnaire.  Lots of times
10 the best way to find out exactly what your views are
11 is to get you outside of those questions, just ask you
12 to tell us what is your opinion about the death
13 penalty as a possible punishment for crime?
14    **A.   Well, I think like one of the questions you**
15 **asked me:  What -- What I consider which offense would**
16 **feel that the death penalty should be used.**
17          I think the only thing I put in there
18 would be for child molestation.  I'm really not either
19 for or -- I really don't know how I would feel about
20 having to give someone the death penalty or not.  I
21 really haven't, you know, thought about it or -- I
22 don't know how it would affect me, if it would affect
23 me maybe afterwards.
24          So, like I said, I really hear some of
25 the jurors comment about religion and other things.

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

**11**

1  Like I said, I believe in God.  I believe, you know,
2  he has a final judgment on everything.  So, like I
3  say, I'm really not -- I'm not torn either/or and I
4  wouldn't know how it would affect me until afterwards.
5     **Q.**   Well, if you're ever going to give it some
6  thought about how it would make you feel afterwards or
7  whether or not you would be able to go through the
8  process and function as a juror, now is the time to do
9  it.
10    **A.   Yeah.**
11    **Q.**   Because we have this hour with you here this
12 morning.  And once we're done, you're either going to
13 be on the jury or not on the jury.  And, of course, if
14 you're not on the jury, you're released from service.
15          You go on about your business and you
16 don't have to worry about it any more.  But if you are
17 on the jury, we can't ask you any more questions and
18 you can't ask us any more questions and you're just
19 bound to follow the law at that point.
20    **A.   I understand.**
21    **Q.**   You've got to follow the law whether you agree
22 with it or disagree with it at that point.
23    **A.   Yes.**
24    **Q.**   Do you have any more feelings you want to
25 express to us about the death penalty?

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

**12**

1     **A.   No, not particularly.**
2     **Q.**   Well, then let me tell you how the law works.
3  And as we go through this, if you have any additional
4  questions or comments, please let me know.
5     **A.   Okay.**
6     **Q.**   First, let me ask you this question, and this
7  just pertains to your views:  Is there any reason --
8  and we have a powerpoint so you can follow along with
9  what we're talking about visually -- is there any
10 reason; moral, ethical or religious that you could not
11 be a part of the process, that is, be a juror in a
12 case that results in the death penalty being assessed?
13    **A.   No.**
14    **Q.**   Okay.  You mentioned that you feel like the
15 death penalty is appropriate for the crime of
16 molestation, but here's -- here's what our law
17 provides for.  Our law provides for a death penalty in
18 this particular situation, that is, our definition of
19 capital murder; that a person commits capital murder
20 when he knowingly murders more than one person during
21 the course of the same criminal transaction.
22          Is that something you feel like ought to
23 be -- ought to subject someone to a possible death
24 penalty?
25    **A.   Possible, I guess, depending on the**

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

**13**

1  **circumstances in which it was committed.**
2  **Q.** Well, that's what the law provides for. The
3  law -- The law doesn't say that every person that
4  commits this crime gets the death penalty. The law
5  says, This is a crime for which people can possibly
6  receive the death penalty.
7  So that's my question to you. Is this
8  the type of crime that you think that some people
9  ought to get the death penalty for?
10  **A.** Yes.
11  **Q.** Okay. If an individual is convicted of this
12  capital murder, we move to the second phase of the
13  trial, which is called the punishment phase, and
14  that's the way all criminal trials work.
15  We have a guilt/innocence phase, then we
16  have a punishment phase. The punishment phase of a
17  capital trial is a little bit different than the
18  punishment phase in another type of criminal trial in
19  that the jury doesn't sit down in a capital trial and
20  decides what the punishment should be within the range
21  of years like we talked about last time.
22  The jury answers questions called special
23  issues. And I'm going to jump ahead a couple of
24  slides, and there are two special issues that are
25  given to a jury in a death penalty case.
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**14**

1  Where a person's been convicted of
2  capital murder, the jury's asked, first of all, is
3  this individual going to be a continuing threat to
4  society. We call that the future dangerousness
5  question, Special Issue No. 1.
6  Then the second question deals with: Is
7  there sufficient mitigation for a life sentence. We
8  call that the mitigation special issue. That's
9  Special Issue No. 2.
10  And the way that the jury answers those
11  questions tells the judge how the judge has to assess
12  the punishment in the case. If the questions are
13  answered one way, the judge has no choice but to
14  assess the death penalty.
15  If the questions are answered a different
16  way, the judge has no choice but to assess the
17  sentence of life in prison without parole. Okay?
18  **A.** Okay.
19  **Q.** We talk about a sentence of life in prison
20  without parole. The judge is going to instruct the
21  jury that that sentence means that the individual
22  convicted of capital murder will never exist again
23  outside the penitentiary.
24  They will serve -- Life means life in
25  Texas now for capital murder. You go to the
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**15**

1  penitentiary for capital murder on a life sentence and
2  you never get out of the penitentiary alive. Okay?
3  So we need to -- you need to keep that in
4  mind for our -- purposes of our discussion today.
5  Okay? You think that's a fair law?
6  **A.** Yes.
7  **Q.** Let me jump back real quick here to this
8  slide. The guilt/innocence phase of any criminal
9  trial, the jury's restricted to just that issue: Is
10  the person guilty or not guilty of the crime as
11  charged.
12  If there's a conviction of -- or if
13  there's a not guilty verdict, the trial is over. We
14  don't punish someone that's been found not guilty,
15  obviously, but if there is a conviction, then the jury
16  moves into the punishment phase of the trial.
17  At the punishment phase of the trial the
18  jury can consider all of this evidence. First of all,
19  they can consider all the evidence they heard at the
20  first phase of the trial. Okay?
21  So all the evidence about what the
22  individual on trial did on that one occasion in order
23  to get convicted of murder, the jury can consider all
24  that evidence.
25  Then we go -- The State could bring
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**16**

1  evidence beyond what we brought to you at the first
2  phase of the trial; such as, evidence of the
3  defendant's bad character, evidence of his bad
4  reputation and evidence of other crimes that he may
5  have committed.
6  We can't bring those things to you at the
7  first phase of the trial; only the punishment phase of
8  the trial. Okay?
9  **A.** Okay.
10  **Q.** Okay. And the jury may receive more evidence
11  at the punishment phase and the jury may not receive
12  more evidence at the punishment phase. If these
13  things don't exist, the jury's not going to hear about
14  them. Okay?
15  If the jury has convicted someone of
16  capital murder after they hear evidence or don't hear
17  evidence at the punishment phase, the judge gets
18  together another jury charge.
19  And in that jury charge the judge poses
20  these special issues to the jury. And here's Special
21  Issue No. 1. Let me give you a second to read through
22  it.
23  **A.** Okay.
24  **Q.** Okay. Did you have occasion to read the
25  paperwork the judge sent home with you last time you
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**17**

1 were in court?
2    **A.** Yes.
3    **Q.** Then you've seen this stuff before, but let's
4 break it down so that I can explain to you all the
5 different parts of it.
6    **A.** Okay.
7    **Q.** First of all, this phrase up here: Do you
8 find beyond a reasonable doubt. That tells the jury
9 that the burden of proof is on the State. Remember
10 that phrase "beyond a reasonable doubt"? We have to
11 prove someone's guilty beyond a reasonable doubt.
12    **A.** Okay.
13    **Q.** So when you see this phrase, that means the
14 burden of proof is on the State. We have to prove to
15 you beyond a reasonable doubt there's a probability
16 that the defendant would commit criminal acts of
17 violence that would constitute a continuing threat to
18 society.
19        And if the State proves that to you
20 beyond a reasonable doubt, the jury is obligated to
21 vote yes. And if we fail, the jury is obligated to
22 vote no.
23    **A.** Okay.
24    **Q.** And you know the effect of the answers?
25    **A.** Yes.

**18**

1    **Q.** Remember -- Remember the way you answer the
2 questions tells the judge how the judge has to
3 sentence. Well, if the question is answered yes, that
4 the individual does constitute a continuing threat to
5 society, the jury is taken one step closer to giving
6 that person the death penalty.
7    **A.** Okay.
8    **Q.** If the question is answered no by ten or more
9 jurors, then the deliberation is over and the jury
10 would return to court and the judge would sentence the
11 individual on trial to a life sentence, because the
12 jury would have found they do not constitute a
13 continuing threat to society.
14        See what I'm saying?
15    **A.** I understand.
16    **Q.** Okay. Now, our legislature has decided that
17 this is -- this is one of the means we're going to use
18 to decide who gets the death penalty and who doesn't.
19 People who commit capital murder and are a continuing
20 threat to society are eligible for the death penalty.
21        People who commit capital murder and a
22 jury finds they're not a continuing threat to society
23 receive a life sentence. Okay?
24    **A.** Okay.
25    **Q.** All right. So some of the -- some of the

**19**

1 other parts of this phrase here. The State has to
2 prove beyond a reasonable doubt there's a probability
3 that the defendant would commit these criminal acts of
4 violence.
5        And the word "probability," like the
6 phrase "beyond a reasonable doubt," is not defined
7 under our law. So you have to give probability and
8 the other terms that aren't defined by law whatever
9 definition you give it in your everyday business.
10 Okay?
11    **A.** (Nods head.)
12    **Q.** So what does probability --
13    **A.** Yes.
14    **Q.** -- mean to you?
15    **A.** That he might do it again.
16    **Q.** Okay. We've heard that definition from a lot
17 of people; might or there's a chance or that type of
18 thing. And our legislature used the word
19 "probability" here. They could have used the term
20 "possibility," but they didn't.
21        And they could have used the term
22 "certainty," but they didn't because they want the
23 State to prove somewhere between those two terms
24 because there's a -- there's a possibility of almost
25 anything.

**20**

1    **A.** Yeah.
2    **Q.** And, obviously, the State can't prove to a
3 certainty that an individual's going to do something
4 in the future, which is what this question is asking.
5 So the legislature has chosen kind of a vague term in
6 between. It has a -- has a -- has a pretty wide range
7 of meaning.
8        Is that kind of how you see that phrase?
9    **A.** Yes.
10    **Q.** Then the next phrase is the phrase "criminal
11 acts of violence." We have to prove there's a
12 probability this individual's going to commit criminal
13 acts of violence.
14        What does that phrase mean to you?
15    **A.** That he could possibly hurt someone again.
16    **Q.** If we break that particular phrase down, it
17 has the word "criminal," so it has to be a criminal
18 act and it has to be a violent act.
19        Do you see that?
20    **A.** Yes.
21    **Q.** Okay. But it doesn't say anything in here
22 about criminal acts of violence against a person. So
23 the law doesn't narrow us down to just criminal acts
24 of violence against a person. It could be criminal
25 acts of violence against property or criminal acts of

21

1  violence against a person.
2          You see that?
3      **A.  Yes.**
4      **Q.**  Sometimes these questions are important for
5  what they contain and sometimes they're important for
6  what they don't contain.
7      **A.  Yes. Okay.**
8      **Q.**  So we have to look at that language of what it
9  contains and what it doesn't contain.  Pretty broad
10 phrase, isn't it?
11     **A.  Yes.**
12     **Q.**  Anywhere from a violent act against property
13 of some type all the way up to and including another
14 murder.  See where that would -- that could -- would
15 also be a criminal act of violence?
16     **A.  Yes.**
17     **Q.**  Assaults, robberies, whatever it might be.
18 Anything that constitutes a criminal act of violence
19 is something that a jury could feel the individual was
20 capable of doing.
21          And the last phrase is the phrase
22 "society."  What does the phrase "society" mean to
23 you?
24     **A.  Everyone around.  But I do have a question.**
25     **Q.**  Sure.

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

22

1      **A.  If -- As a juror, if we're -- know this man is**
2  **going to jail, he won't be back into society.  So when**
3  **you say "committing criminal acts of violence," are we**
4  **to consider the prisoner has -- because that's where**
5  **he'll either be killed or he'll be back in prison, so**
6  **we would consider prisoners, you know, that -- or we**
7  **consider that -- you know, that realm of society or --**
8  **like I said, he won't be back on the street, he'll**
9  **just be, you know, locked up for the rest of his life.**
10     **Q.**  You know, I've spent a lot of time explaining
11 that concept to people since we started this, and you
12 saw it right off.  That's -- That's part of the --
13 part of the issue with this question.
14          Here's a guy the jury has to deliberate
15 on who's never going to get back out in free society.
16 So what does this term "society" mean?  So is the term
17 broad enough to you to include both prison society and
18 free society?
19     **A.  I guess it would have to if you're asking it.**
20     **Q.**  It doesn't make much sense to ask it if it
21 doesn't include prison society, does it?
22     **A.  Yes.**
23     **Q.**  And you also understand that there are a
24 number of people that move back and forth between
25 prison and outside society?

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

23

1      **A.  Guards, yeah.**
2      **Q.**  Exactly.  Guards, visitors --
3      **A.  Yes.**
4      **Q.**  -- ministers, healthcare individuals --
5      **A.  Yes.**
6      **Q.**  -- educators?
7      **A.  Okay.**
8      **Q.**  Sometimes people escape from the penitentiary.
9  It's just a -- You see it as being a pretty wide open
10 question?
11     **A.  Yes.**
12     **Q.**  So the question then to you is -- and you see
13 the issue exactly -- is the guy going to be in --
14 sentenced to the penitentiary the rest of his life.
15          Is it possible that the State could prove
16 to you beyond a reasonable doubt that an individual
17 who's going to be in the penitentiary the rest of
18 their life could be a continuing threat to society?
19     **A.  Yes.**
20     **Q.**  So given all of that, here's the next
21 question:  Knowing that a yes answer moves the
22 individual on trial one step closer to receiving the
23 death penalty, could you answer yes if the State
24 proved it to you beyond a reasonable doubt?

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

24

1      **Q.**  No problem about that?
2      **A.  No problem.**
3      **Q.**  On the other hand, if the State failed in its
4  burden of proof, would you be able to answer the
5  question no?
6      **A.  Yes.**
7      **Q.**  See, that's your obligation as a juror, is to
8  take into consideration this question and then all the
9  evidence that you've heard during the course of the
10 trial.
11     **A.  Okay.**
12     **Q.**  Now, one of the things I want to make sure you
13 understand also, and I'm sure you do, is that this
14 question is a completely different question you're
15 asked with the first phase of the trial.
16          At the first phase of the trial you're
17 asked to concentrate on what did this guy do on
18 this -- one particular date and did he -- did he do
19 the acts as charged by the State of Texas.
20     **A.  Okay.**
21     **Q.**  See.  One day, very limited inquiry, very
22 limited issue.  Is he guilty or not guilty of the
23 crime that we charged him with doing on this one
24 particular point in time.
25          And then this question is asking you to

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

25

1    kind of look into the future and see if there's a
2    probability that he would constitute a continuing
3    threat to society in the future.  So one day in time
4    versus what's his future prognosis.
5    **A.   Is he capable of doing it again?**
6    **Q.**   Uh-huh.  Or doing something -- or doing some
7    type of --
8    **A.   Yes.**
9    **Q.**   -- criminal act of violence.
10    **A.   Okay.**
11    **Q.**   So we don't have --
12        THE REPORTER:  Allow him to finish.  One
13    at a time.
14    **Q.**   (BY MR. GILL)  Okay.  So we don't have to
15    prove that he's going to commit another murder.  We
16    have to prove there's a probability he's going to
17    commit some type of criminal act of violence, that
18    wide open phrase.
19    **A.   Yes.**
20    **Q.**   Okay.  Any more questions or anything about
21    Special Issue No. 1?
22    **A.   No.**
23    **Q.**   Okay.  So the next thing is Special Issue No.
24    2.  And I'll give you a second to read through that
25    because it's fairly lengthy.
    ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
    alliedfwtx@aol.com

26

1    **A.   Okay.**
2    **Q.**   Okay.  Again, one of the first things that's
3    notable about this special issue is what it does not
4    contain.  It does not have the phrase "do you find
5    beyond a reasonable doubt" up here.  So that tells you
6    what?  There's no burden of proof on the State of
7    Texas for this question.
8    **A.   Okay.**
9    **Q.**   We have a burden of proof at the
10    guilt/innocence phase.  We have the burden of proof on
11    Special Issue No. 1, but no burden of proof on Special
12    Issue No. 2, because it doesn't have that phrase "do
13    you find beyond a reasonable doubt" up here.
14    **A.   Okay.**
15    **Q.**   And you also know from our previous
16    discussions, there's never any burden of proof on the
17    defense.  So the defense has no burden of proof on
18    this question either.
19    **A.   Okay.**
20    **Q.**   This is just up to you to decide as an
21    individual juror if you find that there's some type of
22    sufficient mitigating circumstance or circumstances
23    about the case to warrant the life sentence instead of
24    the death penalty.  Okay?
25    **A.   Okay.**
    ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
    alliedfwtx@aol.com

27

1    **Q.**   This is a -- This is a way for the jury to
2    say, Even though this guy's guilty of capital murder
3    and even though we think that he's going to be a
4    continuing threat to society, there's something about
5    him or something about this case that makes him less
6    morally blameworthy than someone else who might have
7    done the same thing.
8    **A.   Yes.**
9    **Q.**   Because that's the definition of mitigating
10    evidence, and the judge is going to give you this
11    instruction if you're a juror in the case.
12        Mitigating evidence is any evidence a
13    juror might regard as reducing the defendant's moral
14    blameworthiness, that makes him less morally
15    blameworthy than someone else.
16    **A.   Okay.**
17    **Q.**   Okay.  Is there anything you could think of as
18    we sit here today that might make someone less morally
19    blameworthy than someone else that's committed the
20    same type of act?
21    **A.   Depending on circumstances on why it was done.**
22    **Q.**   And a lot of people have given that reasoning.
23    It depends a lot on the guy's motivation?
24    **A.   Yes.**
25    **Q.**   There's some motivations that might be
    ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
    alliedfwtx@aol.com

28

1    mitigating and some motivations that might be
2    aggravating, that might be -- that might not rise to
3    the level of a sufficient mitigating circumstance,
4    right?
5    **A.   Yes.**
6    **Q.**   Okay.  Another example we have used quite a
7    bit is an individual 18 years of age.  An individual
8    18 years of age under the laws of the State of Texas
9    can receive the death penalty.
10    **A.   Okay.**
11    **Q.**   But -- And, of course, when I give these
12    factual scenarios, we're not talking about this case,
13    but this is just an illustration, an example.
14        A juror that's deliberating on the case
15    of an 18-year-old that's been convicted of capital
16    murder might look at that 18-year-old and say, This
17    guy is only 18 years old.  He is not as mature as
18    someone that's in his 30's or 40's that might have
19    committed the same act; that his brain may not have
20    completely formed yet.
21        He hasn't had the type of world
22    experiences that lead him to form a solid and moral
23    compass like someone who may be in their 30's and 40's
24    and has lived more of life and seen more and
25    experienced more.
    ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
    alliedfwtx@aol.com

29

1   A.   Okay.
2   Q.   And a juror might say, Because of that, I find
3  that to be a sufficient mitigating circumstance under
4  the facts of this case, and, therefore, I think a life
5  sentence is more justified than the death penalty.
6   A.   Okay.
7   Q.   See where that might be the case?
8   A.   Yes.
9   Q.   Another juror might say, Wait a minute here.
10  I don't think that's a sufficient mitigating
11  circumstance because of what he did up here; the
12  circumstance with the offense, his character and
13  background, et cetera, and he might think 18 years old
14  is sufficiently mature.
15       They're as mature as anybody else because
16  they can drive an automobile, they can attend
17  colleges, they can serve in the military, they can
18  vote, they can do everything an adult can do, so that
19  matter is not a sufficient mitigating circumstance.
20       So it's just up to each individual juror
21  to decide for himself or herself based upon all the
22  circumstances of the offense, the defendant's
23  character and his background and his personal moral
24  culpability if there is a sufficient -- and we
25  highlight that word "sufficient" -- a sufficient

31

1  for himself or herself all the evidence they've heard,
2  is there something sufficiently mitigating here, and
3  it could be from the State's first witness.
4        The State could bring the evidence
5  because we don't know what you think is sufficiently
6  mitigating, and you may not know until you've heard
7  all the facts of the case.
8   A.   Yeah.
9   Q.   But the State's first witness may have proven
10  that the events on trial happened at the defendant's
11  18th birthday party.  So if you think -- if you think
12  being 18 is sufficiently mitigating, the State could
13  have proven that to you.
14       See how that might work?
15  A.   Yes.
16  Q.   And, again, that's just an example.
17  A.   Okay.
18  Q.   And that example is to show you that that
19  mitigating -- sufficient mitigating evidence could
20  come from anywhere and the burden of proof is not on
21  the defense and they're not obligated to bring it to
22  you.
23  A.   Okay.
24  Q.   Because they don't know what it might be to
25  you.

30

1  mitigating circumstance or circumstances to warrant a
2  life sentence instead of the death penalty.
3   A.   Yes, I understand.
4   Q.   Okay.  And your job as a juror would be, if
5  you find something to be sufficiently mitigating, that
6  you answer yes.  And you say, Yes.  There is something
7  sufficiently mitigating here, so the life sentence is
8  imposed.
9   A.   Okay.
10  Q.   And if you find some mitigating evidence but
11  don't find it sufficient or if you don't find there's
12  any mitigating evidence, nothing that reduces the
13  guy's moral blameworthiness, you vote no, because
14  there's nothing there that mitigates for a life
15  sentence instead of the death penalty.
16  A.   Yes.
17  Q.   Okay.  So once we break it down, it's a --
18  it's a fairly straightforward concept, isn't it --
19  A.   Yes.
20  Q.   -- once we break it all down?
21       Now, again, there's no burden of proof on
22  the State because it doesn't say anything about beyond
23  a reasonable doubt up here and there's never any
24  burden of proof on the defense.
25       So it's strictly up to a juror to decide

32

1   A.   Okay.
2   Q.   So given all that, knowing that a no answer to
3  Special Issue No. 2 would result in the death penalty,
4  in other words, the jury's deliberations are over at
5  that point, you return your verdict to open court and
6  the guy on trial gets the death penalty, knowing all
7  that, would you be able to answer Question No. 2 no if
8  you felt like that was the right answer?
9   A.   Based on the evidence, yes.
10  Q.   Based on the evidence.  Exactly.
11       On the other hand, if you felt like yes
12  was the right answer, would you be able to answer yes
13  knowing that the defendant would be -- that you would
14  return to court and the judge would assess a life
15  sentence?
16  A.   Yes.
17  Q.   Again, based on the evidence, right?
18  A.   (Nods head.)
19  Q.   And that's a juror's job --
20       THE REPORTER:  Your answer?
21       THE WITNESS:  Yes.
22  Q.   (BY MR. GILL)  And that's a juror's job
23  throughout the course of a criminal trial, is to base
24  their decisions on the evidence and upon the law that
25  they're given by the judge.

33

1    Would you be able to follow your oath as
2  a juror and follow the laws as the judge gives it to
3  you?
4    **A.  Yes.**
5    **Q.**  Is there anything you've heard about here
6  today that -- that you have an -- have an issue with
7  or have a question about?
8    **A.  No.**
9    **Q.**  Because this is just about it.  We've been
10 through the whole capital murder death penalty
11 statutory scheme here.  This is your job as a juror.
12   **A.  I understand.**
13   **Q.**  So now knowing everything that you'd be called
14 upon to do as a juror, is there any reason you can
15 think of, whether it's moral, ethical or religious,
16 you could not be a part of the process that would
17 result in someone receiving the death penalty?
18   **A.  No.**
19   **Q.**  Thank you very much for your time, Mr. Dennis.
20   **A.  Thank you.**
21    MR. GILL:  That's all we have, Your
22 Honor.
23    THE COURT:  Defense?
24   **VOIR DIRE EXAMINATION BY THE DEFENDANT**
25 BY MR. CUMMINGS:

34

1    **Q.**  Good morning, Mr. Dennis.
2    **A.  Good morning.**
3    **Q.**  I'm Fred Cummings, this is Larry Moore and
4  Pamela Fernandez, and this is our client, John Hummel.
5    I want to take about the same amount of
6  time that Mr. Gill took this morning to hopefully just
7  kind of carry on a conversation with you.
8    **A.  Okay.**
9    **Q.**  We're close to having a jury and you're very
10 close to being on it.  Okay.  How does that make you
11 feel?
12   **A.  Really, the way -- if -- I mean, I feel**
13 **this -- I'm supposed to -- it's supposed to be my**
14 **service.  I'm supposed to do it, so if I'm called to**
15 **do it, I'll do it.  If not, I'll go back to work.**
16   **Q.**  You, 20 years ago in Los Angeles, were on a
17 jury?
18   **A.  Yes.**
19   **Q.**  Can you tell me about that experience?
20   **A.  It was a murder trial.  It lasted about -- I**
21 **guess about four weeks.  It was a long process.  You**
22 **know, certain things were interesting.  Didn't take**
23 **anything bad from it.**
24   **First time I actually saw how the court**
25 **system really worked, and nothing negative in the**

35

1  way -- as far as against the lawyers or how, you know,
2  it was conducted.  So it was an interesting
3  experience.
4    **Q.**  There have been some -- over the years some
5  highly publicized trials out in California, and Trials
6  lawyers have difficulty understanding how -- why it
7  takes them so long in California to try a case.
8    Did you -- Did you-all work full days for
9  those four weeks?
10   **A.  No, because sometimes we would come in the**
11 **court and we'd be sitting out waiting for them to call**
12 **us in and they would come and tell us to go home.**
13 **Might have had something else on the docket or**
14 **sometimes we would come in and -- they wouldn't have**
15 **us come in until ten and then we'd go right back out**
16 **to lunch at 12, then leave court at two, so...**
17   **Q.**  Now, that's been my suspicion.  This case will
18 be tried probably in two weeks.  It might be a little
19 more.  It might be a little less.  Typically, our
20 judges give deference to jurors and you take priority.
21 That's -- I believe will be your experience if you're
22 called to serve in this case.
23    I don't think you've got any problems
24 being honest with us.  You've asked questions when you
25 needed something clarified.  So this slide that I have

36

1  here as far as the rights of a potential juror is
2  probably unnecessary, but we still have the ability to
3  exercise strikes.
4    And so I'd just kind of like to go
5  through the same information or many of the same
6  things that Mr. Gill went over with you just to be
7  sure I'm comfortable.  Okay?
8    **A.  Okay.**
9    **Q.**  If there's any comment that you want to make
10 or if there's any question that you want to ask,
11 please do so, because as Mr. Gill told you, when we're
12 through this morning, when you and I are done with our
13 conversation, the judge will excuse you and shortly
14 thereafter you'll be called back in and told whether
15 you're going to serve or not.
16   **A.  Okay.**
17   **Q.**  It will happen today.
18    Just generally, when did you form your
19 opinion regarding the death penalty?
20   **A.  Never really.  Like I said, I've never really**
21 **thought about it.  That's why I say I don't know which**
22 **way I would feel.  Like I said, basically, all I do is**
23 **follow the law, you know, what I'm instructed to do.**
24   **Q.**  All right.  We've gone over the process.
25 We've done it kind of piecemeal in the way we've been

37

1  doing this particular case with the mini panel and
2  then the individual.
3          These are the elements of capital murder
4  as it applies in this particular indictment.  Okay?
5      A.  Okay.
6      Q.  It comes out of the Code of Criminal Procedure
7  and the Penal Code, and this is the roadmap that the
8  State has to follow in order to prove their case --
9      A.  Okay.
10     Q.  -- to you individually beyond a reasonable
11 doubt.  And if they don't follow that roadmap, if they
12 get off track in any way, then they haven't met their
13 burden.  And you've already been through this process
14 once before and you know the proper verdict in that
15 case.
16     A.  Yes.
17     Q.  But have you got any questions about capital
18 murder as it applies to this particular indictment?
19     A.  No.
20     Q.  Are you comfortable with what they're being
21 required to prove?
22     A.  Yes.
23     Q.  All right.  On or about a particular date in
24 Tarrant County, Texas, the person they have accused
25 knowingly caused the death of one individual, and they

39

1  this.  If a jury decides beyond a reasonable doubt,
2  each individual -- each of the individual jurors, all
3  12, say guilty, that individual is never going home.
4  He's going to die in the penitentiary.
5      A.  Yes.
6      Q.  It's either going to be natural causes or some
7  date certain in an execution.
8      A.  Yes.
9      Q.  Okay.  And you obviously understand the
10 gravity of this.
11     A.  Yes.
12     Q.  All right.  The process is one in which
13 Mr. Gill went over with you.  I've kind of summarized
14 it on this slide.  The 12 of you have to decide guilty
15 of capital murder.
16          And then if you've done that, there is a
17 punishment phase.  Mr. Gill talked about the bad
18 things that could be introduced at the punishment
19 phase.  You're going to hear the good things as well.
20          If there is a prior criminal history,
21 they get to introduce it.  If there isn't, you
22 obviously are not going to hear about any prior crime.
23 You may very well hear about the good things that the
24 individual has done in their life in an effort to give
25 you the total picture so you can make this very

38

1  have to tell you how that death occurred, and that
2  would be called the manner or means.
3          And then what makes it capital as opposed
4  to a regular murder, they have to allege -- or excuse
5  me -- they have to prove that what they have alleged,
6  that it occurred during the same criminal transaction
7  with another knowing murder.
8      A.  Yes.
9      Q.  Okay.  If the jury decides that that is the
10 case, same criminal transaction, two murders, then
11 you'll be dealing with the punishment range for
12 capital murder.  That punishment range only applies to
13 capital murder.  Okay?
14     A.  Okay.
15     Q.  The first-degree felony, which applies to a
16 single murder and several other felonies, high-level
17 felonies, is 5 to 99 or life, but that life has the
18 possibility of parole.
19     A.  Okay.
20     Q.  Capital life is life without parole.  And I
21 know it's in your questionnaire.  You indicated that
22 you accept if an individual -- if you say life without
23 parole, he'll never get out.
24     A.  Yes.
25     Q.  Okay.  And you picked up on the reality of

40

1  important decision.  Okay?
2      A.  Okay.
3      Q.  You -- The process is that you just don't go
4  back there and make a decision for one punishment
5  versus the other.  You're called upon to answer these
6  questions.  And then as a result of those questions,
7  you know what the results will be.  There is some
8  structure to it.
9      A.  Yes.
10     Q.  Okay.  So it takes essentially 36 votes, three
11 by each -- three from each of the jurors:  Guilty, yes
12 as to future dangerousness question and no as to the
13 mitigation question.
14          And if that is the way things progress,
15 if that's the decision of each of you, then a death
16 sentence results.  Okay?
17     A.  Yes.
18     Q.  But the presumption here is life.  They've got
19 to meet their burden as far as guilty in that first
20 special issue and you've got to decide there is no
21 reason not to assess the death sentence or else a
22 death sentence results.  Okay?
23     A.  Okay.
24     Q.  Any questions about that process?
25     A.  No.

