1                    REPORTER'S RECORD
                    VOLUME 39 OF 55
2            TRIAL COURT CAUSE NO. 1184294D
             COURT OF APPEALS NO. AP-76,596
3

4  STATE OF TEXAS          )(     IN THE 432ND JUDICIAL
                           )(
5  VS.                     )(     DISTRICT COURT OF
                           )(
6  JOHN WILLIAM HUMMEL     )(     TARRANT COUNTY, TEXAS

7

8

9            *************************************

10                TRIAL ON THE MERITS        FILED IN
                                      COURT OF CRIMINAL APPEALS
11           *************************************

12                                          FEB 02 2012

13                                     Louise Pearson, Clerk

14

15          On the 21st day of June, 2011, the

16  following proceedings came on to be heard in the

17  above-entitled and -numbered cause before the Honorable

18  Ruben Gonzalez, Jr., Judge Presiding, held in Fort

19  Worth, Tarrant County, Texas:

20          Proceedings reported by machine shorthand.

21

22

23

24                  ANGIE TAYLOR, CSR, RPR
                    Official Court Reporter
25                  432nd DISTRICT COURT

ORIGINAL

```
 1                    A P P E A R A N C E S

 2

 3   HONORABLE D. MILES BRISSETTE - SBOT NO. 50511628
     HONORABLE ROBERT K. GILL - SBOT NO. 07961600
 4   Assistant District Attorneys
     401 W. Belknap Street
 5   Fort Worth, Texas  76196
     Phone:  817-884-1400
 6

 7                    Attorney(s) for the State of Texas.

 8

 9
     HONORABLE FRED CUMMINGS - SBOT NO. 05225400
10   HONORABLE LARRY M. MOORE - SBOT NO. 14357800
     4210 West Vickery Boulevard
11   Fort Worth, Texas 76107
     Phone:  817-338-4800
12
     HONORABLE PAMELA S. FERNANDEZ - SBOT NO. 24045868
13   403 North Sylvania, Suite 11
     Fort Worth, Texas 76111
14   817-831-3003

15
                     Attorney(s) for the Defendant.
16

17

18

19

20

21

22

23

24

25
```

1

CHRONOLOGICAL INDEX
VOLUME 39
2                           TRIAL ON THE MERITS

3
JUNE 21, 2011                                      PAGE      VOL
4

5   STATE'S WITNESSES        DIRECT    CROSS    VOIR DIRE    VOL

6   Ernest Van Der Leest     38,57,    111      14,23,        39
                             99,122             53,69,75
7
    Kristie Freeze           129,162   165      158           39
8
    Shiping Bao             180,212   208,213                 39
9
    Gary Sisler             216                               39
10

11
    Proceedings Concluded...................    259          39
12
    Court Reporter's Certificate...........    260          39
13

14
                    ALPHABETICAL WITNESS INDEX
15
    WITNESSES                DIRECT    CROSS    VOIR DIRE    VOL
16
    Bao, Shiping            180,212   208,213                 39
17
    Freeze, Kristie         129,162   165      158           39
18
    Sisler, Gary            216                               39
19
    Van Der Leest, Ernest   38,57,    111      14,23,        39
20                          99,122             53,69,75

21

22

23

24

25

1                        EXHIBIT INDEX

2

| NO. | STATE | DESCRIPTION | OFRD | ADMT | VOL |
|-----|-------|-------------|------|------|-----|
| 4 | 229B2 | MetroPCS Records | 158 | 162 | 39 |
| 5 | 229C1 | MetroPCS Text Records Redacted | *110 | *111 | 39 |
| 6 | 229D2 | MetroPCS Records | 163 | 163 | 39 |
| 7 | 229E1 | MetroPCS Records Redacted | *110 | *111 | 39 |
| 8 |  |  |  |  |  |
| 9 | 229F1 | MetroPCS Records | 93,126 | 93,126 | 39 |
| 10 | 250 | M.E. Photograph | 258 | 258 | 39 |
| 11 | 251 | M.E. Photograph | 258 | 258 | 39 |
| 12 | 252 | M.E. Photograph | 258 | 258 | 39 |
| 13 | 253 | M.E. Photograph | 258 | 258 | 39 |
| 14 | 254 | M.E. Photograph | 258 | 258 | 39 |
| 15 | 270A | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 16 | 270B | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 17 | 270C | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 18 | 270D | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 19 | 270E | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 20 | 270F | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 21 | 270G | M.E. Diagram-Jodi Hummel | 245 | 245 | 39 |
| 22 | 270H | M.E. Diagram-Jodi Hummel | 246 | 246 | 39 |
| 23 | 271A | M.E. Diagram-C. Bedford | 232 | 232 | 39 |
| 24 | 271B | M.E. Diagram-C. Bedford | 232 | 232 | 39 |
| 25 | 271C | Model-Skull-C. Bedford | 230 | 230 | 39 |

EXHIBIT INDEX

| STATE NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|
| 272A | M.E. Diagram | 200 | 200 | 39 |
| 272B | M.E. Diagram | 200 | 200 | 39 |
| 272C | M.E. Diagram | 200 | 200 | 39 |
| 273B | Wells Fargo Records Poster | *58 | *58 | 39 |
| 273C | Wells Fargo Poster | *58 | *58 | 39 |
| 273F | Excerpt of Wells Fargo Binder | 53 | 57 | 39 |
| 303 | Image of Book Cover | 165 | 165 | 39 |
| 304 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 305 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 306 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 307 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 308 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 309 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 310 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 311 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 312 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 313 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 314 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 315 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 316 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 317 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          EXHIBIT INDEX

| | STATE NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|---|
| 4 | 318 | M.E. Photo-Joy Hummel | 194 | 198 | 39 |
| 5 | 353 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 6 | 354 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 7 | 355 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 8 | 356 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 9 | 357 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 10 | 358 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 11 | 359 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 12 | 360 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 13 | 361 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 14 | 362 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 15 | 363 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 16 | 364 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 17 | 365 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 18 | 366 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 19 | 367 | M.E. Photo-C. Bedford | 225 | 229 | 39 |
| 20 | 368 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 21 | 369 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 22 | 370 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 23 | 371 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 24 | 372 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 25 | 373 | M.E. Photo-C. Bedford | 242 | 243 | 39 |

1                      EXHIBIT INDEX

2  STATE
   NO.      DESCRIPTION              OFRD      ADMT      VOL
3

| STATE NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|
| 374 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 375 | M.E. Photo-C. Bedford | 242 | 243 | 39 |
| 376 | Photo - Blood Card | 251 | 251 | 39 |
| 377 | Photo - Blood Card | 202 | 202 | 39 |
| 378 | Photo - Blood Card | 236 | 236 | 39 |
| 379 | Photo - Fetus | 202 | 202 | 39 |
| 385 | M.E. Photograph | 258 | 258 | 39 |
| 386 | M.E. Photograph | 258 | 258 | 39 |
| 387 | M.E. Photograph | 258 | 258 | 39 |
| 405A | DME-Original-Walmart Burleson | -- | *37 | 39 |
| 405B | DME-Excerpts-Walmart Burleson | -- | 37 | 39 |
| 406A | DME-Original-Walmart Grand Prairie | -- | *37 | 39 |
| 406B | DME-Excerpts-Walmart Grand Prairie | -- | 37 | 39 |
| 407A | DME-Original-Walmart Arlington | -- | *37 | 39 |
| 407B | DME-Excerpts-Walmart Arlington | -- | 37 | 39 |
| 408A | DME-Coast Inn-Original | *22 | *22 | 39 |
| 408B | DME-Coast Inn-Excerpt | 22,46 | 46 | 39 |
| 412 | Still Image E-Z Mart | 63 | 65 | 39 |
| 413 | Still Image E-Z Mart | 63 | 65 | 39 |

EXHIBIT INDEX

| STATE NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|
| 414 | Still Image E-Z Mart | 63 | 65 | 39 |
| 415 | Still Image Walmart | 63 | 65 | 39 |
| 416 | Still Image Walmart | 63 | 65 | 39 |
| 417 | Still Image Walmart | 63 | 65 | 39 |
| 418 | Still Image Walmart | 63 | 65 | 39 |
| 419 | Still Image Walmart | 63 | 65 | 39 |
| 420 | Still Image Walmart | 63 | 65 | 39 |
| 421 | Still Image Walmart | 63 | 65 | 39 |
| 422 | Still Image Walmart | 63 | 65 | 39 |
| 423 | Still Image Walmart | 63 | 65 | 39 |
| 424 | Still Image Walmart | 63 | 65 | 39 |
| 425 | Still Image Walmart | 63 | 65 | 39 |
| 426 | Still Image Coast Inn | 63 | 65 | 39 |
| 427 | Still Image - Main Attraction | 63 | 63 | 39 |
| 431 | DME-ATM-Walmart | -- | 37 | 39 |
| 432A | DME-E-Z Mart-Joshua Complete | -- | *37 | 39 |
| 432B | DME-E-Z Mart-Joshua Redacted | -- | 37 | 39 |
| 437B | Remnant of Shirt - Joy Hummel | 191 | 191 | 39 |
| 441 | Photos-Known DNA Samples | 252 | 252 | 39 |
| 442 | Photos-Known DNA Samples | 252 | 255 | 39 |

EXHIBIT INDEX

| | STATE NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|---|
| 3 | 445 | Map-Blow-up | *59 | *59 | 39 |
| 4 | 446 | Comparison Photo | 68 | 99 | 39 |
| 5 | 447 | Still Photos from DME | 63 | 65 | 39 |
| 6 | 448 | Photo-Walmart | 63 | 65 | 39 |
| 7 | 449 | Photos-Walmart | 63 | 65 | 39 |
| 8 | 450 | Photos-Walmart | 63 | 65 | 39 |
| 9 | 451 | Photos-Walmart | 63 | 65 | 39 |
| 10 | 452 | Photos-Walmart | 63 | 65 | 39 |
| 11 | 453 | Photos-Walmart | 63 | 65 | 39 |
| 12 | 454 | Photos-Walmart | 63 | 65 | 39 |
| 13 | 455 | Photos-Walmart | 63 | 65 | 39 |
| 14 | 456 | Photos-Walmart | 63 | 65 | 39 |
| 15 | 457 | Photos-Walmart | 63 | 65 | 39 |
| 16 | 458 | Photos-Walmart | 63 | 65 | 39 |
| 17 | 459 | Photos-Walmart | 63 | 65 | 39 |
| 18 | 460 | Photos-Walmart | 63 | 65 | 39 |
| 19 | 462 | Wallet | 49 | 49 | 39 |
| 20 | 463 | Keys | 49 | 49 | 39 |
| 21 | 464 | Motel Keys | 49 | 49 | 39 |
| 22 | 465A | Boot | 49 | 49 | 39 |
| 23 | 465B | Boot | 49 | 49 | 39 |
| 24 | 466 | Black Shirt | 49 | 49 | 39 |
| 25 | 467 | Pants | 49 | 49 | 39 |

11

PROCEEDINGS

1   PROCEEDINGS

2        (June 21, 2011 ~ 9:07 a.m.)

3        (Open court, Defendant present, no jury)

4        THE COURT:  We're back on the record in the

5   John Hummel case.

6        Previously -- or yesterday, the Court was

7   provided with a question with regard to a series of

8   video recordings that were taken place at an E-Z Mart, a

9   Walmart -- and was there another location, State?

10        MR. BRISSETTE:  E-Z Mart and Walmart have

11   been talked about so far, Your Honor, and there's

12   footage -- hyper technically from an ATM -- a banking

13   establishment inside a Walmart.

14        THE COURT:  All right.  And at that time

15   the Defense made an objection on the basis that there

16   was a lack of foundation or the requisite basis for the

17   admission of the evidence had not been satisfied.

18        The Court has been provided some evidence

19   or provided case law to review and has done so and

20   considered it.  Tentatively, it's the Court's

21   conclusion, based upon the Angleton Case, 971 S.W.2d 65,

22   and in a underpinning contained within Darnell Alonzo

23   Page v. State -- and I do not have the cite with me, but

24   the Court of Appeals cause number is 01-02-1213 CR,

25   contains an underpinning of a Reavis v. State from the

12

1   Fort Worth Court of Appeals, the 2002 84 S.W.3d 716,

2   that addresses specifically the admittance of the

3   security videotape.

4        Now, I would like to ask the Defense, have

5   you had an opportunity to review the case law that was

6   provided by the State, and do you have a response?

7        MR. CUMMINGS:  I have no response this

8   morning, Your Honor.

9        THE COURT:  All right.  Now, I will ask, do

10   you believe it's necessary for the Court to conduct an

11   examination of the videotape before admitting it, or

12   based upon your knowledge, have the requisites been

13   satisfied based upon the Rule of Evidence 901 and the

14   Angleton case, the Reavis case I cited to and the Alonzo

15   Page v. State case?

16        MR. MOORE:  No, I still -- I still object

17   to the admission.  I don't -- I still don't think they

18   laid the predicate.  He said that he didn't know.  He

19   couldn't -- it was his opinion that there been no

20   alteration of the tape, but he didn't know that as a

21   fact, and there's been no testimony.

22        In Angleton, a lot of the admissibility of

23   the tape turned upon the fact that it was taken from the

24   person of the Defendant.  And in this particular

25   instance, our problem is we don't have anybody that has

13

1   had custody of the tape up until the time that Mr. Van

2   Der Leest took it to testify that it was not materially

3   altered in any way.

4        THE COURT:  All right.  And under Rule 901,

5   that's not required.

6        MR. MOORE:  Well --

7        THE COURT:  I understand your objection,

8   and I'm overruling it on that basis.

9        MR. MOORE:  That's fine, Judge.

10        THE COURT:  Now, with regard to -- do you

11   want me to review the tape to determine whether or not

12   the evidence sufficient (sic) to support a finding that

13   the matter in question is what the proponent -- or what

14   the State claims it to be?

15        MR. MOORE:  It -- it would be my request

16   that you do so.

17        THE COURT:  All right.  State, can you go

18   ahead and set up the camera so that we can -- or the

19   video, and I will have a couple of questions for Mr. Van

20   Der Leest.

21        MR. BRISSETTE:  And -- and, Judge,

22   before -- while Mr. Van Der Leest is doing that, Page v.

23   State is 125 S.W.3d 640.

24        THE COURT:  Thank you.

25        MR. BRISSETTE:  And Thierry vs. State, that

14

1   cites page that we used yesterday is 288 S.W.3d 80.

2        THE COURT:  Thank you.

3        MR. BRISSETTE:  Judge, we have him as, I

4   think, chronological order.  Van Der Leest can start

5   with the E-Z Mart, which is State's Exhibit 432B, Your

6   Honor, that we've offered for all purposes.

7        THE COURT:  You may proceed.

8        (State's Exhibit No. 432B published)

9        THE COURT:  State, what was that exhibit?

10   432; is that correct?

11        MR. BRISSETTE:  432B; as in boy, Yes, Your

12   Honor.

13        THE COURT:  Thank you.

14        ERNEST VAN DER LEEST,

15   having been first duly sworn, testified as follows:

16        VOIR EXAMINATION

17   BY MR. BRISSETTE:

18   Q.  Mr. Van Der Leest, I believe the next in the

19   timeline is the Burleson Walmart; is that correct?

20   A.  It is, sir.

21        MR. BRISSETTE:  Judge, that would be 405B,

22   as in boy.

23        (State's Exhibit No. 405B published)

24   Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,

25   the ATM footage that you collected, does it come through

1 the store we just looked at in 405B?

2    A.  It does, sir.

3    Q.  And would that be State's 431?

4    A.  I believe that's correct.

5    Q.  Can you show the Judge State's 431 on the

6 screen?

7       (State's Exhibit No. 431 published)

8       THE WITNESS:  That's it.

9       MR. BRISSETTE:  Judge, if I may, as part of

10 our proffer to this while you're looking at it?

11    Q.  (BY MR. BRISSETTE)  Mr. Van Der Leest, you've

12 had a chance to look at State's 343, have you not?

13    A.  I have.

14    Q.  There is an ATM receipt on State's 343.  Do you

15 recognize that receipt?

16    A.  I do.

17    Q.  And does it have a time stamp on it?

18    A.  It does.

19    Q.  And what is that time stamp?

20    A.  01:46:54 a.m.

21    Q.  The State's 431 that's on the screen right now,

22 were you able to look at the metadata associated with

23 that video?

24    A.  Yes.

25    Q.  Did it have a time stamp as well?

1    A.  It did.

2    Q.  And what was the time stamp on the metadata?

3    A.  1:46:54.

4       THE REPORTER:  I'm sorry?

5       THE WITNESS:  1:46:54.

6    Q.  (BY MR. BRISSETTE)  So the receipt that we're

7 seeing here in State's 343, do you have an opinion as if

8 it was generated while Mr. Hummel is standing there, or

9 can you tell us that from the video?

10    A.  The metadata is not displayed on the screen

11 here, but this video displays Mr. Hummel at the ATM at

12 the time this receipt was printed.

13    Q.  And did they only have one -- you've been to

14 the store, correct?

15    A.  I have.

16    Q.  You been to the bank and to the Walmart,

17 correct?

18    A.  I have been to the Walmart and to the loss

19 prevention officer's office for the bank.

20    Q.  Do you know if they have more than one ATM

21 machine?

22    A.  In that -- in that Walmart?

23    Q.  Yes.

24    A.  There's only one.

25    Q.  All right.  The next Walmart, I believe, is the

1 Walmart in Grand Prairie; is that correct?

2    A.  That is correct.

3       THE COURT:  Excuse me just -- the proffer

4 that you were discussing, what was the metadata

5 information that was retrieved from?  What exhibit was

6 that?

7       MR. BRISSETTE:  Your Honor, we're -- on the

8 screen we have State's Exhibit 431 displayed on the

9 screen.

10       THE COURT:  And the one that's been

11 proffered right there?

12       MR. BRISSETTE:  This is 343 that's already

13 been admitted that Mr. Hummel gave to investigator Steve

14 Steele.

15       THE COURT:  Thank you.

16    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,

17 is the Grand Prairie Walmart, State's 406B, is that the

18 next one in the timeline?

19    A.  It is.

20    Q.  And can you show 406B to the Judge, please?

21       (State's Exhibit No. 406B published)

22       MR. BRISSETTE:  Your Honor, in continuation

23 of the State's proffer --

24    Q.  (BY MR. BRISSETTE)  Mr. Van Der Leest, State's

25 Exhibit 343 -- that's been admitted there to your

1 left -- does it have a Walmart receipt on it, sir?

2    A.  It does.

3    Q.  And what store is that?  Are you familiar with

4 that store that's depicted on the receipt, 343?

5    A.  I am.

6    Q.  Is that the receipt from the Grand Prairie

7 Walmart?

8    A.  It is.

9    Q.  Is it a charge or cash transaction?

10    A.  This is a charge -- this is a cash transaction.

11    Q.  And what is it for?

12    A.  It is for a knit top.

13    Q.  And is that what's depicted there on the screen

14 that we just saw in State's 406B?

15    A.  It is.

16    Q.  And what time was that based on the receipt?

17    A.  04:33:23.

18    Q.  Is the Arlington Walmart, State's 407B, the

19 next in the chronological timeline?

20    A.  It is, sir.

21    Q.  Can you show that to the Judge, please?

22       (State's Exhibit No. 407B published)

23       MR. BRISSETTE:  Your Honor, in conference

24 with Defense Counsel while we were showing that last

25 exhibit, the State would anticipate adding one

19

1  additional piece of evidence that would be in the same
2  line of objections, I think, from the Defense.
3        If I may, just briefly, with Mr. Van Der
4  Leest put another number for your consideration while
5  the jury is out?
6        THE COURT: You may.
7        Q.  (BY MR. BRISSETTE) Investigator Van Der Leest,
8  you had a chance to process video collected from the
9  Coast Inn; is that correct?
10       A.  I have.
11       Q.  And that's been labeled as 408A, a copy on Gold
12  Optical for the original; is that correct?
13       A.  That is correct.
14       Q.  And 408B, which is a copy for the jury; is that
15  correct?
16       A.  That is correct.
17       Q.  And did you prepare both exhibits?
18       A.  I did.
19       Q.  And are you familiar with the contents on both
20  exhibits?
21       A.  I am.
22       Q.  What are the contents?
23       A.  The contents on A is the original data files
24  from the DVR, includes the player and the video itself;
25  and on the B case is a Quick Time video, H264 video, of

21

1        Q.  And have you been able to make observations of
2  Mr. Hummel's tattoos here this morning prior to your
3  testimony?
4        A.  I have.
5        Q.  Are you able to look at Mr. Hummel's right
6  forearm?
7        A.  I did.
8        Q.  Were you able to -- as part of your training
9  with LEVA, is there a -- part of your certification,
10  does that cover photographic comparison?
11       A.  It does.
12       Q.  And what is photographic comparison?
13       A.  Photographic comparison is whenever you take a
14  known image and you compare against an unknown image or
15  items that are within that image.
16       Q.  Can a known image also be a visual inspection
17  by yourself as the -- as the forensic analyst?
18       A.  It can.
19       Q.  And did you conduct that this morning on Mr.
20  Hummel?
21       A.  I did.
22       Q.  Do you have an opinion as to any unique
23  characteristics that you observed on the individual on
24  State's 408B?
25       A.  I did.

20

1  the cameras after I have edited them together.
2        Q.  Have you had occasion to study what's on 408B?
3        A.  I have.
4        Q.  And as part of your analysis of 408B, do you
5  look for class characteristics and unique
6  characteristics of individuals depicted in 408B?
7        A.  I do.
8        Q.  With class characteristics, did you recognize a
9  particular shirt that has been -- has been part of your
10  investigation?
11       A.  I did.
12       Q.  What shirt is that?
13       A.  It is a Mac Tools shirt.
14       Q.  The Mac Tool shirt that's already been admitted
15  into evidence would be consistent with that?
16       A.  Yes.
17       Q.  What are unique characteristics?
18       A.  Unique characteristics, for example with the
19  Mac shirt, would be if there was a hole in a specific
20  location or a stain, maybe a bleach stain since this is
21  a black shirt that's in a specific location. That would
22  make it unique.
23       Q.  Can people actually have unique characteristics
24  to themselves?
25       A.  They can.

22

1        Q.  And what is that?
2        A.  The tattoo that is on the right forearm is
3  consistent with the tattoo that is on the right forearm
4  of the individual in the videos.
5        Q.  And 408A, the original, did you receive this
6  from Investigator Jim Rizy?
7        A.  I did.
8        MR. BRISSETTE: Your Honor, that would end
9  our proffer on that. We would offer 408A for the record
10  only, and we would offer in front of the jury 408B for
11  all purposes.
12       THE COURT: Well, with regard to 408A at
13  this time, do you have any objections?
14       MR. CUMMINGS: No, Your Honor.
15       THE COURT: 408A is admitted for the
16  record.
17       (State's Exhibit No. 408A admitted)
18       THE COURT: Regarding 408B, any objection?
19       MR. CUMMINGS: I agreed to consider it at
20  this time because I think it is -- the objection I have
21  is going to be the same as I have to the -- the videos
22  that you have observed up to this point.
23       THE COURT: All right.
24       MR. CUMMINGS: I'm not sure if we have them
25  all played or not.

23

1    THE COURT:  Do you have a copy of 408B for
2  me to review, or do you have one in the video form that
3  you're going to play?
4         MR. BRISSETTE:  Yes, sir.
5         THE COURT:  All right.  You may proceed.
6  Turn off the lights.
7    (State's Exhibit No. 408B published)
8    THE COURT:  All right.  And, Mr. Brissette,
9  do you have any questions for Mr. Van Der Leest with
10  regard to the exhibits?
11         MR. BRISSETTE:  I believe that concludes
12  the State's proffer at this time, Your Honor.
13         THE COURT:  All right.
14         MR. CUMMINGS:  Your Honor, may I ask a
15  couple of questions --
16         THE COURT:  You may.
17         MR. CUMMINGS:  -- to clarify the exhibits?
18  I'm not sure it's clear.
19         VOIR DIRE EXAMINATION
20  BY MR. CUMMINGS:
21    Q.  Mr. Van Der Leest, when we are looking at the
22  Walmart videos, that's a particular system that you have
23  said a couple of times during your testimony.  What is
24  it?
25    A.  There -- there's actually two systems.  The

24

1  ones where you see the metadata on the screen are March
2  Networks.  The one from Grand Prairie where you do not
3  see the metadata is a Verint Technology System.
4    Q.  What the Judge has observed this morning, 432B,
5  is -- is that a -- that's an E-Z Mart.  In the case of
6  432B, is this edited?  Is this something that you
7  compiled?
8    A.  Yes.  I took the different camera angles that
9  the original files came in and edited them into a fluid
10  video as he moved from one camera -- camera angle to the
11  other.
12    Q.  And that's also the case in 405B, the Burleson
13  Walmart.  That is a compilation of many different
14  cameras, correct?
15    A.  Yes, sir.
16    Q.  And in discovery I was provided with several,
17  or numerous camera shots from each of the Walmarts that
18  went for 30 minutes some cases -- or, you know, they
19  varied as far as length, correct?
20    A.  Yes, sir.
21    Q.  So you have gone through and extracted from
22  those various cameras or various separate videos; is
23  that correct?
24    A.  That is correct.
25    Q.  And edited it for what we have viewed here this

25

1  morning?
2    A.  That is correct.
3    Q.  And that is going to be the case with -- 431 is
4  the ATM.  Is that a -- just one camera shot?
5    A.  Yes, sir, it is.
6    Q.  Okay.  And the only -- so any editing that may
7  have occurred there is just to have the period of time
8  in which the individual you believe to be John Hummel is
9  depicted on that video, correct?
10    A.  That is correct.
11    Q.  As far as 406B, that's a Grand Prairie Walmart.
12  That's again the same situation?
13         Now, wait a second.  Did you say Grand
14  Prairie is a different system?
15    A.  It is.
16    Q.  Okay.  Is it -- I believe it's multiple
17  cameras, though, is it not?
18    A.  It is.
19    Q.  So the same process applies?
20    A.  Exactly the same process; although, with the
21  Grand Prairie Walmart, because there was no on-screen
22  metadata for me -- for me to be able to determine which
23  camera view he moved from, I actually had the loss
24  prevention officer come to the video lab.
25         And he sat down with me, and based on his

26

1  knowledge of the floor plan of the Walmart, he told me
2  which camera angle to put first and then next and then
3  next and next for the Court.
4    Q.  Okay.  The -- the next one is an Arlington
5  Walmart.  Again, the same situation.  I -- I don't have
6  the number down as far as the exhibit.  I guess it's
7  probably 40 -- 407B, and then 408B is the Coast Inn, the
8  last one we saw that hasn't been dealt with yet.  Even
9  there, you have sequentially depicted three different
10  cameras; is that correct?
11    A.  No, sir.  There's four different cameras.
12    Q.  Four different cameras.  Okay.
13         So the raw data, you get it, and then it
14  shows the four different videos all running together.
15  You have put it in such a situation that it is
16  chronologically displayed?
17    A.  Yes, sir.
18    Q.  As far as this viewing of my client's right
19  forearm this morning and comparing it to the video on
20  the screen, specifically 408B, that's a pretty grainy
21  shot from across the room in the manager's office, or
22  whatever, of that Coast Inn.  Are you relying upon that
23  shot to make that comparison?
24    A.  I am not.  Throughout all these videos, you can
25  see -- you can see in a darker image on the forearms on

27

1 the Walmarts video specifically. The detail is not
2 sufficient enough to make out the shape per se except
3 for the Walmart Arlington video when he's standing at
4 the cash register. You can clearly see the shape of the
5 tattoo there, and that is consistent with the shape of
6 the tattoo that is in the Oceanside motel video.
7    Q.  Yet the detail is not sufficient to identify
8 the actual -- the tattoo -- or what -- what the tattoo
9 is of, is it?
10    A.  It is not.
11    Q.  I mean, overall shape, but to discern what is
12 actually supposed to be represented with the tattoo,
13 it's not quite good enough, is it?
14    A.  It -- it is not. It can give us the location,
15 it can give us the -- the shape of the tattoo. But, for
16 example, if it -- if it had the word "Mom" on -- written
17 on it, these cameras and these surveillance systems do
18 not have enough detail within them to be able to read
19 that.
20    Q.  When you testified that these exhibits have not
21 been altered in any way, they have been edited. The --
22 the subject matter remains the same, but you have cut
23 and paste and created a video presentation for the jury;
24 is that accurate?
25    A.  That is correct.

28

1    Q.  I'm going to take you back to Grand Prairie
2 where you had to have the assistance of the loss
3 prevention officer. You, working with your equipment
4 downstairs on the other videos, rely upon some hidden
5 metadata information that is displayed on your
6 equipment, correct?
7    A.  You have to go through a different process in
8 order to get to it, but, yes, yes, you can see the
9 metadata of the files.
10    Q.  Did you rely on it for these other exhibits
11 other than Grand Prairie?
12    A.  I did not. On the ones where the metadata was
13 displayed on the screen as the date and time, I relied
14 on that.
15    Q.  But as far as Grand Prairie, in that situation
16 you had the assistance of whom?
17    A.  I don't recall his name off the top of my head.
18 I have it written down in my office in special crimes.
19    Q.  And it was his -- it was that individual, that
20 employee of Walmart, who directed you to display a
21 particular camera in sequence with other cameras?
22    A.  It was.
23        MR. CUMMINGS: That's all the questions I
24 have.
25        THE COURT: All right. After reviewing the

29

1 videos contained in State's Exhibits 432 -- and I'm
2 going in the sequence that it was presented -- 432, 405,
3 431, 406, 407 and 408, the Court finds that under
4 Rule -- Texas Rules of Evidence 9.01(b) and specifically
5 3 and 4, that the Court -- the State has sufficiently
6 established evidence sufficient to support a finding
7 that the matter in question is what a proponent claims.
8        And that is Mr. Hummel traveling to and
9 from the Walmarts in question and being videotaped, as
10 well as photographed in the form of the ATM, the
11 circumstances under -- under which those photographs
12 were assembled and the videotape assembled is consistent
13 with what has been presented to the Court; in addition
14 to also confirmed by other exhibits formally, State's
15 Exhibit 343, specifically, the ATM, as well as the
16 transactional information from the Walmart.
17        As a result, the Court finds that the
18 evidence is sufficient to support a finding that the
19 matter in question is what a proponent claims.
20        Do you require any other findings, Defense?
21 Your objection is overruled.
22        MR. MOORE: Judge, I have a particular
23 objection that each of the exhibits have been modified
24 from the original form in that they've been edited
25 together to form what appears to be a sequential

30

1 photograph based on the time -- time and date stamp on
2 the video in regard to all the videos except the Grand
3 Prairie video. And there's no showing that the time and
4 date stamp is correct in regard to those videos, and
5 that the sequence -- sequence is correct.
6        THE COURT: And you're talking specifically
7 with regard to the Grand Prairie, and that would be
8 406B?
9        MR. MOORE: Well, Grand Prairie doesn't
10 have any date stamp. He relied on some other witness
11 who's not present to testify to tell him the sequence in
12 which to place the various camera shots. So we don't
13 know if that's a true and accurate representation of the
14 way that it actually occurred or not.
15        That witness is not present, and there's --
16 you know, he -- he said he based on his understanding or
17 his testimony regarding the way that the various aisles
18 ran and so forth. And so I think that the -- you know,
19 by editing the tape together in that fashion and
20 representing it as a sequential -- as one flowing
21 sequence, he's relied on somebody else's advice as to
22 the way that the aisles run in the thing, and there is
23 no -- there's not any ability to verify that that's
24 actually the sequence in which it occurred.
25        THE COURT: Okay. Now, I'm going -- for

31                                                                          33

1   the moment, I'm going to tell you I disagree with regard
2   to the testimony.
3           Mr. Van Der Leest, didn't you previously
4   testify that the information contained in 406B from the
5   Grand Prairie Walmart, that does not include the
6   information on the bottom of the screen but just merely
7   the photograph, you retrieved the information, looked at
8   the information based upon what was on the equipment?
9           THE WITNESS:  That is correct.  Whenever I
10  retrieved it with the gentleman who came to my office,
11  when I originally retrieved it from him at the Grand
12  Prairie Walmart, I visually saw the time and date on
13  their interface that they have.  That's how we knew to
14  locate these images on the time and date in question
15  that we were looking for.
16          THE COURT:  All right.  Thank you, Mr. Van
17  Der Leest, for clarifying that.
18          You're factually incorrect about what he
19  contended there.  It's still the Court's conclusion that
20  that would be -- satisfy your Rule 901(b).
21          Any other objections or any other matters
22  need to be taken up at this time?
23          All right.  We'll take a ten-minute recess
24  before we bring in the jury.  Thank you.
25          (Recess from 10:11 a.m. to 10:29 a.m.)

1           And I think that the -- the purpose of our
2   motion requesting that there be a date certain on which
3   all the evidence will be provided to us is to allow us
4   to adequately represent the Defendant, and to allow the
5   evidence to come in in an untimely, fashion impacts our
6   ability to do that.  So I object to all those tapes, and
7   I object to this evidence on that basis.
8           THE COURT:  All right.  State, do you have
9   a response?
10          MR. BRISSETTE:  Yes, Your Honor, but I'll
11  do them in reverse order.  First with the videotapes, it
12  was during one of the hearings in chambers where Defense
13  asked if we would have all the evidence available for
14  them to preview prior to the commencement of trial.
15  That was a discussion that was had back in chambers, and
16  we said, Yes, we'll have stuff available.
17          The videotapes in the fashion it's been
18  here have been in open court with all the evidence the
19  Defense has flipped through the last two weeks.  They've
20  had a chance to see the stuff.  It's been here
21  available.  It's been here ready to be viewed by whoever
22  wants it.
23          They have the raw data.  Everything that
24  Mr. Van Der Leest has talked about the videotapes is
25  contained in the raw data.  The State has just put them

32                                                                          34

1           (Open court, Defendant present, no jury)
2           THE COURT:  Back on the record.
3           Mr. Moore, Mr. Cummings, I understand that
4   you want to take up one matter --
5           MR. MOORE:  Yeah, Judge.  They are -- it's
6   my belief that they intend to offer some of the evidence
7   that we have got -- you gave us the opportunity to
8   review yesterday, the evidence that was taken from his
9   property here in the sheriff's office.  And I'm going to
10  object to it at this point.
11          I am going to object to the introduction of
12  any of that evidence, the introduction of any of that
13  evidence on the basis that that's not been timely
14  provided --
15          THE REPORTER:  I'm sorry.  I can barely
16  hear you.
17          MR. MOORE:  That the evidence was not
18  timely provided to us pursuant to the orders of the
19  Court.  We think that there's a due process violation
20  for us to get it this late in the game.
21          We also object to the introduction of the
22  videotapes, which the Court has already ruled to be
23  admissible, on the same basis.  We got the raw footage.
24  We never got the final exhibits that have been offered
25  here in court.

1   in sequential order.  We have not altered any evidence.
2   We've simply prepared it where it's available for court.
3   The Defense had all those.  We gave those over in
4   discovery.
5           With respect to the Defendant's clothes,
6   yes, we did go get them yesterday with a subpoena.  The
7   State was put in a position last week when we went to
8   offer records -- business records for Wells Fargo that
9   we could not link the records up even though they never
10  filed the objection subject to the business records
11  affidavit, as the Rules of Evidence state.
12          So the State was put in a position to
13  further strengthen its position to get the rest of the
14  records.  And we went over and looked, and the wallet
15  did contain a credit card that purports to be the same
16  card that the -- Mr. Reeves testified to last week, the
17  Wells Fargo expert that linked up the credit card that
18  was found in the Defendant's possessions.
19          So all the information that's -- the
20  Defense has been given in discovery all the information,
21  all the clothing, the description of the wallet, the
22  watch, the keys of Mr. Hummel and the discovery that was
23  turned over from the San Diego County Jail.
24          Mr. Cummings' business card is actually in
25  the pants pocket of the clothes that have been marked

35

1 for identification purposes now. They're the same
2 clothes and boots that Mr. Hummel wore the night he was
3 in court here on the 31st of December, 2009, and the
4 possessions that have been there, the wallet and such,
5 is all descript -- and talked about in the San Diego
6 County Jail records, which I believe have been filed
7 under seal, as well as part of business records
8 affidavits.
9        THE COURT:  All right.  You want to add
10 something more, Mr. Cummings?
11        MR. CUMMINGS:  Just so the record is clear,
12 those are the clothes that Mr. Hummel had on when you
13 had him brought to this courtroom the day I was -- I met
14 him in this court.  He was brought straight here before
15 he was booked into jail.
16        THE COURT:  That is correct.
17        MR. CUMMINGS:  So I met him, gave him my
18 card, we had our hearing about three hours, Mr.
19 Brissette and myself; and then he left here, was booked
20 into jail, and that's why my card is present.
21        Those clothes were just what he had on when
22 he finally got booked in later on that night on the
23 31st.
24        THE COURT:  I'm going to allow the evidence
25 in, because in a form of rebuttal or anticipation that

36

1 the State is offering additional evidence to support
2 their evidence.  Accordingly, the information was
3 available to the Defense during the course of discovery.
4 May not have been in the exact form that's being
5 presented in the Court; however, the raw data and the
6 information was.
7        In addition to it, the Court does not find
8 that it's a violation of the Defendant's Sixth Amendment
9 rights due process claim.  The Defendant has had
10 sufficient time to review the documentation;
11 furthermore, it was on notice with the pants and the
12 clothing that the Defendant was arrested in at the time
13 when counsel was appointed and to meet with the
14 individual.
15        These -- these items are not new in the
16 sense that this is evidence of a nature that should
17 surprise anyone because it has been in the custody of
18 the Sheriff's Department.
19        Are there any other matters or rulings that
20 you require before we proceed forward, Defense?
21        MR. MOORE:  Only other objection to any of
22 the clothes is on the basis of the -- same basis as we
23 raised in the Pretrial Motions to Suppress, the illegal
24 nature of the arrest.  They are a product of that, and
25 so we would continue those objections as to the clothes.

37

1        THE COURT:  All right.  I understand.  Your
2 objection is overruled.
3        All right.  Both sides ready for the jury?
4        MR. BRISSETTE:  Yes, Your Honor.
5        MR. MOORE:  Yes, Judge.
6        THE COURT:  Thank you.  Let's bring in the
7 jury.
8        (Jury present)
9        THE COURT:  Good morning, members of the
10 jury.
11        All right.  State, you may proceed.
12        MR. BRISSETTE:  Your Honor, may the Court
13 inform the jury of its rulings regarding our evidence?
14        THE COURT:  Yes.  State's Exhibits 405B --
15 or 405A is admitted for the record only.  405B is
16 admitted for all purposes.
17        406A is admitted for the record only.  406B
18 is admitted for all purposes.
19        407A is admitted for the record only, and
20 407B is admitted for all purposes.
21        432A is admitted for the record only.  432B
22 is admitted for all purposes.
23        And then 431 is admitted for all purposes.
24        You may proceed.
25        (State's Exhibit Nos. 405A, 405B, 406A,

38

1        406B, 407A, 407B, 432A, 432B, 431 admitted)
2        ERNEST VAN DER LEEST,
3 having been first duly sworn, testified as follows:
4        DIRECT EXAMINATION
5 BY MR. BRISSETTE:
6    Q.  You're the same Investigator Van Der Leest that
7 was here yesterday, correct?
8    A.  I am.
9    Q.  You talked yesterday, I believe, briefly about
10 a system known as Avid; is that correct?
11    A.  I did.
12    Q.  And what is the Avid Forensic System that you
13 utilize?
14    A.  The Avid System is a nonlinear editing system.
15    Q.  Does it -- is it configured in two different
16 application settings for you?  By that -- how many Avid
17 systems do you work on?
18    A.  I -- I work on two.
19    Q.  And how many does your partner work on?
20    A.  Two.
21    Q.  And you have a work station, a big work station
22 down in the lab?
23    A.  I do.
24    Q.  And you also have a smaller application there
25 on your laptop?

39

40

41

42

1    A.  I do.

2    Q.  The exhibits that the Judge just talked about

3  in the jury's presence, do you have those loaded on your

4  laptop today?

5    A.  I do.  They are on the hard drive -- or the

6  external hard drive.

7      MR. BRISSETTE:  Your Honor, with the

8  Court's permission, I'd like to start with the first

9  video, which I believe chronologically is from the E-Z

10  Mart from the night of December the 17th.

11      THE COURT:  Granted.

12      MR. BRISSETTE:  May we take the lights

13  down, Judge?

14      THE COURT:  You may.

15      (State's Exhibit published)

16    Q.  (BY MR. BRISSETTE)  Mr. Van Der Leest, on that

17  exhibit does the individual that's depicted in the

18  center of the frame, did that individual go back out to

19  a vehicle of some sort?

20    A.  He does.

21    Q.  And does that individual -- based on your

22  observations, does that individual stay there for an

23  extended period of time at the left rear quarter panel?

24    A.  He does.

25    Q.  And at some point does the individual leave?

1  at the bottom of the screen the metadata front door

2  ice -- or front ice machine?

3    A.  Yes, sir.

4    Q.  Do you have an opinion as to what's at the end

5  of that hallway or end of that store as one walks toward

6  the top of the exhibit?

7    A.  There is the -- the in-store bank.

8    Q.  Did you collect digital assets from that

9  in-store bank?

10    A.  I did.

11    Q.  Is that what's depicted on 431?

12    A.  It is.

13    Q.  Can you publish 431 to the jury, please?

14      (State's Exhibit No. 431 published)

15      THE WITNESS:  That's it.

16    Q.  (BY MR. BRISSETTE)  431, I believe, was a

17  one-frame-per-second image; is that correct, sir?

18    A.  That is correct.

19    Q.  And for presentation purposes, did you hold the

20  frame count for, I believe, ten frames?

21    A.  I did.

22    Q.  And that would be ten frames per second?

23    A.  That is correct.

24    Q.  On 343 what's the time stamp of the ATM

25  receipt?

1    A.  He does.

2    Q.  The next point in time for video that you

3  collected, what store was that?

4    A.  This was the Walmart in Burleson.

5    Q.  I believe that is State's 405B.  Is that your

6  understanding, Mr. Van Der Leest?

7    A.  That is correct.

8    Q.  You have that loaded in the Avid forensic

9  system?

10    A.  I do.

11    Q.  With the Court's permission, can you publish

12  that to the jury?

13    A.  Yes, I can.

14      (State's Exhibit No. 405B published)

15    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,

16  are you familiar with the exhibit -- I believe it's that

17  paper right to your left there.  Is that 343?

18    A.  It is, sir.

19    Q.  Are you familiar with an ATM receipt that's

20  depicted in State's 343?

21    A.  I am.

22    Q.  And where is that ATM receipt from, sir?

23    A.  It is from the First Community Bank that's

24  located within the Walmart in Burleson, Texas.

25    Q.  The footage that we just saw that had depicted

1    A.  It is 01:46:54 a.m.

2    Q.  Do you have video footage from a Walmart

3  located in the city of Grand Prairie?

4    A.  I do.

5    Q.  I believe that's State's 406B; is that correct?

6    A.  It is.

7    Q.  Can you publish 406B for the jury, please?

8      (State's Exhibit No. 406B published)

9    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,

10  is part of this exhibit, which is 406B, were you able to

11  identify a particular vehicle that a subject of interest

12  of yours was driving?

13    A.  Yes.

14    Q.  And is that what we're seeing here to begin

15  with?

16    A.  Yes.

17      (State's Exhibit No. 406B published)

18    Q.  (BY MR. BRISSETTE)  And, Mr. Van Der Leest, to

19  your left, State's 343, do you recognize contained on

20  343 a receipt that you know to be generated by a

21  corporation known as Walmart?

22    A.  I do.

23    Q.  Does that have a date and time?

24    A.  It does.

25    Q.  What is the date and time?

43

1   A.   December the 18th, 2009, 04:33:23.

2   Q.   How did the -- how does the receipt show that

3   the bill was -- was settled?

4   A.   This was a cash payment.

5   Q.   With respect to 406B, as in boy, that's been

6   debited on the screen, do you have an opinion as to the

7   person of interest settled charges there on that deal?

8   A.   It was a cash payment.

9   Q.   And what was the receipt for?

10   A.   The receipt was for a knit top.

11   Q.   With respect to 431, 406B and 405B, do you have

12   an opinion as to whether or not the person of interest

13   in the video had a pen or a piece of paper in their

14   hands to take down, say, prices?

15   A.   I do.

16   Q.   And what is that opinion?

17   A.   I -- I never observed any action such as that.

18   Q.   Do you have an opinion, in those same exhibits,

19   as to whether the person was ever wiping their face or

20   putting their hands to their face like they were either

21   sneezing or wiping moisture from their nose or wiping

22   their eyes?

23   A.   I do not recall ever seeing that.

24   Q.   I believe there's a video from an Arlington

25   Walmart; is that correct?

44

1   A.   There is.

2   Q.   And would that be 407B?

3   A.   It is.

4   Q.   And has the sun come up on December the 18th

5   for that video, sir?

6   A.   It has.

7   Q.   With the Court's permission, can you publish

8   407B?

9   A.   Yes.

10        (State's Exhibit No. 407B published)

11   Q.   (BY MR. BRISSETTE)  Investigator Van Der Leest,

12   if we were to continue 408 -- or excuse me -- the

13   Arlington one, which is 407B, as in boy, what do we see

14   going forward?

15   A.   He exits the store and gets in his vehicle and

16   the vehicle leaves the parking lot.

17   Q.   Did you have an occasion, through the course of

18   your investigation, to come into possession of digital

19   assets from an establishment in the state of California,

20   specifically, the Coast Inn?

21   A.   I did.

22   Q.   And who did you receive those from?

23   A.   Chief Investigator Rizy.

24        MR. BRISSETTE:  May I approach witness,

25   Your Honor?

45

1        THE COURT:  You may.

2   Q.   (BY MR. BRISSETTE)  Showing you what's been

3   marked for identification purposes as 408B, as in boy.

4   Do you recognize that?

5   A.   I do.

6   Q.   Do you recognize some of the handwriting on it?

7   A.   I do.

8   Q.   In fact, there's two different -- there's three

9   different peoples' handwriting; the person that put the

10   exhibit, as one.  Do you recognize the handwriting at

11   the bottom?

12   A.   I do.

13   Q.   Do you recognize initials, date up here at the

14   top?

15   A.   I do not know whose initials those are.

16   Q.   Whose handwriting is at the bottom?

17   A.   That's mine.

18   Q.   Did you prepare this exhibit?

19   A.   I did.

20   Q.   And what's contained on 408B?

21   A.   It is video footage from the Coast Inn in

22   Oceanside, California.

23   Q.   Were you able to take the raw images and

24   prepare them for Court, much like you have the other

25   exhibits that the jury's just seen?

46

1   A.   I was.

2   Q.   Were you able to -- what does it depict?

3   A.   It depicts Mr. Hummel registering and -- for a

4   hotel room.

5        MR. BRISSETTE:  We'd offer 408B at this

6   time, Your Honor, tender to Defense.

7        MR. CUMMINGS:  Your Honor, I make the same

8   objections that we put forth this morning outside the

9   presence of the jury, as to specifically Texas Rule of

10   Evidence 901.  We also renew our pretrial objections to

11   the -- this exhibit.

12        THE COURT:  Based upon the earlier hearing?

13        MR. CUMMINGS:  Yes.

14        THE COURT:  All right.  Both of your

15   objections are overruled.  State's Exhibit 408 (sic) is

16   admitted.

17        And more specifically, I believe it's 408B.

18        MR. BRISSETTE:  Yes, sir.

19        THE COURT:  408 is admitted for the record

20   only (sic).

21        (State's Exhibit No. 408B admitted)

22        MR. BRISSETTE:  May it be published as

23   well, Your Honor?

24        THE COURT:  It may.

25        (State's Exhibit No. 408B published)

47

1    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,
2  as part of your efforts in this case, did you receive a
3  subpoena from our office yesterday to serve upon the
4  Tarrant County Sheriff's Department?
5    A.  I did.
6    Q.  And who did you serve?
7    A.  I served Chief Allen Dennis.  He's the chief
8  over the confinement bureau.
9    Q.  Did Mr. Dennis give you a -- a box of items
10  that was in his possession?
11    A.  He did.
12    MR. BRISSETTE:  May I approach the witness,
13  Your Honor?
14    THE COURT:  You may.
15    Q.  (BY MR. BRISSETTE)  Showing you what's been
16  marked for identification purposes as State's 462, 463,
17  and 464, and ask you to take a look at those and see if
18  you recognize those items?
19    A.  I do.
20    Q.  Were these items that you collected yesterday?
21    A.  They are.
22    Q.  Can you -- what does 462 appear to be?
23    A.  462 is a men's tri-fold wallet, black in color.
24    Q.  And 463?
25    A.  Is a alarm key fob for what appears to be a

48

1  Ford Windstar.
2    Q.  And do you recognize the name that's depicted
3  on the key for 464?
4    A.  I do.
5    Q.  Showing you what's been marked for
6  identification purposes as 465A and B.  Do you recognize
7  465A and B?
8    A.  I do.
9    Q.  And were these items that you received from
10  Chief Dennis as well?
11    A.  Yes.
12    Q.  Can you -- is there a description to give to
13  465A and B?
14    A.  Yes.
15    Q.  What are they?
16    A.  They are black steel-toe boots, manufacturer by
17  Brahma.
18    Q.  State's 466, do you recognize 466?
19    A.  I do.
20    Q.  And what is 466?
21    A.  It is a black T-shirt.
22    Q.  State's 467, do you recognize 467?
23    A.  I do.
24    Q.  And what is 467?
25    A.  A pair of black men's slacks.

49

1    Q.  Do they have a particular manufacturer?
2    A.  They do.
3    Q.  What is that?
4    A.  Puritan.
5    Q.  Do they have a size like a --
6    A.  They do.
7    Q.  Like a waistline?
8    A.  34/30.
9    Q.  So 34 inches waistline; 30 inches in length?
10    A.  Correct.
11    MR. BRISSETTE:  Your Honor, at this time
12  the State would tender to Defense Counsel State's 462
13  and all of its contents, 463, 464, 465A and B, 466 and
14  467.
15    MR. CUMMINGS:  Your Honor, we renew our
16  objections that we made prior to Mr. Van Der Leest's
17  testimony here this morning before the jury.
18    Further, I object to 462, 63, 64, 65, 66,
19  and 67 as to relevance.
20    THE COURT:  Any additional objections?
21    MR. CUMMINGS:  No, Your Honor.
22    THE COURT:  Your objections are overruled.
23    462, 463, 464, 465A and B, 466 and 467 are
24  admitted.
25    (State's Exhibit Nos. 462-464, 465A,

50

1    465B, 466-467 admitted)
2    MR. BRISSETTE:  May I approach the witness,
3  Your Honor?
4    THE COURT:  You may.
5    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,
6  State's Exhibit 340B, can you read the manufacturer and
7  the waist and length size of the fabric tag that's
8  depicted inside the exhibit, please?
9    A.  It is a Puritan tag, 34W by 30L.
10    Q.  State's 464, sir, I asked you a minute ago if
11  you recognized the name on the exhibit.  Can you tell
12  the members of the jury what establishment this key
13  belongs to?
14    A.  Coast Inn.
15    Q.  Do you know a particular room number on here?
16    A.  214, I believe.
17    Q.  Let's not guess if we have the number.
18    A.  24.
19    Q.  As part of your work in this case, do you
20  review records that are obtained through the Grand Jury
21  process to look for further digital assets?
22    A.  I do.
23    Q.  Did you have an occasion to look at some
24  banking records in this case?
25    A.  I did.

51

1    Q.  And what was the purpose of your review of
2    banking records?
3    A.  To determine whether or not there was any other
4    video assets that may be related to this case.
5    Q.  Did you have an occasion to look specifically
6    at some Wells Fargo records?
7    A.  I did.
8    Q.  Were you able to make any observations whether
9    or not a merchant by the name of E-Z Mart Joshua were in
10   those records?
11   A.  They -- I did.
12   Q.  And prior to you take out a larger exhibit, records
13   that just pertained and had references to the E-Z Mart,
14   other events that you know are related specifically to
15   this case?
16
17   A.  I did.
18   MR. BRISSETTE:  May I approach the witness,
19   Your Honor?
20   THE COURT:  You may.
21   Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,
22   I'm going to show you what's been marked for
23   identification purposes as 273F, as in Frank.  Do you
24   recognize this exhibit?
25   A.  I do.

52

1    Q.  Have you had a chance to review the pages that
2    are contained in that exhibit?
3    A.  I have.
4    Q.  And do those pages depict transactions from
5    somebody's account?
6    A.  It does.
7    Q.  And through your investigative years of
8    service, I guess for lack of a better term, have you
9    come to figure out how to read and translate banking
10   records?
11   A.  Somewhat, yes.
12   Q.  With specific to Wells Fargo, have you learned
13   how to translate particular charges used by different
14   credit cards?
15   A.  Yes.
16   Q.  In looking inside 462, if I showed you a Wells
17   Fargo credit card that ended in 5408, do you see credit
18   card transactions or debit card transactions that end in
19   5408 contained in 273F, as in Frank?
20   A.  I do.
21   Q.  For the E-Z Mart charges in -- Joshua,
22   Texas, do the last four digits end in 5408?
23   A.  They do.
24   Q.  Can you tell the members of the jury whose name
25   appears on 462?

53

1    A.  John W. Hummel.
2    MR. BRISSETTE:  Your Honor, at this time
3    the State would tender to Defense Counsel 273F and offer
4    it for all purposes.
5    MR. CUMMINGS:  May I ask Investigator Van
6    Der Leest a couple of questions, Your Honor?
7    THE COURT:  You may proceed.
8    VOIR DIRE EXAMINATION
9    BY MR. CUMMINGS:
10   Q.  Investigator Van Der Leest, how many owners are
11   there of that Wells Fargo account?
12   A.  I believe there are three.
13   Q.  The records that have been handed to me as
14   273F, as in Frank, cover a period of time.  Do you know
15   what length of time?
16   A.  I believe it begins September the 15th of 2009
17   and ends January the 14th of 2010.
18   Q.  These records reflect transactions from all
19   three bank cards?
20   A.  Yes.
21   MR. CUMMINGS:  Your Honor, my objection to
22   this exhibit is that it's overbroad.  It -- it starts in
23   early September -- actually, the first record I see, it
24   may very well cover from 9/15 --
25   THE COURT:  Let me visit with the lawyers

54

1    on the side about the exhibit.  Thanks.
2    (BENCH CONFERENCE PROCEEDINGS)
3    THE COURT:  Okay.  Which are you interested
4    in?
5    MR. BRISSETTE:  I'm interested in all
6    the -- to start with --
7    THE REPORTER:  I'm sorry.  Can you speak
8    into the microphone?
9    MR. BRISSETTE:  Yes, ma'am.  My apologies.
10   To start with, Judge, we're interested in
11   all the E-Z Mart transactions.  Mr. Van Der Leest went
12   through the large exhibit last week, as I thought that
13   the Court's instruction, the Defense objection was --
14   and we found just the pages in the banking records that
15   contained E-Z Mart transactions.  Every E-Z Mart Joshua
16   transaction links back to the Defendant's credit card.
17   THE COURT:  Okay.  So each page has one of
18   those E-Z Mart transactions on it?
19   MR. BRISSETTE:  Yes, sir.  And if it
20   doesn't have an E-Z Mart transaction on it, it gets into
21   the -- when the time we're talking about of the offense
22   date, December 17th and December 18th, where we have
23   charges for the night of the offense and then flight
24   from the offense to California.
25   MR. CUMMINGS:  The --

55

1  THE COURT: I'm listening.

2  MR. CUMMINGS: Okay. The exhibit starts --

3  first transaction, I think, is 9/21, which is remote in

4  time from the sequence of events that are -- make it

5  a -- that this trial is based on. The E-Z Mart is not

6  the scene of this offense. I don't think we've had --

7  I'm trying to remember. I don't think we've had any

8  testimony that that particular location is relevant at

9  all to the case at this point.

10  THE COURT: Okay. Let me ask a question.

11  MR. BRISSETTE: Yes.

12  THE COURT: Isn't there testimony with

13  regard to Mr. Hummel meeting with Ms. Freeze at the E-Z

14  Mart?

15  MR. BRISSETTE: Yes, Your Honor.

16  THE COURT: And that's contained within the

17  video confession that was taken --

18  MR. CUMMINGS: Yes.

19  THE COURT: -- over at the San Diego jail?

20  MR. BRISSETTE: It is contained there where

21  he was asked by Sergeant Carlson how long he's been

22  thinking about this. And I don't want to misquote it,

23  Judge. It's either a couple months or several months,

24  and this is -- the first couple of pages of this, in

25  fairness to the Defense, is the first references is in

56

1  the larger exhibit that's an A number for what you have

2  in front of you. It's the first reference to E-Z Mart.

3  The State's position with the -- with the

4  phone records that would come in behind this is you see

5  transactions to begin with of fuel and -- and what we

6  believe is cigarette purchases here, and then it

7  progresses to where Mr. Hummel says in his statement

8  that began with calling and then texting.

9  Then the two documents, when you look at

10  them together, in addition to his statement, corroborate

11  not only as motive, but put the timeline in contextual

12  references together that he was frequenting the

13  establishment, and this is where he met Ms. Freeze.

14  THE COURT: Okay. Do you have anything

15  else to add?

16  MR. CUMMINGS: No, Your Honor. I've made

17  all the objections I have --

18  THE COURT: The State has -- has clearly

19  established the relevance of State's Exhibit 273 in

20  relation to the video confession that was taken by --

21  from John Hummel at the San Diego County Jail. In

22  addition to it, it is contextual in time. It is

23  tailored to identify those specific dates, and

24  therefore, it is not overbroad.

25  Your objection is overruled. 273F will be

57

1  admitted.

2  MR. CUMMINGS: I had an objection as to

3  relevance as well.

4  THE COURT: I did. And I also established

5  it by -- based upon that the context of what was

6  discussed in the form of Mr. Hummel's testimony or

7  confession and that it corroborates that information and

8  he discusses, regarding Ms. Freeze, how they first met

9  and that he would meet her at the E-Z Mart in Joshua,

10  Texas, and it specifies that in 273F.

11  MR. CUMMINGS: So my objection is

12  overruled?

13  THE COURT: Your objection is overruled.

14  (OPEN COURT PROCEEDINGS)

15  THE COURT: Members of the jury, 273F is

16  admitted.

17  (State's Exhibit No. 273F admitted)

18  DIRECT EXAMINATION (Cont'd)

19  BY MR. BRISSETTE:

20  Q. Mr. Van Der Leest, directing your attention to

21  the last two pages of the Exhibit 273F, first I'd like

22  to have you look at the second to last page on 273F and

23  see if it is an identical representation to 273B, as in

24  boy?

25  A. It is.

58

1  Q. Has 273B, as in boy, been highlighted down in

2  your digital evidence lab?

3  A. Yes.

4  Q. Would 273B aid in your testimony today before

5  the jury to explain these records?

6  A. It would.

7  Q. If you could look at the last page in 273F,

8  sir. I'll show you what's been marked for

9  identification purposes as 273C, ask you to do the same

10  thing to compare if the -- the background, the actual

11  black text, is consistent with the last page of 273F.

12  A. It is.

13  Q. And has the other highlighting and lettering

14  been added by your team down in the lab to aid you in

15  your testimony today before the jury?

16  A. It has.

17  MR. BRISSETTE: Your Honor, at this time

18  the State will offer 273B and C for demonstrative

19  purposes before the jury.

20  MR. CUMMINGS: I have no additional

21  objections to 273B and C.

22  THE COURT: Your objection continues to be

23  overruled. 273B and C are admitted for demonstrative

24  purposes.

25  (State's Exhibit Nos. 273B, 273C admitted)

59

1    MR. BRISSETTE:  May they be published, Your
2  Honor?
3    THE COURT:  They may.
4    Q.  (BY MR. BRISSETTE)  Mr. Van Der Leest, did you
5  take those bank records and make contact with some
6  establishments throughout the southwestern part of the
7  United States?
8    A.  I did.
9    Q.  Showing you what's been marked for
10  identification purposes as State's 445.  Did you prepare
11  or assist in preparing 445 for -- for presentation
12  before the jury today?
13    A.  I did.
14    Q.  Are you familiar with the items that are
15  depicted with the different colored flags and symbols on
16  445?
17    A.  I am.
18    MR. BRISSETTE:  Your Honor, at this time
19  the State would tender to Defense 445 and offer it for
20  demonstrative purposes before the jury.
21    MR. CUMMINGS:  Your Honor, I have no
22  objection to State's 445.
23    THE COURT:  It is admitted for
24  demonstrative purposes.
25    (State's Exhibit No. 445 admitted)

60

1    MR. CUMMINGS:  Your Honor, may I move so
2  that I can observe?
3    THE COURT:  Please.
4    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,
5  let's see if we can walk through this without tripping
6  over everything.
7    In State's Exhibit 273C, were you able to
8  identify some fueling locations throughout the
9  southwestern part of the United States?
10    A.  I was.
11    Q.  And were you able to make contact with certain
12  fueling locations or gasoline merchants throughout the
13  southwest part of the United States?
14    A.  Yes.
15    Q.  Can you take the members of the jury through
16  what you did as part of your investigation?
17    A.  After looking at the bank records, I -- I
18  noticed a transaction in Midland, Texas.  I contacted
19  the Town and Country corporate office located in
20  Houston, as I recall, and attempted to get video from
21  the store for the same time that this transaction
22  occurred, and I was unable to get video from them.
23    Q.  Did you next make an attempt to locate digital
24  assets in New Mexico?
25    A.  I did.  I contacted the sheriff's office in --

61

1  in that county, Vado, New Mexico, and requested the same
2  and was told that there was no one there that had the
3  capability of retrieving anything like that.
4    Q.  Did you attempt to contact a Chevron in Tucson,
5  Arizona?
6    A.  I did.  I contacted the Tucson, Chevron, and
7  they said there was no video available.
8    Q.  El Centro, California?
9    A.  El Centro, I contacted a person at the store.
10  I had some communication issues.  They -- they spoke
11  Spanish primarily as their primary language, and they
12  said that they would have a manager call me back.
13    I attempted on two other occasions to
14  contact that manager and was never able to get through
15  to anyone to recover that.
16    Q.  Are you familiar with a 1998 Ford Windstar and
17  its capacity for fuel?
18    A.  I am.
19    Q.  Are you familiar with the EPA studies for that
20  vehicle for that model year as to miles per gallon?
21    A.  I am.
22    Q.  What is the approximate range of fuel, if it's
23  a full load, between -- for a 1998 Ford Windstar?
24    A.  About 320 miles.
25    Q.  You've had a chance to prepare the exhibit, I

62

1  believe, 445, the map.  Were you able to do distance
2  measurements between the locations that are depicted on
3  the map?
4    A.  I was.
5    Q.  And are those within range of the fuel load for
6  the 1998 Ford Windstar based on the federal government
7  standards?
8    A.  It is.
9    Q.  Also on the -- I believe the last page of your
10  exhibit there, 273F in front of you, do you see a credit
11  card transaction that's one, two, three, four, five
12  lines down from the header?
13    A.  I do.
14    Q.  And do you recognize that establishment in
15  Joshua, Texas?
16    A.  I do.
17    Q.  And what is the transaction date for that, sir?
18    A.  12/16.
19    Q.  Mr. Van Der Leest, as part of your preparation
20  for court, did you print a number of stills from the
21  exhibits that we've seen here today?
22    A.  I did.
23    Q.  And do these stills highlight some different
24  parts of the exhibits for your testimony today before
25  the jury?

63

65

1    A.  It does.

2    Q.  You've had a chance to look at State's Exhibits
3  412 through 427, inclusive, have you not?

4    A.  I have.

5    Q.  And are those exhibits that you prepared
6  yourself?

7    A.  I did.

8    Q.  And have you had a chance to look at State's
9  447 through 460, inclusive?

10   A.  I have.

11   Q.  And are those images that you prepared in
12  preparation for your testimony today?

13   A.  They are.

14       MR. BRISSETTE:  Your Honor, at this time
15  the State would tender to Defense Counsel State's 427
16  and offer at this time for the record only, just 427.

17       MR. CUMMINGS:  No objection to 427 being
18  offered for the record only.

19       THE COURT:  427 for the record only is
20  admitted.

21       (State's Exhibit No. 427 admitted)

22       MR. BRISSETTE:  We would tender to Defense
23  Counsel State's 412 through 426 and then 447 through 460
24  inclusive and offer those for all purposes.

25       MR. CUMMINGS:  Your Honor, regarding

1  addition to it, the still photographs would be helpful
2  as an aid to the jury to determine the accuracy of the
3  video.  In addition to it, to look for characteristics
4  that would identify clearly the Defendant and those
5  videotapes.  Accordingly, it is not duplicitous -- or
6  duplicative, excuse me, and therefore should be and will
7  be admitted.

8       All right.  Thank you.

9       MR. BRISSETTE:  Yes, sir.

10      (OPEN COURT PROCEEDINGS)

11      THE COURT:  Members of the jury, 427 (sic)
12  is admitted for the record only.  Exhibits 412 through
13  426 are admitted for all purposes, and State's Exhibits
14  447 through 460 are also admitted.  The Defendant's
15  objection is overruled.

16      (State's Exhibit Nos. 412-426,

17      447-460 admitted)

18      THE COURT:  You may proceed.

19   Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,
20  in your forensic field, is there a science known as
21  photographic comparison?

22   A.  There is.

23   Q.  Can you explain to the jury what photographic
24  comparison means to you as a forensic video analyst?

25   A.  It is the process by which you take a known

64

66

1  State's Exhibit 412 through 426, we have the same
2  objections for these exhibits as we put forth for the
3  videotapes from which they are taken.

4       Further, they are, in fact, duplicative of
5  the exhibits that the jury has already observed this
6  morning on the source videotapes.  We object on that
7  basis as well.

8       And just so that it saves a little time, I
9  have the same objections to 447 through 460.

10      THE COURT:  I need to talk to the lawyers
11  just briefly.

12      MR. CUMMINGS:  Do you need the exhibits,
13  Your Honor?

14      THE COURT:  No.

15      (BENCH CONFERENCE PROCEEDINGS)

16      THE COURT:  Regarding your objection, I
17  wanted to do it outside the presence of the jury.  I
18  wanted to rule on it, but I also wanted to articulate
19  the reasons for it.

20      I'm going to overrule your objection.  I'll
21  give a continuous running objection.  However, part of
22  that is based upon your claim that the authentication
23  comes into question.  The admissibility of that evidence
24  should be brought -- is -- has already been decided by
25  the Court based upon what I've articulated.  But in

1  image and you compare it against an unknown image for
2  unique and class characteristics.

3    Q.  Let's start with unique.  What are unique
4  characteristics?

5    A.  A unique characteristic would be something that
6  would set a person or an object apart from all others.

7    Q.  What are class characteristics?

8    A.  Class characteristics are characteristics that
9  would put it into a class, such as a four-door
10  automobile, a pickup truck, a short-sleeve shirt, et
11  cetera.

12   Q.  You've had an occasion to testify as an expert
13  in this field as well before in state district court,
14  have you not?

15   A.  I have.

16   Q.  Have you used photographic comparison to rule
17  individuals into a situation and, in addition, rule
18  people out of a situation?

19   A.  I have.

20   Q.  I believe you have in front of you a blue
21  binder labeled State's Exhibit 446; is that correct?

22   A.  I do.

23   Q.  Did you generate 446?

24   A.  I did.

25   Q.  How many pages are contained in 446?

67

1    A.  60.

2    Q.  How many image pages?

3    A.  59.

4    Q.  And there's a -- a face page, is there not?

5    A.  There is.

6    Q.  So a total of 60 pages?

7    A.  Correct.

8    Q.  What's contained on those 60 pages?

9    A.  These are still images taken from the assorted

10   videos depicting certain things within each image that I

11   wanted to make sure that the trier of fact was aware of.

12   Q.  Are you able, as part of your investigation, to

13   have access to physical items of evidence?

14   A.  I am.

15   Q.  And did you have opportunity, prior to them

16   being admitted into the courtroom, to take those into

17   the photographic booth down on the fourth floor and

18   actually photograph those images?

19   A.  We did.

20   Q.  Does that then become your known?

21   A.  It does.

22   Q.  Are you able to take a known then and compare

23   it to the video exhibits that we've shown the jury this

24   morning?

25   A.  I am.

68

1    Q.  And are your opinions as to class and possibly

2    unique characteristics contained in State's 446?

3    A.  It is.

4    Q.  And is that what you would be able to present

5    as an expert here today as what's contained in 446?

6    A.  Yes.

7         MR. BRISSETTE:  Your Honor, at this time

8    the State would tender to Mr. Cummings State's 446 and

9    offer it for all purposes.

10        MR. CUMMINGS:  Your Honor, it's 59

11   different images, and I need to ask Mr. Van Der Leest

12   several voir dire questions outside the presence of the

13   jury before we can deal with the admission of this

14   particular exhibit.

15        THE COURT:  All right.  Members of the

16   jury, since it's 10 till 12:00, we're going to go ahead

17   and break -- allow you to break for lunch right now.

18        Please remember the Court's previous

19   instructions.  Do not discuss this case with anybody or

20   amongst yourselves or discuss what court you're in right

21   now as a juror.

22        Please be back at 1:30.  Thank you very

23   much.  You're excused for lunch.

24        We'll take a ten-minute recess to take a

25   look at the photographs.

1         MR. CUMMINGS:  Thank you, Your Honor.

2         THE COURT:  All right.  Thank you.  We'll

3    be in recess.

4         (Recess from 11:50 a.m. to 12:10 p.m.)

5         (Open court, Defendant present, no jury)

6         THE COURT:  All right.  Both -- everybody

7    ready to go on the record?

8         MR. CUMMINGS:  Yes, Your Honor.

9         THE COURT:  Okay.  The Defense has

10   requested to have an opportunity to review 59 pages

11   contained in State's Exhibit 446 for the purposes of

12   objections and conducting a voir dire examination.

13        Mr. Cummings, you may proceed.

14        MR. CUMMINGS:  Thank you, Your Honor.

15                VOIR DIRE EXAMINATION

16   BY MR. CUMMINGS:

17   Q.  Mr. Van Der Leest, during the break, I was able

18   to visit with you to kind of clarify some things from

19   State's Exhibit No. 446, which is a notebook that

20   contains 59 pages of photographs that you prepared and

21   one page of text, correct?

22   A.  That is correct.

23   Q.  And what I'm able to -- or what you have told

24   me during the break is that these -- these are

25   comparisons of stills from the videos with some

70

1    photographs you've taken of articles of clothing

2    associated with John Hummel, correct?

3    A.  Yes.

4    Q.  The -- so the process -- well, would you

5    describe the process for the Judge?

6    A.  I'd be glad to.

7         Whenever we're processing video within that

8    Avid nonlinear editor, we have the ability to look at

9    each frame of video individually.  In order to export a

10   still image of that frame, it's as simple as placing an

11   in and out marker on each side of that frame of video

12   and then exporting it as a still image.

13        And it is from those still images that I

14   exported from the multiple videos I worked in this case

15   that you see on the pages of this -- of this image chart

16   comparison.

17   Q.  So, in fact, if -- because you've given me the

18   benefit of the digital file as well, I -- I believe you

19   intended to disclose your findings with the jury and

20   display it on your projector digitally?

21   A.  Correct.

22   Q.  And as you progress through your digital

23   presentation, the photos are added as you testify and

24   the arrows -- or directing your -- our attention to what

25   you're discussing in the photograph are added as you

71

1  progress through the slides?
2      A.  That is correct.
3      Q.  This is a presentation that deals with, first,
4  the uniform shirt in pages 2 -- or 1 of 59 through 8 of
5  59; is that correct?
6      A.  I believe it is, yes.
7      Q.  When you did this, you actually took the
8  uniform shirt, the -- the piece of evidence to your lab
9  and photographed it?
10     A.  We photographed it on the fourth floor in what
11  we call the green room.  It's a photographic room that
12  we have.
13     Q.  A room within the District Attorney's Office
14  that you-all have enhanced for that purpose,
15  photographic purposes?
16     A.  Yes.
17     Q.  I mean, I'm not --
18     A.  Yes.  It is -- it is a room that we have set up
19  for taking pictures, taking images of clothing, people,
20  whatever we need to.
21     Q.  Now, when you -- you've got additional training
22  and education regarding forensic videos, correct?
23     A.  Correct.
24     Q.  In the exhibit that you have here, you have
25  taken a slide or a frame from a -- a -- a frame from a

72

1  video, and you are comparing it to that photograph you
2  took in your green room.
3      A.  Mark Porter actually took the photos.
4      Q.  Okay.  Fine.
5          Did you use any sort of measuring device to
6  make the comparison between your known photograph and
7  the excerpts from the videos?
8      A.  I did not.
9      Q.  Did you -- did you rely upon your -- a lot of
10  different tools, really, your background as an
11  investigator, as a street officer?  You're -- just the
12  fact that you're a man who's lived life and you make
13  observations and you pay particular attention to
14  details; is that correct?
15     A.  Yes, sir.
16     Q.  The next item that you apparently focus on is a
17  black photograph -- excuse me -- black, button-up man's
18  short-sleeve shirt with an emblem of some sort on the
19  front, and you cover those comparisons with the video
20  excerpt through -- the front is covered through 14 of
21  59, correct?
22     A.  Yes, sir.
23     Q.  And then the back is covered from 15 through 19
24  of 59, and then you focus on the hat, correct?
25     A.  Yes, sir.

73

1      Q.  And it runs through the sequence of photos
2  through 24.
3          Page 25 of 59, what is the focus there?
4  What are you doing?
5      A.  My focus on this was to show the class
6  characteristics of the hat that -- that is in evidence.
7      Q.  Okay.  One more slide.  25 of 59.
8      A.  Oh, I'm sorry, sir.
9      Q.  You -- you finish with the hat, and what is the
10  next -- this next sequence that you're covering?
11     A.  This -- this is an image taken from the ATM
12  surveillance video.
13     Q.  And so we're still addressing the same articles
14  of clothing that you have discussed prior to this
15  through the earlier sequences?
16     A.  That is correct.  In this image you can see the
17  fedora hat, the dark hat with the light trim, and you
18  can see the emblem on the front of the dark shirt.
19     Q.  Okay.  And to close out the subject matter, you
20  then -- on page 42 of 59, you moved to a different
21  garment, and you make similar comparisons?
22     A.  That is correct.
23     Q.  Okay.  Thank you.
24         MR. CUMMINGS:  Your Honor, my objection to
25  the testimony from Investigator Van Der Leest is that

74

1  it -- it's -- it invades the province of the jury.  It's
2  not necessary for any expertise to compare photographs
3  and make observations from them.
4          There's no -- I mean, it's not a matter of
5  showing dimensions are identical or, you know,
6  scientific measurements are not used.  It's -- it's -- a
7  juror can look for themselves and compare photographs to
8  this extent.  Maybe -- maybe they wouldn't do it in
9  detail.
10         And my objection is to Investigator Van Der
11  Leest providing opinions as to these photographs.
12  Opinions are reserved for expert testimony.  I think
13  this invades the province of the jury and goes outside
14  his area of expertise.
15         He's learned a lot and provided the Court
16  with testimony about videos and -- and what's entailed
17  with videos and components of it that we might not
18  otherwise know, but this is merely comparing photographs
19  to see if they depict the same images.  Every one of
20  those jurors is just as capable of doing that as he or
21  I.  That's my objection, Your Honor.
22         MR. BRISSETTE:  Your Honor, now that we're
23  outside the presence of the jury, may I ask Mr. Van Der
24  Leest a few more questions about his training in
25  photographic comparison?

75

1   THE COURT: You may.

2   VOIR DIRE EXAMINATION

3   BY MR. BRISSETTE:

4   Q.   Mr. Van Der Leest, as part of your photographic

5   comparison, do you actually go to fabric school?

6   A.   Yes.

7   Q.   Can you explain to the Judge what we're talking

8   about when I say fabric school?

9   A.   Sure.  The manufacturing process for clothing

10   is -- is rather unique.  In these images that we have

11   here for this trial, the shirt, for example, being

12   displayed now is on page 42/59 is a simple black T-shirt

13   that has been screen printed with a logo for Mac Tools.

14           There -- there's no way for me to determine

15   how many of these that were made because there's --

16   during the process -- this is a simple black shirt.

17   These are class characteristics that I'm pointing out.

18   With -- with all of these images, it's class

19   characteristics.  It's not unique characteristics.

20   Q.   With Mr. Cummings' pinstripe coat here, how the

21   fabric lays and how the stripes come about on the

22   lapels, would that be unique characteristics when you're

23   looking at photographs and trying to compare fabric?

24   A.   It -- it would if you could see the detail.

25   The coat that Mr. Hummel is wearing is actually a -- a

76

1   better representative of -- if you could get the detail

2   from the camera of where the seams come together.

3           Because the way clothing is manufactured,

4   the cloth is laid out on a table, it has a pattern, and

5   then it is cut, say, for example, for the front part of

6   the shirt.  And then the sleeves are cut from the sides

7   of -- of that extra fabric.  So whenever they are sewn

8   together, chances are there's not going to be the same

9   lines that come together at the same location on two

10   shirts.

11   Q.   Is photographic comparison, in your studies

12   with LEVA, is that a sub discipline of your overall

13   forensic video certification that you have?

14   A.   It is a sub discipline of what we do.

15   Q.   Is also a sub discipline if you want to do a

16   height comparison of the individuals, you would go out

17   and do a reverse projection?

18   A.   Yes.

19           MR. BRISSETTE: Your Honor, I believe under

20   Rodgers versus State, 205 S.W.3d 525, specifically at

21   page 527, it discusses what needs to be met under Rules

22   of Evidence 702.

23           And I have Stevenson versus State, which is

24   304 S.W.3d 603, out of the Fort Worth Court of Appeals.

25   It is published on video forensics and the disciplines

77

1   that are involved in it and how experts such as Mr. Van

2   Der Leest would -- their testimony would have actually

3   assist the trier of fact in deciding the case.

4           THE COURT:  Do you have any additional

5   questions, Mr. Cummings?

6           MR. CUMMINGS:  No, Your Honor.

7           THE COURT:  All right.  Now, with regard to

8   the -- the purpose of the proffer that's contained

9   within State's Exhibit 446 --

10           MR. BRISSETTE:  Yes, sir.

11           THE COURT:  -- what is the purpose behind

12   these -- the exhibit, if you can state it?

13           MR. BRISSETTE:  Sure.

14           The attack -- or the voir dire has been

15   from the Defense -- and it's been carried on through

16   jury selection -- that if there are issues with the

17   statement or if a statement is challenged, that they --

18   I anticipate there will be a Jury Charge of they can

19   disregard the items in the statement, have to consider

20   the case based on everything other than what's in the

21   statements themselves.

22           So the State has to prove up identity

23   throughout the process that Mr. Hummel is one and

24   same that did these acts and was pertained -- or

25   portrayed on these in his flight.  If we're talking

78

1   about the Mac Tool shirt, either when he gets his boots

2   and goes to Oceanside for the other events that are

3   contained therein, it goes to the identity of the

4   individual.

5           And we're working two prongs here, Judge,

6   not knowing what the -- the final Court's Charge is

7   going to be.  And it's a way for us, through the

8   forensic process, to rule out all inconsistencies.

9           I believe Mr. Van Der Leest would tell the

10   jury and tell the Court he found no inconsistencies.

11   There are class characteristic consistencies throughout,

12   and there are actually several unique consistencies

13   throughout the images, that being the tattoo on the

14   right forearm.  And that's linking the individual

15   together, because I think if you recall Mr. Van Der

16   Leest's direct testimony when he was talking about the

17   Walmart videos, we refer to the person as a person of

18   interest because of the quality.  You're not actually

19   making a facial recognition ID.  You're ID --

20   identifying the clothes that have already been admitted

21   in evidence and coming up with whether or not there's

22   consistencies or inconsistencies.

23           You've seen the image quality.  We're down

24   to looking at pixels that are other than the face for a

25   person such as Mr. Van Der Leest to make a call, and

79

1  that's the proffer on this.

2      THE COURT:  All right.  The Court finds

3  that State's Exhibit 446 should be admitted for the

4  following reasons:  Based upon the review of the

5  testimony, the information that's contained within 446

6  perhaps would be of a clarifying value for the jurors

7  because it identifies the specific clothing that's

8  unique or has unique characteristics that was worn

9  allegedly by the Defendant on the days in question in

10  December, 2009.

11      As a result, the information that is

12  proffered by the State for the purposes of identifying

13  those characteristics that might otherwise escape the

14  notice of the jurors would be helpful.  It is also the

15  State's responsibility to prove the case beyond a

16  reasonable doubt.

17      As a result of those burdens and -- and the

18  reasons that I've discussed, those -- the testimony of

19  Mr. Van Der Leest should be and will be admitted as well

20  as State's Exhibit 446.

21      Are there any other findings -- or

22  objections that you may have, Mr. Cummings, Mr. Moore?

23      MR. MOORE:  Just can we have a continuing

24  objection to all the testimony?

25      THE COURT:  Yes, you may.

80

1      MR. MOORE:  On that same basis that was

2  enunciated?

3      THE COURT:  All right.  And have I

4  addressed all your objections?

5      MR. MOORE:  Yes, Judge.

6      THE COURT:  All right.  All right.  Let's

7  go ahead and take our lunch recess, and let's be back in

8  an hour.

9      (Recess from 12:27 p.m. to 1:35 p.m.)

10      (Open court, Defendant present, no jury)

11      THE COURT:  Both sides ready to proceed?

12      MR. BRISSETTE:  State's ready.

13      MR. CUMMINGS:  Yes, Your Honor.

14      During the break, I visited with Mr. Gill

15  and Mr. Brissette regarding an exhibit or set of

16  exhibits I anticipate we'll be seeing introduced here

17  shortly, and I thought that we could deal with the

18  Defense objections to those proposed exhibits.

19      And I'm talking about 229B through F, I

20  think, Your Honor.  They were offered through the

21  MetroPCS custodian and introduced for purposes of the

22  record only at that time.  Mr. Brissette has amended his

23  original exhibits trying to address some of my

24  complaints about the subject matter, and I'd like to

25  deal with my objections to what he has come up with with

81

1  his amendments or revisions, whichever word you choose.

2      THE COURT:  Before we go any further, let

3  me make sure I understand.  Who's going to be the

4  sponsoring witness in 229B1 through B -- I'm sorry --

5  229B through E1?

6      MR. BRISSETTE:  The sponsoring witness,

7  Your Honor, would have been the custodian from MetroPCS

8  when he put the initial records in.  We have since done

9  redactions to those, and the remaining items, I believe,

10  are subject to the original offer from the custodian,

11  who was here last week as to the entirety of it.

12      We have redacted out stuff that the Defense

13  told us they would object to, and I think we have

14  exhibits that are in a presentation format for all

15  purposes before the jury for 29E-1 and 29C-1.  Those

16  belong to Joy Hummel's phone.

17      And there's one remaining phone number with

18  respect to 29C-1 that Mr. Van Der Leest is familiar

19  with, belongs to one Trish Murphy.  With that, the

20  numbers that are highlighted and contained in that

21  exhibit have all been identified.  At that point, once

22  Mr. Van Der Leest says that in front of the jury,

23  they've all been identified in open court.

24      So what's left in here has been identified

25  for the jury.  The phone numbers that are left in 29E-1

82

1  have also all been identified in open court through

2  testimony.

3      THE COURT:  Okay.

4      MR. BRISSETTE:  With respect to --

5      THE COURT:  Let me ask some questions first

6  off so I can just get clear.  All right.  Let's look at

7  29 -- 229B1.  Okay.  The number, 817-770-3723, and who

8  is that related to?

9      MR. BRISSETTE:  Are we looking in Bravo 1,

10  Judge?

11      THE COURT:  Yes.

12      MR. BRISSETTE:  3723 is Joy Hummel.

13      THE COURT:  And who is the one that

14  identified Ms. Hummel's phone number?

15      MR. BRISSETTE:  Ms. Hummel's phone number

16  was identified by a gentleman by the name of Chris

17  Paris.  And you'll see, if you look at Ms. Hummel's

18  records, which are text messages in 29E-1, you'll see

19  that Mr. Paris' phone number and Ms. --

20      THE COURT:  I'm sorry.  Slow down.

21      Okay.  What's the phone number that you're

22  referring to at this point?

23      MR. BRISSETTE:  Mr. Paris' phone number --

24  you're asking how do I identify --

25      THE COURT:  Yes.

83

1  MR. BRISSETTE: -- Ms. Hummel's phone

2  number?

3  THE COURT: And I already have Ms. Hummel's

4  identified through Mr. Paris.

5  MR. BRISSETTE: Correct. I was just

6  showing the Court through the records how we linked that

7  together with Mr. Paris, and that was actually done in

8  29C1 with Mr. Paris and Ms. -- Mrs. Hummel exchanging

9  text messages.

10  THE COURT: Okay. So with regard to the

11  others that you're identifying?

12  MR. BRISSETTE: (817) 212-8181 has been

13  identified.

14  THE COURT: Who does that belong to?

15  MR. BRISSETTE: That belongs to Ms. Kristie

16  Freeze.

17  THE COURT: And what testimony has

18  identified that number with Ms. Freeze?

19  MR. BRISSETTE: Redirect examination of

20  Chris Paris after Defense asked Mr. Paris if he ever

21  made phone contact with Ms. Freeze.

22  There has also been testimony and -- and an

23  exhibit, Judge, that I only have one copy of which is

24  229F-1 that Mr. Paris also identified Ms. Freeze's phone

25  number and -- and if you'll recall in 29F-1 -- 229F-1,

84

1  that is subscriber information that the custodian from

2  MetroPCS testified to.

3  At sidebar, Defense asked us to remove the

4  MIN numbers from that and strike Mrs. Freeze's address,

5  and they wouldn't have further objection to it, and

6  that's what's listed in 229F-1. The redactions have

7  been made in accordance with the instructions I received

8  at the sidebar.

9  THE COURT: And that color coding remains

10  consistent throughout all the exhibits?

11  MR. BRISSETTE: Yes, Your Honor.

12  THE COURT: Okay.

13  MR. BRISSETTE: The next number, if we're

14  looking at B, as in boy, 1229B1 (sic) would be that

15  number of (682) 558-3863. Mark Porter from our office

16  identified that number to belong to a Gretchen Bow.

17  And then the last number that -- in the

18  translation key in Exhibit B1 of 229, (817) 323-7667,

19  was testified to by the owner of that phone number at

20  the time, Chris Paris. So I believe in 229B1, we have

21  identified all the phone numbers that are left and

22  highlighted throughout the document.

23  Those numbers that are not contained in the

24  translation key at the top have been stricken from the

25  record, and the lines remain with the blue line number

85

1  to the left of it and gray boxes filling in the fields

2  where those phone numbers, any reference to date and

3  time, source, destination or message have been removed,

4  as indicated throughout the exhibit.

5  THE COURT: All right. Now, based upon

6  the -- the representation of the State, Mr. Cummings, do

7  you have any objections?

8  MR. CUMMINGS: We're dealing with the

9  Exhibit 229B-1 only at the moment, aren't we, Judge? Is

10  that what you're asking me?

11  THE COURT: Yes, B1.

12  MR. CUMMINGS: The -- these are text

13  messages, Your Honor.

14  THE COURT: Well, first off is that -- let

15  me address this part with you. The numbers that have

16  been identified through the testimony of Mr. Paris, Mr.

17  Harris, Ms. -- Mark Porter, those -- that testimony has

18  identified and authenticated those numbers associated

19  with those individuals on those dates, correct?

20  MR. CUMMINGS: Mark Porter indicated that

21  he had reviewed records or something like that, and he

22  associated those numbers with those names.

23  THE COURT: All right. Now, with regard to

24  Mr. Paris, he had personal knowledge of those phone

25  numbers, and he identified them through the course of

86

1  his testimony, correct?

2  MR. CUMMINGS: He identified Joy's and --

3  THE COURT: And Mr. Hummel.

4  MR. CUMMINGS: And his own, and he -- he

5  may have done Mr. Hummel.

6  THE COURT: Okay. Now, with regard to Mr.

7  Paris, he testified and identified his number, correct?

8  MR. CUMMINGS: Yes.

9  THE COURT: All right. So there's no

10  outstanding numbers that have not been identified

11  through the various pieces of testimony at this time?

12  MR. CUMMINGS: Identification, correct.

13  THE COURT: Now, for the purposes of the

14  record, that's been properly authenticated by the

15  records custodian pertaining to those phone calls, and

16  the State has redacted those other conversations that

17  are not pertinent or relevant to the case.

18  MR. CUMMINGS: To some extent.

19  THE COURT: All right. Do you have any

20  specific objections to any passages that you believe are

21  not relevant? I'll consider them now at this point.

22  MR. CUMMINGS: Thank you, Judge.

23  The lady, Gretchen Bow, we object to her

24  being included in this exhibit. She has -- her name was

25  brought up, and Mr. Porter was -- Mr. Porter or Mr.

87

1  Paris, I cannot remember who the witness was -- was
2  merely asked does this number belong to this person. If
3  you'll look, Your Honor, the --
4          THE COURT: Which -- which one are you
5  referring to?
6          MR. CUMMINGS: B1.
7          THE COURT: Thank you.
8          MR. CUMMINGS: That's -- that's -- that's
9  why I wanted to do this outside the presence. It's very
10 detail oriented stuff here.
11         She's identified with purple. That's
12 probably not the right color, but that's what I'm going
13 to call it, (682) 558-3863. My objection to anything in
14 this document pertaining to her is a right to confront
15 the witness. This is hearsay. It's not even relevant.
16 They haven't established any sort of relevance.
17         This is for the benefit of the Court. This
18 is allegedly a exotic dancer with whom there was some
19 apparent communication between John Hummel and her.
20 This is being offered to -- as character evidence, and
21 we haven't heard from her. We don't know who she is --
22 who she is. I -- I identify her as an exotic dancer
23 merely because Mr. Brissette informed me that that's who
24 she is or what she is.
25         THE COURT: Okay. Mr. Brissette, how is

88

1  that relevant to this case regarding Ms. Gretchen Bow?
2          MR. GILL: Judge, if I could address that?
3          THE COURT: Yes.
4          MR. GILL: It's motive evidence. Mr.
5  Hummel tells us on the interview that he gave
6  Investigator Rizy in San Diego that he wanted to be
7  single. And it's our theory that one of the reasons he
8  wanted to be single is so he could pursue women like
9  Gretchen Bow, who he's obviously pursuing, as you can
10 see from the text of the text messages that's included
11 in the exhibit.
12         We're not offering those items for the
13 truth of the matter asserted, so they're not hearsay.
14 We're offering -- offering them to show that those
15 conversations were took -- took place and those
16 statements were made by the Defendant.
17         So the relevance is motive. There's no
18 hearsay implication because we're not offering it for
19 the truth of the matter asserted. And we're not
20 offering it for character. We're offering it for
21 motive.
22         MR. CUMMINGS: Your Honor?
23         THE COURT: Yes, sir.
24         MR. CUMMINGS: If -- throughout the State's
25 opening statement, they identified the object of their

89

1  motive, their proof of motive, and that is Kristie
2  Freeze. She's the only one identified. She is
3  identified in the videotaped statement taken in San
4  Diego on 12/20/09 of John Hummel, and he specifically
5  says Kristie Freeze on that tape.
6          Gretchen Bow is never mentioned anywhere
7  else throughout the evidence of this case other than
8  these text messages and the questions asked of the
9  witness -- I think it was Porter -- that identified her.
10         Further, Gretchen Bow is in the text
11 messages beginning on 11/13/09 and continuing through
12 the early -- or no, not just early -- continuing through
13 November. And it appears that the last entry is on
14 12/5/09 if I've -- so it's not relevant to the conduct
15 that this case is about. The time period is remote.
16 It's before -- several days before. It has nothing to
17 do with...
18         THE COURT: State, do you have a response
19 to what the Defense has just urged other than what
20 you've already previously stated?
21         MR. GILL: Well, just a -- just
22 timeframe-wise, Mr. Hummel tells us on that interview in
23 San Diego that his motive began a couple of months
24 before he gave the statement in San Diego, so this is
25 all relevant as far as time frame goes.

90

1          THE COURT: All right.
2          MR. MOORE: Judge, we have one --
3          THE COURT: Mr. Moore, I have a tentative
4  conclusion if you'd like to listen to it to exclude the
5  testimony regarding those exhibits. Do you want to urge
6  anything else?
7          MR. MOORE: Well, I -- we're talking about
8  Gretchen Bow. I've got an objection to everybody,
9  Kristie Freeze's --
10         THE COURT: All right.
11         MR. MOORE: -- testimony as well. While
12 we're talking about it, I want to make sure.
13         You know, Mr. Gill has indicated that this
14 evidence is being offered to show that the statements
15 were made. I've got two big problems with that. One is
16 they've got evidence that this text was made from that
17 phone, but not any evidence as to who made the -- who
18 texted that message or who received that message.
19         So in that regard they proved up, yeah, a
20 text message was sent to that phone or a text message
21 was received to that phone, but they haven't tied it to
22 any particular individual.
23         The second and the more -- and the more
24 cogent objection with all of these, Mr. Gill's indicated
25 that they're not being offered for the truth of the

91

1   matter asserted, and if they're being offered as motive
2   evidence, then they are. They are being offered for the
3   truth of the matter asserted because that is the basis
4   of the motive, is what they're saying.
5          It is hearsay, and more than that, it's
6   Crawford evidence. It's communicated evidence to which
7   we have a right to confront that person in court. And
8   so we object on the basis of Crawford that we're being
9   denied confrontation of that person that purportedly
10  made that text message.. We don't have the right to
11  cross-examine that person.
12         THE COURT: Well, the Court's opinion is
13  that regarding the conversations or text messages
14  between the Defendant and Gretchen Bow, it ends December
15  5th. And with regard to that, the timelessness is a
16  factor in the Court's opinion and, therefore, the -- the
17  trans -- the communications or the transmittals that are
18  going on between the two should be excluded.
19         Now, with regard to the Defendant
20  communicating with Kristie Freeze and vice versa, the
21  testimony has been thus far that was his motivating
22  factor for committing or allegedly committing the acts
23  of murder, capital murder and, therefore, should be
24  considered by the -- the jury for -- under 404(b) for
25  motive and intent.

92

1          Now, regarding the Crawford objection,
2   State, do you have a response?
3          MR. GILL: My response is we're not
4   offering these matters for the truth of the matter
5   asserted.
6          THE COURT: All right. I'm going to
7   sustain the State's response or overrule your objection
8   based upon Crawford objection, Mr. Moore.
9          Now, State, you will redact or however
10  remove the communications from the Defendant to Gretchen
11  Bow in the exhibits. And I'm examining specifically
12  229B1.
13         Are there any other references to Ms. Bow
14  contained in the other exhibits?
15         MR. BRISSETTE: I believe so, Your Honor.
16         THE COURT: Those also need to be removed.
17         All right. Are both sides ready to proceed
18  with the jury?
19         MR. BRISSETTE: No, Your Honor. We have
20  other exhibits that we need to get a ruling on from you
21  outside the presence because I imagine they're going to
22  have objections.
23         THE COURT: All right. What other exhibits
24  do you want for the Court to take up?
25         MR. BRISSETTE: 229F1 in front of you, we

93

1   would ask that that be admitted in front of the jury for
2   all purposes.
3          229C1 --
4          THE COURT: Just a moment. Let's deal with
5   one exhibit at a time.
6          Mr. Cummings, with regard to 229F1, do you
7   have any objection?
8          MR. CUMMINGS: Your Honor, my -- you have
9   the only copy of that, and that's fine. My
10  understanding is that on -- well, let me just look at
11  it.
12         I have no additional objections to 229F1.
13  From my review of it, it only address those two
14  telephone numbers.
15         THE COURT: All right. 229F1 is admitted.
16         (State's Exhibit No. 229F1 admitted)
17         THE COURT: 229B1?
18         MR. BRISSETTE: Your Honor, that's --
19         THE COURT: Which was -- I was just going
20  to say is that the -- with the changes that I ordered to
21  be made, do you have any other additional objections
22  with regard to 229B1, Mr. Cummings?
23         MR. CUMMINGS: No, Your Honor. We -- we
24  will persist in objecting as the basis of -- that we've
25  already made as far as the right to confront the

94

1   witness. We do believe it's hearsay, and if you
2   overrule our objection, we would like to have a limiting
3   instruction.
4          THE COURT: And I've asked you to prepare
5   one for the Court.
6          MR. CUMMINGS: I -- I can do that, Judge.
7          THE COURT: All right. Now, 229, as
8   directed, will be admitted. In the present form it will
9   not be.
10         MR. BRISSETTE: Yes, Your Honor. The State
11  intends to call that 229B2 or Bravo 2.
12         THE COURT: With the corrections or the
13  changes ordered by the Court.
14         MR. BRISSETTE: Yes.
15         THE COURT: Now, with regard to 229C1.
16         MR. CUMMINGS: Those are some text messages
17  from Joy's phone, Your Honor. I have the same
18  objections. We start at 10/2/09 with communications
19  between -- alleged communications between Mrs. Hummel
20  and John Hummel.
21         There are apparent -- there are phone
22  numbers that are unidentified so far. I believe there's
23  (817) 680-1602 that I don't -- I don't have it in my
24  notes as being identified yet.
25         MR. BRISSETTE: And I think I made the

95

1 proffer that Mr. Van Der Leest knows that to be a person
2 by the name of Trish Murphy.
3          Is that correct, Mr. Van Der Leest?
4          THE WITNESS:  That is correct, sir.
5          THE COURT:  Okay.
6          MR. CUMMINGS:  The objections I have are
7 the same.  They go to relevance of the -- of the remote
8 material as to date from the offense date.  In other
9 words, 10/2/09 is where this record begins, which is
10 over two and a half months prior to the alleged date of
11 the offense.
12          There are -- I don't know who this Chris
13 Murphy is.  We haven't got the ability to confront him
14 and cross-examine him as to the communications that are
15 contained within here.  They're hearsay.  We don't have
16 any knowledge of whether or not these text messages were
17 done by Joy or that they were done by Clyde having
18 borrowed her phone or John having borrowed her phone.  I
19 mean, one device to another, we have no evidence as to
20 who was using the device at that time.
21          THE COURT:  All right.  With regard to Ms.
22 Murphy or Mr. Murphy -- I don't know who -- but it's the
23 number (817) 680-6962.  How is that relevant?
24          MR. BRISSETTE:  Your Honor, Ms. Murphy is
25 here and was going to be a witness this afternoon.

96

1 Rachel is here this morning.  She is the person that
2 will be identifying the living person as Joy Hummel
3 before she was murdered.
4          THE COURT:  All right.  So I'm going to
5 table that for the time being, based upon the State's
6 representations.
7          In regard to 229D1 --
8          MR. CUMMINGS:  The phone calls -- D1 is
9 John Hummel's telephone calls, and that's what's
10 represented in the document.  They start at 10/1/09, so
11 the remoteness objection as far as relevance persists
12 with this document.  These are telephone calls both --
13 both sent and received or called and answered.
14          THE COURT:  State, what's the purpose of
15 you offering these records?
16          MR. GILL:  Well, Your Honor, it's the --
17 it's the same -- same theory we had for admissibility of
18 the text messages.  It's the contact between he and
19 Kristie Freeze and -- and the other individuals that
20 have been identified through testimony.
21          THE COURT:  With regard to Ms. --
22          MR. BRISSETTE:  Judge, the purple phone
23 number --
24          THE COURT:  Yes.
25          MR. BRISSETTE:  -- is being taken out.

97

1 This was something that the State had planned that we
2 were supposed to be talking to Defense Counsel this
3 weekend, and we never heard from Mr. Cummings, or I
4 would have had this done then.  So I'm removing Ms.
5 Bow's phone number from this, and we're reprinting the
6 exhibit downstairs.
7          THE COURT:  All right.  So 229D1 will be
8 modified to remove Ms. Bow's information.
9          And then finally I have 229E1.  State,
10 what's the purpose of you offering E1, and who does
11 that -- and (817) 7701-1823, (sic) who is that
12 associated with?
13          MR. CUMMINGS:  John Hummel.
14          THE COURT:  Thank you.
15          And this is just to record the time frames
16 that he answered the phone; is that correct?
17          MR. BRISSETTE:  Your Honor, I believe if
18 we're dealing with Echo 1, that is Ms. -- that is Ms.
19 Hummel's cell phone records of -- the telephone number
20 is 1823.  Contained in that highlighted in yellow is Mr.
21 Hummel's.
22          The blue in that record is Chris Paris'.
23 As we go further on through the record, line 1309 is
24 identified as Papa John's Pizza, which has been
25 authenticated by the phone number contained in the bank

98

1 records that have been admitted.  Lines 1335 and 1336
2 have been identified as Delaney Elementary School.
3          THE COURT:  Mr. Cummings?
4          MR. CUMMINGS:  My objection to that
5 particular exhibit, Your Honor, is based upon a lack of
6 relevance to the offenses that we are here on trial.
7          THE COURT:  Your objection regarding 229E1
8 is overruled.  229E1 will be admitted.
9          All right.  Are there any other exhibits
10 that we need to discuss at this time?
11          MR. BRISSETTE:  Not from the State, Judge.
12          MR. CUMMINGS:  One of those was tabled,
13 correct?
14          THE COURT:  That is correct, and that's
15 with regard to Ms. -- one of the anticipated witnesses
16 that will be speaking later, and that witness is, once
17 again?
18          MR. BRISSETTE:  Ms. Murphy, Your Honor.
19          THE COURT:  Thank you.  All right.
20          MR. CUMMINGS:  Thank you, Your Honor.  I
21 felt like if we did this now, we'd be more efficient
22 than --
23          THE COURT:  We will see.
24          All right.  Are both sides ready for the
25 jury?

99

1    MR. BRISSETTE:  The State's ready, Your
2  Honor.
3    MR. CUMMINGS:  Yes, sir.
4    THE COURT:  Let's bring in the jury.
5    (Jury present)
6    THE COURT:  You may proceed when you're
7  ready.
8    MR. BRISSETTE:  Your Honor, may the Court
9  inform the jury as to its ruling on 446, please?
10    THE COURT:  Members of the jury, State's
11  Exhibit 446 is admitted.
12    (State's Exhibit No. 446 admitted)
13    THE COURT:  You may proceed.
14    DIRECT EXAMINATION (Cont'd)
15  BY MR. BRISSETTE:
16    Q.  Investigator Van Der Leest, before lunch we
17  started talking about your photographic comparison work.
18  Exhibit 446, is that contained on your laptop as well?
19    A.  It is.
20    MR. BRISSETTE:  Your Honor, with the
21  Court's permission, may we publish 446 using the
22  projector?
23    THE COURT:  You may.
24    Q.  (BY MR. BRISSETTE)  Mr. Van Der Leest, I know
25  that it may sound daunting that there's 59 pages in

100

1  there, but do they actually -- if we were looking at
2  this forensically down in the lab, do certain amount of
3  those slides stack on top of each other as a
4  transparency, if you want to look at it that way?
5    A.  They do.
6    Q.  Can you take us -- are they divided into sets
7  based on your -- how your opinion comes down in this
8  case?
9    A.  They are.
10    Q.  Can you go through the first set for us then?
11    A.  I can.
12      The two images from the E-Z Mart video,
13  these were images taken from the video itself.  The two
14  images that are of the uniform shirt that are on the
15  mannequin, what I'm doing is using the shirts -- the
16  picture taken with the shirt on the mannequin is my
17  known.  The pictures -- the images taken from the E-Z
18  Mart are the unknown.
19      I'm comparing class characteristics of the
20  shirt from the video, the unknown, with class
21  characteristics of the known, specifically, the name
22  tag, the badge, the patch that's on the left shoulder
23  and the epaulets that are up on the shoulders
24  themselves.
25    Q.  Is there a next set of images, sir?

101

1    A.  There is.
2    Q.  Can you show those to the jury?
3    A.  Again, the image on the left is from the
4  Burleson Walmart video.  The image on the right is a
5  photograph we took of the shirt that is in evidence, the
6  front portion of the shirt.  And the arrows point to
7  specific areas of the shirt that are consistent in both
8  of these images.  Again, these are class
9  characteristics.
10    Q.  And that is on slide 14 of 59; is that correct?
11    A.  Correct, sir.
12    Q.  Is there a next grouping?
13    A.  There is.
14    Q.  Can you show that to the members of the jury?
15    A.  Again, the image on the left is from the
16  Burleson Walmart.  Image on the right is the back of the
17  shirt.  The one on the right is our known; the one on
18  the left is our unknown.  And the arrows are pointing to
19  areas within both images that are consistent for class
20  characteristics.
21    Q.  And that -- for reference purposes on 446, is
22  that image 19?
23    A.  It is.
24    Q.  Is there another grouping, sir?
25    A.  There is.

102

1    Q.  Can you show that to the jury?
2    A.  Again, image on the left is from the Burleson
3  Walmart.  Image on the right is the hat that is in
4  evidence sitting on the mannequin.  The lower image is
5  also from the Burleson Walmart.  Again, the arrows point
6  to the class characteristics of the hat being similar in
7  both the known and the unknown.
8    Q.  That's in 2459, sir?
9    A.  Yes, sir.
10    Q.  Is there another set?
11    A.  There is.
12    Q.  Can you show that to the jury?
13    A.  The image --
14    Q.  You're on 34 of -- 35 of 59; is that correct,
15  sir?
16    A.  Yes, sir.  The image on the upper right corner
17  is a still image taken from the ATM video; the image on
18  the left top is an image taken from the surveillance
19  camera video at the Kennedale Police Department; and the
20  image in the center is our known that was taken here at
21  the District Attorney's Office.
22      And this slide just represents that you can
23  see the structure of the emblem in all three, and they
24  are consistent with the same class characteristics.
25    Q.  Is there another set, sir?

1  A.  There is.

2  Q.  Can you take us to that, please?

3       Image 41 of 59, what are we looking at

here, sir?

4  A.  Again we're looking at the hat, more

5  specifically with the arrows that are -- the two sets of

6  arrows that are at the top.  We're looking at specific

7  areas of the known, which is the image on the left,

8  being the -- the dark area that is in the middle of the

9  gray area of the hat.  The bottom arrows simply are

10  pointing out that this is a -- a dark hat with a light

11  band around the head.

12       But the top arrows point to specific

13  locations within that gray image that is on the black

14  hat that is consistent class characteristics for the

15  hat.

16  Q.  Do you have another set, sir?

17  A.  I do.

18  Q.  Can you please show that to the jury?

19  A.  (Witness complies).

20  Q.  51 of 59, what are we looking at here?

21  A.  What we're looking at for our known is the Mac

22  Tools shirt, and on the right we see an image that was

23  taken from the Arlington video after Mr. Hummel left the

24  Kennedale police station.

---

1  to examine Mr. Hummel's right arm?

2  A.  I did.

3  Q.  What did you observe?

4  A.  I observed a tattoo on his right forearm.

5  Q.  Directing your attention to the screen in 446,

6  slide 59, do you have an opinion as to the unique

7  characteristics that are displayed on the screen?

8  A.  Yes.

9  Q.  And what is that opinion?

10  A.  This -- my opinion is that the tattoo is

11  consistent throughout all these images in its location,

12  its shape and its size.

13  Q.  With respect to the general class

14  characteristics you talked about on the first 58 slides,

15  did you find any inconsistencies throughout all the

16  videos that you've looked at and testified about today?

17  A.  I have found no inconsistencies.

18  Q.  Are you familiar in western cultures as to

19  where gentlemen wear a wedding ring?

20  A.  I am.

21  Q.  Have you had a chance to review certain videos

22  in this case to determine whether or not Mr. Hummel had

23  a wedding ring on at some point?

24  A.  I did.

25  Q.  Can you please pull one of those images up for

---

1       We're looking at, on the bottom left, the

2  arrow points to the Mac Tools logo, and on the -- on the

3  known and on the unknown, you can see what appears to be

4  a light colored set pixels in the same location within

5  that shirt.

6       On the right you can see a white set of

7  pixels on the known, and again on the unknown, the white

8  pixels are in that same general location.  And it's

9  consistent within the top -- the top two arrows as well

10  as far as the lettering that makes out the Mac word.

11  Again, these are class characteristics for this shirt,

12  known versus unknown.

13  Q.  And your final eight, sir?  What are we looking

14  at here, sir, for the first set of arrows?

15  A.  Okay.  On the left is images that's taken from

16  the Coast Inn video.  On the right is an image taken

17  from the Kennedale Police Department interview.  And in

18  the middle, again, is our known.

19       And once again, I am using the arrows to

20  point out the class characteristics that are similar

21  with all of these images.

22  Q.  And slide 59, are there unique class

23  characteristics you talked about, I think, before lunch?

24  A.  There are.

25  Q.  Prior to testimony today, did you have a chance

---

1  us on the screen?

2       Let me ask it this way, Mr. Van Der Leest:

3  Can you take us to the video, please?

4  A.  I'll have to open it all up.  I have a still

5  image of those.

6  Q.  You do?  Can you show us the still?

7  A.  Not on here.

8  Q.  Do you have a hard copy?

9  A.  I have hard copies.

10  Q.  And you -- that are already admitted into

11  evidence?

12  A.  They have.

13  Q.  Can you retrieve one from the witness stand

14  there?

15  A.  (Witness complies).

16       MR. BRISSETTE:  Your Honor, may we have the

17  lights?

18  Q.  (BY MR. BRISSETTE)  Mr. Van Der Leest, in

19  State's Exhibit 451 and 456, are you able to determine a

20  metallic object on Mr. Hummel's left ring finger?

21  A.  I am.

22  Q.  And in State's 449, what are we looking at

23  there?

24  A.  You're looking at the left hand and no metallic

25  object.

107

Q. And is that in Oceanside?

A. It is.

Q. Now, when we talk about looking at individual frames like these exhibits here, were you able to look at the video and see if there was any artifacts in those areas of -- of question?

A. I was.

Q. What's an artifact, for the jury's benefit?

A. An artifact would be something that during the compression phase of -- of capturing the video, an artifact would be something where a pixel was -- takes a color from a surrounding area and puts it there when it shouldn't be there.

Q. Were you able to follow frame by frame of the Walmart in which Mr. Hummel purchased his boots?

A. I was.

Q. Were you able to see some class characteristics of the boots that are now in evidence?

A. I was.

Q. And by the boots in evidence, I mean the second sets, the ones he bought on video.

A. Yes.

Q. Do they have some unique color characteristics to the sole of the boot?

A. They have some class characteristics to the

108

sole of the boot, yes.

Q. And is that a different color than the actual sole? Is there some insets?

A. There is.

Q. And what color are the insets?

A. Yellow.

Q. And could you determine that by your review of the video as well?

A. I could.

Q. There's a wallet, I believe, in front of you as well, Mr. Van Der Leest; is that correct?

A. Yes, sir.

Q. Do you have an opinion as to if you open the wallet up now and look at the placement of the credit card you talked about earlier, were you able to see that on the transaction at the Arlington Walmart as well?

A. I was.

Q. Is it consistent with the placement of the card as it sits in the wallet today?

A. It is.

Q. Did you notice anything else about the wallet that caught your eye in review of it?

A. I did.

Q. What was that?

A. Whenever the wallet was opened at the Arlington

109

Walmart, on the left portion of the wallet, you could see to me what appeared to be an image, a photograph of some type, and that is not in here now.

Q. And do you have a still image of that as well?

A. I do.

Q. And which number is that, sir?

A. 459.

Q. And so I'm clear, your still image from Oceanside that's listed as 449, you saw no metallic object consistent with the ring on his left-hand ring finger, correct?

A. That is correct.

MR. BRISSETTE: May I approach the witness, Your Honor?

THE COURT: You may.

Q. (BY MR. BRISSETTE) With respect to State's Exhibit 229C1 and 229E1, are you familiar with Ms. Hummel's -- Mrs. Hummel's cell tower calls or calls and text messages from her phone as prepared in these two exhibits?

A. I am.

Q. Are you familiar with a lady by the name of Trish Murphy?

A. I am.

Q. Do you know Trish Murphy's phone number?

110

A. It is -- not off the top of my head, no.

Q. Is (817) 68 --

MR. CUMMINGS: Your Honor. I'm going to object to him leading his witness.

THE COURT: Sustained.

MR. BRISSETTE: May I show him the exhibit, Your Honor?

THE COURT: You may approach.

Q. (BY MR. BRISSETTE) I'm showing you what's been marked for identification purposes as State's 229C1. Do you recognize the number highlighted in pink in that exhibit?

A. Yes.

Q. And have you spoken to the person who owns that phone number currently?

A. By voicemail.

Q. And who does that person purport to be?

A. Trish Murphy.

MR. BRISSETTE: Your Honor, at this time based on the rulings outside the court (sic), the State would conditionally offer 229E1 and 229C1, tender to Defense.

MR. CUMMINGS: Your Honor, I renew my objections that were made outside the presence of the jury after the lunch hour. I have no additional

1 objections to the ones I already made.

2      THE COURT: 229E1 and C1 are conditionally

3 admitted. Your objection is overruled.

4      (State's Exhibit Nos. 229C1,

5      229E1 admitted)

6      THE COURT: You may proceed.

7   Q.  (BY MR. BRISSETTE) Thank you, Investigator Van

8 Der Leest.

9      MR. BRISSETTE: We pass the witness, Your

10 Honor.

11      THE COURT: Cross-examination?

12      MR. CUMMINGS: May I approach, Your Honor?

13      THE COURT: You may.

14      CROSS-EXAMINATION

15 BY MR. CUMMINGS:

16   Q.  In your direct examination with Mr. Brissette,

17 you were talking about a photograph -- you were

18 identifying a photograph regarding ring -- a wedding

19 ring, or whatever. Is that this photograph here?

20   A.  No, sir.

21   Q.  459? Would you -- is it 451?

22   A.  451 and 456 have the ring; 449 does not.

23   Q.  Did you -- thank you.

24   A.  Yes, sir.

25   Q.  449 is taken from a -- it's a captured still

---

112

1 from the video at the Coast Inn, correct?

2   A.  Yes, sir.

3   Q.  Is that the best quality you have?

4   A.  Yes, sir.

5   Q.  Did you use any -- in doing your work with the

6 videos, you have specialized software and specialized

7 computer equipment to deal with frame by frame and that

8 sort of thing, correct?

9   A.  Yes, sir.

10   Q.  As far as enhancing this so that it would be

11 clearer, whether or not he's wearing a ring or not, does

12 your software or your equipment do that for you?

13   A.  I'm sorry. Could you repeat the question?

14   Q.  As far as enhancing the photograph -- I -- I

15 assume, since you've offered this as an exhibit, this is

16 the best we get, correct, as far as clarity of this

17 particular still?

18   A.  That's a pretty good image, yes, sir.

19   Q.  Okay. Do you say that because you're familiar

20 with the quality of the source?

21   A.  I -- I am, yes, sir.

22   Q.  It's certainly not as clear as if I took your

23 photograph right now with a camera, is it?

24   A.  That is correct.

25   Q.  All right. So that's all relative, pretty good

---

114

1 image.

2      You talked about the wallet that you have

3 there on the counter next to you. You-all got this out

4 of John's property, did you not?

5   A.  Yes, sir.

6   Q.  Now, you indicate that there is a --

7 photograph that's visible in -- in the -- in one of the

8 images that you have offered before this jury, correct?

9   A.  Correct.

10   Q.  That photograph was -- which -- what context

11 are we talking about?

12   A.  Whenever -- in the image from the Arlington

13 Walmart, whenever the wallet is opened, on the left side

14 of the wallet, you can see what appears to be an image

15 of a picture.

16   Q.  There's no photo compartment in this wallet, is

17 there?

18   A.  There is not.

19   Q.  Okay. No plastic sleeves in which somebody

20 could -- could place a photograph if they had one,

21 correct?

22   A.  That is correct.

23   Q.  There is no physical evidence to indicate that

24 there ever was any such item in this particular State's

25 Exhibit 462, correct?

---

114

1   A.  That is correct.

2   Q.  You got that out of -- from the Sheriff's

3 Department?

4   A.  Yes, sir.

5   Q.  John arrived here in the custody of the

6 Sheriff's Department December 31st, 2009, is that

7 correct, or do you know?

8   A.  That is correct.

9   Q.  John was placed into the custody of the Tarrant

10 County jail, and his property was put in their

11 possession -- the Sheriff's Department's possession

12 until you-all recovered it yesterday, correct?

13   A.  Yes, sir.

14   Q.  Prior to John coming here, he didn't have the

15 full ability to control his person nor the things on his

16 person, did he? He was in custody, wasn't he?

17   A.  Yes, sir.

18   Q.  I mean, we have seen depicted on this large

19 screen the fact that one of your partners or one of the

20 supervisors in your office, Chief Rizy, actually talked

21 to John while he was in custody on the 20th of December,

22 2009. At that time he didn't have possession of that

23 exhibit, did he?

24   A.  No, sir.

25   Q.  He was in jail clothes when he was talking to

115

1   those three investigators?

2   A.   That is correct.

3   Q.   We saw video of John being -- and we heard
testimony from a border patrol officer that John was, in
fact, taken into custody at that point.  So from the
point that he was taken into custody by border patrol,
he's been in custody ever since, has he not?

8   A.   Yes.

9   Q.   He's been transferred from agency to agency,
and the items that one would normally have control over,
such as your wallet, are actually secured for
safekeeping or for whatever purpose by law enforcement
authorities that have that individual in custody,
correct?

15   A.   That is correct.

16   Q.   The videos that you have put before the jury
today are videos that you went to various locations and
obtained from businesses that nowadays use those videos
all the time, correct?

20   A.   Yes.

21   Q.   Primarily for security purposes, both internal
and external, correct?

23   A.   Yes.

24   Q.   As a matter of fact, your office has created
the lab that you and your partner run because of the

116

1   prevalence of video in our culture now, correct?

2   A.   Yes.

3   Q.   But one of the things that you do is you
take -- and in the case of Walmart, what the jury saw is
not what you got when you picked up those tapes, when
you did -- and if you want me to ask that a little
more -- I see your -- your lack of comfort there.

8        Okay.  When you picked up those tapes, they
weren't in the edited version the jury saw?

10   A.   That is correct.

11   Q.   You actually, from Walmart, get a series of
several videotapes that you have edited for them and
combined all into one exhibit.

14   A.   That is correct.

15   Q.   So each time you went to one of these places,
particularly Walmart, but not just Walmart, E-Z Mart
does the same thing, they have multiple cameras going at
any one time, and when you ask for the evidence from
them, we get perhaps a stream of several cameras or
several videos being played at the same time?

21   A.   That is correct.

22   Q.   The presentation that you-all have made here is
one that you have, in a sense, created.  I mean, they
don't have those circles identifying a particular
individual on their videos that they provided you, do

117

1   they?

2   A.   That is correct, they do not.

3   Q.   One of your jobs is to make things to edit, to
make it clearer for the consumer or whatever, to present
your package in the best possible way.  All accurate?

6   A.   Yes, sir.

7   Q.   Your -- I'm sorry.  You brought us so many
different things, it takes me a minute.

9        You showed us a graph of tape that came in
through, I think, Mr. Porter, your partner.  Mr. Barry's
work?

12   A.   Correct.

13   Q.   Is that his name, Barry?

14   A.   Yes, Barry Dickey.

15   Q.   And just to kind of hopefully put an end to
that, you're the one that got Barry Dickey involved,
correct?

18   A.   Correct.

19   Q.   However, he didn't come here to tell us how he
went about doing what he did.  You've attempted or have
done that today or yesterday -- I don't remember
which -- correct?

23   A.   I think that's incorrect.

24   Q.   Okay.  Correct me.

25   A.   This, what you're showing now, is a visual

118

1   representation of the waveforms from the original file
at the bottom, 220F, and a representation of the
waveform after Mr. Dickey's work of 220D.

4   Q.   And this appears to be a very noisy
environment, correct?

6   A.   Yes, sir.

7   Q.   And, in fact, was why you sent it to Mr.
Dickey, correct?

9   A.   Yes, sir.

10   Q.   Now, what we got back had some conversation
cleaned up without the diesel noise in the background,
best he could do, right?

13   A.   Yes, sir.

14   Q.   But, in fact, there is a period that, for
whatever reason, it's just dead space.  And the point of
all this is some of it couldn't be cleaned up to the
point where we had conversation.  It was just dead air
or whatever; is that fair?  Or would you like to say it
in your own words?

20   A.   Well, the -- the dead air, I believe we figured
out exactly why that is.

22   Q.   There is a very loud engine in the background
and there are two men conversing.  We have as much as of
their conversation as could be captured by your expert?

25   A.   That is correct.

119

1    Q.   Okay.  Whether or not there were additional
2  conversations, he did what he could to get what he --
3  what was played for the jury?
4    A.   That is correct.
5    Q.   Okay.  This exhibit that's still up in front of
6  the jury right now, State's Exhibit 446, correct?
7    A.   Yes, sir.
8    Q.   You -- you're merely highlighting observations
9  that you made in your lab by having the actual garment
10  there and looking for similarities within the videos
11  that you've presented to this jury, correct?
12    A.   Not only similarities but differences as well.
13  I'm looking for both.
14    Q.   But you didn't point out any differences, and
15  you actually said you didn't find any?
16    A.   Correct.
17    Q.   Okay.  So -- these are observations that you
18  made and have presented to the jury.  I mean, you did it
19  with your own eyes, you got years of experience as a law
20  enforcement officer, and the training that you have as
21  far as video, that had nothing -- that had nothing to do
22  with the observations you made.  You made those
23  observations with your vision without the benefit of any
24  measuring devices and have pointed out to the jury those
25  observations through this exhibit, correct?

120

1    A.   Correct.
2    Q.   Okay.  Metadata.  That is -- is that the date
3  that we are seeing at the bottom of some of these
4  devices -- or some of these exhibits?
5    A.   Yes, it's a portion of the metadata.
6    Q.   Okay.  So define metadata for me?
7    A.   Video travels in three streams:  Audio, video,
8  and there's a metadata that goes along with it.  It --
9  it can tell the audio and video how to sync.  It can
10  tell it when to play, when not to play; and it can be
11  graphically displayed on the screen, as we've seen in
12  the video with the date and the time or frame rate or
13  whatever the -- the software engineer wants the metadata
14  to be.
15    Q.   Okay.  So it's a lot more than just the date
16  and time indicated on the screen?
17    A.   It can be, yes.
18    Q.   Okay.  Well, let me talk about just the date
19  and time that we saw in some of the videos.
20        And you're familiar with all the videos in
21  this case and even the ones from Unit 47 and Unit 51,
22  correct?
23    A.   I am.
24    Q.   The date and time that's indicated on the
25  bottom of the screen, that's dictated by the recording

121

1  equipment, true?
2    A.   Can be.
3    Q.   Okay.  I guess what I'm getting at -- and let
4  me just jump to the -- to what I'm getting at, and you
5  tell me.
6        For instance, Unit 47, Unit 51, the
7  evidence before the jury is that, you know, there's a
8  certain time and date indicated on that VHS tape.  Well,
9  at the very same time that 47's recording, 51 may be
10  recording, and the date and time indicated on it may be
11  slightly different?
12    A.   That is correct.
13    Q.   Okay.  So just because we have made -- metadata
14  doesn't necessarily mean it is a hundred percent
15  accurate or correlated.  One tape is not going to
16  necessarily translate to another?
17    A.   That is correct.
18    Q.   The bits of video from California is Pacific
19  Time, is it not, or do you -- can you assume that?
20    A.   I can assume that.
21    Q.   Okay.  So the point is is that you got to
22  calibrate these things, and they're not necessarily
23  synchronized?
24    A.   That is correct.
25    Q.   Okay.  Thank you, sir.

122

1        MR. CUMMINGS:  I'll pass the witness, Your
2  Honor.
3        THE COURT:  Redirect?
4        MR. BRISSETTE:  Your Honor, at this time
5  the State would tender to Defense Counsel State's 468,
6  business records affidavit of the jail records from the
7  San Diego County Jail that have been filed back in
8  December of 2010 pursuant to the Rules of Evidence.  We
9  offer them for the record only at this point
10        MR. CUMMINGS:  Your Honor, we have no
11  objections to this being offered for the record only at
12  this point.  If it's -- if we go further than that,
13  we'll have to revisit.
14        THE COURT:  State's Exhibit 468 is admitted
15  for the record only.
16        (State's Exhibit No. 468 admitted)
17        THE COURT:  State, you may proceed.
18        MR. BRISSETTE:  May I approach the witness,
19  Your Honor?
20        THE COURT:  You may.
21        REDIRECT EXAMINATION
22  BY MR. BRISSETTE:
23    Q.   Mr. Van Der Leest, I'm going to direct your
24  attention to State's 468 to an item and ask you to
25  compare it to an item that's been marked for

123

1 identification purposes as State's 469 and see if
2 they're not one and the same.
3    A.  I do see some variances in the two, some
4 differences in the two.
5    Q.  Is the center of 469, does it have some
6 security features to it to blot out certain areas?
7    A.  Yes.
8    Q.  Certain areas that -- Social Security number
9 and other things that -- identification are redacted?
10    A.  Yes.
11    Q.  Okay.  With respect to the bottom of 469, have
12 you had a chance to compare it to the page in the
13 records that have been admitted for the record only?
14    A.  I have.
15    Q.  And do you see an area where it indicates
16 whether or not there's a ring present as part of the
17 property?
18        MR. MOORE:  Objection, calls for a hearsay
19 response; testifying from a document that's not in
20 evidence.
21        MR. BRISSETTE:  Judge, I'll be happy to
22 rephrase.
23        THE COURT:  Sustained.  First off, I'll
24 sustain the objection.  Rephrase.
25    Q.  (BY MR. BRISSETTE)  Without going into the

125

1 Department?
2    A.  Yes.
3    Q.  Was it in the sealed bag with the wallet, the
4 keys and the boot laces to the boots that have been
5 admitted into evidence?
6    A.  The bag was not sealed whenever I retrieved it.
7    Q.  Does it have an individual's name at the top?
8    A.  It does.
9    Q.  And who?  And you recognize that individual's
10 name?
11    A.  I do.
12    Q.  Does it have a date of birth that you're
13 familiar with?
14    A.  Yes.
15        MR. BRISSETTE:  We'd offer 469 at this
16 time, Your Honor, for the record only.
17        MR. CUMMINGS:  Your Honor, again, it's for
18 the record only.  We have no objections to coming into
19 the record.  We don't want to waive any objections we've
20 made prior in the pretrial --
21        THE REPORTER:  I couldn't hear the last
22 part.
23        MR. CUMMINGS:  We don't intend to waive any
24 objections we made at pretrial, but since it's being
25 offered for the record only, we have no objection to it

124

1 answer, is there a section on the property sheet to note
2 whether or not an individual presents with any rings?
3    A.  Yes.
4    Q.  Is there a section on the sheet to know if an
5 individual presents with any watches?
6    A.  Yes.
7    Q.  Is there a section on the sheet that -- to show
8 if an individual presents with any -- any United States
9 currency?
10    A.  Yes.
11    Q.  And is there a section for the individual
12 that's being booked into a facility to sign their name?
13    A.  Yes.
14    Q.  Do you see a signature of an individual on 469?
15    A.  No.
16    Q.  Do you see it on 468 in the records?
17    A.  Yes.
18    Q.  And both -- without going into -- is there an
19 indication whether or not there's a ring?
20        MR. MOORE:  Objection.  It's calling for
21 him to testify from a document that's not in evidence.
22 It would be an answer based on hearsay.
23        THE COURT:  Sustained.
24    Q.  (BY MR. BRISSETTE)  Did you retrieve 469 as
25 part of your subpoena request to the Sheriff's

126

1 being put into the record.
2        THE COURT:  All right.  State's Exhibit 469
3 for the record only is admitted.  May I see it?
4        (State's Exhibit No. 469 admitted)
5        THE COURT:  You may proceed.
6        MR. BRISSETTE:  Your Honor, I don't know if
7 this has been offered in front of the jury in its
8 current state.  The State would offer 229F1 for all
9 purposes, tender to Defense.
10        MR. CUMMINGS:  Your Honor, I've seen it.
11 It's the one we dealt with at the pretrial hearing, and
12 I believe that I have no additional objections to 229F1.
13        THE COURT:  All right.  229F1 is admitted.
14 Your objection is overruled as dealt with during the
15 pretrial.
16        (State's Exhibit No. 229F1 admitted)
17    Q.  (BY MR. BRISSETTE)  Investigator Van Der Leest,
18 in 229F1, there are several colors of -- of highlight in
19 that document, are there not?
20    A.  There are.
21    Q.  Do you see a phone number highlighted in
22 yellow?
23    A.  I do.
24    Q.  And can you tell us the name associated to that
25 as listed in the MetroPCS document?

1   A.   Joy Hummel.

2   Q.   Is there a number highlighted in green?

3   A.   There is.

4   Q.   And who is that number associated to?

5   A.   Joy Hummel.

6   Q.   Is there a billing address?

7   A.   There is.

8   Q.   What is the billing address?

9   A.   600 Little School Road, Kennedale, Texas

10  76060-5408.

11  Q.   In your course of your investigation, have you

12  come to know the -- who is assigned to the number in

13  yellow in the Hummel family, or do you need the other

14  exhibits to link that up?

15  A.   Yes, please.

16  Q.   Let's go with the -- the number highlighted in

17  red.

18  A.   Okay.

19  Q.   Have you come to know that phone number?

20  A.   I have.

21  Q.   And whose phone number is that listed in 29 --

22  229F 1?

23  A.   Kristie Freeze.

24  Q.   Thank you.

25       MR. BRISSETTE:  Pass the witness.

1        THE COURT:  Cross-examination?

2        MR. CUMMINGS:  We have nothing further for

3   Mr. Van Der Leest.

4        THE COURT:  All right.  May he be finally

5   excused?

6        MR. MOORE:  Subject to recall, but he can

7   be excused.

8        THE COURT:  All right.  Mr. Van Der Leest,

9   you know the rules.  Don't talk about your testimony

10  with anybody other than the lawyers or discuss it with

11  any other witnesses.

12       THE WITNESS:  Yes, sir.

13       THE COURT:  You may step down.  Thank you,

14  sir.

15       (Witness retires)

16       THE COURT:  State, call your next witness.

17       MR. GILL:  We call Kristie Freeze.

18       THE COURT:  Kristie Freeze.

19       (Witness enters courtroom)

20       THE COURT:  Ms. Freeze, would you please

21  come up?

22       Ms. Freeze, would you raise your right

23  hand?

24       (Witness sworn)

25       THE COURT:  Please be seated, ma'am.

1   Please pull the microphone to you.

2        State, you may proceed when you're ready.

3             KRISTIE FREEZE,

4   having been first duly sworn, testified as follows:

5             DIRECT EXAMINATION

6   BY MR. GILL:

7   Q.   Would you tell the jury your name, please?

8   A.   Kristie Freeze.

9   Q.   And, Ms. Freeze, are you currently employed?

10  A.   Yes, sir.

11  Q.   And what city do you work in?

12  A.   Cleburne.

13  Q.   What city do you live in?

14  A.   Joshua.

15  Q.   How long have you lived in Joshua?

16  A.   Since I was 16.

17  Q.   And approximately how old are you now?

18  A.   27.

19  Q.   So you've been living in Joshua for

20  approximately 11 years?

21  A.   Yes, sir.

22  Q.   Do you have children?

23  A.   One.

24  Q.   And is that a male child or female child?

25  A.   Female.

1   Q.   And how old is she?

2   A.   She's seven.

3   Q.   Would you do me a favor?  Would you spell your

4   name for the record, please?

5   A.   K-r-i-s-t-i-e, F-r-e-e-z-e.

6   Q.   Before being employed at your current job, how

7   were you employed?

8   A.   At E-Z Mart.

9   Q.   What is E-Z Mart?

10  A.   It's a convenience store.

11  Q.   And where is that E-Z Mart convenience store

12  located?

13  A.   In Joshua.

14  Q.   And is it located on a -- on a major street or

15  road in Joshua?

16  A.   174.

17  Q.   And where is Joshua in relation to Fort Worth?

18  A.   About 20 minutes south.

19  Q.   Is it between Burleson and Cleburne?

20  A.   Yes.

21  Q.   Is there a restaurant in Joshua, Texas, by the

22  name of Huddle House?

23  A.   Yes.

24  Q.   And where is Huddle House located in relation

25  to the E-Z Mart where you're employed?

131

1    A.   Further south.

2    Q.   Approximately how far?

3    A.   About a mile.

4    Q.   And you said you also lived in Joshua for about
5  11 years.  Have you lived in an apartment complex in
6  Joshua?

7    A.   Yes, I do.

8    Q.   In December of 2009, were you living in an
9  apartment complex in Joshua?

10    A.   Yes.

11    Q.   And approximately where in Joshua is that
12  apartment complex located?

13    A.   540 North Main Street.

14    Q.   Where is it in relation to the Huddle House?

15    A.   Right behind it.

16    Q.   So it's located very close to the Huddle House?

17    A.   Yes.

18    Q.   Is Main Street the same thing as Highway 174?

19    A.   No, it branches off.

20    Q.   So they -- so where you live, are they parallel
21  to each other?

22    A.   Yes.

23    Q.   And that Huddle House is located on 174; is
24  that right?

25    A.   Yes.

132

1    Q.   And were you employed at the -- how long were
2  you employed at the E-Z Mart?

3    A.   For about a year and a half.

4    Q.   Would that have included the time period of the
5  fall of 2009?

6    A.   Yes.

7    Q.   Were you employed at the E-Z Mart in December
8  of 2009?

9    A.   Yes.

10    Q.   Did the E-Z Mart have a store number?

11    A.   I don't remember it.

12    Q.   It did have a store number, though, didn't it?

13    A.   Yes.

14    Q.   But you don't remember what the store number
15  was?

16    A.   Yes.

17    Q.   Now, while you were employed by the E-Z Mart,
18  what were your job duties?

19    A.   Same as a regular cashier, stock, clean, take
20  care of customers, place orders for inventory.

21    Q.   So basically, were you a clerk in a convenience
22  store for the -- for the E-Z Mart folks?

23    A.   Yes.

24    Q.   And while you were working at the E-Z Mart
25  located in Joshua, did you happen to meet an individual

133

1  that you came to know as John Hummel?

2    A.   Yes.

3    Q.   Do you see that individual in the courtroom
4  today?

5    A.   Yes.

6    Q.   Would you please point to him and describe what
7  he's wearing today?

8    A.   A suit.

9    Q.   Is he the last individual at the table over
10  here to my left?

11    A.   Yes.

12        MR. GILL:  Can the record reflect she's
13  identified the Defendant?

14        THE COURT:  The record will so reflect.

15    Q.   (BY MR. GILL)  And how did you meet Mr. John
16  Hummel?

17    A.   He came into the store.

18    Q.   He was a customer at your store?

19    A.   Yes.

20    Q.   And approximately when would it have been that
21  you first met Mr. Hummel at your store?

22    A.   Late 2009.

23    Q.   Was he a frequent customer at the store?

24    A.   He hadn't been before I met him.

25    Q.   Okay.  After you met him, did he become a

134

1  frequent customer at the store?

2    A.   Yes.

3    Q.   What type of items would he purchase at the
4  store?

5    A.   Cigarettes and gas.

6    Q.   Approximately how often did he come into the
7  store?

8    A.   Every day after.

9    Q.   After -- after you met him, he started coming
10  into the store every day?

11    A.   Yes.

12    Q.   Did you happen to have conversations with him?

13    A.   Yes.

14    Q.   And what did y'all talk about at that time?

15    A.   Anything and everything.

16    Q.   When he came to your store, would he be clothed
17  in any particular way?

18    A.   He would wear his uniform.

19    Q.   What type of uniform would that be?

20    A.   His security uniform, light blue shirt, black
21  slacks, black shoes.

22    Q.   Did you happen to discuss his employment with
23  him?

24    A.   Yes.

25    Q.   Did he tell you where he was employed?

1    A.  Yes.

2    Q.  What did he tell you?

3    A.  Walls.

4    Q.  Do you understand what Walls is?

5    A.  Walls is a hospital in Cleburne.

6    Q.  Did he describe what his duties were at the --

7  at the hospital?

8    A.  Security officer.

9    Q.  Did he describe to you what his -- his working

10 hours were?

11   A.  I believe so, but I couldn't tell you what

12 times they were.

13   Q.  So generally when you would see him,

14 approximately what time of the day or night would it be

15 when he would stop in your store?

16   A.  Evening and then early in the morning.

17   Q.  When you would see him in the evening, would he

18 be on his way to work or on his way home from work?

19   A.  To work.

20   Q.  When you'd see him in the morning, would he be

21 on his way home from work then?

22   A.  Yes.

23   Q.  What else did you discuss with Mr. Hummel back

24 in the -- in the fall of 2009, just generally?

25   A.  Can't name any specifics.

1    Q.  All right.  Well, did you discuss family with

2  him?

3    A.  Yes.

4    Q.  Did you discuss -- did he discuss his family?

5    A.  Yes.

6    Q.  What did you discuss -- understand his family

7  to include?

8    A.  His wife, his daughter and his father-in-law.

9    Q.  Did you explain to him that you had a family?

10   A.  Yes.

11   Q.  Did you tell him about your daughter?

12   A.  Yes.

13   Q.  Were you married at the time?

14   A.  Yes.

15   Q.  And were you undergoing any particular type of

16 change with regard to your life at that time?

17   A.  I was going through a divorce.

18   Q.  Now, after -- after talking to him on several

19 occasions, did he ask for your phone number?

20   A.  Yes.

21   Q.  Approximately how many occasions did you visit

22 with him before he asked for your phone number?

23   A.  15, 20.

24   Q.  Did you give him your phone number?

25   A.  Yes.

1    Q.  Shortly after you gave him your phone number,

2  did he begin telephoning you?

3    A.  Yes.

4    Q.  Did he also text message you?

5    A.  Yes.

6    Q.  Throughout the fall of 2009, let's say from

7  October through December of 2009, did he call you on a

8  frequent or infrequent basis?

9    A.  Frequent.

10   Q.  And what do you mean when you say "frequent"?

11   A.  Daily.

12   Q.  Approximately -- I'm sorry?

13   A.  Daily.

14   Q.  Would he sometimes call you multiple times each

15 day?

16   A.  Yes.

17   Q.  Would sometimes those phone calls be in the 15,

18 20, 30 telephone calls per day range?

19   A.  There's only one occasion that I know of him

20 calling me repeatedly like that.

21   Q.  When would that be?

22   A.  December 16th.

23   Q.  How about the text messages?

24   A.  They were constant.

25   Q.  Okay.  And they were constant from the time he

1  first began texting you?

2    A.  Yes.

3    Q.  So just -- just on a general basis -- in fact,

4  did you have the occasion to go through an exhibit this

5  morning which listed in detail the text messages between

6  you and Mr. Hummel?

7    A.  Yes.

8    Q.  So approximately how many times on a given day

9  was Mr. Hummel text messaging you?

10   A.  It depended.  If -- if I responded, it could be

11 a lot.  If I didn't respond, it was only a few.

12   Q.  But needless to say, throughout the fall -- the

13 November and December of 2009, were there literally

14 hundreds of text messages exchanged between you and Mr.

15 Hummel?

16   A.  Yes.

17   Q.  And were there dozens of phone calls, telephone

18 calls exchanged between you and Mr. Hummel?

19   A.  Yes.

20   Q.  Were some of those phone calls brief phone

21 calls?

22   A.  Yes.

23   Q.  And were some of those phone calls relatively

24 lengthy phone calls?

25   A.  Yes.

139

1    Q.  By their nature, text messages -- messages are
2  generally rather brief; is that correct?
3    A.  Yes.
4    Q.  And was that the -- was the tendency with you
5  and Mr. Hummel to exchange brief text messages back and
6  forth?
7    A.  Yes.
8    Q.  In the document you looked at today, did you
9  recognize the content of the -- of the text message
10  conversations between you and Mr. Hummel?
11    A.  Yes.
12    Q.  And did that document accurately reflect those
13  text message conversations?
14    A.  Yes.
15    Q.  What kind of vehicle did Mr. Hummel drive back
16  in the fall of 2009?
17    A.  A purple van.
18    Q.  Is that what he was -- would drive when you saw
19  him at the E-Z Mart convenience store?
20    A.  Yes.
21    Q.  You mentioned that he purchased gas and
22  cigarettes there.  Do you-all have a -- have a
23  pay-at-the-pump system at that E-Z Mart?
24    A.  No.
25    Q.  So if an individual purchases something,

140

1  gasoline or anything else, would they have to pay for
2  that item inside the store?
3    A.  Yes, they would.
4    Q.  Would they actually have to produce payment to
5  you as the -- as the clerk of the store?
6    A.  Yes.
7    Q.  How did Mr. Hummel pay for his purchases?
8    A.  A bank card.  I don't know if it's debit or
9  credit.
10    Q.  But he gave you some type of -- some type of
11  plastic --
12    A.  Yes.
13    Q.  -- to pay for his purchases; is that right?
14    A.  Yes.
15    Q.  Did Mr. Hummel like to wear cologne?
16    A.  Yes.
17    Q.  What kind of cologne did he like to wear?
18    A.  Axe.
19    Q.  Any particular variety?
20    A.  I really can't remember.
21    Q.  It was an Axe brand?  That's a brand of
22  cologne?
23    A.  Yes.
24    Q.  When you would see him at the E-Z Mart, did you
25  all stay inside and have your conversations, or did some

141

1  of those conversations take place outside?
2    A.  Some were inside; some were outside.
3    Q.  Generally if you were outside talking, what
4  were y'all doing out there?
5    A.  Smoking.
6    Q.  Was Mr. Hummel talkative with you during these
7  visits?
8    A.  Yes.
9    Q.  After a period of time, did you and Mr. Hummel
10  form a -- a friendship?
11    A.  Yes.
12    Q.  Did he try to take the friendship further?
13    A.  Yes.
14    Q.  How did he attempt to do that?
15    A.  He basically wanted to have sex.
16    Q.  And was he -- was he persistent about that?
17    A.  Pretty much, yes.
18    Q.  Did there -- did there ever come a time when
19  that took place?
20    A.  Yes.
21    Q.  And how -- explain to me how that happened,
22  please.  What -- what was the situation in your life at
23  that point?
24    A.  I was under a lot of stress.  Like I said, I
25  was going through a divorce, worried about losing my

142

1  daughter, my boyfriend and I were arguing.
2    Q.  And was -- it was on that occasion that the --
3  the sex with Mr. Hummel took place?
4    A.  Yes.
5    Q.  Was that a -- one-time thing?
6    A.  Yes.
7    Q.  Do you know approximately when that took place?
8    A.  Based on the text messages that I read this
9  morning, it was December 10th.
10    Q.  Of 2009?
11    A.  Yes.
12    Q.  Now, after -- after that particular event took
13  place, did you learn something else from Mr. Hummel that
14  caused you a great deal of discomfort with him and your
15  relationship?
16    A.  Yes.
17    Q.  What was that?
18    A.  I found out his wife was pregnant.
19    Q.  And why did that cause you discomfort?
20    A.  Because he had no concern for the safety of his
21  unborn child.
22    Q.  And what -- what steps, if any, did you take
23  with regard to that information when you received it?
24    A.  I told him not to talk to me, not to text me
25  anymore.

143

1   Q.  Approximately when in time was it that you
2   learned that his wife was pregnant?
3       A.  I would say a day or two after having sex.
4       Q.  Did you learn it from him?
5       A.  Yes.
6       Q.  Did you learn it from him talking on the phone
7   or through a text message?
8       A.  On the phone.
9       Q.  Did you and he exchange text messages regarding
10  you finding out that his wife was pregnant?
11      A.  Yes.
12      Q.  And in those text messages, did you tell him
13  basically to leave you alone?
14      A.  Yes.
15      Q.  Even previous to that, had you informed him
16  about the -- about the state of your relationship with
17  him?
18      A.  Yes.
19      Q.  What had you told him?
20      A.  We were friends, that he was married, that I
21  had a boyfriend and it wouldn't be anything more.
22      Q.  Did he seem to understand that?
23      A.  Yes.
24      Q.  Was that -- had that been your position
25  basically throughout the relationship?

144

1       A.  Yes.
2       Q.  After you had the discussion with him about his
3   wife being pregnant and you informed him that you
4   just -- for him to leave you alone, did he persist in
5   trying to reach you, in trying to converse with you
6   and -- and persist in text messaging you?
7       A.  Yes.
8       Q.  Did he persist in telephoning you?
9       A.  I believe so.
10      Q.  At that point was there something -- an event
11  occurring in your life?  You said you -- you and he had
12  the one-time sex on December 10th, and a couple days
13  after that is when you found out that his wife was
14  pregnant and you attempted to break off your
15  relationship with him.  Was something else happening in
16  your life at that point?
17      A.  Be specific.
18      Q.  The divorce?
19      A.  Yes.
20      Q.  Okay.  Did you have a divorce hearing in
21  December of 2009?
22      A.  Yes.
23      Q.  What date was that on?
24      A.  December 16th.
25      Q.  Had you informed Mr. Hummel that you had a

145

1   court date set for your divorce on December 16th?
2       A.  Yes.
3       Q.  So did he know about that before December 16th?
4       A.  Yes.
5       Q.  And did you and he exchange text messages with
6   regard to your upcoming divorce hearing?
7       A.  Yes.
8       Q.  In fact, did you exchange text messages with
9   him on December 16th with regard to your upcoming court
10  hearing?
11      A.  Yes.
12      Q.  Did you exchange text messages before your
13  hearing?
14      A.  Yes.
15      Q.  Did you exchange messages after your hearing?
16      A.  Yes.
17      Q.  Did he inquire of you the result of your
18  hearing?
19      A.  I let him know that I won.
20      Q.  All right.  And what did you let him know?
21      A.  That I won, that my daughter would be staying
22  with me, and it was over.
23      Q.  Did you inform him that -- that your divorce
24  had, in fact, been granted?
25      A.  Yes.

146

1       Q.  So your divorce was final on what date?
2       A.  December 16th.
3       Q.  Of 2009?
4       A.  Yes.
5       Q.  Did you inform Mr. Hummel that you had some
6   plans that day?
7       A.  Yes.
8       Q.  And what plans did you inform him that you had?
9       A.  I was supposed to have a divorce party.
10      Q.  Were you supposed to have a divorce party?
11      A.  I told him that I was going to have one.
12      Q.  So -- so there really was not a divorce party?
13      A.  No.  I didn't feel like having it.
14      Q.  But you informed Mr. Hummel that there was a
15  divorce party?
16      A.  Yes.
17      Q.  Why did you do that?
18      A.  Because I wanted to be left alone.
19      Q.  Did it succeed?
20      A.  No.
21      Q.  Why not?
22      A.  Because he kept calling me and texting me.
23      Q.  Okay.  You referred earlier in your testimony
24  to there being one day where he really persistently
25  telephoned you.

147

1    A.   Yes.

2    Q.   Is that the date?

3    A.   Yes.

4    Q.   Do you remember approximately how many times he

5   telephoned you that day?

6    A.   No.

7    Q.   But it was numerous?

8    A.   Yes.

9    Q.   At some point did you finally respond to one of

10  his -- did he also text message you numerous times that

11  day?

12   A.   Yes.

13   Q.   And at one point did you finally respond to one

14  of his text messages or one of his telephone calls?

15   A.   Yes.

16   Q.   And what did you inform him?

17   A.   That I had been asleep.

18   Q.   And did he -- did he persist in attempting to

19  contact you?

20   A.   Yes.

21   Q.   And did you carry on -- after that point, did

22  you carry on a text message conversation with him?

23   A.   Yes.

24   Q.   Now, December 17th, is that a significant day

25  in your life also?

148

1    A.   Yes, it is.

2    Q.   What -- what is significant about December

3   17th?

4    A.   It's my daughter's birthday.

5    Q.   So how old would your daughter have been on

6   December 16 -- December 17th of 2009?

7    A.   Six.

8    Q.   So that was her sixth birthday; is that

9   correct?

10   A.   Yes.

11   Q.   Did Mr. Hummel attempt to converse with you or

12  did he text you on that particular day?

13   A.   Yes.

14   Q.   What was the subject of his text messages on

15  that day?

16   A.   Tell Kylie (phonetic) happy birthday.  He

17  wanted to come over, wanted to know what I was cooking,

18  let me know what he was cooking.

19   Q.   So before December 17th of 2009, had he met

20  your daughter?

21   A.   I don't know.  I don't think so, but I can't

22  say positively.

23   Q.   Is it possible that he had?

24   A.   It's possible.

25   Q.   Okay.  Did he seem -- did he seem to care that

149

1   it was her birthday that day?

2    A.   Yeah.

3    Q.   Did he tell you anything and give you a message

4   that he wanted you to relay to her?

5    A.   Tell her he said happy birthday.

6    Q.   Did he persist in trying to get together with

7   you that day?

8    A.   Yes.

9    Q.   Were you giving him any information back about

10  that as a possible plan for the two of you?

11   A.   I let him know that Kylie would be there.  He

12  said that's okay, so I said okay.

13   Q.   So was -- so it was all right with him to visit

14  with your daughter there?  You felt like -- like that

15  was okay?

16   A.   Yes.

17   Q.   Were you attempting to have a -- have a

18  friendly relationship with him at this point?

19   A.   I was trying to be friends, not anything more,

20  and he understood that it wasn't going to be anything

21  more.

22   Q.   So on December 17th of -- of 2009, did he come

23  to your apartment to visit you?

24   A.   Yes.

25   Q.   Do you remember approximately what time of day

150

1   or night it was?

2    A.   It was -- it was at night.

3    Q.   And -- in the evening?

4    A.   Yes.

5    Q.   After dark sometime?

6    A.   I believe so.

7    Q.   Okay.  And what were you doing at home at that

8   time?

9    A.   I really couldn't tell you.

10   Q.   Well, let me ask you this:  Did -- it was your

11  daughter's birthday.  Did you do anything special for

12  her birthday?

13   A.   I cooked for her.

14   Q.   What did you cook?

15   A.   Spaghetti.

16   Q.   And why spaghetti?

17   A.   Because that's her favorite meal.

18   Q.   Was there anything in particular about the

19  spaghetti that you recall?

20   A.   I forgot the mushrooms.

21   Q.   Why is that -- why is that significant?

22   A.   Because she loves mushrooms, and she gave me a

23  hard time about it.

24   Q.   Okay.  It was her birthday, the mushrooms were

25  her favorite, and you forgot them?

153

1    A.  Yeah.

2    Q.  This was -- this was -- this was not the -- the

3  way you wanted things to be; is that right?

4    A.  No.

5    Q.  Do you remember seeing a conversation about

6  that in your text messages back and forth with Mr.

7  Hummel on that day?

8    A.  Yes.

9    Q.  Was he -- was he concerned about what you were

10  cooking your daughter for -- for her birthday dinner?

11    A.  Yes.

12    Q.  When he showed up at your house that night, was

13  your daughter there?

14    A.  Yes.

15    Q.  Did Mr. Hummel come in and -- and visit with

16  you and your daughter?

17    A.  Yes.

18    Q.  Do you remember approximately how long he

19  stayed?

20    A.  About 30 minutes, same as always.

21    Q.  I take it he -- he visited you at your house

22  on -- on several other occasions?

23    A.  Yes.

24    Q.  And he generally stayed about 30 minutes.  Is

25  that what I understand from your testimony?

152

1    A.  Yes.

2    Q.  And at some point, I take it, he left?

3    A.  Yes.

4    Q.  Was he in uniform that night or -- or not?

5    A.  Yes.

6    Q.  Now, after he left your house that night on

7  December 17th of 2009, have you ever heard from Mr.

8  Hummel again in person?

9    A.  No.

10    Q.  Did you ever receive another text message from

11  him?

12    A.  No.

13    Q.  Did he ever attempt to contact you by telephone

14  in any fashion?

15    A.  Nope.

16    Q.  Have you attempted to contact Mr. Hummel at any

17  point?

18    A.  Yes.  I sent him a -- a message on the 19th

19  saying, Hey.

20    Q.  On December 19th?

21    A.  Yes.

22    Q.  And what did that message say?

23    A.  Hey, H-e-y.

24    Q.  Is that all it said?

25    A.  That's it.

153

1    Q.  What was the purpose of sending that -- that

2  text message?

3    A.  I hadn't heard from him.

4    Q.  At that point had you heard anything about the

5  events that had transpired at his house around midnight

6  on December the 18th of 2009?

7    A.  No.

8    Q.  When did you learn about what had happened at

9  his house that night?

10    A.  Sometime after that I saw it on the news.

11    Q.  Let me ask you about -- about the text message

12  you sent him on the 19th.  You sent him a message that

13  said, Hey?

14    A.  Uh-huh.

15    Q.  Did he text message you back in response to

16  that?

17    A.  No.

18    Q.  So you heard about the -- the fire at his home

19  on the news?

20    A.  Yes.

21    Q.  And what was your reaction to that?

22    A.  I was shocked.

23    Q.  At some point after that, did you hear that

24  the -- the allegation he had been involved in -- in the

25  murder of his family?

154

1    A.  I did not know that he was involved until

2  Miles, the D.A., showed up at my house.

3    Q.  So you had -- so you hadn't heard anything

4  about it on the news or -- or by any other means?

5    A.  I heard there was a fire.

6    Q.  Okay.

7    A.  And that they died.

8    Q.  But you hadn't heard anything beyond that?

9    A.  No.

10    Q.  And your next contact was with a member of the

11  Tarrant County D.A.'s Office; is that right?

12    A.  Yes.

13    Q.  And at some point did you -- were you called to

14  testify as a witness in front of the Tarrant County

15  Grand Jury?

16    A.  Yes.

17    Q.  And on the day you testified, whenever that

18  might have been, did you have the benefit of having your

19  text messages to be able to read and refer back to?

20    A.  No, I did not.

21    Q.  The text message that I referred to, the ones

22  between you and Mr. Hummel.

23    A.  I did not have those.

24    Q.  Those -- those were not shown to you until

25  sometime later; is that correct?

155

1    A.  Yes.

2    Q.  Sometime after your Grand Jury appearance?

3    A.  Yes.

4    Q.  Did Mr. Hummel ever discuss with you the fact
that he wanted to leave his wife?

6    A.  He said that he wasn't in love with her, but
7  he -- he didn't say that he was going to leave.

8    Q.  Is that something that you wanted him to do,
9  leave his wife?

10    A.  No.

11    Q.  From your point of view, was there any -- any
12  future in your relationship with him?

13    A.  No.

14    Q.  Did you explain that to him?

15    A.  Repeatedly.

16    Q.  What was his reaction to that?

17    A.  He kept saying he would take what he could get.

18    Q.  At some point were you contacted by an
19  individual by the name of Chris?

20    A.  Yes.

21    Q.  And did you understand Chris to be a friend of
22  Mr. John Hummel?

23    A.  Yes.

24    Q.  And what was it that -- that Chris wanted you
25  to do or was asking from you?

156

1    A.  He -- he said that John asked him to call me
2  and ask me if I wanted his information so I could write
3  him.

4    Q.  And what was your response to that?

5    A.  I told him no.

6    Q.  Why is that?

7    A.  Because it was his fault that the D.A. was at
8  my house and I had to go downtown and answer questions
9  and that I'm sitting right here now.  I was upset about
10  the whole situation.

11    Q.  So you're not -- you're not very happy about
12  having to be here today?

13    A.  No, I'm not.

14    Q.  Are you concerned about your -- about the
15  situation with -- with the custody of your daughter?  Is
16  that a concern to you?

17    A.  No.

18    Q.  Ms. Freeze, I'm going to show you what's been
19  marked as 229B1 and ask you if you have ever had a
20  chance to -- to look through this particular document?

21    A.  Yes, I have.

22    Q.  Okay.  Is that something that you looked
23  through today?

24    A.  Yes.

25    Q.  And how do you recognize it?

157

1    A.  My signature is on it.

2    Q.  Okay.  I asked you to look through that, and
3  then if you recognize the contents of it, to put your
4  initials or to sign that document; is that correct?

5    A.  Yes.

6    Q.  And you did so?

7    A.  Yes.

8    Q.  And is 229B1 a -- a printout of the text
9  messages that were exchanged between you and Mr. John
10  Hummel?

11    A.  Yes.

12    Q.  And is it an accurate rendition of the text
13  messages that were exchanged between you and Mr. Hummel?

14    A.  Yes.

15    Q.  And does it accurately show the text
16  conversations that you had with Mr. Hummel beginning
17  in -- I think it was October of 2009; is that right?
18  I'm sorry.  It's November of 2009.

19    A.  Yes.

20    Q.  And those text messages continue up to and
21  including December 17th of 2009?

22    A.  Yes.

23    Q.  And then there's one additional text message
24  from you to Mr. Hummel on December 19th where you asked
25  him or told him, Hey?

158

1    A.  Yes.

2    Q.  And it's an accurate rendition of those text
3  conversations?

4    A.  Yes.

5    Q.  Okay.  I'm going to show you now State's 229B2,
6  which I can represent to you is -- if you want to take
7  just a second to look through it and see if it also
8  contains those same text messages that you examined
9  earlier today?

10    A.  It appears to be the same.

11    Q.  Okay.  And within that exhibit, which is 229B2,
12  is your telephone number highlighted with the color red?

13    A.  Yes.

14    Q.  And is Mr. Hummel's telephone number
15  highlighted with the color yellow?

16    A.  Yes.

17        MR. BRISSETTE:  Your Honor, at this point
18  we're going to offer 229B2 for all purposes.

19        MR. MOORE:  May I ask her a question or two
20  on voir dire regarding these exhibits, Judge?

21        THE COURT:  You may.

22            VOIR DIRE EXAMINATION

23  BY MR. MOORE:

24    Q.  Ms. Freeze, let me show you what's been marked
25  for identification purposes as State's Exhibit No.

159

1  229B2. The text messages that were between you and John
2  are the ones that are highlighted in red and yellow; is
3  that correct?
4      A.  Yes.
5      Q.  And those are the ones you recognize?
6      A.  Yes.
7      Q.  The ones that are -- are in green here, do you
8  recognize any of those messages?
9      A.  No.
10     Q.  And later on, there's some back here that are
11 in blue.  Do you recognize any of those messages?
12     A.  No.
13     Q.  So just -- it's the ones in -- in red and
14 yellow that you've reviewed and that you look at and
15 that you recognize as being communication between you
16 and John; is that correct?
17     A.  Yes.
18     Q.  As far as the others in there, you don't really
19 know anything about the -- the truth or veracity of
20 those text messages; is that correct?
21     A.  No.
22     Q.  Okay.  Thank you.
23         MR. MOORE:  Judge, I --
24         THE COURT:  Let me visit with the attorneys
25 on the side.

160

1         (BENCH CONFERENCE PROCEEDINGS)
2         MR. MOORE:  I don't have any additional
3  objections to that exhibit other than the ones we
4  previously made, some of which have been cured by her
5  testimony.
6         I do object to the -- the text messages
7  that have not been testified to, the ones that are
8  marked by blue.
9         THE COURT:  Okay.  Now, the green is Joy
10 Hummel, correct?
11        MR. GILL:  That's right.
12        THE COURT:  And it's already been
13 established through Mr. Paris, who's identified those
14 text messages.  In addition to it, are there any other
15 text messages that has not been previously identified or
16 testified to by Mr. Paris or another witness?
17        MR. GILL:  No, sir.
18        THE COURT:  Mr. Moore, do you have anything
19 else to add?
20        MR. MOORE:  No, I think that the text
21 messages in green were --
22        THE REPORTER:  I'm sorry.  Can you speak
23 into the microphone?
24        MR. MOORE:  I'm sorry.  I'm leaning back
25 here.

161

1         I think the ones in green were the ones
2  that involve Joy and the ones in blue at the back were
3  the ones that Mr. Paris made.
4         THE COURT:  That is correct.  I believe
5  that's also Mr. Harris.
6         MR. MOORE:  Paris.
7         MR. GILL:  Paris.
8         THE COURT:  Paris.  Thank you.
9         All right.  Anything else?
10        MR. MOORE:  Huh-uh.
11        THE COURT:  229B2 is admitted for all
12 purposes.  Your objection is overruled.
13        MR. MOORE:  And for -- just for the record,
14 Judge, our objection is he identified this phone number
15 and he testified that there were some calls made.  I
16 don't think he was -- he ever specifically identified
17 any of those texts.
18        THE COURT:  Okay.  I -- well, first off is
19 that if it was -- if it wasn't identified, I believe it
20 was properly authenticated based upon his testimony and
21 based upon the overall summation of all the information
22 that he testified to regarding the text, as well as the
23 telephone conversations, as well the records that were
24 reflected to that are in the record.  Therefore, I do
25 find that if there wasn't a specific identification to

162

1  the text, it would still be admissible.  If, however, I
2  do believe that there was some conversation about some
3  text, that he did transmit, I'm not going to --
4         MR. GILL:  That, Your Honor.  We're also
5  not offering the content of these for the truth of the
6  matter asserted.  Actually, the relevance of it is, is
7  to show that their conversation -- a text conversation
8  between Mr. Hummel and his wife.
9         THE COURT:  All right.  Your objection is
10 overruled.
11        (OPEN COURT PROCEEDINGS)
12        THE COURT:  Members of the jury, State's
13 Exhibit 229B2 is admitted for all purposes.
14        (State's Exhibit No. 229B2 admitted)
15        DIRECT EXAMINATION (Cont'd)
16 BY MR. GILL:
17     Q.  Ms. Freeze, now let me hand you what's been
18 marked as 229D, as in dog, 2 and ask if you could take a
19 second and look through that exhibit?  In fact, let's go
20 just back to December 16th.  That might be the easiest
21 way for you to authenticate this.
22         You testified earlier there was a date that
23 Mr. Hummel telephoned you repeatedly; is that correct?
24     A.  Yes.
25     Q.  That was December 16th of 2009?

**163**

1    A.  Yes.

2    Q.  Do you see your -- your telephone number

3  reprinted in State's Exhibit 229D2?

4    A.  Yes.

5    Q.  And the date December 16th?

6    A.  Yes.

7    Q.  Does that accurately reflect the telephone

8  calls that were placed to your telephone from Mr.

9  Hummel's telephone on December 16th of 2009?

10    A.  Yes.

11    Q.  Does the document go on to accurately reflect

12  the telephone calls that were made -- before and after

13  on the document -- the telephone calls that were made

14  back and forth between you and Mr. Hummel?

15    A.  Yes.

16         MR. GILL:  We'll offer 229D2.

17         MR. MOORE:  Judge, I would have the same

18  objections that we -- that I made in connection with the

19  prior Exhibit, No. 229B2, in regard to 229D2.

20         THE COURT:  All right.  Your objection is

21  overruled.  The Court's ruling -- previous ruling

22  applies.  229D2, Delta, 2 is admitted.

23         (State's Exhibit No. 229D2 admitted)

24    Q.  (BY MR. GILL) Ms. Freeze, you testified that

25  Mr. Hummel visited you the evening of your daughter's

**164**

1  birthday?

2    A.  Yes.

3    Q.  And while he was there, your daughter was

4  present in your apartment also?

5    A.  Yes.

6    Q.  And so at least on that occasion, Mr. Hummel

7  had an opportunity to converse and -- and interact with

8  your daughter?

9    A.  Yes.

10    Q.  And did -- did they share something that

11  evening due to the fact that it was her birthday?

12    A.  He read her a book.

13    Q.  What book did he read?

14    A.  It Could Have Been Worse.

15    Q.  And what -- what kind of book is that?

16  Children's book?

17    A.  Yes.

18    Q.  And why was it that book that she wanted read

19  to her on that particular occasion?

20    A.  It's her favorite.

21    Q.  And your daughter turned what age that evening?

22    A.  Six.

23    Q.  Let me show you what's been marked as State's

24  Exhibit No. 303 and ask if you recognize what's

25  contained in State's Exhibit 303?

**165**

1    A.  It's the book.

2    Q.  Is that a copy of the cover of the -- of the

3  book that Mr. Hummel read to your daughter that evening?

4    A.  Yes.

5         MR. GILL:  We offer 303.

6         MR. MOORE:  Judge, I don't have any

7  objections.

8         THE COURT:  303 is admitted for all

9  purposes.

10         (State's Exhibit No. 303 admitted)

11         MR. GILL:  May I publish it, Your Honor?

12         THE COURT:  You may.

13    Q.  (BY MR. GILL)  Ms. Freeze, is this the cover of

14  the book that Mr. Hummel read to your daughter on the

15  evening hours of December 17th of 2009?

16    A.  Yes.

17         MR. GILL:  We pass the witness.

18         THE COURT:  Cross-examination?

19         MR. MOORE:  Thank you, Your Honor.

20         <u>CROSS-EXAMINATION</u>

21  BY MR. MOORE:

22    Q.  Ms. Freeze, I'm Larry Moore.  We visited by

23  telephone before; is that correct?

24    A.  Yes.

25    Q.  You were kind enough to talk to me when I

**166**

1  called you.

2         I want to ask you a few questions about

3  your relationship with John, and if I ask you something

4  you don't understand, just let me know, and I'll try to

5  rephrase it.  Okay?

6    A.  Okay.

7    Q.  You said that you had worked at the E-Z Mart --

8  that -- that you did work at the E-Z Mart for about a

9  year and a half; is that right?

10    A.  Yes.

11    Q.  How long had you been working there when you

12  first met John?

13    A.  About six months.

14    Q.  And I think you said that generally he would --

15  he would come in in the evening hours on his way to work

16  and then stop back in the early morning hours on his way

17  back from work; is that right?

18    A.  Yes.

19    Q.  What shift did you work?

20    A.  10:00 to 6:00.

21    Q.  10:00 at night until 6:00 in the morning?

22    A.  Morning.

23    Q.  What days did you work?

24    A.  I really don't remember.

25    Q.  Okay.  Did you -- did you work seven days a

167

1   week, or was it --
2      A.   No.
3      Q.   -- five days or four?
4      A.   Four days a week.
5      Q.   Was your shift always 10:00 p.m. to 6:00 a.m.?
6      A.   Yes, it was.
7      Q.   Did you work the same days of the week every
8   week, or did your shift rotate?
9      A.   I worked same days every week if we weren't
10  short.  If they were short, I worked more.
11     Q.   When you would work at the store in -- in
12  that -- from 10:00 at night until 6:00 in the morning,
13  would you be the only employee for the E-Z Mart that was
14  there during that time?
15     A.   Yes.
16     Q.   The -- and I think you said that the store sits
17  there on Highway 174 as you're going south from Fort
18  Worth to Cleburne; is that right?
19     A.   Yes.
20     Q.   What kind of gasoline do y'all sell?
21     A.   Regular, super.
22     Q.   Was -- was it a particular brand gasoline?
23     A.   No.
24     Q.   You said that -- that the first time that John
25  came into the store that you recall meeting him was

168

1   sometime in late 2009 --
2      A.   Yes.
3      Q.   -- is that right?
4           By late 2009, can you narrow it down?  Was
5   it September, October, November, December, or do you
6   have any idea?
7      A.   I have no idea.
8      Q.   Do you know how long he had been stopping in
9   the store or for about how long he had been stopping in
10  the store whenever y'all decided that y'all were going
11  to become friends?  You said that you talked to him 15
12  or 20 times.
13     A.   I would say two weeks to a month's time.
14     Q.   Two weeks to a month?
15     A.   Yeah.
16     Q.   Now, he would stop in a lot.  Would he stop in
17  on the way to work and then coming home from work the
18  same day or would it be on different days, or how would
19  it work?
20     A.   In the beginning he would stop in on his way to
21  work but not on his way back.  And then as time went on,
22  it was -- yes, he'd be there on his way to work and
23  back.
24     Q.   Okay.  Do you know what hours he worked at the
25  hospital?

169

1      A.   No, I don't.
2      Q.   On the days that you weren't working, do you
3   know whether or not he stopped at the E-Z Mart or not?
4      A.   Do I know?
5      Q.   Uh-huh.
6      A.   No, I don't know what he did --
7      Q.   Okay.
8      A.   -- outside.
9      Q.   Would -- would -- when y'all first started
10  talking together, I take it that -- you said that y'all
11  would go outside and smoke together and just kind of
12  have general conversation and so forth; is that right?
13     A.   Yes.
14     Q.   After that first two weeks or a month, whatever
15  it was, at -- how -- how would you characterize your --
16  your relationship at that point?
17     A.   We were friends.
18     Q.   You -- you said, at one point in talking to Mr.
19  Gill, that Mr. Hummel would -- was pushing you or in
20  some way trying to get you to have -- engage in sexual
21  relations with him; is that right?
22     A.   Yes.
23     Q.   When did that -- when did that start?
24     A.   I can't tell you.
25     Q.   Okay.  Now, you said earlier on direct

170

1   examination that you were going through a divorce during
2   that period of time in late 2009; is that right?
3      A.   Yes.
4      Q.   When was your divorce actually filed?
5      A.   I filed December, 2008.
6      Q.   Okay.  So you had -- your -- your divorce had
7   been going on for almost a year by the time you met Mr.
8   Hummel; is that right?
9      A.   Yes.
10     Q.   You also said something about that you had a
11  boyfriend at that time -- at the time that you came to
12  know Mr. Hummel; is that right?
13     A.   I still have that boyfriend.
14     Q.   Okay.  Were -- how long had you been involved
15  with your boyfriend at that point?
16     A.   A year.
17     Q.   Okay.  So you had -- you had had a
18  relationship.  Was it a boyfriend/girlfriend
19  relationship that you had with your boyfriend for about
20  a year?
21     A.   Yes.
22     Q.   So you had had a romantic relationship with
23  this man for about a year, probably two-thirds of a year
24  anyway, by the time that you ever met John Hummel; is
25  that right?

171

1    A.  Yes.

2    Q.  You indicated in your -- in your direct
3  examination that you were always very up front with John
4  and very frank about the fact that your friendship with
5  him was as -- as friends; is that right?

6    A.  Yes.

7    Q.  And that you didn't -- it was not a romantic
8  relationship, in your mind; is that -- is that correct?

9    A.  I indicated to John that we were friends and
10  that he was married and that I had a boyfriend.

11    Q.  Okay.  And you told me, I think on -- or you
12  told Mr. Gill on direct examination that he indicated to
13  you that he understood that; is that right?

14    A.  Yes.

15    Q.  All right.  Did he -- did you ever discuss with
16  him running off and getting married?

17    A.  No.

18    Q.  Did you ever discuss with Mr. Hummel y'all
19  making a life together and going forward from that point
20  together as man and wife?

21    A.  John had said something about it's sad that
22  when you find someone or when you -- you're finally able
23  to meet somebody that you feel like you could be with,
24  you're not able to.

25    Q.  Okay.  So there was a recognition to what he

173

1    Q.  And that's the one and only time that -- that
2  you had any kind of sexual -- sexual relationship with
3  Mr. Hummel?

4    A.  Yes, it is.

5    Q.  And -- and the best that you could recall from
6  looking at the text messages and so forth, that was
7  sometime around the 10th of December?

8    A.  Yes.

9    Q.  Now, in those text messages, there are
10  occasions where you and Mr. Hummel have very graphic
11  descriptions of sexual relations and so forth; is that
12  right?

13    A.  It's called sexting, yes.

14    Q.  It's called what?

15    A.  Sexting.

16    Q.  Sexting.  Okay.

17        Was it your intent by those text messages
18  to lead him on in any way?

19    A.  No.

20    Q.  Did you feel like that -- that those text
21  messages were in any way inconsistent with what you had
22  continually told him from the very first, that y'all
23  weren't going to have any kind of relationship together?

24    A.  No, it was conflicting, but we were just having
25  fun.

172

1  told you, that it was not -- that your relationship
2  wasn't going anywhere; is that right?

3    A.  Rephrase, please.

4    Q.  Okay.  You said that what he told you is that
5  it's sad that when you finally meet somebody that you
6  feel like you could have a relationship with, that it
7  just can't happen or it's not going to be able to
8  happen, something like that?

9    A.  Yes.

10    Q.  So did that denote to you that he recognized
11  there was not going to be a relationship?

12    A.  Yes.

13    Q.  Okay.  And -- and you had made that clear to
14  him before you ever found out his wife was pregnant; is
15  that right?

16    A.  Yes.

17    Q.  Throughout your relationship, your relationship
18  with Mr. Hummel is one of friends?

19    A.  Yes.

20    Q.  Now, at one point you indicated that you were
21  having some problems, that you were under a lot of
22  stress because you were going to have a hearing on
23  your -- on your divorce and -- and you were having
24  problems with your boyfriend; is that right?

25    A.  Yes.

174

1    Q.  Okay.  Do you recall when it was that you
2  learned that his -- his wife was pregnant?

3    A.  Within a day or two after having sex.

4    Q.  Okay.  So sometime after the 10th of -- of
5  December of 2009?

6    A.  Yes.

7    Q.  And you learned it from Mr. Hummel, is the way
8  I understand it; is that correct?

9    A.  Yes.

10    Q.  Do you recall how it came up in the
11  conversation or anything else?

12    A.  He was wearing the Axe cologne while getting
13  ready to (sic) work, and she made a statement about how
14  it made her nauseous, and I said, Is she pregnant?  And
15  he said, yes.

16    Q.  Okay.  And then at that point I think you said
17  that you -- you told him, That's it, I don't want to
18  have anything else to do with you, I don't want to talk
19  to you or something like that?

20    A.  I told him to leave me alone, yes.

21    Q.  Okay.  And you discussed with him throughout
22  your relationship that you weren't going to be a
23  home-wrecker.  You weren't going -- he was in a
24  relationship, you were in a relationship, and that you
25  weren't going to have any part of -- of ending his

175

1   marriage; is that correct?

2      A.  Yes.

3      Q.  As a matter of fact, you told him that that was

4   part of the problem in your marriage; is that right?

5      A.  Yes.

6      Q.  Mr. Hummel never discussed with you that he

7   wanted to leave his wife or his family; is that correct?

8      A.  Not that I recall, no.

9      Q.  All right.  Your -- you said your divorce

10  became final.  You had a hearing on the 16th, and the

11  divorce became final on the 16th; is that right?

12     A.  Yes.

13     Q.  The 16th of December of 2009?

14     A.  Yes.

15     Q.  And you were -- you were happy because you been

16  concerned about a pending custody issue in regard to the

17  case; is that right?

18     A.  I was relieved that I became sole managing

19  conservatorship of my daughter, yes.

20     Q.  All right.  And that was an important day for

21  you because of that; is that right?

22     A.  Yes.

23     Q.  Then on the 17th -- I think you said December

24  17th was your daughter's sixth birthday?

25     A.  Yes.

177

1      A.  Yeah.

2      Q.  You told him you didn't want him to call you,

3   you didn't want him to -- to text you anymore or

4   anything like that; is that correct?

5      A.  Again, I told him to leave me alone.  He wanted

6   to know if it was indefinite.  I told him I didn't know.

7      Q.  It was indefinite?

8      A.  Yeah.

9      Q.  Okay.  When -- when you had not heard from him

10  after the 17th, you texted him on December the 19th; is

11  that right?

12     A.  Yes.

13     Q.  So at that point, you were trying to get ahold

14  of him, I take it, to see what was going on, how come

15  you hadn't heard from him?

16     A.  I was -- yeah.

17     Q.  Okay.  Chris -- there was a -- Mr. Gill had

18  asked you about after the time that John was arrested in

19  connection with this case, Chris Paris contacted you and

20  asked you if -- on behalf of John if you wanted

21  information on how to write him; is that right?

22     A.  Yes.

23     Q.  And you told Mr. Paris no; is that correct?

24     A.  Yes.

25     Q.  Okay.  And you haven't written to John since

176

1      Q.  When was the conversation -- you testified

2   there was a conversation about your cooking spaghetti

3   for your daughter and that you had forgot the mushrooms

4   and so forth.  When did that conversation take place?

5      A.  December 17th.

6      Q.  All right.  Was it by telephone or by text

7   message?

8      A.  It was by text message.

9      Q.  So that's reflected in the text messages that

10  have been introduced in evidence?

11     A.  Yes.

12     Q.  You said that -- how -- how many times during

13  the time that you knew John Hummel, up to and including

14  December the 17th, how many times during that whole time

15  do you think he actually came to your apartment?

16     A.  Less than a handful of times.

17     Q.  By handful, you mean five, six?

18     A.  Three, four, maybe.

19     Q.  All right.  When you had -- when you -- on that

20  one occasion around December the 10th when you had

21  sexual relations with John, was that at your apartment?

22     A.  Yes.

23     Q.  You had told John that you didn't want to have

24  anything to do with him whenever you found out his wife

25  was pregnant; is that right?

178

1   he's been in jail; is that right?

2      A.  No.

3      Q.  Have you -- after that first phone call, did

4   Mr. Paris continue to call -- call you?  I'm sorry.

5      A.  He called me again.  He said it seemed like I

6   needed somebody to talk to since I was so upset about

7   this whole ordeal.

8      Q.  Did he -- during -- did he try to -- to

9   establish a relationship with you?

10     A.  He wanted to know where I worked, what I looked

11  like, if I had a Facebook, if I was married or single.

12     Q.  Okay.  So it was your impression he was kind of

13  hitting on you at that point?

14     A.  Yes.

15     Q.  Thank you very much, Ms. Freeze.

16        MR. MOORE:  I'll pass the witness, Judge.

17        THE COURT:  Redirect?

18        MR. GILL:  No further questions, Your

19  Honor.

20        MR. MOORE:  Judge, I have no objection to

21  Ms. Freeze being excused at this point.  I would ask

22  that she remain subject to the Rule and subject to

23  recall.

24        THE COURT:  All right.  Ms. Freeze, you are

25  subject to being recalled.  The Rule has been invoked.

179

1  You may not discuss your testimony with anybody or any
2  other potential witnesses.  You may not be present in
3  the courtroom while the trial is ongoing.  You need to
4  make yourself available if in the event either side
5  contacts you for -- contacts you for the purposes of
6  testifying again.  Do you understand, Ms. Freeze?
7             THE WITNESS:  Yes, I do.
8             THE COURT:  Thank you, ma'am.  You may step
9  down.
10            (Witness retires)
11            THE COURT:  All right.  We will take a
12  ten-minute recess.  Please remember your previous
13  instructions, members of the jury.  Thank you very much.
14  We'll be in recess for ten minutes.
15            (Recess from 3:47 p.m. to 4:15 p.m.)
16            (Open court, Defendant present, no jury)
17            THE COURT:  All right.  Let's bring in the
18  jury, please.
19            (Jury present)
20            THE COURT:  Please be seated.
21            State, call your next witness.
22            MR. BRISSETTE:  Dr. Bao.
23            THE COURT:  Dr. Bao.
24            (Witness enters courtroom)
25            THE COURT:  Dr. Bao, please come up.

180

1             Please raise your right hand.  Face me.
2             THE WITNESS:  Okay.
3             (Witness sworn)
4             THE COURT:  Please be seated, sir.
5             Doctor, would you please pull the
6  microphone closer to you so we can hear what you say?
7             THE WITNESS:  Okay.
8             THE COURT:  All right.  You may proceed
9  when you're ready.
10                  SHIPING BAO,
11  having been first duly sworn, testified as follows:
12            DIRECT EXAMINATION
13  BY MR. BRISSETTE:
14       Q.  Good afternoon, Doctor.  How are you, sir?
15       A.  Very good.  Thank you.
16       Q.  Can you state your full name for the record?
17       A.  My name -- my name is Shiping Bao.
18       Q.  How do you spell "Shiping"?
19       A.  S-h-i-p-i-n-g.
20       Q.  And how do you spell your last name, Doctor?
21       A.  B-a-o.
22       Q.  Doctor, where did you grow up?
23       A.  I grew up in China.
24       Q.  What part of China?  What province?
25       A.  Called Anhui Province, which is five -- five

181

1  hours from China City.
2       Q.  And did you go to university in China?
3       A.  Yeah.
4       Q.  What years did you go to university there?
5       A.  1980.
6       Q.  Did you receive a master's of science degree
7  from -- in China?
8       A.  Yes.
9       Q.  What was your master's of science in, what --
10  what specialty?
11       A.  It's called radiological medicine.
12       Q.  Dr. Bao, I think that microphone will adjust up
13  if you want it to so you don't have to bend over.
14       A.  Okay.
15       Q.  Okay.  And where did you receive your medical
16  degree from?
17       A.  Anhui Medical University.
18            THE REPORTER:  I'm sorry?
19            THE WITNESS:  Anhui, A-n-h-u-i -- A-n-h-u-i
20  Medical University.
21       Q.  (BY MR. BRISSETTE)  Was that in the country of
22  China as well, sir?
23       A.  Yeah.
24       Q.  When did you come to the United States?
25       A.  In 1992.

182

1       Q.  And were you -- have you been working in the
2  medical field since 1992 in the United States?
3       A.  Yes.
4       Q.  Have you been accepted as a -- a medical doctor
5  here in the United States?
6       A.  Yes.
7       Q.  And where are you board certified?
8       A.  Texas, and also -- oh, I have the Texas medical
9  license.  I certified in anatomical, clinical and
10  forensic pathology by American Board of Pathology.
11       Q.  And do you currently hold a position here in
12  Tarrant County?
13       A.  Yeah, Deputy Medical Examiner.
14       Q.  You work for Dr. Peerwani's office?
15       A.  Yes.
16       Q.  Did you do any residencies while you were in
17  the states in the field of medicine?
18       A.  I did the pathology residency in Birmingham,
19  Alabama from 2004 to 2008.
20       Q.  Was that in the Baptist Health System there in
21  Birmingham?
22       A.  Yes.
23       Q.  And from 1988 to 1992, did you do a residency
24  in China?
25       A.  From -- I'm sorry?

183

1    Q.  From '88 to '92, were you doing a residency in
2    radiation oncology there in mainland China?
3    A.  Yes.
4    Q.  Did you -- when did you start at the Tarrant
5    County ME's Office as a Deputy Medical Examiner?
6    A.  In -- on July 1st, 2009.
7    Q.  Prior to that, were you doing a fellowship at
8    Dr. Peerwani's office in the field of forensic
9    pathology?
10   A.  Yeah, for one year.
11   Q.  Have you had an opportunity from 1992 to 1995
12   to work at Florida State University?
13   A.  Yes.
14   Q.  What did you do at FSU?
15   A.  Medical research.
16   Q.  From 1995 to 2001, did you have a chance to
17   work at the Washington State University?
18   A.  Yes.
19   Q.  And what were you doing there?
20   A.  Also medical research, cancer.
21   Q.  Were you working in the College of Pharmacy
22   there at Washington State?
23   A.  Yes.
24   Q.  And were you also a medical research scientist
25   at a private corporation known as XL Sci-Tech in

184

1    Richland Washington as well?
2    A.  Yes.
3    Q.  Are you a member of the National Association of
4    Medical Examiners?
5    A.  Yes.
6    Q.  And how long have you been a member of that?
7    A.  Three years.
8         THE REPORTER:  I'm sorry?
9         THE WITNESS:  Three.
10   Q.  (BY MR. BRISSETTE)  As a Deputy Medical
11   Examiner, are you assigned cases each morning to -- to
12   work?
13   A.  Yes.
14   Q.  And who does the assignments, typically?
15   A.  Dr. Peerwani.
16   Q.  Dr. Peerwani decides which of his deputies
17   will -- will work on bodies that have been presented for
18   autopsy; is that correct?
19   A.  That -- that's during the weekdays.  During the
20   weekend, I -- I decide myself.
21   Q.  People work shifts on the weekends?
22   A.  Uh-huh.
23   Q.  Is that yes?
24   A.  Yes.
25   Q.  On a particular case that would be presented

185

1    for autopsy, does Dr. Peerwani's office assign a
2    particular case number to the remains as they are
3    presented for autopsy?
4    A.  Yes.
5    Q.  Are you familiar with a Medical Examiner Case
6    No. 0914836?
7    A.  Yes, I did autopsy on this case.
8    Q.  Was this a male or a female?
9    A.  Female.
10   Q.  Was this an adult female or a child female?
11   A.  Adult female.
12   Q.  When a person presents at autopsy, what do you
13   do to begin with?  Are they still in a body bag?
14   A.  First we review the chart.  We review the
15   medical history, the scene investigation, then pursue
16   the autopsy.
17   Q.  Do you begin with x-rays of the body bag?
18   A.  Yes.
19   Q.  Why do you do that?
20   A.  We try to detect all -- all the metals in the
21   body --
22        THE REPORTER:  I'm sorry?
23        THE WITNESS:  All the metal, m-e-t-a-l.
24        THE COURT:  All the metals.
25        THE WITNESS:  Metals, yeah.  In case the

186

1    bodies -- the knives with the body.
2    Q.  (BY MR. BRISSETTE)  After -- is the body at
3    some point removed from the -- the body bag that it was
4    presented in?
5    A.  Uh-huh.
6    Q.  Is that yes?
7    A.  Yes.
8    Q.  Do you take photographs to document your
9    findings as you go through these?
10   A.  Yes.
11   Q.  In addition to documentation via photograph, do
12   you make drawings of the injuries that you see when you
13   look at a body during autopsy?
14   A.  Yes.
15   Q.  And are those things that you keep in the
16   normal course of your business as part of your report?
17   A.  Yes.
18   Q.  Did you have an occasion then to do an autopsy
19   with that case number on a particular date in December
20   of 2009?
21   A.  Yes.
22   Q.  What date did you do this autopsy?
23   A.  Let me go through the chart.
24        December 19th, 2009.
25   Q.  When you first look at the body, do you make

187

1  notations as to whether or not the body presented with
2  any particular clothing?
3      A.  Yes.
4      Q.  If you need to refer to your records, please do
5  so.  But can you tell the members of the jury what
6  clothing that the body with this particular case number
7  presented with?
8      A.  Okay.  I need go through the chart.
9          On this case the bodies presented to me
10 with black body bag and she clad in, pink shorts and
11 white T-shirt and bra.
12     MR. BRISSETTE:  May I approach the witness,
13 Your Honor?
14     THE COURT:  You may.
15     Q.  (BY MR. BRISSETTE)  Dr. Bao, when you collect
16 items of clothing such as this after you've had a chance
17 to read your death investigator's report, did you
18 package certain items in an -- or one-gallon paint cans
19 that day?
20     A.  Yes.
21     Q.  I'm going to show you what's been marked for
22 identification purposes as 473A, our exhibit number.  Do
23 you recognize the tape and the markings on that can?
24     A.  Yes.
25     Q.  And are they consistent with your lab number or

188

1  your ME number for the autopsy you're talking about
2  today?
3      A.  Yes.  Normally we have the case number and the
4  name.
5      Q.  Did -- did you place items in that particular
6  can?
7      A.  Yes.
8      Q.  And with respect to that can, can you identify
9  and tell us what you placed in that can?
10     A.  This is the blouse.
11     Q.  Is that the blouse or the white T-shirt you
12 talked about?
13     A.  I'm not sure.
14     Q.  Let me show you what's been marked for
15 identification purposes as State's 470.  Take a look at
16 470 and see if you can tell me what, if anything,
17 relates to this case with 470?
18     A.  This case labeled "bra," so it's white bra.
19     Q.  471, do you recognize this can, sir?
20     A.  Yes.  It also has name and case number, pink
21 shorts.
22     Q.  And are these the pink shorts that you just
23 talked about that the body presented with?
24     A.  Yes.
25     Q.  And did you place them in this can?

189

1      A.  Uh-huh.
2      Q.  Is that yes?
3      A.  Yes.
4      Q.  Let me show you what's been marked for
5  identification purposes as State's 304.  Do you
6  recognize 304?
7      A.  Yes.
8      Q.  And is this how the body presented at autopsy?
9      A.  Yes.
10     Q.  Once the bag was removed?
11     A.  Yes.
12     Q.  State's 305, is that another representative
13 photo of the body as it presented at autopsy?
14     A.  Yes.
15     Q.  Do you recognize the autopsy date on the card?
16     A.  Yes.  There's a date and the case number.
17     Q.  All right.  Would the autopsy had been started
18 then on the date that's depicted on the ruler in the
19 photos?
20     A.  Yes.
21     Q.  So the date would have been what?
22     A.  December 18, 2009.
23     Q.  Now, the shirt that you collected, is that
24 depicted here in 305?
25     A.  305, yes.  Yeah, this is the shirt, yeah.

190

1      Q.  And in State's 304 is the -- the bra that you
2  just testified, is that depicted here?
3      A.  Yes.
4      Q.  Doctor, I'm going to show you what's been
5  marked and identified as 437B.  Do you recognize the
6  shirt that came out of the -- the can labeled 437A to be
7  one and the same as depicted in your photos there?
8      A.  Yeah, this is -- yeah, white shorts.
9      Q.  Do you recall looking at these photos in
10 preparation for your testimony at the Medical Examiner's
11 Office where this -- where this photo is depicted on a
12 larger screen when we were prepping?
13     A.  I do not recall any -- it's -- it's been two
14 years.
15     Q.  All right.  Do you remember visiting a couple
16 of weeks ago?
17     A.  Uh-huh.
18     Q.  Is that yes?
19     A.  Yes.
20     Q.  Do you remember looking at photos of this
21 shirt?
22     A.  Yes.
23     Q.  And do you remember looking at your report here
24 and refreshed your memory that you placed an item in a
25 particular can?  Do you recall that?

191

1    A.  Yes.

2    Q.  Is that -- is this the item that's depicted in

3  305?

4    A.  Uh-huh.

5    Q.  Around the neck of the individual?

6    A.  Okay.

7    Q.  Is that --

8    A.  Yes.

9    Q.  Is it the one and the same?

10   A.  Yes.

11        MR. BRISSETTE:  Your Honor, at this time

12  we'd offer 437B for all purposes.  I believe that

13  completes the conditional statement.

14        MR. MOORE:  Judge, we have no additional

15  objections other than the one we raised in connection

16  with the pretrial motions.

17        THE COURT:  All right.  437B is admitted

18  for all purposes.  Your objection is overruled.

19        (State's Exhibit No. 437B admitted)

20        MR. BRISSETTE:  Your Honor, at this time

21  the State would tender to Defense Counsel item and

22  contents labeled 470 and 471 and offer them for all

23  purposes as well to link our conditional photos from

24  earlier.

25        MR. MOORE:  All right.  Judge, I don't have

192

1  any additional objections to those exhibits other than

2  what we raised at pretrial.

3        THE COURT:  470 and 471 is admitted.  Your

4  objection continues to be overruled.

5        You may proceed.

6        (State's Exhibit Nos. 470, 471 admitted)

7        MR. BRISSETTE:  Your Honor, I believe that

8  removes the conditional statement as well from the

9  images that Ms. Belcher testified to about the bra.  I

10  will get those numbers to the Court when I can find

11  them.

12   Q.  (BY MR. BRISSETTE)  Dr. Bao, as part of

13  autopsy, do you -- you say you document it with

14  photographs; is that correct?

15   A.  Yes.

16   Q.  We've already looked at two photographs.  I

17  want to show you -- do you recognize State's Exhibit

18  306?

19   A.  Yes.

20   Q.  State's Exhibit 307?

21   A.  Yes.

22   Q.  State's Exhibit 308?

23   A.  Yes.

24   Q.  State's Exhibit 309?

25   A.  Yes.

193

1    Q.  State's 310?

2    A.  Yes.

3    Q.  State's 311?

4    A.  Yes.

5    Q.  State's Exhibit 312?

6    A.  Yes.

7    Q.  State's 313?

8    A.  Yes.

9    Q.  State's 314?

10   A.  Yes.

11   Q.  On State's Exhibit 315, have some items been

12  shaded prior to the exhibit being brought to court?

13   A.  Yes.

14   Q.  In your original photograph, there were areas

15  of -- of the body that was autopsied that were visible;

16  is that correct?

17   A.  Yes.

18   Q.  And some images have been -- some graphic

19  block-outs have been placed on the photo; is that

20  correct?

21   A.  Yes.

22   Q.  And you've had this photo taken --

23   A.  Yeah, I have photo with me.

24   Q.  State's 316?

25   A.  Yes.

194

1    Q.  State's 317 and 318?

2    A.  Yes.

3    Q.  Do you recognize those photos?

4    A.  Yes.

5    Q.  Were all -- were all those photos taken at your

6  instruction or by you during autopsy?

7    A.  Yes.  I have same photo with me.

8    Q.  And you keep a collection -- you say you have

9  same photo with you.  You keep a collection of the

10  photos with you as part of your case file; is that

11  correct?

12   A.  Yes.

13        MR. BRISSETTE:  At this time the State

14  would tender to Defense Counsel State's 304 through 318,

15  inclusive.

16        MR. MOORE:  Judge, may we approach?

17        (BENCH CONFERENCE PROCEEDINGS)

18        MR. MOORE:  I don't have any -- I just want

19  to make sure.  It looks like -- tell you what, I don't

20  have any objections to 304 through 314.  I do object to

21  315 because I don't think that there's any wounds

22  depicted on that that I can't -- that are not shown in

23  other photographs.

24        I don't have any objection to 316 or 317.

25        I do object to 318 on the ground of 403.

195

1  It's more prejudicial than probative.

2           THE COURT:  All right.  The exhibits with

3  the exception of 315 and 318, those are admitted.

4           Now, with regard to 315, do you have a

5  response?

6           MR. BRISSETTE:  I didn't hear their

7  objection.

8           MR. MOORE:  My only objection is that I

9  think -- I don't see any wounds that are depicted on

10  that that aren't depicted on some other photographs.

11          THE COURT:  So you're saying that this is

12  irrelevant?

13          MR. MOORE:  Yeah.

14          THE COURT:  Or it's cumulative?

15          MR. MOORE:  Cumulative.

16          MR. BRISSETTE:  Judge, on 315 it's the only

17  picture we have of the chest below the breast area that

18  shows the stab wounds to the abdomen.  We're talking

19  about the one to the right of the ruler and right below

20  the ruler.

21          THE COURT:  Okay.

22          MR. BRISSETTE:  That's why the photo was

23  chosen.

24          THE COURT:  Do you have any other

25  significance to that particular area of the stabbing?

196

1           MR. BRISSETTE:  Well, I think it goes to

2  the last photo you have at the bottom there.

3           The doctor's going to testify that there

4  were organs behind those stab wounds that were damaged

5  as result of these injuries.

6           THE COURT:  Okay.  315 is admitted.

7           Now, with regard to 318?

8           MR. BRISSETTE:  We have -- there's been

9  testimony today before the Court that the individual was

10  pregnant.  This is the photo that starts the chain of

11  custody for the DNA samples to prove paternity for this

12  baby and for the -- the fact that she was pregnant.

13          MR. MOORE:  Paternity of this baby is not

14  an issue in this --

15          THE COURT:  It's still contextual, though.

16  I understand what you're also saying, but however, the

17  matter at hand is that this goes to -- well, go ahead

18  and complete your thought.

19          MR. BRISSETTE:  It -- it -- it -- it --

20  with -- based on the stab wounds that you have depicted

21  in 315 in the area which the body is stabbed, it goes to

22  what Mr. Hummel was stabbing at.  When you look at the

23  stab wounds in 315 and you line that up anatomically on

24  a female that's pregnant and you're stabbing in the area

25  where the womb is.

197

1           THE COURT:  I've carefully weighed the

2  information and argument of Counsel; however, the Court

3  finds that under the 403 analysis the probative value

4  substantially outweighs the danger of unfair prejudice.

5           Accordingly, the State has the burden of

6  sustaining and proving beyond a reasonable doubt that

7  the events in question involving Mrs. Joy Hummel being

8  pregnant at the time of the offense in addition to her

9  death, the manner of its death, that these photographs

10  should be and will be admitted.

11          MR. MOORE:  And, Judge, just so that I'm

12  sure, we have an additional objection that that

13  particular photograph is more prejudicial because it's

14  not really relevant.  He's not indicted in this case

15  with having killed the baby, and for that reason, our --

16  our argument is that the prejudice overrules --

17  outweighs the probative value.

18          I understand it's the Court's ruling.  I

19  just want to make sure my objection --

20          THE COURT:  Absolutely.  Absolutely.  I

21  understand it.  But I also want to emphasize the

22  thoughtfulness that I have considered this heavily in

23  that the fact that this is contextual, in that the

24  course -- that you've also said that there's an issue

25  with regard to the transaction of the events of the

198

1  deaths, the manner and how they occurred are a potential

2  issue for the fact finder.  Accordingly, these

3  photographs should be and will be considered on that --

4  as part of the Court's logic as well.

5           MR. MOORE:  All right.  I understand the

6  Court's ruling.

7           THE COURT:  All right.

8           (OPEN COURT PROCEEDINGS)

9           THE COURT:  Members of the jury, Exhibits

10  471 -- 470, 471 -- that's not been the subject of what

11  we were discussing.  Excuse me.

12          State's Exhibits 304, 305 through 318 are

13  admitted.

14          (State's Exhibit Nos. 304-318 admitted)

15       Q.  (BY MR. BRISSETTE)  Dr. Bao, at the request of

16  our office, did you redraw some of your drawings that

17  you had in this so I could discern what you were writing

18  on the document?

19       A.  Yes.

20       Q.  Is it safe to say that your notes in autopsy

21  are in your handwriting and -- and very few people can

22  read them?

23       A.  Could be.

24       Q.  Could be?

25       A.  Yeah.

201

1    Q.  At our request, did you make three new
2    drawings?
3    A.  Yes, I did.
4    Q.  With the understanding that we were going to
5    blow those up?
6    A.  Yes.  I have the copy with me, too.
7    Q.  I'd like to show you what's been marked for
8    identification purposes --
9         MR. BRISSETTE:  Judge, may the witness
10   stand up so he can see the exhibit --
11        THE COURT:  He may.
12        MR. BRISSETTE:  -- for identification?
13   Q.  (BY MR. BRISSETTE)  Dr. Bao, if you can stand
14   up.
15        Do you recognize what's now marked as 272A?
16   Is this one of your drawings, sir?
17   A.  Yeah, it's my handwriting, case number, my name
18   and the deceased --
19        THE REPORTER:  I'm sorry?
20        THE WITNESS:  The name of the deceased.
21   Q.  (BY MR. BRISSETTE)  272B and 272C, are those
22   your drawings as well, sir?
23   A.  Yes, sir.
24   Q.  And did you cause those to be generated at our
25   request?

200

1    A.  Yes.
2         MR. BRISSETTE:  At this time the State
3    would tender to Defense Counsel 272A through C and offer
4    them for all purposes before the jury.
5         MR. MOORE:  Judge, I have no objection to
6    those exhibits.
7         THE COURT:  272A, B and C are admitted.
8         (State's Exhibit Nos. 272A, 272B,
9         272C admitted)
10        MR. BRISSETTE:  Your Honor, may those three
11   be published at some point?
12        THE COURT:  They may.
13   Q.  (BY MR. BRISSETTE)  Dr. Bao, as part of
14   autopsy, do you collect certain body fluids from a
15   deceased?
16   A.  Yes.
17   Q.  Do you collect them in vials?
18   A.  Yes.
19   Q.  And do you collect them on blood cards?
20   A.  Yes.
21   Q.  I'm going to show you what's been marked for
22   identification purposes as 377.  Do you recognize the
23   small card in the picture of 377?
24   A.  Yes, which has the case number and the name.
25   Q.  And would you put a blood card in -- in an item

such as that?
2    A.  Yes.
3    Q.  Direct -- directly below that in 377, there
4    appears to be what, in your professional world?  What is
5    this object here?
6    A.  This is blood card.
7         THE REPORTER:  I'm sorry?
8         THE WITNESS:  Blood card.
9    Q.  (BY MR. BRISSETTE)  And who puts the blood on
10   the blood card?
11   A.  The technician.
12   Q.  And is that technician working at your
13   direction?
14   A.  Yes.
15   Q.  Is that tech -- tech -- technician working
16   right next to you?
17   A.  Yes, we work together.
18   Q.  And is that a blood card from a person you came
19   to know as Joy Hummel?
20   A.  Yes.
21   Q.  And was this blood card generated at the time
22   of autopsy?
23   A.  Yes.
24   Q.  Item 379, did you have an occasion to collect
25   different parts of tissue or a fetus, a baby, from Mrs.

202

1    Hummel?
2    A.  Yes.
3    Q.  And did you package the -- the -- the fetus in
4    an evidence bag?
5    A.  Yes.
6    Q.  And do you see your initials on the evidence
7    bag?
8    A.  Yes.
9    Q.  And this is the evidence bag that you collected
10   on December the 18th, 2009?
11   A.  Yes.
12        MR. BRISSETTE:  Your Honor, at this time
13   the State would offer 377 and 379 for all purposes,
14   removing our conditional from earlier.
15        MR. MOORE:  Judge, I have no additional
16   objections other than those we previously made.
17        THE COURT:  377 and 379 are admitted.
18        (State's Exhibit Nos. 377, 379 admitted)
19   Q.  (BY MR. BRISSETTE)  Dr. Bao, I'm going to show
20   you what's been marked for identification purposes as
21   State's Exhibit 441.  On page 1 of 441, do you recognize
22   an evidence card -- blood card depicted in this as well?
23   A.  Yes, it's my signature there.
24   Q.  All right.  And you're talking about the second
25   card down on the left side; is that correct?

203

1   A.  Yes.

2   Q.  And is that a blood card you collected of Joy

3   Bedford Hummel?

4   A.  Yes.

5   Q.  And did you collect that same card -- this card

6   at autopsy that day as well?

7   A.  Yes.

8         MR. BRISSETTE:  Judge, may the doctor step

9   down to the board?

10        THE COURT:  He may.

11  Q.  (BY MR. BRISSETTE)  Dr. Bao, can you come down

12  here to explain your findings?

13  A.  Yes.

14  Q.  You have to make one promise for everybody when

15  you're down here.  You have to keep your voice up very

16  loud, or she's going to get upset at us.  Okay?  It's

17  late in the day.

18        If you could take a pointer, on 272A --

19  what are we looking at here on 272A, sir?

20  A.  She had a total of thirty-five stab wounds on

21  body, including ten on the chest, two on the abdomen,

22  one on the right thigh, seven on posterior neck, fifteen

23  on back.

24  Q.  And why do you document injuries such as this?

25  A.  This is routine for every autopsy case.  We

204

1   document any injuries on the body.

2   Q.  And it's routine for you to count the number of

3   penetrations to the body?

4   A.  Yeah.

5   Q.  With respect to the internal organs in this

6   area, on the front of the body, did you determine, when

7   you did the autopsy, that there were any damage to the

8   internal organs of this person?

9   A.  Yes.  In all the stab wounds, I found out --

10  there are total of ten stab wounds.  Ones to chest

11  cavity, the ones through heart, twice; ones through

12  lungs, four times; ones through liver, five times.

13        THE REPORTER:  I'm sorry?

14        THE WITNESS:  Liver, five times, which

15  cause the death.

16  Q.  (BY MR. BRISSETTE)  Can you show me on 272A

17  approximately where the liver is in the body using the

18  left side of the diagram?

19  A.  The heart is here.  The heart was once or

20  twice, either from back or from front.  It's hard to

21  tell.  The lungs, right lung, left lung and liver is

22  here.

23  Q.  What's in the center here where you have

24  indications of two stab wounds in the center above

25  what's drawn on this drawing as the belly button; is

205

1   that correct?

2   A.  Yes.

3   Q.  If this individual was carrying a child, where

4   would the child be located in the womb when this --

5   A.  In early stage of -- of the child is here.

6   Q.  Dr. Bao, in 272B, what are we looking at here,

7   sir?

8   A.  That's a total of six lacerations on the right

9   parietal skull up to 3.5 by 2.5, which is this bigger

10  one.  This is probably caused by multiple hit.

11  Q.  Would you say it was multiple hit by -- by an

12  object?  Can you --

13  A.  Yeah.

14  Q.  Was it a soft object or a hard object?

15  A.  Hard object.  Probably the baseball bat,

16  according to the investigation report.

17  Q.  Was the scalp -- was the skin broken on --

18  on -- on this person's head?

19  A.  Yeah, lacerations means the -- the skin or the

20  scalp break.

21  Q.  Did the skull suffer any injuries as a result

22  of the -- the wounds that you saw?

23  A.  In this case, I did not see any skull

24  fractures.

25  Q.  To do autopsy, the person presented with hair

206

1   on the head; is that correct?

2   A.  Yes.

3   Q.  And was the head shaved for you to do your

4   autopsy?

5   A.  Yeah, we shave hair.

6   Q.  272C, sir, what are we looking at here?

7   A.  She had six incised wound.  Incised wound means

8   cut, means the length of the wound is greater than

9   depth.  So she had two on the neck, each side of the

10  neck, three on the right hand and one on left hand.

11  Q.  With respect to the neck, are those wounds

12  going across the neck like this, left to right or right

13  to left?

14  A.  They're one on each side.  It's hard to tell

15  the direction of the injury.

16  Q.  You said they were longer than they were deep.

17  Were they -- how long were they?  Do you recall?

18  A.  A one-inch and a two-inch.  This is one, two --

19  one-inch long and two-inch long.  This -- this wound is

20  superficial.  There's no lethal injury.

21        THE REPORTER:  I'm sorry?

22        THE WITNESS:  No lethal injury.  Lethal.

23  Q.  (BY MR. BRISSETTE)  Is there a phrase in your

24  profession called defensive wounds?

25  A.  Yes.

207

1    Q.  What is a defensive wound to you, Dr. Bao?

2    A.  Defense -- defense wound means the people try

3  to protect -- protect themself.  They use their hand to

4  try to grab the knife, which cause typical this type of

5  injury.

6    Q.  The wounds that you're talking about on 272C on

7  the hands, do you -- is it your medical opinion that

8  those appear to be defensive in nature?

9    A.  Yes.

10   Q.  Dr. Bao, as part of your internal exam, did you

11 have a chance to look at the trachea and larynx of this

12 individual?

13   A.  Yes, which is particularly important in this

14 case because the body present with superficial thermal

15 burns and the skin spillage.  One of my job is to -- to

16 determine if she died before the house fire or after

17 house fire.

18          In this case, I did not see any soot in the

19 larynx, in the trachea.  Also, the postmortem toxicology

20 report shows there's no carbon monoxide in the blood,

21 meaning she died before the fire.

22   Q.  Where were the thermal injuries on this

23 individual?

24   A.  On -- on the back, butt, legs and arms.

25   Q.  Through the -- through the work at the Medical

208

1  Examiner's Office at your direction, were you able to

2  identify these remains?

3    A.  Yes.

4    Q.  And what was the name that was given to these

5  remains through your investigation?

6    A.  The name of deceased?

7    Q.  Yes?

8    A.  Joy Bedford Hummel.

9    Q.  H-u-m-m-e-l?

10   A.  Yes.

11   Q.  What was the cause of death, sir?

12   A.  Multiple stab wounds.

13   Q.  And what was the manner of death?  What was

14 your ruling?

15   A.  Homicide.

16   Q.  Thank you.

17          MR. BRISSETTE:  Pass the witness.

18          THE COURT:  Cross-examination?

19          MR. MOORE:  Thank you, Judge.

                CROSS-EXAMINATION

BY MR. MOORE:

22   Q.  Dr. Bao, in connection with your autopsy, were

23 you able to make some kind of estimate as to how old the

24 fetus was?

25   A.  Yes, according to the weight of the fetus.

209

1    Q.  And approximately how old was the fetus at that

2  point?

3    A.  14 to 15 weeks.

4    Q.  Is a fetus -- is a fetus that is 14 to 15 weeks

5  old capable of survival outside of the womb?

6    A.  No.

7    Q.  You indicated that there were a number of stab

8  wounds clustered in the -- in the areas that you've

9  shown on those diagrams.  When stab wounds are clustered

10 in a particular area like that, is that suggestive to

11 any particular thing to you?

12   A.  Means he did multiple times.

13   Q.  All right.  Multiple times in one particular

14 area --

15   A.  Yes.

16   Q.  -- is that correct?

17          You indicated that there was a -- a

18 toxicological report done that indicated that there was

19 no $CO_2$ in the blood?

20   A.  Yes.

21   Q.  Was there any other chemicals found within the

22 body?

23   A.  No.

24   Q.  Would you -- do you have a copy of the

25 toxicological report --

210

1    A.  Yes, I do.

2    Q.  Would you refer to that for me, please?

3    A.  Yes.  Right here.

4    Q.  Okay.

5          MR. MOORE:  May I approach, Judge?

6          THE COURT:  You may.

7    Q.  (BY MR. MOORE)  May I see the report?

8    A.  Yes, right here.

9    Q.  Okay.  What is this right here?

10   A.  It's amphetamine.

11   Q.  Amphetamine.  Did the -- did -- did the

12 toxicological report show positive for amphetamine?

13   A.  In autopsy tests, we do two steps of tests.

14 First we call a screen test.  Screen test is very

15 sensitive.  We can detect almost everything.  Because

16 it's too sensitive, sometimes cause false positive.  If

17 we find particular chemical positive, then we do

18 confirmation test.

19   Q.  And you found a positive for amphetamine, but

20 when you did the confirmation test --

21   A.  It's negative.  There's nothing.  This is false

22 positive.

23   Q.  Okay.

24   A.  It's common in the medical tests.

25   Q.  All right.  That's the reason you do the

211

1  confirmation test?

2     A.  Yeah.  We do for every case if one of them is

3  positive.

4     Q.  All right.  The -- on the autopsy that you did

5  of Mrs. Hummel, you indicated that there were stab

6  wounds that were found on the front of the body and on

7  the back of the body and actually one on the leg; is

8  that correct?

9     A.  Yes.

10    Q.  All right.  The blunt-force impact that you saw

11  to the head, I think you said that there -- there was

12  not -- that was not a lethal wound; is that right?

13    A.  I did not see the skull fracture.  I did not

14  see the brain injury.  But this wound could cause the

15  concussion, which I cannot tell --

16    Q.  Okay.

17    A.  -- from autopsy.

18    Q.  Could you tell whether or not -- whether or not

19  that wound would be sufficient to cause the person to

20  lose consciousness?

21    A.  Could.

22    Q.  What -- what she died of was the stab wounds;

23  is that correct?

24    A.  Yes, stab wounds to the heart, to the lung and

25  to the liver.

212

1     Q.  All right.  Thank you very much, Doctor.

2        MR. MOORE:  I pass the witness, Judge.

3        THE WITNESS:  Thank you.

4        THE COURT:  Redirect?

5        MR. BRISSETTE:  Yes, Your Honor, briefly.

6              REDIRECT EXAMINATION

7  BY MR. BRISSETTE:

8     Q.  Dr. Bao, when a body receives that much trauma

9  from multiple sources of infliction, can it be a

10  combination of all that could ultimately cause the death

11  as well?

12    A.  Yes.

13    Q.  And you listed the stab wounds to be the -- the

14  ultimate cause of death.  Would the baseball bat, in

15  splitting the back of somebody's head open, would that

16  cause serious bodily injury to the individual?

17    A.  Since I did not see the skull fracture and the

18  brain contusion, I -- I'm not sure.  The baseball bat

19  injury can cause death, but I'm too sure the stab wounds

20  could cause death a hundred percent.  Went through heart

21  two times; lung, four times; liver, five times.  That's

22  good enough.

23    Q.  How long would somebody live after their heart

24  has been stabbed that many times, their liver has been

25  stabbed that many times and their lungs have been

213

1  stabbed that many times?

2     A.  I would say below two minutes.

3     Q.  Thank you.

4        MR. BRISSETTE:  Pass the witness.

5        THE COURT:  Recross?

6        MR. MOORE:  Yes, if I could, Judge.

7              RECROSS-EXAMINATION

8  BY MR. MOORE:

9     Q.  You said that the person that was stabbed that

10  many times would live below -- less than two minutes,

11  right?

12    A.  Yes.

13    Q.  Do you know the trauma associated with it?  Do

14  you know how long a person that was stabbed that many

15  times would be conscious?

16    A.  I -- I cannot tell.

17    Q.  Okay.  You indicated that there were two on the

18  diagram a moment ago.  I think you pointed there were

19  two stab wounds to the abdomen of Ms. Hummel above her

20  navel; is that correct?

21    A.  Yes.

22    Q.  And I think you -- I believe you indicated that

23  the child, the -- the fetus, would have been positioned

24  below her navel at this point of her pregnancy; is that

25  correct?

214

1     A.  Yes, it's still in the pelvic.

2     Q.  It's still in the pelvic region?

3     A.  Yeah.

4     Q.  You did not denote any stab wounds to the

5  fetus, did you?

6     A.  No.

7     Q.  All right.

8        MR. CUMMINGS:  That's all, Judge.  Pass the

9  witness.

10       MR. BRISSETTE:  No redirect, Your Honor.

11       THE COURT:  May Dr. Bao be -- step down

12  or -- I'm not really sure.  One of your witnesses, I

13  believe, has examined more than one person?

14       MR. BRISSETTE:  That would be Dr. Sisler,

15  Your Honor.

16       THE COURT:  All right.  May Dr. Bao be

17  excused?

18       MR. BRISSETTE:  Yes.

19       MR. MOORE:  Yes.

20       THE COURT:  Doctor, you may step down.

21  Thank you very much.

22       THE WITNESS:  Thank you.

23       (Witness retires)

24       THE COURT:  State, call your next witness.

25       MR. GILL:  We call Dr. Sisler.

215

217

1    THE COURT:  And while Dr. Sisler is coming

2    up, I do want to talk to the attorneys briefly.

3    (BENCH CONFERENCE PROCEEDINGS)

4    THE COURT:  Mr. Moore, there was one

5    additional grounds the reason I permitted the

6    photograph, and I wanted to make that part of the record

7    at this time, and that's regarding Article 38.36.  In

8    all prosecutions for murder, the State or the Defendant

9    shall be permitted to offer testimony as to all relevant

10   facts and circumstances surrounding the killing and the

11   previous relationship existing between the accused and

12   the deceased, together with all relevant facts and

13   circumstances going to show the condition of the mind of

14   the accused at the time of the offense.

15       And that was an additional fact that the

16   Court was considering.

17       MR. MOORE:  I understand, Your Honor.  I

18   still don't agree with you.

19       THE COURT:  I appreciate that.  Thank you

20   very much.

21   (OPEN COURT PROCEEDINGS)

22   (Witness enters courtroom)

23       THE COURT:  Dr. Sisler, please raise your

24   right hand, sir.

25   (Witness sworn)

1    A.  I believe since about 1970.

2    Q.  And how long have you been involved in

3    pathology, forensic pathology, specifically?

4    A.  I -- I took combined training since 1971.

5    Q.  Have you served in the military?

6    A.  Yes, sir.

7    Q.  In what capacity did you serve in the military?

8    A.  I had a varied career.  Infantry in Korea,

9    pharmacist and physician.

10   Q.  What are your duties with the Tarrant County

11   Medical Examiner's Office?

12   A.  To establish the cause of death and then how --

13   rule on how the death occurred.  We have several

14   categories of how a death occurred.  Natural manner,

15   which is a heart attack; accident, a car wreck; suicide,

16   person takes their own life; and then homicide.

17   Q.  And generally is the type of medicine you

18   practice known as forensic pathology?

19   A.  Yes, sir.

20   Q.  So tell the jury, please, what forensic

21   pathology is.

22   A.  Again, it's to establish the cause of death, to

23   investigate suspicious death, investigate homicides,

24   suicides.

25   Q.  And have you done that on a -- on a -- on a

216

218

1    THE COURT:  Please be seated, Doctor.

2    You may proceed.

3    GARY L. SISLER,

4    having been first duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. GILL:

7    Q.  Doctor, would you please tell the jury your

8    name?

9    A.  It's Dr. Gary L. Sisler.

10   Q.  And, Dr. Sisler, how are you occupied or

11   employed?

12   A.  As a Deputy Medical Examiner for Tarrant,

13   Parker, Denton and Johnson Counties.

14   Q.  And how long have you been employed in that

15   capacity?

16   A.  Approximately 22 years.

17   Q.  And what is your training and education that

18   qualifies you to hold that position?

19   A.  I received my D.O. degree from Kansas City

20   College of Osteopathic Medicine and Surgery.  I trained

21   in forensic and anatomic pathology at William Beaumont

22   Army Medical Center.  I'm licensed to practice medicine

23   in the State of Texas.

24   Q.  And how long have you been licensed to practice

25   medicine in the State of Texas?

1    daily or weekly basis for the last 22 years with the

2    Tarrant County Medical Examiner's Office?

3    A.  Yes, sir.

4    Q.  Were you employed by the Tarrant County Medical

5    Examiner's Office on December the 18th of 2009?

6    A.  Yes, sir.

7    Q.  And did you happen to be working in the morgue

8    that day?

9    A.  Yes, sir.

10   Q.  Who is Dr. Lucille Tennant?

11   A.  She was a fellow that was in training with us

12   at that time.

13   Q.  And as a -- as a fellow in training, did she

14   work with you, or did you work with her in the -- in the

15   conducting of autopsies in Tarrant County, Texas, for a

16   period of time?

17   A.  Yes, sir.

18   Q.  And on December the 18th of 2009, did you

19   assist her in conducting an autopsy which has received

20   your case number, 0914835?

21   A.  Yes, sir.

22   Q.  And does each case that comes into your office

23   receive a unique case number?

24   A.  Yes, sir.

25   Q.  So is the case number of 0914835 unique to the

219

1 case that you and Dr. Tennant conducted an autopsy on on
2 December the 18th of 2009?
3    A.  Yes, sir.
4    Q.  And how do you begin your autopsy?  How did you
5 do that on that particular date with regard to this
6 particular case?
7    A.  First we do an external examination noting any
8 abnormalities, recording them with photography and line
9 drawings.
10         After that, then we proceed to enter the
11 chest and examine the heart, the lungs, again noting any
12 abnormalities.  And then after that, we proceed to the
13 abdomen, examine the abdominal organs, and then after
14 that, we proceed to examine the head and the brain,
15 again, documenting any abnormalities.
16    Q.  And Case No. 0914835, on December 18th of 2009,
17 how did this particular body present to you?
18    A.  There were external thermal injuries; in other
19 words, burns.
20    Q.  Okay.  And how extensive were those thermal
21 injuries?
22    A.  Almost a hundred percent of the body.
23    Q.  Okay.  So would it be a fair statement that the
24 body you observed in this case number was almost 100
25 percent burned?

220

1    A.  Yes, sir.
2    Q.  Okay.  And did your inspection of the body at
3 that time reveal anything else about it?
4    A.  There was some head trauma that -- after --
5 we documented the head trauma after we cleaned the --
6 the skull off.
7    Q.  And what -- what did that -- that head trauma
8 consist of?
9    A.  Multiple skull fractures.
10    Q.  Was that body capable of being identified in
11 the -- in the condition it was presented to you?
12    A.  No, sir.
13    Q.  Were you capable -- was it capable -- were you
14 capable of making an age assessment on that body in the
15 position it was presented to you?
16    A.  No, sir.
17    Q.  And why was that?
18    A.  Because all the external features were burned
19 away.
20    Q.  Tell the jury what pugilistic posturing is.
21    A.  This is a posture that after thermal injuries,
22 the -- the muscles that flex your arms contract, and the
23 pugilistic deal is where the arms are drawn up
24 against -- over the front of the body similar to a
25 fighter.

221

1    Q.  You said that's something that's caused by the
2 reaction to heat?
3    A.  Yes, sir.
4    Q.  Did this -- did this -- well, I take it this
5 body had been in a fire.  Is that how it appeared to
6 you?
7    A.  Yes, sir.
8    Q.  All right.  Did the fire cause partial
9 detachment of anything?
10    A.  I think there were extremities.  I think the
11 right -- right hand was amputated.  The skin over the
12 body, arms, was burned away exposing the -- the muscle
13 and bone.
14    Q.  And you said after your external examination
15 you do a -- an incision in the chest?
16    A.  Yes, sir.
17    Q.  And did you -- you proceeded with your autopsy
18 on this body on that occasion?
19    A.  Yes, sir.
20    Q.  Okay.  Were there any -- any findings of note
21 in -- in the chest cavity?
22    A.  No, sir.
23    Q.  Were there any findings of note anywhere on
24 this body, particularly from the -- from the neck down?
25    A.  I -- I'll take that back, sir.  You have some

222

1 atherosclerosis in the coronary arteries.
2    Q.  What is that just for --
3    A.  It's the narrowing of the coronary arteries
4 that supply the heart.  They're partially closed off
5 with fatty deposits.
6    Q.  Okay.  Would you describe to the jury what your
7 examination of the -- of the head of this individual
8 revealed?
9    A.  Multiple right-sided depressed skull fractures.
10    Q.  And for -- for those of us who don't practice
11 medicine, what is a depressed skull fracture?
12    A.  That means there's a depressed fracture of
13 the -- the right side of the body.
14    Q.  Did it appear that this individual had been
15 struck by some type of object?
16    A.  Yes, sir.
17    Q.  Based upon your training and your experience,
18 did you have a suspicion at that time what that object
19 might be?
20    A.  It was -- it would be a blunt object, sir.
21    Q.  Is a baseball bat or a bat a blunt object?
22    A.  I would say so, sir.
23    Q.  Would these injuries that you found with regard
24 to Case No. 0914835 be consistent with that individual's
25 head being struck by a bat?

223

1    A.  Yes, sir.

2    Q.  Do you have an opinion as to how much force

3  this individual's head -- how much force was used by

4  that bat to strike the individual's head?

5    A.  I would say a high velocity of blunt injury.

6    Q.  Since the body came in -- to you in a burned

7  condition, did you take any additional steps to inspect

8  it to see whether or not the fire had caused the death

9  of the individual?

10    A.  Inspection, sir.

11    Q.  Okay.  And what did you inspect?

12    A.  We -- from a fire fatality, we look to see if

13  there's soot in the airways.

14    Q.  Did you find soot in the airways of this body?

15    A.  No, sir.

16    Q.  You also inspect the lungs?

17    A.  Yes, sir.

18    Q.  And what did you find with regard to the lungs?

19    A.  No evidence of soot in the deep air -- deeper

20  airways and mostly pulmonary edema.

21    Q.  What did all that indicate to you with regard

22  to the fire?

23    A.  That the -- the person was dead during the

24  fire.

25    Q.  Now, who is Dr. Dana Austin?

224

1    A.  She's our forensic anthropologist.

2    Q.  And what is her job description at the Tarrant

3  County Medical Examiner's Office?

4    A.  She examines skeletons, specializing in bone

5  pathology.

6    Q.  And did she have occasion to examine this

7  particular body?

8    A.  Yes, sir.

9    Q.  And were her skills used to help reconstruct

10  the skull on this particular body?

11    A.  Yes, sir.

12    Q.  Doctor, I'm going to show you what has been

13  marked as State's Exhibits No. 353 through 367 and ask

14  if you'd take a second and look through these and see if

15  you recognize each of these as being photographs that

16  were taken at your direction or by you during this

17  particular autopsy?

18    A.  (Witness complies).

19    Q.  Okay, Doctor.  Do you recognize the scene

20  depicted in each of those photographs?

21    A.  Yes, sir.

22    Q.  And were each of those photographs taken during

23  the autopsy of Case No. 0914835?

24    A.  Yes, sir.

25    Q.  Do the photographs that you've just seen, which

225

1  are State's Exhibit 353 through 367, illustrate the

2  condition the body appeared when you first saw it?

3    A.  Yes, sir.

4    Q.  And there -- are there also various photographs

5  taken during different points in the autopsy?

6    A.  Yes, sir.

7    Q.  Do the photographs illustrate the -- the damage

8  that was done to the skull of this individual?

9    A.  Yes, sir.

10    Q.  And do they illustrate some of Dr. Austin's

11  work in reconstructing the skull?

12    A.  Yes, sir.

13    Q.  Do they illustrate the -- the depressed skull

14  fractures that you've described earlier to the jury?

15    A.  Yes, sir.

16    Q.  Do they also illustrate the -- the extensive

17  thermal damage to the body?

18    A.  Yes, sir.

19        MR. GILL:  We offer 353 through 367.

20        (BENCH CONFERENCE PROCEEDINGS)

21        MR. MOORE:  Judge, I have no objection to

22  353 through 358, the photographs that depict the way

23  they appeared at the time of -- of the autopsy.

24        THE COURT:  Those will be admitted.

25        MR. MOORE:  I object to 359, 360, 361, 362,

226

1  363, 364, 365, 366 and 367, as each of them depicts the

2  scene after a portion of the skull removed in autopsy.

3        THE COURT:  Mr. Gill, your response?

4        MR. GILL:  First of all, these photographs

5  were originally taken in color, and we have only

6  reproduced these particular exhibits in black and white

7  so that we can -- we can minimize the effect on the

8  jury.

9        Second of all, they're relevant to show the

10  condition the skull was in and the means that these --

11  that these medical professionals had to go through in

12  order to reconstruct the skull and examine it to arrive

13  at a cause of death, which is -- which is the

14  underpinnings of the relevance is to illustrate the --

15  the cause of death being blunt trauma to the head.

16        THE COURT:  So Exhibits 359 or -- and --

17  through 367 is to establish the manner of death by blunt

18  force trauma?

19        MR. GILL:  That's correct.

20        THE COURT:  Okay.  Now, you're minimizing

21  by making them black and white photographs.  Now, did

22  any other experts rely upon the photographs in

23  anticipation?  I believe you said something about an

24  anthropologist; is that correct?

25        MR. GILL:  Dr. Sisler worked with Dr.

227

1 Austin, a forensic anthropologist in -- in the
2 reconstruction and examination of this skull.
3           THE COURT: Okay. Did she refer to these
4 photographs for the purposes of her work?
5           MR. GILL: Yes, she did; although, she's
6 not going to testify.
7           THE COURT: She is not going to testify?
8 Okay.
9           Now, the Court finds that -- well, 359
10 through 367, to establish the manner and means of death
11 and the efforts to establish beyond a reasonable doubt
12 the State's burden caused the death caused by blunt
13 force trauma should be and will be considered by the
14 jury. Your objection is overruled.
15           Was there anything else that you wanted to
16 add, Mr. Moore?
17           MR. MOORE: No, Judge.
18           THE COURT: All right. Yes, sir?
19           MR. MOORE: I -- I do have a 403 objection
20 to those same numbers, Your Honor.
21           THE COURT: All right.
22           MR. MOORE: The relevance -- the basis of
23 the 403 objection is each of those photographs is taken
24 at a time, after they have already removed the skull
25 from -- a portion of the skull from the body. They've

228

1 cleaned the skull in some -- in a number of the
2 photographs, and I think that the -- the photograph,
3 because the -- it does not reflect the way that the body
4 appeared at the time that they received it, but it
5 reflects after they have done a surgical intervention is
6 more prejudicial than probative.
7           THE COURT: Well, first off, is that there
8 hasn't been any -- there hasn't been any testimony about
9 any medical intervention for life-saving efforts.
10           MR. MOORE: No, and -- and I must have
11 misspoke. I mean, as part of the autopsy they removed
12 it --
13           THE COURT: Okay. Now, as part of the
14 autopsy, as we all understand autopsies through our
15 experiences, is that that's necessary to establish the
16 cause of death in that it is normal and it's part of the
17 autopsy procedure to show to the jury and prove to the
18 Defense what -- what steps were taken to perform a
19 correct autopsy.
20           And as a result of your 403 objection,
21 after conducting a balancing test, is that the probative
22 value substantially outweighs the prejudicial effect and
23 should be considered by the jury under the
24 circumstances.
25           MR. MOORE: All right.

229

1           THE COURT: Thank you.
2           (OPEN COURT PROCEEDINGS)
3           THE COURT: Members of the jury, State's
4 Exhibit 353 through 367 are admitted.
5           (State's Exhibit Nos. 353-367 admitted)
6      Q. (BY MR. GILL) Dr. Sisler, although numerous
7 photographs were taken during your autopsy in Cause No.
8 0914835, did you also have occasion to create some
9 sketches that illustrated the -- the injuries to this
10 individual?
11     A. Yes, sir.
12     Q. And did you and Dr. Austin collaborate and
13 sketch some three-dimensional -- make a
14 three-dimensional sketch on a model skull for
15 presentation to the jury of the injuries to this
16 individual's skull?
17     A. Yes, sir.
18     Q. Let me show you what's been marked as State's
19 Exhibit No. 271C, and ask if you recognize 271C?
20     A. Yes, sir.
21     Q. And is 271C a -- an exhibit that you and Dr.
22 Austin prepared to illustrate to the jury what you found
23 with respect to this case?
24     A. Yes, sir.
25     Q. And is it a true and accurate representation of

230

1 your findings in this case?
2      A. Yes, sir.
3           MR. GILL: We offer 271C.
4           MR. MOORE: Judge, I don't have any
5 objection.
6           THE COURT: 271C is admitted.
7           (State's Exhibit No. 271C admitted)
8           MR. GILL: May I have the doctor step down
9 in front of the jury, please?
10           THE COURT: That's granted Mr. -- Dr.
11 Sisler.
12     Q. (BY MR. GILL) If you would, Doctor, would you
13 take 271C --
14           THE REPORTER: I'm sorry. Excuse me.
15           MR. GILL: I'm sorry. Sorry.
16     Q. (BY MR. GILL) Would you take 271C and
17 illustrate to the jury what you found in reference to
18 the skull of this individual?
19     A. This is the right side of the head. As
20 illustrated here, there's a large area outlined in
21 purple, a depressed skull fracture. Then this is
22 involving, as I say, the right side of the head,
23 fractures extend into the mandible, the -- the orbit and
24 the maxillary sinus.
25           And then extending from the posterior,

231

1   there's another fracture that extends across the -- the
2   back of the head and ends in a -- in a burned area.  And
3   then in front of the depressed skull fracture, then
4   there's another fracture that extends across the left
5   side.  They meet in a burned area of the skull.
6       Q.  So for -- so for purposes of the record, do
7   the -- do the purple lines on State's Exhibit 271C
8   indicate fractures?
9       A.  Yes, sir.
10      Q.  And what do the black lines on the -- on the
11  model illustrate?
12      A.  The sutures of the skull.
13      Q.  And what are the sutures of the skull?
14      A.  It's where the different bones meet.
15      Q.  So -- so the sutures are a natural process?
16      A.  Yes, sir.
17      Q.  Thank you, Doctor.
18          If you could, while you're up, let me show
19  you what has been marked as State's Exhibits 271A and
20  271B and ask if you recognize each of these items?
21  Let's take 271B first, since it's in front.
22          Do you recognize 271B?
23      A.  Yes, sir.
24      Q.  Do you recognize 271A?
25      A.  Yes, sir.

232

1       Q.  And are both of these exhibits blow-ups of
2   sketches that were done by you during the course of this
3   autopsy -- you or Dr. Tennant during the course of this
4   autopsy?
5       A.  Yes, sir.
6       Q.  And do they truly and accurately depict your
7   findings in Case No. 0914835?
8       A.  Yes, sir.
9           MR. GILL:  We offer 271A and B.
10          MR. MOORE:  Judge, I've seen the exhibits,
11  and I don't have any objection.
12          THE COURT:  271A and B are admitted.
13          (State's Exhibit Nos. 271A, 271B admitted)
14      Q.  (BY MR. GILL)  And, Dr. Sisler, if you could
15  step up to this easel, please.  Let's start with 271A.
16          All right, Doctor.  Would you explain to
17  the jury what we see on State's Exhibit 271A?
18      A.  On the right side here, these are what we call
19  split -- heat-split lacerations.  The -- the -- the heat
20  causes a stretching of the skin, and as it stretches, it
21  splits.  There's heat splits here, here and then over
22  the right side of the face.
23          On this one we depicted in not -- not as
24  great detail as on the mannequin.  This area is the area
25  of depressed fracture that I mentioned already.

233

1       Q.  And on the -- the left side of the -- the.
2   skull, were there --
3       A.  There was some -- some burned area in this
4   area.  Actually, the left side of the face and left side
5   of the body, which the other one I'll talk about.
6   This -- the left side, was spared.
7       Q.  So the left side was spared the -- the thermal
8   damage which had occurred to the right side?
9       A.  Yes, sir.
10      Q.  And then 271B?
11      A.  This is the pugilistic attitude that -- that
12  was mentioned already.  This is where the arms are
13  pulled up over the front of the chest like a fighter,
14  and that's due to the contraction of the flexor muscles.
15  They're stronger than the extensor muscles, and the heat
16  causes them to come up into what we call pugilistic or a
17  fighter position.
18          Then all the chest was blackened and
19  charred, and there was a large defect of the abdomen
20  that was burned away with the intestines protruding.
21  There's extensive heat damage of the -- of the upper
22  extremities.
23          And I think I mentioned this already.
24  There was a heat amputation of the right hand and then
25  over this -- this extremity, all of the -- the -- there

234

1   was burning and charring of the extremity with exposure
2   of muscles.
3           And then this is an area of sparing that
4   was on the left side of the body.  These extremities
5   were blackened and charred.  The skin over the -- the
6   right kneecap was burned away exposing the kneecap.
7           On the back we had extensive black and
8   charred skin.  There was a large defect with exposure of
9   the bone -- pelvic bone and the posterior chest wall,
10  and then this is a back view of the sparing.  All the
11  extremities were -- the skin was burned away exposing
12  the muscle and bone.
13      Q.  And as a -- as a result of the autopsy and
14  inquest you performed here, as a result of your
15  examinations, did you come to a conclusion as to what
16  caused the death of this individual?
17      A.  We said the cause of death was blunt force
18  trauma of the head.
19      Q.  And did you arrive at a -- a manner of death?
20      A.  Yes, sir.
21      Q.  And what was that?
22      A.  Homicide.
23      Q.  Thank you, Doctor.  Go ahead and take your
24  seat.
25      A.  (Witness complies).

235

1    Q.  Now, Doctor, you mentioned earlier that this
2    individual was not capable of being identified; is that
3    correct?
4    A.  Yes, sir.
5    Q.  And as part of your responsibilities as -- as a
6    Deputy Medical Examiner for Tarrant County, Texas, do
7    you have the responsibility to try to identify this
8    individual?
9    A.  Yes, sir.
10   Q.  And in -- order to do so -- in order -- for
11   other purposes, do you collect samples from the body at
12   the time of autopsy?
13   A.  Yes, sir.
14   Q.  And are some of those samples that you collect
15   blood cards that could be used later on to obtain a DNA
16   profile in order to arrive and establish the identity of
17   this individual?
18   A.  Yes, sir.
19   Q.  Let me show you what has been marked as State's
20   Exhibit No. 378 and ask if it bears the -- the case
21   number that we've been referring to, 0914857?
22   A.  Yes, sir.
23   Q.  Okay.  And is that -- does that exhibit portray
24   some forensic samples that were collected in connection
25   with this case?

236

1    A.  Yes, sir.
2    Q.  And do you recognize it?
3    A.  Yes, sir.
4    Q.  And was that collected -- was that item
5    depicted there collected -- what is it, please?  What is
6    the item that was collected?
7    A.  It's what we call a blood card.  It's actually
8    a piece of cardboard that we put a -- a drop of blood
9    on.
10   Q.  And at the -- at the end after it's collected,
11   is it sealed in the small coin envelope that appears in
12   the upper left-hand corner of the photograph?
13   A.  Yes, sir.
14   Q.  And is this coin envelope then sealed within
15   the larger envelope that appears on the right-hand side
16   of the photograph?
17   A.  Yes, sir.
18        MR. GILL:  Your Honor, we offer at this
19   point without condition State's Exhibit No. 378.
20        MR. MOORE:  Judge, I have no additional
21   objection.
22        THE COURT:  378 is admitted for all
23   purposes.
24        (State's Exhibit No. 378 admitted)
25   Q.  (BY MR. GILL)  Doctor, let me now show you

237

1    what's been marked as State's Exhibit No. 441, and if
2    you could refer to the left-hand -- the photograph on
3    the left-hand side of page 1 and see if you recognize
4    another blood card that was drawn in connection with
5    this particular case we've been speaking of?
6    A.  Yes.
7    Q.  Okay.  Is that the -- it's in the --
8    left-hand column, the third from the top?  0914837; is
9    that correct?
10   A.  That's from the other case, sir.
11   Q.  Okay.  I'm sorry.  0914835; is that correct?
12   A.  Yes, sir.
13   Q.  I'm sorry.  I misspoke on this -- on State's
14   Exhibit No. 378, Doctor.  This was Case No. 0914835,
15   correct?
16   A.  Yes, sir.
17   Q.  All right.  And you recognize it?
18   A.  Yes, sir.
19   Q.  The 091857 I was referring to, you recognize
20   that as being a number of the University of North Texas
21   Health Science Center?
22   A.  Yes, sir.
23   Q.  Okay.  I apologize for that.
24        So the -- with regard to State's Exhibit
25   No. 441, you're referring to the envelope that's in the

238

1    upper left-hand corner of the photograph; is that
2    correct?
3    A.  Yes, sir.
4    Q.  0914835?
5    A.  Yes, sir.
6    Q.  Does that envelope contain another blood card
7    that you connect -- collected in connection with this
8    case?
9    A.  Yes, sir.
10   Q.  And that same day, Doctor, did you have
11   occasion to perform another autopsy?
12   A.  Yes, sir.
13   Q.  And if I could direct your attention to Case
14   No. 0914837.
15   A.  Yes, sir.
16   Q.  And was this -- did you also come across this
17   body in your morgue on that -- that same date, December
18   18th of 2009?
19   A.  Yes, sir.
20   Q.  And how did the body in this particular case
21   present to you?
22   A.  It's a -- was with global charring.
23   Q.  Could you tell -- well, what do you mean by
24   global charring?
25   A.  Total burns.

239

1   Q.  Was this a -- was this a large body or a small
2   body?
3   A.  Small body, sir.
4   Q.  And did it appear to be consistent with a body
5   of a child?
6   A.  Yes, sir.
7   Q.  And during the course of your autopsy, did you
8   come to learn the sex of this particular child?
9   A.  Yes, sir.
10   Q.  And what sex was the child?
11   A.  A female.
12   Q.  And you said the body presented to you with
13   global charring.  Could you explain that in a little
14   more detail to the jury, please?
15   A.  The whole surface of the body showed burns.
16   Q.  Was it -- was it burns, or was it extensive
17   burns?
18   A.  Extensive.
19   Q.  And how -- how deep did those burns go?
20   A.  Full thickness.
21   Q.  And full thickness of the skin?
22   A.  Yes, sir.
23   Q.  All right.  Did you have occasion to more
24   closely inspect the head of the -- of the body that was
25   delivered to you in connection with this case?

240

1   A.  Yes, sir.
2   Q.  And what did your inspection reveal?
3   A.  After the -- the skin, we cleansed the --
4   the -- the skull.  There was extensive fractures, again
5   on the right side and extended as one fracture line
6   extended from the depressed fracture across the -- the
7   front of the skull and ended up in the left side.
8   Q.  After your visual inspection, were photographs
9   taken of this particular body?
10   A.  Yes, sir.
11   Q.  And did you also do sketches in this particular
12   case, as you did in the other case you've testified to?
13   A.  Yes, sir.
14   Q.  And did you go ahead and conduct a -- the
15   Y-shaped incision and -- and do an autopsy of the --
16   chest cavity of this individual?
17   A.  Yes, sir.
18   Q.  And did that reveal anything of note?
19   A.  No, sir.
20   Q.  Now, you mentioned with regard to the other
21   case number we just got done discussing that one of
22   your -- one of the important aspects of the body that
23   you examined was to examine to see if there's any soot
24   in the -- in the breathing areas of the body.  Did you
25   conduct that same examination with regard to this case?

241

1   A.  Yes, sir.
2   Q.  And what were your findings?
3   A.  The airways were negative for soot.
4   Q.  And what does that mean to you?
5   A.  That the -- the decedent was dead before the
6   fire.
7   Q.  Doctor, let me hand you what's been marked as
8   368 through 375 and ask you to examine each of these.
9   A.  (Witness complies).
10   Q.  And, Doctor, do you recognize each of the
11   photographs contained in State's Exhibits 368 through
12   375?
13   A.  Yes, sir.
14   Q.  And were these photographs all taken during
15   your autopsy of the body we've been discussing?
16   A.  Yes, sir.
17   Q.  Did Dr. Austin collaborate with you in this
18   case also?
19   A.  Yes, sir.
20   Q.  Did you and she also prepare a series of
21   sketches with regard to the condition of this body at
22   the time of autopsy?
23   A.  Yes, sir.
24   Q.  Do the photographs illustrate the condition the
25   body was in when it was presented to you at the morgue?

242

1   A.  Yes, sir.
2   Q.  And does it further illustrate the efforts you
3   and Dr. Austin had to go through to reconstruct the
4   skull of the individual and then arrive at a cause of
5   death?
6   A.  Yes, sir.
7        MR. GILL:  We offer 370 -- I'm sorry -- 368
8   through 375.
9        (BENCH CONFERENCE PROCEEDINGS)
10        THE COURT:  Go ahead, Mr. Moore.
11        MR. MOORE:  Judge, I'm going to object to
12   all of the exhibits, 368 through 375, on the basis that
13   they are not relevant to the Indictment in this case.
14   He's not charged in this Indictment with the murder of
15   the child, Jodi Hummel, and therefore, these -- these
16   photographs are not relevant to prove any fact that's
17   necessary to be proved before this jury.
18        I specifically object to Exhibits No. --
19   beginning with No. 368, 369 and 370 appear to purport
20   the body the way that it appeared at the morgue.
21        Beginning with 371 through 375, the
22   exhibits depict scenes after the Medical Examiner's
23   Office has cleaned the skull, removed pieces of the
24   skull, attempted to piece pieces back together, and they
25   don't depict the scene as the way that it appeared at

243

1    the time.  So we feel like they are not admissible.

2         I also object on the basis that all of

3    these are not -- are more prejudicial than they are

4    probative.

5         THE COURT:  State, your response?

6         MR. GILL:  Your Honor, we would have the

7    same -- same reasoning and rationale for offering these

8    as we did the autopsy on the other case that Dr. Sisler

9    just testified to.  Obviously, this is same transaction

10   contextual evidence in connection with the -- the case

11   on trial.  We believe they're relevant.  And their

12   probative value is not substantially outweighed by

13   prejudicial effect.

14        And again, the -- the originals of these

15   are in color.  We have made these exhibits in black and

16   white to reduce the -- the effect on the jury, and also

17   it's -- just like for Mr. Bedford, which I didn't get to

18   add for the record, the -- the uncleaned photographs are

19   more gorier than the photographs that we have included

20   here, which show the -- the body parts and -- and

21   cleaned up at autopsy.

22        THE COURT:  For the reasons stated by the

23   State, the Court does find that the State's Exhibits 368

24   through 375 should be considered by the jury.  I'm

25   specifically overruling your 403 objection after

244

1    taking -- conducting a -- a balancing examination.

2         Furthermore, under Article -- Texas Code of

3    Criminal Procedure 38.36, in murder cases that

4    information and circumstances involving the family are

5    admissible, particularly with regard to, one,

6    establishing the identity of the individual, the manner

7    and means of the death and to show that it was

8    contextual -- contextual and transactional.

9         Given those factors, the Court has

10   determined that the evidence should be and will be

11   considered by the jury.

12        Your objection is overruled.

13        Are there any other rulings that you

14   require?

15        MR. MOORE:  Not at this point, Judge.

16        THE COURT:  All right.

17        (OPEN COURT PROCEEDINGS)

18        THE COURT:  Members of the jury, State's

19   Exhibits 368 through 375 inclusively are admitted.

20        (State's Exhibit Nos. 368-375 admitted)

21        Q.  (BY MR. GILL)  Dr. Sisler, did you also -- you

22   testified you also had occasion to prepare some sketches

23   with regard to this case; is that right?

24        A.  Yes, sir.

25        Q.  If I could have you step down and take a look

245

1    at State's Exhibit Nos. 270A through 270G and see if you

2    recognize each of these as being sketches that you

3    prepared in connection with this autopsy in Cause No.

4    0914837?

5         A.  (Witness complies).

6         Q.  Doctor, do you recognize State's 270A through

7    G?

8         A.  Yes, sir.

9         Q.  And do each of them accurately depict the scene

10   as you observed it on December the 18th of 2009?

11        A.  Yes, sir.

12        Q.  Will they assist you in explaining your work to

13   the jury?

14        A.  Yes, sir.

15        MR. GILL:  We offer 270A through G.

16        MR. MOORE:  Judge, I have seen the diagram.

17   I have no objection.

18        THE COURT:  270A through G are admitted.

19        (State's Exhibits 270A, 270B, 270C, 270D,

20        270E, 270F, 270G admitted)

21        Q.  (BY MR. GILL)  Doctor, while you're there, let

22   me show you 270H and ask you if that is an exhibit that

23   was prepared by you and Dr. Austin?

24        A.  Yes, sir.

25        Q.  And do 207H accurately portray the injuries

246

1    that were inflicted on this body as it was presented to

2    you on December the 18th of 2009?

3         A.  Yes, sir.

4         Q.  And will that assist you in explaining your

5    testimony to the jury?

6         A.  Yes, sir.

7         MR. GILL:  We offer 270H.

8         MR. MOORE:  Judge, I have seen that exhibit

9    and I have no objections.

10        THE COURT:  207H is admitted.

11        (State's Exhibit No. 270H admitted)

12        MR. GILL:  May the Doctor step in front of

13   the jury and show them 270H, Your Honor?

14        THE COURT:  He may.

15        THE WITNESS:  The back of the head was

16   burned, fragmented and missing, the -- the missing parts

17   illustrated with the ruler.  And then on the right side,

18   we have another depressed skull fracture that extends

19   over the right side, and then there's a process called

20   the mastoid process below the ear canal that's

21   fractured.

22        Then we have fracture lines extending from

23   the mastoid process anterior into the zygomatic bone.

24   It's the bone that connects the frontal bone and face to

25   the temporal bone here.

247

1    Then there's another fracture that extends
2  from the back of the depressed fracture across the front
3  of the skull and ends in -- in a bone -- burned bone on
4  the left here.
5    Q.  (BY MR. GILL)  So what type of injuries were
6  they that you observed to the skull of this individual?
7    A.  Multiple right-side skull fractures.
8    THE REPORTER:  I'm sorry, sir?
9    THE WITNESS:  Multiple right-side skull
10  fractures.
11    Q.  (BY MR. GILL)  Thank you, Doctor.
12    I'm going to show you -- ask you to
13  illustrate these charts to the jury next, if you don't
14  mind, starting with State's Exhibit 270A.
15    A.  This is a -- a side view of the back of the
16  right side that I mentioned that was burned away, and
17  then we have the fracture extending from the right
18  across the frontal skull ending in a -- a unboned burned
19  area.
20    Q.  And then 270B?
21    A.  This was the area of a depressed skull
22  fracture.  We have a fracture that -- mastoid process.
23  It extended into the zygomatic process that connects the
24  maxillary bone and the frontal bone to the temporal
25  bone.

249

1    A.  Then we have the skin that's burned away over
2  the -- the right pelvic area with exposure of bone and
3  muscle, and then we have another heat amputation of the
4  right mid-thigh here.
5    Q.  And then Exhibit F?
6    A.  Again, this is the illustration, the skin is
7  burned away from the left thigh and with heat amputation
8  to the left lower leg.
9    Q.  And then Exhibit G?
10    A.  I title this as global charring, which I use
11  the -- when I say "global," the whole body is burned.
12  And we have the burned away skin of the anterior chest,
13  and this -- I have -- it's intact blackened charred skin
14  over the chest and abdomen.
15    Here we have charred loss of the eyes and
16  skin of the face, and then when we have the heat
17  fractures posterior -- this is all missing that I
18  mentioned before, and then we have what we call cooked
19  brain protruding, and then we have charred blackened
20  skin over the back.
21    And then on this side, the left side, we
22  have the skin and ribs burned away with exposure of
23  charred lungs and small intestine.
24    And then we have over the right side, the
25  burned away skin with exposure of the ribs of the right

248

1    This is the fracture that extended from the
2  depressed fracture across the left -- or right side of
3  the skull and ended up over here in bone -- burned bone.
4  This is the area that was missing charred -- charred
5  fragmented bone.
6    Q.  Doctor, 270C, please.
7    A.  This is an illustration of the right extremity.
8  The skin's burned away over the right upper arm, the
9  exposure of bone and muscle, and then we have a heat
10  amputation of the forearm at the elbow -- the elbow, and
11  this part was amputated.
12    Then we have illustration of the skin
13  burned away with exposure of bone and muscle over the
14  right side, and then we have heat amputation of the
15  right lower leg.
16    Q.  And then, Doctor, 270D?
17    A.  This is a posterior view of the skin of the
18  buttocks that's burned away with exposure of the pelvic
19  bones.  And then in this illustration, we have the
20  skin's burned away of the left arm with exposure of the
21  bone with a heat fracture of the -- of the left arm.
22    And then we have -- the skin's burned away
23  with exposure of the right arm with muscle and bone
24  exposed and a heat amputation at the elbow.
25    Q.  And, Doctor, 270E, as in Edward?

250

1  flank, and it's the right --
2    THE REPORTER:  I'm sorry?  I'm sorry?
3    THE WITNESS:  Subcutaneous tissue burned
4  away with exposure to charred liver and intestines.
5    Q.  (BY MR. GILL)  Would you repeat the last
6  portion of your answer?  I don't think everybody heard
7  it.
8    A.  The -- over the right flank, the right side of
9  the body, the skin is burned away, and we have exposure,
10  burned liver and intestines in this area.
11    Q.  Thank you, Doctor.
12    Doctor, was this body capable -- capable of
13  being visually identified?
14    A.  No, sir.
15    Q.  And again, just like with the other autopsy you
16  testified to here earlier today, did you have occasion
17  to retain, for later identification purposes and later
18  testing, certain forensic samples from this body?
19    A.  Yes, sir.
20    Q.  And did those include obtaining blood cards
21  that could be used for DNA profiling purposes?
22    A.  Yes, sir.
23    Q.  Let me show you what's been marked as State's
24  Exhibit No. 376 and ask if you are able to recognize the
25  exhibits portrayed in State's 376.

251

1    A.  Yes, sir.

2    Q.  And were those samples that were obtained by

3    you for use in this Case No. 0914837?

4    A.  Yes, sir.

5    Q.  And was the blood card sealed in the coin

6    envelope which appears in the upper left-hand corner of

7    that photograph?

8    A.  Yes, sir.

9    Q.  And was the coin envelope then sealed inside

10   with inside -- within the larger envelope that appears

11   on the right side of the photograph?

12   A.  Yes, sir.

13        MR. GILL:  At this point, Your Honor, we're

14   going to offer State's 376 without condition for all

15   purposes.

16        MR. MOORE:  I have no additional

17   objections, Your Honor.

18        THE COURT:  376 is admitted for all

19   purposes.

20        (State's Exhibit No. 376 admitted)

21   Q.  (BY MR. BRISSETTE)  Again, Doctor, let me ask

22   you to refer to State's Exhibit No. 441 and ask if there

23   is a blood card within an envelope contained on that

24   photograph on the left-hand side on page 1?

25   A.  Yes, sir.

252

1    Q.  And do you recognize it as being from the same

2    Case No. 0914837?

3    A.  Yes, sir.

4    Q.  And was that blood card drawn and prepared at

5    your direction in connection with this case?

6    A.  Yes, sir.

7         MR. GILL:  At this point, Your Honor, we're

8    going to offer State's Exhibit No. 441 without

9    condition.

10        MR. MOORE:  I have no additional

11   objections, Your Honor.

12        THE COURT:  441 is admitted for all

13   purposes.

14        (State's Exhibit No. 441 admitted)

15        THE COURT:  Your Honor, now that all the

16   condition precedents have been satisfied, the State

17   offers 442 for all purposes.

18        MR. MOORE:  Judge, I have the same

19   objections that we previously made, plus I object that

20   442 is essentially a summary of testimony that was given

21   in front the jury by Ms. Van Winkle.  It's a

22   demonstrative exhibit.  It's not an exhibit itself.

23        THE COURT:  All right.  Let me visit with

24   the State and the Defense over here.

25        (BENCH CONFERENCE PROCEEDINGS)

253

1         THE COURT:  Let me take a look at the

2    exhibit, please.

3         Oh, yes, I remember this now.

4         Okay.  And your objection again is?

5         MR. MOORE:  My objection is --

6         THE COURT:  I'm sorry.  Speak into the

7    microphone, please.

8         MR. MOORE:  I'm sorry.

9         My objection is it's a summary of the

10   testimony.  They went through the chart exhibit by

11   exhibit as they had her testify, and then they

12   summarized her testimony over here on the far right part

13   of the chart.  And what you've got is essentially a

14   summary of her testimony.

15        And my objection is that it well may have

16   been usable in front of the jury as a jury aid or as a

17   demonstrative exhibit, but it's not evidence.  The

18   evidence is what she said, and so I object on that

19   basis.

20        THE COURT:  Do you have a response?

21        MR. GILL:  Well, that's why we're offering

22   it because her testimony was long and it was detailed

23   and this was an accurate summary of her testimony and as

24   it relates to all the different exhibits that were

25   admitted during the -- the course of the trial.

254

1         THE COURT:  It was voluminous, and not only

2    that, but it is an essential to this -- to the

3    Prosecution presenting its case.  Your objection is

4    overruled.  442 is admitted.

5         MR. MOORE:  Judge, we also --

6         THE COURT:  I'm sorry.  I can't hear

7    you.

8         MR. MOORE:  We have the same prior

9    objections that we made in connection with all those --

10   the depict -- the photographs and things that are

11   contained are the results of the search, which we -- the

12   searches that were done which we raised in the Pretrial

13   Motions to Suppress, and so we would renew those

14   objections as well as the -- the new objections that

15   I've made at this point.

16        THE COURT:  Thank you for clarifying that.

17   Your objection is noted, continues to be overruled, and

18   you have a running objection with regard to those

19   matters.  442 is still admitted.

20        Yes, Mr. Cummings?

21        MR. CUMMINGS:  Your bailiff just told me

22   the jury wants a break.

23        (OPEN COURT PROCEEDINGS)

24        THE COURT:  All right.  Members of the jury

25   I've heard your call.  I've heard your call.  We're at a

257

1 stopping point.

2          MR. GILL:  Judge, can I ask five more

3 questions with the doctor?  I can pass him on direct

4 examination?

5          THE COURT:  You may.

6          MR. GILL:  Thank you.

7          THE COURT:  Please continue.

8          MR. GILL:  Would you tell the jury what the

9 results of your ruling was on State's Exhibit --

10         THE COURT:  442 -- ladies and gentlemen,

11 442 is admitted for all purposes.

12         (State's Exhibit No. 442 admitted)

13    Q.  (BY MR. GILL)  Now, Doctor Sisler, with regard

14 to cause -- your Case No. 0914837, did you arrive at an

15 opinion as to cause of death?

16    A.  Yes, sir.

17    Q.  And what is that opinion?

18    A.  I said blunt force trauma of head.

19    Q.  And the manner of death?

20    A.  Homicide.

21    Q.  Would the injuries suffered --

22        Well, let me ask you this first:  Was

23 this -- was this body consistent in size with that of a

24 five-year-old child?

25    A.  Yes, sir.

256

1    Q.  Would the injuries suffered by this

2 five-year-old child be consistent with that

3 five-year-old child being struck by a baseball bat?

4    A.  Yes, sir.

5    Q.  Let me show you what has been admitted into

6 evidence as State's Exhibit No. 331B.  Let me ask you if

7 the injuries suffered by this five-year-old child were

8 consistent with being struck by an item such as State's

9 Exhibit 331B?

10    A.  Yes, sir.

11    Q.  With regard to the other autopsy that we

12 discussed with you earlier, No. 0914835, the adult male,

13 were the injuries suffered by him to his head consistent

14 with being struck by State's Exhibit 331B?

15    A.  Yes, sir.

16    Q.  And, Doctor, at some point after having

17 conducted these autopsies, did you learn from the

18 University of North Texas Health Science Center the

19 identity of these two bodies?

20    A.  Yes, sir.

21    Q.  And what did you learn was the identity of the

22 body presented to you in Cause No -- Case No. 0914835,

23 the adult male?

24    A.  I learned he was identified as Clyde Edward

25 Bedford.

1    Q.  And with regard to your Case No. 0914837, the

2 five-year-old child, did you learn the identity of the

3 five-year-old child?

4    A.  Yes, sir.

5    Q.  And what was that?

6    A.  It was -- she was identified as Jodi Ruth

7 Hummel.

8          MR. GILL:  We pass the witness, Your Honor.

9          THE COURT:  Members of the jury, we have

10 reached a stopping point, and we will break for the

11 evening.  We'll resume the trial at 9:00 a.m. tomorrow.

12         Please remember the Court's previous

13 instructions.  Do not discuss this case with anyone,

14 including amongst yourselves, until both sides have

15 presented their case and -- there's a number of other

16 things that still need to be accomplished before you're

17 sent to the jury room for your deliberations.  If you

18 have any questions regarding your instructions, please

19 refer to the pamphlet.

20         We'll be in recess until 9:00 a.m.  Thank

21 you very much.

22         (Jury not present)

23         MR. BRISSETTE:  Judge, while we're outside

24 the presence of the jury, as a matter of housekeeping, I

25 believe now, through the presentation of Dr. Bao, we

258

1 have proved up the conditions that were placed upon

2 State's Exhibits 250, 251, 252, 253, 254, 385, 386 and

3 387, those being, Judge, and I would proffer to the

4 Court that the first set of numbers was the shirt that

5 was recovered from the body of Joy Hummel, and 386 and

6 387 were the bra that was recovered.

7          Those were conditionally admitted when Ms.

8 Belcher testified and --

9          THE COURT:  So you're offering it for all

10 purposes at this time?

11         MR. BRISSETTE:  Yes, Your Honor.

12         THE COURT:  Mr. Moore or Mr. Cummings,

13 what's your response?

14         MR. MOORE:  Judge, I don't have any

15 additional objections other than those that we

16 previously made in connection with those exhibits.

17         THE COURT:  During the pretrial hearing?

18         MR. MOORE:  Well, at the time that they

19 were originally offered and those -- they hark back to

20 the pretrial hearing, Judge.

21         THE COURT:  All right.  State's Exhibits

22 250, 251, 252, 253, 254, 385, 386, 387 are admitted for

23 all purposes.

24         (State's Exhibit Nos. 250-254,

25         385-387 admitted)

**'**

**'88** [1] - 183:1
**'92** [1] - 183:1

**0**

**01-02-1213** [1] - 11:24
**01:46:54** [2] - 15:20, 42:1
**04:33:23** [2] - 18:17, 43:1
**0914835** [12] - 218:20, 218:25, 219:16, 222:24, 224:23, 229:8, 232:7, 237:11, 237:14, 238:4, 256:12, 256:22
**0914836** [1] - 185:6
**0914837** [7] - 237:8, 238:14, 245:4, 251:3, 252:2, 255:14, 257:1
**0914857** [1] - 235:21
**091857** [1] - 237:19

**1**

**1** [7] - 71:4, 82:9, 97:18, 127:22, 202:21, 237:3, 251:24
**10** [1] - 68:16
**10/1/09** [1] - 96:10
**10/2/09** [2] - 94:18, 95:9
**100** [1] - 219:24
**10:00** [4] - 166:20, 166:21, 167:5, 167:12
**10:11** [1] - 31:25
**10:29** [1] - 31:25
**10th** [5] - 142:9, 144:12, 173:7, 174:4, 176:20
**11** [2] - 129:20, 131:5
**11/13/09** [1] - 89:11
**11:50** [1] - 69:4
**12/16** [1] - 62:18
**12/20/09** [1] - 89:4
**12/31/2013** [1] - 260:21
**12/5/09** [1] - 89:14
**1229B1** [1] - 84:14
**125** [1] - 13:23
**12:00** [1] - 68:16
**12:10** [1] - 69:4
**12:27** [1] - 80:9
**1309** [1] - 97:23

**1335** [1] - 98:1
**1336** [1] - 98:1
**14** [4] - 72:20, 101:10, 209:3, 209:4
**14th** [1] - 53:17
**15** [6] - 72:23, 136:23, 137:17, 168:11, 209:3, 209:4
**15th** [1] - 53:16
**16** [2] - 129:16, 148:6
**16th** [13] - 137:22, 144:24, 145:1, 145:3, 145:9, 146:2, 162:20, 162:25, 163:5, 163:9, 175:10, 175:11, 175:13
**174** [4] - 130:16, 131:18, 131:23, 167:17
**17th** [15] - 39:10, 54:22, 147:24, 148:3, 148:6, 148:19, 149:22, 152:7, 157:21, 165:15, 175:23, 175:24, 176:5, 176:14, 177:10
**18** [1] - 189:22
**1823** [1] - 97:20
**18th** [12] - 43:1, 44:4, 54:22, 153:6, 202:10, 218:5, 218:18, 219:2, 219:16, 238:18, 245:10, 246:2
**19** [2] - 72:23, 101:22
**1970** [1] - 217:1
**1971** [1] - 217:4
**1980** [1] - 181:5
**1988** [1] - 182:23
**1992** [4] - 181:25, 182:2, 182:23, 183:11
**1995** [2] - 183:11, 183:16
**1998** [3] - 61:16, 61:23, 62:6
**19th** [6] - 152:18, 152:20, 153:12, 157:24, 177:10, 186:24
**1:30** [1] - 68:22
**1:35** [1] - 80:9
**1:46:54** [2] - 16:3, 16:5
**1st** [1] - 183:6

**2**

**2** [4] - 71:4, 94:11,

162:18, 163:22
**2.5** [1] - 205:9
**20** [4] - 130:18, 136:23, 137:18, 168:12
**2001** [1] - 183:16
**2002** [1] - 12:1
**2004** [1] - 182:19
**2008** [2] - 170:5, 182:19
**2009** [46] - 35:3, 43:1, 53:16, 79:10, 114:6, 114:22, 131:8, 132:5, 132:8, 133:22, 135:24, 137:6, 137:7, 138:13, 139:16, 142:10, 144:21, 146:3, 148:6, 148:19, 149:22, 152:7, 153:6, 157:17, 157:18, 157:21, 162:25, 163:9, 165:15, 168:1, 168:4, 170:2, 174:5, 175:13, 183:6, 186:20, 186:24, 189:22, 202:10, 218:5, 218:18, 219:2, 219:16, 238:18, 245:10, 246:2
**2010** [2] - 53:17, 122:8
**2011** [1] - 11:2
**2012** [1] - 260:17
**205** [1] - 76:20
**207H** [2] - 245:25, 246:10
**20th** [1] - 114:21
**21** [1] - 11:2
**212-8181** [1] - 83:12
**214** [1] - 50:16
**22** [2] - 216:16, 218:1
**220D** [1] - 118:3
**220F** [1] - 118:2
**229** [2] - 84:18, 94:7
**229B** [2] - 80:19, 81:5
**229B-1** [1] - 85:9
**229B1** [8] - 81:4, 82:7, 84:20, 92:12, 93:17, 93:22, 156:19, 157:8
**229B2** [9] - 94:11, 158:5, 158:11, 158:18, 159:1, 161:11, 162:13, 162:14, 163:19
**229C1** [6] - 93:3, 94:15, 109:17, 110:10, 110:21, 111:4

**229D** [1] - 162:18
**229D1** [2] - 96:7, 97:7
**229D2** [5] - 163:3, 163:16, 163:19, 163:22, 163:23
**229E1** [7] - 97:9, 98:7, 98:8, 109:17, 110:21, 111:2, 111:5
**229F** [1] - 127:22
**229F-1** [3] - 83:24, 83:25, 84:6
**229F1** [10] - 92:25, 93:6, 93:12, 93:15, 93:16, 126:8, 126:12, 126:13, 126:16, 126:18
**24** [2] - 50:18, 73:2
**2459** [1] - 102:8
**25** [2] - 73:3, 73:7
**250** [2] - 258:2, 258:22
**250-254** [1] - 258:24
**251** [2] - 258:2, 258:22
**252** [2] - 258:2, 258:22
**253** [2] - 258:2, 258:22
**254** [2] - 258:2, 258:22
**25th** [1] - 260:16
**27** [1] - 129:18
**270A** [6] - 245:1, 245:6, 245:15, 245:18, 245:19, 247:14
**270B** [2] - 245:19, 247:20
**270C** [2] - 245:19, 248:6
**270D** [2] - 245:19, 248:16
**270E** [2] - 245:20, 248:25
**270F** [1] - 245:20
**270G** [2] - 245:1, 245:20
**270H** [4] - 245:22, 246:7, 246:11, 246:13
**271A** [7] - 231:19, 231:24, 232:9, 232:12, 232:13, 232:15, 232:17
**271B** [5] - 231:20, 231:21, 231:22, 232:13, 233:10
**271C** [9] - 229:19, 229:21, 230:3, 230:6, 230:7, 230:13, 230:16, 231:7
**272A** [7] - 199:15, 200:3, 200:7, 200:8, 203:18, 203:19,

204:16
**272B** [3] - 199:21, 200:8, 205:6
**272C** [4] - 199:21, 200:9, 206:6, 207:6
**273** [1] - 56:19
**273B** [7] - 57:23, 58:1, 58:4, 58:18, 58:21, 58:23, 58:25
**273C** [3] - 58:9, 58:25, 60:7
**273F** [13] - 51:23, 52:19, 53:3, 53:14, 56:25, 57:10, 57:15, 57:17, 57:21, 57:22, 58:7, 58:11, 62:10
**288** [1] - 14:1
**29** [2] - 82:7, 127:21
**29C-1** [2] - 81:15, 81:18
**29C1** [1] - 83:8
**29E-1** [3] - 81:15, 81:25, 82:18
**29F-1** [1] - 83:25

**3**

**3** [1] - 29:5
**3.5** [1] - 205:9
**30** [5] - 24:18, 49:9, 137:18, 151:20, 151:24
**303** [5] - 164:24, 164:25, 165:5, 165:8, 165:10
**304** [7] - 76:24, 189:5, 189:6, 190:1, 194:14, 194:20, 198:12
**304-318** [1] - 198:14
**305** [5] - 189:12, 189:24, 189:25, 191:3, 198:12
**306** [1] - 192:18
**307** [1] - 192:20
**308** [1] - 192:22
**309** [1] - 192:24
**30L** [1] - 50:9
**310** [1] - 193:1
**311** [1] - 193:3
**312** [1] - 193:5
**313** [1] - 193:7
**314** [2] - 193:9, 194:20
**315** [8] - 193:11, 194:21, 195:3, 195:4, 195:16, 196:6, 196:21, 196:23
**316** [2] - 193:24, 194:24

**317** [2] - 194:1, 194:24
**318** [6] - 194:1,
194:14, 194:25,
195:3, 196:7, 198:12
**31st** [3] - 35:3, 35:23,
114:6
**320** [1] - 61:24
**323-7667** [1] - 84:18
**331B** [3] - 256:6,
256:9, 256:14
**34** [2] - 49:9, 102:14
**34/30** [1] - 49:8
**340B** [1] - 50:6
**343** [12] - 15:12,
15:14, 16:7, 17:12,
17:25, 18:4, 29:15,
40:17, 40:20, 41:24,
42:19, 42:20
**34W** [1] - 50:9
**35** [1] - 102:14
**353** [5] - 224:13,
225:1, 225:19,
225:22, 229:4
**353-367** [1] - 229:5
**358** [1] - 225:22
**359** [3] - 225:25,
226:16, 227:9
**360** [1] - 225:25
**361** [1] - 225:25
**362** [1] - 225:25
**363** [1] - 226:1
**364** [1] - 226:1
**365** [1] - 226:1
**366** [1] - 226:1
**367** [7] - 224:13,
225:1, 225:19,
226:1, 226:17,
227:10, 229:4
**368** [7] - 241:8,
241:11, 242:7,
242:12, 242:19,
243:23, 244:19
**368-375** [1] - 244:20
**369** [1] - 242:19
**370** [2] - 242:7, 242:19
**371** [1] - 242:21
**3723** [1] - 82:12
**375** [7] - 241:8,
241:12, 242:8,
242:12, 242:21,
243:24, 244:19
**376** [5] - 250:24,
250:25, 251:14,
251:18, 251:20
**377** [6] - 200:22,
200:23, 201:3,
202:13, 202:17,
202:18
**378** [5] - 235:20,
236:19, 236:22,

236:24, 237:14
**379** [4] - 201:24,
202:13, 202:17,
202:18
**38.36** [2] - 215:7,
244:3
**385** [2] - 258:2, 258:22
**385-387** [1] - 258:25
**386** [3] - 258:2, 258:5,
258:22
**387** [3] - 258:3, 258:6,
258:22
**3:47** [1] - 179:15

---

**4**

**4** [1] - 29:5
**40** [1] - 26:7
**401** [1] - 260:23
**403** [6] - 194:25,
197:3, 227:19,
227:23, 228:20,
243:25
**404(b** [1] - 91:24
**405** [1] - 29:2
**405A** [2] - 37:15, 37:25
**405B** [10] - 14:21,
14:23, 15:1, 24:12,
37:14, 37:15, 37:25,
40:5, 40:14, 43:11
**406** [1] - 29:3
**406A** [2] - 37:17, 37:25
**406B** [16] - 17:17,
17:20, 17:21, 18:14,
25:11, 30:8, 31:4,
37:17, 38:1, 42:5,
42:7, 42:8, 42:10,
42:17, 43:5, 43:11
**407** [1] - 29:3
**407A** [2] - 37:19, 38:1
**407B** [9] - 18:18,
18:22, 26:7, 37:20,
38:1, 44:2, 44:8,
44:10, 44:13
**408** [4] - 29:3, 44:12,
46:15, 46:19
**408A** [6] - 19:11, 22:5,
22:9, 22:12, 22:15,
22:17
**408B** [17] - 19:14,
20:2, 20:4, 20:6,
21:24, 22:10, 22:18,
23:1, 23:7, 26:7,
26:20, 45:3, 45:20,
46:5, 46:17, 46:21,
46:25
**41** [1] - 103:3
**412** [4] - 63:3, 63:23,
64:1, 65:12
**412-426** [1] - 65:16

**42** [1] - 73:20
**42/59** [1] - 75:12
**426** [3] - 63:23, 64:1,
65:13
**427** [7] - 63:3, 63:15,
63:16, 63:17, 63:19,
63:21, 65:11
**431** [14] - 15:3, 15:5,
15:7, 15:21, 17:8,
25:3, 29:3, 37:23,
38:1, 41:11, 41:13,
41:14, 41:16, 43:11
**432** [3] - 14:10, 29:1,
29:2
**432A** [2] - 37:21, 38:1
**432B** [7] - 14:5, 14:8,
14:11, 24:4, 24:6,
37:21, 38:1
**432nd** [2] - 260:4,
260:22
**437A** [1] - 190:6
**437B** [4] - 190:5,
191:12, 191:17,
191:19
**441** [8] - 202:21,
237:1, 237:25,
251:22, 252:8,
252:12, 252:14
**442** [7] - 252:17,
252:20, 254:4,
254:19, 255:10,
255:11, 255:12
**445** [7] - 59:10, 59:11,
59:16, 59:19, 59:22,
59:25, 62:1
**446** [20] - 66:21,
66:23, 66:25, 68:2,
68:5, 68:8, 69:11,
69:19, 77:9, 79:3,
79:5, 79:20, 99:9,
99:11, 99:12, 99:18,
99:21, 101:21,
105:5, 119:6
**447** [4] - 63:9, 63:23,
64:9, 65:14
**447-460** [1] - 65:17
**449** [4] - 106:22,
109:9, 111:22,
111:25
**451** [3] - 106:19,
111:21, 111:22
**456** [2] - 106:19,
111:22
**459** [2] - 109:7, 111:21
**460** [4] - 63:9, 63:23,
64:9, 65:14
**462** [9] - 47:16, 47:22,
47:23, 49:12, 49:18,
49:23, 52:16, 52:25,
113:25

**462-464** [1] - 49:25
**463** [4] - 47:16, 47:24,
49:13, 49:23
**464** [5] - 47:17, 48:3,
49:13, 49:23, 50:10
**465A** [6] - 48:6, 48:7,
48:13, 49:13, 49:23,
49:25
**465B** [1] - 50:1
**466** [5] - 48:18, 48:20,
49:13, 49:23
**466-467** [1] - 50:1
**467** [5] - 48:22, 48:24,
49:14, 49:23
**468** [5] - 122:5,
122:14, 122:16,
122:24, 124:16
**469** [8] - 123:1, 123:5,
123:11, 124:14,
124:24, 125:15,
126:2, 126:4
**47** [2] - 120:21, 121:6
**47's** [1] - 121:9
**470** [7] - 188:15,
188:16, 188:17,
191:22, 192:3,
192:6, 198:10
**471** [6] - 188:19,
191:22, 192:3,
192:6, 198:10
**473A** [1] - 187:22
**4:15** [1] - 179:15

---

**5**

**51** [4] - 103:21,
120:21, 121:6, 121:9
**525** [1] - 76:20
**527** [1] - 76:21
**540** [1] - 131:13
**5408** [3] - 52:17,
52:19, 52:22
**558-3863** [2] - 84:15,
87:13
**58** [1] - 105:14
**59** [18] - 67:3, 68:10,
69:10, 69:20, 71:4,
71:5, 72:21, 72:24,
73:3, 73:7, 73:20,
99:25, 101:10,
102:14, 103:3,
103:21, 104:22,
105:6
**5th** [1] - 91:15

---

**6**

**60** [3] - 67:1, 67:6,
67:8
**600** [1] - 127:9

**603** [1] - 76:24
**63** [1] - 49:18
**64** [1] - 49:18
**640** [1] - 13:23
**65** [2] - 11:21, 49:18
**66** [1] - 49:18
**67** [1] - 49:19
**68** [1] - 110:2
**680-1602** [1] - 94:23
**680-6962** [1] - 95:23
**682** [2] - 84:15, 87:13
**6:00** [4] - 166:20,
166:21, 167:5,
167:12
**6:15** [1] - 259:12

---

**7**

**702** [1] - 76:22
**716** [1] - 12:1
**7180** [1] - 260:21
**76060-5408** [1] -
127:10
**76196** [1] - 260:23
**7701-1823** [1] - 97:11

---

**8**

**8** [1] - 71:4
**80** [1] - 14:1
**817** [6] - 83:12, 84:18,
94:23, 95:23, 97:11,
110:2
**817-770-3723** [1] -
82:7
**84** [1] - 12:1

---

**9**

**9.01(b** [1] - 29:4
**9/15** [1] - 53:24
**9/21** [1] - 55:3
**901** [3] - 12:13, 13:4,
46:10
**901(b)** [1] - 31:20
**971** [1] - 11:21
**9:00** [2] - 257:11,
257:20
**9:07** [1] - 11:2

---

**A**

**a.m** [9] - 11:2, 15:20,
31:25, 42:1, 69:4,
167:5, 257:11,
257:20
**abdomen** [6] - 195:18,
203:21, 213:19,
219:13, 233:19,
249:14

**abdominal** [1] - 219:13

**ability** [5] - 30:23, 33:6, 70:8, 95:13, 114:15

**able** [31] - 15:22, 21:1, 21:5, 21:8, 25:22, 27:18, 42:10, 45:23, 46:2, 51:8, 60:7, 60:11, 61:14, 62:1, 67:12, 67:22, 68:4, 69:17, 69:23, 106:19, 107:4, 107:14, 107:17, 108:15, 154:19, 171:22, 171:24, 172:7, 208:1, 208:23, 250:24

**abnormalities** [3] - 219:8, 219:12, 219:15

**above-styled** [1] - 260:10

**absolutely** [2] - 197:20

**accepted** [1] - 182:4

**access** [1] - 67:13

**accident** [1] - 217:15

**accomplished** [1] - 257:16

**accordance** [1] - 84:7

**according** [2] - 205:16, 208:25

**accordingly** [4] - 36:2, 65:5, 197:5, 198:2

**account** [2] - 52:5, 53:11

**accuracy** [1] - 65:2

**accurate** [8] - 27:24, 30:13, 117:5, 121:15, 157:12, 158:2, 229:25, 253:23

**accurately** [7] - 139:12, 157:15, 163:7, 163:11, 232:6, 245:9, 245:25

**accused** [2] - 215:11, 215:14

**action** [1] - 43:17

**acts** [2] - 77:24, 91:22

**actual** [4] - 27:8, 58:10, 108:2, 119:9

**add** [5] - 35:9, 56:15, 160:19, 227:16, 243:18

**added** [3] - 58:14, 70:23, 70:25

**adding** [1] - 18:25

**addition** [10] - 29:13,

36:7, 56:10, 56:22, 65:1, 65:3, 66:17, 160:14, 186:11, 197:8

**additional** [24] - 19:1, 36:1, 49:20, 58:20, 71:21, 77:4, 93:12, 93:21, 110:25, 119:1, 126:12, 157:23, 160:2, 191:14, 192:1, 197:12, 202:15, 215:5, 215:15, 223:7, 236:20, 251:16, 252:10, 258:15

**address** [7] - 80:23, 84:4, 85:15, 88:2, 93:13, 127:6, 127:8

**addressed** [1] - 80:4

**addresses** [1] - 12:2

**addressing** [1] - 73:13

**adequately** [1] - 33:4

**adjourned** [1] - 259:12

**adjust** [1] - 181:12

**admissibility** [3] - 12:22, 64:23, 96:17

**admissible** [4] - 32:23, 162:1, 243:1, 244:5

**admission** [3] - 11:17, 12:17, 68:13

**admit** [1] - 259:3

**admittance** [1] - 12:2

**admitted** [108] - 17:13, 17:25, 20:14, 22:15, 22:17, 37:15, 37:16, 37:17, 37:18, 37:19, 37:20, 37:21, 37:22, 37:23, 38:1, 46:16, 46:19, 46:21, 49:24, 50:1, 57:1, 57:16, 57:17, 58:23, 58:25, 59:23, 59:25, 63:20, 63:21, 65:7, 65:12, 65:13, 65:14, 65:17, 67:16, 78:20, 79:3, 79:19, 93:1, 93:15, 93:16, 94:8, 98:1, 98:8, 99:11, 99:12, 106:10, 111:3, 111:5, 122:14, 122:16, 123:13, 125:5, 126:3, 126:4, 126:13, 126:16, 161:11, 162:13, 162:14, 163:22, 163:23, 165:8, 165:10, 191:17, 191:19, 192:3,

192:6, 195:3, 196:6, 197:10, 198:13, 198:14, 200:7, 200:9, 202:17, 202:18, 225:24, 229:4, 229:5, 230:6, 230:7, 232:12, 232:13, 236:22, 236:24, 244:19, 244:20, 245:18, 245:20, 246:10, 246:11, 251:18, 251:20, 252:12, 252:14, 253:25, 254:4, 254:19, 255:11, 255:12, 256:5, 258:7, 258:22, 258:25, 260:14

**admitting** [1] - 12:11

**adult** [4] - 185:10, 185:11, 256:12, 256:23

**advice** [1] - 30:21

**affidavit** [2] - 34:11, 122:6

**affidavits** [1] - 35:8

**afternoon** [2] - 95:25, 180:14

**age** [2] - 164:21, 220:14

**agency** [2] - 115:9

**ago** [3] - 50:10, 190:16, 213:18

**agree** [1] - 215:18

**agreed** [1] - 22:19

**ahead** [7] - 13:18, 68:16, 80:7, 196:17, 234:23, 240:14, 242:10

**ahold** [1] - 177:13

**aid** [4] - 58:4, 58:14, 65:2, 253:16

**air** [3] - 118:17, 118:20, 223:19

**airways** [4] - 223:13, 223:14, 223:20, 241:3

**aisles** [2] - 30:17, 30:22

**Alabama** [1] - 182:19

**alarm** [1] - 47:25

**allegation** [1] - 153:24

**alleged** [2] - 94:19, 95:10

**allegedly** [3] - 79:9, 87:18, 91:22

**Allen** [1] - 47:7

**allow** [4] - 33:3, 33:4, 35:24, 68:17

**almost** [4] - 170:7, 210:15, 219:22, 219:24

**alone** [5] - 143:13, 144:4, 146:18, 174:20, 177:5

**Alonzo** [2] - 11:22, 12:14

**alteration** [1] - 12:20

**altered** [3] - 13:3, 27:21, 34:1

**amended** [1] - 80:22

**Amendment** [1] - 36:8

**amendments** [1] - 81:1

**American** [1] - 182:10

**amount** [1] - 100:2

**amphetamine** [4] - 210:10, 210:11, 210:12, 210:19

**amputated** [2] - 221:11, 248:11

**amputation** [6] - 233:24, 248:10, 248:14, 248:24, 249:3, 249:7

**analysis** [2] - 20:4, 197:3

**analyst** [2] - 21:17, 65:24

**anatomic** [1] - 216:21

**anatomical** [1] - 182:9

**anatomically** [1] - 196:23

**Angelica** [1] - 260:3

**ANGELICA** [1] - 260:21

**angle** [2] - 24:10, 26:2

**angles** [1] - 24:8

**Angleton** [3] - 11:21, 12:14, 12:22

**ANHUI** [2] - 181:19

**Anhui** [3] - 180:25, 181:17, 181:19

**answer** [4] - 124:1, 124:22, 156:8, 250:6

**answered** [2] - 96:13, 97:16

**anterior** [2] - 246:23, 249:12

**anthropologist** [3] - 224:1, 226:24, 227:1

**anticipate** [3] - 18:25, 77:18, 80:16

**anticipated** [1] - 98:15

**anticipation** [2] - 35:25, 226:23

**anyway** [1] - 170:24

**apart** [1] - 66:6

**apartment** [7] - 131:5,

131:9, 131:12, 149:23, 164:4, 176:15, 176:21

**apologies** [1] - 54:9

**apologize** [1] - 237:23

**apparent** [2] - 87:19, 94:21

**Appeals** [3] - 11:24, 12:1, 76:24

**appear** [5] - 47:22, 207:8, 222:14, 239:4, 242:19

**appearance** [1] - 155:2

**appeared** [7] - 109:2, 221:5, 225:2, 225:23, 228:4, 242:20, 242:25

**application** [2] - 38:16, 38:24

**applies** [2] - 25:19, 163:22

**appointed** [1] - 36:13

**appreciate** [1] - 215:19

**approach** [11] - 44:24, 47:12, 50:2, 51:18, 109:13, 110:8, 111:12, 122:18, 187:12, 194:16, 210:5

**approximate** [1] - 61:22

**area** [25] - 74:14, 103:9, 103:10, 107:12, 123:15, 195:17, 195:25, 196:21, 196:24, 204:6, 209:10, 209:14, 230:20, 231:2, 231:5, 232:24, 233:3, 233:4, 234:3, 247:19, 247:21, 248:4, 249:2, 250:10

**areas** [9] - 101:7, 101:19, 103:8, 107:6, 123:6, 123:8, 193:14, 209:8, 240:24

**arguing** [1] - 142:1

**argument** [2] - 197:2, 197:16

**Arizona** [1] - 61:5

**Arlington** [9] - 18:18, 26:4, 27:3, 43:24, 44:13, 103:24, 108:16, 108:25, 113:12

**arm** [5] - 105:1, 248:8,

248:20, 248:21, 248:23
**arms** [5] - 207:24, 220:22, 220:23, 221:12, 233:12
**Army** [1] - 216:22
**arrest** [1] - 36:24
**arrested** [2] - 36:12, 177:18
**arrive** [5] - 226:12, 234:19, 235:16, 242:4, 255:14
**arrived** [1] - 114:5
**arrow** [1] - 104:2
**arrows** [11] - 70:24, 101:6, 101:18, 102:5, 103:6, 103:7, 103:10, 103:13, 104:9, 104:14, 104:19
**arteries** [2] - 222:1, 222:3
**Article** [2] - 215:7, 244:2
**articles** [2] - 70:1, 73:13
**articulate** [1] - 64:18
**articulated** [1] - 64:25
**artifact** [3] - 107:8, 107:9, 107:11
**artifacts** [1] - 107:5
**asleep** [1] - 147:17
**aspects** [1] - 240:22
**assembled** [2] - 29:12
**asserted** [6] - 88:13, 88:19, 91:1, 91:3, 92:5, 162:6
**assessment** [1] - 220:14
**assets** [5] - 41:8, 44:19, 50:21, 51:4, 60:24
**assign** [1] - 185:1
**assigned** [2] - 127:12, 184:11
**assignments** [1] - 184:14
**assist** [5] - 59:11, 77:3, 218:19, 245:12, 246:4
**assistance** [2] - 28:2, 28:16
**associated** [8] - 15:22, 70:2, 85:18, 85:22, 97:12, 126:24, 127:4, 213:13
**Association** [1] - 184:3
**assorted** [1] - 67:9

**assume** [3] - 112:15, 121:19, 121:20
**atherosclerosis** [1] - 222:1
**ATM** [1] - 11:12, 14:25, 15:14, 16:11, 16:20, 25:4, 29:10, 29:15, 40:19, 40:22, 41:24, 73:11, 102:17
**attack** [2] - 77:14, 217:15
**attempt** [5] - 60:23, 61:4, 141:14, 148:11, 152:13
**attempted** [6] - 60:20, 61:13, 117:20, 144:14, 152:16, 242:24
**attempting** [2] - 147:18, 149:17
**attention** [6] - 57:20, 70:24, 72:13, 105:5, 122:24, 238:13
**attitude** [1] - 233:11
**Attorney's** [2] - 71:13, 102:21
**attorneys** [2] - 159:24, 215:2
**audio** [2] - 120:7, 120:9
**Austin** [7] - 223:25, 227:1, 229:12, 229:22, 241:17, 242:3, 245:23
**Austin's** [1] - 225:10
**authenticate** [1] - 162:21
**authenticated** [4] - 85:18, 86:14, 97:25, 161:20
**authentication** [1] - 64:22
**authorities** [1] - 115:13
**automobile** [1] - 66:10
**autopsied** [1] - 193:15
**autopsies** [3] - 218:15, 228:14, 256:17
**autopsy** [56] - 184:18, 185:1, 185:3, 185:7, 185:12, 185:16, 186:13, 186:18, 186:22, 188:11, 189:8, 189:13, 189:15, 189:17, 192:13, 194:6, 198:20, 200:14, 201:22, 203:6, 203:25, 204:7,

205:25, 206:4, 208:22, 210:13, 211:4, 211:17, 218:19, 219:1, 219:4, 221:17, 224:17, 224:23, 225:5, 225:23, 226:2, 228:11, 228:14, 228:17, 228:19, 229:7, 232:3, 232:4, 234:13, 235:12, 238:11, 239:7, 240:15, 241:15, 241:22, 243:8, 243:21, 245:3, 250:15, 256:11
**available** [7] - 33:13, 33:16, 33:21, 34:2, 36:3, 61:7, 179:4
**Avid** [6] - 38:10, 38:12, 38:14, 38:16, 40:8, 70:8
**aware** [1] - 67:11
**axe** [1] - 140:18
**Axe** [2] - 140:21, 174:12

## B

**B-a-o** [1] - 180:21
**B1** [3] - 84:18, 85:11, 87:6
**baby** [4] - 196:12, 196:13, 197:15, 201:25
**background** [4] - 58:10, 72:10, 118:11, 118:22
**badge** [1] - 100:22
**bag** [10] - 125:3, 125:6, 185:13, 185:17, 186:3, 187:10, 189:10, 202:4, 202:7, 202:9
**bailiff** [1] - 254:21
**balancing** [2] - 228:21, 244:1
**band** [1] - 103:12
**Bank** [1] - 40:23
**bank** [9] - 16:16, 16:19, 41:7, 41:9, 53:19, 59:5, 60:17, 97:25, 140:8
**banking** [5] - 11:12, 50:24, 51:2, 52:9, 54:14
**Bao** [20] - 179:22, 179:23, 179:25, 180:17, 181:12,

187:15, 192:12, 198:15, 199:13, 200:13, 202:19, 203:11, 205:6, 207:1, 207:10, 208:22, 212:8, 214:11, 214:16, 257:25
**BAO** [1] - 180:10
**Baptist** [1] - 182:20
**barely** [1] - 32:15
**Barry** [3] - 117:13, 117:14, 117:16
**Barry's** [1] - 117:10
**baseball** [5] - 205:15, 212:14, 212:18, 222:21, 256:3
**based** [29] - 11:21, 12:12, 12:13, 18:16, 25:25, 30:1, 30:16, 31:8, 39:21, 46:12, 55:5, 57:5, 62:6, 64:22, 64:25, 77:20, 79:4, 85:5, 92:8, 96:5, 98:5, 100:7, 110:20, 124:22, 142:8, 161:20, 161:21, 196:20, 222:17
**basis** [20] - 11:15, 11:16, 13:8, 32:13, 32:23, 33:7, 36:22, 64:7, 80:1, 91:3, 91:8, 93:24, 137:8, 138:3, 218:1, 227:22, 242:12, 243:2, 253:19
**bat** [8] - 205:15, 212:14, 212:18, 222:21, 222:25, 223:4, 256:3
**bears** [1] - 235:20
**Beaumont** [1] - 216:21
**became** [3] - 175:10, 175:11, 175:18
**become** [3] - 67:20, 133:25, 168:11
**Bedford** [4] - 203:3, 208:8, 243:17, 256:25
**began** [3] - 56:8, 89:23, 138:1
**begin** [6] - 42:14, 56:5, 137:2, 185:13, 185:17, 219:4
**beginning** [5] - 89:11, 157:16, 168:20, 242:19, 242:21
**begins** [2] - 53:16,

95:9
**behalf** [1] - 177:20
**behind** [4] - 56:4, 77:11, 131:15, 196:4
**Belcher** [2] - 192:9, 258:8
**belief** [1] - 32:6
**Belknap** [1] - 260:23
**belly** [1] - 204:25
**belong** [4] - 81:16, 83:14, 84:16, 87:2
**belongs** [3] - 50:13, 81:19, 83:15
**below** [7] - 195:17, 195:19, 201:3, 213:2, 213:10, 213:24, 246:20
**BENCH** [8] - 54:2, 64:15, 160:1, 194:17, 215:3, 225:20, 242:9, 252:25
**bend** [1] - 181:13
**benefit** [5] - 70:18, 87:17, 107:8, 119:23, 154:18
**best** [5] - 112:3, 112:16, 117:5, 118:12, 173:5
**better** [2] - 52:8, 76:1
**between** [22] - 61:23, 62:2, 72:6, 87:19, 91:14, 91:18, 94:19, 96:18, 130:19, 138:5, 138:14, 138:18, 139:10, 154:22, 157:9, 157:13, 159:1, 159:15, 162:8, 163:14, 215:11
**beyond** [4] - 79:15, 154:8, 197:6, 227:11
**big** [2] - 38:21, 90:15
**bigger** [1] - 205:9
**bill** [1] - 43:3
**billing** [2] - 127:6, 127:8
**binder** [1] - 66:21
**Birmingham** [2] - 182:18, 182:21
**birth** [1] - 125:12
**birthday** [12] - 148:4, 148:8, 148:16, 149:1, 149:5, 150:11, 150:12, 150:24, 151:10, 164:1, 164:11, 175:24
**bits** [1] - 121:18
**black** [19] - 20:21,

47:23, 48:16, 48:21,
48:25, 58:11, 72:17,
75:12, 75:16,
103:14, 134:20,
134:21, 187:10,
226:6, 226:21,
231:10, 234:7,
243:15
blackened [4] -
233:18, 234:5,
249:13, 249:19
bleach [1] - 20:20
block [1] - 193:19
block-outs [1] -
193:19
blood [20] - 200:19,
200:25, 201:6,
201:9, 201:10,
201:18, 201:21,
202:22, 203:2,
207:20, 209:19,
235:15, 236:7,
236:8, 237:4, 238:6,
250:20, 251:5,
251:23, 252:4
Blood [1] - 201:8
blot [1] - 123:6
blouse [2] - 188:10,
188:11
blow [2] - 199:5, 232:1
blow-ups [1] - 232:1
blue [7] - 66:20, 84:25,
97:22, 134:20,
159:11, 160:8, 161:2
blunt [9] - 211:10,
222:20, 222:21,
223:5, 226:15,
226:17, 227:12,
234:17, 255:18
blunt-force [1] -
211:10
board [2] - 182:7,
203:9
Board [1] - 182:10
bodies [4] - 184:17,
186:1, 187:9, 256:19
bodily [1] - 212:16
body [75] - 185:13,
185:17, 185:21,
186:1, 186:2, 186:3,
186:13, 186:25,
187:1, 187:6,
187:10, 188:23,
189:8, 189:13,
193:15, 196:21,
200:14, 203:21,
204:1, 204:3, 204:6,
204:17, 207:14,
209:22, 211:6,
211:7, 212:8,

219:17, 219:22,
219:24, 220:2,
220:10, 220:14,
220:24, 221:5,
221:12, 221:18,
221:24, 222:13,
223:6, 223:14,
224:7, 224:10,
225:2, 225:17,
227:25, 228:3,
233:5, 234:4,
235:11, 238:17,
238:20, 239:1,
239:2, 239:3, 239:4,
239:12, 239:15,
239:24, 240:9,
240:22, 240:24,
241:15, 241:21,
241:25, 242:20,
243:20, 246:1,
249:11, 250:9,
250:12, 250:18,
255:23, 256:22,
258:5
bone [22] - 221:13,
224:4, 234:9,
234:12, 246:23,
246:24, 246:25,
247:3, 247:24,
247:25, 248:3,
248:5, 248:9,
248:13, 248:21,
248:23, 249:2
bones [2] - 231:14,
248:19
book [8] - 164:12,
164:13, 164:15,
164:16, 164:18,
165:1, 165:3, 165:14
booked [4] - 35:15,
35:19, 35:22, 124:12
boot [3] - 107:24,
108:1, 125:4
booth [1] - 67:17
boots [7] - 35:2,
48:16, 78:1, 107:15,
107:18, 107:20,
125:4
border [2] - 115:4,
115:6
borrowed [2] - 95:18
bottom [11] - 31:6,
41:1, 45:11, 45:16,
103:10, 104:1,
118:2, 120:3,
120:25, 123:11,
196:2
bought [1] - 107:21
Bow [10] - 84:16,
86:23, 88:1, 88:9,

89:6, 89:10, 90:8,
91:14, 92:11, 92:13
Bow's [2] - 97:5, 97:8
box [1] - 47:9
boxes [1] - 85:1
boy [8] - 14:11, 14:22,
43:5, 44:13, 45:3,
57:24, 58:1, 84:14
boyfriend [8] - 142:1,
143:21, 170:11,
170:13, 170:15,
170:19, 171:10,
172:24
boyfriend/girlfriend
[1] - 170:18
bra [6] - 187:11,
188:18, 190:1,
192:9, 258:6
Brahma [1] - 48:17
brain [4] - 211:14,
212:18, 219:14,
249:19
branches [1] - 131:19
brand [3] - 140:21,
167:22
Bravo [2] - 82:9, 94:11
break [2] - 68:17,
69:17, 69:24, 80:14,
144:14, 205:20,
254:22, 257:10
breast [1] - 195:17
breathing [1] - 240:24
brief [3] - 138:20,
139:2, 139:5
briefly [5] - 19:3, 38:9,
64:11, 212:5, 215:2
bring [4] - 31:24, 37:6,
99:4, 179:17
Brissette [7] - 23:8,
35:19, 80:15, 80:22,
87:23, 87:25, 111:16
BRISSETTE [166] -
11:10, 13:21, 13:25,
14:3, 14:11, 14:17,
14:21, 14:24, 15:9,
15:11, 16:6, 17:7,
17:12, 17:16, 17:22,
17:24, 18:23, 19:7,
22:8, 23:4, 23:11,
33:10, 37:4, 37:12,
38:5, 39:7, 39:12,
39:16, 40:15, 41:16,
42:9, 42:18, 44:11,
44:24, 45:2, 46:5,
46:18, 46:22, 47:1,
47:12, 47:15, 49:11,
50:2, 50:5, 51:18,
51:21, 53:2, 54:5,
54:9, 54:19, 55:11,
55:15, 55:20, 57:19,

58:17, 59:1, 59:4,
59:18, 60:4, 63:14,
63:22, 65:9, 65:19,
68:7, 74:22, 75:3,
76:19, 77:10, 77:13,
80:12, 81:6, 82:4,
82:9, 82:12, 82:15,
82:23, 83:1, 83:5,
83:12, 83:15, 83:19,
84:11, 84:13, 92:15,
92:19, 92:25, 93:18,
94:10, 94:14, 94:25,
95:24, 96:22, 96:25,
97:17, 98:11, 98:18,
99:1, 99:8, 99:15,
99:20, 99:24,
106:16, 106:18,
109:13, 109:16,
110:6, 110:9,
110:19, 111:7,
111:9, 122:4,
122:18, 122:22,
123:21, 123:25,
124:24, 125:15,
126:6, 126:17,
127:25, 158:17,
179:22, 180:13,
181:21, 184:10,
186:2, 187:12,
187:15, 191:11,
191:20, 192:7,
192:12, 194:13,
195:6, 195:16,
195:22, 196:1,
196:8, 196:19,
198:15, 199:9,
199:12, 199:13,
199:21, 200:2,
200:10, 200:13,
201:9, 202:12,
202:19, 203:8,
203:11, 204:16,
206:23, 208:17,
212:5, 212:7, 213:4,
214:10, 214:14,
214:18, 251:21,
257:23, 258:11,
259:6, 259:8
broken [1] - 205:17
brought [6] - 35:13,
35:14, 64:24, 86:25,
117:7, 193:12
burden [2] - 197:5,
227:12
burdens [1] - 79:17
bureau [1] - 47:8
Burleson [9] - 14:19,
24:12, 40:4, 40:24,
101:4, 101:16,
102:2, 102:5, 130:19

burned [29] - 219:25,
220:18, 221:12,
223:6, 231:2, 231:5,
233:3, 233:20,
234:6, 234:11,
246:16, 247:3,
247:16, 247:18,
248:3, 248:8,
248:13, 248:18,
248:20, 248:22,
249:1, 249:7,
249:11, 249:12,
249:22, 249:25,
250:3, 250:9, 250:10
burning [1] - 234:1
burns [7] - 207:15,
219:19, 238:25,
239:15, 239:16,
239:17, 239:19
business [6] - 34:8,
34:10, 34:24, 35:7,
122:6, 186:16
businesses [1] -
115:18
butt [1] - 207:24
buttocks [1] - 248:18
button [2] - 72:17,
204:25
button-up [1] - 72:17
BY [74] - 14:17, 14:24,
15:11, 16:6, 17:16,
17:24, 19:7, 23:20,
38:5, 39:16, 40:15,
41:16, 42:9, 42:18,
44:11, 45:2, 47:1,
47:15, 50:5, 51:21,
53:9, 57:19, 59:4,
60:4, 65:19, 69:16,
75:3, 99:15, 99:24,
106:18, 109:16,
110:9, 111:7,
111:15, 122:22,
123:25, 124:24,
126:17, 129:6,
133:15, 158:23,
162:16, 163:24,
165:13, 165:21,
180:13, 181:21,
184:10, 186:2,
187:15, 192:12,
198:15, 199:13,
199:21, 200:13,
201:9, 202:19,
203:11, 204:16,
206:23, 208:21,
210:7, 212:7, 213:8,
216:6, 229:6,
230:12, 232:14,
236:25, 244:21,
245:21, 250:5,

251:21, 255:13

**C**

**C1** [1] - 111:2
**calibrate** [1] - 121:22
**California** [5] - 44:19,
45:22, 54:24, 61:8,
121:18
**camera** [13] - 13:18,
24:8, 24:10, 24:17,
25:4, 25:23, 26:2,
28:21, 30:12, 76:2,
102:19, 112:23
**cameras** [11] - 20:1,
24:14, 24:22, 25:17,
26:10, 26:11, 26:12,
27:17, 28:21,
116:17, 116:19
**canal** [1] - 246:20
**cancer** [1] - 183:20
**cannot** [3] - 87:1,
211:15, 213:16
**cans** [1] - 187:18
**capability** [1] - 61:3
**capable** [9] - 74:20,
209:5, 220:10,
220:13, 220:14,
235:2, 250:12
**capacity** [3] - 61:17,
216:15, 217:7
**capital** [1] - 91:23
**captured** [2] - 111:25,
118:24
**capturing** [1] - 107:10
**car** [1] - 217:15
**carbon** [1] - 207:20
**card** [34] - 34:15,
34:16, 34:17, 34:24,
35:18, 35:20, 52:17,
52:18, 54:16, 62:11,
108:15, 108:18,
140:8, 189:15,
200:23, 200:25,
201:6, 201:8,
201:10, 201:18,
201:21, 202:22,
202:25, 203:2,
203:5, 236:7, 237:4,
238:6, 251:5,
251:23, 252:4
**cardboard** [1] - 236:8
**cards** [5] - 52:14,
53:19, 200:19,
235:15, 250:20
**care** [2] - 132:20,
148:25
**career** [1] - 217:8
**carefully** [1] - 197:1
**Carlson** [1] - 55:21

**carried** [1] - 77:15
**carry** [2] - 147:21,
147:22
**carrying** [1] - 205:3
**case** [81] - 11:5,
11:19, 12:5, 12:14,
12:15, 19:25, 24:5,
24:12, 25:3, 47:2,
50:19, 50:24, 51:4,
51:16, 55:9, 68:19,
70:14, 77:3, 77:20,
79:15, 86:17, 88:1,
89:7, 89:15, 100:8,
105:22, 116:4,
120:21, 175:17,
177:19, 184:25,
185:2, 185:7,
185:25, 186:19,
187:6, 187:9, 188:3,
188:17, 188:18,
188:20, 189:16,
194:10, 197:14,
199:17, 200:24,
203:25, 205:23,
207:14, 207:18,
211:2, 218:20,
218:22, 218:23,
218:25, 219:1,
219:6, 219:24,
229:23, 230:1,
235:20, 235:25,
237:5, 237:10,
238:8, 238:20,
239:25, 240:12,
240:21, 240:25,
241:18, 242:13,
243:8, 243:10,
244:23, 252:5,
254:3, 257:13,
257:15
**Case** [13] - 11:21,
185:5, 219:16,
222:24, 224:23,
232:7, 237:14,
238:13, 251:3,
252:2, 255:14,
256:22, 257:1
**cases** [3] - 24:18,
184:11, 244:3
**cash** [5] - 18:9, 18:10,
27:4, 43:4, 43:8
**cashier** [1] - 132:19
**categories** [1] -
217:14
**caught** [1] - 108:22
**caused** [2] - 142:14,
205:10, 221:1,
223:8, 227:12,
234:16
**causes** [2] - 232:20,

233:16
**cavity** [3] - 204:11,
221:21, 240:16
**cell** [2] - 97:19, 109:18
**Center** [3] - 216:22,
237:21, 256:18
**center** [5] - 39:18,
102:20, 123:5,
204:23, 204:24
**Centro** [2] - 61:8, 61:9
**Cert** [1] - 260:21
**Certain** [1] - 123:8
**certain** [10] - 33:2,
60:11, 67:10, 100:2,
105:21, 121:8,
123:6, 187:18,
200:14, 250:18
**certainly** [1] - 112:22
**certification** [2] - 21:9,
76:13
**certified** [2] - 182:7,
182:9
**certify** [2] - 260:5,
260:12
**cetera** [1] - 66:11
**chain** [1] - 196:10
**challenged** [1] - 77:17
**chambers** [3] - 33:12,
33:15, 260:11
**chance** [14] - 15:12,
19:8, 33:20, 52:1,
61:25, 63:2, 63:8,
104:25, 105:21,
123:12, 156:20,
183:16, 187:16,
207:11
**chances** [1] - 76:8
**change** [1] - 136:16
**changes** [2] - 93:20,
94:13
**character** [2] - 87:20,
88:20
**characteristic** [2] -
66:5, 78:11
**characteristics** [36] -
20:5, 20:6, 20:8,
20:17, 20:18, 20:23,
21:23, 65:3, 66:2,
66:4, 66:7, 66:8,
68:2, 73:6, 75:17,
75:19, 75:22, 79:8,
79:13, 100:19,
100:21, 101:9,
101:20, 102:6,
102:24, 103:15,
104:11, 104:20,
104:23, 105:7,
105:14, 107:17,
107:23, 107:25
**characterize** [1] -

169:15
**charge** [2] - 18:9,
18:10
**Charge** [2] - 77:18,
78:6
**charged** [1] - 242:14
**charges** [4] - 43:7,
52:13, 52:21, 54:23
**charred** [10] - 233:19,
234:5, 234:8, 248:4,
249:13, 249:15,
249:19, 249:23,
250:4
**charring** [5] - 234:1,
238:22, 238:24,
239:13, 249:10
**chart** [6] - 70:15,
185:14, 186:23,
187:8, 253:10,
253:13
**charts** [1] - 247:13
**chemical** [1] - 210:17
**chemicals** [1] - 209:21
**chest** [12] - 195:17,
203:21, 204:10,
219:11, 221:15,
221:21, 233:13,
233:18, 234:9,
240:16, 249:12,
249:14
**Chevron** [2] - 61:4,
61:6
**chief** [2] - 44:23, 47:7
**Chief** [3] - 47:7, 48:10,
114:20
**child** [18] - 129:24,
142:21, 185:10,
205:3, 205:4, 205:5,
213:23, 239:5,
239:8, 239:10,
242:15, 255:24,
256:2, 256:3, 256:7,
257:2, 257:3
**children** [1] - 129:22
**children's** [1] - 164:16
**China** [8] - 180:23,
180:24, 181:1,
181:2, 181:7,
181:22, 182:24,
183:2
**choose** [1] - 81:1
**chosen** [1] - 195:23
**Chris** [10] - 82:16,
83:20, 84:20, 95:12,
97:22, 155:19,
155:21, 155:24,
177:17, 177:19
**chronological** [2] -
14:4, 18:19
**chronologically** [2] -

26:16, 39:9
**cigarette** [1] - 55:6
**cigarettes** [2] - 134:5,
139:22
**circles** [1] - 116:24
**circumstances** [5] -
29:11, 215:10,
215:13, 228:24,
244:4
**cite** [1] - 11:23
**cited** [1] - 12:14
**cites** [1] - 14:1
**city** [3] - 42:3, 129:11,
129:13
**City** [2] - 181:1,
216:19
**clad** [1] - 187:10
**claim** [2] - 36:9, 64:22
**claims** [3] - 13:14,
29:7, 29:19
**clarify** [2] - 23:17,
69:18
**clarifying** [3] - 31:17,
79:6, 254:16
**clarity** [1] - 112:16
**class** [24] - 20:5, 20:8,
66:2, 66:7, 66:8,
66:9, 68:1, 73:5,
75:17, 75:18, 78:11,
100:19, 100:20,
101:8, 101:19,
102:6, 102:24,
103:15, 104:11,
104:20, 104:22,
105:13, 107:17,
107:25
**clean** [1] - 132:19
**cleaned** [6] - 118:11,
118:16, 220:5,
228:1, 242:23,
243:21
**cleansed** [1] - 240:3
**clear** [6] - 23:18,
35:11, 82:6, 109:8,
112:22, 172:13
**clearer** [2] - 112:11,
117:4
**clearly** [3] - 27:4,
56:18, 65:4
**Cleburne** [4] - 129:12,
130:19, 135:5,
167:18
**clerk** [2] - 132:21,
140:5
**client's** [1] - 26:18
**clinical** [1] - 182:9
**close** [2] - 73:19,
131:16
**closed** [1] - 222:4
**closely** [1] - 239:24

closer [1] - 180:6
cloth [1] - 76:4
clothed [1] - 134:16
clothes [9] - 34:5,
  34:25, 35:2, 35:12,
  35:21, 36:22, 36:25,
  78:20, 114:25
clothing [11] - 34:21,
  36:12, 70:1, 71:19,
  73:14, 75:9, 76:3,
  79:7, 187:2, 187:6,
  187:16
clustered [2] - 209:8,
  209:9
Clyde [2] - 95:17,
  256:24
CO2 [1] - 209:19
Coast [8] - 19:9, 26:7,
  26:22, 44:20, 45:21,
  50:14, 104:16, 112:1
coat [2] - 75:20, 75:25
Code [1] - 244:2
coding [1] - 84:9
cogent [1] - 90:24
coin [4] - 236:11,
  236:14, 251:5, 251:9
collaborate [2] -
  229:12, 241:17
collect [9] - 41:8,
  187:15, 200:14,
  200:17, 200:19,
  201:24, 203:5,
  235:11, 235:14
collected [13] - 14:25,
  19:8, 40:3, 47:20,
  189:23, 202:9,
  203:2, 235:24,
  236:4, 236:5, 236:6,
  236:10, 238:7
collection [2] - 194:8,
  194:9
College [2] - 183:21,
  216:20
cologne [4] - 140:15,
  140:17, 140:22,
  174:12
color [11] - 47:23,
  84:9, 87:12, 107:12,
  107:23, 108:2,
  108:5, 158:12,
  158:15, 226:5,
  243:15
colored [2] - 59:15,
  104:4
colors [1] - 126:18
column [1] - 237:8
combination [1] -
  212:10
combined [2] -
  116:13, 217:4

comfort [1] - 116:7
coming [6] - 78:21,
  114:14, 125:18,
  134:9, 168:17, 215:1
commencement [1] -
  33:14
committing [2] - 91:22
common [1] - 210:24
communicated [1] -
  91:6
communicating [1] -
  91:20
communication [3] -
  61:10, 87:19, 159:15
communications [5] -
  91:17, 92:10, 94:18,
  94:19, 95:14
Community [1] -
  40:23
compare [9] - 21:14,
  58:10, 66:1, 67:22,
  74:2, 74:7, 75:23,
  122:25, 123:12
comparing [4] - 26:19,
  72:1, 74:18, 100:19
comparison [14] -
  21:10, 21:12, 21:13,
  26:23, 65:21, 65:24,
  66:16, 70:16, 72:6,
  74:25, 75:5, 76:11,
  76:16, 99:17
comparisons [3] -
  69:25, 72:19, 73:21
compartment [1] -
  113:16
compilation [1] -
  24:13
compiled [1] - 24:7
complaints [1] - 80:24
complete [1] - 196:18
completes [1] -
  191:13
complex [3] - 131:5,
  131:9, 131:12
complies) [6] -
  103:20, 106:15,
  224:18, 234:25,
  241:9, 245:5
components [1] -
  74:17
compression [1] -
  107:10
computer [1] - 112:7
concern [2] - 142:20,
  156:16
concerned [3] - 151:9,
  156:14, 175:16
concludes [1] - 23:11
conclusion [4] -
  11:21, 31:19, 90:4,

234:15
concussion [1] -
  211:15
condition [11] -
  215:13, 220:11,
  223:7, 225:2,
  226:10, 236:19,
  241:21, 241:24,
  251:14, 252:9,
  252:16
conditional [4] -
  191:13, 191:23,
  192:8, 202:14
conditionally [3] -
  110:21, 111:2, 258:7
conditions [1] - 258:1
conduct [5] - 12:10,
  21:19, 89:14,
  240:14, 240:25
conducted [2] - 219:1,
  256:17
conducting [5] -
  69:12, 218:15,
  218:19, 228:21,
  244:1
CONFERENCE [8] -
  54:2, 64:15, 160:1,
  194:17, 215:3,
  225:20, 242:9,
  252:25
conference [1] - 18:23
confession [3] -
  55:17, 56:20, 57:7
configured [1] - 38:15
confinement [1] - 47:8
confirmation [3] -
  210:18, 210:20,
  211:1
confirmed [1] - 29:14
conflicting [1] -
  173:24
confront [4] - 87:14,
  91:7, 93:25, 95:13
confrontation [1] -
  91:9
connect [1] - 238:7
connection [13] -
  163:18, 177:19,
  191:15, 208:22,
  235:24, 237:4,
  238:7, 239:25,
  243:10, 245:3,
  252:5, 254:9, 258:16
connects [2] - 246:24,
  247:23
conscious [1] -
  213:15
consciousness [1] -
  211:20
conservatorship [1] -

175:19
consider [3] - 22:19,
  77:19, 86:21
consideration [1] -
  19:4
considered [8] -
  11:20, 91:24,
  197:22, 198:3,
  227:13, 228:23,
  243:24, 244:11
considering [1] -
  215:16
consist [1] - 220:8
consistencies [3] -
  78:11, 78:12, 78:22
consistent [21] -
  20:15, 22:3, 27:5,
  29:12, 58:11, 84:10,
  101:7, 101:19,
  102:24, 103:15,
  104:9, 105:11,
  108:18, 109:10,
  187:25, 222:24,
  239:4, 255:23,
  256:2, 256:8, 256:13
constant [2] - 137:24,
  137:25
consumer [1] - 117:4
Cont'd [3] - 57:18,
  99:14, 162:15
contact [10] - 59:5,
  60:11, 61:4, 61:14,
  83:21, 96:18,
  147:19, 152:13,
  152:16, 154:10
contacted [6] - 60:18,
  60:25, 61:6, 61:9,
  155:18, 177:19
contacts [2] - 179:5
contain [2] - 34:15,
  238:6
contained [30] - 11:22,
  29:1, 31:4, 33:25,
  42:19, 45:20, 52:2,
  52:19, 54:15, 55:16,
  55:20, 66:25, 67:8,
  68:2, 68:5, 69:11,
  77:8, 78:3, 79:5,
  81:20, 84:23, 92:14,
  95:15, 97:20, 97:25,
  99:18, 164:25,
  241:11, 251:23,
  254:11
contains [4] - 11:25,
  69:20, 158:8, 260:6
contended [1] - 31:19
content [2] - 139:9,
  162:5
contents [6] - 19:19,
  19:22, 19:23, 49:13,

157:3, 191:22
context [2] - 57:5,
  113:10
contextual [7] - 56:11,
  56:22, 196:15,
  197:23, 243:10,
  244:8
continually [1] -
  173:22
continuation [1] -
  17:22
continue [5] - 36:25,
  44:12, 157:20,
  178:4, 255:7
continues [4] - 58:22,
  192:4, 254:17, 259:2
continuing [3] - 79:23,
  89:11, 89:12
continuous [1] - 64:21
contract [1] - 220:22
contraction [1] -
  233:14
control [2] - 114:15,
  115:10
contusion [1] - 212:18
convenience [4] -
  130:10, 130:11,
  132:21, 139:19
conversation [13] -
  118:10, 118:17,
  118:24, 147:22,
  151:5, 162:2, 162:7,
  169:12, 174:11,
  176:1, 176:2, 176:4
conversations [12] -
  86:16, 88:15, 91:13,
  119:2, 134:12,
  139:10, 139:13,
  140:25, 141:1,
  157:16, 158:3,
  161:23
converse [3] - 144:5,
  148:11, 164:7
conversing [1] -
  118:23
cook [1] - 150:14
cooked [2] - 150:13,
  249:18
cooking [4] - 148:17,
  148:18, 151:10,
  176:2
copies [1] - 106:9
copy [9] - 19:11,
  19:14, 23:1, 83:23,
  93:9, 106:8, 165:2,
  199:6, 209:24
corner [4] - 102:16,
  236:12, 238:1, 251:6
coronary [2] - 222:1,
  222:3

corporate [1] - 60:19
corporation [2] -
42:21, 183:25
correct [146] - 14:10,
14:19, 15:4, 16:14,
16:17, 17:1, 17:2,
19:9, 19:12, 19:13,
19:15, 19:16, 24:14,
24:19, 24:23, 24:24,
25:2, 25:9, 25:10,
26:10, 27:25, 28:6,
30:4, 30:5, 31:9,
35:16, 38:7, 38:10,
40:7, 41:17, 41:18,
41:23, 42:5, 43:25,
49:10, 66:21, 67:7,
69:21, 69:22, 70:2,
70:21, 71:2, 71:5,
71:22, 71:23, 72:14,
72:21, 72:24, 73:16,
73:22, 83:5, 85:19,
86:1, 86:7, 86:12,
95:3, 95:4, 97:16,
98:13, 98:14,
101:10, 101:11,
102:14, 108:11,
109:11, 109:12,
112:1, 112:8,
112:16, 112:24,
113:8, 113:9,
113:21, 113:22,
113:25, 114:1,
114:7, 114:8,
114:12, 115:2,
115:14, 115:15,
115:19, 115:22,
116:1, 116:10,
116:14, 116:21,
117:2, 117:12,
117:17, 117:18,
117:22, 117:24,
118:5, 118:8,
118:25, 119:4,
119:6, 119:11,
119:16, 119:25,
120:1, 120:22,
121:12, 121:17,
121:24, 139:2,
148:9, 154:25,
157:4, 159:3,
159:16, 159:20,
160:10, 161:4,
162:23, 165:23,
171:8, 174:8, 175:1,
175:7, 177:4,
177:23, 184:18,
192:14, 193:16,
193:20, 194:11,
202:25, 205:1,
206:1, 209:16,
211:8, 211:23,

213:20, 213:25,
226:19, 226:24,
228:19, 235:3,
237:9, 237:11,
237:15, 238:2, 260:6
corrections [1] -
94:12
correctly [1] - 260:13
correlated [1] - 121:15
corroborate [1] -
56:10
corroborates [1] -
57:7
Counsel [11] - 18:24,
49:12, 53:3, 63:15,
63:23, 97:2, 122:5,
191:21, 194:14,
197:2, 200:3
counsel [2] - 36:13,
260:8
count [2] - 41:20,
204:2
counter [1] - 113:3
Counties [1] - 216:13
country [1] - 181:21
Country [1] - 60:19
COUNTY [1] - 260:2
county [1] - 61:1
County [17] - 34:23,
35:6, 47:4, 56:21,
114:10, 122:7,
154:11, 154:14,
182:12, 183:5,
217:10, 218:2,
218:4, 218:15,
224:3, 235:6, 260:5
couple [9] - 13:19,
23:15, 23:23, 53:6,
55:23, 55:24, 89:23,
144:12, 190:15
course [10] - 36:3,
44:17, 85:25,
127:11, 186:16,
197:24, 232:2,
232:3, 239:7, 253:25
court [21] - 11:3, 32:1,
32:25, 33:18, 34:2,
35:3, 35:14, 62:20,
66:13, 68:20, 69:5,
80:10, 81:23, 82:1,
91:7, 110:20, 145:1,
145:9, 179:16,
193:12, 260:11
COURT [282] - 11:4,
11:14, 12:9, 13:4,
13:7, 13:10, 13:17,
13:24, 14:2, 14:7,
14:9, 14:13, 17:3,
17:10, 17:15, 19:6,
22:12, 22:15, 22:18,

22:23, 23:1, 23:5,
23:8, 23:13, 23:16,
28:25, 30:6, 30:25,
31:16, 32:2, 33:8,
35:9, 35:16, 35:24,
37:1, 37:6, 37:9,
37:14, 39:11, 39:14,
45:1, 46:12, 46:14,
46:19, 46:24, 47:14,
49:20, 49:22, 50:4,
51:20, 53:7, 53:25,
54:3, 54:17, 55:1,
55:10, 55:12, 55:16,
55:19, 56:14, 56:18,
57:4, 57:13, 57:14,
57:15, 58:22, 59:3,
59:23, 60:3, 63:19,
64:10, 64:14, 64:16,
65:10, 65:11, 65:18,
68:15, 69:2, 69:6,
69:9, 75:1, 77:4,
77:7, 77:11, 79:2,
79:25, 80:3, 80:6,
80:11, 81:2, 82:3,
82:5, 82:11, 82:13,
82:20, 82:25, 83:3,
83:10, 83:14, 83:17,
84:9, 84:12, 85:5,
85:11, 85:14, 85:23,
86:3, 86:6, 86:9,
86:13, 86:19, 87:4,
87:7, 87:25, 88:3,
88:23, 89:18, 90:1,
90:3, 90:10, 91:12,
92:6, 92:16, 92:23,
93:4, 93:15, 93:17,
93:19, 94:4, 94:7,
94:12, 94:15, 95:5,
95:21, 96:4, 96:14,
96:21, 96:24, 97:7,
97:14, 98:3, 98:7,
98:14, 98:19, 98:23,
99:4, 99:6, 99:10,
99:13, 99:23,
109:15, 110:5,
110:8, 111:2, 111:6,
111:11, 111:13,
122:3, 122:14,
122:17, 122:20,
123:23, 124:23,
126:2, 126:5,
126:13, 128:1,
128:4, 128:8,
128:13, 128:16,
128:18, 128:20,
128:25, 133:14,
158:21, 159:24,
160:9, 160:12,
160:18, 161:4,
161:8, 161:11,
161:18, 162:9,

162:11, 162:12,
163:20, 165:8,
165:12, 165:18,
178:17, 178:24,
179:8, 179:11,
179:17, 179:20,
179:23, 179:25,
180:4, 180:8,
185:24, 187:14,
191:17, 192:3,
195:2, 195:11,
195:14, 195:21,
195:24, 196:6,
196:15, 197:1,
197:20, 198:7,
198:8, 198:9,
199:11, 200:7,
200:12, 202:17,
203:10, 208:18,
210:6, 212:4, 213:5,
214:11, 214:16,
214:20, 214:24,
215:1, 215:4,
215:19, 215:21,
215:23, 216:1,
225:24, 226:3,
226:16, 226:20,
227:3, 227:7,
227:18, 227:21,
228:7, 228:13,
229:1, 229:2, 229:3,
230:6, 230:10,
232:12, 236:22,
242:10, 243:5,
243:22, 244:16,
244:17, 244:18,
245:18, 246:10,
246:14, 251:18,
252:12, 252:15,
252:23, 253:1,
253:20, 254:1,
254:16, 254:23,
254:24, 255:5,
255:7, 255:10,
257:9, 258:9,
258:12, 258:17,
258:21, 259:1,
259:10
Court [40] - 11:6,
11:18, 11:24, 12:1,
12:10, 26:3, 29:3,
29:5, 29:13, 29:17,
32:19, 32:22, 36:5,
36:7, 37:12, 45:24,
64:25, 74:15, 76:24,
78:10, 79:2, 83:6,
87:17, 92:24, 94:5,
94:13, 99:8, 192:10,
196:9, 197:2,
215:16, 227:9,
243:23, 244:9,

258:4, 259:2, 260:3,
260:4, 260:22,
260:22
Court's [16] - 11:20,
31:19, 39:8, 40:11,
44:7, 54:13, 68:18,
78:6, 91:12, 91:16,
99:21, 163:21,
197:18, 198:4,
198:6, 257:12
courtroom [8] - 35:13,
51:13, 67:16,
128:19, 133:3,
179:3, 179:24,
215:22
cover [6] - 21:10,
53:14, 53:24, 72:19,
165:2, 165:13
covered [2] - 72:20,
72:23
covering [1] - 73:10
CR [1] - 11:24
Crawford [4] - 91:6,
91:8, 92:1, 92:8
create [1] - 229:8
created [3] - 27:23,
115:24, 116:23
credit [9] - 34:15,
34:17, 52:14, 52:17,
54:16, 62:10,
108:14, 140:9
crimes [1] - 28:18
Criminal [1] - 244:3
cross [6] - 91:11,
95:14, 111:11,
128:1, 165:18,
208:18
CROSS [3] - 111:14,
165:20, 208:20
cross-examination
[4] - 111:11, 128:1,
165:18, 208:18
CROSS-
EXAMINATION [3] -
111:14, 165:20,
208:20
cross-examine [2] -
91:11, 95:14
CSR [1] - 260:21
culture [1] - 116:1
cultures [1] - 105:18
Cummings [13] - 32:3,
35:10, 68:8, 69:13,
77:5, 79:22, 85:6,
93:6, 93:22, 97:3,
98:3, 254:20, 258:12
CUMMINGS [74] -
12:7, 22:14, 22:19,
22:24, 23:14, 23:17,
23:20, 28:23, 35:11,

35:17, 46:7, 46:13,
49:15, 49:21, 53:5,
53:9, 53:21, 54:25,
55:2, 55:18, 56:16,
57:2, 57:11, 58:20,
59:21, 60:1, 63:17,
63:25, 64:12, 68:10,
69:1, 69:8, 69:14,
69:16, 73:24, 77:6,
80:13, 85:8, 85:12,
85:20, 86:2, 86:4,
86:8, 86:12, 86:18,
86:22, 87:6, 87:8,
88:22, 88:24, 93:8,
93:23, 94:6, 94:16,
95:6, 96:8, 97:13,
98:4, 98:12, 98:20,
99:3, 110:3, 110:23,
111:12, 111:15,
122:1, 122:10,
125:17, 125:23,
126:10, 128:2,
214:8, 254:21, 259:7
**Cummings'** [2] -
34:24, 75:20
**cumulative** [2] -
195:14, 195:15
**cured** [1] - 160:4
**currency** [1] - 124:9
**current** [2] - 126:8,
130:6
**custodian** [5] - 80:21,
81:7, 81:10, 84:1,
86:15
**custody** [13] - 13:1,
36:17, 114:5, 114:9,
114:16, 114:21,
115:5, 115:6, 115:7,
115:13, 156:15,
175:16, 196:11
**customer** [3] - 133:18,
133:23, 134:1
**customers** [1] -
132:20
**cut** [4] - 27:22, 76:5,
76:6, 206:8

## D

**D.A** [2] - 154:2, 156:7
**D.A.'s** [1] - 154:11
**D.O** [1] - 216:19
**D1** [1] - 96:8
**daily** [3] - 137:11,
137:13, 218:1
**damage** [2] - 204:7,
225:7, 225:17,
233:8, 233:21
**damaged** [1] - 196:4
**Dana** [1] - 223:25

**dancer** [2] - 87:18,
87:22
**danger** [1] - 197:4
**dark** [5] - 73:17,
73:18, 103:9,
103:11, 150:5
**darker** [1] - 26:25
**Darnell** [1] - 11:22
**data** [5] - 19:23, 26:13,
33:23, 33:25, 36:5
**Date** [1] - 260:21
**date** [38] - 28:13, 30:1,
30:4, 30:10, 31:12,
31:14, 33:2, 42:23,
42:25, 45:13, 54:22,
62:17, 85:2, 95:8,
95:10, 120:2,
120:12, 120:15,
120:18, 120:24,
121:8, 121:10,
125:12, 144:23,
145:1, 146:1, 147:2,
162:22, 163:5,
186:19, 186:22,
189:15, 189:16,
189:18, 189:21,
219:5, 238:17
**dates** [2] - 56:23,
85:19
**daughter** [18] - 136:8,
136:11, 142:1,
145:21, 148:5,
148:20, 149:14,
151:10, 151:13,
151:16, 156:15,
164:3, 164:8,
164:21, 165:3,
165:14, 175:19,
176:3
**daughter's** [4] - 148:4,
150:11, 163:25,
175:24
**daunting** [1] - 99:25
**days** [11] - 79:9,
89:16, 144:12,
166:23, 166:25,
167:3, 167:4, 167:7,
167:9, 168:18, 169:2
**dead** [5] - 118:15,
118:17, 118:20,
223:23, 241:5
**deal** [8] - 43:7, 68:13,
80:17, 80:25, 93:4,
112:7, 142:14,
220:23
**dealing** [2] - 85:8,
97:18
**deals** [1] - 71:3
**dealt** [3] - 26:8,
126:11, 126:14

**death** [29] - 187:17,
197:9, 204:15,
208:11, 208:13,
212:10, 212:14,
212:19, 212:20,
217:12, 217:13,
217:14, 217:22,
217:23, 223:8,
226:13, 226:15,
226:17, 227:10,
227:12, 228:16,
234:16, 234:17,
234:19, 242:5,
244:7, 255:15,
255:19
**deaths** [1] - 198:1
**debit** [2] - 52:18,
140:8
**debited** [1] - 43:6
**deceased** [5] - 199:18,
199:20, 200:15,
208:6, 215:2
**decedent** [1] - 241:5
**December** [61] - 35:3,
39:10, 43:1, 44:4,
54:22, 79:10, 91:14,
114:6, 114:21,
122:8, 131:8, 132:7,
137:7, 137:22,
138:13, 142:9,
144:12, 144:21,
144:24, 145:1,
145:3, 145:9, 146:2,
147:24, 148:2,
148:6, 148:19,
149:22, 152:7,
152:20, 153:6,
157:21, 157:24,
162:20, 162:25,
163:5, 163:9,
165:15, 168:5,
170:5, 173:7, 174:5,
175:13, 175:23,
176:5, 176:14,
176:20, 177:10,
186:19, 186:24,
189:22, 202:10,
218:5, 218:18,
219:2, 219:16,
238:17, 245:10,
246:2
**decide** [1] - 184:20
**decided** [2] - 64:24,
168:10
**decides** [1] - 184:16
**deciding** [1] - 77:3
**deep** [3] - 206:16,
223:19, 239:19
**deeper** [1] - 223:19
**defect** [2] - 233:19,

234:8
**Defendant** [17] - 11:3,
12:24, 32:1, 33:4,
36:9, 36:12, 65:4,
69:5, 79:9, 80:10,
88:16, 91:14, 91:19,
92:10, 133:13,
179:16, 215:8
**Defendant's** [5] - 34:5,
34:18, 36:8, 54:16,
65:14
**defense** [2] - 207:2
**Defense** [35] - 11:15,
12:4, 18:24, 19:2,
29:20, 33:12, 33:19,
34:3, 34:20, 36:3,
36:20, 46:6, 49:12,
53:3, 54:13, 55:25,
59:19, 63:15, 63:22,
69:9, 77:15, 80:18,
81:12, 83:20, 84:3,
89:19, 97:2, 110:22,
122:5, 126:9,
191:21, 194:14,
200:3, 228:18,
252:24
**defensive** [3] -
206:24, 207:1, 207:8
**define** [1] - 120:6
**degree** [3] - 181:6,
181:16, 216:19
**Delaney** [1] - 98:2
**deliberations** [1] -
257:17
**delivered** [1] - 239:25
**Delta** [1] - 163:22
**demonstrative** [6] -
58:18, 58:23, 59:20,
59:24, 252:22,
253:17
**denied** [1] - 91:9
**Dennis** [3] - 47:7,
47:9, 48:10
**denote** [2] - 172:10,
214:4
**Denton** [1] - 216:13
**Department** [7] -
36:18, 47:4, 102:19,
104:17, 114:3,
114:6, 125:1
**Department's** [1] -
114:11
**depended** [1] - 138:10
**depict** [9] - 46:2, 52:4,
74:19, 225:22,
232:6, 242:22,
242:25, 245:9,
254:10
**depicted** [28] - 18:4,
18:13, 20:6, 25:9,

26:9, 39:17, 40:20,
40:25, 41:11, 48:2,
50:8, 59:15, 62:2,
114:18, 189:18,
189:24, 190:2,
190:7, 190:11,
191:2, 194:22,
195:9, 195:10,
196:20, 202:22,
224:20, 232:23,
236:5
**depicting** [1] - 67:10
**depicts** [2] - 46:3,
226:1
**deposits** [1] - 222:5
**depressed** [12] -
222:9, 222:11,
222:12, 225:13,
230:21, 231:3,
232:25, 240:6,
246:18, 247:2,
247:21, 248:2
**depth** [1] - 206:9
**deputies** [1] - 184:16
**Deputy** [5] - 182:13,
183:5, 184:10,
216:12, 235:6
**Der** [60] - 13:2, 13:20,
13:22, 14:4, 14:18,
14:24, 15:11, 17:16,
17:24, 19:3, 19:7,
23:9, 23:21, 31:3,
31:17, 33:24, 38:6,
39:16, 40:6, 40:15,
42:9, 42:18, 44:11,
47:1, 49:16, 50:5,
51:21, 53:6, 53:10,
54:11, 57:20, 59:4,
60:4, 62:19, 65:19,
68:11, 69:17, 73:25,
74:10, 74:23, 75:4,
77:2, 78:9, 78:15,
78:25, 79:19, 81:18,
81:22, 95:1, 95:3,
99:16, 99:24, 106:2,
106:18, 108:11,
111:8, 122:23,
126:17, 128:3, 128:8
**DER** [2] - 14:14, 38:2
**describe** [5] - 70:5,
133:6, 135:6, 135:9,
222:6
**described** [1] - 225:14
**descript** [1] - 35:5
**description** [3] -
34:21, 48:12, 224:2
**descriptions** [1] -
173:11
**destination** [1] - 85:3
**detachment** [1] -

221:9
**detail** [10] - 27:1, 27:7, 27:18, 74:9, 75:24, 76:1, 87:10, 138:5, 232:24, 239:14
**detailed** [1] - 253:22
**details** [1] - 72:14
**detect** [2] - 185:20, 210:15
**determine** [10] - 13:11, 25:22, 51:3, 65:2, 75:14, 105:22, 106:19, 108:7, 204:6, 207:16
**determined** [1] - 244:10
**device** [3] - 72:5, 95:19, 95:20
**devices** [2] - 119:24, 120:4
**diagram** [3] - 204:18, 213:18, 245:16
**diagrams** [1] - 209:9
**Dickey** [3] - 117:14, 117:16, 118:8
**Dickey's** [1] - 118:3
**dictated** [1] - 120:25
**died** [4] - 154:7, 207:16, 207:21, 211:22
**Diego** [9] - 34:23, 35:5, 55:19, 56:21, 88:6, 89:4, 89:23, 89:24, 122:7
**diesel** [1] - 118:11
**differences** [3] - 119:12, 119:14, 123:4
**different** [25] - 24:8, 24:13, 25:14, 26:9, 26:11, 26:12, 26:14, 28:7, 38:15, 45:8, 45:9, 52:13, 59:15, 62:23, 68:11, 72:10, 73:20, 108:2, 117:8, 121:11, 168:18, 201:25, 225:5, 231:14, 253:24
**digital** [7] - 41:8, 44:18, 50:21, 58:2, 60:23, 70:18, 70:22
**digitally** [1] - 70:20
**digits** [1] - 52:22
**dimensional** [2] - 229:13, 229:14
**dimensions** [1] - 74:5
**dinner** [1] - 151:10
**dire** [4] - 68:12, 69:12, 77:14, 158:20
**DIRE** [5] - 23:19, 53:8,

69:15, 75:2, 158:22
**direct** [9] - 78:16, 111:16, 122:23, 169:25, 171:2, 171:12, 201:3, 238:13, 255:3
**DIRECT** [7] - 38:4, 57:18, 99:14, 129:5, 162:15, 180:12, 216:5
**directed** [2] - 28:20, 94:8
**directing** [3] - 57:20, 70:24, 105:5
**direction** [5] - 201:13, 206:15, 208:1, 224:16, 252:5
**directly** [1] - 201:3
**disagree** [1] - 31:1
**discern** [2] - 27:11, 198:17
**discipline** [3] - 76:12, 76:14, 76:15
**disciplines** [1] - 76:25
**discomfort** [2] - 142:14, 142:19
**discovery** [5] - 24:16, 34:4, 34:20, 34:22, 36:3
**discuss** [16] - 68:19, 68:20, 70:19, 98:10, 128:10, 134:22, 135:23, 136:1, 136:4, 136:6, 155:4, 171:15, 171:18, 179:1, 257:13
**discussed** [6] - 57:6, 73:14, 79:18, 174:21, 175:6, 256:12
**discusses** [2] - 57:8, 76:21
**discussing** [5] - 17:4, 70:25, 198:11, 240:21, 241:15
**discussion** [2] - 33:15, 144:2
**display** [2] - 28:20, 70:20
**displayed** [8] - 16:10, 17:8, 26:16, 28:5, 28:13, 75:12, 105:7, 120:11
**displays** [1] - 16:11
**disregard** [1] - 77:19
**distance** [1] - 62:1
**District** [2] - 71:13, 102:21, 260:4, 260:22
**district** [1] - 66:13

**divided** [1] - 100:6
**divorce** [18] - 136:17, 141:25, 144:18, 144:20, 145:1, 145:6, 145:23, 146:1, 146:9, 146:10, 146:12, 146:15, 170:1, 170:4, 170:6, 172:23, 175:9, 175:11
**DNA** [3] - 196:11, 235:15, 250:21
**doctor** [12] - 180:5, 180:22, 182:4, 190:4, 203:8, 216:7, 230:8, 236:25, 241:7, 245:6, 250:12, 255:3
**Doctor** [25] - 180:14, 180:20, 212:1, 214:20, 216:1, 224:12, 224:19, 230:12, 231:17, 232:16, 234:23, 235:1, 237:14, 238:10, 241:10, 245:21, 246:12, 247:11, 248:6, 248:16, 248:25, 250:11, 251:21, 255:13, 256:16
**doctor's** [1] - 196:3
**document** [19] - 84:22, 87:14, 96:10, 96:12, 123:19, 124:21, 126:19, 126:25, 139:8, 139:12, 156:20, 157:4, 163:11, 163:13, 186:8, 192:13, 198:18, 203:24, 204:1
**documentation** [2] - 36:10, 186:11
**documented** [1] - 220:5
**documenting** [1] - 219:15
**documents** [1] - 56:9
**dog** [1] - 162:18
**done** [15] - 11:19, 81:8, 83:7, 86:5, 95:17, 97:4, 117:21, 209:18, 217:25, 225:8, 228:5, 232:2, 240:21, 254:12
**door** [2] - 41:1, 66:9
**doubt** [3] - 79:16, 197:6, 227:11

**down** [28] - 25:25, 26:6, 28:18, 38:22, 39:13, 43:14, 58:1, 58:14, 62:12, 67:17, 78:23, 82:20, 100:2, 100:7, 128:13, 168:4, 179:9, 202:25, 203:9, 203:11, 203:15, 214:11, 214:20, 221:24, 230:8, 244:25
**downstairs** [2] - 28:4, 97:6
**downtown** [1] - 156:8
**dozens** [1] - 138:17
**Dr** [47] - 179:22, 179:23, 179:25, 181:12, 182:14, 183:8, 184:15, 184:16, 185:1, 187:15, 192:12, 198:15, 199:13, 200:13, 202:19, 203:11, 205:6, 207:1, 207:10, 208:22, 212:8, 214:11, 214:14, 214:16, 214:25, 215:1, 215:23, 216:9, 216:10, 218:10, 219:1, 223:25, 225:10, 226:25, 229:6, 229:12, 229:21, 230:10, 232:3, 232:14, 241:17, 242:3, 243:8, 244:21, 245:23, 257:25
**drawing** [1] - 204:25
**drawings** [6] - 186:12, 198:16, 199:2, 199:16, 199:22, 219:9
**drawn** [4] - 204:25, 220:23, 237:4, 252:4
**drive** [4] - 39:5, 39:6, 139:15, 139:18
**driving** [1] - 42:12
**drop** [1] - 236:8
**due** [4] - 32:19, 36:9, 164:11, 233:14
**duly** [5] - 14:15, 38:3, 129:4, 180:11, 216:4
**duplicative** [2] - 64:4, 65:6
**duplicitous** [1] - 65:5
**during** [30] - 23:23, 33:12, 36:3, 69:17,

69:24, 75:16, 80:14, 107:9, 126:14, 141:6, 167:14, 170:1, 176:12, 176:14, 178:8, 184:19, 186:13, 194:6, 223:23, 224:16, 224:22, 225:5, 229:7, 232:2, 232:3, 239:7, 241:14, 253:25, 258:17
**duties** [3] - 132:18, 135:6, 217:10
**DVR** [1] - 19:24

## E

**E1** [2] - 81:5, 97:10
**ear** [1] - 246:20
**early** [6] - 53:23, 89:12, 135:16, 166:16, 205:5
**easel** [1] - 232:15
**easiest** [1] - 162:20
**Echo** [1] - 97:18
**edema** [1] - 223:20
**edit** [1] - 117:3
**edited** [8] - 20:1, 24:6, 24:9, 24:25, 27:21, 29:24, 116:9, 116:12
**editing** [3] - 25:6, 30:19, 38:14
**editor** [1] - 70:8
**education** [2] - 71:22, 216:17
**Edward** [2] - 248:25, 256:24
**effect** [4] - 226:7, 228:22, 243:13, 243:16
**efficient** [1] - 98:21
**efforts** [4] - 47:2, 227:11, 228:9, 242:2
**eight** [1] - 104:13
**either** [5] - 43:20, 55:23, 78:1, 179:4, 204:20
**El** [2] - 61:8, 61:9
**elbow** [3] - 248:10, 248:24
**Elementary** [1] - 98:2
**emblem** [3] - 72:18, 73:18, 102:23
**emphasize** [1] - 197:21
**employed** [12] - 129:9, 130:6, 130:7, 130:25, 132:1, 132:2, 132:7,

132:17, 134:25,
216:11, 216:14,
218:4
**employee** [2] - 28:20,
167:13
**employment** [1] -
134:22
**end** [7] - 22:8, 41:4,
41:5, 52:18, 52:22,
117:15, 236:10
**ended** [3] - 52:17,
240:7, 248:3
**ending** [2] - 174:25,
247:18
**ends** [4] - 53:17,
91:14, 231:2, 240:23
**enforcement** [2] -
115:12, 119:20
**engage** [1] - 169:20
**engine** [1] - 118:22
**engineer** [1] - 120:13
**enhanced** [1] - 71:14
**enhancing** [2] -
112:10, 112:14
**entailed** [1] - 74:16
**enter** [1] - 219:10
**enters** [3] - 128:19,
179:24, 215:22
**entirety** [1] - 81:11
**entry** [1] - 89:13
**enunciated** [1] - 80:2
**envelope** [9] - 236:11,
236:14, 236:15,
237:25, 238:6,
251:6, 251:9,
251:10, 251:23
**environment** [1] -
118:5
**EPA** [1] - 61:19
**epaulets** [1] - 100:23
**equipment** [6] - 28:3,
28:6, 31:8, 112:7,
112:12, 121:1
**ERNEST** [2] - 14:14,
38:2
**escape** [1] - 79:13
**essential** [1] - 254:2
**essentially** [2] -
252:20, 253:13
**establish** [8] - 178:9,
217:12, 217:22,
226:17, 227:10,
227:11, 228:15,
235:16
**established** [5] - 29:6,
56:19, 57:4, 87:16,
160:13
**establishing** [1] -
244:6
**establishment** [5] -

11:13, 44:19, 50:12,
56:13, 62:14
**establishments** [1] -
59:6
**estimate** [1] - 208:23
**et** [1] - 66:10
**evening** [10] - 135:16,
135:17, 150:3,
163:25, 164:11,
164:21, 165:3,
165:15, 166:15,
257:11
**event** [3] - 142:12,
144:10, 179:4
**events** [6] - 51:15,
55:4, 78:2, 153:5,
197:7, 197:25
**Evidence** [6] - 12:13,
29:4, 34:11, 46:10,
76:22, 122:8
**evidence** [62] - 11:17,
11:18, 13:12, 19:1,
20:15, 29:6, 29:18,
32:6, 32:8, 32:12,
32:13, 32:17, 33:3,
33:5, 33:7, 33:13,
33:18, 34:1, 35:24,
36:1, 36:2, 36:16,
37:13, 58:2, 64:23,
67:13, 71:8, 73:6,
78:21, 87:20, 88:4,
89:7, 90:14, 90:16,
90:17, 91:2, 91:6,
95:19, 101:5, 102:4,
106:11, 107:18,
107:20, 113:23,
116:18, 121:7,
123:20, 124:21,
125:5, 176:10,
202:4, 202:6, 202:9,
202:22, 223:19,
243:10, 244:10,
253:17, 253:18,
256:6, 260:7
**exact** [1] - 36:4
**exactly** [2] - 25:20,
118:21
**exam** [1] - 207:10
**examination** [18] -
12:11, 69:12, 83:19,
111:11, 111:16,
128:1, 165:18,
170:1, 171:3,
171:12, 208:18,
219:7, 221:14,
222:7, 227:2,
240:25, 244:1, 255:4
**EXAMINATION** [19] -
14:16, 23:19, 38:4,
53:8, 57:18, 69:15,

75:2, 99:14, 111:14,
122:21, 129:5,
158:22, 162:15,
165:20, 180:12,
208:20, 212:6,
213:7, 216:5
**examinations** [1] -
234:15
**examine** [10] - 91:11,
95:14, 105:1,
219:11, 219:13,
219:14, 224:6,
226:12, 240:23,
241:8
**examined** [3] - 158:8,
214:13, 240:23
**Examiner** [6] - 182:13,
183:5, 184:11,
185:5, 216:12, 235:6
**Examiner's** [7] -
190:10, 208:1,
217:11, 218:2,
218:5, 224:3, 242:22
**Examiners** [1] - 184:4
**examines** [1] - 224:4
**examining** [1] - 92:11
**example** [4] - 20:18,
27:16, 75:11, 76:5
**except** [2] - 27:2, 30:2
**exception** [1] - 195:3
**excerpt** [1] - 72:20
**excerpts** [1] - 72:7
**exchange** [6] - 139:5,
143:9, 145:5, 145:8,
145:12, 145:15
**exchanged** [4] -
138:14, 138:18,
157:9, 157:13
**exchanging** [1] - 83:8
**exclude** [1] - 90:4
**excluded** [1] - 91:18
**excuse** [3] - 44:12,
65:6, 72:17
**Excuse** [3] - 17:3,
198:11, 230:14
**excused** [5] - 68:23,
128:5, 128:7,
178:21, 214:17
**Exhibit** [105] - 14:5,
14:8, 14:23, 15:7,
17:8, 17:21, 17:25,
18:22, 22:17, 23:7,
29:15, 37:25, 39:15,
40:14, 41:14, 42:8,
42:17, 44:10, 46:15,
46:21, 46:25, 49:25,
50:6, 56:19, 57:17,
57:21, 58:25, 59:25,
60:7, 63:21, 64:1,
65:16, 66:21, 69:11,

69:19, 77:9, 79:3,
79:20, 84:18, 85:9,
93:16, 99:11, 99:12,
106:19, 109:17,
111:4, 113:25,
119:6, 122:14,
122:16, 126:2,
126:4, 126:16,
158:25, 162:13,
162:14, 163:3,
163:19, 163:23,
164:24, 164:25,
165:10, 191:19,
192:6, 192:17,
192:20, 192:22,
192:24, 193:5,
193:11, 198:14,
200:8, 202:18,
202:21, 225:1,
229:4, 229:5,
229:19, 230:7,
231:7, 232:13,
232:17, 235:20,
236:19, 236:24,
237:1, 237:14,
237:24, 244:20,
245:1, 246:11,
247:14, 249:5,
249:9, 250:24,
251:20, 251:22,
252:8, 252:14,
255:9, 255:12,
256:6, 256:9,
256:14, 258:24
**exhibit** [60] - 14:9,
17:5, 18:25, 26:6,
39:17, 40:16, 41:6,
42:10, 45:10, 45:18,
46:11, 50:8, 50:11,
51:13, 51:24, 52:2,
53:22, 54:1, 54:12,
55:2, 56:1, 61:25,
62:10, 68:14, 71:24,
77:12, 80:15, 81:21,
83:23, 85:4, 86:24,
88:11, 93:5, 97:6,
98:5, 99:18, 110:6,
110:12, 112:15,
114:23, 116:13,
119:5, 119:25,
138:4, 158:11,
160:3, 162:19,
187:22, 193:12,
199:10, 229:21,
235:23, 245:22,
246:8, 252:22,
253:2, 253:10,
253:11, 253:17
**Exhibits** [17] - 29:1,
37:14, 63:2, 65:12,
65:13, 198:9,

198:12, 224:13,
226:16, 231:19,
241:11, 242:18,
243:23, 244:19,
245:19, 258:2,
258:21
**exhibits** [48] - 19:17,
19:20, 23:10, 23:17,
27:20, 28:10, 29:14,
29:23, 32:24, 39:2,
43:18, 45:25, 62:21,
62:24, 63:5, 64:2,
64:5, 64:12, 67:23,
80:16, 80:18, 80:23,
81:14, 84:10, 90:5,
92:11, 92:14, 92:20,
92:23, 98:9, 107:4,
109:20, 120:4,
127:14, 158:20,
192:1, 195:2, 200:6,
226:6, 232:1,
232:10, 242:12,
242:22, 243:15,
250:25, 253:24,
258:16, 260:14
**existing** [1] - 215:11
**exits** [1] - 44:15
**exotic** [2] - 87:18,
87:22
**Exp** [1] - 260:21
**experience** [2] -
119:19, 222:17
**experiences** [1] -
228:15
**expert** [5] - 34:17,
66:12, 68:5, 74:12,
118:24
**expertise** [2] - 74:2,
74:14
**experts** [2] - 77:1,
226:22
**explain** [9] - 58:5,
65:23, 75:7, 136:9,
141:21, 155:14,
203:12, 232:16,
239:13
**explaining** [2] -
245:12, 246:4
**export** [1] - 70:9
**exported** [1] - 70:14
**exporting** [1] - 70:12
**exposed** [1] - 248:24
**exposing** [3] - 221:12,
234:6, 234:11
**exposure** [12] - 234:1,
234:8, 248:9,
248:13, 248:18,
248:20, 248:23,
249:2, 249:22,
249:25, 250:4, 250:9

extend [1] - 230:23
extended [5] - 39:23, 240:5, 240:6, 247:23, 248:1
extending [3] - 230:25, 246:22, 247:17
extends [4] - 231:1, 231:4, 246:18, 247:1
extensive [7] - 219:20, 225:16, 233:21, 234:7, 239:16, 239:18, 240:4
extensor [1] - 233:15
extent [2] - 74:8, 86:18
external [6] - 39:6, 115:22, 219:7, 219:18, 220:18, 221:14
extra [1] - 76:7
extracted [1] - 24:21
extremities [4] - 221:10, 233:22, 234:4, 234:11
extremity [3] - 233:25, 234:1, 248:7
eye [1] - 108:22
eyes [3] - 43:22, 119:19, 249:15
EZ [37] - 11:8, 11:10, 14:5, 24:5, 39:9, 51:9, 51:14, 52:21, 54:11, 54:15, 54:18, 54:20, 55:5, 55:13, 56:2, 57:9, 100:12, 100:17, 116:16, 130:8, 130:9, 130:11, 130:25, 132:2, 132:7, 132:10, 132:17, 132:22, 132:24, 139:19, 139:23, 140:24, 166:7, 166:8, 167:13, 169:3

**F**

F-r-e-e-z-e [1] - 130:5
fabric [6] - 50:7, 75:5, 75:8, 75:21, 75:23, 76:7
face [9] - 43:19, 43:20, 67:4, 78:24, 180:1, 232:22, 233:4, 246:24, 249:16
Facebook [1] - 178:11
facial [1] - 78:19
facility [1] - 124:12
fact [26] - 12:21,

12:23, 45:8, 64:4, 67:11, 70:17, 72:12, 77:3, 114:19, 115:5, 115:24, 118:7, 118:14, 138:3, 145:8, 145:24, 155:4, 162:19, 164:11, 171:4, 175:3, 196:12, 197:23, 198:2, 215:15, 242:16
factor [2] - 91:16, 91:22
factors [1] - 244:9
facts [2] - 215:10, 215:12
factually [1] - 31:18
fair [2] - 118:18, 219:23
fairness [1] - 55:25
fall [5] - 132:5, 135:24, 137:6, 138:12, 139:16
false [2] - 210:16, 210:21
familiar [15] - 18:3, 19:19, 40:16, 40:19, 59:14, 61:16, 61:19, 81:18, 105:18, 109:17, 109:22, 112:19, 120:20, 125:13, 185:5
family [8] - 127:13, 136:1, 136:4, 136:6, 136:9, 153:25, 175:7, 244:4
far [19] - 11:11, 24:19, 25:11, 26:6, 26:18, 28:15, 89:25, 91:21, 93:25, 94:22, 96:11, 104:10, 112:10, 112:14, 112:16, 119:21, 131:2, 159:18, 253:12
Fargo [6] - 34:8, 34:17, 51:6, 52:12, 52:17, 53:11
fashion [4] - 30:19, 33:5, 33:17, 152:14
fatality [1] - 223:12
father [1] - 136:8
father-in-law [1] - 136:8
fatty [1] - 222:5
fault [1] - 156:7
favor [1] - 130:3
favorite [3] - 150:17, 150:25, 164:20
features [2] - 123:6, 220:18

federal [1] - 62:6
fedora [1] - 73:17
fellow [2] - 218:11, 218:13
fellowship [1] - 183:7
felt [2] - 98:21, 149:14
female [9] - 129:24, 129:25, 185:8, 185:9, 185:10, 185:11, 196:24, 239:11
fetus [9] - 201:25, 202:3, 208:24, 208:25, 209:1, 209:4, 213:23, 214:5
few [4] - 74:24, 138:11, 166:2, 198:21
field [5] - 65:20, 66:13, 182:2, 182:17, 183:8
fields [1] - 85:1
fifteen [1] - 203:22
fighter [3] - 220:25, 233:13, 233:17
figure [1] - 52:9
figured [1] - 118:20
file [3] - 70:18, 118:1, 194:10
filed [5] - 34:10, 35:6, 122:7, 170:4, 170:5
files [3] - 19:23, 24:9, 28:9
filling [1] - 85:1
final [6] - 32:24, 78:6, 104:13, 146:1, 175:10, 175:11
finally [7] - 35:22, 97:9, 128:4, 147:9, 147:13, 171:22, 172:5
finder [1] - 198:2
findings [10] - 29:20, 70:19, 79:21, 186:9, 203:12, 221:20, 221:23, 230:1, 232:7, 241:2
fine [3] - 13:9, 72:4, 93:9
finger [2] - 106:20, 109:11
finish [1] - 73:9
fire [12] - 153:18, 154:5, 207:16, 207:17, 207:21, 221:5, 221:8, 223:8, 223:12, 223:22, 223:24, 241:6
First [1] - 40:23
first [41] - 14:15, 26:2, 33:11, 38:3, 39:8,

53:23, 55:3, 55:24, 55:25, 56:2, 57:8, 57:21, 71:3, 82:5, 85:14, 100:10, 104:14, 105:14, 123:23, 129:4, 133:21, 138:1, 161:18, 166:12, 167:24, 169:9, 169:14, 173:22, 178:3, 180:11, 185:14, 186:25, 210:14, 216:4, 219:7, 225:2, 226:4, 228:7, 231:21, 255:22, 258:4
five [16] - 62:11, 167:3, 176:17, 180:25, 203:20, 204:12, 204:14, 212:21, 255:2, 255:24, 256:2, 256:3, 256:7, 257:2, 257:3
five-year-old [6] - 255:24, 256:2, 256:3, 256:7, 257:2, 257:3
flags [1] - 59:15
flank [2] - 250:1, 250:8
flex [1] - 220:22
flexor [1] - 233:14
flight [2] - 54:23, 77:25
flipped [1] - 33:19
floor [3] - 26:1, 67:17, 71:10
Florida [1] - 183:12
flowing [1] - 30:20
fluid [1] - 24:9
fluids [1] - 200:14
fob [1] - 47:25
focus [4] - 72:16, 72:24, 73:3, 73:5
fold [1] - 47:23
folks [1] - 132:22
follow [1] - 107:14
following [1] - 79:4
follows [5] - 14:15, 38:3, 129:4, 180:11, 216:4
footage [6] - 11:12, 14:25, 32:23, 40:25, 42:2, 45:21
force [7] - 211:10, 223:2, 223:3, 226:18, 227:13, 234:17, 255:18
Ford [4] - 48:1, 61:16, 61:23, 62:6

forearm [7] - 21:6, 22:2, 22:3, 26:19, 78:14, 105:4, 248:10
forearms [1] - 26:25
foregoing [1] - 260:6
Forensic [1] - 38:12
forensic [17] - 21:17, 40:8, 65:20, 65:24, 71:22, 76:13, 78:8, 182:10, 183:8, 216:21, 217:3, 217:18, 217:20, 224:1, 227:1, 235:24, 250:18
forensically [1] - 100:2
forensics [1] - 76:25
forgot [3] - 150:20, 150:25, 176:3
form [9] - 23:2, 29:10, 29:24, 29:25, 35:25, 36:4, 57:6, 94:8, 141:10
formally [2] - 29:14, 259:4
format [1] - 81:14
Fort [5] - 12:1, 76:24, 130:17, 167:17, 260:23
forth [10] - 30:18, 46:8, 64:2, 139:6, 151:6, 163:14, 169:12, 173:6, 173:11, 176:4
forward [3] - 36:20, 44:14, 171:19
foundation [1] - 11:16
four [11] - 26:11, 26:12, 26:14, 52:22, 62:11, 66:9, 167:3, 167:4, 176:18, 204:12, 212:21
four-door [1] - 66:9
fourth [2] - 67:17, 71:10
fracture [21] - 211:13, 212:17, 222:11, 222:12, 230:21, 231:1, 231:3, 231:4, 232:25, 240:5, 240:6, 246:18, 246:22, 247:1, 247:2, 247:17, 247:22, 248:1, 248:2, 248:21
fractured [1] - 246:21
fractures [10] - 205:24, 220:9, 222:9, 225:14, 230:23, 231:8,

240:4, 247:7,
247:10, 249:17
**fragmented** [2] -
246:16, 248:5
**frame** [14] - 39:18,
41:17, 41:20, 70:9,
70:10, 70:11, 71:25,
89:25, 107:14,
112:7, 120:12
**frames** [4] - 41:20,
41:22, 97:15, 107:4
**frank** [1] - 171:4
**Frank** [3] - 51:23,
52:19, 53:14
**freeze** [16] - 55:13,
56:13, 57:8, 83:21,
128:20, 128:22,
129:9, 156:18,
158:24, 162:17,
163:24, 165:22,
178:15, 178:21,
178:24, 179:6
**Freeze** [11] - 83:16,
83:18, 89:2, 89:5,
91:20, 96:19,
127:23, 128:17,
128:18, 129:8,
165:13
**FREEZE** [1] - 129:3
**Freeze's** [3] - 83:24,
84:4, 90:9
**frequent** [5] - 133:23,
134:1, 137:8, 137:9,
137:10
**frequenting** [1] -
56:12
**friend** [1] - 155:21
**friendly** [1] - 149:18
**friends** [7] - 143:20,
149:19, 168:11,
169:17, 171:5,
171:9, 172:18
**friendship** [3] -
141:10, 141:12,
171:4
**front** [32] - 22:10,
41:1, 41:2, 56:2,
62:10, 66:20, 72:19,
72:20, 73:18, 76:5,
81:22, 92:25, 93:1,
101:6, 108:10,
119:5, 126:7,
154:14, 171:3,
204:6, 204:20,
211:6, 220:24,
230:9, 231:3,
231:21, 233:13,
240:7, 246:12,
247:2, 252:21,
253:16

**frontal** [3] - 246:24,
247:18, 247:24
**FSU** [1] - 183:14
**fuel** [4] - 56:5, 61:17,
61:22, 62:5
**fueling** [2] - 60:8,
60:12
**full** [5] - 61:23, 114:15,
180:16, 239:20,
239:21
**fun** [1] - 173:25
**furthermore** [2] -
36:11, 244:2
**future** [1] - 155:12

## G

**gallon** [2] - 61:20,
187:18
**game** [1] - 32:20
**garment** [2] - 73:21,
119:9
**GARY** [1] - 216:3
**Gary** [1] - 216:3
**gas** [2] - 134:5, 139:21
**gasoline** [4] - 60:12,
140:1, 167:20,
167:22
**general** [4] - 104:8,
105:13, 138:3,
169:12
**generally** [7] - 135:13,
135:24, 139:2,
141:3, 151:24,
166:14, 217:17
**generate** [1] - 66:23
**generated** [4] - 16:8,
42:20, 199:24,
201:21
**gentleman** [2] - 31:10,
82:16
**gentlemen** [2] -
105:19, 255:10
**GILL** [56] - 88:2, 88:4,
89:21, 92:3, 96:16,
128:17, 129:6,
133:12, 133:15,
160:11, 160:17,
161:7, 162:4,
162:16, 163:16,
163:24, 165:5,
165:11, 165:13,
165:17, 178:18,
214:25, 216:6,
225:19, 226:4,
226:19, 226:25,
227:5, 229:6, 230:3,
230:8, 230:12,
230:15, 230:16,
232:9, 232:14,

236:18, 236:25,
242:7, 243:6,
244:21, 245:15,
245:21, 246:7,
246:12, 247:5,
247:11, 250:5,
251:13, 252:7,
253:21, 255:2,
255:6, 255:8,
255:13, 257:8
**gill** [6] - 80:14, 90:13,
169:19, 171:12,
177:17, 226:3
**gill's** [1] - 90:24
**given** [6] - 34:20,
70:17, 138:8, 208:4,
244:9, 252:20
**glad** [1] - 70:6
**global** [5] - 238:22,
238:24, 239:13,
249:10, 249:11
**Gold** [1] - 19:11
**gorier** [1] - 243:19
**government** [1] - 62:6
**grab** [1] - 207:4
**grainy** [1] - 26:20
**Grand** [19] - 17:1,
17:17, 18:6, 24:2,
25:11, 25:13, 25:21,
28:1, 28:11, 28:15,
30:2, 30:7, 30:9,
31:5, 31:11, 42:3,
50:20, 154:15, 155:2
**granted** [3] - 39:11,
145:24, 230:10
**graph** [1] - 117:9
**graphic** [2] - 173:10,
193:18
**graphically** [1] -
120:11
**gray** [1] - 85:1,
103:10, 103:14
**great** [2] - 142:14,
232:24
**greater** [1] - 206:8
**green** [7] - 71:11,
72:2, 127:2, 159:7,
160:9, 160:21, 161:1
**Gretchen** [9] - 84:16,
86:23, 88:1, 88:9,
89:6, 89:10, 90:8,
91:14, 92:10
**grew** [1] - 180:23
**ground** [1] - 194:25
**grounds** [1] - 215:5
**grouping** [2] - 101:12,
101:24
**grow** [1] - 180:22
**guess** [4] - 26:6,
50:17, 52:8, 121:3

## H

**H-e-y** [1] - 152:23
**H264** [1] - 19:25
**hair** [2] - 205:25,
206:5
**half** [3] - 95:10, 132:3,
166:9
**hallway** [1] - 41:5
**HAND** [1] - 260:16
**hand** [21] - 106:24,
109:10, 128:23,
162:17, 180:1,
196:17, 206:10,
207:3, 215:24,
221:11, 233:24,
236:12, 236:15,
237:2, 237:3, 237:8,
238:1, 241:7, 251:6,
251:24
**handed** [1] - 53:13
**handful** [2] - 176:16,
176:17
**hands** [3] - 43:14,
43:20, 207:7
**handwriting** [6] - 45:6,
45:9, 45:10, 45:16,
198:21, 199:17
**happy** [5] - 123:21,
148:16, 149:5,
156:11, 175:15
**hard** [9] - 39:5, 39:6,
106:8, 106:9,
150:23, 204:20,
205:14, 205:15,
206:14
**hark** [1] - 258:19
**Harris** [2] - 85:17,
161:5
**hat** [12] - 72:24, 73:6,
73:9, 73:17, 102:3,
102:6, 103:5,
103:10, 103:11,
103:15, 103:16
**head** [25] - 28:17,
103:12, 110:1,
205:18, 206:1,
206:3, 211:11,
212:15, 219:14,
220:4, 220:5, 220:7,
222:7, 222:25,
223:3, 223:4,
226:15, 230:19,
230:22, 231:2,
234:18, 239:24,
246:15, 255:18,
256:13
**header** [1] - 62:12
**Health** [3] - 182:20,
237:21, 256:18

**hear** [6] - 32:16,
125:21, 153:23,
180:6, 195:6, 254:6
**heard** [15] - 87:21,
97:3, 115:3, 152:7,
153:3, 153:4,
153:18, 154:3,
154:5, 154:8, 177:9,
177:15, 250:6,
254:25
**hearing** [13] - 35:18,
46:12, 126:11,
144:20, 145:6,
145:10, 145:13,
145:15, 145:18,
172:22, 175:10,
258:17, 258:20
**hearings** [1] - 33:12
**hearsay** [8] - 87:15,
88:13, 88:18, 91:5,
94:1, 95:15, 123:18,
124:22
**heart** [9] - 204:11,
204:19, 211:24,
212:20, 212:23,
217:15, 219:11,
222:4
**heat** [14] - 221:2,
232:19, 232:21,
233:15, 233:21,
233:24, 248:9,
248:14, 248:21,
248:24, 249:3,
249:7, 249:16
**heat-split** [1] - 232:19
**heavily** [1] - 197:22
**height** [1] - 76:16
**help** [1] - 224:9
**helpful** [2] - 65:1,
79:14
**hereby** [1] - 260:5
**hidden** [1] - 28:4
**high** [1] - 223:5
**highlight** [2] - 62:23,
126:18
**highlighted** [11] -
58:1, 81:20, 84:22,
97:20, 110:11,
126:21, 127:2,
127:16, 158:12,
158:15, 159:2
**highlighting** [2] -
58:13, 119:8
**Highway** [2] - 131:18,
167:17
**history** [1] - 185:15
**hit** [2] - 205:10, 205:11
**hitting** [1] - 178:13
**hold** [3] - 41:19,
182:11, 216:18

hole [1] - 20:19
home [6] - 135:18, 135:21, 150:7, 153:18, 168:17, 174:23
home-wrecker [1] - 174:23
homicide [4] - 208:15, 217:16, 234:22, 255:20
homicides [1] - 217:23
Honor [114] - 11:11, 12:8, 14:6, 14:12, 17:7, 17:22, 18:23, 22:8, 22:14, 23:12, 23:14, 33:10, 37:4, 37:12, 39:7, 44:25, 46:6, 46:7, 46:23, 47:13, 49:11, 49:15, 49:21, 50:3, 51:19, 53:2, 53:6, 53:21, 55:15, 56:16, 58:17, 59:2, 59:18, 59:21, 60:1, 63:14, 63:25, 64:13, 68:7, 68:10, 69:1, 69:8, 69:14, 73:24, 74:21, 74:22, 76:19, 77:6, 80:13, 80:20, 81:7, 84:11, 85:13, 87:3, 88:22, 92:15, 92:19, 93:8, 93:18, 93:23, 94:10, 94:17, 95:24, 96:16, 97:17, 98:5, 98:18, 98:20, 99:2, 99:8, 99:20, 106:16, 109:14, 110:3, 110:7, 110:19, 110:23, 111:10, 111:12, 122:2, 122:4, 122:10, 122:19, 125:16, 125:17, 126:6, 126:10, 158:17, 162:4, 165:11, 165:19, 178:19, 187:13, 191:11, 191:20, 192:7, 200:10, 202:12, 212:5, 214:10, 214:15, 215:17, 227:20, 236:18, 243:6, 246:13, 251:13, 251:17, 252:7, 252:11, 252:15, 257:8, 258:11, 259:7
hopefully [1] - 117:15
hospital [3] - 135:5,

135:7, 168:25
hotel [1] - 46:4
hour [2] - 80:8, 110:25
hours [7] - 35:18, 135:10, 165:15, 166:15, 166:16, 168:24, 181:1
House [2] - 130:22, 130:24, 131:14, 131:16, 131:23
house [9] - 151:12, 151:21, 152:6, 153:5, 153:9, 154:2, 156:8, 207:16, 207:17
housekeeping [1] - 257:24
Houston [1] - 60:20
Huddle [5] - 130:22, 130:24, 131:14, 131:16, 131:23
HUMMEL [1] - 208:9
Hummel [98] - 11:5, 16:8, 16:11, 17:13, 21:20, 25:8, 29:8, 34:22, 35:2, 35:12, 46:3, 53:1, 55:13, 56:7, 56:21, 70:2, 75:25, 77:23, 82:12, 83:8, 86:3, 86:5, 87:19, 88:5, 89:4, 89:22, 94:19, 94:20, 96:2, 97:13, 103:24, 105:22, 107:15, 127:1, 127:5, 127:13, 133:1, 133:16, 133:21, 135:23, 138:6, 138:9, 138:15, 138:18, 139:5, 139:10, 139:15, 140:7, 140:15, 141:6, 141:9, 142:3, 142:13, 144:25, 146:5, 146:14, 148:11, 151:7, 151:15, 152:8, 152:16, 154:22, 155:4, 155:22, 157:10, 157:13, 157:16, 157:24, 160:10, 162:8, 162:23, 163:14, 163:25, 164:6, 165:3, 165:14, 169:19, 170:8, 170:12, 170:24, 171:18, 172:18, 173:3, 173:10, 174:7, 175:6,

176:13, 196:22, 197:7, 201:19, 202:1, 203:3, 208:8, 211:5, 213:19, 242:15, 257:7, 258:5
Hummel's [18] - 21:2, 21:5, 57:6, 81:16, 82:14, 82:15, 82:17, 83:1, 83:3, 96:9, 97:19, 97:21, 105:1, 106:20, 109:18, 158:14, 163:9
hundred [3] - 121:14, 212:20, 219:22
hundreds [1] - 138:14
hyper [1] - 11:12

**I**

ice [2] - 41:2
ID [2] - 78:19
idea [2] - 168:6, 168:7
identical [2] - 57:23, 74:5
identification [21] - 35:1, 45:3, 47:16, 48:6, 51:23, 58:9, 59:10, 86:12, 110:10, 123:1, 123:9, 158:25, 161:25, 187:22, 188:15, 189:5, 199:8, 199:12, 200:22, 202:20, 250:17
identified [39] - 81:21, 81:23, 81:24, 82:1, 82:14, 82:16, 83:4, 83:13, 83:18, 83:24, 84:16, 84:21, 85:16, 85:18, 85:25, 86:2, 86:7, 86:10, 87:11, 88:9, 88:16, 89:3, 89:9, 94:24, 96:20, 97:24, 98:2, 133:13, 160:13, 160:15, 161:14, 161:16, 161:19, 190:5, 220:10, 235:2, 250:13, 256:24, 257:6
identifies [1] - 79:7
identify [10] - 27:7, 42:11, 56:23, 60:8, 65:4, 82:24, 87:22, 188:8, 208:2, 235:7
identifying [6] - 78:20, 79:12, 83:11, 96:2, 111:18, 116:24
identity [7] - 77:22,

78:3, 235:16, 244:6, 256:19, 256:21, 257:2
illegal [1] - 36:23
illustrate [12] - 225:1, 225:7, 225:10, 225:13, 225:16, 226:14, 229:22, 230:17, 231:11, 241:24, 242:2, 247:13
illustrated [3] - 229:9, 230:20, 246:17
illustration [4] - 248:7, 248:12, 248:19, 249:6
image [43] - 21:14, 21:15, 21:16, 26:25, 41:17, 66:1, 67:2, 67:10, 70:10, 70:12, 70:15, 73:11, 73:16, 78:23, 101:3, 101:4, 101:15, 101:16, 101:22, 102:2, 102:3, 102:4, 102:13, 102:16, 102:17, 102:18, 102:20, 103:3, 103:8, 103:14, 103:23, 104:16, 106:5, 109:2, 109:4, 109:8, 112:18, 113:1, 113:12, 113:14
images [26] - 31:14, 45:23, 63:11, 67:9, 67:18, 68:11, 70:13, 71:19, 74:19, 75:10, 75:18, 78:13, 100:12, 100:13, 100:14, 100:17, 100:25, 101:8, 101:19, 104:15, 104:21, 105:11, 105:25, 113:8, 192:9, 193:18
imagine [1] - 92:21
impact [1] - 211:10
impacts [1] - 33:5
implication [1] - 88:18
important [3] - 175:20, 207:13, 240:22
impression [1] - 178:12
in-store [2] - 41:7, 41:9
inch [4] - 206:18, 206:19
inches [2] - 49:9

incised [2] - 206:7
incision [2] - 221:15, 240:15
include [3] - 31:5, 136:7, 250:20
included [5] - 86:24, 88:10, 132:4, 243:19, 260:9
includes [1] - 19:24
including [4] - 157:21, 176:13, 203:21, 257:14
inclusive [1] - 63:3, 63:9, 63:24, 194:15
inclusively [1] - 244:19
inconsistencies [5] - 78:8, 78:10, 78:22, 105:15, 105:17
inconsistent [1] - 173:21
incorrect [2] - 31:18, 117:23
indefinite [2] - 177:6, 177:7
indicate [4] - 113:6, 113:23, 223:21, 231:8
indicated [18] - 85:4, 85:20, 90:13, 90:24, 120:16, 120:24, 121:8, 121:10, 171:2, 171:9, 171:12, 172:20, 209:7, 209:17, 209:18, 211:5, 213:17, 213:22
indicates [1] - 123:15
indication [1] - 124:19
indications [1] - 204:24
indicted [1] - 197:14
Indictment [2] - 242:13, 242:14
individual [46] - 21:23, 22:4, 25:8, 28:19, 36:14, 39:17, 39:18, 39:21, 39:22, 39:25, 78:4, 78:14, 90:22, 107:3, 115:13, 116:25, 124:2, 124:5, 124:8, 124:11, 124:14, 132:25, 133:3, 133:9, 139:25, 155:19, 191:5, 196:9, 205:3, 207:12, 207:23, 212:16, 222:7, 222:14, 223:9,

225:8, 229:10,
230:18, 234:16,
235:2, 235:8,
235:17, 240:16,
242:4, 244:6, 247:6
**individual's** [6] -
125:7, 125:9,
222:24, 223:3,
223:4, 229:16
**individually** [1] - 70:9
**individuals** [5] - 20:6,
66:17, 76:16, 85:19,
96:19
**infantry** [1] - 217:8
**inflicted** [1] - 246:1
**infliction** [1] - 212:9
**inform** [6] - 37:13,
99:9, 145:23, 146:5,
146:8, 147:16
**informally** [1] - 259:9
**information** [23] -
17:5, 28:5, 29:16,
31:4, 31:6, 31:7,
31:8, 34:19, 34:20,
36:2, 36:6, 57:7,
79:5, 79:11, 84:1,
97:8, 142:23, 149:9,
156:2, 161:21,
177:21, 197:2, 244:4
**informed** [5] - 87:23,
143:15, 144:3,
144:25, 146:14
**infrequent** [1] - 137:8
**initial** [1] - 81:8
**initials** [4] - 45:13,
45:15, 157:4, 202:6
**injuries** [18] - 186:12,
196:5, 203:24,
204:1, 205:21,
207:22, 219:18,
219:21, 220:21,
222:23, 229:9,
229:15, 245:25,
247:5, 255:21,
256:1, 256:7, 256:13
**injury** [8] - 206:15,
206:20, 206:22,
207:5, 211:14,
212:16, 212:19,
223:5
**Inn** [8] - 19:9, 26:7,
26:22, 44:20, 45:21,
50:14, 104:16, 112:1
**inquest** [1] - 234:14
**inquire** [1] - 145:17
**insets** [2] - 108:3,
108:5
**inside** [8] - 11:13,
50:8, 52:16, 140:2,
140:25, 141:2,

251:9, 251:10
**inspect** [4] - 223:7,
223:11, 223:16,
239:24
**inspection** [5] - 21:16,
220:2, 223:10,
240:2, 240:8
**instance** [2] - 12:25,
121:6
**instruction** [3] -
54:13, 94:3, 194:6
**instructions** [5] -
68:19, 84:7, 179:13,
257:13, 257:18
**intact** [1] - 249:13
**intend** [2] - 32:6,
125:23
**intended** [1] - 70:19
**intends** [1] - 94:11
**intent** [2] - 91:25,
173:17
**interact** [1] - 164:7
**interest** [4] - 42:11,
43:7, 43:12, 78:18
**interested** [3] - 54:3,
54:5, 54:10
**interface** [1] - 31:13
**internal** [4] - 115:21,
204:5, 204:8, 207:10
**intervention** [2] -
228:5, 228:9
**interview** [3] - 88:5,
89:22, 104:17
**intestine** [1] - 249:23
**intestines** [3] -
233:20, 250:4,
250:10
**introduced** [3] -
80:16, 80:21, 176:10
**introduction** [3] -
32:11, 32:12, 32:21
**invades** [2] - 74:1,
74:13
**inventory** [1] - 132:20
**investigate** [2] -
217:23
**investigation** [8] -
20:10, 44:18, 60:16,
67:12, 127:11,
185:15, 205:16,
208:5
**investigative** [1] -
52:7
**Investigator** [11] -
14:24, 22:6, 38:6,
44:23, 53:5, 73:25,
74:10, 88:6, 99:16,
111:7, 126:17
**investigator** [13] -
17:13, 17:16, 19:7,

40:15, 42:9, 44:11,
47:1, 50:5, 51:21,
53:10, 60:4, 65:19,
72:11
**investigator's** [1] -
187:17
**investigators** [1] -
115:1
**invoked** [1] - 178:25
**involve** [1] - 161:2
**involved** [6] - 77:1,
117:16, 153:24,
154:1, 170:14, 217:2
**involving** [3] - 197:7,
230:22, 244:4
**irrelevant** [1] - 195:12
**issue** [4] - 175:16,
196:14, 197:24,
198:2
**issues** [2] - 61:10,
77:16
**item** [12] - 72:16,
113:24, 122:24,
122:25, 140:2,
190:24, 191:2,
191:21, 200:25,
236:4, 236:6, 256:8
**Item** [1] - 201:24
**items** [18] - 21:15,
36:15, 47:9, 47:18,
47:20, 48:9, 59:14,
67:13, 77:19, 81:9,
88:12, 115:10,
134:3, 187:16,
187:18, 188:5,
193:11, 231:20
**itself** [3] - 19:24,
100:13, 252:22

## J

**Jail** [4] - 34:23, 35:6,
56:21, 122:7
**jail** [7] - 35:15, 35:20,
55:19, 114:10,
114:25, 122:6, 178:1
**January** [2] - 53:17,
260:17
**Jim** [1] - 22:6
**job** [4] - 130:6, 132:18,
207:15, 224:2
**jobs** [1] - 117:3
**Jodi** [2] - 242:15,
257:6
**John** [37] - 11:5, 25:8,
53:1, 56:21, 70:2,
87:19, 89:4, 94:20,
95:18, 96:9, 97:13,
114:5, 114:9,
114:14, 114:21,

115:3, 115:4, 133:1,
133:15, 155:22,
156:1, 157:9, 159:1,
159:16, 166:3,
166:12, 167:24,
170:24, 171:3,
171:9, 171:21,
176:13, 176:21,
176:23, 177:18,
177:20, 177:25
**John's** [2] - 97:24,
113:4
**Johnson** [1] - 216:13
**Joshua** [17] - 51:9,
52:21, 54:15, 57:9,
62:15, 129:14,
129:15, 129:19,
130:13, 130:15,
130:17, 130:21,
131:4, 131:6, 131:9,
131:11, 132:25
**Joy** [13] - 81:16,
82:12, 95:17, 96:2,
127:1, 127:5, 160:9,
161:2, 197:7,
201:19, 203:2,
208:8, 258:5
**Joy's** [2] - 86:2, 94:17
**Judge** [68] - 13:9,
13:21, 14:3, 14:21,
15:5, 15:9, 17:20,
18:21, 24:4, 29:22,
32:5, 37:5, 39:2,
39:13, 54:10, 55:23,
70:5, 75:7, 78:5,
80:5, 82:10, 83:23,
85:9, 86:22, 88:2,
90:2, 94:6, 96:22,
98:11, 123:21,
158:20, 159:23,
161:14, 163:17,
165:6, 178:16,
178:20, 191:14,
191:25, 194:16,
195:16, 197:11,
199:9, 200:5,
202:15, 203:8,
208:19, 210:5,
212:2, 213:6, 214:8,
225:21, 227:17,
230:4, 232:10,
236:20, 242:11,
244:15, 245:16,
246:8, 252:18,
254:5, 255:2,
257:23, 258:3,
258:14, 258:20,
259:6
**Judicial** [2] - 260:4,
260:22

**July** [1] - 183:6
**jump** [1] - 121:4
**June** [1] - 11:2
**juror** [2] - 68:21, 74:7
**jurors** [3] - 74:20,
79:6, 79:14
**jury** [113] - 11:3, 19:5,
19:14, 22:10, 27:23,
31:24, 32:1, 37:3,
37:7, 37:10, 37:13,
40:12, 41:13, 42:7,
46:9, 49:17, 50:12,
52:24, 57:15, 58:5,
58:15, 58:19, 59:12,
59:20, 60:15, 62:25,
64:5, 64:17, 65:2,
65:11, 65:23, 67:23,
68:13, 68:16, 69:5,
70:19, 74:1, 74:13,
74:23, 77:16, 78:10,
80:10, 81:15, 81:22,
81:25, 91:24, 92:18,
93:1, 98:25, 99:4,
99:5, 99:9, 99:10,
101:2, 101:14,
102:1, 102:12,
103:19, 110:25,
113:8, 115:16,
116:4, 116:9, 119:3,
119:6, 119:11,
119:18, 119:24,
121:7, 126:7, 129:7,
162:12, 179:13,
179:16, 179:18,
187:5, 198:9, 200:4,
216:7, 217:20,
220:20, 222:6,
225:14, 226:8,
227:14, 228:17,
228:23, 229:3,
229:15, 229:22,
230:9, 230:17,
232:17, 239:14,
242:17, 243:16,
243:24, 244:11,
244:18, 245:13,
246:5, 246:13,
247:13, 252:21,
253:16, 254:22,
254:24, 255:8,
257:9, 257:17,
257:24, 259:4
**Jury** [7] - 37:8, 50:20,
77:18, 154:15,
155:2, 179:19,
257:22
**jury's** [3] - 39:3, 45:25,
107:8

# K

**Kansas** [1] - 216:19
**keep** [4] - 186:15, 194:8, 194:9, 203:15
**Kennedale** [4] - 102:19, 103:25, 104:17, 127:9
**kept** [2] - 146:22, 155:17
**key** [5] - 47:25, 48:3, 50:12, 84:18, 84:24
**keys** [2] - 34:22, 125:4
**killed** [1] - 197:15
**killing** [1] - 215:10
**kind** [12] - 69:18, 117:15, 139:15, 140:17, 164:15, 165:25, 167:20, 169:11, 173:2, 173:23, 178:12, 208:23
**kneecap** [1] - 234:6
**knife** [1] - 207:4
**knit** [2] - 18:12, 43:10
**knives** [1] - 186:1
**knowing** [1] - 78:6
**knowledge** [4] - 12:12, 26:1, 85:24, 95:16
**known** [22] - 21:14, 21:16, 38:10, 42:21, 65:20, 65:25, 67:20, 67:22, 72:6, 100:17, 100:21, 101:17, 102:7, 102:20, 103:8, 103:22, 104:3, 104:7, 104:12, 104:18, 183:25, 217:18
**knows** [1] - 95:1
**Korea** [1] - 217:8
**Kristie** [10] - 83:15, 89:1, 89:5, 90:9, 91:20, 96:19, 127:23, 128:17, 128:18, 129:8
**KRISTIE** [2] - 129:3, 130:5
**Kylie** [2] - 148:16, 149:11

# L

**lab** [9] - 25:24, 38:22, 58:2, 58:14, 71:8, 100:2, 115:25, 119:9, 187:25
**labeled** [5] - 19:11, 66:21, 188:18,

190:6, 191:22
**lacerations** [3] - 205:8, 205:19, 232:19
**laces** [1] - 125:4
**lack** [4] - 11:16, 52:8, 98:5, 116:7
**ladies** [1] - 255:10
**lady** [2] - 86:23, 109:22
**laid** [2] - 12:18, 76:4
**language** [1] - 61:11
**lapels** [1] - 75:22
**laptop** [3] - 38:25, 39:4, 99:18
**large** [6] - 54:12, 114:18, 230:20, 233:19, 234:8, 239:1
**larger** [5] - 51:13, 56:1, 190:12, 236:15, 251:10
**Larry** [1] - 165:12
**larynx** [2] - 207:11, 207:19
**last** [21] - 18:24, 26:8, 33:19, 34:7, 34:16, 52:22, 54:12, 57:21, 57:22, 58:7, 58:11, 62:9, 81:11, 84:17, 89:13, 125:21, 133:9, 180:20, 196:2, 218:1, 250:5
**late** [6] - 32:20, 133:22, 168:1, 168:4, 170:2, 203:17
**law** [5] - 11:19, 12:5, 115:12, 119:19, 136:8
**lawyers** [3] - 53:25, 64:10, 128:10
**lays** [1] - 75:21
**lead** [1] - 173:18
**leading** [1] - 110:4
**leaning** [1] - 160:24
**learn** [8] - 142:13, 143:4, 143:6, 153:8, 239:8, 256:17, 256:21, 257:2
**learned** [6] - 52:12, 74:15, 143:2, 174:2, 174:7, 256:24
**least** [1] - 164:6
**leave** [9] - 39:25, 143:13, 144:4, 155:5, 155:7, 155:9, 174:20, 175:7, 177:5
**leaves** [1] - 44:16
**Leest** [58] - 13:2, 13:20, 13:22, 14:4, 14:18, 14:24, 15:11,

17:16, 17:24, 19:4, 19:7, 23:9, 23:21, 31:3, 31:17, 33:24, 38:6, 39:16, 40:6, 40:15, 42:9, 42:18, 44:11, 47:1, 50:5, 51:21, 53:6, 53:10, 54:11, 57:20, 59:4, 60:4, 62:19, 65:19, 68:11, 69:17, 73:25, 74:11, 74:24, 75:4, 77:2, 78:9, 78:25, 79:19, 81:18, 81:22, 95:1, 95:3, 99:16, 99:24, 106:2, 106:18, 108:11, 111:8, 122:23, 126:17, 128:3, 128:8
**LEEST** [2] - 14:14, 38:2
**Leest's** [2] - 49:16, 78:16
**left** [56] - 18:1, 35:19, 39:23, 40:17, 42:19, 81:24, 81:25, 84:21, 85:1, 100:22, 101:3, 101:15, 101:18, 102:2, 102:18, 103:8, 103:24, 104:1, 104:15, 106:20, 106:24, 109:1, 109:10, 113:13, 133:10, 146:18, 152:2, 152:6, 202:25, 204:18, 204:21, 206:10, 206:12, 206:13, 231:4, 233:1, 233:4, 233:6, 233:7, 234:4, 236:12, 237:2, 237:3, 237:8, 238:1, 240:7, 247:4, 248:2, 248:20, 248:21, 249:7, 249:8, 249:21, 251:6, 251:24
**left-hand** [8] - 109:10, 236:12, 237:2, 237:3, 237:8, 238:1, 251:6, 251:24
**leg** [3] - 211:7, 248:15, 249:8
**legs** [1] - 207:24
**length** [5] - 24:19, 49:9, 50:7, 53:15, 206:8
**lengthy** [1] - 138:24
**less** [2] - 176:16, 213:10

**lethal** [3] - 206:20, 206:22, 211:12
**Lethal** [1] - 206:22
**lettering** [2] - 58:13, 104:10
**LEVA** [2] - 21:9, 76:12
**license** [1] - 182:9
**licensed** [2] - 216:22, 216:24
**life** [9] - 72:12, 136:16, 141:22, 144:11, 144:16, 147:25, 171:19, 217:16, 228:9
**life-saving** [1] - 228:9
**light** [4] - 73:17, 103:11, 104:4, 134:20
**lights** [3] - 23:6, 39:12, 106:17
**limiting** [1] - 94:2
**line** [6] - 19:2, 84:25, 97:23, 196:23, 219:8, 240:5
**Lines** [1] - 98:1
**lines** [6] - 62:12, 76:9, 84:25, 231:7, 231:10, 246:22
**link** [3] - 34:9, 127:14, 191:23
**linked** [2] - 34:17, 83:6
**linking** [1] - 78:14
**links** [1] - 54:16
**listed** [6] - 84:6, 109:9, 126:25, 127:21, 138:5, 212:13
**listen** [1] - 90:4
**listening** [1] - 55:1
**literally** [1] - 138:13
**live** [4] - 129:13, 131:20, 212:23, 213:10
**lived** [4] - 72:12, 129:15, 131:4, 131:5
**liver** [9] - 204:12, 204:14, 204:17, 204:21, 211:25, 212:21, 212:24, 250:4, 250:10
**living** [3] - 96:2, 129:19, 131:8
**load** [2] - 61:23, 62:5
**loaded** [2] - 39:3, 40:8
**locate** [2] - 31:14, 60:23
**located** [11] - 40:24, 42:3, 60:19, 130:12, 130:14, 130:24, 131:12, 131:16, 131:23, 132:25,

205:4
**location** [9] - 11:9, 20:20, 20:21, 27:14, 55:8, 76:9, 104:4, 104:8, 105:11
**locations** [5] - 60:8, 60:12, 62:2, 103:14, 115:17
**logic** [1] - 198:4
**logo** [2] - 75:13, 104:2
**look** [38] - 15:12, 15:22, 20:5, 21:5, 47:17, 50:21, 50:23, 51:5, 56:9, 57:22, 58:7, 63:2, 63:8, 65:3, 68:25, 70:8, 74:7, 82:6, 82:17, 87:3, 93:10, 100:4, 107:4, 108:14, 156:20, 157:2, 158:7, 159:14, 162:19, 186:13, 186:25, 188:15, 196:22, 207:11, 223:12, 224:14, 244:25, 253:1
**looked** [8] - 15:1, 31:7, 34:14, 105:16, 139:8, 156:22, 178:10, 192:16
**looking** [29] - 15:10, 23:21, 31:15, 52:16, 60:17, 75:23, 78:24, 82:9, 84:14, 100:1, 103:3, 103:5, 103:7, 103:21, 103:22, 104:1, 104:13, 106:22, 106:24, 107:3, 119:10, 119:13, 173:6, 190:9, 190:20, 190:23, 203:19, 205:6, 206:6
**looks** [1] - 194:19
**lose** [1] - 211:20
**losing** [1] - 141:25
**loss** [4] - 16:18, 25:23, 28:2, 249:15
**loud** [2] - 118:22, 203:16
**love** [1] - 155:6
**loves** [1] - 150:22
**lower** [3] - 102:4, 248:15, 249:8
**Lucille** [1] - 218:10
**lunch** [6] - 68:17, 68:23, 80:7, 99:16, 104:23, 110:25
**lung** [4] - 204:21, 211:24, 212:21

lungs [7] - 204:12, 204:21, 212:25, 219:11, 223:16, 223:18, 249:23

## M

m-e-t-a-l [1] - 185:23
ma'am [3] - 54:9, 128:25, 179:8
Mac [8] - 20:13, 20:14, 20:19, 75:13, 78:1, 103:22, 104:2, 104:10
machine [2] - 16:21, 41:2
Main [2] - 131:13, 131:18
mainland [1] - 183:2
major [1] - 130:14
male [4] - 129:24, 185:8, 256:12, 256:23
man [3] - 72:12, 170:23, 171:20
man's [1] - 72:17
manager [2] - 61:12, 61:14
manager's [1] - 26:21
managing [1] - 175:18
mandible [1] - 230:23
mannequin [4] - 100:15, 100:16, 102:4, 232:24
manner [9] - 197:9, 198:1, 208:13, 217:14, 226:17, 227:10, 234:19, 244:6, 255:19
manufactured [1] - 76:3
manufacturer [3] - 48:16, 49:1, 50:6
manufacturing [1] - 75:9
map [2] - 62:1, 62:3
March [1] - 24:1
Mark [4] - 72:3, 84:15, 85:17, 85:20
marked [29] - 34:25, 45:3, 47:16, 48:5, 51:22, 58:8, 59:9, 110:10, 122:25, 156:19, 158:24, 160:8, 162:18, 164:23, 187:21, 188:14, 189:4, 190:5, 199:7, 199:15, 200:21, 202:20, 224:13,

229:18, 231:19, 235:19, 237:1, 241:7, 250:23
marker [1] - 70:11
markings [1] - 187:23
marriage [2] - 175:1, 175:4
married [5] - 136:13, 143:20, 171:10, 171:16, 178:11
Mart [37] - 11:8, 11:10, 14:5, 24:5, 39:10, 51:9, 51:14, 52:21, 54:11, 54:15, 54:18, 54:20, 55:5, 55:14, 56:2, 57:9, 100:12, 100:18, 116:16, 130:8, 130:9, 130:11, 130:25, 132:2, 132:7, 132:10, 132:17, 132:22, 132:24, 139:19, 139:23, 140:24, 166:7, 166:8, 167:13, 169:3
master's [2] - 181:6, 181:9
mastoid [3] - 246:20, 246:23, 247:22
material [1] - 95:8
materially [1] - 13:2
matter [18] - 13:13, 27:22, 29:7, 29:19, 32:4, 73:19, 74:4, 80:24, 88:13, 88:19, 91:1, 91:3, 92:4, 115:24, 162:6, 175:3, 196:17, 257:24
matters [5] - 31:21, 36:19, 92:4, 254:19, 259:5
maxillary [2] - 230:24, 247:24
ME [1] - 188:1
ME's [1] - 183:5
meal [1] - 150:17
mean [14] - 27:11, 71:17, 74:4, 95:19, 107:20, 114:18, 116:23, 119:18, 121:14, 137:10, 176:17, 228:11, 238:23, 241:4
meaning [1] - 207:21
means [11] - 65:24, 154:4, 205:19, 206:7, 206:8, 207:2, 209:12, 222:12, 226:10, 227:10,

244:7
measurements [2] - 62:2, 74:6
measuring [2] - 72:5, 119:24
Medical [17] - 181:17, 181:20, 182:13, 183:5, 184:4, 184:10, 185:5, 190:10, 207:25, 216:12, 216:22, 217:11, 218:2, 218:4, 224:3, 235:6, 242:22
medical [12] - 181:15, 182:2, 182:4, 182:8, 183:15, 183:20, 183:24, 185:15, 207:7, 210:24, 226:11, 228:9
Medicine [1] - 216:20
medicine [6] - 181:11, 182:17, 216:22, 216:25, 217:17, 222:11
meet [9] - 36:13, 57:9, 132:25, 133:15, 171:23, 172:5, 231:5, 231:14, 259:9
meeting [2] - 55:13, 167:25
member [3] - 154:10, 184:3, 184:6
members [17] - 37:9, 50:12, 52:24, 57:15, 60:15, 65:11, 68:15, 99:10, 101:14, 162:12, 179:13, 187:5, 198:9, 229:3, 244:18, 254:24, 257:9
memory [1] - 190:24
men [1] - 118:23
men's [2] - 47:23, 48:25
mentioned [9] - 89:6, 139:21, 232:25, 233:12, 233:23, 235:1, 240:20, 247:16, 249:18
merchant [1] - 51:9
merchants [1] - 60:12
merely [5] - 31:6, 74:18, 87:2, 87:23, 119:8
message [24] - 85:3, 90:18, 90:20, 91:10, 137:4, 139:9, 139:13, 143:7, 147:10, 147:22,

149:3, 152:10, 152:18, 152:22, 153:2, 153:11, 153:12, 153:15, 154:21, 157:23, 176:7, 176:8
messages [45] - 82:18, 83:9, 85:13, 88:10, 89:8, 89:11, 91:13, 94:16, 95:16, 96:18, 109:19, 137:23, 138:5, 138:14, 139:1, 139:5, 142:8, 143:9, 143:12, 145:5, 145:8, 145:12, 145:15, 147:14, 148:14, 151:6, 154:19, 157:9, 157:13, 157:20, 158:8, 159:1, 159:8, 159:11, 159:20, 160:6, 160:14, 160:15, 160:21, 173:6, 173:9, 173:17, 173:21, 176:9
messaging [2] - 138:9, 144:6
met [13] - 35:13, 35:17, 56:13, 57:8, 76:21, 133:21, 133:24, 133:25, 134:9, 148:19, 166:12, 170:7, 170:24
metadata [17] - 15:22, 16:2, 16:10, 17:4, 24:1, 24:3, 25:22, 28:5, 28:9, 28:12, 41:1, 120:2, 120:5, 120:6, 120:8, 120:13, 121:13
metal [1] - 185:23
metallic [3] - 106:20, 106:24, 109:9
metals [2] - 185:20, 185:24
Metals [1] - 185:25
MetroPCS [4] - 80:21, 81:7, 84:2, 126:25
Mexico [2] - 60:24, 61:1
microphone [6] - 54:8, 129:1, 160:23, 180:6, 181:12, 253:7
mid [1] - 249:4
mid-thigh [1] - 249:4
middle [2] - 103:9, 104:18

Midland [1] - 60:18
midnight [1] - 153:5
might [5] - 74:17, 79:13, 154:18, 162:20, 222:19
mile [1] - 131:3
miles [2] - 61:20, 61:24
Miles [1] - 154:2
military [2] - 217:5, 217:7
MIN [1] - 84:4
mind [3] - 171:8, 215:13, 247:14
mine [1] - 45:17
minimize [1] - 226:7
minimizing [1] - 226:20
minute [5] - 31:23, 50:10, 68:24, 117:8, 179:12
minutes [7] - 24:18, 130:18, 151:20, 151:24, 179:14, 213:2, 213:10
misquote [1] - 55:22
missing [4] - 246:16, 248:4, 249:17
misspoke [2] - 228:11, 237:13
model [3] - 61:20, 229:14, 231:11
modified [2] - 29:23, 97:8
moisture [1] - 43:21
Mom [1] - 27:16
moment [4] - 31:1, 85:9, 93:4, 213:18
monoxide [1] - 207:20
month [2] - 168:14, 169:14
month's [1] - 168:13
months [5] - 55:23, 89:23, 95:10, 166:13
MOORE [77] - 12:16, 13:6, 13:9, 13:15, 29:22, 30:9, 32:5, 32:17, 36:21, 37:5, 79:23, 80:1, 80:5, 90:2, 90:7, 90:11, 123:18, 124:20, 128:6, 158:19, 158:23, 159:23, 160:2, 160:20, 160:24, 161:6, 161:10, 161:13, 163:17, 165:6, 165:19, 165:21, 178:16, 178:20, 191:14, 191:25,

194:16, 194:18,
195:8, 195:13,
195:15, 196:13,
197:11, 198:5,
200:5, 202:15,
208:19, 208:21,
210:5, 210:7, 212:2,
213:6, 214:19,
215:17, 225:21,
225:25, 227:17,
227:19, 227:22,
228:10, 228:25,
230:4, 232:10,
236:20, 242:11,
244:15, 245:16,
246:8, 251:16,
252:10, 252:18,
253:5, 253:8, 254:5,
254:8, 258:14,
258:18
mOORE [1] - 213:8
Moore [10] - 32:3,
79:22, 90:3, 92:8,
160:18, 165:22,
215:4, 227:16,
242:10, 258:12
morgue [4] - 218:7,
238:17, 241:25,
242:20
morning [21] - 12:8,
21:2, 21:19, 24:4,
25:1, 26:19, 37:9,
46:8, 49:17, 64:6,
67:24, 96:1, 135:16,
135:20, 138:5,
142:9, 166:16,
166:21, 166:22,
167:12, 184:11
mostly [1] - 223:20
motel [1] - 27:6
motion [1] - 33:2
motions [1] - 191:16
Motions [2] - 36:23,
254:13
motivating [1] - 91:21
motive [10] - 56:11,
88:4, 88:17, 88:21,
89:1, 89:23, 91:1,
91:4, 91:25
move [1] - 60:1
moved [3] - 24:10,
25:23, 73:20
MR [374] - 11:10, 12:7,
12:16, 13:6, 13:9,
13:15, 13:21, 13:25,
14:3, 14:11, 14:17,
14:21, 14:24, 15:9,
15:11, 16:6, 17:7,
17:12, 17:16, 17:22,
17:24, 18:23, 19:7,

22:8, 22:14, 22:19,
22:24, 23:4, 23:11,
23:14, 23:17, 23:20,
28:23, 29:22, 30:9,
32:5, 32:17, 33:10,
35:11, 35:17, 36:21,
37:4, 37:5, 37:12,
38:5, 39:7, 39:12,
39:16, 40:15, 41:16,
42:9, 42:18, 44:11,
44:24, 45:2, 46:5,
46:7, 46:13, 46:18,
46:22, 47:1, 47:12,
47:15, 49:11, 49:15,
49:21, 50:2, 50:5,
51:18, 51:21, 53:2,
53:5, 53:9, 53:21,
54:5, 54:9, 54:19,
54:25, 55:2, 55:11,
55:15, 55:18, 55:20,
56:16, 57:2, 57:11,
57:19, 58:17, 58:20,
59:1, 59:4, 59:18,
59:21, 60:1, 60:4,
63:14, 63:17, 63:22,
63:25, 64:12, 65:9,
65:19, 68:7, 68:10,
69:1, 69:8, 69:14,
69:16, 73:24, 74:22,
75:3, 76:19, 77:6,
77:10, 77:13, 79:23,
80:1, 80:5, 80:12,
80:13, 81:6, 82:4,
82:9, 82:12, 82:15,
82:23, 83:1, 83:5,
83:12, 83:15, 83:19,
84:11, 84:13, 85:8,
85:12, 85:20, 86:2,
86:4, 86:8, 86:12,
86:18, 86:22, 87:6,
87:8, 88:2, 88:4,
88:22, 88:24, 89:21,
90:2, 90:7, 90:11,
92:3, 92:15, 92:19,
92:25, 93:8, 93:18,
93:23, 94:6, 94:10,
94:14, 94:16, 94:25,
95:6, 95:24, 96:8,
96:16, 96:22, 96:25,
97:13, 97:17, 98:4,
98:11, 98:12, 98:18,
98:20, 99:1, 99:3,
99:8, 99:15, 99:20,
99:24, 106:16,
106:18, 109:13,
109:16, 110:3,
110:6, 110:9,
110:19, 110:23,
111:7, 111:9,
111:12, 111:15,
122:1, 122:4,

122:10, 122:18,
122:22, 123:18,
123:21, 123:25,
124:20, 124:24,
125:15, 125:17,
125:23, 126:6,
126:10, 126:17,
127:25, 128:2,
128:6, 128:17,
129:6, 133:12,
133:15, 158:17,
158:19, 158:23,
159:23, 160:2,
160:11, 160:17,
160:20, 160:24,
161:6, 161:7,
161:10, 161:13,
162:4, 162:16,
163:16, 163:17,
163:24, 165:5,
165:6, 165:11,
165:13, 165:17,
165:19, 165:21,
178:16, 178:18,
178:20, 179:22,
180:13, 181:21,
184:10, 186:2,
187:12, 187:15,
191:11, 191:14,
191:20, 191:25,
192:7, 192:12,
194:13, 194:16,
194:18, 195:6,
195:8, 195:13,
195:15, 195:16,
195:22, 196:1,
196:8, 196:13,
196:19, 197:11,
198:5, 198:15,
199:9, 199:12,
199:13, 199:21,
200:2, 200:5,
200:10, 200:13,
201:9, 202:12,
202:15, 202:19,
203:8, 203:11,
204:16, 206:23,
208:17, 208:19,
208:21, 210:5,
210:7, 212:2, 212:5,
212:7, 213:4, 213:6,
213:8, 214:8,
214:10, 214:14,
214:18, 214:19,
214:25, 215:17,
216:6, 225:19,
225:21, 225:25,
226:4, 226:19,
226:25, 227:5,
227:17, 227:19,
227:22, 228:10,

228:25, 229:6,
230:3, 230:4, 230:8,
230:12, 230:15,
230:16, 232:9,
232:10, 232:14,
236:18, 236:20,
236:25, 242:7,
242:11, 243:6,
244:15, 244:21,
245:15, 245:16,
245:21, 246:7,
246:8, 246:12,
247:5, 247:11,
250:5, 251:13,
251:16, 251:21,
252:7, 252:10,
252:18, 253:5,
253:8, 253:21,
254:5, 254:8,
254:21, 255:2,
255:6, 255:8,
255:13, 257:8,
257:23, 258:11,
258:14, 258:18,
259:6, 259:7, 259:8
multiple [14] - 25:16,
70:14, 116:17,
137:14, 205:10,
205:11, 208:12,
209:12, 209:13,
212:9, 220:9, 222:9,
247:7, 247:9
murder [6] - 91:23,
153:25, 215:8,
242:14, 244:3
murdered [1] - 96:3
Murphy [9] - 81:19,
95:2, 95:13, 95:22,
95:24, 98:18,
109:23, 110:18
Murphy's [1] - 109:25
muscle [6] - 221:12,
234:12, 248:9,
248:13, 248:23,
249:3
muscles [4] - 220:22,
233:14, 233:15,
234:2
mushrooms [4] -
150:20, 150:22,
150:24, 176:3
must [1] - 228:10
MY [1] - 260:16

**N**

name [32] - 28:17,
48:2, 50:11, 51:9,
52:24, 82:16, 86:24,
95:2, 100:21,

109:22, 117:13,
124:12, 125:7,
125:10, 126:24,
129:7, 130:4,
130:22, 135:25,
155:19, 180:16,
180:17, 180:20,
188:4, 188:20,
199:17, 199:20,
200:24, 208:4,
208:6, 216:8
names [1] - 85:22
narrow [1] - 168:4
narrowing [1] - 222:3
National [1] - 184:3
natural [2] - 217:14,
231:15
nature [4] - 36:16,
36:24, 139:1, 207:8
nauseous [1] - 174:14
navel [2] - 213:20,
213:24
necessarily [3] -
121:14, 121:16,
121:22
necessary [4] - 12:10,
74:2, 228:15, 242:17
neck [7] - 191:5,
203:22, 206:9,
206:10, 206:11,
206:12, 221:24
need [14] - 31:22,
64:10, 64:12, 68:11,
71:20, 92:16, 92:20,
98:10, 127:13,
179:3, 187:4, 187:8,
257:16, 259:5
needed [1] - 178:6
needless [1] - 138:12
needs [1] - 76:21
negative [2] - 210:21,
241:3
Networks [1] - 24:2
never [7] - 32:24,
34:9, 43:17, 61:14,
89:6, 97:3, 175:6
New [2] - 60:24, 61:1
new [3] - 36:15, 199:1,
254:14
news [3] - 153:10,
153:19, 154:4
next [23] - 14:18,
16:25, 17:18, 18:19,
26:2, 26:3, 26:4,
40:2, 60:23, 72:16,
73:10, 84:13,
100:25, 101:12,
113:3, 128:16,
154:10, 179:21,
201:16, 214:24,

247:13
**night** [13] - 35:2, 35:22, 39:10, 54:23, 135:14, 150:1, 150:2, 151:12, 152:4, 152:6, 153:9, 166:21, 167:12
**NO** [1] - 260:21
**noise** [1] - 118:11
**noisy** [1] - 118:4
**nonlinear** [2] - 38:14, 70:8
**normal** [2] - 186:16, 228:16
**normally** [2] - 115:10, 188:3
**North** [3] - 131:13, 237:20, 256:18
**Nos** [14] - 37:25, 49:25, 58:25, 65:16, 111:4, 192:6, 198:14, 200:8, 202:18, 229:5, 232:13, 244:20, 245:1, 258:24
**nose** [1] - 43:21
**notations** [1] - 187:1
**note** [4] - 124:1, 221:20, 221:23, 240:18
**notebook** [1] - 69:19
**noted** [1] - 254:17
**notes** [2] - 94:24, 198:20
**nothing** [5] - 89:16, 119:21, 128:2, 210:21
**notice** [3] - 36:11, 79:14, 108:21
**noticed** [1] - 60:18
**noting** [2] - 219:7, 219:11
**November** [4] - 89:13, 138:13, 157:18, 168:5
**nowadays** [1] - 115:18
**number** [75] - 11:24, 19:4, 26:6, 50:15, 50:17, 56:1, 62:20, 81:17, 82:7, 82:14, 82:15, 82:19, 82:21, 82:23, 83:2, 83:18, 83:25, 84:13, 84:15, 84:16, 84:17, 84:19, 84:25, 86:7, 87:2, 95:23, 96:23, 97:5, 97:19, 97:25, 109:6, 109:25, 110:11, 110:15, 123:8, 126:21, 127:2,

127:4, 127:12, 127:16, 127:19, 127:21, 132:10, 132:12, 132:14, 136:19, 136:22, 136:24, 137:1, 158:12, 158:14, 161:14, 163:2, 185:2, 186:19, 187:6, 187:22, 187:25, 188:1, 188:3, 188:20, 189:16, 199:17, 200:24, 204:2, 209:7, 218:20, 218:23, 218:25, 219:24, 228:1, 235:21, 237:20, 240:21, 257:15
**numbered** [1] - 260:10
**numbers** [16] - 81:20, 81:25, 84:4, 84:21, 84:23, 85:2, 85:15, 85:18, 85:22, 85:25, 86:10, 93:14, 94:22, 192:10, 227:20, 258:4
**numerous** [4] - 24:17, 147:7, 147:10, 229:6

**O**

**object** [35] - 12:16, 32:10, 32:11, 32:21, 33:6, 33:7, 49:18, 64:6, 66:6, 81:13, 86:23, 88:25, 91:8, 106:20, 106:25, 109:10, 110:4, 160:6, 194:20, 194:25, 201:5, 205:12, 205:14, 205:15, 222:15, 222:18, 222:20, 222:21, 225:25, 242:11, 242:18, 243:2, 252:19, 253:18
**objecting** [1] - 93:24
**objection** [77] - 11:15, 13:7, 22:18, 22:20, 29:21, 29:23, 34:10, 36:21, 37:2, 53:21, 54:13, 56:25, 57:2, 57:11, 57:13, 58:22, 59:22, 63:17, 64:16, 64:20, 64:21, 65:15, 73:24, 74:10, 74:21, 79:24, 84:5, 87:13, 90:8, 90:24, 92:1, 92:7, 92:8, 93:7,

94:2, 96:11, 98:4, 98:7, 111:3, 123:18, 123:24, 124:20, 125:25, 126:14, 161:12, 161:14, 162:9, 163:20, 178:20, 191:18, 192:4, 194:24, 195:7, 195:8, 197:12, 197:19, 200:5, 225:21, 227:14, 227:19, 227:23, 228:20, 230:5, 232:11, 236:21, 243:25, 244:12, 245:17, 253:4, 253:5, 253:9, 253:15, 254:3, 254:17, 254:18, 259:1, 259:3
**objections** [48] - 19:2, 22:13, 31:21, 36:25, 46:8, 46:10, 46:15, 49:16, 49:20, 49:22, 56:17, 58:21, 64:2, 64:9, 69:12, 79:22, 80:4, 80:18, 80:25, 85:7, 86:20, 92:22, 93:12, 93:21, 94:18, 95:6, 110:24, 111:1, 122:11, 125:18, 125:19, 125:24, 126:12, 160:3, 163:18, 165:7, 191:15, 192:1, 194:20, 202:16, 246:9, 251:17, 252:11, 252:19, 254:9, 254:14, 258:15
**observations** [10] - 21:1, 39:22, 51:8, 72:13, 74:3, 119:8, 119:17, 119:22, 119:23, 119:25
**observe** [2] - 60:2, 105:3
**observed** [9] - 21:23, 22:22, 24:4, 43:17, 64:5, 105:4, 219:24, 245:10, 247:6
**obtain** [1] - 235:15
**obtained** [3] - 50:20, 115:18, 251:2
**obtaining** [1] - 250:20
**obviously** [2] - 88:9, 243:9
**occasion** [20] - 20:2, 44:17, 50:23, 51:5, 66:12, 137:19,

138:4, 142:2, 164:6, 164:19, 176:20, 186:18, 201:24, 221:18, 224:6, 229:8, 238:11, 239:23, 244:22, 250:16
**occasions** [5] - 61:13, 136:19, 136:21, 151:22, 173:10
**occupied** [1] - 216:10
**occurred** [9] - 25:7, 30:14, 30:24, 60:22, 198:1, 217:13, 217:14, 233:8, 260:10
**occurring** [1] - 144:11
**Oceanside** [5] - 27:6, 45:22, 78:2, 107:1, 109:9
**October** [3] - 137:7, 157:17, 168:5
**OF** [2] - 260:1, 260:2
**offense** [4] - 54:21, 54:23, 54:24, 55:6, 95:8, 95:11, 197:8, 215:14
**offenses** [1] - 98:6
**offer** [33] - 22:9, 22:10, 32:6, 34:8, 46:5, 53:3, 58:18, 59:19, 63:16, 63:24, 68:9, 81:10, 110:21, 122:9, 125:15, 126:8, 158:18, 163:16, 165:5, 191:12, 191:22, 200:3, 202:13, 215:9, 225:19, 230:3, 232:9, 236:18, 242:7, 245:15, 246:7, 251:14, 252:8
**offered** [15] - 14:6, 32:24, 63:18, 80:20, 87:20, 90:14, 90:25, 91:1, 91:2, 112:15, 113:8, 122:11, 125:25, 126:7, 258:19
**offering** [14] - 36:1, 88:12, 88:14, 88:18, 88:20, 92:4, 96:15, 97:10, 162:5, 243:7, 253:21, 258:9
**offers** [1] - 252:17
**Office** [11] - 71:13, 102:21, 154:11, 183:5, 190:11, 208:1, 217:11,

218:2, 218:5, 224:3, 242:23
**office** [16] - 16:19, 26:21, 28:18, 31:10, 32:9, 47:3, 60:19, 60:25, 84:15, 114:20, 115:24, 182:14, 183:8, 185:1, 198:16, 218:22
**officer** [6] - 25:24, 28:3, 72:11, 115:4, 119:20, 135:8
**officer's** [1] - 16:19
**Official** [2] - 260:3, 260:22
**OFFICIAL** [1] - 260:16
**often** [1] - 134:6
**old** [12] - 129:17, 130:1, 148:5, 208:23, 209:1, 209:5, 255:24, 256:2, 256:3, 256:7, 257:2, 257:3
**on-screen** [1] - 25:21
**once** [5] - 81:21, 98:16, 104:19, 189:10, 204:19
**oncology** [1] - 183:2
**one** [56] - 16:13, 16:20, 16:24, 17:10, 17:18, 18:25, 23:2, 24:2, 24:10, 25:4, 26:4, 26:8, 30:20, 32:4, 33:12, 41:5, 41:17, 44:13, 45:10, 54:17, 61:2, 62:11, 69:21, 73:7, 74:19, 77:23, 81:17, 81:19, 82:13, 83:23, 87:4, 88:7, 89:2, 90:2, 90:15, 93:5, 94:5, 95:19, 98:12, 98:15, 101:17, 105:25, 106:13, 113:7, 113:20, 114:19, 115:10, 116:3, 116:13, 116:15, 116:18, 116:23, 117:3, 117:16, 121:15, 123:2, 126:11, 129:23, 137:19, 142:5, 144:12, 146:11, 146:24, 147:9, 147:13, 147:14, 157:23, 169:18, 172:18, 172:20, 173:1, 176:20, 183:10, 187:18,

190:7, 191:9, 191:15, 195:19, 199:16, 203:14, 203:22, 205:10, 206:10, 206:14, 206:18, 206:19, 207:15, 209:13, 211:2, 211:7, 214:12, 214:13, 215:4, 232:23, 233:5, 240:5, 240:21, 240:22, 244:5
**one-frame-per-second** [1] - 41:17
**one-gallon** [1] - 187:18
**one-inch** [2] - 206:18, 206:19
**one-time** [2] - 142:5, 144:12
**ones** [20] - 24:1, 28:12, 107:21, 111:1, 120:21, 154:21, 159:2, 159:5, 159:7, 159:13, 160:3, 160:7, 161:1, 161:2, 161:3, 204:10, 204:11, 204:12
**ongoing** [1] - 179:3
**open** [7] - 33:18, 81:23, 82:1, 106:4, 108:13, 212:15, 260:11
**Open** [5] - 11:3, 32:1, 69:5, 80:10, 179:16
**OPEN** [8] - 57:14, 65:10, 162:11, 198:8, 215:21, 229:2, 244:17, 254:23
**opened** [2] - 108:25, 113:13
**opening** [1] - 88:25
**opinion** [19] - 12:19, 16:7, 21:22, 41:4, 43:6, 43:12, 43:16, 43:18, 91:12, 91:16, 100:7, 105:6, 105:9, 105:10, 108:13, 207:7, 223:2, 255:15, 255:17
**opinions** [3] - 68:1, 74:11, 74:12
**opportunity** [6] - 12:5, 32:7, 67:15, 69:10, 164:7, 183:11
**Optical** [1] - 19:12
**orbit** [1] - 230:23

**ordeal** [1] - 178:7
**order** [9] - 14:4, 28:8, 33:11, 34:1, 70:9, 226:12, 235:10, 235:16
**ordered** [2] - 93:20, 94:13
**orders** [2] - 32:18, 132:20
**organs** [4] - 196:4, 204:5, 204:8, 219:13
**oriented** [1] - 87:10
**original** [9] - 19:12, 19:23, 22:5, 24:9, 29:24, 80:23, 81:10, 118:1, 193:14
**originally** [3] - 31:11, 226:5, 258:19
**originals** [1] - 243:14
**Osteopathic** [1] - 216:20
**otherwise** [2] - 74:18, 79:13
**outlined** [1] - 230:20
**outs** [1] - 193:19
**outside** [16] - 46:8, 64:17, 68:12, 74:13, 74:23, 87:9, 92:21, 110:20, 110:24, 141:1, 141:2, 141:3, 169:8, 169:11, 209:5, 257:23
**outstanding** [1] - 86:10
**outweighed** [1] - 243:12
**outweighs** [3] - 197:4, 197:17, 228:22
**overall** [3] - 27:11, 76:12, 161:21
**overbroad** [2] - 53:22, 56:24
**overrule** [3] - 64:20, 92:7, 94:2
**overruled** [22] - 29:21, 37:2, 46:15, 49:22, 56:25, 57:12, 57:13, 58:23, 65:15, 98:8, 111:3, 126:14, 161:12, 162:10, 163:21, 191:18, 192:4, 227:14, 244:12, 254:4, 254:17, 259:1
**overrules** [1] - 197:16
**overruling** [2] - 13:8, 243:25
**own** [4] - 86:4, 118:19, 119:19, 217:16
**owner** [1] - 84:19

**owners** [1] - 53:10
**owns** [1] - 110:14

## P

**p.m** [7] - 69:4, 80:9, 167:5, 179:15, 259:12
**Pacific** [1] - 121:18
**package** [3] - 117:5, 187:18, 202:3
**page** [16] - 14:1, 54:17, 57:22, 58:7, 58:11, 62:9, 67:4, 69:21, 73:3, 73:20, 75:12, 76:21, 123:12, 202:21, 237:3, 251:24
**Page** [3] - 11:23, 12:15, 13:22
**pages** [14] - 52:1, 52:4, 54:14, 55:24, 57:21, 66:25, 67:2, 67:6, 67:8, 69:10, 69:20, 70:15, 71:4, 99:25
**paint** [1] - 187:18
**pair** [1] - 48:25
**pamphlet** [1] - 257:19
**panel** [1] - 39:23
**pants** [2] - 34:25, 36:11
**Papa** [1] - 97:24
**paper** [2] - 40:17, 43:13
**parallel** [1] - 131:20
**parietal** [1] - 205:9
**Paris** [21] - 82:17, 83:4, 83:7, 83:8, 83:20, 83:24, 84:20, 85:16, 85:24, 86:7, 87:1, 160:13, 160:16, 161:3, 161:6, 161:7, 161:8, 177:19, 177:23, 178:4
**Paris'** [3] - 82:19, 82:23, 97:22
**Parker** [1] - 216:13
**parking** [1] - 44:16
**part** [38] - 15:9, 20:4, 20:9, 21:8, 21:9, 35:7, 42:10, 47:2, 50:19, 59:6, 60:9, 60:13, 60:16, 62:19, 64:21, 67:12, 75:4, 76:5, 85:15, 123:16, 124:25, 125:22, 174:25, 175:4, 180:24, 186:16,

192:12, 194:10, 198:4, 200:13, 207:10, 215:6, 228:11, 228:13, 228:16, 235:5, 248:11, 253:12
**partial** [1] - 221:8
**partially** [1] - 222:4
**particular** [51] - 12:24, 20:9, 23:22, 28:21, 29:22, 42:11, 49:1, 50:15, 52:13, 55:8, 68:14, 72:13, 90:22, 98:5, 112:17, 113:24, 116:24, 134:17, 136:15, 140:19, 142:12, 148:12, 150:18, 156:20, 164:19, 167:22, 184:25, 185:2, 186:19, 187:2, 187:6, 188:5, 190:25, 195:25, 197:13, 209:10, 209:11, 209:13, 210:17, 219:5, 219:6, 219:17, 224:7, 224:10, 224:17, 226:6, 237:5, 238:20, 239:8, 240:9, 240:11
**particularly** [4] - 116:16, 207:13, 221:24, 244:5
**parties** [2] - 260:8, 260:15
**partner** [3] - 38:19, 115:25, 117:10
**partners** [1] - 114:19
**parts** [4] - 62:24, 201:25, 243:20, 246:16
**party** [4] - 146:9, 146:10, 146:12, 146:15
**pass** [11] - 111:9, 122:1, 127:25, 165:17, 178:16, 208:17, 212:2, 213:4, 214:8, 255:3, 257:8
**passages** [1] - 86:20
**paste** [1] - 27:23
**patch** [1] - 100:22
**paternity** [1] - 196:11
**Paternity** [1] - 196:13
**pathology** [9] - 182:10, 182:18, 183:9, 216:21, 217:3, 217:18,

217:21, 224:5
**Pathology** [1] - 182:10
**patrol** [2] - 115:4, 115:6
**pattern** [1] - 76:4
**pay** [5] - 72:13, 139:23, 140:1, 140:7, 140:13
**pay-at-the-pump** [1] - 139:23
**payment** [3] - 43:4, 43:8, 140:4
**Peerwani** [2] - 184:15, 184:16
**Peerwani's** [3] - 182:14, 183:8, 185:1
**pelvic** [5] - 214:1, 214:2, 234:9, 248:18, 249:2
**pen** [1] - 43:13
**pending** [1] - 175:16
**penetrations** [1] - 204:3
**people** [6] - 20:23, 66:18, 71:19, 184:21, 198:21, 207:2
**peoples'** [1] - 45:9
**per** [5] - 27:2, 41:17, 41:22, 61:20, 137:18
**percent** [4] - 121:14, 212:20, 219:22, 219:25
**perform** [2] - 228:18, 238:11
**performed** [1] - 234:14
**perhaps** [2] - 79:6, 116:19
**period** [9] - 25:7, 39:23, 53:14, 89:15, 118:14, 132:4, 141:9, 170:2, 218:16
**permission** [4] - 39:8, 40:11, 44:7, 99:21
**permitted** [2] - 215:5, 215:9
**persist** [6] - 93:24, 144:4, 144:6, 144:8, 147:18, 149:6
**persistent** [1] - 141:16
**persistently** [1] - 146:24
**persists** [1] - 96:11
**person** [32] - 12:24, 43:7, 43:12, 43:19, 45:9, 61:9, 66:6, 78:17, 78:25, 87:2, 91:7, 91:9, 91:11, 95:1, 96:1, 96:2,

110:14, 110:17, 114:15, 114:16, 152:8, 185:12, 201:18, 204:8, 205:25, 211:19, 213:9, 213:14, 214:13, 217:16, 223:23
person's [1] - 205:18
personal [1] - 85:24
pertained [2] - 51:14, 77:24
pertaining [2] - 86:15, 87:14
pertinent [1] - 86:17
pharmacist [1] - 217:9
Pharmacy [1] - 183:21
phase [1] - 107:10
phone [50] - 56:4, 81:16, 81:17, 81:25, 82:14, 82:15, 82:19, 82:21, 82:23, 83:1, 83:21, 83:24, 84:19, 84:21, 85:2, 85:24, 86:15, 90:17, 90:20, 90:21, 94:17, 94:21, 95:18, 96:8, 96:22, 97:5, 97:16, 97:19, 97:25, 109:19, 109:25, 110:15, 126:21, 127:19, 127:21, 136:19, 136:22, 136:24, 137:1, 137:17, 138:17, 138:20, 138:23, 138:24, 143:6, 143:8, 161:14, 178:3
phonetic [1] - 148:16
photo [11] - 113:16, 189:13, 190:11, 193:19, 193:22, 193:23, 194:7, 194:9, 195:22, 196:2, 196:10
photograph [29] - 30:1, 31:7, 67:18, 70:25, 72:1, 72:6, 72:17, 101:5, 109:2, 111:17, 111:18, 111:19, 112:14, 112:23, 113:7, 113:10, 113:20, 186:11, 193:14, 197:13, 215:6, 228:2, 236:12, 236:16, 237:2, 238:1, 251:7, 251:11, 251:24
photographed [3] -

29:10, 71:9, 71:10
photographic [13] - 21:10, 21:12, 21:13, 65:21, 65:23, 66:16, 67:17, 71:11, 71:15, 74:25, 75:4, 76:11, 99:17
photographs [39] - 29:11, 65:1, 68:25, 69:20, 70:1, 74:2, 74:7, 74:11, 74:18, 75:23, 186:8, 192:14, 192:16, 194:23, 195:10, 197:9, 198:3, 224:15, 224:20, 224:22, 224:25, 225:4, 225:7, 225:22, 226:4, 226:21, 226:22, 227:4, 227:23, 228:2, 229:7, 240:8, 241:11, 241:14, 241:24, 242:16, 243:18, 243:19, 254:10
photography [1] - 219:8
photos [11] - 70:23, 72:3, 73:1, 189:19, 190:7, 190:9, 190:20, 191:23, 194:3, 194:5, 194:10
phrase [1] - 206:23
physical [2] - 67:13, 113:23
physician [1] - 217:9
picked [2] - 116:5, 116:8
pickup [1] - 66:10
picture [4] - 100:16, 113:15, 195:17, 200:23
pictures [2] - 71:19, 100:17
piece [5] - 19:1, 43:13, 71:8, 236:8, 242:24
pieces [3] - 86:11, 242:23, 242:24
pink [4] - 110:11, 187:10, 188:20, 188:22
pinstripe [1] - 75:20
pixel [1] - 107:11
pixels [4] - 78:24, 104:4, 104:7, 104:8
Pizza [1] - 97:24
place [13] - 11:8, 30:12, 88:15, 113:20, 132:20,

141:1, 141:19, 142:3, 142:7, 142:13, 176:4, 188:5, 188:25
placed [6] - 114:9, 163:8, 188:9, 190:24, 193:19, 258:1
placement [2] - 108:14, 108:18
places [1] - 116:15
placing [1] - 70:10
plan [2] - 26:1, 149:10
planned [1] - 97:1
plans [2] - 146:6, 146:8
plastic [2] - 113:19, 140:11
play [3] - 23:3, 120:10
played [3] - 22:25, 116:20, 119:3
player [1] - 19:24
plus [1] - 252:19
pocket [1] - 34:25
point [58] - 22:22, 32:10, 39:25, 40:2, 55:9, 81:21, 82:22, 86:21, 101:6, 102:5, 103:13, 104:20, 105:23, 115:5, 115:6, 118:15, 118:17, 119:14, 121:21, 122:9, 122:12, 133:6, 141:23, 144:10, 144:16, 147:9, 147:13, 147:21, 149:18, 152:2, 152:17, 153:4, 153:23, 154:13, 155:11, 155:18, 158:17, 169:16, 169:18, 170:15, 171:19, 172:20, 174:16, 177:13, 178:13, 178:21, 186:3, 200:11, 209:2, 213:24, 236:19, 244:15, 251:13, 252:7, 254:15, 255:1, 256:16, 257:10
pointed [2] - 119:24, 213:18
pointer [1] - 203:18
pointing [3] - 75:17, 101:18, 103:11
points [2] - 104:2, 225:5
Police [2] - 102:19,

104:17
police [1] - 103:25
Porter [5] - 72:3, 84:15, 85:17, 85:20, 89:9
porter [3] - 86:25, 117:10
portion [6] - 101:6, 109:1, 120:5, 226:2, 227:25, 250:6
portions [2] - 260:7
portray [1] - 235:23, 245:25
portrayed [2] - 77:25, 250:25
position [9] - 34:7, 34:12, 34:13, 56:3, 143:24, 182:11, 216:18, 220:15, 233:17
positioned [1] - 213:23
positive [6] - 210:12, 210:16, 210:17, 210:19, 210:22, 211:3
positively [1] - 148:22
possession [5] - 44:18, 47:10, 114:11, 114:22
possessions [2] - 34:18, 35:4
possible [4] - 117:5, 148:23, 148:24, 149:10
possibly [1] - 68:1
posterior [5] - 203:22, 230:25, 234:9, 248:17, 249:17
postmortem [1] - 207:19
posture [1] - 220:21
posturing [1] - 220:20
potential [2] - 179:2, 198:1
practice [4] - 216:22, 216:24, 217:18, 222:10
Prairie [16] - 17:1, 17:17, 18:6, 24:2, 25:11, 25:14, 25:21, 28:1, 28:11, 28:15, 30:3, 30:7, 30:9, 31:5, 31:12, 42:3
precedents [1] - 252:16
predicate [1] - 12:18
pregnancy [1] - 213:24
pregnant [13] -

142:18, 143:2, 143:10, 144:3, 144:14, 172:14, 174:2, 174:14, 176:25, 196:10, 196:12, 196:24, 197:8
prejudice [2] - 197:4, 197:16
prejudicial [6] - 195:1, 197:13, 228:6, 228:22, 243:3, 243:13
preparation [3] - 62:19, 63:12, 190:10
prepare [8] - 19:17, 45:18, 45:24, 59:10, 61:25, 94:4, 241:20, 244:22
prepared [9] - 34:2, 63:5, 63:11, 69:20, 109:19, 229:22, 245:3, 245:23, 252:4
preparing [1] - 59:11
prepping [1] - 190:12
presence [9] - 39:3, 46:9, 64:17, 68:12, 74:23, 87:9, 92:21, 110:24, 257:24
present [21] - 11:3, 30:11, 30:15, 32:1, 35:20, 37:8, 68:4, 69:5, 80:10, 94:8, 99:5, 117:4, 123:16, 164:4, 179:2, 179:16, 179:19, 207:14, 219:17, 238:21, 257:22
presentation [9] - 27:23, 41:19, 59:11, 70:23, 71:3, 81:14, 116:22, 229:15, 257:25
presented [23] - 29:2, 29:13, 36:5, 119:11, 119:18, 184:17, 184:25, 185:3, 186:4, 187:1, 187:7, 187:9, 188:23, 189:8, 189:13, 205:25, 220:11, 220:15, 239:12, 241:25, 246:1, 256:22, 257:15
presenting [1] - 254:3
presents [1] - 124:2, 124:5, 124:8, 185:12
pretrial [9] - 46:10, 125:20, 125:24, 126:11, 126:15,

191:16, 192:2, 258:17, 258:20
**Pretrial** [2] - 36:23, 254:12
**pretty** [4] - 26:20, 112:18, 112:25, 141:17
**prevalence** [1] - 116:1
**prevention** [3] - 16:19, 25:24, 28:3
**preview** [1] - 33:14
**previous** [6] - 68:18, 143:15, 163:21, 179:12, 215:11, 257:12
**previously** [8] - 11:6, 31:3, 89:20, 160:4, 160:15, 202:16, 252:19, 258:16
**prices** [1] - 43:14
**primarily** [2] - 61:11, 115:21
**primary** [1] - 61:11
**print** [1] - 62:20
**printed** [2] - 16:12, 75:13
**printout** [1] - 157:8
**private** [1] - 183:25
**probative** [7] - 195:1, 197:3, 197:17, 228:6, 228:21, 243:4, 243:12
**problem** [2] - 12:25, 175:4
**problems** [3] - 90:15, 172:21, 172:24
**Procedure** [1] - 244:3
**procedure** [1] - 228:17
**proceed** [22] - 14:7, 23:5, 36:20, 37:11, 37:24, 53:7, 65:18, 69:13, 80:11, 92:17, 99:6, 99:13, 111:6, 122:17, 126:5, 129:2, 180:8, 192:5, 216:2, 219:10, 219:12, 219:14
**proceeded** [1] - 221:17
**PROCEEDINGS** [16] - 54:2, 57:14, 64:15, 65:10, 160:1, 162:11, 194:17, 198:8, 215:3, 215:21, 225:20, 229:2, 242:9, 244:17, 252:25, 254:23
**proceedings** [3] -

259:12, 260:7, 260:13
**process** [20] - 19:8, 25:19, 25:20, 28:7, 32:19, 36:9, 50:21, 65:25, 70:4, 70:5, 75:9, 75:16, 77:23, 78:8, 231:15, 246:19, 246:20, 246:23, 247:22, 247:23
**processing** [1] - 70:7
**produce** [1] - 140:4
**product** [1] - 36:24
**profession** [1] - 206:24
**professional** [1] - 201:4
**professionals** [1] - 226:11
**proffer** [9] - 15:10, 17:3, 17:23, 22:9, 23:12, 77:8, 79:1, 95:1, 258:3
**proffered** [2] - 17:11, 79:12
**profile** [1] - 235:16
**profiling** [1] - 250:21
**progress** [2] - 70:22, 71:1
**progresses** [1] - 56:7
**projection** [1] - 76:17
**projector** [2] - 70:20, 99:22
**promise** [1] - 203:14
**prongs** [1] - 78:5
**proof** [1] - 89:1
**properly** [2] - 86:14, 161:20
**property** [5] - 32:9, 113:4, 114:10, 123:17, 124:1
**proponent** [3] - 13:13, 29:7, 29:19
**proposed** [1] - 80:18
**Prosecution** [1] - 254:3
**prosecutions** [1] - 215:8
**protect** [2] - 207:3
**protruding** [2] - 233:20, 249:19
**prove** [5] - 77:22, 79:15, 196:11, 228:17, 242:16
**proved** [3] - 90:19, 242:17, 258:1
**provided** [10] - 11:7, 11:18, 11:19, 12:6, 24:16, 32:14, 32:18,

33:3, 74:15, 116:25
**providing** [1] - 74:11
**Province** [1] - 180:25
**province** [3] - 74:1, 74:13, 180:24
**proving** [1] - 197:6
**publish** [6] - 40:11, 41:13, 42:7, 44:7, 99:21, 165:11
**published** [17] - 14:8, 14:23, 15:7, 17:21, 18:22, 23:7, 39:15, 40:14, 41:14, 42:8, 42:17, 44:10, 46:22, 46:25, 59:1, 76:25, 200:11
**pugilistic** [4] - 220:20, 220:23, 233:11, 233:16
**pull** [3] - 105:25, 129:1, 180:5
**pulled** [1] - 233:13
**pulmonary** [1] - 223:20
**pump** [1] - 139:23
**purchase** [1] - 134:3
**purchased** [2] - 107:15, 139:21
**purchases** [4] - 56:6, 139:25, 140:7, 140:13
**Puritan** [2] - 49:4, 50:9
**purple** [5] - 87:11, 96:22, 139:17, 230:21, 231:7
**purport** [2] - 110:17, 242:19
**purportedly** [1] - 91:9
**purports** [1] - 34:15
**purpose** [9] - 33:1, 51:1, 71:14, 77:8, 77:11, 96:14, 97:10, 115:12, 153:1
**purposes** [65] - 14:6, 22:11, 35:1, 37:16, 37:18, 37:24, 37:23, 41:19, 45:3, 47:16, 48:6, 51:23, 53:4, 58:9, 58:19, 58:24, 59:10, 59:20, 59:24, 63:24, 65:13, 68:9, 69:11, 71:15, 79:12, 80:21, 81:15, 86:13, 93:2, 101:21, 110:10, 115:21, 123:1, 126:9, 158:18, 158:25, 161:12, 162:13, 165:9, 179:5, 187:22, 188:15,

189:5, 191:12, 191:18, 191:23, 199:8, 200:4, 200:22, 202:13, 202:20, 227:4, 231:6, 235:11, 236:23, 250:17, 250:21, 251:15, 251:19, 252:13, 252:17, 255:11, 258:10, 258:23
**pursuant** [2] - 32:18, 122:8
**pursue** [2] - 88:8, 185:15
**pursuing** [1] - 88:9
**pushing** [1] - 169:19
**put** [19] - 19:4, 26:2, 26:15, 33:25, 34:7, 34:12, 45:9, 46:8, 56:11, 64:2, 66:9, 81:8, 114:10, 115:16, 117:15, 126:1, 157:3, 200:25, 236:8
**puts** [2] - 107:12, 201:9
**putting** [1] - 43:20

## Q

**qualifies** [1] - 216:18
**quality** [4] - 78:18, 78:23, 112:3, 112:20
**quarter** [1] - 39:23
**questions** [15] - 13:19, 23:9, 23:15, 28:23, 53:6, 68:12, 74:24, 77:5, 82:5, 89:8, 156:8, 166:2, 178:18, 255:3, 257:18
**Quick** [1] - 19:25
**quite** [1] - 27:13

## R

**Rachel** [1] - 96:1
**radiation** [1] - 183:2
**radiological** [1] - 181:11
**raise** [3] - 128:22, 180:1, 215:23
**raised** [4] - 36:23, 191:15, 192:2, 254:12
**ran** [1] - 30:18
**range** [3] - 61:22, 62:5, 137:18
**rate** [1] - 120:12

**rather** [2] - 75:10, 139:2
**rationale** [1] - 243:7
**raw** [6] - 26:13, 32:23, 33:23, 33:25, 36:5, 45:23
**rays** [1] - 185:17
**reach** [1] - 144:5
**reached** [1] - 257:10
**reaction** [3] - 153:21, 155:16, 221:2
**read** [12] - 27:18, 50:6, 52:9, 142:8, 154:19, 164:12, 164:13, 164:18, 165:3, 165:14, 187:17, 198:22
**ready** [12] - 33:21, 37:3, 69:7, 80:11, 80:12, 92:17, 98:24, 99:1, 99:7, 129:2, 174:13, 180:9
**really** [9] - 72:10, 140:20, 146:12, 146:24, 150:9, 159:18, 166:24, 197:14, 214:12
**rear** [1] - 39:23
**reason** [4] - 118:15, 197:15, 210:25, 215:5
**reasonable** [3] - 79:16, 197:6, 227:11
**reasoning** [1] - 243:7
**reasons** [5] - 64:19, 79:4, 79:18, 88:7, 243:22
**Reavis** [2] - 11:25, 12:14
**rebuttal** [1] - 35:25
**recalled** [1] - 178:25
**receipt** [15] - 15:14, 15:15, 16:6, 16:12, 18:1, 18:4, 18:6, 18:16, 40:19, 40:22, 41:25, 42:20, 43:2, 43:9, 43:10
**receive** [7] - 22:5, 44:22, 47:2, 152:10, 181:6, 181:15, 218:23
**received** [9] - 48:9, 84:7, 90:18, 90:21, 96:13, 142:23, 216:19, 218:19, 228:4
**receives** [1] - 212:8
**recess** [11] - 31:23, 31:25, 68:24, 69:3, 69:4, 80:7, 80:9,

Case 4:16-cv-00133-O   Document 23-19   Filed 07/06/17   Page 94 of 101   PageID 5306
23

179:12, 179:14, 179:15, 257:20
**recognition** [2] - 78:19, 171:25
**recognize** [49] - 15:15, 20:8, 42:19, 45:4, 45:6, 45:10, 45:13, 47:18, 48:2, 48:6, 48:18, 48:22, 51:24, 62:14, 110:11, 125:9, 139:9, 156:25, 157:3, 159:5, 159:8, 159:11, 159:15, 164:24, 187:23, 188:19, 189:6, 189:15, 190:5, 192:17, 194:3, 199:15, 200:22, 202:21, 224:15, 224:19, 229:19, 231:20, 231:22, 231:24, 236:2, 237:3, 237:17, 237:19, 241:10, 245:2, 245:6, 250:24, 252:1
**recognized** [2] - 50:11, 172:10
**reconstruct** [3] - 224:9, 226:12, 242:3
**reconstructing** [1] - 225:11
**reconstruction** [1] - 227:2
**record** [44] - 11:4, 22:9, 22:16, 32:2, 35:11, 37:15, 37:17, 37:19, 37:21, 46:19, 53:23, 63:16, 63:18, 63:19, 65:12, 69:7, 80:22, 84:25, 86:14, 95:9, 97:15, 97:22, 97:23, 122:9, 122:11, 122:15, 123:13, 125:16, 125:18, 125:19, 125:25, 126:1, 126:3, 130:4, 133:12, 133:14, 161:13, 161:24, 180:16, 215:6, 231:6, 243:18, 259:9, 259:11
**Record** [2] - 260:9, 260:13
**recording** [4] - 120:25, 121:9, 121:10, 219:8
**recordings** [1] - 11:8

**records** [35] - 34:8, 34:9, 34:10, 34:14, 35:6, 35:7, 50:20, 50:24, 51:2, 51:6, 51:10, 51:13, 52:10, 53:13, 53:18, 54:14, 56:4, 58:5, 59:5, 60:17, 81:8, 82:18, 83:6, 85:21, 86:15, 96:15, 97:19, 98:1, 122:6, 123:13, 124:16, 161:23, 187:4
**recover** [1] - 61:15
**recovered** [3] - 114:12, 258:5, 258:6
**recross** [1] - 213:5
**RECROSS** [1] - 213:7
**RECROSS-EXAMINATION** [1] - 213:7
**red** [4] - 127:17, 158:12, 159:2, 159:13
**redact** [1] - 92:9
**redacted** [3] - 81:12, 86:16, 123:9
**redactions** [2] - 81:9, 84:6
**REDIRECT** [2] - 122:21, 212:6
**redirect** [5] - 83:19, 122:3, 178:17, 212:4, 214:10
**redraw** [1] - 198:16
**reduce** [1] - 243:16
**Reeves** [1] - 34:16
**refer** [8] - 78:17, 154:19, 187:4, 210:2, 227:3, 237:2, 251:22, 257:19
**reference** [4] - 56:2, 85:2, 101:21, 230:17
**references** [4] - 51:14, 55:25, 56:12, 92:13
**referred** [2] - 146:23, 154:21
**referring** [5] - 82:22, 87:5, 235:21, 237:19, 237:25
**reflect** [7] - 53:18, 133:12, 133:14, 139:12, 163:7, 163:11, 228:3
**reflected** [2] - 161:24, 176:9
**reflects** [2] - 228:5, 260:13
**refreshed** [1] - 190:24
**regard** [46] - 11:7,

13:10, 22:12, 23:10, 30:2, 30:4, 30:7, 31:1, 55:13, 77:7, 83:10, 85:23, 86:6, 90:19, 91:15, 91:19, 93:6, 93:22, 94:15, 95:21, 96:7, 96:21, 98:15, 136:16, 142:23, 145:6, 145:9, 163:19, 175:16, 195:4, 196:7, 197:25, 219:5, 222:23, 223:18, 223:21, 237:24, 240:20, 240:25, 241:21, 244:5, 244:23, 254:18, 255:13, 256:11, 257:1
**regarding** [19] - 22:18, 30:17, 37:13, 57:8, 63:25, 64:16, 71:22, 80:15, 88:1, 90:5, 91:13, 92:1, 98:7, 111:18, 143:9, 158:20, 161:22, 215:7, 257:18
**region** [1] - 214:2
**register** [1] - 27:4
**registering** [1] - 46:3
**regular** [2] - 132:19, 167:21
**related** [3] - 51:4, 51:15, 82:8
**relates** [2] - 188:17, 253:24
**relation** [4] - 56:20, 130:17, 130:24, 131:14
**relations** [3] - 169:21, 173:11, 176:21
**relationship** [24] - 142:15, 143:16, 143:25, 144:15, 149:18, 155:12, 166:3, 169:16, 170:18, 170:19, 170:22, 171:8, 172:1, 172:6, 172:11, 172:17, 173:2, 173:23, 174:22, 174:24, 178:9, 215:11
**relative** [1] - 112:25
**relatively** [1] - 138:23
**relay** [1] - 149:4
**relevance** [11] - 49:19, 56:19, 57:3, 87:16, 88:17, 95:7, 96:11, 98:6, 162:6, 226:14,

227:22
**relevant** [15] - 55:8, 86:17, 86:21, 87:15, 88:1, 89:14, 89:25, 95:23, 197:14, 215:9, 215:12, 226:9, 242:13, 242:16, 243:11
**relied** [3] - 28:13, 30:10, 30:21
**relieved** [1] - 175:18
**rely** [4] - 28:4, 28:10, 72:9, 226:22
**relying** [1] - 26:22
**remain** [2] - 84:25, 178:22
**remaining** [2] - 81:9, 81:17
**remains** [5] - 27:22, 84:9, 185:2, 208:2, 208:5
**remember** [18] - 55:7, 68:18, 87:1, 117:21, 132:11, 132:14, 140:20, 147:4, 149:25, 151:5, 151:18, 166:24, 179:12, 190:15, 190:20, 190:23, 253:3, 257:12
**remote** [3] - 55:3, 89:15, 95:7
**remoteness** [1] - 96:11
**remove** [3] - 84:3, 92:10, 97:8
**removed** [8] - 85:3, 92:16, 186:3, 189:10, 226:2, 227:24, 228:11, 242:23
**removes** [1] - 192:8
**removing** [2] - 97:4, 202:14
**rendition** [2] - 157:12, 158:2
**renew** [4] - 46:10, 49:15, 110:23, 254:13
**repeat** [2] - 112:13, 250:5
**repeatedly** [3] - 137:20, 155:15, 162:23
**rephrase** [4] - 123:22, 123:24, 166:5, 172:3
**report** [9] - 186:16, 187:17, 190:23, 205:16, 207:20, 209:18, 209:25,

210:7, 210:12
**reported** [1] - 260:11
**REPORTER** [17] - 16:4, 32:15, 54:7, 125:21, 160:22, 181:18, 184:8, 185:22, 199:19, 201:7, 204:13, 206:21, 230:14, 247:8, 250:2, 253:6, 254:6
**Reporter** [2] - 260:3, 260:22
**Reporter's** [2] - 260:9, 260:12
**represent** [2] - 33:4, 158:6
**representation** [6] - 30:13, 57:23, 85:6, 118:1, 118:2, 229:25
**representations** [1] - 96:6
**representative** [2] - 76:1, 189:12
**represented** [2] - 27:12, 96:10
**representing** [1] - 30:20
**represents** [1] - 102:22
**reprinted** [1] - 163:3
**reprinting** [1] - 97:5
**reproduced** [1] - 226:6
**request** [5] - 13:15, 124:25, 198:15, 199:1, 199:25
**requested** [3] - 61:1, 69:10, 260:8
**requesting** [1] - 33:2
**require** [3] - 29:20, 36:20, 244:14
**required** [1] - 13:5
**requisite** [1] - 11:16
**requisites** [1] - 12:12
**research** [3] - 183:15, 183:20, 183:24
**reserved** [1] - 74:12
**residencies** [1] - 182:16
**residency** [3] - 182:18, 182:23, 183:1
**respect** [12] - 34:5, 43:5, 43:11, 81:18, 82:4, 105:13, 109:16, 123:11, 188:8, 204:5, 206:11, 229:23
**respective** [1] -

260:14
**respond** [3] - 138:11, 147:9, 147:13
**responded** [1] - 138:10
**response** [15] - 12:6, 12:7, 33:9, 89:18, 92:2, 92:3, 92:7, 123:19, 153:15, 156:4, 195:5, 226:3, 243:5, 253:20, 258:13
**responsibilities** [1] - 235:5
**responsibility** [2] - 79:15, 235:7
**rest** [1] - 34:13
**restaurant** [1] - 130:21
**result** [9] - 29:17, 79:11, 79:17, 145:17, 196:5, 205:21, 228:20, 234:13, 234:14
**results** [2] - 254:11, 255:9
**resume** [1] - 257:11
**retain** [1] - 250:17
**retires** [3] - 128:15, 179:10, 214:23
**retrieve** [2] - 106:13, 124:24
**retrieved** [5] - 17:5, 31:7, 31:10, 31:11, 125:6
**retrieving** [1] - 61:3
**reveal** [3] - 220:3, 240:2, 240:18
**revealed** [1] - 222:8
**reverse** [2] - 33:11, 76:17
**review** [17] - 11:19, 12:5, 13:11, 23:2, 32:8, 36:10, 50:20, 51:1, 52:1, 69:10, 79:4, 93:13, 105:21, 108:7, 108:22, 185:14
**reviewed** [2] - 85:21, 159:14
**reviewing** [1] - 28:25
**revisions** [1] - 81:1
**revisit** [1] - 122:13
**ribs** [2] - 249:22, 249:25
**Richland** [1] - 184:1
**right-hand** [1] - 236:15
**right-side** [2] - 247:7, 247:9

**right-sided** [1] - 222:9
**rights** [1] - 36:9
**ring** [11] - 105:19, 105:23, 106:20, 109:10, 111:18, 111:19, 111:22, 112:11, 123:16, 124:19
**rings** [1] - 124:2
**Rizy** [4] - 22:6, 44:23, 88:6, 114:20
**Road** [1] - 127:9
**road** [1] - 130:15
**Rodgers** [1] - 76:20
**romantic** [2] - 170:22, 171:7
**room** [9] - 26:21, 46:4, 50:15, 71:11, 71:13, 71:18, 72:2, 257:17
**rotate** [1] - 167:8
**routine** [2] - 203:25, 204:2
**rule** [5] - 64:18, 66:16, 66:17, 78:8, 217:13
**Rule** [7] - 12:13, 13:4, 29:4, 31:20, 46:9, 178:22, 178:25
**ruled** [1] - 32:22
**ruler** [4] - 189:18, 195:19, 195:20, 246:17
**Rules** [4] - 29:4, 34:11, 76:21, 122:8
**rules** [1] - 128:9
**ruling** [9] - 92:20, 99:9, 163:21, 197:18, 198:6, 208:14, 255:9, 259:2
**rulings** [4] - 36:19, 37:13, 110:20, 244:13
**run** [2] - 30:22, 115:25
**running** [5] - 26:14, 64:21, 171:16, 254:18, 259:3
**runs** [1] - 73:1
**Ruth** [1] - 257:6

**S**

S-h-i-p-i-n-g [1] - 180:19
**S.W.2d** [1] - 11:21
**S.W.3d** [5] - 12:1, 13:23, 14:1, 76:20, 76:24
**sad** [2] - 171:21, 172:5
**safe** [1] - 198:20
**safekeeping** [1] - 115:12

**safety** [1] - 142:20
**samples** [6] - 196:11, 235:11, 235:14, 235:24, 250:18, 251:2
**San** [9] - 34:23, 35:5, 55:19, 56:21, 88:6, 89:3, 89:23, 89:24, 122:7
**sat** [1] - 25:25
**satisfied** [3] - 11:17, 12:13, 252:16
**satisfy** [1] - 31:20
**saves** [1] - 64:8
**saving** [1] - 228:9
**saw** [14] - 18:14, 26:8, 31:12, 40:25, 109:9, 115:3, 116:4, 116:9, 120:19, 139:18, 153:10, 205:22, 211:10, 225:2
**scalp** [2] - 205:17, 205:20
**scene** [6] - 55:6, 185:15, 224:19, 226:2, 242:25, 245:9
**scenes** [1] - 242:22
**scheduling** [1] - 259:9
**School** [2] - 98:2, 127:9
**school** [2] - 75:5, 75:8
**Sci** [1] - 183:25
**Sci-Tech** [1] - 183:25
**Science** [2] - 237:21, 256:18
**science** [3] - 65:20, 181:6, 181:9
**scientific** [1] - 74:6
**scientist** [1] - 183:24
**screen** [24] - 15:6, 15:21, 16:10, 17:8, 17:9, 18:13, 24:1, 25:21, 26:20, 28:13, 31:6, 41:1, 43:6, 75:13, 105:5, 105:7, 106:1, 114:19, 120:11, 120:16, 120:25, 190:12, 210:14
**se** [1] - 27:2
**seal** [1] - 35:7
**sealed** [6] - 125:3, 125:6, 236:11, 236:14, 251:5, 251:9
**seams** [1] - 76:2
**search** [1] - 254:11
**searches** [1] - 254:12
**seat** [1] - 234:24
**seated** [4] - 128:25, 179:20, 180:4, 216:1

**second** [11] - 25:13, 41:17, 41:22, 57:22, 90:23, 107:20, 158:7, 162:19, 202:24, 224:14, 226:9
**section** [4] - 124:1, 124:4, 124:7, 124:11
**secured** [1] - 115:11
**security** [5] - 12:3, 115:21, 123:6, 134:20, 135:8
**Security** [1] - 123:8
**see** [67] - 24:1, 24:3, 26:25, 27:4, 28:8, 33:20, 44:13, 47:17, 52:17, 53:23, 56:4, 57:23, 60:5, 62:10, 70:15, 73:16, 73:18, 74:19, 75:24, 82:17, 82:18, 88:10, 98:23, 102:23, 103:23, 104:3, 104:6, 105:7, 107:17, 108:15, 109:2, 113:14, 116:7, 123:1, 123:3, 123:15, 124:14, 124:16, 126:3, 126:21, 133:3, 135:13, 135:17, 135:20, 140:24, 158:7, 163:2, 177:14, 186:12, 188:16, 195:9, 199:10, 202:6, 205:23, 207:18, 210:7, 211:13, 211:14, 212:17, 223:8, 223:12, 224:14, 232:17, 237:3, 240:23, 245:1
**seeing** [6] - 16:7, 42:14, 43:23, 80:16, 120:3, 151:5
**seem** [3] - 143:22, 148:25
**selection** [1] - 77:16
**sell** [1] - 167:20
**sending** [1] - 153:1
**sense** [2] - 36:16, 116:23
**sensitive** [2] - 210:15, 210:16
**sent** [7] - 90:20, 96:13, 118:7, 152:18, 153:12, 257:17
**separate** [1] - 24:22
**September** [3] - 53:16, 53:23, 168:5
**sequence** [10] - 28:21,

29:2, 30:5, 30:11, 30:21, 30:24, 55:4, 73:1, 73:10
**sequences** [1] - 73:15
**sequential** [3] - 29:25, 30:20, 34:1
**sequentially** [1] - 26:9
**Sergeant** [1] - 55:21
**series** [3] - 11:7, 116:11, 241:20
**serious** [1] - 212:16
**serve** [3] - 47:3, 47:6, 217:7
**served** [2] - 47:7, 217:5
**service** [1] - 52:8
**set** [14] - 13:18, 66:6, 71:18, 80:15, 100:10, 100:25, 102:10, 102:25, 103:17, 104:4, 104:6, 104:14, 145:1, 258:4
**sets** [3] - 100:6, 103:6, 107:21
**settings** [1] - 38:16
**settled** [2] - 43:3, 43:7
**seven** [3] - 130:2, 166:25, 203:22
**several** [12] - 24:16, 55:23, 68:12, 78:12, 89:16, 116:12, 116:19, 116:20, 126:18, 136:18, 151:22, 217:13
**sewn** [1] - 76:7
**sex** [7] - 141:15, 142:3, 143:3, 144:12, 174:3, 239:8, 239:10
**sexting** [1] - 173:13
**Sexting** [2] - 173:15, 173:16
**sexual** [5] - 169:20, 173:2, 173:11, 176:21
**shaded** [1] - 193:12
**shall** [1] - 215:9
**shape** [6] - 27:2, 27:4, 27:5, 27:11, 27:15, 105:12
**shaped** [1] - 240:15
**share** [1] - 164:10
**shave** [1] - 206:5
**shaved** [1] - 206:3
**sheet** [3] - 124:1, 124:4, 124:7
**Sheriff's** [6] - 36:18, 47:4, 114:2, 114:6, 114:11, 124:25

**sheriff's** [2] - 32:9, 60:25
**shift** [3] - 166:19, 167:5, 167:8
**shifts** [1] - 184:21
**sHIPING** [1] - 180:10
**Shiping** [2] - 180:17, 180:18
**shirt** [35] - 20:9, 20:12, 20:13, 20:14, 20:19, 20:21, 48:21, 66:10, 71:4, 71:8, 72:18, 73:18, 75:11, 75:12, 75:16, 76:6, 78:1, 100:14, 100:16, 100:20, 101:5, 101:6, 101:7, 101:17, 103:23, 104:5, 104:11, 134:20, 187:11, 188:11, 189:23, 189:25, 190:6, 190:21, 258:4
**shirts** [2] - 76:10, 100:15
**shocked** [1] - 153:22
**shoes** [1] - 134:21
**short** [4] - 66:10, 72:18, 167:10
**short-sleeve** [2] - 66:10, 72:18
**shortly** [2] - 80:17, 137:1
**shorts** [4] - 187:10, 188:21, 188:22, 190:8
**shot** [3] - 25:4, 26:21, 26:23
**shots** [2] - 24:17, 30:12
**shoulder** [1] - 100:22
**shoulders** [1] - 100:23
**show** [48] - 15:5, 17:20, 18:21, 43:2, 51:22, 58:8, 73:5, 88:14, 90:14, 101:2, 101:14, 102:1, 102:12, 103:19, 106:6, 110:6, 124:7, 156:18, 157:15, 158:5, 158:24, 162:7, 164:23, 187:21, 188:14, 189:4, 190:4, 192:17, 199:7, 200:21, 202:19, 204:16, 210:12, 215:13, 224:12, 226:9, 228:17, 229:18, 231:18,

235:19, 236:25, 243:20, 244:7, 245:22, 246:13, 247:12, 250:23, 256:5
**showed** [5] - 52:16, 117:9, 151:12, 154:2, 239:15
**showing** [10] - 18:24, 30:3, 45:2, 47:15, 48:5, 59:9, 74:5, 83:6, 110:9, 117:25
**shown** [4] - 67:23, 154:24, 194:22, 209:9
**shows** [3] - 26:14, 195:18, 207:20
**sic** [7] - 13:12, 46:15, 65:11, 84:14, 97:11, 110:20, 174:13
**sic)** [1] - 46:20
**side** [40] - 54:1, 70:11, 113:13, 159:25, 179:4, 202:25, 204:18, 206:9, 206:14, 222:13, 230:19, 230:22, 231:5, 232:18, 232:22, 233:1, 233:4, 233:6, 233:7, 233:8, 234:4, 236:15, 237:3, 240:5, 240:7, 246:17, 246:19, 247:7, 247:9, 247:15, 247:16, 248:2, 248:14, 249:21, 249:24, 250:8, 251:11, 251:24
**sidebar** [2] - 84:3, 84:8
**sided** [1] - 222:9
**sides** [6] - 37:3, 76:6, 80:11, 92:17, 98:24, 257:14
**sign** [2] - 124:12, 157:4
**signature** [3] - 124:14, 157:1, 202:23
**significance** [1] - 195:25
**significant** [3] - 147:24, 148:2, 150:21
**similar** [4] - 73:21, 102:6, 104:20, 220:24
**similarities** [2] - 119:10, 119:12

**simple** [3] - 70:10, 75:12, 75:16
**simply** [2] - 34:2, 103:10
**single** [3] - 88:7, 88:8, 178:11
**sinus** [1] - 230:24
**Sisler** [13] - 214:14, 214:25, 215:1, 215:23, 216:9, 216:10, 226:25, 229:6, 230:11, 232:14, 243:8, 244:21, 255:13
**SISLER** [1] - 216:3
**sits** [2] - 108:19, 167:16
**sitting** [2] - 102:4, 156:9
**situation** [9] - 25:12, 26:5, 26:15, 28:15, 66:17, 66:18, 141:22, 156:10, 156:15
**six** [6] - 148:7, 164:22, 166:13, 176:17, 205:8, 206:7
**Sixth** [1] - 36:8
**sixth** [2] - 148:8, 175:24
**size** [4] - 49:5, 50:7, 105:12, 255:23
**skeletons** [1] - 224:4
**sketch** [2] - 229:13, 229:14
**sketches** [6] - 229:9, 232:2, 240:11, 241:21, 244:22, 245:2
**skills** [1] - 224:9
**skin** [21] - 205:17, 205:19, 207:15, 221:11, 232:20, 234:5, 234:8, 234:11, 239:21, 240:3, 248:12, 248:17, 249:1, 249:6, 249:12, 249:13, 249:16, 249:20, 249:22, 249:25, 250:9
**skin's** [3] - 248:8, 248:20, 248:22
**skull** [42] - 205:9, 205:21, 205:23, 211:13, 212:17, 220:6, 220:9, 222:9, 222:11, 224:10, 225:8, 225:11, 225:13, 226:2,

226:10, 226:12, 227:2, 227:24, 227:25, 228:1, 229:14, 229:16, 230:18, 230:21, 231:3, 231:5, 231:12, 231:13, 233:2, 240:4, 240:7, 242:4, 242:23, 242:24, 246:18, 247:3, 247:6, 247:7, 247:9, 247:18, 247:21, 248:3
**slacks** [2] - 48:25, 134:21
**sleeve** [2] - 66:10, 72:18
**sleeves** [2] - 76:6, 113:19
**slide** [6] - 71:25, 73:7, 101:10, 102:22, 104:22, 105:6
**slides** [3] - 71:1, 100:3, 105:14
**slightly** [1] - 121:11
**slow** [1] - 82:20
**small** [5] - 200:23, 236:11, 239:1, 239:3, 249:23
**smaller** [1] - 38:24
**smoke** [1] - 169:11
**smoking** [1] - 141:5
**sneezing** [1] - 43:21
**Social** [1] - 123:8
**soft** [1] - 205:14
**software** [3] - 112:6, 112:12, 120:13
**sole** [4] - 107:24, 108:1, 108:3, 175:18
**someone** [1] - 171:22
**sometime** [7] - 150:5, 153:10, 154:25, 155:2, 168:1, 173:7, 174:4
**sometimes** [3] - 137:14, 137:17, 210:16
**somewhat** [1] - 52:11
**soot** [6] - 207:18, 223:13, 223:14, 223:19, 240:23, 241:3
**sorry** [32] - 16:4, 32:15, 54:7, 73:8, 81:4, 82:20, 112:13, 117:7, 137:12, 157:18, 160:22, 160:24, 178:4, 181:18, 182:25, 184:8, 185:22,

199:19, 201:7, 204:13, 206:21, 230:14, 230:15, 237:11, 237:13, 242:7, 247:8, 250:2, 253:6, 253:8, 254:6
**Sorry** [1] - 230:15
**sort** [5] - 39:19, 72:5, 72:18, 87:16, 112:8
**sound** [1] - 99:25
**source** [3] - 64:6, 85:3, 112:20
**sources** [1] - 212:9
**south** [3] - 130:18, 131:1, 167:17
**southwest** [1] - 60:13
**southwestern** [2] - 59:6, 60:9
**space** [1] - 118:15
**spaghetti** [4] - 150:15, 150:16, 150:19, 176:2
**Spanish** [1] - 61:11
**spared** [2] - 233:6, 233:7
**sparing** [2] - 234:3, 234:10
**speaking** [2] - 98:16, 237:5
**special** [2] - 28:18, 150:11
**specialized** [2] - 112:6
**specializing** [1] - 224:4
**specialty** [1] - 181:10
**specific** [11] - 20:19, 20:21, 52:12, 56:23, 79:7, 86:20, 101:7, 103:7, 103:13, 144:17, 161:25
**specifically** [20] - 12:2, 26:20, 27:1, 29:4, 29:15, 30:6, 44:20, 46:9, 46:17, 51:5, 51:15, 76:20, 89:4, 92:11, 100:21, 103:6, 161:16, 217:3, 242:18, 243:25
**specifics** [1] - 135:25
**specifies** [1] - 57:10
**spell** [3] - 130:3, 180:18, 180:20
**spillage** [1] - 207:15
**split** [2] - 232:19
**splits** [2] - 232:21
**splitting** [1] - 212:15
**spoken** [1] - 110:14
**sponsoring** [2] - 81:4, 81:6

stab [18] - 195:18, 196:4, 196:20, 196:23, 203:20, 204:9, 204:10, 204:24, 208:12, 209:7, 209:9, 211:5, 211:22, 211:24, 212:13, 212:19, 213:19, 214:4
stabbed [6] - 196:21, 212:24, 212:25, 213:1, 213:9, 213:14
stabbing [3] - 195:25, 196:22, 196:24
stack [1] - 100:3
stage [1] - 205:5
stain [2] - 20:20
stamp [8] - 15:17, 15:19, 15:25, 16:2, 30:1, 30:4, 30:10, 41:24
stand [3] - 106:13, 199:10, 199:13
standards [1] - 62:7
standing [2] - 16:8, 27:3
start [10] - 14:4, 39:8, 54:6, 54:10, 66:3, 94:18, 96:10, 169:23, 183:4, 232:15
started [4] - 99:17, 134:9, 169:9, 189:17
starting [1] - 247:14
starts [3] - 53:22, 55:2, 196:10
state [10] - 11:23, 11:25, 13:23, 34:11, 44:19, 66:13, 77:12, 126:8, 143:16, 180:16
State [61] - 11:9, 12:6, 12:15, 13:14, 13:17, 13:25, 14:9, 18:25, 29:5, 33:8, 33:25, 34:7, 34:12, 36:1, 37:11, 49:12, 53:3, 56:18, 58:18, 59:19, 63:15, 68:8, 76:20, 76:23, 77:22, 79:12, 85:6, 86:16, 89:18, 92:2, 92:9, 94:10, 96:14, 97:1, 97:9, 98:11, 110:20, 122:5, 122:17, 126:8, 128:16, 129:2, 179:21, 183:12, 183:17, 183:22, 191:21, 194:13, 197:5,

200:2, 202:13, 214:24, 215:8, 216:23, 216:25, 243:5, 243:23, 252:16, 252:24, 259:6, 260:5
STATE [1] - 260:1
State's [168] - 14:5, 14:8, 14:23, 15:3, 15:5, 15:7, 15:12, 15:14, 15:21, 16:7, 17:8, 17:17, 17:21, 17:23, 17:24, 18:14, 18:18, 18:22, 21:24, 22:17, 23:7, 23:12, 29:1, 29:14, 37:14, 37:25, 39:15, 40:5, 40:14, 40:20, 41:14, 42:5, 42:8, 42:17, 42:19, 44:10, 46:15, 46:21, 46:25, 47:16, 48:18, 48:22, 49:12, 49:25, 50:6, 50:10, 56:3, 56:19, 57:17, 58:25, 59:10, 59:22, 59:25, 60:7, 63:2, 63:8, 63:15, 63:21, 63:23, 64:1, 65:13, 65:16, 66:21, 68:2, 68:8, 69:11, 69:19, 77:9, 79:3, 79:15, 79:20, 80:12, 88:24, 92:7, 93:16, 96:5, 99:1, 99:10, 99:12, 106:19, 106:22, 109:16, 110:10, 111:4, 113:24, 119:6, 122:5, 122:14, 122:16, 122:24, 123:1, 126:2, 126:4, 126:16, 158:5, 158:25, 162:12, 162:14, 163:3, 163:23, 164:23, 164:25, 165:10, 188:15, 189:5, 189:12, 190:1, 191:19, 192:6, 192:17, 192:20, 192:22, 192:24, 193:1, 193:3, 193:5, 193:7, 193:9, 193:11, 193:24, 194:1, 194:14, 198:12, 198:14, 200:8, 202:18, 202:21, 224:13, 225:1, 227:12, 229:3, 229:5, 229:18, 230:7,

231:7, 231:19, 232:13, 232:17, 235:19, 236:19, 236:24, 237:1, 237:13, 237:24, 241:11, 243:23, 244:18, 244:20, 245:1, 245:6, 245:19, 246:11, 247:14, 250:23, 250:25, 251:14, 251:20, 251:22, 252:8, 252:14, 255:9, 255:12, 256:6, 256:8, 256:14, 258:2, 258:21, 258:24
statement [12] - 56:7, 56:10, 77:17, 77:19, 88:25, 89:3, 89:24, 174:13, 191:13, 192:8, 219:23
statements [3] - 77:21, 88:16, 90:14
states [1] - 182:17
States [7] - 59:7, 60:9, 60:13, 124:8, 181:24, 182:2, 182:5
station [3] - 38:21, 103:25
stay [2] - 39:22, 140:25
stayed [2] - 151:19, 151:24
staying [1] - 145:21
steel [1] - 48:16
steel-toe [1] - 48:16
Steele [1] - 17:14
step [9] - 128:13, 179:8, 203:8, 214:11, 214:20, 230:8, 232:15, 244:25, 246:12
steps [4] - 142:22, 210:13, 223:7, 228:18
Steve [1] - 17:13
Stevenson [1] - 76:23
still [27] - 12:16, 12:17, 31:19, 65:1, 67:9, 70:10, 70:12, 70:13, 73:13, 102:17, 106:4, 106:6, 109:4, 109:8, 111:25, 112:17, 119:5, 162:1, 170:13, 185:13, 196:15, 214:1, 214:2, 215:18, 254:19, 257:16

stills [3] - 62:20, 62:23, 69:25
stock [1] - 132:19
stop [5] - 135:15, 166:16, 168:16, 168:20
stopped [1] - 169:3
stopping [4] - 168:8, 168:9, 255:1, 257:10
store [35] - 15:1, 16:14, 18:3, 18:4, 40:3, 41:5, 41:7, 41:9, 44:15, 60:21, 61:9, 130:10, 130:11, 132:10, 132:12, 132:14, 132:22, 133:17, 133:18, 133:21, 133:23, 134:1, 134:4, 134:7, 134:10, 134:16, 135:15, 139:19, 140:2, 140:5, 167:11, 167:16, 167:25, 168:9, 168:10
straight [1] - 35:14
stream [1] - 116:19
streams [1] - 120:7
street [2] - 72:11, 130:14
Street [3] - 131:13, 131:18, 260:23
strengthen [1] - 34:13
stress [2] - 141:24, 172:22
stretches [1] - 232:20
stretching [1] - 232:20
stricken [1] - 84:24
strike [2] - 84:4, 223:4
stripes [1] - 75:21
stronger [1] - 233:15
struck [5] - 222:15, 222:25, 256:3, 256:8, 256:14
structure [1] - 102:23
studies [2] - 61:19, 76:11
study [1] - 20:2
stuff [4] - 33:16, 33:20, 81:12, 87:10
styled [1] - 260:10
sub [3] - 76:12, 76:14, 76:15
subcutaneous [1] - 250:3
subject [12] - 27:22, 34:10, 42:11, 73:19, 80:24, 81:10, 128:6, 148:14, 178:22,

178:25, 198:10
subpoena [3] - 34:6, 47:3, 124:25
subscriber [1] - 84:1
substantially [3] - 197:4, 228:22, 243:12
succeed [1] - 146:19
suffer [1] - 205:21
suffered [4] - 255:21, 256:1, 256:7, 256:13
sufficient [7] - 13:12, 27:2, 27:7, 29:6, 29:18, 36:10, 211:19
sufficiently [1] - 29:5
suggestive [1] - 209:10
suicide [1] - 217:15
suicides [1] - 217:24
suit [1] - 133:8
summarized [1] - 253:12
summary [4] - 252:20, 253:9, 253:14, 253:23
summation [1] - 161:21
sun [1] - 44:4
super [1] - 167:21
superficial [2] - 206:20, 207:14
supervisors [1] - 114:20
supply [1] - 222:4
support [4] - 13:12, 29:6, 29:18, 36:1
supposed [4] - 27:12, 97:2, 146:9, 146:10
Suppress [2] - 36:23, 254:13
surface [1] - 239:15
Surgery [1] - 216:20
surgical [1] - 228:5
surprise [1] - 36:17
surrounding [2] - 107:12, 215:10
surveillance [1] - 27:17, 73:12, 102:18
survival [1] - 209:5
suspicion [1] - 222:18
suspicious [1] - 217:23
sustain [2] - 92:7, 123:24
sustained [3] - 110:5, 123:23, 124:23
sustaining [1] - 197:6
sutures [3] - 231:12, 231:13, 231:15
sworn [8] - 14:15,

38:3, 128:24, 129:4,
180:3, 180:11,
215:25, 216:4
**symbols** [1] - 59:15
**sync** [1] - 120:9
**synchronized** [1] -
121:23
**system** [6] - 23:22,
25:14, 38:10, 38:14,
40:9, 139:23
**System** [4] - 24:3,
38:12, 38:14, 182:20
**systems** [3] - 23:25,
27:17, 38:17

**T**

**T-shirt** [4] - 48:21,
75:12, 187:11,
188:11
**table** [3] - 76:4, 96:5,
133:9
**tabled** [1] - 98:12
**tag** [3] - 50:7, 50:9,
100:22
**tailored** [1] - 56:23
**talkative** [1] - 141:6
**tape** [10] - 12:20,
12:23, 13:1, 13:11,
30:19, 89:5, 117:9,
121:8, 121:15,
187:23
**tapes** [3] - 33:6, 116:5,
116:8
**TARRANT** [1] - 260:2
**Tarrant** [14] - 47:4,
114:9, 154:11,
154:14, 182:12,
183:4, 216:12,
217:10, 218:2,
218:4, 218:15,
224:2, 235:6, 260:4
**tattoo** [11] - 22:2, 22:3,
27:5, 27:6, 27:8,
27:12, 27:15, 78:13,
105:4, 105:10
**tattoos** [1] - 21:2
**Taylor** [1] - 260:3
**TAYLOR** [1] - 260:21
**team** [1] - 58:14
**tech** [2] - 201:15
**Tech** [1] - 183:25
**technically** [1] - 11:12
**technician** [3] -
201:11, 201:12,
201:15
**Technology** [1] - 24:3
**telephone** [19] - 93:14,
96:9, 96:12, 97:19,
137:18, 138:17,

147:14, 152:13,
158:12, 158:14,
161:23, 163:2,
163:7, 163:8, 163:9,
163:12, 163:13,
165:23, 176:6
**telephoned** [3] -
146:25, 147:5,
162:23
**telephoning** [2] -
137:2, 144:8
**temporal** [2] - 246:25,
247:24
**ten** [8] - 31:23, 41:20,
41:22, 68:24,
179:12, 179:14,
203:21, 204:10
**ten-minute** [3] - 31:23,
68:24, 179:12
**tendency** [1] - 139:4
**tender** [13] - 46:6,
49:12, 53:3, 59:19,
63:15, 63:22, 68:8,
110:21, 122:5,
126:9, 191:21,
194:14, 200:3
**Tennant** [3] - 218:10,
219:1, 232:3
**tentative** [1] - 90:3
**tentatively** [1] - 11:20
**term** [1] - 52:8
**test** [6] - 210:14,
210:18, 210:20,
211:1, 228:21
**testified** [26] - 14:15,
27:20, 34:16, 38:3,
84:2, 84:19, 86:7,
105:16, 129:4,
154:17, 160:7,
160:16, 161:15,
161:22, 162:22,
163:24, 176:1,
180:11, 190:2,
192:9, 216:4,
240:12, 243:9,
244:22, 250:16,
258:8
**testify** [11] - 13:2,
30:11, 31:4, 66:12,
70:23, 124:21,
154:14, 196:3,
227:6, 227:7, 253:11
**testifying** [2] - 123:19,
179:6
**testimony** [52] - 12:21,
21:3, 23:23, 30:17,
31:2, 49:17, 51:12,
55:8, 55:12, 57:6,
58:4, 58:15, 62:24,
63:12, 73:25, 74:12,

74:16, 77:2, 78:16,
79:5, 79:18, 79:24,
82:2, 83:17, 83:22,
85:16, 85:17, 86:1,
86:11, 90:5, 90:11,
91:21, 96:20,
104:25, 115:4,
128:9, 146:23,
151:25, 160:5,
161:20, 179:1,
190:10, 196:9,
215:9, 228:8, 246:5,
252:20, 253:10,
253:12, 253:14,
253:22, 253:23
**testing** [1] - 250:18
**tests** [3] - 210:13,
210:24
**TEXAS** [2] - 260:1,
260:21
**Texas** [20] - 29:4,
40:24, 46:9, 52:22,
57:10, 60:18, 62:15,
127:9, 130:21,
182:8, 216:23,
216:25, 218:15,
235:6, 237:20,
244:2, 256:18,
260:5, 260:23
**text** [73] - 58:11,
69:21, 82:18, 83:9,
85:12, 88:10, 89:8,
89:10, 90:16, 90:20,
91:10, 91:13, 94:16,
95:16, 96:18,
109:19, 137:4,
137:23, 138:5,
138:9, 138:14,
139:1, 139:5, 139:9,
139:13, 142:8,
142:24, 143:7,
143:9, 143:12,
144:6, 145:5, 145:8,
145:12, 147:10,
147:14, 147:22,
148:12, 148:14,
151:6, 152:10,
153:2, 153:11,
153:15, 154:19,
154:21, 157:8,
157:12, 157:15,
157:20, 157:23,
158:2, 158:8, 159:1,
159:20, 160:6,
160:14, 160:15,
160:20, 161:22,
162:1, 162:3, 162:7,
173:6, 173:9,
173:17, 173:20,
176:6, 176:8, 176:9,

177:3
**texted** [2] - 90:18,
177:10
**texting** [3] - 56:8,
138:1, 146:22
**texts** [1] - 161:17
**THE** [314] - 11:4,
11:14, 12:9, 13:4,
13:7, 13:10, 13:17,
13:24, 14:2, 14:7,
14:9, 14:13, 15:8,
16:4, 16:5, 17:3,
17:10, 17:15, 19:6,
22:12, 22:15, 22:18,
22:23, 23:1, 23:5,
23:8, 23:13, 23:16,
28:25, 30:6, 30:25,
31:9, 31:16, 32:2,
32:15, 33:8, 35:9,
35:16, 35:24, 37:1,
37:6, 37:9, 37:14,
39:11, 39:14, 41:15,
45:1, 46:12, 46:14,
46:19, 46:24, 47:14,
49:20, 49:22, 50:4,
51:20, 53:7, 53:25,
54:3, 54:7, 54:17,
55:1, 55:10, 55:12,
55:16, 55:19, 56:14,
56:18, 57:4, 57:13,
57:15, 58:22, 59:3,
59:23, 60:3, 63:19,
64:10, 64:14, 64:16,
65:11, 65:18, 68:15,
69:2, 69:6, 69:9,
75:1, 77:4, 77:7,
77:11, 79:2, 79:25,
80:3, 80:6, 80:11,
81:2, 82:3, 82:5,
82:11, 82:13, 82:20,
82:25, 83:3, 83:10,
83:14, 83:17, 84:9,
84:12, 85:5, 85:11,
85:14, 85:23, 86:3,
86:6, 86:9, 86:13,
86:19, 87:4, 87:7,
87:25, 88:3, 88:23,
89:18, 90:1, 90:3,
90:10, 91:12, 92:6,
92:16, 92:23, 93:4,
93:15, 93:17, 93:19,
94:4, 94:7, 94:12,
94:15, 95:4, 95:5,
95:21, 96:4, 96:14,
96:21, 96:24, 97:7,
97:14, 98:3, 98:7,
98:14, 98:19, 98:23,
99:4, 99:6, 99:10,
99:13, 99:23,
109:15, 110:5,
110:8, 111:2, 111:6,

111:11, 111:13,
122:3, 122:14,
122:17, 122:20,
123:23, 124:23,
125:21, 126:2,
126:5, 126:13,
128:1, 128:4, 128:8,
128:12, 128:13,
128:16, 128:18,
128:20, 128:25,
133:14, 158:21,
159:24, 160:9,
160:12, 160:18,
160:22, 161:4,
161:8, 161:11,
161:18, 162:9,
162:12, 163:20,
165:8, 165:12,
165:18, 178:17,
178:24, 179:7,
179:8, 179:11,
179:17, 179:20,
179:23, 179:25,
180:2, 180:4, 180:7,
180:8, 181:18,
181:19, 184:8,
184:9, 185:22,
185:23, 185:24,
185:25, 187:14,
191:17, 192:3,
195:2, 195:11,
195:14, 195:21,
195:24, 196:6,
196:15, 197:1,
197:20, 198:7,
198:9, 199:11,
199:19, 199:20,
200:7, 200:12,
201:7, 201:8,
202:17, 203:10,
204:13, 204:14,
206:21, 206:22,
208:18, 210:6,
212:3, 212:4, 213:5,
214:11, 214:16,
214:20, 214:22,
214:24, 215:1,
215:4, 215:19,
215:23, 216:1,
225:24, 226:3,
226:16, 226:20,
227:3, 227:7,
227:18, 227:21,
228:7, 228:13,
229:1, 229:3, 230:6,
230:10, 230:14,
232:12, 236:22,
242:10, 243:5,
243:22, 244:16,
244:18, 245:18,
246:10, 246:14,

246:15, 247:8,
247:9, 250:2, 250:3,
251:18, 252:12,
252:15, 252:23,
253:1, 253:6,
253:20, 254:1,
254:6, 254:16,
254:24, 255:5,
255:7, 255:10,
257:9, 258:9,
258:12, 258:17,
258:21, 259:1,
259:10, 260:1
**themself** [1] - 207:3
**themselves** [4] -
20:24, 74:7, 77:21,
100:24
**theory** [2] - 88:7,
96:17
**therefore** [6] - 56:24,
65:6, 91:16, 91:23,
161:24, 242:15
**therein** [1] - 78:3
**thermal** [7] - 207:14,
207:22, 219:18,
219:20, 220:21,
225:17, 233:7
**they've** [5] - 29:24,
33:19, 81:23, 90:16,
227:25
**thickness** [2] -
239:20, 239:21
**Thierry** [1] - 13:25
**thigh** [3] - 203:22,
249:4, 249:7
**thinking** [1] - 55:22
**third** [1] - 237:8
**thirds** [1] - 170:23
**thirty** [1] - 203:20
**thirty-five** [1] - 203:20
**thoughtfulness** [1] -
197:22
**Three** [1] - 184:9
**three** [16] - 26:9,
35:18, 45:8, 53:12,
53:19, 62:11,
102:23, 115:1,
120:7, 176:18,
184:7, 199:1,
200:10, 206:10,
229:13, 229:14
**three-dimensional** [2]
- 229:13, 229:14
**Throughout** [1] -
172:17
**throughout** [18] -
26:24, 59:6, 60:8,
60:12, 77:23, 78:11,
78:13, 84:10, 84:22,
85:4, 88:24, 89:7,

105:11, 105:15,
137:6, 138:12,
143:25, 174:21
**tied** [1] - 90:21
**timeframe** [1] - 89:22
**timeframe-wise** [1] -
89:22
**timelessness** [1] -
91:15
**timeline** [4] - 14:19,
17:18, 18:19, 56:11
**timely** [2] - 32:13,
32:18
**tissue** [2] - 201:25,
250:3
**title** [1] - 249:10
**today** [23] - 39:4,
51:12, 58:4, 58:15,
59:12, 62:21, 62:24,
63:12, 68:5, 104:25,
105:16, 108:19,
115:17, 117:21,
133:4, 133:7, 139:8,
156:12, 156:23,
158:9, 188:2, 196:9,
250:16
**toe** [1] - 48:16
**together** [20] - 20:1,
26:14, 29:25, 30:19,
56:10, 56:12, 76:2,
76:8, 76:9, 78:15,
83:7, 149:6, 169:10,
169:11, 171:19,
171:20, 173:23,
201:17, 215:12,
242:24
**tomorrow** [2] -
257:11, 259:4
**took** [14] - 13:2, 24:8,
71:7, 72:2, 72:3,
88:15, 101:5,
112:22, 141:19,
142:3, 142:7,
142:12, 217:4
**Tool** [2] - 20:14, 78:1
**tools** [1] - 72:10
**Tools** [4] - 20:13,
75:13, 103:23, 104:2
**top** [15] - 18:12, 28:17,
41:6, 43:10, 45:14,
84:24, 100:3,
102:18, 103:7,
103:13, 104:9,
110:1, 125:7, 237:8
**total** [5] - 67:6,
203:20, 204:10,
205:8, 238:25
**toward** [1] - 41:5
**tower** [1] - 109:18
**Town** [1] - 60:19

**toxicological** [3] -
209:18, 209:25,
210:12
**toxicology** [1] -
207:19
**trachea** [2] - 207:11,
207:19
**trained** [1] - 216:20
**training** [9] - 21:8,
71:21, 74:24,
119:20, 216:17,
217:4, 218:11,
218:13, 222:17
**trans** [1] - 91:17
**transaction** [12] -
18:9, 18:10, 54:16,
54:20, 55:3, 60:18,
60:21, 62:11, 62:17,
108:16, 197:25,
243:9
**transactional** [2] -
29:16, 244:8
**transactions** [8] -
52:4, 52:18, 53:18,
54:11, 54:15, 54:18,
56:5
**transcription** [1] -
260:6
**transferred** [1] - 115:9
**translate** [3] - 52:9,
52:13, 121:16
**translation** [2] - 84:18,
84:24
**transmit** [1] - 162:3
**transmittals** [1] -
91:17
**transparency** [1] -
100:4
**transpired** [1] - 153:5
**trauma** [10] - 212:8,
213:13, 220:4,
220:5, 220:7,
226:15, 226:18,
227:13, 234:18,
255:18
**traveling** [1] - 29:8
**travels** [1] - 120:7
**tri** [1] - 47:23
**tri-fold** [1] - 47:23
**trial** [8] - 33:14, 55:5,
75:11, 98:6, 179:3,
243:11, 253:25,
257:11
**trier** [2] - 67:11, 77:3
**trim** [1] - 73:17
**tripping** [1] - 60:5
**Trish** [5] - 81:19, 95:2,
109:23, 109:25,
110:18
**truck** [1] - 66:10

**true** [4] - 30:13, 121:1,
229:25, 260:6
**truly** [2] - 232:6,
260:13
**truth** [7] - 88:13,
88:19, 90:25, 91:3,
92:4, 159:19, 162:5
**try** [7] - 141:12, 166:4,
178:8, 185:20,
207:2, 207:4, 235:7
**trying** [9] - 55:7,
75:23, 80:23, 144:5,
149:6, 149:19,
169:20, 177:13
**Tucson** [2] - 61:4,
61:6
**turn** [1] - 23:6
**turned** [3] - 12:23,
34:23, 164:21
**twice** [2] - 204:11,
204:20
**two** [47] - 23:25,
33:19, 38:15, 38:18,
38:20, 45:8, 56:9,
57:21, 61:13, 62:11,
76:9, 78:5, 90:15,
91:18, 93:13, 95:10,
100:12, 100:13,
103:6, 104:9,
109:19, 118:23,
123:3, 123:4, 143:3,
149:10, 158:19,
168:13, 168:14,
169:14, 170:23,
174:3, 190:13,
192:16, 203:21,
204:24, 206:9,
206:18, 206:19,
210:13, 212:21,
213:2, 213:10,
213:17, 213:19,
256:19
**two-inch** [2] - 206:18,
206:19
**two-thirds** [1] - 170:23
**type** [10] - 109:3,
134:3, 134:19,
136:15, 140:10,
207:4, 217:17,
222:15, 247:5
**typical** [1] - 207:4
**typically** [1] - 184:14

**U**

**ultimate** [1] - 212:14
**ultimately** [1] - 212:10
**unable** [1] - 60:22
**unboned** [1] - 247:18
**unborn** [1] - 142:21

**uncleaned** [1] -
243:18
**under** [13] - 13:4, 29:3,
29:11, 35:7, 76:19,
76:21, 91:24,
141:24, 172:21,
197:3, 228:23, 244:2
**undergoing** [1] -
136:15
**underpinning** [2] -
11:22, 11:25
**underpinnings** [1] -
226:14
**understood** [2] -
149:20, 171:13
**unfair** [1] - 197:4
**unidentified** [1] -
94:22
**uniform** [7] - 71:4,
71:8, 100:14,
134:18, 134:19,
134:20, 152:4
**unique** [22] - 20:5,
20:17, 20:18, 20:22,
20:23, 21:22, 66:2,
66:3, 66:5, 68:2,
75:10, 75:19, 75:22,
78:12, 79:8, 104:22,
105:6, 107:23,
218:23, 218:25
**Unit** [4] - 120:21,
121:6
**United** [7] - 59:7, 60:9,
60:13, 124:8,
181:24, 182:2, 182:5
**University** [6] -
181:17, 181:20,
183:12, 183:17,
237:20, 256:18
**university** [2] - 181:2,
181:4
**unknown** [9] - 21:14,
66:1, 100:18,
100:20, 101:18,
102:7, 104:3, 104:7,
104:12
**untimely** [1] - 33:5
**up** [55] - 13:1, 13:18,
22:22, 31:22, 32:4,
34:9, 34:17, 44:4,
45:13, 71:18, 72:17,
77:22, 78:21, 80:25,
86:25, 90:19, 92:24,
100:23, 105:25,
106:4, 108:14,
116:5, 116:8,
118:11, 118:16,
119:5, 127:14,
128:21, 151:12,
154:2, 157:20,

171:3, 174:10,
176:13, 179:25,
180:22, 180:23,
181:12, 196:23,
199:5, 199:10,
199:14, 203:15,
205:9, 215:2,
220:23, 231:18,
232:15, 233:13,
233:16, 240:7,
243:21, 248:3,
258:1, 259:5
**upcoming** [2] - 145:6,
145:9
**upper** [6] - 102:16,
233:21, 236:12,
238:1, 248:8, 251:6
**ups** [1] - 232:1
**upset** [3] - 156:9,
178:6, 203:16
**urge** [1] - 90:5
**urged** [1] - 89:19
**usable** [1] - 253:16
**utilize** [1] - 38:13

**V**

**Vado** [1] - 61:1
**value** [5] - 79:6, 197:3,
197:17, 228:22,
243:12
**VAN** [2] - 14:14, 38:2
**Van** [61] - 13:1, 13:19,
13:22, 14:4, 14:18,
14:24, 15:11, 17:16,
17:24, 19:3, 19:7,
23:9, 23:21, 31:3,
31:16, 33:24, 38:6,
39:16, 40:6, 40:15,
42:9, 42:18, 44:11,
47:1, 49:16, 50:5,
51:21, 53:5, 53:10,
54:11, 57:20, 59:4,
60:4, 62:19, 65:19,
68:11, 69:17, 73:25,
74:10, 74:23, 75:4,
77:1, 78:9, 78:15,
78:25, 79:19, 81:18,
81:22, 95:1, 95:3,
99:16, 99:24, 106:2,
106:18, 108:11,
111:7, 122:23,
126:17, 128:3,
128:8, 252:21
**van** [1] - 139:17
**variances** [1] - 123:3
**varied** [2] - 24:19,
217:8
**variety** [1] - 140:19
**various** [7] - 24:22,

30:12, 30:17, 86:11,
115:17, 225:4
**vehicle** [6] - 39:19,
42:11, 44:15, 44:16,
61:20, 139:15
**velocity** [1] - 223:5
**veracity** [1] - 159:19
**verify** [1] - 30:23
**Verint** [1] - 24:3
**versa** [1] - 91:20
**version** [1] - 116:9
**versus** [3] - 76:20,
76:23, 104:12
**VHS** [1] - 121:8
**via** [1] - 186:11
**vials** [1] - 200:17
**vice** [1] - 91:20
**video** [66] - 11:8,
13:19, 15:23, 16:9,
16:11, 19:8, 19:24,
19:25, 23:2, 24:10,
25:9, 25:24, 26:19,
27:1, 27:3, 27:6,
27:23, 30:2, 30:3,
39:9, 40:2, 42:2,
43:13, 43:24, 44:5,
45:21, 51:4, 55:17,
56:20, 60:20, 60:22,
61:7, 65:3, 65:24,
67:23, 70:7, 70:9,
70:11, 72:1, 72:19,
73:12, 76:13, 76:25,
100:12, 100:13,
100:20, 101:4,
102:17, 102:19,
103:24, 104:16,
106:3, 107:5,
107:10, 107:21,
108:8, 112:1, 115:3,
116:1, 119:21,
120:7, 120:9,
120:12, 121:18
**videos** [29] - 22:14,
22:21, 23:22, 24:22,
26:14, 26:24, 28:4,
29:1, 30:2, 30:4,
67:10, 69:25, 70:14,
71:22, 72:7, 74:16,
74:17, 78:17,
105:16, 105:21,
112:6, 115:16,
115:17, 115:18,
116:20, 116:25,
119:10, 120:19,
120:20
**videotape** [3] - 12:3,
12:11, 29:12
**videotaped** [2] - 29:9,
89:3
**videotapes** [8] -

32:22, 33:11, 33:17,
33:24, 64:3, 64:6,
65:5, 116:12
**view** [5] - 25:23,
155:11, 234:10,
247:15, 248:17
**viewed** [2] - 24:25,
33:21
**viewing** [1] - 26:18
**violation** [2] - 32:19,
36:8
**visible** [2] - 113:7,
193:15
**vision** [1] - 119:23
**visit** [8] - 53:25, 69:18,
136:21, 149:13,
149:23, 151:15,
159:24, 252:23
**visited** [4] - 80:14,
151:21, 163:25,
165:22
**visiting** [1] - 190:15
**visits** [1] - 141:7
**visual** [3] - 21:16,
117:25, 240:8
**visually** [2] - 31:12,
250:13
**voice** [1] - 203:15
**voicemail** [1] - 110:16
**VOIR** [6] - 14:16,
23:19, 53:8, 69:15,
75:2, 158:22
**voir** [4] - 68:12, 69:12,
77:14, 158:20
**volume** [1] - 260:9
**voluminous** [1] -
254:1
**vs** [1] - 13:25

**W**

**waist** [1] - 50:7
**waistline** [2] - 49:7,
49:9
**wait** [1] - 25:13
**waive** [2] - 125:19,
125:23
**walk** [1] - 60:5
**walks** [1] - 41:5
**wall** [1] - 234:9
**wallet** [16] - 34:14,
34:21, 35:4, 47:23,
108:10, 108:14,
108:19, 108:21,
108:25, 109:1,
113:2, 113:13,
113:14, 113:16,
115:11, 125:3
**walls** [2] - 135:3,
135:5

**Walls** [1] - 135:4
**Walmart** [42] - 11:9,
11:10, 11:13, 14:19,
16:16, 16:18, 16:22,
16:25, 17:1, 17:17,
18:1, 18:7, 18:18,
23:22, 24:13, 25:11,
25:21, 26:1, 26:5,
27:3, 28:20, 29:16,
31:5, 31:12, 40:4,
40:24, 42:2, 42:21,
43:25, 78:17, 101:4,
101:16, 102:3,
102:5, 107:15,
108:16, 109:1,
113:13, 116:4,
116:11, 116:16
**Walmarts** [3] - 24:17,
27:1, 29:9
**wants** [3] - 33:22,
120:13, 254:22
**Washington** [3] -
183:17, 183:22,
184:1
**watch** [1] - 34:22
**watches** [1] - 124:5
**waveform** [1] - 118:3
**waveforms** [1] - 118:1
**wear** [4] - 105:19,
134:18, 140:15,
140:17
**wearing** [4] - 75:25,
112:11, 133:7,
174:12
**wedding** [3] - 105:19,
105:23, 111:18
**week** [9] - 34:7, 34:16,
54:12, 81:11, 167:1,
167:4, 167:7, 167:8,
167:9
**weekdays** [1] - 184:19
**weekend** [2] - 97:3,
184:20
**weekends** [1] - 184:21
**weekly** [1] - 218:1
**weeks** [7] - 33:19,
168:13, 168:14,
169:14, 190:16,
209:3, 209:4
**weighed** [1] - 197:1
**weight** [1] - 208:25
**Wells** [6] - 34:8, 34:17,
51:6, 52:12, 52:16,
53:11
**West** [1] - 260:23
**western** [1] - 105:18
**whichever** [1] - 81:1
**white** [9] - 104:6,
104:7, 187:11,
188:11, 188:18,

190:8, 226:6,
226:21, 243:16
**whole** [5] - 156:10,
176:14, 178:7,
239:15, 249:11
**wife** [14] - 136:8,
142:18, 143:2,
143:10, 144:3,
144:13, 155:5,
155:9, 162:8,
171:20, 172:14,
174:2, 175:7, 176:24
**William** [1] - 216:21
**Windstar** [4] - 48:1,
61:16, 61:23, 62:6
**Winkle** [1] - 252:21
**wiping** [3] - 43:19,
43:21
**wise** [1] - 89:22
**with..** [1] - 89:17
**witness** [47] - 30:10,
30:15, 44:24, 47:12,
50:2, 51:18, 81:4,
81:6, 87:1, 87:15,
89:9, 94:1, 95:25,
98:16, 103:20,
106:13, 106:15,
109:13, 110:4,
111:9, 122:1,
122:18, 127:25,
128:15, 128:16,
128:24, 154:14,
160:16, 165:17,
178:16, 179:10,
179:21, 180:3,
187:12, 199:9,
208:17, 212:2,
213:4, 214:9,
214:23, 214:24,
215:25, 224:18,
234:25, 241:9,
245:5, 257:8
**Witness** [3] - 128:19,
179:24, 215:22
**WITNESS** [23] - 15:8,
16:5, 31:9, 41:15,
95:4, 128:12, 179:7,
180:2, 180:7,
181:19, 184:9,
185:23, 185:25,
199:20, 201:8,
204:14, 206:22,
212:3, 214:22,
246:15, 247:9,
250:3, 260:16
**witnesses** [4] - 98:15,
128:11, 179:2,
214:12
**womb** [3] - 196:25,
205:4, 209:5

**women** [1] - 88:8
**won** [2] - 145:19, 145:21
**word** [3] - 27:16, 81:1, 104:10
**words** [3] - 95:9, 118:19, 219:19
**wore** [1] - 35:2
**world** [1] - 201:4
**worn** [1] - 79:8
**worried** [1] - 141:25
**Worse** [1] - 164:14
**Worth** [5] - 12:1, 76:24, 130:17, 167:18, 260:23
**wound** [9] - 206:7, 206:8, 206:19, 207:1, 207:2, 211:12, 211:14, 211:19
**wounds** [24] - 194:21, 195:9, 195:18, 196:4, 196:20, 196:23, 203:20, 204:9, 204:10, 204:24, 205:22, 206:11, 206:24, 207:6, 208:12, 209:8, 209:9, 211:6, 211:22, 211:24, 212:13, 212:19, 213:19, 214:4
**wreck** [1] - 217:15
**wrecker** [1] - 174:23
**write** [2] - 156:2, 177:21
**writing** [2] - 198:17, 260:8
**written** [3] - 27:16, 28:18, 177:25

## X

**x-rays** [1] - 185:17
**XL** [1] - 183:25

## Y

**y'all** [9] - 134:14, 141:4, 167:20, 168:10, 169:9, 169:10, 171:18, 173:22
**Y-shaped** [1] - 240:15
**year** [15] - 61:20, 132:3, 166:9, 170:7, 170:16, 170:20, 170:23, 183:10, 255:24, 256:2, 256:3, 256:7, 257:2,

257:3
**years** [9] - 52:7, 119:19, 129:20, 131:5, 181:4, 184:7, 190:14, 216:16, 218:1
**yellow** [7] - 97:20, 108:6, 126:22, 127:13, 158:15, 159:2, 159:14
**yesterday** [10] - 11:6, 14:1, 32:8, 34:6, 38:7, 38:9, 47:3, 47:20, 114:12, 117:21
**you-all** [5] - 71:14, 113:3, 114:12, 116:22, 139:22
**yourself** [3] - 21:17, 63:6, 179:4
**yourselves** [2] - 68:20, 257:14

## Z

**zygomatic** [2] - 246:23, 247:23