WR-81,578-01

# CLERK'S RECORD

## VOLUME 1 of 4

Writ Number: **C-432-009923-1184294-A**

Filed In the **432ND DISTRICT COURT**
of Tarrant County, Texas
Hon. **RUBEN GONZALEZ, JR.**, Presiding Judge



### EX PARTE: JOHN WILLIAM HUMMEL

vs.

### THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 29 2015

## ATTORNEY FOR THE APPELLANT   Abel Acosta, Clerk

**BRAD D. LEVENSON,**
**DIRECTOR, OFFICE OF CAPITAL WRITS**
**1700 N. CONGRESS AVE. SUITE 460**
**AUSTIN, TEXAS 78711**
**PHONE:        512/463-8600**
**FAX:           512/463-8590**
**SBOT:          24073411**
**Attorney for JOHN WILLIAM HUMMEL, Appellant**

Delivered to the Court of Criminal Appeals for the State Of
Texas At Capitol Station, AUSTIN, Texas, on the

26 day of January 2015

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

**SUSAN RUSSELL** _Susan Russell_

Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. _____ **WR-81,578-01** _____
Filed in the Court of Criminal Appeals for the State of Texas,
at Capitol Station, AUSTIN, Texas, this

_____ day of _____, _____

_____ LOUISE PEARSON _____, Clerk

By _____, Deputy

Application for Writ of Habeas Corpus
from Tarrant County, Texas

432ND DISTRICT COURT
Ex Parte:
JOHN WILLIAM HUMMEL

WRIT NO. C-432-009923-1184294-A

# CLERK'S SUMMARY SHEET

**APPLICANT'S NAME:**   JOHN WILLIAM HUMMEL

**OFFENSE:**   CAPITAL MURDER - MULTIPLE

**PLEA:**   NOT GUILTY

**CAUSE NO:**   1184294D

**SENTENCE:**   DEATH

**SENTENCE DATE:**   6/28/2011

**TRIAL JUDGE'S NAME:**   HONORABLE RUBEN GONZALEZ, JR.

**APPEAL NO:**   AP-76,596

**CITATION TO OPINION:**   N/A  **S.W. NA**

**HEARING HELD:**   YES BY WAY OF AFFIDAVIT

**FINDINGS & CONCLUSIONS FILED:**   YES

**RECOMMENDATION:**   DENIED

**HABEAS JUDGE'S NAME:**   HONORABLE RUBEN GONZALEZ JR.

**NAME OF COUNSEL IF APPLICANT IS REPRESENTED: BRAD D. LEVENSON**

# INDEX

Caption.........................................................................................................................1

Application for Writ of Habeas Corpus...........................................................................2

Waiver of Service.........................................................................................................469

State's Unopposed Motion for Copies of Juror Questionnaires and Information Cards .......................470

State's Unopposed Motion for Copies of Sealed Exhibits Filed with Application for
Writ of Habeas Corpus .................................................................................................475

State's Motion for Affidavits of Applicant's Trial and Appellate Counsel ................................479

Order .........................................................................................................................486

Order .........................................................................................................................487

Motion in Response to Request for Trial and Appellate Counsel Affidavits ...........................488

Order .........................................................................................................................500

## VOLUME 2

State's Memorandum in Support of its Motion for Affidavits of Applicant's Trial and
Appellate Counsel .......................................................................................................501

Memorandum/Order ....................................................................................................524

Counsel's Affidavit in Response to Writ Allegations ......................................................527

Order .........................................................................................................................557

Unopposed Motion to Extend Time to File the State's Reply to Application for
Writ of Habeas Corpus .................................................................................................559

Memorandum/Order ....................................................................................................564

Affidavit of John W. Stickels (Post Conviction Application for Writ of Habeas Corpus) .........................565

State's Reply to Application for Writ of Habeas Corpus ....................................................570

Response to State's Answer to Claim One of Hummel's Application for Habeas Corpus Relief (Juror Misconduct); Request for Status Conference ....................................793

Order ............................................................................................................................801

Notice of Filing Supplemental Exhibits in Support of Article 11.071 Application Filed June 4, 2013 ..........................................................................................802

Supplemental Response to State's Answer: Exhibits 42 through 46 ....................................813

Motion for Protective Order of Privileged Exhibits ..............................................................910

State's Reply to Applicant's "Motion for Protective Order of Privileged Exhibits ....................916

Order ............................................................................................................................925

State's Motion to Extend Time to File its Supplemental Reply to Application for Writ of Habeas Corpus ........................................................................................................926

Order ............................................................................................................................931

Counsel's Supplemental Affidavit in Response to Writ Allegations ......................................932

State's Supplemental Reply to Application for Writ of Habeas Corpus ................................943

### VOLUME 3

Unopposed Response to State's Motion for Court for Order Findings and Conclusions; Proposed Order ............................................................................................................1009

State's Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law ........................................................................................................1014

This Page Not Used (1019-1023) ....................................................................................1019

Order ............................................................................................................................1024

Unopposed Response to State's Motion for Court to Order Findings and Conclusions: Proposed Order ............................................................................................................1025

Applicant's Proposed Findings of Fact and Conclusions of Law: Proposed Order ..............1031

State's Proposed Memorandum, Findings of Fact, and Conclusions of Law ......................1107

Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law ........1245

Request for an Extension of Time to Resolve Issues and Enter Findings of Fact and
Conclusions of Law ....................................................................................................1383

Order ........................................................................................................................1384

Order from the Court of Criminal Appeals of Texas ...................................................1395

## VOLUME 4

Findings of Fact, Conclusions of Law, Recommendations and Order ..............................1398

Order ........................................................................................................................1535

## INSTRUMENTS FILED IN CAUSE NUMBER 1184294D

Indictment ..................................................................................................................1536
Capital Judgment .......................................................................................................1538
Partial Reporter's Record Sentencing ........................................................................1542
Trial Court's Certification of Defendants Right of Appeal ............................................1549
Court's Charge Guilt/Innocents ..................................................................................1550
Court's Charge Punishment ........................................................................................1565
Criminal Docket Sheet ...............................................................................................1574

## DOCUMENTS FILED PRIOR TO APPLICATION

Order .........................................................................................................................1586
Unopposed Motion to Seal Confidential Juror Information (Capital Case) ..................1587
Email to Abel Acosta ..................................................................................................1590
Letter from Office of Capital Writs/Clerks Response ..................................................1593
Letter from Office of Capital Writs/Clerks Response ..................................................1596
Letter from Office of Capital Writs/Clerks Response ..................................................1599
Order .........................................................................................................................1602
Unopposed Motion for Ninety-Day Extension of Time to File Initial State
Habeas Application .....................................................................................................1604
Order .........................................................................................................................1614
Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record;
Proposed Order ..........................................................................................................1617
Unopposed Motion for Copies of Juror Questionnaires; Proposed Order ..................1657

Clerk's Certificate.......................................................................................................1664

# *CAPTION*

| THE STATE OF TEXAS | § |
| COUNTY OF TARRANT | § |

At a term of the **432ND DISTRICT COURT** of Tarrant County, Texas, the Honorable **RUBEN GONZALEZ, JR.** sitting as Judge of said court, the following proceedings were had, to-wit:

Writ Number: **C-432-009923-1184294-A**

EX PARTE:

JOHN WILLIAM HUMMEL

VS.

THE STATE OF TEXAS

1

## IN THE 432nd JUDICIAL DISTRICT COURT
## TARRANT COUNTY, TEXAS

C-432-00 9923-1184294-A

FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS
JUN 05 2013
TIME _____
BY _____ 12:19 ____
_____ DEPUTY

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| JOHN WILLIAM HUMMEL, | ) | 1184294D |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS
## (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAM FARINA-HENRY (No. 24082979)
(E-mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**2**

# TABLE OF CONTENTS

APPLICATION FOR A WRIT OF HABEAS CORPUS ......................................... 1

PROCEDURAL HISTORY ...................................................................... 4

A.   Trial Court Proceedings ...................................................................... 4

    1. Indictment ................................................................................ 4

    2. Trial ......................................................................................... 4

    3. State Appellate Proceedings .................................................... 5

    4. State Habeas Proceedings ........................................................ 6

STATEMENT OF FACTS ...................................................................... 6

A.   Evidence at Trial ................................................................................ 6

    1. Guilt/Innocence Phase Presentation ....................................... 6

    2. The Prosecution Punishment Phase Presentation .................... 6

    3. The Defense Punishment Phase Presentation .......................... 8

B.   Post-Conviction Investigation ......................................................... 13

    1. Family and Early Life ............................................................ 13

    2. Teenage Years ....................................................................... 16

    3. Military Service ..................................................................... 19

    4. Adult Years ............................................................................ 21

STANDARD OF CARE ....................................................................... 25

A.   Ineffective Assistance of Trial Counsel ........................................... 25

B.   Ineffective Assistance of Appellate Counsel ................................... 29

ARGUMENT ...................................................................................... 30

**3**

CLAIM ONE: HUMMEL WAS DENIED HIS DUE PROCESS RIGHT TO AN IMPARTIAL JURY WHEN JUROR DAVIS COMMITTED MISCONDUCT BY AUTOMATICALLY VOTING FOR DEATH ...................................................... 30

A.  Legal Standard.................................................................................... 31

B.  Juror Davis Automatically Voted for Death Based on Testimony During the Guilt/Innocence Phase Evidence ...................................................... 33

C.  Juror Davis's Misconduct Entitles Hummel to a New Trial ........................... 34

D.  Juror Davis's Misconduct Entitles Hummel to a New Punishment Phase ..... 35

E.  Conclusion........................................................................................... 36

CLAIM TWO: HUMMEL'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO ARGUE THAT THE STATE'S EVIDENCE WAS INSUFFICIENT TO SHOW FUTURE DANGER ...................................... 36

A.  Relevant Facts ................................................................................... 37

B.  The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding That There Was a Probability That Hummel Would Commit Future Acts of Violence.............................................................................................. 38

C.  Trial and Appellate Counsel Were Ineffective for Failing to Argue That The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding of Future Dangerousness ...................................................................... 40

CLAIM THREE: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL WAS NOT A FUTURE DANGER .. 40

A.  Trial Counsel's Performance Was Unreasonable for Failing to Present Evidence That Hummel Was Not a Future Danger ........................................ 42

B.  Hummel Was Prejudiced by Trial Counsel's Failure to Present Readily Available Evidence That Hummel Would Not Constitute a Future Danger to Society ................................................................................................. 43

     1.  Behavior in Tarrant County Jail .............................................. 43

     2.  Mental Health Expert.............................................................. 46

C.  Conclusion........................................................................................... 46

**4**


CLAIM FOUR: TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT EXPERT TESTIMONY REGARDING HUMMEL'S LIFE HISTORY ........................................................................................................ 47

A.  Legal Standard ................................................................................ 48

B.  Counsel Should Have Presented the Testimony of an Expert to Explain Hummel's Social History ................................................................ 50

    1. Childhood ................................................................................... 51

    2. Adulthood ................................................................................... 56

C.  The Failure to Present an Expert to Explain Hummel's Social History Prejudiced His Trial ........................................................................ 60

CLAIM FIVE: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT RELEVANT LAY WITNESSES ............................................ 62

A.  Trial Counsel Failed to Identify and Present Lay Witness Testimony Regarding Hummel's Complete Life Story .................................... 64

    1. Witnesses Available to Testify .................................................. 65

    2. Further Information From Witnesses Who Testified ................. 70

B.  Counsel's Failure to Present This Testimony Lacked Any Strategic Rationale and Was Therefore Deficient Performance .................................... 71

C.  Trial Counsel's Deficient Performance Prejudiced Hummel's Trial ............. 72

CLAIM SIX: TRIAL COUNSEL ERRED BY FAILING TO PRESENT HUMMEL'S MILITARY SERVICE AS MITIGATION EVIDENCE ................ 73

A.  Testimony at Trial .......................................................................... 75

B.  Trial Counsel's Failure to Present Hummel's Military Service as Mitigation Evidence Constituted Ineffective Assistance of Counsel ................ 76

    1. Available Evidence of Hummel's Military Service ................... 76

C.  Conclusion ....................................................................................... 79

CLAIM SEVEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL SUFFERED FROM COMPLEX POST-TRAUMATIC STRESS DISORDER RESULTING FROM ATTACHMENT TRAUMA ............................................................................... 80

A.   Legal Standard ............................................................................... 81

B.   Trial Counsel Performed Deficiently in Failing to Present Evidence of Hummel's Attachment Trauma and Complex PTSD, Through a Qualified Expert Witness After a Thorough Investigation ............................................ 82

  1.   Trial Counsel's Investigation into Hummel's Childhood ....................... 82

  2.   Trial Counsel Mistakenly Relied on the Testimony of a Neuropsychologist Hired Before Counsel's Investigation Had Concluded. 83

  3.   Reasonable Professional Norms Required Counsel Retain the Assistance of an Expert with Specialized Expertise in Attachment Trauma and Complex PTSD 85

C.   Trial Counsel's Failure to Present Testimony Regarding Hummel's Attachment Trauma and Complex PTSD from a Qualified Expert Witness Prejudiced Hummel's Trial ............................................................................... 91

CLAIM EIGHT: HUMMEL'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE STATE IMPERMISSIBLY INJECTED INFLAMMATORY AND PREJUDICIAL EVIDENCE INTO BOTH PHASES OF THE TRIAL; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE ............................................................................... 93

A.   Relevant Facts ............................................................................... 94

B.   The State's Focus on Inflammatory, Emotion-Driven Evidence and Argument to Secure a Conviction of Capital Murder Deprived Hummel of His Right to a Fair Trial ............................................................................... 98

  1.   Contextual Evidence ............................................................................... 98

  2.   Emotion-Driven Evidence ....................................................................... 100

C.   The Evidence Presented Referencing Jodi and the Unborn Child Constituted Impermissible Victim Impact Evidence at Punishment and Deprived Hummel of the Right to a Fair Punishment Proceeding ............................................ 102

**6**

D.  Trial Counsel Was Ineffective for Failing to Object to This Evidence, as Was Appellate Counsel for Failing to Raise This Error on Appeal ...................... 104

E.  Conclusion ..................................................................................................... 105

CLAIM NINE: TRIAL COUNSEL FAILED TO EFFECTIVELY PRESENT EVIDENCE THAT HUMMEL'S CONFESSION SHOULD BE SUPPRESSED ................................................................................................................... 105

A.  Relevant Facts ............................................................................................... 106

    1.  Warrantless Detention .......................................................... 106

    2.  Arrest ....................................................................................... 109

    3.  Detention and Confession .................................................... 109

    4.  Pre-Trial Hearing ................................................................... 110

B.  Trial Counsel Performed Deficiently in Failing to Present Relevant Documents and Transcripts of Phone Calls to Support Their Motion to Suppress ......................................................................................................... 113

C.  Had Trial Counsel Not Performed Deficiently, the Court Would Have Found Hummel's Detention Unlawful and Granted the Motion to Suppress Hummel's Confession .................................................................................... 116

    1.  Unlawful Detention .............................................................. 116

    2.  Attenuation Analysis ........................................................... 117

    3.  Conclusion ............................................................................. 124

D.  Appellate Counsel Was Ineffective in Failing to Sufficiently Appeal the Court's Failure to Grant the Defense Motions to Suppress .......................... 124

CLAIM TEN: APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO APPEAL THE TRIAL COURT'S ERRONEOUS DENIAL OF DEFENSE COUNSEL'S VALID CHALLENGES FOR CAUSE OF NINE PROSPECTIVE JURORS ..................................................................................................................... 126

A.  Relevant Facts ............................................................................................... 127

B.  The Trial Court Erred by Failing to Grant Trial Counsel's Challenges for Cause ............................................................................................................ 128

    1. Potential Juror Bancroft.......................................................................... 128

    2. Potential Juror Butler.............................................................................. 129

    3. Potential Juror McFarland ...................................................................... 130

    4. Potential Juror Cuevas ............................................................................ 130

    5. Potential Juror Powell............................................................................. 131

    6. Potential Juror Guidroz........................................................................... 132

    7. Potential Juror Zeiger ............................................................................. 132

    8. Potential Juror Beauchamp ..................................................................... 132

    9. Potential Juror Hermosillo...................................................................... 133

C.  The Court's Erroneous Denial of Valid Challenges for Cause Prejudiced Hummel's Trial .......................................................................................... 134

    1. Juror Sanchez.......................................................................................... 135

D.  Hummel's Appellate Counsel Was Ineffective by Failing to Appeal the Court's Ruling on Trial Counsel's Motions to Strike for Cause.................. 136

E.  Conclusion..................................................................................................... 137

CLAIM ELEVEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S DISCRIMINATORY USE OF PEREMPTORY STRIKES TO REMOVE MINORITY VENIRE MEMBERS IN VIOLATION OF HUMMEL'S CONSTITUTIONAL RIGHTS ....................................................... 137

A.  Legal Standard............................................................................................... 138

    1. Comparative Juror Analysis ................................................................... 139

B.  Jury Selection in Hummel's Case ................................................................. 140

C.  Minority Prospective Jurors Discriminatorily Struck by the State ............... 140

    1. Prospective Juror Gonzales .................................................................... 140

**8**

    2. Prospective Juror Williams ............................................................. 141

    3. Prospective Juror Dennis .............................................................. 142

D.  Comparative Juror Analysis ............................................................ 142

E.  Deficient Performance and Prejudice .............................................. 144

CLAIM TWELVE: HUMMEL'S DEATH SENTENCE SHOULD BE VACATED
BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED
THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING .... 145

A.  The Texas Statute and Hummel's Jury Instructions ...................... 146

B.  Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital
    Jury May Find Mitigating and Warrant a Life Sentence .............................. 147

C.  Conclusion ......................................................................................... 150

CLAIM   THIRTEEN:   HUMMEL'S   DEATH   SENTENCE   IS
UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'
ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY ..... 151

A.  Supreme Court Precedent Mandates That the Death Penalty Not Be Applied
    Arbitrarily ......................................................................................... 152

B.  Texas' Death Penalty Scheme Is Unconstitutional ........................ 153

    1. Geography ..................................................................................... 155

    2. Race .............................................................................................. 158

C.  Conclusion ......................................................................................... 160

CLAIM FOURTEEN: HUMMEL'S RIGHTS UNDER THE SIXTH, EIGHTH,
AND   FOURTEENTH   AMENDMENTS   TO   THE   UNITED   STATES
CONSTITUTION   WERE   VIOLATED   WHEN   THE   TRIAL   COURT   WAS
PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE
JUROR WOULD RESULT IN A LIFE SENTENCE ......................................... 160

A.  The Supreme Court Has Invalidated Jury Instructions That Place An Added
    Burden on the Sentencer Before Finding Mitigating Circumstances. .......... 162

**9**

B.   Texas' 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence .............................................................................. 164

C.   The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations.................................................................................................. 165

D.   Conclusion ..................................................................................................... 167

CLAIM FIFTEEN: HUMMEL IS INELIGIBLE FOR A DEATH SENTENCE BECAUSE OF HIS MENTAL IMPAIRMENTS................................................. 167

PRAYER FOR RELIEF..................................................................................... 171

**10**

# TABLE OF AUTHORITIES

## Federal Cases

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ............................................ passim
*Allen v. United States*, 164 U.S. 492 (1896) .......................................................... 166
*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006) ......................................... 136
*Arizona v. Washington*, 434 U.S. 497 (1978) ....................................................... 166
*Atkins v. Virginia*, 536 U.S. 304 (2002) ................................................. 168, 169, 170
*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................... 138
*Bobby v. Van Hook*, 558 U.S. 4 (2009) .................................................................... 26
*Brewer v. Quarterman*, 550 U.S. 286 (2007) ....................................................... 151
*Brown v. Illinois*, 422 U.S. 590 (1975) ................................................. 118, 120, 124
*Bruton v. United States*, 391 U.S. 123 (1968) .......................................................... 1
*Chapman v. California*, 386 U.S. 18 (1967) ............................................................ 30
*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) .......................................................... 26
*Darden v. Wainwright*, 477 U.S. 168 (1986) ............................................................ 1
*Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007) .......................................... 126
*Downum v. United States*, 372 U.S. 734 (1963) ................................................... 166
*Enmund v. Florida*, 458 U.S. 782 (1982) ............................................................. 168
*Evitts v. Lucey*, 469 U.S. 387 (1985) ....................................................... 29, 125, 136
*Florida v. Royer*, 460 U.S. 491 (1983) ................................................................. 117
*Ford v. Wainwright*, 477 U.S. 399 (1986) ............................................................ 152
*Furman v. Georgia*, 408 U.S. 238 (1972) .............................................................. 152
*Gideon v. Wainwright*, 372 U.S. 335 (1963) ..................................................... 31, 32
*Godfrey v. Georgia*, 446 U.S. 420 (1980) .............................................................. 153
*Gregg v. Georgia*, 428 U.S. 153 (1976) ........................................................ 153, 157
*Harrington v. Richter*, 131 S. Ct. 770 (2011) .................................................. 26, 28
*Hernandez v. New York*, 500 U.S. 352 (1991) ...................................................... 138
*Hodge v. Kentucky*, 133 S. Ct. 506 (2012) ........................................................... 148
*Irvin v. Dowd*, 366 U.S. 717 (1961) ........................................................ 30, 126, 134
*Jackson v. Virginia*, 443 U.S. 307 (1979) ......................................................... 2, 37
*Johnson v. California*, 545 U.S. 162 (2005) ........................................................ 138
*Jurek v. Texas*, 428 U.S. 262 (1976) .................................................................. passim
*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .................................................... 113
*Lockett v. Ohio*, 438 U.S. 586 (1978) ....................................................... 1, 32, 146
*Lutwak v. United States*, 344 U.S. 604 (1953) .......................................................... 1
*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................................ 148
*McKoy v. North Carolina*, 494 U.S. 433 (1990) ................................................... 164
*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005) ...................................................... 27

*Miller-El v. Dretke*, 545 U.S. 231 (2005) .............................................. 138, 139, 140

*Mills v. Maryland*, 486 U.S. 367 (1988) ............................................... 162, 163, 164

*Morgan v. Illinois*, 504 U.S. 719 (1992) .............................................. 31, 32, 35, 36

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................................ 26

*Parker v. Gladden*, 385 U.S. 363 (1966) .................................................................. 36

*Penry v. Johnson*, 532 U.S. 782 (2001) ........................................................... 150, 154

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ................................... 149, 151, 154, 158

*Porter v. McCollum*, 558 U.S. 30 (2009) ........................................................ passim

*Rice v. Collins*, 546 U.S. 333 (2006) ...................................................................... 138

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008) ..................................... 29, 136

*Rivera v. Illinois*, 566 U.S. 148 (2009) .................................................................. 93

*Rompilla v. Beard*, 545 U.S. 374 (2005) ......................................... 26, 27, 28, 73

*Roper v. Simmons*, 543 U.S. 551 (2005) .............................................................. 168

*Rose v. Clark*, 478 U.S. 570 (1986) ........................................................................ 30

*Sears v. Upton*, 130 S. Ct. 3259 (2010) ................................................................. 71

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................................. passim

*Smith v. Robbins*, 528 U.S. 259 (2000) ............................................................. passim

*Snyder v. Louisiana*, 552 U.S. 472 (2008) ........................................................... 138

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................................. passim

*Taylor v. Alabama*, 457 U.S. 687 (1982) ....................................... 121, 122, 123, 124

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................... 61, 72, 148

*United States v. Brown*, 553 F.3d 768 (5th Cir. 2008) ........................................ 139

*United States v. Watson*, 423 U.S. 411 (1976) .................................................... 116

*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) ............................... 136

*United States v. York*, 600 F.3d 347 (5th Cir. 2010) ..................................... 31, 34

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ..................................................... 25

*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................................... 126

*Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir. 2009) ........................... 62, 72

*Whitaker v. Quarterman*, 200 Fed. Appx. 351 (5th Cir. 2006) ............................ 81

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................... passim

*Williams v. Taylor*, 529 U.S. 362 (2000) .......................................... 29, 47, 73

*Wong Sun v. United States*, 371 U.S. 487 (1963) ................................................ 120

*Wood v. Allen*, 558 U.S. 290 (2010) ...................................................................... 74

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ....................................... 152, 153

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................... 160

## State Cases

*Akins v. State*, 202 S.W.3d 879 (Tex. App.—Fort Worth 2006) .......................... 117

*Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App. 1986) ................................... passim

*Beltran v. State*, 728 S.W.2d 382 (Tex. Crim. App. 1987) ..................................... 39


*Bennett v. State*, 738 S.W.2d 33 (Tex. App.—Texarkana 1987, no pet.)............... 35

*Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007).................... 38, 39, 40

*Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997)............................ 102, 103

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) .......................... 42, 46, 81

*Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004) .............. 99, 100, 101, 105

*Ex parte Adams*, 768 S.W.2d 281 (Tex. Crim. App. 1989)........................... 93, 94

*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)............................... 62

*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) ............................... 62, 145

*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012) .................................... 25

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)........................ passim

*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012).................................. 25

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ................................ 28

*Ex parte Miller*, 330 S.W.3d 610 (Tex. Crim. App. 2009)......................... 104, 105

*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)................... 29, 40, 136

*Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004)........................... 30, 126

*Garcia v. State*, 201 S.W.3d 695 (Tex. Crim. App. 2006) ..................................... 99

*Griffith v. State*, 983 S.W.2d 282 (Tex. Crim. App. 1998).................................... 46

*Heath v. Boyd*, 175 S.W.2d 214 (Tex. 1943) ...................................................... 116

*Hollis v. State*, 219 S.W.3d 446 (Tex. App.—Austin 2007) .............................. 116

*Hughes v. State*, 878 S.W.2d 142 (Tex. Crim. App. 1992) ................................. 129

*Johnson v. State*, 496 S.W.2d 72 (Tex. Crim. App. 1973) .................................. 121

*Johnson v. State*, 871 S.W.2d 744 (Tex. Crim. App. 1994) ................................ 121

*Keeton v. State*, 724 S.W.2d 58 (Tex. Crim. App. 1987) ..................................... 39

*Linscomb v. State*, 829 S.W.2d 164 (Tex. Crim. App. 1992) .............................. 138

*Maixner v. State*, 753 S.W.2d 151 (Tex. Crim. App. 1988) ........................ 118, 122

*Martinez v. State*, 763 S.W.2d 413 (Tex. Crim. App. 1988) ............................... 134

*Mayes v. State*, 816 S.W.2d 79 (Tex. Crim. App. 1991) ...................................... 99

*Meza v .State*, 206 S.W.3d 684 (Tex. Crim. App. 2006)............................... 30, 124

*Monge v. State*, 315 S.W.3d 35 (Tex. Crim. App. 2010)..................................... 117

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) .................... 93, 101

*Munroe v. State*, 637 S.W.2d 475 (Tex. Crim. App. 1982)................................... 35

*Newbury v. State*, 135 S.W.3d 22 (Tex. Crim. App. 2004) ................................. 100

*Nieto v. State*, 365 S.W.3d 673 (Tex. Crim. App. 2012)..................................... 138

*Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000) .............................. 101, 105

*Rogers v. State*, 853 S.W.2d 29 (Tex. Crim. App. 1993) ..................................... 99

*Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002) ................................... 102

*Self v. State*, 709 S.W.2d 662 (Tex. Crim. App. 1986)............................... 118, 123

*State v. Johnson*, 871 S.W.2d 744 (Tex. Crim. App. 1994) ............................... 118

*State v. Mazuca*, 375 S.W.3d 294 (Tex. Crim. App. 2012)......................... 118, 122

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999).............. 25, 26, 117, 124

**13**

*Valle v. State*, 109 S.W.3d 500 (Tex. Crim. App. 2003) ........................................ 38

*Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981) ................................ 38, 39

*Warren v. State*, 562 S.W.2d 474 (Tex. Crim. App. 1981) .................................... 39

*Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) .................................... 139

**Statutes**

Tex. Code Crim. Proc. Art. 35.261 ...................................................................... 138

Tex. Code Crim. Proc. Art. 37.071 ............................................. 146, 147, 161, 162

**Other Authority**

ABA Guidelines for the Appointment and Performance of Counsel in Death
Penalty Cases (1989) ......................................................................................... 82

ABA Guidelines for the Appointment and Performance of Defense Counsel in
Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ...................... passim

ABA Standards for Criminal Justice (3d ed. 1993) ................................................ 27

ABA Supplementary Guidelines for the Mitigation Function of Defense Team in
Death Penalty Cases, 36 HOFSTRA L. REV. 677 (2008) .......................... 48, 49, 63

Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE
CHAMPION (Aug. 1985) ............................................................................... 61, 63

John Blume & Pamela Leonard, *Capital Cases: Principles of Developing and
Presenting Mental Health Evidence in Criminal Cases*, THE CHAMPION (Nov.
2000) .................................................................................................................. 73

John Blume, *Mental Health Issues in Criminal Cases: The Elements of a
Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4
(Aug. 1995) ....................................................................................................... 49

Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital
Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923 (2008)  85

Mark D. Cunningham et al., *Serious Assaults on Prison Staff*, 39 J. CRIM. JUSTICE
143 (2011) ......................................................................................................... 43

Richard G. Dudley & Pamela Blume Leonard, *Getting it Right: Life History
Investigation As the Foundation for A Reliable Mental Health Assessment*, 36
HOFSTRA L. REV. 963 (2008) ............................................................................ 81

State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21,
2006) ................................................................................... 27, 28, 62, 136

**14**

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

*"Fairness is what Justice really is."*

- Justice Potter Stewart

In every criminal trial, "[a] defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953); *accord Bruton v. United States*, 391 U.S. 123, 135 (1968). Still, there is an equally-recognized principle that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Darden v. Wainwright*, 477 U.S. 168, 188 (1986) (Blackmun, J., dissenting) ("Although the Constitution guarantees a criminal defendant only 'a fair trial [and] not a perfect one,' . . . this Court has stressed repeatedly . . . that the Eighth Amendment requires a heightened degree of reliability in any case where a State seeks to take the defendant's life.").

While broadly viewed it appears that John Hummel received such a "fair" trial, in actuality there were significant errors that permeated Hummel's trial, infringing his right to a fair and impartial jury, his right to effective and diligent counsel, and his right to have the jury measure the full weight of his life's story against the State's case in punishment.

Despite the best efforts of the criminal justice system, errors occur, often unseen in the moment, but revealed upon post-conviction habeas investigation. In Hummel's case, the strength of his conviction and the reliability of his death sentence crumble under the impact of a single instance of juror misconduct. Here, a juror, who swore to follow the court's instructions and deliberate both guilt and punishment cases, made up his mind as to Hummel's guilt and death sentence during the middle of the State's case at guilt. In deciding to vote for guilt and for

1

**15**

death before all the evidence had been presented, this juror robbed Hummel of his constitutional protection of a fair and impartial tribunal.

Next, a sentence can only be found competent if supported by sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). In Texas, the law demands that only those defendants who are found to be in danger of committing future acts of violence may receive the death penalty. Yet, the State did not present sufficient evidence to meet this burden of proof, a fact Hummel's trial counsel and appellate counsel failed to argue on his behalf. Further, evidence available to his trial counsel to counter the State's case—testimony from prison guards and an expert witness that Hummel was not likely to commit future acts of violence—was neither investigated nor presented by trial counsel.

And while trial counsel's efforts in Hummel's case were certainly valiant, they still fell short of fulfilling the rigorous investigative demands of a capital case. Trial counsel investigated the relationships between Hummel and his immediate family members, narrowly focusing on suspicions that Hummel was sexually abused. However, proof of this did not materialize and their investigation into other avenues of mitigation evidence suffered.

For example, counsel failed to investigate several important time periods and themes in Hummel's life, particularly his military service and adult life. As a result, Hummel's jury heard a defense presentation that thematically and chronologically skipped from Hummel's abusive, neglected childhood to the violent acts on the night of the crime. A complete investigation would have enabled trial counsel to present to the jury Hummel's entire life story, thus providing an understanding of how Hummel became the person he did. The jury would have learned about significant mitigating themes in Hummel's life, including the attachment trauma he suffered as a child, causing him to escape into fantasy role-playing games as a teenager, his formation of a new identity and early

2

**16**

successful service in the United States Marine Corps, and ultimately his struggles with severe physical ailments and complex post-traumatic stress disorder in the period leading up to the crime.

Hummel's constitutional right to a fair trial was further infringed by improperly prejudicial evidence presented by the State. During the guilt/innocence presentation, the State presented substantial evidence about the death of Hummel's six-year-old-daughter and the unborn child, despite neither being part of the indicted crime. The argument and evidence put forward by the State included irrelevant and highly prejudicial testimony from the girl's teachers and a photograph of the excised fetus. Evidence that normally would have been prejudicial in the punishment phase, became even more objectionable and incendiary when presented in the guilt/innocence phase.

These and other errors, as will be explained in detail below, accumulated to undermine the constitutional safeguards of due process in Hummel's capital trial. Whether individually or collectively, these errors raise concerns about the wisdom and justice of imposing the most final of punishments in this case. For the reasons discussed below, Hummel's conviction and sentence should be overturned, and Hummel should be granted a new trial or a reversal of his death sentence.

**17**

# I.

## PROCEDURAL HISTORY

John William Hummel is confined under a sentence of death pursuant to the judgment of the 432nd District Court, Tarrant County, Texas, case number 1184294D, which was rendered on June 27, 2011, and entered on June 29, 2011. (45 RR at 97; CR at 747-49.)[1]

### A. Trial Court Proceedings

On December 23, 2009, this Court appointed Fred Cummings to represent Hummel during his capital trial. (CR at 21.) Larry Moore was appointed to represent Hummel as co-counsel on December 31, 2009. (*Id.* at 24.)

#### 1. Indictment

On February 17, 2010, a grand jury indicted Hummel with capital murder in the course of knowingly causing the deaths of Clyde Bedford and Joy Hummel during the same criminal transaction. (CR at 2.)

#### 2. Trial

Voir dire began on April 28, 2011, and concluded on June 2, 2011. (11 RR at 28; 31 RR at 28.) Hummel was arraigned on April 28, 2011. (11 RR at 21.) The court entered a plea of not guilty on Hummel's behalf. (11 RR at 22.) Opening statements for the guilt/innocence phase of the trial began on June 13, 2011. (33 RR at 19.) The State's case-in-chief continued until June 22, 2011, when the State rested. (40 RR at 23.) Defense counsel did not call any affirmative witnesses and rested its case shortly thereafter. (*Id.* at 28.) Closing arguments occurred on the same day, and the case was submitted to the jury for deliberations. (*Id.* at 50 *et seq.*, 78.) The jury found Hummel guilty of capital murder. (*Id.* at 79; *see also* CR at 721.)

---

[1] "CR" refers to the Clerk's Record in Hummel's trial. "RR" refers to the Reporter's Record in Hummel's trial.

**18**

The punishment phase began the same day. (41 RR at 7.) Neither party made opening statements to the jury. (*Id.*) The State presented its case-in-chief until the defense was permitted to present several out-of-state witnesses on June 24, 2011. (43 RR at 50.) On June 27, 2011, the State called three additional witnesses before resting its case. (44 RR at 33.) Defense counsel then called two further witnesses before resting its case. (*Id.* at 163.) On June 28, the State called two rebuttal witnesses (45 RR at 6, 32) before resting its case in rebuttal. (*Id.* at 46.) Defense counsel did not present any rebuttal witnesses. (*Id.* at 47.)

Both sides then gave closing arguments, and the jury immediately retired for deliberations. (45 RR at 57, 65, 73, 93.) Later that same day, the jury returned a verdict of "Yes" to Special Issue One, and "No" to Special Issue Two. (45 RR at 94-95.) John Hummel was formally sentenced to death on June 28, 2011. (45 RR at 97; CR at 747-49.)

### 3. State Appellate Proceedings

On June 28, 2011, Hummel was notified of his right to appeal. (CR at 745.) Hummel was declared indigent and John Stickels was appointed to represent him. (*Id.* at 757.) A Motion for New Trial was filed on July 21, 2011, alleging insufficient evidence to sustain Hummel's conviction and the jury's finding as to Special Issue One. (*Id.* at 761.) The court took no action on the motion (*id.* at 763), and it was denied under operation of law on September 22, 2011. *See* Tex. R. App. Pro. Art 21.8.

Mr. Stickels filed an opening appellate brief in *John William Hummel v. The State of Texas*, Cause Number AP-76,956, in the Court of Criminal Appeals ("CCA") on September 21, 2012. The State submitted a brief in response on January 18, 2013. Appellate counsel did not file a reply brief. The CCA heard oral arguments on February 27, 2013. As of the date of this filing, the CCA has not issued a decision on Hummel's appeal.

**19**

### 4. State Habeas Proceedings

The 432nd District Court appointed the Office of Capital Writs ("OCW") to represent Hummel in filing an application for a writ of habeas corpus pursuant to the Code of Criminal Procedure Article 11.071 on June 30, 2011.  (CR at 746.) This Application follows.

## II.

## STATEMENT OF FACTS

### A. Evidence at Trial

### 1. Guilt/Innocence Phase Presentation

The prosecution presented evidence that on the night of December 17, 2009, Hummel used a baseball bat and several knives to murder his wife Joy Hummel, their daughter Jodi, and Joy's father Clyde Bedford.  Hummel then set the house on fire and left Texas for California, where he was arrested.  (*See* 33-40 RR.)

The defense presented no evidence during the guilt/innocence stage. (40 RR at 24.)

### 2. The Prosecution Punishment Phase Presentation

The State presented three main areas of evidence in favor of the death penalty during the punishment phase.  First, the prosecution argued that Hummel's actions leading up to and following the crime exhibited he had planned the murders and was happy once they were completed.  The prosecution presented the testimony of Kennedale police investigator James Rizy to describe how Hummel had attempted to poison his family two days before the crime.  Rizy also testified that Hummel had left after the crime and traveled to Oceanside, California, where he went to a strip club and took drugs.  (41 RR at 8-31.)  Scott Matejka testified that he met Hummel at the California strip club and the two of them decided to go to Mexico to buy drugs.  Matejka stated that he and Hummel smoked crack cocaine

**20**

and that Hummel was stopped at the border when crossing back from Mexico. (42 RR at 23-52.)

Next, the prosecution focused on other alleged bad conduct on the part of Hummel as evidence of aggravation, specifically implying sexual deviance. The prosecution presented the testimony of two strippers, Tomiko Race and Gretchen Bow, who testified that Hummel would frequently visit them and request dances. They stated that Hummel would call them after work and wanted to spend time with them. (42 RR at 72-85, 109-29.) The prosecution also presented the testimony of William Ford, a doctor at the hospital where Hummel worked as a security guard, and Champion Security employees Matt Sullivan and Cindy Green. Dr. Ford testified that he found pornography on his own work computer and suspected that someone was using the computer when he was not in his office. (*Id.* at 95-108.) The prosecution offered testimony of a computer expert to show that Hummel had accessed Dr. Ford's computer and the testimony of Cindy Green to show that Hummel was on shift at the hospital when Dr. Ford's computer was used. (*Id.* at 138-78.) Hummel's supervisor Matt Sullivan testified that Hummel had received infractions for this unauthorized computer use, as well as smoking and watching television. Sullivan had a disciplinary meeting with Hummel the morning after the crime, where Hummel admitted to his infractions. (*Id.* at 5-13.)

Finally, the prosecution presented rebuttal testimony to discount Hummel's military service. Lieutenant Colonel Michael Dougherty testified that Hummel was an average Marine who had to be counseled about his frequent visits to strip clubs. In addition, Dougherty testified that the medals Hummel received for his service were received by all members of his unit and not earned for his individual efforts. (45 RR at 5-30.) Captain Sergio Santos testified that Hummel was not a very impressive Marine, and that Santos had revoked Hummel's security clearance

**21**

because he left the base without permission and had questionable integrity. (*Id.* at 32-46.)

In closing, the prosecution argued that Hummel would be a future danger based on the planning and lack of restraint shown in the crime (45 RR at 86), and that nothing in Hummel's history was sufficiently mitigating to warrant a life sentence. (45 RR at 87.)

### 3. The Defense Punishment Phase Presentation

#### a. Lay Witnesses

During the punishment phase of trial, Hummel's counsel presented the testimony of Hummel's sister, two former girlfriends, two school employees from Hummel's high school, and four members of the Pack family from South Carolina that were friends with Hummel's family when he was a child. The testimony offered by these witnesses fell into three main categories: Hummel's family life as a child, Hummel's educational disability, and Hummel's experience in romantic relationships.

##### i. Family Life

First, trial counsel presented evidence that Hummel was raised in a family environment that lacked love and appropriate relationships. Counsel presented the testimony of Hummel's sister, Neata Woody, who was nine years older than Hummel. In addition, counsel presented Linda Pack, who had been close friends with Hummel's mother Jackie, as well as Mark Pack (Linda's son), Christy Pack (Mark's wife), and Derrick Parris (Mark's cousin). The Packs would go every Sunday to the Hummels' house for dinner.

Hummel and his family lived outside of town on a farm owned by a local dentist. Hummel would help his father out on the farm. (43 RR at 105-08.) Neata testified that her parents never showed affection to their children and that she mainly took care of Hummel as a child. (*Id.* at 211.)

8

**22**

Neata felt her parents were abusive. (43 RR at 221.) Her parents would discipline them with strikes from a belt and often would leave them alone. (*Id.* at 213-18.) Mark Pack remembered Hummel's father throwing Hummel off a tractor on one occasion. (*Id.* at 112.) Derrick Parris also remembered once when Hummel's father beat him with a belt, leaving marks, and once with a broom handle. (*Id.* at 153.)

Hummel's parents had a strange relationship. Linda Pack testified that Hummel's father cheated on Hummel's mother and that Hummel's mother once asked Linda if she would sleep with her husband. (43 RR at 143-44.) Neata remembered walking in on her father receiving oral sex from a woman from their church. (*Id.* at 252.) Parris remembered Hummel's father slapping Parris's mother on the rear inappropriately. (*Id.* at 155.)

Hummel's parents were strict. They would only allow few friends to visit, like the Packs for Sunday dinners. (43 RR at 218.) They provided essential care to Neata and Hummel, but never any affection. (*Id.* at 249-50.) Hummel's mother was more generous to other people's children than her own. (*Id.* at 127.) She would spend money for gifts for other people's children, like shoes for Linda Pack's daughter, but not on her own kids. (*Id.* at 138-45.)

When Hummel was young, kids called him "Bacon" because of how he smelled. (43 RR at 223.) His friends believed he was not smart. They made fun of him when they thought he was making up having girlfriends. (*Id.* at 159, 168.) Hummel was very quiet at Sunday dinners. (*Id.* at 126.) While the others would play games after dinner, Hummel would go to his room and play video games. (*Id.* at 109.)

In addition to her testimony regarding Hummel's life as a child, Neata also testified about knowing the victims Joy and Jodi, and that Hummel was having financial problems. (43 RR at 229-32.) On cross-examination, Neata told the jury

9

**23**

that she did not want to be there testifying for her brother, but had been subpoenaed by the defense. She believed Hummel was responsible for the victims' deaths and that the jury should do what was "correct." She stated that she and her family were "broken" when they lost the victims. She also stated that she thought Hummel would kill her parents with a sword. (*Id.* at 232-48, 255-56.)

### ii. Education

Next, trial counsel offered evidence that Hummel struggled in school due to a learning disability. Parris testified that Hummel was "stupid" and could not spell the word "egg." (43 RR at 159-61.) Haila Scoggins (now Haila Adams) was the special education teacher for Hummel when he was in high school. Hummel had a disability in his writing, like dyslexia, and needed accommodations in order to graduate from high school. According to Scoggins, Hummel was quiet, pleasant, and cooperative and liked to play video games and "Dungeons and Dragons." Although Scoggins held parent teacher conferences, Hummel's parents never attended and she only met Hummel's mother once during his school career. The last time she saw Hummel was just after he graduated from high school when he was working at a fast food restaurant. (*Id.* at 50-72.) Tommy Stribble was the special education director for Hummel's schools and was custodian of records. He confirmed that Hummel failed the fourth grade, was a member of ROTC, and lacked any disciplinary problems. (*Id.* at 75-100.)

### iii. Romantic Life

Finally, trial counsel presented evidence regarding Hummel's romantic life. Stephanie Bennett testified that she and Hummel met in high school and began double dating with her older brother. They mainly went to the movies, hung out, and went to church together. Hummel wanted to marry Bennett, but she was not ready. They broke up and Hummel was upset, but he was never violent towards her. (43 RR at 170-83.) Another girlfriend, Letti Ulbright, testified that she had a

10

**24**

relationship with Hummel for a brief period after he was in the Marines. Ulbright was pregnant and homeless when she met Hummel. They began their relationship in California, but soon moved to South Carolina to become a family. They lived in a trailer and Hummel work at a Kohler factory. When Ulbright gave birth two months later, Hummel's sister Neata came to her one day with a letter supposedly from Hummel saying he no longer wanted to be a family. Neata sent Ulbright back to California. Ulbright testified that Hummel was never violent or abusive to her. (*Id.* at 185-206.)

### iv.  Other Evidence

In addition to the themes described above, Derrick Parris testified briefly regarding Hummel's adult life. Parris described how Hummel lost weight to become a Marine and had more self-esteem while he was enlisted. Parris was surprised Hummel became a Marine and an intelligence analyst because he was not smart. After he came back from the Marines, Hummel would go to strip clubs. According to Parris, Hummel had a hard time distinguishing the fantasy flirting of the strippers from someone who actually was attracted to him. (43 RR at 157-61, 166.)

### b.  Expert Witnesses

The defense presented the testimony of two expert witnesses: a prison classification expert and a neuropsychologist.

### i.  Prison Classification

Frank Aubuchon, a former Texas Department of Criminal Justice ("TDCJ") employee, testified as a defense expert on the prison classification system. Aubuchon described the various types of facilities that Hummel might be placed in if given life without parole. He also described the security protocols that prisons use to keep guards safe. (44 RR at 34-59.)

**25**

Aubuchon described the process TDCJ uses to classify an inmate based on his crime and past conduct, ranging from least restricted ("G1") to most restricted ("G5") and Administrative Segregation. Based on Hummel's offense reports, military records, medical records, and jail behavior, Aubuchon predicted that Hummel would be classified as a "G3" if given a sentence of life without parole. He also believed based on Hummel's good behavior and military history, Hummel would function well in prison. (44 RR at 59-73.)

On cross-examination, Aubuchon admitted that he did not know that Hummel had once gone absent without leave ("AWOL") in the military. Further, Aubuchon agreed that prisoners can escape, can make weapons, and can hurt others while in prison. However, he testified that escapes are rare and that the prison system has adapted to prevent violent acts by inmates. (44 RR at 73-116.)

### ii. Mental Health

Dr. Antoinette McGarrahan testified that she was a forensic psychologist who specialized in neuropsychology, the study of brain behavior. She performed an evaluation of Hummel, including a clinical interview, review of Hummel's vital records such as medical, education, and military records, and interviews with Hummel's sister and mother. (44 RR at 118-23.)

Dr. McGarrahan testified that Hummel had an IQ of 109 and did not exhibit any diagnosable clinical disorders. However, in her opinion Hummel did suffer from several traits of narcissism, antisocial personality disorder, schizoid disorder, and borderline personality disorder. Hummel's narcissistic traits meant he was self-focused and lacked empathy. His anti-social traits meant that Hummel was irresponsible, deceitful, and manipulative. Hummel's schizoid features caused Hummel to be detached in his relationships with others. Finally, Hummel's borderline traits caused Hummel to feel empty and lack goals. These traits were involuntary and permanent. (44 RR at 124-32.)

12

**26**

Dr. McGarrahan testified that the lack of nurturing Hummel experienced from his family contributed to these feelings. Hummel became unable to express his emotions, holding in his anger and frustrations, and unable to form meaningful relationships. Ultimately Hummel's emotions came out in a flood on the night of the crime. (44 RR at 132-43.)

On cross-examination, Dr. McGarrahan agreed that Hummel was irresponsible, grandiose, manipulative, impulsive, and unable to appreciate consequences of his actions. She also agreed that Hummel was like a "sleeping volcano" and that she could not tell whether another set of circumstances would set him off. (44 RR at 146-55.)

### B. Post-Conviction Investigation

Post-conviction investigation has uncovered significantly more details regarding Hummel's life history that were available to present to his capital jury.

### 1. Family and Early Life

Hummel was born in 1975 to John Hummel Sr. ("John Sr.") and his wife Jackie. Hummel's mother Jackie was raised in an abusive home. She, her brother Thomas Hamilton, and their siblings, witnessed their father severely beat their mother. Their mother would hide bottles of pepper juice and bleach around the house so that she could throw them at their father when he was violent. During one such episode, their mother shot and wounded their father. Their mother would in turn beat her own children to the point they would cry for each other. Jackie's family was also very poor. There were times when their mother worked two jobs and could only feed them by boiling a potato; they would drink the liquid for lunch and eat the potato for dinner. (Ex. 12 at ¶¶3-4, 17 [Affidavit ("Aff.") of Thomas Hamilton].)

13

**27**

Jackie married John Sr., and they had two children together, John Hummel Jr. and Neata Hummel Woody.[2]  Hummel was born in Grand Prairie, Texas, but the family moved to Pacolet, South Carolina when Hummel was around four years old.  The Hummels moved after Jackie got into legal trouble for writing bad checks.  In addition, the family moved to follow a traveling preacher named Andrew Carrigan who had started the Morning Star Baptist Church in Pacolet. (Ex. 12 at ¶¶6-7 [Aff. of Hamilton].)

Another reason for the move was John Sr.'s extramarital affairs, which were common knowledge in the family.  John Sr. had been caught cheating, but he and Jackie remained married.  In fact, Jackie may have even encouraged these affairs. (Ex. 12 at ¶8 [Aff. of Hamilton].)

Because of financial problems, the Hummels eventually moved onto a farm in South Carolina.  John Sr. worked the farm (in addition to his day job at the Kohler ceramics plant) in exchange for free rent.  The farm was out in the country and isolated from the rest of the town.  (Ex. 12 at ¶9 [Aff. of Hamilton]; Ex. 15 at ¶4(a) [Aff. of Christy Pack]; Ex. 3 at ¶7 [Aff. of Haila Adams]; Ex. 13 at ¶5 [Aff. of Brian Jeter].)

As a result, Hummel was isolated from other children.  He hardly left the farm except for school and church.  He did not have friends except those that were invited over by his parents.  Even kids Hummel knew that also lived out in rural areas, "country kids," did not become friends with Hummel until he was in high

---

[2] Post-conviction investigation has been unable to ascertain more information regarding the Hummel family's origins. John Hummel Sr. passed away in 2005 and has no living relatives that post-conviction counsel has been able to identify. Jackie Hummel and Neata Woody, as well as other immediate family members of Hummel, have been contacted multiple times and have either refused to be interviewed or have been prevented from being interviewed by other family members.

14

**28**

school. Possibly because of this isolation, people found Hummel to be quiet and odd. He was shy around other people. He would get visibly nervous whenever kids would tease him or when he was put on the spot by an adult. He seemed afraid to fail in front others. (Ex. 12 at ¶12 [Aff. of Hamilton]; Ex. 15 at ¶4(a-b) [Aff. of Pack]; Ex. 13 at ¶¶2, 5 [Aff. of Jeter].)

Neata moved away when she was seventeen and Hummel was eight. Around that time, Hummel's uncle Thomas Hamilton moved to South Carolina from Texas and became Hummel's support. Hamilton often babysat Hummel. He taught Hummel to hunt and fish. Hummel would ask Hamilton to play games with him, because Hamilton was kind to Hummel and would not get upset when Hummel won—unlike Hummel's father. Unfortunately, Hamilton moved back to Texas when Hummel was around thirteen. (Ex. 12 at ¶¶10-11 [Aff. of Hamilton].)

Hummel's father was an obsessive and violent person. He liked to shoot plastic toy soldier figures and then paint their "wounds" red. He also liked to pour lighter fluid on ant hills and set them ablaze. Hummel had an opposite personality from his father and did not obsess over guns. However, his father made Hummel play war games with him anyway. Hummel's father was wrapped up in his own life of work at the plant and tending the farm. He did not spend much time with his family, preferring instead to play video games or watch TV in his free time. He never encouraged Hummel. So great was his absence that Hummel's teachers were not even aware that Hummel had a father in his life. (Ex. 12 at ¶¶13-14 [Aff. of Hamilton]; Ex. 3 at ¶7 [Aff. of Adams]; Ex. 8 at ¶4 [Aff. of Lance Dupre].)

Hummel's mother Jackie was also wrapped up in her own life. She spent most of her time with her own friends. She never spent time, money, or energy to take Hummel to the movies, parks, or shopping malls, etc. Outside observers did not think Jackie ever showed love or concern for her son. No one witnessed either

**29**

parent ever express love, give Hummel or Neata hugs or kisses, or say "I love you." (Ex. 12 at ¶15 [Aff. of Hamilton]; Ex. 15 at ¶4(c) [Aff. of Pack].)

However, Hummel's parents maintained strict control over their son's daily life—where he went, who he would see, etc.—all while not showing him attention or affection. The attitude they expressed to Hummel was "do your homework and go to school and stay out of our way." As a result, Hummel spent most of his free time in his room, playing video games or watching TV. (Ex. 12 at ¶16 [Aff. of Hamilton]; Ex. 15 at ¶3(a) [Aff. of Pack].)

## 2. Teenage Years

During his teenage years, Hummel "blended into the woodwork" at school. He struggled with a learning disability at school, yet neither of his parents took an interest in his schoolwork. Teachers observed that he never initiated conversations and did not seem to interact with the other children. It was like he was hiding or trying to avoid attention. Hummel was never aggressive, never angry, always maintaining an even keel and acting like nothing bothered him. He did not talk about his family. (Ex. 3 at ¶¶3-6 [Aff. of Adams]; Ex. 19 at ¶7 [Aff. of Joseph Patterson]; Ex. 10 at ¶6 [Aff. of Shana Fowler].)

Hummel's earliest friends were other boys who would help out on the Hummel's farm. (Ex. 13 at ¶¶2, 6 [Aff. of Jeter]; Ex. 19 at ¶¶2, 6 [Aff. of Patterson].) It appeared to others that Hummel wanted closer relationships but was unable to form them. In friendships Hummel did make, he was often manipulated and used. For example, Hummel's friends would get him to buy things for them or to give them rides places. Hummel wore a smile and tried to please his peers, going out of his way to do what they wanted. As a result of this desire to please, Hummel presented different characters of himself to his peers depending on the audience. Some believed he was a class clown, while others described him as shy and quiet. He played sports with some classmates, seeming athletic, while others

16

**30**

never believed he was athletic, preferring instead to play video games. Hummel was influenced to be like the people around him, trying to fit in and make closer relationships with others. (Ex. 6 at ¶¶12-13 [Aff. of Chad Brown]; Ex. 8 at ¶7 [Aff. of Dupre]; Ex. 13 at ¶¶3-4 [Aff. of Jeter]; Ex. 19 at ¶¶3-4, 8-9 [Aff. of Patterson]; Ex. 3 at ¶11 [Aff. of Adams].)

Hummel was often the object of ridicule. Friends made fun of his inability to spell, saying that he was stupid, and made fun of his attempts to date girls. They also teased him for being immature. Hummel had problems interacting socially with his peers at their level. He would say random things that did not make sense—like thinking the word "corn" was a catchphrase. He could not explain why he thought what he said was funny. He would jump into conversations of others with comments that were immature and not relevant to what was being said. His friends also teased him about his clothes. Hummel would wear strange shirts with dragons, camouflage pants, and bedroom slippers that he called "moccasins." Despite his awkwardness and his friends' taunts, Hummel continued to try to please his friends. When he was teased or bullied, Hummel would back off, not confronting the other individuals or getting mad. (Ex. 8 at ¶¶5-7 [Aff. of Dupre]; Ex. 10 at ¶¶3-5 [Aff. of Fowler]; Ex. 6 at ¶¶10-15 [Aff. of Brown].)

By late high school, Hummel had developed a passion (bordering on obsession) for role-playing games, such as Dungeons and Dragons. These games were some of the few things that made him excited. They provided Hummel with a way to escape his real life. Hummel would often talk about the games after they were over, reminiscing about the game. However, Hummel would frequently create characters that were too complex for him to manage. It was difficult for Hummel to mentally keep up with the type of characters he tried to play. This lead to poor results in the games. And while other players would use a single character, Hummel tried to create multiple characters at the same time. He would constantly

17

**31**

change his characters to try to be better at the game, often taking whatever successful moves his friends did and copying them. Hummel had trouble stepping away from the fantasy of the games. One time he tried to pull game dice out while he was driving a car full of his friends somewhere, just to continue playing the game. His friends had to force him to stop playing and concentrate on driving. Whatever conversations were going on, Hummel would turn them to talking about fantasy games. (Ex. 3 at ¶8 [Aff. of Adams]; Ex. 8 at ¶3 [Aff. of Dupre]; Ex. 6 at ¶¶6-9 [Aff. of Brown].)

During his senior year, Hummel dated Stephanie Bennett after they met while he was working at a Hardee's fast food restaurant. After speaking on the phone several times, and before ever going on a date in person, Hummel told Bennett that he loved her. Bennett did not think it was normal to be that serious so quickly. From the beginning of their relationship, Hummel got very close to Bennett and her family. He would go to church and eat with the Bennetts every Sunday, and would spend holidays with them. Hummel would talk about his and Bennett's future and say that they would get married. He wanted to plan everything about their future together. Yet, Bennett did not feel the same and started pulling away. Hummel had no idea and thought they were going to spend the rest of their lives together. When Bennett broke up with Hummel, he was hurt and surprised. (Ex. 5 at ¶4 [Aff. of Stephanie Bennett].)

At the end of his senior year, Hummel graduated high school, passing his exit exam only after receiving an accommodation for his learning disability. After graduating, Hummel did not appear to have any goals or ambitions, nor did he get any encouragement from his family or community. He worked at the Hardee's and lived briefly on his own. Hummel struggled financially, and when his apartment was broken into he was faced with the prospect of moving back in with his parents. Instead, he chose to join the United States Marine Corps, a decision that surprised

18

**32**

many of his friends. To them, Hummel would not fit well in the military and the decision to join seemed impulsive and not well thought-out. (Ex. 3 at ¶¶9-10 [Aff. of Adams]; Ex. 6 at ¶16 [Aff. of Brown]; Ex. 8 at ¶8 [Aff. of Dupre].)

### 3. Military Service

Despite Hummel's learning disability, he was identified for service in the intelligence division. Hummel was tasked with plotting troop movements and building terrain models for combat exercises, a job that matched his passion for fantasy games. He was stationed at Camp Pendleton in Oceanside, California. Friends back home in South Carolina noted that Hummel seemed proud to be in the military, happy with his life, and the most physically fit he had ever been. (Ex. 29 [Military Records]; Ex. 6 at ¶¶17-18 [Aff. of Brown].)

Hummel also made strong friendships in the military. Hummel's roommate, Wayne "Buddy" Matthias, who was also in the intelligence division, introduced Hummel to his friends, Fred Emmer and Efrain Chaidez. The four became close friends, spending most of their daily free time and weekends together. Although they each had different personalities and backgrounds, they connected. Like the others, Hummel used the military to start a new identity and new life and leave his South Carolina past behind him. (Ex. 14 at ¶¶2-4 [Aff. of Wayne Matthias]; Ex. 9 at ¶¶2-3 [Aff. of Fred Emmer]; Ex. 7 at ¶¶2-4 [Aff. of Efrain Chaidez].)

Hummel was quiet and shy at first, but he got more comfortable and outgoing as time went on. His friends felt he did well in the Marines and was a dependable guy, who had their back. He was generous, friendly, and stayed out of trouble. (Ex. 14 at ¶4 [Aff. of Matthias]; Ex. 7 at ¶¶5-7 [Aff. of Chaidez]; Ex. 9 at ¶¶3-4 [Aff. of Emmer].)

As time went on, Hummel's friends noticed that he began copying their mannerisms, dressing like they did, and even getting tattoos like them. Hummel was like a "chihuahua" following around bigger dogs. Even as he acted like his

**33**

friends, it was clear he felt like an outsider trying to fit in. His friends had to sit him down and tell him that he had to stop copying them and that he needed to become his own person. (Ex. 14 at ¶8 [Aff. of Matthias]; Ex. 9 at ¶9 [Aff. of Emmer].)

The group often drank and went to strip clubs during their free time. Hummel became particularly absorbed with going to strip clubs and made friends with the staff at the clubs. He tried to show the strippers he cared for them, offering to escort them out of the bars and getting mad at anyone who mistreated them. However, Hummel was not a "ladies' man" and never actually dated the strippers, or any other women. Hummel interpreted the attention he got at the strip clubs as meaningful, when in fact these relationships were more in Hummel's mind than in reality. Similarly, Hummel was still obsessed with role-playing games and fantasy, to such an extent that his friends felt he was disconnected from reality and dodging real life. (Ex. 14 at ¶¶6-7 [Aff. of Matthias]; Ex. 7 at ¶¶8-9 [Aff. of Chaidez]; Ex. 9 at ¶¶5, 7 [Aff. of Emmer].)

Although Hummel had gotten fit upon entering the Marines, over time he gained weight and was labeled what the Marines called a "Fat Body." The Marine Corps method was to break down its members and build them into the Marine ideal, which did not include being overweight. Those who were overweight were put on a management program. This also meant that they could not get promoted, even though promotions were usually automatic based on how long someone served. As a result, Hummel kept missing promotions and saw younger men get promoted above him even though he had been there longer. (Ex. 9 at ¶10 [Aff. of Emmer]; Ex. 14 at ¶5 [Aff. of Matthias].)

In addition to impacting his promotions, Hummel's weight made him the object of ridicule among fellow Marines. He was bullied by others in his company, and given a hard time by his supervisors. Even his friends teased him,

20

**34**

calling him a "Fat Body" and "teddy bear." (Ex. 7 at ¶10 [Aff. of Chaidez]; Ex. 9 at ¶10 [Aff. of Emmer].)

In the spring of 2000, all three of Hummel's friends left Camp Pendleton. Chaidez was transferred to San Diego to attend school, while Matthias and Emmer were discharged. As a result, Hummel was left with two more years of service without his close friends and support group. Not long after they were discharged, Matthias and Emmer received a call that Hummel had attempted to go AWOL, but his truck had broken down in Arizona. Matthias and Emmer picked Hummel up and brought him back to the base. He told them that he was stressed and that he could not handle the military without the support of his friends. (Ex. 14 at ¶¶8-9 [Aff. of Matthias]; Ex. 9 at ¶¶11-14 [Aff. of Emmer]; Ex. 7 at ¶12 [Aff. of Chaidez].)

Because he had left the base without authorization, Hummel was restricted to the base and his security clearance was taken away. This meant he could no longer do intelligence work and was assigned menial tasks. He was distraught about losing his security clearance. He was no longer the friendly, outgoing person his friends had known. He finished the remainder of his time in the Marines and was discharged back to South Carolina. His friends from high school noticed that he was no longer fit, assertive, confident, and proud the way he had been when he joined the military. He seemed brooding and less jovial. It seemed like he had lost the sense of belonging that he had once had. (Ex. 14 at ¶10 [Aff. of Matthias]; Ex. 9 at ¶¶13-14 [Aff. of Emmer]; Ex. 7 at ¶13 [Aff. of Chaidez]; Ex. 6 at ¶19 [Aff. of Brown].)

### 4. Adult Years

Hummel returned home to South Carolina after his military discharge, bringing with him the pregnant homeless girl Letti Ulbright. For a brief time, Hummel held a stable job at the factor where his father worked and lived with

**35**

Ulbright as though they were a family. However, after Hummel's sister Neata sent Ulbright away from him, Hummel began to drift, moving from temporary job to temporary job. His friends noticed that he now smoked and drank a lot, which he had not done before the military. Hummel also went frequently to strip clubs. Whereas before his time in the military Hummel occasionally visited a strip club, now it was a "way of life" for him. These trips to strip clubs replaced his role-playing games. Hummel took the attention from strippers seriously. He would act like the strippers were interested in him and wanted relationships. Hummel seemed like he was living in a fantasy world, out of touch with reality, spending much of his time watching movies and at strip clubs. (Ex. 30 [Hummel Employment Records]; Ex. 8 at ¶9 [Aff. of Dupre]; Ex. 6 at ¶¶20-23 [Aff. of Brown].)

Hummel started dressing in dark, gothic clothing and listening to "hard" music. He started spending time romantically with a woman he had known in high school, Shana Fowler, but would periodically disappear for a while and then show back up suddenly, with no explanation. (Ex. 6 at ¶¶24-25 [Aff. of Brown]; Ex. 10 at ¶¶7-8 [Aff. of Fowler].)

One day he simply stopped hanging around his friends altogether. When his friends looked for him, they were told he had moved to another town in South Carolina, and even then they could not find him. Hummel ultimately moved to Texas to live with his cousin. Before he left, one night he visited Fowler and gave her son some collectible figurines that he had kept pristine in their original packaging. Fowler felt it was unusual for Hummel to give up his collectibles. He spoke about moving to Texas, but had no plans or purpose. (Ex. 6 at ¶26 [Aff. of Brown]; Ex. 10 at ¶9 [Aff. of Fowler].)

When Hummel arrived in Texas, his extended family members noticed that he had changed. They felt that Hummel was not the same person as he had been

**36**

growing up. He was no longer the same active, fun kid that his uncle Thomas Hamilton had known in South Carolina. (Ex. 12 at ¶¶19-20 [Aff. of Hamilton].)

In very short succession after moving to Texas, Hummel began dating Joy Bedford, she became pregnant, they married, and Joy gave birth to Jodi Hummel. Hummel got work at the Williamson-Dickey clothing factory. Less than a year later, however, Hummel injured his back at work, causing him to take medical leave and undergo multiple surgeries. Over the next several years, Hummel required significant medical care and was unable to work. (Ex. 30 [Hummel employment records]; Ex. 25 [Hummel medical records].)

Hummel's lack of employment caused his family substantial financial problems. A neighbor remembers helping Hummel to seek VA benefits from the military. Hummel's wife worked long hours as a massage therapist and would tell their neighbor, George Goodson, about how hard times were for the family. Goodson gave the family a computer and sold them one of his cars to help out. In addition to his back injury Hummel developed Crohn's disease, which further debilitated him. Ultimately, finances got so bad that Goodson helped Hummel and his family move into Joy's father's home. (Ex. 11 at ¶¶2-8 [Aff. of George Goodson].)

The Hummels attended a Sunday school class at Shady Oaks Baptist Church in Hurst, Texas, where they met Chris and Tonya Paris. The families became close friends and their kids frequently played together. Chris Paris remembers that Hummel and Joy had opposite personalities, with Joy being social and outgoing while Hummel was very quiet and reserved. Hummel was friendly, though, and would cook meals for parties—even though he could not eat the meals because of the special diet required by his Crohn's disease. Hummel tried to interact with people and appeared to be a good father to Jodi. (Ex. 16 at ¶¶2-3 [Aff. of Christopher Paris]; Ex. 17 at ¶¶2-3 [Aff. of Tonya Paris].)

**37**

Hummel would share facts of his life with others, but never opened up about his feelings or problems. Chris Paris knew that Hummel had been in the military, but Hummel never talked about what that experience had been like for him. Hummel also never opened up about the impact of his medical problems and how his pain bothered him. (Ex. 16 at ¶¶4-5 [Aff. of Chris Paris].)

The Parises knew of the Hummels' financial problems and that Hummel had been unemployed for a long time. Joy worked very hard, even going to friends' houses after work to give massages and getting home very late. The Parises helped out when they could, including fixing Hummel's roof so that they could get house insurance. Chris Paris also helped fix Hummel's truck and paid for a down payment on a van when the truck later was in an accident. (Ex. 16 at ¶¶6-7 [Aff. of Chris Paris].)

Hummel, his family, and his friends were very excited in 2009 when Hummel was able to get work as a night security guard. The job seemed to pull Hummel out of a slump and gave him pride. A drawback to the job, though, was that Hummel was not around his family and friends as much, since he worked nights. He began missing church and other social events. (Ex. 16 at ¶8 [Aff. of Chris Paris].)

This separation, and a strained marriage, led Hummel to begin an affair in late 2009. His friends could tell there were tensions between Hummel and Joy. The Parises tried to offer their support to help Hummel and Joy repair their marriage. A month before the crime occurred, at a church conference, Joy spoke to Tonya Paris about the strain between her and Hummel. When Hummel picked up Joy from the conference, Chris Paris could tell there was something wrong between them. (Ex. 17 at ¶4 [Aff. of Tonya Paris]; Ex. 16 at ¶9 [Aff. of Chris Paris].)

**38**

When the crime occurred and the word of it spread, Hummel's friends were shocked and surprised. People that grew up with him in South Carolina, his military friends, and his newest friends in Fort Worth felt the crime was out of character for the Hummel they knew. No one ever experienced any anger or violence from Hummel. When his military friends heard that Hummel had traveled back to California after the crime, it seemed to them that Hummel was "chasing 1999" and trying to get back to a place where he was happy. (Ex. 19 at ¶9 [Aff. of Patterson]; Ex. 13 at ¶8 [Aff. of Jeter]; Ex. 7 at ¶14 [Aff. of Chaidez]; Ex. 14 at ¶11 [Aff. of Matthias]; Ex. 9 at ¶15 [Aff. of Emmer]; Ex. 11 at ¶9 [Aff. of Goodson]; Ex. 17 at ¶5 [Aff. of Tonya Paris]; Ex. 16 at ¶10 [Aff. of Chris Paris].)

## III.
## STANDARD OF CARE

### A. Ineffective Assistance of Trial Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Hummel must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

**39**

To establish deficiency, Hummel must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688). A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393–94 (2005) (O'Connor, J., concurring) (*citing Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1482 (2010) (ABA Standards "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA Standards for Criminal Justice] as "guides to determining what is reasonable."'") (quoting *Wiggins*, 539 U.S. at 524). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Hummel's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at

**40**

the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ("ABA Guidelines") and the ABA Standards for Criminal Justice (3d ed. 1993) ("ABA Standards"); *see also* State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21, 2006) ("Texas Guidelines").

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Pursuant to the ABA Guidelines, counsel was required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines, Guideline 10.7. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the ABA Standards state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." ABA Standards, Standard 4-4.1 (emphasis added); Texas Guidelines, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or

27

**41**

statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guidelines, Guideline 10.10.1. The CCA holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d at 400–01 (Cochran, J., concurring).

To establish prejudice, Hummel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94). Hummel need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

**42**

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "[i]t is unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence.]" *Id.* The Texas Court of Criminal appeals "[has] adapted the Supreme Court's prejudice test to require that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

### B. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are governed by *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

**43**

An appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza v .State*, 206 S.W.3d 684, 689 (Tex. Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error").

## IV.

## ARGUMENT

## CLAIM ONE

### HUMMEL WAS DENIED HIS DUE PROCESS RIGHT TO AN IMPARTIAL JURY WHEN JUROR DAVIS COMMITTED MISCONDUCT BY AUTOMATICALLY VOTING FOR DEATH

Some constitutional rights are so basic to a fair trial that their denial can never be treated as harmless error. *Chapman v. California*, 386 U.S. 18, 23 (1967). "The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right to a trial before an impartial jury."). And the violation of this right, like the violation of the right to counsel and the right to an impartial judge, undermines the integrity of the trial itself and necessitates a reversal without a showing of prejudice. *Rose v. Clark*, 478 U.S. 570, 578 (1986) (Harmless error analysis "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."); *Irvin*, 366 U.S. at 722 ("The failure to accord an accused a fair hearing violates even the minimal standards of due process.").

During jury selection for Hummel's capital trial, Juror Davis agreed that he would not vote for a death sentence before hearing and considering evidence presented at the punishment phase of Hummel's trial. He affirmed this by taking the juror's oath. Yet prior to the conclusion of the guilt/innocence phase evidence

**44**

presentation, Juror Davis made up his mind not only to find Hummel guilty, but also to vote for a death sentence. Because of this misconduct, Hummel was denied his constitutionally protected, due process right to be tried before an impartial jury. As such, his sentence violates applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and should therefore be reversed.

## A. Legal Standard

"From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials *before impartial tribunals* in which every defendant stands equal before the law." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) (emphasis added). The very nature of the voir dire process is designed to seat jurors who are fair, open-minded, and unbiased. Each juror selected swears to abide by and fulfill certain oaths, duties, and admonitions. These promises include, among other things, that each juror will pay close attention and consider all of the evidence admitted by the court. (33 RR at 10-11.) When any juror violates these promises, either intentionally or inadvertently, the defendant's Sixth Amendment right to a trial by an impartial jury is threatened. *See United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010) ("Under the Sixth Amendment, every defendant has the right to trial by an impartial jury. Deliberations prior to the close of evidence threaten that impartiality.") (internal citations omitted).

To be considered an impartial jury in a capital case, jurors must not simply meet typical standards regarding biases and prejudices; they must also be able to consider whether evidence presented by the defense is mitigating. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.").

**45**

"[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original) (plurality opinion); *accord Abdul-Kabir v. Quarterman*, 550 U.S. 233, 234 (2007). The corollary that "the sentencer *may not refuse to consider* . . . relevant mitigating evidence" is equally "well established." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (emphasis added; internal quotations omitted).

Furthermore, *each* juror individually must be able to consider mitigating evidence, since "[t]he measure of a jury is taken by reference to the impartiality of each, individual juror." *Morgan*, 504 U.S. at 734 n.8. The importance of this focus on individual jurors is highlighted by the vast amounts of time and resources that are spent on individualized voir dire in capital cases. *Cf. Gideon*, 372 U.S. at 344 (noting that "reason and reflection" indicate the obvious need for appointed counsel because "[g]overnments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime.").

A juror who does not consider the evidence presented by the defendant during the punishment phase of trial, but instead automatically votes for death based on a finding of guilt, commits misconduct and violates the defendant's due process rights. *Morgan*, 504 U.S. at 735 ("[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law.").

**46**

**B. Juror Davis Automatically Voted for Death Based on Testimony During the Guilt/Innocence Phase Evidence**

Juror Davis was individually questioned on May 19, 2011. (22 RR at 150.) Davis was accepted by both sides to be seated as a juror in Hummel's trial. Along with the other jurors, he was sworn in on June 13, 2011, and took an oath that he would consider all evidence and pay close attention throughout the trial. (*Id.* at 10.) Additionally, the oath stated, "You must not be influenced in any degree by any personal feeling of sympathy for or prejudice against the State or the Defendant in this case, for each is entitled to the same fair and impartial consideration." (*Id.* at 13.) Juror Davis also stated several times throughout his individual voir dire that he would render a verdict based on the law and evidence of the case and set his feelings aside. (*See, e.g.*, *id.* at 162.)

During post-conviction habeas investigation, however, juror Davis revealed that he had not followed his promises to counsel or his oath. Davis met with a post-conviction investigator and discussed his participation in Hummel's trial. Davis revealed that he had not considered any of the evidence presented during the punishment phase of trial. Instead, Davis stated:

> The turning point for me was during the guilt phase when the woman Hummel had an affair with testified. At that point I made up my mind and decided Hummel should get the death penalty. There is nothing his attorneys could have said that would have made a difference to me.
> After deciding Hummel should get the death penalty, the rest of the trial felt like a formality. We answered the punishment phase questions, but my mind was already made up.

(Ex. 22 at ¶¶ 4-5 [Aff. of Juror Davis].)

In making these statements, Davis revealed that he had violated his oath, deciding Hummel's guilt and automatically assigning a death sentence before the conclusion of the prosecution's evidence at the guilt/innocence phase.

**47**

## C. Juror Davis's Misconduct Entitles Hummel to a New Trial

Juror Davis made his decision that Hummel was guilty and deserved a death sentence *prior* to the conclusion of evidence during the guilt/innocence phase. Therefore, his decision to find Hummel guilty was based solely on a partial presentation of the State's evidence. When Davis was sworn in at the beginning of the trial, he received the following instruction from the trial court: "Since you will need to consider all the evidence admitted by me, it is important that you pay close attention to the evidence as it's presented." (33 RR at 10-11.) The trial court further reminded jurors in the charge that "it is your sworn duty to follow all of the rules of law as I explain them to you." (4 CR at 709.) In several locations throughout the charge jurors were instructed on their duty to make a determination as to the defendant's guilt "after careful and impartial consideration of all the evidence in the case." (4 CR at 710, 717.) Juror Davis clearly disregarded all of these instructions when he determined Hummel's guilt prior to hearing all of the evidence in the case.

Jurors who prematurely decide guilt in a case reach conclusions most likely unfavorable to the defendant before the defense has a chance to present its case or the court has the opportunity to properly instruct the jury. When jurors form premature conclusions about a case, the burden of proof will have been, in effect, shifted from the State to the defendant, who then has "the burden of changing by evidence the opinion thus formed." *York*, 600 F.3d at 357 (quoting *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993). Therefore, requiring a juror to consider all of the evidence in the case prior to making a determination of guilt protects a defendant's Sixth Amendment right to a fair trial as well as his due process rights and insures the burden remains on the State to prove the case beyond a reasonable doubt.

34

**48**

Juror Davis's refusal to consider all evidence prior to making a determination of guilt denied Hummel the right to an impartial jury for the guilt/innocence phase.  As such, Hummel's conviction should be reversed and he should be afforded a new trial.

### D. Juror Davis's Misconduct Entitles Hummel to a New Punishment Phase

Independently, because Juror Davis's decision was made prior to the presentation of any evidence at the punishment phase, he was constitutionally impaired from being an impartial juror during the punishment phase. *Morgan*, 504 U.S. at 729 ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do").

Automatically voting for death after a finding of guilt essentially erases the State's burden to prove beyond a reasonable doubt that a defendant will be a continuing threat to society.  Further, it signifies that the juror has refused to consider any of the evidence presented during the punishment phase that might mitigate against a death sentence. *Skipper*, 476 U.S. at 4 (noting that a "sentencer may not refuse to consider" mitigation evidence).

As such, Hummel was denied his right to an impartial jury during the punishment phase of his trial. *Cf. Munroe v. State*, 637 S.W.2d 475, 478 (Tex. Crim. App. 1982) (recognizing that a defendant is denied a fair and impartial trial when a single juror increases punishment based on impermissible discussion of parole law); *Bennett v. State*, 738 S.W.2d 33, 34 (Tex. App.—Texarkana 1987, no pet.) (finding defendant was denied right to trial by impartial jury when evidence revealed that the jury determined sentence before hearing evidence on punishment).  Because of this, his sentence of death should be vacated.

**49**

## E. Conclusion

Juror Davis's decision to convict Hummel before the end of the guilt/innocence presentation, and his subsequent refusal to hold the State to their burden for the future dangerousness special issue or to consider mitigating evidence presented during the punishment phase of trial, violated the oath he took as a juror and denied Hummel his core constitutional right to twelve impartial jurors. *Parker v. Gladden*, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."). The presence of a juror who automatically assigned the death penalty violated Hummel's due process rights. *See Morgan*, 504 U.S. at 727 ("The failure to accord an accused a fair hearing violates even the minimal standards of due process."). Thus, Hummel's conviction and sentence are unconstitutional and cannot be carried out. *Id.* at 729 ("If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence."). His conviction and sentence of death should be reversed.

<div align="center">

## CLAIM TWO

## HUMMEL'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO ARGUE THAT THE STATE'S EVIDENCE WAS INSUFFICIENT TO SHOW FUTURE DANGER

</div>

The evidence presented by the State during the punishment phase regarding Hummel's potential for future acts of violence can only be described as marginal. Hummel had no criminal record and no history of disciplinary incidents while in custody before trial. The State failed even to present anecdotal evidence that Hummel had committed any type of aggressive or violent actions in his childhood, teenage years, or adult life, before the days leading up to the crime. The prosecution relied almost exclusively on the facts of the crime as aggravating

<div align="center">36</div>

**50**

evidence.   Yet, those facts were insufficient to suggest Hummel had any probability of committing violent acts in the future.

As such, the prosecution's evidence was legally insufficient for a jury to find beyond a reasonable doubt that there was a probability Hummel would be a future danger. *Jackson*, 443 U.S. at 316 ("no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."). However, neither trial nor appellate counsel argued this to the Court. Because counsel failed to argue that the evidence was insufficient, Hummel's rights were violated under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law.   His death sentence should be reversed.

### A. Relevant Facts

The prosecution's presentation at the punishment phase of trial regarding Hummel's likelihood of violence focused almost entirely on Hummel's actions surrounding the crime.   Kennedale Police Department investigator James Rizy testified that Hummel had attempted to poison his family two days before the crime occurred. (41 RR at 8-31.)  Besides the crime itself, this was the only act of violence or even attempt at violence the prosecution pointed to in Hummel's past. The remainder of the State's punishment case consisted of testimony regarding Hummel's trips to strip clubs and viewing of pornography, his use of marijuana and other drugs, and that Hummel was a below average employee. (*See* 42 RR at 5, 23, 72, 95, 109.)  In rebuttal to the defense's punishment presentation, the State called two military servicemen to testify that Hummel was a below average Marine, who was counseled for going to strip clubs and whose security clearance was revoked. (*See* 45 RR at 6, 32.)

**51**

In closing argument, the prosecution described Hummel as a "monster" and an "animal," stating that he was a future danger because of his attempt, and then murder of, his family. (45 RR at 59, 62-64, 85-87.)

## B. The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding That There Was a Probability That Hummel Would Commit Future Acts of Violence

Although the CCA has held that the facts of a particular crime and the circumstances surrounding it can support a finding of future dangerousness, it does not follow that the underlying facts alone in all cases will provide such support. *See, e.g., Valle v. State*, 109 S.W.3d 500, 503 (Tex. Crim. App. 2003). For example, in *Wallace v. State*, the defendant was found guilty of capital murder in the course of a robbery and sentenced to death. 618 S.W.2d 67, 68 (Tex. Crim. App. 1981). The State's only evidence regarding whether the defendant would commit future violent acts was the defendant's own admission on cross-examination that he had attempted a robbery a few weeks before the murder, and that the defendant had a military violation for being absent without leave. *Id.* at 68-69. According to the CCA, "[t]here was no other evidence presented that could be considered relevant to the issue of future violent conduct. Specifically, there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence." *Id.* at 69. The CCA found the evidence of future violent conduct to be legally insufficient, and reformed the defendant's punishment to life imprisonment. *Id.*

Similarly, in *Berry v. State*, the defendant was found guilty of murdering her infant son and sentenced to death. 233 S.W.3d 847, 850-51 (Tex. Crim. App. 2007). Evidence at punishment showed that Berry had abandoned one of her other children as well. *Id.* at 861. The State argued that because there was a possibility, albeit a slim one, that she could become pregnant in prison, she posed a danger to

any hypothetical future children. *Id.* at 862, 864. The CCA held that the evidence indicated that the defendant had only ever been dangerous to two of her children, and had not "harmed or attempted to harm any of her other children, an unrelated child, or any other person." *Id.* at 864. Because there was a very low probability she would have any more children, the Court found it unlikely that she would be a future danger, and reformed her sentence to one of life imprisonment. *Id.*

The fact patterns of *Wallace* and *Berry* mirror the evidence presented during Hummel's punishment phase. Besides the underlying crime itself, the only other evidence of violence the State introduced was Hummel's thwarted attempt to poison his family shortly before the murders. As in *Wallace*, "there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence" presented by the State. 618 S.W.2d at 69. The rest of the State's case at punishment consisted of testimony that Hummel frequented strip clubs, occasionally used illicit drugs, and looked at pornography on a computer at work. While these behaviors may not have painted Hummel in the most flattering light, these prior acts are legally insufficient to support a finding that there is a probability that Hummel would commit future acts of criminal violence. *See also Beltran v. State*, 728 S.W.2d 382, 390 (Tex. Crim. App. 1987) (defendant's multiple convictions for drunk driving were not criminal acts of violence and thus did not support a finding of future dangerousness); *Keeton v. State*, 724 S.W.2d 58, 60-61, 64 (Tex. Crim. App. 1987) (prior conviction for possession of marijuana and uncooperativeness during probation were not sufficient for a finding of future dangerousness); *Wallace*, 618 S.W. 2d at 68-69; *Warren v. State*, 562 S.W.2d 474, 477 (Tex. Crim. App. 1981) (a prior felony theft conviction was insufficient to sustain a finding of future dangerousness).

Further, Hummel was found guilty of killing his family, but this was the only violent or criminal act proved beyond a reasonable doubt before the jury.

39

**53**

Like the defendant in *Berry*, had Hummel received a sentence of life without parole there is no possibility he would have the opportunity to start a family, or undergo the familial and financial stressors he was experiencing at the time of the crime. (*See* Ex. 1 at ¶59 [Aff. of Dr. Susan Hardesty].) As such, *Berry* clearly establishes that a rational jury would have necessarily entertained a reasonable doubt as to whether Hummel was a future danger solely on the basis of his crime.

### C. Trial and Appellate Counsel Were Ineffective for Failing to Argue That The Evidence at Trial Was Legally Insufficient to Support the Jury's Finding of Future Dangerousness

Despite the lack of evidence of future dangerousness presented by the State, and the precedential cases of *Wallace* and *Berry*, neither trial counsel nor appellate counsel raised a claim that the State's evidence of future dangerousness was insufficient to support the jury's verdict. Counsels' failure to argue this point was objectively unreasonable. *Ex parte Santana*, 227 S.W.3d at 704-05 (noting that appellate counsel, like trial counsel, is held to a *Strickland* standard of professional responsibility). If "a rational jury would have necessarily entertained a reasonable doubt as to the probability of [an] appellant's dangerousness in the future," the trial court's judgment must be changed to one of life imprisonment. *Berry*, 233 S.W.3d at 860. Hummel's sentence should be vacated and reformed to life in prison, or remanded for a new punishment phase of trial.

### CLAIM THREE

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL WAS NOT A FUTURE DANGER

The first of two questions the Hummel jury had to answer following the punishment phase was "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." (CR at 726.) The State had the burden of proving beyond a reasonable doubt that the answer to this question was "Yes." (*Id.*) Trial counsel, however,

**54**

was ineffective for failing to present available evidence that would have convinced the jurors to answer this question "No," thereby guaranteeing a life sentence for Hummel. *See Jurek v. Texas*, 428 U.S. 262, 274-75 (1976) ("prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system."); ABA Guidelines, Guideline 10.11 (commentary), ("Studies show that 'future dangerousness is on the minds of most capital jurors, and is thus at issue in virtually all capital trials,' whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration." (internal quotation marks omitted)).

Counsel failed to present affirmative evidence in the form of lay witnesses, expert witnesses, jail records, and criminal background records that would have rebutted the State's assertion that Hummel was a "future danger." Trial counsel could and should have elicited testimony from several Officers at the Tarrant County Jail, who would have testified that Hummel was not classified as "High Risk," that Hummel got along with officers and other inmates, and that Hummel was not aggressive or threatening. Though counsel did present testimony from a prison classification expert, counsel also should have presented testimony from a behavioral or mental health expert to discuss how Hummel's personality and past history indicated that it was unlikely that he would commit future acts of criminal violence.

Trial counsel's failure to present evidence that would have convinced the jury that Hummel was not a future danger was objectively unreasonable and Hummel suffered prejudice. Because Hummel's rights under the state and Federal Constitutions, state statutory, and United States Supreme Court and state case law were violated, Hummel is entitled to a new punishment phase trial.

**55**

## A. Trial Counsel's Performance Was Unreasonable for Failing to Present Evidence That Hummel Was Not a Future Danger

During the punishment phase, trial counsel called Frank AuBuchon, a former Texas Department of Criminal Justice ("TDCJ") classifications officer, to educate the jury about the prison system in Texas, including how inmates were classified and the various security features of TDCJ prisons. (44 RR at 34, *passim*.) AuBuchon did not meet or interview Hummel, but testified in broad terms that Hummel would do well in the prison system based on his good behavior in county jail and his military record. (*Id.* at 73.) However, trial counsel did not admit any records relating to Hummel's time in the Tarrant County jail nor his time in the military.

The presentation of a prison classification expert alone, without any further evidence that Hummel as an individual would have not posed a danger in the future, fell short of offering relevant evidence to the jury's determination of the first special issue. The CCA has stated that the future danger special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). While it is "theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, . . . incapacitation is not the sole focus of the Legislature or of our death penalty precedents." *Id.* at 269. Thus, although AuBuchon could offer evidence that the TDCJ system would be able to minimize any risk of danger from Hummel, this testimony did little to address the more important question of whether there was any likelihood that Hummel posed a danger in the future. Instead, trial counsel should have presented readily available lay and witness testimony that would have addressed this question, as discussed below.

**56**

## B. Hummel Was Prejudiced by Trial Counsel's Failure to Present Readily Available Evidence That Hummel Would Not Constitute a Future Danger to Society

Had trial counsel thoroughly investigated the matter of whether Hummel was a future danger, counsel would have discovered several sheriff's officers at the Tarrant County jail who could have testified to Hummel's good behavior during his time in custody before and during trial. Additionally, trial counsel should have employed an expert witness to discuss why Hummel's past behavioral patterns and mental health status indicated that he would likely not be a future danger in a prison setting. Trial counsel's failure to investigate and present this evidence was unreasonable and objectively deficient.

### 1. Behavior in Tarrant County Jail

Inmates who have had disciplinary problems during previous periods of incarceration are more likely to commit future acts of criminal violence in prison. *See* Mark D. Cunningham et al., *Serious Assaults on Prison Staff*, 39 J. CRIM. JUSTICE 143, 147 (2011). Common sense suggests the opposite then to be true. As such, trial counsel should have presented testimony from witnesses with personal knowledge of Hummel's good behavior in the Tarrant County jail, as well as jail records that confirm the same.

New inmates are sorted into classifications upon arrival at the Tarrant County jail according to their respective risk level. (Ex. 20 at ¶2 [Aff. of Tommy Rigmaiden].) "High Risk" inmates wear red uniforms and general population (or low risk) inmates wear green uniforms. (Ex. 26 at 6 [Tarrant County Jail Dress Code Policy]; Ex. 20 at ¶¶2-4 [Aff. of Rigmaiden].) Inmates are classified as "High Risk" if they are deemed to be assaultive, an escape risk, or high profile due to the nature of the charges or the inmate's community status. (Ex. 27 at 5-6 [Tarrant County Jail Risk Policy].) Any time a "High Risk" inmate leaves their cell, they are placed in handcuffs and leg irons and accompanied by two officers.

**57**

(Ex. 27 at 6 [Tarrant County Risk Policy]; Ex. 20 at ¶3 [Aff. of Rigmaiden].)  Low risk inmates are not restrained outside their cells and are only accompanied by one officer.  (Ex. 20 at ¶4 [Aff. of Rigmaiden]; Ex. 4 at ¶6 [Aff. of Cody Bell].)  Low risk inmates are functionally equivalent to a general population inmate in a state prison setting.  (Ex. 20 at ¶4 [Aff. of Rigmaiden].)

Hummel was not categorized as a "High Risk" inmate during his incarceration at Tarrant County jail.  Detention Officer Tommy Rigmaiden, of the Tarrant County Sheriff's Office, remembers Hummel wore a green suit for the period of time before and during his trial.[3]  (Ex. 20 at ¶5 [Aff. of Rigmaiden].)  Tarrant County Sheriff's Officer Cody Bell also would have testified that, as a low profile and low risk inmate, Hummel wore a green suit.  (Ex. 4 at ¶6 [Aff. of Bell].)

Tarrant County Sheriff's officers also would have testified that Hummel was quiet and respectful in his interactions with jail staff.  Officer Rigmaiden saw Hummel in the jail every day for a two-year period, remembering him as "quiet and reserved."  (Ex. 20 at ¶6 [Aff. of Rigmaiden].)  Officer Bell reported that every time he interacted with Hummel, Hummel was pleasant and outgoing.  (Ex. 4 at ¶3 [Aff. of Bell].)  Hummel and Officer Bell shared a more personal connection, as they both had served in the military.  *Id.*  Occasionally the two would talk about their experiences in boot camp, and the mental and physical rigors of military service.  *Id.*  Tarrant County Sheriff's Officer Rory Thomas would have testified that Hummel was quiet, speaking only to the officers when he needed something and otherwise would not bother anyone.  (Ex. 21 at ¶4 [Aff. of Rory Thomas].)

---

[3]  In Tarrant County, after an inmate receives a death sentence, they are automatically classified as "High Risk" regardless of prior classification.  (Ex. 27 at 6 [Tarrant County Risk Policy].)

**58**

Most importantly, officers from the Tarrant County jail would have testified that Hummel was never a threat to officers, jail staff, or other inmates. Hummel never gave officers any problems or trouble and was very compliant with the jail rules, as evidenced by Hummel's lack of any disciplinary infractions during his pretrial and trial incarceration in Tarrant County. (Ex. 4 at ¶4 [Aff. of Bell]; Ex. 20 at ¶8 [Aff. of Rigmaiden]; Ex. 21 at ¶3 [Aff. of Thomas]; Ex. 28 at 2 [Tarrant County Sheriff's Office Letter].) Hummel was not assaultive or aggressive towards officers or other inmates, and he got along well with other inmates. (Ex. 4 at ¶¶4, 7 [Aff. of Bell]; Ex. 20 at ¶9 [Aff. of Rigmaiden]; Ex. 21 at ¶5 [Aff. of Thomas].) Several officers would have testified that they believed there was no danger that Hummel would be violent in prison in the future, and that he would have adjusted well to a general population setting in prison. (Ex. 4 at ¶8 [Aff. of Bell]; Ex. 20 at ¶9 [Aff. of Rigmaiden].)

This testimony would have provided the jury with highly persuasive evidence that Hummel was not likely to be a future danger if sentenced to a term of life without the possibility of parole. Hummel had no history of violent or criminal actions prior to this crime, and similarly had no disciplinary problems while in jail custody awaiting his trial. In making the claim that Hummel was a future danger, the State argued that if he could kill his family, he could do anything if given the chance in prison. (*See* 45 RR at 86.) However, this assertion is contradicted by the two years Hummel spent in a general population jail setting. Classified as a low risk inmate, Hummel was subject to less stringent security controls and had greater access to other inmates. Yet, in two years of custody, Hummel did not have a single disciplinary infraction and was described as "a model inmate," never behaving aggressively or engaging in assaultive behavior. There is a reasonable probability that, with this testimony, Hummel's jury would have voted "No" to the first special issue resulting in a life sentence.

**59**

## 2. Mental Health Expert

Because expert witness testimony is one of the most powerful tools an attorney can use to present their case, trial counsel should have presented a mental health expert to explain how Hummel's past patterns of behavior and mental status did not support a finding that he would be a future danger. *See Coble*, 330 S.W.3d at 268. Had trial counsel retained such an expert, such as Dr. Susan Hardesty (*see* Claim Seven, *post*), the following testimony could have been presented.

There are several factors to indicate that there is a low risk of Hummel committing future acts of violence in a prison setting. Hummel did not have a significant history of violence prior to the crime, and his coping mechanism for significant stressors was passive acceptance, denial, and retreat into fantasy games, movies or books. In a prison setting, Hummel would be unlikely to encounter the severe stressors that plagued him prior to the crime, namely familial and financial stress. For the rest of his life, Hummel would be in a contained, restricted environment in which his primary needs would be met, but he would not encounter relational and attachment issues. (Ex. 1 at ¶59 [Aff. of Dr. Hardesty].)

Testimony from an expert would have provided particularly credible evidence to the jury regarding Hummel's likelihood of future acts of violence. *Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) ("An appellant's potential for being a future danger is a question of fact which the jury must answer. Furthermore, this Court has previously recognized that testimony from mental health experts is relevant to that issue." (internal citation omitted)). Trial counsel's failure to provide such testimony to the jury prejudiced Hummel's trial.

## C. Conclusion

If jurors had heard testimony from the three Tarrant County sheriff's officers and an expert witness, as discussed above, there is a reasonable probability that at least one juror would not have found Hummel to be a future danger. Testimony

**60**

from officers who personally supervised Hummel during his time in jail would have been highly persuasive. Moreover, testimony from an expert witness explaining why Hummel's personality, behavior patterns and mental health made it unlikely Hummel would be a future danger would have been invaluable in convincing a jury to vote "No" on the first special issue.

Trial counsel's failure to present testimony from corrections officers and a mental health expert constituted deficient performance that was not reasonable under prevailing professional norms. *See Williams*, 529 U.S. at 395-96 (counsel ineffective for failing to uncover and present evidence of, inter alia, defendant's good conduct in prison); ABA Guidelines, Guideline 10.11 (commentary) (citing *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) as holding that "evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does 'not relate specifically to petitioner's culpability for the crime he committed.'"). Because there is a reasonable probability that at least one juror would have found the information presented through these witnesses negated the State's theory that Hummel would present a continuing threat to society, Hummel is entitled to a new punishment phase. *See Wiggins*, 539 U.S. at 536.

## CLAIM FOUR

## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT EXPERT TESTIMONY REGARDING HUMMEL'S LIFE HISTORY

During the punishment phase, trial counsel presented testimony from lay witnesses about Hummel's childhood in South Carolina. As discovered in post-conviction investigation, trial counsel could and should have presented a complete narrative of Hummel's life, including testimony from lay witnesses about other periods in Hummel's life. (*See* Claim Five, *post.*) Further, however, trial counsel failed to present an expert witness to explain the full narrative of Hummel's life

**61**

story. Such an expert could have drawn connections for the jury between the life events Hummel experienced and the behaviors he later exhibited. Under applicable professional norms for capital counsel, trial counsel's failure to hire such an expert constitutes deficient performance. *See Strickland*, 466 U.S. at 688; ABA Guidelines, Guideline 10.11(F)(2) (retaining a social historian can facilitate compliance with the requirement in the ABA Guidelines of presenting "insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability."); *see also* ABA Supplementary Guidelines for the Mitigation Function of Defense Team in Death Penalty Cases, Guideline 10.11, 36 HOFSTRA L. REV. 677, 689-90 (2008) (hereinafter "ABA Supplementary Guidelines"). This failure prejudiced Hummel's applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Legal Standard

Since *Wiggins v. Smith*, defense attorneys in capital cases have been on notice as to the necessity of performing a wide-ranging investigation into their client's life history. 539 U.S. at 510. Defense attorneys now regularly retain mitigation specialists as part of the defense team, who review records and meet with witnesses, gathering and weaving the bare facts of the client's life into a compelling narrative. ABA Guidelines, Guideline 10.7 (commentary) (noting that a "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); ABA Supplementary Guidelines, Guideline 10.4(A) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

**62**

However, it is not enough to simply gather the facts of a defendant's life story and then present it through lay witness testimony. An expert should also be retained to synthesize that information into a coherent psycho-social narrative for presentation to the jury. *See* ABA Guidelines, Guideline 10.11 (commentary) (noting the importance of presenting "the client's complete social history" at punishment); *see also* ABA Supplementary Guidelines, Guideline 10.11. Such an expert then uses their particularized expertise relevant to the defendant to present the social history developed by a mitigation specialist in a cohesive narrative. John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4, 10 (Aug. 1995) ("[P]ersuasive expert testimony must . . . enable the jury to see the world from your client's perspective, i.e., to appreciate his subjective experience.").

Like any subject matter that warrants an expert opinion, here, the defendant's life story must be explained to the jury in a way that illuminates why it is relevant to moral culpability. It is not sufficient to present a parade of witnesses discussing the defendant's history—an expert must also be hired to give that life history context.

> . . . In other words, you have to give the fact-finder a view of the crime from the defendant's perspective. If you don't, you run the risk of making your client seem "otherly," frightening and thus expendable. What you strive for is to enable the fact-finder to look through your client's eyes and to walk, at least for a few minutes, in his shoes.

*Id.*

**63**

### B. Counsel Should Have Presented the Testimony of an Expert to Explain Hummel's Social History

In Hummel's case, trial counsel were clearly aware of the importance of utilizing expert witness testimony, as they presented an expert to speak to Hummel's mental health (*but see* Claim Seven, *post*), as well as an expert to discuss the prison classification system. (*See* 44 RR at 34-116.) Had counsel similarly performed a sufficient investigation and presentation of Hummel's social history, they would have been able to retain the services of a social history expert witness, such as social worker Laura Smith.

Ms. Smith received her Masters of Science in Social Work from the University of Texas at Austin and is currently employed by the Travis County Health and Human Services division. In her position she supervises a team of social workers who provide support services to families at various community centers operated by Travis County. She has over a decade of experience providing counseling and care to incarcerated individuals and their families, as well as to at-risk youths. She holds an Advanced Practitioner license from the Texas State Board of Social Worker Examiners and is an adjunct faculty member at the University of Texas at Austin. (Ex. 2 at ¶¶1-3 [Aff. of Laura Smith].)

If Ms. Smith had been consulted by Hummel's trial counsel, she could have provided an explanation to the jury of how Hummel's life history shaped the person he became later in life. As Ms. Smith explains, "All of us are a product of our life experiences and social history. To understand how a person comes to take certain actions in life, one must look at what elements of his life were brought to bear on that decision. Often what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past." (Ex. 2 at ¶8 [Aff. of Laura Smith].)

**64**

Particularly, after reviewing testimony and affidavits provided by those closest to Hummel, as well as his various medical, educational, and military records, Ms. Smith would have explained how Hummel's early development started him down a path resulting in Hummel being "nearly incapable of forming close and intimate relationships" and "leading to a total inability to manage multiple stressors such as loss of income, multiple medical illnesses, and emotional stress/fatigue." (Ex. 2 at ¶9 [Aff. of Laura Smith].) Beyond merely a medical diagnosis that portrayed Hummel as having negative and dangerous traits (*see* Claim Seven, *post*), the jury would have learned the following about Hummel's development as a child and how the resulting impairments rose to the surface throughout his life.

### 1. Childhood

#### a. Early Childhood Development

Hummel's parents did not provide a stable, supportive environment in Hummel's early childhood. His father was abusive and overly obsessed with guns and violence. His mother was also not a nurturing figure, showing greater interest in her own life and friends, rather than her children. Hummel lacked much of the love and concern one would expect from parental figures. To a large degree, he was cared for and raised by his sister, who was only nine years older than he. However, as a child herself, Neata was incapable of providing for the physical and emotional needs of a baby. (Ex. 2 at ¶¶10-13 [Aff. of Laura Smith].) The lack of this nurturing was fundamentally damaging to Hummel's development as a person. Ms. Smith notes:

> Erik Erikson's widely accepted theory of "identity development" posits that there are eight stages an individual goes through during their development. At each stage, there is a critical conflict, which requires a healthy resolution to create a new quality in self. For example, at infancy, the crisis is trust versus mistrust. A baby cries and, if its needs are attended to and it is nurtured, the baby leaves the

51

**65**

> stage of infancy having developed a sense of trust in its caregivers and
> in the world. If the baby is neglected, or needs are ignored, the baby
> moves into toddlerhood with a sense of fear and mistrust of caregivers
> and the world at large. Erikson's research suggests that trust and
> identity formation are the key ingredients to a healthy development of
> self and identity.

(*Id.* at ¶8.)  In Hummel's case, he did not experience the attachments to his
parental figures that would have allowed him to form feelings of trust and a secure
self and identity.  Hummel's uncle, another substitute caregiver in his early life,
witnessed Hummel's lack of social development.  Hummel appeared to be afraid to
interact with others and afraid of failing in front of people.  Empirical evidence
shows "that children who do not securely attach with an adult early in their social
development grow up to experience attachment problems in adulthood, especially
an extreme sensitivity to rejection." (*Id.* at ¶¶17-18, 21.)

The consistent theme heard from family and friends who knew the Hummels
was that the household lacked the normal displays of affection and love.
Underneath the family's façade of normalcy was an apparent lack of care and
concern for Hummel and his sister.  Hummel's "needs were not consistently met,
and . . . [a]ppropriate caring relationships were not modeled."  Attachment theory
states that infants "grieve and mourn when an appropriate maternal attachment is
not formed."  The lack of parental care, replaced by substitute caregivers, meant
that Hummel lacked a "'blueprint' for how to create intimacy and close
relationships."  Hummel, therefore, "never formed appropriate love relationships
or became capable of adult attachments," deficits which had "serious impacts on
his ability to form relationships throughout the rest of his life and his ability to
relate and empathize with others." (Ex. 2 at ¶¶18-23 [Aff. of Laura Smith].)

Moreover, Hummel's exposure to abuse further impaired his development
and put him at risk for serious psychiatric disorders.  In addition to impacting brain

**66**

development physically, studies show that "80% of adults who had been physically abused as children met the diagnostic criteria for at least one psychiatric disorder by age 21." Such disorders include depression and posttraumatic stress disorder. Also, "[a] child's exposure to overly mature sexual content or a child's direct experience with sexual abuse can interrupt attachment patterns as well as create disturbances in the creation of a true identity or sense of self. . . . According to a National Institute of Justice study, abused and neglected children were 11 times more likely to be arrested for criminal behavior as a juvenile, 2.7 times more likely to be arrested for violent and criminal behavior as an adult, and 3.1 times more likely to be arrested for one of many forms of violent crime." (Ex. 2 at ¶¶30-31 [Aff. of Laura Smith].)

### b. Formative Years – Child to Young Adult

As he grew up, Hummel's developmental impairments frustrated his ability to attach to others. He physically isolated himself from others and did his best to avoid attention. Despite his efforts, he was frequently teased and bullied by classmates. Because of a learning disability, he struggled to do well in school. When he did make friends, Hummel had trouble appropriately interacting with his peers. He would interrupt conversations with random, immature comments and believe comments he made were funny even if no one else understood them. (Ex. 2 at ¶¶32-40 [Aff. of Laura Smith].)

"Because [Hummel] never formed secure attachments, he also never formed a solid sense of self. Identity is built around emotional development and relationships with others." Based on Erikson's theory of psychosocial development, from age six to eleven Hummel should have been negotiating a crisis of "Industry versus Inferiority." "If a child succeeds academically, feels competent and supported, they exit this stage in a state of Industry." Instead, Hummel,

**67**

"entered pre-adolescence in a state of total inferiority without social supports or parental love and connection." (Ex. 2 at ¶43 [Aff. of Laura Smith].)

These deficits compounded as Hummel entered his teenage years. "A young person successfully navigates adolescence by establishing an identity—defined by individuation and unique qualities, but also by connection to groups and associations with others—therefore entering adulthood with a solid sense of self. A young person not completing this stage successfully . . . enters adulthood confused, extremely sensitive to rejection, and with a weak or non-existent sense of self." Hummel's inability to attach appropriately to others and his feelings of inferiority led him to be easily influenced by his peers. Friends were able to manipulate Hummel and take advantage of a clear desire on his part to have more meaningful relationships. As a result of Hummel's eagerness to please others, his peers came to have "widely disparate impressions" of him. Hummel himself failed to develop a clear sense of his own identity. (Ex. 2 at ¶¶41-42, 44-45 [Aff. of Laura Smith].)

Although Hummel "instinctually kept trying to reach out and connect," all he received in return was "continuous abuse, neglect, bullying, or confusion." This desire to connect but inability to succeed was likely "extremely frustrating" and "potentially rage building." (Ex. 2 at ¶46 [Aff. of Laura Smith].)

### c. Teenage Years

Leading into Hummel's teen years, this lack of attachment and absence of clear identity led Hummel to seek alternate fulfillment and means of escape from his reality. Hummel became absorbed with movies, video games, and especially role-playing games like Dungeons and Dragons. In these games, Hummel created characters that had special abilities and who could interact with other fictional characters. (Ex. 2 at ¶¶47-48 [Aff. of Laura Smith].)

However, Hummel exhibited his psychological impairments in the way he played these games. While most players would create one character at a time,

**68**

Hummel had several. Hummel would constantly change aspects of his characters, mimicking the attributes of his friends' characters. Hummel would also consistently be forced to abandon his characters and create new ones because his characters had become too complex for his own abilities to play them. (Ex. 2 at ¶¶49-50 [Aff. of Laura Smith].)

Hummel's reliance on these games for escape meant that he had difficulty putting the games down, often attempting to play when his friends wanted a break or at inappropriate times. He would also reminisce afterwards about games they had played. Hummel did not seem to always know the line between reality and fantasy. (Ex. 2 ¶¶51-52 [Aff. of Laura Smith].)

This blurring of reality and fantasy came to bear on the one significant romantic relationship Hummel experienced during high school. Before ever having a date, Hummel told a girl he loved her. Hummel became overly attached both to her and her family, spending weekends and holidays with them. Yet, as his girlfriend began to pull away, Hummel continued to believe they would stay together and ultimately get married. When the girlfriend ended the relationship, Hummel was completely surprised and hurt. (Ex. 2 at ¶¶53-55 [Aff. of Laura Smith].)

As Hummel ended his young adult years, graduating from high school and entering the adult world, he was left with "feelings of rejection and failure and an urge to escape." These feelings "only further served to limit his social skills and keep him disconnected from others." The impacts of the psychological impairments Hummel experienced as he grew up became a "self-fulfilling prophecy—his fears of not being able to connect and therefore being rejected, led to his odd behavior, bullying, and a further and further sense of isolation." (Ex. 2 at ¶56 [Aff. of Laura Smith].)

55

**69**

## 2. Adulthood

Hummel's entrance into the adult world brought with it all the feelings of isolation, rejection, and failure he had experienced as a child, but with the addition of a new found responsibility to react to those feelings. At first, Hummel enjoyed a brief success—living in his own apartment with a steady job at a music company's warehouse. However, Hummel struggled to live independently and pay his bills. When his apartment was broken into, his parents insisted that he return back home to live with them. (Ex. 2 at ¶¶57-59 [Aff. of Laura Smith].)

Rather than return to his parents, however, Hummel chose what his friends saw as an impulsive and surprising alternative, joining the United States Marine Corps. Leaving his family and friends behind, Hummel essentially "wiped the board clean" of his life and escaped to a completely new identity as a Marine. This action completed the cycle that would become a fixture in Hummel's adult life: a brief period of success followed by a recurrence of his childhood feelings of failure, rejection, and a desire to escape, to which Hummel would react by impulsively and dramatically fleeing from the source of these feelings. (Ex. 2 at ¶¶60, 114 [Aff. of Laura Smith].)

### a. Military Service

Upon entering the military, Hummel initially thrived both in his duties and in his personal connections. He was based in Oceanside, California, and was selected for the intelligence division, where he worked on strategy and planning war games. He made three close friends, with whom he spent most of his days and weekends. Hummel formed a new identity with these other men, adopting their mannerisms, dress, and even tattoos. His friends noted how, like them, he seemed to be starting a new life in the military. And when on leave and back in South Carolina, his friends there saw a change in Hummel, who was more physically fit, happy, and proud. (Ex. 2 at ¶¶61-65, 70 [Aff. of Laura Smith].)

**70**

However, Hummel carried with him to the military his interest in fantasy games and problems separating reality from fiction. Through his new friends, he began frequenting strip clubs. His friends remember Hummel spending his free time at the clubs, getting to know the staff and strippers, and even acting as though he had personal relationships with the women. And in his intelligence duties, he was given sensitive information and made maps and plans that reminded him of his role-playing games. Even to outside observers Hummel appeared to be dodging real life. (Ex. 2 at ¶¶66-68 [Aff. of Laura Smith].)

Consistent with his life pattern, Hummel's success in the military began to decline and was replaced by rejection, failure, and isolation. Over time, Hummel had gained significant weight and was less physically fit. In the Marines, this both made him the target of ridicule and prevented his promotion. Then, in the early part of 2000, Hummel's three friends were transferred or discharged from the military. This meant that he lost his closest friends and the support network they created for him. As Hummel struggled to adapt to this loss, his feelings of failure returned. He briefly went absent without leave ("AWOL") and, though he returned to the base, he was stripped of his security clearance and lost his intelligence job. (Ex. 2 at ¶¶72-78 [Aff. of Laura Smith].)

The loss of Hummel's friends was significant, "especially since he had struggled so much to form any meaningful relationships at all and had finally felt he was competent and successful, proud and happy—only to have it all start to unravel." The loss was "compounded to an even greater degree as [Hummel] lost his intelligence job and security clearance, knew his superiors were disappointed in him and felt they could not trust him, and was relegated to mundane work." Hummel finished his military service having lost the sense of pride he once felt and instead again "feeling a very strong sense of rejection and failure." (Ex. 2 at ¶¶77, 79, 83 [Aff. of Laura Smith].)

**71**

### b. Return to South Carolina

As he was leaving the military, Hummel met a group of homeless youth in his trips to strip clubs. Again attempting to form connections, Hummel would buy these individuals food and hotel rooms to sleep in. He began a relationship with one young woman name Letti Ulbright, who was pregnant. When Hummel returned to South Carolina and was discharged, he took Letti with him and started a new identity. "They were like a family" and this "represented a new life for [Hummel], a new chance at success." Hummel was now "in the role of 'man of the house' and trying to do the right thing by a woman in need, even though he was not the baby's father." It was "another attempt by [Hummel] at connection and an effort at being in the role he thought he was supposed to have." (Ex. 2 at ¶¶80-85 [Aff. of Laura Smith].)

However, once again Hummel's brief success turned to failure and his "attachments and relationships were severed." After Ulbright gave birth, Hummel's sister Neata orchestrated sending Ulbright back to California, supposedly because Ulbright was not good for Hummel. "Neata's involvement in orchestrating [Ulbright]'s departure shows her role as more of a maternal than sibling figure to [Hummel], and also demonstrates an over-involvement and inappropriate role with [Hummel]. The episode would have further cemented [Hummel]'s negative experience with family attachments, creating hostility and sensitivity. It also continued a pattern that led [Hummel] to desire escape from his current life situation." (Ex. 2 ¶87 [Aff. of Laura Smith].)

In the absence of Ulbright, Hummel drifted, looking for a way to escape. He took temporary jobs, continued visiting strip clubs, and began drinking and smoking heavily. His high school friends noted how Hummel acted like the strippers were his girlfriends and that he seemed to be living in a fantasy world. Hummel stopped hanging out with his friends and eventually moved to Texas

**72**

without telling many people where he was going. (Ex. 2 at ¶¶88-96 [Aff. of Laura Smith.])

By this point in Hummel's adult life, Erickson's theory of development would suggest he was struggling with the crisis of Intimacy versus Isolation. Hummel's inability to form real, lasting relationships drove him further into isolation. "Once again, when faced with failure and his own inability to live independently in relationship to others, [Hummel] 'wiped the board clean,' abandoning all his friendships and moving away unexpectedly. This impulsive conduct fell squarely within the patterns of behavior [Hummel] had developed over the course of his life whereby he reacted to stress by escaping and attempting to start a new life, a new identity, functionally a 'new game.'" (Ex. 2 at ¶97 [Aff. of Laura Smith].)

### c. Texas

Shortly after moving to Texas, Hummel began a relationship with Joy Bedford. The relationship moved quickly, with Joy becoming pregnant and the couple marrying only a few months into the relationship. Hummel got a job at a clothing manufacturer's warehouse and his daughter Jodi was born less than a year after he had moved to Texas. Despite the rapidity with which Hummel adopted his new life as father and husband, Hummel experienced one of his longest episodes of success over the next year. (Ex. 2 at ¶¶98-99 [Aff. of Laura Smith].)

However, like all prior episodes of success, this too began to crumble. While working at the warehouse, Hummel tripped over a box and injured his back, requiring multiple surgeries. Over the next several years, Hummel was unable to work, suffering severe back pain, a diagnosis of Crohn's disease[4], and multiple

---

[4] Chron's disease is "a type of inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. John's case was severe enough to warrant surgery: an upper duodenal resection. The surgery

**73**

medical procedures. Hummel's family suffered financially. They depended on help from friends and eventually moved into Joy's father's house. Hummel's marriage soured, with Hummel again feeling like a failure as he received pressure from his wife and father-in-law to provide for his family. Although Hummel was eventually able to return to work after four years of severe medical problems, the work was menial and did little to improve his family's financial situation. (Ex. 2 at ¶¶99-105 [Aff. of Laura Smith].)

Again Hummel fixated on a desire to escape. He briefly entered a romantic relationship with Kristi Freeze, a clerk he met at a convenience store. Like his previous romantic relationships, though, Hummel believed the relationship was serious just as Freeze was ending the relationship. Their relationship, which Hummel perceived as an escape from his real life, ended shortly before the crime. Following the crime, Hummel took a further act of disconnection and escape, driving back to California, the place he had experienced his closest connections and greatest success. (Ex. 2 at ¶¶106-10 [Aff. of Laura Smith].)

## C. The Failure to Present an Expert to Explain Hummel's Social History Prejudiced His Trial

Trial counsel's failure to present the testimony of an expert witness like Laura Smith prejudiced Hummel's capital trial by failing to explain to the jury why his life story mitigated his actions. At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability. Moral culpability acknowledges an elementary psychological reality—

---

involved removing a part of the bowel and reconnecting the remaining pieces. This type of surgery is debilitating due to the fact that there is a period when one cannot eat and then a slow advancing of diet. Typically, a single abdominal surgery of this kind requires a minimum of six months of recovery time to return to full functioning. Multiple surgeries take proportionately longer for a person to feel fully well." (Ex. 1 at ¶30 [Aff. of Dr. Hardesty].)

**74**

that people do not arrive at their choices from the same path. Thus, it follows that the degree of "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice. Indeed, mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added). Thus, a jury's understanding of the evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense. Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION (Aug. 1985) ("[E]xplain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime.").

Had Ms. Smith testified, the jury would have learned that "Hummel's life has been deeply impaired by the lack of appropriate nurturing and attachment he experienced as a child." In Ms. Smith's opinion:

> This lack of attachment impacted the way [Hummel] relates to the world and how he acts in it. As a child [Hummel] spent most of his time isolated and alone, and was neglected emotionally by his parents, thereby making it nearly impossible to learn how to form relationships with other people, outside of fantasy games. As a result, [Hummel] is unable to solve problems in real life versus escaping to fantasy. He has a tendency to run away or disappear when things get difficult, without a clear understanding of what the consequences might be for those actions.

(Ex. 2 at ¶¶111-12 [Aff. of Laura Smith].) Hummel's experiences in joining the military, during his military service, his relationships in South Carolina, his move to Texas, and his life in Texas illustrate the pattern Hummel's life took: brief success, then failure, and, because he cannot cope or adapt to his problems, an overwhelming desire to escape. (Ex. 2 at ¶¶113-14 [Aff. of Laura Smith].)

61

**75**

Without this testimony, Hummel's jury was not given all the necessary tools to understand the impact of his social history on his behaviors and his moral culpability. Although some facts regarding Hummel's life were presented in the form of lay witness testimony, expert testimony was vital to explain how the jury should understand and interpret those facts. *See Walbey v. Quarterman*, 309 Fed. Appx. 795, 802 (5th Cir. 2009) (unpublished) ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original). Had such an expert been presented, there is a reasonable probability that the outcome of Hummel's trial would have been different. *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

## CLAIM FIVE

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT RELEVANT LAY WITNESSES

It is well-established that, in preparation for the punishment phase of a capital trial, counsel must conduct "extensive and generally unparalleled investigation into personal and family history." ABA Guidelines, Guideline 10.7 (commentary); *see* Texas Guidelines, Guideline 11.1(A)(3)(b), ("The investigation for the punishment phase of the trial should generally encompass . . . development of character witnesses and family background evidence."); *see Wiggins*, 539 U.S. at 510.

Hummel's trial counsel investigated Hummel's early childhood and relationships with his immediate family members. Counsel's investigation, however, was narrowly focused on suspicions that Hummel was sexually abused. Proof of such abuse did not materialize, and counsel did not rigorously pursue other avenues of mitigation evidence. As a result, Hummel's counsel was only

**76**

able to present the testimony of his sister, two ex-girlfriends, two teachers, and four family friends.    The testimony elicited from these witnesses primarily described the household Hummel grew up in.

Lacking from their presentation was testimony about the remainder of Hummel's life: his educational and social struggles as an adolescent, his obsessive escapes into fantasy role-playing games as a teenager, his transition to adulthood, his mainly successful experience in the military, his difficult transition back to civilian life, and the physical ailments and financial stressors he experienced in the years before the crime.

This broad narrative of Hummel's life is exactly the result envisioned by the rigorous, sweeping investigation required of capital trial counsel.    *See* ABA Supplementary Guidelines, Guideline 10.4 ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").    Trial counsel's failure to fully investigate Hummel's life meant that significant areas of mitigating evidence were never uncovered.  Had counsel presented lay witnesses from throughout Hummel's life, the jury would have heard a more comprehensive and compelling story of how Hummel became the person he was as an adult.  Blum, *Investigation in a Capital Case*, at 27 ("[E]xplain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime.").

Because the jury was not given all the relevant mitigating information available about Hummel, it was denied the opportunity to properly weigh whether Hummel was deserving of life without parole.  *Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have

63

**77**

struck a different balance."). Thus, trial counsel's ineffective assistance prejudiced Hummel's applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law. Hummel's conviction and sentence of death should be reversed.

## A. Trial Counsel Failed to Identify and Present Lay Witness Testimony Regarding Hummel's Complete Life Story

During trial counsel's investigation of Hummel's life, their focus quickly centered on Hummel's immediate family and his early childhood years in South Carolina. Their questions of potential witnesses focused on searching for information about possible physical and sexual abuse they believed had occurred within the Hummel family. (Ex. 15 at ¶5 [Aff. of Pack].) Even when interviewing witness who would have other relevant information about Hummel, trial counsel kept their focus on his immediate family. (Ex. 12 at ¶21 [Aff. of Hamilton].) Yet counsel's investigation never uncovered the information they suspected existed.[5]

Had counsel fully investigated, they would have discovered many witnesses who were available to testify about Hummel's life in South Carolina, his service in the military, and his life following his honorable discharge from the military. Further, counsel would have discovered that many of the witnesses they called to testify (all from South Carolina) had more information to provide about Hummel's life. As laid out in the statement of facts above, and as discussed in Claim Four,

---

[5] Counsel uncovered suggestions that Hummel's sister had been sexually abused by their father, and the suspicion that Neata had then sexually abused Hummel. However, counsel failed to elicit any such information from Neata on the witness stand. Counsel failed to directly ask Neata these questions, which might have yielded results, given that at least one person heard her admit in the courthouse hallway that she had been sexually abused by her father. (Ex. 18 at ¶15 [Aff. of Derrick Parris].) Unfortunately, since her testimony, Neata has refused to speak with post-conviction counsel. Trial counsel's failure to ask Neata about the suspicions that formed the main basis of their mitigation theme was prejudicial deficient performance.

*ante*, Hummel's life story showed a pattern of attachment problems, social failure, and resulting escapism. The witnesses available to counsel, had they done a thorough investigation, would have been instrumental in providing that narrative.

### 1. Witnesses Available to Testify

#### a. South Carolina

Even though counsel focused their mitigation presentation on Hummel's early childhood and life in South Carolina, they failed to present a key member of Hummel's family who could have shed light on that theme. Hummel's uncle Thomas Hamilton had been contacted by defense counsel, but was only asked for names of other people to interview. Yet, Hamilton was willing to testify how he had taken care of Hummel when he was a child, and that Hummel's parents were more wrapped up in their own lives and failed to nurture Hummel. Hamilton could have given the jury a window into the abuse he and Hummel's mother had witnessed and suffered themselves as children, as well as the neglect Hummel later suffered from his mother and father. Hamilton's testimony would have provided the jury a first-hand account of how Hummel's early childhood stunted his development and social skills. (Ex. 12 at ¶¶2-16 [Aff. of Hamilton].)

Next, despite counsel's investigation in South Carolina, their focus on Hummel's immediate family caused them to ignore several key witnesses who were close to Hummel in his youth and who would have testified about his teenage and adult years. For example, Brian Jeter and Joseph "JoJo" Patterson were two of Hummel's first friends he was ever close to. Jeter and Patterson would come over to the Hummel farm and help out. Like Hummel, Jeter lived out in the countryside, so he knew what it was like to grow up isolated from the rest of kids that lived in town. (Ex. 13 at ¶¶2, 5, 6 [Aff. of Jeter]; Ex. 19 at ¶¶2, 6 [Aff. of Patterson].)

**79**

Jeter, Patterson, and Hummel spent much of their early high school years together. They ate lunch together every day at school and went skating on the weekends. As such, Jeter and Patterson had a unique perspective to offer the jury about Hummel's early teenage years, such as how he first interacted with friends and what his personality was like. They would have been able to share with the jury how Hummel was quiet, but could be the "class clown." Patterson remembers how Hummel would act goofy in classes. Both recall that Hummel became athletic as he spent time around them, joining them in playing pick-up games of football and basketball. This testimony would have given the jury a first glimpse at Hummel's attempts to form relationships with fellow students, including what would become his habit of taking on the behaviors of those he was around. Both were willing to testify, but neither were contacted by trial counsel. (Ex. 13 at ¶¶2-4, 7 [Aff. of Jeter]; Ex. 19 at ¶¶2-5, 10 [Aff. of Patterson].)

Also available to testify were Chad Brown and Lance Dupre, though neither spoke to trial counsel. Brown and Dupre were two of a group of four friends, including Hummel and Derrick Parris, that became a close knit group in Hummel's final years in high school and before he joined the Marines. The group would spend most weekends together, watching movies and playing video games and role-playing games like "Dungeons and Dragons." Several times the group went to the Hummel house, bringing them into contact with Hummel's parents. (Ex. 6 at ¶¶2-5, 27 [Aff. of Brown]; Ex. 8 at ¶¶2-4, 10 [Aff. of Dupre].)

Although Derrick Parris testified, his testimony was primarily focused on the Hummel family, the fact that kids teased Hummel for being slow, and that Hummel went to strip clubs after serving in the military. Had Brown and Dupre testified, the jury would have learned many more details about Hummel's strange behaviors around peers and his disconnection from reality. Their testimony would have shown that Hummel was easily influenced by his peers, even to the point of

66

**80**

being manipulated and used. Hummel could not read social cues, responding inappropriately in conversations and saying strange things he thought were funny, but which he could not explain. He seemed immature, including when dating women. (Ex. 6 at ¶¶10-15 [Aff. of Brown]; Ex. 8 at ¶¶5-7 [Aff. of Dupre].)

Brown was also in a unique position to offer testimony about Hummel's obsession with role-playing games, which the group often played. He could have provided the jury first-hand accounts how Hummel could not separate reality from fantasy. He also had insight into Hummel's personality, describing Hummel's desire to play multiple characters, which he could not keep up with, and his constant desire to improve his characters based on what other players did. (Ex. 6 at ¶¶6-9 [Aff. of Brown].)

Brown and Dupre could also have described the changes in behavior Hummel exhibited both upon entering the military and when discharged. At first, Hummel showed pride at being in the military and became more physically fit than he had been before that. But toward the end of his service, Hummel lost the confidence and fitness he had displayed earlier. When Hummel returned to South Carolina after his discharge, he was more brooding and depressed, and he had starting drinking and smoking heavily. Going to strip clubs became his primary focus, and Hummel seemed to think the attention he received from the strippers was real affection. This testimony would have shown the jury both how Hummel's military experience impacted his behavior and how he continued to be disconnected from reality. It also would have given the jury testimony from a period of Hummel's life after high school, which was absent from the trial testimony. (Ex. 6 at ¶¶16-26 [Aff. of Brown]; Ex. 8 at ¶¶8-9 [Aff. of Dupre].)

Finally, trial counsel could have offered the testimony of Shana Fowler. Fowler had grown up around Hummel and could testify that he was a shy kid who was made fun of but never fought back. In addition, though, Fowler was

67

**81**

romantically involved with Hummel after he returned from the military. She could have explained to the jury how Hummel acted strangely during that period, often disappearing and then reappearing without warning. She also was one of the few people to be around Hummel just before he moved to Texas, and could have told the jury how Hummel gave away some of his personal possessions just before leaving and seemed to have no plan or purpose. Fowler was never interviewed by trial counsel, but would have been willing to testify. (Ex. 10 at ¶¶2-10 [Aff. of Fowler].)

### b. Marine Corps

As discussed in Claim Six, *post*, trial counsel failed to present any positive evidence related to Hummel's military service as mitigation. In addition, counsel failed to present the testimony of any of Hummel's fellow service members about Hummel's life during that service. Hummel's three closest friends, and the people he most successfully attached to throughout his life, were available and willing to testify, yet trial counsel never contacted them. Wayne "Buddy" Matthias, Fred Emmer, and Efrain Chaidez were three of the most significant people in Hummel's life. Their testimony would have explained to the jury how Hummel bonded with these three in the early years of his military service. (Ex. 9 at ¶¶2-5 [Aff. of Emmer]; Ex. 14 at ¶¶2-4 [Aff. of Matthias]; Ex. 7 at ¶¶2-5 [Aff. of Chaidez].)

Their testimony would also have shed light on how Hummel's experience during his time in the military impacted his later behavior. It was in the military that Hummel began drinking and smoking and frequenting strip clubs. Hummel adopted the behaviors of his friends as part of his desire to attach and form relationships with them. This was also when Hummel first transferred his disconnection from reality experienced while playing role-playing games to his relationships with strippers. (Ex. 7 at ¶¶4, 8 [Aff. of Chaidez]; Ex. 9 at ¶¶5, 7-9 [Aff. of Emmer]; Ex. 14 at ¶¶6-8 [Aff. of Matthias].)

**82**

Finally, this testimony was vital to explain to the jury the importance of Hummel's failure in the last years of his military service, as the result of his friends leaving. The combination of being bullied for his weight, losing the support network of his friends, and then losing his security clearance and intelligence job changed Hummel's positive military experience into another life failure. (Ex. 7 at ¶¶10-13 [Aff. of Chaidez]; Ex. 9 at ¶¶10-14 [Aff. of Emmer]; Ex. 14 at ¶¶5, 9-10 [Aff. of Matthias].)

### c. Texas

Trial counsel also failed to present any witnesses who lived in Texas and who could speak to Hummel's life in the years leading up to the crime. Although relevant to Hummel's childhood, many of the witnesses offered by the defense had not seen Hummel since he was a teenager. Had counsel fully investigated, they would have found George Goodson, a neighbor of the Hummels, and Chris and Tonya Paris, a couple from the Hummels' Sunday school class that was close friends with the family. Counsel spoke to Goodson over the phone, but never contacted Chris or Tonya Paris, even though Chris Paris testified briefly for the prosecution about filing a missing person report after the crime. All three were willing to testify had they been asked. Chris Paris even visited Hummel often in jail, to talk with Hummel as a religious minister, and brought Hummel's mother to visit. (Ex. 11 at ¶10 [Aff. of Goodson]; Ex. 16 at ¶¶10-13 [Aff. of Chris Paris]; Ex. 17 at ¶6 [Aff. of Tonya Paris].)

These three witnesses could have shed light on the financial struggle that Hummel and his family were under. They were aware of Hummel's medical problems related to his back injury and Crohn's disease. When Hummel was able to get a job, the Parises shared in the excitement, and when the Hummels needed support, Goodson and the Parises offered their help. They were also aware of the toll the financial problems were taking on Hummel's marriage to Joy. The Parises,

**83**

especially, witnessed the growing tension between Hummel and Joy in the months leading up to the crime. Their testimony would have provided the jury much needed context for Hummel's actions, which were left largely unexplained. (Ex. 11 at ¶¶2-8 [Aff. of Goodson]; Ex. 17 at ¶¶2-5 [Aff. of Tonya Paris]; Ex. 16 at ¶¶2-9 [Aff. of Chris Paris].)

## 2. Further Information From Witnesses Who Testified

Besides having these additional witnesses testify, counsel could have elicited more, significant testimony from those witnesses that were called to the stand. For example, Stephanie Bennett testified that she had dated Hummel in high school, he had taken the relationship too seriously, and she broke up with him. (43 RR at 170-78.) With further questioning, Bennett could have revealed that Hummel told her he loved her before ever going on an in-person date. He began integrating into her family, going to church and Sunday dinners with them and spending holidays at their house. As the relationship progressed, Bennett started pulling away, but Hummel kept acting like they would get married, missing all of Bennett's cues. Ultimately he was shocked when she broke up with him. (Ex. 5 at ¶¶3-4 [Aff. of Bennett].)

Hummel's teacher Haila Adams[6] also testified, explaining how Hummel had a learning disorder and needed an accommodation to graduate high school. (43 RR at 50-66.) Adams could also have testified that in class Hummel "blended into the woodwork" and did not seem to interact with the other kids. She noted how isolated the Hummels' farm was and that Hummel's parents never took an interest in his schoolwork. She also noticed how Hummel got excited about Dungeons and Dragons and seemed to want to escape from real life. (Ex. 3 at ¶¶2-10 [Aff. of Adams].)

---

[6] Haila Adams testified under her maiden name, "Haila Scoggins."

Finally, Christy Pack testified about the Sunday dinners her family shared at Hummel's house in South Carolina and how Hummel's mother was generous to visitors but not her children. (43 RR at 122-30.) Pack could also have told the jury how isolated Hummel was on the farm and how growing up there made him act strangely. In addition to speaking about the Hummels' Sunday dinners, Pack could have explained that she never witnessed any love shown by the Hummels to each other—no hugs, no kisses, no "I love you." (Ex. 15 at ¶¶3-4 [Aff. of Pack].)

This additional testimony would have provided the jury with important details of how Hummel struggled to adjust and attach normally as a child, how he could not interact with other children easily, and how, when he did form a relationship, he was over-attached and clung to the other person to his detriment.

## B. Counsel's Failure to Present This Testimony Lacked Any Strategic Rationale and Was Therefore Deficient Performance

Each of these witnesses was available and willing to testify had trial counsel chosen to perform a full and thorough investigation. Failing to do so was neither reasonable nor strategic. Counsel had significant time within which to investigate Hummel's case, including multiple trips to South Carolina. Although investigating the household Hummel grew up in was a reasonable area of investigation, counsel had no justification for isolating their investigation to this subject alone. *Sears v. Upton*, __ U.S. __, 130 S. Ct. 3259, 3265 (2010) ("[T]hat a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudice [the defendant]."). There were no sound strategic reasons for failing to investigate Hummel's teenage friends, with whom he remained close, as well as the friends Hummel developed while in the military and while living in Texas. *Wiggins*, 539 U.S. at 527 ("Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish

71

**85**

that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy."). Therefore, counsel deficiently performed by failing to conduct a complete investigation into Hummel's life and present these witnesses.

### C. Trial Counsel's Deficient Performance Prejudiced Hummel's Trial

Even though counsel presented lay witnesses testimony, the contrast between the narrow picture the jury heard about Hummel's early life and the complete narrative that could have been told is stark. *See Walbey*, 309 Fed. Appx. at 802 ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original). Hummel's jury heard only from witnesses about his very early life in South Carolina. They were not given information from his closest peers during his adolescence, and they were provided virtually no information about Hummel's life once he left South Carolina for the Marine Corps.

The absence of this information was particularly prejudicial to Hummel for two reasons. First, there is a probability that within the various facets of Hummel's life story lay specific mitigating evidence that would have impacted individual jurors' decisions regarding Hummel's culpability. Indeed, mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard*, 542 U.S. at 87 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (emphasis added). Thus, any specific piece of Hummel's life story might have served as the basis for a juror to vote for life over death.

Next, the lay witnesses' testimony about Hummel's life would have compounded its impact by supporting the testimony of expert witnesses trial

**86**

counsel did or could have presented.[7]  John Blume & Pamela Leonard, *Capital Cases: Principles of Developing and Presenting Mental Health Evidence in Criminal Cases*, THE CHAMPION, at 63 (Nov. 2000) (noting that counsel "must support expert findings through lay witnesses.")  Counsel's expert witness, Dr. Antoinette McGarrahan, testified that Hummel had spent a lifetime of repressing negative emotions.  (44 RR at 138.)  However, the jury was given only stories of Hummel up to his teenage years.  Instead of asking the jury to make the mental leap directly from Hummel's childhood experience to his actions during the crime, the information available after a thorough investigation of Hummel's entire life would have supported a comprehensive history of Hummel's life that took the jury step by step down that mitigating path.

Had trial counsel fully investigated Hummel's life story and presented a complete complement of lay witnesses, the jury would have been drawn a significantly different picture about Hummel's origins and the person he ultimately became.  There is a reasonable probability that the results of Hummel's trial would have been different.

## CLAIM SIX

## TRIAL COUNSEL ERRED BY FAILING TO PRESENT HUMMEL'S MILITARY SERVICE AS MITIGATION EVIDENCE

Trial counsel's duty to conduct a thorough investigation of possible mitigating evidence has been well established by the Supreme Court.  *Porter*, 558 U.S. at 40; *Rompilla*, 545 U.S.at 387; *Wiggins*, 539 U.S. at 522-23; *Williams*, 529 U.S. at 396; *Strickland*, 466 U.S. at 688.  A decision to end this investigation, or forgo investigative avenues entirely, must be strategic; it must be "borne of deliberation and not happenstance, inattention, or neglect."  *Wood v. Allen*, 558 U.S. 290, 307 (2010) (Stevens, J., dissenting) ("A decision cannot be fairly

---

[7] *See* Claim Seven, *post*.

**87**

characterized as "strategic" unless it is a conscious choice between two legitimate and rational alternatives"); *Wiggins*, 539 U.S. at 526 (counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment");

> As the Supreme Court discussed in *Strickland*,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.

Hummel's trial counsel investigated Hummel's family and childhood home. However, they failed to investigate and present evidence that Hummel served honorably in the United State Marine Corps. Such evidence is one of the hallmark areas of information about a defendant that may persuade a jury to spare his or her life. *Porter*, 558 U.S. at 43 ("Our Nation has a long tradition of according leniency to veterans in recognition of their service."). Yet trial counsel did not interview any persons from Hummel's years of military service.

Trial counsel's failure to present this evidence constituted deficient performance which prejudiced Hummel's trial. Nothing in trial counsel's investigation into Hummel's background justified the failure to investigate and present this evidence. Several available witnesses who knew Hummel as a Marine were available and willing to testify on Hummel's behalf. Instead, the jury heard only evidence that suggested Hummel was a substandard Marine and argument that they should completely discount his service to his country. Had the jury heard how Hummel served honorably in the Marine Corps, there is a reasonable probability that the outcome of his trial would have been different. *Strickland*, 466 U.S. at 694. Trial counsel's ineffective assistance violated Hummel's applicable state and

**88**

federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.  Hummel's sentence of death should be reversed.

### A. Testimony at Trial

During the punishment phase of trial, Hummel's trial counsel presented the testimony of Hummel's sister, two former girlfriends, four friends of Hummel's family from South Carolina, and two employees of the South Carolina school district where Hummel attended high school.  (*See* 43 RR.)   None of these witnesses offered more than a cursory explanation that they were aware Hummel had joined the Marines and later was discharged.

In contrast, as rebuttal witnesses during the final day of testimony at the punishment phase, the prosecution offered the testimony of Lieutenant Colonel Carl Dougherty and Captain Sergio Santos, two former Marines who had supervised Hummel at the end of his time in the Marines.  (*See* 45 RR at 5, 32.) Lt. Col. Dougherty testified that Hummel was an average Marine who was able to fulfill his general duties.  (45 RR at 11, 18.)   However, he also testified that Hummel had to be counseled about spending too much time at strip clubs, that he had been disciplined for smoking at a time when it could have caused an explosion on a ship, and that he failed to maintain his weight and fitness.  (45 RR at 12-15, 30.)  Further, Lt. Col. Dougherty testified that all of the medals Hummel received for his service had been "I was there" medals that were given to basically anyone who showed up.  (45 RR at 15-17.)

Cpt. Santos testified that Hummel was "not very impressive" as a Marine. (45 RR at 34.)  He described how Hummel had questionable integrity, bragged about things he did not do, lied to his senior officers, and went absent from his base for twenty hours.  (45 RR at 35-40.)  Cpt. Santos explained that he himself had revoked Hummel's security clearance for these actions.  (45 RR at 36.)  This was the final testimony the jury heard before closing arguments.

## B. Trial Counsel's Failure to Present Hummel's Military Service as Mitigation Evidence Constituted Ineffective Assistance of Counsel

Evidence of one's military service is one of the most mitigating pieces of evidence that can be produced by defense counsel. *See Porter*, 558 U.S. at 43 ("Our Nation has a long tradition of according leniency to veterans in recognition of their service.") Military service offers the jury a reason to spare a defendant's life that is completely divorced from the nature of the crime. As such, it remains compelling evidence to be presented regardless of the particular facts of a case.

Had trial counsel conducted a complete investigation, they would have uncovered at least four witnesses who were willing to testify on Hummel's behalf about his service in the Marine Corps: Wayne "Buddy" Matthias, Efrain Chaidez, Fred Emmer, and Christopher Boling. This testimony would have provided a stark contrast to what the jury heard from the State.

These witnesses would have testified that Hummel was a good, if only average, Marine. Further, their testimony would have rebutted and explained away the negative testimony of Lt. Col. Dougherty and Cpt. Santos. Instead of hearing the negatively put evidence that Hummel got in trouble for being at strip clubs and leaving his base, the jury would have seen the context of those actions. Far from painting Hummel as an undependable, substandard Marine, this evidence would have humanized Hummel's struggle to fit in and attach to others.

### 1. Available Evidence of Hummel's Military Service

Buddy Matthias was a close friend who met Hummel when they served together at Camp Pendleton in Oceanside, California, from around 1998 to 2000. (Ex. 14 at ¶2 [Aff. of Matthias].) Hummel and Matthias were both in the intelligence branch and were assigned as roommates for two years. (*Id.* at ¶3.) Because Hummel was new to the base and was shy, and Matthias had an established group of friends, he invited Hummel into the group which included

76

**90**

Fred Emmer and Efrain Chaidez. (*Id.* at ¶4.) They were a close group and spent most days together. (Ex. 7 at ¶3 [Aff. of Chaidez].)

Matthias, Emmer, and Chaidez remember Hummel as a fine Marine, who never got into trouble. Chaidez notes that Hummel was "a dependable guy, and I felt like if I ever needed help John would have my back." (Ex. 7 at ¶7 [Aff. of Chaidez].)

Chaidez connected with Hummel despite having very different backgrounds and personalities. It seemed Hummel was looking to get away from his past life, like Chaidez, and wanted to make a better life in the military. (Ex. 7 at ¶4 [Aff. of Chaidez].) Emmer also connected with Hummel, as a fellow East-coaster and a sort of outsider being stationed in California. He remembers Hummel as shy, but a "good guy." (Ex. 9 at ¶¶3-4 [Aff. of Emmer].)

Even Hummel's friends back home in South Carolina noticed the positive attitude in Hummel because of his military service. One friend remembers the pride Hummel showed at being a Marine. Later, the friend even noticed that after John was discharged he had lost some of the sense of pride and happiness. (Ex. 6 at ¶19 [Aff. of Brown].)

As time went on, Matthias noticed that Hummel seemed overly attached to the group. (Ex. 14 at ¶8 [Aff. of Matthias].) Emmer described it as though Hummel was an outsider trying to fit in the group. (Ex. 9 at ¶9 [Aff. of Emmer].) Hummel gained confidence, but through acting like the others in the group and by hanging out with them at places like strip clubs. (Ex. 14 at ¶¶6, 8 [Aff. of Matthias]; Ex. 7 at ¶8 [Aff. of Chaidez].)

Unfortunately, Hummel struggled with his weight, which limited his success in the Marines and made him an object of ridicule and harassment. Hummel's weight problems meant that although he performed well, he was never recommended for a promotion. Looking back, Hummel's friends realize that he

**91**

was struggling and needed more support. (Ex. 14 at ¶5 [Aff. of Matthias]; Ex. 9 at ¶10 [Aff. of Emmer.]; Ex. 7 at ¶¶5-6, 10-11 [Aff. of Chaidez].)

Then in 2000, all of Hummel's friends and support network left Camp Pendleton. Matthias and Emmer were discharged from the Marines and moved off base. (Ex. 14 at ¶8 [Aff. of Matthias]; Ex. 9 at ¶11 [Aff. of Emmer].) Chaidez was transferred away to San Diego. (Ex. 7 at ¶12 [Aff. of Chaidez].) The friends Hummel leaned on for support and stability were gone. (*Id.*)

Soon after his friends left, Matthias and Emmer got a call from Hummel for help. He was in Arizona, where his truck had broken down as he attempted to go AWOL. Matthias and Emmer picked Hummel up and towed his truck back to the base. On the way back, Hummel told them about how stressed he was because all of his friends had left. He said he could no longer handle being a Marine without any support network. Because Hummel returned to the base before the weekend ended, he was only in trouble for an unauthorized absence. It was this same unauthorized absence that led Cpt. Santos to revoke Hummel's security clearance. (Ex. 14 at ¶9 [Aff. of Matthias]; Ex. 9 at ¶¶12-13 [Aff. of Emmer].)

During his last years of service, Hummel changed from the outgoing, friendly, confident guy his friends knew. (Ex. 14 at ¶10 [Aff. of Matthias].) It was during this period when Dougherty and Santos supervised Hummel and witnessed his poor performance. He was hurt by the loss of his security clearance and intelligence job. (Ex. 7 at ¶13 [Aff. of Chaidez].) But though his military career ended with struggles and with the disregard of his superiors, this did not detract from Hummel's earlier proud and successful service to his country. Christopher Boling supervised Hummel during his first years at Camp Pendleton.[8] He recalls

---

[8] Mr. Boling is retired from the military and currently works for the Department of Defense overseas. During post-conviction investigation, Mr. Boling was interviewed and agreed to sign an affidavit based on his statements about Hummel.

**92**

Hummel as a competent Marine, who did solid work and never gave anyone problems. Although his performance was not the top of his class, Hummel was also happy to do whatever task Boling assigned him. Had Boling been at Camp Pendleton when Hummel began to struggle, he would have worked to mentor Hummel through the problem, rather than penalizing him. Instead, Hummel was honorably discharged in May 2002. (Ex. 29 at 1 [Hummel Military Records].)

## C. Conclusion

The failure by trial counsel to investigate and present the testimony of Matthias, Chaidez, Emmer, and Boling constituted deficient performance. During counsel's investigation, there was no suggestion from Hummel or anyone else that investigating into Hummel's military service would prove to be fruitless. Nor did counsel make initial attempts at these witnesses in such a way that gave them reasonable grounds to end their investigation. As such, there are no reasonable grounds to have ended the investigation, and such a decision cannot be considered strategic.

This deficient performance prejudiced Hummel's trial. Instead of hearing the positive nature of Hummel's service, the jury was left to regard only the view put forward by the prosecution—that Hummel deserved no credit for his service and in fact should be negatively viewed for his actions while in the Marines.

Had the jury heard the available testimony, it would have significantly weighed upon the scale for life without parole, rather than a death sentence. But for trial counsel's failure to act effectively, there is a reasonable probability that the outcome of Hummel's trial would have been different. *Strickland*, 466 U.S. at 694.

---

Following his interview, however, Mr. Boling was transferred from a base in Germany to Afghanistan and post-conviction counsel has not been able to reach him, despite repeated efforts.

**93**



## CLAIM SEVEN

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL SUFFERED FROM COMPLEX POST-TRAUMATIC STRESS DISORDER RESULTING FROM ATTACHMENT TRAUMA

Trial counsel's investigation into Hummel's life revealed several lay witnesses, who testified during the punishment phase about the parental neglect, physical abuse, and social isolation that plagued Hummel's childhood. However, trial counsel's narrow investigative focus on Hummel's early years, meant they overlooked the existence and importance of a number of witnesses from Hummel's high school years, his military service in the Marines, and his life in Texas. This oversight prevented counsel from learning facts that would have established a clear pattern of behavior indicating that Hummel suffered from complex post-traumatic stress disorder ("PTSD") resulting from attachment trauma he experienced as a child. Further, based on the investigation they did complete, trial counsel failed to retain an expert who specialized in trauma-related disorders and then have that expert explain to the jurors Hummel's attachment trauma-related disorder and its significance as mitigation evidence.

Because trial counsel's representation was objectively unreasonable, and there is a probability that the outcome of Hummel's trial would have been different, Hummel's rights under the federal and State Constitutions, state statutory law, and United States Supreme Court and state case law were violated. Thus, Hummel's sentence of death should be reversed.

**94**

## A. Legal Standard

Expert witness testimony is one of the most powerful tools an attorney can use to present their case. *See Coble*, 330 S.W.3d at 268 (noting the "high persuasive value of 'scientific' expert testimony"). The use of expert witnesses to present mental health and mitigation evidence is standard practice in capital cases. *See Whitaker v. Quarterman*, 200 Fed. Appx. 351, 356 (5th Cir. 2006) (noting that a "mental health expert is frequently a valuable source of mitigation evidence in capital sentencing proceedings"). However, the more complex the subject matter, "the more the jury looks to the background, experience, and status of the expert himself rather than to the content of his testimony." *Coble*, 330 S.W.3d at 268. With this in mind, trial counsel should select which mental health expert to retain for a case based on the particular life history of the defendant. *See* Richard G. Dudley & Pamela Blume Leonard, *Getting it Right: Life History Investigation As the Foundation for A Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963, 974-75 (2008) ("As a general rule, it is never appropriate to expect a mental health expert to deliver a comprehensive mental health assessment of the client until the life history investigation is complete.").

It is also well-established that trial counsel has a duty to make a reasonable investigation of a defendant's life history and personal circumstances. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d at 396. Professional norms dictate that trial counsel should identify and interview as many lay witnesses as possible, including family members, friends, and coworkers, among others. ABA Guidelines, Guideline 10.7 (commentary). Absent proper investigation, "counsel's evaluation and advice

81

**95**

amount to little more than a guess." 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1 (commentary).

**B. Trial Counsel Performed Deficiently in Failing to Present Evidence of Hummel's Attachment Trauma and Complex PTSD, Through a Qualified Expert Witness After a Thorough Investigation**

As discussed more fully in Claims Four and Five, *ante*, trial counsel failed to conduct a complete investigation of Hummel's full life history and psycho-social development. Further, had trial counsel contacted numerous additional witnesses from Hummel's childhood, teenage years, military service, and life in Texas, a pattern of severe attachment trauma would have clearly emerged.

Despite not having the full picture of Hummel's life story, trial counsel was aware of the abuse, neglect, and social isolation Hummel suffered as a child, presenting several witnesses during the punishment phase to testify about these facts. However, trial counsel failed to hire an appropriate expert witness with specialized experience in trauma-related disorders to examine Hummel and testify about Hummel's attachment trauma and complex post-traumatic stress disorder and their effects on Hummel's life and mental health.

**1. Trial Counsel's Investigation into Hummel's Childhood**

From their investigation into Hummel's life, trial counsel presented several lay witnesses who testified about Hummel's childhood. Hummel grew up on a farm in South Carolina, where he was socially isolated. (43 RR at 105-08.) His parents were strict and did not show Hummel or his older sister Neata any affection. (*Id.* at 211.) Hummel received abuse at the hands of both his mother and his father. Neata described being beaten with a belt and Mark Pack saw Hummel's father throw Hummel off of a tractor. (*Id.* at 112, 221.) Hummel's parents did not take an active role in his education either. (*Id.* at 55-56.)

**96**

Hummel's father cheated on his mother, and Neata remembered walking in on her father receiving oral sex from a woman who went to their church. (43 RR at 252.) Additionally, Hummel's mother once asked Linda Pack to sleep with her husband, and Derrick Parris saw Hummel's father slap Parris' mother on the rear. (*Id.* at 143-44, 155.) The Hummels only allowed friends and guests who they approved of to visit their house and play with their children, rarely allowing anyone over other than the Pack family. (*Id.* at 219.) Hummel's mother was also more generous to other children, buying gifts for the Pack children, but not her own. (*Id.* at 127, 138-45.)

Hummel struggled to find lasting friendships and meaningful romantic relationships. Stephanie Bennett, John's high school girlfriend, testified that John talked about the two getting married far too quickly after they began dating. (43 RR at 170-83.) Later, John misinterpreted and overvalued the attention he received from dancers at strip clubs. (*Id.* at 157-61, 166.) When Hummel was discharged from the Marines, he brought a homeless pregnant woman back to South Carolina with him. Hummel lived with her and her baby for a while, even though the child was not his. (*Id.* at 185-206.)

## 2. Trial Counsel Mistakenly Relied on the Testimony of a Neuropsychologist Hired Before Counsel's Investigation Had Concluded

On June 4, 2010, over one year before the start of Hummel's trial, the court approved defense counsel's request to hire Dr. Antoinette McGarrahan, a forensic psychologist and neuropsychologist. Dr. McGarrahan's areas of expertise are "the interplay between psychology or mental health and the law" (forensic psychology), and "[the] area of clinical psychology that involves evaluating the brain, studying brain behavior relationships to determine cognitive functioning." (44 RR at 118.) Dr. McGarrahan conducted a neuropsychological and diagnostic evaluation of

83

**97**

Hummel on October 13, 2010, and December 20, 2010. (*Id.* at 121.) These evaluations did not reveal the existence of any cognitive brain impairments, nor significant diagnosable mental illnesses. (*Id.* at 125-26.)

Despite these findings, and their knowledge of the trauma Hummel had experienced as a child, trial counsel presented Dr. Antoinette McGarrahan as their sole expert witness regarding Hummel's mental health. Dr. McGarrahan's evaluation revealed that Hummel had an IQ of 109, and did not have any serious clinical mental disorders. (44 RR at 125-26.) According to Dr. McGarrahan, Hummel had traits of several personality disorders, including narcissistic, antisocial, schizoid, and borderline features. (*Id.* at 127-32.) Dr. McGarrahan thought that the neglect Hummel experienced as a child affected the development of these personality traits. Because Hummel was not allowed to express emotions as a child, he repressed them for years until they all came out on the night of the crime. (*Id.* at 133-140.)

While it was not unreasonable to hire Dr. McGarrahan to conduct a neuropsychological evaluation, it was unreasonable for trial counsel to retain her as the sole testifying mental health expert witness. Dr. McGarrahan was hired for her specific expertise in cognitive brain function and forensic psychology. However, Dr. McGarrahan was hired before trial counsel's investigation was anywhere near complete; therefore, trial counsel could not have known what specific type of expert was necessary for Hummel's defense. *See* Dudley, 36 HOFSTRA L. REV. at 974-75. When Dr. McGarrahan's investigatory evaluations did not reveal significant mental impairment, trial counsel should have developed a theme for Hummel's punishment case, utilizing the information they had.

**98**

### 3. Reasonable Professional Norms Required Counsel Retain the Assistance of an Expert with Specialized Expertise in Attachment Trauma and Complex PTSD

"All too often, mental health evaluations in both trial and post-conviction settings focus simply on the question of whether or not a particular client meets diagnostic criteria for a particular psychiatric disorder." Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923, 943 (2008). Capital defense counsel must not become so focused on finding evidence of a discrete psychiatric disorder that it overlooks existing symptoms and impairments, an explanation of which may provide a more complete and accurate picture of a defendant's mental health status. *Id.* Here, trial counsel unreasonably presented the results of Dr. McGarrahan's evaluations, namely that Hummel had traits in common with several personality disorders. Specifically, Dr. McGarrahan testified that these traits included a lack of empathy, difficulty conforming to society, exploitative or manipulative behaviors, and feeling detachment from others. (*See* 44 RR at 128-32.) Instead of presenting these aggravating traits of a partial diagnosis, trial counsel should have retained a mental health expert with the specific expertise to provide a complete, all-encompassing explanation of Hummel's symptoms and mental health status.

As previously discussed, a thorough investigation of Hummel's life history would have revealed a pattern of attachment trauma, isolation, and escapism. (*See* Claims Four and Five, *ante*.) Even trial counsel's partial investigation revealed evidence that Hummel's childhood was rife with neglect and abuse. Thus, it was unreasonable for trial counsel not to seek out, prepare, and present the testimony of an expert witness who had particular expertise in the area of attachment trauma and/or trauma-related disorders.

85

**99**

For example, counsel could have retained an expert such as Dr. Susan Hardesty, a forensic psychiatrist with The Meninger Clinic in Houston, Texas. Dr. Hardesty specializes in understanding the role of trauma, including neglect and abandonment, on childhood development. (Ex. 1 at ¶5 [Aff. of Dr. Hardesty].)[9] With a full history of Hummel's life, Dr. Hardesty could have presented the following information to Hummel's jury.

### a. Attachment Trauma and Complex PTSD

"Attachment theory" is a psychological principle regarding the effect of early childhood emotional attachments on adult relationships. The theory states that a person must form a secure emotional attachment to a consistent caregiver early in life in order to develop an integrated sense of self. If a person does not develop a stable emotional identity, that person's later ability to form mature, secure, reciprocal adult relationships will be severely compromised. (Ex. 1 at ¶37 [Aff. of Dr. Hardesty].)

"Attachment trauma" is defined as a severe disruption of the critical early childhood relationship or attachment between the child and the primary caregiver(s). Trauma in this context is best described as "feeling alone in the midst of unbearably painful emotions." While trauma is often conceptualized as being a single event, attachment trauma is ongoing, consistent, and pervasive. Extensive and consistent neglect from parental figures prompts fearful reactions in children. When a child experiences fear or abuse, they seek out emotional comfort from a caregiver. However, when the source of the fear or abuse is also the caregiver, the child has no source of emotional comfort and therefore feels alone and afraid. This emotional experience is traumatic for a child, and repetitive episodes of such trauma leads to the child developing a very unstable sense of self and attachment.

---

[9] (*See also* Ex. 1 at Attachment A [Aff. of Dr. Hardesty].)

**100**

The child's sense of attachment is severely disrupted, as the child needs the parent to survive, but the child is also constantly afraid of being abandoned by their parent. Again, the child's fear cannot be alleviated as the source of comfort is also the source of the fear and distress. (Ex. 1 at ¶38 [Aff. of Dr. Hardesty].)

### b. Hummel's Experience of Attachment Trauma

Hummel clearly experienced attachment trauma as a result of his parents' neglect, physical abuse, and social isolation. As a result, Hummel suffered from a trauma-related illness which is best described as complex post-traumatic stress disorder. (Ex. 1 at ¶57 [Aff. of Dr. Hardesty].)

Hummel's parents were very strict, and neither Hummel nor his sister received comfort or affection from either parent. (*See* Ex. 15 at ¶4c [Aff. of Christy Pack].) Hummel and his sister both experienced physical abuse at the hands of their mother and father. Unfortunately, Hummel's mother was herself the victim of childhood abuse. (Ex. 12 at ¶3 [Aff. of Hamilton].) Parents who were abused have a hard time being nurturing parents themselves. (Ex. 1 at ¶40 [Aff. of Dr. Hardesty].) Hummel's mother also reserved her attention for other children, giving gifts to others but not to her own children. (*See* Ex. 15 at ¶3b [Aff. of Christy Pack].)

Neither of Hummel's parents were engaged in his upbringing. Hummel's father was functionally absent as he was focused on work or satisfying his own needs and desires. (Ex. 12 at ¶3 [Aff. of Hamilton].) He had multiple extramarital affairs, including one encounter that occurred in front of his daughter, Neata. (*Id.* at ¶8; 43 RR at 252.) Hummel's mother was similarly not involved in Hummel's life. (*See e.g.*, Ex. 3 at ¶9 [Aff. of Adams].)

Hummel's childhood environment was not conducive to forming a secure sense of self and safe attachment patterns. In fact, such an environment, in which emotional neglect is rampant and familial boundaries are disregarded, is highly

**101**

likely to cause dysregulation of attachment and promote the formation of a disorder. (Ex. 1 at ¶41 [Aff. of Dr. Hardesty].)

The severe impact of this attachment trauma is evident in Hummel's psycho-social history, as well as his personality. Hummel was consistently described as passive, withdrawn, quiet, guarded, and socially inept. His personal interests, video games, movies, and fantasy role-playing games, reflect feelings of escapism. (Ex. 1 at ¶42 [Aff. of Dr. Hardesty].)

Of greater consequence is Hummel's inability to form healthy, secure social relationships. Hummel's life reflects a pattern of craving social attachment, but not being able to create secure attachments to others. (Ex. 1 at ¶43 [Aff. of Dr. Hardesty].) Hummel experienced teasing and bullying throughout his life, from elementary school to the Marines. His own friends teased him as well, further exacerbating and mimicking the attachment trauma he experienced from his parents. Hummel longed for and needed the support of his friends, but in making fun of him, they too played the dual roles of abuser and supporter. (*Id.* at ¶43.)

This pattern is especially evident in the years surrounding Hummel's military service. In the Marines, Hummel found himself in a close-knit social group with three other Marines. Though Hummel seemed to merge his identity with those of his friends, copying their clothing styles and mannerisms, he also experienced a period of relative stability and success. (Ex. 9 at ¶8 [Aff. of Emmer]; Ex. 14 at ¶14 [Aff. of Matthias].) Hummel was an intelligence analyst, a job he thoroughly enjoyed. However, when his three friends were discharged, Hummel's attachments and support network disappeared and his performance suffered. (Ex. 1 at ¶44 [Aff. of Dr. Hardesty].)

Several years later, after Hummel was discharged, he returned to South Carolina with Letti Ulbright, a pregnant homeless woman, in tow. Though the baby was not Hummel's, he lived with Ulbright and began to care for her. During

**102**

this period, Hummel worked at the same factory as his father, and again experienced a relative degree of stability. However, Hummel's attachment to Ulbright was disrupted when Neata contrived to send Ulbright back to California. (43 RR at 185-206.) Following Ulbright's departure, Hummel began to drift, bouncing from temporary job to temporary job. His friends noticed a change too, as Hummel began going to strip clubs frequently and drinking and smoking, two activities he previously did not engage in. (Ex. 6 at ¶¶20-25 [Aff. of Brown].)

Hummel's experiences with strip clubs reflect his inability to read social cues and develop meaningful relationships. (*See* Ex. 1 at ¶43 [Aff. of Dr. Hardesty].) Hummel often mistook the attentions and flirtations of the strippers as meaningful, and Hummel would call and text these women even when he was not at the clubs. (Ex. 6 at ¶22 [Aff. of Brown].) Stephanie Bennett, Hummel's high school girlfriend, also felt that Hummel did not interpret social cues well. Hummel's attachment to Bennett was too quick, as he told her he loved her before they had met and quickly assumed that the two would get married. (Ex. 5 at ¶4 [Aff. of Bennett].)

Shortly after moving to Texas, Hummel was able to find relative stability once more. He met and married Joy within the first year of living in Texas, and their daughter Jodi was born in July 2004. Things were going well for the first year of their marriage. Though money was tight, John was employed full-time at a warehouse and the family was getting by. (Ex. 1 at ¶27 [Aff. of Dr. Hardesty].) However, due to forces beyond Hummel's control, his situation began to spiral once more.

While working at the warehouse, Hummel tripped over a box and severely injured his back. After two unsuccessful surgeries, Hummel was left weakened, in constant pain, and unable to work to support his family. Hummel, Joy, and Jodi moved into Joy's father's home to save money. Hummel's medical situation

**103**

worsened when he was diagnosed with Crohn's disease, an inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding and vomiting. Hummel's case was so severe that an operation to remove part of his bowel was required. This operation resulted in multiple complications, as Hummel developed peritonitis and blood clots in his arms, and required an ostomy with an external bag. Typically, abdominal surgeries such as Hummel's require a minimum of six months of recovery time. However, given Hummel's previous surgeries, it would have taken even longer for Hummel to return to anything resembling full strength. (Ex. 1 at ¶¶28-31 [Aff. of Dr. Hardesty].)

Hummel's debilitating medical problems left him feeling helpless, weakened, and in constant pain. Joy and her father, though, did not understand just how weak he was as a result of the multiple invasive surgeries he had undergone. It was difficult and painful for Hummel to perform any physical tasks, and he was unable to work for a period of four years. Moreover, Hummel's ostomy was humiliating, as the odors and spills negatively affected many aspects of his relationship with Joy. This was a period of time in Hummel's life when he again needed to feel a supportive attachment to his wife and family, but instead, Hummel felt disconnected, rejected, and isolated. When Hummel was able to return to employment, he was not able to find enough work to alleviate the family's financial issues. (Ex. 1 at ¶¶32-35 [Aff. of Dr. Hardesty].)

Ultimately, the great weight of these stressors in Hummel's life mimicked the original attachment trauma Hummel suffered as a child, which in turn prompted a post-traumatic response. (Ex. 1 at ¶46 [Aff. of Dr. Hardesty].) The trauma Hummel suffered is an overall sense of abandonment and fear, similar to the feelings he experienced in early childhood when he felt neglected by his family. (*Id.* at ¶52.) Hummel's physical pain, sense of being unjustly injured, financial stress, and feeling misunderstood and unsupported by his family

**104**

continuously recapitulated the emotional distress of Hummel's painful childhood. (*Id.* at ¶53.)  With any type of trauma, a post-traumatic reaction is characterized by the fact that emotional responses have been conditioned to the highest level of emotional valence reached in the past.  (*Id.* at ¶52.)  Essentially, this means that small events, or series of events, may induce an emotional response that is disproportionate to an expected emotional reaction.  (*Id.*)  Hummel's actions are consistent with the disproportionate emotional valence of a trauma response.  (*Id.* at ¶53.)

Many people who suffer attachment trauma experience a dissociative quality in post-trauma responses.  (*Id.* at ¶54.)  This dissociative quality is often reflected as emotional blunting, or a feeling of disconnection from the reality of the post-trauma response.  (*Id.*)  Emotional blunting in these scenarios is not a callous response, but rather a protective mechanism that is part of the learned response to severe distress and trauma.  (*Id.* at ¶55.)  Hummel's interview with the police demonstrates the typical dissociative quality and emotional blunting that is consistent with a post-trauma response.  (*Id.* at ¶54.)  Moreover, Hummel's actions in fleeing to southern California, where he served as a Marine, demonstrates an attempt to return to the one place Hummel felt accepted, successfully attached to others, and secure.  (*Id.* at ¶56.)

## C. Trial Counsel's Failure to Present Testimony Regarding Hummel's Attachment Trauma and Complex PTSD from a Qualified Expert Witness Prejudiced Hummel's Trial

John Hummel suffered from complex post-traumatic stress disorder due to attachment trauma he experienced as a child in the form of parental neglect, physical abuse, and social isolation.  This trauma manifested itself in Hummel's repeated inability to create secure attachments with others throughout his life, as evident in his failed romantic endeavors and lack of personal success when he was

91

**105**

not surrounded by a supportive social network.  After finding relative stability in Texas with his wife Joy and daughter Jodi, Hummel was suddenly afflicted with a back injury and a debilitating abdominal disorder, Crohn's disease, each requiring several unsuccessful surgeries.  Hummel was weak, in constant pain, and unable to work or fulfill his duties as a husband and father.  At a time when Hummel required support, he instead felt neglected, isolated, misunderstood, and abandoned, essentially reliving the trauma of his youth.  Hummel's reaction to his physical pain and emotional stressors was consistent with a post-traumatic response.

Hummel's trial counsel unreasonably failed to present evidence that Hummel suffered from attachment trauma and complex post-traumatic stress disorder for two reasons.  First, trial counsel did not conduct a thorough investigation of Hummel's entire life history, including Hummel's high school years, military service, and life after the military.  Witnesses from these time periods would have provided information that clearly established a behavioral pattern demonstrating Hummel's inability to create attachments and secure relationships to others.  Second, trial counsel failed to hire an expert in trauma-related disorders to explain the impact and scope of Hummel's childhood and other traumatic experiences.  Had trial counsel conducted a full investigation and hired a trauma expert to present evidence of Hummel's attachment trauma and complex post-traumatic stress disorder, there is a reasonable probability Hummel would have received a life sentence.  Presenting a complete picture of Hummel's troubled and traumatic childhood would have served to lessen his moral culpability in the eyes of the jury.  "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Wiggins*, 539 U.S. at

**106**

535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)); *see also Ex parte Gonzales*, 204 S.W. 3d at 399 (granting habeas relief due to trial counsel's ineffective assistance for failing to present evidence that the defendant suffered post-traumatic stress disorder due to childhood trauma).   Because Hummel's constitutional right to effective assistance of counsel was violated and he suffered prejudice, he is entitled to a new trial.

## CLAIM EIGHT

### HUMMEL'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE STATE IMPERMISSIBLY INJECTED INFLAMMATORY AND PREJUDICIAL EVIDENCE INTO BOTH PHASES OF THE TRIAL; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE

The Fifth and Fourteenth Amendments of the U.S. Constitution guarantee the accused in a criminal case the right to a fair trial. *Ex parte Adams*, 768 S.W.2d 281, 293 (Tex. Crim. App. 1989) ("In order to comply with the dictates of the Fourteenth Amendment of the Constitution, the ultimate aim of the process must be fundamental fairness.").   As part of this right, a defendant's trial should be free from inflammatory, gruesome, and prejudicial evidence that is irrelevant to any element of the offense and is instead designed to motivate a jury's decision based on emotion. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (Evidence that has an "undue tendency to suggest a decision on an improper basis, commonly . . . an emotional one" is inadmissible) (internal quotation omitted) (citing FED. R. EVID. 403 advisory committee's note).   This protection ensures "the fundamental elements of fairness in a criminal trial." *Rivera v. Illinois*, 566 U.S. 148, 158 (2009) (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)).

In this case, Hummel was tried on an indictment for the capital murder of Joy Hummel ("Joy") and Clyde Bedford ("Bedford").   During Hummel's capital trial the prosecution consistently focused on inflammatory evidence and argument

**107**

regarding unindicted victims—Jodi Hummel ("Jodi") and an unborn child—evidence that only could have inflamed the jury's emotions. Much of this evidence was allowed in by the court over trial counsel's objections. As a result, the inflammatory and prejudicial nature of this evidence and argument violated Hummel's state and federal Constitutional rights, as well as violated state statutory law, and United States Supreme Court and state case law. The appropriate remedy for Hummel is a new trial. *See Ex parte Adams*, 768 S.W.2d at 294.

## A. Relevant Facts

Three capital murder indictments were originally filed against Hummel. The first was for the death of Jodi, a child under the age of six. (37 RR at 74.) The second was for the death of Joy and her unborn child. (*Id.* at 75.) The third was for the death of Joy and Bedford. (*Id.*) The State proceeded to trial on the third indictment, capital murder for killing Bedford and Joy in one transaction. (33 RR at 17-18.)

Despite proceeding to trial only on this indictment, the State immediately shifted the focus of the trial to the death of Jodi and the unborn child. In the first twenty pages of the transcript during the State's opening statement, all but four pages reference either Jodi or the unborn child. (33 RR at 19-25, 27, 29, 31-34, 36-38.)

The State's theme during its opening statement centered on Jodi's biggest fear—monsters in the night. (33 RR at 19.) Much of the State's opening presentation of the facts was given from Jodi's point of view or contained references to her. (*See, e.g.*, *id.* at 20 ("Jodi's house"); *id.* at 21 ("Jodi was in her first semester at a little school . . ."); *id.* at 25 ([Jodi] was excited because . . . it was only three days away from the Christmas party"); *id.* at 29 ("[N]o pitter-patter of the feet running around from a five and a half-year old"); *id.* at 34 ("[F]ire pouring out of Jodi's room").) The State finished its opening statement by returning to this

**108**

theme, stating "you're going to see that the person that Jodi should have feared the most was not a monster that was imaginary; it was the gentleman she called Daddy sitting right over there." (*Id.* at 55.)

The first witness called by the State was Audria Hastings, Jodi's kindergarten teacher. (33 RR at 63-65.) Hastings described what a typical day would be at school for Jodi, and told the jury that "[s]he was very good, sweet. She was shy at first, but she would open up with the other kids and me throughout the year, just like all the other kids." (*Id.* at 66.) Hastings authenticated two videos that were admitted as evidence, both showing Jodi interacting with teachers and other students at school. (*Id.* at 69-71.) One showed the students in class learning about pumpkins and the second showed students engaging in activities related to Christmas. (*Id.* at 70.) The videos were admitted over defense counsel's objections of relevance, unfair prejudice, and being extraneous evidence. (*Id.* at 71-74.)

The second witness called by the State, Constance Smith, continued the focus on Jodi. Smith was the school nurse at the kindergarten Jodi attended. (33 RR at 78.) She described how Jodi arrived at the nurse's office one day after falling on the playground. (*Id.* at 79.) Smith explained how she though it "was real nice" that Joy came in to check on Jodi after the injury. (*Id.* at 80.) The prosecutor offered into evidence the report that Smith filed regarding Jodi's injuries. (*Id.* at 83.)

The prosecution consistently made references to Jodi throughout the remainder of trial. (*See, e.g.*, 36 RR at 4, 50, 58; 37 RR at 167, 198, 203; 40 RR at 10, 18.) Continuing in the same pattern, closing argument was filled with references to Jodi. (40 RR at 50-54, 56-57, 69.) The prosecutor reminded the jury that "little Jodi would not be enjoying Christmas in a few days" during its plea to find Hummel guilty. (*Id.* at 76.)

**109**

The State also shifted the focus of the trial to Joy's unborn child, another unindicted victim. Similarly to Jodi, the unborn child was a frequent subject of the State's opening statement. (33 RR at 25 ("[Joy] had just recently gone to her doctor and was able to hear the baby's heartbeat for the first time."); *see also, e.g.*, *id.* at 29, 31.) Constant reminders to the jury of this unborn child were also provided throughout the duration of the trial. (*See, e.g.*, *id.* at 68; 38 RR at 9; 39 RR at 101, 142-43.) Repeated references were also made to the death of the unborn child during the State's closing argument. (40 RR at 50, 53, 56.)

In addition to their arguments, the State offered highly inflammatory photographic evidence of the unborn child. First, the State called a forensic technologist who described a photograph of "fetal material" that was admitted into evidence over defense counsel's objection. (38 RR at 90-95.) The photo was originally admitted for record purposes only, but its inflammatory nature was described to the jury. (*Id.*) This impact was then compounded and expanded during the testimony of the autopsy doctor, Dr. Shiping Bao. The photo of the fetus was admitted for all purposes during his testimony and described as "the fetus in an evidence bag." (39 RR at 202.)[10]

The State then introduced a particularly gruesome autopsy photograph during Dr. Bao's testimony showing the excised fetus and what was presumably Joy's uterus which had been removed from her body. (39 RR at 194.)[11] Trial counsel objected to the photograph as being more prejudicial than probative and that it was not relevant because Hummel was not indicted for the death of the unborn child. (*Id.* at 194-95, 197.) However, the court overruled the objection, holding that the prejudicial impact did not outweigh the probative value because "the State has the burden of sustaining and proving beyond a reasonable doubt that

---

[10] The photograph of the fetus in a bag is shown at 52 RR at 68.
[11] The photograph of the fetus and the womb is shown at 51 RR at 206.

**110**

the events in question involving Mrs. Joy Hummel being pregnant at the time of the offense . . ." (*Id.* at 197.) The court later returned to this point, noting that it was also considering Article 38.36's allowance of "testimony as to all relevant facts and circumstances surrounding the killing" when making his prior ruling. (*Id.* at 215; *see* Tex. Code Crim. Proc. art. 38.36.)

The State's focus on the unindicted victims continued in the punishment phase. During the cross-examination of Neata Woody, Hummel's sister, the State elicited that Neata loved Jodi and but needed to "wait" before visiting her gravestone. (43 RR at 234-35.) Neata described for the jury how she had sent Jodi a dress for Christmas, but was never able to get a photograph of Jodi wearing it because it burned in the fire. (*Id.* at 235.) When asked how the loss of Joy and Jodi had affected the Hummel family, Neata described them as "a broken family." (*Id.* at 236.) Later in her testimony, Neata described which of the family relatives would and would not have been good "grandmothers" for Jodi. (*Id.* at 239.)

A number of other friends of the Hummel family presented by the State as punishment witnesses referenced either Jodi or the unborn child. During the testimony of Tomiko Race, the State introduced a number of photographs of Jodi. (42 RR at 78-79.) Melody Anderson described for the jury being in the hospital room when Jodi was born, seeing sonograms of the unborn child, and that Bedford was a good grandfather to Jodi. (44 RR at 8, 10-11, 14.) Phillip King told the jury that Bedford had to go and pick up Jodi from the bus every day. (*Id.* at 22.) Cindy Lee, the director of the Senior Center that Bedford went to, described to the jury how Jodi would come in to get donuts. (*Id.* at 149.)

In addition to this testimony, the State introduced thirty-one inflammatory and prejudicial photographs of the unindicted victims during the punishment

97

**111**

phase.[12]  Eight photos showed Jodi from Hummel's MySpace account (42 RR at 79), seventeen photos showed Jodi from Joy's MySpace account (43 RR at 236), three family photos depicted Jodi and a pregnant Joy (*id.* at 245-46), and three sonograms of the unborn child (43 RR at 248; 44 RR at 10-11), were admitted into evidence.  One of the sonogram photographs was sent to Hummel's mother by Joy and "Hi Grandma" was written on the photograph.  (43 RR at 248.)  All thirty-one photographs were admitted without objection by trial counsel.  (42 RR at 79; 43 RR at 246-47; 44 RR at 11.)

The State made repeated references to Jodi and the unborn child during closing arguments at the punishment phase.  (45 RR at 61) ("[T]here are four victims in this case, and today's their day in court."); (*id.* at 85) ("Because it's just not—not just about the two victims that were named in this particular indictment."); (*see also id.* at 57-59, 62-63, 85-86, 88-90.)

## B. The State's Focus on Inflammatory, Emotion-Driven Evidence and Argument to Secure a Conviction of Capital Murder Deprived Hummel of His Right to a Fair Trial

The State's frequent and inflammatory references to Jodi and the unborn child were prejudicial and violated Hummel's right to a fair trial.  The evidence presented was not permissible as contextual evidence of the crime that was being tried, and was instead impermissibly designed to inflame the jury's passion based on victim impact and shock-value evidence.

### 1. Contextual Evidence

Contextual evidence regarding criminal acts occurring in the same transaction as the indicted crime can be admissible when "several crimes are intermixed, or blended with one another, or connected so that they form an

---

[12] These photographs can be viewed in the reporter's record at 52 RR at 72-73 and 53 RR at 146, 155, 158, 160, 162, 164-66, 249-65, 269.  Three of the photographs were not stored in the reporter's record, 53 RR at 266-68.

indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others." *Mayes v. State*, 816 S.W.2d 79, 86 n.4 (Tex. Crim. App. 1991) (internal quotation omitted) (citing *Nichols v. State,* 260 S.W. 1050, 1051 (1924)).   However, necessity is the driving force behind the admission of this type of evidence. *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). "Only if the facts and circumstances of the instant offense would make little or no sense without also bringing in the same transaction contextual evidence, should the same transaction contextual evidence be admitted." *Id.*; *accord Erazo v. State*, 144 S.W.3d 487, 493 (Tex. Crim. App. 2004) ("A crime-scene photograph or an autopsy photograph is not admissible simply to show the death of the individual.  These photographs are admissible despite the fact, *and because*, they show more than the testimony.  But that "something more" must be relevant and helpful to the jury.")  (emphasis in original).   Further, same-transaction contextual evidence must still be admissible under the other rules of evidence, beyond just being relevant. *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006).

The State's presentation went far beyond what was necessary as same-transaction contextual evidence. *See Rogers*, 853 S.W.2d at 33.  It was apparent from the opening moments of trial that the State's focus would be on Jodi's death. (33 RR at 19-20.)  The theme of the case presented by the State was essentially that while Jodi was afraid of monsters in the dark, the real monster that she needed to worry about was her father. (*Id.* at 55.)  While this would have been an appropriate theme if Hummel was indicted for Jodi's death, framing the case in this light clouded for the jury what the true legal issue was—the deaths of Joy and Bedford.

And while it may have been permissible for the State to submit some evidence regarding both Jodi and the unborn child's death, the amount, detail, and focus of the testimony surpassed any contextual purpose.  The two videos of Jodi

**113**

interacting with other students at school (33 RR at 69-71) and the testimony from her teacher and the school nurse (33 RR at 63-83) were not relevant evidence in a trial for her mother's and grandfather's death.

Further, the reference and photographs of the fetus removed during the autopsy provided no helpful or relevant information to the jury regarding the crime that occurred. The jury had already learned that Joy was pregnant when she died— no other contextual evidence was necessary to understand the events of the crime. No relevant purpose was served by the jury being shown a picture of the removed fetus and uterus. *See Erazo*, 144 S.W.3d at 493 ("this photograph adds nothing helpful to the already-admitted testimony that the victim was pregnant, that the appellant knew she was pregnant, and that the fetus died as a result of the mother's death. The photograph does not show that the appellant knew that the victim was pregnant. And, the photograph does not show that the appellant was the unborn child's father. In contrast to a crime-scene photograph, which would assist a jury in visualizing the scene, the photograph in this case does not add anything that is relevant to these facts."). Rather, this photo's only purpose was to inflame the jury.

### 2. Emotion-Driven Evidence

Instead of being same-transaction contextual evidence, the State's focus in argument and evidence on Jodi and the unborn child should not have been allowed to be submitted to the jury because of the inflammatory and emotional nature.

The CCA has allowed photographic evidence that is gruesome in nature, when those photographs show the actions of the defendant and "results of what [the defendant] has participated in causing." *Newbury v. State*, 135 S.W.3d 22, 43 (Tex. Crim. App. 2004). However, in *Erazo,* the CCA determined that the admission of a photograph of a dead fetus was inadmissible, prejudicial, and required reversal of the judgment. *Erazo*, 144 S.W.3d at 496. In Erazo's murder

**114**

trial, the defendant was not indicted for the unborn child's death and the CCA determined that the photograph would not be helpful to the jury. Rather, it "appeal[ed] to the jury's emotional side and encourage[d] the jurors to make a decision on an emotional basis." *Id.* at 493, 495; *see also Reese v. State*, 33 S.W.3d 238, 242 (Tex. Crim. App. 2000) ("The contents of the photograph has an emotional impact that suggests that the jury's decision be made on an emotional basis and not on the basis of the other relevant evidence introduced at trial.").

This logic holds true in Hummel's case, as he was not on trial for the unborn child's death.[13] The graphic image of the fetus and Joy's uterus encouraged the jurors to make a decision on an emotional, rather than rational basis. *Reese*, 33 S.W.3d at 244 ("The State sent the jury into deliberations thinking about Paula's unborn child. Given the record before us, we have no fair assurance that the error did not influence the jury, or had but a slight effect.") In *Reese* and *Erazo*, the CCA found a prejudicial impact from showing a photograph of a fetus to the jury during the *punishment phase* of trial. Providing such an inflammatory and emotion-laden photograph to Hummel's jury during his *guilt/innocence phase* only served to heighten its prejudicial impact.

Similarly, the argument and evidence regarding Jodi was entirely focused on considerations of the emotional impact of Jodi's death. The teacher and nurse testimony, as well as the videos played to the jury, had no relevant purpose except to inflame the jury and encourage the jurors to make their decision on Hummel's guilt on an emotional basis. *See Montgomery*, 810 S.W.2d at 378. The State reminded jurors that "little Jodi would not be enjoying Christmas in a few days"

---

[13] In overruling defense counsel's objections, the trial court suggested the State needed to establish beyond a reasonable doubt that Joy was pregnant. (39 RR at 197.) However, based on the indictment, the prosecution needed only to prove that Joy was killed. It had no burden of proof or element related to the unborn child.

**115**

during closing argument, guaranteeing that the juror's focus would be on the unindicted victims during deliberations. (40 RR at 76; *see also id.* at 50-54, 56-57, 69 (other references to Jodi and the unborn child during closing argument).)

Because of the inflammatory and prejudicial nature of this evidence, Hummel's right to a fair trial by an impartial jury was infringed. There is a reasonable likelihood that his conviction was based on an emotional response of the jury to the psychologically-charged argument and evidence presented by the State. Thus, there is a reasonable probability that, but for this constitutional infringement, the outcome of Hummel's trial would have been different.

**C. The Evidence Presented Referencing Jodi and the Unborn Child Constituted Impermissible Victim Impact Evidence at Punishment and Deprived Hummel of the Right to a Fair Punishment Proceeding**

Victim impact evidence may be admissible during a punishment hearing if it is related to the defendant's personal responsibility for the crime. *Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002). This evidence must still pass a Rule 403 balancing test to determine whether the probative value is substantially outweighed by its prejudicial effect. *Id.* at 336. This balancing test is particularly difficult regarding victim impact evidence, and "requires heightened judicial supervision and careful selection of such evidence . . . . [to] guard against the potential prejudice of 'sheer volume,' barely relevant evidence, and overly emotional evidence." . at 336 (footnote omitted). Victim impact evidence that fails this test is inadmissible. *Id.* at 339.

Furthermore, according to the CCA in *Cantu v. State*, victim impact testimony that is offered must pertain to the victim named in the indictment. 939 S.W.2d 627, 637 (Tex. Crim. App. 1997). This is because "[t]he danger of unfair prejudice to a defendant inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which he is being tried is

**116**

unacceptably high," as this "evidence serves no purpose other than to inflame the jury." *Id.* Even if the evidence was admissible during the guilt phase as same-transaction contextual evidence (which it was not), its inflammatory nature made it inadmissible during the punishment stage. *Id.* at 636. While the admission of victim impact evidence regarding an unindicted victim was error in *Cantu*, the court held the error to be harmless because it occurred during one witnesses' testimony and was not mentioned in argument by the prosecutor. *Id.* at 637-38.

Here, the victim impact evidence used by the State during the punishment phase referencing Jodi and the unborn child violated Hummel's right to a fair trial. As noted in *Cantu*, victim impact evidence regarding a victim not named in the indictment is not admissible during the punishment stage. *Cantu*, 939 S.W.2d at 637. The evidence offered by the State referencing Jodi and the unborn child qualified as impermissible victim impact evidence. (*See, e.g.*, 43 RR at 236 (Neata Woody describing the family as "broken" after Jodi's death); *id.* at 247-48 ("Hi Grandma" sonogram); 44 RR at 19 (Jodi's visits to Bedford's Senior Center).)

Moreover, the victim impact evidence at issue is distinct from the evidence deemed harmless in *Cantu*. In *Cantu*, only one witness provided inadmissible victim impact testimony and no reference was made to that evidence in argument. *Cantu*, 939 S.W.2d at 637-38. In contrast, five punishment phase witnesses referenced Jodi's or the unborn child's death (42 RR at 78-79; 43 RR at 234-39; 44 RR at 8, 10-11, 14, 22, 149), thirty-one photographs of the unindicted victims were introduced (42 RR at 78-79; 43 RR at 236, 245-46, 248; 44 RR at 10-11), and numerous references to them were made in closing (45 RR at 57-59, 61-63, 85-86, 88-90).

Because of the inflammatory and prejudicial nature of this evidence, Hummel's right to a fair punishment stage was infringed. Even if the court determines that the evidence of the unindicted victims constituted proper same-

**117**

transaction contextual evidence during the guilt/innocence phase, the introduction of this evidence at the punishment stage was in error. There is a reasonable likelihood that his death sentence was based on an emotional response of the jury to the psychologically-charged argument and evidence presented by the prosecution. Thus, there is a reasonable probability that, but for this constitutional infringement, the outcome of Hummel's punishment would have been different.

### D. Trial Counsel Was Ineffective for Failing to Object to This Evidence, as Was Appellate Counsel for Failing to Raise This Error on Appeal

To the extent trial counsel failed to properly object and preserve the errors committed by the State and court, trial counsel performed deficiently and that prejudiced Hummel's right to counsel and a fair trial. The inadmissible, inflammatory evidence offered by the State throughout Hummel's trial was occasionally objected to by defense counsel (*see, e.g.*, 39 RR at 194-97), while other times no objection was made (*see, e.g.*, 42 RR at 79). No strategic reason exists for this failure, and the admission of this highly inflammatory evidence prejudiced Hummel by encouraging the jury to make their decision on an emotional, rather than an evidentiary, basis.

To the extent that this argument should have been raised on appeal, appellate counsel was ineffective for failing to present it. *See Smith*, 528 U.S. at 285 (applying the *Strickland* standard). No claim was raised on direct appeal either challenging the proceeding as being fundamentally unfair because of the focus on the unindicted victims or re-raising trial counsel's objection to the State's use of the photographs of the fetus. *Ex parte Miller*, 330 S.W.3d 610, 624 (Tex. Crim. App. 2009) ("[I]f appellate counsel fails to raise a claim that has indisputable merit under well-settled law and would necessarily result in reversible error, appellate counsel is ineffective for failing to raise it."). No logical reason exists for the direct appeal counsel's failure, particularly in light of case law regarding the

**118**



prejudicial nature photographs of unborn fetuses. *See Erazo*, 144 S.W.3d at 496; *Reese*, 33 S.W.3d at 244.

### E. Conclusion

Because of the violation of Hummel's due process right to a fair trial, his conviction and sentence should be reversed. Alternatively, the ineffective assistance Hummel received from trial and appellate counsel also entitles him to a new trial. Finally, at the very least, Hummel deserves a new direct appeal in which to raise these meritorious issues. *See Ex parte Miller*, 330 S.W.3d at 626 (noting when ineffective assistance of appellate counsel is shown, the "proper remedy in a case such as this is to return applicant to the point at which he can give notice of appeal").

## CLAIM NINE

## TRIAL COUNSEL FAILED TO EFFECTIVELY PRESENT EVIDENCE THAT HUMMEL'S CONFESSION SHOULD BE SUPPRESSED

In pretrial motions, Hummel's trial counsel argued that statements he made to police after being arrested in California were the result of an unconstitutional arrest. The motion requested these statements be suppressed, as well as any evidence obtained by the State as a result of those statements.

In support of their motion, trial counsel questioned several of the law enforcement personnel involved in Hummel's arrest. This included questioning of Captain Darrell Hull of the Kennedale Police Department and Officer Paul Kandal of the United States Border Patrol and Customs Office ("Border Patrol"). However, trial counsel failed to offer as exhibits transcripts[14] of the phone calls

---

[14] Exhibit 24 is a set of transcripts created post-conviction of audio recordings in the possession of trial counsel, submitted to them by CD discovery from the Tarrant County District Attorney's office. Trial counsel could and should have submitted either similarly created transcripts or the audio recordings themselves as evidence at their pre-trial hearing.

**119**

that took place between Hull, Kandal, and the Kennedale dispatcher during the detaining and arrest of Hummel. Counsel also failed to submit other documents created by the Border Patrol during their detention of Hummel.

Had trial counsel submitted these transcripts and documents as exhibits, it would have established that there was no lawful basis for Hummel's detention by the Border Patrol, that Hummel's resulting arrest was unlawful, and that his subsequent confession was a violation of his rights under the Fourth Amendment. Therefore, trial counsel's deficient performance in not offering this evidence prejudiced Hummel's applicable state and federal Constitutional rights, as well as state statutory law and state case law. *See Strickland*, 466 U.S. at 687. Hummel's conviction and death sentence should be vacated.

## A. Relevant Facts

### 1. Warrantless Detention

On December 20, 2009, at 5:48 a.m. PST, Hummel was stopped by the Border Patrol while entering the United States from Mexico at the San Ysidro Port of Entry. (Ex. 23 at 1 [Border Patrol Documents].) Hummel provided his Texas driver's license as identification, which was insufficient at that time pursuant to the 2007 Western Hemisphere Travel Initiative. 8 U.S.C. § 1185; (7 RR at 113). Because of his insufficient identification, Border Patrol Officer Jorge Bernal ran a computer search that resulted in a warning screen indicating Hummel might be armed and dangerous. (7 RR at 114.) Officer Bernal then referred Hummel to Border Patrol Officer Ernesto Enriquez for further questioning.

At 6:03 a.m. PST, Officer Enriquez conducted a computer search through the Treasury Enforcement Communications System ("TECS"), the National Crime Information Center ("NCIC") system, and the Integrated Automated Fingerprint Identification System ("IAFIS"). (Ex. 23 at 2 [Border Patrol Documents].) The TECS indicated that Hummel had no outstanding warrants, no FBI record, and no

**120**

SID or state offender ID number. (*Id.*) However, the NCIC search revealed that a missing person report had been filed on Hummel. (*Id.*) The missing person report stated:

> SENSITIVE SUBJECT POSSIBLY MENTALLY UNSTABLE PERSON OF INTEREST IN HOMICIDE CONSIDER ARMED AND DANGEROUS APPROACH WITH CAUTION SUBJECT HAS MILITARY BACKGROUND DO NOT ARREST OR DETAIN BASED ON THIS RECORD
> IF LOCATED CONTACT KENNEDALE PD 8174785416 ADVISE LOCATION AND DIRECTION OF TRAVEL

(Ex. 23 at 4 [Border Patrol Documents].)

At 6:49 a.m. PST, Officer Enriquez called the Kennedale Police Department to confirm Hummel as a missing person. (Ex. 24 at 2 [Phone Transcripts].) He informed the Kennedale dispatcher that the Border Patrol was holding Hummel. When asked whether he was holding Hummel "for any other reason," Enriquez stated, "[j]ust for this missing report that we got from you." (*Id.* at 3.)

In response to this phone call, the Kennedale dispatcher contacted Captain Hull and informed him that Hummel had been found in California. (8 RR at 29-30.) Captain Hull instructed the dispatcher to call the Border Patrol and tell them, "[w]e want to put a hold on him for a warrant for arson." (Ex. 24 at 5 [Phone Transcripts].) After speaking with the dispatcher, Captain Hull called several other detectives and told them to meet at the police department "to start the process of the warrant." (8 RR at 31.)

At 7:09 a.m. PST, the Kennedale dispatcher spoke with Officer Enriquez and stated that Kennedale Police Department wanted the Border Patrol "to place a hold on him." (Ex. 24 at 6 [Phone Transcripts].) As a result, Officer Enriquez notified Officer Kandal in Border Patrol Enforcement, who took charge of processing Hummel. (7 RR at 145.)

**121**

At 7:16 a.m. PST, Officer Kandal called the Kennedale dispatcher to get information about the warrant Hummel was to be processed under. When asked about the warrant type and number, the dispatcher replied "I am not 100% sure. I have a number for our captain. He said that when we got a call from y'all to give it to you that way you can speak with him directly." (Ex. 24 at 8 [Phone Transcripts].) The dispatcher admitted, "[w]e just have him filed as a missing person, and he has a pending warrant for arson." (*Id.*) Officer Kandal noted, "[s]o you don't have an active warrant outstanding on him then, right?" He informed the dispatcher that "part of the problem with it is that he's an otherwise admissible person. He's actually a citizen in the country, and we can't hold him on something that hasn't been processed yet." (*Id.* at 9.) The dispatcher suggested that Officer Kandal call Captain Hull. (*Id.*)

At 7:34 a.m. PST, the dispatcher again spoke with Captain Hull and asked whether he had spoken to Officer Kandal. She informed Captain Hull that Kandal "needed the NIC number for the warrant. I told him that it was probably being processed as we were speaking, and he said that's not good enough, that he had to have it active or he couldn't hold him because of the guy's rights." (Ex. 24 at 10 [Phone Transcripts].) Captain Hull admitted "I believe he's right. I was hoping they would just hold him, to be honest with you." (*Id.*)

Captain Hull instructed the dispatcher to call Kennedale Police Detective Jason Charbonnet and request that he meet at the Kennedale Police Department to help draft the warrant. Meanwhile, Captain Hull stated that he would call Officer Kandal. (Ex. 24 at 11 [Phone Transcripts].) At 7:37 a.m. PST, the dispatcher spoke to Detective Charbonnet. (*Id.* at 12.)

Over the next several hours, Captain Hull and Officer Kandal spoke over the phone regarding the issue of Hummel's warrant. (8 RR at 32-33.) These conversations, however, were not recorded because they did not go through the

108

**122**

dispatch. (8 RR at 50.) As of 9:12 a.m. PST, a search of the NCIC system indicated "no identifiable record" or warrant for Hummel. (Ex. 23 at 5 [Border Patrol Documents].)

## 2. Arrest

At 10:48 a.m. PST, an affidavit was sworn and signed and a warrant for Hummel's arrest was issued exactly five hours after Hummel was detained by the Border Patrol. (Ex. 23 at 8 [Border Patrol Documents]). The affidavit drafted for the arrest warrant relied on the fact that Hummel "was located in California" with the Border Patrol after "trying to re-enter the United States from Mexico through the port of entry." (*Id.*) At 10:52 a.m. PST, Officer Kandal called the Kennedale Police Department to confirm that he received the arrest warrant and was on his way to arrest Hummel. (Ex. 24 at 15 [Phone Transcripts].) Following Hummel's arrest, Officer Kandal stated in his report only that he contacted "Kennedale and confirmed the warrant to be active and outstanding." (Ex. 23 at 3 [Border Patrol Documents].)

The warrant was received by the Border Patrol approximately three-and-a-half hours after Officer Kandal informed the Kennedale Police Department that he could not hold Hummel as a U.S. citizen without such a warrant.

## 3. Detention and Confession

At 12:15 p.m. PST, Hummel was transported to the San Diego County Jail and booked at 12:46 p.m. PST. (State Trial Ex. 469.) At 1:02 p.m. PST, Hummel was seen by medical staff for an intake interview. (Ex. 25 at 2 [San Diego Medical Records].) At 4:00 p.m. PST, Hummel underwent a chest x-ray, which returned normal. (*Id.* at 16.) At 4:38 p.m. PST, Hummel was also seen by a doctor for complaints of abdominal and muscular pain. (*Id.* at 18-19.)

At 10:20 p.m. PST, Detective Charbonnet and Investigator Jim Rizy, who had flown in from Kennedale, begin interviewing Hummel. (State Pretrial Ex. 46

109

**123**

at 2.) They read him his *Miranda* rights and began the interview. (*Id.*) Hummel subsequently confessed to killing his family, explaining in detail the crime and informing the detective where the murder weapons could be found. (*Id.*) The interview concluded at 12:28 a.m. PST, December 21, 2009, with Hummel signing a written confession. (*Id.* at 88.) Following the interview, the Kennedale Police Department located the weapons described by Hummel in his confession. The weapons were forensically tested and admitted as evidence against Hummel at his trial. (33 RR at 161; 37 RR at 187.)

### 4. Pre-Trial Hearing

Defense counsel for Hummel filed two Motions to Suppress Oral or Written Statements of the Defendant, requesting that all statements made by Hummel to the Border Patrol agents and to the Kennedale detectives be suppressed. (2 CR at 336, 348). Trial counsel argued that the Border Patrol illegally detained Hummel and, in doing so, tainted any subsequent statements that Hummel made after being arrested as a result of that detention. (*Id.*) Trial counsel alleged that the arrest itself, even though effectuated by a warrant, was similarly tainted by the illegal detention. (*Id.*)

At a pretrial hearing on this motion, Border Patrol Officers Enriquez and Kandal were called to the stand to testify to the events that led to Hummel's detention.

At the hearing, Officer Enriquez testified that his initial computer search of the NCIC system showed a missing person report for Hummel. (7 RR at 140-41.) However, contrary to his written report, Officer Enriquez also testified that Hummel's status as a missing person was also flagged in the TECS. (*Id.* at 141; Ex. 23 at 2 [Border Patrol Documents].) Officer Enriquez admitted that the missing persons report indicated that Hummel was not to be detained, but instead that Kennedale was to be notified of his location. (7 RR at 149.) He noted that

110

**124**

when he spoke with the Kennedale dispatcher, she indicated Hummel had an arrest warrant for arson. (7 RR at 152.)

Officer Enriquez testified that despite never confirming that a warrant had been issued for Hummel, he referred the case to Officer Kandal for processing based on his phone conversation with the Kennedale dispatcher. (7 RR at 144-45, 160.)   Finally, Officer Enriquez stated that if Kennedale had not suggested Hummel had an outstanding warrant, the Border Patrol would have released Hummel upon verifying his U.S. citizenship. (8 RR at 157.)  However, because he was told a warrant existed, Officer Enriquez stopped his efforts to determine Hummel's citizenship. (*Id.* at 162.)

Office Kandal testified that he knew a warrant did not exist for Hummel during his initial detention.  Officer Kandal admitted that the Border Patrol learned that Hummel was a U.S. citizen, around the time of his 7:30 a.m. PST phone call with the Kennedale dispatcher, before an arrest warrant was finalized.  (8 RR at 85-87, 90.)   Kandal stated that he continued to hold Hummel because the Kennedale Police Department had not yet told him how they wanted to handle Hummel's status as a missing person.  (*Id.* at 90.)

However, Officer Kandal also stated that the Border Patrol had the independent authority to hold Hummel based on federal law.  Kandal testified that the Border Patrol can detain, fine, and even imprison someone for failing to provide proper entry documentation, under the Western Hemisphere Travel Initiative.  (8 RR at 62.)  He also stated that under the Homeland Security Act, a person is not free to leave until the Border Patrol is satisfied of their right to enter the United States.  (*Id.* at 63.)  Kandal's testimony suggested there were numerous violations of federal law that would serve as the basis for the Border Patrol to detain Hummel.  (*Id.* at 67.)  Office Kandal further suggested that the Border Patrol could detain someone, even without a violation of law, as long as six, twenty-four,

111

**125**

and seventy-two hours (under various standards) in order to determine whether they are a U.S. citizen and whether they are wanted by another jurisdiction. (*Id.* at 68.)

Through his testimony, Officer Kandal implied that the Border Patrol detained Hummel based on his attempt to come into the country without proper documentation, as an administrative violation, and under their authority to determine his citizenship. (8 RR at 73-74.) Kandal's testimony made it appear that the Border Patrol would have held Hummel, even though a warrant did not exist, based on their own policies and procedures. (*Id.* at 98-101.)

At the conclusion of the hearing, the court denied the motion, saying that Hummel's detention by the Border Patrol was lawful. The court stated that its decision was based on the Border Patrol's authority to detain Hummel pursuant to the Intelligence Reform and Terrorism Prevention Act of 2004, Western Hemisphere Travel Initiative, and other laws which grant the United States the authority to protect its borders. (10 RR at 62-63; 11 RR at 6.) Because the detention was lawful and Hummel was read his *Miranda* rights, the statements were deemed admissible. (10 RR at 63.) The court also said that even if the detention was unlawful, the statements were sufficiently attenuated from the unlawful arrest, without further discussion or explanation. (10 RR at 64.)

**126**

## B. Trial Counsel Performed Deficiently in Failing to Present Relevant Documents and Transcripts of Phone Calls to Support Their Motion to Suppress

The Sixth Amendment right to counsel guarantees that counsel will litigate competently a defendant's claims to suppress unlawfully obtained evidence. *Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986).   A defendant may be prejudiced if either trial counsel or appellate counsel "performed inadequately" in arguing unlawful search and seizure issues. *Id.*

As support for its pretrial motions to suppress Hummel's confession, trial counsel relied primarily on the testimony of the Border Patrol agents and Kennedale police officers involved in the detention and arrest process.   As exhibits, trial counsel offered only a printout of the missing persons report from the NCIC system (Def. Pre-Trial Ex. 1), and two reports created after Hummel had been arrested (Def. Pre-Trial Ex. 2 and 3).

Yet, questioning by trial counsel of the Border Patrol Officers makes clear that counsel was in the possession of documents and reports created by the Border Patrol and the recorded phone calls made between Captain Hull, Officer Kandal, and the Kennedale dispatcher.   (*See, e.g.*, 8 RR at 47-48.)   Inexplicably, trial counsel failed to offer these documents and phone calls as exhibits to support their motions.[15]

The failure to provide these exhibits to the court constituted deficient performance by trial counsel, as the failure left the court to rely exclusively on the

---

[15] To the extent counsel had not received either the Border Patrol documents or the recorded phone calls with sufficient time to produce exhibits, counsel deficiently performed by failing to request a continuance of the pre-trial hearing in order to produce such exhibits.   The Court had previously instructed counsel that "with regard to the timeliness aspect" of receiving discovery from the State, "if there is some type of surprise, I would expect you to request a continuance as you need it at that time."   (3 RR at 17.)

testimony of the Border Patrol officers themselves. This testimony, especially by Officer Kandal, insinuated to the court that both the Kennedale police and the Border Patrol were continuously acting openly and candidly during Hummel's detention. Viewed from the light cast by the Border Patrol's testimony, it would appear that: (1) the Kennedale police and Border Patrol agents were open about the fact that no warrant existed for Hummel; (2) the Border Patrol would regularly hold someone while a state agency processed a warrant; and (3) the Border Patrol independently had reason to be holding Hummel during the period no warrant existed.

Had the court been provided with the Border Patrol documents and with the actual, unimpeachable transcripts of the phone calls, rather than qualified, verbal explanations of them, a significantly different picture would have been presented. The phone calls make clear that the Border Patrol was holding Hummel solely at the request of Kennedale police. From the early stages of Hummel's detention, Officer Enriquez informs Kennedale that the Border Patrol was not holding Hummel for "any other reason" than "just for this missing report that we got from you." (Ex. 24 at 3 [Phone Transcripts].) By 7:16 a.m. PST, Officer Kandal had also informed Kennedale that Hummel was "an otherwise admissible person. He's actually a citizen in the country, and we can't hold him on something that hasn't been processed yet." (*Id.* at 9.) From the beginning of Hummel's detention, these documents make clear the Border Patrol, regardless of whether it had authority to hold Hummel under some federal law or policy, was affirmatively not holding him under any such authority. Thus, these documents directly challenge and invalidate the testimony provided by Officer Kandal about the use of such authority, which served as the primary justification for the court's finding that Hummel's detention was not illegal.

**128**

Rather, these documents revealed a concerted effort on the part of Kennedale police and the Border Patrol to invent some justification to hold Hummel while Kennedale police *started* the process of drafting a warrant. After stating that the Border Patrol could not hold Hummel, Officer Kandal was instructed to speak with Captain Hull. (Ex. 24 at 9 [Phone Transcripts].) Captain Hull, meanwhile, appeared to know it was problematic that a warrant had not even been started, and was hurrying to gather detectives to start the process. (*Id.* at 10-11 ("I believe he's right. I was hoping they would just hold him, to be honest with you.").) It was only after conversations occured between Captain Hull and Officer Kandal, which were not recorded, that Officer Kandal indicated he would be able to hold Hummel until a warrant was created. (8 RR at 32-33.)

That the process Kennedale police and the Border Patrol used to arrest Hummel was not legitimate is made clear by the report drafted by Officer Kandal following Hummel's arrest. (Ex. 23 at 3 [Border Patrol Documents].) Nowhere in the report is reference made to any violation of federal law for which Hummel was detained by the Border Patrol. Neither does the report suggest Hummel was detained in order to confirm his status as a U.S. citizen.[16] Instead, the report states only that Office Kandal conducted computer inquiries, "identifying John HUMMEL as the subject of a Felony Warrant for Arson in Kennedale, Texas in a subsequent homicide investigation. CBP Enforcement Officer Kandal contacted the Kennedale [sic] and confirmed the warrant to be active and outstanding. A warrant abstract was requested and received." (*Id.*)

---

[16] The report notes that a "CBP Officer performed a fingerprints query on John HUMMEL through the Integrated Automated Fingerprint Identification System (IAFIS) with positive results." (Ex. 23 at 3 [Border Patrol Documents].) This appears to be referencing when Officer Enriquez confirmed Hummel's citizenship before Officer Kandal's initial phone call with Kennedale at 7:16 a.m. PST. (8 RR at 87, 90.)

**129**

Given the importance the court placed on the explanation given by the Border Patrol of its behavior, the documents in possession of the Border Patrol and transcripts of its agents' actual conversations with Kennedale would have provided compelling evidence of the Border Patrol and Kennedale police's actual motivations and actions. But for trial counsel's deficient performance in litigating the motions to suppress, there is a reasonable probability that the result of the trial would have been different, "i.e., that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction." *Hollis v. State*, 219 S.W.3d 446, 456 (Tex. App.—Austin 2007) (citing *Jackson v. State*, 973 S.W.2d 954, 956-57 (Tex. Crim. App. 1998)).

### C. Had Trial Counsel Not Performed Deficiently, the Court Would Have Found Hummel's Detention Unlawful and Granted the Motion to Suppress Hummel's Confession

Hummel's constitutional rights were prejudiced by trial counsel's failure to present this information in support of their motions to suppress his confession. Had the court had this information before it, there is a reasonable likelihood that the motions would have been granted. As such, Hummel's confession, and the evidence collected because of it, would have been excluded from his trial. There is a reasonable probability that the outcome of Hummel's trial would have been different had that evidence been excluded.

### 1. Unlawful Detention

"Under the Fourth Amendment, the people are to be 'secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause . . . .'" *United States v. Watson*, 423 U.S. 411, 415 (1976). Texas courts "have consistently said that the arrest of a citizen without warrant is an unreasonable seizure of his person, unless it is expressly authorized by statute." *Heath v. Boyd*, 175 S.W.2d 214, 215 (Tex. 1943). Further, "the 'fruit of the poisonous tree' doctrine generally precludes the

116

**130**

use of evidence, both direct and indirect, obtained following an illegal arrest." *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

In the present case, the Border Patrol unlawfully detained Hummel, leading to his subsequent arrest and confession. Although the Border Patrol had the authority to initially detain Hummel while they verified his citizenship and right to enter the country, that detention was proper only so long as was necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification."); *Akins v. State*, 202 S.W.3d 879, 885 (Tex. App.—Fort Worth 2006). By at least 7:16 a.m. PST, the Border Patrol had completed any investigation of Hummel that was necessary; Officer Kandal admitted that Hummel was "an otherwise admissible person. He's actually a citizen in the country, and we can't hold him." (Ex. 24 at 9 [Phone Transcripts].) At that time, no arrest warrant had been signed, or even drafted—the Kennedale detectives were still being called into the office to start the warrant process. (*Id.* at 12.)

Had trial counsel presented the necessary exhibits to prove the Border Patrol and Kennedale police unlawfully detained Hummel, the court would have found this detention a violation of Hummel's rights under the Fourth and Fourteenth Amendments. As such, Hummel's confession would have been suppressed, as would the additional evidence obtained because of that confession. Without the confession and this evidence, there is a reasonable probability the outcome of Hummel's trial would have been different. *Thompson*, 9 S.W.3d at 812.

### 2. Attenuation Analysis

If the court had found Hummel's detention to be unlawful, it would have conducted further inquiry into whether his confession was attenuated from the taint of the unlawful detention. Had the court done such an analysis, it would have

**131**

determined that Hummel's statements were not sufficiently attenuated and would have suppressed the confession.

In analyzing motions to suppress evidence, the State of Texas undertakes a *Brown* analysis, using four factors to determine whether a taint is sufficiently attenuated from its alleged result so as to render it harmless in an assessment of admissibility. See *Bell v. State*, 724 S.W.2d 780, 787 (Tex. Crim. App. 1986). In *Brown v. Illinois*, the United States Supreme Court promulgated a four-factor test for evaluating attenuation of a confession:

(1) Whether *Miranda* warnings were given to the defendant

(2) The temporal proximity of the arrest and the confession

(3) The presence of intervening circumstances

(4) The purpose and flagrancy of official misconduct

422 U.S. 590, 603-04 (1975).

None of these four factors are completely dispositive. *State v. Johnson*, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994). In Texas, however, the CCA has indicated that the fourth factor—purposeful and flagrant misconduct—possesses a somewhat higher level of importance relative to the other three. *State v. Mazuca*, 375 S.W.3d 294, 306 (Tex. Crim. App. 2012); *Self v. State*, 709 S.W.2d 662, 667 (Tex. Crim. App. 1986); *Bell*, 724 S.W.2d at 780, 789. In *Mazuca*, the court explained their focus on the purposefulness and flagrancy factor because it "most directly serves the policy of deterrence that fuels the exclusionary rule in the first place." *Mazuca*, 375 S.W.3d at 304 ("But the latest trend seems to be for courts to downplay both the temporal proximity factor and . . . the intervening circumstance factor in preference to the purposefulness and flagrancy factor . . . . We favor this emerging trend"); *Maixner v. State*, 753 S.W.2d 151, 157 (Tex. Crim. App. 1988) ("Given the deterrent purpose of the exclusionary rule of the Fourth Amendment of

118

**132**

Article 38.23, the fourth factor, the purpose and flagrancy of the police conduct, may be the most important factor of the four").

### a. Purposefulness and Flagrancy of Conduct

The CCA emphasizes the importance of the purposefulness factor because the very objective of the exclusionary rule is to deter police misconduct. An unlawful arrest "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right." *Bell*, 724 S.W.2d at 789. Thus, the court has stated that in cases of flagrant abuse, the clearest indications of attenuation are necessary to allow admissibility of tainted evidence. *Id.*

Courts have found flagrant abuse in cases where there is "reliance on factors in making an arrest which were so lacking in indicia or probable cause as to render belief in its existence entirely unreasonable," when "an arrest is effectuated as a pretext for collateral objectives," or when "an arrest is unnecessarily intrusive on personal privacy." *Bell*, 724 S.W.2d at 789. These indicia of purposeful and flagrant action are not an exhaustive list, but rather, the court engages in analysis of purposefulness and flagrancy on a case by case basis.

The misconduct of the Kennedale police and Border Patrol in detaining Hummel, when all parties were well aware there was no state warrant and no other authority being utilized to hold him was without question purposeful and flagrant.

First, the transcripts of phone calls make clear that the Border Patrol was not exercising any of its independent authority to detain Hummel and had informed Kennedale police of that fact. Officer Paul Kandal specifically stated that Hummel was "an otherwise admissible person . . . actually a citizen in the country." (Ex. 24 at 9 [Phone Call Transcripts].) Next, the phone transcripts and trial testimony make explicitly clear that both Kennedale police and the Border Patrol were aware that no warrant existed for Hummel's arrest at the time he was detained. Officer

**133**

Kandal specifically told Kennedale Police Department that he could not hold him based on something that had not yet been processed. (*Id.*) Captain Hull admitted that he knew this to be true, despite instructing the Kennedale dispatcher to request that the Border Patrol hold Hummel, and that he was just "hoping they would hold him anyway." (*Id.* at 10.) The facts on their face show that the Border Patrol's detention of Hummel was "so lacking in indicia or probable cause as to render belief in its existence entirely unreasonable." *Bell*, 724 S.W.2d at 789.

Further, the Border Patrol documents and phone call transcripts make clear that Kennedale police and Border Patrol engaged in purposeful and flagrant disregarding of the unlawfulness of Hummel's detention, solely as a pretext for the collateral objective of delaying him until an arrest warrant could be created. At trial, Border Patrol agents suggested they detained Hummel due to a wide range of authority that they possessed under federal law. However, the phone calls and Officer Kandal's post-arrest report showed this explanation was merely a post-hoc rationalization of his conduct.

Acknowledging that no authority exists to detain someone, yet doing so anyway, is exactly the type of purposeful and flagrant flouting of the law meant to be deterred.

### b. Intervening Circumstances

Evidence is tainted when it has been come at "by exploitation of that illegality" and not by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 487, 488 (1963); *Brown*, 422 U.S. at 599. For an intervening circumstance to attenuate the taint of police misconduct, it must affect the situation in such a way that shows no causal connection between the confession and the misconduct and unlawful detention. *Bell*, 724 S.W.2d at 789.

**134**

The United States Supreme Court has considered whether an arrest warrant obtained subsequent to an illegal arrest was an intervening circumstance. *See Taylor v. Alabama*, 457 U.S. 687 (1982). In *Taylor*, the police obtained a proper arrest warrant after the defendant had been illegally arrested and was being questioned. *Id.* at 692. The Supreme Court found that although the arrest warrant was proper, it was not an intervening circumstance that attenuated the taint of the illegal arrest. *Id.* To the contrary, the arrest warrant was contingent upon evidence obtained by the police from the initial illegal arrest and, therefore, inextricably linked to the original unconstitutional conduct. *Id.* at 692-93.

In contrast, the CCA has held that the issuance of a proper arrest warrant can, in some cases, be an intervening circumstance sufficient to break the causal chain and attenuate the taint. *See Johnson v. State*, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994); *Johnson v. State*, 496 S.W.2d 72, 74 (Tex. Crim. App. 1973). Typically, though, this is limited to situations in which the evidence obtained (whether actual physical evidence or a verbal or written confession) would have eventually been obtained by police even if they had waited to obtain a proper arrest warrant. In *Johnson*, the defendant was identified and incriminated based on some photographs that had been taken of him during a warrantless detention. *Johnson*, 496 S.W.2d at 72. In finding the subsequent arrest warrant valid, the court noted that those photographs could have, and probably would have, been obtained sometime in the future, and so the taint was attenuated. *Id.*

Like *Taylor*, the proper arrest and ultimate confession by Hummel in this case are inextricably linked to the original unconstitutional conduct by Kennedale police and the Border Patrol. All the events that transpired—Hummel's arrest, transport to the San Diego County Jail, and interview with Kennedale detectives— were a direct result of the Border Patrol's initial unlawful detention.

**135**

Also notable is the fact that Hummel was in custody for the entirety of the time leading up to his confession. He was never released or told that he was free to go. In *Maixner v. State*, the CCA found attenuation via the intervening circumstance of a release of the defendant from custody. 753 S.W.2d at 156. In that case, the defendant was told that he was free to leave, but he insisted on staying to make a statement. *Id.* Hummel certainly was not free to leave in this case, and was kept in multiple kinds of detention without access to legal counsel or any opportunity to step away from the situation and "consider carefully and objectively his options and to exercise his free will." *Taylor*, 457 U.S. at 691.

Further, unlike *Johnson*, there is no indication in this case that Hummel's confession would have been obtained without the unlawful detention. The direct causal connection between the Border Patrol's illegal detention of Hummel and his confession is clear. The confession was obtained through the exploitation of his unlawful detention. The fact that correct arrest procedures were used once an arrest warrant came into existence is not enough to overcome the taint from the misconduct.[17]

---

[17] Even if the argument could be made that these intervening circumstances are enough, the CCA criticizes usage of this factor as dispositive or sufficient to establish attenuation and pushes for a fuller analysis that incorporates the purposefulness and flagrancy factor. *Mazuca*, 375 S.W.3d at 303 ("Since *Reed* was decided, a number of other court of appeals opinions have cited it as authority for the proposition that the intervention of a valid arrest warrant between an illegal arrest or detention and the subsequent discovery and seizure of contraband will suffice to attenuate the taint of the primary illegality. Unlike *Reed*, however, these subsequent court of appeals opinions seem to turn exclusively on the intervening-circumstance factor, as if that factor alone were categorically sufficient to establish attenuation, without any need to incorporate the purpose-and-flagrancy factor into the analysis").

**136**

### c. Temporal Proximity

The time from when Hummel was initially detained to his arrest and booking into the San Diego jail was approximately seven hours. He spent nine-and-a-half hours at the jail before he was questioned by Kennedale detectives. Considering that during the entirety of this time, Hummel remained in custody, this factor should not provide sufficient attenuation of the unlawful detention. In *Taylor*, the United States Supreme Court acknowledged that time between the taint and the confession becomes much less relevant when that time is spent in custody without legal counsel. *Taylor*, 457 U.S. at 691 ("[A] difference of a few hours is not significant where, as here, the petitioner was in police custody, unrepresented by counsel").

Further, the CCA has determined temporal proximity to be of relatively little importance in the scheme of this analysis, as well as insufficient on its own to determine attenuation. *See Self*, 709 S.W.2d 662 ("[T]emporal proximity of the arrest and the confession . . . is generally not a strong determining factor per se"). As discussed previously, Hummel was simply transported from one venue to another during this time, with no intervening events that would have made a substantial difference in the causal chain or attenuated the taint.

### d. *Miranda* Warnings

Even the CCA has noted that the final factor, whether *Miranda* warnings were given, "requires little more than a brief mention . . . as they almost always are [given as] a matter of routine, but even repeated warnings *alone* are not enough to purge the taint of an otherwise illegal arrest." *Bell*, 724 S.W.2d at 788. Hummel was given *Miranda* warnings before he offered his statement to the Kennedale police while in custody in California. However, *Brown*'s main premise for the creation of the four-factor test we now use is that *Miranda* warnings in and of themselves are not sufficient to stave off a taint of evidence. *Brown*, 422 U.S. at

123

**137**

601 ("*Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation"). Thus, simply being provided *Miranda* warnings does not eliminate the taint created by police misconduct in effectuating the arrest. *See also Taylor*, 457 U.S. at 693 (stating that even if a statement is voluntarily made, it does not cure the illegality of the initial arrest).

### 3. Conclusion

Reviewing the four factors laid out in *Brown*, it is clear that the purposeful and flagrant misconduct on the part of the Kennedale police and Border Patrol officers weighs heavily against finding any attenuation of their unlawful actions. Further, there is no evidence that there were intervening circumstances that broke the causal chain between the unlawful detention and Hummel's confession, nor was the time between the two sufficient to attenuate the taint. Finally, the fact that Hummel received *Miranda* warnings is insufficient to outweigh the impact of the other factors. Had trial counsel performed effectively in the litigation of their motions to suppress, by introducing unimpeachable phone transcripts and Border Patrol documents, the court would likely have found Hummel was unlawfully detained and the taint from that illegal conduct was not attenuated from his confession. Thus, Hummel's confession would have been suppressed, as would have the introduction of evidence gained from that confession including the murder weapons. Therefore, the results of his trial would likely have been different. *Thompson*, 9 S.W.3d at 812.

### D. Appellate Counsel Was Ineffective in Failing to Sufficiently Appeal the Court's Failure to Grant the Defense Motions to Suppress

An appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza*, 206 S.W.3d at 689 (noting appellate counsel's "constitutional duty to review the record for any arguable error"); *see*

<center>124</center>

**138**

*Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Evitts*, 469 U.S. at 396-97 (the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right).

On appeal, direct appellate counsel raised a claim regarding the court's failure to grant the Defense's motion to suppress Hummel's confession. (Ex. 31 at 2 [Excerpts of Appellate Brief].) However, appellate counsel focused his arguments on the affidavit used to secure Hummel's arrest warrant. (*Id.* at 4-8.) Regarding the unlawful detention by the Border Patrol, appellate counsel states simply that Hummel's confession was "the culmination and result of all of the previous unconstitutional state actions," alluding to an earlier discussion of false statements made by the Kennedale police to the Border Patrol officers and the Border Patrol's detention of Hummel. (*Id.* at 3.)

Appellate counsel should have more clearly argued that Hummel's confession should have been suppressed based on the actions of the Kennedale Police and Border Patrol Officers. To the extent appellate counsel failed to clearly allege and preserve the error created by the unlawful detention of Hummel by the Border Patrol officers, counsel performed deficiently and that deficient performance prejudiced Hummel. Appellate counsel's performance fell below the reasonable standards of professional conduct. *Evitts*, 469 U.S. at 394 n.6 ("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all."). Hummel's conviction and sentence should be overturned.

**139**

## CLAIM TEN

## APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO APPEAL THE TRIAL COURT'S ERRONEOUS DENIAL OF DEFENSE COUNSEL'S VALID CHALLENGES FOR CAUSE OF NINE PROSPECTIVE JURORS

"The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722; *see also Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right to a trial before an impartial jury").   For a jury to be considered impartial in a capital case, jurors must not only meet typical standards regarding biases and prejudices; but they must also be able to consider evidence presented for the two special issues—(1) whether the defendant would constitute a continuing threat to society ("Special Issue One"); and (2) whether there are sufficient mitigating circumstances to warrant a sentence of life imprisonment rather than death ("Special Issue Two").   In instances where a venire member's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," the remedy is for the court to grant a challenge for cause to exclude the potential juror. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007).

At Hummel's trial, at least nine venire members illustrated that their views would impair their ability to follow the court's instructions and their oath.   Trial counsel properly moved to challenge the venire members for cause.   However, the trial court improperly denied these challenges.   As a result, trial counsel was forced to exercise peremptory challenges on these potential jurors.   Trial counsel moved several times to obtain additional peremptory challenges, but the trial court granted only two additional challenges.   These two additional challenges were not sufficient to cure the error of the trial court's denial of the valid challenges for

**140**

cause. As a result, an impartial, objectionable juror ultimately sat on Hummel's jury. Hummel's rights were further impaired by his appellate counsel's failure to raise this issue on direct appeal. Both errors prejudiced Hummel's rights and rendered his conviction and death sentence unlawfully and unconstitutionally imposed in violation of applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

## A. Relevant Facts

Of the twenty-one challenges for cause raised by trial counsel, twelve were denied by the court. At least nine of the twelve denied challenges—those of prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo—should have been granted by the trial court. The information provided by these nine venire members during individual voir dire showed that their views would prevent them from following the court's instructions and their oath. The trial court attempted to rehabilitate two of the venire members, but no attempt was made with the remaining seven potential jurors in question.

Because the trial court denied these valid challenges for cause, counsel was forced to use nine peremptory strikes to remove the nine venire members. Trial counsel requested additional peremptory challenges on three different occasions. The first request was for seven additional peremptory strikes to compensate for the improperly denied challenges for cause. (28 RR at 161.) The trial court denied the motion, but granted one additional peremptory challenge. (*Id.*) The second request occurred later that same day and the court once again granted one additional peremptory challenge, despite trial counsel re-urging his initial motion for seven additional challenges. (*Id.* at 228.) The final motion for additional peremptory challenges was made the following day. The trial court denied trial counsel's third request for additional challenges. (30 RR at 5-6.)

**141**

Juror Sanchez, the very next potential juror brought in for individual voir dire, was sworn in as the twelfth juror despite the fact that he was a highly objectionable juror. Trial counsel unsuccessfully challenged him for cause and stated for the record that Sanchez was an objectionable juror and that a peremptory challenge would have been used if Hummel still had one left. (*Id.* at 78.)

## B. The Trial Court Erred by Failing to Grant Trial Counsel's Challenges for Cause

A review of the juror questionnaires and the individual voir dire of the nine prospective jurors shows that their responses warranted their striking for cause. The court erred in failing to grant trial counsel's motions to strike.

### 1. Potential Juror Bancroft

Potential juror Bancroft indicated during his individual voir dire that he believed there was a burden on the defense team to produce evidence on mitigation. Bancroft was specifically asked whether the defense had the burden to "bring [him] the mitigating circumstances or to convince [him] of the sufficiency of the mitigating circumstance." (16 RR at 193.) He replied, "[S]ince you're the – defending him, yeah, you would probably have to tell me something about him . . . if someone's trying to prove the Defendant's character and background, I – you've got to tell me." (*Id.* at 193-94.) It is clear from his answers that Bancroft thought the defense had the burden of proving there were sufficient mitigating factors even after the State explained, "[T]here's never a burden of proof on a Defendant in a criminal case." (*Id.* at 158.) Trial counsel moved to challenge Bancroft for cause based on the fact that he placed the burden to produce mitigating evidence on Hummel. (*Id.* at 199.) The trial court erroneously denied the challenge even though Bancroft was never rehabilitated. (*Id.*) Trial counsel then struck Bancroft with a peremptory challenge. (*Id.*)

128

**142**

## 2. Potential Juror Butler

Trial counsel moved to strike potential juror Butler for cause on two grounds: (1) she was unable to distinguish a difference in the degree of likelihood for probability and possibility; and (2) she required there to be a nexus between mitigation and the actual commission of the crime. (16 RR at 250.) The language of Special Issue One is, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" (4 CR at 733.) Trial counsel reviewed this language with Butler and asked her if she saw a difference in the degree of likelihood for possibility and probability. Butler answered that she interpreted both words the same, and there was no difference in the degree of likelihood to her. (16 RR at 240-41.)

The CCA has stated, "In its usual acceptation, a 'probability' is something more than a 'possibility' . . . Requiring more than a mere possibility that the defendant would commit criminal acts of violence and would constitute a continuing threat to society prevents the freakish and wanton assessment of the death penalty." *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992). The State clearly explained the law to Butler prior to defense counsel questioning the potential juror. (16 RR at 208-09.) Butler initially agreed with the State that a probability "[is] not a certainty . . . [is] not just possible, but it sits somewhere in between there." (*Id.* at 209.) Nevertheless, when trial counsel spoke to her about the difference, she could not articulate one. Therefore, her opinions were impermissibly lowering the State's burden of proof as to Special Issue One.

Additionally, Butler explained that she thought the language of Special Issue Two would compel her to find mitigating circumstances only if they were directly related to the crime. (16 RR at 247.) Although trial counsel explained to her the law does not presume it to be that way, she said that she could not give a

129

**143**

mitigating circumstance much application under the instruction if it did not have anything to do with the circumstances surrounding the crime. (*Id.* at 247-48.)

Trial counsel challenged Butler for cause on these two grounds, which the trial court denied. Trial counsel then removed potential juror with a peremptory challenge. (16 RR at 250-51.)

### 3. Potential Juror McFarland

During the individual voir dire of potential juror McFarland, she stated that she would not only consider whether there was a probability that Hummel would commit criminal acts of violence, but also whether there was a probability that a third party, like a family member, would commit criminal acts of violence on his behalf when deciding Special Issue One. (17 RR at 281-83.) McFarland would attribute acts of a third person to Hummel when answering Special Issue One when the language clearly does not allow the substitution of a third party for Hummel. Trial counsel challenged McFarland on this basis, but the trial court denied the challenge. (*Id.* at 289.) Trial counsel then struck McFarland with a peremptory challenge. (*Id.*)

### 4. Potential Juror Cuevas

Potential juror Cuevas admitted during her individual questioning that she would automatically answer Special Issue One "Yes" based on finding an individual guilty of capital murder for murdering two victims. (20 RR at 230-31.) Additionally, Cuevas indicated on her juror questionnaire that the death penalty should be used for the murder of children and police officers, showing her predisposition to sentencing someone with death when they murdered a child. (Ex. 35 at 7 [Cuevas Questionnaire].) Furthermore, Cuevas spoke about a friend from her Sunday school class who was murdered in the course of his duties as a police officer. The individual that murdered her friend was found guilty of capital murder and had since been executed. (20 RR at 216-18.) The trial court attempted to

**144**

rehabilitate Cuevas based on the answers provided during trial counsel's voir dire, but even after a fairly lengthy process, she was never able to provide a clear answer to the court as to whether she would be able to evaluate guilt and future dangerousness separately. (*Id.* at 233-36.) Trial counsel challenged Cuevas for cause because she would automatically answer "Yes" to Special Issue One, had a predisposition towards the death penalty, and because she lied on the questionnaire when she answered that she had never been interested in the outcome of any criminal case when she clearly followed her friend's murder case. (*Id.* at 236-37; Ex. 35 at 5 [Cuevas Questionnaire].) The trial court denied the challenge, and trial counsel exercised a peremptory challenge. (20 RR at 238.)

### 5. Potential Juror Powell

Trial counsel challenged potential juror Powell for cause because she would reduce the State's burden of proof regarding Special Issue One. (21 RR at 58.) Powell admitted that if an individual was guilty of two murders, with no justification, and the victims were innocent, she would automatically answer Special Issue One "Yes." (*Id.* at 55-56.) She further admitted that she was not tricked into answering the question that way, but that was how she really felt. (*Id.*) Additionally, Powell worked as a clerk in the Tarrant County Criminal Courts. (*Id.* at 6.) She had a close relationship with other people who worked in the building, like the prosecutors, as admitted by the State when he said, "[Y]ou know most every prosecutor and you've helped raise just about all of us that have come through the ranks over the years." (*Id.* at 7.) Therefore, Powell was familiar with the criminal justice system and clearly understood what she was answering when she said she would automatically answer Special Issue One "Yes." Further, her connection to the criminal justice system may have biased her opinion as a juror. There was no attempt to rehabilitate Powell. The trial court denied trial counsel's

**145**

challenge for cause on potential juror Powell, and trial counsel removed her with a peremptory challenge. (*Id.* at 59.)

### 6. Potential Juror Guidroz

During his individual voir dire, potential juror Guidroz stated that he would place a burden on Hummel to provide mitigating evidence with regard to Special Issue Two. (27 RR at 109.) No one tried to rehabilitate potential juror Guidroz based on his answers placing an impermissible burden on Hummel. Trial counsel challenged Guidroz for cause and the trial court denied the challenge. (*Id.* at 115-16.) Trial court then struck potential juror Guidroz with a peremptory challenge. (*Id.*)

### 7. Potential Juror Zeiger

Zeiger indicated during his individual questioning that he had a predisposition to answer Special Issue One "Yes" if he found someone guilty of capital murder. (28 RR at 94.) When trial counsel asked the potential juror if he thought a person would always be a danger if he killed at least two people during the course of a single criminal transaction, Zeiger responded, "I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again." (*Id.* at 92.) There was not an attempt to rehabilitate potential juror Zeiger even though an automatic "Yes" answer clearly lowers the State's burden of proof on Special Issue One. Trial counsel challenged the potential juror for cause based on his predisposition to answer Special Issue One "Yes," but the court denied the challenge, and trial counsel used a peremptory challenge to remove Zeiger. (*Id.* at 103-04.)

### 8. Potential Juror Beauchamp

Trial counsel's attempt to strike potential juror Beauchamp for cause was based on Beauchamp admitting that answering Special Issue One "Yes" was a foregone conclusion when someone was found guilty of capital murder, not

**146**

mentally retarded, the incident was not an accident, self-defense was not involved, and the victims were innocent.  (28 RR at 155.)  Beauchamp stated that the evidence she received in the guilt/innocence phase to find someone guilty was enough to answer Special Issue One "Yes."  (*Id.* at 156.)  No one tried to rehabilitate Beauchamp, but the trial court still denied trial counsel's challenge for cause and counsel removed her with a peremptory challenge. (*Id.* at 158.)

### 9.  Potential Juror Hermosillo

During potential juror Hermosillo's individual voir dire, her answers showed that she would require Hummel to provide a reason why he committed the crime and also place a burden on Hummel to prove mitigation for Special Issue Two. Hermosillo specifically stated, "[I]n defending a Defendant, you would have to . . . present reasons why that may have caused this incident or this murder.  I know the burden of proof is on the – the. D.A . . . but you also have to – in my mind . . . prove his character or prove . . . something about him to where I would want to know . . . like this was his first time." (28 RR at 217.)  After trial counsel told her that the law does not place a burden on Hummel to present this type of evidence, she still insisted, stating, "I think you have to convince me that there's another side of that person." (*Id.* at 218.)

After trial counsel concluded their voir dire of Hermosillo, the trial court conducted its own lengthy voir dire. (28 RR at 222-25.)  The trial court's attempt at rehabilitating Hermosillo showed that she understood what the law was, but her personal opinions conflicted with the laws in question.  Finally, potential juror Hermosillo stated that she could follow the juror instructions. (*Id.* at 225.)  But, by this point her answers were not believable.  Trial counsel challenged Hermosillo for cause based on her answers, but the trial court denied the challenge. (*Id.* at 226.)  Trial counsel then exercised a peremptory challenge to remove potential juror Hermosillo. (*Id.* at 227.)

**147**

## C. The Court's Erroneous Denial of Valid Challenges for Cause Prejudiced Hummel's Trial

The nine venire members discussed above clearly held opinions that placed them in opposition to some of the court's instructions and their oaths as jurors. For the majority of the nine venire members, there was not an attempt made to rehabilitate the potential juror after he or she expressed their views. Even when an attempt was made, it was clear that the jurors had opinions that directly conflicted with what would be required of them as a juror. "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man." *Irvin*, 366 U.S. at 727. Therefore, the trial court was in error when it denied these nine valid challenges for cause.

After exhausting the two additional peremptory challenges granted by the trial court, defense counsel made a third motion for additional peremptory challenges, discussing additional challenges for cause that were improperly denied. (30 RR at 5.) In denying the motion, the court stated that the granting of two additional peremptory challenges was not based solely on trial counsel's motion, but was based on the entirety of the voir dire process. (*Id.*) However, two additional peremptory challenges were clearly not sufficient to "reinstate" the previously exhausted peremptory challenges trial counsel was forced to use to correct the trial court's improper denial of nine valid challenges for cause. *Martinez v. State*, 763 S.W.2d 413, 415 (Tex. Crim. App. 1988).

When the trial court erroneously overrules a challenge for cause, harm is shown when peremptory challenges are exhausted, a request for additional peremptory challenges is denied, and a juror is seated who would have been struck using a peremptory challenge. *Bell*, 724 S.W.2d at 795. This is exactly what happened in Hummel's case. Immediately before the twelfth juror was chosen, trial counsel requested additional peremptory strikes. However, the court denied

**148**

the motion. As a result, juror Sanchez, an objectionable juror, was seated. Trial counsel would have exercised a peremptory challenge on Sanchez had one remained. But, due to the exhaustion of peremptory challenges on erroneously denied challenges for cause, there were not any remaining. As a result, Hummel was harmed because he was forced to accept Sanchez as a juror.

### 1. Juror Sanchez

From the outset, Sanchez was clearly not a juror trial counsel wanted to accept. First, Sanchez had experienced the murder of a close family member, his wife's nephew. (30 RR at 48.) He also worked with children as a music teacher at a school. (Ex. 40 at 4 [Sanchez Questionnaire].) Furthermore, he had a young daughter. (*Id.* at 5.) He additionally stated on his questionnaire that he thought the death penalty should be used for "murder of a child [and] premeditated cold blooded murder," which were particularly relevant issues in Hummel's case. (*Id.* at 7.)

Sanchez also showed that he did not understand what his duties would be in reference to the first or second phase of the trial. (*See, e.g.*, 30 RR at 27.) He did not have a clear understanding as to what the term "probability" meant in regards to Special Issue One, defining it as, "That the Defendant probably did the crime without any doubts." (30 RR at 26.) Although it was explained to him that this determination would occur after a guilty finding, he still kept confusing what would be required of him in the guilt/innocence phase and the punishment phase.

Based on the answers provided by Sanchez during his individual voir dire, on his questionnaire, and his overall demeanor during the questioning, trial counsel wanted to exercise a peremptory challenge on Sanchez. Trial counsel stated their desire to use a peremptory challenge for this juror on the record. Since they did not have one remaining, Hummel was forced to have this objectionable juror sit in judgment of his life.

**149**

## D. Hummel's Appellate Counsel Was Ineffective by Failing to Appeal the Court's Ruling on Trial Counsel's Motions to Strike for Cause

It is well-settled that criminal defendants are entitled to effective assistance of counsel during their direct appeals. The effectiveness of appellate counsel is determined using the familiar two-prong *Strickland* standard. *See Robbins*, 528 U.S. at 285; *Evitts*, 469 U.S. at 396-97; *Ex parte Santana*, 227 S.W.3d at 704-05. Appellate counsel is considered ineffective if counsel's performance was objectively unreasonable, and this deficient performance prejudiced the defendant. *See Ries*, 522 F.3d at 531; *Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006).

Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an appellate brief. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); *accord Ries*, 522 F.3d at 531-32; *see Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the State Bar of Texas Guidelines and Standards for Capital Counsel outlines the duties of appellate counsel. Counsel must "review the appellate record for all reviewable errors" and prepare "a well-researched and drafted appellate brief." Texas Guidelines, Guideline 12.2(A)(8).

In Hummel's case, appellate counsel's failure to raise any issues regarding the court's erroneous denial of challenges for cause was objectively deficient. These issues are clearly on the record, therefore there is no question that appellate counsel was aware of the problem. Furthermore, trial counsel filed a motion requesting additional peremptory challenges that laid out in detail some of the specific challenges for cause that were incorrectly denied. (4 CR at 632-36.)

Appellate counsel's performance fell below the reasonable standards of professional conduct and prejudiced Hummel's appeal. *Evitts*, 469 U.S. at 394 n.6

**150**

("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all.").

### E. Conclusion

It is clear that Hummel's jury would have had a different composition if trial counsel had not been forced to use nine of their peremptory challenges on jurors that the trial court should have excused for cause. However, since the court erroneously denied trial counsel's challenges for cause, they had no choice but to use their peremptory challenges to excuse those venire members. This error by the trial court prejudiced Hummel by forcing him to accept objectionable jurors that trial counsel should have been able to strike with peremptory challenges.

Furthermore, appellate counsel prejudiced Hummel's rights by failing to raise this issue on direct appeal. Had appellate counsel conducted a thorough review of the record, this violation of Hummel's rights would have been glaringly apparent. Therefore, Hummel's conviction and sentence of death should be overturned.

<center>

**CLAIM ELEVEN**

**TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S DISCRIMINATORY USE OF PEREMPTORY STRIKES TO REMOVE MINORITY VENIRE MEMBERS IN VIOLATION OF HUMMEL'S CONSTITUTIONAL RIGHTS**

</center>

It is well-established law that the State may not exercise peremptory challenges to strike venire members based on race. During the voir dire process of Hummel's trial, the State exercised peremptory challenges against three minority prospective jurors—Gonzales, a Hispanic male; Williams, an African American female; and Dennis, an African American male. Trial counsel was ineffective for failing to object to the State's purposefully discriminatory and unconstitutional

<center>137</center>

<center>**151**</center>

strikes. The State's use of peremptory strikes on these three prospective jurors and trial counsel's failure to object each constitute violations of Hummel's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law.

### A. Legal Standard

The Fourteenth Amendment of the United States Constitution and the Texas Code of Criminal Procedure bar the use of peremptory challenges to exclude potential jurors on account of the juror's race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *accord Rice v. Collins*, 546 U.S. 333, 338 (2006); *Johnson v. California*, 545 U.S. 162, 168 (2005); Tex. Code Crim. Proc. Art. 35.261(a). The Supreme Court explained that excluding jurors because of their race is particularly egregious because it "undermine[s] public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87. Excluding even one juror on the basis of their race violates these core provisions of the law and entitles a defendant to a new trial. *See Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992).

A *Batson* challenge follows a three-step analytical process. First, the defendant must make out a prima facie case of intentional discrimination by the State. *Batson*, 476 U.S. at 93-94. A prima facie case is established by demonstrating that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 94 (citing *Washington v. Davis*, 426 U.S. 229, 239-42 (1975)). Next, the State must provide race-neutral reasons for using a peremptory challenge on the juror(s) in question. *Id.* at 94, 97. Finally, the court must determine whether the defendant has established purposeful discrimination. *Id.* at 98; *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 239-40 (2005); *Hernandez v. New York*, 500 U.S. 352, 363 (1991); *Nieto v. State*, 365 S.W.3d 673, 675-76 (Tex. Crim. App. 2012).

138

**152**

### 1. Comparative Juror Analysis

Although statistics regarding the State's use of its peremptory strikes may indicate a pattern of discriminatory jury selection, comparative juror analysis is a more powerful tool for uncovering purposeful discrimination. In *Miller-El*, the Supreme Court described the underlying concept behind comparative juror analysis: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." 545 U.S. at 241. The compared jurors do not need to be identical in all aspects to uphold a *Batson* claim. *Id.* at n.6 ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.").

Comparative juror analysis is an intensive process that requires close scrutiny and comparison of venire members' juror cards, juror questionnaires, and answers during the voir dire interview. Because of the utility of comparative juror analysis for determining whether the State engaged in purposeful discrimination, the Fifth Circuit Court of Appeals requires such an analysis to take place when investigating the merits of a *Batson* challenge. *See United States v. Brown*, 553 F.3d 768, 796 (5th Cir. 2008). Comparative juror analysis is an analytical theory that describes the record evidence regarding the jurors in question, and not a separate issue that is waived if not raised during earlier proceedings. *See Young v. State*, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991).

Comparative juror analysis is not restricted to comparing jurors struck by the State to those who ultimately serve on the jury. Rather, minority jurors struck by the State can be compared to any white jurors accepted by the State, even if those white jurors were later struck by the defense. *Miller-El*, 545 U.S. at n.4. If the

**153**

State struck a minority juror but accepted a similarly-situated white juror, this is evidence of purposeful discrimination. *Id.* at 241.

## B. Jury Selection in Hummel's Case

The jury selection process in Hummel's case began on April 28, 2011, when the venire panel was sworn in and filled out their juror questionnaires. (11 RR at 28, 96.) The court had potential jurors return for mini-panels starting May 4, 2011, where some individuals were excused by agreement and others were struck for cause. (*See, e.g.*, 12 RR at 20, 127.) Potential jurors were then interviewed individually by each side starting on May 10. (*See, e.g.*, 15 RR at 9.) Following the individual voir dire interview, the court considered challenges for cause. (*See, e.g.*, 15 RR at 118.) If the prospective juror was not struck by the court for cause, the State was offered the first opportunity to remove the juror with a peremptory strike. (*See, e.g.*, 15 RR at 118.) If the State accepted the prospective juror, then the defense had the chance to exercise a peremptory strike of its own. (*See, e.g.*, 15 RR at 119.)

Hummel's seated jury consisted of four white males, four white females, one African American male, one African American female, one Hispanic male, and one Hispanic female. The two alternates were both white females.

## C. Minority Prospective Jurors Discriminatorily Struck by the State

Out of the twelve peremptory challenges the State used, four were exercised against minority panelists. Three of the four strikes were purposefully and unconstitutionally discriminatory.

### 1. Prospective Juror Gonzales

The individual voir dire for prospective juror Gonzales was conducted on May 11, 2011. Gonzales, a twenty-two-year-old Hispanic male, only answered questions from the State before the State used its second peremptory strike to

**154**

remove him from the jury. (Ex. 38 at 3 [Gonzales Questionnaire]; 16 RR at 122.) Trial counsel failed to object to the State's strike.

Prospective juror Gonzales's individual voir dire indicated that he believed in the death penalty for serious crimes. (16 RR at 102-03.) Following a lengthy discussion about capital murder trial procedure by the State, Gonzales confirmed that he would be able to answer the two special issues in a way that would result in a death sentence. (16 RR at 118.) Although he answered that life without parole would be a more serious punishment when he filled out his questionnaire, he clarified during questioning that his answer was based upon the belief that the individual would be locked up alone. (Ex. 38 at 5-6 [Gonzales Questionnaire]; 16 RR at 106-07.) He stated that life without parole would not be as hard once he learned that an individual in general population would not be secluded by themself, but rather, locked up with a community of people. (16 RR at 107.)

## 2. Prospective Juror Williams

Prospective juror Williams was interviewed by the State and trial counsel on May 23, 2011. Williams, a forty-seven-year-old African American female, worked as a teacher's assistant at Fort Worth ISD. (Ex. 41 at 2-3 [Williams Questionnaire].) After both sides questioned Williams, the State used its eighth peremptory challenge to remove her from the jury. (24 RR at 260.) Trial counsel did not raise any objections to the State's use of a peremptory strike on Williams.

Prospective juror Williams's individual voir dire and her questionnaire indicated that she believed in the death penalty, but could also consider life without parole, depending on the facts of the crime that was committed. (Ex. 41 at 5-6 [Williams Questionnaire]; 24 RR at 252-53.) She also thought that the death penalty should be used about as frequently as it had been previously. (Ex. 41 at 6 [Williams Questionnaire].) Williams stated she could follow the juror's oath. (24 RR at 237.) During her individual questioning, Williams stated that she did not

141

**155**

have a moral, ethical, or religious problem judging an individual and could answer the two special issues in a way that would lead to a death sentence if supported by the evidence. (24 RR at 230, 252.)

### 3. Prospective Juror Dennis

Dennis, a forty-four-year-old African American male, was questioned individually on June 1, 2011. (Ex. 36 at 3 [Dennis Questionnaire]; 29 RR at 5.) He answered questions from both sides during his individual voir dire before the State used its twelfth peremptory challenge to remove him from the jury. (29 RR at 50.) Trial counsel did not object to the State's striking of Dennis.

During Dennis's individual voir dire and on his questionnaire, he indicated that he believed in the death penalty and thought it should be used about as frequently as it had been previously. (Ex. 36 at 6 [Dennis Questionnaire]; 29 RR at 13.) Dennis indicated that whether a person should receive the death penalty depended on the circumstances of the crime. (29 RR at 13.) Throughout the process of questioning, Dennis stated several times that he could answer both special issues in a way that would result in a death sentence as long as the evidence was there. (*Id.* at 23-24, 44.) He also stated that he did not have any moral, ethical, or religious objection to judging another person. (*Id.* at 33.)

### D. Comparative Juror Analysis

An analysis of answers provided by prospective jurors Gonzales, Williams, and Dennis during their individual voir dire and on their questionnaires reveals that they provided responses similar to several non-minority venire members accepted by the State. This indicates that the State's use of peremptory challenges for Gonzales, Williams, and Dennis was racially motivated. *See Miller-El*, 545 U.S. at 241.

As discussed in the previous section, all three individuals believed in the death penalty. On their questionnaires, Gonzales and Williams both summarized

142

**156**

their death penalty beliefs as, "I believe that the death penalty is appropriate for all crimes involving murder." (Ex. 38 at 6 [Gonzales Questionnaire]; Ex. 41 at 6 [Williams Questionnaire].) On his questionnaire, Dennis indicated "I believe that the death penalty is appropriate for some crimes involving murder, and I could return a verdict which assessed the death penalty in a proper case." (Ex. 36 at 6 [Dennis Questionnaire].) A large number of State-accepted white panelists shared the same belief, including several who ultimately served on the jury. (*See, e.g.*, Ex. 32 at 6 [Armstrong Questionnaire]; Ex. 33 at 6 [Base Questionnaire]; Ex. 34 at 6 [Cantrell Questionnaire].)

Additionally, Williams and Dennis both answered that they believed the death penalty should be used as a punishment for crime about as frequently as it has been previously. (Ex. 41 at 6 [Williams Questionnaire]; Ex. 36 at 6 [Dennis Questionnaire].) Although Gonzales answered he thought it should be used "less frequently," he explained during his individual questioning that his answer was based on the belief that prisoners were locked up "alone." (Ex. 38 at 6 [Gonzales Questionnaire]; 16 RR at 106-07.) Many of the white panelists accepted by the State answered identically to Williams and Dennis, including several who ultimately served on the jury. (*See, e.g.*, Ex. 32 at 6 [Armstrong Questionnaire]; Ex. 33 at 6 [Base Questionnaire]; Ex. 34 at 6 [Cantrell Questionnaire]. In fact, two white jurors who were accepted by both sides and served on the jury believed the death penalty should be used "less frequently." (Ex. 37 at 6 [Ferianc Questionnaire]; Ex. 39 at 6 [Olson Questionnaire].)

Furthermore, the three minority panelists in question were not more strongly in favor of life without parole as a sentence than white panelists accepted by the State. When describing their view on life in prison without parole, both Gonzales and Williams agreed that life would be "appropriate in all cases of capital murder." (Ex. 38 at 5 [Gonzales Questionnaire]; Ex. 41 at 5 [Williams Questionnaire].)



Several other white panelists the State did not exercise a strike on, including one who served on the jury, also stated life without parole is "appropriate in all cases of murder." (*See, e.g*, Ex. 39 at 5 [Olson Questionnaire].)

Based on their willingness to consider the death penalty as discussed above, and further answers provided during individual voir dire, all three prospective minority jurors were open to considering both the death penalty and life without parole. Their answers indicated that they did not have a bias for either the State or the defense. A large number of State-accepted white panelists provided similar answers, including many who ultimately served on the jury. (*See, e.g.*, Ex. 32 at 5-6 [Armstrong Questionnaire]; Ex. 33 at 5-6 [Base Questionnaire]; Ex. 34 at 5-6 [Cantrell Questionnaire].)

### E. Deficient Performance and Prejudice

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." ABA Guidelines, Guideline 10.8 (Commentary) (citing Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43). Trial counsel violated this important duty by failing to raise a *Batson* challenge when the State used three peremptory challenges to remove minority prospective jurors Gonzales, Williams, and Dennis. In fact, trial counsel failed to raise any objections to the removal of these three jurors. As such, the State was not required to provide a race-neutral reason for its removal of prospective jurors Gonzales, Williams, and Dennis, making the task of comparative juror analysis, and appellate review, much more difficult.

A close analysis of these three prospective jurors indicates that their qualifications and opinions were similar to those of white venire members accepted by the State. Trial counsel had possession of each panelist's juror questionnaire and was present for all of the individual voir dire sessions. Counsel should have

**158**

been aware that Gonzales, Williams, and Dennis were similarly situated to white panelists accepted by the State. Indeed, based on the answers provided by the three minority prospective jurors during their individual voir dire, it appears that they fell right in the middle of the road when expressing their views on the death penalty and life without parole. The striking similarity of their answers with many State-accepted white panelists should have been observed by trial counsel to reveal the State's discriminatory motive behind its peremptory challenges to prospective jurors Gonzales, Williams, and Dennis.

Trial counsel's failure to object to a racially discriminatory peremptory strike was objectively unreasonable performance.[18] As discussed in the previous section, prospective jurors Gonzales, Williams, and Dennis were similarly situated to other accepted jurors in terms of their qualifications and opinions regarding the death penalty. There is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left Hummel with a constitutionally-infirm jury; a malady that can only be remedied by a new trial. *See Robbins*, 528 U.S. at 285; *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d at 329-30.

### CLAIM TWELVE

### HUMMEL'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING

The "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

---

[18] To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them. *See Robbins*, 528 U.S. at 285.

less than death." *Lockett*, 438 U.S. at 604 (emphasis in original, footnote omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."). Texas' statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of this Constitutional mandate. Therefore, Hummel's death sentence violates his applicable state and federal Constitutional rights, as well as state statutory law, United State Supreme Court case law, and state case law, and should be vacated.

## A. The Texas Statute and Hummel's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute instructs that a trial court shall submit at least two issues to the jury: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. Tex. Code Crim. Proc. Art. 37.071 §2 (b)(1), (e)(1).

Regarding this second special issue, the trial court shall also instruct the jury that if the jury finds a circumstance warranting life, the court will sentence the defendant to life in prison and the defendant will be ineligible for parole. *Id.* at §2 (e)(2)(A-B). Further, the court instructs that the jury must answer this question "Yes" or "No," that it may not answer "No" unless unanimous or "Yes" unless ten

**160**

or more jurors agree, and that the jurors need not agree on the particular evidence that is mitigating. *Id.* at §2 (f)(1-3).

Along with these procedural instructions, the Texas statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's *moral blameworthiness*." Tex. Code Crim Proc. Art. 37.071 §2 (f)(4) (emphasis added). No further definition of "moral blameworthiness" is provided. Neither are there further instructions regarding the relationship of this instruction to the dictates of the special issue itself.

As directed by the statute, the trial court in Hummel's case gave the statutorily required instructions during the punishment phase of trial before the jury retired to deliberate. (4 CR at 727.) Specifically, the court instructed the jury to answer Special Issue Number 2: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." (*Id.* at 727.) In addition, the court admonished the jury that in answering Special Issue Number 2, "You shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." (*Id.* at 727.)

### B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and Warrant a Life Sentence

The Supreme Court has long required that a jury "must be permitted to 'consider fully' . . . mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir*, 550 U.S. at 260. Each juror must have broad

**161**

discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the State approves as mitigating. *Tennard*, 542 U.S. at 285 ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations omitted); *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Furthermore, the avenues of mitigation open to a capital jury are not, and must not be, limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."); *Hodge v. Kentucky*, __ U.S. __, 133 S. Ct. 506, 506 (2012) (Sotomayor, J., dissenting from denial of cert.) ("Mitigation evidence need not, and rarely could, 'explain' a heinous crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead."). For example, the Supreme Court has upheld the mitigating potential of evidence that an inmate has adjusted well in prison leading up to his trial. *Skipper*, 476 U.S. at 4-5.

In *Skipper*, the Court considered evidence that the defendant wished to present from two jailers and a visitor that the defendant had "made a good adjustment" in jail. *Id.* at 3. The Court noted that "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id.* at 4-5 (quoting *Lockett*

**162**

*v. Ohio*, 438 U.S. at 604.). Thus, such evidence could not "be excluded from the sentencer's consideration." *Id.* at 5.

Importantly, the Court noted that evidence regarding Skipper's adjustment in prison "would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4; *Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."). Yet the Court found that it could "hardly be disputed" that this evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Skipper*, 476 U.S. at 4, 7 ("[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination.").

Like the defendant in *Skipper*, Hummel presented to the jury evidence regarding his background and character as mitigation evidence. Some of this evidence related to the conceptualization of mitigation expressed in *Wiggins* that "defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less *culpable*." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*) (emphasis added). However, other evidence—*i.e.*, that Hummel had been a Marine—bore no specific link to his legal or moral blameworthiness for the crime in question. Rather, such evidence offered compelling argument that, although legally and morally to blame for the crime, Hummel was a worthwhile person who was not deserving of a death sentence. Just as much as evidence that Hummel's mental health or background contributed to the crime, this type of evidence held equal potential for jurors to weigh and decide it mitigated Hummel's overall deservingness of being executed. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) ("[S]o long as the class of murderers subject to capital punishment is

149

**163**

narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant."). However, based on the language of Texas' statute, it is unclear how any evidence of a positive character and worthwhile life, as opposed to a "disadvantaged background," would be given effect by the jury.

Because of the statutorily mandated instruction, the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to Hummel's "moral blameworthiness." For any of Hummel's jurors to have given full effect to evidence they found warranted a sentence of life, but that did not reduce Hummel's blameworthiness for the crime, the juror would have had to violate their instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001). Because, "[w]e generally presume that jurors follow their instructions," there is a reasonable probability that the result of Hummel's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### C. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Hummel's trial, the jury was prohibited from giving effect to any mitigation evidence that did not meet a narrowed category of evidence, unconstitutionally limiting their ability to give that reasoned moral response. *Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

The Supreme Court previously upheld the validity of the Texas death penalty statute "on the basis of assurances that the special issues would be

**164**

interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry v. Lynaugh*, 492 U.S. at 318. Since that time, repeat warnings have been,

> issued from th[e] Court regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death.

*Brewer v. Quarterman*, 550 U.S. 286, 296 (2007).

In this case, the application of the Texas death penalty statute impaired Hummel's rights to have *all* mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence. *Penry v. Lynaugh*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced."). Therefore, Hummel's death sentence should be reversed.

### CLAIM THIRTEEN

### HUMMEL'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY

Because of the prosecutorial discretion established under Texas' system of administering criminal justice, a vast minority of Texas counties are responsible for a sizable majority of death sentences assessed over the last thirty-six years. Both geographic and racial disparities have created a system of capital punishment in Texas that punishes, not based on the heinousness of a defendant's crime, but on the irrelevant factors of where he lives and what races were involved in the crime. Hummel's capital sentence was handed down in the midst of this arbitrary system. As such, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Hummel's sentence of death violates his applicable state and federal Constitutional rights, as well as state

151

**165**

statutory law, and United States Supreme Court and state case law and should be vacated.

## A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

The United States Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."). The Court briefly suspended the death penalty in *Furman v. Georgia* during the 1970s based on this heightened standard. 408 U.S. 238 (1972) (per curiam). The Court rested its decision on the basis that the lack of guidance and narrowing in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

Following *Furman*, the Court has been careful to weigh a death penalty sentencing scheme to determine whether there are suitable safeguards to prevent the arbitrary assignment of death. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case"). In finding mandatory death sentencing unconstitutional, the Court noted that juries will often refuse to convict defendants because they are deterred from automatically sentencing someone to death. *Id.* at 302. "Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly." *Id.* at

303.  Instead, a death penalty scheme must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Id.*

In 1976, the Court believed States had developed an answer to the *Furman* test that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  The Court held that procedural reforms—such as a bifurcated trial, narrowing of death eligible crimes, and proportional appellate review—"focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant" preventing it from "wantonly and freakishly impos[ing] the death sentence." *Id.* at 206-07.

Even those procedures, however, continue to be reviewed for their effectiveness in preventing the arbitrary assessment of death.  *Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980) (reviewing the application of Georgia's aggravating factor that a crime be "outrageously or wantonly vile, horrible or inhuman").  When it can be said that "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," a state's death penalty scheme can no longer be said to be imposing a death sentence "based on reason rather than caprice or emotion." *Id.* at 433.

## B.  Texas' Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas' death penalty statute in *Jurek v. Texas* in 1976.  428 U.S. at 273-74 ("[T]he Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.").  The Court found that Texas' narrowing of death eligible crimes and

153

**167**

bifurcation of the guilt/innocence and penalty trials would likely ensure "the evenhanded, rational, and consistent imposition of death sentences under law." *Id.* at 276. However, even this judgment has been the subject of repeated review to ensure that the practical effect of Texas's system is not the creation of an arbitrary assignment of death. *See, e.g., Penry v. Lynaugh*, 492 U.S. at 328 (invalidating Texas' statute for failing to instruct juries they may consider mitigating evidence); *Penry v. Johnson*, 532 U.S. at 804 (invalidating Texas' supplemental instruction on mitigation for failing to sufficiently provide a jury the mechanism to consider mitigation evidence).

Were a court to review the state of the death penalty in Texas today, it would find much the same "lightning strike" phenomenon that was found unconstitutional in *Furman*. In 2011, Texas had 1,089 murders. Tex. Dep't of Pub. Safety, *Index Crime Analysis 2011, available at* http://www.txdps.state.tx.us/crimereports/11/citCh3.pdf (last visited on May 28, 2013). Yet, only eight death sentences were assessed by Texas juries in 2011. Tex. Dep't Crim. Justice, *Offenders on Death Row, available at* http://www.tdcj.state.tx.us/stat/dr_offenders_on_dr.html (last visited on May 28, 2013). Further, the number of death sentences assessed throughout the state has declined significantly over the three decades. (*Id.*) Despite being the "capital of capital sentencing," the numbers show that even in Texas a death sentence is becoming increasingly rare as a utilized punishment.

Although Texas juries continue to be guided by the special issues under Texas law in making a judgment in an individual capital case, there are other factors at work that mean that Texas' system no longer functions as an "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

**168**

## 1. Geography

Since 1976, there have been 780 offenders that either have been executed or are currently housed on death row in Texas. Tex. Dep't Crim. Justice, *Death Row Information, available at* http://www.tdcj.state.tx.us/death_row/index.html (last visited May 22, 2013). Yet only 119 out of the 254 counties in Texas have contributed an offender to that list.[19] *Id.* Seven counties (Bexar, Dallas, Harris, Jefferson, Nueces, Smith, and Tarrant) accounted for nearly eighty percent of these offenders. *Id.* Five additional counties (Cameron, El Paso, Lubbock, Montgomery, and Travis) accounted for another ten percent. *Id.*

Texas is not alone in this phenomenon. Multiple studies conducted throughout the country have identified geographic discrepancies with the imposition of the death penalty within a particular state.[20] *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. 389 (2010) (discussing studies in Arizona, Pennsylvania, Missouri, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty* (March 2009), *available at* http://works.bepress.com/adam_gershowitz/5/ (last

---

[19] Only 119 counties of the 254 have ever sentenced an inmate to death, including people who are no longer on death row, making up the over 1000 inmates that have received a death sentence in Texas since 1976. Tex. Dep't Crim. Justice, *Number of Offenders Sentenced to Death From Each County, available at* http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited May 22, 2013).

[20] This, of course, says nothing of the geographic discrepancy identified *between* the various states that assess the death penalty. *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL OF RIGHTS J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique. The result is that-not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty-significant discrepancies exist among the death penalty jurisdictions.").

visited September 20, 2012). In one study, the authors found that over a four year period in Missouri, seventy-six percent of cases charged as either murder one, murder two, or involuntary manslaughter met the statutory definition to be eligible for the death penalty. Katherine Barnes et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-11 (2009). However, only five percent of those ever faced a death penalty trial. *Id.* at 309. As a result, prosecutors throughout the state made the decision not to seek death in seventy-one percent of death eligible cases. *Id.* This discretion was not spread evenly, though, as prosecutors in St. Louis City and Jackson County charged capital cases far less frequently (6.5 percent of cases) than prosecutors in the rest of the state (20 percent). *Id.* at 344.

A commission created to study the death penalty in New Jersey similarly noted concern about "the existence of variability among counties in the application of the death penalty." New Jersey Death Penalty Commission Report at 43 (Jan. 2007) available at http://www.njleg.state.nj.us/committees/dpsc_final.pdf (last visited May 26, 2012). The commission considered a hypothetical where:

> The exact same case of a killing occurs in neighboring counties. All of the circumstances are the same. In one county the defendant is capitally prosecuted, is subject to a penalty trial, and is subject to the ultimate outcome of death. In the other county the defendant is not so treated; either through a plea bargaining or other processes he receives a penalty that is much less harsh.

*Id.* Although the facts of the hypothetical could be attributed to multiple factors, the commission was "troubled by the degree to which the geographic location where the crime was committed appears to affect the ultimate disposition of the case." *Id.*

In *Jurek* and in *Gregg*, the Supreme Court considered the issue of whether prosecutorial discretion in choosing which cases to seek the death penalty created

156

**170**

an impermissible arbitrariness in capital sentencing. *Gregg*, 428 US. at 199; *Jurek*, 428 U.S. at 274 ("we reject it for the reasons set out in our opinion today in *Gregg*"). The Court determined that this decision-making worked to remove defendants from the risk of death and did not violate the constitution, as long as the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg*, 428 U.S. at 199. Justice White, in his concurrence, noted that the decision of prosecutors would likely mirror that of juries in deciding which cases to seek death based on the seriousness of the offense.

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

Experience of the last thirty-six years has shown that the practical effect of the use of prosecutorial discretion has not been to narrow the field of death eligible defendants to the most serious and heinous cases. It stretches credulity to imagine that the seven counties in Texas that are responsible for nearly eighty percent of the inmates executed or currently on death row correspondingly have significantly more heinous crimes occurring than other counties. Rather, other factors like ideological beliefs regarding the death penalty, the depth of experience in prosecuting capital cases, and the available resources (both time and money) to prosecute a capital case impact a prosecutor's decision whether the seek the death penalty. *See* Gershowitz, *Statewide Capital Punishment*, at 11-15 (noting various times prosecutor offices have declined to pursue the death penalty because of available resources).

**171**

The influence of such factors on the capital system in Texas renders it no longer the "evenhanded, rational, and consistent" system of imposing the death penalty the Supreme Court expected it to be in 1976. *Jurek*, 428 U.S. at 276. The Court on a prior occasion reversed course in its belief that the Texas system would work properly in practice. *Compare Penry v. Lynaugh*, 492 U.S. at 318 ("the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present") *with Jurek*, 428 U.S. at 272 (noting the Texas CCA indicated it would "interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"). The geographic disparities in the imposition of the death penalty in Texas offer equally compelling grounds to abandon the expectation that prosecutorial discretion can offer a consistent application of the law. *Marbury v. Madison*, 1 Cranch 137, 163 (U.S. 1803) ("The government of the United States has been emphatically termed a government of laws, and not of men.").

## 2. Race

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases. David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUMAN RIGHTS L. REV. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICHIGAN J. OF RACE & LAW 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUSTON L. REV. 807 (2008-2009) (same); Scott Phillips, *Continued Racial*

**172**

*Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUSTON L. REV. 131 (2012) (same).

One study considered the Harris County District Attorney's decisions regarding the charging of capital cases under the Holmes administration. Phillips, 45 HOUSTON L. REV. at 816, 818. The study found that disparities existed between the treatment of black and white defendants and victims. *Id.* at 830. Although black and white defendants were charged with capital murder at relatively similar rates, black defendants were more likely to have committed a less serious offense than their white counterparts. *Id.* In contrast, black victims were significantly less likely to prompt a capital charge than white victims. *Id.* at 834.

A second study looked at the same factors in Harris County under the Rosenthal administration to determine if the same racial disparities continued. Phillips, 50 HOUSTON L. REV. at 134. While this second study revealed that race of the defendant did not matter under the Rosenthal administration, race of the victim still proved to be a controlling factor. *Id.* at 148. The findings of the second study suggest that "the death penalty was imposed on behalf of white victims at more than twice the rate one would expect if the system were blind to race, and . . . on behalf of white female victims at more than five times the rate one would expect if the system were blind to race and gender." *Id.* at 150.

In another study, a random sample of 276 adults were given a file summary for a triple murder case. Epstein, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. at 407-08. The variables in the experiment were 1) some of the group was given a maximum sentence to allot of life without parole, while others could give a death sentence and 2) the suspect's name for some was a race-neutral name and for others was a name traditionally associated with minorities. *Id.* The results of the study showed that the verdicts of guilt varied little when only life without parole

was possible, but when the maximum sentence was death the defendants with traditional minority names were significantly more likely to be found guilty. *Id.*

The existence of racial disparities in capital sentencing can also cut in the opposite direction, depending on the geographic region of the study. *See* Barnes, 51 ARIZ. L. REV. at 348. A study of Missouri's death penalty revealed that black defendants were about a third as likely to face a capital charge as white defendants. *Id.* White defendants were also more likely to have those capital charges go to trial, while black defendants were more likely to have a jury reject the capital charge. *Id.*

Regardless of the direction of the disparity, these studies show that race continues to be a motivating factor behind the imposition of the death penalty— even if that factor is unconsciously applied. When the law is utilized in such a way that it becomes more directed at a "particular class of persons," especially in the context of racial discrimination, the implementation of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

### C. Conclusion

For the foregoing reasons, Texas' death penalty scheme is unconstitutional. Therefore, Hummel sentence of death should be vacated.

### CLAIM FOURTEEN

### HUMMEL'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

The "10-12" jury instruction in the Texas capital sentencing scheme violates Hummel's applicable state and federal Constitutional rights, as well as state

160

**174**

statutory law and state case law. Therefore, Hummel's death sentence should be vacated.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased;[21] (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. Art. 37.071 § 2(b)(1)-(2), (e)(1).

The court shall sentence a defendant to death if jury answers "Yes" to the first two special issues and "No" to the third special issues. If the jury returns a "No" answer to either of the first two special issues, a "Yes" to the third special issue, or if the jury is unable to answer all of the questions submitted to them under these guidelines, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. Art. 37.071 § 2(g).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. Art. 37.071 § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. Tex. Code Crim. Proc. Art. 37.071 § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds a mitigating circumstance under the third special issue, the

---

[21] This second special issue is used in cases where the jury has found a defendant guilty under the law of parties. Art. 37.071(b)(2). In Hummel's case the jury was only given the first and third special issues. (4 CR at 726-27.)

**175**

defendant will be sentenced to life without parole.  Tex. Code Crim. Proc. Art. 37.071 (e)(2).  Yet, the jury is not instructed about, and indeed is prohibited from being informed of, the effect of failure to agree on any of the questions submitted to them, which also renders a life without parole sentence.  Tex. Code Crim. Proc. Art. 37.071 § 2(a)(1).

Trial counsel filed a pretrial motion to declare the Texas capital sentencing scheme unconstitutional, including a challenge to the constitutionality of the 10-12 instruction, on August 4, 2010.  (2 CR at 272-75.)  The court denied trial counsel's motion on April 26, 2011.  (10 RR at 53.)  Despite the pre-trial defense motion that this statutory "10-12" rule would mislead the jury, the trial court instructed the jury in accordance with the requirements of the statute.  Following deliberations, the jury returned unanimous answers of "Yes" to the continuing threat question and "No" to the mitigating circumstances question.  (45 RR at 94-95.)

Because this statutory scheme misinforms the jury and brings outside considerations that impermissibly bear on the jury's verdict, the Texas statute violates the principles of the Eighth and Fourteenth Amendments, depriving Hummel of a fair sentencing trial.

**A. The Supreme Court Has Invalidated Jury Instructions That Place An Added Burden on the Sentencer Before Finding Mitigating Circumstances.**

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors.  In the state of Maryland, the capital sentencing jury proceeded through three sections of a verdict form.  In Section I, the jury was asked to evaluate whether any of ten aggravating factors was present.  *Id.* at 385-86.  If the jury unanimously found at least one aggravating factor, it was instructed to move on to Section II, where it was instructed to mark "Yes" next to any mitigating factors it

162

**176**

unanimously found. *Id.* at 386-88.  The jury was only instructed to move on to Section III if one or more of the mitigating factors in Section II had been marked "Yes."[22]  *Id.* at 388.  If all the mitigating factors in Section II were marked "No," the defendant was sentenced to death.  *Id.* at 389.

In assessing the constitutionality of this sentencing scheme, the *Mills* Court noted that "in a capital case 'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.'" 486 U.S. at 374 (alteration and emphasis in original) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion))).  The *Mills* Court held that the Maryland capital sentencing scheme was unconstitutional because a reasonable jury could have interpreted the jury instructions and the accompanying verdict form as requiring that the jury should mark "No" next to a mitigating factor unless the jurors were unanimous, even if all but one of the jurors thought that factor was present.  *See Mills*, 486 U.S. at 378-79, 384.  Given this potential interpretation by a reasonable juror, there was an unacceptable risk that the jury could be prevented from reaching the balancing stage even if all twelve jurors believed that some mitigating circumstance was present but could not agree on a particular mitigating factor.  *Id.* at 384 ("[T]he sentencer must be permitted to consider all mitigating evidence.  The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.").

---

[22] In Section III, jurors were asked to balance the mitigating circumstances marked "Yes" in Section II against the aggravating circumstances marked "Yes" in Section I. *Id.* at 388-89.

**177**

Similarly, in *McKoy v. North Carolina* the Supreme Court examined a North Carolina capital sentencing scheme that burdened the ability of a majority of a jury to reach a life sentence. 494 U.S. 433 (1990). In that case, the requirement that the jury find the presence of an individual mitigating factor unanimously was explicit in the statute. *Id.* at 435. Because the unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," the North Carolina statute violated the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

## B. Texas' 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence

*Mills* and *McKoy* establish that a jury should not be instructed in a way that allows a minority of the jury to sway the verdict to a sentence of death. *Mills*, 486 U.S. at 384 ("The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."). Yet the 10-12 rule embodied in the Texas scheme does just this.

Hummel's jury was asked to consider whether he posed a future danger and whether any mitigating factors warranted a life sentence. (53 RR at 8-9.) This situation is best explained with a hypothetical. Suppose that in Hummel's jury, Jurors one through five wanted to answer "No" to the future dangerousness question. Under Texas' scheme, they would not have the ten votes needed to answer the first special issue. In addition, they were instructed that they could not answer the question without a unanimous "Yes" vote or ten votes of "No." It is a reasonable probability that these five jurors might be swayed by the seven vote majority to come to an agreed "Yes" vote, fearing that not answering the question might result in a mistrial.

164

**178**

Suppose then, that during deliberations on the second special issue, jurors six through ten wanted to answer "Yes" to finding mitigating evidence. Again, their five votes would be short of the ten needed to get a life sentence and would be subject to pressure from the seven vote majority to agree to a unanimous "No" vote. Without knowledge that under Texas law a single holdout "No" juror on this special issue would result in a life sentence, there is a reasonable possibility that these jurors would change their vote instead of allow what they perceived to be a mistrial.

With the jury thus answering the future dangerousness special issue "Yes" and the mitigation special issue "No" under these circumstances, Hummel would be sentenced to death. Yet under the hypothetical, ten jurors would have found a valid statutory reason to grant a life sentence. Only two jurors would have answered the special issues in a way that would lead to a death sentence. Yet the requirement under the statute to instruct that ten votes for *each* special issue are needed to answer a special issue, and the simultaneous prohibition under the statute from telling the jury the truth that a single vote is enough to assign a life verdict, allows a minority of jurors to rule while impairing the ability of the majority of jurors to effectuate their desire for a life sentence. This is exactly the risk the Supreme Court expressed in *Mills* and *McKoy* violates the protections of the Eight and Fourteenth Amendments. Thus, the capital sentencing scheme employed in Texas is unconstitutional.

## C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations

In addition to violating the Supreme Court precedent of *Mills* and *McKoy* by giving undue effect to a minority voice in the jury, the effect of Texas' 10-12 rule creates an impermissible outside influence on jury deliberations. By misleading jurors as to the result of their failure to reach a unanimous or ten vote agreement,

165

**179**

the statute improperly coerces juries into death sentences on the basis of stimuli divorced from the merits of the case.

It is a classic and common feature of American jurisprudence that when a jury is unable to agree a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963). Yet this option is so costly and cumbersome, the law presumes that jurors should enter deliberations able to be swayed in their opinion in order to reach a verdict. *Allen v. United States*, 164 U.S. 492, 501 (1896). A reasonable juror should feel the weight of the instructions from the trial court and attempt to avoid reaching an impasse.

This concern over having a mistrial understandably rises to new heights in a capital case. Unlike nearly all other cases, the constitutionally required procedures and safeguards that take place in a capital trial create an atmosphere in which a juror is keenly aware of the expense and care being taken. Jurors are told of the weeks that are spent and the hundreds of veniremen that are questioned in order to find twelve suitable jurors. They are told to expect (and usually sit through) a long trial with copious amounts of evidence from lay and expert witness. They are treated to not one, but two sets of opening argument, closing argument, and jury instructions. They are led to believe that all manner of experts could be retained at great expense to testify at the trial. (53 RR at 47.)

In this setting, a reasonable juror would understandably be loath to be the cause of a mistrial by failing to reach a verdict. The jurors are then instructed that they must reach a unanimous (or ten person) vote in order to answer the special issues in the punishment phase. Yet, unlike any trials that a juror might be generally familiar with, under Texas law a verdict will be reached if the jury fails to answer the special issues during the punishment phase. The law's desire for unanimity no longer operates.

166

**180**

However, by intentionally failing to instruct the jury that a sentence of life without parole will result, even if the jury fails to reach an agreement on any of the special issues, the statute misleads a juror about the effect of their vote.    A reasonable juror could, therefore, labor under the impression that a failure to reach an agreement with the other eleven jurors would result in a costly re-trial.  Instead of operating as an intended incentive to reach a verdict, in a capital case the 10-12 rule creates an outside influence on a juror's deliberation and vote.

### D. Conclusion

Because of the reasons stated above, the Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments of the Constitution.  Thus, Hummel's death sentence was impermissibly obtained and should be vacated.

## CLAIM FIFTEEN

## HUMMEL IS INELIGIBLE FOR A DEATH SENTENCE BECAUSE OF HIS MENTAL IMPAIRMENTS

Hummel's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, because his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution.

In *Atkins v. Virginia*, the Supreme Court held the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of mentally retarded individuals.  The Court determined that society recognized the lesser moral culpability of criminal offenders with mental retardation, as evidenced by a national consensus prohibiting the execution of persons with mental retardation.  Because of their diminished culpability, the execution of a person with mental retardation would not serve any valid retributive or deterrent function.  Furthermore, several factors indicated that persons with mental retardation were at

much greater risk of wrongfully receiving a sentence of death. *Atkins v. Virginia*, 536 U.S. 304, 320-21 (2002).

The underlying rationale behind the national consensus observed by the Court was the lesser individual culpability of a person with mental retardation. In *Atkins*, the Court noted that persons with mental retardation, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control their impulses." *Atkins*, 536 U.S. at 318. Recognizing these cognitive deficits, the Court then held that "the large number of States prohibiting the execution of mentally retarded . . . persons provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* at 316. The Court reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*. 543 U.S. 551, 571 (2005).

Next, the Court examined what impact this diminished culpability had on the legitimate goals of criminal punishment. Unless the imposition of the death penalty "measurably contributes" to one or both of the penological goals of retribution or deterrence, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (internal quotation omitted). The Court held that the retributive value of punishment "necessarily depends on the culpability of the offender." *Atkins,* 536 U.S. at 319. With respect to capital punishment "the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." *Id.* at 319. Subjecting persons with mental retardation to capital punishment similarly did not serve a deterrent purpose. The deterrent value of punishment is necessarily reduced when an individual's cognitive and behavioral impairments "make it less likely that they can process the

168

**182**

information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320. Executing persons with mental retardation would also have no deterrent effect with respect to offenders who are not mentally retarded. *Id.*

Finally, the Court reasoned that the reduced capacity of mentally retarded offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . ." *Atkins*, 536 U.S. at 320 (internal quotation omitted). Mentally retarded individuals are less able to "make a persuasive showing of mitigation . . . . are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* a 320-21. Mental retardation is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with mental retardation "face a special risk of wrongful execution." *Id.* at 321.

Hummel suffers from mental impairments that affect him in much the same way as intellectual disability. Complex post-traumatic stress disorder, due to attachment trauma, prevents Hummel from responding and reacting to social situations and stressors in the way that an average individual would. (Ex. 1 at ¶¶ 37, 42-42, 52, 57 [Aff. of Dr. Hardesty].)

Like intellectual disability which requires "significant limitations in adaptive skills such as communication, self-care, and self-direction," Hummel's mental impairment left him unable to control his impulses and engage in logical reasoning. (Ex. 1 at ¶¶52, 57 [Aff. of Dr. Hardesty].) As in *Atkins*, these cognitive deficiencies significantly reduce Hummel's moral culpability. As Hummel's impairments left him unable to consider the future repercussions of his actions, there is no deterrent value in his execution. Further, Hummel's mental

169

**183**

impairments make him susceptible to an enhanced risk of wrongful execution as they diminished his ability to communicate with counsel and others, and are likely to be misinterpreted by a jury as an aggravating, rather than a mitigating factor.

The same concerns that underlie execution of mentally retarded offenders exist in Hummel's case as well. The imposition of the death penalty would be grossly disproportionate to Hummel's moral culpability, would not "measurably advance the deterrent or retributive purpose of the death penalty," and carries an enhanced risk of error. *Atkins*, 536 U.S. at 320-21. For these reasons, this Court should vacate Hummel's death sentence.

**184**

## IV.

## PRAYER FOR RELIEF

WHEREFORE, John William Hummel prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of his claims;

2. Vacate his death sentence and conviction;

3. Grant any other relief that law or justice may require.

Respectfully submitted,

DATED:     June 5, 2013

By _Robert Romig_

Robert Romig

By _____

Sam Farina-Henry

171

**185**

STATE OF TEXAS                    §

COUNTY OF TARRANT          §

VERIFICATION

     BEFORE ME, the undersigned authority, on this day personally appeared Robert Romig, who upon being duly sworn by me testified as follows:

     1.     I am a member of the State Bar of Texas.

     2.     I am the duly authorized attorney for John William Hummel, having the authority to prepare and to verify Hummel's Application for Post-Conviction Writ of Habeas Corpus.

     3.     I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

_____
Robert Romig

     SUBSCRIBED AND SWORN TO BEFORE ME on this 5th day of June, 2013.

_____
Notary Public, State of Texas



ELIZABETH GARZA
Notary Public, State of Texas
My Commission Expires
APRIL 29, 2015

Notary · · · · Bond

172

**186**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Application for Writ of Habeas Corpus by hand to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, via hand delivery)

Honorable Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, via hand delivery)

Helena Faulkner, Asst. Crim. D.A.
Tarrant County District Attorney
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, via hand delivery)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on June 5, 2013 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Robert Romig

173

**187**

## IN THE 432nd JUDICIAL DISTRICT COURT
## TARRANT COUNTY, TEXAS

C — 432-009923 — 1184294-A

FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS
JUN 05 2013
TIME _____
BY _____ 12:19 pm
DEPUTY

|  |  |
|---|---|
| EX PARTE | ) |
| JOHN WILLIAM HUMMEL, | ) |
| APPLICANT | ) |
|  | ) |
|  | ) |
|  | ) |

Trial Cause No.
1184294D

## EXHIBITS 1-31
## TO INITIAL APPLICATION FOR A WRIT OF HABEAS CORPUS
## VOLUME 1

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAM FARINA-HENRY (No. 24082979)
(E-mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**188**

**EXHIBITS:  Ex Parte John Hummel**

<u>**Expert Affidavits**</u>

Exhibit 1:    Dr. Susan Hardesty

Exhibit 2:    Laura Smith

<u>**Lay Witness Affidavits**</u>

Exhibit 3:    Haila Adams

Exhibit 4:    Cody Bell

Exhibit 5:    Stephanie Bennett

Exhibit 6:    Chad Brown

Exhibit 7:    Efrain Chaidez

Exhibit 8:    Lance Dupre

Exhibit 9:    Fred Emmer

Exhibit 10:    Shana Fowler

Exhibit 11:    George Goodson

Exhibit 12:    Thomas Hamilton

Exhibit 13:    Brian Jeter

Exhibit 14:    Wayne Matthias

Exhibit 15:    Christy Pack

Exhibit 16:    Christopher Paris

Exhibit 17:    Tonya Paris

Exhibit 18:    Derrick Parris

Exhibit 19:    Joseph Patterson

Exhibit 20:    Tommy Rigmaiden

Exhibit 21:    Rory Thomas

Exhibit 22:    Juror Nathaniel Davis

**189**

**Other Records**

Exhibit 23:    Border Patrol Documents

Exhibit 24:    Phone Transcripts

Exhibit 25:    San Diego Medical Records

Exhibit 26:    Tarrant County Policy – Dress Code

Exhibit 27:    Tarrant County Policy – High Risk Inmates

Exhibit 28:    Tarrant County Sherriff's Office letter

Exhibit 29:    Hummel Military Records

Exhibit 30:    Hummel Employment Records

Exhibit 31:    Excerpts from Appellate Brief

**Excerpts of Juror Questionnaires (Under Seal)**

Exhibit 32:    Questionnaire of Juror Armstrong

Exhibit 33:    Questionnaire of Juror Base

Exhibit 34:    Questionnaire of Juror Cantrell

Exhibit 35:    Questionnaire of Prospective Juror Cuevas

Exhibit 36:    Questionnaire of Prospective Juror Dennis

Exhibit 37:    Questionnaire of Juror Ferianc

Exhibit 38:    Questionnaire of Prospective Juror Gonzales

Exhibit 39:    Questionnaire of Juror Olson

Exhibit 40:    Questionnaire of Juror Sanchez

Exhibit 41:    Questionnaire of Prospective Juror Williams

**190**

## AFFIDAVIT OF DR. SUSAN J. HARDESTY

I, Susan J. Hardesty, state and declare as follows:

**Education and Experience**

1. I, Susan J Hardesty, am the Vice President and Medical Director for The Menninger Clinic, in Houston Texas.

2. I received my medical training at The University of North Carolina at Chapel Hill, graduating in 1990 with the degree Doctor of Medicine with Honors. I completed Residency in Psychiatry at The Medical University of South Carolina ("MUSC"). I am board-certified in psychiatry and in forensic psychiatry.

3. I am licensed to practice medicine in both Texas and South Carolina. I have a special interest in hospital psychiatry and forensic psychiatry. In my role as Medical Director, I oversee the clinical practice of all physicians at The Menninger Clinic. I am also the administrative supervisor of the pharmacy, the social workers and the psychologists who practice at the clinic.

4. In my forensic practice I do both civil and criminal evaluations. At MUSC, I was the director of the forensic fellowship. In that role I performed or supervised more than 100 criminal evaluations for the state of South Carolina. I am familiar with all phases of evaluation for criminal responsibility, criminal competencies and mitigation.

5. In my clinical practice at The Menninger Clinic a major focus of the work is in understanding the role of trauma in the lives of people. Trauma is a term that includes both physical trauma, such as abuse, assault, and physical injury as well as emotional trauma, which includes, neglect, emotional abuse, abandonment and other issues of

1

**191**

EXHIBIT 1 Page 1





early childhood development. I have presented and published in the academic field of trauma and treatment of trauma.

6. A copy of my resume is attached to this affidavit as Attachment A.

**Examination of John Hummel**

Purpose of Evaluation

7. I was contacted by the Office of Capital Writs, current post-conviction counsel for John Hummel. I was asked to perform a mental health assessment of Mr. Hummel and diagnose any mental illnesses or impairments Hummel suffered during his life and at the time of the crime. I was also asked to review and comment upon mental health testimony presented by Dr. Antoinette McGarrahan on behalf of Mr. Hummel during his capital trial.

8. I interviewed Mr. Hummel on April 12, 2013 at the Polunsky Unit in Livingston Texas. The interview was conducted in the contact interview room, at the Polunsky Unit, from 1:15 PM to approximately 4:00 PM on the above date.

9. I also reviewed a number of materials provided by post-conviction counsel, including witness affidavits, trial testimony, school and medical records, and academic literature. A full list of the materials I reviewed can be found as Attachment B.

Consent

10. Mr. Hummel was informed of my identity and affiliation with the Office of Capital Writs and the Menninger Clinic. He was informed that I was hired to assist in the appeal of his death penalty sentence. Mr. Hummel understood the limits and intent of this evaluation and agreed to proceed with the evaluation.

2



**192**

EXHIBIT 1 Page 2

Mental Status and Cognitive Evaluations

11. I conducted examinations of Mr. Hummel's mental status and cognitive function. Mr. Hummel readily cooperated with both examinations.

12. Based on the initial consent, Mr. Hummel's intact mental state, intact cognitive examination, and his understanding of the appeal process and possible outcomes, I felt that he had full capacity to proceed with the interview.

**Background**

13. John Hummel was born on November 4, 1975, in Arlington, Texas. His father was John Harold Hummel and his mother was Jackie Lou Hummel. John has one sister, Neata Romaine Hummel, who is nine years older than John. He was raised in Pacolet, South Carolina. John's family lived on a farm where his father worked in addition to his job at Kohler Manufacturing Company. John and Neata were socially isolated on the farm except for school.

14. John describes his family as very strict and much focused on religion. His father was always working and his mother was very strict about following the rules. John describes Neata his sister as his primary caregiver and felt she was more like a mother to him. His parents used corporal punishment to enforce the rules of the family. He did not describe the spankings as abusive. However, John's friends and uncle describe the style of parenting used by John's parents as extremely neglectful and emotionally hurtful.

15. If John and Neata made noise or disobeyed then they were punished, often getting beat with a belt. Neata was hit with a clothes hanger. John spent a lot of time isolated in his room with games. When he was



3

**193**

EXHIBIT 1 Page 3

angry he would beat up a pillow.  John and Neata were not allowed to show anger when they were being punished. John recalls receiving very little affection as a child, except from Neata.

16. John's mother especially did not show love to her children, but would show affection for other people's children by buying them gifts. When asked if he felt depressed to see his mother give expensive gifts to her friend's children while denying him and his sister even modest items John downplayed this issue.  John seemed very affectively disconnected from the content of this question and other questions about the incongruity between his view of his family and the views others had of the Hummels.

17. John attended elementary and high school in Pacolet and Jonesville, South Carolina. John struggled in school despite having an above average IQ.  He had a learning disorder that impacted his ability to read and spell.  This disorder was not formally diagnosed until John was in high school. Once he had accommodations made for his learning disorder, he was able to pass the high school exit examinations.  In addition, he was colorblind. This made him the butt of many jokes among his peers at school. John minimized the issue of teasing and did not elaborate on that issue in our conversation.

18. During his senior year of high school, John dated a young woman named Stephanie Bennett, whom he liked a lot. He integrated himself into Bennett's family and believed their relationship would end in marriage. At the time, Bennett began to distance herself from John; he did not recognize the emotional cues she was giving. She expressed surprise that he did not pick up on these cues. John was unable to explain the emotional disconnect between himself and Bennett.  He

4

**194**



EXHIBIT 1 Page 4



was unsure why the relationship with Bennett failed and what his role in the failure of the relationship might have been.

19. John described himself as an avid player of Dungeons & Dragons during school. He felt very at home in the fantasy world and played multiple characters in these games. Friends reported that John often tried to emulate their game play.

20. After high school John began to work at the warehouse of the BMG music company. He stated he was doing okay but could not make enough money to cover his expenses. He describes an incident in which he and his girlfriend came home to find his apartment being broken into. Shortly after the incident his family urged him to return home. John at this point decided to join the Marines.

21. John described the early part of his career in the Marines as good. He did basic training at Parris Island in South Carolina and was chosen to work as an intelligence specialist when a training slot in that specialty became available. John thrived in the work he was doing and interacted well with his colleagues and platoon leaders. His work involved reviewing and plotting intelligence data on troop and supply movements and positions. He felt he was good at the work and, in fact, so good that he felt he was better than some of the newer officers.

22. During the Marines, John began to frequent strip clubs and befriend strippers who worked there, believing that they cared for him on a personal level. John in fact became obsessed with the relationships he formed with the strippers. Again he had a distorted view of the roles and relationships he had formed. John also overvalued and emulated the style of dress and behavior of his close friends to the point that



5

**195**

EXHIBIT 1 Page 5

they found it necessary to bring this to his attention and ask that he be his own man.

23. John stated he did well until his friends were reassigned and a new captain took over, He then got sloppy with his appearance, gained weight, was placed in a special weight control unit.  Again, John was isolated from a support group and was subjected to teasing and humiliation. John felt he was treated unfairly during this time because it was his belief that the captain took out his dislike of one of John's colleagues, who had transferred out of the unit, on John.

24. John stated that, as he became disillusioned with the new leadership of his intelligence group, he got more depressed, gained more weight and felt very isolated. At one point, John attempted to go absent without leave. He was not away from his base for long but this episode resulted in the loss of his security clearance and the work that he enjoyed. After losing his role as an intelligence specialist, his assignments seemed trivial and he decided not to re-enlist and left the Marines with an honorable discharge.

25. During his visits to the strip clubs John met Lettie Ulbright, a homeless woman who was pregnant, and befriended her. John was not the father of the child, but he brought her home with him to South Carolina when he left the Marines. They lived in a mobile home together and John worked at the Kohler Manufacturing Company making plumbing appliances. For a while, he and the Ulbright did well together. John stopped going to strip clubs and seemed to be doing okay. John's sister Neata, however, arranged for Ulbright to leave shortly after her baby was born and John again began to drift.

6

**196**

EXHIBIT 1 Page 6

26. John's employment history shows that he changed jobs frequently. John worked at a cigarette warehouse, worked as a security guard and also worked in a restaurant. During this period, John was spending much more time at strip clubs, using marijuana, smoking cigarettes, and drinking. He remained obsessed with fantasy games and computer games. Rather than return home and live with his parents, John abruptly left South Carolina and moved to Texas.

27. Once in Texas he met his future wife, Joy. Joy became pregnant in November 2003, and the two were married in early 2004. Their daughter Jodi was born in July 2004. According to John, things were going pretty well during the first year of his marriage. Money was tight, but John was employed at a clothing warehouse and the family was getting by. John described work at the warehouse as hard, trivial, and at times unfair. John was teased by his coworkers and he felt they did not take good care of the work environment, which John believes led to him suffering an injury on the job.

28. One day, one of John's coworkers left a box open behind him while they were working on the packing line. John stepped back and tripped over the box, severely injuring his back. He injured two discs in his back, requiring two surgeries which ultimately were not fully successful. Following the surgeries, John had constant back and leg pain and he could not work.

29. With John physically unable to work, the family began to struggle financially. This left John increasingly stressed over his family's situation. Eventually, John, Joy and Jodi were forced to move into Joy's father's home.

7

**197**

EXHIBIT 1 Page 7

30. To make matters worse, John was diagnosed with Crohn's disease, a type of inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. John's case was severe enough to warrant surgery: an upper duodenal resection. The surgery involved removing a part of the bowel and reconnecting the remaining pieces. This type of surgery is debilitating due to the fact that there is a period when one cannot eat and then a slow advancing of diet. Typically, a single abdominal surgery of this kind requires a minimum of six months of recovery time to return to full functioning. Multiple surgeries take proportionately longer for a person to feel fully well.

31. John suffered multiple complications from this surgery. He ended up with peritonitis and needed an ostomy with an external bag. He also developed blood clots in both arms. After about a year, John had healed enough to have the colostomy reversed but still suffered from severe leg and back pain. The orthopedic surgeon recommended another surgery. But after the significant problems with the bowel surgery, and the minimal success of his prior back surgeries, John was very frightened of having yet another operation. After refusing the operation, the surgeon discharged John, saying he had reached maximum medical benefit of treatment and he was expected to return to some type of sedentary work. John received a small disability settlement but was denied permanent disability benefits. At this point, John was unable to lift objects or stand for long periods of time, so he no longer could perform manufacturing or warehouse work. Due to the family's precarious financial situation, John could not afford work training to obtain a more skilled job.

8

**198**

EXHIBIT 1 Page 8

32. John again felt helpless and as though he was unfairly treated as a result of problems that were beyond his control. Because of his medical conditions, John was unable to work for four years. At home, John was criticized for not having enough money, for not helping with the baby, for not getting a better job, and for not helping more around the house. However, John was weakened by his surgeries and medical problems, and was in constant pain. He felt both Joy and her father did not understand just how weak he was and how difficult and painful it was for him perform physical tasks. John underwent five significant, invasive surgeries and felt that as he was just beginning to fully recover, he was not being supported by his family.

33. John's medical problems negatively impacted his marriage and life with Joy. Joy tried to help, but she did not understand or accept that John could not physically do the things he had done in the past. John was humiliated by having the ostomy, by the occasional odors, leaks and spills. These issues negatively impacted their sexual relationship as well. John and Joy required the help of friends for things John would normally have been able to provide. Moreover, Joy's father was also critical of John's inability to provide for the family and to perform certain tasks.

34. John often felt like he was not cared for, misunderstood, and being blamed for things that were beyond his control.

35. John finally found a job as a security guard, making between 8 to 10 dollars an hour. He said it was very difficult to support the family on that small amount of money so Joy also had to work. John attempted to alleviate his stress about the situation his family was in by playing computer games and smoking, but was criticized for these activities.

**199**

EXHIBIT 1 Page 9

36. Shortly after starting his new job, John met a young woman, Kristie Freeze, who worked at a convenience store and the two began corresponding frequently. Eventually, John became caught up in the belief that he was in a meaningful relationship with Freeze. In fact, she did not view her association with John in the same way. After a single sexual encounter, Freeze decided to end their relationship, leaving John feeling more than ever trapped in a difficult marriage, alone, with no emotional support, and no hope for change.

**Discussion**

37. Mr. Hummel has a trauma-related illness that has been lifelong and pervasive, and can best be characterized as complex post-traumatic stress disorder, due to attachment trauma. "Attachment theory" is the psychological construct that one must form secure an emotional attachment to a consistent caregiver to be able to develop an integrated sense of self and to later be able to form mature, reciprocal adult relationships. "Attachment trauma" is the term used to define severe disruption of the development of personality and a sense of stable emotional self, which occurs when the early childhood relationships with mother or other primary caregivers are disrupted and/or pathological. Research shows that basic attachment patterns that are evident by one year of age are reflected in adult attachment disorders.

38. Dr. Jon Allen describes this as "a stress pile-up model" which "predicates childhood adversity as promoting disorder in the face of adult stress." And further, in discussing attachment trauma, Dr. Allen notes that trauma in this context can best be described as feeling alone in the midst of unbearably painful emotions. For a child, physical or



10

**200**

EXHIBIT 1 Page 10

sexual abuse creates fear, and if the abuser is also the caregiver, the child has no source of emotional comfort, and therefore is alone and afraid. Extensive, consistent neglect from a caregiver provokes the same fearful reaction, and a child will similarly feel alone and afraid with no recourse as a result of neglectful parenting. Repetitive episodes of this type of trauma lead to a very unstable sense of self and an attachment in which the child desperately needs the parent to survive but at the same time is constantly fearful of abandonment by the caregiver. Moreover, the child feels alone and has no recourse for easing the fear and finding comfort because the source of comfort is also the source of the distress. This creates a very disorganized and, at times, dissociative response from the child.

39. As I reviewed the affidavits and testimony of the many witnesses who have known John and his family, I discerned a clear pattern of attachment trauma.

40. John's parents were very strict and showed him, and his sister, very little affection. His mother rarely hugged or comforted John and Neata. John's mother was herself a victim of childhood abuse and, in what is well known as a sad and vicious cycle, perpetrated abuse on her own children. This is commonly seen as the abused parent herself does not know how to be a nurturing parent. John's mother was described as a disciplinarian and she was not particularly engaged with her children's lives. For example, John's learning disability was not addressed until he was in high school. John's father was functionally absent from John's life as he was primarily focused on his work or satisfying his own needs. John's mother had legal problems prior to leaving Texas. John's father had multiple affairs, at

11

**201**

EXHIBIT 1 Page 11

times in the home. Neata observed one such affair when she caught her father with another woman in the family home.

41. The environment described above has the characteristics of a setting in which there would be little safety or security with respect to relationships and the formation of secure sense of self and safe attachment patterns. The idea of an emotionally disconnected mother with a strict and harshly punitive disciplinary style and a self-absorbed father who is frequently absent and indiscreet in his violations of familial boundaries is a typical environment in which dysregulation of attachment and personality disorder formation is likely to occur.

42. The impact of this attachment trauma is seen in John's social interactions with others in high school, the military, and beyond. John was consistently described by friends as passive, withdrawn, quiet, guarded, socially inept, slow, and frequently was the butt of jokes. John was also very focused on escapism, as reflected by the amount of time he spent playing fantasy role-playing games, watching movies, and staying in his room.

43. John has a very passive and avoidant personality style. He did not respond to obviously upsetting situations. He misread social cues. He looked for safety in environments he could control. He craved social attachment at the same time he did not know how to be a social being. The long pattern of teasing and frustrated relationships that he experienced throughout his life created a vicious cycle of seeking nurturing connections with others, then forming maladaptive relationships leading to rejection by the people to whom he went to for support.

12

**202**

EXHIBIT 1 Page 12

44. In the Marines, John seemed to merge his identity with that of his close friends, copying their dress, behavior and even personal mannerisms. This was severe enough that his friends had to call it to his attention. However, this was probably the most successful period of his life, as John finally had a group of friends to provide support to him. He functioned well as long as he was supported by a sense of safe attachment. When his friends in the Marines were discharged, John's performance suffered without his support network.

45. This pattern was repeated when he brought Lettie Ulbright to South Carolina after his military service. During the period that they lived together, John functioned well. However, when this safe attachment was disrupted by his family, John again regressed, bouncing from job to job and engaging in unhealthy activities.

46. The events of John's life leading up to the crime created significant feelings of stress, severe illness, the need for nurture, the failure of the nurturer and feeling alone without hope—mimicked the original attachment trauma John had experienced as a child. However, the adult response to the abandonment is rage, anger or flight. John first attempted to flee to distractions, like games and smoking, then a "better" relationship, then, in anger, he attempted to eliminate the source of the pain. Not the original parents, but the person(s) who should have been his nurturers but who unknowingly recapitulated the past pattern.

47. John believed that the original back injury was the fault of the coworkers who teased and ridiculed him, and who themselves did not do good work. He blamed the injury on the sloppiness of his coworkers.

13

**203**

EXHIBIT 1 Page 13

48. The resulting two back surgeries were unsuccessful, leaving John weakened, in constant pain, and unable to work and support his family. His failure to be able to work was not his fault, but he was expected by his family to do things which he was unable to do. Thus, at a time when John most needed to feel a supportive attachment to his wife and family, John instead felt disconnected and rejected.

49. These feelings of unfairness were compounded when John developed Crohn's disease. John was forced to undergo abdominal surgery and suffered multiple complications, which resulted in John needing an ostomy and external bag. This complication furthered John's feelings of isolation, incapacitation, and failure. Moreover, John could not work and was denied disability benefits, which meant John's family faced significant financial difficulties.

50. John was able to return to work after four years of unemployment. However, the work did not pay enough to alleviate the family's financial stresses.

51. Amidst this tumultuous backdrop, John met and began a relationship with Kristie Freeze. Consistent with his pattern, he misread cues and quickly saw this relationship as an escape from the cumulative stress of the prior four years. The prospect of safety from ridicule, embarrassment and abandonment again clouded his ability to accurately judge the nature and context of the relationship and it soon failed.

52. Ultimately, the great weight of the stressors in John's life, which mimicked the attachment trauma he experienced as a child, created a post-traumatic response in John. The trauma suffered by those with attachment trauma is usually the total sense of abandonment and fear

14

**204**

EXHIBIT 1 Page 14

that occurred in early childhood. With any type of trauma, the hallmark of having a post-traumatic reaction is that responses become conditioned to the highest level of emotional valence reached in the past. This essentially means that a small event or series of events may trigger an emotional response that is hugely disproportionate to what would be expected from the event. The fight or flight mechanism of the body is activated. It is well known that this is an emotion driven response driven in the brain by the limbic system (that part of the brain that mediates emotional response) and the necessity of attaining safety literally causes the slower, cortical brain (thinking and logic) to be bypassed.

53. Here, John's feelings of fear and being alone were the results of the series of severe and painful medical conditions and procedures. These feelings then likely started a chain of events that repeatedly triggered stressful reactions. In addition to the physical pain, stress and distress, John's sense of being unjustly injured and misunderstood by his family continuously recapitulated the emotional distress of his childhood. The combination of feeling belittled by his inability to meet his expectations as a man, a father and provider and the termination of his escapist relationship with Freeze culminated in a very disorganized and self-defeating strategy that is typical in a severe stress response. The clumsiness of John's later actions and his rage are consistent with the disproportionate emotional valence of the trauma response.

54. In post-trauma responses, there is a dissociative quality and often a frank dissociative episode inherent in the response. Dissociation is evident in the details of this crime, the emotional blunting that was

15

evident in the interview after the event and the seemingly normal and unconcerned behavior that he showed immediately after killing his family. In John's case, there was not frank dissociation, but there was a dissociative quality present in his emotional response.

55. Many attachment trauma patients describe this dissociative quality as watching the events from a distance. They are aware of what is happening, but once the immediate fear and rage are discharged, the events take on the quality of being like a movie, or a play. There is a disconnection from the reality of the tragedy. Emotional blunting is often misconstrued as callousness or lack of caring, but this is not actually the case. In trauma response, the emotional blunting is protective and carries the psychological safety that also has become part of the learned response to the severe distress.

56. In essence, John was disconnected mentally and emotionally from the likely outcome of the commission of a serious crime but was relieved of the extreme emotional pressure to escape a relationship in which he was reliving the emotional trauma of his childhood. And so, his physical escape was as poorly planned and executed as the crime. John's former military friend best summarized by saying John was "chasing 1999," a time in the middle of John's military service when he was surrounded by a network of supportive friends. It is not coincidental that this is where John went, in the context of attachment trauma and his history. It is the one place where, for a while, John was fully accepted, successful, and safe.

## Expert Opinion

57. It is my opinion, to a reasonable degree of medical certainty, that John Hummel suffered from a form of traumatic illness best summarized as

16

**206**

EXHIBIT 1 Page 16

complex post-traumatic stress disorder due to attachment trauma.[1] John clearly experienced attachment trauma as a result of his parents' neglect, physical abuse and social isolation.  This trauma is evident from John's repeated inability to create secure attachments with others, as reflected in his failed romantic relationships and his lack of personal success when not surrounded by a support network. Ultimately, through no fault of his own, John found himself in a great deal of physical pain and financial and emotional stress.  However, John again felt neglected and abandoned during this vulnerable period of his life. As such, John essentially was reliving the attachment trauma of his youth, which ultimately resulted in a post-trauma response. In trauma, when the adult experiences an event or series of events that re-capitulate the childhood trauma, the result is the highly charged flight or fight response.  The abused child can neither fight nor escape, but the adult can. For John, his attempts to escape both intellectually and through another relationship were not successful. So the passive fear of the infant became the rage of the adult. John described that as the unrelenting internal pressure, almost a voice in his head, driving him to do something. Another characteristic of this type of response is the fact that because one is not operating from the rational, thinking part of the brain, but rather from the highly

---

[1] Complex post-traumatic stress disorder is not formally included in the The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Revised ("DSM-IV-TR"), or the forthcoming fifth edition ("DSM-V-TR"). It is the subject of much research and much is published in the literature on it. Similarly, this disorder is not formally included in the current edition of the International Statistical Classification of Diseases and Related Health Problems, Tenth Edition ("ICD-10"), but it is proposed for inclusion in the forthcoming ICD-11.

17

**207**

EXHIBIT 1 Page 17

sensitized, emotional part of the brain, careful planning, logic, and consideration of the consequences in essence "go out the window." The details of the crime and the "escape" are quite consistent with this pattern and quite inconsistent with the intellectual level and skills that Mr. Hummel possessed.

58. It is also my opinion, to a reasonable degree of medical certainty, that Mr. Hummel met the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Revised ("DSM-IV-TR") for Personality Disorder NOS, with borderline and dependent traits and met the criteria for Dysthymia. Dysthymia is a chronic low level depression and anxiety often associated with persons who have experienced trauma. It is characterized by low mood, low self-esteem, low energy or fatigue more days than not.

**Future Risk of Violence**

59. While Mr. Hummel has committed a serious and violent crime, if one considers the psychological components of his history and both his past and current level of adaptation to the prison setting, it is my opinion, that, the long term risk of further violence is low to moderate, particularly in the prison setting. The reason for this opinion is as follows: (A) John did not have a significant past history of violence until the crime. (B) John's coping style was in fact, until the time of the crime, a passive acceptance and denial of the circumstances that surrounded him or escape into games, movies, books, etc. (C) John is unlikely to have the extreme set of circumstance that were the antecedents to the crime, namely financial and familial stressors. (D) John will be in a contained environment in which his needs are met, but there is not a relational model that would be iterative of

18

**208**

EXHIBIT 1 Page 18



attachment. (E) John has established a more informed religious attachment than previously, providing greater personal stability.

60. Mr. Hummel discussed his coping with prison and with the idea of being in general population and he has a perspective of acceptance of responsibility for his offense while maintaining the best possible use of the remainder of his life in a confined setting.

61. I have read and reviewed this nineteen page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 21 of May, 2013 in Houston, Harris County, Texas.

Dr. Susan J. Hardesty

Subscribed and sworn to before me on May 21, 2013.

Notary Public, State of Texas

ELIZABETH H. GOLMON
Notary Public, State of Texas
My Commission Expires
December 17, 2013

19

**209**

EXHIBIT 1 Page 19

## List of Materials Reviewed

1. Allen, JG Mentalizing in the Development and Treatment of Attachment Trauma. c. 2013
2. Skodol, AE et. al. Personality Disorders in DSM-5 Section 3, Publication Pending. 2013
3. Testimony of "
   A. Dr. Antoinette Rose McGarrahan
   B. Neata Woody
   C. Haila Scoggins
   D. Linda Jean Petty Pack
   E. Stephanie Ruth Bennett
   F. Mark Pack
   G. Christie Gregory Pack
4. Affidavit of:
   A. Chad Brown
   B. Brian Jeter
   C. Christy Pack
   D. Haila Adams
   E. Joseph "JoJo" Patterson
   F. Lance Dupre
   G. Shana Fowler
   H. Stephanie Bennett
   I. Thomas Hamilton
   J. Efrain Chaidez
   K. George Goodson
   L. Christopher Paris
   M. Tonya Paris
5. School Records of Jodi Hummel, James F. Delaney Elementary School
6. School Records of John W. Hummel Spartanburg High School
7. School Records of John W. Hummel Union County School District
8. Hummel, Employment Records, Champion National Security
9. Hummel, Prison clinic records, MHMR Tarrant County
10. Hummel, Social Security Disability Decision, 2/20/09
11. Hummel Medical Records, Spartanburg County, 12/09-12/10
12. Hummel Medical Records, Texas Back Institute
13. Videotaped interview of John Hummel in California 1/11/10

20

**210**



EXHIBIT 1 Page 20

# AFFIDAVIT OF LAURA SMITH

I, Laura Smith, state and declare as follows:

**Education and Experience**

1.  I received a Bachelor of Arts degree in Psychology from the University of Texas at Austin in 1999. I went on to complete a Master's of Science in Social Work with a Clinical Concentration in 2001, also from the University of Texas at Austin.

2.  I am currently employed by Travis County as the supervisor of a team of social workers who provide intensive support services to families in need through community centers operated by Travis County Health and Human Services.    Prior to this, from 2001 to 2003 I worked directly with incarcerated fathers, their children, and the caregivers who supported those children through a non-profit organization called Family Forward. From 2003-2011, I worked in counseling and case management of the formerly incarcerated as they returned to the community via a non-profit organization called Crime Prevention Institute. From 2011-2013, I worked in drop-out prevention programs with at risk youth residing in public housing through a non-profit organization called Communities in Schools of Central Texas.

3.  I am also an adjunct faculty member at the University of Texas at Austin School of Social Work, teaching Theories and Methods of Interventions with Groups. I am trained as a Victim/Offender Mediation Specialist and an Offender Employment Specialist. I have been licensed by the State of Texas as a Licensed Master Social Worker since 2001. In 2012, I received my Advanced Practitioner license from the Texas State Board of Social

1

**211**

EXHIBIT 2 Page 1

Worker Examiners, allowing me to practice independently in the State of Texas.

4.    A copy of my resume is attached to this affidavit.

## Involvement in John Hummel's Case

5.    I was contacted by current counsel for John Hummel and asked to consult on his post-conviction habeas corpus proceedings. Specifically, I was asked to provide an explanation of Mr. Hummel's life history and an opinion of the elements in that life history that particularly impacted Mr. Hummel's development and decision-making.

6.    To form my opinion, I reviewed various records from Mr. Hummel's life, including educational, employment, medical, military, and Veterans Affairs records, as well as letters sent to Mr. Hummel by his mother Jackie Hummel and sister Neata Woody. In addition, I reviewed the testimony of witnesses presented by Mr. Hummel's trial counsel at the punishment phase of his capital trial. Finally, I reviewed affidavits collected from Mr. Hummel's post-conviction counsel. A list of the testimony and affidavits reviews is attached to this affidavit.

7.    On March 7, 2013, I interviewed Mr. Hummel at the Polunsky Unit in Livingston, Texas. The interview lasted approximately five hours. Mr. Hummel was cooperative and appeared to put forth his best effort in answering my questions.[1]

## Introduction

8.    All of us are a product of our life experiences and social history. To understand how a person comes to take certain actions in life, one must

---

[1] Information from that interview is contained throughout this affidavit and cited to as "Interview with John Hummel."

**212**

EXHIBIT 2 Page 2



look at what elements of his life were brought to bear on that decision. Often what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past. Erik Erikson's widely accepted theory of "identity development" posits that there are eight stages an individual goes through during their development. At each stage, there is a critical conflict, which requires a healthy resolution to create a new quality in self. For example, at infancy, the crisis is trust versus mistrust. A baby cries and, if its needs are attended to and it is nurtured, the baby leaves the stage of infancy having developed a sense of trust in its caregivers and in the world. If the baby is neglected, or needs are ignored, the baby moves into toddlerhood with a sense of fear and mistrust of caregivers and the world at large. Erikson's research suggests that trust and identity formation are the key ingredients to a healthy development of self and identity. (Erik Erikson, Identity and the Life Cycle, 1980)

9. This affidavit seeks to explore the areas in which John Hummel did not successfully resolve these developmental conflicts, nor did his parents or support system, thereby rendering him nearly incapable of forming close and intimate relationships, leading to a total inability to manage multiple stressors such as loss of income, multiple medical illnesses, and emotional stress/fatigue. When these multiple factors collided, John's limited abilities to empathize and problem solve were overshadowed by his inability to love and connect, resulting in a violent crime in which he was trying to escape a life he could not handle.

**Early Development: Instability and Lack of Nurturing**

10. John Hummel was born on November 4, 1975 in Arlington, Texas. The Hummel family consisted of John, his father John Sr., his mother Jackie,



and his sister Neata. Neata is nine years older than John. When John was around three years old, his family moved to Pacolet, South Carolina. The Hummel family was following a traveling minister named Andrew Carrigan, who started the Morning Star Baptist church in Pacolet. John's family moved onto a farm that was isolated from the rest of the town. (Affidavit of Thomas Hamilton.)

11. John's parents were not a stable, supportive influence in his life. John Sr. was overly interested in guns and violence. John's uncle, Thomas Hamilton, remembers John Sr. taking green plastic army toy figures and shooting them with a .22 caliber rifle. He would then paint the figures red where the bullets had hit. John's father would also pour lighter fluid on ant piles and set them on fire. John's father would make John play war games with him even though John did not share his father's interest. John's father seemed more "wrapped up" in his own life rather than John's. (Affidavit of Thomas Hamilton.) On at least some occasions, John's father physically abused him by hitting him with a belt or other object. (Affidavit of Derrick Parris.) John's father once threw him from a moving tractor, at approximately age 12. (Testimony of Mark Pack.)

12. John's mother was also not a nurturing figure. Jackie Hummel did not show love and concern for her children. (Affidavit of Thomas Hamilton.) John's mother showed greater interest in her friends and their children than her own children. Jackie Hummel was generous with other children, buying them clothes and toys. Even at Christmas, it appeared that Jackie was focused on others, not John or Neata. (Testimony of Christy Pack and Linda Pack.)

13. Much of the early care and raising of John fell to his sister Neata, who was herself a nine-year-old child when John was born. Neata reports being the

one who fed, changed, and generally cared for John as a baby. She also states that her parents left her alone to care for John for hours at a time. From all accounts, Neata was the only one paying attention to John's needs and acting as a parental figure. John reports that his sister Neata did most of the daily work in raising him. (Testimony of Neata Woody; Interview of John Hummel.) However, a nine year old is not a mature enough caregiver to attend to the needs of a baby, both physical and emotional.

14. Neata left home and moved to Texas when she was eighteen and John was nine. When this happened, John lost the person he was likely the closest too.

15. About this same time, John's uncle Thomas Hamilton moved to South Carolina and lived with the Hummels for nearly six years. He remembers John as a timid and shy child. Hamilton took Neata's place as the person giving John any attention. (Affidavit of Thomas Hamilton.)

16. Hamilton taught John how to hunt and fish, and played games with him. Often, they would not catch anything because John was so interested in talking to Hamilton. John liked playing games with his uncle because his uncle would not get angry if he lost, unlike John's father. (Affidavit of Thomas Hamilton.)

17. Hamilton worried about John's social development because it did not seem like John got off the farm very often. John's parents never allowed him to socialize with other kids or families, with the exception of Jackie's friend Linda Pack and her children. To Hamilton, John seemed afraid to interact with people because he would fail in front of them and get picked on. (Affidavit of Thomas Hamilton; Interview of John Hummel.)

18. John's daily routine consisted largely of attending school and church and helping out on the farm. Hamilton noted that John's parents did not seem

**215**

EXHIBIT 2 Page 5



pay much attention to John while at the same time controlling his life. Their attitude toward John was "do your homework" and "stay out of our way." (Affidavit of Thomas Hamilton.)

19. One of John's primary interactions with people outside his family was on Sundays, when the Pack family would come to dinner at the Hummel's house. Derrick Parris, a Pack cousin and one of John's close friends growing up, remembers attending church at Morningside Baptist with the Hummels and then going nearly every Sunday for dinner at their house. But for Parris, it felt like the Hummels were "acting" like a family. Each week, they would prepare the same meal and play board games. (Affidavit of Derrick Parris.)

20. Parris did not feel there was genuine love between John's family members. John's parents did not show much outward affection for their children. Christy Pack, who married John's friend Mark Pack and attended these Sunday dinners, did not remember seeing anyone in the Hummel family ever hug or kiss or say "I love you." (Affidavit of Christy Pack; Affidavit of Derrick Parris.)

21. From his early life history, it is clear that John did not experience secure attachments in his childhood with his parents. The most important tenet of attachment theory is that an infant/child forms a secure bond with an adult caregiver who is responsive to its needs. It is believed, and supported by empirical evidence, that children who do not securely attach with an adult early in their social development grow up to experience attachment problems in adulthood, especially an extreme sensitivity to rejection.

22. In fact, John Bowlby (1960), one of the original researchers and attachment theorists, stated that infants in fact grieve and mourn when an

6

appropriate maternal attachment is not formed. He also suggests that an inability to form close relationships is the result of the too frequent substitution of caregivers. This most certainly applies in John's case. Early in his infancy, his mother (a primary attachment figure) turned over the caregiving to his nine year old sister, who was not able to meet his physical and emotional needs, resulting in a very early and deep seated grief and longing, as well as the lack of a 'blueprint' for how to create intimacy and close relationships.

23. As a child, John's needs were not consistently met, and emotional expression was not allowed in the home. Appropriate caring relationships were not modeled. Because of this, it appears that John never formed appropriate love relationships or became capable of adult attachments. This deficit would have serious impacts on his ability to form relationships throughout the rest of his life and his ability to relate and empathize with others. According to Social Learning Theory, the work of Albert Bandura, humans (especially children) learn social skills and behaviors almost entirely through observational modeling and imitating those skills. If emotional expression is not allowed in the home—caring gestures are not displayed, the child is not allowed to form many friendships, and the child is not shown love by his parents—the 'act' of love is not something that has been modeled or taught and is therefore not possible to demonstrate.

**Exposure to Abuse**

24. As a child, John also suffered some physical abuse by his parents, and he was exposed to abuse of others.

25. Neata testified that both her parents hit her and John. (Testimony of Neata Woody.) John reports that his mother whipped his sister Neata with a

7



metal hanger. (Interview of John Hummel.) This abuse is somewhat unsurprising, as John's mother Jackie had experienced physical abuse as a child. Her father was very abusive to her mother. Jackie's mother responded by hiding bottles of pepper juice and bleach to throw at him. One occasion of abuse ended with her mother shooting her father. Jackie's mother also hit her and her siblings to the point where they would cry for each other. (Affidavit of Thomas Hamilton.)

26. Friends recall that John's father hit him on occasions, sometimes with objects, when John would make mistakes. (Testimony of Derrick Parris.)

27. In addition to physical abuse, there are signs that John was exposed to inappropriate sexual conduct, possibly rising to abuse. John's father had been caught having multiple sexual affairs, which may have been another reason the family relocated to South Carolina. These affairs did not end his parents' marriage, though, and the behavior did not stop. John's friends saw John's father act inappropriately with women. (Testimony of Derrick Parris.) Neata once came upon her father receiving oral sex from a female member of their church. (Affidavit of Thomas Hamilton; Testimony of Neata Woody.)

28. In addition to his affairs, there are signs that John's father may have sexually abused Neata. Neata left home at the age of seventeen, and at least one person reported hearing Neata admit that her father sexually abused her. Others report that Jackie showed feelings of hatred for Neata. Neata would frequently leave home and go to the Pack family's house. (Affidavit of Derrick Parris.)

29. Further, Neata has exhibited strange behavior toward John, suggesting that she may also have transferred her abuse into abuse of John. In letters from Neata to John, she often references secrets kept between only the two of



them, and she specifically states that her mother was tested for dementia and the results were clear. Neata says, "that means she does remember. When she laughs and tells me it never happened. No wonder things are so messed up, like us." (Letters from Neata Woody to John Hummel.)

30. Physical abuse can have obvious immediate as well as long term physical consequences for a child such as shaken baby syndrome and impaired brain development in extreme cases. However, there are also significant long term consequences of physical abuse, consequences which manifest psychologically and behaviorally. According to one longitudinal study, 80% of adults who had been physically abused as children met the diagnostic criteria for at least one psychiatric disorder by age 21. (Silverman, Reinherz, & Giaconia, 1996). Other psychological and emotional conditions associated with abuse and neglect include panic disorder, dissociative disorders, attention-deficit/hyperactivity disorder, depression, anger, posttraumatic stress disorder, and reactive attachment disorder (Teicher, 2000; De Bellis & Thomas, 2003; Springer, Sheridan, Kuo, & Carnes, 2007).

31. It has not been confirmed that John experienced any sexual abuse directly. Witnesses have said that John's father was known for promiscuity in extra marital affairs, and some have alluded to suspicions of sexual abuse of John's sister Neata. Neata does not confirm this, but has reported witnessing her father engaged in sexual acts with other women. If John was in fact exposed to sexual abuse, even indirectly, there are long term consequences associated. A child's exposure to overly mature sexual content or a child's direct experience with sexual abuse can interrupt attachment patterns as well as create disturbances in the creation of a true

**219**

EXHIBIT 2 Page 9



identity or sense of self. The necessary components in establishing a positive identity include love, attention, nurturing, affection, intimacy, autonomy, power, and control. The experience of abuse or neglect impacts each of these areas. An abusive experience affects the child's identity, how the child behaves in order to have his/her needs met, and how the child responds and interacts with other people. (US Department of Health and Human Services, Urquiza and Winn, 1994). According to a National Institute of Justice study, abused and neglected children were 11 times more likely to be arrested for criminal behavior as a juvenile, 2.7 times more likely to be arrested for violent and criminal behavior as an adult, and 3.1 times more likely to be arrested for one of many forms of violent crime (juvenile or adult) (English, Widom, & Brandford, 2004).

## Formative Years:  Continued Lack of Support and Attachment

32. John's social development was impaired early on by the geographic isolation he experienced growing up on the farm where his family lived. Because the farm was in a remote, rural area, John was naturally separated from many of his peers. (Affidavit of Brian Jeter.) Even more, though, John's parents strictly limited when John could leave the farm and whether other people could visit him. (Affidavit of Christy Pack.)

33. Even when visitors were allowed, such as the weekly Pack family Sunday dinners, John would isolate himself. Christy Pack remembers John as quiet, seeming to prefer retreating to his bedroom to play rather than staying with the group. (Testimony of Christy Pack.)

34. The year Neata left, John lost the person who was most nurturing to him. It does not appear that his parents changed their behavior to start raising him. Neither parent took an interest in John's education, despite the fact

**220**

EXHIBIT 2 Page 10



that John was struggling.  As a result, John was required to repeat the fourth grade that year.  It took his uncle moving to South Carolina for John to regain a support figure in his life.  (Interview with John Hummel; Hummel school records; Affidavit of Thomas Hamilton.)

35. In school, John struggled with a serious learning impairment because of dyslexia. (Affidavit of Haila Adams.) His school records (and later testing by the military) indicate that John's intellect was average to above average. However, his disability meant he had a hard time spelling and writing, which made it difficult to succeed in his classwork.

36. In high school, John was enrolled in a special education resource class to address his learning problems.  John almost was not allowed to graduate high school, taking the exit exam's writing portion four times.  On his fourth attempt, John was given an alternative scoring to account for his deficits in spelling and grammar.  Only then was he able to pass and graduate. (Testimony of Tommy Stribble; Testimony of Haila Adams.)

37. His special education teacher, Haila Adams, felt like John "blended into the woodwork" in class, rarely engaging and often trying to avoid attention.  Adams was unsure whether John had many or any friends, as most other children did not interact with John.  John never acted out; he just seemed lonely. (Affidavit of Haila Adams.)

38. John was frequently teased and bullied by other school children, including those he considered his friends.  They saw him as slow and an oaf.  John was teased and bullied because he was unable to write or spell well. (Affidavit of Chad Brown.)  Kids would call him "Bacon," a nickname John hated, because of the way he smelled.  His family heated their home with a wood-burning stove, which made his clothes smell.  (Affidavit of Thomas Hamilton; Affidavit of Derrick Parris.)  But John was not good at

11



confrontation. When teased, John would back down, not saying anything, holding in his emotions. (Affidavit of Shana Fowler.)

39. John struggled in his ability to interact with his peers. Friends report that John would jump into a conversation with comments that were immature or not relevant. He would say random things that did not make sense to others, but that he thought were funny. For example, one friend remembers John saying the word "corn" like it was a catchphrase. When asked, John could not explain why he said it or why he thought it was funny. (Affidavit of Chad Brown.)

40. John did not dress appropriately to his peers. This may have been because his family did not have the means to give him new clothes, or because John was struggling to express his individuality. Friends remember him wearing things like bedroom slippers (which John called "moccasins"), cargo pants, trench coats, and shirts with pictures of dragons—often all at once. (Affidavit of Chad Brown; Affidavit of Derrick Parris.)

41. John was easily influenced by his peers. He was eager to please and wanted to be liked. Friends would take advantage of John because he was easy to manipulate. They would have John buy things, like video games or a PlayStation console, telling John he would be "cool" if he did. They had John drive them around because he had a car. One friend, Chad Brown, has said that John seemed to like the responsibility and that he thought John was trying to have deeper connections and closer friendships with people. But Brown reports that despite John's efforts these deeper connections never seemed to materialized for John. (Affidavit of Chad Brown; Affidavit of Derrick Parris.)

42. Many of the people who spent time with John in high school came to have widely disparate impressions of John. For example, some friends viewed

**222**

EXHIBIT 2 Page 12



John as athletic, playing sports often with them. (Affidavit of Brian Jeter; Affidavit of Joseph Paterson.) Others thought John was overweight, not athletic, and only interested in video games. (Affidavit of Shana Fowler; Affidavit of Haila Adams; Testimony of Derrick Parris). Some saw him as the class clown, friendly to everyone. (Affidavit of Joseph Paterson.) Others remember John as someone who was quiet and kept to himself, doing anything he could to avoid attention. (Affidavit of Shana Fowler; Affidavit of Christy Pack; Affidavit of Haila Adams.)

43. From John's interactions with others during his formative years, it is apparent that he continued to be unable to properly attach and form positive, supportive relationships. Even those he considered his close friends would tease and manipulate him. Because John never formed secure attachments, he also never formed a solid sense of self. Identity is built around emotional development and relationships with others. Again, referencing Erik Erikson's well documented theory of psychosocial development, the crises John should have been negotiating ages six to eleven were Industry versus Inferiority. If a child succeeds academically, feels competent and supported, they exit this stage in a state of Industry. In John's case, he was neglected and abused by parents, his school work was suffering, and he did not feel socially or academically competent in the least bit. Instead he entered pre-adolescence in a state of total inferiority without social supports or parental love and connection.

44. John's identity in the eyes of others was unclear. John's friends and family report different 'versions' of John. What's more, John's identity in his own eyes also seems unclear. He describes himself as a loner and isolated, without any attachments or interesting relationships. As will be discussed,

13

**223**

EXHIBIT 2 Page 13



he became fairly obsessed with role playing games in which he creates multiple characters, and often times had trouble letting go of those characters.

45. The next stage in Erikson's psychosocial development theory is Identity versus Role Confusion. A young person successfully navigates adolescence by establishing an identity—defined by individuation and unique qualities, but also by connection to groups and associations with others—therefore entering adulthood with a solid sense of self. A young person not completing this stage successfully, as it is clear John did not, enters adulthood confused, extremely sensitive to rejection, and with a weak or non-existent sense of self.

46. John did not appropriately develop socially, academically, or emotionally. It appears he instinctually kept trying to reach out and connect, but all he received in return was continuous abuse, neglect, bullying, or confusion. He was never successful in any relationships, and even his close friends found him odd or off-putting. This lack of connection, but basic human desire to connect, is extremely frustrating, potentially rage building. In my opinion, John did not understand how to succeed in relationships, yet desperately wished to please others.

**Early Adulthood: Escapism, Failure, and Rejection**

47. As a young adult, John did not appear to have any goals or ambitions. During high school, John worked part-time at a local Hardee's fast-food restaurant. (Hummel social security records.) Friends did not see particular encouragement from John's family to make plans for the future. (Affidavit of Chad Brown.) John began to be focused on movies, video games, and role-playing games, such as Dungeons and Dragons.

14



(Affidavit of Chad Brown; Affidavit of Derrick Parris.)   One of his teachers, Haila Adams, noticed these games were one of the few things John ever was excited about.   She felt that John played these games as a way to escape his real life. (Affidavit of Haila Adams.)

48.   In role-playing games, players design a character representing an individual in an imaginary setting.   These characters may have special skills or powers, such as the ability to use magic spells or communicate with animals.   Game play is performed through the verbal impersonation of the characters by the players. Characters interact with each other, and with the fictional setting's inhabitants, to solve problems, have battles, or gather treasure, with the players using dice to randomly determine event outcomes.   Over time, characters gain experience "points" and become more powerful.

49.   Usually, a player will keep a character for several months.   However, John had difficulty keeping up with the characters he created.   John liked to play more advanced characters that required remembering complex information in order to be successful.   John created characters that were too complex for him to mentally keep up with.   Because of this either his game would have poor results or he would have to abandon his character.   (Affidavit of Chad Brown.)

50.   Most players also usually played only one character.   John would play two or three characters at the same time.   John would also change his characters based on what his friends were doing in the game.   When other players were successful, John would mimic the actions of the other players to make his characters better. (Affidavit of Chad Brown.)

51.   John had trouble separating himself from these role-playing games.   He would frequently carry the game pieces with him.   In conversations with

15



friends, John would attempt to get the subject always back to the games they were playing. One friend remembers a time that their group took a break from playing to go somewhere. While driving, John pulled out the dice and wanted to continue playing. The others had to stop John and tell him to focus on the road and what was going on around him. (Affidavit of Chad Brown.)

52. John also did not always seem to know where the line was between reality and the game. A friend remembers playing the video game "Zelda" with John and other friends. The person playing had his character stab someone in the game, saying "I bet that hurt." John took a knife and poked him in the shoulder. Though he got in trouble, John did not seem to know what he had done wrong. (Affidavit of Derrick Parris.)

53. John brought this to bear on his relationships with others as well. He dated a woman named Stephanie Bennett during his senior year of high school. Bennett was one year younger than John. They started their relationship by talking often over the phone after a mutual friend introduced them. Before they had ever met in person, John told Bennett that he was falling in love with her. Bennett thought this was strange, but continued to date him. (Affidavit of Stephanie Bennett.)

54. Once in this relationship, John started becoming overly attached. He became close to Bennett's family. He started going to her church, instead of with his own family. He even started to eat Sunday dinner with Bennett's family rather than his own. Bennett remembers that John spent most holidays at her house. (Affidavit of Stephanie Bennett.)

55. After a short while, John started talking to Bennett about their future together. He wanted to plan everything out about their future. To Bennett, it was like the idea that they were going to get married was a "done deal"

16



in John's mind. Yet at this same time, Bennett started pulling away from John. John did not seem to realize at all, thinking everything was fine. Ultimately, Bennett broke off their relationship. John was surprised and upset. (Affidavit of Stephanie Bennett.)

56. Once again, John's inability to attach left him feeling alone, angry, left out, and frustrated. He tried to escape through role playing games, but this only served to further alienate him from his friends who believed that even the way he played the games was odd and off-putting. He could not succeed even in the game, contributing to feelings of rejection and failure and an urge to escape. This loneliness, rejection, and need to escape only further served to limit his social skills and keep him disconnected from others. This cycle became a self-fulfilling prophecy—his fears of not being able to connect and therefore being rejected, led to his odd behavior, bullying, and a further and further sense of isolation. This isolation continued to inhibit a healthy development of self.

**Graduation: Failed Independence**

57. On June 2, 1995, John graduated from Jonesville High School. (Hummel school records.) He quit his part-time job at the Hardee's and began work at a warehouse for BMG Music. John moved out of his parents' home and got an apartment of his own. (Interview with John Hummel.)

58. John's friends would come to his apartment because he was older and they were still in high school. They would bring girls over with them and hang out. John started drinking and going to bars. John even had a long-term relationship with a woman named Jennifer Wood. (Affidavit of Derrick Parris.)

59. After two years of living on his own, however, John struggled to pay his bills and live independently as an adult. Then one day, he and Jennifer arrived at his apartment just in time to interrupt a break-in. Although nothing was taken, John's parents insisted he move back to their house. John decided rather than live at home again, he would join the Marine Corps. (Interview with John Hummel.)

60. Once again, John's relationship failed and his ability to live on his own and support himself adequately failed. Rather than go back to his parent's house where he felt he would be miserable and yet again dependent on his controlling and unloving parents, he again escaped from his current life, "wiped the board clean" and joined the Marines.

**Military Career: Opportunity for Success**

61. John enlisted in the Marine Corps on September 26, 1997. John was initially assigned to combat support, but part way through basic training John was identified as having a sufficient aptitude to qualify for work as an intelligence specialist. For the next year, John went back and forth between various Marine trainings and spending time back in South Carolina. In late 1998, John was stationed at Camp Pendleton, California. (Interview with John Hummel; Hummel military records.)

62. Unlike prior to joining the military, John initially succeeded and thrived in the military. John's commanders felt John was a very competent Marine who did solid work. They never felt he gave his commanders any problems. Friends remember John as dependable, quiet, and laid back. John stayed out of trouble, even when friends would get into altercations. (Affidavit of Efrain Chaidez.)

**228**

EXHIBIT 2 Page 18



63. At Camp Pendleton, John became particularly close to three men – Wayne "Buddy" Matthias, Fred Emmer, and Efrain Chaidez. John and Mathias were roommates and both worked in the intelligence branch. Matthias had been at Camp Pendleton for about a year before John arrived and already had a group of friends. Matthias brought John into the group when he arrived. (Affidavit of Wayne Matthias.)

64. The four friends (John, Matthias, Emmer and Chaidez) had very different personalities and backgrounds when they first connected, but they became very close, even forming a new identity together. Chaidez was from inner-city Chicago where he had been involved in a gang. He recognized in John the same desire he had to make a new life in the military. He felt John was trying to escape his life in rural South Carolina. (Affidavit of Efrain Chaidez.)

65. The four friends spent most of their time together, hanging out daily and spending almost all their weekends together. Matthias noticed that John started to copy many of the behaviors of him and Emmer. He started wearing the same types of clothes and getting tattoos. He even started emulating some of Matthias's mannerisms. Matthias had to talk to John about being his own person and that he should not copy his friends. (Affidavit of Wayne Matthias.)

66. John and his friends spent a lot of time playing games, drinking, and going to strip clubs. John began to gravitate to strip clubs even more than the others. Mathias remembers John going to these clubs almost every night. John became friendly with the staff and the strippers. Emmer does not remember John ever dating anyone or having relationships with women other than interacting with strippers. Chaidez recalls that John would especially try to show the women that he cared about them by asking to



escort them to their cars. He even stood up to other men if he thought they were mistreating the women. John became so attached that he talked about opening up his own strip club. (Affidavit of Wayne Mathias; Affidavit of Efrain Chaidez; Affidavit of Fred Emmer.)

67. John continued to be interested in playing role-playing games like Dungeons and Dragons. His friends noted that he was interested in fantasy, to an extent that was more than usual. To them it seemed like John was dodging real life. (Affidavit of Wayne Mathias; Affidavit of Fred Emmer.)

68. In his role as an intelligence specialist, John had a security clearance to receive sensitive information. He would be told about enemy movements, make reports and maps reflecting this information, and then communicate that information to his commanders. He built terrain models of the areas his fellow Marines would operate in. He enjoyed this job, and said it reminded him of playing role playing games. (Interview with John Hummel.)

69. John felt fulfilled by this work, it gave him a chance to play those role playing games, but in real life. His basic needs were attended to, he made a living, he felt connected, and the military provided a strong structure and discipline that he could not create on his own. In the military, similar to in prison, most decisions are made for you. There is a uniform, a chain of command, expected behavior, clear expectations, and clear feedback.

70. When John would return home to South Carolina on leave, his friends noticed a change in him. They saw that John was more fit and in shape physically. John seemed happy and proud. Chad Brown remembers John riding in a car with friends during one leave when the subject of the Monica Lewinsky scandal came up. John got very serious and told the

group "that's my commander-in-chief you are talking about." Brown was impressed by the seriousness and loyalty John expressed. (Affidavit of Chad Brown.)

71. As the first period of his life where John experienced relative success, both in being recognized for his abilities and in forming close friendship bonds, John would have particularly tied his sense of self to this time in his life. Even this success was moderated by his past: his copying of his friends shows a lack of clear sense of self or identity; and he continued to rely on finding fulfillment in fantasy. This time in war games rather than video games or role-playing games. John exhibited a need to connect to others, without the actual capacity to do so in an appropriate or effective manner. Yet, he was able to form some bonds and find his place and an identity.

## Military Career: Return to Failure

72. Not everything was positive for John, though, in the Marines. During his trips home, he would no longer exercise and would eat junk food. Over time, this meant that he gained significant weight and lost some of his fitness. He constantly struggled to meet the physical requirements of the Marines. (Interview of John Hummel.)

73. Upon his return, this weight gain made him a target of teasing and even some bullying by other members of his unit. His friends noticed that he was overweight, and even poked fun at him sometimes. Chaidez recalls that John particularly got a hard time from some of his commanding sergeants. John was assigned to a "Weight Control" program during his first deployment overseas in late 1999. (Affidavit of Wayne Matthias; Affidavit of Efrain Chaidez; Affidavit of Fred Emmer; Hummel military records.)



74. Unfortunately for John, just as this struggle was reaching its worst, his friends and support in the military were transferred away. Matthias, Emmer, and Chaidez were all transferred away or discharged in early 2000. The friends went their separate ways, while John remained behind at Camp Pendleton to finish another two years of service. (Affidavit of Wayne Matthias; Affidavit of Efrain Chaidez; Affidavit of Fred Emmer.)

75. Looking back, John's friends see that time as a point when John lost his support system. Chaidez believes John needed more attention paid to him, particularly because of his weight struggles. John seemed to be struggling and did not have "tough" enough "skin" to get through it. (Affidavit of Efrain Chaidez.)

76. Shortly after their discharge, Mathias and Emmer learned that John was not doing well and had changed in demeanor. In May of 2000, they got a call from John. John had planned on going AWOL, but had only gotten as far as Arizona when his truck broke down. Mathias and Emmer drove out to Arizona and brought John and the truck back to California. They could tell John was stressed and depressed. John told them he was having a hard time because he no longer had a support network. (Affidavit of Wayne Mathias; Affidavit of Fred Emmer.)

77. For John, it was compounded that he was bullied and overweight, felt like a failure in the only job he had ever been successful at, and lost his only friends, all at the same time. This was a significant loss for John, especially since he had struggled so much to form any meaningful relationships at all and had finally felt he was competent and successful, proud and happy— only to have it all start to unravel.

78. Because John returned to base in a short time, he was only given a minor reprimand and fine. However, his new commanders took action to revoke

John's security clearance. Without that security clearance, he was no longer eligible to work as an intelligence specialist. Instead, John was given mundane and custodial jobs, such as moving cargo on and off ships or setting up command tents. (Interview with John Hummel; Hummel military records.)

79. The loss was compounded to an even greater degree as John lost his intelligence job and security clearance, knew his superiors were disappointed in him and felt they could not trust him, and was relegated to mundane work and feeling a very strong sense of rejection and failure.

80. John continued going to strip clubs, frequently by himself. He met and began spending time with a group of homeless young adults who lived in Oceanside, California near the military base. John would buy the kids food, take them to movies, and rent them hotel rooms to stay in. John even dated some of the women in the group. (Interview with John Hummel.)

81. Once again, John made an attempt to connect and to feel useful. He likely was being used by this group of homeless individuals, who only wanted to hang around him so he would buy things or do things for them (similar to his "friends" in high school). This is again not a meaningful connection, but another misguided attempt at real connection.

82. A few months before John was to be discharged, he began a relationship with a twenty-year-old homeless woman name Letti Ulbright. Ulbright was pregnant at the time, though John was not the father. Hummel and Ulbright decided that she would come back to South Carolina with John and they would be a family. (Testimony of Letti Hubertz.)

83. In April 2002, John was sent back to South Carolina to attend separation classes and be discharged from the Marines. As he got closer to his discharge, John's high school friends noticed that John started to lose the

**233**

EXHIBIT 2 Page 23



confidence and assertiveness he had developed at the early stages of his military service. He physically became less fit and stopped exercising. John was no longer proud and jovial, but instead was described as brooding. He attended only one day of separation classes and then stopped going, ending his military career with a reprimand for an Unauthorized Absence. (Hummel military records; Affidavit of Chad Brown.)

### Return to South Carolina: Repeating Patterns of Failure and Escape

84. Once back in South Carolina as a civilian, John and Ulbright moved in with John's parents and John got a job at the Kohler factory with his father, glazing toilets and sinks. After a few months, John and Ulbright moved to their own mobile home. John worked the night shift and no longer frequented strip clubs or bars. They were like a family, spending time with John's parents and John's sister Neata who was living in South Carolina again. (Testimony of Letti Hubertz.)

85. This might have represented a new life for John, a new chance at success. Even though he was spending time with his parents and working for his father, he was in the role of "man of the house" and trying to do the right thing by a woman in need, even though he was not the baby's father. In my opinion, this was another attempt by John at connection and an effort at being in the role he thought he was supposed to have—that of a provider.

86. In September 2002, Ulbright gave birth to a baby boy. Two weeks after the baby was born, John's sister Neata convinced John that Ulbright was not good for him and he should break off the relationship. One day while John was at work, Neata took Ulbright to a bus station and gave her a ticket to California and a letter Neata said was from John saying he was not ready to be a father. The letter said John had left for Texas, although he



had not. When Ulbright looked at the ticket, she noticed that it had been purchased two weeks before. (Testimony of Letti Hubertz; Testimony of Neata Woody.)

87. Once again, John's attachments and relationships were severed. Neata's involvement in orchestrating Letti's departure shows her role as more of a maternal than sibling figure to John, and also demonstrates an over involvement and inappropriate role with John. The episode would have further cemented John's negative experience with family attachments, creating hostility and sensitivity. It also continued a pattern that led John to desire escape from his current life situation.

88. After Ulbright left South Carolina, John quit his job at Kohler. For the next year, John changed jobs often, working at a cigarette warehouse, a temporary security agency, and a Cracker Barrel restaurant. (Hummel social security records.)

89. John also reverted back to spending most of his time and money drinking, smoking, and frequenting strip clubs. John's high school friends remembered that prior to the military, John never smoked or drank, having seen his father suffer a heart attack from smoking. Now, John smoked both tobacco and marijuana, and drank frequently. His trips to strip clubs became "more like a way of life for him." John went to strip clubs "almost every night." (Affidavit of Chad Brown; Affidavit of Derrick Parris; Affidavit of Joseph Patterson.)

90. John's friends saw a different John than the person who they had grown up with. He wore black clothing, a trench coat, and goth-style rings. John listened to harder music than before. (Affidavit of Chad Brown.)

91. John replaced his interest in playing Dungeons and Dragons with trips to see strippers. John seemed to think the attention he received from women

**235**

EXHIBIT 2 Page 25



at the clubs was real. He acted like the women were his girlfriends. His friends explained to John the girls were just working, and often the women would give him fake phone numbers, but John would continue to talk about the women like they wanted to have relationships with him. To his friends, John seemed to be living in a fantasy world. (Affidavit of Chad Brown; Affidavit of Derrick Parris.)

92. At this point, John was becoming less and less connected to reality. His propensity for role playing games as an escape from reality turned into creating fictional relationships in real life. This is another indication of poor social skills, and an inability to read people accurately, as well as a true need for connection and closeness but an inability to form those relationships.

93. As time went on, John was clearly struggling. One friend from school that he became romantically involved with remembers John as drifting in and out of her life. They would hang out and then she would not hear from him for a while. Then he would suddenly show up at her house unannounced. He did not seem to have any goals or plans, or significant relationships. (Affidavit of Shana Fowler.)

94. In late 2003, John left his hometown and moved to another town in South Carolina without telling his friends. After a few days of absence, his friends asked John's parents where John was and discovered he had left without saying anything to anyone. (Affidavit of Chad Brown.)

95. John briefly moved in with a stripper and her boyfriend. However, the couple had not paid their rent and soon they were being evicted. Facing moving back with his parents, John chose instead to move to Texas and live with his cousin, Michael. (Interview with John Hummel.)

96. John left South Carolina and moved to Texas with little or no warning to any of his friends. He spoke to one friend about moving, but did not have any definite plans or purpose. She remembers that one night John gave her son some collectible figurines that she knew John loved. She thought it was strange for him to give those up. That was the last time she saw John. (Affidavit of Shana Fowler.)

97. Once again, when faced with failure and his own inability to live independently in relationship to others, John "wiped the board clean," abandoning all his friendships and moving away unexpectedly. This impulsive conduct fell squarely within the patterns of behavior John had developed over the course of his life whereby he reacted to stress by escaping and attempting to start a new life, a new identity, functionally a "new game." In Erikson's theory of development the crisis to be resolved during adulthood (age 19-40) is Intimacy vs. Isolation. John clearly was suffering and not able to form intimate connections, leading to more and more of a sense of loneliness and isolation.

**Life in Texas: Repeating the Pattern of Failure and Need to Escape**

98. Soon after arriving in Texas, John's cousin introduced him to Joy Bedford. John and Joy had a short romance before Joy became pregnant around November 2003. The couple married in February 2004 and their daughter Jodi was born that summer on July 17, 2004. (Interview with John Hummel.)

99. Around the same time John married Joy, John got a job at the warehouse of clothing company Williamson Dickey. After a year of relative stability, however, John tripped over a box at work in May 2005. John's back was



injured in the fall, putting John on worker's compensation. (Hummel Employment Records.)

100. Over the next several years, John struggled with medical problems that prevented him from working. He received multiple surgeries for his back injury, but continued to experience significant pain from the injury. John applied for but was denied Social Security disability benefits in late 2006. (Hummel Medical Records.)

101. Around this same time, however, doctors diagnosed John with Crohn's disease, a type of inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. John's case was severe enough to require surgery, and a significant portion of his large intestine was removed. For a time, John was required to wear a colostomy bag. John also had to eat a special diet. (Hummel Medical Records; Interview with John Hummel; Affidavit of Christopher Paris.) Crohn's Disease is extremely limiting and can have very serious complications. Sufferers begin to associate eating with fear of intense abdominal pain. The frequent attacks of diarrhea and the continuous use of a colostomy bag can create humiliation, social isolation, and low self-esteem (New York Times, In Depth Report).

102. Because of John's medical problems and inability to work, John's family began to struggle financially. George Goodson, one of the Hummels' neighbors, remembers helping John's family move into Joy's father's home when their financial situation was particularly bad. Goodson gave John a computer to help them out and sold the Hummels one of his cars. He also remembers John asking for help getting VA medical benefits set up. Joy worked as a massage therapist and Goodson would occasionally get massages from Joy. During those massages, he remembers Joy talking



about how tough things were for her family. (Affidavit of George Goodson.)

103. In 2008, John and Joy started attending a Sunday school class at Shady Oaks Baptist Church. They became friends with Christopher and Tonya Paris. The Parises knew that John and Joy were struggling financially. They recall that Joy would work long hours, even coming to their house after the regular workday in order to give them massages. Christopher Paris helped out by repairing the Hummels' roof so that they could qualify for home insurance. He also helped make repairs on John's truck when it broke down. When John was in an accident that crashed the truck, the Parises gave John's family the down payment for a van. (Affidavit of Christopher Paris; Affidavit of Tonya Paris.)

104. The medical problems did not allow John to work and the resulting financial strain caused stress in his marriage to Joy. John reports Joy and her father being continuously angry with him for not doing enough around the house and not working. He was living with Joy's father, and living in daily pain, and feeling again like a miserable failure, without many options to remedy the situation. (Interview of John Hummel.)

**Spiral Towards the Crime**

105. In 2009, John was able to return to work. Because of his medical problems, though, he was only able to secure work that did not require much physical activity—as a night-shift security guard. The modest income he received did little to help his struggling financial situation. (Interview of John Hummel.)

106. Instead, John became increasingly disconnected. He spent less and less time with his family because of his night shift work. His marriage began

**239**

EXHIBIT 2 Page 29



to suffer. Joy told John he was no longer allowed to play Dungeons and Dragons, and both Joy and her father expressed dissatisfaction with John's performance as a husband, father, and provider. (Interview with John Hummel.)

107. About a month before the crime, John went to Christopher Paris's house to pick up Joy from a weekend church retreat. Christopher Paris could see by the way John and Joy were interacting that something was wrong between them. (Affidavit of Christopher Paris.)

108. In late 2009, John began a relationship with Kristi Freeze, a convenience store clerk he saw on his way to work. Freeze was herself going through a divorce. They exchanged frequent calls and text messages, and their relationship briefly became romantic. (Testimony of Kristi Freeze.)

109. For John, this relationship was a way of putting aside his troubled family life. However, like most of John's other relationships, he inflated in his mind the seriousness of his relationship with Freeze. He started talking about the possibility that they could start a new life together. In contrast, Freeze told John that she did not want their relationship to continue. On December 10, 2009, Freeze and John had sex for the first and only time. After that, Freeze told John that she was ending their relationship because John was married and had a family. (Testimony of Kristi Freeze.) Freeze ended her relationship with John on December 17, 2009, the day of the crime.

110. Following the crime, John drove over 1,300 miles to Oceanside, California. This journey is significant not only as physical escape on the part of John but also because he returned to the place that held the most positive memories for him. As one friend put it, John's journey to

**240**

EXHIBIT 2 Page 30

California was "chasing 1999" when he had briefly experienced a successful life and positive personal attachments. (Affidavit of Efrain Chaidez.)

## Expert Opinion/Conclusion

111. It is my opinion, which I hold to a reasonable degree of academic and professional certainty, that John Hummel's life has been deeply impaired by the lack of appropriate nurturing and attachment he experienced as a child. It is clear that from John's childhood, through school, the military, and into his adult family life that he had an extreme sensitivity to rejection and failure, primarily due to a lack of an ability to form healthy attachments.

112. This lack of attachment impacted the way John relates to the world and how he acts in it. As a child John spent most of his time isolated and alone, and was neglected emotionally by his parents, thereby making it nearly impossible to learn how to form relationships with other people, outside of fantasy games. As a result, John is unable to solve problems in real life versus escaping to fantasy. He has a tendency to run away or disappear when things get difficult, without a clear understanding of what the consequences might be for those actions.

113. John joined the military primarily because he faced returning to life as a child in his parents' house. He was able to escape and start a new identity in the military, finally forming meaningful relationships with several of his colleagues. However, when these friends left the military, John lost the support network he had created and reached his limit of feeling incompetent and being bullied. In response to this loss, John attempted to go AWOL, but did not take into account the fact that in breaking the

31

**241**

EXHIBIT 2 Page 31



military's rules he would lose his security clearance (the part of the military he loved) and reduce him to being ordered to do menial tasks (what he hated about the military). Instead, John left the military behind, moved back to South Carolina and started a new "character" with a homeless, pregnant girl. When that family identity was taken away through the peculiar interference of his sister Neata, John once again felt the need to escape his life by quitting his job and moving to Texas.

114. A familiar pattern emerges from John's life story. First, John enjoys a brief bout of success that ultimately turns into failure. Next, John is unable to cope with that failure or make normal, rational, healthy changes to his situation. Finally, because he cannot adapt to his problems, John escapes from his failure—often in a complete and sudden way, such as by starting his life over, in a new place with new characters. For John, starting over was psychologically like the idea of clearing a game board of its pieces and setting them up again to begin anew.

115. Leading up to the crime, John would have been experiencing extreme stress and feelings of failure due to his family tensions, financial difficulties, and physical ailments. With the end of his relationship to Freeze, John was left alone to confront these stressors. Consistent with his life trajectory, John did not have the ability to cope; he likely felt useless and picked on and angry, and felt he had no one to talk to or turn to for help. But unlike other periods, the permanency of his role as husband and father conflicted with his desire and ability to escape.

116. If I had been retained to provide expert testimony in John Hummel's capital trial, I would have testified about the life events John experienced and the psychological impairments and patterns he faced. I believe that this information would have offered a window into how John came to take



the actions he did and why his moral culpability for those actions was diminished.

I have read and reviewed this thirty-five page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on May 22, 2013 in the City of Austin, Travis County, Texas.

Laura E. Smith, LMSW-AP

Subscribed and sworn to before me on May 22, 2013.



Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

33

## List of Testimony and Affidavits Reviewed

1. Testimony of:
   a. Christy Pack
   b. Mark Pack
   c. Linda Pack
   d. Derrick Parris
   e. Haila Scoggins
   f. Letti Hubertz
   g. Neata Woody
   h. Stephanie Bennett
   i. Tommy Stribble
   j. Dr. Antoinette McGarrahan

2. Affidavits of:
   a. Brian Jeter
   b. Buddy Mathias
   c. Chad Brown
   d. Christopher Paris
   e. Christy Pack
   f. Efrain Chaidez
   g. Fred Emmer
   h. George Goodson
   i. Haila Adams
   j. Joseph Patterson
   k. Lance Dupre
   l. Shana Fowler
   m. Stephanie Bennett
   n. Thomas Hamilton



## Bibliography of Publications Relied On

Bandura, Albert, Social Learning Theory, General Learning Corporation, 1971.

Bowlby, John, "Grief and mourning in infancy and early childhood", Psychoanalytic Study of the Child, Volume 15, 1960.

De Bellis & Thomas, "Biologic findings of post traumatic stress disorder and child maltreatment," Current Psychiatry Reports, Volume 5, 2003.

English, Widom, & Brandford, "Another look at the effects of child abuse," National Institute of Justice Journal, 251, 2004.

Erickson, Erik, Identity and the Life Cycle, W.W. Norton & Company, 1980.

New York Times, In Depth Report, health.nytimes.com/health/guides/disease/crohn's-disease/print.html

Silverman, Reinherz, & Giaconia, "The long term sequelae of child and adolescent abuse: a longitudinal community study," Journal of Child Abuse and Neglect, August 1996.

Springer, Sheridan, Kuo, & Carnes, "Long term physical and mental health consequences of childhood physical abuse: Results from a large population based sample of men and women," Journal of Child Abuse and Neglect, May 2007.

Teicher, Martin, "Wounds that time won't heal: The neurobiology of child abuse," The Dana Foundation, October 2000.

US Department of Health and Human Services, Urquiza and Winn, "Treatment for abused and neglected children: Infancy to age 18," Circle Solutions, Inc., 1994.

11500 Bittern Hollow
Austin, TX 78758
(512) 294-9519
laurasmith@gmail.com

# Laura Elmore Smith, LMSW-AP

## EXPERIENCE

**Travis County Health and Human Services and Veterans Services**          May 2013-Present
*Social Services Program Administrator*
- Provide clinical oversight and programming support to the Family Support Services Division of Travis County HHS/VS
- Serve as policy consultant and decision making substitute for Division Director
- Responsible for policy and procedure development, interpretation and revision
- Supervise a team of 8 master's level social workers working in 7 community centers
- Provide project management for division initiatives and community collaborations
- Serve as department lead for disaster response coverage
- Support initial and ongoing program development, and assist in applying for required funds
- Accountable manager for over $750,000 in local, state, and federal grants, ensuring compliance

**State of Texas, Office of Capital Writs**          March 2012-present
*Consultant*
- Contracted position as Social Historian
- Conduct document review, case consultation, and client interviews for indigent capitally convicted individuals
- Work with legal team to determine investigative leads, pertinent information, and key points to provide mitigating information in appeals process
- Assist legal team in drafting social history for the court

**University of Texas at Austin School of Social Work, Austin, TX**          September 2011-present
*Adjunct Faculty*
- Teaching SW 393R26: Theories and Methods of Group Intervention
Brief course description: This course is grounded in the identification, analysis, and implementation of empirically based intervention strategies for group work with children, adolescents, adults, and the elderly. This course will focus on using multiple perspectives in the advanced application of theories, models, and skills utilized in short-and longer-term group interventions. The framework of the course is based on social work values and the ethical decision-making process, as illuminated by the NASW Code of Ethics.

**Communities In Schools of Central Texas, Inc., Austin, TX**          June 2011-May 2013
*Senior Program Coordinator*
- Supervised all programs at CIS funded by the Housing Authority of the City of Austin
- Responsible for all contract deliverables, outcomes, and reporting
- Managed relationship between CIS and HACA—HACA is CIS' 2nd largest funding source
- Supervised front line social workers
- Hired, trained and managed new staff, manage team of 8
- Managed all new program development for in school and after school programing for kids living in public housing
- Assisted in grant writing and fundraising efforts
- Supervised master's level social work interns

**246**

EXHIBIT 2 Page 36



11500 Bittern Hollow
Austin, TX 78758
(512) 294-9519
laurasmith@gmail.com

# Laura Elmore Smith, LMSW-AP

**Crime Prevention Institute, Inc.  Austin, TX**                    July 2005—May 2011
*Executive Director*
- Designed and managed pre and post release re-entry programs for former offenders returning to Travis county from incarceration.
- Served as liaison to planning bodies and community groups working toward macro level change in offender re-entry
- Managed resource planning and fund development, including coordinating an annual fundraising event, public and private grant writing efforts, and ongoing contributions campaign, raising up to $320,000
- Supervised and evaluated staff, volunteers, and social work interns, team of 6-8
- Created and maintained close collaborations with TDCJ and other state and local criminal justice agencies and organizations
- Served as Program Manager and  Clinician, facilitating pre and post release groups for formerly incarcerated, as needed

*Program Director/Case Manager*                    September 2003-July 2005
- Monitored development and maintained the success of all programs
- Made presentations in the community regarding CPI and services provided
- Assisted in local, state, and federal grant writing and individual and foundation based fundraising
- Provided pre-release education and post-release case management for incarcerated women participating in the Enterprising Girl Scouts Beyond Bars Program
- Facilitated groups and provided individual counseling and case management to formerly incarcerated persons
- Supervised master's level social work interns

**Family Forward, Austin, TX**
*Wrap Around Services Coordinator*                    September 2002-September 2003
- Provided and coordinated direct service delivery to children of incarcerated parents and their families in three Texas counties.
- Provided training to staff and volunteers for effective program implementation
- Networked with agencies and individuals to promote the wrap around program in all three counties
- Developed family strengthening activities for work with children and their incarcerated father
- Provided supervision for Bachelor's level social work interns
- Conducted thorough evaluation of project and reported results

*Austin Area Team Leader*                    January 2002-September 2002
- Developed and expanded Family Forward's family education and support programs in Austin
- Recruited, trained, and supervised volunteers
- Supervised Bachelor's level social work interns
- Participated in grant writing process through research

*Direct Service Specialist*                    May 2001-January 2002
- Facilitated family education programs and support groups
- Developed new family education and support curricula
- Revised and developed new evaluation tools

## 247

EXHIBIT 2 Page 37



11500 Bittern Hollow
Austin, TX 78758
(512) 294-9519
laurasmith@gmail.com

# Laura Elmore Smith, LMSW-AP

### Federal Correctional Institution, Drug Abuse Program, Bastrop, TX
*MSSW Intern*                                                 January 2001-May 2001
- Co-facilitated drug treatment groups with male inmates
- Participated in psychological testing and assessment of inmates
- Provided individual counseling to inmates

### Austin/Travis County Integral Care, Austin, TX
*Para-Professional Crisis Counselor*                          May 1997-August 2001

- Provided crisis counseling, suicide prevention, and information/referral on 24 hour hotline
- Founded and led Hotline Community Outreach team
- Trained volunteers by being observed, observing, and providing feedback

### EDUCATION

**The University of Texas at Austin**
*Master of Science in Social Work*                            2001
*Concentration: Clinical Social Work*

**The University of Texas at Austin**
*Bachelor of Arts in Psychology*                             1999

### Community Service

*Volunteer Consultant, Sending Solidarity*                    2011- Present
A non-profit sending educational material into incarcerated youth

*Volunteer Facilitator, Bridges To Life*                      2005-2006
Facilitated groups of victims and offenders in a restorative healing process

### Relevant Training

Offender Employment Specialist Training                       2009
Victim/Offender Mediation Training                            2005
Long Distance Dads Incarcerated Fathers Training             2001
Certified Field Instructor—UT Austin School of Social Work    2001-Present

### Awards

UT Austin Student Volunteer of the Year                       1999
NASW UT Austin Student of the Year                            2001
Ring of Honor Mental Health Award (Crime Prevention Institute) 2005
Greenlights Nonprofit Excellence Award (Crime Prevention Institute) 2006

**248**

EXHIBIT 2 Page 38

## AFFIDAVIT OF HAILA ADAMS

I, Haila Adams, state and declare as follows:

1. My name is Haila Adams. I live in Pacolet, South Carolina. I am currently teaching at Broome High school. For four years I taught special education classes at Jonesville High School in Jonesville, South Carolina.

2. I taught John Hummel in a special education class for four years. I taught him for one class every day. John had a learning disability in the written language. He was severely dyslexic and what he wrote was hard to read due to spelling and grammatical errors.

3. Students with learning disabilities are put on an individualized education program ("IEP"). The IEP is developed by the student's teachers, counselors, administration, and parents. I do not remember John's parents ever coming to any IEP meetings. I saw John's mother once, but I think it was during an open house, not an IEP meeting. I did not know John's father was in the picture. I thought his parents might have been divorced.

4. John always blended into the woodwork at school. John would never initiate a conversation, but would talk if someone spoke to him first. Other children did not interact with John. I always thought John was hiding or trying to avoid attention.

5. John never acted out or displayed anger or aggression. He was not passive-aggressive or defiant either. He just seemed alone and lonely.

6. John was even-keeled. He never did anything to draw attention to himself. If something was bothering him, he would ignore it and pretend it was not happening. He would do anything he could to avoid drawing attention to himself.



1

**249**

EXHIBIT 3 Page 1

7. John's family lived in a small house in the middle of a large piece of property that was a farm. Their house was very isolated and there were not any other people close to them. John never talked about his family life or working on the farm. I did not even know that John had a father in his life.

8. The only thing I ever saw John really interested in and excited about was role-playing games. He played games like Dungeons and Dragons. To me, it seemed like John liked these kinds of games because they were an escape from his real life. I just got that feeling from him being so isolated on the farm.

9. In order to graduate from high school in South Carolina, all students must pass a standardized test. I helped get John an accommodation on the exam to account for John's learning disability. One of the few times I ever talked to John's mother was to discuss this accommodation. We spoke by phone. I believe John only had to take the exit exam once to pass with his accommodation. With the accommodation, John's test was graded for content only and not style because of his learning disability. When John found out he had passed, he cried.

10. John never talked about his goals or dreams. He was just grateful to get out of high school. After he graduated, I saw him working at Hardee's once. He leaned out the window of the drive-through, handed me my food and talked to me briefly.

11. I was surprised to learn that John joined the military. He was never really athletic and he did not do many extra-curricular activities.

12. I was interviewed by members of John's defense team. I testified at John's trial about his learning disability and good behavior in class.

13. If I had been asked, I would have additionally testified to the information contained in this affidavit.



2

**250**

EXHIBIT 3 Page 2

14. On January 5, 2013, I met with an investigator from the Office of Capital Writs and spoke to the same investigator on the phone on January 25, 2013 and March 30, 2013.

15. I have read and reviewed this three (3) page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 26 of April, 2013 in Pacolet, South Carolina.

*Shila Adams*

Subscribed and sworn to before me on 4/26 , 2013.

*Jennifer Reif*

Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond



3

**251**

EXHIBIT 3 Page 3

## AFFIDAVIT OF CODY BELL

I, Cody Bell, state and declare as follows:

1. My name is Cody Bell.  I am currently employed with the Tarrant County Sheriff's Office and have been for the past seven years.  I am primarily assigned as an officer in the Tarrant county jail facilities.

2. I got to know John Hummel throughout the time he was incarcerated at Tarrant County awaiting and during his capital trial.

3. Every time I dealt with Hummel he was pleasant and outgoing towards me. We shared a connection because we both were in the military.  We talked about boot camp and about how tough the military was mentally and physically.

4. John was a nice guy.  He seemed friendly to just about everyone.  He never gave me any trouble, nor did he ever get into trouble ever that I knew of.

5. John seemed very well adjusted to being in jail.  He did not have any problems with our rules.  He was very compliant.

6. I remember John wore a green suit.  Most inmates charged with capital murder wear red suits, which means they are escorted by two officers at all times and handcuffed.  A green suit is most often given to lower profile inmates and those who the classification team decides are not a violence risk.  If you wear a green suit, you are escorted by one officer and not handcuffed.

7. John never had any trouble with the other inmates.  This was kind of surprising because I felt like John seemed like a guy that had a "pick on me" sign on his back.  He just looked and acted like a guy who had been picked on his whole life.  But none of the other inmates messed with him. John just has this unassuming aura about him.

_CB_

1

**252**

EXHIBIT 4 Page 1

8.  I think John would do well in a prison setting in the future. It almost seemed like the structure and rules of jail gave John a break from something. I do not think John would be a danger of being violent in the future. Whatever it was that set him off to commit his crime, I got the sense that all that was over. I could not see it happening again.

9.  I was never contacted by anyone on John Hummel's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

10. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2 of May, 2013 in Fort Worth, Tarrant County, Texas.

_____
Cody Bell

Subscribed and sworn to before me on May 2, 2013.

_____
Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

2

**253**

EXHIBIT 4 Page 2

## AFFIDAVIT OF STEPHANIE BENNETT

I, Stephanie Bennett, state and declare as follows:

1.  My name is Stephanie Bennett. I reside in Pacolet, South Carolina.

2.  I have known John Hummel since we dated when we were both in high school. John was a senior and I was a junior.

3.  I testified at John's capital trial in Fort Worth, Texas, in June 2011. During my testimony, I related the following information:

    a.  I dated John my junior year of high school. We met through a mutual friend who worked at Hardee's with John. We first talked on the phone with each other for a month or two and then started dating.

    b.  John was shy. He always acted appropriately with me when we were on dates. We would watch movies or hang out together. He would go to church with me.

    c.  We broke up because John was more serious about the relationship than I was. He wanted to get married, but I did not. I think he was pretty hurt when we broke up because he did not expect it.

    d.  I lost contact with John after that. The last time I saw him was about six years before the trial when his father passed away.

4.  In addition to my testimony, I would have gladly testified to the following, if asked.

    a.  Even before we ever met in person, John told me over the phone that he thought he was falling in love with me. I did not know how to respond to that. It did not seem usual to have gotten that serious so quickly. I kept talking to John, though, and met him and then dated him, because I liked that he showed interest in me.

SB

1

**254**

EXHIBIT 5 Page 1

b. Right from the beginning of our relationship, John got very close to me and to my family. When we started dating, John was going to a different church than me. But after a while John started going every Sunday to my church. He would also come over for Sunday dinner to my aunt's house. He even started spending holidays at my house.

c. After a few months, John started talking about our future. He was ready to graduate and wanted to plan out everything about our future. For a while in our relationship, we just kissed and held hands. Later on we slept together. After we had sex the first time, John became even more lovey-dovey toward me. It was like our getting married was a done deal in his mind.

d. When I started to pull away, I don't think John had any idea. He thought everything was fine and that we were going to spend the rest of our lives together.

e. When I broke up with him, he was upset. He cried and tried to talk me out of it. But he was not aggressive or threatening in any way.

5. I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 25 of April, 2013 in Spartanburg, South Carolina.

Stephanie Bennett

Subscribed and sworn to before me on 4/26, 2013.



Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2015

**Notary without Bond**

**256**

EXHIBIT 5 Page 3

SB



## AFFIDAVIT OF CHAD BROWN

I, Chad Brown, state and declare as follows:

1. My name is Chad Brown. I live in Spartanburg, South Carolina.

2. I first met John Hummel when I was eight or nine years old. Our fathers worked together at Kohler. Back then, we only spent time together occasionally, and when we did, my father was always around.

3. I reconnected with John when I was fourteen or fifteen years old. We would hang out two or three times per week. The main people in our group of friends were John, Lance Dupre, Derrick Parris, and me.

4. John's father was similar to mine in that once he got home from work he did not want to have people around much.

5. John's father was a "working man." He had a good work ethic and would go to work, come home, eat dinner, and watch television until it was time for bed. John's mother was not a typical homemaker. She worked outside of the home chopping wood and other activities like that. She was similar to John in personality. I would not say she was unintelligent, but she was simple. I met John's sister one or two times before John left for the military. She had a wild streak.

6. John and I were into role-playing games like Star Wars and Dungeons and Dragons. We were also into videogames, sometimes spending all weekend playing them. This was from when I was about fourteen until I was seventeen. John is four to five years older than me.

7. John would always develop characters in the role-playing games that were too complex for him to manage. It was very difficult for John to stay with his characters for a long time because he could not mentally keep up with them. For example, John liked to use wizards as his characters. The



1

**257**

EXHIBIT 6 Page 1



wizards are really hard to play because you have to remember more for the character to be successful with spells. Your success with those characters depends on your intelligence. If you could not build and remember the attributes for those characters then it would lead to poor results in the story.

8. Usually, a player will keep a character for months at a time. John, however, would play two or three characters at the same time. He would get dissatisfied with his characters and constantly changed them to try to make them smarter or fit the narrative of the game better. John would also switch the attributes of his character when he saw what other player were doing with their characters, so that he could copy what everyone else did.

9. John's interest in Dungeons and Dragons was way over the top. John would almost always have the game pieces and dice with him. I remember times when we stopped playing a game for a little while to go somewhere else. John had trouble stopping the game and would pull out the dice to continue playing as he was driving. We had to tell him to concentrate on the road and to stop playing. He was always too wrapped up in the game before the military. Regardless of the topic of our conversations, John would always try to get the subject back to the game.

10. John told several of us that people at school would call him "Bacon." After that we would joke around and call him "Bacon" too.

11. I thought John was a little slow intellectually. Once I saw a paper he wrote in high school and there were a lot of two and three letter words spelled wrong. His other friends and I laughed at John for that.

12. John was very easily influenced by other people. He wanted to be liked and was very eager to please everybody. We could tell John to do things





for us and he would do it. That is how he got his PlayStation. We told him it would be cool if he got one, so he did.

13. We probably used John because he was easy to manipulate. We would get John to give us rides to places, like to a comic book convention, for example. He always drove us around places and never complained. I think he liked the responsibility and it ensured that he always had company. John always seemed to want to have deeper connections to people and closer friendships. But that never seemed to happen.

14. John was more immature than his friends in terms of the things he thought were funny. He would say random things that did not make sense, but he would think they were funny. When we asked why he said these things, he would just chuckle at us. One example I can think of is a catch phrase John always used. He would say "corn" all the time. He would say this every time after he belched. He never could explain why he said it or why he thought it was funny. John would also try to jump into conversations other people were having, but his comments were very immature and not relevant to the ongoing conversation.

15. John never really cared about the clothes that he wore. He never dressed like anyone else his age. Most of his peers wore jeans and polo shirts. John would wear shirts with fire and dragons on them, and bedroom shoes, which he called "moccasins."

16. Before joining the military, John did not appear to have any goals or ambitions. I never saw him get any encouragement from his family. There were also not a lot of options for personal growth or development in Pacolet. I was surprised when John enlisted. He was easygoing and the military did not seem like a good fit for him.



**259**

EXHIBIT 6 Page 3

17. One time when John was on leave from the military, he was in a car with some friends who were joking around about Bill Clinton and Monica Lewinsky. John did not laugh at the jokes, but got very serious and said "That's my commander-in-chief you are talking about." I was impressed at John's loyalty to someone he had never met.

18. I remember seeing John in his role as part of the military because he worked as a recruiting assistant in South Carolina at the beginning of his service before he shipped out and also right at the end of his service. During his time in the military, John kept in shape and was fitter than he ever was before joining the military.

19. John seemed to be happy in the military, so I was surprised that he said he did not want to reenlist. As John got closer to being discharged, he exercised less. His assertiveness and confidence seemed to go away. After the military, John seemed more brooding and less jovial. He did not seem like he had the same pride and feelings of loyalty or belonging that I remembered him showing when he got upset about the Bill Clinton jokes.

20. After he came back to South Carolina from the military, John would drink and smoke. I had never seen John smoke or drink before he joined the military. Previously, he had always been against smoking because his father smoked and had a heart attack. John even started smoking marijuana.

21. After John got back from the military, he would go to strip clubs and bars frequently. John occasionally went to strip clubs before the military, but after he got out it was more like a way of life for him. After the military when John started going to strip clubs, he did not play role-playing games as often.



4

**260**

EXHIBIT 6 Page 4

22. John took the attention he received from the girls at the strip clubs seriously. He thought they were actually interested in him. We gave him a hard time about it, and said the girls were just working, but he did not seem to get it.

23. John always seemed like he was living in a fantasy world, or out of touch with reality. He was too interested in playing the role-playing games, he took the attention of the strippers way too seriously, and he was extremely into movies. I remember going over to their house and seeing a ton of VHS tapes. John was always watching movies and could tell you about any of them.

24. After the military, John also started wearing black clothes. He wore a black trench coat and goth-style rings. The rest of his friends did not dress like that.

25. John also listened to different music after the military. Before, John would listen to Top-40 pop music, but afterwards he was into harder music like "Insane Clown Posse."

26. John still spent time with our group of friends after he was discharged from the military. One day, though, all of a sudden, he just stopped hanging out with us. We went to his parents' house and they told us he moved to another town. We tried to find him in that new town, but we never did. I never saw John again after that.

27. I was never contacted by anyone on John Hummel's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

28. On January 5, 2013, I met with an investigator from the Office of Capital Writs. On April 1, 2013, I spoke with the same investigator on the phone.



**261**

EXHIBIT 6 Page 5

29.   I have read and reviewed this six (6) page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _4 / 26 /_____ , 2013 in Spartanburg, South Carolina.


_Chad Brown_
Chad Brown


Subscribed and sworn to before me on _4 | 26_____ , 2013.


_[signature]_
Notary Public, State of Texas


JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016
Notary without Bond

**262**
EXHIBIT 6 Page 6

## AFFIDAVIT OF EFRAIN CHAIDEZ

I, Efrain Chaidez, state and declare as follows:

1. My name is Efrain Chaidez. I currently am employed as a Hospital Corpsman Chief for the United State Navy. I am stationed at Fort Sam Houston in San Antonio, Texas.

2. I met John Hummel around 1998/1999. We were both in the military together at Camp Pendleton in Oceanside, California. John was in the Marines and I was in the Navy. I was a corpsman, which is like a medic.

3. My friend Fred Emmer introduced me to John and to Buddy Matthias. The four of us hung out together. We were a close group of friends and saw each other almost daily. We pretty much spent all of our weekends together.

4. We all had very different personalities and backgrounds, but still managed to be friends. I was from inner-city Chicago and had been involved in a gang there. I got into the military to get away from that life. I think John had a similar goal. He was from the country and seemed like he did not want to be a rural farm boy anymore. Like the rest of us, John wanted something different out of life. The four of us were able to form a new identity together.

5. My impression of John was that he was pretty shy and quiet and not as assertive as the rest of us. He would join in on an existing conversation, but he would never lead or initiate one.

6. John stayed away from trouble. One time, the four of us got in an altercation at a Denny's restaurant. I remember John staying out of the fight and taking care of a friend who had been hurt.

1

**263**

EXHIBIT 7 Page 1

7. John was a good Marine. He was a dependable guy, and I felt like if I ever needed help John would have my back. John was pretty generous too. I remember him often giving me money for drinks or food or other things.

8. We would go a lot to strip clubs and became friends with the strippers. John particularly tried to show them he cared about them. He would want to escort them out of the bar and stand up for them if anyone was mistreating them.

9. John was really into Dungeons and Dragons.

10. John was also a little heavier than all of us. Compared to the rest of us, he seemed kind of like a teddy bear. Buddy and I would joke with John about his weight, though not to the point of hurting our friendship. I know there were times when he was bullied about his weight by others in his company. I think particularly John's sergeants gave him a hard time about not meeting the weight standards.

11. Looking back, I would have paid more attention to John, now that I know what it is like to supervise men. He was very quiet and I suspected that he was struggling with something. He would have been more on my radar.

12. I was transferred from Camp Pendleton in 2000 to San Diego where I went to school for a certification in public health. Not long after that, Buddy and Fred also left. We all went our separate ways, but John stayed behind. I did not really stay in touch much with John after that. When Fred, Buddy, and I left, the people John would go to for support were gone. I do not think he had any close friends like us. The stability and friendship we had with each other was lost.

13. I do remember that John losing his security clearance hit him hard. He seemed distraught over the matter.

14. I was shocked when I heard about John's conviction. When I heard that he had gone back to Oceanside, California after the crime, my first thought was "John was chasing 1999." That was an important and memorable time in my life and I believe in his.

15. I was never contacted by anyone on John's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

16. On March 27, 2013, and April 16, 2013, I spoke with an investigator from the Office of Capital Writs on the phone.

17. I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _2 1 AM_ , 2013 in San Antonio, Texas.


_____
Efrain Chaidez


Subscribed and sworn to before me on _2 1 APR_ , 2013.


_____
Notary Public, State of Texas
2 16 808 1 01 1
CARRILLO, MARCELO A.
LNC(SW/AW), USN
NOTARY PUBLIC
AUTHORITY TITLE 10USC1044
TO SEAL REQUIRED BY STATUTE
SERVING WITH THE ARMED FORCES


3

**265**

EXHIBIT 7 Page 3

## AFFIDAVIT OF LANCE DUPRE

I, Lance Dupre, state and declare as follows:

1.  My name is Lance Dupre.

2.  I have known John Hummel since I was around seventeen years old and I met him while we both worked at Hardees. John was around eighteen years old.

3.  John and I and our friend Chad Brown would hang out often on the weekends together. We mainly liked to watch movies, play video games, and play role-playing games. I remember John was particularly into role playing games and often would talk about them after we finished playing. He liked to reminisce about the games.

4.  We would occasionally go to John's house. I remember meeting his parents a few times. His dad never really spoke to us. He would just sit and watch TV.

5.  John was not the smartest guy. We would make fun of him, sometimes to his face. We made fun of how bad his spelling was. I remember people called him Bacon and he hated that.

6.  John was also more immature and impulsive than the rest of us. For example, he started dating a girl he met at a flea market. It seemed very random and we made fun of him for it.

7.  But John also always wanted to please everyone. I remember that he would always drive the group around. When he was older and had an apartment after high school, he would let all of us come hang there. He seemed like he wanted people to like him.

8.  After we graduated from high school, I went off to college and I spent less time with John. I was surprised when I found out that John had joined the



1

**266**

EXHIBIT 8 Page 1

military.  It seemed like another one of John's impulsive decisions. Several of us laughed at the idea that he was in the intelligence branch.  It did not seem like a well thought out decision.

9.  After John came back from the military, I only saw him a few times.  He seemed to go to strip clubs a lot.  He also was smoking and drinking, which I had never seen him do before the military.

10.  I was never contacted by anyone on John Hummel's defense team.  Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

11.  I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 25th of April, 2013 in Columbia, South Carolina.

_____
Lance Dupre

Subscribed and sworn to before me on April 25, 2013.

_____
Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

2

EXHIBIT 8 Page 2



# AFFIDAVIT OF ELIZABETH GARZA

I, Elizabeth Garza, declare the following:

1. My name is Elizabeth Garza.

2. I am currently an investigator for Office of Capital Writs ("OCW"), in Austin, Texas. I have held this position from April 2011 to the present. In my capacity as an OCW investigator, I performed work on the John Hummel case.

3. On February 7, 2013, I contacted Fred Emmer by phone. Mr. Emmer currently lives in Oakland, New Jersey. I introduced myself to Mr. Emmer by name, stated I was an investigator for the Office of Capital Writs, and that our office represented John Hummel in his post-conviction appeal.

4. I asked Mr. Emmer if he was willing to speak with me about his friendship with John Hummel during their time in the Marines when they were stationed together at Camp Pendleton. He was agreeable.

5. At the conclusion of the interview, I asked Mr. Emmer whether he would be willing to sign an affidavit reflecting the information we had just discussed. Mr. Emmer agreed to sign an affidavit.

6. On April 29, 2013, I spoke with Mr. Emmer by phone and reviewed the affidavit that had been drafted for his signature. Mr. Emmer confirmed the content of the affidavit. He requested that the affidavit be emailed to him and stated that he would sign it and have it notarized. He agreed to mail the signed affidavit to the OCW.

**268**

EXHIBIT 9 Page 1

7. After failing to receive the affidavit, I attempted to contact Mr. Matthias on several occasions, but to no avail.  As of May 28, 2013, the OCW has not received Mr. Emmer's signed affidavit.

8. The affidavit which Mr. Emmer approved by phone on April 29, 2013, is attached hereto.

9.  I have read and reviewed this two-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 28th day of May, 2013 in Austin, Texas.

Elizabeth Garza

Subscribed and sworn to before me on May 28 , 2013.

Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

2

**269**

EXHIBIT 9 Page 2



## AFFIDAVIT OF FRED EMMER

I, Fred Emmer, state and declare as follows:

1. My name is Fred Emmer. I reside in Oakland, New Jersey, and am currently employed as a paramedic.

2. I met John Hummel when he and I served together in the United States Marine Corps from 1998 to 2000 at Camp Pendleton in Oceanside, California. I met John through my friend Buddy Matthias. John and Buddy both worked in intelligence and I worked as a medic

3. Buddy and I were stationed together at Camp Pendleton and became good friends. John was stationed at Camp Pendleton after Buddy and I had been there a while. John was pretty shy and withdrawn when he first came to Camp Pendleton. But he was a pretty good guy, so we accepted John into our group of friends. Over time John became more comfortable and outgoing.

4. I think John and I connected because he was from the east coast, like me. We were both kind of outsiders being stationed in California.

5. All of us were young guys, and we were away from our families. So most of our free time was spent drinking, playing games, and going to strip clubs. John was particularly absorbed with going to strip clubs. But John was not a "ladies' man." I do not remember him ever dating anyone or having relationships with women. The only women I really saw him interact with were strippers. John even talked about all of us opening our own strip club.

6. John seemed to really like the west coast and the relaxed atmosphere there. I was really surprised that he decided to go back to South Carolina after the military. He never really spoke about South Carolina or his family there.

1

**270**

EXHIBIT 9 Page 3

7.   John was also very enthusiastic about fantasy stuff. It was a little weird. He was really into role playing games, more than was usual. He liked wizards, and dragons, and swords – those kinds of things. It seemed like John was dodging real life too much.

8.   John was an overweight, geeky kind of guy. He looked and acted like someone who would be bullied as a kid.

9.   John seemed to feel like an outsider trying to fit in. I remember him copying some of the mannerisms Buddy and I had, as well as how we would dress or what we liked to do. I think he even got tattoos because we had them. It was like Buddy and I were two big dogs and John was a little Chihuahua following us around. Despite the teasing, though, after John was around us for a while he showed more confidence and was less shy.

10.   John had a hard time as a Marine. The military likes to break people down and then build them back up to fit the military culture. But if you looked at John you could tell that he was not what you would picture for a Marine. He especially got a hard time about being overweight. We would tease him about being what they call in the Marines a "Fat Body." I think that bothered John.

11.   Because Buddy and I came in before John, we were discharged while John still had time left to serve. I got discharged in April of 2000. Buddy and I moved to Vista, California, and got an apartment together for four months. Then I moved away.

12.   John lost it a bit when Buddy and I left. Not long after Buddy and I left, we got a call from the Base asking if we knew where John was. I had sold John my truck and apparently he had taken off without telling anyone. Pretty soon, John called Buddy and I from Arizona where the truck had

2

**271**

EXHIBIT 9 Page 4

broken down.  Buddy and I rented a U-Haul to tow the truck back and to bring John back to base.

13. We got John back to base in time and I believe he only got a non-judicial punishment for an unauthorized absence.  But this meant that he was restricted and could not leave base for a long time.  So I do not remember seeing John much more after that.

14. It seemed like John was having a tough time.   All our group of friends had left except for him.  He no longer had the people around him that he had gotten comfortable with.

15. I heard about John's crime from Buddy.  I was shocked.  I would never have imagined the quiet, friendly John I knew doing this.

16. I was never contacted by anyone on John's defense team.  Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

17. I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _____ , 2013 in _____, New Jersey.

_____

Fred Emmer

Subscribed and sworn to before me on _____, 2013.


_____

Notary Public, State of New Jersey

3

**272**

EXHIBIT 9 Page 5

## AFFIDAVIT OF SHANA FOWLER

I, Shana Fowler, state and declare as follows:

1. My name is Shana Fowler. I live in Spartanburg, South Carolina.

2. I met John Hummel in eighth grade. I had moved to Jonesville, South Carolina that year, and he and I became friends.

3. John was mostly quiet and kept to himself. He was very nice and funny, and I could tell that he liked me, though we did not date at the time. There was something strange about him, though.

4. Other children made fun of John at school. John was not good at confrontation. If someone made fun of him, John would just back off and not say anything back.

5. John was really into video games. He did not really have any other hobbies. He was not athletic at all.

6. John did not talk about his family much. I knew John lived on a farm, but he did not talk about that much.

7. I hung out with John for a while after he got out of the military. We were intimate a few times, but we never really dated. John was nice and a gentleman. He seemed more confident after being in the Marines.

8. But even then something was strange about John. We would hang out with each other, and then I would not hear from him for a while, until he suddenly showed up at my house again. John never talked about his goals or what he wanted to do in the future.

9. The last time I saw John, he talked about moving to Texas. He did not seem to have any definite plans or purpose. John had some X-Men figurines that were collectibles and that he kept pristine in the original packages. He gave them to my son Austin. John knew Austin liked them



1



so John gave them to him. I do not know what was going on in John's life that night that made him want to get rid of his collectibles.

10. I was never contacted by anyone on John Hummel's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

11. On January 4, 2013, I met with an investigator from the Office of Capital Writs. I spoke with the same investigator on the phone on January 25, 2013 and March 26, 2013.

12. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 26 of April, 2013 in Spartanburg, South Carolina.

_Shana Fowler_
Shana Fowler

Subscribed and sworn to before me on 4 26 , 2013.

_Jenny Reif_
Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

SF

**274**

EXHIBIT 10 Page 2

## AFFIDAVIT OF GEORGE GOODSON

I, George Goodson, state and declare as follows:

1. My name is George Goodson.  I live in Watauga, Texas.

2. I first met John Hummel when he and his family lived in the same apartment complex as I did in Grand Prairie, Texas.  I have known John for about six years.

3. At the time I met John, he was working and everything seemed fine.  But shortly thereafter John injured his back and was not able to work anymore.

4. After that, I remember John's family came down on hard times financially. I used to help them out as much as I could, so I saw them pretty frequently. I gave John an old computer of mine and I sold his family one of my cars.

5. Besides his back injury, John got diagnosed with Crohn's disease.  I remember John asking me to help him get set up for his VA benefits.  I also remember John had to wear a colostomy bag because of it.  John did not really talk to me about his medical problems, though.

6. I would occasionally get massages from Joy.  She and I would talk sometimes during the massage.  She talked about how tough things were for them.

7. I never really saw John have friends over or go out.  He seemed to stay at the house while Joy worked.  He would take care of their daughter.

8. At some point John and Joy's financial trouble got so bad that they had to move.  I helped them move into Joy Hummel's father's home.

9. I was very surprised when I heard about the crime.  I have spent time in prison before for drugs.  I met murderers in prison.  I would never have thought John would do something like this.  It was very out of character for him.



1

**275**

EXHIBIT 11 Page 1

10. I spoke to John's defense counsel twice before trial. I told them I was willing to testify. I was never called to testify. Had I been called as a witness I would have testified to what is contained in this affidavit.

11. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2 of May, 2013 in Watauga, _Tarrant_ County, Texas.

George Goodson

Subscribed and sworn to before me on May 2, 2013.



(Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond



2

**276**

EXHIBIT 11 Page 2

## AFFIDAVIT OF THOMAS HAMILTON

I, Thomas Hamilton, state and declare as follows:

1. My name is Thomas Hamilton. I live in Fort Worth, Texas. John Hummel is my nephew. His mother, Jackie Hummel, is my sister.

2. Jackie is the oldest sibling followed by Edwina Penny, Donnie Hamilton, and then myself. Jackie is about eleven years older than me.

3. It was no secret that my father was very abusive and violent towards my mother. My mother would hide bottles of pepper juice and bleach around the house so that whenever my father got violent with her, she could throw the liquids in his eyes. The abuse got so bad that at one point my mother left him. She started seeing another man, who eventually became our step-father. My father did not stop, though, and tried to beat up my mother's boyfriend. My mother ended up shooting my father in the knee during that fight.

4. Growing up, my family was very poor. My mother worked two jobs trying to make ends meet. There were days when my mother would boil a potato and have us drink the liquid for lunch. Later, she would feed us the potato for dinner.

5. Jackie met her husband John Hummel, Sr., when I was around five years old. She and John Sr. lived in Grand Prairie, Texas.

6. Jackie and John Sr. had two children. Neata was the oldest born in 1966 and John was the youngest born in 1975. John's family moved from Texas to Pacolet, South Carolina, when he was around four years old. I moved to South Carolina a few years later in 1983 or 1984. I lived with John's family for six to eight months. Then I got my own house in Pacolet.



1

EXHIBIT 12 Page 1 **277**

7. The Hummel's moved out to South Carolina right after Jackie was arrested for writing "hot" checks. They moved to follow a church – Morning Star Baptist. I think Jackie was looking for a fresh start and they got convinced to move to Pacolet by the preacher, Brother Carrigan. I attended Morning Star Baptist with them when I lived in Pacolet.

8. It was commonly known in our family that John's father got caught cheating on John's mother a few times, but they always got back together. The rumor was that Jackie actually encouraged these extramarital affairs. I think that was another reason they moved away from Texas, because of John Sr.'s affairs.

9. To save money, they moved to a farm that was really secluded from the rest of Pacolet. The owner of the farm was a local dentist and he allowed the Hummels to live there rent free in exchange for taking care of his cattle.

10. While I lived in South Carolina, I would often babysit John. He was a very timid child. I do not believe he got off the farm very much, except for going to school.

11. I taught John to hunt and fish. We would walk around hunting quail and rabbit. We had difficult catching animals because John liked to talk too much. We also played games together. John liked playing with me because I was younger than his parents and because it was okay to beat me. I remember John Sr. would get angry if he was not winning a game, but I was not like that.

12. To me, it did not seem like John had good social development. John was pretty shy around people. I remember other children used to tease and call John "Bacon" because he smelled like bacon. John would get visibly



2

EXHIBIT 12 Page 2 **278**

nervous if he was put on the spot by someone. It seemed like he was afraid that he would fail in front of other people.

13. John Sr. was a strange fellow. I remember he would pour lighter fluid on anthills and set them on fire. He also seemed obsessed with guns. He would lay out green plastic army toy figures and shoot them with his 22 caliber rifle. Then he would pick them back up and paint them red where he had shot them. John never seemed like that at all. He had the opposite personality of his father. I remember John Sr. making John play war games with him.

14. John Sr. never encouraged John. He seemed too wrapped up in himself. Between his work at Kohler and tending to the farm, John Sr. did not spend much time with his family. And whatever time he did get, he used for himself, playing video games or watching TV.

15. Jackie was also pretty wrapped up in herself. She did not work outside the house and she spent a lot of time with her friend Linda Pack. She did not seem to have a lot of concern for John. I remember taking John and Neata to a movie, and it was clear their parents never took them anywhere like that - no movies, amusement parks, shopping malls, etc.

16. Jackie and John Sr. seemed to control every aspect of John's life, while at the same time never really seem to pay him much attention. Their attitude toward John was "do your homework and go to school and stay out of our way." But they would not let him leave the farm a lot. Mostly I think he watched TV and played video games.

17. I do not know whether John was ever abused. His sister Neata has talked about being beaten as a child. My mother would hit Jackie and I and our sister and brother really good – to the point we would cry for each other. I



3

EXHIBIT 12 Page 3    **279**

could never spank my kids because of that, but I do not know how it affected Jackie.

18. I moved back to Texas in 1989, when John was about thirteen years old. I wanted to go back to be closer to my children. By that time, Neata had moved back to South Carolina.

19. I was surprised that John joined the military. I think he must have been looking for something. I was also surprised at how John had changed when he got out of the military and came to live in Texas. Before the military, John was a jovial kid. After he got out, John seemed like he had an altered mindset. He was not the same active, fun kid that I knew in South Carolina. I remember talking with other family members and it being the general consensus that John did not come back the same person from the military. At family functions in Texas, John would sit by himself and not talk to anyone.

20. I was in the Army for a short period of time. Basic training in the military either makes you a part of the team or it alters your mindset. I think being in the Marines altered John's mind.

21. I spoke once to someone over the phone who I believe were John's defense attorneys. They were mostly interested in finding out about Neata and asked me questions about finding other people in South Carolina. I was never asked to testify at John's trial. Had I been asked, I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.



4

EXHIBIT 12 Page 4 **280**

22. I have read and reviewed this five page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2 of May, 2013 in Fort Worth, Tarrant County, Texas.



Thomas Hamilton

Subscribed and sworn to before me on May 2, 2013.



Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

**Notary without Bond**



## AFFIDAVIT OF BRIAN JETER

I, Brian Jeter, state and declare as follows:

1. My name is Brian Jeter. I live in Pacolet, South Carolina.

2. John Hummel and I were friends growing up. We met in elementary school, but we did not really start hanging out together until we were about fourteen years old. From our freshman year in high school through our senior year, John and I would hang out at school during lunch and recess.

3. John was a nice, quiet kid. He was friendly with everyone, but was not really a member of a particular social "group."

4. John was athletic. We would play sports together after school. Mainly we played "pick-up" games of football.

5. I lived near John. We both lived in the rural areas so we were both the country kids, isolated from the kids that lived in town.

6. My friend JoJo Patterson and I would sometimes help John and his father on their farm. I did not interact with John's family much. His sister, Neata, mostly spent time in her room.

7. I was never contacted by anyone on John Hummel's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

8. On January 7, 2013, I spoke on the phone with an investigator from the Office of Capital Writs. When I heard about John's conviction I was shocked. That is not the John I remembered from growing up.

9. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the ___ of April, 2013 in ___Pacolet___, South Carolina.

BJ                                      1                                      **282**

EXHIBIT 13 Page 1

_Brian Jeter_
Brian Jeter

Subscribed and sworn to before me on 4/26_____, 2013.

_Jenny Reif_
Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

**283**

EXHIBIT 13 Page 2

## AFFIDAVIT OF ELIZABETH GARZA

I, Elizabeth Garza, declare the following:

1. My name is Elizabeth Garza.

2. I am currently an investigator for Office of Capital Writs ("OCW"), in Austin, Texas. I have held this position from April 2011 to the present. In my capacity as an OCW investigator, I performed work on the John Hummel case.

3. On January 28, 2013, I contacted Wayne "Buddy" Matthias by phone. Mr. Matthias currently resides in Puyallup, Washington. I introduced myself by name, stated I was an investigator for the Office of Capital Writs, and that our office represented John Hummel in his post-conviction appeal.

4. I asked Mr. Matthias if he was willing to speak with me about his friendship with John Hummel during their time in the Marines when they were stationed together at Camp Pendleton. He was agreeable.

5. At the conclusion of the interview, I asked Mr. Matthias whether he would be willing to sign an affidavit reflecting the information we had just discussed. Mr. Matthias agreed to sign an affidavit.

6. On April 23, 2013, I spoke with Mr. Matthias by phone and reviewed the affidavit that had been drafted for his signature. Mr. Matthias confirmed the content of the affidavit. He requested that the affidavit be mailed to him so he could sign it and have it notarized. He agreed to mail the signed affidavit to the OCW.

1

**284**

EXHIBIT 14 Page 1

7. After failing to receive the affidavit, I attempted to contact Mr. Matthias on several occasions, but to no avail. As of May 28, 2013, the OCW has not received Mr. Matthias' signed affidavit.

8. The affidavit which Mr. Matthias approved by phone on April 23, 2013, is attached hereto.

9. I have read and reviewed this two-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 28th day of May, 2013 in Travis County, Austin, Texas.

Elizabeth Garza

Subscribed and sworn to before me on May 28, 2013.

Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

## AFFIDAVIT OF WAYNE "BUDDY" MATTHIAS

I, Wayne Matthias, state and declare as follows:

1. My name is Wayne Matthias. Everyone calls me "Buddy." I reside in Puyallup, Washington.

2. I met John Hummel when he and I served together in the United States Marine Corps from around 1998 to 2000 at Camp Pendleton in Oceanside, California.

3. I started the military in the infantry, which is where I met my friend Fred Emmer. Then I was transferred to the intelligence branch. Fred and I had been at Camp Pendleton about two years before John was transferred there. He was in intelligence too, so he and I were assigned as roommates. We were roommates for about two years.

4. I remember when John first arrived he was very shy. He did not know anyone. Fred and I had a group of friends already, so I invited John to hang out with us. At first we called John "Redneck" because he was from South Carolina.

5. John did fine as a Marine, although he struggled some. He was a bit overweight. He also was pretty messy. Being overweight and messy are both things not allowed in the Marines. His weight was especially a problem because it meant he could not get promoted. Most of the time promotions are automatic based on how much time you have spent in the military. But weight problems will prevent you from getting recommended for a promotion. John kept missing promotions and seeing other, younger guys get promotions even though they arrived after he did. I think not getting promoted frustrated John.

1

**286**

EXHIBIT 14 Page 3

6.  Most of our free time we would just hang out and go to the beach and watch movies. We spent a lot of time drinking and going to strip clubs. He became friends with the staff at the clubs, not just the dancers. As time went on, John seemed more confident and outgoing.

7.  John was also into fantasy and role playing games. He really liked Dungeons and Dragons, which we would play sometimes because I liked it too.

8.  During our friendship, I started noticing some changes in John's behavior. It was like he started to copy many of the things that Fred and I did. His wardrobe started to look like a mixture of Fred and I. I liked to wear bowling style shirts and I noticed John started to wear them too. Fred and I had lots of tattoos and John started getting more and more tattoos. He started to wear rings and jewelry like I did. He even started to have the same mannerisms as we did. At some point it got so bad that Fred and I sat John down and told him that he had to become his own person and stop doing everything we did. That conversation happened several months before Fred and I were getting out of the military. Fred and I both were discharged around the same time, in early 2000. We moved into an apartment together for a few months in Vista, California, which was about forty miles from the base. I think a bunch of our other friends all left the base about the same time. John still had time to serve after we all left.

9.  Not long after I got discharged, Fred and I got a call from John in Arizona. Apparently he left the base without authorization. John told us he was heading back to South Carolina, but his truck broke down. We had to go pick him up in Arizona and tow the truck back. John was stressed out. I think he was depressed. John said that he could not take being in the

2

**287**

EXHIBIT 14 Page 4



military now that he did not have his support system anymore and all his friends had left.

10. After we got back, John got in trouble for leaving the base. I did not see John at all after that. I heard from some stripper friends I stayed in touch with that John had changed since Fred and I were no longer around. He was no longer the same outgoing, friendly guy that he had become with us.

11. I heard about John's crime from a former stripper that also knew John. When I heard that after the crime John had gone back to Oceanside, California, I thought he must have been trying to get back to a place where we had good times.

12. I was never contacted by anyone on John's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

13. I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _____ , 2013 in Puyallup, Washington.


_____
Wayne "Buddy" Matthias


Subscribed and sworn to before me on _____, 2013.


_____
Notary Public, State of Washington

3

**288**

EXHIBIT 14 Page 5

## AFFIDAVIT OF CHRISTY PACK

I, Christy Pack, state and declare as follows:

1. My name is Christy Pack. I reside in Pacolet, South Carolina.

2. I have known John Hummel for over twenty-five years. We met when I was sixteen and started dating my husband Mark Pack.

3. I testified at John's capital trial in Fort Worth, Texas, in June 2011. During my testimony, I related the following information:

    a. I met John at church because our families socialized together. The Pack family would go to the Hummel's house every Sunday for dinner. We did this every Sunday for about five years. During those dinners, John was always very quiet. After dinner he would stay in his bedroom and play video games.

    b. John's mother was very loving with other people's children, but not her own. She made John and his sister Neata clean the kitchen on Sundays and we were not allowed to help. Even when they celebrated Christmas it seemed like Mrs. Hummel was focused on other people's children rather than her own.

4. In addition to my testimony, I would have gladly testified to the following if asked.

    a. The Hummel family seemed really isolated on their farm. I do not think John had any other friends besides my husband's family. I am not sure that other people were allowed over to the house.

    b. I think this isolation did something to John. He was very quiet and odd. I can't say exactly what was different, but he seemed off in some way.

1

**289**

EXHIBIT 15 Page 1



    c. I did not see very much love in the Hummel family. Neither John's father nor mother seemed to show love to their children, at least not in public. I do not remember seeing anyone ever hug or kiss or say "I love you."

5.     I was interviewed by John's defense attorneys. They asked a lot of questions about discipline and love and the family in general. They asked about the attention John's parents gave to their children and how they paid more attention to other children sometimes. I remember them asking several times whether we knew about any physical or sexual abuse that John or Neata suffered. They asked a lot of questions about John's dad having an affair. I told them that I could not remember there being anything that suggested to me that John had been abused.

6.     I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 27 of April, 2013 in Pacolet , South Carolina.

                                      *Christy Pack*
                                      Christy Pack

Subscribed and sworn to before me on 4|27 , 2013.



Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016
Notary without Bond

**290**

EXHIBIT 15 Page 2

## AFFIDAVIT OF CHRISTOPHER PARIS

I, Christopher Paris, state and declare as follows:

1. My name is Christopher Garlan Paris. In December 2009, I was married to Tonya Paris, though we are now divorced.

2. I met John Hummel in 2008 when he and his wife joined the Sunday school class my wife and I attended at Shady Oaks Baptist Church, in Hurst, Texas. Our families became good friends. My kids would play with John's daughter Jodi. My wife Tonya was very close to John's wife Joy.

3. John was a very quiet and reserved person. His wife Joy was the opposite — she was very social and had a bubbly personality. John was not unfriendly, though. I remember that he liked to cook. He would cook when we had parties. I remember him making big meals, but that he could not eat what he cooked because of a special diet he had to be on. All the cooking was for other people.

4. John never really shared or opened up about his life. He did not seem to really connect to people that way. John would occasionally share personal information, but it was more like giving facts than really opening up. For example, I knew John served in the military doing something with computers and was stationed on a ship at one point. But he never talked about how he liked the experience or if anything bad happened to him.

5. John did not talk about his health very much, but you could tell he was having a hard time. I knew he had problems because of his special diet. Joy talked to me about how John had to wear a colostomy bag, but John never talked about it. You could also tell that John's back gave him



1

frequent pain because of some injury he had. But John never complained or said how he had hurt his back.

6. John's family struggled financially. John was unemployed for a long time and he and Joy had a hard time making ends meet. Joy was a very hard worker. It seemed like she worked all the time. She occasionally would come to our house to give us massages. This happened after the end of the work day, so I know Joy would not get home those days until very late.

7. My family helped out as much as we could. I patched John and Joy's roof so that they could qualify for home insurance. I also helped fix their truck when it broke down. When John crashed the truck later, our Sunday school class paid the down payment for the Hummels' van because they did not have the money.

8. I remember when John got his job as a night security guard. He was very excited about it. Having a job seemed to pull him out of a slump, like he was proud about himself. The downside, though, of John working the night shift was that he was not around as much. I remember his attendance at church decreasing and that we saw less of him after he started the job.

9. Toward the end of 2009, I could tell John and Joy were having some problems in their marriage. It was obvious there were tensions between John and Joy. They even came to dinner at our house so my wife and I could offer support. I believe Joy wanted me to talk to John to try to help him because he was struggling with his faith and his role as "man of the house." I remember about a month before the crime happened, several of the women from the church went on a retreat, including Joy. They all came back from the retreat to my house, and John picked up Joy. You could see in their interaction with each other that something was wrong between them.



2

**292**

EXHIBIT 16 Page 2

10. When I learned about this crime, I was shocked. I have been in trouble with the law before, so I know that good people can be capable of bad acts. But I never would have expected John to do something like this. It was very out of character for the John I knew.

11. After the crime happened, I visited John in the Tarrant County jail. I have done prison ministries before for over ten years, so I was allowed to visit John as a chaplain. I also took John's mother to visit him. John was very remorseful every time I saw him. He also seemed cluttered and not put together. It was not the same John I remembered.

12. I was never contacted by anyone on John's defense team. Had I been contacted I would have told them what is contained in this affidavit.

13. I was called as a witness for the prosecution during the guilt/innocence phase of John's trial. I testified that I and members of John's Sunday school class went to his house after we heard about the fire, and that out of concern for his safety I filed a missing person report. I also testified that our Sunday school paid for the down payment of the Hummels's van and that after the crime I spoke to Kristi Freeze. Had I been asked, I would have testified to the contents of this affidavit as well.

3

**293**

EXHIBIT 16 Page 3



14.  I have read and reviewed this four page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2 of May, 2013 in Fort Worth, Tarrant County, Texas.

Christopher Paris

Subscribed and sworn to before me on May 2, 2013.

Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

**Notary without Bond**



4

**294**

EXHIBIT 16 Page 4

## AFFIDAVIT OF TONYA PARIS

I, Tonya Paris state and declare as follows:

1. My name is Tonya Paris.  In December 2009, I was married to Chris Paris, though we are now divorced.

2.  I knew John Hummel for around two years before the crime occurred.  My husband and I spent a lot of time with the Hummels.  I was close to Joy.

3. John was a quiet guy.  He did not really stand out in any way.  Once he felt comfortable around you, he would talk some.  He seemed like a good dad with Jodi.

4. I knew John and his family were having financial troubles.  I was with Joy at a women's conference about a month before the crime.  Joy opened up to me about the troubles she and John were having.  Chris and I had some trouble ourselves, so I think Joy felt comfortable sharing with me.

5. Joy never said anything about any domestic violence.  It did not seem like Joy was afraid of John at all or worried about him being violent.

6. I was never contacted by anyone on John's defense team.  Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.



1

**295**

EXHIBIT 17 Page 1

7.    I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2 of May, 2013 in Euless, Tarrant County, Texas.

Tonya Paris

Subscribed and sworn to before me on May 2, 2013.



Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

2

**296**

EXHIBIT 17 Page 2



# AFFIDAVIT OF DERRICK PARRIS

I, Derrick Parris, state and declare as follows:

1.  My name is Derrick Parris.

2.  I grew up with John Hummel in Pacolet, South Carolina. He was about five years older than me. We were close friends from when I was around five years old until I was fourteen and John graduated high school.

3.  I testified at John's capital trial in June 2011, in Fort Worth, Texas. I testified generally about the following:

    a.  I have known John since we were children going to the same church, Morning Star Baptist church. I would go out to his house often to play together.

    b.  I witnessed John's father hit him on two occasions. Once, John's dad beat him with belt for letting a bull loose from the farm. The second time, John's dad hit him with a broom handle.

    c.  I also saw John's father act inappropriately toward women. For example, I witnessed him smack my mom on the bottom.

    d.  John went to a different high school than I did. But I was aware that kids there called him "Bacon" as a nickname because of how he smelled. John did not seem to like that nickname.

    e.  John and I hung out a few times after he came back from the military. We would go to strip clubs. If one of the girls showed interested in John, he would take it seriously and be infatuated.

    f.  John was quiet, not outgoing, overweight, and not very smart. It surprised me that he joined the Marines.

4.  In addition to this testimony, had I been asked I would have gladly testified to the following information.

i

**297**

EXHIBIT 18 Page 1

5. From the time I was five years old until I was about twelve, I joined the Hummels for Sunday dinner. Each week we would have the same dinner – beef, rice, corn, and dinner rolls. After dinner the adults would play board games and the kids would play together. The Hummel family was a little strange. It always felt to me like they were "acting" like a family. There did not seem to be a lot of genuine love in the family.

6. As I got older, I had a suspicion that John's parents might have been abusive to John and his sister Neata. In addition to the few times I saw John's dad hit him, I remember feeling like there was more going on that I did not see. For example, John's mom Jackie would get unusually angry at him if his room was not immaculate. Also, under the surface it seemed like Jackie hated Neata. I remember Neata coming over to my aunt Linda's house often. I got the impression she was getting away from something.

7. John's other friends and I made fun of John all the time. Looking back I feel bad about how we picked on him. John was just a big oaf. He was naïve and wanted to please people. If our group of friends wanted something, we would ask John to go get it and he would. We got him to spend his money on us.

8. John dressed strangely growing up. He would wear things like cut-off shorts, trench coats, and house shoes that John insisted were "moccasins." Sometimes he would wear all of them at the same time.

9. John was really into role playing games and fantasy stuff. He got really into the games. I don't think he always knew where the line was between the game and reality. I remember one time we were playing the video game Zelda, and my cousin Jason had his character stab another character in the game. Jason said something like "I bet that hurt." Then John took a

**298**


knife and poked Jason in the shoulder. Our parents got really upset. But John did not seem to get that anything was wrong.

10. From when I was sixteen or so until I was twenty-one, I spent a lot of time hanging out with John. John had an apartment because he had graduated high school. Chad Brown and I and our other friends spent a lot of time hanging out at John's apartment. Mainly we did it because we could take girls over there. We could not take them to our houses, but John did not mind if we came to his place. Also, John was older and could buy alcohol. Looking back, we really used John. But he seemed to like the attention.

11. We would drink and go to strip clubs. John took the attention from the girls seriously. He acted like he had relationships with the strippers. At one point, John was going to the clubs almost every night. He talked about the strippers like they were girlfriends. The girls would give him fake phone numbers. I remember later when John would come back on leave from the military, he would go to the strip clubs and spend all his money on the girls.

12. I lost contact with John after he moved to Texas.

13. I was interviewed by John's attorney Larry Moore. So were my mother, my cousins Mark and Christy Pack, and my aunt Linda Pack. We all traveled to Fort Worth together to testify at John's trial.

14. It seemed like most of the witnesses from South Carolina that the defense brought to trial wanted John to get the death penalty. I remember my aunt Linda saying many times "I do not know what I can do to help. John deserves the death penalty anyway." She also said that John should have already been executed. I know aunt Linda and Mark and Christy Pack all had to be forced to testify by subpoena. While I was sitting in the hallway during John's trial, I heard Linda, Mark, and Christy all say that John



killed his daughter and should "just die." It seemed strange to me that John's attorneys wanted these people to testify at John's trial.

15. While sitting in the hallway at trial, I also remember that several of the South Carolina witnesses were sitting together talking. The people in the group included myself, my wife Christina Parris, my aunt Linda Pack, Mark and Christy Pack, Stephanie Bennett, and John's sister Neata and her husband Bill Woody. During one of the conversations, Neata stated that her father, John Sr., had sexual abused her. She specifically said that he had raped and fondled her. I do not know why she said it then, and that was all the details she gave.

16. I have read and reviewed this four page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _____, 2013 in Fairfax, South Carolina.

Derrick Parris

Subscribed and sworn to before me on May 21, 2013.

Notary Public, State of South Carolina

**300**

EXHIBIT 18 Page 4

## AFFIDAVIT OF JOSEPH "JOJO" PATTERSON

I, Joseph Patterson, state and declare as follows:

1. My name is Joseph Patterson. Everyone calls me "JoJo."

2. I met John Hummel in seventh or eighth grade. We were in classes together. I was one of his best friends. We would eat lunch together every day at school. John, our friend Brian Jeter, and I would go out together on the weekend often. We would mostly go to the Skating Palace to roller skate. For a while we went almost every weekend.

3. John loved the outdoors. We would go fishing and hunting sometimes. We also played football, baseball, and basketball with our friends. John was our running back. We would play during recess and after school, but mostly we would play basketball after school. John became more athletic once he started hanging out with me and Brian Jeter.

4. John was quiet, but he also was the class clown. Sometimes John would be playing around in class and a teacher would tell him to be quiet. John would put his head down and pretend to be mad, but he was just pretending. John was just goofy.

5. John was never into doing drugs or drinking. He did not use marijuana, cocaine, beer, or smoke cigarettes.

6. Brian and I would help John and his dad out on their family's farm. John and his dad would bale hay and Brian and I would help. John's dad, John Sr., was a quiet guy.

7. John did not really talk about his family. If something was brought up in conversation about family John might say something, but he would not bring up the subject on his own.



1

8.  John was not what you would call a "ladies' man."  He was shy around girls.

9.  I never saw John mad, nor sad.  He always had a smile on his face.  I would never think he could hurt anyone.

10. I was never contacted by anyone on John Hummel's defense team.  Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

11. On January 7, 2013, I met with an investigator from the Office of Capital Writs.  On March 28, 2013, I spoke to the same investigator on the phone.

12. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 26 of April, 2013 in Union, South Carolina.

Joseph Patterson
Joseph Patterson

Subscribed and sworn to before me on 4/26 , 2013.

Notary Public, State of Texas


JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016
Notary without Bond



**302**

EXHIBIT 19 Page 2

## AFFIDAVIT OF TOMMY RIGMAIDEN

I, Tommy Rigmaiden, state and declare as follows:

1.  My name is Tommy Rigmaiden.   I am employed as a detention officer for the Tarrant County Sheriff's Office in Fort Worth, Texas.  I have worked for the Tarrant County Sheriff since June 2006.

2.  New inmates are classified when they arrive at the Tarrant County jail. High risk or high profile inmates wear red suits.  An inmate's charge is not necessarily taken into account, but those charged with capital murder are usually well-covered by the news media so those inmates are usually given a red suit at first for their own protection.

3.  "Red suits" are kept in small housing units ("pods") and are confined to their cell most of the time.  They are able to leave their cell for "rotation" to shower or have recreation time for one hour per day.  Any time a "red suit" leaves their pod they are placed in full restraints, handcuffs and leg irons, and accompanied by two officers.

4.  Low profile and low risk inmates wear green suits.  "Green suits" are more equivalent to a general population inmate.  They are generally not placed in restraints when they leave their pods and are accompanied by one officer.

5.  John wore a green suit in the period of time before and during his trial.

6.  I saw John Hummel in the Tarrant County jail every day for a two-year period.  John was quiet and reserved.

7.  John became more talkative with staff as time went on.  I remember he talked about being in the Marines.  I was in the Navy and the Army, but John and I never talked in detail about our military service.



1

**303**

EXHIBIT 20 Page 1

8.  I never had any problems with John and never had any concerns about him as an inmate. When John was on rotation, he would shower and then go watch television.

9.  John was not assaultive or aggressive towards officers or other inmates. I do not believe that John would be a future danger in prison. John got along well with others and would have adjusted well to a general population setting in prison.

10. I was never contacted by anyone on John Hummel's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

11. On April 11, 2013, I met with an investigator from the Office of Capital Writs.

**304**

EXHIBIT 20 Page 2

12.   I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _2_ day of May, 2013 in Fort Worth, _Tarrant_ County, Texas.

_(signature)_

Tommy Rigmaiden

Subscribed and sworn to before me on _May 2_, 2013.

_(signature)_

Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

**305**

EXHIBIT 20 Page 3

## AFFIDAVIT OF RORY THOMAS

I, Rory Thomas, state and declare as follows:

1. My name is Rory Thomas. I am currently employed with the Tarrant County Sheriff's Office and have been for the past six years. I am primarily assigned as an officer in the Tarrant County jail facilities.

2. I got to know John Hummel throughout the time he was incarcerated at the Tarrant County jail awaiting and during his capital trial.

3. John was a model inmate. He never gave me any trouble. To my knowledge, John never gave anyone problems.

4. John was a quiet guy. He would speak to the officers if he needed something, but would otherwise not bother anyone.

5. The other inmates got along with John. I do not remember any inmates being aggressive with John. And John never gave any signs of being aggressive at all.

6. I never felt threatened by John. I never felt he was a danger to himself or anyone else.

7. I was never contacted by anyone on John Hummel's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.



1

**306**

EXHIBIT 21 Page 1

8.   I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2 of May, 2013 in Fort Worth, Tarrant County, Texas.



Rory Thomas

Subscribed and sworn to before me on May 2, 2013.

Notary Public, State of Texas

JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

**Notary without Bond**



2

**307**

EXHIBIT 21 Page 2

## AFFIDAVIT OF NATHANIEL DAVIS

I, Nathaniel Davis, state and declare as follows:

1. My name is Nathaniel Davis. I am a resident of Fort Worth, Texas.

2. I served as a juror on the capital murder trial of John Hummel in June 2011.

3. I do not really remember much about the punishment phase questions we were asked to answer. It was clear that Hummel's attorneys were not trying to win the case; they were trying to keep him from getting the death penalty.

4. The turning point for me was during the guilt phase when the woman Hummel had an affair with testified. At that point I made up my mind and decided Hummel should get the death penalty. There is nothing his attorneys could have said that would have made a difference to me.

5. After deciding Hummel should get the death penalty, the rest of the trial felt like a formality. We answered the punishment phase questions, but my mind was already made up.

6. I remember during the trial Hummel teared up one or two times. I think it was when he saw pictures of his wife and daughter. Otherwise, he seemed like an empty shell of a person sitting there.

7. At the punishment phase, I think the main theme of the defense was to talk about how Hummel had been picked on as a kid. I remember they talked about people calling him "Bacon." I did not feel like the defense showed us anything particular that seemed like mitigation. Hummel just seemed like he had a pattern of making bad decisions.

8. I have read and reviewed this two page affidavit.

1

**308**

EXHIBIT 22 Page 1




I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on May ~~19~~, 2013 in _Irving_ , _Dallas County_ , Texas.

_Nathaniel Davis_
Nathaniel Davis

Subscribed and sworn to before me on May ~~19~~, 2013.



Notary Public, State of Texas

JENNIFER RENEE RENF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

**Notary without Bond**

2

**309**

EXHIBIT 22 Page 2




# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security
### San Diego Field Office
### San Ysidro/Otay Mesa Passenger
### Other Officer Report / Narrative Continuation

Narrative continuation ☐     Report of Other Officer Involved in Incident ☒

REPORTING OFFICER (Name/Title/Agency):  J. BERNAL (#17768) / I / CBP(C)

Subjects Name:   JOHN WILLIAM HUMMEL      DOB:  11/04/1975

Port-of-Entry:   San Ysidro    Seizure No.:  200 -250 -     Date:

TOPIC:  ARMED AND DANGEROUS OF JOHN WILLIAM HUMMEL

IOIL No. (If Any):   200 -2504-

(Write in first person:  Record observations, statements and behavior, contraband concealment, and other pertinent facts)

On 20 December 2009 at approximately 0548 hours JOHN WILLIAM HUMMEL applied for admission into the United States via the San Ysidro Port of Entry pedestrian primary lanes. Upon reaching the primary booth HUMMEL presented his Texas Driver License (████████) as his entry document.  A query of HUMMEL's name disclosed him as being Armed and Dangerous. I escorted HUMMEL to the Port Enforcement Team for further disposition.

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law enforcement agencies. It is loaned to you by and remains the property of U.S. Customs and Border Protection. Neither it nor its contents are to be distributed outside the agency to which it is loaned.

#17768

REPORTING OFFICER/BADGE NO:               SUPERVISOR/BADGE NO:

**310**

AREA CODE (619)  SAN YSIDRO:  690-8800;  OTAY MESA:  671-8900

EXHIBIT 23 Page 1



**U.S. CUSTOMS AND BORDER PROTECTION**
**Department of Homeland Security**
**San Diego Field Office**
**San Ysidro/Otay Mesa Passenger**
**Other Officer Report / Narrative Continuation**



Narrative continuation ☐          Report of Other Officer Involved in Incident ☒

REPORTING OFFICER (Name/Title/Agency):  E. Enriquez / I / CBP(I)

Subjects Name:    John William HUMMEL                      DOB:  11/04/1975

Port-of-Entry:    San Ysidro    Seizure No.:  2010-2504-                Date:  12/20/2009

TOPIC:  MISSING PERSON, NIC/M588568332

IOIL No. (If Any):    2010-2504-

(Write in first person: Record observations, statements and behavior, contraband concealment, and other pertinent facts)

On December 20, 2009 at 0603 hours while assigned to the San Ysidro, CA Port Enforcement Team (SYS POE PET) vehicle case Intake Officer, I conducted ten-finger print on subject John William HUMMEL who was referred in from pedestrian primary inspection as missing person/possible armed and dangerous, NCIC (National Crime Information System) missing person lookout. Integrated Automated Fingerprint Identification System (IAFIS) result was negative on HUMMEL. Additional CBP computer system query, Treasury Enforcement Communication System (TECS) indicated that FARIAS has an no outstanding warrant, negative FBI record, negative SID, SSN ████████ AT 0650 hours, I telephonically contacted the ORI, Kennedale PD at (817) 478-5416 for confirmation of HUMMEL as missing person. Officer Rene of Kennedale PD confirmed that HUMMEL has an outstanding warrant. SYS Criminal Enforcement Unit (CEU), CBP Enforcement Officer Kandall was notified to inform of the warrant and for disposition of HUMMEL.

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law enforcement agencies. It is loaned to you by and remains the property of U.S. Customs and Border Protection. Neither it nor its contents are to be distributed outside the agency to which it is loaned.

07312

REPORTING OFFICER/BADGE NO:                              SUPERVISOR/BADGE NO:

**311**




# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security
### San Diego Field Office
### San Ysidro Criminal Enforcement Unit
### Enforcement Officer Report

| | |
|---|---|
| Narrative continuation ☐ | Report of Other Officer Involved in Incident ☒ |

REPORTING OFFICER (Name/Title/Agency):  Kandal, Paul / I / CBP(Enforcement)

Subjects Name:  HUMMEL, John                         DOB:  11/04/1975

Port-of-Entry:  San Ysidro   Seizure No.: _____   Date:  12/20/09

TOPIC:  NCIC Warrant: Arson

IOIL No. (If Any): _____

(Write in first person: Record observations, statements and behavior, contraband concealment, and other pertinent facts)

INC# PAW09-12-1408
NIC: W797829550
WNO: 0900017546
FBI# None
Charge: Arson
Agency: Kennedale Police Department, Texas.

On December 20, 2009 at approximately 5:48 am, John HUMMEL applied for entry into the United States through the San Ysidro Port of Entry Pedestrian Primary. John HUMMEL presented a valid Texas State Drivers License and Social Security Card bearing his name, date of birth, and photo as his documentation to Customs and Border Protection (CBP) Officer Bernal as proof of identity. CBP Officer Bernal received 2 negative Customs declarations and queried John HUMMEL in the Interagency Border Inspection System (IBIS) and received a computer generated referral.  John HUMMEL was escorted to the secondary office for further inspection.

In the Secondary office, CBP Officer Enriquez conducted name queries on John HUMMEL which was a positive match for a missing person armed and dangerous out of the State of Texas. A CBP Officer performed a fingerprints query on John HUMMEL through the Integrated Automated Fingerprint Identification System (IAFIS) with positive results. The ORI in the case is Kenneth County. ORI was contacted and confirmed John HUMMEL as being missing. The San Ysidro Criminal Enforcement Unit was contacted and CBP Enforcement Officer Kandal responded.

CBP Enforcement Officer Kandal conducted further queries through the National Law Enforcement Telecommunication System (NLETS) identifying John HUMMEL as the subject of a Felony Warrant for Arson in Kennedale, Texas in a subsequent homicide investigation. CBP Enforcement Officer Kandal contacted the Kennedale and confirmed the warrant to be active and outstanding. A warrant abstract was requested and received. John HUMMEL was arrested and booked into the San Diego County Jail (SDCJ).

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law enforcement agencies. It is loaned to you by and remains the property of U.S. Customs and Border Protection. Neither it nor its contents are to be distributed outside the agency to which it is loaned.

Reporting Officer/Badge NO: Paul Kandal #2491

AREA CODE (619) SAN YSIDRO: 690-8800; OTAY MESA: 671-8900

**312**

EXHIBIT 23 Page 3

```
     08:53            TECS II - NCIC/NLETS RECORD DISPLAY      122009   T2MRM401
TID= R0AQ                                                               T2PRM405

*********************************************************************************
OLN/22576933 OLS/TX OLY/2011
MNP/MP DLC/20091218 OCA/0900017596
VLD/20091219
MIS/LAW ENFORCEMENT SENSITIVE SUBJECT POSSIBLY MENTALLY UNSTABLE PERSON OF
MIS/INTEREST IN HOMICIDE CONSIDER ARMED AND DANGEROUS APPROACH WITH CAUTION
MIS/SUBJECT HAS MILITARY BACKGROUND DO NOT ARREST OR DETAIN BASED ON THIS RECOR
D
MIS/ IF LOCATED CONTACT KENNEDALE PD 8174785416 ADVISE LOCATION AND DIRECTION O
F
MIS/ TRAVEL
LIC/VLR144 LIS/TX LIY/2010 LIT/PC
VIN/2FMDA5141WBA54391 VYR/1998
VMA/FORD VMO/WIN VST/SD VCO/MAR



(F1/F2=HELP)  (F3=MAIN MENU)  (F4=PREV MENU)  (F7=PREV SCREEN)  (F8=NEXT SCREEN)
```

12/20/09

0650 - contacted Kennedale PD.
817 478 5416
ADVISE DISPO of subject

Rene

Hold for Warrant

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law
enforcement agencies. It is loaned to you by and remains the
property of U.S. Customs and Border Protection. Neither it nor
its contents are to be distributed outside the agency to which
it is loaned.

**313**

EXHIBIT 23 Page 4

```
     09:12          TECS II EXTERNAL MESSAGE DISPLAY          12202009  T2MD0611
                                                                       T2PD0634
  QUEUE TYPE:    PERSONAL              QUEUE NAME:  Q812
                                       MSG STATUS:   NACK
  ******************** TEXT OF MESSAGE *************** PAGE 01 ***************
  FROM NCIC    ON 12/20/09 AT 09:12:15
  NL01CQUQ81272300723
  CAUSC0404
  NO IDENTIFIABLE RECORD IN THE NCIC INTERSTATE IDENTIFICATION INDEX
  (III) FOR PUR/C.NAM/HUMMEL,JOHN WILLIAM.SEX/M.RAC/W.DOB/19751104.
  END
```

```
  MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                          PF16(NEXT MSG). PF19(MSG LOG)  PF18=(REROUTE)
  END OF THIS MESSAGE
  (PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law
enforcement agencies. It is loaned to you by and remains the
property of U.S. Customs and Border Protection. Neither it nor
its contents are to be distributed outside the agency to which
it is loaned.

**314**

EXHIBIT 23 Page 5



DEC. 20. 2009  1:52PM    KENNEDALE POLICE DEPARTMENT                    No. 0125   P. 1

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law
enforcement agencies. It is loaned to you by and remains the
property of U.S. Customs and Border Protection. Neither it nor
its contents are to be distributed outside the agency to which
it is loaned.

THE STATE OF TEXAS      }{

COUNTY OF TARRANT      }{

### ARREST WARRANT AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned Affiant, who after being duly sworn on oath deposes and says:

My name is Detective J. Charbonnet #314 of the Kennedale Police Department, having been so employed as a peace officer with the City of Kennedale since 2002. I have good reason to believe, and do believe, that on or about the 17th day of December, 2009, in Tarrant County, Texas, John William Hummel, W/M, 4 November 1975, did then and there commit the offense of Arson of a Habitation of the Texas Penal Code Section 28.02, by intentionally or knowingly, starting a fire, regardless of whether the fire continued after ignition, or caused an explosion with intent to destroy a habitation.

My belief is based on the following information:
On the 18th of December 2009, at approximately 00:18 hrs. the City of Kennedale, Tarrant County, Texas Fire / EMS Department received a call for service for a structure fire located at 600 Little School Road, Kennedale, Tarrant County, Texas.

The police department was first on scene at 600 Little School Road. The officer found smoke and flames emitting from the habitation. Civilians at the scene indicated that there were people inside the habitation. The officer tried the front door and found it to be locked. Due to the exigent circumstances, the officer forced entry into the habitation by kicking the door two times. The officer observed the atmospheric conditions inside the residence to be that of heavy black smoke with zero visibility.

The Kennedale Fire Department with the mutual aid assistance of the cities of Forest Hill and Mansfield were able to take control and then put out the fire. During the fire department's searches of the residence, three individuals were found deceased inside the habitation.

The Tarrant County Fire Marshal's Office and the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) were called into investigate the cause and origin of the fire. ATF canine handler, Lt. Joey Lankford from the Bedford Fire Department along with his partner, Rio an ATF certified accelerant detection canine assisted Special Agent Steve Steele of the ATF to conduct the origin and cause investigation.

The habitation located at 600 Little School Road is an approximate 1100 square foot house consisting of a pier and beam construction with a wood frame and exterior siding. The roof is that of a wood decking and composition shingles. The front of the habitation faces towards the west. There are two bedrooms on the south side of the habitation. There is one bedroom on the north side of the habitation. The front door as indicated above was found closed and secure when the first officer arrived on scene. Investigators later found the rear door to the habitation was open upon their arrival with the door handle lock on the actual handle in the locked position with no signs of forced entry. The only known individuals to have keys to the habitation were the individuals living at the habitation.

An examination of the habitation found heavy fire damage in each of the three bedrooms described above. The bedrooms on the south side of the habitation were heavily damaged from direct fire in the bedrooms. The bedroom on the north side of the habitation was also heavily damaged direct fire in the bedroom. The center portion of the residence showed signs of heat and smoke damage but no significant direct fire activity.

There were no signs of communication between the fires in the two bedrooms on the south side of the habitation

**315**

EXHIBIT 23 Page 6

with the fire in the bedroom on the north side of the habitation. There were three individuals found inside these bedrooms. In the bedroom on the southeast corner of the residence the body of a young child, approximate age 6 was found. In the bedroom on the southwest corner of the residence the body of Joy Hummel, approximate age 34 was found. In the bedroom on the northwest corner of the residence the body of Clyde E. Bedford, approximate age 57 was found.

In the southwest bedroom near the body of Joy Hummel, investigators found a large amount of what appeared to be human blood. Samples of carpet were collected from the large area of pooled blood. Samples of what appeared to be blood droplets on a mirror were also collected.

The accelerant detection canine, Rio was brought into the habitation to conduct a search of the habitation. Rio is trained to detect and alert upon finding trace amounts of ignitable liquids commonly used in starting fires. On two separate searches through the habitation, Rio alerted to two locations in each of the three bedrooms. Rio also alerted in one area in the center of the habitation. Samples of the debris in the area where Rio alerted were collected for lab examination.

The origin and cause examination produced no accidental sources for the fire. The arson investigators at the scene based upon their years of experience and training concluded that this was a series of intentionally set fires throughout the habitation. Under Texas law the fire would be ruled an Arson in accordance section 28.02 of the Texas Penal Code.

The husband of Joy Hummel arrived back at their residence at 600 Little School Road at approximately 05:20hrs. His full name is John William Hummel, W/M, 4 November 1975. Mr. Hummel arrived back in his family's van. Mr. Hummel was met by Captain Hull of the Kennedale Police Department. Mr. Hummel showed no emotion and asked no questions other than whether or not anyone made it out. Mr. Hummel was asked by Captain Hull to come down to the Kennedale Police Department to provide them with a statement as to he accounting of time during the night. Mr. Hummel followed in his personal vehicle to the police station. Special Agent Steve Steele and Detective Jason Charbonnet interviewed Mr. Hummel at the station. It was during this interview that Mr. Hummel was informed that the fire department found the bodies of his wife, father-in-law and daughter in the habitation after the putting out the fire. Mr. Hummel showed no emotion after receiving this news.

He was asked about the doors at the habitation when he left. Mr. Hummel indicated that when he left for the evening that the doors were locked as far as he knew. He voluntarily gave the police department his clothes and footwear that he had on at the time. During the collection of the clothing, investigators noticed what appeared to be dried blood on his pants and his socks. These items were sent to the Medical Examiner's Office for further testing.

Mr. Hummel indicated that he left the residence at 600 Little School Road on the 17th of December at approximately 21:00 hrs. He provided receipts for various establishments in and around the metroplex. One of those receipts indicated that Mr. Hummel purchased twenty dollars worth of gasoline at 22:47 hours in Joshua, Texas.

Mr. Hummel left the police station in his personal van at approximately 07:00 hrs on the 18th of December 2009. Authorities subsequent to his leaving the police station have tried to make contact with Mr. Hummel concerning the well being of his family pet that was recovered at the scene by Kennedale Animal Control. He has not returned their call.

He failed to show at the memorial service held the night of the 18th at the Hummel family church in Hurst, Texas. Mr. Hummel has not contacted any authorities regarding the remains of his wife, daughter or father-in-law.

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law enforcement agencies. It is loaned to you by and remains the property of U.S. Customs and Border Protection. Neither it nor its contents are to be distributed outside the agency to which it is loaned.

**316**

EXHIBIT 23 Page 7

Dec. 20. 2009  1:52PM   KENNEDALE POLICE DEPARTMENT                No. 0125  P. 3

No other known family and friends have seen or heard from Mr. Hummel after his visit from at the Kennedale police station. Mr. Hummel's church was concerned about his well-being on Saturday, December 19, 2009. Christopher Harris from the Shady Oaks Baptist Church in Hurst, Texas filed with the Kennedale Police Department a missing persons report for Mr. Hummel. Kennedale Police entered into the TCIC and NCIC system a missing persons report.

Mr. Hummel was located in California by the United States Customs and Boarder Protection trying re-enter the United States from Mexico through the port of entry known as San Ysidro in southern California. Mr. Hummel was on foot at the time.

Wherefore, affiant requests that an arrest warrant be issued for the suspect hereinbefore designated according to the laws of this State.

Witness my signature, this the ___20___ day of _DECEMBER_, 2009.

_____
Affiant

SUBSCRIBED AND SWORN TO BEFORE ME, this ___20th___ day of _December_, 2009, At ___12:48___ o'clock ___p___.m.

_____
MAGISTRATE IN AND FOR TARRANT COUNTY, TEXAS

_Judge, 396th District Court_
TITLE OF OFFICE

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law enforcement agencies. It is loaned to you by and remains the property of U.S. Customs and Border Protection. Neither it nor its contents are to be distributed outside the agency to which it is loaned.

**317**

EXHIBIT 23 Page 8

Dec. 20. 2009  1:53PM   KENNEDALE POLICE DEPARTMENT                    No. 0125  P. 4

WARRANT NUMBER _____

THE STATE OF TEXAS                    }{

COUNTY OF TARRANT                     }{

## WARRANT OF ARREST

TO ANY PEACE OFFICER OF THE STATE OF TEXAS:

The undersigned Magistrate having therefore found that probable cause exists for the issuance of this warrant, you are hereby commanded to arrest HUMMEL, John William W/M 11-4-1975, hereinafter referred to as the suspect, and bring the said suspect before a Magistrate in and for Tarrant County, Texas, instanter, then and there to answer the State of Texas for an offense against the laws of said State, to-wit: **ARSON OF A HABITATION**, which is a FIRST DEGREE FELONY, a violation of Texas Penal Code, Section 28.02, of which offense the said suspect is accused by the written affidavit, under oath of Detective J. Charbonnet #314 the Kennedale Police Department, filed before me anterior to issuance of this warrant.

WITNESS my official signature, this the _20th_ day of _December_, AD, 2009.

RECOMMENDED BOND: $ _500,000._

_George Gallagher_
MAGISTRATE IN AND FOR TARRANT COUNTY, TEXAS

_Judge, 396th District Court_
TITLE HELD BY MAGISTRATE.

CAME TO HAND on the _____ day of _____, 2009, and executed on the

_____ Day of _____, 2009.

BY: _____

NAME OF PEACE OFFICER

_____

DESCRIPTION OF OFFICE

PROPERTY OF U.S. CUSTOMS & BORDER PROTECTION SERVICE

This document is for the confidential and exclusive use of law enforcement agencies. It is loaned to you by and remains the property of U.S. Customs and Border Protection. Neither it nor its contents are to be distributed outside the agency to which it is loaned.

WARRANT NUMBER _____

**318**

EXHIBIT 23 Page 9



*Simply Transcribe*

3301 El Salido Pkwy.
Apt. 712B
Cedar Park, TX 78613
Phone: 512-213-5403
Email: larue.lindsey@gmail.com
Website: www.simplytranscribe.com

March 2, 2013

To Whom It May Concern:

This letter is to state that the transcription services for Robert Romig were provided by myself, Lindsey LaRue, of Simply Transcribe.

I am a freelance transcriptionist with three and a half years of experience in this field of work. My experience started out with education and a year of work in the field of medical transcription, and I have since moved on to providing general transcription services. I transcribe a number of interviews, speeches, radio programs, seminars, etc.

I was asked to transcribe 12 telephone conversations for Mr. Romig and completed those on March 2, 2013.

Sincerely,

Lindsey LaRue
*Simply Transcribe*
*Austin, Texas*
*512-213-5403*

20091220-084933-1005-[POS 2]
December 20, 2009 at 08:49:33am

Speaker 1:     Kennedale Police.  This is Renee.  How may I help you?

Speaker 2:     Hi.  Good morning, ma'am.  This is CBP Officer Enriquez here at San Ysidro
               Port of Entry.  We have an individual here that is on the missing report from your
               ORI.

Speaker 1:     Okay.  Where are you at again, sheriff?

Speaker 2:     San Ysidro, California Port of Entry.

Speaker 1:     Can you spell that?  I'm sorry.  I'm having a hard time understanding you.

Speaker 2:     I'm sorry.  San Ysidro.  S-A-N Y-S-I-D-R-O.  San Ysidro.

Speaker 1:     California?

Speaker 2:     California.  Yes, ma'am.

Speaker 1:     And who do you have?

Speaker 2:     I'm sorry?

Speaker 1:     You said you have a missing person?

Speaker 2:     Yeah, we have located a missing person from your ORI.

Speaker 1:     Okay.  The person's name?

Speaker 2:     Okay.  Last name is Hummel.  H-U-M-M-E-L.  First name John.  Middle name is
               William.  Date of birth: November 4, 1975.

Speaker 1:     And where did you see him at?

Speaker 2:     Well, we have him right now.  He came from Mexico.

Speaker 1:     He came from Mexico?

Speaker 2:     Yes, ma'am.  He's coming back to the United States.  We can hold him here.

Speaker 1:     Okay.  Do you have him in your custody?

Speaker 2:     Yes, ma'am.

Speaker 1:     Okay.  Can I have your name, please?

Speaker 2:     Enriquez is the last name.  E-N-R-I-Q-U-E-Z.

**320**

EXHIBIT 24 Page 2

Speaker 1:    And a contact number for you, sir?

Speaker 2:    619-662-2241.

Speaker 1:    And are you holding him for any other reason?

Speaker 2:    Just for this missing report that we got from you.

Speaker 1:    Okay.  Let me contact our captain, and I'll have him call you back.  619-662-2241, correct?

Speaker 2:    Extension 2251.

Speaker 1:    2251.  And just ask for Enriquez?

Speaker 2:    Enriquez.  Yeah.  I'll be standing by.

Speaker 1:    All right.  Okay.  Thank you, sir.

Speaker 2:    You're welcome.

Speaker 1:    Bye-bye.

Speaker 2:    Okay.

**321**

EXHIBIT 24 Page 3

20091220-090707-1004-[POS 1]
December 20, 2009 at 09:07:07am

| | |
|---|---|
| Speaker 1: | Kennedale Police. |
| Speaker 2: | Hey, Renee? |
| Speaker 1: | Mmm-hmm? |
| Speaker 2: | If you would, have customs hold him.  He is not free to go.  We are going to get a warrant for him for arson.  If you would, have customs hold him. |
| Speaker 1: | Okay.  Do I just tell him to hold him pending a warrant?  Or… |
| Speaker 2: | Yes.  If you can, call him, however you've been communicating with him.  If you need to, send them a [00:00:29] indicating that we have put a hold on him for arson. |
| Speaker 1: | Arson.  Okay.  I'll call him. |
| Speaker 2: | Okay.  Thank you. |
| Speaker 1: | Thank you. |
| Speaker 2: | Hey. |
| Speaker 1: | Yes? |
| Speaker 2: | Can you tell me exactly where he's at? |
| Speaker 1: | He is in San Ysidro.  I'll spell it.  It's S-A-N and the second word is Y-S-I-D-R-O, California with the Port of Entry control people.  I Googled it, and it's right on the border kind of near where Tijuana is in Mexico. |
| Speaker 2: | Yeah. |
| Speaker 1: | On the far, far side. |
| Speaker 2: | All right.  Will you spell that last part of San again? |
| Speaker 1: | It's Y-S-I-D-R-O. |
| Speaker 2: | Okay.  What's the phone number there? |
| Speaker 1: | It's going to be 619-662-2241, extension 2251, and it's Officer Enriquez. |
| Speaker 2: | Spell it for me. |
| Speaker 1: | E-N-R-I-Q-U-E-Z is who has him in custody. |

**322**

EXHIBIT 24 Page 4

Speaker 2:    All right.  Tell me one more time.

Speaker 1:    The spelling or the number?

Speaker 2:    The spelling.

Speaker 1:    E-N-R-I-Q-U-E-Z.

Speaker 2:    All right.  Go ahead and put a hold on him, and I'll give you a call back to let you know where to go from there.

Speaker 1:    Okay.  So just call him and say we want to put a hold on him for a warrant for arson.

Speaker 2:    Yes.

Speaker 1:    Okay.

Speaker 2:    Okay?

Speaker 1:    All right.

Speaker 2:    Thank you.

Speaker 1:    You're welcome.

**323**

EXHIBIT 24 Page 5

20091220-090940-1005-[POS 2]
December 20, 2009 at 09:09:40am

Speaker 1:    [00:00:10]

Speaker 2:    Yes, I need extension 2251.

Speaker 1:    2251?  Can you hold on a second, please?

Speaker 2:    Yes sir.

Speaker 1:    Can I ask who is calling?

Speaker 2:    This is Renee with the Kennedale Police Department.  I'm trying to reach an Officer Enriquez.

Speaker 1:    Okay.  Let me transfer you over there.

Speaker 2:    Thank you.

Speaker 3:    San Ysidro Port Enforcement.  This is Officer Enriquez.  How can I help you, please?

Speaker 2:    Hello.  This is Renee with the Kennedale Police Department.  I'm calling you regarding a missing person.  Last name Hummel.  First name John.

Speaker 3:    Yes ma'am.

Speaker 2:    We need to go ahead and put a hold on that person and not have him released.  He has a warrant pending for arson.

Speaker 3:    Okay.  You want us to hold him here?

Speaker 2:    Yes.  We'd like to place a hold on him.

Speaker 3:    All right.  Somebody will contact us, or somebody will be coming down here to pick him up?

Speaker 2:    Somebody should be contacting you shortly.  They have to process a warrant.

Speaker 3:    Okay.  Thank you.

Speaker 2:    Okay.  Thank you.

Speaker 3:    You're welcome.  Bye.

**324**

EXHIBIT 24 Page 6

20091220-091610-1005-[POS 2]
December 20, 2009 at 09:16:10am

Speaker 1:     Port Enforcement Team.  How may I help you this morning?

Speaker 2:     Hi.  Can I have extension number 2251, please?

Speaker 3:     Port Enforcement.  This is Enriquez.  How can I help you?

Speaker 2:     Give me just one second.  Kennedale Police.  Please hold.

**325**

EXHIBIT 24 Page 7

20091220-091651-1005-[POS 2]
December 20, 2009 at 09:16:51am

Speaker 1:    Officer Enriquez?

Speaker 2:    This is Officer Enriquez, ma'am.

Speaker 1:    This is Renee with the Kennedale Police Department. I just wanted to let you know I spoke with our captain. He said he'll have somebody out to pick him up on a plane sometime today. If you need to contact our captain, I can give you that number.

Speaker 2:    Okay. Ma'am, I just called our enforcement unit that handles the warrant. He's going to call you over there and get some information.

Speaker 1:    Okay. Thank you.

Speaker 2:    Okay? His name is Kandal.

Speaker 1:    Kandal?

Speaker 2:    Kandal. Yeah. As a matter of fact, he might be calling right now.

Speaker 1:    Okay. Thank you.

Speaker 2:    Thank you, ma'am.

Speaker 1:    Bye-bye. Kennedale Police.

Speaker 3:    Good morning. This is Enforcement Officer Kandal with U.S. Customs and Border Protection in San Ysidro.

Speaker 1:    Hello.

Speaker 3:    Hello. Good morning. One of my fellow officers downstairs called you guys on a Mr. John Hummel.

Speaker 1:    Mmm-hmm.

Speaker 3:    I am going to be the case agent taking him over to county. Is he a no bail full extraditable warrant?

Speaker 1:    I am not 100% sure. I have a number for our captain. He said that when we got a call from y'all to give it to you that way you can speak with him directly.

Speaker 3:    Okay. Do you have an abstract on this gentleman?

Speaker 1:    I don't know. I don't think so. We just have him filed as a missing person, and he has a pending warrant for arson.

**326**

EXHIBIT 24 Page 8

Speaker 3:    Okay. Does that arson have a – what's it called attached to it? What's the word I'm looking for? Does that arson warrant have a NIC number associated with it?

Speaker 1:    Right now the only NIC number we have on him is the missing person NIC number.

Speaker 3:    Okay. So you don't have an active warrant outstanding on him then, right?

Speaker 1:    I believe it's being processed as we speak. I'm going to need you to probably contact our captain because I don't have any more information than that. Can I give you that number?

Speaker 3:    Yeah. Hold on a second. Let me grab that.

Speaker 1:    I'm sorry. I wish I had more information.

Speaker 3:    Well, part of the problem with it is that he's an otherwise admissible person. He's actually a citizen in the country, and we can't hold him on something that hasn't been processed yet. Let me go ahead and get his number.

Speaker 1:    All right. It's going to be Captain Hull. H-U-L-L.

Speaker 3:    H-U-L-L.

Speaker 1:    His number is going to be 817-538-7371. Your last name is Kandal? Is that correct?

Speaker 3:    It's spelled K-A-N-D-A-L.

Speaker 1:    And a contact number for you?

Speaker 3:    619-662-2202.

Speaker 1:    All right. If you give him a call, he should be able to answer all your questions, Mr. Kandal.

Speaker 3:    Thank you much.

Speaker 1:    Thank you.

20091220-093424-1005-[POS 2]
December 20, 2009 at 09:34:24am

Speaker 1:     Kennedale Police. This is Renee. How may I help you?

Speaker 2:     Hey, Renee. I need to find a number for Jason Charbonnet. I can't get him to answer his phone.

Speaker 1:     Okay.

Speaker 2:     I don't know if we've got a home phone number for him or not.

Speaker 1:     Bear with me for a second. I've got 817-377-1811.

Speaker 2:     Hold on just a second. 817...

Speaker 1:     377-1811. Did you talk to Kandal?

Speaker 2:     Who?

Speaker 1:     Enforcement Officer Kandal?

Speaker 2:     Uh-uh.

Speaker 1:     Okay. He is trying to call you. He is saying that he can't hold Hummel if there is no NCI number for the warrant. If there is no active warrant, he can't hold him. It's something about being an admissible person and a U.S. citizen.

Speaker 2:     All right.

Speaker 1:     Do you want that number?

Speaker 2:     Is that the same number you gave me?

Speaker 1:     No. It's a different number, different guy.

Speaker 2:     Oh, geez. He hasn't called me yet.

Speaker 1:     He said he was going to call you as soon as I got off the phone with him because he was asking me a lot of questions that I didn't have the answers to. He want to know if he was a no bail full extradite, and he needed the NIC number for the warrant. I told him that it was probably being processed as we were speaking, and he said that's not good enough, that he had to have it active or he couldn't hold him because of the guy's rights.

Speaker 2:     Oh, I believe he's right. I was hoping they would just hold him, to be honest with you. All right. The guy hasn't called me yet. Let me see if I can get pulled over. I'm going down the road. All right. Can you give me Jason's number again?

**328**

EXHIBIT 24 Page 10

Speaker 1:    Yes.  Do you want me to just call Charbonnet for you?

Speaker 2:    Yeah, just call him if you don't mind.

Speaker 1:    And tell him what?

Speaker 2:    Just tell him that he needs to come in to the PD, that we need to get a warrant done on our suspect.

Speaker 1:    Okay.

Speaker 2:    All right.  Give me this other guy's number that I need to call.

Speaker 1:    Okay.  It's going to be 619-662-2202, and his name is Kandal.  K-A-N-D-A-L. Do I need to call Carlson too?

Speaker 2:    No, I've already talked to him.

Speaker 1:    Okay.

Speaker 2:    I know I'm being a pain in the butt, but can you tell me that number again?  I'm trying to drive.

Speaker 1:    Well, don't kill yourself.  619-662-2202.

Speaker 2:    2202?

Speaker 1:    Mmm-hmm.

Speaker 2:    Okay.  And his name was Kandal?

Speaker 1:    Yes.  I will call Charbonnet.

Speaker 2:    Okay.  Thank you, ma'am.

Speaker 1:    You're welcome.  Bye-bye.

**329**

EXHIBIT 24 Page 11

20091220-093725-1005-[POS 2]
December 20, 2009 at 09:37:25am

Speaker 1:     We're not able to take your call right now.  Please leave a message...

Speaker 2:     Hello?

Speaker 3:     Hi.  This is Renee with the Kennedale Police Department.  Can I speak to Detective Charbonnet, please?

Speaker 2:     Sure.  Hold on just one second, Renee.

Speaker 4:     Hello?

Speaker 3:     Detective Charbonnet, the captain needs you to come in immediately.  Hummel is located in San Ysidro, California and a warrant needs to be issued for him for arson in order for them to continue holding him.

Speaker 4:     Okay.  Has anybody contacted Carlson?

Speaker 3:     Yes.

Speaker 4:     All right.  I'll call him.

Speaker 3:     Okay.

Speaker 4:     Thanks.

Speaker 3:     Bye.

**330**

EXHIBIT 24 Page 12

20091220-111637-1005-[POS 2]
December 20, 2009 at 11:16:37am

Speaker 1:     Kennedale Police.

Speaker 2:     Hey.

Speaker 1:     Mmm-hmm?

Speaker 2:     Run me a soundex on the name Eddie [00:00:08] E-D-D-I-E.

Speaker 1:     Okay.  Are we looking for a particular city?

Speaker 2:     600 Little Road, Kennedale, Texas.

Speaker 1:     Eddie.  E-D-D-I-E.

Speaker 2:     Yes, ma'am.

Speaker 1:     Okay.

Speaker 2:     Thank you.

Speaker 1:     Bye.

**331**

EXHIBIT 24 Page 13

20091220-125140-1004-[POS 1]
December 20, 2009 at 12:51:40pm

Speaker 1:     Kennedale Police.  This is Renee.  How may I help you?

Speaker 2:     Hey, Renee.  This is Enforcement Officer Kandal.  Captain Hull just tried to call
               me, but his phone is not ringing.

Speaker 1:     Okay.  If you'll just stay on the line, I'm going to put you on hold for a second.

Speaker 2:     Thanks.

20091220-125225-1005-[POS 2]
December 20, 2009 at 12:52:25pm

Speaker 1:    This is Captain Hull.

Speaker 2:    Hey, Captain Hull.  It's Kandal.  I got your fax.  I'm on my way down to arrest him.

Speaker 1:    Wonderful.  Thank you, sir.

Speaker 2:    You got it.  You'll be getting a call from San Ysidro Sheriff's Department later on.

Speaker 1:    Okay.

Speaker 2:    All right.

Speaker 1:    Thanks.

Speaker 2:    Yeah.

**333**

EXHIBIT 24 Page 15

20091220-132343-1005-[POS 2]
December 20, 2009 at 1:23:43pm

Speaker 1:     You have reached the Port Enforcement Team at the [00:00:23] San Ysidro.
               Please leave a message at the sound of the beep.  Record at the tone.

**334**

EXHIBIT 24 Page 16

20091220-132436-1005-[POS 2]
December 20, 2009 at 1:24:36pm

Speaker 1:     Kennedale Police.

Speaker 2:     Good morning.  This is enforcement officer Kandal over at San Ysidro.

Speaker 1:     Hi.  This is Renee.  I just entered it.

Speaker 2:     Oh, you did?

Speaker 1:     Yes.

Speaker 2:     Okay.  I had to come to a different phone because he just told us that he swallowed a freaking thing of crack, so we're going to move his ass like – I'm going to pull this right now.  That's why I was trying to call you.

Speaker 1:     Okay.

Speaker 2:     If I see this on here, his ass is going straight to county because they've got medical staff on site.  We won't have to take him to the doctor.  You know what I mean?

Speaker 1:     Okay.  So our guy swallowed the crack?

Speaker 2:     Yes.

Speaker 1:     Okay.

Speaker 2:     Hold on a second.  Let me freaking pull this.

Speaker 1:     Do you want the NCI number?  Would that be faster for you?

Speaker 2:     That will help.  Hang on a second.  I've got to get it out of there anyway.  Hold on a second.  Of course, I came into a computer that doesn't have – fucking thing.  Goddammit.  Okay.  What's the NCI number?

Speaker 1:     W0797829550.

Speaker 2:     Hang on a second.  Are you the one that responds to these?

Speaker 1:     Yes.

Speaker 2:     Okay.  I'm going to log in and send this to you right now.  Oh, man.  Right when I was on the phone, I was shooting the breeze with the captain, of course.  You know, I've got to talk to them higher-ups.  The phone is

**335**

EXHIBIT 24 Page 17

ringing on the other end. My supervisor picks it up and that's what they tell him. I was like, "Oh, Christ."

Speaker 1:     He's just a big ol' problem child.

Speaker 2:     He's a pain in the ass. He's lucky I didn't have a hold of him after I read that report. He's lucky I didn't strangle the shit out of him. I used to work for the fire department too.

Speaker 1:     Oh, man.

Speaker 2:     Yeah. So I've been around the block a little bit. Okay. Let's see what we've got here. All right. We've got something. That's good. Something's in here. That's not what I want. Okay. All right. Make sure this goes through the right way. Oh, come on. Did you dispatch the fire department too?

Speaker 1:     No, I wasn't here for that.

Speaker 2:     Oh, you weren't?

Speaker 1:     No. That was a couple days ago.

Speaker 2:     Now, does your dispatch center do both?

Speaker 1:     Yes. We do everything.

Speaker 2:     You're like where I used to work out in north central that way. Let's see. All right. Oh, come on. Yes. Yes. There it is right there. Okay. Hold on a second.

Speaker 1:     I just got something [inaudible 00:02:56] U.S. Customs.

Speaker 2:     Yeah, that's the hit that I just ran. That's the hit, so hold on a second. Let me send you the [inaudible 00:03:06] on it. Okay. What's ORI?

Speaker 1:     TX220729.

Speaker 2:     What's the OCA on it? I don't have it right in front of me.

Speaker 1:     OCA is going to be – oh, wow. Where is it? I'm sorry. Hold on just a second. I just had it. Crap. Where is it? 0900017546. Do y'all use OMNEX?

Speaker 2:     It's an interface system that works with it. It's not that system directly. It's works over the top of it.

**336**

EXHIBIT 24 Page 18

Speaker 1:     Oh, I was going to tell you a cheat.

Speaker 2:     Yeah, I know.  It's a pain in the ass.

Speaker 1:     Ours all you have to do is right click, and it populates everything.

Speaker 2:     See, ours doesn't do that.  It's the government.  We run on DOS.  Come on.  What are you new here?  Just figure out how you get your tax money back at end of the year.  There you go.  Okay.  I'm giving you guys a fax number too just in case.  Okay.  You should have it right now.

Speaker 1:     Yep.  Just got it.  Thank you.

Speaker 2:     Okay.  Thank you.

Speaker 1:     Bye-bye.

Speaker 2:     Bye.

**337**

EXHIBIT 24 Page 19



# San Diego County
# SHERIFF'S DEPARTMENT

## MEDICAL RECORDS UNIT
8525 Gibbs Drive   Suite 303, San Diego, California   92123
Phone:  (858) 974-5968                    FAX:  (858) 974-5902

## DECLARATION OF CUSTODIAN OF MEDICAL RECORDS
William D. Didier, RHIA
Custodian of Medical Records

**PATIENT NAME:  <u>JOHN HUMMEL BOOKING NUMBER:  9797544</u>**

Says as follows:

That the Declarant is the duly authorized Custodian of the Medical Records of San Diego County Sheriff's Department, Medical Services Division and has authority to certify said records and;

That the copy of the medical records attached to this Declaration is a true copy of the records described in the Subpoena Duces Tecum, and;

That the records were prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event. This Certification does not extend to any other records that maybe attached which were produced by another organization. Those records were utilized in the continuity of care.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _____1- 31- 11_____                    _____
                                            (Signature of Declarant)

                                            William D. Didier, RHIA
                                            Chief, Medical Records & Privacy Officer
                                            Medical Services Division
                                            San Diego County Sheriff's Department

Rev Jun 09

**338**

EXHIBIT 25 Page 1

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

JIM:   400175230  **Book #:** 9797544     **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975 **Age:** 35   **Des.:** W   **Sex:** M   **SSN:** ▮▮▮▮▮

**Created Dt/Tm:** 12-20-2009 1302      **Created By:** BELL,DEBORAH

| | |
|---|---|
| N | Have you been injured, hurt or in an accident in the last 72 hours? |
| | Explain: |
| N | During the time of arrest were you treated in a hospital? |
| | Name of hospital: |
| | Were you given any medications at the hospital? |
| | Name of medication: |
| N | During the time of arrest were you tasered/restrained with any device other than handcuffs? |
| | Explain: |
| | If tasered, were barbs removed in the hospital and which hospital? |
| | Explain: |
| Y | Do you have any major medical problems? |
| | Explain: Crohn's Dx; Hx back surgeries d/t (2) herniated discs |
| N | Do you have any communicable diseases? |
| | Explain: |
| N | When was your last CXR? |
| | Explain: |
| N | Do you have any psychiatric problems? |
| | Explain: |
| N | Are you a client of the Regional Center for developmentally disabled? |
| | Which Center? |
| N | Are you feeling suicidal? |
| | Explain: |
| Y | Is the inmate/patient alert and oriented? |
| | Explain: |

<div style="writing-mode: vertical">The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit</div>

Facility: 944
370M MED

Page 1 of 2

Printed: 01-31-2011 1318
Printed By: COPADOS2, BONDOC

**339**

EXHIBIT 25 Page 2

San Diego County Sheriff's Department Medical Records Unit

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

**JIM:** 400175230  **Book #:** 9797544  **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975  **Age:** 35  **Des.:** W  **Sex:** M  **SSN:** 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

**Created Dt/Tm:** 12-20-2009 1302  **Created By:** BELL,DEBORAH

N  Breathalyzer result?

    Record result:

Y  Are vital signs indicated?

Explain & Document: 98.4

Y  Fit for Booking?

    Disposition:

Facility: 944
370M MED

Printed: 01-31-2011 1318

340

EXHIBIT 25 Page 3  BONDOC

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit control of either, in the ordinary course of Medical Services Division, staff physicians, or persons acting under the

| | | | |
|---|---|---|---|
| **JIM:** 400175230 | **Book #:** 9797544 | **Book Dt/Tm:** 12-20-2009 1246 | |

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975 **Age:** 35 **Des.:** W **Sex:** M **SSN:** ▮▮▮▮▮

**Created Dt/Tm:** 12-20-2009 1641 **Created By:** GONZALES,ANTONIC

---

Y **Vital signs?**

**BP:** 116/72

**TPR:** 98.3, 80, 20

**Describe:** ht 72" wt 200# 6332 12/20/09

---

N **Are you being seen by a physician?**

**Physicians name:**
**Psychiatrist:**

---

N **Are you a client of the Regional Center for the developmentally disabled?**

**Which Center:**

---

**Allergies**

N **Medications?**

**Describe:**

---

Y **Food?**

**Describe:** red meat, milk, raw vegetables, nuts

---

Y **Bee sting?**

**Carry Kit:** none
**Swelling:** yes

---

**Are you pregnant?**

**LMP?**
**EDC?**

---

**Have you had a baby in the last 12 months?**

**Explain:**

---

**Have you had an abortion recently?**

**Date:**

---

Y **Do you have health insurance?**

**Explain:** va

---

Facility: 944
161B MED

Page 1 of 7

Printed: 01-31-2011 1319

**341**

EXHIBIT 25 Page 4 BONDOC

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

JIM:  400175230  Book #:  9797544      Book Dt/Tm:  12-20-2009 1246

Name(L,F,M,S):  HUMMEL, JOHN, WILLIAM

DOB: 11-04-1975  Age: 35   Des.:  W   Sex: M   SSN: ▒▒▒▒▒▒

Created Dt/Tm:  12-20-2009 1641        Created By:  GONZALES,ANTONIC

| | | |
|---|---|---|
| Y | Do you use street drugs? | |
| | Type: | crystal |
| | Amount: | small |
| | Last Used: | last night |
| N | Do you have problems when you stop using them? | |
| | Explain: | |
| N | Do you use alcohol? | |
| | Type: | |
| | Amount: | |
| | Last Used: | |
| N | Do you have problems when you stop using it? | |
| | Explain: | |
| N | Do you have asthma? | |
| | Explain: | |
| N | Hypertension? | |
| | Explain: | |
| N | Infection? | |
| | Explain: | |
| N | Diabetes? | |
| | Explain: | |
| N | Heart problems? | |
| | Explain: | |
| Y | Orthopedic? | |
| | Explain: | herniated disc L4/L5 |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

Facility: 944

161B MED

Page 2 of 7

Printed: 01-31-2011 1148

Printed By: SBONDOC, S BONDOC

342

EXHIBIT 25 Page 5

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

JIM:   400175230   **Book #:** 9797544      **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975   **Age:** 35   **Des.:** W   **Sex:** M   **SSN:** ███████

**Created Dt/Tm:** 12-20-2009 1641      **Created By:** GONZALES,ANTONIC

| | | |
|---|---|---|
| N | Seizure? | |
| | Explain: | |
| N | On renal dialysis? | |
| | Name of Clinic, MD: | |
| Y | Do you have any other medical problems? | |
| | Explain: Crohns disease | |
| N | Do you have any dental problems? | |
| | Explain: | |
| N | Do you have TB? | |
| | Last x-ray: | |
| | 2 Rx: | |
| | 3+ Rx: | |
| N | Hepatitis? | |
| | Last date: | |
| | Type: | |
| | Rx Name: | |
| N | Venereal disease? | |
| | Type: | |
| | Last Date: | |
| | RX Name: | |
| Y | HIV tested? | |
| N | HIV positive? | |
| | MD Name: | |
| | T-Cell: | |
| | Rx Name: | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

JIM:  400175230  **Book #:** 9797544    **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975 **Age:** 35   **Des.:** W  **Sex:** M  **SSN:** ▮▮▮▮▮▮

**Created Dt/Tm:**  12-20-2009 1641     **Created By:** GONZALES,ANTONIC

| | | |
|---|---|---|
| N | AIDS? | |
| | MD Name: | |
| | T-Cell: | |
| | Rx Name: | |
| N | Scabies? | |
| | Explain: | |
| N | Lice? | |
| | Explain: | |
| N | Crabs? | |
| | Explain: | |
| N | Rash on body? | |
| | Explain: | |
| N | Open sores on private parts? | |
| | Explain: | |
| N | Do you have any other communicable diseases? | |
| | Explain: | |

**Mental Status**

| | | |
|---|---|---|
| Y | Alert and oriented person? | |
| | Describe: | |
| Y | Alert and oriented place? | |
| | Describe: | |
| Y | Alert and oriented time? | |
| | Describe: | |
| Y | Alert and oriented date? | |
| | Describe: | |

**Level of Consciousness**

<div style="writing-mode: vertical-rl">
The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit
</div>

EXHIBIT 25 Page 7

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

JIM:  400175230  **Book #:** 9797544    **Book Dt/Tm:** 12-20-2009 1246
**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM
**DOB:** 11-04-1975  **Age:** 35  **Des.:** W  **Sex:** M  **SSN:** ▮▮▮▮▮▮▮▮
**Created Dt/Tm:** 12-20-2009 1641    **Created By:** GONZALES,ANTONIC

| | | |
|---|---|---|
| Y | Alert? | |
| | Describe: | |
| N | Lethargic? | |
| | Describe: | |
| N | Stuporous? | |
| | Describe: | |
| N | Other? | |
| | Describe: | |
| **Physical Appearance** | | |
| Y | Clean? | |
| N | Malodorous? | |
| | Describe: | |
| N | Malnourished? | |
| | Describe: | |
| N | Alcohol breath? | |
| | Describe: | |
| N | Disheveled? | |
| | Describe: | |
| **Mobility** | | |
| Y | Ambulatory? | |
| | Explain: | |
| N | Limitations? | |
| | Describe: | |
| N | Prosthetics? | |
| | Describe: | |

The record was prepared by the personnel of the San Diego County Sheriff's Department in the ordinary course of Medical Services Division business at or near the time of the act, condition or event. San Diego County Sheriff's Department Medical Records Unit control of either, Medical Services Division, staff physicians, or persons acting under the

Facility: 944
161B MED
Page 5 of 7
Printed: 01-31-...
345
EXHIBIT 25 Page 8

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

JIM:  400175230  **Book #:** 9797544     **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975  **Age:** 35  **Des.:** W  **Sex:** M  **SSN:** ▮▮▮▮▮

**Created Dt/Tm:**  12-20-2009 1641     **Created By:** GONZALES,ANTONIC

| | | |
|---|---|---|
| Y | Normal speech? | |
| | Describe: | |
| Y | Normal thought process? | |
| | Describe: | |
| Y | Cooperative behavior? | |
| | Describe: | |
| N | Unusual affect / mood? | |
| | Describe: | |
| Y | Visible signs of illness? | |
| | Describe: R inguinal hernia | |
| N | Sight limitation? | |
| | Describe: | |
| N | Hearing limitation? | |
| | Describe: | |
| N | Unusual skin color / temp. turgor? | |
| | Describe: | |
| N | Needle marks present? | |
| | Describe: | |
| N | Loss of bladder / bowel function? | |
| | Describe: | |
| N | SOB / persistent cough? | |
| | Describe: | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

JIM:   400175230  **Book #:** 9797544     **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975  **Age:** 35   **Des.:** W   **Sex:** M   **SSN:** ▮▮▮▮▮▮

**Created Dt/Tm:**   12-20-2009 1641     **Created By:** GONZALES,ANTONIC

| | |
|---|---|
| Y | **Other** |

       **Describe:** ex marine

       **Describe:** CXR 12/20/09

       **Describe:** no to exp drugs

| | |
|---|---|
| Y | **Explain sick call process?** |

       **Explain:**

| | |
|---|---|
| Y | **Scheduling clinic / provider appointment?** |
| N | **Are you currently taking any medications?** |

**Record in Med Screen**

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

EXHIBIT 25 Page 310

# SAN DIEGO SHERIFFS DEPARTMENT

## PSYCHIATRIC QUESTIONS

**JIM:** 400175230 **Book #:** 9797544   **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975 **Age:** 35   **Des.:** W   **Sex:** M   **SSN:** ▮▮▮▮▮

**Created Dt/Tm:** 12-20-2009 1641   **Created By:** GONZALES,ANTONIC

| N | Do you have any current psychiatric / mental health problems? |
|---|---|
| | Explain: |
| N | Do you have any previous mental health history? |
| | Explain: |
| N | Do you know your psychiatrist / clinic name? |
| | Explain: |
| N | Any visual hallucinations? |
| | Explain: |
| N | Any auditory hallucinations? |
| | Explain: |
| N | Any suicidal ideation? |
| | Explain: |
| N | Any homicidal ideation? |
| | Explain: |
| N | Any prior suicide attempts? |
| | Explain: |
| N | Are you currently taking any psychiatric medications? |

Record in Med Screen

The record was prepared by the personnel of the San Diego County Sheriff's Department, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event. control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

Facility: 944
166B MED
Page 1 of 1
Printed: 01-31-20
**348**
EXHIBIT 25 Page 11 BONDOC

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

349

EXHIBIT 25 Page 12

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Observations

JIM:  400175230  **Book #:** 9797544    **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** HUMMEL, JOHN, WILLIAM

**DOB:** 11-04-1975  **Age:** 35   **Des.:** W   **Sex:** M   **SSN:** ▮▮▮▮▮

| | | |
|---|---|---|
| Y | Okay to house at SDCJ? | |
| | Why? | |
| Y | Okay to house at VDF? | |
| | Why? | |
| Y | Okay to house at SBDF? | |
| | Why? | |
| Y | Okay to house at GBDF? | |
| | Why? | |
| Y | Okay to house at EMDF? | |
| | Why? | |
| Y | Okay to house at LCDF? | |
| | Why? | |
| Y | Okay to house at DDF? | |
| | Why? | |
| U | Inmate worker? | |
| U | Okay for kitchen? | |
| U | Okay for other work? | |
| U | Classification - Adult Institutional (AI)? | |
| U | Medical - Okay for AI? | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

Facility: 944
160B MED

Page 1 of 1

Printed: 01-31-2011 1319
Printed By: DBONDOC31, BONDOC

**350**

EXHIBIT 25 Page 13

# SAN DIEGO SHERIFF'S DEPARTMENT

## Patient Profile

| Criteria | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Start Dt/Tm: 12-20-2009 1246 | | | | End Dt/Tm: 12-31-2009 1530 | | | |
| | Medication Name: ALL | | | | Medication Status: ALL | | | |

| Status | Encounter Dt/Tm | Med Order Dt/Tm | Medication | Strength | Rte | Freq | Notes | Start Dt/Tm | End Dt/Tm |
|---|---|---|---|---|---|---|---|---|---|
| Discontinue | 12-30-2009 1337 | 12-30-2009 1820 | DESENEX 2% POWDER | 1 GM | TP | BID | | 12-30-2009 1818 | 01-13-2010 181 |
| Discontinue | 12-22-2009 0700 | 12-22-2009 1201 | ULTRAM 50MG TABLET | 100 MG | PO | BID | | 12-22-2009 0800 | 02-20-2010 075 |
| Discontinue | 12-20-2009 1638 | 12-20-2009 1640 | GELUSIL TABLET CHEWABLE | 6 TAB | PO | QAM | | 12-20-2009 1639 | 12-23-2009 163 |
| Discontinue | 12-20-2009 1638 | 12-20-2009 1640 | MOTRIN (GEN.) 400MG TABLET | 800 MG | PO | BID | | 12-20-2009 1639 | 12-23-2009 163 |

Facility 1
380M MED

San Diego County Sheriff's Department Medical Records Unit

This record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

Printed: 01-31-2011 1320
Page 1

EXHIBIT 25 Page 14

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

**JIM:** 400175230    **Book #:** 9797544    **Book Dt/Tm:** 12-20-2009 1246

**Name(L,F,M,S):** Hummel, John, ,

**DOB:** 11-04-1975    **Age:** 35    **Des.:** W    **Sex:** M    **SSN:** ████████

**Fac:** 944    **Area:**    **HU:**    **Cell:**    **Bed:**

**Health Service #:**    **Health Status:** UNKNOWN

**Medical Classification:** NO

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

Facility: RELS

433M MED

Page 1 of 1

Printed: 01-31-...

352

EXHIBIT 23 Page 15

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Booking Intake                **Reason:** Tb Screening                **Date:** 12-20-2009 1246

**Resource:**                                                          **Cost:**

**Notes:**

## Objective

### Tests

**Test:** X-RAY                                **Req'd by:** EGOLDSSH        **At:** 12-20-2009 1246

**Reason:** Required                          **Taken by:** BVELANSH        **At:** 12-20-2009 1600

**Result:** WNL        **At:** 12-20-2009 1600   **Desc:**

## Orders

### Encounter Notes

**Entry Date:** 12-20-2009 2244        **Entered By:** BVELANSH,   VELANDIA

Diagnostic Imaging Report
Case ID: 9797544-122015
Patient ID: 400175230
Patient Name: HUMMEL, JOHN
Facility: San Diego Central Jail

DOS: 12/20/2009 S
DOB: 11/4/1975
Sex: M

PROCEDURE(S)
CPT Code CPT Description ICD Code ICD Description
71010 CHEST-1V V71.2 Screening/Observation of TB

Exam: CHEST-1V

RESULTS: The heart is normal in size and configuration. The mediastinum is
normal without adenopathy. The lung fields are clear, without mass, infiltrate,
or effusion. The osseous structures are unremarkable. No tuberculosis is seen.

CONCLUSION: Normal chest examination, without tuberculosis.

Radiologist:  BRYAN BERKEY, M.D. Date Read:12/20/2009 3:57:27 PM

Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

San Diego County Sheriff's Department Medical Records

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

**SAN DIEGO SHERIFFS DEPARTMENT**

**Medical Chart**

Encounter Detail

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

---

### Encounter Detail

**Type:** Rnsc                **Reason:** Exam                **Date:** 12-20-2009 1638

**Resource:** Gonzales, Antonio Sh6332                **Cost:** $0.00

**Notes:**

### Diagnosis

Unspec D/o Muscle Ligamen

Abdominal Pain, Epigastri

### Subjective

**Entry Date:** 12-20-2009 1638        **Entered By:** AGONZ2SH,  GONZALES

Hx of Crohns dis, HNP L4/5, inguinal hernia, acid reflux

### Objective

### Instructions

| MEDICAL HOLD | COMPLETE |
| LOWER BUNK | COMPLETE |
| LOWER TIER | COMPLETE |

### Plan

**Provider:** SNP , ESTD GOLDSTEIN     **Plan Dt/Tm:** 12-20-2009 1639 **Completed By:** GONZALES , ANTONIO

**Completed Dt/Tm:** 12-20-2009 1639   **Patient Education:** Y      **Phone Order Status:**

**SNP:** INDIGESTION

**Entry Date:**                **Entered By:** ESNPXXSH, SNP

Per SNP INDIGESTION.  2. Gelusil 6 tabs PO qd x 3 days, to be taken 2 tablets
ac x 3 days.

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

---

**355**

EXHIBIT 25 Page 18

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Plan

**Provider:** SNP , ESTD GOLDSTEIN     **Plan Dt/Tm:** 12-20-2009 1639 **Completed By:** GONZALES , ANTONIO

**Completed Dt/Tm:** 12-20-2009 1639   **Patient Education:** Y     **Phone Order Status:**

**SNP:** MUSCULAR STRAINS

**Entry Date:**                                    **Entered By:** ESNPXXSH, SNP

Per SNP MUSCULAR STRAINS.  2.  Motrin 800 mg PO bid x 5 days (if no peptic
ulcer disease) OR Tylenol 975 mg PO BID x 5 days

## Orders

### Medications

| | | |
|---|---|---|
| **Type:** F | **Medication:** GELUSIL TABLET CHEWABLE | **Rx #:**     402738056 |
| **Status:** DISCONTINUED | **Strength:**     6 TAB | |
| **Rte:** PO | **Freq:** QAM | **Start Dt/Tm:** 12-20-2009 1639     **End Dt/Tm:** 12-23-2009 1638 |
| **SNP:** | **Provider:** SNP , ESTD GOLDSTEIN | |
| **Notes:** | | |

| | | |
|---|---|---|
| **Type:** F | **Medication:** MOTRIN (GEN.) 400MG TABLET | **Rx #:**     402738055 |
| **Status:** DISCONTINUED | **Strength:**     800 MG | |
| **Rte:** PO | **Freq:** BID | **Start Dt/Tm:** 12-20-2009 1639     **End Dt/Tm:** 12-23-2009 1638 |
| **SNP:** | **Provider:** SNP , ESTD GOLDSTEIN | |
| **Notes:** | | |

## Encounter Notes

**Entry Date:** 12-20-2009 1640     **Entered By:** AGONZ2SH,  GONZALES

S:  Hx of Crohns dis, herniated disc L4/5, inguinal hernia, acid reflux.
States had hernia for 10 ys but not bothering him. Laminectomy 2005.  I just
need some pain meds for my slip disc.
O:  AOX3, VSS, resp reg and unlabored, healed scar in abdomen and lumbar
aspect, bulging R inguinal hernia, no ttp.
A:  Alt in Health Maintenance
P:  SNP MS strain/Indigestion started. Sched MDSC 12/23/09 for eval.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

## Encounter Detail

**Type:** Rnsc                    **Reason:** Safety Cell              **Date:** 12-21-2009 0213
**Resource:**                                                        **Cost:** $0.00
  **Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-21-2009 0213 **Temp (°F):**    .0 **Pulse:**   98  **Respiration:** 18
**Blood Pressure:** 154/72    **Wgt:**      **Hgt:** 6´00" **Provider:** PARAS , ROWELL
  **SNP:**
  **Notes:**

**Vitals Dt/Tm:** 12-21-2009 1041 **Temp (°F):**   98.5 **Pulse:**   117 **Respiration:** 18
**Blood Pressure:** 125/86    **Wgt:**      **Hgt:** 6´00" **Provider:** DEGUZMAN , ROMEO
  **SNP:**
  **Notes:**

## Orders

## Encounter Notes

**Entry Date:** 12-21-2009 1023        **Entered By:** RDEGUZSH,  DEGUZMAN

```
S = " I am not suicidal and never was "
O = Cleared from safety cell by Dr. Monroe in good condition.  Alert and
verbally responsive, oriented X3, conversant, speech clear, coherent,
respiration even and unlabored, lungs clear, no SOB, denies s/s of TB,
afebrile, ambulatory.  Skin warm and dry , intact, no needle tracks noted.
Denies taking any medication.  Strongly denies SI, HI, VH and AH.  Dr. Monroe
discussed housing with Lt. Madsen.  Escorted by deputies to observation cell #1,
PSU nurse informed.  Instructed to notify staff for any changes in health
condition, verbalized understanding.
A = Altered coping mechanism
P = psych sick call for follow up
     Sign sick call PRN
```

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date: 12-21-2009 0933**      **Entered By: RDEGUZSH, DEGUZMAN**

Clarification of previous notes: I/P was not angry to control deputy. Claimed he does not know what happened and he has no intention to kill himself.

**Entry Date: 12-21-2009 0931**      **Entered By: RDEGUZSH, DEGUZMAN**

S = " I was angry, control deputy did not respect me"
O = Pacing, respiration even and unlabored, safety garment, refused water when offered.
A = Potential for self harm
P = Monitor per protocol

**Entry Date: 12-21-2009 0833**      **Entered By: RDEGUZSH, DEGUZMAN**

Being seen and assessed by Dr. Monroe.

**Entry Date: 12-21-2009 0740**      **Entered By: RDEGUZSH, DEGUZMAN**

S = Non verbal
O =Sleeping on (L) side, respiration even and unlabored, safety garment, refused to answer when water offered.
A = Potential for self harm
P = Monitor per protocol

**Entry Date: 12-21-2009 0645**      **Entered By: RPARASSH, PARAS**

S-I just want some water
O-standing near door, breathing unlabored, skin appears dry, water 1 cup given, safety garment on.
A-pot for self harm
P-cto and offer/encourage water hourly

**Entry Date: 12-21-2009 0600**      **Entered By: RPARASSH, PARAS**

S: Non verbal
O: Laying asleep on his back with garment on, breathing spontanously.
A: Pot for self harm
P: Monitor qh and as needed, offer water while awake.

**Entry Date: 12-21-2009 0501**      **Entered By: RPARASSH, PARAS**

S-non verbal asleep
O-asleep on back, no distress noted, breathing appears unlabored, skin appears dry, safety garment on.
A-pot for self harm
P-cto and offer/encourage water hourly

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date: 12-21-2009 0405**        **Entered By: RPARASSH,  PARAS**

S-I know I'm here so I don't hurt myself
O-awake, sitting up eating breakfast and drinking milk, no distress noted,
breathing unlabored, skin dry, safety garment on.
A-pot for self harm
P-cto and offer/encourage water hourly

**Entry Date: 12-21-2009 0308**        **Entered By: ALONGNSH,  LONGNO**

S:  " No "
O: Awake laying on his L side looking blankly on the wall, garments on.
Breathing spontanously Offered water replied " no".
A: Pot for self harm
P: Monitor qh and as needed, offer water while awake.

**Entry Date: 12-21-2009 0226**        **Entered By: RPARASSH,  PARAS**

S-non verbal
O-laying on r/s, quiet, no distress noted, breathing appears unlabored, skin
appears dry, safety garment on.
A-pot for self harm
P-cto and offer/encourage water hourly

**Entry Date: 12-21-2009 0214**        **Entered By: RPARASSH,  PARAS**

S-I just woke up, I have no problems
O-Brought for safety cell placement per LT, per deputy d/t confession and
statements made to investigators stating "I have nothing to live for", alert,
no distress, vss, breathing unlabored, skin warm/dry, no visible signs of
injury, ambulates, placed by deputy 7839 safety cell placement no force used.
A-Potential for self harm
P-Monitor hourly per protocol, safety garment given, offer water when awake

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**359**

EXHIBIT 25 Page 22

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

### Encounter Detail

**Type:** Psych Sc          **Reason:** Safety Cell          **Date:** 12-21-2009 0535

**Resource:** Monroe, Michael Psychmd          **Cost:**

**Notes:**

### Diagnosis

R/o 309.4

Nondependent Cocaine Abus

Nondependent Cannabis Abu

### Objective

### Orders

### Encounter Notes

**Entry Date:** 12-21-2009 1017          **Entered By:** MMONRONS,  MONROE

```
Cleared to Sheriff Dept.  Discussed housing with Lt. Madsen.  Referred to
physcian sick call for reported crohn's disease.  Psychiatrist f/u 1-2 days.
See Safety Cell Eval in chart.  Will brief facility psychiatrist.
```

### Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Rnsc      **Reason:** Mob Daily      **Date:** 12-22-2009 0243

**Resource:** Maaghop, Blessilda Sh6552      **Cost:** $0.00

     **Notes:**

## Objective

## Orders

## Encounter Notes

**Entry Date:** 12-22-2009 2357      **Entered By:** BMAAGHSH, MAAGHOP

S="I'm okay, no VS"

O=Lying on the mattress on the floor, refused VS. Alert oriented X 3.
Ambulatory, NAD, breathing even and unlabored. Skin appears dry, intact and
well perfused. Speech clear and coherent with good eye contact. Denies SI/HI.
Wears his safety garment properly. Sleeping on and off on. No Suicide gestures
noted. No c/o presented.

A=Alteration in thought process

P=Continue close observation for SI/HI and Q hourly check.

**Entry Date:** 12-22-2009 0622      **Entered By:** BMAAGHSH, MAAGHOP

Q hourly rounds completed.

**Entry Date:** 12-22-2009 0243      **Entered By:** BMAAGHSH, MAAGHOP

S="I am not suicidal"

O=Placed in MOB for Close Observation due to S/P safety cell placement as per
Lt. Kania. I/P alert oriented X 3. Ambulatory, NAD, breathing even and
unlabored. Skin appears dry, intact and well perfused. Speech clear and
coherent with good eye contact. Denies SI/HI. Wears his safety garment
properly. Sleeping on and off on the mattress on the floor. No Suicide gestures
noted.

A=Alteration in thought process

P=Continue close observation for SI/HI. Q hourly check and as needed.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

## Encounter Detail

| | | |
|---|---|---|
| **Type:** Mdsc | **Reason:** Exam | **Date:** 12-20-2009 1642 |
| **Resource:** Gonzales, Antonio Sh6332 | | **Cost:** |

**Notes:** Crohns dis
HNP L4/5
Inguinal hernia

## Objective

## Orders

### Medications

| | | |
|---|---|---|
| **Type:** F | **Medication:** ULTRAM 50MG TABLET | **Rx #:** 402741467 |
| **Status:** DISCONTINUED | **Strength:** 100 MG | |
| **Rte:** PO | **Freq:** BID | **Start Dt/Tm:** 12-22-2009 0800 | **End Dt/Tm:** 02-20-2010 0759 |
| **SNP:** | **Provider:** GABEL , ELLEN | |
| **Notes:** | | |

## Encounter Notes

**Entry Date:** 12-22-2009 1129    **Entered By:** AGONZ2SH,  GONZALES

orders noted.

**Entry Date:** 12-22-2009 1117    **Entered By:** EGABELNS,  GABEL

went to mob to evaluate patient who has h/o reducible rt inguinal hernia

l4 l5 disc surgery and crohns disease c/o pain

no activation of crohns

IMp reducible inquinal hernia

 s/p lumbar surgery

crohns

plan maintain present treatment

## Med Alerts

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

## Encounter Detail

**Type:** Psych Sc          **Reason:** Exam                    **Date:** 12-21-2009 1201

**Resource:** Monroe, Michael Psychmd                **Cost:**

   **Notes:** S-Cell f/u

## Diagnosis

Unspecified Adjustment Re

## Objective

## Orders

## SAN DIEGO SHERIFFS DEPARTMENT

### Medical Chart

---

## Encounter Detail

## Encounter Notes

---

**Entry Date: 12-22-2009 1226**        **Entered By: PHUANGNS, HUANG**

PSYCH EVAL

See J275+

I reviewed available documentation, including JIMS and paper notes.

I met inmate at his MOB cell and interviewed him verbally.

Based on the data I obtained:


IMP: 309.9


34 yo M without evident psychiatric treatment history.


RE: Danger to Self:

Yesterday [12-21-09], at approx. 2am, inmate disclosed to "investigators"

"having nothing more to live for" in the context of situational factors.  When

this reached deputees' awareness, deputees placed inmate into safety cell due

to concern about danger to self.

 Later, yesterday, inmate was transferred from safety cell to MOB [per psych

notes, inmate was cleared to sheriff's department].

 Currently, inmate is on safety cell protocol [q15min checks + room is devoid

of items except safety cell garment + mattress].


 Today, when I spoke with inmate, his only compliant was back pain, which was a

chronic condition, but has increased in severity.  When I asked him about the

events [outlined above], he clearly and convincingly denied to me that he ever

had suicidal thoughts/urges/intent/plan, and he expressed lack of understanding

of why he has been placed on restrictions.


 MSE: see J275 page 2


 Based on my verbal interview with inmate today, in conjunction with his MSE

when I examined him today, integrated with all of the documentation available

to me [including 12-21-09 deputee note documenting reason for safety cell

placement], I do not consider inmate to be currently at sufficiently high risk

of danger to self to indicate continuation of safety cell protocol, but close

psych follow up is indicated.


 RE: Lifetime psychiatric history:

 RE: his lifetime psychiatric history, he denied ever being actively suicidal

and denied ever attempting suicide.  He endorsed that he has never come close

to attempting suicide.

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

---

**364**

EXHIBIT 1 Page 27

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

He denied ever seeing a psychiatrist before being incarcerated [currently].
He denied ever being on psych meds.
He denied family hx of psychiatric illness.

Inmate may benefit from psychopharm mgt of his chronic pain [currently on
Ultram] at some point.

PLAN
1. DC safety cell protocol.
2. MOB housing [continuation versus transfer] per medical
3. psych follow up in 2 to 3 days.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

EXHIBIT 23 Page 23 ONDOC

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Rnsc        **Reason:** Mob Daily        **Date:** 12-22-2009 0830

**Resource:** Gonzales, Antonio Sh6332        **Cost:** $0.00

**Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-22-2009 0830 **Temp (°F):**   98.6 **Pulse:**   118 **Respiration:** 20
**Blood Pressure:** 103/68    **Wgt:**    **Hgt:** 6'00" **Provider:** GONZALES , ANTONIO
   **SNP:**
   **Notes:**

**Vitals Dt/Tm:** 12-22-2009 2356 **Temp (°F):**   .0 **Pulse:**    **Respiration:**
**Blood Pressure:** 0/0    **Wgt:**    **Hgt:** 6'00" **Provider:** MAAGHOP , BLESSILDA
   **SNP:**
   **Notes:** Refused VS

## Instructions

DIET - HIGH PROTEIN                        COMPLETE

## Orders

### Encounter Notes

**Entry Date:** 12-23-2009 0613        **Entered By:** AERECESH,  ERECE
Hourly checks completed.

**Entry Date:** 12-23-2009 0206        **Entered By:** BMAAGHSH,  MAAGHOP
S="I'm okay, no VS"
O=Lying on the mattress on the floor, refused VS. Alert oriented X 3.
Ambulatory, NAD, breathing even and unlabored. Skin appears dry, intact and
well perfused. Speech clear and coherent with good eye contact. Denies SI/HI.
Wears his safety garment properly. Sleeping on and off on. No Suicide gestures
noted. No c/o presented.
A=Alteration in thought process
P=Continue close observation for SI/HI and Q hourly check.

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

### Encounter Detail

#### Encounter Notes

**Entry Date:** 12-22-2009 2239        **Entered By:** PSANTESH,  SANTELLA

shift hourly safety checks completed.

**Entry Date:** 12-22-2009 1836        **Entered By:** PSANTESH,  SANTELLA

s-it is cold.

o-ambulatory, aox3, appears to be in no acute distress. no skin issues noted.

denies any suicidal ideation. ip is calm and cooperative.

a-altered health maintenance.

p-continue plan of care.

**Entry Date:** 12-22-2009 0830        **Entered By:** AGONZ2SH,  GONZALES

S:   MOB rounds: I have pain on my back.

O:   AOX3, VSS, NAD, resp reg and unlabored, skin warm and dry, no  suicide gestures

A:   Alt. in Health Maintenance

P:   Cont tx plan for close observation.

### Med Alerts

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Social Svcs Sc          **Reason:** Treatment          **Date:** 12-22-2009 1619

**Resource:** Fleming, David Sh6699                              **Cost:** $0.00

**Notes:** Individual Treatment: see notes

## Objective

## Orders

### Encounter Notes

**Entry Date:** 12-22-2009 1619          **Entered By:** DFLEMISH, FLEMING

```
Individual Treatment: Interviewed I/P through flap of his MOB cell at request
of nursing staff.  He was alert and oriented, speech well organized with good
volume and appropriate content.  Mood angry and frustrated but I/P adamantly
denied SI/HI.  His food was uneaten and when questioned about it he said he has
Crohn's Disease and must have a special diet.  I/P also complained about being
cold.  His room was cool and he has only a safety garment without sleeves for
warmth.  I/P appeared to be well aware of his situation, knowing that he is
being extradited to Texas and claiming that he is eager to go back and deal
with the charges.  I agreed to talk to nursing staff about his diet and being
cold.


Consulted with nursing staff who said they would contact dietary about I/P's
special diet and look into I/P's complaints about being cold.
```

## Med Alerts

San Diego County Sheriff's Department Medical Records Unit

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Rnsc      **Reason:** Exam      **Date:** 12-23-2009 1147

**Resource:** Salgado, Rodolfo Sh6554      **Cost:** $0.00

Notes:

## Objective

### Vitals

**Vitals Dt/Tm:** 12-23-2009 1147 **Temp (°F):**  97.9 **Pulse:**  80 **Respiration:** 20
**Blood Pressure:** 119/70   **Wgt:**   **Hgt:** 6´00" **Provider:** SALGADO , RODOLFO
SNP:
Notes:

**Vitals Dt/Tm:** 12-23-2009 1610 **Temp (°F):**  98.0 **Pulse:**  112 **Respiration:** 20
**Blood Pressure:** 124/87   **Wgt:**   **Hgt:** 6´00" **Provider:** COSTA , CESAR
SNP:
Notes:

**Vitals Dt/Tm:** 12-24-2009 0118 **Temp (°F):**  98.4 **Pulse:**  95 **Respiration:** 18
**Blood Pressure:** 123/79   **Wgt:**   **Hgt:** 6´00" **Provider:** CHINN , MELINDA
SNP:
Notes:

## Orders

### Encounter Notes

**Entry Date:** 12-24-2009 0544      **Entered By:** MCHINNSH,  CHINN

Hourly Rounds done.
Ate breakfast.

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date: 12-24-2009 0119          Entered By: MCHINNSH,  CHINN**

S "It's my back that's bothering me."

O A/Ox3, VSS, NAD.  Claims he injured his back 4-5 years ago at his work as a
shipper. Denies any flare up of his crohns ds. although he states he is not
suppose to eat red meat and raw veggies because it triggers a flare up. He
claims we serve those food most of the time and he therefore cannot eat his
meals. Claims his R inguinal hernia has been there for some time too and is not
currently an issue. Denies SI, HI, AH, VH.

A Alt Comfort

P Cont current plan

**Entry Date: 12-23-2009 1610          Entered By: CCOSTASH,  COSTA**

S-" Yeah I can walk around."

O- alert and oriented x3, respiration is regular and unlabored, speech is clear
and coherent,  claims his back still hurts, reported being independent with ADL
and has full ROM, skin is warm and dry to touch.

A-Altered Health Maintenance

P-continue current treatment plan

**Entry Date: 12-23-2009 1147          Entered By: RSALGASH,  SALGADO**

S="I am not suicidal, just my back"

O=I/P alert oriented X 3. Ambulating around his room with stable gait,
breathing even and unlabored. Skin warm/dry and intact, speech clear and
coherent with good eye contact. Denies SI/HI,, c/o of back pain/off, NAD. Took
his AM meds and ate 100 % lunch..

A=Alteration in thought process

P=Advised to report to staff any change in condition and verbalized
understanding.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**370**

EXHIBIT 25 Page 33

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

## Encounter Detail

**Type:** Rnsc      **Reason:** Mob Daily      **Date:** 12-24-2009 0848

**Resource:** Salgado, Rodolfo Sh6554      **Cost:** $0.00

     **Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-24-2009 0848 **Temp (°F):** 98.4 **Pulse:** 81 **Respiration:** 20
**Blood Pressure:** 121/80    **Wgt:**    **Hgt:** 6'00" **Provider:** SALGADO , RODOLFO
     SNP:
     Notes:

**Vitals Dt/Tm:** 12-24-2009 1550 **Temp (°F):** 98.1 **Pulse:** 81 **Respiration:** 20
**Blood Pressure:** 123/80    **Wgt:**    **Hgt:** 6'00" **Provider:** SANTELLA , PAUL
     SNP:
     Notes:

**Vitals Dt/Tm:** 12-25-2009 0107 **Temp (°F):** 98.0 **Pulse:** 65 **Respiration:** 18
**Blood Pressure:** 121/73    **Wgt:**    **Hgt:** 6'00" **Provider:** CHINN , MELINDA
     SNP:
     Notes: 99% RA

## Orders

### Encounter Notes

**Entry Date:** 12-25-2009 0550      **Entered By:** MCHINNSH, CHINN

Hourly Rounds Done.
Ate 100% of breakfast.

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date: 12-25-2009 0108**          **Entered By: MCHINNSH, · CHINN**

S " Good."

O A/Ox3, VSS, NAD. No complaints tonight. Informed that the nutritionist has
been informed of his med condition and the food that triggers discomfort.  In
good mood, calm, cooperative.  On SI "I never even tried, I've never been."
Sleeps well.

A Alt in health maintenance/Risk for Ineffective coping

P Cont current plan.

**Entry Date: 12-24-2009 2228**          **Entered By: PSANTESH, SANTELLA**

Shift hourly safety rounds completed.

**Entry Date: 12-24-2009 1550**          **Entered By: PSANTESH, SANTELLA**

s-i'm okey. i eat what i can.

o-ambulatory, aox3, nad. breathing is regular and unlabored. denies cough/sob.
no skin issues noted. i/p is calm and cooperative, denies any suicidal ideas.
contracts for safety.

a-altered health maintenance.

p-continue plan of care. dietician e-mailed for the need of a special diet
regarding ip's chron's disease.

**Entry Date: 12-24-2009 0849**          **Entered By: RSALGASH, SALGADO**

S: "I' m okay but my back still bothering me".

O: I/P alert oriented X 3. respiration regular, ambulating with steady gait,
skin warm/dry and intact, speech clear and coherent, able to get up from bed
for V/S with no difficulty but claims his back still bothering him. Denies
AH/VH/SI/HI, denies feeling depressed, took his AM meds and NAD.

A: Alteration in thought process

P: Advised to report to staff any change in condition and verbalized
understanding.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

EXHIBIT 25 Page 35

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Psych Sc          **Reason:** 01- Follow-up          **Date:** 12-22-2009 1237

**Resource:** Huang, Peter Psychmd          **Cost:**

   **Notes:**

## Objective

## Orders

### Encounter Notes

**Entry Date:** 12-24-2009 1334          **Entered By:** MISIDRSH,  ISIDRO

noted

**Entry Date:** 12-24-2009 0801          **Entered By:** NSWARONS,  SWAROVSKI

Pt was seen in medical unit. He reports good mood. sleep and appetite WNL, he
denies SI, HI. He stated "I never was suicidal. I don't know how they come up
with this idea". MSE WNL, details see chart
A Adjustment reaction. Pt is stable.
P no psych. meds ordered. No need to follow up, RTC PRN

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Social Svcs Sc          **Reason:** Treatment          **Date:** 12-24-2009 1349

**Resource:** Malay, Mark Sh0666          **Cost:** $0.00

   **Notes:** DISCHARGE PLANNING: see notes

## Objective

## Orders

### Encounter Notes

**Entry Date:** 12-24-2009 1349          **Entered By:** MMALAYSH,  MALAY

```
DISCHARGE PLANNING: Per Sheriff's Information Processing , it is anticipated
I/P will be extradited before the 11th of January back to TX where he is facing
serious charges.
```

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Rnsc      **Reason:** Mob Daily      **Date:** 12-25-2009 0907

**Resource:** Salgado, Rodolfo Sh6554      **Cost:** $0.00

     **Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-25-2009 0907 **Temp (°F):** 98.7 **Pulse:** 63 **Respiration:** 18

**Blood Pressure:** 115/72    **Wgt:**    **Hgt:** 6'00" **Provider:** SALGADO , RODOLFO

     **SNP:**

     **Notes:**

**Vitals Dt/Tm:** 12-25-2009 2011 **Temp (°F):** 98.3 **Pulse:** 60 **Respiration:** 18

**Blood Pressure:** 122/70    **Wgt:**    **Hgt:** 6'00" **Provider:** NEAL , DIANA

     **SNP:**

     **Notes:**

## Orders

## Encounter Notes

**Entry Date:** 12-26-2009 0414      **Entered By:** DNEALXSH,  NEAL

Hourly checks were done during the shift.

**Entry Date:** 12-25-2009 2010      **Entered By:** DNEALXSH,  NEAL

S "I am ok"

O he is alert and oriented x3 with easy resp, NAD. ADL's per self, cooperative.

No verbalization of SI,AH,VH or HI.

A Alt in health maint.

P Continue current RX.

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event. The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

### Encounter Detail

#### Encounter Notes

**Entry Date:** 12-25-2009 0908          **Entered By:** RSALGASH,   SALGADO

S: "I' m okay".

O: I/P alert, oriented X 3. respiration regular, ambulating with steady gait,
skin warm/dry/intact, speech clear and coherent, ROM on 4 extremeties no
limitation, able to sit up for V/S with no difficulty, no c/o back at this
time, denies AH/VH/SI/HI, denies feeling depressed and NAD.

A: Alteration in thought process

P: Advised to report to staff any change in condition and verbalized
understanding.Continue current treatment plan.

### Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Rnsc          **Reason:** Mob Daily          **Date:** 12-26-2009 0923

**Resource:** Deguzman, Romeo Sh0770          **Cost:** $0.00

**Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-26-2009 0923 **Temp (°F):** 97.5 **Pulse:** 87 **Respiration:** 18

**Blood Pressure:** 107/79   **Wgt:**      **Hgt:** 6´00" **Provider:** DEGUZMAN , ROMEO

**SNP:**

**Notes:**

**Vitals Dt/Tm:** 12-26-2009 2127 **Temp (°F):** 98.1 **Pulse:** 68 **Respiration:** 18

**Blood Pressure:** 131/77   **Wgt:**      **Hgt:** 6´00" **Provider:** MANALILI , CARLOS

**SNP:**

**Notes:**

## Orders

## Encounter Notes

**Entry Date:** 12-27-2009 0613        **Entered By:** MCHINNSH,  CHINN

Hourly Rounds done.
Slept well and ate breakfast.

**Entry Date:** 12-26-2009 2357        **Entered By:** MCHINNSH,  CHINN

S "I'm okay."
O A/Ox3, VSS, NAD. Walk up to the door to get his meds then placed his hand
over his back suggesting some discomfort but he did not verbally complain about
anything. Sleeping well.
A Alt Comfort/Alt health maintenance
P Cont current plan

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date:** 12-26-2009 0923        **Entered By:** RDEGUZSH,  DEGUZMAN

S = " Waiting for them to get me.  I will go to Texas"

O = Alert and verbally responsive, oriented X3, respiration even and unlabored,
speech clear, cooperative, follows direction, afebrile, ambulatory.  Denies
pain / discomfort, denies SI, HI, VH and AH.  Instructed to notify staff for
any changes in health condition, verbalized understanding.

A = Altered health maintenance

P = Continue current treatment plan and monitor every hour for signs of life

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Rnsc       **Reason:** Mob Daily       **Date:** 12-27-2009 0921

**Resource:** Deguzman, Romeo Sh0770       **Cost:** $0.00

   **Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-27-2009 0921 **Temp (°F):**  98.4 **Pulse:**  68 **Respiration:** 18

**Blood Pressure:** 113/74   **Wgt:**   **Hgt:** 6'00" **Provider:** DEGUZMAN , ROMEO

   **SNP:**

   **Notes:**

**Vitals Dt/Tm:** 12-27-2009 2228 **Temp (°F):**  97.8 **Pulse:**  68 **Respiration:** 18

**Blood Pressure:** 120/79   **Wgt:**   **Hgt:** 6'00" **Provider:** CHINN , MELINDA

   **SNP:**

   **Notes:**

## Orders

### Encounter Notes

**Entry Date:** 12-28-2009 0507       **Entered By:** MCHINNSH,  CHINN

Hourly Rounds Done.
Woke up and ate breakfast.

**Entry Date:** 12-27-2009 2228       **Entered By:** MCHINNSH,  CHINN

S "I'm tired of sleeping on this floor."
O A/Ox3, VSS, NAD. RR regular and unlabored, speech is clear, coherent, skin
pink. C/C is back pain and addressed by pain med. Denies SI, HI, AH,VH. Sleeps
soundly most of the shift. No c/o about his chrohn's sx/s or his R ing hernia
bothering him.
A Alt health maintenance.
P Cont current plan

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

---

**Entry Date:** 12-27-2009 0921          **Entered By:** RDEGUZSH,  DEGUZMAN

S = " OK "

O = Alert and verbally responsive, oriented X3, respiration even and unlabored,
speech clear, cooperative, follows direction, afebrile, ambulatory.  Denies SI,
HI , VH and AH.  No complaints made, no significant change of condition noted.
Instructed to notify staff for any changes in health condition, verbalized
understanding.

A = Altered health maintenance

P = Continue current treatment plan and monitor every hour for signs of life

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

---

EXHIBIT 25 Page 48

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

## Encounter Detail

**Type:** Rnsc         **Reason:** Mob Daily              **Date:** 12-28-2009 0902

**Resource:** Salgado, Rodolfo Sh6554                     **Cost:** $0.00

**Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-28-2009 0902 **Temp (°F):**   98.1 **Pulse:**    69 **Respiration:** 20
**Blood Pressure:** 120/77    **Wgt:**    **Hgt:** 6´00" **Provider:** SALGADO , RODOLFO
        **SNP:**
        **Notes:**

**Vitals Dt/Tm:** 12-28-2009 1948 **Temp (°F):**   98.1 **Pulse:**    62 **Respiration:** 18
**Blood Pressure:** 113/75    **Wgt:**    **Hgt:** 6´00" **Provider:** NEAL , DIANA
        **SNP:**
        **Notes:**

**Vitals Dt/Tm:** 12-31-2009 0013 **Temp (°F):**   98.5 **Pulse:**    68 **Respiration:** 18
**Blood Pressure:** 106/69    **Wgt:**    **Hgt:** 6´00" **Provider:** ERECE , ANGELA
        **SNP:**
        **Notes:**

## Orders

### Encounter Notes

**Entry Date:** 12-31-2009 0631       **Entered By:** AERECESH,   ERECE

supplemental entry:
Pls disregard previous entries.

**Entry Date:** 12-31-2009 0606       **Entered By:** AERECESH,   ERECE

Routine hourly MOB rounds/checks completed.

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date:** 12-31-2009 0014      **Entered By:** AERECESH, ERECE

S: "I' m fine".

O: A/Ox3, NAD, breathing even and unlabored, skin w/d/perfusing, ambulating
with steady gait.  I/P is cooperative with VS/assessment, speech clear and
coherent, denies AH/VH/SI/HI.

A: Alteration in Comfort

P: Continue current treatment plan. I/P for extradition to texas in am.

**Entry Date:** 12-29-2009 0514      **Entered By:** DNEALXSH, NEAL

Hourly checks completed during the shift. Ate bkf.

**Entry Date:** 12-28-2009 1947      **Entered By:** DNEALXSH, NEAL

S 'I'm ok"

O He is alert and oriented x3, NAD. ADL's per self. No verbalization of SI, AH,
VH abd HI.

A Alt in health maint.

P Continue current Rx plan.

**Entry Date:** 12-28-2009 0903      **Entered By:** RSALGASH, SALGADO

S: "I' m okay".

O: I/P is alert, oriented X 3. respiration regular, ambulating with steady
gait, skin warm/dry/intact, speech clear and coherent, ROM on 4 extremeties no
limitation, able to sit up for V/S with no difficulty,  c/o back pain off/on ,
denies AH/VH/SI/HI, denies feeling depressed and NAD.

A: Alteration in Comfort

P: Advised to report to staff any change in condition and verbalized
understanding.Continue current treatment plan.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT
## Medical Chart

## Encounter Detail

| | | |
|---|---|---|
| **Type:** Rnsc | **Reason:** Mob Daily | **Date:** 12-29-2009 0822 |
| **Resource:** Salgado, Rodolfo Sh6554 | | **Cost:** $0.00 |
| **Notes:** | | |

## Objective

### Vitals

**Vitals Dt/Tm:** 12-29-2009 0822 **Temp (°F):** 98.5 **Pulse:** 60 **Respiration:** 20
**Blood Pressure:** 110/66 **Wgt:** **Hgt:** 6´00" **Provider:** SALGADO , RODOLFO
    **SNP:**
    **Notes:**

**Vitals Dt/Tm:** 12-29-2009 1637 **Temp (°F):** 97.9 **Pulse:** 60 **Respiration:** 18
**Blood Pressure:** 109/77 **Wgt:** **Hgt:** 6´00" **Provider:** SONGALIA , ALBERTO
    **SNP:**
    **Notes:**

**Vitals Dt/Tm:** 12-30-2009 0046 **Temp (°F):** .0 **Pulse:** **Respiration:**
**Blood Pressure:** 0/0 **Wgt:** **Hgt:** 6´00" **Provider:** MONTENEGRO , EVANGELINE
    **SNP:**
    **Notes:** REFUSED

## Orders

## Encounter Notes

**Entry Date:** 12-30-2009 0046 **Entered By:** EMONTESH, MONTENEGRO

S: "No complaints voiced".
O: Asleep when received and was approached for vitals but was refusing.
Respirations observed, full and regular. Unlabored. Color perfused. No
distress presented.
A: Alteration in health maintenance
P: Continue with current treatment plan.

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event. The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

## Encounter Detail

### Encounter Notes

**Entry Date: 12-29-2009 1637**          **Entered By: ASONGASH,   SONGALIA**

S=MOB Round. Stated he is fine.

O=Alert. Verbally responsive. Calm & cooperative. Skin warm & dry. Breathing
not labored. Able to ambulate.

A=Altered Health Maintenance.

P=Continue current treatment & observation.


**Entry Date: 12-29-2009 0823**          **Entered By: RSALGASH,   SALGADO**

S: "I' m alright".

O: I/P is alert, oriented X 3. respiration regular, skin warm/dry/intact,
speech clear and coherent, ambulatory with stable gait, no c/o back pain during
assessment, ROM on 4 extremities no limitation, denies AH/VH/SI/HI. NAD.

A: Alteration in Comfort

P: Advised to report to staff any change in condition and verbalized
understanding. Seen by dietitian and continue current treatment plan.

## Med Alerts

**384**

EXHIBIT 25 Page 45

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

**Type:** Dietician Evaluation     **Reason:** Exam      **Date:** 12-29-2009 0852

**Resource:** Tutt, Marlene Sh0954      **Cost:** $0.00

    **Notes:**

## Objective

## Orders

### Encounter Notes

**Entry Date:** 12-29-2009 0852      **Entered By:** MTUTTXSH,  TUTT

Met with patient to discss food tolerances.  Stated concerns about red meat and raw vegetables, green vegetables and corn .Agreed to remove "breading" from entree (chicken patty and fish).  Advised that  most meat items were chicken or turkey at breakfast and  lunch.  Four items from dinner were ID to be replaced on the menu.  The nutritional supplement is tolerated.Stated that apples and oranges were too much work to peel. However, they will not be replace at this time. He will eat what he tolerates from his tray.

## Med Alerts

San Diego County Sheriff's Department Medical Records Unit

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

### Encounter Detail

**Type:** Rnsc          **Reason:** Mob Daily          **Date:** 12-30-2009 1338

**Resource:** Salgado, Rodolfo Sh6554          **Cost:** $0.00

**Notes:**

### Diagnosis

Unspec Disorder Skin&subc

### Objective

#### Vitals

**Vitals Dt/Tm:** 12-30-2009 1338 **Temp (°F):** 97.7 **Pulse:** 20 **Respiration:** 20
**Blood Pressure:** 116/68 **Wgt:** **Hgt:** 6´00" **Provider:** SALGADO , RODOLFO
**SNP:**
Notes: 02 sat 100 RA

**Vitals Dt/Tm:** 12-30-2009 1815 **Temp (°F):** 98.2 **Pulse:** 94 **Respiration:** 20
**Blood Pressure:** 104/64 **Wgt:** **Hgt:** 6´00" **Provider:** ALLAN , MARYLENE
**SNP:**
Notes: O2 sat 96% RA

**Vitals Dt/Tm:** 12-31-2009 0633 **Temp (°F):** 97.7 **Pulse:** 81 **Respiration:** 18
**Blood Pressure:** 110/53 **Wgt:** **Hgt:** 6´00" **Provider:** ERECE , ANGELA
**SNP:**
Notes: 02 sats 98% RA

**Vitals Dt/Tm:** 12-31-2009 0640 **Temp (°F):** 98.5 **Pulse:** 68 **Respiration:** 18
**Blood Pressure:** 106/69 **Wgt:** **Hgt:** 6´00" **Provider:** ERECE , ANGELA
**SNP:**
Notes: pls disregard VS @ 0633

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Plan

**Provider:** SNP , ESTD GOLDSTEIN     **Plan Dt/Tm:** 12-30-2009 1818 **Completed By:** ALLAN , MARYLENE
**Completed Dt/Tm:** 12-30-2009 1818   **Patient Education:** Y     **Phone Order Status:**
**SNP:** FUNGAL INFECTIONS

**Entry Date:**                          **Entered By:** ESNPXXSH, SNP

Per SNP FUNGAL INFECTIONS.   TREATMENT PLAN:

1.  Micatin (Miconazole nitrate) cream 2%, BID x 14 days.  Provide amount
necessary to treat infected area.
2.  Advise I/P if no improvement after treatment is completed to sign up for
s/c.

## Orders

### Medications

| | | | |
|---|---|---|---|
| **Type:** F | **Medication:** DESENEX 2% POWDER | | **Rx #:** 402757004 |
| **Status:** DISCONTINUED | **Strength:** | 1 GM | |
| **Rte:** TP | **Freq:** BID | **Start Dt/Tm:** 12-30-2009 1818 | **End Dt/Tm:** 01-13-2010 1817 |
| **SNP:** | | **Provider:** SNP , ESTD GOLDSTEIN | |
| **Notes:** | | | |

## Encounter Notes

**Entry Date:** 12-31-2009 0635      **Entered By:** AERECESH,  ERECE

I/P for extradition to Texas, left @ approx 0635.

**Entry Date:** 12-31-2009 0635      **Entered By:** AERECESH,  ERECE

Hourly checks completed.

**Entry Date:** 12-31-2009 0632      **Entered By:** AERECESH,  ERECE

supplemental entry for 0030
S: "I' m fine".
O: A/Ox3, NAD, breathing even and unlabored, skin w/d/perfusing, ambulating
with steady gait.  I/P is cooperative with VS/assessment, speech clear and
coherent, denies AH/VH/SI/HI.
A: Alteration in Comfort
P: Continue current treatment plan. I/P for extradition to texas in am.

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

## Encounter Detail

### Encounter Notes

**Entry Date: 12-30-2009 2245**        **Entered By: MALLANSH,  ALLAN**

Routine hourly MOB rounds/checks completed.

**Entry Date: 12-30-2009 1815**        **Entered By: MALLANSH,  ALLAN**

S = "Can i have something for my athlete's foot?"
O = A/O x 3. NAD. Respiration even and unlabored. No s/s of distress noted.
Skin warm, dry and perfused. Ambulatory with steady gait. With peeling off of
dried  skin on both feet. No swelling/redness noted. Calm and cooperative.
A = Altered health maintenance
P = Fungal infection snp initiated. Continue with the current treatment plan.

**Entry Date: 12-30-2009 1338**        **Entered By: RSALGASH,  SALGADO**

S: I' m alright".
O: Alert/O x 3, respiration regular, skin warm/dry and well perfussed, no c/o
back pain, ate 100 % lunch, sleeping off/on. NAD. Compliant with meds.
Showered.
A: Alteration in Comfort
PAdvised to report to staff any change in condition and verbalized
understanding. I/P scheduled for transfer to Texas tomorrow, Endorsed to the
next shift.

## Med Alerts

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**388**

JIMS - J000028                San Diego County Sheriff's Department                Page: 1 of 2
Detention Services - All Sheriff Facilities
Run Date: 31-JAN-2011                MAR by Booking Number                
Run Time: 13:21
Book#: 9797544 HUMMEL, JOHN
Start Date: 20-DEC-09
End Date: 31-DEC-09

Name: HUMMEL, JOHN      Bk#: 9797544      Fac: RBLS      AREA:      HU:      CELL

## MEDICATIONS

| Type | Medication | Generic Name | Rx # | Strength | Rte | Freq | Start Dt/Tm | End Dt/Tm | Status |
|---|---|---|---|---|---|---|---|---|---|
| F | MOTRIN (GEN.) 400MG TABLET | IBUPROFEN | 402738055 | 800 MG | PO | BID | 12-20-2009 1638 | 12-23-2009 1638 | D/C: 12-23-2009 0445 |
| F | GELUSIL TABLET CHEWABLE | MAG HYDROX/AL HYDROX/SIMETH | 402738056 | 6 TAB | PO | QAM | 12-20-2009 1638 | 12-23-2009 1638 | D/C: 12-23-2009 0445 |
| F | DESENEX 2% POWDER | MICONAZOLE NITRATE | 402757004 | 1 GM | TP | BID | 12-30-2009 1337 | 01-13-2010 1817 | D/C: 12-31-2009 033 |
| F | ULTRAM 50MG TABLET | TRAMADOL HCL | 402741467 | 100 MG | PO | BID | 12-22-2009 0700 | 02-20-2010 0759 | D/C: 12-31-2009 0 |



## ADMINISTRATION

| Medication/Dosage Notes | Dose# | Admin Dt/Time | Presc Date/Time | Admin By | Route/Site | Reason Not Administered | Admin Notes |
|---|---|---|---|---|---|---|---|
| GELUSIL 6TAB | 1 | 12-20-09 16:39 | 12-20-09 16:40 | ESNPXXSH | PO | | |
| | 3 | 12-22-09 08:00 | 12-22-09 08:56 | SALBAOSH | PO | | |
| | 4 | 12-23-09 08:00 | 12-23-09 08:09 | CROQUESH | PO | | |
| MOTRIN 800MG | 1 | 12-20-09 16:39 | 12-20-09 16:39 | ESNPXXSH | PO | | |
| | 4 | 12-21-09 21:00 | 12-21-09 19:48 | ECAMBASH | PO | | |
| | 5 | 12-22-09 08:00 | 12-22-09 08:56 | SALBAOSH | PO | | |
| | 6 | 12-22-09 21:00 | 12-22-09 20:33 | CDOTIMSH | PO | | |
| | 7 | 12-23-09 08:00 | 12-23-09 08:09 | CROQUESH | PO | | |
| ULTRAM 100MG | 2 | 12-22-09 21:00 | 12-22-09 20:33 | CDOTIMSH | PO | | |
| | 3 | 12-23-09 08:00 | 12-23-09 08:09 | CROQUESH | PO | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.
San Diego County Sheriff's Department Medical Records Unit
EXHIBIT 25 Page 52

JIMS - J000028

San Diego County Sheriff's Department
Detention Services - All Sheriff Facilities
Run Date: 31-JAN-2011        MAR by Booking Date
Run Time: 13:21
Book#: 9797544 HUMMEL, JOHN
Start Date: 20-DEC-09
End Date: 31-DEC-09

Page: 2 of 2

Case 4:16-cv-00133-O   Document 25   Filed 07/06/17   Page 418 of 534   PageID 8195



| Medication/Dosage Notes | Dose# | Admin Dt/Time | Presc Date/Time | Admin By | Route/Site | Reason Not Administered | Admin Notes |
|---|---|---|---|---|---|---|---|
| | 4 | 12-23-09 21:00 | 12-23-09 20:20 | CDOTIMSH | PO | | |
| | 5 | 12-24-09 08:00 | 12-24-09 08:25 | MISIDRSH | PO | | |
| | 6 | 12-24-09 21:00 | 12-24-09 20:26 | CMANALSH | PO | | |
| | 7 | 12-25-09 08:00 | 12-25-09 09:00 | CROQUESH | PO | | |
| | 8 | 12-25-09 21:00 | 12-25-09 21:06 | BORRXXSH | PO | | |
| | 9 | 12-26-09 08:00 | 12-26-09 09:34 | AAPSAYSH | PO | | |
| | 10 | 12-26-09 21:00 | 12-26-09 21:00 | MCHINNSH | PO | | |
| | 11 | 12-27-09 08:00 | 12-27-09 07:59 | DPHEL2SH | PO | | |
| | 12 | 12-27-09 21:00 | 12-27-09 18:49 | CMANALSH | PO | | |
| | 13 | 12-28-09 08:00 | 12-28-09 08:30 | CDOTIMSH | PO | | |
| | 14 | 12-28-09 21:00 | 12-28-09 21:27 | MVIVIESH | PO | | |
| | 15 | 12-29-09 08:00 | 12-29-09 05:53 | EPUSUNSH | PO | | |
| | 16 | 12-29-09 21:00 | 12-29-09 19:22 | CDOTIMSH | PO | | |
| | 17 | 12-30-09 08:00 | 12-30-09 08:30 | MAGUINSH | PO | | |
| | 18 | 12-30-09 21:00 | 12-30-09 19:57 | ESANC3SH | PO | | |

390

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

EXHIBIT 25 Page 53

**CONFIDENTIAL MEDICAL/MENTAL HEALTH INFORMATION TRANSFER SUMMARY**

To: TEXAS

Facility: MEDICAL SERVICES DIVISION
Address: SAN DIEGO CENTRAL JAIL
Telephone: 1173 FRONT ST.
SAN DIEGO, CA 92101
PHONE (619) 615-2450

Date: 12-30-09

**SENT**

INMATE NAME: HUMMEL, JOHN

AKA: _____

| | |
|---|---|
| Please list most recent findings on the applicable sections below. Please write n/a, if not applicable. If necessary, please include any other relevant medical history while in custody. | **RELEVANT MEDICAL HISTORY:** CROHN'S DISEASE HERNIATED DISC L4-L5 |

Medical Diagnosis/Date: CHRONIC BACK PAIN

Psychiatric Diagnosis/Date:

Suicide Attempt(s)/Date(s): n/a

Dental Needs/Date :

Special Diets/Date :

ALLERGIES: MILK PRODUCTS, PEANUT, VEGETABLE FLAVOR

Current Medications (dose, route, frequency, start date, stop date): *(including TB)*
- [ ] N/A
- [X] See attachment (JIMS MAR screen print)

Recent Lab Works/X-ray (date and result):
- [X] N/A
- [ ] See attachment (Copies of lab reports)

Treatments (frequency, start date, stop date):
- [X] N/A
- [ ] See description: _____

Pending Appointments and/or Lab Works (start date & stop date) :
- [X] N/A
- [ ] See description: _____

Pregnant (Circle one):
Yes    No    Unknown    (N/A)    EDC: ____

TB: PPD Test Administration Date: _____
PPD Test Reading: Date: _____ Result: _____ mm
Chest X-Ray: [✓] normal  [ ] abnormal  Date: 12/20/09
Active TB Disease:    [ ] suspect    [ ] known

If suspect or known active TB disease, attach TB Patient Plan and provide the date Local Health Officer was notified of the pending transfer:
- [X] N/A    [ ] Notification Date: _____

Tests (Circle as appropriate):

| | Result (+/-) | Treated? | Date |
|---|---|---|---|
| RPR / VDRL: | Yes    No | | |
| GC: | Yes    No | | |
| Chlamydia: | Yes    No | n/a | |
| Syphilis: | Yes    No | | |
| Other screening test results and dates *(including hepatitis)* | | | |

Immunizations given/date : n/a

Additional Information:

COMPLETED BY: M. ALUM /RN    ARJIS #: 9037    12/30/09                    Signature/Title/ARJIS #/Date

SPECIAL TRANSPORT INSTRUCTIONS: _____

**Note:** Place a copy of this form in inmate/patient's medical chart.

| | |
|---|---|
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION CONFIDENTIAL MEDICAL/MENTAL HEALTH INFORM: J204ATION TRANSFER SUMMARY Page 1 of 1 | [ ] DDF  [ ] GBDF/EMDF  [ ] LCDF  [ ] SBDF  [X] SDCJ  [ ] VDF Patient's Name: HUMMEL, JOHN D.O.B. 11/4/1975 |

Form J204  Rev 06/08          9797544

San Diego County Sheriff's Department Medical Records Unit ... this record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division business at or near the time of the act, condition or event.

EXHIBIT 25 Page 54

391

| Admitting Diagnosis: | Medications: (None ☐) |
|---|---|
| Allergies: (NKDA ☐) _Milk products, Peanut_ | _morphin 800 mg, pelusil chew_ |
| _CXR - 12/20/09 Vegetable Pladder_ | _tablets_ |
| PPD Date: _____ mm HIV Status: | |

Admission Data: Date: _2/24/09_ Time: _2211_ Height: _72"_ Weight: _201_ B/P: _116/72_ T/P/R: _98.3, 80, 20_

Nursing Assessment & Reason For Admission To MOB: _For cluse observation due to_
_S/P Safety cell placement_

Special Considerations: Toupee ☐ Glasses ☐ Contact Lenses ☐ Hearing Aid ☐ Dentures ☐ Wheelchair ☐ Crutches ☐

Prosthetic Device ☐ Lower Bunk ☐ Special Diet ☐ _____

Other _____

Last Menstrual Period (N/A ☑) _____ Para _____ Gravida _____ TAB _____ SAB _____

Past Medical Problems/Hospitalizations (when/where)  N/A ☐ _____

## PHYSICAL ASSESSMENT

Neuro (Alert and oriented x 3 ☑) _____

**Diagram Visible Injuries Present** (none ☐)

Cardio (S1,S2 w/peripheral pulses and no edema ☑) _____

Respiratory (Clear all fields ☑) _____

Abdominal (Soft and supple, BS present ☑) _____

Skin (Warm, dry and intact ☑) _____

Alcohol/Drug Usage (Denies ☑) _____

Signature: _____ RN          _____ ID#

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
**MEDICAL ADMISSION RECORD**
Page 1 of 1

☐ DDF   ☐ GBDF/EMDF   ☐ LCDF   ☐ SBDF   ☐ SDCJ   ☐ VDF

Patient's Name: _HUMMEL, JOHN_

D.O.B: _11/4/1975_

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit




| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | For close observation due to S/P safety cell Placement | | | |
| PSYCH DIAGNOSIS | | | | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | | | | |
| PENDING APPTS | | | | | | |
| LAST MD VISIT | | | | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Suicide watch | | | |
| NURSING PROBLEM | | | | | | |
| GOALS | | | | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | | | | |
| AM SHIFT | | | | | | |
| VS/WT | | | | | | |
| PM SHIFT | | | | | | |
| VS/WT | | | | | | |
| NOC SHIFT RN 6552 12/21-22/09 | | | Placed in MOB for Close Observation due to S/P safety cell placement. I/P alert oriented X 3. Ambultory. NAD, breathing even and unlabored. Skin appears dry and well perfused. Speech clear and coherent with good eye contact. Denies SI/HI. Wears his safety garment properly. Mattress on the floor, sleeping on and off. No Suicide gestures noted. | | | |
| VS/WT | | | 98.3   80   20   116/72 | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

4

**393**

EXHIBIT 25 Page 56

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | . | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | Ultram | | | |
| PENDING APPTS | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | Psyc SC 12/22/09<br>MDSC 12/22/09 | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Universal Precaution | | | |
| NURSING PROBLEM | | | Alt in health maintenance | | | |
| GOALS | | | . | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | Monitor VS q shift | | | |
| AM SHIFT RN 6332 / LVN 6545 12/22/09 | | | AOX3, VSS, NAD, RESP REG AND UNLABORED, SKIN WARM AND DRY, NO SUICIDE GESTURES. C/O BACK PAIN. MDSC/PSYCH TODAY | | | |
| VS/WT | | | 98.6, 118, 20, 103/68 | | | |
| PM SHIFT rn 7748/7655 | | | Seen by psych this morning. No complaints. | | | |
| VS/WT | | | | | | |
| NOC SHIFT RN 7875/6552 | | | I/P was seen by Psych yesterday and safety cell protocol was d/c'd. He was also seen by MD d/t c/o Crohns disease, Rt inguinal hernia, and back pain – was prescribed ultram. No suicidal gestures noted/observed. No complaints presented. Ate 100% of breakfast served. | | | |
| VS/WT | | | Refused VS. | | | |

4

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | Ultram | | | |
| PENDING APPTS | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | Psyc SC 12/22/09 MDSC 12/22/09 | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Universal Precaution | | | |
| NURSING PROBLEM | | | Alt in health maintenance | | | |
| GOALS | | | | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | Monitor VS q shift | | | |
| AM SHIFT RN 6554/6423 | | | I/P I ALERT ORIENTED X 3. AMBULATING WITH STABLE GAIT, BREATHING EVEN AND UNLABORED. SKIN WARM/DRY/INTACT, SPEECH CLEAR AND COHERENT WITH GOOD EYE CONTACT. DENIES SI/HI, C/O OF BACK PAIN/OFF, NAD. TOOK HIS AM MEDS AND ATE 100 % LUNCH. | | | |
| VS/WT | | | 97.9, 80, 20, 119/70 | | | |
| PM SHIFT RN 9393/7655 12/23/09 | | | Denies si/hi, no ah/vh. alert and oriented x3, walking around cell at times with no complaint of shortness of breath, denies having bowel problem during shift, complain of back pain specially when getting up from his bed. | | | |
| VS/WT | | | 124/87, 98, 112, 20 | | | |
| NOC SHIFT RN 7875/5231 | | | Cc: Back problem, chronic, old injury. States Crohns ds and hernia not a concern right now. States unable to eat red meat and raw veggies as it triggers his crohns ds. M. Tutt e-mailed. Ate breakfast, no self harming gestures noted. | | | |
| VS/WT | | | 98.4    95    18    123/79 | | | |

**395**

EXHIBIT 25 Page 58

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | Ultram | | | |
| PENDING APPTS | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | Psyc SC 12/22/09<br>MDSC 12/22/09 | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Universal Precaution | | | |
| NURSING PROBLEM | | | Alt in health maintenance | | | |
| GOALS | | | | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | Monitor VS q shift | | | |
| AM SHIFT RN 6554/6733 | | | I/P alert oriented X 3. respiration regular, ambulating with steady gait, skin warm/dry and intact, speech clear and coherent, able to get up from bed for V/S with no difficulty, claims his back still bothering him off/on. Denies AH/VH/SI/HI, denies feeling depressed, took AM meds and NAD. Seen by a psychiatrist no new order. | | | |
| VS/WT | | | 98.4 7.9, 80, 20, 119/70 | | | |
| PM SHIFT RN 7748/9455 | | | No change in medical condition | | | |
| VS/WT | | | 98.1  81  20  123/80 | | | |
| NOC SHIFT RN 6734/5231 | | | Cc: Back problem, chronic, old injury. States Crohns ds and hernia not a concern right now. States unable to eat red meat and raw veggies as it triggers his crohns ds. M. Tutt e-mailed. Ate breakfast, no self harming gestures noted. Sleeps and eats well. | | | |
| VS/WT | | | 98.4  65  18  121/73  99%RA | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | Ultram | | | |
| PENDING APPTS | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | Psyc SC 12/22/09<br>MDSC 12/22/09 | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Universal Precaution | | | |
| NURSING PROBLEM | | | Alt in health maintenance | | | |
| GOALS | | | | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | Monitor VS q shift | | | |
| AM SHIFT RN.6554/6423 | | | I/P alert, oriented X 3. respiration regular, ambulating with steady gait, skin warm/dry/intact, speech clear and coherent, ROM on 4 extremities no limitation, able to sit up for V/S with no difficulty, no c/o back at this time, denies AH/VH/SI/HI, denies feeling depressed and NAD. | | | |
| VS/WT | | | 98.7, 62, 18, 119/70 | | | |
| PM SHIFT RN | | | | | | |
| VS/WT | | | | | | |
| NOC SHIFT RN 7847 | | | NAD, alert and oriented. Ate bkf. | | | |
| VS/WT | | | 98.3-60-18    122/70 | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit, staff physicians, or persons acting under the control of either,

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | Ultram | | | |
| PENDING APPTS | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | Psyc SC 12/22/09<br>MDSC 12/22/09 | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Universal Precaution | | | |
| NURSING PROBLEM | | | Alt in health maintenance | | | |
| GOALS | | | | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | Monitor VS q shift | | | |
| AM SHIFT 12/26/09<br>RN 0770 | | | AOX3, not in any form of distress, afebrile, ambulatory.  Claimed he is going to Texas for extradition.  Denies SI, HI, VH and AH.  No complaints | | | |
| VS/WT | | | 98.5, 87, 18, 107/79 | | | |
| PM SHIFT RN | | | | | | |
| VS/WT | | | | | | |
| NOC SHIFT RN 5231 | | | A/Ox3. VSS, NAD. Sleeps well, no complaints. Ate breakfast. | | | |
| VS/WT | | | 98.1    68    18   131/77 | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**398**

EXHIBIT 25 Page 61

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|
| **ADMISSION DATE** | | | 12/21/09 | **AGE:** | **ACUITY** | high |
| **MEDICAL DIAGNOSIS** | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| **PSYCH DIAGNOSIS** | | | | | | |
| **SIGNIFICANT LABS** | | | | | | |
| **MEDS /IV** | | | Ultram | | | |
| **PENDING APPTS** | | | Psych SC 12/24/09 | | | |
| **LAST MD VISIT** | | | Psyc SC 12/22/09 <br> MDSC 12/22/09 | | | |
| **TB STATUS** | | | | | | |
| **EQUIPMENT** | | | | | | |
| **PRECAUTIONS** | | | Universal Precaution | | | |
| **NURSING PROBLEM** | | | Alt in health maintenance | | | |
| **GOALS** | | | | | | |
| **TARGET DATE** | | | | | | |
| **NURSING INTERVENTION** | | | Monitor VS q shift | | | |
| **AM SHIFT 12/27/09** <br> **RN 0770 / RN 9325** | | | AOX3, not in any form of distress, afebrile, ambulatory. Denies SI, HI, VH and AH. No complaints | | | |
| **VS/WT** | | | 98.4, 68, 18, 113/74 | | | |
| **PM SHIFT RN** | | | | | | |
| **VS/WT** | | | | | | |
| **NOC SHIFT RN 5231** | | | A/Ox3, VSS, NAD. C/o LBP exacerbated by sleeping on the floor. Sleeps well. Ate breakfast. | | | |
| **VS/WT** | | | 97.81    68    18    120/79 | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**399**

EXHIBIT 25 Page 62

| ROOM | 06 | NAME | | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|---|---|---|
| ADMISSION DATE | | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | | | | |
| SIGNIFICANT LABS | | | | | | | |
| MEDS /IV | | | | Ultram | | | |
| PENDING APPTS | | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | | Psyc SC 12/22/09 MDSC 12/22/09 | | | |
| TB STATUS | | | | | | | |
| EQUIPMENT | | | | | | | |
| PRECAUTIONS | | | | Universal Precaution | | | |
| NURSING PROBLEM | | | | Alt in health maintenance | | | |
| GOALS | | | | | | | |
| TARGET DATE | | | | | | | |
| NURSING INTERVENTION | | | | Monitor VS q shift | | | |
| AM SHIFT 12/28/09 RN 6554/6868 | | | | Alert, oriented x 3, ambulatory, denies feeling depressed, no SI/HI/AH/VH, c/o back pain off/on but able to move all 4 extremities with no limitation. NAD. | | | |
| VS/WT | | | | 98.1, 69, 20, 120/77 | | | |
| PM SHIFT RN | | | | | | | |
| VS/WT | | | | | | | |
| NOC SHIFT RN 7847 | | | | NAD, alert and oriented x3.Ate bkf | | | |
| VS/WT | | | | 98.1-62-18    113/75 | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

3

**400**

EXHIBIT 25 Page 63

| ROOM 06 NAME | Hummell, John | | BOOKING # | 9797544 |
|---|---|---|---|---|
| ADMISSION DATE | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | |
| SIGNIFICANT LABS | | | | |
| MEDS./IV | Ultram | | | |
| PENDING APPTS | Psych SC 12/24/09 | | | |
| LAST MD VISIT | Psyc SC 12/22/09 MDSC 12/22/09 | | | |
| TB STATUS | | | | |
| EQUIPMENT | | | | |
| PRECAUTIONS | Universal Precaution | | | |
| NURSING PROBLEM | Alt in health maintenance | | | |
| GOALS | | | | |
| TARGET DATE | | | | |
| NURSING INTERVENTION | Monitor VS q shift | | | |
| AM SHIFT 12/29/09 RN 6554/9549 | Alert/O x 3, respiration regular, no c/o back pain, appetite good and sleeping off/on. NAD. Seen by dietitian. | | | |
| VS/WT | 98.5, 60, 20, 110/66 | | | |
| PM SHIFT RN 12/29/09 RN6868/.7655 | No c/o given.Independent of ADL's. | | | |
| VS/WT | 97.9   60    109/77 | | | |
| NOC SHIFT RN 9400 | Refused vitals. No complaints voiced. Ate most meals | | | |
| VS/WT | REFUSED | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**401**

EXHIBIT 25 Page 64

| ROOM | 06 | NAME | Hummell, John | | BOOKING # | 9797544 |
|------|----|----|----|----|----|----|
| ADMISSION DATE | | | 12/21/09 | AGE: | ACUITY | high |
| MEDICAL DIAGNOSIS | | | Crohns disease, Rt inguinal hernia, Back pain. | | | |
| PSYCH DIAGNOSIS | | | | | | |
| SIGNIFICANT LABS | | | | | | |
| MEDS /IV | | | Ultram, miconazole | | | |
| PENDING APPTS | | | Psych SC 12/24/09 | | | |
| LAST MD VISIT | | | Psyc SC 12/22/09<br>MDSC 12/22/09 | | | |
| TB STATUS | | | | | | |
| EQUIPMENT | | | | | | |
| PRECAUTIONS | | | Universal Precaution | | | |
| NURSING PROBLEM | | | Alt in health maintenance | | | |
| GOALS | | | | | | |
| TARGET DATE | | | | | | |
| NURSING INTERVENTION | | | Monitor VS q shift | | | |
| AM SHIFT RN 6554/LVN 6077 | | | Alert/O x 3, respiration regular, skin w/d/well perfuse, no c/o back pain, ate 100 % lunch, sleeping off/on, showered and NAD. Showered. I/P scheduled for transfer to Texas tomorrow, please prepare d/c summary. | | | |
| VS/WT | | | 98.5, 60, 20, 110/66 | | | |
| PM SHIFT RN 9033<br>12/30/09 | | | Complaining of athlete's foot. With peeling off of dried skin on both feet. No swelling/redness noted. Fungal infection snp initiated. Calm and cooperative. Scheduled for transfer to Texas tomorrow. Transfer summary completed. | | | |
| VS/WT | | | 98.2   94   18   104/64 | | | |
| NOC SHIFT RN 7875/3575 | | | No complaints presented.  For extradition to Texas in am.  Ate 100% of breakfast served. | | | |
| VS/WT | | | REFUSED | | | |

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**402**

Reason for Safety Cell Placement:
DTS

Date and Time: 21 Dec 09  0208

SUBJECTIVE Chief complaint and precipitating event:
Denied he said, or was suicidal

**HISTORY:** Previous self-injury/violence/suicide attempt — ☐ Denied
Denied

Previous psychiatric outpatient treatment History — ☐ Denied
Denied

Previous psychiatric hospitalization: — ☐ Denied
Denied

Drug/alcohol abuse history. Describe:
"I can't drink because of the Crohn's." "Crack" 1st time yesterday." Ecstasy 200'. The 4 months 6 2x/day use "couple years"

**OBJECTIVE Mental Status Evaluation:**

APPEARANCE: ☒ Well Groomed ☐ Little care ☐ Appropriate   L.O.C.: ☒ Alert and awake ☐ Drowsy ☐ Stupor ☐ Coma

EYE CONTACT: ☒ Good ☐ Fair ☐ Poor ☐ None

ATTITUDE: ☒ Cooperative ☐ Guarded ☐ Non-disclosing ☐ Hostile/Belligerent ☐ Uncooperative

BEHAVIOR: ☒ Calm ☐ Apprehensive ☐ Agitated ☐ Motor Retardation ☐ Tearful ☐ Withdrawn

Speech: ☒ Clear ☐ Slurred ☐ Slow ☐ Pressured ☐ Quiet ☐ Rapid ☐ Selectively Mute ☐ Aphasic

Conversation: ☒ Spontaneous ☐ Only in response to questions ☐ Relevant ☐ Irrelevant

ORIENTED TO: ☒ Person ☒ Place ☒ Month ☒ Year ☒ Situations ☐ None

MEMORY: Immediate intact ☒ Yes ☐ No   Recent Intact ☒ Yes ☐ No   Remote Intact ☒ Yes ☐ No

PERCEPTUAL SYMPTOMS: ☒ Normal ☐ Hallucinations ☐ Auditory ☐ Visual ☐ Olfactory   Explain: Denied now & past

DEPRESSIVE SYMPTOMS INCLUDING:

Sleep Disturbance ☐ Yes ☐ No      Eating Disturbance ☐ Yes ☐ No
Crying Spells ☐ Yes ☐ No      Feelings of Helplessness ☐ Yes ☐ No      } Denied
Feelings of Hopelessness ☐ Yes ☐ No

SUICIDE THINKING: ☒ Denied ☐ Passive ☐ Active ☐ Plan
Would you ask for help if you felt like hurting yourself? ☒ Yes ☐ No

HOMICIDE THINKING: ☒ Denied ☐ Passive ☐ Active ☐ Plan ☐ Intent

AFFECT: ☒ Appropriate ☐ Inappropriate ☐ Labile ☐ Expansive ☐ Constricted ☐ Blunted ☐ Angry

MOOD: ☒ Stable ☐ Depressed ☐ Anxious ☐ Irritable ☐ Elevated ☐ Apathetic ☒ Congruent ☐ Incongruent

THOUGHT PROCESSES: ☒ Intact ☐ Concrete ☐ Abstract ☐ Thought Blocking ☐ Circumstantial
☐ Disorganized ☐ Loose Association ☐ Tangential ☐ Flight of ideas ☐ Slow, hesitant

THOUGHT CONTENT: ☒ Appropriate to situation ☐ Grandiose ☐ Obsessions ☐ Compulsions ☐ Paranoia ☐ Delusions ☐ Impoverished   Denied now & past

IMPULSE CONTROL: ☐ Good ☒ Fair ☐ Poor

JUDGEMENT: ☐ Intact ☐ Impaired ☒ Mild ☐ Moderate ☐ Severe   INSIGHT: ☐ Good understanding ☒ Adequate ☐ Partial recognition ☐ Poor

MOTIVATION FOR TREATMENT: ☒ Excellent ☐ Good ☐ Fair ☐ Poor

**OBJECTIVE** (Narrative Notes):
(Use Form 239B for additional notes.)   Discussed housing c̄ Lt. Hadsen.

DIAGNOSIS(ES) Including Codes: 303.90 – 305.60, 305.20 II R/O 301.9  GAF: III Def IV 8 V 50   DSM IV CODE(S)

MEDICATIONS: List current medications being taken and dosage:
Denied by 4 medication.

**PLAN:** ☐ Cleared to Mainline with Psych follow-up ☐ Psych Housing ☐ PSU Admission ☐ Voluntary ☐ Involuntary WIC 5150)
☐ Cleared to Mainline without Psych follow-up ☐ Cleared to Sheriff Department (B&R) ☐ Cleared to classification
☒ Contracted for Safety ☒ Yes ☐ No      ☐ Continue to observe      ☐ Obtain UBH History

MEDICATIONS: ☐ Continue after verified per Policy ☐ Expected benefit, risks, side effects, alternatives discussed
☒ Schedule follow up appointment in Psych OP clinic ☐ 2-3 Days ☐ 1-2 weeks ☐ 4 weeks ☒ Other
☐ Refer to Social Worker ☐ Refer to RN to assess for ETOH/substance withdrawal ☒ Refer to RN to verify meds and dosage ☒ Refer to MD sick call
Cleared to Sheriff Dept

Psychiatrist/Psychologist Signature:      Date and Time: 21 Dec 09  0850

NO UBH HISTORY

REMINDER: If you are prescribing psychotropic meds Form 1261 must be signed by you and inmate/patient.

Monroe PhD

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
PSYCHIATRY SAFETY CELL EVALUATION
Page 1 of 1

☐ DDF ☐ GBDF/EMDF ☐ LCDF ☐ SBDF ☐ SDCJ ☐ VDF

Patient's Name: Hummel   John

D.O.B.: 11-4-78

**403**

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division staff physicians, or personnel within the control of either the ordinary course of Medical Services Division business at or near the act, condition or event under the San Diego County Sheriff's Department Medical Records Unit

Booking Number: 9 7 9 7 5 4 4

EXHIBIT 25 Page 66

Form J273 Rev 02/05

**DEMOGRAPHIC DATA:**

Age _____ ☐ Male ☐ Female

Race: ☐ Caucasian ☐ Black ☐ Asian
☐ Hispanic ☐ Am. Native ☐ Other

Marital Status: ☐ Single ☐ Married
☐ Separated ☐ Divorced ☐ Widowed

**DSM-IV DIAGNOSIS(ES):** (Including Code)

Axis I: _____

Axis II: _____

Axis III: _____

Axis IV: Psychosocial stressors: Interaction with the legal system: other: _____

Axis V: GAF: _____

**PLAN:**

Medication
☐ Expected benefit, risks, side effects, alternatives discussed
☐ Given Written information regarding medications
☐ Informed consent given and/or signed
☐ Medication(s) prescribed at initial visit:

☐ Lab ordered
☐ Admit to PSU/WPSU
☐ Medical Consultation
☐ Obtain previous medical records
☐ Treatment plan discussed and accepted by patient
☐ Other
☐ Schedule follow up appointment in DOPS clinic
☐ 2-3 Days ☐ 1-2 weeks ☐ 4 weeks
☐ Other

**SUBJECTIVE:** Chief complaint and/or reason for referral:

**HISTORY:** Detention/incarceration, current symptoms

Drug/alcohol abuse history. Describe:

Previous psychiatric outpatient treatment History

Previous psychiatric hospitalization

Suicide attempts/violence

Psychiatrist Signature: _____   Date and Time: _____

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
PSYCHIATRY EVALUATION
Page 1 of 2

☐ DDF ☐ GBDF/EMDF ☐ LCDF ☐ SBDF ☐ SDC ☐ VDF

Patient's Name: _____

Booking Number: _____   D.O.B: _____

Form J274  Rev 03/03

404

EXHIBIT 126 Page 67

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

**MEDICAL HISTORY**

☒ Currently Healthy  _Chronic dx / lower back pain_

☒ Currently Ill, Describe _____

☐ Medications allergies     ☐ NKA  ☒ Current Medications: _Motrin, Ultram (OR) B/L_

☐ As applicable, menstrual Hx/pregnancy/contraception _(Pelvis)_

☐ Head trauma/seizures  ☒ None

---

**RELEVANT FAMILY BACKGROUND**                    ☐ Unremarkable

Family Psychiatric History _____

Mental Illness _____

Alcohol/Drug _____

Academic Background:

Work History _security guard_

Marital History _married_

Children _1 child_

---

**OBJECTIVE Mental Status Evaluation:**

*APPEARANCE:* ☐ Well Groomed ☐ Little care ☐ Appropriate  *L.O.C.:* ☒ Alert and awake ☐ Drowsy ☐ Stupor ☐ Coma

*EYE CONTACT:* ☐ Good ☐ Fair ☐ Poor ☐ None

*ATTITUDE:* ☒ Cooperative ☐ Guarded ☐ Non-disclosing ☐ Hostile/Belligerent ☐ Uncooperative

*BEHAVIOR:* ☒ Calm ☐ Apprehensive ☐ Agitated ☐ Motor Retardation ☐ Tearful ☐ Withdrawn

Speech: ☒ Clear ☐ Slurred ☐ Slow ☐ Pressured ☐ Quiet ☐ Rapid ☐ Selectively Mute ☐ Aphasic

Conversation: ☐ Spontaneous ☒ Only in response to questions ☐ Relevant ☐ Irrelevant

*ORIENTED TO:* ☒ Person ☒ Place ☒ Month ☒ Year ☒ Situations ☐ None

*MEMORY:* Immediate intact ☒ Yes ☐ No   Recent Intact ☒ Yes ☐ No   Remote Intact ☒ Yes ☐ No

*PERCEPTUAL SYMPTOMS:* ☒ Normal ☐ Hallucinations ☐ Auditory ☐ Visual ☐ Olfactory   Explain: _____

*DEPRESSIVE SYMPTOMS INCLUDING:*

Sleep Disturbance ☒ Yes ☐ No    Eating Disturbance ☐ Yes ☒ No

Crying Spells ☐ Yes ☒ No    Feelings of Helplessness ☐ Yes ☒ No

Feelings of Hopelessness ☐ Yes ☒ No

*SUICIDE THINKING:* ☒ Denied ☐ Passive ☐ Active ☐ Plan _____

Would you ask for help if you felt like hurting yourself ☐ Yes ☐ No

*HOMICIDE THINKING:* ☒ Denied ☐ Passive ☐ Active ☐ Plan ☐ Intent

*AFFECT:* ☐ Appropriate ☐ Inappropriate ☐ Labile ☐ Expansive ☒ Constricted ☐ Blunted ☐ Angry

*MOOD:* ☒ Stable ☒ Depressed ☐ Anxious ☐ Irritable ☐ Elevated ☐ Apathetic ☒ Congruent ☐ Incongruent

*THOUGHT PROCESSES:* ☐ Intact ☒ Concrete ☒ Abstract ☐ Thought Blocking ☐ Circumstantial

☐ Disorganized ☐ Loose Association ☐ Tangential ☐ Flight of Ideas ☐ Slow, hesitant

*THOUGHT CONTENT:* ☐ Appropriate to situation ☐ Grandiose ☐ Obsessions ☐ Compulsions ☐ Paranoia ☐ Delusions ☒ Impoverished

*IMPULSE CONTROL:* ☐ Good ☒ Fair ☐ Poor

*JUDGEMENT:* ☐ Intact ☒ Impaired ☐ Mild ☐ Moderate ☐ Severe  *INSIGHT:* ☐ Good understanding ☐ Adequate ☒ Partial recognition ☐ Poor

*MOTIVATION FOR TREATMENT:* ☐ Excellent ☒ Good ☐ Fair ☐ Poor

Psychiatrist Signature: _Peter Hung_               Date and Time _12/22/0_ _12:__

---

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
PSYCHIATRY EVALUATION
Page 2 of 2

☐ DDF ☐ GBDF/EMDF ☐ LCDF ☐ SBDF ☒ SDCJ ☐ VDF

Patient's Name: _____

D.O.B.: _____

Booking Number _____     Date / Time Booking

Form J274 Rev 03/03

405

EXHIBIT 25 Page 68

| Court Date(s) (If Known) | Charges/Legal: |
| --- | --- |
| UBH ☐ Yes ☐ No | |

**SUBJECTIVE/Patient Report or 3rd Party Statements** *Pt reports good mood "I am fine"*
*he denies problems w sleep, appetite is good.*

**Previous Psychiatric Care:** ☐ Yes ☐ No  If yes, explain *Denies PT hx. "I never was*
*suicidal. I don't know how*
**Drug/Alcohol Abuse History:** *they came up with this idea"*
Illicit Drug Use: ☐ Yes ☐ No  Last Use – Frequency and Type
Alcohol Use: ☐ Yes ☐ No  Last Drink – Frequency and Type

**OBJECTIVE** Mental Status Evaluation:
**APPEARANCE:** ☐ Well Groomed ☐ Little care ☒ Appropriate   **L.O.C.:** ☒ Alert and awake ☐ Drowsy ☐ Stupor ☐ Coma
**EYE CONTACT:** ☒ Good ☐ Fair ☐ Poor ☐ None
**ATTITUDE:** ☒ Cooperative ☐ Guarded ☐ Non-disclosing ☐ Hostile/Belligerent ☐ Uncooperative
**BEHAVIOR:** ☒ Calm ☐ Apprehensive ☐ Agitated ☐ Motor Retardation ☐ Tearful ☐ Withdrawn
  **SPEECH:** ☒ Clear ☐ Slurred ☐ Slow ☐ Pressured ☐ Quiet ☐ Rapid ☐ Selectively Mute ☐ Aphasic
  Conversation: ☒ Spontaneous ☐ Only in response to questions ☐ Relevant ☐ Irrelevant
**ORIENTED TO:** ☒ Person ☒ Place ☒ Month ☒ Year ☒ Situations ☐ None
**MEMORY:** Immediate intact ☒ Yes ☐ No  Recent Intact: ☒ Yes ☐ No  Remote Intact: ☒ Yes ☐ No
**PERCEPTUAL SYMPTOMS:** ☒ Normal ☐ Hallucinations ☐ Auditory ☐ Visual ☐ Olfactory  Explain: _____
**DEPRESSIVE SYMPTOMS INCLUDING:**
  Sleep Disturbance ☐ Yes ☒ No     Eating Disturbance ☐ Yes ☒ No
  Crying Spells ☐ Yes ☒ No     Feelings of Helplessness ☐ Yes ☒ No
  Feelings of Hopelessness ☐ Yes ☒ No
**SUICIDE THINKING:** ☒ Denied ☐ Passive ☐ Active ☐ Plan
  Prior Suicide Attempts/Gestures: ☐ Yes ☐ No  How/When: *he denial*
  Would you ask for help if you felt like hurting yourself? ☒ Yes ☐ No
**HOMICIDE THINKING:** ☒ Denied ☐ Passive ☐ Active ☐ Plan ☐ Intent
**AFFECT:** ☒ Appropriate ☐ Inappropriate ☐ Labile ☐ Expansive ☐ Constricted ☐ Blunted ☐ Angry
**MOOD:** ☒ Stable ☐ Depressed ☐ Anxious ☐ Irritable ☐ Elevated ☐ Apathetic ☐ Congruent ☐ Incongruent
**THOUGHT PROCESSES:** ☒ Intact ☐ Concrete ☐ Abstract ☐ Thought Blocking ☐ Circumstantial
  ☐ Disorganized ☐ Loose Association ☐ Tangential ☐ Flight of ideas ☐ Slow, hesitant
**THOUGHT CONTENT:** ☒ Appropriate to situation ☐ Grandiose ☐ Obsessions ☐ Compulsions ☐ Paranoia ☐ Delusions ☐ Impoverished
**IMPULSE CONTROL:** ☐ Good ☒ Fair ☐ Poor
**JUDGEMENT:** ☐ Intact ☐ Impaired ☒ Mild ☐ Moderate ☐ Severe
**INSIGHT:** ☐ Good understanding ☒ Adequate ☐ Partial recognition ☐ Poor ☐ Denied
**MOTIVATION FOR TREATMENT:** ☐ Excellent ☒ Good ☐ Fair ☐ Poor

| Patient Compliant with Medication ☐ Yes ☐ No ☐ Unknown *NA* | Side Effects of Medication ☐ None ☐ Yes (List) *NA* |
| --- | --- |
| **Treatment Response** ☐ None ☐ Minimal ☐ Fair ☐ Good ☐ Excellent *NA* | |

**PLAN:** New medication _____

☐ Expected benefit, risks, side effects, alternatives discussed
☐ Given written information regarding medications
☐ Informed consent signed

☐ Medication(s) Prescribed: (Include dose and frequency) *O meds*

☒ No prescribed medication
☐ Admit to PSU/WPSU ☐ Cleared to _____
☐ Schedule follow up appointment in Psychiatric OP clinic
☐ Severe (STAT<24 hrs) ☐ Urgent (1-3 days)
☐ Non-urgent (1 or 2 weeks) circle one  *PRN*
☐ Greater than 2 weeks (indicate weeks) *PRN*

| Clinician's Signature: | Title: | Date and Time: |
| --- | --- | --- |
| ☒ Physician ☐ Nurse ☐ Det. Lic. M. H. Clinician  *[signature]* | *MD* | *12/24/* |

| DIAGNOSIS (ES) (For Physician's use only, including codes)  *309.9* | DSM IV CODE (S) |
| --- | --- |

☐ DDF ☐ GBDF/EMDF ☐ LCDF ☐ SBDF ☐ SDCJ ☐ other

Patient's Name: *Hummel, John*
D.O.B.: *11-4-75*

Form J275  Rev 7/04     Booking Number *9 9 9 5 4 4*     *12 - 24 -*  **406**

EXHIBIT 25 Page 69

*The record is [attested] by the personnel of the San Diego County Sheriff's Department Medical Services Division or either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or person acting under the...*

*San Diego County Sheriff's Department Medical Records Unit*

The undersigned patient authorizes and requests the San Diego County Sheriff's Medical Services, its physicians, dentists, contracted agents and its medical personnel to administer and perform any and all medical examinations, including photographs, and treatments, dental examinations and treatments, diagnostic procedures to include Telemedicine Consultation, as deemed advisable or necessary.

The undersigned patient authorizes and requests San Diego County Sheriff's Medical Services Division, mental health personnel to provide evaluation and treatment of emotional and mental health problems. The treatment services requested are Outpatient and Inpatient as indicated.

I understand that my participation is voluntary. Confidentiality may be observed except for reference to jail escapes, immediate threats to others, child abuse, loss of consciousness that may impede driving and homicidal or suicidal expressions.

State laws require clinics and physicians to report certain injuries and illnesses. These include communicable diseases (to prevent spread), injuries which may have been caused unlawfully, and illnesses/conditions which cause lapse of consciousness.

I UNDERSTAND THAT IF I AM TAKING MEDICATION SHERIFF MEDICAL STAFF WILL ATTEMPT TO VERIFY IT WITH MY PHYSICIAN OR PHARMACY. IF I DO NOT RECEIVE IT WITHIN SIX (6) DAYS, OR SOONER IF NEEDED, I AM TO SUBMIT A SICK CALL SLIP STATING I NEED MY MEDICATIONS.

I consent to receive verified prescription medications necessary for continuity of my medical/ psychiatric care until I am seen by the Sheriff's medical/psychiatric provider.

IF I AM REFERRED TO A PHYSICIAN/DENTIST, INCLUDING A SPECIALIST, AND HAVE NOT BEEN SEEN OR MY EVALUATION AND TREATMENT HAVE NOT BEEN COMPLETED, I UNDERSTAND THAT I AM RESPONSIBLE TO FOLLOW UP WITH MY OWN PHYSICIAN/DENTIST UPON MY RELEASE.

_John Hummel_
Patient Signature for Acceptance

_12/20/2009_
Date

☐    Patient accepts treatment, but declines to sign waiver.

_____
Staff Signature

_____
Date

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
CONSENT FOR MEDICAL/DENTAL & MENTAL HEALTH TREATMENT
Page 1 of 1

☐ DDF   ☐ GBDF/EMDF   ☐ LCDF   ☐ SBDF   ☐ SDCJ   ☐ VDF

Patient's Name:   HUMMEL, JOHN

D.O.B:   11/4/1975

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit


Form J22b   Rev 03/06


9797544


**407**
EXHIBIT 25 Page 70
12/20/2009

The undersigned patient authorizes and requests the San Diego County Sheriff's Medical Services, its physicians, dentists, contracted agents and its medical personnel to administer and perform any and all medical examinations, including photographs, and treatments, dental examinations and treatments, diagnostic procedures to include Telemedicine Consultation, as deemed advisable or necessary.

The undersigned patient authorizes and requests San Diego County Sheriff's Medical Services Division, mental health personnel to provide evaluation and treatment of emotional and mental health problems. The treatment services requested are Outpatient and Inpatient as indicated.

I understand that my participation is voluntary. Confidentiality may be observed except for reference to jail escapes, immediate threats to others, child abuse, loss of consciousness that may impede driving, and homicidal or suicidal expressions.

State laws require clinics and physicians to report certain injuries and illnesses. These include communicable diseases (to prevent spread), injuries which may have been caused unlawfully, and illnesses/conditions which cause lapse of consciousness.

I UNDERSTAND THAT IF I AM TAKING MEDICATION SHERIFF MEDICAL STAFF WILL ATTEMPT TO VERIFY IT WITH MY PHYSICIAN OR PHARMACY. IF I DO NOT RECEIVE IT WITHIN SIX (6) DAYS, OR SOONER IF NEEDED, I AM TO SUBMIT A SICK CALL SLIP STATING I NEED MY MEDICATIONS.

I consent to receive verified prescription medications necessary for continuity of my medical/ psychiatric care until I am seen by the Sheriff's medical/psychiatric provider.

IF I AM REFERRED TO A PHYSICIAN/DENTIST, INCLUDING A SPECIALIST, AND HAVE NOT BEEN SEEN OR MY EVALUATION AND TREATMENT HAVE NOT BEEN COMPLETED, I UNDERSTAND THAT I AM RESPONSIBLE TO FOLLOW UP WITH MY OWN PHYSICIAN/DENTIST UPON MY RELEASE.

_____        _____
Patient Signature for Acceptance         Date

☐      Patient accepts treatment, but declines to sign waiver.

_____        _____
Staff Signature                          Date

The record was prepared by the personnel of the San Diego County Sheriff's Department Medical Services Division, staff physicians, or persons acting under the control of either, in the ordinary course of Medical Services Division business at or near the time of the act, condition or event.

San Diego County Sheriff's Department Medical Records Unit

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT | ☐ DDF | ☐ GBDF/EMDF | ☐ LCDF | ☐ SBDF | ☐ SDCJ | ☐ VDF |
|---|---|---|---|---|---|---|
| MEDICAL SERVICES DIVISION | | | | | | |

CONSENT FOR MEDICAL/DENTAL & MENTAL HEALTH TREATMENT   Patient's Name:   HUMMEL, JOHN
Page 1 of 1

D.O.B:   11/4/1975





Form J226  Rev 03/06

9797544

**408**

EXHIBIT 25 Page 71



## BUSINESS RECORDS AFFIDAVIT OF CUSTODIAN OF RECORDS FOR THE TARRANT COUNTY SHERIFF'S DEPARTMENT

THE STATE OF TEXAS          §
                            §
COUNTY OF TARRANT           §

BEFORE ME, the undersigned authority, on this day personally appeared **Jerry Rucker**, who by me having been duly sworn made the following affidavit:

"My name is **Jerry Rucker**. I am above the age of twenty-one (21) years, fully competent to make this affidavit, and have personal knowledge of the matters of material fact hereinafter set forth, which are true and correct.

I am employed by the Tarrant County Sheriff's Department and have been since **August 11, 1993**. In this matter, I am the Custodian of Records for the Tarrant County Sheriff's Department, 200 Taylor Street, Fort Worth, Texas 76102; (817) 884-3700.

Attached hereto are **six (6)** pages of records on the from the **Tarrant County Sheriff's Department Confinement Bureau Standard Operating Procedures concerning the Dress-In of Inmates** for a total of **six (6)** pages of the requested records maintained by the Tarrant County Sheriff's Department on Confinement Bureau Standard Operating Procedures concerning the Dress-In of Inmates.

The **six (6)** pages of the requested records are kept by the Tarrant County Sheriff's Department in the regular course of business, and it was in the regular course of business of the Tarrant County Sheriff's Department for an employee or representative of the Tarrant County Sheriff's Department, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

The **six (6)** pages of the attached requested records is a true, correct and exact duplicate of the original document contained in the Tarrant County Sheriff's Department's file.

**BUSINESS RECORDS AFFIDAVIT OF JERRY RUCKER – PAGE 1**

Initial

# 409

EXHIBIT 26 Page 1

Further, Affiant sayeth not."

JERRY RUCKER

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by **JERRY W. RUCKER** on this the 26 day of April_____, 2013.

NOTARY PUBLIC in and for
The State of Texas

*Tammy Dossey*
Notary's Printed Name
My Commission Expires: 7/26/13

TAMMY DOSSEY
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 07-26-2013

**BUSINESS RECORDS AFFIDAVIT OF JERRY RUCKER – PAGE 2**

Initial _____

**410**

EXHIBIT 26 Page 2

**Tarrant County Sheriff's Department**
**Confinement Bureau – Booking Division – Standard Operating Procedures**
**1005: Property / Clothing / Money**
**002: Dress-In**

**1    INVENTORYING CLOTHES** ...................................................................................2
1.1   MALE INMATES.................................................................................................2
1.2   FEMALE INMATES..............................................................................................2
1.3   INVENTORY PERSONAL PROPERTY......................................................................2
1.4   INVENTORY CLOTHING ......................................................................................2
1.5   CONTRABAND AND INJURIES..............................................................................2
1.6   INMATE RETAINED PROPERTY ............................................................................3
1.7   INMATE'S CLOTHES ...........................................................................................3
1.8   INMATE'S SHOES/BOOTS ....................................................................................3
1.9   CLOTHING TAGS ...............................................................................................3
1.10  SHOWER...........................................................................................................3
**2    UNIFORM ISSUED**.........................................................................................4
2.1   TYPE OF UNIFORM ISSUED .................................................................................4
2.2   FLOOR COPY .....................................................................................................4
**3    OTHER ITEMS ISSUED**.................................................................................4
3.1   LINENS, SLIDES AND APPROVED RECEPTACLE.....................................................4
3.2   CUPS AND SPOONS.............................................................................................4
3.3   HYGIENE KIT ....................................................................................................4
3.4   WEEKENDS .......................................................................................................5
**4    TAKEN TO HOUSING UNIT**.........................................................................5
4.1   TRANSFER TO HOUSING- GREEN BAY & COLD SPRINGS........................................5
4.2   TRANSFER TO HOUSING – CORRECTIONS CENTER ................................................5
4.3   TRANSFER TO HOUSING – BELKNAP ...................................................................5
4.4   IF INMATES NOT PICKED UP IN A TIMELY MANNER..............................................5
4.5   FLOOR COPY.....................................................................................................6
4.6   TRANSPORTATION TO SATELLITE JAIL UNITS ......................................................6

Rev B: 2/19/2009

EXHIBIT 26 Page 3

Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1005: Property / Clothing / Money
002: Dress-In

1      INVENTORYING CLOTHES

1.1     **Male Inmates**
        Shall be dressed in the Male Dress-In room.

1.2     **Female Inmates**
        Shall be dressed in the Female Dress-In room.

1.3     **Inventory Personal Property**
        The Dress-In Property Officer will shake down inmate for personal property still remaining on his/her person.  Any property found will be recorded on the Property Record (CFMT-19).

        • The white copy of the Property Record (CFMT-19) shall be attached to the hard copy of the Clothing Record (CFMT-33) and shall be forwarded to Property Storage on Level 3.

1.4     **Inventory Clothing**
        The Dress-In Officer shall inventory the inmate's clothing on the Clothing Record.  List clothing in the simplest term.  There is no need to list long sleeve or short sleeve, lace up, high top, low quarter, etc.

        • Example:  1 Shirt, 1 Pants

1.5     **Contraband and Injuries**
        The inmate shall remove his/her clothing under the supervision of a Dress-In Officer of the same gender.  The Dress-In Officer shall check each item of clothing for contraband prior to storage. The Dress-In Officer shall observe the inmate for any indications of the presence of contraband or injuries.  **Any visual observation of a body cavity shall require probable cause, as defined under 802-008 Body Cavity Search, in the presence of a Supervisor.**

        • Any contraband, legal or illegal, shall be disposed of in accordance with procedures established in Tarrant County Confinement Bureau Procedure "1001-001 Search In and Transfer"

        • Officer shall be alert to any injuries that the inmate might not have reported earlier in the process.

            o If the Officer observes an injury that may not have been previously reported, ask the inmate how the injuries occurred

**Tarrant County Sheriff's Department**
**Confinement Bureau – Booking Division – Standard Operating Procedures**
**1005: Property / Clothing / Money**
**002: Dress-In**

o If the Officer feels the inmate is being evasive, the Officer shall get the inmate alone and ask again

o If it is appears that the injury may have occurred after the inmate entered TCSO custody, the Booking Supervisor shall be immediately notified

o If the injury has not been previously reported, the Booking Supervisor shall ensure that the inmate receives medical treatment

o The Booking Supervisor shall attempt to determine how the inmate became injured and take action according to his findings

1.6 **Inmate Retained Property**
Unless cause exists that dictate otherwise (such as SPC status), the inmate shall be permitted to retain the following items:

- White T-shirt without a pocket or printed design

- Boxer shorts or briefs of any color, for male prisoners

- Panties of any color, for female prisoners

- Bra with no underwire or metal stays, for female prisoners

- Socks, any color

- Eyeglasses

1.7 **Inmate's Clothes**
The inmate's clothing shall be placed in a mesh storage bag affixed to a clothes hanger and will be sprayed with disinfectant.

1.8 **Inmate's Shoes/Boots**
A clothing tag shall be placed on the inmate's shoes. Shoes shall be placed in the bottom of the mesh storage bag.

1.9 **Clothing Tags**
A second clothing tag shall be placed on the hanger inside the mesh storage bag, and the third shall be placed on the hanger outside the mesh storage bag.

1.10 **Shower**
Inmates shall be permitted to shower when he/she arrives at the Housing units.

**Tarrant County Sheriff's Department**
**Confinement Bureau – Booking Division – Standard Operating Procedures**
**1005: Property / Clothing / Money**
**002: Dress-In**

## 2    UNIFORM ISSUED

### 2.1    Type of Uniform Issued
Each inmate shall be issued a jail uniform to wear during his/her incarceration. The color and type of uniform will vary based on the inmate's particular criteria.

- Green Jumpsuits – Male inmates in general population

- Tan shirt and tan pants - Female inmates in general population

- White Quilted SPC Gown - Suicide Precaution - Level I inmates (SPC-I)

- Blue Paper Uniform - Suicide Precautions - Level II inmates (SPC-II)

- Red Uniform – High Risk inmates

### 2.2    Floor Copy
If the inmate is to be dressed in any uniform other than the standard blue or tan, a notation will be made on the back of the floor copy.

## 3    OTHER ITEMS ISSUED

### 3.1    Linens, Slides and Approved Receptacle
The Officer shall issue each inmate a pair of shower shoes (referred to as "slides"). The slides issued will be as close to fitting as possible. Slides are not available in half sizes. The Officer shall issue each inmate an approved receptacle to store his/her belongings. The receptacle shall contain one blanket, one towel and one mattress cover.

### 3.2    Cups and Spoons
The Officer shall ensure that each inmate is issued one cup and one spoon.

### 3.3    Hygiene Kit
A hygiene kit shall be issued only to indigent inmates (less than $3.00 in his/her possession when he/she entered jail). This information is on the inmate's Property Inventory Record that is attached to the Clothing Record. All others will have to purchase their items from the Commissary.

- Feminine hygiene items shall be provided to female inmates in the housing unit

- The Housing Unit Officers are responsible for maintaining an adequate supply at all times. These items shall be issued upon verbal request of the inmate.

**Tarrant County Sheriff's Department**
**Confinement Bureau – Booking Division – Standard Operating Procedures**
**1005: Property / Clothing / Money**
**002: Dress-In**

3.4     **Weekends**
         On the weekends (Friday evening shift through Sunday night shift) inmates that are not indigent may purchase a hygiene kit at the time of Dress-In.

- The Dress-In Officer shall inform the inmates of availability of the Hygiene Kits during the Dress-In process.

- The inmate(s) shall complete a Hygiene Kit purchase form that shall be given to the Inmate Trust Fund Officer so that the cost of the kit may be deducted from the inmate's account.

- The Hygiene Kit shall be obtained from the Booking Supervisor.

4       **TAKEN TO HOUSING UNIT**

4.1     **Transfer to Housing- Green Bay & Cold Springs**
         Inmates assigned to the Green Bay Unit and/or Cold Springs Unit shall be placed in a designated holdover in the Tracking area to be moved by the Transportation Officer.

4.2     **Transfer to Housing – Corrections Center**
         Male and female inmates shall be transferred to their assigned Housing by two separate and distinct methods.

- Male inmates assigned to General Population in the Corrections Center shall be placed on elevator A or B and told which floor they are being assigned. The trusty may assist them in getting to this location.

- Female inmates assigned to General Population in the Corrections Center shall be placed on elevator C or D and told which floor they are being assigned.

- Inmates assigned to single cells in the Corrections Center shall be escorted to their Housing unit.

4.3     **Transfer to Housing – Belknap**
         Inmates assigned to the Belknap Unit shall be escorted to that facility.

- Female inmate shall only be escorted by female Officers

4.4     **If Inmates Not Picked Up In A Timely Manner**
         Notify the Booking Supervisor if inmates assigned to Cold Springs or Green Bay are not being picked up in a timely manner. The Booking Supervisor may assign an Officer(s)

EXHIBIT 26 Page 7

**Tarrant County Sheriff's Department**
**Confinement Bureau – Booking Division – Standard Operating Procedures**
**1005: Property / Clothing / Money**
**002: Dress-In**

to take the inmate to his/her assigned Housing so long as doing so does not interfere with, or slow down, the Booking process.

4.5     **Floor Copy**
         The inmate's floor copy shall be retained by the Dress-In Officer until the inmate is transferred to his/her assigned Housing unit.

4.6     **Transportation to Satellite Jail Units**
         Dress-In Officer shall notify the Intake Officer that there are inmate(s) waiting for transportation to a satellite jail facility, so the Transportation Officer can be notified.

# BUSINESS RECORDS AFFIDAVIT OF CUSTODIAN OF RECORDS FOR THE TARRANT COUNTY SHERIFF'S DEPARTMENT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned authority, on this day personally appeared **Jerry Rucker**, who by me having been duly sworn made the following affidavit:

"My name is **Jerry Rucker**. I am above the age of twenty-one (21) years, fully competent to make this affidavit, and have personal knowledge of the matters of material fact hereinafter set forth, which are true and correct.

I am employed by the Tarrant County Sheriff's Department and have been since **August 11, 1993**. In this matter, I am the Custodian of Records for the Tarrant County Sheriff's Department, 200 Taylor Street, Fort Worth, Texas 76102; (817) 884-3700.

Attached hereto are **six (6)** pages of records on the from the **Tarrant County Sheriff's Department Confinement Bureau Standard Operating Procedures concerning High Risk Inmates** for a total of **six (6)** pages of the requested records maintained by the Tarrant County Sheriff's Department on Confinement Bureau Standard Operating Procedures concerning the Dress-In of Inmates.

The **six (6)** pages of the requested records are kept by the Tarrant County Sheriff's Department in the regular course of business, and it was in the regular course of business of the Tarrant County Sheriff's Department for an employee or representative of the Tarrant County Sheriff's Department, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

The **six (6)** pages of the attached requested records is a true, correct and exact duplicate of the original document contained in the Tarrant County Sheriff's Department's file.

**BUSINESS RECORDS AFFIDAVIT OF JERRY RUCKER – PAGE 1**

Initial

# 417

EXHIBIT 27 Page 1

Further, Affiant sayeth not."

_____
JERRY RUCKER

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by **JERRY W.**

**RUCKER** on this the _26_ day of _April_____, 2013.

_____
NOTARY PUBLIC in and for
The State of Texas

_Tammy Dossey_____
Notary's Printed Name
My Commission Expires: _7/26/13_

TAMMY DOSSEY
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 07-26-2013

**BUSINESS RECORDS AFFIDAVIT OF JERRY RUCKER – PAGE 2**

Initial

**418**

EXHIBIT 27 Page 2



Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1004: Classification
004: High Risk Inmates

| 1 | **GENERAL** | 2 |
|---|---|---|
| 1.1 | DEFINITION | 2 |
| 1.2 | CAUTION | 2 |
| 1.3 | COLOR CODED UNIFORMS | 2 |
| 2 | **CRITERIA FOR HIGH RISK CLASSIFICATION** | 2 |
| 2.1 | ASSAULTIVE | 2 |
| 2.2 | ESCAPE RISK | 3 |
| 2.3 | OVERRIDE | 3 |
| 2.4 | DEATH SENTENCE | 4 |
| 2.5 | HIGH PROFILE | 4 |
| 3 | **HOUSING** | 4 |
| 3.1 | MAXIMUM CUSTODY | 4 |
| 3.2 | SATELLITE FACILITY PROHIBITED | 4 |
| 4 | **INMATES IDENTIFIED AS HIGH RISK** | 4 |
| 4.1 | HIGH RISK INMATES IN BOOKING PROCESS | 4 |
| 4.2 | FLOOR COPY ANNOTATED | 4 |
| 4.3 | DRESS-IN OFFICER NOTIFIED | 4 |
| 4.4 | INMATE TO HOUSING ASSIGNMENT | 4 |
| 5 | **HIGH RISK INMATES BROUGHT FROM HOUSING** | 4 |
| 5.1 | OUTSIDE OF HOLDING CELL | 4 |
| 5.2 | ELECTRIC RESTRAINT BELT | 5 |
| 5.3 | ARRAIGNMENT | 5 |
| 5.4 | OUTSIDE SECURITY PERIMETER | 5 |
| 6 | **REVIEW IN INMATES STATUS** | 5 |
| 6.1 | SUPERVISORY OVERVIEW | 5 |
| 6.2 | 30 DAY REVIEW | 5 |
| 6.3 | OBJECTIVE JAIL CLASSIFICATION STANDARDS | 5 |

Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1004: Classification
004: High Risk Inmates

## 1   GENERAL

### 1.1   Definition
High Risk inmates are identified as those inmates, male and female, classified as assaultive, escape risk, high profile or under sentence of death as defined by this chapter.

### 1.2   Caution
All required precautionary measures shall be utilized when transporting inmates who are classified as HIGH RISK.

### 1.3   Color Coded Uniforms
All inmates classified as HIGH RISK shall be dressed in a red (male) or yellow (female) uniform. Exception: In instances where the HIGH RISK inmate is also classified as suicidal requiring placement in a paper uniform or quilted gown, or when hospitalization requires placement in a patient's gown to facilitate treatment. In such cases, all ancillary documentation shall be properly annotated to reflect the inmate's HIGH RISK status.

## 2   CRITERIA FOR HIGH RISK CLASSIFICATION

### 2.1   Assaultive
An inmate that is classified as assaultive shall be placed on High Risk Status. The following criteria constitute assaultive behavior:

- An inmate who has physically assaulted staff member or another inmate

- An inmate whose mental state and/or aggressive behavior indicates he/she is a risk to staff or other inmates.

- An inmate that has documented history of assaultive behavior in custody

- An inmate whose ICCL history indicates previous assaultive behavior may be classified as HIGH RISK. Consideration shall be given to the elapsed time since the inmate was last released from custody, the number of times the inmate has previously required an assaultive classification, as well as the inmate's interim housing history since last classified as assaultive.

- Based on the Officer's interview with the inmate (and any other relevant factors), the Officer shall arrive at one of the following conclusions:

  o The inmate shall be classified as High Risk and housed accordingly

Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1004: Classification
004: High Risk Inmates

- o   The inmate shall be classified as Behavioral Observation – Maximum Custody (This is not HIGH RISK status)

- o   The inmate shall be classified as General Population – Trial Basis

2.2   **Escape Risk**

An inmate that is classified as an Escape Risk shall be placed on High Risk Status. The following criteria constitute an Escape Risk:

- An inmate in custody for a current charge of escape under Penal Code 38.06(c)(2); Escape from a Secure Correctional Facility.

- An inmate who has escaped or attempted to escape from Tarrant County custody

- An inmate who has known plans to escape, or who is under investigation for attempted escape or facilitating an escape.

- When the Classification Officer is notified by a Housing Supervisor that an inmate has attempted to escape, or that plans for an escape by an inmate are discovered, the Officer shall immediately classify the inmate as HIGH RISK. Upon review by a Classification Supervisor, the inmate shall remain as HIGH RISK when warranted, i.e., criminal charges are filed, escape plans are credible or the inmate's behavior indicates need for caution.

- An inmate in custody for a current felony charge of escape (secured) under Penal Code 38.06 from another agency shall be considered as HIGH RISK only if it can be confirmed the inmate escaped from secured custody or when caution must be exercised where indicators exist beyond just the charged offense, i.e., ICCL history of escape risk, reports from other agencies, etc.

- An inmate whose ICCL history indicates previous escape risk may be classified as HIGH RISK. Consideration may be given to the elapsed time since the inmate was last released from custody when the current charge(s) do not include escape.

- An inmate charged with escape by the Texas Youth Commission shall be classified as HIGH RISK only if it can be confirmed the inmate escaped from secure custody. This charge is routinely used for TYC inmates that fail to return from furlough, which does not rise to the level of escape risk.

2.3   **Override**

When an inmate meets the criteria for HIGH RISK status, and has a security assessment level of less than Maximum, the Classification Officer shall override the assessment to Maximum Custody. The Officer shall forward all documentation of the assessment override to the Classification Supervisor.

Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1004: Classification
004: High Risk Inmates

**2.4 Death Sentence**
When an inmate receives a sentence of Death, that inmate shall be classified as HIGH RISK.

**2.5 High Profile**
Inmates considered High Profile due to nature of charges or community status shall only be classified High Risk with the approval of a Unit Commander or higher.

**3 HOUSING**

**3.1 Maximum Custody**
All inmates identified as HIGH RISK shall be housed in maximum custody housing.

**3.2 Satellite Facility Prohibited**
Inmates classified as HIGH RISK shall be housed in the Correction Center or Belknap.

**4 INMATES IDENTIFIED AS HIGH RISK**

**4.1 HIGH RISK Inmates in Booking Process**
At any point in the booking process an inmate is identified as HIGH RISK, priority processing shall be initiated immediately. The Booking Supervisor shall be notified and the Supervisor shall assign an Officer to escort the inmate through the remainder of the process. All HIGH RISK inmates that are being processed through Booking shall be escorted at all times.

**4.2 Floor Copy Annotated**
The term HIGH RISK shall be placed prominently on the floor copy of all inmates classified as HIGH RISK. This will notify Housing that the inmate is HIGH RISK.

**4.3 Dress-In Officer Notified**
The Escorting Officer shall notify the Dress-In Officer of the status of the inmate to ensure the inmate is dressed into the appropriate colored jail uniform.

**4.4 Inmate to Housing Assignment**
The Escorting Officer shall take the inmate to his/her assigned Housing Unit immediately upon conclusion of the Booking process.

**5 HIGH RISK INMATES BROUGHT FROM HOUSING**

**5.1 Outside of Holding Cell**
All HIGH RISK inmates shall have an Officer Escort and be restrained with handcuffs and leg irons when outside a cell in the Booking or Release section.

Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1004: Classification
004: High Risk Inmates

- HIGH RISK inmates shall not be placed in a holding cell unless absolutely necessary, i.e., an emergency code is called. If it becomes necessary to place the inmate in a holding cell, the Booking Supervisor shall be notified immediately.

- At no time shall a HIGH RISK inmate be held in a holding cell in the Booking area for more than ten (10) minutes. If it becomes necessary to have a HIGH RISK in a holding cell for over ten (10) minutes, the inmate shall be returned to his/her Housing Unit.

5.2 **Electric Restraint Belt**
When an inmate is brought from Housing wearing an electric restraint belt, the Housing Officers shall remain with the inmate at all times. If the Housing Officers are unable to remain with the inmate in Booking, the inmate shall be refused. If, while the inmate is in Booking, the Escorting Officers are called away, he/she shall return the inmate to Housing.

5.3 **Arraignment**
The Arraignment Officer shall not call for a HIGH RISK inmate scheduled for Arraignment until the Arraignment proceedings are ready to begin. In the event the inmate is brought to Booking prior to being called, the Arraignment Officer shall refuse to accept the inmate and the Escorting Officer(s) shall be instructed to return the inmate to his/her Housing Unit until called for at a later time.

5.4 **Outside Security Perimeter**
Anytime a HIGH RISK inmate is escorted outside the secure perimeter of the jail, the Intake Officer shall make sure that restraints are in place on the inmate before allowing the Escorting Officers to proceed to the Sally-Port.

6 **REVIEW IN INMATES STATUS**

6.1 **Supervisory Overview**
A Classification Supervisor shall review each inmate that has been classified or reclassified as HIGH RISK. Any recommendations by the Supervisor to change the HIGH RISK status of the inmate shall be forwarded to the Booking Captain.

6.2 **30 Day Review**
The status on inmates classified as HIGH RISK shall be reviewed and documented at least every 30 days. [Texas Commission on Jail Standards 271.1(a)(10)]

6.3 **Objective Jail Classification Standards**
Inmates shall be reviewed and reassessed based on Objective Jail Classification Standards.

Tarrant County Sheriff's Department
Confinement Bureau – Booking Division – Standard Operating Procedures
1004: Classification
004: High Risk Inmates

- Criteria for removal from HIGH RISK status by a Classification Officer upon review or appeal would be the mitigation of the circumstances and/or conditions that initially required placement on HIGH RISK, or a review of supporting documentation that indicates a lack of veracity and validity in the original move order for HIGH RISK status.

- Inmates classified as assaultive and/or an escape risk may be removed from such status by the Supervisor who originally ordered the status, based on his/her investigation which revealed the order was in error.



# RECORDS MANAGEMENT OFFICE

Tarrant County Plaza Building
200 Taylor Street, 6th Floor
Fort Worth, Texas 76102
Phone (817) 884-3700
Fax (817) 884-2939

July 28, 2011

Office of Capital Writs
Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711

Ms. Elizabeth Garza,

This is in response to your request for records on John William Hummel DOB 11/04/1975. I have attached the records that we do have and listed below the records that we do not have and where to get them, if applicable.

This is from page one of your request. (your numbered items)

#2 – Medical records are kept by John Peter Smith Hospital. Contact Martha Loomis for medical records other than the ones I have attached at 817-884-3524.

#6 – Mr. Hummel was only incarcerated in the Tarrant County Jail one time from December 31, 2009 to June 29, 2011.

#7 – Not applicable

#8 – There are none.

#11 – There are none in his jail file. Contact MHMR for those records at 817-884-3228.

#12 – see #11 above.

This is from page two of your request. (non-numbered items)

Admission summary – contact Kennedale PD at 817-478-5416.

**425**

EXHIBIT 28 Page 1

Criminal History – see page one #4

Family information – Tarrant County Sheriff's Office is not in possession of any of this information. This may also be obtained from Kennedale PD.

Gang affiliation – There is none

Security threat – Mr. Hummel was not listed as a security threat on classification records.

Disciplinary records – There are none.

Grievances – attached

Visitation records – attached


If you have any questions, please contact me at (817) 884-3700.

Sincerely,

Staci Turner
Assistant Records Manager
Tarrant County Sheriff's Office

**426**

EXHIBIT 28 Page 2

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES                   THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.                   ANY ALTERATIONS IN SHADED
AREAS RENDER FORM VOID

# CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| HUMMEL, John, William | USMC-11 | |

| 4.a. GRADE, RATE OR RANK | 4.b. PAY GRADE | 5. DATE OF BIRTH (YYMMDD) | 6. RESERVE OBLIG. TERM. DATE |
|---|---|---|---|
| LCPL | E-3 | 751104 | Year 05   Month 09   Day 25 |

| 7.a. PLACE OF ENTRY INTO ACTIVE DUTY | 7.b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| Charlotte, NC | 3040 Westcroft Circle Apt G40 Spartanburg, SC 29302 |

| 8.a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8.b. STATION WHERE SEPARATED |
|---|---|
| 1stMar 1stMarDiv Campen 92055 | 1stMar 1stMarDiv Campen CA 92055 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | None |
|---|---|---|
| MCRSC, 15303 Andrews Rd., Kansas City, MO 64147-1207 | Amount: $ 250,000.00 | |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| | a. Date Entered AD This Period | 1997 | 11 | 05 |
| | b. Separation Date This Period | 2002 | 05 | 11 |
| 0231-Intelligence Specialist | c. Net Active Service This Period | 04 | 06 | 06 |
| (3 years, 9 months) | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 01 | 09 |
| | f. Foreign Service | 00 | 06 | 10 |
| | g. Sea Service | 01 | 01 | 14 |
| | h. Effective Date of Pay Grade | 1999 | 12 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| Coast Guard Meritorious Unit Commendation, Armed Forces Expeditionary Medal, Humanitarian Service Medal, Sea Service Deployment Ribbon (w/1 star), Rifle Marksman Badge |

| 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|
| (HEZ) Intelligence Analysis System, 1999 |

| 15.a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | Yes | No X | 15.b. HIGH SCHOOL GRADUATE OR EQUIVALENT | Yes X | No | 16. DAYS ACCRUED LEAVE PAID RLB=59.0 |
|---|---|---|---|---|---|---|

| 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | Yes | No X |
|---|---|---|

### 18. REMARKS

GOOD CONDUCT MEDAL PERIOD COMMENCES: 000522
SNM CONTRIBUTED TO THE MONTGOMERY GI BILL
WHILE A MEMBER OF THE MARINE CORPS RESERVE, YOU WILL KEEP THE COMMANDING GENERAL, MCRSC, CALL
TOLL FREE (1-800-255-5082 OR IF WITHIN THE STATE OF MISSOURI CALL COMMERCIAL (913)-236-3110 DSN 465-3108)
INFORMED OF ANY CHANGE OF ADDRESS, MARITAL STATUS, NUMBER OF DEPENDENTS, CIVILIAN EMPLOYMENT, OR
PHYSICAL STANDARDS.  SUBJECT TO ACTIVE DUTY RECALL AND OR ANNUAL SCREENING.

SER 45508-2002-0259

| 19.a. MAILING ADDRESS AFTER SEPARATION (Include Zip Code) | 19.b. NEAREST RELATIVE (Name and address - include Zip Code) |
|---|---|
| 220 Cleveland St Poculet, SC 29372 | |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO   SC   DIR. OF VET AFFAIRS Yes X | No | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED *John W. Hummel* | | J. R. HERNANDEZ JR. CWO2 USMC PERSO |

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) |
|---|

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
|---|---|
| RELEASED FROM ACTIVE DUTY | HONORABLE |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
|---|---|---|
| MARCORSEPMAN PAR 1005 | MBK1 | RE-1A |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| COMPLETION OF REQUIRED ACTIVE SERVICE |

| 29. DATES OF TIME LOST DURING THIS PERIOD | 30. MEMBER REQUESTS COPY 4 |
|---|---|
| (7) 20020402-20020408 | JWH   Initials |

| DD Form 214, NOV 88 | S/N 0102-LF-006-5500 | Previous editions are obsolete. | SER 427 |
|---|---|---|---|

EXHIBIT 20-Page 1

**DEPARTMENT OF THE NAVY**
HEADQUARTERS UNITED STATES MARINE CORPS
MANPOWER MANAGEMENT SUPPORT BRANCH (MMSB)
2008 ELLIOT ROAD
QUANTICO, VA  22134-5030

1070
MMSB-11
March 23, 2010

IN REPLY REFER TO:

TO WHOM IT MAY CONCERN

This is to certify that a unit transaction register search for
John W. Hummel, a former member of the U.S. Marine Corps, last
four SSN ▮▮▮, was conducted for the period November 5, 1997, to
May 11, 2002. The following are extracts from the unit
transaction register entries regarding training, deployments and
non-judicial punishments in the case of John W. Hummel:

10 Sep 98 Driver Improvement School completed

31 Oct 98 to 23 Nov 98 deployed CAX 29 Palms CA

15 Jan 99 to Weight Control

27 Feb 99 to 02 Apr 99 TAD Student Intel Analysis System
Operation School

Credit Career Sea 19 Apr 99 to 29 Apr 99 USS Peleliu

05 May 99 Gas Chamber

Credit Career Sea 07 May 99 to 17 May 99 USS Peleliu

Combat History 15 Aug 99 to 16 Oct 99 Operation Southern
Watch 11th MEU SOC USS Peleliu Persian Gulf

06 Nov 99 from Weight Control

20 Dec 99 Stop Career Sea Deployed 20 Jun 99 to 20 Dec 99
West Pac 11th MEU

29 Feb 00 to 18 Mar 00 deployed 29 Palms CA

22 May 00 Non-judicial punishment awarded forfeiture $288.00
for 1 month (entry doesn't indicate why awarded)

Credit Career Sea 13 Aug 01 to 13 Feb 02 USS Peleliu

Start Hostile Fire Pay Effective 01 Sep 01

Stop Hostile Fire Pay Effective 31 Jan 02

**428**

EXHIBIT 29 Page 2

1070
MMSB-11
March 23, 2010

28 Sep 01 to 07 Jan 02 Enduring Freedom Afghanistan

03 Apr 02 Combat History from 28 Sep 01 to 7 Jan 02
Operation Enduring Freedom Afghanistan

02 Apr 02 to Unauthorized Absence 0700

17 Apr 02 from Unauthorized Absence 0700 9 Apr 02 Time
Lost 02 Apr 02 to 08 Apr 02

Given under my hand at Quantico, Virginia this

23nd day of March, 2010.

By direction of the Commandant of the Marine Corps

J.A. SHATTUCK
Deputy
Manpower Management Support Branch
By direction of the
Commandant of the Marine Corps

2.

**429**

EXHIBIT 29 Page 3

05/18/2000 09:22 7607255207 SITE ISSM DASO PAGE 03

*TF*



# UNITED STATES MARINE CORPS
### 1ST MARINE DIVISION (REIN), FMF
### BOX 555580
### CAMP PENDLETON, CALIFORNIA 92055-5380

IN REPLY REFER TO:
5500
G-2/SSO
18 MAY 00

From: Special Security Office, 1st Marine Division
To: Director, Department of the Navy Central Adjudication
Facility, Washington Naval Yard, 901 M St SE, Washington
D.C. 20388-5389

Subj: SSO RECOMMENDATION FOR SECURITY ACCESS ELIGIBILITY
REPORT, CASE OF LCPL JOHN W. HUMMEL ███████████
USMC

1. SSO recommends that LCPL Hummel's eligibility for access to
Sensitive Compartmented Information be terminated. Subject
has disobeyed lawful orders has since been UA (unauthorized
absence) multiple times, all for less than 24 hours. Subject
has made false official statements and has showed a lack of
trustworthiness.

2. Subject has MOS of 0231 which requires SCI access. If
subject is found ineligible for SCI access, request DONCAF
notify this command as soon as possible in order to begin
paperwork to have subject's MOS revoked.

3. Point of contact at 1st Marine Division is Sgt Reeser,
DSN: 365-5454/5223 or Commercial: (760) 725-5454/5223.

A. I. STRUTTON
CPL USMC

**430**

EXHIBIT 29 Page 4

05/18/2000  09:22   7607255207              SITE ISSM DASD                    PAGE 04
5-18-00, 9:24                                           :7607631424         # 2/ 18

## SECURITY ACCESS ELIGIBILITY REPORT SAER

                                                    00 05 16
                                                     Date

                    UIC MEMBER IS ASSIGNED TO: VII

From:  INTELLIGENCE OFFICER, 1ST BN, 1ST MAR
To:    Director, Central Adjudication Facility

Subject's Name and Rank/Grade: HUMMEL, JOHN W.    LCPL/E-3

Social Security Number: ███████

Current Indoctrination Status: YES    (YES/NO)

Current Debrief Status: _____ CAUS, __X__ SUS   DATE: 00 05 16

Current Duty Station/Assignment: S-2 SECTION, H&S COMPANY,
                        1ST BN, 1ST MAR

Reason for Report: REQUEST REVOCATION OF SECURITY
            CLEARANCE FOR LCPL HUMMEL

Reporting Period: JAN 2000 - MAY 2000

**431**

EXHIBIT 29 Page 5

**PART I:  Check appropriate response for each question and provide explanatory details under comments for any Yes answer(s).**

1.  Has the subject been arrested, detained, or been a party to a civil or criminal action by either military or civilian authorities within the past 2 years?

    NO _____   YES __X__

2.  Has the subject been awarded any nonjudicial punishment not previously reported?

    NO _____   YES __X__

3.  Has the subject been reported for an infraction or violation of any security regulation?

    NO __X__   YES _____

4.  Has the subject had any known significant contact with foreign nationals?

    NO __X__   YES _____

5.  Has the subject been involved in any way with the use of marijuana, drugs, abuse of prescription or non-prescribed drugs?

    NO __X__   YES _____

6.  Has the subject been treated for any illness related to a nervous, emotional, or mental disorder?

    NO __X__   YES _____

7.  Has the subject demonstrated any evidence of frequent, habitual, or compulsive gambling?

    NO __X__   YES _____

8.  Is the subject known to have any excessive indebtedness or recurring financial difficulties?

    NO _____   YES __X__

9.  Does the subject exhibit any signs of an unusually high standard of living or any unexplained affluence?

    NO __X__   YES _____

**432**

EXHIBIT 29 Page 6

10.  Has the subject been repetitively absent from duty or habitually late for duty?

    NO _____    YES __X__

11.  Has the subject shown any indications of sexual practices that might be interpreted or construed as being in any way abnormal?

    NO __X__    YES _____

12.  Has the subject been involved in the possible or probable compromise or unauthorized disclosure of SCI or other classified material?

    NO __X__    YES _____

13.  Has the subject's access to SCI been denied, revoked, or suspended during the reporting period?

    NO _____    YES __X__

14.  Has the subject shown signs of habitually using alcohol to excess?

    NO _____    YES __X__

15.  Do you know of anything which might reflect adversely upon subject's loyalty to the United States?

    NO __X__    YES _____


COMMENTS:  (Identify question and provide details.  Use a separate piece of paper if necessary.)

      SEE  ATTACHED  DOCUMENTATION.

**PART II:** Include observations on the subject's character and stability which should be considered in a determination of SCI access eligibility.

1. **Excellence of character** (subject's trustworthiness, reliability, dependability, discretion, and moral values):

SNM HAS LIED TO HIS SENIORS, ON NUMEROUS OCCASIONS, HIS INTEGRITY IS QUESTIONABLE, AT BEST. HE ALSO WENT U.A. FOR 20 HOURS.

2. **Stability** (subject's maturity, temperament, general attitude toward authority, and ability to work with others):

SNM HAS DISOBEYED DIRECT ORDERS AND STANDING ORDERS ON MULTIPLE OCCASIONS, HE IS IMMATURE AND FAILS TO MEET FINANCIAL OBLIGATIONS

3. **Other comments/observations:**

REVOKE HIS SCI CLEARANCE IMMEDIATELY.

4. **Include documentation or evidence, if available.** ATTACHED.

---

**PART III.** Command recommendation regarding eligibility for SCI access. (If eligible, under what conditions, e.g., observation, probation, or further action.)

REVOKE IMMEDIATELY. HIS SCI CLEARANCE IS CURRENTLY UNDER LOCALIZED SUSPENSION.

Signature

S.R. SANTOS / 1STLT / USMC
Printed Name

BATTALION INTELLIGENCE OFFICER
Title

Copy to:
SSO Navy-523
or
COMNAVSECGRU-N11
(as appropriate)

**434**

EXHIBIT 29 Page 8

S-10-00: 8:14 :

**ADMINISTRATIVE REMARKS (1070)**

G

| DATE 980120 | DATE |
|---|---|
| Articles UCMJ explained to me this date as required by Article 137, UCMJ. | Articles UCMJ explained to me this date as required by Article 137, UCMJ. |
| John W. Hummel | |
| SIGNATURE | SIGNATURE |

980112 3RD RTBN, MCRD, PISC 29905: I HAVE THIS DATE VOLUNTARILY WITHDRAWN AS AN ENLISTEE
UNDER THE PROVISIONS OF THE ENLISTMENT OPTIONS PROGRAM CE FOR ASSIGNMENT TO MOS 0231
TRAINING. ALL OTHER PROVISIONS REMAIN IN EFFECT.

_John William Hummel_    980112

990129 : Counseled this date concerning the following deficiency: substandard
academic performance as a student. The following are recommendations for
corrective action: practice good study habits, ensure that you understand
fully all class assignments, if instructions or assignments are unclear, seek
clarification from your class leader, course team or your chain of command.
You are advised that further deficiencies in your academic performance could
result in your being dropped from the course of instruction. SNM was advised
that within five (5) working days after being advised of this entry, a written
statement to the entry could be submitted and that such a statement will be
filed on the document side of the service record. SNM chooses (will/not to)
make such a statement.

X _John Ed Hummel_    SNM    _PMEttis_    Bydir

990107: Viol of Art 92, UCMJ: While on Dam Neck, VA beach SNM supplied
alcohol to his roommate, who is under the age of 21. Awd red to E-1, forf of
$463.00 pay per mo for 1 mo (total forf of $463.00). Red to E-1 is hereby susp
for a prd of 6 mos, at which time, unless sooner vacated will be remitted w/o
further action. Awd at MCD (LtCol) NJP on 990109. Rot by RUC 54079 on UD#
dtd       Not Appealed.                                          Bydir

990112: I understand I am eligible but not recommended for promotion to LCPL for the
month of February, 1999 promotion period because of weight control. I was advised
that within 5 working days after acknowledgment of this en

990112: I understand I am eligible but not recommended for promotion to LCPL for
the month of February, 1999 promotion period because of weight control. I was advised
that within 5 working days after acknowledgment of this entry, a written rebuttal
can be submitted and this rebuttal will be filed on the document side of my SRB.
I chose (to/not to) make a rebuttal.

_John W. Hummel_    SNM

HUMMEL JOHN WILLIAM

NAME (LAST, FIRST, MIDDLE)        SSN

(11)   ENCLOSURE 1

**435**

EXHIBIT 29 Page 9



## OFFENSES AND PUNISHMENTS (1070)

**980707** : I certify I have been given the opportunity to consult
with a lawyer, provided by the Government at no cost to me, in
regard to a pending NJP for violation(s) of Article 92 of the
UCMJ. I understand I have the right to refuse that NJP: I (do) [do not]
(do not) choose to exercise that right. I further understand
that acceptance of NJP does not preclude my command from taking
other adverse administrative action against me.

_John William Wennel_ _____ SNM

980709: Viol of Art 92, UCMJ: While on Dam Neck VA Beach SNM Supplied
alcohol to his roommate, who is under the age of     limited to E-1 for ? of
$463.00 pay per mo for 1 mo(total forf of $463.00). Red to E-1 is hereby susp
for a prd of 6 mos. at which time, unless sooner vacated will be remitted w/o
further action. Awd at MCD (LtCol) NJP on 980709. Rpt by ROC 54079 on UD# 58
dtd 980709. Not Appealed.

_D. Walker_ _____ Bydir

105
707

IMEL JOHN W

**436**

EXHIBIT 29 Page 10

SITE ISSM DASO                               PAGE 13

G

## ADMINISTRATIVE REMARKS (1070)

| DATE | DATE | |
|------|------|--|
| Articles UCMJ explained to me this date as required by Article 173, USMJ. | Articles UCMJ explained to me this date as required by Article 173, USMJ. | |
| (Signature) | (Signature) | |

970917 : Counseled this date concerning deficiencies: failure to maintain military weight standard per MCO 6100.10B

Specific recommendation for corrective action: Establish a dietary and physical fitness program that will enable you to meet the Marine Corps weight standards.

Assistance available: through the Chain of Command and the Battalion Weight Control Officer.

and I am advised that failure to take corrective action may result in administrative separation or limitation on further services. SNM was advised that within 5 working days after being informed of this entry a written rebuttal to the entry could be submitted and that such a rebuttal will be filed on the document side of the service record. SNM chooses (to) (not to) make such a statement.

John W. Hammel                            SNM

990912 : H&S CO 1stBn, 1stMar, 1stMarDiv, Campen CA: Counseled this date concerning your substandard performance; specifically, your failure to pass the Marine Corps PFT on 990409. I was advised that it is my responsibility to meet the Marine Corps Phisical Fitness Stanards. Assistance is available through the chain of command. I have been advised that failure to correct this deficiency will result in further administretive procedures/and or a limitation on further service. I am advised that within 5 working days after acknowledgement of this entry a written rebuttal could be submitted and that such a rebuttal will be filed on the document side of the service record. I choose (to) (not to) make such a statement.

Cpl W. Howard SNM                         CO

990913: I understand that I am eligible but not recommended for promotion to LCPL due to Weight Control IAW MCO P1400.32B, (par 1204.3n), as applicable, unless waived by appropriate authori I was advised that within 5 working days after acknowledgement of this entry, a awritten rebutt can be submitted and this rebuttal will be filed on the document side of my SRB. I choose (to) (not to) make a rebuttal.

John Hammel                               S

| HUMMEL | John | W | | | |
|--------|------|---|--|--|--|
| NAME (last, first, middle) | | | | SSN | |

NAVMC 118(11) (REV. 3-82) (EF) SN: 0000-00-000-2705 U/I SH
PREVIOUS EDITIONS WILL BE USED

ENCLOSURE

PFC Hummel-

This formal counseling is for your actions for the period of 990806-990809. You have demonstrated a lack of professionalism and discipline. Not only did ~~you~~ ~~~~ which should warrant at least a Page 11, you were also caught smoking in the smoke box during an UNREP. Also, you have been leaving your rack a mess in the morning and forgetting to trice it up. I am tired of getting calls every morning concerning your mess. Cleaning up after you should not be LCpl Matthias' job or mine. I understand that you are on mess duty and have long hours but that is no excuse to live like you are now. This will be the LAST time this is mentioned. Your behavior in the past week has shown that you have no desire to achieve the rank of Lance Corporal. I don't know where this sudden drop in your behavior has come from but it is up to you to correct the problem. We have a small section with a lot of work to be done and cannot afford to lose your contributions when we hit the Persian Gulf. You are a vital part of this section and have shown in the past that you are capable of outstanding work. If you need any help in your deficiencies, you can come to SSgt Boling, Capt Dougherty, Chaplain Hoog or myself. Do not hesitate to ask for anything that will improve yourself.

Sign _____

Date 990908

Sign _____

Sign 990809

ENCLOSURE 4

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *     FOR SSN█████████        * * *
```

```
FROM:   SOCIAL SECURITY ADMINISTRATION
        OFFICE OF CENTRAL OPERATIONS
        300 N. GREENE STREET
        BALTIMORE, MARYLAND  21290-0300
```

```
THE OFFICE OF CAPITAL WRITS            NUMBER HOLDER NAME:
                                       JOHN W HUMMEL
1700 N CONGRESS AVE
STE 460

AUSTIN                    TX  78711

PERIOD REQUESTED   JANUARY 1990   THRU  DECEMBER 2009
```

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|--------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  57-0858564
PEOPLES GROCERY INC
621 JONESVILLE LOCKHART HWY
JONESVILLE  SC 29353-2221
```

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|--------------|-------------|-----------|-------|
| 1991 | | | | | $81.82 |

```
EMPLOYER NUMBER:  █████████
FLAGSTAR ENTERPRISES INC
PO BOX 1619
ROCKY MOUNT NC 27802-1619
```

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|--------------|-------------|-----------|-------|
| 1992 | | | | | $4,849.40 |
| 1993 | | | | | $7,014.90 |
| 1994 | | | | | $6,162.48 |
| 1995 | | | | | $3,952.96 |

```
EMPLOYER NUMBER:  █████████
RCA DIRECT MARKETING INC
 BMG MUSIC PAYROLL
1540 BROADWAY 38TH FL
NEW YORK NY 10036-4039
```

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|--------------|-------------|-----------|-------|
| 1995 | | | | | $2,487.20 |
| 1996 | | | | | $17,138.37 |
| 1997 | | | | | $15,277.41 |

```
                        PAGE 001
```

**439**

EXHIBIT 30 Page 1

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN  ███████ █████       * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:    ███████████
HIRING LINK INC
PO BOX 3481
SPARTANBURG  SC 29304-3481
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1995 | | | | | $3,218.08 |

```
EMPLOYER NUMBER:   ████████████
DEFENSE FINANCE & ACCTG SERVICE -
  KCC
1240 E NINTH ST RM 1907 CODE JDBA
CLEVELAND  OH 44199-0000
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1997 | | | | | $1,455.68 |
| 1998 | | | | | $10,299.96 |
| 1999 | | | | | $13,012.80 |
| 2000 | | | | | $14,827.00 |
| 2001 | | | | | $16,606.56 |
| 2002 | | | | | $6,069.80 |

```
EMPLOYER NUMBER:     ██████████████
███████████████████
% MICHAEL F JENSEN
530 W 2ND AVE
ESCONDIDO  CA 92025-4019
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 2000 | | | | | $292.69 |

```
EMPLOYER NUMBER:   ████████████
KOHLER CO & SUBSIDIARIES
% KOHLER CO TAX DEPARTMENT
444 HIGHLAND DR
KOHLER  WI 53044-1515
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 2002 | | | | | $10,021.28 |

PAGE 002

**440**

EXHIBIT 30 Page 2

```
SSA-1826               ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN ███████████        * * *


YEAR   JAN - MARCH   APRIL -JUNE   JULY - SEPT   OCT - DEC      TOTAL


EMPLOYER NUMBER:    ████████████
EDISC INC
% JOHN C SHORT III
407 ACADEMY ST
FORT MILL SC 29715-2205

2002      -                                                  $2,740.00
2003      -                                                  $3,545.00

EMPLOYER NUMBER:    ████████ INC
████████████
PO BOX 486
GREENVILLE   SC 29602-0486

2002                                                         $1,183.58

EMPLOYER NUMBER:    ████████████
LABOR READY CENTRAL III LLP
PO BOX 2910
TACOMA   WA 98401-2910

2003                                                           $58.30

EMPLOYER NUMBER:    ████████████
CBOCS INC
PO BOX 787
LEBANON   TN 37088-0787

2003                                                         $2,422.29

EMPLOYER NUMBER:    ████████████
ONE STOP FOOD STORES INC
ONE STOP FOOD STORE
PO BOX 187
ROCKWALL   TX 75087-0187

2003      -                                                  $2,756.55

                          PAGE 003
```

**441**

EXHIBIT 30 Page 3

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *     FOR SSN ███████████        * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  ██████████
ATTERRO INC
50 S 10TH ST STE 500
MINNEAPOLIS  MN 55403-2003
```

| | | | | | |
|------|---|---|---|---|---|
| 2004 | - | | | | $5,775.00 |

```
EMPLOYER NUMBER:  ██████████
WILLIAMSON-DICKIE MANUFACTURING
  COMPANY LP
DICKIES
PO BOX 1779
FORT WORTH TX 76101-1779
```

| | | | | | |
|------|---|---|---|---|---|
| 2004 | | | | | $9,393.36 |
| 2005 | | | | | $7,345.26 |
| 2006 | | | | | $245.35 |

```
EMPLOYER NUMBER:  ██████████
SMITH TEMPORARIES INC
CORNERSTONE STAFFING
3861 LONG PRAIRIE RD STE 204
FLOWER MOUND TX 75028-1799
```

| | | | | | |
|------|---|---|---|---|---|
| 2004 | | | | | $3,601.00 |

```
EMPLOYER NUMBER:  ██████████
SILVER STAR SECURITY INC
1616 GATEWAY BLVD
RICHARDSON  TX 75080-3529
```

| | | | | | |
|------|---|---|---|---|---|
| 2009 | | | | - | $5,341.80 |

```
EMPLOYER NUMBER:  ██████████
CHAMPION SECURITY INC
1616 GATEWAY BLVD
RICHARDSON  TX 75080-3529
```

| | | | | | |
|------|---|---|---|---|---|
| 2009 | | | | | $6,533.05 |

**442**

EXHIBIT 30 Page 4

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *    FOR SSN ███ ██ ████        * * *


YEAR   JAN - MARCH   APRIL - JUNE   JULY - SEPT    OCT - DEC      TOTAL


THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY
NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER   2009 MAY NOT BE SHOWN, OR ONLY
PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

                        PAGE 005 END
```

**443**

EXHIBIT 30 Page 5



Hummel002756

# APPLICATION FOR EMPLOYMENT

Position applying for: *Shipper*                                             Date: 6/23/04

Name: *Hummel*        *John*        *W*        Social Security Number: ███/██/████
LAST          FIRST          MIDDLE INITIAL

Are you 18 years of age or older? Yes ✓  No____     Height: Ft. *6*  in. *0*      Weight: *194*

Are you a U.S. citizen? Yes ✓  No____

If not, are you legally authorized to work in the United States? Yes____ No____

Present address: *616  201 West terrent Rd  Grand prary    TX   75050*    (972) 262-0422
Number      Street          City        State    Zip      Tel. No.

How long have you lived at the above address? *3 months*

Were you previously employed by us? *No*

What skills or qualifications do you possess? *Fork lift Driver*

Preferences or limitations on moving or re-location? *None*

What prompted you to apply here? *Working here as a temp*

## RECORD OF EDUCATION

| SCHOOL | NAME AND ADDRESS OF SCHOOL CITY and STATE | COURSE OF STUDY | CHECK LIST YR. COMPLETED | | | | DID YOU GRADUATE? | LIST DIPLOMA |
|---|---|---|---|---|---|---|---|---|
| ELEMENTARY | *Jonesville Elementary    Jonesville, SC* | | 5 | 6 | 7 | ⑧ | ☑ yes ☐ no | |
| HIGH | *Jonesville High    Jonesville  SC* | | 1 | 2 | 3 | ④ | ☑ yes ☐ no | *Yes* |
| COLLEGE | | | 1 | 2 | 3 | 4 | ☐ yes ☐ no | |
| OTHER (Specify) | | | 1 | 2 | 3 | 4 | ☐ yes ☐ no | |

Were you in the U.S. Armed Forces? Yes ✓  No____     If yes, what branch: *Marines*    Serial #: *248595247*

Date of Duty:  From: *4 / 1 / 97*  To: *15  5  02*
Date Month Year          Date Month Year

List duties in the service, including special training: *Intelligence specallists*

Rank at Discharge: *E-3*

## PERSONAL REFERENCES (Not former employers or relatives)

| NAME AND OCCUPATION | ADDRESS Street   City   State | | | PHONE NUMBER |
|---|---|---|---|---|
| *Mike Costlow    Vender* | *Grand prey TX* | | | (972) 989 6929 |
| *Edwind Penny* | *Fort Worth TX* | | (817) | 361-7967 |
| *Eddy Bedford* | *Kennedale* | | | 817 456-9198 |

TCCDA Discovery - J.W. Hummel - Capital Murder          2010-10-26

WD 747 (2/00)

**444**

EXHIBIT 30 Page 6

DVD

427

Hummel002740

# EMPLOYEE SERVICE RECORD

NAME Hummel *(LAST)*  John *(FIRST)*  EMPLOYEE [redacted]

ADDRESS 600 LITTLE SCHOOL RD *(STREET)*  KENNEDALE TX *(CITY)* *(M)* 76060 *(STATE)* TELEPHONE NO. 817-483-9469

DATE OF BIRTH 11-04-1975  SOCIAL SECURITY NO. [redacted]  MARITAL STATUS ☐ SINGLE ☑ MARRIED 6  ☐ SEP ☐ DIV ☐ WID

EDUCATION  1 2 3 4 5 6 7 8 9 *(GRAMMAR SCHOOL)*  1 2 3 4 *(HIGH)*  1 2 3 4 *(COLLEGE)*  *(NAME OF LAST COLLEGE OR SCHOOL ATTENDED)*  DEGREE: NAME  MAJOR SUBJ.

LIFE INS. _____ *(AMT.)* _____ *(EFF. DATE)*  HOSP. _____ *(EFF. DATE)* *(CLASS)*

| PERSONAL DATA | TEST RECORD — Type — Score | |
|---|---|---|
| HGT.____ WGT.____ SEX____ R.____ | F.D.PP____ T____ N____ OTHER:____ | |
| NO. CHILDREN____ AGES____ | M.A.____ A.R.____ TYPE.____ | |
| SPECIAL SKILLS, ABILITIES: | C.A.____ FORE____ | |
| | PERS.____ S.V.____ | |
| | VOCAB.____ I.Q.____ | |

| EMP. TRANS. INC. REM. | DATE | RATE | DEPT. NAME | LINE OR DEPT. NO. | JOB CLASS | JOB TITLE | TERM. CODE | ACC. LOS. | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| Emp | 7-6-04 | 8.00 | Service Center | 20250 | 8 | Shipping | | | |
| MLA/LOA | 5-6-05 | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

WD726

DVD

Hummel002772



PO BOX 619507
DALLAS, TX 75261-9507
(214) 866-1500

## CLAIM CUSTOMER SERVICE CENTER

**Please Note:**
We have a new mailing address for
our claim office. Please use the above
address for any future correspondence.

WILLIAMSON-DICKIE
509 W VICKERY BLVD
Fort Worth, TX 76104

ATTENTION:        Prisilla Treviso



| DATE | 09/20/06 | SUBJECT | Notification of Closing of Claim | | |
|---|---|---|---|---|---|
| INSURED NAME | | Williamson-Dickie Manufacturing Co | | | |
| CLAIM NUMBER | | ACCIDENT / LOSS | | | |
| 272-007309175 | | DATE 05/04/05  LOCATION Fort Worth, TX | | CODE 2303 | |
| POLICY NUMBER | | PRODUCER NUMBER | | DEPARTMENT NUMBER | |
| WC  5342195  00 | | 09 122 000 | | 20250 | |

Please be advised that the following claims, arising out of the captioned matter, have been closed.

Very truly yours,

Patty Durham
Case Manager

<u>CLAIMANT NAME(S)</u>                                     <u>CLAIM NUMBER(S)</u>
John Hummel                                                   272-0073091-001
    CLOSING AMOUNT (INDEMNITY):    $50501  CLOSING DATE: 09/20/06
    CLOSING AMOUNT (EXPENSE):      $4424

DVD                                                    Hummel002773

Prisilla Trevizo

From:           Joyce Hernandez [joyce.hernandez@zurichna.com]
Sent:           Friday, March 10, 2006 10:55 AM
To:             Prisilla Trevizo
Subject:        John Hummel - 2720073091 - Case Summary with reserve changes

Attachments:    Case Summary - John Hummel - 2720073091.doc



Case Summary -
John Hummel - 2...

(See attached file: Case Summary - John Hummel - 2720073091.doc)


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* PLEASE NOTE \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* This E-Mail/telefax message
and any documents accompanying this transmission may contain privileged and/or
confidential information and is intended solely for the addressee(s) named above.
If you are not the intended addressee/recipient, you are hereby notified that any
use of, disclosure, copying, distribution, or reliance on the contents of this E-
Mail/telefax information is strictly prohibited and may result in legal action
against you. Please reply to the sender advising of the error in transmission and
immediately delete/destroy the message and any accompanying documents.   Thank
you.


This email has been scanned by the MessageLabs Email Security System.


1

TCCDA Discovery - J.W. Hummel - Capital Murder                    2010-10-26

**447**

EXHIBIT 30 Page 9

DVD                                                        Hummel002774


**ZURICH**

| **Case Summary Report – Workers' Compensation** |
|---|

## CLAIM INFORMATION:

| Insured: | Williamson-Dickie Manufacturing Co | Claim Number: | 2720073091 |
|---|---|---|---|
| Loss Location: | 9400 BLUEMOUND RD Fort Worth, TX | Date of Injury: | 05/04/05 |
| Site Code: | 2303 | Jurisdiction: | TX |
| Date Reported: | 05/05/05 | Handling Office: | Dallas |
| Policy Number: | WC 5342195 | Disability Status: | Total Disability |
| Policy Period: | 01/01/05 01/01/06 | AWW: | 300.00 |
| Business Unit: | Zurich Global Corp | TTD Rate: | 225.00 |
| | | PPD Rate: | 210.00 |

## CLAIMANT INFORMATION:

| Claimant: | John Hummel | Occupation: | PACK-N-HOLD |
|---|---|---|---|
| Date of Hire: | 07/06/04 | Employment Status: | Full time |
| Claimant DOB: | 11/04/75 | Age/ Life Expectancy: | 030 |
| Marital Status: | Married | Dependents: | 00 |

## RESERVE SUMMARY:

| | Paid to Date | Outstanding Reserve | Total Incurred |
|---|---|---|---|
| Medical | $24,228 | $31,750 | $55,978 |
| Expense | $4,036 | $2,500 | $6,536 |
| Indemnity | $9,795 | $18,900 | $28,695 |
| Totals | $38,059 | $53,150 | $91,209 |

**Accident Description:**
Mr. Hummel was picking up a "C" box from the pack-n-hold line when he took two steps backwards and tripped over three boxes stacked side by side next to a pallet. He fell backwards injuring his back.

**Compensability:**
Investigation determined that Mr. Hummel sustained a compensable worker's compensation injury to the lumbar spine. He was on the job and within the course and scope of his employment at the time of the injury.

**Medical (Injuries, Medical Management):**
Mr.Hummel had a hemi-laminotomy on 8/23/05 and then a revision of decompression 10/18/05; Unfortunately Dr.Combs ordered the MRI and did not order the study with contrast. Patient is now experiencing recurrence of significant pain into the left hip and radicular pain down the leg; the study does have medical basis and is certified. MRI has been authorized with contrast as of 2/20/06.

**Disability Status/Return to Work:**
Mr. Hummel continues on total disability status at this time.

**Recovery/Subrogation, SIF:**
None.

**Litigation:**
None

TCCDA Discovery - J.W. Hummel - Capital Murder                    2010-10-26

**448**

EXHIBIT 30 Page 10

DVD                                                                    Hummel002775

**Basis for Reserve:**
Medical reserves set for conservative medical care, physical therapy, Functional Capacity Evaluation and then Work Hardening.
Expense reserves set for possible surveillance.
Indemnity reserves set for additional 48 weeks of Temporary Income Benefits and 14% whole body impairment rating.

**Specific Plan of Action:**
Continue to monitor medical for appropriate medical care, FCE and probable work hardening if no further surgery is recommended.
Secure Maximum Medical Improvement date as soon as claimant has sufficiently recovered from lumbar surgery.
Request Designated Doctor if claimant's condition becomes stabilized and medical care becomes unproductive.

**Claims Handler:** Joyce Hernandez                    **Office:** Dallas
**Telephone #:** (214) 866-1159                         **Date of Report:** March 10, 2006

**Team Manager:**  Margie Allen
**Telephone # :**  (214) 866-1170

DVD                                                           Hummel002776

| Reserve Analysis | | | Date of Adjustment | | / / |
|---|---|---|---|---|---|
| **Medical:** | | | **Indemnity:** | | |
| **Surgery** | | | **TTD - Temporary Total Disability** | | |
| Hospitalization | $ | - | # weeks | | 48 |
| Surgeon | $ | - | @ weekly rate | $ | 210.00 |
| Anesthesia | $ | - | Subtotal - TTD | $ | 10,080.00 |
| Subtotal - Surgery | $ | - | **TPD - Temporary Partial Disability** | | |
| **Physician** | | | # weeks | | 0 |
| Treating physician | | | @ weekly rate | $ | - |
| # of future visits | | 30 | Subtotal - TPD | $ | - |
| cost per visit | $ | 150.00 | **PTD - Permanent Total Disability** | | |
| Subtotal - Treating Physician | $ | 4,500.00 | Calculation per Actuarial Worksheet | $ | - |
| Chiropractor | | | Subtotal - PTD | $ | - |
| # of future visits | | 0 | **Permanency** | | 14% |
| cost per visit | $ | - | # of weeks | | 42 |
| Subtotal - Chiropractor | $ | - | @ weekly rate | $ | 210.00 |
| Other | $ | - | Subtotal - Permanency | $ | 8,820.00 |
| Subtotal - Physician | $ | 4,500.00 | **Loss of Earnings** | | |
| **Second Opinion** | $ | 1,000.00 | # weeks | | 0 |
| **AME/QME (CA Only)** | $ | - | @ weekly rate | $ | - |
| **Physical Therapy** | | | Subtotal - LOE | $ | - |
| # sessions | | 50 | **Death/Dependent benefits** | | |
| cost per visit | $ | 150.00 | # weeks | | 0 |
| Subtotal - Physical Therapy | $ | 7,500.00 | @ weekly rate | $ | - |
| **Prescriptions** | $ | 5,000.00 | Subtotal - Dependent benefits | $ | - |
| **Nurse Case Management** | $ | - | **Other** | | |
| **Miscellaneous** | | | Scheduled Loss | $ | - |
| Ambulance | $ | - | Vocational Rehabilitation | $ | - |
| Emergency room | $ | - | Death Benefits (lump sum) | $ | - |
| X-rays/ testing | $ | 2,500.00 | Funeral Benefits | $ | - |
| FCE - Functional Capacity Evaluation | $ | 750.00 | Claimant Attorney Fees | $ | - |
| Work Hardening | $ | 10,000.00 | Other | $ | - |
| DME - Durable Medical Equipment | $ | - | Subtotal - Other | $ | - |
| Mileage reimbursement | $ | - | **Total Indemnity Reserve** | $ | 18,900.00 |
| Other Transportation Costs | $ | - | Paid to Date | | 9,795.00 |
| Other | $ | 500.00 | **TOTAL INDEMNITY INCURRED:** | $ | 28,695.00 |
| Subtotal - Miscellaneous | $ | 13,750.00 | | | |
| **Lifetime Medical Reserving Only** | | | | | |
| Annual Expense Expected | $ | - | | | |
| Life Expectancy | | | | | |
| Subtotal - Lifetime Meds | $ | - | | | |
| **Total Medical Reserve** | $ | 31,750.00 | | | |
| Paid to Date | | 24,228.00 | | | |
| **TOTAL MEDICAL INCURRED:** | $ | 55,978.00 | | | |
| **Expenses:** | | | **Totals:** | | |
| **Attorney fees** | $ | - | | | |
| **File Management Services** | | | | | |
| IME - Independent Medical Examination | $ | - | | | |
| Medical records fees | $ | - | | | |
| Fee adjuster - field investigation | $ | - | | | |
| Experts (e.g., engineers) | $ | - | | | |
| Activity check | $ | - | | | |
| Surveillance | $ | 2,500.00 | | | |
| Other | $ | - | | | |
| Subtotal - File Mgmt Services | $ | 2,500.00 | | | |
| **Total Expense Reserve** | $ | 2,500.00 | **TOTAL OUTSTANDING RESERVE:** | $ | 53,150.00 |
| Paid to Date | | 4,036.00 | **TOTAL PAID TO DATE** | | 38,059.00 |
| **TOTAL EXPENSE INCURRED:** | $ | 6,536.00 | **TOTAL INCURRED:** | $ | 91,209.00 |

TCCDA Discovery - J.W. Hummel - Capital Murder                    2010-10-26

**450**

EXHIBIT 30 Page 12

1

# Availability Contract

ID: _____

CHAMPION ☑   SILVER STAR ☐

WHITE ☐   BLUE ☐   DK BLUE ☐

Picture

What current Texas security license do you hold at this time?

☑ NON-COMMISSIONED   ☐ COMMISSIONED

Full Name: _John W Hummel_

Street address: _600 little Schoole Rd_

City: _Kennedele_   State: _Tx_   ZIP: _76060_

Telephone number: _817 770-1823_

SSN: [redacted]   Date available to start work: _ASAP_

In the following spaces please fill out the times you are available to work on the listed days. Do not list preferred times as this may cause you to be excluded from employment due to lack of a schedule that meets your availability.

MONDAY        _6pm - 6Am_

TUESDAY       _6pm - 6Am_

WEDNESDAY     _6pm - 6Am_

THURSDAY      _6pm - 6Am_

FRIDAY        _6pm - 6Am_

SATURDAY      _6pm - 6Am_

SUNDAY        _6pm - 6Am_

I, _John Hummel_, do affirm and understand that I will be bound by the hours of availability listed on this form. I further affirm that all contact information on this form is accurate to the best of my knowledge and that if any of the contact information on this form changes it is my responsibility to notify the company. If I do not notify the company and subsequently can not be reached, appropriate action will be taken.

_John Hummel_          _4/13/2009_
Signature                Date

**Results of Random Drug Screening (Check One)**

| Date: | Positive: | Negative: |
|-------|-----------|-----------|
| 4/17/09 |         | ✓ |
|       |           |   |
|       |           |   |
|       |           |   |

*(Use back for add'l space)*

| Post Assignment | Armed or Unarmed | Date |
|-----------------|------------------|------|
|                 |                  |      |
|                 |                  |      |
|                 |                  |      |
|                 |                  |      |

Birth Date: _11/4/1975_

Birthplace: _Arlington, TX_

Hire Date: _4/17/2009_

Last Employment Date: _____

**451**

EXHIBIT 30 Page 13

2

## EMPLOYEE INFORMATION FORM

DATE: _4/17/2009_　　　SOCIAL SECURITY NUMBER: ███ ██ ████

LAST NAME: _Hummel_　　　　　　　FIRST NAME: _John_

HOME ADDRESS: _600 little School Rd_

CITY: _Kennedale_　　　　　STATE: _Tx_　　ZIP: _76060_

HOME PHONE NUMBER:　　　　( _817_ ) _474_ - _5750_

CELL OR PAGER NUMBER:　　　( _817_ ) _770_ - _1423_

DATE OF BIRTH:　　　　　　_11/04/1975_

MARITAL STATUS (FROM W-4)　　_Married_

FEDERAL EXEMPTIONS/DEDUCTIONS:　_M at 5_

EXTRA WITHHOLDINGS　　　　_0_

### NOTICE OF DISPUTE RESOLUTION POLICY

　　　　Effective August 9, 2002, your employer (the "Company") has adopted a Dispute Resolution Policy. You may read the Dispute Resolution Policy at any time and obtain a copy of it by requesting a copy from Human Resources. Both you and the Company are bound to resolve employment-related disputes, except those excluded, according to the terms of the Dispute Resolution Policy.

　　　　Both you and the Company retain all substantive legal rights and remedies under the Dispute Resolution Policy. You and the Company are both waiving all rights which either may have with regard to trial by jury or federal court for covered employment matters.

　　　　If you continue or accept employment with the Company after August 9, 2002, you agree to resolve all legal claims against the Company through this process rather than through the court system.

EMPLOYEE SIGNATURE: _John Hummel_　　　　　　DATE: _4/17/2009_

### DO NOT WRITE BELOW THIS LINE - OFFICE USE

ASSIGNED COMPANY:　　　　　_Champion_

STATE REGISTRATION FEE:　　_$ 54.00_

PAY RATE:　　　　　　　　_$ 7.50_

TOTAL COST OF UNIFORMS:　　_$ 176.00_

COMPLETED BY:　　　　　　_Green_

ENTERED INTO THE COMPUTER BY:　_Green_

ROLODEX CARD BY:　　　　　_Hummel_

**452**

EXHIBIT 30 Page 14

3

# Registration & Uniform Issuance Acknowledgement

The Department of Public Safety requires that I register as a security officer in the State of Texas. I understand that the fee to register is paid directly to the state. I authorize my employer to deduct the fee out of my paycheck as a loan. My employer will pay the fee to the State on my behalf. Upon termination of my employment, I will pay any remaining balance of the State registration fee through a deduction on my last paycheck.

I am also taking possession of uniforms. The uniforms are the property of my employer. Upon termination of my employment, I may purchase the uniforms without badges or patches or I may return them to my employer. If I return the uniforms, I will receive a 35% refund on the amount I have paid toward the deposit replacement fee. If I fail to give a seven (7) working day notice I may forfeit the refund.

| Description of Items | New | Used | Quantity | Totals |
|---|---|---|---|---|
| Uniform Pants | 30.00 | 25.00 | 2 | 50 |
| Uniform Shirts | 30.00 | 25.00 | 2 | 50 |
| Uniform Belt | 14.00 | 12.00 | | |
| Uniform Dress Tie | 12.00 | 10.00 | | |
| Shoulder Loops | | 6.00 | 1 | 6 |
| Name Tag | | 5.00 | 2 | 10 |
| Dress Blazer | | 50.00 | | |
| Winter Security Coat | 45.00 | 30.00 | | |
| Light Security Coat | 30.00 | 25.00 | 1 | 25 |
| Rain Coat | 25.00 | 20.00 | | |
| Shoes (Non-returnable) | | 30.00 | | |
| Hat Summer (Non-returnable) | | 6.00 | 1 | 6 |
| Hat Winter (Non-returnable) | | 10.00 | | |
| Officers Handbook | | 5.00 | 1 | 5 |
| Hard Hat | 20.00 | 15.00 | | |
| Protective Goggles | | 5.00 | | |
| Badges | | 12.00 | 2 | 24 |
| Patches | | No Charge | | |
| | | | | |
| | | | | |

Separation Date:
Date Employee Informed of Separation:
License Suspense Date:

Total: $2,176

Licensees, registrants or commissioned security officers shall surrender immediately on demand or not later than the seventh day after termination of employment any uniform, badge or other item of equipment, owned by the employer or provided by the employer, issued to the licensee, registrant or commissioned security officer by an employer.

By signing this document I acknowledge that I have received the issued equipment and property listed above and that I agree to abide by State rules.

I authorize the deposit for my State registration fee, uniforms, and equipment (as listed above) to be withheld from my paychecks at 10% of my gross amount each week until the total balance has been liquidated.

*John Hammel*
Employee Signature

*John Hummel*
Employee Printed Name

XXXXXXXXXXX
Employee Social Security Number

*Jeff Jones*
Witness Signature

*Jeff Jones*
Witness Printed Name

4/17/2009
Date

**453**

EXHIBIT 30 Page 15

4

# Orientation Acknowledgement

I, _John Hummel_ have attended the "Orientation" on the date of _4/17/2009_.

**During the orientation class I**

JH✓ Discussed Company policies and regulations

JH✓ Was trained on standard laws and procedures to be followed by all Security Officers.

JH✓ Reviewed training films with the Training Manager.

JH✓ Was instructed on report writing Techniques and Procedures.

JH✓ Received a Security Officers Handbook from the Training Manager.

# Deductions and First Paycheck Acknowledgement Sheet

I _John Hummel_, understand that I am required to pay for my own state registration, or transfer and to deduct the full amount for my uniforms. I also understand that the full amount will be from my paychecks and that this will be done by using the Company procedure. I also understand that the Company procedure is as follows.

The total of the amount between my uniforms and my registration or transfer will be deducted out of my paycheck by taking 10% of my gross pay per week. I also understand that the amounts are $58.00 for registration and $17.00 for a transfer and it varies for the uniforms depending on what required-issue items and what optional-issue items I receive.

I, _John Hummel_, further understand that I will receive my first paycheck the 3rd Friday after the first day I work for the Company.

Therefore since I am starting on the date of _4/17/2009_.

I will receive my first paycheck on the date of _5/1/2009_.

Date _4/17/2009_   Signature _John Hummel_

**454**

EXHIBIT 30 Page 16

5

# INJURIES
## Update to Section 5-5-7 of the Security Officers Handbook

If you are injured, while on duty and performing the lawful duties as a security officer you must do the following:

1.  Any and all injuries must be reported to Dispatch or to an Office Manager.

2   Dispatch will send a Field Supervisor to your location to document the injury.

3.  The Field Supervisor will provide assistance, investigate and take pictures of the injury and location of incident.

4.  You must complete an **EMPLOYEE INJURY CLAIM FORM** *(provided by the Field Supervisor)*.

5.  Field Supervisors will complete a **SUPERVIORS ACCIDENT INVESTIGATION REPORT.**

6.  Injured Officers maybe given a Breathalyzer or Urinalyses test at your post location.

7.  Urgency of medical care will be evaluated by the Field Supervisor and Dispatch.

8.  Approval for medical care will be provided by Dispatch or senior management.

9.  Injured officers are expected to report to office on the next business day to complete additional paperwork or tests.

Failure to report an injury immediately or adhere to items 1, 3, 4, 6, 7, or 8 above may result in you *(the injured person)* to be totally liable for any medical expenses that may be associated with the injury.

SIGNATURE: _John Hemmel_          **DATE:** _4/17/2009_

## *RETURNING TO WORK*

If injured with medical attention you must have an Approved Medical Provider release approving you return to work on full duty or restricted duty basis.

I acknowledged that I have read and understand the above information as it related to injuries.

SIGNATURE: _John Hemmel_          **DATE:** _4/7/2009_

**455**

EXHIBIT 30 Page 17



# APPLICATION FOR EMPLOYMENT

H 817-478-5750

NAME  Hummel        John        William        PHONE  (817 770-4823

PRESENT ADDRESS  LAST  600 little School Rd   FIRST   Kennedale   MIDDLE   Tx   76060
                       STREET              CITY           STATE      ZIP

PREVIOUS ADDRESS  STREET               CITY           STATE      ZIP

SOCIAL SECURITY # ████████   DRIVERS LICENSE # ████████

DATE OF BIRTH  11/04/1975       EYES  Brown      SEX (Circle)  (MALE)  OR  FEMALE

REFERRED BY WHAT NEWSPAPER OR PERSON  Phone Book  Talked to  Neyva - Tina

ARE YOU A U.S. CITIZEN?  Yes      PLACE OF BIRTH  Arlington, Tx

EMPLOYMENT DESIRED
POSITION  Security Guard        HOURLY WAGE DESIRED  Any    MINIMUM STARTING WAGE  Any   7.50  HOUR

ARE YOU EMPLOYED NOW?  NO       IF SO, MAY WE INQUIRE OF YOUR PRESENT EMPLOYER? _____

DATE YOU CAN START?  ASAP     TYPE OF WORK: (Circle One) (FULL-TIME)  PART-TIME

AREA OF TOWN YOU LIVE IN  Kennedale 20 + 820

| YES | NO | |
|-----|----|--|
| ✓ | | 1. DO YOU OWN YOUR OWN RELIABLE TRANSPORTATION? |
| | | PLEASE GIVE: MAKE  Chevrolet   MODEL  S10   COLOR Red White |
| | | LICENSE #  QXW NH   STATE  Tx |
| ✓ | | 2. DO YOU HAVE YOUR OWN TELEPHONE? ✓ |
| ✓ | | 3. CAN YOU WORK EVENINGS AND DEEP NIGHTS? ✓ |
| ✓ | | 4. CAN YOU WORK WEEKENDS? ✓ |
| | | 5. HOW MANY HOURS A WEEK DO YOU WANT TO WORK?  40 |
| | | 6. HOW MANY DAYS OF WORK HAVE YOU MISSED ON YOUR LAST JOB WITHIN THE LAST 3 MONTHS OF EMPLOYMENT? ____ |
| ✓ | | WHY? _____ |
| | | 7. WILL YOU WORK OVERTIME IF REQUESTED BY OUR COMPANY? |
| | ✓ | 8. HAVE YOU EVER BEEN CONVICTED OF A CRIME? ✓ |
| | | PLEASE EXPLAIN _____ |
| | ✓ | 9. DO YOU HAVE ANY WARRANTS OUT FOR YOUR ARREST FOR ANY REASON IN ANY STATE? ✓ |
| | ✓ | 10. DO YOU TAKE ILLEGAL DRUGS? ✓ |
| ✓ | | 11. WILL YOU TAKE A DRUG TEST IF HIRED? ✓ |
| | ✓ | 12. HAVE YOU EVER BEEN ACCUSED OF STEALING FROM A PAST EMPLOYER? ✓ |
| | ✓ | 13. HAVE YOU EVER LIED TO ANYONE FOR ANY REASON? |
| ✓ | | 14. HAVE YOU EVER STOLEN ANYTHING FROM ANYBODY IN YOUR LIFETIME? ✓ |
| ✓ | | 15. WHEN YOUR LAST EMPLOYER IS CALLED, WILL THEY GIVE YOU A GOOD REFERENCE? ✓ |

EDUCATION
| ✓ | | DO YOU HAVE A HIGH SCHOOL DIPLOMA OR EQUIVALENT? WHAT HIGH SCHOOL  Jonesville High ✓ |
| | ✓ | DID YOU ATTEND COLLEGE? WHAT COLLEGE? _____ |

IF YES, HOW MANY YEARS ____ TYPE OF DEGREE, IF ANY _____ ARE YOU ATTENDING NOW _____

MILITARY SERVICE
| ✓ | | BRANCH OF SERVICE  Marine   RANK AT DISCHARGE  E-3   DISCHARGE DATE  May 2002 |

In a continued effort to comply with our Affirmative Action Program and to insure that minority groups, females, veterans of the Vietnam Era, disabled veterans and persons with disabilities are introduced into the workforce and that these employees are considered as opportunities for promotion arise, we ask that you complete the information below: CHECK ALL THAT APPLY

____ BLACK  ____ HISPANIC  ____ ASIAN  ____ AMERICAN INDIAN  ✓ WHITE AND ANY OTHER  ✓ VETERAN  ✓ DISABLED

Our company is an Equal Opportunity Employer and as such does not discriminate in hiring, promotion or terms or conditions of employment because of race, creed, color, sex, age, national origin, ancestry, marital status, eligibility for military service, or handicap. Should you, during your interview, or at any later date if you become employed with us, have reason to believe that anyone in our organization has acted contrary to our E.O.E. policy, you are requested to report any such questionable incidents directly to our Manager.

We cannot guarantee any specific shift, schedule or location to any employee, although we will do everything possible to make assignments suitable to you. We reserve the right to re-assign and re-schedule as the requirements of our business dictate, but will attempt to provide such transfer or re-assignment that are within reasonable commuting distance of your residence. Both full-time and part-time employees may be required to work holidays. This application does not consitute an employment contract. I agree that if I am hired, my employment and compensation can be terminated with or without cause at any time, at the option of my employer or myself. No representative of management, other than the president, has any authority to make any representation or agreement contrary to the foregoing. In order for any change by the president to be effective, it must be made in writing.

## 456

EXHIBIT 30 Page 18

**FORMER EMPLOYERS** | FOR OFFICE USE ONLY COMMENTS

1. PLEASE LOOK UP ALL TELEPHONE NUMBERS  2. LIST ALL EMPLOYMENT IN THE PAST 5 YEARS.  3. LIST PRESENT OR PREVIOUS EMPLOYER FIRST.

NAME Williamson Dickie          SUPERVISOR Roberto
START DATE Oct 2003   ADDRESS Fort Worth TX 509 W Victory Blvd
END DATE May 2005   CITY/STATE/ZIP Fort Worth Tx   76104   START WAGE
POSITION Shipper                TELEPHONE 817 336 7201   END WAGE
REASON FOR LEAVING Hurt on the Job
*(2 yrs)*

FOR OFFICE COMMENTS

NAME American Security          SUPERVISOR
START DATE Jun 2002   ADDRESS
END DATE Sep 2003   CITY/STATE/ZIP Spartenberg, SC   START WAGE
POSITION Security Guard         TELEPHONE   END WAGE
REASON FOR LEAVING Moved to Tx
*(1 yrs)*

FOR OFFICE COMMENTS

NAME US Marine          SUPERVISOR
START DATE Nov 1997   ADDRESS
END DATE May 2002   CITY/STATE/ZIP Comp Pendleton, CA   START WAGE E-2
POSITION E-3 0231-Intelligence Specialist   TELEPHONE   END WAGE E-3
REASON FOR LEAVING Honorable Discharge
*(5 yrs)*

FOR OFFICE COMMENTS

**EXPERIENCED SECURITY OFFICERS** - In order for Operations to better place you, please list all types or names of accounts that you have worked.

1. _____
2. _____
3. _____
4. _____

**PREVIOUS ADDRESSES** - Please list all previous addresses in the last 5 years. Be accurate.

| | | | |
|---|---|---|---|
| 1. YEAR | ADDRESS | CITY | STATE |
| 2. YEAR | ADDRESS | CITY | STATE |
| 3. YEAR | ADDRESS | CITY | STATE |

**PERSONAL REFERENCES**

1. NAME Trey Vinson   PHONE 817 7034427   RELATIONSHIP Worship Leader   CITY/STATE Hurst Tx
2. NAME Chris Grimm   PHONE 817 7070407   RELATIONSHIP Friend   CITY/STATE Hurst Tx

I AUTHORIZE INVESTIGATION OF ALL STATEMENTS CONTAINED IN THIS APPLICATION. I UNDERSTAND THAT MISREPRESENTATION OR OMISSION OF FACTS CALLED FOR IN THIS APPLICATION MAY RESULT IN MY DISMISSAL. FURTHER, I UNDERSTAND AND AGREE THAT IF I AM HIRED, MY EMPLOYMENT IS TERMINABLE AT WILL AND IS FOR AN INDEFINITE PERIOD AND MAY, REGARDLESS OF THE DATE OF PAYMENT OF WAGES AND SALARY, BE TERMINATED AT ANY TIME WITHOUT PREVIOUS NOTICE.

DATE 4/13/2009   SIGNATURE Jordan Adornal

DO NOT WRITE BELOW THIS LINE

INTERVIEWED BY Jeff Jones          DATE 4-13-09
CAR Yes   TELEPHONE Yes   RATING 3
NEATNESS Good   CHARACTER Good   APPEARANCE Good
CRIMINAL HISTORY COMMENTS: none
REMARKS: Needs 3rd Shift
✓ APPROVED ___ DISAPPROVE   STARTING PAY $ 7.50   REPORT DATE

**457**

EXHIBIT 30 Page 19

# EMPLOYMENT VERIFICATION REQUEST

Date: _4-23-08_

**Champion National Security**
2008 E. Randol Mill Rd. suite 100
Arlington, Texas 76011
817-226-9500

**Silver Star Security**
2008 E. Randol Mill Rd. suite 100
Arlington, Texas 76011
817-226-9500

**APPLICANT INFORMATION**

Applicant Name: _John Hummel_                          SS#: ▇▇▇▇▇
Employer Name: _Williamson Dickie_
Employer Phone #: ▇▇▇▇▇▇▇         Fax #: _____
Job title reported by applicant: _employee_
Dates of employment provided by applicant:   Start: _____   End: _____

**STAR WILL PROVIDE INFORMATION ON APPLICANT**

(**PLEASE PROVIDE THE FOLLOWING INFORMATION REGARDING THE APPLICANT NAMED ABOVE**)

Applicant's Dates of Employment:   Start _Oct '03_   End _May 05_
Applicant's Position or Title: _employee_
Applicant's Reason for Leaving: _Injury_

Is this applicant eligible for rehire?   YES   or  (NO)  (Circle one)

Name of person completing this request: _Lori Gordon_          Title: _____

## ** PLEASE FAX YOUR RESPONSE TO: 817-276-9045 **

If you would like to respond by phone, or if you have a question, please call 817-226-9500. Any member of our team can take your call.

**APPLICANT**

I authorize all corporations, companies, persons, educational institutions, and former employers to release information they may have about me, and I release them from any liability and responsibility from doing so. A copy of this document will have the same authority as the original

Date: _4/13/2009_
Print Name: _John Hummel_
Signature: _John Hummel_
Social Security #: ▇▇▇▇▇▇▇

**458**

EXHIBIT 30 Page 20

## OFFICER MINIMUM REQUIREMENTS ACKNOWLEDGEMENT

The following is a list of minimum requirements and abilities that you **MUST** possess in order to perform duties that are a part of any security organization. However, this list does not include all requirements and abilities needed to perform security-related duties satisfactorily and you will be instructed further on duties, procedures and policies that are specialized and not included here during orientation and training.

JwH 1. You must have and be licensed to operate reliable transportation that can remain on post with you since you may have to travel to different posts during the course of your duty.

JwH 2. You must have a working telephone number so that we can contact you for schedule changes and verification.

JwH 3. You must be available to work deep nights, weekends and holidays. Day shifts are reserved for officers of tenure and seniority.

JwH 4. You cannot have any class-B misdemeanors within the last five years. Nor can you have any felonies or class-A misdemeanors on record within a lifetime. You must also be able to qualify for a security license in the state of Texas.

JwH 5. You must be able to pass a supervised urinalysis drug-screen. The drug-screen will detect any illegal substances in your urine in addition to detecting masking agents and other adulterants. If you are on prescription medication, the effects of the medication can not hinder your responsibility to perform any of these minimum requirements nor can the effects prevent you from operating motor vehicles safely.

JwH 6. You must have at least one verifiable work reference and be eligible to work in the United States.

JwH 7. You must be able to speak coherent English and be able to adequately read and legibly write English with proper use of grammar, spelling and punctuation.

JwH 8. You must have adequate use of all of your five senses.

JwH 9. You must be able to stand and walk for 8 to 12 hours at a time. Some job sites will require you to walk over rough terrain and climb long flights of stairs. In addition, you may have to lift and move objects weighing between 10 and 50 pounds. Being highly visible and doing patrols are primary responsibilities for all officers.

JwH 10. You must be able to work during any inclement weather conditions. We are responsible for providing security regardless of weather conditions and we will provide you with most equipment necessary for your comfort.

JwH 11. You must be able to work alone.

JwH 12. You must be able to work regularly with the general public.

JwH 13. You must be able to perform your duties with a flashlight as your primary source of illumination.

JwH 14. You must be able to adequately respond to emergencies and hostile situations without hesitation. In order to respond quickly, you must be able to sprint or dash 50 feet or more with out resting.

JwH 15. You must be able to follow directions and instructions precisely with little to no supervision.

JwH 16. You must be able to maintain an adequate level of hygiene and grooming practices. You must be able to report to work in a clean uniform.

I, _Josh Himmel_, understand that I must meet the above stated requirements and any specialized requirements not mentioned above, and that failure to maintain these requirements can lead to dismissal from orientation and training and if employed can lead to justifiable termination of my employment.

_Josh Himmel_
PROSPECTIVE EMPLOYEE'S SIGNATURE

_Jeff Jones_
WITNESS SIGNATURE

4/13/2009
DATE

4-13-09
DATE

**459**

EXHIBIT 30 Page 21

Cause No. AP-76,596

# IN THE COURT OF CRIMINAL APPEALS

---

## JOHN WILLIAM HUMMEL
Appellant

v.

## THE STATE OF TEXAS,
Appellee

---

**APPEALING THE CONVICTION AND SENTENCE OF DEATH IN CAUSE NO. 1184294D IN THE 432ND DISTRICT COURT OF TARRANT COUNTY, TEXAS, HONORABLE ELIZABETH BERRY, JUDGE PRESIDING (JURY SELECTION) AND THE HONORABLE RUBEN GONZALEZ, (TRIAL) ON THE MERITS**

---

### APPELLANT'S BRIEF ON APPEAL

---

Stickels & Associates, P.C.
John W. Stickels
TBN: 19225300
Katharine D. Stone
State Bar No. 24075726
770 N. Fielder Rd.
P. O. Box 121431
Arlington, Texas 76012
Phone: (817) 479 - 9282
Fax: (817) 622 - 8071
Attorney for Appellant
John William Hummel

**ORAL ARGUMENT REQUESTED**

**460**

EXHIBIT 31 Page 1

## DISCUSSION AND AUTHORITIES POINTS OF ERROR 14, 15, 16 AND 17:

### POINT OF ERROR 14 - RESTATED

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION GIVEN ON DECEMBER 20 AND 21, 2009, IN CALIFORNIA BECAUSE APPELLANT'S CONFESSION WAS INVOLUNTARY.

### POINT OF ERROR 15 - RESTATED

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S CONFESSION GIVEN ON DECEMBER 20 AND 21, 2009, IN CALIFORNIA WAS INVOLUNTARY.

### POINT OF ERROR 16 - RESTATED

APPELLANT'S RIGHTS AS GUARANTEED UNDER THE ARTICLE I, SECTION 9, TO THE TEXAS CONSTITUTION WERE VIOLATED BECAUSE APPELLANT'S CONFESSION GIVEN ON DECEMBER 20 AND 21, 2009, IN CALIFORNIA WAS INVOLUNTARY.

### POINT OF ERROR 17 - RESTATED

APPELLANT'S RIGHTS AS GUARANTEED UNDER ARTICLES 1.04, 1.06, 38.22 SECTION 2, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE WERE VIOLATED IN CONNECTION WITH APPELLANT'S CONFESSION GIVEN ON DECEMBER 20 AND 21, 2009, IN CALIFORNIA.

## DISCUSSION AND AUTHORITIES:

## A.   ERROR IN ADMITTING CONFESSION– STANDARD OF REVIEW:

The standard of review regarding the voluntariness of a confession is a deferential

review of the trial court's determination of the historical facts and a *de novo* review of the law's application to those facts. *Henderson v. State,* 962 S.W.2d 544, 564 (Tex. Crim. App. 1997). The determination of whether the confession was voluntary will turn upon the factual determinations made by the trial judge after hearing and judging the credibility of the testifying witnesses. The standard of review applied by the Appellate Court will then be one of abuse of discretion. *Franks v. State,* 90 S.W.3d 771, 784 (Tex. App. - Fort Worth 2002, no pet.). A court abuses its discretion when it acts without reference to any guiding rules or principles, or by acting arbitrarily or unreasonably. *Galliford v. State,* 101 S.W.3d 600, 604 (Tex. App.-Houston (1st Dist.) 2003, pet. ref'd). The trial court is the exclusive finder of fact in a motion to suppress hearing, and as such, it may choose to believe or disbelieve any or all of any witness's testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

## B.    ERROR IN ADMITTING CONFESSION – RELEVANT FACTS:

Appellant also filed a Motion to Suppress Oral or Written Statement of Defendant Kennedale Police Department and Tarrant County District Attorney's Office]. [Motion No. 76]. [CR. 348]. In Motion Number 76, Appellant alleged that the December 20 and 21 statements were the culmination and result of all of the previous unconstitutional state actions. As result, these statements were not voluntarily given, and the statements and evidence were obtained in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, Article I, Section 9 of the Texas Constitution, and Articles 1.04,1.06, 38.22, and 38.23 of the Texas Code of Criminal Procedure. [CR. 348].

 
As previously discussed, the trial court held a hearing outside the presence of the jury to determine the admissibility of Appellant's statements. [R.R. Vol. 46]. Various witnesses testified to the key events in the investigation.

### TIME LINE TABLE

| DATE AND TIME [Central Time Zone] | EVENT |
|---|---|
| 12/18/09  12:18 hrs | Kennedale Fire Department dispatched to fire at 600 Little School Road |
| 12/18/09  0520 hrs | Appellant is escorted to Kennedale Police Statement |
| 12/18/09  0641 hrs | Appellant signs consent to search at 600 Little School Road |
| 12/19/09  0659 hrs | Appellant read Miranda warnings at Kennedale Police Station |
| 12/19/09  1553 hrs | Christopher Paris completes missing person report |
| 12/20/09  0748 hrs | Appellant detained at San Ysidro Border Entry |
| 12/20/09  0850 hrs | USCBP Officer confirms with Kennedale Police that there is an outstanding warrant for Appellant's arrest |
| 12/20/09  1248 hrs | Arson arrest warrant signed |
| 12/20/09  1446 hrs | Appellant booked into San Diego County Jail |
| 12/21/09  0020 hrs | Investigators begin recorded interview with Appellant |
| 12/22/09  1530 hrs | Capital murder arrest warrant issued |
| 12/31/09 | Capital murder arrest warrant served |

## C. ERROR IN ADMITTING CONFESSION [CONSTITUTIONAL] – THE APPLICABLE LAW:

An arrest warrant is a written order by a magistrate directed to a peace officer commanding him to take a person into custody. Tex. Code Crim. Proc. Art. 15.01 (1965). The affidavit supporting the arrest warrant must provide the issuing magistrate with sufficient information to support an independent judgment that probable cause exists for the issuance of a warrant. *McFarland v. State*, 928 S.W.2d 482 (Tex. Crim. Ap. 1986). The affidavit must show probable cause that an offense was committed and that



the person named committed the offense. *Bell v. State*, 747 S.W.2d 898 (Tex. App. – Fort Worth 1988, pet. ref'd).

The sufficiency of the affidavit is determined by a review of the "four corners" of the document. *Gibbs v. State*, 819 S.W.2d 821 (Tex. Crim. App. 1991). The totality of the circumstances test is used to test the sufficiency of the warrant. *Illinois v. Gates*, 462 U.S. 213, 236-37, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Whaley v. State*, 686 S.W.2d 950 (Tex. Crim. App. 1991). The affidavit must connect the suspect with the offense. *Hankins v. State*, 132 S.W.3d 380 (Tex. Crim. App. 2004). In this case, the arson arrest warrant is defective because the affidavit does not show that Appellant committed the offense of arson. As a result, Appellant was illegally detained in the San Diego County Jail and all statements obtained are inadmissible as "fruit of the poisonous tree."

Since the arrest warrant was erroneously issued, the next issue is whether resulting taint on the subsequently obtained evidence has been attenuated or whether it is inadmissible as "fruit of the poisonous tree." *Gibbs v. State*, 819 S.W.2d 821 (Tex. Crim. App. 1991). In assessing whether the taint has been attenuated, the Supreme Court has identified the following factors as important:

1. whether Miranda warnings were given;
2. the temporal proximity of the arrest and the confession;
3. the presence of intervening circumstances; and,
4. the purpose and flagrancy of the official misconduct.

*Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1976).

As stated above, Appellant urges this Court to find that the affidavit supporting the arson arrest warrant is legally insufficient because it does not connect Appellant with the

commission of the offense. Admittedly, the affidavit may provide sufficient information for a magistrate to determine that an arson offense had been committed at 600 Little Road. However, there are no facts even remotely tending to connect Appellant to the commission of this offense. Conversely, the facts in the affidavit indicate that Appellant was cooperating with the investigation, provided documentation concerning his location at the time of the offense, and surrendered his clothes and shoes to the authorities. These are not the actions of someone who committed a crime.

## D. ERROR IN ADMITTING CONFESSION [CONSTITUTIONAL] – APPLICATION OF THE LAW TO THE FACTS:

The affidavit includes information about suspected blood on Appellant's clothes. However, the affidavit does not explain how suspected blood connects Appellant to an arson crime. The affidavit further explains that Appellant showed no emotion while being questioned and did not attend a church memorial service held less than 24 hours after the fire. These facts do not connect Appellant to the commission of arson. The affidavit does provide information that Appellant was apprehended at the border. However, visiting Mexico does not connect Appellant to the crime.

In addition to the above, the affidavit contains misrepresentations and falsehoods which bear directly on the issue of probable cause. Specifically, detective Charbonnet avers that "Mr. Hummel was informed that the fire department found the bodies of his wife, father-in-law, and daughter in the habitation after putting out the fire. Mr. Hummel showed no emotion after receiving the news." Detective Charbonnet swore at two difference points in the Affidavit that Mr. Hummel showed "no emotion" in regard to this

situation. However, Detective Charbonnet failed to disclose to the magistrate information about the emotional outbursts Appellant suffered during his interrogation. Thus, Detective Charbonnet, by including some information and intentionally omitting other information, gave an inaccurate and misleading picture of Appellant's reactions to the magistrate.

In *Franks v. Delaware*, the Supreme Court determined that affirmative misrepresentations of fact which are knowingly included in a probable cause affidavit, and which are material and necessary to establishing probable cause, render the warrant invalid under the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 667 (1978). While the Court of Criminal Appeals has not yet directly decided whether intentional and material omissions of fact are treated similarly under a *Franks* analysis, some federal courts, including the Fifth Circuit, have indicated that allegations of material omissions are treated the same as material misrepresentations. *Massey v State*, 933 S.W.2d 141, 146 (Tex. Crim. App. 1966). The relevant inquiry is whether the omissions were material to a finding of probable cause, and whether the misrepresentations were intentionally made or with a "disregard for the accuracy of the affidavit." *Bernard v. State*, 817 S.W.2d 359, 367 (Tex. App. – Houston (14th Dist.) 1991, no pet.).

There are no intervening factors which would attenuate the taint from Appellant's unlawful arrest and detention and his subsequent confession. For example, Appellant was not taken before a magistrate upon his arrest even though California law requires the

arresting officer to do so "without unnecessary delay." Cal. Penal Code Sec. 821. This illustrates that there were no intervening factors between the unlawful detention and the subsequent confession and the *Brown v. Illinois* factors establish a test "designed to vindicate the distinct policies and interests of the Fourth Amendment," and the burden is on the prosecution to demonstrate admissibility of the confession. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

## E. ERROR IN ADMITTING STATEMENT AND EVIDENCE (CONSTITUTIONAL) – HARM ANALYSIS:

The harm to Appellant resulting from the trial court's wrongful overruling of his Motion to Suppress Oral or Written Statements of Defendant – (Kennedale Police Department and Tarrant County District Attorney's Office) [Motion No. 76] is obvious. This the jury heard and read Appellants' illegally obtained statement and was the evidence the State used to tie Appellant to the crime. Because Appellant was harmed by the fruits of the illegal conduct, this Court should reverse his conviction and order a new trial. Based on the above and foregoing, Appellant's rights as guaranteed under the Fifth and Fourteenth Amendments to the U. S. Constitution, Article 38.22 of the Texas Code of Criminal Procedure, and Article 1, Section 9 of the Texas Constitution were violated and such violations require Appellant's conviction to be reversed. U.S. Const. Amend. V, IV; Tex. Const. Art. I, §9; and Tex. Code Crim. Proc. Art. 38.22§2 [2001].

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Exhibits 1-31 to Application for a Writ of Habeas Corpus Volume 1 by hand to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, via hand delivery)

Honorable Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, via hand delivery)

Helena Faulkner, Asst. Crim. D.A.
Tarrant County District Attorney
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, via hand delivery)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on June 5, 2013 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_

Robert Romig

**468**

Writ Number:  C-432-009923-1184294-A

### 432ND DISTRICT COURT

OF

TARRANT COUNTY, TEXAS

EX PARTE

### *JOHN WILLIAM HUMMEL*

### *WAIVER OF SERVICE*

Now comes Joe Shannon, Jr., Criminal District Attorney of Tarrant County, Texas and hereby acknowledges that he has this date, **June 5, 2013**, received from the District Clerk a copy of the petition for Writ of Habeas Corpus filed in the above entitled and numbered cause and he hereby waives delivery to him of said petition by certified mail.

It is further acknowledged that the answer to this petition, if any, will be filed within fifteen (15) days from this date.

*JOE SHANNON, JR.*
*CRIMINAL DISTRICT ATTORNEY*

*TARRANT COUNTY, TEXAS*

BY _Pat Halley_

F I L E D
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

June 5, 2013

Time _12:45 pm_
By _jlm_ , Deputy

469

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

**FILED**
TARRANT COUNTY, TEXAS
TIME BY
JUN 24 2013
3:33
Jim pur
DEPUTY

## STATE'S UNOPPOSED MOTION FOR COPIES
## OF JUROR QUESTIONNAIRES AND INFORMATION CARDS

TO THE HONORABLE JUDGE OF SAID COURT:

The State, by and through the Criminal District Attorney of Tarrant County, Texas, requests this Court to order the district clerk to provide the State with copies of all juror questionnaires and information cards filled out by potential jurors in cause number 1184294D.

### I.

A jury convicted Applicant of capital murder in cause number 184294D, styled *The State of Texas v. John William Hummel*, in the 432nd Judicial District Court of Tarrant County, Texas, the Honorable Ruben Gonzalez, judge presiding. The jury's answers to the special issues required the imposition of the death penalty.

### II.

On June 5, 2013, Applicant filed his initial application for writ for habeas corpus in cause number C-432-009923-1184294-A. *See* TEX. CODE CRIM. PROC. art. 11.071.

1



470

III.

In claim ten of his application, Applicant asserts that his appellate counsel was ineffective for failing to appeal the erroneous denial his trial counsels' valid challenges for cause of nine prospective jurors.   In claim eleven, Applicant contends that his trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove minority veniremembers in violation of his constitutional rights.

IV.

This Court previously granted the motion of the Office of Capital Writs to obtain copies of all juror questionaires and information cards filled out by potential jurors in Applicant's capital trial.  In order for the State to fully review, investigate, and respond to Applicant's claims relating to the jury-selection process, the State belives it will be necessary to review the information that trial counsel had in their possession regarding the potential jurors.  It may also be necessary for the State to allow access to this information to the trial attorneys for the State and/or Applicant's trial and appellate attorneys.  The State will not disclose these documents to anyone other than members of the prosecution team and/or Applicant's trial and appellate attorneys as necessary for the State and Applicant's trial and appellate counsel to review and respond to Applicant's contentions.

**471**

V.

The State has spoken to Robert Romig, one of Applicant's post-conviction attorneys with the Office of Capital Writs, which represents Applicant in this habeas proceeding. Mr. Romig informed the State that the Office of Capital Writs does not oppose this motion.

WHEREFORE, PREMISES CONSIDERED, the State requests this Court to order the district clerk to provide the State with copies of the juror questionnaires and information cards created in cause number 1184294D.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Section

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1685
FAX (817) 884-1672

3

**472**

## CERTIFICATE OF SERVICE

A true copy of the State's motion has been mailed to Applicant's habeas counsel,

Brad D. Levinson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N.

Congress Ave., Austin, Texas, 78701, on June 24, 2013.

_Helena F. Faulkner_
HELENA F. FAULKNER

4

**473**

No. C-432-009923-1184294-A

EX PARTE                                      §       IN THE 432ND JUDICIAL
                                              §
                                              §       DISTRICT COURT OF
                                              §
JOHN WILLIAM HUMMEL                           §       TARRANT COUNTY, TEXAS

### ORDER

The Court has considered the State's Unopposed Motion for Copies of Juror Questionnaires and Information Cards. The State's motion is GRANTED.

The District Clerk is ordered to provide the State with photocopies of all juror questionnaires and juror information cards in cause number 1184294D.

The State may only share information from juror questionnaires and information cards with other members of the prosecution team and with Applicant's trial and appellate attorneys. Upon exhaustion of the writ, the State is ordered to return all materials received from this Order to the District Clerk's Office.

SIGNED AND ORDERED on this _____ day of _____ 2013.

_____
**Judge Presiding**

**474**

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | JUDGE PRESIDING |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

**STATE'S UNOPPOSED MOTION FOR COPIES
OF SEALED EXHIBITS FILED WITH
APPLICATION FOR WRIT OF HABEAS CORPUS**

TO THE HONORABLE JUDGE OF SAID COURT:

The State, by and through the Criminal District Attorney of Tarrant County, Texas, requests this Court to order the district clerk to provide the State with copies Exhibits 32-41, which were filed under seal with the application for writ of habeas corpus in the instant cause.

I.

A jury convicted Applicant of capital murder in cause number 184294D, styled *The State of Texas v. John William Hummel*, in the 432nd Judicial District Court of Tarrant County, Texas, the Honorable Ruben Gonzalez, judge presiding. The jury's answers to the special issues required the imposition of the death penalty.

II.

On June 5, 2013, Applicant filed his initial application for writ for habeas corpus in cause number C-432-009923-1184294-A. *See* TEX. CODE CRIM. PROC. art. 11.071. The same day, the Court granted Applicant's Unopposed Motion to Seal Confidential Juror Information filed as Exhibits 32-41 with the application.

1

**475**

III.

Applicant raises several issues regarding jurors and jury selection. Exhibits 32-41 of the application are excerpts of jury questionnaires that contain personal information.

IV.

In order for the State to fully review, investigate, and respond to Applicant's claims relating to the jury-selection process, it is necessary for the State to have Exhibits 32-41 filed with the application. It may also be necessary for the State to allow access to this information to the trial attorneys for the State and/or Applicant's trial and appellate attorneys so that they may respond to Applicant's claims. The State will not disclose these exhibits to anyone other than members of the prosecution team and/or Applicant's trial and appellate counsel as necessary for the State and Applicant's trial and appellate counsel to review and respond to Applicant's contentions.

V.

The State has spoken to Robert Romig, one of Applicant's post-conviction attorneys with the Office of Capital Writs, which represents Applicant in this habeas proceeding. Mr. Romig informed the State that the Office of Capital Writs does not oppose this motion.

WHEREFORE, PREMISES CONSIDERED, the State requests this Court to order the district clerk to provide the State with copies of Exhibits 32-41 filed

2

**476**

with the application for writ of habeas corpus and ordered sealed in the instant case.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Section

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1685
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A true copy of the State's motion has been mailed to Applicant's habeas counsel, Brad D. Levinson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, on June 25, 2013.

HELENA F. FAULKNER

3

**477**

No. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## ORDER

The Court has considered the State's Unopposed Motion For Copies of Sealed Exhibits Filed with Application for Writ of Habeas Corpus.  The State's motion is GRANTED.

The District Clerk is ordered to provide the State with photocopies of sealed Exhibits 32-41 filed with the application for writ of habeas corpus in this cause.

The State may share information from juror questionnaires and information cards with other members of the prosecution team and with Applicant's trial and appellate attorneys.

SIGNED AND ORDERED on this _____ day of _____, 2013.

_____
Judge Presiding

**478**

No. C-432-009923-1184294-A

EX PARTE § IN THE 432ND JUDICIAL
§
§ DISTRICT COURT OF
§
JOHN WILLIAM HUMMEL § TARRANT COUNTY, TEXAS

**STATE'S MOTION FOR AFFIDAVITS
OF APPLICANT'S TRIAL AND APPELLATE COUNSEL**

TO THE HONORABLE JUDGE OF SAID COURT:

The State of Texas, by and through the Criminal District Attorney of Tarrant

County, Texas, requests this Court to order Applicant's counsel at trial and on direct

appeal to provide the State with affidavits in the instant cause.

I.

A jury convicted Applicant of capital murder in cause number 1184294D, styled

*The State of Texas v. John William Hummel*, in the 432nd Judicial District Court of

Tarrant County, Texas, the Honorable Ruben Gonzalez, judge presiding. The jury's

answers to the special issues required the imposition of the death penalty.

II.

On June 5, 2013, Applicant filed his initial application for writ for habeas corpus

in cause number C-432-009923-1184294-A. *See* TEX. CODE CRIM. PROC. art. 11.071.

Applicant contends that he was denied effective assistance of counsel at trial and on

direct appeal because:  (a) trial and appellate counsel failed to challenge the sufficiency

of the State's evidence to show that Applicant was a future danger (claim two); (b) trial

counsel failed to present evidence that Applicant was not a future danger through

1

**479**

testimony of officers from the Tarrant County Jail and of a behavioral or mental-health expert (claim three); (c) trial counsel failed to present expert testimony to explain Applicant's full life story and to draw connections for the jury between Applicant's life events and his later behaviors (claim four); (d) trial counsel failed to present the various witnesses and areas of testimony detailed in the application (claim five); (e) trial counsel failed to present Applicant's military service as mitigating evidence through the witnesses and areas of testimony detailed in the application (claim six); (f) trial counsel failed retain a qualified expert to testify that Applicant suffered from attachment trauma and complex post-traumatic stress disorder and to explain their significance as mitigation evidence, and instead relied only on expert testimony from Dr. Antoinette McGarrahan (claim seven); (g) trial counsel failed to object to and appellate counsel failed to challenge on appeal the impermissible, inflammatory, and prejudicial evidence regarding Jodi Hummel and Joy Hummel's unborn child at both phases of the trial (claim eight); (h) trial counsel failed to support motions to suppress Applicant's confession by introducing transcripts of telephone calls between United States Customs and Border Protection officers and the Kennedale police department and documents created by border officers during Applicant's detention (claim nine); (i) appellate counsel failed to sufficiently appeal the denial of Applicant's motions to suppress (claim nine); (j) appellate counsel failed to appeal the trial court's denial of defense counsel's challenges for cause of nine prospective jurors (claim ten); and (k) trial counsel failed to object that the State's use of peremptory strikes to remove minority veniremembers Gonzalez, Williams, and Dennis was discriminatory (claim eleven).

2

**480**

III.

In order to facilitate the resolution of Applicant's claims, it is necessary for Applicant's trial and appellate counsel to file affidavits addressing in detail Applicant's contentions in his application.

IV.

Applicant was represented at trial by the Hon. Fred Cummings and the Hon. Larry M. Moore.  He was represented on direct appeal by the Hon. John W. Stickels.

WHEREFORE, PREMISES CONSIDERED, the State prays that this Court order Mr. Moore, Mr. Cummings, and Mr. Stickels to each file an affidavit detailing his representation of Applicant in order to resolve the issues raised in this habeas proceeding.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Section

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1685
FAX (817) 884-1672

3

**481**

## CERTIFICATE OF SERVICE

A true copy of the State's motion has been mailed to Applicant's habeas counsel,

Brad D. Levinson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N.

Congress Ave., Austin, Texas, 78701, on June 26, 2013.

HELENA F. FAULKNER

4

**482**

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## MEMORANDUM

Applicant was convicted of capital murder and sentenced to death. Applicant has filed an application for writ of habeas corpus pursuant to TEX. CODE CRIM. PROC. art. 11.071 contending, among other grounds, that he was denied effective assistance of counsel at trial and on direct appeal.

## ORDER

Applicant's trial counsel, the Hon. Fred Cummings and the Hon. Larry M. Moore, are ordered to each file an affidavit discussing representation of Applicant in response to Applicant's allegations that counsel rendered ineffective assistance. Counsels' affidavits shall discuss in detail all relevant investigations, decision-making, and strategies. Counsel may attach documentary exhibits to the affidavits. Mr. Cummings's and Mr. Moore's affidavits shall fully address Applicant's claims that counsel were ineffective because they did not

(a) challenge the sufficiency of the State's evidence to show that Applicant was a future danger as alleged in claim two of the application;

(b) present evidence that Applicant was not a future danger through testimony of officers from the Tarrant County Jail and of a behavioral or mental-health expert as alleged in claim three of the application;

**483**

(c) present expert testimony to explain Applicant's full life story and to draw connections for the jury between Applicant's life events and his later behaviors as alleged in claim four of the application;

(d) present the various witnesses and areas of testimony detailed in claim five of the application;

(e) present Applicant's military service as mitigating evidence through the witnesses and areas of testimony detailed in claim six of the application;

(f) retain a qualified expert to testify that Applicant suffered from attachment trauma and complex post-traumatic stress disorder and to explain their significance as mitigation evidence, and instead relied only on expert testimony from Dr. Antoinette McGarrahan, as alleged in claim seven of the application;

(g) object to allegedly impermissible, inflammatory, and prejudicial evidence regarding Jodi Hummel and Joy Hummel's unborn child at both phases of the trial as alleged in claim eight of the application;

(h) support motions to suppress Applicant's confession by introducing transcripts of telephone calls between United States Customs and Border Protection officers and the Kennedale police department and documents created by border officers during Applicant's detention as alleged in claim nine of the application; and

(i) object that the State's use of peremptory strikes to remove minority veniremembers Gonzalez, Williams, and Dennis was discriminatory as alleged in claim eleven of the application.

2. Applicant's counsel on direct appeal, the Hon. John W. Stickels, is ordered to file an affidavit discussing his representation of Applicant on direct appeal to the Texas Court of Criminal Appeals. Mr. Stickels's affidavit shall address in detail Applicant's allegations that counsel was ineffective for failing to:

(a) challenge the sufficiency of the State's evidence to show future dangerousness as alleged in claim two of the application;

484

(b) challenge impermissible, inflammatory, and prejudicial evidence regarding Jodi Hummel and Joy Hummel's unborn child at both phases of the trial as alleged in claim eight of the application;

(c) sufficiently appeal the denial of Applicant's motions to suppress as alleged in claim nine of the application; and

(d) appeal the trial court's denial of defense counsel's challenges for cause of nine prospective jurors as alleged in claim ten of the application.

3.    Mr. Cummings, Mr. Moore, and Mr. Stickels shall each submit an original and three copies of his affidavit and any supporting documentation to the post-conviction writ clerk **on or before September 9, 2013.**

4.    The Clerk of this Court is ordered to send a copy of this memorandum and order to: (A) Hon. Fred Cummings at 4210 W. Vickery Blvd., Fort Worth, TX 76107, or at his most recent address; (B) Hon. Larry M. Moore, at 4210 W. Vickery Blvd., Fort Worth, TX 76107, or at his most recent address; (C) Hon. John W. Stickels at P.O. Box 121431, Arlington, TX, 76012, or at his most recent address; (D) Hon. Brad D. Levinson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, TX, 78701; and (E) the Appellate Section of the Tarrant County District Attorney's Office.

SIGNED AND ENTERED on this ___ day of _____, 2013.

_____
JUDGE PRESIDING

**485**

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## ORDER

The Court has considered the State's Unopposed Motion for Copies of Juror Questionnaires and Information Cards. The State's motion is GRANTED.

The District Clerk is ordered to provide the State with photocopies of all juror questionnaires and juror information cards in cause number 1184294D.

The State may only share information from juror questionnaires and information cards with other members of the prosecution team and with Applicant's trial and appellate attorneys.

Upon exhaustion of the writ, the State is ordered to return all materials received from this Order to the District Clerk's Office.

SIGNED AND ORDERED on this _3RD_ day of _July_, 2013.

_____
Judge Presiding

**486**

No. C-432-009923-1184294-A

EX PARTE                          §        IN THE 432ND JUDICIAL
                                  §
                                  §        DISTRICT COURT OF
                                  §
JOHN WILLIAM HUMMEL               §        TARRANT COUNTY, TEXAS

## ORDER

The Court has considered the State's Unopposed Motion For Copies of Sealed Exhibits Filed with Application for Writ of Habeas Corpus.  The State's motion is GRANTED.

The District Clerk is ordered to provide the State with photocopies of sealed Exhibits 32-41 filed with the application for writ of habeas corpus in this cause.

The State may share information from juror questionnaires and information cards with other members of the prosecution team and with Applicant's trial and appellate attorneys.

SIGNED AND ORDERED on this _____ day of _____, 2013.

_____
Judge Presiding

**487**

# IN THE 432ND DISTRICT COURT
# TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| John William Hummel, | ) | 1184294D |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## MOTION IN RESPONSE TO REQUEST FOR
## TRIAL AND APPELLATE COUNSEL AFFIDAVITS

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), opposes the State's request to order affidavits from Hummel's trial and direct appeal counsel. The submission of affidavits from trial counsel would create the possibility of privileged or otherwise non-discoverable information reaching the State without providing Hummel an opportunity to object and, further, does not provide a reliable basis for resolving the issues before this Court on post-conviction habeas review, as will be explained more fully below.

## I.

## PROCEDURAL HISTORY

Hummel is confined under a sentence of death pursuant to the judgment of this Court, case number 1184294D, which was entered on June 29, 2011. On that same day, this Court appointed John Stickels as appellate counsel on Applicant's behalf. On August 28, 2012, Mr. Stickels filed an opening brief on appeal, *John Hummel v. The State of Texas*, with the Texas Court of Criminal Appeals ("CCA"), cause number AP-76,596. The State filed a brief in response on January 22, 2013.

2

**488**

The issues raised on direct appeal are still pending before the CCA for consideration.

This Court appointed the OCW on June 30, 2011 to represent Hummel in his state habeas corpus proceedings. The OCW filed an initial state habeas application on June 5, 2013. The State's answer is due to this Court on October 3, 2013, or should the State seek a statutorily authorized sixty-day extension, on December 2, 2013.

## II.

## ARGUMENT

In a motion filed before this Court on June 26, 2013, the State requested that the Court order affidavits from Hummel's trial and direct appeal counsel (Fred Cummings, Larry Moore, and John Stickels) responding to Hummel's allegations of ineffective assistance of counsel. The OCW is opposed to this course of action, for the following reasons.

### A. An Evidentiary Hearing is Needed to Resolve the Many Factual Issues Raised by Hummel's Numerous Claims Alleging Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel focus not only on the actions and omissions of counsel, but also on the reasons for counsel's action or inaction. The actions and omissions complained of may have resulted from sheer inadvertence; they may have resulted from lack of knowledge or experience, inadequate time and resources, or conflicting demands; or they may have been the result of a deliberate decision to pursue a particular course of action. The process of identifying the underlying reasons for counsel's performance or lack thereof, and of distinguishing unreasonable judgments from reasonable judgments, requires the consideration and close examination of all factors and circumstances surrounding counsel's representation. Affidavits, however, inherently preclude the process that is

**489**

necessary to sort out all of the elements that went into the making of particular decisions.

Affidavits are generally produced by an affiant trying to recall somewhat distant events, some of which have faded from memory.  Even if the affiant is questioned by counsel for one side or the other and an affidavit is produced as a result of that process, the assistance the affiant has had in remembering relevant factors is likely to be partisan and one-sided.  The best way for the truth about prior judgments by trial and appellate counsel to be revealed is for the adversarial process to function fully; i.e. for both sides to have an opportunity to probe all the possible factors that influenced counsel's judgments before, during, and after trial, as well as on direct appeal.

The fact-finding process for claims of ineffective assistance of counsel should accordingly rest upon testimony by trial and appellate counsel in an adversarial proceeding, where the fact finder is able to determine the truth based upon counsel's candor in being confronted with and responding to all the factors that may have gone into particular judgment calls and/or courses of action.  Hummel therefore urges this Court to schedule an evidentiary hearing (following an answer by the State to Hummel's claim and once the decision by the CCA on Hummel's direct appeal has been handed down) on his ineffective assistance of counsel claims rather than limiting the parties to the submission of affidavits.

## B. Allowing the State to Collect—or Ordering Hummel's Trial Counsel to Provide—Affidavits Will Likely Prejudice Hummel's Attorney-Client Privilege

Serious issues concerning privileged and otherwise non-discoverable material (e.g. work-product material beyond the scope of the post-conviction issues being litigated, or irrelevant material) being made available to the State are implicated by the submission of affidavits from previous counsel.  As opposed to a

live evidentiary hearing, where habeas counsel would be afforded an opportunity to object and the Court a chance to rule on any objections before such material could be made known to the State, ordering that affidavits be provided to the OCW and the State at the same time provides Hummel with no such safeguard. Once privileged material is disclosed, the violation of that privilege cannot be remedied. *See, e.g., In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997) ("once putatively protected material is disclosed, the very right sought to be protected has been destroyed").

An applicant who raises claims of ineffective assistance on post-conviction habeas waives his attorney-client privilege as to some communications with counsel. However, because of the institutional importance accorded the attorney-client privilege, courts have uniformly held that an allegation of ineffective assistance waives the privilege *only so far* as is necessary to permit counsel to respond to the defendant's specific and particularized allegations regarding counsel's performance. Simply put, the scope of the defendant's ineffectiveness allegation dictates the scope of any resulting waiver. *See, e.g., Osband v. Woodford*, 290 F.3d 1036, 1042 (9th Cir. 2002) ("[A] petitioner in a habeas corpus action who raises a Sixth Amendment claim of ineffective assistance of counsel waives the attorney-client privilege as to the matters challenged") (emphasis added). Therefore, there are likely areas of Hummel's trial and appellate counsels' representations that remain protected under the attorney-client privilege.

## C. The Factual Areas to be Developed by Trial and Appellate Counsel Testimony Have Not Yet Been Designated by This Court

Currently, the State has until October 3, 2013, to respond to Hummel's claim of error in his initial state habeas application. It is unclear at this juncture which claims the State will choose to respond to and whether their responses will raise

**491**

issues of fact or law for this Court's consideration.[1]  It is at least conceivable that, based on the State's response, some of Hummel's claims may be granted or denied by this Court based purely on legal principles.  If so, those areas will not require factual development and there will be no requirement to pierce the attorney-client privilege.  Because the Court has not yet designated which ineffective assistance of counsel issues are to be litigated, if any, disclosure of information by previous counsel is both premature and potentially unethical.

Rules 1.6(b)(5) and 1.6(b)(6) of the American Bar Association's Rules of Professional Conduct provide that a lawyer may reveal information relating to his representation of a client without that client's informed consent to the extent the lawyer reasonably believes necessary in order to respond to allegations in any proceeding concerning his representation of the client or to comply with a court order.   ABA RULES OF PROFESSIONAL CONDUCT 1.6(b)(5), 1.6(b)(6).   Here, because the Court has not yet designated issues, there is no forum for previous counsel to determine what information might be necessary to reveal.  Moreover, there is not yet a formal proceeding underway necessitating any disclosure of information from previous counsel.  Therefore trial and/or appellate counsel being asked at this point to provide any information regarding their representation of Hummel would be tantamount to asking them to violate their ethical duties that stem from the client-attorney relationship.

A recent American Bar Association Ethics Opinion cautions that trial counsel in post-conviction proceedings is prohibited from disclosing confidential client information absent *court-supervised process*. ABA COMM. ON ETHICS AND PROF'L RESPONSIBILITY, Formal Op. 10–456 (2010).  Where evidence is required from trial counsel, "the lawyer can provide evidence fully, subject to judicial

---

[1] Texas law also allows the State to answer by raising a general denial to all claims.

**492**

determinations of relevance and privilege that provide a check on the lawyer disclosing more than is necessary to resolve the defendant's claim." *Id*.   An evidentiary hearing remains the best option for such judicial oversight and the reliable resolution of Hummel's habeas claims.

### D. The State Should be Prohibited from Contacting Previous Counsel outside Habeas Counsel's Presence, and Previous Counsel Should be Prohibited from Turning Over Any Materials to the State

Because examination of trial and appeal counsel is best done in an evidentiary hearing, and because issues of attorney-client privilege are implicated by any discussion with Hummel's prior and current counsel, Hummel further requests that the Court order the State not to communicate with previous counsel outside the presence of current counsel and also prohibit previous counsel from disclosing any materials to the State absent superseding court order.   Such orders will provide another necessary check on the possibility of non-remediable disclosure of privileged, confidential, or irrelevant information pertaining to Hummel.   Also, such orders will make it easier for previous counsel to abide by their ethical and professional responsibilities towards Hummel by removing any potential for casual, unintentional disclosures.

**493**

## III.

## PRAYER FOR RELIEF

For the foregoing reasons, Hummel requests this Court not order affidavits from previous counsel and instead hold an evidentiary hearing once the State has answered Hummel's application.  If the Court is inclined to allow or order the submission of affidavits, Hummel requests that these affidavits be submitted under seal directly to the Court and made reviewable by the OCW for objectionable privileged or otherwise non-discoverable material before being provided to the State.  Finally, Hummel requests that the State be ordered not to communicate with previous counsel absent current counsel's presence and that previous counsel be ordered not to disclose any material to the State absent a superseding court order.[2]

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:      July 2, 2013

By: _Robert Romig_
Robert Romig

By: _____
Sam Farina-Henry

---

[2] While it is recognized that the decisions of other trial courts are in no way binding on this Court, the OCW would respectfully bring to this Court's attention that an almost identical motion was recently granted by the presiding judge of the 71st Judicial District, Harrison County, in another capital state habeas proceeding. That order is incorporated hereto as Exhibit A.

**494**

# IN THE 432ND DISTRICT COURT
## TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | )<br>)<br>)<br>)<br>)<br>) | Trial Cause No.<br>1184294D |

## ORDER

On this date, the Court considered Hummel's Motion in Response to Request for Trial Counsel Affidavits. After due consideration, Hummel's Motion is GRANTED, and

1. No trial or appellate counsel affidavits will be called for at this time;
2. Additionally, the State is ordered not to communicate with previous counsel without current counsel being present; and
3. Previous counsel is ordered not to disclose any material to the State absent a superseding court order.

ORDERED AND SIGNED on this ___ day of_____, 2013.

_____
Ruben Gonzalez, Jr.
Judge, 432nd District Court

9

**495**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by hand)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by hand)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by hand)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on July 2, 2013, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_

Robert Romig

10

**496**

# Exhibit A

CAUSE NO. 09-0411

| | | |
|---|---|---|
| EX PARTE | § | HARRISON COUNTY, TEXAS |
| | § | |
| CORTNÉ MAREESE ROBINSON | § | 71ST JUDICIAL DISTRICT COURT |
| | § | |
| APPLICANT | § | |

## **ORDER**

On this date, the Court considered Applicant's Motion in Response to Request for Trial and Appellate Counsel Affidavits. After due consideration, Applicant's Motion is GRANTED, and

1. No trial counsel affidavits will be called for;

2. Trial counsel may be deposed by both parties in lieu of submitting affidavits;

3. Additionally, Mr. Dunn (and Mr. Hagan) are ordered not to communicate with previous counsel without current counsel being present; and

4. Previous counsel is ordered not to disclose any material to Mr. Dunn (or Mr. Hagan) absent a superseding court order.

ORDERED AND SIGNED on this ____5____ day of ___April___, 2013

_____
Presiding Judge, Judge Joe D. Clayton

**498**

# IN THE 432ND DISTRICT COURT
## TARRANT COUNTY, TEXAS

*FILED*
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS
JUL 0 3 2013
TIME  9:36 am
BY _____ DEPUTY

)
)  Trial Cause No.
EX PARTE                        )  1184294D
John William Hummel,            )
     APPLICANT         )
)
)

## MOTION IN RESPONSE TO REQUEST FOR
## TRIAL AND APPELLATE COUNSEL AFFIDAVITS

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**499**

CAUSE NUMBER ~~1187294D~~ 1184294D

|  | § | IN THE 432ND JUDICIAL |
|---|---|---|
| EX PARTE | § | |
| John William Hummel, | § | DISTRICT COURT |
| APPLICANT | § | |
|  | § | TARRANT COUNTY, TEXAS |

**ORDER**

On July 3, 2013, the defendant, John William Hummel, through his attorneys the Office of Capital Writs, filed a Motion in Response to Request for Trial and Appellate Counsel Affidavits from Hummel's trial and direct appeal counsel.

It is THEREFORE ORDERED that a hearing on this motion is set for **July 29, 2013, at 3:00 p.m.** The parties are ordered to be present and prepared to present any evidence and witnesses for the Court's consideration at that time.

So ordered, _10th_ day of July, 2013.


RUBEN GONZALEZ, JR.
JUDGE, 432ND DISTRICT COURT

**500**