# CLERK'S RECORD

## VOLUME 2 of 4

### Writ Number: C-432-009923-1184294-A

Filed In the **432ND DISTRICT COURT**
of Tarrant County, Texas
Hon. **RUBEN GONZALEZ, JR.**, Presiding Judge



## EX PARTE: JOHN WILLIAM HUMMEL

VS.

THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 29 2015

Abel Acosta, Clerk

## ATTORNEY FOR THE APPELLANT

**BRAD D. LEVENSON,**
**DIRECTOR, OFFICE OF CAPITAL WRITS**
**1700 N. CONGRESS AVE. SUITE 460**
**AUSTIN, TEXAS 78711**
**PHONE:** 512/463-8600
**FAX:** 512/463-8590
**SBOT:** 24073411
**Attorney for JOHN WILLIAM HUMMEL, Appellant**

Delivered to the Court of Criminal Appeals for the State Of
Texas At Capitol Station, AUSTIN, Texas, on the

26 day of January 2015

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

**SUSAN RUSSELL** *Susan Russell*

Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. **WR-81,578-01**
Filed in the Court of Criminal Appeals for the State of Texas,
at Capitol Station, AUSTIN, Texas, this

_____ day of _____, _____

LOUISE PEARSON , Clerk

By _____ , Deputy

# INDEX

Caption .................................................................................................................................1

Application for Writ of Habeas Corpus ..............................................................................2

Waiver of Service ..............................................................................................................469

State's Unopposed Motion for Copies of Juror Questionnaires and Information Cards .......................470

State's Unopposed Motion for Copies of Sealed Exhibits Filed with Application for
Writ of Habeas Corpus .....................................................................................................475

State's Motion for Affidavits of Applicant's Trial and Appellate Counsel .............................479

Order ................................................................................................................................486

Order ................................................................................................................................487

Motion in Response to Request for Trial and Appellate Counsel Affidavits ..........................488

Order ................................................................................................................................500

## VOLUME 2

State's Memorandum in Support of its Motion for Affidavits of Applicant's Trial and
Appellate Counsel ............................................................................................................501

Memorandum/Order .........................................................................................................524

Counsel's Affidavit in Response to Writ Allegations ...........................................................527

Order ................................................................................................................................557

Unopposed Motion to Extend Time to File the State's Reply to Application for
Writ of Habeas Corpus .....................................................................................................559

Memorandum/Order .........................................................................................................564

Affidavit of John W. Stickels (Post Conviction Application for Writ of Habeas Corpus) .........565

State's Reply to Application for Writ of Habeas Corpus ......................................................570

Response to State's Answer to Claim One of Hummel's Application for Habeas
Corpus Relief (Juror Misconduct); Request for Status Conference ......................................793

Order ............................................................................................................................801

Notice of Filing Supplemental Exhibits in Support of Article 11.071
Application Filed June 4, 2013 .......................................................................................802

Supplemental Response to State's Answer: Exhibits 42 through 46 ...................................813

Motion for Protective Order of Privileged Exhibits .............................................................910

State's Reply to Applicant's "Motion for Protective Order of Privileged Exhibits ...................916

Order ............................................................................................................................925

State's Motion to Extend Time to File its Supplemental Reply to Application for
Writ of Habeas Corpus ....................................................................................................926

Order ............................................................................................................................931

Counsel's Supplemental Affidavit in Response to Writ Allegations ......................................932

State's Supplemental Reply to Application for Writ of Habeas Corpus ................................943

## VOLUME 3

Unopposed Response to State's Motion for Court for Order Findings and Conclusions;
Proposed Order ............................................................................................................1009

State's Motion for Court to Order Preparation of Proposed Findings of Fact and
Conclusions of Law ........................................................................................................1014

This Page Not Used (1019-1023) ...................................................................................1019

Order ............................................................................................................................1024

Unopposed Response to State's Motion for Court to Order Findings and Conclusions:
Proposed Order ............................................................................................................1025

Applicant's Proposed Findings of Fact and Conclusions of Law: Proposed Order ..............1031

State's Proposed Memorandum, Findings of Fact, and Conclusions of Law .......................1107

Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law ........1245

Request for an Extension of Time to Resolve Issues and Enter Findings of Fact and
Conclusions of Law ............................................................................................................1383

Order ..................................................................................................................................1384

Order from the Court of Criminal Appeals of Texas ...........................................................1395

## VOLUME 4

Findings of Fact, Conclusions of Law, Recommendations and Order ..................................1398

Order ..................................................................................................................................1535

## INSTRUMENTS FILED IN CAUSE NUMBER 1184294D

Indictment ..........................................................................................................................1536
Capital Judgment ...............................................................................................................1538
Partial Reporter's Record Sentencing ................................................................................1542
Trial Court's Certification of Defendants Right of Appeal ...................................................1549
Court's Charge Guilt/Innocents ..........................................................................................1550
Court's Charge Punishment ...............................................................................................1565
Criminal Docket Sheet .......................................................................................................1574

## DOCUMENTS FILED PRIOR TO APPLICATION

Order ..................................................................................................................................1586
Unopposed Motion to Seal Confidential Juror Information (Capital Case) ..........................1587
Email to Abel Acosta ..........................................................................................................1590
Letter from Office of Capital Writs/Clerks Response ..........................................................1593
Letter from Office of Capital Writs/Clerks Response ..........................................................1596
Letter from Office of Capital Writs/Clerks Response ..........................................................1599
Order ..................................................................................................................................1602
Unopposed Motion for Ninety-Day Extension of Time to File Initial State
Habeas Application ............................................................................................................1604
Order ..................................................................................................................................1614
Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record;
Proposed Order .................................................................................................................1617
Unopposed Motion for Copies of Juror Questionnaires; Proposed Order ..........................1657

Clerk's Certificate..............................................................................................................1664

NO. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

## STATE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AFFIDAVITS OF APPLICANT'S TRIAL AND APPELLATE COUNSEL

COMES NOW the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and submits this memorandum in response to Applicant's Motion in Response to Request for Trial and Appellate Counsel Affidavits. In short, the State's Motion for Affidavits of Applicant's Trial and Appellate Counsel is supported by pertinent law and policy considerations, and Appellant has waived claims relating to attorney-client privilege insofar as the revelation of confidential or privileged information is reasonably necessary to respond to Applicant's ineffective-assistance allegations.

## I.
## Procedural History

A Tarrant County jury convicted Applicant of capital murder in cause number 1184294D for knowingly causing the deaths of his wife, Joy Hummel, and his father-in-law, Clyde Bedford, during the same criminal transaction. The jury's answers to the special issues required the imposition of the death penalty.

1

**501**

Applicant's direct appeal is pending in the Court of Criminal Appeals of Texas in cause number AP-76,596.

On June 5, 2013, Applicant filed his initial application for writ of habeas corpus pursuant to article 11.071 of the Texas Code of Criminal Procedure. Applicant's claims include allegations that his trial and appellate counsel rendered ineffective assistance of counsel. The State has not yet filed its reply to the application.

On June 26, 2013, the State filed a Motion for Affidavits of Applicant's Trial and Appellate Counsel. On July 3, 2013, Applicant filed a Motion in Response to Request for Trial and Appellate Counsel Affidavits. Applicant's motion opposed the State's request for affidavits on the grounds that: (1) an evidentiary hearing is needed to resolve the factual issues raised by Applicant's claims of ineffective assistance; (2) ordering trial counsel to provide affidavits will likely prejudice his attorney-client privilege; (3) the factual issues to be developed by counsel have not been designated by this Court; and (4) the State should be prohibited from contacting previous counsel outside habeas counsel's presence, and previous counsel should be prohibited from turning over any materials to the State. This Court set the matter for a hearing on July 29, 2013, at 3:00 p.m.

**502**

## II.
## ABA Formal Opinion 10-456, Cited By Applicant, Is Not Binding On This Court

Applicant cites ABA Formal Opinion 10-456, which states that, regarding responses to claims for ineffective assistance of counsel, "it is highly unlikely that a disclosure [by former counsel] in response to a prosecution request, *prior to a court-supervised response* by way of testimony or otherwise, will be justifiable." ABA STANDING COMM. ON ETHICS & PROF'L RESPONSIBILITY, Formal Op. 10-456, at 5 (2010) (emphasis added). ABA ethics opinions are not binding on this Court. *See In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998); *see also Melo v. United States*, 825 F.Supp. 2d 457, 463 n.2 (S.D.N.Y. 2011). The ABA opinion itself correctly notes that "[t]he laws, court rules, regulations, rules of professional conduct, and opinions promulgated in individual jurisdictions are controlling." ABA Formal Op. 10-456, at 1 n.1. Thus, this Court is not bound to follow the ABA's Formal Opinion 10-456.

## III.
## Court-Ordered Affidavits Are An Appropriate Means Of Investigating Applicant's Ineffective-Assistance Claims

Applicant contends that the filing of affidavits by his trial and appellate counsel will "likely" prejudice his attorney-client privilege and that a live hearing is required so that he can object and the Court can rule before disclosure of privileged information to the State. Ordinarily, an attorney is not permitted to

3

**503**

reveal confidential information relating to the representation of a client. *See* TEX. R. EVID. 503(b) (discussing general rule of attorney-client privilege); TEX. DISCIPLINARY R. OF PROF'L CONDUCT rule 1.05(b) (lawyer shall not reveal confidential client information except under certain circumstances); *Pope v. State*, 207 S.W.3d 352, 357-59 (Tex. Crim. App. 2006) (discussing attorney work-product privilege); *see also* ABA MODEL R. OF PROF'L CONDUCT rule 1.6(a) (lawyer shall not reveal information relating to representation of client except under certain circumstances).

However, there is no attorney-client privilege as to a communication relevant to an issue of breach of duty by an attorney to the client. TEX. R. EVID. 503(d)(3). Moreover, an attorney may disclose confidential information to the extent it is reasonably necessary to respond to allegations concerning the attorney's representation or to comply with other law or a court order. TEX. DISCIPLINARY R. OF PROF'L CONDUCT rule 1.05(c)(4)&(5); ABA MODEL R. OF PROF'L CONDUCT rule 1.6(b)(5)&(6). An attorney may also reveal unprivileged client information when the lawyer has reason to believe it is necessary in order to respond to allegations in any proceeding concerning the lawyer's representation of the client. TEX. DISCIPLINARY R. OF PROF'L CONDUCT rule 1.05(d)(2)(iii). The rules of professional conduct are not intended to govern or affect judicial application of the attorney-client or work-product privilege, and disclosure of such information may

4

**504**

be judicially compelled only in accordance with recognized exceptions to the attorney-client and work-product privileges. *Id.*, Preamble at ¶ 16.

An applicant alleging that counsel made unreasonable strategic decisions waives any claim of attorney-client privilege with respect to the specific claims asserted. *See United States v. Wines*, 691 F.3d 599, 612 n.21 (5th Cir. 2012) (habeas petitioner alleging ineffective assistance puts communications between himself and counsel directly in issue and implicitly waives attorney-client privilege with respect to those communications), *cert. denied*, 133 S. Ct. 892 (2013); *United States v. Pinson*, 584 F.3d 972, 977-78 (10th Cir. 2009) (same as *Wines*), *cert. denied*, 559 U.S. 955 (2010); *In re Lott*, 424 F.3d 446, 452-53 (6th Cir. 2005) (same as *Wines*), *cert. denied*, 547 U.S. 1092 (2006); *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001) (by alleging ineffective assistance in counsel's choice of defense strategy, Johnson put at issue and waived any privilege that might apply to contents of conversations with counsel to extent those conversations bore on strategic choices), *cert. denied*, 535 U.S. 926 (2002); *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967) ("where, as here, the client alleges a breach of duty to him by the attorney, [federal courts] have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue"); *Ex parte Mowbray*, 943 S.W.2d 461, 467 n.3 (Tex. Crim. App. 1996) (Keller, J., dissenting) (noting that "[a]pparently, no one recognized that applicant

**505**

had waived the attorney/client privilege when she alleged ineffective assistance of counsel"), *cert. denied*, 521 U.S. 1120 (1997); *see also* ABA Formal Opinion 10-456, at 2 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 80(1)(b) & cmt. c (2000) ("A client who contends that a lawyer's assistance was defective waives the privilege with respect to communication relevant to that contention.  Waiver affords to interested parties fair opportunity to establish the facts underlying the claim")).  The seminal ineffective-assistance case, *Strickland v. Washington*, 466 U.S. 669 (1984), itself hinted at the requirement of waiving the privilege.  *Id.* at 691 ("inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions").  This principle of waiver prevents a party from using the privilege as both a sword and a shield.  *See, e.g.*, *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield"); *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir.) ("the attorney-client privilege cannot at once be used as a shield and a sword"), *cert. denied*, 502 U.S. 813 (1991).

Here, Applicant's trial and appellate counsel may, without violating the ethical rules of confidentiality or attorney-client privilege, reveal otherwise privileged information to the extent that such disclosure is reasonably necessary to

**506**

defend themselves against Applicant's specific allegations of ineffective assistance. *See United States v. Ballard*, 779 F.2d 287, 292 (5th Cir.) (lawyer may reveal otherwise privileged communications from client to defend himself against charges of improper conduct without violating ethical rules of confidentiality or attorney-client privilege), *cert. denied*, 475 U.S. 1109 (1986).   Fairness in the judicial process entitles the State to prove the absence of the alleged ineffective assistance – anything less would render the attorney-client privilege a tool for concealment of evidence which is material to the issues raised by Applicant.   If Applicant wished to preserve the confidentiality of privileged communications, he could have chosen not to pursue a claim giving rise to a waiver of the privilege.

Applicant's contention that this Court should address his ineffective-assistance claims *only* by way of in-court live testimony from trial and appellate counsel is without merit.   Article 11.071 expressly authorizes this Court to order affidavits responding to factual issues material to the legality of an applicant's confinement.   TEX. CODE CRIM. PROC. art. 11.071, § 9(a) ("the court may use affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection").   Article 11.071 contains no requirement that counsel's disclosure of information to address Applicant's specific claims of ineffective assistance be made for the first time on the record at a live evidentiary hearing. Likewise, nothing in the Texas or ABA rules of professional conduct provides for

7

**507**

or requires any type of court supervision over an attorney's exercise of his discretion about whether to disclose privileged information reasonably necessary to defend against allegations of ineffective assistance.[1] *See* N.C. STATE BAR, 2011 Formal Ethics Op. 16, 2011 WL 525434 (reviewing language of North Carolina's applicable ethics rules and declining to adopt ABA Formal Op. 10-456). Affidavits have been used by trial courts to resolve ineffective-assistance allegations raised in habeas proceedings. *E.g.*, *Ex parte Broadway*, 301 S.W.3d 694, 696 (Tex. Crim. App. 2009) (trial court considered affidavit from attorney accused of ineffective assistance to enter findings of fact and conclusions of law).

Even if the ABA's Formal Opinion 10-456 were somehow controlling on this Court (which it is not), the opinion does not purport to prohibit an attorney from providing an affidavit to the State when confronted with an ineffective-assistance-of-counsel claim in a habeas application. *See Melo*, 825 F.Supp. 2d at 463 n.2 (citing *Douglas v. United States*, 2011 WL 335861 at *1 (S.D.N.Y. January 28, 2011) (not designated for publication)). "There is no reason that an attorney's initial testimony would need to be otherwise than by affidavit. It is the Court, not the ABA, that is best positioned to decide whether or not to order live testimony in order to resolve credibility issues." *Douglas*, 2011 WL 335861 at *4.

---

[1] If Applicant's former counsel believe that they are unable to comply with the Court's order for affidavits without unnecessarily violating the attorney-client privilege or cannot reasonable determine the scope of Applicant's waiver of the privilege, they are free to seek this Court's guidance.

**508**

Further, the ABA lacks the authority to alter Texas' habeas procedures set forth in article 11.071 by requiring the taking of live testimony or to prohibit the obtaining of court-ordered affidavits from Applicant's trial and appellate counsel. *See id.*

The State's proposed order for affidavits from trial and appellate counsel is wholly consistent with trial and appellate counsels' ethical obligations to reveal no more confidential or privileged information than is necessary because it specifically delineates the areas of alleged deficient conduct to be addressed in counsels' affidavits. The proposed order, in conjunction with the habeas application, make it clear which privileged information counsel may or may not need to disclose in addressing Applicant's contentions.

Further, a court order will subject counsels' affidavits to judicial scrutiny and oversight. Indeed, there is less likelihood of an inadvertent disclosure of confidential or privileged information in an affidavit drafted by counsel after careful review and reflection than under the rigors of live testimony. Such a court-ordered filing would bring counsels' affidavits and disclosures within the Court's supervision, which is consistent with ABA Formal Opinion 10-456. *See Dunlap v. United States*, 2011 WL 2693915 at *1 n.4 (D.S.C. July 12, 2011) (not designated for publication); *Douglas*, 2011 WL 335861 at *4 (interpreting the phrase "court-supervised testimony" in ABA Formal Op. 10-456 to encompass court's procedure for attorney affidavits); *see also Crusoe v. United States*, 2012 WL 877018 at *2

9

**509**

(N.D. Iowa March 15, 2012) (not designated for publication) (directing former counsel to file affidavits containing all information he reasonably believed necessary to respond to specific allegations of ineffective assistance, and referring to the ordered affidavit as "[t]his court-supervised response"). Both the Texas and ABA rules of professional conduct allow disclosure to the extent the attorney believes it is reasonably necessary to comply with other law or a court order. TEX. DISCIPLINARY R. OF PROF'L CONDUCT 1.05(c)(4); ABA MODEL R. OF PROF'L CONDUCT 1.6(b)(6) Even ABA Formal Opinion 10-456 suggests that an attorney can ethically respond to claims made against him when a court directs him to do so. *See* ABA Formal Op. at 1 ("it is highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable").

Applicant suggests that a live evidentiary hearing is needed because affidavits inherently preclude the process of sorting out the elements that went into particular decision-making of his former counsel and can lead to biased recollections.[2] It would be premature to determine whether a live evidentiary hearing is needed on any of the issues raised by Applicant before the State has been afforded a full and fair opportunity to investigate and respond to Applicant's

---

[2] Applicant's skepticism of affidavits apparently does not extend to his own application, which is supported by 22 affidavits. *See* Exhibits 1-22 attached to Initial Application for Writ of Habeas Corpus.

**510**

allegations. Further, Applicant misinterprets the purpose of designating issues and conducting a live evidentiary hearing as provided in section 9 of article 11.071. An evidentiary hearing is designed to resolve controverted, previously unresolved factual issues; its purpose is not to allow an applicant to develop factual issues for the first time. *See* TEX. CODE CRIM. PROC. art. 11.071, § 9 (court shall order a hearing if it determines "that controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist"). Applicant had ample opportunity to develop, and should have developed, the facts supporting his ineffective-assistance claims prior to filing his application. However, Applicant has presented no evidence demonstrating any explanation or motive for counsels' alleged deficient actions.[3]

Court-ordered affidavits provided by Applicant's trial and appellate counsel should supply the basic information the State needs in order to respond to Applicant's claims of ineffective assistance while simultaneously ensuring a reasonable limitation on the breadth of the waiver of the attorney-client privilege. Moreover, such affidavits will be useful to the Court in determining whether a live evidentiary hearing is necessary and, if so, which of Applicant's contentions merits such a hearing. If the Court determines that a live evidentiary hearing is

---

[3] Thus, in the event that the Court does not allow affidavits, the application should be summarily denied because Applicant has failed to rebut the presumption that that counsels' decisions were reasonable. Failure to make this required showing defeats Applicant's claims of ineffectiveness. *See Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999).

11

**511**

unnecessary, the affidavits of trial and appellate counsel will assist the parties in proposing, and the trial court in entering, findings of fact and conclusions of law as required by section 9(e) of section 11.071. *See id.* § 9(e).

For each of the foregoing reasons, the State requests that the Court order Applicant's trial and appellate counsel to file affidavits addressing Applicant's specific claims of ineffective assistance.

## IV.
## The State Must Be Allowed To Interview
## Former Counsel Without Oversight By Habeas Counsel

As previously discussed, Applicant, by raising claims of ineffective assistance, has waived any claim of attorney-client privilege as it relates to his specific allegations of ineffective assistance. *See Wines*, 691 F.3d at 612 n.21; *Pinson*, 584 F3d at 977; *Johnson*, 256 F.3d at 1178. Thus, allowing the State to discuss Applicant's specific allegations with his trial and appellate counsel will not violate Applicant's attorney-client privilege.

Moreover, Applicant's request that the Court prevent the State from communicating with his trial and appellate counsel is without binding precedent or support in the Code of Criminal Procedure, and is contrary to the legislature's clear intent that "[i]t shall be the primary duty of all prosecuting attorneys, including special prosecutors, not to convict, but to see that justice is done." TEX. CODE CRIM. PROC. art. 2.01. Moreover, the State has a legitimate interest in the finality

**512**

of Applicant's conviction. *Ex parte Moreno*, 245 S.W.3d 419, 429 (Tex. Crim. App. 2008) (State possesses legitimate interest in the "repose and finality of convictions"). Consistent with this duty and interest, it may be necessary for the State to interview or otherwise communicate with trial and appellate counsel after they have been ordered to file affidavits so that the State may fully investigate and respond to Applicant's grounds for relief. Counsel always retains the option to not communicate with the State or to decline to reveal certain information to the State.

Applicant's claims of ineffective assistance of counsel have made his trial and appellate counsel crucial witnesses in this habeas proceeding. The ability to interview witnesses is a valuable investigative tool which should not be denied here. Applicant cannot use the attorney-client privilege as a sword and a shield to prevent the State from conducting a full investigation. *See, e.g., Chevron Corp.*, 974 F.2d at 1162 ("The privilege which protects attorney-client communications may not be used both as a sword and a shield"). Fairness certainly dictates that the State not be required to respond to Applicant's allegations, or to participate in a live evidentiary hearing if one is eventually ordered, without being accorded a full opportunity to prepare by speaking to the only witnesses with first-hand knowledge of the facts pertinent to Applicant's allegations of ineffective assistance. Nor should trial and appellate counsel be forced to participate in a live evidentiary

13

**513**

hearing without having the opportunity to be interviewed by the parties, an opportunity that would be afforded any other witness.

Applicant provides no binding authority allowing or requiring this Court to restrict the State's ability to discuss Applicant's specific ineffective-assistance allegations with his trial and appellate counsel. Nor has he provided any evidence that trial and appellate counsel would be likely to divulge privileged information beyond the scope of the Court's order. Applicant's trial counsel are experienced, highly skilled officers of the court who fully understand their ethical obligations to Applicant and who can be trusted to abide by their obligations to Applicant and the Court.[4] *See* State's Exhibit A (Affidavit of Larry M. Moore) & B (Affidavit of Fred Cummings), both attached hereto and incorporated herein.

The federal district court in *Giordano v. United States*, 2011 WL 1831578 (D.Conn. March 17, 2011) (not designated for publication), refused to impose a requirement that the court directly supervise every interaction between the government and the attorney who allegedly provided ineffective assistance or to require that such interviews be on the record. *Id.* at *3. The court reasoned:

> In this Court's experience, attorneys are for the most part very familiar with the process of determining whether specific materials are protected during the course of discovery, and the process of

---

[4] Until now, Applicant's trial and appellate counsel have been trusted to protect privileged and confidential information in representing Applicant and in dealing with the State and others. There is absolutely no reason to assume that counsel will not continue to protect any such information that is not reasonably necessary to disclose in order comply with an order of this Court in responding to Applicant's ineffective-assistance claims.

14

**514**

determining whether the privilege has been waived with regard to specific documents and communications between Mr. Giordano and his former counsel should not be much more difficult than that ordinary process. Here, all counsel are very experienced.

*Id.*

Any restriction on the State's ability to freely communicate with witnesses who are crucial to this habeas proceeding and to the State's ability to investigate and fully respond to Applicant's allegations of ineffective assistance is unwarranted, contrary to the wide ranging discovery encouraged in section 9 of article 11.071, and antithetical to the State's legitimate interests in finality and justice. Thus, this Court should deny Applicant's request to prevent the State from communicating with Applicant's trial and appellate counsel.

## V.
## Prayer

The State requests that this Court adopt its proposed order for affidavits from Applicant's trial and appellate counsel and place no restrictions on the State's ability to communicate with Applicant's trial and appellate counsel.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Section

15

**515**

_(signature)_

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1685
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A true copy of the State's memorandum has been mailed to Applicant's counsel Brad D. Levinson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, on July 26, 2013.

_(signature)_

HELENA F. FAULKNER

16

**516**

# STATE'S EXHIBIT A
## (Affidavit of Larry M. Moore)

No. C-432-009923-1184294-A

| EX PARTE | * | IN 432nd JUDICIAL |
|---|---|---|
| | * | DISTRICT COURT |
| JOHN WILLIAM HUMMEL | * | TARRANT COUNTY, TEXAS |

# AFFIDAVIT

*BEFORE ME*, the undersigned authority, on this date personally appeared the Affiant, a person known by me to be Larry M. Moore, Attorney at Law, who, after being duly sworn by me, stated as follows:

"My name is Larry M. Moore, and I am an Attorney at Law, duly licensed to practice law in the State of Texas.   I was previously appointed as one of the two trial attorneys representing Mr. John William Hummel (the Applicant in this writ application), in Cause No. 1184294, the case which is the underlying basis for this proceeding.  I am aware that the State's Counsel has requested that the Court order Mr. Fred Cummings (Mr. Hummel's other appointed trial counsel in this case), and me, to respond to the ineffective assistance of counsel claims made against us in this writ application.  I have been contacted by Ms. Helena Faulkner, the State's Counsel in this proceeding, and she has advised me that she wishes to call me to testify at a hearing on this matter to be held on Monday, July 29th, 2013; however, I am currently scheduled to leave town for a family vacation on Sunday, July 28th, 2013, and I am not scheduled to return until Friday evening, August 2nd, 20123.  For that reason, Mr. Faulkner has requested that I provide her with an Affidavit detailing my education, training and experience regarding criminal law matters, and my familiarity with the ethical requirements regarding attorney/client confidentiality as required by State Bar Rules. It is for these purposes <u>only</u> that this Affidavit is being submitted.  Although I have briefly scanned the writ application filed in this case, and I therefore have a general

**518**

understanding of ineffective assistance claims being made against us as Mr. Hummel's trial counsel, I have not yet fully read the Application, nor any of its supporting attachments. I have not discussed anything regarding the merits of these claims with the State's Counsel, nor will I do so, in the absence of a Court Order compelling me to do so. I do believe however, that in order to effectively answer these claims, I will be compelled to reveal privileged attorney/client information, specifically including attorney/client communications. I also believe that in order to effectively answer these claims, I will need to have access to our case files in this matter, which have previously been provided to Applicant's writ attorneys with the Applicant's consent; therefore, I have formally requested that those files be returned to us for that purpose, and for purposes of our continuing representation of the Applicant in the two capital murder cases which remain pending against him in the trial court.

I have been licensed to practice law in the State of Texas since November of 1977. I am also licensed to practice in the United States District Court for the Northern District of Texas; the United States Court of Appeals for the Fifth Circuit; and the United States Supreme Court. I am Board Certified in Criminal Law by the Texas Board of Legal Specialization, and I have been so certified since 1982. I was awarded an "*AV Rating*" for "*legal expertise and professional reputation*" by Martindale-Hubbell in September of 1997, and I have maintained that same rating since that date. I have been designated as a "*Texas Super Lawyer*" by *Law and Politics*, as published in *Texas Monthly Magazine*, in each successive year beginning in 2004. From November of 1977, until January 31st, 1986, I served as an Assistant Criminal District Attorney for the Office of the Criminal District Attorney of Tarrant County, Texas. During my tenure as an Assistant District Attorney, I served for several years as Chief of the Economic Crimes Section of that Office; and from November of 1984, through January 31st, 1986, I served as Director of the Criminal Division of that Office, supervising all of the criminal trial attorneys within that office. I have been engaged in the private practice of law since February 1st, 1986, and my practice is devoted exclusively to criminal defense. I have

**519**

continuously maintained an office for the practice of law in Tarrant County, Texas, since February 1st, 1986, and I have represented a large number of defendants in a variety of criminal cases in the criminal courts of Tarrant County, Texas; in the criminal courts of a number of other counties within the State of Texas; in the United States District Court for the Northern District of Texas; in various appellate courts of the State of Texas; and before the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court. I have particular experience in the trial of death penalty cases, having participated in more than a dozen death penalty trials, both in State and federal court. I served on the Committee appointed pursuant to Texas Code of Criminal Procedure Article 26.052, for the formulation and implementation of *Standards for the Qualification of Attorneys for Appointment to Death Penalty Cases in the 8th Administrative Judicial Region of Texas*, from the inception of that Committee upon the enactment of Article 26.052, until 2011; and during my tenure on that Committee, I was the person that was primarily responsible f or the original drafting, and subsequent re-draftings of those *Standards*. I have previously served at two separate times on the State Bar of Texas Committee on Legal Services to the Poor in Criminal Matters; and while serving on that Committee, I was involved in the drafting and implementation of the *State Bar of Texas' Standards for Representation in Death Penalty Cases,* and in the Committee's drafting of its *State Bar Standards for Representation in Non-Capital Cases*. I have previously testified on a number of occasions as an expert witness in regard to various aspects of criminal law and procedure in various courts of the State of Texas, and I have written a number of articles, and spoken at a number of continuing legal education seminars dealing with criminal law topics throughout the State of Texas; including seminars developed and sponsored by the State Bar of Texas; the Texas Criminal Defense Lawyers Association; the Tarrant County Criminal Defense Lawyers Association; the Center for American and International Law; and the Texas Corrections Association. I previously served for approximately three years as an adjunct professor at Texas Wesleyan University School of Law, wherein I supervised the Wesleyan Innocence Project, and

**520**

oversaw the Project's investigation and prosecution of post-conviction innocence claims. I have "team taught" two graduate seminars, and an undergraduate senior level course, on the death penalty at the University of Texas at Arlington. I was previously elected to serve on the Boards of Directors for the Texas Criminal Defense Lawyers Association, and for the Tarrant County Criminal Defense Lawyers Association, ultimately serving as President of the Tarrant County Criminal Defense Lawyers Association in 2004. By education, training and experience, I believe that I am cognizant of the requirements for the "effective assistance of counsel" in a criminal case, particularly including death penalty cases.

I am also familiar with the requirements of Rule 1.05, of the Texas Disciplinary Rules of Professional Conduct, dealing with *"Confidentiality of Information,"* and I am generally familiar with the Texas State Bar Rules as they pertain to the attorney/client confidentiality, and with the Texas Rules of Evidence as they pertain to the attorney/client privilege. I am also aware that in order to answer a claim of ineffective assistance of counsel, a lawyer may only reveal such confidential attorney/client information as is *"reasonably necessary"* to defend himself, or his agents and co-counsel, against such claims."



LARRY M. MOORE
TX. ST. BAR No. 14357800

SUBSCRIBED and SWORN to before me on this the 25th day of July, 2013.

KIMBERLY MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 5-31-2014

KIMBERLY MOORE, Notary Public

**521**

# STATE'S EXHIBIT B
**(Affidavit of Fred Cummings)**

**522**

CAUSE NO. C-432-009923-1184294-A

EX PARTE                                    IN THE 432ND DISTRICT COURT

                                           OF

JOHN WILLIAM HUMMEL                         TARRANT COUNTY, TEXAS

## *AFFIDAVIT*

 *BEFORE ME*, the undersigned authority on this day personally appeared the person known to me to be the Affiant, who, after being duly sworn by me, under oath stated:

  "My name is Fred Cummings. I have been licensed by the State of Texas as an attorney and counselor of law since May 9, 1986. I have been Board Certified in Criminal Law by the Texas Board of Legal Specialization since December 1993 and I have been Board Certified in Criminal Trial Advocacy by the National Board of Trial Advocacy since October 16, 1996. I have been approved for appointment to death penalty cases since 2002. I have been trial counsel in three cases in which the death penalty was assessed. I have represented more than twenty-five other capital murder defendants where a death sentence was not assessed. I have attended more than 230 hours of legal seminars specific to death penalty litigation since 2002. I am familiar with the Guidelines and Standards for Texas Capital Counsel regarding my duties as trial counsel after conviction; the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases; and the Disciplinary Rules of Professional Conduct of the State Bar of Texas. I strive to comply with these rules and guidelines when I respond to claims raised in writs of habeas corpus. In the past, I have responded in the District Courts of Tarrant County by affidavit and by testimony.

         Fred Cummings, *Affiant*

*SUBSCRIBED* and *SWORN* to before me Aundrea Conca, on this the 26th day of July 2013.

         Aundrea Conca, Notary Public

> AUNDREA KRISTINA CONCA
> Notary Public, State of Texas
> My Commission Expires
> August 11, 2015

1

**523**

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

*FILED*
*THOMAS A WILDER, DIST CLERK*
*TARRANT COUNTY, TEXAS*
*JUL 2 9 2013*
*TIME 3:42*
*BY Jim pm*
*DEPUTY*

## MEMORANDUM

Applicant was convicted of capital murder and sentenced to death. Applicant has filed an application for writ of habeas corpus pursuant to TEX. CODE CRIM. PROC. art. 11.071 contending, among other grounds, that he was denied effective assistance of counsel at trial and on direct appeal.

## ORDER

1.    Applicant's trial counsel, the Hon. Fred Cummings and the Hon. Larry M. Moore, are ordered to each file an affidavit discussing representation of Applicant in response to Applicant's allegations that counsel rendered ineffective assistance. Counsels' affidavits shall discuss in detail all relevant investigations, decision-making, and strategies. Counsel may attach documentary exhibits to the affidavits. Mr. Cummings' and Mr. Moore's affidavits shall fully address Applicant's claims that counsel were ineffective because they did not:

   (a) challenge the sufficiency of the State's evidence to show that Applicant was a future danger as alleged in claim two of the application;

   (b) present evidence that Applicant was not a future danger through testimony of officers from the Tarrant County Jail and of a behavioral or mental-health expert as alleged in claim three of the application;

**524**

(c) present expert testimony to explain Applicant's full life story and to draw connections for the jury between Applicant's life events and his later behaviors as alleged in claim four of the application;

(d) present the various witnesses and areas of testimony detailed in claim five of the application;

(e) present Applicant's military service as mitigating evidence through the witnesses and areas of testimony detailed in claim six of the application;

(f) retain a qualified expert to testify that Applicant suffered from attachment trauma and complex post-traumatic stress disorder and to explain their significance as mitigation evidence, and instead relied only on expert testimony from Dr. Antoinette McGarrahan, as alleged in claim seven of the application;

(g) object to allegedly impermissible, inflammatory, and prejudicial evidence regarding Jodi Hummel and Joy Hummel's unborn child at both phases of the trial as alleged in claim eight of the application;

(h) support motions to suppress Applicant's confession by introducing transcripts of telephone calls between United States Customs and Border Protection officers and the Kennedale police department and documents created by border officers during Applicant's detention as alleged in claim nine of the application; and

(i) object that the State's use of peremptory strikes to remove minority veniremembers Gonzalez, Williams, and Dennis was discriminatory as alleged in claim eleven of the application.

2.     Applicant's counsel on direct appeal, the Hon. John W. Stickels, is ordered to file an affidavit discussing his representation of Applicant on direct appeal to the Texas Court of Criminal Appeals.   Mr. Stickels' affidavit shall address in detail Applicant's allegations that counsel was ineffective for failing to:

(a) challenge the sufficiency of the State's evidence to show future dangerousness as alleged in claim two of the application;

**525**

(b) challenge impermissible, inflammatory, and prejudicial evidence regarding Jodi Hummel and Joy Hummel's unborn child at both phases of the trial as alleged in claim eight of the application;

(c) sufficiently appeal the denial of Applicant's motions to suppress as alleged in claim nine of the application; and

(d) appeal the trial court's denial of defense counsel's challenges for cause of nine prospective jurors as alleged in claim ten of the application.

3.      Mr. Cummings, Mr. Moore, and Mr. Stickels shall each submit an original and three copies of his affidavit and any supporting documentation to the post-conviction writ clerk **on or before September 9, 2013.**

4.      The Clerk of this Court is ordered to send a copy of this memorandum and order to: (A) Hon. Fred Cummings at 4210 W. Vickery Blvd., Fort Worth, TX, 76107, or at his most recent address; (B) Hon. Larry M. Moore, at 4210 W. Vickery Blvd., Fort Worth, TX, 76107, or at his most recent address; (C) Hon. John W. Stickels at P.O. Box 121431, Arlington, TX, 76012, or at his most recent address; (D) Hon. Brad D. Levinson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, TX, 78701; and (E) the Appellate Section of the Tarrant County District Attorney's Office.

SIGNED AND ENTERED on this _29th_ day of _July_, 2013.

JUDGE PRESIDING

**526**

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | * | IN 432nd JUDICIAL |
| | * | DISTRICT COURT |
| JOHN WILLIAM HUMMEL | * | TARRANT COUNTY, TEXAS |

### COUNSEL'S AFFIDAVIT IN RESPONSE TO WRIT ALLEGATIONS

*BEFORE ME*, the undersigned authority, on this date personally appeared the Affiant, a person known by me to be Larry M. Moore, Attorney at Law, who, after being duly sworn by me, stated as follows:

"My name is Larry M. Moore, and I am an Attorney at Law, duly licensed to practice law in the State of Texas.   I was previously appointed as one of the two trial attorneys representing Mr. John William Hummel (the Applicant in this *Writ Application*), in Cause No. 1184294, the case which is the underlying basis for this proceeding.  I have received a copy of the Court's Order dated July 29th, 2013, ordering that I and Fred Cummings (Mr. Hummel's other appointed trial counsel in this case), file written affidavits in this cause on or before September 9th, 2013, responding to the ineffective assistance of counsel claims made against us in the *Writ Application*, more particularly Claims Numbers 2, 3, 4, 5, 6, 7, 8, 9 and 11.  This Affidavit is therefore submitted pursuant to that Order of the Court.

### Professional Background

I have been licensed to practice law in the State of Texas since November of 1977.  I am also licensed to practice in the United States District Court for the Northern District of Texas; the United States Court of Appeals for the Fifth Circuit; and the United States Supreme Court.   I am Board Certified in Criminal Law by the Texas Board of Legal Specialization, and I have been so certified since 1982.   I was awarded an *"AV Rating"* for *"legal expertise and professional reputation"* by Martindale-Hubbell in September of 1997, and I have maintained that rating since that date (now designated as *"AV Preeminent"*).  I

**527**

have been chosen as a *"Texas Super Lawyer"* by *Law and Politics*, and as published in *Texas Monthly Magazine*, in each successive year beginning in 2004.  From November of 1977, until January 31st, 1986, I served as an Assistant Criminal District Attorney for the Office of the Criminal District Attorney of Tarrant County, Texas.  During my tenure as an Assistant District Attorney, I served for several years as Chief of the Economic Crimes Section of that Office; and from November of 1984, through January 31st, 1986, I served as Director of the Criminal Division of that Office, supervising all of the criminal trial attorneys within the office (well over 100 lawyers).  I have been engaged in the private practice of law since February 1st, 1986, and my practice is devoted exclusively to criminal defense.  I have continuously maintained an office for the practice of law in Fort Worth, Tarrant County, Texas, since February 1st, 1986; and I have represented a large number of defendants in a variety of criminal cases in the criminal courts of Tarrant County, Texas; in the criminal courts of a number of other counties within the State of Texas; in the United States District Court for the Northern District of Texas; in various appellate courts within the State of Texas; and before the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court.  I have particular experience in the trial of death penalty cases, having participated in approximately a dozen death penalty trials, both in State and federal court.  I previously served on the Committee appointed pursuant to Texas Code of Criminal Procedure Article 26.052, for the formulation and implementation of *Standards for the Qualification of Attorneys for Appointment to Death Penalty Cases in the 8th Administrative Judicial Region of Texas*, from the inception of that Committee upon the original enactment of Article 26.052, until 2011; and during my tenure on that Committee, I was the person that was primarily responsible for the original drafting, and subsequent re-draftings of those *Standards*.  I have previously served at two separate times on the State Bar of Texas Committee on Legal Services to the Poor in Criminal Matters, and while serving on that Committee, I was involved in the drafting and implementation of the *State Bar of Texas Standards for Representation in Death Penalty Cases;* and later, in the Committee's drafting of its *State Bar of Texas Standards for Representation in Non-Capital*

*Cases*. I have previously testified on a number of occasions as an expert witness in regard to various aspects of criminal law and procedure in various courts of the State of Texas, and I have written a number of articles, and spoken at a number of continuing legal education seminars dealing with criminal law topics throughout the State of Texas; including seminars developed and sponsored by the State Bar of Texas; the Tarrant County Criminal District Attorney's Office; the Texas Criminal Defense Lawyers Association; the Tarrant County Criminal Defense Lawyers Association; the Center for American and International Law; and the Texas Corrections Association. I previously served for approximately three years as an adjunct professor at Texas Wesleyan University School of Law, wherein I supervised the Wesleyan Innocence Project, and oversaw the Project's investigation and prosecution of post-conviction innocence claims. I have previously helped to *"team teach"* two graduate seminars and an undergraduate senior level course on the death penalty at the University of Texas at Arlington. I was previously elected to serve on the Boards of Directors of the Texas Criminal Defense Lawyers Association and the Tarrant County Criminal Defense Lawyers Association, ultimately serving as President of the Tarrant County Criminal Defense Lawyers Association in 2004. By education, training and experience, I believe that I am generally cognizant of the requirements for the *"effective assistance of counsel"* in a criminal case, particularly including death penalty cases.

Response to Writ Allegations

I have reviewed the *Initial Application for Writ of Habeas Corpus* filed in this cause, together with its supporting documents. I have specifically reviewed the claims of *"ineffective assistance of counsel"* that are made against Fred Cummings and me, and which are contained within the *Writ Application* as Claims Numbers 2, 3, 4, 5, 6, 7, 8, 9 & 11. Based upon the totality of our representation of Mr. Hummel at his trial, I do not believe that Mr. Cummings and I provided ineffective assistance of counsel to Mr. Hummel at his trial, and I shall attempt to respond to these claims individually as ordered by the Court.

<u>Claim Two</u> - (Trial Counsel's Ineffectiveness For Failing to Argue that
the State's Evidence Was Legally Insufficient to Show Future Danger)

In Claim Two, the Applicant alleges first, that the evidence at Mr. Hummel's trial
was "*legally insufficient*" to support the jury's affirmative answer to Special Issue No. 1 at
Appellant's trial; and second, that we as Applicant's trial counsel, were ineffective for
failing to argue such legal insufficiency of the evidence to the Court at Applicant's trial. In
the *Writ Application*, Applicant's writ counsel argue in conclusory terms that the evidence
adduced at Applicant's trial was legally insufficient, analogizing the facts of Applicant's
case to those of several other cases wherein the appellate court has ultimately determined
that the evidence in those cases was legally insufficient to support an affirmative finding to
Special Issue No. 1. I am aware that the Court of Criminal Appeals has consistently held
that the facts of the offense alone may be sufficient to support an affirmative finding on the
"*future dangerousness*" issue. I am further aware that in appellate challenges to the legal
sufficiency of the evidence to support such a finding, the Court may look to other cases
wherein the State has failed to present sufficient evidence to sustain its burden;
nevertheless, I am also aware that the resolution of such a legal sufficiency challenge <u>must</u>
be resolved upon the facts of each individual case pursuant to controlling precedent from
the Court of Criminal Appeals. In the instant case, I do not recall arguing the "*legal
insufficiency*" of the evidence to support an affirmative answer to Special Issue No. 1 to the
Trial Court. It is my belief that such an argument would have been a futile, as I did <u>not</u>
believe that the Trial Judge would ever grant an instructed verdict against the State on
that special issue, based upon all of the facts adduced at Applicant's trial. Further, I did
<u>not</u> believe that such a request or argument upon that issue was necessary to be made in
the trial court in order to preserve the legal sufficiency issue for review during an appeal of
the case. Unfortunately, the State's evidence regarding the crime, the planning and
premeditation of the offense, the prior unsuccessful poisoning attempt (the evidence of
which was contained within the Applicant's statements to the police obtained upon his
arrest, and introduced through Investigator Rizy, a District Attorney's Office investigator,

not a Kennedale Police Officer as alleged in the _Writ Application_), his attempts to secret the crime, his flight, etc., all painted a horrific picture which I did not believe that the Trial Court would deem to be legally insufficient to support an affirmative answer to Special Issue No. 1. Additionally, there were even parts of our own mental health expert's (Dr. McGarrahan) testimony that could conceivably be seen as supporting such an affirmative answer to the Special Issue. Although we did not make such a _"legal sufficiency"_ argument to the Court, both Mr. Cummings and I did argue to the jury that the evidence in the case did <u>not</u> support an affirmative answer to the Special Issue, and we aggressively sought to demonstrate that fact through the evidence which we introduced at punishment as part of our trial strategy. For such reasons, I do <u>not</u> believe that our failure to argue the _"legal insufficiency"_ of the evidence to support an affirmative finding to Special Issue No. 1 to the Trial Court constitutes ineffective assistance.

Claim Three - (Trial Counsel's Ineffectiveness for Failing
to Present Evidence that Applicant Was Not a Future Danger)

In Claim Three, Applicant asserts that we were ineffective in failing to present _"readily available evidence"_ that Applicant would not constitute a _"future danger,"_ through Tarrant County Jail Officers supervising Applicant while he was confined therein, and through a mental health expert who would explain how "Hummel's past patterns of behavior and mental status did not support a finding that he would be a future danger."

First and foremost, it is important to note that through almost <u>every</u> witness that we called a punishment in Applicant's trial, we sought to demonstrate that Applicant had <u>never</u> previously committed an act of violence, and that he would not constitute a future danger. Applicant's writ counsel assert that the prison classification expert whom we called to testify at Applicant's trial, Frank AuBuchon, "testified in broad terms that Hummel would do well in the prison system based on his good behavior in the county jail and his military records." I believe that such a characterization grossly understates Mr. AuBuchon's testimony. He testified that he had reviewed Applicant's military records, medical records, police reports regarding the crime and "specifically regarding what had

occurred at the offense and after his eventual apprehension," a TLETS report, his criminal history, a notice of extraneous offenses "which indicated what his prior criminal background was," and "all of his jail classification records and his incident records for the entire time he's been incarcerated here in Tarrant County." Through Mr. AuBuchon's testimony, we were able to demonstrate not only Applicant's lack of any prior criminal history, but also his absolute lack of any disciplinary issues while incarcerated in the Tarrant County Jail. Based upon all of this information, Mr. AuBuchon was able to testify as to how Applicant would likely be classified if incarcerated for life in the Texas prison system, and how that classification would affect his actual work and living environment within the penitentiary system for the rest of his natural life. Mr. AuBuchon was also able to offer his opinion that based upon his review of all of the relevant records, Applicant would probably adapt quite well to prison life. Through the lay witnesses that we called to testify, we were also able to demonstrate the lack of any previous acts of violence by the Applicant; and then later, through Dr. McGarrahan's testimony, we were again able to show the lack of any prior criminal history for the Applicant, and his good behavior while incarcerated. All of this testimony we hoped would lead the jury to find that Mr. Hummel was not a future danger. In preparation for Applicant's trial, we specifically discussed with Mr. Hummel whether or not there were any jail guards, chaplains, or other jail personnel with whom he felt that he might have a sufficiently good relationship that they might be willing to testify on his behalf. To my recollection, he was unable to provide us with any such names, nor did we develop any through our independent investigation. Obviously, Applicant's writ counsel were able to obtain affidavits from some such individuals whom we did not locate; nevertheless, it is my belief that we communicated essentially the same information that they might have been able to provide to the jury through the other sources that did testify.

In regard to that part of this claim dealing with the allegation that we should have obtained a mental health expert to testify that Applicant would not constitute a future danger, I heartily dispute that assertion. During our pretrial preparation in this case, it soon became apparent that we would need a psychological evaluation done of Mr. Hummel,

in order to adequately investigate and document the possible mental and emotional issues that we felt might exist with Mr. Hummel. We attempted to investigate his background and upbringing as fully as possible, in order to determine how those factors may have influenced his behavior in the commission of this crime, if they did. Mr. Cummings and I specifically discussed potential mental health experts whom we might seek to have appointed to assist us in this regard, and I actually made telephone calls to several different experts. From early in my representation, I determined that I wanted to seek the assistance of Dr. Antoinette McGarrahan in this case, due to my familiarity with her work, my opinion of her abilities, and her reputation in the legal community. I had worked with her previously on several cases, and I know her to be highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions. I also knew that the State intended to use Dr. J. Randall Price as their expert, and due to his prior professional relationship with Dr. McGarrahan, and their mutual respect, I felt it unlikely that he would dispute any findings that she might make. We discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Mr. Hummel. We specifically decided, that based upon her initial findings regarding Mr. Hummel, she should do personality testing in order to determine whether he suffered from any diagnosable personality disorders, as well as any mental illness or disability. As Dr. McGarrahan's evaluation progressed, we specifically discussed with her whether or not she should do a formal violence risk assessment of Mr. Hummel. Due to the nature of the personality disorder that she determined Mr. Hummel suffers, and the results of the objective psychological tests administered by her to him, she indicated that many of the traits that she found to exist in connection with his personality disorder are also characteristics of psychopathy. She indicated that she felt that if she were to do a formal violence risk assessment using a standardized risk assessment instrument such as the Psychopathy Checklist Revised (PCLR), or the Violence Risk Assessment Guide (VRAG), that Mr. Hummel would in all likelihood <u>not</u> have scored *"excessively high;"* however, neither would he have likely scored *"low"* either. She indicated that he would in

all probability score in the "*moderate*" to "*moderately high risk*" range, and it was our consensus belief that such a finding would <u>not</u> have been helpful testimony for us. We were also aware that the Court would limit the evaluation of Mr. Hummel to be done by the State's expert, Dr. Price, to those issues regarding Mr. Hummel which we intended to address in our experts' testimony, and to those "*tests*" administered by our experts. By determining <u>not</u> to do a formal violence risk assessment, we were able to insure that the State's expert would not be able to do one as well.   I had previously worked with the State's expert in this case, Dr. Price, on a number of occasions, and I therefore knew that if given the opportunity, he would do the same type of violence risk assessment that we had discussed with Dr. McGarrahan; and therefore, I believed that it would <u>absolutely not</u> be in Mr. Hummel's best interest to give the State the opportunity to do such a risk assessment of Mr. Hummel with Dr. Price.   Mr. Cummings and I even specifically discussed the feasibility of obtaining another mental health expert (other than Dr. McGarrahan) for purposes of doing such a risk assessment, just in order to see how it might result (specifically Dr. Mark Cunningham, another mental health expert with whom I had previously worked, and who has significant experience and expertise in risk assessment). Our thinking was that if the results of such an assessment were not helpful, then we would simply not use him as a witness; however, we determined that we would not be able to "keep secret" the use of such an additional expert, so we ultimately determined that pursuing such a possibility would <u>not</u> be in Mr. Hummel's best interest for the reasons set out herein.

In Applicant's <u>*Writ Application*</u>, writ counsel present the affidavit of Dr. Susan Hardesty, a psychiatrist, as an example of the type of mental health expert that would have been "*available*" to us for purposes of testifying that Mr. Hummel would not constitute a "*future danger*."   In reviewing Dr. Hardesty's Affidavit, it appears that her opinion rests solely upon her personal assessment of the "*future dangerousness*" issue, and not upon any standardized risk assessment measures, nor any scientific or statistical comparisons.  As such, it is my belief that her opinion would be essentially the same type of testimony that

**534**

the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to *Daubert*, when offered by experts testifying on behalf of the State. For such reason, I have great concern as to whether or not such testimony would even be deemed to be admissible if offered. Additionally, and even more importantly, were such testimony to be admitted on behalf of the Applicant, then it would clearly *"open the door"* to rebuttal testimony by the State's witnesses and experts. In my opinion, that testimony would have been even more devastating to Mr. Hummel's case. Further, Dr. Hardesty's assertions that while incarcerated "John is unlikely to have the extreme set of circumstance (*sic*) that were the antecedents to the crime, namely financial and familial stressors;" and that while incarcerated, "there is not a relational model that would be iterative of attachment," seem to be somewhat unrealistic. My experience, and my discussions with mental health experts and corrections officials over the almost thirty-six years that I have practiced criminal law, have taught me that living in a prison setting can be every bit as stressful, or even more stressful, than living outside of the prison setting. Additionally, for such inmates, prison becomes their home, and they can make attachments and form relationships that can be every bit as strong as those they might develop on the outside. Most importantly, Dr. McGarrahan also disagrees with Dr. Hardesty's assertions in that regard. It was our conscious strategic decision <u>not</u> to seek to elicit any expert opinion testimony regarding the issue of future dangerousness from our witnesses, based upon our knowledge of all of the evidence in the case. Additionally, such testimony would have opened the door to rebuttal testimony from the State upon that issue, as we did <u>not</u> believe that such a course would have been in Mr. Hummel's best interest. Despite the Affidavit of Dr. Hardesty, I <u>still</u> believe that to be the correct decision; and for those reasons, I do not believe that we rendered ineffective assistance of counsel in that regard.

<u>Claim Four</u> - (Trial Counsel's Ineffectiveness for Failing
to Present Expert Testimony Regarding Hummel's Life History)

In Claim Four, the Applicant alleges that we were ineffective by failing "to retain the services of a social history expert witness," who could have "provided an explanation to the

jury of how Hummel's life history shaped the person that he became later in life."  From my education and experience, I am aware of the need to attempt to provide a compelling mitigation case in the punishment phase of any death penalty trial; however, I am not aware of any legal requirement that we utilize a *"social history expert witness"* in every such case in order to accomplish that purpose.  In Applicant's case, we attempted to perform a complete mitigation investigation into every aspect of Mr. Hummel's life.  We obtained the services of an experienced Mitigation Specialist, Ms. Brendan Ross (who holds a Master's Degree in social work), to assist with that investigation.  We also utilized our private investigator to assist us with that investigation.  We intervened dozens of potential witnesses, and attempted to locate any prospective witness who might conceivably have information about the Applicant's life and upbringing which could conceivably be important to our mitigation presentation at trial.  We very literally <u>never</u> stopped our investigation of the Applicant's life history, even through the Applicant's trial.  As we prepared for trial, we discussed as a team the most effective way for us to develop our mitigation case before the jury.  Many of the prospective witnesses to whom we attempted to talk refused to cooperate with us, while others simply could not, or would not, provide us with any helpful information.  Some of them even indicated that they would attempt to convince the jury that Mr. Hummel deserved to receive the death penalty should we attempt to compel them to testify.  We actually subpoenaed several witnesses to appear at Applicant's trial whom we did not ultimately call to testify due to various concerns that we had about their proposed testimony.  We determined that the most effective way for us to present our mitigation case at Applicant's trial, was by using the lay witnesses that we had to present the story of Applicant's life, and then to attempt to use that story as a basis for the opinions to be offered by our expert witnesses, Mr. AuBuchon and Dr. McGarrahan.  Although there were admittedly some *"gaps"* in the life story of Mr. Hummel that we presented, we presented all of those witnesses that we were able to locate and convince to testify, that we felt were necessary to develop the facts regarding Applicant's life.  We then used Dr. McGarrahan to testify not only to Applicant's mental and emotional condition, but also to

how the facts of his life had affected him, and led him to become the person that he was. I have reviewed the Affidavit of Ms. Laura Smith, the "social history expert witness" that Applicant's writ counsel have included in support of this claim. I also requested that Dr. McGarrahan review Ms. Smith's Affidavit as well, in order to assist me in answering this claim. While Ms. Smith's Affidavit contains a number of conclusions regarding how the facts of Mr. Hummel's life affected him, and his ability to cope with the problems in his life, neither Dr. McGarrahan nor I believe that there are any meaningful facts or any necessary expert opinions contained therein which we did not cover in the mitigation presentation that we made to the jury. Perhaps (although far from certain) a witness like Ms. Smith could have helped us to make the presentation of our mitigation case to the jury somewhat more compelling; however, I do not believe that our failure to call such a witness prevented us from presenting the necessary facts, or from developing the expert opinion testimony necessary for us to effectively present our mitigation case. It is my belief and understanding that the question of whether or not we rendered effective assistance to Mr. Hummel turns upon whether or not we adequately investigated and developed the mitigation evidence regarding Mr. Hummel's life, and not upon whether or not we utilized a particular expert witness in order to present the evidence at trial. For such reason, I do not believe that we rendered ineffective assistance in this regard.

Claim Five - (Trial Counsel's Ineffectiveness
For Failing to Present Relevant Lay Witnesses)

In Claim Five, the Applicant alleges that although we investigated Applicant's early childhood and relationships with immediate family members, our investigation "was narrowly focused on suspicions that Hummel was sexually abused," and when proof of such abuse did not materialize, we "did not rigorously pursue other avenues of mitigation evidence." They further indicate in a footnote: "Counsel uncovered suggestions that Hummel's sister had been sexually abused by their father, and the suspicion that Neata then sexually abused Hummel." That allegation is simply not true. Based upon Hummel's presentment to Dr. McGarrahan, and to various members of the trial team; and later based

upon Neata's presentment to Dr. McGarrahan, and to us; it was our collective suspicion that either or both of them may have been sexually abused by their parents, or by some other adult close to the family. Both the Applicant and his sister appear to present symptoms that are commonly found among individuals who have a history of sexual abuse. Even friends of the Hummel family, particularly Mark Pack and Derrick Parris, indicated to us that they had suspected that something of that nature may have been occurring within the Hummel home. Both Dr. McGarrahan and I separately inquired of Mr. Hummel, his sister Neata, and his mother, Jackie Hummel, whether anything of this nature had ever occurred, and it was adamantly denied by each of them. Mr. Hummel indicated that his home life, upbringing, and family life was all very positive, without any instances of abuse or neglect, and there was nothing that he found troubling about it. Neata would admit only to that abuse to which she ultimately testified had occurred, and she specifically denied repeatedly that anything further, or more severe, had taken place. Ms. Jackie Hummel also specifically denied that any abuse had ever occurred within their home, although she did acknowledge that she and her husband were not demonstrative in their affection for their children. None of the neighbors, friends, schoolmates, or other individuals whom we interviewed could provide any proof that any abuse, either sexual or physical, had occurred within the home, other than that which was testified to at trial. In the face of such specific denials, and the lack of any substantive evidence to the contrary, there was absolutely no good faith basis for me to ask that question of Neata on the witness stand, contrary to the assertions of Applicant's writ counsel in their *Writ Application*. Neither Derrick Parris, nor any other person, ever indicated to any member of Mr. Hummel's trial team that they had ever heard Ms. Woody make the statement which Mr. Parris now claims that she made in the courtroom hallway during Mr. Hummel's trial. I am quite confident that if any of the people that Mr. Parris said were also present when Neata made such statement could have corroborated what Mr. Parris said had occurred, then writ counsel would have included their affidavits to that effect with this Application.

Based upon all of my knowledge of, and contact with Mr. Parris, I simply do not believe that actually occurred.

Few, if any, of the members of Mr. Hummel's family wished to assist us in his defense. Some refused to talk to us; some indicated they wished to tell the jury to give him the death penalty; some had knowledge of his chronic marijuana use (even when the family struggled financially); and some even sought to prevent us from talking to other members of the family. Ms. Neata Woody, Applicant's sister, refused to voluntarily testify on Mr. Hummel's behalf. I subpoenaed her to appear against her will. At the hearing in South Carolina to compel her to answer the subpoena, Ms. Woody presented a letter from her doctor indicating that she would not be able to endure such testimony; nevertheless, the South Carolina Court compelled her to appear, and I compelled her to testify against her will. After her testimony, we transported Mr. Woody and her husband to the airport for their return flight. Upon her arrival at the airport, Ms. Woody suffered a serious and debilitating stroke that required her to remain here in the hospital for about another week or so before she was able to fly home. The results of that stroke have left her disabled and unable to work. I attempted to help her obtain benefits from the Court, and from the State of Texas, for that disability, but I was not successful. Obviously, her doctor was correct in his belief as to her inability to testify at Mr. Hummel's trial.

We first interviewed Derrick Parris in the Spartanburg Jail. I had to obtain permission from his attorney in his pending criminal case in order to even be able to talk to him. Each time I spoke with Mr. Parris, the information that he offered about Mr. Hummel's life and background would change to a degree. Despite my concerns over such changes, I nonetheless felt that he had important information regarding the physical abuse of Mr. Hummel by his father that I was unable to prove by any other means. Mr. Parris refused to fly to Texas for the trial. I wired him five hundred dollars ($500) in cash in order to pay for gas and food for him and for members of his family, in order for them to drive to Texas. When he arrived here, his car broke down. I advanced additional funds to him for his meals and expenses, so that he could use that money to pay for the repairs to his car. Neither he,

nor several of the other witnesses that we subpoenaed from South Carolina to testify at the trial, had <u>any</u> funds with which to buy food while they were here in Texas. They had <u>no</u> ability to simply buy it, and then to seek reimbursement later, as was the procedure followed by the District Clerk's Office. Mr. Cummings and I advanced all of those individuals funds with which to buy food and necessities while here in Texas, out of our own pockets. I was also required to guarantee all of the rooms, and all of the room charges, for all of these witnesses, with my personal credit card. While the room rentals were eventually paid directly by the County, the witnesses all received a *per diem* for their food and expenses, so we never actually recouped all of the charges which were required to pay. Additionally, when Mr. Parris checked out of his room, the hotel reported that the comforter from the bed, and other bedding items were missing from the room. I asked Mr. Parris about this by telephone, and he denied any knowledge of the missing items. In order to avoid having the hotel charge Mr. Parris with theft, we paid the replacement costs from our own pockets, which I recall was somewhere around two hundred ($200) dollars or more.

Prior to Mr. Hummel's trial, his mother, Jackie Hummel, was living with her sister, Edwina Penny. Ms. Penny and Mr. Hummel's cousin, Michael Castlow, both indicated that they wished to see Mr. Hummel get the death penalty in this case. Ms. Penney affirmatively sought to keep us from having any contact with Ms. Hummel, even to the point of threatening to have members of the defense team arrested if we came back onto her property. We were eventually able to interview Ms. Hummel only through our own dogged persistence in seeking to do so, something which it appears writ counsel have not yet been able to accomplish. As indicated previously, Mr. Hummel specifically denied to us that any abuse had occurred within the home; even to the point of denying those things which Ms. Woody, Derrick Parris, Mark Pack, and others had told us that they witnessed. Applicant was of little assistance in leading us to individuals who would be willing to testify on his behalf, and our own independent investigation was hampered by an almost universal lack of cooperation from the vast majority of the people that we did contact. We were also



threatened with arrest by other individuals in South Carolina in the event that we persisted in our attempts to speak with them.

I spoke directly with Thomas Hamilton, Mr. Hummel's uncle, and Jackie Hummel's brother, during our pretrial investigation in this case.  During our conversation, I inquired into his knowledge of any possible abuse within the Hummel home.  He was very defensive of his sister, and adamant in his denial that anything of that nature had occurred, even to the point of refuting some of those things which Neata had told us occurred.  In the Affidavit which he provided to writ counsel, he still denies any knowledge of abuse; however, he is much less adamant that anything of that nature could have taken place within the home.  He also told me that he suffers with hepatitis, and that Applicant had promised to give him "a part of his liver" to help him deal with that illness.  Due to the fact that Mr. Hamilton did not support the allegations of abuse made by Neata Woody and other witnesses, and was very defensive of his sister, we did not believe that it was in Mr. Hummel's best interest to call Mr. Hamilton to testify at Mr. Hummel's trial, as his testimony was inconsistent with that of our other witnesses.

Similarly, Fred Cummings spoke directly with George Goodson during our investigation in this case.  Mr. Goodson was supportive of John, but he was also afraid that his testimony would be harmful to John, mainly because of his own prior prison record; and he therefore did not wish to testify.  He had spoken to the prosecutors in the case, and they were aware of his knowledge of the family, and of his criminal record.  We ultimately determined it was not in John's best interest to call him as a witness for all of those reasons.  Our investigator interviewed all of John's neighbors, and none of them would provide helpful testimony, nor wished to testify on John's behalf.  We contacted those individuals whom Mr. Hummel identified as his "*friends*" at work, and they denied any such friendship, indicating that they knew very little of John; that they did not really care for him; and that they did not wish to be called to testify.  We contacted people from the church that the Hummels' attended, particularly including the Minister of the Church, who had moved to a church in Corpus Christi by the time of the trial.  We actually subpoenaed

the Minister to testify; however, he eventually determined that John deserved the death penalty for his crimes, and his sense of loss for John's wife, daughter, and father-in-law made him very uncomfortable and essentially unwilling, to do anything to help John at his trial. We obtained Lance DuPre's name during the course of our investigation. We attempted to contact him through telephone numbers that we discovered for his mother and his aunt. I left a business card at the house where we believed his family to live while I was in South Carolina, asking that he call us. Shortly before trial, we determined that it appeared that Mr. DuPre worked at the State Crime Lab in Columbia, South Carolina. We made telephone calls to <u>every</u> number that we were able to locate as possibly being a way to reach him, yet we never got an answer, nor received any return phone call from him. We exhausted every lead that we had in our efforts to locate him. Prior to trial, we also attempted to contact Christopher Paris. At that time, Mr. Paris had separated from his wife, and we were never able to locate another way by which to contact him. He was not visiting John in the jail at that time, and we were simply unable to locate him even though we aggressively tried to do so.

When we were initially contacted by Applicant's writ counsel, we provided <u>all</u> of our files, notes, and records pertaining to John's cases to them; including those of our mitigation specialist and our investigator. Those files contained the names of every potential witness of whom we became aware, and every one to whom we actually spoke. It is illogical to think that with all of that information as a starting point, and with an additional year or so with which to continue to investigate, that writ counsel would not be able to come up with <u>any</u> additional witnesses. We called those witnesses at trial that we felt were necessary in order to present as complete of a picture as we possibly could of John's life. Obviously, we did not locate <u>every</u> potential witness with knowledge of some aspect of John's life, yet that is <u>not</u> what I believe is required for the effective assistance of counsel. From a review of the affidavits provided in Applicant's <u>*Writ Application*</u>, I fail to see any new material facts, or any different mitigation themes, from what we were actually able to develop at Applicant's trial. Members of the defense team made three separate trips

to South Carolina, and one trip to California, during its investigation in this case. I personally made two trips to South Carolina in an attempt to locate potential witnesses, and to attempt to persuade them to testify on John's behalf. Mr. Cummings and I paid a significant amount of money out of our own pockets (which was not reimbursed by the Court), in our attempts to locate such witnesses and get them to Texas to testify at John's trial. In light of all of our efforts in this regard, the claim by Applicant's writ counsel that we "did not rigorously pursue other avenues of mitigation evidence" is not only factually incorrect, but also personally offensive.

Claim Six - (Trial Counsel's Ineffectiveness in Failing
to Present His Military Service as Mitigation Evidence)

In Claim Six, the Applicant alleges that we were ineffective in that we "failed to investigate and present evidence that Hummel served honorably in the United States Marine Corps." During our investigation into Mr. Hummel's background, we sought to obtain copies of Mr. Hummel's military records. Although we had difficulty in obtaining a "*complete*" copy of such records, we were able to obtain a number of records pertaining to Mr. Hummel's military service which we provided to our expert witnesses, Mr. AuBuchon and Dr. McGarrahan. We specifically inquired of Mr. Hummel regarding individuals in the service whom he befriended, and who might potentially be available to testify on his behalf. He was apparently unable or unwilling to provide us with such information, as I do not recall him ever providing us with the names of any such individuals. We attempted to develop testimony regarding Mr. Hummel's military service through both our lay witnesses, and through the expert witnesses whom we called to testify. We felt that such service could possibly be important to our mitigation presentation, particularly in regard to support for Mr. AuBuchon's opinion as to how Mr. Hummel might function within the prison environment, and in regard to Dr. McGarrahan's opinions as well. My recollection is that Mr. Hummel seemingly "*down-played*" his military service in his discussions with us, and he did not really depict his service in a positive or successful way. We were aware of the disciplinary action taken at the end of Mr. Hummel's service when he went AWOL from his

**543**

post, and we attempted to avoid that issue to the degree possible during the presentation of our witnesses. Obviously, the State felt the need to rebut the information that we presented regarding Hummel's military service, as evidenced by the rebuttal witnesses that they called. In my cross-examination of those witnesses, I attempted to develop as much positive information about his military service, his commendations, and his "*honorable discharge*" from service, as was possible.

I specifically disagree with the assertions of Applicant's writ counsel that: "Several available witnesses who knew Mr. Hummel as a Marine were available and willing to testify on Hummel's behalf." Had Mr. Hummel (or any other person) provided us with any of these names, then we would have attempted to contact them; and our independent investigation was unable to discover such witnesses. Interestingly, of the four witnesses whom writ counsel indicate were available and willing to testify (Wayne Matthias, Efrain Chaidez, Fred Emmer, and Christopher Boling), they have only been to obtain a signed affidavit from one of those individuals, Mr. Efrain Chaidez. They were apparently unable to obtain such signed affidavits from Mr. Matthias, Mr. Emmer and Mr. Boling, much less being able to martial them into court and to obtain their live testimony. I would have obviously loved to have any witness who could have mitigated the negative aspects of the testimony from Mr. Hummel's commanding officers; however, we were not apprised of any such witnesses, and were unable to develop the names of any such prospective witnesses through our independent investigation. It also appears in reviewing in the proffered affidavits, that those individuals would have provided a good deal of negative information about Mr. Hummel's military service in conjunction with that positive information that they could provide. Based upon the totality of these circumstances, and the totality of our representation, I do not believe that our failure to obtain such testimony amounted to ineffective assistance.

<u>Claim Seven</u> - (Trial Counsel's Ineffectiveness for Failing to
Present Evidence that Applicant Suffers From a "Complex
Traumatic Stress Disorder Resulting from Attachment Trauma")

In Claim Seven, Applicant alleges that we were ineffective for failing to retain a mental health expert to testify as to the existence of Applicant's "complex traumatic stress disorder resulting from attachment trauma." In my preparation to draft this Affidavit, I visited at length with Dr. McGarrahan in regard to allegations contained within the <u>*Writ*</u> <u>*Application*</u>, and particularly in regard to the allegations made in regard to this particular claim. Dr. McGarrahan has advised me that she was previously contacted by Applicant's writ counsel, and asked to review the lay witnesses' affidavits which they had obtained, and which they are utilizing in support of their ineffective assistance claims in this Application. After her review of such witness affidavits, it is my understanding that writ counsel inquired as to whether the information contained within those affidavits altered her opinions of Mr. Hummel in any way, or would change the testimony that she gave at Mr. Hummel's trial. She indicated to me that she informed writ counsel that nothing that she was provided changed her opinions or testimony in regard to Mr. Hummel in any way. Dr. McGarrahan further advised that she provided all of her test results, and all of the underlying test data, to another neuro-psychologist retained on behalf of writ counsel for his review. I do not find any affidavit from such neuro-psychologist disputing either the test results that Dr. McGarrahan obtained, the methodology that she used, or the testimony that she gave. I also provided the affidavits of Dr. Hardesty and Ms. Smith to Dr. McGarrahan for her review, and asked her opinions in regard to the information and opinions expressed within those affidavits. Dr. McGarrahan advised that she observed essentially <u>no</u> new or different factual information within the affidavits, other than perhaps some of the information that Applicant may have himself provided. This was consistent with my opinion regarding such affidavits. Dr. McGarrahan indicated that Applicant had consistently denied that he suffered any trauma or abuse in his home, and also denied having any attachment issues. He described his family relationships to her (as he did to us) in positive terms, adamantly denying that any abuse, neglect, or abandonment had

occurred.  Similarly, Neata Woody denied that any abuse, neglect, or abandonment had occurred, over and above that which she testified about at Applicant's trial.  John and Neata's mother also denied that anything of that nature had occurred, as did other family members to whom we spoke.  Dr. McGarrahan indicated that she had seen some evidence of potential PTSD symptomatology in Applicant's presentation to her, and as evidenced by one of the psychological test instrument results.  For those reasons, Dr. McGarrahan went back and re-interviewed Mr. Hummel in order to discuss the *"traumatic event"* that he was thinking about when he responded to the test items asking about a *"traumatic event."*  Although Dr. McGarrahan believed that Mr. Hummel might possibly *"open up"* at that time about the abuse that we suspected had occurred in his home, Mr. Hummel instead indicated to her that the *"traumatic event"* that he was thinking about in answering the test questions was his killing of his family.

Dr. McGarrahan and I specifically discussed Dr. Hardesty's opinion that Applicant suffers from a "complex traumatic stress disorder resulting from attachment trauma."  As noted by Dr. Hardesty, this particular diagnosis is not a disorder that appears within the DSM; nevertheless, "post-traumatic stress disorder" is a recognized disorder that appears within the "anxiety disorders" contained within the DSM.  While Dr. McGarrahan agrees that Mr. Hummel suffers from significant attachment issues, and testified to such opinion during Applicant's trial, she does not believe that sufficient evidence exists for a diagnosis of "post-traumatic stress disorder," although he did display some of those symptoms.  Primarily, there was simply no evidence from Mr. Hummel, his family, or others, that he suffered from any "traumatic event or events" that would constitute the genesis of such a disorder.  Importantly, the diagnostic criteria for PTSD contained within the DSM require that the individual experience, witness, or be confronted with an event or events "that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others," and the individual's response to such event "involved intense fear, helplessness, or horror."  As there was absolutely <u>no</u> <u>evidence</u> from Applicant or anyone else that John had experienced such a "traumatic event," the PTSD diagnosis was simply

not possible.   Additionally, in order to qualify for a diagnosis of PTSD, the diagnostic criteria require that the traumatic event be <u>persistently</u> <u>re-experienced</u>, through recurrent and intrusive distressing recollections of the  event; recurrent distressing dreams of the event; a sense of re-living the experience, such as flashbacks, etc.; the presence of intense psychological distress at exposure to cues that symbolize or resemble an aspect of the traumatic event; and/or  "physiological reactivity" upon exposure to cues that symbolize or resemble an aspect of the traumatic event.   There was absolutely no evidence from any source that Applicant suffered from any such "*re-experiencing*" of the event, such as would satisfy this criteria, and be necessary to a diagnosis of PTSD.

Pursuant to Dr. Hardesty's affidavit, she did a two hour and forty-five minute interview of the Applicant, wherein she conducted a mental status evaluation and an evaluation of his cognitive functioning.  That interview and evaluation (without benefit of any further testing) together with her review of his records, etc., was the basis for her opinions.  Her diagnosis of "complex post-traumatic stress disorder due to attachment trauma," turns upon a finding of attachment trauma in the form of "extensive, consistent neglect from a caregiver."  While Ms. Woody and other witnesses indicated to us that there were instances of neglect and emotional distance within the home; she, the Applicant, and other family members, did not specifically indicate that such "extensive, consistent neglect" had occurred.   Additionally, in interviews with other members of John's family, they attributed his disengagement from social interaction and his preference for playing computer games and spending time alone, to his laziness and to his chronic use of marijuana.  Obviously, we did not wish to present that evidence at Applicant's trial.  Dr. Hardesty's determination that Applicant suffers from a "Personality Disorder NOS," does nevertheless mirror the diagnosis that Dr. McGarrahan made in that regard to great degree.

In sum, neither the members of the defense team, nor Dr. McGarrahan, saw any factual basis that would support a diagnosis of PTSD.   I am aware that social scientists (sociologists and social workers) refer to "*attachment disorder*" within their discipline, even

though such a disorder does not appear in the DSM.  I have previously worked with Ph.D. level social scientists, and even had them testify as to the presence of such an *"attachment disorder"* in other trials; nevertheless, under the facts which we possessed, I did not believe that any additional expert, other than Dr. McGarrahan, would be necessary to adequately address Mr. Hummel's attachment issues at trial.  In my opinion, the approximately eleven hours that Dr. McGarrahan spent interviewing, testing, and evaluating Mr. Hummel, together with the personal interviews that she conducted with members of his family, and the countless hours that she spent reviewing his relevant records, police reports, etc., all gave her a much more compelling basis for her opinion that that of Dr. Hardesty. Under all of these circumstances, I do not believe that our failure to call such an additional expert constitutes ineffective assistance.

<u>Claim Eight</u> - (Trial Counsel's Ineffectiveness in Failing to Object to Victim Impact Evidence Relating to the Deaths of Defendant's Daughter and Unborn Child)

In Claim Eight, the Applicant asserts in a multi-faceted claim that the Applicant's trial was prejudiced by the impermissible injection of inflammatory and prejudicial evidence regarding the deaths of Jodi Hummel and the unborn child that Joy Hummel was carrying at the time of her death.  As part of this Claim, Applicant asserts that we were ineffective in failing to object to the introduction of such evidence.

I agree with the assertion of Applicant's writ counsel that the introduction of evidence in the guilt/innocence stage of Application's trial, regarding the deaths of Jodi Hummel and the unborn baby, far exceeded what should have been admitted as "same transaction contextual evidence."  We specifically objected to the introduction of such evidence, and we were overruled on that basis.  If such evidence was in fact "same transaction contextual evidence," then the allegations of those deaths should have been included within a single indictment alleging all four deaths.  Article 19.03(a)(7), Texas Penal Code, provides that the murders of more than one person "during the same criminal transaction" constitutes the offense of capital murder.  In this instance, the State returned three separate indictments charging capital murder against the Applicant, two of which currently remain pending.  It

seems disingenuous that the State would be allowed to carve a "single criminal transaction" into three separate indictments (presumably giving them three separate "*bites at the apple*"), yet then allow them to claim that the existence of that "same criminal transaction" is what legitimizes the introduction of evidence regarding the un-indicted deaths in the trial of one of the indictments.

I do fervently disagree however, with writ counsel's assertions that: "the inadmissible, inflammatory evidence offered by the State throughout Hummel's trial was occasionally objected to by defense counsel (see, e.g., 39 RR at 194-97), while other times no objection was made (see, e.g., 42 RR at 79)." In my review of Applicant's *Writ Application*, the only evidence regarding Jodi and/or the unborn child that they reference where we did not object, were photographs of Jodi and Joy while pregnant, which were drawn from Applicant's and Joy's "*My Space*" pages. They were photographs made during Joy's and Jodi's lifetime, and they showed them as they appeared during life. They were offered at the punishment stage, after much more damning photographs of Jodi and Joy while pregnant (including autopsy and crime scene photos of their bodies) had already been admitted over our objections during the guilt/innocence phase of the trial. (See: 39 R.R. at 194-198; and 33 R.R. at 71-74, as examples). We did not object to the introduction of those photographs at punishment for essentially two reasons. First, at that stage of the proceedings, and in light of the evidence which had already been admitted over objection, together with the very nature of the content of the photos themselves, I did not believe that there was any meaningful objection that would lie at that point which would be sustained by the Trial Court. Additionally, I believed that the introduction of the autopsy photographs of the unborn fetus was virtually indefensible; and that error had already been preserved and could not be deemed as waived by the admission of this type of evidence. Additionally, I actually had some thought that the photographs being offered at this point might conceivably even help support our mitigation case. It was our belief, and our presentation to the jury, that Applicant actually loved his family, and that the commission of this crime was solely the result of the mental and emotional problems that he suffered,

which we intended to present through Dr. McGarrahan's testimony.   In my mind, the existence of such photos in the *"My Space"* pages added some credence to our assertions of John's love for his family.   The mere fact that he took time to upload such photographs to the "My Space" page was demonstrative of at least some affinity for his family.

Obviously, we were concerned with the prospect that the State would seek to have the jury *"punish"* John for the deaths of Jodi and the unborn child, even though such deaths were not alleged in the indictment on trial.   It was for that reason that I sought to introduce the other two pending indictments into evidence, which alleged the death of Jodi, and the deaths of Joy and her unborn child.   The State's objection to the introduction of those indictments was grounded in their assertion that such indictments were irrelevant to the charge on trial. Such objection seemed both hypocritical and without merit, since they had already introduced a morass of evidence regarding their deaths over our objections.   Even when the Court sustained the State's objection in that regard, and we were left without copies of the actual indictments for presentation to the jury, we nonetheless argued to the jury that they should not punish Mr. Hummel on that basis, as the State still had the ability to call Mr. Hummel to answer for those cases.   It is my memory that we objected at every instance when the State attempted to offer evidence regarding the deaths of Jodi and the unborn child throughout the guilt/innocence phase of the trial, and the Applicant's writ counsel have not cited any instances in their Application where we did not so object, other than to the photographs drawn from the *"My Space"* pages offered at punishment.   Under these circumstances, I do not believe that our failure to object to such photographs constituted ineffective assistance.

<u>Claim Nine</u> - (Trial Counsel's Ineffectiveness for Failing to Effectively Present Evidence that Hummel's Confession Should be Suppressed)

In Claim Nine, Applicant alleges that we were ineffective in failing to introduce transcripts and/or the original tape recordings of pertinent conversations between officers of the Kennedale Police Department and the United States Border Patrol, and copies of reports generated by the Border Patrol agents regarding this incident.   During the

Applicant's suppression hearing, we obtained copies of the tape recordings made of conversations between representatives of the Kennedale Police Department and the U.S. Border Patrol agents from the State's prosecutors. We also obtained copies of the reports generated by the Border Patrol Agents, and we reviewed those recordings and reports in preparation for our cross-examination of those witnesses. We aggressively litigated the issue of the legality of Mr. Hummel's detention by the Border Patrol. During my cross-examination of Border Patrol Officer Paul Kandal, he acknowledged that the only basis upon which he continued to detain Mr. Hummel after they had determined his citizenship, was upon the missing persons report that had been previously generated by the Kennedale Police Department. This was true, even though Officer Kandal acknowledged that the missing persons report specifically directed that Mr. Hummel not be detained, when and if located. To my knowledge and memory, all of the information which I believed to be relevant to the legality of Mr. Hummel's detention which was contained within those recordings and reports was acknowledged by the State's witnesses during our questioning of those witnesses; therefore, there was no need to "impeach" them through introduction of the actual reports and recordings. Officer Kandal's testimony regarding his authority under the Western Hemisphere Travel Initiative to detain individuals seeking to enter the country without the required documentation was limited merely to his assertion that such Initiative granted him lawful authority to detain Mr. Hummel for investigation of his citizenship, or for an administrative violation of the statute. Officer Kandal never asserted that such was the authority upon which he relied to hold Mr. Hummel in this instance; rather, he acknowledged that his sole authority for doing so was the missing person's report previously generated by the Kennedale Police Department, indicating that Mr. Hummel should not be detained on the basis of such report. Additionally, Officer Kandal acknowledged that there had been no rescission of the admonition contained within the report not to hold Mr. Hummel on the basis of that report, yet he continued to do so anyway. Since the witnesses acknowledged those relevant facts contained within the recordings and reports which we felt bore on the legality of his detention, there was not a

necessity to introduce the recordings and the reports themselves. We detailed the relevant facts which we had elicited from the State's witnesses at the suppression hearing which we felt bore upon this issue in the extensive (37 pages) <u>Trial</u> <u>Memorandum</u> which we filed with the Court in support of the motions to suppress. Since it is my belief that the recorded telephone conversations, and the written incident reports of the United States Border Patrol Officers, which are referenced by writ counsel, do <u>not</u> contain relevant facts which were not acknowledged by the witnesses, our decision not to offer those recordings and/or reports into evidence would not constitute ineffective assistance in the absence of a specific showing to the contrary. Even then, such a failure would be viewed in light of the totality of our representation.

    <u>Claim Eleven</u> - (Trial Counsel's Ineffectiveness for Failing to Object to the State's Discriminatory Use of Peremptory Challenges to Remove Minority Venire Members)

In Claim Eleven, the Applicant alleges that we were ineffective for failing to make a *Batson* challenge to the State's use of peremptory challenges to three prospective minority jurors: Mr. Gonzales – a twenty-two year old Hispanic male; Ms. Williams – a forty-seven year old African American female; and Mr. Dennis – a forty-four year old African American male. I am cognizant of the requirements of *Batson* and its progeny, and have made *Batson* challenges on several occasions in the past, in both death penalty cases and non-death penalty cases. In this case, had I believed that the State's use of its peremptory challenges in any of these three instances was racially motivated, then I would have made such a challenge; however, based upon the circumstances in this case, I did <u>not</u> believe that to be the basis for which they struck these individuals. I do not believe that a *Batson* challenge lies in every instance wherein the State uses a peremptory challenge to excuse a juror of a minority race; conversely, I actually believe it to be unethical to make such a challenge in the absence of evidence to suggest some racial motivation for the exercise of the peremptory challenge. I do not have either copies of the questionnaires for these three prospective jurors, nor my notes from my review of their questionnaires and from their individual voir dire examination, as I believe that the Court collected such documents at the conclusion of

voir dire. I also do not have much, if any, independent recollection of their individual questioning. I have reviewed the Court's Reporter's transcript of the individual questioning of each of these prospective jurors however, and it has provided me with some information as to why we would not have objected to the State's exercise of the peremptory challenge as to each of these prospective jurors.

Prospective Juror Gonzales was a very young (age 22) individual, whose father was in law enforcement, and who was personally considering a possible career in law enforcement. His answers in regard to his ability to judge another person were inconsistent, although he did indicate a seeming preference for a sentence of life without parole as opposed to a death sentence, as that would compel the sentenced defendant to spend the remainder of his life dwelling upon what he had done. He seemed to place the responsibility for bringing mitigating evidence before the jury, and the burden of "*persuading*" the jury of the importance of such mitigating evidence, upon the defense. He also had what appeared to be a significant work problem if he were chosen to serve. Based upon his youth, and the totality of his answers, I would <u>not</u> have wanted Mr. Gonzales to serve as a juror in the case, thus I would not have objected to the State's excusal of him. It is apparent from the State's questioning of him that they did not want him as a juror, and I would thereupon have tried to force them to use a strike to excuse him if I could, even though we did not want him as a juror, as that is an important part of the "*art*" of capital voir dire. I see nothing in the transcript of his questioning, nor do I have any recollection of anything, that would suggest that the State's strike of Mr. Gonzales was racially motivated.

Prospective Juror Williams was a forty-seven you old African American female. She worked as a teacher's assistant in an elementary school in the area of special education. She had a nephew (to whom she did not appear to be terribly close) whom had had some trouble with the law. She seemed to have some trouble with the legal concepts regarding the special issues, but announced a general acceptance of the death penalty. She was not really able to provide any examples of mitigating evidence when directly asked. She appeared to be a very nice lady with a kind heart, and a person who was deeply religious. I

would have <u>gladly</u> accepted her as a juror.  From my examination of the record, it is apparent that the State would not accept her due to her being somewhat "*soft*" on the death penalty, and due to an uncertainty as to the position that her Church might ultimately take on capital punishment.  My experience has been that individuals such as her have a great problem in taking the ultimate responsibility of voting for death, and for that reason, we knew that they would not accept her as a juror.  Our portion of her voir dire examination was focused simply upon <u>not</u> providing her with any opportunity to disqualify, so that we could compel the State to use a strike to excuse her.  I see nothing in the record to suggest any racial motivation in the exercise of that strike.

Prospective Juror Dennis was a forty-four year old African American male.  I also do not really have an independent recollection of him or his questioning, but I have reviewed the Court Reporter's Record of his individual voir dire.  It appears that both sides were actually considering accepting him for service, even though there appeared to be issues with him for each side about which they would be concerned.  From the State's perspective, Mr. Dennis did not know how the act of giving a death sentence would personally affect him afterwards, and he was unable to develop further for us how that might ultimately affect his decision-making.  From our perspective, we would have had concerns over the manner in which he emphasized the possible motive for the killings as being the only potential mitigating evidence that he could envision, and he never did really appear to expand his views of mitigating evidence much beyond that point.  His statement that the criminal justice system was "*broken*" due to recent DNA exonerations would also have been a great concern to the State.  We would have probably accepted him as a juror had Mr. Hummel agreed, as we did not accept any prospective jurors for service without an agreement among all of us, including Mr. Hummel.  I find nothing in the record of the questioning of Mr. Dennis which suggests a racial motivation for the exercise of their strike, and I obviously did not see any such basis at the time of his questioning either.

At the time of Mr. Hummel's trial, I had known the lead prosecutor in the case, Bob Gill, for almost thirty (30) years.  I supervised him as a prosecutor in the District Attorney's

Office; I had tried cases previously against him as a defense lawyer before he became a judge; and I had tried cases before him when he served as a District Judge. Throughout that time, I had never known him to be racially biased, nor do I ever recall having seen him act in a racially motivated manner in any of the actions which he had taken in court. While I was far less familiar with Mr. Brissette, than with Mr. Gill, at the time of Mr. Hummel's trial, I had also never seen him act in a racially motivated manner in any case which we had previously had together. Had I seen anything during the voir dire examination of these three prospective jurors that suggested that the State's exercise of their peremptory challenges was in any way racially motivated, then I would have made a _Batson_ challenge, and I would have attempted to prove such racial motivation; I simply did not see anything then, nor do I see anything now, which suggests a racial motivation for the exercises of their peremptory challenges on these three prospective jurors. Such being the case, I do not believe that our failure to make such a _Batson_ challenge constitutes ineffective assistance in this instance.

Conclusion

Several of the claims contained within Applicant's _Writ Application_ to which the Court has ordered that I respond, are phrased in sweeping and conclusory terms, without specific references to those places within the trial record, or to particular items of evidence or portions of testimony where it is alleged that we failed to object. This fact has made it exceedingly difficult to succinctly answer some of the claims that are contained with that Application. I have not read the entire trial transcript in preparing this Affidavit; however, I have referred to portions of such record to refresh my recollection as to the questioned events. Similarly, I have reviewed portions of my trial file, as well as parts of our investigator's and mitigation specialist's files. I have sought the assistance of our Mitigation Specialist, our investigator, and our expert, Dr. McGarrahan, to assist me in locating information within our files pertaining to the issues raised in this _Writ Application_. I have discussed these issues with Fred Cummings, my co-counsel in the trial of this case, but I have essentially worked independently from Mr. Cummings in the actual drafting of

this Affidavit.  I have not discussed the content of this Affidavit with either the counsel for the State, or the counsel for the Applicant.  I have tried to limit my revelation of privileged information which I possess as a result of my representation of Mr. Hummel, to only those matters which I believe are necessary to fully answer the Claims to which I have been ordered to respond.  Should the Court have additional questions, or should the Court order that I respond to additional questions from the counsel for either party in this *Writ Application*, then I will do so in the manner directed by the Court; however, being compelled to answer these Claims has placed me in the virtually untenable position of providing information which I believe to be very harmful to my client, Mr. Hummel, and that is of the utmost concern to me.  The effective assistance of counsel is viewed within the context of the totality of the representation provided in the case.  It is my fervent belief, that we made a comprehensive and laborious effort in the defense of Mr. Hummel, in the face of a mountain of evidence, and a set of horrific facts.  Based upon that totality of our representation, I firmly believe that we provided him the best representation that we could, and that those efforts meet the criteria required for the effective assistance of counsel."



LARRY M. MOORE

SUBSCRIBED and SWORN to before me on this the 9th day of August, 2013.

KIMBERLY MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 5-31-2014

KIMBERLY MOORE, Notary Public

No. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
|---|---|---|
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

*FILED*
*THOMAS A WILDER DIST CLERK*
*TARRANT COUNTY, TEXAS*
*TIME AUG 0 1 2013*
*BY 9:09 am*
*DEPUTY*

## **ORDER**

The Court has previously granted the State's Unopposed Motion For Copies of Sealed Exhibits Filed with Application for Writ of Habeas Corpus.

The District Clerk is ordered to provide the State with photocopies of each of the actual sealed Exhibits 32-41 filed by Applicant with his application for writ of habeas corpus in this cause. These copies are in addition to the copies of all jury questionnaires already provided to the State pursuant to a separate order of this Court.

The State may share information from juror questionnaires and information cards and from these seal exhibits with other members of the prosecution team and with Applicant's trial and appellate attorneys.

SIGNED AND ORDERED on this _1ST_ day of _August_, 2013.

_[signature]_

Judge Presiding

*Amended*
*Upon completion of review by state; the records*
*shall return record clucked out the Clerk of*
*Court. 1st of August, 2013* _[signature]_

**557**

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS
TIME _____
AUG 0 1 2013
BY _9:09 am_
_____ DEPUTY

### ORDER

The Court has previously granted the State's Unopposed Motion For Copies of Sealed Exhibits Filed with Application for Writ of Habeas Corpus.

The District Clerk is ordered to provide the State with photocopies of each of the actual sealed Exhibits 32-41 filed by Applicant with his application for writ of habeas corpus in this cause. These copies are in addition to the copies of all jury questionnaires already provided to the State pursuant to a separate order of this Court.

The State may share information from juror questionnaires and information cards and from these seal exhibits with other members of the prosecution team and with Applicant's trial and appellate attorneys.

SIGNED AND ORDERED on this _1ST_ day of _August_, 2013.

_____
Judge Presiding

*Amended*
Upon completion of review by state; the records shall return record clucked out the Clerk of Court. 1st of August, 2013

**558**

C-432-009923-1184294-A

EX PARTE                          §        IN THE 432ND DISTRICT COURT
                                  §
JOHN WILLIAM HUMMEL               §        OF TARRANT COUNTY, TEXAS

*FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS
SEP 27 2013
TIME:
BY:_____
_____ DEPUTY*

## UNOPPOSED MOTION TO EXTEND TIME TO FILE THE STATE'S REPLY TO APPLICATION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 7(a), the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, requests that the Court grant a sixty-day extension of time for filing its reply to Applicant's application for writ of habeas corpus. The following allegations are made in support of this motion:

I.

A Tarrant County jury convicted Applicant of capital murder in cause number 1184294D and answered the special issues in a way that required the imposition of the death penalty. Applicant's direct appeal is pending following submission in the Texas Court of Criminal Appeals in cause number AP-76,596

II.

The current application, which is Applicant's first, was filed pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071 on June 5, 2013. The State's reply to the application is currently due on October 3, 2013.

1

**559**

III.

The State requests that the deadline to file its reply to the application be extended sixty days to December 2, 2013.

IV.

Applicant raises eighteen claims for relief. Counsel for the State has had other duties which have prevented her from completing the State's reply to the application by the current due date.

V.

This motion is not brought for purposes of delay but to ensure that justice is served and to allow the State the time necessary to research and address the issues raised in this habeas proceeding.

VI.

Counsel's duties since the date that the application was filed have included, but not been limited to:

- Investigating the claims made and preparing to respond to the application in this cause; filing the State's written reply to Applicant's opposition to the State's motion for attorney affidavits in this cause; and preparing for and participating in a hearing to decide the State's motion for attorney affidavits in this cause.

- Counsel is in the process of reading the lengthy record and researching the issues for the State's brief in the death-penalty direct appeal in *Steven Lawayne Nelson v. The State of Texas*, No. AP-76,924.

- Completing a paper for and speaking at a CLE course entitled "Capital and Non-Capital Training for the Prosecution" at the Center for American and International Law in Plano, Texas.

2

**560**

- Updating a paper authored by counsel entitled "State Law of Charging Instruments," which is published every two years by West in its Texas Criminal Procedure – Codes and Rules book.

- Filing the State's briefs in *Andre Lamont Brown*, No. 02-12-00639-CR; *Arthur Louis Foley v. The State of Texas*, No. 08-13-00039-CR; and *Steven N. Washington v. The State of Texas*, Nos. 13-12-00661-CR, 13-12-00662-CR, & 13-12-00663-CR.

- Supervising the work of other attorneys in the appellate section of the District Attorney's Office.

Additionally, this Court has ordered Applicant's trial and appellate attorneys to file affidavits responding to Applicant's claims that he received ineffective assistance of counsel at trial and on appeal. Two of those attorneys have not yet filed the affidavits ordered by the Court.

VII.

Previously, when counsel for the State informed Applicant's habeas counsel, Robert Romig, that the State did not oppose Applicant's motion for an extension of time to file his application, Mr. Romig informed counsel for the State that the Office of Capital Writs did not oppose a motion for extension by the State.

WHEREFORE, PREMISES CONSIDERED, the State of Texas respectfully requests that the Court extend the time for the State to file its reply to December 2, 2013.

3

**561**

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Division


HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1687
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A copy of this motion was mailed to Applicant's habeas counsel, Brad Levenson,

Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave.,

Austin, Texas, 78701, on September 27, 2013.


HELENA F. FAULKNER

4

**562**

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND DISTRICT COURT |
| | § | |
| JOHN WILLIAM HUMMEL | § | OF TARRANT COUNTY, TEXAS |

### MEMORANDUM

The Court has considered the State's Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus filed pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 7(a). The Court finds that the State has shown particularized justifying circumstances for a sixty-day extension of time to file its reply.

### ORDER

1.    It is hereby ordered that the State's Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus is GRANTED. Accordingly, the State's reply in this cause is ordered due on or before December 2, 2013.

2.    The clerk of this Court is ordered to send a copy of this Memorandum and Order to counsel for Applicant, Brad Levenson, Director, Office of Capital Writs, at Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, or at counsel's most recent address; and to the appellate section of the District Attorney's Office.

SIGNED AND ENTERED on this _____ day of _____, 2013.


_____
JUDGE PRESIDING

**563**

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND DISTRICT COURT |
| | § | |
| JOHN WILLIAM HUMMEL | § | OF TARRANT COUNTY, TEXAS |

## MEMORANDUM

The Court has considered the State's Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus filed pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 7(a). The Court finds that the State has shown particularized justifying circumstances for a sixty-day extension of time to file its reply.

## ORDER

1.      It is hereby ordered that the State's Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus is GRANTED. Accordingly, the State's reply in this cause is ordered due on or before December 2, 2013.

2.      The clerk of this Court is ordered to send a copy of this Memorandum and Order to counsel for Applicant, Brad Levenson, Director, Office of Capital Writs, at Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, or at counsel's most recent address; and to the appellate section of the District Attorney's Office.

SIGNED AND ENTERED on this _/sr_ day of _October_, 2013.

_____
JUDGE PRESIDING

**564**

## IN THE 432nd JUDICIAL DISTRICT COURT
## TARRANT COUNTY, TEXAS

| | | |
|---|---|---|
| **EX PARTE** | § | **Trial Cause No.** |
| **JOHN WILLIAM HUMMEL,** | § | **1184294D** |
| **APPLICANT** | § | |
| | § | |
| | § | |

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
OCT 09 2013
TIME _____
BY _____
DEPUTY

## AFFIDAVIT OF JOHN W. STICKELS
## (POST CONVICTION APPLICATION FOR WRIT OF HABEAS CORPUS)

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared John W. Stickels, who, being by me duly sworn, stated as follows:

"My name is John W. Stickels. I was licensed to practice law by the State Bar of Texas in May of 1983. I am Board Certified in Criminal Trial Law and Criminal Appellate Law by the Texas Board of Legal Specialization.

I was appointed to represent Mr. John Hummel in the appeal of his death sentence received in cause number 1184294D in the 432nd District Court of Tarrant County, Texas. In the process of representing Mr. Hummel, I reviewed the transcripts, researched the law applicable to the issues presented, and prepared

**565**

Appellant's Brief.  In addition, I appeared for oral argument before the Texas Court of Criminal Appeals and argued Mr. Hummel's case before that court.

Mr. Hummel's initial application for writ of habeas corpus alleges that I rendered ineffective assistance of counsel for failing to urge on appeal that the state's evidence was insufficient to show that Mr. Hummel is a future danger. Mr. Hummel's application for writ of habeas corpus admits that the Court of Criminal Appeals has stated repeatedly that it is the law in the state of Texas that the facts of a particular crime and the circumstances surrounding it can support a finding of future dangerousness.  In the process of preparing Mr. Hummel's appellate brief, I reviewed the guilt/innocence facts and the applicable law concerning future dangerousness and determined that the facts proven by the State and found by the jury are sufficient to support the jury's finding that Mr. Hummel is a future danger. Because I made this determination, I decided not to include the 'future danger' issue in Mr. Hummel's appellate brief because I considered it to be frivolous.

Mr. Hummel's initial application for writ of habeas corpus alleges that I rendered ineffective assistance of counsel for failing to sufficiently appeal the court's failure to grant the defense motions to suppress. In connection with Mr. Hummel's Motion to Suppress, I reviewed the filed motion to suppress, reviewed the applicable facts, researched the applicable law, and presented the arguments in a proper and suitable manner which as calculated to obtain relief for Mr. Hummel

on this issue. In my opinion, based upon my research and experience, I presented the motion to suppress issue in an appropriate manner that was calculated to obtain relief. I understand the motion to suppress could have been presented in a different manner. However, I made the decision to present the motion to suppress issue in the manner I did because I decided it was the best way to obtain relief.

Mr. Hummel's initial application for writ of habeas corpus also alleges that I rendered ineffective assistance of counsel for failing to appeal the state's impermissible injection of inflammatory and prejudicial evidence into both phases of the trial. In my opinion, the trial court did not err in admitting the complained of evidence because it was admissible as contextual evidence and/or admissible victim impact evidence. Because I determined the trial court did not err in admitting the complained of evidence, I did not include it in Mr. Hummnel's appellate brief.

Mr. Hummel's initial application for writ of habeas corpus further alleges that I rendered ineffective assistance of counsel for failing to appeal the trial court's erroneous denial of defense counsel's valid challenges for cause of nine prospective jurors. Specifically, Mr. Hummel alleges that the trial court erred in failing to grant the defense challenges for cause for prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo and that I rendered ineffective assistance of counsel for failing to appeal the court's

ruling. In the process of writing Mr. Hummel's appellate brief, I reviewed the reporter's record concerning all of the prospective jurors, including prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo. In addition, I researched the applicable law concerning possible challenges for cause with respect to any prospective juror. It was my opinion when I wrote Mr. Hummel's appellate brief that there was no error in the trial court's refusal of defendant's challenges for cause. Therefore, I decided not to include those issues in Mr. Hummel's appellate brief.

In the process of reviewing the record to respond to the allegations in Mr. Hummel's application for writ of habeas corpus, I reviewed the reporter's records specifically concerning prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo. In addition, I researched the applicable law concerning possible challenges for cause with respect prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo. After reviewing the facts and researching the issues concerning prospective jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo, it continues to be my opinion there was no error in the trial court's refusal of defendant's challenges for cause."

Dated October 9, 2013

John W. Stickels

Affidavit of John W. Stickels                                                                 Page 4

**568**

SUBSCRIBED AND SWORN TO me, the undersigned Notary Public, by the said John W. Stickels on the 9th day of October, 2013.



Notary Public, State of Texas

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432nd JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## STATE'S REPLY TO APPLICATION FOR WRIT OF HABEAS CORPUS

COMES NOW, The State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and denies the allegations in the instant application for writ of habeas corpus. The State would show the Court that there is no necessity for a hearing on any of Applicant's allegations.

**I.    Procedural History**

A Tarrant County jury convicted Applicant of capital murder and answered the special issues in a way that required the imposition of the death penalty. The Court of Criminal Appeals of Texas affirmed Applicant's conviction and sentence on direct appeal. *See Hummel v. State*, No. AP-76-596, 2013 WL 6123283 (Tex. Crim. App. Nov. 20, 2013) (Tex. Crim. App. November 20, 2013) (not designated for publication).

The current application, which is Applicant's first, was filed on June 5, 2013. The Court granted the State's request for an extension of time until December 2, 2013, to file its reply.

1

**570**

## II.  Applicant's Claims

Applicant raises the following claims for post-conviction relief:

- Claim One:  Applicant was denied his due-process right to an impartial jury when juror Nathaniel Davis committed misconduct by automatically voting for death.

- Claim Two:  Applicant's trial and appellate counsel were ineffective for failing to argue that the State's evidence was insufficient to show future dangerousness.

- Claim Three:  Trial counsel were ineffective for failing to present evidence that Applicant was not a future danger.

- Claim Four:  Trial counsel were ineffective for failing to present expert testimony regarding Applicant's life history.

- Claim Five:  Trial counsel were ineffective for failing to present relevant lay witnesses.

- Claim Six:  Trial counsel were ineffective for failing to present Applicant's military service as mitigation evidence.

- Claim Seven:  Trial counsel were ineffective for failing to present evidence that Applicant suffered from complex post-traumatic stress disorder resulting from attachment trauma.

- Claim Eight:  Applicant's due process right to a fair trial was violated when the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial; trial and appellate counsel were ineffective.

- Claim Nine:  Trial counsel failed to effectively present evidence that Applicant's confession should be suppressed.

- Claim Ten:  Appellate counsel was ineffective for failing to appeal the trial court's erroneous denial of defense counsel's valid challenges for cause of nine prospective jurors.

**571**

- Claim Eleven: Trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory challenges to remove minority veniremembers in violation of Applicant's constitutional rights.

- Claim Twelve: Applicant's death sentence should be vacated because the punishment-phase jury instruction restricted the evidence the jury could determine was mitigating.

- Claim Thirteen: Applicant's death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty.

- Claim Fourteen: Applicant's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.

- Claim Fifteen: Applicant is ineligible for a death sentence because of his mental impairments.

## III. Statement Of Combined Facts From The Guilt-Innocence And Punishment Phases Of Trial

Applicant lived at 600 Little School Road in Kennedale with his pregnant wife Joy Hummel, his five-year-old daughter Jodi Hummel, and his crippled father-in-law Clyde "Eddie" Bedford. [RR 33: 68, 87; RR 40: 10, 20-21.] A week before Christmas in 2009, Applicant murdered them and set the house on fire because he wanted to pursue another woman. [SX 347B.]

In October 2009, Applicant met Kristie Freeze, a clerk at the E-Z Mart convenience store in Joshua where he sometimes stopped to buy cigarettes and gasoline on his way to or from work as a security guard at Walls Regional Hospital

3

**572**

in Cleburne. [RR 39: 132-35.] After meeting Freeze, Applicant began stopping at the store every day on his way to work in the evening and on his way home early in the morning. [RR 38: 132-35, 166, 168.] After they exchanged telephone numbers, Applicant called Freeze daily and texted her constantly. [RR 39: 136-39; SX 229B1.] Sometimes they texted graphic descriptions of sexual relations (called "sexting") for fun. [RR 39: 173.]

Applicant began wishing that he were single so that he could "pursue [Freeze] better." [SX 347B.] Applicant tried to take his friendship with Freeze further, and he was persistent about wanting to have sex with her. [RR 39: 141.]

On December 4 and 5, Applicant accessed a hospital doctor's computer at work without permission and researched articles about the effects of rat poison on humans and how rat poisoning can cause the death of a human. [RR 43: 36-40; SX 228.]

On December 10, Applicant and Freeze had sex at her apartment. [RR 39: 142, 173, 176; SX 347B.] Two days later, Freeze learned that Applicant's wife was pregnant, which caused Freeze "discomfort" because Applicant "had no concern for the safety of his unborn child." [RR 39: 142-43, 174.] As a result, Freeze told Applicant not to call or text her anymore, but he continued to do so anyway. [RR 39: 142-44, 174.]

4

**573**

On December 16, Freeze's divorce became final. [RR 39: 146.] Applicant called and texted Freeze repeatedly that day. [RR 39: 137-38, 145-47, 162-63.] Freeze told Applicant that she was having a divorce party that day because she wanted him to leave her alone, but he continued contacting her. [RR 39: 146-47.]

Before going to work, Applicant put powdered d-CON rat poison that he stole from Walmart in the turkey meat of the spaghetti sauce he prepared for his family. [RR 41: 11, 14; SX 347C, 349A2.] Applicant intended to kill his family. [SX 349A2.] Applicant, being color-blind, did not notice that the poison turned the meat green. [SX 347C.] His family thought that the meat had gone bad and threw away the meal. [RR 41: 14; SX 347C, 349A2.] Joy called Applicant to tell him what happened, and she ordered a pizza for dinner. [RR 41: 14-16.] Applicant's family members had no idea that he had tried to kill them. [SX 347C.]

Meanwhile, that night, Applicant went to the Huddle House barbeque restaurant in Joshua, which was right in front of Freeze's apartment complex. [RR 39: 94, 131.] Usually when Applicant stopped at the restaurant on his way to work he wore his security-guard uniform, sat in a booth, and talked to Lorie Lewallen while she cooked. [RR 33: 93-95, 104-05.] On the night of December 16, however, Applicant wore "street clothes," "reeked of cologne," sat facing away from Lewallen, was unusually quiet, and seemed "like something was on his mind." [RR 33: 95-96, 105.]

The next morning, December 17, Joe Gordon, the personnel manager for Champion National Security, called Applicant and asked him to come to the office for a counseling session about Applicant's work. [RR 36: 16, 19-21, 39; SX 341B.] Applicant told Gordon that he could not go to the office that day because Joy had the family's van. [SX 341B.] Applicant was scheduled to work that night, but Gordon told Applicant that he could not work until he came to the office. [RR 36: 39; SX 341B.]

That evening, Applicant did not tell Joy that he was not going to work. [SX 347B.] Instead, he got ready as if he were going to work, left home a little after 9:00 p.m., and went to Freeze's apartment. [RR 39: 150-51; SX 347B.] It was Freeze's daughter's sixth birthday. [RR 39: 147-48.] Applicant had persisted all day in trying to see Freeze, so she told him that he could go to her apartment. [RR 39: 147-49, 175.] Applicant read Freeze's daughter her favorite children's book, which was entitled "It Could Have Been Worse." [RR 39: 164.]

Applicant left Freeze's apartment at about 11:00 p.m. so that Freeze would think he was heading to work. [SX 347B.] He stopped for gasoline at E-Z Mart in order to be seen on camera. [RR 39: 39; SX 347B.] Then, he headed home to kill his family. [SX 347B.]

Applicant parked the family van behind his house to avoid being seen and took off his work shirt, white shirt, watch, and boots. [SX 347B.] He went inside

**575**

and grabbed a kitchen knife to "slit [his family members'] throats while they slept." [SX 347B.] He then spent thirty to forty-five minutes contemplating whether to kill Joy, who was fourteen or fifteen weeks pregnant. [RR 39: 209; SX 347B.]

Deciding to carry out his murderous plan, Applicant entered the bedroom where Joy was sleeping and stabbed her in the neck with the kitchen knife, which broke. [SX 347B.] Joy awoke and began fighting back, so Applicant grabbed a baseball bat that was in the room and hit Joy repeatedly in the head until she fell to the floor. [SX 347B.] He then stabbed her with samurai sword replicas and a double-bladed dagger. [SX 347B.] Joy suffered a total thirty-five stab wounds, including two through her heart, four through her lungs, and five through her liver. [RR 39: 203-04, 209, 212; SX 272A.] She also suffered skull lacerations from being hit with the baseball bat and a number of defensive wounds. [RR 39: 205-07.]

After murdering Joy, Applicant rested for about twenty minutes to catch his breath before going to Eddie's bedroom. [SX 347B.] Applicant hit Eddie in the head with the baseball bat five to ten times while Eddie slept in his bed, causing multiple right-side depressed skull fractures. [RR 39: 220; SX 347B.] Applicant then took another break to catch his breath, went to Jodi's room, and hit Jodi in the head five to ten times with the baseball bat while she slept in her toddler bed,

causing extensive multiple right-side skull fractures.  [RR 39: 246-48, 256; SX 347B.]

After placing the murder weapons in a trash bag, Applicant used rolls of toilet paper to set a fire in each victim's bedroom.  [SX 347B.]  He wanted to "make it look like somebody had broken in, killed them, and then tried to cover it up by setting the fires." [SX 347B.]

Applicant left the house, drove around, and disposed of the murder weapons in a dumpster behind an auto parts store in Arlington.  [SX 347B.]  He then continued driving around.  [SX 347B.]  He stopped at various Walmart stores in order to be seen on camera and build his alibi until it was time to return home. [RR 39: 39-44; SX 347B.]

Shortly after midnight on December 18, passersby saw a "huge" fire at Applicant's house and immediately called 9-1-1.  [RR 33: 115-18, 130.] Firefighters from Kennedale, Forest Hill, and Mansfield were dispatched to suppress the fire.  [RR 33: 181; RR 34: 19, 72, 112-13.]  Firefighters remained at the scene and continued putting out hot spots throughout the day and evening.  [RR 34: 65-66, 68, 93, 192-93.]  During their efforts, they found the bodies of Joy, Jodi, and Eddie in three different bedrooms in the house.  [RR 34: 49-51, 92-93, 120-22, 126-28, 142; SX 85-86, 141, 157-59.]

At about 5:00 a.m., Applicant showed up at the fire scene to pretend that he "was coming home trying to be all shocked." [SX 347B.] He approached Kennedale police officer Joshua Worthy and calmly asked what had happened and whether everyone had made it out of the house. [RR 33: 152-54; SX 220D.] A little later, Applicant asked Kennedale police captain Darrell Hull if everyone had made it out of the house. [RR 33: 158; SX 220D.] Applicant told Hull that he had been out at Walmart stores to check prices for Christmas presents. [RR 39: 159; SX 220D.] Hull's immediate impression was that Applicant was not acting appropriately as far as his emotions were concerned. [RR 34: 173.]

Hull invited Applicant to go to the nearby Kennedale police station to get out of the cold weather; Applicant agreed and drove his van to the station. [RR 34: 156, 174; SX 220D.] In the interview room at the station, Applicant gave a voluntary witness statement in which he wrote that he had left home around 9:00 p.m., went to Joshua to visit a friend who was not home, drove around and stopped for gas, and visited several Walmart stores to price Christmas presents; when he returned home, his house was burned down and firemen and police officers were there. [RR 34: 158-59, 161, 175-76; SX 341B, 342.]

Kennedale police sergeant Steven Carlson, Kennedale police detective Jason Charbonnet, and United States Bureau of Alcohol, Tobacco, and Firearms special agent Steven Steele went to the station and conducted a videotaped interview with

9

**578**

Applicant in order to find out any information he had about the house that would assist their origin-and-cause investigation. [RR 34: 163; RR 35: 9-13; SX 341B.] Applicant told the officers that he left home at about 9:00 p.m. as if he were going to work, went to visit a friend in Joshua who was not at home, drove around, went to various Walmart stores to compare prices for Christmas presents, and bought some of the articles of clothing that he was wearing at the station. [RR 35: 44; SX 341B.] Steele became suspicious of Applicant early in the interview because Applicant's story did not make sense. [RR 35: 81; *see* SX 341B.] Applicant gave the officers receipts from the places he had gone, voluntarily signed a consent to search his van and house, and voluntarily turned over the clothes he was wearing. [RR 35: 33, 35, 39, 57, 80; SX 343, 344.] During the interview, Steele saw blood on Applicant's pant leg, and he later saw blood on Applicant's sock and very recent scratches on Applicant's back when Applicant undressed to turn over his clothes. [RR 35: 42-44, 60-62; SX 274-76.]

When the interview concluded, Applicant left the police station in his van and drove to Champion National Security's office in Arlington. While Applicant was at the office, there was nothing unusual about his demeanor, and he never mentioned that anything unusual had happened. [RR 36: 22-23, 42, 50-52; RR 42: 17.] Applicant was counseled and disciplined for watching television, not properly performing his rounds, smoking on the hospital campus, and using doctors'

10

**579**

equipment and computers without authorization. [RR 36: 20-21, 48-49; RR 42: 8-11.]  Applicant admitted committing the infractions, signed the counseling statement, and collected his paycheck. [RR 36: 21-22; RR 42: 10, 12, 15; SX 474.]

Applicant left Champion National Security's office at about 11:00 a.m. and cashed his paycheck. [RR 36: 23; SX 347B.]  He then fled in his van to California because he knew authorities had the evidence to "pin" him for the murders and arson. [SX 347B.]

Members of the Hummel family's church tried unsuccessfully to locate Applicant after the fire, and they became concerned about Applicant's well-being. [RR 36: 64-68.]  The afternoon of December 19, church member Christopher Paris went to the Kennedale Police Department to file a missing-person report on Applicant because he was worried about Applicant's mental stability and scared that Applicant would hurt himself. [RR 36: 65, 71-72, 88.]

At 8:46 p.m. PST[1] on December 19, Applicant checked in to room 24 at the Coast Inn in Oceanside, California.  [RR 37: 80, 82; SX 347B, 408B, 440.]  He was no longer wearing his wedding ring. [RR 39: 106-12; SX 449, 451-56.]

Shortly after checking in at the hotel, Applicant went to the topless bar next door.  [RR 41: 17-22, 30, 56; RR 42: 26; SX 427.]  He met Scott Matejka on the sidewalk near the club, and they struck up a conversation. [RR 41: 19; RR 42: 26-

_____
[1] Pacific Standard Time.

**580**

28, 31.] Applicant and Matejka smoked crack cocaine together in Applicant's hotel room, then drove Applicant's van to a parking lot near the border and walked to Tijuana, Mexico, so that Applicant could buy marijuana. [RR 37: 71-72; RR 41: 29; RR 42: 26-27, 29-32, 47.] They visited several places in Tijuana, including a gentlemen's club, but Matejka never saw Applicant actually obtain any marijuana. [RR 42: 34-35.]

Applicant tried to reenter the United States at the San Ysidro Port of Entry on the California-Mexico border at 5:48 a.m. PST on December 20. [RR 36: 105-06, 111-12; SX 409B.] Applicant was "expressionless" and did not say anything when he approached the pedestrian booth manned by United States Customs and Border Protection (CBP) officer Jorge Bernal. [RR 36: 112, 114, 132.] Applicant presented only his Texas driver's license, which was insufficient documentation for Bernal to allow Applicant to enter the United States. [RR 36: 114, 131-32.] Bernal ran a computer check, which flagged Applicant as armed and dangerous and caused other CBP officers to approach the booth. [RR 36: 115-16, 118, 133.] Applicant was handcuffed and taken to the port-enforcement team for further investigation. [RR 36: 118, 125-26, 130.] During Applicant's detention by CBP, he was arrested after a Texas arson warrant issued and then transferred to the San Diego County Jail. [RR 36: 169; RR 37: 59.]

12

The afternoon of December 20, Carlson, Charbonnet, and James Rizy, an investigator for the Tarrant County Criminal District Attorney's Office, flew to San Diego to interview Applicant at the San Diego County Jail. [RR 36: 168-69; RR 37: 58-59, 62.] After being advised of and waiving his Miranda rights, Applicant voluntarily confessed on videotape and in writing that he killed his family and set his house on fire. [RR 36: 172; RR 37: 12-18, 62-63, 66-68, 79-80; SX 347B, 348, 349B.] Applicant admitted that he had been thinking since October 2009 about killing his family because he wanted to be with Freeze. [SX 347B.] He thought that he deserved to spend the rest of his life in prison or on death row. [SX 347B.] Based on information Applicant provided, Worthy recovered the murder weapons from a dumpster behind an auto parts store in Arlington. [RR 33: 160-64, 206, 212; RR 36: 177-78; RR 37: 87-88.]

## IV.   Reply To Claim One

Applicant alleges that he was denied his due-process right to an impartial jury because juror Nathaniel Davis committed misconduct by automatically voting for a sentence of death. [*See* Application at 30.] Applicant submits an affidavit from Davis indicating that he made up his mind during the guilt-innocence phase of trial to convict Applicant and vote for a death sentence. [Applicant's Exhibit 22.]

13

## A.    Applicable Law: TEX. R. EVID. 606(b)

Rule 606(b) of the Texas Rules of Evidence states the following:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

TEX. R. EVID. 606(b).[2]   An outside influence for purposes of rule 606(b) is "something originating from a source outside of the jury room and other than from the jurors themselves." *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012). "Juries should be protected from post-trial harassment or tampering." *Id.* at 153 (citing *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 367 (Tex. 2000)). "The integrity of jury proceedings must not be jeopardized by unauthorized invasions," such as when an applicant seeks to make a post-verdict inquiry "into the internal processes of the jury." *Tanner v. United States*, 483 U.S. 107, 120 (1987).

[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of

---

[2] Applicant neither cites rule 606(b) nor discusses its effect on his claim. [Application at 30-36.]

14

**583**

those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. 264, 267-68 (1915).

## B.   Davis' Affidavit is Inadmissible and Should Be Stricken

Applicant's claim is based solely on Davis' affidavit detailing his own mental processes in reaching a verdict at Applicant's trial. [Application at 30-36; Applicant's Exhibit 22.] Applicant does not challenge Davis' qualifications as a juror, and Davis' affidavit fails to even suggest an outside influence. [Application at 30-36; Applicant's Exhibit 22.] *See McQuarrie*, 380 S.W.3d at 154 (outside influence is "something originating from a source outside of the jury room and other than from the jurors themselves"). Because Applicant's claim for relief does not fall within either exception to rule 606(b), Davis' affidavit is inadmissible in this habeas proceeding and must be stricken.[3] *See* TEX. R. EVID. 606(b); *see also Ex parte Parra*, 2013 WL 5221110 (Tex. Crim. App. September 18, 2013) (refusing based on TEX. R. EVID. 606(b) to consider juror affidavit); *Bjorgaard v.*

---

[3] Application of TEX. R. EVID. 606(b) does not deprive Applicant of a fair trial or due process. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) (rejecting constitutional challenge to FED. R. EVID. 606(b)); *Golden Eagle Archery Inc.*, 24 S.W.3d at 375 (examining constitutionality of TEX. R. EVID. 606(b) in civil context); *Dunklin v. State*, 194 S.W.3d 14, 19-20 (Tex. App.—Tyler 2006, no pet.) (rejecting challenge to constitutionality of TEX. R. EVID.606(b)).

15

**584**

*State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007) (Tex. R. Evid. 606(b) barred trial court from considering contents of juror affidavit describing jurors' collective thought process), *pet. dism'd, improv. granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008). Without Davis' affidavit, nothing remains to support Applicant's allegations. Accordingly, Applicant's first claim for relief should be denied.

## V.    Reply To Claims Two Through Eleven

Applicant sets forth ten claims for relief alleging that he was denied effective assistance of counsel at his capital-murder trial. Applicant's trial counsel, Fred Cummings and Larry M. Moore, and Applicant's appellate counsel, John W. Stickels, filed court-ordered affidavits addressing Applicant's claims. For the reasons set forth below, Applicant has not met his burden to prove his claims of ineffective assistance, and the Court should deny relief.

### A.    Standard of Review: Ineffective Assistance Claims

#### 1.    General Test for Ineffective-Assistance Claims

A defendant has a Sixth Amendment right to reasonably effective assistance of counsel. U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (1) deficient performance of trial counsel; and (2) the deficiency prejudiced the defense. *Wiggins v Smith*, 539 U.S.

510, 521 (2003); *Strickland*, 466 U.S. at 687; *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010); *Ex parte Briggs*, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005). The test "is the benchmark for judging . . . whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Gosch v. State*, 829 S.W.2d 775, 784 (Tex. Crim. App. 1991) (quoting *Strickland*, 466 U.S. at 686). The reviewing court "must ascertain whether counsel's errors were so serious that counsel was not functioning in a manner envisioned by the Sixth Amendment." *Id.*

To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objectionable standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007). "This means that unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate 'unless the challenged

conduct was so outrageous that no competent attorney would have engaged in it.'" *Morales*, 253 S.W.3d at 696 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)); *see Scheannette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) ("[a] reviewing court can frequently speculate on both sides of an issue, but ineffective assistance claims are not built on retrospective speculation; rather, they must be 'firmly founded in the record'").

Judicial scrutiny of counsel's performance must be highly deferential. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Standards published by the American Bar Association and other similar sources are only "guides" for determining prevailing professional norms "because no set of detailed rules can completely dictate how best to represent a criminal defendant." *Ex parte LaHood*, 401 S.W.3d 45, 50 (Tex. Crim. App. 2013); *see Wiggins*, 539 U.S. at 521 ("the proper measure of attorney performance remains simply reasonableness under prevailing professional norms"). The test for reasonableness is not whether counsel could have done something more or different; an applicant must show that his counsel's performance fell outside the wide range of professionally competent assistance. *Payne v. Allen*, 539 F.3d 1297, 1317 (11th Cir. 2008). Whether a defendant received adequate assistance of counsel is judged by the totality of the representation provided. *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992).

18

If an applicant succeeds in proving deficient performance, he must then satisfy the second *Strickland* prong by establishing that the deficiency prejudiced his defense. *Ex parte Ramirez*, 280 S.W.3d 848, 852 (Tex. Crim. App. 2007). To prove prejudice, an applicant "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012); *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

An applicant has the burden to prove that he received ineffective assistance of counsel. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833. The applicant must meet this burden with more than unsubstantiated or conclusory statements. *United States v. Turcotte*, 405 F.3d 515,

**588**

537 (7th Cir. 2005). An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d 627, 629 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

"The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Ex parte Miller*, 330 S.W.3d 610, 616 (Tex. Crim. App. 2009) (quoting *Scheanette*, 144 S.W.3d at 510).

### 2.    The Test for Adequacy of Counsel's Investigation

One necessary facet of professional assistance is the investigation of the facts and law applicable to a case. *Ex parte LaHood*, 401 S.W.3d at 50. While the courts broadly view claims that an attorney failed to properly investigate a case through the lens of the two-pronged *Strickland* test for ineffective assistance of counsel, the focus of each prong of the test is slightly different when assessing a claim of deficient investigation in the context of the punishment phase of a capital-murder trial. *See Wiggins*, 539 U.S. at 522-23, 534-35.

**589**

Under the first prong of the inquiry, a reviewing court must assess whether the alleged failure to conduct a more thorough investigation was reasonable under the circumstances. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

This "reasonableness" standard "does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533. Nor is counsel forced "to scour the globe on the off chance something will turn up." *Rompilla*, 545 U.S. at 383. "Such a conclusion would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*. *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 689). Rather, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383. In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to "counsel's perspective at the time" investigative decisions were made. *Id.* at 381.

21

**590**

In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527. Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91. Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d 713, 728-29 (Tex. Crim. App. 2006).

Even if an applicant establishes that counsel's failure to investigate was unreasonable under the circumstances, he must further establish that counsel's failure prejudiced his defense. *Wiggins*, 539 U.S. at 534. In order to demonstrate prejudice, an applicant must show that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Ex parte Martinez*,

195 S.W.3d at 730 (quoting *Strickland*, 466 U.S. at 687). To accomplish this, the applicant must prove a reasonable probability that, absent counsel's unprofessional errors, the outcome of the proceeding would have been different. *Rompilla*, 545 U.S. at 390 (quoting *Strickland*, 466 U.S. at 694); *Wiggins*, 539 U.S. at 534; *Ex parte Martinez*, 195 S.W.3d at 730.

### 3.   The Test for Adequacy of Appellate Counsel

The federal constitution does not require the states to create appellate review, but any procedure provided must afford adequate and effective appellate review to indigent clients. *Smith v. Robbins*, 528 U.S. 259, 270 n.5, 276 (2000). In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (1) counsel's decision not to raise a particular point of error was objectively unreasonable, and (2) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex.. Crim. App. 2007). Appellate counsel need not advance *every* argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte* Miller, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily

23

result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

## B.    Facts Relevant To Claims Two Through Eleven

### 1.   Qualifications Of Applicant's Counsel

On December 23, 2009, the Court appointed Cummings to represent Applicant at his capital-murder trial. [CR 1: 21; Cummings' affidavit at 1.] The Court appointed Moore as Cummings' co-counsel on December 31, 2009. [CR 1: 24; Moore's affidavit at 1.] After Applicant's conviction and death sentence, the Court appointed Stickels to represent Applicant on direct appeal. [CR 4: 744; Stickels' affidavit at 1.] Cummings, Moore, and Stickels are highly experienced attorneys who were qualified to represent Applicant. [Moore's affidavit at 1-3; Cummings' affidavit at 1; Stickels' affidavit at 1.]

### 2.   The Investigation Conducted By Applicant's Trial Counsel

Applicant's trial counsel, along with other members of Applicant's defense team, conducted a thorough and reasonable investigation of Applicant's case to support the strategic decisions they made. The record reflects the following relevant matters regarding that investigation:

- On December 31, 2009, the first day Cummings appeared in court on Applicant's behalf, Cummings had the Court appoint Brendan Ross, an experienced licensed social worker and mitigation specialist, and Bobby Walton, an investigator, to assist in conducting the investigation of Applicant's life. [CR 1: 27, 32; Cummings' affidavit at 6-7.] Cummings also had the Court

**593**

appoint Moore as his co-counsel. [CR 1: 24; Cummings' affidavit at 6.]

- Shortly thereafter, the defense team met and began gathering mitigation evidence and identifying potential mitigation witnesses. [Cummings' affidavit at 6.] Ross and Walton assisted trial counsel in performing a complete mitigation investigation into every aspect of Applicant's life. [Moore's affidavit at 10.]

- Ross gathered social records from various sources and interviewed Applicant to start the investigation. [Cummings' affidavit at 6.]

- From the beginning, Ross and Walton worked to locate and interview people associated with Applicant in order to discover anything the prospective witnesses knew about Applicant, including identifying other potential witnesses. [*Id.* at 7.]

- Trial counsel requested that Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist, evaluate Applicant. [RR 44: 118-21.] She spent about eleven hours total on October 13 and December 20, 2010, administering a full neuropsychological evaluation and personality and emotional testing; in doing so, she looked at twenty to thirty different tasks and instruments. [RR 44: 121-22.] Additionally, Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, correspondence from Neata to Applicant, medical records for Applicant's mother Jackie Hummel, and psychological test data from Applicant's evaluation by J. Randall Price, the State's forensic psychologist; she spoke to Neata and Jackie; she performed a clinical interview to ask Applicant about his "entire social history"; she conducted a mental-status examination during which she observed Applicant and discussed with Applicant any psychiatric symptoms he was having; and she discussed the offenses with Applicant in great detail. [RR 44: 121-24.]

- Trial counsel discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Applicant. [Moore's affidavit at 7.]

25

**594**

- Applicant's trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the charged offense. [*Id.* at 7.]

- The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial. [*Id.* at 10.] The defense team worked to put together the best mitigation case it could. [Cummings' affidavit at 6.]

- The defense never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

- The defense team discussed various mitigation themes as they came to light. [Cummings' affidavit at 7.] Such themes included Applicant's participation in role-playing games; Applicant's use of marijuana, alcohol, and other drugs; the possibility that Applicant suffered from being raised in poverty; the possibility that Applicant had a mental disorder or illness; the possibility that Applicant observed sexual abuse in his household; and the possibility that Applicant was abused or neglected as a child. [*Id.*]

- Applicant's defense team discussed the most effective way to develop the mitigation case before the jury. [Moore's affidavit at 10.] Trial counsel determined that the best way to present the mitigation case was to call available lay witnesses to testify about Applicant's life story and to then use that story as a basis for the opinions offered by Dr. McGarrahan. [*Id.*; Cummings' affidavit at 6.]

- The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8.] Members of the defense team made three separate trips to South Carolina and one trip to California. [Moore's affidavit at 16-17.] Moore personally traveled to South Carolina twice to try to locate potential witnesses and persuade them to testify on Applicant's behalf. [*Id.* at 17.] Applicant's trial counsel expended a

26

**595**

"significant" amount of their own money, which was not reimbursed, in their attempts to locate witnesses and get them to Texas to testify at Applicant's trial. [*Id.*]

- Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [*Id.* at 14; Cummings' affidavit at 8.]

- The defense team's own independent investigation was hampered by "an almost universal lack of cooperation from the vast majority of people that [they] did contact." [Moore's affidavit at 14.] The defense-team members were threatened with arrest by other individuals in South Carolina in the event they persisted in their attempts to talk to those individuals. [*Id.* at 14-15.]

- Trial counsel investigated the suspicions of Dr. McGarrahan and other defense-team members that Applicant and/or his sister Neata Woody were sexually abused by their parents or another adult close to the family.[4] [*Id.* at 11-12, 14.] Even friends of the Hummel family, particularly Mark Pack and Derrick Parris, indicated suspicions that something of that nature may have occurred in the Hummel family's home. [*Id.* at 12.] Dr. McGarrahan and Moore separately inquired of Applicant, Neata, and Jackie whether anything of this nature had ever occurred, and they each adamantly denied it. [*Id.* at 12, 14; Cummings affidavit at 8.] None of the neighbors, friends, schoolmates, or other individuals who were interviewed could provide any proof that sexual or physical abuse had occurred other than what was testified to at trial. [Moore's affidavit at 12.]

- Applicant indicated to the defense team that his home life, upbringing, and family life were very positive, and there was nothing that he found troubling about it. [*Id.* at 12, 14.] Applicant

---

[4] Applicant's assertion that his trial counsel uncovered suggestions that Neata was sexually abused by her father and the suspicion that Neata then sexually abused Applicant is "simply *not true*." [Moore's affidavit at 11, (emphasis in original).]

denied witnessing or experiencing any abuse growing up and reported a normal childhood. [Cummings' affidavit at 8.] He even denied those things which Neata, Parris, Mark Pack, and others told the defense team they had witnessed. [Moore's affidavit at 14.] Neata would only admit to that abuse about which she ultimately testified had occurred, and she specifically denied repeatedly that anything further or more severe had taken place. [Id. at 12.] Jackie specifically denied that any abuse had ever occurred in the home, although she acknowledged that she and Applicant's father were not demonstrative in their affection for their children. [Id.]

- Members of the defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial. [Moore's affidavit at 10.] They investigated current friends and associates, family members, present and former church members, school classmates, and former friends. [Cummings' affidavit at 7.]

- Counsel specifically discussed with Applicant on more than one occasion whether there were any jail guards, chaplains, or other personnel with whom he had developed a sufficiently good relationship that they might be willing to testify on his behalf. [Moore's affidavit at 6; Cummings' affidavit at 3.] Applicant said that he did not know of any such potential witnesses, and he never provided the defense team with the names of any personnel. [Moore's affidavit at 6; Cummings' affidavit at 3, 5.] No one on Applicant's defense team ever had any indication that there were jailers who were willing to testify on Applicant's behalf, and counsel did not develop any such names through their independent investigation. [Moore's affidavit at 6; Cummings' affidavit at 3, 5.]

- Neata refused to appear at Applicant's trial until trial counsel had a South Carolina court compel her to appear against her will.[5]

---

[5] At the hearing in South Carolina, Neata presented a doctor's letter indicating that she could not endure such testimony; nevertheless the South Carolina court compelled her to appear at Applicant's trial. [Moore's affidavit at 13.] Moore notes that, after testifying, Neata suffered "a serious and debilitating stroke" that required her to remain in the hospital for a week or so before flying home. [Id.]

597

[Moore's affidavit at 13; Cummings' affidavit at 7.] Counsel compelled Neata to testify against her will. [Moore's affidavit at 13; *see* RR 43: 234, 256.]

- Applicant's mother Jackie lived with her sister Edwina Penny before trial. [Moore's affidavit at 14.] Penny and Applicant's cousin Michael Castlow both indicated that they wanted Applicant to receive the death penalty. [*Id.*; Cummings' affidavit at 7.] Penny affirmatively sought to prevent the defense team from having any contact with Jackie, and Penny threatened to have members of the defense team arrested if they returned to her property to try to interview Jackie. [Moore's affidavit at 14; Cummings' affidavit at 7.] Eventually, the defense team interviewed Jackie, but only because of its "own dogged persistence in seeking to do so." [Moore's affidavit at 14; *see* Cummings' affidavit at 7.]

- Many prospective witnesses contacted by the defense team refused to cooperate, while others simply could not or would not provide any helpful information. [Moore's affidavit at 10.]

- Potential witnesses hid from the defense team, threatened to have them arrested for trespassing or harassment, and denied the team access to critical potential witnesses. [Cummings affidavit at 6.]

- The defense subpoenaed several witnesses whom they ultimately decided not to call to the stand because of various concerns about their proposed testimony. [Moore's affidavit at 10.]

- The defense team identified and interviewed every potential witness it could and used all of the witnesses who could provide admissible relevant mitigation evidence about Applicant, even compelling some who were uncooperative. [Cummings' affidavit at 6.]

- Some of the witnesses interviewed by the defense team could not remember anything relevant, but they gave the defense team leads to others who did. [*Id.* at 7.]

29

**598**

- The defense first interviewed Parris in the Spartanburg Jail in South Carolina after Moore obtained permission from Parris' attorney in his pending criminal case. [Moore's affidavit at 13.] The information Parris offered about Applicant's life and background changed to a degree every time Moore talked to him. [Id.] Despite Moore's concerns about such changes, Moore believed that Parris had important information concerning Applicant's physical abuse by his father that could not be proven by other means. [Id.] The defense called Parris to testify at the punishment phase of Applicant's trial. [RR 43: 149.]

- Moore's affidavit discusses the monetary funds that he provided to Parris and others from South Carolina in order to facilitate their attendance at trial; Moore was never fully reimbursed for the funds he expended. [Moore's affidavit at 13-14.]

- Moore spoke to Applicant's maternal uncle Thomas Hamilton. [Moore's affidavit at 15; Applicant's Exhibit 12.] Hamilton said that Applicant had promised to give him "a part of his liver" to help Hamilton deal with hepatitis. [Moore's affidavit at 15.] When Moore inquired about any possible abuse in the Hummel home, Hamilton became very defensive of his sister Jackie and adamant in his denial that anything of that nature had occurred, even to the point of refuting some of the things that Neata had said occurred.[6] [Id.] The defense team believed it was not in Applicant's best interest to call Hamilton to testify because he did not support the allegations of abuse made by Neata and other witnesses, he was very defensive of Jackie, and his testimony was inconsistent with that of other witnesses. [Id.]

- Cummings spoke to George Goodson, a former neighbor of Applicant and Joy. [Id.; Applicant's Exhibit 11.] While Goodson was supportive of Applicant, he feared that his testimony would harm Applicant, mainly due to his own prison record. [Moore's affidavit at 15.] Goodson had spoken to the prosecutors, who were aware of Goodson's knowledge of Applicant's family and of

---

[6] In his habeas affidavit, Hamilton continues to deny knowledge of abuse, but he is much less adamant that anything of that nature could have occurred in the home. [Moore's affidavit at 15; see Applicant's Exhibit 12.]

Goodson's criminal record. [*Id.*] Goodson did not want to testify at Applicant's trial.[7] [*Id.*] Applicant's trial counsel ultimately determined it was not in Applicant's best interest to call Goodson as a witness at trial. [*Id.*]

- In addition to contacting Goodson, the defense investigator interviewed all of Applicant's neighbors; however, none of them would provide any helpful testimony or testify on Applicant's behalf. [*Id.*]

- The defense team contacted those individuals whom Applicant identified as his "friends" at work, but they denied any such friendship and indicated that they knew very little of Applicant, did not really care for him, and did not want to testify at his trial. [*Id.*]

- The defense team contacted members of the Hummels' church, particularly including the minister, who had moved to a church in Corpus Christi by the time of the trial. [*Id.*] Although the defense subpoenaed the minister to testify, he eventually decided that Applicant deserved the death penalty, and he was unwilling to do anything to help Applicant at his trial. [*Id.* at 15-16.]

- During the course of the investigation, the defense team obtained the name of Lance DuPre, who was part of a group of friends that included Applicant, Chad Brown, and Parris. [*Id.* at 16; *see* Applicant's Exhibit 8.] The defense tried to contact DuPre through telephone numbers they discovered for his mother and aunt; Moore left a business card at the house where he believed DuPre's family lived in South Carolina, asking DuPre to call him; and, shortly before trial, the defense determined that it appeared DuPre worked at the state crime laboratory in Columbia, South Carolina. [Moore's affidavit at 16.] Although the defense team called every number it located as possibly being a way to reach DuPre, he never answered or returned the calls. [*Id.*] Applicant's defense team exhausted every lead it had in its efforts to locate and talk to DuPre. [*Id.*]

_____

[7] Moore's statement that Goodson did not want to testify appears to refute Goodson's assertion in his habeas affidavit that he told trial counsel he was willing to testify. [Applicant's Exhibit 11.]

**600**

- The defense team was unable to locate Christopher Paris prior to trial even though it "aggressively tried to do so." [*Id.*]

- Applicant's defense team was aware that Applicant played Dungeons and Dragons, which Applicant reported as a harmless game he occasionally played on paper. [Cummings' affidavit at 8.] While Applicant's habeas counsel located one witness, Chad Brown, who reported in great detail playing Dungeons and Dragons with Applicant as a young man, Applicant's trial counsel did not locate Brown and did not have that information for trial. [*Id.*]

- Applicant's trial counsel believed that Applicant's military service could be important to the mitigation presentation at trial. [Moore's affidavit at 17.] During discussions with the defense team, Applicant "down-played" his military service and did not depict his military service in a positive or successful way. [*Id.*] Counsel obtained copies of Applicant's military records and specifically asked Applicant about individuals in the service whom he befriended and who might be available to testify on his behalf. [*Id.*] Applicant never provided the names of any such individuals, and the defense team's independent investigation of Applicant's background did not develop the names of Wayne Matthias, Fred Emmer, Efrain Chaidez, or Christopher Boling. [*Id.*]

- The defense located a number of lay witnesses whom trial counsel called to testify at the punishment phase of Applicant's trial: Haila Scoggins,[8] who taught Applicant during his four years in high school; Tommy Stribble, who sponsored and explained Applicant's permanent school records spanning from elementary school through high school; Mark Pack, who was Applicant's childhood friend; Christy Pack, who is Mark Pack's wife; Linda Pack, who was Jackie's best friend for about ten years and spent time with her family at the Hummel's farm; Parris, who was Applicant's friend

---

[8] Scoggins has submitted a habeas affidavit under the name Haila Adams. [Applicant's Exhibit 3.] The State will refer to her as Scoggins, the name under which she testified at Applicant's trial.

32

**601**

and spent time at the Hummel home; Stephanie Bennett, who dated Applicant during his senior year in high school; Letti Hubertz, who began a relationship with Applicant in California while he was in the Marines and moved with him to South Carolina following his discharge from the military; and Applicant's sister Neata.

3.   **Facts Of The Offense And Other Aggravating Facts Shown At Trial**

The overwhelming and compelling aggravating facts established during the guilt-innocence and punishment phases of Applicant's trial include the following:

- A week before Christmas in 2009, Applicant murdered his pregnant wife, his five-year-old daughter, and his crippled father-in-law and set the house on fire because he wanted to be free to pursue a relationship with Freeze, whom he met in October 2009 at the E-Z Mart convenience store where she worked as a clerk and where he stopped to buy cigarettes and gasoline on his way to or from his job as a hospital security guard. [RR 33: 68, 87; RR 39: 132-35; RR 40: 10, 20-21; SX 347B.]

- Applicant called Freeze daily and texted her constantly; they sometimes texted graphic descriptions of sexual relations (called "sexting") for fun. [RR 39: 136-39, 173; SX 229B1.]

- Applicant was persistent about wanting to have sex with Freeze. [RR 39: 141.]

- Applicant started thinking about killing his family in October 2009, and he began wishing that he were single so that he could "pursue [Freeze] better." [SX 347B.]

- On December 4 and 5, Applicant accessed a hospital doctor's computer at work without permission and researched articles about the effects of rat poison on humans and how rat poisoning can cause the death of a human. [RR 43: 36-40; SX 228.]

33

**602**

- On December 10, Applicant and Freeze had sex at her apartment. [RR 39: 142, 173, 176; SX 347B.]

- Two days later, Freeze found out that Applicant's wife was pregnant, which caused Freeze "discomfort" because Applicant "had no concern for the safety of his unborn child." [RR 39: 142-43, 174.] Freeze told Applicant to stop contacting her, but he continued to do so anyway. [RR 39: 142-44, 174.]

- On December 16, the day Freeze's divorce became final, Applicant called and texted her repeatedly. [RR 39: 137-38, 145-47, 162-63.]

- That day, Applicant tried to kill Joy, Eddie, and Jodi by putting powdered d-CON rat poison that he stole from Walmart in the turkey meat of the spaghetti sauce he prepared for them before he went to work. [RR 41: 11, 14; SX 347C, 349A2.] However, Joy thought the meat had gone bad, and she threw it away. [RR 41: 14-16; SX 347C, 349A2.]

- The evening of December 17, Applicant did not tell Joy that he could not go to work due to unresolved disciplinary issues; instead, he got dressed as if he were going to work, left home a little after 9:00 p.m., and went to Freeze's apartment. [RR 39: 150-51; SX 347B.] It was Freeze's daughter's sixth birthday. [RR 39: 147-48.] Applicant read Freeze's daughter her favorite children's book, which was entitled "It Could Have Been Worse." [RR 39: 164.]

- Applicant left Freeze's apartment at about 11:00 p.m., stopped for gasoline at the EZ Mart in order to be seen on camera, then headed home to kill his family. [RR 39: 39; SX 347B.] The jury watched video footage of Applicant at the store. [RR 39: 39-40.]

- Applicant parked the family van behind his house to avoid being seen and took off his work shirt, white shirt, watch, and boots. [SX 347B.] He went inside and grabbed a kitchen knife to "slit [his family members'] throats while they slept." [Id.]

34

- Applicant spent thirty to forty-five minutes contemplating whether to kill Joy, who was fourteen or fifteen weeks pregnant. [RR 39: 209; SX 347B.]

- Applicant entered the bedroom where Joy was sleeping and stabbed her in the neck with the kitchen knife, which broke. [SX 347B.] When Joy awoke and began fighting back, Applicant grabbed a baseball bat that was in the room and hit Joy repeatedly in the head until she fell to the floor. [Id.] He then stabbed her with samurai sword replicas and a double-bladed dagger. [Id.]

- Joy suffered a total thirty-five stab wounds, including two through her heart, four through her lungs, and five through her liver. [RR 39: 203-04, 209, 212; SX 272A.] She also suffered skull lacerations from being hit with the baseball bat and a number of defensive wounds. [RR 39: 205-07.]

- After murdering Joy, Applicant rested for about twenty minutes to catch his breath before going to Eddie's bedroom. [SX 347B.] Applicant hit Eddie in the head with the baseball bat five to ten times while Eddie slept in his bed, causing multiple right-side depressed skull fractures. [RR 39: 220; SX 347B.]

- After taking another break to catch his breath, Applicant went to Jodi's room and hit her in the head five to ten times with the baseball bat while she slept in her toddler bed, causing extensive multiple right-side skull fractures. [RR 39: 246-48, 256; SX 347B.]

- Applicant put the murder weapons into a trash bag, then used rolls of toilet paper to set a fire in each victim's bedroom in order to "make it look like somebody had broken in, killed them and then tried to cover it up by setting the fires. [SX 347B.]

- After disposing of the murder weapons, Applicant drove around and stopped at various Walmart stores in order to be seen on camera and construct his alibi until it was time for him to return home. [RR 39: 39-44; SX 347B.] The jury watched video footage

of Applicant inside the various stores.  [RR 39: 40-44; SX 405B, 406B, 407B, 431.]

- At about 5:00 a.m., Applicant returned to the fire scene at his house and tried "to be all shocked." [SX 347B.] He approached Worthy and calmly asked what had happened and whether everyone had made it out of the house. [RR 33: 152-54; SX 220D.] Applicant lied to Hull, claiming that he had been at Walmart stores checking prices for Christmas presents. [RR 33: 159; SX 220D.] The jury heard an audio recording of Applicant's conversations with Worthy and Hull at the scene. [RR 33: 166, 171-73; SX 220D.]

- When Applicant voluntarily went to the Kennedale police station, he gave false written and oral statements regarding his whereabouts that night. [RR 34: 158-59, 161, 163, 175-76; RR 35: 9-13, 44; SX 341B, 342.]

- During the interview, Steele saw blood on Applicant's pant leg, and he later saw blood on Applicant's sock and very recent scratches on Applicant's back when Applicant undressed to turn over his clothes. [RR 35: 42-44, 60-62; SX 274-76.]

- When the interview at the police station ended, Applicant drove to Champion National Security's office in Arlington. There was nothing unusual about his demeanor, and he never mentioned that anything unusual had happened. [RR 36: 22-23, 42, 50-52; RR 42: 17.]

- At the office, Applicant was counseled and disciplined for watching television, not properly performing his rounds, smoking on the hospital campus, and using doctors' equipment and computers without authorization. [RR 36: 20-21, 48-49; RR 42: 8-11.] Applicant admitted committing the infractions, signed the counseling statement, and collected his paycheck. [RR 36: 21-22; RR 42: 10, 12, 15; SX 474.]

- After leaving the office at about 11:00 a.m., Applicant cashed his paycheck and then fled in his van to California because he knew

**605**

that the authorities had the evidence to "pin" him for the murders and arson. [RR 36: 23; SX 347B.]

- At 8:46 p.m. PST on December 19, Applicant, who was no longer wearing his wedding ring, checked in to room 24 at the Coast Inn in Oceanside, California. [RR 37: 80, 82; RR 39: 106-12; SX 347B, 408B, 440, 449, 451-56.] The jury watched a video showing Applicant's jovial demeanor while checking in at the front desk. [RR 39: 46; SX 408B.]

- Shortly after checking in at the hotel, Applicant went to the topless bar next door. [RR 41: 17-22, 30, 56; RR 42: 26; SX 427.]

- Applicant struck up a conversation with Scott Matejka on the sidewalk near the club. [RR 41: 19; RR 42: 26-28, 31.] They smoked crack cocaine together in Applicant's hotel room, then drove Applicant's van to a parking lot near the border and walked to Tijuana, Mexico, so that Applicant could buy marijuana. [RR 37: 71-72; RR 41: 29; RR 42: 26-27, 29-32, 47.] They visited several places in Tijuana, including a gentlemen's club, but Matejka never saw Applicant actually obtain any marijuana. [RR 42: 34-35.]

- Applicant tried to reenter the United States at the San Ysidro Port of Entry on the California-Mexico border at 5:48 a.m. PST on December 20, but he was detained by CBP because he presented insufficient documentation to allow him to enter the country and because a computer check flagged him as armed and dangerous based on the contents of the missing-person report filed with the Kennedale Police Department. [RR 36: 105-06, 111-12, 114-18, 125-26, 130-33; SX 409B.]

- During his detention by CBP, Applicant was arrested after a Texas arson warrant issued, and he was later transferred to the San Diego County Jail. [RR 36: 169; RR 37: 59.]

- On December 20-21, at the San Diego County Jail, Applicant waived his rights and voluntarily confessed on videotape and in writing that he killed his family and set his house on fire; he

**606**

calmly discussed his motivations and his actions before, during, and after the murders. [SX 347B, 348, 349B.] Applicant admitted that he had been thinking about killing his family since October because he wanted to be with Freeze. [SX 347B.] He thought that he deserved to spend the rest of his life in prison or on death row. [Id.] The jury viewed Applicant's videotaped confession and saw his remorseless demeanor as he casually described his actions.

- Eddie's and Jodi's bludgeoned and burned remains had to be identified at the University of North Texas Center for Human Identification. [RR 38: 84-85.]

- The jury heard medical-examiner testimony about and saw photographs of the extensive injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

- During the fall of 2009, Applicant accessed pornographic websites and his MySpace account on a doctor's computer during a time when the doctor's office was closed and locked. [RR 42: 98-101; see generally RR 43: 20-47.] The jury saw examples of the material Applicant accessed. [RR 42: 104-07; SX 225-28.] The results of a forensic examination of the computer included 2,338 pornographic images and a profile posted by Applicant under the name of "John Long N Hard" on hornymatches.com describing himself, seeking to have women meet him at the hospital, and giving explicit details of what he was looking for in a profile mate. [RR 43: 30-33; SX 475.]

- Gretchen Bow, a topless dancer with the stage name Scarlet, met Applicant at the Showtime club in the fall of 2009. [RR 42: 110-11.] They exchanged telephone numbers, and Applicant called and texted Bow between November 13 and December 5, 2009. [RR 42: 111, 113, 117-18.] Their text messages were introduced into evidence. [RR 42: 116, 119.] Applicant's contacts with Bow were "very frequent," but Bow only texted Applicant back if she wanted to meet him at the club to make money from him. [RR 42: 115-16.] Bow and Applicant would sit and drink together at the club, and sometimes Applicant wanted her to perform for him; it just depended on Applicant's mood. [RR 42: 113, 122.] Bow made at least $100 from Applicant every time he went to the club. [RR 42:

38

607

113.] Applicant invited Bow to visit him at the hospital while he was working so they could smoke marijuana "and [do] other things," but Bow never went. [RR 42: 115, 123.]

- Dr. McGarrahan, a forensic psychologist and neuropsychologist retained by the defense, opined that Applicant murdered his family when the emotions he had repressed for thirty-five years flooded out in an emotional rage at the time of the offense; she admitted, however, that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.] Applicant knew it was wrong to kill his family, but he did it anyway. [RR 44: 156.] Applicant has traits of several different personality disorders, *i.e.*, narcissism, antisocial personality, schizoid personality, and borderline personality. [RR 44: 126-32, 144-45.] Even with treatment, the underlying basis of Applicant's personality disorder would remain. [RR 44: 155.] At the time of trial, Applicant was essentially the same person he was on December 17, 2009, when he brutally murdered his family members and set his house on fire. [*Id.*]

### 4.    Evidence Presented By Applicant's Trial Counsel

During the punishment phase of the trial, Applicant's trial counsel called those witnesses whom they believed had relevant helpful information and were necessary to present as complete a picture of Applicant's life as possible. [Moore's affidavit at 16; Cummings' affidavit at 8.] Counsel presented evidence with the witnesses available to them, and the issues presented were dictated by the available witnesses. [Cummings' affidavit at 8.]

The testimony presented by the lay witnesses called to testify Applicant's trial counsel included the following facts:

- Applicant was born to Jackie and John Hummel, Sr., at Arlington Memorial Hospital when the Hummels lived in Grand Prairie,

39

**608**

Texas. [RR 43: 209.] Neata, Applicant's only sibling, was nine and a half years older than him. [RR 43: 208.]

- From the time Applicant was born, Jackie placed full responsibility for Applicant's care on young Neata; Jackie often left the children home alone. [RR 43: 210-11, 215-16.]

- Applicant's family moved to South Carolina when Applicant was three years old because John Sr. got a job at Kohler. [RR 43: 208-09.]

- When Applicant was eight years old, the Hummels moved to a small cinder-block house that was set far off the road on a 400-acre farm in Jonesville, South Carolina. [RR 43: 105-06, 113, 125, 210.] Applicant's family lived a "cloistered" existence on the farm. [RR 43: 160.]

- Part of Applicant's responsibility growing up on the farm was to help with the livestock. [RR 43: 107.]

- Parris enjoyed visiting the farm as a child because he and Applicant would fish, play video games, play outside in the hay, and "just do boys stuff." [RR 43: 155, 164.]

- Applicant's parents were very restrictive of Applicant and Neata; they controlled who Applicant and Neata had as friends, and they did not allow Applicant and Neata to visit other people's houses, with the exception of going to the house of Jackie's best friend Linda Pack to play with the Pack children. [RR 43: 160, 219-20, 250.]

- The Pack family ate lunch at the Hummel home almost every Sunday after church for a number of years. [RR 43: 105, 123-24, 135-37.] Applicant kept to himself, was very quiet, and generally played video games in his or Neata's bedroom. [RR 43: 109, 126, 129.]

- Jackie would do anything for the Pack children, and she was very generous and extravagant with them; however, she did not treat Applicant and Neata the same way. [RR 43: 110-11, 127, 134, 140-41, 229-30.]

40

**609**

- Applicant's parents never showed Applicant and Neata any affection; they did not hug, kiss, or hold the children. [RR 43: 211-21, 249-50.]

- Applicant's parents were very strict with him. [RR 43: 111.]

- Being disciplined was a common occurrence for Applicant and Neata. [RR 43: 214.] Jackie usually disciplined Applicant and Neata by hitting them with a belt. [RR 43: 213-14, 218.] Applicant's parents beat Applicant and Neata if they did not immediately do as they were told. [RR 43: 215, 250.]

- Applicant and Neata were expected to respond quickly when their parents told them to do something, and they did not talk back to their parents. [RR 43: 119, 128, 139-40.]

- Mark Pack once witnessed John Sr. throw a twelve- or thirteen-year-old Applicant off of a tractor when Applicant drove the tractor too close to a cow. [RR 43: 111-12.]

- Parris witnessed John Sr. hit Applicant on two occasions. [RR 43: 152.] On one occasion, John Sr. hit Applicant with a belt eight or more times on the back, front, head, and shoulders as punishment for turning a bull loose. [RR 43: 152-53.] Another time, when Applicant was accused of kicking a cat, John Sr. hit Applicant four or five times on the back with a broom handle. [RR 43: 153-54.] When John Sr. would hit Applicant, there was no discussion beforehand, and he would not listen to any explanations. [RR 43: 154.]

- Neata felt that her parents were abusive toward her and Applicant. [RR 43: 221.]

- Jackie told Linda about John Sr. having an extramarital affair. [RR 43: 144.]

- Jackie once asked Linda if she would sleep with John Sr.; Linda just laughed it off because nothing was ever pursued. [RR 43: 144-45.]

- When Neata was seventeen, she saw another woman performing oral sex on her father; Applicant was in the room with Neata, but she thought he was asleep. [RR 43: 252.]

41

**610**

- When Parris' mother would walk through the kitchen at the Hummel home, John Sr. would "smack her on the butt and that type of deal." [RR 43: 155.]

- Applicant attended high school in Jonesville, South Carolina, from 1991-95. Although he was a fairly good student, he was considered a special-education student because of his learning disability related to spelling and grammar. [RR 43: 68-70.]

- During the four years Applicant was in high school, his special-education teacher Haila Scoggins had only one telephone conversation Jackie, and she only saw Jackie at school once; Applicant's father was never mentioned. [RR 43: 55-56.]

- Scoggins described Applicant as a quiet, pleasant, cooperative, and responsible student. [RR 43: 60-61.]

- Applicant had no problems with other students, but he did not interact much with them. [RR 43: 61.]

- Scoggins thought Applicant played video games; she recalled that he played Dungeons and Dragons. [RR 43: 65.]

- Applicant took the exam required to graduate high school several times, and he passed after accommodations were made for his learning disability. [RR 43: 56-58.] Applicant cried and was very emotional when Scoggins told him that he had passed the exam. [RR 43: 59.]

- The director of special services for Union County Schools in South Carolina sponsored the introduction of Applicant's permanent school records spanning from elementary school through high school, and he discussed the contents of those records. [See generally RR 43: 75-94.]

- Applicant graduated from high school with a cumulative GPA of 2.515. [RR 43: 91.] He ranked twentieth in a senior class of forty-five students. [Id.]

- In ninth and tenth grades, Applicant participated in a graphic art club. [RR 43: 92.] He was in ROTC in eleventh grade. [Id.] As a senior, Applicant came in second place in an art contest for a logo he designed for Project Hope. [RR 43: 93.]

42

**611**

- In school, kids called Applicant "Bacon" because smelled like bacon due to the wood-burning stove in the Hummel house. [RR 43: 156, 223.] Applicant did not like the nickname. [*Id.*]

- Applicant's friends did not think he was smart. [RR 43: 119-20, 159.]

- During Applicant's senior year of high school, he dated Bennett for almost a year. [RR 43: 172-74.] They talked on the telephone for one or two months before they started dating. [RR 43: 173.] They went to Applicant's senior prom. [RR 43: 174.] They were both shy because neither had dated anyone before. [RR 43: 175.] Applicant started going to church with Bennett. [RR 43: 175, 182.]

- Bennett broke up with Applicant because he was ready for them to get married after high school and was planning their life together, but she was not ready for that. [RR 43: 176-77.] When Bennett broke up with Applicant, he was hurt, and he cried. [RR 43: 177.]

- Bennett remembered Applicant as a nice guy who acted appropriately and treated her appropriately. [RR 43: 174, 178, 180-81.] He knew how to act around women and have conversations that were not explicit or graphic. [RR 43: 180.]

- Bennett never saw anything to suggest that Applicant would be capable of killing four people. [RR 43: 183.]

- When Applicant was nineteen or twenty years old, he moved out of his parents' house and got an apartment with a friend. [RR 43: 225.]

- Applicant joined the Marines on his twenty-second birthday and went to boot camp the same day. [RR 43: 225.]

- Applicant's friends laughed when Applicant said that he was in the intelligence part of the Marines because they "all knew that [Applicant] was stupid." [RR 43: 161.]

- In 2002, near the end of Applicant's service in the Marines, Applicant began a six-month romantic relationship with Hubertz, who was pregnant with another man's child. [RR 43: 187-89, 199.]

43

**612**

- When Applicant was discharged from the Marines in May 2002, he and Hubertz moved to South Carolina together to be a family. [RR 43: 189, 225.] They first lived with Applicant's parents; then they moved to a two-bedroom trailer. [RR 43: 191, 193, 226.] Applicant worked during the evenings at Kohler with his father. [RR 43: 192, 203.] When Hubertz's son was born, they gave him Applicant's last name. [RR 43: 194.]

- Applicant always treated Hubertz with respect; he was never abusive. [RR 43: 192-93.] Applicant and Hubertz had a home life together, and she did not know Applicant to frequent bars or strip clubs or to use drugs. [RR 43: 199, 203-04.]

- A few weeks after Hubertz's son was born, a crying Neata appeared at the trailer where Hubertz and Applicant lived and said that Applicant had left. [RR 43: 195.] Neata gave Hubertz a note supposedly written by Applicant stating that he was scared, that he was not ready to be a father, and that he had moved to Texas. [RR 43: 195.] When Hubertz tried to call Applicant, he hung up on her without speaking. [RR 43: 196.] Neata gave Hubertz an hour to pack, then took her to the bus station and gave her a ticket to California that had been purchased two weeks before. [RR 43: 196-97.] Neata was responsible for making Hubertz leave, but Applicant agreed. [RR 43: 227-28.]

- Parris hung out with Applicant in South Carolina after Applicant returned from the military. [RR 43: 157.] Applicant was a little more self-assured and had a little higher self-esteem when he returned. [RR 43: 166.]

- Applicant and Parris would go to strip clubs, even though Parris was only seventeen years old. [RR 43: 157.] Applicant would get too attached to the dancers; if someone showed Applicant any interest "all of a sudden he was in love." [RR 43: 158-59.]

- Applicant moved to Texas, where he met Joy. [RR 43: 228.]

- Applicant had colitis, which required him to have surgery to remove part of his intestines. [RR 43: 230.] He had a colostomy bag for about a year afterward. [Id.] Applicant was unemployed during the time he had medical problems. [Id.]

44

**613**

- Applicant and Joy had financial problems. [RR 43: 231.] Joy nagged Applicant about money because they did not have food to eat and because Applicant would not hold down a job. [RR 43: 232-33.]

- Neata did not think that Applicant and Joy seemed like a happy loving couple. [RR 43: 253.] Applicant acted "[w]onderful" to his daughter Jodi. [Id.]

- Defense witnesses testified that they never saw Applicant become violent with anyone. [RR 43: 113-14, 166, 178, 232.] When Applicant got frustrated or mad, he would "[j]ust ball up, like he was holding everything in," turn "beet red," and clinch up. [RR 43: 114; see RR 43: 232]

After presenting the lay-witnesses' testimony, the defense called Frank AuBuchon, a prison classification expert. [See generally RR 44: 34-116.] The jury viewed a video depicting maximum security and normal dorm-type facilities in the Texas prison system. [RR 44: 47-48; DX 6.] AuBuchon explained the intake procedures Applicant would undergo if he were sentenced to life without parole, the various classification levels, and the available housing levels and their restrictions. [RR 44: 60-67.] AuBuchon's testimony included the following:

- AuBuchon was provided with the following documents, which he would have seen in classifications in the penitentiary system to evaluate Applicant: "all of [Applicant's] jail classification records and his incident records for the entire time he's been incarcerated here in Tarrant County," his military records, his medical records, his criminal history, police reports regarding the crime and "specifically regarding what had occurred at the offense and after his eventual apprehension," a TLETS report, and a notice of extraneous offense "which indicated what his prior criminal background was." [RR 44: 68-69.]

**45**

**614**

- Applicant had no criminal history and no disciplinary issues during his incarceration in the Tarrant County Jail. [RR 44: 70; Moore's affidavit at 6; Cummings' affidavit at 3-4.]

- AuBuchon testified about how Applicant would likely be classified if he were incarcerated for life without parole in the Texas prison system and how the restrictions placed on such classification would affect Applicant's work and living environment in the penitentiary for the rest of his natural life. [RR 44: 70-73; Moore's affidavit at 6.]

- Other than Applicant's crime, Applicant was a "very unremarkable person from a classification standpoint." [RR 44: 70.]

- AuBuchon opined that Applicant would probably adapt quite well to prison life. [RR 44: 73; Moore's affidavit at 6.]

Trial counsel also called Dr. McGarrahan, the defense's forensic psychologist and neuropsychologist. In addition to the matters previously set forth in § III(B)(3), *supra*, her testimony included the following facts and opinions:

- Dr. McGarrahan illuminated how Applicant's life history had shaped the person he became later in life and related to his commission of the charged offense. [*See generally* RR 44: 118-63.]

- Dr. McGarrahan testified about Applicant's attachment issues and personality traits resulting from his childhood; their affect on how Applicant thought, felt, and reacted to impulses; their significance to Applicant's actions in murdering his family; and why Applicant appeared in his videotaped confession to show no remorse. [RR 44: 126-46, 158-61.]

- Dr. McGarrahan opined that Applicant murdered his family when the emotions he had repressed for thirty-five years flooded out in an emotional rage at the time of the offense; she admitted, however, that Applicant thought about committing

46

615

the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

## 5. Other Evidence Relevant To Applicant's Allegations

In addition to the lay witnesses called to testify by Applicant's trial counsel, other testimony at both phases of trial shed light on portions of Applicant's life. Those matters included the following:

- Paris testified for the State at the guilt-innocence phase of the trial about filing a missing-person report with the Kennedale Police Department when Applicant could not be found after the crime. He further testified that he knew Applicant from church, that he and his wife were in a Sunday school class with Applicant and Joy, that the two couples gathered "on occasion" for events outside church, and that he had been to the Hummel home two or three times. [RR 36: 58, 87.] Paris knew the Hummels to be a close family unit. [RR 37: 87.]

- Paris did roof repair for Applicant and Joy, and they talked about repairing a pick-up truck. [RR 36: 59.]

- When the Hummel family's vehicle was totaled, the Sunday school class pulled together to fund the down payment on a minivan, and Paris took Joy to buy the vehicle. [RR 36: 59.]

- Paris visited Applicant in the Tarrant County Jail for a while, and he had occasion to bring Applicant's mother to the jail to visit Applicant. [RR 36: 89.]

- In the Marines, Applicant was assigned as an intelligence clerk with a security clearance. [RR 45: 18-19, 29.]

- Lieutenant Colonel Michael Doughtery described Applicant as a "pretty average, marginally effective" Marine. [RR 45: 11, 20.]

47

**616**

- Doughtery found Applicant to be fairly good-natured and happy-go-lucky. [RR 45: 13.] If Applicant became frustrated or angry, he became silent, and his face muscles tensed. [RR 45: 13.]

- Applicant received a number of commendations and awards during his military service; however, all but one (a basic rifleman's badge from boot camp) were given to the unit as a whole. [RR 45: 16-17, 27.] Applicant never earned a good-conduct medal, which would have required him to complete three uninterrupted years of service with no nonjudicial punishments. [RR 45: 15.]

- Applicant and Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Doughtery thought would lead them down the wrong path. [RR 45: 12, 23.] Doughtery counseled both Applicant and Matthias on the matter. [RR 45: 12.]

- Applicant had several entries in his military records for failing to maintain his weight and pass the physical fitness test. [RR 45: 30, 34-35.]

- Captain Sergio Santos testified that Applicant was not a very impressive Marine at all. [RR 45: 34.]

- In May 2000, Applicant went AWOL from his post for a period under twenty hours. [RR 45: 35, 46.] As a result, Applicant's pay was docked $282 for one month. [RR 45: 44.]

- After Applicant's unauthorized absence, Santos revoked Applicant's security clearance because he found Applicant to be untrustworthy. [RR 45: 36.] The paperwork to revoke Applicant's clearance states that Applicant lied to his seniors on numerous occasions and that his integrity was questionable. [RR 45: 38, 45.]

- Applicant was a lance corporal when he was honorably discharged from the Marines. [RR 45: 43-44.]

48

**617**

- Applicant and Joy had a very small wedding. [RR 44: 8.] At the time, Joy was pregnant with Jodi and in love with Applicant, and she wanted her daughter to be born in marriage. [*Id.*]

- Things were very difficult financially for Applicant and Joy. [RR 40: 17; RR 44: 9.] Every month was hard for them. [RR 40: 17.] Joy's friends helped the couple out from time to time. [RR 40: 17-18.]

- Applicant could not work for several years because of a hurt back and because of his Crohn's disease. [RR 44: 9, 16.] Applicant had surgeries, and he had a colostomy bag for a period of time. [RR 44: 16.]

- Applicant and Joy continued to struggle financially even after Applicant got his job as a security guard. [RR 44: 16.]

**C.    Reply To Claim Two**

Applicant alleges that his trial and appellate counsel were ineffective in failing to argue that the State's evidence was "legally insufficient" to support an affirmative finding to the future-dangerousness special issue. [*See* Application at 36-37.]

**1.    Applicable Law: Future-Dangerousness**

The future-dangerousness special issue requires the jury to determine beyond a reasonable doubt whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). The State bears the burden of proof on the future-dangerousness special issue. *See Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).

49

**618**

In reviewing the legal sufficiency of the evidence to support an affirmative finding on the future-dangerousness issue, a court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could find beyond a reasonable doubt a probability that the defendant would commit criminal acts of violence. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008). A variety of factors may be considered in determining the future-dangerousness special issue: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence. *Reese v. State*, 33 S.W.3d 238, 245 (Tex. Crim. App. 2000); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). No one factor is dispositive, and an affirmative answer to the special issue may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors. *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim. App. 1995).

50

**619**

The circumstances of the offense "can be among the most revealing evidence of future dangerousness." *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (quoting *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)). In some instances, the circumstances of the offense and the events surrounding it may alone be sufficient to sustain an affirmative answer to this special issue. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *Wilson*, 7 S.W.3d at 142; *Dinkins*, 894 S.W.2d at 358. Such instances arise, for example, when the crime is "so heinous as to display a wanton and callous disregard for human life," *Dinkins*, 894 S.W.2d at 358, or when the circumstances of the offense are sufficiently cold-blooded or calculated. *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

**2.    Applicant Fails To Meet His Burden to Prove That His Trial or Appellate Counsel Were Ineffective For Failing To Challenge The Legal Sufficiency Of The Evidence To Prove His Future Dangerousness**

Applicant's myopic view of the trial evidence runs afoul of the requirement that the evidence be viewed in the light *most favorable* to a finding of Applicant's future-dangerousness. *See Williams*, 273 S.W.3d at 213. Applicant also incorrectly focuses the inquiry only on whether he would pose a future danger *while incarcerated*.

The circumstances of and the events surrounding the charged capital-murder offense are cold-blooded and calculated, and they clearly demonstrate Applicant's

**620**

wanton and callous disregard for the sanctity of human life.  [*See* § III(B)(3), *supra*.] The facts of Applicant's offense are, alone, sufficient to support a finding of future dangerousness. *See, e.g., Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008) (unprovoked nighttime attack against a family in which parents were killed and children nearly killed sufficient to sustain future-dangerousness finding); *Dinkins*, 894 S.W.2d at 358 (evidence of premeditated and brutal murders of two women, including multiple gunshot wounds at close range, sufficient to support affirmative answer to future-dangerousness special issue); *Joiner v. State*, 825 S.W.2d 701, 704 (Tex. Crim. App. 1992) (evidence sufficient to support finding of future dangerousness where defendant murdered two women; first victim was stabbed four times in chest and received series of lacerations to her neck; second victim suffered forty-one stab wounds to chest, blunt force trauma and lacerations to her head, and throat was "slashed"; physical evidence suggested each victim sexually assaulted after death).

Assuming, *arguendo*, that the facts and circumstances were not alone sufficient, those facts, combined with a variety of the other factors previously set forth, overwhelmingly support a finding that Applicant would pose a future danger whether in or out of prison. For example, acted alone, and he showed calculation, forethought, and deliberateness in committing the heinous murders of his family. [SX 347B; *see* § III(B)(3), *supra*.]

Applicant began thinking about killing his family in October 2009 because he wanted to be with Freeze. [SX 347B.] Two weeks before the murders, Applicant researched the effects of rat poison on humans, and he tried to poison his family the night before he succeeded in killing them. [RR 41: 11, 14; RR 43: 36-40; SX 228, 347C, 349A2.] Even when he went home to kill his family, he took time to rest and contemplate his acts before proceeding to each victim's bedroom and inflicting their fatal wounds. [SX 347B.] Joy suffered a total of thirty-five stab wounds, skull lacerations from being hit with the baseball bat, and number of defensive wounds. [RR 39: 203-04, 209, 212; SX 272A.] Applicant hit Eddie and Jodi in the head with the baseball bat five to ten times each, causing multiple skull fractures to each victim. [RR 39: 220, 246-48; SX 374B.] Applicant set the house on fire to cover up his crime, then drove around disposing of the murder weapons and fabricating his alibi. [SX 347B.]

There can be no doubt that Applicant formulated and carried out a calculated, cold-blooded, vicious plan to annihilate his family. *See Dinkins*, 894 S.W.2d at 360 (examining calculated nature of the defendant's acts and forethought with which he planned and executed his crime to determine his propensity to commit future acts of violence). Applicant's actions before, during, and after the murders, as well as Applicant's demeanor and words during his interviews in Kennedale, Texas, and Oceanside, California, demonstrated his utter

lack of any real remorse for his actions, and that lack of remorse provided further support for a future-dangerousness finding.

Dr. McGarrahan, the defense's forensic psychologist, opined that Applicant murdered his family when emotions he had repressed for thirty-five years flooded out in an emotional rage; but, she also testified that Applicant had thought about committing the crimes for quite a while and had done quite a bit of planning. [RR 44: 136-38, 145, 152, 158.] Applicant knew it was wrong to kill his family, but he did it anyway. [RR 44: 156.] Applicant has traits of several different personality disorders, *i.e.*, narcissism, antisocial personality, schizoid personality, and borderline personality. [RR 44: 126-32, 144-45.] Even with treatment, the underlying basis of Applicant's personality disorder would remain. [RR 44: 155.] At the time of trial, Applicant was essentially the same person he was when he viciously murdered his family and set his house on fire. [RR 44: 155.]

Applicant's trial counsel filed affidavits addressing Applicant's second claim for relief. Moore opines that challenging the legal sufficiency of the evidence to find future dangerousness would have been "futile" because: (1) the State's evidence about the crime, the planning and premeditation, the prior poisoning attempt, Applicant's statements, the attempts to secret the crime, and the flight to California "all painted a horrific picture" which Moore did not believe the Court would deem insufficient; and (2) parts of Dr. McGarrahan's testimony could

54

**623**

be viewed as supporting an affirmative finding of future dangerousness. [Moore's affidavit at 4.] Cummings, too, is "confident" that the Court would not have granted a motion for directed verdict based on legal insufficiency as to the future-dangerousness special issue. [Cummings' affidavit at 3.] Moore and Cummings both knew that raising a legal-sufficiency challenge at trial was not necessary to preserve the issue for appeal. [*Id.*; Moore's affidavit at 4.] Counsel argued to the jury that the evidence did not support an affirmative finding of future dangerousness, and they aggressively sought to demonstrate that fact through evidence they introduced at punishment as part of their trial strategy. [Moore's affidavit at 4; Cummings' affidavit at 2-3; RR 45: 65-84.]

Applicant's appellate counsel also filed an affidavit addressing Applicant's contentions. Stickels reviewed the facts and applicable law, and he determined that the facts proven by the State were sufficient to support an affirmative finding that Applicant constituted a future danger. [Stickels' affidavit at 2.] As a result, Stickels did not challenge the future-dangerousness finding on direct appeal because he "considered it to be frivolous." [*Id.*]

Relying on *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007), Applicant asserts that the evidence is legally insufficient to prove his future dangerousness because he was a danger only to his family due to stressors in the outside world which would not exist if he were sentenced to life in prison without

**624**

parole. [Application at 40.] Applicant's narrow interpretation of the future-dangerousness special issue ignores precedent and erroneously seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes within prison. *See, e.g., Lucio v. State*, 351 S.W.3d 878, 902-03 (Tex. Crim. App. 2011) (rejecting arguments that *Berry* or life-without-parole legislative amendments should be read to support construing future-dangerousness special issue to ask whether capital defendant sentenced to life without parole would be dangerous only in prison); *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010). The future-dangerousness special issue asks if a defendant would constitute a continuing threat whether in or out of prison without regard to how long he would actually spend in prison if sentenced to life. *Lucio*, 351 S.W.3d at 903; *Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010); *Estrada*, 313 S.W.3d at 284; *see Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.) (how long life-sentenced capital defendant will spend in prison "is not proper even in the context of the [future-dangerousness] special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term 'society' includes *both* the prison and non-prison populations" (emphasis in original)); *Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting reasoning of plurality opinion in *Smith*). The future-

56

**625**

dangerousness special issue does not entirely involve a prediction of future behavior. *Estrada*, 313 S.W.3d at 381 n.5.

Applicant also misplaces his reliance on *Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981), which set aside the jury's future-dangerousness finding because it was undisputed that Wallace did not murder the victim and "there was no evidence of prior convictions, no prior acts of violence, no character evidence, and no psychiatric evidence." *Id.* at 69. Here, by contrast, Applicant acted alone in planning, carrying out, and trying to cover up the vicious murders of his family members, and he tried to kill his family members with rat poison the night before he succeeded in murdering them. [*See* § III(B)(3), *supra*.] Psychological evidence showed that Applicant knew it was wrong to kill his family, he has traits of several personality disorders, the underlying basis of his personality disorder would remain even with treatment, and he was essentially the same person at the time of trial that he was when he brutally murdered his family and set his house on fire [RR 44: 126-32, 144-45, 155-56.]

Applicant's circumstances are nothing like those found to be deficient in *Berry* or *Wallace*. Trial and appellate counsel correctly concluded that challenging the legal sufficiency of the evidence to establish Applicant's future dangerousness would have been futile and frivolous. [Moore's affidavit at 4; Cummings' affidavit at 3; Stickels' affidavit at 2.] Applicant's counsel were not deficient for failing to

**626**

raise an issue that so clearly lacked merit.  *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("reasonably competent counsel need not perform a useless or futile act"); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d at 623-24 (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

Likewise, Applicant cannot meet his burden to show that the alleged deficiency of his trial or appellate counsel prejudiced him because there is no reasonable probability that the outcome of the punishment phase of his trial or his direct appeal would have been different had counsel advanced a meritless challenge to the legal sufficiency of the future-dangerousness evidence. *See Barrera v. State*, 978 S.W.3d 665, 668-69 (Tex. App.—Corpus Christi 1998, pet. ref'd) (no prejudice resulted from counsel's failure to raise objection that lacked merit).

Applicant's second claim for relief should be denied.

## D.   Reply To Claim Three

Applicant alleges that his trial counsel were ineffective for failing to present evidence that he was not a future danger.  [*See* Application at 40.]  Specifically, Applicant complains that counsel did not present "readily available evidence" that he would not constitute a future danger through:   (1) Tarrant County Jail employees who supervised him while he was confined there; and (2) a mental-

health expert who would explain how his "past patterns of behavior and mental status did not support a finding that he would be a future danger." [*Id*. at 40-47.]

### 1. Applicant Fails To Meet His Burden To Prove That His Trial Counsel Were Ineffective For Failing To Present Testimony Of Tarrant County Jail Employees

Applicant contends that his trial counsel could and should have elicited testimony from deputies at the Tarrant County Jail who would have testified that Applicant was not classified as "high risk," that he got along with officers and other inmates, and that he was not aggressive or threatening. [Application at 41.] He submits affidavits from three jail employees (Tommy Rigmaiden, Rory Thomas, and Cody Bell) and the Tarrant County Sheriff's Department Confinement Bureau Standard Operating Procedures Concerning High Risk Inmates. [*See* Applicant's Exhibits 4, 20, 21, 27.] Applicant asserts that testimony from Rigmaiden, Thomas, and Bell "would have provided the jury with highly persuasive evidence that [he] was not likely to be a future danger if sentenced to a term of life without the possibility of parole." [Application at 45.]

#### a. Applicant Fails To Establish Deficient Performance

Applicant's defense team conducted a thorough investigation in preparing for Applicant's capital-murder trial. [*See* § III(B)(2), *supra*.] Counsel specifically discussed with Applicant on more than one occasion whether there were any jail guards, chaplains, or other personnel with whom he had developed a sufficiently

59

**628**

good relationship that they might be willing to testify on his behalf. [Moore's affidavit at 6; Cummings' affidavit at 3.] Applicant said that he did not know of any such potential witnesses, and he never provided the defense team with the names of any deputies. [Moore's affidavit at 6; Cummings' affidavit at 3, 5.] No one on Applicant's defense team ever had any indication that there were jailers who were willing to testify on Applicant's behalf, and counsel did not develop any such names through their independent investigation. [Moore's affidavit at 6; Cummings' affidavit at 3, 5.] None of the jail employees who have submitted affidavits in this habeas proceeding ever contacted the defense team. [Moore's affidavit at 6; Cummings' affidavit at 5.]

Applicant's Tarrant County Jail records do not support Applicant's claim that he was not classified as "high risk," and "just the opposite is true." [Cummings' affidavit at 5.] In fact, Applicant's records from the Tarrant County Jail attached to Cummings' affidavit reflect that Applicant was classified as "High Custody" during his stay, that he required MHMR services, and that he was on suicide watch. Such facts certainly would have been offered in rebuttal to any inconsistent claim regarding Applicant's classification and would not have benefitted Applicant's defense. The jury may have then assumed that Applicant had no disciplinary issues in jail because his classification left him little opportunity to violate the rules.

**629**

While Applicant's trial counsel did not locate or present evidence from jail employees, AuBuchon, the defense's prison classification expert, testified that he had been provided with the types of documents he would have seen in classifications in the penitentiary system to evaluate Applicant, including "all of [Applicant's] jail classification records and his incident records for the entire time he's been incarcerated here in Tarrant County," his criminal history, his military records, police reports about the crime and Applicant's apprehension, and other records. [RR 44: 68-69; Moore's affidavit at 5-6.] AuBuchon's testimony demonstrated that Applicant had no prior criminal history and no disciplinary issues during his incarceration in the Tarrant County Jail. [RR 44: 70; Moore's affidavit at 6; Cummings' affidavit at 3-4.] Other than Applicant's offense, AuBuchon found Applicant to be a "very unremarkable person from a classification standpoint." [RR 44: 70.] Based on everything he reviewed, AuBuchon testified about how Applicant would likely be classified if he were incarcerated for life without parole in the Texas prison system and how the restrictions placed on such classification would affect Applicant's working and living environment in the prison system for the rest of his natural life. [RR 44: 70-73; Moore's affidavit at 6.] AuBuchon opined that Applicant would probably adapt quite well to prison life. [RR 44: 73; Moore's affidavit at 6.]

**630**

Dr. McGarrahan testified that based on Applicant's jail and military records, he has done "very well" in structured environments. [RR 44: 159.] Lay witnesses called to testify by Applicant's trial counsel testified that they had never known Applicant to become violent. [RR 43: 113-14, 166, 178, 232; Moore's affidavit at 5-6.] Applicant's trial counsel stressed in closing arguments that Applicant did not pose a future danger, in part based on AuBuchon's testimony and because Applicant had no history of violence, no prior criminal history, and no issues during his incarceration in jail. [RR 45: 69, 78-81.]

Applicant's trial counsel presented evidence to inform the jury of Applicant's lack of disciplinary issues in jail, his lack of a criminal history, and the likelihood that Applicant would adapt well to the structured environment of prison life. Applicant's trial counsel communicated essentially the same type of information that Applicant alleges they should have presented. The failure to present essentially cumulative testimony did not constitute deficient performance. *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (counsel's decision not to present cumulative testimony does not constitute ineffective assistance). Applicant's complaint boils down to a second-guessing of the manner in which trial counsel chose to present evidence that Applicant would not be a future danger if he were sentenced to life without parole instead of death.

**631**

Furthermore, Applicant failed to provide his defense team with the names of any jail personnel who might testify on his behalf, and the defense team's independent investigation did not turn up any such employees. [Moore's affidavit at 6; Cummings' affidavit at 3, 5.] Applicant certainly should have been able to identify jail employees with whom he had regular contact and conversations, and he bore some responsibility for trial counsel's failure to locate the witnesses whom he now claims should have been called to testify at his trial. *See Ex parte Martinez*, 195 S.W.3d at 728 (failure to present alleged sexual abuse "is borne primarily by applicant, as he had ample opportunity to divulge this evidence to his lawyer, and at least one of his agents before trial"); *Id.* at 737 (Hervey, J., concurring) (a defendant facing death penalty "has some obligation to assist his trial counsel in investigating his background information. When such a defendant is not forthcoming with this information, he risks that it will not be presented at trial"); *Perez*, 5 S.W.3d at 400 ("[e]ven the most efficacious trial attorney must depend on the client to provide factual information that will aid in the defense").

Trial counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms. Applicant has failed to meet his burden to prove deficient performance by his trial counsel for not presenting testimony of the Tarrant County Jail employees. Applicant's third claim for relief should be denied.

### b. Applicant Fails To Establish Prejudice

Even if Applicant could establish that his trial counsel were deficient for failing to present testimony from the jail employees, he has not met his further burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue "no" instead of "yes" had trial counsel discovered and called Rigmaiden, Thomas, and Bell to testify during the punishment phase of his trial. As previously discussed, the proposed testimony of the jail employees would have been largely cumulative of other evidence that Applicant had no disciplinary issues in jail, that he would likely adjust well to a prison setting if he were sentenced to life without parole, and that he allegedly posed a low risk of future violence. [RR 40: 70-73; RR 43: 113-14, 166, 178, 232; Moore's affidavit at 6.] *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter—from the evidence actually presented at sentencing"); *see also Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir. 2009) (upholding state court's finding of no prejudice where additional testimony was cumulative).

As previously discussed in detail, the jury heard overwhelming aggravating facts. [*See* § III(B)(3), *supra*.] Applicant confessed to committing the premeditated, cold-blooded, heinous murders of his pregnant wife, five-year-old daughter, and crippled father-in-law and then setting the house on fire to cover up

**633**

his crimes.  [SX 347B.]  Not only had Applicant thought about killing his family for two months, he researched the effects of rat poison on humans, he tried to poison his family the day before he succeeded in killing them, and he stopped before each murder to rest and to contemplate his actions before proceeding into each victim's bedroom and inflicting heinous injuries.  [RR 39: 203-04, 209, 212, 220, 246-48, 256; RR 43: 36-40; SX 228, 272A, 347B.]  Applicant confessed his motivation – he wanted to be single in order to pursue a relationship with Freeze.  [SX 347B.]  Applicant disposed of the murder weapons, fabricated an alibi, and eventually fled to California.  [RR 39: 39-44; SX 347B, 405B, 406B, 407B, 431.]  When he went to his employer's office after leaving the Kennedale police station, there was nothing unusual about Applicant's demeanor, and he never mentioned that anything unusual  had happened.  [RR 36: 22-23, 42, 50-52; RR 42: 17.]  Shortly after arriving in Oceanside, California, Applicant went to a strip club, smoked crack cocaine in his hotel room, and went to Tijuana, Mexico.  [RR 37: 71-72; RR 41: 17-22, 29-30, 56; RR 42: 26-27, 29-32, 47; SX 427.].  Applicant had traits of several personality disorders, and at the time of trial he was still the same person he was when he murdered his family members.

There is no reasonable probability that the jury would have arrived at a different conclusion regarding Applicant's future dangerousness if it had heard the testimony of the three jail employees.  Therefore, Applicant has not met his burden

**634**

to demonstrate that he was prejudiced by the alleged deficient performance of his trial counsel. Applicant's third claim for relief should be denied with regard to the jail employees.

## 2. Applicant Fails To Meet His Burden To Prove That His Trial Counsel Were Ineffective For Failing To Present Testimony Of A Mental-Health Expert

Applicant alleges that his trial counsel should have presented a mental-health expert "to explain how [Applicant's] past patterns of behavior and mental status did not support a finding that he would be a future danger." [Application at 46.] He suggests that counsel should have retained an expert such as Dr. Susan Hardesty, a psychiatrist, to testify that he was a low risk to commit future acts of violence in a prison setting because he would be unlikely to encounter the severe familial and financial stressors that plagued him before the crime. [Id.; see Applicant's Exhibit 1.]

### a. Applicant Fails To Prove Deficient Performance

Applicant's trial counsel thoroughly investigated Applicant's background and upbringing to determine how those factors may have influenced Applicant's behavior in the commission of this crime. [Moore's affidavit at 7; see § III(B)(2), supra.] Trial counsel discussed potential mental-health experts whom they might use, and Moore called several experts. [Moore's affidavit at 7.] Counsel retained Dr. McGarrahan because of Moore's previous work with her, his opinion of her

**635**

abilities, her reputation in the legal community, and her good professional relationship with Dr. Price, the State's intended expert. [*Id.*]

As Dr. McGarrahan's evaluation of Applicant progressed, she and trial counsel discussed performing a formal violence risk assessment of Applicant. [*Id.*] Dr. McGarrahan believed that Applicant would score in the "moderate" to "moderately high" risk range on a standardized assessment because many traits of his personality disorder are also characteristics of psychopathy, and it was their consensus belief that such findings would not have been helpful testimony for the defense. [*Id.* at 7-8.] Additionally, they knew that the Court would limit Applicant's evaluation by Dr. Price to issues that counsel intended to address in the defense experts' testimony and to those tests administered by the defense experts. [*Id.* at 8.] Having worked with Dr. Price on a number of previous occasions, Moore knew that, if given the opportunity, Dr. Price would conduct the same type of violence risk assessment the defense had discussed with Dr. McGarrahan. [*Id.*] Moore believed it was absolutely not in Applicant's best interest to give the State an opportunity to do such a risk assessment with Dr. Price. [*Id.*]

Trial counsel specifically discussed the feasibility of retaining Dr. Mark Cunningham, another mental-health expert with whom Moore had worked and who had significant experience and expertise in risk assessment, to see what the results of a standardized risk assessment would be. [*Id.*] However, trial counsel

**636**

ultimately determined that pursuing such a possibility would not be in Applicant's best interest due to the likelihood that their use of such an additional expert would not have remained secret. [Id.]

Offering testimony such as Dr. Hardesty proposes would have opened the door to rebuttal by Dr. Price, which would have been even more devastating to the defense and would have negated any potential benefit derived from such expert testimony. [Moore's affidavit at 8; Cummings' affidavit at 6.] Moore still believes that that he and Cummings made the correct decision. [Moore's affidavit at 9.]

As previously discussed, Applicant's trial counsel presented other testimony designed to convince the jury that Applicant did not pose a future danger. AuBuchon testified that Applicant was a "very unremarkable person from a classification standpoint." [RR 44: 70.] He opined that Applicant would probably adapt quite well to prison life. [RR 44: 73; Moore's affidavit at 6.] Dr. McGarrahan testified that, based on Applicant's jail and military records, he has done "very well" in structured environments. [RR 44: 159.] Lay witnesses called by the defense testified that they had never known Applicant to become violent. [RR 43: 113-14, 166, 178, 232; Moore's affidavit at 5-6.] Applicant's trial counsel stressed in closing arguments that Applicant did not pose a future danger, in part based on the testimony of AuBuchon and McGarrahan and the evidence that

**637**

Applicant had no history of violence, no prior criminal history, and no issues during his incarceration in jail. [RR 45: 69, 78-81.]

Dr. Hardesty's opinions of Applicant's future dangerousness as set forth in her habeas affidavit likely would not satisfy the reliability requirements of rule 702 of the Texas Rules of Evidence. *See* TEX. R. EVID. 702. The Court of Criminal Appeals has held that, when offered by the State, a forensic psychiatrist's testimony concerning future dangerousness did not satisfy the reliability requirement where the expert "cited no books, articles, journals, or even other forensic psychiatrists" for the validity of his methodology. *Coble v. State*, 330 S.W.3d 253, 277 (Tex. Crim. App. 2010). Here, as in *Coble*, nothing indicates the scientific methodology by which Dr. Hardesty reached her opinion, and there is no objective source material to substantiate the validity or appropriateness of her methodology. [Applicant's Exhibit at 1.] Dr. Hardesty's opinions in her affidavit appear to rest solely upon her personal assessment of Applicant's future-dangerousness, not upon any standardized risk assessment measures or any scientific or statistical comparisons. [*Id.*; *see* Moore's affidavit at 8-9 (expressing believe that Hardesty's opinion "would be essentially the same type of testimony that the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to *Daubert*" when offered by the State).] The holding in *Coble*, although involving expert testimony presented by the State,

169

**638**

should apply equally to such evidence offered by the defense in a capital-murder trial. Therefore, Dr. Hardesty's determination that Applicant would not be a future danger if he were sentenced to life in prison is the same type of unreliable prediction of future dangerousness rejected in *Coble* as unreliable. *See Coble*, 330 S.W.3d at 278-79. Applicant's trial counsel would not be deficient for failing to seek out or present expert testimony that they believed would be inadmissible. [*See* Moore's affidavit at 8-9 (expressing concerns about admissibility of such testimony).]

Both Dr. McGarrahan and Moore disagree with Dr. Hardesty's opinions that Applicant, while incarcerated, would be unlikely to have the stressors that were antecedents to his crime and that he would not encounter "a relational model that would be iterative of attachment." [Moore's affidavit at 9; *see* Applicant's Exhibit 1.] Such opinions are "unrealistic" because living in a prison setting can be every bit as stressful, or even more stressful than living outside the prison setting and because prison becomes the inmates' home, and they can make attachments and form relationships that are just as strong as those they might develop on the outside. [Moore's affidavit at 9.]

Testimony such as that proffered by Dr. Hardesty would have endangered Applicant's defense by opening the door to damaging testimony from Dr. Price. The negative effects of Dr. Price's testimony would have outweighed any potential

70

**639**

benefit to be gained from Dr. Hardesty's testimony.  Trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial.  Their decisions about what evidence to present and what expert witnesses to call to testify are matters of trial strategy that are not open to second-guessing in hindsight.  *See Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987) ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

"The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510.

Trial counsel performed well within the wide range of reasonable professional assistance in making their strategic decisions about what evidence to present in their effort to show that Applicant would not pose a risk of future dangerousness.  Applicant has failed to meet his burden to prove that trial counsel performed deficiently by not presenting the evidence proposed by Dr. Hardesty.  Applicant's third claim for relief involving Dr. Hardesty should be denied.

**640**

### b. Applicant Fails To Prove Prejudice

Even if Applicant could establish that his trial counsel were deficient for failing to present the evidence proposed by Dr. Hardesty, he has not met his further burden demonstrate that the deficiency prejudiced him in any way. As set forth in the earlier discussion of Applicant's claim pertaining to the jail employees, the weight of the aggravating facts was staggering and presented a powerful case to meet the State's burden to prove beyond a reasonable doubt that Applicant constituted a future danger. [See § III(B)(3), *supra*.] Lay and expert testimony from defense witnesses informed the jury that Applicant had never been violent, that he had no disciplinary issues in jail and no prior criminal history, that he committed the murders when emotions he repressed his entire life flooded out, and that Applicant would likely adjust very well to the prison environment.

Even if Dr. Hardesty's opinions regarding future dangerousness could pass muster under rule 702 in light of *Coble*, her proposed testimony regarding the future-dangerousness special issue would have added little to the jury's consideration of the issue. Given the totality of the evidence, there is no reasonable probability that Dr. Hardesty's proposed testimony that Applicant would not pose a future danger in prison because he would not likely have attachment issues and stressors that existed in the outside world would have persuaded the jury to answer the future-dangerousness special issue differently.

Applicant has failed to meet his burden to demonstrate that the alleged deficient performance of his trial counsel caused him prejudice. Applicant's third claim for relief concerning Dr. Hardesty should be denied.

**E.    Reply To Claim Four**

Applicant asserts that his trial counsel were ineffective in failing to present expert testimony regarding Applicant's life history.    [Application at 47.] Specifically, Applicant contends that his trial counsel should have retained the services of a "social history expert witness" such as social worker Laura Smith to explain to the jury "how [Applicant's] life history shaped the person that he became later in life." [*Id.* at 50.]  Smith's habeas affidavit provides a lengthy recitation of Applicant's life history taken from lay-witness testimony at trial, lay-witness affidavits obtained by Applicant's habeas counsel, records pertaining to Applicant, and Smith's five-hour interview with Applicant at the Polunsky Unit. [Applicant's Exhibit 2.]  Smith's affidavit concludes with the following opinions: Applicant's life "has been deeply impaired by the lack of appropriate nurturing and attachment he experienced as a child"; this lack of attachment impacted the way Applicant relates to the world and how he acts in it; a familiar pattern in Applicant's life is that brief bouts of success turn into failure, and, because Applicant cannot adapt to his problems, he escapes from his failure; and leading up to the murders, Applicant would have been experiencing "stress and feelings of

failure due to his family tensions, financial difficulties, and physical ailments."
[*Id.*]

### 1. Applicant Fails To Prove That His Trial Counsel Were Deficient For Failing To Call A "Social History Expert Witness" At The Punishment Phase Of Applicant's Trial

Applicant's defense team – which consisted of Applicant's trial counsel, a an experienced mitigation specialist with a masters degree and license in social work, and a private investigator – met shortly after their appointment by the Court and began gathering mitigation evidence and identifying potential mitigation witnesses. [Cummings' affidavit at 6-7; Moore's affidavit at 7.] They performed a thorough mitigation investigation into every aspect of Applicant's life in order to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6; *see* §III(B)(2), *supra*.] The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people that they did contact." [Moore's affidavit at 14.] Members of the defense team resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7; *see* § III(B)(2), *supra*.] Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.] Nevertheless, the defense team identified and interviewed every potential witness it could, and trial counsel used all of the

**74**

**643**

witnesses who could provide admissible relevant mitigation evidence about Applicant, even compelling some who were uncooperative. [Cummings' affidavit at 6.]

As the defense prepared for trial, the team members discussed the most effective way to develop the mitigation case before the jury. [Moore's affidavit at 10.] Trial counsel determined that the best way to present the mitigation case was to present the story of Applicant's life through the available lay witnesses and then to use that story as a basis for the opinions offered by Dr. McGarrahan. [*Id.*; Cummings' affidavit at 6.]

Even if there were some "gaps" in Applicant's life story as presented at trial, counsel presented all of the witnesses whom they were able to locate and convince to testify and whom they thought were necessary to develop the facts of Applicant's life and their mitigation theme. [Moore's affidavit at 10.] Dr. McGarrahan then testified about Applicant's mental and emotional condition, as well as about how the facts of Applicant's life had affected him and had made him the person he was. [*Id.* at 10-11; *see generally* RR 44: 118-63.] She testified during the punishment phase about Applicant's attachment issues and personality traits resulting from his childhood; their affect on how Applicant thought, felt, and reacted to impulses; and their relationship and significance to Applicant's actions in murdering his family. [RR 44: 126-46, 158-61.]

**644**

Based on Moore's education and experience, he is aware of the need to try to provide a compelling mitigation case in the punishment phase of a death-penalty trial, but he is unaware of any legal requirement to use a "social history expert witness" in every such case in order to accomplish that purpose. [Moore's affidavit at 10.] Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation; half of those seminars were specific to identifying and presenting mitigating evidence. [Cummings' affidavit at 6.] Neither of Applicant's trial counsel believe that they were ineffective for presenting the mitigation case in the way they did. [Id.; Moore's affidavit at 11.]

Neither Moore nor Dr. McGarrahan believe that Smith's affidavit contains any meaningful facts or any necessary expert opinions which were not covered in the mitigation presentation at trial.[9] [Moore's affidavit at 11.] See Coble, 496 F.3d at 436 (decision not to present cumulative testimony does not constitute ineffective assistance). The failure to call a witness such as Smith did not prevent Applicant's trial counsel from presenting the necessary facts or developing the expert opinion testimony necessary to effectively present the mitigation case. [Id.] The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. See Brown v. State, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.]

_____

[9] Moore requested that Dr. McGarrahan review Smith's affidavit in order to assist him in answering this claim. [Moore's affidavit at 11.]

**645**

1993, pet. ref'd); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Austin 1989, pet. ref'd).

The failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith did not fall outside the wide range of reasonable professional assistance. Applicant has failed to meet his burden to prove deficient performance on the part of his trial counsel. Applicant's fourth claim for relief should be denied.

**2. Applicant Fails To Meet His Burden To Prove That He Was Prejudiced By The Failure Of Trial Counsel To Call A "Social History Expert Witness" To Testify At The Punishment Phase Of Trial**

Even if Applicant could establish that his trial counsel were deficient for failing to present testimony from a "social history expert witness" such as Smith, he has not met his further burden to demonstrate prejudice.

Applicant's trial counsel performed a thorough investigation and called a number of lay witnesses to testify about Applicant's life history. [*See* § III(B)(2)&(3), *supra*.] Dr. McGarrahan's expert testimony then illuminated how Applicant's life history shaped the person he became later in life and how it related to his commission of the crime. She testified about Applicant's attachment issues and personality traits resulting from his childhood; their affect on how Applicant thought, felt, and reacted to impulses; their significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his

77

**646**

videotaped confession. [RR 44: 126-46, 158-61.] Her testimony was based on nearly eleven hours evaluating Applicant and interviewing him about his "entire social history," reviewing a large volume of records and videos regarding Applicant, talking to Applicant's sister and mother, reviewing medical records of Applicant's mother, and reviewing psychological test data from Dr. Price's evaluation of Applicant conducted the weekend before she testified. [RR 44: 121-24.]

Applicant does not explain how Dr. McGarrahan's evaluation of Applicant or the subject matter of her testimony were deficient or why testimony from a witness such as Smith would have been more persuasive. There is no reason to believe that the jury would have been any more persuaded by Smith's explanation of Applicant's actions than it was by Dr. McGarrahan's. Smith's affidavit contains no meaningful facts or any necessary expert opinions that trial counsel did not cover in the mitigation presentation at trial. [Moore's affidavit at 11.] *See Coble,* 496 F.3d at 437 (counsel not ineffective for failing to present largely cumulative evidence). Smith certainly provides nothing so compelling or of such significant difference that it would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

Smith's affidavit and opinions provide a more complete life history, but they are based, in part, on evidence that was unavailable to the defense at the time of

**647**

trial or for which no competent evidence has been submitted in this habeas proceeding. [*See* Cummings' affidavit at 6; Applicant's Exhibit 2, 9, 14.] Thus, Smith's proffered opinions do not necessarily reflect the testimony she may have been able to present at trial, and there is no indication how her testimony may have been different had she been limited to the testimony available at the time of Applicant's trial.

Applicant's jury was perfectly capable of evaluating the testimony presented by Applicant's lay witnesses and by Dr. McGarrahan and determining without the testimony of a "social history expert witness" such as Smith whether any of the trial testimony justified answering the mitigation special issue "yes" instead of "no." Smith's testimony would have added little to the mitigating evidence already presented at trial; it would not have rendered the mitigating evidence more compelling or understandable, and it would not have risen to the level of tipping the scales against the compelling aggravating facts presented.

There is no reasonable probability that, but for the failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith, he would have received a sentence of life without parole instead of death. Therefore, Applicant has not satisfied his burden to prove that the alleged deficient performance of trial counsel prejudiced him. Applicant's fourth claim for relief should be denied.

**648**

## F.    Reply To Claim Five

Applicant alleges that his trial counsel were ineffective for failing to present testimony from relevant lay witnesses. [Application at 62.] He claims that his trial counsel failed to uncover significant areas of mitigating evidence, present witnesses from throughout his life, and discover that lay witnesses whom they did call to testify had more information to provide about Applicant's life. [*Id.* at 62-63.] As a result, he concludes, the jury did not have all of the relevant available mitigating information necessary to properly weigh whether he deserved a life sentence. [*Id.* at 63.]

### 1.    Applicant Fails To Prove That His Trial Counsel Were Deficient In Their Investigation Of Applicant's Life History Or Presentation Of Lay-Witness Testimony

According to Applicant, his trial counsel narrowly focused their mitigation investigation on suspicions that he was sexually abused and, when such abuse did not materialize, they failed to rigorously pursue other avenues of mitigation evidence. [*Id.* at 62, 64.] Applicant's trial counsel dispute Applicant's contentions as "simply *not true*" and "false." [Moore's affidavit at 11 (emphasis in original); Cummings' affidavit at 7.]

Applicant faults his trial counsel for not calling Hamilton, who is his maternal uncle, and Goodson, who is a former neighbor of Applicant and Joy, to testify at his trial. [Application at 65, 69.] Moore spoke directly with Hamilton

**649**

during the pretrial investigation of Applicant's case and determined that it was not in Applicant's best interest to call Hamilton to testify because he did not support the allegations of abuse made by Neata and other witnesses, he was very defensive of his sister Jackie, and his testimony was inconsistent with that of other witnesses. [Moore's affidavit at 15.] Cummings spoke with Goodson during the investigation of Applicant's case; however, Goodson did not want to testify at Applicant's trial, and counsel ultimately determined it was not in Applicant's best interest to call him as a witness. [*Id.*] Applicant's trial counsel cannot be found deficient for making a reasonable strategic decision not to call Hamilton or Goodson as witnesses after determining that presenting such witnesses' testimony would not be in Applicant's best interest. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427.

Applicant asserts that Parris' testimony focused only on the Hummel family, the fact that kids teased Applicant for being slow, and the fact that Applicant went to strip clubs after his discharge from the military. [Application at 66.] To the contrary, Parris provided important information about Applicant's physical abuse by John Sr. that trial counsel were unable to prove by other means. [Moore's affidavit at 13-14.]

**650**

Applicant contends that trial counsel could have called Brian Jeter, Joseph Patterson, Chad Brown, and Shana Fowler to testify about various aspects of Applicant's life. [Application at 66-68.] Cummings' affidavit states that the defense team's investigation did not locate Brown [Cummings' affidavit at 8]; however, Cummings' and Moore's affidavits do not specifically mention Jeter, Patterson, or Fowler. Assuming, *arguendo*, that counsel did not come across these names during its investigation, it was not the result of counsel failing to conduct a thorough investigation. [*See* § III(B)(2), *supra*.] Applicant fails to explain why his trial counsel should be deemed deficient for not locating these witnesses during their investigation. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); *Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance).

Applicant alleges that DuPre was available to testify but never spoke to Applicant's trial counsel. [Application at 66.] The defense team did obtain DuPre's name during the course of their investigation, and the defense exhausted every lead it had in its efforts to contact DuPre in person or by telephone, but DuPre never contacted the defense. [Moore's affidavit at 16.] Applicant's trial counsel cannot be deemed ineffective for failing to find and present a witness who

82

was unavailable to counsel after repeated, exhaustive attempts to talk to him. Under the circumstances at the time of Applicant's trial, DuPre was not a witness who was available to the defense. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004) (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony). Applicant offers no explanation of how trial counsel's investigation with regard to DuPre was in any manner deficient or unreasonable.

Applicant complains that his trial counsel never contacted Christopher and Tonya Paris, who attended church and Sunday school with Applicant and Joy. [Application at 69.] The defense team was unable to locate Christopher Paris even though they "aggressively tried to do so." [Moore's affidavit at 16.] He testified for the State at the guilt-innocence phase of Applicant's trial about filing a missing-person report when Applicant fled to California after the murdering his family, and he also testified to information similar to many of the facts contained in his habeas affidavit. [RR 36: 58-59, 87, 89.] Although Christopher Paris's habeas affidavit discusses the extent of his relationship with the Hummels and his knowledge of problems in their marriage, he testified at trial that the couples got together "on occasion" outside church for an event and that he viewed the Hummels as a happy family unit. [RR 36: 58, 87.]

83

The defense investigator interviewed all of Applicant's neighbors, but none would provide any helpful testimony or wished to testify on Applicant's behalf. [Moore's affidavit at 15.] The defense contacted those individuals whom Applicant identified as his "friends" at work, but they denied any such friendship and indicated that they knew very little of Applicant, that they did not really care for him, and that they did not wish to be called to testify. [Id.] The defense team contacted people from the Hummels' church and subpoenaed the minister to testify, but he eventually determined that Applicant deserved the death penalty and was essentially unwilling to do anything to help Applicant at his trial. [Id. at 15-16.]

Applicant complains that his trial counsel failed to present any positive evidence related to his military service and to present testimony of his fellow service members Matthias, Emmer, and Chaidez. [Application at 68.] Applicant's sixth claim for relief asserts that his trial counsel were ineffective for failing to discover and present this military-service evidence at trial. For the sake of brevity, the State incorporates its full response to Applicant's sixth claim for relief here, including its arguments that the unsigned statements attributed to Matthias and Emmer should be stricken from this habeas proceeding hearsay. [See § V(G), infra.] Although members of the defense team asked Applicant on numerous occasions if there was anyone in his military service to whom he was close,

Applicant never provided a single name. [Moore's affidavit at 17.] Applicant cannot fault his trial counsel for failing to uncover witnesses when he could have provided such information and chose not to do so. *See Ex parte Martinez*, 195 S.W.3d at 728 (failure to present alleged sexual abuse "is borne primarily by applicant, as he had ample opportunity to divulge this evidence to his lawyer and at least one of his agents before trial"); *Id.* at 737 (Hervey, J., concurring) (a defendant facing death penalty "has some obligation to assist his trial counsel in investigating his background information. When such a defendant is not forthcoming with this information, he risks that it will not be presented at trial"); *Perez*, 5 S.W.3d at 400 ("[e]ven the most efficacious trial attorney must depend on the client to provide factual information that will aid in the defense"). Moreover, the defense team's thorough independent investigation into Applicant's life history did not turn up the names of anyone from Applicant's service in the military. [Moore's affidavit at 17.] In light of trial counsel's reasonable and thorough investigation, they cannot be deemed to have been deficient for not finding Chaidez, Emmer, or Matthias. Moreover, there is no competent evidence that Emmer or Matthias would have been available or that their testimony would have benefitted Applicant's case. *See Ex parte White*, 160 S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show

**654**

witness was available to testify and applicant would have benefitted from witness' testimony).

With regard to lay witnesses who did testify at the punishment phase of Applicant's trial, Applicant alleges that his trial counsel could have elicited additional significant testimony from Bennett, Scoggins, and Christy Pack. [Application at 70-71; *see* Applicant's Exhibits 3, 5, 15.] Many of the facts that Applicant faults his trial counsel for not asking these witnesses were before the jury from either these or other witnesses at trial. [*Compare* Applicant's Exhibits 3, 5, 15 *with* § III(B)(4)&(5), *supra*.] Applicant's trial counsel were not deficient for failing to present largely cumulative testimony. *See Coble*, 496 F.3d at 436 (failure to present cumulative testimony does not constitute ineffective assistance). Any additional evidence contained in the affidavits and not presented at trial are not of such significance that trial counsel should be deemed ineffective for either not discovering the information or not inquiring about it at trial.

Applicant faults trial counsel for not questioning Neata about whether she had been sexually abused by her father and whether she then sexually abused Applicant. [Application at 64 n.2.] Citing Parris' habeas affidavit, Applicant alleges that such questions "might have yielded results, given that at least one person heard [Neata] admit in the courthouse hallway that she had been sexually abused by her father." [*Id.* (citing Applicant's Exhibit 18).] However, no one ever

**655**

informed any member of Applicant's trial team that Neata made such a statement in the courtroom hallway during Applicant's trial. [Moore's affidavit at 12.] Based upon Moore's knowledge of and contact with Parris, he "simply do[es] not believe" that such an event occurred. [*Id.* at 13.] Furthermore, in light of Neata's denials that such abuse occurred, trial counsel had no good-faith basis to engage in the line of questioning suggested by Applicant. [*Id.* at 12.]

Applicant's trial counsel clearly fulfilled their duty to conduct a "reasonable" and thorough investigation of Applicant's life history, even in the face of resistance and lack of cooperation. [*See* § III(B)(2), *supra*.] Counsel had a qualified mitigation specialist and private investigator appointed early in the case; sought funds for and hired a forensic psychologist who explained at trial how Applicant's life history contributed to his commission of the charged offense; traveled to South Carolina to seek out and interview Applicant's family and friends and to investigate his background; sought to discover witnesses from Applicant's family, friends, church, employment, and neighborhood; took all actions necessary to secure the presence of potentially beneficial witnesses at Applicant's trial; were prepared to cross-examine the State's witnesses; presented a strategically developed cohesive mitigation theme based on the witnesses available at the time of Applicant's trial; and urged the jury during final arguments to answer the special issues in a way that would require a sentence of life rather than death. Counsel

presented the testimony of those witnesses who were available to them and whom they believed could provide evidence beneficial to Applicant's case, and counsel presented a cohesive mitigation theme based on strategic choices through lay and expert witnesses. [Moore's affidavit at 16; Cummings' affidavit at 8.]

Applicant's trial counsel acted in full compliance with prevailing professional norms in conducting the mitigation investigation and in making strategic decisions about how to best present the mitigation case in an effort to convince the jury to answer the mitigation special issue "yes." Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); *Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance). The basis of Applicant's current claim – essentially that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – is unpersuasive and should be rejected. *See Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) (courts

88

**657**

"must be particularly wary of 'arguments that essentially come down to a matter of degrees'" involving questions of whether counsel investigated enough or presented enough mitigating evidence; "[t]hose questions are even less susceptible to judicial second-guessing"). In many instances, facts and themes similar to those that Applicant faults his trial counsel for not presenting were developed at Applicant's trial. *See Coble*, 496 F.3d at 437 (counsel not ineffective for failing to present largely cumulative evidence).

The exhaustive investigative efforts of Applicant's trial counsel soundly refute any assertion that trial counsel conducted less than a reasonable investigation designed to uncover relevant mitigating evidence. Counsel acted well within prevailing professional norms. Applicant has failed to meet his burden to prove that his trial counsel were in any way deficient in connection with their investigation and presentation of mitigating evidence. Applicant's fifth claim for relief should be denied.

**2. Applicant Fails To Prove That He Suffered Prejudice From The Manner In Which His Trial Counsel Investigated Applicant's Life History Or Presented Lay-Witness Testimony**

Even if Applicant could establish that trial counsel were somehow deficient in conducting the mitigation investigation or in their presentation of lay-witness testimony, Applicant has not met his further burden to demonstrate prejudice.

89

Applicant's trial counsel conducted a thorough mitigation investigation and presented the evidence they discovered through witnesses who were available and whom counsel believed would benefit Applicant's case at the punishment phase of the trial. [Moore's affidavit at 11-16; Cummings' affidavit at 7-8; *see* § III(B)(2), (4) & (5), *supra*.] There is considerable overlap between the information set forth in the various habeas affidavits that Applicant claims his trial counsel should have discovered and presented via the lay witnesses and the facts and themes trial counsel actually developed at trial. [Moore's affidavit at 16.] *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (no prejudice in failing to present cumulative mitigation evidence; to establish prejudice, new evidence presented in habeas proceeding must differ in substantial way in strength and subject matter from evidence actually presented at sentencing). Moreover, to the extent, if any, that the evidence provided by Applicant is not cumulative, such evidence was not so powerful, compelling, or significant that it would have been reasonably6 likely to persuade the jury to answer the mitigation special issue "yes" instead of "no." The additional allegedly mitigating lay-witness evidence proffered by Applicant falls short of the type that courts have found to support a finding of prejudice. *See, e.g.*, *Rompilla*, 545 U.S.. at 392-93; *Wiggins*, 539 U.S. at 516-17; *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000).

**659**

Applicant's crime was premeditated, cold-blooded, and heinous; the aggravating facts at trial were severe. [*See* § III(B)(3), *supra*.] The jury was aware through lay and expert testimony of neglect, abuse, attachment issues, and family stresses in Applicant's life before and at the time of the crime and their potential effect on his decision to murder his family. Even when the powerful aggravating evidence is reweighed against the totality of the available mitigating evidence, there is no reasonable probability that the addition of the lay-witness testimony Applicant asserts was omitted due to an incomplete investigation would have changed the jury's answer to the mitigation special issue. Applicant has failed to meet his burden to prove that he was prejudiced by the alleged deficient performance of his trial counsel. Applicant's fifth claim for relief should be denied.

**G.     Reply To Claim Six**

Applicant alleges that his trial counsel erred by failing to present Applicant's military service as mitigation evidence. [Application at 73.] Specifically, Applicant complains that trial counsel failed to investigate and present evidence that he served honorably in the Marine Corps, that the jury heard only evidence suggesting he was a substandard Marine, and that counsel could have uncovered at least four witnesses – *i.e.*, Chaidez, Matthias, Emmer, and Christopher Boling –

who were willing to testify on his behalf about his service in the Marines. [*Id.* at 74-76.]

### 1. Statements Attributed To Matthias, Emmer, and Boling Should Be Stricken From The Habeas Record

Applicant submits unsigned documents that apparently were intended to be affidavits recounting alleged conversations that habeas investigator Elizabeth Garza had with Matthias and Emmer. [Applicant's Exhibits 9, 14.] The application also refers to facts learned during an alleged conversation with Boling. [Application at 78-79.] These matters constitute hearsay, *see* TEX. R. EVID. 802, and the facts are not within the personal knowledge of the person to whom Matthias, Emmer, and Boling allegedly made such statements. *See* TEX. R. EVID. 602. As such, all of the facts and/or statements attributed to Matthias, Emmer, and Boling should be stricken and given no consideration in this habeas proceeding.

### 2. Applicant Fails To Meet His Burden To Demonstrate Deficient Performance Regarding The Investigation And Presentation Of Evidence Related To His Military Service

Applicant's claim that trial counsel failed to investigate his military service is simply untrue. Applicant's trial counsel recognized the potential importance of Applicant's military service to the mitigation presentation at trial. [Moore's affidavit at 17.] During discussions with the defense team, Applicant "down-played" his military service and did not depict his military service in a positive or successful way. [*Id.*] Nevertheless, counsel obtained copies of Applicant's

92

**661**

military records. [*Id.*]  They specifically asked Applicant about individuals in the

service whom he befriended and who might be available to testify on his behalf,

but Applicant never provided the names of any such individuals to counsel or other

members of the defense team, and the defense team's independent investigation of

Applicant's background did not develop these names. [*Id.*]  Trial counsel would

have tried to contact Chaidez, Matthias, Emmer, or Boling if anyone had provided

their names to the defense team.  [*Id.*]  Trial counsel did not have the names of any

other Marines whom they could sponsor on this topic.  [Cummings' affidavit at 8.]

Had Applicant provided even one name of someone who had served with him in

the Marines, the defense team likely could have located the others and developed

testimony about his military service.  [*Id.*]

    Moore disagrees with Applicant's habeas assertions that several available

witnesses who knew Applicant as a Marine were available and willing to testify on

Applicant's behalf.  [Moore's affidavit at 18.]  Three of the four "available"

witnesses did not sign notarized affidavits even though they apparently agreed to

do so.  [Applicant's Exhibits 9, 14; Application at 78-79 & n.8.]  Without signed

affidavits or other competent evidence, the habeas record does not establish that

Matthias, Emmer, or Boling were available or willing to testify and what evidence

they would have provided had they been called to testify.  *See Ex parte White*, 160

S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled

witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony).

Furthermore, as Moore's affidavit points out, the witnesses proffered by Applicant would have provided negative information about Applicant's military service in conjunction with the positive information they could provide. [Moore's affidavit at 18.] Trial counsel were aware of the disciplinary action taken when Applicant went AWOL from his military post, and they tried to avoid that issue to the degree possible during presentation of the defense witnesses. [Id. at 17-18.] Counsel's strategic decision to avoid negative evidence is not deficient.

Importantly, the jury was made aware of Applicant's military service through lay and expert witnesses whom trial counsel called to testify at trial. [Moore's affidavit at 17; Cummings' affidavit at 8.] Although the defense's lay witnesses did not give detailed information about Applicant's military service, their testimony informed the jury that Applicant joined the Marines on his twenty-second birthday, served for about four years, was assigned as an intelligence analyst, and was a little more self-assured and had a little higher self-esteem when he left the Marines. [RR 43: 161, 166, 225, 231.] Trial counsel provided Applicant's military records to the defense's expert witnesses, AuBuchon and Dr. McGarrahan, and their trial testimony revealed that Applicant was honorably discharged from the Marines, his military service showed he is able to do well in a

94

structured environment, and he received several commendations for his military service. [RR 44: 70, 73, 159-60.] When the State called two of Applicant's former commanders in rebuttal, trial counsel tried during cross-examination to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [Moore's affidavit at 18; Cummings' affidavit at 8.]

Trial counsel did not fail to recognize the value of Applicant's military service, to investigate Applicant's military service, or to present any evidence of Applicant's military service. Applicant provided no assistance in giving his trial counsel the name of anyone with whom he was close in the military. [Moore's affidavit at 17.] *See Ex parte Martinez*, 195 S.W.3d at 728 (failure to present alleged sexual abuse "is borne primarily by applicant, as he had ample opportunity to divulge this evidence to his lawyer and at least one of his agents before trial"); *Id.* at 737 (Hervey, J., concurring) (a defendant facing death penalty "has some obligation to assist his trial counsel in investigating his background information. When such a defendant is not forthcoming with this information, he risks that it will not be presented at trial"); *Perez*, 5 S.W.3d at 400 ("[e]ven the most efficacious trial attorney must depend on the client to provide factual information that will aid in the defense").

95                                                                                  **664**

Given the totality of the circumstances, the breadth of the defense team's investigation, and the representation provided by Applicant's trial counsel, it is clear that trial counsel acted in a reasonable manner regarding their investigation and presentation of evidence relating to Applicant's military service. Applicant has failed to meet his burden to prove deficient performance of his trial counsel. Applicant's sixth claim for relief should be denied.

### 3.   Applicant Fails To Meet His Burden To Demonstrate Prejudice Resulting From The Alleged Deficient Performance Regarding The Investigation And Presentation Of Evidence Related To His Military Service

Even if Applicant could establish that trial counsel were deficient in failing to call Chaidez as a witness, he has not met his further burden to demonstrate that he suffered prejudice as a result. According to Applicant, he was prejudiced because the jury did not learn of the positive nature of his military service and was left with only the State's view of his service. [Application at 79.]

As previously discussed, the jury learned that Applicant served in the Marines. Applicant's trial counsel obtained Applicant's military records, and they tried to present the positive aspects and minimize the negative aspects of Applicant's military service. [Moore's affidavit at 17.] As Moore states in his affidavit, the evidence submitted by Applicant would have introduced negative aspects of Applicant's military service in addition to any positive information that would have been developed. [*Id.* at 18.]

96

**665**

Three of the four witnesses whom Applicant faults trial counsel for not finding or calling to testify did not follow through with signing affidavits for this habeas proceeding even though they supposedly agreed to do so. [Applicant's Exhibits 9, 14; Application at 78-79 & n.8.] There is no reason to believe that any of these individuals would have made themselves available to testify at Applicant's trial or that their testimony would have benefitted Applicant. *See Ex parte White*, 160 S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony).

Regardless of how Applicant tries to portray his military service, it was not the type of service that the jury would be likely to consider particularly mitigating.[10] Applicant's former commanders called in the State's rebuttal case recalled Applicant as a "pretty average, marginally effective" Marine and not a very impressive Marine. [RR 45: 11, 34.] All but one of the commendations or awards Applicant received during his service were given to the unit as a whole.

[10] *Porter v. McCollum*, 558 U.S. 30 (2009), cited by Applicant, is distinguishable. Had Porter's counsel been effective, the judge and jury would have heard about Porter's "heroic military service in two of the most critical – and horrific – battles of the Korean War and his struggles to regain normality upon his return from war." *Id.* at 41. The Supreme Court recognized the nation's "long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did." *Id.* at 43 (footnote omitted). The relevance of Porter's extensive combat experience was not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter. *Id.* at 43-44 (footnote omitted). Here, the evidence of Applicant's unremarkable military service comes nowhere near the circumstances presented in *Porter*. Moreover, Porter's counsel also had failed to present any mitigating evidence regarding Porter's mental health and family background. Here, Applicant's trial counsel did present mental-health and life-history evidence.

97

**666**

[RR 45: 27.] Applicant and Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Doughtery thought would lead them down the wrong path. [RR 45: 12, 23.] When Applicant was not interested in something, he needed maximum guidance or supervision to make sure it was completed. [RR 45: 22-23.] Applicant had several entries for failing to maintain his weight within the required standards and failing to pass the physical fitness test. [RR 45: 30, 34-35.] Applicant went AWOL for under twenty hours because he was unhappy, and his pay was docked as a result. [RR 45: 35, 46.] Santos had to revoke Applicant's security clearance because Applicant was untrustworthy and he lied to his seniors. [RR 45: 36, 38-39, 45.]

The evidence and arguments at the punishment phase of Applicant's trial would not have been significantly different with the evidence contained in Chaidez's habeas affidavit. Chaidez's testimony is not of the type that would have tipped the scales and have caused the totality of mitigating circumstances to outweigh the overwhelming aggravating facts presented at Applicant's trial.

There is no reasonable probability that the allegedly mitigating military-service evidence proffered by Chaidez (or the statements attributed to Matthias, Emmer, and Boling, for that matter) would had any effect on the jury's answer to the mitigation special issue. Therefore, Applicant has failed to meet his burden to prove that he suffered any prejudice as a result of the alleged deficient performance

98                                                                                                      **667**

of his trial counsel with regard to his military service. Applicant's sixth claim for relief should be denied.

## H.   Reply To Claim Seven

Applicant contends that his trial counsel were ineffective for failing to present evidence that he suffered from complex post-traumatic stress disorder (PTSD) resulting from attachment trauma. [Application at 80.] Specifically, he asserts that counsel should have conducted a complete investigation of his life history and psycho-social development, should have hired an expert witness with specialized experience in trauma-related disorders, and should have called such expert to testify at trial about his attachment trauma and complex PTSD and their effects on his life and mental health. [*Id.* at 82.]

### 1.   Applicant Fails To Demonstrate Deficient Performance In The Failure Of His Trial Counsel To Present Evidence Of Complex PTSD Resulting From Attachment Trauma

The affidavits of Applicant's trial counsel, as well as the record of the trial proceedings, demonstrate that counsel conducted a thorough investigation of Applicant's full life history. [*See* § III(B)(2), *supra*.] Trial counsel specifically discussed potential mental-health experts who could be appointed to assist them, and Moore called several different experts. [Moore's affidavit at 7.] Moore determined early on that he wanted to seek the assistance of Dr. McGarrahan due to his familiarity with her work, his opinion of her abilities, and her reputation in

**668**

the legal community. [*Id.*] Moore previously had worked with Dr. McGarrahan on several cases, and he knew her to be "highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions." [*Id.*] Additionally, due to the prior professional relationship between Dr. Price (the State's expert) and Dr. McGarrahan and their mutual respect, Moore believed it was unlikely that Dr. Price would dispute Dr. McGarrahan's findings. [*Id.*]

Dr. McGarrahan spent approximately eleven hours administering cognitive tests and psychological inventories to Applicant. [RR 44: 121-22.] She also reviewed a large volume of records and videos regarding Applicant, various correspondence from Neata to Applicant, Jackie's medical records, and psychological test data from Dr. Price's evaluation conducted the weekend before she testified; she spoke with Neata and Jackie; she performed a clinical interview to ask Applicant about his "entire social history"; she performed a mental status examination during which she made observations of Applicant and discussed with him any psychiatric symptoms he was having; and she discussed the offenses in great detail with Applicant. [RR 44: 121-24.]

Dr. McGarrahan evaluated Applicant for PTSD. [Cummings' affidavit at 8.] After seeing some evidence of potential PTSD symptomatology in Applicant's presentation to her and on one of the psychological test results, Dr. McGarrahan re-interviewed Applicant in order to discuss the "traumatic event" he was thinking

about when he responded to the test items referring to a "traumatic event." [Moore's affidavit at 20.] Dr. McGarrahan believed that Applicant might then "open up" about the abuse she and other members of the defense team suspected had occurred in Applicant's childhood home.[11] [Id.] Instead, Applicant indicated to Dr. McGarrahan that the "traumatic event" he was thinking about in answering the test questions was his killing of his family. [Id.]

Dr. McGarrahan agrees that Applicant suffers from significant attachment issues and that he displayed some symptoms of PTSD, but sufficient evidence did not exist to diagnose Applicant with PTSD. [Moore's affidavit at 20-21.] Specifically, a PTSD diagnosis was not possible under the diagnostic criteria because there was "absolutely no evidence" from Applicant, his family members, or others that Applicant had experienced the type of traumatic event or events which would constitute the genesis of PTSD or that he had suffered from re-experiencing of the traumatic event such as would satisfy the criteria for a diagnosis of PTSD. [Id. at 20-21.] Dr. McGarrahan determined that Applicant was not symptomatic prior to the deaths of his family members, and Applicant's

_____

[11] Applicant consistently denied to Dr. McGarrahan that he suffered any trauma or abuse in his childhood home and that he had any attachment issues. [Moore's affidavit at 19.] Applicant described his family relationships to Dr. McGarrahan and other defense-team members in positive terms and adamantly denied that any abuse, neglect, or abandonment had occurred. [Id. at 19-20.] Similarly, Neata denied that any abuse, neglect, or abandonment other than what she testified about at trial had occurred. [Id. at 20.] Jackie and other family members to whom the defense team spoke also denied that anything of that nature had occurred. [Id.]

trial counsel relied on her expert opinion and believed there was no such evidence. [Cummings' affidavit at 9.]

Moore is aware that social scientists (sociologists and social workers) refer to "attachment disorder" within their discipline even though it does not appear in the Diagnostic and Statistical Manual of Mental Disorders. [*Id.* at 21-22.] Moore has previously worked with doctorate-level social scientists and has called them to testify about the presence of "attachment disorder" in other trials. [*Id.* at 22.] Under the facts the defense team possessed in Applicant's case, Moore did not believe that any additional expert other than Dr. McGarrahan was necessary to adequately address Applicant's attachment issues at trial. [*Id.*] The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427.

In the present case, Applicant's trial counsel investigated Applicant's life history and consulted with Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist, whom counsel believed was fully qualified to assist them in Applicant's case.[12] Dr. McGarrahan conducted extensive testing of Applicant, including testing for PTSD; she re-interviewed Applicant when one of the test results possibly indicated PTSD; and she concluded that Applicant did not

---

[12] Although Dr. McGarrahan provided her test results and underlying test data to a neuropsychologist retained on behalf of Applicant's habeas counsel, Applicant has submitted no affidavit from such neuropsychologist disputing Dr. McGarrahan's test results, methodology, or testimony. [Moore's affidavit at 19.]

102

**671**

meet the criteria for a diagnosis of PTSD. Under such circumstances, Applicant's trial counsel were not objectively unreasonable for failing to discover or present evidence that Applicant suffered from PTSD. *See, e.g., Campbell v. Coyle,* 260 F.3d 531 (6th Cir. 2001) (counsel's failure to investigate and discover Campbell's PTSD not ineffective when clinical psychologist failed to make such diagnosis); *Pruett v. Thompson,* 996 F.2d 1560, 1573-74 (4th Cir. 1993) (counsel's failure to investigate or present evidence of mental illness, developmental problems, organic brain damage, and PTSD not ineffective where counsel consulted psychiatrist who concluded Pruett did not suffer from any of the alleged mental illnesses or abnormalities); *Taylor v. Mitchell,* 296 F.Supp.2d 784 (N.D. Ohio 2003) (counsel not ineffective for not investigating and discovering Taylor's PTSD after forensic psychologist failed to make such diagnosis).

Nothing raises even an inference that Dr. McGarrahan was not fully qualified to evaluate Applicant, form her opinions, and testify at Applicant's trial, and the strategic decision to call Dr. McGarrahan rather than to retain another type of expert was not objectively unreasonable. The failure of trial counsel to present evidence of complex PTSD after Dr. McGarrahan determined that the diagnosis was unwarranted did not fall outside the wide range of reasonable professional assistance. Therefore Applicant has failed to meet his burden to demonstrate that his trial counsel were deficient for failing to present evidence that he suffered from

103

**672**

complex PTSD resulting from attachment trauma. Applicant's seventh claim for relief should be denied.

### 2. Applicant Fails To Demonstrate Any Prejudice From Failure Of His Trial Counsel To Present Evidence Of Complex Post-Traumatic Stress Disorder Resulting From Attachment Trauma

Even if Applicant could meet his burden to prove that trial counsel was deficient for not presenting evidence regarding complex PTSD resulting from attachment trauma, he has not met his further burden to establish prejudice. While the majority of Applicant's argument regarding prejudice is a restatement of his allegations of deficient performance, he appears to assert that he suffered prejudice because "[p]resenting a complete picture of [his] troubled and traumatic childhood would have served to lessen his moral culpability in the eyes of the jury." [Application at 92.] Applicant's assertions of prejudice either simply assume that prejudice resulted from the alleged deficiency or are too conclusory to satisfy the requirements of *Strickland*. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

Moreover, Applicant's defense team thoroughly investigated Applicant's life history, interviewed Applicant's family and friends who were available to them, and presented testimony from such lay witnesses during the punishment phase of Applicant's trial. [*See* § III(B)(2)&(4), *supra*.] Counsel presented as complete a

**673**

picture of Applicant's life history as possible given the witnesses who were available to the defense at the time of trial.

Importantly, Dr. McGarrahan testified during the punishment phase about Applicant's attachment issues and personality traits resulting from his childhood; their affect on how Applicant thought, felt, and reacted to impulses; and their significance to Applicant's actions in murdering his family. [RR 44: 126-46, 158-61.] The jury did not find Applicant's attachment issues and personality traits, the facts of his life, or their role in his commission of the murders to be sufficiently mitigating to absolve Applicant of moral blameworthiness for his premeditated, calculated, heinous acts. It is unlikely that the jury would have found Dr. Hardesty's testimony more persuasive. The mitigating evidence proffered via Dr. Hardesty is neither substantially greater nor more compelling than the evidence actually presented at Applicant's trial by Dr. McGarrahan. The overwhelming aggravating facts and circumstances related to Applicant's murder of his family members, along with other aggravating evidence in the record, still would have outweighed the totality of Applicant's mitigating evidence even if the jury had heard Dr. Hardesty's testimony and had an opportunity to evaluate the evidence again.

There is no reasonable probability that the proposed testimony about complex PTSD resulting from attachment trauma would have had any effect on the

jury's answer to the mitigation issue. Therefore, Applicant has failed to meet his burden to prove that he suffered prejudice as a result of the alleged deficient performance by his trial counsel. Applicant's seventh claim for relief should be denied.

## I.     Reply To Claim Eight

Applicant alleges that his due-process right to a fair trial was violated when the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial; trial and appellate counsel were ineffective. [Application at 93.]

### 1.     Applicant's Evidentiary Challenge is not Cognizable

While Applicant's complaint is phrased in terms of a due-process denial, his claim is based on his challenge to the admissibility of evidence he deems to be too inflammatory and prejudicial or improper victim-impact evidence. [*Id*. at 93-103.] Claims alleging a violation of a rule of evidence are not cognizable on habeas corpus. *See Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). Further, because evidentiary complaints are subject to a harmless-error analysis, they are not cognizable. *Ex parte Truong*, 770 S.W.2d 810, 913 (Tex. Crim. App. 1989).

To the extent Applicant challenges the admissibility of the evidence at issue, his claim must be rejected because it is not cognizable in this habeas proceeding.

106                                                          **675**

The only cognizable issue is whether trial and appellate counsel rendered ineffective assistance with regard to this evidence.

## 2. Applicant Fails To Demonstrate That Trial Counsel Were Ineffective In Responding To Allegedly Inadmissible Evidence

### a. Applicant's Conclusory Allegations Fail To Establish His Claims

The majority of Applicant's discussion in his eighth claim for relief focuses on his non-cognizable claims that portions of the State's opening statements and jury arguments and various evidence admitted at trial referring to Applicant's unborn child and his five-year-old daughter Jodi were too inflammatory and prejudicial to be admitted, that the evidence was inadmissible as same-transaction contextual evidence, and that some of the punishment-phase evidence constituted impermissible victim-impact evidence. [Application at 93-103.] He provides a single conclusory paragraph to support his claim that his trial counsel were ineffective, alleging that trial counsel performed deficiently "[t]o the extent [they] failed to object and preserve the errors committed by the State and court." [*Id.* at 104.] Applicant's contentions are too conclusory to meet his burden to satisfy either prong of *Strickland*. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

Furthermore, in his paragraph alleging that his trial counsel were ineffective, Applicant provides only two record citations to support his claims. [Application at

107

**676**

104.] The first citation is to the introduction during the guilt-innocence phase of SX 318, an autopsy photograph of the unborn child and Joy's uterus after their removal from Joy's body. [*Id.* (citing RR 39: 194-97).] Applicant recognizes that his trial counsel objected to this exhibit. [*Id.*] He does not challenge the sufficiency of such objections or assert that counsel could have done anything differently. [*Id.*] Under these circumstances, Applicant cannot meet his burden to satisfy the deficient-performance and prejudice prongs of the *Strickland* analysis.

Applicant's second citation to the record is to the introduction of photographs of Applicant's family from his MySpace page during the punishment phase of his trial. [*Id.* (citing RR 42: 79).] Moore did not object to these photographs because he did not think there was any meaningful objection that would be sustained by the Court at that stage of the proceedings and because error had been preserved as to the introduction of the autopsy photograph of the unborn child and would not be deemed waived by the admission of this type of evidence. [Moore's affidavit at 23.] Additionally, Moore thought that these photographs might conceivably help support Applicant's mitigation case by showing that Applicant actually loved his family, as evidenced by the fact that Applicant had uploaded their photographs to his MySpace page, and would help to demonstrate that Applicant's commission of the murders was solely the result of his mental and emotional problems, which counsel intended to present via Dr. McGarrahan. [*Id.*

108

**677**

at 23-24.] Applicant cannot demonstrate that trial counsel were deficient and that he suffered prejudice from his trial counsel's failure to raise what they believed to be a futile objection, especially given their further belief that the photographs at issue might actually benefit Applicant's mitigation case. Applicant's eighth claim for relief should be denied regarding the alleged ineffectiveness of trial counsel.

**b.   Applicant Fails To Establish Deficient Performance**

In the event that the Court interprets Applicant's ineffective-assistance claims as referring to the all of the matters he cites in his non-cognizable challenge to the admissibility of the evidence, Applicant still cannot succeed in showing deficient performance.

Although the State elected to proceed to trial on the capital-murder indictment alleging that Applicant murdered Joy and Eddie in the same criminal transaction [RR 4: 4-5], Applicant also murdered Jodi and his unborn child during the same episode. Evidence relating of the deaths of Jodi and the unborn child was necessary to the jury's understanding of the charged offense (the murders of Joy and Eddie); therefore, such evidence was admissible as same-transaction contextual evidence. *See, e.g., Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (in capital-murder trial for killing homeowner's guest during burglary, evidence Camacho and accomplices kidnapped and later murdered homeowner's wife and son admissible as same-transaction contextual evidence).

Applicant concedes that "it may have been permissible for the State to submit some evidence regarding both Jodi and the unborn child's death." [Application at 99.] He complains, however, that "the amount, detail, and focus of the testimony surpassed any contextual purpose." [*Id.*] "Rarely will the prejudicial value render inadmissible any evidence that is context of the offense." *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986). Simply put, if the evidence at issue constituted same-transaction contextual evidence, then it was admissible. The Court of Criminal Appeals has never found that non-errors may in their cumulative effect cause error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).

With regard to the cited evidence introduced at the punishment phase, admission of those matters is governed by article 37.071 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1). Pursuant to article 37.071, section 2(a)(1), evidence may be presented at the punishment phase by the State and the defense "as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty." *Id.*

Applicant cites opening statements, evidence, and closing arguments from the guilt-innocence phase of the trial that he asserts impermissibly focused on Jodi

and the unborn child because they were not named in the indictment. Specifically,

he cites the Court to the following evidence:

- Applicant asserts that the State's theme during opening statement centered on Jodi's fear of monsters in the night and presented facts given from Jodi's point of view or contained references to her. [Application at 94-95.] Applicant fails to explain how any of the referenced opening statements were improper or to identify any valid legal basis for trial counsel to have objected. [Id.] Furthermore, the State's opening statements at issue were proper given that Applicant murdered Jodi in the same criminal episode as Joy and Eddie, the named victims in the indictment, and the circumstances of her murder were admissible as same-transaction contextual evidence.

- Applicant next cites the testimony of Audria Hastings, Jodi's kindergarten teacher. [Application at 95.] In addition to the evidence delineated by Applicant, Hastings also identified a photograph of Jodi showing how the child looked in class earlier on the day of the murders. [RR 33: 63; SX 1.] Applicant does not set forth why Hastings' testimony was not admissible as same-transaction contextual evidence, and he offers no valid legal objection that his trial counsel should have made to the testimony. [Application at 95.] Rather, Applicant seems to simply assume that the evidence was inflammatory and prejudicial because it referred to Jodi. [Id.] Trial counsel did object to videotapes showing Jodi with her teachers and kindergarten class, and the Court overruled those objections. [RR 33: 70-74.] Clearly Applicant's trial counsel could not have been deficient with regard to these videotapes.

- Applicant complains that testimony from the State's second witness, Constance Smith, the nurse at Jodi's school, continued the focus on Jodi." [Application at 95.] Applicant ignores the fact that the testified-to incident when Jodi hurt herself on the school playground and Joy went to the school to comfort her occurred during the afternoon of December 17, 2009, the same day Applicant murdered his family. [RR 33: 81-82.] Applicant fails to specifically explain why Smith's testimony about the activities of

111

**680**

Joy (a named victim) and Jodi on the day they were murdered was inadmissible. Smith further testified that Joy appeared to be in good health that day and was excited about her pregnancy. [RR 33: 87.] Applicant offers no valid legal basis for his trial counsel to have objected to Smith's testimony referenced in the application. [Application at 95.] He simply assumes that his trial counsel should have objected to the testimony because it referred to Jodi. [*Id.*]

- Applicant asserts that the State "consistently made references to Jodi throughout the remainder of the trial," and he cites numerous pages in the reporter's record to support his contention. [Application at 95.] Applicant does not delineate exactly what testimony on the pages he references was objectionable, and he provides no valid legal basis for his trial counsel to have objected. [*Id.*] Again, Applicant seemingly assumes that his trial counsel should have objected to something on the pages listed because it referenced Jodi. [*Id.*] None of the testimony on the pages cited by Applicant as referencing Jodi went beyond what was permissible as same-transaction contextual evidence, and some of the testimony mentions Jodi in the context of being the daughter of Joy or the granddaughter of Eddie, the victims named in the indictment. [*See* RR 36: 50 (Applicant's co-worker recounts conversation with Applicant on December 18, the morning after the murders; she remarked that Jodi must be excited about Christmas, and Applicant responded, "Yes, she is"), 58 (Christopher Paris came to know that the Hummels had a daughter named Jodi); RR 37: 167 (DNA analyst obtained known DNA samples from autopsy work for Joy, Eddie, and Jodi), 198 (DNA analyst excluded Joy, Eddie, and Jodi as contributors to DNA sample near top rim of Applicant's black hat), 203 (DNA analyst found Jodi's DNA on area of bat); RR 40: 10 (Eddie's former co-worker got to know Eddie's daughter Joy and granddaughter Jodi), 18 (Jodi was Joy's daughter).][13]

- Applicant complains that the State shifted the focus of the trial to Joy's unborn child. [Application at 96.] Applicant offers no

---

[13] Applicant also cites RR 36: 4, which is part of the index and contains no testimony. [Application at 95.]

explanation why any of the opening statements, witness testimony, or closing arguments he cites were improper, and he provides no valid legal basis upon which his trial counsel should have objected. [*Id.*] Rather, he assumes that the referenced matters were improper simply because they referenced the unborn child. [*Id.*] Moreover, a review of the opening statements at issue shows that the focus of the arguments was on Joy and her physical state of being pregnant. [*See* RR 33: 25 (Joy had recently gone to doctor and heard baby's heartbeat for first time), 29 (Joy, who was pregnant, was asleep in the master bedroom when Applicant returned home to commit the murders), 31 ("His wife who is pregnant, lays dead at his feet").] The testimony cited by Applicant referred either to Joy's pregnancy and physical condition near the time of the murders or to Applicant's disregard for the safety of his unborn child's safety, which was relevant to his state of mind leading up to the murders. [*See* RR 33: 68 (in December 2009, Joy "was pregnant"); RR 39: 101 (Freeze testifies she became uncomfortable with Applicant when she learned Joy was pregnant because Applicant had no concern for his unborn child's safety), 143 (Freeze learned Joy was pregnant one or two days after Freeze and Applicant had sex; Freeze and Applicant exchanged texts concerning Freeze finding out about the pregnancy).] The three pages of the State's closing arguments described by Applicant as containing "[r]epeated references" to the unborn child's death contain arguments which were permissible based on properly admitted evidence at trial and did not impermissibly focus the jury on the unborn child's death. [*See* RR 40:50 (Applicant "snuffed out four lives that had nothing to do with him, other than he wanted to be single"), 53 ("He killed his pregnant wife"), 56 (Applicant "killed his pregnant wife").]

- Applicant asserts that the State offered highly inflammatory photographic evidence of the unborn child. [Application at 96.] As previously discussed, Applicant's trial counsel objected to these photographic exhibits. [RR 38: 93; RR 39: 202.] Applicant certainly cannot demonstrate, nor does he attempt to explain, how his trial counsel were deficient with regard to either of these photographs of the unborn child.

113

**682**

Applicant also asserts that the State's focus on the unnamed victims continued in the punishment phase of his trial. [Application at 97.] Specifically, Applicant cites the Court to the following matters:

- Applicant refers to testimony by Applicant's sister Neata that she needed to wait before visiting Jodi's gravestone [RR 43: 234-35]; that she sent Jodi a Christmas dress, but she never got a photo of Jodi in the dress because "everything was burned in their house" [RR 43: 235]; that the loss of Joy and Jodi had left the Hummel family "broken" [RR 43: 236]; and that Applicant's aunt would have been able to take Jodi in and provide for her if Applicant had asked her to do so [RR 43: 239]. [Application at 97.] Applicant fails to explain how any of this testimony was so prejudicial or inflammatory as punishment-phase evidence that his trial counsel acted unreasonably by failing to object to it. [Id.] While Applicant asserts that Neata's description of the Hummel family as "broken" after Jodi's death" was impermissible victim-impact evidence because Jodi was not a named victim, he overlooks that Neata's testimony was in response to a question about how the loss of "*Joy and Jodi*" had affected Neata's family. [RR 43: 236 (emphasis added).] The question included Joy, a named victim, and trial counsel were not objectively unreasonable for failing to object to the testimony.

- Applicant cites testimony from various State's witnesses referencing either Jodi or the unborn child. [Application at 97.] During the portion of Tomiko Race's testimony cited by Applicant, the State introduced a number of photographs of containing Jodi, Joy, and/or Applicant that were posted on Applicant's MySpace page. [RR 43: 78-79.] As previously discussed, Moore did not object to these photographs because he did not think there was any meaningful objection that the Court would sustain, he knew his objections to the autopsy photograph of the unborn child would not be waived by the admission of this type of evidence, and he thought that these photographs might conceivably help support Applicant's mitigation case. [Moore's affidavit at 23-24.] Applicant also cites testimony of Melody Anderson, a friend of Joy's, that she was in the hospital room when Jodi was born; that

114

**683**

she saw sonogram photographs of the unborn child, and that Eddie was a good grandfather to Jodi; Phillip King's testimony that Eddie would leave the senior center and go home in time to pick up Jodi from the bus stop every day; and Cindy Lee's testimony that Jodi would get donuts when Joy dropped off Eddie at the senior center. [Application at 97 (citing RR 44: 8, 10-11, 14, 22, 32[14]).] In context, this testimony focused on the lives and familial relationships of Joy and Eddie, the named victims. [RR 44: 8, 10-11, 14, 22, 32.] Contrary to Applicant's contentions, testimony about Jodi's visits to the senior center when Joy dropped off Eddie did not fall within the definition of victim-impact evidence.[15] *See Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (victim-impact evidence is evidence of the effect of an offense on people other than the victim).

- Applicant asserts that thirty-one "inflammatory and prejudicial" photographs of the unnamed victims during the punishment phase were introduced without objection. [Application at 97-98.] The State has previously discussed counsel's strategic reasons for not objecting to the photographs taken from Applicant's MySpace account. Applicant offers no valid legal basis for his trial counsel to have objected to the remaining photographs he refers to in the application. [Application at 97-98.] The photographs at issue depicted Applicant's family members, including those whom he brutally murdered; they were relevant and admissible at the punishment phase of Applicant's trial. Moreover, many of the photographs also include Joy; therefore, those photographs pertained to a named victim.

- Applicant complains that the State made "repeated references" to Jodi and the unborn child during closing arguments at the punishment phase. [Application at 98.] Applicant simply cites to a number of arguments without any explanation of how they were impermissible punishment-phase arguments or what valid legal

---

[14] Applicant cites Lee's testimony as being located at RR 44: 149. [Application at 97.] However, it is located at RR 44: 32.

[15] Applicant cites RR 44: 19 as containing evidence of Jodi's visits to the senior center where Eddie went every day. [Application at 103.] While that page contains testimony about Joy bringing Eddie to the center, it does not reference Jodi. [RR 44: 19.]

115

**684**

objection his trial counsel should have made. [*Id.*] A review of the cited arguments shows that they were permissible as either summations of the evidence, reasonable deductions from the evidence, or pleas for law enforcement. [RR 45: 57-59, 61, 62-63, 85, 86, 88.] *See Freeman v. State*, 340 S.W.3d 717, 727 (Tex.Crim.App.2011) (setting forth the four permissible areas of jury argument).

Applicant has failed to meet his burden to demonstrate that his trial counsel were deficient for failing to object on the occasions when they did not object, and he certainly cannot prove any deficiency on those occasions when counsel did object. Counsel's multifarious allegations do not specifically detail how each of the matters he cites from the record were improper or what valid legal objection his trial counsel were deficient for not asserting. Rather, as previously discussed, Applicant seems to assume that the opening statements, evidence, and closing arguments that he cites were inadmissible simply because they contain some reference to Jodi or the unborn child. Applicant bears the burden to prove his claims of ineffective assistance, and his general, largely conclusory assertions fail to meet that burden. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements). Applicant's eighth claim for relief should be denied insofar as it pertains to trial counsel.

### Applicant Fails To Establish Prejudice

Even if Applicant could establish that his trial counsel were deficient with regard to the matters cited in the application, he has not met his further burden to

116

**685**

demonstrate a reasonable probability that he would have been acquitted if trial counsel had objected to the matters he cites from the guilt-innocence phase of trial or that he would have been sentenced to life without parole instead of death had counsel objected to the matters Applicant cites from the punishment phase.

Evidence of the circumstances surrounding the murders of Jodi and the unborn child was admissible as same-transaction contextual evidence. *See, e.g., Camacho*, 864 S.W.2d at 532 (in capital-murder trial for killing homeowner's guest during burglary, evidence Camacho and accomplices kidnapped and later murdered homeowner's wife and son admissible as same-transaction contextual evidence). The evidence he cites as being impermissible victim-impact evidence does not fall within the definition of such evidence. *See Roberts*, 220 S.W.3d at 531 (victim-impact evidence is evidence of the effect of an offense on people other than the victim).

At the guilt-innocence phase of the trial, the jury had before it Applicant's videotaped and written confessions to the premeditated, cold-blooded, heinous murders of his pregnant wife, his crippled father-in-law, and his five-year-old daughter on December 18, 2009. [SX 347.] At the punishment phase, the jury had before it overwhelming evidence showing that Applicant was a future danger – especially the facts surrounding the murders of Joy, Eddie, and Jodi – as well as evidence that Applicant had attempted to feed his family members rat poison to kill

117

**686**

them the evening before he succeeded in murdering them. The State presented powerful evidence establishing that Applicant was guilty of capital murder and deserving of the death penalty.

The evidence cited by Applicant to which his trial counsel did not object was not so inflammatory or prejudicial that it would have impermissibly shifted the focus from the relevant issues in Applicant's trial. There is no reasonable probability that he would have been acquitted or sentenced to life without parole had his trial counsel objected to the evidence he cites in his eighth claim for relief. Therefore, Applicant has not met his burden to prove that he was prejudiced by the alleged deficient performance of trial counsel. Applicant's eighth claim for relief should be denied insofar as it pertains to his trial counsel.

### 3. Applicant Fails To Demonstrate That His Appellate Counsel Was Defective For Failing To Appeal The Admission Of Allegedly Inadmissible Evidence

#### a. Applicant's Conclusory Allegations Fail To Establish His Claim

Applicant asserts that "[t]o the extent this argument should have been raised on appeal, appellate counsel was ineffective for failing to present it." [Application at 104.] Applicant presents a single paragraph addressing his contention. [*Id.* at 104-05.] He does not demonstrate that his appellate counsel failed to raise a claim that had indisputable merit under well-settled law that would necessarily have resulted in reversible error. Applicant's allegations are too conclusory to meet his

118

**687**

burden to establish either prong of the *Strickland* analysis, and he should be denied relief. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements). Applicant's eighth claim should be denied insofar as it concerns Applicant's appellate counsel.

### b.    Applicant Fails To Establish Deficient Performance

Applicant asserts that appellate counsel was ineffective for not "re-raising trial counsel's objection" to the State's use of photographs of the unborn child. [Application at 104-05.] Applicant relies primarily on *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004), and *Reese*, 33 S.W.3d at 241-44. [Application at 104-05.] He contends that no logical reason existed for appellate counsel's failure, particularly in light of case law regarding the prejudicial nature of photographs of unborn children. [*Id.*]

Applicant has failed to prove that his appellate counsel was deficient for failing to challenge the admission of the photographs of the unborn child on appeal. SX 379 is an 8x10 color photograph of a biohazard evidence bag containing the unborn child; the photograph does not focus on the unborn child, and the contents are not readily identifiable from the photograph as an unborn child. [SX 379; *see* RR 38: 93 (Court while examining SX 379 states: "It seems to be a mass of biological material; however, I can't discern whether or not it's a fetus or if it's the placenta or if it's some other portion of a pregnancy"). The photographs of unborn children. [*Id.*]

**688**

photograph was conditionally admitted for record purposes only during the testimony of a DNA analyst as part of the chain of custody regarding a DNA profile she extracted from the unborn child. [RR 38: 90-95.] The photograph was later admitted for all purposes during the medical examiner's testimony that he had collected a fetus from Joy and packaged it in an evidence bag as shown in SX 379. [RR 39: 202.] When SX 379 was conditionally admitted by the Court, the State represented that it did not intend to publish the photograph to the jury, and nothing indicates that the photograph ever was published to the jury. [RR 38: 94; RR 39: 202.]

The other photograph at issue, SX 318, was introduced at the guilt-innocence phase of the trial during the medical examiner's testimony. The portion of the exhibit depicting the unborn child measures 5x7, is black and white, and appears to depict the unborn child, an umbilical cord, and Joy's uterus. [SX 318.] The State argued in response to the objections of Applicant's trial counsel that SX 318 was admissible because: (1) Joy was pregnant; (2) the photograph "starts the chain of custody for DNA samples to prove paternity for this baby"; and (3) based on the area of the stab wounds depicted in SX 315 (an autopsy photograph of Joy's wounds) "it goes to what [Applicant] was stabbing at" because when one lines up the stab wounds shown in SX 315 "you line that up anatomically on a female that's pregnant and you're stabbing in the area where the womb is." [RR

39: 196.] The Court concluded that the probative value of SX 318 outweighed any prejudice, that the evidence was contextual, and that the manner in which the deaths occurred was an issue for the jury. [RR 39: 197-98.]

The circumstances regarding the photographs introduced here as SX 318 and 379 differ significantly from those found in *Reese* and *Erazo*. The photograph in *Reese* was an 8x10 color photograph of the victim in her casket with her unborn child wrapped in what appeared to be a blanket next to her offered at the punishment phase of the trial. *Reese*, 33 S.W.3d at 241. The photograph at issue in *Erazo* was a 4x6 color photograph of an unclothed fetus lying on its back on what appeared to be a table with several inches of an umbilical cord protruding from its abdomen. *Erazo*, 144 S.W.3d at 492. In both cases, the court held that the probative value of the photograph was substantially outweighed by the danger of unfair prejudice. *Erazo*, 144 S.W.3d at 492-96; *Reese*, 33 S.W.3d at 240-44.

In *Erazo*, the photograph had almost no probative value because, although the State attempted to admit it during the medical examiner's testimony at guilt-innocence, it was not offered again and admitted until the end of the punishment phase, it was admitted without a sponsoring witness, and no witness properly authenticated the photograph during the trial. *Erazo*, 144 S.W.3d at 492. Additionally, the court held, the photograph added nothing helpful to the already-admitted testimony that the victim was pregnant, that Erazo knew she was

**690**

pregnant, and that the unborn child died as a result of the victim's death.  *Id.* at 493.  In *Reese,* the court acknowledged that the photograph presumably had some probative value to show the results and foreseeable consequences of Reese's violent and vicious nature.  *Reese,* 33 S.W.3d at 241-42.

In the present case, the photographs at issue had probative value to issues in the guilt-innocence phase of Applicant's trial.  SX 379 was admitted as part of the chain of custody of the unborn child collected by the medical examiner and the DNA profile later extracted from the unborn child by a DNA analyst.  [RR 38: 90-95; RR 39: 202.]  When SX 318 was offered during the medical examiner's testimony, the State offered a number of reasons for its admissibility relating to matters in issue during the guilt-innocence phase of the trial.  [RR 39: 196.]  Unlike the photograph in *Erazo,* the photographs were submitted during medical testimony and were properly authenticated.

In *Reese,* the photograph was introduced at the punishment phase when the State did not need it because, according to the court, the fact that the victim and the unborn child were dead was no longer in dispute.  *Reese,* 33 S.W.3d at 242.  Likewise, in *Erazo,* the medical examiner's testimony and the photographs of the victim during guilt-innocence had established that the victim was pregnant and that the unborn child had died; therefore, the court held, the facts of consequence that the photograph was admitted to show were not in dispute.  *Erazo,* 144 S.W.3d

**691**

at 496. Here, by contrast, the photographs were offered during medical testimony at the guilt-innocence phase of the trial, and the State offered a number of reasons to admit the evidence that were related to facts in issue. [RR 39: 196.] The photographs at issue here were not offered merely to show that Joy was pregnant, that she died, that Applicant knew Joy was pregnant, and that the unborn child died as a result of Joy's death. [*Id.*]

In both *Reese* and *Erazo*, the court concluded that, because the unborn child appeared small and vulnerable, the photographs had an emotional impact that suggested the jury's decision be made on an emotional basis and not on the evidence at trial. *Erazo*, 144 S.W.3d at 242; *Reese*, 33 S.W.3d at 495. In both *Reese* and *Erazo*, the State had also emphasized the photograph during closing argument. *Erazo*, 144 S.W.3d at 495; *Reese*, 33 S.W.3d at 244. In *Reese*, the photograph at issue was the only photograph introduced at the punishment phase of trial; in *Erazo* the photograph was one of only two photographs introduced at the punishment phase (the other being Erazo's mugshot). *Erazo*, 144 S.W.3d at 495; *Reese*, 33 S.W.3d at 241.

By contrast, in the case at bar, there is no indication in the record that either photograph was published to the jury. The State did not emphasize the photographs in its closing arguments. The photographs in the present case were two photographs among a multitude of photographs introduced into evidence.

**692**

The photographs admitted at guilt-innocence included autopsy photographs and crime-scene photographs depicting the burned remains of Joy, Eddie, and five-year-old Jodi. In light of these circumstances surrounding the admission of the photographs at issue, the photographs likely would not have had such an emotional impact to suggest that the jury made a decision on some emotional basis rather than on the basis of Applicant's confession to the premeditated, deliberate, heinous murders of his family so that he could pursue a relationship with Freeze.

Moreover, even if error occurred in admitting SX 318 and SX 379, the Court of Criminal Appeals on direct appeal would have proceeded to determine whether the error was harmful under rule 44.2(b) of the Texas Rules of Appellate Procedure. *See Reese*, 33 S.W.3d at 243. Rule 44.2(b) provides that any nonconstitutional error that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

Applicant provides no analysis to demonstrate that the alleged error would have been found harmful under rule 44.2(b). [Application at 104-05.] Thus, he has not met his burden to demonstrate that he would have prevailed on appeal had the error was harmful under rule 44.2(b) of the Texas Rules of Appellate year-old Jodi. In light of these circumstances surrounding the admission of the

**693**

his appellate counsel raised a point of error challenging the admission of the photographs of the unborn child.

Moreover, the admission of the photographs at issue, if error, would have been deemed harmless. The jury had before it Applicant's videotaped confession describing in chilling, remorseless detail how he murdered his pregnant wife, his crippled father-in-law, and his five-year-old daughter; set a fire in each victim's bedroom to cover his guilt; calmly drove around and visited various Walmart stores to fabricate an alibi; and fled to Oceanside, California.  [SX 347B.]  The jury saw numerous photographs depicting the victims' burned bodies during their autopsies and at the crime scene.   The record does not indicate that either photograph was published to the jury, and the State did not emphasize the photographs during its closing arguments.[16]  Based on the entire record at the guilt-innocence phase of the trial, any error in admitting SX 318 and/or SX 379 would have been found harmless on direct appeal.  *See, e.g., Rolle v. State*, 367 S.W.3d 746, 752-56 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (admission of photograph of murder victim's unborn child who was not named victim held harmless, distinguishing *Reese* and *Erazo*).

---

[16] In *Erazo* and *Reese*, the State's emphasis on the photographs during jury argument played a significant role in the findings of harm. *See Reese*, 33 S.W.3d at 244; *Erazo v. State*, 167 S.W.3d 889, 890-91 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (op. on remand for harm analysis).

**694**

Applicant has not met his burden to show that his appellate counsel was deficient for failing to raise a point of error challenging the admissibility of the photographs of the unborn child. Applicant's eighth claim for relief should be denied insofar as it concerns appellate counsel.

### c.    Applicant Fails To Establish Prejudice

Even if Applicant could establish that his appellate counsel performed deficiently, he has not met his further burden to establish prejudice. The reasoning already discussed in demonstrating that any error in admitting the photographs at issue would be harmless further demonstrates that there is no reasonable probability that Applicant would have prevailed on appeal had his appellate counsel raised a point of error challenging the admission SX 318 and SX 379. Applicant has failed to meet his burden to establish that he was prejudiced by his appellate counsel's alleged deficient performance. Applicant's eighth claim for relief should be denied insofar as it pertains to Applicant's appellate counsel.

### J.    Reply To Claim Nine

Applicant alleges that his trial counsel failed to effectively present evidence that Applicant's confessions should be suppressed. [Application at 105.] He also contends that his appellate counsel was ineffective in failing to sufficiently appeal

**695**

the Court's denial of his motions to suppress his oral and written confessions. [*Id.* at 124-25.]

### 1. Applicant Has Not Shown That His Trial Counsel Were Ineffective At The Suppression Hearing

Applicant alleges that his trial counsel were ineffective because they did not: (1) "offer as exhibits transcripts of the phone calls that took place between Hull, Kandal, and the Kennedale dispatcher during the detaining and arrest" of Applicant; and (2) "submit other documents created by the Border Patrol during their detention" of Applicant. [Application at 105-06.] He concludes that the transcripts and documents "would have established that there was no lawful basis for [Applicant's] detention by the Border Patrol, that [Applicant's] resulting arrest was unlawful, and that his subsequent confession was a violation of his rights under the Fourth Amendment."[17] [*Id.* at 106.]

#### a. Applicant Fails To Demonstrate Deficient Performance For Failing to Introduce the Transcript and Report at the Suppression Hearing

Applicant's trial counsel moved to suppress Applicant's confessions and litigated the issue in a contested pretrial hearing lasting four days. [Cummings' affidavit at 9; *see* RR 6-9.] Counsel aggressively litigated a multitude of

_____

[17] The issue in this habeas proceeding is not whether the Court erred in denying Applicant's pretrial motion to suppress his confessions made at the San Diego County Jail on December 20-21, 2009. *See, e.g., Ex parte Grigsby,* 137 S.W.3d 673, 674 (Tex. Crim. App. 2004) (challenge to legality of search and seizure denied because Grigsby forfeited claim by failing to raise it on direct appeal). The only issue is whether Applicant has met his burden to prove that trial counsel were ineffective for failing to introduce the transcript and report at the suppression hearing.

suppression issues, including the legality of Applicant's detention by CBP.  [RR 6-9; Moore's affidavit at 25.]

Applicant's trial counsel obtained copies of the tape recordings and reports relied on by Applicant in this habeas proceeding.  [Moore's affidavit at 25; Cummings' affidavit at 10.]  Counsel reviewed the recordings and report in preparation for cross-examining the witnesses from the Kennedale Police Department and CBP.  [Moore's affidavit at 25; Cummings' affidavit at 10.]  At the suppression hearing, Applicant's trial counsel used the recordings and reports during cross-examination of the relevant witnesses so that the Court was aware of the communications.  [Cummings' affidavit at 10.]

All of the information contained in the recordings and reports that trial counsel believed to be relevant to the legality of Applicant's border detention was acknowledged during cross-examination of the State's witnesses; hence, there was no need to impeach those witnesses by introducing the actual reports and recordings.  [Moore's affidavit at 25-26.]  Applicant's trial counsel detailed the relevant facts elicited from the State's witnesses in the extensive thirty-seven-page trial memorandum filed with the Court in support of the motions to suppress.  [*Id.* at 26.]  The recorded telephone conversations and written incident reports at issue in this habeas proceeding do not contain relevant facts that were not acknowledged

by the witnesses; therefore, the decision not to offer those recordings and/or reports into evidence did not constitute ineffective assistance. [*Id.*]

Applicant's claim that the transcript and report "revealed a concerted effort" on the part of the Kennedale Police Department and CBP "to invent some justification" to hold him while Kennedale officers started the process of drafting a warrant is baseless. [*See* Application at 115.] The Court was well aware at the suppression hearing that Kandal verified Applicant's citizenship, that he told the Kennedale police dispatcher during their telephone conversation at 7:16 a.m. PST that Applicant was an otherwise admissible person whom he could not hold without a warrant, and that Kandal was in contact with Hull during the time the Kennedale Police Department was working to process a warrant. [RR 8: 32-33, 87, 89-90.] Kandal explained that he does not tip his entire hand regarding his ability to hold someone when he is trying to have other agencies accomplish what he needs done in order to move an individual out of his jurisdiction; if Kandal did not push the agencies, they would use CBP as a "crutch" to slow down the process time, and Kandal does not have that kind of time. [RR 8: 100.] Kandal testified that he had to continue holding Applicant to find out what Kennedale wanted to do about Applicant being a missing person. [RR 8: 90-92.] Although the missing-person report said not to detain or arrest Applicant, and Kennedale authorities did not tell Kandal anything different other than the fact they were in the process of

**698**

trying to get an arrest warrant; Kandal does not operate under what a missing-person report says; he operates under the policies and directives of CBP to contact the jurisdiction, verify the information, and find out what the agency wants done with the individual reported missing. [RR 8: 91, 100.] This Court made no finding of wrongdoing, and nothing in the transcript of the telephone calls or the report submitted by Applicant supports his assertion of any improper motive of the Kennedale Police Department or CBP in his detention. *Cf. Hummel*, 2013 WL 6123283 at * 17-18 (holding this Court's rejection of Applicant's claim that he was illegally detained at the border based on lies was supported by record).

Furthermore, the Court determined that Applicant's detention pending the issuance of an arrest warrant was justified based on federal law and CBP's policies and directives. *See id.* (holding this Court's findings that CBP agents had authority to detain Applicant pursuant to federal law and policies and procedures was supported by record). These independent bases for detaining Applicant at the border were correctly considered by the Court because the validity of a stop or an arrest is determined solely by analyzing the *objective* facts surrounding the event. *Garcia v. State*, 827 S.W.2d 937, 943 (Tex. Crim. App. 1992). "Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which [the officers] acted is of no consequence." *Id.* (quoting *United States v. Causey*, 834 F.3d 1179, 1185 (5th Cir. 1987)). Furthermore,

**699**

nothing in the transcript or report submitted by Applicant rebuts this Court's previous determination that Applicant's detention pursuant to federal law or CBP's policies and procedures was lawful. The mere fact that the telephone conversations and later report focused only on one valid basis to detain Applicant at the border did not render alternative objective bases to detain Applicant invalid or inapplicable.

Applicant cannot meet his burden to demonstrate that his trial counsel were objectively unreasonable in failing to introduce the transcript of telephone calls between the Kennedale Police Department and CBP. Trial counsel obtained and reviewed the report and the recorded telephone conversations, they brought out everything they believed to be significant in the report and transcript at the suppression hearing, and they argued these facts to the Court in support of the motions to suppress. Their reasonable strategic choices about how to present their motions to suppress is not subject to being second-guessed in hindsight. *See Strickland*, 466 U.S. at 690-91. The decision of trial counsel not to offer cumulative evidence in a different format does not support Applicant's claim of ineffective assistance. *See Coble*, 496 F.3d at 436 (counsel's decision not to present cumulative testimony does not constitute ineffective assistance); *Barnes v. United States*, 859 F.2d 607, 608 (8th Cir. 1988) ("[d]irect- and cross-examination

**700**

techniques are matters of trial strategy left to the discretion of counsel").

Applicant's ninth claim for relief should be denied.

### b. Applicant Fails To Demonstrate Prejudice From The Failure Of His Trial Counsel To Introduce The Transcript And Report At The Suppression Hearing

Even if Applicant could prove that his trial counsel were deficient for failing

to introduce the transcript and report at the suppression hearing, he has not met his

further burden to demonstrate that he suffered prejudice as a result of the alleged

deficiency. Applicant alleges that prejudice resulted because, had trial counsel

introduced the transcript and report at issue, the Court would have granted his

motions to suppress and excluded his confession and the evidence collected as a

result from his trial. [Application at 116-17.]

As previously set forth, the Court was made aware of the relevant facts

contained in the transcript and report during the suppression hearing and in the

memorandum of law filed by trial counsel in support of their motions to suppress.

Nothing contained in either document provided in this habeas proceeding

contained facts that differed significantly from what the Court heard at the

suppression hearing, and they certainly contain nothing that would have changed

the Court's findings regarding Applicant's lawful detention or the attenuation of

any taint. Even if the recordings and reports had been introduced into evidence.

The failure to offer largely cumulative evidence did not prejudice Applicant. *See*

**701**

*Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter—from the evidence actually presented at sentencing"); *see also Parker*, 565 F.3d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative).

Moreover, there is no reasonable probability that the suppression of Applicant's confession or the murder weapons found as a result of the confessions would have changed the outcome of Applicant's trial. Fire investigators unanimously concluded that the fire at Applicant's house was an arson under the Texas Penal Code. [RR 34: 248-49.] The jury heard medical-examiner testimony about and saw photographs of the extensive injuries Applicant inflicted on Joy, Eddie, and Jodi; clearly these fatal wounds were not caused by the fire. [RR 39: 185-257; SX 304-18, 353-375.] Blood matching the DNA of Applicant, Joy, and Eddie was found on some of the clothes that Applicant voluntarily turned over during his December 18 noncustodial interview at the Kennedale Police Department. [RR 35: 39; RR 37: 190-91, 195-97, 200-01; SX 341B.] During Applicant's interview at the Kennedale police department, Steele saw blood on Applicant's pant leg, and, when Applicant undressed to voluntarily turn over his clothing, Steele saw blood on Applicant's sock and very recent scratch marks on Applicant's back. [RR 35: 42-44, 60-62; SX 274-76.] Applicant's statements at the Kennedale Police Department raised Steele's suspicions because the story did

not make sense. [RR 35: 81; *see* SX 341B.] Shortly after Appellant left the Kennedale police station on December 18, he fled in his van to California. *See Clay*, 240 S.W.3d at 905 n.11 (evidence of flight evinces a consciousness of guilt).

There is no reasonable probability that, had Applicant's trial counsel introduced the transcript and report at issue, he would have prevailed at the suppression hearing or at his trial. Thus, Applicant has not established that he was prejudiced by the alleged deficiency of trial counsel. Applicant's seventh claim for relief should be denied.

### 2. Applicant Fails To Show That His Appellate Counsel Was Ineffective In The Manner He Challenged The Denial Of Applicant's Motion To Suppress

Applicant alleges that his appellate counsel was ineffective for failing to sufficiently appeal the Court's denial of Applicant's motions to suppress. [Application at 124.] He contends that counsel "should have more clearly argued" that Applicant's confession should have been suppressed based on the actions of the Kennedale Police Department and CBP. [*Id.* at 125.]

#### a. Applicant Fails To Prove That Appellate Counsel Was Deficient In The Manner That He Challenged The Denial Of Applicant's Motion To Suppress

In preparing Applicant's direct appeal, Stickels reviewed the motions to suppress filed by trial counsel, reviewed the applicable facts, and researched the applicable law. [Stickels' affidavit at 2-3.] In Stickels' opinion, based on his

**703**

research and experience, he presented the motion-to-suppress issue "in an appropriate manner that was calculated to obtain relief" on appeal. [*Id.* at 3.]

As Applicant recognizes, Stickels challenged the Court's denial of Applicant's motion to suppress his confessions. [Application at 125; Applicant's Exhibit 31.] *See Hummel*, 2013 WL 6123283 at *21-23 (upholding this Court's denial of Applicant's motions to suppress his oral and written confessions). While the appellate arguments focused on the sufficiency of the arrest-warrant affidavit to establish probable cause, Applicant acknowledges that Stickels also stated that Applicant's confession was "the culmination and result of all of the previous unconstitutional state actions," which "allud[ed] to an earlier discussion of false statements" made by the Kennedale Police Department to CBP. [Application at 125.] In this habeas proceeding, Applicant argues only that his appellate counsel "should have more clearly argued" that his confession should have been suppressed based on the actions of these agencies. [*Id.*]. He concludes that, "[t]o the extent appellate counsel failed to clearly allege and preserve the error created by the unlawful detention of [Applicant] by the [CBP] officers, counsel performed deficiently and that deficient performance prejudiced [Applicant]," [*Id.*]

Applicant's conclusory allegations fail to satisfy his burden to demonstrate that his appellate counsel provided ineffective assistance. [Application at 124-25.] *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than

135

unsubstantiated or conclusory statements). Applicant fails to articulate exactly how his appellate counsel should have argued the claims differently or how counsel's failure to do so fell outside the wide range of reasonable professional assistance. The Court of Criminal Appeals addressed Applicant's contention on direct appeal that he was unlawfully detained at the border based on intentional lies and falsehoods and found that the trial court's determination regarding the lawfulness of the detention was supported by the record. *See Hummel*, 2013 WL 6123283 at *17-18. Applicant's allegations constitute nothing more than an improper second-guessing of appellate counsel's strategic decisions made based on counsel's experience and research about how to best challenge the denial of Applicant's motions to suppress his confessions on appeal. *See Scheanette*, 144 S.W.3d at 510 (fact that another attorney may have pursued different tactic insufficient to prove ineffective-assistance claim). Applicant has not met his burden to demonstrate that his appellate counsel was deficient in the manner in which he decided to challenge the Court's denial of his motion to suppress his oral and written confessions. Applicant's seventh claim for relief should be denied.

### b.    Applicant Fails To Show That He Was Prejudiced By The Manner In Which Appellate Counsel Challenged The Denial Of Applicant's Motions To Suppress

Even if Applicant's appellate counsel had "more clearly argued" the issue as Applicant asserts [*see* Application at 125], Applicant fails to meet his burden to show that he would have prevailed on appeal.  As the evidence at the suppression hearing proved, and as the State argued to this Court in connection with the suppression hearing and in its brief on direct appeal to the Court of Criminal Appeals, there was no basis for the Court to suppress Applicant's confessions or the evidence found as a result of the confessions.  Moreover, this Court made no finding of wrongdoing on the part of the Kennedale Police Department or CBP, and no allegation of such wrongdoing is supported by the suppression record.  *Cf. Hummel*, 2013 WL 6123283 at * 17-18 (holding this Court's rejection of Applicant's claim that he was illegally detained at the border based on lies was supported by record).

In addition, as the evidence at the suppression hearing showed, as the State argued, and as the Court found, Applicant's detention pending the issuance of the arrest warrant was justified on several grounds based on federal law and CBP's policies and directives.  *See id.* (holding this Court's findings that CBP agents had authority to detain Applicant pursuant to federal law and policies and procedures was supported by record).  These independent bases supported Applicant's

137

**706**

detention, and there is no reasonable probability that Applicant would have prevailed on appeal had appellate counsel argued the point of error differently. *See State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013) (appellate court will affirm trial court's ruling on search and seizure if it is supported by the record and correct on any theory of law applicable to the case); *Garcia*, 827 S.W.2d at 943 (validity of stop or arrest determined solely by analyzing *objective* facts surrounding the event).

There is no reasonable probability that Applicant would have prevailed on direct appeal had his appellate counsel "more clearly argued" the a point of error challenging the denial of Applicant's motion to suppress his confession. Applicant has not met his burden to demonstrate prejudice as a result of the alleged deficient performance. Applicant's ninth claim for relief should be denied.

**K.    Reply To Claim Ten**

Applicant alleges that his appellate counsel was ineffective for failing to appeal the Court's erroneous denial of challenges for cause of nine prospective jurors who illustrated that their views would impair their ability to follow the Court's instructions and their oath. [Application at 126.] Applicant's contentions concern the Court's denial of challenges for cause against veniremembers Thomas Bancroft, Jr., LaDonna Butler, Kayla McFarland, Leslie Cuevas, Pamela Powell,

138

**707**

Steven Guidroz, Kenneth Zeiger, Donna Beauchamp, and Janie Cantu Hermosillo.

[*Id.* at 127.]

### 1.   Applicable Law: Challenges For Cause

A veniremember may be challenged for cause if he has a bias or prejudice against any phase of the law upon which the defendant is entitled to rely. TEX. CODE CRIM. PROC. 35.16(c)(2). Bias against the law is refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003). Before a prospective juror may be excused for cause on this basis, however, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Gardner*, 306 S.W.3d at 295; *Sells*, 121 S.W.3d at 759. When the record reflects that a veniremember vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295.

The proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Sells*, 121 S.W.3d at 759. The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow it. *Id.*

**708**

When called upon to review a trial court's decision to grant or deny a challenge for cause, an appellate court looks at the entire record to determine if there is sufficient evidence to support the trial court's ruling. *Id.* The appellate court affords considerable deference to the trial court's ruling because the trial judge is in the best position to evaluate a veniremember's demeanor and responses and to hear his tone of voice. *Gardner*, 306 S.W.3d at 295-96; *Feldman v.* State, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Gardner*, 306 S.W.3d at 296; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the reviewing court must defer to the trial court's decision. *Gardner*, 306 S.W.3d at 296; *Ladd*, 3 S.W.3d at 559.

## 2. Applicant Fails To Demonstrate That Appellate Counsel Was Deficient For Failing To Challenge The Denial Of Applicant's Challenges For Cause

Applicant presents only narrow portions of the nine veniremembers' voir dire without substantial argument or authority to support his contentions that the Court erroneously denied his challenges for cause. Applicant fails establish that his appellate counsel's reasoned, researched, strategic decisions were objectively unreasonable and that there is a reasonable probability that the outcome of his

**709**

appeal would have been different had appellate counsel raised the claims Applicant suggests.

Further, Applicant cannot prevail on his claims. In the process of writing Applicant's brief on direct appeal, Stickels reviewed the reporter's record concerning all of the veniremembers, including the nine veniremembers at issue. [Stickels' affidavit at 4.] He researched the applicable law concerning possible challenges for cause. [*Id.*] In counsel's opinion, "there was no error in the trial court's refusal of [Applicant's] challenges for cause." [*Id.*] Therefore, Stickels decided not to include those issues in Applicant's appellate brief. [*Id.*] A review of the pertinent voir dire proceedings shows that Stickels' assessment was correct; therefore, he was not deficient for failing to challenge the Court's denial of the nine challenges for cause at issue. *See Ex parte Flores*, 387 S.W.3d at 639 (appellate counsel need not advance *every* argument, regardless of merit).

### a.   Veniremember Bancroft

During the State's individual voir dire of veniremember Bancroft, he agreed that, if he took the oath as a juror, he would have to follow the law of the State of Texas. [RR 16: 148.] He had no difficulty doing so. [*Id.*] Additionally, the State reminded Bancroft on several occasions that neither the State nor the defense had any burden of proof on the mitigation special issue, and Bancroft responded and

141

agreed that there was never a burden of proof on a defendant, even when there was no burden of proof on the State. [RR 16: 158-59, 161, 165-66.]

During the defense's individual voir dire, trial counsel asked Bancroft if he felt that the language of the mitigation special issue put the burden on defense counsel to bring mitigating circumstances or to convince him of the sufficiency of the mitigating circumstances. [RR 16: 193.] Bancroft responded that "something is going to have to come out" and that, if he did not know the history of a person, "someone's going to have to show me what kind of person they are." [*Id.*]

Bancroft further told defense counsel, "[S]o I guess, you know, since you're the – defending him, you would probably have to tell me something about him." [*Id.*] When defense counsel explained that the law did not envision the defense having that burden, Bancroft responded, "Right." [*Id.*] Then, the following exchange occurred:

> Q.    [DEFENSE COUNSEL] So the way I'm getting – what I'm getting from you is your – you kind of feel like that question is putting a burden on me, am I correct?
>
> A.    What I'm saying is the evidence in the case would be, you know, back to what caused it or what happened, but if you're trying to tell me about the – if someone's trying to prove the Defendant's character and background, I – you've got to tell me or – either he's got to tell me. I mean, I don't know their background or character unless someone does tell me that. Not saying you got to prove it, but someone – I got to know something about your character or background –
>
> Q.    Okay.

142

**711**

A.    – to answer that question.

Q.    *Do you think it would be my obligation to convince you that that evidence was sufficient?*

A.    No.

[RR 16: 194 (emphasis added).]

Applicant challenged veniremember Bancroft for cause because he would create a burden on the defense to produce evidence of mitigating circumstances. [RR 16: 199.] The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [*Id.*]

Bancroft was not challengeable for cause merely because he would place the burden of proof regarding mitigation on the defense.[18] *Saldano*, 232 S.W.3d at 92, 98; *Ladd*, 3 S.W.3d at 559. Moreover, a review of the entire record of Bancroft's relevant voir dire shows that, at worst, his answers vacillated or were contradictory at times regarding the mitigation special issue and whether he would place a burden on the defense. Bancroft's overall voir dire demonstrated his ability to follow the Court's instructions and to answer the mitigation special issue based on the law and the evidence. While Bancroft correctly expressed that there would have to be evidence from some source to allow him to answer the mitigation

---

[18] No burden of proof exists for either the State or the defendant to disprove or prove the mitigating evidence. *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995). A defendant bears a burden of production on mitigation, however. *McFarland*, 928 S.W.2d at 498.

**712**

special issue, he clearly understood that neither side had any burden to convince him of the existence and/or sufficiency of mitigating evidence.

The Court was in the best position to determine whether Bancroft was challengeable for cause, and, based on the appellate record, no clear abuse of discretion is evident. Applicant has failed to demonstrate that Bancroft had a bias or prejudice that would substantially impair his ability to carry out his oath and instructions in accordance with the law. Therefore, appellate counsel was not deficient in deciding not to raise a point of error regarding Bancroft on appeal.

### b.   Veniremember Butler

During the State's individual voir dire of Butler, she stated that "probability" meant "[a] chance that it would happen again." [RR 16: 209.] She agreed that a probability was not a certainty and that a probability fell somewhere between a possibility and a certainty. [Id.] With regard to the mitigation special issue, Butler stated that she would keep an open mind, look at all the evidence, and not automatically answer the special issue "no." [RR 16: 216.]

During the defense's voir dire, Butler agreed that "probability" meant there was "some degree of likelihood." [RR 16: 240.] She said that under the circumstances she and most people probably would interpret the terms "possibility" and "probability" as being "similar." [Id.] Butler indicated that she did not see a difference in the degree of likelihood being inquired about by the two

144

713

terms and that one would not ask her to find a greater degree of likelihood than the other. [RR 16: 241.]

With regard to the mitigation special issue, Butler stated that the question did not place a burden on the defense to prove the existence or sufficiency of a mitigating circumstance. [RR 16: 245-46.] Butler responded affirmatively when the defense asked if she thought the question was talking about blameworthiness for the offense of conviction and if she believed the instruction compelled her to find a mitigating circumstance only if it had some type of direct connection to the commission of the crime. [RR 16: 247-48.] She seemed to state that application of the question as stated by counsel was "confusing." [RR 16: 248-49.]

Applicant challenged Butler for cause on the grounds that: (1) her failure to see a distinction between the terms "probability" and "possibility" reduced the State's burden of proof on the future-dangerousness special issue; and (2) she would require a nexus between a mitigating circumstance and the actual commission of the crime, which unduly narrowed the mitigating circumstances the defense would be allowed to bring to the jury. [RR 16: 250.] The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 251.]

A full reading of Butler's voir dire questioning reveals that she gave conflicting responses regarding the terms "probability" and "possibility." When

145

**714**

questioned by the State, Butler agreed that a probability is not a certainty, is not just possible, and "sits somewhere between there." [RR 16: 209.] Thus, during the State's questioning when the distinction between the terms was explained, Butler had an appropriate understanding of the meaning of the terms, she saw and accepted the distinction between the terms, and she saw a "probability" as something more than a "possibility." At worst, Butler gave conflicting answers about her understanding of "probability." *Compare with Patrick,* 906 S.W.2d at 489 (trial court abused discretion in denying challenge against veniremember who "never indicated that she observed a distinction" between probability and possibility); *Hughes,* 878 S.W.2d at 146-48 (trial court abused discretion in denying challenge for cause against veniremember who unequivocally and insistently maintained he understood "probability" as only a "possibility"). This Court, having witnessed first-hand Butler's responses and demeanor, apparently determined that Butler had exhibited a proper understanding that "probability" meant more than a "possibility." This Court's determination would have been afforded by the Court of Criminal Appeals had a point of error been raised on appeal. *See Feldman,* 71 S.W.3d at 744 (particular deference given to trial court's ruling on challenge for cause when veniremember's answers are vacillating, unclear, or contradictory).

146

**715**

Moreover, the defense's questioning regarding the distinction between a "probability" and a "possibility" merely sought out Butler's interpretation of the terms. [RR 16: 240-41.] Applicant's trial counsel never explained to Butler that the law required her to see and accept the distinction between the terms. *See Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003) (it must be explained to veniremember that law requires him to see and accept distinction between terms "probability" and "possibility"). Under these circumstances, where the law was not carefully or adequately explained to Butler, the Court did not abuse its discretion in denying Applicant's challenge for cause. *Id.*

Trial counsel also challenged Butler for cause because she would require a nexus between mitigating circumstances and the commission of the charged offense. Butler responded during the State's questioning that she would keep an open mind, look at all the evidence, and not automatically answer the mitigation special issue "no." [RR 16: 216.] There is no *per se* evidence that Butler was required to view as having definitive mitigating effect. *Saldano*, 232 S.W.3d at 98. The law only required that Applicant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give effect to that evidence if the jury found it to be mitigating. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012). It is for the jury to determine what evidence, if any, constitutes mitigating evidence and how much weight it should be given. *Pondexter v. State*,

147

**716**

942 S.W.2d 577, 588 (Tex. Crim. App. 1996). Applicant cites no case law which would have required the Court to grant his challenge for cause of Butler on the ground asserted during voir dire.

Applicant has failed to meet his burden to demonstrate that appellate counsel was deficient for declining to raise a point of error on appeal challenging the Court's denial of his challenge for cause of Butler.

### c.   Veniremember McFarland

During the State's individual voir dire, McFarland responded affirmatively when asked if she could give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty, depending on the facts of the case. [RR 17: 237.] She understood the difference between a "probability" and a "possibility." [RR 17: 244-45.] McFarland defined society as "[t]he public . . . a group or community of people." [RR 17: 245.] She agreed that the definition of society was a broad term that could include the world at large. [RR 17: 246.] Then the following relevant exchange occurred:

> Q.    [PROSECUTOR] But the question here is the Legislature said we have – the State has the burden of proof beyond a reasonable doubt that the Defendant is going to be a continuing threat to society. And remember from our discussions earlier that he's going to be – the Defendant committed – convicted of capital murder is going to be in the penitentiary the rest of their life. So you see in your mind, is there a possibility that someone could be a threat to society from the penitentiary?

**717**

A.     Most of me says no, but, you know, a very, very small chance that they could be.  You know, there's the Internet, there's family contact that could do something for them in that way, not – not directly themselves, but I do think there is a – some chance that they could find a way to do something on the outside world outside prison.

Q.     Do people from the penitentiary ever escape from the penitentiary?

A.     Yes.

Q.     Do people from a – from the society outside the penitentiary go to work in the penitentiary?

A.     Yes.

Q.     Do they visit the penitentiary sometimes?

A.     Yes.

Q.     So you see that there's some – some possibility for interaction –

A.     Yes.

Q.     – of – of inmates with people from your definition of society?

A.     Yes.

[RR 17: 246-47.]

Later, the defense revisited the issue in the following exchange:

Q     [DEFENSE COUNSEL]  Okay.  And then I know you had talked earlier about the – the criminal acts of violence.  You had – I understand the way you think of it as being a group in public or a group or community of people.  And [the prosecutor] had talked about [society] also was prison, and I think you said originally that you're thinking no, but then you thought about the Internet?

149

**718**

A.    Yes.

Q.    Okay.

A.    I guess I was just trying to think of ways that an inmate could interact or communicate with the outside world.

Q.    And what if – if the Judge were to tell you or – you understand that in Texas, they don't have access to the Internet?

A.    No, I don't know that.

Q.    Okay.

A.    No, I just – it was something out of my – my head.  I don't know –

Q.    Okay.

A.    – phone calls, letters, you know.

Q.    Okay.

A.    Family visits.

Q.    I'm sorry.  You had said something earlier about also a family member, maybe?

A.    Yes.

Q.    So is your – your definition of – of probability that the Defendant would commit – commit criminal acts would be that it could also be by one of their family members?

A.    Yes.  They could arrange it.

Q.    (BY [DEFENSE COUNSEL]) You understand that the acts would be by the Defendant and not a third person?

150

**719**

A.    Yes.

Q.    Because a second ago, you said it could be by a family member?

A.    Well, I just – I guess I just had in my mind that if someone in prison wanted to get back at someone outside of prison, they would find a way to possibly find harm – you know, find some way of causing harm to them or – or – I don't know how much more to put it into words, but I think if there's a will, there's a way.

Q.    So would it be fair to say for you that –

A.    They may not do it directly, but I think there is a chance that they could do it indirectly.

Q.    Okay.  So be fair to say that for you, you would attribute acts in Special Issue No. 1, acts of a third person, to the Defendant in – in this question?

A.    Yes.

[RR 17: 281-83 (emphasis added).]

Applicant challenged McFarland for cause because, in considering the future-dangerousness special issue, she would consider if there was a probability that a third party would commit criminal acts of violence on Applicant's behalf. [RR 17: 289.]  The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [Id.]

McFarland's overall voir dire showed that she could give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty, depending on the facts of the case, and she understood the difference

151

**720**

between a "probability" and a "possibility" in the future-dangerousness special issue. [RR 17: 237, 244-45.] Her responses at issue, when read as a whole, simply reveal her thought process during questioning about whether a person confined in the penitentiary could commit future acts of violence in society outside of prison. McFarland never indicated that she would hold acts of a third party against Applicant if Applicant himself did not play a part in directing the third party's acts of violence. She responded affirmatively when defense counsel asked, "You understand that the acts would be *by the Defendant and not a third person*?" [RR 17: 282 (emphasis added).]

Applicant cites no authority demonstrating that McFarland was challengeable for cause on the ground he asserted during voir dire. Applicant has failed to meet his burden to demonstrate that his appellate counsel was deficient in declining to raise a point of error on appeal challenging the denial of his challenge for cause of McFarland.

### d.    Veniremember Cuevas

During the State's individual voir dire, Cuevas said that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.] Cuevas acknowledged putting in her questionnaire that she thought the death penalty should be available for capital murder, murder of a policeman, and murder

152

**721**

of children, but she understood the definition of capital murder charged in Applicant's case, and she had no issues with that definition. [RR 20: 197-98.]

Regarding the future-dangerousness special issue, Cuevas stated that she could apply the law to the facts of the case and render a just verdict. [RR 20: 206-07.] She would answer the special issue "yes" if the State met its burden of proof, and she would have no hesitation in answering "no" if the State did not meet its burden. [RR 20: 208.]

Early in the defense's individual voir dire, Cuevas said she formed her opinion regarding the death penalty in 1994 or 1995 when a policeman in her Sunday school class in San Antonio was killed while trying to stop a robbery in his neighborhood. [RR 20: 216.] She "followed the case very closely," she heard about the defendant's bad childhood "and everything that had happened to him," and she thought that defendant in that case deserved the death penalty even though she felt bad for him. [Id.] Cuevas would look that defendant up on the website every couple of years, and she found out a few years ago that he was executed. [Id.] Cuevas did not attend the trial. [RR 20: 217.]

Regarding her views of the death penalty, defense counsel asked Cuevas if she believed that the death penalty "would be the only appropriate option" for the offenses she listed, and Cuevas responded: "Well, I don't know that it's the only option because we have to look at two things and make

153

**722**

our decision based on those – answering those two questions." [RR 20: 224.]

When asked if a life sentence would be an option when dealing with those types of

crimes, Cuevas responded, "I have to answer yes." [Id.]

Finally, with regard to the future-dangerousness special issue, the following

relevant exchange occurred between defense counsel and Cuevas:

> [DEFENSE COUNSEL] And then you're being called upon to
> answer this questions, Special Issue No. 1. Is that something that's
> pretty much a given? I mean, if you've answered all of these
> questions such that a – a guilty verdict has taken place, can you see
> where the – that someone could decide it's a no-brainer, it's – it's an
> automatic response of yes because after all, we've already found these
> things? Is that a yes?
>
> A.    Yes.
>
> Q.    Okay. No, the – the law is that you would – the law puts
> the burden on the State. The law says that they have to bring you
> evidence that this – this particular question, the answer is yes. They
> have to satisfy each of the 12 of you of that.
>
> Would they have already satisfied you if the answer is yes,
> because after all, they have proven these things to you beyond a
> reasonable doubt other than the found to be a future danger at the
> bottom. The slide is really meant to deal with the next special issue.
> That's the only difference.
>
> Can you see that it – with some people, that it could very well
> be an automatic choice, it's – it's a no-brainer?
>
> A.    Yes.
>
> Q.    Okay. Would it be so with you?
>
> A.    Yes

154

**723**

[RR 20: 230-31.]

Following the defense's voir dire, the Court questioned Cuevas to clarify her

responses regarding the future-dangerousness special issue.   [RR 20: 233-36.]

During that exchange, the following occurred:

> THE COURT:  . . . What you said to [defense counsel] was that
> you felt like the answer to Question No. 1 would be automatic based
> upon what your decision was in the guilt/innocence phase of the trial.
>
> And certainly it can be based upon the same evidence.   My
> question to you is whether it's asking the same thing.
>
> [CUEVAS]:  I don't think so.
>
> THE COURT:  Okay.  So just because you found somebody
> guilty of the offense of capital murder, you're not saying that you
> would automatically find that they were going to be a future danger in
> Question No. 1, or are you saying that?   That's what I'm trying to
> figure out.
>
> [CUEVAS]:  I guess it would just depend on the evidence that
> you heard during the trial.  I mean, I don't know that I can adequately
> answer that question at the moment.

[RR 20: 235-36.]

Applicant challenged Cuevas for cause because:   (1) she indicated that her

answer to the future-dangerousness special issue would be automatic based upon

her analysis in finding Applicant guilty; (2) she indicated that she had a

predisposition toward the death penalty; and (3) she never mentioned in her jury

questionnaire anything about having followed the capital-murder case involving

her church Sunday school classmate's murder even though question 85 specifically

**724**

asked that question. [RR 20: 236-37.] The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 20: 238.]

Regarding the future-dangerousness special issue, at worst, Cuevas' answers vacillated, were contradictory, or were unclear as to whether she would automatically answer the question "yes" after a finding of guilt. She also said that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

The mere fact that Cuevas responded on her jury questionnaire that the death penalty should be available for "capital murder, murder of policemen, murder of children" [Applicant's Exhibit 35, p.7] did not, as Applicant alleges, show her predisposition to give the death penalty to someone who murdered a child. [Application at 130.] Cuevas understood and agreed that in Applicant's trial the definition of the crime was the one shown on the State's PowerPoint, she understood that she would have to keep an open mind and consider all phases of the case before reaching a decision, and she believed she could follow the Court's instructions and go through the procedure in reaching a decision. [RR 20: 192, 197.] Cuevas said that her answer to the future-dangerousness special issue would be "no" if the State failed to meet its burden of proof and "yes" if the State met its burden. [RR 20: 206-08.] Cuevas told the State that, regardless of what was in

Cuevas' questionnaire, she could follow her oath and apply the law to the facts in the case and render a just verdict. [RR 20: 206.]

Moreover, with regard to the mitigation special issue, Cuevas could keep an open mind, consider mitigating evidence in a case and vote based on her view of whether it rose to such a level that it was mitigating, and she would vote "yes" if it rose to the level of mitigating in her mind and "no" if it did not. [RR 20: 211.] She would keep an open mind, follow her oath, and give the mitigation issue a fair review. [RR 20: 212-14.] She understood that she had to keep an open mind until the State met its burden in the guilt-innocence phase and on the future-dangerousness special issue and until the jurors decided amongst themselves how to answer the mitigation special issue. [RR 20: 215.]

Furthermore, Cuevas was not challengeable for cause simply because she never mentioned on her jury questionnaire that she followed the capital-murder case involving her Sunday school classmate's murder even though question 85 specifically asked that question. The defense never questioned Cuevas about why she did not include this information in response to question 85 in the jury questionnaire. Nothing in the record indicates whether Cuevas misunderstood that question 85 called for her to include the case of her Sunday school classmate's murderer as a case in which she had an interest. *See Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999) ("written questions are by nature vulnerable to

**726**

misinterpretation"). Given the readiness with which Cuevas disclosed and discussed the case during her individual voir dire, there is no reason to believe that she had any intent to be dishonest. Cuevas disclosed her connection to the case, thus providing the defense an opportunity to intelligently exercise its challenges and to determine whether she could be a disinterested and impartial juror. Nothing indicates that Cuevas' knowledge regarding that case would have had effect on her ability to follow her oath and the law in Applicant's case.

Applicant has failed to meet his burden to prove that his appellate counsel was deficient for declining to raise a point of error on appeal challenging the Court's denial of his challenge for cause of Cuevas.

**e.    Veniremember Powell**

During the State's individual voir dire of Powell regarding the future-dangerousness special issue, Powell indicated that she would answer the special issue "yes" if the State met its burden beyond a reasonable doubt and "no" if the State failed to meet its burden. [RR 21: 19.] She understood that her oath would require her to keep an open mind to everything. [RR 21: 20.] Powell agreed to evaluate the evidence from both the guilt-innocence and punishment phases of trial. [*Id.*] She responded affirmatively when asked if she could "keep an open mind to all the – the process." [RR 21: 29.]

During the defense's voir dire, Powell responded that the future-dangerousness special issue asked her to "[l]ook at the testimonies or the evidence to see if he's going to be a harm to other people in society." [RR 21: 52.] She further responded that she would listen to "all the testimony or whatever information is brought into the trial." [RR 21: 52-53.] She understood that the State bore the burden on the special issue and that the defense had no burden at all. [RR 21: 53.]

The entire exchange about whether Powell would automatically answer the future-dangerousness special issue "yes" based upon finding Applicant guilty is as follows:

> Q.    [DEFENSE COUNSEL] But you're asked to deal with Special Issue No. 1. You're in – I'm trying to set a context here and – – you've already heard evidence of two murders, two knowing murders that don't have any defenses, there's no mental retardation, there's no – the – the accused is within the – the proper age range, it's not an accident, it's not insanity, it's not something that they did because they didn't – they didn't intend to do because they were high or something like that. I believe on your questionnaire you had something like that.
>
> You've already made this choice. You've decided beyond a reasonable doubt that's where we're at. Now you're being asked to ask – answer Special Issue No. 1. Do you – do you see a difference in the – in the role that you have in the punishment phase?
>
> A.    Yes, sir.
>
> Q.    Are you going to be in a mindset that my goodness, I mean, we've already found that this guy's committed two murders. There's no defense. It's a – it's a given. It's a foregone conclusion.

159

**728**

Obviously, the continuing threat to society.  Does that fall within your way of thinking?

> A.     Yes, sir.

> Q.     Okay.  The – it's – it's – you can take into consideration the evidence from the first phase of a trial, obviously –

> A.     Yes, sir.

> Q.     – in answering the special issues in the second phase.

You can – and many times the prosecutor will stand up and – and ask the judge to – to admit all the evidence from the first phase of the trial and during the second phase or whatever for the benefit of the jury.  We all know that's the case anyway, but it's something done.

But my question to you here is – you've already made that decision that, My God, this guy has committed two murders, and there's no justification, they're innocent victims.  The – is this going to be pretty much automatic for you as far as Special Issue No. 1 under those circumstances?

> A.     Yes, sir.

[RR 21: 54-56.]

Applicant challenged Powell for cause on the basis that she would minimize or reduce the State's burden of proof on the future-dangerousness special issue by automatically voting "yes" solely upon the evidence presented to her at the guilt-innocence phase of the trial.  [RR 21: 58.]  In response to the challenge, the State pointed out:

[PROSECUTOR]:  Judge, the entire tenor of her voir dire was that she would be open-minded and follow the law.  [Defense

160

**729**

counsel's] fact pattern, as you'll recall, that – when she answered it would be automatic is – he went through for about four minutes in fact pattern that the juror is allowed to consider as part of answering the question yes. And based on that fact pattern, they go into what (sic) she said that.

They never challenged her on her admissions throughout the State's voir dire for – that she would consider and be open-minded throughout the entire process and hold the State to our burden and never put the burden on the Defense.

[RR 21: 58-59.] The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 21: 59.]

Viewed in context, Powell's response about answering the future-dangerousness special issue cited by Applicant can reasonably be interpreted as reflecting that Powell could answer the future-dangerousness special issue "yes" based on the facts stated by defense counsel. This did not make Powell unfit to serve, as the facts of an offense alone can be sufficient to support a finding of future dangerousness. *See Devoe*, 354 S.W.3d at 462 (in some instances, circumstances of offense and events surrounding it may alone be sufficient to sustain affirmative finding to future-dangerousness special issue). Powell did not manifest an inability to reconsider or reweigh the guilt evidence in the particular context of the future-dangerousness special issue; therefore, she did not demonstrate herself to be unable to objectively follow the law. *See Cooks v. State*, 844 S.W.2d 697, 712 (Tex. Crim. App. 1992) ("the crucial consideration is whether the veniremember is able to re-examine the evidence of guilt in the

161

context of the submitted issues"); *Gardner v. State*, 730 S.W.2d 675, 680 (Tex. Crim. App. 1987) ("[f]or only upon manifesting an inability, once the issue of guilt has been resolved against the accused, to *reconsider guilt evidence in the particular context of special issues*, has a venireman demonstrated himself unable objectively to follow the law" (emphasis in original)). Counsel never explained to Powell that the future-dangerousness issue required a different analysis than finding Applicant guilty; thus, Applicant has not shown that Powell understood the requirements of the law and would be unable to put aside her personal beliefs and follow the law. *See Gardner*, 306 S.W.3d at 295 (before veniremember may be excused for cause, law must be explained to him and he must be asked if he can follow that law regardless of his personal views).

Even if Powell's answers to the defense's questions could be interpreted as Applicant claims, these were not her only relevant responses. Powell indicated during the State's questioning regarding the future-dangerousness special issue that she would hold the State to its burden of proof, that she could vote "no" if the State failed to meet its burden, that she would keep an open mind to everything in the process, and that she would evaluate the evidence from both the guilt-innocence and the punishment phases of trial. [RR 21: 19-20, 29.] During defense counsel's questioning, Powell stated that she would "[l]ook at the testimonies or the evidence to see if he's going to be a harm to other people in society," that she would listen to

**731**

all of the testimony and information brought into the trial, and that she understood

the State bore the burden of proof on the special issue and that the defense had no

burden at all. [RR 21: 52-53.] At worst, Powell gave responses which were

vacillating, unclear, or contradictory about whether she would automatically

answer the future-dangerousness special issue "yes" after finding Applicant guilty

of capital murder.

Applicant states that Powell's connection to the criminal justice system – *i.e.*

she worked as a clerk in Tarrant County and had a close relationship with others

who worked in the court building – "may have biased her opinion as a juror."

[Application at 131.] Applicant never challenged Powell on this ground. [RR 21:

58.] Therefore, such ground would not have been a proper basis to appeal the

denial of Applicant's challenge for cause. *See* TEX. R. APP. P. 33.1(a)(1).

Moreover, Powell's voir dire examination unequivocally demonstrated that her

position in the clerk's office would have absolutely no effect on her service as a

juror.

Based on the entirety of her voir dire, Powell's alleged prejudice was not so

clear as to make the Court's denial of Applicant's challenge for cause a clear abuse

of discretion. Applicant has failed to meet his burden to demonstrate that his

appellate counsel was deficient in declining to raise a point of error on appeal

challenging the Court's denial of his challenge for cause of Powell.

### f.    Veniremember Guidroz

The following relevant exchange occurred during the defense's individual voir dire of Guidroz:

> Q.    [DEFENSE COUNSEL] It's envisioned that that does not put a burden – that the question [regarding mitigation] doesn't put a question on either side, but if the issue is whether or not it's sufficient, some jurors look at that and say, Well, it's got to be my job to convince me it's sufficient.
>
> Do you feel like just by the way the question is worded it puts any kind of legal burden on the Defense to produce the mitigating evidence or to convince the jury that that mitigating evidence is sufficient?
>
> A.    I would say, yes.
>
> Q.    Okay.  And that's a little bit different from what the law requires.
>
> A.    I'm sorry?
>
> Q.    That is different from what the law would envision, but they wrote the question in a bad way.
>
> A.    Okay.

[RR 27: 109.]

Applicant challenged Guidroz for cause because his reading of the mitigation special issue would place the burden on the defendant.  [RR 27: 115.] The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 27: 116.]

164

**733**

Guidroz was not challengeable for cause merely because he would place the burden of proof for the mitigation special issue on the defense. *Saldano*, 232 S.W.3d at 92, 98; *Ladd*, 3 S.W.3d at 559. Moreover, Guidroz stated that, with regard to the mitigation special issue, he could follow his oath and follow the law that the Court gave him. [RR 27: 87.] He could answer the mitigation special issue "no" if he felt it was proper based on the evidence in the case. [RR 27: 91.] He was open to the idea that there could be something that would be sufficient for him to find a mitigating circumstance. [RR 27: 111.] Thus, Guidroz's voir dire demonstrates that he could follow his oath and the law in answering the mitigation special issue.

Applicant has failed to meet his burden to demonstrate that his appellate counsel was deficient in declining to raise a point of error on appeal challenging the Court's denial of his challenge for cause of Guidroz.

### g.   Veniremember Zeiger

During the State's individual voir dire, the State informed Zeiger that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 61, 66.] Zeiger stated that he could answer the question "yes" if the State met its burden of proof and that he could answer "no" if the State failed to meet its burden. [RR 28: 66-67.]

During questioning by the defense, the following exchange occurred:

165

**734**

Q.    [DEFENSE COUNSEL] Well, I guess what I'm trying to get is how you're looking at [the future-dangerousness special issue]. Because he's going to be guilty before you ever ask this question. And you know that under this statutory scheme, that means he killed at least two people during the course of a single criminal transaction.

And what I'm asking for – you is does that tell you that he's always going to be a danger, such that that question is always going to be answered yes; or do you think there could be situations where you would find – could find somebody guilty –

A.    I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again.

Q.    Okay. And – and that's sometimes the problem with the question. You see that – and because of the way you're looking at it, that question really is not serving any purpose, does it.

A.    There might be one – I'm trying to think of the word – one exception.

Q.    I'm sure there probably is an exception where I would say, you know, now maybe he wouldn't do it again because – but not likely.

Q.    Not likely what? Not likely they're –

A.    The person's already found guilty of capital murder, and the question of whether they would commit the crime, I would have to say probably that, you know, yeah, they would, but there might be an exception.

Q.    Okay.

A.    But I don't know what that exception would be, and I'd have to weigh all the – the variables and – and understand, I guess, the individual, the circumstances of the – of what happened and, you know, that's almost – that's a whole life.

166

**735**

Q.   Okay.  And it's – and the question – I just want to make sure that we're on the same page.  The question is not asking you is he going to commit that crime again.

A.   Right.

Q.   The question is:  Is there a probability that he would commit crimes of violence?  And from what –

A.   It's – it's hard to say, but that's a yes-or-no answer.

Q.   Okay.

A.   I mean, to me it's not a yes-or-no answer.

Q.   What would it be?  That's what the question calls for.

A.   Well, it – it's a – you know, it really depends on the individual and – and all the extenuating, you know, circumstances and everything.

Q.   Okay.  Do you fell like that you're predisposed to say that the answer should be yes if you find somebody guilty of capital murder?

A.   Yes.

[RR 28: 92-94.]  Later in the questioning, Zeiger said that the "system" made sense, and he acknowledged that the special issues required the jury to find something additional about the defendant because not every capital murderer would get the death penalty.  [RR 28: 100.]

Applicant challenged Zeiger for cause because he would have a predisposition to answer the future-dangerousness special issue yes.  [RR 28: 103.]  The State responded that the defense had not phrased the question in light of

167

**736**

whether Zeiger could set aside his predisposition and follow his oath as a juror and that Zeiger had said that he could answer "yes" or "no" depending on the facts and circumstances. [*Id.*] The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 28: 103-04.]

Arguably, Zeiger at times gave responses that could be interpreted as showing a predisposition to answer "yes" to the future-dangerousness special issue if someone was guilty of capital murder for killing two people. However, he also stated that there could be an exception, that he would have to weigh all the variables and understand the individual and the circumstances of what happened, and that it depended on the individual and all the extenuating circumstances. Additionally, Zeiger stated during the State's questioning that he could answer the question "yes" if the State met its burden of proof and "no" if it did not. [RR 28: 66-67.]

Given the totality of Zeiger's relevant voir dire, Applicant has not established that Zeiger would be unable to set aside his personal beliefs and follow the Court's instructions and his juror oath. At worst, Zeiger's responses were vacillating, contradictory, or unclear, and no clear abuse of discretion in denying the challenge is shown.

168

**737**

Applicant has failed to meet his burden to demonstrate that his appellate counsel was deficient in declining to raise a point of error on appeal challenging the Court's denial of his challenge for cause of Zeiger.

### h.    Veniremember Beauchamp

During the State's individual voir dire, Beauchamp indicated that she understood that the State bore the burden of proof on the future-dangerousness special issue.  [RR 28: 121-22.]  She could answer the special issue "yes" if the State met its burden of proof and "no" if the State did not meet its burden.  [RR 28: 128-29.]  She responded affirmatively when the prosecutor asked if she could see that finding a defendant guilty of capital murder was a different question than asking if he would possibly constitute a continuing threat to society.  [RR 28: 130-31.]  She understood that the future-dangerousness special issue would not be answered "yes" just because she found the defendant guilty of capital murder; it would depend on the facts of the case.  [RR 28: 131.]  Beauchamp could return a death sentence if it were proper under the facts and law, and she could return a life sentence if the evidence pointed toward it.  [RR 28: 138.]

During the defense's voir dire, Beauchamp stated that her expectation was to be "presented with the whole story . . . in order to make a fair judgment and provide a yes-or-no answer based on that statement."  [RR 28: 154.]  Additionally, the following exchange occurred:

Q.   [DEFENSE COUNSEL] But before you're called upon to answer Special Issue No. 1, you are in a situation where you've already found beyond a reasonable doubt that the individual knowingly committed capital murder. There's not any defense. He's not mentally retarded. No accident. The victim is innocent. There was no self-defense involved. All those issues are gone. You have found this person to have knowingly caused multiple deaths. Okay?

With that context, is it a foregone conclusion with you that the answer to Special Issue No. 1 would be yes?

A.   Yes.

Q.   Because sometimes that's a lot of information to already have about the individual, is it not?

A.   Could be, yes.

Q.   Okay. And I want you to -- I want to be clear with you, I'm asking you if the information that you have received already in the guilt/innocence phase on which you derived your verdict of guilty beyond a reasonable doubt of capital murder without any defense available, any justification, innocent victims, that that by itself is going to be enough for you to answer yes to Special Issue No. 1 and would do so automatically because of the guilt/innocence phase evidence you've received?

A.   Yes, based on the definition.

Q.   Okay. The multiple commission of murders in one criminal transaction for you would be enough to answer this question, correct?

A.   Yes.

Q.   Whose burden is it to prove this question?

A.   The State.

170

**739**

Q.   Okay.  Are they going to – I want to be sure I understand. In a situation where you have found somebody guilty of multiple murders in the same criminal transaction without any of the mistake defenses, accident, anything like that, is your response to Special Issue No. 1 going to be yes every time?

A.   If they provided that, yes.

[RR 28: 155-57.]

Applicant challenged Beauchamp because she would reduce the State's

burden on the future-dangerousness special issue and vote "yes" based upon the

proof of multiple murders in the same transaction.  [RR 28: 158.]  The Court

denied the challenge, and Applicant exercised a peremptory challenge.  [RR 28:

158-59.]

At worst, Beauchamp's answers vacillated, were contradictory, or were

unclear as to whether she would automatically answer the future-dangerousness

special issue "yes" after finding a defendant guilty of a double murder committed

without justification.  She also said that she understood the State's burden of proof

on the future-dangerousness special issue and that she could answer the special

issue "yes" if the State met its burden and "no" if it did not.  [RR 28: 121-22, 128-

29.]  She recognized that finding a defendant guilty of capital murder was a

different question than asking if he would possibly constitute a continuing threat to

society, and that the future-dangerousness special issue would not be answered

"yes" just because she found the defendant guilty of capital murder.  [RR 28: 130-

171

**740**

31.] She could return a death sentence if it were proper under the facts and the law, and she could return a life sentence if the evidence pointed toward it. [RR 28: 138.]

Given the tenor of Beauchamp's entire voir dire, the Court was in the best position to determine whether she was challengeable for cause. Based on the appellate record, no clear abuse of discretion is evident in the denial of the challenge for cause.

Applicant has failed meet his burden to demonstrate that his appellate counsel was deficient in declining to raise a point of error on appeal challenging the Court's denial of his challenge for cause of Beauchamp.

### i.  Veniremember Hermosillo

During the State's individual voir dire, the State informed Hermosillo that the State did not have the burden of proof on the mitigation special issue. [RR 28: 189.] She responded "[r]ight" when the State informed her that the burden did not shift to the defense because the defense never has a burden of proof in a criminal case. [Id.]. She would not have any problem answering the mitigation special issue "yes" if she felt there was mitigating evidence. [RR 28: 192.] She defined her role in deciding the special issue as "[t]o look at all the evidence and, you know, decide for myself, but I'd have to know all the – you know, all the evidence provided by y'all." [RR 28: 192-93.] She understood that a defendant had the right to remain

**741**

silent, and she had no problem with the fact that she might only hear one side of the situation. [RR 28: 193-94.]

During the defense's questioning, counsel informed Hermosillo that neither party bore a burden with regard to the mitigation special issue. [RR 28: 216.] Hermosillo did state that the defense would have to "present reasons why that may have caused this incident or this murder," to prove his character or something about him like whether this was his first time, and to convince her that there is another side to the defendant. [RR 28: 217-18.] Hermosillo responded affirmatively when asked whether, based on the wording of the special issue, the defense would have to present evidence and convince her it was sufficient. [RR 28: 218.] She did think there could be mitigating circumstances that would be sufficient to show that a death sentence was not appropriate. [RR 28: 219.]

The Court questioned Hermosillo. [RR 28: 222.] She understood that she would take an oath to follow the law contained in the Court's instructions. [*Id.*] The following exchange occurred between the Court and Hermosillo:

THE COURT: Okay. As a juror, you would receive an instruction that the law does not require a Defendant to prove his innocence or to produce any evidence at all. Do you understand that instruction?

[HERMOSILLO]: Yes, ma'am.

THE COURT: All right. As a juror, would you be able to follow that instruction, or is your feeling that you've mentioned today,

**742**

is that such a strong feeling that you would not be able to follow that instruction?

[HERMOSILLO]: no, ma'am. I – I would have to, you know, follow all the instructions and really pay attention to, you know, what's put before me. I don't think I would have any problem following instructions, you know. I know – yeah, you know, I think that the Defendant would have to –

THE REPORTER: I'm sorry. Please repeat that.

[HERMOSILLO]: I said I think that the Defendant's attorney would have to show; otherwise, you know, or prove him to be – I'm tired. that they would have to show that he – you know, there's other circumstances that caused him to – to, you know, cause the murder.

But I – I would really have to, you know, follow the rules and listen to everything, all the evidence, before I – you know, I cannot make up my kind and say, Well, yeah, he's guilty, you know. I can't do that. I have to listen to everything that's brought before me.

THE COURT: Well –

[HERMOSILLO]: I wouldn't have any problems with that even though I – you know, in the past I'm thinking – I may have thought, well, you know, once a person's here, he's guilty or – and I can't judge somebody until I know the facts. I've never served on a jury before, so I don't know how things are, you know, brought forth, how the evidence is brought before use and stuff, so I would have to just make sure that I'm, you know, following the Judge's guidance and/or rules or make sure I follow everything exact.

THE COURT: . . . But my question to you is whether you could follow the instruction that the Judge would give you, saying that the Defendant does not have a burden of proof, they do not have to present any evidence whatsoever in any stage of the trial.

[HERMOSILLO]: Yes, ma'am. I think I could.

174

**743**

THE COURT:  Okay.  When you say that you think you can, I need a more definite answer –

[HERMOSILLO]:  I know I can.

[RR 28: 222-25.]

Applicant challenged Hermosillo for cause with regard to the mitigation special issue because she would require the defense to show why or how the crime happened and to produce evidence and convince the jury of the sufficiency of the mitigating evidence.  [RR 28: 225-26.]  The Court denied the challenge, and Applicant exercised a peremptory challenge.  [RR 28: 226-27.]

Hermosillo was not challengeable for cause merely because she would place the burden of proof on mitigation on the defense.  *Saldano*, 232 S.W.3d at 92, 98; *Ladd*, 3 S.W.3d at 559.  Moreover, at worst, Hermosillo gave vacillating, contradictory, or unclear answers about whether she wanted the defense to present mitigating evidence at the punishment phase.  In the end, she assured the Court that she could put aside her personal views, follow the Court's instructions, and not impose a burden of proof on the defense with regard to the mitigation special issue.

Given the tenor of Hermosillo's entire voir dire, the Court was in the best position to determine whether she was challengeable for cause.  Based on the appellate record, no clear abuse of discretion is evident in the denial of the challenge for cause.

175

744

Applicant has failed to demonstrate that his trial counsel was deficient in declining to raise a point of error on appeal challenging the Court's denial of his challenge for cause of Hermosillo.

### 3. Applicant Fails To Prove Prejudice From Appellate Counsel's Failure To Challenge The Denial Of Challenges For Cause On Appeal

Even if Applicant could show that his appellate counsel was deficient in failing to raise points of error on appeal challenging the denial of the nine challenges for cause, he has not met his further burden to show resulting prejudice. A defendant is harmed by the erroneous denial of a challenge for cause only if he used a peremptory strike to remove the unsuccessfully challenged veniremember and then suffered a detriment from the loss of the strike. *Feldman,* 71 S.W.3d at 744. Although the Court did not grant Applicant the full number of additional peremptory strikes he requested, the Court granted him two additional strikes. Thus, in order to demonstrate a reasonable probability that he would have prevailed on appeal, Applicant must show that the Court erroneously denied at least three of his challenges for cause. *Id.; see Hughes,* 878 S.W.2d at 151 (op. on reh'g) ("Where the court reinstates peremptory strikes, to show harm, the party complaining on appeal must show that one additional juror sat on the case than the number of reinstated peremptory strikes").

**745**

As previously discussed, the Court's denials of the nine challenges for cause were supported by the appellate record, and no clear abuse of discretion has been shown. In any event, Applicant would have been unable to establish on appeal that the Court erroneously denied *at least three* of the challenges for cause at issue. Thus, there is no reasonable probability that Applicant's case would have been reversed on appeal had his appellate counsel raised points of error challenging the denial of the nine challenges for cause at issue. Applicant has failed to meet his burden to establish prejudice as a result of appellate counsel's alleged deficient performance. Applicant's tenth claim for relief should be denied.

**L.      Reply To Claim Eleven**

Applicant asserts that his trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove minority veniremembers in violation of Applicant's constitutional rights. [Application at 137.] Applicant's allegations focus on three minority veniremembers – Aaron Gonzales, a Hispanic male; Valerie Williams, an African-American female; and Darryl Dennis, an African-American male. [*Id.* at 137-45.]

**1.      Applicable Law: *Batson***

The purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 88-89 (1986); *Guzman v. State*, 85 S.W.3d 242, 245 (Tex.

Crim. App. 2002). A three-step analysis guides the evaluation of a defendant's equal-protection challenges to a prosecutor's use of peremptory challenges: (1) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (2) upon such a showing, the burden of proof shifts to the State to provide a race-neutral explanation for striking the veniremembers in question; and (3) the trial court must determine whether the defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson*, 476 U.S. at 94-98; *Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012). The ultimate burden of persuasion regarding improper motivation rests with, and never shifts from, the party challenging the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

To establish a *prima facie* case, Applicant must show: (1) the State exercised its strikes to exclude members of a cognizable minority group from the venire; and (2) this fact, along with any other relevant facts and circumstances, raises an inference that the State struck the veniremembers because of their race. *See Batson*, 476 U.S. at 96; *Hassan*, 369 S.W.3d at 875. Applicant bears the burden to establish a *prima facie* case of purposeful racial discrimination. *See Tompkins v. State*, 774 S.W.2d 195, 200 (Tex. Crim. App. 1987), *aff'd by an equally divided Court*, 490 U.S. 754 (1989).

**747**

If a *prima facie* case is shown, the State must then provide facially race-neutral explanations for striking the veniremembers in question. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (citing *Purkett*, 514 U.S. at 767-68). A race-neutral explanation is based on something other than the veniremember's race. *See Hernandez v. New York*, 500 U.S. 352, 360 (1991). Unless discriminatory intent is inherent in the State's explanation, the offered reason is race neutral.[19] *Id.*

The third step of the *Batson* inquiry involves evaluating the prosecutor's facially race-neutral explanations to determine if those explanations are genuine or merely a pretext for purposeful discrimination. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989). Whether the proponent of the strike intended to discriminate on the basis of race is a question of fact. *Hernandez*, 500 U.S. at 367. The focus of the inquiry is on the genuineness, not the reasonableness, of the asserted nonracial motive. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012) (citing *Purkett*, 514 U.S. at 769).

The failure of trial counsel to lodge a *Batson* objection is not presumptively prejudicial for purposes of a claim of ineffective assistance of counsel. *See Young v. Bowersox*, 161 F.3d 1159, 1160-61 (8th Cir. 1998). Even if an error premised on

---

[19] The ultimate plausibility of a facially race-neutral explanation is considered in the third step of the *Batson* analysis, in which the Court determines whether Applicant has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strikes were indeed the product of purposeful discrimination. *Watkins*, 245 S.W.3d at 447 (citing *Purkett*, 514 U.S. at 768).

**748**

*Batson* is shown, it does not warrant setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment. *See id.*

### 2. Applicant Fails To Establish That Trial Counsel Were Deficient For Failing To Raise A *Batson* Challenge

The affidavits filed by Applicant's trial counsel soundly refute Applicant's allegations of deficient performance for failing to raise a *Batson* challenge. Counsel had reasons for not objecting to the State's exercise of peremptory challenges against Gonzales, Williams, and Dennis [Moore's affidavit at 27], and there were "obvious race neutral reasons for each of those strikes." [Cummings' affidavit at 10.]

Moore's affidavit carefully sets forth a number of strategic reasons that he would *not* have wanted Gonzales to be seated on Applicant's jury: (1) Gonzales was only twenty-two years old; (2) his father was in law enforcement, and he was personally considering a possible career in law enforcement; (3) he gave inconsistent answers about his ability to judge another person; (4) he seemingly placed responsibility for bringing mitigating evidence before the jury and the burden of persuading the jury of the importance of such mitigating evidence on the defense; and (5) he appeared to have a significant work problem if he were chosen to serve. [Moore's affidavit at 27.] Because Moore did not want Gonzales to be seated as a juror, he would not have wanted to object to the State's excusal of him; rather, he would have wanted to force the State to use a peremptory strike on

Gonzales, "as that is an important part of the 'art' of capital voir dire." [*Id.*]

Moore has no recollection of anything indicating a racial motivation for the State's peremptory strike of Gonzales, and Moore's review of the record of Gonzales' questioning while preparing his affidavit revealed nothing to suggest such a motivation. [*Id.*]

With regard to Williams, it was apparent to Moore why the State would not accept her as a juror – Williams was somewhat "soft" on the death penalty, and there was an uncertainty as to the position her church might ultimately take on the death penalty. [*Id.* at 28.] Moore and Cummings knew that the State would not accept Williams as a juror because, in Moore's experience, individuals such as Williams have a great problem in taking the ultimate responsibility of voting for death. [*Id.*] The defense's voir dire examination was focused simply upon not providing Williams with a reason to be disqualified so that the State would be compelled to expend a peremptory challenge to excuse her. [*Id.*] In preparing his affidavit, Moore found nothing in the record of the voir dire to suggest any racial motivation in the State's exercise of a peremptory strike against Williams. [*Id.*]

Moore points out that Dennis had issues which would concern both parties:

- From the State's perspective, Dennis did not know how the act of giving a death sentence would personally affect him afterward, he was unable to develop further how that might ultimately affect his decision-making, and he stated that the criminal justice system was "broken" due to recent DNA exonerations. [*Id.*]

181                                                                                                          **750**

- From the defense's perspective, Moore would have concerns about the manner in which Dennis emphasized the possible motive for the killings as being the only potential mitigating evidence that he could envision, and he never really appeared to expand his views of mitigating evidence much beyond that point. [*Id.*]

Moore saw no basis at the time to suggest a racial motivation for the State's exercise of a peremptory strike against Dennis, and he found nothing in his review of the record while preparing his affidavit that would suggest such a basis. [*Id.*]

Moore is cognizant of *Batson* and its progeny. [Moore's affidavit at 26.] He has made *Batson* challenges on several past occasions in both death-penalty and non-death-penalty cases. [*Id.*] He would have made a *Batson* challenge in Applicant's case if he believed that there was anything to suggest that the State's use of peremptory challenges in any of the three instances was in any way racially motivated. [*Id.* at 26, 29.] However, Moore did not believe then, and he sees nothing now to suggest, that the State exercised its peremptory strikes against Gonzales, Williams, or Dennis on racial grounds; therefore, he believes it would have been "unethical" to make such a challenge absent evidence suggesting some racial motivation for the exercise of the peremptory challenge. [*Id.*]

During the thirty years that Moore has known lead prosecutor Robert K. Gill, Moore has never known Gill to be racially biased or to act in a racially

**751**

motivated manner in any of the actions Gill has taken in court.[20]  [*Id.* at 28-29.]

Likewise, Moore had never seen prosecutor Miles Brissette act in a racially

motivated manner in any case that they previously had together. [*Id.* at 29.]

The failure of trial counsel to raise a *Batson* objection during voir dire did

not fall below an objective standard of reasonableness under prevailing

professional norms. Counsel made a reasonable and strategic decision not to raise

a claim for which they saw no basis. *See Ex parte Chandler*, 182 S.W.3d at 356

("reasonably competent counsel need not perform a useless or futile act"); *Mooney*,

817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile

motions") Applicant has failed to meet his burden to prove that his trial counsel

were deficient. Applicant's eleventh claim for relief should be denied.

### 3.   Applicant Fails To Demonstrate Prejudice Resulting From The Failure Of Trial Counsel To Raise A *Batson* Challenge

Even if Applicant could demonstrate that his trial counsel's failure to raise a

*Batson* claim was objectively unreasonable, he bears the further burden to show a

reasonable probability that the outcome of his trial would have been different had

trial counsel lodged a *Batson* objection. *See Batiste v. State*, 888 S.W.2d 9, 15-17

(Tex. Crim. App. 1994) (claim of ineffective assistance for failing to raise *Batson*

claim subject to *Strickland*'s prejudice prong).

---

[20] Moore supervised Gill as a prosecutor in the District Attorney's office, previously tried cases with Gill as a prosecutor and Moore as a defense lawyer, and tried cases before Gill when Gill served as a Tarrant County district judge. [Moore's affidavit at 28-29.]

Applicant makes no real attempt to establish *Strickland* prejudice. The closest he comes is making a conclusory statement that "[t]here is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left [Applicant] with a constitutionally-infirm jury; a malady that can only be remedied by a new trial." [Application at 145 (citations omitted).] The lead prosecutor at Applicant's trial, Robert K. Gill, has proffered an affidavit setting forth numerous facially race-neutral reasons for striking the three veniremembers at issue. [*See* Gill's affidavit, attached hereto as State's Exhibit 1.] Moreover, Applicant's bare assertion is insufficient to satisfy his burden to demonstrate a reasonable probability that the outcome of his trial would have been different had trial counsel raised a *Batson* challenge with regard to Gonzales, Dennis, or Williams.

Moreover, Applicant has not met his burden to show that a *Batson* challenge would have succeeded. Applicant makes no attempt to establish the *prima facie* case required by the first step of the *Batson* analysis. *Batson* requires Applicant to do more than show that minority veniremembers were peremptorily struck from the venire; Applicant must also raise an inference that the prosecutor excluded the veniremembers from the jury on account of their race. *See Batson*, 476 U.S. at 96. Simply alleging that two African-American veniremembers and one Hispanic

184

753

veniremember were impermissibly struck does not satisfy this threshold requirement. *See Hassan*, 369 S.W.3d at 875-78.

Even if Applicant could satisfy the *prima-facie*-case requirement, his allegation that he suffered prejudice because there existed a reasonable probability that the State could not offer race-neutral reasons for the strikes is wrong. Gill's affidavit sets forth the State's explanations for exercising peremptory challenges against Gonzales, Williams, and Dennis. [Gill's affidavit at 1-3.] The State's reasons are race-neutral on their face and, therefore, satisfy the second prong of the *Batson* inquiry. [*Id.*] *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (at second step of process, proponent of strike need only tender facially race-neutral explanation) (citing *Purkett*, 514 U.S. at 767-68).

The final step of the *Batson* analysis requires Applicant to meet his ultimate burden to show that the State's facially race-neutral reasons were a pretext for purposeful discrimination. *See Williams v. State*, 301 S.W.3d 675, 688 (Tex. Crim. App. 2009); *Whitsey*, 796 S.W.2d at 713. In this step, the "ultimate plausibility" of the State's explanation is considered. *Watkins*, 245 S.W.3d at 447. It is not enough merely to show that a proffered explanation turns out to be incorrect. *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002). A party's failure to offer any real rebuttal to a proffered race-neutral explanation can be fatal to his claim. *Id.*

185

**754**

Here, Applicant attempts to show intentional discrimination via a comparative juror analysis.[21]  [*See* Application at 142-45.]  However, his comparative analysis is premature and, therefore, unhelpful because it does not take into account the State's race-neutral explanations for exercising the peremptory strikes at issue.  [*See id.*]  A comparative analysis relates to the third prong of the *Batson* framework and must be conducted in light of the race-neutral explanations tendered by the State.  *See Purkett*, 514 U.S. at 768 ("It is not until the third step that the persuasiveness of the justification [for the peremptory strike] becomes relevant").  Applicant's comparative analysis, which is based upon a narrow view of the record and does not examine the State's race-neutral explanations for striking the veniremembers at issue, cannot even begin to demonstrate pretext or racial motivation behind the State's peremptory strikes at issue.  Applicant has failed to prove that the prosecutor's explanations were incorrect, much less that they were a pretext for discrimination.[22]  Moreover, the voir dire proceedings and jury questionnaires relating to Gonzales, Williams, and Dennis reveal support for each of the State's proffered reasons.

---

[21] Courts have recognized the utility of a comparative analysis to discern whether disparate treatment of veniremembers exists as part of the review of whether the government's explanation for exercising a peremptory strike is genuine. *See Miller-El v. Dretke*, 545 U.S. 231, 232 (2005); *Watkins*, 245 S.W.3d at 448-49.

[22] Even a successful showing of disparity via a comparative juror analysis does not necessarily result in a finding of purposeful discrimination as a comparative analysis is only one of numerous nonexclusive factors used to show intentional discrimination. *See Watkins*, 245 S.W.3d at 449.

186

Furthermore, Applicant's trial counsel did not want Gonzales to serve as a juror [Moore's affidavit at 27]; hence, Gonzales likely would not have been seated even if the State had not struck him. While the defense would have accepted Williams as a juror, there were obvious reasons for the State to strike her [*Id.* at 28]; therefore, a *Batson* challenge regarding Williams would not have succeeded. Finally, both sides had issues with Dennis as a potential juror [Moore's affidavit at 28.], and there has been no showing that the defense would not have exercised a peremptory challenge to remove Dennis had the State accepted him as a juror.

Even if the defense had accepted Dennis, there was always the chance that he would not have been a favorable juror for Applicant. [*See* Moore's affidavit at 28.] Applicant has not met his burden to demonstrate that a *Batson* challenge would have succeeded had it been raised. Moreover, Applicant has not met his burden to show a reasonable probability that the outcome of any stage of his proceedings would have been different had his trial counsel asserted a *Batson* claim during voir dire. There simply is no evidence to suggest either that the alleged deficient performance of trial counsel or the makeup of the seated jury had a prejudicial effect on Applicant's defense at any phase of his trial.[23] *See Batiste,* 888 S.W.2d at 14. Applicant's eleventh claim for relief should be denied.

---

[23] The seated jury consisted of eight white jurors, two African-American jurors, and two Hispanic jurors; both alternates were white. [Application at 140.]

## VI.   Reply to Claim Twelve

Applicant alleges that his death sentence should be vacated because the punishment-phase jury instruction restricted the evidence the jury could determine was mitigating.  [Application at 145.]  He argues that he was unable to have all mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence because the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to his "moral blameworthiness."  [*Id.* at 149-51.]

In accordance with section 2(e) and (f) of section 37.071 of the Texas Code of Criminal Procedure, the Court instructed the jury on Special Issue Two as follows regarding its consideration of mitigating evidence:

If the jury answers Issue Number 1 "yes", then you shall answer Issue Number 2, otherwise, do not answer Issue Number 2.

ISSUE NUMBER 2:  Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

You shall answer Issue Number 2 either "yes" or "no".  You are instructed that you may not answer Issue Number 2 "no" unless you agree unanimously.  You may not answer Issue Number 2 "Yes" unless ten or more jurors agree.  The members of the jury need not agree on what particular evidence supports an affirmative finding on Issue Number 2.  You shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

188

**757**

If the defendant is sentenced to confinement for life without parole, he is ineligible for release from the institutional division of the Texas Department of Criminal Justice on parole.

[CR 4: 727-28 (emphasis added).] TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f).

The punishment charge in this case followed the language of article 37.071 of the Texas Code of Criminal Procedure. [CR 4: 727-28.] TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). The Court of Criminal Appeals has previously rejected claims that the complained-of language in the mitigation special issue unconstitutionally narrows the definition of mitigating evidence to that which reduces the defendant's moral blameworthiness. *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007). The instruction at issue posed no barrier to the jury giving effect to any of Applicant's alleged mitigating evidence. *Id*. Applicant's twelfth claim for relief should be denied.

## VII.   Reply to Claim Thirteen

Applicant alleges that his death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty. [*See* Application at 151.] He asserts that geographical and racial disparities have rendered Texas' death-penalty scheme unconstitutional. [*See id.* at 151-60.]

The Texas death-penalty scheme satisfies constitutional requirements. *See Sonnier v. Quarterman*, 476 F.3d 349, 366 (5th Cir. 2007). The discretion afforded the State to seek the death penalty is not unconstitutional. *Ladd*, 3 S.W.3d at 574;

189

**758**

*see Gregg v. Georgia*, 428 U.S. 153, 199 (1976). Applicant's challenge to the constitutionality of Texas' death-penalty based on the geographic and racial reasons he asserts is without merit. *See Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004) (varying decision-making between counties regarding seeking death penalty does not violate right to equal protection); *Allen v. State*, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003) (rejecting disparate-application claim based on county's financial constraints or ability to seek death penalty); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App. 1999) (rejecting claim based on statistical studies that Texas death sentences are disproportionately imposed in racially discriminatory manner).

Applicant wholly fails to demonstrate that he was singled out for selective prosecution or that the death-penalty statute was applied against him in an unconstitutionally arbitrary or capricious manner. [Application at 151-60.] The materials cited and relied on by Applicant do not establish his claim. *See Brooks*, 990 S.W.2d at 298 (citing *McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987)). Applicant's thirteenth claim for relief should be denied.

## VIII. Reply to Claim Fourteen

Applicant asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. [*See* Application at 160.] He argues that the "10-12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), and that the effect of the "10-12 rule" creates "an impermissible outside influence on jury deliberations" by improperly coercing juries into death sentences. [Application at 162-67.]

Article 37.071, section 2(a)(1) of the Texas Code of Criminal Procedure provides that the trial court, the State, the defendant, and the defendant's attorney may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on the mitigation special issue. TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1). The Court of Criminal Appeals of Texas has repeatedly held that there is no constitutional violation in failing to inform jurors of the effect of their failure to agree on special issues. *E.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Threadgill*, 146 S.W.3d at 673; *Prystash v. State*, 3 S.W.3d 522,

191

**760**

532 (Tex. Crim. App. 1999). Applicant presents no a valid basis to reconsider the

issue. Applicant's fourteenth claim for relief should be denied.

## IX.   Reply to Claim Fifteen

Applicant asserts that he is ineligible for a death sentence because "his

mental impairments rendered him functionally and developmentally below the

requisite level that is subject to execution." [Application at 167.]

Applicant relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that

the Eighth Amendment's ban on excessive and cruel and unusual punishment

prohibited the execution of mentally retarded individuals. [Application at 167.]

The prohibition in *Atkins* on execution of the mentally retarded is based on a

national consensus developed in state legislatures that death is an excessive

punishment for those who are mentally retarded. *See Atkins*, 536 U.S. at 311-16.

The Supreme Court was clear that the national consensus creating the prohibition

applied only to those individuals determined to be mentally retarded under state

law, the definition of which was not uniform but within a fairly well-accepted set

of parameters. *Id.* at 317, 318 n.3. The *Atkins* Court expressly limited its holding

to the mentally retarded, as reflected in the Court's statement that individuals who

are not mentally retarded "are unprotected by the exemption and will continue to

face the threat of execution." *Id.* at 320.

**761**

The Court of Criminal Appeals has rejected an argument that the rule or rationale of *Atkins* extends to exempt persons with mental illness from imposition of the death penalty. *Mays v. State,* 318 S.W.3d 368, 379 (Tex. Crim. App. 2010). Other courts addressing the issue have refused to extend the *Atkins* ruling to those with mental illnesses or disorders. *See, e.g., Franklin v. Bradshaw,* 695 F.3d 439, 455 (6th Cir. 2012); *In re Neville,* 440 F.3d 220, 221 (5th Cir. 2006); *People v. Castaneda,* 51 Cal.4th 1292, 1345, 127 Cal.Rptr.3d 200, 249, 254 P.3d 249, 290 (2011); *Simmons v. State,* 105 So.3d 475, 511 (Fla. 2012); *Lewis v. State,* 279 Ga. 756, 764, 620 S.E.2d 778, 786 (2005); *State v. Dunlap,* 2013 WL 4539806 (Idaho August 27, 2013); *Matheney v. State,* 833 N.W.2d 454, 458 (Ind. 2005); *Dunlap v. Commonwealth,* 2013 WL 3121689 at *65 (Ky. June 20, 2013); *State v. Johnson,* 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock,* 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-60 (2006); *Malone v. State,* 293 P.3d 198, 216 (Okla. Crim. App. 2013).

Dr. McGarrahan, the defense's licensed and experienced forensic psychologist and neuropsychologist, tested Applicant for PTSD and found that he suffered from significant attachment issues and displayed some symptoms of PTSD; however, she did not believe sufficient evidence existed to diagnose Applicant with PTSD. [Moore's affidavit at 20-21; Cummings affidavit at 8.] Had Applicant been diagnosed pretrial as suffering from complex PTSD, such evidence

**762**

could have been presented for the jury's consideration as a mitigating circumstance, thus providing the individual determination that the Eighth Amendment requires in capital cases. However, Applicant presents no persuasive argument that *Atkins* should be extended to require a blanket exemption from the death penalty for persons suffering from complex PTSD. There is no objective evidence that society views as inappropriate the execution of death-eligible individuals who have complex PTSD. Applicant fails to demonstrate a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders. *See Mays*, 318 S.W.3d at 379.

Applicant's claim for relief is not based on mental retardation, and *Atkins* is inapplicable. Moreover, Applicant points to no national consensus for the prohibition he seeks, and there is no constitutional prohibition to prevent Applicant's execution. Applicant's fifteenth claim for relief should be denied.

WHEREFORE, PREMISES CONSIDERED, the State prays that each of Applicant's claims for relief be denied.

194

**763**

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Division

*HELENA F. FAULKNER* (signature)

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

True copies of the State's Reply to Application for Writ of Habeas Corpus were mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on December 2, 2013.

# STATE'S EXHIBIT 1

# (Affidavit of Robert K. Gill)

STATE'S EXHIBIT 1

(Affidavit of Robert K. Gill)

**765**

STATE'S EXHIBIT 1

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432nd JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## AFFIDAVIT OF ROBERT K. GILL

"My name is Robert Keith Gill. I am an assistant criminal district attorney in Tarrant County, Texas. I have been so employed for a little over five years. I was the lead prosecutor on cause number 1184294, *The State of Texas v. John William Humme*l, which is the subject of the instant writ application.

Prior to being employed with the Tarrant County DA's office five years ago, I served over fourteen years as a state district judge hearing felony criminal cases. During my time on the bench I presided over numerous death penalty trials. Before taking the bench in January of 1993, I served over eleven years as an assistant criminal district attorney in Tarrant County. I have prosecuted many criminal cases, including many death penalty cases, both before and after serving on the bench. I am board certified in criminal law by the Texas Board of Legal Specialization and have been continuously board certified since 1988. I am a frequent speaker at continuing legal education courses around the state of Texas on criminal law issues. I am the author of two substantive legal publications dealing with criminal law matters: *The Texas Criminal Lawyers Handbook* and *Texas Criminal Forms* (both James Publishing).

I am familiar with the *Batson* case and its progeny, and with article 35.261 of the Texas Code of Criminal Procedure. I know that the law prohibits a prosecutor from exercising a peremptory challenge on a racial basis. It is not my practice, nor is it the practice of the Tarrant County DA's office, to exercise peremptory challenges on a racial basis. I did not exercise any peremptory challenge on a racial basis in the Hummel case.

In the writ application in the instant case, Applicant alleges that his defense team was ineffective for failing to raise a *Batson* claim at the time of trial with regard to the State's peremptory challenges against three veniremembers. The defense team was not ineffective for failing to raise this claim at trial because the State did not exercise its peremptory challenges against any of these three veniremembers on a racial basis. Each peremptory challenge was made on a strictly non-racial basis; and, in fact, there were

1

STATE'S EXHIBIT 76
1
PENGAD-Bayonne, N.J.

numerous race-neutral reasons for the peremptory challenge used against each of the three individuals.

The race-neutral reasons for the peremptory challenges at issue are as follows:

Veniremember Gonzales #15—The State of Texas exercised a peremptory challenge against this venireman for the following reasons: he was late to court for his individual voir dire appointment; he was only twenty-two years old; he lived with his mother; he was single with no children; he expressed difficulty judging another person; he believed that life without parole was a punishment preferable to the death penalty; he believed that the death penalty should be used less frequently; he had a conflict with jury duty because it would cause him to miss work and he would be worried about his job since he had just recently started the job; he testified that jury duty would be a financial hardship on him; and he testified that he was expecting to take a vacation in June, which was when the trial on the merits was scheduled. Generally I do not want to accept veniremen who have reasons important to them that they cannot serve on a jury. I want people on the jury who do not mind serving and doing their civic duty. On the basis of his jury questionnaire, I had rated Gonzales a weak State's juror before I heard his individual voir dire. After having heard the individual voir dire, my opinion remained the same, and the State exercised a peremptory strike against him.

Veniremember Williams #83— The State of Texas exercised a peremptory challenge against this veniremember for the following reasons: she had a cousin who had been in trouble with the law; she wanted the State to meet its burden on special issue number one by an absolute certainty; she wanted absolute proof that the defendant committed the crime; she had trouble with the concepts contained within the special issues; she found her job as a teacher's assistant to be very stressful; she took blood pressure medication; she liked to watch crime shows on television; she agreed with the statement that life without parole was appropriate in all cases of capital murder; and she did not want to be a juror. Ultimately, it was my opinion that she would have a very difficult time being part of a jury that assessed the death penalty due to her religious views and her elevated burden of proof.

Veniremember Dennis #132— The State of Texas exercised a peremptory challenge against this veniremember for the following reasons: he was a postal clerk by profession; he had a family member who had undergone treatment, counseling, or hospitalization related to molestation; someone in his family had been through a bankruptcy; he had a relative who had been to prison; he had previously served as a juror in a murder case

2

**767**

where the jury returned a not guilty verdict; he said that he had been previously harassed by police; he had worked previously as a security guard (the same profession as the defendant); he felt that the justice system was broken and was terrible at dealing with crime; and he was not sure how he would feel about giving someone the death penalty and how it would affect him after the verdict.

Further Affiant sayeth not.


_____

ROBERT K. GILL
Assistant Criminal District Attorney
Tarrant County, Texas


Subscribed and sworn to before me on this the  5TH  day of November, 2013.


TRISH STEGALL
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 12-03-2015

_____

Notary Public for The State of Texas
My commission expires:  12/3/15

3

**768**

FILED
THOMAS A. WILDER, DIST. CLK.
TARRANT COUNTY, TEXAS

OCT 11 2013

TIME: 1:52

BY_____ SR _____ DEPUTY

CAUSE NO. C-432-009923-1184294-A

| | |
|---|---|
| EX PARTE | IN THE 432ND DISTRICT COURT |
| | OF |
| JOHN WILLIAM HUMMEL | TARRANT COUNTY, TEXAS |

## *AFFIDAVIT*

BEFORE ME, the undersigned authority on this day personally appeared the person known to me to be the Affiant, who, after being duly sworn by me, under oath stated:

"My name is Fred Cummings. I have been licensed by the State of Texas as an attorney and counselor at law since May 9, 1986. I have been Board Certified in Criminal Law by the Texas Board of Legal Specialization since December 1993 and I have been Board Certified in Criminal Trial Advocacy by the National Board of Trial Advocacy since October 16, 1996. I have been in private practice as a criminal defense lawyer since June of 2001. I have been approved for appointment to death penalty cases since 2002. I have been trial counsel in three cases in which the death penalty was assessed. I have represented more than twenty-five other capital murder defendants where a death sentence was not assessed. I have attended more than 230 hours of legal seminars specific to death penalty litigation since 2002. I am familiar with the Guidelines and Standards for Texas Capital Counsel regarding my duties as trial counsel after conviction; the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases; and the Disciplinary Rules of Professional Conduct of the State Bar of Texas. I am providing this affidavit by order of Judge Gonzalez in response to allegations in an application for a writ of habeas corpus that I provided ineffective assistance of counsel to John Hummel. I have reviewed the Initial Application for Writ of Habeas Corpus and I will address the allegations against me and Larry Moore in Claim Two, Claim Three, Claim Four, Claim Five, Claim Six, Claim Seven, Claim Eight, Claim Nine, and Claim Eleven in this affidavit."

"I was appointed to represent John William Hummel, by Judge Ruben Gonzalez on December 23, 2009. I discussed the case with Larry M. Moore and asked him to be co-counsel. He agreed to do so. We discussed and agreed upon a private investigator

and mitigation specialist to add to our defense team as well. I met Mr. Hummel in the holdover of the 432nd District Court of Tarrant County, Texas, on December 31, 2009. He had just arrived at the Tarrant County Jail after being transported from San Diego, California. Judge Gonzalez conducted an Article 15.17 hearing and granted a motion for the appointment of co-counsel, a motion for the appointment of a defense investigator, and a motion for the appointment of a mitigation specialist. Jury selection commenced on April 28, 2011 and continued until June 2, 2011. The jury trial began on June 13, 2011. The jury found the client guilty of capital murder on June 22, 2011 and the punishment phase of the trial began that same day. On June 28, 2011, the jury returned their verdict on the special issues and Mr. Hummel was sentenced to die by lethal injection as a result. During my representation of John Hummel I made eleven non-evidentiary appearances in court on his behalf, participated in thirty-eight (38) days of evidentiary hearings, jury selection, or jury trial, and expended over 595 hours in the investigation of his case and in the preparation of his defense. I believe Mr. Moore expended even more out-of-court time in the representation of John Hummel. On July 6, 2011, I spoke with Mr. Brad Levenson, the Director of the Office of Capital Writs, and pledged my cooperation with his office once he had a release from Mr. Hummel. Once we had that release, Mr. Moore and I released our case files to the Office of Capital Writs for their use in the representation of Mr. Hummel. I released my entire file including my work product. I have discussed the trial team's defense of Mr. Hummel with the lawyers from the Office of Capital Writs on two or three occasions and I have been candid about some of the difficulties we encountered in his defense, particularly with the family members of the Applicant."

## APPLICANT'S CLAIM TWO:
## HUMMEL'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO ARGUE THAT THE STATE'S EVIDENCE WAS INSUFFICIENT TO SHOW FUTURE DANGER

"This claim is not supported by the trial record as it pertains to the arguments made to the jury by Applicant's trial counsel. Larry Moore and I divided the 30 minutes allotted to us for final argument in the punishment phase of Applicant's jury trial. Mr. Moore went first and devoted the majority of his time arguing there was insufficient evidence to answer yes to the first special issue. (Reporter's Record V45,

65-73)  I closed the defense final argument and spent the vast majority of my time arguing the evidence was insufficient as to the first special issue.  (RR45, 73-84)"

"It is true that we did not move for a directed verdict based upon the legal insufficiency of the state's evidence as to Special Issue Number One.  This was not a "failure" on our part.  It is not necessary for trial counsel to make such a motion to preserve that appellate issue.  I am confident that Judge Gonzalez would not have granted such a motion."

**APPLICANT'S CLAIM THREE:**
**TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT**
**HUMMEL WAS NOT A FUTURE DANGER**

"The allegation that Mr. Moore and I failed to present available affirmative evidence that would have rebutted the State's assertion that Mr. Hummel was a "future danger."  This allegation is untrue for the following reasons:"

"I interviewed Applicant on several occasions in an effort to identify potential witnesses for his defense.  On at least two occasions, I asked Mr. Hummel if there were any jailers that he thought would testify on his behalf.  On each occasion Applicant said he did not know of any.  Brendan Ross, our mitigation specialist, met with Applicant and conducted in depth interviews of Mr. Hummel to gather as much information about him as she could.  Our defense investigator, Bobby Walton, interviewed Applicant on several occasions.  Mr. Hummel did not inform any of us of any deputies who indicated a willingness to testify for him.  I spent many hours with Mr. Hummel.  I visited him in jail on at least seven different occasions to interview him as well as counsel him prior to trial.  Each day that we had court, and there were approximately 40 such days, I met with Applicant before court to insure he had fresh civilian clothes to wear that day.  I spent time with him on each of those days discussing his case and answering his questions.  I built a rapport with Mr. Hummel and he was comfortable talking to me.  He never suggested that there were any jailers who were willing to testify for him.  Mr. Moore and I met with Brendan Ross and Bobby Walton regarding our defense of John Hummel to compare notes on several occasions.  None of us had any indication there were jailers who were willing to testify on Mr. Hummel's behalf."

"The defense expert witness, Frank Aubuchon, testified that John Hummel had no disciplinary issues whatsoever in the Tarrant County Jail because he reviewed

**Affidavit in Response to Writ Application for John Hummel – Page 3**

**271**

Applicant's jail records. (RR40, 70) Obviously we provided Mr. Aubuchon those records so that he could use them in his evaluation and then give the jury that information as a basis for that evaluation. We did not offer the actual jail records because they contain a lot of extraneous information that could possibly influence a juror against the client such as the amount of money on his books and how he spent it, who visited him in jail, his communications to and from jail personnel, and the fact that he was given the security designation of "High Custody" throughout most of his incarceration in the Tarrant County Jail. What the jail records do not contain is an affirmative statement that Applicant was a model prisoner or that he had not been disciplined. Applicant suggests we should have offered them to prove a statement of fact that is not contained within the documents and I believe that is unreasonable."

"Within Applicant's jail records is a Primary Inmate Classification Security Level Assessment dated December 31, 2009. This form reflects that the original classification recommended for Mr. Hummel was Level 3 – Medium and that this recommendation was overridden by Chief Alan Dennis who ordered Applicant's classification to be SPC1 – High Custody. High Custody is labeled as Level 2 – Maximum on the form. The primary reason given was the high profile nature of Applicant's case but the boxes next to suicidal, MHMR, and Protective Custody were also marked. When I visited Applicant in the jail for the first time on January 6, 2010 he was wearing handcuffs, leg irons, and a green smock. In my experience the jail dresses an inmate in a green smock if there is some concern about suicide. Applicant admitted that he had made a statement that could be interpreted as suicidal. On January 13, 2010, Mr. Hummel was handcuffed and shackled during my visit with him but I do not have any notes about his clothing. Subsequent to this visit, I do not believe Mr. Hummel was handcuffed and shackled during any of our visits again. With the exception of the first visit, I believe that Mr. Hummel was always dressed in a green jail jumpsuit when I saw him. However, he was still in a "rotation" unit when I visited him on October 12, 2010. In a rotation unit, the inmates are locked individually in cells and typically released for exercise one hour each day. There are Classification Records in the jail records obtained by our mitigation specialist for a period of time from 12/31/09 to 03/29/10 and from 09/29/10 to 04/26/11. During those two periods of time Applicant was evaluated for classification purposes 36 times with no change reflected in his classification: maximum. However, each classification entry also indicated that Mr.

Hummel was non-assaultive and that his classification was due to the high profile nature of his case and that it was a form of protective custody since he was labeled as a "child offender". (See attached relevant excerpts from jail records) These records support my belief that Chief Alan Dennis had an extraordinary interest in Applicant's case. During the break in the trial after the guilty verdict and before the punishment phase began, an individual in casual business clothes walked past the railing on the opposite side of the courtroom and said "We've got the first part done. Now let's finish it." The man then proceeded back into the secured hallway unchallenged by the bailiffs. When I asked one of the bailiffs he told me he was Chief Dennis. I have never seen an administrator for the Tarrant County Sheriff's Office take such an interest in one of my cases. To be clear, I am not suggesting anything improper on the part of Chief Dennis. Arguably he was protecting Applicant from being hurt by another inmate in general population. But his interest, if known, would have a chilling effect on any correction officers contacting us on Applicant's behalf. Providing an affidavit to an investigator is vastly different from testifying in a death penalty jury trial. Detention Officer Rigmaiden, Detention Officer Bell, nor Detention Officer Thomas contacted me or anyone else representing Applicant even though I was listed on their computer system as Applicant's lawyer. Applicant did not give us their names even when I had asked him, on more than one occasion, if there were any possible witnesses among his guards. I would have used them if I had been aware of them. I am confident that John was a model inmate as far as compliance with his guards was concerned but the jail records do not support the statement by Applicant that he was not classified as "High Risk." Just the opposite is true."

"John Hummel did not have any criminal history at the time of his arrest. We did not offer criminal background records because there were none to offer, however, the jury was informed of John Hummel's lack of criminal history through the testimony of our expert witness, Frank Aubuchon. (RR44, 70) The jury learned through the testimony of Frank Aubuchon that Applicant was honorably discharged after serving as a Marine as well. (RR44, 70)

"Mr. Moore and I made a conscious and informed decision to not offer expert testimony regarding Special Issue Number One because that would open the door to an evaluation by the state's expert, Dr. J. Randall Price, Ph.D. We arrived at that decision

after conferring with Dr. Antoinette McGarrahan, Ph.D. who believed that Applicant would not score well on a formal violence risk assessment evaluation. We believe that Dr. Price would have negated any benefit from such expert testimony."

## APPLICANT'S CLAIM FOUR:
## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT EXPERT TESTIMONY REGARDING HUMMEL'S LIFE HISTORY

"I have attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death penalty litigation and half of those were specific to identifying and presenting mitigation evidence. The first day I appeared in court on behalf of Applicant I got Judge Gonzalez to appoint Brendan Ross, a qualified and experienced mitigation specialist in addition to Mr. Moore and Bobby Walton, a defense investigator. We met as a team shortly thereafter and began gathering mitigation evidence and identifying potential mitigation witnesses. Mr. Walton conducted his duties as defense investigator, but in this case those duties included assisting Ms. Ross with potential mitigation witnesses as well. We all worked on putting together the best mitigation case we could. It is always difficult to get family members to speak about the skeletons in the family closet but in this case we had potential witnesses hide from us, threaten to have us arrested for trespassing or harassment, deny us access to critical potential witnesses, and assure us they were going to do everything to see the client get the death penalty. We identified and interviewed every potential witness that we could. We used all of the witnesses who could provide admissible relevant mitigation evidence about Applicant and we even compelled some who were uncooperative. Applicant claims that we were ineffective for not using a Social Worker to explain Applicant's life history. The example provided is a more complete life history but it is based upon additional information from a number of witnesses who were not available to us at trial. The Office of Capital Writs had our full cooperation and assistance. We took their calls and answered their questions. They had the benefit of our investigation to build upon. They had two years to locate additional witnesses that we had not. We used the lay witnesses that we were able to identify to provide as complete a story as we could and used a forensic psychologist to assist us with explaining it to the jury. I do not believe we were ineffective for presenting our defense in this way."

## APPLICANT'S CLAIM FIVE:
## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT RELEVANT LAY WITNESSES

"Applicant claims that we were ineffective for failing to present relevant lay witnesses as a result of an investigation that was narrowly focused on suspicions that Applicant was sexually abused thereby failing to develop other avenues of mitigation evidence. This claim is false. The witnesses that we sponsored in the punishment phase of Applicant's jury trial were all we had after a lengthy investigation into anyone that we could locate that had ever been associated with Applicant."

"I had Brendan Ross, an experienced licensed social worker and mitigation specialist appointed to assist us in our investigation into the life of John Hummel at my first appearance as Applicant's lawyer. Ms. Ross gathered relevant social records from various sources and interviewed Applicant to start that investigation. From that beginning, Ms. Ross and our defense investigator, Bobby Walton, began trying to locate people associated with Applicant and once located, to interview them regarding anything they knew about Applicant including identifying other potential witnesses. We investigated current friends and associates, family members, present and former church members, school classmates, and former friends. We explored various themes as they came to light. We considered Applicant's participation in role-playing games, his use of marihuana, alcohol and other drugs, the possibility that he suffered from being raised in poverty, the possibility that he had a mental disorder or illness, the possibility that he had observed sexual or physical abuse in his household, and the possibility that he had been abused or neglected as a child. We were alert for the existence of these issues but we did select our witnesses on the basis of any one issue. Some of the people identified could not be located. Some who were located would not cooperate with us. Applicant's sister would not meet with us or appear at trial until she was ordered to appear by a district judge. Applicant's aunt threated our investigator with arrest for trespass when she went to the home to interview Applicant's mother. (We were finally able to interview her at our office on a later date) Applicant's aunt and cousin were very open in their belief that Applicant should get the death penalty. Some of the witnesses interviewed could not remember anything relevant but gave us leads to others who did. We conducted our investigation in Texas, California, and

South Carolina.  Those who could provide relevant and helpful testimony were subpoenaed to appear."

"Applicant was not very helpful to our efforts.  He did not provide the names of anyone who served with him in the Marines.  If he had given us even one of their names we could have more than likely located the others and developed testimony about his military service years.  Applicant denied witnessing or experiencing any abuse growing up and reported a normal childhood.  Applicant reported his Dungeons and Dragons role playing games as harmless games that he played on paper occasionally.  The Office of Capital Writs located one witness who reported in great detail playing with Applicant as a young man.  We had not located that witness and did not have that information."

"We presented our evidence in the punishment phase with the witnesses we had available to us.  We were not just obtaining affidavits from people who in some cases did not even sign those affidavits.  The issues presented at punishment were dictated by the available witnesses, not the other way around."

## APPLICANT'S CLAIM SIX:
## TRIAL COUNSEL ERRED BY FAILING TO PRESENT HUMMEL'S MILITARY SERVICE AS MITIGATION EVIDENCE

"The jury was informed of Applicant's military service through the testimony of Frank Aubuchon.  (RR44, 70).  As indicated above, we did not have the names of any other Marines that we could sponsor on this topic.  Applicant wisely chose not to testify.  When the state put on two military witnesses as rebuttal witnesses, we used cross examination to emphasize the positive aspects of Applicant's military service.  Applicant's military records are unremarkable and would not have been any more persuasive with the jury regarding this issue."

## APPLICANT'S CLAIM SEVEN:
## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT HUMMEL SUFFERED FROM COMPLEX POST-TRAUMATIC STRESS DISORDER RESULTING FROM ATTACHMENT TRAUMA

"Dr. Antoinette McGarrahan, Ph.D., an experienced licensed forensic neuropsychologist, evaluated Applicant for Post-Traumatic Stress Disorder and

determined that he was not symptomatic prior to the deaths of his wife and child and father-in-law. We relied on that expert opinion and believe there is no such evidence."

## APPLICANT'S CLAIM EIGHT:
### HUMMEL'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE STATE IMPERMISSIBLY INJECTED INFLAMMATORY AND PREJUDICIAL EVIDENCE INTO BOTH PHASES OF THE TRIAL; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE

"Applicant claims that the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial, over our objections, that we were ineffective. Applicant admits that much of the evidence was allowed in the trial court over trial counsel's objections. The inflammatory and prejudicial evidence was ruled to be contextual by the trial court and therefore admissible. Applicant was indicted for three separate Capital Murders for his alleged conduct on the 17th of December 2009. Applicant's jury trial arose from an indictment that alleged that Applicant knowingly caused the death of his father-in-law, by striking him with a bat, and knowingly caused the death of his wife by stabbing her with a knife or sword during the same criminal transaction. One of the other pending indictments alleges that Applicant caused the death of his daughter, a child under the age of six, by striking her with a bat. By proceeding to trial on the chosen indictment potential jurors could not be fully questioned about the impact a child victim would have upon them. However, the State opened their case with that extraneous murder victim and emphasized it throughout the trial. Mr. Moore and I objected frequently but the court ruled that it was contextual conduct and overruled our objections. We were not ineffective."

## APPLICANT'S CLAIM NINE:
### TRIAL COUNSEL FAILED TO EFFECTIVELY PRESENT EVIDENCE THAT HUMMEL'S CONFESSION SHOULD BE SUPPRESSED

"Mr. Moore and I moved to suppress the video recorded statement of Applicant and litigated the issue in a contested pretrial hearing that lasted from January 18, 2011 through January 21, 2011. (RR6, RR7, RR8, and RR9) Applicant complains that we were ineffective because we did not offer transcripts of recordings of telephone calls between officers of the Customs and Border Protection Service and the Kennedale Police Department during the contested suppression hearing in which we argued the

Border Patrol illegally detained Applicant, and in so doing, tainted any subsequent statements by Applicant.  The very existence of those recordings became known to us during those hearings.  We were given copies and used them during cross-examination of the relevant witnesses so that the trial court was aware of the communications."

### APPLICANT'S CLAIM ELEVEN:
### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S DISCRIMINATORY USE OF PEREMPTORY STRIKES TO REMOVE MINORITY VENIRE MEMBERS IN VIOLATION OF HUMMEL'S CONSTITUTIONAL RIGHTS

"Applicant claims I was ineffective for failing to object to the use of peremptory strikes on Juror #15, Juror #83, and Juror #132.  I was present in court during the individual voir dire of each of these potential jurors.  I did not raise a Batson challenge to the State's use of their peremptory strike in each case because of obvious race neutral reasons for each of those strikes."

"I have responded to these claims to the best of my ability within the constraints of my ethical responsibility to my client.  I will supplement these responses if ordered by the court.

Fred Cummings, *Affiant*

*SUBSCRIBED* and *SWORN* to before me Aundrea Conca, on this the 11th day of October 2013.

Aundrea Conca, Notary Public

AUNDREA KRISTINA CONCA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                          05 13 11 1113
HUMMEL,JOHN WILLIAM               RACE W E   SEX M AGE 35 DOB 11 04 75

CELL:  26 G 01  OFFICER:  CSC  REASON:  010  DATE:  04 26 11 0849
REMARKS:  RE 2MAX/SUSPENSE DATE REVIEW/
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER

CELL:  26 G 01  OFFICER:  MED  REASON:  010  DATE:  03 28 11 0527
REMARKS:  SUSPENSE DATE REVIEW/RMN@2MAX
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER

CELL:  26 G 01  OFFICER:  LJS  REASON:  010  DATE:  02 26 11 2038
REMARKS:  2MAX/SUSPENSE DATE REVIEW
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU         P424SH70
```

Date: 5/13/2011 Time: 11:13:20 AM                              **779**

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                           05 13 11 1113
HUMMEL,JOHN WILLIAM              RACE W E    SEX M AGE 35 DOB 11 04 75

CELL:  26 G 01  OFFICER:  TLS  REASON:  010  DATE:  02 05 11 0257
REMARKS:  KS 0710685
OVER 25            FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION   HIGH PROFILE      CHILD OFFENDER

CELL:  26 G 01  OFFICER:  JWL  REASON:  010  DATE:  02 03 11 1313
REMARKS:  MASS MOVE FROM 25 TO 26
OVER 25            FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION   HIGH PROFILE      CHILD OFFENDER

CELL:  25 G 01  OFFICER:  LJS  REASON:  010  DATE:  01 30 11 1559
REMARKS:  2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25            FELONY            UNSENTENCED        NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER    SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION   HIGH PROFILE      CHILD OFFENDER


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU       P424SH70
```

Date: 5/13/2011 Time: 11:13:25 AM                                **780**

```
INMATE 0763423 CLASSIFICATION                              05 13 11 1113
HUMMEL,JOHN WILLIAM                      RACE W E  SEX M AGE 35 DOB 11 04 75

CELL:  25 G 01  OFFICER:  SWC  REASON:  002  DATE:  01 03 11 1355
REMARKS:  2MAX/MASS MOVE/25G/CAPT. GRAVITT
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER

CELL:  26 G 01  OFFICER:  TMT  REASON:  010  DATE:  01 03 11 0515
REMARKS:  RHS TO 26G 01/CELL CLOSURE/SGT.NEAVES
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER

CELL:  25 G 01  OFFICER:  LJS  REASON:  010  DATE:  12 31 10 1552
REMARKS:  2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

Page: 1 Document Name: untitled

INMATE 0763423 CLASSIFICATION                                05 13 11 1113
HUMMEL,JOHN WILLIAM                    RACE W E   SEX M AGE 35 DOB 11 04 75

CELL:  25 G 01  OFFICER:  CSC  REASON:  010  DATE:  12 15 10 0731
REMARKS:  PLACED IN HOLDING
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER

CELL:  02 B 01  OFFICER:  CSC  REASON:  010  DATE:  12 15 10 0730
REMARKS:  PLACED IN HOLDING
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     HIGH PROFILE        CHILD OFFENDER

CELL:  25 G 01  OFFICER:  DRD  REASON:  010  DATE:  12 04 10 1707
REMARKS:  2.MAX SUSPENSE DATE REVIEW/NO CHANGES
OVER 25              FELONY              UNSENTENCED         NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION     CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70


Date: 5/13/2011 Time: 11:13:33 AM                                    **782**

```
INMATE 0763423 CLASSIFICATION                                    05 13 11 1113
HUMMEL,JOHN WILLIAM                      RACE W E   SEX M AGE 35 DOB 11 04 75


CELL:  25 G 01  OFFICER:  CSC  REASON:  010  DATE:  12 03 10 0920
REMARKS:  RE 2MAX/MAKE SAPCE/
OVER 25              FELONY             UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER      SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION    CHILD OFFENDER


CELL:  55 B 22  OFFICER:  LMS  REASON:  014  DATE:  12 02 10 1900
REMARKS:  REAMIN HI PROFILE
OVER 25              FELONY             UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER      NON-SMOKER         PROTECTIVE CUSTODY
MHMR OBSERVATION    CHILD OFFENDER


CELL:  55 B 22  OFFICER:  LMS  REASON:  010  DATE:  12 02 10 1859
REMARKS:  MASS MOVE/FLOOR CLSED/CPT LEGGETT
OVER 25              FELONY             UNSENTENCED        NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER      NON-SMOKER         PROTECTIVE CUSTODY
MHMR OBSERVATION    CHILD OFFENDER



PF = 1 CELL MENU   2 INMATE MENU   3 MISC MENU    10 MAIN MENU        P424SH70
```

INMATE 0763423 CLASSIFICATION                                    05 13 11 1113
HUMMEL,JOHN WILLIAM                     RACE W E   SEX M AGE 35 DOB 11 04 75

CELL:  26 L 02  OFFICER:  CMB  REASON:  010  DATE:  11 02 10 1330
REMARKS:  2MAX/SUSPENSE DATE REVIEW/NO MOVE
OVER 25               FELONY             UNSENTENCED         NON ASSAULTIVE
MAXIMUM               FIRST OFFENDER     SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION      CHILD OFFENDER

CELL:  26 L 02  OFFICER:  PWM  REASON:  010  DATE:  10 07 10 0157
REMARKS:  NEED CELL/2 MAX
OVER 25               FELONY             UNSENTENCED         NON ASSAULTIVE
MAXIMUM               FIRST OFFENDER     SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION      CHILD OFFENDER

CELL:  26 H 02  OFFICER:  CSC  REASON:  010  DATE:  09 29 10 1405
REMARKS:  RE 2MAX/MAKE SPACE/
OVER 25               FELONY             UNSENTENCED         NON ASSAULTIVE
MAXIMUM               FIRST OFFENDER     SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION      CHILD OFFENDER


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70

Date: 5/13/2011 Time: 11:13:45 AM                                    **784**

```
INMATE 0763423 CLASSIFICATION                        04 14 10 1213
HUMMEL,JOHN WILLIAM                RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  26 P 03  OFFICER: DRD  REASON:  010  DATE:  03 29 10 2216
REMARKS:  2.MAX SUSPENSE DATE REVIEW NO CHANGES
OVER 25           FELONY           UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER   SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  26 P 03  OFFICER: RGB  REASON:  002  DATE:  03 09 10 1822
REMARKS:  MASS MOVE/SGT DUNHAM
OVER 25           FELONY           UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER   SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  25 O 03  OFFICER: DBB  REASON:  010  DATE:  03 05 10 1347
REMARKS:  NEED CELL FOR ANOTHER/2MAX
OVER 25           FELONY           UNSENTENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER   SMOKER             PROTECTIVE CUSTODY
MHMR OBSERVATION


PF = 1 CELL MENU  2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

Page: 1 Document Name: untitled

```
INMATE 0763423 CLASSIFICATION                                04 14 10 1213
HUMMEL,JOHN WILLIAM               RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  25 N 01  OFFICER:  PRH  REASON:  010  DATE:  03 02 10 0809
REMARKS:  2MAX/CELL SWAP/NEED SPC SPACE
OVER 25             FELONY             UNSENTENCED         NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER     SMOKER              PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  55 A 01  OFFICER:  MED  REASON:  010  DATE:  02 26 10 0336
REMARKS:  NEED SPACE FOR ANOTHER/REHSE/RMN@2MAX
OVER 25             FELONY             UNSENTENCED         NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER     NON-SMOKER          PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  25 N 01  OFFICER:  RTF  REASON:  002  DATE:  02 04 10 1320
REMARKS:  REMOVE SPC PER CPT. PILINGTON/RMN 2MAX
OVER 25             FELONY             UNSENTENCED         NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER     NON-SMOKER          PROTECTIVE CUSTODY
MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU          P424SH70
```

```
INMATE 0763423 CLASSIFICATION                              04 14 10 1213
HUMMEL,JOHN WILLIAM                 RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  02 B 01  OFFICER:  RTF  REASON:  002  DATE:  02 04 10 1317
REMARKS:  HOLDING TO RECLASS CELL
OVER 25              FELONY               UNSENTENCED         NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER          PROTECTIVE CUSTODY
MHMR OBSERVATION

CELL:  25 N 01  OFFICER:  RTF  REASON:  005  DATE:  02 04 10 0844
REMARKS:  RMN SPC1 PER JAIL ADMIN/MHMR???
OVER 25              FELONY               UNSENTENCED         NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  25 N 01  OFFICER:  LMS  REASON:  010  DATE:  02 01 10 0816
REMARKS:  2MAX/SUSPENSE DATE REVIEW
OVER 25              FELONY               UNSENTENCED         NON ASSAULTIVE
MAXIMUM             FIRST OFFENDER       NON-SMOKER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70
```

INMATE 0763423 CLASSIFICATION                                    04 14 10 1213
HUMMEL,JOHN WILLIAM                    RACE W E    SEX M AGE 34 DOB 11 04 75

CELL:  25 N 01  OFFICER: DLC  REASON:  010  DATE:  01 26 10 0537
REMARKS:  2MAX/SUSPENSE DATE REVIEW
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  25 N 01  OFFICER: RGB  REASON:  001  DATE:  01 22 10 1736
REMARKS:  MASS MOVE/CPT PILKINGTON
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  25 O 01  OFFICER: RGB  REASON:  002  DATE:  01 22 10 1733
REMARKS:  MASS MOVE/CPT PILKINGTON
OVER 25              FELONY              UNSENTENCED          NON ASSAULTIVE
MAXIMUM              FIRST OFFENDER      NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU         P424SH70

INMATE 0763423 CLASSIFICATION                                      04 14 10 1213
HUMMEL,JOHN WILLIAM                     RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  26 O 01  OFFICER: DRD  REASON:  010  DATE:  01 17 10 1649
REMARKS:  2.MAX SUSPENSE DATE REVIEW/NO CHANGES
OVER 25            FELONY            UNSENTENCED          NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER    NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER: MED  REASON:  010  DATE:  01 13 10 0548
REMARKS:  SUSPENSE DATE REVIEW/RMN@2MAX
OVER 25            FELONY            UNSENTENCED          NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER    NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER: DRD  REASON:  010  DATE:  01 10 10 1635
REMARKS:  RMN2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25            FELONY            UNSENTENCED          NON ASSAULTIVE
MAXIMUM            FIRST OFFENDER    NON-SMOKER           SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU        P424SH70

```
INMATE 0763423 CLASSIFICATION                        04 14 10 1214
HUMMEL,JOHN WILLIAM              RACE W E   SEX M AGE 34 DOB 11 04 75

CELL:  26 O 01  OFFICER:  CMB  REASON:  C    DATE:  01 07 10 0713
REMARKS:  RMN2MAX/SUSPENSE DATE REVIEW/     ANGES
OVER 25            FELONY              UN    TENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER      NON-SMOKER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER:  CMB  REASON:  C    DATE:  01 03 10 1318
REMARKS:  RMN2MAX/SUSPENSE DATE REVIEW/NO CHANGES
OVER 25            FELONY              UN    TENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER      N   S. KER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION

CELL:  26 O 01  OFFICER:  RGB  REASON:  C 4  DATE:  12 31 09 2033
REMARKS:  MUST NOTIFY CHIEF DENNIS BEFORE RELEASED
OVER 25            FELONY              UN    TENCED        NON ASSAULTIVE
MAXIMUM           FIRST OFFENDER      N   S. KER          SUICIDAL
PROTECTIVE CUSTODY MHMR OBSERVATION


PF = 1 CELL MENU   2 INMATE MENU  3 MISC MENU   10 MAIN MENU         P424SH70
```

07635
HUMMEL,JOHN WILLIAM
11/04/75    W    M

# Tarrant County Sheriff's Department
## Confinement Bureau
### Primary Inmate Classification Security Level Assessment



OVERRIDE Reasons
*HIGH PROFILE*
*SPC / PER*
*CHIEF DENNIS*

HIGH RISK
- [ ] ASSAULTIVE
- [ ] ESCAPE
- [ ] SUICIDAL
- [ ] MHMR
- [ ] OTHER

SPECIAL NEEDS
- [x] PROTECTIVE CUSTODY
- [ ] MEDICAL
- [ ] JUVENILE
- [ ] HANDICAP
- [x] OTHER
*HIGH PROFILE*

CFMT-116   GPC-1636   REVISED 9/15/97

Inmate Name: ___ HUMMEL,JOHN WILLIAM  
11/04/75     W          M     _____

Inmate CID: ___  _____

**Circle whether override of security designation was recommended:**      (YES)          NO

**Written explanation of Override:**

HIGH PROFILE

SPC I PER CHIEF DENNIS

**Circle the recommended security designation:**

| HIGH MAXIMUM | (HIGH CUSTODY) | MEDIUM ASSAULTIV E-ESCAPE | MEDIUM | MEDIUM PRE-SENTENCED | MIN.PRE. | MINIMUM | LOW MINIMUM | VERY LOW MINIMUM |
|---|---|---|---|---|---|---|---|---|

**Recommended Housing Assignment:**                                            260  01

**Signature of CLASSIFICATION OFFICER and Assessment Date:**   R Brown 69131     12/31/09     1902

**Supervisory Review of Override:**    R Brown

Circle whether Override of Security was approved or disapproved
(If 'DISAPPROVED' is circled, provide a written explanation)          DISAPPROVED        (APPROVED)

**Written Explanation of Disapproval:**

_____

_____

**Circle Final Security Designation:**

| HIGH MAXIMUM | (HIGH CUSTODY) | MEDIUM ASSAULTIV E-ESCAPE | MEDIUM | MEDIUM PRE-SENTENCED | MIN.PRE. | MINIMUM | LOW MINIMUM | VERY LOW MINIMUM |
|---|---|---|---|---|---|---|---|---|

**Signature of SUPERVISOR and Date of Override Review:**     Sgt Denham 5723    12-14-10

797

PSIT-116    GPC-1636

# IN THE 432ND DISTRICT COURT

# TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| John William Hummel, | ) | 1184294D |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

*FILED*
*THOMAS A WILDER, DIST. CLERK*
*TARRANT COUNTY, TEXAS*
*DEC 18 2013*
*TIME* _10:56_
*BY* _____ *DEPUTY*

## RESPONSE TO STATE'S ANSWER TO CLAIM ONE OF HUMMEL'S APPLICATION FOR HABEAS CORPUS RELIEF (JUROR MISCONDUCT); REQUEST FOR STATUS CONFERENCE

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**793**

Q - 432 - 009923

# IN THE 432ND DISTRICT COURT
## TARRANT COUNTY, TEXAS

| | |
|---|---|
| EX PARTE<br>John William Hummel,<br>    APPLICANT | )<br>)<br>)<br>)<br>)<br>) |

Trial Cause No.
1184294D

FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS
DEC 18 2013
TIME _10:56_
BY _____ DEPUTY

## RESPONSE TO STATE'S ANSWER TO CLAIM ONE OF HUMMEL'S APPLICATION FOR HABEAS CORPUS RELIEF (JUROR MISCONDUCT); REQUEST FOR STATUS CONFERENCE

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), files this Response to the State's Answer ("Answer") to Hummel's Initial Application for Writ of Habeas Corpus ("Application"), filed with this Court on June 5, 2013.

In general, the State's Answer asserts that Hummel has not met his burden of proof to establish that Hummel received ineffective assistance from his trial and appellate counsel, or to show that other errors resulted in a constitutionally infirm trial. The State is incorrect because Hummel's Claims meet and exceed the requisite standards of proof to warrant habeas corpus relief.

Hummel primarily relies on the arguments and authority offered in the Application to this Court. However, the following further discussion is offered to address specific matters raised in the State's Answer.[1]

---

[1] By responding primarily to the State's Answer to Hummel's Claim One, Hummel does not in any way concede the validity of the arguments raised in the remainder of the Answer.

2

**794**

## A. Claim One – Juror Misconduct

Regarding Claim One of Hummel's Application, the State, citing to Rule 606 of the Texas Rules of Evidence, argues that Juror Davis's signed affidavit should not be admitted as evidence. However, the State's argument misstates the scope of Rule 606's prohibition.

Rule 606(b) states that "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring *during the jury's deliberations*, or on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." Tex. Rule. Evid. 606(b) (emphasis added). Texas courts have interpreted this rule as creating a balance between public interest in assuring a fair trial and in protecting the sanctity of deliberations and finality of verdicts. This balance is struck by limiting what jurors may testify about regarding what occurs in the deliberation room. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000) (holding the rule "operates to prohibit jurors from testifying about matters and statements occurring during deliberations"); *McQuarrie v. State*, 380 S.W.3d 145, 151 (Tex. Crim. App. 2012) ("The rule prevents a juror from testifying that the jury discussed improper matters *during deliberation*.") (emphasis in original).

In interpreting Rule 606(b), which applies to both civil and criminal proceedings, the Texas Supreme Court found that the term "deliberations" meant formal juror deliberations "when the jury weighs the evidence to arrive at a verdict" after the submission of all the evidence and instructions. *Golden Eagle Archery, Inc.*, 24 S.W.3d at 371. The Court specifically limited the scope of Rule 606(b) to that period of formal deliberations, and not to broadly cover any moment during the trial the jurors thought about or discussed the evidence. *Id.* "None of the rules contemplate that the jury may begin deliberating during a trial break. On the contrary, the approved jury instructions direct courts to admonish the jury

3

**795**

against informal discussions of the case." *Id.* Thus, in *Golden Eagle*, the Court allowed the testimony of jurors regarding conversations during a trial break, even though it concerned potential misconduct of one of the jurors. *Id.* at 372. The Court held that a juror can "testify about reasons for disqualifying another juror provided the testifying juror's knowledge was gained independent of deliberations." *Id.* at 370.

In the present case, Juror Davis's affidavit states that the "turning point" for him during Hummel's trial "was during the guilt/innocence phase when the woman Hummel had an affair with testified." Juror Davis states, "[a]t that point I made up my mind and decided Hummel should get the death penalty. There is nothing his attorneys could have said that would have made a difference to me." Further, he noted that "[a]fter deciding Hummel should get the death penalty, the rest of the trial felt like a formality." Juror Davis admitted that his "mind was already made up." (Ex. 22 to Application [Aff. of Juror Davis] at ¶¶4-5.)

Juror Davis's statements concern his misconduct during trial in failing to consider all the evidence presented before reaching a punishment decision—including all evidence presented at the punishment phase of trial. These statements are about misconduct that occurred prior to deliberations, squarely falling outside the parameters of Rule 606(b) as defined by this State's Supreme Court and Court of Criminal Appeals. Though these statements concern Juror Davis's thoughts, they do not delve into his formal consideration of the evidence to reach a verdict with the other jurors. Thus, they do not concern deliberations. Indeed, Juror Davis's statements show that he committed misconduct by *failing* to deliberate and consider the evidence presented at trial as he had been instructed to do. (*See* 4 CR at 726 ("In deliberating on Issue Number 1, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage."); 33 RR at 10-11 ("At the conclusion of all the evidence, I will submit to you a written Charge.

4

**796**

Since you will need to consider all the evidence admitted by me, it is important that you pay close attention to the evidence as it's presented.").)

As such, Juror Davis's affidavit contains testimony of the sort of conduct occurring outside of deliberations and in violation of court instructions that Texas courts' have held falls outside the limitations of Rule 606(b). *See Golden Eagle Archery, Inc.*, 24 S.W.3d at 371 ("None of the rules contemplate that the jury may begin deliberating during a trial break."); *see also Quinn v. State*, 958 S.W.2d 395, 397 (Tex. Crim. App. 1997) (juror testimony heard regarding a conversation he had with a co-worker about the case); *Clark v. State*, 717 S.W.2d 910, 918 (Tex. Crim. App. 1986) (juror testimony heard regarding jurors witnessing the defendant in handcuffs); *Chambliss v. State*, 647 S.W.2d 257, 264 (Tex. Crim. App. 1983) (juror testimony heard regarding juror conversation mid-trial with victim's relative).

The Court has made clear that Rule 606(b) was "not intended to eliminate post-trial questioning altogether." *Golden Eagle Archery, Inc.*, 24 S.W.3d at 372. Further, the Texas Court of Criminal Appeals has similarly held that such a constrained interpretation of Rule 606(b) is an appropriate balance between safeguarding juror deliberations while protecting against misconduct by jurors. *McQuarrie*, 380 S.W.3d at 153 ("Our construction has functioned well in the federal courts for years without opining the floodgates to the post-trial questioning of jurors."). Therefore, it is proper and necessary for this Court to consider Juror Davis's affidavit as evidence during post-conviction proceedings.[2]

---

[2] Further, even if the text of Rule 606(b) were interpreted to prevent testimony regarding Juror Davis's misconduct, the rules of evidence must yield to concerns of constitutional violations. *See Crawford v. Washington*, 541 U.S. 36, 50-51 (2004) (noting that "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices."). Juror Davis's failure to deliberate and

5

**797**

## B. Evidentiary Hearing – Affidavit and Live Testimony

Hummel requests this Court schedule a status conference in this proceeding for the purpose of discussing designation of factual and legal issues requiring resolution, as well as discussion of the presentation of evidence by either live or affidavit testimony.

### PRAYER FOR RELIEF

For the foregoing reasons, Hummel requests this Court grant him relief based on the claims raised in his Initial Application for Writ of Habeas Corpus. Further, Hummel requests this case be set for a status hearing as soon as practicable in order to discuss designation of disputed issues and introduction of evidence related to those issues.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

Sam Farina-Henry
Post-Conviction Attorney

DATED:      December 13, 2013      By: _Robert Romig_
Robert Romig
Post-Conviction Attorney

---

consider any evidence presented at the punishment phase of trial denied Hummel his due process rights to a fair trial.

6

**798**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Response as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by mail)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on December 13, 2013, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_
_____
Robert Romig

7

**799**

800



Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS




$ 00.99⁴

02 1R
0002000240    DEC 13  2013
MAILED FROM ZIP CODE 78701

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

DEC 1 8 2013

TIME_____
BY_____ DEPUTY

Joyce Meyers
District Clerk, Tarrant County
401 West Belknap
3rd Floor
Fort Worth, Texas 76196

JiZEAB3 76196



FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 23 2014

NO. C-432-009923-1184294-A

TIME _____ 3:12 _____
BY _____ SK _____ DEPUTY

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 432nd JUDICIAL** |
| | § | |
| | § | **DISTRICT COURT** |
| | § | |
| **JOHN WILLIAM HUMMEL** | § | **TARRANT COUNTY, TEXAS** |

## ORDER

The Court has before it Applicant's Application for Writ of Habeas Corpus filed under Article 11.071 of the Texas Code of Criminal Procedure, the State's reply, and the Applicant's Response filed on December 18, 2014.

The Court sets this matter for a **status hearing** to be held on **Friday, February 28, 2014, at 1:30 PM** for conference and argument regarding the designation of factual and legal issues requiring resolution and whether further presentation of evidence is necessary.

The Clerk of this Court to furnish a copy of this order to Applicant's counsel and to the Appellate Section of the Tarrant County Criminal District Attorney's Office.

SIGNED this the _23RD_ day of _____, 2014.

_____
**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

**801**



THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 2 8 2014

TIME _2:07_____
BY_____SR____ DEPUTY

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

_____ )    Trial Cause No.
                                 )    1184294D
EX PARTE                         )
John William Hummel,             )
        APPLICANT                )
                                 )
_____  )

## NOTICE OF FILING SUPPLEMENTAL EXHIBITS IN SUPPORT OF ARTICLE 11.071 APPLICATION FILED JUNE 4, 2013

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**802**

# IN THE 432ND DISTRICT COURT
## TARRANT COUNTY, TEXAS

| | |
|---|---|
| ——————————— ) | Trial Cause No. |
| EX PARTE ) | 1184294D |
| John William Hummel, ) | |
| APPLICANT ) | |
| ) | |
| ——————————— ) | |

## NOTICE OF FILING SUPPLEMENTAL EXHIBITS IN SUPPORT OF ARTICLE 11.071 APPLICATION FILED JUNE 4, 2013

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), files the attached supplemental exhibits—Exhibit 9A (Affidavit of Fred Emmer) and Exhibit 14A (Affidavit of Buddy Matthias)—in support of Mr. Hummel's Application for Writ of Habeas Corpus, filed in this Court on June 4, 2013.

Respectfully submitted,

DATED:    February 28, 2014

By: _Robert Romig_

Robert Romig

2

**803**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Supplemental Exhibits as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by hand)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by hand)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by hand)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on February 28, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Robert Romig

3

**804**

# EXHIBIT 9A

## AFFIDAVIT OF FRED EMMER

I, Fred Emmer, state and declare as follows:

1. My name is Fred Emmer. I reside in Oakland, New Jersey, and am currently employed as a paramedic.

2. I met John Hummel when he and I served together in the United States Marine Corps from 1998 to 2000 at Camp Pendleton in Oceanside, California. I met John through my friend Buddy Matthias. John and Buddy both worked in intelligence and I worked as a medic

3. Buddy and I were stationed together at Camp Pendleton and became good friends. John was stationed at Camp Pendleton after Buddy and I had been there a while. John was pretty shy and withdrawn when he first came to Camp Pendleton. But he was a pretty good guy, so we accepted John into our group of friends. Over time John became more comfortable and outgoing.

4. I think John and I connected because he was from the east coast, like me. We were both kind of outsiders being stationed in California.

5. All of us were young guys, and we were away from our families. So most of our free time was spent drinking, playing games, and going to strip clubs. John was particularly absorbed with going to strip clubs. But John was not a "ladies' man." I do not remember him ever dating anyone or having relationships with women. The only women I really saw him interact with were strippers. John even talked about all of us opening our own strip club.

6. John seemed to really like the west coast and the relaxed atmosphere there. I was really surprised that he decided to go back to South Carolina after the military. He never really spoke about South Carolina or his family there.

1

**806**

7. John was also very enthusiastic about fantasy stuff. It was a little weird. He was really into role playing games, more than was usual. He liked wizards, and dragons, and swords – those kinds of things. It seemed like John was dodging real life too much.

8. John was an overweight, geeky kind of guy. He looked and acted like someone who would be bullied as a kid.

9. John seemed to feel like an outsider trying to fit in. I remember him copying some of the mannerisms Buddy and I had, as well as how we would dress or what we liked to do. I think he even got tattoos because we had them. It was like Buddy and I were two big dogs and John was a little Chihuahua following us around. Despite the teasing, though, after John was around us for a while he showed more confidence and was less shy.

10. John had a hard time as a Marine. The military likes to break people down and then build them back up to fit the military culture. But if you looked at John you could tell that he was not what you would picture for a Marine. He especially got a hard time about being overweight. We would tease him about being what they call in the Marines a "Fat Body." I think that bothered John.

11. Because Buddy and I came in before John, we were discharged while John still had time left to serve. I got discharged in April of 2000. Buddy and I moved to Vista, California, and got an apartment together for four months. Then I moved away.

12. John lost it a bit when Buddy and I left. Not long after Buddy and I left, we got a call from the Base asking if we knew where John was. I had sold John my truck and apparently he had taken off without telling anyone. Pretty soon, John called Buddy and I from Arizona where the truck had

2

**807**

broken down.  Buddy and I rented a U-Haul to tow the truck back and to bring John back to base.

13. We got John back to base in time and I believe he only got a non-judicial punishment for an unauthorized absence.  But this meant that he was restricted and could not leave base for a long time.  So I do not remember seeing John much more after that.

14. It seemed like John was having a tough time.   All our group of friends had left except for him.  He no longer had the people around him that he had gotten comfortable with.

15. I heard about John's crime from Buddy.  I was shocked.  I would never have imagined the quiet, friendly John I knew doing this.

16. I was never contacted by anyone on John's defense team.  Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

17. I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 23rd d Feb, 2014 in Oakland, New Jersey.

Fred Emmer

Subscribed and sworn to before me on 02/ 23   , 2014.

Notary Public, State of New Jersey

MARY PISULA STEWART
A Notary Public of New Jersey
My Commission Expires August 20, 2018

3

**808**

# EXHIBIT 14A

## AFFIDAVIT OF WAYNE "BUDDY" MATTHIAS

I, Wayne Matthias, state and declare as follows:

1.  My name is Wayne Matthias. Everyone calls me "Buddy." I reside in Puyallup, Washington.

2.  I met John Hummel when he and I served together in the United States Marine Corps from around 1998 to 2000 at Camp Pendleton in Oceanside, *north of w A~* California.

3.  I started the military in the infantry, which is where I met my friend Fred Emmer. Then I was transferred to the intelligence branch. Fred and I had been at Camp Pendleton about two years before John was transferred there. He was in intelligence too, so he and I were assigned as roommates. We were roommates for about two years.

4.  I remember when John first arrived he was very shy. He did not know anyone. Fred and I had a group of friends already, so I invited John to hang out with us. At first we called John "Redneck" because he was from South Carolina.

5.  John did fine as a Marine, although he struggled some. He was a bit overweight. He also was pretty messy. Being overweight and messy are both things not allowed in the Marines. His weight was especially a problem because it meant he could not get promoted. Most of the time promotions are automatic based on how much time you have spent in the military. But weight problems will prevent you from getting recommended for a promotion. John kept missing promotions and seeing other, younger guys get promotions even though they arrived after he did. I think not getting promoted frustrated John.



1

**810**

6. Most of our free time we would just hang out and go to the beach and watch movies. We spent a lot of time drinking and going to strip clubs. He became friends with the staff at the clubs, not just the dancers. As time went on, John seemed more confident and outgoing.

7. John was also into fantasy and role playing games. He really liked Dungeons and Dragons, which we would play sometimes because I liked it too.

8. During our friendship, I started noticing some changes in John's behavior. It was like he started to copy many of the things that Fred and I did. His wardrobe started to look like a mixture of Fred and I. I liked to wear bowling style shirts and I noticed John started to wear them too. Fred and I had lots of tattoos and John started getting more and more tattoos. He started to wear rings and jewelry like I did. He even started to have the same mannerisms as we did. At some point it got so bad that Fred and I sat John down and told him that he had to become his own person and stop doing everything we did. That conversation happened several months before Fred and I were getting out of the military. Fred and I both were discharged around the same time, in early 2000. We moved into an apartment together for a few months in Vista, California, which was about forty ~~miles~~ from the base. I think a bunch of our other friends all left the minute drive when base about the same time. John still had time to serve after we all left.

9. Not long after I got discharged, Fred and I got a call from John in Arizona. Apparently he left the base without authorization. John told us he was heading back to South Carolina, but his truck broke down. We had to go pick him up in Arizona and tow the truck back. John was stressed out. I think he was depressed. John said that he could not take being in the

2

**811**

military now that he did not have his support system anymore and all his friends had left.

10. After we got back, John got in trouble for leaving the base. I did not see John at all after that. I heard from some stripper friends I stayed in touch with that John had changed since Fred and I were no longer around. He was no longer the same outgoing, friendly guy that he had become with us.

11. I heard about John's crime from a former stripper that also knew John. When I heard that after the crime John had gone back to Oceanside, California, I thought he must have been trying to get back to a place where we had good times.

12. I was never contacted by anyone on John's defense team. Had I been contacted I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness.

13. I have read and reviewed this three page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on ___February 14___, 2014 in Puyallup, Washington.

> Notary Public
> State of Washington
> KAREN MARIE SANDERSON
> MY COMMISSION EXPIRES
> October 26, 2016

Wayne "Buddy" Matthias

Subscribed and sworn to before me on _February 14_, 2014.

Karen Sanderson

Notary Public, State of Washington

3

**812**

*C - 432 - 009923 - 1184294 · A*

# IN THE 432ND DISTRICT COURT

# TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ———————————— | ) | Cause No. |
| EX PARTE | ) | 1184294-A |
| John William Hummel, | ) | |
| APPLICANT | ) | |
| | ) | |
| ———————————— | ) | |

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 01 2014

TIME_____ 3:22

BY_____ SR _____ DEPUTY

## SUPPLEMENTAL RESPONSE TO STATE'S ANSWER;
## EXHIBITS 42 THROUGH 46

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**813**

# IN THE 432ND DISTRICT COURT

# TARRANT COUNTY, TEXAS

<table>
<tr><td>_____</td><td>)</td><td>Cause No.</td></tr>
<tr><td>EX PARTE</td><td>)</td><td>1184294-A</td></tr>
<tr><td>John William Hummel,</td><td>)</td><td></td></tr>
<tr><td>         APPLICANT</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

## SUPPLEMENTAL RESPONSE TO STATE'S ANSWER AND EXHIBITS[1]

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), files this Supplemental Response to the State's Answer ("Answer") to Hummel's Initial Application for Writ of Habeas Corpus ("Application"), filed with this Court on June 5, 2013. Hummel reasserts the arguments and authority offered in his Application to this Court. However, the following further discussion and exhibits are also offered to address specific matters raised in the State's Answer.[2]

### A. Legal Standard – Ineffective Assistance of Capital Counsel

In its Answer, the State asserts that "[w]hether a defendant received adequate assistance of counsel is judged by the totality of the representation provided." (State's Answer at 18 (citing *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992).) However, although the entirety of counsel's

---

[1] As part of his Application, Hummel filed forty-one exhibits, labeled as Exhibits 1-41. For ease of record-keeping, the exhibits accompanying this Response will be numbered in sequential order starting with Exhibit 42.

[2] By responding to sections of the State's Answer, Hummel does not in any way concede the validity of the arguments raised in the remainder of the Answer.

**814**

representation may be relevant when judging claims of ineffective assistance, the United States Supreme Court and Texas Court of Criminal Appeals ("CCA") have made clear that a single error may be the basis for a finding of ineffectiveness. *See, e.g., Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991); *Jackson v. State*, 766 S.W.2d 504, 508 (Tex. Crim. App. 1985).

The Supreme Court and the CCA have also stated that the touchstone for evaluating post-conviction claims of error is not whether there is sufficient evidence of guilt or of aggravating evidence to justify the punishment. The Supreme Court has declined "to hold either that the guarantee of effective assistance of counsel belongs solely to the innocent or that it attaches only to matters affecting the determination of actual guilt." *Kimmelman v. Morrison*, 477 U.S. 365, 380 (1986). Rather, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Lafler v. Cooper*, 132 S. Ct. 1376, 1388 (2012). A "reliable trial does not foreclose relief when counsel has failed to assert rights that may have altered the outcome." *Id.*; *see also Ex parte Cockrell*, 2014 WL 941358 at *10 (Tex. Crim. App. Mar. 12, 2014) (finding ineffective assistance based solely on trial counsel's failure to request a sign language interpreter for his client); *Ex parte Crews*, 2014 WL 969964 at *4 (Tex. Crim. App. Mar. 12, 2014) (unpublished) (finding ineffective assistance when counsel failed to object to admission of a video statement discussing a defendant's prior bad acts).

3

**815**

## B. Application Claim Three – Trial Counsel Was Ineffective for Failing to Present Evidence That Hummel Was Not a Future Danger

Hummel maintains that his trial counsel's performance was both deficient and prejudicial based on their failure to adequately investigate and present evidence that Hummel would not be a future danger under the first special issue. Specifically, Hummel's trial counsel failed to secure the testimony of at least three available Tarrant County Sheriff's Office jail staff who would have testified that Hummel was a model inmate who they believed would not be a future danger to anyone while incarcerated.

In its Answer, the State argues that Hummel's trial counsel conducted a "thorough investigation" into the issue of Hummel's future dangerousness, but were unable to locate any guards or other jail staff to interview. (Answer at 59-60.) Specifically, the State (through trial counsel's affidavits) complains that Hummel himself did not identify the jail staff counsel should interview and thus it is his fault for the lack of this testimony. (Answer at 60, 63.) Further, trial counsel lament the fact that the jail staff who have signed post-conviction affidavits stating their willingness to testify never contacted trial counsel and expressed that willingness. (Answer at 60.)

However, the State's arguments fail to diminish trial counsel's deficient performance in not securing the testimony of these officers or other similar testimony, despite its best attempts at diverting the blame to another party. While a defendant may bear some responsibility to assist trial counsel in developing punishment phase evidence, the inability of a defendant to lead counsel to a particular witness does not relieve counsel of the responsibility to continue to investigate areas of evidence. *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005) (holding that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is

4

**816**

bound to make reasonable efforts" to investigate); *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006) (finding that counsel's investigation was deficient despite the fact that the defendant had not mentioned the mitigating information to counsel). By counsel's own admissions, Hummel did nothing to dissuade them from pursuing an investigation into Tarrant County jail staff. He simply could not recall the names of any specific jail staff he could recommend that counsel speak to. (*See* Moore Affidavit at 6; Cummings Affidavit at 3.)

Similarly, the performance of capital counsel is never judged by which witnesses decide to present themselves to counsel and identify how they could be used in the defense's punishment case. It strains credulity to fault the jail staff of Tarrant County for failing to contact Hummel's trial counsel, much less rely on this as an excuse for not investigating into evidence of Hummel's lack of future danger.

Rather, counsel's conduct must be judged on the information that could have been available to them had they pursued sufficient investigation. Regarding Hummel's probability of committing future acts of violence, trial counsel had in their possession information that would have led them to Officers Rigmaiden, Thomas, and Bell, and potentially other jail staff. Records regarding Hummel's pre-trial incarceration, provided to counsel by the Tarrant County Sheriff's Office, contained over 100 pages of log sheets detailing the names and employee numbers of officers who had observed Hummel in their daily inspection rounds. (*See e.g.,* Ex. 44 at 5 [Excerpts of Tarrant County Jail Records].) Even a cursory glance of these records reveals the names of several officers who spent significant amounts of time observing Hummel while he was housed in the Tarrant County jail. Further, the records indicate that without exception Hummel spent his time in Tarrant County without earning discipline from these officers or even provoking a written remark of bad behavior. Identifying potential witnesses to interview about

5

**817**

Hummel's behavior would not have required significant effort on the part of trial counsel—indeed these same records were the source of the information that identified Officers Rigmaiden, Thomas, and Bell to post-conviction counsel. From a simple interview of these three officers, counsel would have found valuable and credible witnesses willing to testify that Hummel was a model inmate—compliant, pleasant, not aggressive, and not threatening—who seemed like someone who would do well in prison and would not be a danger to others. (Ex. 4 at ¶¶3-8 [Aff. of Cody Bell]; Ex. 20 at ¶¶8-9 [Aff. of Tommy Rigmaiden]; Ex. 21 at ¶¶3-5 [Aff. of Rory Thomas].)

Counsel has expressed no strategic reason for failing to investigate and present this type of evidence regarding Hummel's future dangerousness. Indeed counsel states that "I would have used them if I had been aware of them." (Cummings Affidavit at 5.) Yet this information and these witnesses were easily available using records already in counsel's possession. Capital counsel should, at a minimum, inspect records in their possession to identify individuals who have spent significant time around their client, particularly witnesses such as Sheriff's officers who would be especially credible in front of a jury. The failure to identify and interview Officers Rigmaiden, Thomas, and Bell (and potentially other jail staff) was neither strategic, nor reasonable, and was thus deficient performance under the standards required of capital counsel.

Aside from attempting to shift the blame for this failure to Hummel or the officers themselves, the State further suggests that counsel's performance was not deficient, and any deficiency was not prejudicial, because counsel presented the testimony of two expert witnesses, Frank Aubuchon and Dr. Antoinette McGarrahan, as evidence that Hummel was not a future danger. (Answer at 61-62, 64.) This argument misunderstands the impact of the testimony provided by these

**818**

two witnesses, and grossly disregards the value of the testimony that would have been provided by Officers Rigmaiden, Thomas, and Bell.

Frank Aubuchon testified as a witness qualified with an expertise in the prison classification system. (44 RR at 34-73.) Mr. Aubuchon's testimony focused almost entirely on describing the internal management and physical layout of a Texas prison, and describing what the different classifications an inmate might have and what privileges or restrictions those classifications carried. (*Id.*) Though Mr. Aubuchon had reviewed Hummel's jail records and confirmed for the jury that Hummel had not had any disciplinary write-ups, Mr. Aubuchon never met or interviewed Hummel. His testimony was limited to an academic assessment of the ability of the Texas Department of Criminal Justice ("TDCJ") prison system to confine Hummel and a description for the jury of what that confinement might look like.

This information, however, was only partially relevant to the question being asked of the jury. The CCA has stated that the future danger special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). While it would be "theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, . . . incapacitation is not the sole focus of the Legislature or of our death penalty precedents." *Id.* at 269. Thus, the issue never addressed by counsel's presentation was whether Hummel as an individual possessed a likelihood of committing acts of violence in the future.

Dr. Antoinette McGarrahan, the defense's neuropsychologist, testified about her assessment of Hummel's mental health, which also did not function to inform the jury of why Hummel was unlikely to commit future violence. Although Dr.

7

**819**

McGarrahan confirmed that Hummel had not committed infractions while incarcerated in the Tarrant County jail, (44 RR at 159), her testimony was focused on diagnosing Hummel's mental impairments—not assessing his potential for future violence.   Indeed, counsel makes clear in their affidavits that they specifically chose not to have Dr. McGarrahan perform a formal violence risk assessment because certain aspects of Hummel's mental illness might unduly elevate those measures. (Moore Affidavit at 7.)   Counsel even admits that there were parts of Dr. McGarrahan's testimony that could have been understood as supporting a finding of future danger. (Moore Affidavit at 5.)

Finally, none of the lay witnesses presented by the defense could speak persuasively to the question of whether Hummel would be a future danger.   Many had not seen him in years, and most simply testified that he had not committed any acts of violence prior to the crime.   Although this provided some evidence for the jury to estimate Hummel's future behavior, it hardly amounted to the type of present-day, neutral observation of Hummel's behavior that Tarrant County Sheriff's deputies could have provided.

The failure of trial counsel to present evidence from Officers Rigmaiden, Thomas, and Bell (or other jail staff) was both deficient and prejudicial.   The State's case had presented no evidence beyond the facts of the crime itself to suggest that Hummel would have been a future danger.[3]   Given that wide opening to convince the jury that Hummel would not commit future acts of violence, trial counsel should have strove to develop testimony of witnesses who could describe

---

[3] The State's Answer repeats again a laborious account of the details of the crime as though this is sufficient evidence that a man who had never committed a single act of violence in his life before this crime would be likely to do so again in the future.   It is not, and Hummel maintains that his appellate counsel was ineffective in failing to appeal the sufficiency of the evidence of Hummel's future danger. (*See* Application, Claim Two.)

8

**820**

Hummel's current demeanor and behavior, particularly while incarcerated, which is how Hummel would spending the rest of his life. For jurors who were struggling to understand how this individual, who had never before been violent, came to commit the violent act of which they had just convicted him, the inherently credible testimony of Sheriff's officers who did not find Hummel to be any threat or danger would have been extremely powerful evidence that Hummel would not be a future danger.

Weighed against the other evidence presented regarding Hummel's future risk of violence, counsel's failure to investigate this line of witnesses is unreasonable and deficient performance. Further, the impact of such testimony when laid next to the evidence at Hummel's punishment phase is such that a reasonable probability exists the outcome of Hummel's trial would have been different.

## C. Application Claim Four – Trial Counsel Was Ineffective in Failing to Present Expert Testimony Regarding Hummel's Life History

Hummel's trial counsel performed deficiently in failing to present the testimony of an expert focused on explaining Hummel's life history, and the absence of that testimony prejudiced Hummel's trial. In its Answer, the State essentially argues that although such testimony could have been potentially valuable during the punishment phase, there would not have been anything significantly different offered through such an expert witness that was not already offered at trial. (Answer at 74-79.) Particularly, the State points to the testimony of Dr. McGarrahan as fulfilling this role.

The State, however, does not comprehend the distinction between diagnosing a mental illness and explaining the significance of someone's life events. The role of a social history expert is to explain to a jury how a defendant's various life events both stemmed from his biological and sociological roots, and

9

**821**

then led to other significant life experiences, choices, and consequences for the defendant. That this function could not be served solely by the testimony of a neuropsychologist (like Dr. McGarrahan) is made clear by understanding the difference between the field of psychology and the field of social work.

Laura Smith,[4] an expert witness who holds a Master's of Science in Social Work, is an example of the type of witness Hummel's trial counsel could have presented. As Smith notes:

> Although related in the problems each seek to address, namely assisting individuals to better relate to the world around them, psychology and social work focus on different aspects of that problem. Psychology tends to focus on the mental processes of the individual and on diagnosing any impairment in those processes. Social work focusses on the interactions between individuals, between the individual and groups, and between individuals and society, in order to understand how systems and social forces are at play in that individual.

(Ex. 43 at ¶4 [Supplemental Affidavit of Laura Sovine].) Although as a psychologist Dr. McGarrahan may have studied certain concepts like Development Theory or Social Learning Theory, the nature of her psychological training meant her testimony was focused on Hummel's internal mind and feelings. (*Id.* at ¶5.) While the testing and diagnostic measures used by Dr. McGarrahan may have developed a mental health diagnosis to describe to the jury, "it does not tell the story of how that person's diagnosis relates to their development as a child, their interactions with others, or how certain life events motivated their behavior." (*Id.* at ¶6.) Though psychological testimony may provide a "root cause" for an

---

[4] Laura Smith, who provided an affidavit in support of Hummel's Initial Application, recently married and changed her name to Laura Sovine. (Ex. 43 at ¶1 [Supp. Aff. of Sovine].) Because her prior affidavit submitted with Hummel's Application refers to her as Laura Smith, that name shall be used herein for consistency.

**822**

individual's behavior, it "does not seek to provide a narrative to understand how the story may have developed, and what kinds of environmental factors came into play for the individual, such as culture, family discipline, relationships, modeling of relationships, religious beliefs, etc." (Ex. 43 at ¶6 [Supp. Aff. of Sovine].)

During Hummel's trial, Dr. McGarrahan's testimony "focused on explaining her diagnosis of Hummel's mental health disorder and its symptoms." (*Id.* at ¶8.) Her testimony "necessarily centered on the emotions and thoughts within Mr. Hummel's mind" even in the brief discussion when she touched on the issue of Hummel's childhood contributing to his behavior. (*Id.* at ¶8.)

In contrast, testimony from someone with a social work background like Smith "would have presented the jury with the other half of the coin—explaining why and how the stages of Mr. Hummel's life, most importantly his lack of appropriate relationships and nurturing attachments, reinforced his mental impairments and sent him down his life path." (*Id.* at ¶8.) As critical as it may be to have a psychological evaluation and specific diagnosis of a disorder, it was also critical to tell the narrative of how Hummel got to the culmination of his life path—how much influence was organic ("nature") and how much environmental ("nurture")—"both perspectives are equally important to a complete understanding of an individual's behavior." (*Id.* at ¶9.)

This concept of a social history being woven from life events was not foreign to Hummel's trial counsel. In fact, counsel's mitigation specialist was asked to draft a "social history" narrative outlining the various bio-psycho-social factors in Hummel's life, presumably so that counsel themselves could better understand Hummel's story. (Ex. 49 at 2 [Excerpt of Mitigation Social History].) Yet counsel failed to secure the testimony of an expert witness who could communicate this same information to the jury. Despite counsel's post-conviction rationalization that Dr. McGarrahan sufficiently met this purpose, a review of her

11

**823**

testimony makes clear that she was testifying regarding the mental health evaluation and diagnosis for which she was retained. (Ex. 47 [Ex Parte Request for Expert Assistance].) Counsel's failure to hire an expert to describe Hummel's social history was not a reasonable decision based on investigation, but was instead unreasonable given their own investigation and knowledge.

Further, Hummel's punishment phase of trial was prejudiced by the lack of this testimony. Has someone with Smith's background and experience testified, the jury would have gained a depth of understanding about how Hummel's mental impairments related to the events in his life and paths that he took. In her previous affidavit submitted with Hummel's Application, Smith described the testimony she would have offered to complete this picture of Hummel's life story. Smith focused on "how the attachment trauma Mr. Hummel experienced as a child created a pattern of failure and alienation in his life that was compounded through his interactions with others." (Ex. 43 at ¶4 [Supp. Aff. of Sovine].) Particularly, Smith found that Hummel's

> childhood absence of appropriate examples of nurturing and attachment led him to be incapable of stable, affirming attachments and relationships with others. This, in turn, led Mr. Hummel to lack a clear identity of self, exhibited in his abnormal and inappropriate to his age obsession in role-playing games and fantasy, and to his tendency to attempt radical escape when life became difficult. From his childhood and adolescence in South Carolina, to his time in the military, to his adult life in Texas before the crime, Mr. Hummel's life story shows a pattern of creating a new identity for himself that has only a brief success before turning into failure, and which drives him to "clear the game board" for a new start.

(*Id.* at ¶7.) Such testimony is a far cry from the brief mention of Hummel's childhood in Dr. McGarrahan's testimony. Had the jury received the full understanding of Hummel's life history, there is a reasonable probability that at

**824**

least one juror would have found a sufficiently mitigating reason not to assess the death penalty.

### D. Application Claim Six – Trial Counsel Erred by Failing to Present Hummel's Military Service as Mitigation Evidence

Despite his being an intelligence analyst and decorated Marine who was honorably discharged, Hummel's trial counsel failed to investigate and present testimony from people who served with Hummel to describe his service to the jury. Several witnesses, including Wayne "Buddy" Matthias, Fred Emmer, and Efrain Chaidez, were available to not only testify about the dependable and loyal friend Hummel had been as a Marine, but also to explain the frustrations and isolation that lead Hummel's performance as a Marine to suffer and culminated in him losing his security clearance. Instead, what should have been a powerfully mitigating episode of Hummel's life was turned into an aggravating fact by the State's rebuttal witnesses—two of Hummel's superior officers, both of whom minimized Hummel's service and focused on the loss of his security clearance, with no explanation of the facts that lead to this occurrence.

The State suggests that trial counsel's performance was not deficient, relying on statements by trial counsel that: (a) Hummel downplayed his service and did not provide counsel with names of individuals to contact; and that (b) the military records they obtained were not helpful. (Answer at 91-96.) Further, the State suggests there is no prejudice from counsel's failure to identify the witnesses presented by Hummel in post-conviction because the jury learned of Hummel's military service and that "it was not the type of service that the jury would be likely to consider particularly mitigating." (Answer at 96-98.)[5]

---

[5] The State also argues the witnesses identified in post-conviction would not have been available to testify, and points to some of their affidavits being unsigned at the time Hummel filed his initial Application. As of this filing, Hummel has

13

**825**

Yet counsel themselves admit they "felt that such service could possibly be important to our mitigation presentation." (Moore Affidavit at 17.) Counsel "would have obviously loved to have any witness who could have mitigated the negative aspects of the testimony from" the State's rebuttal witnesses. (Moore Affidavit at 18.) Regarding the witnesses identified in post-conviction, counsel argue that if they had had "even one of their names," they could have "located the others and developed testimony about [Hummel's] military service." (Cumming Affidavit at 8; Moore Affidavit at 18.)

In point of fact, Hummel did provide trial counsel with Buddy Matthias's name. In the initial mitigation interview performed by counsel's mitigation specialist on January 13, 2010, just days after being appointed to the case, Hummel gave the name of Buddy Matthias as a person he was still in touch with. (Ex. 48 at 2 [Excerpts from Mitigation Intake Notes].) As counsel admits, from this name alone counsel would likely have been able to discover other persons who served with Hummel and could testify, including Fred Emmer and Efrain Chaidez.

What's more, counsel did not have to rely on Hummel to independently provide them with Matthias's name. The military records in their possession mention several individuals presumably close to Hummel, which counsel could have identified and questioned Hummel about. In one disciplinary record, Hummel is written up for not keeping his room clean. It specifically mentions the job of cleaning his room "should not be LCpl Matthias's job." (Ex. 46 [Excerpt from Military Records].) Based solely on this record one could assume that the "LCpl Matthias" referenced was Hummel's roommate—someone any reasonable counsel would be interested in interviewing regarding their client's time in the

---

submitted signed affidavits from Wayne Matthias (Ex. 14A), Fred Emmer (Ex. 9A), and Efrain Chaidez (Ex. 7), each of whom indicate they would have been willing to testify at Hummel's trial.

14

**826**

service. The record itself, even though a disciplinary report, should have triggered counsel's interest in presenting Hummel's military service as mitigation, as it goes on to say that his superior officer believed Hummel was "a vital part of this section and have shown in the past that you are capable of outstanding work." (Ex. 46 [Military Records].)

Finally, counsel would not have even needed to ask Hummel about the name Matthias in order to discover a way to contact him. Counsel had Hummel's MySpace internet account and profile, which had been preserved from deletion by a subpoena from the Tarrant County District Attorney's office. (Ex. 45 at 1 [Excerpts from John Hummel MySpace Profile].) Within that profile, Hummel has a list of friends associated with his MySpace account—one of whom is Wayne Matthias. (Ex. 45 at 11 [Excerpts from John Hummel Myspace Profile].) That information provided counsel with a direct means of reaching out to Matthias, without ever needing Hummel to provide the connection (though, again, Hummel had already done so).[6]

Thus, trial counsel's after-the-fact rationalizations for why they were unable to secure the testimony of military witnesses are simply not true. Hummel gave counsel the name of someone they should contact (Matthias) and counsel's "independent investigation" would have yielded them the same result. As a type of information particularly mitigating to jurors, trial counsel's failure to sufficiently investigate and present positive information about Hummel's military service constitutes deficient performance.

---

[6] Further, had trial counsel interviewed Mr. Matthias and learned of Fred Emmer as someone who was close to Hummel, they would have been able to contact Mr. Emmer the same way—he is also listed on Hummel's MySpace account. (Ex. 45 11 [Excerpts from John Hummel MySpace Profile].)

**827**

This deficiency was prejudicial precisely because of this mistaken impression the jury was left with about Hummel service—the same impression the State now attempts to use to argue there is no prejudice. Merely alerting the jury to the fact that Hummel served in the Marines was not sufficient in the face of State witnesses downplaying and even disparaging that service. Not only would Matthias, Emmer, and Chaidez have provided testimony regarding the positive side of Hummel's military service, their testimony would have explained and rebutted the negative information from the State's rebuttal witnesses.

Ultimately, the State's own assertion that Hummel's military service "was not the type of service that the jury would be likely to consider particularly mitigating" proves the prejudicial nature of counsel's deficient investigation and presentation of Hummel's military service. (Answer at 97.) Hummel's service to his country should have been a great weight in favor of giving him a life sentence instead of death. Had his jury heard the testimony of Matthias, Emmer, and Chaidez, there is more than a reasonable probability that at least one juror would have voted for life.

### E. Application Claim Seven – Trial Counsel Was Ineffective For Failing to Present Evidence That Hummel Suffered From Complex Post-Traumatic Stress Disorder Resulting from Attachment Trauma

Both the State and trial counsel present arguments answering the unasked question of why evidence of post-traumatic stress disorder ("PTSD") was not presented at Hummel's capital trial. These parties misunderstand the evidence of attachment trauma presented by Dr. Susan Hardesty in Hummel's Application. Because trial counsel should have recognized the need for an expert specifically qualified to testify about the impact of neglect and attachment trauma, Hummel received ineffective representation at his trial.

#### 1. The State and Trial Counsel Misunderstand Attachment Trauma and Complex Post-Traumatic Stress Disorder

16

**828**

The State argues in its answer that trial counsel was not ineffective for "failing to discover or present evidence that [Hummel] suffered from PTSD." (Answer at 103). In support of this statement, the State relies on the affidavits from trial counsel, who each stated that they uncovered no evidence that Mr. Hummel met the diagnostic criteria for PTSD contained within the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Revised ("DSM-IV-TR"). (Cummings Affidavit at 8-9; Moore Affidavit at 20-21.)

These arguments, however, attack a straw man, as Hummel's Application did not allege that he should have been diagnosed with PTSD. Dr. Susan Hardesty, a forensic psychiatrist, examined Hummel and concluded that he "suffered from a form of traumatic illness best characterized as complex post-traumatic stress disorder due to attachment trauma. (Ex. 1 at ¶57 [Aff. of Dr. Susan Hardesty].) Dr. Hardesty specifically noted that complex PTSD was not formally included in the DSM-IV-TR, and that her conclusion was not based on the diagnostic criteria contained within said manual. (Ex. 1 at n. 1[Aff. of Dr. Hardesty]; Ex. 42 at ¶¶4-5 [Supplemental Affidavit of Dr. Susan Hardesty].) The State's attempt to discredit Dr. Hardesty's conclusions regarding the influence of attachment trauma on Hummel by asserting that trial counsel was unable to diagnose Hummel with an entirely different condition is both misleading and misses the point of Dr. Hardesty's expert opinion.

"Attachment trauma is a psychological construct that describes the impact of persistent neglect and disruptions to early childhood relationships on a person's sense of self and personality." (Ex. 42 at ¶7 [Supp. Aff. of Dr. Hardesty].) The traumatic experience associated with attachment trauma does not refer to a specific injury or a discrete traumatic event. Rather, the traumatic experience is the result of a lack of stable parenting, or disruptions to the development of early childhood relationships with caregivers. These disruptions are often characterized by a

17

**829**

pattern of extensive, consistent and repetitive neglect, both physical and emotional. This type of trauma is less observable than active forms of abuse, such as physical, sexual or verbal abuse. (*Id.* at ¶5.)

With any type of trauma, including attachment trauma, post-traumatic reactions are characterized by emotional responses that have been conditioned to the highest level of emotional valence (intensity) reached in the past. (Ex. 1 at ¶52 [Aff. of Dr. Hardesty].) Seemingly minor occurrences can induce an emotional response that is disproportionate to the emotional reaction expected of a person who has not suffered a traumatic experience. (Ex. 1 at ¶54 [Aff. of Dr. Hardesty].) Dissociation is another common emotional response seen in persons suffering from attachment trauma. (*Id.* at ¶54.) This dissociation often takes the form of emotional blunting, or a feeling of disconnection from the reality of the post-trauma response. (*Id.*) Emotional blunting serves as a protective mechanism that is part of the learned response to severe distress and trauma. (*Id.* at ¶55.) Hummel's actions exhibited signs of dissociation and were a disproportionate emotional response, both of which serve to indicate that his actions were consistent with a post-traumatic response due to attachment trauma. (*Id.* at ¶¶53-56.)

## 2. Trial Counsel was Ineffective for Failing to Retain an Expert on Attachment Trauma

In its Answer, the State argues that Dr. McGarrahan was fully qualified to evaluate Hummel and provide testimony regarding Hummel's issues stemming from attachment trauma. The State's assertion overlooks several important pieces of evidence that confirm trial counsel's decision not to retain an expert in the field of attachment trauma was unreasonable.

In his affidavit, trial counsel Larry Moore acknowledges that he retained Dr. McGarrahan due to his "familiarity with her work, my opinion of her abilities, and her reputation in the legal community." Mr. Moore also believed Dr. McGarrahan

18

**830**

would not be as open to critique by the State's witness, neuropsychologist Dr. J. Randall Price, due to Dr. Price's "prior professional relationship with Dr. McGarrahan." (Moore Affidavit at 7.) Dr. McGarrahan was retained in July 2010, conducted a neuropsychological evaluation of Mr. Hummel in October 2010, and performed a follow-up interview of Mr. Hummel in December 2010. The purpose of Dr. McGarrahan's testing was to "assess the level of [Mr. Hummel's] intellectual functioning; to determine the presence of any mental disease or defect; and to investigate the possibility of the presence of any neurological damage or organic injury to [Mr. Hummel's] brain." (Ex. 47 at 2 [Ex Parte Request for Expert Assistance].)

Following Dr. McGarrahan's initial examination of Hummel, his trial counsel was aware that Hummel did not suffer from any injury or damage to his brain, nor did Hummel possess any significant deficits in cognitive functioning. Dr. McGarrahan's testing similarly did not reveal the presence of an Axis I disorder, per the DSM-IV-TR's classification scheme. Based on the lack of cognitive impairment, and the lack of a clinical mental health disorder, Mr. Moore's noted that Hummel's case was an "all psychological/emotional case."

Mr. Moore's admits in his affidavit that he is aware of the concept of attachment disorders. Mr. Moore also acknowledges working with "PhD. Level social scientists" and using them to testify about attachment disorders at other trials. (Moore Affidavit at 21-22.) Despite being aware of the significance of attachment disorders, trial counsel attempted to continue to force a square peg into a round hole by relying on Dr. McGarrahan, whose field of expertise had not revealed compelling mitigating evidence, to discuss Hummel's attachment issues.

Dr. McGarrahan, while certainly qualified to present evidence resulting from her neuropsychological testing, was not a reasonable choice for presenting evidence of attachment trauma. As discussed above, attachment trauma is a

19

**831**

psychological construct that describes the impact of persistent, long-lasting neglect on a person's development. (Ex. 42 at ¶7 [Supp. Aff. of Dr. Hardesty].) Psychological and neuropsychological tests are designed to uncover deficits in function and performance as compared to a normative sample group. However, these tests alone cannot reveal the underlying cause of any deficits or disorders. Personality tests, such as the ones administered by Dr. McGarrahan, can show behavioral patterns that are associated with personality disorders, but which may also be related to other psychiatric maladies. (Ex. 42 at ¶8 [Supp. Aff. of Dr. Hardesty].) Symptoms described in the standard tests that are linked to personality disorders can also be associated with post-traumatic stress disorders, depressive disorders and other anxiety disorders as interpreted in context of the clinical history. (Ex. 42 at ¶8 [Supp. Aff. of Dr. Hardesty].) As such, Dr. McGarrahan's testing by itself could not have uncovered the depth of Hummel's traumatic illness. (*Id.*)

Recognizing attachment trauma, and the full impact of its effects often requires specialized training and experience in the field of attachment disorders. (*Id.* at ¶9.) Dr. Hardesty's expertise in this area was developed over the ten years she has spent working with patients who struggle with attachment issues. (*Id.* at ¶6.) Dr. McGarrahan, on the other hand, noted in her testimony that her professional practice is limited to conducting psychological and neuropsychological evaluations of individuals, and that she did not provide treatment to patients on an ongoing basis. (47 RR at 119-20.) Absent clinical experience with patients suffering from disorders relating to attachment trauma, it is unlikely that a neuropsychologist would be able to fully illustrate effects of various stressors on a person suffering from an attachment disorder. (Ex. 42 at ¶12 [Supp. Aff. of Dr. Hardesty].)

20

**832**

Further, it is no excuse of trial counsel's failure to retain a reasonable expert witness in attachment trauma that Hummel himself denied problems as a child. Persons who have suffered from the emotional neglect that is characteristic of attachment trauma are unlikely to recognize that they had unusual childhood experiences. Children lack the insight necessary to know when they receive less-than-stable parenting. (*Id.* at ¶10.) Dr. McGarrahan states in Mr. Moore's affidavit that Hummel and his sister, Neata Woody, denied any abuse or neglect growing up, facts that she relied on in her analysis of Hummel. (Moore Affidavit at 19-20.) An expert trained and experienced in the field of attachment trauma would have seen this information not as a sign of lack of trauma, but as further confirmation of a diagnosis of complex post-traumatic stress disorder. (Ex. 42 at ¶11 [Supp. Aff. of Dr. Hardesty].)

### 3. Conclusion

Hummel's trial counsel unreasonably failed to present evidence that Hummel suffered from attachment trauma. As discussed in Hummel's Application, capital defense counsel must not focus solely on finding and presenting symptomatic evidence that their client meets the diagnostic criteria for a specific psychological or psychiatric disorder contained within the DSM-IV-TR. *See* Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923, 943 (2008). Here, trial counsel attempted to force a square peg into a round hole, by only offering the testimony of Dr. McGarrahan, a neuropsychologist and forensic psychologist who specializes in neuropsychological testing and forensic examination. According to Dr. McGarrahan's testing, Hummel did not suffer from brain injury or damage, nor did he have significant deficits in cognitive functioning. However, trial counsel did not retain an expert trained and

**833**

experienced in identifying disorders related to attachment trauma, despite counsel's knowledge of the subject matter.

Neuropsychological testing was insufficient to reveal the underlying etiology behind Hummel's psychological and psychiatric symptoms. Proper interpretation of Hummel's psychological makeup required consultation with an expert specifically attuned to the identification and treatment of attachment trauma. Because such an expert was not retained, the testimony presented regarding Hummel's psychological background did not fully illustrate the physiological and psychological impacts of the neglect he suffered as a child. There is a reasonable probability that such evidence would have convinced Hummel's jury to select a verdict of life.

## PRAYER FOR RELIEF

For the foregoing reasons, Hummel requests this Court grant him relief based on the claims raised in his Initial Application for Writ of Habeas Corpus.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

By: _____
/Sam Farina-Henry
Post-Conviction Attorney

DATED:   March 28, 2014       By: _____
Robert Romig
Post-Conviction Attorney

22

**834**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Supplemental Response and Exhibits 42-46 as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by mail)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on March 28, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Sam Fariña-Henry

**835**

## Ex Parte John Hummel
## Supplemental Response to State's Answer
## Exhibit List

42.   Supplemental Affidavit of Dr. Susan Hardesty

43.   Supplemental Affidavit of Laura Smith Sovine

44.   Excerpts of Tarrant County Jail Records

45.   Excerpts from John Hummel MySpace Profile Information

46.   Excerpt from Military Records


Exhibits Filed Ex parte and Under Seal

47.   Ex Parte Request for Expert Assistance

48.   Excerpts from Mitigation Intake Notes

49.   Excerpt from Mitigation Social History

**836**

# EXHIBIT 42

## AFFIDAVIT OF DR. SUSAN HARDESTY

I, Dr. Susan Hardesty , state and declare as follows:

1. I am currently employed as the Vice President and Medical Director for The Menninger Clinic in Houston, Texas. I am board-certified in psychiatry and in forensic psychiatry. I am licensed to practice medicine in Texas and South Carolina.

2. I was previously retained by post-conviction counsel for John Hummel to perform a mental health assessment of Mr. Hummel and to review testimony presented by Dr. Antoinette McGarrahan, the defense's neuropsychologist, on behalf of Mr. Hummel during his capital trial.

3. Post-conviction counsel for Mr. Hummel have asked that I review certain portions of the State's response to my affidavit, including portions of affidavits submitted by Mr. Hummel's trial counsel. The State's response, and both affidavits from trial counsel, focus on the fact that trial counsel's expert, Dr. Antoinette McGarrahan, was unable to diagnose Mr. Hummel with post-traumatic stress disorder ("PTSD") and argues that my diagnosis of Mr. Hummel was incorrect. The State and trial counsel also noted that Dr. McGarrahan testified about "attachment issues" at trial, implying that there is nothing to distinguish her testimony in that regard from my affidavit. These responses mischaracterize my diagnosis and opinions regarding Mr. Hummel, and undervalue the importance and significance of attachment trauma.

4. During the course of my examination of Mr. Hummel and the preparation of my affidavit, it was clear to me that Mr. Hummel did not suffer a discrete physical injury or singular traumatic event that would support a diagnosis of PTSD as defined in the Diagnostic and Statistical Manual of Mental

EXHIBIT 42 Page 1   **838**

Disorders, Fourth Edition Revised ("DSM-IV-TR"). I did not diagnose Mr. Hummel with PTSD according to the diagnostic criteria of the DSM-IV-TR and did not state so in my prior affidavit.

5. Rather, I stated that Mr. Hummel suffered from complex post-traumatic stress disorder due to attachment trauma. This is not a DSM-IV-TR diagnosis but rather a clinical diagnosis founded in learned opinion in a rapidly growing body of psychiatric, psychological and neuroscience literature on neuron connectivity in childhood and the results of deprivation, trauma or neglect on development. "Attachment trauma" does not refer to a specific injury or discrete event. Rather, the traumatic experience is the result of neglect and a lack of stable, nurturing parenting or having disruptions in the development of early childhood relationships with parents and caregivers. As I described in my previous affidavit, this type of trauma is characterized by extensive, consistent and repetitive neglect. Part of the difficulty in identifying this type of trauma is the fact that it is characterized by the <u>absence</u> of caring, predictable parental responses, rather than the observation of active abuse (such as physical, sexual or verbal abuse).

6. In his affidavit, Larry Moore suggests that based on his prior experience with "Ph.D. level social scientists" he did not believe any additional expert was needed to evaluate Mr. Hummel besides Dr. McGarrahan. While I cannot speak to Mr. Moore's depth of knowledge regarding attachment trauma, I can unequivocally state that as an M.D. trained in Psychiatry and Neurology, I myself would not have recognized and fully understood the impact of attachment trauma in Mr. Hummel prior to my 10 years of experience working in psychology and psychiatry with a focus on trauma-informed care.



2

EXHIBIT 42 Page 2   **839**

7. Similarly, I would not expect a neuropsychologist, even one with forensic training, to be able to recognize and understand the full extent of attachment trauma without specific experience in the care and treatment of these patients or without research experience in this very specific aspect of brain development. Attachment trauma is a psychological construct that describes the impact of persistent neglect and disruptions to early childhood relationships on a person's sense of self and personality.

8. Psychological testing and neuropsychological testing are normed tests designed to compare performance to a certain population. Interpretation of these tests is based on absolute findings (e.g., IQ tests, reading level, math level, etc.) and on clinical history and background. The tests are designed to show deficits in function compared to a normative group. They do not reveal the etiology of the deficits. Personality tests will show patterns suggestive of certain behavioral clusters associated with personality disorders, but which may also be related to other types of psychiatric illness. They do not define personality disorders nor do they speak to etiology. Personality disorders can be associated with childhood neglect and abuse, but symptoms described in the standard tests can also be associated with post-traumatic stress disorders, depressive disorders and other anxiety disorders as interpreted in context of the clinical history. As such, Dr. McGarrahan's testing results alone would not have revealed the depth of Mr. Hummel's underlying traumatic illness. They would have to be interpreted in the context of history and clinical judgment which would then be applied to the data to formulate a diagnosis or diagnostic theory.

9. Recognizing attachment trauma and its full impact on a person requires skilled, specialized training and experience in that specific field. There is evidence that attachment trauma can lead to depression, personality disorder,



3

EXHIBIT 42 Page 3 **840**

and dissociation under severe stress. Mr. Hummel suffered from each of these conditions throughout the course of his life as well as in the events leading up to and after his crime.

10. The affidavit of Mr. Moore states that Dr. McGarrahan indicated that Mr. Hummel consistently denied having any attachment issues. It is very unlikely that a person who has suffered the degree of emotional neglect in childhood that leads to this type of trauma will describe themselves as having experienced "trauma" or even bad childhood experiences. Children lack the insight necessary to realize when they receive severely neglectful parenting. In their eyes, their life experience is normal, but in reality, their psychological and physiological brain development is negatively impacted by the lack of parental nurturing and care. I and the other clinicians I work with regularly have to teach our patients about the effects of the emotional neglect they have experienced in their lives. By living through the neglect and unstable parenting of his childhood, it is not surprising that Mr. Hummel lacks the necessary insight to recognize his experience as unusual or harmful. Similarly, Mr. Hummel's sister, Neata Woody, was neglected by their parents and thus would lack the necessary insight as well.

11. It is clear that Mr. Hummel's trial counsel and Dr. McGarrahan observed the signs of Mr. Hummel's attachment trauma—they admit that their own investigation into Mr. Hummel's background led them to inquire about these very issues of Mr. Hummel and his family. They reported Mr. Hummel's mother's description of an extremely neglectful and at times sadistic parenting style. But this data was not extrapolated to the testing results in a way that suggests an understanding of attachment trauma. To fully understand and develop the necessary evidence (and testimony) regarding this attachment trauma, it would have been necessary for Mr. Hummel's trial



4

EXHIBIT 42 Page 4  **841**

counsel to consult with a psychologist or psychiatrist specifically trained and working in this field. Without such consultation, it is unsurprising that they were unable to adequately present this information to Mr. Hummel's jury, nor that they continue to misunderstand the nature of my diagnosis of attachment trauma.

12. The interpretation of the testing results in testimony of Dr. McGarrahan spoke to personality traits only in the context of personality disorder and broad generalizations of behavior. While the description of the absence of nurture was present, the conclusions drawn were not fully illustrative of the stresses, the behaviors and physiological and psychological results of these stressors. Particularly missing were the elements of brain structural change, certain deficits in executive function, and a linkage of these to the period of time during which Mr. Hummel was ill and unable to provide for his family, and was not supported emotionally by them.

13. I have read and reviewed this five-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on March 2ᴜ, 2014 in ___Houston___, Texas.



Dr. Susan Hardesty

Subscribed and sworn to before me on March 26, 2014.

Notary Public, State of Texas

ELIZABETH GOLMON
Notary Public, State of Texas
My Commission Expires
December 17, 2017

5

EXHIBIT 42 Page 5   **842**

# EXHIBIT 43

# AFFIDAVIT OF LAURA SOVINE

I, Laura Sovine, state and declare as follows:

1. I recently changed my name after being married on August 9, 2013. My name before marriage was Laura Smith, and that is the name on my prior affidavit I signed for Mr. Hummel on May 22, 2013.

2. I was previously retained by post-conviction counsel for John Hummel to provide an affidavit discussing Mr. Hummel's life history and the various social and psychological factors in his life that contributed to shaping his character and actions. Post-conviction counsel for Mr. Hummel asked that I review certain portions of the State's response to my affidavit, including portions of affidavits submitted by Mr. Hummel's trial counsel.

3. The State suggests that the testimony of Dr. Antoinette McGarrahan, a defense neuropsychologist, at Mr. Hummel's trial sufficiently discussed how the facts of Hummel's life affected him. The State characterizes Dr. McGarrahan's testimony as describing Mr. Hummel's "attachment issues" and their impact on how Hummel "thought, felt, and acted." The State's response further suggests that there are no significant differences between my affidavit and Dr. McGarrahan's testimony. This argument, however, misunderstands the distinction between the fields of Psychology and Social Work. In doing so, the State's answer fails to appreciate the important difference between the testimony Mr. Hummel's jury heard from Dr. McGarrahan and the testimony I believe I could have offered in mitigation of his sentence.

4. The contents of my affidavit, and therefore the substance of what I might have testified to at Mr. Hummel's trial, focusses on how the attachment trauma Mr. Hummel experienced as a child created a pattern of failure and

1

EXHIBIT 43 Page 1   **844**

alienation in his life that was compounded through his interactions with others. As someone who holds a Master's of Science in Social Work, my training and educational focus differs from someone who has received advanced degrees in the field of Psychology. Although related in the problems each seek to address, namely assisting individuals to better relate to the world around them, psychology and social work focus on different aspects of that problem. Psychology tends to focus on the mental processes of the individual and on diagnosing any impairment in those processes. Social work focusses on the interactions between individuals, between the individual and groups, and between individuals and society, in order to understand how systems and social forces are at play in that individual.

5. My training and education has focused on psychological concepts such as Social Learning Theory, which looks at how social systems interact together and act on an individual. Development Theory is a related concept that focuses on how the impact of social forces on individuals in the early stages of their lives causes the individuals either to thrive or to be impaired. Although these concepts are included within the field of psychology, they are utilized by social workers to focus on the individual's interaction with social forces around him.

6. Importantly, when seeking to understand an individual's life and character, psychology and social work provide different information. A psychologist, using testing and diagnostic measures, can diagnose a specific impairment in the person's mind. While that can provide information about the impulses and emotions the person is feeling, it does not tell the story of how that person's diagnosis relates to their development as a child, their

2

EXHIBIT 43 Page 2 **845**

interactions with others, or how certain life events motivated their behavior. And often it does not seek to provide a narrative to understand how the story may have developed, and what kinds of environmental factors came into play for the individual, such as culture, family discipline, relationships, modeling of relationships, religious beliefs, etc. Psychology mostly seeks to diagnose but does not seek to find root causes and therefore explain motivation more clearly.

7.  In my previous affidavit related to Mr. Hummel's case, I relied on my training, education, and experience as a social worker to evaluate how the mental health diagnosis of Hummel combined with his childhood development and other life events led him down the path he ultimately followed.  Particularly, I believe that his childhood absence of appropriate examples of nurturing and attachment led him to be incapable of stable, affirming attachments and relationships with others.  This, in turn, led Mr. Hummel to lack a clear identity of self, exhibited in his abnormal and inappropriate to his age obsession in role-playing games and fantasy, and to his tendency to attempt radical escape when life became difficult.  From his childhood and adolescence in South Carolina, to his time in the military, to his adult life in Texas before the crime, Mr. Hummel's life story shows a pattern of creating a new identity for himself that has only a brief success before turning into failure, and which drives him to "clear the game board" for a new start.

8.  The testimony of Dr. McGarrahan during Mr. Hummel's capital trial focused on explaining her diagnosis of Hummel's mental health disorder and its symptoms.   She touched on the issue of Hummel's childhood development, and she described Hummel's crime as being the result of

negative emotions flooding out after years of repression. However, as a psychologist, Dr. McGarrahan's testimony necessarily centered on the emotions and thoughts within Mr. Hummel's mind. Testimony from someone with a social work background would have presented the jury with the other half of the coin—explaining why and how the stages of Mr. Hummel's life, most importantly his lack of appropriate relationships and nurturing attachments, reinforced his mental impairments and sent him down his life path.

//

//

//

//

//

//

//

//

4

EXHIBIT 43 Page 4  **847**

9.   Both perspectives are equally important to a complete understanding of an individual's behavior. It is critical to have a psychological evaluation and diagnosis of disorder. But it is also critical to form the narrative of how Mr. Hummel got to that place, how much of it is organic and "nature" vs. how much of it is environmental or "nurture." Had Mr. Hummel had testimony from a social worker during his trial to present this information to the jury, it is possible they would have had a more holistic understanding of him and his motivations.

I have read and reviewed this five page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on March 25 , 2014 in Austin, Texas.



Laura Sovine

Subscribed and sworn to before me on March 25, 2014.

GABRIEL SOLIS
Notary Public, State of Texas
My Commission Expires
January 13, 2016

NOTARY WITHOUT BOND

Notary Public, State of Texas

5

EXHIBIT 43 Page 5 **848**

# EXHIBIT 44

**849**

## BUSINESS RECORDS AFFIDAVIT OF CUSTODIAN OF RECORDS FOR THE TARRANT COUNTY SHERIFF'S DEPARTMENT

THE STATE OF TEXAS         §

                            §

COUNTY OF TARRANT       §

BEFORE ME, the undersigned authority, on this day personally appeared **Jerry Rucker**, who by me having been duly sworn made the following affidavit:

"My name is **Jerry Rucker**. I am above the age of twenty-one (21) years, fully competent to make this affidavit, and have personal knowledge of the matters of material fact hereinafter set forth, which are true and correct.

I am employed by the Tarrant County Sheriff's Department and have been since **August 11, 1993**. In this matter, I am the Custodian of Records for the Tarrant County Sheriff's Department, 200 Taylor Street, Fort Worth, Texas 76102; (817) 884-3700.

Attached hereto are **two (2)** pages of the requested records from the original mug shots; **three (3)** page of records from the original fingerprints; **seven (7)** pages of Classification records; **one (1)** page of records from the Inmate Visitation computer database; **two (2)** pages of the Friends and Relatives Visitation List from the Tarrant County Criminal Justice Computer Information System; **one (1)** page of records from the Inmate Money Room computer database; **three (3)** pages of records for incident on January 1, 2010; **one (1)** DVD of video for incident on January 1, 2010; **and two hundred and eighty-two (282)** pages of the requested records from the Inmate Booking file for the December 31, 2009 to present period of incarceration for a total of **three hundred and one (301)** pages and **one (1)** DVD of the requested records maintained by the Tarrant County Sheriff's Department on Hummel, John; DOB: 11/04/75. Also attached is a Certification of Fingerprints/Mug Shots as Official Copy document, certified by Deputy James Blaszak, which was prepared in response to your request and which is not included in the page count below. In addition, the "Criminal Person Booking List" attached to the copy of records from each Inmate Booking file is not included in the **three hundred and one (301)** page count below.

The **three hundred and one (301)** pages and **one (1)** DVD of the requested records concerning **Hummel, John** are kept by the Tarrant County Sheriff's Department in the regular course of business, and it was in the regular course of business of the Tarrant County Sheriff's Department for an employee or representative of the Tarrant County Sheriff's Department, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

BUSINESS RECORDS AFFIDAVIT OF JERRY RUCKER – PAGE 1

Initial _____

EXHIBIT 44 Page 1   **850**

The **three hundred and one (301)** pages and **one (1)** DVD of the attached requested records is a true, correct and exact duplicate of the original document contained in the Tarrant County Sheriff's Department's file.

Further, Affiant sayeth not."

_(signature)_

**JERRY RUCKER**

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by **JERRY W. RUCKER** on this the ⎯15⎯ day of ⎯April⎯, 2010.

_(signature)_
NOTARY PUBLIC in and for
The State of Texas

_Tammy Dossey_
Notary's Printed Name
My Commission Expires: 7/26/2013

_(notary seal:)_
TAMMY DOSSEY
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 07-26-2013

BUSINESS RECORDS AFFIDAVIT OF JERRY RUCKER – PAGE 2

Initial _(initials)_

EXHIBIT 44 Page 2 **851**

# TARRANT COUNTY SHERIFF'S OFFICE
## DETENTION OPERATIONS COMMAND

◯ OFFENSE     ◉ INCIDENT     ◯ MISCONDUCT     ◯ MEDICAL REPORT

DATE: 1/1/10          TIME: 19:14          SERVICE NUMBER: _____

SUBJECT: Hummel, John W.                    SUBJECT: _____

CID: 0763423      RACE: W    SEX: M          CID: _____   RACE: ____   SEX: ___

DOB: 11/04/1975   LOCATION: 26 O            DOB: _____   LOCATION: _____

NARRATIVE:

At approximatley 1852, Officer R. Thomas # 69709 and I heard a loud banging noise and then a yell coming from cell 26 O. When we arrived we noticed that Inmate Hummel was lying on his back half way out of the shower screaming that he fell and injured his back while taking a shower. A Code 6, Signal 1 was called at approximately 1853 hours. Staff members responding to the Code were Sgt. C. Garrett, Nurse's David Agbiboa, Linda Richards, Barbara Reed, and EMT F. Fry. The inmate was examined by Nurse Agbiboa. The Inmate was then placed onto his bunk per instructions and assistance by Nurse Agbiboa, Officer R. Dillard #68722 and myself. The inmates cell floor was cleaned as needed to remove all standing water. Code 6, Signal 1 was called green at 1903 hours. According to Nurse Agbiboa there were no apparent signs of cuts or bruises on Inmate Hummel.

| REPORTING OFFICER'S SIGNATURE | PRINT NAME | EMPLOYEE# |
|---|---|---|
|  | T. Rigmaiden | 69335 |

CORRECTIONAL PROCEDURES

Inmate Hummel remains in his assigned cell. Cpt Leggett notified of this incident by Sgt Garrett at approximately 1910 hours.

| SUPERVISOR'S SIGNATURE | PRINT NAME | EMPLOYEE# |
|---|---|---|
|  |  |  |
| WATCH COMMANDER'S SIGNATURE | PRINT NAME | EMPLOYEE# |
|  | SGT Carl L. Garrett | 2862 |
| REVIEWED BY | PRINT NAME | EMPLOYEE# |
|  | Cpt J. Leggett | 57153 |

Ver 1.3 08/2004

EXHIBIT 44 Page 3 **852**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

Name: Hummel, John    C.I.D. # 0763423

SPC I

☐ Administrative

☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|

### Part I - ( Special Instructions )
N, T, H, S.

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-1-10 | 1140 | H. Lawson #69933 | | Appears- Asleep on bunk, OK |
| | 1150 | A.L. " " 933 | | on bunk, OK |
| | 1200 | A.L. " " 933 | | on Bunk, OK |
| | 1209 | C. Nogueira | 71303 | Lying on Bunk |
| | 1216 | B. Gies | 70143 | Lying on Bunk |
| | 1223 | BG | 70143 | on Bunk |
| | 1232 | BG | 70143 | on Bunk |
| | 1241 | BG | 70143 | on Bunk |
| | 1250 | BG | 70143 | on Bunk |
| | 1257 | BG | 70143 | on Bunk |
| | 1300 | M. Ybarra | 60054 | Laying on bunk |
| | 1314 | BGies | 70143 | on Bunk |
| | 1323 | B. Gies | 70143 | on Bunk |
| | 1331 | B. Gies | 70143 | on Bunk |
| | 1340 | C. Nogueira | 71303 | Laying on bunk |
| | 1349 | C. Nogueira | 71303 | Laying on bunk |
| | 1359 | C. Nogueira | 71303 | Laying on bunk |
| | 1408 | C. Nogueira | 71303 | Laying on bunk |
| | 1410 | Sgt. C.R. Thomas #5098 | | laying on bunk asleep |
| | 1420 | C. Nogueira | 71303 | Laying on bunk |
| | 1429 | C. Nogueira | 71303 | Laying on bunk |
| | 1438 | C. Nogueira | 71303 | Laying on bunk |
| | 1448 | K Thomas | 69707 | Appears Asleep |
| | 1458 | F. Ali | 76002 | Appears Asleep |

Information continued on back

Yes or No (Circle one)

**853**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** HAMMEL, JOHN            **C.I.D. #** 0763423

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1/1/10 | 1505 | R.Dillel | 68722 | Appears Alurp |
| 1/1/10 | 1513 | T.Rigmaiden | 69385 | Appe - askep in bunk |
| | 1521 | R.Thomas | 69709 | Appears Asleep |
| | 1531 | F. Ali | 71034 | Appear Asleep |
| | 1541 | F. Ali | 71034 | Appears Asleep |
| | 1551 | F. Ali | 71034 | Appears Asleep |
| | 1601 | R.Alene | 70729 | Appears Asleep |
| | 1610 | R.Thomas | 69709 | Appears Asleep |
| | 1620 | R.Thomas | 69709 | Appears Asleep |
| | 1629 | R.Thomas | 69709 | Appears Asleep |
| | 1639 | R.Thomas | 69709 | Sitting up talking with Sgt Garroff |
| | 1648 | R.Thomas | 69709 | Sitting up in Bunk Eating |
| | 1655 | F. Ali | 71034 | Eating |
| 1/1/10 | 1705 | T.Rigmaiden | 69355 | Appn Asleep |
| | 1714 | R.Thomas | 69709 | Appears Asleep |
| | 1723 | R.Thomas | 69709 | Appears Asleep |
| 1-1-10 | 1731 | F. Ali | 71034 | Appears Asleep |
| | 1741 | R.Thomas | 69709 | Appears Asleep |
| | 1750 | R.Thomas | 69709 | Appears Asleep |
| | 1759 | R.Thomas | 69709 | Appears Asleep |
| 1-1-10 | 1808 | T.Rigmaiden | 69335 | Appn Asleep in bunk |
| 1-1-10 | 1806 | R.Thomas | 69709 | Appears Asleep |
| 1-1-10 | 1825 | T.Rigmaiden | 69335 | Awake standing in cell |
| 1-1-10 | 1934 | R.Thomas | 69709 | Appears Taking Shower |
| 1-1-10 | 1843 | R.Thomas | 69709 | Taking Shower |
| 1-1-10 | 1852 | R.Thomas | 69709 | Taking Shower |
| 1-1-10 | 1855 | (no Signal) 1-Fell in shower |
| 1-01-10 | 1903 | (no Signal) 1-Green (Clear) D. Agibiboa -RN |
| 1-01-10 | 1911 | R.Thomas | 69709 | Laying on Bunk |
| 1-01-10 | 1919 | T. Johnson | 70670 | Visit from nurses "David Flyod" |
| 1-01-10 | 1928 | T. Johnson | 70670 | Laying on Bunk |
| 1-01-10 | 1937 | T. Johnson | 70670 | Laying on Bunk |
| 1-01-10 | 1947 | T. Johnson | 70670 | Laying on Bunk |

CFMT-37

EXHIBIT 44 Page 5   **854**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: _Hemm E.I, John_    C.I.D. # _0263423_

☐ Administrative

☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) *SPC I* | Be Specific |
|---|---|---|

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|

**Part I - ( Special Instructions )**

## Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 12-31-09 | 1924 | R. Thomas | 69709 | Placed in South Holdover |
| 12-31-09 | 1931 | L. Espree | 71075 | Sitting with Doctor in Medical |
| 12-31-09 | 1939 | L. Espree | 71075 | Sitting on Bunk in Holdover |
| 12-31-09 | 1946 | L. Espree | 71075 | Sitting on Bunk Talking with MHMR |
| 12-31-09 | 1956 | R. Thomas | 69709 | Sitting on Bench Talking with MHMR |
| 12-31-09 | 2005 | T. Riambe | 69335 | Spoke with MHMR |
| 12-31-09 | 2011 | L. Espree | 71075 | Sitting on Bunk |
| 12-31-09 | 2019 | L. Espree | 71075 | Sitting on Bunk |
| 12-31-09 | 2027 | L. Espree | 71075 | Sitting on Bunk |
| 12-31-09 | 2036 | L. Espree | 71075 | Taking a Shower |
| 12-31-09 | 2045 | L. Espree | 71075 | Taking a Shower |
| 12-31-09 | 2052 | L. Espree | 71075 | Laying on Bunk |
| 12-31-09 | 2100 | L. Espree | 71075 | Laying on Bunk |
| 12-31-09 | 2110 | R. Thomas | 69709 | Appears Asleep |
| 12-31-09 | 2120 | R. Thomas | 69709 | Appears Asleep |
| 12-31-09 | 2129 | T. Riambe | 69535 | Appears Asleep on bunk |
| 12-31-09 | 2136 | L. Espree | 71075 | Appears Asleep |
| 12-31-09 | 2144 | L. Espree | 71075 | Appears Asleep |
| 12-31-09 | 2153 | L. Espree | 71075 | Appears Asleep |
| 12-31-09 | 2201 | L. Espree | 71075 | Appears Asleep |
| 12-31-09 | 2208 | L. Espree | 71075 | Appears Asleep |
| 12-31-09 | 2217 | L. Espree | 71075 | Appears Asleep |
| 12-31-09 | 2225 | L. Espree | 71075 | Sitting Up on Bunk |
| 12-31-09 | 2232 | R. Thomas | 69709 | Appears Asleep |

**855**

Revised 7/2000

CFMT-37

Inhibition change d or back
Yes or No  (Circle one)

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: HUMMEL John          C.I.D. # 0763 423

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| **Date Imposed** | **Authority** | **Date Due Out** | **Actual Date Out** |
| | | | |

### Part I - ( Special Instructions )
SPC I

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-06-10 | 1505 | F. Ali | 71034 | laying on bunk |
| 1-06-10 | 1515 | F. Ali | 71034 | laying on bunk |
| 1-06-10 | 1525 | C. Flynn | 70873 | laying on bunk |
| 1-06-10 | 1535 | F. Ali | 71034 | Appears asleep |
| 1-06-10 | 1545 | C. Flynn | 70873 | asleep on bunk |
| 1-06-10 | 1555 | F. Ali | 71034 | Appears asleep |
| 1-06-10 | 1604 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-06-10 | 1614 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-06-10 | 1623 | T. Rigmaiden | 69335 | awake for food |
| 1-06-10 | 1632 | T. Rigmaiden | 69335 | eating evng meal |
| 01/06/10 | 1640 | Sgt. Garrett | 2862 | using toilet |
| 01-06-10 | 1649 | T. Rigmaiden | 69335 | awake on bunk |
| 1-6-10 | 1659 | D. Harp | 70820 | Appears asleep |
| 1-6-10 | 1705 | F. Ali | 71034 | Appears asleep |
| 1-6-10 | 1715 | F. Ali | 71034 | Appears asleep |
| 01-06-10 | 1724 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 01-06-10 | 1733 | T. Rigmaiden | 69335 | Pm meds given to inmate |
| 01-06-10 | 1742 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 01-06-10 | 1752 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 01-06-10 | 1802 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 01-06-10 | 1812 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 01-06-10 | 1823 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-6-10 | 1830 | F. Ali | 71034 | Appears asleep |
| 1-6-10 | 1835 | F. Ali | 71034 | Appears asleep |

Revised 7/2000
CFMT-37

EXHIBIT   Information redacted
Yes or No  (Circle one)

**856**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

N.T.H.F.

**Name:** _Hummel, John_  **C.I.D. #** _0763425_

SPC-1

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 01/06/10 | 1844 | T. Riamaiden | 69335 | Appears asleep in bunk |
| 1-06-10 | 1854 | F. Ali | 71034 | Appears Asleep |
| 1-06-10 | 1905 | F. Ali | 71034 | Appear Asleep |
| 1-06-10 | 1925 | C. Flynn | 70813 | Appears Asleep on Bunk |
| 1-06-10 | 1933 | R. Thomas | 69709 | Appears Asleep |
| 1-06-10 | 1940 | F. AC | 71034 | Appears Asleep |
| 1-06-10 | 1950 | F. Ali | 71034 | Appears Asleep |
| 1-06-10 | 2000 | F. Ali | 71034 | Appears Asleep |
| 01-06-10 | 2010 | R. Thomas | 69709 | Appears Asleep |
| 1/6/10 | 2016 | R. Dillard | 68722 | Appears Asleep |
| 1/6/10 | 2025 | R. Dillard | 68722 | Appear Asleep |
| 01/06/10 | 2034 | T. Riamaiden | 69335 | Appear Asleep in bunk |
| 01/6/10 | 2040 | R. Dillard | 68722 | Appears Asleep |
| 01/06/10 | 2049 | T. Riamaiden | 69335 | Appears Asleep in bunk |
| 01/06/10 | 2055 | R. Dillard | 68722 | Appears Asleep |
| 01/06/10 | 2105 | R. Thomas | 69709 | Appears Asleep |
| 01-06-10 | 2115 | T. Riamaiden | 69335 | Appears Asleep in bunk |
| 01-06-10 | 2128 | R. Thomas | 69709 | Appears Asleep |
| 01-06-10 | 2134 | R. Thomas | 69709 | Appears Asleep |
| 01-06-10 | 2144 | R. Thomas | 69709 | Appears Asleep |
| 01-06-10 | 2154 | C. Flynn | 70813 | Asleep on Bunk |
| 01-06-10 | 2204 | C. Flynn | 70813 | Asleep on Bunk |
| 01-06-10 | 2214 | C. Flynn | 70813 | Asleep on Bunk |
| 01-06-10 | 2224 | C. Flynn | 70813 | Asleep on Bunk |
| 01-06-10 | 2230 | F. Ali | 71034 | Appears Asleep |
| 01-06-10 | 2240 | R. Thomas | 69709 | Appears Asleep |
|  | 2247 | A. Hrvacs | 5503 | laying on bunk |
|  | 2255 | A. Hrvacs | 5503 | laying on bunk |
|  | 2300 | C. Long | 68920 | laying on bunk |
|  | 2310 | C. Long | 68920 | laying on bunk |
|  | 2320 | C. Long | 68920 | laying on bunk |
|  | 2330 | C. Long | 68920 | laying on bunk |
|  | 2331 | S/F Fallin | 5561 | laying on bunk |

CFMT-37

EXHIBIT 44 Page 8  **857**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

Name: _Hinamc John_    C.I.D. # _0763423_    ☑ Administrative    ☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) _SPC 1_ | | Be Specific |
|---|---|---|---|
| Date Imposed | Authority | Date Due Out | Actual Date Out |

### Part I - ( Special Instructions )
_N T H S_

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-7-10 | 1637 | L. Sparks | 71075 | Lying On Bunk |
| 1-7-10 | 1646 | L. Sparks | 71075 | On Toilet |
| 1-7-10 | 1655 | F. Al. | 71034 | Appear Asleep |
| 01-07-10 | 1704 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 01-07-10 | 1713 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 01-07-10 | 1723 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 01-07-10 | 1732 | R. Thomas | 69709 | Appears Asleep |
| 1-07-10 | 1742 | L. Sparks | 71075 | Appears Asleep |
| 01-07-10 | 1751 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1-07-10 | 1801 | L. Sparks | 71075 | Appears Asleep |
| 1-07-10 | 1810 | R. Thomas | 69709 | Appears Asleep |
| 01-07-10 | 1819 | R. Thomas | 69709 | Appears Asleep |
| 01-07-10 | 1828 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 01-07-10 | 1837 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 01-07-10 | 1847 | R. Thomas | 69709 | Appears Asleep |
| 1-7-10 | 1857 | L. Sparks | 71075 | Appears Asleep |
| 1-7-10 | 1906 | L. Sparks | 71075 | Appears Asleep |
| 1/7/10 | 1916 | T. Johnson | 70070 | Appears asleep |
| 1-7-10 | 1526 | L. Sparks | 71075 | Appears Asleep |
| 1-7-10 | 1936 | L. Sparks | 71075 | Appears Asleep |
| 1/7/10 | 1946 | T. Johnson | 70070 | Appears asleep |
| 01-07-10 | 1955 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1/7/10 | 2005 | T. Johnson | 70070 | Appears asleep |
| 1/7/10 | 2015 | T. John | 70070 | Appears asleep |

Revised 7/2000
CFMT-37

EXHIBIT 44 Page 9
Information continued on back
Yes or No (Circle one)

**858**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

Name: _Howard John_          C.I.D. # _263423_

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1/7/10 | 2025 | Johnsc | 70670 | Appears asleep |
| 1-07-16 | 2035 | F. Al. | 71034 | Appears asleep |
| 1-07-10 | 2045 | F. Al. | 71034 | Appears asleep |
| 01-07-10 | 2056 | T. Rigmaiden | 69355 | Appears Asleep in bunk |
| 1-7-10 | 2105 | L. Ernst | 71025 | Appears asleep |
| 1-7-10 | 2115 | F. Al. | 71034 | Appears Asleep |
| 1-07-10 | 2130 | F. Al. | 71034 | Appears Asleep |
| 1-7-10 | 2129 | L. Ernst | 71025 | Appears asleep |
| 01-07-10 | 2139 | T. Rigmaiden | 69355 | Appears Asleep in bunk |
| 1-7-10 | 2146 | L. Ernst | 71025 | Appears asleep |
| 01-07-10 | 2155 | K. Thomas | 69709 | Appears Asleep |
| 01-07-10 | 2204 | K. Thomas | 69709 | Appears Asleep |
| 1-7-10 | 2214 | L. Ernst | 71025 | Appears asleep |
| 01-07-10 | 2223 | K. Thomas | 69709 | Appears Asleep |
| 01-07-10 | 2233 | K. Thomas | 69709 | Appears Asleep |
| 01-07-10 | 2243 | K. Thomas | 69709 | Appears Asleep |
| | 2250 | C. hing | 68920 | laying on bunk |
| | 2300 | C. hing | 68920 | laying on bunk |
| | 2308 | J. Peder | 70809 | Appears Asleep |
| | 2808 | S. H. William | 57268 | Appears Asleep/laying |
| | 2317 | J. Perez | 70809 | laying on bunk |
| | 2327 | J. Perez | 70809 | laying on bunk |
| | 2337 | J. Perez | 70809 | laying on bunk |
| | 2347 | J. Perez | 70809 | laying on bunk |
| | 2357 | J. Perez | 70809 | laying on bunk |
| 1-8-10 | 0002 | A. Morales | 55165 | laying on bunk |
| | 0010 | S. H. William | 57265 | laying on bunk |
| | 0620 | A. Morales | 55165 | laying on bunk |
| | 0634 | A. Morales | 55165 | laying on bunk |
| | 0640 | A. Morales | 55165 | laying on bunk |
| | 0654 | A. Morales | 55165 | laying on bunk |
| | 0104 | A. Morales | 55165 | laying on bunk |
| | 0108 | S. H. William | 57265 | laying on bunk |

EXHIBIT 44 Page 10   859

CFMT-37

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD   PRISONERS IN SEPARATION

Hummel, John

**Name:** Hummel, John                    D. # 0763423

---

### Part II - Daily Inspection Record
1133   **(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 01/07/10 | 1142 | Zubia | 59687 | ok |
|  | 1151 | Zubia | " | ok |
|  | 1200 | Zubia | " | on |
|  | 1209 | Zub | " | ok |
|  | 1217 | SP | 66215 | ok |
|  | 1225 | SP | 66215 | ok |
|  | 1234 | M.Y | 60054 | OK |
|  | 1243 | MY |  | OK |
|  | 1252 | MY |  | OK |
|  | 1301 | MY |  | OK |
|  | 1309 | O'Bannon | 65681 | Laying on bunk |
|  | 1318 | MY |  | OK |
|  | 1328 | O'Bannon | 65681 | Laying on bunk |
|  | 1338 | O'Bannon | 65681 | Laying on bunk |
|  | 1347 | MY |  | Laying on bunk |
|  | 1356 | MY |  | Laying on bunk |
|  | 1405 | MY |  | OK |
|  | 1414 | MY |  | OK |
|  | 1423 | MY |  | OK |
|  | 1432 | MY |  | Laying on bunk |
|  | 1441 | MY |  | Laying on bunk |
|  | 1450 | MY |  | Laying on bunk |
| 01-07-10 | 1459 | R.Thomas | 69709 | Appears Asleep |
| 01/07/10 | 1505 | R.Dillard | 68722 | Appears Asleep |
| 1-7-10 | 1515 | L.Bypere | 7635 | Appears awake |
| 01-07-10 | 1524 | R.Thomas | 69709 | Appears Asleep |
| 01-07-10 | 1534 | R.Thomas | 69709 | Appears Asleep |
| 1-7-10 | 1540 | R.Dillard | 68722 | Appears Asleep |
| 1-7-10 | 1549 | L.Bypere | 7635 | Appears awake |
| 1-7-10 | 1559 | L.Bypere | 7635 | Appears awake |
| 1-7-10 | 1608 | R.Thomas | 69709 | Appears Asleep |
| 1-7-10 | 1618 | L.Bypere | 7635 | Appears awake |
| 1-7-10 | 1627 | R.Thomas | 69709 | Eating |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

Name: HUMMEL, JOHN          C.I.D. # 0763423

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|
| | NTHF | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|
| | | | |

**Part I - ( Special Instructions )**

See I

**Part II - Daily Inspection Record**
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 01-05-10 | 1457 | J TERRAZAS | 70669 | APPEARS ASLEEP |
| 01-05-10 | 1505 | J TERRAZAS | 70669 | APPEARS ASLEEP |
| 01-05-10 | 1514 | J TERRAZAS | 70669 | APPEARS ASLEEP |
| 01-05-10 | 1523 | T. Rigmaiden | 69355 | Appears Asleep on bunk |
| 1-05-10 | 1530 | J. Hamilton | 70938 | On Bunk - Appears secure |
| 1-05-10 | 1538 | J TERRAZAS | 70669 | APPEARS ASLEEP |
| 1-05-10 | 1546 | J TERRAZAS | 70669 | APPEARS ASLEEP |
| 01-05-10 | 1555 | T Rigmaiden | 69335 | Appear Asleep in bunk |
| 01-05-10 | 1602 | J. Hamilton | 7738 | on Bunk - Appears Secure |
| 01-05-10 | 1610 | J TERRAZAS | 70669 | APPEARS ASLEEP |
| 01-05-10 | 1618 | J Terrazas | 70669 | APPEARS ASLEEP |
| 01-05-10 | 1625 | J Terrazas | 70669 | EATING DINNIN |
| 01-05-10 | 1625 | T Rigmaiden | 69335 | eating evening meal |
| 01-05-10 | 1633 | J. Hamilton | 7938 | EATING Dinner |
| 01-05-10 | 1645 | Sgt Harriot | 2862 | Sleeping |
| 01-05-10 | 1653 | J TERRAZAS | 70669 | STANDING ON CELL FLOOR |
| 1-5-10 | 1657 | J Hamilton | 7736 | Recieved meals |
| 1-5-10 | 1705 | JH | " | On Bunk |
| 1-5-10 | 1715 | JH | " | |
| 1-5-10 | 1725 | JH | " | |
| 1-5-10 | 1730 | JH | " | " |
| 1-5-10 | 1738 | T. Rigmaiden | 69355 | Appears Asleep in bunk |
| 1-5-10 | 1745 | T. Rigmaiden | 69355 | Appears Asleep in bunk |
| 1-5-10 | 1754 | J TERRAZAS | 70669 | APPEARS ASLEEP ON BUNK |

EXHIBIT Continued on back
Information Page # ____
Yes or No  (Circle one)

**861**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

SPCE

**Name:** _Hummel John_                          **C.I.D. #** _0763425_

N TUF

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-5-10 | 1802 | U Terrazus | 70668 | Appears asleep |
| 1-5-10 | 1814 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 1821 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 1830 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 1840 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 1840 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 1856 | U Terrazus | 70669 | Appears asleep in bunk |
| 1-5-10 | 1906 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 1915 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 1924 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 1932 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 1940 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 1949 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 1957 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2006 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2014 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2023 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2032 | T. Rigmaiden | 69335 | Appears asleep on bunk |
| 1-5-10 | 2041 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2050 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2056 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2104 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2113 | U Terrazus | 70669 | Appears asleep on bunk |
| 1-5-10 | 2121 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1/5/10 | 2127 | R Dillard | 68722 | Appears asleep |
| 1-5-10 | 2136 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 2145 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 2153 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 2203 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-5-10 | 2212 | L. Thomas | 69709 | Appears asleep |
| 1-5-10 | 2221 | L. Thomas | 69709 | Appears asleep |
| 1-5-10 | 2230 | R. Thomas | 69709 | Standing at door |
| 1-5-10 | 2240 | R. Thomas | 69709 | Taking shower |

CFMT-37

EXHIBIT 44 Page 13   **862**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

### (Print or Type)

**Name:** Hummel John          **C.I.D. #** 0763423

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) N -T -H -S | | Be Specific |
|---|---|---|---|
| **Date Imposed** | **Authority** | **Date Due Out** | **Actual Date Out** |

### Part I - ( Special Instructions )
SPC I

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-27-10 | 1718 | F. Ali | 71034 | Reading |
| 1-27-10 | 1728 | R Thomas | 69709 | Reading |
| 1-27-10 | 1738 | R Thomas | 69709 | Reading |
| 1-27-10 | 1748 | R Thomas | 69709 | Standing By Door |
| 1-27-10 | 1757 | T Rigmaiden | 69335 | Reading a book |
| 1-27-10 | 1807 | R Thomas | 69709 | Reading A book |
| 1-27-10 | 1814 | R Thomas | 69709 | Reading A book |
| 1-27-10 | 1823 | R Thomas | 69709 | Reading A Book |
| 1-27-10 | 1831 | R Thomas | 69709 | Standing At Door |
| 1-27-10 | 1838 | R Thomas | 69709 | Standing At Door |
| 1-27-10 | 1846 | T Rigmaiden | 69335 | using the Commode |
| 1-27-10 | 1855 | T Rigmaiden | 69335 | Reading the Bible |
| 1-27-10 | 1905 | R Thomas | 69709 | Reading The Bible |
| 1-27-10 | 1915 | T Rigmaiden | 69335 | Standing in his cell |
| 1-27-10 | 1924 | T Rigmaiden | 69335 | Lying Awake in his bunk |
| 1-27-10 | 1934 | T Rigmaiden | 69335 | awake in his bunk |
| 1-27-10 | 1940 | F. Ali | 76002 | Appears Asleep |
| 1-27-10 | 1950 | R Thomas | 69709 | Appears Asleep |
| 1-27-10 | 1959 | R Thomas | 69709 | Appears Asleep |
| 1-27-10 | 2005 | F. Ali | 71034 | Appears Asleep |
| 1-27-10 | 2015 | F. Ali | 71034 | Appears Asleep |
| 1-27-10 | 2025 | F. Ali | 71034 | Appears Asleep |
| 1-27-10 | 2035 | F. Ali | 71034 | Appears Asleep |
| 1-27-10 | 2045 | F. Ali | | Appears Asleep |

**863**

Revised 7/2000
CFMT-37          EXHIBIT 44/Page 14
Information continued on back
Yes or No  (Circle one)

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel John          **C.I.D. #** 0763733

SPCI

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-27-10 | 2055 | F, Al. | 71634 | Appears Asleep |
| 1-27-10 | 2105 | F, Al | 71634 | Appears Asleep |
| 1-27-10 | 2115 | F, Al. | 71634 | Appears Asleep |
| 1-27-10 | 2130 | F, Al. | 71634 | Appears Asleep |
| 1-27-10 | 2140 | R Thomas | 69709 | Appears Asleep |
| 1-27-10 | 2149 | R Thomas | 69709 | Appears Asleep |
| 1-27-10 | 2158 | T. Rigmaidel | 69335 | Appears Asleep in bunk |
| 1-27-10 | 2205 | F. Ali. | 71634 | Appears Asleep |
| 1-27-10 | 2215 | T. Rigmaidel | 69335 | Appears Asleep in bunk |
| 1-27-10 | 2222 | R Thomas | 69709 | Appears Abe Asleep |
| 1-27-10 | 2232 | R Thomas | 69709 | Appears Asleep |
| 1-27-10 | 2242 | R Thomas | 69709 | Appears Asleep |
| 1-27-10 | 2250 | F. Ale. | 71634 | Appears Asleep |
| 1-27-10 | 2300 | CN | 70447 | Appears Sleep |
|  | 2310 | A Mercad | 54845 | Appears Asleep on bunk |
|  | 2315 | A Mercado | 54849 | Appears Asleep on bunk |
|  | 2305 | A Mercado | 54849 | Appears Asleep on bunk |
|  | 2330 | A Mercado | 54849 | Appears Asleep on bunk |
|  | 2348 | A Mercad | 54845 | Appears Asleep on bunk |
|  | 2345 | Sgt Williams | 57265 | Ab Asleep in bu |
|  | 2350 | A Mercado | 54849 | Appears Asleep on bunk |
| 1/28/10 | 0000 | A Mercado | 54849 | Appears Asleep on bunk |
|  | 0010 | C. Olmos | 57777 | Appears Asleep |
|  | 0020 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 0030 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 0040 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 0050 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 0100 | C. Olmos | 57777 | Appears Asleep |
|  | 0110 | CN | 70447 | Appears Sleep |
|  | 0120 | CN | 70447 | Appears Sleep |
|  | 0130 | CN | 70447 | Appears Sleep |
|  | 0140 | CN | 70447 | Appears Sleep |
|  | 015 V | CN | 70447 | Appears Sleep |

CFMT-37

EXHIBIT 44 Page 15    864

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

**Name:** *Himmel John*  **C.I.D. #** *0763493*

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|
| | *N-T-H-S* | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|

**Part I - ( Special Instructions )**

*S P C - I*

## Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time (?) | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 01-28-10 | 1915 | F. Ali | 71034 | Appears Asleep |
| 1-28-10 | 1925 | F. Ali | 71034 | Appears Asleep |
| 1-28-10 | 1935 | F. Ali | 71034 | Appears Asleep |
| 1/28/10 | 1945 | T. Johnson | 70650 | Appears asleep |
| 1-28-10 | 1955 | R. Thomas | 69709 | Appears Asleep |
| 1-28-10 | 2005 | R. Thomas | 69709 | Appears Asleep |
| 1-28-10 | 2015 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-28-10 | 2025 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-28-10 | 2035 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-28-10 | 2045 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1-28-10 | 2055 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-28-10 | 2105 | R. Thomas | 69709 | Appears Asleep |
| 1/28/10 | 2115 | T. Johnson | 70650 | Appears asleep |
| 1-28-10 | 2125 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-28-10 | 2135 | F. Ali | 71034 | Appears Asleep |
| 1/28/10 | 2145 | T. Johnson | 70650 | Appears asleep |
| 1-28-10 | 2155 | F. Ali | 71034 | Appears asleep |
| 1-28-10 | 2205 | F. Ali | 71034 | Appears Asleep |
| 1-28-10 | 2215 | F. Ali | 71034 | Appears Asleep |
| 1-28-10 | 2225 | P. Peters | 71017 | APPEARS ASLEEP |
| 1/28/10 | 2235 | T. Johnson | 70650 | Appears asleep |
| 1-28-10 | 2245 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| | 2300 | J. Doss | 70021 | Appears Asleep in bunk |
| | 2310 | J. Doss | 70021 | Appears Asleep in bunk |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John          **C.I.D. #** 0763423

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-28-10 | 1430 | Ash | 70203 | laying on bunk |
| | 1440 | Ash | 70203 | laying on bunk |
| | 1450 | Ash | 70203 | laying on bunk |
| 1-28-10 | 1459 | F. Do. | 71034 | Reading |
| 1-28-10 | 1503 | R Thomas | 69709 | Reading The Bible |
| 1-28-10 | 1510 | F. Al. | 71034 | Reading |
| 1/28/10 | 1520 | T Johns | 00610 | on bunk reading |
| 1-28-10 | 1530 | T. Rigmaiden | 69335 | ready a book |
| 1-28-10 | 1540 | F. Al. | 71034 | Reading |
| 1-28-10 | 1548 | R Thomas | 69709 | Sitting on Bunk |
| 1-28-10 | 1557 | T. Rigmaiden | 69335 | Reading a book in his bunk |
| 1/28/10 | 1607 | T Johnson | 00610 | on bunk reading |
| 1-28-10 | 1615 | F. Al. | 71034 | Reading |
| 1-28-10 | 1625 | F. Al. | 71034 | Reading |
| 1/28/10 | 1635 | T John | 00610 | Eating dinner |
| 1-28-10 | 1645 | T. Rigmaiden | 69335 | Read the bible |
| 1-28-10 | 1655 | F. Al. | 71034 | Reading |
| 1-28-10 | 1703 | R Thomas | 69709 | Sitting Reading the bible |
| 1-28-10 | 1709 | R Thomas | 69709 | Using Toilet |
| 1-28-10 | 1718 | R Thomas | 69709 | Standing Reading |
| 1-28-10 | 1728 | R Thomas | 69709 | Standing at door |
| 1-28-10 | 1737 | R Thomas | 69709 | Taking Shower |
| 1-28-10 | 1746 | T. Rigmaiden | 69335 | Inmate taking a shower |
| 1-28-10 | 1751 | R Thomas | 69709 | Finishing shower |
| 1-28-10 | 1759 | R Thomas | 69709 | Appears Asleep |
| 1-28-10 | 1808 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1-28-10 | 1818 | R Thomas | 69709 | Appears Asleep |
| 1-28-10 | 1828 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1-28-10 | 1837 | T. Rigmaiden | 69335 | Appears Asleep |
| 1-28-10 | 1847 | R Thomas | 69709 | Appears Asleep |
| 1-28-10 | 1856 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1-28-10 | 1904 | R Thomas | 69709 | Appears Asleep |
| 1-28-10 | 1910 | F. Al. | 71034 | Appears Asleep |

CFMT-37

EXHIBIT 44 Page 17   866

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

**Name:** Hummel John          **C.I.D. #** 076423

☐ **Administrative**

☐ **Disciplinary**

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| **Date Imposed** | **Authority** | **Date Due Out** | **Actual Date Out** |

**Part I - ( Special Instructions )**

*SPC I*

**Part II - Daily Inspection Record**
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-29-10 | 1400 | R Manning | 66665 | ON Bunk Reading |
| | 1410 | R M | 66665 | ON Bunk Reading |
| | 1420 | R M | 66665 | ON Bunk |
| | 1430 | R M | 66665 | ON Bunk |
| | 1440 | M Ybarra | 66654 | Laying on bunk |
| | 1450 | M Y | | Laying on bunk |
| 1-29-10 | 1500 | F, Ali | 71034 | Appears Asleep |
| 1-29-10 | 1510 | F, Ali | 71034 | Appears Asleep |
| | 1520 | J Johns | 70676 | On bunk reading |
| 1-29-10 | 1530 | J Johnson | 70620 | On bunk reading |
| 1-29-10 | 1540 | T, Rigmaiden | 69335 | Read a book |
| 1-29-10 | 1550 | F, Ali | 71034 | Reading |
| 1-29-10 | 1555 | F, Ali | 71034 | Reading |
| 1-29-10 | 1605 | F, Ali | 71034 | Reading |
| 1-29-10 | 1615 | F, Ali | 71034 | Reading |
| 1/29/10 | 1625 | J Johnson | 70610 | On bunk eating |
| 1-29-10 | 1635 | C Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 1641 | C Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 1651 | C Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 1700 | T, Rigmaiden | 69335 | Read a book |
| 1-29-10 | 1710 | C Thomas | 69709 | Reading a Book |
| 1-29-10 | 1720 | C Thomas | 69709 | Standing at Door |
| 1-29-10 | 1730 | C Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 1740 | F, Ali | 71034 | Reading |

Information Continued on Back
Yes or No  (Circle one)

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel John          **C.I.D. #** 0763423

---

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-29-10 | 1750 | F. Ali | 71034 | Reading |
| 1-29-10 | 1758 | R.Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 1807 | T.R.Bammich | 69335 | Reading a book |
| 1-29-10 | 1821 | R.Thomas | 69709 | Standing at door |
| 1-29-10 | 1829 | R.Thomas | 69709 | On Bunk Reading |
| 1-28-10 | 1838 | F. Ali | 71034 | Reading |
| 1-28-10 | 1848 | R.Thomas | 69709 | on Bunk Reading |
| 1-28-10 | 1855 | F. Ali | 71034 | Reading |
| 1/28/10 | 1905 | T. Johnson | 70620 | Standing at door |
| 1-28-10 | 1915 | F. Ali | 71034 | in the Shower |
| 1-28-10 | 1925 | F. Ali | 71034 | Reading |
| 1/28/10 | 1935 | T. John | 70670 | On bunk reading |
| 1/28/10 | 1945 | T. John | 70670 | On bunk reading |
| 1-28-10 | 1955 | F. Ali | 71034 | Reading |
| 1/29/10 | 2001 | R.Dubld | 68722 | Reading |
| 1-29-10 | 2011 | R.Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 2016 | R.Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 2026 | R.Thomas | 69709 | On Bunk Reading |
| 1/29/10 | 2056 | T. John | 70620 | On bunk reading |
| 1/29/10 | 2046 | T. John | 70620 | On bunk reading |
| 1-28-10 | 2056 | F. Ali | 71034 | Reading |
| 1-29-10 | 2102 | R.Dubld | 68722 | Reading |
| 1-29-10 | 2107 | R.Dubld | 68722 | Reading |
| 1-28-10 | 2115 | F. Ali | 71034 | Reading |
| 1-28-10 | 2125 | F. Ali | 71034 | Reading |
| 1-29-10 | 2135 | R.Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 2145 | R.Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 2154 | R.Thomas | 69709 | On Bunk Reading |
| 1-29-10 | 2205 | T. Bigmaiah | 69335 | Appears Asleep in bunk |
| 1-29-10 | 2215 | T. Bigmaiah | 69335 | Appears Asleep in bunk |
| 1-28-10 | 2225 | F. Ali | 71034 | Appears Asleep |
| 1-28-10 | 2235 | F. Ali | 71034 | Appears Asleep |
| 1-29-10 | 2245 | F. Ali | 71034 | Appears Asleep |

CFMT-37

EXHIBIT 44 Page 19   868

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: Hummel, John          C.I.D. # 0763423

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|
| | SPCT | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|

**Part I - ( Special Instructions )**

**Part II - Daily Inspection Record**
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1/30/10 | 1638 | T. Johnson | 70670 | Sitting on bunk reading |
| 1-30-10 | 1647 | T. Rigmaiden | 69335 | Taking a shower |
| 1-30-10 | 1656 | K Thomas | 69769 | Taking a shower |
| 1-30-10 | 1705 | T. Rigmaiden | 69335 | Reading the Bible |
| 1-30-10 | 1716 | T. Rigmaiden | 69335 | Standing at cell door |
| 1-30-10 | 1725 | T. Rigmaiden | 69335 | Stdg at cell door |
| 1-30-10 | 1734 | T. Rigmaiden | 69335 | Reading the Bible |
| 1-30-10 | 1743 | K. Clene | 70729 | Reading the Bible |
| 1-30-10 | 1752 | K. Clene | 70729 | Reading the Bible |
| 1-30-10 | 1801 | T. Rigmaiden | 69335 | Ready the bible |
| 1/30/10 | 1811 | T. Johnson | 70670 | Sitting on bunk reading |
| 1-30-10 | 1820 | T. Rigmaiden | 69335 | Awake in his bunk |
| 1-30-10 | 1830 | T. Rigmaiden | 69335 | Awake in bunk |
| 1-30-10 | 1839 | T. Rigmaiden | 69335 | Appear asleep in his bunk |
| 1-30-10 | 1848 | T. Rigmaiden | 69335 | Appear asleep in bunk |
| 1-30-10 | 1858 | T. Rigmaiden | 69335 | Appear asleep in bunk |
| 1-30-10 | 1908 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 1917 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 1926 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 1935 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 1944 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 1953 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 2002 | K. Clene | 70729 | Appears asleep |
| 1-30-10 | 2011 | K. Clene | 70729 | Appears asleep |

**Revised 7/2000**
CFMT-37

EXHIBIT 33
Information continued
Yes or No  (Circle one)

**869**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John          **C.I.D. #** 0763903

## Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1/30/10 | 2021 | Johnson | 70670 | Appears asleep |
| 1-30-10 | 2030 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2040 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2049 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2058 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2108 | R. Thomas | 69709 | Appears Asleep |
| 1-30-10 | 2117 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2126 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2135 | R. Thomas | 69709 | Appears Asleep |
| 1-30-10 | 2144 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2154 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2203 | T. Rigamaidel | 69535 | Appears Asleep in bunk |
| 1-30-10 | 2213 | R. Thomas | 69709 | Appears secure Asleep |
| 1-30-10 | 2222 | R. Thomas | 69709 | Appears Asleep |
| 1-30-10 | 2232 | R. Thomas | 69709 | Appears Asleep |
| 1-30-10 | 2242 | R. Thomas | 69709 | Appears Asleep |
| 1-30-2010 | 2252 | J. Doss | 70021 | Appears Asleep on bunk |
| | 2300 | J. Doss | 70021 | Appears Asleep on bunk |
| | 2310 | J. Doss | 70021 | Appears Asleep on bunk |
| | 2320 | J. Doss | 70021 | Appears Asleep on bunk |
| | 2330 | J. Doss | 70021 | Appears Asleep on bunk |
| | 2340 | J. Doss | 70021 | Appears Asleep on bunk |
| | 2350 | J. Doss | 70021 | Appears Asleep on bunk |
| 1-31-2010 | 2400 | J. Doss | 70021 | Appears Asleep on bunk |
| 1-31-10 | 0010 | JB | 70759 | Appears Asleep |
| | 0020 | JB | 70759 | Appears Asleep |
| | 0030 | JB | 70759 | Appears Asleep |
| | 0040 | JB | 70759 | Appears Asleep |
| | 0050 | JB | 70759 | Appears Asleep |
| | 0059 | JB | 70759 | Appears Asleep |
| | 0109 | JB | 70759 | Appears Asleep |
| | 0119 | JB | 70759 | Appears Asleep |
| | 0129 | JB | 70759 | Appears Asleep |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

Name: Hummel, John    C.I.D. # 676342-J

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| | SPC I | | |
| Date Imposed | Authority | Date Due Out | Actual Date Out |
| | | | |

### Part I - ( Special Instructions )

N.T.H.S.

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 2-2-10 | 1425 | O'Banie | 65681 | Reading a book |
| | 1434 | Tabor | 55687 | on /writing |
| | 1443 | O'Banie | 65681 | Reading |
| | 1452 | O'Banie | 65681 | Reading |
| 2-2-10 | 1501 | T.R.Lamoisdal | 69335 | Reading a book |
| 2-2-10 | 1511 | K Clene | 70729 | Reading a book |
| 2-2-10 | 1521 | K Thomas | 69709 | Sitting on bunk Reading |
| 2-2-10 | 1530 | R Thomas | 69709 | Sitting on bunk Reading |
| 2-2-10 | 1540 | D. Arep | 70820 | Sitting on bunk reading |
| 2-2-10 | 1550 | K Clene | 70729 | Sitting on bunk reading |
| 2-2-10 | 1600 | K Clene | 70729 | Sitting on bunk reading |
| 2-2-10 | 1610 | K Clene | 70729 | sitting on bunk reading |
| 2-2-10 | 1620 | K Thomas | 69709 | Sitting on bunk Reading |
| 2-2-10 | 1630 | R Thomas | 69709 | Sitting on Bunk Reading |
| 2-2-10 | 1640 | R Thomas | 69709 | sitting on Bunk Reading |
| 2-2-10 | 1650 | T.R.Lamoisdal | 69335 | Read a book in his bunk |
| 2-2-10 | 1705 | S.H. Garrett | 22862 | Reading on bunk |
| 2-2-10 | 1715 | K Clene | 70729 | Reading on Bunk |
| 2-2-10 | 1725 | K Clene | 70729 | Reading on Bunk |
| 2-2-10 | 1735 | R Thomas | 69709 | Standing At door |
| 2-2-10 | 1745 | R Thomas | 69709 | Standing At door |
| 2-2-10 | 1755 | R Thomas | 69709 | Standing At door |
| 2-2-10 | 1805 | R Thomas | 69709 | Taking shower |
| 2-2-16 | 1815 | R Thomas | 69709 | Taking shower |

information continued on back
Yes or No (Circle one)

EXHIBIT 44 Page 22

**871**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Admanel John          **C.I.D. #** O76 3423

---

### Part II - Daily Inspection Record
#### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 2-2-10 | 1825 | K. Clenc | 70729 | Reading book on bunk |
| 2-2-10 | 1835 | K. Clenc | 70729 | Reading book on bunk |
| 2-2-10 | 1845 | K. Clenc | 70729 | Reading book on bunk |
| 2-2-10 | 1855 | K. Clenc | 70729 | Reading book on bunk |
| 2-2-10 | 1905 | T. Rigmaiden | 69335 | Reads a book |
| 2-2-10 | 1915 | K. Clenc | 70729 | Reading book on bunk |
| 2-2-10 | 1925 | K. Clenc | 70729 | Reading book on bunk |
| 2-2-10 | 1935 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 1945 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 1955 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 2005 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 2015 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 2025 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 2034 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 2044 | P. Rosenko | 69227 | Appears Near Sleeping |
| 2-2-10 | 2053 | T. Rigmaiden | 69335 | Appears Asleep in his bunk |
| 2-2-10 | 2102 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2112 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2121 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2131 | R. Thomas | 69709 | Appears Asleep |
| 2-2-10 | 2140 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2150 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2155 | R. Thomas | 68755 | Appears Asleep |
| 2-2-10 | 2204 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2213 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2223 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2232 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2241 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 2-2-10 | 2250 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
|  | 2300 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 2310 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 2320 | C. Olmos | 57777 | Appears Asleep on bunk |
|  | 2330 | C. Olmos | 57777 | Appears Asleep on bunk |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: _Hummel, John_    C.I.D. # _0263423_

☐ **Administrative**

☐ **Disciplinary**

| Offense: (If Disciplinary) | Reason (If Administrative) _SRCI_ | Be Specific |
|---|---|---|

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|

### Part I - ( Special Instructions )
_N.T.H.S._

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 2-03-10 | 1645 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 1655 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 1705 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 1715 | F. Ali | 7103Y | Reading |
| 2-3-10 | 1725 | R. Thomas | 6909 | Reading sitting on Bunk |
| 2-3-10 | 1730 | R. Thomas | 6909 | At Door Taking Medication |
| 2-3-10 | 1740 | F. Ali | 7103Y | Reading |
| 2-3-10 | 1750 | R. Thomas | 6909 | Sitting on Bunk Reading a Book |
| 2/3/10 | 1755 | Amon | 68003 | Laying on Bunk (Movement) |
| 2/3/10 | 1805 | Amon | 68003 | Sitting on Bunk |
| 2/3/10 | 1815 | Amon | 68003 | at Door |
| 2/3/10 | 1825 | Amon | 68003 | at Door |
| 2-3-10 | 1835 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 1844 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 1853 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 2003 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 2013 | R. Thomas | 6909 | Sitting on Bunk Reading |
| 2-3-10 | 1923 | G. Flynn | 70813 | Sitting on Bunk Reading |
| 2-3-10 | 1933 | G. Flynn | 70813 | Sitting on Bunk Reading |
| 2/3/10 | 1943 | Amon | 68003 | In Shower Area |
| 2/3/10 | 1950 | Amon | 68003 | On Bunk |
| 2/3/10 | 2000 | Amon | 68003 | Sitting on Bunk |
| 2/3/10 | 2010 | Amon | 68003 | Sitting on Bunk |
| 2/3/10 | 2016 | Amon | 68003 | On Bunk (Movement) |

Information continued on back
Yes or No  (Circle one)

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

Name: _Himmel  John_          C.I.D. # _0763423_

---

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-12-10 | 1915 7:19 2018 | K. Bennett | 71239 | Sleeping |
| 1-12-10 | Th 2023 TU | T. Rigmaiden | 69335 | Appea Asleep in bunk |
| 1-12-10 | 1932 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 1941 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 1950 | T. Rigmaiden | 69335 | Appear Asleep in bunk |
| 1-12-10 | 2000 | C. Thom | 70813 | Asleep on bunk |
| 1-12-10 | 2010 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-20 | 2019 | T. Rigmaiden | 69335 | Appear Asleep in bunk. |
| 1-12-10 | 2028 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2037 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2045 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2054 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2100 | K. Bennett | 71239 | Sleeping |
| 1-12-10 | 2110 | K. Bennett | 71239 | Sleeping |
| 1-12-10 | 2118 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2128 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2137 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2145 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2155 | C. Thom | 70813 | Appears Asleep on Bunk |
| 1-12-10 | 2205 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2213 | V. Terrazas | 70669 | Appears Asleep |
| 1-12-10 | 2223 | C. Thom | 70813 | Appears Asleep on Bunk |
| 1-12-10 | 2230 | R. Dilley | 68972 | Laying Down |
| 1-12-10 | 2238 | R. Dilley | 68972 | Laying Down |
| 1-12-10 | 2245 | R. Dilley | 68972 | Laying Down |
| 1-12-10 | 2255 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2305 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2315 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2325 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2335 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2345 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2354 | C. Olmos | 57777 | Appears Asleep |
| 1-12-10 | 2357 | S. Williams | 57265 | Cell inspection |

CFMT-37

EXHIBIT 44 Page 25   **874**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

Name: Hummel, John          C.I.D. # 0763423

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|
| | SPC I | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|
| | | | |

**Part I - ( Special Instructions )**

**Part II - Daily Inspection Record**
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-12-10 | 1540 | T. Rigmaiden | 69335 | Inmate in Infirmary |
| 1-12-10 | 1550 | T. Rigmaiden | 69335 | Inmate Return to cell |
| 1-12-10 | 1600 | T. Rigmaiden | 69335 | Awake on his bunk |
| 1-12-10 | 1606 | V. Terrus | 70669 | Reading on Bunk |
| 1-12-10 | 1615 | T. Rigmaiden | 69335 | Awake Reading a book |
| 1-12-10 | 1625 | V. Terrus | 70669 | Reading on Bunk |
| 1-12-10 | 1633 | R. Dillul | 68722 | Sitting on Bunk |
| 1-12-10 | 1640 | K. Bennett | 71239 | eating Dinner |
| 1-12-10 | 1648 | V. Terrus | 70669 | Standing at Sink |
| 1-12-10 | 1700 | T. Rigmaiden | 69335 | Awake read a book |
| 1-12-10 | 1708 | V. Terrus | 70669 | On Bunk reading |
| 1-12-10 | 1717 | T. Rigmaiden | 69335 | Inmate Received medications |
| 1-12-10 | 1726 | V. Terrus | 70669 | on Bunk |
| 1-12-10 | 1736 | V. Terrus | 70669 | on Bunk |
| 1-12-10 | 1744 | V. Terrus | 70669 | Laying on Bunk |
| 1-12-10 | 1753 | T. Rigmaiden | 69335 | Appr. Asleep in bunk |
| 1-12-10 | 1802 | T. Rigmaiden | 69335 | Appr. Asleep in bunk |
| 1-12-10 | 1812 | T. Rigmaiden | 69335 | Appr. Asleep in bunk |
| 1-12-10 | 1823 | T. Rigmaiden | 69335 | Appr. Asleep in bunk |
| 1-12-10 | 1830 | K. Bennett | 71239 | Sleeping |
| 1-12-10 | 1840 | K. Bennett | 71239 | Sleeping |
| 1-12-10 | 1849 | K. Bennett | 71239 | Sleeping |
| 1-12-10 | 1955 | K. Bennett | 71239 | Sleeping |
| 12-10 | 2005 | K. Bennett | 71239 | Sleeping |

Information Furnished on back
Yes or No  (Circle one)

**875**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John          **C.I.D. #** 0763423

---

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-12-10 | 1110 | G Banin | 65681 | Just finish eating |
| | 1119 | M Amos | 69454 | sitting down on bunk reading |
| | 1128 | O Banin | 65681 | sitting on bunk reading |
| | 1137 | O Banin | 65681 | sitting on bunk reading |
| | 1145 | O Banin | 65681 | sitting on bunk reading |
| | 1154 | O Banin | 65681 | sitting on bunk reading |
| | 1202 | D EVANS | 58459 | reading |
| | 1210 | DLE | | READING |
| | 1218 | DLE | | READING |
| | 1226 | DLE | | READING |
| | 1234 | DLE | | reading |
| | 1242 | DLE | | reading |
| | 1250 | DLE | | Reading |
| 1-12-10 | 1300 | P. Felder | 58054 | Reading |
| | 1306 | DLE | | READING |
| | 1314 | DLE | | Reading |
| | 1320 | P. Felder | | Reading |
| | 1327 | DLE | | READING |
| | 1330 | DLE | | READING |
| | 1338 | DLE | | Reading |
| | 1346 | DLE | | Reading |
| | 1355 | M Amos | 69454 | sitting on bunk reading |
| | 1404 | DLE | | Reading |
| | 1413 | DLE | | Reading |
| | 1421 | R McKinney | 66665 | Reading |
| | 1430 | DLE | | Reading |
| | 1438 | DLE | | Reading |
| | 1444 | DLE | | Reading |
| | 1453 | DLE | | Reading |
| 1-12-10 | 1500 | Tym | 70813 | READING ON BUNK |
| | 1510 | Tym | 70813 | READING ON BUNK |
| 1-12-10 | 1520 | T. Rapnicki | 69335 | Remove from cell - visit |
| 1-12-10 | 1530 | T. Hummel | 69335 | Inmate Law visit |

CFMT-37

EXHIBIT 44 Page 27    **876**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: Hummel, John          C.I.D. # 0763423          ☐ Administrative

☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) SPCI | | Be Specific |
|---|---|---|---|
| Date Imposed | Authority | Date Due Out | Actual Date Out |
| | | | |

### Part I - ( Special Instructions )

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-13-10 | 1810 | D. Harp | 70826 | Appears Asleep |
| 1-13-10 | 1820 | R. Thomas | 69709 | Appears Asleep |
| 1-13-10 | 1829 | R. Thomas | 69709 | Appears Asleep |
| 1-13-10 | 1838 | R. Thomas | 69709 | Appears Asleep |
| 1-13-10 | 1847 | R. Thomas | 69709 | Appears Asleep |
| 1-13-10 | 1856 | R. Thomas | 69709 | Appears Asleep |
| 1-13-10 | 1906 | Flynn | 70813 | Asleep on Bunk |
| 1-13-10 | 1916 | Flynn | 70813 | Asleep on Bunk |
| 1-13-10 | 1926 | Flynn | 70813 | Asleep on Bunk |
| 1-13-10 | 1936 | Flynn | 70813 | Asleep on Bunk |
| 1/13/10 | 1946 | D Harp | 70826 | Appears Asleep |
| 1/13/10 | 1956 | DH | | Appears Asleep |
| 1/13/10 | 2006 | DH | | Appears Asleep |
| 1-13-10 | 2016 | C. Flynn | 70813 | Asleep on Bunk |
| 1-13-10 | 2026 | C. Flynn | 70813 | Asleep on Bunk |
| | 2036 | J. Thornhill | | Asleep on Bunk |
| | 2046 | J. Thornhill | | Asleep on Bunk |
| | 2056 | Thornhill | | Asleep on Bunk |
| | 2606 | Thornhill | | Asleep on Bunk |
| | 2116 | Thornhill | | Asleep on Bunk |
| | 2126 | Thornhill | | Asleep on Bunk |
| | 2136 | Thornhill | | Asleep on Bunk |
| | 2146 | Thornhill | | Asleep on Bunk |
| | 2156 | P. Peters | 71017 | Appears Asleep |

**877**

Revised 7/2000
CFMT-37
EXHIBIT 44 Page 28
Information continued on back
Yes or No (Circle one)

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

*NTHS*

(Print or Type)

**Name:** _Hummel, John_     **C.I.D. #** _0763423_

☐ **Administrative**

☐ **Disciplinary**

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| **Date Imposed** | **Authority** | **Date Due Out** | **Actual Date Out** |

### Part I - ( Special Instructions )

*SPC I*

### Part II - Daily Inspection Record
#### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-14-10 | 1952 | R. Thomas | 69709 | Appears Asleep |
| 1-14-10 | 1957 | R. Thomas | 69709 | Appears Asleep |
| 1-14-10 | 2003 | R. Thomas | 65709 | Appears Asleep |
| 1-14-10 | 2008 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2018 | F. Ali | 71034 | Appears Asleep |
| 1-14-10 | 2026 | T. Ritzmaiden | 69335 | Appears Asleep in bunk |
| 1-14-10 | 2035 | T. Ritzmaiden | 69335 | Again Asleep in bunk |
| 1-14-10 | 2043 | R. Thomas | 69709 | Appears Secure / Asleep |
| 1-14-10 | 2045 | F. Ali | 71034 | Appears Secure - Asleep |
| 1-14-10 | 2054 | R. Thomas | 69705 | Appears Asleep |
| 1-14-10 | 2057 | R. Thomas | 69709 | Appears Asleep |
| 1-14-10 | 2104 | R. Thomas | 69709 | Appears Asleep |
| 1-14-10 | 2110 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2120 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2130 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2139 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2148 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2155 | P. Peters | 71017 | APPEARS ASLEEP |
| 1-14-10 | 2205 | R. Thomas | 69709 | Appears Asleep |
| 01-14-10 | 2215 | F. Ali | 71034 | Appears Asleep |
| 01-14-10 | 2225 | R. Thomas | 69709 | Appears Asleep |
| 01-14-10 | 2239 | R. Thomas | 69709 | Appears Asleep |
| 1-14-10 | 2238 | F. Ali | 71034 | Appears Asleep |
| 1-14-10 | 2245 | R. Thomas | 69709 | Appears Asleep |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John                     **C.I.D. #** 0763423

---

### Part II - Daily Inspection Record
1509   (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-16-10 | 1517 | Masters | 71071 | READING |
| 1-16-10 | 1527 | L. Spence | 71075 | READING A BOOK |
| 1-16-10 | 1537 | L. Spence | 71075 | READING A BOOK |
| 1-16-10 | 1547 | C. Flynn | 70813 | READING ON BUNK |
| 1-16-10 | 1557 | C. Flynn | 70813 | STANDING AT TOILET |
| 1-16-10 | 1608 | T. Rigmaiden | 69335 | Awake reading book |
| 1-16-10 | 1613 | T. Rigmaiden | 69335 | Reading a book in bunk |
| 1-16-10 | 1622 | B. Masters | 71071 | READING ON BED |
| 1-16-10 | 1630 | B. Masters | 71071 | READING |
| 1-16-10 | 1638 | B. Masters | 71071 | EATING |
| 1-16-10 | 1648 | L. Spence | 71075 | READING A BOOK |
| 1-16-10 | 1657 | B. Masters | 71071 | READING ON BED |
| 1-16-10 | 1705 | B. Masters | 71071 | READING ON BED |
| 1-16-10 | 1715 | L. Spence | 71075 | READING A BOOK |
| 1-16-10 | 1725 | L. Spence | 71075 | READING A BOOK |
| 1-16-10 | 1734 | B. Masters | 71071 | READING ON BED |
| 1-16-10 | 1744 | L. Spence | 71075 | LAYING ON BUNK |
| 1-16-10 | 1752 | B. Masters | 71071 | READING ON BED |
| 1-16-10 | 1801 | T. Rigmaiden | 69335 | Reading a book on bunk |
| 1-16-10 | 1810 | T. Rigmaiden | 69335 | reading a book in his bunk |
| 1-16-10 | 1819 | T. Rigmaiden | 69335 | Reading a book |
| 1-16-10 | 1829 | T. Rigmaiden | 69335 | Reading a book in his bunk |
| 1-16-10 | 1838 | T. Rigmaiden | 69335 | Reading a book in bunk |
| 1-16-10 | 1848 | C. Flynn | 70813 | ASLEEP ON BUNK |
| 1-16-10 | 1858 | C. Flynn | 70813 | ASLEEP ON BUNK |
| 1-16-10 | 1908 | B. Masters | 71071 | APPEARS ASLEEP |
| 1-16-10 | 1918 | L. Spence | 71075 | Appears asleep |
| 1-16-10 | 1928 | L. Spence | 71075 | Appears asleep |
| 1-16-10 | 1938 | C. Flynn | 70813 | APPEARS ASLEEP ON BUNK |
| 1-16-10 | 1948 | L. Spence | 71075 | Appears asleep |
| 1-16-10 | 1956 | T. Rigmaiden | 69335 | Appear Asleep in bunk |
| 1-16-10 | 2005 | Aubuchon | 71278 | laying in bunk looks asleep |
| 1-16-10 | 2015 | L. Spence | 71075 | Appears asleep |

EXHIBIT 44 Page 30   **879**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: _Hummel John_   C.I.D. # _0763423_

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| | _SPC I_ | | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|
| | | | |

| Part I - ( Special Instructions ) |
|---|
| |

## Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-15-10 | 1935 | F. Ac. | 71034 | Appears Asleep |
| 1-15-10 | 1941 | R. Dillal | 68722 | Appears Asleep |
| 1-15-10 | 1950 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 1959 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2009 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2018 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2027 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2036 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2041 | R Dillal | 68722 | Appears Asleep |
| 1-15-10 | 2050 | F. Ac. | 71034 | Appears Asleep |
| 1-15-10 | 2059 | F. Ac. | 71034 | Appears Asleep |
| 1-15-10 | 2105 | F. Ac. | 71034 | Appears Asleep |
| 1-15-10 | 2110 | F. Ac. | 71034 | Appears Asleep |
| 1-15-10 | 2120 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2128 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2137 | R.T Thomas | 69709 | Appears Asleep |
| 1-15-10 | 2146 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2154 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2203 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2211 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2220 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2229 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2238 | B. Masters | 71077 | Appears Asleep |
| 1-15-10 | 2245 | F. Ac. | 71034 | Appears Asleep |

Revised 7/2000
CFMT-37

EXHIBIT 11 Page 33
Information continued on back
Yes or No (Circle one)

**880**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

Name: _Hemmel John_          C.I.D. # _0763423_

**Part II - Daily Inspection Record**
**(Date, Time and Signature columns must be completed.)**

1451

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-15-10 | 1500 | F, Ali | 71034 | Appears Asleep |
| 1-15-10 | 1510 | F, Ali | 71034 | Appears Asleep |
| 1-15-10 | 1518 | R. Dillard | 68722 | Sitting in Bed |
| 1-15-10 | 1528 | F, AC | 71084 | Sitting on Bed |
| 1-15-10 | 1538 | R Thomas | 69709 | Standing in cell |
| 1-15-10 | 1546 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-15-10 | 1556 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-15-10 | 1606 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-15-10 | 1611 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-15-10 | 1620 | T, Rigmaiden | 69375 | Appears to be reading a book |
| 1-15-10 | 1628 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-15-10 | 1639 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-15-10 | 1646 | R Dilley | 68722 | Sitting on Bunk |
| 1-15-10 | 1652 | R Dilley | 68722 | Sitting on Bunk |
| 1-15-10 | 1702 | R Thomas | 69709 | Sitting on Bunk |
| 1-15-10 | 1711 | R Thomas | 69709 | Sitting on Bunk |
| 1-15-10 | 1720 | F, AC | 71034 | Sitting on Bunk - Eating |
| 1-15-10 | 1730 | F, AC | 71034 | Sitting on Bunk - |
| 1-15-10 | 1740 | R Thomas | 69709 | Sitting on Bunk - |
| 1-15-10 | 1749 | R Thomas | 69709 | Sitting on Bunk |
| 1-15-10 | 1756 | R Thomas | 69709 | Sitting on Bunk |
| 1-15-10 | 1805 | R Thomas | 69709 | Appears Asleep |
| 01/15/10 | 1810 | Sgt Garrett | 2262 | Asleep on Bunk |
| 1-15-10 | 1815 | R Dilley | 68722 | Appears Asleep |
| 1-15-10 | 1823 | R Thomas | 69709 | Appears Asleep |
| 1-15-10 | 1830 | R Dilley | 68722 | Appears Asleep |
| 1-15-10 | 1838 | R Thomas | 69709 | Appears Asleep |
| 1-15-10 | 1845 | R Dilley | 68722 | Appears Asleep |
| 1-15-10 | 1851 | R Dilley | 68722 | Appears Asleep |
| 1-15-10 | 1859 | D, Masters | 71077 | Appears Asleep |
| 1-15-10 | 1905 | F, Al | 71034 | Appears Asleep |
| 1-15-10 | 1915 | F, Ali | 71034 | Appears Asleep |
| 1-15-10 | 1925 | F, Ali | 71034 | Appears Asleep |

CFMT-37

EXHIBIT 44 Page 32   **881**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John          **C.I.D. #** 0763423

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1/19/10 | 1300 | A | 70709 | Appears Asleep |
| | 1309 | A | 70709 | Appears Asleep |
| | 1317 | N. Law | 69933 | Appears - Asleep, OK |
| | 1326 | M. Evans | 68454 | Laying down on bunk |
| | 1335 | A | 70709 | Appears Asleep |
| | 1344 | N. Law | 69933 | Appears - Asleep |
| | 1353 | N. Law | 69933 | Appears - Asleep |
| 01-19-10 | 1402 | N. Law | 69933 | on bunk, Reading Book, OK |
| | 1411 | A | 70709 | on bunk Reading book ok |
| | 1420 | A | 70709 | on bunk reading book ok |
| | 1429 | A | 70709 | on bunk, reading book ok |
| | 1438 | N. Law | 69933 | on bunk reading book ok |
| | 1454 | S.O. | 58523 | on Bunk Reading Book |
| 1-19-10 | 1503 | T. Rigmaiden | 69335 | Awake in cell |
| 1-19-10 | 1512 | R. Thomas | 68709 | Sitting on Bunk |
| 1-19-10 | 1521 | T. Rigmaiden | 69335 | Awake standing in his cell |
| 1-19-10 | 1530 | Sgt. Garza | 2862 | Reading |
| 1-19-10 | 1539 | R. Thomas | 68709 | on Toilet |
| 1-19-10 | 1548 | T. Rigmaiden | 69335 | reading a book |
| 1-19-10 | 1558 | T. Rigmaiden | 69335 | reading a book |
| 1-19-10 | 1607 | T. Rigmaiden | 69335 | reading a book in bunk |
| 1-19-10 | 1616 | D. Boyd | 70820 | Reading a book |
| 1-19-10 | 1630 | Sgt. Garza | 2862 | eating evening meal |
| 1-19-10 | 1640 | R. Thomas | 68709 | standing in cell |
| 1-19-10 | 1650 | R. Thomas | 68709 | Using toilet |
| 1-19-10 | 1659 | R. Thomas | 68709 | Sitting on Bunk reading |
| 1-19-10 | 1709 | R. Thomas | 68709 | Sitting on Bunk reading |
| 1-19-10 | 1718 | T. Rigmaiden | 69335 | Rest on his bunk |
| 1-19-10 | 1728 | T. Rigmaiden | 69335 | Rest in his bunk |
| 1-19-10 | 1737 | T. Rigmaiden | 69335 | Reads on his bunk |
| 1-19-10 | 1746 | T. Rigmaiden | 69335 | Appears to be Reading |
| 1-19-10 | 1756 | R. Thomas | 68709 | Reading on Bunk |
| 1-19-10 | 1805 | R. Thomas | 68709 | Reading on Bunk |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

Name: _Hummel, John_   C.I.D. # _0763423_

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|
| | _SAC - I_ | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|
| | | | |

**Part I - ( Special Instructions )**

_N, T, H, S,_

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-19-10 | 1805 | R. Thomas | 69709 | Reading on Bunk |
| 1-19-10 | 1815 | T. Rimmaidal | 69335 | Read a book on his bunk |
| 1-19-10 | 1824 | T. Rimmaidal | 69335 | Read a book on his bunk |
| 1-19-10 | 834 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 1843 | T. Rimmaidal | 69335 | Appears Asleep in bunk |
| 1-19-10 | 1853 | D. Aarp | 70826 | Appears asleep in bunk |
| 1-19-10 | 1902 | T. Rimmaidal | 69335 | Appears Asleep in bunk |
| 1-19-10 | 1911 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 1921 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 1931 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 1940 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 1950 | T. Rimmaidal | 69335 | Appears Asleep in bunk |
| 1-19-10 | 2000 | D. Aarp | 70826 | Appears Asleep on bunk |
| 1-19-10 | 2010 | D. Aarp | 70826 | Appears Asleep on bunk |
| 1-19-10 | 2019 | T. Rimmaidal | 69335 | Appears reading a book on bunk |
| 1-19-10 | 2028 | T. Rimmaidal | 69335 | Reading a book on his bunk |
| 1-19-10 | 2038 | T. Rimmaidal | 69335 | Reading a book |
| 1-19-10 | 2048 | R. Thomas | 69709 | Reading A book |
| 1-19-10 | 2058 | R. Thomas | 69709 | Reading A BOOK |
| 1-19-10 | 2107 | R. Thomas | 69709 | Reading A BOOK |
| 1-19-10 | 2115 | R. Thomas | 69709 | Reading A BOOK |
| 1-19-10 | 2125 | R. Thomas | 69709 | Reading Appears Asleep |
| 1-19-10 | 2134 | R. Thomas | 69709 | Using Toilet |
| 1-19-10 | 2143 | R. Thomas | 69709 | Using Toilet |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

Name: _Hummel, John_  C.I.D. # _0765423_

_SPC-1_

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-19-10 | 2149 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 2159 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 2209 | D. Harp | 76826 | Appears Asleep |
| 1-19-10 | 2219 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 2229 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 2237 | R. Thomas | 69709 | Appears Asleep |
| 1-19-10 | 2245 | R. Thomas | 69709 | Appears Asleep |
| | 2256 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2306 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2316 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2326 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2336 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2346 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2350 | A. Marado | 5948 | Appears Asleep on bunk |
| | 2355 | A. Marado | 5948 | Appears Asleep on bunk |
| 1/20/10 | 0000 | B. Calhoun | 69801 | Appears asleep on bunk |
| | 0004 | S. Williams | 7115 | Appears Asleep |
| | 0018 | B. Calhoun | 69801 | laying on bunk facing wall |
| | 0028 | B. Calhoun | 69801 | laying on bunk facing wall |
| | 0038 | B. Calhoun | 69801 | appears asleep on bunk |
| | 0048 | B. Calhoun | 69801 | appears asleep |
| | 0058 | B. Calhoun | 69801 | appears asleep |
| | 0100 | C. Long | 68920 | laying on bunk |
| | 0110 | C. Long | 68920 | laying on bunk |
| | 0120 | C. Long | 68920 | laying on bunk |
| | 0130 | C. Long | 68920 | laying on bunk |
| | 0140 | C. Long | 68920 | laying on bunk |
| | 0150 | C. Long | 68920 | laying on bunk |
| | 0200 | C. Long | 68920 | laying on bunk |
| | 0210 | m. Nard | 70624 | Laying on bunk, Appears Asleep |
| | 0220 | m. Nard | 70624 | Laying on bunk, Appears Asleep |
| | 0230 | m. Nard | 70624 | Laying on bunk, Appears Asleep |
| | 0240 | m. Nard | 70624 | Laying on bunk, Appears Asleep |

CFMT-37

EXHIBIT 44 Page 35  **884**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

**Name:** Hummel, John          **C.I.D. #** b763423

☐ Administrative

☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| | NHS | | |
| **Date Imposed** | **Authority** | **Date Due Out** | **Actual Date Out** |
| | | | |

### Part I - ( Special Instructions )
SPC-I

### Part II - Daily Inspection Record
1946 (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-20-10 | 1956 | A. Quinonez | 70865 | Reding on bunk |
| 1-20-10 | 2005 | T. Rigmaiden | 69335 | Reading a book in his bunk |
| 1-20-10 | 2015 | A. Quinonez | 70865 | Reading on bunk |
| 1-20-10 | 2025 | T. Rigmaiden | 69335 | Appears to be Reading a book |
| 1-20-10 | 2035 | Simon | 60603 | Sitting on Bunk |
| 1-20-10 | 2043 | A. Quinonez | 70865 | Reading on bunk |
| 1-20-10 | 2052 | Simon | | On bunk |
| 1-20-10 | 2102 | A. Quinonez | 70865 | Reading on bunk |
| 1-20-10 | 2112 | T. Rigmaiden | 69335 | Reading a book in his bunk |
| 1-20-10 | 2120 | A. Quinonez | 70865 | Reading on bunk |
| 1-20-10 | 2130 | Simon | | Sitting on Bunk |
| 1-20-10 | 2137 | Simon | | Appears Reading |
| 1-20-10 | 2147 | Simon | | Laying on Bunk (Appears asleep) |
| 1-20-10 | 2157 | T. Rigmaiden | 69335 | Appears asleep in bunk |
| 1-20-10 | 2206 | A. Quinonez | 70865 | appears asleep |
| 1-20-10 | 2215 | T. Rigmaiden | 69335 | Appears Asleep in bunk |
| 1-20-10 | 2222 | A. Quinonez | 70865 | appears asleep |
| 1-20-10 | 2230 | A. Quinonez | 70865 | appears asleep |
| 1-20-10 | 2239 | A. Quinonez | 70865 | appears asleep |
| 1-20-10 | 2249 | A. Quinonez | 70865 | appears asleep |
| | 2255 | A. Mercado | 54983 | Appears Asleep on bunk |
| | 2305 | A. Mercado | 54983 | Appears Asleep on bunk |
| | 2315 | A. Mercado | 54983 | Appears Asleep on bunk |
| | 2325 | A. Mercado | 54983 | Appears asleep on bunk |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel John

**C.I.D. #** 0763423

---

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-21-10 | 1641 | Timmon | 68803 | ON Toilet |
| 1-21-10 | 1647 | R. Thomas | 69709 | on Toilet |
| 1-21-10 | 1655 | Timmon | 68862 | ON Bunk (Reading) |
| 1-21-10 | 1705 | Timmon | | Sitting on Bunk (Movement) |
| 1-21-10 | 1715 | Timmon | | ON Bunk |
| 1-21-10 | 1725 | Timmon | | Sitting on Bunk |
| 1-21-10 | 1735 | F. Ali | 71034 | Sitting on bunk |
| 1-21-10 | 1745 | F. Ali | 71034 | Sitting on bunk |
| 1-21-10 | 1753 | Timmon | | ON Bunk |
| 1-21-10 | 1805 | R. Thomas | 69709 | on Bunk Reading |
| 1-21-10 | 1815 | Timmon | | Sitting on Bunk |
| 1-21-10 | 1822 | Timmon | | ON Bunk (Reading) |
| 1-21-10 | 1830 | Timmon | | ON Bunk (Grooming Reading) |
| 1-21-10 | 1838 | R. Thomas | 69709 | On Bunk Reading |
| 1-21-10 | 1848 | R. Thomas | 69709 | On Bunk Reading |
| 1-21-10 | 1856 | R. Thomas | 69709 | on Bunk Reading |
| 1-21-10 | 1906 | Timmon | | ON Bunk |
| 1-21-10 | 1915 | Timmon | | ON Bunk (Movement) |
| 1-21-10 | 1925 | Timmon | | ON Bunk |
| 1-21-10 | 1930 | F. Ali | 71034 | on Bunk |
| 1-21-10 | 1930 | Timmon | | ON Bunk |
| 1-21-10 | 1940 | F. Ali | 71034 | sitting on bunk |
| 1-21-10 | 1949 | T. Ringmaided | 69935 | Read a book |
| 1-21-10 | 1958 | T. Ringmaided | 69335 | Read a book in his bunk |
| 1-21-10 | 2005 | Timmon | | ON Bunk (Movement) |
| 1-21-10 | 2015 | F. Ali | 71034 | Reading book |
| 1-21-10 | 2022 | R. Thomas | 69709 | On Bunk Reading |
| 1-21-10 | 2032 | F. Ali | 71034 | Sitting on Bunk |
| 1-21-10 | 2040 | Timmon | 68803 | ON Bunk |
| 1-21-10 | 2048 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-21-10 | 2056 | Timmon | | ON Bunk (Movement) |
| | 2108 | Timmon | | ON Bunk |
| | 2116 | Timmon | | ON Bunk |

EXHIBIT 44 Page 37   886

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**(Print or Type)**

**Name:** Hummel, John          **C.I.D. #** 0762423

☐ Administrative

☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | Be Specific |
|---|---|---|
| | SPCI | |

| Date Imposed | Authority | Date Due Out | Actual Date Out |
|---|---|---|---|
| | | | |

### Part I - ( Special Instructions )
N.T.H.S

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-21-10 | 1327 | J.C.L | 70203 | reading |
| | 1336 | J.C.L | 70203 | reading |
| | 1345 | J.C.L | 70203 | reading |
| | 1354 | J.C.L | 70203 | reads |
| | 1403 | J.C.L | 70203 | reading |
| | 1412 | Pilin | 55081 | ok |
| | 1421 | J.C.L | 70205 | ok |
| | 1430 | R. Manning | 66665 | DNK |
| | 1438 | J.C.L | 70203 | on bunk |
| | 1447 | J.C.L | 70203 | on bunk |
| 1-21-10 | 1455 | Simon | 66763 | Sitting on bunk |
| 1-21-10 | 1500 | F. Al: | 7034 | Sitting on Bunk |
| 1-21-10 | 1509 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-21-10 | 1518 | F. Al: | 71034 | Stading at the door |
| 1-21-10 | 1527 | R. Thomas | 69709 | Sitting on Bunk Reading |
| | 1532 | Simon | 66763 | On Bunk (Movement) |
| 1-21-10 | 1535 | F. Al: | 71034 | on Bunk. |
| 1-21-10 | 1545 | Simon | | ON Bunk (Appears Reading) |
| 1-21-10 | 1555 | Simon | | Sitting on Bunk |
| 1-21-10 | 1601 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-21-10 | 1610 | F. Al: | 71034 | Appears Asleep |
| | 1616 | Simon | | ON Bunk |
| | 1623 | Simon | | On Bunk |
| 1-21-10 | 1632 | F. Al: | 71034 | Appears Asleep |

Revised 7/2000
CFMT-37
EXHIBIT
Information Reading 0-48   or back
Yes or No  (Circle one)
887

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John        **C.I.D. #** 0763423

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-23-10 | 2122 | R. Thomas | 69709 | Sitting up Reading |
| 1-23-10 | 2131 | T. Alammidad | 69335 | Ready a book in his bunk |
| 1-23-10 | 2140 | T. Alammidad | 69355 | ready a book |
| 1-23-10 | 2149 | R. Thomas | 68709 | Sitting up Reading |
| 1-23-10 | 2159 | R. Thomas | 69209 | Sitting up Reading |
| 1-23-10 | 2209 | R. Thomas | 69709 | Sitting up Reading |
| 1-23-10 | 2215 | R. Thomas | 69709 | Sitting up Reading |
| 1-23-10 | 2224 | T. Alammidad | 69335 | Readin a book in his bunk |
| 1-23-10 | 2224 | T. Alammidad | 69335 | ready a book |
| 1-23-10 | 2240 | R. Thomas | 69709 | Appears Asleep |
| 1-23-10 | 2245 | F. Al | 71034 | Appear Asleep |
| 1-23-10 | 2255 | Al | 70757 | Appears asleep |
| 1-23-10 | 2305 | Al | 70757 | Appears asleep |
| 1-23-10 | 2315 | Al | 70757 | Appears asleep |
| 1-23-10 | 2325 | Al | 70757 | Appears asleep |
| 1-23-10 | 2335 | Al | 70757 | Appears asleep |
| 1-23-10 | 2345 | Al | 70757 | Appears asleep |
| 1-23-10 | 2355 | Al | 70757 | Appears asleep |
| 1-24-10 | 0005 | J. Doss | 70021 | Appears Asleep |
|  | 0015 | J. Doss | 70021 | Appears Asleep |
|  | 0025 | J. Doss | 70021 | Appears Asleep |
|  | 0035 | J. Doss | 70021 | Appears Asleep |
|  | 0045 | J. Doss | 70021 | Appears Asleep |
|  | 0055 | J. Doss | 70021 | Appears Asleep |
|  | 0105 | J. Doss | 70021 | Appears Asleep |
| 1-24-10 | 0115 | S. Perez | 70804 | Laying on bunk |
|  | 0125 | S. Perez | 70804 | Laying on bunk |
|  | 0135 | S. Perez | 70804 | Laying on bunk |
|  | 0145 | S. Perez | 70804 | Laying on bunk |
|  | 0155 | S. Perez | 70804 | Laying on bunk |
|  | 0205 | Al | 69411 | Sleeping on bunk |
|  | 0215 | Al | 69411 | Sleeping on bunk |
|  | 0225 | Al | 69411 | Sleeping on bunk |

CFMT-37

EXHIBIT 44 Page 39   888

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

### (Print or Type)

Name: _Hummel, John_   C.I.D. # _0763423_

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| | SPC I | | |
| Date Imposed | Authority | Date Due Out | Actual Date Out |
| | | | |

### Part I - ( Special Instructions )
N.T.H.S

### Part II - Daily Inspection Record
**(Date, Time and Signature columns must be completed.)**

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1/23/10 | 1734 | R Thomas | 69705 | Sitting on Bunk Reading |
| 1-23-10 | 1744 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1754 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1804 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1814 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1824 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1830 | F. Bq | 71034 | Sitting on Bunk |
| 1-23-10 | 1839 | T Rigmaiden | 69335 | Awake Reading A book |
| 1-23-10 | 1849 | R Thomas | 69709 | Awake Reading A book |
| 1-23-10 | 1857 | R Thomas | 69709 | on Toilet |
| 1-23-10 | 1907 | R Thomas | 69709 | Sitting up Reading A Book |
| 1-23-10 | 1910 | R Thomas | 69709 | Sitting up Reading A Book |
| 1-23-10 | 1920 | R Thomas | 69709 | Sitting up Reading A Book |
| 1-23-10 | 1930 | R Thomas | 69709 | Sitting up Reading A Book |
| 1-23-10 | 1939 | R Thomas | 69709 | Sitting up Reading A Book |
| 1-23-10 | 1945 | R Thomas | 69709 | Sitting up Reading A Book |
| 1/23/10 | 1955 | T John | 0670 | Sitting on bunk reading |
| 1/23/10 | 2005 | John | 0670 | Sitting on bunk reading |
| 1-23-10 | 2015 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 2025 | R Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 2044 | T Rigmaiden | 69335 | Awake Reading a book |
| 1-23-10 | 2053 | R Thomas | 69709 | Sitting up Reading |
| 1-23-10 | 2102 | T Rigmaid | 69335 | Ready a book on his bunk |
| 1-23-10 | 2112 | R Thomas | 69709 | Sitting up Reading |

EXHIBIT ___ Information Page 40

**889**

Yes or No  (Circle one)

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel John      **C.I.D. #** 0763423

---

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-23-10 | 1230 | | 70709 | On Bunk Reading |
| 1-23-10 | 1209 | | 70709 | On Bunk Reading |
| 1-23-10 | 1248 | | 70709 | On Bunk laying down |
| 1-23-10 | 1257 | | 70709 | On Bunk laying down |
| 1-23-10 | 1306 | | 70709 | On Bunk laying down |
| 1-23-10 | 1315 | | 70709 | Appears to be asleep |
| 1-23-10 | 1325 | O'Banion | 65681 | Appears asleep |
| 1-23-10 | 1334 | | 70709 | Appears Asleep |
| 1-23-10 | 1343 | M. EVANS | 69456 | Sitting down reading |
| 1-23-10 | 1350 | O'Banion | 65681 | Standing at the door |
| 1-23-10 | 1359 | M. Evans | 69454 | Sitting down reading |
| 1-23-10 | 1408 | | 70709 | Sitting on Bunk reading |
| 1-23-10 | 1417 | | 70709 | Sitting on bunk reading |
| 1-23-10 | 1426 | | 70709 | Sitting on bunk reading |
| 1-23-10 | 1435 | | 70709 | Sitting on bunk reading |
| 1-23-10 | 1444 | M. EVANS | 69456 | Standing by the toilet |
| 1/23/10 | 1454 | J. Johnson | | Sitting on bunk reading |
| 1-23-10 | 1503 | F. Ali | 71034 | reading Book |
| 1-23-10 | 1510 | F. Ali | 71034 | reading Book |
| 1-23-10 | 1517 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1/23/10 | 1527 | J. Johnson | 70670 | Sitting on toilet |
| 1/23/10 | 1537 | J. Johnson | 70670 | Sitting on Bunk reading |
| 1-23-10 | 1545 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1/23/10 | 1555 | J. Johnson | 70670 | Sitting on Bunk reading |
| 1/23/10 | 1605 | J. Johns | 70670 | Sitting on bunk reading |
| 1/23/10 | 1615 | J. Johns | 70670 | Sitting on bunk reading |
| 1/23/10 | 1625 | J. Johns | 70670 | Sitting on bunk reading/eating |
| 1-23-10 | 1635 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1644 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-23-10 | 1654 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1/23/10 | 1704 | J. Johnson | 70670 | Sitting on bunk reading |
| 1-23-10 | 1714 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1/23/10 | 1724 | J. Johnson | 70670 | Sitting on toilet |

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

**Name:** HUMMEL, JOHN                **C.I.D. #** 0763423

☐ Administrative
☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| | SPC I | | |
| **Date Imposed** | **Authority** | **Date Due Out** | **Actual Date Out** |
| | | | |

**Part I - ( Special Instructions )**

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1-22-10 | 1448 | M. Ybarra | 66654 | Sitting reading |
| 1-22-10 | 1458 | L. Sparks | 71075 | Reading A Book |
| 1-22-10 | 1504 | R. Thomas | 69705 | Reading A Book |
| 1-22-10 | 1510 | F. Ali | 71034 | Sitting on bunk |
| 1-22-10 | 1520 | L. Sparks | 71075 | Standing At Door |
| 1-22-10 | 1530 | L. Sparks | 71075 | Reading A Book |
| 1-22-10 | 1540 | L. Sparks | 71075 | Reading A Book |
| 1/22/10 | 1550 | T. Johnson | 06070 | Reading a book |
| 1-22-10 | 1600 | L. Sparks | 71075 | Reading A Book |
| 1-22-10 | 1610 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1620 | L. Sparks | 71075 | Reading a Book |
| 1-22-10 | 1632 | L. Sparks | 71075 | Asleep on bunk |
| 1-22-10 | 1640 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1649 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1659 | L. Sparks | 71075 | Reading A Book |
| 1-22-10 | 1708 | R. Thomas | 69709 | Reading on Bunk |
| 1-22-10 | 1718 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1/22/10 | 1728 | T. Johnson | | Sitting on Bunk reading |
| 1-22-10 | 1738 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1748 | L. Sparks | 71075 | Standing At Door |
| 1-22-10 | 1758 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1808 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1818 | R. Thomas | 69709 | Sitting on Bunk Reading |
| 1-22-10 | 1828 | L. Sparks | 71075 | Sitting on bunk reading |

Information Continued   Back
Yes or No  (Circle one)

**891**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** _Hamann, Sahl_  **C.I.D. #** _276342_

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

_1828_

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-22-10 | 1838 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 1848 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 1858 | L. Sparks | 71075 | Laying on Bunk |
| 1-22-10 | 1904 | R.T.Kamats | 69710 | Appears Asleep |
| 1-22-10 | 1914 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 1919 | F. Ali | 71034 | Sitting on Bunk |
| 1-22-10 | 1925 | F. Ali | 71034 | Sitting on Bunk |
| 1/22/10 | 1935 | T. Johnson | 70630 | Sitting on Bunk |
| 1-22-10 | 1945 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 1955 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 2005 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 2015 | L. Sparks | 71075 | Sitting on Toilet |
| 1-22-10 | 2025 | F. Ali | 71034 | Sitting on Bunk |
| 1-22-10 | 2035 | R.T.Kamps | 69709 | Sitting on Bunk |
| 1/22/10 | 2045 | T. Johnson | 70630 | Standing at door |
| 1/22/10 | 2055 | T. Johnson | 70630 | Standing at door |
| 1-22-10 | 2105 | L. Sparks | 71075 | Standing at door |
| 1-22-10 | 2115 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 2025 | L. Sparks | 71075 | Sitting on Toilet |
| 1-22-10 | 2135 | L. Sparks | 71075 | Sitting on Bunk |
| 1-22-10 | 2145 | L. Sparks | 71075 | Laying on Bunk |
| 1-22-10 | 2148 | R.T.Kamps | 69709 | Inmate Being Moved to 75 |
| 1-22-10 | 2158 | F. Ali | 71034 | Sitting on bunk |
| 1-22-10 | 2207 | T. Reighmandt | 69335 | Standing at cell door. |
| 1-22-10 | 2215 | T. Reighmandt | 69335 | Standing on cell door |
| 1-22-10 | 2225 | T. Reighmandt | 69335 | Sitting on bunk Awake |
| 1-22-10 | 2235 | T. Reighmandt | 69335 | Sitting on bunk awake |
| 1-22-10 | 2245 | J. Perez | 70804 | Standing at door |
| 1-22-10 | 2255 | J. Perez | 70804 | Sitting on bunk |
| 1-22-10 | 2305 | A. Gee | 71156 | sitting on Bunk |
| 1-22-10 | 2315 | A. Gee | 71156 | Sitting on bunk |
| 1-22-10 | 2325 | A. Gee | 71156 | Sitting in bunk |
| 1-22-10 | 2335 | A. Gee | 71156 | Sitting on Bunk |

CFMT-37

EXHIBIT 44 Page 43   **892**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

(Print or Type)

Name: _Hummel, John_      C.I.D. # _0763423_      ☐ Administrative

☐ Disciplinary

| Offense: (If Disciplinary) | Reason (If Administrative) | | Be Specific |
|---|---|---|---|
| | S P C J | | |
| Date Imposed | Authority | Date Due Out | Actual Date Out |
| | | | |

Part I - ( Special Instructions )

N - T - H - S

### Part II - Daily Inspection Record
(Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|---|---|---|---|---|
| 1/21/10 | 2125 | Simon | 68663 | Laying on Bunk (Movement) |
| 1-21-10 | 2130 | F. Ali | 71034 | Appear Asleep |
| 1-21-10 | 2138 | F. Ali | 71034 | Appears Asleep |
| 1/21/10 | 2145 | Simon | 68663 | Laying on Bunk |
| 1-21-10 | 2155 | Simon | | On Bunk |
| 1-21-10 | 2205 | Simon | | Laying on Bunk |
| 1-21-10 | 2215 | T. Rigmaiden | 69335 | Appear asleep in bunk |
| 1-21-10 | 2224 | T. Rigmaiden | 69335 | Appear Asleep in bunk |
| 1-21-10 | 2234 | T. Rigmaiden | 69335 | Appear Asleep in bunk |
| 1-21-10 | 2244 | T. Rigmaiden | 69335 | Appear Asleep in bunk |
| | 2250 | C. Long | 68920 | laying on bunk |
| | 2300 | C. Long | 68920 | laying on bunk |
| | 2310 | C. Long | 68920 | laying on bunk |
| | 2320 | C. Long | 68920 | laying on bunk |
| | 2330 | C. Long | 68920 | laying on bunk |
| | 2340 | C. Long | 68920 | laying on bunk |
| | 2350 | C. Long | 68920 | laying on bunk |
| 01/22/2010 | 0000 | C. Long | 68920 | laying in bunk |
| 01/22/2010 | 0010 | B. Calhoun | 69801 | laying on bunk /appears asleep |
| | 0020 | B. Calhoun | 69801 | appears asleep |
| | 0030 | B. Calhoun | 69801 | appears asleep on bunk |
| | 0040 | B. Calhoun | 69801 | appears asleep |
| | 0050 | B. Calhoun | 69801 | appears asleep |
| | 0100 | B. Calhoun | 69801 | appears asleep |

EXHIBIT Information Page number
Yes or No  (Circle one)

**893**

# TARRANT COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU INSPECTION RECORD OF PRISONERS IN SEPARATION

**Name:** Hummel, John                **C.I.D. #** 0763433

---

### Part II - Daily Inspection Record
### (Date, Time and Signature columns must be completed.)

| Date | Time | Signature | Empl.# | Remarks |
|------|------|-----------|--------|---------|
| 1-30-10 | 1142 | M. Evans | 69454 | on the toilet |
| | 1151 | M. Evans | 69454 | on the bunk reading |
| | 1200 | M. Evans | 69454 | on the bunk reading |
| | 1209 | M. Evans | 69454 | on the bunk reading |
| | 1217 | M. Evans | 69454 | on the bunk reading |
| | 1226 | M. Evans | 69454 | on the bunk reading |
| | 1235 | Zubin | 58687 | Reading |
| | 1244 | Zubin | 55687 | Reading |
| | 1253 | Zubin | 55687 | Reading |
| | 1302 | D. Irwin | 78692 | reading |
| | 1311 | M. Evans | 69454 | on the toilet |
| | 1321 | D. Irwin | 70692 | On bunk |
| | 1521 | D. Irwin | 70692 | on bunk |
| | 1330 | D. Irwin | 78692 | on bunk |
| | 1340 | D. Irwin | 78692 | on bunk |
| | 1349 | D. Irwin | 78692 | on bunk |
| | 1358 | Zubin | 58687 | OK |
| | 1407 | Zubin | 58687 | ok |
| | 1417 | R. Manning | 66665 | Reading On Bunk |
| | 1426 | M. Evans | 69454 | on bunk reading |
| | 1435 | M. Evans | 69454 | on bunk reading |
| | 1444 | M. Evans | 69454 | on bunk reading |
| 1-30-10 | 1453 | T. Rigmaidw | 69335 | Reading a book |
| | 1502 | V. Clane | 70229 | Reading a book |
| | 1511 | V. Clane | 70229 | Laying on bunk |
| | 1521 | T. Johnson | 70070 | standing at door |
| | 1531 | T. Johnson | 70070 | Standing at door |
| 1-30-10 | 1540 | T. Rigmaidw | 69335 | Reading a book |
| | 1550 | T. Johnson | 70070 | Reading a book |
| 1-30-10 | 1559 | T. Rigmaidw | 69335 | Reading a book on his bunk |
| 1-30-10 | 1609 | V. Thomas | 69705 | Sitting on Bunk |
| | 1618 | V. Clane | 70229 | Sitting on Bunk |
| 1/30/10 | 1628 | J. Johnson | 70070 | Sitting on bunk reading |

CFMT-37

EXHIBIT 44 Page 45   **894**

# EXHIBIT 45





# TARRANT COUNTY

OFFICE OF THE
CRIMINAL DISTRICT ATTORNEY
www.tarrantda.com

JOE SHANNON JR.
CRIMINAL DISTRICT ATTORNEY
817/884-1400

TIM CURRY
CRIMINAL JUSTICE CENTER
401 W. BELKNAP
FORT WORTH, TX 76196-0201

December 30, 2009

**URGENT  VIA FACSIMILE 310-356-3485**

Custodian of Records
MySpace.com
1333 – 2nd Street, First Floor
Santa Monica, CA 90401

Re:  Preservation Letter for ARSON & CAPITAL MURDER

Dear Custodian of Records:

The below listed accounts/profiles which are the subject of an ongoing criminal investigation at this agency and it is requested that said account/profile and all related records, communications and data, and any other information contained therein, be preserved pending the issuance of a GRAND JURY SUBPOENA <u>AND</u> THEN A SEARCH WARRANT.

Please preserve the following information associated with the following accounts:
1. PROFILE with all areas of user entered information;
2. FRIEND LISTS;
3. POSTS/BLOG ENTRIES made by any user on these accounts;
4. MESSAGES/CHATS/EMAIL both in electronic storage and current; and
5. IP ADDRESSES USED TO ACCESS ACCOUNTS with DATE & TIME.

<u>ACCOUNT 1:</u>
Profile URL: http://www.myspace.com/johnfiredragon
FriendID:  102701166

<u>ACCOUNT 2:</u>
Profile URL: www.myspace.com/288006562
FriendID:  288006562

MYSPACE PRESERVATION LETTER                    Page 1 of 2

EXHIBIT 45 Page 1  **896**

**ACCOUNT 3:**
Profile URL: http://www.myspace.com/joyhummel
FriendID: 355262023

**ACCOUNT 4:**
Profile URL: http://www.myspace.com/joybhummel
FriendID: 64118903

If you have any questions concerning this request, please contact me at (insert email address and phone contact).

Thank you for your assistance in this matter.

Sincerely yours,

JOE SHANNON, JR.
CRIMINAL DISTRICT ATTORNEY
TARRANT COUNTY

*Varnell*

Lori L. Varnell, Assistant
Criminal District Attorney
Economic & Computer Crime Unit

cc: Tracey M. Kapsidelis

Pimp-My-Profile.com
Profile Tools

| People ▾        Search

Home | Browse | Search | Invite | Film | Mail | Blog | Video | Games | Music | Forum | Groups | Events | Videos | MyAccount | Login | out
Classifieds

## John Fire Dragon
John Hummel



Male
34 years old

KENNEDALE,
Texas
United
States

Last Login:
12/13/2009

**Mood:** overstimulated ☻
View My: Pics | Gifts

### Contacting John Fire Dragon

✉ Send Message          ✉ Forward to Friend

👤 Add to Friends        ☑ Add to Favorites

📞 IM / Call             🚫 Block User

👥 Add to Group          🎁 Send Gift

### MySpace URL:

www.myspace.com/johnfiredragon

### John Fire Dragon's Interests

**General**      Just about
everything & any
thing
   What Martial Art
   should u pursue?
   **Jeet Kune Do**

   Thas the best u
   could score, Bruce
   Lee's innovated

---

### John Fire Dragon Too much going my mind to think str8t
Posted at 6:44 PM Dec 6, 2009

view more

### John Fire Dragon's Latest Blog Ent
[Subscribe to this Blog]

Book I just Finished  (view more)

[View All Blog Entries]

### John Fire Dragon's Blurbs

**About me:**
Jack of all Trades, Master off none.



Myspace Layouts by Pimp-My-P

Vampires
## Shapeshifting Vampire



martial art . . . u must b well rounded and very smart and could b deadly n a streetfight cuz this is the most effective martial art today!!

**Take this test**

| Music | Just about All of it |
| Movies | You name it I'v seen it |
| Television | Whats els is there beside Video Games |
| Books | Ya right....well do RPGS count? |
| Heroes | |

I'm my own Heroe



Zombie Survival Expert

You know where it is at and are welcome o come along with me :D

**Take this test**
What kind of person are you?
Artist

There are only 400 out of every 1,0( aquire this gift. It is usefull in many w your gift wisely. Follow the stars becau detirmin what animal you becor

**Take this test**

Which Superhero are you? Results
http://www.msplinks.com/MDFodHRwOi8v(
XN1cGVyaGVyb3F1aXouY29t

Your results:

# You are **Green Lantern**

| Green Lantern | ——— | 80% | Hot-heade have stror will power good imag |
| Hulk | ——— | 75% | |
| Catwoman | ——— | 70% | |
| Superman | ——— | 65% | |
| Iron Man | ——— | 65% | |
| Spider-Man | ——— | 60% | |
| Robin | ——— | 60% | |
| The Flash | ——— | 60% | |
| Supergirl | ——— | 57% | |
| Wonder Woman | ——— | 47% | |
| Batman | ——— | 45% | |

Click here to take the Superhero Personality Test

**Who I'd like to meet:**
Real, Kool, Funny PPL

what fighting style do you have?
Martial Artist



Bruce Lee is your idol and favorite pa

Whether it is writing, drawing, or your passion for music you take it very seriously. You are a very deep thinker and write or draw on a daily basis. Your artistic view and style make you unique and you see things in a lot different way. People love your work and you hope to make it big some day whether writing best sellers, painting a museum master piece, or rockin it out on stage whatever you do never give up on your dreams.

Take this test

you keep your composure and never your a black belt in whatever style you and a very worthy advisary. Wax on

Take this test



### John Fire Dragon's Details

| | |
|---|---|
| **Status:** | Married |
| **Here for:** | Networking, Friends |
| **Orientation:** | Straight |
| **Body type:** | 6' 0" / Average |
| **Ethnicity:** | White / Caucasian |
| **Religion:** | Christian - other |
| **Zodiac Sign:** | Scorpio |
| **Smoke / Drink:** | Yes / No |
| **Children:** | Proud parent |

**John Fire Dragon's Friend Space**
**John Fire Dragon has 15 friends.**


Joy


Neata

View John Fire Dragon's Friends:All | Online

**John Fire Dragon's Friends Comme**
**Displaying** 11 **of** 11 **comments** ( Vie
Lady.P.A.Stanley Oct 28 2009 2:06 PM



Check out my page
http://www.msplinks.com/MDFodHRw
vd3d3LmRvdWxpa2a2UudXMvcGhvdG9zL
MDE1ODMuaHRtbD9iPTQmdz00Ng==

**Education:** High school

**Occupation:** Security Guard

**Income:** Less than $30,000

### John Fire Dragon's Schools

| | |
|---|---|
| Jonesville High School | 1991 |
| Jonesville, SC | to |
| Graduated: 1995 | 1995 |
| Student status: Alumni | |
| Degree: High School Diploma | |

Let me know if you like me YES or NO
http://www.msplinks.com/MDFodHRw
vd3d3LmRvdWxpxpa2UudXMvcGhvdG9zL:
MDE1ODMuaHRtbD9iPTQmdz00Ng==

chad    **Jan 21 2009 8:31 PM**



Hey Hummel!

KI Shinju    **Nov 8 2008 5:47 AM**



Yeah... I know its late man... but HAPPY BIRTHDAY anyways.... ^_^ ... See yaaus laters .....

*Steph*    **Oct 3 2008 8:18 AM**



*This comment was sent by your friend via the SuperHug! app. To block this app and all communications from it click Here.*

---------------------------------------------

I blew a kiss at you.

Blow a kiss at me back!



Joy

**Sep 16 2008 9:49 PM**



*This comment was sent by your friend via the Movies app. To block this app and all communications from it click Here.*

--------------------------------------

Can you beat my score on this quiz?

### Think you know 'Dirty Dancing'



I got 70%. Can you do any better?



Joy

**Sep 14 2008 12:35 PM**



*This comment was sent by your friend via the Movies app. To block this app and all communications from it click Here.*

--------------------------------------

Can you beat my score on this

quiz?

**A True Grease Fan woul**
**know...**



I got 100%. Can you do any better?



**Madame Minx**
**(1)**

**Aug 27 2008 9:00 AM**

 

Your input was very
helpful....
Thanks!
Minx!

**John**

**Aug 20 2008 9:11 AM**

 *This comment was sent by*
*your friend via the Super*
*Heroes app.To block this app*
*and all communications*
*from it, click Here.*

--------------------------------
------------

John wants you to join the
alliance in Super Heroes, an
action-packed social
network game on
MySpace.Be a super hero,
buy other heroes, and
battle for the ultimate
victory!

**Join John's Alliance**



**JOY TO THE WORLD**

**Jul 8 2007 7:48 AM**



TO THE LOVE OF MY LIFE, AM VERY BLESSED TO STILL HAVE YOU IN MY LIFE.... DON'T EVER SCAR ME LIKE THAT AGAIN....I LOVE YOU ALWAYS!!!!!!!! YOUR WIFE

**Night Every One and thanks for coming ..**

**Jan 25 2007 10:44 PM**



I am the blackn
I am the
I am the annil
I am the tricks
I am the void i
I am the obli
sha

**JOY TO THE WORLD**

**Sep 15 2006 3:45 PM**



THANK YOU, I LOVE YOU VERY MUCH!!!!!!!!!!!! YOUR WIFE

Help | Terms | Privacy Policy | Safety Tips | Block User | Report Abuse | MySpace
International | MySpace Latino

Press Room | Advertise | Developers

©2003-2009 MySpace.com. All Rights Reserved.



906

EXHIBIT 45 Page 11

# EXHIBIT 46

MAR. 7. 2011  1:17PM    NCIS/RECORDS                        NO. 6338   P. 12/12

05/18/2008  09:22  7607255207              SITE ISSM DASO              PAGE  14
  5-13-061 9 24

PFC Hummel-
This formal counseling is for your actions for the period of 990806-990809. You have demonstrated a
lack of professionalism and discipline. Not only d̶o̶ ̶y̶o̶u̶ ̶s̶m̶o̶k̶e̶ ̶i̶n̶ ̶y̶o̶u̶r̶ ̶r̶a̶c̶k̶ ̶i̶n̶ ̶t̶h̶e̶ ̶m̶o̶r̶n̶i̶n̶g̶ ̶a̶n̶d̶ ̶f̶o̶r̶g̶e̶t̶t̶i̶n̶g̶ ̶t̶o̶ ̶t̶r̶i̶c̶e̶ ̶i̶t̶ ̶u̶p̶
which should warrant at least a Page 11, you were also caught smoking in the smoke box during an
UNREP. Also, you have been leaving your rack a mess in the morning and forgetting to trice it up. I am
tired of getting calls every morning concerning your rack. Cleaning up after you should not be LCpl
Matthies' job or mine. I understand that you are on mess duty and have long hours but that is no excuse to
live like you are now. This will be the LAST time this is mentioned. Your behavior in the past week has
shown that you have no desire to achieve the rank of Lance Corporal. I don't know where this sudden drop
in your behavior has come from but it is up to you to correct the problem. We have a small section with a
lot of work to be done and cannot afford to lose your contributions when we hit the Persian Gulf. You are a
vital part of this section and have shown in the past that you are capable of outstanding work. If you need
any help in your deficiencies, you can come to SSgt Bolling, Capt Dougherty, Chaplain Hoog or myself.
Do not hesitate to ask for anything that will improve yourself.


Sign _____              Sign _____
Date  990908                            Sign  990809

                              ENCLOSURE 4

EXHIBIT 46 Page I  **908**

909

earthsmart

FedEx carbon-neutral
envelope shipping

Align top of FedEx Express® shipping label here.

Sender: Please seal before shipping.

**FedEx Express**  NEW Package
US Airbill   FedEx Tracking Number 8037 2333 1086

0200   FILED: Recipient's Copy

THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS

DEPUTY

1 From
Date 3-28-14
Sender's Name ROBERT ROMIG   Phone 512 463-8600
Company OFFICE OF CAPITAL WRITS
Address 1700 N. CONGRESS AVE   Suite 460
City AUSTIN   State TX   ZIP 78701

2 Your Internal Billing Reference

3 To
Recipient's Name TARRANT COUNTY DISTRICT CLERK   Phone
Company CRIMINAL APPEALS DESK
Address 401 W. BELKNAP
City FORT WORTH   State TX   ZIP 76196

4 Express Package Service
FedEx First Overnight
FedEx Priority Overnight
FedEx Standard Overnight

5 Packaging
☑ FedEx Envelope   ☐ FedEx Pak   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

6 Special Handling and Delivery Signature Options
☐ SATURDAY Delivery
☐ No Signature Required   ☐ Direct Signature   ☐ Indirect Signature

Does this shipment contain dangerous goods?
☐ No   ☐ Yes   ☐ Dry Ice

7 Payment Bill to:
☑ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Total Packages   Total Weight

64

FedEx
0200  8037 2333 1086

MON - 31 MAR AA
STANDARD OVERNIGHT

76196
TX-US
DFW

XH GLEA

356   B
1086 03.31
RT CLSD

Align bottom of peel and stick airbill here.

FED 115356 28MAR14 AUSA   51AC1/CC4F/6600

C-432-009923-1184294-A

## IN THE 432ND DISTRICT COURT

## TARRANT COUNTY, TEXAS

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 01 2014

TIME _____3:22_____
BY _____SR)_____ DEPUTY

| | |
|---|---|
| _____ ) | Cause No. |
| ) | 1184294D |
| EX PARTE ) | |
| John William Hummel, ) | |
| APPLICANT ) | Hearing Requested |
| ) | |
| _____ ) | |

## MOTION FOR PROTECTIVE ORDER OF PRIVILEGED EXHIBITS

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**910**

## IN THE 432ND DISTRICT COURT

## TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | Hearing Requested |
| | ) | |
| | ) | |

## MOTION FOR PROTECTIVE ORDER OF PRIVILEGED EXHIBITS

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), requests this Court designate Exhibits 47 through 49 of Hummel's Supplemental Response (filed concurrently with this motion) as materials protected under attorney-client privilege. Further, Hummel requests this Court issue a protective order that the disclosure of these materials is for the limited purpose of litigating Hummel's post-conviction claims of ineffective assistance, and may not be used against Hummel in future proceedings.

Hummel filed an Application for writ of habeas corpus pursuant to Article 11.071 of the Code of Criminal Procedure with this Court on June 5, 2013. In that Application, Hummel makes certain claims of relief related to ineffective assistance provided by his trial counsel. On December 2, 2013, the State filed its Answer to Hummel's Application, including affidavits from his trial counsel regarding their response to Hummel's claims. At a status hearing on February 28, 2014, this Court denied Hummel's request for an evidentiary hearing to litigate controverted factual issues that arose from the State's Answer. Instead, this Court granted Hummel thirty days with which to supplement his post-conviction claims

2

**911**

with further argument and exhibits. That Supplemental Response is filed concurrently with this motion.

As part of his Supplemental Response, Hummel files eight exhibits necessary for the resolution of controverted factual issues. Three of these exhibits contain privileged information from the defense trial file. As part of the defense trial file, these materials are protected from disclosure and use by parties not within the attorney-client privilege.

An applicant who raises claims of ineffective assistance of post-conviction habeas waives his attorney-client privilege in so far as it is necessary to permit resolution of the particular claims. However, the scope of this waiver is limited to the scope of the applicant's ineffective assistance claims. *See, e.g., Osband v. Woodford*, 290 F.3d 1036, 1042 (9th Cir. 2002) ("[A] petitioner in a habeas corpus action who raises a Sixth Amendment claim of ineffective assistance of counsel waives the attorney-client privilege as to the matters challenged").

Further, the waiver of attorney-client privilege for the sake of resolving claims of ineffective assistance does not extend to a waiver of attorney-client privilege for unlimited purposes. Rather, the disclosed information should only be used in litigating the post-conviction claims, and be prohibited from be used in later proceedings. *See Bittaker v. Woodford*, 331 F.3d 715, 722 (9th Cir. 2003) ("A narrow waiver rule is also consistent with the interests of the habeas petitioner in obtaining a fair adjudication of his petition and securing a retrial untainted by constitutional errors."). Courts considering the scope of the waiver of attorney-client privilege in this context have noted:

> If the federal courts were to require habeas petitioners to give up the privilege categorically and for all purposes, attorneys representing criminal defendants in state court would have to worry constantly about whether their casefiles and client conversations would someday fall into the hands of the prosecution. In addition, they would have to

3

**912**

consider the very real possibility that they might be called to testify against their clients, not merely to defend their own professional conduct, but to help secure a conviction on retrial. A broad waiver rule would no doubt inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the attorney-client and work product privileges are designed to promote.

*Id.* at 722; *see also U.S. v. Nelson*, 611 F3d 191, 217 (4th Cir. 2010) (prohibiting the prosecution from using privileged information revealed by a defendant when litigating his attorney's conflict of interest claim).

As such, it is improper for privileged information disclosed in the course of litigating ineffective assistance claims to be later used by the State or other parties for unrelated proceedings. Hummel should not be forced to choose between asserting his constitutional rights under the Sixth Amendment and putting himself in jeopardy in future proceedings. For this reason, Hummel requests this Court order that Exhibits 47, 48, and 49 filed with Hummel's Supplemental Response be considered privileged materials and instruct that the State may not use information derived from those exhibits in any future proceedings against Hummel, without seeking permission from the Court.

Respectfully submitted,

March 28, 2014

Robert Romig

4

**913**

## IN THE 432nd JUDICIAL DISTRICT COURT
## TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| —————————————— | ) | Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) |  |
|     APPLICANT | ) |  |
|  | ) |  |
| —————————————— | ) |  |

## ORDER

By this order, the Court finds that Exhibits 47, 48, and 49, filed in connection with Hummel's post-conviction habeas application, are privilege attorney work-product information protected from disclosure by statutory and constitutional law, and that these exhibits are being disclosed by Hummel only insofar as it relates to Hummel's claims of ineffective assistance of counsel.

The Court orders that the State may not use these exhibits, the information therein, or any derivative information from these exhibits, in any future retrial or other proceedings against Hummel. If the State believes it is entitled to use this information in a future proceeding, the State will first tender the information to the court presiding over the proceeding for in-camera review and a determination as to whether due process necessitates its disclosure. The State will provide Hummel with notice of its desire for an in-camera review, notice of what information it seeks to disclose, and an opportunity for Hummel to be heard by the presiding court on the matter.

ORDERED AND SIGNED on this ___ day of _____, 2014

———————————————
Ruben Gonzalez
Judge, 432nd Judicial District

5

**914**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Protective Order as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by mail)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on March 28, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_

Robert Romig

6

**915**

FILED
THOMAS A WILDER DIST. CLERK
TARRANT COUNTY, TEXAS
APR 03 2014
TIME____10:19
BY____SR_____ DEPUTY

NO. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

### STATE'S REPLY TO APPLICANT'S "MOTION FOR PROTECTIVE ORDER OF PRIVILEGED EXHIBITS"

COMES NOW the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and submits this reply to Applicant's "Motion for Protective Order of Privileged Exhibits."

## I.
### Procedural History

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant has filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46." Additionally, Applicant has filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. [*See* Motion for protective order at 2-4.]

1

**916**

## II.
## The Court Should Deny Applicant's
## Requested Protection Order

Applicant claims that Exhibits 47 through 49 contain materials from his trial attorneys' files which are protected by the attorney-client privilege. [*Id.* at 3.] He asks this Court to "issue a protective order that the disclosure of these materials is for the limited purpose of litigating [Applicant's] post-conviction claims of ineffective assistance, and may not be used against [Applicant] in further proceedings." [*Id.* at 2.]

The State has not received a copy of Exhibits 47 through 49 or reviewed their contents. Therefore, the State does not concede that the materials submitted in Exhibits 47 through 49 fall within the attorney-client privilege. Assuming, *arguendo*, that Exhibits 47 through 49 contain matters to which a privilege would apply, the State maintains that Applicant waives any such privilege by voluntarily filing the exhibits in this habeas proceeding.

Generally, privileges "are exclusionary rules of evidence that may be used to suppress relevant evidence." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). Texas' rule of attorney-client privilege states that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." TEX. R. EVID. 503(b)(1). Additionally, in

2

**917**

criminal cases, "a client has a privilege to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship." TEX. R. EVID. 503(b)(2).

The attorney-client privilege is not absolute; it may be waived. *Ballew v. State*, 640 S.W.2d 237, 240 (Tex. Crim. App. [Panel Op.] 1980). For example, the privilege can be waived by litigating a claim against an attorney for a breach of legal duty. *See United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986); *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967); *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also* TEX. R. EVID. 503(d)(3) (there is no privilege under rule 503 as to a communication relevant to an issue of breach of duty by a lawyer to the client). A person upon whom the rules confer a privilege against disclosure waives the privilege if he "voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged." TEX. R. EVID. 511.

Here, Applicant does not seek to exclude evidence by invoking the attorney-client privilege. *See Cameron*, 241 S.W.3d at 19 (generally, privileges "are exclusionary rules of evidence"). Instead, he seeks to voluntarily file allegedly privileged materials as exhibits in this state habeas proceeding while maintaining his privilege; this, he cannot do. *See* TEX. R. EVID. 503(d)(3) & 511; *see, e.g.*,

3

**918**

*United States v. Wines*, 691 F.3d 599, 612 n.21 (5th Cir. 2012) (habeas petitioner alleging ineffective assistance puts communications between himself and counsel directly in issue and implicitly waives attorney-client privilege with respect to those communications), *cert. denied*, 133 S. Ct. 892 (2013); *Ex parte Mowbray*, 943 S.W.2d 461, 467 n.3 (Tex. Crim. App. 1996) (Keller, J., dissenting) (noting that "[a]pparently, no one recognized that applicant had waived the attorney/client privilege when she alleged ineffective assistance of counsel"), *cert. denied*, 521 U.S. 1120 (1997); *Wright v. State*, 374 S.W.3d 564, 580 (Tex. App.—Houston [14[th] Dist.] 2012, pet. ref'd) ("[a] party's decision to produce protected written work product, including notes of conversations made in the course of a criminal investigation and information learned during a criminal investigation, unquestionably waives protection of such materials").

Applicant has necessarily placed in issue privileged matters by asserting in this habeas proceeding that his trial counsel breached their legal duty to provide him effective assistance of counsel. This Court previously rejected Applicant's assertion of attorney-client privilege to prevent his trial counsel from filing affidavits in response to his claims of ineffective assistance. Likewise, in the present situation, Applicant should be deemed to waive the attorney-client privilege with respect to any materials he *voluntarily chooses* to submit without court compulsion in an attempt to support his claims of ineffective assistance of

4

**919**

counsel. *See* TEX. R. EVID. 511; *Wright*, 374 S.W.3d at 580 ("[a] party's decision to produce protected written work product, including notes of conversations made in the course of a criminal investigation and information learned during a criminal investigation, unquestionably waives protection of such materials").

Applicant cites *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), and *Osband v. Woodford*, 290 F.3d 1036 (9th Cir. 2002). [Motion for protective order at 3-4.] Neither case requires this Court to grant Applicant's request for a protective order for Exhibits 47 through 49, and Applicant cites no Texas authority requiring the Court to enter such an order in this state habeas proceeding. *Cf. Osband*, 290 F.3d at 1038 (noting that entry of protective orders in federal district court is a matter of discretion). More importantly, disclosure of the privileged materials in *Bittaker* and *Osband* was *compelled* by the court granting the government's motion to discover the materials for use in responding to ineffective-assistance-of-counsel claims in federal habeas proceedings.[1] Here, on the other hand, Applicant, without any compulsion by court order, *voluntarily* submits and relies on matters contained in his trial attorneys' files. Such voluntary disclosure

---

[1] Applicant also cites *United States v. Nicholson*, 611 F.3d 191 (4th Cir. 2010). [Motion for Protective Order at 4.] Nicholson's trial counsel revealed confidential communications during litigation of Nicholson's federal habeas claims that he was denied effective assistance due to an actual conflict of interest. After granting Nicholson relief on his actual-conflict-of-interest claim, the court stated that, on remand for sentencing, Nicholson would be entitled to a protective order prohibiting the government from using privileged information revealed by trial counsel in litigating the claim. *Id.* at 217. It is unclear from the *Nicholson* opinion which party presented the privileged information and whether its disclosure was compelled by the court. Furthermore, Nicholson was granted relief, whereas Applicant has yet to succeed on any of his claims.

5

**920**

of the information contained in Exhibits 47 through 49 should be deemed to constitute a waiver of the attorney-client privilege. *See* TEX. R. EVID. 511; *see also Wright*, 374 S.W.3d at 580 ("[a] party's decision to produce protected written work product, including notes of conversations made in the course of a criminal investigation and information learned during a criminal investigation, unquestionably waives protection of such materials").

Applicant further seeks to have this Court bar itself, potentially other courts, and the State in any "future retrial or other proceedings against [Applicant]" from using or allowing the use of Exhibits 47 through 49, the information therein, or any derivative information without an in-camera review and "a determination as to whether due process necessitates its disclosure." [Motion for protective order at 5.] Nothing requires this Court to enter such an order, and it should decline to do so. Rather, such matters can be raised and determined by the court assigned to preside over any future proceedings that may occur. Imposing such a restriction now would be premature and unwarranted since, as discussed above, Applicant has waived any claims of privilege with respect to Exhibits 47 through 49 by voluntarily filing them in this proceeding.

**921**

## III.
## Prayer

The State prays that the Court deny Applicant's "Motion for Protective Order of Privileged Exhibits." The State further requests that this Court order the district clerk to unseal Exhibits 47 through 49 and provide a copy to the State without restriction so that the State may reply to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46." Finally, the State requests that its current timeline to respond to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46" begin to run only after the Court has ruled on Applicant's motion for a protective order and after the district clerk has provided the State with a copy of Exhibits 47 through 49 filed by Applicant in this proceeding.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Section

**922**

_(signature)_

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1685
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A true copy of the State's memorandum has been mailed to Applicant's counsel Brad D. Levenson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, on April 3, 2014.

_(signature)_

HELENA F. FAULKNER

**923**

NO. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

## ORDER

The Court has considered Applicant's "Motion for Protective Order of Privileged Exhibits" and the State's reply thereto. Applicant's motion is **DENIED**. The Clerk of this Court is ordered to unseal Exhibits 47 through 49 filed by Applicant in this habeas proceeding and to provide a copy of Exhibits 47 through 49 to the State without restriction. Additionally, the Court orders that the State's timeline to respond to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46" will not begin to run until the Clerk of this Court has provided the State with a copy of Exhibits 47 through 49 filed by Applicant in this habeas proceeding.

The Court further orders the Clerk of this Court to furnish a copy of this Order to Applicant's counsel, Brad D. Levenson, Director, Office of Capital Writs, at: Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 79701, or at counsel's most recent address by mailing said document by United States mail; and to the appellate section of the Tarrant County Criminal District Attorney's Office.

_____
JUDGE PRESIDING

**924**

NO. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

## ORDER

The Court has considered Applicant's "Motion for Protective Order of Privileged Exhibits" and the State's reply thereto. Applicant's motion is **DENIED**. The Clerk of this Court is ordered to unseal Exhibits 47 through 49 filed by Applicant in this habeas proceeding and to provide a copy of Exhibits 47 through 49 to the State without restriction. Additionally, the Court orders that the State's timeline to respond to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46" will not begin to run until the Clerk of this Court has provided the State with a copy of Exhibits 47 through 49 filed by Applicant in this habeas proceeding.

The Court further orders the Clerk of this Court to furnish a copy of this Order to Applicant's counsel, Brad D. Levenson, Director, Office of Capital Writs, at: Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 79701, or at counsel's most recent address by mailing said document by United States mail; and to the appellate section of the Tarrant County Criminal District Attorney's Office.

FILED
TARRANT COUNTY
2014 MAY 22  PM 5:05
THOMAS A. WILDER
DISTRICT CLERK

JUDGE PRESIDING

**925**

FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS

JUN 26 2014

TIME ___ 2:17
BY _____
_____ DEPUTY

NO. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

## STATE'S MOTION TO EXTEND TIME TO FILE ITS SUPPLEMENTAL REPLY TO APPLICATION FOR WRIT OF HABEAS CORPUS

COMES NOW the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and requests an extension of time until July 7, 2014, to file its supplemental reply to the application for writ of habeas corpus in this cause.

I.

A Tarrant County jury convicted Applicant of capital murder and answered the special issues in a way that required the imposition of the death penalty. The Court of Criminal Appeals of Texas affirmed Applicant's conviction and sentence on direct appeal. *See Hummel v. State*, No. AP-76-596, 2013 WL 6123283 (Tex. Crim. App. November 20, 2013) (Tex. Crim. App. November 20, 2013) (not designated for publication).

The current application, which is Applicant's first, was filed on June 5, 2013, and raised fifteen claims for relief. The State filed its reply to each of Applicant's claims on December 2, 2013.

**926**

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant then filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46," which dealt specifically with claims three, four, six, and seven. Additionally, Applicant filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. The State filed a reply to Applicant's motion for a protective order.

On May 22, 2014, the Court denied Applicant's motion for protective order. The Court further ordered that the State's time to respond to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46" would begin to run when the clerk of the Court provided the State with copies of Exhibits 47 through 49. On May 28, 2014, the clerk notified the State of the Court's order and provided the State with copies of Exhibits 47 through 49. Hence, this State's supplemental reply is currently due on June 27, 2014.

II.

The State has been working to prepare its supplemental reply to the application for writ of habeas corpus. However, the State will be unable to complete its supplemental reply by the current due date of June 27, 2014. The State is awaiting an affidavit from Applicant's trial counsel, the Hon. Larry Moore, in order to finalize its reply. Mr. Moore's schedule prevented him from

927

completing his affidavit by the current due date for the State's supplemental reply. However, Mr. Moore has assured the State that he will be able to finish his supplemental affidavit at a time that will allow the State to complete its supplemental reply by the requested new due date of July 7, 2014.

### III.

The State requests that the Court grant it an extension of time until July 7, 2014, to complete and file its supplemental reply to the application for writ of habeas corpus in this cause. Granting the State's request for an extension of time will not unnecessarily delay disposition of this proceeding.

WHEREFORE, PREMISES CONSIDERED, the State prays that the Court grant the State an extension of time until July 7, 2014, to file its supplemental reply to the application for writ of habeas corpus.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Section

**928**

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1685
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A true copy of the State's motion for extension of time has been mailed to Applicant's counsel Brad D. Levenson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, on June 26, 2014.

HELENA F. FAULKNER
Assistant Criminal District Attorney

HELENA F. FAULKNER
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1685
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A true copy of the State's motion for extension of time has been mailed to Applicant's counsel Brad D. Levenson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, on June 26, 2014.

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
HELENA F. FAULKNER
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1685
FAX (817) 884-1672

4

**929**

CERTIFICATE OF SERVICE

NO. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
|---|---|---|
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

### ORDER

The Court has considered the "State's Motion To Extend Time To File Its Supplemental Reply To Application For Writ Of Habeas Corpus." The Court finds good cause to extend the time for the State to file its supplemental reply to the application for writ of habeas corpus. The State's motion is **GRANTED**, and the due date for the State to file its supplemental reply is extended to July 7, 2014.

The Court orders the Clerk of this Court to furnish a copy of this Order to Applicant's counsel, Brad D. Levenson, Director, Office of Capital Writs, at: Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 79701, or at counsel's most recent address by mailing said document by United States mail; and to the appellate section of the Tarrant County Criminal District Attorney's Office.

_____
JUDGE PRESIDING

**930**

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY TEXAS

JUL 01 2014

TIME_____7:30_____
BY_____DEPUTY

NO. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
|----------|---|------------------------|
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY TEXAS |

## ORDER

The Court has considered the "State's Motion To Extend Time To File Its Supplemental Reply To Application For Writ Of Habeas Corpus." The Court finds good cause to extend the time for the State to file its supplemental reply to the application for writ of habeas corpus. The State's motion is **GRANTED**, and the due date for the State to file its supplemental reply is extended to July 7, 2014.

The Court orders the Clerk of this Court to furnish a copy of this Order to Applicant's counsel, Brad D. Levenson, Director, Office of Capital Writs, at Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 79701, or at counsel's most recent address by mailing said document by United States mail; and to the appellate section of the Tarrant County Criminal District Attorney's Office.

_George Gallagher_
JUDGE PRESIDING

**931**

SCANNED




FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 07 2014

TIME _____3:32_____
BY_____CPL_____ DEPUTY

No. C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | * | IN THE 432nd JUDICIAL |
| | * | DISTRICT COURT |
| JOHN WILLIAM HUMMEL | * | TARRANT COUNTY, TEXAS |

### COUNSEL'S SUPPLEMENTAL AFFIDAVIT
### IN RESPONSE TO WRIT ALLEGATIONS

*BEFORE ME*, the undersigned authority, on this date personally appeared the Affiant, a person known by me to be Larry M. Moore, Attorney at Law, who, after being duly sworn by me, stated as follows:

"My name is Larry M. Moore, and I am an Attorney at Law, duly licensed to practice law in the State of Texas.    I was previously appointed as one of the two trial attorneys representing the Applicant, John William Hummel, in his capital murder trial in Cause No. 1184294, the case which is the underlying conviction that is the subject of this Writ Application. I am the same Larry M. Moore who previously executed a Counsel's Affidavit in Response to Writ Allegations on August 9th, 2013, in connection with this proceeding and pursuant to the prior Order of this Court. This Counsel's Supplemental Affidavit in Response to Writ Allegations is being submitted pursuant to that same authority, and is intended to supplement my original affidavit in this case, and to constitute a further response to the claims of ineffective assistance of counsel that were raised against me and my co-counsel, Fred Cummings, in the Applicant's Writ Application in this case.  I have reviewed the Applicant's Supplemental Response to State's Answer and Exhibits, and I am therefore familiar with the assertions made therein by Applicant in support of his original Writ Application. This Supplemental Affidavit shall respond to those additional assertions.

**932**

SCANNED

Application Claim Three – Counsel's Ineffectiveness For Failing
To Produce Evidence That Applicant Was Not A Future Danger

In his <u>Supplemental Response</u>, Applicant further develops his complaint regarding our failure to identify as potential witnesses, and to present before the jury at the punishment phase of Applicant's trial, the testimony of three detention officers (Officers Rigmaiden, Thomas, and Bell) from the Tarrant County Jail, who had supervised Applicant during significant portions of his pre-trial detention in connection with this case.   Specifically, Applicant claims that the testimony of such witnesses would have demonstrated that "Hummel was a model inmate – compliant, pleasant, not aggressive, and not threatening – who seemed like someone who would do well in prison and would not be a danger to others. (<u>Supplemental Response</u> at 6).

In my original <u>Affidavit</u>, I explained that despite our requests, Applicant did not provide us with the names of any potential jailers or other jail personnel with whom he felt that he had a sufficient relationship such that they might be willing to testify on his behalf.  Perhaps even more importantly, is the fact that <u>none</u> of the proposed testimony which Applicant now claims that such witnesses could have provided, actually provides facts regarding the Applicant and his pre-trial incarceration which we did not develop through other witnesses at Applicant's trial.  The lack of any problems with Applicant during his pretrial incarceration, including the lack of any disciplinary infractions or instances of violence, was presented to the jury through the testimony of our expert witnesses, Frank Aubuchon and Dr. Antoinette McGarrahan.  Mr. Aubuchon also testified to his opinion that Applicant would adapt well to prison life and function quite well in that environment.  While the testimony of the detention officers might have helped to convey that information to the jury, it was simply <u>not</u> information that we wholly failed to provide to the jury.  Additionally, Applicant's assertion that "the issue never addressed by Counsel's presentation was whether Hummel as an individual possessed a likelihood of committing acts of violence in the future" (<u>Supplemental Response</u> at 7) is simply not true.  Essentially every lay witness who testified at punishment on

behalf of the Applicant was asked, and testified before the jury, about the lack of any prior acts of violence, or propensity towards violence, on the part of the Applicant. In essence, this claim disputes the manner in which we presented that evidence to the jury, and the witnesses that we used for that purpose, rather than our failure to present any such evidence at all. Applicant unfairly denigrates the persuasiveness of the lay witness testimony which we presented on this issue; but perhaps most importantly, Applicant's assertion that the proposed testimony of these detention officers witnesses creates "a reasonable probability" that he outcome of Applicant's trial would have been different is both unsupported and simplistic. I acknowledge that we failed to identify and produce at trial the three detention officers who have given affidavits in connection with this proceeding. In our conversations with Applicant regarding the possibility of finding such witnesses, he not only was unable to identify any such prospective witnesses for us, but he was also not very encouraging that any such witnesses might be found. We nonetheless could have sent our investigator into the jail in an attempt to locate such witnesses, and I have done so in other criminal cases including death penalty cases which I have tried. Unfortunately, my past experience in those situations has also been that once we identify such individuals as prospective witnesses, the State's prosecutors and the detention officers' supervisors talk to them in such a manner that it ultimately has a "chilling effect" upon their willingness to provide favorable testimony on behalf of the defendant. Generally, my experience has also been that unless there is at least some personal relationship with, or affinity for the defendant that has developed with the officers, then the proposed testimony that they would offer becomes much less favorable and available. Our decision not to send an investigator into the jail was based upon these considerations, and upon our determination of the need to have him do other things that we felt might have a greater chance of being helpful to us.

In his <u>Writ Application</u>, Applicant also takes issue with the State's assertions at trial that the facts of the offense standing alone were sufficient to affirmatively answer the "future dangerousness" special issue. Regardless of whether these facts might be "legally sufficient"

to support such an affirmative answer, in my experience from having participated in ten death penalty trials which were tried to verdict, the facts of the particular crime on trial are generally paramount in the jury's determination of that special issue.   The Applicant's statement, wherein he details the fact that he was so physically tired from the murders of his wife and her father, that he had to take time to rest and contemplate his actions before undertaking the murder of his daughter, is the type of evidence which has an indelible impact upon jurors. When such evidence is coupled with the additional fact that within hours before the murder of his family, including the murder of his own daughter, Applicant was reading a bedtime story to the daughter of his new girlfriend, this painted such a graphic and memorable portrait of Applicant as a person that it was probably impossible for anyone to overcome.  For the Applicant to attempt to disregard or to understate the importance of such testimony in regard to this special issue is disingenuous.

For all of the foregoing reasons, as well as those previously delineated in my original <u>Affidavit</u>, and under all of the circumstances of this case, I do not believe that it was ineffective assistance of counsel for us to fail to identify and marshal into court the three detention officers whose affidavits were presented by Applicant in connection with his <u>Writ Application</u>.

Application Claim Four – Counsel's Ineffectiveness For Failing
To Present Expert Testimony Regarding Applicant's Life History

In his <u>Supplemental Response</u>, Applicant reiterates his claim that we were ineffective in failing to present the testimony of a "social history expert" in order to explain the significance of Applicant's "life events" upon him, and upon the "paths that he took."   My original Affidavit responded to this claim at some length, and from my review of Applicant's <u>Supplemental Response</u>, it does not appear to offer anything markedly different from what was alleged originally.   The crux of Applicant's complaint appears to be that we failed to perceive the importance of such testimony; and in doing so, we failed to obtain the testimony

of an expert in the field of social work to give an opinion regarding the impact of such "life events" upon Applicant.

I do not believe that the legal standard for ineffective assistance of counsel commands that we present any certain type of expert witness, or any certain type of expert opinion testimony, in order for us to be effective. Applicant suggests that our failure to present such a witness undermined our ability to offer a complete picture of Applicant's life story; however, other than the particular opinions of Ms. Sovine, Applicant fails to cite any particular facts or circumstances of importance in regard to his "character and background, and the personal moral culpability of the defendant" which we failed to develop before the jury. It appears that the thrust of Applicant's complaint comes with the manner in which we presented the facts regarding his life story, rather than with any outright failure on our part to present such facts. Perhaps the testimony of a social historian could have been helpful to the jury in understanding how Applicant's life events impacted upon him; however, my prior experience has been that jurors often ascribe relatively little importance to opinion testimony of this type, and Applicant offers nothing in support of his contention that there is a "reasonable probability" that such testimony would have been sufficiently mitigating for him to avoid the death penalty.

At Applicant's trial, we attempted to present as complete of a picture of Applicant's "life story" as we were able. We spent countless hours seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers and others) who had known Applicant throughout his life, in order to develop a complete life history before the jury. Many of the people whom we located and contacted simply refused to talk to us. Many of those who talked to us, refused to testify on Applicant's behalf, or indicated that if they were to be called to testify, then they would ask the jury to give him a death sentence. Still others had damaging information regarding Applicant's character and background, such that we could not afford to take a chance that such evidence might come out on cross-examination; therefore, we choose not to use them at Applicant's trial. The lay

witnesses whom we called in order to develop Applicant's life history at his trial, were those through which we felt that we could best develop his life story. We then attempted to use Dr. McGarrahan to explain how those events of Applicant's life had affected him.

Perhaps the use of a "social historian" could have helped us to present Applicant's life story in a somewhat more "compelling" fashion; however, we did develop the important facts of his life, and his "life events." Applicant has not suggested any additional, relevant or compelling facts that we did not develop at his trial; and under such circumstances, I do not believe that our failure to present a social history expert constitutes ineffective assistance of counsel, nor have I ever read any opinion from the appellate courts which indicates that it is.

Application Claim Six – Counsel's Failure To Present
Hummel's Military Service As Mitigating Evidence

In his Supplemental Response, the Applicant speculates that had the jury heard the testimony of the three "military friends" that executed affidavits in connection with this Writ Application, then there is "more than a reasonable probability that at least one juror would have voted for life." (Supplemental Response at 16). The Applicant bases this assertion upon his belief that not only would they "have provided testimony regarding the positive side of Hummel's military service, their testimony would have explained and rebutted the negative information from the State's rebuttal witnesses." (Supplemental Response at 16).

In support of his assertions that we were ineffective for failing to secure the testimony of such witnesses, Applicant has also included as Exhibit 48, a portion of the Intake Summary complied by our Mitigation Specialist, Ms. Brendan Ross, upon her initial interviews of Mr. Hummel, wherein he gave her the name of one of the prospective witnesses, Mr. Buddy Mathias (Matthias). Ms. Ross apparently received this information from Applicant on January 20th, 2010. She then apparently forwarded that name to our investigator, Mr. Bobby Walton, on June 2nd, 2010. I have spoken with both Ms. Ross and Mr. Walton regarding this situation. As indicated in my original Affidavit, Ms. Ross had great difficulty in obtaining any records

**937**

regarding Applicant's military service from the government prior to Applicant's trial.  I personally did not recall that Ms. Ross had been provided with Mr. Mathias' (Matthias') name by the Applicant, nor that she had given it to Mr. Walton.   Ms. Ross has indicated that she was unable to locate any additional information regarding Mr. Mathias (Matthias) from either the government, or from the Applicant.   Mr. Walton indicates that when he received the information from Ms. Ross, he was unsure of Mr. Matthias' first name, and he therefore felt that it would therefore be very difficult, if not impossible, to locate him without further information.  As Mr. Mathias' (Matthias') name never resurfaced in our investigation of the case, Mr. Walton did not pursue it further.

I personally visited with Applicant regarding his military service on several different occasions, and I specifically inquired as to the names and contact information for any members of his unit, or any "military friends" that he had while in the service, that he thought might be willing to come testify at the trial on his behalf.  The Applicant never provided me with any such information.  He further indicated that his military service was not a positive experience, and that he was glad when he got out.   We discussed the circumstances surrounding his having gone AWOL, and his subsequent discharge from the service; and I was also aware of some of the other problems which he encountered while in the military.  Ms. Ross was able to provide me with a copy of his separation from service document (his DD 214), so I was also aware of the particular commendations that he received while in the service, and of his honorable discharge.  I used that information during my cross-examination of the State's rebuttal witnesses in order to develop those positive aspects of Applicant's military record during their testimony.

By Applicant's own admissions to me, his military career was lackluster.  At the time that we were conducting our pretrial investigation into his background, we were spending inordinate amounts of time in seeking to obtain the cooperation of the members of Applicant's own family, and of his "life-long friends," in his defense.   As I have indicated previously, there was almost a universal unwillingness on the part of everyone to assist us in

Applicant's defense.  It appears that Applicant's writ counsel have encountered similar resistance from Applicant's family and "friends."  Based upon the wantonness and severity of the Applicant's crime, it was my belief that we would need something significantly compelling in Applicant's background in order to save him from the death penalty in this case.  It was also my personal belief that Applicant had probably suffered from some type of significant abuse at the hands of his parents during his upbringing which might ultimately help us to explain this crime, even though Applicant and all of his family members continuously denied that any such abuse had ever occurred.  The reason that he gave in his statement to the police for the commission of this crime (i.e.: that he was just "tired" of his life and essentially wanted a "new start") seemed to me to be an alarmingly insufficient motivation for the commission of such a heinous crime.  We concentrated our mitigation efforts in those areas which we felt would be most productive; and his military service, based upon Applicant's own accounts of such service, did not appear to be something that would be particularly fruitful for us in that regard.

Obviously, Applicant's writ counsel were able to obtain witnesses regarding Applicant's military service that we did not locate; however, I question their assertion that such witnesses would have provided testimony regarding "the positive side of Hummel's military service."  A review of the affidavits they obtained indicates that Applicant "struggled with being overweight and messy" (Matthias); had a "hard time" as a Marine (Emmer); and "had a hard time from his sergeants for not making his weight standard" (Chaidez).  I do not believe that these affidavits demonstrate any additional "positive" aspects of his service that we did not develop through our cross-examination of his commanding officers.  While the affidavits do offer some explanation of Applicant's difficulties with isolation and alienation while in the service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending "strip clubs."   For these reasons, I do not believe that this testimony creates a "more than reasonable probability that at least one juror would have voted for life;" and  I

also do not believe that based upon the totality of our representation, that our failure to locate and produce such witnesses for purposes of Applicant's trial was ineffective assistance.

Application Claim Seven – Counsel's Ineffectiveness for
Failing to Present Evidence that Applicant Suffered from Complex
Post-Traumatic Stress Disorder Resulting from Attachment Trauma

In his Supplemental Response, Applicant reiterates and elaborates upon the assertion contained within his original Writ Application that we were ineffective for failing to present evidence regarding the existence of the "complex post-traumatic stress disorder resulting from attachment trauma" with which Dr. Hardesty has diagnosed Applicant as suffering. In the Supplemental Response, Applicant goes further, alleging that we misunderstand "complex post-traumatic stress disorder" and "attachment trauma," and the distinction of such a diagnosis from that of post-traumatic stress disorder as set out in the Diagnostic and Statistical Manual of Mental Disorders (DSM).

I understand that Dr. Hardesty has diagnosed Mr. Hummel as suffering from a disorder which is not contained within the DSM, or within the International Statistical Classification Of Diseases And Related Health Problems; but rather, has diagnosed him with a "clinical diagnosis founded in learned opinion in a rapidly growing body of psychiatric, psychological and neuroscience literature on neuron connectivity in childhood and the results of deprivation, trauma or neglect on development." (Applicant's Exhibit 42 at 2). I also believe that I understand the distinction between her diagnosis for this disorder, from that of a diagnosis of post-traumatic stress disorder pursuant to the DSM. Dr. Hardesty's diagnosis was apparently reached after an interview of Applicant for approximately two hours and forty-five minutes, and her review of the trial testimony of some (apparently not all) of the witnesses who testified on Applicant's behalf at punishment, and of the additional affidavits obtained by Applicant's writ counsel. In my original Affidavit, I discussed our inability to obtain a diagnosis of PTSD for the specific reason that it is the only disorder of this type

contained within the DSM. My experience has been that diagnoses for mental disorders which are not contained within such diagnostic manuals are subject to attack upon that basis alone, and that they can therefore have markedly less effect upon jurors. My greatest concerns with Dr. Hardesty's diagnosis however, come with the overall scarcity of any underlying evidence upon which to base that diagnosis. Dr. Hardesty seeks to explain the denials of emotional neglect, etc., made by the Applicant (and by his sister, his mother, and others) on the basis that persons who have suffered from such chronic neglect are unlikely to be able to recognize that fact, due to their lack of insight and understanding of the effects of such neglect. While I am aware that such denials may not be uncommon in a clinical situation, they nevertheless create a unique and challenging problem in being able to support and defend such a diagnosis before a jury. It has been my experience from having tried criminal cases for more that thirty-five years, that jurors are reticent to accept "learned opinions" in the face of a lack of an evidentiary basis with which to support that opinion. While I also understand that such denials may not create a bar to the making of such a diagnosis, they absolutely cannot be over-looked or ignored, and they create a substantial impediment to a lawyer's ability to effectively defend such a diagnosis before a jury.

Through the testimony of Dr. McGarrahan, and through our lay witnesses, we sought to demonstrate the type of attachment issues which they found present with Applicant, despite his and his family's consistent protestations to the contrary. Dr. McGarrahan testified to every deficit and disorder she found to exist with Applicant, based upon her exhaustive interviews and testing of Applicant; the information that she had received from his family; and her review of his relevant records. Applicant suggests that due to her purported "lack of experience" in dealing with the disorder diagnosed by Dr. Hardesty, that Dr. McGarrahan lacked the expertise necessary to identify and diagnose such disorder. While I am aware that other disciplines may have different nomenclature from that found within the practice of psychiatry and psychology, I am nonetheless skeptical about the jury's willingness to give

credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals.

Further, despite the Applicant's and Dr. Hardesty's assertions that both we, and Dr. McGarrahan, lacked the requisite knowledge and sophistication to adequately convey the "profound effect" that Dr. Hardesty says such attachment trauma had upon Applicant, we nonetheless presented that information which was available to us, and which was supported by the evidence. Additionally, assuming that Dr. Hardesty is correct in her assessment of Applicant's condition, I fail to see how such testimony demonstrates evidence of Applicant's "character, background, and personal moral culpability," that would be sufficient to compel a favorable answer by the jury to the mitigation special issue, in the absence of some direct correlation between that disorder and the commission of the crime, and under all of the facts and circumstances of the case. Based upon all of the foregoing, as well as that information provided in my original <u>Affidavit</u>, it is still my belief that our failure to obtain the testimony of a witness like Dr. Hardesty did not amount to ineffective assistance of counsel.

Conclusion

For the reasons outlined hereinabove, and for those reasons heretofore developed in my original <u>Counsel's Affidavit in Response to Writ Allegations</u>, I do not believe that based upon the totality of our representation in Applicant's case, that we provided him with ineffective assistance of counsel."



LARRY M. MOORE

*SUBSCRIBED* and *SWORN* to before me on this the 1st day of July, 2014.

KIMBERLY MOORE, Notary Public
My Commission Expires: June 18th, 2018

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 07 2014

TIME _3:32_

BY_____ _____DEPUTY

C-432-009923-1184294-A

EX PARTE                          §        IN THE 432nd JUDICIAL
                                 §
                                 §        DISTRICT COURT OF
                                 §
JOHN WILLIAM HUMMEL               §        TARRANT COUNTY, TEXAS

## STATE'S SUPPLEMENTAL REPLY TO APPLICATION
## FOR WRIT OF HABEAS CORPUS

COMES NOW, The State of Texas, by and through the Criminal District

Attorney of Tarrant County, Texas, and files this Supplemental Reply To

Application For Writ Of Habeas Corpus following Applicant's filing of his

"Supplemental Response To State's Answer; Exhibits 42 Through 46." The State

would show the Court that there is no necessity for a further hearing on any of

Applicant's allegations.

## I.    Procedural History

A Tarrant County jury convicted Applicant of capital murder and answered

the special issues in a way that required the imposition of the death penalty. The

Court of Criminal Appeals of Texas affirmed Applicant's conviction and sentence

on direct appeal. *See Hummel v. State*, No. AP-76-596, 2013 WL 6123283 (Tex.

Crim. App. November 20, 2013) (Tex. Crim. App. November 20, 2013) (not

designated for publication).

1

**943**

SCANNED

The current application, which is Applicant's first, was filed on June 5, 2013, and raised fifteen claims for relief. The State filed its reply to each of Applicant's claims on December 2, 2013.

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant then filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46," which dealt specifically with claims three, four, six, and seven. Additionally, Applicant filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. The State filed a reply to Applicant's motion for a protective order.

On May 22, 2014, the Court denied Applicant's motion for protective order. The Court further ordered that the State's time to respond to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46" would begin to run when the clerk of the Court provided the State with copies of Exhibits 47 through 49. On May 28, 2014, the clerk notified the State of the Court's order and provided the State with copies of Exhibits 47 through 49, making the State's supplemental reply due on June 27, 2014. The State has filed a motion for an extension of time until July 7, 2014, to file its supplemental reply.

**944**

## II.   Supplemental Reply To Claim One: Alleged Juror Misconduct

In his first claim for relief, Applicant alleges that he was denied his due-process right to an impartial jury because juror Nathaniel Davis committed misconduct by automatically voting for a sentence of death.   [*See* Initial Application For Writ Of Habeas Corpus at 30.]  At the status hearing on February 28, 2014, the Court ruled that Davis' affidavit was inadmissible in this habeas proceeding pursuant to rule 606(b) of the Texas Rules of Evidence.   *See* TEX. R. EVID. 606(b).  Davis' affidavit should be stricken and given no consideration in this proceeding.  *See id.; see also Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim. App. 2013) (refusing based on TEX. R. EVID. 606(b) to consider juror affidavit); *Bjorgaard v. State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007) (TEX. R. EVID. 606(b) barred trial court from considering contents of juror affidavit describing jurors' collective thought process), *pet. dism'd, improv. granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008).  Applicant's first claim for relief should be denied.

## III.   Supplemental Reply To Claims Three, Four, Six, And Seven: Alleged Ineffective Assistance Of Trial Counsel

Applicant initially raised ten claims for relief alleging that he was denied effective assistance of counsel at his capital-murder trial.  [*See* Initial Application For Writ Of Habeas Corpus at 36-145.]    Applicant's supplemental filing specifically addresses only claims three, four, six, and seven, which the State will address herein.[1]  [*See* Supplemental Response To State's Answer at 4-22.]

### A.   Standard of Review:  Ineffective-Assistance Claims[2]

In order to prove a claim of ineffective assistance, Applicant has the burden to show by a preponderance of the evidence that the performance of his trial counsel fell below an objective standard of reasonableness (*i.e.*, deficient performance) and that, but for the deficiency, the result of the proceeding would have been different (*i.e.*, prejudice).  *Wiggins v Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Ex parte Jiminez*, 364 S.W.3d 866, 882-83 (Tex. Crim. App. 2012).  An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.  *Ex parte Varelas*, 45 S.W.3d 627, 629 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

---

[1] The State does not waive any of its arguments or assertions contained in its previous reply filed on December 2, 2013.

[2] The State's previous reply sets forth in greater detail the applicable standards for reviewing Applicant's claims of ineffective assistance.  [*See* State's Reply To Application For Writ Of Habeas Corpus at 16-24.]

4

**946**

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective *at the time*. *Strickland*, 466 U.S. at 689. Courts must indulge a "strong presumption" that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary; the decision not to investigate is assessed for "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 691. Hindsight is discounted by pegging adequacy to counsel's perspective *at the time* investigative decisions were made. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005).

"The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506,

5

947

1514 (11ᵗʰ Cir. 1995) (quoting *Foster v. Duggar*, 823 F.2d 402, 406 (11ᵗʰ Cir.

1987)).

> It is common practice for petitioners attacking their death
> sentences to submit affidavits from witnesses who say they could have
> supplied additional mitigating circumstance evidence had they been
> called, or, if called, had they been asked the right questions. . . . But
> the existence of such affidavits, artfully drafted though they may be,
> usually proves little of significance. . . . That other witnesses could
> have been called or other testimony elicited usually proves at most the
> wholly unremarkable fact that with the luxury of time and the
> opportunity to focus resources on specific parts of a made record,
> post-conviction counsel will inevitably identify shortcomings in the
> performance of prior counsel.  As we have noted before, "[i]n
> retrospect, one may always identify shortcomings," but perfection is
> not the standard of effective assistance.
>
> The widespread tactic of attacking trial counsel by showing
> what "might have been" proves that nothing is clearer than hindsight –
> except perhaps the rule that we will not judge trial counsel's
> performance through hindsight.

*Id.* at 1513-14 (citations omitted).

## B.   Claim Three:  Failure To Present Testimony Of Jail Guards That Applicant Was Not A Future Danger

Applicant faults his trial counsel for failing to present testimony from

Tarrant County jail guards Tommy Rigmaiden, Rory Thomas, and Cody Bell to

show that Applicant was a "model inmate who[m] they believed would not be a

future danger to anyone while incarcerated." [Supplemental Response To State's

Answer at 4-9; *see* Initial Application For Writ Of Habeas Corpus at 43-45.]

6

**948**

Applicant has not met his burden to show deficient performance or resulting prejudice with regard to this contention.

### 1. No Deficient Performance Has Been Shown

This is not a case where trial counsel conducted no investigation or presented no evidence on the issue of Applicant's future dangerousness. Simply put, the proposed jail-guard testimony does not contain information that Applicant's trial counsel wholly failed to provide to the jury. [Counsel's Supplemental Affidavit In Response To Writ Allegations signed by Larry Moore on 7/1/14 and filed on 7/7/14 (hereinafter "Moore's supplemental affidavit," attached hereto as State's Exhibit 1) at 2.] Applicant minimizes the testimony provided by Dr. Antoinette McGarrahan (the defense's forensic psychologist/neuropsychologist), Frank AuBuchon (the defense's prison-classification expert), and lay witnesses and overvalues the impact of the facts contained in the jail guards' affidavits he submits. [See Supplemental Response To State's Answer at 4-9.] However, this Court cannot overlook the fact that Applicant's trial counsel presented *other* evidence, as well as closing arguments, informing the jury of Applicant's lack of disciplinary issues in jail, his lack of a criminal or violent history, and the likelihood that he would adapt well to the structured prison environment. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; RR 45: 69, 78-81; *see* Affidavit signed and filed by Larry Moore on 8/9/13

949

(hereinafter "Moore's affidavit") at 5-6; Affidavit signed and filed by Fred Cummings on 10/11/13 (hereinafter "Cummings' affidavit") at 3-4; Moore's supplemental affidavit at 2-3.] None of the proposed jail-guard testimony provides any meaningful fact regarding Applicant's pretrial incarceration that trial counsel did not develop at trial through other witnesses. [Moore's supplemental affidavit at 2.] *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (decision not to present cumulative testimony does not constitute ineffective assistance); *see also Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . . is not a sufficient ground to prove ineffectiveness of counsel"); *Id*. at 1518 ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required").

Clearly Applicant's trial counsel did not identify and call to testify the three jail guards whose affidavits Applicant has submitted in this habeas proceeding. [*See* Moore's Supplemental Affidavit at 3.] Despite being asked on more than one occasion, Applicant never indicated there were any jail guards, chaplains, or personnel with whom he had developed a sufficiently good relationship that they might be willing to testify on his behalf. [Moore's affidavit at 6; Cummings' affidavit at 3; Moore's supplemental affidavit at 2.] In conversations with Applicant about the possibility of finding such witnesses, Applicant never identified any such prospective witness, and "he was also not very encouraging

that any such witnesses might be found."[3]  [*Id.*]  In Moore's experience seeking out jail personnel to testify in other criminal cases, including death-penalty cases, such testimony often does not turn out to be particularly favorable by the time of trial unless there is "at least some personal relationship with, or affinity for the defendant that has developed with the officers."  [*Id.*]   In the present case, Applicant's trial counsel decided not to send the defense team's investigator to the jail based on these considerations and upon the determination that the investigator's efforts would be better focused on other areas that might prove more beneficial to Applicant. [*Id.*]

Applicant's assertion that trial counsel never addressed the issue of whether Applicant was an individual possessed a likelihood of committing acts of violence in the future "is simply not true."  [Moore's supplemental affidavit at 2-3; *see* Supplemental Response To State's Answer at 7.]   Applicant's complaint boils down to an impermissible second-guessing of the manner in which his trial counsel presented evidence that he would not be a future danger if he were sentenced to life without parole instead of death. [Supplemental Response to State's Answer at 7.] *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance

---

[3] Applicant states that he did nothing to dissuade trial counsel from pursuing an investigation into Tarrant County jail staff and that he "simply could not recall the names of any specific jail staff he could recommend that counsel speak to."  [Supplemental Response To State's Answer at 5.] To the contrary, even if Applicant could not recall a name, he did not even generally indicate that he had become particularly close to any Tarrant County jail personnel who might be willing to testify for the defense, and he gave his trial counsel no reason to believe that the expenditure of valuable resources in pursuing this area would have yielded anything of value to his case.

**951**

requires that every effort be made to eliminate the distorting effects of hindsight");

*Ex parte Flores*, 387 S.W.3d 626, 633-34 (Tex. Crim. App. 2012) ("Both prongs of

the *Strickland* test are judged by the totality of the circumstances as they existed at

trial, not through 20/20 hindsight");  *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex.

Crim. App. 2007) (reviewing courts must be highly deferential to trial counsel and

avoid deleterious effects of hindsight).  Applicant has failed to overcome the strong

presumption that the performance of his trial counsel fell within the wide range of

reasonable professional assistance.  Therefore, he has not shown that his trial

counsel provided deficient performance by not presenting testimony of Tarrant

County jail guards such as Rigmaiden, Thomas, and Bell.  Applicant's third claim

for relief should be denied.

## 2. No Prejudice Is Shown

Assuming, *arguendo*, that Applicant could establish deficient performance

of his trial counsel, he has failed to meet his further burden to establish a

reasonable probability that the jury would have answered the future-dangerousness

special issue "no" instead of "yes" had Rigmaiden, Thomas, and Bell testified at

the punishment phase of his trial.  Proving prejudice "mandates a fact-intensive

and exhaustive review of the proceedings as a whole," and, because an applicant

bears the burden, "the courts are not responsible for delving into the record,

investigating the case, and then formulating a habeas applicant's claims." *Ex parte*

10

952

*Medina*, 361 S.W.3d 633, 644 (Tex. Crim. App. 2011).   Applicant continues to

allege prejudice in a fairly conclusory fashion that falls far short of meeting his

burden in this regard.  [Supplemental Response To State's Answer at 8-9.]  *See Ex*

*parte Medina*, 361 S.W.3d at 644 (conclusory allegations do not meet prejudice

requirement).

Furthermore, as previously discussed, Applicant's trial counsel presented

*other* evidence demonstrating Applicant's alleged good conduct in the Tarrant

County jail, his lack of a criminal or violent history, and the likelihood that he

would adapt well to the structured prison environment.  [RR 43: 113-14, 166, 178,

232; RR 44: 68-73, 159; *see* Moore's affidavit at 5-6; Cummings' affidavit at 3-4;

Moore's supplemental affidavit at 2-3.]   The facts that Applicant alleges should

have been presented through the jail guards serve largely the same purposes as and

are largely cumulative of other evidence that Applicant had no disciplinary issues

while confined in jail, that he would likely adjust well to a prison setting if he were

sentenced to life without parole, and that he allegedly posed a low risk of future

violence.  [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; Moore's affidavit at

5-6; Moore's supplemental affidavit at 2-3.]  *See Hill v. Mitchell*, 400 F.3d 308,

319 (6th Cir. 2005) ("to establish prejudice, the new evidence must differ in a

substantial way – in strength and subject matter—from the evidence actually

presented at sentencing"); *see also Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir.

2009) (upholding state court's finding of no prejudice where additional testimony was cumulative).

As detailed in the State's previous reply, the jury heard powerful evidence proving Applicant's future dangerousness.[4]   [State's Reply To Application For Writ Of Habeas Corpus at 33-39, 51-58.]   Based on Moore's experience in ten death-penalty cases that were tried to verdict, the facts of the particular offense on trial are "generally paramount" in the jury's determination of the future-dangerousness special issue.   [Moore's supplemental affidavit at 4.]   Here, in Moore's opinion, Applicant's actions before and during the vicious murders of his family members had an "indelible impact" on the jury that was "probably impossible for anyone to overcome." [Id.]

Applicant's claim to be "a man who had never committed a single act of violence in his life before this crime" is simply a game of semantics designed to divert attention from the compelling relevant evidence presented at his trial. [Supplemental Response to State's Answer at 8 n.3.]   Two weeks before the murders, Applicant researched the effects of rat poison on humans, and he tried to poison his family the night before he succeeded in brutally murdering them.   [RR

---

[4] Applicant criticizes the State for what he terms a "laborious account of the details of the crime." [Supplemental Response To State's Answer at 8 n.3.] Meanwhile, he cherry-picks certain facts and seeks to have the Court turn a blind eye to the horrific facts of his crime and the compelling aggravating facts, all of which are relevant to the future-dangerousness special issue. Furthermore, such facts must not be ignored when considering the prejudice prong of the ineffective-assistance analysis.

12

**954**

41: 11, 14; RR 43: 36-40; SX 228, 347C, 349A2.] While Applicant's acts leading up to the murders may not have risen to the level of the *physical* violence he displayed during the murders of his family members, his actions certainly displayed his desire and propensity to commit violence by killing his family in a brutal manner so that he could be free to pursue a relationship with another woman. And Applicant's annihilation of his family, and his demeanor and actions before and afterward (many of which were documented on video and seen by the jury), clearly demonstrated Applicant's cold-hearted capacity for extreme violence and sufficed to establish his future dangerousness.[5]

Applicant's conduct while being closely supervised and classified as "High Custody" in the Tarrant County jail was not the only information relevant to the jury's assessment of Applicant's future dangerousness. No matter how many witnesses were called to testify that Applicant had no disciplinary issues while confined in jail pending his capital-murder trial, the jury would not have been required to answer the future-dangerousness special issue "no" instead of "yes."

---

[5] "The circumstances of the offense can be among the most revealing evidence of future dangerousness." *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (quoting *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)). In some instances, the circumstances of the offense and the events surrounding it may alone be sufficient to sustain an affirmative answer to the future-dangerousness special issue. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *Wilson*, 7 S.W.3d at 142; *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim. App. 1995). Such instances arise, for example, when the crime is "so heinous as to display a wanton and callous disregard for human life," *Dinkins*, 894 S.W.2d at 358, or when the circumstances of the offense are sufficiently cold-blooded or calculated. *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

**955**

The jury could reasonably assume that Applicant had no disciplinary issues in jail because his classification left him little opportunity to violate the rules or because Applicant was on his best behavior pending his capital-murder trial where he faced the death penalty. Moreover, the proposed jail-guard testimony would not have significantly diminished the strength of the evidence demonstrating Applicant's future dangerousness. [*See, e.g.*, State's Reply To Application For Writ Of Habeas Corpus at 51-58.]

There is no reasonable probability that the proposed jail-guard testimony would have been of such a compelling or powerful nature that it would have persuaded the jury to answer the future-dangerousness special issue "no" instead of "yes." Therefore, Applicant has not met his burden to demonstrate that he was prejudiced in any way by the alleged deficient performance of his trial counsel in not presenting the proffered jail-guard evidence. Applicant's third claim for relief should be denied.

**C.    Claim Four: Failure To Present Testimony Of A "Social History Expert"**

Applicant asserts that his trial counsel were ineffective in failing to present testimony of a "social history expert" such as social worker Laura Smith to focus on explaining Applicant's life history. [Supplemental Response To State's Answer at 9-13; *see* Initial Application For Writ Of Habeas Corpus at 47-62.] Applicant criticizes the State for pointing to Dr. McGarrahan's testimony as fulfilling this

role and contends that the State "does not comprehend the distinction between diagnosing a mental illness and explaining the significance of someone's life events." [*Id.* at 9.] Applicant's criticisms are erroneous and unwarranted, and they fail to address the matters relevant to his claim for relief.

## 1. No Deficient Performance Is Shown

Applicant incorrectly seeks to have this Court overlook the mitigation facts and themes actually investigated and presented by his trial counsel and to second-guess counsel for not calling a different witness who may have presented the evidence differently. [Supplemental Response To State's Answer at 9-13; Moore's supplemental affidavit at 5.] *See Strickland,* 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Ellis,* 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight). This is not a case where counsel conducted no investigation or presented no mitigating evidence on Applicant's behalf.[6]  Counsel cannot be deemed ineffective simply because they did not present Applicant's mitigation case using the precise type of expert witness Applicant now alleges. *See*

---

[6] The State previously detailed the investigative efforts of Applicant's trial team, the meager assistance provided by Applicant during the investigation, the difficulties faced by Applicant's trial team in locating witnesses who were willing to testify in Applicant's behalf, and the evidence presented on Applicant's behalf. [*See* State's Reply To Application For Writ Of Habeas Corpus at 24-33, 39-49.]

*Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable").

Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [Moore's supplemental affidavit at 5; *see* State's Reply To Application For Writ Of Habeas Corpus at 24-33 (discussing investigative efforts of trial counsel).] Many people whom the defense team contacted either refused to talk to them, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's supplemental affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

Trial counsel asked the Court to appoint Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist as part of the defense

team. [*See* Applicant's exhibit 47.]  Counsel retained Dr. McGarrahan because of

Moore's previous work with her, his opinion of her abilities, her reputation in the

legal community, and her good professional relationship with Dr. J. Randall Price,

the State's expert forensic psychologist/neuropsychologist.[7]  [Moore's affidavit at

7.]  Dr. McGarrahan interviewed, evaluated, and tested Applicant; reviewed a large

volume of records, correspondence, and videos; spoke with Applicant's sister and

mother; asked Applicant about his "entire social history"; and discussed the

offenses with Applicant in great detail. [RR 44: 118-24.]

Based on their investigation, trial counsel determined that the best way to

present Applicant's mitigation case for the jury was to develop the story of

Applicant's life through the available lay witnesses and to then use that story as a

basis for the opinions offered by Dr. McGarrahan. [Moore's affidavit at 10;

Cummings' affidavit at 6; Moore's supplemental affidavit at 5-6.] Applicant's trial

counsel presented as complete a picture of Applicant's life story as they were able.

[Moore's supplemental affidavit at 5.] Applicant's trial counsel *did* then present

expert testimony about Applicant's life history through Dr. McGarrahan to develop

the relevant social history as part of the defense's mitigation case. [Dr. Price's

_____

[7] The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Affidavit of J. Randall Price, Ph.D. at 1-2 (hereinafter referred to as "Dr. Price's affidavit"; attached hereto as State's Exhibit 2).]

**959**

affidavit at 3-4.] Dr. McGarrahan testified about Applicant's mental and emotional condition, as well as about how the facts of Applicant's life had affected him and had made him the person he was. [Moore's affidavit at 10-11; *see generally* RR 44: 118-63.] She testified about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; and their relationship and significance to Applicant's actions in murdering his family. [RR 44: 126-46, 158-61.] Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness who was "as qualified as a *social history expert* to develop a comprehensive social history and present her findings to the jury," and she testified effectively and credibly regarding Applicant's relevant life history. [Dr. Price's affidavit at 3-4 (emphasis in original).]

Assuming, *arguendo*, that a "social history expert" such as social worker Smith could have helped the jury to understand how Applicant's life events impacted him, Moore's experience has taught him that "jurors often ascribe relatively little importance to opinion testimony of [the] type" contained in Smith's affidavits. [Moore's supplemental affidavit at 5.] The strategic decision of Applicant's trial counsel to rely on a well-qualified forensic psychologist/neuropsychologist (Dr. McGarrahan) rather than a social worker (Smith) to testify about Applicant's life and its effects on him is not alone a basis

to prove a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.*

Even without an expert witness such as Smith, trial counsel presented the relevant facts and developed the expert-opinion testimony necessary to present Applicant's mitigation case through other relevant and competent expert and lay testimony. The *substance* of the testimony from Dr. McGarrahan and other witnesses gave the jury a sufficient understanding of Applicant's life, and Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been called to testify. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance"). Smith's affidavits contain no *meaningful* facts or *necessary* expert opinions that were not covered at Applicant's trial. [Moore's supplemental affidavit at 5.] Contrary to Applicant's assertions, the proposed

**961**

testimony from a "social history expert" such as social worker Smith would have been neither more valuable nor more persuasive than the testimony of Dr. McGarrahan and the lay witnesses. [*See* Supplemental Response To State's Answer at 9; Moore's supplemental affidavit at 5.]

The decision by Applicant's trial counsel to rely on Dr. McGarrahan and lay witnesses, rather than a social worker, to develop Applicant's life history for the jury fell within the wide range of reasonable professional assistance. [*See* Dr. Price's affidavit at 4 (trial counsel were reasonable in relying on Dr. McGarrahan to relate social-history issues to jury).] Applicant simply criticizes the manner in which his trial counsel presented his life history rather than alleging an outright failure to present such facts. [Moore's supplemental affidavit at 5.] Applicant has failed to overcome the strong presumption that the decisions of his trial counsel fell within the wide range of reasonable professional assistance; therefore, he has not met his burden to prove deficient performance. Applicant's fourth claim for relief should be denied

### 2.     No Prejudice Is Shown

Assuming, *arguendo*, that Applicant could prove deficient performance, he has wholly failed to meet his further burden to demonstrate prejudice, *i.e.*, that he would have been sentenced to life without parole rather than death had counsel called the proposed type of witness (a "social history expert") to testify during the

punishment phase of the trial. Applicant does not provide the "fact-intensive and exhaustive review of the proceedings as a whole" that are required to prove prejudice, and this Court is not responsible for formulating his claims. *Ex parte Medina*, 361 S.W.3d at 633.

Applicant's trial counsel performed a thorough investigation, called the available lay witnesses to testify about Applicant's life history, and then used Dr. McGarrahan's expert testimony to illuminate how Applicant's life history shaped the person he became later in life and how it related to his commission of the crime. [*See* Moore's supplemental affidavit at 5-6; *see also* State's Reply To Application For Writ Of Habeas Corpus at 24-33, 39-49.] At trial, Applicant's trial counsel developed the important facts of Applicant's life and his life events for the jury. [Moore's supplemental affidavit at 6.] The contents of Smith's affidavits provide nothing so compelling or of such significant difference that it would have persuaded the jury to answer the mitigation special issue differently. [*See id.*] In Moore's experience, "jurors often ascribe relatively little importance to opinion testimony of [the] type" proffered in Smith's affidavits. [*Id.* at 5.]

Applicant's jury was perfectly capable (without the assistance of a social worker) of evaluating the testimony presented by Applicant's lay witnesses and by Dr. McGarrahan and determining how to answer the mitigation special issue. *See Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (jury did not need expert testimony to

21

understand "humanizing" evidence; jury "could use its common sense or own sense of mercy"). Smith's testimony would have added little to the mitigating evidence already presented at trial. [Moore's supplemental affidavit at 5.] There is no reason to believe that the jury would have been any more persuaded by the testimony of a social worker like Smith than it was by a well-qualified forensic psychologist/neuropsychologist like Dr. McGarrahan, who communicated effectively and used minimal technical jargon while testifying to the same or similar topics. [*See id.*; *see also* Dr. Price's affidavit at 2-4.]

Smith's affidavit contains no *meaningful* facts or any *necessary* expert opinions that trial counsel did not cover in the mitigation presentation at trial. [Moore's affidavit at 11; Moore's supplemental affidavit at 5-6.] *See Coble*, 496 F.3d at 437 (counsel not ineffective for failing to present largely cumulative evidence). The addition of social worker Smith's proposed testimony would not have rendered Applicant's mitigation case, on balance, more compelling or understandable, and it would not have risen to the level of tipping the scales against the compelling aggravating facts presented. [*See* State's Reply To Application For Writ Of Habeas Corpus at 33-39 (discussing aggravating facts).]

There is no reasonable probability that, but for the failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as social worker Smith, the jury would have answered the mitigation special issue

"yes" instead of "no." Applicant has not satisfied, and cannot satisfy, his burden to prove that the alleged deficient performance of his trial counsel prejudiced him in any way. Applicant's fourth claim for relief should be denied.

### D.    Claim Six:   Failure To Present Evidence Of Applicant's Military Service As Mitigating Evidence

Applicant alleges that his trial counsel were ineffective because they failed to present his military service as mitigation evidence.[8]    [See Supplemental Response To State's Answer at 13-16; Initial Application For Writ Of Habeas Corpus at 73-79.] Applicant has not met his burden to prove deficient performance or resulting prejudice.

#### 1. No Deficient Performance Is Shown

This is not a case where Applicant's trial counsel ignored the *potential* value of military service. Trial counsel obtained Applicant's military records. [Moore's affidavit at 17.] The jury was made aware of Applicant's military service through lay and expert witnesses whom trial counsel called to testify; then, during the State's rebuttal case, Applicant tried during cross-examination of two of Applicant's former commanders to emphasize as much as possible the positive

---

[8] The State previously argued that the unsigned "affidavits" of Wayne Matthias and Fred Emmer submitted by Applicant should be stricken from the record. Applicant subsequently submitted affidavits signed by Matthias and Emmer as Applicant's exhibits 9 and 14. Because Applicant has not submitted a signed affidavit from Christopher Boling, the State continues to maintain that all references in the initial application to facts learned during alleged conversations with Boling should be stricken pursuant to Tex. R. Evid. 602 and 802 and given no consideration in this habeas proceeding. [See Initial Application For Writ Of Habeas Corpus at 78-79.]

**965**

aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.] Applicant's complaint boils down to an impermissible second-guessing of the manner in which his trial counsel chose to present evidence of his military service. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing court smuts be highly deferential to trial counsel and avoid deleterious effects of hindsight).

Based on the "wantonness and severity" of Applicant's crime, Moore believed he needed "something significantly compelling in Applicant's background in order to save him from the death penalty." [Moore's supplemental affidavit at 8.] By Applicant's own accounts, his military service did not appear to be something that would be particularly fruitful to his mitigation case. [Moore's supplemental affidavit at 7-8 (Applicant indicated military service was "lackluster" and not a positive experience; Moore was also aware of problems Applicant had in the military).] Applicant's defense team concentrated its mitigation efforts in those areas it felt would be most productive. *[Id.]*

Although Applicant provided the name Buddy Matthias to the defense team's mitigation specialist, she had "great difficulty" obtaining Applicant's military records from the government, and she was unable to locate additional information regarding Matthias from the government or Applicant. [*Id.* at 7.] The mitigation specialist later passed the information on to the defense team's investigator, who determined it would be "very difficult, if not impossible" to locate Matthias without further information.   [*Id.*]   When Moore inquired of Applicant about names and contact information for members of his unit or military friends in the service who might be willing to testify in his behalf, Applicant never provided Moore with such information.   [*Id.*]   Matthias' name never surfaced during the defense team's investigation, and the defense team's investigator did not pursue it further. [*Id.*]

Even if the proposed military witnesses had been located, nothing would have required Applicant's trial counsel to call them to testify. *See Strickland*, 466 U.S. at 688-89 (detailed rules governing attorney conduct would interfere with constitutionally protected independence of counsel, restrict wide latitude counsel must have in making tactical decisions, and distract from overriding mission of vigorous advocacy).   Counsel sought to minimize the negative aspects of Applicant's military service. [Moore's affidavit at 17.] The proposed testimony of Matthias, Emmer, and Chaidez would have provided *both* positive *and* negative

**967**

information about Applicant's military service.  [Moore's affidavit at 18; Moore's supplemental affidavit at 8.]  "While the affidavits do offer some explanation of Applicant's difficulties with isolation and alienation while in the service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending 'strip clubs.'"  [Moore's supplemental affidavit at 8.]

Applicant has failed to meet his burden to overcome the strong presumption that his trial counsel acted within the wide range of reasonable professional assistance.  Therefore, no deficient performance has been shown relating to the presentation of evidence about Applicant's military service.  Applicant's sixth claim for relief should be denied.

## 2.  No Prejudice Is Shown

Assuming, *arguendo*, that Applicant could establish deficient performance for failing to call the proffered military witnesses to testify at trial, he has not established, and cannot establish, that he suffered prejudice as a result.  Applicant does not provide the "fact-intensive and exhaustive review of the proceedings as a whole" that are required to prove prejudice, and this Court is not responsible for formulating his claims.  *Ex parte Medina*, 361 S.W.3d at 633.

Trial counsel did not fail to investigate or present evidence regarding Applicant's military service.  Trial counsel obtained Applicant's military records, and they tried to present the positive and minimize the negative aspects of

Applicant's military service. [Moore's affidavit at 17.] The witnesses proposed by Applicant would have introduced negative aspects of Applicant's military service in addition to any positive information that would have been developed. [*Id.* at 18.] Regardless of Applicant's attempts to characterize his military service as positive and a "powerfully mitigating episode in [his] life," the facts do not support such a characterization.[9] Simply put, Applicant's military career, even as described in the affidavits of the proffered military witnesses, is not the type of service that the jury would have considered a mitigating circumstance, especially when balanced against the murders of Applicant's family members and the testimony of Applicant's commanding officers during the State's rebuttal case. [*See, e.g.,* State's Reply To Application For Writ Of Habeas Corpus at 47-48.]

Applicant's mitigation case would not have been significantly different or more persuasive with the addition of the evidence contained in the affidavits of Matthias, Emmer, or Chaidez. The facts contained in the affidavits certainly are not of the type that, when combined with other mitigating evidence introduced at Applicant's trial, would have tipped the scales and caused the totality of mitigating circumstances to outweigh the overwhelming and compelling aggravating facts in this case. [*See* State's Reply To Application For Writ Of Habeas Corpus at 33-39

_____

[9] Applicant's own description of his military service was that it was "lackluster" and that it was not a positive experience. [Moore's supplemental affidavit at 8.]

27

(discussing aggravating facts).] While Applicant's trial counsel would have liked to have any witnesses who could have mitigated the negative aspects of Applicant's military career, [Moore's affidavit at 18], nothing in the proffered affidavits would have made Applicant's military service more compelling or mitigating, and any positive aspects of the testimony would have been met with negatives as well. [Moore's supplemental affidavit at 8.] "While the [military-witness] affidavits do offer some explanation of Applicant's difficulties with isolation and alienation while in the service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending 'strip clubs.'" [Id.]

Given the totality of the evidence and representation by trial counsel, there is no reasonable probability that the allegedly mitigating evidence contained in the habeas affidavits of Matthias, Emmer, and Chaidez would have convinced the jury to answer the mitigation special issue "yes" instead of "no." Applicant has failed to meet his burden to prove that he suffered any prejudice as a result of the alleged deficient performance of trial counsel with regard to the presentation of his military service. Applicant's sixth claim for relief should be denied.

**E.    Claim Seven: Failure To Present Testimony That Applicant Suffered From Complex Post-Traumatic Stress Disorder Resulting From Attachment Trauma**

Applicant contends that his trial counsel were ineffective for failing to present evidence that he suffered from complex post-traumatic stress disorder (CPTSD) resulting from attachment trauma.  [*See* Supplemental Response To State's Answer at 16-21; Initial Application For Writ Of Habeas Corpus at 80-93.] He asserts that counsel should have recognized the need for an expert specifically qualified to testify about the impact of neglect and attachment trauma.  [*See* Supplemental Response To State's Answer at 16.]  Applicant has failed to meet his burden to prove deficient performance and resulting prejudice.

**1.  No Deficient Performance Is Shown**

In preparing Applicant's mitigation case, trial counsel considered potential mental-health experts who could possibly assist them, and Moore decided on Dr. McGarrahan because of his familiarity with her work, his opinion of her abilities, and her reputation in the legal community.  [Moore's affidavit at 7.]  Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness.  [*Id.*; Dr. Price's affidavit at 3.]  Dr. McGarrahan spent approximately eleven hours administering cognitive tests and psychological inventories to Applicant.  [RR 44: 121-22.]  She also reviewed a large volume of records and videos regarding Applicant, various correspondence from Neata Woody (Applicant's sister) to

29

**971**

Applicant, Jackie Hummel's medical records, and psychological test data from Dr. Price's evaluation conducted the weekend before she testified; she performed a clinical interview to ask Applicant about his "entire social history"; she performed a mental status examination during which she made observations of Applicant and discussed with him any psychiatric symptoms he was having; and she discussed the offenses in great detail with Applicant. [RR 44: 121-24.]

Through the testimony of Dr. McGarrahan and lay witnesses, Applicant's trial counsel sought to demonstrate the type of attachment issues which they found present with Applicant. [Moore's supplemental affidavit at 10; *see* RR 44: 126-46, 158-61.] Moore, who has called experts to testify in other cases about the presence of "attachment disorder," did not believe, based on the available facts that any additional expert other than Dr. McGarrahan was necessary to adequately address Applicant's attachment issues at trial. [Moore's affidavit at 21-22.] Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Hinton*, 134 S. Ct. at 1089.

Dr. McGarrahan, a well-qualified forensic psychologist/neuropsychologist testified at trial to every deficit and disorder she found to exist with Applicant

30

**972**

based upon her exhaustive interviews and testing, the information she received from Applicant's family, and her review of Applicant's relevant records. [Moore's supplemental affidavit at 10.] Trial counsel presented the information available to them that was supported by the evidence. [Id. at 11.] Dr. McGarrahan was qualified to present evidence of attachment issues at trial; having experience in the treatment of a condition, such as CPTSD, is not a prerequisite to conducting a comprehensive forensic psychological evaluation and testifying to the results. [Dr. Price's affidavit at 6-7.] Dr. McGarrahan never diagnosed Applicant with CPTSD or informed counsel that such a diagnosis might be possible. Under such circumstances, assuming, arguendo, that Dr. Hardesty's post-trial diagnosis of CPTSD is correct, Applicant's trial counsel cannot be deemed objectively unreasonable for failing to discover or present a diagnosis of CPTSD at trial. See, e.g., Campbell v. Coyle, 260 F.3d 531 (6th Cir. 2001) (counsel's failure to investigate and discover Campbell's PTSD not ineffective when clinical psychologist failed to make such diagnosis); Pruett v. Thompson, 996 F.2d 1560, 1573-74 (4th Cir. 1993) (counsel's failure to investigate or present evidence of mental illness, developmental problems, organic brain damage, and PTSD not ineffective where counsel consulted psychiatrist who concluded Pruett did not suffer from any of the alleged mental illnesses or abnormalities); Taylor v. Mitchell, 296 F.Supp.2d 784 (N.D. Ohio 2003) (counsel not ineffective for not

973

investigating and discovering Taylor's PTSD after forensic psychologist failed to make such diagnosis).

Even if Applicant's trial counsel had been informed of a diagnosis of CPTSD at the time of Applicant's trial, counsel would not have been required to present testimony regarding the diagnosis. *See Strickland*, 466 U.S. at 688-89 (detailed rules governing attorney conduct would interfere with constitutionally protected independence of counsel, restrict wide latitude counsel must have in making tactical decisions, and distract from overriding mission of vigorous advocacy). CPTSD is a psychological injury resulting from prolonged exposure to very extreme trauma such as entrapment or kidnapping, slavery or enforced labor, long-term imprisonment, torture, or abuse from which there is little or no hope of escape. [Dr. Price's affidavit at 4.] Many signs, symptoms, and conditions have been ascribed to CPTSD, rendering it so non-specific that it has failed to gain general acceptance in the mental-health community as a mental disorder. [*Id.* at 5.] Clinical literature has discussed CPTSD since the late 1980s, but it remains essentially a "syndrome," which is a collection of signs and symptoms that *suggest* some abnormal condition. [*Id.*] Research on CPTSD has not risen to the level required to be determined a disorder (i.e., a constellation of signs and symptoms that is not accounted for by some other condition) even though the developers of both the DSM-IV and the DSM-V have considered it. [*Id.*]

CPTSD has not been included in the DSM-V or in the International Statistical Classification of Diseases and Related Health Problems. [Moore's supplemental affidavit at 9.] In Moore's experience, diagnoses for mental disorders not included in such diagnostic manuals are subject to attack upon that basis alone, and, therefore, they can have markedly less effect upon jurors. [*Id.* at 9-10.] Moore is "skeptical about the jury's willingness to give credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals." [*Id.* at 10-11.]

Moore's greatest concern with Dr. Hardesty's diagnosis of CPTSD "comes with the overall scarcity of any underlying evidence upon which to base that diagnosis. [*Id.* at 10.] While Moore is aware that denials of emotional neglect, *etc.*, may not be uncommon in a clinical situation, "they nevertheless create a unique and challenging problem in being able to support and defend such a diagnosis before the jury." [*Id.*; *see* Dr. Price's affidavit at 7 (although denials of abuse in genuine victims are not uncommon, Dr. Hardesty's allusions to the denials of child abuse or neglect by Applicant and his sister as constituting evidence that abuse and neglect did, in fact, occur is "inappropriate").] In Moore's over thirty-five years trying criminal cases, jurors are reticent to accept "learned opinions" in the face of a lack of an evidentiary basis with which to support that opinion. [Moore's supplemental affidavit at 10.] Moore understands that such

denials do not create a bar to the making of such a diagnosis, but "they absolutely cannot be over-looked or ignored, and they create a substantial impediment to a lawyer's ability to effectively defend such a diagnosis before a jury." [Id.]

Moreover, had Dr. Hardesty testified that she diagnosed Applicant with CPTSD, Dr. Price would have been available to dispute her analysis that Applicant suffers from CPTSD secondary to attachment trauma and that Applicant was reliving the emotional trauma of his childhood when he murdered family members, set the house on fire, and fled to California. [Dr. Price's affidavit at 6.] The most likely motivations for Applicant's offense were "multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled." [Id.] Applicant's childhood may have been marked by the lack of being told he was loved, not having been hugged, being isolated on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse; however, in Dr. Price's opinion, these events are not in the ballpark with the conditions usually discussed in relationship to CPTSD. [Id.] Additionally, Hummel did form attachments with adults such as his sister and uncle; he "escaped" his family of origin shortly after high school when he joined the Marines, where he was successful as an intelligence specialist until he became dissatisfied with his

34

situation, went AWOL, and lost his security clearance; and he maintained several relationships with women, even though he became "attached" to them too quickly and appeared to be poor in interacting with the opposite sex.  [*Id.*]

Applicant's trial counsel could not have been deficient for failing to discover and present a diagnosis of CPTSD when the defense team's well-qualified mental-health expert did not make such a diagnosis.  Moreover, counsel acted within the wide range of reasonable professional assistance and were not objectively unreasonable in making a strategic decision to rely on Dr. McGarrahan rather than to retain another type of expert such as Dr. Hardesty to testify at Applicant's trial. Applicant's attack on counsel's performance is simply based on impermissible second-guessing and hindsight.  *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007) (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight).  Applicant has not met, and cannot meet, his burden to prove that his trial counsel were deficient for not retaining an expert such as Dr. Hardesty to testify that he suffers from CPTSD resulting from attachment trauma.  Applicant's seventh claim for relief should be denied.

977

## 2.   No Prejudice Is Shown

Assuming, *arguendo*, that Applicant could meet his burden to prove deficient performance, he has not met, and cannot meet, his further burden to establish prejudice.  Applicant does not provide the "fact-intensive and exhaustive review of the proceedings as a whole" that are required to prove prejudice, and this Court is not responsible for formulating his claims.  *Ex parte Medina*, 361 S.W.3d at 633.

Applicant's defense team thoroughly investigated Applicant's life history and presented as complete a picture of Applicant's life history as possible given the witnesses who were available to the defense at the time of trial.  [*See* State's Reply To Application For Writ Of Habeas Corpus at 24-33, 39-49; Moore's supplemental affidavit at 5.]  Importantly, Dr. McGarrahan testified during the punishment phase of trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; and their significance to Applicant's actions in murdering his family.  [RR 44: 126-46, 158-61.]

CPTSD is not a disorder contained in the DSM-IV, DSM-V, or the International Statistical Classification of Diseases and Related Mental Health Problems.  [Moore's supplemental affidavit at 9.]  In Moore's experience, affidavit at 5.]  Importantly, Dr. McGar36an testified during the punishment phase

978

diagnoses for mental disorders not included in such diagnostic manuals can have markedly less effect upon the jurors. [*Id.* at 9-11.] Additionally, had Dr. Hardesty testified, Dr. Price would have been available to testify on behalf of the State in order to dispute her diagnosis. [Dr. Price's affidavit at 6.] Further, although denials of abuse in genuine victims are not uncommon, Dr. Hardesty's allusions to the denials of child abuse or neglect by Applicant and his sister as constituting evidence that abuse and neglect did, in fact, occur is "inappropriate." [*Id.* at 7.]

The jury did not find Applicant's attachment issues and personality traits, the facts of his life, or their role in his commission of the murders to be sufficiently mitigating to absolve Applicant of moral blameworthiness for his premeditated, calculated, heinous acts. Moore fails to see how such testimony would have been sufficient to compel a favorable answer by the jury to the mitigation special issue under the facts and circumstances presented here. [Moore's supplemental affidavit at 11.] The overwhelming aggravating facts and circumstances surrounding Applicant's murder of his family members, along with other aggravating evidence in the record, still would have outweighed the totality of Applicant's mitigating evidence even if the jury had heard Dr. Hardesty's testimony, which is not particularly powerful or compelling, and had an opportunity to evaluate the evidence again. [*See* State's Reply To Application For Writ Of Habeas Corpus at 33-39.]

**979**

There is no reasonable probability that the jury would have been persuaded by Dr. Hardesty's testimony to answer the mitigation special issue "yes" instead of "no." Therefore, Applicant has failed to meet his burden to prove that he suffered prejudice as a result of the alleged deficient performance by his trial counsel. Applicant's seventh claim for relief should be denied.

## VI.    Supplemental Reply To Claim Fifteen: Applicant's Eligibility For A Death Sentence

Applicant asserts that he is ineligible for a death sentence because "his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution." [Initial Application For Writ Of Habeas Corpus at 167-70.] He relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of individuals with intellectual disability.[10] [Application at 167.] However, the *Atkins* Court expressly limited its holding to those with intellectual disability, *id*. at 320, and the Court of Criminal Appeals of Texas has rejected an argument that the rule or rationale of *Atkins* extends to exempt persons with mental illness from imposition of the death penalty.[11] *Mays*

---

[10] Although the term "mental retardation" has been employed in the past, the United States Supreme Court now favors use of the term "intellectual disability" to describe the identical phenomenon. *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

[11] As set forth in the State's previous reply, other federal and state courts likewise have refused to extend *Atkins* to those with mental illnesses or disorders. [*See* State's Reply To Application For Writ Of Habeas Corpus at 193.]

38

**980**

*v. State,* 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *see Soliz v. State*, No. AP-76,768 (Tex. Crim. App. June 18, 2014) (Soliz not exempt from death penalty despite expert testimony that Soliz diagnosed with partial fetal-alcohol syndrome and had cognitive and functional abilities similar to person with mental retardation).

Furthermore, Applicant's claim that he is ineligible for the death penalty because of his alleged mental impairments is inconsistent with his objective neuropsychological and psychological test results and the facts of the offense. [Dr. Price's affidavit at 7-9.] Applicant's psychological and neuropsychological test data and life history are not at all similar to an individual with intellectual disability. [*Id.* at 7.] His behavior prior to, during, and after the offense is inconsistent with his allegation about the effect of the alleged mental impairment. [*Id.* at 8-9.] His actions around the time of the offense clearly indicated that he had the capacity to understand and process information, to control his impulses, to engage in logical reasoning, to consider the future repercussions of his actions, and to communicate. [*Id.* at 8-9.]

Even had Applicant been diagnosed pretrial as suffering from CPTSD, such diagnosis would not have exempted him from facing the death penalty. Applicant's claim for relief is not based on intellectual disability, and *Atkins* is

39

**981**

inapplicable. Applicant has failed to demonstrate any valid basis to hold otherwise. Applicant's fifteenth claim for relief should be denied.

WHEREFORE, PREMISES CONSIDERED, the State prays that each of Applicant's claims for relief be denied.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Division

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672

**982**

## CERTIFICATE OF SERVICE

True copies of the State's Supplemental Reply to Application for Writ of Habeas Corpus were mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on July 7, 2014.

HELENA F. FAULKNER

## CERTIFICATE OF SERVICE

True copies of the State's Supplemental Reply to Application for Writ of Habeas Corpus were mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on July 7, 2014.

HELENA F. FAULKNER

## CERTIFICATE OF SERVICE

True copies of the State's Supplemental Reply to Application for Writ of Habeas Corpus were mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on July 7, 2014.

983

# **STATE'S EXHIBIT 1**

## **(Counsel's Supplemental Affidavit In Response To Writ Allegations signed by Larry Moore on 7/1/14 and Filed on 7/14/14)**

STATE'S EXHIBIT 1

(Counsel's Supplemental Affidavit In Response To Writ Allegations signed by Larry Moore on 7/1/14 and Filed on 7/14/14)

**984**

No. C-432-009923-1184294-A

EX PARTE        *        IN THE 432nd JUDICIAL

                     *        DISTRICT COURT

JOHN WILLIAM HUMMEL      *        TARRANT COUNTY, TEXAS

## COUNSEL'S SUPPLEMENTAL AFFIDAVIT
## IN RESPONSE TO WRIT ALLEGATIONS

*BEFORE ME*, the undersigned authority, on this date personally appeared the Affiant, a person known by me to be Larry M. Moore, Attorney at Law, who, after being duly sworn by me, stated as follows:

"My name is Larry M. Moore, and I am an Attorney at Law, duly licensed to practice law in the State of Texas.    I was previously appointed as one of the two trial attorneys representing the Applicant, John William Hummel, in his capital murder trial in Cause No. 1184294, the case which is the underlying conviction that is the subject of this <u>Writ Application.</u>  I am the same Larry M. Moore who previously executed a <u>Counsel's Affidavit in Response to Writ Allegations</u> on August 9th, 2013, in connection with this proceeding and pursuant to the prior Order of this Court.   This <u>Counsel's Supplemental Affidavit in Response to Writ Allegations</u> is being submitted pursuant to that same authority, and is intended to supplement my original affidavit in this case, and to constitute a further response to the claims of ineffective assistance of counsel that were raised against me and my co-counsel, Fred Cummings, in the Applicant's <u>Writ Application</u> in this case.   I have reviewed the <u>Applicant's Supplemental Response to State's Answer and Exhibits,</u> and I am therefore familiar with the assertions made therein by Applicant in support of his original <u>Writ Application.</u> This <u>Supplemental Affidavit</u> shall respond to those additional assertions.

**985**

Application Claim Three  -  Counsel's Ineffectiveness For Failing
To Produce Evidence That Applicant Was Not A Future Danger

In his <u>Supplemental Response</u>, Applicant further develops his complaint regarding our failure to identify as potential witnesses, and to present before the jury at the punishment phase of Applicant's trial, the testimony of three detention officers (Officers Rigmaiden, Thomas, and Bell) from the Tarrant County Jail, who had supervised Applicant during significant portions of his pre-trial detention in connection with this case.   Specifically, Applicant claims that the testimony of such witnesses would have demonstrated that "Hummel was a model inmate - compliant, pleasant, not aggressive, and not threatening - who seemed like someone who would do well in prison and would not be a danger to others. (<u>Supplemental Response</u> at 6).

In my original <u>Affidavit</u>, I explained that despite our requests, Applicant did not provide us with the names of any potential jailers or other jail personnel with whom he felt that he had a sufficient relationship such that they might be willing to testify on his behalf.  Perhaps even more importantly, is the fact that <u>none</u> of the proposed testimony which Applicant now claims that such witnesses could have provided, actually provides facts regarding the Applicant and his pre-trial incarceration which we did not develop through other witnesses at Applicant's trial.  The lack of any problems with Applicant during his pretrial incarceration, including the lack of any disciplinary infractions or instances of violence, was presented to the jury through the testimony of our expert witnesses, Frank Aubuchon and Dr. Antoinette McGarrahan.  Mr. Aubuchon also testified to his opinion that Applicant would adapt well to prison life and function quite well in that environment.  While the testimony of the detention officers might have helped to convey that information to the jury, it was simply <u>not</u> information that we wholly failed to provide to the jury.  Additionally, Applicant's assertion that "the issue never addressed by Counsel's presentation was whether Hummel as an individual possessed a likelihood of committing acts of violence in the future" (<u>Supplemental Response</u> at 7) is simply not true.  Essentially every lay witness who testified at punishment on

behalf of the Applicant was asked, and testified before the jury, about the lack of any prior acts of violence, or propensity towards violence, on the part of the Applicant. In essence, this claim disputes the manner in which we presented that evidence to the jury, and the witnesses that we used for that purpose, rather than our failure to present any such evidence at all. Applicant unfairly denigrates the persuasiveness of the lay witness testimony which we presented on this issue; but perhaps most importantly, Applicant's assertion that the proposed testimony of these detention officers witnesses creates "a reasonable probability" that he outcome of Applicant's trial would have been different is both unsupported and simplistic. I acknowledge that we failed to identify and produce at trial the three detention officers who have given affidavits in connection with this proceeding. In our conversations with Applicant regarding the possibility of finding such witnesses, he not only was unable to identify any such prospective witnesses for us, but he was also not very encouraging that any such witnesses might be found. We nonetheless could have sent our investigator into the jail in an attempt to locate such witnesses, and I have done so in other criminal cases including death penalty cases which I have tried. Unfortunately, my past experience in those situations has also been that once we identify such individuals as prospective witnesses, the State's prosecutors and the detention officers' supervisors talk to them in such a manner that it ultimately has a "chilling effect" upon their willingness to provide favorable testimony on behalf of the defendant. Generally, my experience has also been that unless there is at least some personal relationship with, or affinity for the defendant that has developed with the officers, then the proposed testimony that they would offer becomes much less favorable and available. Our decision not to send an investigator into the jail was based upon these considerations, and upon our determination of the need to have him do other things that we felt might have a greater chance of being helpful to us.

In his Writ Application, Applicant also takes issue with the State's assertions at trial that the facts of the offense, standing alone, were sufficient to affirmatively answer the "future dangerousness" special issue. Regardless of whether these facts might be "legally sufficient"

**987**

to support such an affirmative answer, in my experience from having participated in ten death penalty trials which were tried to verdict, the facts of the particular crime on trial are generally paramount in the jury's determination of that special issue.   The Applicant's statement, wherein he details the fact that he was so physically tired from the murders of his wife and her father, that he had to take time to rest and contemplate his actions before undertaking the murder of his daughter, is the type of evidence which has an indelible impact upon jurors. When such evidence is coupled with the additional fact that within hours before the murder of his family, including the murder of his own daughter, Applicant was reading a bedtime story to the daughter of his new girlfriend, this painted such a graphic and memorable portrait of Applicant as a person that it was probably impossible for anyone to overcome.  For the Applicant to attempt to disregard or to understate the importance of such testimony in regard to this special issue is disingenuous.

For all of the foregoing reasons, as well as those previously delineated in my original <u>Affidavit</u>, and under all of the circumstances of this case, I do not believe that it was ineffective assistance of counsel for us to fail to identify and marshal into court the three detention officers whose affidavits were presented by Applicant in connection with his <u>Writ Application</u>.

**Application Claim Four – Counsel's Ineffectiveness For Failing To Present Expert Testimony Regarding Applicant's Life History**

In his <u>Supplemental Response</u>, Applicant reiterates his claim that we were ineffective in failing to present the testimony of a "social history expert" in order to explain the significance of Applicant's "life events" upon him, and upon the "paths that he took." My original <u>Affidavit</u> responded to this claim at some length, and from my review of Applicant's <u>Supplemental Response</u>, it does not appear to offer anything markedly different from what was alleged originally. The crux of Applicant's complaint appears to be that we failed to perceive the importance of such testimony; and in doing so, we failed to obtain the testimony

**988**

of an expert in the field of social work to give an opinion regarding the impact of such "life events" upon Applicant.

I do not believe that the legal standard for ineffective assistance of counsel commands that we present any certain type of expert witness, or any certain type of expert opinion testimony, in order for us to be effective. Applicant suggests that our failure to present such a witness undermined our ability to offer a complete picture of Applicant's life story; however, other than the particular opinions of Ms. Sovine, Applicant fails to cite any particular facts or circumstances of importance in regard to his "character and background, and the personal moral culpability of the defendant" which we failed to develop before the jury. It appears that the thrust of Applicant's complaint comes with the manner in which we presented the facts regarding his life story, rather than with any outright failure on our part to present such facts.

Perhaps the testimony of a social historian could have been helpful to the jury in understanding how Applicant's life events impacted upon him; however, my prior experience has been that jurors often ascribe relatively little importance to opinion testimony of this type, and Applicant offers nothing in support of his contention that there is a "reasonable probability" that such testimony would have been sufficiently mitigating for him to avoid the death penalty.

At Applicant's trial, we attempted to present as complete of a picture of Applicant's "life story" as we were able. We spent countless hours seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers and others) who had known Applicant throughout his life, in order to develop a complete life history before the jury. Many of the people whom we located and contacted simply refused to talk to us. Many of those who talked to us, refused to testify on Applicant's behalf, or indicated that if they were to be called to testify, then they would ask the jury to give him a death sentence. Still others had damaging information regarding Applicant's character and background, such that we could not afford to take a chance that such evidence might come out on cross-examination; therefore, we choose not to use them at Applicant's trial. The lay

**989**

witnesses whom we called in order to develop Applicant's life history at his trial, were those through which we felt that we could best develop his life story. We then attempted to use Dr. McGarrahan to explain how those events of Applicant's life had affected him.

Perhaps the use of a "social historian" could have helped us to present Applicant's life story in a somewhat more "compelling" fashion; however, we did develop the important facts of his life, and his "life events." Applicant has not suggested any additional, relevant or compelling facts that we did not develop at his trial; and under such circumstances, I do not believe that our failure to present a social history expert constitutes ineffective assistance of counsel, nor have I ever read any opinion from the appellate courts which indicates that it is.

### Application Claim Six – Counsel's Failure To Present Hummel's Military Service As Mitigating Evidence

In his Supplemental Response, the Applicant speculates that had the jury heard the testimony of the three "military friends" that executed affidavits in connection with this Writ Application, then there is "more than a reasonable probability that at least one juror would have voted for life." (Supplemental Response at 16). The Applicant bases this assertion upon his belief that not only would they "have provided testimony regarding the positive side of Hummel's military service, their testimony would have explained and rebutted the negative information from the State's rebuttal witnesses." (Supplemental Response at 16).

In support of his assertions that we were ineffective for failing to secure the testimony of such witnesses, Applicant has also included as Exhibit 48, a portion of the Intake Summary complied by our Mitigation Specialist, Ms. Brendan Ross, upon her initial interviews of Mr. Hummel, wherein he gave her the name of one of the prospective witnesses, Mr. Buddy Mathias (Matthias). Ms. Ross apparently received this information from Applicant on January 20th, 2010. She then apparently forwarded that name to our investigator, Mr. Bobby Walton, on June 2nd, 2010. I have spoken with both Ms. Ross and Mr. Walton regarding this situation. As indicated in my original Affidavit, Ms. Ross had great difficulty in obtaining any records

**990**

regarding Applicant's military service from the government prior to Applicant's trial. I personally did not recall that Ms. Ross had been provided with Mr. Mathias' (Matthias') name by the Applicant, nor that she had given it to Mr. Walton. Ms. Ross has indicated that she was unable to locate any additional information regarding Mr. Mathias (Matthias) from either the government, or from the Applicant. Mr. Walton indicates that when he received the information from Ms. Ross, he was unsure of Mr. Matthias' first name, and he therefore felt that it would therefore be very difficult, if not impossible, to locate him without further information. As Mr. Mathias' (Matthias') name never resurfaced in our investigation of the case, Mr. Walton did not pursue it further.

I personally visited with Applicant regarding his military service on several different occasions, and I specifically inquired as to the names and contact information for any members of his unit, or any "military friends" that he had while in the service, that he thought might be willing to come testify at the trial on his behalf. The Applicant never provided me with any such information. He further indicated that his military service was not a positive experience, and that he was glad when he got out. We discussed the circumstances surrounding his having gone AWOL, and his subsequent discharge from the service; and I was also aware of some of the other problems which he encountered while in the military. Ms. Ross was able to provide me with a copy of his separation from service document (his DD 214), so I was also aware of the particular commendations that he received while in the service, and of his honorable discharge. I used that information during my cross-examination of the State's rebuttal witnesses in order to develop those positive aspects of Applicant's military record during their testimony.

By Applicant's own admissions to me, his military career was lackluster. At the time that we were conducting our pretrial investigation into his background, we were spending inordinate amounts of time in seeking to obtain the cooperation of the members of Applicant's own family, and of his "life-long friends," in his defense. As I have indicated previously, there was almost a universal unwillingness on the part of everyone to assist us in

**991**

Applicant's defense.  It appears that Applicant's writ counsel have encountered similar resistance from Applicant's family and "friends."  Based upon the wantonness and severity of the Applicant's crime, it was my belief that we would need something significantly compelling in Applicant's background in order to save him from the death penalty in this case.  It was also my personal belief that Applicant had probably suffered from some type of significant abuse at the hands of his parents during his upbringing which might ultimately help us to explain this crime, even though Applicant and all of his family members continuously denied that any such abuse had ever occurred.  The reason that he gave in his statement to the police for the commission of this crime (i.e.: that he was just "tired" of his life and essentially wanted a "new start") seemed to me to be an alarmingly insufficient motivation for the commission of such a heinous crime.  We concentrated our mitigation efforts in those areas which we felt would be most productive; and his military service, based upon Applicant's own accounts of such service, did not appear to be something that would be particularly fruitful for us in that regard.

Obviously, Applicant's writ counsel were able to obtain witnesses regarding Applicant's military service that we did not locate; however, I question their assertion that such witnesses would have provided testimony regarding "the positive side of Hummel's military service."  A review of the affidavits they obtained indicates that Applicant "struggled with being overweight and messy" (Matthias); had a "hard time" as a Marine (Emmer); and "had a hard time from his sergeants for not making his weight standard" (Chaidez).  I do not believe that these affidavits demonstrate any additional "positive" aspects of his service that we did not develop through our cross-examination of his commanding officers.  While the affidavits do offer some explanation of Applicant's difficulties with isolation and alienation while in the service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending "strip clubs."  For these reasons, I do not believe that this testimony creates a "more than reasonable probability that at least one juror would have voted for life;" and I

Page 8 of 11, Counsel's Supplemental Affidavit In Response To Writ Allegations [John Hummel, Applicant]

also do not believe that based upon the totality of our representation, that our failure to locate and produce such witnesses for purposes of Applicant's trial was ineffective assistance.

Application Claim Seven – Counsel's Ineffectiveness for
Failing to Present Evidence that Applicant Suffered from Complex
Post-Traumatic Stress Disorder Resulting from Attachment Trauma

In his <u>Supplemental Response</u>, Applicant reiterates and elaborates upon the assertion contained within his original <u>Writ Application</u> that we were ineffective for failing to present evidence regarding the existence of the "complex post-traumatic stress disorder resulting from attachment trauma" with which Dr. Hardesty has diagnosed Applicant as suffering. In the <u>Supplemental Response</u>, Applicant goes further, alleging that we misunderstand "complex post-traumatic stress disorder" and "attachment trauma," and the distinction of such a diagnosis from that of post-traumatic stress disorder as set out in the <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM).

I understand that Dr. Hardesty has diagnosed Mr. Hummel as suffering from a disorder which is not contained within the DSM, or within the <u>International Statistical Classification Of Diseases And Related Health Problems</u>, but, rather, has diagnosed him with a "clinical diagnosis founded in learned opinion in a rapidly growing body of psychiatric, psychological and neuroscience literature on neuron connectivity in childhood and the results of deprivation, trauma or neglect on development." (<u>Applicant's Exhibit 42</u> at 2). I also believe that I understand the distinction between her diagnosis for this disorder, from that of a diagnosis of post-traumatic stress disorder pursuant to the DSM. Dr. Hardesty's diagnosis was apparently reached after an interview of Applicant for approximately two hours and forty-five minutes, and her review of the trial testimony of some (apparently not all) of the witnesses who testified on Applicant's behalf at punishment, and of the additional affidavits obtained by Applicant's writ counsel. In my original <u>Affidavit</u>, I discussed our inability to obtain a diagnosis of PTSD for the specific reason that it is the only disorder of this type

**993**

contained within the DSM.  My experience has been that diagnoses for mental disorders which are not contained within such diagnostic manuals are subject to attack upon that basis alone, and that they can therefore have markedly less effect upon jurors.   My greatest concerns with Dr. Hardesty's diagnosis however, come with the overall scarcity of any underlying evidence upon which to base that diagnosis.  Dr. Hardesty seeks to explain the denials of emotional neglect, etc., made by the Applicant (and by his sister, his mother, and others) on the basis that persons who have suffered from such chronic neglect are unlikely to be able to recognize that fact, due to their lack of insight and understanding of the effects of such neglect.   While I am aware that such denials may not be uncommon in a clinical situation, they nevertheless create a unique and challenging problem in being able to support and defend such a diagnosis before a jury.  It has been my experience from having tried criminal cases for more that thirty-five years, that jurors are reticent to accept "learned opinions" in the face of a lack of an evidentiary basis with which to support that opinion. While I also understand that such denials may not create a bar to the making of such a diagnosis, they absolutely cannot be over-looked or ignored, and they create a substantial impediment to a lawyer's ability to effectively defend such a diagnosis before a jury.

Through the testimony of Dr. McGarrahan, and through our lay witnesses, we sought to demonstrate the type of attachment issues which they found present with Applicant, despite his and his family's consistent protestations to the contrary.  Dr. McGarrahan testified to every deficit and disorder she found to exist with Applicant, based upon her exhaustive interviews and testing of Applicant; the information that she had received from his family; and her review of his relevant records.  Applicant suggests that due to her purported "lack of experience" in dealing with the disorder diagnosed by Dr. Hardesty, that Dr. McGarrahan lacked the expertise necessary to identify and diagnose such disorder.  While I am aware that other disciplines may have different nomenclature from that found within the practice of psychiatry and psychology, I am nonetheless skeptical about the jury's willingness to give

994

credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals.

Further, despite the Applicant's and Dr. Hardesty's assertions that both we, and Dr. McGarrahan, lacked the requisite knowledge and sophistication to adequately convey the "profound effect" that Dr. Hardesty says such attachment trauma had upon Applicant, we nonetheless presented that information which was available to us, and which was supported by the evidence.   Additionally, assuming that Dr. Hardesty is correct in her assessment of Applicant's condition, I fail to see how such testimony demonstrates evidence of Applicant's "character, background, and personal moral culpability," that would be sufficient to compel a favorable answer by the jury to the mitigation special issue, in the absence of some direct correlation between that disorder and the commission of the crime, and under all of the facts and circumstances of the case.  Based upon all of the foregoing, as well as that information provided in my original **Affidavit**, it is still my belief that our failure to obtain the testimony of a witness like Dr. Hardesty did not amount to ineffective assistance of counsel.

## Conclusion

For the reasons outlined hereinabove, and for those reasons heretofore developed in my original Counsel's Affidavit in Response to Writ Allegations, I do not believe that based upon the totality of our representation in Applicant's case, that we provided him with ineffective assistance of counsel.

*Larry M. Moore*

LARRY M. MOORE

*SUBSCRIBED* and *SWORN* to before me on this the 1st day of July, 2014.

*Kimberly Moore*

KIMBERLY MOORE, Notary Public
My Commission Expires: June 18th, 2018

**995**

# STATE'S EXHIBIT 2

## (Affidavit of J. Randall Price, Ph.D.)

STATE'S EXHIBIT 2

(Affidavit of J. Randall Price, Ph.D.)

**996**

No. C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL, | § | TARRANT COUNTY, TEXAS |
| APPLICANT | § | |

### Affidavit of J. Randall Price, Ph.D.

1. My name is J. Randall Price. I am over the age of 21 and fully competent to make this affidavit. Everything contained in this affidavit is within my personal knowledge and is, upon my oath, true. I am a forensic clinical psychologist and neuropsychologist, and I am licensed to practice psychology in the States of Texas, Oklahoma, and Arkansas. My residence is in Fort Worth, Texas. My practice, Price, Proctor & Associates, is located at 11882 Greenville Ave., Suite 107, Dallas, Texas, 75243. I have practiced clinical and forensic psychology and neuropsychology for 30 years. I have consulted in more than 400 capital murder cases and in several hundred non-capital criminal cases. I have consulted on Federal capital murder cases and in cases in many counties in Texas and in Florida, Arizona, Arkansas, Colorado, Louisiana, Oklahoma, Georgia, Mississippi, Pennsylvania, and New Mexico. I have also consulted on a much greater number of criminal cases. I have been retained by both the defense and the prosecution in both state and federal cases. I began keeping records of my testimony in 1997, and, since then, I have testified approximately 37% of the time at the request of the defense, approximately 56% of the time at the request of the prosecution, and approximately 8% of the time at the request of the court.

In addition to maintaining an active independent practice in forensic and clinical psychology and neuropsychology, I have held academic appointments including Professor of Psychology at Richland College since 1975 and Clinical Professor of Psychology at the University of Texas Southwestern Medical School since 2006. From 1994 to 2012, I was a Lecturer in Law at Southern Methodist University School of Law.

I completed the requirements for the Bachelor of Science, Master of Science, and Doctor of Philosophy degrees in psychology at the University of North Texas in Denton, Texas. I completed my post-doctoral clinical internship at the Baylor Institute of Rehabilitation of the Baylor University Medical Center in Dallas, Texas, and I completed a post-doctoral fellowship at the University of Kentucky in Lexington, Kentucky.

I am board-certified in forensic psychology by the American Board of Professional Psychology and in neuropsychology by the American Board of Professional Neuropsychology. I am a Fellow of the National Academy of Neuropsychology. I am a member of the American Psychological Association

**997**

and the Texas Psychological Association. I am also a member of the Psychology and Law Society and the Society of Police and Criminal Psychology.

2. I was contacted by Helena F. Faulkner, Assistant Criminal District Attorney in Tarrant County, Texas and asked to prepare this affidavit. Specifically, Ms. Faulkner requested that I respond to three claims alleged by Mr. Hummel's post-conviction attorneys: (1) Claim 4 alleging that trial counsel was ineffective in failing to present expert testimony regarding Hummel's life history; (2) Claim 7 alleging that trial counsel was ineffective for failing to present evidence that Hummel suffered from "complex post-traumatic stress disorder" resulting from attachment trauma; and, (3) Claim 15 alleging that Hummel is ineligible for a death sentence because of his mental impairments.

3. I reviewed multiple documents in preparation for this affidavit. A complete list of the documents reviewed can be found in *Appendix A*. A list of references cited in this affidavit can be found in *Appendix B*. In addition to reviewing the available records at the time of Hummel's trial, including the raw test data from Dr. McGarrahan's evaluation of Hummel, I personally conducted a psychological evaluation of Mr. Hummel on 6/25/11. This psychological evaluation lasted approximately 7 hours and consisted of the following procedures: (1) clinical interview and comprehensive history; (2) behavioral observations; (3) mental status examination; (4) Personality Assessment Inventory [PAI]; (5) Structured Interview for DSM-IV Personality [SIDP-IV]; (6) Reynolds Intellectual Assessment Scales [RIAS]; and, (7) Repeatable Battery for the Assessment of Neuropsychological Status [RBANS]. Finally, I was present during the entire punishment phase of the trial from 6/22/11 to 6/28/11, including during the testimony of Dr. McGarrahan. I did not testify.

4. *Regarding the allegation that trial counsel was ineffective in failing to present expert testimony regarding Hummel's life history (Claim 4), my memory of listening to all the testimony in the punishment phase of Hummel's trial as well as my review of the punishment phase transcript indicates that Hummel's trial counsel did effectively present expert testimony regarding Hummel's life history through their expert witness, Antoinette McGarrahan, Ph.D.*

In my opinion, Dr. McGarrahan testified effectively and credibly regarding Hummel's relevant life history. She used minimal technical jargon, spoke clearly and communicated effectively, and responded relevantly to cross-examination in a non-defensive fashion. She and Mr. Moore interacted on direct exam in an efficient but non-rehearsed style. I was not surprised as I have known Mr. Moore for at least 25 years and Dr. McGarrahan for approximately 15 years. I have been retained by Mr. Moore in the past and have been cross-examined by him many times. I have the highest of opinions of him as a defense attorney. Dr. McGarrahan was my student in either 1998 or 1999 in a graduate class. The class was titled Psychiatric and Psychological Evidence, which I team-taught with the late Daniel Shuman at the Southern Methodist University Dedman School of Law. The class was composed of both law students from Southern Methodist

2

University and psychology/psychiatry students from the University of Texas Southwestern School of Medicine. After she completed her education and training, Dr. McGarrahan also worked in my office for approximately 5 years. We still team-teach a graduate class in forensic psychology at the University of Texas Southwestern School of Medicine. Dr. McGarrahan has a very active practice in forensic psychology and neuropsychology of her own now and enjoys a positive reputation in both the legal and forensic communities. I read in Mr. Moore's affidavit in response to writ allegations that he retained Dr. McGarrahan partially due to my prior professional relationship with her and because I would not likely dispute any findings she might make. I am certain that this statement is not meant to imply that I would not respectfully disagree with Dr. McGarrahan if I felt it appropriate and if my opinion were based on sound methodology; rather, I am certain that Mr. Moore's statement is based more on our mutual respect and the fact that Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness.

During Dr. McGarrahan's testimony in the punishment phase of Hummel's trial, she testified that she spent approximately 11 hours evaluating Hummel with both neuropsychological procedures to assess his cognitive functioning and with psychological procedures to assess his emotional functioning. She reviewed a large number of written documents and videos, and conducted a clinical interview and history to assist her in arriving at an opinion as to the etiology of any impairment Hummel might have. She also conducted collateral interviews with Hummel's sister and mother. Dr. McGarrahan's findings indicated that Hummel has: (1) a learning disability in written expression; (2) average to almost high average intelligence; (3) mild depression and anxiety; and (4) a Personality Disorder, Not Otherwise Specified with traits and features of narcissism, antisocial, schizoid, and borderline personality disorders. She did not diagnose Hummel with a severe mental disorder. Dr. McGarrahan testified that Hummel's personality dysfunction was the result of his biological makeup and his past experiences and that it was not volitional and was essentially out of his personal control. Dr. McGarrahan's testimony included detailed but easy to understand descriptions of Hummel's personality dysfunction in terms of narcissism, antisocial, schizoid, and borderline traits and features. Her testimony was totally in line with the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revised* (DSM-IV-TR), which was the standard source for diagnosing mental and personality disorders at the time of the trial.

Dr. McGarrahan's testimony regarding the etiology of Hummel's personality dysfunction included descriptions and explanations of the following environmental factors in his life: (1) the lack of consistent, nurturing care from his mother; (2) possible physical neglect; (3) emotional and psychological neglect of both Hummel and his sister; (4) the absence of being told they were loved; (5) the absence of being hugged; (6) the lack of emotional nurturing in the home; (7) the absence of attachment to his mother; (8) the absence of appropriate modeling of attachment behaviors by his primary caregivers; (9) the handing over of caregiving duties to Hummel's sister; and (10) not being given affection by his

3

mother or father. Further, Dr. McGarrahan testified as to how these environmental experiences led to Hummel's lack of ability to express emotions and the continuing "stuffing" of his emotions until they came out in an emotional rage at the time of the offense with "not much thinking going on but emoting, just operating off of pure emotion at the time". She described how Hummel appeared to have flat affect and emotion at the time of her evaluation. She further described how Hummel's significant medical problems are also related to his childhood experiences. Dr. McGarrahan testified to Hummel's perception that both his wife and his father-in-law were very critical of him. She testified that Hummel had quickly fallen in love with a woman named Kristie Freeze and that he wished to pursue a life with her. Testimony was also given by Dr. McGarrahan about how Hummel confused love with sex and how, if any woman showed him attention, he would quickly fall in love with her.

On cross-examination, Dr. McGarrahan answered responsively and honestly to Mr. Gill's questions about narcissism and about how Hummel thinks he is better than everybody, blames others for everything, thinks he should not be criticized, and, when he is repeatedly criticized, he ruminates on it and then the "fuse hits the dynamite." She agreed that Hummel is grandiose; that he lacks empathy; that he is irresponsible, deceitful, and manipulative; that he lacks appropriate emotional expressiveness; and that he is impulsive, but "he did quite a bit of planning leading up to the offenses."

Having heard Dr. McGarrahan's testimony live at the trial stage and having reviewed the transcript, it is my opinion that a *social* history expert was not needed during the punishment phase of Hummel's trial as his trial counsel *did* present the testimony of an expert, Dr. McGarrahan, to explain the *relevant* social history that a jury might consider in the mitigation of his punishment. Many different types of mental health professionals are qualified to both take a social history and present such evidence to a jury. Certainly Dr. McGarrahan, as a well-trained and competent clinical and forensic psychologist and neuropsychologist, is as qualified as a *social history expert* to develop a comprehensive social history and present her findings to the jury. In my opinion, Hummel's trial counsel were reasonable in relying on Dr. McGarrahan to relate social history issues to the jury.

5. *Regarding the allegation that trial counsel was ineffective for failing to present evidence that Hummel suffered from "Complex Post Traumatic Stress Disorder" resulting from attachment trauma (Claim 7), it is my opinion that such evidence is both inconsistent with the science of psychology and with the available evidence concerning Hummel's life history.*

Based on the relevant psychological and psychiatric literature, "Complex Post-Traumatic Stress Disorder" (C-PTSD) is described as a psychological injury resulting from prolonged exposure to very extreme trauma such as entrapment or kidnapping, slavery or enforced labor, long term imprisonment, torture, or abuse from which there is little or no hope of escape. The prolonged exposure to

4

**1000**

trauma, rather than a single isolated traumatic event, is what essentially differentiates C-PTSD from "simple" PTSD. C-PTSD also differs from PTSD in other ways, including a more complex, diffuse, and tenacious constellation of symptoms and personality changes described as a "prodigious array of psychiatric symptoms." (Herman, 1992, p. 379). In fact, many signs, symptoms, and conditions have been ascribed to C-PTSD, rendering it so non-specific that it has failed to gain general acceptance in the mental health community as a mental disorder. The following represent examples of conditions associated with C-PTSD in both "self-help" websites and in the professional literature: (1) eating disorders; (2) depression; (3) substance abuse; (4) truancy and dropping out of school; (5) promiscuity; (6) co-dependence; (7) doormat syndrome; (8) theft; (9) destruction of property; (10) violence; (11) seeking power and control; (12) hypervigilance; (13) clouded perception about others, especially romantic partners; (14) thrill seeking; (15) becoming a "fixer"; (16) avoidance of relationships; (17) blaming others for one's problems; (18) castrophizing; (19) dependency; (20) denial of some reality; (21) escape to fantasy; (22) fear of abandonment; (23) identity disturbance; (24) learned helplessness; (25) low self-esteem; (26) panic attacks; (27) perfectionism; (28) selective amnesia; (29) self-loathing; (30) tunnel vision; (31) affect regulation; (32) self-destructive behavior; (33) difficulty modulating sexual involvement; (34) excessive risk-taking; (35) ineffectiveness; (36) guilt and shame; (37) not being understood; (38) minimizing; (39) inability to trust; (40) victimizing others; (41) conversion symptoms; (42) despair and hopelessness; (43) loss of previously sustaining beliefs; (44) insomnia; (45) sexual dysfunction; (46) dissociation; (47) modulation of anger; (48) suicidality; (49) self-mutilation; (50) anxiety; (51) agitation; (52) somatoform symptoms such as headaches, gastrointestinal disturbance, chronic pain, tremors, choking sensations, nausea, and (53) transient dissociative episodes. (http://outofthefog.net/, www.hatherleigh.com, Herman, 1992). The clinical literature has discussed C-PTSD since the late 1980s, but it remains essentially a "syndrome," which is a collection of signs and symptoms that *suggest* some abnormal condition. However, a "syndrome" is not the same as a "disorder," which is a constellation of signs and symptoms that is *not* accounted for by some other condition. Research on C-PTSD has not risen to the level required to be determined a disorder even though the developers of both the DSM-IV and the DSM-V have considered it either as C-PTSD or DESNPS (Disorders of Extreme Stress Not Otherwise Specified). C-PTSD remains a syndrome.

Syndromes have had a colorful history in the legal system with many of them having been determined to be inadmissible or too controversial to be effective in assisting the trier of fact. (Claus, 2012). This is especially the case when the syndrome involves severe child abuse and is presented as related to the defendant's responsibility for the criminal offense rather than the defendant having been "deprived a morally important safeguard" that may relate to the fairness of the punishment. (Litton, 2005). Multiple syndromes have experienced difficulty in the legal system over the years—battered wife syndrome, rape trauma syndrome, parental alienation syndrome, child sexual abuse

**1001**

accommodation syndrome, shaken baby syndrome, "urban survival syndrome", and most recently "affluenza syndrome."

The fact that Dr. McGarrahan "ruled out" a diagnosis of PTSD is unrelated to whether or not evidence existed that Hummel suffered from C-PTSD. If Dr. McGarrahan had discovered evidence related to PTSD symptoms, she would have presented it to the jury. She may not have referred to C-PTSD *per se*, as it is not a well accepted concept, but she would certainly have presented any symptoms related to PTSD, even if she could not make the diagnosis of PTSD.

While attachment theory is replete in the professional psychological literature since the work of John Bowlby in the 1950s-1960s and Mary Ainsworth in the 1970s-1990s, difficulties with forming attachments or experiencing "attachment trauma" does not equate to the long-term exposure to trauma that occurs with imprisonment, torture, slavery, or the extreme abuse typically associated with C-PTSD. Hummel's childhood may have been marked by the lack of being told he was loved, not having been hugged, being isolated on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse, but, in my opinion, these events are not in the ballpark with the conditions usually discussed in relationship to C-PTSD. Additionally, Hummel did form attachments with adults such as his sister and his uncle. He also "escaped" his family of origin shortly after high school when he joined the United States Marine Corps, where he was successful as an intelligence specialist until he became dissatisfied with his situation, went AWOL, and lost his security clearance. He maintained several relationships with women, even though he became "attached" to them too quickly and appeared to be poor in interacting with the opposite sex. Dr. Hardesty applies this attachment-trauma-induced C-PTSD to the instant offense and opines that Hummel "was disconnected mentally and emotionally" from the likely outcome of the commission of a serious crime but was relieved of the extreme emotional pressure to escape a relationship in which he was reliving the emotional trauma of his childhood. And so, his physical escape was as poorly planned and executed as the crime.

In short, I respectfully disagree with the analysis presented in Dr. Hardesty's affidavit that Hummel suffers from C-PTSD secondary to attachment trauma and that he was "reliving" the emotional trauma of his childhood when he repeatedly stabbed and beat his wife to death, beat his young daughter and father-in-law to death with a baseball bat, set the house on fire, and fled to California. The most likely motivations for Hummel's offense were multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled.

Finally, Dr. McGarrahan presented evidence of attachment issues at the trial stage, and she is qualified to do so. Having experience in the treatment of a condition, such as C-PTSD, is not a prerequisite to conducting a comprehensive forensic psychological evaluation and testifying to the results. In fact, learned

6

**1002**

treatises in forensic psychology postulate that the roles of forensic evaluators and treating doctors are often in conflict and that expert witnessing is best performed by objective forensic evaluators. (Greenberg & Shuman, 1997; Greenberg & Shuman, 2007). While Dr. McGarrahan did not find evidence that Hummel suffered from symptoms of PTSD (or C-PTSD), she presented mitigation testimony that Hummel suffered from attachment issues that affected his personality development. Dr. Hardesty alluded to the denials of child abuse or neglect by Hummel and his sister as constituting evidence that abuse and neglect did occur. While denials in genuine victims are not uncommon, the use of denials as evidence of abuse in and of themselves is inappropriate.

6. *Regarding the claim alleging that Hummel is ineligible for a death sentence because of his mental impairments (Claim 15), it is my opinion that such a claim is both inconsistent with available objective neuropsychological and psychological test results from Hummel and with the facts of the offense.*

Writ counsel alleges that Hummel is ineligible for a death sentence as an extension of *Atkins v. Virginia (2002)* in which the United States Supreme Court ruled that the execution of individuals with mental retardation is a violation of the Eighth Amendment. Writ counsel alleges that Hummel has "mental impairments that affect him in much the same way as intellectual disability as complex post-traumatic stress disorder, due to attachment trauma, prevents Hummel from responding and reacting to social situations and stressors in the way that an average individual would." (Application, p. 169) Writ counsel continues to explain that the underlying reasons for this decision apply in this case because Hummel: (1) has diminished capacities to understand and process information; (2) is unable to control his impulses and engage in logical reasoning; (3) is unable to consider the future repercussions of his actions; and, (4) has diminished ability to communicate with counsel and others.

I have been involved with capital murder cases involving the issue of mental retardation since the early 1990s when I was retained in *Penry v. Lynaugh* (1989) by defense counsel. I testified in both *Penry I* and *Penry II*. Since that time, I have been retained by both the defense and the prosecution in multiple *Atkins* cases in Texas, Oklahoma, and Arkansas.

In my opinion, Hummel's writ counsel's allegation that Hummel has mental impairments (C-PTSD secondary to attachment trauma) which affect him in much the same way as intellectual disability by preventing Hummel from "responding and reacting to social situations and stressors in the way that average individual would" is highly inconsistent with the available objective test data and with the details of Hummel's offense. Individuals with intellectual disability have global deficits in intelligence that place them in the bottom 2-3% of the population. Individuals with intellectual disability have adaptive behavior deficits that prevent them from being fully capable of handling their own daily lives and living independently. Hummel's psychological and neuropsychological test data and life history are not at all similar to an individual with intellectual disability.

7

**1003**

Dr. McGarrahan's neuropsychological test data on Hummel indicates average to above average intelligence, average academic abilities (with the exception of spelling), average attention and concentration abilities, average memory functioning, average language abilities, average motor control, and average visual-spatial abilities. Most importantly, Hummel's executive functioning is average. Executive functioning, typically considered to be controlled by the prefrontal cortex of the brain, includes: (1) abstract thinking; (2) planning ahead; (3) flexible thinking; (4) decision-making; (5) handling novel sequences of actions; (6) self-regulation of behavior; and (7) dealing with difficult situations that require overcoming strong habitual responding. Dr. McGarrahan testified at the trial stage that Hummel's "overall capacity and intellectual ability is average to above average" and that he does not have "intellectual disability". She testified that Hummel does not have a "severe mental disorder" but that he has personality disturbance in several areas including narcissistic, antisocial, schizoid, and borderline traits.

My evaluation of Hummel yielded results consistent with Dr. McGarrahan's. The testing I conducted indicated average to above average intelligence, overall average cognitive capacity, and antisocial as well as narcissistic personality traits. Psychological testing indicated that Hummel endorsed that he keeps reliving something horrible that happened to him. During the clinical interview, Hummel reported that this horrible experience was killing his family.

Thus, the objective test findings do not support the allegations that Hummel lacks the capacity to understand and process information, is unable to control his impulses and engage in logical reasoning, or has diminished capacities to consider the future repercussions of his actions and to communicate. Objective test results indicate he has no cognitive impairment relevant to these allegations.

Hummel's behavior prior to, during, and after the offense is also inconsistent with writ counsel's allegation concerning the effect of mental impairment. Hummel engaged in considerable premeditation and planning before the offense. Hummel's self report to the police and to me during my clinical interview with him indicated that prior to the offense, he met a girl and that he wished he was single so he could pursue her better. He began to ruminate on how both his wife and father-in-law constantly criticized him. He said he was "never good enough for them", "nothing he did was right", and "they always remembered what he did wrong but never remember what he did right". He was also upset because he was "not allowed to do the things that would help him cope with the stress" such as using tobacco, marijuana, and video games. He also began to dwell on the times he was made fun of and teased in his life. He said that his wife wanted to change him, but he did not want to change. He resented that he was the only one that was working and that his wife became pregnant again. He said that this unacceptable situation with his family was "all I could see for the rest of my life." He decided to kill his family. He said that he continued to think about killing his family for several days. He first tried to kill them by putting rat poison in their

8

**1004**

food on 12/16/09, but they could tell something was wrong with the food, and they refused to eat it. On the day of the offense, he pretended to go to work, but, instead, he spent time with at his girlfriend's house. After he left her house at approximately 11pm, he stopped and got gasoline so he would be seen on the surveillance camera there. He drove to his house and took off his shirt, watch, and boots. He parked his van behind the house so it would not be seen. He planned on slitting his family's throats while they slept and making it look like someone broke in and killed them. However, he did not act immediately but he sat in his vehicle and thought about what he was going to do for approximately 30 minutes before he entered the house and began stabbing his wife. However, the knife was dull, and she woke up and started fighting back. He grabbed a baseball bat and hit her, then stabbed her multiple times. He then went into his father-in-law's bedroom and hit him on the head with the baseball bat a few times. He rested, and then he struck his daughter 5-10 times on the head with the baseball bat. After the murders, Hummel used rolls of toilet paper to start fires in each of his family members' bedrooms. After he set the fires, he fled the scene, threw the murder weapons in a Dumpster, and went to several Wal-Mart stores to be seen on the surveillance videos. Hummel then returned to his home to pretend to be shocked to the police and fire-fighters. He left the scene again and stopped to get his paycheck. Then he drove to California, throwing out his wedding ring and pictures of his family on the highway. He arrived in San Diego, checked into a motel, met a guy at a strip club, smoked crack cocaine with him, and then went with him to Mexico to obtain marijuana. Hummel was arrested coming back from Mexico. In my interview with Hummel, he admitted that he did a horrible thing and that he "should have handled the situation better than he did."

In my opinion, Hummel's actions around the time of the offense clearly indicate he had the *capacity* to understand and process information, control his impulses, engage in logical reasoning, and consider the future repercussions of his actions. His self-report to the police and to me indicates he is able to communicate.

*J. Randall Price*

J. Randall Price, Ph.D.

Sworn and subscribed before me this 12th day of June, 2014.

*Rhonda Holden*

Notary Public, State of Texas

Rhonda Holden
Commission Expires
11-04-2016

9

**1005**

## Appendix A
### List of Documents Reviewed

School Records of John Hummel: Jonesville High School
Social Security Administration, Employment Records of John Hummel (1990-2009)
Tarrant County Jail Medical Records of John Hummel
Medical Records of John Hummel, Spartanburg County
Medical Records of John Hummel, Texas Back Institute
Military Records of John Hummel, United States Marine Corp
Veteran's Administration Records of John Hummel
Investigation Records, U.S. Customs and Border Patrol, 12/20/09
Tarrant County Sheriff's Standard Operating Procedures, 4/26/13
Letter from Tarrant County Records Management, 7/28/11
Media Reports of Instant Offense and Trial
Police/Fire Investigation Reports
Warrant of Arrest for John William Hummel, 12/22/09
Tarrant County District Attorney's Office Computer Crimes Unit Report
Video of Interview with John Hummel on 12/20/09 (Files M2U00482-M2U00484)
Written Statements given by John Hummel
Autopsy Reports
DNA Reports
Text Messages
Cell Phone Records
Letters to Jackie Hummel
Transcript of Trial on Punishment (Vol. 44 of 55)
    Melody Anderson
    Philip King
    Cindy Lee
    Frank AuBuchon
    Antoinette McGarrahan
Appellant's Brief on Appeal, 6/5/13
OCW's Initial Application of Writ for Habeas Corpus
OCW's Exhibits 1-41 To Initial Application of Writ for Habeas Corpus
OCW's Supplemental Application of Writ for Habeas Corpus
Larry Moore's Affidavit in Response to Writ Allegations, 8/9/13
State's Original Reply to OCW's Initial Application of Writ for Habeas Corpus
Affidavit of Susan Hardesty, M.D., 5/27/13
Affidavit of Susan Hardesty, M.D., 3/26/14
Affidavit of Haila Adams, 4/26/13
Affidavit of Cody Bell, 5/2/13
Affidavit of Laura Smith, LMSW-AP, 5/22/13
Affidavit of Stephanie Bennett, 4/26/13
Affidavit of Chad Brown, 4/26/13
Affidavit of Efrain Chaidez, 4/27/13
Affidavit of Lance Dupre, 4/25/13
Affidavit of Elizabeth Garza, 5/28/13
Affidavit of Fred Emmer, 4/29/13
Affidavit of George Goodson, 5/2/13
Affidavit of Thomas Hamilton, 5/12/13
Affidavit of Brian Jeter, 4/26/13
Affidavit of Elizabeth Garza, 5/28/13
Affidavit of Wayne Matthias, 4/23/13
Affidavit of Christy Pack, 4/27/13
Affidavit of Christopher Paris, 5/2/13
Affidavit of Tonya Paris, 5/2/13
Affidavit of Derrick Paris, 5/21/13
Affidavit of Joseph Patterson, 4/26/13

**1006**

10

**Affidavit of Tommy Rigmaiden, 5/2/13**
**Affidavit of Rory Thomas, 5/2/13**
**Affidavit of Nathaniel Davis, 5/20/13**
**Raw Test Data from Evaluation by Antoinette McGarrahan, Ph.D., 10/13/10, 12/30/10**
**Raw Test Data/Notes from Evaluation by Randy Price, Ph.D., 6/25/11**

Affidavit of Tommy Rigmaiden, 5/2/13
Affidavit of Rory Thomas, 5/2/13
Affidavit of Nathaniel Davis, 5/20/13.
Raw Test Data from Evaluation by Antoinette McGarrahan, Ph.D., 10/13/10, 12/30/10
Raw Test Data/Notes from Evaluation by Randy Price, Ph.D., 6/25/11

Affidavit of Tommy Rigmaiden, 5/2/13
Affidavit of Rory Thomas, 5/2/13
Affidavit of Nathaniel Davis, 5/20/13
Raw Test Data from Evaluation by Antoinette McGarrahan, Ph.D., 10/13/10, 12/30/10
Raw Test Data/Notes from Evaluation by Randy Price, Ph.D., 6/25/11

11

**1007**

*Appendix B*

Claus, M.D. (2012). Profiles, Syndromes, and the Rule 405 Problem: Addressing a Form of Disguised Character under the Federal Rules of Evidence. Notre Dame Law Review. Vol. 88, Issue 2, 973-1005.

Litton, P.J. (2005). The 'Abuse Excuse' in Capital Sentencing Trials: Is it Relevant to Responsibility, Punishment, or Neither. American Criminal Law Review. 1007, 1027-1072

Herman, J.L. (1992). Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma. Journal of Traumatic Stress. Vol. 5, No. 3, 377-391.

http://hatherleigh.com/

http://outofthefog.net/

**1008**