# CLERK'S RECORD

VOLUME 3 of 4

Writ Number: **C-432-009923-1184294-A**

Filed In the **432ND DISTRICT COURT**
of Tarrant County, Texas
Hon. **RUBEN GONZALEZ, JR.**, Presiding Judge

**EX PARTE: JOHN WILLIAM HUMMEL**

vs.

THE STATE OF TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS
JAN 29 2015
Abel Acosta, Clerk

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

ATTORNEY FOR THE APPELLANT

**BRAD D. LEVENSON,**
**DIRECTOR, OFFICE OF CAPITAL WRITS**
**1700 N. CONGRESS AVE. SUITE 460**
**AUSTIN, TEXAS 78711**
**PHONE: 512/463-8600**
**FAX: 512/463-8590**
**SBOT: 24073411**
**Attorney for JOHN WILLIAM HUMMEL, Appellant**

Delivered to the Court of Criminal Appeals for the State Of Texas At Capitol Station, AUSTIN, Texas, on the 26 day of January, 2015

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

SUSAN RUSSELL *Susan Russell*
Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. WR-81,578-01
Filed in the Court of Criminal Appeals for the State of Texas, at Capitol Station, AUSTIN, Texas, this

_______ day of ____________________, __________

LOUISE PEARSON, Clerk

By ______________________________, Deputy

# INDEX

Caption ........................................ 1

Application for Writ of Habeas Corpus ........................................ 2

Waiver of Service ........................................ 469

State's Unopposed Motion for Copies of Juror Questionnaires and Information Cards ........................................ 470

State's Unopposed Motion for Copies of Sealed Exhibits Filed with Application for Writ of Habeas Corpus ........................................ 475

State's Motion for Affidavits of Applicant's Trial and Appellate Counsel ........................................ 479

Order ........................................ 486

Order ........................................ 487

Motion in Response to Request for Trial and Appellate Counsel Affidavits ........................................ 488

Order ........................................ 500

**VOLUME 2**

State's Memorandum in Support of its Motion for Affidavits of Applicant's Trial and Appellate Counsel ........................................ 501

Memorandum/Order ........................................ 524

Counsel's Affidavit in Response to Writ Allegations ........................................ 527

Order ........................................ 557

Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus ........................................ 559

Memorandum/Order ........................................ 564

Affidavit of John W. Stickels (Post Conviction Application for Writ of Habeas Corpus) ........................................ 565

State's Reply to Application for Writ of Habeas Corpus ........................................ 570

Response to State's Answer to Claim One of Hummel's Application for Habeas Corpus Relief (Juror Misconduct); Request for Status Conference ....793

Order ....801

Notice of Filing Supplemental Exhibits in Support of Article 11.071 Application Filed June 4, 2013 ....802

Supplemental Response to State's Answer: Exhibits 42 through 46 ....813

Motion for Protective Order of Privileged Exhibits ....910

State's Reply to Applicant's "Motion for Protective Order of Privileged Exhibits ....916

Order ....925

State's Motion to Extend Time to File its Supplemental Reply to Application for Writ of Habeas Corpus ....926

Order ....931

Counsel's Supplemental Affidavit in Response to Writ Allegations ....932

State's Supplemental Reply to Application for Writ of Habeas Corpus ....943

**VOLUME 3**

Unopposed Response to State's Motion for Court for Order Findings and Conclusions; Proposed Order ....1009

State's Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law ....1014

This Page Not Used (1019-1023) ....1019

Order ....1024

Unopposed Response to State's Motion for Court to Order Findings and Conclusions: Proposed Order ....1025

Applicant's Proposed Findings of Fact and Conclusions of Law: Proposed Order ....1031

State's Proposed Memorandum, Findings of Fact, and Conclusions of Law ....1107

Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law ....1245

Request for an Extension of Time to Resolve Issues and Enter Findings of Fact and Conclusions of Law ........ 1383

Order ........ 1384

Order from the Court of Criminal Appeals of Texas ........ 1395

## VOLUME 4

Findings of Fact, Conclusions of Law, Recommendations and Order ........ 1398

Order ........ 1535

## INSTRUMENTS FILED IN CAUSE NUMBER 1184294D

Indictment ........ 1536
Capital Judgment ........ 1538
Partial Reporter's Record Sentencing ........ 1542
Trial Court's Certification of Defendants Right of Appeal ........ 1549
Court's Charge Guilt/Innocents ........ 1550
Court's Charge Punishment ........ 1565
Criminal Docket Sheet ........ 1574

## DOCUMENTS FILED PRIOR TO APPLICATION

Order ........ 1586
Unopposed Motion to Seal Confidential Juror Information (Capital Case) ........ 1587
Email to Abel Acosta ........ 1590
Letter from Office of Capital Writs/Clerks Response ........ 1593
Letter from Office of Capital Writs/Clerks Response ........ 1596
Letter from Office of Capital Writs/Clerks Response ........ 1599
Order ........ 1602
Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application ........ 1604
Order ........ 1614
Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record; Proposed Order ........ 1617
Unopposed Motion for Copies of Juror Questionnaires; Proposed Order ........ 1657

Clerk's Certificate ........ 1664

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | Cause No.<br>1184294D | FILED<br>THOMAS A WILDER, DIST. CLERK<br>TARRANT COUNTY, TEXAS<br>AUG 14 2014<br>TIME 10:45<br>BY [illegible] DEPUTY |

**UNOPPOSED RESPONSE TO STATE'S MOTION FOR COURT TO ORDER FINDINGS AND CONCLUSIONS; PROPOSED ORDER**

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**IN THE 432ND DISTRICT COURT**

**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) | Cause No.<br>1184294D<br><br>Hearing Requested |

**UNOPPOSED RESPONSE TO STATE'S MOTION FOR COURT TO ORDER FINDINGS AND CONCLUSIONS; PROPOSED ORDER**

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), responds to the State's motion requesting this Court order the proposed findings and conclusions from each party be filed within thirty days of the Court's order. After speaking with the State, Hummel requests that, if this Court grants the State's motion, the Court order the proposed findings and conclusions be due on November 3, 2014.

Hummel's lead attorney at the OCW will be taking one month of paternity leave beginning on August 18, 2014. In addition, both attorneys assigned to Hummel's case will be filing an initial state habeas application in another capital case at the end of September 2014. Because of these, and other case commitments at the OCW, a filing deadline of November 3, 2014, is necessary and appropriate for Hummel to complete the proposed findings and conclusions for the Court.

The OCW has spoken with Ms. Helena Faulkner, of the Tarrant County District Attorney's office, and that office does not oppose this request. This request is not made to unduly delay the proceeding in Hummel's case.

Thus, Hummel respectfully requests this Court set a filing date of November 3, 2014, for each party's proposed findings of fact and conclusions of law.

Respectfully submitted,

August 12, 2014

Robert Romig

**IN THE 432nd JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| | ) | Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

**ORDER**

This Court orders counsel for both Applicant and the State to file proposed findings of facts and conclusions of law for the Court to consider, on or before November 3, 2014.

ORDERED AND SIGNED on this ___ day of __________, 2014

______________________________
Ruben Gonzalez
Judge, 432nd Judicial District

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Response to State's Motion as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by email)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on August 12, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Robert Romig

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

AUG 04 2014

TIME 3:06
BY ___ DEPUTY

C-432-009923-1184294-A

| EX PARTE | § | IN THE 432ND DISTRICT COURT |
|---|---|---|
| | § | |
| JOHN WILLIAM HUMMEL | § | OF TARRANT COUNTY, TEXAS |

**STATE'S MOTION FOR COURT TO ORDER PREPARATION OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and requests that the Court issue an order finding that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and directing the parties to file proposed findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a)&(b). The following allegations are made in support of this motion:

I.

A Tarrant County jury convicted Applicant of capital murder in cause number 1184294D and answered the special issues in a way that required the imposition of the death penalty. The Court of Criminal Appeals of Texas affirmed Applicant's conviction and sentence on direct appeal. *See Hummel v. State*, No. AP-76,596 (Tex. Crim. App. November 20, 2013) (not designated for publication).

II.

The current application, which is Applicant's first, was filed on June 5, 2013, and raised fifteen claims for relief. The State filed its reply to each of Applicant's claims on December 2, 2013.

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant then filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46," which dealt specifically with claims three, four, six, and seven. Additionally, Applicant filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. The State filed a reply to Applicant's motion for a protective order.

On May 22, 2014, the Court denied Applicant's motion for protective order. The Court further ordered that the State's time to respond to Applicant's "Supplemental Response To State's Answer; Exhibits 42 Through 46" would begin to run when the clerk of the Court provided the State with copies of Exhibits 47 through 49. On May 28, 2014, the clerk notified the State of the Court's order. The Court granted the State an extension of time to file its "Supplemental Reply to Application for Writ of Habeas Corpus," and the State timely filed its supplemental reply on July 7, 2014.

III.

On June 18, 2014, the Court of Criminal Appeals issued an order directing this Court to resolve any remaining issues and enter findings of fact and conclusions of law within 180 days. *See* Order, No. WR-81,578-01 (Tex. Crim. App. June 18, 2014) (not designated for publication). Therefore, the current habeas proceedings must be concluded by December 15, 2014.

IV.

The State asserts that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a). Therefore, the next step in this habeas proceeding is for the Court to order the parties to file proposed findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. 11.071, § 8(b).

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 8(a)&(b) that the Court enter a written order finding that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and directing the parties to file proposed findings of fact and conclusions of law for the Court to consider.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Division

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672

CERTIFICATE OF SERVICE

A copy of this motion was mailed to Applicant's habeas counsel, Brad Levenson, Director, Office of Capital Writs, Stephen F. Austin Bldg., 1700 N. Congress Ave., Austin, Texas, 78701, on August 4, 2014.

HELENA F. FAULKNER

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432ND DISTRICT COURT |
| | § | |
| JOHN WILLIAM HUMMEL | § | OF TARRANT COUNTY, TEXAS |

MEMORANDUM

Having carefully reviewed the Application for Writ of Habeas Corpus, the State's Reply to Application for Writ of Habeas Corpus, Applicant's Supplemental Response to State's Answer, the State's Supplemental Reply to Application for Writ of Habeas Corpus, all of the exhibits and materials filed by each party, and the entire records of the trial and habeas proceedings, the Court hereby determines pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 8(a) that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and death sentence.

ORDER

The Court orders counsel for Applicant and counsel for the State to file proposed findings of fact and conclusions of law for the Court to consider **within thirty days of the date of this order**. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(b).

The Court further orders and directs the Clerk of this Court to furnish a copy of this Memorandum and Order to Applicant's counsel, Brad D. Levenson, Office of Capital Writs, at 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, or at his most recent address, by mailing said document by United States mail; and to the appellate section of the Tarrant County Criminal District Attorney's Office.

SIGNED AND ENTERED on this the ____ day of ________________, 2014.

______________________________
JUDGE PRESIDING

WRIT NO(s) C-432-009923-1184294-A

EX PARTE: ~~STATE OF TEXAS~~

JOHN WILLIAM HUMMEL

432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

## CAPITAL DEFENSE CLAIM FOR FEE PAYMENT/EXPENSES

Date of ~~Appointment~~ Court Order 9-10-13 Offense(s) CAPITAL MURDER

### DAYS IN COURT

| | # Days | Rate | Amount |
|---|---|---|---|
| **EVIDENTIARY** (jury/bench trial, revocations, etc. if oral testimony heard) | | | |

For Judge's Use Only

### HOURLY WORK (attach itemized statement)

| | # Days | Rate | Amount |
|---|---|---|---|
| **OUT OF COURT TIME** * (trial preparation, motion preparation, etc.) | 21.60 HRS. | 250- | 5,400- |
| **APPELLATE WORK** (research, brief preparation, oral argument, etc.) | | | |
| **EXPENSES** | | | |

* HOURS EXPENDED PURSUANT TO COURT ORDER. SEE ATTACHED ITEMIZATION.

For Judge's Use Only

**TOTAL** $5,400-

I certify to the Court and the Tarrant County Auditor that the above information is true and correct to the best of my knowledge. I further certify that I have not received money or anything of value for representing the accused since my appointment, nor will I receive same except as disclosed to and permitted by the Court and by law. I understand this document is a government record under Section 37.10 TEX.PEN.CODE.

PRINTED NAME: LARRY M. MOORE SIGNATURE [signature]

ADDRESS 4210 W. VICKERY BLVD., FT. WORTH, TX. 76107

Telephone 817-338-4800 State Bar No. 14357800 SSN 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

PURSUANT TO ARTICLE 26.05 TEX. CODE CRIM. PROC. I, THE UNDERSIGNED JUDGE, DIRECT THE AUDITOR OF TARRANT COUNTY TO PAY FROM THE GENERAL FUND OF SAID COUNTY TO THE ABOVE APPOINTED COUNSEL THE TOTAL AMOUNT SHOWN ABOVE FOR REASONABLE AND NECESSARY LEGAL SERVICES AND/OR EXPENSES IN THE ABOVE-STYLED CASE.

[signature] PRESIDING JUDGE 432 COURT

DATE 7/29, 2014.

Copy to Auditor 7-30-2014

Effective 12/14/01 DC-692 GPC-1901

LAW OFFICES OF
MOORE & CUMMINGS
*A Law Firm of Independent Attorneys*
4210 West Vickery Boulevard
Fort Worth, Texas 76107
(817) 338-4800 Office
(817) 989-2442 Fax

**Larry M. Moore**
Board Certified - Criminal Law
Texas Board of Legal Specialization

**Kimberly J. Moore,** *Legal Assistant*
Board Certified - Criminal Law
Texas Board of Legal Specialization

**Fred Cummings,** *Of Counsel*
Board Certified - Criminal Law
Texas Board of Legal Specialization
Board Certified - Criminal Trial Advocate
National Board of Trial Advocacy

July 2nd, 2014

Hon. Ruben Gonzalez, Jr.
Judge, 432nd Jud. Dist. Court
401 West Belknap Street
Fort Worth, Texas 76102

RE: Ex Parte John William Hummel
Post-Conviction Writ No. C-432-009923-1184294-A
Trial Court Case No. 1184294-A – Capital Murder
432nd Judicial District Court, Tarrant County, Texas

Dear Judge Gonzalez:

As you will recall, the Court has heretofore ordered that I respond to allegations made against my co-counsel, Fred Cummings, and me in the above-referenced writ application proceeding, wherein it is alleged by the Office of Capital Writs that we provided ineffective assistance of counsel to John Hummel during the trial of his capital murder case. I filed my original *Counsel's Affidavit in Response to Writ Allegations* in response to the Court's Order on September 10th, 2013. On April 2nd, 2014, I was advised that the Office of Capital Writs had filed a *Supplemental Response to State's Answer* in regard to this matter, which contained further elaboration upon, and expansion of its original claims of ineffective assistance of counsel. As some of these allegations were neither included, nor fully developed in their original writ application, it was my belief that pursuant to the Court's Order, I was obligated to file a supplemental affidavit addressing these matters. I have therefore delivered for filing my *Counsel's Supplemental Affidavit in Response to Writ Allegations* responding to such claims.

Due to the fact that I was required to spend some time in reviewing the Office of Capital Writs' *Supplemental Response*, my file, and parts of the trial transcript in this case, and in drafting my *Supplemental Affidavit*, I have prepared a Statement which reflects that additional time which I was required to spend pursuant to the Court's prior order in responding to those allegations set forth in the Office of Capital Writs' *Supplemental Response*. I would greatly appreciate your review of the enclosed Statement, and your authorization of whatever compensation you might feel is

appropriate for the additional time that I have been required to expend in this matter pursuant to the Court's Order. Please contact me at once should you have any questions in regard to this Statement, or the *Supplemental Affidavit* that I have submitted for filing in this cause. Thank you for your consideration of this request.

Sincerely,

LARRY M. MOORE

LMM/km
Enclosure

LAW OFFICES OF
MOORE & CUMMINGS
*A Law Firm of Independent Attorneys*
4210 West Vickery Boulevard
Fort Worth, Texas 76107
(817) 338-4800 Office
(817) 989-2442 Fax

**Larry M. Moore**
Board Certified - Criminal Law
Texas Board of Legal Specialization

**Kimberly J. Moore,** *Legal Assistant*
Board Certified - Criminal Law
Texas Board of Legal Specialization

**Fred Cummings,** *Of Counsel*
Board Certified - Criminal Law
Texas Board of Legal Specialization
Board Certified - Criminal Trial Advocate
National Board of Trial Advocacy

July 2nd, 2014

Hon. Ruben Gonzalez, Jr.
Judge, 432nd Judicial District Court
401 West Belknap Street
Fort Worth, Texas 76102

RE: Ex Parte John William Hummel
Post-Conviction Writ No. C-432-009923-1184294-A
Trial Court Case No. 1184294-A – Capital Murder
432nd Judicial District Court, Tarrant County, Texas

## STATEMENT

*For Time Expended Pursuant to Court Order (from 10-2-13 to 6-30-14):*

| Date | Activity | Time |
|---|---|---|
| 4-2-14 | Receipt/review telephone message from prosecutor (H. Faulkner), telephone conference with prosecutor re: *Supplemental Response to State's Answer* filed by Office of Capital Writs; receipt/review email from prosecutor together with *Supplemental Response*; review of *Supplemental Response* and supporting exhibits. | .75 hr. |
| 4-24-14 | Receipt/review email from prosecutor (H. Faulkner) re: "*sealed*" exhibits; emails to and from prosecutor; file review. | .40 hr. |
| 5-28-14 | Receipt/review email from prosecutor (H. Faulkner) re: Court's Order unsealing "*sealed*" exhibits; review of unsealed exhibits; file review. | .50 hr. |
| 6-16-14 | Telephone call to prosecutor (H. Faulkner); receipt/review telephone message from prosecutor; telephone conference with prosecutor re: supplemental affidavit. | .25 hr. |

| | | |
|---|---|---|
| 6-17-14 | Emails to Mitigation Specialist (B. Ross), Investigator (B. Walton), and trial co-counsel (F. Cummings) re: supplemental affidavit; receipt/review email from Mitigation Specialist's office; review of *Supplemental Response* and file. | 1.00 hr. |
| 6-18-14 | Email to Mitigation Specialist's office. | .10 hr. |
| 6-20-14 | Receipt/review email from prosecutor (H. Faulkner) re: supplemental affidavit. | .10 hr. |
| 6-23-14 | Review of *Supplemental Response* and file; receipt/review email from Mitigation Specialist (B. Ross); telephone conference with Investigator (B. Walton); emails to and from prosecutor (H. Faulkner); work on supplemental affidavit. | 1.50 hrs. |
| 6-24-14 | Receipt/review email from Investigator (B. Walton). | .10 hr. |
| 6-25-14 | Telephone conference with Mitigation Specialist (B. Ross); telephone conference with Investigator (B. Walton); review of *Supplemental Response* and file; work on supplemental affidavit. | 5.50 hrs. |
| 6-26-14 | Review of *Supplemental Response* and file; work on supplemental affidavit. | 5.00 hrs. |
| 6-27-14 | Review of *Supplemental Response* and file; work on supplemental affidavit; email to prosecutor (H. Faulkner). | 5.25 hrs. |
| 6-30-14 | Delivered supplemental affidavit to prosecutor's (H. Faulkner) office. | .40 hr. |
| 7-1-14 | Receipt/review telephone message from prosecutor (H. Faulkner); emails to and from prosecutor; review of file and trial transcript; corrected and executed supplemental affidavit. | .50 hr. |
| 7-2-14 | Delivered supplemental affidavit to prosecutor's office for filing together with *State's Supplemental Answer*. | .25 hr. |
| | **TOTAL HOURS EXPENDED:** | **21.60 HRS.** |

Larry M. Moore

**IN THE 432nd JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| | ) | Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
AUG 14 2014
TIME 10:45
BY SR DEPUTY

**ORDER**

This Court orders counsel for both Applicant and the State to file proposed findings of facts and conclusions of law for the Court to consider, on or before November 3, 2014.

ORDERED AND SIGNED on this 13th day of Aug., 2014

[signature]
Ruben Gonzalez
Judge, 432nd Judicial District

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) ) ) ) ) ) | Cause No. 1184294D |

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
AUG 14 2014
TIME 4:18
BY [illegible] DEPUTY

## UNOPPOSED RESPONSE TO STATE'S MOTION FOR COURT TO ORDER FINDINGS AND CONCLUSIONS; PROPOSED ORDER

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

SCANNED

**IN THE 432ND DISTRICT COURT**

**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) ) ) ) ) ) | Cause No. 1184294D<br><br>Hearing Requested |

**UNOPPOSED RESPONSE TO STATE'S MOTION FOR COURT TO ORDER FINDINGS AND CONCLUSIONS; PROPOSED ORDER**

John William Hummel ("Hummel"), through his attorneys the Office of Capital Writs ("OCW"), responds to the State's motion requesting this Court order the proposed findings and conclusions from each party be filed within thirty days of the Court's order. After speaking with the State, Hummel requests that, if this Court grants the State's motion, the Court order the proposed findings and conclusions be due on November 3, 2014.

Hummel's lead attorney at the OCW will be taking one month of paternity leave beginning on August 18, 2014. In addition, both attorneys assigned to Hummel's case will be filing an initial state habeas application in another capital case at the end of September 2014. Because of these, and other case commitments at the OCW, a filing deadline of November 3, 2014, is necessary and appropriate for Hummel to complete the proposed findings and conclusions for the Court.

The OCW has spoken with Ms. Helena Faulkner, of the Tarrant County District Attorney's office, and that office does not oppose this request. This request is not made to unduly delay the proceeding in Hummel's case.

Thus, Hummel respectfully requests this Court set a filing date of November 3, 2014, for each party's proposed findings of fact and conclusions of law.

Respectfully submitted,

August 12, 2014

Robert Romig

**IN THE 432nd JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) ) ) ) ) ) | Cause No.<br>1184294D |

**ORDER**

This Court orders counsel for both Applicant and the State to file proposed findings of facts and conclusions of law for the Court to consider, on or before November 3, 2014.

ORDERED AND SIGNED on this ___ day of __________, 2014

______________________
Ruben Gonzalez
Judge, 432nd Judicial District

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Response to State's Motion as follows:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by email)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on August 12, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Robert Romig



OFFICE OF CAPITAL WRITS
Stephen F. Austin Building
1700 N. Congress Ave., Ste. 460
Austin, Texas 78711

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS

UNITED STATES POSTAGE
PITNEY BOWES
02 1M $ 00.406
0004279596 AUG 12 2014
MAILED FROM ZIP CODE 78701

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
AUG 14 2014
TIME 4:15
BY ______ DEPUTY

39 EQW-N3B 76196

1030

C-432-009923-1184294-A

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
OCT 31 2014
TIME 11:06
BY CDO DEPUTY

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) ) ) ) ) ) | Cause No.<br>1184294-A |

**APPLICANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; PROPOSED ORDER**

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

# TABLE OF CONTENTS

APPLICANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ..... 1

MATERIALS CONSIDERED AND CREDIBILITY DETERMINATIONS ..... 1

FINDINGS OF FACT RELATED TO PROCEDURAL HISTORY ..... 2

FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR APPLICANT JOHN HUMMEL ..... 4

FINDINGS OF FACT RELATED TO CLAIM ONE ..... 4

CONCLUSIONS OF LAW RELATED TO CLAIM ONE ..... 5

FINDINGS OF FACT RELATED TO CLAIM TWO ..... 10

CONCLUSIONS OF LAW RELATED TO CLAIM TWO ..... 11

FINDINGS OF FACT RELATED TO CLAIM THREE ..... 13

CONCLUSIONS OF LAW RELATED TO CLAIM THREE ..... 16

FINDINGS OF FACT RELATED TO CLAIM FOUR ..... 17

CONCLUSIONS OF LAW RELATED TO CLAIM FOUR ..... 19

FINDINGS OF FACT RELATED TO CLAIM FIVE ..... 21

CONCLUSIONS OF LAW RELATED TO CLAIM FIVE ..... 23

FINDINGS OF FACT RELATED TO CLAIM SIX ..... 24

CONCLUSIONS OF LAW RELATED TO CLAIM SIX ..... 27

FINDINGS OF FACT RELATED TO CLAIM SEVEN ..... 28

CONCLUSIONS OF LAW RELATED TO CLAIM SEVEN ..... 35

FINDINGS OF FACT RELATED TO CLAIM EIGHT ..... 36

CONCLUSIONS OF LAW RELATED TO CLAIM EIGHT ..... 38

FINDINGS OF FACT RELATED TO CLAIM NINE ..... 41

CONCLUSIONS OF LAW RELATED TO CLAIM NINE .................................. 48

FINDINGS OF FACT RELATED TO CLAIM TEN .......................................... 49

CONCLUSIONS OF LAW RELATED TO CLAIM TEN .................................... 54

FINDINGS OF FACT RELATED TO CLAIM ELEVEN .................................... 56

CONCLUSIONS OF LAW RELATED TO CLAIM ELEVEN ............................ 57

FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM TWELVE .................................................................................................. 60

FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM THIRTEEN ........................................................................................... 62

FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM FOURTEEN ......................................................................................... 63

FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM FIFTEEN ............................................................................................... 65

CONCLUSION ............................................................................................ 66

## TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ........ 6, 61
*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006) ........ 55
*Atkins v. Virginia*, 536 U.S. 304 (2002) ........ 65
*Batson v. Kentucky*, 476 U.S. 79 (1985) ........ 57, 58
*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) ........ 2
*Evitts v. Lucey*, 469 U.S. 387 (1985) ........ 55
*Ex parte Santana*, 227 S.W.3d 700 (2007) ........ 12, 55, 56
*Furman v. Georgia*, 408 U.S. 238 (1972) ........ 63
*Hernandez v. New York*, 500 U.S. 352 (1991) ........ 58
*Irvin v. Dowd*, 366 U.S. 717 (1961) ........ 5
*Johnson v. California*, 545 U.S. 162 (2005) ........ 57
*Lockett v. Ohio*, 438 U.S. 586 (1978) ........ 6, 60
*McCleskey v. Kemp*, 481 U.S. 279 (1987) ........ 61
*Miller-El v. Dretke*, 545 U.S. 231 (2005) ........ 58, 59
*Morgan v. Illinois*, 504 U.S. 719 (1992) ........ 6, 7, 9
*Parker v. Gladden*, 385 U.S. 363 (1966) ........ 9
*Penry v. Johnson*, 532 U.S. 782 (2001) ........ 62
*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........ 61, 62
*Porter v. McCollum*, 558 U.S. 30 (2009) ........ 28
*Purkett v. Elem*, 514 U.S. 765 (1995) ........ 59
*Rice v. Collins*, 546 U.S. 333 (2006) ........ 57
*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008) ........ 55, 56
*Rompilla v. Beard*, 545 U.S. 374 (2005) ........ 16, 27
*Rose v. Clark*, 478 U.S. 570 (1986) ........ 5
*Sears v. Upton*, 130 S. Ct. 3259 (2010) ........ 23
*Skipper v. South Carolina*, 476 U.S. 1 (1986) ........ 6, 61
*Smith v. Robbins*, 528 U.S. 259 (2000) ........ 40, 55
*Snyder v. Louisiana*, 552 U.S. 472 (2008) ........ 58
*Strickland v. Washington*, 466 U.S. 668 (1984) ........ 20, 21, 27
*Tennard v. Dretke*, 542 U.S. 274 (2004) ........ 61
*United States v. Brown*, 553 F.3d 768 (5th Cir. 2008) ........ 59
*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) ........ 12, 56
*United States v. York*, 600 F.3d 347 (5th Cir. 2010) ........ 6
*Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir. 2009) ........ 21, 24
*Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981) ........ 11, 12
*Wiggins v. Smith*, 539 U.S. 510 (2003) ........ passim

*Williams v. Taylor*, 529 U.S. 362 (2000) .................................................. 16, 27
*Wood v. Allen*, 558 U.S. 290 (2010) ................................................................ 27
*Woodson v. North Carolina*, 428 U.S. 280 (1976) ............................................. 63

**State Cases**

*Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App. 1986) ........................................ 55
*Beltran v. State*, 728 S.W.2d 382 (Tex. Crim. App. 1987)...................................... 11
*Bennett v. State*, 738 S.W.2d 33 (Tex. App.—Texarkana 1987, no pet.)................. 9
*Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007)........................................ 12
*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ....................................... 16
*Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004) ................................. 39, 41
*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)................................ 21
*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) ...................................... 21
*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)......................... 17, 36
*Ex parte Miller*, 330 S.W.3d 610 (Tex. Crim. App. 2009)..................................... 41
*Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004)..................................... 5
*Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex. 2000)....................... 7
*Heath v. Boyd*, 175 S.W.2d 214 (Tex. 1943).......................................................... 48
*Keeton v. State*, 724 S.W.2d 58 (Tex. Crim. App. 1987) ....................................... 11
*Linscomb v. State*, 829 S.W.2d 164 (Tex. Crim. App. 1992) .................................. 57
*Mayes v. State*, 816 S.W.2d 79 (Tex. Crim. App. 1991) ........................................ 38
*Monge v. State*, 315 S.W.3d 35 (Tex. Crim. App. 2010)......................................... 48
*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) ............................ 38
*Munroe v. State*, 637 S.W.2d 475 (Tex. Crim. App. 1982)....................................... 9
*Nieto v. State*, 365 S.W.3d 673 (Tex. Crim. App. 2012)......................................... 58
*Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000) .................................. 39, 41
*Rogers v. State*, 853 S.W.2d 29 (Tex. Crim. App. 1993) ................................. 38, 39
*Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002) ....................................... 40
*Valle v. State*, 109 S.W.3d 500 (Tex. Crim. App. 2003) ......................................... 11
*Warren v. State*, 562 S.W.2d 474 (Tex. Crim. App. 1981) ..................................... 12
*Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) ....................................... 59

**Statutes**

Tex. Code Crim. Proc. Art. 35.261(a)..................................................................... 57
Tex. Code Crim. Proc. Art. 37.071 ......................................................................... 64
Tex. Rule. Evid. 606 .................................................................................................. 7

**Other Authority**

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ...................... passim

ABA, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (2008) .................................. 20, 23

State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21, 2006) ........................................................................................ 12, 23, 56



IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

| EX PARTE<br>John William Hummel,<br>APPLICANT | Cause No.<br>1184294-A |
|---|---|

## APPLICANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, having considered John Hummel's Initial Application for Writ of Habeas Corpus ("Application"), filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure, as well as the State's Answer, and supplemental briefing and exhibits from both parties, makes the following Findings of Fact and Conclusions of Law, as directed by Article 11.071, Section 7.

## MATERIALS CONSIDERED AND CREDIBILITY DETERMINATIONS

1. This Court has considered all exhibits filed with Hummel's initial writ Application and the State's Answer, as well as all supplemental exhibits and arguments submitted by the parties. Having denied Hummel's request for an evidentiary hearing, this Court has accepted all exhibits as substantive evidence in lieu of live testimony. The Court finds that the State has waived any challenge to the admission of this testimony.

2. In the absence of live testimony, the Court has weighed the credibility of witnesses solely on the facts contained in their affidavits, including considerations of education and background for those witnesses presented as

expert witnesses. The Court finds that the testimony of those witnesses presented as expert witnesses in Hummel's Application would meet sufficient reliability standards under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) , and that their complete testimony would be admitted at a live hearing. The Court finds each of the witnesses presented by Hummel to be credible based on their affidavits.

**FINDINGS OF FACT RELATED TO PROCEDURAL HISTORY**

3. John William Hummel ("Hummel") is confined under a sentence of death pursuant to the judgment of the 432nd District Court, Tarrant County, cause number 1184294-A, which was rendered on June 27, 2011, and entered on June 29, 2011. (45 RR at 97; CR at 747-49.) [1]

4. On February 17, 2010, a grand jury indicted Hummel with capital murder in the course of knowingly causing the deaths of Clyde Bedford and Joy Hummel during the same criminal transaction. (CR at 2.) This Court appointed attorneys Fred Cummings and Larry Moore to represent Hummel during his capital trial. (CR at 21, 24.) Hummel was arraigned on April 28, 2011. (11 RR at 21.) The court entered a plea of not guilty on Hummel's behalf. (11 RR at 22.) Opening statements for the guilt/innocence phase of the trial began on June 13, 2011. (33 RR at 19.) The State's case-in-chief continued until June 22, 2011, when the State rested. (40 RR at 23.) Defense counsel did not call any affirmative witnesses and rested its case shortly thereafter. (*Id.* at 28.) The jury found Hummel guilty of capital murder. (*Id.* at 79; *see also* CR at 721.)

[1] Citations to "CR" refer to the clerk's record in the case *State of Texas v. John Hummel*, 167th Judicial District Court, Trial Cause No. D-1-DC-09-301250. Citations to "RR" refer to the reporter's record in that same case.

5. The punishment phase of trial began on June 22, 2011. (41 RR at 7.) The State and defense presented their cases-in-chief and the State presented two rebuttal witnesses. (*See* 41RR-45RR.) On June 28, 2011, the case was submitted to the jury, which returned a verdict of "Yes" to Special Issue One, and "No" to Special Issue Two. (45 RR at 94-95.) John Hummel was formally sentenced to death on June 28, 2011. (45 RR at 97; CR at 747-49.)

6. A Motion for New Trial was filed on July 21, 2011, alleging insufficient evidence to sustain Hummel's conviction and the jury's finding as to Special Issue One. (*Id.* at 761.) The Court took no action on the motion (*id.* at 763), and it was denied under operation of law on September 22, 2011. *See* Tex. R. App. Proc. Art 21.8.

7. This Court appointed attorney John Stickels to represent Hummel on appeal. (CR at 757.) Stickels filed an opening appellate brief in *John William Hummel v. The State of Texas*, Cause Number AP-76,956, in the Court of Criminal Appeals ("CCA") on September 21, 2012. The State submitted a brief in response on January 18, 2013. Appellate counsel did not file a reply brief. The CCA heard oral arguments on February 27, 2013. Hummel's direct appeal was denied on November 20, 2013.

8. On June 30, 2011, this Court appointed the Office of Capital Writs ("OCW") to represent Hummel in his post-conviction habeas litigation. (CR at 746.) Hummel's initial application for writ of habeas corpus (the "Application") was filed on June 5, 2013. By order of the trial court, trial counsel Larry Moore and Fred Cummings filed affidavits responding to the Application on September 10, 2013, and October 11, 2013, respectively. The State's Answer to the Application was filed on December 2, 2013. Hummel filed a response to the State's Answer on December 13, 2013, requesting an evidentiary hearing.

9. At a status conference on February 28, 2014, this Court denied Hummel's request for an evidentiary hearing.[2] This Court ordered supplemental briefing from Hummel to be filed with the Court within thirty days. (Transcript of February 28, 2014 hearing, at 8-10.) That supplemental briefing and exhibits was filed on March 28, 2014. The State's supplemental reply and exhibits were filed on July 7, 2014.

10. On August 13, 2014, this Court ordered both parties to file proposed findings of facts and conclusions of law by November 3, 2014.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR APPLICANT JOHN HUMMEL

### FINDINGS OF FACT RELATED TO CLAIM ONE

11. In Claim One of his Application, Hummel alleges that juror Davis committed misconduct by determining Hummel's guilt and punishment prior to the end of the presentation of evidence during the guilt-innocence phase. The Court finds the following facts in support of Claim One.

12. Juror Davis was individually questioned on May 19, 2011. (22 RR at 150.) Davis was accepted by both sides to be seated as a juror in Hummel's trial. Along with the other jurors, he was sworn in on June 13, 2011, and took an oath that he would consider all evidence and pay close attention throughout

[2] Hummel objects to the Court's denial of his request for a live evidentiary hearing to resolve the controverted factual issues material to his incarceration pursuant. (Transcript of February 28, 2014 hearing, at 10-11.) Sections 8 and 9 of Article 11.071 state the court shall determine whether controverted previously unresolved issues of fact material to the legality of the applicant's confinement exist. In his Application, Hummel alleges his trial counsels' performance was deficient and that caused him prejudice. Because this is the type of issue that the court must determine within the meaning of Sections 8 and 9, Hummel again requests an evidentiary hearing to resolve these issues.



the trial. (*Id.* at 10.) Additionally, the oath stated, "You must not be influenced in any degree by any personal feeling of sympathy for or prejudice against the State or the Defendant in this case, for each is entitled to the same fair and impartial consideration." (*Id.* at 13.) Juror Davis also stated several times throughout his individual voir dire that he would render a verdict based on the law and evidence of the case and set his feelings aside. (*See, e.g.*, *id.* at 162.)

13. Davis did not consider any evidence presented during the punishment phase. Rather, Davis determined which punishment Hummel should receive during the presentation of evidence at the guilt-innocence phase of Hummel's trial. Davis decided Hummel should receive the death penalty "when the woman Hummel had an affair with testified. At that point I made up my mind and decided Hummel should get the death penalty. There is nothing [Hummel's] attorneys could have said that would have made a difference to me." (Ex. 22 at ¶¶ 4-5 [Aff. of Juror Davis].)

14. Davis considered the rest of the trial "a formality" as "[his] mind was already made up." (Ex. 22 at ¶¶ 4-5 [Aff. of Juror Davis].)

**CONCLUSIONS OF LAW RELATED TO CLAIM ONE**

15. "The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right to a trial before an impartial jury."). A violation of the right to a fair trial by a panel of impartial jurors undermines the integrity of the trial itself and necessitates a reversal without a showing of prejudice. *Rose v. Clark*, 478 U.S. 570, 578 (1986) (Harmless error analysis "presupposes a trial, at which the defendant,

represented by counsel, may present evidence and argument before an impartial judge and jury.")

16. Each juror selected swears to abide by and fulfill certain oaths, duties, and admonitions. These promises include, among other things, that each juror will pay close attention and consider all of the evidence admitted by the court. (33 RR at 10-11.) When any juror violates these promises, either intentionally or inadvertently, the defendant's Sixth Amendment right to a trial by an impartial jury is threatened. *See United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010) ("Under the Sixth Amendment, every defendant has the right to trial by an impartial jury. Deliberations prior to the close of evidence threaten that impartiality.") (internal citations omitted).

17. To be considered an impartial jury in a capital case, jurors must be able to consider whether evidence presented by the defense is mitigating. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.").

18. "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original) (plurality opinion); *accord Abdul-Kabir v. Quarterman*, 550 U.S. 233, 234 (2007). The corollary that "the sentencer *may not refuse to consider* . . . relevant mitigating evidence" is equally "well established." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (emphasis added; internal quotations omitted).



19. A juror who does not consider the evidence presented by the defendant during the punishment phase of trial, but instead automatically votes for death based on a finding of guilt, commits misconduct and violates the defendant's due process rights. *Morgan*, 504 U.S. at 735 ("[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law.").

20. Rule 606(b) of the Texas Rules of Evidence states that "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring *during the jury's deliberations*, or on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." Tex. Rule. Evid. 606(b) (emphasis added).

21. In interpreting Rule 606(b), which applies to both civil and criminal proceedings, the Texas Supreme Court found that the term "deliberations" meant formal juror deliberations "when the jury weighs the evidence to arrive at a verdict" after the submission of all the evidence and instructions. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 371 (Tex. 2000). The Texas Supreme Court specifically limited the scope of Rule 606(b) to that period of formal deliberations, and not to broadly cover any moment during the trial the jurors thought about or discussed the evidence. *Id.* "None of the rules contemplate that the jury may begin deliberating during a trial break. On the contrary, the approved jury instructions direct courts to admonish the jury against informal discussions of the case." *Id.* Rule 606(b) was "not intended to eliminate post-trial questioning altogether." *Id.* at 372.

22. The statements contained in juror Davis's affidavit describe misconduct that occurred prior to deliberations, squarely falling outside the parameters of

Rule 606(b) as defined by this State's Supreme Court and Court of Criminal Appeals. These statements are about misconduct that occurred prior to deliberations, squarely falling outside the parameters of Rule 606(b) as defined by this State's Supreme Court and Court of Criminal Appeals. Though these statements concern juror Davis's thoughts, they do not delve into his formal consideration of the evidence to reach a verdict with the other jurors. Juror Davis's statements do not concern deliberations, rather they show that he committed misconduct by failing to deliberate and consider the evidence presented at trial as he had been instructed to do. (*See* 4 CR at 726 ("In deliberating on Issue Number 1, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage."); 33 RR at 10-11 ("At the conclusion of all the evidence, I will submit to you a written Charge. Since you will need to consider all the evidence admitted by me, it is important that you pay close attention to the evidence as it's presented.").)

23. On February 28, 2014, this Court orally sustained the State's objection to the admission and consideration of juror Davis's affidavit. Upon further reflection, that ruling is vacated and the State's objection to juror Davis's affidavit is overruled. Juror Davis's affidavit is incorporated and included in the materials considered by this Court in this case. (Transcript of February 28, 2014 hearing, at 14.)

24. Juror Davis made his decision that Hummel was guilty and deserved a death sentence *prior* to the conclusion of evidence during the guilt/innocence phase. Davis violated his oath when he decided Hummel's guilt and automatically assigned Hummel a death sentence before the conclusion of the prosecution's evidence at the guilt-innocence phase.

25. Juror Davis's refusal to consider all evidence prior to making a determination of guilt denied Hummel the right to an impartial jury for the guilt-innocence phase.

26. Because Juror Davis's decision was made prior to the presentation of any evidence at the punishment phase, he was constitutionally impaired from being an impartial juror during the punishment phase. *Morgan*, 504 U.S. at 729 ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do").

27. Hummel was denied his right to an impartial jury during the punishment phase of his trial. *Cf. Munroe v. State*, 637 S.W.2d 475, 478 (Tex. Crim. App. 1982) (recognizing that a defendant is denied a fair and impartial trial when a single juror increases punishment based on impermissible discussion of parole law); *Bennett v. State*, 738 S.W.2d 33, 34 (Tex. App.—Texarkana 1987, no pet.) (finding defendant was denied right to trial by impartial jury when evidence revealed that the jury determined sentence before hearing evidence on punishment).

28. Hummel's constitutional right to be tried by twelve impartial jurors was violated by juror Davis's decision to convict Hummel before the end of the guilt/innocence presentation, and his subsequent refusal to hold the State to their burden for the future dangerousness special issue or to consider mitigating evidence presented during the punishment phase of trial. *See Parker v. Gladden*, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

29. This Court recommends granting Hummel's first claim for relief and remanding the case for a new trial at punishment.

## FINDINGS OF FACT RELATED TO CLAIM TWO

30. In Claim Two of his Application, Hummel alleges that trial and appellate counsel provided ineffective assistance of counsel for failing to argue that the evidence presented at Hummel's trial was legally insufficient to prove there was a probability that Hummel would commit future criminal acts of violence. The Court finds the following facts in support of Claim Two.

31. Besides the crime itself, the only act or attempted act of violence the State presented during the punishment phase was that Hummel attempted to poison his family two days before their deaths. (41 RR at 8-31.) The remainder of the State's punishment case consisted of testimony regarding Hummel's trips to strip clubs and viewing of pornography, his use of marijuana and other drugs, and that Hummel was a below average employee. (*See* 42 RR at 5, 23, 72, 95, 109.) In rebuttal to the defense's punishment presentation, the State called two military servicemen to testify that Hummel was a below average Marine, who was counseled for going to strip clubs and whose security clearance was revoked. (*See* 45 RR at 6, 32.)

32. Neither trial counsel nor appellate counsel raised a claim or objection that the State's evidence of future dangerousness was insufficient to support the jury's verdict. Trial counsel did not move for a directed verdict that there was not a probability Hummel would commit future acts of criminal violence because they did not believe it was necessary to preserve the issue for appellate review, and that they did not believe the Court would have granted the motion. (Affidavit of Fred Cummings at 2-3; Affidavit of Larry Moore at 4-5.) Appellate counsel did not raise this issue on Hummel's direct appeal because counsel "determined that the facts proven by the State and found by the jury are sufficient to support the jury's finding that Mr. Hummel is a future danger. Because I made this determination, I decided

not to include the 'future danger' issue in Mr. Hummel's appellate brief because I considered it to be frivolous." (Affidavit of John Stickels at 3 (filed October 9, 2013).)

## CONCLUSIONS OF LAW RELATED TO CLAIM TWO

33. Although the CCA has held that the facts of a particular crime and the circumstances surrounding it can support a finding of future dangerousness, it does not follow that the underlying facts alone in all cases will provide such support. *See, e.g.*, *Valle v. State*, 109 S.W.3d 500, 503 (Tex. Crim. App. 2003).

34. Besides the underlying crime itself, the only other evidence of violence the State introduced was Hummel's thwarted attempt to poison his family shortly before the murders, which was in essence an extension of the crime itself. As in other cases found by the CCA to have insufficient evidence in support of the first special issue, "there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence" presented by the State. *Wallace v. State*, 618 S.W.2d 67, 69 (Tex. Crim. App. 1981).

35. The rest of the State's case at punishment consisted of testimony that Hummel frequented strip clubs, occasionally used illicit drugs, and looked at pornography on a computer at work. While these behaviors may not have painted Hummel in the most flattering light, these prior acts are legally insufficient to support a finding that there is a probability that Hummel would commit future acts of criminal violence. *See Beltran v. State*, 728 S.W.2d 382, 390 (Tex. Crim. App. 1987) (defendant's multiple convictions for drunk driving were not criminal acts of violence and thus did not support a finding of future dangerousness); *Keeton v. State*, 724 S.W.2d 58, 60-61, 64 (Tex. Crim. App. 1987) (prior conviction for possession of marijuana and

uncooperativeness during probation were not sufficient for a finding of future dangerousness); *Wallace*, 618 S.W. 2d at 68-69; *Warren v. State*, 562 S.W.2d 474, 477 (Tex. Crim. App. 1981) (a prior felony theft conviction was insufficient to sustain a finding of future dangerousness).

36. Further, Hummel was found guilty of killing his family, and this was the only violent or criminal act proved beyond a reasonable doubt before the jury. If Hummel received a sentence of life without parole, there is no possibility he would have the opportunity to start a family or undergo the familial and financial stressors he was experiencing at the time of the crime. (*See* Ex. 1 at ¶59 [Aff. of Dr. Susan Hardesty]); *see also Berry v. State*, 233 S.W.3d 847, 850-51 (Tex. Crim. App. 2007).

37. Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an appellate brief. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); *see Ex parte Santana*, 227 S.W.3d 700, 704-05 (2007) (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the State Bar of Texas Guidelines and Standards for Capital Counsel outlines the duties of appellate counsel. Counsel must "review the appellate record for all reviewable errors" and prepare "a well-researched and drafted appellate brief." State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21, 2006) ("Texas Guidelines"), Guideline 12.2(A)(8).

38. There is a reasonable probability that if trial counsel or appellate counsel had raised a claim that the State did not present sufficient evidence to support finding there was a probability Hummel would commit future acts of violence, Hummel's sentence would have been reversed. There is no

reasonable explanation for trial and appellate counsels' decision not to raise this issue before this Court and the CCA.

39. This Court recommends granting Hummel's second claim for relief and reforming Hummel's sentence to life without parole.

## FINDINGS OF FACT RELATED TO CLAIM THREE

40. In Claim Three of his Application, Hummel alleges that trial counsel provided ineffective assistance of counsel for failing to present evidence in the form of lay witnesses, expert witnesses, jail records, and criminal background records to rebut the State's assertion that there was a probability that Hummel would commit future criminal acts of violence. The Court finds the following facts in support of Claim Three.

41. During the punishment phase, trial counsel called Frank AuBuchon, a former Texas Department of Criminal Justice ("TDCJ") classifications officer, to educate the jury about the prison system in Texas, including how inmates were classified and the various security features of TDCJ prisons. (44 RR at 34, *passim.*) AuBuchon did not meet or interview Hummel, but testified in broad terms that Hummel would do well in the prison system based on his good behavior in county jail and his military record. (*Id.* at 73.)

42. Trial counsel did not admit any records or testimony relating to Hummel's time in the Tarrant County jail nor his time in the military.

43. Hummel was not categorized as a "High Risk" inmate during his incarceration at the Tarrant County Jail. New inmates are sorted into classifications upon arrival at the Tarrant County jail according to their respective risk level. (Ex. 20 at ¶2 [Aff. of Tommy Rigmaiden].) "High Risk" inmates wear red uniforms and general population (or low risk) inmates wear green uniforms. (Ex. 26 at 6 [Tarrant County Jail Dress Code

Policy]; Ex. 20 at ¶¶2-4 [Aff. of Rigmaiden].) Inmates are classified as "High Risk" if they are deemed to be assaultive, an escape risk, or high profile due to the nature of the charges or the inmate's community status. (Ex. 27 at 5-6 [Tarrant County Jail Risk Policy].) Any time a "High Risk" inmate leaves their cell, they are placed in handcuffs and leg irons and accompanied by two officers.

44. "Low Risk" inmates are not restrained outside their cells and are only accompanied by one officer. (Ex. 20 at ¶4 [Aff. of Rigmaiden]; Ex. 4 at ¶6 [Aff. of Cody Bell].) "Low Risk" inmates are functionally equivalent to a general population inmate in a state prison setting. (Ex. 20 at ¶4 [Aff. of Rigmaiden].)

45. Tarrant County Sheriff's Officers could have testified that, as a low profile and low risk inmate, Hummel wore a green suit for the period of time before and during his trial.[3] (Ex. 4 at ¶6 [Aff. of Bell]; Ex. 20 at ¶5 [Aff. of Rigmaiden].)

46. Officers from the Tarrant County Sheriff's Office could have testified that Hummel was not a threat to officers, jail staff, or other inmates. These officers could have testified that Hummel never gave officers any problems or trouble and was very compliant with the jail rules, as evidenced by Hummel's lack of any disciplinary infractions during his pretrial and trial incarceration in Tarrant County. (Ex. 4 at ¶4 [Aff. of Bell]; Ex. 20 at ¶8 [Aff. of Rigmaiden]; Ex. 21 at ¶3 [Aff. of Rory Thomas]; Ex. 28 at 2 [Tarrant County Sheriff's Office Letter].) Hummel was not assaultive or aggressive towards officers or other inmates, and he got along well with

---

[3] In Tarrant County, after an inmate receives a death sentence, they are automatically classified as "High Risk" regardless of prior classification. (Ex. 27 at 6 [Tarrant County Risk Policy].)

other inmates. (Ex. 4 at ¶¶4, 7 [Aff. of Bell]; Ex. 20 at ¶9 [Aff. of Rigmaiden]; Ex. 21 at ¶5 [Aff. of Thomas].) Several officers would have testified that they believed there was no danger that Hummel would be violent in prison in the future, and that he would have adjusted well to a general population setting in prison. (Ex. 4 at ¶8 [Aff. of Bell]; Ex. 20 at ¶9 [Aff. of Rigmaiden].)

47. Hummel was quiet and respectful in his interactions with jail staff. Officer Rigmaiden saw Hummel in the jail every day for a two-year period, remembering him as "quiet and reserved." (Ex. 20 at ¶6 [Aff. of Rigmaiden].) Officer Bell reported that every time he interacted with Hummel, Hummel was pleasant and outgoing. (Ex. 4 at ¶3 [Aff. of Bell].) Tarrant County Sheriff's Officer Rory Thomas would have testified that Hummel was quiet, speaking only to the officers when he needed something and otherwise would not bother anyone. (Ex. 21 at ¶4 [Aff. of Thomas].)

48. Hummel did not have a significant history of violence prior to the crime, and his coping mechanism for significant stressors was passive acceptance, denial, and retreat into fantasy games, movies or books. In a prison setting, Hummel would be unlikely to encounter the severe stressors that plagued him prior to the crime, namely familial and financial stress. For the rest of his life, Hummel would be in a contained, restricted environment in which his primary needs would be met, but he would not encounter relational and attachment issues. (Ex. 1 at ¶59 [Aff. of Dr. Hardesty].)

49. Trial counsel claim they were unable to call Officers Bell, Rigmaiden and Thomas during Hummel's punishment phase because Hummel did not identify any guards that could testify on his behalf, nor did any officers reach out to trial counsel to testify on Hummel's behalf. (Aff. of Cummings at 3, 5; Aff. of Moore at 6.)

## CONCLUSIONS OF LAW RELATED TO CLAIM THREE

50. The CCA has stated that the future danger special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010).

51. Trial counsel's failure to present testimony from corrections officers and a mental health expert constituted deficient performance that was not reasonable under prevailing professional norms. *See Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of, inter alia, defendant's good conduct in prison); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ("ABA Guidelines"), Guideline 10.11 (commentary) (citing *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) as holding that "evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does 'not relate specifically to petitioner's culpability for the crime he committed.'").

52. Trial counsel's asserted reasons for why they did not identify correctional officers to testify on Hummel's behalf—because Hummel did not provide specific names and because no guards contacted trial counsel directly—are neither credible, nor reasonable grounds for failing to investigate this avenue of mitigation. The inability of a defendant to lead counsel to a particular witness does not relieve counsel of the responsibility to continue to investigate areas of evidence. *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005) (holding that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts" to investigate); *Ex*

*parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006) (finding that counsel's investigation was deficient despite the fact that the defendant had not mentioned the mitigating information to counsel). There is no evidence that Hummel dissuaded counsel from pursuing an investigation into Tarrant County jail staff. (*See* Aff. of Moore at 6; Aff. of Cummings at 3.)

53. Trial counsel did not conduct a complete, constitutionally sound investigation in support of their case. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003); ABA Guidelines, Guideline 10.7.

54. There is a reasonable probability that at least one juror would have found the information presented through these witnesses negated the State's theory that there was a probability that Hummel would commit future acts of violence.

55. This Court recommends granting Hummel's third claim for relief and remanding the case for a new trial on punishment.

**FINDINGS OF FACT RELATED TO CLAIM FOUR**

56. In Claim Four of his Application, Hummel alleges that trial counsel performed deficiently in failing to present the testimony of an expert focused on explaining Hummel's life history. In support of Claim Four, the Court finds the following facts.

57. At trial, the defense presented the testimony of Dr. Antoinette McGarrahan, a forensic psychologist who specialized in neuropsychology. Dr. McGarrahan performed an evaluation of Hummel, including a clinical interview, review of Hummel's vital records such as medical, education, and military records, and interviews with Hummel's sister and mother. (44 RR at 118-23.) Dr. McGarrahan testified that Hummel did not exhibit any diagnosable clinical disorders, but did suffer from several traits of



narcissism, antisocial personality disorder, schizoid disorder, and borderline personality disorder. (44 RR at 124-32.) Dr. McGarrahan's testimony focused on explaining her diagnosis of Hummel's mental health disorder and its symptoms. (Ex. 43 at ¶8 [Supp. Aff. of Laura Sovine[4]].)

58. While the testing and diagnostic measures used by Dr. McGarrahan may have developed a mental health diagnosis to describe to the jury, "it does not tell the story of how that person's diagnosis relates to their development as a child, their interactions with others, or how certain life events motivated their behavior." (*Id.* at ¶6.) Though psychological testimony may provide a "root cause" for an individual's behavior, it "does not seek to provide a narrative to understand how the story may have developed, and what kinds of environmental factors came into play for the individual, such as culture, family discipline, relationships, modeling of relationships, religious beliefs, etc." (Ex. 43 at ¶6 [Supp. Aff. of Sovine].)

59. Counsel did not consult with an expert witness focused on discussing Hummel's life history events and explaining their impact on his behaviors. Had they done so, they could have retained an expert like Laura Smith. Ms. Smith received her Masters of Science in Social Work from the University of Texas at Austin and is currently employed by the Travis County Health and Human Services division. (Ex. 2 at ¶¶1-3 [Aff. of Laura Smith].)

60. If Ms. Smith had been consulted by Hummel's trial counsel, she could have provided an explanation to the jury of how Hummel's life history shaped the person he became later in life. As Ms. Smith explains, "All of us are a

---

[4] In Hummel's Application, Ms. Laura Smith provided an expert witness affidavit. (Ex. 2 [Aff. of Laura Smith].) Subsequently, Ms. Smith married and her current name of Laura Sovine was used for her supplemental affidavit filed later with the court. (Ex. 43 [Supp. Aff. of Laura Sovine].)

product of our life experiences and social history. To understand how a person comes to take certain actions in life, one must look at what elements of his life were brought to bear on that decision. Often what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past." (Ex. 2 at ¶8 [Aff. of Smith].)

61. After reviewing testimony and affidavits provided by those closest to Hummel, as well as his various medical, educational, and military records, Ms. Smith would have explained how Hummel's early development started him down a path resulting in Hummel being "nearly incapable of forming close and intimate relationships" and "leading to a total inability to manage multiple stressors such as loss of income, multiple medical illnesses, and emotional stress/fatigue." (Ex. 2 at ¶9 [Aff. of Smith].) This Court adopts the contents of Ms. Smith's affidavit and supplemental affidavit filed with Hummel's Application as substantive testimony that would have been admissible at Hummel's trial.

**CONCLUSIONS OF LAW RELATED TO CLAIM FOUR**

62. At the time of trial counsel's representation of Hummel, professional norms for capital counsel dictated that counsel investigate and present a thorough psycho-social life narrative of the defendant to the jury during the punishment phase of trial. *See* ABA Guidelines, Guideline 10.7 (commentary) (noting that "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); Guideline 10.11(F)(2) (counsel are required to present "insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability."); Guideline 10.11 (commentary) (noting the importance of presenting "the client's complete social history" at punishment); *see also* ABA, *Supplementary Guidelines for the Mitigation*

*Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 688 (2008) ("ABA Supplementary Guidelines"), Guideline 10.4(A) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

63. Trial counsel asserts that the testimony of Dr. McGarrahan was sufficient to communicate the impact of Hummel's life history on his behavior. (Aff. of Moore at 10-11.) This assertion demonstrates a misunderstanding of the difference between mental health testimony and a social history. Instead of explaining a mental health diagnosis, the role of a social history expert is to explain how a defendant's various life events both stemmed from his biological and sociological roots, and then led to other significant life experiences, choices, and consequences for the defendant. This function could not be served solely by the testimony of a neuropsychologist.

64. Hummel's trial counsel failed to sufficiently present a psycho-social life narrative as required under standard professional norms of the time. Specifically, trial counsel failed to retain the assistance of asocial history expert witness to evaluate and interpret Hummel's life history events for the jury. Trial counsel's failure to even retain such an expert was a failure to sufficiently investigate mitigating evidence and constitutes deficient performance. No reasonable strategic grounds justified trial counsel's decision not to present the testimony of an expert witness to explain Hummel's life history. *See Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).

65. Without the testimony of an expert focused on Hummel's social history, Hummel's jury was not given all the necessary tools to understand the impact of his life story on his behaviors and his moral culpability. Although some facts regarding Hummel's life were presented in the form of lay witness testimony, expert testimony was vital to explain how the jury should understand and interpret those facts. *See Walbey v. Quarterman*, 309 Fed. Appx. 795, 802 (5th Cir. 2009) (unpublished) ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original). Had such an expert been presented, there is a reasonable probability that the outcome of Hummel's trial would have been different. *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

**FINDINGS OF FACT RELATED TO CLAIM FIVE**

66. In Claim Five of his Application, Hummel alleges that trial counsel failed to sufficiently investigation and present testimony from lay witnesses in order to fully explain Hummel's life story. In support of Claim Five, the Court finds the following facts.

67. Based on a review of the materials submitted with Hummel's Application, it appears that trial counsel conducted a mitigation investigation that was focused on Hummel's early childhood and relationships with his immediate family members. Questions of potential witnesses focused on searching for information about possible physical and sexual abuse believed to have occurred within the Hummel family. (Ex. 15 at ¶5 [Aff. of Christy Pack].) Even when interviewing witness who would have other relevant information

about Hummel, trial counsel kept their focus on his immediate family. (Ex. 12 at ¶21 [Aff. of Thomas Hamilton].) The ultimate testimony elicited from the witnesses presented by the defense—Hummel's sister, two ex-girlfriends, two teachers, and four family friends—primarily described the household Hummel grew up in.

68. The investigation failed to adequately explore the remainder of Hummel's history. As a result, Hummel's jury was not provided information regarding the remainder of Hummel's life experiences: his educational and social struggles as an adolescent, his obsessive escapes into fantasy role-playing games as a teenager, his transition to adulthood, his mainly successful experience in the military, his difficult transition back to civilian life, and the physical ailments and financial stressors he experienced in the years before the crime.

69. As set out in Hummel's Application, significantly more witnesses were available to testify regarding Hummel's complete life story. The Court adopts the information presented in these witnesses' affidavits as substantive testimony and fact. In sum, Hummel's uncle, four school friends, and an ex-girlfriend could have provided information about Hummel's life growing up in South Carolina apart from the details of his immediate family life, up until his military service. (Ex. 6 [Aff. of Chad Brown]; Ex. 8 [Aff. of Lance Dupre]; Ex. 10 [Aff. of Shana Fowler]; Ex. 12 [Aff. of Hamilton]; Ex. 13 [Aff. of Brian Jeter]; Ex. 19 [Aff. of Joseph Patterson].) Next, three Marines who served with Hummel could have presented testimony about Hummel's military career, including how Hummel struggled to fit in and succeed, drawing parallels to his struggles during childhood. (Ex. 7 [Aff. of Efrain Chaidez]; Ex. 9A [Aff. of Fred Emmer]; Ex. 14A [Aff. of Buddy Matthias].) Finally, witnesses were available to testify about Hummel's life after the

Marine Corps, once he settled in the Fort Worth area, and how his life trajectory continued a downward spiral that had begun in childhood. (Ex. 11 [Aff. of George Goodson]; Ex. 16 [Aff. of Chris Paris]; Ex. 17 [Aff. of Tonya Paris].)

**CONCLUSIONS OF LAW RELATED TO CLAIM FIVE**

70. In preparation for the punishment phase of a capital trial, counsel must conduct "extensive and generally unparalleled investigation into personal and family history." ABA Guidelines, Guideline 10.7 (commentary); *see* Texas Guidelines, Guideline 11.1(A)(3)(b), ("The investigation for the punishment phase of the trial should generally encompass . . . development of character witnesses and family background evidence."); *see Wiggins*, 539 U.S. at 510.

71. This broad narrative of Hummel's life is exactly the result envisioned by the rigorous, sweeping investigation required of capital trial counsel. *See* ABA Supplementary Guidelines, Guideline 10.4 ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

72. Although investigating the household Hummel grew up in was a reasonable area of investigation, counsel had no justification for what appears to have been a narrowing of their investigation to this subject. *Sears v. Upton*, 130 S. Ct. 3259, 3265 (2010) ("[T]hat a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudice [the defendant]."). There were no sound strategic reasons for failing to investigate all the areas of Hummel's life story more

broadly. *Wiggins*, 539 U.S. at 527 ("Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

73. Even though counsel presented lay witnesses testimony, the difference between the limited picture the jury heard about Hummel's early life and the more complete narrative that could have been told prejudiced Hummel's punishment phase. *See Walbey*, 309 Fed. Appx. at 802 ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original).

74. Considering the aforementioned mitigating information from available lay testimony regarding Hummel's life history, the Court finds that this evidence is substantially different and more compelling than the evidence presented at Hummel's trial.

75. This Court recommends granting Hummel's fifth claim for relief and remanding the case for a new trial on punishment.

**FINDINGS OF FACT RELATED TO CLAIM SIX**

76. In Claim Six of his Application, Hummel alleges trial counsel failed to investigate and present testimony from people who served with Hummel in the United States Marine Corps, to describe his military service to the jury. In support of Claim Six, the Court finds the following facts.

77. During rebuttal at the punishment phase of trial, the State offered the testimony of Lieutenant Colonel Carl Dougherty and Captain Sergio Santos,

two former Marines who had supervised Hummel at the end of his time in the Marines. (*See* 45 RR at 5, 32.) Lt. Col. Dougherty testified that Hummel was an average Marine who was able to fulfill his general duties. (45 RR at 11, 18.) However, he also testified that Hummel had to be counseled about spending too much time at strip clubs, that he had been disciplined for smoking at a time when it could have caused an explosion on a ship, and that he failed to maintain his weight and fitness. (45 RR at 12-15, 30.) Further, Lt. Col. Dougherty testified that all of the medals Hummel received for his service had been "I was there" medals that were given to basically anyone who showed up. (45 RR at 15-17.) Cpt. Santos testified that Hummel was "not very impressive" as a Marine. (45 RR at 34.) He described how Hummel had questionable integrity, bragged about things he did not do, lied to his senior officers, and went absent from his base for twenty hours. (45 RR at 35-40.) Cpt. Santos explained that he himself had revoked Hummel's security clearance for these actions. (45 RR at 36.) This was the final testimony the jury heard before closing arguments.

78. Hummel's trial counsel admitted they felt Hummel's military service "could possibly be important to our mitigation presentation." (Aff. of Moore at 17.) Counsel "would have obviously loved to have any witness who could have mitigated the negative aspects of the testimony from" the State's rebuttal witnesses. (Aff. of Moore at 18.) Regarding the witnesses identified in post-conviction, counsel state that if they had had "even one of their names," they could have "located the others and developed testimony about [Hummel's] military service years." (Aff. of Cummings at 8; Aff. of Moore at 18.)

79. Hummel provided trial counsel with the name of Wayne "Buddy" Matthias as a military witness. In the initial mitigation interview performed by

counsel's mitigation specialist on January 13, 2010, just days after being appointed to the case, Hummel gave the name Buddy Matthias as a person he was still in touch with. (Ex. 48 at 2 [Excerpts from Mitigation Intake Notes].) The military records in the possession of trial counsel also indicated the name Matthias as Hummel's roommate. (Ex. 46 [Excerpt from Military Records].) Further, counsel had Hummel's MySpace internet account and profile, which had been preserved from deletion by a subpoena from the Tarrant County District Attorney's office. (Ex. 45 at 1 [Excerpts from John Hummel MySpace Profile].) Within that profile, Hummel has a list of friends associated with his MySpace account—one of whom is Wayne Matthias. (Ex. 45 at 11 [Excerpts from John Hummel Myspace Profile].)

80. Had trial counsel contacted Matthias, they would have learned of the identities of other potential friends of Hummel while in the Marines, including Fred Emmer and Efrain Chaidez. Thus, had trial counsel conducted a complete investigation, they would have uncovered at least three witnesses who were willing to testify on Hummel's behalf about his service in the Marine Corps: Wayne "Buddy" Matthias, Efrain Chaidez, and Fred Emmer. (Ex. 9A at ¶¶2-5 [Aff. of Emmer]; Ex. 14A at ¶¶2-4 [Aff. of Matthias]; Ex. 7 at ¶¶2-5 [Aff. of Chaidez].)

81. The Court adopts the statements in Matthias, Chaidez, and Emmer's affidavits as substantive testimony that could have been presented to Hummel's jury. These witnesses would have testified that Hummel was a dependable friend and Marine. They noticed how Hummel seemed eager to make personal connections with them, to the point of becoming overly attached to the group. Further, their testimony would have rebutted the negative testimony of Lt. Col. Dougherty and Cpt. Santos, explaining how Hummel struggled with his weight and the ability to perform as a Marine.

Their accounts of Hummel's ultimate separation with the Marines would have shown the jury the disappointment and feelings of failure Hummel experienced at the ending of his military career. (Ex. 7 [Aff. of Chaidez]; Ex. 9A [Aff. of Emmer]; Ex. 14A [Aff. of Matthias].)

**CONCLUSIONS OF LAW RELATED TO CLAIM SIX**

82. Trial counsel's duty to conduct a thorough investigation of possible mitigating evidence has been well established by the Supreme Court. *Rompilla*, 545 U.S.at 387; *Wiggins*, 539 U.S. at 522-23; *Williams*, 529 U.S. at 396; *Strickland*, 466 U.S. at 688. A decision to end this investigation, or forgo investigative avenues entirely, must be strategic; it must be "borne of deliberation and not happenstance, inattention, or neglect." *Wood v. Allen*, 558 U.S. 290, 307 (2010) (Stevens, J., dissenting) ("A decision cannot be fairly characterized as "strategic" unless it is a conscious choice between two legitimate and rational alternatives"); *Wiggins*, 539 U.S. at 526 (counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment").

83. Trial counsel failed to investigate and present testimony that Hummel served honorably in the United State Marine Corps. During counsel's investigation, there was no suggestion from Hummel or anyone else that investigating Hummel's military service would prove to be fruitless. And nothing in the investigation counsel did pursue gave them reasonable grounds to end their investigation. As such, there are no reasonable grounds to have ended the investigation, and such a decision cannot be considered strategic.

84. The absence of testimony from witnesses who could speak positively about Hummel's military service prejudiced Hummel's punishment phase of trial. Such evidence is one of the hallmark areas of information about a defendant that may persuade a jury to spare his or her life. *Porter v. McCollum*, 558

U.S. 30, 43 (2009) ("Our Nation has a long tradition of according leniency to veterans in recognition of their service.").

85. The Court recommends granting Hummel's sixth claim for relief and remanding the case for a new trial on punishment.

## FINDINGS OF FACT RELATED TO CLAIM SEVEN

86. In Claim Seven of his Application, Hummel alleges he received ineffective assistance of counsel because his trial attorneys did not investigate nor present evidence that he suffered from complex post-traumatic stress disorder resulting from attachment trauma. In support of Claim Seven, the Court finds the following facts.

87. Trial counsel hired Dr. Antoinette McGarrahan, a forensic psychologist and neuropsychologist. Dr. McGarrahan's areas of expertise are "the interplay between psychology or mental health and the law" (forensic psychology), and "[the] area of clinical psychology that involves evaluating the brain, studying brain behavior relationships to determine cognitive functioning." (44 RR at 118.) Dr. McGarrahan conducted a neuropsychological and diagnostic evaluation of Hummel on October 13, 2010, and December 20, 2010. (*Id.* at 121.) These evaluations did not reveal the existence of any cognitive brain impairments. (*Id.* at 125-26.)

88. According to Dr. McGarrahan, Hummel had traits of several personality disorders, including narcissistic, antisocial, schizoid, and borderline features. (44 RR at 127-32.) Dr. McGarrahan thought that the neglect Hummel experienced as a child affected the development of these personality traits. Because Hummel was not allowed to express emotions as a child, he repressed them for years until they all came out on the night of the crime. (*Id.* at 133-40.)

89. Had trial counsel retained an expert such as Dr. Susan Hardesty, a forensic psychiatrist with The Meninger Clinic in Houston, Texas, who specializes in understanding the role of trauma, including neglect and abandonment, on childhood development, the following information could have been presented to Hummel's jury. (Ex. 1 at ¶5 [Aff. of Dr. Susan Hardesty].)

90. Hummel experienced attachment trauma as a result of his parents' neglect, physical abuse, and social isolation. As a result, Hummel suffered from a trauma-related illness which is best described as complex post-traumatic stress disorder. (Ex. 1 at ¶57 [Aff. of Dr. Hardesty].)

91. "Attachment theory" is a psychological principle regarding the effect of early childhood emotional attachments on adult relationships. The theory states that a person must form a secure emotional attachment to a consistent caregiver early in life in order to develop an integrated sense of self. If a person does not develop a stable emotional identity, that person's later ability to form mature, secure, reciprocal adult relationships will be severely compromised. (Ex. 1 at ¶37 [Aff. of Dr. Hardesty].)

92. "Attachment trauma" is defined as a severe disruption of the critical early childhood relationship or attachment between the child and the primary caregiver(s). Trauma in this context is best described as "feeling alone in the midst of unbearably painful emotions." While trauma is often conceptualized as being a single event, attachment trauma is ongoing, consistent, and pervasive. Extensive and consistent neglect from parental figures prompts fearful reactions in children. When a child experiences fear or abuse, they seek out emotional comfort from a caregiver. However, when the source of the fear or abuse is also the caregiver, the child has no source of emotional comfort and therefore feels alone and afraid. This emotional experience is traumatic for a child, and repetitive episodes of such trauma

leads to the child developing a very unstable sense of self and attachment. The child's sense of attachment is severely disrupted, as the child needs the parent to survive, but the child is also constantly afraid of being abandoned by their parent. Again, the child's fear cannot be alleviated as the source of comfort is also the source of the fear and distress. (Ex. 1 at ¶38 [Aff. of Dr. Hardesty].)

93. Hummel's parents were very strict, and neither Hummel nor his sister received comfort or affection from either parent. (*See* Ex. 15 at ¶4c [Aff. of Pack].) Hummel and his sister both experienced physical abuse at the hands of their mother and father. Unfortunately, Hummel's mother was herself the victim of childhood abuse. (Ex. 12 at ¶3 [Aff. of Hamilton].) Parents who were abused have a hard time being nurturing parents themselves. (Ex. 1 at ¶40 [Aff. of Dr. Hardesty].) Hummel's mother also reserved her attention for other children, giving gifts to others but not to her own children. (*See* Ex. 15 at ¶3b [Aff. of Pack].)

94. Neither of Hummel's parents were engaged in his upbringing. Hummel's father was functionally absent as he was focused on work or satisfying his own needs and desires. (Ex. 12 at ¶3 [Aff. of Hamilton].) He had multiple extramarital affairs, including one encounter that occurred in front of his daughter, Neata. (*Id.* at ¶8; 43 RR at 252.) Hummel's mother was similarly not involved in Hummel's life. (*See e.g.*, Ex. 3 at ¶9 [Aff. of Haila Adams].)

95. Hummel's childhood environment was not conducive to forming a secure sense of self and safe attachment patterns. In fact, such an environment, in which emotional neglect is rampant and familial boundaries are disregarded, is highly likely to cause dysregulation of attachment and promote the formation of a disorder. (Ex. 1 at ¶41 [Aff. of Dr. Hardesty].)

96. The severe impact of this attachment trauma is evident in Hummel's psycho-social history, as well as his personality. Hummel was consistently described as passive, withdrawn, quiet, guarded, and socially inept. His personal interests, video games, movies, and fantasy role-playing games, reflect feelings of escapism. (Ex. 1 at ¶42 [Aff. of Dr. Hardesty].)

97. Of greater consequence is Hummel's inability to form healthy, secure social relationships. Hummel's life reflects a pattern of craving social attachment, but not being able to create secure attachments to others. (Ex. 1 at ¶43 [Aff. of Dr. Hardesty].) Hummel experienced teasing and bullying throughout his life, from elementary school to the Marines. His own friends teased him as well, further exacerbating and mimicking the attachment trauma he experienced from his parents. Hummel longed for and needed the support of his friends, but in making fun of him, they too played the dual roles of abuser and supporter. (*Id.* at ¶43.)

98. This pattern is evident in the years surrounding Hummel's military service. In the Marines, Hummel found himself in a close-knit social group with three other Marines. Though Hummel seemed to merge his identity with those of his friends, copying their clothing styles and mannerisms, he also experienced a period of relative stability and success. (Ex. 9A at ¶8 [Aff. of Emmer]; Ex. 14A at ¶14 [Aff. of Matthias].) Hummel was an intelligence analyst, a job he thoroughly enjoyed. However, when his three friends were discharged, Hummel's attachments and support network disappeared and his performance suffered. (Ex. 1 at ¶44 [Aff. of Dr. Hardesty].)

99. Several years later, after Hummel was discharged, he returned to South Carolina with Letti Ulbright, a pregnant homeless woman. Though the baby was not Hummel's, he lived with Ulbright and began to care for her. During this period, Hummel worked at the same factory as his father, and again

experienced a relative degree of stability. However, Hummel's attachment to Ulbright was disrupted when Neata sent Ulbright back to California. (43 RR at 185-206.) Following Ulbright's departure, Hummel began to drift, bouncing from temporary job to temporary job. His friends noticed a change too, as Hummel began going to strip clubs frequently and drinking and smoking, two activities he previously did not engage in. (Ex. 6 at ¶¶20-25 [Aff. of Brown].)

100. Hummel's experiences with strip clubs reflect his inability to read social cues and develop meaningful relationships. (*See* Ex. 1 at ¶43 [Aff. of Dr. Hardesty].) Hummel often mistook the attentions and flirtations of the strippers as meaningful, and Hummel would call and text these women even when he was not at the clubs. (Ex. 6 at ¶22 [Aff. of Brown].) Stephanie Bennett, Hummel's high school girlfriend, also felt that Hummel did not interpret social cues well. Hummel's attachment to Bennett was too quick, as he told her he loved her before they had met and quickly assumed that the two would get married. (Ex. 5 at ¶4 [Aff. of Stephanie Bennett].)

101. Shortly after moving to Texas, Hummel was able to find relative stability once more. He met and married Joy within the first year of living in Texas, and their daughter Jodi was born in July 2004. Things were going well for the first year of their marriage. Though money was tight, John was employed full-time at a warehouse and the family was getting by. (Ex. 1 at ¶27 [Aff. of Dr. Hardesty].) However, due to forces beyond Hummel's control, his situation began to spiral once more.

102. While working at the warehouse, Hummel tripped over a box and severely injured his back. After two unsuccessful surgeries, Hummel was left weakened, in constant pain, and unable to work to support his family. Hummel, Joy, and Jodi moved into Joy's father's home to save money.

Hummel's medical situation worsened when he was diagnosed with Crohn's disease, an inflammatory bowel disease that causes intense abdominal pain, chronic diarrhea, rectal bleeding and vomiting. Hummel's case was so severe that an operation to remove part of his bowel was required. This operation resulted in multiple complications, as Hummel developed peritonitis and blood clots in his arms, and required an ostomy with an external bag. Typically, abdominal surgeries such as Hummel's require a minimum of six months of recovery time. However, given Hummel's previous surgeries, it would have taken even longer for Hummel to return to anything resembling full strength. (Ex. 1 at ¶¶28-31 [Aff. of Dr. Hardesty].)

103. Hummel's debilitating medical problems left him feeling helpless, weakened, and in constant pain. Joy and her father did not understand just how weak he was as a result of the multiple invasive surgeries he had undergone. It was difficult and painful for Hummel to perform any physical tasks, and he was unable to work for a period of four years. Hummel's ostomy was humiliating, as the odors and spills negatively affected many aspects of his relationship with Joy. This was a period of time in Hummel's life when he again needed to feel a supportive attachment to his wife and family, but instead, Hummel felt disconnected, rejected, and isolated. When Hummel was able to return to employment, he was not able to find enough work to alleviate the family's financial issues. (Ex. 1 at ¶¶32-35 [Aff. of Dr. Hardesty].)

104. The weight of these stressors in Hummel's life mimicked the original attachment trauma Hummel suffered as a child, which in turn prompted a post-traumatic response. (Ex. 1 at ¶46 [Aff. of Dr. Hardesty].) The trauma Hummel suffered as an adult is an overall sense of abandonment and fear, similar to the feelings he experienced in early childhood when he felt

neglected by his family. (*Id.* at ¶52.) Hummel's physical pain, sense of being unjustly injured, financial stress, and feeling misunderstood and unsupported by his family continuously recapitulated the emotional distress of Hummel's painful childhood. (*Id.* at ¶53.) With any type of trauma, a post-traumatic reaction is characterized by the fact that emotional responses have been conditioned to the highest level of emotional valence reached in the past. (*Id.* at ¶52.) Essentially, this means that small events, or series of events, may induce an emotional response that is disproportionate to an expected emotional reaction. (*Id.*) Hummel's actions are consistent with the disproportionate emotional valence of a trauma response. (*Id.* at ¶53.)

105. Many people who suffer attachment trauma experience a dissociative quality in post-trauma responses. ( Ex. 1 at ¶54 [Aff. of Dr. Hardesty].) This dissociative quality is often reflected as emotional blunting, or a feeling of disconnection from the reality of the post-trauma response. (*Id.*) Emotional blunting in these scenarios is not a callous response, but rather a protective mechanism that is part of the learned response to severe distress and trauma. (*Id.* at ¶55.) Hummel's interview with the police demonstrates the typical dissociative quality and emotional blunting that is consistent with a post-trauma response. (*Id.* at ¶54.) Moreover, Hummel's actions in fleeing to southern California, where he served as a Marine, demonstrates an attempt to return to the one place Hummel felt accepted, successfully attached to others, and secure. (*Id.* at ¶56.)

106. Trial counsel were aware that "social scientists (sociologists and social workers" refer to 'attachment disorder'" but did not hire an expert with expertise in this field. (Aff. of Moore at 21-22.)[5]

**CONCLUSIONS OF LAW RELATED TO CLAIM SEVEN**

107. Trial counsel did not conduct a thorough investigation of Hummel's entire life history, including Hummel's high school years, military service, and life after the military. Witnesses from these time periods would have provided information that clearly established a behavioral pattern demonstrating Hummel's inability to create attachments and secure relationships to others.

108. Trial counsel failed to hire an expert in trauma-related disorders to explain the impact and scope of Hummel's childhood and other traumatic experiences. Trial counsel admits in their affidavit that they were aware of attachment disorders, yet failed to investigate or present testimony regarding Hummel's attachment trauma. (*See* Aff. of Moore at 21-22.) Had trial counsel conducted a full investigation and hired a trauma expert to present evidence of Hummel's attachment trauma and complex post-traumatic stress disorder, there is a reasonable probability Hummel would have received a life sentence.

109. Presenting a complete picture of Hummel's troubled and traumatic childhood would have served to lessen his moral culpability in the eyes of the jury. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . .

---

[5] Larry Moore's affidavit describes post-conviction conversations between himself and Dr. Antoinette McGarrahan, a neuropsychologist retained by defense counsel who testified on Hummel's behalf. The statements and opinions attributed to Dr. McGarrahan in Moore's affidavit constitute inadmissible hearsay and were not considered by this Court. (*See* Aff. of Moore at 19-22.)

may be less culpable than defendants who have no such excuse." *Wiggins*, 539 U.S. at 535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)); *see also Ex parte Gonzales*, 204 S.W. 3d at 399 (granting habeas relief due to trial counsel's ineffective assistance for failing to present evidence that the defendant suffered post-traumatic stress disorder due to childhood trauma). Because Hummel's constitutional right to effective assistance of counsel was violated and he suffered prejudice, he is entitled to a new trial.

110. This Court recommends granting Hummel's seventh claim for relief and remanding the case for a new trial on punishment.

## FINDINGS OF FACT RELATED TO CLAIM EIGHT

111. In Claim Eight of his Application, Hummel alleges that the State impermissibly injected evidence and argument regarding an unindicted victim into the guilt/innocence phase of trial, and that his trial and appellate counsel were ineffective in failing to appeal this error. In support of Claim Eight, the Court finds the following facts.

112. Three capital murder indictments were originally filed against Hummel. The first was for the death of Jodi Hummel ("Jodi"), a child under the age of six. (37 RR at 74.) The second was for the death of Hummel's wife Joy Hummel ("Joy") and her unborn child. (*Id.* at 75.) The third was for the death of Joy and Hummel's father-in-law Clyde Bedford ("Bedford"). (*Id.*)

113. The State proceeded to trial on the third indictment, capital murder for killing Bedford and Joy in one transaction. (33 RR at 17-18.) Despite proceeding to trial only on this indictment, the State shifted the focus of the trial to the death of Jodi and the unborn child. In the first twenty pages of the transcript during the State's opening statement, all but four pages reference either Jodi or the unborn child. (33 RR at 19-25, 27, 29, 31-34,

36-38.) Much of the State's opening presentation of the facts was given from Jodi's point of view or contained references to her. (*See, e.g.*, *id.* at 20 ("Jodi's house"); *id.* at 21 ("Jodi was in her first semester at a little school . . ."); *id.* at 25 ([Jodi] was excited because . . . it was only three days away from the Christmas party"); *id.* at 29 ("[N]o pitter-patter of the feet running around from a five and a half-year old"); *id.* at 34 ("[F]ire pouring out of Jodi's room").) The first witnesses presented by the State were Jodi's kindergarten teacher and her school nurse. (33 RR at 63, 78.)

114. Similarly to Jodi, the State focused the trial on Joy's unborn child, another unindicted victim. (33 RR at 25 ("[Joy] had just recently gone to her doctor and was able to hear the baby's heartbeat for the first time."); *see also, e.g.*, *id.* at 29, 31.) Constant reminders to the jury of this unborn child were provided throughout the duration of the trial. (*See, e.g.*, *id.* at 68; 38 RR at 9; 39 RR at 101, 142-43.) Repeated references were also made to the death of the unborn child during the State's closing argument. (40 RR at 50, 53, 56.)

115. The State's focus on the unindicted victims continued in the punishment phase. The State introduced thirty-one photographs of the unindicted victims during the punishment phase. (42 RR at 79; 43 RR at 236, 345-46, 248; 44 RR at 10-11.) The State made repeated references to Jodi and the unborn child during closing arguments at the punishment phase. (45 RR at 61) ("[T]here are four victims in this case, and today's their day in court."); *Id.* at 85 ("Because it's just not—not just about the two victims that were named in this particular indictment."); *see also Id.* at 57-59, 62-63, 85-86, 88-90.)

116. During the guilt/innocence phase of trial, the State introduced an objectively gruesome photograph from Joy's autopsy, showing the excised fetus and

what was presumably Joy's uterus removed from her body. (39 RR at 194.) Trial counsel objected to photographs as being more prejudicial than probative and that they were not relevant because Hummel was not indicted for the death of the unborn child. (*Id.* at 194-95, 197.) However, the Court overruled the objection. Trial counsel did not object to the photographs offered during the punishment phase of trial. (42 RR at 79; 43 RR at 246-47; 44 RR at 11.)

**CONCLUSIONS OF LAW RELATED TO CLAIM EIGHT**

117. A defendant's trial should be free from inflammatory, gruesome, and prejudicial evidence that is irrelevant to any element of the offense and is instead designed to motivate a jury's decision based on emotion. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (Evidence that has an "undue tendency to suggest a decision on an improper basis, commonly . . . an emotional one" is inadmissible) (internal quotation omitted) (citing FED. R. EVID. 403 advisory committee's note).

118. Contextual evidence regarding criminal acts occurring in the same transaction as the indicted crime can be admissible when "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others." *Mayes v. State*, 816 S.W.2d 79, 86 n.4 (Tex. Crim. App. 1991) (internal quotation omitted) (citing *Nichols v. State,* 260 S.W. 1050, 1051 (1924)). However, necessity is the driving force behind the admission of this type of evidence. *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). "Only if the facts and circumstances of the instant offense would make little or no sense without also bringing in the same transaction contextual evidence, should the same transaction contextual evidence be

admitted." *Id.*; *accord Erazo v. State*, 144 S.W.3d 487, 493 (Tex. Crim. App. 2004) ("A crime-scene photograph or an autopsy photograph is not admissible simply to show the death of the individual. These photographs are admissible despite the fact, *and because*, they show more than the testimony. But that "something more" must be relevant and helpful to the jury.") (emphasis in original).

119. The State's presentation went beyond what was necessary as same-transaction contextual evidence. *See Rogers*, 853 S.W.2d at 33. While it may have been permissible for the State to submit some evidence regarding both Jodi and the unborn child's death, the amount, detail, and focus of the testimony surpassed any contextual purpose. For example, the two videos of Jodi interacting with other students at school (33 RR at 69-71) and the testimony from her teacher and the school nurse (33 RR at 63-83) were not relevant evidence in a trial for her mother's and grandfather's death.

120. In addition, no relevant purpose was served by the jury being shown a picture of the removed fetus and uterus. *See Erazo*, 144 S.W.3d at 493 ("this photograph adds nothing helpful to the already-admitted testimony that the victim was pregnant, that the appellant knew she was pregnant, and that the fetus died as a result of the mother's death. The photograph does not show that the appellant knew that the victim was pregnant. And, the photograph does not show that the appellant was the unborn child's father. In contrast to a crime-scene photograph, which would assist a jury in visualizing the scene, the photograph in this case does not add anything that is relevant to these facts."). Rather, these photographs "appeal[ed] to the jury's emotional side and encourage[d] the jurors to make a decision on an emotional basis." *Id.* at 493, 495; *see also Reese v. State*, 33 S.W.3d 238, 242 (Tex. Crim. App. 2000) ("The contents of the photograph has an

emotional impact that suggests that the jury's decision be made on an emotional basis and not on the basis of the other relevant evidence introduced at trial.").

121. Victim impact evidence must still pass a Rule 403 balancing test to determine whether the probative value is substantially outweighed by its prejudicial effect. *Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002). The evidence offered by the State referencing Jodi and the unborn child qualified as impermissible victim impact evidence. (*See, e.g.*, 43 RR at 236 (Neata Woody describing the family as "broken" after Jodi's death); *id.* at 247-48 ("Hi Grandma" sonogram); 44 RR at 19 (Jodi's visits to Bedford's Senior Center).)

122. Because of the inflammatory and prejudicial nature of this evidence, Hummel's right to a fair trial by an impartial jury was infringed. There is a reasonable likelihood that his conviction was based on an emotional response of the jury to the psychologically-charged argument and evidence presented by the State.

123. To the extent trial counsel failed to properly object and preserve the errors committed by the State and court, trial counsel performed deficiently and that prejudiced Hummel's right to counsel and a fair trial. No strategic reason exists for this failure, and the admission of this highly inflammatory evidence prejudiced Hummel by encouraging the jury to make their decision on an emotional, rather than an evidentiary, basis.

124. Similarly, appellate counsel was ineffective for failing to present it. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying the *Strickland* standard). No claim was raised on direct appeal either challenging the proceeding as being fundamentally unfair because of the focus on the unindicted victims or re-raising trial counsel's objection to the State's use of

the photographs of the fetus. *Ex parte Miller*, 330 S.W.3d 610, 624 (Tex. Crim. App. 2009) ("[I]f appellate counsel fails to raise a claim that has indisputable merit under well-settled law and would necessarily result in reversible error, appellate counsel is ineffective for failing to raise it."). No logical reason exists for the direct appeal counsel's failure, particularly in light of case law regarding the prejudicial nature photographs of unborn fetuses. *See Erazo*, 144 S.W.3d at 496; *Reese*, 33 S.W.3d at 244.

125. The Court recommends granting Hummel's eighth claim for relief and remanding the case for a new trial.

**FINDINGS OF FACT RELATED TO CLAIM NINE**

126. In Claim Nine of his Application, Hummel alleges that trial counsel performed ineffectively in failing to present evidence in support of suppressing Hummel's confession. In support of Claim Nine, the Court finds the following facts.

127. On December 20, 2009, at 5:48 a.m. PST, Hummel was stopped by the Border Patrol while entering the United States from Mexico at the San Ysidro Port of Entry. (Ex. 23 at 1 [Border Patrol Documents].) Hummel provided his Texas driver's license as identification, which was insufficient at that time pursuant to the 2007 Western Hemisphere Travel Initiative. 8 U.S.C. § 1185; (7 RR at 113). Because of his insufficient identification, Border Patrol Officer Jorge Bernal ran a computer search that resulted in a warning screen indicating Hummel might be armed and dangerous. (7 RR at 114.) Officer Bernal then referred Hummel to Border Patrol Officer Ernesto Enriquez for further questioning.

128. At 6:03 a.m. PST, Officer Enriquez conducted a computer search through the Treasury Enforcement Communications System ("TECS"), the National

Crime Information Center ("NCIC") system, and the Integrated Automated Fingerprint Identification System ("IAFIS"). (Ex. 23 at 2 [Border Patrol Documents].) The TECS indicated that Hummel had no outstanding warrants, no FBI record, and no SID or state offender ID number. (*Id.*) However, the NCIC search revealed that a missing person report had been filed on Hummel. (*Id.*) The missing person report stated:

> SENSITIVE SUBJECT POSSIBLY MENTALLY UNSTABLE PERSON OF INTEREST IN HOMICIDE CONSIDER ARMED AND DANGEROUS APPROACH WITH CAUTION SUBJECT HAS MILITARY BACKGROUND DO NOT ARREST OR DETAIN BASED ON THIS RECORD
>
> IF LOCATED CONTACT KENNEDALE PD 8174785416 ADVISE LOCATION AND DIRECTION OF TRAVEL

(Ex. 23 at 4 [Border Patrol Documents].)

129. At 6:49 a.m. PST, Officer Enriquez called the Kennedale Police Department to confirm Hummel as a missing person. (Ex. 24 at 2 [Phone Transcripts].) He informed the Kennedale dispatcher that the Border Patrol was holding Hummel. When asked whether he was holding Hummel "for any other reason," Enriquez stated, "[j]ust for this missing report that we got from you." (*Id.* at 3.)

130. In response to this phone call, the Kennedale dispatcher contacted Captain Hull and informed him that Hummel had been found in California. (8 RR at 29-30.) Captain Hull instructed the dispatcher to call the Border Patrol and tell them, "[w]e want to put a hold on him for a warrant for arson." (Ex. 24 at 5 [Phone Transcripts].) After speaking with the dispatcher, Captain Hull called several other detectives and told them to meet at the police department "to start the process of the warrant." (8 RR at 31.)

131. At 7:09 a.m. PST, the Kennedale dispatcher spoke with Officer Enriquez and stated that Kennedale Police Department wanted the Border Patrol "to place a hold on him." (Ex. 24 at 6 [Phone Transcripts].) As a result, Officer Enriquez notified Officer Kandal in Border Patrol Enforcement, who took charge of processing Hummel. (7 RR at 145.)

132. At 7:16 a.m. PST, Officer Kandal called the Kennedale dispatcher to get information about the warrant Hummel was to be processed under. When asked about the warrant type and number, the dispatcher replied "I am not 100% sure. I have a number for our captain. He said that when we got a call from y'all to give it to you that way you can speak with him directly." (Ex. 24 at 8 [Phone Transcripts].) The dispatcher admitted, "[w]e just have him filed as a missing person, and he has a pending warrant for arson." (*Id.*) Officer Kandal noted, "[s]o you don't have an active warrant outstanding on him then, right?" He informed the dispatcher that "part of the problem with it is that he's an otherwise admissible person. He's actually a citizen in the country, and we can't hold him on something that hasn't been processed yet." (*Id.* at 9.) The dispatcher suggested that Officer Kandal call Captain Hull. (*Id.*)

133. At 7:34 a.m. PST, the dispatcher again spoke with Captain Hull and asked whether he had spoken to Officer Kandal. She informed Captain Hull that Kandal "needed the NIC number for the warrant. I told him that it was probably being processed as we were speaking, and he said that's not good enough, that he had to have it active or he couldn't hold him because of the guy's rights." (Ex. 24 at 10 [Phone Transcripts].) Captain Hull admitted "I believe he's right. I was hoping they would just hold him, to be honest with you." (*Id.*)

134. Captain Hull instructed the dispatcher to call Kennedale Police Detective Jason Charbonnet and request that he meet at the Kennedale Police Department to help draft the warrant. Meanwhile, Captain Hull stated that he would call Officer Kandal. (Ex. 24 at 11 [Phone Transcripts].) At 7:37 a.m. PST, the dispatcher spoke to Detective Charbonnet. (*Id.* at 12.)

135. Over the next several hours, Captain Hull and Officer Kandal spoke over the phone regarding the issue of Hummel's warrant. (8 RR at 32-33.) These conversations, however, were not recorded because they did not go through the dispatch. (8 RR at 50.) As of 9:12 a.m. PST, a search of the NCIC system indicated "no identifiable record" or warrant for Hummel. (Ex. 23 at 5 [Border Patrol Documents].)

136. At 10:48 a.m. PST, an affidavit was sworn and signed and a warrant for Hummel's arrest was issued exactly five hours after Hummel was detained by the Border Patrol. (Ex. 23 at 8 [Border Patrol Documents]). The affidavit drafted for the arrest warrant relied on the fact that Hummel "was located in California" with the Border Patrol after "trying to re-enter the United States from Mexico through the port of entry." (*Id.*)

137. At 10:52 a.m. PST, Officer Kandal called the Kennedale Police Department to confirm that he received the arrest warrant and was on his way to arrest Hummel. (Ex. 24 at 15 [Phone Transcripts].) Following Hummel's arrest, Officer Kandal stated in his report only that he contacted "Kennedale and confirmed the warrant to be active and outstanding." (Ex. 23 at 3 [Border Patrol Documents].) The warrant was received by the Border Patrol approximately three-and-a-half hours after Officer Kandal informed the Kennedale Police Department that he could not hold Hummel as a U.S. citizen without such a warrant.

138. At 12:15 p.m. PST, Hummel was transported to the San Diego County Jail and booked at 12:46 p.m. PST. (State Trial Ex. 46 at 9.) At 1:02 p.m. PST, Hummel was seen by medical staff for an intake interview. (Ex. 25 at 2 [San Diego Medical Records].) At 4:00 p.m. PST, Hummel underwent a chest x-ray, which returned normal. (*Id.* at 16.) At 4:38 p.m. PST, Hummel was also seen by a doctor for complaints of abdominal and muscular pain. (*Id.* at 18-19.)

139. At 10:20 p.m. PST, Detective Charbonnet and Investigator Jim Rizy, who had flown in from Kennedale, begin interviewing Hummel. (State Pretrial Ex. 46 at 2.) They read him his *Miranda* rights and began the interview. (*Id.*) Hummel subsequently confessed to killing his family, explaining in detail the crime and informing the detective where the murder weapons could be found. (*Id.*) The interview concluded at 12:28 a.m. PST, December 21, 2009, with Hummel signing a written confession. (*Id.* at 88.) Following the interview, the Kennedale Police Department located the weapons described by Hummel in his confession. The weapons were forensically tested and admitted as evidence against Hummel at his trial. (33 RR at 161; 37 RR at 187.)

140. Trial counsel for Hummel filed two Motions to Suppress Oral or Written Statements of the Defendant, requesting that all statements made by Hummel to the Border Patrol agents and to the Kennedale detectives be suppressed. (2 CR at 336, 348). Trial counsel argued that the Border Patrol illegally detained Hummel and, in doing so, tainted any subsequent statements that Hummel made after being arrested as a result of that detention. (*Id.*) Trial counsel alleged that the arrest itself, even though effectuated by a warrant, was similarly tainted by the illegal detention. (*Id.*)

141. At a pretrial hearing on this motion, Border Patrol Officers Enriquez and Kandal were called to the stand to testify to the events that led to Hummel's detention. At the hearing, Officer Enriquez testified that his initial computer search of the NCIC system showed a missing person report for Hummel. (7 RR at 140-41.) However, contrary to his written report, Officer Enriquez testified that Hummel's status as a missing person was also flagged in the TECS. (*Id.* at 141; Ex. 23 at 2 [Border Patrol Documents].) Officer Enriquez admitted that the missing persons report indicated that Hummel was not to be detained, but instead that Kennedale was to be notified of his location. (7 RR at 149.) He noted that when he spoke with the Kennedale dispatcher, she indicated Hummel had an arrest warrant for arson. (7 RR at 152.)

142. Officer Enriquez testified that despite never confirming that a warrant had been issued for Hummel, he referred the case to Officer Kandal for processing based on his phone conversation with the Kennedale dispatcher. (7 RR at 144-45, 160.) Finally, Officer Enriquez stated that if Kennedale had not suggested Hummel had an outstanding warrant, the Border Patrol would have released Hummel upon verifying his U.S. citizenship. (8 RR at 157.) However, because he was told a warrant existed, Officer Enriquez stopped his efforts to determine Hummel's citizenship. (*Id.* at 162.)

143. Office Kandal testified that he knew a warrant did not exist for Hummel during his initial detention. Officer Kandal admitted that the Border Patrol learned that Hummel was a U.S. citizen, around the time of his 7:30 a.m. PST phone call with the Kennedale dispatcher, before an arrest warrant was finalized. (8 RR at 85-87, 90.) Kandal stated that he continued to hold Hummel because the Kennedale Police Department had not yet told him how they wanted to handle Hummel's status as a missing person. (*Id.* at 90.)

144. However, Officer Kandal also stated that the Border Patrol had the independent authority to hold Hummel based on federal law. Kandal testified that the Border Patrol can detain, fine, and even imprison someone for failing to provide proper entry documentation, under the Western Hemisphere Travel Initiative. (8 RR at 62.) He also stated that under the Homeland Security Act, a person is not free to leave until the Border Patrol is satisfied of their right to enter the United States. (*Id.* at 63.) Kandal's testimony suggested there were numerous violations of federal law that would serve as the basis for the Border Patrol to detain Hummel. (*Id.* at 67.) Office Kandal further suggested that the Border Patrol could detain someone, even without a violation of law, as long as six, twenty-four, and seventy-two hours (under various standards) in order to determine whether they are a U.S. citizen and whether they are wanted by another jurisdiction. (*Id.* at 68.)

145. Through his testimony, Officer Kandal implied that the Border Patrol detained Hummel based on his attempt to come into the country without proper documentation, as an administrative violation, and under their authority to determine his citizenship. (8 RR at 73-74.) Kandal's testimony made it appear that the Border Patrol would have held Hummel, even though a warrant did not exist, based on their own policies and procedures. (*Id.* at 98-101.)

146. At the conclusion of the hearing, this Court denied the defense's motion, reasoning that Hummel's detention by the Border Patrol was lawful. The Court's decision was based on the Border Patrol's authority to detain Hummel pursuant to the Intelligence Reform and Terrorism Prevention Act of 2004, Western Hemisphere Travel Initiative, and other laws which grant

the United States the authority to protect its borders. (10 RR at 62-63; 11 RR at 6.)

147. Prior to the pre-trial hearing, counsel were given copies of the documents and reports created by the Border Patrol, as well as the recorded phone calls made between Captain Hull, Officer Kandal, and the Kennedale dispatcher. (Aff. of Moore at 24-25.) Counsel did not offer these documents and phone calls as exhibits to support their motions.

**CONCLUSIONS OF LAW RELATED TO CLAIM NINE**

148. Texas courts "have consistently said that the arrest of a citizen without warrant is an unreasonable seizure of his person, unless it is expressly authorized by statute." *Heath v. Boyd*, 175 S.W.2d 214, 215 (Tex. 1943). Further, "the 'fruit of the poisonous tree' doctrine generally precludes the use of evidence, both direct and indirect, obtained following an illegal arrest." *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

149. The failure to provide the documents and phone transcripts surrounding Hummel's arrest to the Court constituted deficient performance by trial counsel. The Court was left to rely exclusively on the testimony of the Border Patrol officers themselves. This testimony, especially by Officer Kandal, implied to the Court that both the Kennedale police and the Border Patrol were continuously acting openly and candidly during Hummel's detention. Further, the Court believed the Border Patrol independently had reason to be holding Hummel during the period no warrant existed.

150. Had the Court been provided with the Border Patrol documents and with the actual transcripts of the phone calls, a significantly different picture would have been presented. The phone calls make clear that the Border Patrol was holding Hummel solely at the request of Kennedale police. From the early

stages of Hummel's detention, Officer Enriquez informs Kennedale that the Border Patrol was not holding Hummel for "any other reason" than "just for this missing report that we got from you." (Ex. 24 at 3 [Phone Transcripts].) Thus, these documents directly invalidate the testimony provided by Officer Kandal about the use of Border Patrol authority, which served as the primary justification for this Court's finding that Hummel's detention was not illegal.

151. Based on the arguments and authority laid out in Hummel's Application, this Court would have found Hummel's detention to be illegal and granted trial counsel's motion to suppress Hummel's confession.

152. This Court recommends granting Hummel's ninth claim of relief and remanding the case for a new trial.

**FINDINGS OF FACT RELATED TO CLAIM TEN**

153. In Claim Ten of his Application, Hummel alleges that appellate counsel was ineffective for not raising a number of erroneous decisions made by the trial court in denying challenges for cause raised by Hummel during voir dire. The Court finds the following facts in support of Claim Ten.

154. During voir dire, trial counsel raised twenty-one challenges for cause. Twelve of these challenges were denied by the court. Trial counsel used nine peremptory strikes to remove venire members that the court did not remove for cause.

155. Potential juror Bancroft indicated during his individual voir dire that he believed there was a burden on the defense team to produce evidence on mitigation. Bancroft was specifically asked whether the defense had the burden to "bring [him] the mitigating circumstances or to convince [him] of the sufficiency of the mitigating circumstance." (16 RR at 193.) He replied, "[S]ince you're the – defending him, yeah, you would probably have to tell

me something about him . . . if someone's trying to prove the Defendant's character and background, I – you've got to tell me." (*Id.* at 193-94.)

156. Trial counsel moved to challenge Bancroft for cause based on the fact that he placed the burden to produce mitigating evidence on Hummel. (16 RR at 199.) Potential juror Bancroft was never rehabilitated. (*Id.*) Trial counsel struck Bancroft with a peremptory challenge. (*Id.*)

157. Potential juror Butler for cause on two grounds was unable to distinguish a difference in the degree of likelihood for probability and possibility and required a nexus between mitigation and the actual commission of the crime. (16 RR at 250.) Butler stated that she interpreted the words "possibility" and "probability" to mean the same thing, and there was no difference in the degree of likelihood to her. (*Id.* at 240-41.)

158. Butler explained that she thought the language of Special Issue Two would compel her to find mitigating circumstances only if they were directly related to the crime. (16 RR at 247.) She said that she could not give a mitigating circumstance much application under the instruction if it did not have anything to do with the circumstances surrounding the crime. (*Id.* at 247-48.)

159. Trial counsel challenged Butler for cause on these two grounds, which the trial court denied. Trial counsel then removed potential juror with a peremptory challenge. (16 RR at 250-51.)

160. During the individual voir dire of potential juror McFarland, she stated that she would not only consider whether there was a probability that Hummel would commit criminal acts of violence, but also whether there was a probability that a third party, like a family member, would commit criminal acts of violence on his behalf when deciding Special Issue One. (17 RR at 281-83.)

161. Trial counsel challenged McFarland on this basis, but the trial court denied the challenge. (17 RR at 289.) Trial counsel then struck McFarland with a peremptory challenge. (*Id.*)

162. Potential juror Cuevas admitted during her individual questioning that she would automatically answer Special Issue One "Yes" based on finding an individual guilty of capital murder for murdering two victims. (20 RR at 230-31.)

163. Cuevas indicated on her juror questionnaire that the death penalty should be used for the murder of children and police officers. (Ex. 35 at 7 [Cuevas Questionnaire].)

164. Cuevas spoke about a friend from her Sunday school class who was murdered in the course of his duties as a police officer. The individual that murdered her friend was found guilty of capital murder and had since been executed. (20 RR at 216-18.)

165. Cuevas was never able to provide a clear answer to the court as to whether she would be able to evaluate guilt and future dangerousness separately. (*Id.* at 233-36.)

166. Trial counsel challenged Cuevas for cause because she would automatically answer "Yes" to Special Issue One, had a predisposition towards the death penalty, and because she lied on the questionnaire when she answered that she had never been interested in the outcome of any criminal case when she clearly followed her friend's murder case. (20 RR at 236-37; Ex. 35 at 5 [Cuevas Questionnaire].) The trial court denied the challenge, and trial counsel exercised a peremptory challenge. (20 RR at 238.)

167. Powell admitted that if an individual was guilty of two murders, with no justification, and the victims were innocent, she would automatically answer Special Issue One "Yes." (20 RR at 55-56.) She further admitted that she

was not tricked into answering the question that way, but that was how she really felt. (*Id.*)

168. There was no attempt by the Court or the State to rehabilitate Powell. The trial court denied trial counsel's challenge for cause on potential juror Powell, and trial counsel removed her with a peremptory challenge. (20 RR at 59.)

169. During his individual voir dire, potential juror Guidroz stated that he would place a burden on Hummel to provide mitigating evidence with regard to Special Issue Two. (27 RR at 109.)

170. Neither the State nor the Court tried to rehabilitate potential juror Guidroz based on his answers placing an impermissible burden on Hummel. Trial counsel challenged Guidroz for cause and the trial court denied the challenge. (27 RR at 115-16.) Trial court then struck potential juror Guidroz with a peremptory challenge. (*Id.*)

171. Potential juror Zeiger indicated during his individual questioning that he had a predisposition to answer Special Issue One "Yes" if he found someone guilty of capital murder. (28 RR at 94.) When trial counsel asked the potential juror if he thought a person would always be a danger if he killed at least two people during the course of a single criminal transaction, Zeiger responded, "I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again." (*Id.* at 92.)

172. There was not an attempt to rehabilitate potential juror Zeiger by the State or the Court. Trial counsel challenged the potential juror for cause based on his predisposition to answer Special Issue One "Yes," but the court denied the challenge, and trial counsel used a peremptory challenge to remove Zeiger. (28 RR at 103-04.)

173. Potential juror Beauchamp stated that, for her, answering Special Issue One "Yes" was a foregone conclusion when someone was found guilty of capital murder, not mentally retarded, the incident was not an accident, self-defense was not involved, and the victims were innocent. (28 RR at 155.) Beauchamp stated that the evidence she received in the guilt/innocence phase to find someone guilty was enough to answer Special Issue One "Yes." (*Id.* at 156.)

174. Potential juror Beauchamp was not rehabilitated by the State or the Court. Trial counsel's challenge for cause was denied by the Court, and counsel removed her with a peremptory challenge. (28 RR at 158.)

175. Hermosillo specifically stated, "[I]n defending a Defendant, you would have to . . . present reasons why that may have caused this incident or this murder. I know the burden of proof is on the – the. D.A . . . but you also have to – in my mind . . . prove his character or prove . . . something about him to where I would want to know . . . like this was his first time." (28 RR at 217.) After trial counsel told her that the law does not place a burden on Hummel to present this type of evidence, she still insisted, stating, "I think you have to convince me that there's another side of that person." (*Id.* at 218.)

176. After trial counsel concluded their voir dire of Hermosillo, the trial court conducted its own lengthy voir dire, which revealed that Hermosillo's personal opinions conflicted with the laws in question. (28 RR at 222-25.)

177. Trial counsel challenged Hermosillo for cause based on her answers, but the trial court denied the challenge. (*Id.* at 226.) Trial counsel then exercised a peremptory challenge to remove potential juror Hermosillo. (*Id.* at 227.)

178. Trial counsel exhausted their peremptory strikes, and requested additional peremptory challenges on three occasions. The first request was for seven additional peremptory strikes to compensate for the improperly denied

challenges for cause. (28 RR at 161.) The trial court denied the motion, but granted one additional peremptory challenge. (*Id.*) The second request occurred later that same day and the court once again granted one additional peremptory challenge, despite trial counsel re-urging his initial motion for seven additional challenges. (*Id.* at 228.) The final motion for additional peremptory challenges was made the following day. The trial court denied trial counsel's third request for additional challenges. (30 RR at 5-6.)

179. Juror Sanchez, the very next potential juror brought in for individual voir dire, was sworn in as the twelfth juror. Trial counsel unsuccessfully challenged him for cause and stated for the record that Sanchez was an objectionable juror and that a peremptory challenge would have been used if Hummel still had one left. (30 RR at 78.)

180. Sanchez had experienced the murder of a close family member, his wife's nephew. (30 RR at 48.) He also worked with children as a music teacher at a school. (Ex. 40 at 4 [Sanchez Questionnaire].) Furthermore, he had a young daughter. (*Id.* at 5.) He additionally stated on his questionnaire that he thought the death penalty should be used for "murder of a child [and] premeditated cold blooded murder," which were particularly relevant issues in Hummel's case. (*Id.* at 7.)

181. Sanchez also showed that he did not understand what his duties would be in reference to the first or second phase of the trial. (*See, e.g.*, 30 RR at 27.) He did not have a clear understanding as to what the term "probability" meant in regards to Special Issue One, defining it as, "That the Defendant probably did the crime without any doubts." (30 RR at 26.)

## CONCLUSIONS OF LAW RELATED TO CLAIM TEN

182. When the trial court erroneously overrules a challenge for cause, harm is shown when peremptory challenges are exhausted, a request for additional

peremptory challenges is denied, and a juror is seated who would have been struck using a peremptory challenge. *Bell v. State*, 724 S.W.2d 780, 795 (Tex. Crim. App. 1986).

183. Trial counsel's challenges for cause to potential jurors Bancroft, Butler, McFarland, Cuevas, Powell, Guidroz, Zeiger, Beauchamp, and Hermosillo were erroneously denied by the Court.

184. Trial counsel exhausted their peremptory strikes, and requested additional peremptory challenges on three occasions. The Court granted trial counsel one additional peremptory strike for each of the first two requests, but denied further peremptory strikes in response to the third request. Trial counsel exhausted both additional peremptory strikes.

185. The Court's denial of trial counsel's challenge for cause of juror Sanchez, the venire member interviewed immediately following the Court's denial of counsel's third request for additional peremptory strikes, was erroneous. As a result, an impermissibly biased juror, juror Sanchez, was seated on Hummel's jury and participated in deliberations following both the guilt and punishment phases of trial.

186. Criminal defendants are entitled to effective assistance of counsel during their direct appeals. The effectiveness of appellate counsel is determined using the familiar two-prong *Strickland* standard. *See Robbins*, 528 U.S. at 285; *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Ex parte Santana*, 227 S.W.3d at 704-05. Appellate counsel is considered ineffective if counsel's performance was objectively unreasonable, and this deficient performance prejudiced the defendant. *See Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006).

187. Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an

appellate brief. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); *accord Ries*, 522 F.3d at 531-32; *see Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the State Bar of Texas Guidelines and Standards for Capital Counsel outlines the duties of appellate counsel. Counsel must "review the appellate record for all reviewable errors" and prepare "a well-researched and drafted appellate brief." Texas Guidelines, Guideline 12.2(A)(8)

188. In Hummel's case, appellate counsel's failure to raise any issues regarding the court's erroneous denial of challenges for cause was objectively deficient. Appellate counsel's performance fell below the reasonable standards of professional conduct and prejudiced Hummel's appeal, as juror Sanchez, who would have been struck with a peremptory challenge, was erroneously seated on the jury.

189. The Court recommends granting Hummel's tenth claim for relief and remanding the case for a new trial.

## FINDINGS OF FACT RELATED TO CLAIM ELEVEN

190. In Claim Eleven of his Application, Hummel alleges that trial counsel provided ineffective assistance of counsel for failing to object to the State's discriminatory use of peremptory strikes against minority venire members. The Court finds the following facts in support of Claim Eleven.

191. The jury selection process in Hummel's case began on April 28, 2011, when the venire panel was sworn in and filled out their juror questionnaires. (11 RR at 28, 96.) The court had potential jurors return for mini-panels starting May 4, 2011, where some individuals were excused by agreement and others were struck for cause. (*See, e.g.*, 12 RR at 20, 127.) Potential jurors were

then interviewed individually by each side starting on May 10. (*See, e.g.*, 15 RR at 9.) Following the individual voir dire interview, the court considered challenges for cause. (*See, e.g.*, 15 RR at 118.) If the prospective juror was not struck by the court for cause, the State was offered the first opportunity to remove the juror with a peremptory strike. (*See, e.g.*, 15 RR at 118.) If the State accepted the prospective juror, then the defense had the chance to exercise a peremptory strike of its own. (*See, e.g.*, 15 RR at 119.)

192. Out of the twelve peremptory challenges the State used, four were exercised against minority panelists.

193. Answers provided by prospective jurors Gonzales, Williams, and Dennis during their individual voir dire and on their questionnaires reveals that they provided responses similar to several non-minority venire members accepted by the State.

**CONCLUSIONS OF LAW RELATED TO CLAIM ELEVEN**

194. The Fourteenth Amendment of the United States Constitution and the Texas Code of Criminal Procedure bar the use of peremptory challenges to exclude potential jurors on account of the juror's race. *Rice v. Collins*, 546 U.S. 333, 338 (2006); *Johnson v. California*, 545 U.S. 162, 168 (2005); *Batson v. Kentucky*, 476 U.S. 79, 89 (1985); Tex. Code Crim. Proc. Art. 35.261(a). The Supreme Court explained that excluding jurors because of their race is particularly egregious because it "undermine[s] public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87. Excluding even one juror on the basis of their race violates these core provisions of the law and entitles a defendant to a new trial. *See Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992).

195. A *Batson* challenge follows a three-step analytical process. First, the defendant must make out a prima facie case of intentional discrimination by

the State. *Batson*, 476 U.S. at 93-94. A prima facie case is established by demonstrating that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 94. Next, the State must provide race-neutral reasons for using a peremptory challenge on the juror(s) in question. *Id.* at 94, 97. Finally, the court must determine whether the defendant has established purposeful discrimination. *Id.* at 98; *see also Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 239-40 (2005); *Hernandez v. New York*, 500 U.S. 352, 363 (1991); *Nieto v. State*, 365 S.W.3d 673, 675-76 (Tex. Crim. App. 2012).

196. Although statistics regarding the State's use of its peremptory strikes may indicate a pattern of discriminatory jury selection, comparative juror analysis is a more powerful tool for uncovering purposeful discrimination. In *Miller-El v. Dretke*, the Supreme Court described the underlying concept behind comparative juror analysis as follows:

> If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.

*Miller-El*, 545 U.S. at 241. The compared jurors do not need to be identical in all aspects to uphold a *Batson* claim. *Id.* at 247 n.6 ("A per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.").

197. Comparative juror analysis is an intensive process that requires close scrutiny and comparison of venire members' juror cards, juror questionnaires, and answers during the voir dire interview. The Fifth Circuit Court of Appeals requires a comparative juror analysis to take place when investigating the merits of a *Batson* challenge. *See United States v. Brown*,

553 F.3d 768, 796 (5th Cir. 2008). Comparative juror analysis is an analytical theory that describes the record evidence regarding the jurors in question, and not a separate issue that is waived if not raised during earlier proceedings. *See Young v. State*, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991).

198. Comparative juror analysis is not restricted to comparing jurors struck by the State to those who ultimately serve on the jury. Rather, minority jurors struck by the State can be compared to any white jurors accepted by the State, even if those white jurors were later struck by the defense. *Miller-El*, 545 U.S. at 245 n.4. If the State struck a minority juror but accepted a similarly-situated white juror, this is evidence of purposeful discrimination. *Id.* at 241.

199. The State provided post-hoc explanations for why it used peremptory strikes to remove potential jurors Gonzales, Williams and Dennis. These reasons are not supported by the record, implausible, and are not "at least minimally persuasive . . . for believing the person's ability to perform his or her duties as a juror will be affected." *See Purkett v. Elem*, 514 U.S. 765, 768 (1995).

200. Because the State's proffered race-neutral reasons for striking potential jurors Gonzales, Williams and Dennis are pretextual, this Court finds the strikes to have been made due to impermissible racial discrimination.

201. "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." ABA Guidelines, Guideline 10.8 (commentary) (citing Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, 42-43 (Apr. 1997).

202. Because there is a reasonable probability that a *Batson* challenge would have been successful, and the failure to challenge the State's peremptory strikes

left Hummel with a constitutionally infirm jury, trial counsel was ineffective for failing to object to the strikes of potential jurors Gonzales, Williams and Dennis.

203. The Court recommends granting Hummel's eleventh claim for relief and remanding the case for a new trial.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM TWELVE

204. In Claim Twelve of his Application, Hummel alleges that the Texas death penalty scheme is unconstitutional based on the statutory jury instructions that restrict the type of evidence a jury may consider mitigating in favor of a life sentence. In support of Claim Twelve, the Court makes the following findings and conclusions.

205. The "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original, footnote omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.").

206. The Supreme Court has required that a jury "must be permitted to 'consider fully' [] mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the

ultimate sentence." *Abdul-Kabir*, 550 U.S. at 260. Each juror must have broad discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the State approves as mitigating. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations omitted); *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

207. The avenues of mitigation open to a capital jury are not limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."). The Supreme Court has upheld the mitigating potential of evidence that an inmate has adjusted well in prison leading up to his trial. *Skipper*, 476 U.S. at 4-5.

208. As example, evidence submitted at trial that severed in the United States Marine Corps bore no specific link to his legal or moral blameworthiness for the crime in question. Instead such evidence argued that Hummel was a worthwhile person who was not deserving of a death sentence. This type of evidence held potential for jurors to weigh and decide whether it mitigated Hummel's overall deservingness of being executed. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) ("[S]o long as the class of murderers subject to

capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

209. Because of the statutorily mandated jury instruction, the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to Hummel's "moral blameworthiness." For any of Hummel's jurors to have given full effect to evidence they found warranted a sentence of life, but that did not reduce Hummel's blameworthiness for the crime, the juror would have had to violate the instructions. *See Penry v. Johnson*, 532 U.S. 782, 800 (2001). Because, "[w]e generally presume that jurors follow their instructions," there is a reasonable probability that the result of Hummel's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

210. The application of the Texas death penalty statute impaired Hummel's right to have all mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence. *See Penry*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced."). This Court concludes that Hummel's sentence should therefore be reversed.

211. The Court recommends granting Hummel's twelfth claim for relief and reforming Hummel's sentence to life without parole.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM THIRTEEN

212. In Claim Thirteen of his Application, Hummel alleges that the Texas death penalty scheme is unconstitutional due to the arbitrary nature in which death

sentences are assigned. In support of Claim Thirteen, the Court makes the following findings and conclusions.

213. The Supreme Court suspended the death penalty in *Furman v. Georgia* during the 1970s. 408 U.S. 238 (1972) (per curiam). The Court rested its decision on the basis that the lack of guidance and narrowing considerations in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

214. Based on the geographic and racial disparities identified in Hummel's Application in the administration of the death penalty in Texas, this Court concludes that the current death penalty scheme in Texas violates the Supreme Court's ban on arbitrary imposition of the death penalty.

215. Such a scheme does not meet the heightened reliability required by the Constitution when imposing the death penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case"). This Court concludes that the Texas death penalty as currently imposed is unconstitutional.

216. This Court recommends granting Hummel's thirteenth claim for relief and reforming the sentence to life without parole.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM FOURTEEN

217. In Claim Fourteen of his Application, Hummel alleges that the Texas death penalty scheme is unconstitutional based on its statutory instructions that

instruct jurors they must reach ten votes to assign a life sentence. In support of Claim Fourteen, the Court makes the following findings and conclusions.

218. Under Texas law, the jury is statutorily misinformed about the full impact of the way it may answer special issues during the punishment phase of capital cases. The jury is instructed that it cannot answer "Yes" to either of the first two special issues (future danger and law of parties) without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue (mitigation) without unanimous agreement and that it may only answer "Yes" if at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(f)(2). The jury is not instructed about, and is prohibited from being informed of, the effect of failure to agree on any of the questions submitted to it, which also renders a life without parole sentence. Tex. Code Crim. Proc. art. 37.071, § 2(a)(1).

219. The statutory jury instructions impair a juror's ability to give effect to his or her determination that a defendant is not deserving of the death penalty. This impairment violates a defendant's constitutional rights to due process and a fair trial. The misleading instructions impermissibly direct the jury to a unanimous verdict against the individual moral judgments of the jurors.

220. There is a reasonable probability Hummel's trial would have resulted differently but for the misleading statutory instructions. This Court therefore concludes that Hummel's sentence should be reversed.

221. The Court recommends granting Hummel's fourteenth claim for relief and reforming the sentence to life without parole.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CLAIM FIFTEEN

222. In Claim Fifteen of his Application, Hummel alleges that the mental impairments identified in his Application make him ineligible for execution under the Supreme Court's holding in *Atkins v. Virginia*. 536 U.S. 304, 320-21 (2002). In support of Claim Fifteen, the Court makes the following findings and conclusions.

223. In *Atkins*, the Supreme Court determined that society recognizes the lesser moral culpability of criminal offenders with intellectual disability. 536 U.S. at 320-21. The Court noted that persons with intellectual disability, by definition, have "diminished capacities to understand and process information, to engage in logical reasoning, and to control their impulses." *Id.* at 316. Because of his diminished culpability, the execution of a person with intellectual disability does not serve any valid retributive or deterrent function. *Id.*

224. This Court concludes that Hummel suffers from mental impairments that affect him in much the same way as intellectual disability. The same concerns that underlie execution of intellectually disabled offenders exist in Hummel's case. Complex post-traumatic stress disorder, due to attachment trauma, prevents Hummel from responding and reacting to social situations and stressors in the way that an average individual would, therefore reducing his moral culpability. (Ex. 1 at ¶¶ 37, 42-42, 52, 57 [Aff. of Dr. Hardesty].) The imposition of the death penalty would be grossly disproportionate to Hummel's moral culpability, would not "measurably advance the deterrent or retributive purpose of the death penalty," and would carry an enhanced risk of error. *Atkins*, 536 U.S. at 320-21. For these reasons, this Court

concludes that Hummel is ineligible to receive the death penalty and his sentence should be vacated.

225. The Court recommends granting Hummel's fifteenth claim for relief and reforming the sentence to life without parole.

**CONCLUSION**

Based upon the above, Hummel is entitled to a new trial. The Court recommends the Court of Criminal Appeals grants Hummel relief under the Application, by either reforming his sentence to life without parole, or vacating and remanding the case in whole or in part, as the law and justice require.

Respectfully submitted,

DATED: October 29, 2014

Robert Romig
Post-Conviction Attorney

Sam Farina-Henry
Post-Conviction Attorney

**IN THE 432ND DISTRICT COURT**

**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) ) ) ) ) ) | Cause No.<br>1184294-A |

**ORDER**

The Court hereby adopts and incorporates herein Applicant's proposed findings of fact and conclusions of law in this cause.

The Clerk is hereby ORDERED to prepare a transcript of all papers in Trial Cause 1184294-A and transmit same to the Court of Criminal Appeals as provided by Article 11.071 of the Texas Code of Criminal Procedure.

The Clerk is further ORDERED to send a copy of this Court's findings of fact and conclusions of law, including this Order, to Applicant's counsel and to counsel for the State.

ORDERED AND SIGNED on this ____ day of ____________, 2014.

______________________________
The Honorable Ruben Gonzalez
Judge, 432nd Judicial District Court

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Proposed Findings and Conclusions as follows:

Susan Russell, Lead Appeals Clerk
Tarrant County District Clerk
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy)

This certification is executed on October 29, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Sam Farina-Henry

OCW

# Office of Capital Writs

Brad D. Levenson
Director

October 29, 2014

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

OCT 31 2014

TIME 11:06
BY ______ DEPUTY

Susan Russell, Lead Appeals Clerk
Tarrant County District Clerk
401 West Belknap
3rd Floor
Fort Worth, TX 76196

To Whom it May Concern,

Enclosed please find Applicant's Proposed Findings of Fact and Conclusions of Law regarding *Ex Parte John William Hummel*, cause number 184294-A. Please return a file-stamped copy of the face page to the address below for our records. Thank you.

Sincerely,

Sam Farina-Henry

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590



Office of Capital Writs
1700 N. Congress Ave.
Ste. 460
Austin, TX 78701

U.S. POSTAGE PAID
AUSTIN, TX
78701
OCT 29, 14
AMOUNT
$5.85
00020535-19

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

OCT 31 2014

TIME ________ DEPUTY
BY ________

Susan Russell, Lead Appeals Clerk
Tarrant County District Clerk
401 West Belknap
3rd Floor
Fort Worth, TX 76196

UNITED STATES POSTAL SERVICE
USPS TRACKING #
9114 9011 8986 6817 0518 61

PRIORITY® MAIL
UNITED STATES POSTAL SERVICE
Visit us at usps.com

Label 107R, January 2008

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
NOV 03 2014
TIME 4:44
BY CDO DEPUTY

C-432-009923-1184294-A

| EX PARTE | § | IN THE 432nd JUDICIAL |
|---|---|---|
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## STATE'S PROPOSED MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

COMES NOW, The State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and files its proposed memorandum, findings of fact, and conclusions of law.

## MEMORANDUM

A Tarrant County jury convicted Applicant of capital murder for murdering his wife and father-in-law in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced Applicant to death. Applicant's conviction and sentence were affirmed on direct appeal by the Court of Criminal Appeals of Texas, and the Supreme Court of the United States denied Applicant's petition for writ of certiorari. *See Hummel v. State*, No. AP-76-596, 2013 WL 6123283 (Tex. Crim. App. November 20, 2013) (not designated for publication), *cert. denied*, No. 13-9620 (October 6, 2014).

Applicant timely filed the current habeas application pursuant to TEX. CODE CRIM. PROC. 11.071 on June 5, 2013, raising fifteen claims for relief. This Court

SCANNED

granted the State an extension of time to file its response to the application, and the State timely filed its reply to each of Applicant's claims on December 2, 2013.

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant then filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46," which dealt specifically with claims three, four, six, and seven. Additionally, Applicant filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. The State filed a reply to Applicant's motion for a protective order. On May 22, 2014, the Court denied Applicant's motion for protective order. The State filed its "Supplemental Reply To Application For Writ Of Habeas Corpus" on July 7, 2014.

On August 13, 2014, this Court found that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. The Court ordered the parties to file proposed findings of fact and conclusions of law by November 3, 2014.

The Court has considered the Application for Writ of Habeas Corpus, the State's Reply to Application for Writ of Habeas Corpus, Applicant's Supplemental Response to State's Answer, the State's Supplemental Reply to Application for Writ of Habeas Corpus, all of the exhibits and materials filed by each party, and

the entire records of the trial and habeas proceedings. Where appropriate, the Court has used its personal recollection as permitted under TEX. CODE CRIM. PROC. art. 11.071, § 9(a). Based on its review of the record, the Court makes the following findings of fact and conclusions of law regarding Applicant's claims and recommends that relief be denied:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**CLAIM ONE**
**ALLEGED JUROR MISCONDUCT**

Applicant alleges that he was denied his due-process right to an impartial jury when juror Nathaniel Davis committed misconduct by automatically voting for death.

**Findings of Fact**

1. Nathaniel Davis served as a juror at the guilt-innocence and punishment phases of Applicant's capital-murder trial in cause number 1184294D.

2. Applicant's first claim for relief is based solely on Davis' habeas affidavit detailing his own mental processes in reaching a verdict at Applicant's trial. [Application at 30-36; Applicant's Exhibit 22.]

3. Applicant does not challenge Davis' qualifications as a juror. [Application at 30-36.]

4. Davis' affidavit does not suggest the existence of any influence originating from a source outside of the jury room or other than from the jurors themselves. [Applicant's Exhibit 22.]

**Conclusions of Law**

1. Applicant does not challenge Davis' qualifications as a juror, and his claim for relief is not based on an outside influence. *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (defining "outside influence" for purposes of TEX. R. EVID. 606(b) as "something originating from a source outside of the jury room and other than from the jurors themselves"). Because Applicant's claim for relief does not fall within either exception to TEX. R. EVID. 606(b), Davis' affidavit is inadmissible and is stricken from this habeas proceeding. *See* TEX. R. EVID. 606(b); *see also Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim. App. 2013) (refusing based on TEX. R. EVID. 606(b) to consider juror affidavit); *Bjorgaard v. State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007) (TEX. R. EVID. 606(b) barred trial court from considering contents of juror affidavit describing jurors' collective thought process), *pet. dism'd, improv. granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008).

2. Application of TEX. R. EVID. 606(b) does not deprive Applicant of a fair trial or due process. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) (rejecting constitutional challenge to FED. R. EVID. 606(b)); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 375 (Tex. 2000) (examining constitutionality of TEX. R. EVID. 606(b) in civil context); *Dunklin v. State*, 194 S.W.3d 14, 19-20 (Tex. App.—Tyler 2006, no pet.) (rejecting challenge to constitutionality of TEX. R. EVID. 606(b)).

3. The Court recommends that Applicant's first claim for relief be denied.

## CLAIMS TWO THROUGH ELEVEN
## ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL

Applicant sets forth ten claims for relief alleging that he was denied effective assistance of counsel at trial and on appeal.

**Findings of Fact Relating to Claims Two Through Eleven**

1. On December 23, 2009, the Court appointed Fred Cummings to represent Applicant at his capital-murder trial in cause number 1184294D. [CR 1: 21; Cummings' affidavit at 1.]

2. On December 31, 2009, the Court appointed Larry M. Moore as Cummings' co-counsel for trial. [CR 1: 24; Cummings' affidavit at 5; Moore's affidavit at 1.]

3. On December 31, 2009, Cummings had the Court appoint Brendan Ross, an experienced licensed social worker and mitigation specialist, and Bobby Walton, an experienced private investigator, to assist counsel in investigating Applicant's life. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

4. After Applicant's conviction and death sentence, the Court appointed John W. Stickels to represent Applicant on direct appeal. [CR 4: 744; Stickels' affidavit at 1.]

5. Cummings, Moore, and Stickels are highly experienced criminal defense attorneys who were well-qualified to represent Applicant. [Moore's affidavit at 1-3; Cummings affidavit at 1; Stickels' affidavit at 1.]

6. Cummings, Moore, and Stickels have each filed affidavits responding to Applicant's habeas claims that he was denied effective assistance of counsel at trial and on appeal. [*See* "Affidavit" filed by Cummings (hereinafter referred to as "Cummings' affidavit"); "Counsel's Affidavit in Response to Writ Allegations" filed by Moore (hereinafter referred to as "Moore's affidavit"); "Counsel's Supplemental Affidavit in Response to Writ Allegations" filed by Moore (hereinafter referred to as "Moore's suppl. affidavit"); and "Affidavit of John W. Stickels" filed by Stickels (hereinafter referred to as "Stickels' affidavit").]

**A. Claim for Relief Two**

Applicant alleges that his trial and appellate counsel were ineffective because they failed to argue that the State's evidence was legally insufficient to support an affirmative finding to the future-dangerousness special issue. [*See* Application at 36-37.]

**Findings of Fact**

1. Applicant's trial counsel introduced evidence designed to convince the jury that Applicant was not a future danger, and counsel argued to the jury that the evidence did not support a finding of future dangerousness. [Moore's affidavit at 4; Cummings' affidavit at 2-3; RR 45: 65-84.]

2. Trial counsel correctly believed that any challenge to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have been rejected by this Court and would have been futile. [Moore's affidavit at 4; Cummings' affidavit at 3.]

3. On direct appeal, Stickels did not challenge the jury's finding of future dangerousness because, after reviewing the facts and the applicable law, he considered such a challenge to be "frivolous." [Stickels' affidavit at 2.]

4. Applicant seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes while incarcerated. [*See* Application at 36-40.]

5. The State presented compelling, overwhelming evidence to satisfy its burden to prove beyond a reasonable doubt that Applicant posed a future danger as defined in the Court's charge to the jury.

6. A week before Christmas in 2009, Applicant murdered his pregnant wife Joy Hummel, his five-year-old daughter Jodi Hummel, and his crippled father-in-law Clyde "Eddie" Bedford and set the house on fire because he wanted to be free to pursue a relationship with Kristie Freeze, whom he met in October 2009 at the E-Z Mart convenience store where she worked as a

clerk and where Applicant stopped to buy cigarettes and gasoline on his way to or from his job as a hospital security guard. [RR 33: 68, 87; RR 39: 132-35; RR 40: 10, 20-21; SX 347B.]

7. Applicant began thinking in October 2009 about killing his family because he wanted to be single to "pursue [Freeze] better." [SX 347B.]

8. About two weeks before the murders, Applicant accessed a hospital doctor's computer at work without permission to research articles about the effects of rat poison on humans and how rat poisoning can cause the death of a human. [RR 43: 36-40; SX 228.]

9. Applicant was persistent about wanting to have sex with Freeze, and they had sex at Freeze's apartment on December 10, 2009. [RR 39: 141-42, 173, 176; SX 347B.]

10. Two days after Applicant and Freeze had sex, Freeze found out that Joy was pregnant, which caused Freeze "discomfort" because Applicant "had no concern for the safety of his unborn child"; as a result, Freeze told Applicant to stop contacting her, but he continued to do so anyway. [RR 39: 142-43, 174.]

11. On December 16, 2009, the day Freeze's divorce became final, Applicant called and texted Freeze repeatedly, and he tried to kill Joy, Eddie, and Jodi by putting d-CON rat poison that he stole from Walmart in the turkey meat of the spaghetti sauce he prepared for them before he went to work. [RR 39: 137-38, 145-47, 162-63; RR 41: 11, 14; SX 347C, 349A2.]

12. The evening of December 17, 2009, Applicant pretended to go to work, but he went to Freeze's apartment instead. [RR 39: 150-51; SX 347B.] It was Freeze's daughter's sixth birthday, and Applicant read the child her favorite book, which was entitled "It Could Have Been Worse." [RR 39: 147-48.]

13. Applicant left Freeze's apartment at about 11:00 p.m., stopped for gasoline at the EZ Mart in order to be seen on camera, and then headed home to kill his family. [RR 39: 39; SX 347B.] The jury watched video footage of Applicant at the store. [RR 39: 39-40.]

14. Applicant parked behind his house to avoid being seen; he took off his work shirt, white shirt, watch, and boots; and he went inside and grabbed a kitchen knife to "slit [his family members'] throats while they slept." [SX 347B.]

15. Inside the house, Applicant spent thirty to forty-five minutes contemplating whether to kill Joy, who was fourteen to fifteen weeks pregnant. [RR 39: 209; SX 347B.]

16. After resting and contemplating his actions, Applicant entered the bedroom where Joy was sleeping and stabbed her in the neck with the kitchen knife, which broke. [SX 347B.]

17. When Joy awoke and began fighting back, Applicant grabbed a baseball bat that was in the room, hit Joy repeatedly in the head until she fell to the floor, and then stabbed Joy with samurai sword replicas and a double-bladed dagger. [SX 347B.]

18. Joy suffered a total thirty-five stab wounds, including two through her heart, four through her lungs, and five through her liver; skull lacerations from being hit with the baseball bat; and a number of defensive wounds. [RR 39: 203-07, 209, 212; SX 272A.]

19. After murdering Joy, Applicant rested for about twenty minutes to catch his breath before going to Eddie's bedroom. [SX 347B.]

20. Applicant hit Eddie in the head with the baseball bat five to ten times while Eddie slept in his bed, causing multiple right-side depressed skull fractures. [RR 39: 220; SX 347B.]

21. After taking another break to catch his breath, Applicant went to Jodi's room and hit her in the head five to ten times with the baseball bat while she slept in her toddler bed, causing extensive multiple right-side skull fractures. [RR 39: 246-48, 256; SX 347B.]

22. Applicant used rolls of toilet paper to set a fire in each victim's bedroom in order to "make it look like somebody had broken in, killed them and then tried to cover it up by setting the fires." [SX 347B.]

23. Applicant disposed of the murder weapons, drove around, and stopped at various Walmart stores in order to be seen on camera and construct his alibi until it was time to return home. [RR 39: 39-44; SX 347B.] The jury watched video footage of Applicant inside the various stores. [RR 39: 40-44; SX 405B, 406B, 407B, 431.]

24. At about 5:00 a.m., Applicant returned home and tried "to be all shocked." [SX 347B.]

25. At the scene, Applicant calmly asked officers what had happened and whether everyone made it out, and he lied about where he had been when the fire began. [RR 33: 152-54, 159; SX 220D.] The jury heard an audio recording of Applicant's conversations with officers at the scene. [RR 33: 166, 171-73; SX 220D.]

26. Applicant voluntarily went to the Kennedale police station, where he gave false written and oral statements regarding his whereabouts that night. [RR 34: 158-59, 161, 163, 175-76; RR 35: 9-13, 44; SX 341B, 342.]

27. Applicant left the police station and drove to the office of his employer, Champion National Security, located in Arlington, Texas; there was nothing unusual about Applicant's demeanor, and he never mentioned that anything unusual had happened. [RR 36: 22-23, 42, 50-52; RR 42: 17.]

28. After leaving Champion's office at about 11:00 a.m. on December 18, 2009, Applicant cashed his paycheck and fled in his van to California because he knew that the authorities had the evidence to "pin" him for the murders and arson. [RR 36: 23; SX 347B.]

29. At 8:46 p.m. PST on December 19, 2009, Applicant, who was no longer wearing his wedding ring, checked in at the Coast Inn in Oceanside, California. [RR 37: 80, 82; RR 39: 106-12; SX 347B, 408B, 440, 449, 451-56.]

30. The jury watched a video showing Applicant's jovial demeanor as he checked in at the front desk of the Coast Inn. [RR 39: 46; SX 408B.]

31. Shortly after checking in at the Coast Inn, Applicant went to the topless bar next door. [RR 41: 17-22, 30, 56; RR 42: 26; SX 427.]

32. Applicant struck up a conversation with Scott Matejka on the sidewalk near the topless bar, and they smoked crack cocaine together and went to Tijuana, Mexico, so that Applicant could buy marijuana. [RR 37: 71-72; RR 41: 19, 29; RR 42: 26-32, 47.]

33. Applicant and Matejka visited a gentlemen's club in Tijuana, Mexico, but Matejka never saw Applicant actually obtain any marijuana. [RR 42: 34-35.]

34. On December 20-21, 2009, while at the San Diego County Jail under arrest on a Texas arson warrant after being detained by United States Customs and Border Protection ("CBP") officers at the Texas-Mexico border, Applicant waived his rights and voluntarily confessed on videotape and in writing that he killed his family members and set his house on fire. [RR 36: 169; RR 37: 59; SX 347B, 348, 349B.]

35. The jury viewed Applicant's videotaped confession and saw his remorseless demeanor as he calmly and casually discussed his motivations and actions before, during, and after the murders. [RR 36: 175-76; RR 41: 10; SX 347B; 347C.]

36. The jury heard medical-examiner testimony about and saw photographs of the extensive injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

37. In the fall of 2009, Applicant accessed pornographic websites and his MySpace account on a doctor's computer during a time when the doctor's office was closed and locked. [RR 42: 98-101; *see generally* RR 43: 20-47.] The jury saw examples of the material Applicant accessed. [RR 42: 104-07; SX 225-28.]

38. Results of a forensic examination of the hospital doctor's computer included 2,338 pornographic images and a profile posted by Applicant under the name of "John Long N Hard" on hornymatches.com describing himself, seeking to have women meet him at the hospital where he worked as a security guard, and giving explicit details of what he was looking for in a profile mate. [RR 43: 30-33; SX 475.]

39. Between November 13 and December 5, 2009, Applicant called and texted topless dancer Gretchen Bow, and Applicant paid Bow at least $100 each

time Bow would meet him at the club to sit and drink with him or perform for him. [RR 42: 110-13, 117-18, 122.] Text messages between Applicant and Bow were introduced into evidence. [RR 42: 116, 119.]

40. Applicant invited Bow to visit him at the hospital while he was working as a security guard so they could smoke marijuana "and [do] other things," but Bow never went. [RR 42: 115, 123.]

41. Dr. Antoinette McGarrahan, the defense's forensic psychologist and neuropsychologist, opined that Applicant murdered his family when repressed emotions flooded out in a rage at the time of the offense, but she also admitted that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

42. Applicant knew it was wrong to kill his family, but he did it anyway. [RR 44: 156.]

43. Applicant has traits of several different personality disorders, *i.e.*, narcissism, antisocial personality, schizoid personality, and borderline personality. [RR 44: 126-32, 144-45.]

44. Even with treatment, the underlying basis of Applicant's personality disorder would remain. [RR 44: 155.]

45. At the time of trial, Applicant was essentially the same person he was on December 17, 2009, when he brutally murdered his family members and set his house on fire. [*Id.*]

46. Applicant acted alone in planning, carrying out, and trying to cover up the vicious, cold-blooded, calculated murders of his three family members, and Applicant's actions before, during, and after the murders demonstrated an utter lack of remorse.

47. The circumstances of and events surrounding Applicant's murder of his family members demonstrate forethought, deliberateness, and wanton and callous disregard for the sanctity of human life.

**Conclusions of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010); *Ex parte Briggs*, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005).

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007).

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012); *Ex parte Ramirez*, 280 S.W.3d 848, 852 (Tex. Crim. App. 2007). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Such a claim must be proven by the preponderance of the evidence. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005). An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d 627, 629 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

8. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9. In reviewing the legal sufficiency of the evidence to support an affirmative finding on the future-dangerousness special issue, a court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could find beyond a reasonable doubt a probability that the defendant would commit criminal acts of violence. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008).

10. The future-dangerousness special issue requires the jury to determine beyond a reasonable doubt whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). The State

bears the burden of proof on the future-dangerousness special issue. *See Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).

11. A variety of factors may be considered in determining the future-dangerousness special issue: (a) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (b) the calculated nature of the defendant's acts; (c) the forethought and deliberateness exhibited by the crime's execution; (d) the existence of a prior criminal record, and the severity of the prior crimes; (e) the defendant's age and personal circumstances at the time of the offense; (f) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (g) psychiatric evidence; and (h) character evidence. *Reese v. State*, 33 S.W.3d 238, 245 (Tex. Crim. App. 2000); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). No one factor is dispositive, and an affirmative answer to the special issue may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors. *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim. App. 1995).

12. The circumstances of the offense "can be among the most revealing evidence of future dangerousness." *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (quoting *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)). In some instances, the circumstances of the offense and the events surrounding it may alone be sufficient to sustain an affirmative answer to the future-dangerousness special issue. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *Wilson*, 7 S.W.3d at 142; *Dinkins*, 894 S.W.2d at 358. Such instances arise, for example, when the crime is "so heinous as to display a wanton and callous disregard for human life," *Dinkins*, 894 S.W.2d at 358, or when the circumstances of the offense are sufficiently cold-blooded or calculated. *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

13. The facts of Applicant's offense are, alone, sufficient to support a finding of future dangerousness. *See, e.g.*, *Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008) (unprovoked nighttime attack against a family in which parents were killed and children nearly killed sufficient to sustain future-dangerousness finding); *Dinkins*, 894 S.W.2d at 358 (evidence of premeditated and brutal murders of two women, including multiple gunshot wounds at close range, sufficient to support affirmative answer to future-dangerousness special issue); *Joiner v. State*, 825 S.W.2d 701, 704 (Tex.

Crim. App. 1992) (evidence sufficient to support finding of future dangerousness where defendant murdered two women; first victim was stabbed four times in chest and received series of lacerations to her neck; second victim suffered forty-one stab wounds to chest, blunt force trauma and lacerations to her head, and throat was "slashed"; physical evidence suggested each victim sexually assaulted after death).

14. Even if the facts of Applicant's offense, alone, did not support a finding of future dangerousness, the facts of Applicant's offense along with the other evidence in the trial record were legally sufficient to satisfy the State's burden to prove beyond a reasonable doubt a probability that Applicant would commit criminal acts of violence that would constitute a continuing threat to society. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) (setting forth future-dangerousness special issue); *see also Ladd*, 3 S.W.3d at 213 (State bears burden on future-dangerousness special issue).

15. The future-dangerousness special issue asks if a defendant would constitute a continuing threat whether in or out of prison without regard to how long he would actually spend in prison if sentenced to life. *Lucio v. State* 351 S.W.3d 878, 903 (Tex. Crim. App. 2011); *Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010); *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010); *see Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.) (how long life-sentenced capital defendant will spend in prison "is not proper even in the context of the [future-dangerousness] special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term 'society' includes *both* the prison and non-prison populations" (emphasis in original)); *Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting reasoning of plurality opinion in *Smith*). Applicant's narrow interpretation of the future-dangerousness special issue ignores precedent and erroneously seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes within prison.

16. The circumstances found to be deficient in *Berry v. State*, 223 S.W.3d 847 (Tex. Crim. App. 2007), and *Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981), are nothing like the facts of Applicant's case, and Applicant's reliance on those decisions in the present proceeding is misplaced.

17. Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his trial and appellate counsel fell below

an objective standard of reasonableness under prevailing professional norms because any challenge at trial or on appeal to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have lacked merit and would have been futile. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("reasonably competent counsel need not perform a useless or futile act"); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d 610, 623-24 (Tex. Crim. App. 2009) (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

18. There is no reasonable probability that the outcome of the punishment phase of Applicant's trial or the outcome of Applicant's appeal would have been different had trial and appellate counsel advanced meritless challenges to the legal sufficiency of the evidence to prove Applicant's future dangerousness. *See Barrera v. State*, 978 S.W.3d 665, 668-69 (Tex. App.—Corpus Christi 1998, pet. ref'd) (no prejudice resulted from counsel's failure to raise objection that lacked merit). Therefore, Applicant has failed to meet his burden to prove by a preponderance of the evidence that the alleged deficiency of his trial and appellate counsel resulted in prejudice.

19. The Court recommends that Applicant's second claim for relief be denied.

**B. <u>Claim for Relief Three</u>**

Applicant alleges that his trial counsel were ineffective for failing to present evidence that Applicant was not a future danger through Tarrant County Jail employees who supervised him while he was confined there and through a mental-health expert such psychiatrist Susan Hardesty, M.D. [Application at 40-47.]

**Findings of Fact**

1. Applicant submits affidavits from Tarrant County Jail employees Tony Rigmaiden, Rory Thomas, and Cody Bell, who supervised Applicant while he was confined in the jail. [*See* Applicant's Exhibits 4, 20, 21.]

2. Trial counsel did not identify Rigmaiden, Thomas, or Bell during their investigation. [*See* Moore's suppl. affidavit at 3.]

3. In Moore's experience, testimony of jail personnel is often not particularly favorable to the defense by the time of trial unless there is "at least some personal relationship with, or affinity for the defendant that has developed with the officers." [Moore's suppl. affidavit at 2.]

4. Members of the defense team asked Applicant about the possibility of finding jail guards, chaplains, or other jail personnel with whom Applicant had developed a sufficiently good relationship that they might be willing to testify on his behalf, but Applicant never identified any such prospective witness and was not very encouraging that any such witnesses might be found. [Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

5. In light of Moore's experience in dealing with testimony of jail personnel, as well as the fact that Applicant never identified any such prospective witnesses and was not encouraging that such witnesses might be found, Applicant's trial counsel made a reasonable strategic determination not to send the defense team's private investigator to the jail because his efforts would be better focused on other areas that might prove more beneficial to Applicant's case. [Moore's suppl. affidavit at 2.]

6. Applicant's assertion that he did nothing to dissuade trial counsel from pursuing an investigation into Tarrant County jail staff and that he "simply could not recall the names of any specific jail staff he could recommend that counsel speak to" is unsupported by the record. [*See* Supplemental Response To State's Answer at 5.]

7. Even if Applicant could not recall a specific name, he did not even generally indicate that he had become particularly close to any Tarrant County Jail personnel who might be willing to testify for the defense, and he gave his trial counsel reason to believe that the expenditure of valuable resources in

pursuing this area would not yield anything of value to Applicant's case. [*See* Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

8.  Although Rigmaiden's, Bell's, and Thomas' names appear in jail logs contained in Applicant's Exhibit 44, nothing in those entries show that any of them had developed at least some personal relationship with or affinity for Applicant. [*See* Applicant's Exhibit 44.]

9.  Given Applicant's failure to identify any jail personnel with whom he had developed such close relationship, Applicant's lack of encouragement that such witnesses might be found, and Moore's experiences in seeking testimony from jail personnel, it was not unreasonable for trial counsel to make the strategic investigative decision to focus their efforts on areas that might prove more beneficial to Applicant's case.

10. Trial counsel presented testimony from Frank AuBuchon (the defense team's prison classification expert), Dr. McGarrahan, and lay witnesses to show Applicant's lack of disciplinary issues in jail, Applicant's lack of a violent or criminal history, and the likelihood that Applicant would adapt well to the structured environment of prison life. [RR 43: 113-14, 166, 178, 232; RR 44: 70, 73, 159; Moore's affidavit at 5-6; Cummings' affidavit at 3-4.]

11. Trial counsel stressed in closing arguments that Applicant did not pose a future danger, in part based on AuBuchon's testimony and because Applicant had no history of violence, no prior criminal history, and no issues during his incarceration in jail. [RR 45: 69, 78-81.]

12. The proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, and Bell provides no meaningful new facts about Applicant's pretrial confinement that Applicant's trial counsel did not develop through other witnesses. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; *see* Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

13. The facts that Applicant alleges should have been presented through Rigmaiden, Thomas, and Bell serve largely the same purposes as and are largely cumulative of other evidence that Applicant had no disciplinary issues while confined in jail, that he would likely adjust well to a prison

setting if he were sentenced to life without parole, and that he allegedly posed a low risk of future violence. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; Moore's affidavit at 5-6; Moore's suppl. affidavit at 2-3.]

14. Applicant overrates the potential impact of the facts contained in the habeas affidavits of Rigmaiden, Thomas, and Bell and unfairly overlooks or underrates the testimony presented through Dr. McGarrahan, AuBuchon, and lay witnesses. [*See* Application at 42-45; *see also* RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; RR 45: 69, 78-81; Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

15. Applicant's assertion that his trial counsel never addressed the issue of whether Applicant as an individual possessed a likelihood of committing acts of violence in the future "is simply not true" in light of the evidence presented at Applicant's trial. [Moore's supplemental affidavit at 2-3; *see* Supplemental Response To State's Answer at 7.]

16. Applicant's Tarrant County Jail records attached to Cummings' habeas affidavit reflect that during Applicant's confinement he was classified as "High Custody," required MHMR services, and was on suicide watch. [Cummings' affidavit at 5 & jail records attached thereto.]

17. Applicant's Tarrant County Jail records showing Applicant was closely supervised and classified as "High Custody" would have provided little, if any, benefit to Applicant's punishment case because Applicant's jury could have reasonably assumed that Applicant had no disciplinary issues in jail because his classification left him little opportunity to violate the rules or because Applicant was on his best behavior pending his capital-murder trial where he faced the death penalty.

18. Applicant asserts that trial counsel should have retained a mental-health expert such as Dr. Hardesty, a psychiatrist, "to explain how [Applicant's] past patterns of behavior and mental status did not support a finding that he would be a future danger" and to explain that he was a low risk to commit future acts of violence in a prison setting because he would be unlikely to encounter the severe familial and financial stressors that plagued him before the crime. [Application at 46; *see* Applicant's Exhibit 1.]

19. Trial counsel thoroughly investigated Applicant's background and upbringing in order to determine how those factors may have influenced Applicant's behavior in murdering his family members. [Moore's affidavit at 7.]

20. Trial counsel presented testimony from the available lay and expert witnesses and gave the jury as complete a picture as possible of Applicant's life history from his childhood until he murdered his family members and was confined in jail.

21. Trial counsel discussed potential mental-health experts whom they might use in Applicant's case, they contacted several mental-health experts, and they decided to retain Dr. McGarrahan, a highly qualified forensic psychologist and neuropsychologist, because of Moore's previous work with her, Moore's opinion of her abilities, her reputation in the legal community, and her good professional relationship with J. Randall Price, Ph.D., the forensic psychologist and neuropsychologist retained by the State in this case. [Moore's affidavit at 7.]

22. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

23. Dr. McGarrahan based her testimony on nearly eleven hours evaluating Applicant and interviewing Applicant about his "entire social history," reviewing a large volume of records and videos regarding Applicant, talking to Applicant's sister and mother, reviewing medical records of Applicant's mother, and reviewing psychological test data from Dr. Price's evaluation of Applicant. [RR 44: 121-24.]

24. Trial counsel and Dr. McGarrahan collaborated and made a reasonable strategic decision that it was not in Applicant's best interest and would not benefit Applicant's case to have Dr. McGarrahan or another expert in risk assessment perform a formal violence risk assessment of Applicant. [Moore's affidavit at 7-8.]

25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Affidavit of J. Randall Price, Ph.D. at 1-2 (hereinafter referred to as "Dr. Price's affidavit").]

26. Dr. Hardesty's proposed testimony would have opened the door to damaging testimony from Dr. Price, which would have been devastating to the defense and which would have outweighed any potential benefit to be gained from Dr. Hardesty's proposed testimony. [Moore's affidavit at 8; Cummings' affidavit at 6.]

27. Dr. Hardesty's opinion that Applicant would not pose a future risk of violence, even if it were determined to be admissible at trial, is not so compelling that it would have changed the jury's answer to the future-dangerousness special issue, especially in light of State's powerful evidence that Applicant posed a future danger. [*See* Applicant's Exhibit 1.]

28. Dr. Hardesty's habeas affidavit does not disclose the scientific methodology by which she reached her opinion or contain any objective source material to substantiate the validity or appropriateness of her methodology. [*See* Applicant's Exhibit 1.]

29. Dr. Hardesty's opinions contained in her habeas affidavit rest solely on her personal assessment of Applicant's future dangerousness, not upon any standardized risk assessment measures or any scientific or statistical comparisons. [Applicant's Exhibit 1; *see* Moore's affidavit at 8-9 (expressing belief that Dr. Hardesty's opinion "would be essentially the same type of testimony that the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to *Daubert*" when offered by the State).]

30. Dr. Hardesty's assertions that Applicant, while incarcerated, would not experience the stressors that were antecedents to his crimes and that Applicant would not encounter "a relational model that would be iterative of attachment" are unrealistic assessments of the life in prison that Applicant could face if he were incarcerated on a sentence of life without parole. [Moore's affidavit at 9; *see* Applicant's Exhibit 1.]

31. Trial counsel made a well-reasoned strategic decision based on their thorough investigation, their professional judgment, and their reliance on a well-qualified mental-health expert about how to best present evidence that Applicant would not constitute a future danger if he received a sentence of life without parole instead of death.

32. Even after reviewing the opinions contained in Dr. Hardesty's affidavit, Moore does not question that he and Cummings made the correct decision about how to best present Applicant's case at the punishment phase of the trial. [*See* Moore's affidavit at 9.]

33. Applicant's annihilation of his family, and his demeanor and actions before and afterward (many of which were documented on video recordings seen by the jury), demonstrated Applicant's cold-hearted capacity for extreme violence and sufficed to establish his future dangerousness.

34. The Court rejects Applicant's claim that he had "never committed a single act of violence in his life before this crime." [Supplemental Response to State's Answer at 8 n.3.] Applicant researched the effects of rat poison on humans and tried to poison his family, which exhibited Applicant's desire and propensity to commit acts of violence by killing his family in a brutal manner so that he could be free to pursue a relationship with Freeze. [RR 41: 11, 14; RR 43: 36-40; SX 228, 347C, 349A2.]

35. In Moore's experience in ten death-penalty cases tried to verdict, the facts of the particular offense on trial are "generally paramount" in the jury's determination of the future-dangerousness special issue. [Moore's suppl. affidavit at 4.]

36. In Moore's opinion, Applicant's actions before and during the vicious murders of his family members had an "indelible impact" on the jury that was "probably impossible for anyone to overcome." [Moore's suppl. affidavit at 4.]

37. Trial counsel exercised their prerogative not to call prison employees or a psychiatrist such as Dr. Hardesty to testify at the punishment phase of Applicant's trial on the issue of future dangerousness.

38. Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present testimony from jail personnel on the issue of future dangerousness during the punishment phase of a death-penalty trial.

39. Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present expert testimony such as that proffered by Dr. Hardesty on the issue of future dangerousness during the punishment phase of a death-penalty trial.

40. The failure of trial counsel to discover Rigmaiden, Thomas, and Bell or to retain Dr. Hardesty was not the result of inadequate investigation or preparation of Applicant's case.

41. Applicant's trial counsel performed well within the wide range of reasonable professional assistance in conducting the investigation of Applicant's case and making strategic decisions about what areas of investigation to pursue, what evidence to present, and what witnesses to call in an effort to obtain a favorable answer to the future-dangerousness special issue.

42. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

43. Applicant's allegations of ineffective assistance are conclusory.

44. It is not reasonable to believe that the proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, Bell, and Dr. Hardesty, when weighed along with the remaining relevant evidence contained in the record, would have significantly diminished the powerful impact of the State's evidence of Applicant's future dangerousness and caused the jury to answer the future-dangerousness special issue differently.

**Conclusions of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

6.  In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7.  Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8.  Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d 713, 728-29 (Tex. Crim. App. 2006).

9.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

12. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Austin 1989, pet. ref'd).

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518.

14. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty at trial is not alone a basis to prove a claim of ineffective assistance. The fact that Applicant's habeas counsel now believe that another type of expert witness should have been called to testify on the issue of future dangerousness does not support an allegation of ineffective assistance. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance"); *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (same).

15. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987) ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

16. The failure to present essentially cumulative testimony that Applicant would not pose a future danger if he were sentenced to life without parole instead of death did not constitute deficient performance. *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (counsel's decision not to present

cumulative testimony does not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *Id.* at 1518 ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required").

17. Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present evidence that Applicant would not constitute a future danger if he were sentenced to life without parole instead of death. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight).

18. Dr. Hardesty's proffered opinions of Applicant's future dangerousness do not satisfy the reliability requirements of TEX. R. EVID. 702 because her determination that Applicant would not be a future danger if he were sentenced to life in prison is the same type of unreliable prediction of future dangerousness rejected as unreliable in *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).

19. Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting evidence that Applicant would not pose a future danger if he were sentenced to life without parole fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

20. Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the future-dangerousness special issue differently had counsel called Rigmaiden, Thomas, Bell, and Dr. Hardesty to testify at his trial. *See Ex parte Medina*, 361 S.W.3d 633, 644 (Tex. Crim.

App. 2011) (providing prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

21. Given the cumulative nature of the evidence contained in the habeas affidavits of Rigmaiden, Thomas, and Bell, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue differently had trial counsel discovered and called those witnesses to testify during the punishment phase of Applicant's trial. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir. 2009) (upholding state court's finding of no prejudice where additional testimony was cumulative).

22. There is no reasonable probability that the proposed testimony of Rigmaiden, Thomas, Bell, and Dr. Hardesty would have persuaded Applicant's jury to answer the future-dangerousness special issue differently. This is especially true given that the weight of the aggravating facts was staggering and presented a powerful case to meet the State's burden to prove beyond a reasonable doubt that Applicant constituted a future danger and in light of the fact that the jury heard other lay and expert testimony that Applicant had never been violent, that he had no disciplinary issues in jail and no prior criminal history, that he committed the murders when emotions he repressed his entire life flooded out, and that he would likely adjust very well to the prison environment. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable.

23. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

24. The Court recommends that Applicant's third claim for relief be denied.

C. **Claim for Relief Four**

Applicant alleges that trial counsel were ineffective for failing to present expert testimony of a "social history expert witness" such as social worker Laura Smith to explain to the jury "how [Applicant's] life history shaped the person that he became later in life." [Application at 47-50.]

**Findings Of Fact**

1. Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial, but he is unaware of any legal requirement to use a "social history expert witness" in every such case in order to accomplish that purpose. [Moore's affidavit at 10.]

2. Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3. Prevailing professional norms do not require trial counsel in a death-penalty case to retain a "social history expert witness" such as social worker Smith or to call such a witness to testify at the punishment phase of a death-penalty trial.

4. Applicant's defense team included an experienced mitigation specialist with a master's degree and license in social work and an experienced private investigator. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

5. Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the charged offense. [Moore's affidavit at 7.]

6. Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

7. Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

8. Many people contacted by the defense team either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

9. The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom the team contacted. [Moore's affidavit at 14.]

13. Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14. Trial counsel presented all of the witnesses whom they were able to locate and convince to testify and whom they thought were necessary to develop

the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10; Cummings' affidavit at 6.]

15. Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16. At the request of Applicant's trial counsel, Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist, administered a full neuropsychological evaluation as well as personality and emotional testing involving twenty to thirty different tasks and instruments to Applicant over about eleven hours total on October 13 and December 20, 2010. [RR 44: 118-22.]

17. Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, correspondence from Applicant's sister Neata to Applicant, medical records for Applicant's mother, and psychological test data from Applicant's evaluation by Dr. Price, the State's forensic psychologist and neuropsychologist; she spoke to Neata and Jackie; she performed a clinical interview to ask Applicant about his "entire social history"; she conducted a mental-status examination during which she observed Applicant and discussed with Applicant any psychiatric symptoms he was having; and she discussed the offenses with Applicant in great detail. [RR 44: 121-24.]

18. Trial counsel discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Applicant. [Moore's affidavit at 7.]

19. The defense team discussed various mitigation themes as they came to light, including Applicant's participation in role-playing games; Applicant's use of marijuana, alcohol, and other drugs; the possibility that Applicant suffered from being raised in poverty; the possibility that Applicant had a mental disorder or illness; the possibility that Applicant observed sexual abuse in his household; and the possibility that Applicant was abused or neglected as a child. [Cummings' affidavit at 7.]

20. Trial counsel conducted a thorough investigation and made the strategic decision that the most effective way to develop Applicant's mitigation case was to present evidence of Applicant's life history through the available lay witnesses and then to use that story as a basis for the opinions offered by Dr.

McGarrahan about how Applicant's life history shaped the person he became later in life and how it related to his commission of the murders. [Moore's affidavit at 10; Cummings' affidavit at 6; Moore's suppl. affidavit at 5-6.]

21. Contrary to Applicant's assertions, Applicant's trial counsel *did* present expert testimony about Applicant's life history through Dr. McGarrahan to develop the relevant social history as part of Applicant's mitigation case. [Dr. Price's affidavit at 3-4.]

22. Dr. McGarrahan's testimony during the punishment phase of Applicant's trial illuminated how Applicant's life history shaped the person he became later in life and related to Applicant's murders of his family members. [*See generally* RR 44: 118-63.]

23. Dr. McGarrahan testified during the punishment phase of Applicant's trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

24. Dr. McGarrahan opined that Applicant murdered his family when the emotions he had repressed for thirty-five years flooded out in an emotional rage at the time of the offense; she admitted, however, that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

25. Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness who was at least as qualified as a "social history expert witness" such as social worker Smith to develop a comprehensive social history and present her findings to the jury, and she testified effectively and credibly regarding Applicant's relevant life history. [Dr. Price's affidavit at 3-4.]

26. There is no reason to believe that Applicant's jury would have been more persuaded by the testimony of a social worker like Smith than it was by a well-qualified forensic psychologist and neuropsychologist like Dr. McGarrahan, who communicated effectively and used minimal technical jargon while testifying to the same or similar topics. [*See* Moore's suppl. affidavit at 5; Dr. Price's affidavit at 2-4; RR 44: 118-63.]

27. The *substance* of the testimony from Dr. McGarrahan and other witnesses developed the important facts of Applicant's life and life events and gave the jury a sufficiently complete understanding of Applicant's life history. [*See* Moore's suppl. affidavit at 6.]

28. Trial counsel presented the necessary facts and developed the expert testimony necessary to present Applicant's mitigation case to the jury without retaining Smith and calling her to testify at trial. [Moore's affidavit at 11.]

29. Trial counsel exercised sound trial strategy based on a thorough investigation in determining what witnesses to call at trial and how to best present Applicant's mitigation case to the jury.

30. Trial counsel exercised their prerogative to rely on lay witnesses and Dr. McGarrahan rather than a "social history expert witness" such as social worker Smith.

31. Even if a "social history expert witness" such as social worker Smith could have helped the jury to understand how Applicant's life events impacted him, Moore's extensive experience has taught him that jurors often ascribe relatively little importance to opinion testimony of the type contained in Smith's affidavits. [Moore's supplemental affidavit at 5.]

32. Smith's habeas affidavit provides a lengthy recitation of Applicant's life history taken from lay-witness testimony at trial, lay-witness affidavits obtained by Applicant's habeas counsel, records pertaining to Applicant, and Smith's five-hour interview with Applicant at the Polunsky Unit. [Applicant's Exhibit 2.] However, Smith offers no explanation of how her opinions and proposed testimony might have been different had she been limited to the testimony available to trial counsel at the time of Applicant's trial. [*Id.*]

33. Applicant offers no explanation how Dr. McGarrahan's evaluation of Applicant and the subject matter of her testimony were deficient or why testimony from a social worker such as Smith would have been more persuasive to the jury. [*See* Application at 47-62.]

34. Smith's explanation of Applicant's actions surrounding the murder of his family members would not have been more valuable, persuasive, or credible to the jury than the trial testimony of Dr. McGarrahan and the lay witnesses. [Moore's suppl. affidavit at 5.]

35. Smith's affidavit contains no meaningful facts or any necessary expert opinions that trial counsel did not cover in the mitigation presentation at trial [Moore's affidavit at 11; Moore's suppl. affidavit at 5] or that would have persuaded the jury to answer the mitigation special issue differently.

36. Applicant's trial counsel acted reasonably in relying on Dr. McGarrahan to relate the relevant social-history issues to the jury. [Dr. Price's affidavit at 4.]

37. Applicant simply criticizes the manner in which his experienced trial counsel presented his life history rather than alleging an outright failure to present such facts. [Moore's suppl. affidavit at 5.]

38. Applicant's jury could evaluate the testimony provided by lay witnesses and Dr. McGarrahan and could determine without hearing from a "social history expert witness" such as Smith whether any of the trial testimony justified a "yes" answer to the mitigation special issue.

39. The information contained in Smith's habeas affidavit would not have made Applicant's mitigating evidence more compelling, understandable, or different; it would not have tipped the scales against the powerful aggravating facts presented by the State or changed Applicant's sentence. [Moore's affidavit at 6.]

40. The failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith did not result from an inadequate investigation or inadequate preparation of Applicant's mitigation case.

41. It is not reasonable to believe that the proposed testimony contained in the habeas affidavit of social worker Smith, when considered together with the remaining relevant evidence contained in the record, would have diminished the powerful impact of the aggravating evidence and persuaded the jury to answer the mitigation special issue differently.

42. Applicant incorrectly seeks to have this Court overlook the mitigation facts and themes actually investigated and presented by his trial counsel and to second-guess counsel for not calling a different witness who may have presented the evidence differently. [Supplemental Response To State's Answer at 9-13; Moore's suppl. affidavit at 5.]

43. Applicant's allegation of prejudice is conclusory.

44. Applicant's claim for relief second-guesses in hindsight the strategic decisions of his trial counsel about what witnesses to call and about how to best present Applicant's mitigation case to the jury.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of

counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than a social worker such as Smith to testify about Applicant's life and its effects on him is not alone a basis to support a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been called to testify. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

8. Applicant's trial counsel were not ineffective for failing to present largely cumulative testimony such as that contained in Smith's habeas affidavit. *See Coble*, 496 F.3d at 436 (decision not to present cumulative testimony does

not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

9. The strategic decisions made by Applicant's trial counsel based on a thorough investigation about what witnesses to call to testify and how to best present Applicant's mitigation case were matters of trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427.

10. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller*, 810 F.2d at 1410 ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander*, 775 F.2d at 602).

11. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located a different expert who could have testified to the same or similar subject matter does not support Applicant's claim of ineffective assistance.

12. Applicant's jury did not require the assistance of a social worker such as Smith in order to evaluate the testimony presented by Applicant's lay and expert witnesses and to determine the appropriate answer to the mitigation special issue. *See Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (jury did not need expert testimony to understand "humanizing" evidence; jury "could use its common sense or own sense of mercy").

13. Applicant's complain constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present mitigation evidence at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 389 S.W.3d at 633-34 ("Both prongs

of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

14. Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting mitigating evidence at trial fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's allegations are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

15. Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the mitigation special issue differently had counsel called a "social history expert witness" such as Smith to testify. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

16. There is no reasonable probability that, but for the failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith, the jury would have answered the mitigation special issue "yes" instead of "no." The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. The record does not affirmatively demonstrate Applicant's claims, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

17. The Court recommends that Applicant's fourth claim for relief be denied.

### D. Claim for Relief Five

Applicant alleges that his trial counsel were ineffective for failing to present testimony from relevant lay witnesses that was necessary for the jury to properly weigh whether Applicant deserved a life sentence. [Application at 62-63.] Specifically, Applicant contends that counsel failed to uncover significant areas of mitigating evidence, present witnesses from throughout his life, and discover that lay witnesses whom they called to testify had more information to provide about Applicant's life. [*Id.*]

**Findings Of Fact**

1. Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial. [Moore's affidavit at 10.]

2. Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3. Based on the wantonness and severity of Applicant's crime, trial counsel needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel concentrated their efforts in those areas they felt would be most productive. [Moore's suppl. affidavit at 7-8.]

4. Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

5. Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the murders. [Moore's affidavit at 7.]

6. Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

7. Many people whom the defense team contacted either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

8. The defense team identified and interviewed every potential witness it could locate. [Cummings' affidavit at 6.]

9. The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom they contacted. [Moore's affidavit at 14.]

13. Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14. Trial counsel presented all of the witnesses whom they were able to locate and convince to testify, whom they thought could provide admissible relevant mitigation evidence about Applicant, and who were necessary to develop the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10, 16; Cummings' affidavit at 6, 8.]

15. Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16. Trial counsel called a number of lay and expert witnesses to testify at the punishment phase of Applicant's trial: Haila Scoggins, who taught Applicant during his four years in high school; Tommy Stribble, who sponsored and explained Applicant's permanent school records spanning from elementary school through high school; Mark Pack, who was Applicant's childhood friend; Christy Pack, who is Mark Pack's wife; Linda Pack, who was Jackie's best friend for about ten years and spent time with her family at the Hummel's farm; Parris, who was Applicant's friend and spent time at the Hummel home; Stephanie Bennett, who dated Applicant during his senior year in high school; Letti Hubertz, who began a relationship with Applicant in California while he was in the Marines and moved with him to South Carolina following his discharge from the military; Applicant's older sister Neata; Dr. McGarrahan, a forensic psychologist and neuropsychologist; and AuBuchon, the defense's prison classification expert

17. The lay witnesses called to testify by Applicant's trial counsel presented evidence about a variety of matters including Applicant's childhood, family life, school years, work history, medical history, and military service.

a. Applicant was born to Jackie and John Hummel, Sr., at Arlington Memorial Hospital when the Hummels lived in Grand Prairie, Texas. [RR 43: 209.] Neata, Applicant's only sibling, was nine and a half years older than Applicant. [RR 43: 208.]

b. From the time Applicant was born, Jackie placed full responsibility for Applicant's care on young Neata and often left the children home alone. [RR 43: 210-11, 215-16.]

c. Applicant's family moved to South Carolina when Applicant was three years old, and five years later the family moved to a small cinder-block house that was set far off the road on a 400-acre farm in Jonesville, South Carolina, where they lived a "cloistered existence." [RR 43: 105-06, 113, 125, 160, 208-10.]

d. When Parris visited the farm where the Hummel family lived, he and Applicant would fish, play video games, play outside in the hay, and "just do boys stuff." [RR 43: 155, 164.]

e. Applicant's parents controlled who Applicant and Neata could have as friends and did not allow Applicant and Neata to visit other people's houses, with the exception of going to the house of Jackie's best friend Linda Pack to play with the Pack children. [RR 43: 160, 219-20, 250.]

f. When the Pack family ate lunch at the Hummel home almost every Sunday after church for a number of years, Applicant would keep to himself and play video games in his or Neata's bedroom. [RR 43: 105, 109, 123-24, 126, 129, 135-37.]

g. Jackie was very generous and extravagant with the Pack children, but not at all with Applicant and Neata. [RR 43: 110-11, 127, 134, 140-41, 229-30.]

h. Applicant's parents were very strict; they never showed Applicant and Neata any affection; and they did not hug, kiss, or hold the children. [RR 43: 111, 211-21, 249-50.]

i. Applicant and Neata were expected to respond quickly when their parents told them to do something, they did not talk back to their parents, and they were often disciplined with a belt if they did not do as they were told. [RR 43: 119, 128, 139-40, 213-14, 218, 250.]

j. Neata felt that her parents were abusive toward her and Applicant. [RR 43: 221.]

j. Mark Pack witnessed John Sr. throw a twelve- or thirteen-year-old Applicant off of a tractor when Applicant drove the tractor too close to a cow. [RR 43: 111-12.] Parris witnessed John Sr. hit Applicant on two occasions: (1) he hit Applicant with a belt eight or more times on the back, front, head, and shoulders as punishment for turning a bull loose; and (2) he hit Applicant four or five times on the back with a broom handle when Applicant was accused of kicking a cat. [RR 43: 152-54.]

k. When Neata was seventeen years old, she saw another woman performing oral sex on her father; Applicant was asleep in the room with Neata. [RR 43: 252.] When Parris' mother would walk through the kitchen at the Hummel home, John Sr. would "smack her on the butt and that type of deal." [RR 43: 155.]

l. Applicant was a quiet, pleasant, cooperative, and responsible high school student who had no problems with other students, although he did not interact much with them. [RR 43: 60-61.] He graduated with a cumulative GPA of 2.515 and ranked twentieth in a senior class of forty-five students, but he was considered a special-education student because of his learning disability related to spelling and grammar. [RR 43: 68-70, 91.] Trial counsel introduced evidence regarding Applicant's permanent school records spanning from elementary school through high school. [*See generally* RR 43: 75-94.] Applicant's parents did not seem interested in Applicant's education. [RR 43: 55-56.]

m. Applicant participated in a graphic art club in ninth and tenth grades and in ROTC in eleventh grade; as a senior, Applicant came in second place in an art contest for a logo he designed for Project Hope. [RR 43: 92-93.]

n. The Hummels' wood-burning stove caused Applicant to smell like bacon, and Applicant did not like that his classmates nicknamed him "Bacon" as a result. [RR 43: 156, 223.]

o. Applicant's friends thought Applicant was "stupid." [RR 43: 119-20, 159, 161.]

p. Applicant played video games and Dungeons and Dragons. [RR 43: 65.]

q. Applicant dated Bennett for about a year during his senior year of high school, but she broke up with him because he wanted to marry her after high school and she was not ready for that type of relationship. [RR 43: 172-76, 182.] Applicant cried and was hurt when Bennett broke up with him. [RR 43: 177.] Bennett remembered Applicant as a nice guy who treated her appropriately and who knew how to act around women; she saw nothing to suggest that Applicant would be capable of killing four people. [RR 43: 174, 178, 180-81, 183.]

r. Applicant moved into an apartment with a friend when he was nineteen or twenty years old. [RR 43: 225.]

s. Applicant joined the Marines on his twenty-second birthday and went to boot camp the same day. [RR 43: 225.]

t. In 2002, near the end of Applicant's service in the Marines, Applicant began a six-month romantic relationship with Hubertz, who was pregnant with another man's child, and they moved together to South Carolina in May 2002 when Applicant was discharged from the Marines. [RR 43: 187-89, 199, 225.] Applicant worked and had a home life with Hubertz, Applicant gave Hubertz's son his last name, and Hubertz did not know Applicant to frequent bars or strip clubs or to use drugs. [RR 43: 191-94, 199, 203-04, 226.] Applicant treated Hubertz with respect and was never abusive. [RR 43: 192-93.] A few weeks after Hubertz's son was born, Applicant agreed for his sister to send Hubertz and her newborn son on a bus back to California. [RR 43: 195-97, 227-28.]

u. Applicant was more self-assured and had more self-esteem when he returned to South Carolina after serving in the military. [RR 43: 157, 166.]

v. When Applicant went to strip clubs after returning from the military, Applicant would get too attached to the dancers, and, if someone showed Applicant any interest, "all of a sudden he was in love." [RR 43: 157-59.]

w. Applicant moved to Texas, where he met Joy. [RR 43: 228.]

x. Neata did not think that Applicant and Joy seemed like a happy loving couple, but Applicant acted "[w]onderful" toward Jodi. [RR 43: 253.]

y. Applicant had colitis and underwent surgery to remove part of his intestines, resulting in Applicant having a colostomy bag for about a year afterward. [RR 43: 230.] Applicant was unemployed during the time that he had medical problems, and Joy would nag Applicant about not having enough money for food. [RR 43: 230-33.]

z. Witnesses testified that they had never seen Applicant become violent with anyone. [RR 43: 113-14, 166, 178, 232.] When Applicant became frustrated or mad, he "[j]ust ball[ed] up, like he was holding everything in," turned "beet red," and clinched up. [RR 43: 114; *see* RR 43: 232.]

18. Dr. McGarrahan testified about how Applicant's mental health and life history affected the person he became and related to the murders of his family members.

a. Applicant has a learning disability in the area of spelling. [RR 44: 125.]

b. Applicant has a full-scale IQ score of 109, which falls in the average to almost high-average range. [RR 44: 125-26.]

c. Applicant does not suffer from a severe mental disorder or primary psychiatric condition, although he showed mild depression and anxiety. [RR 44: 126, 145.]

d. Applicant has traits of several personality disorders, *i.e.*, narcissism, antisocial, schizoid, and borderline. [RR 44: 126-27.] A personality disorder is a longstanding enduring maladaptive way of interacting with the world which often causes an individual to have a great deal of impairment in the ability to interact with the world. [RR 44: 127.] Personality disorders affect how a person thinks, feels, and behaves in his ability to control his impulses. [RR 44: 127.]

e. Narcissists are often demanding and need attention, affection, and admiration. [RR 44: 128.] They have very high thoughts of themselves and often lack empathy. [RR 44: 129.] Their outward self-esteem is often developed as a way to defend against feelings of very low self-esteem due to failure and lack of accomplishments in life. [RR 44: 129.] Sometimes they exploit or step on others to get what they need in life. [RR 44: 129.]

f. Applicant meets the adult criteria for antisocial personality disorder, which is someone who has difficulty conforming to societal standards. [RR 44: 130-31.] Persons with adult antisocial personality disorder are irresponsible in many areas of their lives, they are often underachievers, they can be deceitful and manipulative, and they are impulsive. [RR 44: 130.]

g. Persons with schizoid personality disorder have a long-standing pattern of detachment in their relationships with others. [RR 44: 131.] They often appear "flat," *i.e.*, there is not emotional expression on their faces, and they may not express much emotion over time. [RR 44: 131.] Other than close family members, they are essentially unable to form attachments with others. [RR 44: 132.]

h. Individuals with a diagnosis of borderline personality disorder often lack direction about their plan for life and what their goals are going to be. [RR 44: 132.] They chronically feel empty inside, so they are always searching for something that they are unable to fill. [RR 44: 132.]

i. Development of a personality disorder is out of a person's control; it develops over time as a result of experiences with the world and biological makeup. [RR 44: 128.]

j. Dr. McGarrahan absolutely believed that the environment in which Applicant was raised was a major contributing factor to his personality makeup as an adult. [RR 44: 133, 135.] Applicant's mother came from an emotionally neglectful home herself, and she did not develop the skills or ability to show affection, attention, or nurturing. [RR 44: 135.] Applicant's mother's caregiving was inconsistent, and there was emotional and psychological neglect of Applicant and Neata. [RR 44: 133-34.] The caregiving duties were

given to young Neata. [RR 44: 135.] Applicant's mother did not play with Applicant and Neata, put them on her lap, hug them, tell them she loved them, or give them affection. [RR 44: 133, 135.]

k. The internal emotions that people experience do not develop if critical periods are missed early in life. [RR 44: 136.] Learning to appropriately express emotions comes along with early development from watching others model it and having the opportunity to express emotions. [RR 44: 136.] However, emotions were not allowed to be expressed in the Hummel home; Applicant's emotions were controlled by his mother. [RR 44: 136-37.] Applicant feels emotions, but he is unable to express them. [RR 44: 136.]

l. Dr. McGarrahan opined that Applicant repressed his emotions for over thirty years, that he did not know how to express his emotions appropriately, and that the repressed emotions came out in a flood of emotional rage at the time of the murders. [RR 44: 138.] Applicant was not doing much thinking; he was operating on pure emotion at the time. [RR 44: 138-39.]

m. In Applicant's San Diego confession, Applicant appeared to be very blunt, unaffected, and unfeeling because after committing the murders his flood of emotion was out and he was back to having difficulty showing what he was feeling and experiencing. [RR 44: 140.]

n. There is a hereditary component to Applicant's personality, which is supported by the fact that Applicant's mother and sister exhibit the same types of personality issues. [RR 44: 140.] Applicant, his mother, and his sister all have a very difficult time expressing their emotions, and they all come across as cold and unfeeling at times. [RR 44: 140-41.]

o. Applicant could not express a good reason why he committed the murders of his family members other than that he had been thinking about wrongs done to him dating back to fourth grade that most people would have long forgotten. [RR 44: 141.] "And all of the wrongs done to him from elementary school through junior high, high school into the military, his acquaintances who made fun of him, the stressors he was dealing with at home, all built up and came out in an explosive rage." [RR 44: 141.]

p. Applicant stated that Joy and Eddie criticized and nagged him about his lack of a job at times, his inability to do things around the house, and his medical problems. [RR 44: 142.]

q. Applicant told Dr. McGarrahan that, in the months leading up to the offense, he rapidly fell in love with Freeze and that being single more and more attractive so that he might pursue a life with her even though he intellectually knew that Freeze did not feel the same way about him. [RR 44: 142.] With Applicant's personality makeup, any affection or attention became emotional for him or became what Applicant thought was emotional. [RR 44: 143.] This was evident in Applicant's history that, if a woman showed him some attention, even if it was a stripper or a casual acquaintance, it quickly developed into what Applicant thought love was supposed to be in a relationship with a man and a woman. [RR 44: 143-44.] Applicant was looking for a loving relationship, but he did not know how to go about getting it. [RR 44: 144.]

r. One important thing in Applicant's personality is his inability to form and maintain close relationships, including with close relatives such as his mother and sister. [RR 44: 144.]

s. The issues regarding Applicant's personality, the genesis of which was his childhood, played a big role in his commission of the murders. [RR 44: 145.] As a result of repressing his emotions, in the weeks leading up to the offense, Applicant was fixating on conduct dating back to grade school because he was not allowed to deal with his emotions at the time. [RR 44: 145.] A lifetime of Applicant repressing his emotions led to this event. [RR 44: 158.]

t. Applicant told Dr. McGarrahan that he loved his daughter, and he could not explain why he murdered her. [RR 44: 158.]

u. Applicant did not decide to have personality issues; these issues were visited upon him by heredity and his environment. [RR 44: 159.]

v. Based on Applicant's jail and military records, Applicant has done fairly well in structured environments. [RR 44: 159.] Although Applicant had a time when he left his military post without

permission, he also received several commendations for his military service and was honorably discharged from the service. [RR 44: 160.]

19. Testimony from other witnesses at the guilt-innocence and punishment phases of the trial shed further light on Applicant's life history.

a. Applicant and Joy married in a very small wedding while Joy was pregnant with Jodi. [RR 44: 8.]

b. Applicant and Joy faced financial hardships every month, and Joy's friends helped out the couple from time to time. [RR 40: 17-18; RR 44: 9.]

c. Applicant could not work for several years because of a hurt back and because of his Crohn's disease. [RR 44: 9, 16.] Applicant had surgeries, and he had a colostomy bag for a period of time. [RR 44: 16.]

d. Applicant and Joy continued to struggle financially even after Applicant got his job as a security guard. [RR 44: 16.]

e. Christopher Paris, a State's witness, testified that he knew Applicant from church, that he and his wife were in a Sunday school class with Applicant and Joy, that the two couples gathered "on occasion" for events outside church, that he had been to the Hummel home two or three times, and that he knew the Hummels to be a close family unit. [RR 36: 58, 87.]

f. When the Hummel family's vehicle was totaled, the Sunday school class pulled together to fund the down payment on a minivan, and Paris took Joy to buy the vehicle. [RR 36: 59.]

g. Paris visited Applicant in the Tarrant County Jail for a while, and he occasionally brought Applicant's mother to the jail to visit Applicant. [RR 36: 89.]

h. In the Marines, Applicant was an intelligence clerk with a security clearance. [RR 45: 18-19, 29.]

i. Lieutenant Colonel Michael Doughtery described Applicant as a "pretty average, marginally effective" Marine. [RR 45: 11, 20.]

j. Doughtery found Applicant to be fairly good-natured and happy-go-lucky; if Applicant became frustrated or angry, he became silent and his face muscles tensed. [RR 45: 13.]

k. Although Applicant received a number of military commendations and awards, all but one (a basic rifleman's badge from boot camp) were given to the unit as a whole. [RR 45: 16-17, 27.]

l. Applicant never earned a good-conduct medal, which would have required him to complete three uninterrupted years of service with no nonjudicial punishments. [RR 45: 15.]

m. During Applicant's military service, Applicant and Buddy Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Doughtery thought would lead them down the wrong path. [RR 45: 12, 23.] Doughtery counseled both Applicant and Matthias on the matter. [RR 45: 12.]

n. Applicant had several entries in his military records for failing to maintain his weight and pass the physical fitness test. [RR 45: 30, 34-35.]

o. Captain Sergio Santos testified that Applicant was not a very impressive Marine at all. [RR 45: 34.]

p. In May 2000, Applicant went AWOL from his post for a period under twenty hours and had his pay docked for a month as a result. [RR 45: 35, 44, 46.]

q. Santos revoked Applicant's security clearance because he found Applicant to be untrustworthy. [RR 45: 36.]

r. The paperwork to revoke Applicant's security clearance states that Applicant lied to his seniors on numerous occasions and that his integrity was questionable. [RR 45: 38, 45.]

s. Applicant was a lance corporal when he was honorably discharged from the Marines. [RR 45: 43-44.]

20. Moore talked to Applicant's maternal uncle Thomas Hamilton during the pretrial investigation and made a strategic decision that it was not in Applicant's best interest to call Hamilton to testify because Hamilton did not support the allegations of abuse made by Neata and other witnesses, he was very defensive of his sister Jackie, and his testimony was inconsistent with that of other witnesses. [Moore's affidavit at 15.]

21. Cummings talked to George Goodson, a former neighbor of Applicant and Joy, during the investigation of Applicant's case; however, Goodson did not want to testify at Applicant's trial, and counsel ultimately made a strategic decision that it was not in Applicant's best interest to call Goodson as a witness. [Moore's affidavit at 15.]

22. The failure to locate Brian Jeter, Joseph Patterson, Chad Brown, and Shana Fowler as mitigation witnesses did not result from an inadequate investigation into Applicant's life history, and Applicant has not shown otherwise.

23. The defense team obtained Lance DuPre's name and exhausted every lead it had in trying to contact him in person or by telephone, but he never contacted the defense. [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts made to locate and interview DuPre were in any manner deficient or unreasonable. [*See* Application at 66-67.]

24. The defense team did not locate Paris before trial even though it "aggressively tried to do so." [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts to locate Paris were in any manner deficient or unreasonable. [*See* Application at 69-70.]

25. Paris' trial testimony covered many facts which were the same as or similar to those matters contained in his habeas affidavit. [*Compare* RR 36: 58-59, 87, 89 *with* Applicant's Exhibit 16.]

26. Although Paris's habeas affidavit discusses the extent of his relationship with the Hummels and his knowledge of problems in their marriage, he testified at trial that the couples got together "on occasion" outside church

for an event and that he viewed the Hummels as a happy family unit. [RR 36: 58, 87.]

27. The defense team's private investigator interviewed all of Applicant's neighbors, but none provided helpful testimony or wished to testify on Applicant's behalf. [Moore's affidavit at 15.]

28. The defense team contacted those individuals whom Applicant identified as his "friends" at work; however, they denied the existence of any such friendship and indicated that they knew very little of Applicant, that they did not really care for Applicant, and that they did not want to testify. [Moore's affidavit at 15.]

29. The defense team contacted people from the Hummels' church and subpoenaed the minister to testify; however, the minister later determined that Applicant deserved the death penalty, and he was unwilling to help Applicant at his trial. [Moore's affidavit at 15-16.]

30. Trial counsel investigated the suspicions of Dr. McGarrahan, other defense-team members, and friends of the Hummel family that Applicant and/or Neata were sexually abused by their parents or another adult close to the family. [Moore's affidavit at 11-12, 14.]

a. Applicant, Neata, and Jackie each adamantly denied that any type of sexual abuse ever occurred, and none of the other individuals who were interviewed could provide any proof that sexual or physical abuse had occurred other than what was testified to at trial. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

b. Applicant told members of the defense team that his home life, upbringing, and family life were very positive; he denied witnessing or experiencing any abuse growing up; and he adamantly denied even those things which others told the defense team they had witnessed. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

c. Neata would only admit to that abuse about which she ultimately testified, and she repeatedly denied that anything further or more severe had taken place. [Moore's affidavit at 12.]

d. Jackie denied any abuse in the home, although she acknowledged that she and Applicant's father were not demonstrative in their affection for Applicant and Neata. [Moore's affidavit at 12.]

e. Applicant's contention that trial counsel narrowly focused their mitigation investigation on suspicions that Applicant was sexually abused and that counsel failed to rigorously pursue other avenues of mitigation evidence is untrue and unsupported by the record. [Moore's affidavit at 11; Cummings' affidavit at 7; see Application at 62, 64.]

f. No one informed any defense-team member that Neata said in the hallway during trial that her father had sexually abused her or that she had sexually abused Applicant. [Moore's affidavit at 12; *see* Application at 64 n.2 (citing Applicant's Exhibit 18).] Based on Moore's knowledge of and contact with Parris, Moore "simply do[es] not believe" that such an event occurred. [Moore's suppl. affidavit at 13.]

g. Because Neata denied that sexual abuse had occurred, Applicant's trial counsel had no good-faith basis to engage in the line of questioning suggested by Applicant, and counsel cannot be considered deficient for asking such questions under the circumstances. [Moore's suppl. affidavit at 12.]

31. During the investigation, Applicant's trial counsel did not overlook the *potential* value of Applicant's military service. Applicant's trial counsel obtained Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.] Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.]

32. By Applicant's own accounts, his military service was not something that would be particularly fruitful to his mitigation case, and Moore knew about problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

33. Applicant has not provided an affidavit signed by Christopher Boling; therefore, all references to statements allegedly made by Boling to a third party are stricken and given no consideration.

34. Applicant provided Matthias' name to the defense team's mitigation specialist, but the team was unable to locate him. [Moore's suppl. affidavit at 7.]

35. Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf, but Applicant never provided the names of Emmer, Chaidez, or Boling, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17; Moore's suppl. affidavit at 7.]

36. The failure to locate Matthias, Emmer, Chaidez, and Boling did not result from an inadequate investigation into Applicant's life history for purposes of developing a mitigation case.

37. Trial counsel made a strategic decision to attempt to minimize the negative aspects of Applicant's military service. [Moore's affidavit at 17.] The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez would not have made Applicant's military service more compelling or mitigating, and the evidence would have provided both positive and negative information about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.] The affidavits of Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation while in the military service, but "they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending 'strip clubs.'" [Moore's suppl. affidavit at 8.]

38. Applicant's military career as described in the habeas affidavits of Chaidez, Emmer, and Matthias is not the type of military service that, when combined with other mitigating evidence introduced at Applicant's trial, would have tipped the scales against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony

of Applicant's commanding officers about Applicant's military service during the State's rebuttal case.

39. Many facts that Applicant faults his trial counsel for not asking Bennett, Scoggins, and Christy Pack during their trial testimony were elicited from either these or other witnesses at Applicant's trial.

40. Any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did ask about at trial is not so compelling or of such significance that trial counsel can be deemed deficient for not discovering it and/or inquiring about it at trial, especially in light of the thorough investigation conducted by trial counsel and the totality of the evidence presented at trial.

41. There is no reason to believe that any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial would have changed the outcome of the punishment phase of Applicant's trial.

42. Applicant's trial counsel had a qualified mitigation specialist and private investigator appointed early in the case; sought funds for and hired a forensic psychologist and neuropsychologist who explained at trial how Applicant's life history contributed to his commission of the charged offense; traveled to South Carolina to seek out and interview Applicant's family and friends and to investigate his background; sought to discover witnesses from Applicant's family, friends, church, employment, and neighborhood; took all actions necessary to secure the presence of potentially beneficial witnesses at Applicant's trial; were prepared to cross-examine the State's witnesses; presented a strategically developed cohesive mitigation theme based on the witnesses available at the time of Applicant's trial; and urged the jury during final arguments to answer the special issues in a way that would require a sentence of life rather than death.

43. Applicant's trial counsel complied with prevailing professional norms in making strategic decisions, in presenting the testimony of the available beneficial witnesses, and in constructing a cohesive mitigation theme through lay and expert witnesses.

44. Trial counsel exercised their prerogative in deciding what witnesses to call to testify and what questions to ask them.

45. Applicant's claim that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented is unpersuasive second-guessing in hindsight.

46. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

47. There is considerable overlap between the information that Applicant claims his trial counsel should have discovered and presented via the lay witnesses and the facts and themes trial counsel actually developed at trial. [Moore's affidavit at 16.]

48. To the extent that any of the evidence or proposed testimony provided by Applicant is not cumulative, there is no reason to believe that such evidence would have been considered so powerful, compelling, or significant by the jury that it would have changed Applicant's sentence.

49. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls far short of the type that courts have found to support a finding of prejudice.

50. Applicant's crime was premeditated, cold-blooded, and heinous; the aggravating facts at trial were severe.

51. The jury was well aware through lay and expert testimony of neglect, abuse, attachment issues, and family stresses in Applicant's life before and at the time of the murders and their potential effect on Applicant's decision to murder his family.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

6. In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7. Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8. Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

9. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

12. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427. The decisions of Applicant's trial counsel to call certain witnesses and not to call others who were uncooperative or would not

benefit Applicant's case were the result of an extensive investigation and strategic reasoning about the best way to present Applicant's case.

13. Trial counsel thoroughly investigated Applicant's background for mitigation purposes and called all of the available witnesses who could provide relevant, beneficial evidence. The actions of trial counsel fall within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Moore v. Johnson*, 194 F.3d 586, 591-92 (5th Cir. 1999).

14. To obtain relief on an ineffective-assistance claim based on an uncalled witness, an applicant must show that the witness was available to testify and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). Applicant's trial counsel cannot be deemed ineffective for failing to call family members, neighbors, church members, coworkers, and others who did not want to testify or whose testimony would not have benefitted Applicant's mitigation case. Likewise, Applicant's trial counsel cannot be faulted for failing to call witnesses whom they made reasonable efforts to locate and interview without success.

15. Applicant's trial counsel fulfilled their duty to conduct a reasonable and thorough investigation of Applicant's life history as part of the mitigation investigation, even in the face of dealing with threats, uncooperative witnesses, and witnesses whose testimony would have damaged Applicant's case.

16. Under the circumstances at the time of Applicant's trial, DuPre was not a witness who was available to the defense. *See Ex parte White*, 160 S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony).

17. Applicant's trial counsel were not deficient for failing to present largely cumulative testimony. *See Coble*, 496 F.3d at 436 (failure to present cumulative testimony does not constitute ineffective assistance).

18. No prejudice results from the failure to present cumulative mitigation evidence. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (no prejudice in failing to present cumulative mitigation evidence; to establish prejudice, new evidence presented in habeas proceeding must differ in

substantial way in strength and subject matter from evidence actually presented at sentencing).

19. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located witnesses who were not found during a thorough investigation or has presented evidence that could have been asked of witnesses who did testify does not support Applicant's claim of ineffective assistance.

20. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); *Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance).

21. The basis of Applicant's current claim – essentially that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – is rejected as unpersuasive. *See Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) (courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees'" involving questions of whether counsel investigated enough or presented enough mitigating evidence; "[t]hose questions are even less susceptible to judicial second-guessing"); *Dowthitt v. State*, 230 F.3d 733, 743 (5th Cir. 2000) (same).

22. Applicant's complaints constitute an impermissible second-guessing of the manner in which is experienced trial counsel chose to present Applicant's mitigation case at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

23.    Counsel acted well within prevailing professional norms, and Applicant has failed to meet his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting Applicant's life history to develop the mitigation case fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's complaints are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

24.    The additional allegedly mitigating lay-witness evidence proffered by Applicant falls short of the type that courts have found to support a finding of prejudice. *See, e.g.*, *Rompilla*, 545 U.S. at 392-93; *Wiggins*, 539 U.S. at 516-17; *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000).

25.    Given the largely cumulative nature of the evidence that Applicant alleges his trial counsel should have presented, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the mitigation special issue differently had trial counsel discovered and called those witnesses to testify. *See Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker*, 565 F.2d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative).

26.    Even when the powerful aggravating evidence is reweighed against the totality of the available mitigating evidence, there is no reasonable probability that, but for the failure of Applicant's trial counsel to present the testimony at issue, the jury would have answered the mitigation special issue differently. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the recordm, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

27.    The Court recommends that Applicant's fifth claim for relief be denied.

E. **Claim for Relief Six**

Applicant alleges that his trial counsel were ineffective for failing to present Applicant's military service as mitigation evidence. [Application at 73.]

**Findings Of Fact**

1. Based on the wantonness and severity of Applicant's crime, Moore believed that he needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel made a strategic decision to concentrate its mitigation efforts in those areas they felt would be most productive. [Moore's supplemental affidavit at 7-8.]

2. Applicant has not submitted a signed affidavit from Christopher Boling; instead, he relies on statements Boling allegedly made to a third person.

3. Applicant's trial counsel did not overlook the *potential* value of Applicant's military service to the mitigation presentation at trial. [Moore's affidavit at 17.]

4. Applicant's trial counsel obtained copies of Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

5. Lay witnesses for the defense informed the jury that Applicant joined the Marines on his twenty-second birthday, served for about four years, was assigned as an intelligence analyst, and was more self-assured and had a higher self-esteem when he left the Marines. [RR 43: 161, 166, 225, 231.]

6. The defense's expert witnesses testified that they reviewed Applicant's military records, that Applicant was honorably discharged from the Marines, that Applicant's military service showed his ability to do well in a structured environment, and that Applicant received several commendations for his military service. [RR 44: 70, 73, 159-60.]

7. By Applicant's own accounts to members of the defense team, his military service was "lackluster," was not a positive experience, and was not something that would be particularly fruitful to his mitigation case, and

Moore knew about the problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

8. Trial counsel made a strategic decision to attempt to avoid or minimize negative evidence related to Applicant's military career. [Moore's affidavit at 17; Moore's suppl. affidavit at 7-8.]

9. Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

10. Trial counsel knew about disciplinary action taken when Applicant went AWOL from his military post, and counsel made a strategic decision to try to avoid that issue to the degree possible during presentation of the defense witnesses. [Moore's affidavit at 17-18.]

11. Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf. [Moore's suppl. affidavit at 7; Moore's affidavit at 17.]

12. Applicant never provided the names of Chaidez, Emmer, or Boling to trial counsel or other defense-team members, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17.]

13. Applicant provided Matthias' name to the defense team's mitigation specialist, but the defense team was not able to locate him. [Moore's suppl. affidavit at 7.]

14. The failure of trial counsel to locate Mathhias or to discover Emmer, Chaidez, and Boling was not the result of an inadequate investigation into Applicant's background and life history.

15. The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez do not make Applicant's military service more compelling or mitigating, and such testimony would have provided both positive and

negative information to the jury about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.]

16. Although the affidavits provided by Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation during his military service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending strip clubs. [Moore's suppl. affidavit at 8.]

17. Applicant's military service was not, as Applicant claims, a positive and "powerfully mitigating episode in [his] life."

    a. Applicant was a "pretty average, marginally effective" Marine; he was not a very impressive Marine. [RR 45: 11, 34.]

    b. All but one of Applicant's commendations and awards were given to his military unit as a whole. [RR 45: 27.]

    c. Applicant and Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Doughtery thought would lead them down the wrong path. [RR 45: 12, 23.]

    d. When Applicant was not interested in something, he needed maximum guidance or supervision to ensure its completion. [RR 45: 22-23.]

    e. Applicant had several entries for failing to maintain his weight within the required standards and failing to pass the physical fitness test. [RR 45: 30, 34-35.]

    f. Applicant went AWOL for under twenty hours because he was unhappy, and his pay was docked as a result. [RR 45: 35, 46.]

    g. Santos revoked Applicant's security clearance because Applicant was untrustworthy and lied to his seniors. [RR 45: 36, 38-39, 45.]

18. Regardless of how Applicant tries to portray his military service, the facts contained in the habeas affidavits of Matthias, Emmer, and Chaidez, as well as the testimony of Dougherty and Santos presented during the State's

rebuttal case, rebut any assertion that the jury would have considered Applicant's military service to be particularly mitigating.

19. The punishment-phase evidence and arguments would not have been significantly different or more compelling had the evidence contained in the habeas affidavits of Chaidez, Matthias, and Emmer been introduced as evidence at the punishment phase of Applicant's trial.

20. There is no reasonable probability that the facts contained the habeas affidavits of Chaidez, Matthias, and Emmer would have caused the totality of the mitigating circumstances to outweigh the overwhelming and compelling aggravating facts presented at Applicant's trial.

21. Applicant's military career, even as described in the habeas affidavits of Matthias, Emmer, and Chaidez is not the type of service that the jury would have considered to be a particularly mitigating circumstance, especially when balanced against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony of Applicant's commanding officers during the State's rebuttal case.

22. Trial counsel exercised their prerogative in deciding what witnesses to call and what questions to ask about Applicant's military service.

23. Applicant's arguments simply second-guess in hindsight the manner in which his highly experienced trial counsel strategically chose to present evidence of Applicant's military service.

**Conclusions Of Law**

1. All references by Applicant to facts learned during alleged conversations of others with Christopher Boling are stricken pursuant to TEX. R. EVID. 602 and 802 and are given no consideration in this habeas proceeding.

2. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

3. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

4. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

5. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

6. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

7. In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

8. Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

9. Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

10. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

11. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

12. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518. The fact that another attorney

may have pursued a different tactic at trial is insufficient to support a claim of ineffective assistance. *Scheanette*, 144 S.W.3d at 510.

14. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); Payne, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance). Courts must be particularly wary of arguments that essentially come down to a matter of degrees involving questions of whether counsel investigated enough or presented enough mitigating evidence. *Dowthitt*, 230 F.3d at 743.

15. To obtain relief based on an uncalled witness, an applicant must show the witness was available and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d at 52. The witnesses whose affidavits Applicant presents in this habeas proceeding would have provided negative information about Applicant's military service in conjunction with the positive information they could provide, and Applicant's trial counsel made a reasonable strategic decision based on their investigation of Applicant's military service to avoid the negative aspects of his service to the degree possible during the presentation of the defense witnesses.

16. *Porter v. McCollum*, 558 U.S. 30 (2009), cited by Applicant, is distinguishable from Applicant's case. The evidence of Applicant's unremarkable military service comes nowhere near the circumstances presented in *Porter*. *See id.* at 41, 43-44.

17. Given the totality of the circumstances, the breadth of the defense team's investigation, the strategic decisions resulting from the investigation, and the totality of the representation provided, Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in not locating Matthias, Emmer, Chaidez, and Boling as witnesses to testify about Applicant's military service fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's

claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

18. There is no reasonable probability that the facts contained in the affidavits of Chaidez, Matthias, and Emmer would have had any effect on the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's allegations are not firmly founded in the record, and Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of trial counsel.

19. The Court recommends that Applicant's sixth claim for relief be denied.

## F. <u>Claim for Relief Seven</u>

Applicant contends that his trial counsel were ineffective for failing to present evidence that he suffered from complex post-traumatic stress disorder (CPTSD) resulting from attachment trauma. [*See* Supplemental Response To State's Answer at 16-21; Initial Application For Writ Of Habeas Corpus at 80-93.] Applicant alleges that trial counsel should have: (a) conducted a complete investigation of his life history and psycho-social development; (b) hired an expert witness with specialized experience in trauma-related disorders; and (c) called such expert to testify at trial about his attachment trauma and CPTSD and their effects on his life and mental health. [*See* Application at 82.]

**Findings Of Fact**

1.      CPTSD is a psychological injury resulting from prolonged exposure to very extreme trauma such as entrapment or kidnapping, slavery or enforced labor, long-term imprisonment, torture, or abuse from which there is little or no hope of escape. [Dr. Price's affidavit at 4.]

2.      Many signs, symptoms, and conditions have been ascribed to CPTSD, rendering it so non-specific that it has failed to gain general acceptance in the mental-health community as a mental disorder. [Dr. Price's affidavit at 5.]

3.      Research on CPTSD has not risen to the level required to be determined a disorder, *i.e.*, a constellation of signs and symptoms that is not accounted for by some other condition, even though the developers of both the fourth and fifth editions of the Diagnostic and Statistical Manual of Mental Disorders (the DSM-IV and DSM-V) have considered it. [Dr. Price's affidavit at 5.]

4.      CPTSD has remained essentially a "syndrome," which is a collection of signs and symptoms that suggest some abnormal condition. [Dr. Price's affidavit at 5.]

5.      CPTSD is not included in the DSM-V or in the International Statistical Classification of Diseases and Related Health Problems. [Moore's suppl. affidavit at 9.]

6.      Trial counsel thoroughly investigated Applicant's life history and presented as complete a picture of Applicant's life history as possible given the witnesses who were available to the defense at the time of Applicant's trial.

7.      At trial, Applicant's trial counsel presented the available information that was supported by the evidence. [Moore's suppl. affidavit at 11.]

8.      Trial counsel considered potential mental-health experts who might assist them in developing the mitigation case, and Moore called several different experts. [Moore's affidavit at 7.]

9.      Moore had previously worked in several cases with Dr. McGarrahan, a forensic psychologist and neuropsychologist whom Moore knew to be

"highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions." [Moore's affidavit at 7.]

10. Trial counsel retained Dr. McGarrahan due to Moore's familiarity with her work, his opinion of her abilities, her reputation in the legal community; and the prior professional relationship and mutual respect between Dr. Price (the State's expert) and Dr. McGarrahan. [Moore's affidavit at 7.]

11. Dr. McGarrahan spent approximately eleven hours administering cognitive tests and psychological inventories to Applicant. [RR 44: 121-22.]

12. Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, various correspondence from Applicant's sister Neata Woody to Applicant, Jackie Hummel's medical records, and psychological test data from Dr. Price's evaluation conducted the weekend before she testified; she performed a clinical interview to ask Applicant about his "entire social history"; she performed a mental status examination during which she made observations of Applicant and discussed with him any psychiatric symptoms he was having; and she discussed the offenses in great detail with Applicant. [RR 44: 121-24.]

13. There is no indication that Dr. McGarrahan ever diagnosed Applicant with CPTSD or informed Applicant's trial counsel that such a diagnosis might be possible.

14. At trial, Dr. McGarrahan testified about every deficit and disorder she found to exist with Applicant based upon her exhaustive interviews and testing, the information she received from Applicant's family, and her review of Applicant's relevant records. [Moore's suppl. affidavit at 10.]

15. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; and their significance to Applicant's actions in murdering his family members. [RR 44: 126-46, 158-61.]

16. Moore has called experts, including doctorate-level social scientists, to testify in other trials about the presence of "attachment disorder," but he did not believe based on the available facts in Applicant's case that any

additional expert other than Dr. McGarrahan was necessary to adequately address Applicant's attachment issues at trial. [Moore's affidavit at 21-22.]

17. Dr. McGarrahan was qualified to evaluate Applicant and to present evidence of attachment issues at Applicant's trial [Dr. Price's affidavit at 6-7], and the strategic decision of trial counsel to call Dr. McGarrahan rather than to retain another type of expert witness was not objectively unreasonable.

18. While Dr. Hardesty has experience in treating patients with attachment disorder and CPTSD, such experience is not a prerequisite to conducting a comprehensive forensic psychological evaluation and testifying at trial to the results of the evaluation. [Dr. Price's affidavit at 6-7.]

19. Trial counsel exercised their prerogative and made a strategic decision to present evidence about Applicant's attachment issues and other psychological issues through the testimony of Dr. McGarrahan and lay witnesses. [Moore's supplemental affidavit at 10; see RR 44: 126-46, 158-61.]

20. Even if Applicant's trial counsel had been informed of a diagnosis of CPTSD at the time of Applicant's trial, counsel would not have been required to present testimony about the diagnosis at trial, as such diagnosis reasonably could be viewed as damaging evidence of future dangerousness.

21. In Moore's experience, diagnoses for mental disorders which are not included in the diagnostic manuals are subject to attack at trial on that basis alone and, therefore, can have markedly less effect upon jurors. [Moore's suppl. affidavit at 9-10.] Moore is "skeptical about the jury's willingness to give credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals." [Moore's suppl. affidavit at 10-11.]

22. In over thirty-five years trying criminal cases, Moore has found that jurors are reticent to accept "learned opinions" without an evidentiary basis to support them. [Moore's suppl. affidavit at 10.] Moore would be concerned about the "scarcity" of underlying evidence upon which Dr. Hardesty based her diagnosis of CPTSD. [Moore's suppl. affidavit at 10.]

23. Dr. Hardesty's allusions to the denials of child abuse or neglect by Applicant and Neata as constituting evidence that abuse and neglect did, in fact, occur are "inappropriate." [Dr. Price's affidavit at 7.]

24. While denial of abuse does not foreclose a clinical diagnosis, such denials create a "unique and challenging problem in being able to support and defend such a diagnosis before the jury" that cannot be overlooked or ignored in the trial of a criminal case. [Moore's suppl. affidavit at 10.]

25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Dr. Price's affidavit at 1-2.]

26. Had Dr. Hardesty testified that she diagnosed Applicant with CPTSD, Dr. Price would have been available to testify and dispute her analysis that Applicant suffered from CPTSD secondary to attachment trauma and that such condition played any role in Applicant's murder of his family members. [Dr. Price's affidavit at 6.]

27. Events in Applicant's childhood such as the lack of being told he was loved, not having been hugged, being isolated on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse are not in the ballpark with the conditions usually discussed in relationship to CPTSD. [Dr. Price's affidavit at 6.]

28. Hummel has shown an ability to form attachments with adults such as his sister and uncle; he "escaped" his family of origin shortly after high school when he joined the Marines, where he was successful as an intelligence specialist until he became dissatisfied with his situation, went AWOL, and lost his security clearance; and he maintained several relationships with women, even though he became "attached" to them too quickly and appeared to be poor in interacting with the opposite sex. [Dr. Price's affidavit at 6.]

29. Applicant's most likely motivations for murdering his family members were "multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled." [Dr. Price's affidavit at 6.]

30. The jury did not find Applicant's attachment issues and personality traits, the facts of his life, or their role in his commission of the murders to be sufficiently mitigating to absolve Applicant of moral blameworthiness for his premeditated, calculated, heinous acts.

31. Even with the addition of Dr. Hardesty's proposed testimony about CPTSD, the overwhelming and compelling aggravating facts and circumstances in this case still would have outweighed the totality of Applicant's mitigating evidence.

32. Dr. Hardesty's proffered testimony about CPTSD contained in her habeas affidavit would not have been substantially more compelling than the evidence presented through Dr. McGarrahan, and there is no reasonable probability that the jury would have been persuaded by Dr. Hardesty's diagnosis of CPTSD to answer the mitigation special issue in Applicant's favor.

33. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

34. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

35. Applicant's allegations of prejudice are conclusory.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under

prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelds*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. Applicant's trial counsel cannot be deemed to have been deficient for failing to discover and present a diagnosis of CPTSD when the defense team's well-qualified mental-health expert did not make such a diagnosis. *See, e.g.*, *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001) (counsel's failure to investigate and discover Campbell's PTSD not ineffective when clinical

psychologist failed to make such diagnosis); *Pruett v. Thompson*, 996 F.2d 1560, 1573-74 (4th Cir. 1993) (counsel's failure to investigate or present evidence of mental illness, developmental problems, organic brain damage, and PTSD not ineffective where counsel consulted psychiatrist who concluded Pruett did not suffer from any of the alleged mental illnesses or abnormalities); *Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003) (counsel not ineffective for not investigating and discovering Taylor's PTSD after forensic psychologist failed to make such diagnosis).

8. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; Weisinger, 775 S.W.2d at 427. Applicant's trial counsel acted within the wide range of reasonable professional assistance and were not objectively unreasonable in making a strategic decision to rely on Dr. McGarrahan rather than to retain another type of expert such as Dr. Hardesty to testify at Applicant's trial.

9. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty is not alone a basis to prove a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been retained and called to testify about a diagnosis that was not available to counsel at the time of trial. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

10. Applicant's attack on counsel's performance is simply based on impermissible second-guessing and hindsight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight). Applicant has not met his burden to prove that his trial counsel were deficient for not retaining an expert such

as Dr. Hardesty to testify that he suffers from CPTSD resulting from attachment trauma.

18. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. There is no reasonable probability that the proposed testimony of Dr. Hardesty contained in her habeas affidavits about CPTSD resulting from attachment trauma would have changed the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the recordm, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

12. The Court recommends that Applicant's seventh claim for relief be denied.

**G. <u>Claim for Relief Eight</u>**

Applicant alleges that his due-process right to a fair trial was violated when the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial and that his trial and appellate counsel were ineffective. [Application at 93.]

**<u>Findings Of Fact</u>**

1. The State elected to proceed to trial on the capital-murder indictment alleging that Applicant murdered Joy and Eddie in the same criminal transaction. [RR 4: 4-5]

2. Applicant also murdered his daughter Jodi and his unborn child during the same criminal episode.

3. Applicant's discussion of his eighth claim for relief, which is phrased as a due-process violation, largely focuses on whether portions of the State's opening statements and jury arguments and various trial evidence referring to Jodi and the unborn child were too inflammatory and prejudicial to be admitted, were inadmissible as same-transaction contextual evidence, and were impermissible victim-impact evidence. [*See* Application at 93-103.]

4. Applicant provides a single conclusory paragraph and only two record citations to support his claim that his trial counsel were ineffective, alleging that trial counsel performed deficiently "[t]o the extent [they] failed to object and preserve the errors committed by the State and court." [Application at 104 (citing RR 39: 194-97; RR 42: 79).]

   a. Applicant first cites the introduction during the guilt-innocence phase of SX 318, an autopsy photograph of the unborn child and Joy's uterus after their removal from Joy's body. [Application at 104 (citing RR 39: 194-97).] Trial counsel objected to the introduction of SX 318, [RR 39: 194-97], and Applicant neither challenges the sufficiency of the objections made by trial counsel nor asserts that counsel could have done anything differently. [*See* Application at 104.]

   b. Applicant's second record citation is to the introduction of photographs of Applicant's family members from Applicant's MySpace page during the punishment phase of his trial. [Application at 104 (citing RR 42: 79).] Moore did not object to these photographs because he did not think there was any meaningful objection to the photographs that the Court would sustain at the punishment stage of the trial and because Moore made a strategic decision that the photographs might benefit Applicant's case by showing that Applicant loved his family and by demonstrating that Applicant's commission of the murders was solely the result of his mental and emotional problems. [Moore's affidavit at 23-24.]

5. Applicant neither explains how any of the referenced opening statements discussing Jodi were improper nor identifies any valid legal basis for his trial counsel to have objected. [*See* Application at 94-95.]

6. The State's opening statements at the guilt-innocence phase referring to Jodi were proper because Applicant murdered Jodi in the same criminal episode as Joy and Eddie, who were the named victims in the indictment, and the circumstances of Jodi's murder were admissible as same-transaction contextual evidence.

7. Applicant seems to simply assume that the cited testimony of Audria Hastings, Jodi's kindergarten teacher, was inflammatory and prejudicial because it referred to Jodi. [*See* Application at 95.] Applicant neither explains why Hastings' testimony was inadmissible as same-transaction contextual evidence nor offers any valid legal objection that trial counsel should have made to Hastings' testimony. [*See id.*] Moreover, in addition to Hastings' testimony delineated by Applicant, Hastings identified a photograph of Jodi showing how the child looked in class earlier on the day of the murders. [RR 33: 63; SX 1.]

8. Trial counsel objected during Hastings' testimony to videotapes showing Jodi with her teachers and kindergarten class, and the Court overruled those objections. [RR 33: 70-74.]

9. Applicant complains that testimony of Jodi's school nurse, Constance Smith, "continued the focus on Jodi" at the guilt-innocence phase of the trial. [Application at 95.]

a. The testified-to incident when Jodi hurt herself on the school playground and Joy went to the school to comfort her occurred the afternoon of December 17, 2009, the same day Applicant murdered his family. [RR 33: 81-82.]

b. Smith also testified that on the day of the murders Joy appeared to be in good health and was excited about her pregnancy. [RR 33: 87.]

c. Applicant fails to specifically explain why Smith's testimony about the activities and interactions of Joy (a named victim) and her daughter Jodi on the day Applicant murdered them was inadmissible. [*See* Application at 95.]

d. Applicant offers no valid legal basis for his trial counsel to have objected to Smith's testimony referenced in the application. [Application at 95.]

e. Applicant simply assumes that trial counsel should have objected to the testimony because it referred to Jodi. [Application at 95.]

10. Applicant asserts that the State "consistently made references to Jodi throughout the remainder of the trial," and he cites numerous pages in the reporter's record to support his contention. [Application at 95.]

a. Applicant does not delineate exactly what testimony on the pages he cites was objectionable, and this Court will not make Applicant's arguments for him. [*See* Application at 95.]

b. Applicant provides no valid legal basis for his trial counsel to have objected to testimony on the pages he cites. [Application at 95.]

c. Applicant seems to simply assume that trial counsel should have objected to something on the pages listed because it referenced Jodi. [*See* Application at 95.]

d. Some testimony on the pages cited by Applicant mentions Jodi in the context of being the daughter of Joy or the granddaughter of Eddie, the two victims named in the indictment for which Applicant was on trial. [*See* RR 36: 50 (Applicant's co-worker recounts conversation with Applicant on December 18, the morning after the murders; she remarked that Jodi must be excited about Christmas, and Applicant responded, "Yes, she is"), 58 (Christopher Paris came to know that the Hummels had a daughter named Jodi); RR 37: 167 (DNA analyst obtained known DNA samples from autopsy work for Joy, Eddie, and Jodi), 198 (DNA analyst excluded Joy, Eddie, and Jodi as contributors to DNA sample near top rim of Applicant's black hat), 203 (DNA analyst found Jodi's DNA on area of bat); RR 40: 10 (Eddie's former co-worker got to know Eddie's daughter Joy and granddaughter Jodi), 18 (Jodi was Joy's daughter). ]

e. None of the testimony on the pages cited by Applicant as referencing Jodi went beyond what was permissible as same-transaction contextual evidence.

11. Applicant complains that the State shifted the focus of the trial to Joy's unborn child. [*See* Application at 96.]

a. Applicant offers no specific explanation why the opening statements, witness testimony, or closing arguments he cites were improper. [*See* Application at 96.]

b. Applicant provides no valid legal basis upon which his trial counsel should have objected. [Application at 96.]

c. Applicant seems to assume that the referenced matters were improper simply because they referenced the unborn child. [*See id.*]

d. The focus of the opening statements cited by Applicant was on Joy (a named victim) and her physical state of being pregnant. [*See* RR 33: 25 (Joy had recently gone to doctor and heard baby's heartbeat for first time), 29 (Joy, who was pregnant, was asleep in the master bedroom when Applicant returned home to commit the murders), 31 ("His wife who is pregnant, lays dead at his feet").]

e. The testimony Applicant cites referred either to Joy's pregnancy and physical condition near the time of the murders or to Applicant's disregard for his unborn child's safety, which was relevant to his state of mind leading up to the murders. [*See* RR 33: 68 (in December 2009, Joy "was pregnant"); RR 39: 101 (Freeze testifies she became uncomfortable with Applicant when she learned Joy was pregnant because Applicant had no concern for his unborn child's safety), 143 (Freeze learned Joy was pregnant one or two days after Freeze and Applicant had sex; Freeze and Applicant exchanged texts concerning Freeze finding out about the pregnancy).]

f. The three pages of the State's closing arguments described by Applicant as containing "[r]epeated references" to the unborn child's death contain arguments which were permissible based on properly admitted evidence at trial and did not impermissibly focus the jury on the unborn child's death. [*See* RR 40:50 (Applicant "snuffed out four lives that had nothing to do with him, other than he wanted to be single"), 53 ("He killed his pregnant wife"), 56 (Applicant "killed his pregnant wife").]

12. Applicant's trial counsel objected to SX 318 and 379, the two alleged highly inflammatory photographs of the unborn child cited by Applicant. [Application at 96; RR 38: 93; RR 39: 194-97, 202; *see* SX 318, 379.] Applicant makes no allegation of any other objection that his trial counsel could or should have raised. [*See* Application at 96.]

13. Applicant refers to punishment-phase testimony by Applicant's sister Neata that she needed to wait before visiting Jodi's gravestone [RR 43: 234-35]; that she sent Jodi a Christmas dress, but she never got a photo of Jodi in the dress because "everything was burned in their house" [RR 43: 235]; that the loss of Joy and Jodi had left the Hummel family "broken" [RR 43: 236]; and that Applicant's aunt would have been able to take Jodi in and provide for her if Applicant had asked her to do so [RR 43: 239]. [Application at 97.]

a. Applicant fails to explain how the testimony he cites was so prejudicial or inflammatory as punishment-phase evidence as to render it inadmissible or to articulate a valid legal objection that his trial counsel could have, but did not, make. [*See* Application at 97.]

b. In asserting that Neata's description of the Hummel family as "'broken' after Jodi's death" was impermissible victim-impact evidence because Jodi was not a named victim, Applicant overlooks that Neata's testimony was in response to a question about how the loss of "Joy *and* Jodi" had affected Neata's family; thus, the question included a named victim. [RR 43: 236 (emphasis added); *see* Application at 97.]

14. Applicant cites punishment-phase testimony from various State's witnesses referencing either Jodi or the unborn child. [*See* Application at 97.]

a. During the portion of Tomiko Race's testimony cited by Applicant, the State introduced a number of photographs depicting Jodi, Joy, and/or Applicant that were posted on Applicant's MySpace page. [RR 43: 78-79.] Moore made a reasonable strategic decision not to object to the photographs. [Moore's affidavit at 23-24.]

b. Applicant cites Melody Anderson's testimony that she was in the hospital room when Jodi was born, that she saw sonogram photographs of the unborn child, and that Eddie was a good grandfather to Jodi; Phillip King's testimony that Eddie would leave the senior center and go home in time to pick up Jodi from the bus

stop every day; and Cindy Lee's testimony that Jodi would get donuts when Joy dropped off Eddie at the senior center. [Application at 97 (citing RR 44: 8, 10-11, 14, 22, 32 ).]

i. In context, the testimony cited by Applicant focused on the lives and familial relationships and activities of Joy and Eddie, the named victims. [RR 44: 8, 10-11, 14, 22, 32.]

ii. Contrary to Applicant's contentions, testimony about Jodi's visits to the senior center when Joy dropped off Eddie did not fall within the definition of victim-impact evidence.

iii. Applicant provides no valid legal objection that his trial counsel should have, but did not, make.

15. Applicant asserts that thirty-one "inflammatory and prejudicial" photographs of the unnamed victims during the punishment phase were introduced without objection. [Application at 97-98.] As discussed in previous findings of fact herein, trial counsel had strategic reasons for not objecting to the photographs taken from Applicant's MySpace account. Applicant offers no valid legal basis for his trial counsel to have objected to the remaining photographs to which he refers. [*See* Application at 97-98.] Finally, many of the photographs at issue include Joy, a named victim at trial.

16. Applicant complains that the State made "repeated references" to Jodi and the unborn child during closing arguments at the punishment phase of trial. [Application at 98.]

a. Applicant simply cites a number of arguments without any explanation of how they were impermissible punishment-phase arguments or what valid legal objection his trial counsel should have made, and the Court will not make Applicant's arguments for him. [*See* Application at 98.]

b. The cited arguments were permissible as either summations of the evidence, reasonable deductions from the evidence, or pleas for law enforcement. [RR 45: 57-59, 61, 62-63, 85, 86, 88.]

17. Applicant presents a single paragraph addressing his contention that his appellate counsel was ineffective for failing to raise the cited matters on direct appeal. [*See* Application at 104-05.]

18. Applicant fails to identify specific points of error that his appellate counsel should have raised or substantive arguments that counsel should have made on direct appeal to the Court of Criminal Appeals. [*See* Application at 104-05.]

19. Applicant asserts in conclusory fashion that his appellate counsel was ineffective for not "re-raising trial counsel's objection" to the State's use of photographs of the unborn child in light of case law regarding the prejudicial nature of photographs of unborn children. [Application at 104-05.]

   a. SX 379 is an 8x10 color photograph of a biohazard evidence bag containing the unborn child. The photograph does not focus on the unborn child, and the contents are not readily identifiable from the photograph as an unborn child. [SX 379; *see* RR 38: 93.]

   b. SX 379 was conditionally admitted for record purposes only during the testimony of a DNA analyst as part of the chain of custody regarding a DNA profile she extracted from the unborn child. [RR 38: 90-95.] It was later admitted for all purposes during the medical examiner's testimony that he had collected a fetus from Joy and packaged it in an evidence bag as show in in SX 379. [RR 39: 202.]

   c. SX 379 was never published to the jury. [*See* RR 38: 94; RR 39: 202.]

   d. SX 318 is a photograph introduced at the guilt-innocence phase of the trial during the medical examiner's testimony. The portion of SX 318 depicting the unborn child measures 5x7; is black and white; and appears to depict the unborn child, an umbilical cord, and Joy's uterus. [SX 318.]

   e. The State argued in response to the objections of Applicant's trial counsel that SX 318 was admissible because: (1) Joy was pregnant; (2) the photograph "starts the chain of custody for DNA samples to prove paternity for this baby"; and (3) based on the area of the stab wounds depicted in SX 315 (an autopsy photograph of Joy's wounds) "it goes to what [Applicant] was stabbing at" because when one lines up the stab wounds shown in SX 315 "you line that up anatomically on a female that's pregnant and you're stabbing in the area where the womb is." [RR 39: 196.]

f. The Court concluded that the probative value of SX 318 outweighed any prejudice, that the evidence was contextual, and that the manner in which the deaths occurred was an issue for the jury. [RR 39: 197-98.]

g. SX 318 was never published to the jury.

h. The circumstances regarding the photographs introduced here as SX 318 and 379 differ significantly from those found in *Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000), and *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004), which are relied on by Applicant.

i. SX 318 and 379 had probative value to issues in the guilt-innocence phase of Applicant's trial.

(a) SX 379 was admitted as part of the chain of custody of the unborn child collected by the medical examiner and the DNA profile later extracted from the unborn child by a DNA analyst. [RR 38: 90-95; RR 39: 202.]

(b) When SX 318 was offered during the medical examiner's testimony, the State offered a number of reasons for its admissibility relating to matters in issue during the guilt-innocence phase of the trial. [RR 39: 196.]

ii. SX 318 and 379 were offered during medical testimony at the guilt-innocence phase of the trial, they were properly authenticated, and the State offered a number of reasons to admit the evidence that were related to facts in issue. [RR 39: 196.]

iii. SX 318 and 379 were not offered merely to show that Joy was pregnant, that she died, that Applicant knew Joy was pregnant, and that the unborn child died as a result of Joy's death. [*Id.*]

iv. Neither SX 318 nor 379 was published to the jury; the State did not emphasize the photographs in its closing arguments; the photographs were among a multitude of photographs introduced into evidence; and the photographs admitted at guilt-innocence included autopsy photographs and crime-scene photographs depicting the buried remains of Joy, Eddie, and five-year-old Jodi.

v. In light of the circumstances surrounding the admission of SX 318 and 379 into evidence, the photographs would not have had such an emotional impact to suggest that the jury made a decision on some emotional basis rather than on the basis of Applicant's confession to the premeditated, deliberate, heinous murders of his family members so that he could pursue a relationship with Freeze.

i. Applicant provides no analysis demonstrating that the alleged error in admitting SX 318 and 379 would have been found harmful under TEX. R. APP. P. 44.2(b) had appellate counsel raised a point of error challenging the admission of the photographs of the unborn child. [Application at 104-05.]

j. Any error in admitting SX 318 and/or 379 was harmless under TEX. R. APP. P. 44.2(b).

i. The jury had before it Applicant's videotaped and written confessions describing in chilling, remorseless detail the premeditated, cold-blooded, heinous murders of his pregnant wife, his crippled father-in-law, and his five-year-old daughter; the measures Applicant took to cover up his crimes, including setting fires in each victim's bedroom, disposing of the murder weapons, and fabricating an alibi; and his flight to Oceanside, California. [SX 347B.]

ii. The jury saw numerous photographs depicting the victims' burned bodies during their autopsies and at the crime scene.

iii. Neither photograph at issue was published to the jury.

iv. The State did not emphasize the photographs during closing arguments.

v. The jury heard overwhelming evidence to support its verdict finding Applicant guilty of capital murder and its answers to the special issues in a manner that required imposition of the death penalty.

**Conclusions Of Law**

1. Claims alleging a violation of a rule of evidence are not cognizable on habeas corpus. *See Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). Further, because evidentiary complaints are subject to a harmless-error analysis, they are not cognizable. *Ex parte Truong*, 770 S.W.2d 810, 913 (Tex. Crim. App. 1989). Therefore, to the extent Applicant challenges the admissibility of the arguments and evidence at issue, his claim for relief is not cognizable in this habeas proceeding.

2. The only cognizable issue is whether trial and appellate counsel rendered ineffective assistance with regard to this evidence.

3. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

4. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

5. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

6.     An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

7.     An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

8.     Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

9.     In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

10.    Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

11.    Applicant's contentions regarding his claims of ineffective assistance are too conclusory to meet his burden to satisfy either prong of *Strickland*. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

12. Evidence relating of the deaths of Jodi and the unborn child was admissible as same-transaction contextual evidence. *See, e.g.*, *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (in capital-murder trial for killing homeowner's guest during burglary, evidence Camacho and accomplices kidnapped and later murdered homeowner's wife and son admissible as same-transaction contextual evidence).

13. Although Applicant complains that "the amount, detail, and focus of the testimony surpassed any contextual purpose" [Application at 99], "[r]arely will the prejudicial value render inadmissible any evidence that is context of the offense." *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986). The Court of Criminal Appeals has never found that non-errors may in their cumulative effect cause error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).

14. The evidence Applicant cites as being impermissible victim-impact evidence does not fall within the definition of such evidence. *See Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (victim-impact evidence is evidence of the effect of an offense on people other than the victim).

15. Applicant has not met his burden to demonstrate by a preponderance of the evidence that the performance of trial counsel on either occasions when trial counsel objected or when they did not object fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range or reasonable professional assistance. Therefore, Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

16. There is no reasonable probability that the evidence cited by Applicant was so inflammatory or prejudicial that it would have impermissibly shifted the focus from the relevant issues in Applicant's trial and that Applicant would have been acquitted or sentenced to life without parole had his trial counsel objected to the evidence cited. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance.

17. Applicant fails to demonstrate that appellate counsel could have raised points of error on appeal challenging the admissibility of SX 318 and 379 that would have had indisputable merit under well-settled law and would have necessarily resulted in reversible error. *See Ex parte Flores*, 387 S.W.3d at 639. Therefore, Applicant has failed to meet his burden to establish that his trial counsel were ineffective for failing to raise a challenge on direct appeal to the Court's admission of those exhibits into evidence.

18. Even if the Court erred in admitting SX 318 and 379 into evidence, the error would have been subject to a harmless-error analysis pursuant to TEX. R. APP. P. 44.2(b), which requires the appellate court to disregard any nonconstitutional error that does not affect substantial rights. Based on the entire record at the guilt-innocence phase of the trial, any error in admitting SX 318 and SX 379 would have been disregarded as harmless on direct appeal. *See, e.g.*, *Rolle v. State*, 367 S.W.3d 746, 752-56 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (admission of photograph of murder victim's unborn child who was not named victim held harmless, distinguishing *Reese* and *Erazo*); *Erazo v. State*, 167 S.W.3d 889, 890-91 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (op. on remand for a harmless-error analysis; error in *Erazo* found to be harmless). Applicant has not met his burden to show by a preponderance of the evidence that his appellate counsel's decision not to challenge the admission of SX 318 and 379 on appeal constituted deficient performance that resulted in prejudice.

19. The Court recommends that Applicant's eighth claim for relief be denied.

## H. Claim for Relief Nine

Applicant alleges that his trial counsel failed to effectively present evidence that Applicant's confessions should be suppressed and that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions. [Application at 105-06.]

**Findings Of Fact**

1. Applicant alleges that his trial counsel were ineffective because they did not: (a) "offer as exhibits transcripts of the phone calls that took place between [Kennedale police captain Darrell] Hull, [CBP officer Paul] Kandal, and the Kennedale dispatcher during the detaining and arrest" of Applicant; and (b) "submit other documents created by the Border Patrol during their detention" of Applicant which allegedly "would have established that there was no lawful basis for [Applicant's] detention by the Border Patrol, that [Applicant's] resulting arrest was unlawful, and that his subsequent confession was a violation of his rights under the Fourth Amendment." [Application at 105-06.]

2. Trial counsel moved to suppress Applicant's statements and confessions, as well as seized evidence, and counsel and litigated the issue in a contested pretrial suppression hearing lasting four days. [CR 2: 324-51; RR 6-9; Cummings' affidavit at 9.]

3. Trial counsel aggressively litigated a multitude suppression issues, including the legality of Applicant's detention by CBP. [RR 6-9; Moore's affidavit at 25.]

4. Following the pretrial suppression hearing, Applicant's trial counsel filed an extensive trial memorandum in support of the motions to suppress. [CR 3: 406-42; Moore's affidavit at 26.]

5. Trial counsel obtained copies of the tape recordings and reports relied upon by Applicant in this habeas proceeding. [Moore's affidavit at 25; Cummings' affidavit at 10.]

6. Trial counsel reviewed the recordings and reports at issue in preparation for cross-examining the witnesses from the Kennedale Police Department and CBP at the pretrial suppression hearing. [Moore's affidavit at 25; Cummings' affidavit at 10.]

7. At the pretrial suppression hearing, trial counsel used the recordings and reports at issue during cross-examination of the relevant witnesses so that the Court was aware of the communications. [Cummings' affidavit at 10.]

8. All of the significant relevant facts contained in the recorded telephone conversations and written reports relied on by Applicant in this habeas

proceeding were acknowledged by the witnesses at the pretrial suppression hearing. [Moore's affidavit at 26.]

9. The Court was made aware of the relevant facts contained in the transcript and report during the pretrial suppression hearing and in the memorandum of law filed by trial counsel in support of the motions to suppress.

10. The transcript and the written report submitted by Applicant in this habeas proceeding do not contain facts that differed significantly from what the Court heard at the pretrial suppression hearing, and the documents would not have changed the Court's findings regarding Applicant's lawful detention or the attenuation of any taint.

11. All of the information contained in the recordings and reports that trial counsel believed to be relevant to the legality of Applicant's border detention was acknowledged during cross-examination of the State's witnesses during the suppression hearing; hence, there was no need for Applicant's trial counsel to impeach those witnesses by introducing the actual reports and recordings. [Moore's affidavit at 25-26.]

12. The Court was well aware at the pretrial suppression hearing that Kandal verified Applicant's citizenship, that Kandal told the Kennedale police dispatcher during their telephone conversation at 7:16 a.m. PST that Applicant was an otherwise admissible person whom he could not hold without a warrant, that Kandal stated he could not hold Applicant in order to encourage the Kennedale Police Department to act quickly so that Kandal could move Applicant out of his jurisdiction, and that Kandal was in contact with Hull during the time the Kennedale Police Department was working to process a warrant. [RR 8: 32-33, 87, 89-90, 100.]

13. Kandal was required to continue holding Applicant in order to determine what Kennedale wanted to do about Applicant being a missing person. [RR 8: 90-92.] Kandal was not bound by the language in the Kennedale Police Department's missing-person report instructing agencies not to detain or arrest Applicant because Kandal operates under the policies and directives of CBP to contact the jurisdiction, verify the information, and find out what the agency wants done with the individual who has been reported missing. [RR 8: 91, 100.]

14. The record does not support Applicant's claim that the transcript and report at issue "revealed a concerted effort" on the part of the Kennedale Police Department and CBP "to invent some justification" to hold Applicant while Kennedale officers started the process of obtaining an arrest warrant. [*See* Application at 115.]

15. Neither the transcript of the telephone calls nor the written report submitted by Applicant in this habeas proceeding supports Applicant's assertion of any improper motive or wrongdoing on the part of the Kennedale Police Department or CBP in Applicant's detention. *Cf. Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's rejection of Applicant's claim that he was illegally detained at the border based on lies was supported by the record).

16. The Court of Criminal Appeals addressed on direct appeal Applicant's contention that he was unlawfully detained at the border based on intentional lies and falsehoods and found that this Court's determination regarding the lawfulness of the detention was supported by the record. *See Hummel*, 2013 WL 6123283 at *7-18.

17. As the Court held in denying Applicant's pretrial motions to suppress, Applicant's detention by CBP pending the issuance of an arrest warrant was justified on several grounds based on federal law and CBP's policies. *See Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's findings that CBP agents had authority to detain Applicant pursuant to federal law and policies and procedures was supported by record).

18. Nothing in the transcript or report submitted by Applicant in this habeas proceeding invalidates this Court's previous determination that Applicant's detention pursuant to federal law or CBP's policies and procedures was lawful, and the Court would not have changed any of its findings or rulings related to Applicant's motions to suppress had Applicant's trial counsel introduced the transcript and report into evidence at the pretrial suppression hearing.

19. There is no reasonable probability that Applicant would have been acquitted or sentenced to life without parole if the Court had suppressed Applicant's confession or the murder weapons found as a result of the confession.

    a. Fire investigators unanimously concluded that the fire at Applicant's house was an arson under the Texas Penal Code. [RR 34: 248-49.]

b. The jury heard medical-examiner testimony about and saw photographs of the extensive non-fire-related injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

c. Blood matching the DNA of Applicant, Joy, and Eddie was found on clothing that Applicant voluntarily turned over during his December 18, 2009, noncustodial interview at the Kennedale Police Department. [RR 35: 39; RR 37: 190-91, 196-97, 200-01; SX 341B.]

d. During Applicant's interview at the Kennedale Police Department, Steele saw blood on Applicant's pant leg, blood on Applicant's socks, and very recent scratch marks on Applicant's back. [RR 35: 42-44, 60-62; SX 274-76.]

e. Applicant's statements at the Kennedale Police Department raised Steele's suspicions because Applicant's story did not make sense. [RR 35: 81; *see* SX 341B.]

f. Shortly after leaving the police station on December 18, 2009, Applicant fled in his van to California, which evidenced Applicant's consciousness of guilt.

20. Applicant contends that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions because he "should have more clearly argued" that Applicant's confession should have been suppressed based on the actions of the Kennedale Police Department and CBP. [Application at 124-25.]

21. In preparing Applicant's brief on direct appeal, appellate counsel reviewed the motions to suppress filed by trial counsel, reviewed the applicable facts, and researched the applicable law. [Stickels' affidavit at 2-3.]

22. On direct appeal to the Court of Criminal Appeals, appellate counsel challenged this Court's denial of Applicant's motion to suppress his confessions. [*See* Application at 125; Applicant's Exhibit 31.]

23. Based on his research and experience, Applicant's appellate counsel presented appellate issues challenging the denial of Applicant's motions to suppress in "an appropriate manner that [he believes] was calculated to obtain relief" on appeal. [Stickels' affidavit at 3.]

24. The appellate arguments advanced by Applicant's appellate counsel focused on the sufficiency of the arrest-warrant affidavit to establish probable cause and also argued that Applicant's confession was "the culmination and result of all of the previous unconstitutional state actions," which "allud[ed] to an earlier discussion of false statements" made by the Kennedale Police Department to CBP.

25. Applicant does not articulate exactly how his appellate counsel should have argued the claims differently or how counsel's failure to do so fell outside the wide range of reasonable professional assistance. [*See* Application at 124-25.]

26. Applicant's complaint simply second-guesses in hindsight his appellate counsel's strategic decisions based on counsel's experience and research about how to best challenge on direct appeal the Court's denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions. [*See* Application at 124-25.]

27. Applicant has not shown that the appellate contention he alleges counsel should have made had indisputable merit under settled case law. Therefore, Applicant has not demonstrated that he would have prevailed on appeal had his appellate counsel raised different issues or argued the issues raised differently. [*See* Application at 124-25.]

28. There was no legal or factual basis for the Court to suppress Applicant's confessions or the evidence found as a result of the confessions.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that

counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d at 704-05.

8. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9. The validity of a stop or an arrest is determined solely by analyzing the objective facts surrounding the event. *Garcia v. State*, 827 S.W.2d 937, 943 (Tex. Crim. App. 1992). "Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which [the officers] acted is of no consequence." *Id.* (quoting *United States v. Causey*, 834 F.3d 1179, 1185 (5th Cir. 1987)). The telephone conversations and later written CBP report focused on only one valid basis to detain Applicant at the border and such evidence would not have rendered alternative objective bases to detain Applicant invalid or inapplicable.

10. Applicant's conclusory allegations fail to satisfy his burden to demonstrate that his appellate counsel provided ineffective assistance. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. Applicant's allegations amount to nothing more than an impermissible second-guessing of appellate counsel's strategic decisions made based on counsel's experience and research about how to best challenge the denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions on appeal. *See Strickland*, 466 U.S. at 690-91; *see also Scheanette*, 144 S.W.3d at 510 (fact that another attorney may have pursued different tactic insufficient to prove ineffective-assistance claim).

12. The strategic decisions of Applicant's trial counsel not to offer cumulative evidence in a different format do not support a claim of ineffective assistance. *See Parker*, 565 F.3d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative); *Coble*, 496 F.3d at 436 (counsel's decision not to present cumulative testimony does not

constitute ineffective assistance); *Barnes v. United States*, 859 F.2d 607, 608 (8th Cir. 1988) ("[d]irect- and cross-examination techniques are matters of trial strategy left to the discretion of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

13. There is no reasonable probability that, had Applicant's trial counsel introduced the transcript of the telephone calls and the written report at issue, Applicant would have prevailed at the suppression hearing or at his trial. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

14. Applicant has not met his burden to demonstrate by a preponderance of the evidence that his appellate counsel failed to raise a claim of indisputable merit under settled law. Applicant has not shown deficient performance of his appellate counsel.

15. There is no reasonable probability that Applicant would have prevailed on direct appeal had his appellate counsel "more clearly argued" the point of error challenging the denial of Applicant's motion to suppress his confession and the evidence seized as a result of the confession. Therefore, Applicant has not met his burden to prove by a preponderance of the evidence that he suffered any prejudice as a result of his appellate counsel's alleged deficient performance.

16. The Court recommends that Applicant's ninth claim for relief be denied.

## I. <u>Claim for Relief Ten</u>

Applicant alleges that his appellate counsel was ineffective for failing to appeal the Court's erroneous denial of challenges for cause of nine prospective jurors who illustrated that their views would impair their ability to follow the Court's instructions and their oath. [Application at 126.]

**Findings Of Fact**

1. Applicant's allegations concern the Court's denial of Applicant's challenges for cause against veniremembers Thomas Bancroft Jr., LaDonna Butler, Kayla McFarland, Leslie Cuevas, Pamela Powell, Steven Guidroz, Kenneth Zeiger, Donna Beauchamp, and Janie Cantu Hermosillo. [Application at 126-37.]

2. On direct appeal, Applicant's appellate counsel reviewed the entire voir dire proceedings, including the voir dire of the nine veniremembers at issue in this habeas proceeding, and he researched the applicable law. [Stickels' affidavit at 4.]

3. Applicant's appellate counsel did not raise points of error relating to the nine veniremembers at issue because in his opinion "there was no error in the trial court's refusal of [Applicant's] challenges for cause." [Stickels' affidavit at 4.]

4. Applicant cites only limited excerpts of the nine veniremembers' relevant voir dire and offers no substantial argument or authority to support his assertions that the Court erroneously denied his challenges for cause. [Application at 126-27.] Applicant's arguments and assertions overlook the totality of the voir dire of the nine prospective jurors at issue.

5. Veniremember Bancroft

   a. Applicant challenged veniremember Bancroft for cause because he would create a burden on the defense to produce evidence of mitigating circumstances. [RR 16: 199.]

   b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 199.]

   c. Bancroft agreed that, if he took the oath as a juror, he would have to follow the law of the State of Texas and that he had no difficulty doing so. [RR 16: 148.]

   d. The State reminded Bancroft several times that neither party had any burden of proof on the mitigation special issue, and Bancroft agreed that a criminal defendant never had a burden of proof, even when there was no burden of proof on the State. [RR 16: 158-59, 161, 165-66.]

e. When Applicant's trial counsel asked if Bancroft felt the language of the mitigation special issue put the burden on the defense to bring mitigating circumstances or to convince him of the sufficiency of the mitigating circumstances, Bancroft responded that "something is going to have to come out," that "someone's going to have to show me what kind of person they are," and that "since you're . . . defending him, you would probably have to tell me something about him." [RR 16: 193.]

f. When Applicant's trial counsel explained that the law did not envision the defense having the burden on the mitigation special issue, Bancroft responded "[r]ight," and then the following exchange occurred:

> Q. [DEFENSE COUNSEL] So . . . what I'm getting from you is . . . you kind of feel like that question is putting a burden on me, am I correct?
>
> A. [BANCROFT] What I'm saying is the evidence in the case would be, you know, back to what caused it or what happened, but . . . if someone's trying to prove the Defendant's character and background, I – you've got to tell me or either he's got to tell me. I mean, I don't know their background or character unless someone does tell me that. Not saying you got to prove it, but . . . I got to know something about your character or background –
>
> Q. Okay.
>
> A. – to answer that question.
>
> Q. Do you think it would be my obligation to convince you that that evidence was sufficient?
>
> A. No.

[RR 16: 194 (emphasis added).]

g. While Bancroft correctly expressed that there would have to be evidence from some source to allow him to answer the mitigation special issue, he clearly understood that neither side bore any burden to convince him of the existence and/or sufficiency of mitigating evidence.

h. At worst, Bancroft's answers were vacillating or contradictory at times regarding the mitigation special issue and whether he would place a burden on the defense.

i. Bancroft's overall voir dire demonstrated his ability to follow the Court's instructions and to answer the mitigation special issue based on the law and the evidence.

6. Veniremember Butler

a. Applicant challenged Butler for cause on the grounds that: (i) her failure to see a distinction between the terms "probability" and "possibility" reduced the State's burden of proof on the future-dangerousness special issue; and (ii) she would require a nexus between a mitigating circumstance and the actual commission of the crime, which unduly narrowed the mitigating circumstances the defense would be allowed to bring to the jury. [RR 16: 250.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 251.]

c. During the State's individual voir dire, Butler stated that "probability" meant "[a] chance that it would happen again." [RR 16: 209.]

d. Butler agreed that a "probability" was not a certainty and that a probability fell somewhere between a "possibility" and a certainty. [RR 16: 209.]

e. During the defense's voir dire, Butler agreed that "probability" meant there was "some degree of likelihood." [RR 16: 240.]

f. Butler stated that she and most people probably would interpret the terms "possibility" and "probability" as being "similar." [RR 16: 240.]

g. Butler indicated that she did not see a difference in the degree of likelihood being inquired about by the two terms and that one would not ask her to find a greater degree of likelihood than the other. [RR 16: 241.]

h. During the State's questioning when the distinction between the terms "probability" and "possibility" was explained, Butler had an

appropriate understanding of the meaning of the terms, she saw and accepted the distinction between the terms, and she saw a "probability" as something more than a "possibility."

i. The defense's questioning regarding the distinction between a "probability" and a "possibility" merely sought out Butler's interpretation of the terms and did not explain that the law required Butler to see and accept the distinction between the terms. [RR 16: 240-41.]

j. At worst, Butler's answers about her understanding of "probability" were vacillating, contradictory or unclear.

k. Based on Butler's overall responses and demeanor, she exhibited a proper understanding that "probability" meant more than a "possibility."

l. With regard to the mitigation special issue, Butler stated that she would keep an open mind, look at all the evidence, and not automatically answer the special issue "no." [RR 16: 216.]

m. Butler stated that the mitigation special issue did not place a burden on the defense to prove the existence or sufficiency of a mitigating circumstance. [RR 16: 245-46.]

n. Butler responded affirmatively when Applicant's trial counsel asked if she thought the mitigation special issue was talking about blameworthiness for the offense of conviction and if she believed the instruction compelled her to find a mitigating circumstance only if it had some type of direct connection to the commission of the crime. [RR 16: 247-48.]

o. Butler found the application of the mitigation special issue as stated by Applicant's trial counsel to be "confusing." [RR 16: 248-49.]

p. Butler responded during the State's questioning that she would keep an open mind, look at all the evidence, and not automatically answer the mitigation special issue "no." [RR 16: 216.]

q. Butler's overall voir dire showed that she would follow the Court's instructions in answering the mitigation special issue.

7. Veniremember McFarland

a. Applicant challenged McFarland for cause because, in considering the future-dangerousness special issue, she would consider if there was a probability that a third party would commit criminal acts of violence on Applicant's behalf. [RR 17: 289.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 17: 289.]

c. McFarland indicated that she could give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty, depending on the facts of the case. [RR 17: 237.]

d. McFarland defined society as "[t]he public . . . a group or community of people," and she agreed that the definition of society was a broad term that could include the world at large. [RR 17: 245-46.] Then, the following relevant exchange occurred:

> Q. [PROSECUTOR] But the question here is the Legislature said we have – the State has the burden of proof beyond a reasonable doubt that the Defendant is going to be a continuing threat to society.
>
> And remember from our discussions earlier that he's going to be . . . convicted of capital murder is going to be in the penitentiary the rest of their life. So you see in your mind, is there a possibility that someone could be a threat to society from the penitentiary?
>
> A. [MCFARLAND] Most of me says no, but, you know, a very, very small chance that they could be. You know, there's the Internet, there's family contact that could do something for them in that way, not – not directly themselves, but I do think there is a – some chance that they could find a way to do something on the outside world outside prison.
>
> Q. Do people from the penitentiary ever escape from the penitentiary?
>
> A. Yes.
>
> Q. Do people from . . . the society outside the penitentiary go to work in the penitentiary?

A. Yes.

Q. Do they visit the penitentiary sometimes?

A. Yes.

Q. So you see that there's some . . . possibility for interaction –

A. Yes.

Q. – of – of inmates with people from your definition of society?

A. Yes.

[RR 17: 246-47.]

e. Applicant's trial counsel later revisited the issue in the following exchange:

Q. [DEFENSE COUNSEL] Okay. And then I know you had talked earlier about . . . the criminal acts of violence. . . . I understand the way you think of it as being a group in public or a group or community of people. And [the prosecutor] had talked about [society] also was prison, and I think you said originally that you're thinking no, but then you thought about the Internet?

A. Yes. . . . I guess I was just trying to think of ways that an inmate could interact or communicate with the outside world.

Q. And what if – if the Judge were to tell you or – you understand that in Texas, they don't have access to the Internet?

A. No, I don't know that.

Q. Okay.

A. No, . . . it was something out of . . . my head. I don't know –

Q. Okay.

A. – phone calls, letters, you know.

Q. Okay.

A. Family visits.

Q. I'm sorry. You had said something earlier about also a family member, maybe?

A. Yes.

Q. So is . . . your definition . . . of probability that the Defendant would commit – commit criminal acts would be that it could also be by one of their family members?

A. Yes. They could arrange it.

* * *

Q. (BY [DEFENSE COUNSEL]) You understand that the acts would be by the Defendant and not a third person?

A. Yes.

Q. Because a second ago, you said it could be by a family member?

A. Well, . . . I guess I just had in my mind that if someone in prison wanted to get back at someone outside of prison, they would find a way to possibly . . . find some way of causing harm to them or – or – I don't know how much more to put it into words, but I think if there's a will, there's a way.

Q. So would it be fair to say for you that –

A. They may not do it directly, but I think there is a chance that they could do it indirectly.

Q. Okay. So be fair to say that for you, you would attribute acts in Special Issue No. 1, acts of a third person, to the Defendant in – in this question?

A. Yes.

[RR 17: 281-83.]

f. Read as a whole, McFarland's responses at issue simply reveal her thought process during questioning about whether a person confined in the penitentiary could commit future acts of violence in society outside of prison.

g. McFarland never indicated that she would hold acts of a third party against Applicant if Applicant himself did not play a part in directing the third party's acts of violence.

h. McFarland responded affirmatively when defense counsel asked, "You understand that the acts would be by the Defendant and not a third person?" [RR 17: 282.]

i. McFarland's overall voir dire demonstrates her ability to follow the Court's instructions in answering the mitigation special issue and to give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty depending on the facts of the case. [RR 17: 237; 244-45.]

8. Veniremember Cuevas

a. Applicant challenged Cuevas for cause because: (i) she indicated that her answer to the future-dangerousness special issue would be automatic based upon her analysis in finding Applicant guilty; (ii) she indicated that she had a predisposition toward the death penalty; and (iii) she never mentioned in her jury questionnaire anything about having followed the capital-murder case involving her church Sunday school classmate's murder even though question 85 specifically asked that question. [RR 20: 236-37.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 20: 238.]

c. During the State's individual voir dire, Cuevas said that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

d. Although Cuevas put in her questionnaire that the death penalty should be available for capital murder, murder of a policeman, and murder of children, she understood and had no issue with the

definition of capital murder as charged in Applicant's case. [RR 20: 197-98.]

e. Defense counsel asked Cuevas if she believed that the death penalty "would be the only appropriate option" for the offenses she listed in her questionnaire, and Cuevas responded: "Well, I don't know that it's the only option because what's been explained is we have to look at two things and make our decision based on . . . answering those two questions." [RR 20: 224.] When asked if a life sentence would be an option when dealing with those types of crimes, Cuevas responded, "I have to answer yes." [*Id.*]

f. Cuevas' response on her jury questionnaire that the death penalty should be available for "capital murder, murder of policemen, murder of children" [Applicant's Exhibit 35, p.7] did not, as Applicant alleges, show her predisposition to give the death penalty to someone who murdered a child. [Application at 130.]

g. Cuevas understood and agreed that in Applicant's trial the definition of the crime was the one shown on the State's PowerPoint, she understood that she would have to keep an open mind and consider all phases of the case before reaching a decision, and she believed she could follow the Court's instructions and go through the procedure in reaching a decision. [RR 20: 192, 197.]

h. Cuevas told the State that, regardless of what was in Cuevas' questionnaire, she could follow her oath and apply the law to the facts in the case and render a just verdict. [RR 20: 206.]

i. With regard to the mitigation special issue, Cuevas could keep an open mind, consider mitigating evidence in a case, and vote based on her view of whether the evidence rose to such a level that it was mitigating, and she would vote "yes" if it rose to the level of mitigating in her mind and "no" if it did not. [RR 20: 211.] Cuevas would keep an open mind, follow her oath, and give the mitigation issue a fair review. [RR 20: 212-14.] She understood that she had to keep an open mind until the State met its burden in the guilt-innocence phase and on the future-dangerousness special issue and until the jurors decided amongst themselves how to answer the mitigation special issue. [RR 20: 215.]

j. Regarding the future-dangerousness special issue, Cuevas stated that she could apply the law to the facts of the case and render a just verdict. [RR 20: 206-07.] She would answer the special issue "yes" if the State met its burden of proof, and she would have no hesitation in answering "no" if the State did not meet its burden. [RR 20: 208.]

k. With regard to the future-dangerousness special issue, the following relevant exchange occurred between Applicant's trial counsel and Cuevas:

[DEFENSE COUNSEL] And then you're being called upon to answer this questions, Special Issue No. 1. Is that something that's pretty much a given? I mean, if you've answered all of these questions such that a – a guilty verdict has taken place, can you see where the – that someone could decide it's a no-brainer, it's – it's an automatic response of yes because after all, we've already found these things? Is that a yes?

A. [CUEVAS] Yes.

Q. Okay. No, . . . the law puts the burden on the State. The law says that they have to bring you evidence that this – this particular question, the answer is yes. They have to satisfy each of the 12 of you of that.

Would they have already satisfied you if the answer is yes, because after all, they have proven these things to you beyond a reasonable doubt other than the found to be a future danger at the bottom. The slide is really meant to deal with the next special issue. That's the only difference.

Can you see that it – with some people, that it could very well be an automatic choice, it's – it's a no-brainer?

A. Yes.

Q. Okay. Would it be so with you?

A. Yes.

[RR 20: 230-31.]

l. The Court questioned Cuevas to clarify her responses regarding the future-dangerousness special issue:

> THE COURT: . . . What you said to [defense counsel] was that you felt like the answer to Question No. 1 would be automatic based upon what your decision was in the guilt/innocence phase of the trial.
>
> And certainly it can be based upon the same evidence. My question to you is whether it's asking the same thing.
>
> [CUEVAS]: I don't think so.
>
> THE COURT: Okay. So just because you found somebody guilty of the offense of capital murder, you're not saying that you would automatically find that they were going to be a future danger in Question No. 1, or are you saying that? That's what I'm trying to figure out.
>
> [CUEVAS]: I guess it would just depend on the evidence that you heard during the trial. I mean, I don't know that I can adequately answer that question at the moment.

[RR 20: 235-36.]

m. Regarding the future-dangerousness special issue, Cuevas' answers, at worst, were vacillating, contradictory, or unclear as to whether she would automatically answer the question "yes" after a finding of guilt.

n. Cuevas stated that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

o. Early in the defense's individual voir dire, Cuevas said she formed her opinion regarding the death penalty in 1994 or 1995 when a policeman in her Sunday school class in San Antonio, Texas, was killed while trying to stop a robbery in his neighborhood. [RR 20: 216.] Cuevas "followed the case very closely," she heard about the defendant's bad childhood "and everything that had happened to him," and she thought the defendant in that case deserved the death penalty even though she felt bad for him. [*Id.*] Cuevas would look that defendant up on the Internet every couple of years, and she found

out a few years ago that he was executed. [*Id.*] Cuevas did not attend the trial. [RR 20: 217.]

p. Cuevas was not challengeable for cause simply because she never mentioned on her jury questionnaire that she followed the capital-murder case involving her Sunday school classmate's murderer even though question 85 specifically asked that question. The defense never questioned Cuevas about why she did not include this information in response to question 85 in the jury questionnaire. Nothing in the record indicates whether Cuevas misunderstood that question 85 called for her to include the case of her Sunday school classmate's murderer as a case in which she had an interest. *See Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999) ("written questions are by nature vulnerable to misinterpretation").

q. Given the readiness with which Cuevas disclosed and discussed the case of her Sunday school classmate's murderer during her individual voir dire, the Court finds that Cuevas had no intention to be dishonest in her responses to the jury questionnaire.

r. Cuevas disclosed her connection to the case involving her Sunday school classmate's murderer, thus providing the defense an opportunity to intelligently exercise its challenges and to determine whether she could be a disinterested and impartial juror.

s. Nothing indicates that Cuevas' knowledge regarding the case involving her Sunday school classmate's murderer would have had effect on her ability to follow her oath and the law in Applicant's case.

t. Cuevas' overall voir dire demonstrated that she would follow her oath and the Court's instructions and render a punishment verdict based on the facts in evidence and the law provided by the Court.

9. Veniremember Powell

a. Applicant challenged Powell for cause on the basis that she would minimize or reduce the State's burden of proof on the future-dangerousness special issue by automatically voting "yes" solely upon the evidence presented to her at the guilt-innocence phase of the trial. [RR 21: 58.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 21: 59.]

c. During the State's individual voir dire, Powell indicated that she would answer the future-dangerousness special issue "yes" if the State met its burden beyond a reasonable doubt and "no" if the State failed to meet its burden. [RR 21: 19.]

d. Powell understood that her oath would require her to keep an open mind to everything. [RR 21: 20.]

e. Powell agreed to evaluate the evidence from both the guilt-innocence and punishment phases of trial. [RR 21: 20.]

f. Powell responded affirmatively when asked if she could "keep an open mind to all the – the process." [RR 21: 29.]

g. During the defense's voir dire, Powell responded that the future-dangerousness special issue asked her to "[l]ook at the testimonies or the evidence to see if he's going to be a harm to other people in society." [RR 21: 52.]

h. Powell responded that she would listen to "all the testimony or whatever information is brought into the trial." [RR 21: 52-53.]

i. Powell understood that the State bore the burden on the future-dangerousness special issue and that the defense had no burden at all. [RR 21: 53.]

j. The entire exchange about whether Powell would automatically answer the future-dangerousness special issue "yes" based upon finding Applicant guilty is as follows:

Q. [DEFENSE COUNSEL] But you're asked to deal with Special Issue No. 1. . . . I'm trying to set a context here and – you've already heard evidence of two murders, two knowing murders that don't have any defenses, there's no mental retardation, . . . the accused is within . . . the proper age range, it's not an accident, it's not insanity, it's not something that . . . they didn't intend to do because they were high or something like that. I believe on your questionnaire you had something like that.

You've already made this choice. You've decided beyond a reasonable doubt that's where we're at. Now you're being asked to . . . answer Special Issue No. 1. Do you – do you see a difference in the – in the role that you have in the punishment phase?

A. [POWELL] Yes, sir.

Q. Are you going to be in a mindset that my goodness, I mean, we've already found that this guy's committed two murders. There's no defense. It's a – it's a given. It's a foregone conclusion. Obviously, the continuing threat to society. Does that fall within your way of thinking?

A. Yes, sir.

Q. Okay. . . . [Y]ou can take into consideration the evidence from the first phase of a trial, obviously –

A. Yes, sir.

Q. – in answering the special issues in the second phase.

You can – and many times the prosecutor will stand up and – and ask the judge to – to admit all the evidence from the first phase of the trial and during the second phase or whatever for the benefit of the jury. We all know that's the case anyway, but it's something done.

But my question to you here is – you've already made that decision that, My God, this guy has committed two murders, and there's no justification, they're innocent victims. The – is this going to be pretty much automatic for you as far as Special Issue No. 1 under those circumstances?

A. Yes, sir.

[RR 21: 54-56.]

k. In response to the defense's challenge for cause to Powell, the State pointed out:

[PROSECUTOR]: Judge, the entire tenor of [Powell's] voir dire was that she would be open-minded and follow the law. [Defense counsel's] fact pattern, as you'll recall, that – when she answered it

would be automatic is – he went through for about four minutes in fact pattern that the juror is allowed to consider as part of answering the question yes. And based on that fact pattern, they go into what (sic) she said that.

They never challenged her on her admissions throughout the State's voir dire for – that she would consider and be open-minded throughout the entire process and hold the State to our burden and never put the burden on the Defense.

[RR 21: 58-59.]

l. The fact that Powell could answer the future-dangerousness special issue "yes" based on the facts of an offense did not render her unfit to serve because the circumstances of an offense and the events surrounding it may alone be sufficient to sustain an affirmative finding to the future-dangerousness special issue.

m. Powell did not manifest an inability to reconsider or reweigh the evidence from the guilt-innocence phase in the particular context of the future-dangerousness special issue; therefore, Powell did not demonstrate herself to be unable to objectively follow the law.

n. Counsel never explained to Powell that the future-dangerousness issue required a different analysis than finding Applicant guilty; thus, Applicant has not shown that Powell understood the requirements of the law and would be unable to put aside her personal beliefs and follow the law.

o. At worst, Powell's responses were vacillating, unclear, or contradictory about whether she would automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

p. Powell's overall voir dire showed that she would follow the Court's instructions and answer the future-dangerousness special issue based on the facts and the law and that she would not automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

q. Applicant never challenged Powell on the ground he states in this habeas proceeding that her connection to the criminal justice system –

*i.e.*, she worked as a clerk in Tarrant County and had a close relationship with others who worked in the court building – "may have biased her opinion as a juror." [Application at 131.] Alternatively, Powell's voir dire examination unequivocally demonstrated that her position in the clerk's office would have absolutely no effect on her service as a juror.

10. Veniremember Guidroz

a. Applicant challenged Guidroz for cause because his reading of the mitigation special issue would place the burden on the defendant. [RR 27: 115.]

b. The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 27: 116.]

c. The following relevant exchange occurred during the defense's individual voir dire of Guidroz:

Q. [DEFENSE COUNSEL] It's envisioned that. . . the question [regarding mitigation] doesn't put a question on either side, but if the issue is whether or not it's sufficient, some jurors look at that and say, Well, it's got to be my job to convince me it's sufficient.

Do you feel like just by the way the question is worded it puts any kind of legal burden on the Defense to produce the mitigating evidence or to convince the jury that that mitigating evidence is sufficient?

A. [GUIDROZ] I would say, yes.

Q. Okay. And that's a little bit different from what the law requires.

A. I'm sorry?

Q. That is different from what the law would envision, but they wrote the question in a bad way.

A. Okay.

[RR 27: 109.]

d. Guidroz could answer the mitigation special issue "no" if he felt it was proper based on the evidence in the case. [RR 27: 91.]

e. Guidroz was open to the idea that there could be something that would be sufficient for him to find a mitigating circumstance. [RR 27: 111.]

f. Guidroz's overall voir dire demonstrates that he could follow his oath and the law in answering the mitigation special issue. [RR 27: 87.]

11. Veniremember Zeiger

a. Applicant challenged Zeiger for cause because he would have a predisposition to answer the future-dangerousness special issue "yes." [RR 28: 103.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 28: 103-04.]

c. During the State's individual voir dire, the State informed Zeiger that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 61, 66.]

d. Zeiger stated that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and that he could answer "no" if the State failed to meet its burden. [RR 28: 66-67.]

e. During questioning by Applicant's trial counsel, the following exchange occurred:

Q. [DEFENSE COUNSEL] Well, I guess what I'm trying to get is how you're looking at [the future-dangerousness special issue]. Because he's going to be guilty before you ever ask this question. And you know that under this statutory scheme, that means he killed at least two people during the course of a single criminal transaction.

And what I'm asking for – you is does that tell you that he's always going to be a danger, such that that question is always going to be answered yes; or do you think there could be situations where you would find – could find somebody guilty –

A. [ZEIGER] I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again.

Q. Okay. And – and that's sometimes the problem with the question. You see that – and because of the way you're looking at it, that question really is not serving any purpose, does it.

A. There might be one – I'm trying to think of the word – one exception.

Q. I'm sure there probably is an exception where I would say, you know, now maybe he wouldn't do it again because – but not likely.

Q. Not likely what? Not likely they're –

A. The person's already found guilty of capital murder, and the question of whether they would commit the crime, I would have to say probably that, you know, yeah, they would, but there might be an exception.

Q. Okay.

A. But I don't know what that exception would be, and I'd have to weigh all the – the variables and – and understand, I guess, the individual, the circumstances of . . . what happened and, you know, that's almost – that's a whole life.

Q. Okay. . . . I just want to make sure that we're on the same page. The question is not asking you is he going to commit that crime again.

A. Right.

Q. The question is: Is there a probability that he would commit crimes of violence? And from what –

A. It's – it's hard to say, but that's a yes-or-no answer.

Q. Okay.

A. I mean, to me it's not a yes-or-no answer.

Q. What would it be? That's what the question calls for.

A. Well, . . . it really depends on the individual and – and all the extenuating, you know, circumstances and everything.

Q. Okay. Do you feel like that you're predisposed to say that the answer should be yes if you find somebody guilty of capital murder?

A. Yes.

[RR 28: 92-94.]

f. Zeiger later said that the "system" made sense, and he acknowledged that the special issues required the jury to find something additional about the defendant because not every capital murderer would get the death penalty. [RR 28: 100.]

g. Zeiger's counsel did not ask whether Zeiger could set aside his predisposition and follow his oath as a juror.

h. Arguably, Zeiger at times gave responses that could be interpreted as showing a predisposition to answer "yes" to the future-dangerousness special issue if someone was guilty of capital murder for killing two people. However, he also stated that there could be an exception, that he would have to weigh all the variables and understand the individual and the circumstances of what happened, and that it depended on the individual and all the extenuating circumstances. Additionally, Zeiger stated during the State's questioning that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and "no" if it did not. [RR 28: 66-67.]

i. At worst, Zeiger's responses were vacillating, contradictory, or unclear.

j. In context, Zeiger's entire voir dire established that he would be able to set aside his personal beliefs and follow the Court's instructions in answering the future-dangerousness special issue.

12. Veniremember Beauchamp

a. Applicant challenged Beauchamp because she would reduce the State's burden on the future-dangerousness special issue and vote "yes" based upon the proof of multiple murders in the same transaction. [RR 28: 158.]

b. The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 158-59.]

c. During the State's individual voir dire, Beauchamp indicated her understanding that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 121-22.]

d. Beauchamp understood the State's burden of proof on the future-dangerousness special issue and could answer question "yes" if the State met its burden of proof and "no" if the State did not meet its burden. [RR 28: 121-22, 128-29.]

e. Beauchamp could see that finding a defendant guilty of capital murder was a different question than asking if he would possibly constitute a continuing threat to society. [RR 28: 130-31.]

f. Beauchamp understood that the future-dangerousness special issue would not be answered "yes" just because she found the defendant guilty of capital murder; it would depend on the facts of the case. [RR 28: 131.]

g. Beauchamp could return a death sentence if it were proper under the facts and law, and she could return a life sentence if the evidence pointed toward it. [RR 28: 138.]

h. During voir dire by Applicant's trial counsel, Beauchamp stated that her expectation was to be "presented with the whole story . . . in order to make a fair judgment and provide a yes-or-no answer based on that statement." [RR 28: 154.] Additionally, the following exchange occurred:

> Q. [DEFENSE COUNSEL] But before you're called upon to answer Special Issue No. 1, you are in a situation where you've already found beyond a reasonable doubt that the individual knowingly committed capital murder. There's not any defense. He's

not mentally retarded. No accident. The victim is innocent. There was no self-defense involved. All those issues are gone. You have found this person to have knowingly caused multiple deaths. Okay?

With that context, is it a foregone conclusion with you that the answer to Special Issue No. 1 would be yes?

A. [BEAUCHAMP] Yes.

Q. Because sometimes that's a lot of information to already have about the individual, is it not?

A. Could be, yes.

Q. Okay. And . . . I want to be clear with you. I'm asking you if the information that you have received already in the guilt/innocence phase on which you derived your verdict of guilty beyond a reasonable doubt of capital murder without any defense available, any justification, innocent victims, that that by itself is going to be enough for you to answer yes to Special Issue No. 1 and would do so automatically because of the guilt/innocence phase evidence you've received?

A. Yes, based on the definition.

Q. Okay. The multiple commission of murders in one criminal transaction for you would be enough to answer this question, correct?

A. Yes.

* * *

Q. . . . Whose burden is it to prove this question?

A. The State.

Q. Okay. . . . I want to be sure I understand. In a situation where you have found somebody guilty of multiple murders in the same criminal transaction without any of the mistake defenses, accident, anything like that, is your response to Special Issue No. 1 going to be yes every time?

A. If they provided that, yes.

[RR 28: 155-57.]

i. At worst, Beauchamp's answers were vacillating, contradictory, or unclear as to whether she would automatically answer the future-dangerousness special issue "yes" after finding a defendant guilty of a double murder committed without justification.

j. Beauchamp's overall voir dire showed that she would follow the Court's instructions and answer the future-danger special issue based on the facts and law.

13. Veniremember Hermosillo

a. Applicant challenged Hermosillo for cause with regard to the mitigation special issue because she would require the defense to show why or how the crime happened and to produce evidence and convince the jury of the sufficiency of the mitigating evidence. [RR 28: 225-26.]

b. The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 226-27.]

c. During the State's individual voir dire, the State informed Hermosillo that the State did not have the burden of proof on the mitigation special issue. [RR 28: 189.]

d. Hermosillo understood that the defense never had a burden of proof on the mitigation special issue. [RR 28: 189.]

e. Hermosillo would not have any problem answering the mitigation special issue "yes" if she felt there was mitigating evidence. [RR 28: 192.]

f. Hermosillo defined her role in deciding the special issue as "[t]o look at all the evidence and, you know, decide for myself, but I'd have to know all the – you know, all the evidence provided by y'all." [RR 28: 192-93.]

g. Hermosillo understood a defendant's right to remain silent, and she had no problem with the fact that she might hear only one side of the situation. [RR 28: 193-94.]

h. Applicant's trial counsel informed Hermosillo that neither party bore a burden with regard to the mitigation special issue. [RR 28: 216.]

i. Hermosillo stated that the defense would have to "present reasons why that may have caused this incident or this murder," to prove the defendant's character or something about him like whether this was his first time, and to convince her that there is another side to the defendant. [RR 28: 217-18.]

j. Hermosillo responded affirmatively when asked whether the defense would have to present evidence and convince her it was sufficient. [RR 28: 218.]

k. Hermosillo thought there could be mitigating circumstances that would be sufficient to show that a death sentence was not appropriate. [RR 28: 219.]

l. When the Court questioned Hermosillo, she understood that she would take an oath to follow the law contained in the Court's instructions. [RR 28: 222.]

m. The following exchange occurred between the Court and Hermosillo:

> THE COURT: Okay. As a juror, you would receive an instruction that the law does not require a Defendant to prove his innocence or to produce any evidence at all. Do you understand that instruction?
>
> [HERMOSILLO]: Yes, ma'am.
>
> THE COURT: All right. As a juror, would you be able to follow that instruction, or is your feeling that you've mentioned today, is that such a strong feeling that you would not be able to follow that instruction?
>
> [HERMOSILLO]: No, ma'am. I – I would have to, you know, follow all the instructions and really pay attention to, you know, what's put before me. I don't think I would have any problem following instructions, you know. . . . I think that the Defendant would have to –
>
> THE REPORTER: I'm sorry. Please repeat that.

[HERMOSILLO]: I said I think that the Defendant's attorney would have to show; otherwise, you know, or prove him to be – I'm tired – that they would have to show that he – you know, there's other circumstances that caused him to – to, you know, cause the murder.

But I – I would really have to, you know, follow the rules and listen to everything, all the evidence, before I – you know, I cannot make up my kind and say, Well, yeah, he's guilty, you know. I can't do that. I have to listen to everything that's brought before me.

THE COURT: Well –

[HERMOSILLO]: I wouldn't have any problems with that even though . . . in the past . . . I may have thought, well, you know, once a person's here, he's guilty or – and I can't judge somebody until I know the facts. I've never served on a jury before, so I don't know how things are, you know, brought forth, how the evidence is brought before use and stuff, so I would have to just make sure that I'm, you know, following the Judge's guidance and/or rules or make sure I follow everything exact.

THE COURT: . . . But my question to you is whether you could follow the instruction that the Judge would give you saying that the Defendant does not have a burden of proof, they do not have to present any evidence whatsoever in any stage of the trial.

[HERMOSILLO]: Yes, ma'am. I think I could.

THE COURT: Okay. When you say that you think you can, I need a more definite answer –

[HERMOSILLO]: I know I can.

[RR 28: 222-25.]

n. At worst, Hermosillo gave vacillating, contradictory, or unclear answers about whether she wanted the defense to present mitigating evidence at the punishment phase.

o. In the end, Hermosillo assured the Court that she could put aside her personal views, follow the Court's instructions, and not impose a

burden of proof on the defense with regard to the mitigation special issue.

14. The Court granted Applicant two additional peremptory strikes during the course of the voir dire proceedings.

**Conclusions Of Law**

1. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

2. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

3. A veniremember may be challenged for cause if he has a bias or prejudice against any phase of the law upon which the defendant is entitled to rely. TEX. CODE CRIM. PROC. art. 36.16(c)(2). Bias against the law is refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

4. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003).

5. Before a prospective juror may be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Gardner*, 306 S.W.3d at 295; *Sells*, 121 S.W.3d at 759.

6. The proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Sells*, 121 S.W.3d at 759. The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow it. *Id.*

7. When called upon to review a trial court's decision to grant or deny a challenge for cause, an appellate court looks at the entire record to determine if there is sufficient evidence to support the trial court's ruling. *Sells*, 121 S.W.3d at 759. An appellate court affords considerable deference to the trial court's ruling because the trial judge is in the best position to evaluate a veniremember's demeanor and responses and to hear his tone of voice. *Gardner*, 306 S.W.3d at 295-96; *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

8. A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Gardner*, 306 S.W.3d at 296; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007).

9. When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the reviewing court must defer to the trial court's decision. *Gardner*, 306 S.W.3d at 296; *Ladd*, 3 S.W.3d at 559.

10. Because the Court granted Applicant two additional peremptory strikes, in order to demonstrate a reasonable probability that he would have prevailed on appeal, Applicant must show that the Court erroneously denied at least three of his challenges for cause. *Feldman*, 71 S.W.3d at 744; *see Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1992) (op. on reh'g) ("Where the court reinstates peremptory strikes, to show harm, the party complaining on appeal must show that one additional juror sat on the case than the number of reinstated peremptory strikes").

11. Applicant has failed to establish that appellate counsel's strategic decisions were objectively unreasonable and that there is a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised the claims Applicant suggests.

12. Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his appellate counsel fell below an objective standard of reasonableness under prevailing professional norms

because counsel, based on a review of the record and the law, determined that points of error on appeal challenging the denial of Applicant's challenges for cause would have been without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d at 623-24 (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

13. Applicant's allegations are too conclusory to meet his burden to establish the first prong of *Strickland*, and he should be denied relief. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

14. Even if Applicant could show that his appellate counsel was deficient for failing to raise points of error on appeal challenging the denial of the nine challenges for cause he refers to in this claim, he has not met his further burden to show resulting prejudice. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

15. Applicant would have been unable to establish on appeal that the Court erroneously denied at least three of the nine challenges for cause at issue. Thus, there is no reasonable probability that Applicant's case would have been reversed on appeal had appellate counsel raised points of error challenging the denial of the nine challenges for cause at issue. Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered prejudice as a result of the alleged deficient performance of his appellate counsel.

16. The Court recommends that Applicant's tenth claim for relief be denied.

J. **Claim for Relief Eleven**

Applicant asserts that trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove minority veniremembers in violation of Applicant's constitutional rights. [Application at 137.]

**Findings Of Fact**

1. Applicant's allegations focus on three minority veniremembers: Aaron Gonzales, a Hispanic male; Valerie Williams, an African-American female; and Darryl Dennis, an African-American male. [Application at 137-45.]

2. Moore has raised *Batson* challenges on several past occasions in both death-penalty and non-death-penalty cases, and he would have raised a *Batson* challenge in Applicant's case had he believed there was anything to suggest any racial motivation in the State's use of peremptory strikes on Gonzales, Williams, or Dennis. [Moore's affidavit at 26, 29.]

3. Applicant makes no attempt to establish the *prima facie* case required by the first step of the *Batson* analysis. [*See* Application at 137-45.]

4. Trial counsel had strategic reasons for not objecting to the State's exercise of peremptory challenges against Gonzales, Williams, and Dennis. [Moore's affidavit at 27].

5. Trial counsel recognized that there were "obvious race neutral reasons for each of [the State's peremptory] strikes" at issue in this habeas proceeding. [Cummings' affidavit at 10.]

6. There were a number of strategic reasons that trial counsel did not want Gonzales to be seated on Applicant's jury: (a) Gonzales was only twenty-two years old; (b) his father was in law enforcement, and he was personally considering a possible career in law enforcement; (c) he gave inconsistent answers about his ability to judge another person; (d) he seemingly placed responsibility for bringing mitigating evidence before the jury and the burden of persuading the jury of the importance of such mitigating evidence on the defense; and (e) he appeared to have a significant work problem if he were chosen to serve. [Moore's affidavit at 27.]

7. Moore did not object to the State's excusal of Gonzales because Moore did not want Gonzales seated as a juror and because Moore wanted to force the State to use a peremptory strike on Gonzales, "as that is an important part of the 'art' of capital voir dire." [Moore's affidavit at 27.]

8. Even if the State had not struck Gonzales, he likely would not have been seated as a juror at Applicant's trial because Applicant's trial counsel did not want him to serve as a juror. [*See* Moore's affidavit at 27]

9. It was apparent to Moore that the State would not accept Williams as a juror because Williams was somewhat "soft" on the death penalty and there was uncertainty about the position her church might ultimately take on the death penalty. [Moore's affidavit at 28.]

10. In Moore's experience, individuals such as Williams have a great problem in taking the ultimate responsibility of voting for death. [Moore's affidavit at 28.]

11. Trial counsel wanted the State to be compelled to expend a peremptory challenge to excuse Williams from the jury. [Moore's affidavit at 28.]

12. A *Batson* challenge regarding Williams would not have succeeded because there were obvious reasons for the State to strike her. [Moore's affidavit at 28.]

13. Both sides had issues with Dennis as a potential juror. [Moore's affidavit at 28.]

14. Applicant makes no showing that the defense would not have exercised a peremptory strike to remove Dennis had the State accepted him as a juror.

15. Had the defense accepted Dennis as a juror for Applicant's trial, there is a possibility that he would not have been a favorable juror for Applicant. [*See* Moore's affidavit at 28.]

16. The State had no racial motivation for exercising a peremptory strike against Gonzales, Williams, or Dennis, and it would have been "unethical" in Moore's opinion to make a *Batson* challenge absent any basis to support it. [Moore's affidavit at 26-29.]

17. Over the course of thirty years, Moore has never known lead prosecutor Robert K. Gill to be racially biased or to act in a racially motivated manner in any of the actions Gill has taken in court. [Moore's affidavit at 28-29.]

18. Moore has never known prosecutor Miles Brissette act in a racially motivated manner in any case that they previously had together. [Moore's affidavit at 29.]

19. Applicant's trial counsel made a reasonable and strategic decision not to raise what they believed would be a futile *Batson* claim.

20. Lead prosecutor Gill provided an affidavit in this habeas proceeding setting forth a number of facially race-neutral reasons for the State's exercise of peremptory strikes on Gonzales, Williams, and Dennis. [Gill's affidavit (State's Exhibit 1).]

21. The voir dire proceedings and the jury questionnaires relating to Gonzales, Williams, and Dennis support the State's facially race-neutral reasons for exercising peremptory on those veniremembers as set forth in Gill's habeas affidavit.

22. Applicant's comparative analysis does not take into account the State's race-neutral explanations for exercising the three peremptory strikes at issue. [*See* Application at 142-45.]

23. With regard to the *Strickland* prejudice prong, Applicant offers only the bare assertion that "[t]here is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left [Applicant] with a constitutionally-infirm jury; a malady that can only be remedied by a new trial." [Application at 145 (citations omitted).]

24. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

25. Applicant's assertions of prejudice are conclusory.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at

521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances

as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. A three-step analysis guides the evaluation of a defendant's equal-protection challenges to a prosecutor's use of peremptory challenges: (a) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (b) upon such a showing, the burden of proof shifts to the State to provide a race-neutral explanation for striking the veniremembers in question; and (c) the trial court must determine whether the defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson v. Kentucky*, 476 U.S. 79, 94-98 (1986); *Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012).

8. The ultimate burden of persuasion regarding improper motivation rests with, and never shifts from, the party challenging the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

9. The failure of trial counsel to lodge a *Batson* objection is not presumptively prejudicial for purposes of a claim of ineffective assistance of counsel. *See Young v. Bowersox*, 161 F.3d 1159, 1160-61 (8th Cir. 1998). Even if an error premised on *Batson* is shown, it does not warrant setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment. *See id.*

10. The failure of Applicant's trial counsel to raise a *Batson* objection during voir dire did not fall below an objective standard of reasonableness under prevailing professional norms because counsel made a reasonable strategic decision not to raise a claim that they believed to be without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions") Applicant has failed to meet his burden to prove that his trial counsel were deficient.

11. *Batson* requires Applicant to do more than show that minority veniremembers were peremptorily struck from the venire; Applicant must also raise an inference that the prosecutor excluded the veniremembers from the jury on account of their race. *See Batson*, 476 U.S. at 96. Simply alleging that two African-American veniremembers and one Hispanic

veniremember were impermissibly struck does not satisfy this threshold requirement. *See Hassan*, 369 S.W.3d at 875-78.

12. The State's facially race-neutral reasons for exercising the peremptory strikes at issue satisfy the second prong of the *Batson* inquiry. *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (at second step of process, proponent of strike need only tender facially race-neutral explanation) (citing *Purkett*, 514 U.S. at 767-68).

13. A comparative analysis relates to the third prong of the *Batson* framework and must be conducted in light of the race-neutral explanations tendered by the State. *See Purkett*, 514 U.S. at 768 ("It is not until the third step that the persuasiveness of the justification [for the peremptory strike] becomes relevant"). Applicant's comparative analysis, which is based upon a narrow view of the record and does not examine the State's race-neutral explanations for striking the veniremembers at issue, cannot even begin to demonstrate pretext or racial motivation behind the State's peremptory strikes at issue. Applicant has failed to prove that the prosecutor's explanations were incorrect, much less that they were a pretext for discrimination.

14. Applicant has not met his burden to satisfy the three-pronged analysis of *Batson*; therefore, he has not met his burden to establish that a *Batson* challenge would have succeeded. Under such circumstances, Applicant has not proven by a preponderance of the evidence that the performance of his trial counsel fell below an objective standard of reasonableness under prevailing professional norms. Applicant's claims are not firmly founded in the record, and Applicant fails to establish deficient performance by his trial counsel.

15. Even if Applicant could demonstrate that his trial counsel's failure to raise a *Batson* claim was objectively unreasonable, he bears the further burden to show a reasonable probability that the outcome of his trial would have been different had trial counsel lodged a Batson objection. *See Batiste v. State*, 888 S.W.2d 9, 15-17 (Tex. Crim. App. 1994) (claim of ineffective assistance for failing to raise Batson claim subject to Strickland's prejudice prong).

16. There is no reasonable probability that the outcome of any stage of Applicant's proceedings would have been different had Applicant's trial counsel asserted a *Batson* claim during voir dire. There simply is no

evidence to suggest either that the alleged deficient performance of trial counsel or the makeup of the seated jury had a prejudicial effect on Applicant's defense at any phase of his trial. *See Batiste*, 888 S.W.2d at 14.

17. The Court recommends that Applicant's eleventh claim for relief be denied.

**CLAIM TWELVE:**
**CONSIDERATION OF MITIGATING EVIDENCE**

Applicant alleges that his death sentence should be vacated because the punishment-phase jury instruction restricted the evidence the jury could determine was mitigating. [Application at 145.] He argues that he was unable to have all mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence because the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to his "moral blameworthiness." [*Id.* at 149-51.]

**Finding of Fact**

1. Special issue two in the Court's charge on punishment instructed the jury regarding the consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

**Conclusions of Law**

1. The complained-of language in the mitigation special issue did not unconstitutionally narrow the definition of mitigating evidence to that which reduced Applicant's moral blameworthiness. *Roberts*, 220 S.W.3d at 534.

2. Special Issue Two posed no barrier to the jury giving effect to any of Applicant's alleged mitigating evidence. *Roberts*, 220 S.W.3d at 534.

## CLAIM THIRTEEN:
## ARBITRARY IMPOSITION OF THE DEATH PENALTY

Applicant alleges that his death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty. [*See* Application at 151.] He asserts that geographical and racial disparities have rendered Texas' death-penalty scheme unconstitutional. [*See id.* at 151-60.]

**Findings of Fact**

1. Applicant has not shown that he was singled out for selective prosecution or that the death-penalty statute was applied against him in any unconstitutionally arbitrary or capricious manner. [Application at 151-60.]

2. The materials cited and relied on by Applicant do not establish his claim.

**Conclusions of Law**

1. The discretion afforded the State to seek the death penalty is not unconstitutional. *Ladd*, 3 S.W.3d at 574; *see Gregg v. Georgia*, 428 U.S. 153, 199 (1976).

2. Applicant's challenge to the constitutionality of Texas' death-penalty scheme based on the geographic and racial reasons he asserts is without merit. *See Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004) (varying decision-making between counties regarding seeking death penalty does not violate right to equal protection); *Allen v. State*, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003) (rejecting disparate-application claim based on county's financial constraints or ability to seek death penalty); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App. 1999) (rejecting claim based on statistical studies that Texas death sentences are disproportionately imposed in racially discriminatory manner).

## CLAIM FOURTEEN: "10-12" RULE

Applicant asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the Court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. [*See* Application at 160.] He argues that the "10-12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), and that the effect of the "10-12 rule" creates "an impermissible outside influence on jury deliberations" by improperly coercing juries into death sentences. [Application at 162-67.]

**Findings of Fact**

1. Special issue two of the Court's punishment charge instructed the jury regarding its consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

3. The Court did not instruct the jury that a hold-out vote by one juror would result in a life sentence.

**Conclusions of Law**

1. This Court was prohibited by TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1) from instructing any juror or prospective juror of the effect of a failure of the jury to agree on the mitigation special issue.

2. There is no constitutional violation in failing to inform jurors of the effect of their failure to agree on special issues. *E.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Luna v. State*, 268 S.W.3d 594, 09 (Tex.

Crim. App. 2008); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

## CLAIM FIFTEEN: ELIGIBILITY FOR THE DEATH PENALTY

Applicant asserts that he is ineligible for a death sentence because "his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution." [Application at 167.]

**Findings of Fact**

1. Applicant relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eight Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of individuals with intellectual disability. [Application at 167.]

2. Although the term "mental retardation" has been employed in the past, such as it was at the time *Atkins* was decided, the Supreme Court of the United States now favors use of the term "'intellectual disability' to describe the identical phenomenon," and this Court will therefore follow suit. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

3. Applicant's claim for relief is not based on intellectual disability as was the claim in *Atkins*.

4. Applicant offers no persuasive argument that *Atkins* should be extended to require a blanket exemption from the death penalty for persons suffering from CPTSD.

5. There is no objective evidence that society views as inappropriate the execution of death-eligible individuals who have CPTSD.

6. Applicant fails to demonstrate a trend among state legislatures to categorically prohibit the imposition of capital punishment against offenders who suffer from CPTSD.

7. Applicant does not suffer from a major mental illness. [RR 44: 145.]

8. Applicant's objective neuropsychological and psychological test results and the facts of the offense are inconsistent with Applicant's claim that he is ineligible for the death penalty because of an alleged mental impairment. [Dr. Price's affidavit at 7-9.]

9. Applicant's behavior prior to, during, and after the charged capital-murder offense is inconsistent with his allegation about the effect of the alleged mental impairment. [Dr. Price's affidavit at 8-9.]

10. Applicant's actions around the time of the offense clearly indicated that he had the capacity to understand and process information, to control his impulses, to engage in logical reasoning, to consider the future repercussions of his actions, and to communicate. [Dr. Price's affidavit at 8-9.]

11. Applicant's psychological and neuropsychological test data and his life history are not at all similar to an individual with intellectual disability. [Dr. Price's affidavit at 7.]

**Conclusions of Law**

1. Applicant's claim is not based on an intellectual disability, and *Atkins* does not extend to exempt persons with mental illness from imposition of the death penalty. *Soliz v. State*, 432 S.W.3d 895, 903-04 (Tex. Crim. App. 2014) (Soliz not exempt from death penalty despite expert testimony that Soliz diagnosed with partial fetal-alcohol syndrome and had cognitive and functional abilities similar to person with mental retardation); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *see Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *People v. Castaneda*, 51 Cal.4th 1292, 1345, 127 Cal.Rptr.3d 200, 249, 254 P.3d 249, 290 (2011); *Simmons v. State*, 105 So.3d 475, 511 (Fla. 2012); *Lewis v. State*, 279 Ga. 756, 764, 620 S.E.2d 778, 786 (2005); *State v. Dunlap*, 2013 WL 4539806 (Idaho August 27, 2013); *Matheney v. State*, 833 N.W.2d 454, 458 (Ind. 2005); *Dunlap v. Commonwealth*, 2013 WL 3121689 at *65 (Ky. June 20, 2013); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock*, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-60 (2006); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013).

2. Applicant would have been eligible for the death penalty even if he had been diagnosed with CPTSD. *See Soliz v. State*, 432 S.W.3d at 903-04; *Mays*, 318 S.W.3d at 379.

WHEREFORE, PREMISES CONSIDERED, the State prays that the Court adopt its proposed memorandum, findings of fact, and conclusions of law and that each of Applicant's claims for relief be denied.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Division

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672

**CERTIFICATE OF SERVICE**

A copy of the State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on November 3, 2014.

HELENA F. FAULKNER

CERTIFICATE OF SERVICE

A copy of the State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on November 3, 2014.

HELENA F. FAULKNER

CERTIFICATE OF SERVICE

A copy of the State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on November 3, 2014.

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
NOV 04 2014
TIME 2:10
BY ______ DEPUTY

C-432-009923-1184294-A

| EX PARTE | § | IN THE 432nd JUDICIAL |
|---|---|---|
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

**AMENDED STATE'S PROPOSED MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW**

COMES NOW, The State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and files its amended proposed memorandum, findings of fact, and conclusions of law.

**MEMORANDUM**

A Tarrant County jury convicted Applicant of capital murder for murdering his wife and father-in-law in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced Applicant to death. Applicant's conviction and sentence were affirmed on direct appeal by the Court of Criminal Appeals of Texas, and the Supreme Court of the United States denied Applicant's petition for writ of certiorari. *See Hummel v. State*, No. AP-76-596, 2013 WL 6123283 (Tex. Crim. App. November 20, 2013) (not designated for publication), *cert. denied*, No. 13-9620 (October 6, 2014).

Applicant timely filed the current habeas application pursuant to TEX. CODE CRIM. PROC. 11.071 on June 5, 2013, raising fifteen claims for relief. This Court

granted the State an extension of time to file its response to the application, and the State timely filed its reply to each of Applicant's claims on December 2, 2013.

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant then filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46," which dealt specifically with claims three, four, six, and seven. Additionally, Applicant filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. The State filed a reply to Applicant's motion for a protective order. On May 22, 2014, the Court denied Applicant's motion for protective order. The State filed its "Supplemental Reply To Application For Writ Of Habeas Corpus" on July 7, 2014.

On August 13, 2014, this Court found that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. The Court ordered the parties to file proposed findings of fact and conclusions of law by November 3, 2014.

The Court has considered the Application for Writ of Habeas Corpus, the State's Reply to Application for Writ of Habeas Corpus, Applicant's Supplemental Response to State's Answer, the State's Supplemental Reply to Application for Writ of Habeas Corpus, all of the exhibits and materials filed by each party, and

the entire records of the trial and habeas proceedings. Where appropriate, the Court has used its personal recollection as permitted under TEX. CODE CRIM. PROC. art. 11.071, § 9(a). Based on its review of the record, the Court makes the following findings of fact and conclusions of law regarding Applicant's claims and recommends that relief be denied:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### CLAIM ONE
### ALLEGED JUROR MISCONDUCT

Applicant alleges that he was denied his due-process right to an impartial jury when juror Nathaniel Davis committed misconduct by automatically voting for death.

**Findings of Fact**

1. Nathaniel Davis served as a juror at the guilt-innocence and punishment phases of Applicant's capital-murder trial in cause number 1184294D.

2. Applicant's first claim for relief is based solely on Davis' habeas affidavit detailing his own mental processes in reaching a verdict at Applicant's trial. [Application at 30-36; Applicant's Exhibit 22.]

3. Applicant does not challenge Davis' qualifications as a juror. [Application at 30-36.]

4. Davis' affidavit does not suggest the existence of any influence originating from a source outside of the jury room or other than from the jurors themselves. [Applicant's Exhibit 22.]

## Conclusions of Law

1. Applicant does not challenge Davis' qualifications as a juror, and his claim for relief is not based on an outside influence. *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (defining "outside influence" for purposes of TEX. R. EVID. 606(b) as "something originating from a source outside of the jury room and other than from the jurors themselves"). Because Applicant's claim for relief does not fall within either exception to TEX. R. EVID. 606(b), Davis' affidavit is inadmissible and is stricken from this habeas proceeding. *See* TEX. R. EVID. 606(b); *see also Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim. App. 2013) (refusing based on TEX. R. EVID. 606(b) to consider juror affidavit); *Bjorgaard v. State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007) (TEX. R. EVID. 606(b) barred trial court from considering contents of juror affidavit describing jurors' collective thought process), *pet. dism'd, improv. granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008).

2. Application of TEX. R. EVID. 606(b) does not deprive Applicant of a fair trial or due process. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) (rejecting constitutional challenge to FED. R. EVID. 606(b)); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 375 (Tex. 2000) (examining constitutionality of TEX. R. EVID. 606(b) in civil context); *Dunklin v. State*, 194 S.W.3d 14, 19-20 (Tex. App.—Tyler 2006, no pet.) (rejecting challenge to constitutionality of TEX. R. EVID. 606(b)).

3. The Court recommends that Applicant's first claim for relief be denied.

## CLAIMS TWO THROUGH ELEVEN
## ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL

Applicant sets forth ten claims for relief alleging that he was denied effective assistance of counsel at trial and on appeal.

**Findings of Fact Relating to Claims Two Through Eleven**

1. On December 23, 2009, the Court appointed Fred Cummings to represent Applicant at his capital-murder trial in cause number 1184294D. [CR 1: 21; Cummings' affidavit at 1.]

2. On December 31, 2009, the Court appointed Larry M. Moore as Cummings' co-counsel for trial. [CR 1: 24; Cummings' affidavit at 5; Moore's affidavit at 1.]

3. On December 31, 2009, Cummings had the Court appoint Brendan Ross, an experienced licensed social worker and mitigation specialist, and Bobby Walton, an experienced private investigator, to assist counsel in investigating Applicant's life. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

4. After Applicant's conviction and death sentence, the Court appointed John W. Stickels to represent Applicant on direct appeal. [CR 4: 744; Stickels' affidavit at 1.]

5. Cummings, Moore, and Stickels are highly experienced criminal defense attorneys who were well-qualified to represent Applicant. [Moore's affidavit at 1-3; Cummings affidavit at 1; Stickels' affidavit at 1.]

6. Cummings, Moore, and Stickels have each filed affidavits responding to Applicant's habeas claims that he was denied effective assistance of counsel at trial and on appeal. [*See* "Affidavit" filed by Cummings (hereinafter referred to as "Cummings' affidavit"); "Counsel's Affidavit in Response to Writ Allegations" filed by Moore (hereinafter referred to as "Moore's affidavit"); "Counsel's Supplemental Affidavit in Response to Writ Allegations" filed by Moore (hereinafter referred to as "Moore's suppl. affidavit"); and "Affidavit of John W. Stickels" filed by Stickels (hereinafter referred to as "Stickels' affidavit").]

## A. Claim for Relief Two

Applicant alleges that his trial and appellate counsel were ineffective because they failed to argue that the State's evidence was legally insufficient to support an affirmative finding to the future-dangerousness special issue. [*See* Application at 36-37.]

**Findings of Fact**

1. Applicant's trial counsel introduced evidence designed to convince the jury that Applicant was not a future danger, and counsel argued to the jury that the evidence did not support a finding of future dangerousness. [Moore's affidavit at 4; Cummings' affidavit at 2-3; RR 45: 65-84.]

2. Trial counsel correctly believed that any challenge to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have been rejected by this Court and would have been futile. [Moore's affidavit at 4; Cummings' affidavit at 3.]

3. On direct appeal, Stickels did not challenge the jury's finding of future dangerousness because, after reviewing the facts and the applicable law, he considered such a challenge to be "frivolous." [Stickels' affidavit at 2.]

4. Applicant seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes while incarcerated. [*See* Application at 36-40.]

5. The State presented compelling, overwhelming evidence to satisfy its burden to prove beyond a reasonable doubt that Applicant posed a future danger as defined in the Court's charge to the jury.

6. A week before Christmas in 2009, Applicant murdered his pregnant wife Joy Hummel, his five-year-old daughter Jodi Hummel, and his crippled father-in-law Clyde "Eddie" Bedford and set the house on fire because he wanted to be free to pursue a relationship with Kristie Freeze, whom he met in October 2009 at the E-Z Mart convenience store where she worked as a

clerk and where Applicant stopped to buy cigarettes and gasoline on his way to or from his job as a hospital security guard. [RR 33: 68, 87; RR 39: 132-35; RR 40: 10, 20-21; SX 347B.]

7.    Applicant began thinking in October 2009 about killing his family because he wanted to be single to "pursue [Freeze] better." [SX 347B.]

8.    About two weeks before the murders, Applicant accessed a hospital doctor's computer at work without permission to research articles about the effects of rat poison on humans and how rat poisoning can cause the death of a human. [RR 43: 36-40; SX 228.]

9.    Applicant was persistent about wanting to have sex with Freeze, and they had sex at Freeze's apartment on December 10, 2009. [RR 39: 141-42, 173, 176; SX 347B.]

10.   Two days after Applicant and Freeze had sex, Freeze found out that Joy was pregnant, which caused Freeze "discomfort" because Applicant "had no concern for the safety of his unborn child"; as a result, Freeze told Applicant to stop contacting her, but he continued to do so anyway.   [RR 39: 142-43, 174.]

11.   On December 16, 2009, the day Freeze's divorce became final, Applicant called and texted Freeze repeatedly, and he tried to kill Joy, Eddie, and Jodi by putting d-CON rat poison that he stole from Walmart in the turkey meat of the spaghetti sauce he prepared for them before he went to work. [RR 39: 137-38, 145-47, 162-63; RR 41: 11, 14; SX 347C, 349A2.]

12.   The evening of December 17, 2009, Applicant pretended to go to work, but he went to Freeze's apartment instead. [RR 39: 150-51; SX 347B.] It was Freeze's daughter's sixth birthday, and Applicant read the child her favorite book, which was entitled "It Could Have Been Worse." [RR 39: 147-48.]

13.   Applicant left Freeze's apartment at about 11:00 p.m., stopped for gasoline at the EZ Mart in order to be seen on camera, and then headed home to kill his family. [RR 39: 39; SX 347B.]   The jury watched video footage of Applicant at the store. [RR 39: 39-40.]

14. Applicant parked behind his house to avoid being seen; he took off his work shirt, white shirt, watch, and boots; and he went inside and grabbed a kitchen knife to "slit [his family members'] throats while they slept." [SX 347B.]

15. Inside the house, Applicant spent thirty to forty-five minutes contemplating whether to kill Joy, who was fourteen to fifteen weeks pregnant. [RR 39: 209; SX 347B.]

16. After resting and contemplating his actions, Applicant entered the bedroom where Joy was sleeping and stabbed her in the neck with the kitchen knife, which broke. [SX 347B.]

17. When Joy awoke and began fighting back, Applicant grabbed a baseball bat that was in the room, hit Joy repeatedly in the head until she fell to the floor, and then stabbed Joy with samurai sword replicas and a double-bladed dagger. [SX 347B.]

18. Joy suffered a total thirty-five stab wounds, including two through her heart, four through her lungs, and five through her liver; skull lacerations from being hit with the baseball bat; and a number of defensive wounds. [RR 39: 203-07, 209, 212; SX 272A.]

19. After murdering Joy, Applicant rested for about twenty minutes to catch his breath before going to Eddie's bedroom. [SX 347B.]

20. Applicant hit Eddie in the head with the baseball bat five to ten times while Eddie slept in his bed, causing multiple right-side depressed skull fractures. [RR 39: 220; SX 347B.]

21. After taking another break to catch his breath, Applicant went to Jodi's room and hit her in the head five to ten times with the baseball bat while she slept in her toddler bed, causing extensive multiple right-side skull fractures. [RR 39: 246-48, 256; SX 347B.]

22. Applicant used rolls of toilet paper to set a fire in each victim's bedroom in order to "make it look like somebody had broken in, killed them and then tried to cover it up by setting the fires." [SX 347B.]

23. Applicant disposed of the murder weapons, drove around, and stopped at various Walmart stores in order to be seen on camera and construct his alibi until it was time to return home. [RR 39: 39-44; SX 347B.] The jury watched video footage of Applicant inside the various stores. [RR 39: 40-44; SX 405B, 406B, 407B, 431.]

24. At about 5:00 a.m., Applicant returned home and tried "to be all shocked." [SX 347B.]

25. At the scene, Applicant calmly asked officers what had happened and whether everyone made it out, and he lied about where he had been when the fire began. [RR 33: 152-54, 159; SX 220D.] The jury heard an audio recording of Applicant's conversations with officers at the scene. [RR 33: 166, 171-73; SX 220D.]

26. Applicant voluntarily went to the Kennedale police station, where he gave false written and oral statements regarding his whereabouts that night. [RR 34: 158-59, 161, 163, 175-76; RR 35: 9-13, 44; SX 341B, 342.]

27. Applicant left the police station and drove to the office of his employer, Champion National Security, located in Arlington, Texas; there was nothing unusual about Applicant's demeanor, and he never mentioned that anything unusual had happened. [RR 36: 22-23, 42, 50-52; RR 42: 17.]

28. After leaving Champion's office at about 11:00 a.m. on December 18, 2009, Applicant cashed his paycheck and fled in his van to California because he knew that the authorities had the evidence to "pin" him for the murders and arson. [RR 36: 23; SX 347B.]

29. At 8:46 p.m. PST on December 19, 2009, Applicant, who was no longer wearing his wedding ring, checked in at the Coast Inn in Oceanside, California. [RR 37: 80, 82; RR 39: 106-12; SX 347B, 408B, 440, 449, 451-56.]

30. The jury watched a video showing Applicant's jovial demeanor as he checked in at the front desk of the Coast Inn. [RR 39: 46; SX 408B.]

31. Shortly after checking in at the Coast Inn, Applicant went to the topless bar next door. [RR 41: 17-22, 30, 56; RR 42: 26; SX 427.]

32. Applicant struck up a conversation with Scott Matejka on the sidewalk near the topless bar, and they smoked crack cocaine together and went to Tijuana, Mexico, so that Applicant could buy marijuana. [RR 37: 71-72; RR 41: 19, 29; RR 42: 26-32, 47.]

33. Applicant and Matejka visited a gentlemen's club in Tijuana, Mexico, but Matejka never saw Applicant actually obtain any marijuana. [RR 42: 34-35.]

34. On December 20-21, 2009, while at the San Diego County Jail under arrest on a Texas arson warrant after being detained by United States Customs and Border Protection ("CBP") officers at the Texas-Mexico border, Applicant waived his rights and voluntarily confessed on videotape and in writing that he killed his family members and set his house on fire. [RR 36: 169; RR 37: 59; SX 347B, 348, 349B.]

35. The jury viewed Applicant's videotaped confession and saw his remorseless demeanor as he calmly and casually discussed his motivations and actions before, during, and after the murders. [RR 36: 175-76; RR 41: 10; SX 347B, 347C.]

36. The jury heard medical-examiner testimony about and saw photographs of the extensive injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

37. In the fall of 2009, Applicant accessed pornographic websites and his MySpace account on a doctor's computer during a time when the doctor's office was closed and locked. [RR 42: 98-101; *see generally* RR 43: 20-47.] The jury saw examples of the material Applicant accessed. [RR 42: 104-07; SX 225-28.]

38. Results of a forensic examination of the hospital doctor's computer included 2,338 pornographic images and a profile posted by Applicant under the name of "John Long N Hard" on hornymatches.com describing himself, seeking to have women meet him at the hospital where he worked as a security guard, and giving explicit details of what he was looking for in a profile mate. [RR 43: 30-33; SX 475.]

39. Between November 13 and December 5, 2009, Applicant called and texted topless dancer Gretchen Bow, and Applicant paid Bow at least $100 each

time Bow would meet him at the club to sit and drink with him or perform for him. [RR 42: 110-13, 117-18, 122.] Text messages between Applicant and Bow were introduced into evidence. [RR 42: 116, 119.]

40. Applicant invited Bow to visit him at the hospital while he was working as a security guard so they could smoke marijuana "and [do] other things," but Bow never went. [RR 42: 115, 123.]

41. Dr. Antoinette McGarrahan, the defense's forensic psychologist and neuropsychologist, opined that Applicant murdered his family when repressed emotions flooded out in a rage at the time of the offense, but she also admitted that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

42. Applicant knew it was wrong to kill his family, but he did it anyway. [RR 44: 156.]

43. Applicant has traits of several different personality disorders, *i.e.*, narcissism, antisocial personality, schizoid personality, and borderline personality. [RR 44: 126-32, 144-45.]

44. Even with treatment, the underlying basis of Applicant's personality disorder would remain. [RR 44: 155.]

45. At the time of trial, Applicant was essentially the same person he was on December 17, 2009, when he brutally murdered his family members and set his house on fire. [*Id.*]

46. Applicant acted alone in planning, carrying out, and trying to cover up the vicious, cold-blooded, calculated murders of his three family members, and Applicant's actions before, during, and after the murders demonstrated an utter lack of remorse.

47. The circumstances of and events surrounding Applicant's murder of his family members demonstrate forethought, deliberateness, and wanton and callous disregard for the sanctity of human life.

**Conclusions of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010); *Ex parte Briggs*, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005).

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007).

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012); *Ex parte Ramirez*, 280 S.W.3d 848, 852 (Tex. Crim. App. 2007). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Such a claim must be proven by the preponderance of the evidence. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005). An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d 627, 629 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable, and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

8. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9. In reviewing the legal sufficiency of the evidence to support an affirmative finding on the future-dangerousness special issue, a court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could find beyond a reasonable doubt a probability that the defendant would commit criminal acts of violence. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008).

10. The future-dangerousness special issue requires the jury to determine beyond a reasonable doubt whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). The State

bears the burden of proof on the future-dangerousness special issue. *See Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).

11. A variety of factors may be considered in determining the future-dangerousness special issue: (a) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (b) the calculated nature of the defendant's acts; (c) the forethought and deliberateness exhibited by the crime's execution; (d) the existence of a prior criminal record, and the severity of the prior crimes; (e) the defendant's age and personal circumstances at the time of the offense; (f) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (g) psychiatric evidence; and (h) character evidence. *Reese v. State*, 33 S.W.3d 238, 245 (Tex. Crim. App. 2000); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). No one factor is dispositive, and an affirmative answer to the special issue may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors. *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim. App. 1995).

12. The circumstances of the offense "can be among the most revealing evidence of future dangerousness." *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (quoting *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)). In some instances, the circumstances of the offense and the events surrounding it may alone be sufficient to sustain an affirmative answer to the future-dangerousness special issue. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *Wilson*, 7 S.W.3d at 142; *Dinkins*, 894 S.W.2d at 358. Such instances arise, for example, when the crime is "so heinous as to display a wanton and callous disregard for human life," *Dinkins*, 894 S.W.2d at 358, or when the circumstances of the offense are sufficiently cold-blooded or calculated. *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

13. The facts of Applicant's offense are, alone, sufficient to support a finding of future dangerousness. *See, e.g.*, *Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008) (unprovoked nighttime attack against a family in which parents were killed and children nearly killed sufficient to sustain future-dangerousness finding); *Dinkins*, 894 S.W.2d at 358 (evidence of premeditated and brutal murders of two women, including multiple gunshot wounds at close range, sufficient to support affirmative answer to future-dangerousness special issue); *Joiner v. State*, 825 S.W.2d 701, 704 (Tex.

Crim. App. 1992) (evidence sufficient to support finding of future dangerousness where defendant murdered two women; first victim was stabbed four times in chest and received series of lacerations to her neck; second victim suffered forty-one stab wounds to chest, blunt force trauma and lacerations to her head, and throat was "slashed"; physical evidence suggested each victim sexually assaulted after death).

14. Even if the facts of Applicant's offense, alone, did not support a finding of future dangerousness, the facts of Applicant's offense along with the other evidence in the trial record were legally sufficient to satisfy the State's burden to prove beyond a reasonable doubt a probability that Applicant would commit criminal acts of violence that would constitute a continuing threat to society. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) (setting forth future-dangerousness special issue); *see also Ladd*, 3 S.W.3d at 213 (State bears burden on future-dangerousness special issue).

15. The future-dangerousness special issue asks if a defendant would constitute a continuing threat whether in or out of prison without regard to how long he would actually spend in prison if sentenced to life. *Lucio v. State* 351 S.W.3d 878, 903 (Tex. Crim. App. 2011); *Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010); *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010); *see Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.) (how long life-sentenced capital defendant will spend in prison "is not proper even in the context of the [future-dangerousness] special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term 'society' includes *both* the prison and non-prison populations" (emphasis in original)); *Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting reasoning of plurality opinion in *Smith*). Applicant's narrow interpretation of the future-dangerousness special issue ignores precedent and erroneously seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes within prison.

16. The circumstances found to be deficient in *Berry v. State*, 223 S.W.3d 847 (Tex. Crim. App. 2007), and *Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981), are nothing like the facts of Applicant's case, and Applicant's reliance on those decisions in the present proceeding is misplaced.

17. Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his trial and appellate counsel fell below

an objective standard of reasonableness under prevailing professional norms because any challenge at trial or on appeal to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have lacked merit and would have been futile. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("reasonably competent counsel need not perform a useless or futile act"); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d 610, 623-24 (Tex. Crim. App. 2009) (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

18.   There is no reasonable probability that the outcome of the punishment phase of Applicant's trial or the outcome of Applicant's appeal would have been different had trial and appellate counsel advanced meritless challenges to the legal sufficiency of the evidence to prove Applicant's future dangerousness. *See Barrera v. State*, 978 S.W.3d 665, 668-69 (Tex. App.—Corpus Christi 1998, pet. ref'd) (no prejudice resulted from counsel's failure to raise objection that lacked merit). Therefore, Applicant has failed to meet his burden to prove by a preponderance of the evidence that the alleged deficiency of his trial and appellate counsel resulted in prejudice.

19.   The Court recommends that Applicant's second claim for relief be denied.

**B.   Claim for Relief Three**

Applicant alleges that his trial counsel were ineffective for failing to present evidence that Applicant was not a future danger through Tarrant County Jail employees who supervised him while he was confined there and through a mental-health expert such psychiatrist Susan Hardesty, M.D. [Application at 40-47.]

**Findings of Fact**

1. Applicant submits affidavits from Tarrant County Jail employees Tony Rigmaiden, Rory Thomas, and Cody Bell, who supervised Applicant while he was confined in the jail. [*See* Applicant's Exhibits 4, 20, 21.]

2. Trial counsel did not identify Rigmaiden, Thomas, or Bell during their investigation. [*See* Moore's suppl. affidavit at 3.]

3. In Moore's experience, testimony of jail personnel is often not particularly favorable to the defense by the time of trial unless there is "at least some personal relationship with, or affinity for the defendant that has developed with the officers." [Moore's suppl. affidavit at 2.]

4. Members of the defense team asked Applicant about the possibility of finding jail guards, chaplains, or other jail personnel with whom Applicant had developed a sufficiently good relationship that they might be willing to testify on his behalf, but Applicant never identified any such prospective witness and was not very encouraging that any such witnesses might be found. [Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

5. In light of Moore's experience in dealing with testimony of jail personnel, as well as the fact that Applicant never identified any such prospective witnesses and was not encouraging that such witnesses might be found, Applicant's trial counsel made a reasonable strategic determination not to send the defense team's private investigator to the jail because his efforts would be better focused on other areas that might prove more beneficial to Applicant's case. [Moore's suppl. affidavit at 2.]

6. Applicant's assertion that he did nothing to dissuade trial counsel from pursuing an investigation into Tarrant County jail staff and that he "simply could not recall the names of any specific jail staff he could recommend that counsel speak to" is unsupported by the record. [*See* Supplemental Response To State's Answer at 5.]

7. Even if Applicant could not recall a specific name, he did not even generally indicate that he had become particularly close to any Tarrant County Jail personnel who might be willing to testify for the defense, and he gave his trial counsel reason to believe that the expenditure of valuable resources in

pursuing this area would not yield anything of value to Applicant's case. [*See* Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

8. Although Rigmaiden's, Bell's, and Thomas' names appear in jail logs contained in Applicant's Exhibit 44, nothing in those entries show that any of them had developed at least some personal relationship with or affinity for Applicant. [*See* Applicant's Exhibit 44.]

9. Given Applicant's failure to identify any jail personnel with whom he had developed such close relationship, Applicant's lack of encouragement that such witnesses might be found, and Moore's experiences in seeking testimony from jail personnel, it was not unreasonable for trial counsel to make the strategic investigative decision to focus their efforts on areas that might prove more beneficial to Applicant's case.

10. Trial counsel presented testimony from Frank AuBuchon (the defense team's prison classification expert), Dr. McGarrahan, and lay witnesses to show Applicant's lack of disciplinary issues in jail, Applicant's lack of a violent or criminal history, and the likelihood that Applicant would adapt well to the structured environment of prison life. [RR 43: 113-14, 166, 178, 232; RR 44: 70, 73, 159; Moore's affidavit at 5-6; Cummings' affidavit at 3-4.]

11. Trial counsel stressed in closing arguments that Applicant did not pose a future danger, in part based on AuBuchon's testimony and because Applicant had no history of violence, no prior criminal history, and no issues during his incarceration in jail. [RR 45: 69, 78-81.]

12. The proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, and Bell provides no meaningful new facts about Applicant's pretrial confinement that Applicant's trial counsel did not develop through other witnesses. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; *see* Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

13. The facts that Applicant alleges should have been presented through Rigmaiden, Thomas, and Bell serve largely the same purposes as and are largely cumulative of other evidence that Applicant had no disciplinary issues while confined in jail, that he would likely adjust well to a prison

setting if he were sentenced to life without parole, and that he allegedly posed a low risk of future violence. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; Moore's affidavit at 5-6; Moore's suppl. affidavit at 2-3.]

14. Applicant overrates the potential impact of the facts contained in the habeas affidavits of Rigmaiden, Thomas, and Bell and unfairly overlooks or underrates the testimony presented through Dr. McGarrahan, AuBuchon, and lay witnesses. [*See* Application at 42-45; *see also* RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; RR 45: 69, 78-81; Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

15. Applicant's assertion that his trial counsel never addressed the issue of whether Applicant as an individual possessed a likelihood of committing acts of violence in the future "is simply not true" in light of the evidence presented at Applicant's trial. [Moore's supplemental affidavit at 2-3; *see* Supplemental Response To State's Answer at 7.]

16. Applicant's Tarrant County Jail records attached to Cummings' habeas affidavit reflect that during Applicant's confinement he was classified as "High Custody," required MHMR services, and was on suicide watch. [Cummings' affidavit at 5 & jail records attached thereto.]

17. Applicant's Tarrant County Jail records showing Applicant was closely supervised and classified as "High Custody" would have provided little, if any, benefit to Applicant's punishment case because Applicant's jury could have reasonably assumed that Applicant had no disciplinary issues in jail because his classification left him little opportunity to violate the rules or because Applicant was on his best behavior pending his capital-murder trial where he faced the death penalty.

18. Applicant asserts that trial counsel should have retained a mental-health expert such as Dr. Hardesty, a psychiatrist, "to explain how [Applicant's] past patterns of behavior and mental status did not support a finding that he would be a future danger", and to explain that he was a low risk to commit future acts of violence in a prison setting because he would be unlikely to encounter the severe familial and financial stressors that plagued him before the crime. [Application at 46; *see* Applicant's Exhibit 1.]

19. Trial counsel thoroughly investigated Applicant's background and upbringing in order to determine how those factors may have influenced Applicant's behavior in murdering his family members. [Moore's affidavit at 7.]

20. Trial counsel presented testimony from the available lay and expert witnesses and gave the jury as complete a picture as possible of Applicant's life history from his childhood until he murdered his family members and was confined in jail.

21. Trial counsel discussed potential mental-health experts whom they might use in Applicant's case, they contacted several mental-health experts, and they decided to retain Dr. McGarrahan, a highly qualified forensic psychologist and neuropsychologist, because of Moore's previous work with her, Moore's opinion of her abilities, her reputation in the legal community, and her good professional relationship with J. Randall Price, Ph.D., the forensic psychologist and neuropsychologist retained by the State in this case. [Moore's affidavit at 7.]

22. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

23. Dr. McGarrahan based her testimony on nearly eleven hours evaluating Applicant and interviewing Applicant about his "entire social history," reviewing a large volume of records and videos regarding Applicant, talking to Applicant's sister and mother, reviewing medical records of Applicant's mother, and reviewing psychological test data from Dr. Price's evaluation of Applicant. [RR 44: 121-24.]

24. Trial counsel and Dr. McGarrahan collaborated and made a reasonable strategic decision that it was not in Applicant's best interest and would not benefit Applicant's case to have Dr. McGarrahan or another expert in risk assessment perform a formal violence risk assessment of Applicant. [Moore's affidavit at 7-8.]

25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Affidavit of J. Randall Price, Ph.D. at 1-2 (hereinafter referred to as "Dr. Price's affidavit").]

26. Dr. Hardesty's proposed testimony would have opened the door to damaging testimony from Dr. Price, which would have been devastating to the defense and which would have outweighed any potential benefit to be gained from Dr. Hardesty's proposed testimony. [Moore's affidavit at 8; Cummings' affidavit at 6.]

27. Dr. Hardesty's opinion that Applicant would not pose a future risk of violence, even if it were determined to be admissible at trial, is not so compelling that it would have changed the jury's answer to the future-dangerousness special issue, especially in light of State's powerful evidence that Applicant posed a future danger. [*See* Applicant's Exhibit 1.]

28. Dr. Hardesty's habeas affidavit does not disclose the scientific methodology by which she reached her opinion or contain any objective source material to substantiate the validity or appropriateness of her methodology. [*See* Applicant's Exhibit 1.]

29. Dr. Hardesty's opinions contained in her habeas affidavit rest solely on her personal assessment of Applicant's future dangerousness, not upon any standardized risk assessment measures or any scientific or statistical comparisons. [Applicant's Exhibit 1; *see* Moore's affidavit at 8-9 (expressing belief that Dr. Hardesty's opinion "would be essentially the same type of testimony that the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to *Daubert*" when offered by the State).]

30. Dr. Hardesty's assertions that Applicant, while incarcerated, would not experience the stressors that were antecedents to his crimes and that Applicant would not encounter "a relational model that would be iterative of attachment" are unrealistic assessments of the life in prison that Applicant could face if he were incarcerated on a sentence of life without parole. [Moore's affidavit at 9; *see* Applicant's Exhibit 1.]

31. Trial counsel made a well-reasoned strategic decision based on their thorough investigation, their professional judgment, and their reliance on a well-qualified mental-health expert about how to best present evidence that Applicant would not constitute a future danger if he received a sentence of life without parole instead of death.

32. Even after reviewing the opinions contained in Dr. Hardesty's affidavit, Moore does not question that he and Cummings made the correct decision about how to best present Applicant's case at the punishment phase of the trial. [*See* Moore's affidavit at 9.]

33. Applicant's annihilation of his family, and his demeanor and actions before and afterward (many of which were documented on video recordings seen by the jury), demonstrated Applicant's cold-hearted capacity for extreme violence and sufficed to establish his future dangerousness.

34. The Court rejects Applicant's claim that he had "never committed a single act of violence in his life before this crime." [Supplemental Response to State's Answer at 8 n.3.] Applicant researched the effects of rat poison on humans and tried to poison his family, which exhibited Applicant's desire and propensity to commit acts of violence by killing his family in a brutal manner so that he could be free to pursue a relationship with Freeze. [RR 41: 11, 14; RR 43: 36-40; SX 228, 347C, 349A2.]

35. In Moore's experience in ten death-penalty cases tried to verdict, the facts of the particular offense on trial are "generally paramount" in the jury's determination of the future-dangerousness special issue. [Moore's suppl. affidavit at 4.]

36. In Moore's opinion, Applicant's actions before and during the vicious murders of his family members had an "indelible impact" on the jury that was "probably impossible for anyone to overcome." [Moore's suppl. affidavit at 4.]

37. Trial counsel exercised their prerogative not to call prison employees or a psychiatrist such as Dr. Hardesty to testify at the punishment phase of Applicant's trial on the issue of future dangerousness.

38. Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present testimony from jail personnel on the issue of future dangerousness during the punishment phase of a death-penalty trial.

39. Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present expert testimony such as that proffered by Dr. Hardesty on the issue of future dangerousness during the punishment phase of a death-penalty trial.

40. The failure of trial counsel to discover Rigmaiden, Thomas, and Bell or to retain Dr. Hardesty was not the result of inadequate investigation or preparation of Applicant's case.

41. Applicant's trial counsel performed well within the wide range of reasonable professional assistance in conducting the investigation of Applicant's case and making strategic decisions about what areas of investigation to pursue, what evidence to present, and what witnesses to call in an effort to obtain a favorable answer to the future-dangerousness special issue.

42. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

43. Applicant's allegations of ineffective assistance are conclusory.

44. It is not reasonable to believe that the proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, Bell, and Dr. Hardesty, when weighed along with the remaining relevant evidence contained in the record, would have significantly diminished the powerful impact of the State's evidence of Applicant's future dangerousness and caused the jury to answer the future-dangerousness special issue differently.

**<u>Conclusions of Law</u>**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

6.  In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7.  Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8.  Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d 713, 728-29 (Tex. Crim. App. 2006).

9.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

12. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Austin 1989, pet. ref'd).

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518.

14. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty at trial is not alone a basis to prove a claim of ineffective assistance. The fact that Applicant's habeas counsel now believe that another type of expert witness should have been called to testify on the issue of future dangerousness does not support an allegation of ineffective assistance. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance"); *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (same).

15. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987) ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

16. The failure to present essentially cumulative testimony that Applicant would not pose a future danger if he were sentenced to life without parole instead of death did not constitute deficient performance. *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (counsel's decision not to present

cumulative testimony does not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *Id.* at 1518 ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required").

17. Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present evidence that Applicant would not constitute a future danger if he were sentenced to life without parole instead of death. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight).

18. Dr. Hardesty's proffered opinions of Applicant's future dangerousness do not satisfy the reliability requirements of TEX. R. EVID. 702 because her determination that Applicant would not be a future danger if he were sentenced to life in prison is the same type of unreliable prediction of future dangerousness rejected as unreliable in *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).

19. Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting evidence that Applicant would not pose a future danger if he were sentenced to life without parole fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

20. Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the future-dangerousness special issue differently had counsel called Rigmaiden, Thomas, Bell, and Dr. Hardesty to testify at his trial. *See Ex parte Medina*, 361 S.W.3d 633, 644 (Tex. Crim.

App. 2011) (providing prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

21. Given the cumulative nature of the evidence contained in the habeas affidavits of Rigmaiden, Thomas, and Bell, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue differently had trial counsel discovered and called those witnesses to testify during the punishment phase of Applicant's trial. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir. 2009) (upholding state court's finding of no prejudice where additional testimony was cumulative).

22. There is no reasonable probability that the proposed testimony of Rigmaiden, Thomas, Bell, and Dr. Hardesty would have persuaded Applicant's jury to answer the future-dangerousness special issue differently. This is especially true given that the weight of the aggravating facts was staggering and presented a powerful case to meet the State's burden to prove beyond a reasonable doubt that Applicant constituted a future danger and in light of the fact that the jury heard other lay and expert testimony that Applicant had never been violent, that he had no disciplinary issues in jail and no prior criminal history, that he committed the murders when emotions he repressed his entire life flooded out, and that he would likely adjust very well to the prison environment. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable.

23. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

24. The Court recommends that Applicant's third claim for relief be denied.

## C. Claim for Relief Four

Applicant alleges that trial counsel were ineffective for failing to present expert testimony of a "social history expert witness" such as social worker Laura Smith to explain to the jury "how [Applicant's] life history shaped the person that he became later in life." [Application at 47-50.]

**Findings Of Fact**

1. Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial, but he is unaware of any legal requirement to use a "social history expert witness" in every such case in order to accomplish that purpose. [Moore's affidavit at 10.]

2. Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3. Prevailing professional norms do not require trial counsel in a death-penalty case to retain a "social history expert witness" such as social worker Smith or to call such a witness to testify at the punishment phase of a death-penalty trial.

4. Applicant's defense team included an experienced mitigation specialist with a master's degree and license in social work and an experienced private investigator. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

5. Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the charged offense. [Moore's affidavit at 7.]

6. Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

7. Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

8. Many people contacted by the defense team either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

9. The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom the team contacted. [Moore's affidavit at 14.]

13. Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14. Trial counsel presented all of the witnesses whom they were able to locate and convince to testify and whom they thought were necessary to develop

the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10; Cummings' affidavit at 6.]

15. Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16. At the request of Applicant's trial counsel, Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist, administered a full neuropsychological evaluation as well as personality and emotional testing involving twenty to thirty different tasks and instruments to Applicant over about eleven hours total on October 13 and December 20, 2010. [RR 44: 118-22.]

17. Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, correspondence from Applicant's sister Neata to Applicant, medical records for Applicant's mother, and psychological test data from Applicant's evaluation by Dr. Price, the State's forensic psychologist and neuropsychologist; she spoke to Neata and Jackie; she performed a clinical interview to ask Applicant about his "entire social history"; she conducted a mental-status examination during which she observed Applicant and discussed with Applicant any psychiatric symptoms he was having; and she discussed the offenses with Applicant in great detail. [RR 44: 121-24.]

18. Trial counsel discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Applicant. [Moore's affidavit at 7.]

19. The defense team discussed various mitigation themes as they came to light, including Applicant's participation in role-playing games; Applicant's use of marijuana, alcohol, and other drugs; the possibility that Applicant suffered from being raised in poverty; the possibility that Applicant had a mental disorder or illness; the possibility that Applicant observed sexual abuse in his household; and the possibility that Applicant was abused or neglected as a child. [Cummings' affidavit at 7.]

20. Trial counsel conducted a thorough investigation and made the strategic decision that the most effective way to develop Applicant's mitigation case was to present evidence of Applicant's life history through the available lay witnesses and then to use that story as a basis for the opinions offered by Dr.

McGarrahan about how Applicant's life history shaped the person he became later in life and how it related to his commission of the murders. [Moore's affidavit at 10; Cummings' affidavit at 6; Moore's suppl. affidavit at 5-6.]

21. Contrary to Applicant's assertions, Applicant's trial counsel *did* present expert testimony about Applicant's life history through Dr. McGarrahan to develop the relevant social history as part of Applicant's mitigation case. [Dr. Price's affidavit at 3-4.]

22. Dr. McGarrahan's testimony during the punishment phase of Applicant's trial illuminated how Applicant's life history shaped the person he became later in life and related to Applicant's murders of his family members. [*See generally* RR 44: 118-63.]

23. Dr. McGarrahan testified during the punishment phase of Applicant's trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

24. Dr. McGarrahan opined that Applicant murdered his family when the emotions he had repressed for thirty-five years flooded out in an emotional rage at the time of the offense; she admitted, however, that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

25. Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness who was at least as qualified as a "social history expert witness" such as social worker Smith to develop a comprehensive social history and present her findings to the jury, and she testified effectively and credibly regarding Applicant's relevant life history. [Dr. Price's affidavit at 3-4.]

26. There is no reason to believe that Applicant's jury would have been more persuaded by the testimony of a social worker like Smith than it was by a well-qualified forensic psychologist and neuropsychologist like Dr. McGarrahan, who communicated effectively and used minimal technical jargon while testifying to the same or similar topics. [*See* Moore's suppl. affidavit at 5; Dr. Price's affidavit at 2-4; RR 44: 118-63.]

27. The *substance* of the testimony from Dr. McGarrahan and other witnesses developed the important facts of Applicant's life and life events and gave the jury a sufficiently complete understanding of Applicant's life history. [*See* Moore's suppl. affidavit at 6.]

28. Trial counsel presented the necessary facts and developed the expert testimony necessary to present Applicant's mitigation case to the jury without retaining Smith and calling her to testify at trial. [Moore's affidavit at 11.]

29. Trial counsel exercised sound trial strategy based on a thorough investigation in determining what witnesses to call at trial and how to best present Applicant's mitigation case to the jury.

30. Trial counsel exercised their prerogative to rely on lay witnesses and Dr. McGarrahan rather than a "social history expert witness" such as social worker Smith.

31. Even if a "social history expert witness" such as social worker Smith could have helped the jury to understand how Applicant's life events impacted him, Moore's extensive experience has taught him that jurors often ascribe relatively little importance to opinion testimony of the type contained in Smith's affidavits. [Moore's supplemental affidavit at 5.]

32. Smith's habeas affidavit provides a lengthy recitation of Applicant's life history taken from lay-witness testimony at trial, lay-witness affidavits obtained by Applicant's habeas counsel, records pertaining to Applicant, and Smith's five-hour interview with Applicant at the Polunsky Unit. [Applicant's Exhibit 2.] However, Smith offers no explanation of how her opinions and proposed testimony might have been different had she been limited to the testimony available to trial counsel at the time of Applicant's trial. [*Id.*]

33. Applicant offers no explanation how Dr. McGarrahan's evaluation of Applicant and the subject matter of her testimony were deficient or why testimony from a social worker such as Smith would have been more persuasive to the jury. [*See* Application at 47-62.]

34. Smith's explanation of Applicant's actions surrounding the murder of his family members would not have been more valuable, persuasive, or credible to the jury than the trial testimony of Dr. McGarrahan and the lay witnesses. [Moore's suppl. affidavit at 5.]

35. Smith's affidavit contains no meaningful facts or any necessary expert opinions that trial counsel did not cover in the mitigation presentation at trial [Moore's affidavit at 11; Moore's suppl. affidavit at 5] or that would have persuaded the jury to answer the mitigation special issue differently.

36. Applicant's trial counsel acted reasonably in relying on Dr. McGarrahan to relate the relevant social-history issues to the jury. [Dr. Price's affidavit at 4.]

37. Applicant simply criticizes the manner in which his experienced trial counsel presented his life history rather than alleging an outright failure to present such facts. [Moore's suppl. affidavit at 5.]

38. Applicant's jury could evaluate the testimony provided by lay witnesses and Dr. McGarrahan and could determine without hearing from a "social history expert witness" such as Smith whether any of the trial testimony justified a "yes" answer to the mitigation special issue.

39. The information contained in Smith's habeas affidavit would not have made Applicant's mitigating evidence more compelling, understandable, or different; it would not have tipped the scales against the powerful aggravating facts presented by the State or changed Applicant's sentence. [Moore's affidavit at 6.]

40. The failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith did not result from an inadequate investigation or inadequate preparation of Applicant's mitigation case.

41. It is not reasonable to believe that the proposed testimony contained in the habeas affidavit of social worker Smith, when considered together with the remaining relevant evidence contained in the record, would have diminished the powerful impact of the aggravating evidence and persuaded the jury to answer the mitigation special issue differently.

42. Applicant incorrectly seeks to have this Court overlook the mitigation facts and themes actually investigated and presented by his trial counsel and to second-guess counsel for not calling a different witness who may have presented the evidence differently. [Supplemental Response To State's Answer at 9-13; Moore's suppl. affidavit at 5.]

43. Applicant's allegation of prejudice is conclusory.

44. Applicant's claim for relief second-guesses in hindsight the strategic decisions of his trial counsel about what witnesses to call and about how to best present Applicant's mitigation case to the jury.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of

counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than a social worker such as Smith to testify about Applicant's life and its effects on him is not alone a basis to support a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been called to testify. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

8. Applicant's trial counsel were not ineffective for failing to present largely cumulative testimony such as that contained in Smith's habeas affidavit. *See Coble*, 496 F.3d at 436 (decision not to present cumulative testimony does

not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

9. The strategic decisions made by Applicant's trial counsel based on a thorough investigation about what witnesses to call to testify and how to best present Applicant's mitigation case were matters of trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427.

10. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller*, 810 F.2d at 1410 ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander*, 775 F.2d at 602).

11. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located a different expert who could have testified to the same or similar subject matter does not support Applicant's claim of ineffective assistance.

12. Applicant's jury did not require the assistance of a social worker such as Smith in order to evaluate the testimony presented by Applicant's lay and expert witnesses and to determine the appropriate answer to the mitigation special issue. *See Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (jury did not need expert testimony to understand "humanizing" evidence; jury "could use its common sense or own sense of mercy").

13. Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present mitigation evidence at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 389 S.W.3d at 633-34 ("Both prongs

of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

14. Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting mitigating evidence at trial fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's allegations are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

15. Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the mitigation special issue differently had counsel called a "social history expert witness" such as Smith to testify. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

16. There is no reasonable probability that, but for the failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith, the jury would have answered the mitigation special issue "yes" instead of "no." The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. The record does not affirmatively demonstrate Applicant's claims, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

17. The Court recommends that Applicant's fourth claim for relief be denied.

**D. Claim for Relief Five**

Applicant alleges that his trial counsel were ineffective for failing to present testimony from relevant lay witnesses that was necessary for the jury to properly weigh whether Applicant deserved a life sentence. [Application at 62-63.] Specifically, Applicant contends that counsel failed to uncover significant areas of mitigating evidence, present witnesses from throughout his life, and discover that lay witnesses whom they called to testify had more information to provide about Applicant's life. [*Id.*]

**Findings Of Fact**

1. Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial. [Moore's affidavit at 10.]

2. Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3. Based on the wantonness and severity of Applicant's crime, trial counsel needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel concentrated their efforts in those areas they felt would be most productive. [Moore's suppl. affidavit at 7-8.]

4. Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

5. Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the murders. [Moore's affidavit at 7.]

6. Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

7. Many people whom the defense team contacted either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

8. The defense team identified and interviewed every potential witness it could locate. [Cummings' affidavit at 6.]

9. The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom they contacted. [Moore's affidavit at 14.]

13. Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14. Trial counsel presented all of the witnesses whom they were able to locate and convince to testify, whom they thought could provide admissible relevant mitigation evidence about Applicant, and who were necessary to develop the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10, 16; Cummings' affidavit at 6, 8.]

15. Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16. Trial counsel called a number of lay and expert witnesses to testify at the punishment phase of Applicant's trial: Haila Scoggins, who taught Applicant during his four years in high school; Tommy Stribble, who sponsored and explained Applicant's permanent school records spanning from elementary school through high school; Mark Pack, who was Applicant's childhood friend; Christy Pack, who is Mark Pack's wife; Linda Pack, who was Jackie's best friend for about ten years and spent time with her family at the Hummel's farm; Parris, who was Applicant's friend and spent time at the Hummel home; Stephanie Bennett, who dated Applicant during his senior year in high school; Letti Hubertz, who began a relationship with Applicant in California while he was in the Marines and moved with him to South Carolina following his discharge from the military; Applicant's older sister Neata; Dr. McGarrahan, a forensic psychologist and neuropsychologist; and AuBuchon, the defense's prison classification expert

17. The lay witnesses called to testify by Applicant's trial counsel presented evidence about a variety of matters including Applicant's childhood, family life, school years, work history, medical history, and military service.

a. Applicant was born to Jackie and John Hummel, Sr., at Arlington Memorial Hospital when the Hummels lived in Grand Prairie, Texas. [RR 43: 209.] Neata, Applicant's only sibling, was nine and a half years older than Applicant. [RR 43: 208.]

b. From the time Applicant was born, Jackie placed full responsibility for Applicant's care on young Neata and often left the children home alone. [RR 43: 210-11, 215-16.]

c. Applicant's family moved to South Carolina when Applicant was three years old, and five years later the family moved to a small cinder-block house that was set far off the road on a 400-acre farm in Jonesville, South Carolina, where they lived a "cloistered existence." [RR 43: 105-06, 113, 125, 160, 208-10.]

d. When Parris visited the farm where the Hummel family lived, he and Applicant would fish, play video games, play outside in the hay, and "just do boys stuff." [RR 43: 155, 164.]

e. Applicant's parents controlled who Applicant and Neata could have as friends and did not allow Applicant and Neata to visit other people's houses, with the exception of going to the house of Jackie's best friend Linda Pack to play with the Pack children. [RR 43: 160, 219-20, 250.]

f. When the Pack family ate lunch at the Hummel home almost every Sunday after church for a number of years, Applicant would keep to himself and play video games in his or Neata's bedroom. [RR 43: 105, 109, 123-24, 126, 129, 135-37.]

g. Jackie was very generous and extravagant with the Pack children, but not at all with Applicant and Neata. [RR 43: 110-11, 127, 134, 140-41, 229-30.]

h. Applicant's parents were very strict; they never showed Applicant and Neata any affection; and they did not hug, kiss, or hold the children. [RR 43: 111, 211-21, 249-50.]

i. Applicant and Neata were expected to respond quickly when their parents told them to do something, they did not talk back to their parents, and they were often disciplined with a belt if they did not do as they were told. [RR 43: 119, 128, 139-40, 213-14, 218, 250.] Neata felt that her parents were abusive toward her and Applicant. [RR 43: 221.]

j. Mark Pack witnessed John Sr. throw a twelve- or thirteen-year-old Applicant off of a tractor when Applicant drove the tractor too close to a cow. [RR 43: 111-12.] Parris witnessed John Sr. hit Applicant on two occasions: (1) he hit Applicant with a belt eight or more times on the back, front, head, and shoulders as punishment for turning a bull loose; and (2) he hit Applicant four or five times on the back with a broom handle when Applicant was accused of kicking a cat. [RR 43: 152-54.]

k. When Neata was seventeen years old, she saw another woman performing oral sex on her father; Applicant was asleep in the room with Neata. [RR 43: 252.] When Parris' mother would walk through the kitchen at the Hummel home, John Sr. would "smack her on the butt and that type of deal." [RR 43: 155.]

l. Applicant was a quiet, pleasant, cooperative, and responsible high school student who had no problems with other students, although he did not interact much with them. [RR 43: 60-61.] He graduated with a cumulative GPA of 2.515 and ranked twentieth in a senior class of forty-five students, but he was considered a special-education student because of his learning disability related to spelling and grammar. [RR 43: 68-70, 91.] Trial counsel introduced evidence regarding Applicant's permanent school records spanning from elementary school through high school. [*See generally* RR 43: 75-94.] Applicant's parents did not seem interested in Applicant's education. [RR 43: 55-56.]

m. Applicant participated in a graphic art club in ninth and tenth grades and in ROTC in eleventh grade; as a senior, Applicant came in second place in an art contest for a logo he designed for Project Hope. [RR 43: 92-93.]

n. The Hummels' wood-burning stove caused Applicant to smell like bacon, and Applicant did not like that his classmates nicknamed him "Bacon" as a result. [RR 43: 156, 223.]

o. Applicant's friends thought Applicant was "stupid." [RR 43: 119-20, 159, 161.]

p. Applicant played video games and Dungeons and Dragons. [RR 43: 65.]

q. Applicant dated Bennett for about a year during his senior year of high school, but she broke up with him because he wanted to marry her after high school and she was not ready for that type of relationship. [RR 43: 172-76, 182.] Applicant cried and was hurt when Bennett broke up with him. [RR 43: 177.] Bennett remembered Applicant as a nice guy who treated her appropriately and who knew how to act around women; she saw nothing to suggest that Applicant would be capable of killing four people. [RR 43: 174, 178, 180-81, 183.]

r. Applicant moved into an apartment with a friend when he was nineteen or twenty years old. [RR 43: 225.]

s. Applicant joined the Marines on his twenty-second birthday and went to boot camp the same day. [RR 43: 225.]

t. In 2002, near the end of Applicant's service in the Marines, Applicant began a six-month romantic relationship with Hubertz, who was pregnant with another man's child, and they moved together to South Carolina in May 2002 when Applicant was discharged from the Marines. [RR 43: 187-89, 199, 225.] Applicant worked and had a home life with Hubertz, Applicant gave Hubertz's son his last name, and Hubertz did not know Applicant to frequent bars or strip clubs or to use drugs. [RR 43: 191-94, 199, 203-04, 226.] Applicant treated Hubertz with respect and was never abusive. [RR 43: 192-93.] A few weeks after Hubertz's son was born, Applicant agreed for his sister to send Hubertz and her newborn son on a bus back to California. [RR 43: 195-97, 227-28.]

u. Applicant was more self-assured and had more self-esteem when he returned to South Carolina after serving in the military. [RR 43: 157, 166.]

v. When Applicant went to strip clubs after returning from the military, Applicant would get too attached to the dancers, and, if someone showed Applicant any interest, "all of a sudden he was in love." [RR 43: 157-59.]

w. Applicant moved to Texas, where he met Joy. [RR 43: 228.]

x. Neata did not think that Applicant and Joy seemed like a happy loving couple, but Applicant acted "[w]onderful" toward Jodi. [RR 43: 253.]

y. Applicant had colitis and underwent surgery to remove part of his intestines, resulting in Applicant having a colostomy bag for about a year afterward. [RR 43: 230.] Applicant was unemployed during the time that he had medical problems, and Joy would nag Applicant about not having enough money for food. [RR 43: 230-33.]

z. Witnesses testified that they had never seen Applicant become violent with anyone. [RR 43: 113-14, 166, 178, 232.] When Applicant became frustrated or mad, he "[j]ust ball[ed] up, like he was holding everything in," turned "beet red," and clinched up. [RR 43: 114; *see* RR 43: 232.]

18. Dr. McGarrahan testified about how Applicant's mental health and life history affected the person he became and related to the murders of his family members.

a. Applicant has a learning disability in the area of spelling. [RR 44: 125.]

b. Applicant has a full-scale IQ score of 109, which falls in the average to almost high-average range. [RR 44: 125-26.]

c. Applicant does not suffer from a severe mental disorder or primary psychiatric condition, although he showed mild depression and anxiety. [RR 44: 126, 145.]

d. Applicant has traits of several personality disorders, *i.e.*, narcissism, antisocial, schizoid, and borderline. [RR 44: 126-27.] A personality disorder is a longstanding enduring maladaptive way of interacting with the world which often causes an individual to have a great deal of impairment in the ability to interact with the world. [RR 44: 127.] Personality disorders affect how a person thinks, feels, and behaves in his ability to control his impulses. [RR 44: 127.]

e. Narcissists are often demanding and need attention, affection, and admiration. [RR 44: 128.] They have very high thoughts of themselves and often lack empathy. [RR 44: 129.] Their outward self-esteem is often developed as a way to defend against feelings of very low self-esteem due to failure and lack of accomplishments in life. [RR 44: 129.] Sometimes they exploit or step on others to get what they need in life. [RR 44: 129.]

f. Applicant meets the adult criteria for antisocial personality disorder, which is someone who has difficulty conforming to societal standards. [RR 44: 130-31.] Persons with adult antisocial personality disorder are irresponsible in many areas of their lives, they are often underachievers, they can be deceitful and manipulative, and they are impulsive. [RR 44: 130.]

g. Persons with schizoid personality disorder have a long-standing pattern of detachment in their relationships with others. [RR 44: 131.] They often appear "flat," *i.e.*, there is not emotional expression on their faces, and they may not express much emotion over time. [RR 44: 131.] Other than close family members, they are essentially unable to form attachments with others. [RR 44: 132.]

h. Individuals with a diagnosis of borderline personality disorder often lack direction about their plan for life and what their goals are going to be. [RR 44: 132.] They chronically feel empty inside, so they are always searching for something that they are unable to fill. [RR 44: 132.]

i. Development of a personality disorder is out of a person's control; it develops over time as a result of experiences with the world and biological makeup. [RR 44: 128.]

j. Dr. McGarrahan absolutely believed that the environment in which Applicant was raised was a major contributing factor to his personality makeup as an adult. [RR 44: 133, 135.] Applicant's mother came from an emotionally neglectful home herself, and she did not develop the skills or ability to show affection, attention, or nurturing. [RR 44: 135.] Applicant's mother's caregiving was inconsistent, and there was emotional and psychological neglect of Applicant and Neata. [RR 44: 133-34.] The caregiving duties were

given to young Neata. [RR 44: 135.] Applicant's mother did not play with Applicant and Neata, put them on her lap, hug them, tell them she loved them, or give them affection. [RR 44: 133, 135.]

k. The internal emotions that people experience do not develop if critical periods are missed early in life. [RR 44: 136.] Learning to appropriately express emotions comes along with early development from watching others model it and having the opportunity to express emotions. [RR 44: 136.] However, emotions were not allowed to be expressed in the Hummel home; Applicant's emotions were controlled by his mother. [RR 44: 136-37.] Applicant feels emotions, but he is unable to express them. [RR 44: 136.]

l. Dr. McGarrahan opined that Applicant repressed his emotions for over thirty years, that he did not know how to express his emotions appropriately, and that the repressed emotions came out in a flood of emotional rage at the time of the murders. [RR 44: 138.] Applicant was not doing much thinking; he was operating on pure emotion at the time. [RR 44: 138-39.]

m. In Applicant's San Diego confession, Applicant appeared to be very blunt, unaffected, and unfeeling because after committing the murders his flood of emotion was out and he was back to having difficulty showing what he was feeling and experiencing. [RR 44: 140.]

n. There is a hereditary component to Applicant's personality, which is supported by the fact that Applicant's mother and sister exhibit the same types of personality issues. [RR 44: 140.] Applicant, his mother, and his sister all have a very difficult time expressing their emotions, and they all come across as cold and unfeeling at times. [RR 44: 140-41.]

o. Applicant could not express a good reason why he committed the murders of his family members other than that he had been thinking about wrongs done to him, dating back to fourth grade that most people would have long forgotten. [RR 44: 141.] "And all of the wrongs done to him from elementary school through junior high, high school into the military, his acquaintances who made fun of him, the stressors he was dealing with at home, all built up and came out in an explosive rage." [RR 44: 141.]

p. Applicant stated that Joy and Eddie criticized and nagged him about his lack of a job at times, his inability to do things around the house, and his medical problems. [RR 44: 142.]

q. Applicant told Dr. McGarrahan that, in the months leading up to the offense, he rapidly fell in love with Freeze and that being single more and more attractive so that he might pursue a life with her even though he intellectually knew that Freeze did not feel the same way about him. [RR 44: 142.] With Applicant's personality makeup, any affection or attention became emotional for him or became what Applicant thought was emotional. [RR 44: 143.] This was evident in Applicant's history that, if a woman showed him some attention, even if it was a stripper or a casual acquaintance, it quickly developed into what Applicant thought love was supposed to be in a relationship with a man and a woman. [RR 44: 143-44.] Applicant was looking for a loving relationship, but he did not know how to go about getting it. [RR 44: 144.]

r. One important thing in Applicant's personality is his inability to form and maintain close relationships, including with close relatives such as his mother and sister. [RR 44: 144.]

s. The issues regarding Applicant's personality, the genesis of which was his childhood, played a big role in his commission of the murders. [RR 44: 145.] As a result of repressing his emotions, in the weeks leading up to the offense, Applicant was fixating on conduct dating back to grade school because he was not allowed to deal with his emotions at the time. [RR 44: 145.] A lifetime of Applicant repressing his emotions led to this event. [RR 44: 158.]

t. Applicant told Dr. McGarrahan that he loved his daughter, and he could not explain why he murdered her. [RR 44: 158.]

u. Applicant did not decide to have personality issues; these issues were visited upon him by heredity and his environment. [RR 44: 159.]

v. Based on Applicant's jail and military records, Applicant has done fairly well in structured environments. [RR 44: 159.] Although Applicant had a time when he left his military post without

permission, he also received several commendations for his military service and was honorably discharged from the service. [RR 44: 160.]

19. Testimony from other witnesses at the guilt-innocence and punishment phases of the trial shed further light on Applicant's life history.

a. Applicant and Joy married in a very small wedding while Joy was pregnant with Jodi. [RR 44: 8.]

b. Applicant and Joy faced financial hardships every month, and Joy's friends helped out the couple from time to time. [RR 40: 17-18; RR 44: 9.]

c. Applicant could not work for several years because of a hurt back and because of his Crohn's disease. [RR 44: 9, 16.] Applicant had surgeries, and he had a colostomy bag for a period of time. [RR 44: 16.]

d. Applicant and Joy continued to struggle financially even after Applicant got his job as a security guard. [RR 44: 16.]

e. Christopher Paris, a State's witness, testified that he knew Applicant from church, that he and his wife were in a Sunday school class with Applicant and Joy, that the two couples gathered "on occasion" for events outside church, that he had been to the Hummel home two or three times, and that he knew the Hummels to be a close family unit. [RR 36: 58, 87.]

f. When the Hummel family's vehicle was totaled, the Sunday school class pulled together to fund the down payment on a minivan, and Paris took Joy to buy the vehicle. [RR 36: 59.]

g. Paris visited Applicant in the Tarrant County Jail for a while, and he occasionally brought Applicant's mother to the jail to visit Applicant. [RR 36: 89.]

h. In the Marines, Applicant was an intelligence clerk with a security clearance. [RR 45: 18-19, 29.]

i. Lieutenant Colonel Michael Doughtery described Applicant as a "pretty average, marginally effective" Marine. [RR 45: 11, 20.]

j. Doughtery found Applicant to be fairly good-natured and happy-go-lucky; if Applicant became frustrated or angry, he became silent and his face muscles tensed. [RR 45: 13.]

k. Although Applicant received a number of military commendations and awards, all but one (a basic rifleman's badge from boot camp) were given to the unit as a whole. [RR 45: 16-17, 27.]

l. Applicant never earned a good-conduct medal, which would have required him to complete three uninterrupted years of service with no nonjudicial punishments. [RR 45: 15.]

m. During Applicant's military service, Applicant and Buddy Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Doughtery thought would lead them down the wrong path. [RR 45: 12, 23.] Doughtery counseled both Applicant and Matthias on the matter. [RR 45: 12.]

n. Applicant had several entries in his military records for failing to maintain his weight and pass the physical fitness test. [RR 45: 30, 34-35.]

o. Captain Sergio Santos testified that Applicant was not a very impressive Marine at all. [RR 45: 34.]

p. In May 2000, Applicant went AWOL from his post for a period under twenty hours and had his pay docked for a month as a result. [RR 45: 35, 44, 46.]

q. Santos revoked Applicant's security clearance because he found Applicant to be untrustworthy. [RR 45: 36.]

r. The paperwork to revoke Applicant's security clearance states that Applicant lied to his seniors on numerous occasions and that his integrity was questionable. [RR 45: 38, 45.]

s. Applicant was a lance corporal when he was honorably discharged from the Marines. [RR 45: 43-44.]

20. Moore talked to Applicant's maternal uncle Thomas Hamilton during the pretrial investigation and made a strategic decision that it was not in Applicant's best interest to call Hamilton to testify because Hamilton did not support the allegations of abuse made by Neata and other witnesses, he was very defensive of his sister Jackie, and his testimony was inconsistent with that of other witnesses. [Moore's affidavit at 15.]

21. Cummings talked to George Goodson, a former neighbor of Applicant and Joy, during the investigation of Applicant's case; however, Goodson did not want to testify at Applicant's trial, and counsel ultimately made a strategic decision that it was not in Applicant's best interest to call Goodson as a witness. [Moore's affidavit at 15.]

22. The failure to locate Brian Jeter, Joseph Patterson, Chad Brown, and Shana Fowler as mitigation witnesses did not result from an inadequate investigation into Applicant's life history, and Applicant has not shown otherwise.

23. The defense team obtained Lance DuPre's name and exhausted every lead it had in trying to contact him in person or by telephone, but he never contacted the defense. [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts made to locate and interview DuPre were in any manner deficient or unreasonable. [*See* Application at 66-67.]

24. The defense team did not locate Paris before trial even though it "aggressively tried to do so." [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts to locate Paris were in any manner deficient or unreasonable. [*See* Application at 69-70.]

25. Paris' trial testimony covered many facts which were the same as or similar to those matters contained in his habeas affidavit. [*Compare* RR 36: 58-59, 87, 89 *with* Applicant's Exhibit 16.]

26. Although Paris's habeas affidavit discusses the extent of his relationship with the Hummels and his knowledge of problems in their marriage, he testified at trial that the couples got together "on occasion" outside church

for an event and that he viewed the Hummels as a happy family unit. [RR 36: 58, 87.]

27. The defense team's private investigator interviewed all of Applicant's neighbors, but none provided helpful testimony or wished to testify on Applicant's behalf. [Moore's affidavit at 15.]

28. The defense team contacted those individuals whom Applicant identified as his "friends" at work; however, they denied the existence of any such friendship and indicated that they knew very little of Applicant, that they did not really care for Applicant, and that they did not want to testify. [Moore's affidavit at 15.]

29. The defense team contacted people from the Hummels' church and subpoenaed the minister to testify; however, the minister later determined that Applicant deserved the death penalty, and he was unwilling to help Applicant at his trial. [Moore's affidavit at 15-16.]

30. Trial counsel investigated the suspicions of Dr. McGarrahan, other defense-team members, and friends of the Hummel family that Applicant and/or Neata were sexually abused by their parents or another adult close to the family. [Moore's affidavit at 11-12, 14.]

a. Applicant, Neata, and Jackie each adamantly denied that any type of sexual abuse ever occurred, and none of the other individuals who were interviewed could provide any proof that sexual or physical abuse had occurred other than what was testified to at trial. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

b. Applicant told members of the defense team that his home life, upbringing, and family life were very positive; he denied witnessing or experiencing any abuse growing up; and he adamantly denied even those things which others told the defense team they had witnessed. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

c. Neata would only admit to that abuse about which she ultimately testified, and she repeatedly denied that anything further or more severe had taken place. [Moore's affidavit at 12.]

d. Jackie denied any abuse in the home, although she acknowledged that she and Applicant's father were not demonstrative in their affection for Applicant and Neata. [Moore's affidavit at 12.]

e. Applicant's contention that trial counsel narrowly focused their mitigation investigation on suspicions that Applicant was sexually abused and that counsel failed to rigorously pursue other avenues of mitigation evidence is untrue and unsupported by the record. [Moore's affidavit at 11; Cummings' affidavit at 7; see Application at 62, 64.]

f. No one informed any defense-team member that Neata said in the hallway during trial that her father had sexually abused her or that she had sexually abused Applicant. [Moore's affidavit at 12; *see* Application at 64 n.2 (citing Applicant's Exhibit 18).] Based on Moore's knowledge of and contact with Parris, Moore "simply do[es] not believe" that such an event occurred. [Moore's suppl. affidavit at 13.]

g. Because Neata denied that sexual abuse had occurred, Applicant's trial counsel had no good-faith basis to engage in the line of questioning suggested by Applicant, and counsel cannot be considered deficient for asking such questions under the circumstances. [Moore's suppl. affidavit at 12.]

31. During the investigation, Applicant's trial counsel did not overlook the *potential* value of Applicant's military service. Applicant's trial counsel obtained Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.] Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.]

32. By Applicant's own accounts, his military service was not something that would be particularly fruitful to his mitigation case, and Moore knew about problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

33. Applicant has not provided an affidavit signed by Christopher Boling; therefore, all references to statements allegedly made by Boling to a third party are stricken and given no consideration.

34. Applicant provided Matthias' name to the defense team's mitigation specialist, but the team was unable to locate him. [Moore's suppl. affidavit at 7.]

35. Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf, but Applicant never provided the names of Emmer, Chaidez, or Boling, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17; Moore's suppl. affidavit at 7.]

36. The failure to locate Matthias, Emmer, Chaidez, and Boling did not result from an inadequate investigation into Applicant's life history for purposes of developing a mitigation case.

37. Trial counsel made a strategic decision to attempt to minimize the negative aspects of Applicant's military service. [Moore's affidavit at 17.] The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez would not have made Applicant's military service more compelling or mitigating, and the evidence would have provided both positive and negative information about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.] The affidavits of Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation while in the military service, but "they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending strip clubs." [Moore's suppl. affidavit at 8.]

38. Applicant's military career as described in the habeas affidavits of Chaidez, Emmer, and Matthias is not the type of military service that, when combined with other mitigating evidence introduced at Applicant's trial, would have tipped the scales against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony

of Applicant's commanding officers about Applicant's military service during the State's rebuttal case.

39. Many facts that Applicant faults his trial counsel for not asking Bennett, Scoggins, and Christy Pack during their trial testimony were elicited from either these or other witnesses at Applicant's trial.

40. Any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial is not so compelling or of such significance that trial counsel can be deemed deficient for not discovering it and/or inquiring about it at trial, especially in light of the thorough investigation conducted by trial counsel and the totality of the evidence presented at trial.

41. There is no reason to believe that any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial would have changed the outcome of the punishment phase of Applicant's trial.

42. Applicant's trial counsel had a qualified mitigation specialist and private investigator appointed early in the case; sought funds for and hired a forensic psychologist and neuropsychologist who explained at trial how Applicant's life history contributed to his commission of the charged offense; traveled to South Carolina to seek out and interview Applicant's family and friends and to investigate his background; sought to discover witnesses from Applicant's family, friends, church, employment, and neighborhood; took all actions necessary to secure the presence of potentially beneficial witnesses at Applicant's trial; were prepared to cross-examine the State's witnesses; presented a strategically developed cohesive mitigation theme based on the witnesses available at the time of Applicant's trial; and urged the jury during final arguments to answer the special issues in a way that would require a sentence of life rather than death.

43. Applicant's trial counsel complied with prevailing professional norms in making strategic decisions, in presenting the testimony of the available beneficial witnesses, and in constructing a cohesive mitigation theme through lay and expert witnesses.

44. Trial counsel exercised their prerogative in deciding what witnesses to call to testify and what questions to ask them.

45. Applicant's claim that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented is unpersuasive second-guessing in hindsight.

46. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

47. There is considerable overlap between the information that Applicant claims his trial counsel should have discovered and presented via the lay witnesses and the facts and themes trial counsel actually developed at trial. [Moore's affidavit at 16.]

48. To the extent that any of the evidence or proposed testimony provided by Applicant is not cumulative, there is no reason to believe that such evidence would have been considered so powerful, compelling, or significant by the jury that it would have changed Applicant's sentence.

49. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls far short of the type that courts have found to support a finding of prejudice.

50. Applicant's crime was premeditated, cold-blooded, and heinous; the aggravating facts at trial were severe.

51. The jury was well aware through lay and expert testimony of neglect, abuse, attachment issues, and family stresses in Applicant's life before and at the time of the murders and their potential effect on Applicant's decision to murder his family.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

6. In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7. Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8. Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

9. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

12. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427. The decisions of Applicant's trial counsel to call certain witnesses and not to call others who were uncooperative or would not

benefit Applicant's case were the result of an extensive investigation and strategic reasoning about the best way to present Applicant's case.

13. Trial counsel thoroughly investigated Applicant's background for mitigation purposes and called all of the available witnesses who could provide relevant, beneficial evidence. The actions of trial counsel fall within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Moore v. Johnson*, 194 F.3d 586, 591-92 (5th Cir. 1999).

14. To obtain relief on an ineffective-assistance claim based on an uncalled witness, an applicant must show that the witness was available to testify and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). Applicant's trial counsel cannot be deemed ineffective for failing to call family members, neighbors, church members, coworkers, and others who did not want to testify or whose testimony would not have benefitted Applicant's mitigation case. Likewise, Applicant's trial counsel cannot be faulted for failing to call witnesses whom they made reasonable efforts to locate and interview without success.

15. Applicant's trial counsel fulfilled their duty to conduct a reasonable and thorough investigation of Applicant's life history as part of the mitigation investigation, even in the face of dealing with threats, uncooperative witnesses, and witnesses whose testimony would have damaged Applicant's case.

16. Under the circumstances at the time of Applicant's trial, DuPre was not a witness who was available to the defense. *See Ex parte White*, 160 S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony).

17. Applicant's trial counsel were not deficient for failing to present largely cumulative testimony. *See Coble*, 496 F.3d at 436 (failure to present cumulative testimony does not constitute ineffective assistance).

18. No prejudice results from the failure to present cumulative mitigation evidence. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (no prejudice in failing to present cumulative mitigation evidence; to establish prejudice, new evidence presented in habeas proceeding must differ in

substantial way in strength and subject matter from evidence actually presented at sentencing).

19. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located witnesses who were not found during a thorough investigation or has presented evidence that could have been asked of witnesses who did testify does not support Applicant's claim of ineffective assistance.

20. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); *Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance).

21. The basis of Applicant's current claim – essentially that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – is rejected as unpersuasive. *See Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) (courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees'" involving questions of whether counsel investigated enough or presented enough mitigating evidence; "[t]hose questions are even less susceptible to judicial second-guessing"); *Dowthitt v. State*, 230 F.3d 733, 743 (5th Cir. 2000) (same).

22. Applicant's complaints constitute an impermissible second-guessing of the manner in which his experienced trial counsel chose to present Applicant's mitigation case at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

23. Counsel acted well within prevailing professional norms, and Applicant has failed to meet his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting Applicant's life history to develop the mitigation case fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's complaints are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

24. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls short of the type that courts have found to support a finding of prejudice. *See, e.g.*, *Rompilla*, 545 U.S. at 392-93; *Wiggins*, 539 U.S. at 516-17; *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000).

25. Given the largely cumulative nature of the evidence that Applicant alleges his trial counsel should have presented, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the mitigation special issue differently had trial counsel discovered and called those witnesses to testify. *See Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker*, 565 F.2d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative).

26. Even when the powerful aggravating evidence is reweighed against the totality of the available mitigating evidence, there is no reasonable probability that, but for the failure of Applicant's trial counsel to present the testimony at issue, the jury would have answered the mitigation special issue differently. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

27. The Court recommends that Applicant's fifth claim for relief be denied.

**E. Claim for Relief Six**

Applicant alleges that his trial counsel were ineffective for failing to present Applicant's military service as mitigation evidence. [Application at 73.]

**Findings Of Fact**

1. Based on the wantonness and severity of Applicant's crime, Moore believed that he needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel made a strategic decision to concentrate its mitigation efforts in those areas they felt would be most productive. [Moore's supplemental affidavit at 7-8.]

2. Applicant has not submitted a signed affidavit from Christopher Boling; instead, he relies on statements Boling allegedly made to a third person.

3. Applicant's trial counsel did not overlook the *potential* value of Applicant's military service to the mitigation presentation at trial. [Moore's affidavit at 17.]

4. Applicant's trial counsel obtained copies of Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

5. Lay witnesses for the defense informed the jury that Applicant joined the Marines on his twenty-second birthday, served for about four years, was assigned as an intelligence analyst, and was more self-assured and had a higher self-esteem when he left the Marines. [RR 43: 161, 166, 225, 231.]

6. The defense's expert witnesses testified that they reviewed Applicant's military records, that Applicant was honorably discharged from the Marines, that Applicant's military service showed his ability to do well in a structured environment, and that Applicant received several commendations for his military service. [RR 44: 70, 73, 159-60.]

7. By Applicant's own accounts to members of the defense team, his military service was "lackluster," was not a positive experience, and was not something that would be particularly fruitful to his mitigation case, and

Moore knew about the problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

8. Trial counsel made a strategic decision to attempt to avoid or minimize negative evidence related to Applicant's military career. [Moore's affidavit at 17; Moore's suppl. affidavit at 7-8.]

9. Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

10. Trial counsel knew about disciplinary action taken when Applicant went AWOL from his military post, and counsel made a strategic decision to try to avoid that issue to the degree possible during presentation of the defense witnesses. [Moore's affidavit at 17-18.]

11. Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf. [Moore's suppl. affidavit at 7; Moore's affidavit at 17.]

12. Applicant never provided the names of Chaidez, Emmer, or Boling to trial counsel or other defense-team members, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17.]

13. Applicant provided Matthias' name to the defense team's mitigation specialist, but the defense team was not able to locate him. [Moore's suppl. affidavit at 7.]

14. The failure of trial counsel to locate Matthias or to discover Emmer, Chaidez, and Boling was not the result of an inadequate investigation into Applicant's background and life history.

15. The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez do not make Applicant's military service more compelling or mitigating, and such testimony would have provided both positive and

negative information to the jury about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.]

16. Although the affidavits provided by Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation during his military service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending strip clubs. [Moore's suppl. affidavit at 8.]

17. Applicant's military service was not, as Applicant claims, a positive and "powerfully mitigating episode in [his] life."

   a. Applicant was a "pretty average, marginally effective" Marine; he was not a very impressive Marine. [RR 45: 11, 34.]

   b. All but one of Applicant's commendations and awards were given to his military unit as a whole. [RR 45: 27.]

   c. Applicant and Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Doughtery thought would lead them down the wrong path. [RR 45: 12, 23.]

   d. When Applicant was not interested in something, he needed maximum guidance or supervision to ensure its completion. [RR 45: 22-23.]

   e. Applicant had several entries for failing to maintain his weight within the required standards and failing to pass the physical fitness test. [RR 45: 30, 34-35.]

   f. Applicant went AWOL for under twenty hours because he was unhappy, and his pay was docked as a result. [RR 45: 35, 46.]

   g. Santos revoked Applicant's security clearance because Applicant was untrustworthy and lied to his seniors. [RR 45: 36, 38-39, 45.]

18. Regardless of how Applicant tries to portray his military service, the facts contained in the habeas affidavits of Matthias, Emmer, and Chaidez, as well as the testimony of Dougherty and Santos presented during the State's

rebuttal case, rebut any assertion that the jury would have considered Applicant's military service to be particularly mitigating.

19. The punishment-phase evidence and arguments would not have been significantly different or more compelling had the evidence contained in the habeas affidavits of Chaidez, Matthias, and Emmer been introduced as evidence at the punishment phase of Applicant's trial.

20. There is no reasonable probability that the facts contained in the habeas affidavits of Chaidez, Matthias, and Emmer would have caused the totality of the mitigating circumstances to outweigh the overwhelming and compelling aggravating facts presented at Applicant's trial.

21. Applicant's military career, even as described in the habeas affidavits of Matthias, Emmer, and Chaidez is not the type of service that the jury would have considered to be a particularly mitigating circumstance, especially when balanced against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony of Applicant's commanding officers during the State's rebuttal case.

22. Trial counsel exercised their prerogative in deciding what witnesses to call and what questions to ask about Applicant's military service.

23. Applicant's arguments simply second-guess in hindsight the manner in which his highly experienced trial counsel strategically chose to present evidence of Applicant's military service.

**<u>Conclusions Of Law</u>**

1. All references by Applicant to facts learned during alleged conversations of others with Christopher Boling are stricken pursuant to TEX. R. EVID. 602 and 802 and are given no consideration in this habeas proceeding.

2. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

3. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

4. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

5. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

6. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

7. In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

8. Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

9. Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

10. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

11. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

12. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518. The fact that another attorney

may have pursued a different tactic at trial is insufficient to support a claim of ineffective assistance. *Scheanette*, 144 S.W.3d at 510.

14. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); Payne, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance). Courts must be particularly wary of arguments that essentially come down to a matter of degrees involving questions of whether counsel investigated enough or presented enough mitigating evidence. *Dowthitt*, 230 F.3d at 743.

15. To obtain relief based on an uncalled witness, an applicant must show the witness was available and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d at 52. The witnesses whose affidavits Applicant presents in this habeas proceeding would have provided negative information about Applicant's military service in conjunction with the positive information they could provide, and Applicant's trial counsel made a reasonable strategic decision based on their investigation of Applicant's military service to avoid the negative aspects of his service to the degree possible during the presentation of the defense witnesses.

16. *Porter v. McCollum*, 558 U.S. 30 (2009), cited by Applicant, is distinguishable from Applicant's case. The evidence of Applicant's unremarkable military service comes nowhere near the circumstances presented in *Porter*. *See id.* at 41, 43-44.

17. Given the totality of the circumstances, the breadth of the defense team's investigation, the strategic decisions resulting from the investigation, and the totality of the representation provided, Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in not locating Matthias, Emmer, Chaidez, and Boling as witnesses to testify about Applicant's military service fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's

claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

18. There is no reasonable probability that the facts contained in the affidavits of Chaidez, Matthias, and Emmer would have had any effect on the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's allegations are not firmly founded in the record, and Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of trial counsel.

19. The Court recommends that Applicant's sixth claim for relief be denied.

## F. <u>Claim for Relief Seven</u>

Applicant contends that his trial counsel were ineffective for failing to present evidence that he suffered from complex post-traumatic stress disorder (CPTSD) resulting from attachment trauma. [*See* Supplemental Response To State's Answer at 16-21; Initial Application For Writ Of Habeas Corpus at 80-93.] Applicant alleges that trial counsel should have: (a) conducted a complete investigation of his life history and psycho-social development; (b) hired an expert witness with specialized experience in trauma-related disorders; and (c) called such expert to testify at trial about his attachment trauma and CPTSD and their effects on his life and mental health. [*See* Application at 82.]

**Findings Of Fact**

1. CPTSD is a psychological injury resulting from prolonged exposure to very extreme trauma such as entrapment or kidnapping, slavery or enforced labor, long-term imprisonment, torture, or abuse from which there is little or no hope of escape. [Dr. Price's affidavit at 4.]

2. Many signs, symptoms, and conditions have been ascribed to CPTSD, rendering it so non-specific that it has failed to gain general acceptance in the mental-health community as a mental disorder. [Dr. Price's affidavit at 5.]

3. Research on CPTSD has not risen to the level required to be determined a disorder, *i.e.*, a constellation of signs and symptoms that is not accounted for by some other condition, even though the developers of both the fourth and fifth editions of the Diagnostic and Statistical Manual of Mental Disorders (the DSM-IV and DSM-V) have considered it. [Dr. Price's affidavit at 5.]

4. CPTSD has remained essentially a "syndrome," which is a collection of signs and symptoms that suggest some abnormal condition. [Dr. Price's affidavit at 5.]

5. CPTSD is not included in the DSM-V or in the International Statistical Classification of Diseases and Related Health Problems. [Moore's suppl. affidavit at 9.]

6. Trial counsel thoroughly investigated Applicant's life history and presented as complete a picture of Applicant's life history as possible given the witnesses who were available to the defense at the time of Applicant's trial.

7. At trial, Applicant's trial counsel presented the available information that was supported by the evidence. [Moore's suppl. affidavit at 11.]

8. Trial counsel considered potential mental-health experts who might assist them in developing the mitigation case, and Moore called several different experts. [Moore's affidavit at 7.]

9. Moore had previously worked in several cases with Dr. McGarrahan, a forensic psychologist and neuropsychologist whom Moore knew to be

"highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions." [Moore's affidavit at 7.]

10. Trial counsel retained Dr. McGarrahan due to Moore's familiarity with her work, his opinion of her abilities, her reputation in the legal community; and the prior professional relationship and mutual respect between Dr. Price (the State's expert) and Dr. McGarrahan. [Moore's affidavit at 7.]

11. Dr. McGarrahan spent approximately eleven hours administering cognitive tests and psychological inventories to Applicant. [RR 44: 121-22.]

12. Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, various correspondence from Applicant's sister Neata Woody to Applicant, Jackie Hummel's medical records, and psychological test data from Dr. Price's evaluation conducted the weekend before she testified; she performed a clinical interview to ask Applicant about his "entire social history"; she performed a mental status examination during which she made observations of Applicant and discussed with him any psychiatric symptoms he was having; and she discussed the offenses in great detail with Applicant. [RR 44: 121-24.]

13. There is no indication that Dr. McGarrahan ever diagnosed Applicant with CPTSD or informed Applicant's trial counsel that such a diagnosis might be possible.

14. At trial, Dr. McGarrahan testified about every deficit and disorder she found to exist with Applicant based upon her exhaustive interviews and testing, the information she received from Applicant's family, and her review of Applicant's relevant records. [Moore's suppl. affidavit at 10.]

15. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; and their significance to Applicant's actions in murdering his family members. [RR 44: 126-46, 158-61.]

16. Moore has called experts, including doctorate-level social scientists, to testify in other trials about the presence of "attachment disorder," but he did not believe based on the available facts in Applicant's case that any

additional expert other than Dr. McGarrahan was necessary to adequately address Applicant's attachment issues at trial. [Moore's affidavit at 21-22.]

17. Dr. McGarrahan was qualified to evaluate Applicant and to present evidence of attachment issues at Applicant's trial [Dr. Price's affidavit at 6-7], and the strategic decision of trial counsel to call Dr. McGarrahan rather than to retain another type of expert witness was not objectively unreasonable.

18. Even if Dr. Hardesty has experience in treating patients with attachment disorder and CPTSD, such experience is not a prerequisite to conducting a comprehensive forensic psychological evaluation and testifying at trial to the results of the evaluation. [Dr. Price's affidavit at 6-7.]

19. Trial counsel exercised their prerogative and made a strategic decision to present evidence about Applicant's attachment issues and other psychological issues through the testimony of Dr. McGarrahan and lay witnesses. [Moore's supplemental affidavit at 10; see RR 44: 126-46, 158-61.]

20. Even if Applicant's trial counsel had been informed of a diagnosis of CPTSD at the time of Applicant's trial, counsel would not have been required to present testimony about the diagnosis at trial, as such diagnosis reasonably could be viewed as damaging evidence of future dangerousness.

21. In Moore's experience, diagnoses for mental disorders which are not included in the diagnostic manuals are subject to attack at trial on that basis alone and, therefore, can have markedly less effect upon jurors. [Moore's suppl. affidavit at 9-10.] Moore is "skeptical about the jury's willingness to give credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals." [Moore's suppl. affidavit at 10-11.]

22. In over thirty-five years trying criminal cases, Moore has found that jurors are reticent to accept "learned opinions" without an evidentiary basis to support them. [Moore's suppl. affidavit at 10.] Moore would be concerned about the "scarcity" of underlying evidence upon which Dr. Hardesty based her diagnosis of CPTSD. [Moore's suppl. affidavit at 10.]

23. Dr. Hardesty's allusions to the denials of child abuse or neglect by Applicant and Neata as constituting evidence that abuse and neglect did, in fact, occur are "inappropriate." [Dr. Price's affidavit at 7.]

24. While denial of abuse does not foreclose a clinical diagnosis, such denials create a "unique and challenging problem in being able to support and defend such a diagnosis before the jury" that cannot be overlooked or ignored in the trial of a criminal case. [Moore's suppl. affidavit at 10.]

25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Dr. Price's affidavit at 1-2.]

26. Had Dr. Hardesty testified that she diagnosed Applicant with CPTSD, Dr. Price would have been available to testify and dispute her analysis that Applicant suffered from CPTSD secondary to attachment trauma and that such condition played any role in Applicant's murder of his family members. [Dr. Price's affidavit at 6.]

27. Events in Applicant's childhood such as the lack of being told he was loved, not having been hugged, being isolated on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse are not in the ballpark with the conditions usually discussed in relationship to CPTSD. [Dr. Price's affidavit at 6.]

28. Hummel has shown an ability to form attachments with adults such as his sister and uncle; he "escaped" his family of origin shortly after high school when he joined the Marines, where he was successful as an intelligence specialist until he became dissatisfied with his situation, went AWOL, and lost his security clearance; and he maintained several relationships with women, even though he became "attached" to them too quickly and appeared to be poor in interacting with the opposite sex. [Dr. Price's affidavit at 6.]

29. Applicant's most likely motivations for murdering his family members were "multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled." [Dr. Price's affidavit at 6.]

30. The jury did not find Applicant's attachment issues and personality traits, the facts of his life, or their role in his commission of the murders to be sufficiently mitigating to absolve Applicant of moral blameworthiness for his premeditated, calculated, heinous acts.

31. Even with the addition of Dr. Hardesty's proposed testimony about CPTSD, the overwhelming and compelling aggravating facts and circumstances in this case still would have outweighed the totality of Applicant's mitigating evidence.

32. Dr. Hardesty's proffered testimony about CPTSD contained in her habeas affidavit would not have been substantially more compelling than the evidence presented through Dr. McGarrahan, and there is no reasonable probability that the jury would have been persuaded by Dr. Hardesty's diagnosis of CPTSD to answer the mitigation special issue in Applicant's favor.

33. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

34. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

35. Applicant's allegations of prejudice are conclusory.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under

prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. Applicant's trial counsel cannot be deemed to have been deficient for failing to discover and present a diagnosis of CPTSD when the defense team's well-qualified mental-health expert did not make such a diagnosis. *See, e.g.*, *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001) (counsel's failure to investigate and discover Campbell's PTSD not ineffective when clinical

psychologist failed to make such diagnosis); *Pruett v. Thompson*, 996 F.2d 1560, 1573-74 (4th Cir. 1993) (counsel's failure to investigate or present evidence of mental illness, developmental problems, organic brain damage, and PTSD not ineffective where counsel consulted psychiatrist who concluded Pruett did not suffer from any of the alleged mental illnesses or abnormalities); *Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003) (counsel not ineffective for not investigating and discovering Taylor's PTSD after forensic psychologist failed to make such diagnosis).

8. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; Weisinger, 775 S.W.2d at 427. Applicant's trial counsel acted within the wide range of reasonable professional assistance and were not objectively unreasonable in making a strategic decision to rely on Dr. McGarrahan rather than to retain another type of expert such as Dr. Hardesty to testify at Applicant's trial.

9. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty is not alone a basis to prove a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been retained and called to testify about a diagnosis that was not available to counsel at the time of trial. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

10. Applicant's attack on counsel's performance is simply based on impermissible second-guessing and hindsight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight). Applicant has not met his burden to prove that his trial counsel were deficient for not retaining an expert such

as Dr. Hardesty to testify that he suffers from CPTSD resulting from attachment trauma.

18. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. There is no reasonable probability that the proposed testimony of Dr. Hardesty contained in her habeas affidavits about CPTSD resulting from attachment trauma would have changed the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the recordm, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

12. The Court recommends that Applicant's seventh claim for relief be denied.

**G. <u>Claim for Relief Eight</u>**

Applicant alleges that his due-process right to a fair trial was violated when the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial and that his trial and appellate counsel were ineffective. [Application at 93.]

**<u>Findings Of Fact</u>**

1. The State elected to proceed to trial on the capital-murder indictment alleging that Applicant murdered Joy and Eddie in the same criminal transaction. [RR 4: 4-5]

2. Applicant also murdered his daughter Jodi and his unborn child during the same criminal episode.

3. Applicant's discussion of his eighth claim for relief, which is phrased as a due-process violation, largely focuses on whether portions of the State's opening statements and jury arguments and various trial evidence referring to Jodi and the unborn child were too inflammatory and prejudicial to be admitted, were inadmissible as same-transaction contextual evidence, and were impermissible victim-impact evidence. [*See* Application at 93-103.]

4. Applicant provides a single conclusory paragraph and only two record citations to support his claim that his trial counsel were ineffective, alleging that trial counsel performed deficiently "[t]o the extent [they] failed to object and preserve the errors committed by the State and court." [Application at 104 (citing RR 39: 194-97; RR 42: 79).]

   a. Applicant first cites the introduction during the guilt-innocence phase of SX 318, an autopsy photograph of the unborn child and Joy's uterus after their removal from Joy's body. [Application at 104 (citing RR 39: 194-97).] Trial counsel objected to the introduction of SX 318 [RR 39: 194-97], and Applicant neither challenges the sufficiency of the objections made by trial counsel nor asserts that counsel could have done anything differently. [*See* Application at 104.]

   b. Applicant's second record citation is to the introduction of photographs of Applicant's family members from Applicant's MySpace page during the punishment phase of his trial. [Application at 104 (citing RR 42: 79).] Moore did not object to these photographs because he did not think there was any meaningful objection to the photographs that the Court would sustain at the punishment stage of the trial and because Moore made a strategic decision that the photographs might benefit Applicant's case by showing that Applicant loved his family and by demonstrating that Applicant's commission of the murders was solely the result of his mental and emotional problems. [Moore's affidavit at 23-24.]

5. Applicant neither explains how any of the referenced opening statements discussing Jodi were improper nor identifies any valid legal basis for his trial counsel to have objected. [*See* Application at 94-95.]

6. The State's opening statements at the guilt-innocence phase referring to Jodi were proper because Applicant murdered Jodi in the same criminal episode as Joy and Eddie, who were the named victims in the indictment, and the circumstances of Jodi's murder were admissible as same-transaction contextual evidence.

7. Applicant seems to simply assume that the cited testimony of Audria Hastings, Jodi's kindergarten teacher, was inflammatory and prejudicial because it referred to Jodi. [*See* Application at 95.] Applicant neither explains why Hastings' testimony was inadmissible as same-transaction contextual evidence nor offers any valid legal objection that trial counsel should have made to Hastings' testimony. [*See id.*] Moreover, in addition to Hastings' testimony delineated by Applicant, Hastings identified a photograph of Jodi showing how the child looked in class earlier on the day of the murders. [RR 33: 63; SX 1.]

8. Trial counsel objected during Hastings' testimony to videotapes showing Jodi with her teachers and kindergarten class, and the Court overruled those objections. [RR 33: 70-74.]

9. Applicant complains that testimony of Jodi's school nurse, Constance Smith, "continued the focus on Jodi" at the guilt-innocence phase of the trial. [Application at 95.]

   a. The testified-to incident when Jodi hurt herself on the school playground and Joy went to the school to comfort her occurred the afternoon of December 17, 2009, the same day Applicant murdered his family. [RR 33: 81-82.]

   b. Smith also testified that on the day of the murders Joy appeared to be in good health and was excited about her pregnancy. [RR 33: 87.]

   c. Applicant fails to specifically explain why Smith's testimony about the activities and interactions of Joy (a named victim) and her daughter Jodi on the day Applicant murdered them was inadmissible. [*See* Application at 95.]

   d. Applicant offers no valid legal basis for his trial counsel to have objected to Smith's testimony referenced in the application. [Application at 95.]

e. Applicant simply assumes that trial counsel should have objected to the testimony because it referred to Jodi. [Application at 95.]

10. Applicant asserts that the State "consistently made references to Jodi throughout the remainder of the trial," and he cites numerous pages in the reporter's record to support his contention. [Application at 95.]

a. Applicant does not delineate exactly what testimony on the pages he cites was objectionable, and this Court will not make Applicant's arguments for him. [*See* Application at 95.]

b. Applicant provides no valid legal basis for his trial counsel to have objected to testimony on the pages he cites. [Application at 95.]

c. Applicant seems to simply assume that trial counsel should have objected to something on the pages listed because it referenced Jodi. [*See* Application at 95.]

d. Some testimony on the pages cited by Applicant mentions Jodi in the context of being the daughter of Joy or the granddaughter of Eddie, the two victims named in the indictment for which Applicant was on trial. [*See* RR 36: 50 (Applicant's co-worker recounts conversation with Applicant on December 18, the morning after the murders; she remarked that Jodi must be excited about Christmas, and Applicant responded, "Yes, she is"), 58 (Christopher Paris came to know that the Hummels had a daughter named Jodi); RR 37: 167 (DNA analyst obtained known DNA samples from autopsy work for Joy, Eddie, and Jodi), 198 (DNA analyst excluded Joy, Eddie, and Jodi as contributors to DNA sample near top rim of Applicant's black hat), 203 (DNA analyst found Jodi's DNA on area of bat); RR 40: 10 (Eddie's former co-worker got to know Eddie's daughter Joy and granddaughter Jodi), 18 (Jodi was Joy's daughter).]

e. None of the testimony on the pages cited by Applicant as referencing Jodi went beyond what was permissible as same-transaction contextual evidence.

11. Applicant complains that the State shifted the focus of the trial to Joy's unborn child. [*See* Application at 96.]

a. Applicant offers no specific explanation why the opening statements, witness testimony, or closing arguments he cites were improper. [*See* Application at 96.]

b. Applicant provides no valid legal basis upon which his trial counsel should have objected. [Application at 96.]

c. Applicant seems to assume that the referenced matters were improper simply because they referenced the unborn child. [*See id.*]

d. The focus of the opening statements cited by Applicant was on Joy (a named victim) and her physical state of being pregnant. [*See* RR 33: 25 (Joy had recently gone to doctor and heard baby's heartbeat for first time), 29 (Joy, who was pregnant, was asleep in the master bedroom when Applicant returned home to commit the murders), 31 ("His wife who is pregnant, lays dead at his feet").]

e. The testimony Applicant cites referred either to Joy's pregnancy and physical condition near the time of the murders or to Applicant's disregard for his unborn child's safety, which was relevant to his state of mind leading up to the murders. [*See* RR 33: 68 (in December 2009, Joy "was pregnant"); RR 39: 101 (Freeze testifies she became uncomfortable with Applicant when she learned Joy was pregnant because Applicant had no concern for his unborn child's safety), 143 (Freeze learned Joy was pregnant one or two days after Freeze and Applicant had sex; Freeze and Applicant exchanged texts concerning Freeze finding out about the pregnancy).]

f. The three pages of the State's closing arguments described by Applicant as containing "[r]epeated references" to the unborn child's death contain arguments which were permissible based on properly admitted evidence at trial and did not impermissibly focus the jury on the unborn child's death. [*See* RR 40: 50 (Applicant "snuffed out four lives that had nothing to do with him, other than he wanted to be single"), 53 ("He killed his pregnant wife"), 56 (Applicant "killed his pregnant wife").]

12. Applicant's trial counsel objected to SX 318 and 379, the two alleged highly inflammatory photographs of the unborn child cited by Applicant. [Application at 96; RR 38: 93; RR 39: 194-97, 202; *see* SX 318, 379.] Applicant makes no allegation of any other objection that his trial counsel could or should have raised. [*See* Application at 96.]

13. Applicant refers to punishment-phase testimony by Applicant's sister Neata that she needed to wait before visiting Jodi's gravestone [RR 43: 234-35]; that she sent Jodi a Christmas dress, but she never got a photo of Jodi in the dress because "everything was burned in their house" [RR 43: 235]; that the loss of Joy and Jodi had left the Hummel family "broken" [RR 43: 236]; and that Applicant's aunt would have been able to take Jodi in and provide for her if Applicant had asked her to do so [RR 43: 239]. [Application at 97.]

a. Applicant fails to explain how the testimony he cites was so prejudicial or inflammatory as punishment-phase evidence as to render it inadmissible or to articulate a valid legal objection that his trial counsel could have, but did not, make. [*See* Application at 97.]

b. In asserting that Neata's description of the Hummel family as "'broken' after Jodi's death" was impermissible victim-impact evidence because Jodi was not a named victim, Applicant overlooks that Neata's testimony was in response to a question about how the loss of "Joy *and* Jodi" had affected Neata's family; thus, the question included a named victim. [RR 43: 236 (emphasis added); *see* Application at 97.]

14. Applicant cites punishment-phase testimony from various State's witnesses referencing either Jodi or the unborn child. [*See* Application at 97.]

a. During the portion of Tomiko Race's testimony cited by Applicant, the State introduced a number of photographs depicting Jodi, Joy, and/or Applicant that were posted on Applicant's MySpace page. [RR 43: 78-79.] Moore made a reasonable strategic decision not to object to the photographs. [Moore's affidavit at 23-24.]

b. Applicant cites Melody Anderson's testimony that she was in the hospital room when Jodi was born, that she saw sonogram photographs of the unborn child, and that Eddie was a good grandfather to Jodi; Phillip King's testimony that Eddie would leave the senior center and go home in time to pick up Jodi from the bus

stop every day; and Cindy Lee's testimony that Jodi would get donuts when Joy dropped off Eddie at the senior center. [Application at 97 (citing RR 44: 8, 10-11, 14, 22, 32 ).]

i. In context, the testimony cited by Applicant focused on the lives and familial relationships and activities of Joy and Eddie, the named victims. [RR 44: 8, 10-11, 14, 22, 32.]

ii. Contrary to Applicant's contentions, testimony about Jodi's visits to the senior center when Joy dropped off Eddie did not fall within the definition of victim-impact evidence.

iii. Applicant provides no valid legal objection that his trial counsel should have, but did not, make.

15. Applicant asserts that thirty-one "inflammatory and prejudicial" photographs of the unnamed victims during the punishment phase were introduced without objection. [Application at 97-98.] As discussed in previous findings of fact herein, trial counsel had strategic reasons for not objecting to the photographs taken from Applicant's MySpace account. [Moore's affidavit at 23-24.] Applicant offers no valid legal basis for his trial counsel to have objected to the remaining photographs to which he refers. [*See* Application at 97-98.] Finally, many of the photographs at issue include Joy, a named victim at trial.

16. Applicant complains that the State made "repeated references" to Jodi and the unborn child during closing arguments at the punishment phase of trial. [Application at 98.]

a. Applicant simply cites a number of arguments without any explanation of how they were impermissible punishment-phase arguments or what valid legal objection his trial counsel should have made, and the Court will not make Applicant's arguments for him. [*See* Application at 98.]

b. The cited arguments were permissible as either summations of the evidence, reasonable deductions from the evidence, or pleas for law enforcement. [RR 45: 57-59, 61, 62-63, 85, 86, 88.]

17. Applicant presents a single paragraph addressing his contention that his appellate counsel was ineffective for failing to raise the cited matters on direct appeal. [*See* Application at 104-05.]

18. Applicant fails to identify specific points of error that his appellate counsel should have raised or substantive arguments that counsel should have made on direct appeal to the Court of Criminal Appeals. [*See* Application at 104-05.]

19. Applicant asserts in conclusory fashion that his appellate counsel was ineffective for not "re-raising trial counsel's objection" to the State's use of photographs of the unborn child in light of case law regarding the prejudicial nature of photographs of unborn children. [Application at 104-05.]

a. SX 379 is an 8x10 color photograph of a biohazard evidence bag containing the unborn child. The photograph does not focus on the unborn child, and the contents are not readily identifiable from the photograph as an unborn child. [SX 379; *see* RR 38: 93.]

b. SX 379 was conditionally admitted for record purposes only during the testimony of a DNA analyst as part of the chain of custody regarding a DNA profile she extracted from the unborn child. [RR 38: 90-95.] It was later admitted for all purposes during the medical examiner's testimony that he had collected a fetus from Joy and packaged it in an evidence bag as show in in SX 379. [RR 39: 202.]

c. SX 379 was never published to the jury. [*See* RR 38: 94; RR 39: 202.]

d. SX 318 is a photograph introduced at the guilt-innocence phase of the trial during the medical examiner's testimony. The portion of SX 318 depicting the unborn child measures 5x7; is black and white; and appears to depict the unborn child, an umbilical cord, and Joy's uterus. [SX 318.]

e. The State argued in response to the objections of Applicant's trial counsel that SX 318 was admissible because: (1) Joy was pregnant; (2) the photograph "starts the chain of custody for DNA samples to prove paternity for this baby"; and (3) based on the area of the stab wounds depicted in SX 315 (an autopsy photograph of Joy's wounds) "it goes to what [Applicant] was stabbing at" because when one lines up the stab wounds shown in SX 315 "you line that up anatomically on a female that's pregnant and you're stabbing in the area where the womb is." [RR 39: 196.]

f. The Court concluded that the probative value of SX 318 outweighed any prejudice, that the evidence was contextual, and that the manner in which the deaths occurred was an issue for the jury. [RR 39: 197-98.]

g. SX 318 was never published to the jury.

h. The circumstances regarding the photographs introduced here as SX 318 and 379 differ significantly from those found in *Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000), and *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004), which are relied on by Applicant.

i. SX 318 and 379 had probative value to issues in the guilt-innocence phase of Applicant's trial.

(a) SX 379 was admitted as part of the chain of custody of the unborn child collected by the medical examiner and the DNA profile later extracted from the unborn child by a DNA analyst. [RR 38: 90-95; RR 39: 202.]

(b) When SX 318 was offered during the medical examiner's testimony, the State offered a number of reasons for its admissibility relating to matters in issue during the guilt-innocence phase of the trial. [RR 39: 196.]

ii. SX 318 and 379 were offered during medical testimony at the guilt-innocence phase of the trial, they were properly authenticated, and the State offered a number of reasons to admit the evidence that were related to facts in issue. [RR 39: 196.]

iii. SX 318 and 379 were not offered merely to show that Joy was pregnant, that she died, that Applicant knew Joy was pregnant, and that the unborn child died as a result of Joy's death. [RR 39: 196.]

iv. Neither SX 318 nor 379 was published to the jury; the State did not emphasize the photographs in its closing arguments; the photographs were among a multitude of photographs introduced into evidence; and the photographs admitted at guilt-innocence included autopsy photographs and crime-scene photographs

depicting the burned remains of Joy, Eddie, and five-year-old Jodi.

v. In light of the circumstances surrounding the admission of SX 318 and 379 into evidence, the photographs would not have had such an emotional impact to suggest that the jury made a decision on some emotional basis rather than on the basis of Applicant's confession to the premeditated, deliberate, heinous murders of his family members so that he could pursue a relationship with Freeze.

i. Applicant provides no analysis demonstrating that the alleged error in admitting SX 318 and 379 would have been found harmful under TEX. R. APP. P. 44.2(b) had appellate counsel raised a point of error challenging the admission of the photographs of the unborn child. [Application at 104-05.]

j. Any error in admitting SX 318 and/or 379 was harmless under TEX. R. APP. P. 44.2(b).

i. The jury had before it Applicant's videotaped and written confessions describing in chilling, remorseless detail the premeditated, cold-blooded, heinous murders of his pregnant wife, his crippled father-in-law, and his five-year-old daughter; the measures Applicant took to cover up his crimes, including setting fires in each victim's bedroom, disposing of the murder weapons, and fabricating an alibi; and his flight to Oceanside, California. [SX 347B.]

ii. The jury saw numerous photographs depicting the victims' burned bodies during their autopsies and at the crime scene.

iii. Neither photograph at issue was published to the jury.

iv. The State did not emphasize the photographs during closing arguments.

v. The jury heard overwhelming evidence to support its verdict finding Applicant guilty of capital murder and its answers to the special issues in a manner that required imposition of the death penalty.

**Conclusions Of Law**

1. Claims alleging a violation of a rule of evidence are not cognizable on habeas corpus. *See Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). Further, because evidentiary complaints are subject to a harmless-error analysis, they are not cognizable. *Ex parte Truong*, 770 S.W.2d 810, 913 (Tex. Crim. App. 1989). Therefore, to the extent Applicant challenges the admissibility of the arguments and evidence at issue, his claim for relief is not cognizable in this habeas proceeding.

2. The only cognizable issue is whether trial and appellate counsel rendered ineffective assistance with regard to this evidence.

3. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

4. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

5. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

6. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

7. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

8. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

9. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

10. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

11. Applicant's contentions regarding his claims of ineffective assistance are too conclusory to meet his burden to satisfy either prong of *Strickland*. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

12. Evidence relating of the deaths of Jodi and the unborn child was admissible as same-transaction contextual evidence. *See, e.g.*, *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (in capital-murder trial for killing homeowner's guest during burglary, evidence Camacho and accomplices kidnapped and later murdered homeowner's wife and son admissible as same-transaction contextual evidence).

13. Although Applicant complains that "the amount, detail, and focus of the testimony surpassed any contextual purpose" [Application at 99], "[r]arely will the prejudicial value render inadmissible any evidence that is context of the offense." *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986). The Court of Criminal Appeals has never found that non-errors may in their cumulative effect cause error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).

14. The evidence Applicant cites as being impermissible victim-impact evidence does not fall within the definition of such evidence. *See Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (victim-impact evidence is evidence of the effect of an offense on people other than the victim).

15. Applicant has not met his burden to demonstrate by a preponderance of the evidence that the performance of trial counsel on either occasions when trial counsel objected or when they did not object fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range or reasonable professional assistance. Therefore, Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

16. There is no reasonable probability that the evidence cited by Applicant was so inflammatory or prejudicial that it would have impermissibly shifted the focus from the relevant issues in Applicant's trial and that Applicant would have been acquitted or sentenced to life without parole had his trial counsel objected to the evidence cited. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance.

17. Applicant fails to demonstrate that appellate counsel could have raised points of error on appeal challenging the admissibility of SX 318 and 379 that would have had indisputable merit under well-settled law and would have necessarily resulted in reversible error. *See Ex parte Flores*, 387 S.W.3d at 639. Therefore, Applicant has failed to meet his burden to establish that his appellate counsel was ineffective for failing to raise a challenge on direct appeal to the Court's admission of those exhibits into evidence.

18. Even if the Court erred in admitting SX 318 and 379 into evidence, the error would have been subject to a harmless-error analysis pursuant to TEX. R. APP. P. 44.2(b), which requires the appellate court to disregard any nonconstitutional error that does not affect substantial rights. Based on the entire record at the guilt-innocence phase of the trial, any error in admitting SX 318 and SX 379 would have been disregarded as harmless on direct appeal. *See, e.g., Rolle v. State*, 367 S.W.3d 746, 752-56 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (admission of photograph of murder victim's unborn child who was not named victim held harmless, distinguishing *Reese* and *Erazo*); *Erazo v. State*, 167 S.W.3d 889, 890-91 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (op. on remand for a harmless-error analysis; error in *Erazo* found to be harmless). Applicant has not met his burden to show by a preponderance of the evidence that his appellate counsel's decision not to challenge the admission of SX 318 and 379 on appeal constituted deficient performance that resulted in prejudice.

19. The Court recommends that Applicant's eighth claim for relief be denied.

## H. Claim for Relief Nine

Applicant alleges that his trial counsel failed to effectively present evidence that Applicant's confessions should be suppressed and that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions. [Application at 105-06.]

**Findings Of Fact**

1. Applicant alleges that his trial counsel were ineffective because they did not: (a) "offer as exhibits transcripts of the phone calls that took place between [Kennedale police captain Darrell] Hull, [CBP officer Paul] Kandal, and the Kennedale dispatcher during the detaining and arrest" of Applicant; and (b) "submit other documents created by the Border Patrol during their detention" of Applicant which allegedly "would have established that there was no lawful basis for [Applicant's] detention by the Border Patrol, that [Applicant's] resulting arrest was unlawful, and that his subsequent confession was a violation of his rights under the Fourth Amendment." [Application at 105-06.]

2. Trial counsel moved to suppress Applicant's statements and confessions, as well as seized evidence, and counsel and litigated the issue in a contested pretrial suppression hearing lasting four days. [CR 2: 324-51; RR 6-9; Cummings' affidavit at 9.]

3. Trial counsel aggressively litigated a multitude suppression issues, including the legality of Applicant's detention by CBP. [RR 6-9; Moore's affidavit at 25.]

4. Following the pretrial suppression hearing, Applicant's trial counsel filed an extensive trial memorandum in support of the motions to suppress. [CR 3: 406-42; Moore's affidavit at 26.]

5. Trial counsel obtained copies of the tape recordings and reports relied upon by Applicant in this habeas proceeding. [Moore's affidavit at 25; Cummings' affidavit at 10.]

6. Trial counsel reviewed the recordings and reports at issue in preparation for cross-examining the witnesses from the Kennedale Police Department and CBP at the pretrial suppression hearing. [Moore's affidavit at 25; Cummings' affidavit at 10.]

7. At the pretrial suppression hearing, trial counsel used the recordings and reports at issue during cross-examination of the relevant witnesses so that the Court was aware of the communications. [Cummings' affidavit at 10.]

8. All of the significant relevant facts contained in the recorded telephone conversations and written reports relied on by Applicant in this habeas

proceeding were acknowledged by the witnesses at the pretrial suppression hearing. [Moore's affidavit at 26.]

9. The Court was made aware of the relevant facts contained in the transcript and report during the pretrial suppression hearing and in the memorandum of law filed by trial counsel in support of the motions to suppress.

10. The transcript and the written report submitted by Applicant in this habeas proceeding do not contain facts that differed significantly from what the Court heard at the pretrial suppression hearing, and the documents would not have changed the Court's findings regarding Applicant's lawful detention or the attenuation of any taint.

11. All of the information contained in the recordings and reports that trial counsel believed to be relevant to the legality of Applicant's border detention was acknowledged during cross-examination of the State's witnesses during the suppression hearing; hence, there was no need for Applicant's trial counsel to impeach those witnesses by introducing the actual reports and recordings. [Moore's affidavit at 25-26.]

12. The Court was well aware at the pretrial suppression hearing that Kandal verified Applicant's citizenship, that Kandal told the Kennedale police dispatcher during their telephone conversation at 7:16 a.m. PST that Applicant was an otherwise admissible person whom he could not hold without a warrant; that Kandal stated he could not hold Applicant in order to encourage the Kennedale Police Department to act quickly so that Kandal could move Applicant out of his jurisdiction, and that Kandal was in contact with Hull during the time the Kennedale Police Department was working to process a warrant. [RR 8: 32-33, 87, 89-90, 100.]

13. Kandal was required to continue holding Applicant in order to determine what Kennedale wanted to do about Applicant being a missing person. [RR 8: 90-92.] Kandal was not bound by the language in the Kennedale Police Department's missing-person report instructing agencies not to detain or arrest Applicant because Kandal operates under the policies and directives of CBP to contact the jurisdiction, verify the information, and find out what the agency wants done with the individual who has been reported missing. [RR 8: 91, 100.]

14. The record does not support Applicant's claim that the transcript and report at issue "revealed a concerted effort" on the part of the Kennedale Police Department and CBP "to invent some justification" to hold Applicant while Kennedale officers started the process of obtaining an arrest warrant. [*See* Application at 115.]

15. Neither the transcript of the telephone calls nor the written report submitted by Applicant in this habeas proceeding supports Applicant's assertion of any improper motive or wrongdoing on the part of the Kennedale Police Department or CBP in Applicant's detention. *Cf. Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's rejection of Applicant's claim that he was illegally detained at the border based on lies was supported by the record).

16. The Court of Criminal Appeals addressed on direct appeal Applicant's contention that he was unlawfully detained at the border based on intentional lies and falsehoods and found that this Court's determination regarding the lawfulness of the detention was supported by the record. *See Hummel*, 2013 WL 6123283 at *7-18.

17. As the Court held in denying Applicant's pretrial motions to suppress, Applicant's detention by CBP pending the issuance of an arrest warrant was justified on several grounds based on federal law and CBP's policies. *See Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's findings that CBP agents had authority to detain Applicant pursuant to federal law and policies and procedures was supported by record).

18. Nothing in the transcript or report submitted by Applicant in this habeas proceeding invalidates this Court's previous determination that Applicant's detention pursuant to federal law or CBP's policies and procedures was lawful, and the Court would not have changed any of its findings or rulings related to Applicant's motions to suppress had Applicant's trial counsel introduced the transcript and report into evidence at the pretrial suppression hearing.

19. There is no reasonable probability that Applicant would have been acquitted or sentenced to life without parole if the Court had suppressed Applicant's confession or the murder weapons found as a result of the confession.

    a. Fire investigators unanimously concluded that the fire at Applicant's house was an arson under the Texas Penal Code. [RR 34: 248-49.]

    b. The jury heard medical-examiner testimony about and saw photographs of the extensive non-fire-related injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

c. Blood matching the DNA of Applicant, Joy, and Eddie was found on clothing that Applicant voluntarily turned over during his December 18, 2009, noncustodial interview at the Kennedale Police Department. [RR 35: 39; RR 37: 190-91, 196-97, 200-01; SX 341B.]

d. During Applicant's interview at the Kennedale Police Department, Steele saw blood on Applicant's pant leg, blood on Applicant's socks, and very recent scratch marks on Applicant's back. [RR 35: 42-44, 60-62; SX 274-76.]

e. Applicant's statements at the Kennedale Police Department raised Steele's suspicions because Applicant's story did not make sense. [RR 35: 81; *see* SX 341B.]

f. Shortly after leaving the police station on December 18, 2009, Applicant fled in his van to California, which evidenced Applicant's consciousness of guilt.

20. Applicant contends that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions because he "should have more clearly argued" that Applicant's confession should have been suppressed based on the actions of the Kennedale Police Department and CBP. [Application at 124-25.]

21. In preparing Applicant's brief on direct appeal, appellate counsel reviewed the motions to suppress filed by trial counsel, reviewed the applicable facts, and researched the applicable law. [Stickels' affidavit at 2-3.]

22. On direct appeal to the Court of Criminal Appeals, appellate counsel challenged this Court's denial of Applicant's motion to suppress his confessions. [*See* Application at 125; Applicant's Exhibit 31.]

23. Based on his research and experience, Applicant's appellate counsel presented appellate issues challenging the denial of Applicant's motions to suppress in "an appropriate manner that [he believes] was calculated to obtain relief" on appeal. [Stickels' affidavit at 3.]

24. The appellate arguments advanced by Applicant's appellate counsel focused on the sufficiency of the arrest-warrant affidavit to establish probable cause and also argued that Applicant's confession was "the culmination and result of all of the previous unconstitutional state actions," which "allud[ed] to an earlier discussion of false statements" made by the Kennedale Police Department to CBP.

25. Applicant does not articulate exactly how his appellate counsel should have argued the claims differently or how counsel's failure to do so fell outside the wide range of reasonable professional assistance. [*See* Application at 124-25.]

26. Applicant's complaint simply second-guesses in hindsight his appellate counsel's strategic decisions based on counsel's experience and research about how to best challenge on direct appeal the Court's denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions. [*See* Application at 124-25.]

27. Applicant has not shown that the appellate contention he alleges counsel should have made had indisputable merit under settled case law. Therefore, Applicant has not demonstrated that he would have prevailed on appeal had his appellate counsel raised different issues or argued the issues raised differently. [*See* Application at 124-25.]

28. There was no legal or factual basis for the Court to suppress Applicant's confessions or the evidence found as a result of the confessions.

**Conclusions Of Law**

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that

counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d at 704-05.

8.  Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9.  The validity of a stop or an arrest is determined solely by analyzing the objective facts surrounding the event. *Garcia v. State*, 827 S.W.2d 937, 943 (Tex. Crim. App. 1992). "Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which [the officers] acted is of no consequence." *Id.* (quoting *United States v. Causey*, 834 F.3d 1179, 1185 (5th Cir. 1987)). The telephone conversations and later written CBP report focused on only one valid basis to detain Applicant at the border and such evidence would not have rendered alternative objective bases to detain Applicant invalid or inapplicable.

10. Applicant's conclusory allegations fail to satisfy his burden to demonstrate that his appellate counsel provided ineffective assistance. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. Applicant's allegations amount to nothing more than an impermissible second-guessing of appellate counsel's strategic decisions made based on counsel's experience and research about how to best challenge the denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions on appeal. *See Strickland*, 466 U.S. at 690-91; *see also Scheanette*, 144 S.W.3d at 510 (fact that another attorney may have pursued different tactic insufficient to prove ineffective-assistance claim).

12. The strategic decisions of Applicant's trial counsel not to offer cumulative evidence in a different format do not support a claim of ineffective assistance. *See Parker*, 565 F.3d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative); *Coble*, 496 F.3d at 436 (counsel's decision not to present cumulative testimony does not

constitute ineffective assistance); *Barnes v. United States*, 859 F.2d 607, 608 (8th Cir. 1988) ("[d]irect- and cross-examination techniques are matters of trial strategy left to the discretion of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

13. There is no reasonable probability that, had Applicant's trial counsel introduced the transcript of the telephone calls and the written report at issue, Applicant would have prevailed at the suppression hearing or at his trial. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

14. Applicant has not met his burden to demonstrate by a preponderance of the evidence that his appellate counsel failed to raise a claim of indisputable merit under settled law. Applicant has not shown deficient performance of his appellate counsel.

15. There is no reasonable probability that Applicant would have prevailed on direct appeal had his appellate counsel "more clearly argued" the point of error challenging the denial of Applicant's motion to suppress his confession and the evidence seized as a result of the confession. Therefore, Applicant has not met his burden to prove by a preponderance of the evidence that he suffered any prejudice as a result of his appellate counsel's alleged deficient performance.

16. The Court recommends that Applicant's ninth claim for relief be denied.

## I. Claim for Relief Ten

Applicant alleges that his appellate counsel was ineffective for failing to appeal the Court's erroneous denial of challenges for cause of nine prospective jurors who illustrated that their views would impair their ability to follow the Court's instructions and their oath. [Application at 126.]

**Findings Of Fact**

1. Applicant's allegations concern the Court's denial of Applicant's challenges for cause against veniremembers Thomas Bancroft Jr., LaDonna Butler, Kayla McFarland, Leslie Cuevas, Pamela Powell, Steven Guidroz, Kenneth Zeiger, Donna Beauchamp, and Janie Cantu Hermosillo. [Application at 126-37.]

2. On direct appeal, Applicant's appellate counsel reviewed the entire voir dire proceedings, including the voir dire of the nine veniremembers at issue in this habeas proceeding, and he researched the applicable law. [Stickels' affidavit at 4.]

3. Applicant's appellate counsel did not raise points of error relating to the nine veniremembers at issue because in his opinion "there was no error in the trial court's refusal of [Applicant's] challenges for cause." [Stickels' affidavit at 4.]

4. Applicant cites only limited excerpts of the nine veniremembers' relevant voir dire and offers no substantial argument or authority to support his assertions that the Court erroneously denied his challenges for cause. [Application at 126-27.] Applicant's arguments and assertions overlook the totality of the voir dire of the nine prospective jurors at issue.

5. Veniremember Bancroft

   a. Applicant challenged veniremember Bancroft for cause because he would create a burden on the defense to produce evidence of mitigating circumstances. [RR 16: 199.]

   b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 199.]

   c. Bancroft agreed that, if he took the oath as a juror, he would have to follow the law of the State of Texas and that he had no difficulty doing so. [RR 16: 148.]

   d. The State reminded Bancroft several times that neither party had any burden of proof on the mitigation special issue, and Bancroft agreed that a criminal defendant never had a burden of proof, even when there was no burden of proof on the State. [RR 16: 158-59, 161, 165-66.]

e. When Applicant's trial counsel asked if Bancroft felt the language of the mitigation special issue put the burden on the defense to bring mitigating circumstances or to convince him of the sufficiency of the mitigating circumstances, Bancroft responded that "something is going to have to come out," that "someone's going to have to show me what kind of person they are," and that "since you're . . . defending him, you would probably have to tell me something about him." [RR 16: 193.]

f. When Applicant's trial counsel explained that the law did not envision the defense having the burden on the mitigation special issue, Bancroft responded "[r]ight," and then the following exchange occurred:

Q. [DEFENSE COUNSEL] So . . . what I'm getting from you is . . . you kind of feel like that question is putting a burden on me, am I correct?

A. [BANCROFT] What I'm saying is the evidence in the case would be, you know, back to what caused it or what happened, but . . . if someone's trying to prove the Defendant's character and background, I – you've got to tell me or either he's got to tell me. I mean, I don't know their background or character unless someone does tell me that. Not saying you got to prove it, but . . . I got to know something about your character or background –

Q. Okay.

A. – to answer that question.

Q. Do you think it would be my obligation to convince you that that evidence was sufficient?

A. No.

[RR 16: 194 (emphasis added).]

g. While Bancroft correctly expressed that there would have to be evidence from some source to allow him to answer the mitigation special issue, he clearly understood that neither side bore any burden to convince him of the existence and/or sufficiency of mitigating evidence.

h. At worst, Bancroft's answers were vacillating or contradictory at times regarding the mitigation special issue and whether he would place a burden on the defense.

i. Bancroft's overall voir dire demonstrated his ability to follow the Court's instructions and to answer the mitigation special issue based on the law and the evidence.

6. Veniremember Butler

a. Applicant challenged Butler for cause on the grounds that: (i) her failure to see a distinction between the terms "probability" and "possibility" reduced the State's burden of proof on the future-dangerousness special issue; and (ii) she would require a nexus between a mitigating circumstance and the actual commission of the crime, which unduly narrowed the mitigating circumstances the defense would be allowed to bring to the jury. [RR 16: 250.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 251.]

c. During the State's individual voir dire, Butler stated that "probability" meant "[a] chance that it would happen again." [RR 16: 209.]

d. Butler agreed that a "probability" was not a certainty and that a probability fell somewhere between a "possibility" and a certainty. [RR 16: 209.]

e. During the defense's voir dire, Butler agreed that "probability" meant there was "some degree of likelihood." [RR 16: 240.]

f. Butler stated that she and most people probably would interpret the terms "possibility" and "probability" as being "similar." [RR 16: 240.]

g. Butler indicated that she did not see a difference in the degree of likelihood being inquired about by the two terms and that one would not ask her to find a greater degree of likelihood than the other. [RR 16: 241.]

h. During the State's questioning when the distinction between the terms "probability" and "possibility" was explained, Butler had an

appropriate understanding of the meaning of the terms, she saw and accepted the distinction between the terms, and she saw a "probability" as something more than a "possibility."

i. The defense's questioning regarding the distinction between a "probability" and a "possibility" merely sought out Butler's interpretation of the terms and did not explain that the law required Butler to see and accept the distinction between the terms. [RR 16: 240-41.]

j. At worst, Butler's answers about her understanding of "probability" were vacillating, contradictory or unclear.

k. Based on Butler's overall responses and demeanor, she exhibited a proper understanding that "probability" meant more than a "possibility."

l. With regard to the mitigation special issue, Butler stated that she would keep an open mind, look at all the evidence, and not automatically answer the special issue "no." [RR 16; 216.]

m. Butler stated that the mitigation special issue did not place a burden on the defense to prove the existence or sufficiency of a mitigating circumstance. [RR 16: 245-46.]

n. Butler responded affirmatively when Applicant's trial counsel asked if she thought the mitigation special issue was talking about blameworthiness for the offense of conviction and if she believed the instruction compelled her to find a mitigating circumstance only if it had some type of direct connection to the commission of the crime. [RR 16: 247-48.]

o. Butler found the application of the mitigation special issue as stated by Applicant's trial counsel to be "confusing." [RR 16: 248-49.]

p. Butler responded during the State's questioning that she would keep an open mind, look at all the evidence, and not automatically answer the mitigation special issue "no." [RR 16: 216.]

q. Butler's overall voir dire showed that she would follow the Court's instructions in answering the mitigation special issue.

7. Veniremember McFarland

a. Applicant challenged McFarland for cause because, in considering the future-dangerousness special issue, she would consider if there was a probability that a third party would commit criminal acts of violence on Applicant's behalf. [RR 17: 289.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 17: 289.]

c. McFarland indicated that she could give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty, depending on the facts of the case. [RR 17: 237.]

d. McFarland defined society as "[t]he public . . . a group or community of people," and she agreed that the definition of society was a broad term that could include the world at large. [RR 17: 245-46.] Then, the following relevant exchange occurred:

Q. [PROSECUTOR] But the question here is the Legislature said we have – the State has the burden of proof beyond a reasonable doubt that the Defendant is going to be a continuing threat to society.

And remember from our discussions earlier that he's going to be . . . convicted of capital murder is going to be in the penitentiary the rest of their life. So you see in your mind, is there a possibility that someone could be a threat to society from the penitentiary?

A. [MCFARLAND] Most of me says no, but, you know, a very, very small chance that they could be. You know, there's the Internet, there's family contact that could do something for them in that way, not – not directly themselves, but I do think there is a – some chance that they could find a way to do something on the outside world outside prison.

Q. Do people from the penitentiary ever escape from the penitentiary?

A. Yes.

Q. Do people from . . . the society outside the penitentiary go to work in the penitentiary?

A. Yes.

Q. Do they visit the penitentiary sometimes?

A. Yes.

Q. So you see that there's some . . . possibility for interaction –

A. Yes.

Q. – of – of inmates with people from your definition of society?

A. Yes.

[RR 17: 246-47.]

e. Applicant's trial counsel later revisited the issue in the following exchange:

Q. [DEFENSE COUNSEL] Okay. And then I know you had talked earlier about . . . the criminal acts of violence. . . . I understand the way you think of it as being a group in public or a group or community of people. And [the prosecutor] had talked about [society] also was prison, and I think you said originally that you're thinking no, but then you thought about the Internet?

A. Yes. . . . I guess I was just trying to think of ways that an inmate could interact or communicate with the outside world.

Q. And what if – if the Judge were to tell you or – you understand that in Texas, they don't have access to the Internet?

A. No, I don't know that.

Q. Okay.

A. No, . . . it was something out of . . . my head. I don't know –

Q. Okay.

A. – phone calls, letters, you know.

Q. Okay.

A. Family visits.

Q. I'm sorry. You had said something earlier about also a family member, maybe?

A. Yes.

Q. So is . . . your definition . . . of probability that the Defendant would commit – commit criminal acts would be that it could also be by one of their family members?

A. Yes. They could arrange it.

* * *

Q. (BY [DEFENSE COUNSEL]) You understand that the acts would be by the Defendant and not a third person?

A. Yes.

Q. Because a second ago, you said it could be by a family member?

A. Well, . . . I guess I just had in my mind that if someone in prison wanted to get back at someone outside of prison, they would find a way to possibly . . . find some way of causing harm to them or – or – I don't know how much more to put it into words, but I think if there's a will, there's a way.

Q. So would it be fair to say for you that –

A. They may not do it directly, but I think there is a chance that they could do it indirectly.

Q. Okay. So be fair to say that for you, you would attribute acts in Special Issue No. 1, acts of a third person, to the Defendant in – in this question?

A. Yes.

[RR 17: 281-83.]

f. Read as a whole, McFarland's responses at issue simply reveal her thought process during questioning about whether a person confined in the penitentiary could commit future acts of violence in society outside of prison.

g. McFarland never indicated that she would hold acts of a third party against Applicant if Applicant himself did not play a part in directing the third party's acts of violence.

h. McFarland responded affirmatively when defense counsel asked, "You understand that the acts would be by the Defendant and not a third person?" [RR 17: 282.]

i. McFarland's overall voir dire demonstrates her ability to follow the Court's instructions in answering the mitigation special issue and to give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty depending on the facts of the case. [RR 17: 237, 244-45.]

8. Veniremember Cuevas

a. Applicant challenged Cuevas for cause because: (i) she indicated that her answer to the future-dangerousness special issue would be automatic based upon her analysis in finding Applicant guilty; (ii) she indicated that she had a predisposition toward the death penalty; and (iii) she never mentioned in her jury questionnaire anything about having followed the capital-murder case involving her church Sunday school classmate's murder even though question 85 specifically asked that question. [RR 20: 236-37.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 20: 238.]

c. During the State's individual voir dire, Cuevas said that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

d. Although Cuevas put in her questionnaire that the death penalty should be available for capital murder, murder of a policeman, and murder of children, she understood and had no issue with the

definition of capital murder as charged in Applicant's case.  [RR 20: 197-98.]

e.  Defense counsel asked Cuevas if she believed that the death penalty "would be the only appropriate option" for the offenses she listed in her questionnaire, and Cuevas responded:  "Well, I don't know that it's the only option because what's been explained is we have to look at two things and make our decision based on . . . answering those two questions."  [RR 20: 224.]  When asked if a life sentence would be an option when dealing with those types of crimes, Cuevas responded, "I have to answer yes." [*Id.*]

f.  Cuevas' response on her jury questionnaire that the death penalty should be available for "capital murder, murder of policemen, murder of children" [Applicant's Exhibit 35, p.7] did not, as Applicant alleges, show her predisposition to give the death penalty to someone who murdered a child. [Application at 130.]

g.  Cuevas understood and agreed that in Applicant's trial the definition of the crime was the one shown on the State's PowerPoint, she understood that she would have to keep an open mind and consider all phases of the case before reaching a decision, and she believed she could follow the Court's instructions and go through the procedure in reaching a decision. [RR 20: 192, 197.]

h.  Cuevas told the State that, regardless of what was in Cuevas' questionnaire, she could follow her oath and apply the law to the facts in the case and render a just verdict. [RR 20: 206.]

i.  With regard to the mitigation special issue, Cuevas could keep an open mind, consider mitigating evidence in a case, and vote based on her view of whether the evidence rose to such a level that it was mitigating, and she would vote "yes" if it rose to the level of mitigating in her mind and "no" if it did not.  [RR 20: 211.]  Cuevas would keep an open mind, follow her oath, and give the mitigation issue a fair review.  [RR 20: 212-14.]  She understood that she had to keep an open mind until the State met its burden in the guilt-innocence phase and on the future-dangerousness special issue and until the jurors decided amongst themselves how to answer the mitigation special issue. [RR 20: 215.]

j. Regarding the future-dangerousness special issue, Cuevas stated that she could apply the law to the facts of the case and render a just verdict. [RR 20: 206-07.] She would answer the special issue "yes" if the State met its burden of proof, and she would have no hesitation in answering "no" if the State did not meet its burden. [RR 20: 208.]

k. With regard to the future-dangerousness special issue, the following relevant exchange occurred between Applicant's trial counsel and Cuevas:

[DEFENSE COUNSEL] And then you're being called upon to answer this questions, Special Issue No. 1. Is that something that's pretty much a given? I mean, if you've answered all of these questions such that a – a guilty verdict has taken place, can you see where the – that someone could decide it's a no-brainer, it's – it's an automatic response of yes because after all, we've already found these things? Is that a yes?

A. [CUEVAS] Yes.

Q. Okay. No, . . . the law puts the burden on the State. The law says that they have to bring you evidence that this – this particular question, the answer is yes. They have to satisfy each of the 12 of you of that.

Would they have already satisfied you if the answer is yes, because after all, they have proven these things to you beyond a reasonable doubt other than the found to be a future danger at the bottom. The slide is really meant to deal with the next special issue. That's the only difference.

Can you see that it – with some people, that it could very well be an automatic choice, it's – it's a no-brainer?

A. Yes.

Q. Okay. Would it be so with you?

A. Yes.

[RR 20: 230-31.]

l. The Court questioned Cuevas to clarify her responses regarding the future-dangerousness special issue:

> THE COURT: . . . What you said to [defense counsel] was that you felt like the answer to Question No. 1 would be automatic based upon what your decision was in the guilt/innocence phase of the trial.
>
> And certainly it can be based upon the same evidence. My question to you is whether it's asking the same thing.
>
> [CUEVAS]: I don't think so.
>
> THE COURT: Okay. So just because you found somebody guilty of the offense of capital murder, you're not saying that you would automatically find that they were going to be a future danger in Question No. 1, or are you saying that? That's what I'm trying to figure out.
>
> [CUEVAS]: I guess it would just depend on the evidence that you heard during the trial. I mean, I don't know that I can adequately answer that question at the moment.

[RR 20: 235-36.]

m. Regarding the future-dangerousness special issue, Cuevas' answers, at worst, were vacillating, contradictory, or unclear as to whether she would automatically answer the question "yes" after a finding of guilt.

n. Cuevas stated that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

o. Early in the defense's individual voir dire, Cuevas said she formed her opinion regarding the death penalty in 1994 or 1995 when a policeman in her Sunday school class in San Antonio, Texas, was killed while trying to stop a robbery in his neighborhood. [RR 20: 216.] Cuevas "followed the case very closely," she heard about the defendant's bad childhood "and everything that had happened to him," and she thought the defendant in that case deserved the death penalty even though she felt bad for him. [*Id.*] Cuevas would look that defendant up on the Internet every couple of years, and she found

out a few years ago that he was executed. [*Id.*] Cuevas did not attend the trial. [RR 20: 217.]

p. Cuevas was not challengeable for cause simply because she never mentioned on her jury questionnaire that she followed the capital-murder case involving her Sunday school classmate's murderer even though question 85 specifically asked that question. The defense never questioned Cuevas about why she did not include this information in response to question 85 in the jury questionnaire. Nothing in the record indicates whether Cuevas misunderstood that question 85 called for her to include the case of her Sunday school classmate's murderer as a case in which she had an interest. *See Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999) ("written questions are by nature vulnerable to misinterpretation").

q. Given the readiness with which Cuevas disclosed and discussed the case of her Sunday school classmate's murderer during her individual voir dire, the Court finds that Cuevas had no intention to be dishonest in her responses to the jury questionnaire.

r. Cuevas disclosed her connection to the case involving her Sunday school classmate's murderer, thus providing the defense an opportunity to intelligently exercise its challenges and to determine whether she could be a disinterested and impartial juror.

s. Nothing indicates that Cuevas' knowledge regarding the case involving her Sunday school classmate's murderer would have had effect on her ability to follow her oath and the law in Applicant's case.

t. Cuevas' overall voir dire demonstrated that she would follow her oath and the Court's instructions and render a punishment verdict based on the facts in evidence and the law provided by the Court.

9. Veniremember Powell

a. Applicant challenged Powell for cause on the basis that she would minimize or reduce the State's burden of proof on the future-dangerousness special issue by automatically voting "yes" solely upon the evidence presented to her at the guilt-innocence phase of the trial. [RR 21: 58.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 21: 59.]

c. During the State's individual voir dire, Powell indicated that she would answer the future-dangerousness special issue "yes" if the State met its burden beyond a reasonable doubt and "no" if the State failed to meet its burden. [RR 21: 19.]

d. Powell understood that her oath would require her to keep an open mind to everything. [RR 21: 20.]

e. Powell agreed to evaluate the evidence from both the guilt-innocence and punishment phases of trial. [RR 21: 20.]

f. Powell responded affirmatively when asked if she could "keep an open mind to all the – the process." [RR 21: 29.]

g. During the defense's voir dire, Powell responded that the future-dangerousness special issue asked her to "[l]ook at the testimonies or the evidence to see if he's going to be a harm to other people in society." [RR 21: 52.]

h. Powell responded that she would listen to "all the testimony or whatever information is brought into the trial." [RR 21: 52-53.]

i. Powell understood that the State bore the burden on the future-dangerousness special issue and that the defense had no burden at all. [RR 21: 53.]

j. The entire exchange about whether Powell would automatically answer the future-dangerousness special issue "yes" based upon finding Applicant guilty is as follows:

Q. [DEFENSE COUNSEL] But you're asked to deal with Special Issue No. 1. . . . I'm trying to set a context here and – you've already heard evidence of two murders, two knowing murders that don't have any defenses, there's no mental retardation, . . . the accused is within . . . the proper age range, it's not an accident, it's not insanity, it's not something that . . . they didn't intend to do because they were high or something like that. I believe on your questionnaire you had something like that.

You've already made this choice. You've decided beyond a reasonable doubt that's where we're at. Now you're being asked to . . . answer Special Issue No. 1. Do you – do you see a difference in the – in the role that you have in the punishment phase?

A. [POWELL] Yes, sir.

Q. Are you going to be in a mindset that my goodness, I mean, we've already found that this guy's committed two murders. There's no defense. It's a – it's a given. It's a foregone conclusion. Obviously, the continuing threat to society. Does that fall within your way of thinking?

A. Yes, sir.

Q. Okay. . . . [Y]ou can take into consideration the evidence from the first phase of a trial, obviously –

A. Yes, sir.

Q. – in answering the special issues in the second phase. You can – and many times the prosecutor will stand up and – and ask the judge to – to admit all the evidence from the first phase of the trial and during the second phase or whatever for the benefit of the jury. We all know that's the case anyway, but it's something done. But my question to you here is – you've already made that decision that, My God, this guy has committed two murders, and there's no justification, they're innocent victims. The – is this going to be pretty much automatic for you as far as Special Issue No. 1 under those circumstances?

A. Yes, sir.

[RR 21: 54-56.]

k. In response to the defense's challenge for cause to Powell, the State pointed out:

[PROSECUTOR]: Judge, the entire tenor of [Powell's] voir dire was that she would be open-minded and follow the law. [Defense counsel's] fact pattern, as you'll recall, that – when she answered it

would be automatic is – he went through for about four minutes in fact pattern that the juror is allowed to consider as part of answering the question yes. And based on that fact pattern, they go into what (sic) she said that.

They never challenged her on her admissions throughout the State's voir dire for – that she would consider and be open-minded throughout the entire process and hold the State to our burden and never put the burden on the Defense.

[RR 21: 58-59.]

l. The fact that Powell could answer the future-dangerousness special issue "yes" based on the facts of an offense did not render her unfit to serve because the circumstances of an offense and the events surrounding it may alone be sufficient to sustain an affirmative finding to the future-dangerousness special issue.

m. Powell did not manifest an inability to reconsider or reweigh the evidence from the guilt-innocence phase in the particular context of the future-dangerousness special issue; therefore, Powell did not demonstrate herself to be unable to objectively follow the law.

n. Counsel never explained to Powell that the future-dangerousness issue required a different analysis than finding Applicant guilty; thus, Applicant has not shown that Powell understood the requirements of the law and would be unable to put aside her personal beliefs and follow the law.

o. At worst, Powell's responses were vacillating, unclear, or contradictory about whether she would automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

p. Powell's overall voir dire showed that she would follow the Court's instructions and answer the future-dangerousness special issue based on the facts and the law and that she would not automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

q. Applicant never challenged Powell on the ground he states in this habeas proceeding that her connection to the criminal justice system –

*i.e.*, she worked as a clerk in Tarrant County and had a close relationship with others who worked in the court building – "may have biased her opinion as a juror." [Application at 131.] Alternatively, Powell's voir dire examination unequivocally demonstrated that her position in the clerk's office would have absolutely no effect on her service as a juror.

10. Veniremember Guidroz

a. Applicant challenged Guidroz for cause because his reading of the mitigation special issue would place the burden on the defendant. [RR 27: 115.]

b. The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 27: 116.]

c. The following relevant exchange occurred during the defense's individual voir dire of Guidroz:

Q. [DEFENSE COUNSEL] It's envisioned that . . . the question [regarding mitigation] doesn't put a question on either side, but if the issue is whether or not it's sufficient, some jurors look at that and say, Well, it's got to be my job to convince me it's sufficient.

Do you feel like just by the way the question is worded it puts any kind of legal burden on the Defense to produce the mitigating evidence or to convince the jury that that mitigating evidence is sufficient?

A. [GUIDROZ] I would say, yes.

Q. Okay. And that's a little bit different from what the law requires.

A. I'm sorry?

Q. That is different from what the law would envision, but they wrote the question in a bad way.

A. Okay.

[RR 27: 109.]

d. Guidroz could answer the mitigation special issue "no" if he felt it was proper based on the evidence in the case. [RR 27: 91.]

e. Guidroz was open to the idea that there could be something that would be sufficient for him to find a mitigating circumstance. [RR 27: 111.]

f. Guidroz's overall voir dire demonstrates that he could follow his oath and the law in answering the mitigation special issue. [RR 27: 87.]

11. Veniremember Zeiger

a. Applicant challenged Zeiger for cause because he would have a predisposition to answer the future-dangerousness special issue "yes." [RR 28: 103.]

b. The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 28: 103-04.]

c. During the State's individual voir dire, the State informed Zeiger that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 61, 66.]

d. Zeiger stated that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and that he could answer "no" if the State failed to meet its burden. [RR 28: 66-67.]

e. During questioning by Applicant's trial counsel, the following exchange occurred:

Q. [DEFENSE COUNSEL] Well, I guess what I'm trying to get is how you're looking at [the future-dangerousness special issue]. Because he's going to be guilty before you ever ask this question. And you know that under this statutory scheme, that means he killed at least two people during the course of a single criminal transaction.

And what I'm asking for – you is does that tell you that he's always going to be a danger, such that that question is always going to be answered yes, or do you think there could be situations where you would find – could find somebody guilty –

A. [ZEIGER] I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again.

Q. Okay. And – and that's sometimes the problem with the question. You see that – and because of the way you're looking at it, that question really is not serving any purpose, does it.

A. There might be one – I'm trying to think of the word – one exception.

Q. I'm sure there probably is an exception where I would say, you know, now maybe he wouldn't do it again because – but not likely.

Q. Not likely what? Not likely they're –

A. The person's already found guilty of capital murder, and the question of whether they would commit the crime, I would have to say probably that, you know, yeah, they would, but there might be an exception.

Q. Okay.

A. But I don't know what that exception would be, and I'd have to weigh all the – the variables and – and understand, I guess, the individual, the circumstances of . . . what happened and, you know, that's almost – that's a whole life.

Q. Okay. . . . I just want to make sure that we're on the same page. The question is not asking you is he going to commit that crime again.

A. Right.

Q. The question is: Is there a probability that he would commit crimes of violence? And from what –

A. It's – it's hard to say, but that's a yes-or-no answer.

Q. Okay.

A. I mean, to me it's not a yes-or-no answer.

Q. What would it be? That's what the question calls for.

A. Well, . . . it really depends on the individual and – and all the extenuating, you know, circumstances and everything.

Q. Okay. Do you feel like that you're predisposed to say that the answer should be yes if you find somebody guilty of capital murder?

A. Yes.

[RR 28: 92-94.]

f. Zeiger later said that the "system" made sense, and he acknowledged that the special issues required the jury to find something additional about the defendant because not every capital murderer would get the death penalty. [RR 28: 100.]

g. Zeiger's counsel did not ask whether Zeiger could set aside his predisposition and follow his oath as a juror.

h. Arguably, Zeiger at times gave responses that could be interpreted as showing a predisposition to answer "yes" to the future-dangerousness special issue if someone was guilty of capital murder for killing two people. However, he also stated that there could be an exception; that he would have to weigh all the variables and understand the individual and the circumstances of what happened, and that it depended on the individual and all the extenuating circumstances. Additionally, Zeiger stated during the State's questioning that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and "no" if it did not. [RR 28: 66-67.]

i. At worst, Zeiger's responses were vacillating, contradictory, or unclear.

j. In context, Zeiger's entire voir dire established that he would be able to set aside his personal beliefs and follow the Court's instructions in answering the future-dangerousness special issue.

12. Veniremember Beauchamp

a. Applicant challenged Beauchamp because she would reduce the State's burden on the future-dangerousness special issue and vote "yes" based upon the proof of multiple murders in the same transaction. [RR 28: 158.]

b. The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 158-59.]

c. During the State's individual voir dire, Beauchamp indicated her understanding that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 121-22.]

d. Beauchamp understood the State's burden of proof on the future-dangerousness special issue and could answer question "yes" if the State met its burden of proof and "no" if the State did not meet its burden. [RR 28: 121-22, 128-29.]

e. Beauchamp could see that finding a defendant guilty of capital murder was a different question than asking if he would possibly constitute a continuing threat to society. [RR 28: 130-31.]

f. Beauchamp understood that the future-dangerousness special issue would not be answered "yes" just because she found the defendant guilty of capital murder; it would depend on the facts of the case. [RR 28: 131.]

g. Beauchamp could return a death sentence if it were proper under the facts and law, and she could return a life sentence if the evidence pointed toward it. [RR 28: 138.]

h. During voir dire by Applicant's trial counsel, Beauchamp stated that her expectation was to be "presented with the whole story . . . in order to make a fair judgment and provide a yes-or-no answer based on that statement." [RR 28: 154.] Additionally, the following exchange occurred:

> Q. [DEFENSE COUNSEL] But before you're called upon to answer Special Issue No. 1, you are in a situation where you've already found beyond a reasonable doubt that the individual knowingly committed capital murder. There's not any defense. He's

not mentally retarded. No accident. The victim is innocent. There was no self-defense involved. All those issues are gone. You have found this person to have knowingly caused multiple deaths. Okay?

With that context, is it a foregone conclusion with you that the answer to Special Issue No. 1 would be yes?

A. [BEAUCHAMP] Yes.

Q. Because sometimes that's a lot of information to already have about the individual, is it not?

A. Could be, yes.

Q. Okay. And . . . I want to be clear with you. I'm asking you if the information that you have received already in the guilt/innocence phase on which you derived your verdict of guilty beyond a reasonable doubt of capital murder without any defense available, any justification, innocent victims, that that by itself is going to be enough for you to answer yes to Special Issue No. 1 and would do so automatically because of the guilt/innocence phase evidence you've received?

A. Yes, based on the definition.

Q. Okay. The multiple commission of murders in one criminal transaction for you would be enough to answer this question, correct?

A. Yes.

* * *

Q. . . . Whose burden is it to prove this question?

A. The State.

Q. Okay. . . . I want to be sure I understand. In a situation where you have found somebody guilty of multiple murders in the same criminal transaction without any of the mistake defenses, accident, anything like that, is your response to Special Issue No. 1 going to be yes every time?

A. If they provided that, yes.

[RR 28: 155-57.]

i. At worst, Beauchamp's answers were vacillating, contradictory, or unclear as to whether she would automatically answer the future-dangerousness special issue "yes" after finding a defendant guilty of a double murder committed without justification.

j. Beauchamp's overall voir dire showed that she would follow the Court's instructions and answer the future-danger special issue based on the facts and law.

13. Veniremember Hermosillo

a. Applicant challenged Hermosillo for cause with regard to the mitigation special issue because she would require the defense to show why or how the crime happened and to produce evidence and convince the jury of the sufficiency of the mitigating evidence. [RR 28: 225-26.]

b. The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 226-27.]

c. During the State's individual voir dire, the State informed Hermosillo that the State did not have the burden of proof on the mitigation special issue. [RR 28: 189.]

d. Hermosillo understood that the defense never had a burden of proof on the mitigation special issue. [RR 28: 189.]

e. Hermosillo would not have any problem answering the mitigation special issue "yes" if she felt there was mitigating evidence. [RR 28: 192.]

f. Hermosillo defined her role in deciding the special issue as "[t]o look at all the evidence and, you know, decide for myself, but I'd have to know all the – you know, all the evidence provided by y'all." [RR 28: 192-93.]

g. Hermosillo understood a defendant's right to remain silent, and she had no problem with the fact that she might hear only one side of the situation. [RR 28: 193-94.]

h. Applicant's trial counsel informed Hermosillo that neither party bore a burden with regard to the mitigation special issue. [RR 28: 216.]

i. Hermosillo stated that the defense would have to "present reasons why that may have caused this incident or this murder," to prove the defendant's character or something about him like whether this was his first time, and to convince her that there is another side to the defendant. [RR 28: 217-18.]

j. Hermosillo responded affirmatively when asked whether the defense would have to present evidence and convince her it was sufficient. [RR 28: 218.]

k. Hermosillo thought there could be mitigating circumstances that would be sufficient to show that a death sentence was not appropriate. [RR 28: 219.]

l. When the Court questioned Hermosillo, she understood that she would take an oath to follow the law contained in the Court's instructions. [RR 28: 222.]

m. The following exchange occurred between the Court and Hermosillo:

THE COURT: Okay. As a juror, you would receive an instruction that the law does not require a Defendant to prove his innocence or to produce any evidence at all. Do you understand that instruction?

[HERMOSILLO]: Yes, ma'am.

THE COURT: All right. As a juror, would you be able to follow that instruction, or is your feeling that you've mentioned today, is that such a strong feeling that you would not be able to follow that instruction?

[HERMOSILLO]: No, ma'am. I – I would have to, you know, follow all the instructions and really pay attention to, you know, what's put before me. I don't think I would have any problem following instructions, you know. I think that the Defendant would have to –

THE REPORTER: I'm sorry. Please repeat that.

[HERMOSILLO]: I said I think that the Defendant's attorney would have to show; otherwise, you know, or prove him to be – I'm tired – that they would have to show that he – you know, there's other circumstances that caused him to – to, you know, cause the murder.

But I – I would really have to, you know, follow the rules and listen to everything, all the evidence, before I – you know, I cannot make up my kind and say, Well, yeah, he's guilty, you know. I can't do that. I have to listen to everything that's brought before me.

THE COURT: Well –

[HERMOSILLO]: I wouldn't have any problems with that even though . . . in the past . . . I may have thought, well, you know, once a person's here, he's guilty or – and I can't judge somebody until I know the facts. I've never served on a jury before, so I don't know how things are, you know, brought forth, how the evidence is brought before use and stuff, so I would have to just make sure that I'm, you know, following the Judge's guidance and/or rules or make sure I follow everything exact.

THE COURT: . . . But my question to you is whether you could follow the instruction that the Judge would give you saying that the Defendant does not have a burden of proof, they do not have to present any evidence whatsoever in any stage of the trial.

[HERMOSILLO]: Yes, ma'am. I think I could.

THE COURT: Okay. When you say that you think you can, I need a more definite answer –

[HERMOSILLO]: I know I can.

[RR 28: 222-25.]

n. At worst, Hermosillo gave vacillating, contradictory, or unclear answers about whether she wanted the defense to present mitigating evidence at the punishment phase.

o. In the end, Hermosillo assured the Court that she could put aside her personal views, follow the Court's instructions, and not impose a

burden of proof on the defense with regard to the mitigation special issue.

14. The Court granted Applicant two additional peremptory strikes during the course of the voir dire proceedings.

**Conclusions Of Law**

1. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

2. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

3. A veniremember may be challenged for cause if he has a bias or prejudice against any phase of the law upon which the defendant is entitled to rely. TEX. CODE CRIM. PROC. art. 36.16(c)(2). Bias against the law is refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

4. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003).

5. Before a prospective juror may be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Gardner*, 306 S.W.3d at 295; *Sells*, 121 S.W.3d at 759.

6. The proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Sells*, 121 S.W.3d at 759. The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow it. *Id.*

7. When called upon to review a trial court's decision to grant or deny a challenge for cause, an appellate court looks at the entire record to determine if there is sufficient evidence to support the trial court's ruling. *Sells*, 121 S.W.3d at 759. An appellate court affords considerable deference to the trial court's ruling because the trial judge is in the best position to evaluate a veniremember's demeanor and responses and to hear his tone of voice. *Gardner*, 306 S.W.3d at 295-96; *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

8. A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Gardner*, 306 S.W.3d at 296; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007).

9. When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the reviewing court must defer to the trial court's decision. *Gardner*, 306 S.W.3d at 296; *Ladd*, 3 S.W.3d at 559.

10. Because the Court granted Applicant two additional peremptory strikes, in order to demonstrate a reasonable probability that he would have prevailed on appeal, Applicant must show that the Court erroneously denied at least three of his challenges for cause. *Feldman*, 71 S.W.3d at 744; *see Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1992) (op. on reh'g) ("Where the court reinstates peremptory strikes, to show harm, the party complaining on appeal must show that one additional juror sat on the case than the number of reinstated peremptory strikes").

11. Applicant has failed to establish that appellate counsel's strategic decisions were objectively unreasonable and that there is a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised the claims Applicant suggests.

12. Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his appellate counsel fell below an objective standard of reasonableness under prevailing professional norms

because counsel, based on a review of the record and the law, determined that points of error on appeal challenging the denial of Applicant's challenges for cause would have been without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d at 623-24 (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

13. Applicant's allegations are too conclusory to meet his burden to establish the first prong of *Strickland*, and he should be denied relief. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

14. Even if Applicant could show that his appellate counsel was deficient for failing to raise points of error on appeal challenging the denial of the nine challenges for cause he refers to in this claim, he has not met his further burden to show resulting prejudice. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

15. Applicant would have been unable to establish on appeal that the Court erroneously denied at least three of the nine challenges for cause at issue. Thus, there is no reasonable probability that Applicant's case would have been reversed on appeal had appellate counsel raised points of error challenging the denial of the nine challenges for cause at issue. Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered prejudice as a result of the alleged deficient performance of his appellate counsel.

16. The Court recommends that Applicant's tenth claim for relief be denied.

**J. <u>Claim for Relief Eleven</u>**

Applicant asserts that trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove minority veniremembers in violation of Applicant's constitutional rights. [Application at 137.]

**Findings Of Fact**

1. Applicant's allegations focus on three minority veniremembers: Aaron Gonzales, a Hispanic male; Valerie Williams, an African-American female; and Darryl Dennis, an African-American male. [Application at 137-45.]

2. Moore has raised *Batson* challenges on several past occasions in both death-penalty and non-death-penalty cases, and he would have raised a *Batson* challenge in Applicant's case had he believed there was anything to suggest any racial motivation in the State's use of peremptory strikes on Gonzales, Williams, or Dennis. [Moore's affidavit at 26, 29.]

3. Applicant makes no attempt to establish the *prima facie* case required by the first step of the *Batson* analysis. [*See* Application at 137-45.]

4. Trial counsel had strategic reasons for not objecting to the State's exercise of peremptory challenges against Gonzales, Williams, and Dennis. [Moore's affidavit at 27].

5. Trial counsel recognized that there were "obvious race neutral reasons for each of [the State's peremptory] strikes" at issue in this habeas proceeding. [Cummings' affidavit at 10.]

6. There were a number of strategic reasons that trial counsel did not want Gonzales to be seated on Applicant's jury: (a) Gonzales was only twenty-two years old; (b) his father was in law enforcement, and he was personally considering a possible career in law enforcement; (c) he gave inconsistent answers about his ability to judge another person; (d) he seemingly placed responsibility for bringing mitigating evidence before the jury and the burden of persuading the jury of the importance of such mitigating evidence on the defense; and (e) he appeared to have a significant work problem if he were chosen to serve. [Moore's affidavit at 27.]

7. Moore did not object to the State's excusal of Gonzales because Moore did not want Gonzales seated as a juror and because Moore wanted to force the State to use a peremptory strike on Gonzales, "as that is an important part of the 'art' of capital voir dire." [Moore's affidavit at 27.]

8. Even if the State had not struck Gonzales, he likely would not have been seated as a juror at Applicant's trial because Applicant's trial counsel did not want him to serve as a juror. [*See* Moore's affidavit at 27]

9. It was apparent to Moore that the State would not accept Williams as a juror because Williams was somewhat "soft" on the death penalty and there was uncertainty about the position her church might ultimately take on the death penalty. [Moore's affidavit at 28.]

10. In Moore's experience, individuals such as Williams have a great problem in taking the ultimate responsibility of voting for death. [Moore's affidavit at 28.]

11. Trial counsel wanted the State to be compelled to expend a peremptory challenge to excuse Williams from the jury. [Moore's affidavit at 28.]

12. A *Batson* challenge regarding Williams would not have succeeded because there were obvious reasons for the State to strike her. [Moore's affidavit at 28.]

13. Both sides had issues with Dennis as a potential juror. [Moore's affidavit at 28.]

14. Applicant makes no showing that the defense would not have exercised a peremptory strike to remove Dennis had the State accepted him as a juror.

15. Had the defense accepted Dennis as a juror for Applicant's trial, there is a possibility that he would not have been a favorable juror for Applicant. [*See* Moore's affidavit at 28.]

16. The State had no racial motivation for exercising a peremptory strike against Gonzales, Williams, or Dennis, and it would have been "unethical" in Moore's opinion to make a *Batson* challenge absent any basis to support it. [Moore's affidavit at 26-29.]

17. Over the course of thirty years, Moore has never known lead prosecutor Robert K. Gill to be racially biased or to act in a racially motivated manner in any of the actions Gill has taken in court. [Moore's affidavit at 28-29.]

18. Moore has never known prosecutor Miles Brissette act in a racially motivated manner in any case that they previously had together. [Moore's affidavit at 29.]

19. Applicant's trial counsel made a reasonable and strategic decision not to raise what they believed would be a futile *Batson* claim.

20. Lead prosecutor Gill provided an affidavit in this habeas proceeding setting forth a number of facially race-neutral reasons for the State's exercise of peremptory strikes on Gonzales, Williams, and Dennis. [Gill's affidavit (State's Exhibit 1).]

21. The voir dire proceedings and the jury questionnaires relating to Gonzales, Williams, and Dennis support the State's facially race-neutral reasons for exercising peremptory on those veniremembers as set forth in Gill's habeas affidavit.

22. Applicant's comparative analysis does not take into account the State's race-neutral explanations for exercising the three peremptory strikes at issue. [*See* Application at 142-45.]

23. With regard to the *Strickland* prejudice prong, Applicant offers only the bare assertion that "[t]here is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left [Applicant] with a constitutionally-infirm jury; a malady that can only be remedied by a new trial." [Application at 145 (citations omitted).]

24. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

25. Applicant's assertions of prejudice are conclusory.

<u>**Conclusions Of Law**</u>

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at

521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances

as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7. A three-step analysis guides the evaluation of a defendant's equal-protection challenges to a prosecutor's use of peremptory challenges: (a) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (b) upon such a showing, the burden of proof shifts to the State to provide a race-neutral explanation for striking the veniremembers in question; and (c) the trial court must determine whether the defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson v. Kentucky*, 476 U.S. 79, 94-98 (1986); *Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012).

8. The ultimate burden of persuasion regarding improper motivation rests with, and never shifts from, the party challenging the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

9. The failure of trial counsel to lodge a *Batson* objection is not presumptively prejudicial for purposes of a claim of ineffective assistance of counsel. *See Young v. Bowersox*, 161 F.3d 1159, 1160-61 (8th Cir. 1998). Even if an error premised on *Batson* is shown, it does not warrant setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment. *See id.*

10. The failure of Applicant's trial counsel to raise a *Batson* objection during voir dire did not fall below an objective standard of reasonableness under prevailing professional norms because counsel made a reasonable strategic decision not to raise a claim that they believed to be without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"). Applicant has failed to meet his burden to prove that his trial counsel were deficient.

11. *Batson* requires Applicant to do more than show that minority veniremembers were peremptorily struck from the venire; Applicant must also raise an inference that the prosecutor excluded the veniremembers from the jury on account of their race. *See Batson*, 476 U.S. at 96. Simply alleging that two African-American veniremembers and one Hispanic

veniremember were impermissibly struck does not satisfy this threshold requirement. *See Hassan*, 369 S.W.3d at 875-78.

12. The State's facially race-neutral reasons for exercising the peremptory strikes at issue satisfy the second prong of the *Batson* inquiry. *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (at second step of process, proponent of strike need only tender facially race-neutral explanation) (citing *Purkett*, 514 U.S. at 767-68).

13. A comparative analysis relates to the third prong of the *Batson* framework and must be conducted in light of the race-neutral explanations tendered by the State. *See Purkett*, 514 U.S. at 768 ("It is not until the third step that the persuasiveness of the justification [for the peremptory strike] becomes relevant"). Applicant's comparative analysis, which is based upon a narrow view of the record and does not examine the State's race-neutral explanations for striking the veniremembers at issue, cannot even begin to demonstrate pretext or racial motivation behind the State's peremptory strikes at issue. Applicant has failed to prove that the prosecutor's explanations were incorrect, much less that they were a pretext for discrimination.

14. Applicant has not met his burden to satisfy the three-pronged analysis of *Batson*; therefore, he has not met his burden to establish that a *Batson* challenge would have succeeded. Under such circumstances, Applicant has not proven by a preponderance of the evidence that the performance of his trial counsel fell below an objective standard of reasonableness under prevailing professional norms. Applicant's claims are not firmly founded in the record, and Applicant fails to establish deficient performance by his trial counsel.

15. Even if Applicant could demonstrate that his trial counsel's failure to raise a *Batson* claim was objectively unreasonable, he bears the further burden to show a reasonable probability that the outcome of his trial would have been different had trial counsel lodged a Batson objection. *See Batiste v. State*, 888 S.W.2d 9, 15-17 (Tex. Crim. App. 1994) (claim of ineffective assistance for failing to raise Batson claim subject to Strickland's prejudice prong).

16. There is no reasonable probability that the outcome of any stage of Applicant's proceedings would have been different had Applicant's trial counsel asserted a *Batson* claim during voir dire. There simply is no

evidence to suggest either that the alleged deficient performance of trial counsel or the makeup of the seated jury had a prejudicial effect on Applicant's defense at any phase of his trial. *See Batiste*, 888 S.W.2d at 14.

17. The Court recommends that Applicant's eleventh claim for relief be denied.

**CLAIM TWELVE:**
**CONSIDERATION OF MITIGATING EVIDENCE**

Applicant alleges that his death sentence should be vacated because the punishment-phase jury instruction restricted the evidence the jury could determine was mitigating. [Application at 145.] He argues that he was unable to have all mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence because the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to his "moral blameworthiness." [*Id.* at 149-51.]

**Finding of Fact**

1. Special issue two in the Court's charge on punishment instructed the jury regarding the consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

**Conclusions of Law**

1. The complained-of language in the mitigation special issue did not unconstitutionally narrow the definition of mitigating evidence to that which reduced Applicant's moral blameworthiness. *Roberts*, 220 S.W.3d at 534.

2. Special Issue Two posed no barrier to the jury giving effect to any of Applicant's alleged mitigating evidence. *Roberts*, 220 S.W.3d at 534.

**CLAIM THIRTEEN:**
**ARBITRARY IMPOSITION OF THE DEATH PENALTY**

Applicant alleges that his death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty. [*See* Application at 151.] He asserts that geographical and racial disparities have rendered Texas' death-penalty scheme unconstitutional. [*See id.* at 151-60.]

**Findings of Fact**

1. Applicant has not shown that he was singled out for selective prosecution or that the death-penalty statute was applied against him in any unconstitutionally arbitrary or capricious manner. [Application at 151-60.]

2. The materials cited and relied on by Applicant do not establish his claim.

**Conclusions of Law**

1. The discretion afforded the State to seek the death penalty is not unconstitutional. *Ladd*, 3 S.W.3d at 574; *see Gregg v. Georgia*, 428 U.S. 153, 199 (1976).

2. Applicant's challenge to the constitutionality of Texas' death-penalty scheme based on the geographic and racial reasons he asserts is without merit. *See Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004) (varying decision-making between counties regarding seeking death penalty does not violate right to equal protection); *Allen v. State*, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003) (rejecting disparate-application claim based on county's financial constraints or ability to seek death penalty); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App. 1999) (rejecting claim based on statistical studies that Texas death sentences are disproportionately imposed in racially discriminatory manner).

## CLAIM FOURTEEN: "10-12" RULE

Applicant asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the Court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. [*See* Application at 160.] He argues that the "10-12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), and that the effect of the "10-12 rule" creates "an impermissible outside influence on jury deliberations" by improperly coercing juries into death sentences. [Application at 162-67.]

**Findings of Fact**

1. Special issue two of the Court's punishment charge instructed the jury regarding its consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

3. The Court did not instruct the jury that a hold-out vote by one juror would result in a life sentence.

**Conclusions of Law**

1. This Court was prohibited by TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1) from instructing any juror or prospective juror of the effect of a failure of the jury to agree on the mitigation special issue.

2. There is no constitutional violation in failing to inform jurors of the effect of their failure to agree on special issues. *E.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Luna v. State*, 268 S.W.3d 594, 09 (Tex.

Crim. App. 2008); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

## CLAIM FIFTEEN: ELIGIBILITY FOR THE DEATH PENALTY

Applicant asserts that he is ineligible for a death sentence because "his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution." [Application at 167.]

**Findings of Fact**

1. Applicant relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eight Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of individuals with intellectual disability. [Application at 167.]

2. Although the term "mental retardation" has been employed in the past, such as it was at the time *Atkins* was decided, the Supreme Court of the United States now favors use of the term "'intellectual disability' to describe the identical phenomenon," and this Court will therefore follow suit. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

3. Applicant's claim for relief is not based on intellectual disability as was the claim in *Atkins*.

4. Applicant offers no persuasive argument that *Atkins* should be extended to require a blanket exemption from the death penalty for persons suffering from CPTSD.

5. There is no objective evidence that society views as inappropriate the execution of death-eligible individuals who have CPTSD.

6. Applicant fails to demonstrate a trend among state legislatures to categorically prohibit the imposition of capital punishment against offenders who suffer from CPTSD.

7. Applicant does not suffer from a major mental illness. [RR 44: 145.]

8. Applicant's objective neuropsychological and psychological test results and the facts of the offense are inconsistent with Applicant's claim that he is ineligible for the death penalty because of an alleged mental impairment. [Dr. Price's affidavit at 7-9.]

9. Applicant's behavior prior to, during, and after the charged capital-murder offense is inconsistent with his allegation about the effect of the alleged mental impairment. [Dr. Price's affidavit at 8-9.]

10. Applicant's actions around the time of the offense clearly indicated that he had the capacity to understand and process information, to control his impulses, to engage in logical reasoning, to consider the future repercussions of his actions, and to communicate. [Dr. Price's affidavit at 8-9.]

11. Applicant's psychological and neuropsychological test data and his life history are not at all similar to an individual with intellectual disability. [Dr. Price's affidavit at 7.]

**Conclusions of Law**

1. Applicant's claim is not based on an intellectual disability, and *Atkins* does not extend to exempt persons with mental illness from imposition of the death penalty. *Soliz v. State*, 432 S.W.3d 895, 903-04 (Tex. Crim. App. 2014) (Soliz not exempt from death penalty despite expert testimony that Soliz diagnosed with partial fetal-alcohol syndrome and had cognitive and functional abilities similar to person with mental retardation); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *see Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *People v. Castaneda*, 51 Cal.4th 1292, 1345, 127 Cal.Rptr.3d 200, 249, 254 P.3d 249, 290 (2011); *Simmons v. State*, 105 So.3d 475, 511 (Fla. 2012); *Lewis v. State*, 279 Ga. 756, 764, 620 S.E.2d 778, 786 (2005); *State v. Dunlap*, 2013 WL 4539806 (Idaho August 27, 2013); *Matheney v. State*, 833 N.W.2d 454, 458 (Ind. 2005); *Dunlap v. Commonwealth*, 2013 WL 3121689 at *65 (Ky. June 20, 2013); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock*, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-60 (2006); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013).

2. Applicant would have been eligible for the death penalty even if he had been diagnosed with CPTSD. *See Soliz v. State*, 432 S.W.3d at 903-04; *Mays*, 318 S.W.3d at 379.

WHEREFORE, PREMISES CONSIDERED, the State prays that the Court adopt its proposed memorandum, findings of fact, and conclusions of law and that each of Applicant's claims for relief be denied.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

CHARLES M. MALLIN
Assistant Criminal District Attorney
Chief of the Appellate Division

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672

**CERTIFICATE OF SERVICE**

A copy of the Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on November 4, 2014.

Helena F. Faulkner
HELENA F. FAULKNER

CERTIFICATE OF SERVICE

A copy of the Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on November 4, 2014.

HELENA F. FAULKNER

CERTIFICATE OF SERVICE

A copy of the Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was mailed to opposing counsel, Brad D. Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas, 78711, on November 4, 2014.



FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
DEC 15 2014
TIME 11:27
BY ____ DEPUTY

**WR-81,578-01**
[No. C-432-009923-1184294-A]

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 432nd JUDICIAL** |
| | § | |
| | § | **DISTRICT COURT** |
| | § | |
| **JOHN WILLIAM HUMMEL** | § | **TARRANT COUNTY, TEXAS** |

**REQUEST FOR AN EXTENSION OF TIME TO RESOLVE ISSUES AND ENTER FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:**

The trial court respectfully requests an extension of sixty days to resolve issues and enter findings and conclusions in this case.

On June 18, 2014, the Court of Criminal Appeals ordered the trial court to resolve remaining issues and enter findings of fact and conclusions of law within 180 days. On October 31, 2014, the Applicant filed his final proposed findings and conclusions of law, and on November 4, 2014, the State filed its final proposed findings of fact and conclusions of law. Since that time, the trial court has been working on its findings in addition to conducting its regular trial docket.

The trial court's findings and conclusions are currently due on December 15, 2014. To adequately resolve the issues and in the interest of justice, this Court requests an additional sixty (60) days, to **February 13, 2015** to file its findings of fact and conclusions of law, and to transmit the complete writ record to the Court of Criminal Appeals.

**RESPECTFULLY REQUESTED AND SIGNED** this the 15TH day of December 2014.

**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

SCANNED

**C-432-009923-1184294-A**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 432nd JUDICIAL** |
| | § | |
| | § | **DISTRICT COURT** |
| | § | |
| **JOHN WILLIAM HUMMEL** | § | **TARRANT COUNTY, TEXAS** |

**ORDER**

1. The Court directs the **Tarrant County District Clerk's Office** to transmit the Court's **Request for an Extension of Time to Resolve Issues and Enter Findings of Fact and Conclusions of Law,** and **a copy of the current writ docket in this case** to the **Clerk of the Court of Criminal Appeals.**
2. The **Tarrant County District Clerk's Office** is ordered to send a copy of the trial Court's **Request for an Extension of Time to Resolve Issues and to Enter Findings of Fact and Conclusions of Law**, and a copy of **the present order** to Applicant's counsel, and to the **Appellate Section** of the Tarrant County Criminal District Attorney's Office.

**SIGNED** this the 15TH day of December 2014.

[signature]

**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

1385

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

COURT OF CRIMINAL APPEALS
CAPITOL STATION
P O BOX 12308
AUSTIN TEXAS 78711

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) RECEIVED IN COURT OF CRIMINAL APPEALS

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

DEC 19 2014

Abel Acosta, Clerk

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☑ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number *(Transfer from service label)* 7014 0510 0001 4740 5212

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

CRIMINAL APPEALS
OFFICIAL USE

| | |
|---|---|
| Postage | $ 140 |
| Certified Fee | 330 |
| Return Receipt Fee (Endorsement Required) | 270 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 740 |

Postmark Here — DEC 16 2014 — USPS — 78761

Sent To: CCA
Street, Apt. No.; or PO Box No.: PO B 12308 Capital Station
City, State, ZIP+4: Austin TX 78711

PS Form 3800, August 2006 See Reverse for Instructions

7014 0510 0001 4740 5212

C-432-009923-1184294-A
Ex Parte: JOHN WILLIAM HUMMEL
Application for Writ of Habeas Corpus
Filed: 6/5/2013

432 PRE-WRIT DOCS.
VOL. I

DEATH PENALTY — VOL I

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER
BOX

| C | FILED | In Court No. |
|---|---|---|
| | | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. In Vol II |
| | | COPY TO STATE. WAIVER OF SERVICE FILED. |
| | PRE-WRIT | DOCUMENTS FILED BY OFFICE OF |
| | CAPITAL | WRITS. |
| | 12.21.12 | Unopposed Motion for Copies of Juror |
| | | Questionnaires; Proposed Order |
| | | cc: state, JSC |
| | 12.21.12 | Unopposed Motion for Copies of |
| | | Materials in Clerk's and Reporter's Record; |
| | | Proposed Order. cc: state, JSC |
| ✓ | 2.15.13 | ORDER (Applicant's Motion for Ninety- |
| | | Day Extension of Time to File Amended |
| | | State Habeas Application). |
| ✓ | 3.7.13 | OCW Requests for Background Checks on |
| | | Hummel family members. sent copies. |

DISPOSITION

DEFENDANT'S ATTORNEY OCW - Brad Levenson

| C | | |
|---|---|---|
| ✓ | 6.5.13 | Unopposed Motion to Seal Confidential |
| | | Juror Information (Capital Case). |
| | | cc: state, JSC |
| ✓ | 6.5.13 | ORDER. cc: state, JSC |
| | | — GO TO VOL II — |

SCANNED

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

16925

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

C-432-009923-1184294-A
Ex Parte: JOHN WILLIAM HUMMEL
Application for Writ of Habeas Corpus
Filed: 6/5/2013

VOL. II
432

VOL. 2

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER
BOX

In Court No. D432

| C | FILED | |
|---|---|---|
| ✓ | 6.5.13 | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. pages 1-187 |
| ✓ | ~~6-5-13~~ | ~~COPY TO STATE. WAIVER OF SERVICE FILED.~~ |
| | | — GO TO VOL III — |

DISPOSITION

| C | R |
|---|---|
| | |

DEFENDANT'S ATTORNEY OCW - Brad Levenson

C

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

16925

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

1387

C-432-009923-1184294-A
Ex Parte: JOHN WILLIAM HUMMEL
Application for Writ of Habeas Corpus
Filed: 6/5/2013

VOL III 432

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER
BOX

| C | FILED | In Court No. |
|---|---|---|
| | In Vol II | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. vol II |
| | | COPY TO STATE. WAIVER OF SERVICE FILED. |
| | | |
| ✓ | 6.5.13 | EXHIBITS 1-20 (pages 188-305) |
| | | TO INITIAL APPLICATION FOR A WRIT |
| | | OF HABEAS CORPUS — VOL. I |
| | | |
| | | — GO TO VOL. IV — |

DISPOSITION

DEFENDANT'S ATTORNEY Brad Levenson OCW

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

16925

VOL. IV

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER
BOX

In Court No. D432

| C | FILED | |
|---|---|---|
| | | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. vol II |
| | | COPY TO STATE. WAIVER OF SERVICE FILED. |
| | | |
| ✓ | 6.5.13 | EXHIBITS 21-31 (pages 306-468) |
| | | TO INITIAL APPLICATION FOR A WRIT |
| | | OF HABEAS CORPUS – VOL I |
| ✓ | 6.5.13 | WAIVER OF SERVICE FILED |
| | | — GO TO VOL V — |

DISPOSITION

DEFENDANT'S ATTORNEY Brad Levenson
OCW

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

16925

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

VOL. V

C-432-009923-1184294-A

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER

BOX

In Court No. D 432

| C | FILED | |
|---|---|---|
| | | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. vol. II |
| | | COPY TO STATE. WAIVER OF SERVICE FILED. |
| √ | 6.24.13 | State's Unopposed Motion for Copies of Juror Questionnaire and Information Cards. |
| √ | 6.25.13 | State's Unopposed Motion for Copies of Sealed Exhibits Filed With Application for Writ of Habeas Corpus |
| √ | 6.26.13 | State's Motion for Affidavits of Applicant's Trial and Appellate Counsel. |
| √ | 7.3.13 | Motion In Response to Request for Trial and Appellate Counsel Affidavits. cc: State, JSC |

DISPOSITION

DEFENDANT'S ATTORNEY Brad Levenson OCW 512/463-8600 — Robert Romig 512/463-8522

| C | | |
|---|---|---|
| √ | 7.3.13 | ORDER (State's Unopposed Motion for Copies of Sealed Exhibits) - cc: State, JSC |
| √ | 7.3.13 | ORDER (State's Unopposed Motion for Copies of Juror Questionnaires). cc: State, JSC |
| √ | 7.10.13 | ORDER (setting hearing for 7/29/13) cc: JSC, State, OCW |
| √ | 7.26.13 | State's Memorandum In Support of Its Motion for Affidavits of Applicant's Trial and Appellate Counsel. cc: |

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

# WRIT DOCKET

C

| | Date | Entry |
|---|---|---|
| ✓ | 7-29-13 | Hearing Held on OCW Motion. |
| ✓ | 7-29-13 | Memorandum and Order. cc: State, CCA, OCW, John Stickels, Larry Moore, Fred Cummings |
| ✓ | 8-1-13 | ORDER (Granting Copies of Exhibits 32-41 to State) cc: JSC, OCW |
| ✓ | 9-10-13 | Counsel's Affidavit in Response to Writ Allegations. cc: State, OCW, JSC |
| ✓ | 9-27-13 | Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus. |
| ✓ | 10-1-13 | Memorandum and Order. cc: State, OCW |
| ✓ | 10-9-13 | Affidavit of John W. Stickels (Post Conviction Application for Writ of Habeas Corpus): cc: State, JSC, OCW |
| ✓ | 10-9-13 | Capital Defense Claim for Fee Payment / Expenses. |
| ✓ | 10-11-13 | Affidavit (Fred Cummings). cc: State, JSC, OCW |
| ✓ | 12-2-13 | State's Reply to Application for Writ of Habeas Corpus. |
| ✓ | 12-18-13 | Response to State's Answer to Claim One of Hummel's Application for Habeas Corpus Relief (Juror Misconduct); Request for Status Conference. cc: State, JSC |
| ✓ | 1-23-2014 | Order - Status hearing - 2-28-2014 cc: State, John Stickels, Larry Moore, Fred Cummings |
| ✓ | 2-28-2014 | Notice of Filing Supplemental Exhibits in Support of Article 11.071 Application filed 6-4-2013 - CC: State, JSC |
| | | SEE VOL VI |

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER
BOX

In Court No. D432-

| C | FILED | |
|---|---|---|
| | | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. VOL II |
| | | COPY TO STATE. WAIVER OF SERVICE FILED. |
| ✓ | 4-1-2014 | Motion for Protective Order of Privileged Exhibits CC: State, ISC |
| ✓ | 4-1-2014 | Supplemental Response to States Answer: Exhibits 43 through 46 |
| ✓ | 4-3-2014 | States Reply to Applicants Motion for Protective order of privileged Exhibits. |
| ✓ | 5-22-2014 | Order - CC, State & Brad Levenson |
| ✓ | 7-7-2014 | Counsels Supplemental Affidavit in Response to Writ Allegations CC: State, ISC, Brad Levenson |
| ✓ | 7-7-2014 | States Supplemental Reply to Application for Writ of Habeas Corpus |
| ✓ | 6-26-2014 | States Motion to extend Time to file its Supplemental Reply to Application for Writ of Habeas Corpus |

DISPOSITION

DEFENDANT'S ATTORNEY Brad Levenson - Robert Romig
OCW
512-463-8600

| C | | |
|---|---|---|
| ✓ | 7-1-2014 | Order CC: Brad Levenson, State |
| ✓ | 7-29-2014 | Capital Defense Clinic letter - Larry Moore |
| ✓ | 8-4-2014 | States Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law |
| ✓ | 8/14/2014 | Unopposed Response to States Motion for Court to Order Findings & Conclusions, Proposed order: CC, State, ISC, Brad Lev. |
| ✓ | 8-14-2014 | Order - CC, State, ISC, Brad Levenson |
| ✓ | 8-14-14 | Unopposed response to state's motion for court to order findings and conclusions proposed order. CC: State, ISC |
| | | - OVER - |

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

16925

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

# WRIT DOCKET

| C | | |
|---|---|---|
| ✓ | 10-31-14 | Applicant's Proposed Findings of Fact and Conclusions of Law; Proposed Order filed. cc: JSC State |
| ✓ | 11-3-14 | State's Proposed Memorandum, Findings of Fact, and Conclusions of Law filed. |
| | | go TO VOLUME VII |

C-432-009923-1184294-A VOL VII 4352
Ex Parte: JOHN WILLIAM HUMMEL
APPLICATION FOR WRIT OF HABEAS CORPUS
FILED: 6/5/2013

VOLUME VII

# POST CONVICTION–WRIT OF HABEAS CORPUS

DRAWER

BOX

| C | FILED | In Court No. |
|---|---|---|
| | 6-5-13 | APPLICATION FOR WRIT OF HABEAS CORPUS FILED. |
| | | COPY TO STATE. WAIVER OF SERVICE FILED. |
| ✓ | 11-4-14 | Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law Filed |

| C | R |
|---|---|
| | |

DISPOSITION

DEFENDANT'S ATTORNEY

C

16925

ENTERED ON:
C - COMPUTER
R - MONTHLY REPORT

Thomas A. Wilder
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT
PAPERS AND MUST NOT BE REMOVED



FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 20 2015

TIME 1:49
BY SL DEPUTY

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. WR-81,578-01

EX PARTE JOHN WILLIAM HUMMEL

ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
CAUSE NO. C-432-009923-1184294-A IN THE 432ND DISTRICT COURT
TARRANT COUNTY

*Per curiam.*

## ORDER

In June 2011, a jury found applicant guilty of the offense of capital murder. The jury answered the statutory punishment questions in such a way that the trial court set applicant's punishment at death. Pursuant to Article 11.071 §§ 4(a) and (b)[1], applicant's initial application for a writ of habeas corpus was apparently timely filed in the trial court on June

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

SCANNED

5, 2013. On June 18, 2014, because it had been a year since the application was filed in the trial court, this Court ordered the trial court to resolve any remaining issues and enter findings of fact and conclusions of law within 180 days from the date of the order. The clerk was ordered to immediately thereafter transmit the complete writ record to this Court.

On December 18, 2014, this Court received a request for a 60-day extension for the trial court to enter findings and conclusions in the case. According to the portion of the record sent with the trial court's request for an extension, the parties filed their proposed findings on October 31, 2014 and November 4, 2014. Pursuant to Article 11.071 §§ 8(c) and 9(e), the trial court has 15 days after the parties file their proposed findings and conclusions to make its own findings and conclusions, and then the clerk is required to immediately forward the writ record to this Court. The statutory time frame for the court to make its findings and conclusions has already run. Nonetheless, we will grant the trial court 30 days from the December 15, 2014, due date to finish its findings and conclusions and have the clerk forward the record to this Court. No further extensions of time shall be entertained.

IT IS SO ORDERED THIS THE 12TH DAY OF JANUARY, 2015.

Do Not Publish



P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS

UNITED STATES POSTAGE
PITNEY BOWES
02 1R $ 00.40[6]
0002003152 JAN 14 2015
MAILED FROM ZIP CODE 78701

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
JAN 20 2015
TIME 1:49
BY SK DEPUTY

RE: WR-81,578-01

Appeals

DISTRICT CLERK TARRANT COUNTY
THOMAS WILDER
401 W. BELKNAP
FORT WORTH, TX 76196

56 KQV-S38 76196