# CLERK'S RECORD

### VOLUME 4 of 4

Writ Number: **C-432-009923-1184294-A**

Filed In the **432ND DISTRICT COURT**
of Tarrant County, Texas
Hon. **RUBEN GONZALEZ, JR.**, Presiding Judge



### EX PARTE: JOHN WILLIAM HUMMEL

vs.

### THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

**RECEIVED IN
COURT OF CRIMINAL APPEALS**

**JAN 29 2015**

**Abel Acosta, Clerk**

## ATTORNEY FOR THE APPELLANT

**BRAD D. LEVENSON,**
**DIRECTOR, OFFICE OF CAPITAL WRITS**
**1700 N. CONGRESS AVE. SUITE 460**
**AUSTIN, TEXAS 78711**
**PHONE:**       **512/463-8600**
**FAX:**          **512/463-8590**
**SBOT:**        **24073411**
**Attorney for JOHN WILLIAM HUMMEL, Appellant**

Delivered to the Court of Criminal Appeals for the State Of
Texas At Capitol Station, AUSTIN, Texas, on the

26 day of January, 2015

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

SUSAN RUSSELL *Susan Russell*

Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. **WR-81,578-01**
Filed in the Court of Criminal Appeals for the State of Texas,
at Capitol Station, AUSTIN, Texas, this

_____ day of _____, _____

_____ LOUISE PEARSON _____, Clerk

By _____, Deputy

# INDEX

Caption..................................................................................................................1

Application for Writ of Habeas Corpus .............................................................................2

Waiver of Service...................................................................................................469

State's Unopposed Motion for Copies of Juror Questionnaires and Information Cards .......................470

State's Unopposed Motion for Copies of Sealed Exhibits Filed with Application for
Writ of Habeas Corpus ...........................................................................................475

State's Motion for Affidavits of Applicant's Trial and Appellate Counsel ...............................479

Order ..................................................................................................................486

Order ..................................................................................................................487

Motion in Response to Request for Trial and Appellate Counsel Affidavits .............................488

Order ..................................................................................................................500

## VOLUME 2

State's Memorandum in Support of its Motion for Affidavits of Applicant's Trial and
Appellate Counsel ................................................................................................501

Memorandum/Order .............................................................................................524

Counsel's Affidavit in Response to Writ Allegations .......................................................527

Order ..................................................................................................................557

Unopposed Motion to Extend Time to File the State's Reply to Application for
Writ of Habeas Corpus ...........................................................................................559

Memorandum/Order .............................................................................................564

Affidavit of John W. Stickels (Post Conviction Application for Writ of Habeas Corpus) .....................565

State's Reply to Application for Writ of Habeas Corpus .....................................................570

Response to State's Answer to Claim One of Hummel's Application for Habeas
Corpus Relief (Juror Misconduct); Request for Status Conference ....................................793

Order ...................................................................................................................................801

Notice of Filing Supplemental Exhibits in Support of Article 11.071
Application Filed June 4, 2013 ..........................................................................................802

Supplemental Response to State's Answer: Exhibits 42 through 46 ...................................813

Motion for Protective Order of Privileged Exhibits .............................................................910

State's Reply to Applicant's "Motion for Protective Order of Privileged Exhibits ...............916

Order ...................................................................................................................................925

State's Motion to Extend Time to File its Supplemental Reply to Application for
Writ of Habeas Corpus .......................................................................................................926

Order ...................................................................................................................................931

Counsel's Supplemental Affidavit in Response to Writ Allegations ....................................932

State's Supplemental Reply to Application for Writ of Habeas Corpus ...............................943

**VOLUME 3**

Unopposed Response to State's Motion for Court for Order Findings and Conclusions;
Proposed Order ................................................................................................................1009

State's Motion for Court to Order Preparation of Proposed Findings of Fact and
Conclusions of Law ..........................................................................................................1014

This Page Not Used (1019-1023) .....................................................................................1019

Order .................................................................................................................................1024

Unopposed Response to State's Motion for Court to Order Findings and Conclusions:
Proposed Order ................................................................................................................1025

Applicant's Proposed Findings of Fact and Conclusions of Law: Proposed Order ............1031

State's Proposed Memorandum, Findings of Fact, and Conclusions of Law .....................1107

Amended State's Proposed Memorandum, Findings of Fact, and Conclusions of Law ......1245


Request for an Extension of Time to Resolve Issues and Enter Findings of Fact and
Conclusions of Law .................................................................................................1383

Order ......................................................................................................................1384

Order from the Court of Criminal Appeals of Texas ...........................................1395

## VOLUME 4

Findings of Fact, Conclusions of Law, Recommendations and Order ................1398

Order ......................................................................................................................1535

### INSTRUMENTS FILED IN CAUSE NUMBER 1184294D

Indictment ..............................................................................................................1536
Capital Judgment ..................................................................................................1538
Partial Reporter's Record Sentencing ..................................................................1542
Trial Court's Certification of Defendants Right of Appeal ....................................1549
Court's Charge Guilt/Innocents .............................................................................1550
Court's Charge Punishment ..................................................................................1565
Criminal Docket Sheet ..........................................................................................1574

### DOCUMENTS FILED PRIOR TO APPLICATION

Order ......................................................................................................................1586
Unopposed Motion to Seal Confidential Juror Information (Capital Case) ............1587
Email to Abel Acosta .............................................................................................1590
Letter from Office of Capital Writs/Clerks Response ............................................1593
Letter from Office of Capital Writs/Clerks Response ............................................1596
Letter from Office of Capital Writs/Clerks Response ............................................1599
Order ......................................................................................................................1602
Unopposed Motion for Ninety-Day Extension of Time to File Initial State
Habeas Application ................................................................................................1604
Order ......................................................................................................................1614
Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record;
Proposed Order .....................................................................................................1617
Unopposed Motion for Copies of Juror Questionnaires; Proposed Order ...........1657

Clerk's Certificate...................................................................................................1664

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 21, 2015

TIME_____

BY_____ DEPUTY

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432nd JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, RECOMMENDATIONS AND ORDER

The Court has considered the Application for Writ of Habeas Corpus, the State's Reply to Application for Writ of Habeas Corpus, Applicant's Supplemental Response to State's Answer, the State's Supplemental Reply to Application for Writ of Habeas Corpus, all of the exhibits and materials filed by each party, and the entire records of the trial and habeas proceedings. Where appropriate, the Court has used its personal recollection as permitted under TEX. CODE CRIM. PROC. art. 11.071, § 9(a). Based on its review of the record, the Court makes the following findings of fact and conclusions of law regarding Applicant's claims and recommends that relief be denied:

### HISTORY OF THE CASE

A Tarrant County jury convicted Applicant of capital murder for murdering his wife and father-in-law in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced Applicant to death. Applicant's conviction and sentence were affirmed on direct appeal by the Court of Criminal Appeals of Texas, and the Supreme Court of the United States denied

SCANNED

**1398**

Applicant's petition for writ of certiorari. *See Hummel v. State*, No. AP-76-596, 2013 WL 6123283 (Tex. Crim. App. November 20, 2013) (not designated for publication), *cert. denied*, No. 13-9620 (October 6, 2014).

Applicant timely filed the current habeas application pursuant to TEX. CODE CRIM. PROC. 11.071 on June 5, 2013, raising fifteen claims for relief. This Court granted the State an extension of time to file its response to the application, and the State timely filed its reply to each of Applicant's claims on December 2, 2013.

On February 28, 2014, the Court held a status hearing and granted Applicant thirty days to supplement his post-conviction claims with further arguments and exhibits. Applicant then filed his "Supplemental Response To State's Answer; Exhibits 42 Through 46," which dealt specifically with claims three, four, six, and seven. Additionally, Applicant filed Exhibits 47 through 49 *ex parte* under seal along with a motion seeking to have this Court issue a protective order for the exhibits. The State filed a reply to Applicant's motion for a protective order. On May 22, 2014, the Court denied Applicant's motion for protective order. The State filed its "Supplemental Reply to Application for Writ of Habeas Corpus" on July 7, 2014.

On August 13, 2014, this Court found that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. The Court ordered the parties to file proposed findings of fact and

**1399**

conclusions of law by November 3, 2014. Both parties have filed their proposed findings as ordered.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Claim One
### Alleged Juror Misconduct

Applicant alleges that he was denied his due-process right to an impartial jury when juror Nathaniel Davis committed misconduct by automatically voting for death.

**Findings of Fact**

1.  Nathaniel Davis served as a juror at the guilt-innocence and punishment phases of Applicant's capital-murder trial in cause number 1184294D.

2.  Applicant's first claim for relief is based solely on Davis' habeas affidavit detailing his own mental processes in reaching a verdict at Applicant's trial. [Application at 30-36; Applicant's Exhibit 22.]

3.  Applicant does not challenge Davis' qualifications as a juror. [Application at 30-36.]

4.  Davis' affidavit does not suggest the existence of any influence originating from a source outside of the jury room or other than from the jurors themselves. [Applicant's Exhibit 22.]

3

**1400**

## Conclusions of Law

1.  Applicant does not challenge Davis' qualifications as a juror, and his claim for relief is not based on an outside influence. *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (defining "outside influence" for purposes of TEX. R. EVID. 606(b) as "something originating from a source outside of the jury room and other than from the jurors themselves"). Because Applicant's claim for relief does not fall within either exception to TEX. R. EVID. 606(b), Davis' affidavit is inadmissible and is stricken from this habeas proceeding. *See* TEX. R. EVID. 606(b); *see also Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim. App. 2013) (refusing based on TEX. R. EVID. 606(b) to consider juror affidavit); *Bjorgaard v. State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007) (TEX. R. EVID. 606(b) barred trial court from considering contents of juror affidavit describing jurors' collective thought process), *pet. dism'd*, *improv. granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008).

2.  Application of TEX. R. EVID. 606(b) does not deprive Applicant of a fair trial or due process. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) (rejecting constitutional challenge to FED. R. EVID. 606(b)); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 375 (Tex. 2000) (examining constitutionality of TEX. R. EVID. 606(b) in civil context); *Dunklin v. State*, 194 S.W.3d 14, 19-20 (Tex. App.—Tyler 2006, no pet.) (rejecting challenge to constitutionality of TEX. R. EVID. 606(b)).

3.  The Court recommends that Applicant's first claim for relief be denied.

**1401**

## Claims Two through Eleven
### Alleged Ineffective Assistance of Counsel

Applicant sets forth ten claims for relief alleging that he was denied effective assistance of counsel at trial and on appeal.

### **Findings of Fact Relating to Claims Two through Eleven**

1.  On December 23, 2009, the Court appointed Fred Cummings to represent Applicant at his capital-murder trial in cause number 1184294D. [CR 1: 21; Cummings' affidavit at 1.]

2.  On December 31, 2009, the Court appointed Larry M. Moore as Cummings' co-counsel for trial. [CR 1: 24; Cummings' affidavit at 5; Moore's affidavit at 1.]

3.  On December 31, 2009, Cummings had the Court appoint Brendan Ross, an experienced licensed social worker and mitigation specialist, and Bobby Walton, an experienced private investigator, to assist counsel in investigating Applicant's life. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

4.  After Applicant's conviction and death sentence, the Court appointed John W. Stickels to represent Applicant on direct appeal. [CR 4: 744; Stickels' affidavit at 1.]

5.  Cummings, Moore, and Stickels are highly experienced criminal defense attorneys who were well-qualified to represent Applicant. [Moore's affidavit at 1-3; Cummings affidavit at 1; Stickels' affidavit at 1.]

6.  Cummings, Moore, and Stickels have each filed affidavits responding to Applicant's habeas claims that he was denied effective assistance of counsel at trial and on appeal. [*See* "Affidavit" filed by Cummings (hereinafter referred to as "Cummings' affidavit"); "Counsel's Affidavit in Response to Writ Allegations" filed by Moore (hereinafter referred to as "Moore's affidavit"); "Counsel's Supplemental Affidavit in Response to Writ Allegations" filed by Moore (hereinafter referred to as "Moore's suppl. affidavit"); and "Affidavit of John W. Stickels" filed by Stickels (hereinafter referred to as "Stickels' affidavit").]

**1402**

## A.   **Claim for Relief Two**

Applicant alleges that his trial and appellate counsel were ineffective because they failed to argue that the State's evidence was legally insufficient to support an affirmative finding to the future-dangerousness special issue. [*See* Application at 36-37.]

### **Findings of Fact**

1.   Applicant's trial counsel introduced evidence designed to convince the jury that Applicant was not a future danger, and counsel argued to the jury that the evidence did not support a finding of future dangerousness. [Moore's affidavit at 4; Cummings' affidavit at 2-3; RR 45: 65-84.]

2.   Trial counsel correctly believed that any challenge to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have been rejected by this Court and would have been futile. [Moore's affidavit at 4; Cummings' affidavit at 3.]

3.   On direct appeal, Stickels did not challenge the jury's finding of future dangerousness because, after reviewing the facts and the applicable law, he considered such a challenge to be "frivolous." [Stickels' affidavit at 2.]

4.   Applicant seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes while incarcerated. [*See* Application at 36-40.]

5.   The State presented compelling, overwhelming evidence to satisfy its burden to prove beyond a reasonable doubt that Applicant posed a future danger as defined in the Court's charge to the jury.

6.   A week before Christmas in 2009, Applicant murdered his pregnant wife Joy Hummel, his five-year-old daughter Jodi Hummel, and his crippled father-in-law Clyde "Eddie" Bedford and set the house on fire because he wanted to be free to pursue a relationship with Kristie Freeze, whom he met in October 2009 at the E-Z Mart convenience store where she worked as a

**1403**

clerk and where Applicant stopped to buy cigarettes and gasoline on his way to or from his job as a hospital security guard. [RR 33: 68, 87; RR 39: 132-35; RR 40: 10, 20-21; SX 347B.]

7.    Applicant began thinking in October 2009 about killing his family because he wanted to be single to "pursue [Freeze] better." [SX 347B.]

8.    About two weeks before the murders, Applicant accessed a hospital doctor's computer at work without permission to research articles about the effects of rat poison on humans and how rat poisoning can cause the death of a human. [RR 43: 36-40; SX 228.]

9.    Applicant was persistent about wanting to have sex with Freeze, and they had sex at Freeze's apartment on December 10, 2009. [RR 39: 141-42, 173, 176; SX 347B.]

10.   Two days after Applicant and Freeze had sex, Freeze found out that Joy was pregnant, which caused Freeze "discomfort" because Applicant "had no concern for the safety of his unborn child"; as a result, Freeze told Applicant to stop contacting her, but he continued to do so anyway.    [RR 39: 142-43, 174.]

11.   On December 16, 2009, the day Freeze's divorce became final, Applicant called and texted Freeze repeatedly, and he tried to kill Joy, Eddie, and Jodi by putting d-CON rat poison that he stole from Walmart in the turkey meat of the spaghetti sauce he prepared for them before he went to work. [RR 39: 137-38, 145-47, 162-63; RR 41: 11, 14; SX 347C, 349A2.]

12.   The evening of December 17, 2009, Applicant pretended to go to work, but he went to Freeze's apartment instead. [RR 39: 150-51; SX 347B.] It was Freeze's daughter's sixth birthday, and Applicant read the child her favorite book, which was entitled "It Could Have Been Worse." [RR 39: 147-48.]

13.   Applicant left Freeze's apartment at about 11:00 p.m., stopped for gasoline at the EZ Mart in order to be seen on camera, and then headed home to kill his family. [RR 39: 39; SX 347B.] The jury watched video footage of Applicant at the store. [RR 39: 39-40.]

**1404**

14. Applicant parked behind his house to avoid being seen; he took off his work shirt, white shirt, watch, and boots; and he went inside and grabbed a kitchen knife to "slit [his family members'] throats while they slept." [SX 347B.]

15. Inside the house, Applicant spent thirty to forty-five minutes contemplating whether to kill Joy, who was fourteen to fifteen weeks pregnant. [RR 39: 209; SX 347B.]

16. After resting and contemplating his actions, Applicant entered the bedroom where Joy was sleeping and stabbed her in the neck with the kitchen knife, which broke. [SX 347B.]

17. When Joy awoke and began fighting back, Applicant grabbed a baseball bat that was in the room, hit Joy repeatedly in the head until she fell to the floor, and then stabbed Joy with samurai sword replicas and a double-bladed dagger. [SX 347B.]

18. Joy suffered a total thirty-five stab wounds, including two through her heart, four through her lungs, and five through her liver; skull lacerations from being hit with the baseball bat; and a number of defensive wounds. [RR 39: 203-07, 209, 212; SX 272A.]

19. After murdering Joy, Applicant rested for about twenty minutes to catch his breath before going to Eddie's bedroom. [SX 347B.]

20. Applicant hit Eddie in the head with the baseball bat five to ten times while Eddie slept in his bed, causing multiple right-side depressed skull fractures. [RR 39: 220; SX 347B.]

21. After taking another break to catch his breath, Applicant went to Jodi's room and hit her in the head five to ten times with the baseball bat while she slept in her toddler bed, causing extensive multiple right-side skull fractures. [RR 39: 246-48, 256; SX 347B.]

22. Applicant used rolls of toilet paper to set a fire in each victim's bedroom in order to "make it look like somebody had broken in, killed them and then tried to cover it up by setting the fires." [SX 347B.]

**1405**

23. Applicant disposed of the murder weapons, drove around, and stopped at various Walmart stores in order to be seen on camera and construct his alibi until it was time to return home. [RR 39: 39-44; SX 347B.] The jury watched video footage of Applicant inside the various stores. [RR 39: 40-44; SX 405B, 406B, 407B, 431.]

24. At about 5:00 a.m., Applicant returned home and tried "to be all shocked." [SX 347B.]

25. At the scene, Applicant calmly asked officers what had happened and whether everyone made it out, and he lied about where he had been when the fire began. [RR 33: 152-54, 159; SX 220D.] The jury heard an audio recording of Applicant's conversations with officers at the scene. [RR 33: 166, 171-73; SX 220D.]

26. Applicant voluntarily went to the Kennedale police station, where he gave false written and oral statements regarding his whereabouts that night. [RR 34: 158-59, 161, 163, 175-76; RR 35: 9-13, 44; SX 341B, 342.]

27. Applicant left the police station and drove to the office of his employer, Champion National Security, located in Arlington, Texas; there was nothing unusual about Applicant's demeanor, and he never mentioned that anything unusual had happened. [RR 36: 22-23, 42, 50-52; RR 42: 17.]

28. After leaving Champion's office at about 11:00 a.m. on December 18, 2009, Applicant cashed his paycheck and fled in his van to California because he knew that the authorities had the evidence to "pin" him for the murders and arson. [RR 36: 23; SX 347B.]

29. At 8:46 p.m. PST on December 19, 2009, Applicant, who was no longer wearing his wedding ring, checked in at the Coast Inn in Oceanside, California. [RR 37: 80, 82; RR 39: 106-12; SX 347B, 408B, 440, 449, 451-56.]

30. The jury watched a video showing Applicant's jovial demeanor as he checked in at the front desk of the Coast Inn. [RR 39: 46; SX 408B.]

31. Shortly after checking in at the Coast Inn, Applicant went to the topless bar next door. [RR 41: 17-22, 30, 56; RR 42: 26; SX 427.]

**1406**

32.   Applicant struck up a conversation with Scott Matejka on the sidewalk near the topless bar, and they smoked crack cocaine together and went to Tijuana, Mexico, so that Applicant could buy marijuana. [RR 37: 71-72; RR 41: 19, 29; RR 42: 26-32, 47.]

33.   Applicant and Matejka visited a gentlemen's club in Tijuana, Mexico, but Matejka never saw Applicant actually obtain any marijuana. [RR 42: 34-35.]

34.   On December 20-21, 2009, while at the San Diego County Jail under arrest on a Texas arson warrant after being detained by United States Customs and Border Protection ("CBP") officers at the Texas-Mexico border, Applicant waived his rights and voluntarily confessed on videotape and in writing that he killed his family members and set his house on fire. [RR 36: 169; RR 37: 59; SX 347B, 348, 349B.]

35.   The jury viewed Applicant's videotaped confession and saw his remorseless demeanor as he calmly and casually discussed his motivations and actions before, during, and after the murders. [RR 36: 175-76; RR 41: 10; SX 347B, 347C.]

36.   The jury heard medical-examiner testimony about and saw photographs of the extensive injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

37.   In the fall of 2009, Applicant accessed pornographic websites and his MySpace account on a doctor's computer during a time when the doctor's office was closed and locked. [RR 42: 98-101; *see generally* RR 43: 20-47.] The jury saw examples of the material Applicant accessed. [RR 42: 104-07; SX 225-28.]

38.   Results of a forensic examination of the hospital doctor's computer included 2,338 pornographic images and a profile posted by Applicant under the name of "John Long N Hard" on hornymatches.com describing himself, seeking to have women meet him at the hospital where he worked as a security guard, and giving explicit details of what he was looking for in a profile mate. [RR 43: 30-33; SX 475.]

39.   Between November 13 and December 5, 2009, Applicant called and texted topless dancer Gretchen Bow, and Applicant paid Bow at least $100 each

**1407**

time Bow would meet him at the club to sit and drink with him or perform for him. [RR 42: 110-13, 117-18, 122.] Text messages between Applicant and Bow were introduced into evidence. [RR 42: 116, 119.]

40. Applicant invited Bow to visit him at the hospital while he was working as a security guard so they could smoke marijuana "and [do] other things," but Bow never went. [RR 42: 115, 123.]

41. Dr. Antoinette McGarrahan, the defense's forensic psychologist and neuropsychologist, opined that Applicant murdered his family when repressed emotions flooded out in a rage at the time of the offense, but she also admitted that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

42. Applicant knew it was wrong to kill his family, but he did it anyway. [RR 44: 156.]

43. Applicant has traits of several different personality disorders, *i.e.*, narcissism, antisocial personality, schizoid personality, and borderline personality. [RR 44: 126-32, 144-45.]

44. Even with treatment, the underlying basis of Applicant's personality disorder would remain. [RR 44: 155.]

45. At the time of trial, Applicant was essentially the same person he was on December 17, 2009, when he brutally murdered his family members and set his house on fire. [*Id.*]

46. Applicant acted alone in planning, carrying out, and trying to cover up the vicious, cold-blooded, calculated murders of his three family members, and Applicant's actions before, during, and after the murders demonstrated an utter lack of remorse.

47. The circumstances of and events surrounding Applicant's murder of his family members demonstrate forethought, deliberateness, and wanton and callous disregard for the sanctity of human life.

11

**1408**

## Conclusions of Law

1.   In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence:   (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense.   *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010); *Ex parte Briggs*, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005).

2.   To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms.   *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.   He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.   *Strickland*, 466 U.S. at 689; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007).

3.   An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012); *Ex parte Ramirez*, 280 S.W.3d 848, 852 (Tex. Crim. App. 2007).   A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694.   An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings.   *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.   An applicant bears the burden to prove that he received ineffective assistance of counsel.   *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).   Such a claim must be proven by the preponderance of the evidence. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

**1409**

5.    An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005). An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d 627, 629 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

6.    Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.    In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that:  (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

8.    Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9.    In reviewing the legal sufficiency of the evidence to support an affirmative finding on the future-dangerousness special issue, a court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could find beyond a reasonable doubt a probability that the defendant would commit criminal acts of violence. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008).

10.   The future-dangerousness special issue requires the jury to determine beyond a reasonable doubt whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). The State

**1410**

bears the burden of proof on the future-dangerousness special issue. *See Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).

11. A variety of factors may be considered in determining the future-dangerousness special issue: (a) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (b) the calculated nature of the defendant's acts; (c) the forethought and deliberateness exhibited by the crime's execution; (d) the existence of a prior criminal record, and the severity of the prior crimes; (e) the defendant's age and personal circumstances at the time of the offense; (f) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (g) psychiatric evidence; and (h) character evidence. *Reese v. State*, 33 S.W.3d 238, 245 (Tex. Crim. App. 2000); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). No one factor is dispositive, and an affirmative answer to the special issue may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors. *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim. App. 1995).

12. The circumstances of the offense "can be among the most revealing evidence of future dangerousness." *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (quoting *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)). In some instances, the circumstances of the offense and the events surrounding it may alone be sufficient to sustain an affirmative answer to the future-dangerousness special issue. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *Wilson*, 7 S.W.3d at 142; *Dinkins*, 894 S.W.2d at 358. Such instances arise, for example, when the crime is "so heinous as to display a wanton and callous disregard for human life," *Dinkins*, 894 S.W.2d at 358, or when the circumstances of the offense are sufficiently cold-blooded or calculated. *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

13. The facts of Applicant's offense are, alone, sufficient to support a finding of future dangerousness. *See, e.g., Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008) (unprovoked nighttime attack against a family in which parents were killed and children nearly killed sufficient to sustain future-dangerousness finding); *Dinkins*, 894 S.W.2d at 358 (evidence of premeditated and brutal murders of two women, including multiple gunshot wounds at close range, sufficient to support affirmative answer to future-dangerousness special issue); *Joiner v. State*, 825 S.W.2d 701, 704 (Tex.

**1411**

Crim. App. 1992) (evidence sufficient to support finding of future dangerousness where defendant murdered two women; first victim was stabbed four times in chest and received series of lacerations to her neck; second victim suffered forty-one stab wounds to chest, blunt force trauma and lacerations to her head, and throat was "slashed"; physical evidence suggested each victim sexually assaulted after death).

14.  Even if the facts of Applicant's offense, alone, did not support a finding of future dangerousness, the facts of Applicant's offense along with the other evidence in the trial record were legally sufficient to satisfy the State's burden to prove beyond a reasonable doubt a probability that Applicant would commit criminal acts of violence that would constitute a continuing threat to society. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) (setting forth future-dangerousness special issue); *see also Ladd*, 3 S.W.3d at 213 (State bears burden on future-dangerousness special issue).

15.  The future-dangerousness special issue asks if a defendant would constitute a continuing threat whether in or out of prison without regard to how long he would actually spend in prison if sentenced to life. *Lucio v. State* 351 S.W.3d 878, 903 (Tex. Crim. App. 2011); *Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010); *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010); *see Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.) (how long life-sentenced capital defendant will spend in prison "is not proper even in the context of the [future-dangerousness] special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term 'society' includes *both* the prison and non-prison populations" (emphasis in original)); *Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting reasoning of plurality opinion in *Smith*). Applicant's narrow interpretation of the future-dangerousness special issue ignores precedent and erroneously seeks to evaluate his future dangerousness solely in terms of his likelihood to commit violent acts or crimes within prison.

16.  The circumstances found to be deficient in *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007), and *Wallace v. State*, 618 S.W.2d 67 (Tex. Crim. App. 1981), are nothing like the facts of Applicant's case, and Applicant's reliance on those decisions in the present proceeding is misplaced.

17.  Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his trial and appellate counsel fell below

**1412**

an objective standard of reasonableness under prevailing professional norms because any challenge at trial or on appeal to the legal sufficiency of the evidence to prove Applicant's future dangerousness would have lacked merit and would have been futile. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("reasonably competent counsel need not perform a useless or futile act"); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d 610, 623-24 (Tex. Crim. App. 2009) (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

18. There is no reasonable probability that the outcome of the punishment phase of Applicant's trial or the outcome of Applicant's appeal would have been different had trial and appellate counsel advanced meritless challenges to the legal sufficiency of the evidence to prove Applicant's future dangerousness. *See Barrera v. State*, 978 S.W.3d 665, 668-69 (Tex. App.—Corpus Christi 1998, pet. ref'd) (no prejudice resulted from counsel's failure to raise objection that lacked merit). Therefore, Applicant has failed to meet his burden to prove by a preponderance of the evidence that the alleged deficiency of his trial and appellate counsel resulted in prejudice.

19. The Court recommends that Applicant's second claim for relief be denied.

## B. **Claim for Relief Three**

Applicant alleges that his trial counsel were ineffective for failing to present evidence that Applicant was not a future danger through Tarrant County Jail employees who supervised him while he was confined there and through a mental-health expert such psychiatrist Susan Hardesty, M.D. [Application at 40-47.]

**1413**

## Findings of Fact

1.  Applicant submits affidavits from Tarrant County Jail employees Tony Rigmaiden, Rory Thomas, and Cody Bell, who supervised Applicant while he was confined in the jail. [*See* Applicant's Exhibits 4, 20, 21.]

2.  Trial counsel did not identify Rigmaiden, Thomas, or Bell during their investigation. [*See* Moore's suppl. affidavit at 3.]

3.  In Moore's experience, testimony of jail personnel is often not particularly favorable to the defense by the time of trial unless there is "at least some personal relationship with, or affinity for the defendant that has developed with the officers." [Moore's suppl. affidavit at 2.]

4.  Members of the defense team asked Applicant about the possibility of finding jail guards, chaplains, or other jail personnel with whom Applicant had developed a sufficiently good relationship that they might be willing to testify on his behalf, but Applicant never identified any such prospective witness and was not very encouraging that any such witnesses might be found. [Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

5.  In light of Moore's experience in dealing with testimony of jail personnel, as well as the fact that Applicant never identified any such prospective witnesses and was not encouraging that such witnesses might be found, Applicant's trial counsel made a reasonable strategic determination not to send the defense team's private investigator to the jail because his efforts would be better focused on other areas that might prove more beneficial to Applicant's case. [Moore's suppl. affidavit at 2.]

6.  Applicant's assertion that he did nothing to dissuade trial counsel from pursuing an investigation into Tarrant County jail staff and that he "simply could not recall the names of any specific jail staff he could recommend that counsel speak to" is unsupported by the record. [*See* Supplemental Response To State's Answer at 5.]

7.  Even if Applicant could not recall a specific name, he did not even generally indicate that he had become particularly close to any Tarrant County Jail personnel who might be willing to testify for the defense, and he gave his trial counsel reason to believe that the expenditure of valuable resources in

**1414**

pursuing this area would not yield anything of value to Applicant's case. [*See* Moore's affidavit at 6; Cummings' affidavit at 3; Moore's suppl. affidavit at 2.]

8.    Although Rigmaiden's, Bell's, and Thomas' names appear in jail logs contained in Applicant's Exhibit 44, nothing in those entries show that any of them had developed at least some personal relationship with or affinity for Applicant. [*See* Applicant's Exhibit 44.]

9.    Given Applicant's failure to identify any jail personnel with whom he had developed such close relationship, Applicant's lack of encouragement that such witnesses might be found, and Moore's experiences in seeking testimony from jail personnel, it was not unreasonable for trial counsel to make the strategic investigative decision to focus their efforts on areas that might prove more beneficial to Applicant's case.

10.   Trial counsel presented testimony from Frank AuBuchon (the defense team's prison classification expert), Dr. McGarrahan, and lay witnesses to show Applicant's lack of disciplinary issues in jail, Applicant's lack of a violent or criminal history, and the likelihood that Applicant would adapt well to the structured environment of prison life. [RR 43: 113-14, 166, 178, 232; RR 44: 70, 73, 159; Moore's affidavit at 5-6; Cummings' affidavit at 3-4.]

11.   Trial counsel stressed in closing arguments that Applicant did not pose a future danger, in part based on AuBuchon's testimony and because Applicant had no history of violence, no prior criminal history, and no issues during his incarceration in jail. [RR 45: 69, 78-81.]

12.   The proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, and Bell provides no meaningful new facts about Applicant's pretrial confinement that Applicant's trial counsel did not develop through other witnesses. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; *see* Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

13.   The facts that Applicant alleges should have been presented through Rigmaiden, Thomas, and Bell serve largely the same purposes as and are largely cumulative of other evidence that Applicant had no disciplinary issues while confined in jail, that he would likely adjust well to a prison

**1415**

setting if he were sentenced to life without parole, and that he allegedly posed a low risk of future violence. [RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; Moore's affidavit at 5-6; Moore's suppl. affidavit at 2-3.]

14.   Applicant overrates the potential impact of the facts contained in the habeas affidavits of Rigmaiden, Thomas, and Bell and unfairly overlooks or underrates the testimony presented through Dr. McGarrahan, AuBuchon, and lay witnesses. [*See* Application at 42-45; *see also* RR 43: 113-14, 166, 178, 232; RR 44: 68-73, 159; RR 45: 69, 78-81; Moore's affidavit at 5-6; Cummings' affidavit at 3-4; Moore's suppl. affidavit at 2-3.]

15.   Applicant's assertion that his trial counsel never addressed the issue of whether Applicant as an individual possessed a likelihood of committing acts of violence in the future "is simply not true" in light of the evidence presented at Applicant's trial. [Moore's supplemental affidavit at 2-3; *see* Supplemental Response To State's Answer at 7.]

16.   Applicant's Tarrant County Jail records attached to Cummings' habeas affidavit reflect that during Applicant's confinement he was classified as "High Custody," required MHMR services, and was on suicide watch. [Cummings' affidavit at 5 & jail records attached thereto.]

17.   Applicant's Tarrant County Jail records showing Applicant was closely supervised and classified as "High Custody" would have provided little, if any, benefit to Applicant's punishment case because Applicant's jury could have reasonably assumed that Applicant had no disciplinary issues in jail because his classification left him little opportunity to violate the rules or because Applicant was on his best behavior pending his capital-murder trial where he faced the death penalty.

18.   Applicant asserts that trial counsel should have retained a mental-health expert such as Dr. Hardesty, a psychiatrist, "to explain how [Applicant's] past patterns of behavior and mental status did not support a finding that he would be a future danger" and to explain that he was a low risk to commit future acts of violence in a prison setting because he would be unlikely to encounter the severe familial and financial stressors that plagued him before the crime. [Application at 46; *see* Applicant's Exhibit 1.]

**1416**



19. Trial counsel thoroughly investigated Applicant's background and upbringing in order to determine how those factors may have influenced Applicant's behavior in murdering his family members. [Moore's affidavit at 7.]

20. Trial counsel presented testimony from the available lay and expert witnesses and gave the jury as complete a picture as possible of Applicant's life history from his childhood until he murdered his family members and was confined in jail.

21. Trial counsel discussed potential mental-health experts whom they might use in Applicant's case, they contacted several mental-health experts, and they decided to retain Dr. McGarrahan, a highly qualified forensic psychologist and neuropsychologist, because of Moore's previous work with her, Moore's opinion of her abilities, her reputation in the legal community, and her good professional relationship with J. Randall Price, Ph.D., the forensic psychologist and neuropsychologist retained by the State in this case. [Moore's affidavit at 7.]

22. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

23. Dr. McGarrahan based her testimony on nearly eleven hours evaluating Applicant and interviewing Applicant about his "entire social history," reviewing a large volume of records and videos regarding Applicant, talking to Applicant's sister and mother, reviewing medical records of Applicant's mother, and reviewing psychological test data from Dr. Price's evaluation of Applicant. [RR 44: 121-24.]

24. Trial counsel and Dr. McGarrahan collaborated and made a reasonable strategic decision that it was not in Applicant's best interest and would not benefit Applicant's case to have Dr. McGarrahan or another expert in risk assessment perform a formal violence risk assessment of Applicant. [Moore's affidavit at 7-8.]

**1417**



25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Affidavit of J. Randall Price, Ph.D. at 1-2 (hereinafter referred to as "Dr. Price's affidavit").]

26. Dr. Hardesty's proposed testimony would have opened the door to damaging testimony from Dr. Price, which would have been devastating to the defense and which would have outweighed any potential benefit to be gained from Dr. Hardesty's proposed testimony. [Moore's affidavit at 8; Cummings' affidavit at 6.]

27. Dr. Hardesty's opinion that Applicant would not pose a future risk of violence, even if it were determined to be admissible at trial, is not so compelling that it would have changed the jury's answer to the future-dangerousness special issue, especially in light of State's powerful evidence that Applicant posed a future danger. [*See* Applicant's Exhibit 1.]

28. Dr. Hardesty's habeas affidavit does not disclose the scientific methodology by which she reached her opinion or contain any objective source material to substantiate the validity or appropriateness of her methodology. [*See* Applicant's Exhibit 1.]

29. Dr. Hardesty's opinions contained in her habeas affidavit rest solely on her personal assessment of Applicant's future dangerousness, not upon any standardized risk assessment measures or any scientific or statistical comparisons. [Applicant's Exhibit 1; *see* Moore's affidavit at 8-9 (expressing belief that Dr. Hardesty's opinion "would be essentially the same type of testimony that the Court of Criminal Appeals has previously indicated does not meet the criteria for admissibility pursuant to *Daubert*" when offered by the State).]

30. Dr. Hardesty's assertions that Applicant, while incarcerated, would not experience the stressors that were antecedents to his crimes and that Applicant would not encounter "a relational model that would be iterative of attachment" are unrealistic assessments of the life in prison that Applicant could face if he were incarcerated on a sentence of life without parole. [Moore's affidavit at 9; *see* Applicant's Exhibit 1.]

**1418**

31. Trial counsel made a well-reasoned strategic decision based on their thorough investigation, their professional judgment, and their reliance on a well-qualified mental-health expert about how to best present evidence that Applicant would not constitute a future danger if he received a sentence of life without parole instead of death.

32. Even after reviewing the opinions contained in Dr. Hardesty's affidavit, Moore does not question that he and Cummings made the correct decision about how to best present Applicant's case at the punishment phase of the trial. [*See* Moore's affidavit at 9.]

33. Applicant's annihilation of his family, and his demeanor and actions before and afterward (many of which were documented on video recordings seen by the jury), demonstrated Applicant's cold-hearted capacity for extreme violence and sufficed to establish his future dangerousness.

