IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JOHN HUMMEL, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:16-CV-0133-O |
| | § | (Death Penalty Case) |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GWENDOLYN S. VINDELL
Assistant Attorney General
State Bar No. 24088591
    *Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *gwendolyn.vindell2@oag.texas.gov*

*Counsel for Respondent*

# TABLE OF CONTENTS

ANSWER ............................................................................................... 1

JURISDICTION .................................................................................... 1

PETITIONER'S ALLEGATIONS ........................................................ 1

GENERAL DENIAL ............................................................................. 2

STATEMENT OF THE CASE ............................................................. 2

STATEMENT OF FACTS .................................................................... 3

I.     Facts of Hummel's Capital Murder. .................................................. 3

II.    Evidence Presented During the Punishment Phase. ....................... 7

       A.     State's evidence .................................................................... 7

       B.     Defense's evidence ............................................................ 12

ARGUMENT ....................................................................................... 22

I.     Standard of Review ........................................................................ 22

II.    Hummel Fails to Demonstrate that the State Court Unreasonably
       Denied his Claim Alleging Ineffective Assistance of Trial Counsel at the
       Punishment Phase of Trial (Claim 1).............................................. 26

       A.     Counsel properly argued that the State's evidence of future
              danger was insufficient (claim 1-F). .................................... 29

       B.     Counsel effectively investigated and presented witnesses in
              mitigation of punishment (claims 1-A through 1-E)............. 35

              1.     Tarrant County Jail guards (claim 1-A) ..................... 38

              2.     Complex Post-Traumatic-Stress-Disorder expert (claim 1-
                     B) ................................................................................ 46

              3.     Life history expert (claim 1-C) ................................... 58

              4.     Lay witnesses (claim 1-D) .......................................... 64

              5.     Military service (claim 1-E)......................................... 71

6.    Conclusion...................................................................76

III.   Hummel Fails to Demonstrate that the State Court Unreasonably Denied His Ineffective Assistance of Appellate Counsel Claim (Claim 2). ...................................................................................................77

    A.    Hummel's allegation that appellate counsel failed to challenge the sufficiency of the State's future dangerousness case is waived and without merit (claim 2-A). ...........................................80

    B.    Appellate counsel effectively argued that Hummel's detention by U.S. Border Patrol was illegal (claim 2-B). ...........................82

        1.    Appellate counsel raised and adequately briefed Hummel's claim that his detention by U.S. Border Patrol was illegal. ......82

        2.    The record does not support Hummel's claim. ..........................85

            i.    Facts surrounding the detention.................................86

            ii.    The state court's denial of this claim was reasonable.....88

IV.   Hummel's Claim That the Texas Capital Sentencing Scheme Violates the Eighth Amendment Because the Instructions Unconstitutionally Narrowed the Definition of Mitigating Evidence Lacks Merit (Claim 3). ......90

V.    Hummel's Claim that his Death Sentence is Unconstitutional Because Texas Arbitrarily Administers the Death Penalty is Without Merit (Claim 4). ..................................................................................92

VI.   The "10/12 Rule" is Constitutionally Sound (Claim 5). ...................95

CONCLUSION...................................................................................96

## ANSWER

Petitioner John Hummel was properly convicted of and received the death penalty for the brutal murders of his pregnant wife, his five-year-old daughter, and his father-in-law. He now challenges his presumptively valid capital murder conviction and death sentence by filing a writ of habeas corpus petition pursuant to 28 U.S.C. § 2254 with a brief in support. However, Hummel fails to demonstrate that the state court's adjudication of his claims was either incorrect or unreasonable. Therefore, the Director respectfully requests that Hummel's petition for a writ of habeas corpus be denied with prejudice and that a certificate of appealability also be denied.

## JURISDICTION

Hummel seeks habeas corpus relief in this Court pursuant to 28 U.S.C. § 2254, which provides the Court with jurisdiction over the subject matter and the parties, as Hummel was convicted within this Court's jurisdiction.

## PETITIONER'S ALLEGATIONS

The Director understands Hummel to assert the following grounds for relief:

1.  Hummel received ineffective assistance of trial counsel (IATC) during the punishment phase of trial when counsel failed to:

    a.   Present evidence that Hummel was not a future danger based on the testimony of three guards from the Tarrant County Jail;
    b.   Present evidence that Hummel suffered from complex Post-Traumatic-Stress Disorder resulting from attachment trauma;
    c.   Present expert testimony regarding Hummel's life history;
    d.   Present testimony from the following lay witnesses:
        1)   Thomas Hamilton;
        2)   Brian Jeter;
        3)   Joseph "JoJo" Patterson;

1

4) Chad Brown;
5) Lance Dupre;
6) Shana Fowler;
7) George Goodson;
8) Christopher Paris; and
9) Tonya Paris;

e. Present Hummel's military service; and
f. Argue that the prosecution's case was insufficient to show future danger.

2. Hummel received ineffective assistance of appellate counsel (IAAC) when appellate counsel:

a. Failed to argue that the prosecution's case was insufficient to show future danger; and
b. Focused only on the arrest-warrant affidavit and ignored the unlawful detention by Border Patrol.

3. The jury instructions submitted to the jury during punishment unconstitutionally restricted the evidence that the jury could determine was mitigating.

4. Hummel's death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administrating the death penalty.

5. Hummel's Sixth, Eighth, and Fourteenth Amendment rights were violated because the trial court was prohibited from instructing the jury that a vote by one juror would result in life.

Pet. for Writ of Habeas Corpus, ECF No. 12, at 17–118 ("Petition").

## GENERAL DENIAL

The Director denies each allegation of fact made by Hummel except those supported by the record and those specifically admitted herein.

## STATEMENT OF THE CASE

Hummel was convicted on June 28, 2011, of capital murder committed on December 17, 2009. 4 CR 747–750. Pursuant to the jury's answers to the special issues on future dangerousness and mitigation, the trial court sentenced Hummel to

death. *Id.* The Texas Court of Criminal Appeals ("CCA") affirmed Hummel's conviction on direct appeal. *Hummel v. State,* No. AP-76,596, 2013 WL 6123283, *1–4 (Tex. Crim. App. Nov. 20, 2013), *cert. denied*, *Hummel v. Texas*, 135 S. Ct. 52 (2014).

While his direct appeal was pending, Hummel filed a state habeas application. 1 SHCR[1] 2–468. The trial court—the same trial judge who had presided over all trial proceedings—entered findings of fact and conclusions of law recommending denial of relief. 4 SHCR 1398–1534. The CCA denied relief. *Ex parte Hummel,* No. WR-81,578-01, 2016 WL 537608 (Tex. Crim. App. Feb. 10, 2016), *cert. denied*, *Hummel v. Texas*, 137 S. Ct. 63 (2016). Hummel timely filed his federal petition for habeas relief with brief in support on February 4, 2017. ECF No. 12. This proceeding follows.

## STATEMENT OF FACTS

### I.    Facts of Hummel's Capital Murder.

On direct appeal, the CCA accurately summarized the evidence from the guilt-innocence phase of trial as follows:

> In Fall 2009, [Hummel] resided in a house on Little School Road in Kennedale with his pregnant wife, Joy Hummel; their five-year-old daughter, Jodi Hummel; and [Hummel's] father-in-law, Clyde Bedford. [Hummel] worked as an overnight security guard at Walls Hospital in Cleburne, and he often stopped at an E–Z Mart convenience store in Joshua on his way to and from work. He met Kristie Freeze, who worked as a clerk at the E–Z Mart, and he called and texted her numerous times between October and December 2009. Freeze testified that [Hummel] told her that he was married, but he was not in love with his wife. Freeze also informed [Hummel] that she was divorcing her husband and dating someone else. Although Freeze initially told [Hummel] that they could only be friends, they sent each other sexually explicit text messages and eventually had sexual intercourse on December 10. [Hummel] informed

---

[1]    "SHCR" refers to the State Habeas Transcript compiled by the state court, preceded by volume number and followed by page reference.

3

Freeze that his wife was pregnant a few days later. Freeze instructed [Hummel] not to contact her anymore, but he continued to call and text her. On December 16, Freeze told [Hummel] that her divorce had become final.

Lorie Lewallen, a cook who worked the night shift at the Huddle House restaurant near the E–Z Mart, testified that [Hummel] regularly came into the restaurant on his way to and from work in December 2009. He usually wore his work uniform, sat in a booth that faced Lewallen, and talked to her while she cooked. However, when [Hummel] was there on the night of December 16, he sat facing away from Lewallen, wore "street clothes," and "reeked of cologne." Lewallen testified that [Hummel] was unusually quiet and seemed "like something was on his mind" that night.

Freeze testified that she permitted [Hummel] to visit her and her young daughter at their apartment in Joshua on the evening of December 17. [Hummel] arrived after dark wearing his security-guard uniform and stayed for about thirty minutes.

In the early morning hours of December 18, emergency personnel responded to a fire at [Hummel's] home. A passerby noticed that the house was on fire shortly after 12:00 a.m. and called 9-1-1. When police officer Joshua Worthy arrived at the scene approximately fifteen minutes later, he kicked open the front door and was unable to see anything but smoke and flames inside the house. He yelled to determine if anyone was inside, but no one responded. He also noticed that the back door to the residence was open. Firefighters later extinguished the blaze and discovered the burned bodies of Joy, Jodi, and Bedford, each inside of his or her bedrooms. Jodi and Bedford were found in their beds. Joy was located on the floor, with blood-soaked clothing nearby. Agent Steven Steele of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") investigated the scene and observed that Joy had injuries to her hands and upper body that appeared to be caused by some means other than the fire.

[Hummel] approached Officer Worthy outside the house at around 4:30 a.m. He asked Worthy what had happened and "if everyone had made it out[,]" Worthy replied that he did not know, and he accompanied [Hummel] to his minivan that was parked in a church parking lot across the street. Worthy and [Hummel] conversed while [Hummel] sat in his minivan and smoked a cigarette. [Hummel] told Worthy that he lived in the house with his pregnant wife, daughter, and father-in-law. Worthy testified that [Hummel] placed his "head down in his hands" a few times

4

during their conversation, but he "wasn't crying" and was just "basically sitting there." When Captain Darrell Hull walked over to them and asked [Hummel] what he had been doing that evening, he replied that he had gone to Walmart to check prices for Christmas presents. [Hummel] continued to ask "if everybody had made it out[,]" and the officers again responded that they did not know.

Hull testified that [Hummel] agreed to follow him to the Kennedale Police Department [KPD] in his own minivan, and they arrived around 5:15 or 5:30 a.m. Hull took [Hummel] to a room and asked [Hummel] to write a statement explaining what happened. He left [Hummel] alone in the room to write his statement and began recording [Hummel]. Hull testified that [Hummel] signed a witness statement that read,

> So I left my home around 9:00 p.m. I drove down to Joshua to visit a friend but [he] was not home. I drove around for awhile to wait and see if he would come home, but he didn't. I stopped and got gas, drove around some more. Then I began to visit Walmarts to price things for Christmas. I came home a little after 5:00 a.m. and found it burned down, and firemen and police were still there.

[Hummel] also provided written consent for police to search his house and van.

During the interview with Detective Jason Charbonnet, Sergeant Eric Carlson, and Agent Steele, Steele noticed what appeared to be blood on [Hummel's] pants. Steele testified that [Hummel] agreed to give him the clothes [Hummel] was wearing in exchange for clothes provided by another officer. When [Hummel] changed clothes, Steele observed blood on the bottom of his sock and scratch marks on his back.

[Hummel] thereafter left the police department and went to the office of his employer, Champion Security, in Arlington. He arrived at 8:00 a.m. He attended a meeting, then picked up his paycheck before leaving the office at 11:00 a.m. Co-workers who spoke to [Hummel] that morning were unaware that anything unusual had happened until people began calling and asking for him later that day. [Hummel's] co-workers and his friends from church were unable to reach him on his cell phone. Later, a concerned friend went to the police department to file a missing-person report on [Hummel].

Steele and other arson investigators ultimately determined that the fire at [Hummel's] home was an "incendiary fire," and they ruled out

5

accidental causes. Steele testified that there were three separate and distinct fires, or "areas of origin," within the house. Shiping Bao, the Deputy Medical Examiner who performed Joy's autopsy, testified that Joy was pregnant with a fourteen to fifteen week old fetus when she died. Joy had a total of thirty-five stab wounds, including ten to her chest, two to her abdomen, one to her right thigh, seven to her neck, and fifteen to her back. She suffered damage to her internal organs, including her heart, lungs, and liver. She had incised wounds on her hands that appeared to be defensive in nature. She also had six lacerations on her skull, which indicated that she had been struck multiple times with a hard object. Bao concluded that the cause of Joy's death was multiple stab wounds and the manner of her death was homicide. The lack of soot in her airways and the lack of carbon monoxide in her blood indicated that she was dead before the fire. Deputy Medical Examiner Gary Sisler testified that both Bedford and Jodi suffered extensive skull fractures. Sisler determined that the cause of their deaths was blunt-force injury, the lack of soot in their airways indicated that they were dead before the fire, and the manner of their deaths was homicide.

On December 20, Customs and Border Protection Officer ("CBP") Jorge Bernal encountered [Hummel] at the United States port of entry between Tijuana, Mexico, and San Ysidro, California. Bernal testified that [Hummel] approached his booth on foot and presented himself for entry into the United States at 5:48 a.m. When Bernal entered [Hummel's] name and date of birth into the computer system, an "armed and dangerous" notification "popped up on [the] screen." [Hummel] was handcuffed and taken to the Port Enforcement Team for further investigation. He was later transported to the San Diego County Jail.

That night, Kennedale officers Carlson and Charbonnet and Investigator James Rizy of the Tarrant County District Attorney's Office arrived at the San Diego County Jail. They mirandized [Hummel], conducted a videotaped interview with him, and obtained consent to search his minivan in San Ysidro and his hotel room in Oceanside, California. [Hummel] confessed his involvement in the instant offense both orally and in writing.

                                    . . .

Officers collected video that confirmed [Hummel's] presence at Huddle House on December 16 and E–Z Mart on December 17. They also obtained video that confirmed [Hummel's] presence at Walmart stores in Burleson, Grand Prairie, and Arlington on December 18. Store receipts indicated that [Hummel] was present at the Burleson Walmart

at 1:46 a.m. and the Grand Prairie Walmart at 4:33 a.m.

In the early morning hours of December 21, officers searched a dumpster at an auto parts store in Arlington, Texas, and found a number of weapons including an aluminum baseball bat, a large sword and sheath, a small sword and sheath, a dagger, and a kitchen knife. The small sword, dagger, and kitchen knife were contained in a white plastic trash bag, and the handle of the dagger appeared to be broken. DNA testing was performed on these weapons and on [Hummel's] clothing that he gave to officers at the [KPD].

[Hummel's] socks and pants had areas that tested positive for blood. Joy's DNA profile matched DNA profiles from [Hummel's] socks and pants, as well as the large sword, dagger, and kitchen knife. Bedford's DNA profile was the same as DNA profiles that were obtained from [Hummel's] pants and the white plastic trash bag. Jodi's DNA profile was the same as a DNA profile obtained from an area on the aluminum baseball bat that tested presumptively positive for blood. The DNA profile obtained from the dagger handle and the large sword sheath was the same as [Hummel's] DNA profile. Neither [Hummel] nor Joy could be excluded as contributors to a DNA mixture that was obtained from the small sword.

*Hummel*, 2013 WL 6123283, at *1–4.

## II.   Evidence Presented During the Punishment Phase.

### A.   State's evidence

In addition to the heinous facts of the crime presented at guilt/innocence, the State presented additional aggravating facts surrounding the commission of the offense. Specifically, two weeks prior to the murders, Hummel had accessed a doctor's computer at the hospital at which he worked as a security guard without permission and researched articles on the effects and symptoms of rat poison on humans. 42 RR 149–50; 43 RR 36–39.[2] Hummel told investigators that he then attempted to poison

---

[2]      "RR" refers to the reporter's record in Hummel's trial court proceeding, preceded by the volume number and followed by the page numbers.

his family by putting d-CON rat poison into the spaghetti sauce for their dinner. 41 RR 11, 14. His family, however, thought the meat had gone bad, threw it away, and ordered pizza as a substitute meal. 41 RR 14–16.

The State also presented evidence that showed that, after Hummel fled from the murders in Texas and checked into the Coast Inn in Oceanside, California, Hummel went to the gentlemen's club next door. 41 RR 17–18. Outside the hotel, he met Scott Matejka. 41 RR 19; 42 RR 27. Matejka had crack-cocaine on him, which he and Hummel smoked together. 41 RR 29; 42 RR 29. Matejka and Hummel then traveled together to Tijuana in search of marijuana. 41 RR 29; 42 RR 31–32. While in Mexico, Hummel and Matejka visited another gentlemen's club. 42 RR 33. Although Matejka testified that he never saw Hummel actually obtain marijuana in the gentlemen's club, Hummel told investigators that he had drugs in his pockets when he attempted to cross the border back into California that he either swallowed or discarded in the bathroom. 42 RR 34; 41 RR 29–30.

The State also presented other relevant evidence. On December 18, 2009, Hummel was counseled by his employer regarding infractions committed while on the job—unauthorized computer use and smoking on a smoke-free campus. 42 RR 9–11. Hummel admitted to the infractions. 42 RR 12. Hummel accessed 2,338 pornographic images during his unauthorized uses of the doctor's computer. 42 RR 98–99, 105–06, 144; 43 RR 33. Hummel also accessed his profile, "John Long N Hard," on the website horneymatches.com, where he sought women who would meet him for sexual encounters at the hospital while he was on-duty. 43 RR 30–32.

