**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOHN HUMMEL,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:16-cv-00133-O** |
| | § | |
| **LORIE DAVIS, Director, Texas** | § | **Death Penalty Case** |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner John Hummel ("Petitioner") petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional because (1) he was denied effective assistance of counsel at trial; (2) he was denied effective assistance of counsel on direct appeal; (3) the jury instruction is unconstitutional; and (4) the Texas death penalty statute is unconstitutional. Having reviewed the record, briefs, exhibits, and oral argument of the parties, the Court concludes that Petitioner is not entitled to relief under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), **DENIES** the petition, and **DISMISSES** this action **with prejudice**.

## I. BACKGROUND

On June 28, 2011, a jury in Texas state court convicted Petitioner of capital murder. 4 Clerk's Record [1] ("CR") 747–50. After receiving jury answers to special issues on future dangerousness and mitigation, the trial court sentenced Petitioner to death. *Id.* The Texas Court of

---

[1] The Clerk's Record is the district court clerk's record containing the papers filed during trial.

Criminal Appeals ("CCA") affirmed the conviction on direct appeal. *Hummel v. State*, No. AP-76,596, 2013 WL 6123283, *1–4 (Tex. Crim. App. 2013), *cert. denied* 135 S. Ct. 52 (2014). While direct appeal was pending, Petitioner filed a state habeas petition in Texas state court. 1 Sate Habeas Clerk's Record[2] ("SHCR") 2–468. The trial judge in the habeas proceeding—who had also presided over the trial—entered findings of fact and conclusions of law recommending denial of relief. 4 SHCR 1398–1534. The CCA denied habeas relief. *Ex parte Hummel*, No. WR-81,578-01, 2016 WL 537608 (Tex. Crim. App. 2016), *cert. denied* 137 S. Ct. 63 (2016). Petitioner timely filed a federal habeas petition in this Court on February 4, 2017. Petition, ECF No. 12. Respondent filed its Response on July 6, 2017, Resp., ECF No. 26, and Petitioner filed a Reply on August 2, 2017. Reply, ECF No. 29. On December 18, 2018, the Court held a hearing on this matter to allow the parties to present anything in support of their respective positions. Electronic Minute Entry, ECF No. 37.

### A.    Facts of Petitioner's Crime and Capture

The Court adopts the following recitation of facts from the CCA's opinion on direct appeal:

> In Fall 2009, [Petitioner] resided in a house on Little School Road in Kennedale with his pregnant wife, Joy Hummel; their five-year-old daughter, Jodi Hummel; and [Petitioner's] father-in-law, Clyde Bedford. [Petitioner] worked as an overnight security guard at Walls Hospital in Cleburne, and he often stopped at an E–Z Mart convenience store in Joshua on his way to and from work. He met Kristie Freeze, who worked as a clerk at the E–Z Mart, and he called and texted her numerous times between October and December 2009. Freeze testified that [Petitioner] told her that he was married, but he was not in love with his wife. Freeze also informed [Petitioner] that she was divorcing her husband and dating someone else. Although Freeze initially told [Petitioner] that they could only be friends, they sent each other sexually explicit text messages and eventually had sexual intercourse on December 10. [Petitioner] informed Freeze that his wife was pregnant a few days later. Freeze instructed [Petitioner] not to contact her anymore, but he continued to call and text her. On December 16, Freeze told [Petitioner] that her divorce had become final.

---

[2] The State Habeas Clerk's Record is the district court clerk's record containing the papers filed in the convicting court during the state habeas proceedings.

Lorie Lewallen, a cook who worked the night shift at the Huddle House restaurant near the E–Z Mart, testified that [Petitioner] regularly came into the restaurant on his way to and from work in December 2009. He usually wore his work uniform, sat in a booth that faced Lewallen, and talked to her while she cooked. However, when [Petitioner] was there on the night of December 16, he sat facing away from Lewallen, wore "street clothes," and "reeked of cologne." Lewallen testified that [Petitioner] was unusually quiet and seemed "like something was on his mind" that night.

Freeze testified that she permitted [Petitioner] to visit her and her young daughter at their apartment in Joshua on the evening of December 17. [Petitioner] arrived after dark wearing his security-guard uniform and stayed for about thirty minutes.

In the early morning hours of December 18, emergency personnel responded to a fire at [Petitioner's] home. A passerby noticed that the house was on fire shortly after 12:00 a.m. and called 9-1-1. When police officer Joshua Worthy arrived at the scene approximately fifteen minutes later, he kicked open the front door and was unable to see anything but smoke and flames inside the house. He yelled to determine if anyone was inside, but no one responded. He also noticed that the back door to the residence was open. Firefighters later extinguished the blaze and discovered the burned bodies of Joy, Jodi, and Bedford, each inside of his or her bedroom. Jodi and Bedford were found in their beds. Joy was located on the floor, with blood-soaked clothing nearby. Agent Steven Steele of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") investigated the scene and observed that Joy had injuries to her hands and upper body that appeared to be caused by some means other than the fire.

[Petitioner] approached Officer Worthy outside the house at around 4:30 a.m. He asked Worthy what had happened and "if everyone had made it out[.]" Worthy replied that he did not know, and he accompanied [Petitioner] to his minivan that was parked in a church parking lot across the street. Worthy and [Petitioner] conversed while [Petitioner] sat in his minivan and smoked a cigarette. [Petitioner] told Worthy that he lived in the house with his pregnant wife, daughter, and father-in-law. Worthy testified that [Petitioner] placed his "head down in his hands" a few times during their conversation, but he "wasn't crying" and was just "basically sitting there." When Captain Darrell Hull walked over to them and asked [Petitioner] what he had been doing that evening, he replied that he had gone to Walmart to check prices for Christmas presents. [Petitioner] continued to ask "if everybody had made it out[,]" and the officers again responded that they did not know.

Hull testified that [Petitioner] agreed to follow him to the Kennedale Police Department in his own minivan, and they arrived around 5:15 or 5:30 a.m. Hull took [Petitioner] to a room and asked [Petitioner] to write a statement

explaining what happened. He left [Petitioner] alone in the room to write his statement and began recording [Petitioner]. Hull testified that [Petitioner] signed a witness statement that read,

> So I left my home around 9:00 p.m. I drove down to Joshua to visit a friend but [he] was not home. I drove around for a while to wait and see if he would come home, but he didn't. I stopped and got gas, drove around some more. Then I began to visit Walmarts to price things for Christmas. I came home a little after 5:00 a.m. and found it burned down, and firemen and police were still there.

[Petitioner] also provided written consent for police to search his house and van.

During the interview with Detective Jason Charbonnet, Sergeant Eric Carlson, and Agent Steele, Steele noticed what appeared to be blood on [Petitioner's] pants. Steele testified that [Petitioner] agreed to give him the clothes [Petitioner] was wearing in exchange for clothes provided by another officer. When [Petitioner] changed clothes, Steele observed blood on the bottom of his sock and scratch marks on his back.

[Petitioner] thereafter left the police department and went to the office of his employer, Champion Security, in Arlington. He arrived at 8:00 a.m. He attended a meeting, then picked up his paycheck before leaving the office at 11:00 a.m. Co-workers who spoke to [Petitioner] that morning were unaware that anything unusual had happened until people began calling and asking for him later that day. [Petitioner's] co-workers and his friends from church were unable to reach him on his cell phone. Later, a concerned friend went to the police department to file a missing-person report on [Petitioner].

Steele and other arson investigators ultimately determined that the fire at [Petitioner's] home was an "incendiary fire," and they ruled out accidental causes. Steele testified that there were three separate and distinct fires, or "areas of origin," within the house. Shiping Bao, the Deputy Medical Examiner who performed Joy's autopsy, testified that Joy was pregnant with a fourteen to fifteen week old fetus when she died. Joy had a total of thirty-five stab wounds, including ten to her chest, two to her abdomen, one to her right thigh, seven to her neck, and fifteen to her back. She suffered damage to her internal organs, including her heart, lungs, and liver. She had incised wounds on her hands that appeared to be defensive in nature. She also had six lacerations on her skull, which indicated that she had been struck multiple times with a hard object. Bao concluded that the cause of Joy's death was multiple stab wounds and the manner of her death was homicide. The lack of soot in her airways and the lack of carbon monoxide in her blood indicated that she was dead before the fire. Deputy Medical Examiner Gary Sisler testified that both Bedford and Jodi suffered extensive skull fractures. Sisler determined that the cause of their

deaths was blunt-force injury, the lack of soot in their airways indicated that they were dead before the fire, and the manner of their deaths was homicide.

On December 20, Customs and Border Protection Officer ("CBP") Jorge Bernal encountered [Petitioner] at the United States port of entry between Tijuana, Mexico, and San Ysidro, California. Bernal testified that [Petitioner] approached his booth on foot and presented himself for entry into the United States at 5:48 a.m. When Bernal entered [Petitioner's] name and date of birth into the computer system, an "armed and dangerous" notification "popped up on [the] screen." [Petitioner] was handcuffed and taken to the Port Enforcement Team for further investigation. He was later transported to the San Diego County Jail.

That night, Kennedale officers Carlson and Charbonnet and Investigator James Rizy of the Tarrant County District Attorney's Office arrived at the San Diego County Jail. They mirandized [Petitioner], conducted a videotaped interview with him, and obtained consent to search his minivan in San Ysidro and his hotel room in Oceanside, California. [Petitioner] confessed his involvement in the instant offense both orally and in writing. Rizy testified that [Petitioner's] written statement read:

> I left the house at 9:00 p.m. Thursday[,] December, 12/17/2009, in my uniform. Stopped at a store to get some cigarettes off of Mansfield Highway. Went to Joshua to visit Kristie. Sat in her living room to watch TV. I left her house and went and got gas. I then went home, killed my family, set the house on fire, drove around and looked around for a place to dump the weapons.

> Then I drove back to Burleson to go to that Walmart. Then just drove around and stopped at various other [w]almarts to be seen on camera until it was time for me to go home. I knew I could not tell y'all I was working because y'all would check. I then went to the police station in Kennedale and lied to detectives about knowing what happened.

> On 12/18 of '09, after being released by detectives, I realized they had enough evidence to prove I did [those] horrible . . . things. So I went to my work office to pick up my check and cashed it. I then proceeded to drive to California late Saturday night. I arrived in Oceanside, California, and met a man. We drove down to Tijuana. Returning to U.S., border patrol checked my ID and found out I had [a] warrant. I'm glad that I got caught so I could tell the truth about what happened.

> I remember standing there holding the kitchen knife contemplating on whether or not to kill my wife for about 30 minutes. I stabbed her in the neck. She screamed. The knife broke. She began to try and fight back. I grabbed the baseball bat and hit her in the head repeatedly until she fell

> on the ground. Then I grabbed some of my other knives and swords [and] began stabbing her.
>
> I then killed my father-in-law and daughter by striking them in the head with a baseball bat. Then I set the fires.

Officers collected video that confirmed [Petitioner's] presence at Huddle House on December 16 and E–Z Mart on December 17. They also obtained video that confirmed [Petitioner's] presence at Walmart stores in Burleson, Grand Prairie, and Arlington on December 18. Store receipts indicated that [Petitioner] was present at the Burleson Walmart at 1:46 a.m. and the Grand Prairie Walmart at 4:33 a.m.

In the early morning hours of December 21, officers searched a dumpster at an auto parts store in Arlington, Texas, and found a number of weapons including an aluminum baseball bat, a large sword and sheath, a small sword and sheath, a dagger, and a kitchen knife. The small sword, dagger, and kitchen knife were contained in a white plastic trash bag, and the handle of the dagger appeared to be broken. DNA testing was performed on these weapons and on [Petitioner's] clothing that he gave to officers at the Kennedale Police Department.

[Petitioner's] socks and pants had areas that tested positive for blood. Joy's DNA profile matched DNA profiles from [Petitioner's] socks and pants, as well as the large sword, dagger, and kitchen knife. Bedford's DNA profile was the same as DNA profiles that were obtained from [Petitioner's] pants and the white plastic trash bag. Jodi's DNA profile was the same as a DNA profile obtained from an area on the aluminum baseball bat that tested presumptively positive for blood. The DNA profile obtained from the dagger handle and the large sword sheath was the same as [Petitioner's] DNA profile. Neither [Petitioner] nor Joy could be excluded as contributors to a DNA mixture that was obtained from the small sword.

*Hummel*, 2013 WL 6123283, at *1–4.

### B.  State's Evidence of Petitioner's Sexual Deviancy and Illegal Drug Use

At the punishment phase of trial, the State presented evidence of Petitioner's sexual deviancy and illegal drug use. Prior to the murder, on December 18, 2009, Petitioner's employer counseled him regarding infractions he had committed while on the job, including watching television instead of working and using doctors' equipment and computers without authorization.

42 Reporter's Record[3] ("RR") 9–11. Specifically, Petitioner accessed 2,338 pornographic images during his unauthorized computer use. *Id.* at 98–99, 105–06, 144; 43 RR 33. Petitioner also used the website horneymatches.com to solicit women to meet him for sexual encounters at the hospital while he was on-duty. 43 RR 30–32. Petitioner admitted to these infractions. 42 RR 12.

Also prior to the murder, in the fall of 2009, Petitioner repeatedly contacted Gretchen Bow, a dancer at the Showtime club, met her at the club, and each time payed her at least $100 to perform for him individually. *Id.* at 112–13, 120. Petitioner frequently asked Bow to visit him at the hospital while he was working so that they could "smoke weed and [do] other things." *Id.* at 114–15.

After the murder, Petitioner fled from Texas, checked into the Coast Inn in Oceanside, California, and went to the gentlemen's club next door. 41 RR 17–18. Outside the hotel, he met Scott Matejka. *Id.* at 19; 42 RR 27. Matejka was carrying crack-cocaine, and he and Petitioner smoked it together. *Id.* at 29; 42 RR 29. Matejka and Petitioner then traveled together to Tijuana in search of marijuana. *Id.* at 29; 42 RR 31–32. While in Mexico, Petitioner and Matejka visited another gentlemen's club. 42 RR 33. Petitioner later told investigators that he had drugs in his pockets when he attempted to cross the border back into California, and that he had swallowed some of it and discarded the rest in the bathroom. 41 RR 29–30.

### C.   State's Evidence of Petitioner's Substandard Military Service

At the punishment phase of trial, the State also presented evidence of Petitioner's substandard military service. Lieutenant Colonel ("LTC") Michael John Doughtery testified that Petitioner was an intelligence clerk under his command. 45 RR 8, 18. LTC Doughtery described Petitioner as a "pretty average, marginally effective" Marine. *Id.* at 11. LTC Doughtery said that he periodically counseled Petitioner, warning him about the "inordinate amount" of off-duty hours

---

[3] The Reporter's Record is the state criminal court's record of trial.

he spent going to strip clubs, drinking, and spending time with unvirtuous people. *Id.* at 11–12, 23. LTC Doughtery described Petitioner as a good-natured and happy-go-lucky type of person who would become silent and tense the muscles in his face when he was frustrated or angry. *Id.* at 13.

LTC Doughtery testified that, according the Petitioner's records, military officials caught Petitioner smoking during an operation in violation of Marine Corps policy. *Id.* at 14–15. LTC Doughtery explained that the Marine Corps awards good conduct medals to members who serve three uninterrupted years without any non-judicial punishments. *Id.* at 15. Petitioner served in the Marine Corps for more than three years, *id.* at 20, but never received this medal. *Id.* at 15. LTC Doughtery said that, although Petitioner received a Coast Guard Meritorious Unit Commendation, an Armed Forces Expeditionary medal, a Humanitarian Service medal, and a Sea Service Deployment Ribbon, each award was for the unit and not for Petitioner specifically. *Id.* at 15–17, 27. LTC Doughtery also testified that Petitioner's rifle marksman badge was the lowest qualification for marksmanship necessary for a Marine to pass basic training. *Id.* at 17.

