### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

*John Hummel*

**v.**

*Lorie Davis*

4-16-CV-00133-O

**Death Penalty Case**

**Execution Date:**
**March 18, 2020**

#### Hummel's <u>Amended</u> Motion for Authorization of Funding and for Appointment of Experts to Assist in Clemency Proceedings

**Michael Mowla**
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Hummel

## I.    **Table of Contents**

I.      Table of Contents ..................................................................................... 2

II.     Table of Appendix .................................................................................. 4

III.    Procedural History ................................................................................. 5

        Hummel is convicted of Capital Murder ........................................... 5

        The conviction and sentence are affirmed on direct appeal ........................ 6

        State Habeas proceeding ................................................................ 6

        Federal court proceedings ............................................................. 6

        Hummel's execution is set for March 18, 2020 .............................. 7

IV.     Facts supporting this Motion ............................................................... 7

        Hummel's military record presented at trial and during the
        state habeas proceeding ................................................................ 7

        Security features of Texas prisons ................................................. 9

        Pretrial and posttrial incarceration in Tarrant County ............................. 10

        Hummel's past behavior and mental status did not support a
        finding of future dangerousness ................................................... 11

        State's argument about Hummel's future dangerousness ....................... 15

        Critical evidence that must be presented to the Texas Board of
        Pardons and Parole so that it may determine whether Hummel
        should receive a commutation .................................................... 16

V.      Arguments for funding ........................................................................ 19

        18 U.S.C. § 3599(e)-(f) and *Harbison* mandate funding for the
        clemency proceeding .................................................................... 19

        Why expert-funding is necessary in Hummel's case ........................ 21

        Other evidence shows that Hummel is a low-risk inmate who
        will cause no problems   if allowed to spend the rest of his
        natural life in prison ................................................................... 22

Dr. Stanulis's opinion regarding future dangerousness and Coble requires further inquiry ............................................... 23

The mitigation investigation was never completed. Undersigned Attorney for Hummel could not have raised the issues Hummel seeks to raise for clemency in the federal habeas proceeding................................................................. 25

VI.    Request for Funding ....................................................... 27

VII.   Conclusion and Prayer.................................................... 29

VIII.  Certificate of Service..................................................... 30

IX.    Certificate of Conference ............................................... 30

II.     **Table of Appendix**

*See* **ECF-47-1, filed February 3, 2020**

- Capital Judgment and Partial Reporter's Record from the sentencing hearing (AppMotion.001-010)

- Order setting the execution date and related documents (AppMotion.011-018)

- Declaration of Dr. William Brown (AppMotion.019-044)

- Vitae of Dr. William Brown (AppMotion.045-064)

- Excerpts from *State v. Erbie Lee Bowser*, No. F16-00688 (363rd Dist. Ct. Dallas Co.) on May 1, 2017 (AppMotion.065-131)

- Excerpts from *State v. Erbie Lee Bowser*, No. F16-00688 (363rd Dist. Ct. Dallas Co.) on May 2, 2017 (AppMotion.132-266)

- Declaration of Dr. Robert Stanulis (AppMotion.267-268)

- Vitae of Dr. Robert Stanulis (AppMotion.269-278)

- APA's Amicus Brief in Coble v Texas. (AppMotion.279-311).

- TDCJ Records from Use of Force received December 13, 2019 (AppMotion.312)

- TDCJ Records from the Central Grievance Office received December 17, 2019 (AppMotion.313-316)

- TDCJ Records from Records and Classifications received December 20, 2019 (AppMotion.317-344)

- TDCJ Records from Property received December 20, 2019 (AppMotion.345-399)

**To the Honorable District Judge:**

Under 18 U.S.C. § 3599(e)-(f) (2020) and *Harbison v. Bell*, 556 U.S. 180, 184-194 (2009), John Hummel files this Motion for Authorization of Funding and for Appointment of Experts to Assist in Clemency Proceedings:

## III.   Procedural History

1.      Hummel cites from the Appendix in the § 2254-proceeding (ECFs 13-15 as "App2254"), the record from the trial (ECFs 24-25 by volume number), and the Appendix to this motion ("AppMotion").

### Hummel is convicted of Capital Murder

2.      On June 22, 2011, Hummel was convicted of Capital Murder—multiple victims per Tex. Penal Code § 19.03(a)(7) (2009). A jury found that on or about December 17, 2009, during the same criminal transaction, Hummel killed two persons. (AppMotion.001-010).

3.      On June 28, 2011, the same jury answered "Yes" to Special Issue 1: "Do you find from the evidence beyond a reasonable doubt that there is a probability that (Hummel) would commit criminal acts of violence that would constitute a continuing threat to society?"; and "No" to Special Issue 2: "(considering)…all the evidence including…circumstances of the offense, (Hummel's) character and background, and the personal moral culpability of (Hummel), do you find that there is sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" Hummel was sentenced to death and the Judgment was signed on June 29, 2011. (AppMotion.001-010).

**The conviction and sentence are affirmed on direct appeal**

4.      On November 20, 2013, the Texas Court of Criminal Appeals ("TCCA") affirmed the Judgment and sentence. *Hummel v. State*, No. AP-76,596, 2013 Tex.Crim.App.Unpub.LEXIS 1239 (Tex.Crim.App. Nov. 20, 2013) (unpublished). Hummel filed a petition for writ of certiorari, which was denied on October 6, 2014. *Hummel v. Texas*, 135 S.Ct. 52 (2014).

