IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JOHN WILLIAM HUMMEL, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 4:16-CV-133-O |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

ORDER GRANTING IN PART MOTION FOR CLEMENCY FUNDING

Petitioner filed an amended motion on February 4, 2020 (ECF No. 48), seeking twenty

thousand dollars in funding for separate sociological and neuropsychological evaluations of

Petitioner for use in Petitioner's forthcoming clemency proceeding.   For the reasons discussed

below, this Court will grant a portion of the funding requested but requires considerably more

detailed information before it can certify the reasonable necessity of any amount above the

statutory figure set forth in 18 U.S.C. § 3599(g)(2).

As explained in this Court's opinion denying Petitioner's petition for federal habeas corpus

relief, *Hummel v.* Davis, 4:16-CV-133-O, 2018 WL 276331 (N.D. Tex. Jan. 3, 2018), Petitioner

fatally stabbed his pregnant wife more than thirty times and beat her with a baseball bat after

contemplating whether to do so for half an hour.   He then fatally beat his five-year-old daughter

and father-in-law with the baseball bat.   He set their house on fire and disposed of the murder

weapons.   He returned to the crime scene later and repeatedly asked law enforcement personnel

if anyone had made it out of the house.   Two days after giving law enforcement officials a

statement in which he denied any involvement in the murders, Petitioner was apprehended in

California as he entered the United States from Mexico.   Petitioner subsequently gave a recorded statement in which he confessed to committing the murders and setting the house on fire.

At the punishment phase of Petitioner's capital murder trial, Petitioner's trial counsel presented extensive testimony about Petitioner's childhood and passage into early adulthood, including Petitioner's four-year service as a Marine lance corporal and intelligence officer.   Dr. Antoinette McGarrahan, a forensic psychologist, testified for the defense.   She stated that her neuropsychological evaluation revealed Petitioner is in the average to above-average intelligence range, Petitioner did not suffer from any severe mental disorder, but he may suffer from a combination of personality disorders including narcissistic, anti-social, schizoid, and borderline, which she attributed to Petitioner's mother's failure as his primary caregiver.   Dr. McGarrahan concluded that even though Petitioner knew his decision to kill was wrong, he acted on pure emotion without thinking in a burst of explosive rage after ruminating on all the wrongs done to him over his lifetime.   She concluded, however, that Petitioner had done fairly well in a structured environment and had acknowledged that he was wrong in committing the murders.

Petitioner's eleventh-hour request for expert funding in connection with his proposed state clemency application proposes to offer the Texas Board of Pardons and Paroles a new explanation for his murderous rampage on December 17-18, 2009.   Dr. McGarrahan testified at trial, without contradiction, that Petitioner committed his capital offense after Petitioner ruminated extensively over all the perceived wrongs done to him in the past and that he simply snapped.   Petitioner now proposes to offer the Texas Board of Pardons and Paroles expert opinions from a sociologist and a mental health expert who will opine that Petitioner's murderous rampage also resulted from a reaction to Military Total Institution and post-traumatic stress disorder.

2

Section 3599(a) authorizes federal funding for petitioners who face the prospect of death and are "financially unable to obtain adequate representation to investigative, expert, or other reasonably necessary services." *Crutsinger v. Davis*, 898 F.3d 584, 586 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 801 (2019).   A natural consideration informing the district court's exercise of discretion under § 3599 is the likelihood that the contemplated services will help the applicant win relief and proper application of the "reasonably necessary" standard requires courts to consider the potential merit of the claims that the applicant wants to pursue.   *Ayestas v. Davis*, 138 S. Ct. 1080, 1094 (2018).   The touchstone of the inquiry is the likely utility of the services requested; § 3599 cannot be read to guarantee that an applicant will have enough money to turn over every stone. *Id.*; *Crutsinger*, 898 F.3d at 586.   An applicant must articulate specific reasons why the services are warranted, which includes demonstrating the underlying claim is at least plausible.   *Ayestas*, 138 S. Ct. at 1094; *Crutsinger*, 898 F.3d at 587.