41

1    Q.   Special Issue No. 1 is straight out of the
2    Code of Criminal Procedures.  So make yourself
3    comfortable.  That's the same language that Mr. Gill
4    put before you.
5            And he talked to you or with you about
6    some of the terminology in this question to establish
7    his own comfort level as to what your comprehension or
8    understanding of these terms are.  And I had the
9    benefit of listening to that and I don't have any
10   problem with the conversation you-all had about that.
11           What sort of evidence would you want to
12   hear in order to make this kind of decision or make
13   this -- this kind of decision?
14   **A.   Well, past acts.  Like I said, his past, what**
15   **he -- you know, what he violated before, did he have**
16   **allegations of it before, was he ever convicted of**
17   **anything like that before, things of that nature.**
18   Q.   Okay.  Prior history.  Would you find any sort
19   of expert testimony persuasive or not?
20   **A.   As far as if an expert is assuming or giving**
21   **facts?**
22   Q.   Experts are able to give you opinions based
23   upon, hopefully, facts.  And you'll hear as many or
24   more from the State as you may hear from us.  Okay?
25   But I'm just curious.  You've been through this

42

1    before.  You're a knowledgeable man.
2            Is that going to -- Is that the sort of
3    thing that would be helpful?
4    **A.   Well, I would have to weigh it when I hear it.**
5    **I don't -- not necessarily because it's an expert that**
6    **I would kind of go his way or believe that if he's**
7    **making an assumption or something, that could possibly**
8    **happen.**
9            Like I said, there will be other things
10   given to us, like I said, basically, how he was
11   before, which is fact versus what an expert might
12   assume.
13           Like I said, I'd have to weigh it as it
14   came.  I couldn't just because he's an expert say,
15   yes, to follow that.  Like I said, basically what you
16   bring in his past, if he's done things toward that
17   nature before, then depending on what the expert says,
18   I'll have to balance it.
19   Q.   Okay.  The burden is on them.  As far as this
20   question is concerned, I want to be sure that you
21   understand the process and set the context you're
22   going to be answering that question in.
23           In order to -- Before you see Special
24   Issue No. 1, you're going to have decided beyond a
25   reasonable doubt that a capital murder has occurred.

43

1    So that's going to be the knowing commission of two
2    murders.
3            There's not any defenses.  It's not an
4    accident.  There's not any mental issues such as
5    insanity or mental retardation that might impact your
6    decision.  It's a -- You're going to -- You have
7    decided beyond a reasonable doubt that capital murder
8    has occurred.
9            It's only then that you'll be called upon
10   to answer this question.  Okay?  You might take into
11   consideration, and you probably will take into
12   consideration, what you've heard in the
13   guilt/innocence phase of the trial as far as the
14   accusation in the indictment.
15           But do you see this as asking you for
16   more or asking you to make a different evaluation?
17   **A.   Basically asked me to use my judgment.  Like I**
18   **said, just use my judgment and maybe just experience**
19   **from my life, things that, you know, we go through and**
20   **things we see.**
21   Q.   This Special Issue No. 2, when you get here,
22   the progression is that you've already found, each of
23   the 12 of you, beyond a reasonable doubt guilt and
24   you've already found, each of the 12 of you, beyond a
25   reasonable doubt that Special Issue No. 1 is true, or

44

1    yes is the proper response.
2            You've indicated the history and
3    background and kind of a track record of the
4    individual is going to be important to you, correct?
5    **A.   Yes.**
6    Q.   Are you going to be able to make this
7    evaluation, take this one final look?
8            You've already decided in this situation
9    not only the things that I put on the slide before you
10   prior to Special Issue No. 1, but you've already
11   decided this gentleman is, in your opinion, beyond a
12   reasonable doubt a future danger.  Okay?
13   **A.   Okay.**
14   Q.   Will you give consideration to mitigating
15   evidence and evaluate this question?
16   **A.   Yes.**
17   Q.   You see how it's kind of a -- Oh, I've heard
18   it described as a safety net.  It's one final look at
19   the total picture to make a -- kind of a gut check,
20   kind of a is it really appropriate to assess death?
21   **A.   Yes, I believe so.**
22   Q.   You think this is a process that you can
23   participate in?
24   **A.   Yes.**
25   Q.   You've given it some thought since we've had

45

1 you up here last, at least that's what I kind of
2 picked up when you were talking with Mr. Gill, have
3 you not?
4    **A.  Yes.**
5    **Q.**  You said something when you were talking with
6 Mr. Gill about being important to know why it was
7 done, and, of course, that's not part of the proof.
8 But when you -- when we talk about mitigation, and I
9 actually have a definition, it's a little broader than
10 that.  Can you see that?
11    **A.  Yes.**
12    **Q.**  My concern with that comment you made is, is
13 that based upon this definition and your comment that
14 you might consider mitigation only as it applies to
15 the offense.  Is that a fair statement or --
16    **A.  I'm not understanding your question.**
17    **Q.**  I don't blame you.  I mean, we've been doing
18 this so long, we're punchy.  I'm sorry.  That wasn't a
19 very good question.  I don't even know if it was a
20 question.
21         There -- Mr. Gill talked to you about
22 age, you know, may be mitigating --
23    **A.  Yeah.**
24    **Q.**  -- may not be.  That obviously is more of the
25 status of the individual, not the offense.

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

47

1    **A.  Yes.**
2    **Q.**  Okay.  What did your mother-in-law do for the
3 Los Angeles Sheriff's Department?
4    **A.  She was like a clerk.**
5    **Q.**  Did she retire from there?
6    **A.  Yes.**
7    **Q.**  You worked as a security guard during the
8 Olympics in 1984.
9    **A.  Yes.**
10    **Q.**  What did you do?
11    **A.  I worked at a housing where they kept -- where**
12 **the athletes stayed, USC.**
13    **Q.**  You get any special training in order to do
14 that?
15    **A.  No, not really.**
16    **Q.**  I'm trying to remember whether the -- the
17 incident in one of the Olympics involving the
18 Israelis.  Wasn't that before 1984?
19    **A.  That was before.**
20    **Q.**  Is that something that you-all were trained
21 about and worried about?
22    **A.  No.  Because where we were -- like I said, I**
23 **think our training lasted maybe four or five hours and**
24 **it was basically just observe, document.  We had to do**
25 **like a daily log.  And, like I said, check the**

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

46

1    **A.  Yes.**
2    **Q.**  And what I'm trying to find out is if you will
3 give consideration, at least, to anything that you may
4 hear regarding the defendant and whatever evidence is
5 brought to you in the punishment phase to try to get
6 you to take a look at the individual --
7    **A.  Yes.**
8    **Q.**  -- in addition to the crime.
9    **A.  Yes.**
10    **Q.**  Okay.  Do you think -- When they talk about
11 reducing the defendant's moral blameworthiness, I
12 don't really -- we have asked most jurors what they
13 believe that means, and I don't think we've gotten the
14 same response.  I don't know that I could give you a
15 definition of what that means.  I guess it's an
16 individual thing.
17         What does that mean to you?
18    **A.  Like I said, the reason why he committed this**
19 **offense.**
20    **Q.**  Okay.  And that's the concern we have is that
21 you would narrow mitigation to just that.  Mitigation
22 is not according to law, or at least there's no tie
23 between the crime and the evidence presented as far as
24 mitigation.
25         So will you accept that and listen?

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

48

1 credentials as the athletes came in and out of the
2 housing.
3    **Q.**  Did -- Were you able to see any of the games?
4    **A.  No.**
5    **Q.**  No.  There wasn't any perks?
6    **A.  Pins from different countries.  Some of the**
7 **athletes would give you pins.**
8    **Q.**  We had some -- I believe it was gymnastic
9 games here.  That's where I learned about the pins.
10    **A.  Yes.**
11    **Q.**  Swapping the pins and getting you a collection
12 and stuff like that.
13         You indicated that you thought the
14 criminal justice system was broken?
15    **A.  Yes, sir.**
16    **Q.**  What do you mean by that?
17    **A.  Just by how -- like out here, I think you guys**
18 **have the -- just release the prisoners who have been**
19 **in jail for 27 years.  They say there are more**
20 **prisoners in jail that might be released or might not,**
21 **but we don't have the money to check everybody's DNA**
22 **to see if they're innocent or guilty.  So, like I say,**
23 **I don't believe that's fair.**
24    **Q.**  How would that apply to your service?
25    **A.  It doesn't.  That's a totally different**

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

49

1  situation.
2      Q.  Okay.  Does it give you concern about making
3  sure the evidence is -- is there before you make your
4  decision?
5      A.  Yes.  That the evidence would have to be
6  there, yes.
7      Q.  The last thing I want to talk about is this
8  slide here, and it's really important because I think
9  you're close.  I don't know how they'll exercise their
10  decision.  You'll know shortly.
11         But you have these rights.  You have the
12  right to the truth, the absolute truth.  You have the
13  right to your own determination regarding what's
14  mitigation.  It takes 12 votes, and that's the
15  protection we have.
16         All 12 -- It's a unanimous situation.
17  It's not like anything else you've done except that
18  experience you had 20 years ago.  It's not a majority
19  rules.  You're just as powerful -- just as important
20  as any other juror in that room.  Okay?
21      A.  Okay.
22      Q.  You have any questions about that?
23      A.  No.
24      Q.  Thank you very much for your attention.
25         THE COURT:  Mr. Dennis, if you will have
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

50

1  a seat out in the front hallway, we will call you back
2  out in just a few minutes.
3         PROSPECTIVE JUROR:  Okay.
4         THE COURT:  State have a challenge for
5  cause?
6         MR. GILL:  No, Your Honor.
7         THE COURT:  Defense?
8         MR. CUMMINGS:  No, Your Honor.
9         THE COURT:  State need to exercise a
10  peremptory?
11         MR. GILL:  May we have a moment?
12         THE COURT:  Yes.  State?
13         MR. GILL:  What was the question?
14         THE COURT:  Does the State exercise a
15  peremptory?
16         MR. GILL:  We do.
17         THE COURT:  Would you call him back in,
18  please.  All right.  Mr. Dennis, you are not going to
19  be remaining as a juror in the case.  You don't have
20  to return for any further proceedings.
21         I want to thank you, though, very much
22  for your participation in the process.  It's vital to
23  our system of justice.  If you will leave that plastic
24  part of your jury badge with the bailiff, the central
25  jury room is going to mail you your jury check.
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

51

1         PROSPECTIVE JUROR:  Okay.
2         THE COURT:  Okay.  Thank you very much.
3         PROSPECTIVE JUROR:  Thank you.
4         MR. BRISSETTE:  Judge, before we call the
5  next one, can we talk to the defense?
6         THE COURT:  Yes.  Talk to the defense.
7         MR. BRISSETTE:  Can we step back in the
8  back?
9         THE COURT:  You sure can.  Why don't we
10  just take a little break.
11         (Break taken.)
12         (Defendant present.)
13         THE COURT:  Okay.  On the record.
14         It's my understanding that the parties
15  have agreed to excuse Jurors 133 and 138; is that
16  correct?
17         MR. BRISSETTE:  Yes, Your Honor.
18         THE COURT:  Is that correct,
19  Mr. Cummings?
20         MR. CUMMINGS:  Yes.  And I've spoken to
21  Mr. Hummel and he's in agreement with that, Your
22  Honor.
23         THE COURT:  Is that correct, Mr. Hummel?
24         THE DEFENDANT:  Yes, ma'am.
25         THE COURT:  Okay.  I need to bring in 133
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

52

1  because he is the juror who is currently on bond for
2  potential contempt charges for failure to appear at
3  the mini panel.  So if you'll bring him in, please.
4         THE BAILIFF:  Bring him all the way up?
5         THE COURT:  You can just have him stand
6  at the gate right there.  Okay.  Right there.
7         Mr. Nikko Martinez; is that correct?
8         PROSPECTIVE JUROR:  Yes.
9         THE COURT:  And, Mr. Martinez, you
10  appeared in front of Judge Gonzalez and he placed you
11  on bond for your failure to appear at the mini panel
12  interview that was conducted in this case; is that
13  right?
14         PROSPECTIVE JUROR:  Yes.
15         THE COURT:  Okay.  Did you get taken into
16  custody by the bailiffs?
17         PROSPECTIVE JUROR:  Yes.
18         THE COURT:  And how did you make a bond?
19         PROSPECTIVE JUROR:  My -- I got bonded
20  out.  I don't know if my uncle or my dad bailed me
21  out.
22         THE COURT:  Okay.  Did they pay a
23  bondsman or did they pay a cash bond?
24         PROSPECTIVE JUROR:  I'm not too sure.  I
25  don't really know.  I think it was a bondsman.
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

53

1   THE COURT: So you haven't had any
2 out-of-pocket expenses for --
3   PROSPECTIVE JUROR: Well, it's -- it was
4 a bondsman. His name is David --
5   MR. CUMMINGS: -- Gallagher?
6   PROSPECTIVE JUROR: I'm not sure what the
7 name is.
8   THE COURT: Okay. Are you going to pay
9 your uncle or your dad back for the money that they --
10   PROSPECTIVE JUROR: Yes.
11   THE COURT: -- paid the bondsman?
12   PROSPECTIVE JUROR: Yes.
13   THE COURT: Okay. Do you know how much
14 that is?
15   PROSPECTIVE JUROR: I think it was 50 for
16 the --
17   THE COURT: Okay. Well, that's not very
18 much money. But I'm assuming that being taken into
19 custody and having to appear in front of Judge
20 Gonzalez made an impression on you on how important
21 this is?
22   PROSPECTIVE JUROR: Yes.
23   THE COURT: Okay. And you have an uncle
24 who's a deputy sheriff, right?
25   PROSPECTIVE JUROR: Yes.

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

54

1   THE COURT: Okay. Well, it is important,
2 and this case is of particular seriousness. And so
3 that's why your not showing up when you were supposed
4 to has been taken so seriously.
5   PROSPECTIVE JUROR: I just -- I mean, I
6 forgot all about it. I was at work.
7   THE COURT: Okay. Well --
8   PROSPECTIVE JUROR: I just -- I mean, I
9 had just got this new job and I work ten-hour days and
10 I just forgot all about it.
11   THE COURT: Okay. Well, I'm -- I'm going
12 to not punish you any further than you've already been
13 punished. Okay?
14   PROSPECTIVE JUROR: Thank you.
15   THE COURT: You're going to be released
16 as a potential juror and you're also going to be
17 released from any further liability on your bond. The
18 bondsman's not going to give you your money back, but
19 you're not going to be on bond any more. Okay?
20   PROSPECTIVE JUROR: Okay.
21   THE COURT: But just let that be a lesson
22 to you to --
23   PROSPECTIVE JUROR: Yes.
24   THE COURT: -- how serious that is.
25 Okay?

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

55

1   PROSPECTIVE JUROR: Uh-huh.
2   THE COURT: All right. Well, you can go
3 for today and you don't have to come back any more on
4 this case.
5   PROSPECTIVE JUROR: Okay. Thank you.
6   THE COURT: Okay. Thank you. 134.
7   THE BAILIFF: 134 is here.
8   THE COURT: Okay. We're ready. You're
9 going to sit right up here in this green chair,
10 please.
11   PROSPECTIVE JUROR: Good morning.
12   THE COURT: Good morning. You are
13 Potential Juror No. 134, Maria Ruiz; is that correct?
14   PROSPECTIVE JUROR: That is correct.
15   THE COURT: All right. Ms. Ruiz, I need
16 for you to raise your right hand, please.
17   (Prospective juror sworn.)
18   THE COURT: Okay. You're going to need
19 to either scoot up or move that microphone because
20 everybody is going to need to be able to hear you.
21 It's a little nerve racking being up there all by
22 yourself, but you're the 134th person that we've
23 talked to and everybody has been nervous to sit in
24 that seat.
25   Okay. This is your individual interview.

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

56

1 The attorneys for both sides in this case are going to
2 have the opportunity to talk to you today about some
3 legal issues, some questions off your jury
4 questionnaire and the death penalty. Okay?
5   PROSPECTIVE JUROR: Okay.
6   THE COURT: You'll recall that the person
7 on trial is John William Hummel, and he is represented
8 by Fred Cummings, Larry Moore and Pamela Fernandez,
9 and the State of Texas is represented by Miles
10 Brissette and Robert Gill.
11   Has anything changed since you filled out
12 your jury questionnaire about a month ago that would
13 affect your ability to serve in this case?
14   PROSPECTIVE JUROR: No.
15   THE COURT: Has anything about your
16 schedule changed since we talked to you at the mini
17 panel discussion that would affect your ability to
18 serve?
19   PROSPECTIVE JUROR: No.
20   THE COURT: Okay. Well, it's going to
21 take about an hour for both sides to talk to you.
22 There's water right here in this pitcher if you're
23 thirsty. Okay?
24   PROSPECTIVE JUROR: Okay.
25   THE COURT: All right. State, you may

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

57

1   proceed.
2         MR. GILL:  Thank you, Judge.
3             MARIA RUIZ,
4   a prospective juror, having been first duly sworn,
5   testified as follows:
6       **VOIR DIRE EXAMINATION BY THE STATE**
7   BY MR. BRISSETTE:
8       Q.   Good morning, ma'am.  How are you?
9       A.   Okay.  Thank you.
10      Q.   We're going to go over a little bit about your
11  questionnaire first and then talk to you about some of
12  the laws that applies in a punishment phase of a
13  capital case.
14           Did you have a chance to study your
15  homework assignment the judge gave you a couple weeks
16  ago?
17      A.   I didn't.
18      Q.   Okay.  So as we go through some of this, you
19  have raised five children?  Yes?
20      A.   Yes.  Five.
21      Q.   Congratulations, ma'am.
22      A.   Thanks.
23      Q.   Was it difficult to keep all five in line as
24  they were growing up?
25      A.   Not so much.  They're good kids, so...
       ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
                  alliedfwtx@aol.com

58

1       Q.   Your husband works as a mechanic for the
2   federal government, for the postal service?
3       A.   Yes.
4       Q.   How long has he worked for the federal
5   government?
6       A.   Well, I guess since '98, '99 for the post
7   office, but he was active duty in the Army since 1989
8   or '90.
9       Q.   And what does he do?  He's a reservist now in
10  the Army, is he not?
11      A.   Yes, sir.  Yes, sir.
12      Q.   What does he do in the Army?
13      A.   I'm not sure.
14      Q.   Do you know his rank?
15      A.   E-7.
16      Q.   E-7?
17      A.   Yes.
18      Q.   Has he been deployed overseas as part of the
19  ongoing operations?
20      A.   Yes.  2005 he was in Iraq and, I think, 2008
21  in Oklahoma for a year each time.
22      Q.   Oklahoma?
23      A.   Uh-huh.
24      Q.   Does he work with a particular deal?  Is he
25  with the tanks or is he with artillery?
       ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
                  alliedfwtx@aol.com

59

1       A.   Well, heavy equipment.
2       Q.   Is he a mechanic then with them as well?
3       A.   Yes.
4       Q.   Does he enjoy his work with the military?
5       A.   Yes, he does.
6       Q.   He also -- He also was a -- tried to apply at
7   the Fort Worth Police Department at one point?
8       A.   Yes.
9       Q.   What was his interest in the police
10  department?
11      A.   He just likes that job, helping people.
12      Q.   And he chose to go with the postal service
13  instead?
14      A.   Yes.
15      Q.   Some would say that's a safer job?
16      A.   I guess.
17      Q.   And I notice that you were born in Mexico?
18      A.   Yes, I was.
19      Q.   And when did you become a United States
20  citizen?
21      A.   Maybe -- I guess four years ago.
22      Q.   What's your favorite Disney movie?
23      A.   I guess, Bambi.
24      Q.   Is there a particular place that you like
25  playing bingo at?
       ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
                  alliedfwtx@aol.com

60

1       A.   Yes.
2       Q.   Which bingo hall is your favorite?
3       A.   Over there on Carson Street, Haltom City.
4       Q.   The -- You have a sister that is married to a
5   person that's been in some trouble?
6       A.   Yes.  My brother-in-law is in jail right now.
7   DUI.
8       Q.   Is he -- You listed on your questionnaire
9   that -- is your brother-in-law, has he been violent
10  towards your sister?
11      A.   Yes.
12      Q.   Is that the domestic violence that's listed in
13  your questionnaire?
14      A.   No.  That happened to me.
15      Q.   This is -- quite an intimate room we can
16  get with the number of people that are here.
17           The domestic violence that you received,
18  was that from your husband?
19      A.   Yes.
20      Q.   Was he charged here in Tarrant County?
21      A.   Yes.
22      Q.   What was the outcome of that prosecution?
23      A.   He just had to go to some classes.
24      Q.   How long ago was that?
25      A.   Maybe ten years ago.
       ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
                  alliedfwtx@aol.com

**61**

1  Q.  Did you have to go to a particular court ten
2  years ago?  Did you have to go to classes as well?
3  A.  No.  I don't -- I don't think so.
4  Q.  Did you have to come down and meet with
5  anybody in this building to talk about the case?
6  A.  I really don't remember if I came to court or
7  just went to the lawyer's office.
8  Q.  Were you wanting the case to be dismissed
9  after he took the classes?
10  A.  Yes.
11  Q.  Because you understand that ten years ago,
12  that would have been the office that I work at?
13  A.  Oh.
14  Q.  The district attorney's office would be the
15  one prosecuting your husband back then.
16  A.  Uh-huh.
17  Q.  It may have included -- back then I was in the
18  domestic violence unit.  It may have been myself and
19  others that are here in the courtroom that were the
20  prosecutors back then in that -- on that team.
21  A.  I don't think it went to trial.
22  Q.  Okay.
23  A.  I'm not sure.
24  Q.  Was it something that you wanted to be
25  dismissed?

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**62**

1  A.  Yes, because he went to classes.
2  Q.  Have things gotten better?
3  A.  Yes.
4  Q.  Would you hold any of that against the State
5  of Texas for us being the -- we represent all the law
6  enforcement when it comes to court.
7  So you understand that my office, the
8  office that Mr. Gill and I work for, would have been
9  the ones prosecuting that case.  Any problems with
10  that?
11  A.  No.
12  Q.  The case that your brother-in-law is currently
13  in jail for, is he in jail here across the street?
14  A.  I'm not sure because they moved him from one
15  jail to another one.  So right now I don't know where
16  he is at.
17  Q.  But is it here in Fort Worth, though?
18  A.  Yes.
19  Q.  And you understand that would be our office as
20  well?
21  A.  Yes, sir.
22  Q.  Any issues with us prosecuting your
23  brother-in-law for the DWI and the domestic violence
24  against your sister?
25  A.  No, because I think he's where he's supposed

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**63**

1  to be right now.
2  Q.  And I forgot to mention earlier.  We're going
3  to have some stuff show up here on the screen.  You
4  understand that the only oath you're under right now
5  is simply to tell us the truth?
6  A.  Yes.
7  Q.  Whatever your feelings are, we're going to
8  talk about them.  Let us know -- that way everybody
9  can make an informed decision.  Okay?
10  A.  Okay.
11  Q.  So when we started at the back of your
12  questionnaire, we got into topics that talked about
13  the death penalty and capital punishment.
14  As we go through those, you had to fill
15  this out in a vacuum.  Think back about six weeks ago
16  when you filled this out and you were hustled into
17  that big room and nobody really told you what was
18  going on until Judge Gonzalez said that this was going
19  to be a capital murder case.
20  And then we gave you the questionnaire,
21  but we really didn't tell you what -- how to -- how
22  the law actually worked and you had to fill this out
23  in a vacuum.
24  You have a question here that, Are you
25  generally in favor of the death penalty as punishment

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

**64**

1  for capital murder, and you checked yes.
2  Anybody that takes a life don't deserve
3  to live is your answer.  And you've had a chance to
4  listen to Mr. Gill and Mr. Cummings when we talked to
5  you in the larger group, not the biggest group, but
6  the 50-person group.
7  A.  Uh-huh.
8  Q.  You understand that there's different
9  elements, different procedures for a capital crime.
10  So it's not available for all murders.
11  A.  Uh-huh.
12  Q.  So you understand that now?
13  A.  Yes, I do.
14  Q.  Does that help answer some of your questions
15  and maybe change some of your answers here that --
16  capital crime, you have to go through certain
17  procedures and steps to qualify for a capital offense?
18  A.  Uh-huh.
19  Q.  And the death penalty is only available for
20  those type of crimes?
21  A.  Uh-huh.
22  Q.  Does that make some sense?
23  A.  Yes.
24  Q.  Does that make sense now when you look at your
25  answer that you may have to reserve the capital

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

65

1  punishment for --
2          THE REPORTER:  I'm sorry.
3          THE COURT:  Okay.  Ma'am, if you will
4  just wait.  He has to finish his question before you
5  start answering, because she has to type everything
6  down.
7          PROSPECTIVE JUROR:  Okay.
8          THE COURT:  Okay.  Thank you.
9      Q.  (BY MR. BRISSETTE)  My fault.  So as we look
10  at this, that's what we're going to go through this
11  morning as part of this -- because if you take an oath
12  as a juror, that's the second oath.
13          If you're selected as a juror in a case,
14  you have to render a verdict that's based on the law
15  and the evidence.  So this morning we want to
16  understand what your feelings are.  We want to
17  understand your feelings on the capital punishment, on
18  murder and on capital punishment.  We'll go through
19  both.
20          But if you're selected as a juror, the
21  law says you have to set all your personal feelings
22  aside and keep an open mind and follow the law.  The
23  judge is going to give you the law in the case.
24          Mr. Gill talked to you a couple weeks ago
25  about the Court's charge.  The judge prepares a
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

66

1  document, and it won't be 26 pages -- It might be
2  long, though -- and it lays out all the law that the
3  jury would take back with them to the jury room to
4  deliberate a case.
5          So your second oath, if you're selected
6  as a juror, is that you're going to render a verdict
7  that's based on the law that the judge gives you.  And
8  you take the law the judge gives you and you apply it
9  to everything you've heard as a juror.
10          So all the exhibits that come in, all the
11  testimony that you hear from the witness stand, just
12  like what you're sitting at now, that's how you work
13  through this.  And the law asks you to keep an open
14  mind and wait until all the evidence comes in before
15  you make a decision.
16          Does that make some sense?
17      A.  Yes.
18      Q.  Do you think you could do that?
19      A.  Yes, I can.
20      Q.  It's a pretty simple concept, but in -- just
21  in thought, but applying it takes a different
22  approach.  You got to keep an open mind to follow your
23  oath as a juror.  And based on your oath as a juror,
24  render the facts in the case and judge them and go
25  through them.
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

67

1          Does that make some sense?
2      A.  Yes, it does.
3      Q.  First question of the day for you:  Is there
4  any reason, be it moral, ethic or religious, you
5  cannot be part of a process that results in a death
6  penalty?
7      A.  No.
8      Q.  When we're talking about a capital crime, the
9  law that we're talking about in this case is what's on
10  the screen now:  A person commits capital murder when
11  he knowingly murders more than one person during the
12  same criminal transaction.  So there's two homicides
13  during the same criminal transaction.
14          Now, if you recall from what Mr. Gill
15  talked to you about a couple weeks ago, when Bob was
16  up, the words that aren't defined in the penal code,
17  like "same criminal transaction."
18      A.  Uh-huh.
19      Q.  You get to apply what it means in your normal,
20  everyday life; what the word "transaction" means, what
21  the word "sane" means to you.  And you get to come up
22  with what the definition is in your own mind for that
23  phrase.  Okay?
24      A.  (Nods head.)
25      Q.  Some examples of that that we've talked about
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

68

1  here to the first 133 folks that have been through
2  here, "same criminal transaction" may be when the
3  federal building up in Oklahoma City was blown up back
4  in the '90's.
5          That was one bomb that took out a lot of
6  folks.
7      A.  Uh-huh.
8      Q.  Other examples have been where we have had,
9  you know, massive shootings where people go in -- like
10  when the church was shot here in Fort Worth -- where
11  people go in and people were shot in different parts
12  of the church.  It wasn't all the same room.
13          Or we have an individual that gets upset
14  at somebody else, a couple of his buddies, and goes
15  across town and may shoot one person in one part of
16  Fort Worth and they drive to the other part of Fort
17  Worth and shot another buddy because he's mad at them
18  because they cheated on him, took some money from him.
19          Those are just examples that have been
20  around, but it's up to you and what you decide what
21  "same criminal transaction" means to you.  Okay?
22      A.  Okay.
23      Q.  But that brings up an important point of what
24  the State has to do.  Remember when you take that
25  second oath to follow the law, the State brings forth,
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

69

1  if you'll recall, an indictment in a case, and that
2  puts the defendant on notice for what they're being
3  charged with.
4      **A.  Uh-huh.**
5      **Q.**  And we have to list out all the elements of
6  the offense in there.  And one of the elements is what
7  they call a manner and means element.  And what that
8  is, is if -- it's a homicide case and I say that, the
9  defendant on or about a certain date did knowingly
10  kill an individual by shooting him with a firearm.
11          The manner and means of the death was
12  shooting with a firearm.  Okay?
13     **A.  Okay.**
14     **Q.**  That's in the indictment.  At trial the
15  testimony doesn't bear that out.  At trial it bears
16  out that the person wasn't shot with a firearm.  They
17  were stabbed with a knife.  Okay?
18     **A.  Okay.**
19     **Q.**  Words have meaning in a courtroom, especially
20  words that the State of Texas chooses to put in an
21  indictment.
22          So if the indictment said, shot with a
23  firearm, and it was proven that they were stabbed with
24  a knife, the jury has no choice but to find the
25  defendant not guilty, do they?