34. The Court rejects Applicant's claim that he had "never committed a single act of violence in his life before this crime." [Supplemental Response to State's Answer at 8 n.3.] Applicant researched the effects of rat poison on humans and tried to poison his family, which exhibited Applicant's desire and propensity to commit acts of violence by killing his family in a brutal manner so that he could be free to pursue a relationship with Freeze. [RR 41: 11, 14; RR 43: 36-40; SX 228, 347C, 349A2.]

35. In Moore's experience in ten death-penalty cases tried to verdict, the facts of the particular offense on trial are "generally paramount" in the jury's determination of the future-dangerousness special issue. [Moore's suppl. affidavit at 4.]

36. In Moore's opinion, Applicant's actions before and during the vicious murders of his family members had an "indelible impact" on the jury that was "probably impossible for anyone to overcome." [Moore's suppl. affidavit at 4.]

37. Trial counsel exercised their prerogative not to call prison employees or a psychiatrist such as Dr. Hardesty to testify at the punishment phase of Applicant's trial on the issue of future dangerousness.

**1419**

38.  Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present testimony from jail personnel on the issue of future dangerousness during the punishment phase of a death-penalty trial.

39.  Prevailing professional norms impose no absolute requirement for trial counsel in a death-penalty case to present expert testimony such as that proffered by Dr. Hardesty on the issue of future dangerousness during the punishment phase of a death-penalty trial.

40.  The failure of trial counsel to discover Rigmaiden, Thomas, and Bell or to retain Dr. Hardesty was not the result of inadequate investigation or preparation of Applicant's case.

41.  Applicant's trial counsel performed well within the wide range of reasonable professional assistance in conducting the investigation of Applicant's case and making strategic decisions about what areas of investigation to pursue, what evidence to present, and what witnesses to call in an effort to obtain a favorable answer to the future-dangerousness special issue.

42.  Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

43.  Applicant's allegations of ineffective assistance are conclusory.

44.  It is not reasonable to believe that the proposed testimony contained in the habeas affidavits of Rigmaiden, Thomas, Bell, and Dr. Hardesty, when weighed along with the remaining relevant evidence contained in the record, would have significantly diminished the powerful impact of the State's evidence of Applicant's future dangerousness and caused the jury to answer the future-dangerousness special issue differently.

## Conclusions of Law

1.  In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

**1420**

2.  To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.   He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.  An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5.  Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533.  "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

**1421**

6.  In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7.  Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8.  Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d 713, 728-29 (Tex. Crim. App. 2006).

9.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

**1422**

12. The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Austin 1989, pet. ref'd).

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518.

14. Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty at trial is not alone a basis to prove a claim of ineffective assistance. The fact that Applicant's habeas counsel now believe that another type of expert witness should have been called to testify on the issue of future dangerousness does not support an allegation of ineffective assistance. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance"); *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (same).

15. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987) ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

16. The failure to present essentially cumulative testimony that Applicant would not pose a future danger if he were sentenced to life without parole instead of death did not constitute deficient performance. *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (counsel's decision not to present

**1423**

cumulative testimony does not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *Id.* at 1518 ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required").

17.  Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present evidence that Applicant would not constitute a future danger if he were sentenced to life without parole instead of death.   Such arguments do not support an allegation of ineffective assistance.  *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330  (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight).

18.  Dr. Hardesty's proffered opinions of Applicant's future dangerousness do not satisfy the reliability requirements of Tex. R. Evid. 702 because her determination that Applicant would not be a future danger if he were sentenced to life in prison is the same type of unreliable prediction of future dangerousness rejected as unreliable in *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).

19.  Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting evidence that Applicant would not pose a future danger if he were sentenced to life without parole fell below an objective standard of reasonableness under prevailing professional norms.   Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance.   Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

20.  Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the future-dangerousness special issue differently had counsel called Rigmaiden, Thomas, Bell, and Dr. Hardesty to testify at his trial.  *See Ex parte Medina*, 361 S.W.3d 633, 644 (Tex. Crim.

**1424**

App. 2011) (providing prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

21. Given the cumulative nature of the evidence contained in the habeas affidavits of Rigmaiden, Thomas, and Bell, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue differently had trial counsel discovered and called those witnesses to testify during the punishment phase of Applicant's trial. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir. 2009) (upholding state court's finding of no prejudice where additional testimony was cumulative).

22. There is no reasonable probability that the proposed testimony of Rigmaiden, Thomas, Bell, and Dr. Hardesty would have persuaded Applicant's jury to answer the future-dangerousness special issue differently. This is especially true given that the weight of the aggravating facts was staggering and presented a powerful case to meet the State's burden to prove beyond a reasonable doubt that Applicant constituted a future danger and in light of the fact that the jury heard other lay and expert testimony that Applicant had never been violent, that he had no disciplinary issues in jail and no prior criminal history, that he committed the murders when emotions he repressed his entire life flooded out, and that he would likely adjust very well to the prison environment. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable.

23. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

24. The Court recommends that Applicant's third claim for relief be denied.

**1425**

## C.   Claim for Relief Four

Applicant alleges that trial counsel were ineffective for failing to present expert testimony of a "social history expert witness" such as social worker Laura Smith to explain to the jury "how [Applicant's] life history shaped the person that he became later in life." [Application at 47-50.]

## Findings Of Fact

1.   Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial, but he is unaware of any legal requirement to use a "social history expert witness" in every such case in order to accomplish that purpose. [Moore's affidavit at 10.]

2.   Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3.   Prevailing professional norms do not require trial counsel in a death-penalty case to retain a "social history expert witness" such as social worker Smith or to call such a witness to testify at the punishment phase of a death-penalty trial.

4.   Applicant's defense team included an experienced mitigation specialist with a master's degree and license in social work and an experienced private investigator. [CR 1: 27, 32; Cummings' affidavit at 6-7.]

5.   Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the charged offense. [Moore's affidavit at 7.]

6.   Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

**1426**



7. Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

8. Many people contacted by the defense team either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

9. The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10. The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11. Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12. The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom the team contacted. [Moore's affidavit at 14.]

13. Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14. Trial counsel presented all of the witnesses whom they were able to locate and convince to testify and whom they thought were necessary to develop

**1427**

the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10; Cummings' affidavit at 6.]

15.  Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16.  At the request of Applicant's trial counsel, Dr. McGarrahan, an experienced and licensed forensic psychologist and neuropsychologist, administered a full neuropsychological evaluation as well as personality and emotional testing involving twenty to thirty different tasks and instruments to Applicant over about eleven hours total on October 13 and December 20, 2010. [RR 44: 118-22.]

17.  Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, correspondence from Applicant's sister Neata to Applicant, medical records for Applicant's mother, and psychological test data from Applicant's evaluation by Dr. Price, the State's forensic psychologist and neuropsychologist; she spoke to Neata and Jackie; she performed a clinical interview to ask Applicant about his "entire social history"; she conducted a mental-status examination during which she observed Applicant and discussed with Applicant any psychiatric symptoms he was having; and she discussed the offenses with Applicant in great detail. [RR 44: 121-24.]

18.  Trial counsel discussed Dr. McGarrahan's evaluation with her as she reviewed the relevant records and conducted her interviews and testing of Applicant. [Moore's affidavit at 7.]

19.  The defense team discussed various mitigation themes as they came to light, including Applicant's participation in role-playing games; Applicant's use of marijuana, alcohol, and other drugs; the possibility that Applicant suffered from being raised in poverty; the possibility that Applicant had a mental disorder or illness; the possibility that Applicant observed sexual abuse in his household; and the possibility that Applicant was abused or neglected as a child. [Cummings' affidavit at 7.]

20.  Trial counsel conducted a thorough investigation and made the strategic decision that the most effective way to develop Applicant's mitigation case was to present evidence of Applicant's life history through the available lay witnesses and then to use that story as a basis for the opinions offered by Dr.

**1428**

McGarrahan about how Applicant's life history shaped the person he became later in life and how it related to his commission of the murders. [Moore's affidavit at 10; Cummings' affidavit at 6; Moore's suppl. affidavit at 5-6.]

21. Contrary to Applicant's assertions, Applicant's trial counsel *did* present expert testimony about Applicant's life history through Dr. McGarrahan to develop the relevant social history as part of Applicant's mitigation case. [Dr. Price's affidavit at 3-4.]

22. Dr. McGarrahan's testimony during the punishment phase of Applicant's trial illuminated how Applicant's life history shaped the person he became later in life and related to Applicant's murders of his family members. [*See generally* RR 44: 118-63.]

23. Dr. McGarrahan testified during the punishment phase of Applicant's trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; their relationship and significance to Applicant's actions in murdering his family; and why Applicant appeared to show no remorse in his videotaped confession. [RR 44: 126-46, 158-61.]

24. Dr. McGarrahan opined that Applicant murdered his family when the emotions he had repressed for thirty-five years flooded out in an emotional rage at the time of the offense; she admitted, however, that Applicant thought about committing the crimes for quite a while and did quite a bit of planning. [RR 44: 136-38, 145, 152, 158.]

25. Dr. McGarrahan is a competent, meticulous, and exceedingly honest expert witness who was at least as qualified as a "social history expert witness" such as social worker Smith to develop a comprehensive social history and present her findings to the jury, and she testified effectively and credibly regarding Applicant's relevant life history. [Dr. Price's affidavit at 3-4.]

26. There is no reason to believe that Applicant's jury would have been more persuaded by the testimony of a social worker like Smith than it was by a well-qualified forensic psychologist and neuropsychologist like Dr. McGarrahan, who communicated effectively and used minimal technical jargon while testifying to the same or similar topics. [*See* Moore's suppl. affidavit at 5; Dr. Price's affidavit at 2-4; RR 44: 118-63.]

**1429**

27. The *substance* of the testimony from Dr. McGarrahan and other witnesses developed the important facts of Applicant's life and life events and gave the jury a sufficiently complete understanding of Applicant's life history. [*See* Moore's suppl. affidavit at 6.]

28. Trial counsel presented the necessary facts and developed the expert testimony necessary to present Applicant's mitigation case to the jury without retaining Smith and calling her to testify at trial. [Moore's affidavit at 11.]

29. Trial counsel exercised sound trial strategy based on a thorough investigation in determining what witnesses to call at trial and how to best present Applicant's mitigation case to the jury.

30. Trial counsel exercised their prerogative to rely on lay witnesses and Dr. McGarrahan rather than a "social history expert witness" such as social worker Smith.

31. Even if a "social history expert witness" such as social worker Smith could have helped the jury to understand how Applicant's life events impacted him, Moore's extensive experience has taught him that jurors often ascribe relatively little importance to opinion testimony of the type contained in Smith's affidavits. [Moore's supplemental affidavit at 5.]

32. Smith's habeas affidavit provides a lengthy recitation of Applicant's life history taken from lay-witness testimony at trial, lay-witness affidavits obtained by Applicant's habeas counsel, records pertaining to Applicant, and Smith's five-hour interview with Applicant at the Polunsky Unit. [Applicant's Exhibit 2.] However, Smith offers no explanation of how her opinions and proposed testimony might have been different had she been limited to the testimony available to trial counsel at the time of Applicant's trial. [*Id.*]

33. Applicant offers no explanation how Dr. McGarrahan's evaluation of Applicant and the subject matter of her testimony were deficient or why testimony from a social worker such as Smith would have been more persuasive to the jury. [*See* Application at 47-62.]

**1430**

34. Smith's explanation of Applicant's actions surrounding the murder of his family members would not have been more valuable, persuasive, or credible to the jury than the trial testimony of Dr. McGarrahan and the lay witnesses. [Moore's suppl. affidavit at 5.]

35. Smith's affidavit contains no meaningful facts or any necessary expert opinions that trial counsel did not cover in the mitigation presentation at trial [Moore's affidavit at 11; Moore's suppl. affidavit at 5] or that would have persuaded the jury to answer the mitigation special issue differently.

36. Applicant's trial counsel acted reasonably in relying on Dr. McGarrahan to relate the relevant social-history issues to the jury. [Dr. Price's affidavit at 4.]

37. Applicant simply criticizes the manner in which his experienced trial counsel presented his life history rather than alleging an outright failure to present such facts. [Moore's suppl. affidavit at 5.]

38. Applicant's jury could evaluate the testimony provided by lay witnesses and Dr. McGarrahan and could determine without hearing from a "social history expert witness" such as Smith whether any of the trial testimony justified a "yes" answer to the mitigation special issue.

39. The information contained in Smith's habeas affidavit would not have made Applicant's mitigating evidence more compelling, understandable, or different; it would not have tipped the scales against the powerful aggravating facts presented by the State or changed Applicant's sentence. [Moore's affidavit at 6.]

40. The failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith did not result from an inadequate investigation or inadequate preparation of Applicant's mitigation case.

41. It is not reasonable to believe that the proposed testimony contained in the habeas affidavit of social worker Smith, when considered together with the remaining relevant evidence contained in the record, would have diminished the powerful impact of the aggravating evidence and persuaded the jury to answer the mitigation special issue differently.

**1431**

42. Applicant incorrectly seeks to have this Court overlook the mitigation facts and themes actually investigated and presented by his trial counsel and to second-guess counsel for not calling a different witness who may have presented the evidence differently. [Supplemental Response To State's Answer at 9-13; Moore's suppl. affidavit at 5.]

43. Applicant's allegation of prejudice is conclusory.

44. Applicant's claim for relief second-guesses in hindsight the strategic decisions of his trial counsel about what witnesses to call and about how to best present Applicant's mitigation case to the jury.

## Conclusions Of Law

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of

**1432**

counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.   An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.   An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.   Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.   Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than a social worker such as Smith to testify about Applicant's life and its effects on him is not alone a basis to support a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been called to testify. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

8.   Applicant's trial counsel were not ineffective for failing to present largely cumulative testimony such as that contained in Smith's habeas affidavit. *See Coble*, 496 F.3d at 436 (decision not to present cumulative testimony does

**1433**

not constitute ineffective assistance); *Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

9. The strategic decisions made by Applicant's trial counsel based on a thorough investigation about what witnesses to call to testify and how to best present Applicant's mitigation case were matters of trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427.

10. Applicant's trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present Applicant's case at the punishment phase of his trial. *See Miller*, 810 F.2d at 1410 ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander*, 775 F.2d at 602).

11. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located a different expert who could have testified to the same or similar subject matter does not support Applicant's claim of ineffective assistance.

12. Applicant's jury did not require the assistance of a social worker such as Smith in order to evaluate the testimony presented by Applicant's lay and expert witnesses and to determine the appropriate answer to the mitigation special issue. *See Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (jury did not need expert testimony to understand "humanizing" evidence; jury "could use its common sense or own sense of mercy").

13. Applicant's complaint constitutes an impermissible second-guessing of the manner in which his experienced trial counsel chose to present mitigation evidence at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 389 S.W.3d at 633-34 ("Both prongs

**1434**

of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

14. Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting mitigating evidence at trial fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's allegations are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

15. Applicant's conclusory allegations of prejudice fail to meet his burden to establish by a preponderance of the evidence a reasonable probability that the jury would have answered the mitigation special issue differently had counsel called a "social history expert witness" such as Smith to testify. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

16. There is no reasonable probability that, but for the failure of Applicant's trial counsel to retain and present testimony from a "social history expert witness" such as Smith, the jury would have answered the mitigation special issue "yes" instead of "no." The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. The record does not affirmatively demonstrate Applicant's claims, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

17. The Court recommends that Applicant's fourth claim for relief be denied.

**1435**

## D.   Claim for Relief Five

Applicant alleges that his trial counsel were ineffective for failing to present testimony from relevant lay witnesses that was necessary for the jury to properly weigh whether Applicant deserved a life sentence.   [Application at 62-63.] Specifically, Applicant contends that counsel failed to uncover significant areas of mitigating evidence, present witnesses from throughout his life, and discover that lay witnesses whom they called to testify had more information to provide about Applicant's life. [*Id.*]

### Findings Of Fact

1.   Based on his education and experience, Moore is aware of the need to provide a compelling mitigation case in a death-penalty trial.   [Moore's affidavit at 10.]

2.   Cummings has attended more than two dozen professional continuing legal education seminars since 2002 that are specific to death-penalty litigation, and half of those seminars were specific to identifying and presenting mitigating evidence at trial. [Cummings' affidavit at 6.]

3.   Based on the wantonness and severity of Applicant's crime, trial counsel needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel concentrated their efforts in those areas they felt would be most productive.   [Moore's suppl. affidavit at 7-8.]

4.   Applicant's defense team performed a complete mitigation investigation into every aspect of Applicant's life, which included gathering records and evidence, interviewing Applicant, and identifying and interviewing potential witnesses. [Moore's affidavit at 7, 10; Cummings' affidavit at 6-7.]

**1436**

5.      Trial counsel investigated Applicant's background and upbringing as fully as possible to determine how those factors may have influenced Applicant's behavior in the commission of the murders. [Moore's affidavit at 7.]

6.      Applicant's trial counsel conducted a thorough investigation during which they spent "countless hours" seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers, and others) who had known Applicant throughout his life in order to develop a complete history before the jury. [*See* Moore's suppl. affidavit at 5.] The defense team interviewed dozens of potential witnesses and tried to locate anyone who might conceivably be important to the mitigation presentation at trial in an effort to put together the best mitigation case possible. [Moore's affidavit at 10; Cummings' affidavit at 6.]

7.      Many people whom the defense team contacted either refused to talk, refused to testify on Applicant's behalf, or indicated that they would ask the jury to sentence Applicant to death if they testified. [Moore's suppl. affidavit at 5.] Still others whom the defense team contacted had damaging information about Applicant's character and background, and counsel chose not to call them at trial in order to avoid the possibility that such information would come out during the State's cross-examination. [*Id.*]

8.      The defense team identified and interviewed every potential witness it could locate. [Cummings' affidavit at 6.]

9.      The defense team conducted its investigation in Texas, South Carolina, and California. [Cummings' affidavit at 7-8; Moore's affidavit at 16-17.]

10.      The defense team never stopped its investigation of Applicant's life history, even through the trial. [Moore's affidavit at 10.]

11.      Applicant provided little assistance in leading the defense team to individuals who would be willing to testify on his behalf. [Moore's affidavit at 14; Cummings' affidavit at 8.]

12.      The defense team's investigation was hampered by "an almost universal lack of cooperation from the vast majority of people" whom they contacted. [Moore's affidavit at 14.]

**1437**

13.    Members of Applicant's defense team met resistance and threats in their efforts to locate and talk to potential witnesses. [Moore's affidavit at 14-15; Cummings' affidavit at 6-7.]

14.    Trial counsel presented all of the witnesses whom they were able to locate and convince to testify, whom they thought could provide admissible relevant mitigation evidence about Applicant, and who were necessary to develop the facts of Applicant's life history and the mitigation theme. [Moore's affidavit at 10, 16; Cummings' affidavit at 6, 8.]

15.    Trial counsel compelled some uncooperative witnesses to testify at Applicant's trial, including Applicant's sister Neata. [Moore's affidavit at 13; Cummings' affidavit at 6-7; *see* RR 43: 234, 256.]

16.    Trial counsel called a number of lay and expert witnesses to testify at the punishment phase of Applicant's trial:  Haila Scoggins, who taught Applicant during his four years in high school; Tommy Stribble, who sponsored and explained Applicant's permanent school records spanning from elementary school through high school; Mark Pack, who was Applicant's childhood friend; Christy Pack, who is Mark Pack's wife; Linda Pack, who was Jackie's best friend for about ten years and spent time with her family at the Hummel's farm; Parris, who was Applicant's friend and spent time at the Hummel home; Stephanie Bennett, who dated Applicant during his senior year in high school; Letti Hubertz, who began a relationship with Applicant in California while he was in the Marines and moved with him to South Carolina following his discharge from the military; Applicant's older sister Neata; Dr. McGarrahan, a forensic psychologist and neuropsychologist; and AuBuchon, the defense's prison classification expert

17.    The lay witnesses called to testify by Applicant's trial counsel presented evidence about a variety of matters including Applicant's childhood, family life, school years, work history, medical history, and military service.

    a.    Applicant was born to Jackie and John Hummel, Sr., at Arlington Memorial Hospital when the Hummels lived in Grand Prairie, Texas. [RR 43: 209.]  Neata, Applicant's only sibling, was nine and a half years older than Applicant. [RR 43: 208.]

**1438**

b.     From the time Applicant was born, Jackie placed full responsibility for Applicant's care on young Neata and often left the children home alone. [RR 43: 210-11, 215-16.]

c.     Applicant's family moved to South Carolina when Applicant was three years old, and five years later the family moved to a small cinder-block house that was set far off the road on a 400-acre farm in Jonesville, South Carolina, where they lived a "cloistered existence." [RR 43: 105-06, 113, 125, 160, 208-10.]

d.     When Parris visited the farm where the Hummel family lived, he and Applicant would fish, play video games, play outside in the hay, and "just do boys stuff." [RR 43: 155, 164.]

e.     Applicant's parents controlled who Applicant and Neata could have as friends and did not allow Applicant and Neata to visit other people's houses, with the exception of going to the house of Jackie's best friend Linda Pack to play with the Pack children. [RR 43: 160, 219-20, 250.]

f.     When the Pack family ate lunch at the Hummel home almost every Sunday after church for a number of years, Applicant would keep to himself and play video games in his or Neata's bedroom. [RR 43: 105, 109, 123-24, 126, 129, 135-37.]

g.     Jackie was very generous and extravagant with the Pack children, but not at all with Applicant and Neata. [RR 43: 110-11, 127, 134, 140-41, 229-30.]

h.     Applicant's parents were very strict; they never showed Applicant and Neata any affection; and they did not hug, kiss, or hold the children. [RR 43: 111, 211-21, 249-50.]

i.     Applicant and Neata were expected to respond quickly when their parents told them to do something, they did not talk back to their parents, and they were often disciplined with a belt if they did not do as they were told. [RR 43: 119, 128, 139-40, 213-14, 218, 250.] Neata felt that her parents were abusive toward her and Applicant. [RR 43: 221.]

42

**1439**

j.    Mark Pack witnessed John Sr. throw a twelve- or thirteen-year-old Applicant off of a tractor when Applicant drove the tractor too close to a cow. [RR 43: 111-12.] Parris witnessed John Sr. hit Applicant on two occasions: (1) he hit Applicant with a belt eight or more times on the back, front, head, and shoulders as punishment for turning a bull loose; and (2) he hit Applicant four or five times on the back with a broom handle when Applicant was accused of kicking a cat. [RR 43: 152-54.]

k.    When Neata was seventeen years old, she saw another woman performing oral sex on her father; Applicant was asleep in the room with Neata. [RR 43: 252.] When Parris' mother would walk through the kitchen at the Hummel home, John Sr. would "smack her on the butt and that type of deal." [RR 43: 155.]

l.    Applicant was a quiet, pleasant, cooperative, and responsible high school student who had no problems with other students, although he did not interact much with them. [RR 43: 60-61.] He graduated with a cumulative GPA of 2.515 and ranked twentieth in a senior class of forty-five students, but he was considered a special-education student because of his learning disability related to spelling and grammar. [RR 43: 68-70, 91.] Trial counsel introduced evidence regarding Applicant's permanent school records spanning from elementary school through high school. [*See generally* RR 43: 75-94.] Applicant's parents did not seem interested in Applicant's education. [RR 43: 55-56.]

m.    Applicant participated in a graphic art club in ninth and tenth grades and in ROTC in eleventh grade; as a senior, Applicant came in second place in an art contest for a logo he designed for Project Hope. [RR 43: 92-93.]

n.    The Hummels' wood-burning stove caused Applicant to smell like bacon, and Applicant did not like that his classmates nicknamed him "Bacon" as a result. [RR 43: 156, 223.]

o.    Applicant's friends thought Applicant was "stupid." [RR 43: 119-20, 159, 161.]

43

**1440**

p.   Applicant played video games and Dungeons and Dragons. [RR 43: 65.]

q.   Applicant dated Bennett for about a year during his senior year of high school, but she broke up with him because he wanted to marry her after high school and she was not ready for that type of relationship. [RR 43: 172-76, 182.] Applicant cried and was hurt when Bennett broke up with him. [RR 43: 177.] Bennett remembered Applicant as a nice guy who treated her appropriately and who knew how to act around women; she saw nothing to suggest that Applicant would be capable of killing four people. [RR 43: 174, 178, 180-81, 183.]

r.   Applicant moved into an apartment with a friend when he was nineteen or twenty years old. [RR 43: 225.]

s.   Applicant joined the Marines on his twenty-second birthday and went to boot camp the same day. [RR 43: 225.]

t.   In 2002, near the end of Applicant's service in the Marines, Applicant began a six-month romantic relationship with Hubertz, who was pregnant with another man's child, and they moved together to South Carolina in May 2002 when Applicant was discharged from the Marines. [RR 43: 187-89, 199, 225.] Applicant worked and had a home life with Hubertz, Applicant gave Hubertz's son his last name, and Hubertz did not know Applicant to frequent bars or strip clubs or to use drugs. [RR 43: 191-94, 199, 203-04, 226.] Applicant treated Hubertz with respect and was never abusive. [RR 43: 192-93.] A few weeks after Hubertz's son was born, Applicant agreed for his sister to send Hubertz and her newborn son on a bus back to California. [RR 43: 195-97, 227-28.]

u.   Applicant was more self-assured and had more self-esteem when he returned to South Carolina after serving in the military. [RR 43: 157, 166.]

v.   When Applicant went to strip clubs after returning from the military, Applicant would get too attached to the dancers, and, if someone showed Applicant any interest, "all of a sudden he was in love." [RR 43: 157-59.]

**1441**

w.   Applicant moved to Texas, where he met Joy. [RR 43: 228.]

x.   Neata did not think that Applicant and Joy seemed like a happy loving couple, but Applicant acted "[w]onderful" toward Jodi. [RR 43: 253.]

y.   Applicant had colitis and underwent surgery to remove part of his intestines, resulting in Applicant having a colostomy bag for about a year afterward. [RR 43: 230.] Applicant was unemployed during the time that he had medical problems, and Joy would nag Applicant about not having enough money for food. [RR 43: 230-33.]

z.   Witnesses testified that they had never seen Applicant become violent with anyone. [RR 43: 113-14, 166, 178, 232.] When Applicant became frustrated or mad, he "[j]ust ball[ed] up, like he was holding everything in," turned "beet red," and clinched up. [RR 43: 114; *see* RR 43: 232.]

18.  Dr. McGarrahan testified about how Applicant's mental health and life history affected the person he became and related to the murders of his family members.

a.   Applicant has a learning disability in the area of spelling. [RR 44: 125.]

b.   Applicant has a full-scale IQ score of 109, which falls in the average to almost high-average range. [RR 44: 125-26.]

c.   Applicant does not suffer from a severe mental disorder or primary psychiatric condition, although he showed mild depression and anxiety. [RR 44: 126, 145.]

d.   Applicant has traits of several personality disorders, *i.e.*, narcissism, antisocial, schizoid, and borderline. [RR 44: 126-27.] A personality disorder is a longstanding enduring maladaptive way of interacting with the world which often causes an individual to have a great deal of impairment in the ability to interact with the world. [RR 44: 127.] Personality disorders affect how a person thinks, feels, and behaves in his ability to control his impulses. [RR 44: 127.]

45

**1442**

e.   Narcissists are often demanding and need attention, affection, and admiration. [RR 44: 128.] They have very high thoughts of themselves and often lack empathy. [RR 44: 129.] Their outward self-esteem is often developed as a way to defend against feelings of very low self-esteem due to failure and lack of accomplishments in life. [RR 44: 129.] Sometimes they exploit or step on others to get what they need in life. [RR 44: 129.]

f.   Applicant meets the adult criteria for antisocial personality disorder, which is someone who has difficulty conforming to societal standards. [RR 44: 130-31.] Persons with adult antisocial personality disorder are irresponsible in many areas of their lives, they are often underachievers, they can be deceitful and manipulative, and they are impulsive. [RR 44: 130.]

g.   Persons with schizoid personality disorder have a long-standing pattern of detachment in their relationships with others. [RR 44: 131.] They often appear "flat," *i.e.*, there is not emotional expression on their faces, and they may not express much emotion over time. [RR 44: 131.] Other than close family members, they are essentially unable to form attachments with others. [RR 44: 132.]

h.   Individuals with a diagnosis of borderline personality disorder often lack direction about their plan for life and what their goals are going to be. [RR 44: 132.] They chronically feel empty inside, so they are always searching for something that they are unable to fill. [RR 44: 132.]

i.   Development of a personality disorder is out of a person's control; it develops over time as a result of experiences with the world and biological makeup. [RR 44: 128.]

j.   Dr. McGarrahan absolutely believed that the environment in which Applicant was raised was a major contributing factor to his personality makeup as an adult. [RR 44: 133, 135.] Applicant's mother came from an emotionally neglectful home herself, and she did not develop the skills or ability to show affection, attention, or nurturing. [RR 44: 135.] Applicant's mother's caregiving was inconsistent, and there was emotional and psychological neglect of Applicant and Neata. [RR 44: 133-34.] The caregiving duties were

**1443**

given to young Neata. [RR 44: 135.] Applicant's mother did not play with Applicant and Neata, put them on her lap, hug them, tell them she loved them, or give them affection. [RR 44: 133, 135.]

k.   The internal emotions that people experience do not develop if critical periods are missed early in life. [RR 44: 136.] Learning to appropriately express emotions comes along with early development from watching others model it and having the opportunity to express emotions. [RR 44: 136.] However, emotions were not allowed to be expressed in the Hummel home; Applicant's emotions were controlled by his mother. [RR 44: 136-37.] Applicant feels emotions, but he is unable to express them. [RR 44: 136.]

l.   Dr. McGarrahan opined that Applicant repressed his emotions for over thirty years, that he did not know how to express his emotions appropriately, and that the repressed emotions came out in a flood of emotional rage at the time of the murders. [RR 44: 138.] Applicant was not doing much thinking; he was operating on pure emotion at the time. [RR 44: 138-39.]

m.   In Applicant's San Diego confession, Applicant appeared to be very blunt, unaffected, and unfeeling because after committing the murders his flood of emotion was out and he was back to having difficulty showing what he was feeling and experiencing. [RR 44: 140.]

n.   There is a hereditary component to Applicant's personality, which is supported by the fact that Applicant's mother and sister exhibit the same types of personality issues. [RR 44: 140.] Applicant, his mother, and his sister all have a very difficult time expressing their emotions, and they all come across as cold and unfeeling at times. [RR 44: 140-41.]

o.   Applicant could not express a good reason why he committed the murders of his family members other than that he had been thinking about wrongs done to him dating back to fourth grade that most people would have long forgotten. [RR 44: 141.] "And all of the wrongs done to him from elementary school through junior high, high school into the military, his acquaintances who made fun of him, the stressors he was dealing with at home, all built up and came out in an explosive rage." [RR 44: 141.]

**1444**

p.  Applicant stated that Joy and Eddie criticized and nagged him about his lack of a job at times, his inability to do things around the house, and his medical problems. [RR 44: 142.]

q.  Applicant told Dr. McGarrahan that, in the months leading up to the offense, he rapidly fell in love with Freeze and that being single more and more attractive so that he might pursue a life with her even though he intellectually knew that Freeze did not feel the same way about him. [RR 44: 142.] With Applicant's personality makeup, any affection or attention became emotional for him or became what Applicant thought was emotional. [RR 44: 143.] This was evident in Applicant's history that, if a woman showed him some attention, even if it was a stripper or a casual acquaintance, it quickly developed into what Applicant thought love was supposed to be in a relationship with a man and a woman. [RR 44: 143-44.] Applicant was looking for a loving relationship, but he did not know how to go about getting it. [RR 44: 144.]

r.  One important thing in Applicant's personality is his inability to form and maintain close relationships, including with close relatives such as his mother and sister. [RR 44: 144.]

s.  The issues regarding Applicant's personality, the genesis of which was his childhood, played a big role in his commission of the murders. [RR 44: 145.] As a result of repressing his emotions, in the weeks leading up to the offense, Applicant was fixating on conduct dating back to grade school because he was not allowed to deal with his emotions at the time. [RR 44: 145.] A lifetime of Applicant repressing his emotions led to this event. [RR 44: 158.]

t.  Applicant told Dr. McGarrahan that he loved his daughter, and he could not explain why he murdered her. [RR 44: 158.]

u.  Applicant did not decide to have personality issues; these issues were visited upon him by heredity and his environment. [RR 44: 159.]

v.  Based on Applicant's jail and military records, Applicant has done fairly well in structured environments. [RR 44: 159.] Although Applicant had a time when he left his military post without

**1445**



permission, he also received several commendations for his military service and was honorably discharged from the service. [RR 44: 160.]

19. Testimony from other witnesses at the guilt-innocence and punishment phases of the trial shed further light on Applicant's life history.

    a.    Applicant and Joy married in a very small wedding while Joy was pregnant with Jodi. [RR 44: 8.]

    b.    Applicant and Joy faced financial hardships every month, and Joy's friends helped out the couple from time to time. [RR 40: 17-18; RR 44: 9.]

    c.    Applicant could not work for several years because of a hurt back and because of his Crohn's disease. [RR 44: 9, 16.] Applicant had surgeries, and he had a colostomy bag for a period of time. [RR 44: 16.]

    d.    Applicant and Joy continued to struggle financially even after Applicant got his job as a security guard. [RR 44: 16.]

    e.    Christopher Paris, a State's witness, testified that he knew Applicant from church, that he and his wife were in a Sunday school class with Applicant and Joy, that the two couples gathered "on occasion" for events outside church, that he had been to the Hummel home two or three times, and that he knew the Hummels to be a close family unit. [RR 36: 58, 87.]

    f.    When the Hummel family's vehicle was totaled, the Sunday school class pulled together to fund the down payment on a minivan, and Paris took Joy to buy the vehicle. [RR 36: 59.]

    g.    Paris visited Applicant in the Tarrant County Jail for a while, and he occasionally brought Applicant's mother to the jail to visit Applicant. [RR 36: 89.]

    h.    In the Marines, Applicant was an intelligence clerk with a security clearance. [RR 45: 18-19, 29.]

**1446**

i.      Lieutenant Colonel Michael Dougherty described Applicant as a "pretty average, marginally effective" Marine. [RR 45: 11, 20.]

j.      Dougherty found Applicant to be fairly good-natured and happy-go-lucky; if Applicant became frustrated or angry, he became silent and his face muscles tensed. [RR 45: 13.]

k.      Although Applicant received a number of military commendations and awards, all but one (a basic rifleman's badge from boot camp) were given to the unit as a whole. [RR 45: 16-17, 27.]

l.      Applicant never earned a good-conduct medal, which would have required him to complete three uninterrupted years of service with no nonjudicial punishments. [RR 45: 15.]

m.      During Applicant's military service, Applicant and Buddy Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Dougherty thought would lead them down the wrong path. [RR 45: 12, 23.] Dougherty counseled both Applicant and Matthias on the matter. [RR 45: 12.]

n.      Applicant had several entries in his military records for failing to maintain his weight and pass the physical fitness test. [RR 45: 30, 34-35.]

o.      Captain Sergio Santos testified that Applicant was not a very impressive Marine at all. [RR 45: 34.]

p.      In May 2000, Applicant went AWOL from his post for a period under twenty hours and had his pay docked for a month as a result. [RR 45: 35, 44, 46.]

q.      Santos revoked Applicant's security clearance because he found Applicant to be untrustworthy. [RR 45: 36.]

r.      The paperwork to revoke Applicant's security clearance states that Applicant lied to his seniors on numerous occasions and that his integrity was questionable. [RR 45: 38, 45.]

**1447**

s.  Applicant was a lance corporal when he was honorably discharged from the Marines. [RR 45: 43-44.]

20.  Moore talked to Applicant's maternal uncle Thomas Hamilton during the pretrial investigation and made a strategic decision that it was not in Applicant's best interest to call Hamilton to testify because Hamilton did not support the allegations of abuse made by Neata and other witnesses, he was very defensive of his sister Jackie, and his testimony was inconsistent with that of other witnesses. [Moore's affidavit at 15.]

21.  Cummings talked to George Goodson, a former neighbor of Applicant and Joy, during the investigation of Applicant's case; however, Goodson did not want to testify at Applicant's trial, and counsel ultimately made a strategic decision that it was not in Applicant's best interest to call Goodson as a witness. [Moore's affidavit at 15.]

22.  The failure to locate Brian Jeter, Joseph Patterson, Chad Brown, and Shana Fowler as mitigation witnesses did not result from an inadequate investigation into Applicant's life history, and Applicant has not shown otherwise.

23.  The defense team obtained Lance Dupre's name and exhausted every lead it had in trying to contact him in person or by telephone, but he never contacted the defense. [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts made to locate and interview Dupre were in any manner deficient or unreasonable. [*See* Application at 66-67.]

24.  The defense team did not locate Paris before trial even though it "aggressively tried to do so." [Moore's affidavit at 16.] Applicant offers no explanation of how the investigative efforts to locate Paris were in any manner deficient or unreasonable. [*See* Application at 69-70.]

25.  Paris' trial testimony covered many facts which were the same as or similar to those matters contained in his habeas affidavit. [*Compare* RR 36: 58-59, 87, 89 *with* Applicant's Exhibit 16.]