Hummel contacted Gretchen Bow, a dancer at the Showtime, on numerous occasions to meet at the club and would pay her at least $100 each time she performed for him. 42 RR 112–13, 120. Hummel would also ask Bow to visit him at the hospital while he was working so that they could "smoke weed and other things." 42 RR 114–15.

Melody Anderson, a friend of Hummel's wife Joy, testified that Joy and Hummel had financial problems. 44 RR 6, 8–9. Joy was responsible for the finances in the family, and after Hummel hurt his back and was diagnosed with Crohn's disease, the conversation about their finances changed significantly. 44 RR 9. When Hummel could not work, Joy obtained her certification as a massage therapist. 44 RR 10. A week before Joy was murdered, she had shown Anderson sonogram photographs of her nearly eleven-week-old baby. 44 RR 11. Anderson testified that she observed that Jodi, Hummel's daughter, loved her father a lot and was very affectionate with him. 44 RR 14. Anderson testified that Hummel and Joy still struggled financially even after Hummel got the security guard job. 44 RR 15.

Philip W. King knew Eddie, Hummel's father-in-law, through the Kennedale Senior Center where King was a volunteer. 44 RR 19, 28. Joy would drop him off every weekday and make sure he was situated for the day. 44 RR 19–20. At the end of the day, King would drop Eddie off at home, in time for Eddie to get his granddaughter Jodi from the bus. 44 RR 21–22. King said that everybody at the senior center loved Eddie. 44 RR 25.

Cindy Gail Lee was the Director of the Kennedale Senior Center on December 18, 2009. 44 RR 28. Lee recalled that, before she left for a short trip to Walmart, Eddie had not shown up for his normal appointment. 44 RR 29. Because that was unusual, Lee visited Eddie's house and found that it had been burned. 44 RR 29–30. When she returned to the senior center, she made an announcement about the fire, and several people cried and were upset. 44 RR 30–31. Lee described Eddie as a fantastic guy who was laughing all the time and talked to everyone. 44 RR 32–33.

Finally, the State presented evidence regarding Hummel's military service. Lieutenant Colonel ("LTC") Michael John Doughtery testified that Hummel was an intelligence clerk under his command. 45 RR 8, 18. LTC Doughtery described Hummel as a "pretty average, marginally effective" Marine who was not the best performer. 45 RR 11. LTC Doughtery remembered that he had to counsel Hummel from time to time about how he spent his off-duty hours. 45 RR 11. Hummel and Lance Corporal Wayne Matthias spent an inordinate amount of time in strip clubs, drinking, and with people who LTC Doughtery worried might lead them down the wrong path. 45 RR 12, 23. LTC Doughtery thought Hummel was a good-natured and happy-go-lucky type of person, but he could tell when Hummel was frustrated or angry because he would go silent and the muscles in his face would tense up. 45 RR 13.

LTC Doughtery testified that, according the Hummel's military records, he received two violations for smoking when he was not allowed to. 45 RR 14–15. Hummel never received a good conduct medal during his service, which was awarded

10

to those who have served three uninterrupted years without any non-judicial punishments. 45 RR 15. LTC Doughtery testified that, although Hummel received a Coast Guard Meritorious Unit Commendation, an Armed Forces Expeditionary medal, a Humanitarian Service medal, and a Sea Service Deployment Ribbon, all were for the unit and not for Hummel specifically. 45 RR 15–17, 27. LTC Doughtery testified that Hummel's rifle marksman badge was the lowest qualification for rifle marksman that every Marine receives before leaving basic boot camp. 45 RR 17.

On cross-examination, LTC Doughtery testified that Hummel was a good mechanic and was able to do things with electronics that he found particularly sharp, but if he was tasked with something he was not interested in, he needed maximum guidance or supervision to ensure completion. 45 RR 22–23. LTC Doughtery testified that Hummel also had several infractions for failure to maintain his weight and failure to pass a physical fitness test. 45 RR 30.

The State's final witness, Captain Sergio Ricardo Santos, testified that he was the intelligence officer that took over command of Hummel, and Hummel was not a very impressive Marine. 45 RR 34–35. Captain Santos testified that Hummel did not appear to be within weight standards and did not pass the physical fitness test. 45 RR 34–35. Captain Santos testified that, while Hummel was under his command, he had an unauthorized absence of under 20 hours. 45 RR 35. Captain Santos had to revoke Hummel's security clearance after his unauthorized leave because they no longer found him trustworthy. 45 RR 36. Captain Santos testified that Hummel had lied to his corporals and sergeants regarding whether he was cleaning his room,

pressing his uniform, and other things that constituted a pattern of questionable integrity. 45 RR 38. Hummel also disobeyed orders. 45 RR 39.

### B.    Defense's evidence

Hummel's counsel called eleven witnesses on his behalf. The first, Haila Scoggins, was Hummel's special education teacher at Jonesville High School in South Carolina. 43 RR 52–53. Scoggins testified that Hummel remained in her special education classes for all four years of his high school. 43 RR 53–54. Scoggins testified that Hummel had a learning disability in written language and had dyslexia. 43 RR 56. Scoggins described Hummel as quiet, pleasant, cooperative, and responsible. 43 RR 60. Scoggins never had discipline problems with Hummel when he was her student. 43 RR 61. Scoggins recalled that Hummel enjoyed playing Dungeons and Dragons. 43 RR 65. Scoggins believed that, had Hummel received accommodations for his learning disability, he might have attended college. 43 RR 66.

Tommy Jeffrey Stribble, the Director of Special Services for Union County Schools in South Carolina, testified that Hummel's school records showed that he failed the fourth grade the first time he went. 43 RR 86. The records also showed that Hummel failed the writing portion of his exit exams three times and only passed on his fourth attempt after special accommodations were made for him. 43 RR 88–89. The records indicate that Hummel graduated with a 2.414 grade point average. 43 RR 91. Hummel also participated in ROTC while he was in school. 43 RR 92. Hummel designed a logo for Project Hope and received a second-place award. 43 RR 93.

Hummel was absent sixteen days during his second grade year and was tardy ten times during his fourth grade year. 43 RR 94.

Mark Pack, a family friend of Hummel's, testified that he had known Hummel since he was nine or ten years old and used to eat Sunday dinner with the Hummel family for fifteen or sixteen years. 43 RR 104–05. Pack described Hummel as "an isolated person," who kept to himself and played video games. 43 RR 109–10. Pack said that Hummel's mother would do anything that Pack and his siblings asked but would not do the same for her own children. 43 RR 110. Pack testified that he witnessed Hummel being physically punished once when he was twelve or thirteen years old. 43 RR 111–12. Pack never saw Hummel get violent with anybody, although he did see Hummel get frustrated or mad. 43 RR 113–14. Hummel would ball up and hold everything in when he was frustrated. 43 RR 114. Pack thought Hummel was a slow learner. 43 RR 119–20.

Christy Gregory Pack, who was married to Mark Pack, testified that she first met Hummel at church. 43 RR 124. Christy said that, whenever they would go over for Sunday dinners, Hummel would be very quiet and stay in his bedroom playing video games. 43 RR 126. Christy testified that Hummel's mother was very generous with the Pack family but was very strict with her own children. 43 RR 127.

Linda Jean Petty Pack, Mark Pack's mother, was good friends with Hummel's mother, Jackie. 43 RR 137. Linda recalls that Jackie was very strict with her kids, although she never saw her physically strike them. 43 RR 138. Linda never saw Hummel back-talk or disobey his parents, and both Hummel children would be quick

13

to do whatever their parents asked of them. 43 RR 139–40. Linda believed Jackie treated the Pack children better than her own children. 43 RR 140. Linda remembers that when Hummel's sister Neata moved out, Jackie gave her $20, but when Linda's mother gave Neata $10, Jackie took $10 back because she did not want Neata to have more than $20. 43 RR 142. On that same day, Jackie bought one of the Pack children a $50 pair of shoes. 43 RR 145.

Derrick Joe Parris, Linda Pack's nephew, was good friends with Hummel when they were children. 43 RR 150–51. Parris witnessed Hummel's father hit Hummel twice, once with a belt and once with a broomstick. 43 RR 152–54. Parris and Hummel would play Nintendo games together. 43 RR 155. Parris saw Hummel's father smack Parris's mother on the behind, which caused problems with Parris's father. 43 RR 155. Parris testified that Hummel was given the nickname "Bacon" at school because he would smell like bacon when he got to school. 43 RR 156–57.

When Hummel came back from the military, he and Parris would go to bars and strip clubs, even though Parris was not old enough to go to bars. 43 RR 157–58. Parris described Hummel as getting "a little too attached" to the girls dancing in the strip club. 43 RR 158–59. Parris testified that Hummel was always behind in school. 43 RR 159. Parris had never known Hummel to be violent with anybody. 43 RR 160. Parris testified that it surprised him when Hummel joined the Marines because Hummel was overweight and not very athletic. 43 RR 161. Parris testified that he and his friends laughed when Hummel told them he was an intelligence analyst in

the Marines because they did not believe Hummel was smart. 43 RR 161. Parris never knew Hummel to use drugs before the Marines. 43 RR 169.

Stephanie Bennett testified that she was Hummel's former high school girlfriend. 43 RR 172–73. Bennett testified that they dated a little less than a year. 43 RR 174. Bennett said that both she and Hummel were a little shy. 43 RR 175. Bennett testified that she and Hummel broke up because Hummel got very serious about the relationship, talking about getting married after high school, and Bennett was not ready for that. 43 RR 176. Bennett never knew Hummel to be violent towards anybody, and Hummel always treated her appropriately. 43 RR 178.

Letti Bandit Hubertz was homeless when she met Hummel in San Diego. 43 RR 187–89. Hubertz and Hummel started dating a month before Hummel got out of the Marine Corps. 43 RR 189. Hubertz was pregnant at the time. 43 RR 189–90. When Hummel got out of the Marine Corps, he and Hubertz moved back to South Carolina together, where they were to be a family. 43 RR 190–91. When they first moved back, they lived with Hummel's parents, and Hummel began working with his dad at Kohler. 43 RR 191–92. Hummel always treated her with respect and showed great concern for her while she was pregnant. 43 RR 192. He was never abusive towards her in any way. 43 RR 193. Hummel and Hubertz eventually moved into their own two-bedroom trailer shortly before Hubertz gave birth to her child. 43 RR 193–94. Hubertz's baby was given Hummel's last name, even though it was not his child. 43 RR 189, 194.

Hubertz testified that she thought their relationship was progressing well, until the day that Neata showed up at their trailer and told her that Hummel had gone. 43 RR 195. Neata handed Hubertz a letter purportedly from Hummel, in which he said he was not ready to be a father and had left for Texas. 43 RR 195. Neata told Hubertz that she had one hour to get her stuff for her and her son, as they had purchased a bus ticket back to California for them. 43 RR 196. When Hubertz got to the bus station, she noticed that the ticket had been purchased two weeks earlier. 43 RR 196. Hubertz testified that she never knew Hummel to frequent bars or strip clubs or use drugs. 43 RR 199. Hubertz attempted to contact Hummel after she got to California but was repeatedly hung up on. 43 RR 199.

Hummel's sister, Neata Woody, testified that she took care of Hummel when they were children, even though their mother did not work outside the home, because she was told to. 43 RR 208, 211. Neata testified that her parents were never affectionate with them. 43 RR 211. Neata's mother was the disciplinarian in the family, often using a belt to dole out punishment. 43 RR 213–14, 218. Such punishment was common in the Hummel household. 43 RR 214. It was also common for the Hummel children to be left alone in the house, even before elementary school. 43 RR 215. One time, Neata called the operator when she was scared while just she and Hummel were home. 43 RR 218. Neata testified that, when she was seventeen, she saw a woman performing oral sex on her father. 43 RR 252.

Neata and Hummel were only allowed to have friends visiting that their parents approved of. 43 RR 219. Neata believes that her parents were abusive

16

towards her and Hummel. 43 RR 221. Neata knew that Hummel was called "Bacon" at school because he smelled like bacon as a result of the wood-burning stove that heated the house. 43 RR 223. Neata testified that Hummel joined the military when he was 22 years old. 43 RR 225. Neata testified that she and Hummel talked about his relationship with Hubertz, and he let her take care of it. 43 RR 227. It was Neata's decision that Hubertz should leave, and Hummel agreed to it. 43 RR 227. Neata said that when Hummel got off work, he went to his parents' house, and Neata picked Hubertz up and told her that Hummel did not want to be with her anymore. 43 RR 227.

Hummel was in the Marines for four years. 43 RR 231. After Hummel got out of the Marine Corps, he had colitis and got surgery to get some of his intestines removed. 43 RR 230. Hummel also wore a colostomy bag for a while after the surgery. 43 RR 230. Hummel and his wife had financial problems. 43 RR 231. Neata testified that, although she saw anger if people made Hummel mad, he was never violent towards anybody. 43 RR 232. Neata said that Hummel was nice to Joy and wonderful with his daughter Jodi. 43 RR 253.

Finally, the defense called two expert witnesses. The first, Frank G. Aubuchon, testified that, based on his review of Hummel's military, medical, offense, and jail classification records, he believed that Hummel would be classified as general population Level 3, which is the minimum level a life-sentenced-without-parole inmate could receive. 44 RR 64, 67, 69. Aubuchon relied on the following observations in arriving at his conclusion: other than Hummel's crime, he was a very

17

unremarkable person; Hummel lacked a criminal record; Hummel was honorably discharged from the military; and Hummel had no disciplinaries while in jail. 44 RR 70, 113. Aubuchon testified that, if Hummel received a life sentence, the remainder of his life would be as a prisoner. 44 RR 71. Aubuchon believed that Hummel would make a good adjustment to life in prison, based on the fact that Hummel had behaved well for the year he spent incarcerated in Tarrant County Jail and based on his good behavior in the military, which is a similarly highly-structured environment. 44 RR 73. Aubuchon admitted, however, that he did not know that Hummel had gone absent without leave while in the military. 44 RR 74.

Dr. Antoinette Rose McGarrahan, the final defense witness, was a forensic psychologist, with a specialty in neuropsychology. 44 RR 118. Dr. McGarrahan testified that she conducted a full neuropsychological evaluation, as well as a personality and emotional evaluation, of Hummel for a total of eleven hours. 44 RR 121. Dr. McGarrahan looked at twenty to thirty different tasks and instruments. 44 RR 122. In her evaluation of Hummel, Dr. McGarrahan also reviewed numerous records, including military, medical, school, and Tarrant County Jail records, as well as his video-recorded statements, statements from Neata Woody and her husband, and various cards, letters, and correspondence. 44 RR 122–23. Dr. McGarrahan also interviewed Neata for two and a half hours by phone and spoke with Hummel's mother for one hour. 44 RR 123. Dr. McGarrahan reviewed Hummel's mother's medical records and also subsequently reviewed psychological test data performed by the State's expert, Dr. Randy Price. 44 RR 123–24. Dr. McGarrahan also performed

a clinical interview with Hummel, which delved into his social history and the circumstances of the offense. 44 RR 124.

Dr. McGarrahan found that Hummel suffered from a disorder of written expression, but his IQ was in the average to above-average range. 44 RR 125. Dr. McGarrahan did not find that Hummel suffered from any severe mental disorders on the Axis I, although Hummel did show some mild depression and anxiety. 44 RR 126. Dr. McGarrahan explained that Hummel's primary problems were personality related, resulting in her giving him a personality disorder, general criteria diagnosis of not otherwise specified. 44 RR 126. The specific areas Hummel had difficulties with were in the diagnoses of narcissistic, antisocial, schizoid, and borderline personality disorders. 44 RR 127.

Dr. McGarrahan testified that she believed that both genetic, but largely environmental, factors played a major role in the development of Hummel's personality. 44 RR 133, 135. Dr. McGarrahan testified that, based on her discussions with Hummel's mother, his sister, and a review of the records, Hummel's mother's caregiving was inconsistent, not nurturing, and neglectful. 44 RR 133, 135. Hummel's mother did not show love or affection to her children. 44 RR 133–35. Dr. McGarrahan testified that an individual's ability to learn reciprocity and form attachments is a direct result of the involvement of the primary caregiver. 44 RR 134. Dr. McGarrahan believed that Hummel's mother was a major contributing factor to his personality. 44 RR 135. Although Hummel did feel emotions, he was unable to express them because he was controlled by his mother. 44 RR 136–37.

19

Importantly, Dr. McGarrahan testified that she believed Hummel committed the murders "in a flood of emotional rage" that was a result of thirty years of repression of those emotions. 44 RR 138. Hummel's emotional state was such that, even though he knew what he was doing was wrong, he was operating on pure emotion. 44 RR 138–39, 156. Dr. McGarrahan believed that Hummel acted blunt and unaffected in his interviews because, once the flood of emotions ended, he was "back to expressionless difficulty showing what he's feeling and what he's experiencing." 44 RR 139–40. When Dr. McGarrahan asked Hummel why he committed the crime, he explained that he had been ruminating on all the wrongs done to him over his lifetime and this rumination built up into an explosive rage. 44 RR 141. Hummel described his own wife and father-in-law as having been consistently critical of his lack of job, his inability to do things around the house, and his medical problems. 44 RR 142.