On cross-examination, LTC Doughtery testified that Petitioner was an intelligence specialist with a Top Secret Sensitive Compartment and Information security clearance. *Id.* at 22, 29. Petitioner was a good mechanic and was able to use electronics, but if his superiors tasked him with something he was not interested in, he required maximum guidance or supervision to ensure completion. *Id.* at 22–23. LTC Doughtery also testified that Petitioner received several infractions for failure to maintain his weight and failure to pass a physical fitness exam, but did not receive any judicial or nonjudicial punishments while under his command. *Id.* at 26, 30.

Captain ("CPT") Sergio Ricardo Santos, an intelligence officer who took over command of Petitioner, testified that Petitioner was "not [a] very impressive Marine." *Id.* at 34–35. CPT Santos said that Petitioner did not appear to be within weight standards and did not pass the

physical fitness exam. *Id.* at 34–35. While under CPT Santos's command, Petitioner had an unauthorized absence of under 20 hours. *Id.* at 35. Petitioner was unhappy and decided to drive his car toward the Carolinas. *Id.* at 46. After his car broke down, one of his fellow Marines found him and picked him up. *Id.* CPT Santos had to revoke Petitioner's security clearance after his unauthorized leave because his superiors no longer found him trustworthy. *Id.* at 36. Petitioner's superiors also docked his pay by $282 as a nonjudicial punishment for the infraction. *Id.* at 44–45. CPT Santos also testified that Petitioner lied to his superiors about whether he was cleaning his room, had pressed his uniform, or had conducted other duties, a pattern of dishonesty that called his integrity into question. *Id.* at 38. CPT Santos said that Petitioner eventually began disobeying "the simplest of orders." *Id.* at 39.

On cross-examination, CPT Santos testified that, at some point, Petitioner's superiors promoted him to Lance Corporal, and he remained at that rank until he was honorably discharged. *Id.* at 43–44.

### D. State's Evidence Concerning Petitioner's Victims

At the punishment phase of trial, the State also presented evidence about Petitioner's victims. Melody Anderson was a friend of Petitioner's family. 44 RR 6–7. Anderson testified that Joy and Petitioner had financial problems. *Id.* at 8–9. Joy was responsible for the finances in the family, and after Petitioner hurt his back and contracted Crohn's disease—causing him to become unemployed—Joy obtained her certification as a massage therapist so that she could work to provide for the family. *Id.* at 9–10. Anderson observed that Jodi, Petitioner's daughter, loved her father "a lot" and was affectionate with him. *Id.* at 14. Anderson testified that Petitioner and Joy still struggled financially even after Petitioner began working as a security guard. *Id.* at 15.

Philip W. King was a volunteer at the Kennendale Senior Center, where Joy would drop off her father Eddie every weekday. *Id.* at 18–20. King testified that he would drop off Eddie at home at the end of the day in time for Eddie to pick up his granddaughter Jodi from the bus. *Id.* at 21–22. King said that Eddie had "a very high spirit" and that everybody at the senior center loved him. *Id.* at 25.

Cindy Gail Lee was the Director of the Kennendale Senior Center. *Id.* at 28. Lee testified that when she discovered that Eddie's house had been burned she informed the members of the senior center. *Id.* at 29–31. Several people cried and everyone was upset. *Id.* at 31. Lee described Eddie as a "fantastic guy" who laughed all the time and talked to everyone he met. *Id.* at 32–33.

### E.     State's Evidence of Petitioner's Attempted Murder

The State also presented evidence that Petitioner previously attempted to murder his family. Two weeks prior to the murders, while working as a security guard at the hospital, Petitioner accessed a doctor's computer without permission and researched articles on the effects and symptoms of rat poison on humans. 42 RR 149–50; 43 RR 36–39. He then attempted to poison his family by putting d-CON rat poison into the spaghetti sauce for their dinner. 41 RR 11, 14. This attempted murder failed when his family noticed that the food had turned green, concluded that it had spoiled, and threw it away. *Id.* at 14–16.

### F.     Defense Lay Witness Testimony

At the punishment phase of trial, Petitioner's trial counsel called nine lay witnesses who testified on his behalf.

#### 1.     Haila Scoggins, Petitioner's Special Education Teacher

Haila Scoggins was Petitioner's special education teacher at Jonesville High School in South Carolina. 43 RR 52–53. Scoggins testified that Petitioner remained in her special education

classes for all four years of his high school education. *Id.* at 53–54. Scoggins said that Petitioner had a learning disability in writing, had severe dyslexia, wrote phonetically, and was a horrible speller. *Id.* at 56. She described Petitioner as quiet, pleasant, cooperative, and responsible. *Id.* at 60. She never had to discipline him and never saw him get in a fight with other students. *Id.* at 61. Scoggins said that Petitioner enjoyed playing Dungeons and Dragons. *Id.* at 65. She believed that Petitioner could have attended college if he had received accommodations for his learning disability. *Id.* at 66.

### 2.     Tommy Jeffrey Stribble, Director of Special Services

Tommy Jeffrey Stribble is the Director of Special Services for Union County Schools in South Carolina. *Id.* at 75. Stribble testified that, according to Petitioner's school records, Petitioner failed the fourth grade and failed the writing portion of his exit exams three times, only passing on his fourth attempt after the school changed the scoring rubric for him. *Id.* at 86, 88–89. The records further indicated that Petitioner graduated high school with a 2.515 grade point average. *Id.* at 91. Stribble also testified that Petitioner participated in ROTC, received a second-place award in an art contest, was absent sixteen days during his second grade year, and was tardy ten times during his fourth grade year—the same year he had to repeat. *Id.* at 92–94.

### 3.     Mark Pack, Friend of Petitioner's Family

Mark Pack is a family friend of Petitioner's. *Id.* at 103. He knew Petitioner since he was nine or ten years old and frequently ate Sunday dinner with Petitioner's family for fifteen or sixteen years. *Id.* at 104–05. Mark described Petitioner as "an isolated person" who kept to himself and played single-player video games. *Id.* at 109–10. He also described Petitioner as a slow learner. *Id.* at 119–20. Mark never saw Petitioner become violent with anybody. *Id.* at 113–14. Mark said

that when Petitioner became frustrated or mad, Petitioner would "ball up," hold everything in, and turn "beet red." *Id.* at 114.

Mark testified that Petitioner's mother would do anything for him and his siblings—including pick him up from school and deliver food to him—but would not do the same for Petitioner or her daughter. *Id.* at 110. One time Mark witnessed Petitioner's dad physically punish Petitioner when he was twelve or thirteen years old by pushing him off a six- or seven-foot tractor. *Id.* at 111–12.

### 4. Christy Gregory Pack, Friend of Petitioner's Family

Christy Gregory Pack is Mark Pack's wife. *Id.* at 122. She first met Petitioner at church. *Id.* at 124. Christy testified that, whenever she and her husband would go over to Petitioner's house for Sunday dinners, Petitioner would be very quiet and stay in his bedroom playing video games. *Id.* at 126. Christy said that Petitioner's mother was "very generous" with the Pack family but "very strict" with her own children. *Id.* at 127.

### 5. Linda Jean Petty Pack, Friend of Petitioner's Mother

Linda Jean Petty Pack is Mark Pack's mother and was a good friend of Petitioner's mother, Jackie, for about ten years. *Id.* at 135, 137. Linda testified that Jackie was strict with her kids—stricter than her husband was—and told Linda that she spanked her children. *Id.* at 138. Linda never saw Petitioner talk back or disobey his parents, and she saw that both Petitioner and his sister were quick to obey their parents. *Id.* at 139–40. Linda testified that Jackie treated the Pack children better than she treated her own children, withholding money from her children but treating the Pack children to expensive gifts. *Id.* at 140, 142, 145.

### 6. Derrick Joe Parris, Petitioner's Childhood Friend

Derrick Joe Parris is Linda Pack's nephew and was a good friend of Petitioner when they were children. *Id.* at 150–51. Parris and Petitioner played Nintendo games together as kids. *Id.* at 155. When Parris visited Petitioner's house, Parris witnessed Petitioner's father hit Petitioner twice—one time with a belt and another time with a broomstick. *Id.* at 152–54. Parris also saw Petitioner's father "smack" Parris's mother on her buttocks, which caused friction between their families. *Id.* at 155. Parris said that Petitioner was nicknamed "Bacon" at school because he smelled like bacon when he arrived at school. *Id.* at 156–57. Parris also said that Petitioner was always behind in school. *Id.* at 159.

When Petitioner came back from the military, he took Parris to bars and strip clubs, even though Parris was seventeen years old. *Id.* at 157–58. Parris said that Petitioner would get "a little too attached" to the girls dancing in the strip club and become infatuated with any dancer that showed him interest. *Id.* at 158–59. Parris also testified that he never knew of Petitioner being violent with anybody. *Id.* at 160. Parris was surprised when Petitioner joined the Marines because Petitioner was overweight and not athletic. *Id.* at 161. Parris and his friends laughed when Petitioner told them that he was an intelligence analyst in the Marines because they "knew that [Petitioner] was stupid." *Id.* at 161. Parris never knew of Petitioner using drugs until after he left the Marine Corps. *Id.* at 169.

7.    Stephanie Bennett, Petitioner's Former High School Girlfriend

Stephanie Bennett was Petitioner's former high school girlfriend. *Id.* at 172–73. Bennett testified that they dated a little less than a year and that both she and Petitioner were a little shy. *Id.* at 174–75. Bennett broke up with Petitioner when he began to speak to her about getting married after high school. *Id.* at 176–77. Bennett never knew of Petitioner being violent towards anybody, and she testified that Petitioner always treated her appropriately. *Id.* at 174, 178.

### 8. Letti Bandit Hubertz, Petitioner's Former Girlfriend

Letti Bandit Hubertz, a homeless woman, was Petitioner's girlfriend in San Diego. *Id.* at 187–89. Hubertz and Petitioner started dating a month before Petitioner finished serving in the Marine Corps. *Id.* at 189. At the time, Hubertz had one child and was pregnant with the child of another man. *Id.* at 189–90. When Petitioner left the Marine Corps, he moved with Hubertz to South Carolina to start a family there. *Id.* at 190–91. When they arrived in South Carolina they lived with Petitioner's parents, and Petitioner began working with his dad at Kohler. *Id.* at 191–92. Hubertz testified that Petitioner always treated her with respect, showed great concern and care for her while she was pregnant, and was never abusive towards her in any way. *Id.* at 192–93. Petitioner and Hubertz eventually moved into their own two-bedroom trailer shortly before Hubertz gave birth. *Id.* at 193–94. Hubertz gave her baby Petitioner's last name. *Id.* at 194.

Hubertz testified that she thought her relationship with Petitioner was progressing well, until one day, Petitioner's sister Neata showed up at their trailer crying and gave Hubertz a letter purportedly from Petitioner, in which he said that he was not ready to be a father and had left to Texas. *Id.* at 195. Neata told Hubertz that she had purchased a bus ticket for her and her son to return back to California, and that they had one hour to pack and leave. *Id.* at 196. When Hubertz arrived at the bus station and inspected the tickets, she realized that Neata had purchased the ticket two weeks earlier. *Id.* at 196. Hubertz testified that she never knew of Petitioner frequenting bars or strip clubs or using drugs. *Id.* at 199. Hubertz attempted to contact Petitioner after she got to California, but Petitioner repeatedly hung up on her. *Id.* at 199.

### 9. Neata Woody, Petitioner's Sister

Neata Woody is Petitioner's sister. *Id.* at 208. Neata testified that she took care of Petitioner instead of their mother, because their mother told her to, even though their mother did not work

outside the home. *Id.* at 211. Neata testified that their parents were never affectionate with them. *Id.* at 211. While both parents disciplined them—mostly with a belt—their mother was the primary disciplinarian in the family. *Id.* at 213–14, 218. Their parents frequently left Neata and Petitioner alone in the house, even before elementary school. *Id.* at 215. Once when their parents left them alone, Neata was so frightened that she called the telephone operator. *Id.* at 218. Neata also testified that, when she was seventeen, she saw a woman who was not her mother performing oral sex on her father. *Id.* at 252. Petitioner was in the same room with her, apparently sleeping, when she witnessed the adultery. *Id.* at 252. Neata and Petitioner were allowed to have friends visit them only if their parents approved. *Id.* at 219. Neata concluded that their parents were abusive towards her and Petitioner. *Id.* at 221.

Neata testified that Petitioner's peers called him "Bacon" at school because the smoke from the wood-burning stove at home caused him to smell like bacon. *Id.* at 223. Neata also testified that she spoke with Petitioner about his relationship with Hubertz, and that he agreed to allow her to send Hubertz away. *Id.* at 227. Neata also testified that Petitioner joined the Marine Corps when he was 22 years old. *Id.* at 225. Petitioner was in the Marine Corps for four years. *Id.* at 231. After Petitioner left the Marine Corps, Petitioner's doctor diagnosed him with colitis and conducted surgery on him to remove some of his intestines. *Id.* at 230. Petitioner wore a colostomy bag for a period after the surgery. *Id.* at 230. Neata also testified that Petitioner and his wife had financial problems. *Id.* at 231. Neata said that, although she saw Petitioner get angry, she never saw him become violent toward anybody. *Id.* at 232. Neata said that Petitioner was nice to Joy and "wonderful" with his daughter Jodi. *Id.* at 253.

### G. Defense Expert Witness Testimony

At the punishment phase of trial, trial counsel also called two expert witnesses who testified on Petitioner's behalf.

### 1. Frank G. Aubuchon, Prison Classification Expert

Frank G. Aubuchon is a prison consultant with previous experience working in prisons. 44 RR 34–38. Aubuchon testified that, based on his review of Petitioner's military, medical, criminal, and jail classification records, he believed that a prison would classify Petitioner as a general population Level 3 inmate, which is the minimum level a life-sentenced-without-parole inmate could receive. *Id.* at 64, 67, 69–70. Aubuchon relied on the following observations in arriving at his conclusion: other than his crime, Petitioner was a "very unremarkable person"; he lacked a criminal record; he received an honorable discharge from the Marine Corps; and he had no disciplinary issues while in jail. *Id.* at 70, 113. Aubuchon believed that Petitioner would make a good adjustment to life in prison because he had behaved well during the year he spent incarcerated in Tarrant County Jail, and because he behaved well in the military, a similarly structured environment. *Id.* at 73. Aubuchon did not know that Petitioner went absent without leave while serving in the Marine Corps. *Id.* at 74.

### 2. Dr. Antoinette Rose McGarrahan, Forensic Neuropsychologist

Dr. Antoinette Rose McGarrahan is a forensic psychologist with a specialty in neuropsychology. *Id.* at 118. Dr. McGarrahan conducted a complete neuropsychological evaluation and personality and emotional evaluation of Petitioner. *Id.* at 121. The combined evaluations took eleven hours. *Id.* Dr. McGarrahan used twenty to thirty different tests and instruments in her evaluation. *Id.* at 122. Dr. McGarrahan also reviewed numerous records, including Petitioner's military, medical, school, and Tarrant County Jail records, as well as his video-recorded statements, and various cards, letters, and correspondence that Neata sent to

Petitioner. *Id.* at 122–23. Dr. McGarrahan also interviewed Neata for two and a half hours by phone and spoke with Jackie, Petitioner's mother, for one hour. *Id.* at 123. Dr. McGarrahan reviewed Jackie's medical records and subsequently reviewed psychological test data obtained by the State's expert, Dr. Randy Price. *Id.* at 123–24. Dr. McGarrahan also performed a clinical interview of Petitioner, asking about his social history and the details of the offense. *Id.* at 124.