**State Habeas proceeding**

5.      On June 5, 2013, Hummel filed an application under Tex. Code Crim. Proc. Art. 11.071 (2013). The convicting court signed FFCL recommending that relief be denied. On February 10, 2016, the TCCA adopted the findings and denied relief. *Ex parte Hummel*, No. WR-81,578-01, 2016 Tex.Crim.App.Unpub.LEXIS 1152 (Tex.Crim.App. Feb. 10, 2016) (per curium, Alcala, J. dissenting). On October 3, 2016, the SCOTUS denied the petition for writ of certiorari.  *Hummel v. Texas*, 137 S.Ct. 63 (2016).

**Federal court proceedings**

6.      On February 4, 2017, Hummel filed in this Court the petition for writ of habeas corpus under 28 U.S.C. § 2254 (2017). On January 3, 2018, this Court entered the Opinion and judgment denying the petition. *Hummel v. Davis*, No. 4:16-cv-00133-O, 2018 U.S.Dist.LEXIS 735 (N.D.Tex. Jan. 3, 2018).  On November 19, 2018, the Fifth Circuit denied Hummel's application for a certificate of appealability ("COA"). *Hummel v. Davis*, 908 F.3d 987 (5th Cir. 2018). Hummel filed a petition for writ of certiorari to the 5th Circuit. On October 17, 2019, the SCOTUS denied the petition. *Hummel v. Davis*, 140 S.Ct. 160 (2019).

**Hummel's execution is set for March 18, 2020**

7.     On November 19, 2019, the convicting court signed the *Order Setting Execution Date* and set the execution for **March 18, 2020**. (AppMotion.011-018).

## IV.   Facts supporting this Motion

**Hummel's military record presented at trial and during the state habeas proceeding**

8.     During punishment, as evidence of his military service trial counsel presented Neata Woody (Hummel's sister), ex-girlfriends Hubertz and Bennett, South Carolina friends Mark, Christy, and Linda Pack, Derrick Parris, Stribble (former special-ed teacher), and Scoggins (former teacher). These witnesses knew only and were surprised that Hummel was a Marine. (RR43.160-166, 225, 231). They knew that Hummel was "an analyst for the intelligence part" but laughed because they knew Hummel to be "stupid" (RR43.161).

9.     But when Hummel joined the Marines, he initially thrived in his intelligence job and personal connections.  (App2254.0230, 0239, 0266). However, his military career ended with a strong sense of rejection and failure. (App2254.0235).

10.     For rebuttal, the State presented Marine Lieutenant Colonel Doughtery and Captain Santos, who supervised Hummel. Per Doughtery, Hummel was "an average Marine" who was counseled about spending time in strip-clubs (RR45.10-12, 23). Hummel was reprimanded for smoking during restocking of a ship. (RR45.14). Hummel did not receive a good-conduct medal because he failed to go three years without an infraction (RR45.15). Because Hummel was not in Iraq or Afghanistan, he was not awarded a "Global War on Terrorism" badge (RR45.18).

11.     Per Santos, Hummel was "[n]ot very impressive" because he failed to

maintain proper weight or pass his fitness test (RR45.34-35). Because once Hummel was "absent" for less than 20 hours—but did not desert—Santos revoked Hummel's security clearance (RR45.35-36).

12.     During the State habeas proceeding, three witnesses with knowledge of Hummel's time in the Marines were presented: Wayne "Buddy" Matthias, Efrain Chaidez, and Fred Emmer. Emmer (App2254.0270-0272) served with Hummel from 1998-2000 at Camp Pendleton. Hummel was shy but a "pretty good guy," eventually became comfortable and outgoing, and was "really into role-playing games, more than was usual," and "[i]t seemed like (Hummel) was dodging real life too much."  Emmer and Matthias left the Marines before Hummel, causing Hummel to "(lose) it a bit." When Emmer heard about the deaths, he was shocked and would have never imagined "the quiet, friendly (Hummel) doing (such a crime)."

13.     Matthias (App2254.0284-0286) served with Hummel in the intelligence division at Pendleton from 1998-2000 and they were roommates. Hummel was shy at first and struggled with his weight.  In the Marines, weight-problems prevent one from promotions and Hummel kept missing promotions. Not being promoted frustrated Hummel. They spent time drinking and going to strip-clubs. Hummel became friends with the strippers. He liked playing Dungeons and Dragons. After his discharge, when Matthias saw him, Hummel was "stressed out" and depressed. Hummel said he "could not take being in the military" because he no longer had his support system and all his friends left.

14.     Chaidez (App2254.0265-0267) met Hummel at Pendleton while in the

Navy and was friends with Emmer, Matthias, and Hummel. They saw each other regularly and spent weekends together. Chaidez was from Chicago and was in a gang. He believed that Hummel wanted a different life for himself than before. Hummel stayed out of trouble. Once several of them got into an altercation at a Denny's. Hummel did not fight and took care of a friend who was hurt. Chaidez considered Hummel a good Marine, dependable, and "would have (Chaidez's) back." Hummel was generous and often gave Chaidez money for drinks, food, and other things. Hummel was "really into Dungeons and Dragons." Chaidez remembers that when Hummel lost his security clearance, it "hit him hard" and he was "distraught." When Chaidez heard about Hummel's conviction, he was shocked.