There is no constitutional entitlement to clemency.   *Conn. Bd. Of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981) "[A]n inmate has 'no constitutional or inherent right' to commutation of his sentence.") (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979)); *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 626 (2018). The heart of executive clemency is "to grant clemency as a matter of grace, thus allowing the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations."   *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 280-81 (1998).   A petition for clemency, much like an appeal for an affirmative answer to the Texas capital sentencing statute's mitigation special issue, is an appeal for mercy as a matter of grace. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. at 282 ("A death row inmate's petition for clemency is also a 'unilateral hope.'   The defendant in effect accepts the finality of the death

3

sentence for purposes of *adjudication*, and appeals for clemency as a matter of grace."); *Hernandez v. Davis*, 2017 WL 2271495, \*28 (W.D. Tex. May 23, 2017) ("the Texas capital sentencing scheme's 'mitigation' Special Issue serves not to render the defendant eligible for the death penalty or to 'select' the defendant for execution; rather, it allows the capital sentencing jury unfettered discretion to dispense an act of grace to the otherwise condemned defendant."), *CoA denied*, 750 F. App'x 378 (5th Cir. Oct. 29, 2018), *cert. denied*, 140 S. Ct. 136 (2019).

Clemency is a prerogative granted to executive authorities to help ensure that justice is tempered with mercy; it is not for the Judicial Branch to determine the standards for this discretion. *Cavasoz v. Smith*, 565 U.S. 1, 8-9 (2011); *Young v. Gutierrez*, 895 F.3d 829, 832 (5th Cir. 2018) (clemency decisions are predicated on purely subjective evaluations and predictions of future behavior). Extra flexibility is required when the criminal process has reached an end and a highly individualized and merciful decision like executive clemency is at issue. *Faulder v. Tex. Bd. Of Pardons & Paroles*, 178 F.3d 343, 344 (5th Cir. 1999) (pardon and commutation decisions are not traditionally the business of courts and are subject to the ultimate discretion of the executive power). "But petitioners cannot invoke clemency to end-run *Ayestas*'s emphasis on the 'utility' of further investigation and expert involvement. Doing so would directly thwart *Ayestas*'s admonition against 'fishing expeditions.'" *Crutisnger v. Davis*. 898 F.3d at 587.

As explained in this Court's Show Cause Order issued February 4, Petitioner's amended motion for expert funding did not explain why a pair of out-of-state experts are necessary to perform the requested evaluations. In his Response, Petitioner argues that his sociologist, Nevada-based Dr. William Brown, himself a military veteran, will furnish new mitigating evidence explaining "the military sociocultural influences and experiences Hummel experienced along with the other acute stress that caused him to 'snap' one night." Essentially, Petitioner proposes to

employ Dr. Brown's theory of "Military Total Institution" ("MTI") to explain Petitioner's murderous rampage within the context of "the posttraumatic stress disorder Hummel suffered." Petitioner represents that Dr. Brown is the only expert located who is well-versed in MTI. Petitioner proposes that Dr. Brown can complete his work for four thousand dollars.   Dr. Brown has furnished a declaration establishing his familiarity with MTI and ability to explain same to the Texas Board of Pardons and Paroles.   The retention of Dr. Brown's services appears reasonably necessary in this case – especially in view of Petitioner's representation that Dr. Brown will not need to travel to Texas to complete his work for Petitioner.

Petitioner proposes to use the report of Oregon-based forensic psychologist and neuropsychologist Dr. Robert Stanulis to address the issue of Petitioner's future dangerousness. In his Response to this Court's Show Cause Order, Petitioner informs that he does not propose to have Dr. Stanulis perform a new neuropsychological evaluation on Petitioner.   Instead, Petitioner proposes to have Dr. Stanulis perform a "risk assessment" on Petitioner and educate the Texas Board of Pardons and Paroles on the historically low risk of recidivism and generally low accuracy of jury predictions of future dangerousness among those convicted of capital murder.   Petitioner requests sixteen thousand dollars for Dr. Stanulis for travel, document review, a four-day trip to perform ill-defined services (which do not apparently include a neuropsychological evaluation), and preparation of a report.   Petitioner has not yet explained how the contents of Dr. Stanulis's report will differ significantly from the report or testimony furnished at trial by Dr. McGarrahan.

Petitioner has not yet explained that a local mental health expert is unavailable to conduct the type of limited-scope risk assessment Petitioner proposes Dr. Stanulis undertake.   Petitioner has failed to explain in any rational manner why sixteen thousand dollars is necessary at this juncture to perform a risk assessment on Petitioner of the type Petitioner now proposes.   That Dr.

Stanulis recently testified successfully for another Texas capital murder defendant (at trial) does not make him the *only*, or even the most convenient, mental health expert available to perform the services in question.   That Dr. Stanulis is willing to offer a discount on his usual two hundred fifty dollar an hour rate does not mean his professional services are not fungible.