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

70

1      **A.  Yes.**
2      **Q.**  Because the words have meaning and the State
3  chose the wrong words.  Person may be guilty as all
4  get out for the homicide, but the State didn't live up
5  to its burden by meeting the elements beyond a
6  reasonable doubt.
7          Does that make some sense?
8      **A.  Yes, it does.**
9      **Q.**  And as a juror, when you take that second
10  oath, you have to -- despite what you think is fair.
11  The fair thing is to find a defendant not guilty.  You
12  may be very upset at the DAs that were trying the case
13  and call their boss or go to the media and tell them
14  what a lousy job we did, but the tie goes to the
15  runner and that's how our system works.
16          Do you agree with that?
17     **A.  Yes.**
18     **Q.**  If you took an oath as a juror, do you think
19  you could obey the rules and follow the law in that
20  case?
21     **A.  Yes.**
22     **Q.**  Now, the same holds true with what Mr. Gill
23  talked to you about when he talked about witness
24  statements or statements made by a particular -- a
25  defendant.

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

71

1      **A.  Uh-huh.**
2      **Q.**  Remember that the police have to follow
3  certain procedures to take a statement from somebody
4  that's in custody.  Okay?
5      **A.  Yes.**
6      **Q.**  And if they don't do that right, the rules say
7  you have to disregard that statement and not use it in
8  your evaluation of whether or not the State met its
9  burden of proof.
10          Now, that could be just as difficult as
11  looking at the two manner and means, but if that is an
12  issue, the Court's charge will have the instructions
13  on how to do that in the charge.
14          Is -- your oath as a juror, you would
15  have to follow those instructions.  And if the State
16  didn't meet their burden in how they got the
17  statement, you would have to disregard that statement
18  and render your verdict based on the other evidence.
19          Can you do that?  Can you follow that
20  law?
21     **A.  Yes.**
22     **Q.**  The other part of this is when we're talking
23  about reaching a guilt/innocence verdict.  Remember
24  that if we don't prove that it's the same criminal
25  transaction to you, it still may be homicide, but it

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

72

1  may not be part of the same criminal transaction.
2  That's a regular murder.
3      **A.  Okay.**
4      **Q.**  You remember us talking about that?
5      **A.  Yes, I do.**
6      **Q.**  And a regular murder has a punishment range of
7  5 to 99 years or life.  Remember when Mr. Gill talked
8  to you about -- that the low end of the punishment
9  range could be reserved for some crime.  And then the
10  high end, that you have to look at the facts first?
11     **A.  Yes, I remember.**
12     **Q.**  And I don't know if it was clear, and
13  sometimes it isn't, and I want to make sure it is.
14  When you're looking at the punishment range for a
15  case, whether it's the capital phase we're going to
16  talk about here in a second or a phase for a regular
17  homicide, you already found that individual guilty of
18  that crime.
19          So that information that you use to find
20  the person guilty of the homicide, if we're talking
21  about 5 to life, you found the person guilty, so you
22  have some information at that point.
23          Now, you can decide that this case merits
24  a low end of the punishment range or it's a case that
25  it's the most heinous you can think of and it needs

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

73

1  the upper end of the punishment range, but the law
2  requires you as a juror to keep an open mind and
3  consider both. Okay?
4  **A. Okay.**
5  **Q.** It doesn't tell you how long you have to
6  consider it. It just says you have to consider it.
7  In your consideration, you apply the facts that you've
8  gathered throughout the case and then you make an
9  informed decision as to the appropriate punishment.
10      Can you do that?
11  **A. Yes, I can.**
12  **Q.** The question always goes: If the facts
13  justify it, the facts being the evidence, and the law
14  allows it, which is that range, can you give full and
15  fair consideration to the range of punishment?
16      And I think what you're saying is: Yes.
17  You could follow your oath as a juror and keep that
18  open mind?
19  **A. Yes.**
20  **Q.** When we're talking about evidence at a
21  punishment phase, whether it's a regular homicide case
22  or a capital case, the State -- as I just said, you
23  can take all the evidence you've heard at the first
24  phase and consider that, but the State can bring you
25  additional evidence at the punishment phase.

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

74

1      We can bring you evidence of bad
2  character or bad reputation of a defendant that we
3  were not allowed to talk about during the
4  guilt/innocence phase, the first phase of the case.
5      There may be other crimes a particular
6  person has done that weren't in that indictment that
7  would be read to the jury that we can bring up in the
8  punishment phase as well and prove up additional
9  crimes.
10      Does that make some sense?
11  **A. Yes.**
12  **Q.** So when you go back for the second
13  deliberation -- I know you read your homework
14  assignment -- those two questions, the two special
15  issues that we have to deal with, we have shorthand
16  versions of them here called future dangerousness,
17  which is Question No. 1, and sufficient mitigation for
18  a life sentence.
19      And depending on how a jury answers those
20  two questions tells the judge how to sentence a
21  particular defendant. I know you had in your
22  questionnaire that Question No. 34: You want to serve
23  as a juror on the case, and you checked no.
24      You know it's not really a volunteer
25  service like the military right now. People really

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

75

1  don't want to come down to jury duty.
2      Does that make some sense?
3  **A. Yes.**
4  **Q.** I know you're doing your civic duty. And I
5  know that you put on here that I wouldn't like to have
6  somebody's fate in my hands. And you understand
7  that -- you know the answer -- the outcome to your --
8  how you answer the questions, but, ultimately, it's
9  the judge that does the sentencing.
10      Does that make some sense?
11  **A. Yes, it does.**
12  **Q.** What are your thoughts on that?
13  **A. Well, I think the judge has more knowledge,**
14  **that's why he's a judge -- or she's the judge, and I**
15  **respect her for that.**
16  **Q.** Okay. But you understand that how you answer
17  the questions, the judge has to follow what you --
18  what you -- the jury recommends, if you're on the
19  jury?
20  **A. Yes.**
21  **Q.** So you're simply answering two questions
22  independently because you have to vote each time after
23  each question?
24  **A. Yes.**
25  **Q.** And it depends on how you -- how you as a

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

76

1  jury, if you were on the jury, vote for those
2  questions determines what the judge has to do.
3      Does that make some sense?
4  **A. Yes.**
5  **Q.** The jury is not actually sentencing the
6  person. The judge is just reading what the jury has
7  put forth and deciding based on how that sequence
8  comes out what takes place.
9      Does that make some sense?
10  **A. Yes.**
11  **Q.** Do you have any concerns that you would have
12  any trouble doing any of that, answering the two
13  questions?
14  **A. No.**
15  **Q.** Anybody on the ground behind me?
16  **A. No.**
17  **Q.** Okay. The judge would instruct you, if you're
18  on the jury, that a sentence of life without parole
19  means that a defendant is ineligible from release from
20  prison on parole.
21      So if you find a person guilty of capital
22  murder in the State of Texas under the definition we
23  gave you, you've already found that they've committed
24  two homicides during the same criminal transaction, so
25  they've killed two people, there's two options for --

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

77

1  legally left in their life.
2      They're either going to spend the rest of
3  their life in prison and die of natural causes or
4  they're going to be executed by the State of Texas at
5  some point in time.
6      Does that make some sense?
7   **A.  Yes.**
8   **Q.**  So, like, you just keep that in the back of
9  their mind, that they're not going to be out on the
10  streets again, as we go through and look at these
11  questions.
12      Special Issue No. 1.  Give you a second
13  to look over that and refresh your memory.  So the
14  folks down in Austin that got called back into special
15  session this week, they're the ones that came up with
16  these two questions and they could have chosen any
17  words that they wanted to put in here.
18      And the first word I want to go over with
19  you here is "probability."  They could have put
20  absolute certainty in here.  They could have put the
21  lower end possible in here, but they put probability
22  in here.
23      Do you have an everyday meaning for
24  probability in your life?
25   **A.  Well, like I tell the kids, if they do**

78

1  something bad --
2   **Q.**  There's a probability --
3   **A.  Yes.**
4   **Q.**  -- that something bad's going to happen to
5  them?
6   **A.  Yes.**
7   **Q.**  Okay.  And it's -- it's one where you've got
8  to put your everyday meaning to it.  It's not an
9  absolute certainty.
10      Would you agree with that?
11   **A.  Yes.**
12   **Q.**  And someone said that it's more likely than
13  not.  It's greater than possible.  But you have to --
14  when you're looking at this, would you agree with me,
15  you have to size up and look at everything as you're
16  looking at the questions, because you had a chance to
17  read over them and reflect on them before you came to
18  court, didn't you?
19   **A.  Yes.**
20   **Q.**  Criminal acts of violence.  Here, once again,
21  they could have put anything they wanted in the
22  legislature.  They could have put future homicides,
23  future murders.
24      A criminal act of violence could be an
25  assault such as what you've received in the past.

79

1  Okay?
2   **A.  Uh-huh.**
3   **Q.**  Do you see where it could be many different
4  things that -- you know, an act of violence?  It's
5  what you yourself -- It's not defined anywhere.  So
6  this is one of those that -- where it would be
7  something a juror first themselves have to come up
8  with their own meaning and then collectively as part
9  of a whole, as part of the jury.
10      Does that make some sense?
11   **A.  Yes, it does.**
12   **Q.**  In your mind, can you think of some criminal
13  acts of violence -- what might be criminal acts of
14  violence?
15   **A.  Rape, just robbing a bank.**
16   **Q.**  And there could be acts of violence -- would
17  you agree with me that there'd be acts of violence in
18  prison?
19   **A.  Yes.**
20   **Q.**  And really any place could be turned violent
21  and have a violent act at any time depending on who's
22  in there, right?
23   **A.  Right.**
24   **Q.**  That's kind of what happens in society.
25  Intersections one day are a peaceful place and the

80

1  next day there's a gun battle there.
2      You've seen that throughout your life,
3  right?
4   **A.  Yes, I have.**
5   **Q.**  And when we talk about society in this
6  context -- What does society mean to you?
7   **A.  People.**
8   **Q.**  People?
9   **A.  Anybody.**
10   **Q.**  And people could be in prison and people could
11  be out of prison, right?
12   **A.  Right.**
13   **Q.**  And in our prisons we have people that aren't
14  in trouble working in the prisons, like the guards and
15  stuff like that.  Yes?
16   **A.  Yes.**
17   **Q.**  So you see how society could affect and be
18  more than just prisoners if we're looking at their --
19  if we're looking at this in the context that they're
20  never leaving the penitentiary system, then that has
21  to be part of society or we wouldn't be able to answer
22  the question ever, right?
23   **A.  Right.**
24   **Q.**  Now, following that oath as a juror to keep an
25  open mind, you have to hold the State, in this

81

1 question, to its burden of proof that you had during
2 the guilt/innocence phase, whether or not they were
3 guilty of the capital murder.
4       For this Special Issue No. 1, you have to
5 hold the State to its burden of proof. Mr. Gill and I
6 have to prove to a jury beyond a reasonable doubt that
7 a particular person would be a future danger.
8       Does that make any sense?
9    A.  Yes, it does.
10   Q.  And the State's only entitled to a "yes"
11 answer from a jury if we prove to the jury unanimously
12 that a person is a future danger.
13       Does that make some sense?
14   A.  Yes.
15   Q.  If we don't prove to a jury beyond a
16 reasonable doubt that they are a future danger, what
17 should the jury say?
18   A.  No.
19   Q.  No. Knowing that a "yes" answer to that first
20 question would move a defendant one step closer to the
21 death penalty, would you be able to answer "yes" if
22 the State proves to you beyond a reasonable doubt that
23 it should be yes?
24   A.  Yes.
25   Q.  The same would hold true if Mr. Gill and I
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

82

1 don't meet our burden, we don't prove to a jury beyond
2 a reasonable doubt, would you be able to answer that
3 question no?
4    A.  Yes. I would be able to.
5    Q.  And that's part of your oath as a juror, to
6 keep that open mind and make that call at that time,
7 right?
8    A.  Right.
9    Q.  Now, I want to make sure we're clear. Do you
10 understand that it takes 36 unanimous votes to reach
11 the death penalty?
12   A.  Yes.
13   Q.  And what we're talking about is a jury has
14 already voted 12 to 0 unanimously to find someone
15 guilty. There's a separate vote for Special Issue
16 No. 1. It's not an automatic vote from Special Issue
17 No. 1 from the guilt/innocence phase.
18       You don't vote guilt/innocence guilty,
19 then automatically say yes.
20   A.  Yes.
21   Q.  You have to keep that --
22   A.  Sorry.
23   Q.  You have to keep that open mind as a juror and
24 take another look at the facts from scratch and look
25 at it. The crime itself may get you to a yes. That's
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

83

1 possible under the law.
2       But the law says to be a fair juror and
3 to keep that open mind, you have to look at all the
4 evidence. Can you do that?
5    A.  Yes.
6    Q.  And you'll treat Question 1 separate than the
7 guilt/innocence phase?
8    A.  Yes.
9    Q.  If a jury answers Question 1 "yes," then we go
10 to Question 2. Question 2. I'll let you read over
11 that again.
12   A.  (Witness complies.)
13   Q.  Okay. So they got wordy with the second
14 question. Do you ever wonder why legislation gets
15 long? It's because they have a typewriter that
16 doesn't stop. Okay.
17       But this is an important question. And
18 the first thing you'll notice on this second question
19 is there's no burden on this case on this question.
20 Okay?
21   A.  Okay.
22   Q.  The beyond a reasonable doubt is gone. Some
23 would say this is a question that's solely in the
24 jury's province. This is the jury's question. It's a
25 question to give pause, because we already have 24
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

84

1 votes that are unanimous. If there's another 12
2 votes, then the death penalty would be imposed. Okay?
3    A.  (Nods head.)
4    Q.  This is a question for a jury to take a second
5 and say, let's take some pause here to make sure we're
6 doing justice. Let's look at it. Let's see what
7 there is. Okay?
8    A.  (Nods head.)
9    Q.  So as part of this, part of your oath, you
10 have to follow your oath. That's -- It's the simplest
11 thing for the jury, but it's hard sometimes. Your job
12 would be simply to follow your oath and apply the law
13 and the facts. Okay?
14   A.  Okay.
15   Q.  So as part of that, the judge would instruct
16 the jury that they shall consider mitigating evidence
17 to be evidence that a juror might regard as reducing
18 the defendant's moral blameworthiness.
19       So for this question, the jury is being
20 asked to look at the case as a whole, the entire case,
21 and see if there's any mitigating evidence. Okay?
22   A.  (Nods head.)
23   Q.  If there's any mitigating evidence, the
24 jury -- each juror must make a decision in their own
25 heart and mind if it's a sufficient level of
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

85

1  mitigating evidence.
2      Does it reduce the defendant's moral
3  blameworthiness sufficient enough for me to say, Yes,
4  there is something, and a life sentence would be
5  better than the death penalty.  Okay?
6      A.  Okay.
7      Q.  In your oath as a juror, you have to keep that
8  open mind and be receptive to looking for mitigating
9  evidence.
10      Does that make some sense?
11      A.  Yes, it does.
12      Q.  You may not find some, but then, again, you
13  might.  And the law contemplates that.  And if you do
14  find mitigating evidence, it asks you to give it
15  effect in your mind and see if it's of a sufficient
16  level to warrant an answer of yes to this question.
17  Okay?
18      A.  Okay.
19      Q.  Questions on that?
20      A.  No.
21      Q.  So you understand that when Mr. Hummel came --
22  when we were in the large room downstairs on the first
23  floor, that was Mr. Hummel's only obligation in this
24  case, is to show up that day?
25      A.  Yes.

86

1      Q.  Okay.  And he's been here every day since, but
2  his only obligation was to show up that day under the
3  law.  So they don't have a burden.  All right?  Your
4  oath as a juror says you can't hold them responsible
5  for anything.
6      Does that make some sense?
7      A.  Yes, it does.
8      Q.  As human nature, you may want to know what's
9  going on.  You may want to hear stuff.  That's
10  everybody.  Any time you walk into a courtroom, "I
11  wonder what they did" is the phrase that most jurors
12  say.
13      But when you take that oath and you
14  follow that oath as a juror, you have to put all that
15  aside.  Does that make some sense?
16      A.  Yes, it does.
17      Q.  You can't ask the defense for anything.  And
18  if they don't bring you anything, you can't hold that
19  against them.  That's part of your oath.  You have to
20  be able to set all that aside and base your decisions
21  solely on the evidence that you hear in the courtroom.
22  Okay?
23      A.  Okay.
24      Q.  So if they don't have a burden to this
25  question and I don't have a burden as the State of

87

1  Texas, where would mitigating evidence come from?  And
2  it may come from any of the testimony you hear in the
3  case.
4      It may be from the first or second
5  witness you hear in the trial or it may be one of the
6  last witnesses you hear or it may be a piece of
7  evidence that comes in.  It may be a statement, a
8  video, a photo.  It may be a story about a person's
9  life.  Don't know.  Okay?
10      A.  (Nods head.)
11      Q.  Because right now you don't know anything
12  about the case and I can't tell you anything about the
13  case.  And it's not fair to put you on the spot until
14  you get to hear all the evidence, right?
15      A.  Right.
16      Q.  And when you first hear something, it may not
17  be mitigating, but when you look at it as a whole, it
18  might be mitigating.  And that -- your oath as a juror
19  to keep that open mind and wait until all the facts to
20  come in to make your decision, then you get to -- get
21  a second Court's charge for these two special issues,
22  and the judge will give you the law and instruct you
23  on how to answer the questions and how to work through
24  them.
25      Does that make sense?

88

1      A.  Yes, it does.
2      Q.  So can you keep an open mind and be on the
3  lookout for mitigating evidence if you were a juror?
4      A.  Yes.
5      Q.  And if you find mitigating evidence, could you
6  keep the open mind and see if it rises to a level
7  that's sufficient in your mind to vote yes to this
8  question?
9      A.  Yes.
10      Q.  And if it doesn't rise to a level that's
11  sufficient in your mind, would you be able to vote no?
12      A.  Yes.
13      Q.  And you'd be able to vote no knowing that a no
14  answer to this would likely result in the death
15  penalty?
16      A.  Yes.
17      Q.  Any questions on that oath you got to follow?
18      A.  No.
19      Q.  It's a rather simple thing when they swear a
20  jury in, but it's very important in a case that you
21  look at everything in the context of your oath.  Your
22  oath drives what you have to do as a jury.
23      Does that make some sense?
24      A.  Yes.
25      Q.  Is there anything I haven't gone over with you

89

1  this morning about all this that we need to know
2  about?
3      **A.  No.  Nothing.**
4      **Q.**  So your oath as a juror, what's it mean to
5  you?
6      **A.  It's like the law.  You have to follow it.**
7      **Q.**  And when -- when in doubt, you rely on your
8  oath and you let your oath and the Court's charge tell
9  you how to work through the problems.
10          Does that make some sense?
11      **A.  Yes.**
12      **Q.**  Any questions for us?
13      **A.  No.**
14          MR. BRISSETTE:  Thank you, Your Honor.
15  Pass the juror.
16          THE COURT:  Okay.  Defense?
17          MR. MOORE:  Thank you, Your Honor.
18      **VOIR DIRE EXAMINATION BY THE DEFENSE**
19  BY MR. MOORE:
20      **Q.**  Ms. Ruiz, I'm Larry Moore.  Fred Cummings and
21  Pamela Fernandez and I represent John in this case.
22  And I want to take a little while to visit with you
23  about your prospective service as a juror.  Okay?
24      **A.  Okay.**
25      **Q.**  And we'll talk a little bit about the same

90

1  things that you talked with Mr. Brissette about, but I
2  don't see them the way he sees them.  Okay?
3      **A.  Okay.**
4      **Q.**  And that really doesn't make any difference
5  because none of us are going to be jurors in this
6  case, but you might, and I want to make sure that I
7  understand how you feel.
8          This is a two-step process.  Okay?  First
9  step is we tell you everything, all of the law, that
10  might possibly come into play in this trial.  And the
11  reason we do that is so that you can look at it and
12  see what you think about it.  Okay?
13          Because Mr. Brissette has talked to you
14  about taking that oath as a juror.  And once you take
15  that oath, you're bound to follow that.  What we don't
16  want to do is have somebody put in the position of
17  taking that oath and for the first time finding out
18  there is some law that they're going to have to apply
19  that they don't agree with, because you're not
20  required to do that -- you're not required to take an
21  oath to be a juror in a case where there's some law
22  that you just can't live with.
23          You understand?
24      **A.  Yes, I do.**
25      **Q.**  So what we ask you is -- we tell you what the

91

1  law is and we ask you to kind of do an introspective
2  look and see, How do I feel about that.  And if I
3  don't like it and I disagree with it, if I disagree
4  with it such that I don't think that I can work within
5  that law.
6          And if it is, you don't have to take the
7  oath.  You're not -- This isn't a test to see who gets
8  on jury duty.  Okay?  If you can follow the law,
9  great.  If you can't follow the law, then you may not
10  be qualified as a juror in this particular kind of
11  case.
12          See how that works?
13      **A.  Yes.**
14      **Q.**  So the only important thing about it is you
15  look at it, you make a decision for yourself and you
16  tell us honestly how you feel about all this.
17          Then the second part of this process is
18  we -- both sides have to decide about how comfortable
19  we are with your answers because we get to excuse a
20  certain number of people from service in the case.
21  Okay?
22      **A.  Okay.**
23      **Q.**  So if I ask you something you don't understand
24  or if I word it badly, just ask me to explain it, or
25  if you have a question, just feel free to ask it

92

1  because this is the only time we get to do this.
2  Okay?
3      **A.  Okay.**
4      **Q.**  All right.  I want to talk to you a little bit
5  about your questionnaire.  You -- How old were you
6  when you came here from Mexico?
7      **A.  18.**
8      **Q.**  Did you come by yourself?  Did you come with
9  your parents?  How is it that you got --
10      **A.  I came with my aunt.  She brought me here the**
11  **first time.  After six months here I went back to**
12  **Mexico and then I came back by myself.**
13      **Q.**  When you went back, what did you go back for
14  the first time?
15      **A.  It was Christmas, so I wanted to spend it with**
16  **my family and I ended up staying six months in Mexico.**
17      **Q.**  Okay.  Do you still have family that lives in
18  Mexico?
19      **A.  Yes.**
20      **Q.**  When did you work at the Joint Reserve Base at
21  the BX?
22      **A.  I think it was -- I started in '99.  I worked**
23  **for almost five years.**
24      **Q.**  You said that if you changed your occupation
25  you'd change it to student.  What would you like to

93

1  study?
2     **A.   Social services.**
3     **Q.**   Like what?  In what way?
4     **A.   Well, like, I would love to work in the**
5  **offices where they apply for food stamps and help like**
6  **that.**
7     **Q.**   Okay.  How long have you and your husband been
8  married?
9     **A.   Almost 20 years.**
10    **Q.**   Are the -- two -- you got two girls that
11  are 20.  Are they twins or --
12    **A.   Yes, they are.**
13    **Q.**   And all five of your kids are in school right
14  now?
15    **A.   Yes.**
16    **Q.**   Congratulations.
17    **A.   Thanks.**
18    **Q.**   That's exceptional.  Were you raised in a --
19  in a church in Mexico?  Did you go to church in
20  Mexico?
21    **A.   No.**
22    **Q.**   Was your family just not religious or --
23    **A.   No.  They were not religious.**
24    **Q.**   Your husband was raised Catholic?
25    **A.   Yes.**

94

1     **Q.**   Do y'all ever attend any services at all at
2  this point?
3     **A.   No.**
4     **Q.**   You've got a daughter that is going to some
5  type of counseling?
6     **A.   Yes.**
7     **Q.**   Which daughter is it?
8     **A.   Victoria.  She's 18.  She's the baby.**
9     **Q.**   Okay.  The youngest girl?
10    **A.   Yes.**
11    **Q.**   What is the nature of the counseling she's
12  going to?
13    **A.   Well, it started when she was 13.  She started**
14  **to pull her hair out.  I don't know the name of that,**
15  **but she's in counseling.  She goes every week.**
16    **Q.**   Okay.  Is it a social worker that she goes to
17  see or is it a psychologist?
18    **A.   Psychologist.**
19    **Q.**   Do you know the name of the psychologist?
20    **A.   Just by her first name.  Vanessa.**
21    **Q.**   How long has she -- has your daughter gone to
22  see the psychologist?
23    **A.   She just started going.  Maybe five weeks.**
24    **Q.**   That's not very long.  Have you noticed, does
25  she appear to be helping her at all?