26.  Although Paris's habeas affidavit discusses the extent of his relationship with the Hummels and his knowledge of problems in their marriage, he testified at trial that the couples got together "on occasion" outside church

**1448**

for an event and that he viewed the Hummels as a happy family unit. [RR 36: 58, 87.]

27. The defense team's private investigator interviewed all of Applicant's neighbors, but none provided helpful testimony or wished to testify on Applicant's behalf. [Moore's affidavit at 15.]

28. The defense team contacted those individuals whom Applicant identified as his "friends" at work; however, they denied the existence of any such friendship and indicated that they knew very little of Applicant, that they did not really care for Applicant, and that they did not want to testify. [Moore's affidavit at 15.]

29. The defense team contacted people from the Hummels' church and subpoenaed the minister to testify; however, the minister later determined that Applicant deserved the death penalty, and he was unwilling to help Applicant at his trial. [Moore's affidavit at 15-16.]

30. Trial counsel investigated the suspicions of Dr. McGarrahan, other defense-team members, and friends of the Hummel family that Applicant and/or Neata were sexually abused by their parents or another adult close to the family. [Moore's affidavit at 11-12, 14.]

   a. Applicant, Neata, and Jackie each adamantly denied that any type of sexual abuse ever occurred, and none of the other individuals who were interviewed could provide any proof that sexual or physical abuse had occurred other than what was testified to at trial. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

   b. Applicant told members of the defense team that his home life, upbringing, and family life were very positive; he denied witnessing or experiencing any abuse growing up; and he adamantly denied even those things which others told the defense team they had witnessed. [Moore's affidavit at 12, 14; Cummings' affidavit at 8.]

   c. Neata would only admit to that abuse about which she ultimately testified, and she repeatedly denied that anything further or more severe had taken place. [Moore's affidavit at 12.]

52

**1449**

    d.    Jackie denied any abuse in the home, although she acknowledged that she and Applicant's father were not demonstrative in their affection for Applicant and Neata. [Moore's affidavit at 12.]

    e.    Applicant's contention that trial counsel narrowly focused their mitigation investigation on suspicions that Applicant was sexually abused and that counsel failed to rigorously pursue other avenues of mitigation evidence is  untrue and unsupported by the record. [Moore's affidavit at 11; Cummings' affidavit at 7; see Application at 62, 64.]

    f.    No one informed any defense-team member that Neata said in the hallway during trial that her father had sexually abused her or that she had sexually abused Applicant.  [Moore's affidavit at 12; *see* Application at 64 n.2 (citing Applicant's Exhibit 18).]  Based on Moore's knowledge of and contact with Parris, Moore "simply do[es] not believe" that such an event occurred. [Moore's suppl. affidavit at 13.]

    g.    Because Neata denied that sexual abuse had occurred, Applicant's trial counsel had no good-faith basis to engage in the line of questioning suggested by Applicant, and counsel cannot be considered deficient for asking such questions under the circumstances. [Moore's suppl. affidavit at 12.]

31.    During the investigation, Applicant's trial counsel did not overlook the *potential* value of Applicant's military service.  Applicant's trial counsel obtained Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.]  Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 166, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's supplemental affidavit at 8.]

**1450**

32.   By Applicant's own accounts, his military service was not something that would be particularly fruitful to his mitigation case, and Moore knew about problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

33.   Applicant has not provided an affidavit signed by Christopher Boling; therefore, all references to statements allegedly made by Boling to a third party are stricken and given no consideration.

34.   Applicant provided Matthias' name to the defense team's mitigation specialist, but the team was unable to locate him. [Moore's suppl. affidavit at 7.]

35.   Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf, but Applicant never provided the names of Emmer, Chaidez, or Boling, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17; Moore's suppl. affidavit at 7.]

36.   The failure to locate Matthias, Emmer, Chaidez, and Boling did not result from an inadequate investigation into Applicant's life history for purposes of developing a mitigation case.

37.   Trial counsel made a strategic decision to attempt to minimize the negative aspects of Applicant's military service. [Moore's affidavit at 17.] The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez would not have made Applicant's military service more compelling or mitigating, and the evidence would have provided both positive and negative information about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.] The affidavits of Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation while in the military service, but "they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending 'strip clubs.'" [Moore's suppl. affidavit at 8.]

38.   Applicant's military career as described in the habeas affidavits of Chaidez, Emmer, and Matthias is not the type of military service that, when combined with other mitigating evidence introduced at Applicant's trial, would have tipped the scales against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony

**1451**

of Applicant's commanding officers about Applicant's military service during the State's rebuttal case.

39. Many facts that Applicant faults his trial counsel for not asking Bennett, Scoggins, and Christy Pack during their trial testimony were elicited from either these or other witnesses at Applicant's trial.

40. Any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial is not so compelling or of such significance that trial counsel can be deemed deficient for not discovering it and/or inquiring about it at trial, especially in light of the thorough investigation conducted by trial counsel and the totality of the evidence presented at trial.

41. There is no reason to believe that any evidence contained in the habeas affidavits of Bennett, Scoggins, and Christy Pack that Applicant's trial counsel did not ask about at trial would have changed the outcome of the punishment phase of Applicant's trial.

42. Applicant's trial counsel had a qualified mitigation specialist and private investigator appointed early in the case; sought funds for and hired a forensic psychologist and neuropsychologist who explained at trial how Applicant's life history contributed to his commission of the charged offense; traveled to South Carolina to seek out and interview Applicant's family and friends and to investigate his background; sought to discover witnesses from Applicant's family, friends, church, employment, and neighborhood; took all actions necessary to secure the presence of potentially beneficial witnesses at Applicant's trial; were prepared to cross-examine the State's witnesses; presented a strategically developed cohesive mitigation theme based on the witnesses available at the time of Applicant's trial; and urged the jury during final arguments to answer the special issues in a way that would require a sentence of life rather than death.

43. Applicant's trial counsel complied with prevailing professional norms in making strategic decisions, in presenting the testimony of the available beneficial witnesses, and in constructing a cohesive mitigation theme through lay and expert witnesses.

44. Trial counsel exercised their prerogative in deciding what witnesses to call to testify and what questions to ask them.

**1452**

45. Applicant's claim that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented is unpersuasive second-guessing in hindsight.

46. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

47. There is considerable overlap between the information that Applicant claims his trial counsel should have discovered and presented via the lay witnesses and the facts and themes trial counsel actually developed at trial. [Moore's affidavit at 16.]

48. To the extent that any of the evidence or proposed testimony provided by Applicant is not cumulative, there is no reason to believe that such evidence would have been considered so powerful, compelling, or significant by the jury that it would have changed Applicant's sentence.

49. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls far short of the type that courts have found to support a finding of prejudice.

50. Applicant's crime was premeditated, cold-blooded, and heinous; the aggravating facts at trial were severe.

51. The jury was well aware through lay and expert testimony of neglect, abuse, attachment issues, and family stresses in Applicant's life before and at the time of the murders and their potential effect on Applicant's decision to murder his family.

## Conclusions Of Law

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

**1453**

2.   To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.   He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.   An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852.   A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694.   An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.   "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.   In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

5.   Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533.   "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

**1454**

6.    In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

7.    Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

8.    Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

9.    An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

10.   An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

11.   Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

12.   The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427. The decisions of Applicant's trial counsel to call certain witnesses and not to call others who were uncooperative or would not

**1455**

benefit Applicant's case were the result of an extensive investigation and strategic reasoning about the best way to present Applicant's case.

13. Trial counsel thoroughly investigated Applicant's background for mitigation purposes and called all of the available witnesses who could provide relevant, beneficial evidence. The actions of trial counsel fall within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Moore v. Johnson*, 194 F.3d 586, 591-92 (5th Cir. 1999).

14. To obtain relief on an ineffective-assistance claim based on an uncalled witness, an applicant must show that the witness was available to testify and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). Applicant's trial counsel cannot be deemed ineffective for failing to call family members, neighbors, church members, coworkers, and others who did not want to testify or whose testimony would not have benefitted Applicant's mitigation case. Likewise, Applicant's trial counsel cannot be faulted for failing to call witnesses whom they made reasonable efforts to locate and interview without success.

15. Applicant's trial counsel fulfilled their duty to conduct a reasonable and thorough investigation of Applicant's life history as part of the mitigation investigation, even in the face of dealing with threats, uncooperative witnesses, and witnesses whose testimony would have damaged Applicant's case.

16. Under the circumstances at the time of Applicant's trial, Dupre was not a witness who was available to the defense. *See Ex parte White*, 160 S.W.3d at 52 (to obtain relief on ineffective-assistance claim based on uncalled witness, applicant must show witness was available to testify and applicant would have benefitted from witness' testimony).

17. Applicant's trial counsel were not deficient for failing to present largely cumulative testimony. *See Coble*, 496 F.3d at 436 (failure to present cumulative testimony does not constitute ineffective assistance).

18. No prejudice results from the failure to present cumulative mitigation evidence. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (no prejudice in failing to present cumulative mitigation evidence; to establish prejudice, new evidence presented in habeas proceeding must differ in

**1456**

substantial way in strength and subject matter from evidence actually presented at sentencing).

19. "The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance." *Scheanette*, 144 S.W.3d at 510. The fact that habeas counsel has located witnesses who were not found during a thorough investigation or has presented evidence that could have been asked of witnesses who did testify does not support Applicant's claim of ineffective assistance.

20. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); *Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance).

21. The basis of Applicant's current claim – essentially that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – is rejected as unpersuasive. *See Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) (courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees'" involving questions of whether counsel investigated enough or presented enough mitigating evidence; "[t]hose questions are even less susceptible to judicial second-guessing"); *Dowthitt v. State*, 230 F.3d 733, 743 (5th Cir. 2000) (same).

22. Applicant's complaints constitute an impermissible second-guessing of the manner in which his experienced trial counsel chose to present Applicant's mitigation case at trial. Such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

**1457**

23. Counsel acted well within prevailing professional norms, and Applicant has failed to meet his burden to prove by a preponderance of the evidence that the performance of his trial counsel in investigating and presenting Applicant's life history to develop the mitigation case fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's complaints are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

24. The additional allegedly mitigating lay-witness evidence proffered by Applicant falls short of the type that courts have found to support a finding of prejudice. *See, e.g.*, *Rompilla*, 545 U.S. at 392-93; *Wiggins*, 539 U.S. at 516-17; *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000).

25. Given the largely cumulative nature of the evidence that Applicant alleges his trial counsel should have presented, Applicant has not met his burden to establish a reasonable probability that the jury would have answered the mitigation special issue differently had trial counsel discovered and called those witnesses to testify. *See Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Parker*, 565 F.2d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative).

26. Even when the powerful aggravating evidence is reweighed against the totality of the available mitigating evidence, there is no reasonable probability that, but for the failure of Applicant's trial counsel to present the testimony at issue, the jury would have answered the mitigation special issue differently. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

27. The Court recommends that Applicant's fifth claim for relief be denied.

**1458**

E.    **Claim for Relief Six**

Applicant alleges that his trial counsel were ineffective for failing to present

Applicant's military service as mitigation evidence. [Application at 73.]

**Findings Of Fact**

1.   Based on the wantonness and severity of Applicant's crime, Moore believed that he needed "something significantly compelling" in Applicant's background in order to save him from the death penalty, so trial counsel made a strategic decision to concentrate its mitigation efforts in those areas they felt would be most productive. [Moore's supplemental affidavit at 7-8.]

2.   Applicant has not submitted a signed affidavit from Christopher Boling; instead, he relies on statements Boling allegedly made to a third person.

3.   Applicant's trial counsel did not overlook the *potential* value of Applicant's military service to the mitigation presentation at trial. [Moore's affidavit at 17.]

4.   Applicant's trial counsel obtained copies of Applicant's military records and made the jury aware of Applicant's military service through lay and expert witnesses at trial. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

5.   Lay witnesses for the defense informed the jury that Applicant joined the Marines on his twenty-second birthday, served for about four years, was assigned as an intelligence analyst, and was more self-assured and had a higher self-esteem when he left the Marines. [RR 43: 161, 166, 225, 231.]

6.   The defense's expert witnesses testified that they reviewed Applicant's military records, that Applicant was honorably discharged from the Marines, that Applicant's military service showed his ability to do well in a structured environment, and that Applicant received several commendations for his military service. [RR 44: 70, 73, 159-60.]

7.   By Applicant's own accounts to members of the defense team, his military service was "lackluster," was not a positive experience, and was not something that would be particularly fruitful to his mitigation case, and

**1459**

Moore knew about the problems Applicant had in the military. [Moore's suppl. affidavit at 7-8.]

8.     Trial counsel made a strategic decision to attempt to avoid or minimize negative evidence related to Applicant's military career. [Moore's affidavit at 17; Moore's suppl. affidavit at 7-8.]

9.     Trial counsel tried during cross-examination of Applicant's former commanders in the State's rebuttal case to emphasize as much as possible the positive aspects of Applicant's military service, his commendations, and his honorable discharge. [RR 43: 161, 225, 231; RR 44: 70, 73, 159-60; Moore's affidavit at 17-18; Cummings' affidavit at 8; Moore's suppl. affidavit at 8.]

10.    Trial counsel knew about disciplinary action taken when Applicant went AWOL from his military post, and counsel made a strategic decision to try to avoid that issue to the degree possible during presentation of the defense witnesses. [Moore's affidavit at 17-18.]

11.    Moore asked Applicant about names and contact information for members of Applicant's military unit or for military friends who might be willing to testify on Applicant's behalf. [Moore's suppl. affidavit at 7; Moore's affidavit at 17.]

12.    Applicant never provided the names of Chaidez, Emmer, or Boling to trial counsel or other defense-team members, and the defense team's independent investigation of Applicant's background did not develop these names. [Moore's affidavit at 17.]

13.    Applicant provided Matthias' name to the defense team's mitigation specialist, but the defense team was not able to locate him. [Moore's suppl. affidavit at 7.]

14.    The failure of trial counsel to locate Matthias or to discover Emmer, Chaidez, and Boling was not the result of an inadequate investigation into Applicant's background and life history.

15.    The matters contained in the habeas affidavits of Matthias, Emmer, and Chaidez do not make Applicant's military service more compelling or mitigating, and such testimony would have provided both positive and

**1460**

negative information to the jury about Applicant's military service. [Moore's affidavit at 18; Moore's suppl. affidavit at 8.]

16.   Although the affidavits provided by Matthias, Emmer, and Chaidez offer some explanation of Applicant's difficulties with isolation and alienation during his military service, they also detail Applicant's shortcomings as a Marine, and his proclivity for drinking and attending strip clubs. [Moore's suppl. affidavit at 8.]

17.   Applicant's military service was not, as Applicant claims, a positive and "powerfully mitigating episode in [his] life."

   a.   Applicant was a "pretty average, marginally effective" Marine; he was not a very impressive Marine. [RR 45: 11, 34.]

   b.   All but one of Applicant's commendations and awards were given to his military unit as a whole. [RR 45: 27.]

   c.   Applicant and Matthias spent an inordinate amount of time in strip clubs and drinking, and they associated with people whom Dougherty thought would lead them down the wrong path. [RR 45: 12, 23.]

   d.   When Applicant was not interested in something, he needed maximum guidance or supervision to ensure its completion. [RR 45: 22-23.]

   e.   Applicant had several entries for failing to maintain his weight within the required standards and failing to pass the physical fitness test. [RR 45: 30, 34-35.]

   f.   Applicant went AWOL for under twenty hours because he was unhappy, and his pay was docked as a result. [RR 45: 35, 46.]

   g.   Santos revoked Applicant's security clearance because Applicant was untrustworthy and lied to his seniors. [RR 45: 36, 38-39, 45.]

18.   Regardless of how Applicant tries to portray his military service, the facts contained in the habeas affidavits of Matthias, Emmer, and Chaidez, as well as the testimony of Dougherty and Santos presented during the State's

**1461**

rebuttal case, rebut any assertion that the jury would have considered Applicant's military service to be particularly mitigating.

19. The punishment-phase evidence and arguments would not have been significantly different or more compelling had the evidence contained in the habeas affidavits of Chaidez, Matthias, and Emmer been introduced as evidence at the punishment phase of Applicant's trial.

20. There is no reasonable probability that the facts contained in the habeas affidavits of Chaidez, Matthias, and Emmer would have caused the totality of the mitigating circumstances to outweigh the overwhelming and compelling aggravating facts presented at Applicant's trial.

21. Applicant's military career, even as described in the habeas affidavits of Matthias, Emmer, and Chaidez is not the type of service that the jury would have considered  to be a particularly mitigating circumstance, especially when balanced against the powerful aggravating circumstances surrounding the murders of Applicant's family members and the testimony of Applicant's commanding officers during the State's rebuttal case.

22. Trial counsel exercised their prerogative in deciding what witnesses to call and what questions to ask about Applicant's military service.

23. Applicant's arguments simply second-guess in hindsight the manner in which his highly experienced trial counsel strategically chose to present evidence of Applicant's military service.

## Conclusions Of Law

1. All references by Applicant to facts learned during alleged conversations of others with Christopher Boling are given no consideration in this habeas proceeding pursuant to TEX. R. EVID. 602 and 802.

2. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence:  (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

**1462**

3.   To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.   He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

4.   An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852.   A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."   *Strickland*, 466 U.S. at 687, 694.   An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

5.   "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.   In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).

6.   Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533.   "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

**1463**

7.  In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

8.  Counsel's conscious decision not to pursue a defense or to call a witness is not insulated from review, but, unless an applicant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found ineffective. *Ex parte Flores*, 387 S.W.3d at 633. To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

9.  Though not dispositive, the level of cooperation of the accused with his counsel may also be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d at 728-29.

10. An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

11. An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

12. Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

13. "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518. The fact that another attorney

**1464**

may have pursued a different tactic at trial is insufficient to support a claim of ineffective assistance. *Scheanette*, 144 S.W.3d at 510.

14. Neither *Strickland* nor *Wiggins* nor any other precedent required Applicant's trial counsel to investigate every conceivable line of mitigating evidence or to discover and call to testify every possible witness who may have known something about Applicant's life history. *See Rompilla*, 545 U.S. at 383 (counsel not forced "to scour the globe on the off chance something will turn up"); Payne, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance). Courts must be particularly wary of arguments that essentially come down to a matter of degrees involving questions of whether counsel investigated enough or presented enough mitigating evidence. *Dowthitt*, 230 F.3d at 743.

15. To obtain relief based on an uncalled witness, an applicant must show the witness was available and that the testimony would have benefitted him. *See Ex parte White*, 160 S.W.3d at 52. The witnesses whose affidavits Applicant presents in this habeas proceeding would have provided negative information about Applicant's military service in conjunction with the positive information they could provide, and Applicant's trial counsel made a reasonable strategic decision based on their investigation of Applicant's military service to avoid the negative aspects of his service to the degree possible during the presentation of the defense witnesses.

16. *Porter v. McCollum*, 558 U.S. 30 (2009), cited by Applicant, is distinguishable from Applicant's case. The evidence of Applicant's unremarkable military service comes nowhere near the circumstances presented in *Porter*. *See id.* at 41, 43–44.

17. Given the totality of the circumstances, the breadth of the defense team's investigation, the strategic decisions resulting from the investigation, and the totality of the representation provided, Applicant has not met his burden to prove by a preponderance of the evidence that the performance of his trial counsel in not locating Matthias, Emmer, Chaidez, and Boling as witnesses to testify about Applicant's military service fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance. Applicant's

**1465**

claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

18. There is no reasonable probability that the facts contained in the affidavits of Chaidez, Matthias, and Emmer would have had any effect on the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's allegations are not firmly founded in the record, and Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of trial counsel.

19. The Court recommends that Applicant's sixth claim for relief be denied.

## F.  **Claim for Relief Seven**

Applicant contends that his trial counsel were ineffective for failing to present evidence that he suffered from complex post-traumatic stress disorder (CPTSD) resulting from attachment trauma.  [*See* Supplemental Response To State's Answer at 16-21; Initial Application for Writ of Habeas Corpus at 80-93.] Applicant alleges that trial counsel should have:  (a) conducted a complete investigation of his life history and psycho-social development; (b) hired an expert witness with specialized experience in trauma-related disorders; and (c) called such expert to testify at trial about his attachment trauma and CPTSD and their effects on his life and mental health.  [*See* Application at 82.]

**1466**

## Findings Of Fact

1. CPTSD is a psychological injury resulting from prolonged exposure to very extreme trauma such as entrapment or kidnapping, slavery or enforced labor, long-term imprisonment, torture, or abuse from which there is little or no hope of escape. [Dr. Price's affidavit at 4.]

2. Many signs, symptoms, and conditions have been ascribed to CPTSD, rendering it so non-specific that it has failed to gain general acceptance in the mental-health community as a mental disorder. [Dr. Price's affidavit at 5.]

3. Research on CPTSD has not risen to the level required to be determined a disorder, *i.e.*, a constellation of signs and symptoms that is not accounted for by some other condition, even though the developers of both the fourth and fifth editions of the Diagnostic and Statistical Manual of Mental Disorders (the DSM-IV and DSM-V) have considered it. [Dr. Price's affidavit at 5.]

4. CPTSD has remained essentially a "syndrome," which is a collection of signs and symptoms that suggest some abnormal condition. [Dr. Price's affidavit at 5.]

5. CPTSD is not included in the DSM-V or in the International Statistical Classification of Diseases and Related Health Problems. [Moore's suppl. affidavit at 9.]

6. Trial counsel thoroughly investigated Applicant's life history and presented as complete a picture of Applicant's life history as possible given the witnesses who were available to the defense at the time of Applicant's trial.

7. At trial, Applicant's trial counsel presented the available information that was supported by the evidence. [Moore's suppl. affidavit at 11.]

8. Trial counsel considered potential mental-health experts who might assist them in developing the mitigation case, and Moore called several different experts. [Moore's affidavit at 7.]

9. Moore had previously worked in several cases with Dr. McGarrahan, a forensic psychologist and neuropsychologist whom Moore knew to be

**1467**

"highly competent, meticulous in her work, an excellent witness on the stand, and exceedingly honest in her opinions." [Moore's affidavit at 7.]

10. Trial counsel retained Dr. McGarrahan due to Moore's familiarity with her work, his opinion of her abilities, her reputation in the legal community; and the prior professional relationship and mutual respect between Dr. Price (the State's expert) and Dr. McGarrahan. [Moore's affidavit at 7.]

11. Dr. McGarrahan spent approximately eleven hours administering cognitive tests and psychological inventories to Applicant. [RR 44: 121-22.]

12. Dr. McGarrahan reviewed a large volume of records and videos regarding Applicant, various correspondence from Applicant's sister Neata Woody to Applicant, Jackie Hummel's medical records, and psychological test data from Dr. Price's evaluation conducted the weekend before she testified; she performed a clinical interview to ask Applicant about his "entire social history"; she performed a mental status examination during which she made observations of Applicant and discussed with him any psychiatric symptoms he was having; and she discussed the offenses in great detail with Applicant. [RR 44: 121-24.]

13. There is no indication that Dr. McGarrahan ever diagnosed Applicant with CPTSD or informed Applicant's trial counsel that such a diagnosis might be possible.

14. At trial, Dr. McGarrahan testified about every deficit and disorder she found to exist with Applicant based upon her exhaustive interviews and testing, the information she received from Applicant's family, and her review of Applicant's relevant records. [Moore's suppl. affidavit at 10.]

15. Dr. McGarrahan testified during the punishment phase of the trial about Applicant's attachment issues and personality traits resulting from his childhood; their effect on how Applicant thought, felt, and reacted to impulses; and their significance to Applicant's actions in murdering his family members. [RR 44: 126-46, 158-61.]

16. Moore has called experts, including doctorate-level social scientists, to testify in other trials about the presence of "attachment disorder," but he did not believe based on the available facts in Applicant's case that any

**1468**

additional expert other than Dr. McGarrahan was necessary to adequately address Applicant's attachment issues at trial. [Moore's affidavit at 21-22.]

17. Dr. McGarrahan was qualified to evaluate Applicant and to present evidence of attachment issues at Applicant's trial [Dr. Price's affidavit at 6-7], and the strategic decision of trial counsel to call Dr. McGarrahan rather than to retain another type of expert witness was not objectively unreasonable.

18. Even if Dr. Hardesty has experience in treating patients with attachment disorder and CPTSD, such experience is not a prerequisite to conducting a comprehensive forensic psychological evaluation and testifying at trial to the results of the evaluation. [Dr. Price's affidavit at 6-7.]

19. Trial counsel exercised their prerogative and made a strategic decision to present evidence about Applicant's attachment issues and other psychological issues through the testimony of Dr. McGarrahan and lay witnesses. [Moore's supplemental affidavit at 10; see RR 44: 126-46, 158-61.]

20. Even if Applicant's trial counsel had been informed of a diagnosis of CPTSD at the time of Applicant's trial, counsel would not have been required to present testimony about the diagnosis at trial, as such diagnosis reasonably could be viewed as damaging evidence of future dangerousness.

21. In Moore's experience, diagnoses for mental disorders which are not included in the diagnostic manuals are subject to attack at trial on that basis alone and, therefore, can have markedly less effect upon jurors. [Moore's suppl. affidavit at 9-10.] Moore is "skeptical about the jury's willingness to give credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals." [Moore's suppl. affidavit at 10-11.]

22. In over thirty-five years trying criminal cases, Moore has found that jurors are reticent to accept "learned opinions" without an evidentiary basis to support them. [Moore's suppl. affidavit at 10.] Moore would be concerned about the "scarcity" of underlying evidence upon which Dr. Hardesty based her diagnosis of CPTSD. [Moore's suppl. affidavit at 10.]

**1469**

23. Dr. Hardesty's allusions to the denials of child abuse or neglect by Applicant and Neata as constituting evidence that abuse and neglect did, in fact, occur are "inappropriate." [Dr. Price's affidavit at 7.]

24. While denial of abuse does not foreclose a clinical diagnosis, such denials create a "unique and challenging problem in being able to support and defend such a diagnosis before the jury" that cannot be overlooked or ignored in the trial of a criminal case. [Moore's suppl. affidavit at 10.]

25. The State retained Dr. Price, a highly experienced forensic psychologist and neuropsychologist, who evaluated Applicant at the time of trial, was present during the entire punishment phase of the trial, and was available to testify had he been called by the State to do so. [Dr. Price's affidavit at 1-2.]

26. Had Dr. Hardesty testified that she diagnosed Applicant with CPTSD, Dr. Price would have been available to testify and dispute her analysis that Applicant suffered from CPTSD secondary to attachment trauma and that such condition played any role in Applicant's murder of his family members. [Dr. Price's affidavit at 6.]

27. Events in Applicant's childhood such as the lack of being told he was loved, not having been hugged, being isolated on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse are not in the ballpark with the conditions usually discussed in relationship to CPTSD. [Dr. Price's affidavit at 6.]

28. Hummel has shown an ability to form attachments with adults such as his sister and uncle; he "escaped" his family of origin shortly after high school when he joined the Marines, where he was successful as an intelligence specialist until he became dissatisfied with his situation, went AWOL, and lost his security clearance; and he maintained several relationships with women, even though he became "attached" to them too quickly and appeared to be poor in interacting with the opposite sex. [Dr. Price's affidavit at 6.]

29. Applicant's most likely motivations for murdering his family members were "multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled." [Dr. Price's affidavit at 6.]

**1470**

30. The jury did not find Applicant's attachment issues and personality traits, the facts of his life, or their role in his commission of the murders to be sufficiently mitigating to absolve Applicant of moral blameworthiness for his premeditated, calculated, heinous acts.

31. Even with the addition of Dr. Hardesty's proposed testimony about CPTSD, the overwhelming and compelling aggravating facts and circumstances in this case still would have outweighed the totality of Applicant's mitigating evidence.

32. Dr. Hardesty's proffered testimony about CPTSD contained in her habeas affidavit would not have been substantially more compelling than the evidence presented through Dr. McGarrahan, and there is no reasonable probability that the jury would have been persuaded by Dr. Hardesty's diagnosis of CPTSD to answer the mitigation special issue in Applicant's favor.

33. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

34. Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

35. Applicant's allegations of prejudice are conclusory.

## Conclusions Of Law

1. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence:   (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under

**1471**

prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.     An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.     An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.     An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.     Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.     Applicant's trial counsel cannot be deemed to have been deficient for failing to discover and present a diagnosis of CPTSD when the defense team's well-qualified mental-health expert did not make such a diagnosis. *See, e.g., Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001) (counsel's failure to investigate and discover Campbell's PTSD not ineffective when clinical

**1472**

psychologist failed to make such diagnosis); *Pruett v. Thompson*, 996 F.2d 1560, 1573-74 (4th Cir. 1993) (counsel's failure to investigate or present evidence of mental illness, developmental problems, organic brain damage, and PTSD not ineffective where counsel consulted psychiatrist who concluded Pruett did not suffer from any of the alleged mental illnesses or abnormalities); *Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003) (counsel not ineffective for not investigating and discovering Taylor's PTSD after forensic psychologist failed to make such diagnosis).

8.    The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown*, 866 S.W.2d at 678; Weisinger, 775 S.W.2d at 427. Applicant's trial counsel acted within the wide range of reasonable professional assistance and were not objectively unreasonable in making a strategic decision to rely on Dr. McGarrahan rather than to retain another type of expert such as Dr. Hardesty to testify at Applicant's trial.

9.    Courts should not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton*, 134 S. Ct. at 1089. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is virtually unchallengeable." *Id.* The strategic decision of Applicant's trial counsel to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist, rather than Dr. Hardesty is not alone a basis to prove a claim of ineffective assistance. *See Waters*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel"). Applicant's trial counsel cannot be deemed ineffective simply because habeas counsel after the fact believe that another type of expert should have been retained and called to testify about a diagnosis that was not available to counsel at the time of trial. *See Ex parte Miller*, 330 S.W.3d at 616 ("The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance").

10.    Applicant's attack on counsel's performance is simply based on impermissible second-guessing and hindsight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight). Applicant has not met his burden to prove that his trial counsel were deficient for not retaining an expert such

**1473**

as Dr. Hardesty to testify that he suffers from CPTSD resulting from attachment trauma.

18. Applicant's assumptions and conclusions that prejudice resulted from the alleged deficiency of trial counsel do not satisfy *Strickland*'s prejudice prong. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. There is no reasonable probability that the proposed testimony of Dr. Hardesty contained in her habeas affidavits about CPTSD resulting from attachment trauma would have changed the jury's answer to the mitigation special issue. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

12. The Court recommends that Applicant's seventh claim for relief be denied.

## G.   Claim for Relief Eight

Applicant alleges that his due-process right to a fair trial was violated when the State impermissibly injected inflammatory and prejudicial evidence into both phases of the trial and that his trial and appellate counsel were ineffective.

[Application at 93.]

## Findings Of Fact

1. The State elected to proceed to trial on the capital-murder indictment alleging that Applicant murdered Joy and Eddie in the same criminal transaction. [RR 4: 4-5]

**1474**

2.   Applicant also murdered his daughter Jodi and his unborn child during the same criminal episode.

3.   Applicant's discussion of his eighth claim for relief, which is phrased as a due-process violation, largely focuses on whether portions of the State's opening statements and jury arguments and various trial evidence referring to Jodi and the unborn child were too inflammatory and prejudicial to be admitted, were inadmissible as same-transaction contextual evidence, and were impermissible victim-impact evidence. [*See* Application at 93-103.]

4.   Applicant provides a single conclusory paragraph and only two record citations to support his claim that his trial counsel were ineffective, alleging that trial counsel performed deficiently "[t]o the extent [they] failed to object and preserve the errors committed by the State and court." [Application at 104 (citing RR 39: 194-97; RR 42: 79).]

   a.   Applicant first cites the introduction during the guilt-innocence phase of SX 318, an autopsy photograph of the unborn child and Joy's uterus after their removal from Joy's body. [Application at 104 (citing RR 39: 194-97).] Trial counsel objected to the introduction of SX 318 [RR 39: 194-97], and Applicant neither challenges the sufficiency of the objections made by trial counsel nor asserts that counsel could have done anything differently. [*See* Application at 104.]

   b.   Applicant's second record citation is to the introduction of photographs of Applicant's family members from Applicant's MySpace page during the punishment phase of his trial. [Application at 104 (citing RR 42: 79).] Moore did not object to these photographs because he did not think there was any meaningful objection to the photographs that the Court would sustain at the punishment stage of the trial and because Moore made a strategic decision that the photographs might benefit Applicant's case by showing that Applicant loved his family and by demonstrating that Applicant's commission of the murders was solely the result of his mental and emotional problems. [Moore's affidavit at 23-24.]

5.   Applicant neither explains how any of the referenced opening statements discussing Jodi were improper nor identifies any valid legal basis for his trial counsel to have objected. [*See* Application at 94-95.]

**1475**

6.    The State's opening statements at the guilt-innocence phase referring to Jodi were proper because Applicant murdered Jodi in the same criminal episode as Joy and Eddie, who were the named victims in the indictment, and the circumstances of Jodi's murder were admissible as same-transaction contextual evidence.

7.    Applicant seems to simply assume that the cited testimony of Audria Hastings, Jodi's kindergarten teacher, was inflammatory and prejudicial because it referred to Jodi. [*See* Application at 95.] Applicant neither explains why Hastings' testimony was inadmissible as same-transaction contextual evidence nor offers any valid legal objection that trial counsel should have made to Hastings' testimony. [*See id.*] Moreover, in addition to Hastings' testimony delineated by Applicant, Hastings identified a photograph of Jodi showing how the child looked in class earlier on the day of the murders. [RR 33: 63; SX 1.]

8.    Trial counsel objected during Hastings' testimony to videotapes showing Jodi with her teachers and kindergarten class, and the Court overruled those objections. [RR 33: 70-74.]

9.    Applicant complains that testimony of Jodi's school nurse, Constance Smith, "continued the focus on Jodi" at the guilt-innocence phase of the trial. [Application at 95.]

    a.    The testified-to incident when Jodi hurt herself on the school playground and Joy went to the school to comfort her occurred the afternoon of December 17, 2009, the same day Applicant murdered his family. [RR 33: 81-82.]

    b.    Smith also testified that on the day of the murders Joy appeared to be in good health and was excited about her pregnancy. [RR 33: 87.]

    c.    Applicant fails to specifically explain why Smith's testimony about the activities and interactions of Joy (a named victim) and her daughter Jodi on the day Applicant murdered them was inadmissible. [*See* Application at 95.]

    d.    Applicant offers no valid legal basis for his trial counsel to have objected to Smith's testimony referenced in the application. [Application at 95.]

**1476**

e.    Applicant simply assumes that trial counsel should have objected to the testimony because it referred to Jodi. [Application at 95.]

10.    Applicant asserts that the State "consistently made references to Jodi throughout the remainder of the trial," and he cites numerous pages in the reporter's record to support his contention. [Application at 95.]

a.    Applicant does not delineate exactly what testimony on the pages he cites was objectionable, and this Court will not make Applicant's arguments for him. [*See* Application at 95.]

b.    Applicant provides no valid legal basis for his trial counsel to have objected to testimony on the pages he cites. [Application at 95.]

c.    Applicant seems to simply assume that trial counsel should have objected to something on the pages listed because it referenced Jodi. [*See* Application at 95.]

d.    Some testimony on the pages cited by Applicant mentions Jodi in the context of being the daughter of Joy or the granddaughter of Eddie, the two victims named in the indictment for which Applicant was on trial. [*See* RR 36: 50 (Applicant's co-worker recounts conversation with Applicant on December 18, the morning after the murders; she remarked that Jodi must be excited about Christmas, and Applicant responded, "Yes, she is"), 58 (Christopher Paris came to know that the Hummels had a daughter named Jodi); RR 37: 167 (DNA analyst obtained known DNA samples from autopsy work for Joy, Eddie, and Jodi), 198 (DNA analyst excluded Joy, Eddie, and Jodi as contributors to DNA sample near top rim of Applicant's black hat), 203 (DNA analyst found Jodi's DNA on area of bat); RR 40: 10 (Eddie's former co-worker got to know Eddie's daughter Joy and granddaughter Jodi), 18 (Jodi was Joy's daughter). ]

e.    None of the testimony on the pages cited by Applicant as referencing Jodi went beyond what was permissible as same-transaction contextual evidence.

80

**1477**

11.    Applicant complains that the State shifted the focus of the trial to Joy's unborn child. [*See* Application at 96.]

    a.    Applicant offers no specific explanation why the opening statements, witness testimony, or closing arguments he cites were improper. [*See* Application at 96.]

    b.    Applicant provides no valid legal basis upon which his trial counsel should have objected. [Application at 96.]

    c.    Applicant seems to assume that the referenced matters were improper simply because they referenced the unborn child. [*See id.*]

    d.    The focus of the opening statements cited by Applicant was on Joy (a named victim) and her physical state of being pregnant. [*See* RR 33: 25 (Joy had recently gone to doctor and heard baby's heartbeat for first time), 29 (Joy, who was pregnant, was asleep in the master bedroom when Applicant returned home to commit the murders), 31 ("His wife who is pregnant, lays dead at his feet").]

    e.    The testimony Applicant cites referred either to Joy's pregnancy and physical condition near the time of the murders or to Applicant's disregard for his unborn child's safety, which was relevant to his state of mind leading up to the murders. [*See* RR 33: 68 (in December 2009, Joy "was pregnant"); RR 39: 101 (Freeze testifies she became uncomfortable with Applicant when she learned Joy was pregnant because Applicant had no concern for his unborn child's safety), 143 (Freeze learned Joy was pregnant one or two days after Freeze and Applicant had sex; Freeze and Applicant exchanged texts concerning Freeze finding out about the pregnancy).]

    f.    The three pages of the State's closing arguments described by Applicant as containing "[r]epeated references" to the unborn child's death contain arguments which were permissible based on properly admitted evidence at trial and did not impermissibly focus the jury on the unborn child's death. [*See* RR 40:50 (Applicant "snuffed out four lives that had nothing to do with him, other than he wanted to be single"), 53 ("He killed his pregnant wife"), 56 (Applicant "killed his pregnant wife").]