Hummel also described his rapid infatuation with Kristie Freeze, despite knowing she did not reciprocate his feelings. 44 RR 142–43. Dr. McGarrahan said that this was common in Hummel's history, whenever a woman would show interest. 44 RR 143–44. Although Hummel sought relationships, he was unable to form any relationships with anyone, whether romantic, platonic, or even familial. 44 RR 144. Dr. McGarrahan agreed that the issues regarding Hummel's personality and the genesis of his childhood played a big role in the commission of the offense. 44 RR 145. Dr. McGarrahan did testify, however, that Hummel had planned and thought about the murders for a period of time before they happened. 44 RR 152. Dr. McGarrahan

20

said that Hummel was essentially the same person today that he was on December 17, 2009. 44 RR 155.

Dr. McGarrahan testified that Hummel has done fairly well in structured environments and had received several commendations for his service in the military. 44 RR 159–60. Dr. McGarrahan testified that, although Hummel once left his military post without permission, he did not receive a judicial punishment; instead, it was administratively handled. 44 RR 160. Dr. McGarrahan said that Hummel admitted that he was wrong in carrying out the offense. 44 RR 162.

Lastly, on the cross-examination of State's witness LTC Doughtery, defense counsel elicited testimony that Hummel was in fact an intelligence specialist when he was in LTC Doughtery's command. 45 RR 22. LTC Doughtery testified that Hummel did not receive any nonjudicial punishments under his watch. 45 RR 26. Defense counsel also elicited testimony that Hummel had security clearance while he was under LTC Doughtery's command. 45 RR 29. And, under cross-examination, State's witness Captain Santos testified that, at some point, Hummel had been promoted to Lance Corporal. 45 RR 43. Hummel was still a Lance Corporal when he was honorably discharged. 45 RR 43–44. Captain Santos testified that Hummel received only the nonjudicial punishment of his pay being docked $282 for his unauthorized leave. 45 RR 44–45.

# ARGUMENT

## I.  Standard of Review

Under § 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless:

> it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court.

*Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citation omitted). A state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Terry Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. In order to determine if the state court made an unreasonable application a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

22

could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102. This is the "only question that matters under § 2254(d)(1)." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Thus "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.* at 102–03 (citations omitted). It is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286

F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002). State courts are presumed to know and follow the law. *Woodford*, 537 U.S. at 24. Even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Richter*, 562 U.S. at 102.

If the Supreme Court has not "broken sufficient legal ground to establish . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *Terry Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103. A federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests the proposed rule is not clearly established. *Yarborough*, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner carries "the burden of rebutting

the presumption of correctness by clear and convincing evidence." *Id.* "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). This presumption is "especially strong" where, as here, the state trial judge and the state habeas judge are one and the same. *Compare* 4 CR 749 (showing Honorable Ruben Gonzalez, Jr., as presiding over Hummel's proceedings), *with* 4 SHCR 1534 (same); *see also Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *Buxton v. Lynaugh*, 879 F.2d 140, 146 (5th Cir. 1989).

Except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011). Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2). Review pursuant to § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

Finally, an evidentiary hearing is precluded unless (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the petitioner establishes by clear and

25

convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. *Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000). For example, a petitioner who does not present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). *Id.* at 433. However, § 2254(e)(2) has "force [only] where § 2254(d)(1) does not bar federal habeas relief." *Pinholster*, 563 U.S. at 185.

Accordingly, even if a petitioner can leap the § 2254(e)(2) hurdle, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 185. And whatever discretion remains after *Pinholster* to hold an evidentiary hearing, it is still appropriate to deny such a hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007). Hummel has not met this standard.

## II.    Hummel Fails to Demonstrate that the State Court Unreasonably Denied his Claim Alleging Ineffective Assistance of Trial Counsel at the Punishment Phase of Trial (Claim 1).

In his first ground Hummel claims trial counsel were ineffective at the punishment phase of trial when they failed to argue that the State's case was insufficient to show future dangerousness and failed to investigate and present several witnesses in mitigation of punishment. Petition at 17–118. At bottom, Hummel faults trial counsel for failing to emphasize—whether through argument or

26

through the presentation of additional witnesses—that, other than the murders, Hummel did not have a violent history but did have a troubled upbringing. *Id*. However, Hummel fails to show that his trial counsel were deficient in any way or that he was prejudiced by any such deficiency, and the state court was reasonable in denying his claim. This Court should similarly deny Hummel's claim.

*Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective-assistance-of-trial-counsel (IATC) claims. *See Pinholster*, 563 U.S. at 189 ("There is no dispute that the clearly established federal law here is *Strickland v. Washington*."). To prove ineffectiveness, an inmate must establish that counsel's actions or omissions were deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. A reviewing court may dispose of a claim if counsel rendered reasonably effective assistance or there was a lack of prejudice. *Id*. If one is found dispositive, the court need not address the other. *Id*. at 697; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

To establish deficiency, courts "must be highly deferential" to counsel's conduct, and an inmate must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688–89. There is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id*. at 689. And, every effort must be made to eliminate the "distorting effects of hindsight." *Id*. An inmate's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

To establish prejudice, an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding"; Hummel may not simply allege, but must "affirmatively prove" prejudice. *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Indeed, under § 2254(d), "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). As such, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).

It should be noted that in determining the merits of an ineffective assistance claim under *Strickland*, the American Bar Association (ABA) Guidelines cited so frequently by petitioners are just that—guidelines. The Supreme Court has soundly rejected the notion that the ABA's guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 17 (2009) (per curiam) (internal quotation marks omitted).

28

The Court emphasized that the same was true of all state and private organization rules, noting that they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* (quotation marks omitted). Thus, while it is true that the Court's decisions in *Strickland*, *Williams*,[3] *Wiggins*,[4] and *Rompilla*[5] all refer approvingly to the ABA Guidelines, the guidelines were not adopted as law. *Wiggins*, 539 U.S. at 524.

### A. Counsel properly argued that the State's evidence of future danger was insufficient (claim 1-F).[6]

Hummel asserts that his trial counsel rendered ineffective assistance when they failed to argue that the State's evidence was insufficient to show future danger. Petition at 64–66. Hummel specifically argues that the State focused almost entirely and exclusively on the facts of the crime as support for finding that Hummel was a future danger. *Id.* at 64–65. Minimizing the facts of the murders, Hummel argues that the State's evidence showing Hummel's potential for future acts of violence was "marginal" because Hummel lacked a criminal record, had no history of disciplinary

---

[3]     *(Terry) Williams v. Taylor*, 529 U.S. at 362.

[4]     *Wiggins v. Smith*, 539 U.S. 510 (2003).

[5]     *Rompilla v. Beard*, 545 U.S. 374 (2005).

[6]     Hummel raised this claim as the last in a series of other IATC claims; however, all the remaining IATC claims relate to the mitigation case presented by trial counsel, and the instant claim relating to a simple failure to argue that the State's evidence, standing alone, was insufficient to show future danger is the broadest of those claims. Therefore, the Director is addressing the broadest claim first. The remaining IATC claims will be addressed in the order they are raised in Hummel's federal petition. And, the portion of this claim related to the ineffective assistance of appellate counsel is addressed under the IAAC section below. *See* Argument, III.A, *infra.*

29

incidents while in pre-trial incarceration, and had not committed any type of aggressive or violent act throughout his life. *Id*. at 65. Thus, Hummel contends that the State failed to meet its burden to show that Hummel was a future danger, and trial counsel was ineffective for failing to argue that issue. *Id*. However, such an allegation is contradicted by the record, and the state court therefore reasonably denied his claim.

As a preliminary matter, Hummel fails to support his claim with any legal principles regarding the sufficiency of the State's future dangerousness case.[7] *See* Petition at 64–66. Hummel wholly fails to explain how trial counsel were deficient or that any such deficiency prejudiced the defense, and thus, this claim is entirely conclusory. *See Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982), (explaining that "[m]ere conclusory statements do not raise a constitutional issue in a habeas case").

---

[7]     Hummel does allege that his state habeas claim 2, which corresponds to the federal claim 1-F, "is really a *Wiggins* and *Wong* argument," but it is unclear what this argument refers to, as the claim presented to the state habeas court did not refer to counsel's failure to investigate and present evidence. *See* 1 SHCR 50–54. To the extent that this portion of his claim—which was not part of state habeas claim 2—repeats and incorporates counsel's failure to investigate and present the evidence alleged in his remaining IATC claims, such claims will be addressed below and the prejudice analysis under *Wiggins* and *Wong v. Belmontes*, 558 U.S. 15 (2009), conducted accordingly. *See* Section II.B, *infra*. To the extent that Hummel is attempting to add something new, such a new claim was not presented to the state court and would thus be unexhausted and procedurally barred. *See Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015). Additionally, to the extent that counsel's reference to "the subsections above" is an attempt to cumulate error, such a claim is also unexhausted and procedurally barred and, moreover, without merit, as Hummel fails to show that he is entitled to relief on any of his independent IATC claims. *See* Section II.B, *infra*; *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (holding that federal habeas relief is only available for cumulative errors that are of a constitutional dimension and, because none of the petitioner's ineffective assistance claims satisfied both prongs of *Strickland*, the petitioner had not presented any errors of constitutional dimension); *United States v. Moye*, 951 F.2d 59, 63 n. 7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail").

Nevertheless, Hummel raised this claim in his state habeas application. 1 SHCR 50–54. Hummel's attorneys responded via affidavit, and the state court found that Hummel failed to prove deficiency or prejudice. 2 SHCR 527–556, 769–778; 4 SHCR 1413. It thus denied relief on this claim. *Ex parte Hummel,* 2016 WL 537608, at *1.

When examining counsel's closing argument to determine whether it was proper, the Court must consider the closing argument in its entirety. *Riley v. Cockrell*, 339 F.3d 308, 317 (5th Cir. 2003). Here, the record clearly refutes Hummel's allegation, and the state court correctly found that Hummel's trial counsel did in fact argue that the State's evidence did not support a finding of future dangerousness. 4 SHCR 1403. Indeed, the record shows that, when considering the argument in its entirety, trial counsel Moore explicitly made even the specific arguments Hummel asserts that they failed to make. In particular, Moore made the following argument:

> In order for you to answer yes [to the future danger question], each one of you have to be convinced in your own heart, your own mind, that the only answer is yes and that they have provided it to you. And I submit to you that they just haven't. *There is no testimony before you from any source in any place that before this offense and the weeks leading up to this offense, . . . in the 35 years he's lived, he's never been violent to anybody.*

45 RR 67. Both Moore and Cummings reiterated consistently that there was no evidence showing that Hummel had ever been violent before, given his lack of disciplinary and criminal record, and that the State wanted to focus only on the facts of the crime. 45 RR 69, 72, 76, 78, 80, 82. Cummings asked the jury to consider what role, if any, evidence of Hummel frequently visiting strip clubs played in considering

whether Hummel was a future threat to society. 45 RR 77–78. In short, defense counsel spent a majority of their closing statements arguing that the State had not met its burden to show that Hummel was a future danger to society. 45 RR 65–83; 2 SHCR 770–71. Therefore, his allegation that trial counsel failed to argue that the evidence was insufficient to show future danger is flatly untrue.

Moreover, as the state court found, the State's case was sufficient. 4 SHCR 1403 (finding that the State "presented compelling, overwhelming evidence to satisfy its burden to prove beyond a reasonable doubt that [Hummel] posed a future danger as defined in the Court's charge to the jury"). Despite Hummel's protestations, the heinous nature of the crime was itself sufficient for the jury to answer the future dangerousness special issue in the affirmative. *See* Statement of the Facts, Section I, *supra*; *see Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000) (finding that, under Texas law, the facts of the crime alone can be sufficient to support a future dangerousness finding); *cf. Wong*, 558 U.S. at 27–28 ("It is hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of McConnell's murder."); *Leavitt v. Arave*, 646 F.3d 605, 616 (9th Cir. 2011) ("Given the exceptional depravity of this murder, it is unlikely that additional evidence . . . would have made a difference."). As Moore summarized:

> [Hummel]'s statement wherein he details the fact that he was so physically tired from the murders of his wife and her father, that he had to take time to rest and contemplate his actions before undertaking the murder of his daughter, is the type of evidence which has an indelible impact upon jurors. When such evidence is coupled with the additional fact that within hours before the murder of his family, including the murder of his own daughter, [Hummel] was reading a bedtime story to the daughter of his new girlfriend, this painted such a graphic and

32

> memorable portrait of [Hummel] as a person that it was probably
> impossible for anyone to overcome.

2 SHCR 935. Added to that is the cold, calculating way in which Hummel thought about and prepared to commit the murders—he lied about whether he was going to work; he ensured he was seen on camera at a gas station prior to the murders; he parked behind his own house to avoid being seen; he removed some of his clothing; he contemplated whether to kill his wife, who was many weeks pregnant at the time; he disposed of the murder weapons and then drove around to various Walmart stores in order to be seen on camera; he returned to the scene of the crime and acted as if he had no knowledge about the events that had occurred; and he appeared jovial when he checked into a hotel in California after fleeing. *See* Statement of Facts, Section I, *supra; see also* 33 RR 152–54; 39 RR 39–44, 46, 150–51, 209. Such facts "demonstrate forethought, deliberateness, and wanton and callous disregard for the sanctity of human life." 4 SHCR 1408. And, such evidence was sufficient to support the jury's finding of future danger. *Wong*, 558 U.S. at 27–28; *Leavitt*, 646 F.3d at 616.

Further, even assuming the facts of Hummel's crime are not *alone* sufficient to support a finding of future danger, the state court found that the facts *in addition to* the other evidence at trial "were legally sufficient to satisfy the State's burden to prove beyond a reasonable doubt a probability that [Hummel] would commit criminal acts of violence that would constitute a continuing threat to society." 4 SHCR 1412. Indeed, the evidence the State presented in addition to the facts of the crime was compelling. *See* Statement of Facts, Section II.A, *supra*. Most notably, the State presented evidence showing that, prior to committing the offenses that would

33

ultimately lead to the death of his family, Hummel had *previously* attempted to kill them by poisoning them. 41 RR 11, 14; 42 RR 149–50; 43 RR 36–39. And, while it is true that Hummel did not have other acts of *violence* in his history, the State presented evidence of Hummel's lifelong history of antisocial behaviors, which could lead a jury to reasonably believe would pose a continuing threat of violence. 41 RR 17–19, 29–30; 42 RR 9–11, 27, 29, 34 98–99, 105–06, 114–15, 144; 43 RR 33; 45 RR 12, 13, 23, 38–39.

Consequently, the state habeas court found that "any challenge to the legal sufficiency of the evidence to prove [Hummel]'s future dangerousness would have been rejected by this Court and would have been futile." 4 SHCR 1403. Thus, the state court found that Hummel had not shown that counsel were deficient for failing to challenge the State's case. *Id*. at 1412–13. And, the state court found that there is "no reasonable probability that the outcome of the punishment phase of [Hummel]'s trial . . . would have been different had trial . . . counsel advanced meritless challenges to the legal sufficiency of the evidence to prove [Hummel]'s future dangerousness." *Id*. at 1413. Hummel wholly fails to show that the state court's denial of this claim was contrary to, or an unreasonable application of, clear Supreme Court precedent. Nor does Hummel show that the decision was unreasonable in light of the evidence presented before the state court. Thus, Hummel fails to meet his burden under AEDPA, and this Court should deny his claim.

34

**B.      Counsel effectively investigated and presented witnesses in mitigation of punishment (claims 1-A through 1-E).**

In his remaining IATC claims, Hummel faults his trial counsel for failing to investigate and present various lay and expert witnesses. Petition at 22–63. Hummel specifically alleges that trial counsel should have investigated and presented sufficient evidence regarding his non-violent history while incarcerated, his alleged personality disorder, his cohesive life history, and his military service. *Id*. Had the jury heard this additional evidence, Hummel claims that there was a reasonable probability that at least one juror would have voted for life. *Id*. Hummel essentially chastises his trial counsel for not exploring every branch and turning over every leaf they could find. But, as discussed in further detail below, trial counsel's extensive investigation and development of mitigating evidence was objectively reasonable under the circumstances. And, due to either the false, cumulative, or double-edged nature of the evidence Hummel now presents, along with the overwhelming evidence presented by the State during punishment, Hummel simply cannot show that the jury would have answered the special issues differently but for counsels' alleged errors. As such, Hummel fails to demonstrate either prong of the *Strickland* test, and this Court should therefore deny Hummel's instant allegation.

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley*, 339 F.3d at 316 (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Supreme Court has observed that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

Thus, a particular decision not to investigate further "must be directly assessed for reasonableness in all the circumstances," and a heavy measure of deference is given to counsel's strategic decisions. *Id.* at 691. And, "[c]ounsel's decision to pursue one course rather than another is not to be judged in hindsight," and the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance. *Gray v. Lucas,* 677 F.2d 1086, 1094 (5th Cir. 1982).  Indeed, a "conscious and informed decision on trial tactics and strategy is not a permissible basis for a claim of ineffective assistance of counsel unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial." *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

In terms of a mitigation investigation, an inmate "'must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011) (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)). In assessing reasonableness in this context, the courts should "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,'"

36

which must include a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 688–89). The question of the effectiveness of pretrial investigation is one of degree; it is not subject to precise measurement. *Strickland*, 466 U.S. at 680; *Dowthitt v. Johnson*, 230 F.3d. 733, 743 (5th 2000). Indeed, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

Relatedly, for uncalled witnesses, an inmate must name the witness, prove the witness's availability, allege what the witness would have testified to, and explain how such testimony would have been beneficial. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Specificity on both issues is necessary because, to assess the likelihood of a different result, reviewing courts "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. And, in order to answer that question, it is necessary to consider *all* the relevant evidence a jury would have had before it if counsel pursued a different path—not just the mitigation evidence counsel should have presented, but also any potentially damaging aggravating evidence that would come along with it. *See Wong*, 558 U.S. at 20.