Dr. McGarrahan found that Petitioner suffered from a learning disability impairing his ability to express himself in writing, but that his IQ was in the average to high-average range. *Id.* at 125. Dr. McGarrahan said that Petitioner did not suffer from any severe mental disorders, although Petitioner did show some signs of mild depression and anxiety. *Id.* at 126. Dr. McGarrahan concluded that Petitioner may have suffered from a combination of personality disorders, including narcissistic, antisocial, schizoid, and borderline disorders. *Id.* at 126–27.

Dr. McGarrahan testified that, while genetic and environmental factors affected Petitioner's personality, environmental factors played a major role in his personality development. *Id.* at 133, 135. Dr. McGarrahan concluded that, based on her discussions with Petitioner's mother and sister, and a review of the records, Petitioner's mother was inconsistent, not nurturing, unaffectionate, and neglectful. *Id.* at 133, 135. Dr. McGarrahan testified that an individual's ability to learn relational reciprocity and to form human attachments is a direct result of the involvement of the primary caregiver from an early age. *Id.* at 134. Dr. McGarrahan believed that Petitioner's mother, in neglecting her duties as Petitioner's primary caregiver, was a major contributing factor to his personality disorders. *Id.* at 135.

Dr. McGarrahan testified that, while Petitioner felt emotions, he was unable to express them because of his mother's control over him. *Id.* at 136–37. Dr. McGarrahan believed that thirty years of repressed emotions caused Petitioner to experience a "flood of emotional rage" that caused

him to commit the murders. *Id.* at 138. Dr. McGarrahan explained that, even though Petitioner had the ability to know that his decision to kill was wrong, the flood of emotions caused him to act on pure emotion without thinking. *Id.* at 138–39, 156. Dr. McGarrahan believed that Petitioner acted unemotional in his interviews because, once the flood of emotions ended, he returned to a state of "expressionless difficulty [at] showing what he's feeling and what he's experiencing." *Id.* at 139–40. When Dr. McGarrahan asked Petitioner why he committed the crime, he explained to her that he had been ruminating on all the wrongs done to him over his lifetime and that this rumination built up into an explosive rage. *Id.* at 141. Petitioner told Dr. McGarrahan that his wife and father-in-law were consistently critical of his state of unemployment, his inability to work around the house, and his medical problems. *Id.* at 142.

Petitioner also spoke with Dr. McGarrahan about how he rapidly became infatuated with Kristie Freeze, despite knowing that she did not reciprocate his feelings. *Id.* at 142–43. Dr. McGarrahan explained that Petitioner had previously behaved this way whenever a woman would appear to show any interest in him. *Id.* at 143–44. Although Petitioner sought out relationships, he was unable to form and maintain close relationships with anyone, whether romantic or familial. *Id.* at 144. Dr. McGarrahan believed that Petitioner's personality disorders, rooted in his childhood experiences, played a significant role in his commission of the offense. *Id.* at 145. Dr. McGarrahan did testify, however, that Petitioner planned the murders. *Id.* at 152. She said that Petitioner is the same person today that he was on December 17, 2009, with the same personality disorders. *Id.* at 155.

Finally, Dr. McGarrahan testified that Petitioner has done fairly well in structured environments and has received several commendations for his service in the military. *Id.* at 159–60. Moreover, when Petitioner once left his military post without permission, he did not

receive a judicial punishment; instead, his superiors settled the case administratively by docking his pay. *Id.* at 160. Petitioner also admitted to Dr. McGarrahan that he was wrong in committing the murders. *Id.* at 162.

## II.  LEGAL STANDARDS

### A.  Antiterrorism and Effective Death Penalty Act

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, a federal court may not issue a writ of habeas corpus for a defendant convicted in state court,

> unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court.

*Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d)). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted).

A state court decision is "contrary" to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). To constitute an unreasonable application, the state court decision must "appl[y] clearly established federal law erroneously or incorrectly" in a way that is also "objectively unreasonable." *Id.* at 409–10. A state court decision is objectively unreasonable if no "fairminded jurist" could agree with its reasoning. *Harrington*,

562 U.S. at 102. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

"[T]he 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). "Even though a thorough and well-reasoned state court opinion may be more likely to be correct and to withstand judicial review, it simply does not follow that 'the criterion of a reasonable determination is whether it is well reasoned.'" *Id.*

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. "If this standard is difficult to meet, that is because it was meant to be . . . Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (citations omitted).

In determining whether a state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, the reviewing court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

AEDPA also grants federal habeas relief for state court decisions that were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated

findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). "The presumption is especially strong when the state habeas court and the trial court are one in the same." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). "The standard is demanding but not insatiable . . . ." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Finally, the Fifth Circuit has held that "a full and fair hearing [in state court] is not a precondition to . . . applying § 2254(d)'s standards of review." *Valdez*, 274 F.3d at 951. AEDPA amended the previous version of 28 U.S.C. § 2254, and "[t]hese amendments jettisoned all references to a 'full and fair hearing' . . . leav[ing] no room for judicial imposition of a full and fair hearing prerequisite." *Id.* at 949–50.

## B. Ineffective Assistance of Trial Counsel

If a convicted defendant claims in a habeas petition that trial counsel's assistance was so defective as to require reversal of a conviction or death sentence, this Court reviews their ineffective-assistance-of-trial-counsel (IATC) claim under the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Cullen*, 563 U.S. at 189 ("There is no dispute that the clearly established federal law here is *Strickland v. Washington*.").

First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result

unreliable." *Id.* If one prong of *Strickland* is dispositive, the court need not address the other. *See id.* at 697.

### 1. Whether Trial Counsel's Performance was Deficient

To prove deficient performance, the defendant has the burden of showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Moreover, "'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009).

The Court "must be particularly wary of 'argument[s] [that] essentially come[ ] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (alterations in original); *see also Strickland*, 466 U.S. at 680 ("[T]he amount of pretrial investigation that is reasonable defies precise measurement." (quotation marks omitted)). "Counsel's decision not to present cumulative testimony does not constitute ineffective assistance." *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *see also Waters v. Thomas*, 46 F.3d 1506, 1513–14, 1518 (11th Cir. 1995) ("It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could

have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. . . . [But t]he test for ineffectiveness is not whether counsel could have done more; perfection is not required."). Moreover, IATC "does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 690).

### 2.  Whether Trial Counsel's Deficient Performance Prejudiced Defendant

"[T]he defendant [must] affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* The defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer— including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "[T]he court must decide whether the additional mitigating evidence was so compelling that there was a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death was not an appropriate sentence." *Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003) (quotation marks omitted).

### 3.  Standard of Review for IATC Under AEDPA

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). But when IATC claims are reviewed on habeas under the already deferential standard of review in § 2254(d), "a state court has even more latitude to reasonably determine that a defendant has not satisfied [*Strickland*'s already highly deferential] standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted); *see also Knowles*, 556 U.S. 111, 123 (noting that IATC claims on habeas are subject to "doubly deferential judicial review").

**C.  Ineffective Assistance of Appellate Counsel**

If a convicted defendant claims in a habeas petition that appellate counsel's assistance on direct appeal was so defective as to require reversal of a conviction or death sentence, this Court reviews their ineffective-assistance-of-appellate-counsel (IAAC) claim under the two-part test in *Strickland*. *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004); *see also Evitts v. Lucey*, 469 U.S. 387, 395–96 (1985) (holding that *Strickland* applies to appellate counsel on direct appeal).

1.  Whether Appellate Counsel's Performance was Deficient

"Counsel is not deficient for not raising every non-frivolous issue on appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). Counsel "rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). "It is not only reasonable but effective for counsel on appeal to winnow out weaker arguments and focus on a few key issues." *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989). "A brief that raises every colorable issue runs the risk of burying good arguments . . . ." *Jones v. Barnes*, 463 U.S. 745, 753 (1983).

"Instead, to be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *Phillips*, 210 F.3d at 348 (quoting *Strickland*, 466 U.S. at 688). "This reasonableness standard requires counsel 'to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention.'" *Id.* (quoting *United States v. Williamson*, 183 F.3d 458, 462–63 (5th Cir. 1999)).

> Such directly controlling precedent is rare. Often, factual differences will make authority easily distinguishable, whether persuasively or not. In such cases, it is not necessarily providing ineffective assistance of counsel to fail to construct an argument that may or may not succeed. But failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation.

*Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (quotation marks omitted) (quoting *Williamson*, 183 F.3d at 463 n.7). Moreover, a defendant can overcome the presumption of effective assistance by showing that appellate counsel ignored "a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Smith*, 528 U.S. at 288 (quotation marks omitted).

### 2. Whether Appellate Counsel's Deficient Performance Prejudiced Defendant

"[T]he defendant [must] affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* The defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). In other words, a defendant "must show a reasonable probability that, but

for his counsel's unreasonable [assistance] . . . he would have prevailed on his appeal." *Smith*, 528 U.S. at 285–86.

### 3. Standard of Review for IAAC Under AEDPA

"Judicial scrutiny of counsel's performance [is] highly deferential." *Schaetzle*, 343 F.3d at 445 (quoting *Strickland*, 466 U.S. at 689). Moreover, because of the already deferential standard of review in AEDPA, the Court's review of IAAC claims on habeas are "doubly deferential." *Cf. Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (citations omitted)).

## III. ALLEGED DUE PROCESS LIMITS ON AEDPA DEFERENCE

Petitioner claims that AEDPA's deferential standard of review under § 2254(d) does not apply to his federal habeas claims for three reasons: (1) he did not receive a "full and fair" hearing when he first litigated these claims in state habeas court; (2) § 2254(d) is a form of issue preclusion; and (3) due process prohibits giving preclusive effect to a prior adjudication if it did not include a full and fair hearing. *See* Reply 7–16, ECF No. 29. The Court disagrees with Petitioner's conclusion and finds that the re-litigation bar in § 2254(d) applies to each of Petitioner's AEDPA claims.

Petitioner argues that deference under § 2254(d) is not proper because he did not receive a "full and fair" hearing on his habeas claims when he previously litigated them in state habeas court. The Fifth Circuit has previously rejected this argument in similar cases. In *Valdez*, the Petitioner claimed that § 2254(d) deference did not apply to his petition because his prior state habeas proceeding was not an "adjudication on the merits" unless it included a "full and fair" hearing. 274 F.3d at 948. The Fifth Circuit disagreed, holding "that a full and fair hearing is not a

prerequisite to the application of AEDPA's deferential framework." *Id.* The Fifth Circuit explained:

> In 1996, Congress enacted AEDPA, amending § 2254. These amendments jettisoned all references to a "full and fair hearing" . . . . *To reintroduce a full and fair hearing requirement . . . would have the untenable result of rendering the amendments enacted by Congress a nullity*.

*Id.* at 949–50 (emphasis added). Because the Fifth Circuit has conclusively decided that Congress did not imply a "full and fair" hearing prerequisite to deference under AEDPA, this Court will not interpret the language of § 2254(d) in any way that infers a "full and fair" hearing prerequisite.

Petitioner's argument is also a constitutional one: he contends that without a "full and fair" hearing prerequisite, deference under § 2254(d) would violate due process. Reply 9, ECF No. 29. Petitioner characterizes § 2254(d) as "a form of issue preclusion," *Id.* at 8, and observes that due process prohibits applying issue preclusion "where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Allen v. McCurry*, 449 U.S. 90, 101 (1980). But Petitioner cites no authority holding that "§ 2254(d) is a form of issue preclusion," and this Court is not aware of any. The precedent that Petitioner does cite holds that § 2254(d) is substantially dissimilar from issue preclusion. *See* Reply 6, ECF No. 29 (citing *Harrington*, 562 U.S. at 102 ("As amended by AEDPA, § 2254(d) *stops short of imposing a complete bar* on federal-court relitigation of claims already rejected in state proceedings." (emphasis added))); *see also Felker v. Turpin*, 518 U.S. 651, 664 (1996) (describing AEDPA as "a modified res judicata rule"). This Court declines to accept Petitioner's novel theory of federal due process.

For these reasons, and because each of Petitioner's claims here were previously litigated in state habeas court, this Court will apply the deferential standard of review in § 2254(d) to each of Petitioner's claims.

## IV. FEDERAL HABEAS CLAIM 1 (STATE HABEAS CLAIMS 2, 3, 4, 5, 6, & 7): INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his first AEDPA claim, Petitioner asserts six instances of IATC. The Court will analyze each allegation of IATC in turn.

### A. Federal Habeas Claim 1-A (State Habeas Claim 3) & Federal Habeas Claim 1-B (State Habeas Claim 7): Trial Counsel Failed to Present Evidence that Petitioner Was Not a Future Danger and that Petitioner Suffered Complex Post-Traumatic Stress Disorder ("CPTSD")

Petitioner claims that the state habeas court rejected State Habeas Claims 3 and 7 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts.

#### 1. State Habeas Court's Application of Clearly Established Federal Law

Petitioner claims that he received IATC because his trial counsel[4] did not present evidence that Petitioner was not a future danger, and relatedly, did not present evidence that Petitioner suffered from complex post-traumatic stress disorder resulting from attachment trauma. Pet. 26, ECF No. 12. Specifically, Petitioner alleges that trial counsel should have presented "(1) the testimony of the Tarrant County Sheriff deputies [Tony Rigmaiden, Rory Thomas, and Cody Bell,] who interacted with Petitioner for 19 months; and (2) the expert testimony of Dr. Hardesty, which would have shown that Petitioner would not pose a future danger if he were sentenced to life

---

[4] Petitioner's trial counsel is an experienced Texas criminal defense attorney. 2 SHCR 527–29. Martindale-Hubbell rates him "AV Preeminent" for "legal expertise and professional reputation," and the *Texas Monthly Magazine*'s *Law and Politics* classifies him as a "Texas Super Lawyer." *Id.* at 527–28. He served for nine years as an Assistant Criminal District Attorney in Tarrant County, Texas. *Id.* at 528. Before representing Petitioner, he worked in private practice for more than two decades, focusing exclusively on criminal defense. *Id.* He has participated in approximately twelve death penalty cases. *Id.* Pursuant to Texas Code of Criminal Procedure Article 26.052, he was appointed to the Committee for formulating and implementing *Standards for the Qualification of Attorneys for Appointment to Death Penalty Cases in the 8th Administrative Judicial Region of Texas*, and he was primarily responsible for drafting and subsequently revising these standards. *Id.* He also served on the State Bar of Texas Committee on Legal Services to the Poor in Criminal Matters, and while doing so, he helped to draft and implement the *State Bar of Texas Standards for Representation in Death Penalty Cases*, and the *State Bar of Texas Standards for Representation in Non-Capital Cases*. *Id.* at 528–29.

without parole . . . ." *Id.* at 28. Dr. Hardesty would have testified in part that Petitioner was not a future danger in prison because he suffered from CPTSD. *See id.* at 40.

The state habeas court considered these arguments and rejected them. *See* 4 SHCR 1413–25. The state habeas court found that the unsubmitted testimony was "essentially cumulative" and an "unreliable prediction of future dangerousness." *Id.* at 1423–24. The state habeas court also found that trial counsel "made a well-reasoned strategic decision" to not call Rigmaiden, Thomas, and Bell, or present the type of violence-risk assessment contained in Dr. Hardesty's affidavit. *Id.* at 1423. Trial counsel made this decision "based on [trial counsels'] thorough investigation, their professional judgment, and available witness testimony, and their reliance on a well-qualified mental-health expert about how to best present [Petitioner's] case at the punishment phase of his trial." *Id.* For State Habeas Claim 7 specifically, the state habeas court found that Petitioner's trial counsel made a "strategic decision . . . to rely on Dr. McGarrahan, a well-qualified forensic psychologist and neuropsychologist"—who did not make a CPTSD diagnosis—"rather than [to rely on] Dr. Hardesty . . . ." *Id.* at 1472–73.