### Security features of Texas prisons

15.     Former TDCJ classifications officer Frank AuBuchon discussed the security features of Texas prisons and evaluated Hummel's situation. (RR44.34-117). TDCJ-units have up to Level 5 (maximum security) prisons (RR44.39-42). The minimum-security level for an inmate serving life-without-parole is "G3," which is permanent and does **not** allow the inmate to attain a lower classification. (RR44.64, 67). G3-inmates must remain in Level 5 prisons (RR44.64). G3 inmates may reside only in two-inmate cells. (RR44.64). G3-inmates are **not** allowed to have jobs that allow them in loading docks or outside prison walls without an armed guard. (RR44.65, 111). G3-inmates may be reclassified as G4 if they become noncompliant with any issue. (RR44.66). A G5-inmate's conduct is violent, sexual, or who are found out of place. (RR44.67). Any inmate may be placed in administrative segregation if he attempts or succeeds in escape or assault. (RR44.67).

16.     AuBuchon reviewed police reports, military, medical, offense, and jail records, criminal background. He concluded that Hummel would be classified G3 if sentenced to life-without-parole (RR44.69-70). Hummel would be placed in a maximum-security prison and would function well based on his good behavior and military history. (RR44.69-73).

**Pretrial and posttrial incarceration in Tarrant County**

17.     In the Tarrant County Jail, inmates are divided based on risk level: high-risk inmates wear red uniforms while low-risk inmates wear green uniforms. (App2254.301, 412). High-risk inmates commit assault, are an escape-risk, or are high-profile. (App2254.419-420). A high-risk inmate **cannot** leave his cell without handcuffs, leg irons, and escort by two officers. (App2254.301, 420). Low-risk inmates are **not** restrained and are escorted by one officer. (App2254.254, 301). Although most inmates charged with capital offenses wear red uniforms—and after receiving a death-sentence are classified "high-risk" regardless of prior classification—during his incarceration in Tarrant County from December 31, 2009 until after trial on July 28, 2011—Hummel always wore a green uniform and was "low-risk." (App2254.254, 301, 420, 666).

18.     The Tarrant County Sheriff deputies who interacted with Hummel stated that Hummel was always quiet, respectful, pleasant, and never caused trouble with anybody. (App2254.0254, 0301-0302, 0304). Hummel complied with all rules and had no disciplinary infractions. (App2254.0254, 0304, 0424). The officers believed that Hummel would **not** be a future danger in prison and would adjust well to a general population setting. (App2254.0255, 0302).

10

**Hummel's past behavior and mental status did <u>not</u> support a finding of future dangerousness**

19.     Psychiatrist Dr. Susan Hardesty explained that Hummel's past behavior and mental status did **not** support a finding that he would be a future danger (App2254.0194-0211): Hummel suffered from posttraumatic stress disorder due to attachment-trauma caused by his neglect, physical abuse, and social isolation by his parents.

20.     This attachment-trauma was further explained by Laura Smith, who reviewed the punishment testimony, affidavits, and Hummel's medical, educational, and military records, and provided Hummel's history and an opinion of the elements that impacted Hummel's development and decision-making (App2254.0213-0297): "[O]ften what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past."  Hummel's early development caused him to be "nearly incapable of forming close and intimate relationships" and "a total inability to manage multiple stressors such as loss of income, multiple medical illnesses, and emotional stress/fatigue." His parents did not provide a stable, supportive environment.  His father was abusive. When Hummel was 12, his father pushed him from a moving tractor for getting too close to a cow, causing him to fall seven feet. (RR43.111-112). Physical abuse causes significant long-term consequences that manifest psychologically. Up to 80% of adults who were physically abused as children meet the diagnostic criteria for at least one psychiatric disorder by age 21. (App2254.0219). Physical abuse and neglect may cause panic, dissociative, posttraumatic-stress, and reactive attachment disorder.

21.     Much of the early care of Hummel fell to his sister Neata, nine years his senior. Hummel did not experience the attachments to his parents that would have allowed him to form feelings of trust and security. (App2254.0218). Children who do not securely attach with an adult have problems with attachment in adulthood and an extreme sensitivity to rejection. (App2254.0219). Hummel failed to develop socially, academically, and emotionally, and despite his efforts to connect to others, in return he sustained "…continuous abuse, neglect, bullying, or confusion," which was likely "extremely frustrating" and "potentially rage building." (App2254.0226). Hummel became absorbed with video and role-playing games like Dungeons and Dragons, which he likely used to escape reality. (App2254.0226-0227). Hummel did not appear to understand the difference between reality and fantasy. (App2254.0228). Hummel became infatuated if a stripper showed "interest" in him. (App2254.0296).