Petitioner has not yet explained why a local mental health expert, i.e., one who would not require four days of travel to conduct a "non-neuropsychological" evaluation of Petitioner, is unavailable to perform the limited range of professional services Petitioner proposes Dr. Stanulis perform in this case.   Petitioner's contentions that Dr. McGarrahan failed to perform a risk assessment or to fully advise Petitioner's jury about possible future dangerous factors rings hollow in the absence of a copy of her report or other documentation establishing that she actually failed to perform a risk assessment on Petitioner as part of her pre-trial mental health evaluation.   Dr. McGarrahan performed a thorough mental health evaluation of Petitioner and testified extensively concerning Petitioner's background and mental health.    The burden is on Petitioner to show that a new risk assessment of the nature described in Petitioner's Response to this Court's Show Cause Order is reasonably necessary at this juncture.    Thus far, Petitioner has failed to carry this burden.

Moreover, as best this Court can discern from Petitioner's motion and reply to this Court's Show Cause Order, the new evidence Petitioner proposes to present through Dr. Stanulis is inherently double-edged in nature, in that it tends to establish Petitioner (as the product of MTI and post-traumatic stress disorder), will pose more of a risk of future violence than a convicted capital murderer suffering from the personality disorders Dr. McGarrahan identified during her trial testimony.   Significantly, Petitioner alleges no facts suggesting there was any inaccuracy in Dr. McGarrahan's trial testimony or that Petitioner's mental health status has changed since the time Dr. McGarrahan performed her extensive mental health evaluation.   Thus, Petitioner has

6

failed to establish the reasonable utility of a sixteen-thousand-dollar non-neuropsychological evaluation of Petitioner by a neuropsychologist.

The Court will grant Petitioner the statutory cap of seven-thousand five-hundred dollars to secure the services of Dr. Brown and a qualified mental health expert of Petitioner's choosing. Petitioner may retain the services of Dr. Brown to perform the services identified in Petitioner's Response to this Court's Show Cause Order.   Petitioner has not yet explained why Dr. Stanulis's professional services, as opposed to those of myriad locally available (and much less expensive) mental health experts, are reasonably necessary in this case.   Petitioner has not alleged that a Texas-based neuropsychologist is unavailable to perform the narrow risk assessment he proposes Dr. Stanulis perform in connection with Petitioner's clemency proceeding.   Nor has Petitioner furnished this Court with sufficient hard data explaining why a narrow risk assessment of the type proposed by Petitioner requires the expenditure of sixteen thousand dollars.   The issue remaining before this Court is not the reasonableness of the proposed professional mental health services per se; it is rather whether the services of a highly compensated out-of-state expert are reasonably necessary to perform the type of limited-scope risk assessment Petitioner identifies.

Finally, given the fact that on November 19, 2019, the Texas trial court scheduled Petitioner's execution date and Petitioner waited until February 3, 2020 to file his original motion requesting funding for investigative and expert expenses to be incurred in connection with his clemency proceeding, this Court questions Petitioner's diligence.   The United States Supreme Court denied certiorari in Petitioner's case on October 7, 2019.   The time for the type of clemency investigation Petitioner now proposes Dr. Stanulis and Dr. Brown undertake began at that time, not in February 2020.

Accordingly, it is hereby ORDERED that:

1.    Petitioner's amended motion for authorization of funding and appointment of experts to assist in clemency proceedings, filed February 4, 2020 (ECF No. 48), is GRANTED IN PART as follows: Petitioner is authorized to incur the sum of seven thousand five hundred dollars ($7,500.00) in conformity with 18 U.S.C. § 3599(g)(2) for the purposes of securing the services of (a) Dr. Brown to perform the services described in Petitioner's Response to this Court's Show Cause Order and (b) a qualified mental health professional to obtain the risk assessment described in Petitioner's Response to this Court's Show Cause Order.

2.    Petitioner's request for an additional twelve thousand, five hundred dollars in expert mental health funding is DENIED without prejudice to Petitioner right to seek additional funding for the services of a qualified mental health professional to perform the limited scope risk assessment described in Petitioner's Response to this Court's Show Cause Order.

3.    Petitioner original motion for funding, filed February 3, 2020 (ECF No. 47), is DISMISSED AS MOOT.

SIGNED February 11, 2020.

Reed O'Connor
UNITED STATES DISTRICT JUDGE