95

1     **A.   A little bit.**
2     **Q.**   You're -- You say this incident with your
3  husband where he got charged with domestic violence
4  was about ten years ago?
5     **A.   Yes.**
6     **Q.**   Did it happen on one occasion or more than one
7  occasion?
8     **A.   One.**
9     **Q.**   How did the -- How did the police get called
10  or how did they get involved?
11    **A.   Oh, I called them.**
12    **Q.**   Did it happen at home or --
13    **A.   Home.**
14    **Q.**   The -- Don Carter represented your husband in
15  that case; is that correct?
16    **A.   That's correct.**
17    **Q.**   Did you talk to Mr. Carter in connection with
18  his representation of your husband?
19    **A.   Yes.  I met him once in his office.**
20    **Q.**   Did you call -- Do you recall if you ever went
21  down and talked with the district attorney's office
22  about the case?
23    **A.   No.  I don't recall.  I don't think so.**
24    **Q.**   Okay.  Did Mr. Carter ask you to give him
25  something in writing as some kind of a request to

96

1  the case be disposed a certain way or something like
2  that?
3     **A.   Yes, I think I did.**
4     **Q.**   The -- You said your husband ended up going to
5  some classes and stuff like that.  Did that help
6  y'all's relationship?
7     **A.   Yes, it did.**
8     **Q.**   Was the -- the disposition of that case what
9  you wanted to happen in that case, is that what
10  happened?
11    **A.   Yes.**
12    **Q.**   Okay.  Now, you got a brother-in-law that you
13  say is in jail for DWI right now?
14    **A.   Yes.  He is in jail.**
15    **Q.**   How long has he been in jail?
16    **A.   A little over a year.**
17    **Q.**   Where is he at, do you know?
18    **A.   I don't know.**
19    **Q.**   Did you have much contact with him before he
20  got locked up?
21    **A.   No, not really.**
22    **Q.**   You said that you really don't want to serve
23  in this case because you wouldn't like to have
24  somebody's fate in your hands.
25       Have you ever been in the position where

97

1  you've had to make life and death decisions?
2    **A.   No, I don't think so.**
3    **Q.**   Ever had a sick relative or anything where you
4  had to go to the hospital and make a decision as to
5  whether or not they're going to continue treatment or
6  anything like that?
7    **A.   No.**
8    **Q.**   All right.  I want to talk to you a little bit
9  about the law that might apply to the trial of the
10 case and I want to talk to you about the views on the
11 death penalty in connection with that.
12         That little slide that's up on the -- on
13 the thing right there, all that tells you is you've
14 got your -- absolute right to your own opinion.  Just
15 tell us what -- tell us how you feel and what you
16 think and that nobody is going to argue with you about
17 it.
18         Murder in Texas has got a pretty simple
19 definition.  If I knowingly cause somebody's death and
20 there's no legal excuse for it, then that's a murder.
21 Okay?  And "knowingly" is a legally defined term.  It
22 means that I'm reasonably certain that my conduct is
23 going to cause his death.
24         There are -- We punish homicides.  That's
25 a -- Homicides are a crime where somebody loses their
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

98

1  life based on what's in the mind of the defendant, the
2  person that commits the crime.
3         And for it to be murder, it's got to be
4  intentionally or knowingly.  Intentionally is it's my
5  conscience objective or desire to cause the death, or
6  knowingly, I'm reasonably certain that my conduct is
7  going to cause his death.
8         So it's got to be one of those two mental
9  states in order for it to be murder.  Okay?
10   **A.   Okay.**
11   **Q.**   If I do it negligently or if I do it
12 recklessly, that may still be a crime, but that's a
13 lesser mental state and it's not murder.  Okay?
14   **A.   Okay.**
15   **Q.**   See how that works?  And that presumes that
16 there's not -- there's sometimes when I can cause
17 somebody's death knowingly or intentionally and it not
18 be a murder.
19         If I'm acting in self-defense or defense
20 of my family or something like that, then the law
21 recognizes that as a justification.  It's not a crime.
22 See what I mean?
23   **A.   Yes.**
24   **Q.**   Okay.  So we're talking about a situation
25 where that doesn't apply.  I go out and I decide I'm
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

99

1  going to take somebody's life and there's no
2  justification for it, then it's a murder.
3         That offense is the one that has a wide
4  range of punishment from five years to 99 years or
5  life.  And the -- And the thought is, there's a
6  thousand different fact situations that might fit that
7  definition, you know, how it happened, why it
8  happened, things like that could be different.
9         And so the jury when they find somebody
10 guilty of murder, they go out and they decide on a
11 number between five years and 99 years or life as to
12 what they feel like is appropriate for that particular
13 offense.  Okay?
14         And the presumption is, there are some
15 murders where five years is going to be the proper
16 sentence and there's some murders where life would be
17 the proper sentence.  You see what I mean?
18   **A.   Yes.**
19   **Q.**   Okay.  Now, the law says that in order to be
20 qualified as a juror, a juror has to be able to fairly
21 consider that full range of punishment.  If they don't
22 agree with it, they don't like it, then they may not
23 be qualified to serve, but that's up to the individual
24 juror.  It depends on how they view it and what they
25 think.
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

100

1         And one of the questions in the
2  questionnaires asked about:  Are you generally in
3  favor of the death penalty.  And the answer that you
4  gave was:  Anybody that takes a life does not deserve
5  to live.
6         What were you thinking when you wrote
7  that?  What was your thought?
8    **A.   Well, I was thinking about the pain of the**
9  **family.  I was thinking about my kids.  What if**
10 **something like that would happen to any of my kids.**
11   **Q.**   Uh-huh.  Do you think that -- you know, do you
12 think that -- that acting as a juror in a case, if you
13 were to find somebody guilty of murder, if you find --
14 if you found that they knowingly caused somebody's
15 death without any legal excuse, do you think that you
16 could fairly consider that full range of punishment
17 from five years to 99 years or life?
18   **A.   Yes.**
19   **Q.**   Okay.  So you're not of a mind -- Even though
20 that's what you were thinking at the time you wrote
21 that, you're not of the mind that you could never
22 consider five years as a punishment; is that correct?
23   **A.   That's correct.**
24   **Q.**   Okay.  You indicated that you thought that the
25 death penalty in some way might help the families of
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

101

1  the victims.  What did you mean by that?
2  **A.   Well, like -- sorry -- like a lot of people,**
3  **they need closure, but, like you say, now that you're**
4  **saying it depends on the murder, if it's going to be**
5  **death penalty or not.**
6  **Q.**   Yeah.  And I -- I think I understand what you
7  were saying, but, you know, the process, the legal
8  process is not going to bring that child back.  It may
9  give them some closure by bringing that person to
10 justice.  Okay?
11        Doesn't necessarily mean that the
12 penalties that the jury feels is appropriate is
13 necessarily going to be what the family feels is
14 appropriate.
15 **A.**   Yes.
16 **Q.**   You understand?
17 **A.**   Yes.
18 **Q.**   Because we don't let the families dictate the
19 punishment.  The jury, the community, comes in and
20 makes that decision because the crime -- the crime not
21 only can affect families, but it's a crime against the
22 community.  That's why jurors come in and they make an
23 independent decision as to what they think is
24 appropriate over everything they hear.
25        Do you agree with that process?

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

102

1  **A.**   Yes, I do.
2  **Q.**   And some -- And there's some people that are
3  never going to get closure.  The process -- you know,
4  the legal process does what it's going to do and it
5  may or may not satisfy them and they may never be
6  satisfied because that loss will always be there.
7        You see what I mean?
8  **A.**   Yes.
9  **Q.**   Okay.  It's only if the defendant is found
10 guilty of a certain kind of murder -- Am I going the
11 wrong way -- that's capital murder where the death
12 penalty or life without parole are a possibility.
13        Life for murder is different than life
14 for capital murder.  Life for murder is an offense
15 that carries with it the possibility of parole.  The
16 law -- You get an instruction that will tell you that
17 a person that's convicted of murder can be eligible
18 for parole after they've served one-half of their
19 sentence or 30 calendar years, whichever is less,
20 because everything from 60 years on up is treated the
21 same for parole eligibility purposes.
22        Once you've served 30 years, whether you
23 have 60 years, 70 years or life, you're eligible for
24 parole for murder.  It doesn't mean the Board of
25 Pardon and Paroles are going to control you, okay,

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

103

1  because that decision is out of everybody's hands
2  except theirs.
3        The governor of the state and the Board
4  of Pardon and Paroles will make that decision, but you
5  have to serve half of that sentence before you're ever
6  even eligible to make that decision.
7        See how that works?
8  **A.**   Yes.
9  **Q.**   Okay.  With capital murder and life without
10 parole, you're never eligible.  You see?  You either
11 die in prison -- and if there's -- you still have
12 family left, you know, they can come claim your body,
13 or, if not, you're buried in the prison cemetery.
14        Life without parole means you never
15 leave.  Okay?
16 **A.**   Okay.
17 **Q.**   And that's the distinction, because we don't
18 have life without parole for any other offense other
19 than capital murder.  Just like we don't have the
20 death penalty for any other offenses other than
21 capital murder.  Those two distinct punishments are
22 reserved for this one crime.  Okay?
23 **A.**   Okay.
24 **Q.**   Now, there's different ways that you can
25 commit capital murder.  You've heard about, you know,

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

104

1  killing a police officer in the line of duty.  That's
2  capital murder.
3        Well, the way they've alleged it in this
4  indictment is this multiple murder scheme.  Okay?  And
5  what the statute says, it's more than one murder
6  committed during the course of a single criminal
7  transaction or the same criminal transaction.
8        And I want to talk to you a little bit
9  about some of this to make sure I understand how you
10 feel about it.  Mr. Brissette told you they've got to
11 allege everything in the indictment that they intend
12 to prove.
13        And the reason for it is because we're
14 entitled to know what it is that we're supposed to
15 defend against.  Okay?  It wouldn't be fair, I don't
16 think, to, you know, say, Okay.  We're going to prove
17 that you killed somebody by running over them with a
18 car.  And when we get to trial, oh, big surprise, you
19 didn't run over them with a car.  You pushed them off
20 the cliff.  See what I mean?
21        So that's -- that's the reason that the
22 law says they've got to allege everything and include
23 it the way that it is.  Do you have any questions
24 about how that works?
25 **A.**   No.

ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

105

1    Q.  Are you comfortable with the prospect that a
2  jury could find themselves in the position of hearing
3  evidence that was at variance with what they allege in
4  their indictment?  They could say it happened one way
5  and prove it happened a different way.
6         See what I mean?
7    A.  Yes.
8    Q.  Now, that guy -- the victim is still dead.
9  And the jury is, at that point, in the position where
10  they're fixing to have to set the killer free and find
11  him not guilty based on that mistake.  Some jurors can
12  do that; some can't.
13         Would you be able to do that?
14    A.  Yes.
15    Q.  You think it's important to make them give us
16  notice as to what it is we're supposed to defend
17  against?
18    A.  Yes, it is.
19    Q.  Okay.  And that's the whole purpose of it.
20  And these are kind of extreme examples, but the reason
21  is, so that you'll understand what the law would
22  require you if you're called to serve.  Okay?
23    A.  Okay.
24    Q.  One of the things that's kind of interesting
25  about this is, we don't define for you that term "same

106

1  criminal transaction."  You can have a murder and a
2  murder and it not be a capital murder, because if
3  they're not in the same criminal transaction, then
4  it's two separate murders and you punish him
5  separately for each one of them.
6         See what I mean?
7    A.  Yes.
8    Q.  So the jury would have to find, in order to
9  find capital murder, that a person knowingly killed
10  one individual and he knowingly killed another
11  individual and that for -- by whatever definition you
12  give it, it was all during one transaction.  Okay?
13    A.  Okay.
14    Q.  And Mr. Brissette gave you some examples, I
15  guess, of things that an individual juror might
16  consider as the same transaction.  That's a decision
17  you make independently.  Okay?
18    A.  (Nods head.)
19    Q.  You define that for yourself what it means,
20  whether it means putting a hand grenade in a car with
21  four people and killing all four people at one time or
22  the Oklahoma City bombing where you kill over 100 or
23  whatever it is that you think a single criminal
24  transaction constitutes.
25         See how that works?

107

1    A.  Yes.
2    Q.  Let me ask you a question, give you a
3  hypothetical situation.  If you go down -- If you
4  decide you're going to go Christmas shopping and
5  you're going to buy Christmas presents for your oldest
6  daughter, when you go to the Sears store and you go on
7  one floor and you buy makeup and you pay for it and
8  you go to the next floor and you buy a nightgown and
9  you pay for it, that is a single transaction or is
10  that two transactions?
11    A.  That's two transactions.
12    Q.  Okay.  And that's the kind of decision-making
13  that you may have to engage in to decide, Is this all
14  one transaction or is this more than one transaction.
15  Because if it's more than one transaction, it's not
16  capital murder.  Okay?
17    A.  Okay.
18    Q.  Any questions about that, how that works?
19    A.  No.
20    Q.  All right.  We talked a minute ago about if
21  you go out to decide punishment in a murder case, you
22  know, you go out and you go and y'all decide the
23  number of years.
24         And with capital murder -- you find
25  somebody of capital murder guilty, the punishment is

108

1  different because we use this special issue
2  submission.  And the way this is intended to work is
3  this is -- these questions are intended to decide of
4  all those people convicted of capital murder who is
5  going to get life in the penitentiary and who is going
6  to get the death penalty.  Okay?
7         And there's a presumption that they're
8  going to get life unless the State can prove something
9  additional.  See what I mean?
10    A.  (Nods head.)
11    Q.  You need to speak up because she can't catch a
12  nod.
13    A.  Yes.
14    Q.  I can see it fine, but she's having trouble.
15  Because it doesn't -- These questions are intended to
16  be the mechanism by which we decide of everybody
17  guilty of capital murder, who's going to get the death
18  penalty, who's going to get life.
19         If we wanted everybody that was found
20  guilty of capital murder to get the death penalty, we
21  could try to write the statute that way, but that's
22  not what they said.
23         They said it's going to be a life
24  sentence unless the State proves the first question
25  and the jury finds in a particular way in regards to

109

1    the second question. See what I mean?
2        A.   Yes.
3        Q.   Okay. For this process to be meaningful, we
4    would assume that we're asking the jury to find
5    something different than they would have already found
6    in regard to a particular defendant when they found
7    him guilty.
8             Because if finding him guilty meant, you
9    know, that he got the death penalty, then these
10   questions don't mean anything. Do you agree with me
11   on that?
12       A.   Yes, I do.
13       Q.   Okay. The first question asks you, and they
14   refer to it as the future dangerousness question, and
15   it asks the jury to find as he sits there in court, is
16   there that probability that he is going to do certain
17   things; that he would commit certain types of acts in
18   the future; that he's going to commit criminal acts of
19   violence.
20            And not only are they going to be
21   criminal acts of violence, but they're going to be of
22   such a magnitude and degree that you would consider
23   him to be a threat. Okay? You see what I mean?
24       A.   Yes.
25       Q.   All right. The problem with this is, is they
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

110

1    don't define any of those questions -- any of those
2    words, and so we leave it to the jurors'
3    understandings.
4             It's kind of like when we talked earlier
5    about that single criminal transaction or same
6    transaction, we leave it to your understanding. And
7    the way that you define probability may be different
8    from the way that the guy next to him defines it.
9             See how that works?
10       A.   Yes.
11       Q.   All right. Now, they told you that it's
12   not -- you know, they didn't use the term "is there a
13   chance" or "is it possible" or "could it possibly
14   occur." They said is it "probable" or they want you
15   to find is it probable.
16            Do you see a distinction between the
17   question that's being asked if they ask, Is it
18   possible that it could occur as opposed to is it
19   probable that it could occur?
20       A.   Yes.
21       Q.   Why do you think you look -- If you're trying
22   to decide whether something's probably going to
23   happen, how would you make that decision? What would
24   you look at in order to determine whether something
25   would probably occur in the future?
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

111

1        A.   I guess one of the things would be like if
2    during the trial, it comes out that the person has a
3    bad temper, stuff like that.
4        Q.   Uh-huh. And you can hear additional evidence
5    in the punishment phase that you didn't hear at the
6    first part. Any fact that the judge finds to be
7    relevant to the sentencing phase is admissible to
8    either side; any good thing or bad thing about this
9    person from their whole life is admissible for the
10   jury to help them, if it does.
11            If whenever he was six years old the
12   defendant pushed the little lady that lived next door
13   down a flight of stairs, the jury gets to hear about
14   that, if the State chooses to introduce it.
15            If when the little boy was six years old
16   he used to help his neighbor across the street, you
17   know, the Defense can put that on if they wish to try
18   to give the jury information that will give them some
19   insight as to the particular individual.
20            See how that works?
21       A.   Yes.
22       Q.   And some people, in order to find that
23   there's -- he's probably going to commit criminal acts
24   of violence in the -- in the future, want to look at,
25   has he committed criminal acts of violence in the
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

112

1    past. Okay.
2             Was this -- Obviously, you would have
3    found him guilty of these two murders or you would
4    never be asked this question, but you may want to look
5    beyond that; is that the first and only time that he's
6    ever been violent or does he have a history of
7    violence.
8             See what I mean?
9        A.   Yes.
10       Q.   And even then, if somebody has been violent in
11   the past, you know, that doesn't always mean that
12   they're going to continue to be violent in the future.
13   I mean, the jury decides that.
14            It may be that that was a one-time
15   occurrence, kind of the situation with your husband.
16   He did it one time. He got punished for it and that's
17   the end of it. And the jury takes all that into
18   consideration in deciding whether he's probably going
19   to do this in the future.
20            See how it works?
21       A.   Yes.
22       Q.   You have any questions about that?
23       A.   No.
24       Q.   All right. And it's only if the jury is
25   convinced beyond a reasonable doubt that the question
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

113

1  should be answered yes, that they can answer the
2  question. Okay.
3          Mr. Brissette told you that if the jury
4  chooses to, the facts of the murder alone may be
5  sufficient for the jury to answer the question yes.
6  If they look at the facts of the case and for them
7  those facts alone are sufficient to convince them
8  beyond a reasonable doubt that they know enough about
9  this person's character and background and the type of
10 person he is to know that he's going to be a threat,
11 that's sufficient. Okay.
12         Other jurors -- but it's up to the
13 jurors, because another juror may not think that the
14 facts alone are sufficient. Okay. The law doesn't
15 say that you have to find it based on that. It says
16 that you can if you want to.
17     A.  Okay.
18     Q.  See how that works?
19         And they have to -- And they have to do
20 it by that same standard of proof beyond a reasonable
21 doubt that they have to prove that he's guilty. We
22 don't define beyond a reasonable doubt for you. Okay?
23     A.  Okay.
24     Q.  It's the highest standard of proof in the law,
25 and I want to talk to you a little bit. I don't

114

1  remember if in the panel that you were on they
2  actually talked to you about the burdens of proof, but
3  there's a difference.
4          If I go to sue you in civil court -- If
5  you back into my car in the parking lot when we're
6  leaving today and I want to sue you for the damage, I
7  have to prove that you damaged my car by a
8  preponderance of the evidence. That has a legal
9  definition. It's the greater weight and degree of the
10 credible evidence. The greater weight and degree of
11 the credible evidence, that's the standard by which I
12 must prove that you're at fault. Okay?
13     A.  Okay.
14     Q.  If the State of Texas decided that you were an
15 unfit parent and was going to try to take that
16 13-year-old boy away from you and terminate your
17 rights so that you would no longer have any parental
18 authority over that child, he'd be removed from your
19 home and placed someplace else. They have to do it by
20 clear and convincing evidence.
21         And clear and convincing evidence is
22 legally defined. It's defined as being the type of
23 evidence that would be sufficient to establish a firm
24 conviction or belief of the truth of the matter being
25 asserted in the mind of the fact finder.

115

1  So there would have to be evidence
2  sufficient to establish in the mind of the jury a firm
3  conviction or belief that you were an unfit parent.
4  Okay?
5      A.  Okay.
6      Q.  Proof beyond a reasonable doubt is more than
7  that. It's proof beyond any reasonable doubt. And I
8  guess there's a distinction between what constitutes a
9  reasonable doubt and what an unreasonable doubt might
10 be. All right.
11         It may be that a jury may -- that a
12 particular juror may say, Well, I don't doubt that he
13 did it on his own because the little green martians
14 may have come down and made him do it.
15         That's a doubt that's not based on reason
16 and common sense. It's about reasonable doubt, and
17 that's not what we're talking about. We're talking
18 about beyond any reasonable doubt.
19         See how that works?
20     A.  Yes.
21     Q.  If you have a doubt, you don't even have to be
22 able to enunciate what it is. I mean, you don't even
23 have to be able to say this is what it is. It's just
24 something that you feel that hasn't been proved.
25         See how that works?

116

1      A.  Yes.
2      Q.  You have any questions about that first
3  question or how we get there?
4      A.  No.
5      Q.  All right. It's only if the jury answers that
6  question unanimously yes that we get to the second
7  question. If they answer it no, there's a life
8  sentence and everybody goes home. All right.
9          Do you have any thought about what
10 happens if the jury can't get ten people to answer the
11 question no or 12 people to answer the question yes?
12     A.  No.
13     Q.  Okay. Let me tell you. You might get an
14 instruction -- If the jury says, Judge, we're tied up
15 six to six. We can't answer the question. You might
16 get an instruction from the Court that says, Go back
17 and try to continue to deliberate, okay, and arrive at
18 a verdict, if you can.
19         But in that instruction, the Court will
20 tell you, you may not violate your individual
21 conscience just -- in order to reach a verdict. Okay?
22     A.  (Nods head.)
23     Q.  Because the jury verdict is a cumulative
24 verdict of all 12 jurors or all 10 jurors if they can
25 agree, but it's got to be the individual juror's

117

1  verdict because he can't -- he has to vote his own
2  conscience. Regardless what everybody else is doing
3  back there, he has to vote his own heart and his mind.
4  Okay?
5      A.  Okay.
6      Q.  And the only way that there's ever a death
7  sentence is if all 12 jurors answer the first question
8  no -- I mean, the first question yes and the second
9  question no.
10     A.  Okay.
11     Q.  It has to be unanimous.  If the jury -- You
12 see how one juror can ensure that a death sentence
13 will not result if in their own heart and mind they
14 don't think the death sentence is the only appropriate
15 punishment?
16     A.  Yes.  I can see it.
17     Q.  All right.  This is the second question, and
18 this is -- the only time you even get this question is
19 if you already found the guy guilty of capital murder
20 and you found that he's a future danger.  That's the
21 only time you get it.
22         So we operate from the position that the
23 jury has already made those two findings, and then
24 they're asked to decide whether or not there's any
25 mitigating circumstance or circumstances that tells
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

118

1  them that a life sentence is enough; that him spending
2  the rest of his life and dying in prison is enough to
3  pay for what he did.  Okay?
4      A.  Okay.
5      Q.  Now, they don't have to prove that there is no
6  mitigating evidence or no mitigating evidence
7  circumstance.  There's no burden of proof assigned in
8  that question.
9          I'm not required to prove or the Defense
10 is not required to prove that there is a mitigating
11 circumstance.  Okay?  That doesn't mean that we
12 wouldn't offer evidence for the jury, but mitigating
13 evidence is what you take it to be.
14         And so it may be that it's something that
15 I'm not looking at in the evidence because it may be
16 something that you see in the way that the crime was
17 committed or in this person's background or whatever
18 that tells you the life sentence is enough.  Okay?
19     A.  Okay.
20     Q.  So it may be that I'm over here talking about
21 one thing and you're thinking about something else and
22 that's perfectly fine, because you can get ten people
23 to agree that the answer to that question should be
24 yes and it could be for ten different reasons.
25         One can say, Yes.  I think it's a
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

119

1  mitigating circumstance that this person helped his
2  little grandmother when he was growing up.  And
3  another person can say, That doesn't mean that much to
4  me, but he served in the military and helped -- you
5  know, helped his country.
6          Another juror can say, Well, you know,
7  the single -- there's one single act of kindness that
8  stands out in my mind that he did, you know, when he
9  was a child that tells me that that person is worth
10 saving.  See what I mean?
11     A.  Yes.
12     Q.  It's an individual decision and it's not
13 assumed that I'm going to have to prove it.  See how
14 that works?
15     A.  Yes.
16     Q.  It doesn't mean we're going to sit here like
17 lumps during the trial.  It just means that I don't
18 have a legal burden to bring that.
19         You have any question about that?
20     A.  No.
21     Q.  Now, it's sometimes a little bit problemsome
22 because you look at that question and it asks you, Is
23 it a sufficient mitigating circumstance to tell you
24 that a life sentence is appropriate.  It's kind of
25 asking you to weigh, but it doesn't give you much
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

120

1  instruction on how you weigh the evidence.
2          You see what I mean?
3      A.  Yes.
4      Q.  And, basically, all I can tell you is you have
5  to decide in your own heart what you think the
6  appropriate sentence is based on everything you've
7  heard.  Any questions about that?
8      A.  No.
9      Q.  Okay.  It has -- Once again, the question has
10 to be answered unanimously no in order for there to be
11 a death sentence if ten jurors agree it can be
12 answered yes.  All right?
13     A.  Okay.
14     Q.  You have been very patient with me,
15 Ms. Ruiz.  Have you got any questions about any of
16 this we talked about up to this point?
17     A.  No.
18     Q.  You feel like you understand the process?
19     A.  Yes.
20     Q.  Do you feel like that you could go into the
21 jury box and just be fair and call it the way that you
22 see it?
23     A.  Yes.
24     Q.  There's a great temptation for jurors to feel
25 sympathy for the families of the victims and to feel
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

121

1  anger on the acts of the accused. The jury has to
2  look at the evidence in the case and make their
3  decision based on the evidence that they see.
4        Can you do that?
5    **A.  Yes.**
6    **Q.** Is there anything about this process -- You
7  know, we've talked to you three times now and we've
8  talked to you about the death penalty and everything
9  else.
10        Is there anything about this process that
11  makes you in any way feel like John Hummel is guilty
12  of anything?
13   **A.  No.**
14   **Q.** Okay. That's what the trial's for. The law
15  says we have to talk about everything that might
16  possibly come up right now or we don't get to do it
17  later. Okay?
18   **A.  Okay.**
19   **Q.** Ms. Ruiz, thank you very much.
20        MR. MOORE: I'll pass.
21        THE COURT: And if you'll have a seat out
22  in the front hallway, we'll call you back in in just a
23  few minutes.
24        PROSPECTIVE JUROR: Okay.
25        THE COURT: Thank you.
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

122

1        State have a challenge for cause?
2        MR. BRISSETTE: No, ma'am.
3        THE COURT: Does the Defense?
4        MR. MOORE: No, Judge.
5        THE COURT: State exercise a peremptory?
6        MR. BRISSETTE: No.
7        THE COURT: Defense?
8        MR. MOORE: No.
9        THE COURT: All right. Ms. Ruiz, you are
10  going to be a juror in the case of The State of Texas
11  vs. John William Hummel. I need to administer an oath
12  to you as a juror and then you will also be sworn in
13  again once all 12 of you are assembled on the morning
14  of trial.
15        PROSPECTIVE JUROR: Okay.
16        THE COURT: So if you'll raise your right
17  hand, please.
18        (Juror sworn.)
19        THE COURT: Okay. Now, you will remember
20  that the trial is scheduled to begin on Monday,
21  June 13th, at 9 o'clock. You will need to report to
22  the 432nd District Court on the sixth floor, which is
23  where you had your mini panel interview.
24        PROSPECTIVE JUROR: Okay.
25        THE COURT: Okay?
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

123

1        PROSPECTIVE JUROR: (Nods head.)
2        THE COURT: Like they've told you before,
3  the trial is scheduled to last approximately two
4  weeks, and at this point I don't see that date -- the
5  beginning of the trial changing.
6        If it does for some reason change, you
7  will be notified by the Court. Okay?
8        PROSPECTIVE JUROR: Okay.
9        THE COURT: Otherwise, just be here that
10  morning at 9 o'clock. Wear your jury badge so that
11  people will know that you're a juror and they'll know
12  not to talk about the case around you. That also is
13  your parking pass.
14        And then I have given you these
15  instructions previously and you have a copy of them in
16  writing, but in order to, hopefully, avoid the jury
17  having to be sequestered in this case, it is very,
18  very important that the jury follow all of their
19  instructions.
20        So I'm going to remind you, once again,
21  not to -- not to ask anybody about the law applicable
22  to this case or research the law or this case on your
23  own. Do not discuss the case with anyone or the legal
24  instructions.
25        It is most important that you not discuss
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

124

1  the case with anyone, conduct Internet research or
2  read or listen to any media report about the case.
3  You may not receive information about this case from
4  any other source other than what you are presented in
5  the courtroom concerning the case. That means to not
6  Google or search any party or lawyer or court
7  personnel in this case.
8        Do not conduct any research whatsoever on
9  the Internet about this case or the parties or facts
10  involved in it. You may not write or blog about the
11  case, events surrounding the case or your jury
12  service. You may not Tweet about the parties, events
13  or facts in this case or your jury service on this
14  case.
15        Do not send e-mails to anyone conveying
16  your jury experience or information about this case.
17  Do not use your cell phone to call anyone to ask
18  questions about issues in this case, to report facts
19  about this case or to research the case.
20        You may not use Facebook, MySpace,
21  LinkedIn, YouTube, Twitter or any other social network
22  on the Internet to discuss your jury service or issues
23  in this case or people involved in this case or to
24  research persons involved in this case.
25        Do you have any questions regarding those
ALLIED COURT REPORTERS * (817) 335-5568 * (800) 562-7055
alliedfwtx@aol.com

125

1  instructions or what's expected of you?

2       PROSPECTIVE JUROR:  No.

3       THE COURT:  Okay.  Then we will see you

4  on Monday, June 13th, at 9 o'clock in the 432nd.

5  Okay.  Thank you.

6       (Juror dismissed.)

7       THE COURT:  Do y'all want to address 136

8  before we break for lunch?  Okay.  Chronologically,

9  No. 135 was dismissed by agreement; 136, we are -- we

10  have reached in chronological order.  She was

11  interviewed yesterday and we did challenges for cause

12  yesterday.

13       Does the State exercise a peremptory on

14  136?

15       MR. GILL:  No, Your Honor.

16       THE COURT:  Does the Defense?

17       MR. CUMMINGS:  Yes, Your Honor.

18       (Break taken.)