81

**1478**

12. Applicant's trial counsel objected to SX 318 and 379, the two alleged highly inflammatory photographs of the unborn child cited by Applicant. [Application at 96; RR 38: 93; RR 39: 194-97, 202; *see* SX 318, 379.] Applicant makes no allegation of any other objection that his trial counsel could or should have raised. [*See* Application at 96.]

13. Applicant refers to punishment-phase testimony by Applicant's sister Neata that she needed to wait before visiting Jodi's gravestone [RR 43: 234-35]; that she sent Jodi a Christmas dress, but she never got a photo of Jodi in the dress because "everything was burned in their house" [RR 43: 235]; that the loss of Joy and Jodi had left the Hummel family "broken" [RR 43: 236]; and that Applicant's aunt would have been able to take Jodi in and provide for her if Applicant had asked her to do so [RR 43: 239]. [Application at 97.]

    a. Applicant fails to explain how the testimony he cites was so prejudicial or inflammatory as punishment-phase evidence as to render it inadmissible or to articulate a valid legal objection that his trial counsel could have, but did not, make. [*See* Application at 97.]

    b. In asserting that Neata's description of the Hummel family as "'broken' after Jodi's death" was impermissible victim-impact evidence because Jodi was not a named victim, Applicant overlooks that Neata's testimony was in response to a question about how the loss of "Joy *and* Jodi" had affected Neata's family; thus, the question included a named victim. [RR 43: 236 (emphasis added); *see* Application at 97.]

14. Applicant cites punishment-phase testimony from various State's witnesses referencing either Jodi or the unborn child. [*See* Application at 97.]

    a. During the portion of Tomiko Race's testimony cited by Applicant, the State introduced a number of photographs depicting Jodi, Joy, and/or Applicant that were posted on Applicant's MySpace page. [RR 43: 78-79.] Moore made a reasonable strategic decision not to object to the photographs. [Moore's affidavit at 23-24.]

    b. Applicant cites Melody Anderson's testimony that she was in the hospital room when Jodi was born, that she saw sonogram photographs of the unborn child, and that Eddie was a good grandfather to Jodi; Phillip King's testimony that Eddie would leave the senior center and go home in time to pick up Jodi from the bus

**1479**

stop every day; and Cindy Lee's testimony that Jodi would get donuts when Joy dropped off Eddie at the senior center. [Application at 97 (citing RR 44: 8, 10-11, 14, 22, 32 ).]

    i.    In context, the testimony cited by Applicant focused on the lives and familial relationships and activities of Joy and Eddie, the named victims. [RR 44: 8, 10-11, 14, 22, 32.]

    ii.    Contrary to Applicant's contentions, testimony about Jodi's visits to the senior center when Joy dropped off Eddie did not fall within the definition of victim-impact evidence.

    iii.    Applicant provides no valid legal objection that his trial counsel should have, but did not, make.

15.    Applicant asserts that thirty-one "inflammatory and prejudicial" photographs of the unnamed victims during the punishment phase were introduced without objection. [Application at 97-98.] As discussed in previous findings of fact herein, trial counsel had strategic reasons for not objecting to the photographs taken from Applicant's MySpace account. [Moore's affidavit at 23-24.] Applicant offers no valid legal basis for his trial counsel to have objected to the remaining photographs to which he refers. [*See* Application at 97-98.] Finally, many of the photographs at issue include Joy, a named victim at trial.

16.    Applicant complains that the State made "repeated references" to Jodi and the unborn child during closing arguments at the punishment phase of trial. [Application at 98.]

    a.    Applicant simply cites a number of arguments without any explanation of how they were impermissible punishment-phase arguments or what valid legal objection his trial counsel should have made, and the Court will not make Applicant's arguments for him. [*See* Application at 98.]

    b.    The cited arguments were permissible as either summations of the evidence, reasonable deductions from the evidence, or pleas for law enforcement. [RR 45: 57-59, 61, 62-63, 85, 86, 88.]

17.    Applicant presents a single paragraph addressing his contention that his appellate counsel was ineffective for failing to raise the cited matters on direct appeal. [*See* Application at 104-05.]

**1480**

18. Applicant fails to identify specific points of error that his appellate counsel should have raised or substantive arguments that counsel should have made on direct appeal to the Court of Criminal Appeals. [*See* Application at 104-05.]

19. Applicant asserts in conclusory fashion that his appellate counsel was ineffective for not "re-raising trial counsel's objection" to the State's use of photographs of the unborn child in light of case law regarding the prejudicial nature of photographs of unborn children. [Application at 104-05.]

    a.    SX 379 is an 8x10 color photograph of a biohazard evidence bag containing the unborn child. The photograph does not focus on the unborn child, and the contents are not readily identifiable from the photograph as an unborn child. [SX 379; *see* RR 38: 93.]

    b.    SX 379 was conditionally admitted for record purposes only during the testimony of a DNA analyst as part of the chain of custody regarding a DNA profile she extracted from the unborn child. [RR 38: 90-95.] It was later admitted for all purposes during the medical examiner's testimony that he had collected a fetus from Joy and packaged it in an evidence bag as show in in SX 379. [RR 39: 202.]

    c.    SX 379 was never published to the jury. [*See* RR 38: 94; RR 39: 202.]

    d.    SX 318 is a photograph introduced at the guilt-innocence phase of the trial during the medical examiner's testimony. The portion of SX 318 depicting the unborn child measures 5x7; is black and white; and appears to depict the unborn child, an umbilical cord, and Joy's uterus. [SX 318.]

    e.    The State argued in response to the objections of Applicant's trial counsel that SX 318 was admissible because: (1) Joy was pregnant; (2) the photograph "starts the chain of custody for DNA samples to prove paternity for this baby"; and (3) based on the area of the stab wounds depicted in SX 315 (an autopsy photograph of Joy's wounds) "it goes to what [Applicant] was stabbing at" because when one lines up the stab wounds shown in SX 315 "you line that up anatomically on a female that's pregnant and you're stabbing in the area where the womb is." [RR 39: 196.]

84

**1481**

f.   The Court concluded that the probative value of SX 318 outweighed any prejudice, that the evidence was contextual, and that the manner in which the deaths occurred was an issue for the jury. [RR 39: 197-98.]

g.   SX 318 was never published to the jury.

h.   The circumstances regarding the photographs introduced here as SX 318 and 379 differ significantly from those found in *Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000), and *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004), which are relied on by Applicant.

    i.   SX 318 and 379 had probative value to issues in the guilt-innocence phase of Applicant's trial.

      (a)   SX 379 was admitted as part of the chain of custody of the unborn child collected by the medical examiner and the DNA profile later extracted from the unborn child by a DNA analyst. [RR 38: 90-95; RR 39: 202.]

      (b)   When SX 318 was offered during the medical examiner's testimony, the State offered a number of reasons for its admissibility relating to matters in issue during the guilt-innocence phase of the trial. [RR 39: 196.]

    ii.   SX 318 and 379 were offered during medical testimony at the guilt-innocence phase of the trial, they were properly authenticated, and the State offered a number of reasons to admit the evidence that were related to facts in issue. [RR 39: 196.]

    iii.   SX 318 and 379 were not offered merely to show that Joy was pregnant, that she died, that Applicant knew Joy was pregnant, and that the unborn child died as a result of Joy's death. [RR 39: 196.]

    iv.   Neither SX 318 nor 379 was published to the jury; the State did not emphasize the photographs in its closing arguments; the photographs were among a multitude of photographs introduced into evidence; and the photographs admitted at guilt-innocence included autopsy photographs and crime-scene photographs

**1482**

depicting the burned remains of Joy, Eddie, and five-year-old Jodi.

    v.    In light of the circumstances surrounding the admission of SX 318 and 379 into evidence, the photographs would not have had such an emotional impact to suggest that the jury made a decision on some emotional basis rather than on the basis of Applicant's confession to the premeditated, deliberate, heinous murders of his family members so that he could pursue a relationship with Freeze.

    i.    Applicant provides no analysis demonstrating that the alleged error in admitting SX 318 and 379 would have been found harmful under TEX. R. APP. P. 44.2(b) had appellate counsel raised a point of error challenging the admission of the photographs of the unborn child. [Application at 104-05.]

    j.    Any error in admitting SX 318 and/or 379 was harmless under TEX. R. APP. P. 44.2(b).

        i.    The jury had before it Applicant's videotaped and written confessions describing in chilling, remorseless detail the premeditated, cold-blooded, heinous murders of his pregnant wife, his crippled father-in-law, and his five-year-old daughter; the measures Applicant took to cover up his crimes, including setting fires in each victim's bedroom, disposing of the murder weapons, and fabricating an alibi; and his flight to Oceanside, California. [SX 347B.]

        ii.    The jury saw numerous photographs depicting the victims' burned bodies during their autopsies and at the crime scene.

        iii.    Neither photograph at issue was published to the jury.

        iv.    The State did not emphasize the photographs during closing arguments.

        v.    The jury heard overwhelming evidence to support its verdict finding Applicant guilty of capital murder and its answers to the special issues in a manner that required imposition of the death penalty.

**1483**

## Conclusions Of Law

1. Claims alleging a violation of a rule of evidence are not cognizable on habeas corpus. *See Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). Further, because evidentiary complaints are subject to a harmless-error analysis, they are not cognizable. *Ex parte Truong*, 770 S.W.2d 810, 913 (Tex. Crim. App. 1989). Therefore, to the extent Applicant challenges the admissibility of the arguments and evidence at issue, his claim for relief is not cognizable in this habeas proceeding.

2. The only cognizable issue is whether trial and appellate counsel rendered ineffective assistance with regard to this evidence.

3. In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

4. To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

5. An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

**1484**

6.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

7.  An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

8.  Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

9.  In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

10. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

11. Applicant's contentions regarding his claims of ineffective assistance are too conclusory to meet his burden to satisfy either prong of *Strickland*. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

**1485**

12. Evidence relating of the deaths of Jodi and the unborn child was admissible as same-transaction contextual evidence. *See, e.g., Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (in capital-murder trial for killing homeowner's guest during burglary, evidence Camacho and accomplices kidnapped and later murdered homeowner's wife and son admissible as same-transaction contextual evidence).

13. Although Applicant complains that "the amount, detail, and focus of the testimony surpassed any contextual purpose" [Application at 99], "[r]arely will the prejudicial value render inadmissible any evidence that is context of the offense." *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986). The Court of Criminal Appeals has never found that non-errors may in their cumulative effect cause error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).

14. The evidence Applicant cites as being impermissible victim-impact evidence does not fall within the definition of such evidence. *See Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (victim-impact evidence is evidence of the effect of an offense on people other than the victim).

15. Applicant has not met his burden to demonstrate by a preponderance of the evidence that the performance of trial counsel on either occasions when trial counsel objected or when they did not object fell below an objective standard of reasonableness under prevailing professional norms. Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range or reasonable professional assistance. Therefore, Applicant's claims are not firmly founded in the record, and Applicant has failed to establish deficient performance on the part of his trial counsel.

16. There is no reasonable probability that the evidence cited by Applicant was so inflammatory or prejudicial that it would have impermissibly shifted the focus from the relevant issues in Applicant's trial and that Applicant would have been acquitted or sentenced to life without parole had his trial counsel objected to the evidence cited. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant's claims are not firmly founded in the record, and Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance.

**1486**

17.    Applicant fails to demonstrate that appellate counsel could have raised points of error on appeal challenging the admissibility of SX 318 and 379 that would have had indisputable merit under well-settled law and would have necessarily resulted in reversible error. *See Ex parte Flores*, 387 S.W.3d at 639.    Therefore, Applicant has failed to meet his burden to establish that his appellate counsel was ineffective for failing to raise a challenge on direct appeal to the Court's admission of those exhibits into evidence.

18.    Even if the Court erred in admitting SX 318 and 379 into evidence, the error would have been subject to a harmless-error analysis pursuant to TEX. R. APP. P. 44.2(b), which requires the appellate court to disregard any nonconstitutional error that does not affect substantial rights.    Based on the entire record at the guilt-innocence phase of the trial, any error in admitting SX 318 and SX 379 would have been disregarded as harmless on direct appeal. *See, e.g., Rolle v. State*, 367 S.W.3d 746, 752-56 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (admission of photograph of murder victim's unborn child who was not named victim held harmless, distinguishing *Reese* and *Erazo*); *Erazo v. State*, 167 S.W.3d 889, 890-91 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (op. on remand for a harmless-error analysis; error in *Erazo* found to be harmless).    Applicant has not met his burden to show by a preponderance of the evidence that his appellate counsel's decision not to challenge the admission of SX 318 and 379 on appeal constituted deficient performance that resulted in prejudice.

19.    The Court recommends that Applicant's eighth claim for relief be denied.

**H.**    **Claim for Relief Nine**

Applicant alleges that his trial counsel failed to effectively present evidence that Applicant's confessions should be suppressed and that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions. [Application at 105-06.]

**1487**

## Findings Of Fact

1.   Applicant alleges that his trial counsel were ineffective because they did not: (a) "offer as exhibits transcripts of the phone calls that took place between [Kennedale police captain Darrell] Hull, [CBP officer Paul] Kandal, and the Kennedale dispatcher during the detaining and arrest" of Applicant; and (b) "submit other documents created by the Border Patrol during their detention" of Applicant which allegedly "would have established that there was no lawful basis for [Applicant's] detention by the Border Patrol, that [Applicant's] resulting arrest was unlawful, and that his subsequent confession was a violation of his rights under the Fourth Amendment." [Application at 105-06.]

2.   Trial counsel moved to suppress Applicant's statements and confessions, as well as seized evidence, and counsel and litigated the issue in a contested pretrial suppression hearing lasting four days.   [CR 2: 324-51; RR 6-9; Cummings' affidavit at 9.]

3.   Trial counsel aggressively litigated a multitude suppression issues, including the legality of Applicant's detention by CBP. [RR 6-9; Moore's affidavit at 25.]

4.   Following the pretrial suppression hearing, Applicant's trial counsel filed an extensive trial memorandum in support of the motions to suppress. [CR 3: 406-42; Moore's affidavit at 26.]

5.   Trial counsel obtained copies of the tape recordings and reports relied upon by Applicant in this habeas proceeding.   [Moore's affidavit at 25; Cummings' affidavit at 10.]

6.   Trial counsel reviewed the recordings and reports at issue in preparation for cross-examining the witnesses from the Kennedale Police Department and CBP at the pretrial suppression hearing.   [Moore's affidavit at 25; Cummings' affidavit at 10.]

7.   At the pretrial suppression hearing, trial counsel used the recordings and reports at issue during cross-examination of the relevant witnesses so that the Court was aware of the communications. [Cummings' affidavit at 10.]

8.   All of the significant relevant facts contained in the recorded telephone conversations and written reports relied on by Applicant in this habeas

**1488**

proceeding were acknowledged by the witnesses at the pretrial suppression hearing. [Moore's affidavit at 26.]

9.    The Court was made aware of the relevant facts contained in the transcript and report during the pretrial suppression hearing and in the memorandum of law filed by trial counsel in support of the motions to suppress.

10.    The transcript and the written report submitted by Applicant in this habeas proceeding do not contain facts that differed significantly from what the Court heard at the pretrial suppression hearing, and the documents would not have changed the Court's findings regarding Applicant's lawful detention or the attenuation of any taint.

11.    All of the information contained in the recordings and reports that trial counsel believed to be relevant to the legality of Applicant's border detention was acknowledged during cross-examination of the State's witnesses during the suppression hearing; hence, there was no need for Applicant's trial counsel to impeach those witnesses by introducing the actual reports and recordings. [Moore's affidavit at 25-26.]

12.    The Court was well aware at the pretrial suppression hearing that Kandal verified Applicant's citizenship, that Kandal told the Kennedale police dispatcher during their telephone conversation at 7:16 a.m. PST that Applicant was an otherwise admissible person whom he could not hold without a warrant, that Kandal stated he could not hold Applicant in order to encourage the Kennedale Police Department to act quickly so that Kandal could move Applicant out of his jurisdiction, and that Kandal was in contact with Hull during the time the Kennedale Police Department was working to process a warrant. [RR 8: 32-33, 87, 89-90, 100.]

13.    Kandal was required to continue holding Applicant in order to determine what Kennedale wanted to do about Applicant being a missing person. [RR 8: 90-92.] Kandal was not bound by the language in the Kennedale Police Department's missing-person report instructing agencies not to detain or arrest Applicant because Kandal operates under the policies and directives of CBP to contact the jurisdiction, verify the information, and find out what the agency wants done with the individual who has been reported missing. [RR 8: 91, 100.]

**1489**

14.     The record does not support Applicant's claim that the transcript and report at issue "revealed a concerted effort" on the part of the Kennedale Police Department and CBP "to invent some justification" to hold Applicant while Kennedale officers started the process of obtaining an arrest warrant. [*See* Application at 115.]

15.     Neither the transcript of the telephone calls nor the written report submitted by Applicant in this habeas proceeding supports Applicant's assertion of any improper motive or wrongdoing on the part of the Kennedale Police Department or CBP in Applicant's detention. *Cf. Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's rejection of Applicant's claim that he was illegally detained at the border based on lies was supported by the record).

16.     The Court of Criminal Appeals addressed on direct appeal Applicant's contention that he was unlawfully detained at the border based on intentional lies and falsehoods and found that this Court's determination regarding the lawfulness of the detention was supported by the record. *See Hummel*, 2013 WL 6123283 at *7-18.

17.     As the Court held in denying Applicant's pretrial motions to suppress, Applicant's detention by CBP pending the issuance of an arrest warrant was justified on several grounds based on federal law and CBP's policies. *See Hummel*, 2013 WL 6123283 at *17-18 (holding this Court's findings that CBP agents had authority to detain Applicant pursuant to federal law and policies and procedures was supported by record).

18.     Nothing in the transcript or report submitted by Applicant in this habeas proceeding invalidates this Court's previous determination that Applicant's detention pursuant to federal law or CBP's policies and procedures was lawful, and the Court would not have changed any of its findings or rulings related to Applicant's motions to suppress had Applicant's trial counsel introduced the transcript and report into evidence at the pretrial suppression hearing.

19.     There is no reasonable probability that Applicant would have been acquitted or sentenced to life without parole if the Court had suppressed Applicant's confession or the murder weapons found as a result of the confession.

     a.     Fire investigators unanimously concluded that the fire at Applicant's house was an arson under the Texas Penal Code. [RR 34: 248-49.]

93

**1490**

b.   The jury heard medical-examiner testimony about and saw photographs of the extensive non-fire-related injuries Applicant inflicted on Joy, Eddie, and Jodi. [RR 39: 185-257; SX 304-18, 353-75.]

c.   Blood matching the DNA of Applicant, Joy, and Eddie was found on clothing that Applicant voluntarily turned over during his December 18, 2009, noncustodial interview at the Kennedale Police Department. [RR 35: 39; RR 37: 190-91, 196-97, 200-01; SX 341B.]

d.   During Applicant's interview at the Kennedale Police Department, Steele saw blood on Applicant's pant leg, blood on Applicant's socks, and very recent scratch marks on Applicant's back. [RR 35: 42-44, 60-62; SX 274-76.]

e.   Applicant's statements at the Kennedale Police Department raised Steele's suspicions because Applicant's story did not make sense. [RR 35: 81; see SX 341B.]

f.   Shortly after leaving the police station on December 18, 2009, Applicant fled in his van to California, which evidenced Applicant's consciousness of guilt.

20.   Applicant contends that his appellate counsel was ineffective in failing to sufficiently appeal the Court's denial of his motions to suppress his oral and written confessions because he "should have more clearly argued" that Applicant's confession should have been suppressed based on the actions of the Kennedale Police Department and CBP. [Application at 124-25.]

21.   In preparing Applicant's brief on direct appeal, appellate counsel reviewed the motions to suppress filed by trial counsel, reviewed the applicable facts, and researched the applicable law. [Stickels' affidavit at 2-3.]

22.   On direct appeal to the Court of Criminal Appeals, appellate counsel challenged this Court's denial of Applicant's motion to suppress his confessions. [See Application at 125; Applicant's Exhibit 31.]

23.   Based on his research and experience, Applicant's appellate counsel presented appellate issues challenging the denial of Applicant's motions to suppress in "an appropriate manner that [he believes] was calculated to obtain relief" on appeal. [Stickels' affidavit at 3.]

**1491**

24.   The appellate arguments advanced by Applicant's appellate counsel focused on the sufficiency of the arrest-warrant affidavit to establish probable cause and also argued that Applicant's confession was "the culmination and result of all of the previous unconstitutional state actions," which "allud[ed] to an earlier discussion of false statements" made by the Kennedale Police Department to CBP.

25.   Applicant does not articulate exactly how his appellate counsel should have argued the claims differently or how counsel's failure to do so fell outside the wide range of reasonable professional assistance. [*See* Application at 124-25.]

26.   Applicant's complaint simply second-guesses in hindsight his appellate counsel's strategic decisions based on counsel's experience and research about how to best challenge on direct appeal the Court's denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions. [*See* Application at 124-25.]

27.   Applicant has not shown that the appellate contention he alleges counsel should have made had indisputable merit under settled case law. Therefore, Applicant has not demonstrated that he would have prevailed on appeal had his appellate counsel raised different issues or argued the issues raised differently. [*See* Application at 124-25.]

28.   There was no legal or factual basis for the Court to suppress Applicant's confessions or the evidence found as a result of the confessions.

## Conclusions Of Law

1.   In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2.   To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.   He must overcome the strong presumption that

**1492**

counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.  An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.  An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.  Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.  In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d at 704-05.

**1493**

8.  Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

9.  The validity of a stop or an arrest is determined solely by analyzing the objective facts surrounding the event. *Garcia v. State*, 827 S.W.2d 937, 943 (Tex. Crim. App. 1992). "Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which [the officers] acted is of no consequence." *Id.* (quoting *United States v. Causey*, 834 F.3d 1179, 1185 (5ᵗʰ Cir. 1987)). The telephone conversations and later written CBP report focused on only one valid basis to detain Applicant at the border and such evidence would not have rendered alternative objective bases to detain Applicant invalid or inapplicable.

10. Applicant's conclusory allegations fail to satisfy his burden to demonstrate that his appellate counsel provided ineffective assistance. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements); *see also Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

11. Applicant's allegations amount to nothing more than an impermissible second-guessing of appellate counsel's strategic decisions made based on counsel's experience and research about how to best challenge the denial of Applicant's motions to suppress his confessions and the evidence seized as a result of his confessions on appeal. *See Strickland*, 466 U.S. at 690-91; *see also Scheanette*, 144 S.W.3d at 510 (fact that another attorney may have pursued different tactic insufficient to prove ineffective-assistance claim).

12. The strategic decisions of Applicant's trial counsel not to offer cumulative evidence in a different format do not support a claim of ineffective assistance. *See Parker*, 565 F.3d at 1283 (upholding state court's finding of no prejudice where additional testimony was cumulative); *Coble*, 496 F.3d at 436 (counsel's decision not to present cumulative testimony does not

**1494**

constitute ineffective assistance); *Barnes v. United States*, 859 F.2d 607, 608 (8th Cir. 1988) ("[d]irect- and cross-examination techniques are matters of trial strategy left to the discretion of counsel"); *see also Hill*, 400 F.3d at 319 ("to establish prejudice, the new evidence must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

13.  There is no reasonable probability that, had Applicant's trial counsel introduced the transcript of the telephone calls and the written report at issue, Applicant would have prevailed at the suppression hearing or at his trial. The alleged deficiencies of Applicant's trial counsel, even if they occurred, were not so serious as to deprive Applicant of a fair trial whose result is reliable. Applicant fails to meet his burden to establish by a preponderance of the evidence that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel.

14.  Applicant has not met his burden to demonstrate by a preponderance of the evidence that his appellate counsel failed to raise a claim of indisputable merit under settled law. Applicant has not shown deficient performance of his appellate counsel.

15.  There is no reasonable probability that Applicant would have prevailed on direct appeal had his appellate counsel "more clearly argued" the point of error challenging the denial of Applicant's motion to suppress his confession and the evidence seized as a result of the confession. Therefore, Applicant has not met his burden to prove by a preponderance of the evidence that he suffered any prejudice as a result of his appellate counsel's alleged deficient performance.

16.  The Court recommends that Applicant's ninth claim for relief be denied.

## I.   **Claim for Relief Ten**

Applicant alleges that his appellate counsel was ineffective for failing to appeal the Court's erroneous denial of challenges for cause of nine prospective jurors who illustrated that their views would impair their ability to follow the Court's instructions and their oath. [Application at 126.]

**1495**

## Findings Of Fact

1.   Applicant's allegations concern the Court's denial of Applicant's challenges for cause against veniremembers Thomas Bancroft Jr., LaDonna Butler, Kayla McFarland, Leslie Cuevas, Pamela Powell, Steven Guidroz, Kenneth Zeiger, Donna Beauchamp, and Janie Cantu Hermosillo.  [Application at 126-37.]

2.   On direct appeal, Applicant's appellate counsel reviewed the entire voir dire proceedings, including the voir dire of the nine veniremembers at issue in this habeas proceeding, and he researched the applicable law.  [Stickels' affidavit at 4.]

3.   Applicant's appellate counsel did not raise points of error relating to the nine veniremembers at issue because in his opinion "there was no error in the trial court's refusal of [Applicant's] challenges for cause." [Stickels' affidavit at 4.]

4.   Applicant cites only limited excerpts of the nine veniremembers' relevant voir dire and offers no substantial argument or authority to support his assertions that the Court erroneously denied his challenges for cause. [Application at 126-27.]  Applicant's arguments and assertions overlook the totality of the voir dire of the nine prospective jurors at issue.

5.   Veniremember Bancroft

   a.   Applicant challenged veniremember Bancroft for cause because he would create a burden on the defense to produce evidence of mitigating circumstances. [RR 16: 199.]

   b.   The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 16: 199.]

   c.   Bancroft agreed that, if he took the oath as a juror, he would have to follow the law of the State of Texas and that he had no difficulty doing so. [RR 16: 148.]

   d.   The State reminded Bancroft several times that neither party had any burden of proof on the mitigation special issue, and Bancroft agreed that a criminal defendant never had a burden of proof, even when there was no burden of proof on the State. [RR 16: 158-59, 161, 165-66.]

**1496**

e.    When Applicant's trial counsel asked if Bancroft felt the language of the mitigation special issue put the burden on the defense to bring mitigating circumstances or to convince him of the sufficiency of the mitigating circumstances, Bancroft responded that "something is going to have to come out," that "someone's going to have to show me what kind of person they are," and that "since you're . . . defending him, you would probably have to tell me something about him." [RR 16: 193.]

f.    When Applicant's trial counsel explained that the law did not envision the defense having the burden on the mitigation special issue, Bancroft responded "[r]ight," and then the following exchange occurred:

> Q.    [DEFENSE COUNSEL] So . . . what I'm getting from you is . . . you kind of feel like that question is putting a burden on me, am I correct?
>
> A.    [BANCROFT] What I'm saying is the evidence in the case would be, you know, back to what caused it or what happened, but . . . if someone's trying to prove the Defendant's character and background, I – you've got to tell me or either he's got to tell me.  I mean, I don't know their background or character unless someone does tell me that.  Not saying you got to prove it, but . . . I got to know something about your character or background –
>
> Q.    Okay.
>
> A.    – to answer that question.
>
> Q.    Do you think it would be my obligation to convince you that that evidence was sufficient?
>
> A.    No.

[RR 16: 194 (emphasis added).]

g.    While Bancroft correctly expressed that there would have to be evidence from some source to allow him to answer the mitigation special issue, he clearly understood that neither side bore any burden to convince him of the existence and/or sufficiency of mitigating evidence.

**1497**

h.   At worst, Bancroft's answers were vacillating or contradictory at times regarding the mitigation special issue and whether he would place a burden on the defense.

i.   Bancroft's overall voir dire demonstrated his ability to follow the Court's instructions and to answer the mitigation special issue based on the law and the evidence.

6.   Veniremember Butler

a.   Applicant challenged Butler for cause on the grounds that:  (i) her failure to see a distinction between the terms "probability" and "possibility" reduced the State's burden of proof on the future-dangerousness special issue; and (ii) she would require a nexus between a mitigating circumstance and the actual commission of the crime, which unduly narrowed the mitigating circumstances the defense would be allowed to bring to the jury.  [RR 16: 250.]

b.   The Court denied the challenge for cause, and Applicant exercised a peremptory challenge.  [RR 16: 251.]

c.   During the State's individual voir dire, Butler stated that "probability" meant "[a] chance that it would happen again."  [RR 16: 209.]

d.   Butler agreed that a "probability" was not a certainty and that a probability fell somewhere between a "possibility" and a certainty. [RR 16: 209.]

e.   During the defense's voir dire, Butler agreed that "probability" meant there was "some degree of likelihood."  [RR 16: 240.]

f.   Butler stated that she and most people probably would interpret the terms "possibility" and "probability" as being "similar."  [RR 16: 240.]

g.   Butler indicated that she did not see a difference in the degree of likelihood being inquired about by the two terms and that one would not ask her to find a greater degree of likelihood than the other.  [RR 16: 241.]

h.   During the State's questioning when the distinction between the terms "probability" and "possibility" was explained, Butler had an

101

**1498**

appropriate understanding of the meaning of the terms, she saw and accepted the distinction between the terms, and she saw a "probability" as something more than a "possibility."

i.      The defense's questioning regarding the distinction between a "probability" and a "possibility" merely sought out Butler's interpretation of the terms and did not explain that the law required Butler to see and accept the distinction between the terms. [RR 16: 240-41.]

j.      At worst, Butler's answers about her understanding of "probability" were vacillating, contradictory or unclear.

k.      Based on Butler's overall responses and demeanor, she exhibited a proper understanding that "probability" meant more than a "possibility."

l.      With regard to the mitigation special issue, Butler stated that she would keep an open mind, look at all the evidence, and not automatically answer the special issue "no." [RR 16: 216.]

m.      Butler stated that the mitigation special issue did not place a burden on the defense to prove the existence or sufficiency of a mitigating circumstance. [RR 16: 245-46.]

n.      Butler responded affirmatively when Applicant's trial counsel asked if she thought the mitigation special issue was talking about blameworthiness for the offense of conviction and if she believed the instruction compelled her to find a mitigating circumstance only if it had some type of direct connection to the commission of the crime. [RR 16: 247-48.]

o.      Butler found the application of the mitigation special issue as stated by Applicant's trial counsel to be "confusing." [RR 16: 248-49.]

p.      Butler responded during the State's questioning that she would keep an open mind, look at all the evidence, and not automatically answer the mitigation special issue "no." [RR 16: 216.]

q.      Butler's overall voir dire showed that she would follow the Court's instructions in answering the mitigation special issue.

**1499**

7.     Veniremember McFarland

a.     Applicant challenged McFarland for cause because, in considering the future-dangerousness special issue, she would consider if there was a probability that a third party would commit criminal acts of violence on Applicant's behalf. [RR 17: 289.]

b.     The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 17: 289.]

c.     McFarland indicated that she could give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty, depending on the facts of the case. [RR 17: 237.]

d.     McFarland defined society as "[t]he public . . . a group or community of people," and she agreed that the definition of society was a broad term that could include the world at large. [RR 17: 245-46.] Then, the following relevant exchange occurred:

Q.     [PROSECUTOR] But the question here is the Legislature said we have – the State has the burden of proof beyond a reasonable doubt that the Defendant is going to be a continuing threat to society.

And remember from our discussions earlier that he's going to be . . . convicted of capital murder is going to be in the penitentiary the rest of their life. So you see in your mind, is there a possibility that someone could be a threat to society from the penitentiary?

A.     [MCFARLAND] Most of me says no, but, you know, a very, very small chance that they could be. You know, there's the Internet, there's family contact that could do something for them in that way, not – not directly themselves, but I do think there is a – some chance that they could find a way to do something on the outside world outside prison.

Q.     Do people from the penitentiary ever escape from the penitentiary?

A.     Yes.

Q.     Do people from . . . the society outside the penitentiary go to work in the penitentiary?

**1500**

A.   Yes.

Q.   Do they visit the penitentiary sometimes?

A.   Yes.

Q.   So you see that there's some . . . possibility for interaction –

A.   Yes.

Q.   – of – of inmates with people from your definition of society?

A.   Yes.

[RR 17: 246-47.]

e.   Applicant's trial counsel later revisited the issue in the following exchange:

Q.   [DEFENSE COUNSEL] Okay.  And then I know you had talked earlier about . . . the criminal acts of violence. . . . I understand the way you think of it as being a group in public or a group or community of people.  And [the prosecutor] had talked about [society] also was prison, and I think you said originally that you're thinking no, but then you thought about the Internet?

A.   Yes. . . . I guess I was just trying to think of ways that an inmate could interact or communicate with the outside world.

Q.   And what if – if the Judge were to tell you or – you understand that in Texas, they don't have access to the Internet?

A.   No, I don't know that.

Q.   Okay.

A.   No, . . . it was something out of . . . my head.  I don't know –

Q.   Okay.

A.   – phone calls, letters, you know.

**1501**

Q.    Okay.

A.    Family visits.

Q.    I'm sorry. You had said something earlier about also a family member, maybe?

A.    Yes.

Q.    So is . . . your definition . . . of probability that the Defendant would commit – commit criminal acts would be that it could also be by one of their family members?

A.    Yes. They could arrange it.

* * *

Q.    (BY [DEFENSE COUNSEL]) You understand that the acts would be by the Defendant and not a third person?

A.    Yes.

Q.    Because a second ago, you said it could be by a family member?

A.    Well, . . . I guess I just had in my mind that if someone in prison wanted to get back at someone outside of prison, they would find a way to possibly . . . find some way of causing harm to them or – or – I don't know how much more to put it into words, but I think if there's a will, there's a way.

Q.    So would it be fair to say for you that –

A.    They may not do it directly, but I think there is a chance that they could do it indirectly.

Q.    Okay. So be fair to say that for you, you would attribute acts in Special Issue No. 1, acts of a third person, to the Defendant in – in this question?

A.    Yes.

[RR 17: 281-83.]

**1502**

f.  Read as a whole, McFarland's responses at issue simply reveal her thought process during questioning about whether a person confined in the penitentiary could commit future acts of violence in society outside of prison.

g.  McFarland never indicated that she would hold acts of a third party against Applicant if Applicant himself did not play a part in directing the third party's acts of violence.

h.  McFarland responded affirmatively when defense counsel asked, "You understand that the acts would be by the Defendant and not a third person?" [RR 17: 282.]

i.  McFarland's overall voir dire demonstrates her ability to follow the Court's instructions in answering the mitigation special issue and to give fair consideration in a capital-murder case to a sentence of life imprisonment without parole or the death penalty depending on the facts of the case. [RR 17: 237, 244-45.]

8.  Veniremember Cuevas

a.  Applicant challenged Cuevas for cause because: (i) she indicated that her answer to the future-dangerousness special issue would be automatic based upon her analysis in finding Applicant guilty; (ii) she indicated that she had a predisposition toward the death penalty; and (iii) she never mentioned in her jury questionnaire anything about having followed the capital-murder case involving her church Sunday school classmate's murder even though question 85 specifically asked that question. [RR 20: 236-37.]

b.  The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 20: 238.]

c.  During the State's individual voir dire, Cuevas said that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

d.  Although Cuevas put in her questionnaire that the death penalty should be available for capital murder, murder of a policeman, and murder of children, she understood and had no issue with the

**1503**

definition of capital murder as charged in Applicant's case. [RR 20: 197-98.]

e.   Defense counsel asked Cuevas if she believed that the death penalty "would be the only appropriate option" for the offenses she listed in her questionnaire, and Cuevas responded: "Well, I don't know that it's the only option because what's been explained is we have to look at two things and make our decision based on . . . answering those two questions." [RR 20: 224.] When asked if a life sentence would be an option when dealing with those types of crimes, Cuevas responded, "I have to answer yes." [*Id.*]

f.   Cuevas' response on her jury questionnaire that the death penalty should be available for "capital murder, murder of policemen, murder of children" [Applicant's Exhibit 35, p.7] did not, as Applicant alleges, show her predisposition to give the death penalty to someone who murdered a child. [Application at 130.]

g.   Cuevas understood and agreed that in Applicant's trial the definition of the crime was the one shown on the State's PowerPoint, she understood that she would have to keep an open mind and consider all phases of the case before reaching a decision, and she believed she could follow the Court's instructions and go through the procedure in reaching a decision. [RR 20: 192, 197.]

h.   Cuevas told the State that, regardless of what was in Cuevas' questionnaire, she could follow her oath and apply the law to the facts in the case and render a just verdict. [RR 20: 206.]

i.   With regard to the mitigation special issue, Cuevas could keep an open mind, consider mitigating evidence in a case, and vote based on her view of whether the evidence rose to such a level that it was mitigating, and she would vote "yes" if it rose to the level of mitigating in her mind and "no" if it did not. [RR 20: 211.] Cuevas would keep an open mind, follow her oath, and give the mitigation issue a fair review. [RR 20: 212-14.] She understood that she had to keep an open mind until the State met its burden in the guilt-innocence phase and on the future-dangerousness special issue and until the jurors decided among themselves how to answer the mitigation special issue. [RR 20: 215.]