### 1.    Tarrant County Jail guards (claim 1-A)

Hummel first alleges that his trial counsel were ineffective for failing to investigate and present evidence from Hummel's pretrial incarceration showing that he was not a future danger. Petition at 22–41. Hummel specifically argues that trial counsel were ineffective for not calling three jail guards—Detention Officers Cody Bell, Tommy Rigmaiden, and Rory Thomas—who purportedly would have testified that Hummel was always categorized as a "low-risk" inmate and was otherwise quiet, respectful, pleasant, and never caused any trouble. *Id.* at 23. Hummel alleges that the guards would have additionally testified that Hummel complied with all the rules and never received any disciplinary infractions while he was incarcerated. *Id.* However, Hummel fails to show that the state court unreasonably denied this claim.

In declining to provide Hummel relief on this claim, the state court found that, while it is true that Hummel's trial counsel did not identify the three officers during their investigation, it was reasonable trial strategy for counsel not to focus their investigative efforts on jail personnel. 4 SHCR 1414. In his affidavit before the state court, Moore averred that, in his experience, testimony from jail personnel is not particularly favorable to the defense at trial unless the defense can also establish some personal relationship between the jailer and the defendant. 2 SHCR 934. When any of the defense team members attempted to ascertain whether any such relationship might exist between Hummel and his jail guards, the state court found that Hummel provided no helpful information whatsoever to further their investigative efforts—he did not name a single guard who might be helpful, he was

not encouraging that any such witness even existed, and he in fact indicated that investigative efforts would not yield anything. 2 SHCR 771, 773; 4 SHCR 1414–15. Nor do the jail records that Hummel attempts to use to discredit counsel's investigative efforts indicate any personal relationship or affinity with Hummel. 4 SHCR 1415.

And, while Hummel is correct to point out that the duty to investigate and seek out witnesses lies with trial counsel and not the defendant, the Supreme Court has noted that trial counsel's actions are substantially influenced by information *supplied* by the defendant, and the reasonableness of investigative decisions depends on this information. *See Schriro v. Landrigan*, 550 U.S 465, 476–77 (2007) (finding that where the defendant interferes with counsel's attempts to present a case in mitigation, he cannot later claim ineffective assistance). Here, the representations made by Hummel, coupled with other observations and strategic choices, gave trial counsel sound reason to think that additional investigation into this avenue of evidence would have been fruitless. *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); *see also Rompilla*, 545 U.S. at 383 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Additionally, Cummings noted in his affidavit that he had observed that Police Chief Alan Dennis had an "extraordinary interest" in Hummel's case. 2 SHCR 773. Counsel believed that, based on their past

experience, such an interest by the Chief of Police, along with a general unwillingness to talk to supervisors or the State, would have had a "chilling effect" on any guard's willingness to provide favorable testimony for Hummel. 2 SHCR 773, 934.

Thus, it is reasonable to believe that counsel strategically decided that further investigation would have been pointless. As the state court found:

> Given [Hummel]'s failure to identify any jail personnel with whom he had developed such [a] close relationship, [Hummel]'s lack of encouragement that such witnesses might be found, and [counsel]'s experiences in seeking testimony from jail personnel, it was not unreasonable for trial counsel to make the strategic investigative decision to focus their efforts on areas that might prove more beneficial to [Hummel]'s case.

4 SHCR 1415. The state court properly found that trial counsel's failure to discover the three jailers was not a result of inadequate investigation, and they properly exercised their prerogative to not call the jailers as witnesses. 4 SHCR 1419–20.

Moreover, the evidence Hummel alleges the jail guards would have testified to would have proven either false or cumulative. Indeed, Hummel's allegation that he was classified as a "low-risk" inmate is belied by the record. Specifically, Hummel alleges that the jail guards would have testified that Hummel always "wore a green uniform and was thus considered 'low-risk.'" Petition at 23. However, as the state habeas court found, the jail records reflect that Hummel was classified as a "high risk" inmate, who was on suicide watch and required Mental Health and Mental Retardation services. 4 SHCR 1416; 2 SHCR 791–92. In fact, Cummings explained that Hummel was originally classified as medium risk, but that status was overridden by Chief Dennis when he ordered an upgrade to high custody because of

40

the high-profile nature of Hummel's case and because of the reasons previously listed. 2 SHCR 772, 791. Cummings admitted that Hummel was in a green jumpsuit whenever he saw him, but Cummings' experience—as confirmed by Hummel's jail record—was that green jumpsuits were for suicidal inmates, and Hummel had admitted to Cummings that he said something that could be construed as suicidal. *Id*. at 772. As noted by Cummings, while Hummel may have been a model inmate, the jail records certainly do *not* reflect that he was classified as a "low-risk" inmate. *Id*. at 773.

And, as the state habeas court found, the remaining facts that Hummel wishes trial counsel had presented—that Hummel was a respectful inmate who complied with the rules and had no disciplinary actions against him—"serve largely the same purpose as and are largely cumulative of other evidence that [Hummel] had no disciplinary issues while confined in jail, that he would likely adjust well to a prison setting if he were sentenced to life without parole, and that he allegedly posed a low risk of future violence." 4 SHCR 1415–16. Indeed, the state habeas court found, and the record reflects, that defense counsel presented two expert witnesses and many lay witnesses to show Hummel's lack of disciplinary issues in jail, his lack of violent or criminal history, and the likelihood that he would adapt well to life in prison. *Id*. at 1415; *see* Statement of Facts, Section II.B, *supra*.

Specifically, expert Frank AuBuchon testified that he believed Hummel would adjust well to life in prison and would be classified at the minimum acceptable risk level for his offense. 44 RR 64, 67, 69, 73. AuBuchon based his belief on his review of

the jail records and the fact that Hummel had behaved himself well during the year he was in pretrial incarceration, specifically focusing on his lack of disciplinary activity. *Id*. Expert Dr. McGarrahan also testified that Hummel had done well in structured environments. 44 RR 159–60. And, numerous lay witnesses testified that Hummel had never been violent and was a quiet, pleasant person. 43 RR 60, 113–14, 126, 139–40, 160, 178, 193, 232, 253. Moreover, as discussed previously and as found by the state court, trial counsel's closing arguments were centered on the idea that Hummel did not pose a future danger if sentenced to life imprisonment, "based in part on AuBuchon's testimony and because [Hummel] had no history of violence, no prior criminal history, and no issues during his incarceration in jail." 4 SHCR 1415; Argument, Section II.A, *supra*.

Thus, the state court correctly concluded that the proposed testimony of the three guards "provides no meaningful new facts about [Hummel]'s pretrial confinement" or about his potential for future danger "that [Hummel]'s trial counsel did not develop through other witnesses." 4 SHCR 1415. Hummel merely "overrates the potential impact of the facts contained in the habeas affidavits . . . and unfairly overlooks or underrates the testimony presented through Dr. McGarrahan, AuBuchon, and lay witnesses." *Id*. at 1416.

But, as Hummel himself acknowledges, the failure to present cumulative evidence that Hummel would not pose a future danger is not deficient performance. *Id*. at 1423 (citing *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007)). Hummel's attempts to distinguish *Coble* from the instant case are unavailing. Indeed, Hummel

42

focuses, in part, on the fact that the petitioner in *Coble* had not presented evidence of the proposed testimony, but rather had merely speculated as to what that testimony might be. *See* Petition at 26 (citing *Coble*, 496 F.3d at 436). However, while it is true that, in the instant case, Hummel has presented actual, not speculative, evidence of what the witnesses would have testified to, the fact remains that such testimony is now assuredly— not speculatively—cumulative. Hummel's argument hurts, rather than helps, him. As Moore pointed out in his affidavit, Hummel essentially disputes "the manner in which [they] presented that evidence to the jury, and the witnesses which [they] used for that purpose, rather than [their] failure to present any evidence at all." 2 SHCR 934. Such a claim cannot form the basis for deficient conduct on the part of Hummel's trial counsel. *Strickland*, 466 U.S. at 691

Even assuming counsel was somehow deficient, Hummel cannot show prejudice when weighing the proffered mitigating evidence against the aggravating evidence presented at trial. *See Strickland*, 466 U.S. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999) (finding no prejudice due to brutal facts of murder); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (finding no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State").

As the evidence previously set forth demonstrates, Hummel is a violent individual. *See* Statement of Facts, Section I, *supra*; Argument, Section II.A, *supra*.

43

Indeed, Hummel's "annihilation of his family, and his demeanor and actions before and afterward (many of which were documented on video recordings seen by the jury), demonstrated [Hummel]'s cold-hearted capacity for extreme violence and sufficed to establish future dangerousness." 4 SHCR 1419. And, as the state court concluded, it is not reasonable to believe that the proposed evidence, i.e. further evidence that Hummel behaved well while in prison, would have significantly diminished the State's case, when weighed with other evidence on the record. *Id.* at 1420.

Indeed, because much of the evidence that Hummel faults counsel for failing to uncover was actually presented in some form to the jury, any additional testimony regarding such evidence would have been cumulative of evidence already admitted at trial. *See Parr v. Quarterman*, 472 F.3d 245, 258 (5th Cir. 2006); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994). Thus, the omission of such evidence was not prejudicial. And, even if further evidence of Hummel's classification status had been presented, it would have "provided little, if any, benefit to [Hummel]'s punishment case because [Hummel]'s jury could have reasonably assumed that [Hummel] had no disciplinary issues in jail because his classification left him little opportunity to violate the rules or because [Hummel] was on his best behavior pending his capital-murder trial where he faced the death penalty." 4 SHCR 1416. As such, the proposed testimony Hummel believes counsel should have proffered is insignificant when considered against the entire body of the State's aggravating evidence. *See Wong*, 558 U.S. at 20. Hummel cannot prove prejudice.

44

Hummel relies on *Skipper v. South Carolina*, 476 U.S. 1 (1986), to show that the state court's decision was unreasonable. In *Skipper*, the only evidence petitioner had presented of his good behavior in prison was testimony from petitioner himself and his former wife. 476 U.S. at 3. When the trial court refused to admit testimony of two jailers and one visitor to the jail to show that he had made a good adjustment in prison, the Supreme Court held that such exclusion of evidence deprived petitioner of his right to place relevant mitigating evidence before the sentencer. *Id*. at 5.

In rejecting the State's argument that the proposed evidence was cumulative of the testimony at trial, the Court held that the proffered evidence was not cumulative because the evidence at trial was "the sort of evidence that a jury naturally would tend to discount as self-serving." *Id*. at 9. "The testimony of more disinterested witnesses—and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges—would quite naturally be given much greater weight by the jury." *Id*. Therefore, the Court could not "confidently conclude that *credible* evidence that petitioner was a good prisoner would have had no effect upon the jury's deliberations." *Id*. (emphasis added).

*Skipper* is clearly distinguishable from the instant case. Indeed, not only was evidence of Hummel's good behavior presented through disinterested and credible witnesses at his trial, but their observations and opinions were based on objective jail records showing those facts to be true. Neither AuBuchon, nor Dr. McGarrahan, nor many of the lay witnesses would be the type of "self-serving" witnesses that a jury

45

would discount. And, the state court here does not say that evidence of his behavior while incarcerated was somehow irrelevant; the state court simply says that this relevant evidence was *already presented* through credible witnesses at trial. *See* 4 SHCR 1416. Thus, the state court correctly concluded that, "[g]iven the cumulative nature of the evidence contained in the habeas affidavits of Rigmaiden, Thomas, and Bell, [Hummel] has not met his burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue differently had trial counsel discovered and called those witnesses to testify during the punishment phase of [Hummel]'s trial." *Id.* at 1425.

Finally, Hummel must overcome the doubly-difficult-to-surmount bar that favors Judge Gonzalez's findings and conclusions, which carry the especially strong presumption that can only be overcome with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Richter*, 562 U.S. at 101–02; *Clark*, 202 F.3d at 764; *Buxton*, 879 F.2d at 146. Hummel, however, truly fails to show an inadequate investigation. Moreover, he fails to show how such an investigation would have resulted in evidence that makes him less morally culpable. Hummel fails to prove both prongs of *Strickland*. And, he fails to overcome the doubly difficult and especially strong presumption that favors the state court's decision. Thus, Hummel's claim must fail.

## 2. Complex Post-Traumatic-Stress-Disorder expert (claim 1-B)

Hummel next contends that counsel were ineffective for failing to present expert Dr. Susan Hardesty to explain how Hummel's past patterns of behavior and mental status did not support a finding of future danger. Petition at 23. Hummel

46

specifically alleges that he suffered from complex Post-Traumatic-Stress-Disorder ("C-PTSD") "due to attachment trauma caused by his parents' neglect, physical abuse, and social isolation." *Id*. at 24. Hummel argues that Dr. Hardesty would have opined that, while Hummel had committed a violent and serious crime, she believed that his long-term risk of violence was low to moderate in a prison setting, based on Hummel's lack of a violent history, his normally passive and escapist coping mechanism, the lack of financial or familial stressors in prison, the lack of opportunities to form attachments in prison, and his acceptance of his personal responsibility. *Id*. at 24–25. Had this disorder been presented through expert testimony, Hummel argues, the defense would have shown the jury that the triple murder he committed in December 2009 stemmed from a post-trauma response that occurred as a result of him "reliving the attachment trauma of his youth." *Id*. at 24. Hummel argues that this would have shown that he was not a future danger. *Id*. at 23. The record indicates, however, that counsel had clear strategic reasons for avoiding expert testimony that showed Hummel was not a future danger. Hummel, therefore, cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance under the *Strickland* standard. And, Hummel fails to show that he was in any way prejudiced by his counsel's alleged deficiencies. Thus, this Court should deny his instant allegation.

In rejecting Hummel's claim, the state court found that Hummel's trial counsel were not deficient in failing to present the expert testimony of Dr. Hardesty. 4 SHCR 1419. First, the state habeas court found that trial counsel exercised reasonable trial

strategy in choosing to present Dr. McGarrahan as an expert witness and not another mental health expert to show that Hummel was not a future danger. *Id*. at 1469. Indeed, the state court found that trial counsel thoroughly investigated Hummel's background to see how the various factors of his childhood affected his actions. *Id*. at 1417; 2 SHCR 532–33. During that pretrial investigation, "it soon became apparent that [counsel] would need a psychological evaluation done of Mr. Hummel, in order to adequately investigate and document the possible mental and emotional issues [they] felt might exist with Mr. Hummel." 2 SHCR 532–33.

To that end, Dr. McGarrahan was an experienced and licensed forensic psychologist who specialized in neuropsychology. 44 RR 118. Dr. McGarrahan spent eleven hours interviewing Hummel, talked to Hummel's family, and reviewed a substantial number of records related to Hummel's background. 2 SHCR 547–48; 44 RR 121–24. Trial counsel strategically chose Dr. McGarrahan because of trial counsel's prior experience with her, her reputation in the legal community, and because counsel believed that Dr. McGarrahan's findings and opinions would stand against the State's expert Dr. J. Randall Price if he was called. 2 SHCR 533; 4 SHCR 1417.

As the state court found, Dr. McGarrahan ultimately testified to every personality disorder she found to exist based on her review and investigation. 4 SHCR 1468. Dr. McGarrahan testified that Hummel did not suffer from any of the Axis I mental disorders but did suffer from personality disorder, not otherwise specified. 44 RR 126. Dr. McGarrahan testified that Hummel's upbringing and background played

48

a large role in the development of his personality and focused in particular on "attachment issues and personality traits" resulting from his relationship with his mother as a child. 4 SHCR 1417; 44 RR 133–45. Dr. McGarrahan believed Hummel committed the crimes "in a flood of emotional rage" that was a result of thirty years of repression of the negative emotions he experienced through his many failed relationships. 44 RR 138, 141–42.

Further, in his affidavit, Moore "heartily disputed" that they should have obtained and presented an expert on future dangerousness:

> [W]e specifically discussed with [Dr. McGarrahan] whether or not she should do a formal violence risk assessment of Mr. Hummel. Due to the nature of the personality disorder that she determined Mr. Hummel suffers, and the results of the objective psychological tests administered by her to him, she indicated that many of the traits that she found to exist in connection with his personality disorder are also characteristics of psychopathy. She indicated that she felt that if she were to do a formal violence risk assessment using a standardized risk assessment instrument such as the Psychopathy Checklist Revised (PCLR), or the Violence Risk Assessment Guide (VRAG), that Mr. Hummel would in all likelihood <u>not</u> have scored "*excessively high,*" however, neither would he have likely scored "*low*" either. She indicated that he would in all probability score in the "*moderate*" to "*moderately high risk*" range, and it was our consensus belief that such a finding would <u>not</u> have been helpful testimony for us.