Petitioner contends that the state habeas court's decisions on these claims violated clearly established federal law in *Skipper v. South Carolina*, 476 U.S. 1 (1986), wherein the U.S. Supreme Court reversed a sentence of death after the trial court excluded evidence of defendant's good behavior while incarcerated. *See* Pet. 28, ECF No. 12.

In *Skipper*,

> [P]etitioner presented as mitigating evidence his own testimony and that of his former wife, his mother, his sister, and his grandmother. This testimony, for the most part, concerned the difficult circumstances of his upbringing. Petitioner and his former wife, however, both testified briefly that petitioner had conducted himself well during the 7 ½ months he spent in jail between his arrest and trial. Petitioner also testified that during a prior period of incarceration he had earned the equivalent of a high school diploma and that, if sentenced to life imprisonment rather than to death, he would behave himself in prison and

would attempt to work so that he could contribute money to the support of his family.

Petitioner also sought to introduce testimony of two jailers and one "regular visitor" to the jail to the effect that petitioner had "made a good adjustment" during his time spent in jail. The trial court, however, ruled that . . . such evidence would be irrelevant and hence inadmissible. . . .

After hearing closing arguments—during the course of which the prosecutor contended that petitioner would pose disciplinary problems if sentenced to prison and would likely rape other prisoners—the jury sentenced petitioner to death.

476 U.S. at 2–3 (citation omitted).

The Supreme Court in *Skipper* held that the excluded testimony was "relevant evidence in mitigation of punishment" that "might serve as a basis for a sentence less than death." *Id.* at 4–5 (quotation marks omitted). Significantly, the Supreme Court held that the excluded testimony was not cumulative. *Id.* at 8. The Supreme Court explained:

The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses—and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges—would quite naturally be given much greater weight by the jury.

*Id.* Because the testimony was not cumulative, the Supreme Court concluded that the erroneous exclusion was not harmless:

[W]e [cannot] confidently conclude that credible evidence that petitioner was a good prisoner would have had no effect upon the jury's deliberations. The prosecutor himself, in closing argument, made much of the dangers petitioner would pose if sentenced to prison, and went so far as to assert that petitioner could be expected to rape other inmates. Under these circumstances, it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence."

*Id.* The Supreme Court accordingly reversed and remanded for a new sentencing hearing. *Id.* at 8–9.

In considering Petitioner's IATC claim here, the Court observes at the outset that *Skipper* was on direct appeal and was not an IATC case. *Skipper* considered whether the law *permitted* a trial court to exclude a certain kind of mitigation evidence. It did not purport to address what kind of mitigation evidence a trial counsel *must offer* to provide objectively reasonable assistance of counsel—much less the level of representation that is so manifestly deficient and prejudicial that any reasonable jurist, reviewing under the doubly deferential standard in AEDPA, would find IATC under *Strickland*.

Regardless, Petitioner's case is distinguishable from *Skipper*. In *Skipper*, defendant offered "his own testimony and that of his former wife, his mother, his sister, and his grandmother"—as well as testimony by jail personnel—that he behaved well in prison. 476 U.S. at 2–3. The Supreme Court found that the testimony by defendant and his family was "self-serving," and therefore concluded that further testimony by jail personnel would not be cumulative. By contrast, here Petitioner called two experts—Frank AuBuchon and Dr. McGarrahan—to testify that Petitioner had no disciplinary issues in jail, lacked a violent or criminal history, and would likely adapt well to prison life. *See supra* Part I.G. AuBuchon and Dr. McGarrahan are disinterested experts who did not give the same kind of "self-serving" testimony as in *Skipper*. Because AuBuchon, Dr. McGarrahan, and multiple lay witnesses, together presented comprehensive, unrebutted testimony that Petitioner had no history of crime, violent behavior, or discipline in jail, *see supra* Part I.F–G, any further testimony on these points would have been cumulative. Trial counsel therefore did not provide ineffective assistance under *Skipper* by not calling Rigmaiden, Thomas, Bell, and Dr. Hardesty.

It is true *Skipper* held "that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Id.* at 4 (quoting *Eddings v. Oklahoma*, 455 U.S.

104, 114 (1982)). But here the sentencer did not refuse to consider, nor did the trial court preclude the sentencer from considering, testimony by Rigmaiden, Thomas, Bell, or Dr. Hardesty. Instead, trial counsel made a strategic decision not to present such testimony.

It is also true that trial counsel's investigation did not identify Rigmaiden, Thomas, or Cody—each of whom supervised Petitioner while he was in jail—as potential witnesses. But trial counsel explained in an affidavit that in his professional experience, the testimony of jail personnel is often not particularly favorable to the defense, unless there is "at least some personal relationship with, or affinity for the defendant that has developed with the officers . . . ." 2 SHCR 934. Trial counsel asked Petitioner if there were any jail guards, chaplains, or personnel, with whom he had developed a good relationship, but Petitioner never identified such prospective witnesses and discouraged trial counsel about the possibility of finding such witnesses. *See id.* at 532, 934. Trial counsel therefore made a strategic determination not to investigate possible witnesses among jail personnel. *See id.*

Petitioner contends that this strategic decision was ineffective under clearly established federal law in *Rompilla v. Beard*, 545 U.S. 374 (2005). *See* Pet. 33, ECF No. 12. In *Rompilla*,

> Rompilla's evidence in mitigation consisted of relatively brief testimony: five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man. Rompilla's 14–year–old son testified that he loved his father and would visit him in prison. The jury acknowledged this evidence to the point of finding, as two factors in mitigation, that Rompilla's son had testified on his behalf and that rehabilitation was possible. But the jurors assigned the greater weight to the aggravating factors, and sentenced Rompilla to death. . . .

*Id.* at 378. Before trial, Rompilla's counsel interviewed Rompilla and his family, and examined reports by three mental health experts, but none of these efforts yielded helpful mitigating evidence. *See id.* at 381–82. Nevertheless, trial counsel neglected to investigate Rompilla's school records, juvenile and adult criminal records, and history of alcohol dependence. *See id.* at 382. The

Supreme Court held that "the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance" because,

> Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans. It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.

*Id.* at 383–84. Trial counsel's oversights prejudiced Rompilla because they would have added up to a significant mitigation case that would have been far more effective than "the few naked pleas for mercy actually put before the jury . . . ." *Id.* at 391.

In sum, the Supreme Court held that even if "the defendant himself ha[s] suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id.* at 377. But in reaching this conclusion, the Supreme Court noted that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* at 383.

Trial counsel's strategic decision not to investigate further for possible witnesses at the Tarrant County jail is distinguishable from *Rompilla*. First, the rule in *Rompilla* requires counsel to "obtain and review material that counsel knows *the prosecution will probably rely on as evidence of aggravation* at the sentencing phase of trial," *id.* at 377 (emphasis added), and the prosecution here would not have relied on testimony by jail personnel that Petitioner had behaved

well in prison to make a case of aggravation. Second, whereas in *Rompilla* trial counsel did not investigate the defendant's criminal history, trial counsel here called multiple expert and lay witnesses to show that Petitioner had no history of violence, criminal behavior, or misbehavior while incarcerated. *See supra* Part I.F–G. Third, trial counsel's mitigation case here is much stronger than in *Rompilla*. Whereas trial counsel's mitigation case in *Rompilla* amounted to "[a] few naked pleas for mercy," 545 U.S. at 391, Petitioner's trial counsel called numerous witnesses and presented a thorough mitigation case.

The state habeas court reasonably applied *Strickland* to State Habeas Claims 3 and 7. First, the state habeas court reasonably concluded that trial counsel provided adequate representation. Trial counsel called two expert witnesses and multiple lay witnesses to show that Petitioner had no history of violence, criminal behavior, or misbehavior while incarcerated, and that he would adapt well to prison life. *See supra* Part I.F–G. Any additional evidence on the absence of future dangerousness, from either lay or expert witnesses, would have been cumulative. *Cf. Coble*, 496 F.3d at 436 ("Counsel's decision not to present cumulative testimony does not constitute ineffective assistance."); *Dowthitt*, 230 F.3d at 743 ("We must be particularly wary of 'argument[s] [that] essentially come[ ] down to a matter of degrees." (alterations in original)). When Petitioner informed trial counsel that he did not have any personal relationships with jail personnel, trial counsel made a strategic choice not to pursue the testimony of jail personnel who counsel feared would be otherwise favorable to the State's case. *See* 2 SHCR 532. Trial counsel also considered the possibility of having Dr. McGarrahan present her opinion on Hummel's risk of future dangerousness based on a violence-risk assessment, but trial counsel declined to do so because counsel feared it would open the door to powerful rebuttal testimony by the state's expert, Dr. Price. *See id.* at 532–34. These actions are "sound trial strategy" that "fall[ ] within the wide range

of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *cf. Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).

Finally, the state habeas court reasonably concluded that trial counsel, in failing to call Rigmaiden, Thomas, Bell, and Dr. Hardesty as witnesses, did not prejudice the defense. Because trial counsel had already made a "powerful case" that Petitioner would not be a future danger, 4 SHCR 1425, additional cumulative testimony proffered by trial counsel would not have likely changed the jury's verdict. Petitioner has not shown that he would have received a life sentence but for the omitted testimony. *Cf. Strickland*, 466 U.S. 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

Supporting this conclusion is the fact that this crime was particularly heinous, even compared to other capital crimes. Petitioner initially attempted to murder his family with rat poison. *Supra* Part I.E. Two weeks later, while his family was sleeping in their beds, Petitioner murdered each of them, one by one. *See supra* Part I.A. Using two swords, a dagger, and a kitchen knife, he stabbed his pregnant wife a total of thirty-five times, including three times to her abdomen. *Id.* He also beat her repeatedly with a baseball bat as she fought for her life and the life of her unborn child. *Id.* After killing his wife and unborn child, he rested for about twenty minutes to catch his breath. *See* State's Exhibit ("SX") 347B. Then, using the same baseball bat, he beat his sleeping father-in-law in the head multiple times until he died. *See supra* Part I.A. He then took another break to catch his breath, SX 347B, and finally beat his sleeping 5-year-old daughter in the head multiple times until she died. *See supra* Part I.A. He burned his house down to destroy

the evidence and spent the night driving around to establish an alibi. *See id.* The next day, he appeared emotionless to police investigators and coworkers. *Id.* He then immediately left to California, and then Mexico, to consume drugs and hire prostitutes. *See supra* Part I.B.

The evidence shows that this crime was not a spontaneous or impulsive act. Petitioner planned to murder his family to free himself to pursue a sexual relationship with Kristie Freeze and become a father figure to her 6-year-old daughter. Petitioner told investigators that before the murder he began to wish he were single so that he could "pursue [Freeze] better." State Exhibit 347B. Indeed, immediately before executing his homicidal plan, Petitioner spent time with Freeze and read to her daughter from her favorite children's book. 39 RR 164.

Given the calculated brutality, personal cruelty, and cold-bloodedness of this particular crime, as well as the number of victims, any unreasonably omitted mitigation evidence must be more than run-of-the-mill. The omission of mitigating evidence would only prejudice Petitioner if it reduced Petitioner's moral culpability in a manner proportionate to the depravity of his crime. *See Strickland*, 466 U.S. at 695 ("When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that *the balance of aggravating and mitigating circumstances did not warrant death*." (emphasis added)). Here, trial counsel only overlooked cumulative testimony and otherwise made a "powerful case" that Petitioner was not a future danger. 4 SHCR 1425. Even if this constituted deficient performance, especially upon consideration of the heinousness of Petitioner's crime, the Court finds that the error would not have affected a single juror's sentencing decision.

The state habeas court's decisions on State Habeas Claims 3 and 7 did not unreasonably or erroneously apply clearly established federal law under *Strickland* and its progeny. Petitioner has

not shown that the state habeas court's decisions on State Habeas Claims 3 and 7 were either "contrary to" or an "unreasonable application of" clearly established federal law.

2. <u>State Habeas Court's Determination of Facts</u>

Petitioner also contends that the state habeas court rejected State Habeas Claims 3 and 7 based on an unreasonable determination of the facts. *See* Pet. 32–41, ECF No. 12.

Relying on trial counsel's affidavit, the state habeas court found as fact that, in trial counsel's experience, "testimony of jail personnel is often not particularly favorable to the defense by the time of trial unless there is 'at least some personal relationship with, or affinity for the defendant that has developed with the officers.'" 2 SHCR 1414. Petitioner points to no evidence in the record refuting trial counsel's experience. *See* Pet. 32–33. And indeed, at oral argument before this Court, Petitioner's lawyer conceded that without a personal relationship with the prisoner, jail personnel testimony is not useful for the defendant. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

Relying on trial counsel's affidavit, the state habeas court found as fact:

> "Members of the defense team asked [Petitioner] about the possibility of finding jail guards, chaplains, or other jail personnel with whom [Petitioner] had developed a sufficiently good relationship that they might be willing to testify on his behalf, but [Petitioner] never identified any such prospective witness and was not very encouraging that any such witnesses might be found."

2 SHCR 1414. Petitioner claims that this finding "is undermined" because "trial counsel could have identified who spent a significant amount of time watching Petitioner over the 18-month period from the jail logs . . . ." Pet. 33, ECF No. 12. However, simply because certain jail personnel

spent "a significant amount of time watching Petitioner" does not necessarily mean that they "developed a sufficiently good relationship that they might be willing to testify on [Petitioner's] behalf." The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

The state habeas court found as fact that "[Petitioner's] assertion that he did nothing to dissuade trial counsel from pursuing an investigation into Tarrant County jail staff and that he 'simply could not recall the names of any specific jail staff he could recommend that counsel speak to' is unsupported by the record." 2 SHCR 1414. Petitioner asserts, without argument, that this finding was unreasonable, *see* Pet. 32–33, ECF No. 12, but nothing in the record contradicts it. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

The state habeas court found as fact that "[A]lthough Rigmaiden's, Bell's, and Thomas' names appear in jail logs contained in [Petitioner's] Exhibit 44, nothing in those entries show that any of them had developed at least some personal relationship with or affinity for [Petitioner]." 2 SHCR 1415. According to Petitioner, this finding is unreasonable because jail logs are not diaries and do not ordinarily provide evidence of a personal relationship. *See* Pet. 33, ECF No. 12. But in the next sentence, Petitioner contradicts this assertion by claiming that jail logs can, in fact, show that prison personnel spent a significant amount of time watching and inmate, thereby indicating the existence of a personal relationship. *See id.* Notwithstanding these contradictory assertions, the state habeas court's finding is reasonable: the jail logs did not reveal whether jail personnel, in addition to overseeing Petitioner, had also developed a personal relationship with him. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

The state habeas court found as fact that the proposed testimony of Rigmaiden, Thomas, and Bell "provides no meaningful new facts about [Petitioner's] pretrial confinement that

[Petitioner's] trial counsel did not develop through other witnesses." 4 SHCR 1415. Petitioner claims that this finding is unreasonable because these witnesses would have testified that: (1) "Petitioner was quiet, respectful, pleasant, and never caused trouble with the [Tarrant County Jail] staff or other inmates"; (2) "Petitioner complied with all rules and had no disciplinary infractions while at Tarrant County Jail"; and (3) "Petitioner would not be a future danger in prison and would have adjusted well to a general population setting in prison." Pet. 33–34, ECF No. 12. But trial counsel called other witnesses who testified to the facts of Petitioner's good behavior in jail and adaptability to prison life. *See supra* Part I.F–G. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

The state habeas court stated in its conclusions of law:

> "Dr. Hardesty's proffered opinions of [Petitioner's] future dangerousness do not satisfy the reliability requirements of Tex. R. Evid. 702 because her determination that [Petitioner] would not be a future danger if he were sentenced to life in prison is the same type of unreliable prediction of future dangerousness rejected as unreliable in *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010)."