22.     Before he left the Marines, Hummel began a relationship with Letti Ulbright, a 21-year-old homeless pregnant woman. (App2254.0235). Hummel took Ulbright to South Carolina hoping to start a life. Soon after her child was born, Hummel's sister Neata took Ulbright to a bus station, gave her a ticket to California, and a letter Neata said was from Hummel in which purportedly said he was not ready to be a father and had left for Texas (although he had not). (App2254.0236). Smith believes that this ending of the relationship with Ulbright further cemented Hummel's negative experience with family attachments, creating hostility, and continued a pattern that led him to desire escape from his life situation. (App2254.0237). Hummel soon began drinking heavily and going to strip-clubs,

acting like the strippers were his "girlfriends." Hummel appeared to live in a fantasy world. (App2254.0235). By the time he returned to Texas, Hummel's inability to form lasting relationships drove him further into isolation. When faced with his failures, Hummel "wiped the board clean" by "escaping" and starting a new life, or functionally a "new game." (App2254.0239).

23.     Hummel soon began a relationship with Joy Bedford, who became pregnant. (App2254.0240). They married in February 2004 and Jodi was born on July 17, 2004. Hummel found work at a warehouse. But after a year of stability, in May 2005 Hummel tripped over a box at work and injured his back, causing him to suffer through several surgeries.  (App2254.0240). For several years Hummel was unable to work and suffered from severe back pain and Crohn's disease, an inflammatory bowel disease that causes abdominal pain, chronic diarrhea, rectal bleeding, and vomiting. His case was so severe that he required an upper duodenal resection— removal of a part of the bowel and reconnecting the remaining pieces. (App2254.0200). His family suffered financially. (App2254.0240). They had to move into the home of Joy's father and soon his marriage began to suffer due in part to financial strain. Four years after his injury, Hummel returned to work as a nightshift security guard, which paid little. (App2254.0241).

24.     In late 2009, Hummel began a relationship with Kristie Freeze, a convenience store clerk going through a divorce. (App2254.0242). After texting and talking for several months, they had sex once on December 10, 2009 (a week before the crime). Freeze ended the relationship after she learned that Joy was pregnant.

(RR39.137-143). Yet Hummel believed that the relationship was serious and an "escape" from his life. (App2254.0001, 0241-0242). After he killed his family, Hummel drove over 1,300 miles to California because it was not only a "physical escape" but also a return to the place with the most positive memories. (App2254.0242-0243). Hummel's life was a pattern of starting tasks or relationships, brief success ending in total failure, inability to cope, and ending in an overwhelming desire to escape. (App2254.0243-0244).

25.     As Dr. Hardesty further explained (App2254.0194-0211): his trauma was evident from his inability to create secure attachments as evident in failed romantic relationships and lack of personal success when without a support network. Through **no** fault of his due to an injury, Hummel was in great physical pain, had financial and emotional stress, and felt abandoned. Hummel was reliving the attachment-trauma of youth, which resulted in the extreme post-trauma response.

26.     When an adult experiences events that recapitulate childhood-trauma, the result is a highly charged flight-or-fight response. The abused child cannot fight or escape, but the adult can. Hummel's attempts to escape intellectually or through another relationship were unsuccessful. Thus, the child's fear became the adult's rage. Hummel described this as an "…unrelenting internal pressure…voice in his head…driving him to do something." Hummel was not operating from the rational, thinking part of the brain, but from the highly sensitized, emotional part. Planning, logic, and consideration of consequences are disregarded. Hummel met the criteria in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition ("DSM-IV-

TR") for Personality Disorder NOS (not otherwise specified) with borderline and dependent traits, and met the criteria for Dysthymia, a chronic low-level depression and anxiety in those who experience trauma, characterized by low mood, low self-esteem, or fatigue most days.

27.     Although Hummel committed a violent crime, based on his history and level of adaptation to prison, his risk of further violence is low-to-moderate because Hummel (App2254.0210-0211): (1) (before the crime) did **not** have a significant history of violence; (2) (before the crime) coped through passive acceptance, denial of circumstances, or escape into games, movies, and books; (3) is unlikely to experience extreme financial and familial stressors in prison; (4) will have his needs met; (5) established an informed religious attachment, providing greater personal stability; (6) discussed coping with prison in general population and has perspective of acceptance of responsibility while making the best use of the rest of his life.

**State's argument about Hummel's future dangerousness**

28.     The State argued focused on Hummel's "propensity for violence" based on the crime, portraying him as without a "single solitary internal restraint" (to refrain from committing future acts of violence) (RR45.66): "…under Special Issue 1, it's about (his) character for violence…no matter who the victim is, it's all relevant when you're deciding whether… he's going to be a continuing threat to society. And you know that he is. It's not about what type of restraints that can be put on him (by TDCJ)…It's about who is he is…his character for violence…"

15

**Critical evidence that must be presented to the Texas Board of Pardons and Parole so that it may determine whether Hummel should receive a commutation**

29.     The evidence discussed below is what must be presented to the Clemency Section of the Texas Board of Pardons and Paroles ("TBPP") so that it may determine whether Hummel should receive a commutation of the death sentence and be sentenced to life in prison. Hummel directs this Court's attention to the Declaration of Dr. William Brown (AppMotion.019-044), Dr. Brown's vitae (AppMotion.045-064), Dr. Brown's testimony in the death penalty trial of *State v. Erbie Lee Bowser*, No. F16-00688 (363rd Dist. Ct. Dallas Co.) on May 1, 2017 (AppMotion.072-085) and May 2, 2017 (AppMotion.138-184). The facts in Dr. Brown's Declaration and attachments are too extensive to repeat here so Hummel incorporates them into this motion and asks this Court to consider them.