19

20

21

22

23

24

25

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

---

126

1       **D I S C L O S U R E**

2

3  NOTE:  Texas Supreme Court rule adopted and

4       promulgated in conformity with Chapter 52 of

5       the Government Code, V.T.C.A.

6

7

8       Please be advised that pursuant to the

9  Texas Government Code with regard to disclosure, I, to

10  the best of my knowledge, have no existing or past

11  financial, business, professional, family or social

12  relationships with any of the parties or their

13  attorneys which might reasonably create an appearance

14  of partiality.

15

16

17

18  JACCI WALKER, CSR NO. 6843
   Expiration Date:  12/31/13

19  Deputy Official Court Reporter,
   432nd District Court

20  5208 Airport Freeway, Suite 105
   Fort Worth, Texas  76117

21  (817) 335-5568

22

23

24

25

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

---

127

1  THE STATE OF TEXAS  )
   COUNTY OF TARRANT   )

2       I, Jacci Walker, Deputy Official Court Reporter in

3  and for the 432nd District Court of Tarrant County,

4  State of Texas, do hereby certify that the above and

5  foregoing contains a true and correct transcription of

6  all portions of evidence and other proceedings

7  requested in writing by counsel for the parties to be

8  included in this volume of the Reporter's Record, in

9  the above-styled and numbered cause, all of which

10  occurred in open court or in chambers and were

11  reported by me.

12       I, Jacci Walker, further certify that this

13  Reporter's Record of the proceedings truly and

14  correctly reflects the exhibits, if any, admitted by

15  the respective parties.

16       I further certify that the total cost for the

17  preparation of this Reporter's Record is _____ and

18  was paid/will be paid by TARRANT COUNTY.

19       WITNESS MY OFFICIAL HAND this the 12th day of

20  January, 2012.

21

22  JACCI WALKER, CSR NO. 6843
   Expiration Date:  12/31/13

23  Deputy Official Court Reporter,
   432nd District Court

24  5208 Airport Freeway, Suite 105
   Fort Worth, Texas  76117

25  (817) 335-5568

ALLIED COURT REPORTERS  *  (817) 335-5568  *  (800) 562-7055
alliedfwtx@aol.com

---

|  | **1989** [1] - 58:7 | **7** | acts [22] - 17:16, 19:3, 20:11, 20:13, 20:22, 20:23, 20:25, 24:3, 24:19, 41:14, 78:20, 79:13, 79:16, 79:17, 109:17, 109:18, 109:21, 111:23, 111:25, 121:1 | 92:23, 93:9 |
| **'** |  | 7 [1] - 4:3 | | alone [3] - 113:4, 113:7, 113:14 |
| | **2** | 70 [1] - 102:23 | | ALPHABETICAL [1] - 4:1 |
| '90 [1] - 58:8 | | 76117 [2] - 126:20, 127:24 | | amount [1] - 34:5 |
| '90's [1] - 68:4 | 2 [8] - 14:9, 25:24, | | | Angeles [6] - 9:8, 9:14, 9:23, 10:3, 34:16, 47:3 |
| '98 [1] - 58:6 | 26:12, 32:3, 32:7, | **8** | addition [1] - 46:8 | anger [1] - 121:1 |
| '99 [2] - 58:6, 92:22 | 43:21, 83:10 | | additional [5] - 12:3, 73:25, 74:8, 108:9, 111:4 | answer [36] - 18:1, 23:21, 23:23, 24:4, 30:6, 32:2, 32:7, 32:8, 32:12, 32:20, 40:5, 43:10, 64:3, 64:14, 64:25, 75:7, 75:8, 75:16, 80:21, 81:11, 81:19, 81:21, 82:2, 85:16, 87:23, 88:14, 100:3, 113:1, 113:5, 116:7, 116:10, 116:11, 116:15, 117:7, 118:23 |
| | 20 [4] - 34:16, 49:18, 93:9, 93:11 | 817 [2] - 126:21, 127:24 | address [1] - 125:7 |
| **0** | 2005 [1] - 58:20 | 89 [1] - 4:9 | administer [1] - 122:11 |
| 0 [1] - 82:14 | 2008 [1] - 58:20 | | admissible [2] - 111:7, 111:9 |
| | 2011 [1] - 5:3 | **9** | admitted [1] - 127:14 |
| **1** | 2012 [1] - 127:20 | | adopted [1] - 126:3 |
| | 24 [1] - 83:25 | 9 [3] - 122:21, 123:10, 125:4 | adult [1] - 29:18 |
| 1 [16] - 5:3, 14:5, | 26 [1] - 66:1 | 99 [3] - 38:17, 72:7, 99:4, 99:11, 100:17 | advised [1] - 126:8 |
| 16:21, 25:21, 26:11, | 27 [1] - 48:19 | 9:01 [1] - 5:3 | affect [9] - 6:9, 9:19, 10:22, 11:4, 56:13, 56:17, 80:17, 101:21 | answered [7] - 14:13, 14:15, 18:3, 18:8, 113:1, 120:10, 120:12 |
| 41:1, 42:24, 43:25, | 29 [11] - 4:3, 4:4, 4:4, | | | |
| 44:10, 74:17, 77:12, | 4:6, 4:7, 4:9, 4:9, | **A** | | answering [4] - 42:22, 65:5, 75:21, 76:12 |
| 81:4, 82:16, 82:17, | 4:10, 4:10, 4:11, 5:2 | | afterwards [3] - 10:23, 11:4, 11:6 |
| 83:6, 83:9 | 2:00 [1] - 7:14 | a.m [2] - 7:14, 7:15 | age [28] - 28:7, 28:8, 45:22 | answers [8] - 13:22, 14:10, 17:24, 64:15, 74:19, 83:9, 91:19, 116:5 |
| 10 [1] - 116:24 | | A.M [1] - 5:3 | | |
| 100 [1] - 106:22 | **3** | ability [4] - 6:10, 36:2, 56:13, 56:17 | aggravating [1] - 28:2 | appear [4] - 52:2, 52:11, 53:19, 94:25 |
| 105 [2] - 126:20, 127:23 | 30 [2] - 102:19, 102:22 | able [20] - 11:7, 24:4, 32:7, 32:12, 33:1, 41:22, 44:6, 48:3, 55:20, 80:21, 81:21, 82:2, 82:4, 86:20, 88:11, 88:13, 99:20, 105:13, 115:22, 115:23 | ago [15] - 6:8, 34:16, 49:18, 56:12, 57:16, 59:21, 60:24, 60:25, 61:2, 61:11, 63:15, 65:24, 67:15, 95:4, 107:20 | appearance [1] - 126:13 |
| 10:00 [1] - 7:15 | 30's [2] - 28:18, 28:23 | | | appeared [2] - 8:4, 52:10 |
| 12 [13] - 35:16, 39:3, | 33 [1] - 4:4 | | | applicable [1] - 123:21 |
| 39:14, 43:23, 43:24, | 335-5568 [2] - 126:21, 127:24 | | | applies [8] - 37:4, 37:18, 38:12, 38:15, 45:14, 57:12 |
| 49:14, 49:16, 82:14, | 34 [1] - 74:22 | | agree [12] - 11:21, 70:16, 78:10, 78:14, 79:17, 90:19, 99:22, 101:25, 109:10, 116:25, 118:23, 120:11 | |
| 84:1, 116:11, | 36 [2] - 40:10, 82:10 | | | apply [10] - 48:24, 59:6, 66:8, 67:19, 73:7, 84:12, 90:18, 93:5, 97:9, 98:25 |
| 116:24, 117:7, 122:13 | | above-styled [1] - 127:9 | | |
| 12/31/13 [2] - 126:18, 127:22 | **4** | absolute [4] - 49:12, 77:20, 78:9, 97:14 | agreed [1] - 51:15 | applying [1] - 66:21 |
| 122 [3] - 4:10, 4:10, 4:11 | 40's [2] - 28:18, 28:23 | accept [2] - 38:22, 46:25 | agreement [2] - 51:21, 125:9 | approach [1] - 66:22 |
| 125 [1] - 4:7 | 432nd [5] - 122:22, 125:4, 126:19, 127:3, 127:23 | Accepted............ [1] - 4:10 | Agreement............... .. [1] - 4:6 | appropriate [10] - 12:15, 44:20, 73:9, 99:12, 101:12, 101:14, 101:24, 117:14, 119:24, 120:6 |
| 12th [1] - 127:19 | | accident [1] - 43:4 | ahead [2] - 5:13, 13:23 | |
| 13 [1] - 94:13 | | according [2] - 8:12, 46:22 | Airport [2] - 126:20, 127:23 | area [1] - 9:5 |
| 13-year-old [1] - 114:16 | **5** | accusation [1] - 43:14 | alive [1] - 15:2 | argue [1] - 97:16 |
| 132 [2] - 5:5, 5:14 | 5 [3] - 38:17, 72:7, 72:21 | accused [2] - 37:24, 121:1 | allegations [1] - 41:16 | Army [3] - 58:7, 58:10, |
| 133 [3] - 51:15, 51:25, 68:1 | 50 [2] - 4:4, 53:15 | act [13] - 20:18, 21:12, 21:15, 21:18, 25:9, 25:17, 27:20, 28:19, 78:24, 79:4, 79:21, 119:7 | allege [4] - 38:4, 104:11, 104:22, 105:3 | |
| 134 [3] - 55:6, 55:7, 55:13 | 50-person [1] - 64:6 | | alleged [2] - 38:5, 104:3 | |
| 134th [1] - 55:22 | 51 [1] - 4:6 | | allow [1] - 25:12 | |
| 135 [1] - 125:9 | 52 [1] - 126:4 | | allowed [1] - 74:3 | |
| 136 [3] - 125:7, 125:9, 125:14 | 5208 [2] - 126:20, 127:23 | acting [2] - 98:19, 100:12 | allows [1] - 73:14 | |
| 138 [1] - 51:15 | 55 [1] - 5:2 | active [1] - 58:7 | almost [3] - 19:24, | |
| 13th [2] - 122:21, 125:4 | 57 [1] - 4:9 | | | |
| 18 [7] - 28:7, 28:8, 28:17, 29:13, 31:12, 92:7, 94:8 | | | | |
| 18-year-old [2] - 28:15, 28:16 | **6** | | | |
| 18th [1] - 31:11 | 60 [2] - 102:20, 102:23 | | | |
| 1984 [2] - 47:8, 47:18 | 6843 [2] - 126:18, 127:21 | | | |

58:12
arrive [1] - 116:17
artillery [1] - 58:25
aside [3] - 65:22, 86:15, 86:20
assault [1] - 78:25
assaults [1] - 21:17
assembled [1] - 122:13
asserted [1] - 114:25
assess [6] - 14:11, 14:14, 14:16, 32:14, 40:21, 44:20
assessed [1] - 12:12
assigned [1] - 118:7
assignment [2] - 57:15, 74:14
assume [2] - 42:12, 109:4
assumed [1] - 119:13
assuming [2] - 41:20, 53:18
assumption [1] - 42:7
AT [1] - 5:3
athletes [3] - 47:12, 48:1, 48:7
attend [2] - 29:16, 94:1
attention [1] - 49:24
attorney's [2] - 61:14, 95:21
attorneys [2] - 56:1, 126:13
aunt [1] - 92:10
Austin [1] - 77:14
authority [1] - 114:18
automatic [1] - 82:16
automatically [1] - 82:19
automobile [1] - 29:16
available [2] - 64:10, 64:19
avoid [1] - 123:16

**B**

baby [1] - 94:8
background [5] - 29:13, 29:23, 44:3, 113:9, 118:17
bad [9] - 16:3, 34:23, 39:17, 74:1, 74:2, 78:1, 111:3, 111:8
bad's [1] - 78:4
badge [2] - 50:24, 123:10
badly [1] - 91:24
bailed [1] - 52:20
bailiff [1] - 50:24

BAILIFF [2] - 52:4, 55:7
bailiffs [1] - 52:16
balance [1] - 54:18
Bambi [1] - 59:23
bank [1] - 79:15
base [2] - 32:23, 86:20
Base [1] - 92:20
based [17] - 29:21, 32:9, 32:10, 32:17, 41:22, 45:13, 65:14, 66:7, 66:23, 71:18, 76:7, 98:1, 105:11, 113:15, 115:15, 120:6, 121:3
battle [1] - 80:1
bear [1] - 69:15
bears [1] - 69:15
become [1] - 59:19
begin [1] - 122:20
beginning [1] - 123:5
behind [1] - 76:15
belief [2] - 114:24, 115:3
benefit [1] - 41:9
best [2] - 10:10, 126:10
better [3] - 8:1, 62:2, 85:5
between [7] - 19:23, 20:6, 22:24, 46:23, 99:11, 110:16, 115:8
beyond [34] - 16:1, 17:8, 17:10, 17:11, 17:15, 17:20, 19:2, 19:6, 23:16, 23:24, 26:5, 26:13, 30:22, 37:10, 39:1, 42:24, 43:7, 43:23, 43:24, 44:11, 70:5, 81:6, 81:15, 81:22, 82:1, 83:22, 112:5, 112:25, 113:8, 113:20, 113:22, 115:6, 115:7, 115:18
big [2] - 63:17, 104:18
biggest [1] - 64:5
binds [1] - 8:11
bingo [2] - 59:25, 60:2
birthday [1] - 31:11
bit [12] - 6:18, 8:16, 13:17, 28:7, 57:10, 89:25, 92:4, 95:1, 97:8, 104:8, 113:25, 119:21
blame [1] - 45:17
blameworthiness [6] - 27:14, 27:15, 30:13, 46:11, 84:18, 85:3
blameworthy [2] -

27:6, 27:19
blog [1] - 124:10
blown [1] - 68:3
Board [2] - 102:24, 103:3
Bob [1] - 67:15
body [1] - 103:12
bomb [1] - 68:5
bombing [1] - 106:22
bond [6] - 52:1, 52:11, 52:18, 52:23, 54:17, 54:19
bonded [1] - 52:19
bondsman [4] - 52:23, 52:25, 53:4, 53:11
bondsman's [1] - 54:18
born [1] - 59:17
boss [1] - 70:13
bound [2] - 11:19, 90:15
box [1] - 120:21
boy [2] - 111:15, 114:16
brain [1] - 28:19
break [8] - 17:4, 20:16, 30:17, 30:20, 51:10, 51:11, 125:8, 125:18
bring [14] - 15:25, 16:6, 31:4, 31:21, 42:16, 51:25, 52:3, 52:4, 73:24, 74:1, 74:7, 86:18, 101:8, 119:18
bringing [1] - 101:9
brings [2] - 68:23, 68:25
BRISSETTE [8] - 51:4, 51:7, 51:17, 57:7, 65:9, 89:14, 122:2, 126:9
Brissette [7] - 6:6, 56:10, 90:1, 90:13, 104:10, 106:14, 113:3
Brissette.... [1] - 4:9
broad [2] - 21:9, 22:17
broader [1] - 45:9
broken [1] - 48:14
brother [5] - 60:6, 60:9, 62:12, 62:23, 96:12
brother-in-law [5] - 60:6, 60:9, 62:12, 62:23, 96:12
brought [3] - 16:1, 46:5, 92:10
buddies [1] - 68:14
buddy [1] - 68:17

building [2] - 61:5, 68:3
building's [1] - 7:23
burden [28] - 6:22, 17:9, 17:14, 24:4, 26:6, 26:9, 26:10, 26:11, 26:16, 26:17, 30:21, 30:24, 31:20, 37:13, 40:19, 42:19, 70:5, 71:9, 71:16, 81:1, 81:5, 82:1, 83:19, 86:3, 86:24, 86:25, 118:7, 119:18
burdens [1] - 71:22
buried [1] - 103:13
business [3] - 11:15, 19:9, 126:11
buy [3] - 107:5, 107:7, 107:8
BX [1] - 92:21
BY [11] - 7:6, 7:7, 25:14, 32:22, 33:24, 33:25, 57:6, 57:7, 65:9, 89:18, 89:19

**C**

calendar [1] - 102:19
California [2] - 35:5, 35:7
cannot [1] - 67:5
capable [2] - 21:20, 25:5
capital [56] - 12:19, 13:12, 13:17, 13:19, 14:2, 14:22, 14:25, 15:1, 16:16, 18:19, 18:21, 27:2, 28:15, 33:10, 37:3, 37:17, 38:3, 38:12, 38:13, 38:20, 39:15, 42:25, 43:7, 57:13, 63:13, 63:19, 64:1, 64:9, 64:16, 64:17, 64:25, 65:17, 65:18, 67:8, 67:10, 72:15, 73:22, 76:21, 81:3, 102:11, 102:14, 103:9, 103:19, 103:21, 103:25, 104:2, 106:2, 106:9, 107:16, 107:24, 107:25, 108:4, 108:17, 108:20, 117:19
car [5] - 104:18, 104:19, 106:20, 114:5, 114:7
carries [1] - 102:15

carry [1] - 34:7
Carson [1] - 60:3
Carter [3] - 95:14, 95:17, 95:24
case [101] - 5:24, 6:1, 6:10, 6:23, 8:9, 8:21, 9:19, 12:12, 13:25, 14:12, 26:23, 27:5, 27:11, 28:12, 28:14, 29:4, 29:7, 31:7, 35:7, 35:17, 35:22, 37:1, 37:8, 37:15, 38:10, 50:19, 52:12, 54:2, 55:4, 56:1, 56:13, 57:13, 61:5, 61:8, 62:9, 62:12, 63:19, 65:13, 65:23, 66:4, 66:24, 67:9, 69:1, 69:8, 70:12, 70:20, 72:15, 72:23, 72:24, 73:8, 73:21, 73:22, 74:4, 74:23, 83:19, 84:20, 85:24, 87:3, 87:12, 87:13, 88:20, 89:21, 90:6, 90:21, 91:11, 91:20, 95:15, 95:22, 96:1, 96:8, 96:9, 96:23, 97:10, 100:12, 107:21, 113:6, 121:2, 122:10, 123:12, 123:17, 123:22, 123:23, 124:1, 124:2, 124:3, 124:5, 124:7, 124:9, 124:11, 124:13, 124:14, 124:16, 124:18, 124:19, 124:23, 124:24
cases [1] - 9:14
cash [1] - 52:23
catch [1] - 108:11
Catholic [1] - 93:24
caused [2] - 37:25, 100:14
causes [2] - 39:6, 77:3
cell [1] - 124:17
cemetery [1] - 103:13
central [1] - 50:24
certain [12] - 34:22, 39:7, 64:16, 69:9, 71:3, 91:20, 96:1, 97:22, 98:6, 102:10, 109:16, 109:17
certainty [4] - 19:22, 20:3, 77:20, 78:9
certify [3] - 127:4, 127:12, 127:16
cetera [1] - 29:13
chair [1] - 55:9

challenge [2] - 50:4, 122:1
Challenge...... [1] - 4:7
Challenge.......... [1] - 4:4
challenges [1] - 125:11
chambers [1] - 127:10
chance [5] - 19:17, 57:14, 64:3, 78:16, 110:13
change [3] - 64:15, 92:25, 123:6
changed [5] - 6:9, 6:13, 56:11, 56:16, 92:24
changing [1] - 123:5
Chapter [1] - 126:4
character [5] - 16:3, 29:12, 29:23, 74:2, 113:9
charge [7] - 16:18, 16:19, 65:25, 71:12, 71:13, 87:21, 89:8
charged [6] - 15:11, 24:19, 24:23, 60:20, 69:3, 95:3
charges [1] - 52:2
cheated [1] - 68:18
check [4] - 44:19, 47:25, 48:21, 50:25
checked [2] - 64:1, 74:23
child [4] - 10:18, 101:8, 114:18, 119:9
children [1] - 57:19
choice [3] - 14:13, 14:16, 69:24
chooses [3] - 69:20, 111:14, 113:4
chose [2] - 59:12, 70:3
chosen [2] - 20:5, 77:16
Christmas [3] - 92:15, 107:4, 107:5
chronological [1] - 125:10
chronologically [1] - 125:8
church [4] - 68:10, 68:12, 93:19
circumstance [12] - 26:22, 28:3, 29:3, 29:11, 29:12, 29:19, 30:1, 117:25, 118:7, 118:11, 119:1, 119:23
circumstances [6] - 13:1, 26:22, 27:21, 29:22, 30:1, 117:25

citizen [1] - 59:20
City [3] - 60:3, 68:3, 106:22
civic [1] - 75:4
civil [1] - 114:4
claim [1] - 103:12
clarified [1] - 35:25
classes [5] - 60:23, 61:2, 61:9, 62:1, 96:5
clear [4] - 72:12, 82:9, 114:20, 114:21
clerk [1] - 47:4
client [1] - 34:4
cliff [1] - 104:20
close [3] - 34:9, 34:10, 49:9
closer [3] - 18:5, 23:22, 81:20
closure [3] - 101:3, 101:9, 102:3
code [1] - 67:16
Code [5] - 37:6, 37:7, 41:2, 126:5, 126:9
collection [1] - 48:11
collectively [1] - 79:8
colleges [1] - 29:17
comfort [1] - 41:7
comfortable [5] - 36:7, 37:20, 41:3, 91:18, 105:1
comment [5] - 10:1, 10:25, 36:9, 45:12, 45:13
comments [1] - 12:4
commission [1] - 43:1
commit [4] - 17:16, 18:19, 18:21, 19:3, 20:12, 25:15, 25:17, 103:25, 109:17, 109:18, 111:23
commits [4] - 12:19, 13:4, 67:10, 98:2
committed [9] - 13:1, 16:5, 27:19, 28:19, 46:18, 76:23, 104:6, 111:25, 118:17
committing [1] - 22:3
common [1] - 115:16
community [2] - 101:19, 101:22
compass [1] - 28:23
completely [2] - 24:14, 28:20
complies [1] - 83:12
comprehension [1] - 41:7
concentrate [1] - 24:17
concept [3] - 22:11,

30:18, 66:20
concern [3] - 45:12, 46:20, 49:2
concerned [1] - 42:20
concerning [1] - 124:5
concerns [1] - 76:11
conduct [4] - 97:22, 98:6, 124:1, 124:8
conducted [2] - 35:2, 52:12
conformity [1] - 126:4
confronted [1] - 5:25
congratulations [2] - 57:21, 93:16
connection [2] - 95:17, 97:11
conscience [3] - 98:5, 116:21, 117:2
consider [18] - 10:15, 15:18, 15:19, 15:23, 22:4, 22:6, 22:7, 45:14, 73:3, 73:6, 73:24, 84:16, 99:21, 100:16, 100:22, 106:16, 109:22
consideration [8] - 24:8, 43:11, 43:12, 44:14, 46:3, 73:7, 73:15, 112:18
constitute [4] - 17:17, 18:4, 18:12, 25:2
constitutes [3] - 21:18, 106:24, 115:8
contact [1] - 96:19
contain [4] - 21:5, 21:6, 21:9, 26:4
contains [2] - 21:9, 127:5
contemplates [1] - 85:13
contempt [1] - 52:2
context [4] - 42:21, 80:6, 80:19, 88:21
continue [3] - 97:5, 112:12, 116:17
continuing [4] - 14:3, 17:17, 18:4, 18:13, 18:19, 18:22, 23:18, 25:2, 27:4
control [1] - 102:25
conversation [3] - 34:7, 36:13, 41:10
conveying [1] - 124:15
convicted [9] - 13:11, 14:1, 14:22, 15:23, 16:15, 28:15, 41:16, 102:17, 108:4
conviction [4] - 15:12, 15:15, 114:24, 115:3

convince [1] - 113:7
convinced [1] - 112:25
convincing [2] - 114:20, 114:21
copy [1] - 123:15
correct [15] - 5:15, 7:25, 9:8, 44:4, 51:16, 51:18, 51:23, 52:7, 55:13, 55:14, 95:15, 95:16, 100:22, 100:23, 127:5
correctly [1] - 127:14
cost [1] - 127:16
counsel [1] - 127:7
counseling [3] - 94:5, 94:11, 94:15
countries [1] - 48:6
country [1] - 119:5
County [5] - 9:4, 9:20, 37:24, 60:20, 127:3
COUNTY [2] - 127:1, 127:18
couple [5] - 13:23, 57:15, 65:24, 67:15, 68:14
course [7] - 11:13, 12:21, 24:9, 28:11, 32:23, 45:7, 104:6
court [20] - 5:10, 8:4, 8:6, 8:16, 9:14, 17:1, 18:10, 32:5, 32:14, 34:24, 35:11, 35:16, 61:1, 61:6, 62:6, 78:18, 109:15, 114:4, 124:6, 127:10
COURT [68] - 5:5, 5:7, 5:13, 5:17, 5:21, 6:3, 6:12, 6:16, 7:2, 33:23, 49:25, 50:4, 50:7, 50:9, 50:12, 50:14, 50:17, 51:2, 51:6, 51:9, 51:13, 51:18, 51:23, 51:25, 52:5, 52:9, 52:15, 52:18, 52:22, 53:1, 53:8, 53:11, 53:13, 53:17, 53:23, 54:1, 54:7, 54:11, 54:15, 54:21, 54:24, 55:2, 55:6, 55:8, 55:12, 55:15, 55:18, 56:6, 56:15, 56:20, 56:25, 65:3, 65:8, 89:16, 121:21, 121:25, 122:3, 122:5, 122:7, 122:9, 122:16, 122:19, 122:25, 123:2, 123:9, 125:3,

125:7, 125:16
Court [13] - 5:7, 5:9, 116:16, 116:19, 122:22, 123:7, 126:3, 126:19, 126:19, 127:2, 127:3, 127:22, 127:23
Court's [4] - 65:25, 71:12, 87:21, 89:8
courtroom [5] - 61:19, 69:19, 86:10, 86:21, 124:5
create [1] - 126:13
credentials [1] - 48:1
credible [2] - 114:10, 114:11
crime [25] - 10:13, 12:15, 13:4, 13:5, 13:8, 15:10, 24:23, 39:22, 46:8, 46:23, 64:9, 64:16, 67:8, 72:9, 72:18, 82:25, 97:25, 98:2, 98:12, 98:21, 101:20, 101:21, 103:22, 118:16
crimes [4] - 16:4, 64:20, 74:5, 74:9
Criminal [2] - 37:6, 41:2
criminal [47] - 9:15, 12:21, 13:14, 13:18, 15:8, 17:16, 19:3, 20:10, 20:12, 20:17, 20:22, 20:23, 20:24, 20:25, 21:15, 21:18, 22:3, 25:9, 25:17, 32:23, 38:6, 38:10, 39:20, 48:14, 67:12, 67:13, 67:17, 68:2, 68:21, 71:24, 72:1, 76:24, 78:20, 78:24, 79:12, 79:13, 104:6, 104:7, 106:1, 106:3, 106:23, 109:18, 109:21, 110:5, 111:23, 111:25
CSR [2] - 126:18, 127:21
culpability [1] - 29:24
Cummings [6] - 6:4, 34:3, 51:19, 56:8, 64:4, 89:20
CUMMINGS [5] - 33:25, 50:8, 51:20, 53:5, 125:17
Cummings. [1] - 4:4
cumulative [1] - 116:23

curious [1] - 41:25
custody [3] - 52:16, 53:19, 71:4

### D

dad [2] - 52:20, 53:9
daily [1] - 47:25
damage [1] - 114:6
damaged [1] - 114:7
danger [5] - 44:12, 81:7, 81:12, 81:16, 117:20
dangerousness [4] - 14:4, 40:12, 74:16, 109:14
DARRYL [2] - 4:3, 7:3
Darryl [2] - 5:6, 5:14
DAs [1] - 70:12
Date [2] - 126:18, 127:22
date [5] - 24:18, 37:23, 39:7, 69:9, 123:4
dates [1] - 6:14
daughter [4] - 94:4, 94:7, 94:21, 107:6
David [1] - 53:4
days [2] - 35:8, 54:9
dead [1] - 105:8
deal [2] - 58:24, 74:15
dealing [1] - 38:11
deals [1] - 14:6
death [68] - 5:24, 10:9, 10:12, 10:16, 10:20, 11:25, 12:12, 12:15, 12:17, 12:23, 13:4, 13:6, 13:9, 13:25, 14:14, 18:6, 18:18, 18:20, 23:23, 26:24, 28:9, 29:5, 30:2, 30:15, 32:3, 32:6, 33:10, 33:17, 36:19, 37:25, 38:1, 40:15, 40:21, 40:22, 44:20, 56:4, 63:13, 63:25, 64:19, 67:5, 69:11, 81:21, 82:11, 84:2, 85:5, 88:14, 97:1, 97:11, 97:19, 97:23, 98:5, 98:7, 98:17, 100:3, 100:15, 100:25, 101:5, 102:11, 103:20, 108:6, 108:17, 108:20, 109:9, 117:6, 117:12, 117:14, 120:11, 121:8
decide [20] - 18:18,