**1504**

j.   Regarding the future-dangerousness special issue, Cuevas stated that she could apply the law to the facts of the case and render a just verdict. [RR 20: 206-07.] She would answer the special issue "yes" if the State met its burden of proof, and she would have no hesitation in answering "no" if the State did not meet its burden. [RR 20: 208.]

k.   With regard to the future-dangerousness special issue, the following relevant exchange occurred between Applicant's trial counsel and Cuevas:

[DEFENSE COUNSEL] And then you're being called upon to answer this questions, Special Issue No. 1. Is that something that's pretty much a given?  I mean, if you've answered all of these questions such that a – a guilty verdict has taken place, can you see where the – that someone could decide it's a no-brainer, it's – it's an automatic response of yes because after all, we've already found these things? Is that a yes?

A.   [CUEVAS] Yes.

Q.   Okay. No, . . . the law puts the burden on the State. The law says that they have to bring you evidence that this – this particular question, the answer is yes. They have to satisfy each of the 12 of you of that.

Would they have already satisfied you if the answer is yes, because after all, they have proven these things to you beyond a reasonable doubt other than the found to be a future danger at the bottom. The slide is really meant to deal with the next special issue. That's the only difference.

Can you see that it – with some people, that it could very well be an automatic choice, it's – it's a no-brainer?

A.   Yes.

Q.   Okay. Would it be so with you?

A.   Yes.

[RR 20: 230-31.]

**1505**

l.   The Court questioned Cuevas to clarify her responses regarding the future-dangerousness special issue:

> THE COURT: . . . What you said to [defense counsel] was that you felt like the answer to Question No. 1 would be automatic based upon what your decision was in the guilt/innocence phase of the trial.
>
> And certainly it can be based upon the same evidence. My question to you is whether it's asking the same thing.
>
> [CUEVAS]: I don't think so.
>
> THE COURT: Okay. So just because you found somebody guilty of the offense of capital murder, you're not saying that you would automatically find that they were going to be a future danger in Question No. 1, or are you saying that? That's what I'm trying to figure out.
>
> [CUEVAS]: I guess it would just depend on the evidence that you heard during the trial. I mean, I don't know that I can adequately answer that question at the moment.

[RR 20: 235-36.]

m.   Regarding the future-dangerousness special issue, Cuevas' answers, at worst, were vacillating, contradictory, or unclear as to whether she would automatically answer the question "yes" after a finding of guilt.

n.   Cuevas stated that she could keep an open mind to consider all phases of the case before reaching a decision and that she could follow the rules the Court gave her and go through the procedure. [RR 20: 192.]

o.   Early in the defense's individual voir dire, Cuevas said she formed her opinion regarding the death penalty in 1994 or 1995 when a policeman in her Sunday school class in San Antonio, Texas, was killed while trying to stop a robbery in his neighborhood. [RR 20: 216.] Cuevas "followed the case very closely," she heard about the defendant's bad childhood "and everything that had happened to him," and she thought the defendant in that case deserved the death penalty even though she felt bad for him. [*Id.*] Cuevas would look that defendant up on the Internet every couple of years, and she found

**1506**

out a few years ago that he was executed. [*Id.*] Cuevas did not attend the trial. [RR 20: 217.]

p.  Cuevas was not challengeable for cause simply because she never mentioned on her jury questionnaire that she followed the capital-murder case involving her Sunday school classmate's murderer even though question 85 specifically asked that question. The defense never questioned Cuevas about why she did not include this information in response to question 85 in the jury questionnaire. Nothing in the record indicates whether Cuevas misunderstood that question 85 called for her to include the case of her Sunday school classmate's murderer as a case in which she had an interest. *See Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999) ("written questions are by nature vulnerable to misinterpretation").

q.  Given the readiness with which Cuevas disclosed and discussed the case of her Sunday school classmate's murderer during her individual voir dire, the Court finds that Cuevas had no intention to be dishonest in her responses to the jury questionnaire.

r.  Cuevas disclosed her connection to the case involving her Sunday school classmate's murderer, thus providing the defense an opportunity to intelligently exercise its challenges and to determine whether she could be a disinterested and impartial juror.

s.  Nothing indicates that Cuevas' knowledge regarding the case involving her Sunday school classmate's murderer would have had effect on her ability to follow her oath and the law in Applicant's case.

t.  Cuevas' overall voir dire demonstrated that she would follow her oath and the Court's instructions and render a punishment verdict based on the facts in evidence and the law provided by the Court.

9.  Veniremember Powell

a.  Applicant challenged Powell for cause on the basis that she would minimize or reduce the State's burden of proof on the future-dangerousness special issue by automatically voting "yes" solely upon the evidence presented to her at the guilt-innocence phase of the trial. [RR 21: 58.]

110

**1507**

b.   The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 21: 59.]

c.   During the State's individual voir dire, Powell indicated that she would answer the future-dangerousness special issue "yes" if the State met its burden beyond a reasonable doubt and "no" if the State failed to meet its burden. [RR 21: 19.]

d.   Powell understood that her oath would require her to keep an open mind to everything. [RR 21: 20.]

e.   Powell agreed to evaluate the evidence from both the guilt-innocence and punishment phases of trial. [RR 21: 20.]

f.   Powell responded affirmatively when asked if she could "keep an open mind to all the – the process." [RR 21: 29.]

g.   During the defense's voir dire, Powell responded that the future-dangerousness special issue asked her to "[l]ook at the testimonies or the evidence to see if he's going to be a harm to other people in society." [RR 21: 52.]

h.   Powell responded that she would listen to "all the testimony or whatever information is brought into the trial." [RR 21: 52-53.]

i.   Powell understood that the State bore the burden on the future-dangerousness special issue and that the defense had no burden at all. [RR 21: 53.]

j.   The entire exchange about whether Powell would automatically answer the future-dangerousness special issue "yes" based upon finding Applicant guilty is as follows:

Q.   [DEFENSE COUNSEL] But you're asked to deal with Special Issue No. 1. . . . I'm trying to set a context here and – you've already heard evidence of two murders, two knowing murders that don't have any defenses, there's no mental retardation, . . . the accused is within . . . the proper age range, it's not an accident, it's not insanity, it's not something that . . . they didn't intend to do because they were high or something like that. I believe on your questionnaire you had something like that.

**1508**

You've already made this choice. You've decided beyond a reasonable doubt that's where we're at. Now you're being asked to . . . answer Special Issue No. 1. Do you – do you see a difference in the – in the role that you have in the punishment phase?

A.  [POWELL] Yes, sir.

Q.  Are you going to be in a mindset that my goodness, I mean, we've already found that this guy's committed two murders. There's no defense. It's a – it's a given. It's a foregone conclusion. Obviously, the continuing threat to society. Does that fall within your way of thinking?

A.  Yes, sir.

Q.  Okay. . . . [Y]ou can take into consideration the evidence from the first phase of a trial, obviously –

A.  Yes, sir.

Q.  – in answering the special issues in the second phase.

You can – and many times the prosecutor will stand up and – and ask the judge to – to admit all the evidence from the first phase of the trial and during the second phase or whatever for the benefit of the jury. We all know that's the case anyway, but it's something done.

But my question to you here is – you've already made that decision that, My God, this guy has committed two murders, and there's no justification, they're innocent victims. The – is this going to be pretty much automatic for you as far as Special Issue No. 1 under those circumstances?

A.  Yes, sir.

[RR 21: 54-56.]

k.  In response to the defense's challenge for cause to Powell, the State pointed out:

[PROSECUTOR]:  Judge, the entire tenor of [Powell's] voir dire was that she would be open-minded and follow the law. [Defense counsel's] fact pattern, as you'll recall, that – when she answered it

**1509**

would be automatic is – he went through for about four minutes in fact pattern that the juror is allowed to consider as part of answering the question yes. And based on that fact pattern, they go into what (sic) she said that.

They never challenged her on her admissions throughout the State's voir dire for – that she would consider and be open-minded throughout the entire process and hold the State to our burden and never put the burden on the Defense.

[RR 21: 58-59.]

l.      The fact that Powell could answer the future-dangerousness special issue "yes" based on the facts of an offense did not render her unfit to serve because the circumstances of an offense and the events surrounding it may alone be sufficient to sustain an affirmative finding to the future-dangerousness special issue.

m.      Powell did not manifest an inability to reconsider or reweigh the evidence from the guilt-innocence phase in the particular context of the future-dangerousness special issue; therefore, Powell did not demonstrate herself to be unable to objectively follow the law.

n.      Counsel never explained to Powell that the future-dangerousness issue required a different analysis than finding Applicant guilty; thus, Applicant has not shown that Powell understood the requirements of the law and would be unable to put aside her personal beliefs and follow the law.

o.      At worst, Powell's responses were vacillating, unclear, or contradictory about whether she would automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

p.      Powell's overall voir dire showed that she would follow the Court's instructions and answer the future-dangerousness special issue based on the facts and the law and that she would not automatically answer the future-dangerousness special issue "yes" after finding Applicant guilty of capital murder.

q.      Applicant never challenged Powell on the ground he states in this habeas proceeding that her connection to the criminal justice system –

**1510**

*i.e.*, she worked as a clerk in Tarrant County and had a close relationship with others who worked in the court building – "may have biased her opinion as a juror." [Application at 131.] Alternatively, Powell's voir dire examination unequivocally demonstrated that her position in the clerk's office would have absolutely no effect on her service as a juror.

10.   Veniremember Guidroz

a.   Applicant challenged Guidroz for cause because his reading of the mitigation special issue would place the burden on the defendant. [RR 27: 115.]

b.   The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 27: 116.]

c.   The following relevant exchange occurred during the defense's individual voir dire of Guidroz:

Q.   [DEFENSE COUNSEL] It's envisioned that . . . the question [regarding mitigation] doesn't put a question on either side, but if the issue is whether or not it's sufficient, some jurors look at that and say, Well, it's got to be my job to convince me it's sufficient.

Do you feel like just by the way the question is worded it puts any kind of legal burden on the Defense to produce the mitigating evidence or to convince the jury that that mitigating evidence is sufficient?

A.   [GUIDROZ] I would say, yes.

Q.   Okay. And that's a little bit different from what the law requires.

A.   I'm sorry?

Q.   That is different from what the law would envision, but they wrote the question in a bad way.

A.   Okay.

[RR 27: 109.]

**1511**

    d.    Guidroz could answer the mitigation special issue "no" if he felt it was proper based on the evidence in the case. [RR 27: 91.]

    e.    Guidroz was open to the idea that there could be something that would be sufficient for him to find a mitigating circumstance. [RR 27: 111.]

    f.    Guidroz's overall voir dire demonstrates that he could follow his oath and the law in answering the mitigation special issue. [RR 27: 87.]

11.    Veniremember Zeiger

    a.    Applicant challenged Zeiger for cause because he would have a predisposition to answer the future-dangerousness special issue "yes." [RR 28: 103.]

    b.    The Court denied the challenge for cause, and Applicant exercised a peremptory challenge. [RR 28: 103-04.]

    c.    During the State's individual voir dire, the State informed Zeiger that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 61, 66.]

    d.    Zeiger stated that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and that he could answer "no" if the State failed to meet its burden. [RR 28: 66-67.]

    e.    During questioning by Applicant's trial counsel, the following exchange occurred:

        Q.    [DEFENSE COUNSEL] Well, I guess what I'm trying to get is how you're looking at [the future-dangerousness special issue]. Because he's going to be guilty before you ever ask this question. And you know that under this statutory scheme, that means he killed at least two people during the course of a single criminal transaction.

        And what I'm asking for – you is does that tell you that he's always going to be a danger, such that that question is always going to be answered yes; or do you think there could be situations where you would find – could find somebody guilty –

        A.    [ZEIGER] I guess personally, I think, yes. I mean, found guilty, capital murder, two people, probably yes. I would think that that person would do it again.

Q.   Okay.  And – and that's sometimes the problem with the question.  You see that – and because of the way you're looking at it, that question really is not serving any purpose, does it.

A.   There might be one – I'm trying to think of the word – one exception.

Q.   I'm sure there probably is an exception where I would say, know, now maybe he wouldn't do it again because – but not likely.

Q.   Not likely what?  Not likely they're –

A.   The person's already found guilty of capital murder, and the question of whether they would commit the crime, I would have to say probably that, you know, yeah, they would, but there might be an exception.

Q.   Okay.

A.   But I don't know what that exception would be, and I'd have to weigh all the – the variables and – and understand, I guess, the individual, the circumstances of . . . what happened and, you know, that's almost – that's a whole life.

Q.   Okay. . . . I just want to make sure that we're on the same page.  The question is not asking you is he going to commit that crime again.

A.   Right.

Q.   The question is:  Is there a probability that he would commit crimes of violence?  And from what –

A.   It's – it's hard to say, but that's a yes-or-no answer.

Q.   Okay.

A.   I mean, to me it's not a yes-or-no answer.

Q.   What would it be?  That's what the question calls for.

**1513**

A.     Well, . . . it really depends on the individual and – and all the extenuating, you know, circumstances and everything.

Q.     Okay.  Do you feel like that you're predisposed to say that the answer should be yes if you find somebody guilty of capital murder?

A.     Yes.

[RR 28: 92-94.]

f.      Zeiger later said that the "system" made sense, and he acknowledged that the special issues required the jury to find something additional about the defendant because not every capital murderer would get the death penalty.  [RR 28: 100.]

g.     Zeiger's counsel did not ask whether Zeiger could set aside his predisposition and follow his oath as a juror.

h.     Arguably, Zeiger at times gave responses that could be interpreted as showing a predisposition to answer "yes" to the future-dangerousness special issue if someone was guilty of capital murder for killing two people.  However, he also stated that there could be an exception, that he would have to weigh all the variables and understand the individual and the circumstances of what happened, and that it depended on the individual and all the extenuating circumstances.  Additionally, Zeiger stated during the State's questioning that he could answer the future-dangerousness special issue "yes" if the State met its burden of proof and "no" if it did not.  [RR 28: 66-67.]

i.      At worst, Zeiger's responses were vacillating, contradictory, or unclear.

j.      In context, Zeiger's entire voir dire established that he would be able to set aside his personal beliefs and follow the Court's instructions in answering the future-dangerousness special issue.

**1514**

12.   Veniremember Beauchamp

a.   Applicant challenged Beauchamp because she would reduce the State's burden on the future-dangerousness special issue and vote "yes" based upon the proof of multiple murders in the same transaction. [RR 28: 158.]

b.   The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 158-59.]

c.   During the State's individual voir dire, Beauchamp indicated her understanding that the State bore the burden of proof on the future-dangerousness special issue. [RR 28: 121-22.]

d.   Beauchamp understood the State's burden of proof on the future-dangerousness special issue and could answer question "yes" if the State met its burden of proof and "no" if the State did not meet its burden. [RR 28: 121-22, 128-29.]

e.   Beauchamp could see that finding a defendant guilty of capital murder was a different question than asking if he would possibly constitute a continuing threat to society. [RR 28: 130-31.]

f.   Beauchamp understood that the future-dangerousness special issue would not be answered "yes" just because she found the defendant guilty of capital murder; it would depend on the facts of the case. [RR 28: 131.]

g.   Beauchamp could return a death sentence if it were proper under the facts and law, and she could return a life sentence if the evidence pointed toward it. [RR 28: 138.]

h.   During voir dire by Applicant's trial counsel, Beauchamp stated that her expectation was to be "presented with the whole story . . . in order to make a fair judgment and provide a yes-or-no answer based on that statement." [RR 28: 154.]   Additionally, the following exchange occurred:

Q.   [DEFENSE COUNSEL] But before you're called upon to answer Special Issue No. 1, you are in a situation where you've already found beyond a reasonable doubt that the individual knowingly committed capital murder. There's not any defense. He's

**1515**

not mentally retarded. No accident. The victim is innocent. There was no self-defense involved. All those issues are gone. You have found this person to have knowingly caused multiple deaths. Okay?

With that context, is it a foregone conclusion with you that the answer to Special Issue No. 1 would be yes?

A.     [BEAUCHAMP] Yes.

Q.     Because sometimes that's a lot of information to already have about the individual, is it not?

A.     Could be, yes.

Q.     Okay. And . . . I want to be clear with you. I'm asking you if the information that you have received already in the guilt/innocence phase on which you derived your verdict of guilty beyond a reasonable doubt of capital murder without any defense available, any justification, innocent victims, that that by itself is going to be enough for you to answer yes to Special Issue No. 1 and would do so automatically because of the guilt/innocence phase evidence you've received?

A.     Yes, based on the definition.

Q.     Okay. The multiple commission of murders in one criminal transaction for you would be enough to answer this question, correct?

A.     Yes.

* * *

Q.     . . . Whose burden is it to prove this question?

A.     The State.

Q.     Okay. . . . I want to be sure I understand. In a situation where you have found somebody guilty of multiple murders in the same criminal transaction without any of the mistake defenses, accident, anything like that, is your response to Special Issue No. 1 going to be yes every time?

119

**1516**

A.      If they provided that, yes.

[RR 28: 155-57.]

i.      At worst, Beauchamp's answers were vacillating, contradictory, or unclear as to whether she would automatically answer the future-dangerousness special issue "yes" after finding a defendant guilty of a double murder committed without justification.

j.      Beauchamp's overall voir dire showed that she would follow the Court's instructions and answer the future-danger special issue based on the facts and law.

13.   Veniremember Hermosillo

a.      Applicant challenged Hermosillo for cause with regard to the mitigation special issue because she would require the defense to show why or how the crime happened and to produce evidence and convince the jury of the sufficiency of the mitigating evidence. [RR 28: 225-26.]

b.      The Court denied the challenge, and Applicant exercised a peremptory challenge. [RR 28: 226-27.]

c.      During the State's individual voir dire, the State informed Hermosillo that the State did not have the burden of proof on the mitigation special issue. [RR 28: 189.]

d.      Hermosillo understood that the defense never had a burden of proof on the mitigation special issue. [RR 28: 189.]

e.      Hermosillo would not have any problem answering the mitigation special issue "yes" if she felt there was mitigating evidence. [RR 28: 192.]

f.      Hermosillo defined her role in deciding the special issue as "[t]o look at all the evidence and, you know, decide for myself, but I'd have to know all the – you know, all the evidence provided by y'all." [RR 28: 192-93.]

g.      Hermosillo understood a defendant's right to remain silent, and s had no problem with the fact that she might hear only one side of situation. [RR 28: 193-94.]

h.     Applicant's trial counsel informed Hermosillo that neither party bore a burden with regard to the mitigation special issue. [RR 28: 216.]

i.     Hermosillo stated that the defense would have to "present reasons why that may have caused this incident or this murder," to prove the defendant's character or something about him like whether this was his first time, and to convince her that there is another side to the defendant. [RR 28: 217-18.]

j.     Hermosillo responded affirmatively when asked whether the defense would have to present evidence and convince her it was sufficient. [RR 28: 218.]

k.     Hermosillo thought there could be mitigating circumstances that would be sufficient to show that a death sentence was not appropriate. [RR 28: 219.]

l.     When the Court questioned Hermosillo, she understood that she would take an oath to follow the law contained in the Court's instructions. [RR 28: 222.]

m.     The following exchange occurred between the Court and Hermosillo:

THE COURT: Okay. As a juror, you would receive an instruction that the law does not require a Defendant to prove his innocence or to produce any evidence at all. Do you understand that instruction?

[HERMOSILLO]: Yes, ma'am.

THE COURT: All right. As a juror, would you be able to follow that instruction, or is your feeling that you've mentioned today, is that such a strong feeling that you would not be able to follow that instruction?

[HERMOSILLO]: No, ma'am. I – I would have to, you know, follow all the instructions and really pay attention to, you know, what's put before me. I don't think I would have any problem following instructions, you know. . . . I think that the Defendant would have to –

THE REPORTER: I'm sorry. Please repeat that.

**1518**

[HERMOSILLO]: I said I think that the Defendant's attorney would have to show; otherwise, you know, or prove him to be – I'm tired – that they would have to show that he – you know, there's other circumstances that caused him to – to, you know, cause the murder.

But I – I would really have to, you know, follow the rules and listen to everything, all the evidence, before I – you know, I cannot make up my kind and say, Well, yeah, he's guilty, you know. I can't do that. I have to listen to everything that's brought before me.

THE COURT: Well –

[HERMOSILLO]: I wouldn't have any problems with that even though . . . in the past . . . I may have thought, well, you know, once a person's here, he's guilty or – and I can't judge somebody until I know the facts. I've never served on a jury before, so I don't know how things are, you know, brought forth, how the evidence is brought before use and stuff, so I would have to just make sure that I'm, you know, following the Judge's guidance and/or rules or make sure I follow everything exact.

THE COURT: . . . But my question to you is whether you could follow the instruction that the Judge would give you saying that the Defendant does not have a burden of proof, they do not have to present any evidence whatsoever in any stage of the trial.

[HERMOSILLO]: Yes, ma'am. I think I could.

THE COURT: Okay. When you say that you think you can, I need a more definite answer –

[HERMOSILLO]: I know I can.

[RR 28: 222-25.]

n.   At worst, Hermosillo gave vacillating, contradictory, or unclear answers about whether she wanted the defense to present mitigating evidence at the punishment phase.

o.   In the end, Hermosillo assured the Court that she could put aside her personal views, follow the Court's instructions, and not impose a

122

**1519**

burden of proof on the defense with regard to the mitigation special issue.

14. The Court granted Applicant two additional peremptory strikes during the course of the voir dire proceedings.

## Conclusions Of Law

1. In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that: (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623; *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

2. Appellate counsel need not advance every argument, regardless of merit. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24. However, if appellate counsel fails to raise a claim that has "indisputable merit under well-settled law and would necessarily result in reversible error," then counsel is ineffective for failing to raise it. *Ex parte Flores*, 387 S.W.3d at 639 (quoting *Ex parte Miller*, 330 S.W.3d at 624).

3. A veniremember may be challenged for cause if he has a bias or prejudice against any phase of the law upon which the defendant is entitled to rely. TEX. CODE CRIM. PROC. art. 36.16(c)(2). Bias against the law is refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

4. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003).

5. Before a prospective juror may be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Gardner*, 306 S.W.3d at 295; *Sells*, 121 S.W.3d at 759.

**1520**

6.  The proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Sells*, 121 S.W.3d at 759.  The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow it.  *Id.*

7.  When called upon to review a trial court's decision to grant or deny a challenge for cause, an appellate court looks at the entire record to determine if there is sufficient evidence to support the trial court's ruling. *Sells*, 121 S.W.3d at 759.  An appellate court affords considerable deference to the trial court's ruling because the trial judge is in the best position to evaluate a veniremember's demeanor and responses and to hear his tone of voice. *Gardner*, 306 S.W.3d at 295-96; *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

8.  A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion.  *Gardner*, 306 S.W.3d at 296; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007).

9.  When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the reviewing court must defer to the trial court's decision. *Gardner*, 306 S.W.3d at 296; *Ladd*, 3 S.W.3d at 559.

10. Because the Court granted Applicant two additional peremptory strikes, in order to demonstrate a reasonable probability that he would have prevailed on appeal, Applicant must show that the Court erroneously denied at least three of his challenges for cause. *Feldman*, 71 S.W.3d at 744; *see Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1992) (op. on reh'g) ("Where the court reinstates peremptory strikes, to show harm, the party complaining on appeal must show that one additional juror sat on the case than the number of reinstated peremptory strikes").

11. Applicant has failed to establish that appellate counsel's strategic decisions were objectively unreasonable and that there is a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised the claims Applicant suggests.

12. Applicant has not met his burden to prove by a preponderance of the evidence that the representation of his appellate counsel fell below an objective standard of reasonableness under prevailing professional norms

**1521**

because counsel, based on a review of the record and the law, determined that points of error on appeal challenging the denial of Applicant's challenges for cause would have been without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"); *see also Ex parte Miller*, 330 S.W.3d at 623-24 (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)).

13.   Applicant's allegations are too conclusory to meet his burden to establish the first prong of *Strickland*, and he should be denied relief. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

14.   Even if Applicant could show that his appellate counsel was deficient for failing to raise points of error on appeal challenging the denial of the nine challenges for cause he refers to in this claim, he has not met his further burden to show resulting prejudice. *See Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

15.   Applicant would have been unable to establish on appeal that the Court erroneously denied at least three of the nine challenges for cause at issue. Thus, there is no reasonable probability that Applicant's case would have been reversed on appeal had appellate counsel raised points of error challenging the denial of the nine challenges for cause at issue. Applicant has failed to meet his burden to establish by a preponderance of the evidence that he suffered prejudice as a result of the alleged deficient performance of his appellate counsel.

16.   The Court recommends that Applicant's tenth claim for relief be denied.

## J.   Claim for Relief Eleven

Applicant asserts that trial counsel were ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove minority veniremembers in violation of Applicant's constitutional rights. [Application at 137.]

**1522**

## Findings Of Fact

1. Applicant's allegations focus on three minority veniremembers:   Aaron Gonzales, a Hispanic male; Valerie Williams, an African-American female; and Darryl Dennis, an African-American male. [Application at 137-45.]

2. Moore has raised *Batson* challenges on several past occasions in both death-penalty and non-death-penalty cases, and he would have raised a *Batson* challenge in Applicant's case had he believed there was anything to suggest any racial motivation in the State's use of peremptory strikes on Gonzales, Williams, or Dennis. [Moore's affidavit at 26, 29.]

3. Applicant makes no attempt to establish the *prima facie* case required by the first step of the *Batson* analysis. [*See* Application at 137-45.]

4. Trial counsel had strategic reasons for not objecting to the State's exercise of peremptory challenges against Gonzales, Williams, and Dennis. [Moore's affidavit at 27].

5. Trial counsel recognized that there were "obvious race neutral reasons for each of [the State's peremptory] strikes" at issue in this habeas proceeding. [Cummings' affidavit at 10.]

6. There were a number of strategic reasons that trial counsel did not want Gonzales to be seated on Applicant's jury:  (a) Gonzales was only twenty-two years old; (b) his father was in law enforcement, and he was personally considering a possible career in law enforcement; (c) he gave inconsistent answers about his ability to judge another person; (d) he seemingly placed responsibility for bringing mitigating evidence before the jury and the burden of persuading the jury of the importance of such mitigating evidence on the defense; and (e) he appeared to have a significant work problem if he were chosen to serve. [Moore's affidavit at 27.]

7. Moore did not object to the State's excusal of Gonzales because Moore did not want Gonzales seated as a juror and because Moore wanted to force the State to use a peremptory strike on Gonzales, "as that is an important part of the 'art' of capital voir dire." [Moore's affidavit at 27.]

**1523**

8.  Even if the State had not struck Gonzales, he likely would not have been seated as a juror at Applicant's trial because Applicant's trial counsel did not want him to serve as a juror. [*See* Moore's affidavit at 27]

9.  It was apparent to Moore that the State would not accept Williams as a juror because Williams was somewhat "soft" on the death penalty and there was uncertainty about the position her church might ultimately take on the death penalty. [Moore's affidavit at 28.]

10. In Moore's experience, individuals such as Williams have a great problem in taking the ultimate responsibility of voting for death. [Moore's affidavit at 28.]

11. Trial counsel wanted the State to be compelled to expend a peremptory challenge to excuse Williams from the jury. [Moore's affidavit at 28.]

12. A *Batson* challenge regarding Williams would not have succeeded because there were obvious reasons for the State to strike her. [Moore's affidavit at 28.]

13. Both sides had issues with Dennis as a potential juror. [Moore's affidavit at 28.]

14. Applicant makes no showing that the defense would not have exercised a peremptory strike to remove Dennis had the State accepted him as a juror.

15. Had the defense accepted Dennis as a juror for Applicant's trial, there is a possibility that he would not have been a favorable juror for Applicant. [*See* Moore's affidavit at 28.]

16. The State had no racial motivation for exercising a peremptory strike against Gonzales, Williams, or Dennis, and it would have been "unethical" in Moore's opinion to make a *Batson* challenge absent any basis to support it. [Moore's affidavit at 26-29.]

17. Over the course of thirty years, Moore has never known lead prosecutor Robert K. Gill to be racially biased or to act in a racially motivated manner in any of the actions Gill has taken in court. [Moore's affidavit at 28-29.]

**1524**

18.  Moore has never known prosecutor Miles Brissette act in a racially motivated manner in any case that they previously had together. [Moore's affidavit at 29.]

19.  Applicant's trial counsel made a reasonable and strategic decision not to raise what they believed would be a futile *Batson* claim.

20.  Lead prosecutor Gill provided an affidavit in this habeas proceeding setting forth a number of facially race-neutral reasons for the State's exercise of peremptory strikes on Gonzales, Williams, and Dennis. [Gill's affidavit (State's Exhibit 1).]

21.  The voir dire proceedings and the jury questionnaires relating to Gonzales, Williams, and Dennis support the State's facially race-neutral reasons for exercising peremptory on those veniremembers as set forth in Gill's habeas affidavit.

22.  Applicant's comparative analysis does not take into account the State's race-neutral explanations for exercising the three peremptory strikes at issue. [*See* Application at 142-45.]

23.  With regard to the *Strickland* prejudice prong, Applicant offers only the bare assertion that "[t]here is a reasonable probability that the State would not have been able to provide a race-neutral reason for their removal from the jury. This failure to object left [Applicant] with a constitutionally-infirm jury; a malady that can only be remedied by a new trial." [Application at 145 (citations omitted).]

24.  Applicant has not provided the type of fact-intensive and exhaustive review of the proceedings as a whole that is required to meet his burden to prove prejudice.

25.  Applicant's assertions of prejudice are conclusory.

## Conclusions Of Law

1.  In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at

**1525**

521; *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892-93; *Ex parte Briggs*, 187 S.W.3d at 466.

2.  To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696; *Ex parte Ellis*, 233 S.W.3d at 330.

3.  An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d at 633; *Ex parte Ramirez*, 280 S.W.3d at 852. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson*, 877 S.W.2d at 771. Such a claim must be proven by the preponderance of the evidence. *See Bone*, 77 S.W.3d at 833.

5.  An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *Turcotte*, 405 F.3d at 537. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d at 629; *Thompson*, 9 S.W.3d at 813.

6.  Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330. "Both prongs of the Strickland test are judged by the totality of the circumstances

**1526**

as they existed at trial, not through 20/20 hindsight." *Ex parte Flores*, 387 S.W.3d at 633-34.

7.   A three-step analysis guides the evaluation of a defendant's equal-protection challenges to a prosecutor's use of peremptory challenges: (a) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (b) upon such a showing, the burden of proof shifts to the State to provide a race-neutral explanation for striking the veniremembers in question; and (c) the trial court must determine whether the defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson v. Kentucky*, 476 U.S. 79, 94-98 (1986); *Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012).

8.   The ultimate burden of persuasion regarding improper motivation rests with, and never shifts from, the party challenging the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

9.   The failure of trial counsel to lodge a *Batson* objection is not presumptively prejudicial for purposes of a claim of ineffective assistance of counsel. *See Young v. Bowersox*, 161 F.3d 1159, 1160-61 (8th Cir. 1998). Even if an error premised on *Batson* is shown, it does not warrant setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment. *See id.*

10.   The failure of Applicant's trial counsel to raise a *Batson* objection during voir dire did not fall below an objective standard of reasonableness under prevailing professional norms because counsel made a reasonable strategic decision not to raise a claim that they believed to be without merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions"). Applicant has failed to meet his burden to prove that his trial counsel were deficient.

11.   *Batson* requires Applicant to do more than show that minority veniremembers were peremptorily struck from the venire; Applicant must also raise an inference that the prosecutor excluded the veniremembers from the jury on account of their race. *See Batson*, 476 U.S. at 96. Simply alleging that two African-American veniremembers and one Hispanic

**1527**

veniremember were impermissibly struck does not satisfy this threshold requirement. *See Hassan*, 369 S.W.3d at 875-78.

12. The State's facially race-neutral reasons for exercising the peremptory strikes at issue satisfy the second prong of the *Batson* inquiry. *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (at second step of process, proponent of strike need only tender facially race-neutral explanation) (citing *Purkett*, 514 U.S. at 767-68).

13. A comparative analysis relates to the third prong of the *Batson* framework and must be conducted in light of the race-neutral explanations tendered by the State. *See Purkett*, 514 U.S. at 768 ("It is not until the third step that the persuasiveness of the justification [for the peremptory strike] becomes relevant"). Applicant's comparative analysis, which is based upon a narrow view of the record and does not examine the State's race-neutral explanations for striking the veniremembers at issue, cannot even begin to demonstrate pretext or racial motivation behind the State's peremptory strikes at issue. Applicant has failed to prove that the prosecutor's explanations were incorrect, much less that they were a pretext for discrimination.

14. Applicant has not met his burden to satisfy the three-pronged analysis of *Batson*; therefore, he has not met his burden to establish that a *Batson* challenge would have succeeded. Under such circumstances, Applicant has not proven by a preponderance of the evidence that the performance of his trial counsel fell below an objective standard of reasonableness under prevailing professional norms. Applicant's claims are not firmly founded in the record, and Applicant fails to establish deficient performance by his trial counsel.

15. Even if Applicant could demonstrate that his trial counsel's failure to raise a *Batson* claim was objectively unreasonable, he bears the further burden to show a reasonable probability that the outcome of his trial would have been different had trial counsel lodged a Batson objection. *See Batiste v. State*, 888 S.W.2d 9, 15-17 (Tex. Crim. App. 1994) (claim of ineffective assistance for failing to raise Batson claim subject to Strickland's prejudice prong).

16. There is no reasonable probability that the outcome of any stage of Applicant's proceedings would have been different had Applicant's trial counsel asserted a *Batson* claim during voir dire. There simply is no

**1528**

evidence to suggest either that the alleged deficient performance of trial counsel or the makeup of the seated jury had a prejudicial effect on Applicant's defense at any phase of his trial. *See Batiste*, 888 S.W.2d at 14.

17. The Court recommends that Applicant's eleventh claim for relief be denied.

## Claim Twelve
## Consideration of Mitigating Evidence

Applicant alleges that his death sentence should be vacated because the punishment-phase jury instruction restricted the evidence the jury could determine was mitigating. [Application at 145.] He argues that he was unable to have all mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence because the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to his "moral blameworthiness." [*Id.* at 149-51.]

## Finding of Fact

1. Special issue two in the Court's charge on punishment instructed the jury regarding the consideration of mitigating evidence. [CR 4: 727-28.]

2. The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

## Conclusions of Law

1. The complained-of language in the mitigation special issue did not unconstitutionally narrow the definition of mitigating evidence to that which reduced Applicant's moral blameworthiness. *Roberts*, 220 S.W.3d at 534.

2. Special Issue Two posed no barrier to the jury giving effect to any of Applicant's alleged mitigating evidence. *Roberts*, 220 S.W.3d at 534.

**1529**

## Claim Thirteen
## Arbitrary Imposition of the Death Penalty

Applicant alleges that his death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty. [*See* Application at 151.]   He asserts that geographical and racial disparities have rendered Texas' death-penalty scheme unconstitutional. [*See id.* at 151-60.]

### Findings of Fact

1. Applicant has not shown that he was singled out for selective prosecution or that the death-penalty statute was applied against him in any unconstitutionally arbitrary or capricious manner. [Application at 151-60.]

2. The materials cited and relied on by Applicant do not establish his claim.

### Conclusions of Law

1. The discretion afforded the State to seek the death penalty is not unconstitutional. *Ladd*, 3 S.W.3d at 574; *see Gregg v. Georgia*, 428 U.S. 153, 199 (1976).

2. Applicant's challenge to the constitutionality of Texas' death-penalty scheme based on the geographic and racial reasons he asserts is without merit. *See Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004) (varying decision-making between counties regarding seeking death penalty does not violate right to equal protection); *Allen v. State*, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003) (rejecting disparate-application claim based on county's financial constraints or ability to seek death penalty); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App. 1999) (rejecting claim based on statistical studies that Texas death sentences are disproportionately imposed in racially discriminatory manner).

**1530**

## Claim Fourteen
## "10-12" Rule

Applicant asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the Court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. [*See* Application at 160.]  He argues that the "10-12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), and that the effect of the "10-12 rule" creates "an impermissible outside influence on jury deliberations" by improperly coercing juries into death sentences. [Application at 162-67.]

**Findings of Fact**

1.  Special issue two of the Court's punishment charge instructed the jury regarding its consideration of mitigating evidence. [CR 4: 727-28.]

2.  The Court's mitigation special issue complied with the requirements of TEX. CODE CRIM. PROC. art. 37.071, § 2(e)&(f). [CR 4: 727-28.]

3.  The Court did not instruct the jury that a hold-out vote by one juror would result in a life sentence.

**Conclusions of Law**

1.  This Court was prohibited by TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1) from instructing any juror or prospective juror of the effect of a failure of the jury to agree on the mitigation special issue.