2 SHCR 532–34 (emphasis in original). Moore also concluded that, because the trial court would limit the State's evaluation of Mr. Hummel to those issues and tests which the defense focused on and used, they would be "able to insure that the State's expert would not be able to do one as well." *Id.* at 534. Having worked with Dr. Price previously, Moore knew that, if given the opportunity, Dr. Price would conduct the same type of violence risk assessment that counsel and Dr. McGarrahan discussed, and he, therefore, believed that it would be *against* Hummel's best interest to present

49

the State with such an opportunity. *Id.* Counsel even considered more creative ways of obtaining that information:

> Mr. Cummings and I even specifically discussed the feasibility of obtaining another mental health expert (other than Dr. McGarrahan) for purposes of doing such a risk assessment, just in order to see how it might result (specifically Dr. Mark Cunningham, another mental health expert with whom I had previously worked, and who has significant experience and expertise in risk assessment). Our thinking was that if the results of such an assessment were not helpful, then we would simply not use him as a witness; however, we determined that we would not be able to "keep secret" the use of such an additional expert, so we ultimately determined that pursuing such a possibility would <u>not</u> be in Mr. Hummel's best interest for the reasons set out herein.

2 SHCR 534. Counsel thus adopted the strategy mentioned previously by presenting only an expert (Dr. McGarrahan) on the issue of how Hummel's mental health and personality issues should be considered in mitigation of punishment, and not one on future dangerousness. *Id.* at 532–34; *see also* 4 SHCR 1417 (finding that trial counsel and Dr. McGarrahan strategically decided that it was not in Hummel's best interest to perform a formal violence risk assessment).

Further, with regard to the decision of whether to call an expert about the C-PTSD resulting from attachment trauma diagnosis specifically, Moore did not believe that calling Dr. Hardesty would have been effective trial strategy, as serious doubts exist as to whether her testimony would have survived a reliability challenge. 2 SHCR 534–35. As noted by both Moore and the state habeas court, Dr. Hardesty does not rely on any risk assessment measures or any scientific or statistical comparisons in order to arrive at her diagnosis. *Id.*; 4 SHCR 1418 ("Dr. Hardesty's habeas affidavit does not disclose the scientific methodology by which she reached her opinion or

contain any objective source material to substantiate the validity or appropriateness of her methodology."); 2 SHCR 200–208. Indeed, Dr. Hardesty herself acknowledges that C-PTSD cannot be found within the two major diagnostic manuals—the Diagnostic and Statistical Manual of Mental Disorders ("DSM") or the International Statistical Classification of Diseases and Related Health Problems ("ICD"). 2 SHCR 207. In Moore's experience, diagnoses for disorders not contained within diagnostic manuals are subject to attack on that basis alone. *Id*. at 941. Moore was therefore reasonably "skeptical about the jury's willingness to give credence and/or weight to the diagnosis of a mental disorder which lacks formal recognition within any of the universally accepted diagnostic manuals." 2 SHCR 941–42.

Nor does counsel believe that a jury would be swayed by a doctor's attempt to explain Hummel's denials of emotional abuse or neglect as itself indicative of C-PTSD, as such denials present "a unique and challenging" evidentiary problem when attempting to support and defend such a diagnosis before a jury. 2 SHCR 936, 941–42; 4 SHCR 1740. As Moore explains, "It has been my experience from having tried criminal cases for more than thirty-five years, that jurors are reticent to accept 'learned opinions' in the face of a lack of an evidentiary basis with which to support that opinion." 2 SHCR 941. Thus, it was certainly reasonable that trial counsel strategically decided that Dr. McGarrahan's testimony regarding Hummel's background, his attachment issues, and her diagnoses of personalities found within widely-accepted diagnostic manuals was a preferable strategy over the type of testimony Dr. Hardesty now proffers.

51

The state court found that counsel properly exercised their prerogative to call Dr. McGarrahan instead of another expert. 4 SHCR 1419. And, unless Hummel can demonstrate that counsel's chosen strategy "was so poor that it robbed [him] of any opportunity to get a fair trial," challenging counsel's informed decisions on trial tactics is not a permissible basis for a claim of ineffective assistance of counsel. *Smith,* 311 F.3d at 668. Hummel does no such thing. Instead, as the state habeas court found, Hummel engages in the type of second-guessing of his trial counsel's strategic decisions that is impermissible. 4 SHCR 1424; *Strickland*, 466 U.S. at 689.

Indeed, federal law is clear that whether or not to retain a defense expert is the very sort of trial decision that is insulated from ineffective assistance claims and disfavored on federal habeas review because it is a matter of strategy. *See Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."). Counsel cannot be considered ineffective for not hiring every kind of expert to contest the State's case or develop a theory that might have supported Hummel's defense. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."). Nor does *Strickland* require counsel to "canvass[] the field to find a more favorable defense expert." *Dowthitt*, 230 F.3d. at 748; *see also Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) (explaining that the Sixth

52

Amendment does not require attorneys to "shop around" for more favorable expert testimony).

And, although Hummel is convinced that testimony regarding his mental disorders would have had significant value as mitigating evidence, it was reasonable for counsel to believe that such evidence was more likely to be perceived as aggravating, rather than mitigating, to a jury. For instance, evidence that Hummel suffered from C-PTSD and, as a result, was susceptible to violent "emotional rages" could be more damaging than beneficial to Hummel because it could be used to show the jury that he continues to be a dangerous person. Using a condition (C-PTSD) that he developed over thirty years prior the murder to excuse his acts as essentially beyond his control could also appear callous to a jury and could potentially bolster the State's contention that Hummel was a person who no longer, if ever, had any internal restraints.

As a result, such evidence is, at best, a double-edged sword which could reasonably be construed as more likely to prove harmful to Hummel than to serve as mitigating evidence against a death sentence. *See Wiggins,* 539 U.S. at 535 (Wiggins's history "contained little of the double edge we have found to justify limited investigations in other cases."); *Kitchens v. Johnson*, 190 F.3d 698, 702–03 (5th Cir. 1999) (finding counsel's decision not to investigate mitigating evidence of child abuse, alcoholism, and mental illness was sound strategy where evidence was "double-edged" in nature). Thus, the state court accurately found that, even if Hummel was diagnosed with C-PTSD, trial counsel were still not required to present that evidence

because such a diagnosis could reasonably be seen by a jury as evidence of future dangerousness. 4 SHCR 1469. Given the potential damage it could cause, counsel's decision not to further investigate or present evidence of Hummel's alleged mental health disorder in other to show he was not a future danger was clearly reasonable in light of the circumstances. Hummel fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.

Nor does Hummel demonstrate that the state court was unreasonable when it found that Hummel had failed to show that he was in any way prejudiced by trial counsel's alleged deficiencies with regard to Dr. Hardesty. 4 SHCR 1474. As discussed previously, the aggravating evidence in this case, especially given the facts of the crime, is powerful. *See* Argument, Section II.A, *supra*; 4 SHCR 1425. And, despite the fact that the jury heard about Hummel's attachment and personality issues through Dr. McGarrahan, the jury simply did not find such attachment issues "sufficiently mitigating to absolve [Hummel] of moral blameworthiness for his premeditated, calculated, heinous acts." *Id*. at 1471.

Moreover, notwithstanding whether Dr. Hardesty's opinion testimony would have been admissible,[8] the state habeas court found that her testimony was not so

---

[8]     Hummel focuses much of his argument on the state court's finding that Dr. Hardesty's testimony does not satisfy the reliability requirements of Texas Rule of Evidence 702 "[b]ecause her determination that [Hummel] would not be a future danger if he were sentenced to life in prison is the same type of unreliable predication of future dangerousness rejected as unreliable in *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010)." Petition at 34; 4 SHCR 1424. However, whether or not Dr. Hardesty's testimony would have been admissible in this case is irrelevant to the prejudice analysis that follows because such an analysis assumes for the sake of argument that it would have been and addresses only the *weight* of the proffer. Therefore, Hummel's attempts to distinguish *Coble* are inapposite.

54

compelling that it would have changed the jury's answer to the future dangerousness question. 4 SHCR 1418, 1471. Indeed, as discussed previously, C-PTSD is not a formally recognized diagnosis; instead, it is just—as Dr. Hardesty herself described it—a "clinical diagnosis founded in learned opinion in a rapidly growing body of psychiatric, psychological and neuroscience literature on neuron connectivity in childhood and the results of deprivation, trauma or neglect on development." 2 SHCR 207, 839. As such, the weight given to such evidence by the jury would have been minimal.

Further, the fact that evidence of a mental illness could be perceived as aggravating, as well as mitigating, bodes in favor of finding no prejudice. *See* 4 SHCR 1469. The Fifth Circuit has denied claims such as the one Hummel presents for lack of prejudice due to the double-edged nature of evidence presented. *See Trevino v. Davis*, No. 15-70019, 2017 WL 2772574, *4–5 (5th Cir. 2017) (holding that proposed evidence showing that petitioner had Fetal Alcohol Spectrum Disorder, but also that he was violent and involved in gang activity, was "a significant double-edged problem that was not present in *Wiggins*," and which did not prejudice petitioner); *Miniel v. Cockrell*, 339 F.3d 331, 346–48 (5th Cir. 2003) (upholding the state court's conclusion that the petitioner was not prejudiced by counsel's failure to investigate and present evidence of abuse and neglect during his childhood); *Ladd*, 311 F.3d at 349 (failure to present evidence of troubled childhood, mental retardation diagnosis as a child, low IQ test score, being put on a psychomotor inhibitor, and good behavior in institutional settings not prejudicial because some of the evidence was double edged, and the rest

55

had only "minimal[]" mitigating value); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (counsel not ineffective for failing to present evidence of alleged brain injury, abusive childhood, and drug and alcohol problems because evidence is "double-edged").

Finally, because a prejudice analysis must encompass the *entire* body of evidence that would have been presented to the jury had counsel pursued a different route, the state court reasonably found that, had counsel called Dr. Hardesty to testify that Hummel had C-PTSD, State's witness "Dr. Price would have been available to testify and dispute her analysis." 4 SHCR 1470; *see also Wong*, 558 U.S. at 20; *see also Kansas v. Cheever,* 134 S. Ct. 596, 601 (2013) (if defendant presents evidence through psychological expert who has examined him, State is also permitted to use, in rebuttal, testimony from expert who has examined him). Indeed, Dr. Price is a "highly experienced forensic psychologist and neuropsychologist, who evaluated [Hummel] at the time of trial, was present during the entire punishment phase of trial, and was available to testify had he been called by the State to do so." *Id.*

In his affidavit, Dr. Price explained that he would have directly refuted any diagnosis of C-PTSD on the basis that evidence of C-PTSD is "both inconsistent with the science of psychology and with the available evidence concerning Hummel's life history." 2 SHCR 998. Indeed, so many signs and symptoms have been ascribed to C-PTSD that it has been rendered so non-specific as to not gain acceptance in the medical community. *Id.* at 1001. And, although Hummel's "childhood may have been marked by the lack of being told he was loved, not having been hugged, being isolated

56

on a farm, escaping into fantasy games, being spanked, and other forms of neglect or even abuse," such events are not typically within the ballpark of the circumstances usually associated with causing C-PTSD. *Id.* at 1002. Moreover, Dr. Hardesty's use of Hummel's denials of neglect and abuse as "evidence of abuse in and of themselves is inappropriate." *Id.* at 1003.

Importantly, Dr. Price would have testified that he did not agree that Hummel suffers from C-PTSD such that "he was 'reliving' the emotional trauma of his childhood when he repeatedly stabbed and beat his wife to death, beat his young daughter and father-in-law to death with a  baseball bat, set the house on fire, and fled to California." *Id.* at 1002. Most damaging of all, Dr. Price would have testified that, in reality, Hummel's motivations for brutally murdering his family were likely "multiple and interactive, including his frustration for having been repeatedly teased as a child and criticized as an adult, a desire to escape financial and personal familial obligations, and, in general, a perception of not having had the life to which he was entitled." *Id.*

When weighing the entire body of the mitigating evidence that Hummel alleges his counsel should have presented against the aggravating evidence that was and would have been presented, including the testimony of Dr. Price, "there is no reasonable probability that the jury would have been persuaded by Dr. Hardesty's diagnosis of C-PTSD to answer the mitigation special issue in [Hummel]'s favor." 4 SHCR 1471. As such, Hummel cannot show that he was prejudiced by his counsel's alleged deficiency.

Because Hummel can satisfy neither prong of *Strickland*, the state court reasonably denied his claim, and relief should be denied.

### 3.    Life history expert (claim 1-C)

Hummel also alleges that his trial counsel failed to investigate and call an expert to present evidence to explain Hummel's life history and opine as to which elements of Hummel's life history impacted Hummel's development and decision-making in mitigation of punishment. Petition at 41–45. In support of this claim, Hummel attaches an affidavit from social worker Laura Sovine (maiden name Smith), in which she recites a lengthy story of Hummel's background gleaned from lay witness testimony at trial, affidavits provided by state habeas counsel, multiple records, and an interview with Hummel. *Id.* at 41–42; Pet. App. 0214.[9] Sovine concluded that Hummel "has been deeply impaired by a lack of appropriate nurturing and attachment as a child" and suggests that, by testifying to this conclusion, she "would have offered a window into how [Hummel] came to take the actions he did and why his moral culpability for those actions was diminished." Pet. App. 0243–0245. However, Hummel wholly fails to show how his counsel were ineffective for failing to present this testimony at trial, and this claim should be denied.

First, he fails to show in any meaningful way that trial counsel were deficient. He indicts counsel for not using a "social life history" expert. However, as the state habeas court found, prevailing professional norms do not require the use of a social

---

[9]      "Pet. App." refers to the appendix of exhibits Hummel attaches to his federal habeas petition. *See* ECF Nos. 13–15.

life history expert, and Hummel has not shown that the use of experts in regard to a petitioner's life history is professionally mandated. 4 SHCR 1426. Instead, Hummel's defense team consisted of two trial counsel, an experienced mitigation specialist with a master's degree and license in social work, and an experienced private investigator, which was found reasonable by the state court. 4 SHCR 1426, 1430–31, 33. The defense team completed a full mitigation investigation with the specific goal of using lay witnesses that were available and helpful to present the story of Hummel's life and then using that story to form the basis of experts' opinions regarding Hummel's mental and emotional conditions and the effects these conditions had on his life. 2 SHCR 536–37; 4 SHCR 1428–29. To that end, counsel "spent countless hours seeking lay witnesses (including family members, friends, teachers, coaches, school administrators, past employers, ministers and others) who had known [Hummel] throughout his life." 2 SHCR 936.

Ultimately, the fruits of this extensive investigation were that nine lay witnesses and two expert witnesses were presented at trial, all of which testified to Hummel's difficulty forming relationships, inability to cope when attachments fell apart, and the impact of these facts on the murders. 4 SHCR 1429; 43 RR 109–10, 114, 126, 158–59, 176, 189–90. In particular, defense expert Dr. McGarrahan testified to Hummel's mother's role in Hummel's attachment issues and opined that the murders happened in an emotional rage that occurred as a result of an inability to healthily express his emotions. 4 SHCR 1429; 44 RR 133–39. Dr. McGarrahan testified to Hummel's difficulties forming relationships—not just romantic, but also

59

platonic and familial—which, she testified, was based in part on his rapid attachments to people who showed interest in him. 44 RR 142–44.

Thus, while admittedly more complete, the evidence proffered in Sovine's affidavit is cumulative of the evidence already strategically presented by counsel at trial, and the state court was reasonable to so conclude. 4 SHCR 1429, 1433. Because the "*substance* of the testimony from Dr. McGarrahan and other witnesses developed the important facts of [Hummel]'s life and life events and gave the jury a sufficiently complete understanding of [Hummel]'s life history," Hummel takes issue merely with the *degree* to which trial counsel investigated and presented this evidence, and such an argument impermissibly second-guesses counsel's actions. 4 SHCR 1430–31, 1433–34; *see Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) ("We must be particularly wary of arguments that essentially come down to a matter of degrees.").

That Hummel is judging in hindsight counsels' decision to pursue one course rather than another is made doubly clear by the fact that neither Hummel nor Sovine address the unavailability of witnesses at the time of trial. *See Gray,* 677 F.2d at 1094; 2 SHCR 774; 4 SHCR 1430. Indeed, despite a thorough investigation, many witnesses were simply uncooperative—several actively hid from counsel, others threatened counsel with criminal action, and yet others said that they believed Hummel deserved the death penalty and would testify as such if called. 2 SHCR 774, 936; 4 SHCR 1427. Counsel even had to compel Hummel's own sister to testify at his trial in his defense. 2 SHCR 774; 4 SHCR 1428.

60

Nevertheless, counsel called all of those witnesses they could identify and would be helpful to the defense to provide Hummel's complete life story and a forensic psychologist to cohesively explain that story to the jury. 2 SHCR 774; 4 SHCR 1427. As the state court held, such a decision was certainly reasonable trial strategy, based on the evidence that was available to trial counsel at the time of the trial, and such an alleged failure to retain a life history expert was certainly not the result of inadequate investigation. 4 SHCR 1430–31. Nor does Hummel show that his trial counsel's strategic decision to utilize Dr. McGarrahan instead of a social history expert like Sovine was unreasonable. *Id*. Thus, Hummel fails to show that trial counsel was deficient.

Second, Hummel fails to demonstrate that he was prejudiced by counsel's alleged deficiency. 4 SHCR 1429, 1431–32, 1435. Indeed, given the weight of the State's future danger case, *see* Argument, Section II.A, *supra*, it is not reasonable to believe that the facts in Sovine's affidavit would have diminished the impact of the aggravating factors present in Hummel's case. 4 SHCR 1431. This is particularly true when, as discussed above, the facts presented in the affidavit are merely cumulative of the evidence actually presented at trial, as no prejudice can result from the failure to present cumulative evidence. *See Wong*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference"). There is certainly no reason to believe that the jury would have been more persuaded by a social worker expert than they were by a licensed psychologist and neuropsychologist, who communicated Hummel's life story "effectively and used

minimal technical jargon" in doing so. 4 SHCR 1429 (citing affidavit of Dr. Price, 2 SHCR 998).