2 SHCR 1424. Petitioner complains that because Dr. Hardesty's testimony was not analogous to the testimony in *Coble* this is an unreasonable determination of fact. *See* Pet. 34–41, ECF No. 12. The Court disagrees. Even if the state habeas court's application of *Coble* was erroneous, the state habeas court made a *legal* determination based on state law. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Petitioner has not shown with clear and convincing evidence that this is an unreasonably determined fact.

Finally, the state habeas court found as fact:

> Dr. Hardesty's opinion that [Petitioner] would not pose a future risk of violence, even if it were determined to be admissible at trial, is not so compelling that it would have changed the jury's answer to the future dangerousness special issue,

especially in light of State's powerful evidence that Applicant posed a future danger.

4 SHCR 1418. Petitioner claims that this is an unreasonable determination of fact because Dr. Hardesty's testimony was both credible and weighty. *See* Pet. 34–41, ECF No. 12. But the question whether Dr. Hardesty's testimony "would have changed the jury's answer to the future dangerousness special issue," is really the question whether prejudice exists under *Strickland*. As such, this "finding of fact" is actually a legal determination. Petitioner has not shown with clear and convincing evidence that this is an unreasonably determined fact.

Petitioner has not shown that the state habeas court's decisions on State Habeas Claims 3 and 7 were "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claims 1-A and 1-B.

## B. Federal Habeas Claim 1-C (State Habeas Claim 4): Trial Counsel Failed to Present Expert Testimony Regarding Petitioner's Life History

Petitioner claims that the state habeas court rejected State Habeas Claim 4 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 46–52, ECF No. 12.

### 1. State Habeas Court's Application of Clearly Established Federal Law

Petitioner claims that he received IATC because his trial counsel "failed to present expert testimony regarding Petitioner's life history (Ground 1-C)." *Id.* at 41. Specifically, Petitioner alleges that trial counsel should have presented "the expert testimony of Laura Smith, who . . . provide[d] an explanation of Petitioner's life history and an opinion of the elements in the life history that impacted Petitioner's development and decision-making." *Id.*

The state habeas court considered this argument and rejected it, finding that "prevailing professional norms do not require trial counsel in a death-penalty case to retain a 'social history

expert witness' such as social worker Smith or to call such a witness to testify at the punishment phase of a death-penalty trial." 4 SHCR 1426. Nevertheless, the state habeas court found that trial counsel "performed a complete mitigation investigation into every aspect of [Petitioner's] life, which included gathering records and evidence, interviewing [Petitioner], and identifying and interviewing potential witnesses." *Id.* The state habeas court also found that "contrary to [Petitioner's] assertions, [Petitioner's] trial counsel *did* present expert testimony about [Petitioner's] life history through Dr. McGarrahan to develop the relevant social history as part of [Petitioner's] mitigation case." *Id.* at 1429 (emphasis in original). The state habeas court found that Dr. McGarrahan's testimony "gave the jury a sufficiently complete understanding of Applicant's life history," *id.* at 1430, and that Smith's testimony would have been "largely cumulative." *Id.* at 1433.

Petitioner contends that the state habeas court's decision on State Habeas Claim 4 violated clearly established federal law in *Williams v. Taylor*, 529 U.S. 362 (2000). *See* Pet. 48, ECF No. 12. In *Williams*,

> The evidence offered by Williams' trial counsel at the sentencing hearing consisted of the testimony of Williams' mother, two neighbors, and a taped excerpt from a statement by a psychiatrist. One of the neighbors had not been previously interviewed by defense counsel, but was noticed by counsel in the audience during the proceedings and asked to testify on the spot. The three witnesses briefly described Williams as a "nice boy" and not a violent person. The recorded psychiatrist's testimony did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone.
>
> In his cross-examination of the prosecution witnesses, Williams' counsel repeatedly emphasized the fact that Williams had initiated the contact with the police that enabled them to solve the murder and to identify him as the perpetrator of the recent assaults, as well as the car thefts. In closing argument, Williams' counsel characterized Williams' confessional statements as "dumb," but asked the jury to give weight to the fact that he had "turned himself in, not on one crime but on four . . . that the [police otherwise] would not have solved."

> The weight of defense counsel's closing, however, was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life.

> The jury found a probability of future dangerousness and unanimously fixed Williams' punishment at death. . . .

*Id.* at 369–70 (citations omitted). Trial counsel, however, failed to introduce certain relevant evidence in mitigation:

> Among the evidence reviewed that had not been presented at trial were documents prepared in connection with Williams' commitment when he was 11 years old that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was "borderline mentally retarded," had suffered repeated head injuries, and might have mental impairments organic in origin.

*Id.* at 370. The Supreme Court in *Williams* held that this oversight constituted IATC. *Id.* at 371. It explained:

> [Trial counsel's] representation during the sentencing phase fell short of professional standards—*a judgment barely disputed by the State in its brief to this Court*. The record establishes that counsel *did not begin to prepare* for that phase of the proceeding *until a week before the trial*. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, *not because of any strategic calculation* but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

> Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." *Counsel failed even to return the phone call of a certified public accountant who had offered to testify* that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to

thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison. . . .

We are also persuaded . . . that counsel's unprofessional service prejudiced Williams within the meaning of *Strickland*. . . . *[T]he sole argument in mitigation that trial counsel did advance . . . [was that] Williams turned himself in*, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that. While this, coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability.

*Id.* at 395–98 (citations omitted) (emphasis added).

Petitioner's case is distinguishable from *Williams*. Petitioner's trial counsel presented evidence of Petitioner's life history through Dr. McGarrahan. *See supra* Part I.G.2. Trial counsel's preparation was not last minute or haphazard; it was diligent and meticulous.[5] And trial counsel presented a thorough mitigation case based on Petitioner's character and background and the circumstances of the offense, *see supra* Part I.F–G, whereas in *Williams*, "the sole argument in mitigation" was that Williams turned himself in to the police. 529 U.S. at 398. Any additional testimony by Smith would not have "influenced the jury's appraisal of [Petitioner's] moral culpability" in the same way additional mitigation evidence would have influenced the jury in *Williams*.

---

[5] In preparing their mitigation case, trial counsel sought out lay witnesses from among Petitioner's family and friends. Despite these efforts, "[f]ew, if any, of the members of Mr. Hummel's family wished to assist [trial counsel] in his defense. Some refused to talk to [trial counsel]; some indicated they wished to tell the jury to give [Petitioner] the death penalty; some had knowledge of [Petitioner's] chronic marijuana use (even when the family struggled financially); and some even sought to prevent [trial counsel] from talking to other members of the family." 2 SHCR 539. Multiple individuals threatened to call the police if trial counsel initiated further contact with them. *See id.* at 540–41. Trial counsel's "independent investigation was hampered by an almost universal lack of cooperation from the vast majority of the people" they contacted. *Id.* at 540. Notwithstanding these obstacles, trial counsel successfully collected an assortment of lay witnesses. Trial counsel even used their own money to pay certain witnesses to travel to Texas to testify. *Id.* at 539–40.

Petitioner next contends that the state habeas court violated clearly established federal law in *Rompilla* by failing to adequately investigate Petitioner's social history. *See* Pet. 50, ECF No. 12; *cf. supra* Part IV.A (discussing *Rompilla*). But *Rompilla* held that trial counsel "is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 545 U.S. at 377. The holding in *Rompilla* does not apply here, because the prosecution was not likely to rely on social worker Smith's testimony—testimony that would have been favorable to Petitioner. And to the extent social worker Smith's testimony would have mitigated the State's proof of Hummel's death-worthiness, it was cumulative of mitigating social history testimony that trial counsel had already discovered and presented.

Petitioner finally contends that the state habeas court violated clearly established federal law in *Wiggins v. Smith*, 539 U.S. 510 (2003). *See* Pet. 50, 52, ECF No. 12. In *Wiggins*, trial counsel moved the court to bifurcate sentencing to enable them to present two arguments at sentencing, one "retrying guilt" and one presenting mitigation evidence. 539 U.S. at 515. When the court denied the motion, trial counsel decided to argue only that Wiggins did not commit the offense, and trial counsel "introduced no evidence of Wiggins' life history . . . or family background." 539 U.S. at 516–17. Wiggins claimed that his attorneys "had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." *Id.* at 516.

"To support his [IATC] claim, [Wiggins' counsel] presented testimony by Hans Selvog, a licensed social worker certified as an expert by the court." *Id.* at 516. According to Selvog:

> [Wiggins'] mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men

> while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner—an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id.* at 516–17. Wiggins' attorneys did not discover this evidence as they did not retain a forensic social worker to prepare a social history. *See id.* at 517. Wiggins' attorneys claimed that this was not an oversight but a strategic choice to "retry guilt" at sentencing rather than present a mitigation case focused on his troubled childhood. *See id.* at 518.

But the Supreme Court held that "[c]ounsel's decision not to expand their investigation [into Wiggins' social history] . . . fell short of the professional standards that prevailed in Maryland in 1989 . . . [because] standard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report." *Id.* at 524. Moreover, trial counsel had already discovered troubling facts about Wiggins' background that called for further investigation. *See id.* at 525. The Supreme Court also concluded that trial counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment," because trial counsel had moved the court to bifurcate the sentencing trial in order to enable them to present a mitigation defense. *See id.* at 526. If trial counsel was planning to present a mitigation case, "they had every reason to develop the most powerful mitigation case possible." *Id.*

Petitioner's case is distinguishable from *Wiggins*. In *Wiggins*, trial counsel did not investigate defendant's social history or offer any social history as mitigating evidence. By contrast

here, trial counsel not only investigated defendant's social history, *see* 2 SHCR 536, but also offered evidence of it at sentencing. *See supra* Part I.G.2.

The state habeas court reasonably applied *Strickland* to State Habeas Claim 4. First, the state habeas court reasonably concluded that trial counsel provided adequate representation. Trial counsel hired a social worker, Ms. Brendan Ross, for the mitigation investigation, 2 SHCR 536, and called lay witnesses who knew Petitioner and an expert in neuropsychology to discuss Petitioner's social history and its effect on his behavior. *See supra* Part I.G.2. Additional evidence in the form of third-party narrative from a social worker would have been cumulative. *Cf. Coble*, 496 F.3d at 436 ("Counsel's decision not to present cumulative testimony does not constitute ineffective assistance."); *Dowthitt*, 230 F.3d at 743 ("We must be particularly wary of 'argument[s] [that] essentially come[ ] down to a matter of degrees." (alterations in original)). Trial counsel also acted based on experience and strategic judgment, declining to introduce a social history expert witnesses because his "prior experience ha[d] been that jurors often ascribe relatively little importance to opinion testimony of this type," and because he believed her testimony would have been cumulative. *See* 2 SHCR 536–37, 936. This is "sound trial strategy" that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *cf. Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).

Finally, the state habeas court reasonably concluded that trial counsel, by not calling additional witnesses, did not prejudice Petitioner. Petitioner has not shown that a juror would likely have rejected the death penalty but for the omission of social worker Smith's cumulative testimony. *Cf. Strickland*, 466 U.S. 694 ("The defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). The heinousness of Petitioner's crime supports this finding even further. *See supra* Part IV.A.1.

The state habeas court's decision on State Habeas Claim 4 did not unreasonably or erroneously apply clearly established federal law under *Strickland* and its progeny. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 4 was either "contrary to" or an "unreasonable application of" clearly established federal law.

2.      State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 4 based on an unreasonable determination of the facts. *See* Pet. 51–52, ECF No. 12.

The state habeas court found as fact that "[p]revailing professional norms do not require trial counsel in a death penalty case to retain a 'social history expert witness' such as social worker Smith or to call such a witness to testify at the punishment phase of a death-penalty trial." 4 SHCR 1426. Petitioner claims that this is an unreasonable determination of facts, Pet. 46, ECF No. 12, but cites no contrary evidence of prevailing professional norms. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

The state habeas court found as fact that trial counsel "performed a complete mitigation investigation into every aspect of [Petitioner's] life, which included gathering records and evidence, interviewing [Petitioner], and identifying and interviewing potential witnesses." 4 SHCR 1426. Petitioner claims that this is an unreasonable determination of fact because Smith

would have provided better and more detailed testimony than Dr. McGarrahan. *See* Pet. 46–47, ECF No. 12. Even if true, this does not show that trial counsel failed to conduct a thorough factual investigation. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

The state habeas court found as fact that, "contrary to [Petitioner's] assertions, [Petitioner's] trial counsel *did* present expert testimony about [Petitioner's] life history through Dr. McGarrahan to develop the relevant social history as part of [Petitioner's] mitigation case." 4 SHCR 1429. The state habeas court also found as fact that the "substance of the testimony from Dr. McGarrahan and other witnesses developed the important facts of [Petitioner's] life and life events and gave the jury a sufficiently complete understanding of [Petitioner's] life history." *Id.* at 1430. Again, Petitioner claims that this is an unreasonable determination of fact because social worker Smith would have provided better and more detailed testimony than Dr. McGarrahan. *See* Pet. 46–47, ECF No. 12. Even if true, this does not show that Dr. McGarrahan's expert testimony failed to give the jury a "sufficiently complete understanding" of Petitioner's life history. The Court finds Petitioner has not rebutted these factual findings with clear and convincing evidence.

The state habeas court found as fact that "[S]mith's affidavit contains no meaningful facts or any necessary expert opinions that trial counsel did not cover in the mitigation presentation at trial or that would have persuaded the jury to answer the mitigation special issue differently." 2 SHCR 1431. Petitioner claims that social worker Smith's affidavit indeed discusses facts not raised in the mitigation presentation, including,

> her conclusion that the abuse and neglect Petitioner suffered as a child [made] him unable to form relationships with other people outside of fantasy games, is unable to solve problems in real life versus escaping to fantasy, and runs away or disappears when things get difficult without a clear understanding of what the consequences might be for those actions . . . .

Pet. 51, ECF No. 12. In reality, trial counsel did present many of these facts as evidence in mitigation. *See supra* Part I.F–G. Social worker Smith's opinions are substantially similar to Dr. McGarrahan's testimony tying Petitioner's behavior to personality disorders and an inability to form healthy relationships that resulted from his upbringing, social development, and genetic make-up. 44 RR 135–46. In any case, the state habeas court did not claim that social worker Smith's affidavit contained *no* additional facts—only that it did not contain other "*meaningful* facts" or "*necessary* expert opinions."[6] 2 SHCR 1431 (emphasis added). Petitioner has not shown how the facts and expert opinions unique to Smith's affidavit were "meaningful" and "necessary." The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 4 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 1-C.

**C.    Federal Habeas Claim 1-D (State Habeas Claim 5):   Trial Counsel Failed to Present Relevant Lay Witness Testimony**

Petitioner claims that the state habeas court rejected State Habeas Claim 5 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 55–57, ECF No. 12.