30.     Dr. Brown has a B.A. in Social Work and an M.A. and PhD in Sociology with an emphasis in Criminology earned at UNLV. His expertise is **not** only academic but also practical through extensive personal and professional experience. (AppMotion.019). Dr. Brown is a Vietnam combat veteran who served as an infantryman with the 173rd Airborne Brigade, a Drill Sergeant at Ft. Lewis, Washington, and a Leadership Honor Graduate from Officer Candidate School at Ft. Benning, Georgia, where he received a commission in Infantry and later as a Platoon Leader in B-Company, 75th Rangers.  (AppMotion.019).

31.     Dr. Brown will testify about the importance of providing the trier of fact with the significance of Hummel's voluntary military service and the problems Hummel likely experience as he attempted to reintegrate back into the civilian

16

culture. (AppMotion.44). Hummel's inability to cope was discussed at trial and the state habeas proceeding but never properly explained. Dr. Brown can provide an expert-explanation of what may have caused Hummel his acute problems after his honorable discharge from the Marines.

32.    Dr. Brown will prepare a sociological report about Hummel's premilitary, military, and postmilitary history that provides a comprehensive understanding of the influence of the Military Total Institution ("MTI") on Hummel's postmilitary behavior and experiences as Hummel became acutely entangled in the criminal justice system through this capital murder case. (AppMotion.025). This evaluation is applicable for mitigation in Hummel's case and will assists this Court to determine the effects that military sociocultural influences and experiences had on Hummel at the time of the crime and to determine the potential impact of these influences on his behavior and state of mind. (AppMotion.025). Dr. Brown can also provide an understanding of the influence of the MTI when Hummel killed his family and provide a context for considering the relationship of the posttraumatic stress disorder Hummel suffered to his crime by understanding the content and dynamics of his military training and other military experiences. (AppMotion.025). Dr. Brown's report will address the training Hummel received in the Marines, the impact of military acculturation, and military experiences on Hummel's postmilitary social behavior. The report will address problems faced by veterans like Hummel in their efforts to reintegrate back into the civilian culture. (AppMotion.044).

33.    As Dr. Brown explains, it is irrelevant that Hummel did **not** serve in

17

combat. (AppMotion.020-022). Instead for over three years, Hummel worked as intelligence specialist. This does not mean that Hummel's time in the Marines was without significant stress. Intelligent specialists may be involved in operations that are classified, so Hummel's activities may not be available for direct review. And, Hummel may be downplaying or concealing his involvement in special operations because of the classified nature of the work. The fact that Hummel got into trouble because he went to strip clubs or briefly left the base for about 20 hours is **not** relevant to the issues that Dr. Brown says should have been raised before the triers of fact. (AppMotion.020-022). This is critical since the evidence shows that Hummel's crime on December 17, 2009 was most likely a "one-off incident of extreme violence" that is **not** characteristic of who Hummel is.  (AppMotion.020).

34.    Hummel also directs this Court's attention to the Declaration of Dr. Robert Stanulis (AppMotion.267-268), his vitae (AppMotion.270-278), his testimony in the death penalty trial of *State v. Erbie Lee Bowser*, No. F16-00688 (363rd Dist. Ct. Dallas Co.) on May 1, 2017 (AppMotion.086-130) and May 2, 2017 (AppMotion.185-264), and the APA's Amicus Brief in *Coble*. (AppMotion.280-311).

35.    Like in Dr. Brown's case, the facts in Dr. Stanulis's Declaration and attachments are too extensive to repeat here so Hummel incorporates them into this motion and asks this Court to consider them.  In addition to issues that Dr. Brown will address, Dr. Stanulis will address issues like which he testified in *Bowser*. Dr. Stanulis has been qualified as an expert on future dangerousness in Oregon since about 1995. Oregon's death-penalty statute was modeled after Texas. Oregon recently

18

modified its death penalty statute and eliminated future dangerousness. (AppMotion.267).

36.    Dr. Stanulis disagrees with the State's central argument that Hummel did not have a "single solitary internal constraint" since his history, military service, and prison record contradict this assertion. The difficulties in predicting future dangerousness were not presented. The jury was led to believe that the determination can easily be made, and per Dr. Stanulis, it **cannot**. (AppMotion.267).

37.    Dr. Stanulis believes that it is critical to examine Hummel's record to see if an appropriate risk assessment was done.  An appropriate risk assessment considers the base-rate (how often future violence occurs) in estimating risk. The base-rate of violence is low in prison, with one study showing that only 5% of inmates engaged in seriously assaultive behavior while 20% had **no** record of disciplinary infractions at all. (AppMotion.268). This information will be critical for the TBPP too consider when deciding whether to grant Hummel a commutation.

## V.    Arguments for funding

### 18 U.S.C. § 3599(e)-(f) and *Harbison* mandate funding for the clemency proceeding

38.    Under 18 U.S.C. § 3599(e)-(f) (2020) and *Harbison v. Bell*, 556 U.S. 180, 184-194 (2009), Attorney for Hummel has a continuing duty to represent Hummel in "**all available postconviction process, together with applications for stays of execution and other appropriate motions and procedures**," and "**proceedings for executive or other clemency as may be available…**" 18 U.S.C. § 3599(e) (2020) (emphasis supplied); *Harbison*, 556 U.S. at 184. To assist this continuing duty

of representation, Attorney for Hummel seeks reasonably necessary funding for expert-assistance to properly present issues in a clemency petition to the TBPP and other available postconviction processes and motions for stay as necessary.