26:20, 29:21, 30:25, 39:14, 40:20, 68:20, 72:23, 91:18, 98:25, 99:10, 107:4, 107:13, 107:21, 107:22, 108:3, 108:16, 110:22, 117:24, 120:5
decided [6] - 18:16, 42:24, 43:7, 44:8, 44:11, 114:14
decides [4] - 13:20, 38:9, 39:1, 112:13
deciding [2] - 76:7, 112:18
decision [25] - 40:1, 40:4, 40:15, 41:12, 41:13, 43:6, 49:4, 49:10, 63:9, 66:15, 73:9, 84:24, 87:20, 91:15, 97:4, 101:20, 101:23, 103:1, 103:4, 103:6, 106:16, 107:12, 110:23, 119:12, 121:3
decision-making [1] - 107:12
decisions [3] - 32:24, 86:20, 97:1
defend [2] - 104:15, 105:16
DEFENDANT [2] - 33:24, 51:24
defendant [19] - 5:4, 17:16, 19:3, 32:13, 46:4, 51:12, 69:2, 69:9, 69:25, 70:11, 70:25, 74:2, 74:21, 76:19, 81:20, 98:1, 102:9, 109:6, 111:12
defendant's [7] - 16:3, 27:13, 29:22, 31:10, 46:11, 84:18, 85:2
Defendant's [3] - 4:4, 4:7, 4:9
defense [12] - 26:17, 30:24, 31:21, 33:23, 50:7, 51:5, 51:6, 86:17, 89:16, 98:19
Defense [5] - 111:17, 118:9, 122:3, 122:7, 125:16
DEFENSE [1] - 89:18
defenses [1] - 43:3
deference [1] - 35:20
define [5] - 105:25, 106:19, 110:1, 110:7, 113:22
defined [7] - 19:6,

19:8, 67:16, 79:5, 97:21, 114:22
defines [1] - 110:8
definition [13] - 12:18, 19:9, 19:16, 27:9, 45:9, 45:13, 46:15, 67:22, 76:22, 97:19, 99:7, 106:11, 114:9
degree [4] - 38:15, 109:22, 114:9, 114:10
deliberate [3] - 22:14, 66:4, 116:17
deliberating [1] - 28:14
deliberation [2] - 18:9, 74:13
deliberations [1] - 32:4
dennis [1] - 49:25
DENNIS [2] - 4:3, 7:3
Dennis [7] - 5:6, 5:15, 5:17, 7:8, 33:19, 34:1, 50:18
department [1] - 59:10
Department [2] - 47:3, 59:7
deployed [1] - 58:18
Deputy [4] - 5:7, 126:19, 127:2, 127:22
deputy [2] - 5:9, 53:24
described [1] - 44:18
deserve [2] - 64:2, 100:4
designed [1] - 5:22
desire [1] - 98:5
despite [1] - 70:10
determination [1] - 49:13
determine [1] - 110:24
determines [1] - 76:2
dictate [1] - 101:18
die [3] - 39:4, 77:3, 103:11
difference [2] - 90:4, 114:3
different [22] - 8:11, 13:17, 14:15, 17:5, 24:14, 43:16, 48:6, 48:25, 64:8, 64:9, 66:21, 68:11, 79:3, 99:6, 99:8, 102:13, 103:24, 105:5, 108:1, 109:5, 110:7, 118:24
difficult [1] - 57:23, 71:10
difficulty [1] - 35:6
DIRE [4] - 7:6, 33:24,

57:6, 89:18
Dire [4] - 4:3, 4:4, 4:9, 4:9
dire [1] - 8:3
disagree [3] - 11:22, 91:3
disclosure [1] - 126:9
discuss [3] - 123:23, 123:25, 124:22
discussed [1] - 6:13
discussion [2] - 15:4, 56:17
discussions [1] - 26:16
dismissed [4] - 61:8, 61:25, 125:6, 125:9
Disney [1] - 59:22
disposed [1] - 96:1
disposition [1] - 96:8
disregard [2] - 71:7, 71:17
distinct [1] - 103:21
distinction [3] - 103:17, 110:16, 115:8
District [2] - 122:22, 126:19, 127:3, 127:23
district [2] - 61:14, 95:21
DNA [1] - 48:21
docket [1] - 35:13
document [2] - 47:24, 66:1
domestic [5] - 60:12, 60:17, 61:18, 62:23, 95:3
Don [1] - 95:14
done [12] - 10:5, 11:12, 27:7, 27:21, 36:12, 36:25, 39:16, 39:24, 42:16, 45:7, 49:17, 74:6
door [1] - 111:12
doubt [39] - 17:8, 17:10, 17:11, 17:15, 17:20, 19:2, 19:6, 23:16, 23:24, 26:5, 26:13, 30:23, 37:11, 39:1, 42:25, 43:7, 43:23, 43:25, 44:12, 70:6, 81:6, 81:16, 81:22, 82:2, 83:22, 89:7, 112:25, 113:8, 113:21, 113:22, 115:6, 115:7, 115:9, 115:12, 115:15, 115:16, 115:18, 115:21
down [14] - 13:19,

17:4, 20:16, 20:23, 30:17, 30:20, 61:4, 65:6, 75:1, 77:14, 95:21, 107:3, 111:13, 115:14
downstairs [1] - 85:22
downtown [1] - 10:2
drive [3] - 10:2, 29:16, 68:16
drives [1] - 88:22
DUI [1] - 60:7
duly [2] - 7:4, 57:4
during [13] - 12:20, 24:9, 38:6, 47:7, 67:11, 67:13, 74:3, 76:24, 81:1, 104:6, 106:12, 111:2, 119:17
duty [5] - 58:7, 75:1, 75:4, 91:8, 104:1
DWI [2] - 62:23, 96:13
dying [1] - 118:2

### E

E-7 [2] - 58:15, 58:16
e-mails [1] - 124:15
educators [1] - 23:6
effect [2] - 17:24, 85:15
effort [1] - 39:24
either [11] - 6:16, 10:6, 10:18, 11:12, 22:5, 26:18, 39:6, 55:19, 77:2, 103:10, 111:8
either/or [1] - 11:3
element [1] - 69:7
elements [5] - 37:3, 64:9, 69:5, 69:6, 70:5
eligibility [1] - 102:21
eligible [5] - 18:20, 102:17, 102:23, 103:6, 103:10
end [7] - 8:10, 72:8, 72:10, 72:24, 73:1, 77:21, 112:17
ended [2] - 92:16, 96:4
enforcement [1] - 62:6
engage [1] - 107:13
enjoy [1] - 59:4
ensure [1] - 117:12
entire [1] - 84:20
entitled [2] - 81:10, 104:14
enunciate [1] - 115:22
equipment [1] - 59:1
escape [1] - 23:8

especially [1] - 69:19
essentially [1] - 40:10
establish [3] - 41:6, 114:23, 115:2
et [1] - 29:13
ethic [1] - 67:4
ethical [2] - 12:10, 33:15
evaluate [1] - 44:15
evaluation [3] - 43:16, 44:7, 71:8
events [3] - 31:10, 124:11, 124:12
everyday [4] - 19:9, 67:20, 77:23, 78:8
evidence [72] - 8:13, 15:18, 15:19, 15:21, 15:24, 16:1, 16:2, 16:3, 16:4, 16:10, 16:12, 16:16, 16:17, 24:9, 27:10, 27:12, 30:10, 30:12, 31:1, 31:4, 31:19, 32:9, 32:10, 32:17, 32:24, 41:11, 44:15, 46:4, 46:23, 49:3, 49:5, 65:15, 66:14, 71:18, 73:13, 73:20, 73:23, 73:25, 74:1, 83:4, 84:16, 84:17, 84:21, 84:23, 85:1, 85:9, 85:14, 86:21, 87:1, 87:7, 87:14, 88:3, 88:5, 105:3, 111:4, 114:8, 114:10, 114:11, 114:20, 114:21, 114:23, 115:1, 118:6, 118:12, 118:13, 118:15, 120:1, 121:2, 121:3, 127:6
exactly [4] - 10:10, 23:2, 23:13, 32:10
EXAMINATION [4] - 7:6, 33:24, 57:6, 89:18
example [4] - 28:6, 28:13, 31:16, 31:18
examples [5] - 67:25, 68:8, 68:19, 105:20, 106:14
except [2] - 49:17, 103:2
exceptional [1] - 93:18
excuse [6] - 36:13, 38:4, 51:15, 91:19, 97:20, 100:15
Excused [1] - 4:6
executed [1] - 77:4

execution [1] - 39:7
exercise [6] - 36:3, 49:9, 50:9, 50:14, 122:5, 125:13
exhibits [2] - 66:10, 127:14
exist [2] - 14:22, 16:13
existing [1] - 126:10
expanded [1] - 7:23
expected [1] - 125:1
expenses [1] - 53:2
experience [6] - 34:19, 35:3, 35:21, 43:18, 49:18, 124:16
experienced [1] - 28:25
experiences [1] - 28:22
expert [6] - 41:19, 41:20, 42:5, 42:11, 42:14, 42:17
experts [1] - 41:22
Expiration [2] - 126:18, 127:22
explain [2] - 17:4, 91:24
explained [1] - 8:23
explaining [1] - 22:10
express [1] - 11:25
extreme [1] - 105:20

**F**

Facebook [1] - 124:20
fact [4] - 42:11, 99:6, 111:6, 114:25
facts [19] - 29:4, 31:7, 41:21, 41:23, 66:24, 72:10, 73:7, 73:12, 73:13, 82:24, 84:13, 87:19, 113:4, 113:6, 113:7, 113:14, 124:9, 124:13, 124:18
factual [1] - 28:12
fail [1] - 17:21
failed [1] - 24:3
failure [2] - 52:2, 52:11
fair [10] - 15:5, 45:15, 48:23, 70:10, 70:11, 73:15, 83:2, 87:13, 104:15, 120:21
fairly [5] - 7:22, 25:25, 30:18, 99:20, 100:16
families [4] - 100:25, 101:18, 101:21, 120:25
family [8] - 92:16,

92:17, 93:22, 98:20, 100:9, 101:13, 103:12, 126:11
far [7] - 35:1, 36:1, 40:19, 41:20, 42:19, 43:13, 46:23
fate [2] - 75:6, 96:24
fault [2] - 65:9, 114:12
favor [2] - 63:25, 100:3
favorite [2] - 59:22, 60:2
federal [3] - 58:2, 58:4, 68:3
feelings [5] - 11:24, 63:7, 65:16, 65:17, 65:21
felonies [2] - 38:16, 38:17
felony [1] - 38:15
felt [2] - 32:8, 32:11
Fernandez [4] - 6:5, 34:4, 56:8, 89:21
few [2] - 50:2, 121:23
fill [2] - 63:14, 63:22
filled [3] - 6:7, 56:11, 63:16
final [3] - 11:2, 44:7, 44:18
financial [1] - 126:11
finder [1] - 114:25
findings [1] - 117:23
fine [2] - 108:14, 118:22
finish [2] - 25:12, 65:4
firearm [4] - 69:10, 69:12, 69:16, 69:23
firm [2] - 114:23, 115:2
first [44] - 6:23, 7:4, 8:24, 12:6, 14:2, 15:18, 15:20, 16:1, 16:7, 17:7, 24:15, 24:16, 26:2, 31:3, 31:9, 34:24, 38:15, 40:19, 57:4, 57:11, 67:3, 68:1, 72:10, 73:23, 74:4, 77:18, 79:7, 81:19, 83:18, 85:22, 87:4, 87:16, 90:8, 90:17, 92:11, 92:14, 94:20, 108:24, 109:13, 111:6, 112:5, 116:2, 117:7, 117:8
first-degree [1] - 38:15
fit [1] - 99:6
five [13] - 9:6, 47:23, 57:19, 57:20, 57:23,

92:23, 93:13, 94:23, 99:4, 99:11, 99:15, 100:17, 100:22
fixing [1] - 105:10
flight [1] - 111:13
floor [3] - 85:23, 107:7, 107:8, 122:22
folks [3] - 68:1, 68:6, 77:14
follow [30] - 8:11, 8:15, 8:18, 11:19, 11:21, 12:8, 33:1, 33:2, 36:23, 37:8, 37:11, 42:15, 65:22, 66:22, 68:25, 70:19, 71:2, 71:15, 71:19, 73:17, 75:17, 84:10, 84:12, 86:14, 88:17, 89:6, 90:15, 91:8, 91:9, 123:18
followed [1] - 81:5
following [1] - 80:24
follows [2] - 7:5, 57:5
food [1] - 93:5
foregoing [1] - 127:5
forget [1] - 10:6
forgot [3] - 54:6, 54:10, 63:2
form [2] - 28:22, 36:18
format [1] - 8:15
formed [1] - 28:20
Fort [7] - 59:7, 62:17, 68:10, 68:16, 126:20, 127:24
forth [3] - 22:24, 68:25, 76:7
four [6] - 34:21, 35:9, 47:23, 59:21, 106:21
fred [1] - 89:20
Fred [3] - 6:4, 34:3, 56:8
free [4] - 22:15, 22:18, 91:25, 105:10
Freeway [2] - 126:20, 127:23
front [4] - 50:1, 52:10, 53:19, 121:22
full [4] - 35:8, 73:14, 99:21, 100:16
function [1] - 11:8
functioning [1] - 7:25
future [20] - 14:4, 20:4, 25:1, 25:3, 25:4, 40:12, 44:12, 74:16, 78:22, 78:23, 81:7, 81:12, 81:16, 109:14, 109:18, 110:25, 111:24, 112:12, 112:19, 117:20

**G**

Gallagher [1] - 53:5
games [2] - 48:3, 48:9
gate [1] - 52:6
gathered [1] - 73:8
generally [3] - 36:18, 63:25, 100:2
gentleman [1] - 44:11
GILL [11] - 5:6, 7:7, 25:14, 32:22, 33:21, 50:6, 50:11, 50:13, 50:16, 57:2, 125:15
Gill [2] - 6:6, 56:10
gill [17] - 34:6, 36:6, 36:11, 39:13, 39:17, 41:3, 45:2, 45:6, 45:21, 62:8, 64:4, 65:24, 67:14, 70:22, 72:7, 81:5, 81:25
Gill.......... [1] - 4:3
girl [1] - 94:9
girls [1] - 93:10
given [8] - 13:25, 23:20, 27:22, 32:2, 32:25, 42:10, 44:25, 123:14
God [1] - 11:1
Gonzalez [3] - 52:10, 53:20, 63:18
Google [1] - 124:6
government [2] - 58:2, 58:5
Government [2] - 126:5, 126:9
governor [1] - 103:3
grandkids [1] - 9:10
grandmother [1] - 119:2
gravity [1] - 39:10
great [2] - 91:9, 120:24
greater [3] - 78:13, 114:9, 114:10
green [2] - 55:9, 115:13
grenade [1] - 106:20
ground [1] - 76:15
group [3] - 64:5, 64:6
growing [2] - 57:24, 119:2
guard [1] - 47:7
guards [3] - 23:1, 23:2, 80:14
guess [11] - 12:25, 22:19, 34:21, 46:15, 58:6, 59:16, 59:21, 59:23, 106:15, 111:1, 115:8

guilt [1] - 43:23
guilt/innocence [10] -
13:15, 15:8, 26:10,
43:13, 71:23, 74:4,
81:2, 82:17, 82:18,
83:7
guilty [36] - 15:10,
15:13, 15:14, 17:11,
24:22, 27:2, 39:3,
39:14, 40:11, 40:19,
48:22, 69:25, 70:3,
70:11, 72:17, 72:20,
72:21, 76:21, 81:3,
82:15, 82:18, 99:10,
100:13, 102:10,
105:11, 107:25,
108:17, 108:20,
109:7, 109:8, 112:3,
113:21, 117:19,
121:11
gun [1] - 80:1
gut [1] - 44:19
guy [8] - 22:14, 23:13,
24:17, 28:17, 32:6,
105:8, 110:8, 117:19
guys [1] - 48:17
gymnastic [1] - 48:8

**H**

hair [1] - 94:14
half [2] - 102:18, 103:5
hall [1] - 60:2
hallway [2] - 50:1,
121:22
Haltom [1] - 60:3
hand [6] - 5:19, 24:3,
32:11, 55:16,
106:20, 122:17
HAND [1] - 127:19
hands [3] - 75:6,
96:24, 103:1
hard [1] - 84:11
head [11] - 19:11,
32:18, 67:24, 84:3,
84:8, 84:22, 87:10,
106:18, 108:10,
116:22, 123:1
healthcare [1] - 23:4
hear [26] - 6:18, 10:24,
16:13, 16:16, 39:19,
39:22, 39:23, 41:12,
41:23, 41:24, 42:4,
46:4, 55:20, 66:11,
86:9, 86:21, 87:2,
87:5, 87:6, 87:14,
87:16, 101:24,
111:4, 111:5, 111:13
heard [12] - 15:19,

19:16, 24:9, 31:1,
31:6, 33:5, 43:12,
44:17, 66:9, 73:23,
103:25, 120:7
hearing [1] - 105:2
heart [4] - 84:25,
117:3, 117:13, 120:5
heavy [1] - 59:1
heinous [1] - 72:25
help [6] - 64:14, 93:5,
96:5, 100:25,
111:10, 111:16
helped [3] - 119:1,
119:4, 119:5
helpful [1] - 42:3
helping [2] - 59:11,
94:25
hereby [1] - 127:4
herself [2] - 29:21,
31:1
hesitate [1] - 9:1
high [2] - 38:16, 72:10
high-level [1] - 38:16
highest [1] - 113:24
highlight [1] - 29:25
highly [1] - 35:5
himself [2] - 29:21,
31:1
history [4] - 39:20,
41:18, 44:2, 112:6
hold [6] - 62:4, 80:25,
81:5, 81:25, 86:4,
86:18
holds [1] - 70:22
home [7] - 16:25,
35:12, 39:3, 95:12,
95:13, 114:19, 116:8
homework [2] - 57:15,
74:13
homicide [6] - 69:8,
70:4, 71:25, 72:17,
72:20, 73:21
Homicides [1] - 97:25
homicides [4] - 67:12,
76:24, 78:22, 97:24
honest [1] - 35:24
honestly [1] - 91:16
Honor [9] - 33:22,
50:6, 50:8, 51:17,
51:22, 89:14, 89:17,
125:15, 125:17
hopefully [3] - 34:6,
41:23, 123:16
hospital [1] - 97:4
hot [1] - 6:20
hour [4] - 6:24, 11:11,
54:9, 56:21
hours [1] - 47:23
housing [2] - 47:11,
48:2

human [1] - 86:8
Hummel [8] - 6:4,
34:4, 51:21, 51:23,
56:7, 85:21, 121:11,
122:11
hummel's [1] - 85:23
hurt [1] - 20:15
husband [10] - 58:1,
60:18, 61:15, 93:7,
93:24, 95:3, 95:14,
95:18, 96:4, 112:15
hustled [1] - 63:16
hypothetical [1] -
107:3

**I**

illustration [1] - 28:13
impact [1] - 43:5
important [16] - 21:4,
21:5, 40:1, 44:4,
45:6, 49:8, 49:19,
53:20, 54:1, 68:23,
83:17, 88:20, 91:14,
105:15, 123:18,
123:25
imposed [2] - 30:8,
84:2
impression [1] - 53:20
incident [2] - 47:17,
95:2
include [3] - 22:17,
22:21, 104:22
included [2] - 61:17,
127:8
including [1] - 21:13
independent [1] -
101:23
independently [2] -
75:22, 106:17
indicated [4] - 38:21,
44:2, 48:13, 100:24
indictment [11] - 37:4,
37:18, 43:14, 69:1,
69:14, 69:21, 69:22,
74:6, 104:4, 104:11,
105:4
individual [38] - 5:22,
8:3, 13:11, 14:3,
14:21, 15:22, 18:4,
18:11, 21:19, 23:16,
23:22, 26:21, 28:7,
29:20, 37:2, 37:25,
38:22, 39:2, 39:3,
39:24, 44:4, 45:25,
46:6, 46:16, 55:25,
68:13, 69:10, 72:17,
99:23, 106:10,
106:11, 106:15,

111:19, 116:20,
116:25, 119:12
individual's [2] - 20:3,
20:12
individually [1] -
37:10
individuals [1] - 23:4
ineligible [1] - 76:19
information [6] - 36:5,
72:19, 72:22,
111:18, 124:3,
124:16
informed [2] - 63:9,
73:9
innocent [1] - 48:22
inquiry [1] - 24:21
insanity [1] - 43:5
insight [1] - 111:19
instead [4] - 26:23,
30:2, 30:15, 59:13
instruct [4] - 14:20,
76:17, 84:15, 87:22
instructed [1] - 36:23
Instructed.......... [1] -
4:11
instruction [6] -
27:11, 102:16,
116:14, 116:16,
116:19, 120:1
instructions [6] -
71:12, 71:15,
123:15, 123:19,
123:24, 125:1
intend [1] - 104:11
intended [3] - 108:2,
108:3, 108:15
intentionally [3] -
98:4, 98:17
interest [1] - 59:9
interesting [3] - 34:22,
35:2, 105:24
Internet [3] - 124:1,
124:9, 124:22
intersections [1] -
79:25
interview [5] - 5:22,
8:10, 52:12, 55:25,
122:23
interviewed [1] -
125:11
intimate [1] - 60:15
introduce [2] - 39:21,
111:14
introduced [1] - 39:18
introspective [1] -
91:1
involved [4] - 95:10,
124:10, 124:23,
124:24
involving [1] - 47:17

Iraq [1] - 58:20
Israelis [1] - 47:18
Issue [17] - 14:5, 14:9,
16:21, 25:21, 25:23,
26:11, 26:12, 32:3,
41:1, 42:24, 43:21,
43:25, 44:10, 77:12,
81:4, 82:15, 82:16
issue [10] - 14:8, 15:9,
22:13, 23:13, 24:22,
26:3, 33:6, 40:20,
71:12, 108:1
issues [12] - 5:24,
5:25, 13:23, 13:24,
16:20, 43:4, 56:3,
62:22, 74:15, 87:21,
124:18, 124:22
itself [1] - 82:25

**J**

JACCI [2] - 126:18,
127:21
Jacci [3] - 5:8, 127:2,
127:12
jail [10] - 22:2, 48:19,
48:20, 60:6, 62:13,
62:15, 96:13, 96:14,
96:15
January [1] - 127:20
job [9] - 30:4, 32:19,
32:22, 33:11, 54:9,
59:11, 59:15, 70:14,
84:11
John [6] - 6:3, 34:4,
56:7, 89:21, 121:11,
122:11
Joint [1] - 92:20
Judge [6] - 52:10,
53:19, 57:2, 63:18,
116:14, 122:4
judge [35] - 14:11,
14:13, 14:16, 14:20,
16:17, 16:19, 16:25,
18:2, 18:10, 27:10,
32:14, 32:25, 33:2,
36:13, 51:4, 57:15,
65:23, 65:25, 66:7,
66:8, 66:24, 74:20,
75:9, 75:13, 75:14,
75:17, 76:2, 76:6,
76:17, 84:15, 87:22,
111:6
judges [1] - 35:20
judgment [3] - 11:2,
43:17, 43:18
jump [2] - 13:23, 15:7
JUNE [1] - 5:3
June [2] - 122:21,

125:4
**JUROR** [41] - 5:12, 5:16, 6:2, 6:11, 6:15, 7:1, 50:3, 51:1, 51:3, 52:8, 52:14, 52:17, 52:19, 52:24, 53:3, 53:6, 53:10, 53:12, 53:15, 53:22, 53:25, 54:5, 54:8, 54:14, 54:20, 54:23, 55:1, 55:5, 55:11, 55:14, 56:5, 56:14, 56:19, 56:24, 65:7, 121:24, 122:15, 122:24, 123:1, 123:8, 125:2
**Juror** [5] - 4:10, 4:10, 4:11, 5:14, 55:13
**juror** [74] - 5:20, 6:10, 7:4, 8:9, 8:21, 9:19, 11:8, 12:11, 22:1, 24:7, 26:21, 27:11, 27:13, 28:14, 29:2, 29:9, 29:20, 30:4, 30:25, 33:2, 33:11, 33:14, 36:1, 49:20, 50:19, 52:1, 54:16, 55:17, 57:4, 65:12, 65:13, 65:20, 66:6, 66:9, 66:23, 70:9, 70:18, 71:14, 73:2, 73:17, 74:23, 79:7, 80:24, 82:5, 82:23, 83:2, 84:17, 84:24, 85:7, 86:4, 86:14, 87:18, 88:3, 89:4, 89:15, 89:23, 90:14, 90:21, 91:10, 99:20, 99:24, 100:12, 106:15, 113:13, 115:12, 117:12, 119:6, 122:10, 122:12, 122:18, 123:11, 125:6
**juror's** [3] - 32:19, 32:22, 116:25
**Jurors** [1] - 51:15
**jurors** [18] - 6:1, 10:25, 18:9, 35:20, 39:2, 40:11, 46:12, 86:11, 90:5, 101:22, 105:11, 113:12, 113:13, 116:24, 117:7, 120:11, 120:24
**JURORS** [1] - 4:2
**jurors'** [1] - 110:2
**jury** [104] - 6:7, 9:22, 11:13, 11:14, 11:17, 13:19, 13:22, 13:25, 14:10, 14:21, 15:15,

15:18, 15:23, 16:10, 16:11, 16:15, 16:18, 16:19, 16:20, 17:8, 17:20, 17:21, 18:5, 18:9, 18:12, 18:22, 21:19, 22:14, 27:1, 34:9, 34:17, 38:9, 39:1, 50:24, 50:25, 56:3, 56:12, 66:3, 69:24, 74:7, 74:19, 75:1, 75:18, 75:19, 76:1, 76:5, 76:6, 76:18, 79:9, 81:6, 81:11, 81:15, 81:17, 82:1, 82:13, 83:9, 83:24, 84:11, 84:16, 84:19, 84:24, 88:20, 88:22, 91:8, 99:9, 101:12, 101:19, 105:2, 105:9, 106:8, 108:25, 109:4, 109:15, 111:10, 111:13, 111:18, 112:13, 112:17, 112:24, 113:3, 113:5, 115:2, 115:11, 116:5, 116:10, 116:14, 116:23, 117:11, 117:23, 118:12, 120:21, 121:1, 123:10, 123:16, 123:18, 124:11, 124:13, 124:16, 124:22
**jury's** [6] - 14:2, 15:9, 16:13, 32:4, 83:24
**justice** [5] - 9:15, 48:14, 50:23, 84:6, 101:10
**justification** [2] - 98:21, 99:2
**justified** [1] - 29:5
**justify** [1] - 73:13

## K

**KATHERINE** [1] - 4:7
**keep** [17] - 15:3, 57:23, 65:22, 66:13, 66:22, 73:2, 73:17, 77:8, 80:24, 82:6, 82:21, 82:23, 83:3, 85:7, 87:19, 88:2, 88:6
**Keller** [1] - 7:18
**kept** [1] - 47:11
**kids** [5] - 57:25, 77:25, 93:13, 100:9, 100:10
**kill** [2] - 69:10, 106:22

**killed** [5] - 22:5, 76:25, 104:17, 106:9, 106:10
**killer** [1] - 105:10
**killing** [2] - 104:1, 106:21
**kind** [28] - 6:19, 8:14, 20:5, 20:8, 25:1, 34:7, 36:4, 36:25, 39:13, 41:12, 41:13, 42:6, 44:3, 44:17, 44:19, 44:20, 45:1, 79:24, 91:1, 91:10, 95:25, 102:10, 105:20, 105:24, 107:12, 110:4, 112:15, 119:24
**kindness** [1] - 119:7
**knife** [2] - 69:17, 69:24
**knowing** [9] - 23:21, 32:2, 32:6, 32:13, 33:13, 38:7, 43:1, 81:19, 88:13
**knowingly** [12] - 12:20, 37:25, 67:11, 69:9, 97:19, 97:21, 98:4, 98:6, 98:17, 100:14, 106:9, 106:10
**knowledge** [2] - 75:13, 126:10
**knowledgeable** [1] - 42:1

## L

**lady** [1] - 111:12
**language** [2] - 21:8, 41:3
**large** [1] - 85:22
**larger** [1] - 64:5
**Larry** [4] - 6:4, 34:3, 56:8, 89:20
**last** [12] - 6:14, 7:12, 8:4, 8:6, 8:15, 13:21, 16:25, 21:21, 45:1, 49:7, 87:6, 123:3
**lasted** [1] - 34:20, 47:23
**law** [67] - 8:12, 8:17, 8:19, 11:19, 11:21, 12:2, 12:16, 12:17, 13:2, 13:3, 13:4, 15:5, 19:7, 19:8, 20:23, 32:24, 36:23, 46:22, 47:2, 60:6, 60:9, 62:5, 62:12, 62:23, 63:22, 65:14, 65:21, 65:22, 65:23,