2.  There is no constitutional violation in failing to inform jurors of the effect of their failure to agree on special issues. *E.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Luna v. State*, 268 S.W.3d 594, 09 (Tex.

134

**1531**

Crim. App. 2008); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

### Claim Fifteen
### Eligibility for the Death Penalty

Applicant asserts that he is ineligible for a death sentence because "his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution." [Application at 167.]

### Findings of Fact

1.  Applicant relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eight Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of individuals with intellectual disability. [Application at 167.]

2.  Although the term "mental retardation" has been employed in the past, such as it was at the time *Atkins* was decided, the Supreme Court of the United States now favors use of the term "'intellectual disability' to describe the identical phenomenon," and this Court will therefore follow suit. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

3.  Applicant's claim for relief is not based on intellectual disability as was the claim in *Atkins*.

4.  Applicant offers no persuasive argument that *Atkins* should be extended to require a blanket exemption from the death penalty for persons suffering from CPTSD.

5.  There is no objective evidence that society views as inappropriate the execution of death-eligible individuals who have CPTSD.

6.  Applicant fails to demonstrate a trend among state legislatures to categorically prohibit the imposition of capital punishment against offenders who suffer from CPTSD.

7.    Applicant does not suffer from a major mental illness. [RR 44: 145.]

8.    Applicant's objective neuropsychological and psychological test results and the facts of the offense are inconsistent with Applicant's claim that he is ineligible for the death penalty because of an alleged mental impairment. [Dr. Price's affidavit at 7-9.]

9.    Applicant's behavior prior to, during, and after the charged capital-murder offense is inconsistent with his allegation about the effect of the alleged mental impairment. [Dr. Price's affidavit at 8-9.]

10.   Applicant's actions around the time of the offense clearly indicated that he had the capacity to understand and process information, to control his impulses, to engage in logical reasoning, to consider the future repercussions of his actions, and to communicate. [Dr. Price's affidavit at 8-9.]

11.   Applicant's psychological and neuropsychological test data and his life history are not at all similar to an individual with intellectual disability. [Dr. Price's affidavit at 7.]

**Conclusions of Law**

1.    Applicant's claim is not based on an intellectual disability, and *Atkins* does not extend to exempt persons with mental illness from imposition of the death penalty. *Soliz v. State*, 432 S.W.3d 895, 903-04 (Tex. Crim. App. 2014) (Soliz not exempt from death penalty despite expert testimony that Soliz diagnosed with partial fetal-alcohol syndrome and had cognitive and functional abilities similar to person with mental retardation); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *see Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *People v. Castaneda*, 51 Cal.4th 1292, 1345, 127 Cal.Rptr.3d 200, 249, 254 P.3d 249, 290 (2011); *Simmons v. State*, 105 So.3d 475, 511 (Fla. 2012); *Lewis v. State*, 279 Ga. 756, 764, 620 S.E.2d 778, 786 (2005); *State v. Dunlap*, 2013 WL 4539806 (Idaho August 27, 2013); *Matheney v. State*, 833 N.W.2d 454, 458 (Ind. 2005); *Dunlap v. Commonwealth*, 2013 WL 3121689 at *65 (Ky. June 20, 2013); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock*, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-60 (2006); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013).

**1533**

2.  Applicant would have been eligible for the death penalty even if he had been diagnosed with CPTSD.  *See Soliz v. State*, 432 S.W.3d at 903-04; *Mays*, 318 S.W.3d at 379.

**RECOMMENDATION**

This Court recommends that Applicant's requests for relief be denied.

**SIGNED AND ENTERED** this _21ST_ day of _January_, 2015.

**HON. RUBEN GONZALEZ, Jr.**
**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**

137

**1534**

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 21 2015

TIME_____
BY_____ DEPUTY

C-432-009923-1184294-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 432nd JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## ORDER

The Court takes judicial notice of the reporter's record and clerk's records for the underlying trial in this case. The Court further takes judicial notice of all hearings attendant to this case over which the Court personally presided.

The Court recommends to the Texas Court of Criminal Appeals that it **DENY** relief to JOHN WILLIAM HUMMEL in this cause.

The Court further orders and directs:

1.     The Clerk of this Court to file these findings and transmit them, along with the Writ Transcript, to the Clerk of the Texas Court of Criminal Appeals as required by law.

2.     The Clerk of this Court to furnish a copy of the Court's finding to Applicant, John William Hummel, by and through his counsel of record, the Hon. Brad Levenson, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas 78711, and to the appellate section of the Tarrant County Criminal District Attorney's Office.

**SIGNED AND ENTERED** this _21 ST_ day of _January_, 2015.

**HON. RUBEN GONZALEZ, Jr.**
**JUDGE PRESIDING**
**432nd JUDICIAL DISTRICT COURT**



138

**1535**

| | |
|---|---|
| NAME   JOHN WILLIAM HUMMEL | OFFENSE   MURDER - CAPITAL MULTIPLE |
| ADDRESS    600 LITTLE SCHOOL, #RD | DATE   12/17/2009 |
| KENNEDALE TX 76060 | I.P. JOY HUMMEL, CLYDE BEDFORD |
| RACE W  SEX M  AGE 34  DOB 11/4/1975 | |
| CASE NO. 1184294   DATE FILED      12/22/2009 | AGENCY Kennedale PD |
| CID NO.   0763423 | OFFENSE NO. 0900017546 |
| | COURT 432nd District Court |

INDICTMENT NO. 1184294

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

**THE GRAND JURORS OF TARRANT COUNTY, TEXAS,**

duly elected, tried, empaneled, sworn, and charged to inquire of offenses committed in Tarrant County, in the State of Texas, upon their oaths do present in and to the

396th DISTRICT COURT

of said County that JOHN WILLIAM HUMMEL, hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 17th day of December 2009, did

THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, CLYDE BEDFORD, BY STRIKING HIM WITH A BAT AND DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, JOY HUMMEL, BY STABBING HER WITH A KNIFE AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

PARAGRAPH TWO:  AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 17TH DAY OF DECEMBER, 2009, DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, CLYDE BEDFORD, BY STRIKING HIM WITH A BAT AND DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, JOY HUMMEL, BY STABBING HER WITH A DAGGER AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

PARAGRAPH THREE:  AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 17TH DAY OF DECEMBER, 2009, DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, CLYDE BEDFORD, BY STRIKING HIM WITH A BAT AND DID THEN AND THERE KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, JOY HUMMEL, BY STABBING HER WITH A SWORD AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

**1536**

NAME     JOHN WILLIAM HUMMEL
CASE NO. 1184294
PAGE     2 of 2

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Filed (Clerk's use only)

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 1 7 2010

TIME 10:35

BY_____ DEPUTY

_____
     Criminal District Attorney
     Tarrant County, Texas
     INDICTMENT - ORIGINAL

_____
     Foreman of the Grand Jury

**1537**

CASE NO. 1184294D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 432nd |
| | § | |
| VS | § | DISTRICT COURT OF |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |

## CAPITAL JUDGMENT

On June 13, 2011 this cause was called for trial and the State by her Criminal District Attorney, Assistants MILES BRISSETTE and ROBERT GILL and the attorneys for the Defendant, JOHN WILLIAM HUMMEL, Honorable FRED CUMMINGS, LARRY M. MOORE and PAMELA FERNANDEZ, announced ready for trial; and the State having made known that it would seek the Death Penalty in this cause and the Defendant having been heretofore arraigned; and, it appearing to the Court that the Defendant was mentally competent and the Defendant having been charged in the Indictment with Capital Murder; thereupon, a Jury of good and lawful men and women, to-wit:  Juror No. 100, Foreperson, and eleven others, was duly selected, impaneled and sworn as the law directs, and the said Criminal District Attorney read to the Jury, Count One, Paragraph Two and Paragraph Three of the Indictment herein, and the Defendant having stood mute, and counsel for the Defendant having entered a plea of Not Guilty to Count One, Paragraph Two, and Paragraph Three on behalf of the Defendant, of the Indictment, hereto; and the Jury, after hearing the evidence, and being duly charged by the Court, retired to consider its verdict, and after deliberation, returned into open court on the 28th day of June, 2011, the following verdict, to-wit:

### VERDICT FORM

We the Jury, find the Defendant, JOHN WILLIAM HUMMEL, guilty of the offense of Capital Murder, as charged in the indictment.

Signed: *Juror No. 100*
Foreperson of the Jury

The parties announced ready for the second phase of the trial, and the Jury, having heard all the evidence, and being duly charged by the Court, retired to consider its verdict, and after due deliberation, returned into open court, on the 28th day of June, 2011, their answers to the following Special Issues, and their verdict:

**1538**

SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

In your verdict you will
answer "Yes" or "No"                    Answer:      <u>YES</u>


SPECIAL ISSUE NO. 2


Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

In you verdict you will
answer "Yes" or "No"                    Answer:      <u>NO</u>


**VERDICT FORM**

We, the Jury, having unanimously agreed upon the answer to the foregoing issues do hereby return the same into court as our verdict.

Signed: *Juror No. 100*
Foreperson of the Jury


After an individual poll of the Jurors, the Court duly accepted the verdict and ORDERED the same to be filed.

The Jury having answered Special Issue One "YES" and Special Issue Two, "NO", it being mandatory that the punishment be death, the Court assessed the punishment at Death.

The Defendant, JOHN WILLIAM HUMMEL, was asked by the Court, whether he had anything to say why sentence should not be pronounced against him, and the Defendant answered nothing in bar thereof;

The Court proceeded, in the presence of the said Defendant JOHN WILLIAM HUMMEL, and his counsel of record, to pronounce sentence against him as follows:

IT IS THEREFORE THE ORDER, JUDGMENT AND DECREE OF THIS COURT that you be remanded to the custody of the Sheriff of Tarrant County, Texas, delivered to the Institutional Division of the Texas Department of Criminal Justice, where you shall be continuously confined until 6:00 p.m. on a date to be determined by this Court upon a mandate of affirmance issued by the Texas Court of Criminal Appeals at the state penitentiary at Huntsville.

You shall be caused to die by intravenous injection of a substance or substances in a lethal quantity sufficient to cause your death until you are dead. Said execution procedure to be determined and to be supervised by the Director of the Institutional Division of the Texas Department of Criminal Justice.

**1539**

The Clerk of this Court is ordered to issue to the Director of the Institutional Division of the
Texas Department of Criminal Justice a death warrant in accordance with this sentence.

HON. RUBEN GONZALEZ, JR.
PRESIDING JUDGE
432ND DISTRICT COURT
TARRANT COUNTY, TEXAS

June 29, 2011
Date Signed

**1540**

CASE NO. 1184294D         COUNT ONE
INCIDENT NO./TRN: 9047565932

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 432ND DISTRICT COURT |
| | § | |
| v. | § | |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX08542212 | § | Date:  JUN 2 8 2011 |



Right Thumbprint

X _Tracy Tremaine_ 71305

**PERSON TAKING PRINT**

# JUDGMENT AND SENTENCE
# FINGERPRINT PAGE

Clerk

KW

Page 4 of 4

**1541**

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL COURT CAUSE NO. 1184294D

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PARTIAL REPORTER'S RECORD

SENTENCING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 28th day of June, 2011, the
following proceedings came on to be heard in the
above-entitled and -numbered cause before the Honorable
Ruben Gonzalez, Jr., Judge Presiding, held in Fort
Worth, Tarrant County, Texas:

Proceedings reported by machine shorthand.

ANGIE TAYLOR, CSR, RPR
Official Court Reporter
432nd DISTRICT COURT

ORIGINAL

1                    A P P E A R A N C E S

2

3    HONORABLE ROBERT K. GILL - SBOT NO. 07961600
     HONORABLE D. MILES BRISSETTE - SBOT NO. 50511628
4    Assistant District Attorneys
     401 W. Belknap Street
5    Fort Worth, Texas  76196
     Phone:  817-884-1400
6

7                    Attorney(s) for the State of Texas.

8

9
     HONORABLE LARRY M. MOORE - SBOT NO. 14357800
10   HONORABLE FRED CUMMINGS - SBOT NO. 05225400
     4210 West Vickery Boulevard
11   Fort Worth, Texas 76107
     Phone:  817-338-4800
12

13   HONORABLE PAMELA S. FERNANDEZ - SBOT NO. 24045868
     403 N. Sylvania, Suite 11
14   Fort Worth, Texas  76111
     Phone:  817-831-3003
15

16
                     Attorney(s) for the Defendant.
17

18

19

20

21

22

23

24

25

<pre>
 1                    CHRONOLOGICAL INDEX
                            VOLUME 1
 2                 PARTIAL REPORTER'S RECORD
                           SENTENCING
 3

 4      <u>JUNE 28, 2011</u>                        <u>PAGE</u>      <u>VOL</u>

 5

 6      Sentencing.............................      4         1

 7      Sentencing Excerpt Concluded...........      5         1

 8      Reporter's Certification...............      6         1

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

STATE VS. JOHN WILLIAM HUMMEL

```
 1                P R O C E E D I N G S

 2              (June 28, 2011 ~ 2:53 p.m.)

 3              (Open court, Defendant and jury present)

 4              THE COURT:  Is there any legal reason that

 5    sentence should not be pronounced?

 6              MR. CUMMINGS:  No legal reason, Your Honor.

 7              THE COURT:  Mr. John William Hummel, the

 8    jury having found you guilty of capital murder of Clyde

 9    Bedford, Joy Hummel as charged in the Indictment and the

10    jury having returned a unanimous verdict to Issue No. 1,

11    answered, yes, and Issue No. 2, answered, no, and it

12    being mandatory that your punishment accordingly be set

13    at death, the Court hereby orders and sentences you to

14    death by lethal injection.

15              It is therefore the Order, Judgment and

16    Decree of this Court that you be remanded to the custody

17    of the sheriff of Tarrant County, Texas, delivered to

18    the Institutional Division of the Texas Department of

19    Criminal Justice where you shall be continuously

20    confined until 6:00 p.m. on a date to be determined by

21    this Court upon a mandate of affirmance issued by the

22    Texas Court of Criminal Appeals at the state

23    penitentiary at Huntsville.

24              You shall be caused to die by intravenous

25    injection of a substance or substances in a lethal
```