Moreover, the state court reasonably found that the jury simply did not need a social history expert in order to understand the evidence that was already presented at trial regarding the difficulties in Hummel's life; therefore, Hummel cannot show that the outcome of the jury's decision would have changed had they presented such an expert. 4 SHCR 1431, 1434. Indeed, in *Wong*, the Supreme Court rejected an argument similar to Hummel's, stating:

> . . . [T]he body of mitigating evidence the Ninth Circuit would have required [counsel] to present was neither complex nor technical. It required only that the jury make logical connections of the kind a layperson is well equipped to make. The jury simply did not need expert testimony to understand the "humanizing" evidence; it could use its common sense or own sense of mercy.

*Id*. at 24. So, too, could Hummel's jury use its own common sense—without the assistance of a life history expert like Sovine—to understand Hummel's background of abuse, neglect, and difficulty forming relationships. Ignoring this, Hummel instead asks this Court to "overlook the mitigation facts and themes actually investigated and presented by his trial counsel and to second-guess counsel for not calling a different witness who may have presented the evidence differently." 4 SHCR 1432.

And, this case is readily distinguishable from *Williams*, *Wiggins*, and *Rompilla*, upon which Hummel relies. *See* Petition at 48–52. In *Wiggins*, defense counsel offered no mitigating evidence at trial in spite of the compelling evidence of physical and sexual abuse that was available. 539 U.S. at 516–17. Further, Wiggins's counsel only reviewed a Pre-Sentence Investigation report and records from the

62

Department of Social Services, and the Court concluded that defense counsel were unreasonable to cease investigation after learning that Wiggins had an alcoholic mother and problems in foster care. *Id.* at 518, 522–23. In *Williams*, defense counsel failed to prepare for sentencing until a week before trial; and failed to present evidence of neglect and abuse as a child, borderline mental retardation, and compelling evidence of a lack of future dangerousness found in his prison records. *Williams*, 529 U.S. at 396. And, in *Rompilla*, the Court held that defense counsel were ineffective for failing to adequately review and investigate the capital defendant's prior rape and assault conviction when (1) counsel knew the State intended to introduce the prior rape conviction and trial transcript of the rape victim; (2) the prior conviction file was easily available to counsel; and (3) counsel reviewed only a portion of the prior conviction file without examining other material in the file concerning evidence of Rompilla's alcohol abuse, his poor background, test scores showing low cognitive level, and test results pointing to the need for further mental evaluation, all of which countered the assertions of Rompilla and his family that Rompilla's background was unremarkable. 545 U.S. at 385–86. Moreover, the Court specifically compared defense counsel's debatable obligation to pursue some "potential lines of enquiry" and the "sure bet" obligation of Rompilla's counsel to thoroughly review the prior conviction file for the previously noted reasons. *Id.* at 382–83, 389. The Court specifically noted that if defense counsel had examined available evidence, it was "uncontested they would have found a range of mitigation leads that no other source had opened up." *Id.* at 392. This missing mitigating evidence "add[ed] up to a

mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury [.]" *Id.* at 393.

In contrast to the situations in *Wiggins*, *Williams,* and *Rompilla*, Hummel's defense team thoroughly investigated his background, and developed and presented a very compelling mitigation defense, comprised of the type of evidence now proposed. While this later-discovered evidence might provide more detail into Hummel's childhood, it does not so drastically change the original case in mitigation as happened in *Williams,* 529 U.S. at 395–98*, Wiggins,* 539 U.S. at 516–17, 525–26, 534–35, and *Rompilla*, 545 U.S. at 390–93. As such, Hummel truly fails to show an inadequate investigation conducted by his trial counsel and to show that such an investigation would have resulted in evidence that makes him less morally culpable. As with the two previous IATC claims, Hummel fails to prove both prongs of *Strickland*. Thus, he fails to show that the state court's denial of this claim was unreasonable under AEDPA.

### 4.    Lay witnesses (claim 1-D)

Hummel asserts that, because trial counsel focused only on Hummel's immediate family and on physical or sexual abuse, trial counsel did not uncover numerous other lay witnesses who could have testified in mitigation of punishment, and as such, trial counsel missed the opportunity to present historical evidence of Hummel's struggles in education, inability to connect, obsession with role-playing games, severe medical issues, successful military career, and difficulty coping. Petition at 55–56. To support this ground for relief, Hummel relies on affidavits from:

64

Thomas Hamilton, Brian Jeter, Joseph "JoJo" Patterson, Chad Brown, Lance Dupre, Shana Fowler, George Goodson, Christopher Paris, Tonya Paris, and Derrick Parris. Pet. App. at 0259–264, 0268–269, 0273–276, 0277–283, 0289–293, 0299–300. However, Hummel fails to show that the state court unreasonably denied this claim.

As previously and thoroughly discussed, Hummel's trial counsel conducted an extensive mitigation investigation. 4 SHCR 1452. In conducting this investigation, trial counsel "explored various themes as they came to light," including Hummel's "participation in role-playing games, his use of marihuana, alcohol and other drugs, the possibility that he had a mental disorder or illness, the possibility that he had observed sexual or physical abuse in his household, and the possibility that he had been abused or neglected as a child." 2 SHCR 775. Trial counsel explained that, while they remained alert for the existence of these issues, they did not select their witnesses on the basis of any one issue and certainly never excluded any on the basis that they were pursuing only allegations of physical or sexual abuse alone. *Id.*

Rather, the witness selection was based on trial counsel's ability or inability to secure witnesses: some could not be located, some were located but not cooperative, Hummel's own sister would not meet with them or appear at trial until compelled, Hummel's aunt threatened defense team members with arrest for trespassing when they attempted to interview Hummel's mother, and several of Hummel's family members openly stated that they believed Hummel deserved the death penalty. 2 SHCR 775; 4 SHCR 1437. Nor did Hummel himself assist his trial counsel in locating or uncovering helpful witnesses. 2 SHCR 540, 776. According to trial counsel,

Hummel did not provide any names of anyone who served with him in the military, denied witnessing or experiencing any abuse, reported having a normal childhood, and described his Dungeons and Dragons gaming as harmless games that he played on paper sometimes. 2 SHCR 776.

While it might have been the investigator's responsibility to uncover more evidence, a petitioner cannot claim ineffective assistance of counsel when he and his witnesses are responsible for the failure to discover evidence. *Nixon v. Epps,* 405 F.3d 318, 325–26 (5th Cir. 2005) (defendant cannot block counsel from presenting line of defense, then claim ineffective assistance); *Johnson,* 306 F.3d at 252–53 (defense team not deficient where they spent hours interviewing family members, maintained weekly contact, asked about "laundry list" of topics, inquired about substance abuse, physical abuse, sexual abuse, and brain injury, but family failed to disclose pertinent information); *Soria v. Johnson,* 207 F.3d 232, 250–51 (5th Cir. 2000) (counsel should not be faulted for defendant's decision to conceal evidence of abuse); *see also Schriro,* 550 U.S. at 475. Thus, the state habeas court properly found that trial counsel cannot be ineffective for failing to call family members, neighbors, church members, coworkers, and others who did not want to testify, would not have testified favorably, or were unable to be located. 4 SHCR 1456.

Moreover, the record is clear that trial counsel did in fact uncover some of the witnesses that Hummel now proffers, but counsel either could not locate those witnesses, despite very reasonable efforts to do so, or strategically decided not to call them. Specifically, trial counsel interviewed Hummel's uncle Thomas Hamilton, but,

differing slightly from the testimony that Hamilton now proffers, Hamilton was adamant that no abuse had ever occurred—even to the point of contradicting Hummel's sister's testimony—and was very defensive of his sister. 2 SHCR 541. Trial counsel, therefore, reasonably decided not to call Hamilton, as they believed it would be against Hummel's best interests. 4 SHCR 1448.

Similarly, trial counsel Cummings spoke with George Goodson during their investigation, who was supportive of Hummel but also indicated that he was afraid that his criminal history would be harmful. 2 SHCR 541. Goodson, therefore, did not wish to testify, since he has spoken with prosecutors in the case, and they were well aware of his criminal record. *Id*. Trial counsel strategically decided that calling Goodson was not in Hummel's best interest. *Id*.; 4 SHCR 1448.

And, with regard to Hummel's allegation that trial counsel should have uncovered evidence about the physical and sexual abuse experienced by Neata Woody, trial counsel stated that they did suspect that Neata and Hummel had been abused, but every single person they interviewed denied any such abuse. 2 SHCR 538. Neither Derrick Parris—whose affidavit Hummel now proffers—nor any other person ever indicated that they heard Neata tell Parris that she had been sexually abused by her father. *Id*.; 4 SHCR 1450. Counsel had in fact interviewed Parris prior to trial, but the information Parris offered about Hummel's life and background would change each time they spoke. 2 SHCR 539. Therefore, based on trial counsel's knowledge of and contact with Parris, he does not believe that such an event occurred. *Id*.; 4 SHCR 1450.

67

The defense had also obtained Lance Dupre's name in the course of their investigation. 2 SHCR 542. Moore described their efforts to locate Dupre as follows:

> We attempted to contact him through telephone numbers that we discovered for his mother and his aunt. I left a business card at the house where we believed his family to live while I was in South Carolina, asking that he call us. Shortly before trial, we determined that it appeared that Mr. [Dupre] worked at the State Crime Lab in Columbia, South Carolina. We made telephone calls to <u>every</u> number that we were able to locate as possibly being a way to reach him, yet we never got an answer, nor received any return phone calls from him. We exhausted every lead that we had in our efforts to locate him.

*Id*. Thus, although Dupre now alleges in his affidavit that he was never contacted by the defense but, had he been contacted by the defense, he would have testified in Hummel's favor, such an allegation appears to be flatly untrue. *See* Pet. App. 0269. Hummel makes no effort to show how trial counsel's investigative efforts to locate Dupre were deficient or unreasonable, and Hummel certainly does not show that the state court's finding that "Dupre was not a witness who was available to the defense" was unreasonable. 4 SHCR 1448, 1456; *see also Day*, 566 F.3d at 538.

Finally, trial counsel also attempted to contact Christopher Paris but were unsuccessful because Paris had separated from his wife prior to trial, Paris was not visiting Hummel in jail at that time, and they were never able to locate another method to contact him. 2 SHCR 542; 4 SHCR 1448. Hummel again makes no effort to show how trial counsel's "investigative efforts to locate Paris were in any manner deficient or unreasonable." 4 SHCR 1448.

Nor does Hummel demonstrate how trial counsel's failure to locate the remaining witnesses—Jeter, Patterson, Brown, Fowler, and Tonya Paris—was the

result of inadequate investigation. 4 SHCR 1448. Counsel's decisions to call certain witnesses and not to call other uncooperative or damaging witnesses were the result of extensive investigation and strategic reasoning. *Id.* at 1455–56. Even if trial counsel left some stone unturned, the Supreme Court has never held in *Strickland* or any other case that an investigation must result in constructing a fully blossomed family tree complete with every knot, blemish, and dark mark. *See Rompilla*, 545 U.S. at 383 (holding that counsel is not forced "to scour the globe on the off chance something will turn up").

Additionally, as found by the state habeas court and despite Hummel's protestations to the contrary, much of the evidence that these witnesses discuss in their affidavits was testified to at trial. *See* Statement of Facts, Section II.B, *supra*; 4 SHCR 1453 ("There is considerable overlap between the information that [Hummel] claims his trial counsel should have discovered and presented via the lay witnesses and the facts and themes trial counsel actually developed at trial."). Indeed, trial counsel put this same type of argument before a jury through nine lay witnesses and two expert witnesses, all of who testified to Hummel's school experience, his difficult childhood, his attachment issues, his video-game playing tendencies, and his inability to cope. Statement of Facts, Section II.B, *supra*; 4 SHCR 1438–48 (extensive summary of all the defense witness testimony). Truly, Hummel's complaint here amounts to this: trial counsel did not put on the same type of or as much evidence before the jury as current federal counsel would have. This is precisely the type of backward-looking second guessing which *Strickland* strictly prohibits. *See* 4 SHCR

1453 (finding that Hummel's "claim that trial counsel should have investigated more, called more lay witnesses, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented is unpersuasive second-guessing in hindsight"); *Skinner*, 576 F.3d at 220. Thus, the state habeas court properly found that trial counsel cannot be deficient for failing to present cumulative evidence. *Id.* at 1456.

Nor can a petitioner demonstrate prejudice with duplicative evidence. *Id.*; *Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997). "The jury was well aware through lay and expert testimony of neglect, abuse, attachment issues, and family stresses in [Hummel]'s life before and at the time of the murders and their potential effect on [Hummel]'s decision to murder his family." 4 SHCR 1453. And, a finding of lack of prejudice is especially true in light of the premeditated, cold-blooded, and heinous nature of his crime. *Id.*

Further, some of the evidence Hummel refers to may not be considered mitigating at all and may have had a harmful, "double-edged" result. *See Wiggins*, 539 U.S. at 535 (Wiggins's history "contained little of the double edge we have found to justify limited investigations in other cases."). For instance, Brown averred in his affidavit that Hummel was so interested in Dungeons and Dragons that he would play it while driving, and his friends would have to tell him to pay attention to the road, which can arguably be considered just as, if not more, damaging than it is beneficial to Hummel. Pet. App. at 0260. And, both Brown and Dupre averred that Hummel engaged in destructive behaviors, including drinking, smoking marijuana,

70

and going to strip clubs frequently and becoming overly attached to the strippers. Pet. App. at 0260, 0269. As such, this evidence is, at best, a double-edged sword, and Hummel cannot show that he was prejudiced. *See also Miniel*, 339 F.3d at 346–48; *Ladd*, 311 F.3d at 349; *Johnson*, 306 F.3d at 253; *Kitchens*, 190 F.3d at 702–03; *Williams*, 125 F.3d at 278.

Yet again, Hummel fails to show that his counsel was deficient or that he was prejudiced by his counsel's actions. Nor does he show that the state court unreasonably denied his claims. His claim should be denied.

### 5.    Military service (claim 1-E)

In his final IATC issue, Hummel faults trial counsel because, even though they presented several lay witnesses who testified to Hummel's military service, trial counsel failed to uncover and call three Marines who served with Hummel. Petition at 57–60. Hummel specifically alleges that counsel should have called Fred Emmer, Wayne "Buddy" Matthias, and Efrain Chaidez, all of whom would testify to what Hummel did in the military and would provide context to the negative information presented by the State. *Id*. at 58–60, 63. Hummel disputes the state court's denial of this claim on the basis that "evidence of military service is one of the most mitigating pieces of evidence that can be presented," a claim which he alleges is supported by the Supreme Court's holding in *Porter v. McCollum*, 558 U.S. 30 (2009). *See* Petition at 68.

However, *Porter* is clearly distinguishable. In *Porter*, defense counsel presented only one witness in mitigation of Porter's punishment: Porter's ex-wife. 558

U.S. at 32. Counsel's mitigation case amounted to nothing more than evidence about Porter's turbulent relationship with the victim and the facts of the crime. *Id.* at 32, 41. On state habeas, substantial new mitigating evidence was proffered as to, among other things, Porter's heroic military service and the trauma that resulted from such service. *Id.* at 33. Specifically, the evidence showed that Porter had served on the front-lines in two separate engagements, received two Purple Hearts and other commendations, and had gone absent without leave (AWOL) on multiple occasions, with one of those occasions resulting in imprisonment. *Id.* at 35.

The Supreme Court first found that trial counsel's mitigation investigation was lacking. *Id.* at 31, 39. Trial counsel met with Porter only once, never obtained any of Porter's school, medical, or military records, and never interviewed any of Porter's family members. *Id.* And, although Porter had instructed counsel not to speak with his ex-wife or son, Porter gave no other instructions limiting counsel's investigation. *Id.* at 40. The Supreme Court held that counsel's decision not to investigate "did not reflect reasonable professional judgment." *Id.*

Having found that counsel was deficient, the Court also found prejudice. *Id.* at 42. The Court specifically found that the judge and jury at Porter's original sentencing proceeding "heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 41. Noting that there is "a long tradition of according leniency to veterans in recognition of their service, *especially for those who fought on the front lines as Porter did,*" the Court held that Porter's combat experience was relevant not only because "he served honorably under extreme

hardship and gruesome conditions," but also because "the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter." *Id*. at 43–44 (emphasis added). Thus, the state court "unreasonably discounted" the evidence of Porter's military service. *Id*. at 43.

Here, notwithstanding the *degree* to which Hummel's own military service is or is not as "heroic" as Porter's,[10] Hummel's trial counsel in no way overlooked the potential value of Hummel's military service. 4 SHCR 1459. Indeed, unlike trial counsel in *Porter* who did not obtain *any* records relating to Porter's background, Hummel's counsel obtained copies of Hummel's military records, which they provided to their expert witnesses. 2 SHCR 543; 4 SHCR 1459. They also specifically inquired of Hummel whether he could suggest anyone who he had befriended in the military that might be willing to testify on his behalf, but Hummel was unwilling or unable to provide any such names.[11] 2 SHCR 543. In fact, Hummel "indicated that his military service was not a positive experience, and that he was glad when he got out." *Id*. at 938. Despite Hummel's lack of cooperation, counsel noted that Matthias' name did

---

[10]    Indeed, the state habeas court specifically found that the "evidence of [Hummel]'s unremarkable military service comes nowhere near the circumstances presented in *Porter*." 4 SHCR 1465. To be sure, the evidence presented at trial showed that Hummel was a mediocre Marine, who had difficulty following requirements and never received any individual commendations. 45 RR 11, 14–17, 27, 30, 34–36, 38–39. Hummel did not even go ashore when he was deployed abroad. 45 RR 40. This is clearly different from the caliber of Porter's service, and thus, the state court reasonably found Hummel's reliance on *Porter* unconvincing.