1.    <u>State Habeas Court's Application of Clearly Established Federal Law</u>

Petitioner claims that he received IATC because trial counsel "failed to present relevant lay witnesses (Ground 1-D)." *Id.* at 53. Specifically, Petitioner alleges that trial counsel should have called Thomas Hamilton, Brian Jeter, Joseph "JoJo" Patterson, Chad Brown, Lance Dupre, Shana Fowler, George Goodson, Christopher Paris, and Tonya Paris, who were primarily Petitioner's friends and fellow churchgoers. As lay witnesses, Petitioner contends that they could

---

[6] These adjectives may indicate that the state habeas court made a legal conclusion.

have testified about his good character, history of non-violence, and traumatic life circumstances. *See id.* at 53–55. The state habeas court considered this argument and rejected it, finding that trial counsel "identified and interviewed every potential witness it could locate," 4 SHCR 1437, and "fulfilled their duty to conduct a reasonable and thorough investigation . . . even in the face of dealing with threats, uncooperative witnesses, and witnesses whose testimony would have damaged [Petitioner's] case." *Id.* at 1456. The state habeas court concluded that the omitted witnesses' testimony would have been cumulative. *See id.*

Petitioner argues that the state habeas court's decision on State Habeas Claim 5 violated clearly established federal law in *Wiggins v. Smith*, 539 U.S. 510 (2003). Pet. 56, ECF No. 12; *cf. supra* Part IV.B (discussing *Wiggins*). But Petitioner's case is distinguishable from *Wiggins*. In *Wiggins*, trial counsel did not investigate Wiggins' social history or offer any social history as mitigating evidence. By contrast here, trial counsel thoroughly investigated potentially relevant lay witnesses, *see* 2 SHCR 537–43, and offered their testimony at sentencing. *See supra* Part I.F.

The state habeas court reasonably applied *Strickland* to State Habeas Claim 5. First, the state habeas court reasonably concluded that trial counsel provided adequate representation. Trial counsel called nine relevant lay witnesses, including close friends, relatives, and romantic partners, who testified generally to Petitioner's background and behavior. *See supra* Part I.F. Additional lay witness testimony would have been largely cumulative of the existing evidence. *Cf. Coble*, 496 F.3d at 436 ("Counsel's decision not to present cumulative testimony does not constitute ineffective assistance."); *Dowthitt*, 230 F.3d at 743 ("We must be particularly wary of 'argument[s] [that] essentially come[ ] down to a matter of degrees." (alterations in original)). Trial counsel also acted based on experience and strategic judgment, making a thorough investigation of relevant lay witnesses and calling those witnesses trial counsel "felt were necessary in order to present as

complete of a picture as we possibly could of [Petitioner's] life." 2 SHCR 542. This is "sound trial strategy" that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Finally, the state habeas court reasonably concluded that trial counsel, in failing to call additional witnesses, did not prejudice Petitioner. 4 SHCR 1458. Petitioner has not shown that a juror would likely have reconsidered the death penalty but for the omission of additional, cumulative lay witness testimony. *Cf. Strickland*, 466 U.S. 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). The heinousness of Petitioner's crime supports this finding even further. *See supra* Part IV.A.1.

The state habeas court's decision on State Habeas Claim 5 did not unreasonably or erroneously apply clearly established federal law under *Strickland* and its progeny. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 5 was either "contrary to" or an "unreasonable application of" clearly established federal law.

### 2. State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 5 based on an unreasonable determination of the facts. *See* Pet. 56, ECF No. 12.

Petitioner asserts in conclusory fashion that the entire set of factual findings with respect to State Habeas Claim 5 were unreasonably determined. *See* Pet. 56, ECF No. 12. As evidence supporting this contention, Petitioner claims that trial counsel "[did] not uncover[ ] . . . his struggles with education, his inability to connect with people, his obsession with role-playing games, his experience in the military . . . his difficulty living like other persons who deal with relationships and financial issues, [and] his severe medical issues with Crohn's disease and a back injury." *Id.*

at 55–56. But trial counsel did uncover these facts through the testimony of many witnesses. *See supra* Part I.F–G. The Court finds Petitioner has not rebutted with clear and convincing evidence the presumption that the state habeas court reasonably determined these facts. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 5 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 1-D.

**D.      Federal Habeas Claim 1-E (State Habeas Claim 6):  Trial Counsel Failed to Present Petitioner's Military Service as Mitigation Evidence**

Petitioner claims that the state habeas court rejected State Habeas Claim 6 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 57–64, ECF No. 12.

1.      <u>State Habeas Court's Application of Clearly Established Federal Law</u>

Petitioner claims that he received IATC because his trial counsel "failed to present Petitioner's military service as mitigation evidence (Ground 1-E)." *Id.* at 57. Specifically, Petitioner argues that trial counsel should have called Wayne "Buddy" Matthias, Efrain Chaidez, and Fred Emmer, who had each encountered Petitioner in the military. The state habeas court considered and rejected this argument, finding that "trial counsel made a strategic decision to attempt to avoid or minimize negative evidence related to Petitioner's military career." 4 SHCR 1460. While trial counsel did not locate Matthias, Emmer, and Chaidez, *see id.* at 1465, the state habeas court found that their testimony would have given both negative and positive information, and therefore would not have necessarily portrayed Petitioner's military service in a more positive

light. *See id.* at 1461–62, 1465. The state habeas court therefore concluded that trial counsel's failure to locate Matthias, Emmer, and Chaidez was not IATC. *See id.* at 1465.

Petitioner argues that the state habeas court violated clearly established federal law under *Porter v. McCollum*, 558 U.S. 30 (2000). In *Porter*,

> The defense put on only one witness, Porter's ex-wife, and read an excerpt from a deposition. The sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son. Although his lawyer told the jury that Porter "has other handicaps that weren't apparent during the trial" and Porter was not "mentally healthy," he did not put on any evidence related to Porter's mental health. . . .

> In 1995, Porter filed a petition for postconviction relief in state court, claiming his penalty-phase counsel failed to investigate and present mitigating evidence. The court conducted a 2–day evidentiary hearing, during which Porter presented extensive mitigating evidence, all of which was apparently unknown to his penalty-phase counsel. Unlike the evidence presented during Porter's penalty hearing, which left the jury knowing hardly anything about him other than the facts of his crimes, the new evidence described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity.

558 U.S. at 32–33.

Porter's father physically abused him and on one occasion nearly shot him to death. *See id.* at 34. To escape the abuse, Porter enlisted in the Army and was involved in extensive combat in Korea. *See id.* at 34–35. Porter suffered a gunshot wound during an advance on Chinese forces in the battle of Kunu-ri, which involved five days of combat, including hand to hand fighting. *See id.* at 34. Porter was also wounded in the battle of Chip'yong-ni, wherein his regiment was cut off and defended itself for two days and two nights from mortar, artillery, and machine gun fire, and suffered more than 50% casualties. *See id.* at 34–35. The battles were "very trying, horrifying experiences." *Id.* at 35. For his heroic service, Porter received the Presidential Unit Citation, two Purple Hearts, and the Combat Infantryman Badge, among other decorations. *Id.* After these

combat experiences, Porter repeatedly went AWOL, suffered "dreadful nightmares and would attempt to climb his bedroom walls with knives at night." *Id.* "Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all." *Id.* at 36. "In addition to this testimony regarding his life history, Porter presented an expert in neuropsychology, Dr. Dee, who . . . concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior." *Id.* The Supreme Court held in a *per curiam* opinion that trial counsel's failure to investigate and present this evidence in mitigation constituted IATC. *See id.* at 38–44.

Petitioner contends that, like in *Porter*, he received IATC because trial counsel neglected to introduce testimony that would have reflected more positively on his military career. *See* Pet. 60–64, ECF No. 12. But Petitioner's case is distinguishable from *Porter*. In *Porter* trial counsel did not present any evidence of the defendant's military service; here, multiple witnesses testified to Petitioner's experience in the Marine Corps. *See supra* Part I.C. Porter was a decorated combat veteran with a record of heroic service; here, Petitioner was an unremarkable intelligence specialist with no individual commendations. *See supra id.* Porter suffered gunshot wounds and mental and emotional trauma from horrific combat experiences; here, Petitioner never faced combat and did not maintain his assigned weight. *See supra id.* The reasons for finding IATC in *Porter* are not applicable here. The state habeas court did not violate clearly established federal law in *Porter*.

The state habeas court reasonably applied *Strickland* to State Habeas Claim 6. First, the state habeas court reasonably concluded that trial counsel provided adequate representation. Petitioner's military experience was unimpressive and in some ways reflected poorly on him, which is why the State called witnesses to speak about his military background. *See supra id.* Trial counsel therefore made a strategic decision to cross-examine those witnesses "to develop as much

positive information about his military service, his commendations, and his '*honorable* discharge' from service, as was possible." 2 SHCR 544 (emphasis in original). Trial counsels' decision not to focus additional attention on Petitioner's military background was "sound trial strategy" that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Finally, the state habeas court reasonably concluded that trial counsel, in failing to call additional witnesses, did not prejudice Petitioner. Petitioner has not shown that a juror would likely have reconsidered the death penalty but for the omission of testimony that in some ways reflected poorly on Petitioner. *Cf. Strickland*, 466 U.S. 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). The heinousness of Petitioner's crime supports this finding even further. *See supra* Part IV.A.1.

The state habeas court's decision on State Habeas Claim 6 did not unreasonably or erroneously apply clearly established federal law under *Strickland* and its progeny. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 6 was either "contrary to" or an "unreasonable application of" clearly established federal law.

2.     State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 6 based on an unreasonable determination of the facts. *See* Pet. 61, ECF No. 12.

The state habeas court found as fact that "trial counsel did not overlook the *potential* value of [Petitioner's] military service to the mitigation presentation at trial." 4 SHCR 1459 (emphasis in original). The state habeas court also found as fact that "by [Petitioner's] own accounts to members of the defense team, his military service was 'lackluster,' was not a positive experience, and was not something that would be particularly fruitful to his mitigation case, and [trial counsel]

knew about the problems [Petitioner] had in the military." *Id.* at 1459–60. The state habeas court also found as fact that "[t]rial counsel made a strategic decision to attempt to avoid or minimize negative evidence related to [Petitioner's] military career." *Id.* 1460. Petitioner contends that these were unreasonable determinations of fact because trial counsel could have put on testimony by persons who had "real knowledge of what Petitioner did in the military." Pet. 60, ECF No. 12. This does not rebut the fact that trial counsel considered, investigated, and presented through cross-examination, Petitioner's military service as mitigation evidence. 2 SHCR 543–44, 937–40. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 6 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 1-E.

> **E.** **Federal Habeas Claim 1-F (State Habeas Claim 2): Trial Counsel Failed to Argue that the State's Evidence was Insufficient to Show Future Danger**

Petitioner claims that the state habeas court rejected State Habeas Claim 2 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 64–66, ECF No. 12.

> 1.    State Habeas Court's Application of Clearly Established Federal Law

Petitioner claims that he "received IATC and IAAC because trial and appellate counsel failed to argue that the State's evidence was insufficient to show future danger (Ground 1-F)." Pet. 64, ECF No. 12. The Court will address the IATC claim here and the IAAC claim separately in Part V.A.

Petitioner argues that the State's case for future dangerousness focused almost entirely on the facts of the crime, and that the State's proof of future dangerousness was "marginal" since Petitioner had no history of criminal activity, aggression, or discipline while incarcerated. *Id.* at 64–65. Petitioner argues that the State failed to meets its burden to prove future dangerousness, and concomitantly, that trial counsel was ineffective because they failed to argue the issue. *Id.* at 65. The state habeas court considered and rejected these arguments, finding that "[t]he facts of [Petitioner's] offense are, alone, sufficient to support a finding of future dangerousness." 4 SHCR 1411. The state habeas court also found that, in addition to the facts of the offense, the State admitted enough evidence "to prove beyond a reasonable doubt a probability that [Petitioner] would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 1412.

Petitioner asserts without explanation that the state habeas court violated clearly established federal law under *Wiggins*. Pet. 65, ECF No. 12; *cf. supra* Part IV.B (discussing *Wiggins*). But in *Wiggins*, the Supreme Court found IATC because trial counsel did not investigate Wiggins' social history or offer any social history as mitigating evidence. Trial counsel's failure to argue legal insufficiency here is not analogous to trial counsel's failure to investigate social history in *Wiggins*.

Finally, Petitioner argues that the state habeas court violated clearly established federal law under *Wong v. Belmontes*, 558 U.S. 15 (2009). Pet. 65, ECF No. 12. In *Wong*, the Supreme Court reversed a decision of the Ninth Circuit holding that trial counsel was ineffective by failing to investigate and present sufficient mitigating evidence. *See* 558 U.S. at 16–19. The Supreme Court assumed inadequate representation for the sake of argument but found no prejudice. *See id.* at 19–20. Specifically, the Supreme Court found that trial counsel presented "substantial"

mitigating evidence: nine witnesses who testified on a range of topics over a span of two days. *See id.* at 21. Petitioner appears to argue that he received IATC because his trial counsel did not put on a mitigating case as strong as the one in *Wong*. *See* Pet. 65–66, ECF No. 12. But the Supreme Court in *Wong* did not establish a negative inference that every trial counsel who presents a less comprehensive mitigation case than the one in *Wong* is constitutionally ineffective. The state habeas court did not violate clearly established federal law in *Wong*.

The state habeas court reasonably applied *Strickland* to State Habeas Claim 2. First, the state habeas court reasonably concluded that trial counsel provided adequate representation. Trial counsel made a strategic decision not to argue legal insufficiency because he believed that "such an argument would have been [ ] futile." 2 SHCR 530. Indeed, trial counsel "did *not* believe that the Trial Judge would ever grant an instructed verdict against the State on that issue, based upon all of the facts adduced at [Petitioner's] trial." *Id.* (emphasis in original). However, trial counsel "did argue to the jury that the evidence in the case did *not* support an affirmative answer to [ ] Special Issue [No. 1][7], and [ ] aggressively sought to demonstrate that fact through the evidence which [was] introduced at punishment as part of [the] trial strategy." *See id.* at 531 (emphasis in original). This is "sound trial strategy" that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Finally, the state habeas court reasonably concluded that trial counsel, in failing to call additional witnesses, did not prejudice Petitioner. Petitioner has not shown that he would not have received the death penalty but for trial counsel's decision not to argue legal insufficiency. *Cf. Strickland*, 466 U.S. 694 ("The defendant must show that there is a reasonable probability that, but

---

[7] This question concerns future dangerousness. *See* Tex. Crim. Proc. Code § 37.071(b) ("On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . . . .").

for counsel's unprofessional errors, the result of the proceeding would have been different."). Indeed, on direct appeal the CCA concluded that the evidence was sufficient to support the death penalty. *Hummel*, 2013 WL 6123283, at *4.

The state habeas court's decision on State Habeas Claim 2 did not unreasonably or erroneously apply clearly established federal law under *Strickland* and its progeny. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 2 was either "contrary to" or an "unreasonable application of" clearly established federal law.

### 2. State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 2 based on an unreasonable determination of the facts. *See* Pet. 66, ECF No. 12. But Petitioner does not identify what facts the state habeas court unreasonably determined. *See id.* The Court finds Petitioner has not rebutted with clear and convincing evidence the presumption that the state habeas court reasonably determined the facts supporting its decision. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 2 was "based on an unreasonable determination of the facts."

## V. FEDERAL CLAIMS 1 & 2 (STATE HABEAS CLAIMS 2 & 9)—INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his second § 2254 claim, Petitioner asserts two instances of ineffective assistance of appellate counsel. The Court will analyze each allegation of IAAC in turn.