39.     Because the execution is set for **March 18, 2020**, the applications for commutation of the death sentence to a lesser penalty [37 Tex. Admin. Code § 143.57 (2020)] or for reprieve from execution [37 Tex. Admin. Code § 143.43 (2020)] are due **February 26, 2020** with supplementation due **March 3, 2020**.

40.     Clemency is an important stage of the proceedings and encompasses a much broader degree of relevance than state and federal judicial systems can reach and may consider issues of mercy and questions about the failings of the judicial system. As recognized in *Harbison*, "[c]lemency is deeply rooted in our Anglo-American tradition of law and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." Far from regarding clemency as a matter of mercy alone, we have called it "the 'fail safe' in our criminal justice system." *Harbison*, 556 U.S. at 192 (citations omitted); *see also Dretke v. Haley*, 541 U.S. 386, 399 (2004) (Kennedy, J., dissenting) ("Among its benign if too-often ignored objects, the clemency power can correct injustices that the ordinary criminal process seems unable or unwilling to consider.").

41.     Further, whether funding is reasonably necessary under § 3599(f) for clemency is **not** limited by whether the inmate states a viable "claim" for relief or whether procedural defenses preclude consideration of such a claim. *See Wood v. Thaler*, A-09-CA-789-SS, 2009 U.S.Dist.LEXIS 103787, at *13-14 (W.D. Tex., Nov. 6,

2009), citing *Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997) and *Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000) as cases limiting the "reasonable necessity" requirement and noting that "in the context of clemency proceedings, their holdings are not squarely on point").

42.     Mitigation evidence is critical to clemency process regardless of whether procedural hurdles or legal circumstances limited its development in the postconviction process. Such evidence has its own importance in clemency to the issue of whether the inmate's life should be spared. *Harbison*, 556 U.S. at 193-194 (discussing virtue of continued representation given the mitigation development in federal habeas and its ostensible value to clemency).

### Why expert-funding is necessary in Hummel's case

43.     Hummel requests reasonably necessary funding in order to investigate and to prepare a clemency petition to the TBPP. During the trial court and state habeas proceedings, Hummel's counsel did **not** present evidence about the MTI or the issues that Dr. Brown and Dr. Stanulis will address. This critical information may explain why Hummel snapped and killed his family for what appears to have been merely a desire to leave his wife and start a new life with Freeze, who ended the relationship with him before it really began. (RR39.137-143; App2254.0242).

44.     A person with a minimal grasp of reality **not** burdened by the acute issues caused by the MTI as he tried to integrate back into civilian life would have left his spouse and paid the minimal child support based on his low income. He would **not** have wiped out his family to "escape" from his life into a relationship that never arose beyond one sexual encounter. (App2254.0241-0242).

21

45.    The information that Dr. Brown and Dr. Stanulis can provide may serve as strong mitigating evidence for the TBPP to consider commuting Hummel's death sentence. This information and issues have **not** been addressed before. Trial counsel submitted scant evidence of Hummel's service in the Marines. Trial counsel did not properly explain the evidence that was submitted. And although state habeas counsel presented evidence from Matthias, Chaidez, and Emmer (App2254.0265-0267, 0270-0272, 0284-0286), this was after the trial during which the State presented Colonel Doughtery and Captain Santos, who referred to Hummel as "an average Marine" because of strip-clubs, struggles with his weight, and once being "absent" for less than 20 hours from the base, causing his security clearance to be revoked. (RR45.10-12, 23, 35-36). What Doughtery and Santos really alleged is that their failure to supervise and train Hummel over minor issues wiped out over three years of honorable service by Hummel in the intelligence division. Doughtery and Santos were covering their failures as supervisors. The State used them to advance the theory that Hummel is "too dangerous" to spend his life in prison, where he has thrived for over a decade and has caused no trouble.  Given the facts and circumstances, this theory is preposterous.

### Other evidence shows that Hummel is a low-risk inmate who will cause no problems if allowed to spend the rest of his natural life in prison

46.    Hummel's record since he entered jail and later TDCJ shows that he is **not** a future danger. TDCJ records from Use of Force received December 13, 2019 (AppMotion.312) show that at least since November 2012, Hummel has never been involved in a use of force.  TDCJ records from the Central Grievance Office received December 17, 2019 (AppMotion.313-316) show that in late 2012, Hummel filed one

grievance because he was freezing and merely asked that the heat be turned on and he be allowed a blanket. This was a reasonable request.

47.     TDCJ records from Records and Classifications received December 20, 2019 (AppMotion.317-344) show standard documents in an inmate's file with Records and Classifications. And, TDCJ records from Property received December 20, 2019 (AppMotion.345-399) show minor issues related to property, receipts for purchases made in the commissary, short restrictions regarding not possessing nail-clippers or tweezers (which are standard), and confiscation of minor items like a malfunctioning hot-pot, envelopes, or books. These are minor issues that are relevant to whether Hummel is a "future danger" if he spends the rest of his life in prison only because they show that Hummel will **not** cause problems and has always been a low-risk inmate.