66:2, 66:7, 66:8, 66:13, 67:9, 68:25, 70:19, 71:20, 73:1, 73:13, 83:1, 83:2, 84:12, 85:13, 86:3, 87:22, 89:6, 90:9, 90:18, 90:21, 91:1, 91:5, 91:8, 91:9, 96:12, 97:9, 98:20, 99:19, 102:16, 104:22, 105:21, 113:14, 113:24, 121:14, 123:21, 123:22
**laws** [3] - 28:8, 33:2, 57:12
**lawyer** [1] - 124:6
**lawyer's** [1] - 61:7
**lawyers** [3] - 6:4, 35:1, 35:6
**lays** [1] - 66:2
**lead** [1] - 28:22
**learned** [1] - 48:9
**least** [4] - 7:22, 45:1, 46:3, 46:22
**leave** [5] - 35:16, 50:23, 103:15, 110:2, 110:6
**leaving** [2] - 80:20, 114:6
**left** [2] - 77:1, 103:12
**legal** [9] - 5:25, 56:3, 97:20, 100:15, 101:7, 102:4, 114:8, 119:18, 123:23
**legally** [3] - 77:1, 97:21, 114:22
**legislation** [1] - 83:14
**legislature** [4] - 18:16, 19:18, 20:5, 78:22
**lengthy** [1] - 25:25
**less** [5] - 27:5, 27:14, 27:18, 35:19, 102:19
**lesser** [1] - 98:13
**lesson** [1] - 54:21
**level** [7] - 28:3, 38:16, 41:7, 84:25, 85:16, 88:6, 88:10
**liability** [1] - 54:17
**Life** [1] - 14:24
**life** [66] - 6:9, 9:8, 10:5, 14:7, 14:17, 14:19, 14:24, 15:1, 18:11, 18:23, 22:9, 23:14, 23:18, 26:23, 28:24, 29:4, 30:2, 30:7, 30:14, 32:14, 38:17, 38:20, 38:22, 39:24, 40:18, 43:19, 64:2, 67:20, 72:7,

72:21, 74:18, 76:18, 77:1, 77:3, 77:24, 80:2, 85:4, 87:9, 97:1, 98:1, 99:1, 99:5, 99:11, 99:16, 100:4, 100:17, 102:12, 102:13, 102:14, 102:23, 103:9, 103:14, 103:18, 108:5, 108:8, 108:18, 108:23, 111:9, 116:7, 118:1, 118:2, 118:18, 119:24
**likely** [2] - 78:12, 88:14
**limited** [2] - 24:21, 24:22
**line** [2] - 57:23, 104:1
**LinkedIn** [1] - 124:21
**list** [1] - 69:5
**LIST** [1] - 4:1
**listed** [2] - 60:8, 60:12
**listen** [3] - 46:25, 64:4, 124:2
**listening** [1] - 41:9
**live** [4] - 64:3, 70:4, 90:22, 100:5
**lived** [3] - 9:4, 28:24, 111:12
**lives** [1] - 92:17
**locked** [2] - 22:9, 96:20
**log** [1] - 47:25
**look** [29] - 21:8, 25:1, 28:16, 44:7, 44:18, 46:6, 64:24, 65:9, 72:10, 77:10, 77:13, 78:15, 82:24, 83:3, 84:6, 84:20, 87:17, 88:21, 90:11, 91:2, 91:15, 110:21, 110:24, 111:24, 112:4, 113:6, 119:22, 121:2
**looking** [8] - 71:11, 72:14, 78:14, 78:16, 80:18, 80:19, 85:8, 118:15
**lookout** [1] - 88:3
**Los** [6] - 9:8, 9:13, 9:23, 10:2, 34:16, 47:3
**loses** [1] - 97:25
**loss** [1] - 102:6
**lousy** [1] - 70:14
**love** [1] - 93:4
**low** [2] - 72:8, 72:24
**lower** [1] - 77:21
**lumps** [1] - 119:17

**lunch** [2] - 35:16, 125:8

## M

**ma'am** [5] - 51:24, 57:8, 57:21, 65:3, 122:2
**mad** [1] - 68:17
**magnitude** [1] - 109:22
**mail** [1] - 50:25
**mails** [1] - 124:15
**majority** [2] - 9:7, 49:18
**makeup** [1] - 107:7
**man** [2] - 22:1, 42:1
**manner** [4] - 38:2, 69:7, 69:11, 71:11
**Maria** [1] - 55:13
**MARIA** [2] - 4:8, 57:3
**married** [2] - 60:4, 93:8
**martians** [1] - 115:13
**MARTINEZ** [1] - 4:5
**Martinez** [1] - 52:7
**martinez** [1] - 52:9
**massive** [1] - 68:9
**matter** [2] - 29:19, 114:24
**mature** [3] - 28:17, 29:14, 29:15
**mean** [35] - 19:14, 20:14, 21:22, 22:16, 34:12, 45:17, 46:17, 48:16, 54:5, 54:8, 80:6, 89:4, 98:22, 99:17, 101:1, 101:11, 102:7, 102:24, 104:20, 105:6, 106:6, 108:9, 109:1, 109:10, 109:23, 112:8, 112:11, 112:13, 115:22, 117:8, 118:11, 119:3, 119:10, 119:16, 120:2
**meaning** [6] - 20:7, 69:19, 70:2, 77:23, 78:8, 79:8
**meaningful** [1] - 109:3
**means** [21] - 14:21, 14:24, 17:13, 18:17, 38:2, 46:13, 46:15, 67:19, 67:20, 67:21, 68:21, 69:7, 69:11, 71:11, 76:19, 97:22, 103:14, 106:19,

106:20, 119:17, 124:5
**meant** [1] - 109:8
**mechanic** [2] - 58:1, 59:2
**mechanism** [1] - 108:16
**media** [2] - 70:13, 124:2
**meet** [4] - 40:19, 61:4, 71:16, 82:1
**meeting** [2] - 6:14, 70:5
**memory** [1] - 77:13
**mental** [4] - 43:4, 43:5, 98:8, 98:13
**mention** [1] - 63:2
**mentioned** [1] - 12:14
**merits** [1] - 72:23
**met** [3] - 37:12, 71:8, 95:19
**Mexico** [7] - 59:17, 92:6, 92:12, 92:16, 92:18, 93:19, 93:20
**microphone** [2] - 6:17, 55:19
**might** [43] - 19:15, 19:17, 21:17, 27:6, 27:13, 27:18, 27:25, 28:1, 28:2, 28:16, 28:18, 29:2, 29:7, 29:9, 29:13, 31:14, 31:24, 35:13, 35:18, 35:19, 42:11, 43:5, 43:10, 45:14, 48:20, 66:1, 79:13, 84:17, 85:13, 87:18, 90:6, 90:10, 97:9, 99:6, 100:25, 106:15, 115:9, 116:13, 116:15, 121:15, 126:13
**Miles** [2] - 6:6, 56:9
**military** [4] - 29:17, 59:4, 74:25, 119:4
**mind** [29] - 15:4, 65:22, 66:14, 66:22, 67:22, 73:2, 73:18, 77:9, 79:12, 80:25, 82:6, 82:23, 83:3, 84:25, 85:8, 85:15, 87:19, 88:2, 88:6, 88:7, 88:11, 98:1, 100:19, 100:21, 114:25, 115:2, 117:3, 117:13, 119:8
**mini** [5] - 37:1, 52:3, 52:11, 56:16, 122:23
**ministers** [1] - 23:4
**minute** [2] - 29:9,

107:20
**minutes** [2] - 50:2, 121:23
**mistake** [1] - 105:11
**mitigates** [1] - 30:14
**mitigating** [38] - 26:22, 27:9, 27:12, 28:1, 28:3, 29:3, 29:10, 29:19, 30:1, 30:5, 30:7, 30:10, 30:12, 31:2, 31:6, 31:12, 31:19, 44:14, 45:22, 84:16, 84:21, 84:23, 85:1, 85:8, 85:14, 87:1, 87:17, 87:18, 88:3, 88:5, 117:25, 118:6, 118:10, 118:12, 119:1, 119:23
**mitigation** [10] - 14:7, 14:8, 40:13, 45:8, 45:14, 46:21, 46:24, 49:14, 74:17
**molestation** [2] - 10:18, 12:16
**moment** [1] - 50:11
**Monday** [2] - 122:20, 125:4
**money** [5] - 48:21, 53:9, 53:18, 54:18, 68:18
**month** [2] - 6:8, 56:12
**months** [2] - 92:11, 92:16
**MOORE** [4] - 89:17, 89:19, 122:4, 122:8
**mOORE** [1] - 121:20
**Moore** [4] - 6:5, 34:3, 56:8, 89:20
**Moore....** [1] - 4:9
**moral** [10] - 12:10, 27:13, 28:22, 29:23, 30:13, 33:15, 46:11, 67:4, 84:18, 85:2
**morally** [3] - 27:6, 27:14, 27:18
**morning** [22] - 5:9, 5:11, 5:12, 5:18, 7:8, 7:9, 7:10, 8:10, 8:23, 11:12, 34:1, 34:2, 34:6, 36:12, 55:11, 55:12, 57:8, 65:11, 65:15, 89:1, 122:13, 123:10
**MORRISON** [1] - 4:7
**most** [4] - 46:12, 72:25, 86:11, 123:25
**mother** [1] - 47:2
**mother-in-law** [1] - 47:2

**motivation** [1] - 27:23
**motivations** [2] - 27:25, 28:1
**move** [5] - 6:17, 13:12, 22:24, 55:19, 81:20
**moved** [1] - 62:14
**moves** [2] - 15:16, 23:21
**movie** [1] - 59:22
**MR** [26] - 5:6, 7:7, 25:14, 32:22, 33:21, 33:25, 50:6, 50:8, 50:11, 50:13, 50:16, 51:4, 51:7, 51:17, 51:20, 53:5, 57:2, 57:7, 65:9, 89:14, 89:17, 89:19, 121:20, 122:2, 122:6, 122:8, 125:15, 125:17
**multiple** [1] - 104:4
**murder** [72] - 12:19, 13:12, 14:2, 14:22, 14:25, 15:1, 15:23, 16:16, 18:19, 18:21, 21:14, 25:15, 27:2, 28:16, 33:10, 34:20, 37:3, 37:18, 38:4, 38:7, 38:12, 38:13, 38:16, 39:15, 42:25, 43:7, 63:19, 64:1, 65:18, 67:10, 72:2, 72:6, 76:22, 81:3, 97:18, 97:20, 98:3, 98:9, 98:13, 98:18, 99:2, 99:10, 100:13, 101:4, 102:10, 102:11, 102:13, 102:14, 102:17, 102:24, 103:9, 103:19, 103:21, 103:25, 104:2, 104:4, 104:5, 106:1, 106:2, 106:9, 107:16, 107:21, 107:24, 107:25, 108:4, 108:17, 108:20, 113:4, 117:19
**murders** [10] - 12:20, 38:10, 43:2, 64:10, 67:11, 78:23, 99:15, 99:16, 106:4, 112:3
**must** [2] - 84:24, 114:12
**MY** [1] - 127:19
**MySpace** [1] - 124:20

## N

**name** [5] - 53:4, 53:7, 94:14, 94:19, 94:20
**narrow** [2] - 20:23, 46:21
**natural** [2] - 39:6, 77:3
**nature** [4] - 41:17, 42:17, 86:8, 94:11
**necessarily** [3] - 42:5, 101:11, 101:13
**need** [15] - 5:18, 6:17, 6:25, 15:3, 50:9, 51:25, 55:15, 55:18, 55:20, 89:1, 101:3, 108:11, 122:11, 122:21
**needed** [1] - 35:25
**needs** [1] - 72:25
**negative** [1] - 34:25
**negligently** [1] - 98:11
**neighbor** [1] - 111:16
**nerve** [2] - 6:20, 55:21
**nervous** [1] - 55:23
**net** [1] - 44:18
**network** [1] - 124:21
**never** [17] - 10:6, 14:22, 15:2, 22:15, 26:16, 30:23, 36:20, 38:23, 39:3, 80:20, 100:21, 102:3, 102:5, 103:10, 103:14, 112:4
**new** [1] - 54:9
**next** [8] - 20:10, 23:20, 25:23, 51:5, 80:1, 107:8, 110:8, 111:12
**night** [2] - 7:12, 7:19
**nightgown** [1] - 107:8
**NIKKO** [1] - 4:5
**nikko** [1] - 52:7
**NO** [2] - 126:18, 127:21
**nobody** [2] - 63:17, 97:16
**none** [1] - 90:5
**normal** [1] - 67:19
**notable** [1] - 26:3
**NOTE** [1] - 126:3
**nothing** [4] - 30:12, 30:14, 34:25, 89:3
**notice** [5] - 9:12, 59:17, 69:2, 83:18, 105:16
**noticed** [1] - 94:24
**notified** [1] - 123:7
**number** [5] - 22:24, 60:16, 91:20, 99:11, 107:23

numbered [1] - 127:9

## O

o'clock [3] - 122:21, 123:10, 125:4
oath [39] - 8:5, 8:11, 33:1, 63:4, 65:11, 65:12, 66:5, 66:23, 68:25, 70:10, 70:18, 71:14, 73:17, 80:24, 82:5, 84:9, 84:10, 84:12, 85:7, 86:4, 86:13, 86:14, 86:19, 87:18, 88:17, 88:21, 88:22, 89:4, 89:8, 90:14, 90:15, 90:17, 90:21, 91:7, 122:11
obey [1] - 70:19
objective [1] - 98:5
obligated [3] - 17:20, 17:21, 31:21
obligates [1] - 8:7
obligation [3] - 24:7, 85:23, 86:2
observe [1] - 47:24
obviously [5] - 15:15, 20:2, 39:9, 39:22, 45:24
Obviously [1] - 112:2
occasion [4] - 15:22, 16:24, 95:6, 95:7
occupation [1] - 92:24
occur [4] - 110:14, 110:18, 110:19, 110:25
occurred [5] - 38:1, 38:6, 42:25, 43:8, 127:10
occurrence [1] - 112:15
OF [4] - 4:1, 5:2, 127:1, 127:1
offense [12] - 10:15, 29:12, 29:22, 45:15, 45:25, 46:19, 64:17, 69:6, 99:3, 99:13, 102:14, 103:18
offenses [1] - 103:20
offer [1] - 118:12
office [9] - 58:7, 61:7, 61:12, 61:14, 62:7, 62:8, 62:19, 95:19, 95:21
officer [1] - 104:1
offices [1] - 93:5
OFFICIAL [1] - 127:19
Official [3] - 126:19, 127:2, 127:22

Oklahoma [4] - 58:21, 58:22, 68:3, 106:22
old [5] - 28:17, 29:13, 92:5, 111:11, 111:15
oldest [1] - 107:5
Olympics [2] - 47:8, 47:17
once [10] - 11:12, 30:17, 30:20, 37:14, 78:20, 90:14, 95:19, 102:22, 122:13, 123:20
Once [1] - 120:9
one [62] - 10:5, 10:14, 12:20, 14:13, 15:22, 18:5, 18:17, 23:22, 24:12, 24:18, 24:21, 24:23, 25:3, 25:12, 26:2, 37:25, 39:12, 40:4, 44:7, 44:18, 47:17, 51:5, 59:7, 61:15, 62:14, 62:15, 67:11, 68:5, 68:15, 69:6, 78:7, 79:6, 79:25, 81:20, 87:5, 95:6, 95:8, 98:8, 99:3, 100:1, 102:18, 103:22, 104:5, 105:4, 105:24, 106:5, 106:10, 106:12, 106:21, 107:7, 107:14, 107:15, 111:1, 112:14, 112:16, 117:12, 118:21, 118:25, 119:7
one-half [1] - 102:18
one-time [1] - 112:14
ones [2] - 62:9, 77:15
ongoing [1] - 58:19
open [18] - 7:21, 23:9, 25:18, 32:5, 65:22, 66:13, 66:22, 73:2, 73:18, 80:25, 82:6, 82:23, 83:3, 85:8, 87:19, 88:2, 88:6, 127:10
operate [1] - 117:22
operations [1] - 58:19
opinion [4] - 10:12, 36:19, 44:11, 97:14
opinions [1] - 41:22
opportunity [2] - 5:23, 56:2
opposed [2] - 38:3, 110:18
options [1] - 76:25
order [14] - 15:22, 37:8, 41:12, 42:23, 47:13, 98:9, 99:19,

106:8, 110:24, 111:22, 116:21, 120:10, 123:16, 125:10
otherwise [1] - 123:9
ought [3] - 12:22, 12:23, 13:9
out-of-pocket [1] - 53:2
outcome [2] - 60:22, 75:7
outside [3] - 10:11, 14:23, 22:25
overseas [1] - 58:18
own [12] - 41:7, 49:13, 67:22, 79:8, 84:24, 97:14, 115:13, 117:1, 117:3, 117:13, 120:5, 123:23

## P

PAGE [1] - 4:2
pages [1] - 66:1
paid [2] - 53:11, 127:18
paid/will [1] - 127:18
pain [1] - 100:8
Pamela [4] - 6:5, 34:4, 56:8, 89:21
panel [6] - 37:1, 52:3, 52:11, 56:17, 114:1, 122:23
paperwork [1] - 16:25
Pardon [2] - 102:25, 103:4
parent [2] - 114:15, 115:3
parental [1] - 114:17
parents [1] - 92:9
parking [2] - 114:5, 123:13
parole [15] - 14:17, 14:20, 38:18, 38:20, 38:23, 76:18, 76:20, 102:12, 102:15, 102:18, 102:21, 102:24, 103:10, 103:14, 103:18
Paroles [2] - 102:25, 103:4
part [23] - 12:11, 22:12, 22:13, 33:16, 45:7, 50:24, 58:18, 65:11, 67:5, 68:15, 68:16, 71:22, 72:1, 79:8, 79:9, 80:21, 82:5, 84:9, 84:15,

86:19, 91:17, 111:6
partiality [1] - 126:14
participate [1] - 44:23
participation [1] - 50:22
particular [23] - 7:17, 12:18, 20:16, 24:18, 24:24, 37:1, 37:4, 37:18, 37:23, 54:2, 58:24, 59:24, 61:1, 70:24, 74:5, 74:21, 81:7, 91:10, 99:12, 108:25, 109:6, 111:19, 115:12
particularly [2] - 8:2, 12:1
parties [6] - 51:14, 124:9, 124:12, 126:12, 127:7, 127:15
parts [3] - 17:5, 19:1, 68:11
party [2] - 31:11, 124:6
pass [3] - 89:15, 121:20, 123:13
past [7] - 41:14, 42:16, 78:25, 112:1, 112:11, 126:10
patient [1] - 120:14
pause [2] - 83:25, 84:5
pay [6] - 52:22, 52:23, 53:8, 107:7, 107:9, 118:3
peaceful [1] - 79:25
penal [1] - 67:16
Penal [1] - 37:7
penalties [1] - 101:12
penalty [50] - 5:24, 10:9, 10:13, 10:16, 10:20, 11:25, 12:12, 12:15, 12:17, 12:24, 13:4, 13:6, 13:9, 13:25, 14:14, 18:6, 18:18, 18:20, 23:23, 26:24, 28:9, 29:5, 30:2, 30:15, 32:3, 32:6, 33:10, 33:17, 36:19, 56:4, 63:13, 63:25, 64:19, 67:6, 81:21, 82:11, 84:2, 85:5, 88:15, 97:11, 100:3, 100:25, 101:5, 102:12, 103:20, 108:6, 108:18, 108:20, 109:9, 121:8
penitentiary [9] - 14:23, 15:1, 15:2, 23:8, 23:14, 23:17,

39:4, 80:20, 108:5
people [34] - 9:15, 13:5, 13:8, 18:19, 18:21, 19:17, 22:11, 22:24, 23:8, 27:22, 59:11, 60:16, 68:9, 68:11, 74:25, 76:25, 80:7, 80:8, 80:10, 80:13, 91:20, 101:2, 102:2, 106:21, 108:4, 111:22, 116:10, 116:11, 118:22, 123:11, 124:23
Peremptory [2] - 4:4, 4:7
peremptory [4] - 50:10, 50:15, 122:5, 125:13
perfectly [1] - 118:22
perks [1] - 48:5
person [36] - 6:3, 8:24, 12:19, 12:20, 13:3, 15:10, 18:6, 20:22, 20:24, 21:1, 37:24, 55:22, 56:6, 60:5, 67:10, 67:11, 68:15, 69:16, 70:3, 72:20, 72:21, 74:6, 76:6, 76:21, 81:7, 81:12, 98:2, 101:9, 102:17, 106:9, 111:2, 111:9, 113:10, 119:1, 119:3, 119:9
person's [4] - 14:1, 87:8, 113:9, 118:17
personal [2] - 29:23, 65:21
personnel [1] - 124:7
persons [1] - 124:24
persuasive [1] - 41:19
pertains [1] - 12:7
phase [37] - 13:12, 13:13, 13:15, 13:16, 13:18, 15:8, 15:16, 15:17, 15:20, 16:2, 16:7, 16:11, 16:12, 16:17, 24:15, 24:16, 26:10, 39:17, 39:19, 43:13, 46:5, 57:12, 72:15, 72:16, 73:21, 73:24, 73:25, 74:4, 74:8, 81:2, 82:17, 83:7, 111:5, 111:7
phone [1] - 124:17
photo [1] - 87:8
phrase [19] - 17:7, 17:10, 17:13, 19:1, 19:6, 20:8, 20:10, 20:14, 20:16, 21:10,

STATE V. JOHN WILLIAM HUMMEL

21:21, 21:22, 25:18, 26:4, 26:12, 67:23, 86:11
**picked** [2] - 38:25, 45:2
**picture** [2] - 39:25, 44:19
**piece** [1] - 87:6
**piecemeal** [1] - 36:25
**pins** [4] - 48:6, 48:7, 48:9, 48:11
**pitcher** [1] - 56:22
**place** [4] - 59:24, 76:8, 79:20, 79:25
**placed** [2] - 52:10, 114:19
**plastic** [1] - 50:23
**play** [1] - 90:10
**playing** [1] - 59:25
**pocket** [1] - 53:2
**point** [12] - 11:19, 11:22, 24:24, 32:5, 59:7, 68:23, 72:22, 77:5, 94:2, 105:9, 120:16, 123:4
**Police** [1] - 59:7
**police** [4] - 59:9, 71:2, 95:9, 104:1
**portions** [1] - 127:6
**poses** [1] - 16:19
**position** [5] - 90:16, 96:25, 105:2, 105:9, 117:22
**possibility** [5] - 19:20, 19:24, 38:18, 102:12, 102:15
**possible** [9] - 10:13, 12:23, 12:25, 23:15, 77:21, 78:13, 83:1, 110:13, 110:18
**possibly** [6] - 13:5, 20:15, 42:7, 90:10, 110:13, 121:16
**post** [1] - 58:6
**postal** [2] - 58:2, 59:12
**potential** [3] - 36:1, 52:2, 54:16
**Potential** [2] - 5:14, 55:13
**powerful** [1] - 49:19
**powerpoint** [1] - 12:8
**preparation** [1] - 127:17
**prepares** [1] - 65:25
**preponderance** [1] - 114:8
**present** [3] - 5:4, 5:8, 51:12
**presented** [2] - 46:23,

124:4
**presents** [1] - 107:5
**presumes** [1] - 98:15
**presumption** [3] - 40:18, 99:14, 108:7
**pretty** [5] - 20:6, 21:9, 23:9, 66:20, 97:18
**previous** [1] - 26:15
**previously** [1] - 123:15
**priority** [1] - 35:20
**prison** [14] - 14:17, 14:19, 22:5, 22:17, 22:21, 22:25, 76:20, 77:3, 79:18, 80:10, 80:11, 103:11, 103:13, 118:2
**prisoner** [1] - 22:4
**prisoners** [4] - 22:6, 48:18, 48:20, 80:18
**prisons** [2] - 80:13, 80:14
**probability** [15] - 17:15, 19:2, 19:5, 19:7, 19:12, 19:19, 20:12, 25:2, 25:16, 77:19, 77:21, 77:24, 78:2, 109:16, 110:7
**probable** [3] - 110:14, 110:15, 110:19
**problem** [4] - 24:1, 24:2, 41:10, 109:25
**problems** [3] - 35:23, 62:9, 89:9
**problemsome** [1] - 119:21
**Procedure** [1] - 37:6
**procedures** [3] - 64:9, 64:17, 71:3
**Procedures** [1] - 41:2
**proceed** [2] - 7:2, 57:1
**proceeding** [1] - 5:18
**proceedings** [4] - 5:8, 50:20, 127:6, 127:13
**process** [26] - 5:22, 8:22, 11:8, 12:11, 33:16, 34:21, 36:24, 37:13, 39:12, 40:3, 40:24, 42:21, 44:22, 50:22, 67:5, 90:8, 91:17, 101:7, 101:8, 101:25, 102:3, 102:4, 109:3, 120:18, 121:6, 121:10
**professional** [1] - 126:11
**prognosis** [1] - 25:4
**progress** [1] - 40:14
**progression** [1] -

43:22
**promulgated** [1] - 126:4
**proof** [23] - 6:22, 17:9, 17:14, 24:4, 26:6, 26:9, 26:10, 26:11, 26:16, 26:17, 30:21, 30:24, 31:20, 45:7, 71:9, 81:1, 81:5, 113:20, 113:24, 114:2, 115:6, 115:7, 118:7
**proper** [4] - 37:14, 44:1, 99:15, 99:17
**property** [2] - 20:25, 21:12
**prosecuting** [3] - 61:15, 62:9, 62:22
**prosecution** [1] - 60:22
**prosecutors** [1] - 61:20
**prospect** [1] - 105:1
**prospective** [4] - 7:4, 55:17, 57:4, 89:23
**PROSPECTIVE** [42] - 4:2, 5:12, 5:16, 6:2, 6:11, 6:15, 7:1, 50:3, 51:1, 51:3, 52:8, 52:14, 52:17, 52:19, 52:24, 53:3, 53:6, 53:10, 53:12, 53:15, 53:22, 53:25, 54:5, 54:8, 54:14, 54:20, 54:23, 55:1, 55:5, 55:11, 55:14, 56:5, 56:14, 56:19, 56:24, 65:7, 121:24, 122:15, 122:24, 123:1, 123:8, 125:2
**Prospective** [4] - 4:10, 4:10, 4:11, 5:20
**protection** [1] - 49:15
**prove** [29] - 17:11, 17:14, 19:2, 19:23, 20:2, 20:11, 23:15, 25:15, 25:16, 37:8, 37:21, 38:5, 71:24, 74:8, 81:6, 81:11, 81:15, 82:1, 104:12, 104:16, 105:5, 108:8, 113:21, 114:7, 114:12, 118:5, 118:9, 118:10, 119:13
**proved** [2] - 23:24, 115:24
**proven** [3] - 31:9, 31:13, 69:23
**proves** [3] - 17:19,

81:22, 108:24
**provides** [3] - 12:17, 13:2
**province** [1] - 83:24
**psychologist** [4] - 94:17, 94:18, 94:19, 94:22
**publicized** [1] - 35:5
**pull** [1] - 94:14
**punchy** [1] - 45:18
**punish** [4] - 15:14, 54:12, 97:24, 106:4
**punished** [2] - 54:13, 112:16
**punishment** [44] - 10:13, 13:13, 13:16, 13:18, 13:20, 14:12, 15:16, 15:17, 16:7, 16:11, 16:12, 16:17, 38:11, 38:12, 39:17, 39:18, 40:4, 46:5, 57:12, 63:13, 63:25, 65:1, 65:17, 65:18, 72:6, 72:8, 72:14, 72:24, 73:1, 73:9, 73:15, 73:21, 73:25, 74:8, 99:4, 99:21, 100:16, 100:22, 101:19, 107:21, 107:25, 111:5, 117:15
**punishments** [1] - 103:21
**purpose** [1] - 105:19
**purposes** [2] - 15:4, 102:21
**pursuant** [1] - 126:8
**pushed** [2] - 104:19, 111:12
**put** [17] - 10:17, 41:4, 44:9, 69:20, 75:5, 76:7, 77:17, 77:19, 77:20, 77:21, 78:8, 78:21, 78:22, 86:14, 87:13, 90:16, 111:17
**puts** [1] - 69:2
**putting** [1] - 106:20

**Q**

**qualified** [3] - 91:10, 99:20, 99:23
**qualify** [1] - 64:17
**questionnaire** [14] - 6:7, 9:12, 9:17, 10:9, 38:21, 56:4, 56:12, 57:11, 60:8, 60:13, 63:12, 63:20, 74:22, 92:5