STATE VS. JOHN WILLIAM HUMMEL

```
 1  quantity sufficient to cause your death until you are
 2  dead.   Set execution procedure to be determined and
 3  to be supervised by the director of the Institutional
 4  Division of the Texas Department of Criminal Justice.
 5           The clerk of this court is ordered to issue
 6  to the director of the Institutional Division of the
 7  Texas Department of Criminal Justice a death warrant in
 8  accordance with this sentence.
 9           Mr. Hummel, do you understand your
10  sentence?
11           THE DEFENDANT:   Yes.
12           (Sentencing Excerpt Concluded at 2:54 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

STATE VS. JOHN WILLIAM HUMMEL

1 | THE STATE OF TEXAS      )

2 | COUNTY OF TARRANT       )

3 |          I, Angelica Taylor, Official Court Reporter in

4 | and for the 432nd Judicial District Court of Tarrant

5 | County, State of Texas, do hereby certify that the above

6 | and foregoing contains a true and correct transcription

7 | of all portions of evidence and other proceedings

8 | requested in writing by counsel for the parties to be

9 | included in this volume of the Reporter's Record, in the

10 | above-styled and -numbered cause, all of which occurred

11 | in open court or in chambers and were reported by me.

12 |          I further certify that this Reporter's Record

13 | of the proceedings truly and correctly reflects the

14 | exhibits, if any, admitted by the respective parties.

15 |          I further certify that the total cost for the

16 | preparation of this Reporter's Record is $ 24.00

17 | and was paid by Tarrant County.

18 |          WITNESS MY OFFICIAL HAND this the 28th

19 | day of June, 2011.

20 |

21 | ANGELICA TAYLOR, TEXAS CSR NO. 7180
   | Cert Exp. Date: 12/31/2011
22 | Official Court Reporter
   | 432nd Judicial District Court
23 | 401 West Belknap Street
   | Fort Worth, Texas 76196

24 |

25 |

CASE NO. 1184294D    COUNT ONE
INCIDENT NO./TRN: 9047565932

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 432ND DISTRICT COURT |
| | § | |
| v. | § | |
| | § | |
| JOHN WILLIAM HUMMEL | § | TARRANT COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX08542212 | § | Date: JUN 2 8 2011 |



Right Thumbprint

X _Terry Tremaine_ 71305

**PERSON TAKING PRINT**

## JUDGMENT AND SENTENCE
## FINGERPRINT PAGE

Clerk

Page 4 of 4

**1548**

Case No. 1184294D

THE STATE OF TEXAS

§
§
§
§
§

IN THE 432ND

CRIMINAL DISTRICT COURT

TARRANT COUNTY, TEXAS

vs.

John William
Hummel

FILED
THOMAS A WILDER DIST. CLERK
TARRANT COUNTY, TEXAS
JUN 28 2011
TIME _____
BY _____ DEPUTY

## TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL

Judge Ruben Gonzalez, Jr., judge of the trial court, certifies this criminal case:

✗ is not a plea-bargained case and the defendant has the right of appeal.

____ is a plea-bargained case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal.

____ is a plea-bargained case, but the trial court has given permission to appeal, and the defendant has the right of appeal.

____ involves another appealable order (specify: _____).

____ is a plea-bargained case and the defendant has NO right of appeal.

____ the defendant has waived the right of appeal.

Signed and entered this __28__ day of __June_____, 20_11_.

_____
Judge Ruben Gonzalez, Jr.

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, including any right to file a *pro se* petition for discretionary review pursuant to Rule 68 of the TEXAS RULES OF APPELLATE PROCEDURE. I have been admonished that my attorney must mail a copy of the court of appeals' judgment and opinion to my last known address and that I have only 30 days in which to file a *pro se* petition for discretionary review in the court of appeals, TEX. R. APP. R.68.2. I acknowledge that, if I wish to appeal this case and if I am entitled to do so, it is my duty to inform my appellate attorney, by written communication of any change in the address at which I am currently living or any change in my current prison unit.  I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in my address, I may lose the opportunity to file a pro se petition for discretionary review.

_John Hummel_____
Defendant

Mailing address: _100 N. Lamar St._
_Fort Worth, TX 76102_

Telephone #:_____

FAX # (if any): _____

_____
Attorney for Defendant
State Bar ID # _05225400_

Mailing address: _4210 W. Vickery_
_Fort Worth, TX 76107_

Telephone #:_817 335 3500_

FAX # (if any): _817 737 8866_

**1549**

NO. 1184294D

| THE STATE OF TEXAS | ) | IN THE 432nd JUDICIAL |
| | ) | |
| VS. | ) | DISTRICT COURT OF |
| | ) | |
| JOHN WILLIAM HUMMEL | ) | TARRANT COUNTY, TEXAS |

## COURT'S CHARGE

MEMBERS OF THE JURY:

In any jury trial there are, in effect, two judges.  I am one of the judges; the other is the jury.  It is my duty to preside over the trial and to decide what evidence is proper for your consideration.  It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

First, I will give you some general instructions which apply in every case.  Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations.

You, as jurors, are the judges of the facts.  But in determining what actually happened, that is, in reaching your decision as to the facts, it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you.  You must not substitute or follow

1

**1550**

your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences.   It is also your duty to base your verdict solely upon the evidence that has been presented to you in court.

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.   The fact that a person has been arrested, confined, or indicted for, or otherwise charged with the offense gives rise to no inference of guilt at his trial.

The law does not require a defendant to prove his innocence or produce any evidence at all.   The presumption of innocence alone is sufficient to acquit the Defendant, unless the jurors are satisfied beyond a reasonable doubt of the Defendant's guilt after careful and impartial consideration of all the evidence in the case.   The prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the Defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the Defendant's guilt.

2

**1551**

In the event you have a reasonable doubt as to the Defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not Guilty".

As you determine the facts, you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses and the exhibits.  Remember that any statements, objections, or arguments made by the lawyers are not evidence.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice.  In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding upon you.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instructions given to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

While you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach

3

**1552**

conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

You are to decide whether the State has proved beyond a reasonable doubt that the Defendant is guilty of the crime or crimes charged.

The Defendant is not on trial for any act, conduct, or offense not arising out of this incident, if any. The State has introduced evidence of an extramarital affair with Kristie Freeze in this case. This evidence was admitted only for the purpose of assisting you, if it does, for the purpose of showing the defendant's motive, if any. You cannot consider the testimony unless you find and believe beyond a reasonable doubt that the defendant committed these acts, if any were committed.

Now, bearing in mind these instructions, the Defendant, John William Hummel, stands charged by indictment with the offense of capital murder, alleged to have been committed on or about the 17th day of December, 2009, in Tarrant County, Texas. To this charge, the Defendant stood mute and the Court entered a plea of not guilty on the Defendant's behalf.

A person commits an offense of murder if he knowingly causes the death of an individual.

A person commits an offense of capital murder if he commits murder and murders more than one person during the same criminal transaction.

4

**1553**

"Individual" means a human being who is alive.

A person acts "knowingly," or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Now, if you find from the evidence beyond a reasonable doubt, that John William Hummel, in Tarrant County, Texas, on or about the 17th day of December, 2009, did then and there knowingly cause the death of an individual, Clyde Bedford, by striking him with a bat, and did then and there knowingly cause the death of an individual, Joy Hummel, by stabbing her with a knife, or by stabbing her with a dagger, or by stabbing her with a sword, and both murders were committed during the course of the same criminal transaction, then you will find the defendant guilty of the offense of capital murder as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant not guilty of capital murder as charged in the indictment and next consider the lesser included offenses of murder.

Now, if you find from the evidence beyond a reasonable doubt, that John William Hummel, in Tarrant County, Texas, on or about the 17th day of December, 2009, did knowingly cause the death of an individual, Clyde Bedford, by striking him with a bat, then you will find the Defendant guilty of the offense of

**1554**

murder of Clyde Bedford.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant not guilty of the murder of Clyde Bedford and next consider the offense of murder of Joy Hummel.

Now, if you find from the evidence beyond a reasonable doubt, that John William Hummel, in Tarrant County, Texas, on or about the 17th day of December, 2009, did cause the death of an individual, Joy Hummel, by stabbing her with a knife or by stabbing her with a dagger or by stabbing her with a sword, then you will find the Defendant guilty of the offense of murder of Joy Hummel.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty of the murder of Joy Hummel.

If you should find from the evidence beyond a reasonable doubt that the Defendant is either guilty of capital murder or murder, but you have a reasonable doubt as to which offense he is guilty, then you should resolve the doubt in the defendant's favor, and in such event you will find the Defendant guilty of the lesser offense of murder.

Under our law, a statement of a defendant made while under arrest or in custody may not be used in evidence against the defendant unless it appears that the statement was freely and

6

**1555**

voluntarily made without compulsion or persuasion.  The Court has admitted into evidence before you the alleged oral and written statement of the defendant given in the San Diego County Jail on the evening of December 20, 2009 and morning of December 21, 2009; you are instructed that before you may consider the same for any purpose you must first believe from the evidence beyond a reasonable doubt that the same was freely and voluntarily made by the defendant without compulsion or persuasion.

In this case, if you find from the evidence, or have a reasonable doubt thereof that John William Hummel at the time the oral and or written confession was made, was under the influence of cocaine, if he was under the influence of cocaine, which rendered his oral and or written statement involuntary due to being impaired mentally; and thereby was the product of the law enforcement's unlawful persuasion; then such statement would not be freely and voluntarily made, and in such case you will disregard the alleged oral and or written statement or confession and not consider either for any purpose nor evidence obtained as a result thereof.

Therefore, unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made by the Defendant without compulsion or persuasion, or if you have a

7

**1556**

reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose, nor any evidence obtained as a result thereof.

You are instructed that our law provides that in the event a defendant chooses not to testify, that fact cannot be taken as a circumstance against him. The Defendant, John William Hummel, has chosen not to testify and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberation or take it into consideration for any purpose whatsoever as a circumstance against him.

Your verdict must be by a unanimous vote of all members of the jury. In deliberating on this case, you shall consider the charge as a whole and you must not refer to nor discuss any matters not in evidence.

In all criminal cases, the burden of proof is on the State. The burden of proof rests upon the State throughout the trial and never shifts to the Defendant.

The indictment in this case is no evidence whatsoever of the guilt of the Defendant. It is a mere pleading that is necessary in order to bring this case into court for trial and you will not consider it for any purpose.

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proven beyond a reasonable doubt. The fact that a defendant has

8

**1557**

been arrested, confined, indicted for, or otherwise charged with an offense gives no rise to any inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case and no juror is permitted to communicate to any other juror anything he may have heard regarding the case or any witness therein, from any other source than the witness stand.

You are the exclusive judges of the facts proven, of the credibility of the witnesses, and of the weight to be given their testimony. But you are bound to receive the law from the Court, which is given in these written instructions, and be governed thereby.

The indictment in this case is no evidence whatsoever of the guilt of the Defendant. It is a written instrument necessary in order to bring this case into court for trial, and you will not consider the indictment as any evidence in this case or as any circumstance whatsoever against the Defendant.

You are instructed that a request to have portions of the

9

**1558**

trial transcript to be released to the jury cannot be complied with unless the jury disagrees as to a specific statement of a witness.  Therefore, it will be necessary, if you desire any part of the testimony of any witness, for you to certify that you are in disagreement as to the statement of a witness, and you should request that specific part of the witness's testimony on the point in dispute, and only on that point which is in dispute.

You are further instructed that the Court Reporter will be required to prepare the testimony of the witness involved in order to pick out the point or points upon which you state you are in disagreement, and it will take the Court Reporter more time to prepare the relevant portions of the transcript than it did for the attorneys to put the testimony on.  In the event you ask for any testimony, please be patient and give the Court Reporter sufficient time to prepare the transcript on the point or points in dispute.

Exhibits that were not offered and admitted into evidence by the Court do not exist as evidence.  Therefore, the Court will not and cannot supply any items that have not been admitted into evidence during the trial.

You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to

10

**1559**

the testimony, but you are bound to receive the law from the Court, which is herein given you, and be governed thereby.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry, or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, My Space, LinkedIn, You Tube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict, if any.

After you retire to the jury room, you should select one of your members as your foreman. It is his or her duty to preside at your deliberation, to vote with you, and when you have reached a unanimous verdict, to certify to your verdict by using the attached forms and signing the same as your foreman.

After you retire to consider your verdict, no one has any authority to communicate with you, except the officer who has you in charge. During your deliberations in this case, you must neither consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

**1560**

After you have retired, you may communicate with this Court in writing through the bailiff who has you in charge. Your written communication must be signed by the presiding juror. Do not attempt to talk to the bailiff, the attorneys or the Court regarding any question you may have concerning the trial of the case. Do not disclose to the Court or the bailiff your votes pertaining to guilty or not guilty in your communications.

After you have reached a unanimous verdict or if you desire to communicate with the Court, please press the button, and the bailiff will respond.


RUBEN GONZALEZ, JR., JUDGE
432ND Judicial District Court

12

**1561**

<u>VERDICT   FORMS:   CAPITAL   MURDER</u>

We,   the   Jury,   find   the   Defendant,   John   William   Hummel,
guilty   of   the   offense   of   capital   murder   as   charged   in   the
indictment.

_____
Foreman
DAVID C. BASE

-OR-

We,   the   Jury,   find   the   Defendant,   John   William   Hummel,   not
guilty   of   the   offense   of   capital   murder   as   charged   in   the
indictment.

_____
Foreman

If   the   jury   finds   the   Defendant,   John   William   Hummel,
guilty   of   the   offense   of   capital   murder,   the   jury   shall   not
consider   whether   he   is   guilty   of   the   lesser   included   offenses   of
murder   of   Clyde   Bedford   or   murder   of   Joy   Hummel.

In   the   event   that   the   jury   finds   the   Defendant,   John
William   Hummel,   not   guilty   of   capital   murder,   the   jury   shall
proceed   to   consider   whether   he   is   guilty   of   the   lesser   included
offenses   of   murder   of   Clyde   Bedford   and   murder   of   Joy   Hummel.

13

**1562**

<u>VERDICT FORMS: LESSER INCLUDED OFFENSES OF MURDER</u>

We, the Jury, find the Defendant, John William Hummel, guilty of the lesser included offense of murder of Clyde Bedford.

_____

Foreman

-OR-

We, the Jury, find the Defendant, John William Hummel, not guilty of the lesser included offense of murder of Clyde Bedford.

_____

Foreman

-AND-

14

**1563**

We, the Jury, find the Defendant, John William Hummel, guilty of the lesser included offense of murder of Joy Hummel.

_____
Foreman

-OR-

We, the Jury, find the Defendant, John William Hummel, not guilty of the lesser included offense of murder of Joy Hummel.

_____
Foreman

15

**1564**

NO. 1184294D

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE 432nd JUDICIAL |
| | ) | |
| VS. | ) | DISTRICT COURT OF |
| | ) | |
| JOHN WILLIAM HUMMEL | ) | TARRANT COUNTY, TEXAS |

## COURT'S CHARGE

MEMBERS OF THE JURY:

You have found the defendant, John William Hummel, guilty of the offense of capital murder. You are instructed that the defendant shall be punished by imprisonment in the institutional division of the Texas Department of Criminal Justice for life without parole or by death. In order for the Court to assess the proper punishment, the Court submits two issues to you.

ISSUE NUMBER 1: Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

You shall answer Issue Number 1 either "yes" or "no". The prosecution has the burden of proving that the answer to Issue Number 1 should be "yes" beyond a reasonable doubt, and if it fails to do so you must answer Issue Number 1 "no".

In deliberating on Issue Number 1, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death

1

**1565**

penalty.

You may not answer Issue Number 1 "yes" unless you agree unanimously.   You may not answer Issue Number 1 "no" unless 10 or more jurors agree.   The members of the jury need not agree on what particular evidence supports a negative answer to Issue Number 1.

If the jury answers Issue Number 1 "yes", then you shall answer Issue Number 2, otherwise, do not answer Issue Number 2.

ISSUE NUMBER 2:   Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

You shall answer Issue Number 2 either "yes" or "no".   You are instructed that you may not answer Issue Number 2 "no" unless you agree unanimously.   You may not answer Issue Number 2 "yes" unless ten or more jurors agree.   The members of the jury need not agree on what particular evidence supports an affirmative finding on Issue Number 2.   You shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

If the defendant is sentenced to confinement for life without parole, he is ineligible for release from the

**1566**

institutional division of the Texas Department of Criminal Justice on parole.

Under our law, a statement of a defendant made while under arrest or in custody may not be used in evidence against the defendant unless it appears that the statement was freely and voluntarily made without compulsion or persuasion. The Court has admitted into evidence before you the alleged oral and written statement of the defendant given in the San Diego County Jail on the evening of December 20, 2009 and morning of December 21, 2009; you are instructed that before you may consider the same for any purpose you must first believe from the evidence beyond a reasonable doubt that the same was freely and voluntarily made by the defendant without compulsion or persuasion.

In this case, if you find from the evidence, or have a reasonable doubt thereof that John William Hummel at the time the oral and or written confession was made, was under the influence of cocaine, if he was under the influence of cocaine, which rendered his oral and or written statement involuntary due to being impaired mentally; and thereby was the product of the law enforcement's unlawful persuasion; then such statement would not be freely and voluntarily made, and in such case you will disregard the alleged oral and or written statement or confession and not consider either for any purpose nor evidence

3

**1567**

obtained as a result thereof.

Therefore, unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made by the Defendant without compulsion or persuasion, or if you have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose, nor any evidence obtained as a result thereof.

You are instructed that our law provides that a defendant may testify in his own behalf if he chooses to do so. This, however, is a privilege accorded to a defendant, and in the event he chooses not to testify, that fact cannot be taken as a circumstance against him. John William Hummel has chosen not to testify and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

After argument of counsel, you will retire to the jury room to deliberate. Any further communication must be in writing signed by your foreman through the bailiff to the Court. When you have reached a decision, you will use the attached forms to indicate your answers to the Issues. Your foreman should sign the Certification attesting to your special verdicts reflected in your answers to the Issues.

4

**1568**

You are instructed that a request to have portions of the trial transcript to be released to the jury cannot be complied with unless the jury disagrees as to a specific statement of a witness. Therefore, it will be necessary, if you desire any part of the testimony of any witness, for you to certify that you are in disagreement as to the statement of a witness, and you should request that specific part of the witness's testimony on the point in dispute, and only on that point which is in dispute.

You are further instructed that the Court Reporter will be required to prepare the testimony of the witness involved in order to pick out the point or points upon which you state you are in disagreement, and it will take the Court Reporter more time to prepare the relevant portions of the transcript than it did for the attorneys to put the testimony on. In the event you ask for any testimony, please be patient and give the Court Reporter sufficient time to prepare the transcript on the point or points in dispute.

Exhibits that were not offered and admitted into evidence by the Court do not exist as evidence. Therefore, the Court will not and cannot supply any items that have not been admitted into evidence during the trial.

You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to

**1569**

the testimony, but you are bound to receive the law from the Court, which is herein given you, and be governed thereby.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry, or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, My Space, LinkedIn, You Tube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict, if any.

After you retire to consider your verdict, no one has any authority to communicate with you, except the officer who has you in charge. During your deliberations in this case, you must neither consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

After you have retired, you may communicate with this Court in writing through the bailiff who has you in charge. Your written communication must be signed by the foreman. Do not attempt to talk to the bailiff, the attorneys or the Court regarding any question you may have concerning the trial of the

**1570**

case.   Do not disclose to the Court or the bailiff your votes pertaining to your punishment verdict in your communications.

After you have reached a verdict or if you desire to communicate with the Court, please press the button, and the bailiff will respond.


RUBEN GONZALEZ, JR.
JUDGE, 432nd District Court

7

**1571**

Now, bearing in mind the foregoing instructions, you will answer the following issues:

**ISSUE NUMBER 1**

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

You will answer "yes" or "no".

**Answer:** _____YES_____

If your answer to Issue Number 1 is "yes" then you will answer Issue Number 2; otherwise, you will not answer Issue Number 2.

**ISSUE NUMBER 2**

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

You will answer "yes" or "no".

**Answer:** _____NO_____

8

**1572**

## CERTIFICATION

We, the jury, having agreed upon the answers to the foregoing
issues, return the same into court as our verdict.

_____
                Foreman

**1573**

STATE OF TEXAS Vs. 11842910 HUMMEL, JOHN WILLIAM 0710
CAPITAL MURDER MULTIP TRN# 9047365952
Offense D432 CID# 8768423 DOB:11/04/75
NCIC # 09998026 OFF # 899926

## VOLUME ONE

### RECORD OF CRIMINAL ACTIONS

DETAINER _____

(CRIMINAL) DISTRICT COURT 3X8

TRANSFERRED TO 432 _____ 

| Date | Action |
|---|---|
| 12/23/2009 | COMPLAINT FILED. BOND SET AT $ 2,000,000.⁰⁰ |
| 12/23/2009 | In Custody San Diego So Warrant (Filed) (CC 12-23-09) |
| 12-23-09 | Order transferring from the 393rd District Court to the 432nd District |
| 12-23-09 | Finding a Appointment of Attorney Filed Cummings |
| 12-31-09 | Motion #1: Motion For Appointment of Additional Counsel and Order granting Motion Filed |
| 12-31-09 | Motion #2: Defendant's Motion For Appointment Of Investigation and Order granting Motion Filed |
| 12-31-09 | Motion #3: Motion For The Appointment of A Mitigation Specialist and Order granting Motion Filed |

DISPOSITION OF CASE:
1. _____
2. _____
3. _____
4. _____

State's Attorney _____

On Probation Revocation _____

Defendant's Attorney _____

On Probation Revocation _____

Surety _____

Appeals Attorney _____

| Date | Action |
|---|---|
| 12-31-09 | Election of Counsel and Order Setting Conditions of Bond Filed |
| 12-31-09 | Affidavit of Indigency: Defendants Financial Information Filed |
| 12-31-09 | Conditions of Bond added and Filed |
| FEB 17 2010 | INDICTMENT RETURNED AND FILED |
| FEB 17 2010 | STATES ANNOUNCEMENT OF READY FILED |
| FEB 23 2010 | Writ to Serve Indictment Filed |
| FEB 24 2010 | Affidavit of Indigency filed & granted |

## Thomas A. Wilder
### DISTRICT CLERK
### TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

1574

# RECORD
## OF
## CRIMINAL ACTIONS

| | |
|---|---|
| FEB 2 4 2010 | Request for Appointed Counsel filed. |
| MAR 1 0 2010 | CONSULTATION DOCKET |
| MARCH 10, 2010 | Pamela Fernandez listed as additional counsel per Judge |
| MAY 2 8 2010 | EVIDENCE EXCHANGE DOCKET |
| 5-28-10 | Mitigation Billing filed and Sealed |
| 5-28-10 | Motion #4. Motion For The Production and Inspection of Grand Jury Transcript and Order granting Motion (as redacted) filed |
| 6-9-10 | Motions & Defendants Sealed Ex Parte Non-filed unfiled |
| 7-23-10 | Capital Defense Claim For Fee Payment/Expenses filed. |
| AUG 4 2010 | Motions |
| 8-4-10 | Defendant's Election As To Punishment (Motion No. 80) filed |
| 8-4-10 | Defendant's Application For Community Supervision (Motion No. 81) filed |
| AUG 0 4 2010 | Motion for Requesting Court Reporter to Record all Proceedings filed (Motion No. 6) |
| AUG 0 4 2010 | Motion for Pre-Trial Hearings filed. (Motion No. 7) |
| AUG 0 4 2010 | Motion for leave to Proceed Ex Parte, and in Camera, and on a Sealed Record, with regard to Applications for Expert and Investigative Assistance filed. (Motion No. 8) |
| AUG 0 4 2010 | Motion to Require State to Answers in Writing filed. (Motion No. 9) |
| AUG 0 4 2010 | Defendant's Motion to Appear at all Phases of Pre-Trial and Trial in Civilian Clothes and Without Physical Restraints. (Motion No. 10) |
| | Motion for Court Order to Sheriff to Provide a Suitable Conference Room for the Defendant and His Counsel. (Motion No. 11) |
| AUG 0 4 2010 | Motion to Produce Inconsistent or Mitigating Evidence filed. (Motion No. 12) |
| AUG 0 4 2010 | Motion to Discover Evidence Relative to Diminished Mental Capacity of Defendant filed. (Motion No. 13) |
| AUG 0 4 2010 | Motion for Discovery and Inspection filed (Motion No. 14) |
| AUG 0 4 2010 | Motion to Discover Search and Arrest Warrants filed (Motion No. 15) |
| AUG 0 4 2010 | Motion to Produce Photographic and Artistic Likenesses Displayed to Witnesses filed. (Motion No. 16) |
| AUG 0 4 2010 | Motion to Disclose Documents Signed or Made by the Defendant filed. (Motion No. 17) |
| AUG 0 4 2010 | Motion to Discover Criminal Records of Defendant filed. (Motion No. 18) |
| AUG 0 4 2010 | Motion for Court Order to Provide Copies of This Records of Defendant filed. (Motion No. 19) |

(see inside)

**1575**

## RECORD OF CRIMINAL ACTIONS (CONTINUED)

AUG 0 4 2010 Defendants Motion Requesting the Prosecution to File a
list of Physical Evidence Filed. (Motion No. 20)

AUG 0 4 2010 Defendants Motion to Designate Location of Physical
Evidence Filed. (Motion No. 21)

AUG 0 4 2010 Defendants Motion to Require the Endorsement of Names of
Witnesses upon whose Testimony the Indictment was
Found Filed. (Motion No. 22)

AUG 0 4 2010 Defendants Motion to List State's Witnesses (Trial Witnesses)
Filed. (Motion No. 23)

AUG 0 4 2010 Defendants Motion to List State's Witnesses (All Persons
Contacted) Filed. (Motion No. 24)

AUG 0 4 2010 Motion to Discover Criminal Records of Witnesses Filed. (Motion No. 25)

AUG 0 4 2010 Motion for Disclosure of Grants of Immunity, Leniency or
Plea Bargaining Filed. (Motion No. 26)

AUG 0 4 2010 Motion to Disclose any benefits conferred upon or
Promised to Witnesses Filed. (Motion No. 27)

AUG 0 4 2010 Motion for Discovery of Any Agreements with any
Witness Filed. (Motion No. 28)

AUG 0 4 2010 Motion to Discover Acts of Misconduct by State's
Witnesses Filed. (Motion No. 29)

AUG 0 4 2010 Rule 614 Motion (Gaskin Motion) Filed. (Motion No. 30)

AUG 0 4 2010 Motion to Require Law Enforcement Officers to Maintain
Personal Notes Filed. (Motion No. 31)

AUG 0 4 2010 Defendants Motion to Disclose the Names and Addresses of
Expert Witnesses for the State Filed. (Motion No. 32)

AUG 0 4 2010 Motion in Limine and Motion Requesting a Pretrial Hearing
to Determine Relevancy and Reliability of Expert
Testimony and for Disclosure of Facts and Data
Underlying Expert Opinion Filed. (Motion No. 33)

AUG 0 4 2010 Defendants Motion for Production of Statements of Expert
Witnesses and Production of Writings used to Refresh
Memory of Expert Witnesses Filed. (Motion No. 34)

AUG 0 4 2010 Motion for Production of Material Relative to State
Expert Witnesses Filed. (Motion No. 35)

AUG 0 4 2010 Motion to Disclose Extraneous Offenses Filed. (Motion No. 36)

AUG 0 4 2010 Defendants Motion in Limine to Prohibit Proof of Extraneous
Offenses Filed. (Motion No. 37)

### (SEE VOLUME TWO)

1576

TRN394D HUMMEL JOHN WILLIAM
STATE OF TEXAS Vs.
No. CAPITAL MURDER - MULTIPLE  TRN 9047565932
D432  CID  0763423-  DOB  11/04/75
Offense  NCIC# 09990028  OFF#  099926
OFFENSE:  12/17/09  FILED:  12/22/09

**VOLUME TWO**  **RECORD**
**OF**
**CRIMINAL ACTIONS**

DETAINER _____

(CRIMINAL) DISTRICT COURT ___213___

TRANSFERRED TO ___432___

DISPOSITION OF CASE:
1. _____
2. _____
3. _____
4. _____

COMPLAINT FILED.    BOND SET AT $

State's Attorney _____

On Probation Revocation _____

Defendant's Attorney _____

On Probation Revocation _____

Surety _____

Appeals Attorney _____

| Date | Action |
|------|--------|
| AUG 0 4 2010 | Motion for Pretrial Evidentiary Hearing to Determine Admissibility of Extraneous Offenses Filed (Motion No. 38) |
| AUG 0 4 2010 | Defendants Motion to Prevent Unfair Surprise During Trial Filed (Motion No. 39) |
| AUG 0 4 2010 | Request for Limiting Instructions to the Jury Regarding Extraneous Offenses Filed (Motion No. 40) |
| AUG 0 4 2010 | Motion for Special Venire and for Notice of Jury List Filed (Motion No. 41) |
| AUG 0 4 2010 | Motion for the Court to Hear Exemptions, Excuses and Disqualifications from Jury Service Filed (Motion No. 42) |
| AUG 0 4 2010 | Motion for Individual Voir Dire Filed (Motion No. 43) |
| AUG 0 4 2010 | Motion to Compel State to Exercise Challenges Pursuant to Article 35.13 Filed (Motion No. 44) |
| AUG 0 4 2010 | Motion to Produce Records of Prior Jury Service and to Allow Inquiry into Prior Jury Service Filed (Motion No. 45) |
| AUG 0 4 2010 | Motion for Equal Access to Background Information on Prospective Jurors Filed (Motion No. 46) |

| Date | Action |
|------|--------|
| AUG 0 4 2010 | Motion Requesting Use of a Juror Questionnaire Filed (Motion No. 47) |
| AUG 0 4 2010 | Motion for Discovery of Punishment Evidence Filed (Motion No. 48) |
| AUG 0 4 2010 | Motion for Hearing to Test Qualifications of Prosecution's Character and Reputation Witnesses Filed (Motion No. 49) |
| AUG 0 4 2010 | Motion for Discovery of Victim Impact Testimony Filed (Motion No. 50) |
| AUG 0 4 2010 | Motion in Limine - Character of the Deceased Individuals and/or Victim Impact Testimony Filed (Motion No. 51) |
| AUG 0 4 2010 | Defendants Motion to Exclude the Death Filed |

OVER→

**Thomas A. Wilder**
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

1577

# RECORD
## OF
## CRIMINAL ACTIONS

| | |
|---|---|
| AUG 0 4 2010 | Penalty as Possible Punishment ; and to Declare the Texas Death Penalty Procedure and Article 37.071, Tex. Code Criminal Proc., Unconstitutional on its Face Filed. (Motion No. 52) |
| AUG 0 4 2010 | Motion to Preclude the Death Penalty as a Sentencing Option and/or to Declare Texas Code Criminal Procedure Art. 37.071 Unconstitutional (Failure to Allege Special Issues - Ring v. Arizona) Filed. (Motion No. 53) |
| AUG 0 4 2010 | Motion to Prohibit Consideration of Misconduct Not Resulting in Conviction During the Punishment Hearing Filed. (Motion No. 54) |
| AUG 0 4 2010 | Motion to Preclude the Offer of Evidence of Extraneous Offenses During Punishment (Ring v. Arizona) Filed. (Motion No. 55) |
| AUG 0 4 2010 | Motion to Hold Texas Code Criminal Procedure, Article 37.071 Unconstitutional (Lack of Definitions) Filed. (Motion No. 56) |
| AUG 0 4 2010 | Motion for Court to Declare Code of Criminal Procedure Article 37.071, Section 2, Unconstitutional as Written and as Applied in all cases Filed. (Motion No. 57) |
| AUG 0 4 2010 | Motion for Court to Declare Code of Criminal Procedure Article 37.071, Section 2 (a) Unconstitutional Filed. (Motion No. 58) |
| AUG 0 4 2010 | Motion to Preclude the Death Penalty as a Sentencing Option Due to Arbitrariness in the Charging Process (Bush v. Gore) Filed. (Motion No. 59) |
| AUG 0 4 2010 | Defendant's Motion to Preclude the Death Penalty as a Sentencing Option due to the Unconstitutionality of the Lethal Injection Procedure Utilized by the State of Texas Filed. (Motion No. 60) |
| AUG 0 4 2010 | Motion to Preclude the Death Penalty as a Sentencing Option (Unequal Funding) Filed. (Motion No. 61) |
| AUG 0 4 2010 | Defendant's Motion to Declare the Texas Death Penalty Procedure and Article 37.071, Tex. Code Criminal Proc., Unconstitutional on its Face Filed. (Motion No. 62) |
| AUG 0 4 2010 | Motion to Allow the Defense to Close Arguments on Mitigation Filed. (Motion No. 63) |
| AUG 0 4 2010 | Motion in Limine - Jail Confinement Filed. (Motion No. 64) |
| AUG 0 4 2010 | Motion in Limine in Regard to any Testimony Regarding Hearsay Statements Filed. (Motion No. 65) |
| AUG 0 4 2010 | Motion in Limine in Regard to Any Items of Physical Evidence Seized by Agents of the State Filed. (Motion No. 66) |
| AUG 0 4 2010 | Motion in Limine in Regard to any Oral or Written Statements of the Defendant Filed. (Motion No. 67) |

(see inside)

1578

# RECORDS OF CRIMINAL ACTIONS (CONTINUED)

| Date | Entry |
|---|---|
| AUG 0 4 2010 | Motion in Limine in Regard to Any Oral or Written Statements of the Defendant Filed (Motion No. 69) |
| AUG 0 4 2010 | Motion to Suppress Line-Up, Photospread or Other Pre-Trial Identification Evidence Filed (Motion No. 68) |
| AUG 0 4 2010 | Motion to Suppress In Court Identification of ⅋ Defendant Filed (Motion No. 69) |
| AUG 0 4 2010 | Motion to Suppress Oral or Written Statements of Defendant and Illegally Seized Evidence (Kennedale Police Department and U.S. Bureau of Alcohol, Tobacco and Firearms) Filed (Motion No. 70) |
| AUG 0 4 2010 | Motion to Suppress Evidence Seized from the Defendants Residence Filed (Motion No. 71) |
| AUG 0 4 2010 | Motion to Suppress Evidence Seized from the Person of the Defendant as a Result of Arrest (U.S. Customs and Border Protection Service) Filed (Motion No. 72) |
| AUG 0 4 2010 | Motion to Suppress Oral or Written Statements of Defendant (U.S. Customs and Border Protection Service) Filed (Motion No. 73) |
| AUG 0 4 2010 | Motion to Suppress Physical Evidence Seized from the Defendants Vehicle Filed (Motion No. 74) |
| AUG 0 4 2010 | Motion to Suppress Evidence Seized from the Defendant's Hotel Room Filed (Motion No. 75) |
| AUG 0 4 2010 | Motion to Suppress Oral or Written Statements of Defendant (Kennedale Police Department and Tarrant County District Attorney's Office) Filed (Motion No. 76) |
| AUG 0 4 2010 | Motion for State to Elect Filed (Motion No. 77) |
| AUG 0 4 2010 | Defendants Motion to Allow Additional Pretrial and Trial Motions Filed (Motion No. 78) |
| AUG 0 4 2010 | Motion to Quash the Indictment Filed (Motion No. 79) |
| SEP 2 9 2010 | Special Setting |
| 10-29-10 | Motion #83 Petition For Disclosure of Information Obtained By The Grand Jury |
| 11-11-10 | Scheduling Order |
| 11-12-10 | States Motion For Disclosure of Expert Witness Information Pursuant To Art. 39.14(b) CCP |
| NOV 1 7 2010 | Motions |
| NOV 2 8 2010 | Motions |
| 12-3-2010 | Defendant's Sealed ex parte request for authorization to incur expert expenses |
| 12-3-2010 | Interim mitigation billing |
| DEC 1 7 2010 | Motion No. 84: Interim Attorney's Billing (Sealed) |
| DEC 1 7 2010 | Motion No. 85: Interim Attorney's Billing (Sealed) |
| DEC 1 7 2010 | Motion No. 86: Interim Mitigation Billing (Third Billing (Sealed) |

STATE OF TEXAS Vs. 1184294D HUMMEL, JOHN WILLIAM
CAPITAL MURDER MULTIPL 25 BW PRI75D149095
D432 CID 0763423 DOB 1100475
Offense NCIC# 09990026 OFF# 099926

VOLUME THREE RECORD
OF
CRIMINAL ACTIONS

DETAINER _____

(CRIMINAL) DISTRICT COURT 432

TRANSFERRED TO _____

COMPLAINT FILED. BOND SET AT $

| | DISPOSITION OF CASE: |
|---|---|
| | 1. _____ |
| | 2. _____ |
| | 3. _____ |
| | 4. _____ |
| | State's Attorney _____ |
| | On Probation Revocation _____ |
| | Defendant's Attorney _____ |
| | On Probation Revocation _____ |
| | Surety _____ |
| | Appeals Attorney _____ |

| Date | Entry |
|---|---|
| 12-20-10 | Petition to compel attendance of out of state witness |
| 12-22-10 | Scheduling And Pretrial Order filed, copies to counsel |
| *12-30-10 | Defendant's motion for continuance (#87) |
| *12-29-10 | Notice of intent to introduce business records through affidavit (Sealed) |
| 1-13-11 | Motions |
| 1-13-11 | Motion #88 Motion to Suppress evidence seized from the defendant's person cell phone and seizure |
| 1-18-11 | Motions |
| 1-25-11 | Motion #91 Motion For Transcription of Evidentiary Pretrial Hearing and Order filed (granted 1-25-11) |
| 1-31-11 | Motion No. 89 Defendant's Sealed Ex Parte Request For Authorization To Incur Expert Expenses filed |

| Date | Entry |
|---|---|
| 2-8-11 | Motion #90 Filed Under Seal by Order of the Court |
| 2-11-11 | Defendant's memorandum of law in support of motion to suppress |
| 2-25-11 | State's Memorandum Of Law In Support Of Denying Defendant's Motions To Suppress filed |
| 3-4-11 | Amended Scheduling Order copies to counsel Paula Phillips, Elizabeth Beeley Dee Pardson, Olinda Stevens |

**Thomas A. Wilder**
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

# RECORD
## OF
## CRIMINAL ACTIONS

| Date | Description |
|------|-------------|
| 3-9-11 | Second Amended Scheduling Order filed, copies to all parties |
| 3-18-11 | Defendant's supplemental memorandum of law in support of motion to suppress |
| 4-7-11 | State's Answer To Defendant's Motion To Require The Endorsement of Names of Witnesses Upon Whose Testimony The Indictment Was Found (No.23) |
| 4-13-11 | State's Answer To Defendant's Motion To Produce Inconsistent OR Mitigating Evidence (No.12) |
| 4-13-11 | State's Answer To Defendant's Motion To Discover Diminished Capacity Evidence (No.13) |
| 4-13-11 | State's Answer To Defendant's Motion For Discovery And Inspection (No.14) |
| 4-13-11 | State's Answer To Defendant's Motion To Discover Criminal Records of Defendant (No.16) |
| 4-13-11 | State's Answer To Defendant's Motion To List State's Witnesses (Trial Witnesses) (No.23) |
| 4-13-11 | State's Answer To Defendant's Motion To List State's Witnesses (Persons Contacted) (No.24) |
| 4-13-11 | State's Answer To Defendant's Motions For Disclosure Of Grants of Immunity Leniency or Plea Bargaining (No.36) To Disclose Any Benefits Conferred Upon OR Promised To Witnesses (No.37) For Discovery Of Any Agreements With Any Witnesses (No.38) |
| 4-13-11 | State's Answer To Defendant's Motion To Discover Acts of Misconduct By State's Witnesses (No.39) |
| 4-13-11 | State's Answer To Defendant's Motion To Disclose The Names And Addresses of Expert Witnesses For The State (No.32) |
| 4-13-11 | State's Answer To Defendant's Motion To Disclose Extraneous Offenses (No.26) |
| 4-13-11 | Motion #91 (filed under seal) |
| 4-13-11 | Motion #92 (filed under seal) |

(inside)

**1581**



4-13-11    Motion #93. Requested Jury Questionnaire And Special Instruction To Jury Panel

4-13-11    Motion No. 94. Designation of Defendant's Expert Witnesses

4-14-11    Interim Investigator's Billing (Filed under Seal)

4-14-11    Interim Mitigation Billing (Filed under Seal)

4-21-11    Third Amended Scheduling Order Filed

4-26-11    Defendant's Objection To Improper Disqualification of Veniremen And Motion To Quash Jury Panel (Motion No. 95) And Order

See Volume Four.

STATE OF TEXAS VS. HARVEY, JOHN WILLIAM
CAPITAL MURDER-MULTIPLE TRN #9047565932
No. _____   D432 CID# 0763423      DOB: 11/04/75
Offense _____   NCIC #09990026      Off #099926

| | | |
|---|---|---|
| DETAINER | | RECORD |
| (CRIMINAL) DISTRICT COURT 432 | OF |
| TRANSFERRED TO | CRIMINAL ACTIONS |

*Volume Four*

DISPOSITION OF CASE
1. Death                                                    A
2.
3.
4.

| | COMPLAINT FILED.   BOND SET AT $ |
|---|---|
| 4-28-11 | Defendant arraigned before the Court and entered pleas of Not Guilty to Count One Capital Murder - Multiple and Paragraphs Two and Three Murder |
| 4-28-11 | Order To Issue An Attachment For A Juror filed (returned unsrvd 5611) |
| 4-29-11 | Order of the Court Filed |
| 4-29-11 | Attachment A International Memo 432nd District Court filed Tarrant County Graphics Printing Facility Service Request Form |
| 5-3-11 | Court of Appeals - Memorandum Opinion |
| 5-4-11 | Fax from Texas Regional Asthma And Allergy Center, LLP |

State's Attorney: Miles Brissette, Robert Gill
On Probation Revocation
Defendant's Attorney: Fred Cummings, Larry Moore, Pamela Fernandez
On Probation Revocation
Surety
Appeals Attorney

| | |
|---|---|
| 5-6-11 | Order To Issue An Attachment For A Juror (ex 5-9-11) (Duplicate) |
| 5-9-11 | Certificate of Proceeding Re Writ of Attachment on Juror Nikkoltoney Martinez |
| 5-11-11 | Original Order To Issue An Attachment For A Juror (returned unknown address; out of date) |
| 5-11-11 | Court of Appeals Notice Re Relator's Petition for Writ of mandamus |

**Thomas A. Wilder**
DISTRICT CLERK
TARRANT COUNTY, TEXAS
THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

1583

# RECORD
# OF
# CRIMINAL ACTIONS

| Date | Action |
|------|--------|
| 5-11-11 | Court of Appeals Notice Re: Reporter's Record Filed April 28, 2011. |
| 5-31-2011 6-1-2011 | Defendant's Motion In Additional Peremptory Challenges States Motion to order defendants to submit to mental status Examination and Alternative Motion to Exclude defendants Mental Status Evidence |
| *5-13-11 | Interim Attorney's Billing Filed Under Seal |
| *5-13-11 | Interim Attorney's Billing Filed Under Seal |
| 6-1-11 | Certificate of Proceeding Releasing Juror #133 Nikko Martinez from bond from Order of Attachment. |
| 6-6-11 | States Supplemental Answer to Defendant's Motion To List States Witnesses (Trial Witnesses (No.33) and Motion To Disclose The Names And Addresses of Expert Witnesses For The State. (No.32) |
| 6-8-11 | Motion # 96 : Filed Under Seal by Order of the Court. |
| 6-8-11 | Motion # 97 Supplemental Defense Expert Witness List |
| 6-9-2011 | Motion and Brief of the United States department of Veterans Affairs to Quash Subpoena for Testimony |
| 6-13-11 | State's Second Supplemental Answer To Defendant's Motion To List State's Witnesses (Trial Witnesses) (No.33) and Motion To Disclose The Names And Addresses Of Expert Witnesses For The State (No.32) |
| 6-13-11 | Trial to Jury. Jury previously selected are now Seated and Sworn by the Court. Defendant stands mute as arraignment commences on Count One, Paragraphs Two and Three : Capital Murder Multiple Persons. Defense Counsel enters a plea of Not Guilty on behalf of the Defendant. Testimony Begins. |
| 6-13-11 | Petition To Compel The Attendance of Out Of State Witness filed. |
| 6-13-11 | Petition To Compel The Attendance of Out of State Witness filed. |

(inside)

1584

# RECORD
# OF
# CRIMINAL ACTIONS

1184194D

| | |
|---|---|
| 6-15-11 | Order For The Advance Payment of Nonresident Defense Witness Expenses filed. |
| 6-17-11 | Order For The Advance Payment of Nonresident Defense Witness Expenses filed. |
| 6-22-11 | Court's Charge filed. Verdict: Guilty. Punishment phase commences. Testimony begins. |
| 6-28-11 | Court's Punishment Charge filed. Verdict: Death. Jury is polled at the Request of the Defense, and all answer that this is his or her true verdict. Accordingly. It is ordered that Defendant be remanded to the custody of Tarrant County Sheriff, to be delivered to the Institutional Division of the Texas Department of Criminal Justice, where he shall be confined continuously until a date to be determined by this Court the Defendant be caused to die by intravenous injection of a substance of lethal quantity until death. Defendant advised of appeal rights. |

PRESIDING JUDGE, 432nd DISTRICT COURT

| | |
|---|---|
| 6-28-11 | TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT TO APPEAL FILED |
| 6-28-11 | NOTICE OF APPEAL FILED |
| 6-28-11 | ORDER APPOINTING COUNSEL FOR THE APPEAL AND ORDER FOR COURT REPORTER TO PREPARE REPORTER'S RECORD |
| 6-28-11 | MOTION FOR FREE REPORTER'S RECORD AND AFFIDAVIT OF INABILITY TO PAY FOR COUNSEL AND REPORTER'S RECORD. |
| 6-28-11 | State's Motion To Release Juror Information filed |
| 6-30-11 | Order And Notice filed. |
| 7-8-2011 | Letter to atty John Stickel re: Atty appointment to CCR |
| 7-8-2011 | JUDGMENT, NOTICE of APPEAL, ATTY APPT mENT to CCR State |
| 7-8-11 | JUDGMENT, ATTY APPT on APPEAL + WRIT TO CCR WRITS |

1585

# IN THE 432ND DISTRICT COURT

## TARRANT COUNTY, TEXAS

C-432-009923-1184294-A

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| John William Hummel, | ) | 1184294D |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

*FILED*
*THOMAS A WILDER DIST. CLERK*
*TARRANT COUNTY, TEXAS*
*JUN 05 2013*
*TIME 12:30 pm*
*BY _____ DEPUTY*

## ORDER

On this date, the Court considered Applicant's request to file confidential juror information, Exhibits 32-41, under seal. After due consideration, the request is GRANTED.

ORDERED AND SIGNED on this *5TH* day of June, 2013

Ruben Gonzalez
Judge, 432nd Judicial District

**1586**

# IN THE 432ND DISTRICT COURT

## TARRANT COUNTY, TEXAS

C-432-009923-1184294-A

|  |  |  |
|---|---|---|
| | ) | Trial Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

## UNOPPOSED MOTION TO SEAL CONFIDENTIAL JUROR INFORMATION
### (CAPITAL CASE)

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**1587**

# IN THE 432ND DISTRICT COURT

## TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | Trial Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) |  |
| APPLICANT | ) |  |
| _____ | ) |  |

## UNOPPOSED MOTION TO SEAL CONFIDENTIAL

## JUROR INFORMATION

**To the Honorable Judge Gonzales:**

John William Hummel, by and through his attorneys, the Office of Capital Writs, moves this Court to seal confidential juror information contained in exhibits attached to Hummel's Article 11.071 application which is filed concurrently with this motion.[1]

In the Application, Hummel raises several issues regarding jurors and jury selection. Exhibits 32 through 41 of the Application are excerpts of juror questionnaires that contain personal information. Out of an abundance of caution, and for purposes of juror confidentiality, Hummel requests this Court permit him to file Exhibits 32 through 41 under seal.

Respectfully submitted,

DATED:    June 5, 2013          By _____
                                      Robert Romig
                                      Post-Conviction Attorney
                                      Office of Capital Writs

---

[1] The undersigned spoke with Assistant District Attorney Helena Faulkner, who does not oppose the sealing of the confidential juror information.

**1588**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion to Seal Confidential Juror Information by hand to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original, by hand)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, by hand)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, by hand)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, by mail)

This certification is executed on June 5, 2013, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_
Robert Romig

**1589**

**Joyce L. Meyer**

| | |
|---|---|
| **From:** | Joyce L. Meyer |
| **Sent:** | Monday, March 04, 2013 10:48 AM |
| **To:** | 'Abel Acosta' |
| **Subject:** | John William Hummel Death Penalty Appeal 1184294D |
| **Attachments:** | Untitled.tif |

Abel,

Attached is the Order from Judge Gonzalez granting the Office of Capital Writs access to all sealed exhibits
From the above mentioned case.

If you need additional documentation, you may reach me at 817/884-2022.

Thanks,

Joyce Meyer

Post-Conviction Writs Clerk

Tarrant County District Clerk's Office

1590

01/03/2013 THU 11:56  FAX 512 463 8590 Office of Capital Writs                              ☑003/003

*sent to Abel Acosta*
*3/4/13*

# IN THE 432ND DISTRICT COURT
## TARRANT COUNTY, TEXAS

|  | ) | Trial Cause No. |
|---|---|---|
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) |  |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

FILED
TARRANT COUNTY
2013 JAN -3  AM 11:41
THOMAS A. WILDER
DISTRICT CLERK

## ORDER

On this date, the Court considered Petitioner's Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record. After due consideration, Petitioner's Motion is GRANTED.

The District Clerk and court reporter are ordered to provide the Office of Capital Writs access to all exhibits and sealed materials in the clerk's and reporter's record.

For those materials held by the District Clerk in electronic form, such as video recordings (CD/VHS), the District clerk is ordered to provide the Office of Capital Writs a copy of the electronic files. For those materials held in paper format, the District Clerk is ordered to provide the Office of Capital Writs with photocopies.

For those materials held in physical form, such as evidence or other trial exhibits, the District Clerk is ordered to allow the Office of Capital Writs access to take photographs of such materials.

Any materials from trial still in possession of the court reporter shall likewise be made available to the Office of Capital Writs.

ORDERED AND SIGNED on this _3rd_ day of January, 2013

Ruben Gonzalez, Jr.
Judge, 432nd District Court

3 of 3 1/3/2013 10:55:42 AM [Central Standard Time]

**1591**

**Evelyn Villanueva**

| | |
|---|---|
| **From:** | Fax system [mailtofax@diem.com] |
| **Sent:** | Thursday, January 03, 2013 1:06 PM |
| **To:** | Evelyn Villanueva |
| **Subject:** | Your fax has been successfully sent to Whom it may concern at 5124638590 |

Your fax has been successfully sent to Whom it may concern at 5124638590
-----------------------------
1/3/2013 1:02:58 PM: Transmission Record
      Fax Number:5124638590
      Remote ID:512 463 8590
      Elapsed Time: 2 minutes 26 seconds
      Used Channel: 13 on server ITRIGHTFAX01
      No ANI Data
      No ANI Data
      Resulting status code(0/339; 0/0): Success
      Pages Sent: 1 - 3

**1592**



# OCW

## Office of Capital Writs

Brad D. Levenson
Director

March 6, 2013

Tarrant County Clerk's Office
ATTN: Records Department
401 West Belknap
Fort Worth, TX 76196

**FILED**
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS
MAR 07 2013
TIME ___11:17 am___
BY _____
_____ DEPUTY

Re:   Jackie Lou Hummel
DOB:  12/31/1948

To Whom It May Concern:

Pursuant to Article 11.071, Section 2(b) of the Texas Code of Criminal Procedure and Chapter 78 of the Government Code, the Office of Capital Writs has been appointed to represent **John Hummel** in his post-conviction habeas proceedings. In our capacity as Mr. Hummel's legal representative, and in accordance with the Public Information Act, Chapter 552 of the Texas Government Code, I am requesting a copy of <u>all civil, criminal, and family records</u> and documents in the possession of Tarrant County Clerk's Office relating to **Jackie Lou Hummel.**