[11]    Hummel theorizes that perhaps the reason for Hummel's unwillingness to discuss his military background was because he was involved in top-secret work that, if revealed, could have compromised the lives of his fellow Marines. Petition at 62–63. But, Hummel offers no evidence to support this speculation, and, moreover, it does not change the fact that Hummel was not cooperative with his trial counsel's investigative efforts.

73

come up in the mitigation specialist's investigation, which was then forwarded to the defense investigator, but the defense did not have Matthias' first name—just his nickname, "Buddy"—and they were thus unable to locate him. 2 SHCR 937–38; 4 SHCR 1460. Accordingly, in contrast to the petitioner in *Porter*, trial counsel's failure to locate Matthias, or to discover Emmer and Chaidez, "was not the result of an inadequate investigation into [Hummel]'s background and life history." 4 SHCR 1460.

Further, and again unlike trial counsel in *Porter* who did not present *any* evidence of Porter's service, Hummel's trial counsel *did* present information regarding Hummel's military service through both lay and expert witnesses and through the cross-examination of the State's witnesses. 2 SHCR 543; 4 SHCR 1459. The defense's lay witnesses in fact testified that Hummel "joined the Marines on his twenty-second birthday, served for about four years, was assigned as an intelligence analyst, and was more self-assured and had a higher self-esteem when he left the Marines." 4 SHCR 1459 (citing 43 RR 161, 166, 225, 231). Hummel's expert witnesses testified that Hummel was honorably discharged, could do well in a structured environment based on his performance in the military, and had received several commendations. *Id.* (citing 44 RR 70, 73, 159–60). And, on cross-examination, trial counsel elicited testimony that Hummel was honorably discharged, was an intelligence specialist, had been promoted to Lance Corporal, and had received only a nonjudicial punishment for his unauthorized leave. 45 RR 22, 43–45. Thus, unlike the petitioner in *Porter*, trial counsel offered plenty of humanizing evidence of Hummel's military service. "Courts must be particularly wary of arguments that

74

essentially come down to a matter of degrees involving questions of whether counsel investigated enough or presented enough mitigating evidence." 4 SHCR 1465 (citing *Dowthitt*, 230 F.3d at 743).

Moreover, most of the evidence is, at best, a double-edged sword, and trial counsel's failure to present it can be neither deficient nor prejudicial to Hummel's case. *See Miniel*, 339 F.3d at 346–48. Indeed, trial counsel, through their investigation, had already been aware of the disciplinary action taken against Hummel at the end of his service, and they, therefore, strategically decided to avoid that issue to whatever degree possible. 2 SHCR 543–44; 4 SHCR 1460. Additionally, the three witnesses provide "both positive and negative information" in their affidavits, as explained by trial counsel:

> A review of the affidavits they obtained indicates that [Hummel] "struggled with being overweight and messy" (Matthias); had a "hard time" as a Marine (Emmer); and "had a hard time from his sergeants for not making his weight standard" (Chaidez). I do not believe that these affidavits demonstrate any additional "positive" aspects of his service that we did not develop through our cross-examination of his commanding officers. While the affidavits do offer some explanation of [Hummel]'s difficulties with isolation and alienation while in the service, they also detail [Hummel]'s shortcomings as a Marine, and his proclivity for drinking and attending "strip clubs."

2 SHCR 939; 4 SHCR 1460. Consequently, "the facts contained in the habeas affidavits of Matthias, Emmer, and Chaidez, as well as the testimony of Doughtery and Santos presented during the State's rebuttal case, rebut any assertion that the jury would have considered [Hummel]'s military service to be particularly mitigating." 4 SHCR 1461–62.   The state court was thus correct to conclude that the evidence and argument that Hummel now proffers "would not have been significantly

different or more compelling had the evidence contained in the habeas affidavits of Chaidez, Matthias, and Emmer been introduced as evidence" at trial. *Id*. at 1462. Hummel certainly cannot show that there is a reasonable probability that the information contained in the affidavits "would have caused the totality of the mitigating circumstances to outweigh the overwhelming and compelling aggravating facts presented at [Hummel]'s trial." *Id*.; *see also* Statement of Facts, Sections I, II.A, *supra*. Hummel wholly fails to establish that his counsel was deficient or that he was prejudiced by counsel's alleged deficiency. Nor does Hummel show that the state court's decision was unreasonable. Therefore, this Court should deny Hummel's claim.

### 6.    Conclusion

In sum, developing a mitigation defense under the circumstances of this case was a particularly daunting task. Hummel had violently murdered his pregnant wife, his five-year-old daughter, and his elderly father-in-law and had committed these murders in a cold, callous, and calculating manner. Additionally, Hummel had planned and executed a previous attempt at murdering them, all in order to be able to pursue a relationship with a woman he met at a gas station who herself had a six-year-old daughter. Trial counsel was nevertheless faced with the unenviable task of presenting Hummel in a sympathetic light.

To this end, and despite a lack of cooperation from his client or the client's family, the defense presented an admirable punishment-phase defense, including evidence of good behavior in prison, evidence showing that mental health and

personality disorders affected his decision-making abilities, and compelling evidence of a dysfunctional family life. While witnesses are now willing to supplement the already-known evidence regarding Hummel's behavioral history and family life, trial counsel nevertheless performed an extensive and thorough investigation prior to trial and presented a mitigation case that was strategically reasonable under the circumstances. Regardless, there is no reasonable likelihood of a different result had the jury heard yet another witness expound upon his lack of violent history or heard evidence that Hummel had a not-widely-recognized mental health syndrome. *See Richter*, 562 U.S. at 112 ("[The] likelihood of a different result must be substantial, not just conceivable."). The CCA's rejection of this claim was entirely reasonable and entitled to deference.

## III. Hummel Fails to Demonstrate that the State Court Unreasonably Denied His Ineffective Assistance of Appellate Counsel Claim (Claim 2).

In his second ground for relief, Hummel alleges his appellate counsel was ineffective for failing to argue that the State's case was insufficient to show future danger and for failing to focus his appellate argument on the unlawful detention by Border Patrol, rather than the arrest warrant affidavit. Petition at 67–84. However, Hummel fails to show that his appellate counsel was deficient in any way or that he was prejudiced by any such deficiency, and the state court was reasonable in denying his claim. This Court should, therefore, also deny Hummel's claim.

A criminal defendant is constitutionally entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985); *United States v.*

*Phillips*, 210 F.3d 345, 348 (5th Cir. 2000); *Lombard v. Lynaugh*, 868 F.2d 1475, 1479 (5th Cir. 1989). The familiar standard set out in *Strickland* to prove that counsel rendered unconstitutionally ineffective assistance applies equally to both trial and appellate attorneys. *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2003) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). Thus, to obtain relief, Hummel must demonstrate that his appellate counsel's performance was deficient and that such deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687.

It is well settled that effective assistance of counsel on appeal does not mean that counsel must raise every non-frivolous ground of appeal available. *Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003); *Robbins*, 528 U.S. at 288. Instead, the Supreme Court has recognized the importance of allowing appellate attorneys the freedom to select from available issues in order to maximize the likelihood of success on appeal. *Robbins*, 528 U.S. at 288. Only "solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462–63 (5th Cir. 1999). Thus, counsel should choose the strongest arguments to present to the appellate court, by "winnow[ing] out weaker arguments and focus[ing] on a few key issues." *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). In other words, appellate counsel is only constitutionally obligated to raise and brief those issues that are believed to have the best chance of success. *Barnes*, 463 U.S. at 751–53.

For this reason, the Supreme Court has recognized that, while it is still possible to raise an ineffective-assistance claim based on counsel's failure to raise a particular issue on appeal, it is difficult to demonstrate that counsel was deficient. *Robbins*, 528 U.S. at 288. In order to prove that counsel's failure to raise certain issues constitutes deficient performance and falls "below an objective standard of reasonableness," a petitioner must convince the court that the issues ignored were sufficiently meritorious such that counsel should have asserted them on appeal. *Phillips*, 210 F.3d at 348. The Supreme Court has indicated that a petitioner is able to satisfy this first prong of *Strickland* by showing that a particular non-frivolous issue neglected by counsel was "clearly stronger" than those issues actually presented. *See Robbins*, 528 U.S. at 288. The same analysis applies here. That is, to prove that counsel's performance was deficient, Hummel must demonstrate that the unraised points of error were clearly stronger in posture than those counsel actually brought on direct appeal.

And, to prove that counsel's deficient performance prejudiced his case, counsel's errors become prejudicial when there is a reasonable probability that, but for the error, the ultimate result would have been different. Therefore, to prove prejudice a petitioner must show that, but for counsel's deficient performance, "he would have prevailed on appeal." *Robbins*, 528 U.S. at 286; *Moreno v. Dretke,* 450 F.3d 158, 168 (5th Cir. 2006); *Busby,* 359 F.3d at 714. That is, prejudice cannot be shown in the absence of a reasonable probability that, but for counsel's omitting a

particular ground of error, the case would have been reversed on appeal. *Robbins*, 528 U.S. at 285.

### A.   Hummel's allegation that appellate counsel failed to challenge the sufficiency of the State's future dangerousness case is waived and without merit (claim 2-A).[12]

Hummel argues that his appellate counsel Stickels was ineffective for failing to argue on appeal that the State's future dangerousness case was legally insufficient. Petition at 64–67. As an initial matter, although in the title of his claim Hummel faults both trial and appellate counsel for failing to argue that the State's evidence was insufficient to show future danger, Hummel never again mentions his appellate counsel with respect to this claim. *See id*. Indeed, the only law cited to in support of his claim is *Wiggins* and *Wong*, which, as discussed in great detail above, are cases that govern trial counsel's mitigation investigation. *See id*. at 65–66; *see also* Argument, Section II.B, *supra*. And, in fact, Hummel concludes his argument by conducting the prejudice analysis required by *Wiggins*. Petition at 66.

This conclusory briefing is insufficient to adequately raise a claim of ineffective assistance of appellate counsel and, as such, should be considered waived. *See*, *e.g.*, *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding conclusory allegations are insufficient to raise a valid claim for relief), *cert. denied*, 531 U.S. 849 (2000); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (holding a party who inadequately briefs an issue is considered to have abandoned the claim); *Baylor v.*

---

[12]   As previously indicated, this claim was a portion of Petitioner's Claim 1-F in his federal petition. The remaining portion, related to trial counsel's ineffectiveness, is addressed in Argument, Section II.A, *supra*.

*Dretke*, No. 4:03-CV-265-Y, 2003 WL 22389277, at *6 (N.D. Tex. Oct. 16, 2003) (unpublished) ("[Petitioner] does not direct the court to where in the record this remark was made or offer any reason to believe the remark could be construed as coercive. Thus, this claim is inadequately briefed and is waived." (citing *Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999))).

Even assuming that Hummel has adequately raised this claim, he fails to show that he is entitled to relief. Specifically, as previously and thoroughly discussed, Hummel fails to demonstrate an entitlement to relief on his underlying claim, because, as found by the state court, the State "presented compelling, overwhelming evidence to satisfy its burden to prove beyond a reasonable doubt that [Hummel] posed a future danger as defined in the Court's charge to the jury." 4 SHCR 1403; *see* Argument, Section II.A, *supra* (showing that trial counsel was not ineffective because the State's future dangerousness case was legally sufficient). Therefore, as found by the state court, Stickels did not raise such an argument on direct appeal because doing so would have been frivolous. 4 SHCR 1403, 1412–413. Because the underlying claim regarding the sufficiency of the State's case is not meritorious, the state court properly concluded that Hummel cannot demonstrate prejudice arising from Stickels's failure to raise this claim. 4 SHCR 1413.

Hummel wholly fails to demonstrate that the state court's decision was unreasonable in any respect. His claim should thus be denied.

**B.**     **Appellate counsel effectively argued that Hummel's detention by U.S. Border Patrol was illegal (claim 2-B).**

Hummel next alleges that his appellate counsel was ineffective because he "focused only on the affidavit used to secure Petitioner's arrest warrant and ignored the unlawful detention by the Border Patrol." Petition at 67. Hummel argues that, regarding the detention by the Border Patrol in San Ysidro, Stickels argued only that Hummel's confession was "the culmination and result of all of the previous unconstitutional state actions." *Id*. at 73. Hummel argues that Stickels should have instead argued that Border Patrol lost jurisdiction over Hummel at 7:17 a.m. Pacific Time, once it was established that Hummel was an admissible U.S. citizen, had no active warrant for his arrest, and was no longer "missing" or "armed and dangerous." *Id*. at 75. Hummel alleges that any evidence obtained after that time was illegal fruit of the poisonous tree. *Id*. at 80. Hummel finally contends that Stickels's failure to argue this issue was deficient performance that resulted in prejudice because Hummel's confession was admitted at trial. *Id*. at 80–81. However, Hummel fails to demonstrate that the state court unreasonably denied his claim, and this Court should dismiss his claim with prejudice.

**1.**     **Appellate counsel raised and adequately briefed Hummel's claim that his detention by U.S. Border Patrol was illegal.**

Hummel criticizes Stickels, not for wholly omitting a Fourth Amendment claim based on his allegedly illegal detention, but for focusing only on one aspect of the claim. *See* Petition at 67–84. But, Hummel's argument that the *only* argument counsel made with regard to the illegal detention was that it was the "culmination

and result of all of the previous unconstitutional state actions" is a misrepresentation of the record. *See id*. at 73.

Indeed, Stickels argued in his appellate points of error eight, nine, and ten that the trial court's denial of his motion to suppress evidence seized from Hummel as a result of his arrest at the San Ysidro border crossing was a violation of his rights under the Fifth and Fourteenth Amendments of the U.S. Constitution, under the Texas Constitution, and under the Texas Code of Criminal Procedure. Appellant's Br. at 36–41. Stickels specifically argued that Hummel's arrest and extended detention by Border Patrol was illegal "because it was based on intentional lies and falsehoods of the Kennedale Police Department to the U.S. Customs Officers." *Id*. at 37. Stickels further argued that the falsehoods were intended to induce the Border Patrol officers into keeping Hummel in custody while they obtained an arrest warrant, and that Hummel would have been released but for these lies. *Id*. at 37–38. Stickels concluded:

> The Customs agents would not have kept [Hummel] in custody without the false representations of the Kennedale Police Department. [Hummel] was merely being held for questioning because he was attempt[ing] to re-enter the country without the proper documents and he would have been released except for the false representation by the Kennedale Police Department. The taint of the initial illegal detention tainted the ensuing searches, interrogations, and conviction.

*Id*. at 38. Stickels argued that Hummel was harmed by this allegedly illegal detention because Hummel's confession was admitted at trial. *Id*. at 40. And, the CCA rejected any contention that the detention was illegal, holding:

> To the extent that [Hummel] is arguing that these particular statements were the fruits of an illegal detention at the border, his claim is without merit. [Hummel] contends that, at the time he arrived at the border crossing, there was a missing person report, but no warrant for his

83

arrest. He asserts that Kennedale police officers lied to border-protection agents "about the existence of an arrest warrant with the intent of keeping [him] in custody," and that he "would have been release[d] except for the lies of the Kennedale police department." Based on the evidence presented at the suppression hearing, the trial court found otherwise. The trial court found that the border-protection agents detained [Hummel] in a routine manner when he could not provide sufficient documentation to gain entry to the United States. During the identification check, the border-protection agents received notification that [Hummel] was "missing from Texas" and "armed and dangerous," so they transferred him "to a secondary area for further identification." When they "contacted the Kennedale Police Department to confirm the information," they were notified that an arrest warrant "was in the process of being obtained." Upon verification of the warrant, they transferred [Hummel] "to the San Diego Sheriff's Office to detain [him] until Texas law enforcement officers arrived." The trial court found that the border-protection agents had authority pursuant to federal law to detain [Hummel] under the circumstances, and it denied [Hummel]'s "Motion No. 72."

The trial court's ruling is supported by the record of the suppression hearing. CBP agents Jorge Bernal, Ernesto Enriquez, and Paul Kandal testified that they were following their policies and procedures when they detained [Hummel] for further identification and verification of his status. Enriquez testified that when he called the Kennedale Police Department to verify [Hummel]'s status, he was told to "hold [Hummel] because he has a warrant." Enriquez then referred [Hummel] to Kandal. Captain Darrell Hull of the Kennedale Police Department testified that he told Kandal that he was "in the process of getting an arrest warrant," that he communicated updates to Kandal while in the process of getting the warrant. He also stated that he notified Kandal when the warrant was obtained. Kandal confirmed that he knew [Hummel] did not initially have an arrest warrant and that Kennedale police officers were working to obtain one. Because the trial court's findings are supported by the record, they will not be disturbed on appeal. Points of error eight through ten are overruled.