### A. Federal Habeas Claim 1-F (State Habeas Claim 2): Appellate Counsel Failed to Argue that the State's Evidence was Insufficient to Show Future Danger

In his subject heading for Claim 1-F, Petitioner claims that he received IAAC because appellate counsel failed to argue that the State's evidence was insufficient to show future danger. Pet. 64, ECF No. 12. The state habeas court considered and rejected this claim, finding that the State admitted enough evidence "to prove beyond a reasonable doubt a probability that [Petitioner] would commit criminal acts of violence that would constitute a continuing threat to society." 4 SHCR 1412.

In his § 2254 Petition, Petitioner does not explain what actions or inactions by his appellate counsel constituted IAAC. *See id.* at 64–66. Nor does he cite any cases dealing with IAAC. *See id.* The only law he cites concerns IATC. *See id.* at 65–66.

The Fifth Circuit "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000). "In the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced [petitioner's] right to a fair trial," there is "no merit" to conclusory ineffective assistance claims. *Barnard v. Collins*, 958 F.2d 634, 642 n.11 (5th Cir. 1992).

Furthermore, to the extent Petitioner derives his IAAC claim from similar arguments lodged against trial counsel, it is also meritless for the reasons discussed in Part IV.E. Because Claim 1-F is meritless, this Court concludes that the state habeas court did not unreasonably or erroneously apply clearly established federal law under *Strickland* when it rejected the IAAC portion of State Habeas Claim 2. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 2 was either "contrary to" or an "unreasonable application of" clearly established federal law. Accordingly, the Court **DENIES** Federal Habeas Claim 1-F.

**B.** **Federal Habeas Claim 2 (State Habeas Claim 9): Appellate Counsel Ignored the Unlawful Detention by Border Patrol**

Petitioner claims that the state habeas court rejected State Habeas Claim 9 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 74–84, ECF No. 12.

       1.       <u>State Habeas Court's Application of Clearly Established Federal Law</u>

       a.       *Background Facts*

At trial, Petitioner moved to suppress his confession as the fruit of an illegal detention, and the trial court denied the motion. 10 RR 61–64.[8] Petitioner's appellate counsel challenged this ruling on direct appeal and argued in his brief before the CCA:

> On December 20, 2009, [Petitioner] was detained at the Port of Entry at San Ysidro California by officers of the U.S. Customs and Border Protection Service while returning to the United States from Mexico. The sole reason for the detention was a missing persons report initiated by the Kennedale Police Department. When told by Officer E. Enriquez that [Petitioner] was going to be released, Kennedale Police Officers lied and told Officer Enriquez that an arrest warrant had been issued for [Petitioner] for the offense of arson. In truth, no arrest warrant had been issued and *[Petitioner] would have been released except for the lies of the Kennedale Police Officers*. . . .
>
> When the Customs agents learned that they had been lied to and that no arrest warrant had been issued, Agent Paul Kandal told the Kennedale Police Department that [Petitioner] was going to be released. *At this point in time, the only legal authority used to detain [Petitioner] was the missing persons report which specifically noted that [Petitioner] was not to be detained nor arrested. Despite the lack of authority to detain [Petitioner], he was detained by the Custom Agents until an arrest warrant was issued* at 1248 P.M. (Central Standard Time)—four hours after [Petitioner] was originally unlawfully detained.
>
> [Petitioner's] detention and arrest at the San Ysidro Border Crossing was illegal because it was based on lies and falsehoods of the Kennedale Police Department to the U.S. Customs Officers intended to induce them into keeping [Petitioner] in custody. . . .

---

[8] In Motion No. 72, Petitioner moved to suppress physical evidence, as well as "any evidence of any other kind and character which might be considered 'fruits of the poisonous tree,'" such as a confession. 2 CR 333.

Appellant's Brief at 10–11 (citations omitted) (emphasis added). Appellate counsel claimed that his "illegal detention" violated the Fourth Amendment, "tainted the ensuing searches, interrogations, and conviction," and harmed Petitioner by causing the trial court to admit his confession. *Id.* at 37–38, 40. Appellate counsel specifically argued that Petitioner's confession was "fruit of the poisonous tree." *Id.* at 8, 51.

The CCA affirmed the trial court's ruling, but did so without fully analyzing appellate counsel's Fourth Amendment argument:

> *To the extent that [Petitioner] is arguing that these particular statements were the fruits of an illegal detention at the border, his claim is without merit.* [Petitioner] contends that, at the time he arrived at the border crossing, there was a missing person report, but no warrant for his arrest. He asserts that Kennedale police officers lied to border-protection agents "about the existence of an arrest warrant with the intent of keeping [him] in custody," and that he "would have been release[d] except for the lies of the Kennedale police department." *Based on the evidence presented at the suppression hearing, the trial court found otherwise.* . . .

> *The trial court's ruling is supported by the record of the suppression hearing.* CBP agents Jorge Bernal, Ernesto Enriquez, and Paul Kandal testified that they were following their policies and procedures when they detained [Petitioner] for further identification and verification of his status. . . . Kandal confirmed that he knew [Petitioner] did not initially have an arrest warrant and that Kennedale police officers were working to obtain one. *Because the trial court's findings are supported by the record, they will not be disturbed on appeal.*

*Hummel*, 2013 WL 6123283, at *17–18 (emphasis added).

### b.    *State Habeas Court's Application of* Strickland *Deficiency Prong*

Petitioner then complained to the state habeas court that his appellate counsel was ineffective because appellate counsel did not "sufficiently appeal the [trial] court's failure to grant the Defense motion to suppress" the confession. 1 SHCR 138. Specifically, Petitioner argued that "appellate counsel focused his arguments on the affidavit used to secure [Petitioner's] arrest warrant," and only briefly "allud[ed]" to the "false statements made by the Kennedale police to

the Border Patrol officers and the Border Patrol's detention of Hummel." *Id.* at 139. He argued that instead of focusing on the affidavit, "[a]ppellate counsel should have more clearly argued that [Petitioner's] confession should have been suppressed based on the actions of the Kennedale Police and Border Patrol Officers." *Id.*

The state habeas court disagreed and found that, "[b]ased on his research and experience, [Petitioner's] appellate counsel presented appellate issues challenging the denial of [Petitioner's] motion to suppress in an appropriate manner that [he believed] w[ere] calculated to obtain relief on appeal." 4 SHCR 1491 (quotation marks omitted). The state habeas court concluded that Petitioner's allegations "amount[ed] to nothing more than an impermissible second-guessing of appellate counsel's strategic decisions made based on counsel's experience and research," and accordingly rejected Petitioner's IAAC claim. *Id.* at 1492–95.

In his federal habeas petition, Petitioner claims the state habeas court unreasonably applied *Strickland* to his IAAC claim. *See* Pet. 74, ECF No. 12. Repeating his state habeas IAAC claim— only now with more detail—Petitioner complains that appellate counsel failed to argue that Border Patrol agents lost jurisdiction over him once they established that he was an admissible U.S. citizen, that they had no active warrant for his arrest, and that he was no longer "missing" or "armed and dangerous" (the "jurisdiction-dropping theory"). *See id.* at 74–80. Petitioner asserts that appellate counsel, instead of arguing this jurisdiction-dropping theory, "focused *only* on the affidavit used to secure Petitioner's arrest warrant," and "argued *only* that Petitioner's confession was 'the culmination and result of all of the previous unconstitutional state actions.'" Pet. 67, 73, ECF No. 12 (emphasis added). He claims that these errors prejudiced him by causing the CCA to affirm the trial court's denial of his motion to suppress his confession, which ultimately caused him to receive the death penalty. *See id.* at 80–84.

The state habeas court reasonably rejected this claim and concluded that appellate counsel provided adequate representation under *Strickland*. First, appellate counsel did not fail to raise a "discrete, purely legal issue, where the precedent could not be more pellucid or applicable . . . ." *Schaetzle*, 343 F.3d at 445. Petitioner has not cited a case, and the Court is not aware of any case, where: (1) the original legal authority to hold the detainee disappeared; (2) police subsequently obtained an arrest warrant for the detainee; and (3) the evidence gathered by police after they obtained the warrant was fruit of the poisonous tree.

Second, appellate counsel did not fail to raise a "clearly stronger" issue on appeal. *Cf. Smith*, 528 U.S. at 288. Appellate counsel did not "*ignore*[ ] the unlawful detention by the Border Patrol," as Petitioner claims. Pet. 67, ECF No. 12 (emphasis added). Appellate counsel argued that "[w]hen the Customs agents learned that they had been lied to and that no arrest warrant had been issued," those agents no longer had authority to detain Petitioner. Appellant's Brief at 10. Appellate counsel also argued that "[Petitioner] would have been release[d] except for the lies of the Kennedale Police Department." *Id.* at 38. These arguments imply the jurisdiction-dropping theory: If Border Patrol had no authority to detain Petitioner but for their reliance upon the Kennedale Police Department's misrepresentation about the existence of a warrant, the detention became unlawful as soon as Border Patrol realized that no warrant existed, and Border Patrol at that moment lost jurisdiction over Petitioner. While appellate counsel did not specifically identify this theory, he argued it in substance.[9]

---

[9] Petitioner is therefore also incorrect when he claims that appellate counsel "focused *only* on the affidavit used to secure Petitioner's arrest warrant," Pet. 67, ECF No. 12 (emphasis added), and "argued *only* that Petitioner's confession was 'the culmination and result of all the previous unconstitutional state actions.'" *Id.* at 73 (emphasis added). Appellate counsel's brief also focuses on the alleged illegality of Petitioner's detention. The record flatly contradicts these claims, and the state habeas court therefore reasonably applied *Strickland* in rejecting them.

It follows that appellate counsel's decision to focus on the "lies"[10] of the Kennedale Police Department, rather than the loss of authority to detain Petitioner, was not a failure to raise a "clearly stronger" issue. *Cf. Smith*, 528 U.S. at 288. First, appellate counsel did raise the broader Fourth Amendment issue: he claimed that Petitioner's confession was fruit of the poisonous tree because it flowed from an unlawful arrest and detention. *See* Appellant's Brief at 8, 10–11, 37–38. Second, in arguing the broader issue, he did—albeit obliquely—raise the jurisdiction-dropping theory. *See id.* All that remains of Petitioner's complaint is that appellate counsel did not argue the Fourth Amendment issue in a more detailed way. But the Court "must be particularly wary of 'argument[s] [that] essentially come[ ] down to a matter of degrees. . . . Those questions are even less susceptible to judicial second-guessing." *Cf. Dowthitt*, 230 F.3d at 743 (alterations in original).

Nor has Petitioner demonstrated that the jurisdiction-dropping theory, if indeed a "stronger" argument than the one emphasized by appellate counsel, was a "clearly" stronger one. *Cf. Smith*, 528 U.S. at 288. The Court finds that it was not.[11] The state habeas court reasonably agreed with the state trial court that Border Patrol *did* have authority under federal law to hold Petitioner for the duration of his confinement. If Border Patrol had legal authority to detain Petitioner, emphasizing the jurisdiction-dropping theory would have been an equally unsuccessful strategy on direct appeal.

---

[10] The state habeas court found as fact, "Neither the transcript of the telephone calls nor the written report submitted by [Petitioner] in this habeas proceeding supports [Petitioner's] assertion of any improper motive or wrongdoing on the part of the Kennedale Police Department or CBP in [Petitioner's] detention." 4 SHCR 1490.

[11] The law does not even require this Court to decide whether appellate counsel neglected a clearly stronger "argument." Appellate counsel is only ineffective under *Smith* if he fails to raise a clearly stronger "issue," not if he fails to adopt a clearly stronger argument strategy on an issue already raised. *See Smith*, 528 U.S. at 288 (2000) (holding that appellate counsel must show "that a particular nonfrivolous *issue* was clearly stronger than *issues* that counsel did present" (emphasis added)).

The state habeas court reasonably agreed with the state trial court that Border Patrol agents had authority to hold Petitioner under 8 C.F.R. § 235.1. *See* 4 SHCR 1490; 10 RR 61–64. The regulation reads in pertinent part,

> A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction *and must present a U.S. passport or alternative documentation as required by 22 CFR part 53*. If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.

8 C.F.R. § 235.1(b) (emphasis added). This regulation clearly states that a person seeking entry at the border, claiming to be a U.S. citizen, must (1) establish his citizenship to the Border Patrol officer's satisfaction *and* (2) present adequate documentation. A fair reading of the regulation is that it requires U.S. citizens to establish their citizenship to Border Patrol *by* presenting adequate documentation, in which case Border Patrol had authority to inspect Petitioner as an alien until he presented adequate documentation under 8 C.F.R. § 235.1(b)—which he never did.

Moreover, federal law provides, "Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant . . . to make arrests . . . *for any offense against the United States*, if the offense is committed in the officer's or employee's presence." 8 U.S.C. § 1357 (emphasis added). Petitioner violated 8 C.F.R. § 235.1(b) in the presence of Border Patrol when he failed to present proscribed identification at the Border.

The state habeas court also reasonably agreed with the state trial court that, under *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985), the Fourth Amendment was not an impediment to Border Patrol's authority to detain Petitioner. *See* 4 SHCR 1490; 10 RR 63. In *Montoya de Hernandez*, the Supreme Court held:

> Consistently, therefore, with *Congress' power to protect the Nation* by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the

interior. *Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . .*

473 U.S. at 538–39 (citation omitted) (emphasis added); *see also United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects *is at its zenith at the international border.* Time and again, we have stated that 'searches made at the border . . . *are reasonable simply by virtue of the fact that they occur at the border.*'" (emphasis added)). On the one hand, Border Patrol has maximal constitutional authority to search and seize persons and effects at the border. On the other hand, Petitioner has not cited any case analogous to his own showing that the Fourth Amendment clearly prohibits his detention.

Petitioner claims that under federal law, "[O]nce [Border Patrol officers] determine that a person is a U.S. Citizen and otherwise admissible, they cannot detain or hold the citizen." Pet. 76, ECF No. 12. In support of this proposition, Petitioner cites 8 U.S.C. § 1226 (2009); 8 C.F.R. §§ 236.1–236.7 (2009); and *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26 (1996)), but these authorities only address the power of Border Patrol officers over persons already within the United States, not over persons attempting to enter the United States.

The state habeas court reasonably agreed with the state trial court that the arrest was lawful, and accordingly, Petitioner has not shown that appellate counsel ignored a "clearly stronger" appellate argument strategy. *Cf. Smith*, 528 U.S. at 288. Under Strickland's deferential standard alone, Petitioner gave adequate representation. Under AEDPA's "double deference," Petitioner has not shown that his appellate counsel's representation was, from the perspective of any "fairminded jurist," objectively unreasonable under *Strickland. Cf. Harrington*, 562 U.S. at 102.

c.    *State Habeas Court's Application of* Strickland *Prejudice Prong*

Finally, the state habeas court reasonably concluded that appellate counsel's argument strategy did not prejudice Petitioner under *Strickland*. 4 SHCR 1495. The state habeas court

reasonably agreed with the state trial court that, even if Border Patrol illegally held Petitioner, Petitioner voluntarily confessed. *See id.* at 1489; 10 RR 63–64. [12] If Petitioner voluntarily confessed, the CCA would have affirmed the trial court's ruling admitting the confession even if appellate counsel had successfully argued that the detention was illegal.

"[P]ersons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality . . ." *Brown v. Illinois*, 422 U.S. 590, 603 (1975). To determine whether a confession after an illegal arrest is voluntary, the Supreme Court considers: (1) whether police gave a *Miranda* warning; (2) the temporal proximity of the arrest and confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Id.* at 603–04. If police unlawfully arrest a person, but subsequently obtain probable cause to arrest that person, the discovery of probable cause is an intervening circumstance. *See Brummett v. Collins*, 980 F.2d 1443 (5th Cir. 1992).