### Dr. Stanulis's opinion regarding future dangerousness and Coble requires further inquiry

48.     As Dr. Stanulis discusses and is set forth in the APA Amicus in *Coble*, it is imperative to examine the record to see if appropriate risk assessment was done. In *Coble v. State*, 330 S.W.3d 253 (Tex.Crim.App. 2010), the state's expert provided a baseless opinion regarding the defendant's supposed future dangerousness. While the SCOTUS and Fifth Circuit recognize the fallibility of psychiatric assessments of future dangerousness, "it nevertheless acknowledged the necessary reliance on psychiatry to assist in judicial decisionmaking." *Coble*, 330 S.W.3d at 275; *citing Barefoot v. Estelle*, 463 U.S. 880, 897 (1983). Although "…such expert testimony may, in a particular case, be admissible under Rule 702 and helpful to the jury in a capital

murder trial…, the burden is on the proponent of psychiatric testimony to establish its admissibility in each case." *Id.* at 275-276. The objective of the "gatekeeping" requirement is to make certain that an expert employs the same professional standards of intellectual rigor in the courtroom as is expected in the practice of the relevant field, and the validity of the expert's conclusions depends upon the soundness of the methodology. *Id.* at 276-277.

49.     The TCCA could not tell "[w]hat principles of forensic psychiatry the expert might have relied upon since he cited no books, articles, journals, or even other forensic psychiatrists who practice in this area." *Id.* at 277, *citing* Christopher Slobogin, *Dangerousness and Expertise*, 133 U. Pa. L. Rev. 97, 129 (1984) ("a clinician unfamiliar with the research literature on dangerousness prediction should not be considered qualified to offer a clinical prediction of dangerousness, regardless of her educational or experiential attainments."). There was **no** objective source material in the record to substantiate the expert's methodology as one that is appropriate in the practice of forensic psychiatry. *Id.* at 277. The expert claimed that his testimony relied upon principles in psychiatry, but this was "[s]imply the *ipse dixit*" (dogmatic or unproven statement) of the expert. *Id.* The expert agreed that his methodology is idiosyncratic and one only he developed and used for 20-plus years. *Id.* Although there is a significant body of literature concerning the empirical accuracy of clinical predictions versus actuarial and risk-assessment predictions, the expert did **not** cite any studies and was unfamiliar with the journal articles provided by the prosecution. *Id.* at 277-278. The methodology used by the state's expert in *Coble* was bogus. He

24

"forthrightly stated that 'he does it his way' with his own methodology and has never gone back to see whether his prior predictions of future dangerousness have, in fact, been accurate." *Id*. at 279. And although this expert interviewed Coble in 1990 before the first trial, the expert lost his notes of that interview in a flood and had no independent memory of it. *Id*. The expert did **not** perform any psychiatric assessment of Coble after 18 years of nonviolent behavior on death row. Nor did he refer to any psychological testing that might have occurred during that time. *Id*.

50.    Unlike the state's expert in *Coble*, the opinions of Drs. Brown and Stanulis will be based on a thorough review of the relevant parts of the record, affidavits, an interview of Hummel, and a sound scientific basis based on years of diagnostic data and experience, professional and personal.

51.    As discussed above, Dr. Brown not only has extensive professional experience, he has vast personal experience. He is a Vietnam combat veteran who served as an infantryman with the 173rd Airborne Brigade, a Drill Sergeant, an Honor Graduate from Officer Candidate School at Ft. Benning, and was later a Platoon Leader in the 75th Rangers.   (AppMotion.019). And, the expertise of Dr. Stanulis on the issues is well-stated in his testimony.

### The mitigation investigation was <u>never</u> completed. Undersigned Attorney for Hummel could <u>not</u> have raised the issues Hummel seeks to raise for clemency in the federal habeas proceeding

52.    The mitigation investigation that should be presented to the TBPP was never completed. The claims presented in state habeas informed the scope of the claims presented in federal habeas on an incomplete investigation. Thus, Hummel never presented his complete claims in state or federal courts. Whether it was

through prior counsel's negligence or through barriers erected by the state habeas court through its refusal to allow a hearing so that the issues may be developed, Hummel has **never** presented a full mitigation picture to any court and the investigation into critical mitigating evidence remains unfinished.

53.     The fact that a complete mitigation picture has never been presented to any court distinguishes Hummel's case from those like *Wood v. Thaler*, 2009 U.S.Dist.LEXIS 103787), where the defendant sought funding for an expert to assess his adaptive behavior and for a person to produce a videotape of him in prison to support his assertion in clemency that he was ineligible for execution because he was intellectually disabled. *Id*. at *2. However, Wood had extensively litigated his claim under *Atkins v. Virginia*, 536 U.S. 304 (2002) in both state and federal postconviction successor proceedings, having received authorization for the successor litigation in both courts. In litigation spanning 12 years, Wood developed evidence of his intellectual disability and presented his claims, all of which were denied. *Id*. at *3-7 & 15-16. Though clemency is the "fail-safe" in the judicial system to prevent miscarriages of justice, the court held that clemency is **not** a forum "in which to relitigate issues that have been already considered extensively and thoroughly by the state and federal courts." *Id*. at *15. And, Wood had received a "full and fair" opportunity to litigate his *Atkins* claim and the proposed funding was **not** reasonably necessary because Wood merely proposed relitigating the claim in clemency.