**questionnaires** [1] - 100:2
**questions** [48] - 10:8, 10:11, 10:14, 11:17, 11:18, 12:4, 13:22, 14:11, 14:12, 14:15, 18:2, 21:4, 25:20, 35:24, 37:17, 40:6, 40:24, 49:22, 56:3, 64:14, 74:14, 74:20, 75:8, 75:17, 75:21, 76:2, 76:13, 77:11, 77:16, 78:16, 85:19, 87:23, 88:17, 89:12, 100:1, 104:23, 107:18, 108:3, 108:15, 109:10, 110:1, 112:22, 116:2, 120:7, 120:15, 124:18, 124:25
**quick** [1] - 15:7
**quite** [2] - 28:6, 60:15

**R**

**racking** [2] - 6:20, 55:21
**raise** [3] - 5:19, 55:16, 122:16
**raised** [3] - 57:19, 93:18, 93:24
**range** [14] - 13:20, 20:6, 38:11, 38:12, 72:6, 72:9, 72:14, 72:24, 73:1, 73:14, 73:15, 99:4, 99:21, 100:16
**rank** [1] - 58:14
**rape** [1] - 79:15
**rather** [1] - 88:19
**reach** [2] - 82:10, 116:21
**reached** [1] - 125:10
**reaching** [1] - 71:23
**read** [8] - 16:21, 16:24, 25:24, 74:7, 74:13, 78:17, 83:10, 124:2
**reading** [2] - 9:12, 76:6
**ready** [1] - 55:8
**real** [1] - 15:7
**reality** [1] - 38:25
**really** [23] - 10:18, 10:19, 10:21, 10:24, 11:3, 34:12, 34:25, 36:20, 44:20, 46:12, 47:15, 49:8, 52:25,

STATE v. JOHN LOYD HUMMEL

61:6, 63:17, 63:21,
74:24, 74:25, 79:20,
90:4, 96:21, 96:22
realm [1] - 22:7
reason [12] - 12:7,
12:10, 33:14, 40:21,
46:18, 67:4, 90:11,
104:13, 104:21,
105:20, 115:15,
123:6
reasonable [34] - 17:8,
17:10, 17:11, 17:15,
17:20, 19:2, 19:6,
23:16, 23:24, 26:5,
26:13, 30:23, 37:10,
39:1, 42:25, 43:7,
43:23, 43:25, 44:12,
70:6, 81:6, 81:16,
81:22, 82:2, 83:22,
112:25, 113:8,
113:20, 113:22,
115:6, 115:7, 115:9,
115:16, 115:18
reasonably [3] -
97:22, 98:6, 126:13
reasoning [1] - 27:22
reasons [1] - 118:24
receive [6] - 13:6,
16:10, 16:11, 18:23,
28:9, 124:3
received [2] - 60:17,
78:25
receiving [2] - 23:22,
33:17
recently [1] - 7:23
receptive [1] - 85:8
recklessly [1] - 98:12
recognizes [1] - 98:21
recommends [1] -
75:18
Record [3] - 127:8,
127:13, 127:17
record [2] - 44:3,
51:13
reduce [1] - 85:2
reduces [1] - 30:12
reducing [3] - 27:13,
46:11, 84:17
refer [1] - 109:14
reflect [1] - 78:17
reflects [1] - 127:14
refresh [1] - 77:13
regard [4] - 27:13,
84:17, 109:6, 126:9
regarding [4] - 36:19,
46:4, 49:13, 124:25
regardless [1] - 117:2
regards [1] - 108:25
regular [5] - 38:4,
72:2, 72:6, 72:16,

73:21
relationship [1] - 96:6
relationships [1] -
126:12
relative [1] - 97:3
release [2] - 48:18,
76:19
released [4] - 11:14,
48:20, 54:15, 54:17
relevant [1] - 111:7
religion [1] - 10:25
religious [5] - 12:10,
33:15, 67:4, 93:22,
93:23
rely [1] - 89:7
remaining [1] - 50:19
Remember [1] - 18:1
remember [13] - 5:21,
17:9, 18:1, 47:16,
61:6, 68:24, 71:2,
71:23, 72:4, 72:7,
72:11, 114:1, 122:19
remind [1] - 123:20
removed [1] - 114:18
render [5] - 8:12,
65:14, 66:6, 66:24,
71:18
report [3] - 122:21,
124:2, 124:18
reported [1] - 127:11
REPORTER [3] -
25:12, 32:20, 65:2
Reporter [4] - 5:7,
126:19, 127:2,
127:22
reporter [1] - 5:10
Reporter's [3] - 127:8,
127:13, 127:17
represent [2] - 62:5,
89:21
representation [1] -
95:18
represented [4] - 6:5,
56:7, 56:9, 95:14
reputation [2] - 16:4,
74:2
request [1] - 95:25
requested [1] - 127:7
require [1] - 105:22
required [5] - 37:21,
90:20, 118:9, 118:10
requires [1] - 73:2
research [5] - 123:22,
124:1, 124:8,
124:19, 124:24
reserve [1] - 64:25
Reserve [1] - 92:20
reserved [2] - 72:9,
103:22
reservist [1] - 58:9

respect [1] - 75:15
respective [1] -
127:15
response [2] - 44:1,
46:14
responses [1] - 9:17
responsible [1] - 86:4
rest [5] - 22:9, 23:14,
23:17, 77:2, 118:2
restricted [1] - 15:9
result [5] - 32:3,
33:17, 40:6, 88:14,
117:13
results [2] - 12:12,
40:7, 40:16, 40:22,
67:5
retardation [1] - 43:5
retire [1] - 47:5
return [4] - 18:10,
32:5, 32:14, 50:20
rights [3] - 36:1,
49:11, 114:17
rise [2] - 28:2, 88:10
rises [1] - 88:6
roadmap [2] - 37:7,
37:11
robberies [1] - 21:17
robbing [1] - 79:15
Robert [2] - 6:6, 56:10
room [7] - 49:20,
50:25, 60:15, 63:17,
66:3, 68:12, 85:22
ruiz [1] - 120:15
RUIZ [2] - 4:8, 57:3
Ruiz [5] - 55:13,
55:15, 89:20,
121:19, 122:9
rule [1] - 126:3
rules [3] - 49:19,
70:19, 71:6
run [1] - 104:19
runner [1] - 70:15
running [1] - 104:17

| S |

safer [1] - 59:15
safety [1] - 44:18
sane [1] - 67:21
satisfied [1] - 102:6
satisfy [1] - 102:5
saving [1] - 119:10
saw [2] - 22:12, 34:24
scenarios [1] - 28:12
schedule [2] - 6:13,
56:16
scheduled [2] -
122:20, 123:3
scheme [2] - 33:11,

104:4
school [1] - 93:13
scoot [2] - 6:17, 55:19
scratch [1] - 82:24
screen [2] - 63:3,
67:10
search [1] - 124:6
Sears [1] - 107:6
seat [5] - 5:13, 6:20,
50:1, 55:24, 121:21
second [21] - 13:12,
14:6, 16:21, 25:24,
65:12, 66:5, 68:25,
70:9, 72:16, 74:12,
77:12, 83:13, 83:18,
84:4, 87:4, 87:21,
91:17, 109:1, 116:6,
117:8, 117:17
security [1] - 47:7
see [65] - 17:13, 18:14,
20:8, 20:19, 21:2,
21:14, 23:9, 23:12,
24:7, 24:21, 25:1,
29:7, 31:14, 42:23,
43:15, 43:20, 44:17,
45:10, 48:3, 48:22,
79:3, 80:17, 84:6,
84:21, 85:15, 88:6,
90:2, 90:12, 91:2,
91:7, 91:12, 94:17,
94:22, 98:15, 98:22,
99:17, 102:7, 103:7,
103:10, 104:20,
105:6, 106:6,
106:25, 108:9,
108:14, 109:1,
109:23, 110:9,
110:16, 111:20,
112:8, 112:20,
113:18, 115:19,
115:25, 117:12,
117:16, 118:16,
119:10, 119:13,
120:2, 120:22,
121:3, 123:4, 125:3
sees [1] - 90:2
selected [4] - 8:8,
65:13, 65:20, 66:5
self [1] - 98:19
self-defense [1] -
98:19
send [1] - 124:15
sense [22] - 22:20,
64:22, 64:24, 66:16,
67:1, 70:7, 74:10,
75:2, 75:10, 76:3,
76:9, 77:6, 79:10,
81:8, 81:13, 85:10,
86:6, 86:15, 87:25,
88:23, 89:10, 115:16

sent [1] - 16:25
sentence [36] - 14:7,
14:17, 14:19, 14:21,
15:1, 18:3, 18:10,
18:11, 18:23, 26:23,
29:5, 30:2, 30:7,
30:15, 32:15, 40:16,
40:21, 40:22, 74:18,
74:20, 76:18, 85:4,
99:16, 99:17,
102:19, 103:5,
108:24, 116:8,
117:7, 117:12,
117:14, 118:1,
118:18, 119:24,
120:6, 120:11
sentenced [1] - 23:14
sentencing [3] - 75:9,
76:5, 111:7
separate [3] - 82:15,
83:6, 106:4
separately [1] - 106:5
sequence [1] - 76:7
sequestered [1] -
123:17
serious [1] - 54:24
seriously [1] - 54:4
seriousness [1] - 54:2
serve [12] - 6:10,
14:24, 29:17, 35:22,
36:15, 56:13, 56:18,
74:22, 96:22, 99:23,
103:5, 105:22
served [3] - 102:18,
102:22, 119:4
service [12] - 9:22,
11:14, 34:14, 48:24,
58:2, 59:12, 74:25,
89:23, 91:20,
124:12, 124:13,
124:22
services [2] - 93:2,
94:1
session [1] - 77:15
set [4] - 42:21, 65:21,
86:20, 105:10
several [1] - 38:16
shall [1] - 84:16
sheriff [1] - 53:24
Sheriff's [1] - 47:3
shift [1] - 7:15
shoot [1] - 68:15
shooting [2] - 69:10,
69:12
shootings [1] - 68:9
shopping [1] - 107:4
shorthand [1] - 74:15
shortly [2] - 36:13,
49:10
shot [5] - 68:10,

68:11, 68:17, 69:16, 69:22
**show** [4] - 31:18, 63:3, 85:24, 86:2
**showing** [1] - 54:3
**sick** [1] - 97:3
**side** [1] - 111:8
**sides** [4] - 5:23, 56:1, 56:21, 91:18
**simple** [3] - 66:20, 88:19, 97:18
**simplest** [1] - 84:10
**simply** [3] - 63:5, 75:21, 84:12
**single** [7] - 38:16, 104:6, 106:23, 107:9, 110:5, 119:7
**sister** [3] - 60:4, 60:10, 62:24
**sit** [5] - 13:19, 27:18, 55:9, 55:23, 119:16
**sits** [1] - 109:15
**sitting** [2] - 35:11, 66:12
**situation** [7] - 12:18, 44:8, 49:1, 49:16, 98:24, 107:3, 112:15
**situations** [1] - 99:6
**six** [7] - 63:15, 92:11, 92:16, 111:11, 111:15, 116:15
**sixth** [1] - 122:22
**size** [1] - 78:15
**slide** [6] - 15:8, 35:25, 39:14, 44:9, 49:8, 97:12
**slides** [1] - 13:24
**so..** [3] - 7:21, 35:16, 57:25
**social** [4] - 93:2, 94:16, 124:21, 126:11
**society** [24] - 14:4, 17:18, 18:5, 18:13, 18:20, 18:22, 21:22, 22:2, 22:7, 22:15, 22:16, 22:17, 22:18, 22:21, 22:25, 23:18, 25:3, 27:4, 79:24, 80:5, 80:6, 80:17, 80:21
**soft** [1] - 6:19
**soft-spoken** [1] - 6:19
**solely** [2] - 83:23, 86:21
**solid** [1] - 28:22
**someone** [14] - 10:20, 12:23, 15:14, 16:15, 20:15, 27:6, 27:15, 27:18, 27:19, 28:18,

28:23, 33:17, 78:12, 82:14
**someplace** [1] - 114:19
**something's** [1] - 110:22
**sometimes** [9] - 21:4, 21:5, 23:8, 35:10, 35:14, 72:13, 84:11, 98:16, 119:21
**somewhere** [1] - 19:23
**sorry** [4] - 45:18, 65:2, 82:22, 101:2
**sort** [3] - 41:11, 41:18, 42:2
**source** [1] - 124:4
**space** [1] - 8:2
**Special** [15] - 14:5, 14:9, 16:20, 25:21, 25:23, 26:11, 32:3, 42:23, 43:21, 43:25, 44:10, 81:4, 82:15, 82:16
**special** [13] - 13:22, 13:24, 14:8, 16:20, 26:3, 40:20, 41:1, 47:13, 74:14, 77:12, 77:14, 87:21, 108:1
**spend** [2] - 77:2, 92:15
**spending** [1] - 118:1
**spent** [3] - 9:7, 22:10
**spoken** [2] - 6:19, 51:20
**spot** [1] - 87:13
**stabbed** [2] - 69:17, 69:23
**stairs** [1] - 111:13
**stamps** [1] - 93:5
**stand** [2] - 52:5, 66:11
**standard** [3] - 113:20, 113:24, 114:11
**stands** [1] - 119:8
**start** [1] - 65:5
**started** [6] - 22:11, 63:11, 92:22, 94:13, 94:23
**State** [45] - 6:5, 6:22, 15:25, 17:9, 17:14, 17:19, 19:1, 19:23, 20:2, 23:15, 23:23, 24:3, 24:19, 26:6, 28:8, 30:22, 31:4, 31:12, 37:8, 41:24, 50:14, 56:9, 62:4, 68:24, 68:25, 69:20, 70:2, 70:4, 71:8, 71:15, 73:22, 73:24, 76:22, 77:4, 80:25,

81:5, 81:22, 86:25, 108:8, 108:24, 111:14, 114:14, 122:10, 125:13, 127:4
**STATE** [7] - 7:6, 57:6, 127:1
**state** [8] - 50:4, 50:9, 50:12, 56:25, 98:13, 103:3, 122:1, 122:5
**state's** [1] - 4:3
**State's** [5] - 4:4, 4:9, 31:3, 31:9, 81:10
**statement** [6] - 45:15, 71:3, 71:7, 71:17, 87:7
**statements** [2] - 70:24
**states** [1] - 98:9
**States** [1] - 59:19
**station** [1] - 7:17
**status** [1] - 45:25
**statute** [2] - 104:5, 108:21
**statutory** [1] - 33:11
**stayed** [1] - 47:12
**staying** [1] - 92:16
**step** [6] - 18:5, 23:22, 51:7, 81:20, 90:8, 90:9
**steps** [1] - 64:17
**still** [7] - 7:14, 36:2, 71:25, 92:17, 98:12, 103:11, 105:8
**stop** [1] - 83:16
**store** [1] - 107:6
**story** [1] - 87:8
**straight** [1] - 41:1
**straightforward** [1] - 30:18
**Street** [1] - 60:3
**street** [3] - 22:8, 62:13, 111:16
**streets** [1] - 77:10
**strictly** [1] - 30:25
**strikes** [1] - 36:3
**structure** [1] - 40:8
**student** [1] - 92:25
**study** [2] - 57:14, 93:1
**stuff** [7] - 17:3, 48:12, 63:3, 80:15, 86:9, 96:5, 111:3
**styled** [1] - 127:9
**subject** [1] - 12:23
**submission** [1] - 108:2
**substantial** [1] - 6:9
**sue** [1] - 114:4, 114:6
**sufficient** [24] - 14:7, 26:22, 28:3, 29:3, 29:10, 29:19, 29:24,

29:25, 30:11, 31:19, 74:17, 84:25, 85:3, 85:15, 88:7, 88:11, 113:5, 113:7, 113:11, 113:14, 114:23, 115:2, 119:23
**sufficiently** [6] - 29:14, 30:5, 30:7, 31:2, 31:5, 31:12
**Suite** [2] - 126:20, 127:23
**summarized** [1] - 39:13
**supposed** [7] - 34:13, 34:14, 54:3, 62:25, 104:14, 105:16
**Supreme** [1] - 126:3
**surprise** [1] - 104:18
**surrounding** [1] - 124:11
**suspicion** [1] - 35:17
**swapping** [1] - 48:11
**swear** [2] - 5:18, 88:19
**sworn** [7] - 5:9, 5:20, 7:4, 55:17, 57:4, 122:12, 122:18
**Sworn** ............... [1] - 4:10
**sympathy** [1] - 120:25
**system** [6] - 9:15, 34:25, 48:14, 50:23, 70:15, 80:20

## T

**tanks** [1] - 58:25
**TARRANT** [2] - 127:1, 127:18
**Tarrant** [5] - 9:4, 9:20, 37:24, 60:20, 127:3
**team** [1] - 61:20
**temper** [1] - 111:3
**temptation** [1] - 120:24
**ten** [11] - 18:8, 35:15, 54:9, 60:25, 61:1, 61:11, 95:4, 116:10, 118:22, 118:24, 120:11
**ten-hour** [1] - 54:9
**term** [8] - 19:19, 19:21, 20:5, 22:16, 97:21, 105:25, 110:12
**terminate** [1] - 114:16
**terminology** [1] - 41:6
**terms** [3] - 19:8, 19:23, 41:8

**test** [1] - 91:7
**testified** [2] - 7:5, 57:5
**testimony** [4] - 41:19, 66:11, 69:15, 87:2
**Texas** [20] - 14:25, 24:19, 26:7, 28:8, 35:5, 37:24, 56:9, 62:5, 69:20, 76:22, 77:4, 87:1, 97:18, 114:14, 122:10, 126:3, 126:9, 126:20, 127:4, 127:24
**TEXAS** [1] - 127:1
**THE** [80] - 5:5, 5:7, 5:13, 5:17, 5:21, 6:3, 6:12, 6:16, 7:2, 7:6, 25:12, 32:20, 32:21, 33:23, 33:24, 49:25, 50:4, 50:7, 50:9, 50:12, 50:14, 50:17, 51:2, 51:6, 51:9, 51:13, 51:18, 51:23, 51:24, 51:25, 52:4, 52:5, 52:9, 52:15, 52:18, 52:22, 53:1, 53:8, 53:11, 53:13, 53:17, 53:23, 54:1, 54:7, 54:11, 54:15, 54:21, 54:24, 55:2, 55:6, 55:7, 55:8, 55:12, 55:15, 55:18, 56:6, 56:15, 56:20, 56:25, 57:6, 65:2, 65:3, 65:8, 89:16, 89:18, 121:21, 121:25, 122:3, 122:5, 122:7, 122:9, 122:16, 122:19, 122:25, 123:2, 123:9, 125:3, 125:7, 125:16, 127:1
**theirs** [1] - 103:2
**themselves** [2] - 79:7, 105:2
**there'd** [1] - 79:17
**thereafter** [1] - 36:14
**therefore** [1] - 29:4
**they've** [9] - 31:1, 40:18, 76:23, 76:25, 102:18, 104:3, 104:10, 104:22, 123:2
**thinking** [5] - 100:6, 100:8, 100:9, 100:20, 118:21
**thirsty** [1] - 56:23
**thoughts** [1] - 75:12
**thousand** [1] - 99:6
**threat** [11] - 14:3,

17:17, 18:4, 18:13, 18:20, 18:22, 23:18, 25:3, 27:4, 109:23, 113:10
**three** [3] - 40:10, 40:11, 121:7
**throughout** [3] - 32:23, 73:8, 80:2
**tie** [2] - 46:22, 70:14
**tied** [1] - 116:14
**today** [10] - 8:5, 8:8, 8:25, 15:4, 27:18, 33:6, 36:17, 55:3, 56:2, 114:6
**together** [1] - 16:18
**took** [7] - 8:5, 34:6, 61:9, 68:5, 68:18, 70:18
**topics** [1] - 63:12
**torn** [1] - 11:3
**total** [3] - 39:25, 44:19, 127:16
**totally** [1] - 48:25
**toward** [1] - 42:16
**towards** [1] - 60:10
**town** [1] - 68:15
**track** [2] - 37:12, 44:3
**trained** [1] - 47:20
**training** [2] - 47:13, 47:23
**transaction** [25] - 12:21, 38:6, 38:10, 67:12, 67:13, 67:17, 67:20, 68:2, 68:21, 71:25, 72:1, 76:24, 104:7, 106:1, 106:3, 106:12, 106:16, 106:24, 107:9, 107:14, 107:15, 110:5, 110:6
**transactions** [2] - 107:10, 107:11
**transcription** [1] - 127:5
**treat** [1] - 83:6
**treated** [1] - 102:20
**treatment** [1] - 97:5
**trial** [39] - 6:3, 6:13, 13:13, 13:17, 13:18, 13:19, 15:9, 15:13, 15:16, 15:17, 15:20, 15:22, 16:2, 16:7, 16:8, 18:11, 23:22, 24:10, 24:15, 24:16, 31:10, 32:6, 32:23, 34:20, 43:13, 56:7, 61:21, 69:14, 69:15, 87:5, 90:10, 97:9, 104:18, 111:2, 119:17, 122:14,

122:20, 123:3, 123:5
**trial's** [1] - 121:14
**trials** [2] - 13:14, 35:5
**tried** [2] - 35:18, 59:6
**trouble** [4] - 60:5, 76:12, 80:14, 108:14
**true** [4] - 43:25, 70:22, 81:25, 127:5
**truly** [1] - 127:13
**truth** [5] - 8:7, 49:12, 63:5, 114:24
**try** [6] - 35:7, 46:5, 108:21, 111:17, 114:15, 116:17
**trying** [4] - 46:2, 47:16, 70:12, 110:21
**turned** [1] - 79:20
**Tweet** [1] - 124:12
**twins** [1] - 93:11
**Twitter** [1] - 124:21
**two** [30] - 7:21, 13:24, 19:23, 35:16, 35:18, 38:10, 43:1, 67:12, 71:11, 74:14, 74:20, 75:21, 76:12, 76:24, 76:25, 77:16, 87:21, 90:8, 93:10, 98:8, 103:21, 106:4, 107:10, 107:11, 112:3, 117:23, 123:3
**two-step** [1] - 90:8
**type** [14] - 13:8, 13:18, 19:17, 21:13, 25:7, 25:17, 26:21, 27:20, 28:21, 64:20, 65:5, 94:5, 113:9, 114:22
**types** [1] - 109:17
**typewriter** [1] - 83:15
**typically** [1] - 35:19

## U

**ultimately** [2] - 8:18, 75:8
**unanimous** [4] - 49:16, 82:10, 84:1, 117:11
**unanimously** [4] - 81:11, 82:14, 116:6, 120:10
**uncle** [3] - 52:20, 53:9, 53:23
**under** [7] - 19:7, 28:8, 29:3, 63:4, 76:22, 83:1, 86:2
**understandings** [1] - 110:3
**unfit** [2] - 114:15, 115:3

**unit** [1] - 61:18
**United** [1] - 59:19
**unless** [2] - 108:8, 108:24
**unnecessary** [1] - 36:2
**unreasonable** [1] - 115:9
**up** [50] - 6:17, 6:20, 7:19, 8:1, 17:7, 21:13, 22:9, 26:5, 26:13, 26:20, 29:11, 29:20, 30:23, 30:25, 38:25, 45:1, 45:2, 52:4, 54:3, 55:9, 55:19, 55:21, 57:24, 63:3, 67:16, 67:21, 68:3, 68:20, 68:23, 70:4, 74:7, 74:8, 77:15, 78:15, 79:7, 85:24, 86:2, 92:16, 96:4, 96:20, 97:12, 99:23, 102:20, 108:11, 113:12, 116:14, 119:2, 120:16, 121:16
**upper** [1] - 73:1
**upset** [2] - 68:13, 70:12
**USC** [1] - 47:12

## V

**V.T.C.A** [1] - 126:5
**vacuum** [2] - 63:15, 63:23
**vague** [1] - 20:5
**Vanessa** [1] - 94:20
**variance** [1] - 105:3
**variety** [1] - 9:16
**verdict** [13] - 8:12, 15:13, 32:5, 37:14, 65:14, 66:6, 71:18, 71:23, 116:18, 116:21, 116:23, 116:24, 117:1
**versions** [1] - 74:16
**versus** [3] - 25:4, 40:5, 42:11
**victim** [1] - 105:8
**victims** [2] - 101:1, 120:25
**victoria** [1] - 94:8
**video** [1] - 87:8
**view** [1] - 99:24
**views** [3] - 10:10, 12:7, 97:10
**violate** [1] - 116:20
**violated** [1] - 41:15

**violence** [30] - 17:17, 19:4, 20:11, 20:13, 20:22, 20:24, 20:25, 21:1, 21:15, 21:18, 22:3, 25:9, 25:17, 60:12, 60:17, 61:18, 62:23, 78:20, 78:24, 79:4, 79:13, 79:14, 79:16, 79:17, 95:3, 109:19, 109:21, 111:24, 111:25, 112:7
**violent** [8] - 20:18, 21:12, 60:9, 79:20, 79:21, 112:6, 112:10, 112:12
**visit** [1] - 89:22
**visitors** [1] - 23:2
**visually** [1] - 12:9
**vital** [1] - 50:22
**VOIR** [4] - 7:6, 33:24, 57:6, 89:18
**Voir** [4] - 4:3, 4:4, 4:9, 4:9
**voir** [1] - 8:3
**VOL** [1] - 4:2
**volume** [1] - 127:8
**VOLUME** [1] - 5:2
**volunteer** [1] - 74:24
**vote** [14] - 17:21, 17:22, 29:18, 30:13, 75:22, 76:1, 82:15, 82:16, 82:18, 88:7, 88:11, 88:13, 117:1, 117:3
**voted** [1] - 82:14
**votes** [5] - 40:10, 49:14, 82:10, 84:1, 84:2
**vs** [1] - 122:11

## W

**Wait** [1] - 29:9
**wait** [3] - 65:4, 66:14, 87:19
**waiting** [1] - 35:11
**walk** [1] - 86:10
**WALKER** [2] - 126:18, 127:21
**Walker** [3] - 5:8, 127:2, 127:12
**warrant** [3] - 26:23, 30:1, 85:16
**water** [2] - 6:25, 56:22
**ways** [1] - 103:24
**wear** [1] - 123:10
**WEDNESDAY** [1] - 5:3
**week** [2] - 77:15,

94:15
**weeks** [9] - 34:21, 35:9, 35:18, 57:15, 63:15, 65:24, 67:15, 94:23, 123:4
**weigh** [4] - 42:4, 42:13, 119:25, 120:1
**weight** [2] - 114:9, 114:10
**whatsoever** [1] - 124:8
**whichever** [1] - 102:19
**whole** [6] - 33:10, 79:9, 84:20, 87:17, 105:19, 111:9
**wide** [4] - 20:6, 23:9, 25:18, 99:3
**William** [3] - 6:4, 56:7, 122:11
**wish** [1] - 111:17
**Witness** [1] - 83:12
**witness** [5] - 31:3, 31:9, 66:11, 70:23, 87:5
**WITNESS** [2] - 32:21, 127:19
**witnesses** [1] - 87:6
**WITNESSES** [1] - 4:1
**wonder** [2] - 83:14, 86:11
**word** [8] - 19:5, 19:18, 20:17, 29:25, 67:20, 67:21, 77:18, 91:24
**words** [8] - 32:4, 67:16, 69:19, 69:20, 70:2, 70:3, 77:17, 110:2
**wordy** [1] - 83:13
**worker** [1] - 94:16
**works** [17] - 8:17, 12:2, 58:1, 70:15, 91:12, 98:15, 103:7, 104:24, 106:25, 107:18, 110:9, 111:20, 112:20, 113:18, 115:19, 115:25, 119:14
**world** [1] - 28:21
**worried** [1] - 47:21
**worry** [1] - 11:16
**Worth** [7] - 59:7, 62:17, 68:10, 68:16, 68:17, 126:20, 127:24
**worth** [1] - 119:9
**write** [2] - 108:21, 124:10
**writing** [3] - 95:25, 123:16, 127:7
**wrote** [2] - 100:6,

STATE v. JOHN WILLIAM HUMMEL

100:20

## Y

**y'all** [3] - 94:1, 107:22, 125:7
**y'all's** [1] - 96:6
**year** [2] - 58:21, 96:16
**years** [34] - 9:6, 13:21, 28:7, 28:8, 28:17, 29:13, 34:16, 35:4, 48:19, 49:18, 59:21, 60:25, 61:2, 61:11, 72:7, 92:23, 93:9, 95:4, 99:4, 99:11, 99:15, 100:17, 100:22, 102:19, 102:20, 102:22, 102:23, 107:23, 111:11, 111:15
**yesterday** [2] - 125:11, 125:12
**you-all** [3] - 35:8, 41:10, 47:20
**youngest** [1] - 94:9
**yourself** [6] - 41:2, 55:22, 79:5, 91:15, 92:8, 106:19
**YouTube** [1] - 124:21