These records should include, but are not limited to, all records and documents pertaining to or arising from: (1) the investigation of any crimes Ms. Hummel alleged to have committed; (2) any arrests on Ms. Hummel's record; (3) trial of the these matters or plea negotiations; (4) the investigation or prosecution of any proceedings after trial, including motions for new trial and direct appeals; (5) judgments or sentences; and (6) any other informations relating to judgments, sentences, information, indictments, and/or complaints involving Ms. Hummel.

These records should also include, but are not limited to, all records and documents pertaining to or arising from: (1) marriage and divorce; (2) child custody; (3) child support; (4) restraining orders and temporary restraining orders; and (5) any other matters and/or judgments rendered, related to civil actions.

Please note that the Office of Capital Writs is a state agency and to the extent that you do not charge state agencies for copies, we respectfully request that the records be provided at no charge. If, however, you anticipate there will be a fee charged for copies of these records, please contact me before proceeding with the request. In addition, if there are any documents that fall within this request that your office believes are not subject to disclosure, please provide a list with a general description of each document type and the reason it is being withheld. Such a list will satisfy the current request as it regards those documents. It is not my intent that your office be required to seek an Open Records ruling from the Office of the Attorney General.

**1593**

For the purposes of this request, the terms "records" and "documents" are intended to include, without limitation, all written, typed, printed, recorded, graphic computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, films, electronic facsimiles, computer storage devices, or any other medium. They include, without limitation, letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries or abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (including both videotapes and audiotapes), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

Please send the requested information to:

Office of Capital Writs
Attn: Ashley M. Salinas
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711
Fax: (512) 463-8590

If you have any questions, please do not hesitate to contact me at (512) 463-8518 or via email at ashley.salinas@ocw.texas.gov. Thank you for your time and effort in gathering these records.

Sincerely,

Ashley M. Salinas
Post-Conviction Paralegal

**159**4



# TARRANT COUNTY
## District Clerk Felony Background Search

Thomas A. Wilder
District Clerk

March 7, 2013

Felony Criminal Information based on the following search criteria:

| Last Name | First Name | Middle Name | DOB |
|-----------|------------|-------------|-----|
| HUMMEL | JACKIE | LOU | 12/31/1948 |

No Tarrant County criminal district court cases were located for the past 10 years.

Please note: This search is for district court felony information only. If you wish to obtain a misdemeanor record search please contact the County Clerk's office located on the 2nd floor of 401 W. Belknap, Fort Worth, TX 76196 or at 817-884-1066.

Thomas A. Wilder, District Clerk
Tarrant County, Texas

By: _____
JOYCE MEYER, Deputy

NOTICE: The Tarrant County District Clerk cannot guarantee that the records obtained through this search relate to the person about whom you are seeking information. Searches based on names, dates of birth and other alphanumeric identifiers are not always accurate. The only way to positively link someone to a criminal record is through fingerprint verification.

The information that is provided through this record search may be used by anyone for any purpose; however, it is your responsibility to make sure the records you access through this search pertain to the person about whom you are seeking information. Extreme care should be exercised in using any information obtained through this record search. Neither the Tarrant County District Clerk nor the County of Tarrant shall be responsible for any errors or omissions produced by secondary dissemination of this information.



## Office of Capital Writs



Brad D. Levenson
Director

March 6, 2013

Tarrant County Clerk's Office
ATTN: Records Department
401 West Belknap
Fort Worth, TX 76196

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
MAR 0 7 2013
TIME ___11:18 am___
BY _____
_____ DEPUTY

Re:    Neata Woody AKA Neata Hummel
DOB:   05/23/1965

To Whom It May Concern:

Pursuant to Article 11.071, Section 2(b) of the Texas Code of Criminal Procedure and Chapter 78 of the Government Code, the Office of Capital Writs has been appointed to represent John Hummel in his post-conviction habeas proceedings. In our capacity as Mr. Hummel's legal representative, and in accordance with the Public Information Act, Chapter 552 of the Texas Government Code, I am requesting a copy of all civil, criminal, and family records and documents in the possession of Tarrant County Clerk's Office relating to **Neata Woody AKA Neata Hummel.**

These records should include, but are not limited to, all records and documents pertaining to or arising from: (1) the investigation of any crimes Ms. Woody alleged to have committed; (2) any arrests on Ms. Woody's record; (3) trial of the these matters or plea negotiations; (4) the investigation or prosecution of any proceedings after trial, including motions for new trial and direct appeals; (5) judgments or sentences; and (6) any other informations relating to judgments, sentences, information, indictments, and/or complaints involving Ms. Woody.

These records should also include, but are not limited to, all records and documents pertaining to or arising from: (1) marriage and divorce; (2) child custody; (3) child support; (4) restraining orders and temporary restraining orders; and (5) any other matters and/or judgments rendered, related to civil actions.

Please note that the Office of Capital Writs is a state agency and to the extent that you do not charge state agencies for copies, we respectfully request that the records be provided at no charge. If, however, you anticipate there will be a fee charged for copies of these records, please contact me before proceeding with the request. In addition, if there are any documents that fall within this request that your office believes are not subject to disclosure, please provide a list with a general description of each document type and the reason it is being withheld. Such a list will satisfy the current request as it regards those documents. It is not my intent that your office be required to seek an Open Records ruling from the Office of the Attorney General.

**159½**



For the purposes of this request, the terms "records" and "documents" are intended to include, without limitation, all written, typed, printed, recorded, graphic computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, films, electronic facsimiles, computer storage devices, or any other medium. They include, without limitation, letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries or abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (including both videotapes and audiotapes), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

Please send the requested information to:

**Office of Capital Writs**
**Attn: Ashley M. Salinas**
**1700 N. Congress Avenue, Suite 460**
**Austin, Texas 78711**
**Fax: (512) 463-8590**

If you have any questions, please do not hesitate to contact me at (512) 463-8518 or via email at ashley.salinas@ocw.texas.gov. Thank you for your time and effort in gathering these records.

Sincerely,

Ashley M. Salinas
Post-Conviction Paralegal

# TARRANT COUNTY
## District Clerk Felony Background Search

Thomas A. Wilder
District Clerk

March 7, 2013

Felony Criminal Information based on the following search criteria:

| Last Name | First Name | Middle Name | DOB |
|-----------|------------|-------------|-----|
| WOODY | NEATA | | 05/23/1965 |
| AKA NEATA HUMMEL | | | |

No Tarrant County criminal district court cases were located for the past 10 years.

Please note: This search is for district court felony information only. If you wish to obtain a misdemeanor record search please contact the County Clerk's office located on the 2nd floor of 401 W. Belknap, Fort Worth, TX 76196 or at 817-884-1066.

Thomas A. Wilder, District Clerk
Tarrant County, Texas

By: _Joyce Meyer_
JOYCE MEYER, Deputy

NOTICE: The Tarrant County District Clerk cannot guarantee that the records obtained through this search relate to the person about whom you are seeking information. Searches based on names, dates of birth and other alphanumeric identifiers are not always accurate. The only way to positively link someone to a criminal record is through fingerprint verification.

The information that is provided through this record search may be used by anyone for any purpose; however, it is your responsibility to make sure the records you access through this search pertain to the person about whom you are seeking information. Extreme care should be exercised in using any information obtained through this record search. Neither the Tarrant County District Clerk nor the County of Tarrant shall be responsible for any errors or omissions produced by secondary dissemination of this information.

**1598**



# Office of Capital Writs



Brad D. Levenson
Director

March 6, 2013

Tarrant County Clerk's Office
ATTN: Records Department
401 West Belknap
Fort Worth, TX 76196

**Re:** John Harold Hummel
**DOB:** 12/09/1944

To Whom It May Concern:

Pursuant to Article 11.071, Section 2(b) of the Texas Code of Criminal Procedure and Chapter 78 of the Government Code, the Office of Capital Writs has been appointed to represent **John Hummel** in his post-conviction habeas proceedings. In our capacity as Mr. Hummel's legal representative, and in accordance with the Public Information Act, Chapter 552 of the Texas Government Code, I am requesting a copy of <u>all civil, criminal, and family records</u> and documents in the possession of Tarrant County Clerk's Office relating to **John Harold Hummel.**

These records should include, but are not limited to, all records and documents pertaining to or arising from: (1) the investigation of any crimes Mr. Hummel alleged to have committed; (2) any arrests on Mr. Hummel's record; (3) trial of the these matters or plea negotiations; (4) the investigation or prosecution of any proceedings after trial, including motions for new trial and direct appeals; (5) judgments or sentences; and (6) any other informations relating to judgments, sentences, information, indictments, and/or complaints involving Mr. Hummel.

These records should also include, but are not limited to, all records and documents pertaining to or arising from: (1) marriage and divorce; (2) child custody; (3) child support; (4) restraining orders and temporary restraining orders; and (5) any other matters and/or judgments rendered, related to civil actions.

Please note that the Office of Capital Writs is a state agency and to the extent that you do not charge state agencies for copies, we respectfully request that the records be provided at no charge. If, however, you anticipate there will be a fee charged for copies of these records, please contact me before proceeding with the request. In addition, if there are any documents that fall within this request that your office believes are not subject to disclosure, please provide a list with a general description of each document type and the reason it is being withheld. Such a list will satisfy the current request as it regards those documents. It is not my intent that your office be required to seek an Open Records ruling from the Office of the Attorney General.

1599

For the purposes of this request, the terms "records" and "documents" are intended to include, without limitation, all written, typed, printed, recorded, graphic computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, films, electronic facsimiles, computer storage devices, or any other medium. They include, without limitation, letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries or abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (including both videotapes and audiotapes), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

Please send the requested information to:

Office of Capital Writs
Attn: Ashley M. Salinas
1700 N. Congress Avenue, Suite 460
Austin, Texas  78711
Fax: (512) 463-8590

If you have any questions, please do not hesitate to contact me at (512) 463-8518 or via email at ashley.salinas@ocw.texas.gov.  Thank you for your time and effort in gathering these records.

Sincerely,

Ashley M. Salinas
Post-Conviction Paralegal

**1600**



# TARRANT COUNTY
## District Clerk Felony Background Search

Thomas A. Wilder
District Clerk

March 7, 2013

Felony Criminal Information based on the following search criteria:

| Last Name | First Name | Middle Name | DOB |
|-----------|-----------|-------------|-----|
| HUMMEL | JOHN | HAROLD | 12/09/1944 |

No Tarrant County criminal district court cases were located for the past 10 years.

Please note: This search is for district court felony information only. If you wish to obtain a misdemeanor record search please contact the County Clerk's office located on the 2nd floor of 401 W. Belknap, Fort Worth, TX 76196 or at 817-884-1066.

Thomas A. Wilder, District Clerk
Tarrant County, Texas

By: _Joyce Meyer_
JOYCE MEYER, Deputy

NOTICE: The Tarrant County District Clerk cannot guarantee that the records obtained through this search relate to the person about whom you are seeking information. Searches based on names, dates of birth and other alphanumeric identifiers are not always accurate. The only way to positively link someone to a criminal record is through fingerprint verification.

The information that is provided through this record search may be used by anyone for any purpose; however, it is your responsibility to make sure the records you access through this search pertain to the person about whom you are seeking information. Extreme care should be exercised in using any information obtained through this record search. Neither the Tarrant County District Clerk nor the County of Tarrant shall be responsible for any errors or omissions produced by secondary dissemination of this information.

1601

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

| | ) | Trial Cause No. |
|---|---|---|
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

**ORDER**

On this date, the Court considered Applicant's Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application. After due consideration, Applicant's Motion is GRANTED. The initial state application is due on June 6, 2013.

ORDERED AND SIGNED on this _15th_ day of February, 2013.

Ruben Gonzalez, Jr.
Judge, 432nd District Court

11

**1602**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Unopposed Motion for Ninety-Day Extension of Time to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original and one copy, via mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, via mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, via email)

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Courtesy Copy – via mail)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on February 14, 2013, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_
Robert Romig

12

**1603**

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

EX PARTE

John William Hummel,

      APPLICANT

)
)
)
)
)
)

Trial Cause No.
1184294D

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorney
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**1604**

IN THE 432ND DISTRICT COURT

TARRANT COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| John William Hummel, | ) | 1184294D |
| APPLICANT | ) | |
| | ) | |
| | ) | |
| | ) | |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

John William Hummel ("Applicant"), through his attorneys the Office of Capital Writs ("OCW"), requests this Court grant an extension of time to file his initial state habeas application under article 11.071 of the Texas Code of Criminal Procedure. Article 11.071, section 4(b), authorizes this Court to grant one ninety-day extension for good cause shown. Tex. Code Crim. Proc. art. 11.071 § 4(b). For the reasons set out below, Applicant believes good cause exists to justify the granting of a ninety-day extension, to June 6, 2013, to allow Applicant the opportunity to file a thorough and complete initial state habeas application.[1]

---

[1] The OCW has corresponded with Tarrant County Assistant District Attorney Helena Faulkner regarding this motion. That office does not oppose this motion and the granting of this extension of time.

2

**1605**

# I.

## PROCEDURAL HISTORY

Applicant is confined under a sentence of death pursuant to the judgment of this Court, case number 1184294D, which was entered on June 29, 2011. On June 29, 2011, John Stickels was appointed as appellate counsel on Applicant's behalf. On August 28, 2012, Mr. Stickels filed an opening brief on appeal, *John Hummel v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-76,596. The State's brief in response was filed on January 22, 2013. The issues raised on direct appeal are now before the CCA for consideration.

This Court appointed the OCW on June 30, 2011, to represent Applicant in his state habeas corpus proceedings. Article 11.071 sets the deadline for filing an initial application as the 180th day after the date habeas counsel is appointed or the 45th day after the State files its original brief on direct appeal, which ever date falls later. Tex. Code Crim. Proc. art. 11.071 § 4(a). Therefore, Applicant's initial application for state habeas corpus relief is currently due in this Court on or before March 8, 2013.

# II.

## STATEMENT OF FACTS

Following its appointment, the OCW has endeavored to expeditiously and thoroughly investigate Applicant's background and conviction for any factual and

3

**1606**

legal grounds for habeas corpus relief, as instructed under Article 11.071, section 3(a).

In Applicant's case, the reporter's record alone is fifty-five volumes. Additionally, the OCW has collected and reviewed files created during Applicant's trial, including those held by Applicant's trial counsel, defense team investigators, and various experts hired for either consultation or testimony by the defense team.

To date, the OCW has independently identified and collected various records from Applicant's life history, including educational, medical, criminal, employment, and vital statistic records. The OCW has also completed a substantial independent investigation into Applicant's background and into the circumstances surrounding his conviction of capital murder. At this juncture, the OCW has identified a multitude of witnesses, including many family and friends of Applicant, that have knowledge potentially pertinent to claims Applicant intends to raise in his state habeas Application. While many of those witnesses have been interviewed by post-conviction counsel, some of these interviews are still outstanding. Moreover, given that Appellant spent his childhood in rural South Carolina and his early adult years in the United State Marine Corps, many of these witnesses are located outside of Texas. The OCW is currently in the process of collecting affidavits from these witnesses. Further, the OCW is in the process of identifying additional witnesses who will need to be interviewed.

4

**1607**

The OCW has also hired multiple expert witnesses to assist in the presentation of Applicant's habeas corpus claims, for purposes of both the guilt and punishment phases. Although initial interviews and consultations have occurred, the OCW is in the process of collecting affidavits and reports from these expert witnesses to be included in the state habeas application.

Finally, the OCW just recently received access to sealed materials from the clerk's record, as well as all the juror questionnaires and information cards created during the voir dire at Applicant's trial. Further, the OCW recently was allowed to inspect the files held by the District Attorney's office. The OCW anticipates it will take substantial time to review and digest these additional files.

## III.

## ARGUMENT

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant a single ninety-day extension to a defendant seeking to file an initial state habeas application. Tex. Code Crim. Proc. art. 11.071 § 4(b). The Court may do so if it finds good cause exists, and the ninety days begin counting at the date of the original filing deadline. *Id.* Applicant believes good cause exists in this case to allow ninety days more time to investigate and develop his state habeas petition.

5

**1608**

### A. Many Steps Are Still Required in Order to Complete a Full Investigation of the Legal and Factual Grounds for Habeas Relief

Although the OCW has performed significant work on Applicant's behalf since being appointed, work still remains. A multitude of witnesses, some of whom are out of state, have been identified as having relevant information concerning not only circumstances surrounding the alleged crime, but also Applicant's family life, childhood, adult life, and other important areas of Applicant's background that will likely factor into claims for habeas relief.

In addition, the OCW is working with multiple experts, some of whom are likely to contribute affidavits supporting Applicant's claims. Development of those affidavits is ongoing. Arranging interviews of witnesses and experts, as well as drafting affidavits, will take much of (and likely more than) the next forty-five days. Travel from Austin (where the OCW is headquartered) for interviews of non-local witnesses and subsequent trips to have affidavits signed and notarized takes considerable time and coordination.

The development of these witnesses and experts is particularly important for any claims that Applicant wishes to raise regarding ineffective assistance of trial counsel. The CCA has made clear that the ineffective assistance of counsel issue is best raised on habeas corpus, not direct appeal, due to the outside-the-record nature of such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Capital trial counsel has a duty to make reasonable investigations or to make a

6

**1609**

reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The CCA holds capital trial counsel to a high standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006). Therefore, in order to identify and fully prove claims of ineffective assistance, Applicant must himself fully investigate to determine whether important areas of evidence were left undiscovered.

### B. Any Legal or Factual Grounds That Are Not Raised in Applicant's Initial Application, But Could Have Been Raised, May Be Procedurally Barred From Future Review

Applicant must be particularly diligent in the investigation and presentation of his initial state habeas petition. Article 11.071 provides the single and best opportunity to challenge Applicant's conviction. Statements made in the Legislature during the passage of Article 11.071 illustrate this importance.

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot . . . . What we're attempting to do here is say 'raise everything at one time.' You get one bite of the apple. If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision. But none of this 'every week you file a new petition' which is currently basically what happens . . . . The idea is this: you're going to be able to fund counsel in these

7

**1610**

> instances and we are going to give you one very well-represented run
> at a habeas corpus proceeding. And unless you meet a very fine-tuned
> exception, you're not going to be able to come back time after time
> after time.

*Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting

Representative Pete Gallego at the second reading of S.B. 440 on the floor of the

House of Representatives, May 18, 1995).

The CCA has similarly noted that a habeas application under Article 11.071

is an applicant's one full and fair "bite at the apple." *Ex Parte Medina*, 361

S.W.3d 633, 642 (Tex. Crim. App. 2011). Part of the importance of this

Application rests in the effect its filing takes on a defendant's future litigation over

his conviction. Under Article 11.071, section 5, "[i]f a subsequent application for a

writ of habeas corpus is filed after filing an initial application, a court may not

consider the merits of or grant relief based on the subsequent application unless"

one of three narrow circumstances exists. Tex. Code Crim. Proc. art 11.071 § 5.

Therefore all grounds that are available to Applicant must be raised in this initial

application or they will be procedurally barred from future review by this Court or

the CCA. Similarly, any federal court wishing to review Applicant's conviction

will be limited to only the claims raised in the state habeas proceeding. *See*

*Coleman v. Thompson*, 501 U.S. 722 (1991).

In addition, the importance of developing a full record at the state habeas

proceeding has recently been extolled by the United State Supreme Court. In

8

**1611**

*Cullen v. Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). As such, Applicant is required to produce both all available claims and all available evidence at the filing of his initial application, lest he lose any opportunities to present them later.

## C. The OCW Has a Full Case Load That Also Requires Attention From Its Staff

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCW is appointed in cases that have resulted in a capital sentence post September 1, 2010. These cases occur all across the State. With a legal staff of only five full-time attorneys and two investigators, the OCW staff works diligently to provide the highest caliber representation to each of its clients. Recently, the Supreme Court issued rulings implicating the performance of habeas counsel in *Maples v. Thomas*, 132 S. Ct. 912 (2012) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). These opinions highlight the necessity, if not constitutional duty, of habeas counsel to perform well in its duty to develop habeas applications. Further, the United States Supreme Court is specifically addressing this term the issue of effective state habeas counsel performance in Texas. *See Trevino v. Thaler*, 133 S. Ct. 524 (2012).

While the OCW is focused on the development of Applicant's initial state habeas application, it must also devote attention to other cases that have equally

**1612**

pressing deadlines.  Over the course of the next six months, the OCW anticipates

filing five initial state habeas applications, including Applicant's.  An additional

ninety-day extension would allow the OCW to manage its case load appropriately

and fully investigate and develop this application.

## IV.

### PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the

ninety-day extension authorized under Article 11.071, section 4(b) and extend

Applicant's deadline to file his initial state habeas application to June 6, 2013.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs


DATED:    February 14, 2013        By _____
                                   Robert Romig
                                   Post-Conviction Attorney

10

**1613**

# IN THE 432ND DISTRICT COURT
# TARRANT COUNTY, TEXAS

|  | ) | Trial Cause No. |
|---|---|---|
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

## ORDER

· On this date, the Court considered Petitioner's Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record. After due consideration, Petitioner's Motion is GRANTED.

The District Clerk and court reporter are ordered to provide the Office of Capital Writs access to all exhibits and sealed materials in the clerk's and reporter's record.

For those materials held by the District Clerk in electronic form, such as video recordings (CD/VHS), the District clerk is ordered to provide the Office of Capital Writs a copy of the electronic files. For those materials held in paper format, the District Clerk is ordered to provide the Office of Capital Writs with photocopies.

For those materials held in physical form, such as evidence or other trial exhibits, the District Clerk is ordered to allow the Office of Capital Writs access to take photographs of such materials.

Any materials from trial still in possession of the court reporter shall likewise be made available to the Office of Capital Writs.

ORDERED AND SIGNED on this 3rd day of January, 2013

Ruben Gonzalez, Jr.
Judge, 432nd District Court

**1614**

# IN THE 432ND DISTRICT COURT
## TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | Trial Cause No. |
| EX PARTE | ) | 1184294D |
| John William Hummel, | ) |  |
| APPLICANT | ) |  |
| _____ | ) |  |
|  | ) |  |

## ORDER

On this date, the Court considered Petitioner's Unopposed Motion for Juror Questionnaires. After due consideration, Petitioner's Motion is GRANTED.

The District Clerk is ordered to provide the Office of Capital Writs photocopies of all juror questionnaires and juror information cards.

The Office of Capital Writs may only share information from juror questionnaires and information cards with other members of the defense team, such as attorneys, investigators, and consulted experts. The Office of Capital Writs is ordered not to disclose any juror questionnaires or information cards, including any personal juror information, to petitioner John William Hummel. Upon submission and exhaustion of the writ, the Office of Capital Writs is ordered to return all materials received from this Order to the District Clerk's Office.

ORDERED AND SIGNED on this 3rd day of January, 2013

_____
Ruben Gonzalez, Jr.
Judge, 432nd District Court

**1615**



## Office of Capital Writs



Brad D. Levenson
Director

# FAX COVER SHEET

To: Judge Ruben Gonzales (c/o Tisha Wills)

Fax number: 817-850-2939

From: Robert Romig

Fax number: (512) 463-8590     Direct Line: (512) 463-8522

Date: 1/3/13

Regarding: John Hummel capital case – Amended orders

Total number of pages including cover sheet: 3

Comments:
   Please find attached, two amended orders to accompany motions filed on December 21, 2012. The amended language has been reviewed and agreed upon by the Tarrant County DA's office. Please do not hesitate to contact me with any questions or concerns.

-Robert Romig

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

# IN THE 432ND DISTRICT COURT
# TARRANT COUNTY, TEXAS

EX PARTE
John William Hummel,
      APPLICANT

)
)
)
)
)
)

Trial Cause No.
1184294D

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

DEC 21 2012

TIME _____ 2:15

BY _____ CJC DEPUTY

## UNOPPOSED MOTION FOR COPIES OF MATERIALS
## IN CLERK'S AND REPORTER'S RECORD; PROPOSED ORDER

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**1617**

# IN THE 432ND DISTRICT COURT
# TARRANT COUNTY, TEXAS

EX PARTE                          )    Trial Cause No.
John William Hummel,              )    1184294D
    APPLICANT            )
                                 )
                                 )
                                 )

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

DEC 21 2012

TIME_____2:15_____
BY_____ DEPUTY

## UNOPPOSED MOTION FOR COPIES OF MATERIALS
## IN CLERK'S AND REPORTER'S RECORD; PROPOSED ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, John Hummel, by and through his attorneys of record the Office of Capital Writs ("OCW"), requests this Court order District Clerk Thomas Wilder to provide the OCW with copies of any sealed materials in the clerk's record of Mr. Hummel's case. [1]   Further, the OCW requests this Court order the District Clerk to make available all physical and electronic exhibits not fully reproduced in the reporter's record.

The clerk's record in this case was filed by the District Clerk on October 17, 2011. Within the record is notation of materials that are sealed from the public.

---

[1] The OCW has spoken with Helena Faulkner, Assistant Criminal District Attorney with the Tarrant County District Attorney's Office, regarding this motion. That Office does not oppose this motion.

2

**1618**

The list of sealed materials appears in the clerk's record index at page eleven of Volume One. (*See* Exhibit A.)

The reporter's record in this case was filed on January 25, 2012. Within this records are notations of exhibits filed at trial, but that are not reproduced in the reporter's record. (*See* Exhibit B.) Such exhibits include photographs, large poster displays, and numerous videotapes.

As Mr. Hummel's appointed habeas counsel, the OCW requests copies of the sealed material in the clerk's record and all the exhibits from trial be made available to it. Representation by habeas counsel, such as the OCW, includes the duty to investigate all potential factual or legal grounds that could provide a defendant with habeas corpus relief. Tex. Code Crim. Proc. art. 11.071 §3 ("On appointment, counsel shall investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."); *see* State Bar of Texas, *Guidelines and Standards for Texas Capital Cases*, Guideline 12.2(B)(3)(b) ("Habeas corpus counsel must obtain and read the entire record of the trial, including all transcripts and motions. Counsel has an obligation to independently verify that the official record of all prior proceedings is complete, and to supplement it if necessary.").

3

**1619**

Wherefore, Mr. Hummel requests this Court order the district clerk to provide to the OCW copies of the above mentioned material within the clerk's record and reporter's record of the instant case. [2]

Respectfully submitted,

DATED:     December 17, 2012         By  *Robert Romig*

Robert Romig
Post-Conviction Attorney

_____

[2] The OCW will not make these documents public to anyone other than members of the defense team.

4

**1620**

# IN THE 432ND DISTRICT COURT
# TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | )<br>)<br>)<br>)<br>)<br>) | Trial Cause No.<br>1184294D |

## ORDER

On this date, the Court considered Petitioner's Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record. After due consideration, Petitioner's Motion is GRANTED.

The District Clerk is ordered to provide the OCW with copies of any sealed materials in the clerk's record.

ORDERED AND SIGNED on this _____ day of December, 2012

_____
Ruben Gonzalez, Jr.
Judge, 432nd District Court

5

**1621**

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Unopposed Motion for Copies of Materials in Clerk's and Reporter's Record to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original and one copy, via mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, via mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, via email)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on December 17, 2012, at Austin, Texas.
I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Robert Romig

**1622**

# EXHIBIT A

# CLERK'S RECORD

WRIT COPY

VOLUME 1 of 5

Trial Court Cause No. 1184294D

In the 432ND DISTRICT COURT
of Tarrant County, Texas
Hon. RUBEN GONZALEZ, JR., Presiding Judge

## JOHN WILLIAM HUMMEL, APPELLANT

vs.

THE STATE OF TEXAS

Appealed to the Court of CRIMINAL APPEALS
for the STATE OF TEXAS
at Capitol Station
AUSTIN, TEXAS

## ATTORNEY FOR THE APPELLANT

**JOHN STICKELS, APPOINTED**
**726 N. FIELDER RD**
**ARLINGTON, TEXAS 76012**
**PHONE:   817-479-9282**
**FAX:       817-622-8071**
**SBOT:     19225300**
**Attorney for JOHN WILLIAM HUMMEL, Appellant**

Delivered to the Court of CRIMINAL APPEALS
for the STATE OF TEXAS at Capitol Station,
AUSTIN, Texas, on the

17th day of October, 2011

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

**PAULA FORD**

Deputy District Clerk

(Court of CRIMINAL APPEALS)

Cause No. _____

Filed in the Court of CRIMINAL APPEALS
FOR THE STATE OF Texas, at
Capitol Station, AUSTIN, Texas, this

_____ day of _____, _____

LOUISE PEARSON _____, Clerk

By _____, Deputy

Exhibit A - Page **1624**

11

Trial Court's Certification of Defendants Right of Appeal – 06/28/11 ............................................745

Order and Notice – 06/30/11 ......................................................................................................746

Capital Judgment – 06/29/11 ......................................................................................................747

Letter to Appointed Appeal Attorney – 07/08/11 ........................................................................757

Letter to Court of Criminal Appeals ............................................................................................758

Letter to Court of Criminal Appeals Regarding Writ Attorney Appointed – 07/08/11 ..................759

Order to Transmit Original Sealed Documents to the Court of Criminal Appeals – 07/08/11 ........760

Motion for New Trial – 07/21/11 ................................................................................................761

Certificate of Proceedings – 07/21/11 ........................................................................................763

Letter from Court of Criminal Appeals – 07/22/11 ......................................................................764

Letter to Court of Criminal Appeals Regarding Motion for New Trial Filed – 07/22/11 ...............765

Capital Defense Claim for Fee Payment / Expenses – 08/05/11 ..................................................767

Order to Pay Invoice from Storms Edge Technologies – 08/30/11 ...............................................769

# VOLUME FIVE

Applications for Subpoenas and Subpoenas...............................................................................770

Clerk's Certificate .....................................................................................................................868

### SEALED ENVELOPES ENCLOSED

Sealed - Juror Lists

Sealed - Brendan Ross Mitigation Billing / Mitigation Proposal

Sealed – Motion No. 5 (Defendant's Sealed Ex Parte Motion)

12

Sealed – Motion No. 83 – Defendant's Sealed Ex Parte Request for Authorization to
Incur Expert Expenses

Sealed – Interim Mitigation Billing

Sealed – Motion No. 84 – Interim Attorney's Billing

Sealed - Motion No. 85 – Interim Attorney's Billing

Sealed – Motion No. 86 – Interim Mitigation Billing (Third Billing)

Sealed - Interim Mitigation Billing

Sealed - Interim Investigator's Billing

Sealed - Motion No. 89

Sealed - Motion No. 90

Sealed - Motion No. 91

Sealed - Motion No. 92

Sealed - Notice of Intent to Introduce Business Records Through Affidavit,
Dated December 29, 2010

Sealed – Interim Attorney's Billing

Sealed – Interim Attorney's Billing

Sealed - Motion No. 96

# EXHIBIT B

REPORTER'S RECORD
VOLUME 46 OF 55
TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

STATE OF TEXAS                )(     IN THE 432ND JUDICIAL
                              )(
VS.                           )(     DISTRICT COURT OF
                              )(
JOHN WILLIAM HUMMEL           )(     TARRANT COUNTY, TEXAS

**********************************************

EXHIBIT INDEX

**********************************************

THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS
FILED
JAN 2 3 2012
TIME 3:00
BY 14
DEPUTY

COPY

ANGIE TAYLOR, CSR, RPR
Official Court Reporter
432nd DISTRICT COURT

## MASTER EXHIBIT INDEX

| COURT'S NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|
| 1 | Jury Panel Instructions | 4 | 4 | 12 |
| 2 | Juror Information Sheet | 84 | 84 | 12 |

| STATE'S PRETRIAL NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|
| 1 | Photo of Fire Scene | 26 | 26 | 6 |
| 2 | Photo of Fire Scene | 26 | 26 | 6 |
| 3 | Photo of Fire Scene | 26 | 26 | 6 |
| 4 | Photo of Fire Scene | 28 | 28 | 6 |
| 5 | Photo of Fire Scene | 28 | 28 | 6 |
| 6 | Photo of Fire Scene | 28 | 28 | 6 |
| 7 | Photo of Fire Scene | 35 | 37 | 6 |
| 8 | Photo of Fire Scene | 35 | 37 | 6 |
| 9 | Photo of Fire Scene | 35 | 37 | 6 |
| 10 | Photo of Fire Scene | 35 | 37 | 6 |
| 11 | Photo of Fire Scene | 35 | 37 | 6 |
| 12 | Photo of Fire Scene | 35 | 37 | 6 |
| 13 | Photo of Fire Scene | 35 | 37 | 6 |
| 14 | Photo of Fire Scene | 35 | 37 | 6 |
| 15 | Diagram | 22 | 22 | 6 |
| 16 | Video Clip | 119 | 120 | 7 |
| 17 | Diagram-Kennedale Police Dept. | 54 | 54 | 6 |
| 18 | Statement - J. Hummel | 48 | 48 | 6 |

# MASTER EXHIBIT INDEX

STATE'S PRETRIAL

| NO. | DESCRIPTION | OFRD | ADMT | VOL |
|-----|-------------|------|------|-----|
| 19 | Receipts J. Hummel | 53 | 53 | 6 |
| 20 | Consent to Search | 53 | 53 | 6 |
| 21 | Miranda Warning - J. Hummel | 64 | 64 | 6 |
| 22 | Diagram to Residence | 64 | 64 | 6 |
| 23 | Warrant | 12 | 13 | 6 |
| 24 | Warrant | 12 | 13 | 6 |
| 25 | Miranda Warning Card | 82 | 83 | 6 |
| 26 | Consent to Search | 87 | 87 | 6 |
| 27 | Consent to Search | 87 | 87 | 6 |
| 28 | Statement - J. Hummel | 87 | 87 | 6 |
| 29 | Hand-Drawn Map | 87 | 87 | 6 |
| 30 | Warrant | 12 | 13 | 6 |
| 31 | Warrant | 12 | 13 | 6 |
| 32 | Warrant | 12 | 13 | 6 |
| 32-A | Search Warrant-Camera | 76 | 76 | 7 |
| 33 | Warrant | 12 | 13 | 6 |
| 34 | Consent to Search Dr. Ford | 15 | 15 | 7 |
| 35 | Excerpt from Video | 24 | 24 | 6 |
| 36 | Kennedale, TX Interview DVD | 57 | 58 | 6 |
| 37 | San Diego, CA Interview DVD | 88 | 88 | 6 |

1               <u>MASTER EXHIBIT INDEX</u>

2   <u>STATE'S PRETRIAL</u>

| NO. | DESCRIPTION | OFRD | ADMT | VOL |
|-----|-------------|------|------|-----|
| 38 | Order Declaring Incorporation | 76 | 76 | 7 |
| 39 | Printout from NLETS | 82 | 82 | 7 |
| 40 | Printout from NLETS | 82 | 82 | 7 |
| 41 | Blowup Diagram-Photos of Port | 98 | 98 | 7 |
| 42 | DVD Statement | 7 | 7 | 32 |
| 43 | DVD Statement | 7 | 7 | 32 |
| 44 | Redacted Portion | 32,35 | 36 | 32 |
| 45 | Transcript of Video | 46 | 47 | 32 |
| 46 | Transcript of Video | 46 | 47 | 32 |

(*) Denotes for Record Purposes Only
(**) Denotes Exhibit Withdrawn
(N/A) Denotes Not Admitted

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT NO. 1
# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY DISTRICT COURT'S OFFICE)**

**1632**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

STATE OF TEXAS                )(          IN THE 432ND JUDICIAL

VS.                           )(          DISTRICT COURT OF

JOHN WILLIAM HUMMEL           )(          TARRANT COUNTY, TEXAS

# STATE'S PRETRIAL
# EXHIBIT
# NO. 2
# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1633**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 3

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1634**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

STATE OF TEXAS                )(        IN THE 432ND JUDICIAL

VS.                           )(        DISTRICT COURT OF

JOHN WILLIAM HUMMEL           )(        TARRANT COUNTY, TEXAS

# STATE'S PRETRIAL

# EXHIBIT

# NO. 4

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1635**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 5

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1636**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 6

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1637**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 7

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1638**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 8

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1639**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

STATE OF TEXAS ){ IN THE 432ND JUDICIAL

VS. DISTRICT COURT OF

JOHN WILLIAM HUMMEL ){ TARRANT COUNTY, TEXAS

# STATE'S PRETRIAL EXHIBIT

# NO. 9

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1640**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 10

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1641**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 11

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1642**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 12

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1643**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL
# EXHIBIT
# NO. 13
# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1644**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 14

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1645**

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL EXHIBIT

# NO. 15

# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1646**



Regional Forensic Video Lab
Criminal District Attorney's Office
Tarrant County, Texas
817.884.2760

CD-R

**State's Exhibit #**

PT-16

(GT)

HUMMEL, JOHN W

POE VIDEO                    RFVL#

C# 1184294    Verified By: _____    NP

1647

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

STATE OF TEXAS                  )(        IN THE 432ND JUDICIAL

VS.                             )(        DISTRICT COURT OF

JOHN WILLIAM HUMMEL             )(        TARRANT COUNTY, TEXAS

# STATE'S PRETRIAL
# EXHIBIT
# NO. 17
# (PHOTO OF FIRE SCENE)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1648**



**1649**





Regional Forensic Video Lab
Criminal District Attorney's Office
Tarrant County, Texas
817.884.2760

DVD-R

State's
Exhibit #
PT-37

Copy

SDSO Hummel Interview

C# 1184294D    RFVL# _____

Verified By: _____ EV

TRIAL COURT CAUSE NO. 1184294D
COURT OF APPEALS NO. AP-76,596

| | | |
|---|---|---|
| STATE OF TEXAS | )( | IN THE 432ND JUDICIAL |
| VS. | )( | DISTRICT COURT OF |
| JOHN WILLIAM HUMMEL | )( | TARRANT COUNTY, TEXAS |

# STATE'S PRETRIAL

# EXHIBIT

# NO. 41

# (BLOWUP DIAGRAM

# PHOTOS OF PORT)

**(ORIGINAL LOCATED IN TARRANT COUNTY**

**DISTRICT COURT'S OFFICE)**

**1652**

Joe Shannon, Jr.
**Criminal District Attorney**
**Tarrant County, Texas**
Copy provided in accordance with all local discovery
rules & the open file agreement with the TCCDLA.
RFVL # 09-032

**Disc
Number**

**Verified
By**

State's Ex
PT-42
7 June 2011
118 9294D.

State of Texas vs. J.W. Hummel

KPD Interview
Redaction 1 (Master)

☐ State Copy  ☐ Defense Copy

Master

**1653**



Joe Shannon, Jr.
Criminal District Attorney
Tarrant County, Texas
Copy provided in accordance with all local discovery
rules & the open file agreement with the TCCDLA.

Date
Imaged

Verified
By

6/7/2011

MP

PT. State's 42

6-7-11 AT

Cause #: _1184294_

Defendant: _HUMMEL, JOHN_

COPY

1654



**1655**

Joe Shannon, Jr.
Criminal District Attorney
Tarrant County, Texas
Copy provided in accordance with all local discovery
rules & the open file agreement with the TCCDLA.

Date
Imaged

Verified
By

*MP*

6/8/2011
P.T State's 43
10-7-11 AT
SDSO INTERVIEW 1 REDACTED
Cause #: 1184299

Defendant: HUMMER, JOHN W

COPY

1656

# IN THE 432ND DISTRICT COURT

# TARRANT COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. 1184294D |
| John William Hummel, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

DEC 21 2012

TIME ___2:15___
BY ___COZ___ DEPUTY

## UNOPPOSED MOTION FOR COPIES OF JUROR QUESTIONNAIRES; PROPOSED ORDER

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
SAMUEL FARINA-HENRY (No. 24082979)
(E-Mail: Sam.Farina-Henry@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**1657**

# IN THE 432ND DISTRICT COURT
# TARRANT COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE<br>John William Hummel,<br>APPLICANT | ) ) ) ) ) ) |

Trial Cause No.
1184294D

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

DEC 21 2012

TIME _____ 2:15
BY _____ C.D.C. DEPUTY

## UNOPPOSED MOTION FOR COPIES OF JUROR QUESTIONNAIRES;
## PROPOSED ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, John Hummel, by and through his attorneys of record the Office of Capital Writs ("OCW"), requests this Court order District Clerk Thomas Wilder to provide the OCW with copies of all juror questionnaires and information cards filled out by potential jurors in Mr. Hummel's capital case.[1]

As Mr. Hummel's appointed habeas counsel, the OCW has the duty to investigate all potential factual or legal grounds that could provide a defendant with habeas corpus relief. Tex. Code Crim. Proc. art. 11.071 §3 ("On appointment, counsel shall investigate expeditiously, before and after the appellate record is filed

---

[1] The OCW has spoken with Helena Faulkner, Assistant Criminal District Attorney with the Tarrant County District Attorney's Office, regarding this motion. That Office does not oppose this motion.

2

**1658**

in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."); *see* State Bar of Texas, *Guidelines and Standards for Texas Capital Cases*, Guideline 12.2(B)(3)(b) ("Habeas corpus counsel must obtain and read the entire record of the trial, including all transcripts and motions. Counsel has an obligation to independently verify that the official record of all prior proceedings is complete, and to supplement it if necessary.").

This investigation includes the duty to review the process used to select the jury members in Mr. Hummel's case. Flaws in the procedures used in jury selection, including improper conduct by defense counsel or the state may give rise to claims for relief under the United States or Texas Constitutions. For example, it is a long-established and fundamental principle that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). "Those on the venire must be indifferently chosen to secure the defendant's right under the Fourteenth Amendment to protection of life and liberty against race or color prejudice." *Id.* at 86-87 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 309 (1879)).[2]

---

[2] The *Strauder* Court articulated the problem with discrimination and jury selection, and the reason why it must be guarded against. "[T]he very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand

**1659**

Although *Batson* specifically spoke to the State being unable to use its peremptory strikes to exclude African Americans from the jury on the basis of race, the constitutional protection against race discrimination in jury selection extends beyond peremptory challenges. Any and all circumstances that affect the jury selection process in a defendant's trial are subject to scrutiny under Equal Protection. *See Batson*, 476 U.S. at 93-94 ("[A] black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."); *Miller-El*, 545 U.S. at 253 ("The case for discrimination goes beyond these comparisons to include broader patterns of practice during the jury selection."); *Powers v. Ohio*, 499 U.S. at 400, 409 (1991) ("The State may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at other stages in the selection process.").

To engage in this scrutiny, the OCW must conduct a comparative juror analysis that reviews the qualifications of struck jurors against those that were accepted onto the jury. In *Miller-El v. Dretke*, the United States Supreme Court articulated the importance of comparative juror analysis.

---

upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." *Strauder*, 100 U.S. at 308.

4

**1660**

> More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. If a prosecutor's proffered reason for striking a black panelist applies just as well to a white panelist allowed to serve, that is evidence tending to prove purposeful discrimination.

*Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); see also *Reed v. Quarterman*, 555 F.3d 364, 372-73 (5th Cir. 2009) (noting that Miller-El requires a court to consider a comparative juror analysis in a Batson claim).

Finally, the conduct of defense counsel in their preparation and performance of jury selection may give rise to claims of ineffective assistance of counsel. The OCW must review the information counsel had in its possession regarding the potential jurors to determine whether effective assistance was provided to Mr. Hummel.

Wherefore, Mr. Hummel requests this Court order the district clerk to provide to the OCW copies of the juror questionnaires and information cards created during the instant case.[3]

Respectfully submitted,

DATED:    December 17, 2012      By  *Robert Romig*

Robert Romig
Post-Conviction Attorney

---

[3] The OCW will not make these documents public to anyone other than members of the defense team.

5

**1661**

# IN THE 432ND DISTRICT COURT

# TARRANT COUNTY, TEXAS

EX PARTE )
John William Hummel, )
        APPLICANT )
)
)
                          )

Trial Cause No.
1184294D

## ORDER

On this date, the Court considered Petitioner's Unopposed Motion for Juror Questionnaires. After due consideration, Petitioner's Motion is GRANTED.

The District Clerk is ordered to provide the OCW access to copies of the juror questionnaires and juror information cards.

ORDERED AND SIGNED on this _____ day of December, 2012

                                    _____
                                    Ruben Gonzalez, Jr.
                                    Judge, 432nd District Court

**1662**

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Unopposed Motion for Copies of Juror Questionnaires to:

District Clerk
Tarrant County, Texas
401 West Belknap
3rd Floor
Fort Worth, TX 76196
(Original and one copy, via mail)

Judge Ruben Gonzalez
432nd District Court
401 W. Belknap
6th Floor
Fort Worth, TX 76196
(One courtesy copy, via mail)

Tarrant County District Attorney
Helena Faulkner, Asst. Crim. D.A.
Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
(One copy, via email)

John Hummel
TDCJ # 999567
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on December 17, 2012, at Austin, Texas.
I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Robert Romig

**1663**

Certified True Copy

THE STATE OF TEXAS                    §

COUNTY OF TARRANT                     §

I, Thomas A. Wilder, Clerk of the District Courts of Tarrant County, Texas, do hereby certify that the above and foregoing is a true and correct copy of ALL PROCEEDINGS HAD.

In Writ Number:   **C-432-009923-1184294-A**

EX PARTE: **JOHN WILLIAM HUMMEL**
VS.
THE STATE OF TEXAS

as the same appears on the file and/or record in my said office.

GIVEN UNDER MY HAND and seal of Said Court at office in the City of Fort Worth, Tarrant County, Texas, this the *26*, day of *January*, A.D *2015*

THOMAS A. WILDER
CLERK, DISTRICT COURTS, TARRANT COUNTY, TEXAS

BY *Susan Russell*
Deputy

**1664**