*Hummel*, 2013 WL 6123283, at *17–18. Although the CCA did not find in Hummel's

favor, Stickels believes that he "presented the motion to suppress issue in an

appropriate manner that was calculated to obtain relief," even though he understands

that the motion to suppress issue could have been presented in a different manner. 2

SHCR 567. Thus, counsel fulfilled his obligation to "winnow out weaker arguments and focus on a few key issues." *Mayo*, 882 F.2d at 139; *Barnes*, 463 U.S. at 751–53. Appellate counsel was constitutionally obligated to raise and brief only those issues that are believed to have the best chance of success, and that is what he did here.

Consequently, the state habeas court reasonably found that Hummel "does not articulate exactly how his appellate counsel should have argued the claims differently or how counsel's failure to do so fell outside the wide range of reasonable professional assistance." 4 SHCR 1492. The state court found that Hummel is "simply second-guess[ing] in hindsight his appellate counsel's strategic decisions based on counsel's experience and research about how to best challenge on direct appeal the Court's denial" of Hummel's motions to suppress his confession. *Id*. Thus, Hummel's claims that appellate counsel did not argue an issue on appeal in the *manner* that he wishes he had is unavailing.

### 2.   The record does not support Hummel's claim.

Moreover, Hummel fails to show that Stickels was somehow deficient for strategically choosing to challenge the legality of Hummel's detention in the manner he did or that he would have prevailed on appeal because Hummel again fails to show that his underlying claim is meritorious; indeed, the state court was reasonable to find that Hummel was not illegally detained at the San Ysidro border crossing. Consequently, he cannot show that his appellate counsel was ineffective for failing to adequately brief this claim, and his claim should be denied.

###### i.  Facts surrounding the detention

A suppression hearing was held in which Hummel sought to suppress, as relevant here, any evidence seized and statements given by Hummel as a result of his arrest in California by the U.S. Customs and Border Protection Service. 6 RR 8; 2 CR 324–351 (Motions to Suppress Nos. 70–76). In that hearing, the evidence showed that Hummel was reported missing by Christopher Paris on December 19, 2009. 7 RR 64, 84; 9 RR 132–35. The report, which was entered into the National Crime Information Center system, stated:

> LAW ENFORCEMENT SENSITIVE POSSIBLY MENTALLY UNSTABLE PERSON OF INTEREST IN HOMICIDE CONSIDER ARMED AND DANGEROUS APPROACH WITH CAUTION SUBJECT HAS MILITARY BACKGROUND DO NOT ARREST OR DETAIN BASED ON THIS RECORD IF LOCATED CONTACT KENNEDALE PD . . . ADVISE LOCATION AND DIRECTION OF TRAVEL

SX 39; 6 RR 71–72; 7 RR 83–84; 9 RR 97–98.

At 5:48 a.m. Pacific Standard Time on December 20, 2009, Hummel attempted to reenter the United States from Mexico through the San Ysidro border crossing in California, but Hummel presented only a Texas driver's license, which was insufficient identification to enter the United States under the Western Hemisphere Travel Initiative program. 7 RR 111–13, 123–24; 8 RR 73–74. A computer check of Hummel's name revealed that Hummel was "armed and dangerous," pursuant to the above report. 7 RR 114. Officers then handcuffed Hummel and escorted him to the port enforcement team for secondary processing, pursuant to agency protocol. 7 RR 116–18. Officers testified that, even if the name check had not shown that Hummel

was reported "armed and dangerous," Hummel would still not have been allowed to enter because of his lack of documentation. 7 RR 118–19.

Hummel was presented to Officer Ernesto Enriquez as a missing person lookout and as possibly armed and dangerous. 7 RR 139–40. A fingerprint scan confirmed that Hummel was reported as a missing person, but did not confirm his citizenship status. 7 RR 140–41. The matter, therefore, remained under investigation, and Enriquez called the Kennedale Police Department (KPD). 7 RR 142. KPD told Enriquez to hold Hummel because he had a warrant from KPD, although Enriquez was not able to confirm that warrant. 7 RR 144–45. Enriquez then referred Hummel to Officer Kandal in the Border Patrol prosecutions unit. 7 RR 145; 8 RR 72.

Kandal testified that, when Enriquez referred Hummel to him, he told Enriquez that he would call the jurisdiction with the warrant on Hummel and start making arrangements for Hummel's extradition. 8 RR 72. Kandal was aware that Hummel had committed an administrative violation when he failed to produce adequate identification, and the Border Patrol has the authority to detain Hummel to determine his citizenship status without giving *Miranda*[13] warnings. 8 RR 73–74.

At 7:17 a.m., Kandal spoke with the dispatcher from KPD and ultimately determined that there was not an active warrant on Hummel at that time. 8 RR 76–77, 89–90. At the time that Kandal was attempting to verify Hummel's citizenship, the KPD was still in the process of obtaining the warrant of arson. 8 RR 76, 90.

---

[13]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

However, once Kandal confirmed that Hummel is a U.S. citizen, Kandal told the dispatcher that Hummel is an otherwise admissible person that he cannot hold without a warrant. 8 RR 87, 89–90. Kandal, however, was still required to hold Hummel because KPD had not told him what to do about the missing persons report. 8 RR 70, 90. Agency policies and directives required this for out-of-state missing persons, notwithstanding individual state instructions on whether to detain them or not. 8 RR 70, 91, 99–100. Approximately four hours later, the warrant was signed and verified, and Kandal transported Hummel to the San Diego County Jail. 8 RR 77–78, 81, 92, 98. Hummel was then given *Miranda* warnings and eventually confessed. 6 RR 79–88.

The trial court denied Hummel's motions to suppress, finding that the Border Patrol was authorized to detain Hummel in the manner it did and that Hummel's subsequent statements were lawfully obtained. *See* 10 RR 62–64; 11 RR 5–6.

### ii.      The state court's denial of this claim was reasonable.

The state court found that, based on the aforementioned record, Hummel fails to show this iteration of appellate points of error eight, nine, and ten—focusing on the argument that Border Patrol lost its jurisdiction over Hummel once it was determined that he was an otherwise admissible U.S. Citizen—"had indisputable merit under settled case law," and, therefore, Hummel cannot demonstrate that "he would have prevailed on appeal had his appellate counsel raised different issues or argued the issues raised differently." 4 SHCR 1492.

As summarized by the state court:

> Kandal was required to continue holding [Hummel] in order to
> determine what Kennedale wanted to do about [Hummel] being a
> missing person. Kandal was not bound by the language of the Kennedale
> Police Department's missing-person report instructing agencies not to
> detain or arrest [Hummel] because Kandal operates under the policies
> and directives of the [Border Patrol] to contact the jurisdiction, verify
> the information, and find out what the agency wants done with the
> individual who has been reported missing.

4 SHCR 1489 (internal citations omitted).

Thus, while Hummel is correct to assert that at 7:17 a.m. it was determined that Hummel was an "otherwise admissible" U.S. citizen, he is incorrect to say that "there was no valid reason for Border Patrol to hold him" after that, given the testimony provided by Officer Kandal. Petition at 72; *see also* 8 RR 74–75. Thus, Hummel's assertion that the "sole basis for [Hummel]'s continued detention" was that KPD was in the process of obtaining the arrest warrant is also incorrect. *See* Petition at 75.

Accordingly, the state court reasonably found that "[t]here is no legal or factual basis for the Court to suppress [Hummel]'s confessions or the evidence found as a result of the confessions." 4 SHCR 1492. Hummel attempts to rely on various immigration statutes and provisions to demonstrate counsel's ineffectiveness, but is unable to point to any clear Supreme Court or even state court precedent that would compel a state appellate court to find that Hummel's detention by Border Patrol was unconstitutional or that such a detention vitiates a confession obtained after a warrant was issued, he was transported into state custody, and properly *Mirandized*. *See* Petition at 75–84. Simply put, "[t]here is no reasonable probability that [Hummel] would have prevailed on direct appeal had his appellate counsel 'more clearly argued'

89

the point of error challenging the denial of [Hummel]'s motion to suppress." 4 SHCR 1495. Therefore, Hummel wholly fails to show that he suffered any prejudice as a result of counsel's failure to brief the appellate error in the exact manner he wishes he would have.

Because Hummel fails to demonstrate that the state court's denial of this claim was unreasonable, this Court should similarly deny his claim.

## IV.   Hummel's Claim That the Texas Capital Sentencing Scheme Violates the Eighth Amendment Because the Instructions Unconstitutionally Narrowed the Definition of Mitigating Evidence Lacks Merit (Claim 3).

Hummel objects to the statutorily-required definition of mitigating evidence as that which "a juror might regard as reducing the defendant's moral blameworthiness," *see* Texas Code of Crim. Proc. art. 37.071 § 2(f)(4), complaining that the instruction impermissibly limited the jury's consideration of his mitigation evidence and effectively instructed the jury to disregard mitigating evidence that was unrelated to his moral culpability. Petition at 92–102. Hummel contends that the jury may have been unable to consider evidence of his ability to adapt to the structured prison environment, his difficult childhood, his respectable military service, and his attachment issues. *Id.* at 85–91. However, the state court's conclusion is indisputably correct in light of the fact that Hummel's claim is foreclosed by Supreme Court and Fifth Circuit precedent. Accordingly, AEDPA precludes relief on this claim.

A review of the instruction given clearly shows that Hummel's capital-sentencing jury was not denied a vehicle for expressing its reasoned moral response

to Hummel's mitigating evidence. The trial court instructed the jury on the mitigation special issue as follows:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

4 CR 727. The trial court further instructed that the jury should "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's blameworthiness." *Id.*

The Fifth Circuit has repeatedly held that "Texas' definition 'encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (unpublished) (quoting *Beazley v. Johnson,* 242 F.3d 248, 260 (5th Cir. 2001)); *see also McCoskey v. Thaler*, 478 F. App'x 143, 150 (5th Cir. 2012) (unpublished) ("The capacious definition of 'mitigating evidence' employed in the Texas statute can 'encompass[ ] virtually any mitigating evidence.'"). Furthermore, the Supreme Court specifically commended the new statute as a "[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity." *Penry v. Johnson*, 532 U.S. 782, 802–03 (2001) ("*Penry II*").

And, the Fifth Circuit has soundly rejected Hummel's specific argument that the definition unconstitutionally limits the categories of evidence that may be considered mitigating. *See Sprouse v. Stephens,* 748 F.3d 609, 622 (5th Cir. 2014); *Blue v. Thaler,* 665 F.3d. 647, 663–68 (5th Cir. 2011); *Beazley,* 242 F.3d at 259. In *Blue* the petitioner raised a similar claim arguing that the "moral blameworthiness"

91

definition of mitigating evidence was "unconstitutionally narrow and 'effectively nullif[ied] the word "background" in the special issue itself.'"  665 F.3d at 665–66. Thus, Blue argued, a reasonable juror would assume that "moral blameworthiness" relates only to those factors directly related to the commission of the crime, while other socio-economic and psychological reasons for the defendant's behavior—such as evidence of "poor mental health, low IQ, and good conduct while incarcerated"—were effectively beyond the jury's reach. *Id.* at 666. The Fifth Circuit found this argument foreclosed. *Id.* at 666–67 (relying on *Beazley*).

Further, Hummel's arguments to the contrary are a new rule that is barred by *Teague v. Lane*, 489 U.S. 288 (1989). Accordingly, Hummel has not shown that the state court proceedings denying this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 4 SHCR 1529; 28 U.S.C. 2254(d). Therefore, no relief should issue on this claim.

## V.   Hummel's Claim that his Death Sentence is Unconstitutional Because Texas Arbitrarily Administers the Death Penalty is Without Merit (Claim 4).

In his fourth claim for relief, Hummel contends that Tarrant County sought the death penalty against him as a result of an arbitrary system. Petition at 104. Hummel's claim relies entirely on statistics related to the application of the death penalty in the most populous Texas counties and law review articles stating that race

may be a motivating factor in the likelihood of the State to seek the death penalty. *Id*. at 102–10. Hummel primarily blames the resource disparity between the most populous counties and the least, which he argues plays a large and arbitrary role between when a defendant faces death. *Id*. at 106–10. However, the state court found that this claim is without merit, and the state court's decision was entirely reasonably. 4 SHCR 1530.

"The conscious exercise of some selectivity in [criminal law] enforcement is not in itself a federal constitutional violation" unless the selection was "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). A defendant claiming an equal protection violation in a death penalty case must prove that the prosecutor acted with a discriminatory purpose *in that particular case. McCleskey v. Kemp,* 481 U.S. 279, 292–93 (1987); *see also White v. Thaler*, 522 Fed. App'x 226, 235 (5th Cir. 2013) (explaining that a defendant could not prevail in an equal protection claim challenging the imposition of the death penalty because he could not show evidence of racial discrimination in his particular case). Indeed, the Court in *McCleskey* considered very similar evidence to what Hummel now proffers and rejected the idea that statistics or studies provide proof of discriminatory intent in a particular case. 481 U.S. at 294. Hummel adduces no direct evidence of racial or geographic discrimination. Given the lack of specific proof relating to his own case, the state habeas court reasonably denied Hummel's claim. 4 SHCR 1530.

Further, with regard to Hummel's complaint that the death penalty is disproportionately applied in the top five most populous counties in Texas—including Tarrant County—as compared to other counties, a suspect classification is not implicated by such a claim, and the Texas death-penalty statute is, therefore, "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."[14] *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Given that prosecutorial discretion is essential to the criminal justice process, *see McCleskey*, 481 U.S. at 297, Hummel cannot satisfy this standard. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979); *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

The fact remains that Hummel committed an act for which the United States Constitution and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297. Hummel was not the victim of happenstance, he *chose* to commit this capital murder in Tarrant County. The decision to seek the death penalty was clearly within the prosecutor's discretion, and Hummel fails to demonstrate that a prosecutor would not have sought the death penalty if Hummel had only committed this capital murder in a different county. And while he argues that *Bush v. Gore*, 531 U.S. 98 (2000), supports his claim, the Fifth Circuit has opined that *Bush* has an "utter lack of implication in the criminal procedure context." *Chi v. Quarterman*, 223 F. App'x 435, 440 (5th Cir. 2007) (unpublished). Hummel's briefing generally suggests

---

[14]     The Supreme Court has never held that capital murderers constitute a suspect class, and has even indicated otherwise. *See Gregg*, 428 U.S. at 187–88 (decision to authorize capital punishment for some classes of crimes was one best left to legislature unless "clearly wrong").

that it is constitutionally intolerable that some death-eligible defendants are subjected to the possible imposition of capital punishment, while others are not. But "[t]he Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences." *Williams v. Illinois*, 399 U.S. 235, 243 (1970).

For the foregoing reasons, the state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, federal habeas relief should be denied.

## VI.    The "10/12 Rule" is Constitutionally Sound (Claim 5).

Hummel finally argues that the requirement of ten "No" votes on the special issues violates his Sixth, Eighth, and Fourteenth Amendment rights. Petition at 111–18. At bottom, Hummel argues that that the "10/12 Rule" "mislead[s] the jury into believing the only way a life sentence (without parole) will ever be given to a capital defendant is if ten jurors agree." *Id*. at 115–16.

The Fifth Circuit has repeatedly rejected challenges to the "10/12 Rule." *See Sprouse,* 748 F.3d at 623; *Blue,* 665 F.3d at 669–70; *Druery v. Thaler*, 647 F.3d 535, 542–45 (5th Cir. 2011); *Miller v. Johnson,* 200 F.3d 274, 288–89 (5th Cir. 2000); *Jacobs v. Scott,* 31 F.3d 1319, 1328–29 (1994). Moreover, the Fifth Circuit has held that challenges to the "10/12 Rule" are barred by *Teague. See Blue,* 665 F.3d at 670 (to the extent "10/12 Rule" challenge urges adoption of new rule, it is barred under *Teague*); *Hughes v. Dretke,* 412 F.3d 582, 593–94 (5th Cir. 2005) (rejecting Eighth Amendment challenge to "10/12 Rule" as *Teague*-barred); *Alexander v. Johnson,* 211

95

F.3d 895, 897 (5th Cir. 2000) (argument that "10/12 Rule" created false need for unanimity *Teague*-barred).

Accordingly, the state court's rejection of Hummel's claim was not objectively unreasonable, and his claim is barred by non-retroactivity principles. 4 SHCR 1531.

## CONCLUSION

Because Hummel fails to meet his burden under AEDPA showing the state court unreasonably denied his claims, the Director respectfully requests this Court dismiss with prejudice his federal habeas petition. The Director also respectfully requests this Court deny a Certificate of Appealability.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
   For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

 s/ Gwendolyn S. Vindell
GWENDOLYN S. VINDELL
Assistant Attorney General
   *Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 936-1400
Fax: (512) 936-1280
Email: gwendolyn.vindell2@oag.texas.gov

*Counsel for Respondent*

**CERTIFICATE OF SERVICE**

I do hereby certify that on July 6, 2017, I electronically filed the forgoing pleading with the Clerk of the Court for the United States District Court, Northern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following counsel of record, who consented in writing to accept the Notice as service of this document by electronic means:

Michael Mowla
Michael Mowla PLLC
PO Box 868
Cedar Hill, TX 75106
972-795-2401
Fax: 972-692-6636
Email: michael@mowlalaw.com

Kristin Renea Brown
The Law Office of Kristin R Brown PLLC
17304 Preston Road
Suite 1250
Dallas, TX 75252
214-446-3909
Fax: 214-481-4868
Email: kbrown@idefenddfw.com

      /s/ Gwendolyn S. Vindell
      GWENDOLYN S. VINDELL
      Assistant Attorney General