In this case, the Border Patrol agents discovered that Kennedale Police did not have a warrant to arrest Petitioner, but they continued to hold Petitioner because they believed that federal law and agency policies and procedures authorized them to do so. *See* 8 RR 61–63, 73–74, 77, 98–99. Kennedale Police then obtained a warrant for his arrest, and after the warrant issued, Petitioner remained in lawful custody for ten hours. *See* 6 RR 80–82; 8 RR 92, 98. Border Patrol transported him from the San Ysidro border crossing to the San Diego County Jail, where he received his *Miranda* warning and subsequently confessed. *See* 6 RR 80–82; 8 RR 78, 81. These facts together—the acquisition of a warrant, the length of time between the warrant issuing and Petitioner confessing, the change of environs from the border crossing to the jail, the *Miranda* warning, the apparent good faith of the arresting officers, and the lack of any flagrant official

---

[12] The state trial court and state habeas court refer to this as "attenuation of [the] taint" of the illegal arrest. *See* 4 SHCR 1489; 10 RR 63–64.

misconduct—strongly weigh in favor of finding that Petitioner's confession was voluntary. *Cf., e.g.*, *United States v. Cantu*, 426 Fed. Appx. 253, 259 (2011) (finding attenuation where seven hours passed between an unlawful search and a Mirandized confession); *Brummett*, 980 F.2d 1443 (finding attenuation where the illegal arrest was not flagrant and probable cause developed between the illegal arrest and the confession).

Petitioner has not shown that the state habeas court unreasonably concluded that he voluntarily confessed. Because Petitioner's confession was voluntary, Petitioner has not shown that the jurisdiction-dropping theory would have, if more strenuously emphasized, likely convinced a majority of the Justices on the CCA to exclude his confession. *Cf. Smith*, 528 U.S. at 285–86 ("[The defendant] must show a reasonable probability that, but for his counsel's unreasonable [assistance] . . . he would have prevailed on his appeal."). Nor has Petitioner shown, under AEDPA's "double deference," that any "fairminded" jurist would conclude that appellate counsel's argument strategy prejudiced Petitioner under *Strickland*. *Cf. Harrington*, 562 U.S. at 102.

The state habeas court did not unreasonably or erroneously apply clearly established federal law under *Strickland* when it rejected the IAAC portion of State Habeas Claim 9. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 9 was either "contrary to" or an "unreasonable application of" clearly established federal law.

2.    State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 9 based on an unreasonable determination of the facts. *See* Pet. 74, ECF No. 12.

The state habeas court found as fact,

> The appellate arguments advanced by [Petitioner's] counsel focused on the sufficiency of the arrest-warrant affidavits to establish probable cause and also

argued that [Petitioners] confession was "the culmination and result of all of the previous unconstitutional state actions," which "allud[ed] to an earlier discussion of false statements" made by the Kennedale Police Department to CPD.

4 SHCR 1492. Petitioner claims that this is an unreasonable determination of fact, Pet. 74, ECF No. 12, but points to no evidence contradicting it. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

The state habeas court found as fact, "[Petitioner's] complaint simply second-guesses in hindsight his appellate counsel's strategic decisions based on counsel's experience and research about how to best challenge on direct appeal the Court's denial of [Petitioner's] motions to suppress his confession and the evidence seized as a result of his confession." 4 SHCR 1492. Petitioner claims that this is an unreasonable determination of fact, Pet. 74, ECF No. 12, but this finding—though it appears in the findings of fact section—is a legal conclusion, not a factual determination. Petitioner has not shown with clear and convincing evidence that this is an unreasonably determined fact.

The state habeas court found as fact, "[Petitioner] has not shown that the appellate contention he alleges counsel should have made had indisputable merit under settled case law. Therefore, [Petitioner] has not demonstrated that he would have prevailed on appeal had his appellate counsel raised different issues or argued the issues raised differently." 4 SHCR 1492. Petitioner claims that this is an unreasonable determination of fact, Pet. 74, ECF No. 12, but this finding—though it appears in the findings of fact section—is a legal conclusion, not a factual

determination. Petitioner has not shown with clear and convincing evidence that this is an unreasonably determined fact.

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 9 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 2.

## VI. FEDERAL HABEAS CLAIM 3 (STATE HABEAS CLAIM 12)—MITIGATION INSTRUCTION VIOLATED EIGHTH AND FOURTEENTH AMENDMENTS

Petitioner claims that the state habeas court rejected State Habeas Claim 12 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 91–102, ECF No. 12.

### 1. State Habeas Court's Application of Clearly Established Federal Law

In his third § 2254 claim, Petitioner asserts that his death sentence is unconstitutional because the jury instruction on mitigation evidence in his case violated the Eighth and Fourteenth Amendments. *See id.* at 91–92.

"[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007); *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[T]he sentencer in capital cases must be permitted to consider any relevant mitigating factor . . . ."). In keeping with this clearly established federal law, Texas law requires the trial court to give the capital sentencing jury the following issue to answer:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Crim. Proc. Code § 37.071(2)(e)(1). The trial court instructed the jury on this issue quoting from the statute verbatim. 45 RR 51. The court further admonished the jury, "You shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." *Id.*

Petitioner asserts that this instruction—and Article 37.071 upon which it is based—unconstitutionally limited the jury's consideration of mitigating evidence to Petitioner's personal moral culpability and prevented them from considering evidence of the circumstances of the offense or Petitioner's character and background. *See* Pet. 95–102, ECF No. 12. But contrary to Petitioner's assertion, the Fifth Circuit has held that "*all* mitigating evidence can be given effect under the broad definition of mitigating evidence found in Texas Code of Criminal Procedure article 37.071 § 2(e)." *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (emphasis in original).

Because the challenged jury instructions did not limit the jury's consideration of relevant mitigating evidence, the state trial court did not unreasonably or erroneously apply clearly established federal law under the Eighth and Fourteenth Amendments. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 12 was either "contrary to" or an "unreasonable application of" clearly established federal law.

### 2. State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 12 based on an unreasonable determination of the facts. *See* Pet. 91, ECF No. 12.

The state habeas court found as fact, "Special [I]ssue two in the Court's charge on punishment instructed the jury regarding the consideration of mitigating evidence." 4 SHCR 1529. Petitioner claims that this is an unreasonable determination of fact, Pet. 91, ECF No. 12, but points to no evidence contradicting it. The Court finds Petitioner has not rebutted this factual finding with

clear and convincing evidence. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

The state habeas court found as fact, "The Court's mitigation [S]pecial [I]ssue complied with the requirements of Tex. Code Crim. Proc. art. 37.071, § 2(e)&(f)." 4 SHCR 1529. Again, Petitioner claims that this is an unreasonable determination of fact, Pet. 91, ECF No. 12, but points to no evidence contradicting it. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence.

The state habeas court concluded as a matter of law, "The complained-of language in the mitigation special issue did not unconstitutionally narrow the definition of mitigating evidence to that which reduced [Petitioner's] moral blameworthiness." 4 SHCR 1529. Petitioner claims that this is an unreasonable determination of fact, Pet. 91, ECF No. 12, but this is a legal conclusion, not a factual determination. Petitioner has not shown with clear and convincing evidence that this is an unreasonably determined fact.

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 12 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 3.

## VII. FEDERAL HABEAS CLAIM 4 (STATE HABEAS CLAIM 13)—DEATH SENTENCE VIOLATED EQUAL PROTECTION

Petitioner claims that the state habeas court rejected State Habeas Claim 13 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 102–10, ECF No. 12.

1. <u>State Habeas Court's Application of Clearly Established Federal Law</u>

In his fourth § 2254 claim, Petitioner asserts that his death sentence violates the Equal Protection Clause of the Fourteenth Amendment because Texas counties arbitrarily administer the death penalty, resulting in geographic disparities in the number of capital convictions. *See id.* at 102–110. Petitioner explains:

> The seven counties of Bexar (76), Dallas (107), Harris (294), Jefferson (24), Nueces (24), Smith (24), and Tarrant (74) accounted for 623 persons either executed or presently on death row, or 80% of the 781 persons executed or presently on death row since 1976. The five counties of Cameron (19), El Paso (20), Lubbock (20), Montgomery (18), and Travis (20) account for 97 persons either executed or presently on death row, or 12% of the 781 persons executed or presently on death row since 1976. Thus, twelve counties (out of 254) account for 92% of the persons executed or presently on death row since 1976.

*Id.* at 103 (citations omitted). Moreover, in 2015, the murder rates per 100,000 persons in some of the most populous Texas counties were: (1) Harris—8.8; (2) Dallas—6.6; (3) Tarrant—3.8; (4) Bexar—5.9. *Id.* at 107. But since 1976, the number of persons sentenced to death in those counties were: (1) Harris—294; (2) Dallas—107; (3) Tarrant—74; (4) Bexar—76. *Id.* at 107–08. Petitioner argues that he was unjustifiably more likely to face a death sentence for no reason except that he committed a crime in Tarrant County, as opposed to a neighboring county. *See id.* at 107 ("[T]here is no justification is for the difference between life and death between Tarrant County and neighboring Hood and Waxahachie counties.").

Petitioner also claims that "race is a motivating factor behind the decision to seek the death penalty and the resulting verdicts," and cites law review articles purporting to show "significant disparities . . . between the treatment of black and white defendants and victims" in the "charging of capital cases." *Id.* at 103. Petitioner explains, "Although black and white defendants were charged with capital murder at similar rates, black defendants were more likely to have committed a less-serious offense than white defendants. In contrast, black victims were significantly less-likely to prompt a capital charge than white victims." *Id.*

According to the Supreme Court, "[T]he conscious exercise of some selectivity in [criminal law] enforcement is not in itself a federal constitutional violation" unless the selection was "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). The application of a death penalty statute to a defendant only violates equal protection if the defendant shows that the prosecutor acted with a discriminatory purpose in defendant's case. *McCleskey v. Kemp,* 481 U.S. 279, 292–93 (1987). Moreover, disparate impact statistics, without more, do not prove that a prosecutor had discriminatory intent in seeking the death penalty. *Id.* at 293–97.

Petitioner has not carried his burden of showing that the State targeted Petitioner for the death penalty based on an arbitrary classification, such as race. The mere existence of geographic disparities in capital convictions is not evidence of the use of an arbitrary classification in prosecutorial discretion—much less intentional discrimination against Petitioner. Moreover, statistics showing a disparate racial impact in capital convictions in Texas, without more, do not show that prosecutors discriminated against Petitioner based on his race by pursuing a death sentence.[13]

Because Petitioner has not pointed to any evidence that the State discriminated against him based upon an arbitrary classification, the state trial court did not unreasonably or erroneously apply clearly established federal law under the Equal Protection Clause when it convicted and sentenced Petitioner to death. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 13 was either "contrary to" or an "unreasonable application of" clearly established federal law.

2.    State Habeas Court's Determination of Facts

---

[13] Moreover, while Petitioner cites statistical disparities between black and white criminal defendants, Petitioner is not black.

Petitioner also contends that the state habeas court rejected State Habeas Claim 13 based on an unreasonable determination of the facts. *See* Pet. 103–04, ECF No. 12.

The state habeas court found as fact, "[Petitioner] has not shown that he was singled out for selective prosecution or that the death-penalty statute was applied against him in any unconstitutionally arbitrary or capricious manner." 4 SHCR 1530. Petitioner claims that this was an unreasonable determination of fact. Pet. 103–04, ECF No. 12. First, the state habeas court's conclusion that the statute's application was not arbitrary or capricious is a legal determination, not a determination of fact. Petitioner has not shown with clear and convincing evidence that this is an unreasonably determined fact. Second, Petitioner points to no evidence that he was singled out for selective prosecution. *See id.* at 104–10. The Court finds Petitioner has not rebutted this factual finding with clear and convincing evidence. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 13 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 4.

## VIII.   FEDERAL HABEAS CLAIM 5 (STATE HABEAS CLAIM 14)—"10–12" JURY INSTRUCTION VIOLATED SIXTH, EIGHTH, FOURTEENTH AMENDMENTS

Petitioner claims that the state habeas court rejected State Habeas Claim 14 based on an unreasonable application of clearly established federal law and an unreasonable determination of facts. *See* Pet. 111–18, ECF No. 12.

1.      State Habeas Court's Application of Clearly Established Federal Law

In his fifth § 2254 claim, Petitioner asserts that his death sentence is unconstitutional because the "10–12" jury instruction under Tex. Crim. Proc. Code § 37.071 violated the Sixth, Eighth, and Fourteenth Amendments. *Id.* at 111–18.

The Fifth Circuit has held that "10–12" jury instructions do not violate clearly established federal law under the Sixth, Eighth, or Fourteenth Amendments. *See Druery v. Thaler*, 647 F.3d 535, 542–44 (5th Cir. 2011). In *Blue v. Thaler*, the Fifth Circuit explained:

> [Tex. Crim. Proc. Code § 37.071] requires capital jurors to be instructed that they can answer "Yes" to the future-dangerousness special issue and "No" to the mitigation special issue only if all twelve of them agree to do so and that they can give the opposite answers only if ten or more of them agree to do so. If the jurors answer "No" to the future-dangerousness issue or "Yes" to the mitigation issue, the defendant is sentenced to life without parole. The same result obtains if the jurors fail to agree on an answer, but the statute prohibits the court and the parties from informing the jurors of the effect of their failure to agree. This is commonly known as the '10–12 Rule.' . . .

> [T]he Supreme Court held in *Jones v. United States* that "a failure to instruct the jury as to the consequences of deadlock" in no way affirmatively misleads the jury about its role in the sentencing process. This Court has concluded that *Jones insulates the 10–12 Rule from constitutional attack*. And it has also held that the 10–12 Rule passes constitutional muster independently of the holding announced in *Jones*. Because *no clearly established federal law invalidates the 10–12 Rule or calls its constitutionality into doubt*, [Petitioner] is not entitled to a [certificate of appealability] on this issue.

665 F.3d 647, 669–70 (5th Cir. 2011) (footnotes omitted) (quotation marks omitted) (emphasis added).

The Court therefore finds that the state trial court did not unreasonably or erroneously apply clearly established federal law under the Sixth, Eighth, and Fourteenth Amendments, when it gave a "10–12" jury instruction under Tex. Crim. Proc. Code § 37.071. Petitioner has not shown that the state habeas court's decision on State Habeas Claim 14 was either "contrary to" or an "unreasonable application of" clearly established federal law.

2. State Habeas Court's Determination of Facts

Petitioner also contends that the state habeas court rejected State Habeas Claim 14 based on an unreasonable determination of the facts. *See* Pet. 111, ECF No. 12. But Petitioner does not identify what facts the state habeas court unreasonably determined. *See id.* The Court finds Petitioner has not rebutted with clear and convincing evidence the presumption that the state habeas court reasonably determined the facts supporting its decision on State Habeas Claim 14. *Cf.* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Clark*, 202 F.3d at 764 ("The presumption is especially strong when the state habeas court and the trial court are one in the same.").

Petitioner has not shown that the state habeas court's decision on State Habeas Claim 14 was "based on an unreasonable determination of the facts." Accordingly, the Court **DENIES** Federal Habeas Claim 5.

## IX. CONCLUSION

Because Petitioner is not entitled to relief on any of his AEDPA claims, the Court **DENIES** his Petition for a Writ of Habeas Corpus (ECF No. 12). In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court **DENIES** Petitioner a certificate of appealability because he has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). If Petitioner files a notice of appeal, he may proceed *in forma pauperis* on appeal. 18 U.S.C. § 3006A(d)(7). It is **ORDERED** that this case is **DISMISSED with prejudice**.

**SO ORDERED** on this **3rd day** of **January, 2018**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**