54.     Unlike in *Wood*, Hummel has never had a full and fair opportunity to develop his full mitigation evidence on the issues that Drs. Brown and Stanulis will

present to the TBPP. Further, state habeas counsel did **not** complete the investigation to obtain the evidence that the TBPP must now consider. This handicapped federal habeas counsel in what he could present. Review under 18 U.S.C. § 2254(d)(1) is limited to "the record that was before the state court that adjudicated the claim on the merits" [*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)] unless a petitioner establishes cause to excuse a procedural default as to an ineffective-counsel-claim by showing: (1) state-habeas-counsel was constitutionally deficient in failing to include the claim in the state-habeas application, and (2) the ineffective-counsel-claim is "substantial" (has "some merit."). *See Trevino v. Thaler, 569 U.S. 413, 422-427 (2013)* (a defendant must have a meaningful opportunity to develop and to present an ineffective assistance of trial counsel claim) and *Martinez v. Ryan, 566 U.S. 1, 12-14 (2012)* (as an equitable matter, ineffective assistance of state habeas counsel may constitute cause for a defaulted ineffective assistance of trial counsel claim).

55.     At the very least, Hummel's case presents a potential malfunction in the judicial proceedings for which the "fail-safe" purpose of clemency is well-suited. Hummel is **not** attempting to retread old arguments that have been fully developed and considered by state and federal courts. Hummel should be allowed to present the evidence and information discussed in this motion to the TBPP.

## VI.    Request for Funding

56.     The average expert investigation may require over one hundred hours to review and analyze existing records, formulate an efficient and effective plan. However, due to the time-constraints, Drs. Brown and Stanulis will review only the

most relevant records, which are Hummel's military and medical records with the VA, which are available, and some of the evidence presented in previous proceedings. Drs. Brown and Stanulis will the perform the evaluations and functions they describe in their declarations and as they testified to in the *Bowser* case.

57.    Because Hummel is scheduled for execution, the appointment of Drs. Brown and Stanulis is indispensable and urgent. Again, because the execution is set for **March 18, 2020**, the applications for commutation of the death sentence to a lesser penalty or for reprieve from execution are due **February 26, 2020** with supplementation due **March 3, 2020**.

58.    Without these appointments, Attorney for Hummel will be unable to submit an adequate petition within the time constraints without the expert assistance of Drs. Brown and Stanulis. In fact, because Attorney for Hummel is **not** an expert and is the attorney who cannot testify, he **cannot** present the critical evidence and opinions at all without the expert

59.    A reasonable estimate of the total cost of the requested expert assistance of Drs. Brown and Stanulis is estimated to be about **$20,000** (for both) inclusive of travel. This is a reasonable request given that this is a complex death penalty case in which the defendant is set for execution next month and the rates of the experts of $250/hour, which is reasonable given their expertise and experience.

60.    Hummel understands that additional authorization from the Court is required for amounts exceeding $7,500 per 18 U.S.C. § 3599(g)(2) (2020). However, there is **not** a lot of time remaining to return to this Court to request more than

28

$7,500. Both Drs. Brown and Stanulis as their areas of expertise differ but are critical to provide the necessary information to the TBPP. Thus, Hummel provides this reasonable estimate of the amount necessary for the testimony that must be produced from the experts and presented to the TBPP.

61.    Under 18 U.S.C. § 3599(g)(2), amounts over $7,500 must be certified by this Court, a United States magistrate judge if the services were rendered in connection with the case disposed of entirely before the magistrate judge, and the amount of the excess payment is approved by the chief judge of the Fifth Circuit, who may delegate this approval authority to an active or senior circuit judge. The amount requested is necessary to provide fair compensation for the expert services. Issues raised in this motion are of an unusual character since they are not common, this is a death penalty case, and there are few experts qualified to testify to the issues that Drs. Brown and Stanulis have expertise. These experts must look at numerous documents, interview Hummel, and provide concise opinions about the issues raised in this motion.

## VII.    Conclusion and Prayer

Hummel respectfully requests that this Court grant this Motion for Authorization of Funding and for Appointment of Experts to Assist in Clemency Proceedings and authorize him to retain Dr. William Brown and Dr. Robert Stanulis per 18 U.S.C. 3599(f) with $20,000 authorized for both experts inclusive of travel.

Respectfully submitted,

29

Michael Mowla
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Hummel

**/s/ Michael Mowla**
**Michael Mowla**

## VIII.   Certificate of Service

I certify that on February 4, 2020, a copy of this document was delivered to Gwendolyn Vindell of the Office of Attorney General, P.O. Box 12548, Austin, Texas 78711, by efile or email to gwendolyn.vindell2@oag.texas.gov.

**/s/ Michael Mowla**
**Michael Mowla**

## IX.   Certificate of Conference

I certify that on February 3, 2020, I conferred with Gwendolyn Vindell of the Office of Attorney General, who stated that the Government is opposed to the relief requested in this motion. However, Ms. Vindell agreed to the filing of this Amended Motion (the agreement is only that this Amended Motion may be filed).

**/s/ Michael Mowla**
**Michael Mowla**